IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA

Plaintiff,[1]

Case No. 09-CR-043 JHP

v.

LINDSEY KENT SPRINGER,
OSCAR AMOS STILLEY

Defendant.

FILED
MAR 1 8 2009
Phil Lombardi, Clerk
U.S. DISTRICT COURT

## MEMORANDUM IN SUPPORT OF MOTION FOR IN CAMERA REVIEW OF FIFTH AMENDMENT PROFFER

The Grand Jury has alleged that Lindsey Kent Springer's purpose through Bondage Breaker's Ministries, is to "get rid of the Internal Revenue Service." There can be no doubt this purpose was from the beginning in 1992.

The Fifth Amendment by its terms prevents a person from being "compelled in any criminal case to be a witness against himself." U.S. Const., Amdt. See Mitchell v. United States, 526 U.S. 314, 327 (1999) In Garner v. United States, 424 U.S. 648, 656 (1976) the Supreme Court stated that the "information revealed in the preparation and filing of an income tax return is, for purposes of Fifth Amendment analysis, the testimony of a 'witness,' as that term is used herein."

Since Garner disclosed information on his returns instead of objecting, his Fifth Amendment claim would be defeated by an application of the general

---

[1]This is subject to future debate since purportedly a Grand Jury issued the Indictment!

1

requirement that witnesses must claim the privilege. Garner resisted the application of that requirement, arguing that incriminating disclosures made in lieu of objection are "compelled" in the tax-return context. He relied specifically on three situations in which incriminatory disclosures have been considered compelled despite a failure to claim the privilege. But in each of those narrowly defined situations the protection must be claimed. In each exception the relevant factor was held to deny the individual a "free choice to admit, to deny, or to refuse to answer." Lisenba v. California, 314 U.S. 219, 241 (1941).

Garner relied on Mackey v. United States, 401 U.S. 667 (1971), the relevance of which can be understood only in light of Marchetti v. United States, 390 U.S. 39 (1968), and Grosso v. United States, 390 U.S. 62 (1968). In the latter cases the Court considered whether the Fifth Amendment was a defense in prosecutions for failure to file the returns required of gamblers in connection with the federal occupational and excise taxes on gambling. The Court found that any disclosures made in connection with the payment of those taxes tended to incriminate because of the **pervasive criminal regulation** of gambling activities. Marchetti, supra, at 48-49; Grosso, supra, at 66-67. **Since submitting a claim of privilege in lieu of the returns also would incriminate, the Court held that the privilege could be exercised by simply failing to file.**

It is clear that a witness's Fifth Amendment privilege does not exonerate him from giving testimony merely because he declares that his answers would tend to

be incriminating. See Hoffman v. United States, 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118. It is for the trial judge in the **first** instance to decide whether the witness's silence is justified and to order him to answer only if it is "perfectly clear" that the witness is mistaken and that the answers "cannot possibly" tend to incriminate. Id. at 486, 488, 71 S.Ct. at 818, 819. In making this determination the judge must liberally construe the privilege in favor of the right it was intended to secure. Id. at 486, 71 S.Ct. at 818. United States v. Nunez, 668 F.2d 1116 (10th Cir. 1981)

Where the circumstances supporting the privilege claim are already known to the court, as they were here, there is no error in failing to hold an in camera hearing to obtain additional evidence to support the claim. See In re Brogna, 589 F.2d 24, 28 & n. 5 (1st Cir.); see also United States v. Van Deveer, 577 F.2d 1016, 1018 (5th Cir.); United States v. Harris, 542 F.2d 1283, 1298 (7th Cir.); cert. denied, 430 U.S. 934, 97 S.Ct. 1558, 51 L.Ed.2d 779.

In Malloy v. Hogan, 378 U.S. 1 (1964), the Supreme Court applied the doctrine of Fourteenth Amendment due process incorporation to the Self-Incrimination Clause, so as to bind the States as well as the National Government to recognize the privilege. Malloy, however, established that "[t]he Fourteenth Amendment secures against state invasion the same privilege that the Fifth Amendment guarantees against federal infringement - the right of a person to **remain silent** unless he chooses to speak in the unfettered exercise of his own will, and to suffer

3

no penalty . . . for such silence." 378 U.S., at 8. United States v. Balsys, 524 U.S. 666, 681 (1998)

After Malloy, the Fifth Amendment limitation could no longer be seen as framed for one jurisdiction alone, each jurisdiction having instead become subject to the same claim of privilege flowing from the one limitation. Since fear of prosecution in the one jurisdiction bound by the Clause now implicated the very privilege binding upon the other, the Murphy opinion sensibly recognized that if a witness could not assert the privilege in such circumstances, the witness could be "whipsawed into incriminating himself under both state and federal law even though the constitutional privilege against self-incrimination is applicable to each." 378 U.S., at 55 (internal quotation marks omitted). The whipsawing was possible owing to a feature unique to the guarantee against self-incrimination among the several Fifth Amendment privileges. Malloy, 682

The Fifth Amendment protects against compelled self-incrimination. See Baxter v. Palmigiano, 425 U.S. 308, 316-318 (1976). See also Ohio Adult Parole Authority v. Woodard, 523 U.S. 272, 286 (1998) If answering an agency's investigatory question could expose an employee to a criminal prosecution, he may exercise his Fifth Amendment right to remain silent. See Hale v. Henkel, 201 U.S. 43, 67 (1906); United States v. Ward, 448 U.S. 242, 248 (1980); LaChance v. Erickson, 522 U.S. 262, 267 (1998)

"[P]roper invocation of the Fifth Amendment privilege against compulsory

self-incrimination allows a witness to remain silent, but not to swear falsely." United States v.

Page 405 Apfelbaum, 445 U.S. 115, 117 (1980). See also United States v. Wong, 431 U.S. 174, 180 (1977); Bryson v. United States, 396 U.S. 64, 72 (1969). See also Brogan v. United States, 522 U.S. 398, 404 (1998)

"It is clear that the accused in a criminal case is exempt from giving answers altogether, for (at least on the prosecution's assumption) they will disclose incriminating information that the suspect harbors." Doe v. United States, 487 U.S. 201, 219 (1988)

"Under our system society carries the burden of proving its charge against the accused not out of his own mouth. It must establish its case, not by interrogation of the accused even under judicial safeguards, but by evidence independently secured through skillful investigation. `The law will not suffer a prisoner to be made the deluded instrument of his own conviction.' 2 Hawkins, Pleas of the Crown, c. 46, § 34 (8th ed. 1824). The requirement of specific charges, their proof beyond a reasonable doubt, the protection of the accused from confessions extorted through whatever form of police pressures, the right to a prompt hearing before a magistrate, the right to assistance of counsel, to be supplied by government when circumstances make it necessary, the duty to advise an accused of his constitutional rights - these are all characteristics of the accusatorial system and manifestations of its demands." Moran v. Burbine, 475 U.S. 412, 434 (1986); quoting

Watts v. Indiana, 338 U.S. 49, 54 (1949):

In Miranda v. Arizona, 384 U.S. 436, 467 (1966), the Court acknowledged that "the Fifth Amendment privilege is available outside of criminal court proceedings and serves to protect persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves." Estelle v. Smith, 451 U.S. 454, 467 (1981)

The Fifth Amendment privilege is "as broad as the mischief against which it seeks to guard," Counselman v. Hitchcock, 142 U.S. 547, 562 (1892), and the privilege is fulfilled only when a criminal defendant is guaranteed the right "to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty . . . for such silence." Estelle at 468

A corollary to that principle is that the claim of privilege ordinarily must be presented to a "tribunal" for evaluation at the time disclosures are initially sought. See Albertson v. SACB, 382 U.S. 70, 78-79 (1965); Vajtauer v. Commissioner of Immigration, 273 U.S., at 113; Mason v. United States, 244 U.S. 362, 364-365 (1917). This early evaluation of claims allows the Government to compel evidence if the claim is invalid or if immunity is granted and therefore assures that the Government obtains all the information to which it is entitled. In the gambling tax cases, however, making a claim of privilege when the disclosures were requested, i. e., when the returns were due, **would have identified the claimant as a gambler.** The Court therefore forgave **the usual requirement that the claim of privilege be**

**presented for evaluation in favor of a "claim" by silence**. See Marchetti, 390 U.S., at 50. Nonetheless, it was recognized that one who "claimed" the privilege by **refusing to file could be required subsequently to justify his claim of privilege**. See id., at 61. If a particular gambler would not have incriminated himself by filing the tax returns, the privilege would not justify a failure to file. Garner, 658-659

In Groisso v. United States, 390 U.S. 62, 70 (1968) the Supreme Court concluded "that a taxpayer may not be convicted of conspiracy to evade payment of the tax, if the constitutional privilege would properly prevent his conviction for willful failure to pay it. Cf. Marchetti v. United States, supra, at 60-61

In United States v Sullivan, 274 U.S. 259 (1927), the Supreme Court "upheld a conviction for failure to file an income tax return on the theory that "[i]f the **form of return provided** called for answers that the defendant was privileged from making he could have raised the objection in the return, **but could not on that account refuse to make any return at all**." 274 U.S., at 263. "That declaration was based on the view, first, **that a self-incrimination claim against every question on the tax return, or based on the mere submission of the return, would be virtually frivolous**, and second, that to honor the claim of privilege not asserted at the time the return was due would make the taxpayer rather than a tribunal the final arbiter of the merits of the claim." Albertson v. SACB, 382 U.S. 70, 79 (1965)

"On the other hand, we know that where the governmental scheme clearly evidences the purposes of gathering information from citizens in order to secure

7

their conviction of crime, it contravenes the privilege." Grosso at 73

An application is "filed," as that term is commonly understood, when it is delivered to, and accepted by, the appropriate court officer for placement into the official record. See, e.g., United States v. Lombardo, 241 U.S. 73, 76 (1916) ("A paper is filed when it is delivered to the proper official and by him received and filed"); Black's Law Dictionary 642 (7th ed. 1999) (defining "file" as "[t]o deliver a legal document to the court clerk or record custodian for placement into the official record"). And an application is "properly filed" when its delivery and acceptance are in compliance with the applicable laws and rules governing filings. Artuz v. Bennett, 531 U.S. 4, 8 (2000)

"The testimony of defendants' former accountant that in years prior to 1981 defendants had filed tax returns is proper evidence of willfulness in failing to file returns, United States v. Bohrer, 807 F.2d 159, 161 (10th Cir. 1986)" See U.S. v. Dawes, 874 F.2d 746 (10th Cir. 1989)

The requirement concerning the place of filing of the individual income tax returns is provided in 26 U.S.C.A. § 6091(b)(1)(A) for persons other than corporations. It prescribes the place of filing as "in the internal revenue district in which is located the legal residence or principal place of business of the person making the return. . . ." The federal statute and regulations lay down the rule as a matter of federal law. U.S. v. Taylor, 828 F.2d 630 (10th Cir. 1987)

Beginning in 1992, Lindsey Kent Springer began receiving money through the

8

name Bondage Breaker's Ministries. With hundreds of people around in the Country in support, Springer set out to understand why he was being led to "get rid of the Internal Revenue Service" and convince Congress to replace such collection agency with a system that would both recognize basic rights while achieve uniform tax collection as its only mission.

Springer has learned so many things about the tax collection system that most would conclude it cannot be saved. In the process between 1992 to the present, Springer had been made aware he was being investigated in 1997 and was not told that investigation was concluded until July, 2005, when the U.S. Department of Justice served upon Springer out of case filed in Oklahoma City, under Rule 26 disclosures, Springer's master file which demonstrated the relevant tax code mods showing the investigation began in 1997. The Master File Springer has is dated March 25, 2005.

Beginning in 2003, then Revenue Agent Donna Meadors,[2] was doing a 26 U.S.C. § 6700 investigation against Springer and in early 2004, she informed Springer of this investigation. As this Court can read by the indictment alleged in this case, the key question is whether money given to Springer were for "services" taxable to

---

[2] At the conclusion of this investigation in 2005, Meadors explained she had been approved to be CI and that her application was pending at the time she began her investigation of Springer. Meadors never disclosed her true intentions and never read Springer any rights involving her investigation. Springer cooperated with her request to contact each of Springer's supporters under the condition she would not share the information with anyone else in the Agency and that she was not doing any criminal investigation which as Springer can now show was not true at the time she made the revelations.

Springer or were they "gifts" according to 26 U.S.C. § 102.

In CIR v. Duberstein, 363 U.S. 278, 288 (1960) the Supreme Court stated **"[S]pecifically, the trier of fact must be careful not to allow trial of the issue whether the receipt of a specific payment is a gift to turn into a trial of the tax liability, or of the propriety, as a matter of fiduciary or corporate law, attaching to the conduct of someone else."**

In Bogardus v. CIR, 302 U.S. 34, 40 (1937) the Supreme Court stated that if "the sum of money under consideration was a gift and not compensation, it is exempt from taxation and **cannot be made taxable by resort to any form of subclassification**. If it be in fact a gift, that is an **end of the matter**; and inquiry whether it is a gift of one sort or another is irrelevant. This is necessarily true, for since all gifts are made non-taxable, there can be no such thing under the statute as a taxable gift. **A claim that it is a gift presents the sole and simple question** whether its designation as such is genuine or fictitious - that is to say, whether, though called a gift, it is in reality compensation. To determine that question we turn to the facts, which we have already detailed." Springer submits gifts are income but that they are not reportable or calculated within a persons "gross income." That has never been in dispute.

There is no question that no matter what Springer would have said on any "candid report"
Form 1040 or 1099, as the Grand Jury alleges, any thing Springer would have

placed on any such "form of return" would have offered an appreciable possibility of being used against Springer.

Not just to demonstrate some type of knowledge of the reporting requirement in general, as would communicate knowledge of the law, and any willfulness element supporting evidence, had Springer reported the "transactions" receiving money Springer maintains was presented to him as a gift, as income, and then seeking a refund claiming it was then a gift, the United States would have had a field day with any such communication or testimony given. Under their current theory advanced by the Grand Jury everything given to Springer is not a Gift no matter what. Springer would have been subject to filing a false "return" or even a "false" claim for any refund. Had Springer presented the gifts on a Form 1040 the IRS could have used that report to claim that was a false return also. There simply is no way for Springer to have reported the gifts on any promulgated form that could then have allowed the IRS to pass on the question without anything Springer saying being used against him in any criminal case.

To understand this fully, gifts are not reported by the recipient no matter what the amount. Congress never directed and no regulation says otherwise.

Not long after Springer was told in 2005 of the evidence of the criminal investigation beginning in 1997, that Springer was aware of in 1997, Springer's Master File shows code 914, Springer was, on September 16, 2005, raided and his entire home searched including money taken and any receipts accumulating for

the year 2005 were in the custody of the United States. There is three cases regarding this before this Court. 08-004, 06-156, and 05-01 Misc dealing with Rule 41 Motion. Through out an Agent Report obtained by Springer from Robert D. Metcalfe, Trial Attorney for the U.S. Department of Justice, Agents continue to speak about whether CI is interested in Springer. Springer has no way of explaining why the issues in the Grand Jury indictment took 40 months to burst but this controversy is here now.

There is no way Springer could have submitted anything for year 2005 as alleged in Count Four without anything being said then being used against Springer for that year or any other year.

Springer was under criminal investigation since at least 1997. There is no way Springer could have said anything to the United States that would not have found its way into a claim against Springer. The three times Springer answered questions in 2004, 2005 and 2009, by the United States, never involving any current year, allegedly contains some "false" statement regarding whether the money told to Springer was given as a gift. This if the evidence presented to the Grand Jury proves false would implicate 18 U.S.C. § 201.

Springer can definitely defend those claims if they need to be defended.

There is no way Springer could have presented any information on any Form because of the right to remain silent instead of making disclosures that could have been used against Springer. Again, even the submission of any Form could have

testimonial implications as it could testify records exist, transactions occurred, and that Springer was "aware" of such information.

The fifth amendment privilege against self-incrimination[fn7] "protects a person . . . against being incriminated by his own compelled testimonial communications." Fisher v. United States, 425 U.S. 391, 409, 96 S.Ct. 1569, 1580, 48 L.Ed.2d 39 (1976). It "can be asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory." Kastigar v. United States, 406 U.S. 441, 445, 92 S.Ct. 1653, 1656, 32 L.Ed.2d 212 (1972). Accordingly, a taxpayer may invoke this privilege in response to requests for information in an IRS investigation.

"The central standard for the . . . application [of the fifth amendment privilege against self-incrimination is] whether the claimant is confronted by substantial and `real', and not merely trifling or imaginary, hazards of incrimination." Marchetti v. United States, 390 U.S. 39, 53, 88 S.Ct. 697, 705, 19 L.Ed.2d 889 (1968). The privilege applies only in "instances where the witness has reasonable cause to apprehend danger" of criminal liability. Hoffman v. United States, 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951).

In United States v. LaSalle Nat'l Bank, 437 U.S. 298, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978), the Supreme Court examined the nature of the IRS investigatory system, and, relying in part on the legislative history of the Internal Revenue Code, concluded that the system's "criminal and civil elements are inherently intertwined."

Id. at 309, 98 S.Ct. at 2363. See U.S. v. Argomaniz, 925 F.2d 1349 (11th Cir. 1991); see also Mathis v. United States, 391 U.S. 1, 4, 88 S.Ct. 1503, 1505, 20 L.Ed.2d 381 (1968)("tax investigations frequently lead to criminal prosecutions.")  "The witness is not exonerated from answering merely because he declares that in so doing he would incriminate himself - his say-so does not of itself establish the hazard of incrimination. It is for the court to say whether his silence is justified. . . ." Hoffman v. United States, 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951). See also Sharp, 920 F.2d at 1170 ("Whether there is sufficient hazard of incrimination is of course a question for the courts asked to enforce the privilege.").

Springer is asking the Court to enforce his proper exercise of remaining silent during the Over 11 year criminal investigation of Springer regarding the providing of any information to the United States. Springer can show the Court in Camera clear evidence of being under criminal investigation for 11 years by the IRS because of his mission and support garnered from the public for that mission.

The Circumstances of this controversy warrant the finding that the Fifth Amendment, as extended, protects Springer from having to answer the charges alleged against him in the charges dated March 10, 2009.

A in camera review is warranted.

Respectfully Submitted

Lindsey K. Springer
5147 S. Harvard, # 116
Tulsa, Oklahoma 74135
918-748-5539/955-8225(cell)

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Lindsey Kent Springer's Memorandum in Support of Motion to for In Camera Review regarding Fifth Amendment proffer was not served on:

The United States District Attorney
for the Northern Division of
the United States District of Oklahoma,
Honorable David O'Meilia
Assistant United States Attorney Kenneth P. Snoke,
U.S. Department of Justice's Attorneys
Scott Bradford and Charles O'Reilly,
110 West 7th Street, # 300,
in the City of Tulsa,
State of Oklahoma 74119.

_____
Signature