```
1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE NORTHERN DISTRICT OF OKLAHOMA

3

4   UNITED STATES OF AMERICA,

5           Plaintiff,

6   vs.                          Case No. CR-09-43-SPF

7   LINDSEY KENT SPRINGER and
    OSCAR AMOS STILLEY,
8
            Defendants.
9
    ----------------------------
10

11

12

13

14

15            TRANSCRIPT OF MOTIONS HEARING

16        BEFORE THE HONORABLE STEPHEN P. FRIOT

17            UNITED STATES DISTRICT JUDGE

18                  APRIL 22, 2009

19

20

21

22

23

24

25
```

```
 1   APPEARANCES:

 2   FOR THE GOVERNMENT:
                             Charles Anthony O'Reilly
 3                           US Department of Justice(Box 972)
                             PO Box 972
 4                           Washington, DC 20044

 5                           Kenneth P. Snoke
                             US Attorneys Office (Tulsa)
 6                           110 W. 7th Street, Ste. 300
                             Tulsa, OK 74119
 7

 8
     FOR DEFENDANT SPRINGER:
 9                           Lindsey Kent Springer
                             5147 S. Harvard Ave.
10                           Ste. 116
                             Tulsa, OK 74135
11
                             Robert Scott Williams
12                           Taylor Ryan Schmidt & Van Dalsem
                             1437 S. Boulder Ave., Ste. 850
13                           Tulsa, OK 74119

14   FOR DEFENDANT STILLEY:
                             Oscar Amos Stilley
15                           7103 Race Track Loop
                             Ft. Smith, AR 72901
16
                             Charles Robert Burton, IV
17                           Burton Law Firm, PC
                             320 S. Boston, Ste. 2400
18                           Tulsa, OK 74103

19

20

21

22

23

24

25
```

```
 1          THE COURT:  Good morning.  We're here in United
 2  States of America v. Lindsey Kent Springer and Oscar Amos
 3  Stilley, Criminal 09-43.
 4      I'll first have counsel for the government and then
 5  the defendants give your appearances, please.
 6          MR. O'REILLY:  Good morning, Your Honor, Charles
 7  O'Reilly and Ken Snoke for the United States.
 8          THE COURT:  Very well.  And we have the
 9  defendants pro se and also with standby counsel.  I'll
10  first have appearances from the defendants pro se,
11  please.
12          MR. SPRINGER:  Lindsey Springer, Your Honor.
13  And I've carried so far a limited special appearance, I
14  know the government has taken exception to that, and I
15  believe we're going to be dealing with that today, I hope
16  anyway.
17          MR. STILLEY:  Oscar Amos Stilley, limited
18  special appearance.
19          THE COURT:  Very well.  I'm going to call upon
20  standby counsel to identify themselves.  The reason that
21  I put it that way is that the defendants having insisted
22  on their right to proceed pro se, it should be understood
23  by all that standby counsel are not here in any
24  representative capacity, but I still think it would be
25  appropriate for standby counsel to identify themselves.
```

1          MR. WILLIAMS:  Robert Williams on behalf of --

2     or as standby counsel for Mr. Springer.

3          MR. BURTON:  Good morning, Your Honor, Robert

4     Burton as standby counsel on behalf of Defendant Oscar

5     Stilley.

6          THE COURT:  Okay.  Give me just a moment to get

7     organized here.  We're going to obviously address the

8     motions that have been noticed for hearing today.  There

9     are some other matters both before and after that that I

10    do intend to address.  I have reviewed the transcript of

11    the arraignment proceedings and other proceedings that

12    have been transcribed that took place before Judge

13    Cleary, specifically the proceedings on March 30th, as

14    well as the arraignments with respect to both defendants

15    on March 18.

16         And I think it will come as no surprise to anyone

17    that I carefully reviewed the colloquy that was had with

18    the individual defendants relating to their election to

19    proceed pro se.  And I must say also that I have no

20    misgivings about the adequacy of that colloquy.  However,

21    I think perhaps because of the gravity of that decision

22    to proceed pro se, because of the seriousness of the

23    consequences that could flow from that decision, and

24    because I have had no previous direct contact with these

25    defendants in open court, I think it would be appropriate

1    for me to address that matter in a sense in a way that is

2    supplemental to the colloquy that was had with Judge

3    Cleary.

4        We have two defendants, both of whom have elected to

5    proceed pro se, and most, if not all, of what I'm about

6    to cover will apply equally to both of the defendants.

7    And I think most everything that would be covered and

8    will momentarily be covered in a Faretta colloquy is well

9    known to these defendants.  These defendants, I think I

10   can safely say without contradiction from anyone in the

11   courtroom, these defendants do have a degree of

12   familiarity with the legal process that perhaps surpasses

13   that of the average citizen on the street.

14       So much of what I will cover, by way of a

15   supplemental Faretta colloquy, will be nothing new and

16   not new information to the defendants, I'll be the first

17   to acknowledge that.  But I do think it would be

18   appropriate to cover some of this ground.  Both of you

19   must understand and this, I think, would be at the top of

20   the list of things you already know, both of you must

21   understand that you do have a right to a lawyer and that

22   if you cannot afford your own lawyer the Court will

23   appoint counsel for you at government expense.

24       Both of you have standby counsel.  There's one thing

25   that -- and I wholeheartedly agree with Judge Cleary's

1    decision to appoint standby counsel.  Not only do you

2    have standby counsel, you have very capable standby

3    counsel.  I do agree with Judge Cleary's decision to

4    appoint standby counsel.

5         The Court of Appeals has not made appointment of

6    standby counsel absolutely mandatory, but the Court of

7    Appeals has made it clear that the appointment of standby

8    counsel is desirable, and so I certainly wholeheartedly

9    agree with Judge Cleary's decision to appoint standby

10   counsel.

11        You must understand, though, that your standby

12   counsel serves strictly in a consulting capacity.  And by

13   that I mean that your standby counsel, Messrs Burton and

14   Williams, are not here in a representative capacity.

15   They -- we will not, at this or any other stage of the

16   case, have a tag-team arrangement by which you go a la

17   carte deciding whether you're going to have a lawyer

18   speak for you or not.

19        I don't expect that that's your intent, but lest

20   that thought even cross your mind, it should be

21   understood that your standby counsel are not here to

22   serve in a hybrid capacity.  We will not have hybrid

23   representation.  And your standby counsel are here to

24   consult with you on matters of law or anything else

25   relevant to the case, but they are not here to represent

1    you in any sense of the word and that should be clearly

2    understood.  So you are entitled, though, to have lawyers

3    represent -- appointed to represent you, which is not

4    what you have now.  And that should be understood.

5        Some of the advantages, among many advantages, of

6    having counsel to represent you are certainly a lawyer's

7    legal knowledge and experience may result in obtaining

8    information about the case through the very skillful use

9    of discovery tools available to criminal defendants.  If

10   you're represented by a lawyer, the lawyer may uncover

11   potential violations of constitutional rights or

12   statutory rights and take effective measures to address

13   those issues.  And may in fact identify and obtain for

14   your use and benefit at the trial of this case favorable

15   evidence to be introduced at trial that might not

16   otherwise be discovered.

17       At trial, obviously, if you're represented by

18   counsel, then you have the benefit of a lawyer who has

19   the experience and the knowledge of the entire process to

20   represent you most effectively at trial.  He or she would

21   argue for your side of the case during the entire trial

22   and present the best possible defense on your behalf

23   within the confines of the law.

24       In this case, since this case will be a jury case,

25   beginning with jury selection, jury selection in itself

1   is governed by numerous legal rules and legal procedures

2   and a lawyer's representation and knowledge and

3   understanding of the process could even make a difference

4   and some would say potentially a decisive difference even

5   at the jury selection stage.

6        A lawyer can obviously call witnesses for you,

7   question the witnesses against you, and present evidence

8   very skillfully on your behalf.  A lawyer can counsel

9   with you as to whether you ought to testify and as to the

10  consequences of your personal decision whether or not to

11  testify and what you might have a right not to say.

12       A lawyer will obviously know the rules of evidence

13  and knows what evidence can or cannot come in at your

14  trial.  A lawyer might provide assistance in ensuring

15  that the jury is given complete and accurate jury

16  instructions on the law and may make effective closing

17  arguments on your behalf and would be effective in

18  preventing any inappropriate arguments by the government.

19       A lawyer would also ensure that any errors committed

20  during the trial are properly preserved for appellate

21  review by the Court of Appeals.  And without a lawyer, it

22  is certainly conceivable that there would be items that

23  you, for various reasons, might miss altogether at the

24  trial stage that would put you in a worse position for

25  sentencing purposes in the event that the jury returns a

```
1    verdict of guilty on any of these counts.

2         And I should emphasize, I don't presume that the

3    jury will return a verdict of guilty on any of these

4    counts.  As you appear today and as you will appear

5    throughout the trial, you are cloaked with a presumption

6    of innocence.  And as I will tell the jury when this case

7    is tried, that presumption of innocence continues until

8    such time, if ever, as the government has satisfied the

9    jury beyond a reasonable doubt that you are guilty of the

10   crimes charged.  So I wouldn't want any comment that I

11   make today to be construed in any sense to be based on

12   any assumption I have as to your guilt or innocence.  I

13   am -- I think probably the best word that I can give you

14   to describe my approach to this matter is that I am

15   indifferent as to the result of the trial of this case.

16        If you are convicted -- and I must address this --

17   notwithstanding what I just told you, if you are

18   convicted, a lawyer's assistance may well be useful in

19   preparing for sentencing and ensuring that favorable

20   facts are brought to the attention of the Court and

21   ensuring that the sentence is lawfully imposed.  And a

22   legal -- an attorney's legal knowledge and experience may

23   also be useful in filing an appeal.

24        It will come as no surprise to you, having said what

25   I have said, that I am convinced, and this is on the
```

1  basis of my 37 years of experience in doing this both as

2  a lawyer and as a judge, I am convinced that it is always

3  and without exception unwise to represent yourselves in

4  court.  And that applies in a $500 small claims case in

5  the District Court of Oklahoma County and that applies in

6  this very serious federal criminal prosecution.

7      I'm going to address some questions to you and I

8  want -- we'll first have response from Mr. Springer and

9  then from Mr. Stilley, if the two of you will please

10  approach the lectern.

11      Do you understand that under the law you will not

12  get any special treatment from the Court just because you

13  are representing yourself?  Mr. Springer.

14          MR. SPRINGER:  Yes, I do, Your Honor.

15          THE COURT:  Mr. Stilley?

16          MR. STILLEY:  Yes, Your Honor.

17          THE COURT:  Do you understand that you will not

18  be entitled to continuances and procedural delays just

19  because you intend to represent yourself?  Mr. Springer.

20          MR. SPRINGER:  Yes, Your Honor.

21          THE COURT:  Mr. Stilley?

22          MR. STILLEY:  Yes, Your Honor.

23          THE COURT:  Mr. Stilley, of course, does have a

24  legal education and has practiced law, so the matter I'm

25  about to touch on perhaps applies more to Mr. Springer

```
1    than Mr. Stilley, but do you understand, both of you,
2    that you will be required to abide by the rules of
3    criminal law and the rules of courtroom procedure and
4    that if you demonstrate any unwillingness to abide by
5    those rules, I may terminate your self-representation?
6    Do you understand that, Mr. Springer?
7              MR. SPRINGER:  Yes, Your Honor.
8              THE COURT:  Mr. Stilley?
9              MR. STILLEY:  Your Honor, I understand the
10   requirement to comply with the rules.
11             THE COURT:  Very well.  And, also, do both of
12   you understand that if you are disruptive in the
13   courtroom, the Court can terminate your self-
14   representation and remove you from the courtroom, in
15   which case the trial would continue without your
16   presence?  Do you understand that, Mr. Springer?
17             MR. SPRINGER:  Yes, Your Honor.
18             THE COURT:  Mr. Stilley?
19             MR. WILLIAMS:  I understand that disruptive
20   conduct cannot be tolerated.
21             THE COURT:  Very well.  I also think it's fair
22   to say that the government is not going to go easier on
23   you or give you any special consideration just because
24   you have chosen to represent yourself.  Do you understand
25   that?
```

```
 1              MR. SPRINGER:  Yes, Your Honor.

 2              MR. STILLEY:  Yes, Your Honor.

 3              THE COURT:  Very well.  Finally, if you are

 4  convicted, you will not be able to claim on appeal that

 5  your own lack of legal knowledge or skill constitutes a

 6  basis for new trial.  In other words, as a result of your

 7  decision to proceed as your own counsel, pro se, you will

 8  be precluded from claiming that you received ineffective

 9  assistance of counsel.  Do you understand that,

10  Mr. Springer?

11              MR. SPRINGER:  Yes, Your Honor.

12              THE COURT:  Mr. Stilley?

13              MR. STILLEY:  Yes, Your Honor.

14              THE COURT:  Gentlemen, do you believe, to the

15  very best of your knowledge, that you do understand the

16  dangers and disadvantages of representing yourself?

17  Mr. Springer.

18              MR. SPRINGER:  Yes, Your Honor.

19              THE COURT:  Mr. Stilley?

20              MR. STILLEY:  Yes.

21              THE COURT:  Do you have any questions about

22  these dangers and disadvantages?  Mr. Springer.

23              MR. SPRINGER:  Yes, I do.  When you spoke

24  earlier about standby and you said that he was there to

25  answer my questions, I presume that that is at all stages
```

1  of the case, including at the trial where if I get into a

2  situation where my brain has two issues that have ran

3  into each other that I would be able to take a second and

4  go ask my standby counsel a question about something and

5  then come back and then address the issue.

6          THE COURT:  The short answer to that question is

7  yes.  But there's only one reason for any hesitation on

8  my part and that is that I do have an overriding

9  responsibility to regulate the trial within the outer

10  bounds of reason.  And as I will explain to you at a

11  later stage of this case, there's one person in the

12  courtroom who has a special responsibility to look out

13  for the interests of the jurors, who are not here

14  voluntarily, and to avoid any needless consumption of the

15  time of the jury and that one person is me.  And I'm

16  keenly conscious of that obligation.

17      So within the outer bounds of reason and within the

18  framework of my responsibility to reasonably regulate the

19  trial as it proceeds, yes, I anticipate that you would

20  have the ability throughout the matter, at all stages, to

21  consult with your standby counsel.

22          MR. SPRINGER:  Then the next issue, Your Honor,

23  is, obviously, the Fifth Amendment and the Sixth

24  Amendment have become an issue and this we're talking

25  right now is specifically about the Sixth Amendment in

1    dealing with having to get assistance to subpoena

2    witnesses favorable to my defense, and it came up with

3    standby counsel in a meeting that we had last week and it

4    also came up with Judge Cleary about how we would go

5    about doing that.

6         The government obviously wants an affidavit, which

7    is another sticking point that we had at the initial

8    arraignment both on the 18th and again on the 30th.  So

9    is that issue separate from anything I'm answering here

10   today, are we going to take that up at another point, or

11   is my answer here or any questions I raise, do they need

12   to go to address that issue?  Because there could be many

13   witnesses that the government will not want to call that

14   I will need to call.  And, obviously, economically, I

15   can't battle a $374 billion budget, so I didn't know how

16   to address that.

17             THE COURT:  Well, before we're through today, I

18   plan to set a deadline for applications under Rule 17(b).

19             MR. SPRINGER:  Okay.

20             THE COURT:  And I'll probably address that in a

21   bit more detail, but I do intend to establish a deadline

22   for applications under Rule 17(b).  And that procedure,

23   as specified in Rule 17(b), will govern the availability

24   to you of process at government expense to subpoena

25   necessary witnesses.

```
 1          MR. SPRINGER:  Thank you, Your Honor.
 2          THE COURT:  Do either of you have any other
 3 questions about the advantages and disadvantages of self-
 4 representation?  Mr. Stilley.
 5          MR. STILLEY:  No, not at this time, Your Honor.
 6          THE COURT:  Mr. Springer?
 7          MR. SPRINGER:  Just one brief thing.  It is my
 8 understanding that the United States is in an ongoing
 9 investigation.  In other words, this investigation
10 continues.  I have had experience in the past where when
11 I came into this courthouse my bags were seized, my
12 computer was seized, all because I wasn't somebody who
13 could bring that stuff in the courthouse.  And so is it
14 the Court's understanding that anything I bring into this
15 court for representing myself it is not subject, other
16 than normal random search of the marshals if we go
17 through the metal detector, that none of that information
18 would be available for the government to search or to
19 seize as I'm preparing my defense?
20          THE COURT:  I would suggest that you first
21 consult with your standby counsel as to those matters.  I
22 think I can safely say, as a preliminary and general
23 matter, that if you bring a satchel full of papers that
24 are directly related to your representation of yourself,
25 the government is not entitled to browse those papers.
```

1    That I will give you as a good, solid general rule.  As

2    to how that works as a practical matter at the front door

3    of the courthouse, I'm not going to get involved in

4    unless there is some specific issue raised at a later

5    date.  Any other questions, Mr. Springer?

6              MR. SPRINGER:  No other questions, Your Honor.

7              THE COURT:  Do both of you believe you

8    understand the nature of the charges against you?  Now,

9    mind you, I understand you're challenging those charges,

10   you have filed motions for Bill of Particulars, but so

11   far as can be ascertained from the indictment, as

12   returned, Mr. Springer, do you believe that you

13   understand the general nature of the charges against you?

14             MR. SPRINGER:  Your Honor, honestly, you know,

15   no, I don't understand them.  They're very confusing to

16   me.  I can give you what I do understand and you can see

17   if that answers your question.  I understand there's a

18   conspiracy charged in Count 1 under 18 USC 371, the

19   defraud prong.  I understand that there are three charges

20   of tax evasion under 26 USC 7201.  I do not understand

21   whether it's evasion of assessment, evasion of payment,

22   or how one could go for nine years.  And then, again, the

23   other question is on the two willful failure to files.

24             THE COURT:  Willful failure to file.

25             MR. SPRINGER:  Willful failure to files, right,

1   which is 7203.  I think of all the charges I understand

2   those more than the rest, but I have certain questions

3   that I don't understand.  Like, for instance, I don't

4   understand where they claim the crimes were committed.

5   And I've asked them point-blank, I've said, in the

6   willful failure to files, you allege I did it in Austin,

7   Texas; Tulsa, Oklahoma; or Washington, DC; how could I

8   commit a crime in those places?  That's my nature of not

9   understanding.

10          THE COURT:  Okay.  I understand your point.

11   We'll address that when we address the motions for Bill

12   of Particulars.  I think your recitation, at least for

13   immediate purposes, satisfies me that you do at least

14   understand, subject to the limitations you have

15   described, the general nature of the charges against you.

16       Mr. Stilley, subject to those matters that perhaps

17   that you seek in your motion for Bill of Particulars in

18   which you have, on one hand, joined in Mr. Springer's

19   motion and, on the other hand, also added a few items

20   yourself, do you believe that you understand at least the

21   general nature of the charges against you?

22          MR. STILLEY:  Your Honor, I would have to say,

23   and I'm sure that the Court noted that I had a bit of

24   hesitation when you asked the question concerning

25   assistance of counsel, I cannot understand an indictment

1  that says -- makes allegations, yet I cannot from the
2  face of that determine what, for example, the evasion of
3  tax, what is alleged to have been evaded.  And the reason
4  that that is of great concern to me is that you just told
5  me that my counsel, if I was to apply -- disclose
6  information and apply for counsel, counsel could help me
7  with respect to sentencing issues.  And we all know the
8  tax loss drives the sentencing issues.  And without the
9  knowledge of that, I stand before you not knowing whether
10  the government is asking for, you know, six months or 15
11  years.  And on the basis of that, I cannot, in good
12  conscience, tell you that I think I understand this.
13  I've been over it and obviously I can read --
14         THE COURT:  Now, you must understand that if I
15  conclude that your understanding of these charges is
16  fatally deficient, then I'm not going to let you
17  represent yourself.
18         MR. STILLEY:  I can understand sufficiently the
19  charge.  I can read the charge.  I've read indictments of
20  this nature.  And if I get the Bill of Particulars, I
21  don't see a problem with understanding this.
22      Your Honor, I just don't want to be put in a Catch-
23  22 situation where that I have to say, well, yes, I
24  understand that and then those words come back to haunt
25  me later.  And the government said, well, he said he

 1   understood this, he knows what's -- he doesn't need this,

 2   he doesn't need this in order to understand our theory.

 3          THE COURT:  Well, we'll address that when we

 4   address the motion for Bill of Particulars, but I don't

 5   want you -- I don't want either side of this matter to

 6   make any assumption either way as to what I'm going to do

 7   on the motion for Bill of Particulars.

 8      By the way, on the subject of possible sentence, in

 9   a few moments, I'm going to ask the government to state

10   the possible penalties that apply in this case, so the

11   government counsel will please prepare to make that

12   announcement.

13      Mr. Springer, do you understand that if you are

14   convicted -- and, again, it is necessary for me to

15   address that possible result.

16          MR. SPRINGER:  I understand.

17          THE COURT:  Do you understand, sir, that if you

18   are convicted, there are a number of things that could

19   enhance or increase your sentence under the advisory

20   sentencing guidelines?

21          MR. SPRINGER:  I do, except for whether or not

22   representing myself can enhance.  I'm not -- that's one

23   of the issues that I had.  But other than that, yes, I

24   do.  I want to make certain that representing myself is

25   not used against me.

1          THE COURT:  Perhaps one of the few things I can

2   tell you categorically is that representing yourself in

3   and of itself will not work against you at sentencing.

4          MR. SPRINGER:  Thank you.

5          THE COURT:  That fact.  Now, by representing

6   yourself, you may miss some things that could have

7   adverse consequences.  But in and of itself, your self-

8   representation is not going to count against you for

9   sentencing purposes if indeed the case should proceed to

10  sentencing.

11         MR. SPRINGER:  Thank you, Your Honor.

12         THE COURT:  Very well.  Mr. Stilley, do you

13  understand, sir, that if you are convicted, there are a

14  number of things that could enhance or increase your

15  sentence under the advisory guidelines?

16         MR. STILLEY:  I certainly have a copy of the

17  sentencing guidelines and I understand the guideline

18  driving that.  I would -- I do have a problem with the

19  whole idea of voluntary sentencing guidelines.  But to

20  answer your question, I do understand that there are

21  factors that drive the sentence.  And, of course, that's

22  of great concern even as I, you know, contest any guilt

23  whatsoever.

24         THE COURT:  Well, I don't blame you a bit for

25  being greatly concerned, but I do recognize your

1  statement that you are familiar with the advisory

2  sentencing guidelines.

3      Do both of you understand that if you are convicted

4  and sentenced to a term of incarceration, then you may

5  then be required to serve a term of supervised release

6  under federal sentencing law?  Do you understand that,

7  Mr. Springer?

8           MR. SPRINGER:  I understand that's what it says,

9  Your Honor.

10          THE COURT:  Mr. Stilley?

11          MR. STILLEY:  I understand that's what it says.

12          THE COURT:  And in that event also you may be

13  required to pay a fine or restitution.  Do you understand

14  that, Mr. Springer?

15          MR. SPRINGER:  Yes, I do, Your Honor.

16          THE COURT:  Do you understand that, Mr. Stilley?

17          MR. STILLEY:  Yes.

18          THE COURT:  Very well.  Now, Mr. Springer, tell

19  me just a bit about your educational background.

20          MR. SPRINGER:  Twelfth grade, graduated Jenks

21  High School.  Attained most of my --

22          THE COURT:  Jenks High?

23          MR. SPRINGER:  Jenks High School.

24          THE COURT:  Okay.

25          MR. SPRINGER:  I attained most of my education

```
 1   at Hall and Hall School in Tulsa.  And that's it.
 2            THE COURT:  Mr. Stilley, you do have a law
 3   degree?
 4            MR. STILLEY:  Yes.
 5            THE COURT:  Okay.  And what was your
 6   undergraduate education in?
 7            MR. STILLEY:  Business.
 8            THE COURT:  Okay.  Very well.  Mr. Springer, as
 9   you stand before me today, are you under the influence of
10   any drug, medication, or alcoholic beverage that would in
11   any way impair your ability to understand these
12   proceedings?
13            MR. SPRINGER:  No, I am not, Your Honor.
14            THE COURT:  Mr. Stilley?
15            MR. STILLEY:  No, Your Honor.
16            THE COURT:  Now, if either of you choose to
17   approach the bench and answer this question up here at
18   the bench, I will certainly permit you to do so.  Have
19   either of you ever been diagnosed or treated for a mental
20   illness?  Mr. Springer?
21            MR. SPRINGER:  No, Your Honor, I have not.
22            THE COURT:  Mr. Stilley?
23            MR. STILLEY:  No, Your Honor.
24            THE COURT:  Do either of you have a physical
25   problem that would hinder your self-representation in
```

1    this case such as a hearing problem or poor eyesight?

2    Mr. Springer?

3            MR. SPRINGER:  No, Your Honor, I do not.

4            THE COURT:  Mr. Stilley?

5            MR. STILLEY:  No, Your Honor.

6            THE COURT:  Has anyone advised you not to use a

7    lawyer, Mr. Springer?

8            MR. SPRINGER:  No, Your Honor.

9            THE COURT:  Mr. Stilley?

10           MR. STILLEY:  No.

11           THE COURT:  And, of course, you both understand

12   that if I appoint counsel for you, if you otherwise

13   qualify, that counsel would represent you at the expense

14   of the government.  Again, if you otherwise qualify

15   financially.  Do you understand that, Mr. Springer?

16           MR. SPRINGER:  Yes, I do, Your Honor.

17           THE COURT:  Mr. Stilley?

18           MR. STILLEY:  That's what I've been told.  I

19   have great concern about it in the fact that I stand

20   before you charged with having helped somebody evade tax

21   that was allegedly due on the basis of a gift and that

22   gives me a concern that if I was to receive that, that

23   that could be used against me at a later time to claim

24   that I owed money, didn't pay money on that.

25           THE COURT:  I understand that.  Mr. Springer,

 1   having been advised of your right to counsel and the

 2   advantages of having counsel, the disadvantages and

 3   dangers of proceeding without counsel, and with your

 4   understanding of the nature of these charges and the

 5   possible consequences in the event of a conviction -- and

 6   let me interrupt that.  Government will please state the

 7   maximum possible penalty provided by law for the offenses

 8   charged.

 9          MR. O'REILLY:  Yes, Your Honor.  With respect to

10   Mr. Springer, his charge in Counts 1, 2, 3, 4, 5, and 6,

11   the maximum term of imprisonment possible is 22 years,

12   which is five years each for Counts 1 through 4 and one

13   year each for Counts 5 and 6.

14       With respect to Mr. Stilley, who was charged in

15   Counts 1, 3, and 4, each of those has a five-year maximum

16   term of imprisonment for a maximum potential term of

17   imprisonment of 15 years.

18          THE COURT:  Thank you.  Mr. Springer, having

19   been advised of your right to counsel, the advantages of

20   having counsel, the disadvantages and dangers of

21   proceeding without counsel, and with your understanding

22   of the general nature of these charges and the possible

23   consequences in the event of a conviction, are you

24   certain that you do not want me to appoint a lawyer to

25   defend you or to otherwise arrange for you to have

1  counsel in this case?

2          MR. SPRINGER:  Absolutely certain, Your Honor.

3          THE COURT:  Mr. Stilley?

4          MR. STILLEY:  I do not want counsel appointed to

5  represent me.

6          THE COURT:  Do you understand, Mr. Springer,

7  that even though I have appointed standby counsel, you

8  will still have the responsibility for the organization

9  and the content of your defense in this case?  Do you

10  understand that?

11          MR. SPRINGER:  I do, Your Honor.

12          THE COURT:  So the entire responsibility for a

13  defense rests on your shoulders even though you have the

14  benefit of a lawyer to consult with.  Do you understand

15  that?

16          MR. SPRINGER:  Yes, I do, Your Honor.

17          THE COURT:  And, Mr. Stilley, do you also

18  understand that?

19          MR. STILLEY:  Yes.

20          THE COURT:  I do find that these defendants are

21  competent to waive counsel and that their waiver of

22  counsel is knowing and voluntary and is made with a full

23  understanding and recognition of the dangers and

24  disadvantages of proceeding pro se.  Subject to the

25  Court's inherent power to revoke my order that you will

 1   be permitted to proceed pro se, I will confirm Judge

 2   Cleary's determination and order that you will be

 3   permitted to proceed pro se.  You may be seated.

 4        Now, somewhere -- and I think I could probably lay

 5   my hands on it if I needed to.  Somewhere in these motion

 6   papers is an estimate, and I think it's only an estimate,

 7   but an estimate by the government that there are

 8   approximately 33,000 pages of discovery in this case.  Is

 9   my recollection basically correct about that?

10        MR. O'REILLY:  Yes, Your Honor, I know it's in

11   excess of 30,000 pages.

12        THE COURT:  Okay.  Mr. O'Reilly, you're invited

13   to the lectern, please, to give me just a general

14   overview of where the government stands with respect to

15   producing that discovery, and if that process has not

16   been completed, when you would expect it reasonably could

17   be completed.

18        MR. O'REILLY:  Your Honor, the government had

19   discovery ready to provide to defendants as indicated in

20   our filing as of April 10th.  Mr. Stilley advised he

21   planned to pick it up today.  Mr. Springer, we're not

22   sure when he was planning to pick it up.  There was an

23   issue raised by Mr. Springer with respect to some of the

24   discovery, specifically, I believe, discovery that was

25   obtained during a search of his residence, and I believe

1  more specifically, but it may be broader than this,

2  that -- seized from his computer, which he believes may

3  be subject to a Franks hearing at a later date.

4      Whether or not the Court at a later date decides

5  that the search was invalid, we believe that the

6  discovery still needs to be made available to his

7  co-defendant.  We stand ready to provide it as soon as

8  the Court says, yes, that is discovery that needs to be

9  turned over to Mr. Springer and his co-defendant.  It

10 consists of a number of CD-ROMs or DVDs, I'm not sure

11 which, but it is at our office right now.

12         THE COURT:  To what extent are you producing

13 these discovery materials in digital form, CD-ROM, DVD,

14 whatever, as opposed to hard copy?

15         MR. O'REILLY:  All of it, Your Honor, or

16 practically all of it, Your Honor.

17         THE COURT:  Now, I do recall a case in which the

18 government produced discovery documents, a rather large

19 volume of discovery documents digitally, and in this day

20 and age, there is, as a general proposition, nothing

21 wrong with that.  But every single page, and I do mean

22 this, every single page was a separate pdf file, which

23 rendered those materials very, very difficult to use in

24 any meaningful way.

25     Do we have any such problem with the digital format

```
 1   of the documents that you intend to produce in digital

 2   form in this case?

 3            MR. O'REILLY:  If I may have a moment to consult

 4   with the special agent, he will have a better idea

 5   exactly if that's --

 6            THE COURT:  Please do.

 7      (MR. O'REILLY CONFERS WITH SPECIAL AGENT SHERN.)

 8            MR. O'REILLY:  Yes, Your Honor, after conferring

 9   with the special agent, the documents, the pdf files are

10   of multiple pages in logical context.  We also plan to --

11   I believe we've already prepared a general index that

12   will help guide the defendants through the discovery.

13            THE COURT:  That is very much appreciated.  If

14   the defendants were to pick up today everything that is

15   available today, then from the government's perspective,

16   at least, what would remain to be accomplished by way of

17   the government's compliance with its discovery

18   obligations?

19            MR. O'REILLY:  One matter, which is specifically

20   the hard drive from Mr. Springer's computer, what we have

21   done is we've reduced it to pdf or readable format

22   files.  As I've been told by the technical folks, that is

23   not absolutely everything that's on the hard drive.  When

24   they make those copies, some files get missed.  I think

25   those are all executable files, non -- probably not
```

1  discoverable, but I don't know.  What we have made it
2  known to them is we can make it available.  If they
3  provide a hard drive, we can duplicate the hard drive and
4  give them an exact copy or a mirror image copy of what
5  was seized.
6          THE COURT:  Well, do I hear you then drawing a
7  distinction between the executable files on one hand and
8  the files that have substantive content on the other
9  hand?
10         MR. O'REILLY:  That's my understanding, Your
11 Honor.
12         THE COURT:  And that's a lay terminology, but --
13 okay.  And does the discovery that you are prepared to
14 produce today, does it include the files that do have
15 some substantive content as distinguished from the
16 executable files?
17         MR. O'REILLY:  I hesitate to say it has no
18 executable files, I don't think it does, but all of the
19 content or substantive files, I have been told, are on
20 the discovery that were on the hard drive.
21         THE COURT:  That you now have ready to go?
22         MR. O'REILLY:  Yes, Your Honor.
23         THE COURT:  Okay.  Very well.  So I take it,
24 then, from the government's perspective, the only
25 remaining production that the government has yet to do is

1   what I would call the residual material from the hard

2   drive then?

3          MR. O'REILLY:  Correct, Your Honor.  There may

4   be, as other witnesses are interviewed, if it's reduced

5   to a -- what would be Jencks material, that would be

6   turned over later, but I believe everything else will be

7   provided with this disclosure.

8          THE COURT:  Okay.  Very well.  Thank you.  You

9   may be seated.

10      By the way, on the subject of computers, I have made

11  arrangements for the pro se defendants -- and this is an

12  exception to the rule that would otherwise apply.  I have

13  made arrangements for the pro se defendants to enter the

14  courthouse with laptop computers if you so desire.

15         MR. SPRINGER:  Thank you.

16         THE COURT:  And that ordinarily is a privilege

17  accorded only to lawyers, but I have made arrangements

18  for the pro se defendants to bring their laptop computers

19  into the courthouse if they so desire without

20  interference at the courthouse door.

21      We've probably discussed discovery about as much as

22  we can discuss it at this point.  Forgive me,

23  Mr. O'Reilly, let me make one other inquiry.  To what

24  extent has any production of documents, digitally or in

25  hard copy, already occurred?

1          MR. O'REILLY:  The defendants have picked up

2    nothing as of, I believe, this morning as far as I know.

3          THE COURT:  Okay.  Very well.  Thank you.  We're

4    going to take up the motions at this point.  There are

5    other matters, including scheduling matters, that I do

6    intend to address before we conclude today, but I think

7    perhaps the scheduling can be addressed, I think, with a

8    better confidence level from the standpoint of all

9    concerned after we address the motions that are before

10   the Court.

11       The first motion that I intend to take up is the

12   motion at Docket Entry Number 30, the motion for

13   clarification with respect to specific legal authority

14   for the appointment of a judge.  The government responded

15   to that motion by attaching what I will, in the

16   vernacular, call the cross-designation order.  And

17   viewing the motion as being just exactly what it says it

18   is, a motion for clarification, I intend to grant the

19   motion.  The clarification is the cross-designation

20   order.

21       Does either side care to be heard further on that

22   motion?

23          MR. SPRINGER:  Yes, Your Honor, I would.

24          THE COURT:  I'll be happy to hear you.

25          MR. SPRINGER:  And this is no offense to Your

1    Honor.  This has to do with the rule of law.  28 USC

2    Section 295, 292(b), they work to allow for a judge to be

3    assigned in a temporary capacity, although I'm very

4    gracious and have had two different cases with Your

5    Honor.  Congress only authorized and the President only

6    affirmed three seats for a United States judge in the

7    Northern District.  I contacted -- and the reason why

8    this came up, I contacted the Supreme Court, I contacted

9    the Tenth Circuit, and I walked into the clerk's office

10   to understand how an appointment of a judge takes place

11   in this district and learned that there was nothing on

12   file with the clerk's office, nothing on file at the

13   Tenth Circuit, and nothing on file with the Supreme

14   Court.

15       And when I looked at the Attachment A to what the

16   government provided in its response, it seemed to be a

17   general order that takes each United States district

18   judge in one district in Oklahoma and makes them a judge

19   in every district in Oklahoma in the district of

20   Oklahoma.  I asked the clerk -- the circuit executive's

21   office in Denver was that done in any other district, and

22   they said no.

23       I asked them why was there a presumption of

24   temporariness to this, and they said because it begins

25   one day and ends at the end of the year.  I said, well,

1  how long has this been going on, and they said they renew

2  it every year.  Therefore, under Article II, Section 2 of

3  the Constitution where the President at the advice and

4  consent of the Senate is to appoint judges of the

5  district courts, that I believe that the order of Judge

6  Henry violates Article II, Section 2; violates 28 USC

7  292(b); and violates Section 295.

8       However, I would be settled and would lift my

9  objection if he would just sign an order that says you

10  are appointed to be our judge for this trial.  And other

11  than that, I have a history of not wanting to waive any

12  rights based upon what I've learned in the last 20 years

13  and will preserve the record for that issue.  I believe

14  it's totally separate and distinct from the trial on the

15  merits of the case.

16            THE COURT:  Thank you.  Again, taking the

17  request set forth in the motion for clarification to be

18  just exactly what it says it is, a motion for

19  clarification, the motion is granted.

20            MR. SPRINGER:  Thank you.

21            THE COURT:  And the parties are referred to the

22  cross-designation order that was signed by the chief

23  judge of the Tenth Circuit on December 30, 2008.

24       The next motion is -- and here we have some

25  interrelated motions.  The next motion that I intend to

1   address, with that understanding that there are several

2   related matters, is what started out as the government's

3   unopposed motion for limited unsealing of the search

4   warrant affidavit and materials from Case Number Criminal

5   03-55.

6       Now, that motion was filed.  Apparently, there was

7   some disagreement or miscommunication, whatever, as to

8   whether it was unopposed.  Maybe it was unopposed in

9   theory, but opposed after it was seen, I don't know.

10  That's neither here nor there.

11      In any event, we have the government's unopposed

12  motion that was filed on April 15th, Docket Entry Number

13  39.  We have Mr. Springer's motion to unseal Docket Entry

14  Number 36 filed on April 13th.  And perhaps related, I'm

15  not sure, I'm going to have counsel and the parties

16  educate me on this.  Perhaps related, we have the motion

17  to unseal affidavit and transcript of meeting on

18  September 15, 2005.

19      To some degree or other, perhaps all three of those

20  motions do have some overlapping considerations.  So I'm

21  first -- bearing in mind that they are interrelated to

22  some degree, I'm first going to hear from the government

23  in support of its unopposed motion for limited unsealing

24  of search warrant affidavit and materials from Criminal

25  03-55.

1          MR. O'REILLY:  Yes, Your Honor, Charles

2    O'Reilly.  And, frankly, I apologize for having had

3    unopposed because that's what we understood at the time

4    we filed it.  I guess the Court noted we subsequently

5    noticed when we were informed.  As I understand it, the

6    opposition is not to unseal it, it's to the limited

7    nature of our proposed unsealing.  Which is that for

8    purposes of this case, we need to make discovery to

9    fulfill our discovery obligations and want to make sure

10   that there's no issue with turning over materials that

11   another court has sealed to that.

12        And we also moved to unseal without opposition

13   Mr. Springer's appellate issue before the Tenth Circuit.

14   The Tenth Circuit actually did a partial granting of

15   that.  For purposes of discovery, we are entitled to turn

16   it over.  For all other purposes, the Tenth Circuit case

17   remains sealed.

18        And that's what we're asking for here is that for

19   purposes of providing discovery and then trying this

20   case, the materials that are currently sealed in case

21   03-CR-55 be unsealed for the purposes of providing

22   discovery and being able to try our case and for the

23   defendants to try their case.

24          THE COURT:  So your motion, then, would

25   encompass all sealed materials in that case?

```
 1            MR. O'REILLY:  Yes, Your Honor.

 2            THE COURT:  Okay.  And do you envision that the

 3   unsealing of those sealed materials in Criminal 03-55,

 4   the materials thereby made available would in turn be

 5   subject to any sort of a protective order in this case?

 6            MR. O'REILLY:  That's what we're asking for,

 7   Your Honor, that the remaining part of the protective

 8   order that the Court previously granted, I believe it was

 9   Number 26, Docket Number 26.

10            THE COURT:  And your motion in addition?

11       (MR. O'REILLY AND MR. SNOKE CONFER.)

12            MR. O'REILLY:  Actually, Your Honor, Mr. Snoke

13   has advised me incorrectly.  With respect to the witness

14   involved in this case, which is Mr. Patterson, Eddy

15   Patterson, those materials will be unsealed.  There were

16   some materials with respect to Mrs. Patterson that absent

17   they be discoverable, either exculpatory or somehow

18   something relevant to the defense, those we are not

19   seeking to unseal.

20            THE COURT:  And that is materials on file in

21   Criminal 03-55?

22            MR. O'REILLY:  Yes, Your Honor.

23            THE COURT:  Is that in the form of transcript or

24   interview summaries or what?

25            MR. O'REILLY:  If I may have a moment, Your
```

1  Honor?

2          THE COURT:  Sure.

3      (MR. O'REILLY CONFERS WITH CO-COUNSEL AND AGENT

4  SHERN.)

5          MR. O'REILLY:  I'm advised with respect to

6  Ms. Patterson, it would be a plea agreement and also with

7  respect to some in-camera transcripts.  There may be

8  other documents, I'm not certain.  If -- obviously, if

9  she becomes a witness in this case or if the material is

10 otherwise discoverable, we'll be before Your Honor

11 seeking to have that unsealed for the limited purpose of

12 providing it to them.

13         THE COURT:  And that's Judith Patterson; is that

14 right?

15         MR. O'REILLY:  Yes, Your Honor.

16         THE COURT:  So your motion, then, would

17 encompass the probable cause affidavit for the search on

18 201 West Avenue and all sealed materials in Criminal

19 03-55 except the plea agreement and transcript of

20 in-camera proceedings relating only to Judith Patterson;

21 is that correct?

22         MR. O'REILLY:  Let me confirm that, Your Honor.

23     (MR. O'REILLY CONFERS WITH MR. SNOKE AND AGENT

24 SHERN.)

25         MR. O'REILLY:  First of all, I'll speak to the

```
 1  search warrant affidavit, which is of Mr. Springer's
 2  residence, yes, that in total.  With respect to 03-CR-55,
 3  only because I don't have the docket sheet in front of
 4  me, I'm hesitant to say those are the only things.  What
 5  I would say, Your Honor, or propose is that materials
 6  relating -- any sealed materials relating only to Judith
 7  Patterson will remain sealed at this time.
 8          THE COURT:  Okay.  Now, Mr. O'Reilly, on that
 9  basis then and subject to the exceptions that you propose
10  that the Court carve out at least for now, does the
11  government oppose Mr. Springer's motion to unseal at
12  Docket Entry Number 36?
13          MR. O'REILLY:  One moment, Your Honor.
14      (MR. O'REILLY CONFERS WITH CO-COUNSEL.)
15          MR. O'REILLY:  With respect to the specific
16  documents that Mr. Springer is asking for in Docket Entry
17  Number 36, no, we have no opposition to unsealing those
18  specific documents.
19          THE COURT:  The docket entries that are
20  referenced on the first page of his motion plus the
21  transcript of the sentencing of Eddy Patterson?
22          MR. O'REILLY:  Correct, Your Honor.
23          THE COURT:  Okay.  Very well.  Thank you.
24      Now, the motion that does go hand in hand with the
25  government's motion is, as I have said, Docket Entry
```

1  Number 36, Mr. Springer's motion.  The government has

2  said that it would propose that the Court unseal the

3  probable cause affidavit referred to on the first page of

4  the government's motion at Docket Entry Number 39 as well

5  as all other sealed materials in Criminal 03-55, except

6  the plea agreement and the transcript of in-camera

7  proceedings relating only to Judith Patterson and any

8  other sealed materials in that case that relate

9  exclusively to Judith Patterson.

10      I'll now hear first from Mr. Springer and then from

11  Mr. Stilley as to whether there's any opposition to that

12  motion.

13          MR. SPRINGER:  Thank you, Your Honor.  Your

14  Honor, Mr. Patterson and Mrs. Patterson were both

15  indicted, charged, in my opinion, abused.  I made that

16  position very clear.  The interrelationship between the

17  Department of Justice, the U.S. Attorneys, Mr. and

18  Mrs. Patterson become very important in the credibility

19  of Mr. Patterson.  And Mrs. Patterson is right along with

20  Mr. Patterson.

21      To give you an example, Mrs. Patterson was put in

22  prison erroneously.  And after her appeal by Mr. Stilley

23  and Mr. Barringer were filed at the Tenth Circuit Court

24  of Appeals, the government obtained two different stays

25  to -- or two different extensions of time.

1    Mr. Barringer filed a request to have Mrs. Patterson

2  released from prison.  And eight days later,

3  Mr. Patterson waives his right to a new jury trial.

4  Mrs. Patterson is supposedly in front of Chief Judge

5  Eagan pleading guilty or getting out of jail,

6  Mrs. Patterson signs a declaration with Judge Eagan and

7  this -- this series of events that took place between

8  Doug Horn, Melody Noble Nelson, Donna Meadors, Mr. and

9  Mrs. Patterson, all are, in my opinion, as the evidence

10  will show, fraudulent.

11    And Mr. Patterson, throughout the indictment, is

12  relied upon with Mrs. Patterson in several transactions,

13  several.  In the conspiracy count, there is a $112,000

14  transaction that the government has alleged.  There is a

15  37,000, a 35,000, a 375,000.  And also there is a claim

16  in the government's conspiracy charge that Mr. Stilley

17  and I both were representing Mr. and Mrs. Patterson.

18    On top of that, after the search warrant in 2005,

19  September 15th issued, 16th served, Mr. and

20  Mrs. Patterson together sued Lindsey Springer, Bondage

21  Breakers Ministries, Oscar Stilley, and Jerald

22  Barringer.  And she, through the Richardson law firm,

23  asserted many false statements of which led to a lawsuit

24  by me against the Richardson law firm for libel, which

25  stands at the state Supreme Court right now.

```
1         THE COURT:  I thought that was dismissed for
2   lack of prosecution.
3         MR. SPRINGER:  No, and that is -- and that's
4   erroneous by Judge Morrissey.  I have a case number.  It
5   was the state Supreme Court assigned it to the Court of
6   Appeals.  It was just a mistake.  That's scheduled for
7   the 29th of April for failure to prosecute.  But it's
8   not, because I've already called her and she has made a
9   mistake.  It was just a mistake.
10        THE COURT:  And forgive the interruption, but
11  let me get some clarification.
12        MR. SPRINGER:  Sure.
13        THE COURT:  I gather that you're taking
14  exception to the government's proposed exception to what
15  it would want me to unseal.
16        MR. SPRINGER:  Yes, sir.
17        THE COURT:  To the extent that in the
18  government's motion at Docket Entry Number 39, to the
19  extent that the government proposes that materials be
20  unsealed, do you object to the motion?
21        MR. SPRINGER:  No.
22        THE COURT:  Okay.  So your concern relates to
23  carving out materials relating to Judith Patterson?
24        MR. SPRINGER:  Yes, sir.  Your Honor, I believe
25  this is a public trial.  One of the issues that came up
```

1   about the April 10th discovery is the government has a

2   document they wish me to sign in order to receive

3   materials that they want to get.  You signed an order a

4   day after it was -- a motion was filed granting them --

5   it appears to be certain protections.

6       I'm demanding a public trial.  And although I agree

7   I won't use the information that's provided to me

8   erroneously, I don't believe that we can have one foot in

9   the public domain and one foot in, oh, we have to keep it

10  private.  And what they're doing in respect to these

11  exceptions, Mrs. Patterson, is that very same thing.  On

12  Mr. Patterson's side, they want to let me have it, use it

13  at the trial, but don't make it public.  And then --

14  which the Pattersons have made this a very public issue

15  when they filed two lawsuits.  They renewed one after the

16  other.  And now they want to keep what happened with

17  Mrs. Patterson secret.

18      And I'm just objecting to the nth degree and will

19  remain objecting to that.  And I believe that all that

20  information is very relevant.  That's why it's sealed.

21  There's no other reason for it to be sealed.  The case is

22  over.  They've served their time.  They've gotten their

23  deals.

24      I believe both Mr. and Mrs. Patterson, it will show,

25  were paid by the United States government -- maybe not

1    Mr. O'Reilly and maybe not Mr. Snoke, but they were paid

2    for their testimony.  And I believe the Tenth Circuit

3    cases on that are very clear.  That their testimony, if

4    they received any benefit for their testimony, that that

5    brings their testimony and their statements into

6    question.

7        It also may end up being in the Franks hearing

8    something that, in my opinion, is going to invalidate the

9    search warrant.  The government did make a mention in

10   their response on that issue, which I believe, as you

11   correctly stated earlier, it's all relevant together,

12   it's all one big deal.  And everything that they had

13   asked me about the day of the search had to do with

14   mostly Mr. Patterson and Mrs. Patterson.

15       And to stand here and say that that should remain

16   sealed because it's -- I don't even know if they've given

17   you a reason why it should remain sealed.  I don't even

18   know if they've said that.  They didn't say it in

19   writing.

20           THE COURT:  We'll get to that.

21           MR. SPRINGER:  But I would say, Your Honor, that

22   Mrs. Patterson and what she was paid for her testimony

23   and what Mr. Patterson was paid for his testimony should

24   become relevant for a jury to hear and I should be

25   allowed to discover that and to fetter all that out in

1  the short time before trial on those docket entries.

2          THE COURT:  Thank you, Mr. Springer.

3      Mr. Stilley, do you care to be heard with respect to

4  the government's motion?

5          MR. STILLEY:  Your Honor, I would just join in

6  what Mr. Springer said.

7          THE COURT:  Thank you.  I need to hear from the

8  government specifically as to the basis upon which the

9  government proposes to exclude the materials relating to

10 Mrs. Patterson.

11         MR. O'REILLY:  Your Honor, as I stated before,

12 if there is in that material anything that is relevant to

13 the defense, we would actually want to be able to turn

14 that over.  It's not -- it's simply that, as I stand here

15 today, I do not anticipate Mrs. Patterson being a

16 witness.  Therefore, materials that would be impeaching

17 as to her would not be necessarily relevant.

18     However, if those materials would be something that

19 could impeach Mr. Patterson, then that would be something

20 that the defense is entitled to have and we would seek to

21 turn that over as well.

22         THE COURT:  To some degree, we've got a three-

23 cornered situation here, which is unusual.  The third

24 corner being the Court.  Because what's sought to be

25 unsealed is a court record.  So there's a -- it's not

```
 1   just a two-party or binary relationship.  We've got a
 2   three-cornered situation.  The Court is being asked to
 3   direct the unsealing of court records.
 4       You have told me what you're willing to do and would
 5   be inclined to do in the event that you determine that
 6   any of those matters relating exclusively to
 7   Mrs. Patterson are determined to be discoverable.  What
 8   I'd like to hear from you is the reason that the Court
 9   ought to keep under seal any of the materials that relate
10   exclusively to Mrs. Patterson.  Is there some sort of a
11   problem with a confidential informant or an unnamed
12   cooperator or what?
13           MR. O'REILLY:  If I may have a moment, Your
14   Honor.
15           THE COURT:  Sure.
16       (MR. O'REILLY CONFERS WITH CO-COUNSEL AND AGENT
17   SHERN.)
18           MR. O'REILLY:  Frankly, I am not in a position
19   right now to answer.  I just don't know.  I'm not aware
20   of any confidential informant.  I'm not aware of
21   something that mandates this sealing.  I do know only
22   that the Court sealed these matters.  I would point out
23   that in what Mr. Springer requested to be unsealed is
24   Docket Entry Number 36.  None of those documents are at
25   issue.
```

1          These are -- what the government sought to do in its

2     motion is actually -- is broader than what Mr. Springer

3     had initially proposed.  And all we're doing now is

4     trying to figure out whether everything that is sealed

5     should be made available to the defense and if it's

6     relevant to their defense, absolutely it should.  Or if

7     just some of the materials.  And, unfortunately, Your

8     Honor, I'm just not in a position today to tell you at

9     this moment.  I can find out and will find out.

10          What we would ask the Court to do is direct that

11     whatever we provide that is subject to a sealing order

12     presently be under the Court's protective order, Docket

13     Number 26.  There is no reason for the discovery of this

14     material to be used by the defendants for some other

15     purpose other than their defense of this case.  If for

16     some reason they perceive a need for it in another

17     matter, they would be able to move the Court to unseal it

18     at that time giving the Court cause and reasons at that

19     point.

20          THE COURT:  Thank you.  Anything further from

21     either of the defendants?

22          MR. SPRINGER:  Yes, Your Honor, if I may.  I

23     didn't hear a reason why it needs to stay sealed, but I

24     understand the invite, he needs to go figure that out.

25     But I don't believe that the government should be in

 1    control of what I discover or, as Mr. O'Reilly just said,

 2    if it becomes at a later time known and that the

 3    defendants want to unseal it, well, we can't really

 4    determine what's in there to ask to unseal it until we

 5    can look at it, and we need to get it unsealed to look at

 6    it.

 7         And I'm taking exception with whether or not the

 8    information that's unsealed should be public or not.  I

 9    will abide with any court order that tells me what not to

10    share and what to share.  I will also maintain my

11    objection on that, that it should remain public.  But I

12    do not believe that the government should be the deciding

13    factor over what is discoverable and what is not

14    discoverable to my defense.

15         They said they had no intention of calling

16    Mrs. Patterson.  That does not make them the arbiter of

17    whether or not Mrs. Patterson's testimony will be

18    relevant to her as a witness in my defense and also

19    against Mr. Patterson.

20              THE COURT:  Thank you.

21              MR. SPRINGER:  Thank you.

22              THE COURT:  Mr. O'Reilly, I have one question by

23    way of clarification.  Your motion states that the

24    government would ask the Court to enter an order

25    directing that the government, and I'm paraphrasing,

1   directing that the government may disclose to the

2   defendants the probable cause affidavit and the sealed

3   materials.  Do you contemplate that the government would

4   produce its file copies of the sealed materials or do you

5   contemplate that the Court would direct the clerk of this

6   Court to reproduce those materials from the court record?

7            MR. O'REILLY:  I would have to -- if we have

8   access to those, obviously, we would -- and I believe we

9   do -- that we would just make those available from our

10  records.

11       Your Honor, may I actually propose something that

12  may alleviate this apparent impasse?  I would propose

13  that any materials that we -- that the government

14  perceives are not discoverable from this, that we don't

15  think should be turned over, we provide in camera to Your

16  Honor.  And if you think we're wrong, they get turned

17  over anyway.  It may be after looking at them we think

18  it's all discoverable.

19       And so that would be my proposed solution to this

20  apparent impasse is that Your Honor order us to turn over

21  to you any of the materials in 03-CR-55 that we don't

22  think should be turned over that are presently sealed for

23  the Court's determination in camera with the exception of

24  those unsealed subject to the protective order.

25            THE COURT:  Well, I had already tentatively

1   concluded that that's probably what I was going to have

2   to do.  And as a matter of fact, I had started jotting

3   some notes to that effect.  You may be seated.  Bear with

4   me just a moment, Counsel, I'm going to make a couple of

5   notes and then address the matter, I hope, definitively.

6           MR. SPRINGER:  Your Honor, may I briefly say

7   something in response to what Mr. O'Reilly just said?

8           THE COURT:  Surely.

9           MR. SPRINGER:  In the event that the Court is

10  going to take an in-camera look at whatever it is that

11  Mr. O'Reilly doesn't know is in there that he thinks you

12  should see, that I be at least given a list of some type

13  of descriptive statements that explain what it is in a

14  general sense that the Court is looking at so that I

15  could at least preserve the record making any objections

16  that I may have to that.

17          THE COURT:  Thank you.  That's noted.  Okay.  I

18  do appreciate having the benefit of the views of counsel

19  and the parties with respect to the government's motion

20  at Docket Entry Number 39 as well as Mr. Springer's

21  motion at Docket Entry Number 36.

22      Now, does any of this -- and you all certainly

23  understand the interrelationship of these matters, at

24  this point at least, better than I do.  Does any of this

25  encompass -- and I'll direct this question to

1    Mr. Springer.  Does any of this material encompass the

2    materials that you seek in your motion to unseal

3    affidavit and transcript of meeting on September 15,

4    2005?  In other words, are any of those --

5              MR. SPRINGER:  No.

6              THE COURT:  -- materials sealed in Case Number

7    Criminal 03-55?

8              MR. SPRINGER:  Not that I know of.  That wasn't

9    the intent.

10             THE COURT:  Okay.  Well, we'll get to that

11   motion, then, momentarily.

12             MR. SPRINGER:  Thank you.

13             THE COURT:  My ruling on the motion at Docket

14   Entry Number 39 and 36 is as follows:  First, all sealed

15   materials in Criminal 03-55 that are to be made available

16   to the defendants in this case will be subject to the

17   protective order entered in this case on April 2, 2009.

18   That's Docket Entry Number 26.

19        Second, the government will cause to be delivered to

20   me at my chambers in Oklahoma City legible copies of all

21   sealed materials it asserts should not be produced to the

22   defendants.  That's sealed materials from case Criminal

23   03-55.  That will be delivered to me in my chambers not

24   later than April 30th.

25        Third, the government will produce to the defendants

1    all other sealed materials from Criminal 03-55 as well as

2    the probable cause affidavit not later than April 30,

3    2009.

4        And, finally, as to materials withheld by the

5    government, in other words, those sealed materials that

6    the government elects to deliver to me rather than to the

7    defendants, the government will provide a log, a

8    descriptive log to the defendants providing a general

9    description of the nature of the materials, the apparent

10   date of origin of the materials, and to the extent that

11   this can be done without divulging the substantive

12   content, the names of any individuals signing any

13   documents that are withheld.

14       And to that extent, the motions at Docket Entry

15   Number 36 and 39 are granted.  In all other respects,

16   they're denied.  But I think basically they're granted.

17       Obviously, we've got one more step that will be

18   involved with respect to the sealed materials that the

19   government asserts should not be produced, but I can

20   assure all concerned that once those materials, if any,

21   are delivered to me in chambers, I will address those

22   materials quite promptly.

23       That brings us to --

24           MR. SPRINGER:  Your Honor, may I -- I think it's

25   just an oversight.  On the motion to unseal the affidavit

1  on probable cause, I also asked, if there was, to have

2  unsealed any transcript of the meeting that Mrs. Nelson

3  declared in a declaration in 06156 that occurred to get

4  that search warrant, because she declared that Mr. Shern

5  did not actually show up and answer any questions of the

6  magistrate.

7           THE COURT:  Well, that's -- I haven't ruled on

8  --

9           MR. SPRINGER:  I'm sorry.  I thought you were

10  dealing with 37.

11           THE COURT:  No.  That's where we are now,

12  though.  I'll hear you in support of that.

13           MR. SPRINGER:  Okay.  In 06156, which is a case

14  that stems from the search of my home in 2005,

15  Mrs. Nelson filed a declaration.

16           THE COURT:  Now, that's a civil case?

17           MR. SPRINGER:  That's a civil case.  And I'll do

18  this the best I can.

19           THE COURT:  You're referring to the declaration

20  of Melody Noble Nelson?

21           MR. SPRINGER:  Yes.

22           THE COURT:  Okay.

23           MR. SPRINGER:  And in her declaration, she

24  declares to the district court that she presented an

25  affidavit to get a search warrant to Magistrate

1  McCarthy.  And Mrs. Nelson was also somebody who, as she

2  said in her declaration, she had had confrontations with

3  me in the past.  In particular, it was Mr. and

4  Mrs. Patterson's case that caused so much dilemma.  And

5  it was Mr. and Mrs. Patterson that somehow got paid for

6  their testimony.  And so when they filled out their

7  affidavit saying that they could come into my house and

8  they were searching for currency, which ultimately led to

9  another case, in particular, that case that she filed a

10 declaration in, that Magistrate McCarthy said he had

11 found probable cause based upon the affidavit of

12 Mr. Shern.  And it's a generic document, but it basically

13 suggests that any other information presented to him.

14      And so the affidavit will obviously tell me a lot

15 for my Franks hearing preparation.  But I believe there's

16 enough evidence right now to show that Mrs. Nelson was at

17 least harboring false testimony.  And so if there were

18 any questions that Magistrate McCarthy asked her,

19 including the currency, she filed in a Rule 41 motion,

20 which is not in that civil case and not in this case, she

21 responded that she should be allowed to keep the things

22 that she took because of what she had told Magistrate

23 McCarthy.

24      And later on, they returned some of the money.  It

25 ended up some of it was stolen.  And they returned some

1    of the things that I had asked for.  And this, of course,

2    has obviously led to a December Rule 41 motion which

3    currently pends in front of Judge Frizzell.  Which maybe

4    this Court will -- I'll file a motion to have this Court

5    take that over as well.

6         So I'm interested in understanding to prepare

7    properly for the Franks motion, which I have to file

8    affidavits and explain to the Court why it's warranted.

9    Then I am interested and need to know besides the

10   affidavit of Brian Shern, also what Mrs. -- what Judge

11   McCarthy asked Melody Nelson and what Melody Nelson said

12   in response to any questions that Judge McCarthy had.

13        I'm not challenging anything about Judge McCarthy.

14   I'm only challenging the credibility of Mrs. Nelson.  And

15   that's the reason why I would like to have that

16   transcript.

17             THE COURT:  I take it that so far as you know,

18   it's uncontested that some part of the evidence the

19   government may rely on in this case is the product of

20   that search.

21             MR. SPRINGER:  Yes.

22             THE COURT:  Is that right?

23             MR. SPRINGER:  Yes, sir.  As a matter of fact, I

24   have to tell you, there's one product before that search

25   that was done from 2003 to 2005 with Donna Meadors,

1    Melody Noble Nelson, and Doug Horn that then leads in

2    to -- just to give you a timeline of this, because it's

3    important.  In 2005, I filed 05-466 in Oklahoma City.  It

4    was Lindsey Springer v. the IRS.  The next day, Brian

5    Shern was appointed to be criminally investigating

6    something new.  Not the criminal investigation that has

7    been standing since '97, but a new criminal

8    investigation.  At all times I'm made aware by Bob

9    Metcalf in the Department of Justice that I'm under

10   criminal investigation.

11       In that case, which Your Honor was assigned to that

12   case --

13            THE COURT:  And I hate to disappointment you,

14   but I have no recollection of it.

15            MR. SPRINGER:  I know you do not.  And you

16   never -- we never had a hearing.  It was dealt with

17   pleadings --

18            THE COURT:  Okay.

19            MR. SPRINGER:  -- and I'm fully aware of that.

20   I received in Rule 26 discovery in that case evidence

21   which I've attached to my pleadings that demonstrates the

22   criminal investigations going forward.  The day before

23   they searched my home, I filed my second lawsuit in

24   Oklahoma City based upon a notice of determination filed

25   by the IRS.  And, again, Your Honor, you were assigned to

1    that case.  Again, no hearing was held.

2         And the next day, actually two hours after that,

3    they received the warrant from Magistrate McCarthy to

4    come into my home.  And the next day after they left,

5    Mr. Shern instructed me to call Mrs. Nelson, which I did,

6    and she told me that she was aware of the things that I

7    had filed the day before and that she -- I asked her to

8    recuse herself.  She puts in her declaration that I asked

9    her to recuse herself.  She refused to do it.  And she

10   had a conflict.

11        And so what's relevant to me is the timeline of

12   every time I did something, the criminal/civil

13   coordinator in Oklahoma City responded with something

14   new.  And I think all of it is going to stem -- go into

15   another motion that I have before the Court dealing with

16   the Fifth Amendment.

17        So I believe her transcript, if there is any, which

18   is interesting, that it should be at least given to me

19   with a protective order at best so that I could at least

20   see how she answered those questions.  I do believe it's

21   a possibility she will be a witness in this case because

22   of things Mrs. Patterson and Mr. Patterson are going to

23   say.  And that's all I have, Your Honor.

24             THE COURT:  Thank you.  I'll hear from the

25   government.  I'll give you the benefit of my starting

1  point.  And that is, as we all know, if a defendant wants

2  to have a Franks hearing, then the defendant has to clear

3  a preliminary threshold, essentially showing that there

4  is a good reason to have a Franks hearing.

5       The Supreme Court made that clear in the Franks case

6  itself, that threshold showing requirement has been

7  elaborated upon by the Court of Appeals, subsequent to

8  Franks.  I, frankly, take seriously the requirement that

9  there be a preliminary showing as required by the Franks

10 decision and its progeny before a Franks hearing is to be

11 scheduled, and I certainly intend to be mindful of that

12 requirement in this case.

13      That said, that leaves with the defendant, who would

14 want to have a Franks hearing the obligation to make that

15 preliminary showing.  Hand in hand with the obligation to

16 make that preliminary showing is, it seems to me, the

17 prerogative of obtaining access to the materials with

18 which that preliminary showing might be made.  That's my

19 beginning point.

20      I will now hear from the government with respect to

21 the motion we have at Docket Entry Number 37.

22           MR. O'REILLY:  Yes, Your Honor.  First of all,

23 the government, as far as the affidavit is concerned

24 obviously, with respect to Docket Entry 39, we've moved

25 to have that unsealed and the Court has granted that, the

 1   affidavit for the search warrant.

 2             THE COURT:  Well, I thought there was another

 3   probable cause affidavit.  Is the affidavit you referred

 4   to, Mr. Springer, one and the same as the probable cause

 5   affidavit we've already addressed?

 6             MR. SPRINGER:  That I understand, yes, sir.

 7             THE COURT:  Okay.  I thought there was a

 8   probable cause affidavit and a separate affidavit of

 9   Melody Nelson.

10             MR. SPRINGER:  Actually, that's what the

11   transcript issue is about because of a declaration that I

12   attached.

13             THE COURT:  Okay.  Okay.  Well, we've already

14   covered it then with respect to the affidavit.

15             MR. SPRINGER:  Right.

16             THE COURT:  That brings us to the transcript or

17   whatever record there may be of the colloquy between

18   Melody Nelson and Judge McCarthy.  You may proceed.

19             MR. O'REILLY:  Thank you, Your Honor.  What I'd

20   like to do before I even start is, contrary to

21   Mr. Springer's statement that enough evidence exists now

22   that Ms. Nelson gave false testimony, there's no evidence

23   that she gave false testimony.  And I want that clear for

24   the record.

25        There's also -- I wish I could say there's no

1    evidence that money was stolen.  There is conflicting

2    evidence.  It appears that $17,000 was seized.  However,

3    there is also a record that 19,000 was seized.  That is a

4    matter for a separate case.

5        What is important here is there's no evidence that

6    there is a transcript.  My understanding of procedures in

7    this district is that there are no transcripts kept of

8    when an Assistant U.S. Attorney goes in to seek a search

9    warrant with a magistrate judge.

10       To date, I've heard no reason why or how that

11   transcript, if it even existed or materials -- if there's

12   other materials that went into the judge's making a

13   determination that there was probable cause, we will

14   provide them.  I'm unaware of any.  The only materials

15   I'm aware of are Special Agent Shern's affidavit.  And

16   that, subject to the Court's order, has already been

17   turned over.

18            THE COURT:  Now, I thought we had just

19   established that there was only one affidavit and that

20   was Melody --

21            MR. O'REILLY:  Your Honor, that was a -- I can

22   understand why you're confused.  Melody Noble Nelson gave

23   no affidavit.  The declaration that was spoken of earlier

24   is in Mr. Springer's civil case -- one of Mr. Springer's

25   civil cases.

```
 1              THE COURT:  And I've seen that.
 2              MR. O'REILLY:  Correct, Your Honor.
 3              THE COURT:  And he apparently has that.
 4              MR. O'REILLY:  Correct, Your Honor.
 5              THE COURT:  Okay.
 6              MR. O'REILLY:  The search warrant affidavit --
 7   may I have just one moment?
 8              THE COURT:  You surely may because you've got me
 9   absolutely confused.
10      (MR. O'REILLY CONFERS WITH AGENT SHERN.)
11              MR. O'REILLY:  I just wanted to confirm with
12   Special Agent Shern before I made this categorical
13   statement, it's his affidavit.  There is no affidavit for
14   a search warrant from Ms. Nelson with respect to this
15   case.
16              THE COURT:  Well, that's the reason that I
17   assumed when there was reference to a probable cause
18   affidavit that it came from an agent rather than an
19   AUSA.  Because I don't think AUSAs typically are in the
20   business of signing probable cause affidavits.
21              MR. O'REILLY:  I'm unaware of that practice,
22   Your Honor, correct.
23              THE COURT:  So we're back to where we were ten
24   minutes ago.  Mr. Springer, you're up.  Mr. O'Reilly, you
25   may be seated.
```

```
 1            MR. O'REILLY:  Thank you.
 2            THE COURT:  Now, I --
 3            MR. SPRINGER:  I'm on Exhibit 9, which is her
 4  declaration attached to my motion that she filed in
 5  06-CV-156.
 6            THE COURT:  Right.
 7            MR. SPRINGER:  And it's on page 2 at the bottom,
 8  and it says, "As part of this investigation, I prepared a
 9  search warrant for the search of plaintiff's residence in
10  Kellyville, Oklahoma.  On or about September 15, 2005, I
11  presented a search warrant" -- and on the next page --
12  "and the supporting declaration of IRS Special Agent
13  Brian M. Shern to United States Magistrate Judge Frank H.
14  McCarthy, who signed the search warrant and authorized
15  the search of Springer's residence."
16            THE COURT:  Okay.  Mr. O'Reilly, I take it the
17  government has no objection to producing the declaration
18  of Agent Shern; is that right?
19            MR. O'REILLY:  In fact, Your Honor, we moved for
20  it, Document Number 39, that has already been ordered --
21            THE COURT:  Okay.  I was thinking that there was
22  a probable cause affidavit and that it would not be one
23  and the same as any affidavit signed by AUSA Nelson.
24       Okay.  Now, Mr. Springer, do you have any reason to
25  believe that AUSA Nelson filed an affidavit?  That's a
```

1  matter --

2        MR. SPRINGER:  Okay.  No, I don't, but if she

3  presented something to Magistrate McCarthy, and she's the

4  one that drafted the search warrant, and -- there has to

5  be some record somewhere that that exchange took place.

6  And, I mean, I understand how judges rely on affidavits

7  or declarations, I can understand that, but she declared

8  that she's the one that did all of this and she was a

9  witness to it.  And if there is no meeting, which

10 Mr. O'Reilly says there may not be, then that -- you

11 know, I would accept that statement.

12     But the way it appears right now by the declaration

13 of Mrs. Nelson, that she had an ex parte or however

14 warrants are issued in this district, she went and got it

15 and says that she did all of it.  And for there not to be

16 a record that said she did all of that, you know, I would

17 at least like to know that that's the truth.

18        THE COURT:  Okay.  Thank you.  The motion at

19 Docket Entry Number 37 is granted in part and denied in

20 part.  It seeks an order unsealing the affidavit Melody

21 Noble Nelson declared she tendered to Judge McCarthy, and

22 that presumably would be the affidavit of Agent Brian

23 Shern.  To that extent, the motion is granted with

24 respect to the affidavit of Agent Brian Shern.

25     To the extent that Mr. Springer seeks production of

1    a record of the ex parte meeting between AUSA Nelson and

2    Judge McCarthy, the motion is denied for lack of a

3    showing that any such record exists without prejudice to

4    reassertion of the motion at such time as Mr. Springer

5    may have evidence that such a record exists.

6        That will conclude the proceedings with respect to

7    Docket Entry Number 37 in this case.  As I say, we can

8    revisit that at such time as there may be a showing that

9    such a record does exist.

10            MR. SPRINGER:  Thank you, Your Honor.

11            THE COURT:  That brings us to Docket Entry

12   Number 35 is the next one I want to take up, the motion

13   for protective order, but counsel bear with me for just a

14   moment.

15       Mr. Springer, I'm going to hear the motion at Docket

16   Entry Number 35, your motion for protective order, so

17   you're invited to present that motion.

18            MR. SPRINGER:  I understand the divide between

19   Mr. O'Reilly and myself on determination of the facts.

20   That's why we have jury trials in a great country for

21   that.  That's why our military fights so that we can

22   continue to do this this way.

23       And there is overwhelming evidence that

24   Mr. Patterson and Mrs. Patterson and Mrs. Nelson and

25   Mr. Horn and Donna Meadors overwhelmingly infected the

1  truth in this case and there is not a greater example

2  than the complaint Mr. and Mrs. Patterson filed through

3  the Richardson law firm publicly stating that they have

4  never been in trouble with the law before, did not --

5  were always law-abiding citizens till they met Lindsey

6  Springer, Oscar Stilley, and Jerald Barringer.

7      When Mrs. Nelson herself signed a Rule 404(b)

8  document in the trial of Mr. Patterson demonstrating he

9  had been indicted in 1979 for the very same type of

10  charges that he was having to defend himself in in 2003

11  before first Judge Cook and then Judge Eagan.

12  Mrs. Nelson was fully aware that Mr. Patterson had tax

13  returns prepared by the same person who prepared tax

14  returns for NESCO, who he had allegedly in the indictment

15  attached as one of my exhibits, allegedly refused to file

16  those returns after they were prepared by a competent

17  CPA.

18      And when you take into consideration the Patterson

19  relationship with Nelson and Horn and Donna Meadors prior

20  to the August 2004 time period and then look at what

21  happened as a result of that collision, you come to the

22  conclusion that Mrs. Nelson, Mr. Horn, Mrs. Meadors, all

23  took information and twisted it to a light beyond the

24  least favorable to Lindsey Springer.

25      For example, I attach a letter that Mrs. Meadors

1  sent me doing a 6700 investigation.  In Mrs. Meadors'
2  situation, she was a prospective CID agent, did not
3  disclose that to me, but she also was the revenue agent
4  during the Patterson trial with Mr. and Mrs. Patterson.
5  She worked closely with Mrs. Nelson and Mr. Warren.
6      When she invited a 6700 letter to me, I took that
7  seriously.  I was not selling or offering anything that
8  was a tax shelter program and the government of the
9  United States knew it.  Mr. Metcalf will testify.  He
10 will be a witness in this case.  He will testify that
11 they knew it at all times.
12     I cooperated with a limited understanding that
13 Mrs. Meadors was only looking to see whether or not I had
14 sold tax shelter information.  In 2005, Mr. Metcalf
15 turned over in discovery in an Oklahoma City case that
16 Mrs. Meadors was doing a criminal investigation at the
17 same time.  That earned me a deposition date with
18 Mrs. Meadors on the 9th of April, 2009, of which she all
19 of a sudden had amnesia to everything.
20     I read to her notes that she had put on the file of
21 Lindsey Springer and she said she did not make those.
22 Her name was specifically identified on the files that
23 Mr. Metcalf turned over to me.
24     When I asked her questions about why did she
25 disclose the criminal investigation and the nature of her

1   questions, she said she didn't remember.  I asked her

2   would she remember if she had her notes.  She said, "I

3   may."  So I've now requested discovery in that civil case

4   of her notes so that we can go back and take her

5   deposition again with knowledge.

6       The appearance of trying to hide Mrs. Patterson's

7   information that's sealed with the Court, the propriety

8   of Donna Meadors working in connection with the Patterson

9   case, and then right after the Patterson case was over,

10  she notifies me that she's doing a 6700 investigation on

11  me.  Then in revelation of discovery, getting other

12  information that shows that there was a much broader zeal

13  to get Lindsey Springer, the evidence becomes

14  overwhelming that Mrs. Nelson, who I would just point

15  out, just to give you an example, Mrs. Nelson was not in

16  my house on September 16, 2005, during the search warrant

17  physically, but she was there by telephone numerous

18  times.

19      She declares she's the one that directed them to

20  take the $19,000 in currency that they had found.  She

21  then a week later, after refusing to give it back,

22  opposes my Rule 41 motion, never once tells me or

23  anybody, including the Court, that there is money gone.

24  And then for three months I have to wait.  Mr. Shern

25  politely tells me they're working on it, they're going to

1  give it back, they don't know when they're going to do

2  it.

3      And later, as we find out, Mrs. Nelson and Mr. Horn

4  both declared in 06-156 that they were made aware the day

5  the money was stolen that it was stolen.  And the attempt

6  Mrs. Nelson took to hide that by arguing under 7302 she

7  could keep that currency as forfeiture currency without

8  due process.  And the Supreme Court clearly says that

9  will not happen in this country.  And I asked her, what

10  is your basis for keeping this car titles and currency?

11      Even Magistrate McCarthy footnotes in his denial of

12  my Rule 41 without prejudice, when Mr. Springer comes

13  back and corrects his minor deficiency, that the

14  government needs to explain how that's not -- oh, gosh,

15  what's the word he used?  Contraband.  That the

16  government be prepared if they're going to try to keep

17  the money to show that it was contraband.

18      And the entire time Mrs. Nelson was saying she

19  didn't have to tell me why she was keeping the money, she

20  didn't have to recuse herself.  And then when she files

21  her declaration, she says the reason why I would not call

22  Mr. Springer back is because of previous encounters with

23  Mr. Springer where communications were misconstrued.

24      And so I can tell you, Your Honor, that on the one

25  hand being able to be stop and take a look at the Franks

1    hearing or the idea of it, then brings the question up,

2    why does Mr. Stilley, in this case, have a right to

3    information illegally seized, if it is illegally seized,

4    which I should have a right first to challenge, why

5    should he be given that information, especially when he

6    nor anyone else had a right to it?

7        Now, I can't separate 33,000 documents on a disk.

8    The government has asked me to sign a document they won't

9    even send me so I can see what they want me to waive or

10   sign.  And that's why I've asked can -- and the

11   government has no opposition to it as long as -- although

12   they did write some opposition.  Mr. Stilley had no

13   opposition except he wants the discovery.  But I have a

14   right to stop that and I want to exercise that right.

15       I don't want to waive any rights unless I clearly,

16   as you did today, Your Honor, with the Sixth Amendment, I

17   believe that was very true.  And in this particular

18   instance, if I -- if I don't try to stop the government

19   from sharing illegal information with the public, which

20   is Mr. Stilley in this instance, then the next thing

21   they're going to argue is it's moot.

22       And, Your Honor, I'm not a mystery person with the

23   United States Department of Justice.  I have several

24   cases with them.  I have discovery in several cases.  And

25   most notably, the other day, the Department of Justice

1  told a federal judge in this Court that because federal

2  law did not define the phrase "last known address," that

3  they weren't able to answer my question.

4      And at the same time, the Department of Justice in

5  this case in response to my motions, just to give you an

6  example, they suggest that there are words that income

7  earned, filed return, lawful government function, and

8  others that we don't need to know what the grand jury

9  meant by those.

10     And I can tell you that this is a game of words.  We

11 all know that the tax code is a game of words.  Everyone

12 has a right to try to obtain the best benefit they can

13 for their own cause.  And I believe that the evidence so

14 far is clear enough to warrant turning over the

15 information unsealed and otherwise and I should be given

16 at least ten days to look at that information and put

17 together my Franks motion with my affidavit before any

18 other discovery is shared.  The only reason why I

19 suggested all of it be stopped is because I don't believe

20 the government knows what was seized at the house on

21 their disk versus what wasn't.

22     Mrs. Meadors, which is the lead-in to this deal,

23 she's the one that came into my life under false

24 pretenses.  And I understand IRS agents can lie.  I

25 understand that that is something that they're taught.

1   Except for when it comes to this scenario.  At this point
2   in time, when they come into this courtroom, lying has to
3   stop.  And that's not what happened in my case.
4           THE COURT:  Okay.  You're arguing your Franks
5   motion now.
6           MR. SPRINGER:  Well, I'm arguing for why I
7   should be able to stop Mr. Stilley from being able to get
8   the discovery on this motion pending my right to file for
9   that.  I'm --
10          THE COURT:  Well, let me interrupt with a
11  question.  I understand you're not waiving any rights.
12  Okay.  That's one thing.  And that in and of itself may
13  be sufficient, I don't want you to think otherwise.  But
14  my question is, aside from that, can you suggest to me
15  even in generalities how you're hurt by your co-defendant
16  getting all of the discovery that's now available,
17  including the material that was seized from your house?
18  I mean, is there something there that -- tell me just
19  generically.
20          MR. SPRINGER:  Generically.
21          THE COURT:  Is there something there that you're
22  afraid he's going to stick with you at trial that's going
23  to increase the likelihood that you'll be convicted?
24          MR. SPRINGER:  Okay.  Your Honor, part of my
25  mission, I've sat through 31 criminal trials from start

1  to finish.  I have sat through 27 federal from start to

2  finish.  After I read the Bible, I got a photographic

3  memory.  I've watched people like the Pattersons go to

4  trial for one reason when found guilty all of a sudden

5  change everything that they want to say and do and blame

6  everybody else for their responsibilities.  I have seen

7  that happen so many times that I -- when I -- if somebody

8  asks me to watch a case, I go into it with that in mind.

9      At any time, these two men right here can walk over

10 to this man right here and say we want to work a plea

11 deal out with you.  We want you to come in and testify

12 and we will drop our charges against you.  And they do it

13 --

14      (MR. SPRINGER'S CELL PHONE RINGS.)

15         MR. SPRINGER:  I am so sorry.  I am so sorry.  I

16 don't know how that got turned on, Your Honor.  If you'd

17 like me to step on it or throw it away, I will.

18         THE COURT:  Keep it.  I do expect it won't

19 happen again.

20         MR. SPRINGER:  It will never happen again.

21         THE COURT:  Keep it.

22         MR. SPRINGER:  I don't know how it came on.  It

23 was turned off when I walked in the door.

24         THE COURT:  I've heard more embarrassing ring

25 tones than that.

1          MR. SPRINGER:  That should say something about

2   me then.

3          THE COURT:  Okay.

4          MR. SPRINGER:  But my point is, is that these

5   gentlemen at any time they have 35(b) at their disposal,

6   they have the ability to work deals out.  In fact, in

7   this case alone, one of the issues getting ready to come

8   up in discovery is the multiple grand jury investigations

9   for the last how many ever years of Lindsey Springer

10  going all the way back to 1997 and all the witnesses that

11  came in and all their testimony and all their deals they

12  worked out with the government on the prospective some

13  day in the future they were finally going to get Lindsey

14  Springer.  And that is not beyond the reach of

15  Mr. Stilley.

16      Now, I have nothing to hide, Your Honor, but I am

17  trying to protect my rights.  And Mr. Stilley, at any

18  time, he's not represented by an attorney, so the

19  government can confront him at any time and ask him any

20  questions.  And there's no joint defense agreement that

21  he and I have that somehow protects he and I from

22  anything that he and I disclose to each other.  So there

23  is compelling reasons why I should at least --

24          THE COURT:  Well, is there something in that

25  material that you're afraid he can whack you with at

1    trial that the government might miss?

2         MR. SPRINGER:  Your Honor, frankly, I just -- I

3    don't know what all is on those computers.  I would like

4    to see it.  I would like to know what's there.  They said

5    today that they would let me bring a hard drive.  And I

6    think Mr. O'Reilly said this on the 30th that I -- or

7    Mr. Snoke said.  Excuse me, Mr. O'Reilly wasn't there.

8    That I could, you know, download off their computer.  So

9    I would at least like the benefit of looking at what is

10   on the computer to make certain of that.

11       I really can't answer that question.  I can just

12   tell you that there are many documents, private documents

13   that were written, you know, that should not become, you

14   know, something that the public -- which I look at

15   Mr. Stilley as the public in this scenario.

16       And I will tell you this, Your Honor, if you deny my

17   motion on that issue, it's just going to become the

18   subject of more motions once I get the discovery.  And it

19   seems to me like in fairness, judicial economy, that I

20   should at least have the right to look at what they

21   looked at to decide what I need to have protected before

22   Mr. Stilley has a right to look at it.

23       The government argues, and I understand what they

24   put in their motion, that because he's a defendant, now

25   they're his protector.  And I, of course, obviously,

1    don't agree with that whatsoever.

2        But I believe that when they came into my home,

3    under the Fourth Amendment, I had a right, a protected

4    right, and they came into my home on bad premises and

5    they searched for things not on a warrant, which hasn't

6    even come up yet.  And I believe that if anything is to

7    be protected by the Fourth Amendment, it is a man can

8    retreat to his home and have his privacy there.

9        Now, if I want to disclose documents to Mr. Stilley

10   or if I need to use the documents, and I understand

11   that's what I'm supposed to do, I'm supposed to determine

12   my defense, not the government.  Which is interesting

13   today that they've twice argued that they were the ones

14   to decide that in an indirect way.

15       So I believe that it's my personal right to have

16   that information.  That if they seized it illegally, it

17   should never be disclosed to anybody.  And that's what

18   Franks is all about is protecting the Fourth Amendment,

19   protecting a person's right in his home to be secure in

20   his house, his papers, and effects.

21       I know it doesn't say computer, Your Honor.  And I

22   don't -- I really can't tell you about on the computer

23   what Mr. O'Reilly is talking about.  You know, there's a

24   lot more than a computer that was taken from my home.

25   There's a list, an inventory list that's attached to

1  Mrs. Nelson's declaration, I believe.  And if it's not,
2  I'll make it available.  But there was five or six pages
3  of things that were taken.
4     And one of the issues, too, that you're not really
5  getting here yet, we're going to deal with a Bill of
6  Particulars later on today and you said and that will
7  also make the Court more aware of just exactly how the
8  theory of the government's case pertains to the evidence
9  that they -- my position is unlawfully or illegally
10 seized on September 16, 2005.
11     But I don't have an answer for you right now of how
12 Mr. Stilley can use evidence the government illegally
13 seized from my house against me.  It's like asking a
14 person to waive their Fifth Amendment or their Sixth
15 Amendment, but they can't maintain both.
16     And I'm asking the Court to just give me a little
17 bit of time to understand how I'm going to approach my
18 Franks hearing so that I can stop the use of the evidence
19 or have my chance to do that.  And then, you know, if the
20 Court denies it, then I really don't have anything else I
21 can do about it at that point.  I've preserved my rights
22 for the record on appeal.  And that's all I know to do.
23         THE COURT:  Thank you.  Mr. Stilley, you're
24 certainly entitled to be heard on this before I hear from
25 the government.

1          MR. STILLEY:  Thank you, Judge.  I would say

2    this:  If I was placed in the shoes of Mr. Springer, I

3    would make the same argument.  And I don't disrespect him

4    in the slightest for attempting to protect the privacy of

5    the documents and the other things, effects that he has.

6    And I know someone might look and presume or assume that

7    Oscar Stilley and Lindsey Springer are friends.  That may

8    be so, but there are many instances, especially when the

9    stakes are high, when friendship is cast out the window.

10   That has injured many a person and in a severe way.

11       I respect what Mr. Springer has said.  I respect his

12   arguments.  I understand that, obviously, if there is any

13   document that is to be used against Oscar Stilley, then

14   Oscar Stilley wants to see it.  But it's hard to see how

15   that it could cause a great injury if Mr. Springer's due

16   process rights are respected.  If we slow this down just

17   a little bit, let Mr. Springer examine this material,

18   make his arguments, make his case, see what this Court

19   says.

20       Because, obviously, if the Court suppresses and says

21   no, this is the fruit of the poisonous tree.  Obviously,

22   that's not going to come to haunt Oscar Stilley.  If it's

23   not going to come to haunt Oscar Stilley in this criminal

24   case, it's not Oscar Stilley's business to meddle or to

25   pry into the affairs or the life of Lindsey Springer.

1    Thank you.

2           THE COURT:  Now, let me ask you a question.

3    Separating the materials seized in the search from the

4    other discoverable material may be akin to unscrambling

5    an egg.  I don't know how the government has marked it or

6    sorted it.  But as a practical matter, if I were to

7    proceed as Mr. Springer suggests, it strikes me that

8    perhaps that might effectively result in you getting no

9    discovery until after a Franks hearing has been had.  Is

10   that your understanding?

11          MR. STILLEY:  I don't have a problem with that.

12   And I know some people might say something about a speedy

13   trial, but I think we all know what the rules are on

14   speedy trial.  Speedy trial is set up to require a trial

15   within a certain period of unexcluded days.  So if

16   there's -- and I think all concerned would agree that

17   it's necessary and proper.  I'm certainly saying it's

18   necessary and proper to give Lindsey Springer the right

19   to preserve his due process.  So I don't see how that

20   this delay would injure anybody, the government, me, or

21   Mr. Springer.

22          THE COURT:  Thank you.

23          MR. STILLEY:  Thank you, Judge.

24          THE COURT:  I'll hear from the government.

25          MR. SNOKE:  Your Honor, the government is a bit

1    on the horns of a dilemma in this matter, because as we

2    pointed out in our response, we feel we have a duty to

3    provide discovery to the co-defendant.  As I also pointed

4    out, Mr. Springer has not filed a motion to suppress,

5    which he could have done, I guess.  He could have filed a

6    motion -- a Franks motion.  And, of course, he has

7    explained that he needs more discovery before he can

8    substantiate the preliminary burden on a defendant on

9    filing a Franks motion.  Again, we -- we're just trying

10   to move things along and not cause inordinate delays.

11        Mr. Stilley, of course, even if the Court grants a

12   motion to suppress as to Mr. Springer on -- as a result

13   of a Franks hearing or a motion to suppress that's not

14   yet filed, either of them, Mr. Stilley still has a right,

15   although he seems to be willing to put that aside for a

16   moment in favor of his co-defendant, but he has a right

17   to that material.  And, of course, the government has a

18   right, if Mr. Stilley does not have standing to contest

19   the search of Mr. Springer's house, we have a right to

20   use that evidence against him at the trial.

21        So we're just going to --

22             THE COURT:  Against him?

23             MR. SNOKE:  Against Mr. Stilley.  Because

24   Mr. Stilley, as I pointed out in my response, Mr. Stilley

25   may not have standing to object -- even if that stuff was

1    illegally taken, he may not have standing to oppose the
2    use of that against him at a trial.  And maybe the trial
3    would have to be severed in those cases, I don't know.
4        But the issue is still there that Mr. Stilley can't
5    make this motion really.  Mr. Springer is making the
6    motion or says he's going to make the motion and wants to
7    delay turning over discovery.  And by the way, he hasn't
8    even picked it up himself, of course, in this time period
9    since April 10th when we offered it to him.
10        I don't feel strongly about having -- giving him
11    some time after looking at the affidavit or whatever to
12    file his Franks motion.  But then we're going to have a
13    hearing on the Franks motion presumably and all this is
14    going to take a bunch of time before, apparently, either
15    defendant is going to pick up discovery.  Or maybe
16    Mr. Stilley, at least, is not going to be able to pick up
17    discovery for all the time it takes for the Court to rule
18    on this Franks motion that is being proposed by Defendant
19    Springer.
20        We're just -- you know, we're not -- we've got it
21    available and we think it probably should be turned
22    over.  If all the defendants say we don't want it under
23    these circumstances, then I don't know what, you know,
24    what we say except, all right, that's fine with us.  I
25    mean, if --

1          THE COURT:  Well, are you willing to -- if I

2   were to order that it all be turned over now, in other

3   words, deny this motion, are you willing to bet your case

4   on the legal proposition that it's okay for Mr. Stilley

5   to have it now?

6          MR. SNOKE:  I don't -- I have no -- I have no

7   idea of anything in the discovery materials that there's

8   any point that Mr. Springer can bring that it should not

9   be turned over to Mr. Stilley.  I mean, he's saying that

10  -- he's saying it just on a general principle.  And at

11  first, I thought he was not coming and picking up the

12  discovery because he didn't want to sign what he thought

13  was a protective agreement to the protective order that

14  he opposed.  Actually, our receipt was just to say that

15  he picked it up.  And, of course, he didn't come anyway

16  to pick it up even to sign that simple receipt that said

17  he got the stuff on such-and-such a day.

18      There is -- since Mr. Stilley cannot -- on the cases

19  that I proposed to the Court, I don't think Mr. Stilley

20  has standing to object to that stuff, so I don't see that

21  there's anything in there that retroactively would inure

22  to the benefit of Mr. Springer if we turned over this

23  discovery that he could then say that we somehow breached

24  some right of his.

25          THE COURT:  Well, his theory would certainly be

1  that or would seem to be that if the search was

2  defective, then the government should never have obtained

3  possession of the materials that were seized and ergo the

4  government should not be permitted to use those materials

5  against me.  And since the only reason that Mr. Stilley

6  would have them is that the government illegally seized

7  them, then Mr. Stilley ought not to have the materials

8  either.  That's not too hard to understand.

9           MR. SNOKE:  But if that scenario took place,

10  Your Honor, we -- and the Court made that ruling, and

11  because of that ruling, let's say we decided to drop

12  Mr. Springer from the case, we could still go ahead and

13  use those materials against Mr. Stilley because

14  Mr. Stilley has no standing to make a similar motion to

15  prevent their use.  In which case, we would have to turn

16  those materials over to Mr. Stilley as discovery because

17  we're going to use them in evidence against him at the

18  trial.  Which we're planning to go ahead with now anyway

19  as to both of them.

20           THE COURT:  So you're saying regardless of how

21  successful Mr. Springer might be on his Franks motion, it

22  would be inevitable that Mr. Stilley would get the

23  materials?

24           MR. SNOKE:  Yes, Your Honor, that's in a few

25  words what I'm saying.

1                THE COURT:  Okay.

2                MR. SNOKE:  I also would point out that we're

3    not sharing this with the public as Mr. Springer was

4    talking about.  I mean, this is coming out, as the Court

5    said, under a very limited protective order.  All we're

6    giving them to is Mr. Stilley.  We're not giving them --

7    we're not making all this stuff public.  Whether we --

8                THE COURT:  That's understood.

9                MR. SNOKE:  -- win or lose the Franks motion.

10               THE COURT:  That's understood.  Okay.

11        Mr. Springer, I need to hear from you -- I had been

12   considering phasing the discovery and I'll emphasize I

13   had only been considering that.

14               MR. SPRINGER:  I understand.

15               THE COURT:  Because this case has to get to

16   trial sometime.  I had been considering phasing the

17   discovery pre-Franks and post-Franks, if you will.

18   Pre-Franks, you get the discovery, post-Franks if the

19   motion -- Franks motion is denied, then your co-defendant

20   gets the material.  But I am certainly influenced by the

21   contention that even if you were successful on your

22   Franks motion, that doesn't send Mr. Stilley home free of

23   federal prosecution.  And Mr. Stilley would then

24   inevitably get those materials.  So I need to hear from

25   you as to why that would not mean that we get all the

1    discovery out on the table for both defendants with no

2    further delay.

3              MR. SPRINGER:  First of all, Your Honor,

4    Mr. Snoke is incorrect that if this Court ruled that the

5    evidence that Donna Meadors obtained that led to the

6    Shern affidavit that led to the search of my home was

7    ruled to be taken in violation of my Fourth Amendment

8    rights, the government would be precluded from using that

9    information because they would not be able to take

10   illegal information and now benefit as some consolation

11   for their theft.  And this is not the only theft --

12             THE COURT:  You're saying the government

13   couldn't even use it against Mr. Stilley?

14             MR. SPRINGER:  Well, Your Honor, if you go into

15   the indictment and you take out all the things that stem

16   from the case against me, you don't have anything --

17   remotely anything in Oklahoma that can be connected to

18   Mr. Stilley except one thing, that he came over and

19   testified to a grand jury.  That's it.  And my motion is

20   not having anything to do with that.  There's -- there

21   would be nothing in my home that if taken illegally could

22   then turn around and be used to get Mr. Stilley for any

23   of the charges that the grand jury in this case has

24   alleged against him.

25             THE COURT:  Well, that's really the government's

 1   decision.  Here's my question:  Let's suppose you file a

 2   successful Franks motion and let's suppose that is fatal

 3   to the case against you.

 4           MR. SPRINGER:  Okay.

 5           THE COURT:  And the government says, fine, we've

 6   still got Mr. Stilley in our cross hairs and we're

 7   entitled to use all the evidence that we have obtained

 8   and Mr. Stilley has no standing to object to our use of

 9   any materials we want to use that were seized from

10   Mr. Springer's house, can you cite me any authority that

11   would suggest that Mr. Stilley would be -- or that the

12   government would be legally precluded from using those

13   materials against Mr. Stilley in a case against

14   Mr. Stilley only?

15           MR. SPRINGER:  First of all, Your Honor, those

16   articles are my property.  They were taken illegally from

17   my home.  And I would not authorize the government to

18   keep, retain, to use in any way whatsoever any of the

19   information that they obtained illegally.  I would also

20   bring an action against them for sharing that information

21   against my constitutional rights, which is something that

22   I would strongly urge you, I would prevail on, if they

23   did after you ruled that way.

24       Now, it's interesting, when you say "authority," I

25   do stand on the Fourth Amendment.  I do stand on my right

1  to have the Court rule that the property was taken from

2  me in violation of the Fourth Amendment and that it

3  should be given as it's supposed to back to me.

4       I've also filed a Rule 41 motion, second one,

5  pending with Judge Frizzell over the search, the

6  propriety of the search of the home on other issues.  And

7  if I could have 24 hours to file a response to the Court

8  citing specifically the cases that would prohibit the

9  government from using that information against

10 Mr. Stilley, then I would graciously ask the Court 24

11 hours to do that.

12      I have read the cases, I know they're there.  You

13 know, the government filed their response a day early,

14 which I noted that they did put in their document that

15 they thought they could still prosecute Mr. Stilley with

16 illegally obtained information, knowing illegally

17 obtained information.  But I also know that there are

18 many cases out there that say once that poison is

19 identified that the government can't use that information

20 against anybody else.  And I'm sure it's multiple times

21 from the Supreme Court on the subject.

22      Because taking something illegal is not something

23 that's just for the first time is happening in Lindsey

24 Springer's life.  Many -- much more capable men and women

25 than I have fought to suppress, to prohibit the use of --

1  it's really interesting that they argue and that -- I'm

2  not -- this is not the first time they've argued

3  something for the first time that no one has ever raised

4  before against Lindsey Springer.  But they didn't cite

5  any authority in their response that said that they could

6  use that against a co-defendant.  And I believe --

7        THE COURT:  Well, you need to look at page 12 of

8  their response.

9        MR. SPRINGER:  Usually, I would get seven days

10  to reply if I was granted the right to reply.  I think in

11  Oklahoma City, the rules are that I have to ask for leave

12  to reply.  But in the Northern District, I believe we

13  have -- the rules say we have a right to reply.  And I

14  would still be within the rules of the time period to

15  reply on that, even if the Court did not want to give me

16  a 24-hour period to do that.

17     Now, what page did you say, Your Honor?

18        THE COURT:  Page 12.

19        MR. SPRINGER:  Yeah.  I come from a perspective

20  of trust but verify.  And I read these cases.  Every one

21  of them is either taken out of context or is not

22  specifically squarely on point, has never been raised

23  before.  And I'll be more than happy, if the Court would

24  give me 24 hours, to show exactly why these are not.

25     I came prepared today to argue my motion but did not

1  expect that I was going to have to argue why Mr. Stilley
2  could still be prosecuted.  I would -- if I was
3  Mr. Stilley, what I would be arguing is you couldn't
4  prosecute me, you couldn't use illegally obtained
5  evidence without the permission of the person you stole
6  it from.  But having not -- you know, 24 hours I can fix
7  that for you.
8          THE COURT:  Thank you.  I'm going to take the
9  motion at Docket Entry Number 35 under advisement.  The
10 government's production of discovery materials is stayed.
11         MR. O'REILLY:  Your Honor, what we think we can
12 do is get partial discovery of those materials that were
13 not obtained from the house, I believe those CDs are
14 separate, and at least get some discovery underway.  And
15 to the extent we're going to do that, I would ask that
16 the Court authorize that.
17         THE COURT:  Very well.  It's stayed with respect
18 to materials seized in the search of Mr. Springer's
19 house.  It is not stayed with respect to material that
20 can be ascertained as not having been seized from
21 Mr. Springer's house.
22    Mr. Springer is granted until April 27, 2009, within
23 which to file a reply brief in support of his motion at
24 Docket Entry Number 35.  And the Court will promptly rule
25 as to whether there should be any further delay in the

1   production to Mr. Stilley of materials seized from

2   Mr. Springer's residence.  So on that basis and for those

3   reasons, the motion at Docket Entry Number 35 is taken

4   under advisement.

5       We'll take a midday break at this time.  We'll

6   resume at ten minutes after one.  So that counsel will

7   know what's next, the next motion that we'll take up will

8   be the motion for in-camera review of Fifth Amendment

9   proffer, then we'll get into the motions for a Bill of

10  Particulars.  So court will be in recess until ten

11  minutes after one.

12      (RECESS HAD)

13          THE COURT:  Good afternoon.  We're resuming our

14  motion hearing in Criminal 09-43.  All parties are

15  present as before.  I mentioned before lunch that we'll

16  take up the motion for in-camera review of Fifth

17  Amendment proffer.  I do need to hear argument on that

18  because I'm not sure that I thoroughly understand the

19  motion.  So, Mr. Springer, you're invited to present the

20  motion.

21          MR. SPRINGER:  The motion is the motion for

22  in-camera review; is that correct?

23          THE COURT:  Docket Entry Number 6, that's right.

24          MR. SPRINGER:  Number 6.  Okay.  Back in 1927,

25  the Supreme Court, which the government cites in their

1   brief, said that it would be an extreme if not

2   extravagant exercise of the Fifth Amendment for one to

3   assert that putting anything on the government form

4   requesting information would draw them into danger of the

5   law.  And since 1927, there have been a series of cases

6   of which I put in my memorandum which demonstrate that

7   there -- that is a general rule, but it is supposed to be

8   subject to limitation in that there may arise

9   circumstances where a person would need not to say

10  anything on a request for information form that in a

11  generic sense is targeted at the public at large.

12       And in this particular case, I understand the

13  difference between being on the record in front of the

14  government and being away from the government and

15  expressing the claims that I had.  And the reason why I

16  asked for that is so that I could have that passed upon

17  without giving the government any advantage based upon

18  what I would say.

19       Since -- and it's no secret.  Since 1997, I have had

20  a criminal code entered on my master file with the IRS

21  which halts anything.  I know that there were two -- at

22  least two grand juries in '97, '98, and '99 that I'm

23  aware of.  I was never told that prior to 2005 that a

24  criminal investigation had ended.  In fact, because of my

25  mission and what I am doing in that mission, I believe

1    that the record would show that anything I would say to

2    the government on a form, no matter what it is, just my

3    name only, could be used against me.

4         When I met with them in 2009, I met with them in

5    2005 at my home, they told me I had a Fifth Amendment

6    right not to answer anything.  And there they were in my

7    home trying to gather information.  Maybe different

8    information than what was being sought on a 1040 form,

9    but, nonetheless, they were there gathering information.

10        The information they were trying to gather was not

11   something that technically would have been on a Form

12   1040, but it would have led to the place that they were

13   at my house that day, which is -- and the issue becomes,

14   which I put in my brief, and the Supreme Court said in

15   comparison to gamblers that if anything you would say

16   could bring you into danger of the law, then you have a

17   right to remain silent.

18        And I brought with me a case called United States v.

19   U.S. Coin and Currency, Supreme Court, 401 U.S. 715, 1971

20   decision.  And although it was in respect to gambling,

21   per se, in what I'm about to read, every time you see the

22   quotes in my memorandum of why I should be able to

23   outside the presence of the government assert the Fifth

24   Amendment and explain to this Court why I can't be here

25   today that I read to you on part two of that decision

1    just a sentence.  "These cases held that gamblers in

2    Angelina's position had the Fifth Amendment right to

3    remain silent in the face of the statute's command that

4    they submit reports which could incriminate them.  In the

5    absence of a waiver of that right, such person could not

6    properly be prosecuted at all."

7        And then to go further, and just reiterating the

8    issues in this case as Your Honor starts to grab ahold of

9    it, the underlying theme is whether or not money that

10   people gave me was a gift or whether or not it was for

11   services rendered that should have been reported on a tax

12   form request for information where that form is asking

13   how much income did you earn.

14       And although there's a technical question about

15   whether gifts are income or not, I believe they are

16   income that's not reported, it's excluded from income,

17   from gross income, there seems to be some question as to

18   whether or not in some people's minds whether a gift is

19   income.  Although, again, I don't take exception to that.

20       But the Supreme Court in 1960 said these words and

21   these are very clear.  "Specifically, the trier of fact

22   must be careful not to allow trial of the issues whether

23   the receipt of a specific payment is a gift to turn into

24   a trial of the tax liability or of the propriety as a

25   matter of fiduciary or corporate law attaching to the

1  conduct of someone else."

2      One of the elements in tax evasion and one of the

3  elements in the theory of conspiracy is going to be that

4  the government has to establish we had a motive, that

5  there's a motive for whatever it is that they want to say

6  their theory is.  I cannot address that motive unless I

7  am able to do it outside of the government.  And it's my

8  Fifth Amendment that I am asking the Court along with

9  these cases to recognize.

10      Although the government says, 1927, see Sullivan,

11 back when horse and buggies were the way that people

12 traveled basically for the most part, at least half of

13 them, and just to ignore the 15-plus pages of cases that

14 suggest that I should be allowed to make a Fifth

15 Amendment argument to this Court presenting my position

16 outside of the government's case.

17      And I realize where I'm at right now is as far as

18 I'm going to get to go without doing that, but that I

19 have a right for the Court to pass on that, to pass on

20 whether or not that my remaining silent or my claim of

21 silence or in the act of -- as the government alleges in

22 the indictment, my failure to file a tax return, whether

23 or not it was permissible or not.

24      And so I believe, Your Honor, that the government

25 has given you absolutely nothing to deny my motion on by

1   citing to Sullivan and Garner.  And I would just tell you

2   that in the Garner decision that the government cited to

3   that cited to Sullivan, they said that the preparation

4   and filing of an income tax return is the testimony of a

5   witness.  And that Garner -- that he waived his right

6   under the Fifth Amendment when he reported his illegal

7   gambling and paid tax on that illegal gambling to the

8   United States and that the government was then allowed to

9   use his tax returns as a witness against him in an

10  illegal gambling conviction that the Supreme Court

11  sustained.

12      My case is not about gambling, it's about whether a

13  gift is or is not income and whether or not that income

14  was reportable or not on a Form 1040 or whatever other

15  form the government would say was a proper request for

16  information.  And so that's where I'm standing in my

17  memorandum, Your Honor.

18          THE COURT:  Well, Mr. Springer, one thing I

19  don't quite understand is what beneficial result do you

20  think would or might flow from your having an in-camera

21  session with me so that you could tell me things relevant

22  to your Fifth Amendment protection outside of the hearing

23  of the government?

24          MR. SPRINGER:  That's a good question.  First of

25  all, Your Honor, one of the charges in this case is a tax

1   evasion charge from 2005.  There's no question that my

2   home was raided on September 16, 2005.  And there's no

3   question that the charges in this case stem from, in

4   part, as we took up earlier, Franks issues and so forth,

5   that it stems from that time period.  And yet I'm told I

6   have a right to remain silent and yet at the same time

7   I'm indicted for not saying anything to the IRS by a

8   certain time in 2006 for the year 2005.

9       And it's no doubt that the government is in an

10  ongoing investigation.  There's no doubt that Mr. Shern

11  and the other investigators involved in the case are in a

12  continuing investigation.  This case is by far no means

13  over.  And by allowing you to understand and to rule on

14  the evidence that I have outside the presence of the

15  government, I'm still able to maintain my Fifth Amendment

16  rights not to have any more of the issues that I have to

17  show to be used against me or something that I would have

18  to disclose to them.

19      Now, the Fifth Amendment is, in my view, is a right

20  worth dying over.  It's a -- it's a right that men and

21  women have given their lives for.  I'm sure you know

22  that.  And I am just trying to pay honor in that respect

23  for my own rights to protect my Fifth Amendment right.

24  If the government wants to gather information, they can

25  gather it according to the laws and principles that we've

1 passed.

2          THE COURT:  Well, would it be your expectation

3 or at least your hope that in this in-camera session you

4 would give me information that would satisfy me that some

5 essential element of the government's case could not be

6 proven?

7          MR. SPRINGER:  Yes.  Yes.  With more.  The case

8 I just read to you said they can't even try me, they

9 can't even bring me to trial, and they know it, but

10 they're waiting on you or somebody in your shoes to tell

11 them they can't do what they're doing.  And until they're

12 told that, they're going to continue.  This is not going

13 to stop unless somebody says, Mr. Springer, as long as

14 he's under criminal investigation, has a Fifth Amendment

15 right and you find that I have a Fifth Amendment right

16 not to be giving any information to the government as the

17 Supreme Court, in my memorandum, said that at the first

18 instance this Court is supposed to pass on that question.

19     Just to give you an example, from the time of

20 indictment, until now, we're now in the middle of April.

21 And I did exactly what the Supreme Court told me to do, I

22 filed that, I asked to be able to go in camera to have

23 you pass on that question in the first instance, because

24 I'm not the sole arbiter of my Fifth Amendment rights,

25 this Court is, in this particular instance.  And that's

1  why I filed my motion.  And that's why I asked the Court

2  to do it.

3            THE COURT:  And you think the result of that

4  would be dismissal of the case?

5            MR. SPRINGER:  Or it possibly could result in

6  that.  It certainly would stop any future bleeding that

7  is pending, which is the whole -- originally the whole

8  point of it was.  It's my -- now, you get into a theory

9  that I have, and I'll give it, because it's not unknown.

10 Once it is established that I have a Fifth Amendment

11 right not to give any information on a document that the

12 government intends to use against me purposefully,

13 they're like waiting in the hole for that day to come

14 around where they can get that information, even though

15 they say generically it's just public only.

16     But once the Fifth Amendment is established to give

17 me a right to remain silent in regard to certain

18 questions because of what they're doing, which is

19 criminal investigation, then it is my opinion that that

20 would start to go backwards and protect me as it was

21 intended to protect me from the very beginning.

22            THE COURT:  Thank you.

23            MR. SPRINGER:  Thank you.

24            THE COURT:  Does the government have any

25 response other than that set forth on pages 3 and 4 of

1   your written response?

2          MR. O'REILLY:  Your Honor, unless you have

3   questions, I can direct you to some other cases.  No,

4   Your Honor, the government will rest on its --

5          THE COURT:  Very well.  To the extent that

6   Mr. Springer would anticipate that the results of his

7   in-camera session with the trial judge would result in a

8   finding that the government could not prove an essential

9   element of its case, the motion is precluded by Rule

10  12(b)(2).

11       To the extent that the motion would be based on any

12  other assumption or supposition or theory, the motion has

13  not been shown to be, in any sense, meritorious.  And the

14  motion is accordingly denied.  That's the motion for

15  in-camera review at Docket Entry Number 6.

16       Mr. Springer, I'll hear you in support of your

17  motion for Bill of Particulars.  But before you get up,

18  let me tell you where my starting point is.  As you might

19  expect, and as I think everyone has a right to expect, I

20  have reviewed all these motions.  I have reviewed,

21  especially the motion for Bill of Particulars that hand

22  in hand with that, of course, was a careful review of the

23  indictment.

24       And there are some matters that need not be

25  addressed at the outset.  And that is there are some of

1  the list of items as to which Mr. Springer seeks a Bill

2  of Particulars are not, in any event, fair game for a

3  Bill of Particulars.  And I'll tell you what items in the

4  Bill of Particulars don't even get out of the blocks.

5  Basically, I'm referring now to the list beginning on

6  page 5 of Mr. Springer's motion.

7      The paragraphs I'm about to recite are simply not

8  appropriate subjects for a Bill of Particulars in this

9  case.  That would specifically be paragraphs 1 through 9,

10 12 through 15, 18 through 30, 43, 46 through 52, 59

11 through 64, 71 through 73, and 80 through 89.  There's no

12 need to present any argument as to the need for a Bill of

13 Particulars as to those paragraphs.

14     Now, as to the other paragraphs, my beginning point,

15 and I think this is an entirely appropriate beginning

16 point under the cases that deal with the standard that

17 the Court ought to apply in determining whether to order

18 a Bill of Particulars.  My beginning point is that

19 neither the parties and even more so the Court can

20 confidently evaluate whether a Bill of Particulars is

21 required until the defendants have had the benefit of

22 discovery.  They have not had that benefit.

23     And so the paragraphs in Mr. Springer's list, other

24 than the ones that I just named, could conceivably, in

25 some instances perhaps on a fairly liberal approach,

1    could conceivably be fair game for a Bill of Particulars,

2    but I really don't think -- and I'm going to hear counsel

3    on this or hear from the defendants and then, if need be,

4    from the government.  I really don't think that the case

5    is at a stage at which the Court can confidently

6    determine the need for a Bill of Particulars until the

7    discovery materials have been produced.

8        I'm also influenced by the fact, and I do my dead-

9    level best, especially when a Bill of Particulars is

10   sought, I do my dead-level best to read an indictment

11   with a fairly jaundiced eye, to read it as I think I

12   should for that purpose at least from the defendants'

13   perspective.

14       Having read the indictment with a fairly jaundiced

15   eye and having read it as best I can from the defendants'

16   perspective, I have to say that this indictment is

17   certainly more informative than a good many indictments

18   I've seen.  In some ways, it is impressively

19   informative.  But even that doesn't necessarily carry the

20   day ultimately.

21       So my concern at this point is whether the case is

22   even at a stage, given the fact that discovery -- that

23   production of documents has not yet occurred -- whether

24   the case is even at a stage at which there is any basis

25   upon which the Court might order a Bill of Particulars.

1   Bearing in mind that if I decide not to order a Bill of

2   Particulars at this point, there may be an opportunity

3   down the line to raise the issue once again.

4        I'll be happy to hear first from Mr. Springer and

5   then from Mr. Stilley as to whether there is any basis

6   for the Court to direct that the government provide a

7   Bill of Particulars at this point.

8            MR. SPRINGER:  Your Honor, I filed this Bill of

9   Particulars before arraignment because I have had the

10  United States Department of Justice lawyers use rules

11  against me for years.  And so I took it upon myself to

12  become as familiar with -- as I could with the criminal

13  rules.  And I wanted to preserve my right in the Northern

14  District, if there's no normal order from the Court

15  setting trial, schedule, so forth, that -- ten days is

16  the rule for challenging grand jury, motions to dismiss,

17  venue, many things.

18       After I filed this document and an hour before

19  arraignment, Judge Payne recused himself and we didn't

20  have a judge.  And we went that way till you were

21  appointed to the case.  And even at the time that we were

22  in front of Magistrate Cleary, it was unclear as to what,

23  if anything, the time period had been affected based upon

24  the fact that we didn't have a judge and we had all these

25  rules that kick into gear the moment an arraignment is

1   held.  And so I made this as a anything I want to
2   preserve say to get it on the record.
3       Based upon what I've seen here and heard here today
4   and after you just stated what you stated, outside of
5   just a couple of issues that I don't believe discovery is
6   going to fix, I'm mindful to agree with the Court and
7   withdraw the motion without prejudice to bringing it back
8   up again once the other issues are resolved.
9       But one of the ones that I'm -- I would tell that
10  you discovery is not going to fix has to do with venue.
11  Venue in this district.  And as the Court knows in
12  perusing through the indictment that a large premise of
13  the government's theory is a failure to file a tax
14  return, whether it be in the conspiracy's theory, the tax
15  evasion's theory, or the willful failure to file theory.
16      And the Tenth Circuit has stated that Section 6091
17  governs venue.  And what should scratch the head of
18  everybody is Count 6, which the government alleges this
19  willful failure to file a tax return occurred in three
20  places at the same time.  One is in Austin, Texas; one is
21  in Tulsa, Oklahoma; and the other is in wherever the IRS
22  Commissioner is.
23      And the Tenth Circuit -- and I have a motion ready
24  to file on this, but I withheld it based upon the Court's
25  orders of having this hearing today -- that under Section

1   6091, the question that the Tenth Circuit established was

2   is that the requirement to file a tax return is

3   6091(b)(1)(A), and it says, "Tax returns, General rule,

4   except as provided in subparagraph (B), a return shall be

5   made to the Secretary, (i), in the internal revenue

6   district in which is located the legal residence or

7   principal place of business of the person making the

8   return, or, (ii), at a service center serving the

9   internal revenue district referred to in clause (i) as

10  the Secretary may by regulations designate."  Just above

11  that it says, "When not otherwise provided for by this

12  title, the Secretary shall by regulations prescribe" --

13      Well, it clearly is provided by this title, Tenth

14  Circuit precedent says it's provided by this title.  And

15  I went and I asked Mr. O'Reilly on the 18th, Mr. Snoke

16  was there as well, I believe even Mr. Stilley was there.

17  And I asked them where did they come up to the conclusion

18  that I committed a crime of failure to file tax return in

19  Austin, Texas; Tulsa, Oklahoma; and in, I guess,

20  Washington, DC; where the Commissioner is.

21      And Mr. O'Reilly pointed me to an instruction book

22  on the back page which said Austin, Texas, on it.  Now,

23  if that's the place that a return is required to be filed

24  at issue in this case, then venue would not be in this

25  district.

1      And to add -- or to add insult to the injury that I

2  just expressed, in 1998, Congress overhauled the IRS.

3  They brought the Restructuring and Reform Act of 1998

4  in.  And in that act they ordered all district directors

5  in all internal revenue districts to be done away with.

6  And that was completed -- I just spent two weeks taking

7  depositions in Ohio of treasury agents, Austin and

8  Houston.  They all used to work for district directors,

9  they don't work anymore for district directors.  There

10  are no internal revenue districts and there are no

11  district directors.

12      THE COURT:  You're telling me there's no such

13  thing as an internal revenue district.

14      MR. SPRINGER:  As of October of 2000.  And that

15  was everyone's unanimous testimony with James Strong from

16  the United States Department of Justice there listening

17  to all the colloquies.  And they're all transcribed, and

18  as soon as I have those depositions, I will make them a

19  part of the record at what I'm presenting here.  And that

20  is absolutely, undeniably, no one can question it, a

21  hundred percent fact.  None whatsoever.

22      There are many temporary regulations and regulations

23  that have been passed in the last two years by treasury

24  where they admit that -- like, for instance -- and I

25  attached one of these documents to a document that I

1    filed.  It says everywhere the words "district director"

2    appears, replace that with appropriate official in the

3    regulation.

4         But we all know that they can't change this

5    statute.  We all know that the only way the regulation

6    applies is if this statute doesn't specifically fix the

7    place.  And so although it may seem technical, when

8    you're faced with loss of liberty, you'll use every

9    technicality that you can to protect your rights,

10   especially in this system that we have today.

11        And when it says that I'm supposed to -- and hear me

12   clear on this.  The Tenth Circuit says the scene of the

13   crime of failure to file is the place the return was

14   required to be received.  That's the scene of the crime.

15        Prior to October 2000, there were only two ways in

16   the treasury regulations that you could satisfy 6091.

17   And, by the way, the regulation for 6091 mirrors the

18   statute.

19        If you were mailing your return of information, you

20   mailed it to the service center, which in 2000 would have

21   been, I believe, Kansas City.  It would not be Austin,

22   Texas.  But for sake of argument, it's not in Oklahoma in

23   anyone's imagination.

24        The only way that you otherwise have the ability to

25   provide that information to the IRS, besides mailing it,

1    is to hand-deliver it.  And the Tenth Circuit said a hand

2    delivery occurs at the district director's office.

3        And prior to 2000, October, that was in Oklahoma

4    City.  And the internal revenue district was

5    Oklahoma/Arkansas.  And, again, that has been completely

6    done away with.

7        So I approached Mr. O'Reilly and Mr. Snoke, in good

8    faith, and just asked them, where did the grand jury

9    determine the place that I was required to provide all

10   this information that I in my tax-evasion-purported

11   theory refused to provide it?  And the only answer I got

12   then was the back of the instruction booklet.  Which,

13   again, although it's not law, it's not regulation, and

14   they won't even stand behind the booklet, as we'll see as

15   we go forward, it still says Austin, Texas.  And Austin,

16   Texas, is nowhere -- as far as I understand, it's in

17   Tulsa, Oklahoma.  Nor is it in Oklahoma City or Kansas

18   City or Washington, DC.

19       And so I'm asking the Court besides -- and I do

20   agree, and I hear you loud and clear on whether it's

21   denying without prejudice or withholding -- I would even

22   probably rewrite the Bill of Particulars, at this point,

23   with what I know.  But outside of that, the only thing I

24   do believe that the government needs to produce is venue,

25   the evidence of venue and -- at least their theory of

1   venue.

2       They said in their motion -- their response that a

3   Bill of Particulars -- and they cited to a 2009 district

4   court case in Kansas that just came out.  It's March 17,

5   2009.  And they said the appropriate term for a Bill of

6   Particulars is to understand the theory of the

7   government's case.

8       Now, the Bill of Particulars here, I was obviously

9   breaking down words to understand their theory.  So the

10  Court understands, there is in most criminal tax cases

11  the government alleges how much income the person had

12  that should have been reported.  You don't see that in

13  this indictment.  You don't see -- usually, it'll say --

14  in the cases that I viewed and watched, 1099s or W-2s are

15  used to establish the tax deficiency part of the element

16  of tax deficiency in a tax evasion case.  None of that is

17  existing in the tax evasion charges in this case.

18      I asked the government on the 18th of March, would

19  they concede that all the income that's not alleged to

20  have been received in the indictment was gift and not

21  reported as taxable.  Mr. Snoke and Mr. O'Reilly both

22  didn't really know how to answer that.

23      And that told me that with the multiple grand

24  juries, the multiple people who supported me who were

25  brought into the grand juries and who testified that they

1   gave me gifts, and to put that up against a summary

2   agent's testimony or Mrs. Patterson's testimony seems

3   that the government's theory needs to be more clarified

4   so that I can prepare a defense as to which ones are

5   income, which ones are not.

6        But I can set that aside for the moment, although

7   they're asking me to go through discovery to determine

8   that, and I don't think that's fair, because there are so

9   many people from out of state.  They know right now --

10  the United States Department of Justice knows right now

11  and has a list of every name of every person that they

12  think gave me money that they have in some way decided

13  was not a gift.

14       And it would take no moment for them to turn that

15  information over, regardless of anything else, which

16  would allow me to, again, present a defense on those

17  issues.  But the other words like "filing" and so forth

18  that I asked the Court about and the place where the

19  crime was committed, those types of things I think are

20  separate from, you know, the Court waiting till after

21  discovery.

22            THE COURT:  So I want to make sure that I

23  understand the substance of your argument.  Do I hear you

24  telling me that by statute now there is no IRS district

25  that encompasses Tulsa, Oklahoma?

1          MR. SPRINGER:  Yes, sir.

2          THE COURT:  And, therefore, you could not have

3   committed willful failure to file in the Northern

4   District of Oklahoma.

5          MR. SPRINGER:  Or anywhere else.

6          THE COURT:  Well, you read me a statute that

7   said that also I think allowed in the alternative filing

8   at a service center.

9          MR. SPRINGER:  Right.  But those have been done

10  away with as well.  They no longer exist.  And that

11  service center has to be over the internal revenue

12  district, so said the Tenth Circuit, and it doesn't

13  exist.  They have established what I just learned in the

14  last three weeks is called "areas."  And so, for

15  instance, in Oklahoma City, if you dealt with the IRS

16  prior to 2000, civilly, you would get a letter from

17  district counsel.  Now, you get a letter from area

18  counsel, not district counsel anymore, because they don't

19  have districts anymore.

20      It's true, Your Honor, that whether or not they want

21  information provided to them is different than whether or

22  not a crime has been committed, a willful failure to file

23  crime.  I know for a hundred percent fact that even going

24  back into the '90s and the '80s that Tulsa, Oklahoma, was

25  never a place that a person living in Kellyville was

1  required to either mail or hand-deliver a 1040 Form to.

2  Not one single place in Tulsa, Oklahoma.  And to the

3  extent it would have been Oklahoma City, that's in the

4  Western District.

5         THE COURT:  Well, wouldn't you have been on a

6  permissive basis permitted to file by turning your return

7  in to an IRS employee in Tulsa?

8         MR. SPRINGER:  All of those words -- yes, all of

9  those words were based upon a proper official of the

10  United States, which would be in the internal revenue

11  districts, yes.  But what we're not talking about is on a

12  civil side.  We are totally talking about the scene of

13  the crime, the place in which I was required to do

14  something that because I willfully didn't do, I have

15  offended the United States' laws.  That's what the theory

16  is that they've brought.  And they have to stand and

17  account for that.

18      Whether or not they have civil remedy, whether or

19  not they want to go ahead and say all these people that

20  gave me money is taxable as the Duberstein case says

21  they're supposed to do first, setting all that aside,

22  where is the locus delecti?  Where is the place where

23  this crime -- the crimes that they've alleged were

24  committed?

25      Now, they did bring up in discussion what's called a

1  "continuing offense theory," and I'm more than happy to

2  brief the Court on how an offense cannot be continuing if

3  it never began.  But setting that aside, every one of the

4  charges in this case has to do with the failure or

5  willful failure to provide information to the IRS on a

6  "U.S. individual income tax return."  So that's the

7  crime.

8      If you go to 6012, it talks about a person required

9  to make a return exceeding a certain number.  If you go

10  to 6011, it's about the regulations.  If you go to 7203,

11  it's whoever willfully fails to make.  But in an omission

12  position, "where is the crime committed" became the

13  question.  And the Tenth Circuit and the Supreme Court

14  have answered that question loud and clear, omissions

15  occur at the place where the act was required to take

16  place by law, required by law.  And that's what the

17  indictment says.  Although, I know the government -- and

18  I'm willing to withdraw the required-by-law at the moment

19  for a -- without prejudice to bringing it up again once

20  we see the discovery.

21      But when they say "required by law," they need to

22  mean what they say.  The grand jury said it.  They sold

23  -- they filled out a document.  They had a guy come in

24  and probably testify about it.  I haven't seen it in this

25  case yet because I haven't got that far, but I've seen it

1    in many others.  They actually read the indictment to

2    them, have the person come in and testify so the grand

3    jury hears that they just heard what they've just read,

4    and then the indictment comes out.  And the grand jury

5    says "required by law."  And, yet, I believe you're going

6    to find that the government didn't have any law to show

7    them about where this crime took place.

8         And venue, of course, Your Honor, is essential.

9    Article 3, Section 2, Clause 3, says trial of all crimes

10   shall be held in the state where the crime was committed,

11   but when not committed within any state, the trial shall

12   be at its place or places as Congress by law shall

13   direct.  And Magistrate Cleary said in a civil case that

14   28 USC Section 116 Congress divided the state of Oklahoma

15   up into three judicial districts:  Northern, Eastern, and

16   Western.

17        And so if the crime did not occur in this district,

18   then there's no jurisdiction.  There's no venue.  And if

19   they can go down to Austin, Texas, and have a grand jury

20   in Austin, Texas, indict me for not filing a tax return

21   in Austin, Texas, then I would have the right to

22   challenge whether that law is constitutional.

23        How can Congress say I'm sitting in Tulsa, Oklahoma,

24   doing nothing and I committed a crime in Texas?  That

25   makes no logical sense to anybody who actually hears

1    those words.  But, yet, I understand the tax system and

2    so that's why I would like to have them at least produce

3    some answer as to how the grand jury determined where

4    these crimes were committed based upon the filing of the

5    tax return, not based upon overt acts, affirmative acts,

6    or legal residence.

7            THE COURT:  Can you give me a citation to the

8    statute that abolishes the districts?

9            MR. SPRINGER:  It's -- I believe it's 1001 of

10   the Reform and Restructuring Act, but if you'll give me

11   24 hours, I'll give it to you black and white.  I have

12   the motion ready, but once you got appointed, I just

13   said, okay, now that we have a judge, and the way you

14   said you were setting this all for hearing, then I

15   believed that you would come in and set a trial schedule

16   as your order said and that you would tell us when the

17   motions to dismiss were due and so forth.

18           THE COURT:  So you've got a motion to dismiss

19   cocked and primed?

20           MR. SPRINGER:  Cocked and primed, loaded.

21           THE COURT:  Okay.  We'll cover that on your

22   motion to dismiss then.

23           MR. SPRINGER:  But I can give you the

24   information on when that was done away with without any

25   problem whatsoever.

```
 1             THE COURT:  We'll cover that in your motion to
 2   dismiss.
 3             MR. SPRINGER:  Thank you.
 4             THE COURT:  Mr. Stilley, I'll hear you in
 5   support of your motion for Bill of Particulars.
 6             MR. STILLEY:  Your Honor, are you talking about
 7   my specific Bill of Particulars then?  Is that correct?
 8             THE COURT:  That's true.
 9             MR. STILLEY:  Very good.  Thank you, Judge.  It
10   has already been said and we know what the purpose of a
11   Bill of Particulars is.  It is to pin the government down
12   on their theory.  Now, let's think about the
13   constitutional protections that were given.  One of those
14   constitutional protections is that before another citizen
15   can take $20 and 1 penny away from you in a court of law,
16   you're entitled to a jury.  You're entitled to a jury to
17   make the findings of the facts necessary to do that.  And
18   they decide not only liability, but also how much is
19   due.  It's a protection that we have.
20       Yet, it would appear that the government's theory is
21   that not only do they not have to have the jury find how
22   much tax loss was occasioned, they don't even have to say
23   how much tax loss it was.
24       If the government says what they think the tax loss
25   is, how much money was taken away from them?  They're
```

1  telling us what their theory is, and by any reasonable

2  construction, they're telling us what the potential

3  sentence is.  And I understand that people say, well, we

4  have voluntary sentencing guidelines.  I have my

5  disagreements with that.  And this Court is obviously

6  well aware of the litigation involved in those

7  guidelines.  But whether the guidelines are voluntary or

8  mandatory or otherwise, let's focus on what we have here

9  today.

10      We have the government saying you cheated us out of

11  some money.  They don't even want to say how much it is,

12  because they know.  They know.  As soon as they make that

13  representation, they've helped the defense.  They've

14  helped the defense to understand what their theory is.

15  Duberstein says you just can't do this.  You have to take

16  this a step at a time.

17      Not only are they trying to jump all over all the

18  Duberstein steps, they're trying to leave everything to

19  the end so that there's no way -- no reasonable way to

20  even intelligently ask this Court, hey, if it's

21  voluntary, let's let the jury find it.  Surely we trust

22  these jurors.  We need to see this information.

23          THE COURT:  If what's voluntary?

24          MR. STILLEY:  The sentencing guidelines.  If

25  we're going to follow the -- if the sentencing guidelines

 1   are going to be voluntary anyway, it would seem that the

 2   government would be willing to stake a position, take a

 3   theory, say this is what we believe, and then prove it to

 4   the jury, make them believe that there is this tax loss,

 5   and then say, Judge, look, 12 good men of the ville (sic)

 6   said this is a tax loss, rely on it.

 7        And when you look at the rest of the Constitution,

 8   it just makes sense.  It doesn't make sense to protect

 9   $20 and a penny owned by the citizen and not protect

10   their liberty or at least not protect the difference

11   between loss of liberty, say, six months or five years or

12   ten years or whatever that might be.

13             THE COURT:  Okay.  Well, do I understand then

14   that what you're essentially doing is making an argument

15   to preserve your record against my following the remedy

16   opinion in Booker?  Isn't that basically what you're

17   doing?

18             MR. STILLEY:  Well, the remedy opinion in Booker

19   in my -- I wouldn't say that.

20             THE COURT:  You wouldn't say that?

21             MR. STILLEY:  I wouldn't say that.  The remedy

22   opinion in Booker, as I read it, it just confuses me.  I

23   don't think I'm stupid, but it's just really, really

24   confusing to me.  And even if you take the remedy opinion

25   and say, well, it's going to be voluntary, I don't see

1    anywhere and I don't know of any case law that says that
2    a judge can't say, okay, the government stated their
3    theory, they can prove their theory to this jury and let
4    this jury find it.  And unless there's a good reason, I'm
5    going to rely on what the jury finds and I'm going to
6    base sentence on that.
7        There's -- I heard this Court say, well, couldn't
8    you just voluntarily turn in these forms somewhere else
9    and I heard -- Mr. Springer did, in fact, address this.
10   But let's stop and think about the charge.  The charge is
11   failure to do something required by law.  And there's
12   something called rule of lenity.  Unless it's specified,
13   unless it's laid out, unless it's actually required by
14   law, we're not going to deprive somebody of their
15   liberty.
16       Now, if the government doesn't like the law, they've
17   got the right to change it.  Hey, anybody can lobby
18   Congress, anybody can ask Congress.  Change the law if we
19   don't like it the way it is.  But to suggest that a
20   person might possibly be deprived of their liberty or
21   held to answer in a place where the venue does not lie
22   because they didn't make a voluntary submission seems a
23   bit extreme.  And in keeping with that, I mean, in this
24   case -- it is stated in the indictment that Oscar Stilley
25   went and testified before the grand jury.

1    I asked Mr. Shern if Oscar Stilley was under

2  criminal investigation and was told no.  So believing

3  that, hey, this is my civic duty, I went and gave the

4  testimony.  And within just a few weeks, the government,

5  actually, Mr. Snoke in a criminal case, jumped up and

6  said, oh, Oscar Stilley can't be a lawyer in this case

7  because he's under criminal investigation.

8    Now, let's think about this.  When a person has been

9  told one story and then there's another story being used

10  against him, doesn't it just make sense to make the

11  government say what their theory is?  Pin them down, make

12  them fix the ideas upon which they had intended to

13  deprive a person of their liberty and from that point

14  proceed further.  Thank you, Judge.

15         THE COURT:  Thank you.  I'm not going to hear

16  argument from the government because I'm going to deny

17  both of these motions.  If we weren't going to have a

18  motion to dismiss on this venue issue, then I would

19  require the government to respond this afternoon, but

20  we're going to have a motion to dismiss on the venue

21  issues apparently, so there's no need for me to hear from

22  the government on that this afternoon.

23    I always like to learn law and there's people in

24  this courtroom who know a little more tax law at this

25  point than I do, so I look forward to that motion to

1   dismiss.

2        As I mentioned at the outset, some of the paragraphs

3   of the motion for a Bill of Particulars filed by

4   Mr. Springer are just not appropriate subjects for a Bill

5   of Particulars and I have named those paragraphs.  As to

6   the other paragraphs, if a Bill of Particulars were

7   otherwise appropriate, those matters might be fair game.

8   But as to those paragraphs, there has been no showing, at

9   least at this point, that the defendants' ability to

10  defend themselves is impaired or that they are at risk

11  for a second prosecution.  So both motions are denied

12  without prejudice to reassertion at the appropriate time

13  pursuant to the schedule that the Court will establish

14  before we recess today.

15       I will caution you, though, that a motion for a Bill

16  of Particulars asking for particulars about legal

17  theories or about who said what to a grand jury is not

18  appropriate and will summarily be denied in those

19  respects.

20       Let's see, Pam, does that leave any motions pending?

21            COURTROOM DEPUTY:  Not on your list.

22            THE COURT:  I don't think so.

23            MR. O'REILLY:  I don't believe so, Your Honor.

24            THE COURT:  Now, let's talk about scheduling.  I

25  have carefully reviewed the transcript of the proceedings

1  with Judge Cleary on March 30th.  I particularly make

2  note of page 30 of that transcript.  Mr. Springer states,

3  and apparently very accurately, that he was told that

4  there's about 33,000 pages of discovery.  He says he has

5  got about 150,000 pages remaining at his house.  He

6  anticipates between 100 and 200 witnesses.  That's a

7  matter on which the Court will have a say ultimately.

8  But, nevertheless, he anticipates between 100 and 200

9  witnesses.

10      And Judge Cleary, after that explanation and some

11  other explanation said, "Well, are you thinking about the

12  fall?"  And Mr. Springer said, "Yes, I'm thinking about

13  the fall, if it has to go there."  And then, of course,

14  today we have heard Mr. Stilley, in substance, concur as

15  to the complexity of the case at least.

16      We haven't had any substantial discovery to this

17  point and perhaps none at all.  It's still theoretically

18  possible that discovery may be phased, we'll have to see.

19      But based upon the representations that were made

20  and what I think was a very good faith suggestion or a

21  very good faith response to a suggestion by Judge

22  Cleary -- and when I say good faith response, I'm

23  referring to the good faith response of Mr. Springer to

24  the comment made by -- or the question posed by Judge

25  Cleary, specifically, "Are you thinking about the fall?"

1    Bearing in mind also that I am going to permit --

2    and I could summarily deny, but I am going to permit some

3    motions that arguably could have been precluded by local

4    Rule 12.1 for lack of timely filing.  I am going to

5    permit -- reopen the possibility of motions to dismiss.

6    We're apparently going to have a motion to suppress or a

7    motion for a Franks hearing.  There are other conceivable

8    motions that I'll address.

9    Taking those matters into account, taking into

10   account the sheer massiveness of the discovery involved

11   in this case, taking into account the possibility that

12   discovery may be phased, taking into account the fact

13   that some of the steps involved in getting this case

14   ready for trial in an orderly way are going to have to be

15   sequential rather than having some activities take place

16   concurrently, all of which can be ascertained from the

17   record of our hearing so far today, I have no trouble

18   concluding under 18 United States Code, Section

19   3161(h)(8), that the setting of the trial in this case on

20   October 26th is necessary in light of the other matters

21   that must unfold in order to conduct a trial that is fair

22   to both sides.

23   And I find without any hesitation that to allow a

24   scheduling of the trial that far off, which by the way is

25   ordinarily a very unattractive delay, but that the

scheduling of the trial that far off, but in this case
specifically October 26, 2009, is necessary in order to
put the defendants in a position to properly prepare
their defense to the charges in the indictment and that
the ends of justice outweigh the best interest of the
public and the defendants in a speedy trial.

On that basis, I further find that the period of
delay caused by the setting of the trial for October 26,
2009, is excludable under the Speedy Trial Act, Section
3161(h)(8), on the basis that failure to allow that much
time for trial preparation would deny the defendants the
time reasonably necessary for effective preparation
taking into account the exercise of due diligence.  We
will have a trial date of October 26, 2009, with jury
selection to begin at 9:30 that morning.

I want to address other scheduling matters this
afternoon and I want to do so in an orderly way.  First
of all, I'll inquire of government counsel.  Have either
of the defendants made a request under Rule 16(a)(1)(G),
that is a request for a written summary of expert
testimony?

MR. O'REILLY:  No, Your Honor, we have not
received such a request.

THE COURT:  Okay.  Do the defendants intend to
make such a request?

1          MR. SPRINGER:  Yes, Your Honor, I do anticipate.

2          THE COURT:  Mr. Stilley, I presume you,

3    likewise, intend to do so?

4          MR. STILLEY:  I might.  I didn't realize that

5    there were going to be any experts on the government's

6    behalf.

7          THE COURT:  Well, at most, it would cost you 15

8    minutes of your time to get the request done and then

9    that way you know.  Okay.  Bear with me just a moment.

10       Now, let me inquire of the government.  If the

11   defendants do make a request, a timely request, and I

12   intend to require them to make that request by the 29th

13   of this month, I think it would be fair to say that the

14   government probably ought not to be expected to turn

15   around within a matter of days or even a couple of weeks

16   and provide a written summary of expert testimony

17   pursuant to Rule 16(a)(1)(G).  But on the other hand,

18   that's certainly something we need to get accomplished

19   well before trial.  And with the scheduling we have in

20   this case, there is certainly, at least for that purpose,

21   some time to work with.

22       So let me inquire at this point, does the government

23   intend to present any expert testimony within the

24   contemplation of Rule 16(a)(1)?

25          MR. O'REILLY:  Your Honor, that will be based

```
 1  upon future discussions with the feds.  If money is not
 2  contested, if the amounts are not an issue, we may not
 3  have to call an expert.  But if we have to have somebody
 4  explain to the jury how the accounting is done, to
 5  explain to them what the tax laws says, then we will need
 6  an expert.
 7           THE COURT:  Even if you -- please work from the
 8  lectern.  Even if you don't call a follow-the-money
 9  witness -- which is what you're basically referring to,
10  right?
11           MR. O'REILLY:  Yes, Your Honor.
12           THE COURT:  Okay.  Even if you don't call a
13  follow-the-money witness, would you intend, in any event,
14  to call a summary witness on any other issues?
15           MR. O'REILLY:  If I may have a moment, Your
16  Honor.
17           THE COURT:  Sure.
18      (MR. O'REILLY CONFERS WITH CO-COUNSEL.)
19           MR. O'REILLY:  We may, Your Honor.  At this
20  point, I'm not certain we would, but we might.
21           THE COURT:  Okay.  With an October trial setting
22  -- well, I'll tell you what, I'm going to set other dates
23  and then we're going to circle back and decide when the
24  government needs to provide any written summaries of
25  expert testimony.  But before we do that, we're going to
```

```
 1   take about a five-minute break.  Court will be in recess.
 2        (RECESS HAD)
 3            THE COURT:  I'm going to need you to get your
 4   sharp pencils handy.  I'm going to give you my
 5   preliminary or tentative schedule.  It's going to ripen
 6   into a final schedule before we leave this afternoon.
 7   But I want to give you these dates -- these events and
 8   these dates and then invite any comments that anyone
 9   would have.
10       The next scheduled date would be a deadline for the
11   defendants to make a request under Rule 16(a)(1)(G).
12   That will be April 29th.  Motions to dismiss on any
13   theory, May 15th.  Responses due June 1st.  Any notices
14   under Rule 12.2, May 15th.  Motion to suppress or motion
15   for a Franks v. Delaware hearing, June 1st.  Response,
16   June 15th.  Motion for Bill of Particulars, June 15th.
17   Response, July 1st.  Motion for relief under Rule 14,
18   basically severance, August 3rd.  Response, August 17th.
19   Proposed jury instructions and verdict forms from both
20   sides, August 3rd.  Responses to proposed jury
21   instructions, August 17th.  Notice of intent to use Rule
22   404(b) evidence, September 10th.  Response, September
23   21st.  Trial briefs, September 21st.  Agreed summary of
24   the indictment, or absent agreement, separate proposed
25   summaries of the indictment, September 21st.
```

1    Applications under Rule 17(b), September 21st.  Pretrial

2    conference, October 21st at ten.  Trial, October 26th.

3        Now, it probably doesn't require my explanation for

4    you to gather that with these filings all due by the 21st

5    of September, it is my intent that there basically be a

6    dead period for a month before trial.  I think in a case

7    of any complexity, that is highly desirable.

8        It is not my intent that the parties will be

9    peppering each other with motions that late in the

10   pretrial period.  That's the reason that I have provided

11   for this sort of a schedule, at least tentatively, with

12   the legal work basically wrapped up a month before trial.

13       I'll invite the government first and then the

14   defendants to comment on this tentative schedule.

15           MR. O'REILLY:  The proposed schedule is fine

16   with the government, Your Honor.

17           THE COURT:  Mr. Springer.

18           MR. SPRINGER:  Yes, Your Honor.  First of all,

19   on the 404(b), in the event that that becomes an issue,

20   it would be my position that September 10, 2009, is

21   really too close to trial because of what I may have to

22   or what we may have to do to find witnesses and present

23   evidence under some claim if the government wants to make

24   that.  So I would ask the Court to move that back into

25   July or early August so that the government would be

1   locked in at that point and we would have, you know, at

2   least 60 days to prepare for that.

3       I would look at that this way:  If we were going to

4   be going to trial within 70 days, when would the Court

5   normally under the 70-day window require the government

6   to give 404(b)?  Would it be 45 days before trial or how

7   would that go?  And I would just think that they should

8   know already.  It's not going to be any prejudice to them

9   because they should know already whatever they're going

10  to do or say, so.

11      And then the other issue was to separate from the

12  motions deadline, motions in limine and to move motion in

13  limine separate from those motions and move it to within

14  about 30 days of trial so that we could have an

15  opportunity as we get closer to seeing what the shape of

16  the case is, what the evidence is, and what's actually

17  going to be the controversies that are presented to a

18  jury, that we will better know -- you know, my position

19  is I want to lock the government's theory down as tight

20  as I can possibly lock it.  And so that would give me

21  enough time to consider all the issues that would happen

22  between the original motion deadline and a month before

23  trial.

24          THE COURT:  Mr. Stilley.

25          MR. STILLEY:  In addition to what Mr. Springer

1   just said, I have a problem with the May 15 motion to

2   dismiss deadline.  As I've already suggested to the

3   Court, I need to get the discovery from the government,

4   give them a chance to tell the truth about what Oscar

5   Stilley was told.  In order to get him to testify before

6   the grand jury, I need to get that.  And I feel like that

7   I can demonstrate to this Court that I was lied to in

8   order to get me to testify before the grand jury and that

9   would be a basis for suppressing that evidence.  And

10  after that evidence is suppressed, then upon the basis of

11  what other evidence might be available, I think I can

12  make a good motion to dismiss.

13      I would be satisfied if the motion to dismiss was

14  put to the August 3 and August 17 dates.

15              THE COURT:  Thank you.

16              MR. STILLEY:  Thank you, Judge.

17              THE COURT:  Bear with me just a moment.

18              MR. SPRINGER:  While you're doing that, Your

19  Honor, may I say one more thing?

20              THE COURT:  You surely may.

21              MR. SPRINGER:  What I just heard Mr. Stilley

22  say, I think, is a little bit of a confusion there.  My

23  understanding is in an order the Court issued earlier

24  today, all stuff that was not part of the search for the

25  Franks is to be -- will be turned over separately now to

1  Mr. Stilley.  And I would think that anything he just

2  mentioned in regard to his testimony and so forth, that

3  would already -- that would not be blocked by the

4  possible Franks motion.  And so just pointing that out.

5  And then I would suggest maybe another 15 days on the

6  motion to dismiss -- the motions to dismiss would be

7  ample enough time from that position.  Thank you.

8          THE COURT:  Okay.  First of all, on the notice

9  of intent to use Rule 404(b) evidence, that's going to

10 stay September 10th.  The reason for that is that it will

11 certainly be my expectation that the government will use

12 good professional judgment in determining what to include

13 in that notice.  The earlier I require it to be filed,

14 the more inclusive it would have to be just to protect

15 the government in terms of what it might want to present

16 at trial.  I don't want that kind of a Rule 404(b)

17 notice.  I want a Rule 404(b) notice that really does

18 tell me, with the benefit of the government boiling it

19 down, that really does tell me what 404(b) evidence the

20 government might propose to use.  And for that reason,

21 that date will stay September 10th.

22     Bear with me just a moment on one other scheduling

23 matter.  Okay.

24          MR. O'REILLY:  Your Honor, just one moment, if I

25 may.

 1          THE COURT:  Yes.

 2          MR. O'REILLY:  For clarification, previously, we

 3   were discussing the discovery issue and when the

 4   government would turn over all the rest of the

 5   discovery.  I thought I understood that Mr. Springer was

 6   to provide his objections by April 29th, which may be

 7   something separate from the motion to suppress that you

 8   referenced in your trial schedule.  I'm not sure, I guess

 9   for clarification, for Mr. Stilley to be able to have a

10   meaningful way of moving to dismiss, the earlier we have

11   that ruling on what we can turn over to Mr. Stilley, the

12   earlier we can make that happen.

13          THE COURT:  Well, earlier today I said that

14   Mr. Stilley is entitled to file a reply brief; is that

15   right?  Does it relate to that?

16          MR. SPRINGER:  Actually, Your Honor, I think it

17   was me that was going to get to file the reply brief and

18   you were giving us to the 27th to do that.

19          THE COURT:  And then the materials that the

20   government -- I guess I'm talking about two different

21   things.  The sealed materials that the government

22   believes are not discoverable are to be delivered to my

23   chambers by what date?  What did I say?

24          MR. SPRINGER:  That's a separate issue.

25          MR. O'REILLY:  I believe that was the 29th, Your

1   Honor.

2          MR. SPRINGER:  Yeah.

3          THE COURT:  Okay.

4          MR. BURTON:  Actually, it was April the 30th.

5          MR. O'REILLY:  April 30th, I'm sorry, Your

6   Honor.

7          THE COURT:  Okay.  Now, Mr. O'Reilly, tell me

8   again what your concern is.

9          MR. O'REILLY:  The concern I have is that we

10  have a good chunk of the discoverable material is

11  materials that were obtained as part of the search

12  warrant.  As the discovery is now being phased in,

13  Mr. Stilley will not have the benefit of that until Your

14  Honor rules on Mr. Springer's reply, which I understand

15  that's due Monday.  But if that comes in short order,

16  we'll be fine.  I don't know if the 15th of May will be

17  fast enough.

18         THE COURT:  Okay.  Well, I'm going to make three

19  additions to the schedule that will accommodate to that.

20  Motions to dismiss on any theory will still be due May

21  15th with a response due June 1st.  However, a motion to

22  dismiss on any basis that could not reasonably have been

23  anticipated or factually supported by May 15th will be

24  filed not later than August 3rd with response due August

25  17th.  And any such motion will clearly provide the Court

1    with -- or must clearly provide the Court with a showing
2    that the basis for the motion could not reasonably have
3    been anticipated or factually supported prior to May
4    15th.  And that might apply to some late filed
5    information that Mr. Stilley might not get until later
6    on.
7         Secondly, we'll have a Franks -- a hearing on the
8    motion to suppress or Franks motion.  And I'm going to
9    give this to you again on a tentative basis because I
10   want to inquire as to whether any party or counsel is
11   aware of any intolerable difficulty that this would
12   present, hearing on motion to suppress or Franks motion,
13   if necessary.  Obviously, a Franks motion has to make a
14   preliminary showing to even get a Franks hearing.  But a
15   hearing on motion to suppress or a Franks motion, July
16   9th at nine in the morning.
17        Does that give anybody any heartburn?
18             MR. O'REILLY:  The government is fine with that,
19   Your Honor.
20             MR. SPRINGER:  I'm fine with that, Your Honor.
21             THE COURT:  And finally motions in limine,
22   Mr. Springer, your point is well taken.  Motions in
23   limine, September 21st.  Responses due October 5th.
24        And let me caution both sides, I can't totally rule
25   out that some motion not contemplated by this schedule

1  might have to be filed, but the quality of my attention

2  to motions declines in a linear way with the volume of

3  motions.  So just bear that in mind.  And if anybody is

4  going to win this lawsuit, it's going to be win to those

5  folks sitting in that box.  And a proliferation of

6  motions is not going to move the ball in any substantial

7  way in that direction beyond the motions, so far as I can

8  tell, that are contemplated by this schedule.

9       Anything further that the Court ought to address

10 this afternoon from either side?

11           MR. O'REILLY:  No, Your Honor.

12           MR. SPRINGER:  No, Your Honor.

13           MR. STILLEY:  No, Your Honor.

14           THE COURT:  Court will be in recess.

15      (COURT ADJOURNED.)

16                    REPORTER'S CERTIFICATE

17

18      I HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND

    CORRECT TRANSCRIPT OF PROCEEDINGS:

19

20

                    S/Tracy Washbourne
21                  Tracy Washbourne, RDR, CRR
                    United States Court Reporter
22                  Western District of Oklahoma

23

24

25