1

1          IN THE UNITED STATES DISTRICT COURT

2        FOR THE NORTHERN DISTRICT OF OKLAHOMA

3

4  UNITED STATES OF AMERICA,

5       Plaintiff,

6  vs.                 Case No. CR-09-43-SPF

7  LINDSEY KENT SPRINGER and
    OSCAR AMOS STILLEY,

8       Defendants.

9  ----------------------------

10

11

12

13

14

15        TRANSCRIPT OF MOTIONS HEARING

16     BEFORE THE HONORABLE STEPHEN P. FRIOT

17       UNITED STATES DISTRICT JUDGE

18          JULY 2, 2009

19

20

21

22

23

24

25

```
 1   APPEARANCES:

 2   FOR THE GOVERNMENT:
                             Charles Anthony O'Reilly
 3                           US Department of Justice(Box 972)
                             PO Box 972
 4                           Washington, DC 20044

 5                           Kenneth P. Snoke
                             US Attorneys Office (Tulsa)
 6                           110 W. 7th Street, Ste. 300
                             Tulsa, OK 74119
 7

 8
     FOR DEFENDANT SPRINGER:
 9                           Lindsey Kent Springer
                             5147 S. Harvard Ave.
10                           Ste. 116
                             Tulsa, OK 74135
11
                             Robert Scott Williams
12                           Taylor Ryan Schmidt & Van Dalsem
                             1437 S. Boulder Ave., Ste. 850
13                           Tulsa, OK 74119

14   FOR DEFENDANT STILLEY:
                             Oscar Amos Stilley
15                           7103 Race Track Loop
                             Ft. Smith, AR 72901
16
                             Charles Robert Burton, IV
17                           Burton Law Firm, PC
                             320 S. Boston, Ste. 2400
18                           Tulsa, OK 74103

19
                       EXAMINATION INDEX
20

21   BRIAN SHERN
          DIRECT BY MR. SPRINGER          23
22        DIRECT BY MR. STILLEY           34

23

24

25
```

1          THE COURT:  Good morning.  We're here in

2   Criminal 09-043, United States of America v. Springer and

3   Stilley, to address various motions.

4      Counsel will please give your appearances.

5          MR. O'REILLY:  Charles O'Reilly and Ken Snoke

6   for the United States.

7          MR. SPRINGER:  Lindsey Springer, Your Honor.

8          MR. STILLEY:  Oscar Stilley.

9          THE COURT:  Thank you.  Give me just a moment to

10  get organized here.  We've got a fair amount of ground to

11  cover, I think I can say that without fear of

12  contradiction.  And in some ways, perhaps, some of the

13  things that we have to cover don't fall into neat

14  categories and perhaps there's no one sequence in which

15  we would cover some of these things that logically -- by

16  which each item would logically flow to the next.  But,

17  nevertheless, I think perhaps the first issue that we

18  should address, and this is probably a bit unusual to

19  have this first issue come to the fore on the day that --

20  same day set for a Franks hearing, but I think the first

21  hearing we should address is whether the necessary

22  preliminary showing to trigger the right to a Franks

23  hearing has been made and then we'll address the

24  motions.  If answer to that is, yes, that the necessary

25  preliminary showing has been made, then I think it's

4

1   necessary to address the motions to quash that were

2   recently filed by the government based on the Touhy

3   regulations, among other arguments.

4        We've also got some non-Franks -- what I would call

5   non-Franks issues.  Obviously, the most elaborate motion

6   we have is the Defendant Springer's motion to suppress

7   and for Franks hearing, which is docketed as two separate

8   motions, motion to suppress at Docket Entry Number 74 and

9   a motion for a Franks hearing separately docketed at

10  Docket Entry Number 77.

11       And when I say "non-Franks issues," here is what I

12  mean.  I don't mean this in any pejorative sense at all,

13  but I must say that in some ways the memorandum in

14  support of the motion for Franks hearing and motion to

15  suppress at Docket Entry Number 75 is a bit hard to

16  follow in some ways.  It's one thing for a minister to

17  ramble when he gives a sermon, it's another thing for a

18  brief writer to ramble, well, this brief rambles just a

19  bit, it's a bit hard to follow.  It in some ways

20  challenges the veracity of persons other than Agent

21  Shern.  It is based partly on what I would call classic

22  Franks arguments and it's based partly on other issues

23  that I'm not sure fall into the Franks framework.  And if

24  they don't, then they have to be separately addressed.

25       But, for instance, we've got the issue as to whether

1    there is a sworn affidavit.  We've got the issue under

2    the LaSalle bank case of whether the Internal Revenue

3    Service used its civil tools in support of a criminal

4    investigation following an actual criminal referral.

5    We've got the issue as to the appropriateness of reliance

6    on Agent Meador's work in Special Agent Shern's

7    affidavit.  We've got the issue, again, the basic Franks

8    issue as to whether Agent Shern in his affidavit used --

9    or made false statements or made statements that he

10   recklessly had no reason to believe would be true, in

11   substance, which is the basic Franks issue, obviously.

12   Then we've got an issue as to probable cause to

13   believe -- or at least an asserted issue as to whether

14   there was probable cause to believe that the evidence

15   sought by Special Agent Shern would be found at

16   Mr. Springer's residence.  Those issues, in part, are

17   classic Franks issues and in part not.

18        And as I have said, I don't -- strictly speaking, I

19   don't know that it's necessary to address the motion to

20   quash until after we determine whether to have a Franks

21   hearing.

22        On the other hand, do we have -- perhaps government

23   counsel can tell me.  Do we have witnesses here,

24   subpoenaed individuals here, who are more or less on hold

25   until we resolve the issues as to the motion to quash?

```
1              MR. O'REILLY:  Your Honor, with respect to the
2    Internal Revenue Service employees, they are here.
3    Yesterday, late yesterday, they received partial
4    authorization -- limited authorization to give some
5    testimony, which I will be sharing with the Court and
6    counsel, or I should say defendants, if we reach the
7    point that we have -- if they have to testify.
8         The Department of Justice employee, Mr. Doug Horn,
9    and former Department of Justice employee Melody Noble
10   Nelson, are not here, they were instructed by the
11   Department of Justice, not by counsel for the government
12   here, but by an individual in Washington, DC, with, I
13   believe, the executive office, Tom Anderson, not to
14   appear because of failure to comply with Touhy.
15             THE COURT:  That would be the executive office
16   of the United States Attorneys?
17             MR. O'REILLY:  Yes, sir.
18             THE COURT:  Okay.  Very well.  So the IRS -- if
19   I understand you, then, you're telling me that the
20   individuals with the IRS, who have received subpoenas,
21   are here and at least some of them have received limited
22   authorization to testify, but that the two DOJ
23   individuals are not here.
24             MR. O'REILLY:  Correct.
25             THE COURT:  Okay.  I'm not attracted by the idea
```

 1   of keeping those individuals in limbo.  That may be

 2   unavoidable for just a little while this morning.  We'll

 3   just have to see how that flows.  But I'm sure the

 4   government would object to just going right into a Franks

 5   hearing before the Court determines whether the necessary

 6   preliminary showing has been made.  Am I right about

 7   that?

 8            MR. O'REILLY:  Yes, Your Honor.

 9            THE COURT:  Okay.  Very well.  I'm going to

10   invite Mr. Stilley to the lectern, there is some ground

11   we need to cover.

12       Mr. Stilley, we have a good many motions that are

13   pending, not the least of which is your motion to dismiss

14   at Docket Entry Number 67 in which you contend that you

15   were misinformed, that you were not under criminal

16   investigation at the time that you were subpoenaed to

17   testify before the grand jury in 2006.

18       The government responds that the conversation that

19   you identified occurred on May 17, 2006.  That is

20   suggested by the government's filing Docket Entry Number

21   71 at page 17, more than two months after your appearance

22   before the grand jury on March 9, 2006.

23       First question, was that March 9, 2006 -- as I

24   recall, that was your only appearance before the grand

25   jury; is that right?

1          MR. STILLEY:  I wouldn't dispute that, Your

2   Honor.

3          THE COURT:  Okay.  It's my preliminary

4   conclusion that the record that we have is adequate to

5   permit me to address the issues raised by that motion.

6   But before we go any further, I wanted to make inquiry,

7   Mr. Stilley, of you directly as to whether you believe

8   that the record that we now have consisting of your

9   papers and the government's papers on this issue relating

10  to your motion to dismiss at Docket Entry Number 67 is

11  adequate for the Court to resolve that motion.

12         MR. STILLEY:  The only thing -- I think that the

13  basic question that might prevent the Court from being

14  able to do that is whether there was also a statement

15  prior to the grand jury testimony, a statement that Oscar

16  Stilley was not under criminal investigation.  The

17  government denies that.  They say May 17th was the date

18  of the false statement.  To my knowledge, I've not been

19  disclosed a memorandum of interview for that date.

20    I really think that I should be allowed to see that

21  to see -- they seem very confident that that's the date

22  they did it and seem to think that they did not do it at

23  a previous date.  That is the only thing -- the issue

24  that I think is -- that might need further development in

25  order to allow the Court to decide.  Because, otherwise,

 1  otherwise, there is no admission by the government, no

 2  proof that I see that the false statement was actually

 3  made before the grand jury testimony.

 4          THE COURT:  Okay.  Well, we'll address that,

 5  then, when we come to it.  I don't plan to get into --

 6  the notice for today didn't include these various motions

 7  to dismiss, but perhaps they will provide an opportunity

 8  to flesh that out to some degree.  You may be seated.

 9          MR. STILLEY:  Thank you, Judge.

10          THE COURT:  Okay.  Now, Mr. Springer, I've

11  carefully read your memorandum of law.  You had some 28

12  pages attached to it.  As you're well aware, the first

13  issue is whether you have made the necessary preliminary

14  showing to, in the vernacular, to trigger the right to a

15  Franks hearing.  You, I believe, have accurately recited

16  the basic standard on page 9 of your memorandum.

17      First of all, as to the underlying Franks issue, we

18  have a question as to whether the affidavit is affected

19  by intentional or reckless omissions.  But we get to a

20  Franks hearing on those issues if the defendant makes a

21  substantial showing that the affidavit contains

22  intentional or reckless false statements and if the

23  affidavit purged of its falsities would not be sufficient

24  to support a finding of probable cause.

25      Now, one of my problems with your memorandum is that

1   in some ways it challenges the veracity of persons other

2   than Agent Shern.  However, as you know, the basic issue

3   under Franks is whether he perpetrated intentional

4   falsehoods or recklessly disregarded the facts, that's a

5   rather loose statement of it, in submitting that

6   affidavit to the magistrate.

7        So the issue is -- relates to the affiant.  The

8   affiant is entitled, as you know, to rely on hearsay.  We

9   don't push back past the affiant's statements to the

10  veracity of statements quoted by the affiant, except

11  perhaps under very narrow circumstances.  But your

12  memorandum, in part, it's argumentative.  I'm not

13  critical of it for being argumentative.  But, in part,

14  it's argumentative.  In part, it's your testimony.  In

15  part, it is your argument with what informants of Agent

16  Shern had to say and, in part, it's argument with what

17  Agent Shern had to say, that last part being the heart of

18  the matter for Franks purposes.

19       So, first of all, let me address one preliminary

20  matter.  You started out saying that there was no sworn

21  affidavit.  The government has come back and has

22  responded by saying that, yes, there has been produced in

23  discovery an affidavit signed by Agent Shern and

24  appropriately signed below the phrase "subscribed and

25  sworn before me this 15th day of September, 2005, by

1  Magistrate Judge Frank McCarthy."  Have you seen a

2  document answering that description in the discovery

3  documents?

4          MR. SPRINGER:  Yes, I have, Your Honor.

5          THE COURT:  Okay.  Do we still have an issue as

6  to whether there was a sworn affidavit?

7          MR. SPRINGER:  Absolutely, Your Honor.

8          THE COURT:  I need you to help me on that.

9  Well, first of all, I tell you what, before we get to

10 that, does the government have a copy of the document as

11 described on page 8 of its response?

12         MR. O'REILLY:  Yes, Your Honor.

13         THE COURT:  If you'll please give that to the

14 clerk.

15         MR. O'REILLY:  Shall I mark it as Exhibit 1,

16 Your Honor?

17         THE COURT:  I think you probably should.

18         MR. O'REILLY:  Your Honor, would you like me to

19 give copies to the defense?

20         THE COURT:  Is it the very same thing they've

21 gotten in discovery?

22         MR. O'REILLY:  Yes, it is, Your Honor.

23         THE COURT:  Well, let Mr. Springer see it to

24 verify that and then we'll take it one step at a time.

25         MR. SPRINGER:  Your Honor, may I have a second

1    to compare these, each page?

2           THE COURT:  Surely.

3           MR. SPRINGER:  This is not an accurate copy,

4    Your Honor.

5           MR. O'REILLY:  Your Honor, apparently, in the

6    discovery, one page of the affidavit is missing.  We will

7    certainly provide that discovery, but it is not

8    consequential.

9           THE COURT:  Mr. Springer, what page is missing?

10          MR. SPRINGER:  Page 18, Your Honor.

11          MR. O'REILLY:  Which consists, Your Honor, of

12   paragraphs 25 and 26 and the last paragraph of 24.  If

13   counsel had brought this to our attention, we would have

14   happily provided it already.  Your Honor, we already gave

15   them this.  This is something that was brought to our

16   attention.  This is a copy of what was provided in

17   discovery.  The primary focus of defendant's allegation

18   was this was an unsworn affidavit, which is false, it is

19   a lie.

20          THE COURT:  Okay.  Okay.  You may be seated,

21   Mr. O'Reilly.

22      Mr. Springer, I'm looking at page 18 of the

23   affidavit as included as attachment Number 20 to your

24   memorandum.

25          MR. SPRINGER:  Yes, the one I got from the

1    clerk's office, yes, Your Honor.

2           THE COURT:  So I don't know when you first saw

3    the document, including page 18, but at least since that

4    day you paid a visit to the clerk's office, if not from

5    before that --

6           MR. SPRINGER:  Yes, sir.

7           THE COURT:  -- you have had page 18.

8           MR. SPRINGER:  Yes, sir, I have page 18 of the

9    document I got in the clerk's office.  What I don't have

10   is the document that he's discussing there from the

11   clerk's office.  I understand that he pointed out in his

12   response that it is a partial affidavit from -- in the

13   33,000 pages of discovery that he provided, which was

14   difficult to find, I must say, but I went to the clerk's

15   office and tried to get a certified copy, was denied a

16   certified copy because the rest of the document was not

17   unsealed.  Which I presume if he could get that document

18   in, it would be.

19       But I would argue that the document he has, try and

20   enter as an exhibit as a sworn affidavit, is not a

21   complete document as presented or as even purportedly

22   presented to be sworn.  And that really raises the

23   question that you're on:  If it has got Magistrate

24   McCarthy's signature on it, does that make it a sworn

25   affidavit?  And we have two documents, one from Melody

1  Nelson and one from Brian Shern, both of them filed in

2  the case where I had a Bivens action against them for

3  theft of money, and in both of those documents, Melody

4  Nelson says she presented Brian Shern's affidavit to

5  Magistrate McCarthy and then he signed the search

6  warrant.  Well, it would be impossible --

7            THE COURT:  You're getting ahead of us.

8            MR. SPRINGER:  Okay.

9            THE COURT:  You're getting ahead of us.  The

10  limited purpose for which the Court will receive Exhibit

11  1, if it receives Exhibit 1, is to scrutinize the

12  signature page, not page 18.

13            MR. SPRINGER:  Fine.  For that purpose, may I

14  finish looking at that?

15            THE COURT:  You surely may.  Now, with an

16  understanding, Mr. Springer, as to the limited purpose

17  for which Exhibit 1 is offered, do you have an objection

18  to Exhibit Number 1?  And if so, what is it?

19            MR. SPRINGER:  The document number -- or page

20  number 24 that I got from the clerk's office that does

21  not have Judge McCarthy's signature on it, which is

22  Exhibit Number 22 in Docket Number 75.

23            THE COURT:  I think you mean Exhibit Number 20.

24            MR. SPRINGER:  Twenty.  Twenty, I'm sorry.

25  Exhibit Number 20, that signature of Brian Shern and that

1   writing of the date and the month is a completely

2   different writing than page 24 that they have offered

3   with Magistrate McCarthy's signature on it.  Just to give

4   you some characteristics to show that these are not --

5           THE COURT:  Let me see them.  Hand Exhibit 1 to

6   the clerk, please.

7           MR. SPRINGER:  Exhibit 1 is there.  I'm sorry,

8   that's mine.  That's the one he wants in, right?

9           THE COURT:  Mr. Springer, where did you get the

10  document that is attached as Exhibit 20 to your

11  memorandum?  Is that the one that was on file in the

12  clerk's office?

13          MR. SPRINGER:  Yes, sir.  It was one that I

14  tried to get certified, but they refused to certify it.

15          THE COURT:  And you first saw the one that has

16  been marked as Government's Exhibit 1 when it was turned

17  over to you by way of the government's discovery in this

18  case or did you have it before that?

19          MR. SPRINGER:  No, actually, Your Honor, I tried

20  to get it but was unable to, but I will admit that they

21  gave it to me, but I will not admit that I had seen it

22  before I saw the one that you have there.  Because I

23  could not find that and so I went to the clerk's office

24  to get it after they said they would give it to me.  And

25  it was just a miscommunication really.  But I went and

1    got that from the clerk's office.  And then when I filed

2    my response, it was only -- or my motion, it was only

3    after they responded and cited to that, I forget the

4    number that was on it, SS Shern warrant 04701, that's

5    when I first discovered that document.

6              THE COURT:  Well, it was included in the

7    government's rather voluminous discovery.

8              MR. SPRINGER:  Yes, it was.

9              THE COURT:  Okay.

10             MR. SPRINGER:  That's true.

11             THE COURT:  As you stand here today, do you know

12   whether you had what purports to be the fully signed

13   document before the government produced its discovery in

14   this case?

15             MR. SPRINGER:  Oh, no, no, sir, never had it

16   before.

17             THE COURT:  Okay.  Now, we've got Government's

18   Exhibit Number 1, which purports to be the fully signed

19   document.  You are absolutely right, if you look at the

20   cursive writing on page 24, the cursive writing does not

21   match up, which, in some respects, may not be at all

22   surprising because there can be counterpart originals of

23   the same document.

24        Do you have any reason to believe that what has been

25   marked as Government's Exhibit Number 1 is not a

 1   legitimate counterpart original of the document that is

 2   also attached with, obviously, for some reason, a

 3   truncated page 24 as Exhibit 20 to your memorandum?

 4          MR. SPRINGER:  Well, the short answer to that is

 5   that I haven't gotten to see the original.  I've received

 6   only, as they identified and as what they've offered to

 7   you, a copy.  And the reason why I went to the clerk's

 8   office, Your Honor, was to get an original.  And I seen,

 9   I laid my eyeballs on the document I attached as Number

10   20 with blue ink on it with no signature.

11       But I have never seen the original document that the

12   government is offering to you right now with Magistrate

13   McCarthy's signature on it with the altered or the

14   different handwriting style, different signature from

15   Mr. Shern.  I won't deny that's his signature.  So I will

16   give the government that.

17       But it's just a different -- it's a different

18   signature than the one that was on the one that was in

19   the clerk's office that was in blue ink.  And all I've

20   seen so far is this copy with black copied ink on it.

21   And I've never seen the original that they purport in

22   Exhibit Number 1.  And that's the short answer.

23          THE COURT:  Okay.  Fine.  The government is

24   invited to offer some clarification on this point.

25          MR. O'REILLY:  Your Honor, as you pointed out,

1  multiple copies are made at the time it is done.  I do

2  not know why the clerk's copy does not have the

3  magistrate judge's signature below it, but there's no

4  issue here.  The affidavit was presented to a neutral

5  magistrate.  The magistrate signed off on it, as is shown

6  in what has been offered as Government's Exhibit 1.

7  These are the same documents with the exception of a

8  somewhat slightly different signature because it was

9  probably a different copy of the same document signed.

10         THE COURT:  What I have referred to as a

11  counterpart original?

12         MR. O'REILLY:  Correct, Your Honor.

13         THE COURT:  Or a duplicate original?

14         MR. O'REILLY:  Correct, Your Honor.  I presume

15  that's what it is.  I don't know, but I presume that's

16  exactly what it is.  I will let AUSA Snoke --

17         THE COURT:  We're not going to tag team all day,

18  but I think for this particular purpose it's appropriate.

19  Go ahead.

20         MR. SNOKE:  Your Honor, based on my experience,

21  which is more than his with getting search warrants from

22  not only Magistrate McCarthy over the years, but other

23  magistrates here, often when we take in a number of

24  copies to get a search warrant, the magistrate may only

25  sign one.  And, frequently, the clerk will conform -- put

1   a stamp or something on other copies.  And we may also

2   have our own copies that don't have -- that do not have

3   the magistrate's signature on it.  They're signed by the

4   affiant, but the magistrate doesn't always sign them.

5        This copy, this truncated copy that apparently he

6   got from the clerk's office is the clerk's copy of the

7   original.  Which the magistrate keeps the original of the

8   application and affidavit, gives us the original of the

9   search warrant, keeps a copy of it, so we can go and

10  serve the search warrant on the premises.

11       But as far as this document, the application with

12  the attached affidavit of Brian Shern, I think probably

13  the better copy is the one that the clerk's office has.

14  If the defendant wants to go look at the blue ink again,

15  which he says he has already seen, that's fine.  We can

16  live with this and mark this one as our exhibit and let

17  the Court decide from this one as opposed to the one that

18  we had that we first offered up here.

19       But the issue here is really whether the magistrate

20  signed the thing, not whether one copy or the other has

21  his signature on it.  The front page --

22            THE COURT:  Mark what you have as Exhibit 2 and

23  hand it to the clerk, please.

24            MR. SNOKE:  I'm sorry?

25            THE COURT:  Mark what you have in your hand as

1   Exhibit 2 and hand it to the clerk, please.

2           MR. SPRINGER:  Can I have clarification on what

3   Exhibit 2 is?

4           THE COURT:  Pardon me?

5           MR. SPRINGER:  Exhibit 1 was what was missing

6   page 18.  And Exhibit 2 is?

7           MR. SNOKE:  I think it's what you just

8   produced --

9           THE COURT:  Well, let him -- Mr. Snoke, let him

10  look at it.

11          MR. O'REILLY:  That's a copy of what we have up

12  there.  That's the same thing.

13          MR. SNOKE:  I'm told that this is a copy of

14  Exhibit 1.

15          MR. O'REILLY:  This is the other one.

16          MR. SNOKE:  Oh, this is his.

17          MR. SPRINGER:  Do you want my copy?  Is that

18  what you're asking for, Your Honor?

19          THE COURT:  Well, I thought what Mr. Snoke had

20  in his hand was a different version of the affidavit with

21  a different version of the signature page than what we

22  had as Exhibit 1.

23          MR. SNOKE:  What I have in my hand that I've

24  marked as Exhibit 2 was a copy with -- I thought he was

25  talking about that he got from the clerk's office that

 1   has Magistrate McCarthy's signature both on page 24 and

 2   on the first page, Special Agent Shern's signature on

 3   both the first page and page 24 of the affidavit.  And it

 4   may be the same thing you have up there marked as Exhibit

 5   1, I don't know.

 6              THE COURT:  Hand it to the clerk.

 7              MR. SNOKE:  The other document -- and that's a

 8   copy of the document that exists, Your Honor.

 9              THE COURT:  Okay.  Well, Exhibit -- let's see, I

10   don't think Exhibit 2 adds anything to the record.  It's

11   the same thing, so I'm going to hand it back to the

12   clerk.  Now, let's see, is Agent Shern in the room?

13              MR. SNOKE:  I'm sorry?

14              THE COURT:  Is Agent Shern here?

15              MR. SNOKE:  Yes, Your Honor.

16              THE COURT:  Okay.

17              MR. SNOKE:  Sitting at the counsel table.

18              THE COURT:  Okay.  Very well.  I want to get

19   past this one way or the other without dwelling on it a

20   whole lot longer.  Unless the government has some cogent

21   reason that I should proceed otherwise, it's my intention

22   to permit the defendants to have Agent Shern sworn for

23   the limited purpose, at this point, of telling the Court

24   about the circumstances of the presentation of this

25   affidavit to the magistrate judge so far as he is aware

1   of them, he may not have been physically present, and to

2   tell me whether what we have here as his signature at the

3   end of Exhibit Number 1 is, in fact, his signature and

4   whether the signature that appears on the cover page of

5   Exhibit 1 is, in fact, his signature.  Does the

6   government object to that?

7           MR. O'REILLY:  Your Honor, with that being the

8   limited purpose of Mr. Shern being asked to testify, that

9   would fall within what he has been authorized to do by

10  the IRS and we would have no objection.

11          THE COURT:  Very well.  Mr. Springer, you may

12  proceed.

13          MR. O'REILLY:  Your Honor, would you like me to

14  hand copies of that letter as an exhibit and to counsel?

15          THE COURT:  The testimony authorization?

16          MR. O'REILLY:  Yes, Your Honor.

17          THE COURT:  It's not necessary as far as I'm

18  concerned at this point unless you feel that they should

19  be made part of the record.

20          MR. O'REILLY:  As long as we stay on this

21  limited topic, I don't think it needs to be at this time,

22  Your Honor.

23          THE COURT:  Very well.  Mr. Springer, you may

24  proceed.

25          MR. SPRINGER:  Clarification, Your Honor.  Do we

1  still get a copy of what he just brought up on his

2  approval, even though it's not made a matter of record?

3          THE COURT:  We'll see.  We're not addressing

4  that at the moment.

5          MR. SPRINGER:  Are you asking me to call

6  Mr. Shern now?

7          THE COURT:  He's available for you to call as a

8  witness.

9          MR. SPRINGER:  I will call Mr. Shern.  May I

10 publish over there or can I just use your Exhibit 1 that

11 you just took and use that for --

12         THE COURT:  That's fine.

13                   BRIAN M. SHERN

14     (WITNESS SWORN)

15                  DIRECT EXAMINATION

16 BY MR. SPRINGER:

17 Q.  Good morning.

18 A.  Good morning.

19 Q.  My name is Lindsey Springer, as you know.  Could you

20 please just state specifically your name for the record.

21 A.  Yes, Brian M. Shern.

22 Q.  And could you identify where you currently are

23 employed.

24 A.  Yes.  I'm employed with the Internal Revenue Service

25 criminal investigation division.

1   Q.   And is it true that you've been there since at least

2   February of 2005?

3   A.   Yes.

4   Q.   Is it also true that you are a -- scratch that.

5   Prior to September 15, 2005, had you ever been involved

6   in any other search warrant before that day?

7           MR. O'REILLY:  Objection, Your Honor,

8   relevance.  Putting this as simply as I understand it to

9   determine what happened with respect to this affidavit.

10          THE COURT:  Sustained.

11          MR. SPRINGER:  Okay.

12  Q.   (BY MR. SPRINGER)  Mr. Shern, you've been in the

13  courtroom this morning; is that correct?

14  A.   Yes.

15  Q.   Okay.  And you're aware that there has arisen an

16  issue regarding the affidavit that -- a document that has

17  your name on it on September 15, 2005?

18  A.   Yes.

19  Q.   Are you aware of that?  And could you first say --

20  now, I'm going to hand this to you.  It has been

21  marked --

22          MR. SPRINGER:  May I approach, Your Honor?

23          THE COURT:  You may.

24  Q.   (BY MR. SPRINGER)  -- as Government's Exhibit Number

25  1.  Are you familiar with that document?

1  A.   Yes, I am.

2  Q.   Okay.  And since I don't have a copy of that

3  document here --

4         MR. O'REILLY:  May the record reflect that

5  Mr. Springer is being given a copy of that document?

6         THE COURT:  Very well.

7         MR. SPRINGER:  Thank you.

8  Q.   (BY MR. SPRINGER)  Mr. Shern, can you say what role

9  you had in preparing this document?

10  A.   Yes.  I prepared the -- I wrote the search warrant

11  affidavit, prepared the attachment A and B to the search

12  warrant application.

13  Q.   Okay.  So I take it your testimony is, is that you

14  typed out the whole thing.

15         MR. O'REILLY:  Objection, Your Honor.

16         MR. SPRINGER:  I'm just clarifying his answer.

17         MR. O'REILLY:  Your Honor, objection.  The only

18  question, as I understand, the only relevant portion that

19  we're going to is, did the magistrate sign off on this

20  affidavit.

21         THE COURT:  It's not quite that narrow, but it's

22  narrower than --

23         MR. SPRINGER:  Than where I'm at, I got you.

24         THE COURT:  Sustained.

25         MR. SPRINGER:  I'm with you.

1  Q.  (BY MR. SPRINGER)  Mr. Shern, could you explain how

2  a document that you prepared with the date September 15,

3  2005, that you have before you, got in the hands of the

4  clerk's office?

5          MR. O'REILLY:  Objection, Your Honor.  Calls for

6  speculation.

7          THE COURT:  If he doesn't know, he can say he

8  doesn't know, but that's at least relevant.  Overruled.

9          MR. SPRINGER:  Thank you.

10          THE WITNESS:  I don't know.

11  Q.  (BY MR. SPRINGER)  You don't know.  Do you know how

12  that Exhibit Number 1 got into this courthouse?

13  A.  Yes.  AUSA -- or Special AUSA O'Reilly brought it

14  in.

15  Q.  Okay.  Do you know how the one on September 15,

16  2005, got into this courthouse?

17          MR. O'REILLY:  Objection, Your Honor.  Unclear

18  on what's being asked.  They're both dated September 15,

19  2005.

20          THE COURT:  Clarify that.

21          MR. SPRINGER:  Okay.

22  Q.  (BY MR. SPRINGER)  Is it -- talking about Exhibit 1

23  here that you witnessed today being entered at the

24  Court's request by Mr. O'Reilly.  We're both on that,

25  right?

```
 1   A.   Yes.
 2   Q.   Okay.  And we're specifically speaking about that
 3   document, that exhibit.  Now, is it true that that
 4   document did not exist on September 14, 2005?
 5   A.   I had the affidavit prepared, I think, a few days in
 6   advance of when AUSA Nelson and I brought it in for Judge
 7   McCarthy to sign.
 8   Q.   Okay.  So you and Mrs. Nelson brought this document
 9   that you prepared in to Magistrate McCarthy for him to
10   sign; is that true?
11   A.   Yes.
12   Q.   Okay.  And had you already signed that document
13   before you got in front of Magistrate McCarthy?
14   A.   No.
15   Q.   Did you sign it in front of Magistrate McCarthy?
16   A.   Yes, I did.
17   Q.   How many times did you sign your name in front of
18   Magistrate McCarthy?
19   A.   I don't remember.  A couple of times.  I think we --
20   I sign and then he signed the affidavit and the
21   application for the search warrant.
22   Q.   Did Magistrate McCarthy swear you in?
23   A.   Yes.
24   Q.   Okay.
25              THE COURT:  In how many different places did you
```

BRIAN M. SHERN - DIRECT BY MR. SPRINGER                    28

1    sign the document?
2          THE WITNESS:  I believe I had to sign the front
3    page, the application and affidavit for search warrant,
4    and then I also had to sign the end of the affidavit,
5    which is the last page of this document where Judge
6    McCarthy signed.
7          THE COURT:  Proceed.
8    Q.  (BY MR. SPRINGER)  There were no declarations
9    accompanying this search warrant; is that correct?
10   A.  No.
11   Q.  Okay.  So you witnessed Magistrate McCarthy swear
12   you in and then he witnessed -- after you were sworn in,
13   he witnessed you sign several documents?
14   A.  Yes, he witnessed me sign the front page and the
15   back page of this application, affidavit for search
16   warrant.
17   Q.  Before or after he swore you in?
18   A.  After.
19   Q.  Okay.  And then you turned and watched him sign his
20   name on what has now been marked as Exhibit 1; is that
21   true?
22   A.  I mean, it was a long time ago, I don't remember
23   exactly how it happened, but he swore me in, I signed the
24   front page and the back page, and then he signed.
25   Q.  And then he signed.  Okay.

1  A.   I think so, yeah.

2  Q.   Do you know where the original to Exhibit 1 is

3  located right now?

4  A.   No.

5  Q.   Since the day that you signed the document, Exhibit

6  Number 1 before you, have you seen the original of

7  Exhibit 1 since that day?

8  A.   I don't remember if the original was the one filed

9  that Judge McCarthy's assistant kept and filed with the

10  Court.  I'm not sure what happened to all the different

11  copies of the search warrant.  I just know that I went in

12  there and signed it and he signed it.

13  Q.   Did you leave the courthouse with an original signed

14  search warrant?

15  A.   Yes.  I left the courthouse with -- I don't know if

16  it was a copy, I don't remember if it was a copy or if it

17  was the exact original that I signed.  I honestly don't

18  remember exactly how many copies I signed.  I just

19  remember signing my name to it and he signed his name to

20  it and I don't remember how many copies we --

21         MR. SPRINGER:  Your Honor, may I have one

22  second?

23         THE COURT:  You may.

24         MR. SPRINGER:  Your Honor, I'm going to attempt

25  to enter the document that I got from the clerk's office

1   and I'd like to know how you would like that numbered.

2   Should it be the next number in my defense exhibits

3   attached to my pleadings or should it be Defendant's

4   Exhibit Number 1?

5           THE COURT:  Defendant's Exhibit 1.

6           MR. SPRINGER:  Okay.  I'm sorry, but I only have

7   one copy of this, other than my tabbed stuff.

8           MR. O'REILLY:  Objection as to relevance, Your

9   Honor.  This is simply a copy of -- I believe it's

10  Exhibit 20, which has already been submitted with the

11  defendant's exhibits in support of this motion.  The

12  Court already has this.  Special Agent Shern has

13  testified that the magistrate judge signed after swearing

14  him in.  There is no --

15          THE COURT:  Overruled.

16          MR. SPRINGER:  Your Honor, may I approach?

17          THE COURT:  You may.

18  Q.  (BY MR. SPRINGER)  Realizing that you've never seen

19  that exact document or copy before, but have you seen a

20  document that looks similar to that that I just handed

21  you as Defendant's Exhibit Number 1?

22  A.  I don't recall seeing a copy like this because I

23  don't remember it being blown up this big.

24  Q.  Could you verify that it contains -- whether or not

25  it contains the same information of one of the other

1  copies that you signed, which is Defendant's Exhibit --

2  or Government's Exhibit Number 1, please?

3  A.   Well, I'd have to look at it for a while to make

4  sure.

5  Q.   Okay.

6          THE COURT:  Mr. Springer, do you need him to

7  compare them line for line or just give it a quick look?

8          MR. SPRINGER:  No, I just want him to give it a

9  quick look.

10          THE COURT:  Give it a quick look.

11          MR. SPRINGER:  Mr. O'Reilly has also reviewed

12  the document.  Did you see any quick-look differences in

13  the document?

14          MR. O'REILLY:  Your Honor, it has been marked

15  and highlighted in several places.  I don't know what --

16          THE COURT:  We'll take it one step at a time.

17          MR. SPRINGER:  Thank you.

18          THE WITNESS:  Yes, this looks like a similar

19  copy of my affidavit, yes.

20  Q.   (BY MR. SPRINGER)  Can you turn to page 24 of that

21  document, which is Defendant's Exhibit Number 1?

22  A.   Yes.

23  Q.   Do you recognize the signature there?

24  A.   Yes, that is my signature.

25  Q.   That is your signature.  Slightly different, is it

1  not, than the one on Government's Exhibit Number 1?

2  A.   Yes.

3  Q.   Okay.  And do you recognize the date down at the

4  bottom on the left side?

5  A.   Do I recognize?

6  Q.   Yeah.  Is that September -- does it say September

7  15, 2005, on there, basically?

8  A.   Yes, that's what it says.

9  Q.   Okay.  And do you see a signature on that document?

10  A.   No, I don't.

11  Q.   From Magistrate McCarthy?

12  A.   No.

13  Q.   Okay.  Now, when you were in Magistrate McCarthy's

14  chambers and he swore you in, as you testified, did you

15  only witness him sign one document or did you witness him

16  sign several?

17  A.   I think he just signed --

18          MR. O'REILLY:  Objection as to relevance, Your

19  Honor.

20          THE COURT:  Overruled.

21          THE WITNESS:  I think he just signed once and --

22  to the best of my recollection, I can remember leaving

23  Judge McCarthy's chambers and then going to -- I can't

24  remember the name of his secretary or assistant, but I

25  remember her making several copies of the document and I

1  can't remember if I signed those too or not.  I can't

2  remember.

3  Q.   (BY MR. SPRINGER)  Would you have signed those after

4  you left Judge McCarthy's office after you were sworn in?

5  A.   Yes.

6  Q.   Okay.  Would you be able to explain, if you know,

7  how the unsigned copy with your blue ink signature got

8  into the clerk's office in this courthouse?

9          MR. O'REILLY:  Objection, Your Honor, asked and

10  answered.

11          THE COURT:  Overruled.

12          THE WITNESS:  No, I'm not sure what their

13  procedures are for getting the warrant into the court

14  clerk's office.

15  Q.   (BY MR. SPRINGER)  Did you leave Magistrate

16  McCarthy's office that day with a signed copy of your

17  affidavit signed by him?

18  A.   I think so, but I can't -- I'm pretty sure.  I can't

19  remember if the one we actually presented to you during

20  the search warrant was a signed copy.  I mean, I know it

21  was a true copy that's a valid search warrant, but I

22  don't remember if it had his stamp or if it had his

23  actual physical signature or not.

24  Q.   Have you seen Magistrate McCarthy's stamp on any

25  affidavit signed by you?

1   A.   Yes.  I think some of the copies we have, because I

2   have multiple copies.  I don't know if they're third and

3   fourth copies of the same document, but I have seen a

4   copy with Magistrate McCarthy's stamp on it.

5   Q.   Do you know if you've seen any copies with your

6   signature in blue ink with his stamp on it?

7   A.   I don't recall.

8   Q.   Okay.

9        MR. SPRINGER:  I'm concluded, Your Honor.

10       THE COURT:  Mr. Stilley.

11                   DIRECT EXAMINATION

12  BY MR. STILLEY:

13  Q.   Mr. Shern, would it be fair to say that it's just a

14  little bit difficult to remember the events that occurred

15  all that time ago?

16  A.   Yes, remembering them exactly how they happened, I

17  would say it's difficult to remember back that far.

18  Q.   I believe I heard you say a time or two the word --

19  that you signed a document twice and you used the

20  singular.  Was that intentional?

21  A.   Could you clarify?

22  Q.   Okay.  It sounded to me like you said, "I took the

23  original in and I signed the original in two places, on

24  the first page and then on the signature page."

25  A.   Yes.

 1   Q.   Do you recall saying that?

 2   A.   Yes.

 3   Q.   Was that actually what happened?

 4   A.   I think so, yes.

 5   Q.   So the truth is there's not multiple originals,

 6   there's one original, correct?

 7   A.   I'm not sure.  I don't remember if I signed multiple

 8   documents or not.  I think I just signed -- the best of

 9   my recollection, I just signed one with -- in the judge's

10   chambers, but I may have signed more with the judge

11   magistrate's secretary.

12   Q.   Well, now, the judge magistrate's secretary is not

13   authorized to administer an oath, is she?

14           MR. O'REILLY:  Objection, Your Honor,

15   argumentative.

16           THE COURT:  If he knows.

17   Q.   (BY MR. STILLEY)  Do you know?

18   A.   No.

19   Q.   You don't know one way or the other?

20   A.   I know she's not authorized, right.

21   Q.   Okay.  So the only oath that would qualify under the

22   Fourth Amendment, requirement of oath or affirmation,

23   would have had to have been in front of Judge McCarthy,

24   right?

25           MR. O'REILLY:  Objection, Your Honor.  Calls for

 1  a legal conclusion.

 2          THE COURT:  Sustained.

 3  Q.   (BY MR. STILLEY)  The only time that you even

 4  attempted or thought that you made an oath was in front

 5  of Judge McCarthy, correct?

 6  A.   Yes.

 7  Q.   And what you're telling this judge is that there is

 8  a single original, correct?

 9  A.   To the best of my recollection, yes.

10  Q.   And photocopiers will only make an exact copy,

11  unless there's some attempt to tamper, but a photocopier

12  is going to make an exact copy of the original, correct?

13  A.   Yes.

14  Q.   So the original -- the original that came out of

15  Judge McCarthy's office and went to the clerk's office

16  with blue ink was not signed by Judge McCarthy, correct?

17          MR. O'REILLY:  Objection, Your Honor.  Calls for

18  speculation.

19          THE COURT:  If he knows.

20          THE WITNESS:  I don't know.

21  Q.   (BY MR. STILLEY)  You don't know?

22  A.   No.

23  Q.   Well, you are aware that there's a copy in the

24  clerk's office that has ink on it, correct?

25  A.   I would think so, but I don't know -- I don't have

1  firsthand knowledge of that, no.

2  Q.   Are you trying to persuade the Court that there is

3  some other copy with ink on it that this Court should

4  rely on?

5           MR. O'REILLY:  Objection, Your Honor,

6  argumentative.  Calls for --

7           THE COURT:  Sustained.

8           MR. O'REILLY:  -- speculation.

9           THE COURT:  Sustained.

10          MR. STILLEY:  Okay.

11 Q.   (BY MR. STILLEY)  If you know, is the document in

12 the clerk's office, your affidavit that is in the clerk's

13 office, is that a public record at this point in time?

14 A.   Yes, I think -- yes.

15 Q.   So any member of the public can go get a copy of it,

16 correct?

17 A.   Yes.

18 Q.   And any member of the public would be entitled to

19 rely on that copy, that it is a true and correct copy of

20 the original, correct?

21          MR. O'REILLY:  Objection.  Calls for a legal

22 conclusion.

23          THE COURT:  Sustained.

24 Q.   (BY MR. STILLEY)  Do you have any knowledge of any

25 other location, whether there's another copy of your

1  affidavit with your signature on it in ink other than in

2  the clerk's office?

3  A.   I don't recollect if I have one or not.

4  Q.   Well, if you had one, you should know about it,

5  correct?

6  A.   Yes.  I mean, I know where I keep the copies of the

7  search warrant affidavits that I have, but I'm not a

8  hundred percent sure if I have one with blue ink on it or

9  not.

10 Q.   Well, you wouldn't try to persuade this Court to the

11 preponderance of the evidence that there is another one

12 out there with your ink signature on it, correct?

13         MR. O'REILLY:  Objection.  Unclear on what the

14 question he's asking, Your Honor.

15         THE COURT:  Overruled.

16         THE WITNESS:  Could you ask it again?

17 Q.   (BY MR. STILLEY)  Did you understand the question?

18 A.   No.  Could you ask it again, please?

19 Q.   I'm asking you to admit that you don't have any

20 personal knowledge of another copy of your affidavit that

21 has your ink signature on it anywhere.

22 A.   I don't remember if I have one with an ink signature

23 on it or not.

24 Q.   So then the answer --

25 A.   I could check.

1   Q.   The answer would be that you would not -- you don't

2   claim to be able to convince -- to provide proof in this

3   Court to the preponderance of the evidence that there is

4   another ink-signed copy that has got your ink signature,

5   correct?

6           MR. O'REILLY:  Objection.  Calls for a legal

7   conclusion.  I'm not even sure what's being asked, but.

8           THE COURT:  I'm going to let him -- the witness

9   try to figure out what's being asked one more time.  It

10  has a strong resemblance to what has been asked already,

11  but we'll allow one more run at it.

12          THE WITNESS:  Could you please clarify that

13  previous question?

14  Q.   (BY MR. STILLEY)  Sure.  I'm trying to find out if

15  you think that you have personal knowledge, at least to

16  the preponderance of the evidence, of another ink-signed

17  copy of your affidavit.

18          MR. O'REILLY:  Objection.  Asked and answered

19  and calling for a legal conclusion.

20          THE COURT:  Overruled at this point.

21          THE WITNESS:  Could you ask that one more time?

22  Q.   (BY MR. STILLEY)  Sure.  Glad to.  I'm trying to

23  find out if you think that you have knowledge or evidence

24  of another copy of your affidavit that has ink on it --

25  an ink signature of yours and I'm asking you to admit

1  that you don't have personal knowledge of any other such

2  copy.

3  A.   I can't admit that.  I can say I don't remember if I

4  have another copy with my ink signature on it, but I

5  would have to check.  I don't recall if I do or not.

6  Q.   I'm just asking about your knowledge as you're

7  sitting right here right now.

8           THE COURT:  Next question.

9  Q.   (BY MR. STILLEY)  Do you agree that the copy that's

10  in the clerk's office is an original public record copy

11  of the document?

12           MR. O'REILLY:  Objection, Your Honor.  Asked and

13  answered, calls for a legal conclusion.

14           THE COURT:  Sustained.

15           MR. STILLEY:  Pass the witness.

16           THE COURT:  Cross-examination.

17           MR. O'REILLY:  No, Your Honor.

18           THE COURT:  You may step down.  You may be

19  seated, Mr. Springer.

20           MR. SPRINGER:  Okay.  Thank you, Your Honor.

21           MR. O'REILLY:  Your Honor, for clarification,

22  was Government's Exhibit 1 moved into evidence?  If not,

23  I would move so at this time.

24           THE COURT:  It is received.  May I see?

25           MR. SPRINGER:  I would also, Your Honor, move

 1   Defendant's Exhibit Number 1 into evidence.

 2           THE COURT:  It will be received.  Government's

 3   Exhibit 1 is a copy of a document that has what I'll call

 4   a cover page, it is Administrative Office Form 106.  The

 5   administrative office's name for the document is

 6   "Affidavit for Search Warrant."  And on the cover page

 7   there's a place for the affiant to sign and for the

 8   judicial officer to sign.  Then at the end of the

 9   exhibit, there is another signature page.

10       Now, this is the one that lacks page 18, but for

11   present purposes, given the narrow purpose for which the

12   Court scrutinizes the document, that omission is

13   immaterial.

14       The Court having heard the testimony of Agent Shern,

15   having carefully reviewed Government Exhibit Number 1,

16   finds quite easily that there's no showing of any

17   material irregularity in the execution of the application

18   page, which is the cover page, or the signature page,

19   which is page 24 of this search warrant affidavit, and

20   that it was appropriately presented to Magistrate Judge

21   Frank McCarthy, at which time the affiant, Mr. Shern,

22   swore to the truth of the matters set forth in the

23   affidavit as evidenced by the signature of Magistrate

24   Judge Frank McCarthy.

25       And for that reason, I find as a matter of fact and

1   conclude as a matter of law that there is no material

2   irregularity in the execution of the search warrant

3   affidavit.  And any arguments in the papers now before

4   the Court that are premised on a contrary suggestion may

5   be disregarded and will be disregarded by the Court and

6   may be disregarded by counsel for the government.

7       I'll hand these exhibits to the clerk to retain at

8   least for the time being until such time, if ever, as the

9   Court directs that they be withdrawn.

10      Now, that brings us to the second set of issues.

11  Here we are an hour into it and we have established that

12  the affidavit is an affidavit.  That brings us to the

13  second set of issues.

14          MR. SPRINGER:  Your Honor, may I approach just a

15  second?  When we were going through that, that was for

16  the sole purpose of determining one factor.  And you had

17  asked me earlier, after you gave me a premise of what we

18  were to discuss, why would I argue that that affidavit

19  did not remain an affidavit, why was it not an

20  affidavit.  And when we were starting to go down that

21  road, we got off onto this Brian Shern thing because of

22  Defendant's Exhibit Number 1 and I was unable to then

23  demonstrate to the Court nor was I allowed to ask

24  Mr. Shern any questions with regard to how that document

25  became an affidavit.

1          The only thing that Mr. Shern has said so far is

2    that he walked in, was sworn in by Magistrate McCarthy,

3    and the evidence shows that the only document that's

4    original is not signed by Magistrate McCarthy, that

5    there's no other document.  And, you know, I know it's

6    hard to imagine, but it is -- the document speaks for

7    itself, that they have no evidence of any original

8    document going to Magistrate McCarthy.

9          THE COURT:  Mr. Springer, your next argument

10   about that affidavit is going to be to the Court of

11   Appeals, if necessary.

12         MR. SPRINGER:  Right.  Thank you, Judge.

13         THE COURT:  Very well.

14         MR. STILLEY:  Your Honor, I just didn't -- the

15   Court didn't ask if there was any objections.  For the

16   record, I just want to make it clear that I would suggest

17   that the document has not passed authenticity and it

18   violates the best evidence rule, if I was asked on that

19   about whether I had any objection to that --

20         THE COURT:  Overruled.  The Government's Exhibit

21   1 and the Defendant's Exhibit 1 are received and, trust

22   me, that's the last we're going to hear about the

23   affidavit, the execution of the affidavit.

24         Now, Mr. Springer, you're back up.  At the outset of

25   this hearing, just about an hour ago, I commented and I

1    really meant it when I said I didn't mean to be critical

2    or pejorative in my description, but your memorandum in

3    support of your motion for a Franks hearing in some ways

4    is a bit difficult to follow in terms of what I would

5    call a strict Franks analysis.  You challenge the

6    veracity of persons other than the agent.  You raise some

7    issues that may not, strictly speaking, be Franks issues.

8         We do have the affidavit.  And, as a matter of fact,

9    Pam, if you would give me Government's Exhibit 1 back.

10   Okay.  We do have the affidavit.

11        The issue now, Mr. Springer, is your ability to make

12   the preliminary showing necessary for me to proceed with

13   a full-blown Franks hearing.  And what I want you to do,

14   and I want you to understand me quite clearly, what I

15   want you to do is to show me with the documents you've

16   already got in the record by way of your preliminary

17   showing why I should either disbelieve or treat as being

18   asserted in reckless disregard of the facts statements by

19   Agent Shern in his search warrant affidavit.

20             MR. SPRINGER:  Your Honor, there are witnesses

21   in the courtroom that I've subpoenaed.  Can we ask that

22   they be removed from the courtroom while I answer those

23   questions?

24             THE COURT:  I think that would be appropriate.

25   Subpoenaed witnesses will please be excused.

```
 1           MR. O'REILLY:  Your Honor, we'd ask the case
 2   agent be allowed to remain.
 3           THE COURT:  Yes.
 4           MR. SPRINGER:  May I also see Defendant's
 5   Exhibit Number 1, Your Honor?
 6           THE COURT:  You surely may.  Now, bear in mind,
 7   I'm going to say one more time, bear in mind the ground
 8   rules.
 9           MR. SPRINGER:  Yes, sir.
10           THE COURT:  The issue is whether you have made
11   the necessary preliminary showing.
12           MR. SPRINGER:  Right.
13           THE COURT:  And by that I want you to focus on
14   averments in the affidavit as they may be negated or at
15   least made pointedly questionable or highly questionable
16   by other submissions, other documents in the record.  And
17   I'm not going to be a strict referee.  I may interject
18   myself to some degree as you proceed.  But I want you to
19   turn around and look at that clock on the wall.  You've
20   got until 10:30.
21           MR. SPRINGER:  All right.  Thank you.  From the
22   outset, Your Honor, the affidavit in places strictly
23   relies upon what others have said.  And you mentioned
24   earlier about hearsay informants, relying on informants
25   even if they're false.
```

1    In this case, because Mr. Shern had been a special

2  agent since February, his affidavit almost relies solely

3  on the words written by others, such as Agent Arsenault

4  in the memos for Mr. and Mrs. Patterson, Donna Meadors,

5  who did a 6700 investigation.  And so even though he has

6  a right to rely upon what others have said, that's only

7  if he doesn't know otherwise or had a reason to know

8  otherwise with regard to the statements that he relied

9  upon.

10    Now, in his affidavit, and I will concede certain

11  paragraphs as I go through here to show you exactly what

12  my evidence shows.  Skipping paragraph 1 and 2, skipping

13  paragraph 3, other than he says he has special training,

14  and that becomes, I think, a question that may not have

15  been true with experience in that he had only been an

16  agent for a very short period of time.

17    If you notice on paragraph 4, he says, "As a new

18  special agent, I'm receiving instruction and supervision

19  from Special Agent Don Shoemake."  This is on page 2,

20  paragraph 4.  And then he describes the qualifications of

21  Shoemake or Shoemake.  I'm not sure if I'm pronouncing --

22  Shoemake, Shoemake.  Sorry about that.  He goes on at

23  length in paragraph 4 and talks about somebody else's

24  experience.

25    Then on page 3, he says, "The following information

1  was initially discovered in the course of an

2  investigation and prosecution of Eddie Patterson."  Now,

3  this becomes a very important statement in Mr. Shern's

4  affidavit because the government has tried to argue that

5  when Lindsey Springer was added to the investigation of

6  Eddie Patterson that that took place in June of 2005 and

7  that would appear in their response to my Franks hearing

8  and -- when, in fact, if you notice the very next

9  sentence on page 3, "Information was further developed

10  when the investigation of Eddie Patterson was expanded to

11  include Lindsey Springer with regard to violations of

12  Title 26, 7201 and 7203."

13       "This investigation," he says, "pertains to

14  allegations Lindsey Springer received income from

15  providing legal and tax advice to numerous clients."

16  Now -- "and that he knowingly and willfully did not

17  report this income in order to evade the taxes associated

18  with it."  He goes on, "Information obtained during the

19  investigation also suggests Springer's conduct may

20  constitute a Title 2672 violation."  Which, obviously,

21  that did not end up -- wind up being true.

22       And in the last sentence in paragraph -- page 3 was,

23  "The information was received by the affiant from

24  personal observation" -- which is minimal at best -- "and

25  experience" -- which we know that's from February till

1   September 15th -- "and from other law enforcement

2   officers and other individuals named herein."

3        Now, this is where I believe that you can't just

4   rely upon even if it's false because Mr. Shern said in

5   his affidavit even though he had no personal knowledge of

6   it.  Because as we go through this affidavit, we learn he

7   knew that when they added Lindsey Springer to the Eddie

8   Patterson investigation that was when Arsenault

9   discovered that there was three checks in August,

10  September, and October of 2000 of $10,000 given to

11  Lindsey Springer.  And they've admitted this.  It's

12  actually admitted in this affidavit later on.

13       Mr. Shern suggests that that information was found,

14  as he learned later on, in a statement by Mr. Arsenault,

15  that Mr. Arsenault discovered this during preparing for

16  trial in the Patterson case.  Which the Patterson trial

17  originally scheduled for September of 2003, but ended up

18  being in November of 2003.  Very important distinction

19  and deadline of which he would have known had he looked

20  at any of the documents besides relying upon one view of

21  something that was tainted.  And he knew it was tainted.

22  And I can prove he knew it was tainted.  And there's just

23  several examples of that.

24       If you look at page 3, paragraph 1, he says, "Eddie

25  Patterson was found guilty by a jury in the Northern

1   District of Oklahoma on December 16, 2003, for certain

2   violations.  He was sentenced on September 1, 2004, to

3   110 months imprisonment."  Very important to understand

4   Eddie Patterson got sentenced on September 1, 2004.

5       The Department of Justice comes in and argues I was

6   added to the Eddie Patterson investigation in June of

7   2005.  Mr. Patterson, which I've attached as an

8   exhibit -- Exhibit 22, attached to Docket Number 75, is a

9   joint agreement entered into between the Department of

10  Justice and Eddie Patterson on August 30th, a day before

11  -- the day before he is sentenced.

12      And it's very important to see that the government

13  in that joint agreement, they say they're not going to

14  pursue him anymore, they're not going to charge him

15  anymore, they're -- part of this agreement because of

16  Blakely issues that had arisen that may have drawn into

17  question the jury's verdict, that the government was

18  compelled to enter into this agreement with him and --

19          THE COURT:  By the way, let the record show I

20  just inadvertently made a note on page 3 of Exhibit

21  Number 1, it's a handwritten note down at the bottom of

22  the page, it just says stipulation 8/30/04.  I forget

23  that's an exhibit, but that's the source of that

24  notation.  You may proceed.

25          MR. SPRINGER:  May I lay this right here?  Now,

1  in Exhibit Number 22, on page 2, Mr. Horn and Mrs. Nelson

2  write, "Since the jury trial, the defendant has severed

3  his relationship with his trial attorney, Oscar Stilley,

4  and hired new counsel, Steve Knorr.  On May 6, 2004, the

5  defendant with his attorney, Steve Knorr, was interviewed

6  by the undersigned and agents of the FBI and IRS

7  concerning an ongoing investigation of Oscar Stilley,

8  Gerald Barringer, and Lindsey Springer."

9      Now, it doesn't say that Lindsey Springer, Gerald

10  Barringer, and Oscar Stilley are added to in June of 2006

11  the Patterson grand jury investigation, which is what the

12  government has argued in their response.  And what's

13  suggested here is that in the affidavit on paragraph 1 of

14  page 3 --

15          THE COURT:  As of May of '04 you were old hat

16  with the IRS.  There's no --

17          MR. SPRINGER:  No doubt about it.  No doubt

18  about it.  I totally am establishing now, though, what

19  Mr. Shern knew and he should have known.

20          THE COURT:  Should have known what?

21          MR. SPRINGER:  That I was under criminal

22  investigation and that it wasn't an Eddie Patterson

23  criminal -- it wasn't Eddie Patterson's grand jury

24  criminal investigation in June, it was they added me back

25  in 2003.  And it becomes very relevant for Mr. Shern to

1  rely upon or ends up relying upon what Donna Meadors did

2  and what Tim Arsenault was doing, especially when it

3  comes to what he says is when the criminal investigation

4  began.  So although I'm not going to be able to disrupt

5  paragraph 1, I'm laying a foundation for paragraphs that

6  are going to become attacked here in a moment.

7          THE COURT:  And you've eaten up about half of

8  your time.

9          MR. SPRINGER:  I got you.  On paragraph 2, he

10  says Special Agent Tim Arsenault with Patterson during an

11  interview discussed representation in his criminal

12  trial.  This becomes very important for his theory of

13  establishing that I was being paid by Eddie Patterson to

14  represent him is the way the words are used.  Patterson

15  waived any attorney/client privilege to discuss the

16  issues of being criminally investigation.  At the

17  meeting, Patterson decided to hire Springer right there.

18  This becomes key to probable cause on his theory.

19  Everything else before that by itself doesn't matter.

20  "Hire Springer," he said.

21      Yet, in just two paragraphs later on page 5, he's

22  going to say Patterson didn't give Springer any money for

23  six more months.  On page 5, paragraph 3, Patterson

24  identified three $10,000 checks written to Springer,

25  8/25, 9/25, and 11/9.

 1      So he's telling Magistrate McCarthy I was hired in

 2   March by the Patterson -- by Eddie Patterson with

 3   Stilley.  As he goes on, on page 4, "At the meeting,

 4   Patterson decided to hire Springer and Stilley to

 5   represent him with respect to his criminal tax

 6   investigation."

 7      Now, the very first check that Mr. Patterson gave

 8   me --

 9          THE COURT:  Now, show me -- forgive me, but

10   where that very last passage is that you just read.

11          MR. SPRINGER:  That he hired Springer and

12   Stilley, that's on page 4, paragraph 2, in the last --

13   second to the last sentence.  "At the meeting, Patterson

14   decided to hire Springer and Stilley to represent him

15   with respect to criminal tax investigation."

16          THE COURT:  That's in --

17          MR. SPRINGER:  Page 4, paragraph 2.

18          THE COURT:  Okay.  Proceed.

19          MR. SPRINGER:  Okay.

20          MR. O'REILLY:  Your Honor, just one moment.  I

21   don't know the gentleman that just came in.  I don't know

22   if he's a prospective witness or not.

23          MR. SPRINGER:  No.

24          THE COURT:  Proceed.

25          MR. SPRINGER:  And then if you turn to Exhibit

1  26 of Defense Exhibit Number 25 --

2        THE COURT:  Well, wait, wait.  First of all,

3  let's look at the middle of paragraph 2 on page 4.

4        MR. SPRINGER:  Okay.

5        THE COURT:  "In March 2000, Patterson met with

6  Stilley and Lindsey Springer (Springer) to discuss the

7  issue of him being under criminal investigation for tax

8  violations."  Now, is the antecedent of the pronoun "him"

9  Patterson?

10        MR. SPRINGER:  I can read it no other way.

11        THE COURT:  Okay.  Proceed.

12        MR. SPRINGER:  If you go to Exhibit Number 26 of

13  Docket Number 75 -- which Mr. Shern has told me

14  previously that he had a copy of this when I tried to

15  give it to him.  And that was the -- I'm sorry, I'm

16  missing -- there it is right there.

17     In a letter written to me with that first check, and

18  it has got August 25, 2000, Mr. Patterson writes to

19  Lindsey Springer, "Donation, Dear Lindsey, please find

20  enclosed our donation check hopefully as an encouragement

21  to you to continue your fight against the anti-

22  constitutional issues endorsed, encouraged, and policed

23  by our government.  If we had more Christians standing up

24  for God's laws and for the rights of the American people,

25  this would once again be a country of the people by the

1   people and for the people endowed and blessed by its

2   creator.  Thank you for being willing to suffer

3   persecution to do that which is right.  In closing,

4   please don't forget to call Eric Lynch to discuss the

5   issues he's working on."

6       Now, as we proceed further to page 4, after

7   Patterson on paragraph 3 discusses -- he said -- now,

8   keep in mind this entire affidavit is Mr. Shern never met

9   with Mr. Patterson before he wrote this.  The only thing

10  he did was read Arsenault's memorandum of which

11  Mr. Patterson has never testified that those words are

12  true.  And Mr. Shern writes, "Patterson stated Springer

13  initially told him he needed 45,000 to work on the case.

14  Patterson said he paid Springer this 45,000 over the next

15  several months."  Now, this is a -- presuming from March

16  of 2000 at this meeting where I was hired.

17      "Springer asked Patterson to write 'donation' on the

18  memo line of the checks that were written to him.

19  Springer said he did not charge fees but took money for

20  his ministry.  Patterson said that any payments to

21  Springer represented fees for services related to

22  handling his criminal case.  He sends a letter, which

23  Mr. Shern knows about, with a check, never mentions

24  anything about thank you for helping me in my criminal

25  case, here I'm hiring you, nothing.  And yet he's sitting

 1  there matter of factly telling Magistrate McCarthy

 2  something he knows is not true.

 3      Patterson said that any payments -- and, Mr. Snoke,

 4  I can hear you and if you want to testify, I'll be glad

 5  to put you on the witness stand.

 6          MR. O'REILLY:  Objection, Your Honor.  May the

 7  defendant please refrain from speaking to counsel?

 8          THE COURT:  Well, Mr. Springer has got a good

 9  point and so that objection is overruled.

10          MR. SPRINGER:  Patterson said that any payments

11  to Springer represented fees for services related to

12  handling his criminal case.  Patterson would not have

13  made charitable donations to Springer because he did not

14  believe that Springer had any kind of religious

15  ministry.  Now, this is Mr. Shern, aware of this letter

16  that came with that first check, telling Magistrate

17  McCarthy this based upon his interpretation, altered

18  interpretation of Tim Arsenault's memorandum of interview

19  with Mr. Patterson, Mr. Knorr, Mr. Horn, and the FBI

20  agent.

21      And then he writes, Mr. Shern writes, "Your affiant

22  reviewed various records including checks and

23  correspondence from previous civil IRS audits and

24  criminal investigations from Springer's ministries called

25  Bondage Breakers Ministry."  I take no exception with

1  that one sentence in this paragraph 3.

2      And when you get down to the next important

3  sentence, although I don't know where charitable

4  organization has anything to do with it, he says,

5  Patterson has identified three $10,000 checks written to

6  Springer, gives numbers drawn on the same account, these

7  records were obtained pursuant to a grand jury subpoena

8  issued during the investigation of Patterson.  Now,

9  that's going to become important shortly when you start

10 seeing, which I know you very clearly see now, that the

11 grand jury investigation was long before the government

12 says it was.

13     And then he goes -- and that he thought there was

14 another check written to Springer earlier than August

15 2000 that investigators did not have at the interview.

16 Yet later on, we're going to discover here just shortly

17 that it wasn't later on but yet after.  Look at paragraph

18 4.  "On or around the Spring of 2003, Patterson endorsed

19 a $112,500 check payable to him for the sale of ECC

20 Energy stock over to Stilley for legal fees."  Now, that

21 looks like a very innocent sentence.  It really does.

22 But it wasn't spring of 2003.  The grand jury indictment,

23 as Mr. Shern knew at the time, was June 24, 2003.

24     The reason why he put "spring" in here was to make

25 it look like when Patterson was indicted, Springer got

1  money.  But that wasn't true.

2      They also tried to make it look like, oh, they

3  couldn't find that other $15,000 of the 45 Patterson said

4  he was hiring Springer with, so here they come with their

5  new theory, Patterson said he gave Stilley permission to

6  pay Springer 15,000 for services rendered by Springer for

7  Patterson's criminal case.  See right there, they're

8  trying to tie in Patterson was indicted August 16, 2003,

9  in the spring of 2003.  But yet here, here is that other

10  15,000, Patterson actually had gone from August 16th

11  until the day he got this 112,000.  I have no idea how he

12  got it.  I had -- there was no billing.  There was no

13  commitment.  In fact, the evidence clearly will show that

14  I and another person, who is now deceased, Mr. Clark,

15  were trying to raise money because Mr. Patterson was

16  broke.

17      Mr. Patterson will also get up on that witness stand

18  and tell you that as of April of 2003 he had actually

19  written an e-mail or a request in writing to another

20  attorney asking for a $5,000 retainer fee back.

21  Mr. Shern knows about it.

22          THE COURT:  Okay.  Mr. Springer, you're not

23  doing yourself any good by telling me what you hope to

24  prove some day.

25          MR. SPRINGER:  No, no, I'm just demonstrating

1  for you that --

2          THE COURT:  You're not demonstrating --

3          MR. SPRINGER:  -- that I will take out paragraph

4  4 --

5          THE COURT:  You're not demonstrating anything.

6          MR. SPRINGER:  Okay.

7          THE COURT:  Again, you do yourself no good by

8  telling me what you hope to prove some day.  We're here

9  on the preliminary issue of whether you have made --

10          MR. SPRINGER:  I have made.

11          THE COURT:  -- past tense, the showing.

12          MR. SPRINGER:  I have made.

13          THE COURT:  Okay.

14          MR. SPRINGER:  He testifies, "Your affiant

15  reviewed billing records provided by Patterson that were

16  given from Patterson to Stilley showing description of

17  services provided and amounts charged for work on

18  Patterson's criminal case."  There's not one shred of

19  evidence that he has relied upon to make that statement.

20  I demonstrated in my declaration, I demonstrated in the

21  documents that Mr. Patterson gave me that he had not

22  hired me, that he was supporting me and my mission, and

23  that Mr. Shern knew it, and he turned all this away from

24  it to make it look like something that it wasn't.

25      And I have presented evidence, sufficient evidence

1   in the letter from Mr. Patterson to draw clearly into

2   question the truthfulness of what Mr. Shern told

3   Magistrate McCarthy with regard to the relationship with

4   Mr. Patterson, that he should not have relied upon Tim

5   Arsenault's affidavit.  Which, by the way, is Exhibit

6   Number 8 attached to my motion for a Franks hearing.  And

7   in it Mr. Arsenault says things that knowingly were not

8   true and demonstrated again by this one letter from

9   Mr. Patterson that he sent to me explaining his intent

10  behind the money that he was giving me and why he was

11  supporting me.

12        Now, I demonstrated to you that Mr. Patterson was

13  indicted in April of 2003, that Mr. Shern writes,

14  "Mr. Patterson, after he received an insurance

15  settlement, gave Stilley permission to have Springer

16  receive $90,000 of the money for Springer's expertise and

17  services rendered."  Yet the letter in 2000 from

18  Mr. Patterson shows that that is not the relationship,

19  that it never was the relationship, that there was no

20  money being paid to Mr. Springer for any expertise or

21  services.

22        The last part is about Donna Meadors.  And I

23  sufficiently demonstrated, as the Court has already

24  acknowledged, that Ms. Meadors was doing a criminal

25  investigation, that she was working with several people,

1  and that when she initiated, which is Exhibit 10, her

2  letter dated January 26, 2004, that she knew that she was

3  doing and working in a criminal investigation and that I

4  was under a criminal investigation.

5      And I established -- first of all, if you look at

6  Exhibit Number 5, 6, and 7 of my motion, the government

7  argued that those documents don't have anything to do

8  with Meadors.  But if the Court would just look at them

9  at the bottom, Meadors' name is on each one of those

10 documents with a Bates stamp number, which came directly

11 from her.  Each one of those documents mentions criminal

12 investigation.

13     I gave you the deposition of Ms. Meadors where she

14 testified that she was becoming a criminal investigator.

15 The government has admitted, obviously, that Ms. Meadors

16 was involved in the Patterson case, that Ms. Meadors

17 worked with Tim Arsenault in the Patterson case along

18 with Doug Horn and Melody Noble Nelson, and that under --

19          THE COURT:  As of what day do you say she, in

20 fact, was a criminal investigator?

21          MR. SPRINGER:  In fact, the whole time.  In

22 legal, you know, give me a badge, I have no idea.  She

23 said 2005 once.  The government said 2005.  She told me

24 in a deposition, which I gave to the Court, that she had

25 an application that had been denied already once, but she

1   didn't remember when it was.  She couldn't remember so

2   many things when I took her deposition and -- but the

3   case history sheet, Exhibit Number 11, which she made

4   entries on that they had to give me in discovery in

5   another case, clearly shows that it was 2003 that she was

6   investigating me and she was communicating directly with

7   criminal agents of the IRS.

8        Now, whether you give her, you know, the title

9   criminal investigator or not, she was doing and working

10  side by side in a criminal investigation no different

11  than if she sat in one of the courtrooms up here working

12  the criminal case against Eddie and Judy Patterson.  She

13  was a revenue agent, she got to sit at the case table,

14  she got to run documents, she was training and a criminal

15  investigator.

16            THE COURT:  Under the controlling case law, what

17  is the event that provides the line of demarcation as of

18  which a civil investigation must cease in deference to a

19  criminal?

20            MR. SPRINGER:  When a criminal referral is

21  known.  In Document Number 5 or 6, let me get that to

22  you, they specifically speak about an ongoing criminal

23  referral against Lindsey Springer, ongoing.  There's so

24  much evidence of that, Your Honor, it's overwhelming.

25        Your Honor, I realize you gave me until 10:30, can I

1   have an extra five minutes?

2          THE COURT:  Proceed.

3          MR. SPRINGER:  Well, I don't know why -- I don't

4   have 21 here with me, but I -- in the record attached to

5   my motion, I gave you three documents with Meadors' name

6   on the bottom of them and one of them demonstrates an

7   ongoing criminal investigation referral in place, another

8   one discusses whether they can work me or not with that

9   criminal investigation going on.

10      On Defense Exhibit Number 21, and this is an e-mail

11  from Thomas Concannon, "I've been asked to find out if

12  there is an ongoing promoter action on Lindsey Springer.

13  We have a referral from an RA in Oklahoma relating to

14  Mr. Springer's current and continued non-filer status.  I

15  performed an Internet search and found there's quite a

16  checkered past with promoter involvement in the Omega

17  Group Prime Bank scam, Bondage Breakers Ministry, and the

18  Infinity Group.  Of additional interest is that he has

19  been appointed by God to do battle with the IRS, so we

20  could be up against some stiff competition if we decide

21  to work him."  Ongoing referral.  And this document is

22  March 6, 2003.  And this was provided to me by the

23  government and it had Mrs. Meadors' name on the bottom

24  corner of it with their Bates stamp number.

25          THE COURT:  What am I to infer from that?

1          MR. SPRINGER:  That I was under ongoing criminal

2     referral when they -- when Doug Horn and Melody Nelson

3     started -- decided to do a criminal investigation on

4     Lindsey Springer.  After the Patterson trial, they

5     decided to employ Donna Meadors to send me a 6700

6     investigation letter, a summons, and all that was to

7     further their ongoing criminal investigation.

8          THE COURT:  Looking at Exhibit 21, who is LDC?

9          MR. SPRINGER:  I don't know, but it was in Donna

10    Meadors' file.  It was something she had in her case file

11    that she turned over to Mr. Shern involving his

12    investigation of Lindsey Springer.

13         THE COURT:  Proceed.

14         MR. SPRINGER:  Okay.  So although Mr. Shern

15    can't be held liable for what Ms. Meadors did before he

16    was with the IRS, his statements in the affidavit can be

17    held liable if they were designed or generated or

18    obtained in violation of the Supreme Court's decisions

19    that the Court cited earlier that they cannot be using a

20    civil summons for a criminal investigation when they have

21    an ongoing referral, which is the test -- now, there have

22    been some cases, Your Honor, that I've read that say that

23    the first indicators are badges of fraud are the thing

24    that stops a civil investigator.

25        Donna Meadors' case, she's doing a 6700

1  investigation and the only thing she would never

2  disclose, which is in Mr. Shern's affidavit, is whether I

3  was promoting something or not.

4          THE COURT:  Now, as I believe you indicated

5  earlier in response to a question I had a few minutes

6  ago, is it not true that in the LaSalle case the Supreme

7  Court drew a bright line based on referral?

8          MR. SPRINGER:  Yes.

9          THE COURT:  Show me the document in your

10 submissions that establishes the date of the referral as

11 far as you're concerned.

12         MR. SPRINGER:  Based upon what I've been given

13 by the government so far, Your Honor, it's what I've

14 attached, Exhibit 21, Exhibit 5.  May I have just a

15 second, Your Honor, to answer that question?

16         THE COURT:  Go ahead.

17         MR. SPRINGER:  Exhibit Number 8 attached to my

18 motion for a Franks hearing says, "A promoter

19 investigation has previously been authorized by the" --

20         THE COURT:  Now, where are you reading?

21         MR. SPRINGER:  This is Exhibit Number 8.

22         THE COURT:  I have that, but --

23         MR. SPRINGER:  Memorandum from Kevin McCarthy.

24         THE COURT:  Are you on the first page of it or

25 the second page of it or the third page of it?

1          MR. SPRINGER:  The docket of the clerk shows,

2   Your Honor, that it's just page 1 of 1, 75-8.  I'm

3   sorry.  It's -- I can --

4          THE COURT:  If it's attachment 8, it's a multi-

5   page document.

6          MR. SPRINGER:  Okay.  I'm just going by the

7   clerk's --

8          THE COURT:  Well, no, it's Exhibit 7.  Go ahead.

9          MR. SPRINGER:  Seven?  Okay.  "A promoter

10  investigation has previously been authorized by

11  (unintelligible).  Meanwhile, criminal investigators,

12  field offices have completed further reviews and may be

13  interested in a partial criminal investigation.  CI will

14  contact AT."  This is October 14, 2003.  And we at least

15  know before March 6, 2003, there was an active referral

16  by the -- to the IRS based upon Exhibit Number 7, so --

17  and this goes all the way back to 1996 with

18  Mr. Kirkpatrick's letter that I attached also --

19          THE COURT:  Your time as extended has expired.

20          MR. SPRINGER:  Okay.  Thank you, Your Honor.

21          THE COURT:  Now, Mr. Stilley, your motion, I

22  think, is in some important ways different from

23  Mr. Springer's motion.  Am I right about that?

24          MR. STILLEY:  That is correct, Your Honor.

25          THE COURT:  Then we will address that

1    separately.

2         MR. STILLEY:  Sure.

3         THE COURT:  We'll take a recess at this time and

4    then I will hear from the government under similar time

5    limitation to respond to Mr. Springer's presentation.

6    We'll resume at five minutes till eleven, guided by the

7    clock on the wall there.  Court will be in recess.

8        (RECESS HAD)

9         THE COURT:  Mr. O'Reilly, you may proceed.

10        MR. O'REILLY:  May it please the Court, Your

11   Honor.  Frankly, the government has very little to add to

12   its pleadings.  Mr. Springer has failed to meet the

13   threshold necessary.  He has failed to identify false

14   statements that were necessary to a finding of probable

15   cause.  His allegations of when he was under criminal

16   investigation fail, as indicated in the government's

17   pleadings, by his very documents.

18       And one document I do want to draw attention to,

19   which was discussed, I think it was Document 7, Exhibit 7

20   in his pleadings from -- I think it was 75.  I

21   apologize.  I had that -- this related to the Donna

22   Meadors' materials.  And just for clarification, Meadors

23   at the bottom of the page is part of the Bates

24   numbering.  It does not indicate that she was a party to

25   that actual document, only that it ended up in her file

1    at some point.

2         But one of the phrases in that document was, and I

3    want to find it so I get it -- Document Number 75-7,

4    which is an e-mail -- appears to be an e-mail dated March

5    6, 2003, between --

6              THE COURT:  Excuse me.  Where are you looking?

7              MR. O'REILLY:  75-7.  I don't have a copy of it

8    here in front of me, Your Honor, but -- thank you.  And

9    the very last sentence of the main paragraph states, "So

10   we could be up against some stiff competition if we

11   decide to work him."  Which the implication of that to me

12   is very clear, he was not under investigation, it was he

13   might become so.

14        The 6700 investigation was simply to find out

15   whether or not -- apparently, there was some evidence

16   that he was selling abusive trust materials.  Donna

17   Meadors, as part of her assignment as a revenue agent,

18   looked into it and closed the case with a finding that,

19   in fact, there was no evidence that he was selling

20   abusive trust materials.  That was a civil

21   investigation.  She did not become a special agent until

22   after her training, which was in 2005.

23        But that's not even -- that doesn't really go much

24   to the Franks hearing, because the Franks hearing is

25   supposed to focus on the veracity of the affiant.

 1          In his pleadings, he identified three specifically
 2    -- false statements, as I understand it.  One was that
 3    the investigation of Eddie Patterson was expanded to
 4    include Lindsey Springer.  And as demonstrated in the
 5    government's pleading, 80 -- in response and the
 6    attachments to 80 -- and let me grab those.  Document
 7    80-2, which was filed with the government's response, is
 8    the grand jury expansion authorization with respect to
 9    the Patterson investigation authorizing the expansion of
10    the Patterson grand jury investigation to be expanded to
11    include Lindsey K. Springer.  That occurred on June 10th
12    of 2005.
13          THE COURT:  And that is which --
14          MR. O'REILLY:  Document 80-2, which is
15    attachment A to the government's consolidated response to
16    the defendant's motion to suppress and for Franks
17    hearing.
18          THE COURT:  Dated June 10, 2005.
19          MR. O'REILLY:  Correct, Your Honor.
20          THE COURT:  And now that refers to expanding an
21    existing non-tax grand jury investigation to include an
22    investigation of potential criminal tax violations with
23    respect to Mr. Springer.
24          MR. O'REILLY:  Yes, Your Honor.
25          THE COURT:  Okay.  Very well.  Proceed.

1              MR. O'REILLY:  Also attached to that is various

2   other documentation, which again corroborates Special

3   Agent Shern's statement in the affidavit of when the --

4   how the investigation of Lindsey Springer began.

5        The one documented misstatement that Mr. Shern

6   made --

7              THE COURT:  The sentencing thing?

8              MR. O'REILLY:  Correct, Your Honor.

9              THE COURT:  Okay.  Go ahead.

10             MR. O'REILLY:  And as the Court, you know, the

11  appellate courts have ruled, you redact that, it changes

12  nothing, it doesn't affect probable cause.  Mr. Springer

13  has ignored the evidence of all the other individuals who

14  are identified and who were paying him money and for whom

15  he was providing assistance.  Mr. Springer has failed to

16  identify false statements with the exception of the

17  sentencing and he has failed to -- even if his

18  allegations were taken as true, which we've demonstrated

19  they're not, there's more than enough in the affidavit to

20  establish probable cause.  But there is no basis,

21  certainly not a substantial showing of false statements

22  knowingly and intentionally or with reckless disregard

23  for the truth being included in the affidavit.

24       And, Your Honor, unless you have additional

25  questions, I really have nothing more to add to this.

```
 1            THE COURT:  Exhibit 1 to your response is the
 2    June 10th letter.
 3            MR. O'REILLY:  Yes, Your Honor.
 4            THE COURT:  Refresh my recollection.  Is the
 5    June 3rd letter as referred to at the beginning of that
 6    June 10th letter, is that attached to your --
 7            MR. O'REILLY:  I believe it is, Your Honor.
 8    Hold on.  Yes, Your Honor, it's the last document,
 9    Document 80-10.
10            THE COURT:  That would be -- okay.
11            MR. O'REILLY:  And that is the criminal referral
12    referring Mr. Springer to the Department of Justice tax
13    division seeking to have the tax division authorize a
14    grand jury investigation for purposes of potential Title
15    26 violations.  And that was on -- June 3, 2005.  And as
16    noted on the face of it, handwritten by our office, the
17    tax division, "Patterson investigation expansion."  And
18    as noted in the RE line, "Title 26 grand jury
19    investigation expansion concerning Lindsey K. Springer."
20            THE COURT:  Now, which of these two documents,
21    the June 10th letter or the June 3rd letter, strictly
22    speaking, would you suggest -- or something else, for
23    that matter, I don't mean to confine you on that -- is
24    the definitive demonstration of the date of a referral?
25            MR. O'REILLY:  The referral would be made by the
```

 1  June 3rd letter.  Because that comes from the IRS.  That

 2  is their referral letter to the Department of Justice tax

 3  division seeking authorization to actually conduct a

 4  grand jury investigation of a potential Title 26

 5  violation.

 6          THE COURT:  Thank you.

 7          MR. O'REILLY:  Thank you very much, Your Honor.

 8          THE COURT:  I have no further questions.  Very

 9  well.

10          MR. SPRINGER:  Your Honor, may I reply briefly

11  to that?

12          THE COURT:  You may reply briefly.  I'm not

13  going to give you -- I'll give you -- this is more time

14  than people usually get for a reply.  I'll give you the

15  amount of time that Mr. O'Reilly consumed.

16          MR. SPRINGER:  Okay.

17          THE COURT:  Which, as I say, is it's more time

18  than people usually get for a reply.

19          MR. SPRINGER:  Exhibit 4 attached to Docket

20  Number 81 is a December 15, 2005, grand jury

21  investigation of Lindsey Springer by Doug Horn, written

22  to the Department of Justice to get a subpoena on Oscar

23  Stilley --

24          THE COURT:  Now, now, excuse me.  Say again

25  which document you're --

1          MR. SPRINGER:  It's Document 81-4.

2          THE COURT:  Okay.  And tell me the date of the

3    document.

4          MR. SPRINGER:  The date of the document is

5    December 15, 2005.  And I realize that's after the date,

6    but what's important is because of the catching word that

7    Mr. O'Reilly said that the referral from IRS to the

8    Department of Justice, but the e-mail that I gave you

9    clearly shows a referral in place as of March 6, 2003,

10   and how that -- the LaSalle court is referring to a

11   referral from a revenue agent to the CID.  It's not

12   mentioning a referral from CID to the Department of

13   Justice in Washington.  And that's what Mr. O'Reilly is

14   trying to lead the Court's attention away from.

15      The question of --

16         THE COURT:  Now, wait a second.  The copy I've

17   got -- some of these documents don't have the ECF header

18   that --

19         MR. SPRINGER:  I'm sorry.

20         THE COURT:  So --

21         MR. SPRINGER:  I can give it to you, Your Honor,

22   just to see it.  This is the -- the relevance of this

23   document is if Doug Horn is asking for permission --

24         THE COURT:  Wait just a minute.

25         MR. SPRINGER:  Okay.

```
1              THE COURT:  Okay.  Now, go ahead.
2              MR. SPRINGER:  Okay.  The relevance of this
3    document is it ties in Doug Horn, Melody Nelson, grand
4    jury investigation, Lindsey Springer.  Then as you track
5    backwards to Exhibit -- or Document Number 75, then you
6    see a May 6, 2004, interview by Tim Arsenault, it's
7    Exhibit 8 attached to Docket Number 75, in which he is
8    talking about getting information, trading information
9    with Mr. Patterson on the investigation of Stilley,
10   Springer, and Barringer.
11             Then on September 1, 2004, in a joint agreement,
12   Exhibit Number 22 attached to Docket Number 75, Mr. Horn
13   and Mrs. Nelson enter into an agreement where they
14   explain thoroughly the investigation of Lindsey Springer,
15   Gerald Barringer, and Oscar Stilley under criminal
16   investigation.  And this is Doug Horn, United States
17   Department of Justice.
18             Now, one of the things that Mr. O'Reilly talked
19   today about why Mr. Horn and Mrs. Nelson were not showing
20   up today was because they had not been given permission
21   to testify, had not received it from the Department of
22   Justice in Washington.  And here he refers to the
23   referral in June of -- June 3rd of 2006 from IRS to
24   Washington, DC.  But it's these U.S. Attorneys who work
25   for the Department of Justice, who were officed at that
```

1  time out of Tulsa, Oklahoma, who were doing a criminal

2  investigation of Lindsey Springer.  There is no doubt

3  about it whatsoever.  The record is beyond dispute.

4  That's why they don't dispute it.  That's why they point

5  to the June 3rd letter of when IRS asked Washington to

6  get involved.  But Washington was already involved if we

7  accept that the Department of Justice lawyers in Oklahoma

8  are Washington, DC.

9      He said that a guy named Anderson, I believe you

10 said today, is the one who authorized or told them not to

11 show up on those subpoenas, that they had been told by

12 Washington, DC.

13          THE COURT:  Let me interrupt with a question,

14 Mr. Springer.  I can't remember offhand whether it was

15 the LaSalle case or another definitive case that held to

16 the effect that we're going to establish the referral to

17 the DOJ as the bright line.  Because while a matter is

18 still being investigated by the IRS as part of the

19 treasury department, whether it be strictly speaking

20 civil or criminal or perhaps partly both, the matter

21 becomes factually too entwined within that department to

22 sort it out.  So the referral to the DOJ is the bright

23 line that we're going to look at.  Now, am I remembering

24 something wrong?

25          MR. SPRINGER:  Yes, you are.  The -- I believe

```
1   you have to go to Argumenez (sp) in the 11th Circuit to
2   understand how the Supreme Court had said that the civil
3   and criminal aspects of the IRS are intertwined.  And
4   they said the key was whether or not there were
5   indicators or badges of fraud.  As soon as the revenue
6   agent discovers something they think is a violation of a
7   criminal statute, they have to stop.  And anything that
8   happens from that point --
9           THE COURT:  Now, wait, wait.  As soon as a
10  revenue agent sees a violation of a criminal statute,
11  they --
12          MR. SPRINGER:  They cannot use an IRS summons on
13  a civil case under 7602 to go out and further their
14  criminal investigation for badges of fraud.
15          THE COURT:  Well, revenue agents see criminal
16  violations daily, if not hourly, don't they?
17          MR. SPRINGER:  Well, I don't know for sure, but
18  I can tell you only what I've read and what clearly makes
19  sense to me is, is that you can't use a civil summons to
20  further a criminal investigation.  And just the idea of
21  that being allowed, the abuse is beyond question.
22          THE COURT:  I mean, I get called in for an audit
23  and I sit down with a revenue agent and a revenue agent
24  sees a clear bust on something and it's such a clear bust
25  that it's hard to believe that it was unintentional, but
```

1  all the revenue agent wants to do is collect some

2  additional tax.  They've seen a plausible evidence of a

3  criminal violation, but they're there to do their job,

4  they haven't seen anything that really warrants sending

5  it to the CID.  Doesn't a revenue agent see that every

6  day?

7          MR. SPRINGER:  Except for one -- you're right

8  about that, except they can't issue the summons.  That's

9  the thing that stops them.  And what Ms. Meadors said to

10  me was a summons to produce information in a 6700

11  investigation.  She neither read me my rights, she never

12  told me I was under criminal investigation.  I

13  specifically asked her if she was -- if I was.  And she

14  said no.  And then I asked her, are you working with Doug

15  Horn?  Because I just had witnessed her in the Patterson

16  case working with Doug Horn, Tim Arsenault, and Melody

17  Nelson.  And she said, no, this is totally unconnected,

18  there is no criminal investigation whatsoever.

19          THE COURT:  Now, let's assume -- I realize the

20  abusive tax shelter investigation was discontinued,

21  right?

22          MR. SPRINGER:  Yes, sir.

23          THE COURT:  Okay.  That's their word, it was

24  discontinued.

25          MR. SPRINGER:  Made up.

1          THE COURT:  Okay.  Now, if a revenue agent is

2    investigating an abusive tax shelter, then by definition

3    it's a matter that wouldn't surprise anyone if it also

4    crosses over into the criminal realm.  Are we together on

5    that?

6          MR. SPRINGER:  Except for if you know you're not

7    doing any tax abuse shelter programs, then that's what

8    separates that.  That's why you inquire is there any

9    other motive.  Specifically, in this case, I asked

10   Ms. Meadors what evidence she had that I was selling some

11   abusive tax shelter program.  And her only response in

12   front of her manager in Oklahoma City -- actually, we met

13   in Tulsa, but he came up, his name is Gregory Michael,

14   was a tape that they found for sale by somebody else on

15   the Internet in 1995.

16         THE COURT:  Okay.  It's time for you to

17   conclude.

18         MR. SPRINGER:  Okay.  I believe the test, Your

19   Honor, is when she first determined that there was

20   something in her mind that was criminal worth referring,

21   and her records demonstrate with Exhibit 7 there was an

22   ongoing criminal referral.  Exhibit 8, we're going to

23   expand this.  Exhibit 22, joint agreement in 2004 on the

24   criminal investigation.  We're going to give Eddie

25   Patterson a reduction in his sentence because he's

1    helping us in the criminal investigation of Lindsey

2    Springer.

3              THE COURT:  Okay.  Now, you're repeating

4    yourself.

5              MR. SPRINGER:  Okay.

6              THE COURT:  Thank you.  You may be seated.  I'm

7    going to permit the government to respond briefly on the

8    line of demarcation for the referral.

9              MR. O'REILLY:  Your Honor, Mr. Springer is

10   wrong.  The first instance of observation of a potential

11   criminal violation, CI would be overwhelmed, criminal

12   investigation would be overwhelmed if every time a

13   taxpayer had a false return or did something that had to

14   be referred and they had to stop summons activity.  That

15   is just wrong.  It is not a bright line for that.  But as

16   the Court noted, and I believe the Court is correct, it's

17   when the case gets referred over.

18      If Donna Meadors had been secretly working as a, you

19   know -- she was already a special agent, she was secretly

20   working, we have a very different case.  There's no

21   evidence to support that other than Mr. Springer's

22   speculation.  And the fact is it's not true.  She was

23   working a civil investigation of an alleged abusive trust

24   promotion case.  She looked at it for a little less than

25   a year, I believe, determined that there was insufficient

1   evidence to continue that and closed it down.

2      When Special Agent Shern was assigned to this case

3   in -- I believe it was March or April of 2005, he, as any

4   good agent would, went out and tried to find everything

5   there was about the individual whom he was investigating,

6   and that included Ms. Meadors' files.  And that's the end

7   of that story.  I will answer any other questions, but.

8           THE COURT:  Thank you.  Mr. O'Reilly.

9           MR. O'REILLY:  Thank you.

10          THE COURT:  As I said at the beginning,

11  Mr. Springer's motion at Docket Entry Number 75 covers

12  some issues that, strictly speaking, are Franks issues

13  and some issues which perhaps in some ways are not.  And

14  by that I mean, of course, we have the issue that the

15  Court has already resolved about whether the affidavit

16  is, in fact, a sworn affidavit.  That is not really a

17  classic Franks issue, but it's in the motion and it has

18  been resolved.

19     A good deal of the remaining argument in the motion

20  meanders back and forth between what I would call classic

21  Franks issues and those that are not.  And there may be

22  one or two things that deserve to be addressed just a bit

23  further, but I think it is time to clear the air to some

24  degree.

25     In making the comments that I'm about to make, I

1  rely to a great extent on the papers that are before the

2  Court, specifically the very detailed memorandum that was

3  filed by Mr. Springer on June 1st as well as the

4  government's response that was filed on June 15th, Docket

5  Entry Number 80.

6      By the way, Pam, I'll give this to you and you can

7  return that to Mr. Springer.

8      I had set out to analyze the matter completely on

9  the basis of those papers, in other words, without the

10  benefit of the arguments that I have heard this morning,

11  and perhaps it would have been possible to do so, but the

12  arguments this morning have been very helpful.

13      And the reason that it was my initial desire to do

14  that is that I think it is certainly consistent with the

15  concept of a Franks hearing and the preliminary showing

16  that must be made in order to have a full-blown Franks

17  hearing to expect that the preliminary showing will be

18  made and cogently made by way of submissions that excite

19  the degree of concern or, for lack of a better word,

20  suspicion that it takes in order to justify holding a

21  Franks hearing.

22      So, again, at the risk of being unduly repetitious,

23  it certainly was my intent at the outset to seek to

24  analyze the matter of whether a sufficient preliminary

25  showing had been made on the basis of the papers, but I

1  elected to have arguments this morning, which, as I have

2  said, have been very helpful.

3      I have heard from Mr. Springer, who has, of course,

4  commented on the career progress of both Agent Meadors

5  and Agent Shern.  Agent Shern was a relative newcomer to

6  the dealings of the Internal Revenue Service with

7  Mr. Springer.  For that reason, in preparing his

8  affidavit, it certainly was necessary for him to rely to

9  a considerable extent on the work product of other

10 professionals within the Internal Revenue Service.  And

11 there, of course, is no authority which would preclude an

12 agent from relying on facially credible information

13 developed by other agents within the Internal Revenue

14 Service.  And that is precisely what he did.

15      I find on the basis of the arguments that have been

16 made and on the basis of the submissions that were made

17 to which I have referred that there is no credible or

18 reliable evidence that Agent Shern in any way materially

19 mischaracterized either the activities or the overall

20 mission and purpose of Mr. Springer's activities as

21 outlined in the affidavit, the search warrant affidavit

22 that was signed by Agent Shern.

23      Mr. Springer has referred to a good number of his

24 exhibits.  I have read every single one of the exhibits

25 attached to his motion, collectively or individually.

1   They do not clear the bar that must be cleared in order

2   to have a Franks hearing.  There will be no Franks

3   hearing for that reason.

4       And in that respect, before I comment on some

5   specific items, I'll say as a general proposition that

6   the showing required for a Franks hearing cannot be based

7   on speculation, hyperbole, paranoia, or sheer argument,

8   and we have had a whole lot of all those things this

9   morning.

10       To take but a few examples, looking at Exhibit

11   Number 21 to Docket Entry Number 75, a fair reading of

12   that communication suggests that, among other things, the

13   author of the communication is trying to suggest to the

14   recipient that if we are going to take on Mr. Springer,

15   we -- or in the words of the writer, "if we decide to

16   work him," we had better be ready for some stiff

17   competition.  And that makes reference to things that

18   were already well known to the Internal Revenue Service,

19   in a civil context, Bondage Breakers Ministry and so

20   forth.

21       There is nothing in that document taken in and of

22   itself or viewed in the context of other documents in the

23   record that suggests that at the time in March of '03,

24   2003, when that was written, that there was an existing

25   criminal investigation, much less a criminal referral.

1    We have Exhibit 7, another one that Mr. Springer has

2  made reference to a number of times, which is dated in

3  October of 2003.  A fair reading of that shows that it

4  contemplates a, for lack of a better word, I would call a

5  routine abusive tax shelter investigation which -- or as

6  the author of the memorandum calls it, "a promoter

7  investigation."  It refers to the possibility of a

8  parallel criminal investigation.  It tells me nothing

9  that suggests that a criminal referral had taken place.

10  And, in fact, the evidence before the Court does not

11  establish that a criminal referral took place in 2003 or

12  at any time close to the date of this memorandum that's

13  attached as Exhibit 7.

14    The fact that it has got a Bates number down in the

15  lower right-hand corner that refers to Meadors is of no

16  moment at all.

17    There's another document in the record, which is the

18  deposition of Donna Meadors, she was obviously a witness

19  in the case that was assigned to Judge Kern, Civil

20  08-278, and that would be a deposition that, as I say, is

21  attached to the motion at Docket Entry Number 75 as

22  Exhibit -- I believe it's Exhibit 50.  But that's the

23  deposition of Donna Meadors.

24    There's ample reason for there to be documents

25  floating around the record in this case with a Meadors

1    Bates stamp that don't have anything to do with the

2    activities of Donna Meadors back in 2003.

3        We also have Exhibit 6 -- I'm sorry, that's a

4    duplication of Number 21.  And for that reason, there's

5    no need to comment further on Exhibit 6.

6        The government has attached some informative

7    exhibits to its response.  There is the June 10, 2005,

8    letter, which must be read together with the June 3,

9    2005, letter.  It's really not necessary to rely on these

10   letters as establishing when the relevant referral took

11   place simply because the burden rests with Mr. Springer

12   to demonstrate in a way that would cause the Court to be

13   seriously concerned about when a criminal referral took

14   place.  That, in fact, a criminal referral took place at

15   a much earlier stage than is suggested by the June 3rd

16   and June 10th letters.

17       Mr. Springer has not carried that burden.  However,

18   even if he had raised a significant doubt on that score,

19   that doubt would be authoritatively resolved by the June

20   3 and June 10, 2005, documents that are attached to the

21   government's response.

22       When I started to read this 37-page document, I

23   found it rather daunting.  I did take the time to work my

24   way through it very carefully as well as through the

25   exhibits.  And I find, and I'm quite well satisfied with

1   this finding in terms of the documents in the record and

2   the arguments that the Court has heard this morning, that

3   Defendant Lindsey Springer clearly has not made the

4   predicate showing necessary to establish that the Court

5   ought to hold a Franks hearing and the motion for a

6   Franks hearing will be denied.

7        Now, having said that, Mr. Springer, we're not going

8   to have any do-overs.  I hope I've made myself clear on

9   that.  But is there anything else in your motion that you

10  would suggest to the Court is entirely distinct from

11  Franks issues that ought to be addressed?

12          MR. SPRINGER:  May I have a moment, Your Honor?

13          THE COURT:  You surely may.

14          MR. SPRINGER:  I did raise just one issue that I

15  think needs to be addressed at this point with

16  suppression separate from the Franks hearing, if I'm

17  understanding you correctly.

18       My claim is that Mr. Shern's affidavit did not

19  establish probable cause to believe that the blanket of

20  information attached in Exhibit B, I believe, would be

21  located or found at my house.  There -- if we look

22  through the affidavit --

23          THE COURT:  And I'll be happy to hear -- I will

24  hear you on that because I think that particular issue

25  that you have identified may arguably be outside of the

1    Franks framework.

2           MR. SPRINGER:  And I thought that's what you

3    asked me to do.  I'm sorry if I --

4           THE COURT:  Precisely.  That's exactly what I --

5    that was my inquiry, you have responded to it, so I'll

6    hear you on that point.

7           MR. SPRINGER:  Okay.  The essence of probable

8    cause --

9           THE COURT:  In other words, at this point, we're

10   taking the affidavit, every word in it, with the possible

11   exception of "and sentencing," we're taking every word of

12   the affidavit at face value, correct?

13          MR. SPRINGER:  I am mindful of your order, yes,

14   Your Honor.

15          THE COURT:  Okay.  Very well.

16          MR. SPRINGER:  I'm standing right there on that

17   spot.

18          THE COURT:  Okay.  Proceed.

19          MR. SPRINGER:  I'm trying to --

20          THE COURT:  Now, he says in the affidavit that

21   you had no place of business separate from your

22   residence.  Is that right?

23          MR. SPRINGER:  He says that I have no separate

24   place of business, right.  He never says my business is

25   my residence.  He never says -- no one ever identifies I

1  do anything at my house in his affidavit.  The only thing

2  that he said is he drove by and saw car tags with my name

3  on it on the car tags.  And based upon that --

4  　　　　THE COURT:  As a matter of fact, he says he

5  drove by and saw you.

6  　　　　MR. SPRINGER:  Yes, he did.

7  　　　　THE COURT:  Yes.

8  　　　　MR. SPRINGER:  Yes, he did.

9  　　　　THE COURT:  Okay.

10 　　　　MR. SPRINGER:  They were taking pictures.

11 There's no question that I live in the house and there's

12 no question he identified that I live in that house.

13 There's no question about that.  I have not raised a

14 question about that.  I've raised a question about

15 whether or not the information contained in his affidavit

16 was sufficient enough to allow -- for a United States

17 magistrate to allow an IRS special agent to invade my

18 house.

19 　　　And if we go through the affidavit and we look at

20 it, other than what he has said he has learned from other

21 people, which never identifies I did anything at my

22 house, never identifies that I worked out of my house,

23 nothing, and he had only been an agent for a couple of

24 months, he never identifies how he determined that all

25 this information he was seeking would be found in my

house.  Although, I think he testified it was found in the garage.  Which you know he had driven by the house because you just said so and you know he had seen me because he said so.

But what then allowed the IRS and the magistrate judge to conclude that if they did invade my Fourth Amendment protected space that they were going to find this blanket assertion of evidence to support their -- you know, what had been stated in the -- I believe the Court is accepting Government's Exhibit Number 1, minus page 18, as the current affidavit, not Defendant's Exhibit Number 1 on that subject.

But if you go through and you read the affidavit, he never identifies specifically any person saying anything is going on in my house.  The closest he gets is he talks to a revenue agent, a CID agent in Michigan who gives either a telephone number or a fax number that again ties back to my house.  They never said I was doing anything in that house.  No one, not one witness did he ever say says we know Mr. Springer did what he did to help people at his house.

In fact, one of the theories that is swirling around in the air was I represented people.  Well, how do I do that?  Not at my house.  But yet that's where the search took place.

 1          And it is my contention and what I will argue to the

 2    Tenth Circuit Court of Appeals that the affidavit even if

 3    accepted as the Court has ruled did not establish

 4    probable cause to believe there was anything located at

 5    that place, the place that Mr. Shern searched on

 6    September 16 at 8:20 -- beginning at 8:20, 2005.  And I

 7    would ask the government to tell the Court what in the

 8    affidavit besides the fact that every human being on

 9    earth has a house, every human being has to sleep

10    somewhere, and what else connected my house to the idea

11    that they were going to find probable cause to find these

12    things in that house.  Not one witness, Your Honor,

13    testified.  Not one memorandum, not one exhibit, nothing.

14          THE COURT:  Let me follow up on at least one

15    point.  I can't remember where it is in the affidavit,

16    and as I flip through it, I may come to it, but somewhere

17    in Agent Shern's affidavit he says, in substance, that

18    the kind of activity that I have described in this

19    affidavit generates a lot of paper.

20          MR. SPRINGER:  Yes.

21          THE COURT:  Is that an implausible statement?

22          MR. SPRINGER:  Implausible, absolutely.  From

23    him, absolutely, because --

24          THE COURT:  Well, no, no, no, let's just --

25          MR. SPRINGER:  Yes, it is implausible,

```
 1   especially, in fact, that most everything -- he also -- I
 2   think it's a contradiction, but he talked many times
 3   about how everything is done electronically, it's done on
 4   media, it's done on computers.
 5         THE COURT:  Then let me correct my proposition.
 6   He said, in substance, that the kind of activity that I
 7   have described in this affidavit generates a lot of
 8   records ordinarily.  Is that an implausible statement?
 9         MR. SPRINGER:  No.
10         THE COURT:  Okay.  Very well.  I'll hear from
11   the government.
12         MR. O'REILLY:  Thank you, Your Honor.  As a
13   conditional matter, the Court actually need not even
14   address probable cause argument because the United States
15   Supreme Court held in Leon that courts may reject
16   suppression motions posing no important Fourth Amendment
17   questions by turning immediately to a question of the
18   officer's good faith.  Resolution, and I'm here
19   quoting --
20         THE COURT:  Well, if we're going to litigate
21   good faith, then perhaps he gets another bite at Agent
22   Shern and we end up --
23         MR. O'REILLY:  Well, let's not go there, because
24   we don't need to.  Because the affidavit supplied to the
25   magistrate established that there was no known place of
```

1   business for -- that Mr. Springer operated out of, that

2   he was conducting a business that generated voluminous

3   records, and that there was no other alternative logical

4   place for them to be than his residence from which

5   Mr. Shern here personally observed that the defendant

6   resided, worked -- not worked, but operated out of.

7   Plus, he had the statement from the special agent in

8   Michigan.  I believe that was in paragraph 12 on page 10

9   of the search warrant affidavit.  That Springer stated he

10  had been working with Turner and other clients and that

11  he was in possession of Turner's records, partnership

12  records, and that those records were in Oklahoma.

13       A reasonable inference of that is that they were

14  stored at his residence.  The magistrate judge signed off

15  on this warrant finding that he established probable

16  cause to search the residence and, in fact, records were

17  found.

18       Most importantly and just recently articulated by

19  the Tenth Circuit is that the defendant challenging the

20  search has the burden of proof.  That was in United

21  States v. Harrison, not repeat -- you know, stated

22  anything new, but United States v. Harrison, 566 F.3d

23  1254.  I believe it was decided in May of this year, Your

24  Honor.

25            THE COURT:  Thank you.  On this separate issue,

1    I find and conclude and I find quite easily that on the

2    basis of the factual detail in the first portion of the

3    affidavit augmented, if necessary, and to the extent

4    necessary by the commentary that Agent Shern made on the

5    basis of his experience and the experience of others in

6    the latter part of his affidavit, beginning on page 19,

7    that the affidavit amply demonstrates that it would be

8    quite reasonable to expect that the fruits of the search

9    that were anticipated would, in fact, be located at the

10   home of Defendant Springer.

11       Now, obviously, the Court cannot fall into the trap

12   of holding that a search was justified on the basis of

13   what actually the fruits of the search turned out to be,

14   and I don't do any such thing, but a natural reading of

15   this affidavit would lead, I think, quite readily to the

16   conclusion that the activities described therein would

17   generate records and that those records would highly

18   likely be found at the residence of the subject of the

19   search -- or the residence of the search of the premises

20   where the search was proposed to take place.

21       For that reason, my conclusion on that score on that

22   separate issue, which I think is arguably a separate

23   issue from the other issues as identified by

24   Mr. Springer, is that Mr. Springer's argument is without

25   merit.

1       Now, that brings us to Mr. Stilley's separate

2  motion.  So that everyone will know where we go from here

3  in terms of our schedule this morning, it's now about 20

4  till twelve.  Mr. Stilley, how long would you reasonably

5  need in order to argue your separate motion to suppress

6  that was filed on June 1st and we have as Docket Entry

7  Number 73?

8            MR. STILLEY:  Your Honor, if it's just going to

9  be argument and not any testimony, I wouldn't think very

10 long at all.

11           THE COURT:  You may proceed.

12           MR. O'REILLY:  Your Honor, would now be an

13 appropriate time for the Court to rule on motions to

14 quash with respect to the individuals that were

15 subpoenaed here, I believe, for the Franks hearing?

16           THE COURT:  Well, those motions to quash at this

17 point are moot.

18           MR. O'REILLY:  And I would ask the individuals

19 be excused so they can go on with their business.

20           THE COURT:  Is there any objection to that?

21 Based on the rulings I have made -- I realize you don't

22 like my rulings, but based on the rulings I have made, is

23 there any reason not to excuse the subpoenaed witnesses?

24           MR. SPRINGER:  Could you tell us what other

25 issues you're going to take up today?

```
 1          THE COURT:  I'm going to address Mr. Stilley's

 2   motion, I'm going to address the motion for a bill of

 3   particulars, and then I'm not going to hear argument, but

 4   I'm going to rule on most if not all of the other pending

 5   motions.

 6          MR. SPRINGER:  Only argument, so there will be

 7   no objection.

 8          THE COURT:  They'll be excused.

 9          MR. O'REILLY:  Thank you, Your Honor.

10          MR. STILLEY:  Same here.

11          THE COURT:  Very well.  Mr. Stilley, you may

12   proceed.

13          MR. STILLEY:  Thank you, Judge.  And I think

14   that the Court has a good handle on this and I'm sure the

15   Court has read the motion and understands the reasoning.

16   As I stated earlier, I think we have an admission from

17   the government of a false statement, but they're saying

18   that it was only made at a certain period of time, which

19   was after the time of the testimony at the grand jury.

20   Which unless we had further evidence, that leaves the

21   Court with the task of deciding what do you do when

22   there's a failure to inform someone of the fact that

23   they're a target on the one hand and on the other hand

24   we've got a false statement after the testimony of the

25   grand jury.
```

1         THE COURT:  Bear with me just a moment.

2         MR. STILLEY:  Sure.

3         THE COURT:  Okay.  Go ahead.

4         MR. STILLEY:  Your Honor, when they were -- when

5    they called Eddie Patterson, they very clearly told him

6    at the grand jury -- they very clearly told him that he

7    was a target, gave him the advice, told him he didn't

8    have to answer, and all other such things.  When they

9    called Oscar Stilley, they gave no such advice.  So

10   really, I mean, unless the Court has questions, I think

11   the matter has been adequately presented to this Court.

12        THE COURT:  Well, of course, we're here in this

13   context not to make arguments or rulings on the basis of

14   whether a DOJ policy was complied with but on the basis

15   of whether your constitutional rights were complied

16   with.  And what is the constitutional violation that you

17   assert?

18        MR. STILLEY:  Well, it would be the Fifth

19   Amendment for the simple reason that if when there's a

20   target called and asked to testify, the Fifth Amendment

21   gives that target a right to plead the Fifth Amendment.

22   When the target is not told you're under criminal

23   investigation, we're trying to get you, when the target

24   is not told that, the target does not have a rational

25   basis for intelligently exercising that Fifth Amendment

1  right and say I object, I'm not going to testify to that.

2     Now, the government has a remedy if they want to use

3  testimony of a target, just tell the target.  Then the

4  target can rationally and reasonably exercise those Fifth

5  Amendment rights.  When they don't tell the target, the

6  only fair remedy that I would present to this Court is to

7  let the target later on when the target has been told,

8  then let the target say, okay, I'm raising my Fifth

9  Amendment right to all of this and I want it all stricken

10  and with the remedy being you suppress everything that

11  the target could have prevented from going in to

12  testimony (sic) if he had been told the truth about the

13  fact he was under criminal investigation.

14          THE COURT:  Are you saying that they -- they

15  failed to tell you that you were a target, right?

16          MR. STILLEY:  At the very least.  At the very

17  least.

18          THE COURT:  Okay.  Now, what's your authority

19  for the proposition that as a matter of Fifth Amendment

20  law, not DOJ policy, as a matter of Fifth Amendment law

21  that you're entitled to relief on the basis of that

22  omission?

23          MR. STILLEY:  Your Honor, I cited a few cases in

24  my brief stating that the -- where the testimony was

25  given without the unfettered free will of the witness,

 1  then it is vulnerable to suppression later on.  Now, I

 2  understand, Your Honor, and I wouldn't try to mislead the

 3  Court, that the cases that are cited there are cases in

 4  which there was, I mean, at least arguably some sort of

 5  coercion.  I would argue to this Court that on the basis

 6  of this case law, which says testimony that's given

 7  without the unfettered free will of the witness must be

 8  suppressed.  I would argue that you don't have to torture

 9  somebody in order to make it suppressible evidence.

10          THE COURT:  Now, the day you walked into that

11  grand jury room, you were a seasoned criminal defense

12  lawyer.

13          MR. STILLEY:  Yes.

14          THE COURT:  And you saw an AUSA in that grand

15  jury room.

16          MR. STILLEY:  Yes, I did.

17          THE COURT:  And you thought he was from the

18  government and he was here to help you.

19          MR. STILLEY:  Your Honor, I wouldn't tell you

20  that I trust these people, and I trust them less every

21  day, because I see what they do.  I see what they're

22  doing to me right now.  But at the same time, I'm a

23  citizen.  I have certain obligations under the law.  The

24  government is -- it's a well-established principle, the

25  government is entitled to everybody's testimony.  And

1  this Court and everybody else around here knows that

2  Oscar Stilley did not want to testify against Lindsey

3  Springer.  He didn't want to do that.  But he did it

4  because case law says the government is entitled to

5  everybody's testimony.  There's no admission or statement

6  or warning by the government that you're a target.

7      So what -- this theory would cause any witness to be

8  forced to say, okay, government, I don't believe what

9  you've got to say.  I think that I am a target because,

10  government, when you want to tell somebody they're a

11  target, you tell them.  And when you don't want to tell

12  them, you don't tell them.  So your words don't mean

13  anything at all.

14      The way to get around this problem and to get to a

15  system whereby that we can once again presume that the

16  government is not being dishonest with people is to

17  simply say, hey, government, you got a responsibility to

18  tell people.  Doug Horn filled out his form and said --

19  when he was asking for the subpoena, he said the reason

20  we didn't call Oscar Stilley is because he's a target.

21  And we're told that Brian Shern is just too green, he

22  didn't know, you know.  When in the form where he's

23  supposed to put in about did you warn the target, did you

24  give the proper warnings, he just leaves that blank.  And

25  we're told he's just green, as if he can't ask

1  Mr. Arsenault or lawyers or anybody else, we're told
2  that's just -- it's just accident, that's just a mistake.
3      Now, for some reason, Mr. Shern, seems to have -- he
4  knows the exact day when he made representation that he
5  admits to that was a false representation when he faxed
6  another subpoena asking for further information.  He
7  seems to have that down real good.  Although, to this
8  day, I've not seen a memorandum of interview for this
9  statement, which presumably it should be there.  If I'm
10 wrong, I want to hear the government say it.  Because I
11 don't want to say anything that's untrue.
12     But, now, let's not forget another thing,
13 Mr. Shern's explanation that he gave later, and I think
14 that he would admit to this, but he might not, the
15 explanation that was given after the comments in the
16 Blackstock case was that criminal investigation has
17 different meanings at different times.  Well, stop and
18 think about that.  If they're going to be allowed to do
19 that, how does the LaSalle bright line help us at all?
20 It just wrecks our whole system.  It destroys the
21 presumption that the government is going to deal in good
22 faith and squarely and fairly with the people it deals
23 with.
24     It's more important to carefully and thoroughly and
25 diligently enforce the Fifth Amendment by disallowing the

1  government the fruits of their -- at minimum, violation

2  of their own proceedings rather than to allow the

3  government to continue on to use that information and, in

4  essence, reward them for violating their own rules and,

5  as I'm arguing to the Court, also violating the Fifth

6  Amendment by refusing to give mandatory information

7  necessary for the target to exercise those Fifth

8  Amendment rights.

9      If that's not to be the case, then I would suggest

10  that all the good people of this country, all of them,

11  have a good reason anytime they're called to testify and

12  they just don't want to testify to say, "I'll plead the

13  Fifth," even if they don't have a reasonable basis for

14  believing that they're under criminal investigation,

15  because they might be and the government won't tell the

16  truth about it.

17      Your Honor, I ask -- and I think the government will

18  admit this too.  I ask, I think it was at least twice in

19  letters, what are you investigating Oscar Stilley for?

20  Got nothing.  Well, they wait until the end to say here

21  is what they've got.  What we've got is a situation where

22  that if the government is allowed to use the information

23  that they got by violating their own rules by failing to

24  tell the witness, by failing to give the witness the

25  information necessary to protect his Fifth Amendment

1  rights, number one, we reward misconduct, and, number

2  two, give the people of this country a reason to just say

3  you're not getting my testimony because I can't trust

4  anything that the government says.

5          THE COURT:  Thank you, Mr. Stilley.

6          MR. STILLEY:  Thank you, Judge.

7          THE COURT:  I'll hear from the government.

8          MR. O'REILLY:  Your Honor, Mr. Stilley cites no

9  law in support of his motion to suppress to Your Honor

10 today because there is none.  As the Court noted, this is

11 a violation -- a potential violation of policy.  I don't

12 want to get into the -- unless the Court wants to go

13 there.  But if there was a violation of policy, the

14 remedy is a referral to the office of professional

15 responsibility.  It is not suppression of any evidence.

16     Mr. Stilley could have asserted the Fifth Amendment

17 if that's what he wanted to do.  This is different and

18 the courts have ruled this consistently.

19     Really, I think we have covered the law on our

20 pleadings.  Were there evidence that a misrepresentation

21 had been made to Mr. Stilley prior to his stepping into

22 that grand jury room, we'd have to be arguing a much

23 different case.  I don't know what the result would be.

24 But whereas here, there is no evidence of any

25 misrepresentation being made to him prior to stepping

1  into that grand jury room and prior to him presenting his

2  document and -- let me just -- his response to subpoena,

3  which is Government's Document 80-9 attached to the

4  government's pleadings, and to testify in response to

5  questions made of him by the Assistant U.S. Attorney,

6  there's nothing to suppress because there was no

7  constitutional violation predating his testimony.

8          THE COURT:  Thank you.  Mr. Stilley's motion to

9  suppress at Docket Entry Number 73 will be denied.  And I

10  deny it substantially for the reasons set forth beginning

11  on page 11 of the government's response with the heading

12  "Defendant Stilley not entitled to suppression of grand

13  jury testimony and documents provided to grand jury."

14     The long and the short of it is I'm not going to

15  transmute a possible violation and will assume that one

16  occurred without finding that one occurred, we're not

17  going to transmute a possible violation of DOJ policy

18  into a Fifth Amendment violation.  There's no evidence of

19  an affirmative misrepresentation.  At most, there's a

20  failure to inform the witness that he was a target.  And

21  it is certainly consistent with my understanding of the

22  law that as set forth with respect to the Sixth Circuit

23  case and other cases cited in the government's memorandum

24  that failure to advise of target status prior to

25  testifying is not a basis for suppression of testimony.

1       And until such time as a court such as the Court of

2  Appeals or the Supreme Court holds otherwise, it is my

3  conclusion that the relief sought by Docket Entry Number

4  73, Mr. Stilley's motion to suppress, must be denied and

5  is denied.

6       That brings us to midday.  I do intend to address

7  the motion for bill of particulars as well as -- and I

8  intend to rule.  I believe I have an adequate record with

9  respect to the other motions.  We've got a good many

10 motions to dismiss, beginning with, I believe, Docket

11 Entry Number 51.  I intend to rule on those motions

12 before we adjourn today.  I don't think it will be

13 necessary to hear argument.  They have been, to some

14 degree -- well, they've all been briefed, they've been

15 responded to, there has been a reply, and on some issues

16 there has been a sur-reply.  So the Court certainly does

17 have the benefit of ample advocacy with respect to those

18 motions.  And before we recess today, I anticipate that I

19 will simply rule on those motions.

20      I will resume at ten minutes after one.  Court will

21 be in recess.

22      (RECESS HAD)

23          THE COURT:  Give me just a moment, Counsel, to

24 get the right stack of papers here.

25      Pam, here is Government's Exhibit Number 1 back for

1  you.

2      Now, let's see, I'm looking at Mr. Stilley's

3  adoption of pleadings and I just want to make sure that

4  we're staying organized.  I'm looking at Mr. Stilley's

5  adoption of pleadings docketed as a motion, Docket Entry

6  Number 92, adopting Docket Entries 81 and 82.  Let me see

7  what that is.  Okay.  That relates to the fifth motion to

8  dismiss and the motion for a bill of particulars.  Okay.

9  Very good.  I understand where we are on that.

10      Mr. Stilley, I'll hear you in support of your motion

11  for a bill of particulars.

12          MR. STILLEY:  Did you say you wanted to hear

13  from --

14          THE COURT:  I'm sorry, Mr. Springer.  We're

15  going to start with Mr. Springer.

16          MR. SPRINGER:  I believe, Your Honor, that the

17  government in Count 1 agrees that the first element of a

18  conspiracy charge is that they must prove there was an

19  agreement to violate the law.  They put it in their

20  response, they cited to the jury instructions from the

21  Tenth Circuit.  It's their own words.

22      At the last page of -- the last page of their

23  opposition to the motion for bill of particulars, and I

24  might add just for clarity sake that this bill of

25  particulars was much smaller than the first one that I

1    filed.  After going through 33,000 pages of discovery, I

2    was able to narrow it down to just a few issues.

3        But on page 4 of the government's response in

4    opposition to my bill of particulars, they write, "The

5    purpose of a bill of particulars is to inform the

6    defendant of the charges against him with sufficient

7    precision to allow him to prepare his defense.  The bill

8    of particulars is not necessary if the indictment sets

9    forth the elements of the offense charged."

10       So they agree that it must set forth the elements.

11   They admit the first element is we must have it as an

12   objective, a plan to violate a law, and they want us just

13   to accept that there's some law out there that he and I

14   had a meeting of the mind with or that we had

15   circumstantial evidence to agree that we were going to

16   get in the way of that is a function of the IRS.  They do

17   say impede, impair, obstruct, and defeat the lawful

18   functions of the IRS in the computation, ascertainment,

19   assessment, and collection of taxes.

20           THE COURT:  Okay.  Bear with me just a moment.

21   Your new motion for bill of particulars was filed on June

22   15th; is that right?

23           MR. SPRINGER:  That's correct.  And that would

24   be Docket Number 82.

25           THE COURT:  Right.  Let me lay my hands on

1   that.  I may have gotten here without your new motion.

2           MR. SPRINGER:  I can --

3           THE COURT:  Let me look one more place.  Okay.

4   You'll have to forgive me, I looked at it after you filed

5   it, but I --

6           MR. SPRINGER:  Probably was shocked at how short

7   it was.

8           THE COURT:  I managed to get here without it.

9   You may proceed.

10          MR. SPRINGER:  Okay.  The first element needs to

11  be that -- in order for all five elements to be found to

12  have violated Section 371, each element must be found.

13  And the first element is that the government must prove

14  that Mr. Stilley and I conspired to violate the law.  Not

15  conspired to violate the conspiracy statute, but to

16  violate the law.

17      Now, 371 in the defraud prong does not say these

18  words, "impede, impair, obstruct, and defeat the lawful

19  functions of the IRS in the computation, ascertainment,

20  assessment, and collection of taxes."  Those words aren't

21  there.  So these are words that the government, based

22  upon some case law, have adopted as a general statement

23  as to what the nature of the charges are.

24      And in response in the bill of particulars on page 3

25  of their response at the bottom, for example, they say,

1    "It is clear that defendants understand the phrases

2    required by law, function, and computation,

3    ascertainment, assessment, and collection."  Okay.  That

4    may be a fair statement that we know that assessment is

5    Section 6203, we know that collection is Section 6301.

6    We have no way, though, of getting to those sections on

7    their own because, as the Court knows, my first motion to

8    dismiss is for lack of venue because there is no Internal

9    Revenue Service districts as of October 2000 abolished is

10   the words the government used.

11        So here we have assessment, relying on the district

12   director, doesn't exist.  Collection, relying on the

13   district director, doesn't exist.  So what we're left

14   with is guessing as to what the object of the conspiracy

15   is.  If it's to keep the government in the dark about

16   something, there needs to be a statute that says it is

17   illegal to keep the government in the dark about

18   something.

19        Now, they want myself and I presume Mr. Stilley to

20   just input that "required by law" not only means

21   somewhere in the Internal Revenue Code, but they've

22   actually made argument in dealing with venue that we need

23   to go to regulation sometimes, which brings in their

24   60,000 pages of words written by our IRS and the

25   legislature.

1          And what's so interesting is the whole idea, the

2     concept of an indictment is so that they can't -- they

3     can't charge you again.  And if they did, you could claim

4     double jeopardy to protect you.  But all they would have

5     to do in this particular case is just bump over to

6     another section in the law.  They could go from 7201 to

7     6012.  Oh, well, 6012, we meant that in that area, but

8     6011 is this theory.  And they won't commit to it.  And

9     the reason why they won't commit to it, they'll have to

10    explain.

11         But it is very clear that they admit for the first

12    count, the first element, is that we had to enter into an

13    agreement, the jury must find, the grand jury must

14    allege, to violate the law.  And if we accept their

15    position on it, the only thing we know is we know what

16    all these words mean in 371.

17         Now, "required by law" does not just show up as a

18    problem in Count 1.  It shows up as a problem in Counts 2

19    through 6.  And the theory that --

20              THE COURT:  I need you to walk me through that,

21    then.

22              MR. SPRINGER:  Okay.

23              THE COURT:  Because I distinctly recall, I

24    think, seeing the language you're referring to in Count

25    1, but I may not have had an eye out for it in the other

1    counts.

2            MR. SPRINGER:  371 is mentioned on page 2 of

3    Count 1, page 2 of the indictment, and then the only

4    other section ever mentioned again is on page 7 of Count

5    1 and it also just says 371.  And that in response --

6            THE COURT:  Okay.  And then Count 2 --

7            MR. SPRINGER:  That's a tax evasion theory that

8    does not involve Mr. Stilley as an alleged aider and

9    abetter, but.  And I think -- I think --

10           THE COURT:  Well, okay, now, Count 2, the phrase

11   "as required by law" --

12           MR. SPRINGER:  Right in the middle.

13           THE COURT:  -- is by failing to file a United

14   States individual income tax return as required by law.

15   That's what you're focusing on?

16           MR. SPRINGER:  Yes.  And in the Tenth Circuit's

17   decision, which I gave the Court in my brief, they

18   clearly cite to three sections of law, 7203, 6071, and

19   6091 as the when and where the return is required.  For

20   instance, you don't look at 7201 or 7203 and find out

21   what the day is the return is required, what the form

22   looks like, or where it's supposed to be provided.  And

23   what 7203 says is "when required by this title."  And the

24   government's theory of tax evasion is really a lesser-

25   included offense of failure to file with some affirmative

1   acts attached to it in their theory.

2        And so by asking the Court, based upon their

3   response to venue, what do they -- what did the grand

4   jury mean "required by law"?  7203 in some circuits, like

5   in the Seventh Circuit, 7203 is the statute that requires

6   a return, so says chief Judge Easterbook.

7        But when you go to, let's say, the Sixth Circuit,

8   the Fifth Circuit, the Ninth Circuit, or the Tenth

9   Circuit, then you find that the theory is different.

10  Most of them say it's 6012(a).  But some don't subscribe

11  to that.  And they call it a theory in the Dawes

12  decision.  A statutory origin of theory of which we do

13  not subscribe is what they wrote -- Judge Anderson wrote

14  that one.

15       And so when we're getting into "required by law,"

16  and it seems like because the conspiracy incorporates a

17  failure to provide information to the IRS from, I guess,

18  the 1980s forward is the theory, that it seems to me if

19  you take that one spot and identify for Mr. Stilley and

20  myself what laws are involved in that phrase "required by

21  law," in other words, what law required it, what law said

22  where it was required, what law required what it should

23  look like, and the government --

24            THE COURT:  Do you want this clarification so

25  that you'll know where to prove that you filed your

1    return?

2           MR. SPRINGER:  Or where I wasn't required to

3    file my return, either way.  Venue is a -- by a

4    preponderance of evidence is on the burden of the

5    government.  They must establish that I, in this

6    district, was required by law, as these documents say,

7    required by law to go somewhere and provide something to

8    someone.  And, instead, what they've told this Court in

9    response to the first motion to dismiss is although those

10   places have been abolished, Mr. Springer could have done

11   it.  And I don't stand before you indicted for something

12   I could have done.  I stand indicted for something that I

13   was required by law to do.  And it's no different than

14   being drafted into military.  And the Supreme Court calls

15   it a crime of omission.  And the first thing the Court is

16   required to do is to determine where the act was required

17   to be done by law to determine venue.

18       And when the government gave me their oral response,

19   when they gave me their written response to venue, it

20   said, okay, wait a minute, maybe I'm reading Count 1

21   wrong, maybe I'm reading Count 2, 3, 4, 5, 6 wrong, maybe

22   I'm reading the "required by law" wrong.  And so I've

23   asked them, they've agreed that the districts don't

24   exist, which is 6091's districts, but then they say I'm

25   still required anyway because -- whatever they said.

1       And so I'm asking the Court to ask them to

2  specifically commit to when the grand jury -- when they

3  presented their theory to the grand jury, so that I'm not

4  tried by a trial jury on something different than what

5  the grand jury charged, that I know specifically what was

6  the object of the conspiracy specifically by statute

7  because of the problem that they have with venue and the

8  district directors, in the (unintelligible) districts,

9  and also, as the Tenth Circuit said, for failure to file,

10  where is the place, what is the time.

11      I understand, you know, a theory that suggests that

12  you have to provide information on March 15th or April

13  15th or file an extension August 15th or September 15th,

14  but this is a case against me specifically.  And so when

15  you go through Count 2 and you see "required by law" and

16  then Count 3 you see "required by law" and then you

17  continue on, you start realizing there's a pattern that

18  the word "required by law" is connected to the filing of

19  an individual income tax return.  And up until, you know,

20  now, the Tenth Circuit and the Supreme Court have always

21  said that that's the place where the law fixes the place

22  to do the act.

23      And so my bill of particulars specifically is asking

24  for disclosure in Count 1 of what the first element the

25  government agrees I have a right to know about.  You

1   know, whether they argue that they've said it or not, all

2   they have to do is come up here and say the statute that

3   Mr. Stilley and Mr. Springer intended to violate for the

4   first element of 371 is, and there's a blank line right

5   there, and let them just write that in.  It takes

6   nothing, no moment.  Instead, you're not going to hear

7   that from them.  We'll wait and see what they have to

8   say.

9        And I think the same holds true, Your Honor, for the

10  other counts that -- 7201 says that if I intended to

11  evade or defeat tax imposed by this title or the payment

12  thereof, that's quite an interesting group of ambiguous

13  words, but it says "tax imposed by this title."  And I'm

14  not the one that asked them to put in there their theory

15  was involving failure to file.  They did that on their

16  own.  And so I would just ask the Court to ask them to

17  fill in that blank.  The series of statutes as given in

18  the Tenth Circuit's Taylor decision that show what --

19  since 7203 and 7201 and 371 don't contain the language,

20  any of the words that they put in the indictment, to

21  please explain what they mean by "required by the law."

22  Thank you, Your Honor.

23            THE COURT:  Not so fast.

24            MR. SPRINGER:  Oh.

25            THE COURT:  Now, in the second part of your

1  motion, your narrowed-down motion --

2          MR. SPRINGER:  Yes, sir.

3          THE COURT:  -- you say you also seek the

4  provisions of law that direct the "functions" alleged to

5  have been the object of the conspiracy in Count 1.

6          MR. SPRINGER:  Well, Your Honor, if they're

7  saying that the IRS does assessments, then they need to

8  identify is that the theory that Oscar and I looked at

9  assessment statute and we both had a meeting of the mind

10  somewhere that said, hey, let's get in and impede the

11  function of the IRS assessing something?  Because that's

12  what they're asking us to believe.  And yet the statute,

13  which is 6203 of Title 26, it defers to a regulation that

14  puts that solely in the hands of the district director,

15  which we already know that position was abolished in

16  October of 2000.  So we already know that one is off the

17  table.

18      And then when you get to collection, that's Title

19  26, Section 6301.  And it says that the secretary may

20  collect taxes.  And then it goes to a regulation,

21  301-6301, that says the secretary authorizes the district

22  director to collect taxes.  That's what it says.  I

23  didn't write it.  Just telling you what it says.

24      So collection and assessment can't possibly,

25  required by law, exist without district directors and

1    internal revenue districts for criminal purposes.  This

2    is not just in general or could you, this is talking

3    about attacking a man's liberty over "required by law."

4         Ascertainment, I haven't found a statute yet -- and

5    there are some that would tell you that I have some good

6    knowledge on that subject.  There is not a statute that I

7    can find that uses the word "ascertainment" in the

8    Internal Revenue Code.  I can't find it in any

9    regulations.  I can't find it anywhere.

10        And, of course, assessment and collection are

11   defined by regulation.  And as I pointed out, the only

12   other two words that the government is arguing about is

13   computation and, as the Court brought up, the word

14   "function."  All right.

15        So what are we to believe "function" means?  A

16   lawful act that the IRS is supposed to perform on its

17   own?  There's not one allegation anywhere in the

18   indictment where the IRS alleges or the government

19   alleges that they were on their way to do something and

20   Mr. Stilley or I, in a conspiracy, jumped out in their

21   way and tried to stop them.  Not one allegation of it.

22        Now, Mr. Shern, in his affidavit, did indicate a

23   7212 impede the function of the IRS thought in his

24   affidavit, but that did not result in this indictment.

25   And "computation" is the only word we have left.  And I

1    have to tell you the closest you can get to computation

2    in my definition would be the word "compute," and I can't

3    find that in the tax code either.  And I've asked many

4    people, many people.

5        It seems to me like that they first have to

6    establish that they had a function to compute in order to

7    then show how Mr. Stilley and I were getting in their way

8    of doing that.  And so that would be my point for you to

9    at least consider that "required by law" means something

10   more.

11       There is a point too about a mens rea position that

12   needs to be addressed.  And I think the genius of it

13   comes from the notion in general that everyone is

14   presumed to know the law as a common position that the

15   United States carries.  But in criminal tax cases, and I

16   will just point out that the word "complex" sometimes is

17   designated for the purpose of criminal tax charges

18   because of the complexity it allows an escape from the

19   Speedy Trial Act.

20       But in understanding the Cheek, Bryan (sp), Ratzlaff

21   (sp), and other decisions from the Tenth Circuit and

22   Supreme Court that the government has a burden of showing

23   three things in the mental state in this case as elements

24   needing to be pled and that are not.  And the first one

25   is that they have to show I had a duty under the law, not

1    I could have, but I had to, that I knew that I had to and

2    that I intentionally and voluntarily did not do what I

3    was required by the law to do.  And that's called

4    willfulness.

5        And the Supreme Court went further, expanding on an

6    escape of a gun case, where they were agreeing that in

7    Ratzlaff, dealing with bank technical form filing by

8    regulation, and in Cheek with tax cases, he was an

9    American Airlines pilot.  You know, the guy didn't get a

10   license because he was stupid.  And in both those cases,

11   the Supreme Court said that tax cases are the exception

12   to that general rule, the notion that everyone is

13   presumed to know the law.  And what they said --

14            THE COURT:  Now, it wasn't five minutes ago that

15   you were telling me that you do, in fact, know the law.

16            MR. SPRINGER:  No.  What I said is after I got

17   indicted, I searched the tax code for ascertainment,

18   computation, assessment, and collection, and then I gave

19   you the explanation about what it is that I found.

20            THE COURT:  I thought you said something like

21   there are those who would say that I know a lot about

22   this.

23            MR. SPRINGER:  Well, that's just because of what

24   I've spoken about since I got this charge.

25            THE COURT:  Okay.

```
 1          MR. SPRINGER:  Your Honor, I'm still trying to
 2    do what I do every day.  I'm just trying to survive.
 3          THE COURT:  Okay.
 4          MR. SPRINGER:  Okay?  When I was given the
 5    indictment, before I wrote the bill of particulars, the
 6    first one, the long one, the long version, I went and I
 7    broke down every word in this document.
 8          THE COURT:  As a matter of fact, speaking of
 9    that, I want to get a clear understanding because of
10    where circling back to the phrase "required by law"
11    appears, I certainly see it right in the middle of page 8
12    on Count 2.  Now, where does that phrase appear if it
13    appears in Count 1?
14          MR. SPRINGER:  Actually, actually, Your Honor,
15    it's not that that phrase actually appears in Count 1.
16    It was the first element of a conspiracy charge that the
17    government argued in their motion which admits this as
18    the jury instructions from the Tenth Circuit say, the
19    first element is that they must prove that Mr. Stilley
20    and I had an agreement to violate the law.  And so
21    "required by law" does not appear specifically in Count 1
22    but is an element, the word "law" is an element of Count
23    1.  And the government admits that it is.  They just
24    think that it's okay just to say, you know, they had an
25    agreement to violate the law and leave it right there.
```

119

1          So sorry if I misstated that, Your Honor, that by

2     "required by law" in -- I believe that you can't have

3     Count 1 without 2 through 6, because 2 through 6 talk

4     about basically Count 1 all together.

5               THE COURT:  Okay.  Well, then let's go forward

6     then to -- Count 2 has "as required by law" right in the

7     middle of page 8?

8               MR. SPRINGER:  Yes, sir, it does.

9               THE COURT:  Count 3 has it right in the middle

10    of page --

11              MR. SPRINGER:  Nine.

12              THE COURT:  -- 9.

13              MR. SPRINGER:  Yes.

14              THE COURT:  All right.

15              MR. SPRINGER:  Keep going.  It's going to be on

16    Count 4.

17              THE COURT:  Right off, I don't find that in

18    Count --

19              MR. SPRINGER:  Well, I would just make the

20    subsidiary argument on that, Your Honor, that how can

21    Count 4 tax evasion not have "required by law" and Count

22    3 and Count 2 have it?

23              THE COURT:  Okay.

24              MR. SPRINGER:  Okay?

25              THE COURT:  Now, Count 5 has he was required by

1   law, and this is a willful failure to file, you're the

2   defendant on this count, he was required by law by reason

3   of such gross income.

4           MR. SPRINGER:  Right.

5           THE COURT:  Okay.

6           MR. SPRINGER:  But it never says where it was

7   required to be done and what statute -- you know, 7203

8   does not cover the place the return is required to be

9   made.  It just says, "willfully failed to make a return

10  as required by law."  Those are the words right out of

11  the statute.

12          THE COURT:  Okay.  Thank you.

13          MR. SPRINGER:  Thank you.

14          THE COURT:  I'll hear from the government.  And

15  as a preface to the government's argument, let me simply

16  observe that the bulk of the government's response on

17  these issues says we're not required to plead our

18  evidence, we're not required to outline all of our

19  evidence.  Well, now, we've got a narrowed-down motion

20  for a bill of particulars that really advances a

21  different issue than that which would be responded to by

22  saying we're not required to plead our evidence.

23      He has shown me several places in the indictment

24  where it says he failed to file an individual income tax

25  return as required by law.  My beginning point, and

 1   perhaps before I hear from the government, I'll allow

 2   Mr. Stilley to add anything he would like to add, but my

 3   beginning point is, what's so onerous about saying what

 4   law you're talking about there?  But let me first give

 5   Mr. Stilley an opportunity to address this.

 6       I struck your motion for leave to file your motion

 7   for a bill of particulars out of time because the reason

 8   you gave was a non-starter.  But I believe in that order

 9   I did say I would give you an opportunity to be heard on

10   this, and I'll be happy to hear you on this.

11            MR. STILLEY:  Thank you, Judge.  However you

12   want to do it, whatever order that's convenient and

13   satisfactory to you is fine.  I mean, if the Court felt

14   like it was going to grant the motion, I don't want to

15   waste the Court's time.  But at the same time, I do want

16   to be heard if it might at all be helpful to the Court.

17            THE COURT:  I'll be happy to hear you.

18            MR. STILLEY:  Thank you, Judge.  And the

19   government has complained that there wasn't any citation

20   to authority, and I'm sorry if we failed to provide

21   suitable citation to authority.  On the same day that

22   this was filed, however, we filed Docket Number 81.  And

23   at page 10 of that document is a citation to Bryan v.

24   United States.  It's at the bottom of page 10.  And it

25   says, "In certain cases involving willful violations of

1   the tax laws, we have concluded that the jury must find

2   that the defendant was aware of the specific provision of

3   the tax code that he was charged with violating."

4       Well, we all know it's just elemental.  The

5   government first has to allege the elements of the

6   crime.  And only then are they allowed to prove them.

7   And the allegations under the due process clause, those

8   allegations are the first thing.  That's the

9   prerequisite.  That's how we get started.  And that's why

10  that I have asked that this Court grant this motion and

11  require them to give us the statutes if they intend to

12  prove that we had knowledge of and then see what else is

13  out there.  Then with this information required by due

14  process, see if we need perhaps to amend the motions to

15  dismiss.  We might be satisfied with them, if we saw

16  this.

17      But it's really a matter, I would most respectfully

18  contend, of following the rule of law.  The United States

19  Supreme Court has spoken, they have said what is

20  necessary.  How would the government prove that the

21  defendant, and that would be Oscar Stilley and Lindsey

22  Springer, was aware of a specific provision of the tax

23  code if they don't know it, if they don't know what it

24  is, if they don't know that specific provision?  And if

25  they know the specific provision, as you intimated, why

1    not just say it now?  That gives the defendants a chance

2    to prepare for the defense.  And that's one of the

3    reasons that we require indictments to contain certain

4    information.  That's one of the reasons that we allow for

5    bills for particulars in order to ensure that the

6    defendant gets enough information to adequately prosecute

7    his defense.

8         Now, and, Your Honor, I note the Court, and I think

9    the Court is well aware of this, the artful dodge on the

10   part of the government saying, well, we don't have to

11   show our evidence.  It's not about evidence.  It's about

12   what are they going -- what is this evidence going to go

13   towards.  And that's what the government is trying to

14   avoid having to disclose.

15        The rule of law is really what this country is

16   founded upon.  In certain cases in this country, we have

17   fallen short, we failed.  One of the most -- one of the

18   saddest chapters in this country's history was the Trail

19   of Tears in which 8,000 Indians were sent from the

20   eastern United States to Oklahoma.  8,000 people

21   perished.  And I only raise this and I only say this

22   because the U.S. Supreme Court had given a judgment in

23   favor of the Indians.  Now, there's dispute about whether

24   Andrew Jackson had actually said his final words, you

25   know, well, the Supreme Court has made their decision,

1  let them enforce it.  That's not historically

2  established.  But what is historically established is

3  that the executive branch decided we don't have to follow

4  the Constitution as interpreted by the U.S. Supreme

5  Court.

6      This is a reasonable request.  It's not a request,

7  it's a demand.  It's a command.  It's a recitation of the

8  law.  The constitutional requirements in this type of

9  case from the U.S. Supreme Court, it's entitled to

10  respect.  It's entitled to enforcement.

11      Your Honor, I -- I think that's all I've got unless

12  the Court has questions.

13          THE COURT:  Thank you.

14          MR. STILLEY:  Thank you, Judge.

15          THE COURT:  Okay.  Mr. O'Reilly, I really do

16  want to know what would be onerous, as pled, Count 2

17  refers to failing to file a U.S. individual income tax

18  return as required by law, which theoretically

19  incorporates the entire Internal Revenue Code by

20  reference, the Count 1, Section 371, the key word in

21  Section 371 is "offense," conspiracy to commit an

22  offense, they want to know what the offense was.

23      This is not a matter of pleading evidence.  I want

24  to know what would be so onerous about providing some

25  clarity as to the sections you had your eye on or whoever

1  drafted this for the grand jury, what sections he or she

2  had his or her eye on when they used these words.

3         MR. O'REILLY:  Your Honor, there's nothing that

4  would be onerous about this, it's just not required by

5  law.  The law -- if the Court orders us to do so,

6  obviously, we will comply and tell them what they already

7  know.  As Mr. Springer stated, he recited the different

8  statutes, some of the different statutes that the various

9  courts have ascribed to why people have to file tax

10  returns.

11         THE COURT:  Okay.  Well, let's look at it this

12  way:  Some day, if this case gets to trial, I will be

13  required to draft jury instructions.  And when I draft

14  the jury instructions, it is highly likely that I'm going

15  to need to get sufficiently specific in the jury

16  instructions that I will have to know what is meant here

17  by "required by law" because the jury instructions may

18  have to spell that out, probably will have to spell that

19  out.  So let's just pretend these fellows have gone

20  fishing.  I'm asking you, tell me, for jury instruction

21  purposes, what provisions should I be looking at here?

22         MR. O'REILLY:  Your Honor, what I would tell you

23  is I will get that to you.  I want to make sure that I

24  cover them adequately and correctly.  I could not, off

25  the top of my head, recite you the different provisions

 1   of the Internal Revenue Code that mandate the filings.  I

 2   can absolutely get that.  It's not a secret.  It's black

 3   letter law.

 4      The government's point, and I agree with Your Honor,

 5   that I was trying to figure out what was being requested

 6   and how -- and this is more -- they're asking us to tell

 7   them what the law is.

 8            THE COURT:  Well, no, they're not.  They're not

 9   asking you to tell them what the law is, nor are they

10   asking you to tell them what your evidence is.  They're

11   asking you to tell them what provisions you have in mind,

12   what provisions you rely on when you say they didn't do

13   something required by law.  Sounds pretty reasonable to

14   me, especially, again, as the one who's going to have to

15   write the jury instructions.

16            MR. O'REILLY:  Your Honor, it sounds

17   reasonable.  And, again, like I said, if the Court orders

18   us to do it, we will do so, absolutely.  I don't think

19   it's required for a bill of particulars.  A bill of

20   particulars is a very narrow function when the indictment

21   is unclear so that a person could not protect themselves

22   from double jeopardy or is unclear on what has been

23   charged.  And if the indictment is flawed, which as the

24   Court noted earlier in a previous hearing, no, in fact,

25   it was impressibly informative, I believe your words

1    were.  I appreciated that because I did help draft this
2    indictment.
3        This indictment clearly lays out what the
4    allegations are, which are that these two worked together
5    to defraud the United States under the defraud clause,
6    not the conspiracy to commit a substantive crime clause
7    of the conspiracy statute.
8            THE COURT:  Okay.  So under Section 371, these
9    defendants can safely ignore the words "to commit any
10   offense against the United States"; is that right?
11           MR. O'REILLY:  Yes, Your Honor, that is not what
12   is -- this is charged under the defraud prong, correct.
13           THE COURT:  Okay.  So the words they need to be
14   mindful of are the words "or to defraud the United States
15   or any agency thereof" and so forth.
16           MR. O'REILLY:  Yes, Your Honor.
17           THE COURT:  Okay.  Very well.
18           MR. O'REILLY:  With respect to that, they also
19   then both individually with Mr. Springer and then
20   together in certain years are charged with evading
21   Mr. Springer's taxes.  There's nothing cryptic or unclear
22   about that.  It is clearly alleged in the indictment.  A
23   bill of particulars is not needed or does not, certainly
24   to the government's view, appear to be needed to explain
25   to these two individuals what they are charged with, nor

1    to protect them from double jeopardy.  And that is the

2    function of a bill of particulars.  Not to explain to

3    them what, you know, as the Court said, the government

4    had in mind when it was charging them and used a certain

5    phrase.  If the Court wants us to do so, obviously, we

6    will do that, Your Honor, but I don't think a bill of

7    particulars is warranted.

8            THE COURT:  Thank you.  Mr. Springer, I'm going

9    to rule your way unless you talk me out of it.

10           MR. SPRINGER:  No, no, sir.  I just want to be

11   clear about the defraud.  He brought defraud up and I

12   just wanted to point out that I was coming from -- I was

13   coming from his response where he said the first element

14   from the Tenth Circuit was that they had to show we had a

15   -- they had to prove that we had an agreement to violate

16   a law.

17           THE COURT:  Well, that's why we have court

18   reporters.  I expect you'll -- down the line, if there's

19   any issue on that, I expect you'll be able to show me

20   what we heard just a minute ago.

21           MR. SPRINGER:  Sure.

22           THE COURT:  The motion for bill of particulars

23   at Docket Entry Number 82 will be granted in part and

24   denied in part.  It is granted to this extent:  With

25   respect to Counts 2, 3, 5, and 6, the government is

 1  directed to file a bill of particulars specifying the

 2  provisions which provide for the legal duties with which

 3  the defendants were obligated to comply as "required by

 4  law" as those words are used in those counts.

 5      Given the fact that this case is on a schedule and

 6  that that schedule is oriented toward a trial this

 7  October, the government is directed to file that bill of

 8  particulars within 14 days from this date.  The motion

 9  for bill of particulars both as filed, and I don't know

10  if it has been adopted or not, but if it has, both as

11  filed and as adopted is in all other respects denied.

12      Let's see.  Okay.  Now, do we have any motions

13  pending other than the series of motions to dismiss?

14          MR. O'REILLY:  Not that I'm aware of, Your

15  Honor.  Your Honor, one thing that might help expedite

16  the bill of particulars, if there's additional law, the

17  government will certainly supply it, but I can give you

18  -- give the defendants right now a list of statutes

19  that --

20          THE COURT:  Well, no, you said you wanted time

21  to think about it, and I think you probably ought to take

22  time to think about it.  Because if we get a list this

23  long, we're going to be right back here.  Okay?  I

24  promise you that.  This is not a time to play games.

25          MR. O'REILLY:  Not playing games, Your Honor.

```
1              THE COURT:  I don't want a list this long.

2              MR. O'REILLY:  Actually, Your Honor, it won't

3    be --

4              THE COURT:  Okay.  Okay.  Very well.  I have

5    carefully considered the other motions that are pending,

6    and I'm not sure that this is going to be taking them in

7    the exact order in which they were docketed.  That's

8    obviously neither here nor there.  But I do have the

9    benefit, of course, of the motions, of the papers filed

10   in support of the motions, the government's response, the

11   defendant's reply, and as to some issues the government's

12   sur-replies.

13        Addressing first Mr. Springer's first motion to

14   dismiss at Docket Entry Number 51 joined in by

15   Mr. Stilley at Docket Entry Number 69, it is my

16   conclusion that venue is properly laid in this district

17   and that the motions will be denied.

18        The defendants have cited Title 26, Section 6091,

19   which governs where income tax returns may be filed and

20   which refers to filing "in the internal revenue district

21   in which is located the legal residence of the person

22   making the return."  Now, I've left out some words, but

23   the words I have said there are the relevant ones.

24   That's 26 United States Code, Section 6091(b)(1)(A)(i).

25        Because the internal revenue districts have been
```

1    abolished, the defendants argue that there is no such

2    place as the internal revenue district in which the

3    defendants' legal residence is located.  For that reason,

4    the defendants go on to say that they cannot be

5    prosecuted for these asserted violations because the

6    districts have been abolished and venue is not proper

7    anywhere.

8         Venue, however, is appropriate in each district in

9    which a federal criminal offense is committed.  That is

10   established by 18 United States Code, Section 3237(a).

11   In particular, venue in a conspiracy case is appropriate

12   in any judicial district where the agreement was made or

13   where an overt act in furtherance of the conspiracy was

14   committed.  That much is made clear by our circuit's

15   decision in United States v. Record, 873 F.2d 1363, at

16   page 1366.

17        Now, venue for a tax evasion charge is in any

18   district in which an affirmative act of evasion occurred

19   such as where the return was prepared, signed, mailed, or

20   filed.  Which is established by a decision which is

21   persuasive to me by the Eighth Circuit in United States

22   v. Marchant, 774 F.2d 888, at page 891.

23        Also relevant is a decision from the Ninth Circuit,

24   United States v. Hicks, 947 F.2d 1356, at page 1361, in

25   which the motion to dismiss was held correctly denied by

1    the district court.  And I quote, "Failure to file a tax

2    return is an offense either at the defendant's place of

3    residence or at the collection point where the return

4    should have been filed."

5         Now, leaving out some citations, the Court went on

6    to say that the defendant's "place of residence is

7    Arizona and the collection point for his returns was the

8    IRS center in Utah.  Thus, Hicks' offenses could be

9    deemed to have occurred either in Arizona or Utah."

10        Venue is proper for the crimes charged in the

11   Northern District, in this case, the place of residence

12   and the place where overt acts of conspiracy to evade

13   taxes is charged to have occurred and the place where

14   affirmative acts of evasion are charged to have

15   occurred.  For those reasons, the motions will be denied.

16        I will next take up Mr. Springer's second motion to

17   dismiss, Docket Entry Number 53, joined in by Mr. Stilley

18   at Docket Entry Number 69.  The question presented by

19   this motion is whether the prosecution should be

20   dismissed because the defendants contend that the tax

21   reporting forms and publications in question did not

22   comply with the Paperwork Reduction Act, 44 United States

23   Code, Section 3501.  My conclusion is that the Paperwork

24   Reduction Act does not provide a defense to the crimes

25   charged, for which reason the motions will be denied.

1       Now, Mr. Springer is very, very familiar with the
2   Paperwork Reduction Act.  As a matter of fact, I will go
3   so far as to say that is a law on which he may well be
4   more knowledgeable than anyone else in the courtroom.  In
5   a civil action that he filed in the Northern District
6   reported at 447 F.Supp.2d 1235, Mr. Springer previously
7   argued, as he does here, that he cannot be penalized for
8   having failed to file income tax returns because the
9   Paperwork Reduction Act states that "No person shall be
10  subject to any penalty for failing to comply with a
11  collection of information if the collection of
12  information does not display a valid control number."
13  And that, of course, is a reference to 44 USC Section
14  3512(a)(1).
15      Now, in that case, Judge Eagan quoted a Tenth
16  Circuit decision, Unites States v. Dawes, 951 F.2d 1189,
17  and the passage that's relevant is at pages 1191 and 1192
18  as follows:  "It is settled law that the requirement to
19  file a tax return is mandated by statute, not by
20  regulation" and that explicit statutory requirements such
21  as those involving the filing of income tax returns "are
22  not subject to the Paperwork Reduction Act."  That is
23  from a case involving none other than Lindsey Springer,
24  447 F.Supp.2d at page 1238.
25      Judge Eagan further said, "The PRA, Paperwork

1    Reduction Act, was not designed to repeal the statutory

2    criminal penalty for failing to file an income tax return

3    because tax regulations and instructions lack OMB

4    numbers."  That's from Springer at page 1238 quoting

5    Dawes at page 1193.

6         Back to the Hicks case.  The Ninth Circuit in that

7    case said at page 1359, "Congress enacted the PRA to keep

8    agencies, including the IRS, from deluging the public

9    with needless paperwork.  It did not do so to create a

10   loophole in the tax code."  We hold that the public

11   protection provisions of the PRA constitute no defense to

12   prosecution under 26 United States Code, Section 7203,

13   which I believe is for failure to file returns.  To hold

14   otherwise to interpret the PRA without reference to

15   Congress's purpose would be to elevate form over

16   substance.

17        Any arguable failure to comply with the Paperwork

18   Reduction Act, I conclude, is not a defense to the tax

19   crimes alleged in the indictment and those motions are

20   denied.

21        This brings me to Mr. Springer's third motion to

22   dismiss at Docket Entry Number 55, joined in by

23   Mr. Stilley at Docket Entry Number 69.  This motion

24   raises the question of whether this case ought to be

25   dismissed because there has not been a finding by any

1  trier of fact that the subject income tax received by the

2  defendants -- or the subject income tax -- income, I

3  should say, income received by the defendants was

4  anything other than a gift and thus not subject to income

5  tax.  My conclusion is that the answer to this question

6  is no.

7      The case relied upon by the defendants, the

8  Duberstein case does not hold that there must be a prior

9  determination of fact as to whether income received by

10 the defendants was or was not a gift before the

11 defendants may be tried for the tax crimes charged in

12 this case.  For that reason, the motion at Docket Entry

13 Number 55, joined in by Mr. Stilley at Docket Entry

14 Number 69, will be denied.

15     Now, the defendants do rely, as I have said, on the

16 Duberstein case for their contention that before there

17 may be a criminal trial as to tax evasion there must be a

18 prior determination by a trier of fact in a non-criminal

19 trial that the money in question was not received by the

20 defendant as a gift.  Otherwise, the defendants contend,

21 there is no determination of a "tax deficiency."  And a

22 "tax deficiency" is an element of the crime of tax

23 evasion under Section 7201.

24     26 United States Code, Section 102, provides that

25 gross income for tax purposes does not include "the value

1  of property acquired by gift."  Duberstein was an action

2  brought by a taxpayer and his wife in tax court to review

3  a deficiency asserted by the Internal Revenue Service.

4  The defendant cites the statement in Duberstein at page

5  286 that "the proper criterion" for determining donative

6  intent "is one that inquires what the basic reason for

7  the donor's conduct was in fact, the dominant reason that

8  explains his action in making the transfer."  That's at

9  page 286.

10      Nothing in that passage or in Duberstein or in any

11  of the other authorities cited by the defendants,

12  however, suggests that in a criminal action for tax

13  evasion there must be some type of prior determination as

14  to whether funds constituted a gift.

15      Now, the defendants also argue that the jury in this

16  action cannot be asked to determine whether a substantial

17  tax deficiency exists at the same time that the jury is

18  asked to determine whether the money in question was

19  given to the defendants as a gift.

20      The question of the intent of the donor and all

21  issues regarding whether or not the funds are a gift may

22  be determined by the jury as an issue necessary to the

23  determination of the larger issue of whether the

24  defendant has been proven guilty of the crimes charged.

25      The defendants cite no authorities that suggest

1   otherwise and juries do certainly commonly determine

2   sub-issues like that in reaching their determinations

3   with respect to the broader issues under the indictment.

4   These motions are denied.

5        We're going to take about a 15-minute recess.  We

6   will resume at 25 minutes after the hour.  Court will be

7   in recess.

8        (RECESS HAD)

9            MR. SPRINGER:  Your Honor, may I raise a

10  housekeeping question?

11           THE COURT:  You surely may.

12           MR. SPRINGER:  I'm trying to get ahead and not

13  rehash any old issue.  The sixth motion to dismiss is

14  going to come up, which deals with defraud.  And in light

15  of the Court's order that Count 1 is defraud, I'd like

16  to, when you get to that point to make -- raise a

17  question that would basically amend my bill of

18  particulars slightly to that one count based upon the

19  statements that Mr. O'Reilly made.  Because now the

20  defraud prong, without any offense, now really becomes a

21  necessity for a particular.  And I just -- I didn't

22  really consider that when you went to Counts 2, 3, 5, and

23  6.  I just thought I would bring that up because I knew

24  we were going to Counts --

25           THE COURT:  We'll address that here in just a

1  very few minutes.

2       The Court will now address the fifth motion to

3  dismiss filed by Mr. Springer at Docket Entry Number 59,

4  joined in by Mr. Stilley at Docket Entry Number 69.  This

5  motion raises the question of whether this prosecution

6  should be dismissed because the defendants' -- and this

7  applies to both of them -- whether the defendants' Fifth

8  Amendment privilege against self-incrimination protects

9  them in these circumstances where they claim that any

10  filing of a return would have put them in danger of

11  prosecution because they had been under investigation by

12  the Internal Revenue Service since at least 1995.

13       My conclusion is that the motion is without merit.

14  There is no reason to dismiss this case based on the

15  defendants' argument that they had been under

16  investigation by the Internal Revenue Service since at

17  least 1995.  For that reason, the motions are denied.

18       The privilege against self-incrimination is not a

19  defense, as such, to prosecution for the complete failure

20  or refusal to file a tax return.  In that respect, I am

21  certainly informed by United States v. Sullivan, 274 U.S.

22  259, at page 263.

23       Now, while the privilege may be claimed to protect

24  against specific disclosures sought on a return, where

25  the answers the defendant would be privileged to make,

1   the privilege does not authorize a person to refuse to

2   state his income and "draw a conjurer's circle around the

3   whole matter by his own declaration that to write any

4   work upon the government blank would bring him into

5   danger of the law."  That is the words of the Supreme

6   Court in the Sullivan case at page 263.  I have left the

7   omissions out.  For that reason, these omissions (sic)

8   are denied.

9        Now, as Mr. Springer mentioned just a moment ago,

10  that brings us to the sixth motion to dismiss, Docket

11  Entry Number 61, joined in by Mr. Stilley at Docket Entry

12  Number 69.  Mr. Springer, as filed, the motion at Docket

13  Entry Number 61 poses the question to me as to whether

14  the charges ought to be dismissed because the indictment

15  does not charge fraud with sufficient particularity.

16  Now, I want to hear you as to what you were proposing

17  just a few minutes ago.

18        MR. SPRINGER:  Okay.  Defraud itself is a common

19  law term.  There's no definition for it in Title 18,

20  Section 371.  The Supreme Court and the Tenth Circuit

21  both have defined to be by craftiness, trickiness, or

22  means that are dishonest.  And the government's theory in

23  Count 1 is that we're in a conspiracy to defraud by

24  impeding the functions of the IRS, getting in their way,

25  basically.

1    And by the Court not ordering a bill of particulars

2  on the first element of Count 1, which is that we had an

3  object of the conspiracy to violate the law, there's

4  nothing in Count 1 that actually describes the steps that

5  Mr. Stilley and I allegedly took that would fit under

6  defraud.

7    Craftiness, trickiness, or means that are dishonest

8  is the only definition -- the object of the conspiracy in

9  the indictment begins on page 2, which was -- is relevant

10  to the first element that they admit that they have to

11  prove to a jury and it ends at the bottom of page 3.  And

12  if you include manner and means of the conspiracy to

13  effect the object.  But the object itself on paragraph 9

14  on page 2 reads very shortly, "Beginning in about 2000

15  and continuing until January 2009 within the Northern

16  District of Oklahoma and elsewhere, Springer and Stilley,

17  and others, both known and unknown to the grand jury,

18  unlawfully and knowingly combined, conspired,

19  confederated, and agreed together to defraud the United

20  States by impeding, impairing, obstructing, and defeating

21  the lawful government functions of the Internal Revenue

22  Service, an agency of the United States, in the

23  ascertainment, computation, assessment, and collection of

24  revenue, that is, federal individual income taxes."

25    That is their object.  There is nothing alleged that

1  says crafty, here we did something that was crafty, here
2  we did something that we were trying to be tricky about,
3  or here is where we were dishonest.  The closest you get
4  in anybody's theory to dishonesty, and I don't know how
5  you get there, is failed to file a tax return.  And
6  that's an omission of doing nothing, a dishonest
7  omission.  If it could be accepted, but they didn't plead
8  that.
9       And so we're left with under the rules in civil side
10 we always have -- at least I've learned in the last case
11 that I was in, that fraud has to be pled with
12 particularity, describing exactly what is the thing, who
13 it defrauded, how it was -- in this case, it would be who
14 it tricked, how it was tricky to them, and that sort of
15 thing.  And there's nothing in Count 1 that explains
16 that.
17      And when you don't have a conspiracy to commit an
18 offense against the laws of the United States where you
19 have the substantive object is the statute that the
20 defendants would be alleged to have attempted to
21 accomplish and you're left with this common law term
22 "defraud," then when you plug it in for my request for a
23 bill of particulars, when you come into my bill of
24 particulars, I'm asking the Court as an amendment to ask
25 the government to provide a bill of particulars

1  explaining the tricky, craftiness, or dishonest means

2  that they intend to prove that they mean by this

3  paragraph in the indictment. Because, otherwise, there's

4  nothing.

5        THE COURT: Now, how does that differ from what

6  you argue in your sixth motion to dismiss as filed?

7        MR. SPRINGER: Only adjusting it to address the

8  Court's granting of the bill of particulars, not

9  addressing Count 1, because the government went -- the

10  theory was -- I know it has always said "defraud," but

11  there's not a court in this land that has ever found that

12  two people can conspire to do something that's not

13  illegal and that's a conspiracy to defraud the

14  government. That has never been even thought to be the

15  idea behind Section 371.

16      And so because the government has gone to defraud

17  and because that closed the Court's basic decision on

18  whether or not the word "law" in the first element needed

19  to be identified, I was just adjusting slightly the sixth

20  motion based upon at least asking the Court to amend the

21  bill of particulars. Maybe not -- depending on where you

22  want to go is one thing, but it is my opinion that the

23  government needs to at least explain to us what was the

24  things that we did that meets the word "defraud," crafty,

25  trickiness, or dishonest. Not what they've put in manner

1  and means, because none of that falls into the category

2  of -- I mean, if you look at manner and means, that

3  income, assets, and personal expenses, that's not crafty,

4  tricky, or dishonest.  "Springer and Stilley would and

5  did use Defendant Stilley's" --

6          THE COURT:  If you want a record, you're going

7  to have to slow down.

8          MR. SPRINGER:  I'm sorry.  "Account to conceal

9  Defendant Springer's income, assets, and personal

10 expenses."  See, the word "conceal" shows up right there,

11 but it doesn't say who, doesn't say how it was concealed,

12 doesn't say how it was tricky or dishonest.

13     And then you look at paragraph 11 on page 3 of the

14 indictment, another one of the manner and means, it says,

15 "would and did use Defendant Stilley's credit card to pay

16 defendant's personal expenses."  How is that crafty,

17 tricky, or dishonest?  They don't say.

18     And then Number 12, "Defendant Springer and Stilley

19 would and did use cashier's checks, money orders, cash,

20 and other means to avoid creating the usual record of

21 financial transactions and to conceal Defendant

22 Springer's income.  Now, was that crafty, tricky, or

23 dishonest?

24          THE COURT:  I think you're disproving your

25 point.

```
 1           MR. SPRINGER:  Proving my point?

 2           THE COURT:  I think you are disproving your

 3  point.

 4           MR. SPRINGER:  By reading paragraph 12?

 5           THE COURT:  Yes.  I have a very hard time

 6  seeing -- they don't have to plead your state of mind

 7  beyond what they've already pleaded.

 8           MR. SPRINGER:  Okay.  So all I'd be asking them

 9  in my adjustment to my bill of particulars is what do

10  they mean by "defraud," what does -- what is -- you know,

11  you brought up the issue earlier with them, how am I

12  going to instruct the jury on the law on these other

13  counts.  You were talking judge to Mr. O'Reilly, and I'm

14  just asking the Court, how are we going to instruct the

15  jury on defraud if it's not pled in specifically here is

16  what was tricky to the IRS, that is what we mean when we

17  say you tried to defraud us.  And remember the gist of

18  their words are "impede the functions of the IRS."  And

19  that was, you know, doing something to impede them.  And

20  what they've alleged there is nothing that they had

21  anything to do with.

22      So I'm just saying I understand it's a mixed

23  question of fact and law, but they haven't pled the

24  defraud prong, that's all I'm saying, based upon their

25  argument and their first element of the crime in Count 1.
```

145

1          THE COURT:  And to that extent, I should take

2   your sixth motion to dismiss as being revised.

3          MR. SPRINGER:  Revised.

4          THE COURT:  Very well.  I'll hear from the

5   government.

6          MR. O'REILLY:  Your Honor, the indictment

7   clearly does lay out the manner and means.  We really

8   have nothing to add to what we put in our papers and we

9   would ask the Court to stand by its previous order with

10  respect to the bill of particulars.  If you have any

11  questions for me, I'd be happy to address them, but.

12         THE COURT:  Thank you.  I assume, Mr. Stilley,

13  you join in the revised version of the motion.  Is that

14  correct?

15         MR. STILLEY:  That is correct, Your Honor.

16         THE COURT:  The motion at Docket Entry Number

17  62, joined in by Mr. Stilley at Docket Entry Number 69,

18  as revised, is denied.  The indictment does adequately

19  charge the crimes alleged.  I really don't need to go any

20  further than to recite my reliance on United States v.

21  Redcorn, 528 F.3d 727.  There is a very, I think, helpful

22  passage at page 733.  That's a decision from the Court of

23  Appeals in 2008.

24      The indictment clearly alleges the crimes charged

25  and the indictment is not required to describe the

 1   government's evidence or to plead evidentiary detail or

 2   to identify all facts supporting the allegations or I

 3   should also say to charge with specificity the

 4   defendant's precise state of mind, whether they were

 5   being crafty, underhanded, or whether they were guilty of

 6   any other description of fraudulent conduct.

 7       I also rely on the discussion in Wong Tai v. United

 8   States, 273 U.S. 77, at pages 81 and 82.  And for that

 9   reason, the motion is denied.

10       Of course, that is without prejudice to my earlier

11   order, which certainly does still stand, as to the

12   respect in which several counts of the indictment,

13   specifically Counts 2, 3, 5, and 6, should be clarified

14   by the filing of a bill of particulars as was directed by

15   the Court earlier this afternoon.

16       Now, that brings us, Mr. Springer, to your seventh

17   motion to dismiss at Docket Entry Number 63, joined in by

18   Mr. Stilley at Docket Entry Number 69.  It has got some

19   overlap with your sixth motion to dismiss.  I had a hard

20   time sorting the two out completely.  It has also got

21   some overlap with the matters that we have addressed by

22   way of the motion for a bill of particulars.

23       You raise the question in this motion as to whether

24   Count 1 ought to be dismissed because the indictment

25   fails to allege the person or persons and the code

1  section intended to be impeded by the defendants.  I'm

2  having a little difficulty in light of the rulings I've

3  already made determining what part of that motion ought

4  to be determined or treated as being still viable.

5          MR. SPRINGER:  Count 1, Your Honor, does not

6  identify any specific person who performed any specific

7  function or who had any specific function that they claim

8  Mr. Stilley and I's object was to impede.  And I

9  understand the electronic side of the IRS, to some

10 degree, is not considered by the Court to be a person.

11 However, the conspiracy as charged is that we intended to

12 impede, and they don't tell us who we intended to impede,

13 our object was.

14      And in light of the Court's ruling, I think that

15 that still remains at least something that the government

16 needs to address.  It may have been more importantly put

17 in a bill of particulars at this point based upon the

18 Court's ruling on six, but we know Mr. Shern, he wasn't

19 an IRS agent in 2000 or 2001 or 2 or 3 or 4 or not until

20 mid-2005.

21          THE COURT:  Now, am I to understand,

22 Mr. Springer, that you want the government to allege what

23 IRS employees were impeded?

24          MR. SPRINGER:  Well, how about just the word

25 "who"?  Is there a claim that everybody that works for

1  the IRS Oscar and I conspired to impede?  Because that's

2  how you would have to accept it, you would have to

3  swallow it.  I'm still scratching my head on it.

4           THE COURT:  Well, you'd take that as quite a

5  compliment, wouldn't you?

6           MR. SPRINGER:  Well, I don't know, not anymore.

7  Not anymore.  But I do believe, Your Honor, that it --

8  see, the IRS can't be sued and they can't sue.  They're

9  not somebody themselves who has been given this existing

10 entity power.

11     So the problem is, is I'm having to understand and

12 guess as to what they say I did and who I did it to or

13 who I intended to do it to.  And I believe that that's

14 exactly what the Supreme Court said, that an indictment

15 is not supposed to contain or that it should be dismissed

16 when the claims aren't specific enough.  And the theory

17 that the government has, they've alleged impeded, the

18 Court has accepted defrauded.  We've asked for function

19 and we got five words or four words, but we don't have

20 who.

21     It's the same example that I gave in venue, which I

22 understand the Court has dismissed, but there's more than

23 just one piece or component to impeding an IRS's

24 function.  And they're just asking us just to accept

25 that.  And I'm -- obviously, by the record I've made, I'm

1    not willing to accept it.  I mean, I'll accept what the

2    Court says for now, but that's as far as I can go with

3    it.

4         THE COURT:  Thank you.  Mr. Stilley, I see

5    you're poised to add some words of wisdom.

6         MR. STILLEY:  Thank you, Your Honor.  Yes, the

7    springs are loaded and you can see that.  I just have a

8    very short comment to make and that is with respect to

9    this issue, I would like to be able to know if the

10   government is going to call as witnesses the people that

11   were allegedly interfered with.  And if they're not going

12   to call those people as witnesses, if they're going to

13   try to use hearsay and other kind of ways to insinuate or

14   put inferences in and try to prove their case by

15   inferences, I'd like to know who are those people who

16   were allegedly impaired or impeded or we got in their

17   way, who are those people so that they can be issued

18   subpoenas so we can put them in the witness stand and see

19   what they've got to say.  Because they might well admit,

20   no, neither of you guys interfered with our functions in

21   any way.  Thank you.

22        THE COURT:  Thank you, sir.  I'll hear from the

23   government.

24        MR. O'REILLY:  Your Honor, I have nothing to add

25   to our filings.  There's no requirement that we specify

1   who within -- which specific officers or employees were

2   specifically impeded.  If there is any exculpatory

3   material where people were not, we're going to be turning

4   that over.  I really have no other way to respond to this

5   motion.

6          THE COURT:  Thank you.  The motions at Docket

7   Entry Number 63, joined in -- or the motion I should say

8   at Docket Entry Number 63, joined in by Defendant Stilley

9   at Docket Entry Number 69, will be denied.

10      One thing that was reasonably clear to me, even

11  before today, it certainly is more clear now, is that the

12  charge we have in Count 1 is what is commonly called a

13  Klein conspiracy under the defraud clause of Section

14  371.  This traces back to the Second Circuit's decision

15  in United States v. Klein, 247 F.2d 908.

16      In that case, the Second Circuit observed that in

17  Hammerschmidt v. United States, 265 U.S. 182, the Supreme

18  Court recognized that the defraud clause reaches not only

19  a conspiracy to cheat the government out of property or

20  money, but that it also reaches conspiracy meant to

21  interfere with or obstruct one of the government's lawful

22  functions.  In this case, such as collecting taxes and

23  getting lawful returns in by some means that is

24  dishonest.  And that is exactly what is charged here.

25      I have obviously given the defendants some relief by

1  way of my partial granting of the motion for bill of

2  particulars.  Count 1 does adequately set forth the

3  elements of the crime charged under the defraud clause of

4  Section 371.  And for that reason, the motion at Docket

5  Entry Number 63, joined in by Defendant Stilley at Docket

6  Entry Number 69, is denied.

7      That brings me to the eighth motion to dismiss,

8  Docket Entry Number 65, joined in by Defendant Stilley at

9  Docket Entry Number 69, that presents the question of

10  whether this case ought to be dismissed on the basis of

11  the contention by the defendants that all six counts were

12  obtained by presenting evidence that was illegally

13  obtained or because this prosecution is a product of

14  selective prosecution.

15      The defendants argue that the government relied on

16  violations of Mr. Springer's Fourth and Fifth Amendment

17  rights to secure evidence, which the government then

18  presented to the grand jury.  That, obviously, is

19  substantially addressed or the issues presented by this

20  motion are substantially addressed by my ruling on the

21  Franks matters earlier today.

22      But it should be said, nevertheless, that the first

23  ground for dismissal urged in this motion, which is

24  specifically violation of Defendant Springer's Fourth and

25  Fifth Amendment rights, which resulted in wrongfully

```
 1   obtained evidence being presented to the grand jury is in
 2   any event without merit.
 3       The defendant's position is without merit because
 4   the exclusionary rule does not apply to grand jury
 5   proceedings and evidence obtained by way of an illegal
 6   search is admissible in grand jury proceedings, as held
 7   by the Supreme Court in United States v. Calandra, 414
 8   U.S. 338.  And I refer now to the discussion at page 350.
 9       The motion also contends that this prosecution
10   should be dismissed because it is a product of selective
11   prosecution.  A defendant claiming selective prosecution
12   must demonstrate "that the federal prosecutorial policy
13   had a discriminatory effect and that it was motivated by
14   a discriminatory purpose."  United States v. Armstrong,
15   517 U.S. 456, at page 465, and in that quote I have left
16   out the internal quote.
17       In United States v. Rickman, 638 F.2d 182, the Tenth
18   Circuit affirmed the district court's denial of a
19   defendant's claim of selective prosecution based, as is
20   the case here, on his argument that he was charged as a
21   result of his outspoken criticism of the federal income
22   tax laws.
23       I think it is certainly relevant to my ruling on
24   this motion that in the Rickman case the Court of Appeals
25   said at page 183, and I quote, "Neither aggressive
```

1  display of opposition to a law nor blatant challenge that

2  the government prosecute creates immunity from or a

3  defense to prosecution."  I have no showing of selective

4  prosecution and, consequently, I have no basis for a

5  dismissal as sought in the eighth motion to dismiss.

6      Finally, I've got a motion to dismiss that I

7  addressed earlier today by Mr. Stilley, Docket Entry

8  Number 67.  That raises an issue as to whether this case

9  as against Defendant Stilley ought to be dismissed for

10  failure -- or for violation of Mr. Stilley's Fifth

11  Amendment right against self-incrimination because

12  Mr. Stilley was not told that he was under criminal

13  investigation or a target at the time that he was

14  subpoenaed to testify before the grand jury in 2006.

15  That motion is denied for the reasons that I have stated

16  earlier on the record when we addressed those issues.

17      Bear with me just a moment, Counsel.  I'm also going

18  to address, and I'm told that I failed to address, the

19  fourth motion to dismiss at Docket Entry Number 57,

20  joined in by Mr. Stilley at Docket Entry Number 69.  That

21  motion raises the question of whether this case ought to

22  be dismissed because the indictment does not allege the

23  source of any gross income.  And because the indictment

24  does not allege any specific and substantial tax

25  deficiency, it is not necessary, I conclude, for the

1    indictment to allege the source of the defendant's gross

2    income or a specific and substantial tax deficiency, for

3    which reason these motions are denied.

4         There is no requirement that the indictment charge

5    the exact amount of tax due and owing as stated in United

6    States v. Harrold, 796 F.2d 1275, and this is a case from

7    our Court of Appeals, "Defendant's claim that the

8    indictment should have included the amount of the taxes

9    owed is meritless.  In a Section 7201 prosecution, the

10   government is not obligated to prove the precise amount

11   owed.  Thus, there is no requirement that an indictment

12   under Section 7201 specify the exact amount owed."

13   That's from the Harrold decision at page 1278.  I have

14   left out some citations.

15        As for the defendant's argument that the indictment

16   fails to allege the amounts and the source of gross

17   income and that they are thereby left guessing about

18   which money given by which persons the government intends

19   to argue was not a gift, the government refers the

20   defendants to the material provided in discovery.

21        The government also states at page 8 of Docket Entry

22   Number 71 that this material includes the evidence

23   presented to the grand jury and that this material more

24   than adequately apprises the defendants of the funds

25   alleged to be income.  The Court agrees.  These motions

```
1    will be denied for the reasons I have stated.
2         And, Pam, that leaves no motions pending; is that
3    correct?
4              COURTROOM DEPUTY:  Yes.
5              THE COURT:  Okay.  Very well.  Counsel, I do
6    appreciate the quality of your filings and the quality of
7    your advocacy here.  I will remind you that we're under a
8    schedule that is going to keep you busy getting ready for
9    an October trial.  I will also ask you to keep in mind
10   some comments I made at our last hearing.  I expect both
11   sides to use good judgment in any coming motion work.  I
12   think I had specifically had in mind, for instance, the
13   motions in limine stage and I think I probably said
14   something to the effect that the higher the stack of
15   motions in limine gets, the shorter my attention span
16   gets, or words to that effect.  Please bear that in mind,
17   that is true.
18        And as far as any evidentiary questions, beyond a
19   certain point by way of motions in limine, we really have
20   a situation in which your advocacy can be about as
21   effective if not more effective by educating me in your
22   trial brief about what the anticipated problem is, so
23   that I will be prepared to address it outside of the
24   hearing of the jury, if necessary, at trial rather than
25   treating it entirely as a motion in limine.
```

1    Is there anything further this afternoon from the
2    government?
3         MR. O'REILLY:  No, Your Honor.
4         THE COURT:  From the defendant?
5         MR. SPRINGER:  Yes, Your Honor.  Could you
6    clarify what you just said for me just so I make sure,
7    did you say that if there's going to be multiple motions
8    in limine instead of one motion in limine with
9    everything, you would rather see it in a trial brief that
10   we take up outside the jury at a certain time?  Because I
11   didn't quite follow that and I was trying my darnedest
12   to.  And I'm so sorry.
13        THE COURT:  No, that's not what I meant.
14        MR. SPRINGER:  Okay.
15        THE COURT:  I was not referring to the
16   difference between multiple motions in limine versus all
17   of your motion in limine points included in one motion.
18        MR. SPRINGER:  Okay.
19        THE COURT:  On that score, I have a preference
20   to have separate motions in limine.  But that's not what
21   I was talking about.  What I was talking about was it
22   behooves you to use good judgment and restraint as to
23   your motions in limine in the first instance, for one
24   thing.  Motions that just ask me to obey some particular
25   rule of evidence without giving me a factual context are

1  likely to be overruled out of hand.  That's an abuse of a

2  motion in limine.

3      A motion that really doesn't do anything more than

4  ask me to keep the government from proving a fact that

5  you don't like is not an appropriate motion in limine and

6  will likely be overruled out of hand.  A motion in limine

7  that does nothing more than re-raise a legal issue that I

8  have previously resolved against you is likely to be

9  resolved out of hand.

10     Okay.  Beyond that, there's still all kinds of

11  potential for motions in limine as to evidence that you'd

12  just as soon the jury not hear.  And my suggestion to

13  you, very earnestly, is that you use good judgment as to

14  how many of those issues you drop in my lap before trial.

15          MR. SPRINGER:  And how was that trial brief

16  played in on that?  That's the part I got stuck on.  I'm

17  so sorry.

18          THE COURT:  When you get past about a half a

19  dozen motion in limine issues, then you need to start

20  seriously thinking about just addressing this problem in

21  your trial brief rather than in a motion in limine.

22          MR. SPRINGER:  I'm clear, Your Honor.

23          THE COURT:  Anything further this afternoon from

24  Mr. Stilley?

25          MR. STILLEY:  Yes, Your Honor, just briefly.  If

 1   I might ask, I don't see a deadline for the government

 2   supplying exhibits.  And since this is a document-

 3   intensive case, I wonder if that might be appropriate.

 4   And I apologize, I should have spoke to the government

 5   about this, but I'm thinking, you know, if we could have

 6   that at a reasonable time before trial that that would

 7   give us an opportunity to perhaps stipulate on things and

 8   make the trial go more efficiently.

 9          THE COURT:  Well, obviously, they've already

10   given you voluminous discovery.

11          MR. STILLEY:  Sure.

12          THE COURT:  And in requiring the government to

13   identify their exhibits from within that realm of

14   discovery, you effectively -- and I'm not foreclosing it

15   and my bottom line on that is to suggest that you file a

16   motion asking the Court to establish such a deadline.

17   Then I'll get the defendant's response and then I'll

18   decide what ought to be done in fairness.

19       But I am wary, I'll say initially, I am wary of

20   having had the discovery that you've had of requiring the

21   government, in effect, to make some final trial decisions

22   way before trial in terms of exactly what exhibits

23   they're going to mark and offer at trial.

24       Now, come trial, they're going to be obligated to

25   provide exhibit notebooks to the defendants, and you'll

1   certainly have their exhibits.  But I'm just going to

2   wait and see your motion and see what you have to say on

3   that score in your motion.  If you want the Court to

4   require anything any sooner than trial, I will see the

5   government's response and then I'll decide what is

6   reasonable under all the circumstances.

7            MR. STILLEY:  Thank you, Judge.  I'll talk to

8   opposing counsel.  We might be able to work it out on our

9   own.

10           THE COURT:  That's even better.

11           MR. STILLEY:  Thank you, Judge.

12           THE COURT:  You could probably craft a better

13  solution that way than the Court could do.  Court will be

14  in recess.

15       (COURT ADJOURNED)

16                    REPORTER'S CERTIFICATE

17

18     I HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND

19  CORRECT TRANSCRIPT OF PROCEEDINGS:

20

21                 S/Tracy Washbourne
                   Tracy Washbourne, RDR, CRR
22                 United States Court Reporter
                   Western District of Oklahoma
23

24

25