```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE NORTHERN DISTRICT OF OKLAHOMA

 3

 4   UNITED STATES OF AMERICA,

 5           Plaintiff,

 6   vs.                          Case No. CR-09-43-SPF

 7   LINDSEY KENT SPRINGER and
     OSCAR AMOS STILLEY,
 8
             Defendants.
 9
     ----------------------------
10

11

12

13

14

15            TRANSCRIPT OF PRETRIAL HEARING

16         BEFORE THE HONORABLE STEPHEN P. FRIOT

17            UNITED STATES DISTRICT JUDGE

18                 OCTOBER 21, 2009

19

20

21

22

23

24

25
```

```
 1   APPEARANCES:

 2   FOR THE GOVERNMENT:
                                Charles Anthony O'Reilly
 3                              US Department of Justice(Box 972)
                                PO Box 972
 4                              Washington, DC 20044

 5                              Kenneth P. Snoke
                                US Attorneys Office (Tulsa)
 6                              110 W. 7th Street, Ste. 300
                                Tulsa, OK 74119
 7

 8
     FOR DEFENDANT SPRINGER:
 9                              Lindsey Kent Springer
                                5147 S. Harvard Ave.
10                              Ste. 116
                                Tulsa, OK 74135
11
                                Robert Scott Williams
12                              Taylor Ryan Schmidt & Van Dalsem
                                1437 S. Boulder Ave., Ste. 850
13                              Tulsa, OK 74119

14   FOR DEFENDANT STILLEY:
                                Oscar Amos Stilley
15                              7103 Race Track Loop
                                Ft. Smith, AR 72901
16
                                Charles Robert Burton, IV
17                              Burton Law Firm, PC
                                320 S. Boston, Ste. 2400
18                              Tulsa, OK 74103

19

20

21

22

23

24

25
```

 1            THE COURT:  Good morning.  We're here for motion

 2   hearing and pretrial conference in Criminal 09-043,

 3   United States v. Lindsey Kent Springer and Oscar

 4   Stilley.  I note that we have one of the standby counsel

 5   here, we have both the defendants here, and Mr. Williams

 6   is reported to be close to the courthouse and will be

 7   here momentarily.

 8        Government counsel will please give your

 9   appearances.

10            MR. O'REILLY:  Good morning, Your Honor.

11   Charles O'Reilly and Ken Snoke for the United States.

12            THE COURT:  Thank you.  And, as I have said, I

13   do note the presence of both of the defendants, pro se.

14   Mr. Springer, I do expect Mr. Williams here momentarily.

15   If at any time before he gets here you would prefer that

16   we wait until he does arrive, I certainly want you to so

17   inform me, and I assure you we will wait until he does

18   arrive.  Do we have that understanding?

19            MR. SPRINGER:  Yes, Your Honor.

20            THE COURT:  Very well.  We have a number of

21   motions.  My intent today, just so that everyone will

22   have an understanding as to what we will do, my intent

23   today is to address the pretrial motions, which is

24   predominantly the motions in limine.  There are some

25   things relating to the government's 404(b) notice that I

4

1    think ought to be addressed today so that we'll all have

2    those ground rules in mind in the final few days before

3    trial.  And then we will have a pretrial conference.

4    Some of the matters that we would logically cover in a

5    pretrial conference will be, I think, addressed during

6    the motion hearing and then I also anticipate that we

7    will have a conference to talk about the draft jury

8    instructions.  So we have a fair amount of ground to

9    cover, I really have no doubt that we will be able to

10   cover these matters quite comfortably within the day

11   today, but we do have a fair amount of ground to cover.

12   We've also got some recently filed motions, motions filed

13   yesterday, that we'll address after we finish with the

14   motions in limine.

15        Let's see, Pam, I managed to get here without a pad

16   to write on.  Can you get me a legal pad or pad to write

17   on?

18             MR. SPRINGER:  Your Honor, if I may for a

19   moment.

20             THE COURT:  If you would, work from the lectern,

21   please.

22             MR. SPRINGER:  Yes, sir.  There is a witness in

23   the courtroom by the name of Mr. Miller who is also a

24   Rule 16 proposed expert on behalf of the government, he

25   is in the courtroom today, and I didn't know that until

 1  such time as the Court made a ruling on whether he's --

 2  how is he going to be, is he going to be in the courtroom

 3  during the proceedings and so forth, whether he should be

 4  in the courtroom while the Court is making that

 5  determination if the Court is going to make that

 6  determination.

 7          THE COURT:  Well, that is your sixth motion in

 8  limine.

 9          MR. SPRINGER:  Yes.

10          THE COURT:  I won't hold you to the numbering of

11  that, but we'll take it up first.  How is that?

12          MR. SPRINGER:  That's great.

13          THE COURT:  Okay.  Now, Mr. Springer, we'll

14  address your sixth motion in limine and I'll tell you

15  what it is that I -- concerns me about your sixth motion

16  in limine.  And I will say, preliminarily, with respect

17  to motions in limine filed by any party in any case, a

18  motion in limine, as a general proposition, is a good

19  candidate for a ruling in advance of trial only if I have

20  enough factual information, concrete, particularized

21  factual information in the motion to give me some

22  reliable facts to which to apply the rules of evidence.

23  That's not so much a problem with this sixth motion in

24  limine as it is with regard to some other motions in

25  limine.  But before we address any of the motions in

```
 1   limine, I think it's necessary for us all to have that
 2   understanding.
 3           MR. SPRINGER:  Okay.
 4           THE COURT:  Okay.  Now, with your sixth motion
 5   in limine, I'm looking at the first page of it,
 6   Mr. Springer, and it appears to me, and I want you to set
 7   me straight if I'm wrong, but it appears to me that in
 8   order to grant your sixth motion in limine relating to
 9   Mr. Miller, I would have to conclude, on the basis of the
10   present record, that Mr. Miller would not be capable of
11   giving objective testimony regarding the treatment of any
12   money tendered to you or paid to you by any witness.
13       And I note Mr. Williams has arrived.  Welcome.  Am I
14   right about that?
15           MR. SPRINGER:  Yes, Your Honor, I believe that
16   that is accurate.  I believe there is -- outside of
17   Dr. Roberts' testimony and outside of the case that
18   Mr. Miller handled for the IRS for Dr. Roberts, I believe
19   that Mr. Miller would be objective.  I don't believe that
20   he would be objective in Dr. Roberts' case, which goes to
21   the merits of Count 2 based upon the tax liability
22   because he is the one who participated in the audit, he
23   is the one who Dr. Roberts told the grand jury changed
24   how his structure of -- was appeared, as far as whether
25   Ortho-Neuro Medical Association was Dr. Roberts or not,
```

1    and I believe that that makes him not objective in

2    Dr. Roberts' case.

3              THE COURT:  Thank you.  The sixth motion in

4    limine is denied.  I have -- I have no plausible basis on

5    the basis of the present record to conclude that

6    Mr. Miller would be fatally lacking in the objectivity

7    necessary to give his proposed testimony.  Now, that's as

8    a motion in limine.  There may be matters that arise at

9    trial, perhaps even on a question-by-question basis that

10   may give rise to a legitimate basis for an objection to

11   one or more aspects of Mr. Miller's proposed testimony,

12   but we'll simply have to address that at trial.

13        The sixth motion in limine is denied.

14        Where does that leave us, then, bearing in mind that

15   expert witnesses commonly are permitted to remain in the

16   courtroom, so that they can hear testimony that may form

17   all or part of the basis for their proposed expert

18   testimony, where does that leave us with respect to

19   Mr. Miller's presence in the courtroom this morning?

20              MR. SPRINGER:  I would request he still be

21   remaining outside because we're going to take up issues

22   involving regulations and statutes that -- in the

23   government's fourth bill of particulars that I would like

24   to have settled before Mr. Miller starts listening to the

25   case.  If he's going to be an expert -- I believe the

```
 1  government has even proposed that he's going to be
 2  preparing like an ongoing summary as we go through trial,
 3  so I would request that he not be in the courtroom for
 4  this pretrial matter on that basis just until we do get
 5  the actual theory of the government's case locked in
 6  today.
 7           THE COURT:  Now, you understand Mr. Miller is
 8  not going to change the law, you understand that?
 9           MR. SPRINGER:  And I don't believe technically
10  that it -- from what I can see that he could or it's
11  going to hurt me in that direction, but out of an
12  abundance of caution and because of the regulations that
13  the government cited to on Monday, I believe that it
14  would be in my best interest because I'm going to
15  definitely be cross-examining him on his expertise that
16  we should at least have those corners locked in before we
17  start letting him be exposed to what this Court is going
18  to instruct the jury that the law is.
19           THE COURT:  Very well.  I'll hear from the
20  government as to whether Mr. Miller ought to be
21  excluded.  And first, if you would, give me -- obviously,
22  the counsel and parties on both sides of this case have a
23  definite advantage at this point in that you are much
24  more familiar with your anticipated presentations than I
25  am.  It's my duty to read everything that is presented,
```

1  and I have certainly done that, but that does not include

2  the thousands of pages of discovery material and that

3  certainly does not include -- or does not inform me in

4  any more than a very general way as to your anticipated

5  presentations.  So, Mr. O'Reilly, I would, first of all,

6  invite you on this issue of whether Mr. Miller ought to

7  be permitted to remain in the courtroom today to give me

8  just a general overview of what it is you intend to

9  present through Mr. Miller.

10         MR. O'REILLY:  Thank you, Your Honor.  First of

11  all, I want to note that the defense has presented no

12  basis really to exclude him with respect to the rule on

13  witnesses, there's no evidence being presented today and

14  that's the basis of the rule on witnesses.  Mr. Miller's

15  presence, actually, will be helpful to the government to

16  ensure that we're not overstating his capability of what

17  he'll be testifying about, which I don't anticipate

18  making that argument, but just in case.

19      Mr. Miller will be -- or we intend that he be a

20  summary witness for the government.  He will be present

21  throughout the trial, taking notes, keeping track of the

22  exhibits that are actually admitted.

23         THE COURT:  Is he going to be at the table?

24         MR. O'REILLY:  Actually, Your Honor, we were

25  going to have him sit just behind the table, not at the

1   table.

2          THE COURT:  Well -- and that question was

3   directed to during the trial.  Are you going to have him

4   at your table during the trial or sitting back in the

5   other part of the courtroom?

6          MR. O'REILLY:  Well, actually, Your Honor, we

7   will actually be seeking direction from you on this one,

8   but our intention was to have him not at the table with

9   us.  Mr. Miller would be where the U.S. Attorney is right

10  now and be keeping track of the exhibits that come in,

11  the evidence that is admitted, but not sitting at the

12  table with us.  We anticipate having at the table with us

13  Special Agent Shern, the special agent in the case.

14  We'll be asking for the exclusion of witnesses to be

15  exempt from that and also a paralegal, Ms. Saundra

16  Burgess, who will be assisting us in our electronic

17  presentation.

18          THE COURT:  Was Mr. Miller involved in the

19  investigation of this case before the indictment was

20  returned?

21          MR. O'REILLY:  I believe not, but I'm going to

22  double-check on that.  No, Your Honor, he was not

23  involved in the investigation.

24          THE COURT:  So you don't anticipate calling him

25  as a fact witness in the conventional sense, I take it;

1    is that right?

2            MR. O'REILLY:  Correct, Your Honor.  All of the

3    testimony Mr. Miller would give will be based on the

4    evidence that is presented at trial.  He is not a fact

5    witness in this case; he is a summary witness.

6            THE COURT:  Subject to what Mr. Springer or

7    Mr. Stilley would have to say, I think that's about all I

8    need to hear at this point.

9            MR. O'REILLY:  Thank you, Your Honor.

10           THE COURT:  Mr. Springer, you're back up.  I'm

11   very dubious as to whether Mr. Miller ought to be

12   excluded either today or during trial based on the

13   representations that Mr. O'Reilly has just made, but I'll

14   give you one more chance.

15           MR. SPRINGER:  Dr. Roberts will be taking that

16   stand as a fact witness, the government has him on their

17   list, he testified before the grand jury, he's a key

18   witness to Count 2.  Mr. Miller was involved in those

19   fact developments and, in my opinion, alteration of some

20   of those facts, maybe not intentionally, but still

21   involved.  And, therefore, on that basis, he will be

22   sitting in this courtroom and he will be listening to

23   facts that he can then try to decide how he's going to

24   testify without -- and no other witness in this courtroom

25   is going to have that benefit, so that's my only -- I

```
 1  mean, everything else with Mr. Miller is fine as far as
 2  I'm concerned.
 3            THE COURT:  Very well.  Mr. Stilley, do you have
 4  -- do you desire to be heard on this?
 5            MR. STILLEY:  No, Your Honor.  I would simply
 6  join in Mr. Springer's argument.
 7            THE COURT:  Thank you.  Mr. Miller will be
 8  permitted to remain in the courtroom today.  And on the
 9  basis of the representations that have been made, he will
10  be permitted to remain in the courtroom during the trial
11  in this case.  The sixth motion in limine is denied.
12       And unless -- I think we had good reason to address
13  the sixth motion in limine first, but subject to that
14  sort of a consideration, I intend first to address the
15  motion at Docket Number 159, which is Mr. Springer's
16  emergency motion regarding certain witness.  That started
17  out focusing entirely on Mr. Partridge -- or I guess it's
18  Patridge; is that right?  Patridge.
19            MR. SPRINGER:  That's right, Your Honor.
20            THE COURT:  By the time we had gotten around to
21  Mr. Springer's reply, it still seemed to focus
22  predominantly on Mr. Patridge, but perhaps not
23  exclusively on Mr. Patridge.  Mr. Springer, does this
24  motion still present a live issue that ought to be
25  addressed by the Court?
```

```
 1          MR. SPRINGER:  Only with relationship to

 2   Mr. Burt and it's only because of issues that we learned

 3   subsequent to the motion that he is in the Okmulgee

 4   County jail with Mr. Patridge and from my understanding

 5   is not a witness for the government, at least as far as I

 6   know, but other than that, the care of Mr. Patridge is

 7   over -- better than well.  He's reported that they are

 8   taking exceptionally great care of him and I have had no

 9   other reports of any other instances, Your Honor.

10          THE COURT:  Now, you made brief reference to

11   Mr. Burt.  Tell me, is he one of your subpoenaed

12   witnesses?

13          MR. SPRINGER:  Yes, sir, he is.

14          THE COURT:  And he's in the Okmulgee County

15   jail.

16          MR. SPRINGER:  With Mr. Patridge in the same

17   cell.

18          THE COURT:  Do you have any reason to believe

19   he's being in any way mistreated?

20          MR. SPRINGER:  No, not whatsoever.

21          THE COURT:  Okay.  Then what is there to address

22   with respect -- assuming that I apply your motion at

23   Docket Entry Number 151 to Mr. Burt, what judicial relief

24   do you seek?

25          MR. SPRINGER:  Just that we have access to
```

1    Mr. Burt, that because of how he's being held -- usually,

2    if it was my witness, and he was in Michigan, he would be

3    moved by a writ of habeas whatever and because he's over

4    there now, I'm not sure how I get access to him, but I

5    have not been prohibited from getting access to him, I

6    just haven't -- because of California, I haven't had the

7    time, so I would say you're probably right, the motion is

8    moot at this point.

9         THE COURT:  The emergency motion at Docket Entry

10    Number 159 will be denied.

11       Mr. Springer, I have every confidence that if you

12    have problems getting access to Mr. Burt that you will

13    promptly bring that to the Court's attention.

14       That brings us to Mr. Springer's first motion in

15    limine.  And, as I understand it, Mr. Springer, that is

16    really a two-pronged motion.  It relates initially to

17    presentation of evidence obtained, "By way of Donna

18    Meadors in her official capacity that was obtained

19    unlawfully and is based on hearsay pursuant to Federal

20    Rule of Evidence 802."  Okay.  Now, over on the second

21    page of your motion, Mr. Springer, you talk about the

22    internal revenue district issue that leaves the Court, to

23    put it mildly, skeptical, that's not an issue that I

24    intend to spend much time on.

25         MR. SPRINGER:  Okay.

 1          THE COURT:  And then -- but then at the bottom

 2   of page 2, you say, in substance, that Ms. Meadors is

 3   also expected to testify about what she learned during

 4   her 6700 investigation and that this would be hearsay and

 5   would violate your right of confrontation.  I'm provided

 6   no factual context for that.  And that is an issue that

 7   certainly invites careful attention as needed at trial.

 8   But as a motion in limine, I am very dubious as to

 9   whether I should sit here and categorically rule as you

10   apparently request that I simply bar Donna Meadors from

11   testifying about what she learned during her 6700

12   investigation.  I'm going to give you a very brief

13   opportunity to steer me to a different direction, but

14   that's where I am now.

15          MR. SPRINGER:  In the summons process, Your

16   Honor, non-criminal, non-grand jury, citizens are offered

17   an opportunity to quash summonses that are issued

18   improperly.  And although I was not tendered any of the

19   summonses from the government in the discovery that I

20   received, I was given evidence that was gathered by those

21   summonses.  And those summonses were issued under a code

22   section called 7601 and 7602.  And 7601 allows the IRS to

23   canvass only internal revenue districts, and I'm only

24   making certain that the record is clear as the government

25   stated in one of their pleadings, they don't argue in

1  opposition that the internal revenue districts were

2  abolished in October of 2000.  And, therefore, without

3  any evidence that there was authority for her to issue

4  that summons, according to 7601 and 7602, then she

5  obtained that information unlawfully.  And I'm certain

6  the Court -- well, at least, my understanding is, is that

7  the government is not allowed to bring in unlawfully

8  gathered information, especially in a civil 6700

9  investigation.  Now, I was never given the opportunity to

10 oppose her summonses and for that reason and that reason

11 only I have made this motion.

12      The government argued that it went to a possibility

13 of issues of suppression.  And I believe that if she's

14 going to come in and testify here is what somebody said

15 to me, here is what somebody wrote in response to me,

16 here is what somebody gave me, then the question is going

17 to become how did she get that information according to

18 the law.  I understand IRS can lie to people to get

19 truthful information, I understand that, that's not what

20 I'm saying in this instance.  I'm saying in this instance

21 that she gathered that information unlawfully and she

22 should not be allowed to benefit from the fruits of her

23 unlawful conduct.  And that's my only issue at this time.

24          THE COURT:  I'm rising to the bait again.  How

25 is -- and you don't have to answer this question.  Just

1   idle curiosity with emphasis on the word "idle."  How do

2   you think your phenomenal knowledge of the internal

3   revenue code is going to play with the jury?

4        MR. SPRINGER:  When they have an understanding

5   of my mission and in connection with this going in the

6   trench and fighting as you go, I believe that you'll find

7   that the public in general will understand that I'm only

8   doing what I believe my mission is to do.  I don't

9   believe that there's anything outside of that that would

10  even begin to come in in this case.

11       THE COURT:  I'll hear from the government on the

12  first motion in limine.

13       MR. O'REILLY:  Your Honor, briefly.  We've

14  addressed this already in our consolidated response.  As

15  an initial matter, Mr. Springer's contentions

16  notwithstanding, there's no evidence that there was an

17  unlawful action by Ms. Meadors.

18       THE COURT:  Educate me just a bit as to what she

19  in fact did.

20       MR. O'REILLY:  Ms. Meadors, prior to becoming a

21  special agent, was a revenue agent and that is when she

22  was involved in the 6700 investigation alluded to by

23  Mr. Springer, which was to look and see if -- if there

24  was some evidence that Mr. Springer might have been

25  promoting an abusive tax shelter program or something of

1    that nature, which is what the 6700 program was, as I

2    understood it.  That didn't go anywhere, but based upon

3    the information gathered, that's something that the grand

4    jury then did take and was, you know, able to consider

5    when determining whether or not to return an indictment.

6         Frankly, here is what's a little odd is, I think we

7    indicated, but right now don't even plan on calling

8    Ms. Meadors as a witness as a case in our case in chief,

9    so this is really a moot issues in that sense.  However,

10   we do take exception to any representation that her

11   actions were unlawful, they weren't.  She was diligently

12   working to do her job.  And this is -- there's no basis

13   for this motion in limine.  What it really is, is a

14   motion to suppress evidence that should have been made

15   earlier.  But as the Court noted, other than

16   Mr. Springer's say-so, there's no evidence that there was

17   an unlawful obtaining of evidence.

18         THE COURT:  Thank you.  Mr. Springer.

19         MR. SPRINGER:  In the same respect to being able

20   to file a motion involving inconsistencies in jurors

21   being drawn under the Test case, I must have evidence

22   that the information was obtained lawfully by Mrs.

23   Meadors, and the government failed to tender the

24   summonses when they tendered the evidence that

25   Mrs. Meadors obtained.  I cannot stand here and say that

 1   she obtained it lawfully or unlawfully except for what
 2   the tax code says because that's the only thing I've been
 3   given, and this is in January of 2004 that this began.  I
 4   had no idea from that day forward or that day backwards
 5   what she was doing.  She told me that she had been
 6   investigating me for some time.
 7        During another case that we have -- a civil case
 8   pending, the government tendered discovery to me, which
 9   will come out in this case, and in that instance,
10   Ms. Meadors talks about all the conduct that she was
11   involved in that she enters entries into evidence.  Now,
12   I did not tender that evidence because that's coming in
13   regardless, unless the Court says no.  But the government
14   has not given me the summonses that show that they
15   obtained that information in anything but an unlawful
16   manner.  And for that reason is why I try to move my
17   chess pieces to this spot.  And, you know, if they get
18   through my pawns and my bishops, then I'll start using
19   the knights.
20             THE COURT:  Thank you.  The first motion in
21   limine is denied.
22        That brings us to Mr. Springer's second motion in
23   limine, which has, of course, a mirror image in
24   Mr. Stilley's motion in limine relating to evidence of
25   Mr. Springer's statements.  And my first inquiry is to

1    the government.  One matter that is certainly on my

2    agenda for the pretrial conference, but perhaps we ought

3    to address it now, is whether we need -- are going to

4    need a James hearing and -- to determine the

5    admissibility of co-conspirator hearsay.

6        Obviously, we've got a -- we've got a conspiracy

7    count, for lack of a better word.  The conspiracy count,

8    at least from an evidentiary standpoint, may be the grand

9    jury's flagship count in this case.  It certainly stakes

10   out the scope, to a large degree, the scope of the

11   evidence that will be admissible.  And will apparently be

12   a good deal of evidence come in under the conspiracy

13   count that will be relevant, or is made relevant, by the

14   conspiracy counts that will also be supportive of some of

15   the other counts.  But all that comes back to a question

16   of whether we ought to have a hearing, commonly called a

17   James hearing, to determine the existence, at least as to

18   whether there is an adequate preliminary showing of the

19   existence and scope of a conspiracy.

20       Obviously, we've got ample case law that counsels a

21   district court to do just exactly that and to have that

22   sort of a hearing if it should appear that the

23   government, to any significant degree, does depend on

24   admissibility of co-conspirator, what would otherwise be

25   hearsay, co-conspirator statements.  And I intend to take

1    that advice from the Court of Appeals to heart unless the

2    government is prepared to represent that co-conspirator

3    statements are not going to be a significant part of your

4    case.  So that's the reason, Mr. O'Reilly, that I have

5    invited you to address this matter first.

6          MR. O'REILLY:  Your Honor, I would say the

7    co-conspirator statements are not a significant portion.

8    It's -- however they are, at least two instances where

9    they were alleged as overt acts of the conspiracy.  So I

10   would recommend that we, in fact, probably want to at

11   least address any concerns the Court would have as to

12   whether a conspiracy has been in fact established and

13   that these statements are in fact made in furtherance of

14   that conspiracy.  Specifically, I'm thinking of

15   Mr. Stilley's statements before the grand jury which are

16   alleged as an overt act.  And Mr. Springer's statements

17   in January of this year.

18         THE COURT:  And obviously we've got -- I guess

19   it's part of your Rule 404(b) notice, if nothing else,

20   where you talk about -- you cite that Second Circuit case

21   that says we can regard, Crawford notwithstanding, we can

22   regard a testimonial statement as being admissible and we

23   can admit it if it is shown that it was a statement by a

24   co-conspirator in the course of the conspiracy and in

25   furtherance of the conspiracy.  And there is a fairly

```
 1   cogent passage in that Second Circuit case that certainly
 2   appears to stand for that very proposition.
 3        That's all interesting argument, but I don't have
 4   the testimony.  I need to see that testimony, but we're
 5   not there yet.
 6                MR. O'REILLY:  Correct, Your Honor.
 7                THE COURT:  What would be your proposal, then,
 8   as to the timing of a James hearing?
 9                MR. O'REILLY:  May I have a moment to confer
10   with counsel?
11                THE COURT:  Sure.
12                MR. O'REILLY:  I had to chat with Special Agent
13   Shern to make sure I wasn't double-booking.  We would be
14   available as early as Friday afternoon to do this or we
15   could do it either before or after picking the jury on
16   Monday.
17                THE COURT:  What about this afternoon?
18                MR. O'REILLY:  Possible.  I mean, I think we
19   could do it.  I'm not sure -- it would be cleaner for us
20   if we had a little bit of time to prepare for it.
21                THE COURT:  Okay.  I anticipate that we'll --
22   we'll have to see how long jury selection takes and that
23   will determine exactly when we have a James hearing.  I'm
24   assuming that the defendants whole-heartedly agree that
25   we ought to have a James hearing.
```

1        MR. SPRINGER:  Hundred percent, Your Honor,
2  three-part test.
3        THE COURT:  Mr. Stilley.
4        MR. STILLEY:  Yes, Your Honor.
5        THE COURT:  We'll probably do that right after
6  jury selection.  Given the length of this trial, it's
7  fairly likely that we'll have jury selection, then let
8  the jurors go home and share the news of their new
9  employment and then we'll -- we'll have our James
10  hearing.  And -- anyway, that clarifies one matter
11  relating to Mr. Springer's second motion in limine.
12      Mr. Springer, I need to address that with you.
13  We're going to have a James hearing, that's been settled,
14  and I have no doubt that you're well aware of what is in
15  issue at a James hearing.
16        MR. SPRINGER:  Yes, sir.
17        THE COURT:  That would seem to me to at least
18  require that I defer ruling on your second motion in
19  limine, if not totally moot your second motion in
20  limine.  Is there anything to be gained by addressing
21  that motion further today?
22        MR. SPRINGER:  No, Your Honor.  Mooting it would
23  be, I think, premature.  Setting it aside, holding it in
24  abeyance until you rule on Monday would be -- I believe
25  would be the correct position.  And I would just add that

1    the only way that the government can present a conspiracy

2    is through circumstantial evidence. And it is under that

3    basis, the Court's instruction on page 17, which

4    correctly states we don't know what's in somebody's

5    mind. So it's from that basis that I ask the Court to

6    hold the motion pending Monday.

7            THE COURT: The ruling on the second motion in

8    limine will be deferred until the conclusion of the James

9    hearing.

10       That brings us to Mr. Springer's third motion in

11   limine, which is another one that is actually two

12   motions. Looking at the second page of Mr. Springer's

13   third motion in limine -- and this is another one where

14   the government is going to be up first, as you'll hear in

15   just a moment.

16       Looking at the second page of Mr. Springer's third

17   motion in limine, he requests the Court prohibit the

18   government from attempting to present or presenting, in

19   essence, any certificate or declaration, which I presume

20   would include authenticating certificates.

21       Secondly, Mr. Springer asserts certain -- that there

22   should be certain prerequisites to the introduction of

23   computer evidence. Mr. O'Reilly, my inquiry goes to the

24   first issue.

25            MR. O'REILLY: Yes, sir.

1          THE COURT:   As it happens, I was in Boston

2    shortly after that Massachusetts case was handed down by

3    the Supreme Court that applied to the chemist

4    certificate.   And as it happens, I was with a justice of

5    the Supreme Court of Massachusetts, and you would have

6    thought the world was going to come to an end with that

7    decision.   And, frankly, I was entirely unsurprised by

8    the decision.   I was surprised that Massachusetts or any

9    other state had gotten away so long with, in that case,

10   admitting a chemist certificate in a criminal jury trial

11   as the only evidence that the substance involved was

12   cocaine.   So anyway, that gave the Supreme Court an

13   opportunity to confirm what I had thought would be the --

14   was the law for a long time.

15       That does give me pause if the government plans to

16   present authenticating certificates as to anything that

17   might conceivably be contested in our trial.   So I need

18   you to help me as to whether the government intends to

19   present any -- even something as seemingly innocuous as

20   an authenticating certificate.

21          MR. O'REILLY:   Your Honor, assuming that we

22   can't get stipulations that -- and we're talking about

23   two different types of authenticating documents, I

24   believe.   Which is, one are the business record

25   authenticating documents, which is a -- those documents

1  wherein the person says on their -- well, I think it's
2  902, but that I'm the person, these are real documents,
3  these are really the things that we have and if I came I
4  would testify this way.  And if we can't get stipulations
5  that these are in fact the records that, for example,
6  Arvest Bank would come and say these are our records,
7  then we'll have to drag the people in and have them so
8  testify.  Because I am hesitant to attempt to bring in
9  simply a, you know, what appears under the federal rules
10 would be sufficient given the Supreme Court's ruling on
11 those types of records.
12         THE COURT:  Bear with me a minute.  This is
13 probably Judge Ellis's book, but I bet it says the same
14 thing as my book.  Hold on.  Okay.  The bar under Rule
15 901, which is ordinary -- what I would call ordinary
16 authentication, the bar is pretty low.  You just have to
17 introduce some evidence that the document is what it
18 purports to be.  And that is truly a low bar.  Now, do I
19 hear you saying that there may be some instances in which
20 in lieu of -- as perhaps relates to the business records
21 exception or to business records, that in lieu of a
22 witness testifying to the normal prerequisites to
23 admissibility as a business record, you're going to have
24 a certificate?
25         MR. O'REILLY:  No, Your Honor, what I'm saying

1   is that if we can reach stipulations, we would. If we

2   don't reach stipulations, we're going to be bringing

3   people in to testify to meet that low bar.

4           THE COURT:  Okay.  So, in other words, what I

5   hear you saying, then, is that it's going to be the

6   defendants' call as to whether to put you to your proof

7   on some of these technical prerequisites to admissibility

8   of documents.

9           MR. O'REILLY:  Yes, Your Honor.  We believe that

10  902 -- and Crawford actually does specifically recognize

11  that business records are not testimonial and they're

12  different than the testimonial nature of what was in the

13  Massachusetts' case.

14          THE COURT:  Okay.  So we're talking about the

15  substance of what would be shown by a business record,

16  but we may be one step antecedent to that in determining

17  whether the prerequisites to business records treatment

18  can be met, correct?

19          MR. O'REILLY:  Your Honor, and that is why if we

20  can't reach stipulations we'll be bringing people in.

21          THE COURT:  Okay.

22          MR. O'REILLY:  With respect to tax records, both

23  including records from the IRS, including records from

24  Arkansas and Oklahoma, we're actually going to have

25  witnesses who come in and testify that they've done the

 1   research of the records and determined whether or not

 2   there is any indication that returns were filed and what

 3   their records show and present -- they would lay the

 4   foundation and move into evidence whatever records that

 5   would be properly admissible.  We do not anticipate,

 6   absent getting a stipulation, that the records show --

 7   pointing to the authenticated document that says there

 8   are no records.

 9            THE COURT:  Okay.  Very well.  Thank you.

10   Mr. Springer, I need to hear from you on one or two

11   matters.  First of all, let me address one thing that

12   it's not necessary to devote further attention to this

13   morning, what I call the second prong of your motion

14   relating to evidence derived entirely or in part from a

15   computer system.  Again, you don't give me any factual

16   context.  That's something that we're going to have to

17   address as needed at trial.  That's not something that

18   you have put me in a position to address on a motion in

19   limine.

20      Okay.  As to what I call the first prong, and that

21   is evidence consisting of certificates or affidavits and

22   so forth, I have heard Mr. O'Reilly tell me, and you,

23   that if they have to satisfy authenticating prerequisites

24   with live witnesses they will do so.  That suggests to

25   me, quite strongly then, the issues as to whether I ought

 1  to admit certificates or declarations are, at a minimum,
 2  moot and are likely matters that we should address on a
 3  case-by-case basis at trial.  But if I'm headed in the
 4  wrong direction, this is your chance to tell me.
 5          MR. SPRINGER:  My intention by the motion, Your
 6  Honor, was trying to stay in a broad, sweeping context
 7  that would prohibit or address issues of a general
 8  nature, not get into specifics at trial that I can only,
 9  with thousands of documents, guess as to where the
10  government is going to go.  Now, Friday I'll have some
11  indicator because I'm going to get exhibits, and last
12  Friday I got the exhibit list, so I got some indicator
13  there, but that's the first time I've gotten it, and they
14  just gave me more discovery today.
15      So having set that aside, I have received documents
16  that the government refers to as 4340s, which the Court
17  will become aware of, if not already.  They call those
18  certificates of assessment or certificates of record.
19  And I was privileged under Judge Kearn and Magistrate
20  McCarthy -- I'm sorry, Judge Kearns, to take depositions
21  of people who signed 4340s prior to the case of the
22  Supreme Court in Melendez-Diaz, where the operations of
23  the IRS was made very clear on the record, and I have
24  those records to bring in, that the person who signs the
25  document doesn't actually go and look up to see, they

1  have an underling do it. And that underling's name does
2  not appear anywhere on the documents that were entered in
3  the case in front of Judge Kearn.
4      Now, that case has been stayed, so I haven't been
5  able to get a ruling. And, again, the Melendez-Diaz case
6  came out after I took those depositions so that has not
7  been an issue yet. But in this case the government has
8  tendered 4340s, both in their exhibit list and in
9  substance to me, in their piecemeal discovery that I will
10  just let the Court know that that person will testify on
11  the record that they never searched the records, that
12  they sit in a glass office basically and there's
13  thousands of people that work in Austin, Texas, or
14  wherever the 4340 is going to come out of and that
15  they're just saying I know my person said this is what
16  they said. And when you get into the issue of the state
17  Supreme Court of Massachusetts, it renders these 4340s
18  meaningless because you have the same exact thing, you
19  have a certificate coming in by a person who basically
20  says I'm reading from this document that this says
21  whatever it says. And this is why I'm opposing
22  stipulations. What the government is asking me to do is
23  they're asking me to --
24          THE COURT: You are proposing or opposing?
25          MR. SPRINGER: I'm opposing.

1          THE COURT:  Okay.  Well, you're getting into

2   matters that will be addressed, if at all, at trial.

3          MR. SPRINGER:  The point of it was, is that I

4   have an understanding that I gained from another case

5   that the government brought against me that is the genius

6   behind the motion post the Diaz case.

7          THE COURT:  Okay.  Well, your third motion in

8   limine, as a motion in limine, is denied.  As to both

9   aspects of it, it raises matters that we'll have to

10  address, as needed, at trial.

11      Now, what I am about to say is really for the --

12  intended for both defendants.  I'm not going to get in

13  the business of giving you any legal advice.  You've got

14  standby counsel to consult with.  I'm going to give you a

15  suggestion, and that is that you listen very carefully to

16  what your standby counsel may have to say to you as to

17  the advisability of putting the government to its proof

18  on essentially uncontested things thereby consuming

19  prodigious amounts of time in front of the jury.  Just

20  listen very carefully to what your standby counsel have

21  to say to you on that score.

22      This brings us to the fourth motion in limine, which

23  -- in which Mr. Springer seeks to have the Court exclude

24  evidence that he is a tax protestor unless the parties

25  can agree on a definition of that phrase.  A minute ago

```
 1    you said that your third motion in limine was intended to
 2    raise broad, sweeping issues, that's really not a good
 3    use for a motion in limine and this one is even more
 4    sweeping, but I'll hear you briefly in support of your
 5    fourth motion in limine.
 6              MR. SPRINGER:  In 1998, Congress overhauled the
 7    IRS, made it illegal for people like Mr. Shern and
 8    Mr. Miller to make an indication on a taxpayer's master
 9    file that they were either a tax protestor, an illegal
10    tax protestor, or a dangerous illegal tax protestor,
11    that's T code 140.  And, as a result of that, there is
12    some evidence that -- of a criminal investigation of me
13    that the IRS conducted beginning back in 1995.  That is
14    in the record of this case, but, I, again, don't know
15    whether the government intends to present that evidence
16    at trial.  So I'm only having to go from 33,000 pages
17    perspective, that's it, I don't have any other guess than
18    that.
19         Now, after 1998, they no longer could make that
20    reference, but the government, the lawyers for the
21    government, I believe will argue that that law doesn't
22    apply to them, so when they're representing the IRS, they
23    can refer to me as a tax protestor on a document that the
24    IRS can no longer refer to me as a tax protestor on.  And
25    so this motion is designed only to make the ground fair,
```

1  notwithstanding the Court's position.  If the Court

2  wasn't aware of the impact of the meaning or non --

3  undefined term "tax protestor" has, I mean, obviously,

4  I'm prepared to go either way with the word "tax

5  protestor" and don't mind it, per se, other than the fact

6  that it's illegal, it's unlawful, and Congress said it

7  was unlawful in the tax code.  And so on that basis, I

8  rise on my motion.  That's it.

9        THE COURT:  Do you assert in this case that any

10 of the statutory provisions that the government seeks to

11 apply to you are unconstitutional?

12       MR. SPRINGER:  Yes.  I believe that's developing

13 as the fourth bill of particulars came in.  I believe the

14 word -- I believe several words in both 7203 and 7201 are

15 ambiguous, undefined and they cited no regulations that

16 would define those terms.  And to the extent that Title

17 18, Section 371, conspiracies to defraud, apply to

18 impeding, impairing, obstructing and defeating the lawful

19 functions of the IRS, I absolutely believe that without

20 clarity as to the meaning of terms in the tax codes,

21 which the Court referred earlier, that the main thrust of

22 the government's case is the Count 1, conspiracy, that

23 each of those statutes become very ambiguous.

24       THE COURT:  Are we going to hear you articulate

25 your constitutional argument for the benefit of the jury

1 or is that going to be argument to the Court?

2          MR. SPRINGER:  Actually, I will never argue it

3 to the jury, ever.  However, based upon what happens with

4 the fourth bill of particulars and some of the issues I

5 plan on raising pretrial -- at the pretrial conference,

6 based upon what I got on Monday, it remains to be seen

7 how exactly I will shape my argument for the record.

8          THE COURT:  Well, I'm not so much worried about

9 the record as I am during our trial, the difference

10 between making an argument to the Court versus

11 articulating a position or a belief on a constitutional

12 issue to the jury.

13          MR. SPRINGER:  No.  Never.  No, my position as a

14 defense involving the constitutionality of the statutes

15 is irrelevant.  I'm not -- there is no defense here to

16 the jury involving the constitutionality of anything.  My

17 only argument with you is a legal argument that because,

18 as the government has stated many times, the Court is the

19 one who instructs the jury on the law, so all I'm doing

20 is trying to understand the theory that they're operating

21 under and within that theory, then I can present whatever

22 defense it is that I have in the record and so forth.

23 However, it would never be constitutional, Your Honor,

24 never.

25          THE COURT:  Thank you.  Mr. O'Reilly, I'll hear

1   from the government on the fourth motion in limine.

2          MR. O'REILLY:  Your Honor, as Mr. Springer even

3   seemed to indicate to the Court, he challenges the

4   constitutionality of the tax laws, which has been

5   rejected and is symptomatic of tax protestor activity.

6   We don't intend to be banging the drum on, you know, he's

7   a tax protestor, he's a tax protestor.  That's not -- but

8   it may come up that some witness may make reference to

9   him as a tax protestor.  He exhibits characteristics that

10  the courts have recognized as being those of tax

11  protestor activity.  And it is not illegal for any, you

12  know, member of the Department of Justice or any lay

13  witness to use the term "tax protestor."

14          THE COURT:  Say that again.

15          MR. O'REILLY:  It's not illegal to use the term

16  "tax protestor."  There was a movement -- a congressional

17  act to tell the IRS to stop using that term, which is

18  independent of what Mr. Springer is trying to say, that

19  he needs to even the playing field so that everybody has

20  to use the same -- is under the same restrictions as the

21  IRS agents, which seems odd to us, but I'm not quite sure

22  where that goes.  But, Your Honor, he's made no basis to

23  support his motion in limine other than he doesn't like

24  the term.  He seems to support the allegations of the

25  government, that, in fact, his behavior is what has been

1    characterized as tax-protest activity.

2            THE COURT:  Well, during the pretrial conference

3    that we're going to have today, you will hear me

4    articulate my expectations from both sides for opening

5    statements and the fact opening statements are just that,

6    opening statements, rather than arguments and that will

7    be for the benefit of both sides, but let me anticipate

8    that just a little bit.  As an example, do you intend to

9    use this tax protestor characterization in opening

10   statement?

11           MR. O'REILLY:  May I check with counsel because

12   actually Mr. Snoke is handling opening, but I think I

13   know what the answer is.

14           THE COURT:  Very well.

15           MR. O'REILLY:  No, Your Honor, we aren't

16   intending to use that term in opening statement.

17           THE COURT:  Give me an example of how a witness

18   might let it slip that Mr. Springer or Mr. Stilley,

19   either one, are thought of as tax protestors.

20           MR. O'REILLY:  Perhaps if they were prosecuted

21   and they're testifying how they were involved in tax

22   protestor activities and that's how they met the

23   defendants.  I mean, I'm speculating on that, Your

24   Honor.  It's not something we're going to be seeking to

25   elicit, but --

1          THE COURT:  This would typically be individuals

2    that Mr. Springer chose to associate with?

3          MR. O'REILLY:  Correct, Your Honor.  Yeah, that

4    he was represented in helping with their legal defense.

5    And a large number of our witnesses are in fact people

6    who paid money to Mr. Springer and Mr. Stilley to help

7    them with their defense.

8          THE COURT:  Thank you.  Mr. Springer, I need to

9    hear from you again.  I take seriously my responsibility

10   to see to it that the government and you, for that

11   matter, conduct yourselves at trial in a way that does

12   not jeopardize anyone's right to a fair trial.  And I

13   anticipate, based on what I've heard, that the government

14   senses that I -- I don't want this tax-protestor label to

15   be used in a pejorative way, but I can see where one way

16   or another it might just come out.  And it may be from a

17   witness, perhaps from a witness that you were once

18   associated with on a voluntary basis.  It's one thing for

19   me to admonish the government to see to it that its own

20   agents don't throw that terminology around, but requiring

21   the government to police what people may testify to in

22   front of the jury, who are here under subpoena, perhaps

23   even in a fairly adverse relationship with the government

24   is another thing altogether.  I'm not sure I can protect

25   you from that, but in terms of pejorative use of this

 1   term "tax protestor," so far as I can tell, I'm just

 2   going to have to apply a smell test as we go at trial.  I

 3   don't think I can grant a motion in limine that says

 4   those two words are excluded from this courtroom.

 5         MR. SPRINGER:  Now, so I take it that the

 6   government agrees they will never refer to me as an

 7   "illegal tax protestor" by the way the Court has

 8   characterized what the government just told it and how

 9   it's going to view things.

10         THE COURT:  Well, I don't think Mr. O'Reilly or

11   Mr. Snoke are going to stand up and look at the jury and

12   use those words.

13         MR. SPRINGER:  That's the only thing I was

14   concerned about because in some of the documents that

15   they have written, they use terms to inflame the subject

16   of their sentence.

17         THE COURT:  They're just trying to get me tuned

18   up for trial.

19         MR. SPRINGER:  I understand.  I understand.  I

20   understand that if the witness says it that I'll be

21   allowed to find out whether they were coached by the

22   government if they do say it, which is different than if

23   they said it because it was of their own testimony.  And

24   as long as I have that leeway, Your Honor, I'm more than

25   happy to take it up on a -- I don't know how you're going

1   to preempt the witness to know whether they're going to

2   use the phrase "tax protestor."

3           THE COURT:   If a witness uses that term I assure

4   you, you will be permitted to delve into the matter on

5   cross-examination.

6           MR. SPRINGER:   Just for the record, tax

7   protestor in its general phrase seems to be a bill of

8   attainder almost and which is prohibited by the

9   Constitution, regardless of what Mr. O'Reilly says

10  otherwise.   And the idea is to identify an obnoxious

11  group of people and separate them from the uniform class

12  of people that is everybody covered by a law.   And it is

13  under this framework that I suggest that if we're going

14  to even hear the phrase "tax protestor," then I would --

15  I'll make a motion to the Court that the Court define for

16  the jury what "tax protestor" is in the sense that tax

17  protesting in and of itself, you know, is something that

18  found our nation or whatever versus giving it the element

19  of some type of sanctionable criminal activity.   Because

20  that in and of itself is not -- tax protesting is not a

21  crime, but, again, when you have "protestor" then you add

22  "tax" to it, illegal is just around the corner or just

23  underneath the bench waiting to come out.

24          THE COURT:   Thank you.   The fourth motion in

25  limine, as a motion in limine, is denied.   All parties

1   should certainly have the understanding that the Court

2   will be sensitive to a pejorative use of this

3   tax-protestor label or any similar label, but that's a

4   matter that I'm going to have to address as we go at

5   trial.  And I am confident that the government

6   understands my concerns in that regard.

7       This brings us to Mr. Springer's fifth motion in

8   limine, which is, as I understand it, not opposed by the

9   government; is that correct?

10          MR. O'REILLY:  Your Honor, may I address one

11  thing that Mr. Springer said at the end, which was, if

12  the term came up the Court should give some sort of

13  definition.

14          THE COURT:  Trust me, I'm not going to define

15  tax protestor for the jury.

16          MR. O'REILLY:  Just wanted clarification on

17  that.

18          THE COURT:  Does the government oppose

19  Mr. Springer's fifth motion in limine?  I don't think you

20  do.  He doesn't want you to tell the jurors that because

21  of him they have to pay more taxes.

22          MR. O'REILLY:  No, Your Honor.  As we said in

23  our response, we will not be using that.

24          THE COURT:  The fifth motion in limine is

25  granted.

1    This brings us to the sixth, which we have covered.

2   That brings us to the seventh, which is Mr. Springer's

3   motion for an order prohibiting the government from

4   referencing the term "abusive" at any time it refers to

5   any trust under its 404(b) proffer.  Now, I need to

6   refresh my recollection by looking at the government's

7   response.

8    On this one, I want to start out with Mr. O'Reilly

9   again.  Mr. O'Reilly, I have reviewed your 404(b) notice

10  that makes reference to abusive trusts, and I have

11  reviewed your response to the seventh motion in limine as

12  set forth on page 12 of your response at Docket Entry

13  Number 173.  Without pinning you down unnecessarily or

14  unfairly, I want to get some understanding of -- what is

15  the evidence about the so-called abusive trusts that I'm

16  going to be hearing about and the jury is going to be

17  hearing about at trial?

18       MR. O'REILLY:  It would be with respect to at

19  least one or maybe two witnesses that I'm aware of who,

20  my understanding, may testify with respect to how they

21  were involved with abusive trusts that were promoted, as

22  I understand it, by Mr. Springer and what happened to

23  them, which they then communicated to Mr. Springer, which

24  was that they got hammered for tax.  It goes to

25  Mr. Springer's knowledge of what the tax laws are, that

```
1   you have to file that, you can't do this type of stuff,
2   contrary to his, you know, position that these laws are
3   all too vague and the courts don't make you pay.  Well,
4   they do and these are people who paid him money and the
5   consequences they suffered.
6           THE COURT:  When did this so-called abusive
7   trust activity --
8           MR. O'REILLY:  Mid-nineties, Your Honor.  I want
9   to say '95 to '97, but that I'm not positive of.
10          THE COURT:  Okay.  That's outside the period of
11  the conspiracy, right?
12          MR. O'REILLY:  Yes, Your Honor.
13          THE COURT:  Okay.  And which is not necessarily
14  determinative of anything, but it's certainly
15  noteworthy.  So you anticipate having witnesses talk
16  about what Mr. Springer persuaded them would be an
17  effective tax-planning approach and that it involved
18  these trusts and that it backfired; is that the gist of
19  it?
20          MR. O'REILLY:  That's part of it.  There's also,
21  Your Honor, as I understand it, Mr. Springer assisted
22  people who -- and, actually, let me just -- who were
23  involved with trusts not promoted by Mr. Springer and
24  whom he was then stating various things to get them --
25  basically to assist them, and got paid for it.  People
```

```
 1   who were involved, I think it was called IFC, and there
 2   were some other abusive trust programs that there's not
 3   going to be any allegation that were, you know, promoted
 4   by Mr. Springer.  But the term is highly likely to come
 5   up because several of Mr. Springer's clients and some of
 6   them may have also been Mr. Stilley's clients were
 7   involved in abusive trust programs that got prosecuted,
 8   they may or may not have been prosecuted themselves, but
 9   they paid money to be assisted with the consequences of
10   their prior involvement in abusive trusts that were not
11   promoted by the defendants.  But, again, the term may
12   likely come up.
13           THE COURT:  Well, Mr. Springer's motion by its
14   own terms takes issue with the admissibility of evidence
15   associating him with promotion of abusive trusts.
16           MR. O'REILLY:  And, Your Honor, that's why I
17   addressed that first, but actually his motion seems to be
18   broader than that because he actually -- I'll just read
19   it, "Requests this Court prohibit the prosecution from
20   uttering or stating or referencing the term abusive when
21   referencing the term trust.  And" -- then goes on.  I
22   mean, it's basically --
23           THE COURT:  Well, he's -- what he says is he
24   ties that to your 404(b) notice.  By definition it's --
25   if we're talking about anything that would come in under
```

1 404(b), it's got to be his acts.  I don't read his

2 motion -- or let's put it this way, I do read his motion

3 as objecting to evidence about abusive trusts that he has

4 promoted.  And that may or may not be admissible, but I

5 don't see his motion as much, if any, broader than that.

6          MR. O'REILLY:  And Mr. Springer can address that

7 better than I, obviously.  The way I read it, he was

8 addressing both.

9          THE COURT:  Are we going to hear -- does the

10 government anticipate offering evidence that would tend

11 to indicate that Mr. Springer was a promoter of abusive

12 trusts?

13          MR. O'REILLY:  In the mid-nineties, yes, Your

14 Honor, there is, as I say, a couple of witnesses who say

15 that's how they met him, that's what they were involved

16 with and the consequences.

17          THE COURT:  And your theory of admissibility of

18 that would be what?

19          MR. O'REILLY:  That is evidence -- the evidence

20 that what happened to them was communicated to

21 Mr. Springer, the tax consequences goes to his knowledge,

22 intent, willfulness.  That it's not a mistake, that, oh,

23 I didn't think I had to file, I didn't think people, you

24 know, didn't have to pay taxes.  He knows people have to

25 pay taxes.  And this is something that, you know,

 1   witnesses were involved with him and this may be best
 2   brought up under the 404(b) argument, which actually
 3   Mr. Snoke is going to be discussing that aspect of our
 4   presentation today, but that it goes to his willfulness.
 5   I mean, tax cases are different, we don't have to just
 6   show he earned income and he didn't pay taxes, and he
 7   committed an affirmative act to not pay taxes.  We have
 8   to show he acted willfully, that is with a voluntary,
 9   intentional violation of a known legal duty.  Part of
10   that is showing he's involved with other prior tax
11   schemes that hurt people and that the results were, in
12   fact, communicated by his former clients to Mr. Springer.
13           THE COURT:  Thank you.  Mr. Springer, that
14   perhaps gives you some clarification.  I'll be happy --
15   we -- this is an issue that is not going to be resolved
16   simply by the government saying, no, we don't intend to
17   do that, obviously.
18           MR. SPRINGER:  Right.
19           THE COURT:  And you have heard the government's
20   proposed basis for admissibility of reference to abusive
21   trusts and to you as a promoter of abusive trusts.  And
22   now I need to hear from you in support of your seventh
23   motion in limine.
24           MR. SPRINGER:  The Court was correct in limiting
25   my seventh motion to only the 404(b) statement that the

 1   government made.  Obviously, trusts are going to come up

 2   in this case, there's no dispute between either side that

 3   they are.  Where we start leaving reality for Counts 1

 4   through 7 when we go to the word "promotion," because

 5   the government just said I did not promote -- in their

 6   own theory, I did not promote anything after the

 7   mid-1990s.  Now, obviously, evidence will come in and, in

 8   my opinion, will show quite a different story than the

 9   one that Mr. O'Reilly just gave.  But having said that

10   for now, the word "abusive" is more important to me than

11   the word "trust" in the 404(b).

12        Mr. O'Reilly gave the Court some indication that

13   it's as a result of a promotion that people got penalized

14   or had to pay.  And he said there were two examples that

15   he could come up with, he thought maybe two, but

16   Mr. Snoke will clarify that at the 404(b) conference, I'm

17   sure -- or the 404(b) motion.  So we have the years at

18   issue in 2000 through 2005 and now we're going into

19   mid-1990s, and I specifically am being held to witnesses

20   who gave me money from 2000 forward to 2005, I'm not

21   being allowed -- and the government opposes as they did

22   in their response to my motion, they oppose me presenting

23   any evidence of any people who they agree gave me a

24   gift.  And that gift will build a pattern of showing that

25   everybody who gave me money, gave me money specifically

```
 1  as a gift, not as Mr. O'Reilly instructed the grand jury
 2  because we didn't have the benefit of his narrow view on
 3  "gift."  But --
 4           THE COURT:  You're digressing just a bit.  I
 5  don't blame you, but you are digressing.
 6           MR. SPRINGER:  I'm sorry.
 7           THE COURT:  Let me ask you a question --
 8           MR. SPRINGER:  Okay.
 9           THE COURT:  -- that will clarify this issue on
10  the seventh motion in limine for my benefit.  Do you
11  object to either or both of just the use of the term
12  "abusive" in relation to trust or also to your promotion
13  of a trust regardless of whether they use the word
14  "abusive"?
15           MR. SPRINGER:  No, I welcome their theory on
16  promotion.  I did not raise any objection to that.  I
17  understand their faults and I'll expose those.
18           THE COURT:  It's the characterization of a
19  device as an "abusive" trust --
20           MR. SPRINGER:  "Abusive," yes.
21           THE COURT:  -- that you're objecting?
22           MR. SPRINGER:  That's what I'm objecting to
23  because there's no real way for anybody, other than
24  Mr. O'Reilly putting somebody on the stand that says,
25  yes, I paid penalties, which is just ridiculous, to then
```

1  go from there all the way over to abusive.  And the

2  phrase "abusive" tells the jury something that is not

3  true.  And it's just designed to inflame, it's more

4  prejudicial than it is probative.  There's no question

5  that they should be prohibited from using the word

6  "abusive."  If their witness says, Mr. Springer promoted

7  an abusive trust to me and that witness has an

8  independent basis for that other than Mr. O'Reilly

9  telling him to say it or Mr. Snoke or Mr. Shern or

10  whoever, then the cat is out of the bag just like other

11  issues we've raised.  But in the event that they are

12  going to, out of their mouth, use the phrase, now, did

13  you buy those abusive trusts from somebody who

14  Mr. Springer knew or whatever, see that's the phrase,

15  that's the spot that they indicated in their 404(b) that

16  I stand to oppose because it's -- there's nothing gained

17  by it other than prejudice.  There's no way anybody in

18  the jury or anybody in this courtroom is going to

19  understand the meaning of the phrase.

20          THE COURT:  So your seventh motion in limine

21  goes to an adjective rather than evidence of your

22  promotion of these tax --

23          MR. SPRINGER:  Absolutely.  It's the word

24  "abusive."  It's just the word "abusive."  There's no tax

25  code that says -- Your Honor, Mr. O'Reilly just told you,

1    as I told you earlier, I endured a Donna Meadors 6700

2    investigation, and he told you that there was no finding

3    in that investigation and that is promoting tax abuse

4    shelter programs.

5         THE COURT:  Well, they folded their tent and got

6    on down the road to other issues basically from what I

7    understand.

8         MR. SPRINGER:  Right.

9         THE COURT:  Mr. O'Reilly, you're up.  I need to

10   hear -- the seventh motion in limine boils down to an

11   adjective.  And I need to hear from you about that.

12        MR. O'REILLY:  Your Honor, it's a unique

13   position to be in.  It may well happen, and I don't know

14   what the witness will testify to.  I will tell the

15   Court --

16        THE COURT:  Well, do you plan to use the "A"

17   word yourself?

18        MR. O'REILLY:  If it is brought out in evidence.

19        THE COURT:  No, I'm talking about --

20        MR. O'REILLY:  Not in opening.

21        THE COURT:  Okay.

22        MR. O'REILLY:  In closing argument -- Your

23   Honor, quite frankly, I don't anticipate it.  I mean, if

24   you're asking what I think, no, because the focus of this

25   case is what happened from 2000 forward.  However, if a

1   witness independently, and there will be -- we're not

2   going to be coaching the witnesses, I think Your Honor

3   knows that.  If they testify that IRS penalized me for an

4   abusive trust, and I told Mr. Springer it was an abusive

5   trust, that may be something we do make reference to.

6   But it is not going to be part of our opening argument --

7   or opening statement, I apologize.  Other than that, I

8   don't want to be trying to, you know, guess which words I

9   can and can't use.

10          THE COURT:  I understand.  Thank you.

11  Mr. Springer, anything further?

12          MR. SPRINGER:  Your Honor, if the witness utters

13  the phrase "abusive trust," I'm obviously free to cross-

14  examine that witness.  My concern was the government's

15  404(b), not what the witness is going to say.  They want

16  to introduce evidence under 404(b), that means they're

17  proactively going after it.

18          THE COURT:  And I want to address one thing

19  squarely so that we have, to the extent possible, we all

20  have a common understanding going into this trial.  This

21  evidence as to trusts, and your promotion of trusts, is

22  going to be from the 1990s.

23          MR. SPRINGER:  Right.

24          THE COURT:  Okay.  I'm looking at Justice

25  White's opinion in the Cheek case.  Justice White wrote

1    in part 3(a), in substance -- well, no I'm going to quote

2    it. "Willfulness, as construed by our prior decisions in

3    criminal tax cases, requires the government to prove that

4    the law imposed a duty on the defendant, that the

5    defendant knew of this duty, and that he voluntarily and

6    intentionally violated that duty."  A little later on the

7    court writes, "In such a case, if the government proves

8    actual knowledge of the pertinent legal duty, the

9    prosecution, without more, has satisfied the knowledge

10   component of the willfulness requirement, but carrying

11   this burden requires negating a defendant's claim of

12   ignorance of the law or a claim that because of a

13   misunderstanding of law he had a good-faith belief that

14   he was not violating any of the provisions of the tax

15   laws."

16        Now, regardless of what your theory of your defense

17   may be, and I sense perhaps that your theory of defense

18   is more factual than legal, the government, having

19   alleged a conspiracy that began in 2000, as I read Cheek,

20   and this is your chance to gainsay this, but as I read

21   Cheek, the government is entitled to prove that because

22   of whatever it might be able to prove about your

23   tax-related activities in the mid-nineties, that you

24   sailed into the conspiracy period knowing the tax law --

25        MR. SPRINGER:  My understanding --

```
 1              THE COURT:  -- and knowing the consequences.  If
 2   I'm wrong about that, this is your chance to tell me.
 3              MR. SPRINGER:  My understanding is, Your Honor,
 4   that they say the conspiracy began with me.  The way I
 5   read Count 1 and the way they've written their pleadings
 6   that Mr. Stilley and I, sometime after we met Dr. Roberts
 7   in 2000, which is what they got Dr. Roberts to say to the
 8   grand jury, the evidence will show that it -- that they
 9   allege that Mr. Stilley and I, sometime in 2000, began
10   this conspiracy.  That it wasn't an ongoing thing from
11   the mid-nineties that one or the other of us joined.
12              THE COURT:  Okay.  But that -- and, again, I'm
13   certainly not going to present their case for them or
14   even develop their theory, but their -- it strikes me
15   that perhaps their intent is to show that you came into
16   the conspiracy period fully equipped with knowledge of
17   the tax law and that this trust-related evidence is part
18   what they intend to do on that score.  Is that your
19   understanding?
20              MR. SPRINGER:  Yes, sir.  And that's Siskel and
21   Ebert as far as I'm concerned.  They can bring that in
22   all --
23              THE COURT:  Say that again.
24              MR. SPRINGER:  I'm sorry, that's Siskel and
25   Ebert, two thumbs up, it's a statement in my head.  My
```

1  concern is abuse only -- abusive only.  And unless the

2  jury is going to determine the fact that something was or

3  was not abusive, because there's never been a

4  determination -- a fact determination that anything I

5  ever promoted was abusive, that if we're going to make

6  that a common word coming out of the prosecution's mouth

7  in front of the jury, that they should have to at least

8  put on evidence to this Court first to allow them to use

9  the word "abusive" so that at least there could be to the

10  same level of Daubert or the same level of James there

11  could be some finding by the Court before it allows the

12  prejudicial nature of that word to come in.  And I think,

13  you know, I'm not trying to tell the prosecution what to

14  do, but if they'll just drop "abusive" and present their

15  case, then come on with it.

16          THE COURT:  Thank you.  The seventh motion in

17  limine, as a motion in limine, and I emphasize that, as a

18  motion in limine, is denied.  I hope both sides -- and

19  I'm not saying this as window dressing, I do hope both

20  sides understand that I do take seriously my duty as

21  regulator of the fairness of this trial and that's a duty

22  that I'm not going to forget for one minute during this

23  trial.

24     I have heard what Mr. O'Reilly has had to say and

25  it's my duty to pay close attention to this matter as it

1  unfolds at trial.  And I am obviously now keenly aware of

2  the defendants', particularly Mr. Springer's concerns

3  about this characterization.  It's certainly my

4  expectation that the government will use good judgment

5  and will be as keenly aware of my duty to see to it that

6  both sides have a fair trial as I am.

7      With that understanding, the seventh motion in

8  limine is denied, but I will certainly be mindful, again,

9  of my duty during the trial to see to it that these

10 characterizations are not unfairly used.

11     It's now 10:30, we're going to take a 15-minute

12 break in just a minute.  Pam -- court will be in recess.

13     (RECESS HAD.)

14         THE COURT:  Okay.  Mr. Stilley, we've got your

15 mirror-image motion in limine that addresses out-of-court

16 statements by Mr. Springer.  And as we discussed earlier

17 this morning, it certainly is my view that those matters

18 which are fair game in a conspiracy case ought to be

19 addressed at the conclusion of the James hearing, but if

20 there's anything further on your motion in limine at

21 Docket Entry 149, I'll certainly be happy to hear you at

22 this point.

23         MR. STILLEY:  Your Honor, I feel those issues

24 have been satisfactorily addressed.

25         THE COURT:  Very well.  Pam, did I defer ruling

 1   on Mr. Springer's second motion in limine?

 2           COURTROOM DEPUTY:  Yes.

 3           THE COURT:  That was at Docket Entry Number 145,

 4   I likewise defer ruling until the conclusion of the James

 5   hearing on Mr. Stilley's motion in limine at Docket Entry

 6   Number 149.  Thank you, sir.

 7           MR. STILLEY:  Thank you, Judge.

 8           THE COURT:  At Docket Entry Number 155,

 9   Mr. Stilley adopted Mr. Springer's other motions, and the

10   minutes will show that my rulings -- if we treat

11   Mr. Stilley's adoption of Mr. Springer's motions as a

12   motion itself, and that's entirely up to the clerk, why,

13   we'll show my rulings to be identical.

14       That brings us to the government's motion in limine

15   at Docket Entry Number 137.  Now, I have a response to

16   that motion from Mr. Springer.  Unless I'm sadly

17   mistaken, I don't have one from Mr. Stilley.  Am I right

18   about that, Mr. Stilley?

19           MR. STILLEY:  On 157?

20           THE COURT:  Right.  I'm sorry, 137, the

21   government's motion in limine.  Now, I've got your

22   response on 404(b) that was filed last week with leave of

23   Court.

24           MR. STILLEY:  Your Honor, I don't believe I

25   filed any motion in response to that.

1           THE COURT:  Very well.  Thank you.  Mr. Springer

2    states with respect to the matters set forth in the six

3    numbered paragraphs on pages 2 and 3 of the government's

4    motion in limine at Docket Entry Number 137, that we're

5    simply not going to have an issue.

6        Now, Mr. Springer, even though this is the

7    government's motion, I'd like to address it with you

8    first just to get some clarification.  Okay.  Now, I'm

9    looking at page 4 of the government's motion as well as

10   your response at Docket Entry Number 177.  Okay.  And I'm

11   looking -- I've read your entire response, I assure you,

12   but I'm now looking at page 13 of your response where you

13   say, "At this point, Springer only opposes the

14   prosecution's motion in limine as stated above regarding

15   gifts and Paperwork Reduction Act of both 1980 and 1995,

16   but would caution the prosecution that if documents they

17   intend on relying upon derived from other litigation are

18   allowed in over Springer's objection to relevance and

19   foundation, Springer should be allowed to present

20   testimony and other evidence surrounding those words

21   contained in those pleadings."

22       Okay.  I gather from that -- and now going back,

23   Mr. Springer, to paragraph -- or to page 4, rather, of

24   the government's motion in limine, I gather from that and

25   from the rest of your response, looking at paragraph 1 on

```
 1   page 4, jury nullification; paragraph 2 on page 4, venue;
 2   and paragraph 4 on page 4, jurisdiction; that at least
 3   for purposes of evidence, because this is a motion in
 4   limine, this is not a motion to dismiss -- this is not in
 5   your motion to dismiss at this point.  At least in terms
 6   of evidence, you don't oppose the government on those
 7   issues; is that correct?
 8           MR. SPRINGER:  In the way that they phrased it,
 9   other than in line 2, I believe that both either in
10   defense and venue by a preponderance of the evidence,
11   which is their burden to prove, as well as by good faith,
12   that I believe the internal revenue district, district
13   director issues that have came up in the past will, at
14   some point in time, come out.  Even if it's just in good
15   faith, I intend on staying there, but to the way the
16   government raised it, which says that venue for willful
17   failure to file cannot lie within the Northern District
18   of Oklahoma, I am not opposing that.
19           THE COURT:  Are you going to be arguing venue in
20   front of the jury?
21           MR. SPRINGER:  No.  I would be arguing at the
22   close of the government's case whether they established
23   venue by a preponderance of the evidence.
24           THE COURT:  Okay.  Well -- and that's the reason
25   why I emphasized --
```

58

```
 1           MR. SPRINGER:  I'm sorry.  I'm sorry.  You're
 2    right, Your Honor.  Whether an internal district or
 3    district director exists or not is irrelevant for the
 4    purposes of that statement.
 5           THE COURT:  Okay.  Because this is the
 6    government's motion in limine, we're talking about
 7    evidence that the jury is going to hear.
 8           MR. SPRINGER:  You're right.
 9           THE COURT:  So we don't need to worry about
10    paragraphs 1, 2 and 4 for jury purposes, right?
11           MR. SPRINGER:  Agreed.
12           THE COURT:  Now, your response, I believe, makes
13    it clear that you do oppose the motion with respect to
14    paragraph 3.  And, again, I want to get an understanding
15    of your intentions, to the extent you choose to disclose
16    your intentions, so that I can then hear from the
17    government in support of its motion.  What would you
18    anticipate we're going to be addressing within the
19    presence and hearing of the jury about the Paperwork
20    Reduction Act?
21           MR. SPRINGER:  As the Court noted earlier, and
22    as the government has expressed knowledge and intent, our
23    key to this persecution against me, and I intend on
24    showing that in good faith I relied on the words of
25    Congress of the United States with the Paperwork
```

1   Reduction Act.  I relied on the Dole case from the

2   Supreme Court in 1990, which said typical information

3   collection requests include tax forms.  I relied on the

4   Tenth Circuit's decision in Collins, which will also be

5   something relevant for the jury to see, which in the 12th

6   footnote of the Collins decision the Tenth Circuit wrote,

7   "In United States v. Tedder, this Court held that tax

8   forms were not information collection requests subject to

9   the Paperwork Reduction Act" --

10          THE COURT:  If you want a record, you're going

11   to have to slow down.

12          MR. SPRINGER:  I'm sorry, you're right.  I've

13   got to get good at that.  I'll start that again.  In

14   United States v. Tedder, the Tenth Circuit wrote in the

15   Collins decision, which is U.S. v. Collins, 920 F.2d 619,

16   at page 630 and 31, they wrote, "In United States v.

17   Tedder, 787 F.2d 542, this Court held that tax forms were

18   not information collection requests subject to the

19   Paperwork Reduction Act because the filing of income tax

20   returns was obligatory.

21     This holding is superseded by the Supreme Court's

22   analysis in Dole v. United Steelworkers, which included

23   federal income tax forms within the category of

24   information collection requests under the act.  Dole

25   would also appear to call into question the holdings in

1    Snyder v. The IRS, Cameron v. The IRS, both of which the
2    Tenth Circuit's speaking held the Paperwork Reduction Act
3    inapplicable to IRS forms.  However, Dole does not
4    contravene our recent holding in Lonsdale v. United
5    States, which is 919 F.2d 1414, page 1444, Tenth Circuit
6    1990, that IRS summonses do not constitute information
7    requests under the act because they are issued in the
8    course of an investigation."
9        And then on paragraph 13 of the Collins decision in
10   1990, the Tenth Circuit wrote, "In United States v. Wise,
11   the Second Circuit held the Paperwork Reduction Act did
12   not preclude prosecution from filing false Medicare and
13   Medicaid claims, despite the fact that the forms in
14   question did not contain OMB control numbers.
15   Distinguishing Smith where defendants were prosecuted for
16   failing to file a plan of operations with the forest
17   service, the Second Circuit reasoned
18   the act, 'Only protects persons from penalties for
19   failing to file information.  It does not protect one who
20   files information which is false.'  Quoting Funk, The
21   Paperwork Reduction Act, Paperwork Reduction Meets
22   Administrative Law, 24 Harv. J. on Legis -- it goes, "We
23   recognize that because defendants" -- and this is in the
24   Collins case -- "was charged with tax evasion and not
25   failure to file tax returns, he technically was not being

1    prosecuted for failing to provide information.  Had

2    defendant's tax evasion been effectuated through the

3    filing of false tax returns, Wise would dictate that no

4    Paperwork Reduction Act defense would be available to

5    him, but because the provisions of information in 1040

6    forms is inexorably linked the statutory requirement to

7    pay taxes and defendant failed to file such forms, the

8    Paperwork Reduction Act was applicable to such conduct."

9        And so the last case, which I've cited before, is

10   the Dawes decision in 1991 from the Tenth Circuit, which

11   completely goes against everything that Mr. O'Reilly has

12   told this Court about the Tenth Circuit said that their

13   obligation to file is a statutory one, where they said,

14   "We would be inclined to follow the general analysis of

15   Wunder and Hicks" -- this is in Dawes, which is -- for

16   the record, 951 F.2d 1189 at page 1193, and this is a

17   Tenth Circuit 1991 published decision.  "We would be

18   inclined to follow the general analysis of Wunder and

19   Hicks and hold that the operation of the PRA in these

20   circumstances, which is regulations and instruction

21   booklets, did not repeal the criminal sanction for

22   failing to file an income tax return because the

23   obligation to file is a statutory one; however, we are

24   not compelled to rest our opinion on the statutory origin

25   theory because we find the analysis of other courts which

1  have considered the issue to be persuasive."

2      And I just might add that the Tenth Circuit,

3  recently, in a published decision said, in a case that I

4  had before it, that I raised difficult issues between the

5  Paperwork Reduction Act and the tax code, which is the

6  fourth opportunity I've given the Tenth Circuit to

7  squarely head on the merits and they have rejected me

8  trying to find other reasons.  So I believe --

9          THE COURT:  They're just not taking the hint,

10  are they?

11          MR. SPRINGER:  No, they're not.  And, Your

12  Honor, no one is going to be able to say I didn't try.

13  And the government is sitting in this -- they've told

14  this Court one time that Judge Eagan has already ruled

15  against that the requirement to file is a statutory

16  requirement and doesn't involve regulations in her June

17  22, 2006, decision.  And they've pounded me over the head

18  with that bad decision for three years.  And the same

19  Department of Justice lawyers who appealed in other cases

20  that I've been involved in took the same position that

21  Mr. O'Reilly did in his pleadings to the Tenth Circuit,

22  and they found that argument frivolous, and they

23  published their opinion on August 31st of 2009, that the

24  Commissioner of IRS made a frivolous argument.

25      Now, I've -- admittedly, I understand what the Court

1   has said earlier about what the jury is going to see my

2   knowledge is.  And to that degree, that's going to be

3   just like everything else, it's going to have to come in,

4   but the government has indicated that they are going to

5   present pleadings that I filed in court of which there

6   are at least four that involve the Paperwork Reduction

7   Act.  And I don't know whether they're planning on saying

8   what they've said already, which the Tenth Circuit said

9   was frivolous, that Judge Eagan already said I was wrong

10  and I should have taken her hint in 2006.  I don't know

11  how they're going to use it.  But there is no -- there's

12  not anybody in this courtroom that doesn't belive that

13  relied on the Paperwork Reduction Act of 1995, although

14  it's hard to get anybody to acknowledge there is such a

15  law.  They always want to cite to the 1980 law for some

16  reason and Judge Kearns, I think, told Mr. Snoke in the

17  Blackstock case that after 1995 that we had gone 12 years

18  without anybody addressing anything at the Tenth Circuit

19  on the Paperwork Reduction Act, which was even an

20  interesting statement.

21      But the government has alluded that they plan on

22  trying to use evidence to show intent and knowledge, and

23  I believe that the evidence that they're going to use

24  also shows a good-faith defense.  And I -- I believe,

25  Your Honor, that when you see what the Tenth Circuit said

 1  about the difficulty that they have.  When your liberty

 2  is at stake, difficulty sets aside.  And my liberty was

 3  attacked when Mr. Shern raided my home in the way I saw

 4  it.  And so I began to present what I believe was a

 5  complete defense.  I didn't know anything about a jestum

 6  generis that Judge Anderson referred to in May of 2007.

 7  And I thought I could go on the offense, and I was

 8  wrong.  But the government is trying to keep me from

 9  basically explaining evidence that they plan to tender

10  into the jury's mind.  And it is for that reason that I

11  tell the Court that even if it's not an affirmative

12  defense, if the Court decides at the end of the

13  government's case that I don't have the right to raise

14  that as an affirmative defense for dismissal, and even if

15  I can't get complete defense, as Judge Anderson said in

16  May of 2007, then certainly it should come in under good

17  faith, because nobody doubts that I have done everything

18  I can to get the court system to rule and the IRS to

19  change their policies.

20          THE COURT:  Thank you.  I'll hear from the

21  government on this point 3 on page 4 of the government's

22  motion.

23          MR. O'REILLY:  Your Honor, Mr. Springer's

24  statements notwithstanding, it is very clear that the

25  Paperwork Reduction Act does not provide any defense, let

1   alone a complete defense, as we indicated in our brief.

2   And contrary to what Mr. Springer said, we now agree that

3   his position is not frivolous, frankly with respect to

4   him, who has been told numerous times by numerous courts

5   that he is wrong, his continued recitation of it is

6   frivolous.  However, our concern is the law needs to come

7   from Your Honor, not from the government, not from the

8   defendants.

9       And as we attempted to indicate in our motion in

10  limine, it is a fine line of what is allowable as

11  evidence from a defendant and what is impermissible

12  evidence.  And Willie, which we cited on page 8, talks

13  about that the proof of reasonableness of a belief that

14  he should not have a duty only proves the reasonableness

15  of the defendant's disagreement with the existing law.

16  He has been told numerous times this just ain't so.  If

17  he presents through admissible evidence his good faith,

18  fine, we'll be able to counter that, but what we don't

19  want to have is any attempt by the defendants to be

20  introducing the law, that should be coming from Your

21  Honor.  And I hope I've made myself clear on the

22  distinction.

23          THE COURT:  Well, the law, as a rule of decision

24  to be applied by the jury to the facts as found by the

25  jury in the jury deliberation room, will come from me.

1          MR. O'REILLY:  Yes, Your Honor.

2          THE COURT:  But we do have Cheek, we do have

3    Willie, we do have the other cases that shed considerable

4    light on the extent to which on the issue of willfulness

5    he is entitled to show his understanding of the law.

6          MR. O'REILLY:  The defendant is -- I'm sorry,

7    Your Honor.

8          THE COURT:  And I gather from Mr. Springer's

9    comments just a moment ago that that is the avenue that

10   he has selected for admissibility of -- before the jury,

11   of his arguments based on the Paperwork Reduction Act,

12   which, as you know, doesn't require necessarily that he

13   be legally correct.

14         MR. O'REILLY:  Absolutely, Your Honor.  And

15   that's to the extent that Mr. Springer is able to

16   present, through admissible evidence, what he believed.

17   That's not our objection.  Our objection is if he is

18   trying to intimate, as what it appears to the government

19   he still is, that in fact the Paperwork Reduction Act is

20   a defense, because it is not, and the jury shouldn't be

21   -- I think it should be made very clear to the jury that

22   is in fact the law that, of course, would come from Your

23   Honor.

24       To the extent that he can present through admissible

25   evidence what he believed, that's -- that goes to his

1  good faith.  But yet how he presents that obviously is up

2  to him, but it has to be through admissible evidence, not

3  through asking somebody what he told them or, you know,

4  seeking to elicit impermissible hearsay and the like.

5          THE COURT:  Okay.  Thank you.  Mr. Springer.

6          MR. SPRINGER:  I realize how difficult the

7  government has with the Supreme Court of the United

8  States and I've had difficulty at times myself, but I

9  would point to the Court's attention of United States v.

10  Hubbell, 530 U.S. 27 at page 34, and I quote, "The act of

11  exhibiting such physical characteristics is not the same

12  as a sworn communication by a witness that relates either

13  express or implied assertions of fact or belief.

14  Summarily, the fact that incriminating evidence may be

15  the byproduct of obedience to a regulatory requirement,

16  such as the filing of an income tax return, maintain

17  required records or reporting an accident does not clothe

18  such required conduct within (sic) the testimonial

19  privilege."

20      Now, my intentions, Your Honor, are to present

21  evidence of what I relied upon, which basically are

22  documents that I filed which the Tenth Circuit says is

23  difficult.  And certainly not frivolous.  That's one of

24  the few things I haven't been sanctioned for.  But what

25  the government intends on producing 1040 U.S. individual

1   income tax return forms, and they're going to testify as

2   the grand jury alleged U.S. individual income tax returns

3   were required.  Were required by law.  And as we're going

4   to get into that hopefully in a little while, the Court

5   is going to at least hear me on the government's

6   response, but the question of whether or not they intend

7   on triggering the Paperwork-Reduction-Act defense is of

8   their own peril.  If they're going to continue to rely

9   upon documents that had to be approved by the Office of

10  Management and Budget or that they purported to the

11  public that were, then if that's what they claim I didn't

12  do and that as the Tenth Circuit said inexorably linked,

13  then I ask the Court to allow me to present that good-

14  faith defense and, you know, I will follow the Court's

15  lead on that to get that evidence in.

16      And, really, it's interesting.  Mr. O'Reilly stood

17  up here, and he did not tell you that he wasn't going to

18  use documents that I raised the Paperwork Reduction Act

19  in against me.  In fact, what he said to you was that he

20  thinks I've been over and over and over again told I'm

21  wrong and that, somehow, is conclusive from 2000 to 2005,

22  but yet his own exhibits, even the one he

23  mischaracterizes in the Tenth Circuit's words, is dated

24  June 22, 2006.  See, even if Judge Eagan was right, which

25  she was not, and the Tenth Circuit just said that, we did

1    not rule on the merits in Springer 1, 2 or 3.  They said,

2    we just said that Springer can't raise it as a plaintiff,

3    that's all they said.  It's in their decision, published

4    decision, where they found the commissioner frivolous.

5    But if he plans on introducing through his witnesses and

6    documents that I have my name to that are court records

7    that raise the Paperwork Reduction Act, Your Honor, then

8    he's the one opening the door.  If he's saying I have to

9    file a document that's supposed to be approved by the

10   Paperwork Reduction Act and Office of Management and

11   Budget, he's opening the door.

12        And then his argument about regulation doesn't

13   apply, it's just absolutely unacceptable.

14             THE COURT:  I'm not sure I follow you on that.

15             MR. SPRINGER:  He says over and over again -- he

16   mischaracterizes the Dawes and Collins decision by saying

17   they found that the requirement to file is mandated by

18   statute.  He cites Kerwin from the Fifth Circuit, Wunder

19   from the Sixth Circuit, Salberg from the Seventh Circuit,

20   Nip (ph) from the Ninth -- or from the Eleventh Circuit,

21   Hicks from the Ninth Circuit.  And then when he gets to

22   Dawes and Collins, he says they all stand for the same

23   thing.

24        Now, I understand he's from California and Hicks is

25   not accepted law by the Tenth Circuit, but he seems not

1  to grasp that.  But in each one of those cases all the

2  judges could not decide on what the theory was that

3  required a return.  They all have a different one or two

4  sections.  And the Tenth Circuit, of course, obviously, I

5  read earlier doesn't subscribe to the statutory origin

6  theory, which is clearly stated in Dawes and is clearly

7  why they are saying it's difficult issues that I raise.

8  However, Mr. O'Reilly continues to maintain that the

9  requirement is a single mandate of statute.  And when

10 this Court ordered him to file a bill of particulars,

11 which he refers to as the second, he didn't cite the one

12 statute, he gave us nine statutes, none of which connect

13 to each other.  And then he cited the 6011, which is the

14 closest thing he's gotten to reality in the Tenth

15 Circuit, which begins, "When required by regulation

16 prescribed by the secretary any person made liable for

17 any tax imposed by this title."

18     Regulation is the key and yet he continues to

19 advance in front of this Court something he may get away

20 with in the Ninth Circuit or courts in the Ninth Circuit

21 but not here in the Tenth Circuit.  And that is, is that

22 regulations are absolutely, 100 percent imperative in his

23 theory.  They have to be not only existing, but they have

24 to be shown that I specifically laid my eye balls on them

25 and go, huh-uh, I'm not going by that.  That's his

 1  burden.  At least by Cheek, Willie, as the Court cited

 2  earlier.

 3      And as I cited in Cheek, they said it's the statute

 4  "or" regulation that they have to prove I was aware of.

 5  They weren't talking about 7203 or 7201 where the word

 6  "willfully" appears, that the Supreme Court said is an

 7  element.  It's got to come from somewhere else.  And 7203

 8  is very instructive on this.  It says, "Required by

 9  regulation" -- "Required by this title or by regulation

10  promulgated under this title."  That's what 7203 says,

11  which it's looking for somewhere else to tell the public

12  what they have to do, 7203 is a punishment provision that

13  only says if you do something over here willfully then

14  this statute punishes you.

15      And they keep trying to trick the Court into

16  thinking that the knowledge of 7203 is all that's

17  required, or 7201, and that is not what's required.  It's

18  the duty imposed by the tax code is what Cheek says.  And

19  as the Court said in its -- willfulness, as it read from

20  Cheek earlier on page 201, the government is required to

21  prove that the law imposed a duty on me.  That I was

22  aware of that specific law and that I voluntarily and

23  intentionally violated that specific law.  There's not a

24  single duty put on me from 7203, not one.  And there is

25  no duty in 7201 either.  It's just vague and ambiguous.

1          In fact, the Tenth Circuit referenced, in the Farr

2     case, that this Court was involved in, that 7201 was a

3     generic --

4          THE COURT:  You just had to bring that up,

5     didn't you?  You know how to hurt a guy.

6          MR. SPRINGER:  Well, you know what, actually,

7     I'm thankful.  I've prayed many times how thankful I was

8     for that decision because it really gets to the heart of

9     something that's plagued my life for 19 years.  And I

10    want to get it resolved just like everybody else, I just

11    don't want the outcome that Mr. O'Reilly and Mr. Snoke is

12    seeking.  I want resolution that is acceptable to the

13    human mind, not something that punishes somebody for

14    standing up and asking their government to comply with

15    the law.  So I hope I've made my --

16         THE COURT:  Thank you.  The government's motion

17    in limine, as a motion in limine, is denied as to item 3

18    on page 4.  I'm satisfied that those issues are going to

19    have to be addressed step-wise at trial.  And for that

20    reason, again, item 3 on page 4 of the government's

21    motion in limine, as a motion in limine, is denied.

22         We've all got access to the same cases and there's

23    obviously more cases than just Willie and Cheek, but

24    we're all going to have to start this trial with a clear

25    understanding of the scope of the playing field, if you

```
 1  will, that will be available on the issue of willfulness
 2  and the prerequisites to admissibility of evidence, be it
 3  with respect to the Paperwork Reduction Act or otherwise,
 4  on the issue of willfulness.
 5       As to points 1 through 6 on pages 2 and 3, that's
 6  points 1 through 6 on pages 2 and 3, the government's
 7  motion in limine is granted without opposition.
 8       And as to points 1, 2 and 4 on page 4, the motion is
 9  granted without opposition.
10       That brings us to some issues relating to the
11  government's Rule 404(b) notice.  Obviously, it is not
12  necessary for the Court to work its way through all of
13  the Rule 404(b) issues.  We have the notice, the rules
14  require the notice.  The defendants have the benefit of
15  the notice, and I've got Mr. Springer's response to the
16  government's Rule 404(b) notice.  Mr. Springer's response
17  is at Docket Entry Number 54 -- or 154, rather.  I've got
18  Mr. Stilley's response that was filed on October 14th.
19  The government may wonder where Mr. Stilley got leave to
20  file it.  Well, he got leave to file it in this courtroom
21  in the Rule 17(b) hearing.
22       And I do intend to address very carefully one aspect
23  of the Rule 404(b) notice at this point, and that is
24  this, and as a heads-up to Mr. O'Reilly, you're going to
25  be the next one I'd like to hear from.
```

1     On page 2 of the government's 404(b) notice, and I'm

2 certainly not critical of these broad, generic categories

3 because I know that the defendants are aware of what is

4 sought to be encompassed by these categories.  But on

5 page 2 of the government's 404(b) notice filed the 10th

6 of September, we've got, with respect to Mr. Stilley, one

7 item, the final item, "Defendant Stilley's practice of

8 law including suspensions, sanctions and disbarment

9 proceedings."  The Court authorized Mr. Stilley to

10 respond with respect to the 404(b) issue relating to his

11 Arkansas disciplinary proceedings.  He did respond, as

12 we've all seen.  He attached substantial documents

13 relating to his Arkansas 404(b) proceedings.  I have read

14 all -- I have read Mr. Stilley's response, I have read

15 the attachments to his response.  The issue that arises,

16 at least in my mind, arises because those Arkansas

17 disciplinary proceedings related to the filing of pro se

18 or ghost writing of various pleadings and briefs in

19 Arkansas, the filing of lawsuits that were deemed to be

20 frivolous, not a single one of which related to federal

21 taxation.

22     The findings against Mr. Stilley, to be sure, are

23 findings of seriousness conduct but not a single one of

24 those findings relates to federal taxation or, for that

25 matter, state income taxation, they relate predominantly

1   to the filing of lawsuits that were deemed to be

2   frivolous or ghost writing of pleadings and briefs.  This

3   is the government's opportunity to address the question

4   of whether evidence as to those disciplinary proceedings

5   and presumably the findings in those disciplinary

6   proceedings is within the category of evidence admissible

7   under Rule 404(b), because I'm having a serious problem

8   with that.

9        Obviously, his tax filing history and his

10  involvement with criminal tax matters and so forth is

11  really a horse of a different color, but I'm -- I am

12  really having a problem with the admissibility of

13  evidence relating to his Arkansas disciplinary

14  proceedings and this is the government's opportunity to

15  set me straight.

16          MR. SNOKE:  Your Honor, maybe I can cut this a

17  little short.  On that particular notice, our thought was

18  that, after reading some of the documents, I think same

19  documents that the Court has read, that the only

20  relevance in the trial would be possibly making frivolous

21  arguments as being evidence of a common scheme or plan

22  and making frivolous arguments in tax matters and on tax

23  issues.  As I understand it, the original case, for the

24  most part -- or cases, involved in the disciplinary

25  proceedings were not tax cases but were other types of

1   cases.  The bottom line is, we don't plan to use, in our

2   case in chief, anything in connection with those

3   sanctions/disbarment proceedings that the Court has

4   referred to here.  We consider and still do consider

5   using some of that in cross-examination if it becomes

6   relevant.  But as far as our case in chief, I don't think

7   even the argument that's relevant as a 404(b) because of

8   the frivolous tax argument or the frivolous argument as

9   found in I think one paragraph in the findings of the

10  Court on one of the orders, I don't think that -- we're

11  not going to get into that, basically, Your Honor.

12          THE COURT:  Well, do you intend to either refer

13  to or bring out evidence to the effect that Mr. Stilley

14  is a suspended Arkansas lawyer during your case in

15  chief?

16          MR. SNOKE:  No.

17          THE COURT:  Very well.  Mr. Stilley, it doesn't

18  get any better than that.

19          MR. STILLEY:  Thank you, Judge.  I'm satisfied.

20          MR. SNOKE:  If I may, Your Honor.  I stand

21  corrected in one aspect is I think that it may come up in

22  at least one witness, which is probably my co-counsel's

23  witness, which is why I didn't think of it before.  There

24  was -- one of our witnesses, I think at least one, had a

25  situation where Mr. Stilley had to stop representing him,

```
 1  at least for a period of time, because he was suspended
 2  during this time period.  Some of the things that were
 3  presented to the Court now are the latter part of these
 4  proceedings, but it's been going on for several years and
 5  I think it affected during our time period one witness
 6  who may be saying that he was told by Mr. Stilley he had
 7  to stop representing him at some point.  That would be
 8  the only way that -- we're not going to emphasize it at
 9  all, it just may come up.
10          THE COURT:  So the fact of the matter, then, at
11  least as testified to by this witness, would be that for
12  a time he or she was represented by Mr. Stilley and --
13  but then that representation terminated because of
14  Mr. Stilley's suspension; is that right?
15          MR. SNOKE:  Or was suspended for a period of
16  time.
17          THE COURT:  Which witness is that?
18          MR. SNOKE:  That's what I don't know.  Your
19  Honor, I'm informed by counsel that there's probably two
20  witnesses, and I don't know which they were, I just -- he
21  recalls that that was mentioned in their statements.  The
22  statements have been provided to counsel and maybe they
23  can assist us.  I don't have the agent here right now.
24  We can let him go back -- he was here this morning.  He
25  perhaps could tell us by name which of the two witnesses
```

1  that might mention that.  And it may be that we can avoid

2  -- because it's not really the point of this witness's

3  testimony anyway, it's -- has to do with how much money

4  they paid and for what services, which is going to be our

5  point in all these witnesses that are testifying to a --

6  to being clients of Mr. Springer, Mr. Stilley or both.

7           THE COURT:  So Mr. Stilley was required to

8  withdraw as a result of his suspension.  Is that your

9  understanding?

10          MR. SNOKE:  Or he couldn't make a hearing.  For

11  a period of time he was -- there was times where he was

12  suspended for 30 or 60 days or something.

13          THE COURT:  Okay.  Well, this is really a rat's

14  nest I don't want to get into, because if we start

15  hearing about the Arkansas bar disciplinary proceedings,

16  then there's going to be more to it than perhaps meets

17  the eye.  So what would be onerous about the Court

18  requiring the government, first of all, unless the Court

19  authorizes it after the matter is raised outside the

20  hearing of the jury to require the government to refrain

21  from referring to the suspension or the bar disciplinary

22  proceedings and to admonish the witnesses that any

23  termination of Mr. Stilley's representation is simply to

24  be referred to as a withdrawal from further

25  representation.

```
 1          MR. SNOKE:  I think we could do that as far as
 2   the witnesses go, Your Honor.
 3          THE COURT:  Okay.  That will be what I'll expect
 4   on that point.
 5          MR. SNOKE:  Thank you.
 6          THE COURT:  Now, Mr. Stilley, there's one matter
 7   I need to address with you.  I do intend to exclude
 8   evidence as to your suspension and as to your bar
 9   disciplinary proceedings.  And I'm not going to give you
10   legal advice.  You're a lawyer and you have the benefit
11   of standby counsel, but I want you to understand how
12   little it might take for that door to swing wide open.
13   So listen very carefully to your counsel as to how
14   careful you need to be to keep that door from swinging
15   wide open.  And if you posture yourself as coming from
16   Arkansas as pure as the driven snow, or anything along
17   those lines, then there may be a problem.  So I urge you
18   to listen very carefully to your standby counsel's advice
19   on that score.  Do we have that understanding?
20          MR. STILLEY:  Your Honor, you have a clear
21   understanding here and I thank you for your good counsel.
22          THE COURT:  Well, it's just a suggestion that
23   you listen to your standby counsel.  Very well.
24       I'm just not sure it's necessary.  We've talked
25   about a good many of the things in the government's
```

 1  404(b) notice, and to the extent that we haven't talked

 2  about matters in the government's 404(b) notice, it's

 3  either not tee'd up for the Court to address by way of a

 4  motion or it's a matter that is probably not going to be

 5  in controversy.  Unless one side or the other thinks that

 6  we really should address any other 404(b) matters today,

 7  I'm not inclined to do so.  Mr. Stilley.

 8          MR. STILLEY:  I think that's the best way to do

 9  it.

10          THE COURT:  Mr. Springer.

11          MR. SPRINGER:  I concur with one asterisk.  When

12  you -- I listen very carefully to what you say and what

13  you said to Mr. Stilley I looked as if you were talking

14  to me in a different way.  If a witness starts talking

15  about their belief that a person is as white as the

16  driven snow.  Like if a person says, well, Mr. Stilley if

17  he says it's going to rain, it's going to rain.  Does

18  that open up that door you were warning of or is it only

19  if it comes out of the lips of myself or Mr. Stilley?

20  Because I didn't quite follow that.

21          THE COURT:  Well, you're asking me for an

22  advisory ruling and I'll simply say that -- and your

23  counsel can elaborate on this, but what I am talking

24  about is what is -- we talk -- in the vernacular, we talk

25  about this as opening the door.  What it is as a matter

1  of evidence law is the doctrine of curative

2  admissibility.  And the doctrine of curative

3  admissibility is triggered only where the party who all

4  the while has opposed the admissibility of a certain

5  category of evidence has himself done something to elicit

6  evidence on the other side of that issue or at least

7  arguably on the other side of that issue.  So you're not

8  going to get stuck with anything that it does not appear

9  that you elicited or sought to bring before the jury.

10         MR. SPRINGER:  Thank you.  And I have no other

11  objection on the 404(b), Your Honor.

12         THE COURT:  Very well.  Bear with me just a

13  moment.  Pam, I don't see that we have any other motions

14  pending.  Do we?  Well, we've got a motion for relief

15  from the schedule and we've got one or two other motions,

16  but in terms of motions before the ones filed within the

17  last day or two, Pam, do we have any other motions

18  pending?  Mr. Springer.

19         MR. SPRINGER:  Your Honor, there was an issue

20  about Daubert.  And I don't think it was clear yet as to

21  when we were going to address that.  On the --

22  Mr. Miller, the expert.

23         THE COURT:  What I said in my order was that we

24  would likely address that after the normal trial day is

25  over at some point during trial.  And I realize you

1    wanted a hearing before trial, I have denied that, and I
2    certainly intend to stay with that.
3              MR. SPRINGER:  I believe the Court ruled today
4    James moved to the top of the list on Monday after the
5    jury is picked.
6              THE COURT:  That's true.
7              MR. SPRINGER:  So then that's why I raised -- I
8    just didn't know if that meant it moved to a different
9    day or just whenever.
10             THE COURT:  Well, before we get -- I anticipate,
11   and Mr. O'Reilly will have momentarily an opportunity to
12   correct me if I'm wrong about this, but I anticipate that
13   Mr. Miller will not be called early in the government's
14   case.  And I nevertheless don't intend to wait until late
15   in the government's case for the Daubert hearing.  I plan
16   to have that before we get too terribly far along in the
17   trial, but I don't plan to have that Daubert hearing
18   before the trial starts.
19             MR. SPRINGER:  It would be fundamentally fair if
20   we could have that as soon as possible, just in the -- in
21   trying to understand exactly what Miller is going to say,
22   at least, in a general sense.  I think at this time we've
23   got so many transcripts that he has testified at that the
24   Daubert hearing is very important.
25             THE COURT:  Well -- and we're certainly going to

1  have that hearing.  There are some competing

2  considerations that have a bearing on my assessment of

3  fairness.  On one hand, obviously, the documentary

4  evidence has been available to all parties for quite some

5  time.  And I think you'll be the first to say that it's

6  been available in most respects to the government longer

7  than it's been available to you.  So to that extent, we

8  would certainly have a right to expect that, at least in

9  broad terms and in fact with some degree of specificity,

10  we should be able -- we should be in a position to expect

11  Mr. Miller to be presented at a Daubert hearing to give

12  us the benefit of, at least in broad outlines, his

13  proposed expert testimony without even having heard the

14  entire government's case.  On the other hand, the

15  government would be quick to add that he will be in the

16  courtroom during the entire government's case and that

17  there could be matters that arise during the government's

18  case that could have an impact on the accuracy of his

19  proposed summary testimony to the point that it may have

20  to be molded to the evidence as it comes in as opposed to

21  the evidence as it was expected to come in.  So there are

22  considerations that cut both ways and I'm very mindful of

23  those considerations.

24      That said, I'm now going to invite the government to

25  give me the benefit of its proposal as to at what point

1   we have the Daubert hearing.  It's going to be at 5:30 in

2   the afternoon, the question is on what day or at what

3   basic juncture during the trial?

4          MR. O'REILLY:  Your Honor, I mean, really it's

5   at the Court's convenience.  The Daubert hearing -- we

6   are quite confident that Mr. Miller will be found to be

7   well-qualified and that his testimony will be found to be

8   such that it is admissible, helpful testimony for the

9   jury to understand a case with voluminous exhibits.  I

10  mean, there are hundreds of exhibits of checks, of

11  expenses that a person such as Mr. Miller is necessary to

12  coalesce that and explain it to the jury just what it all

13  means.  And that, of course, his expertise has previously

14  been found to be well-qualified to testify in this vein.

15       One other completely different matter --

16          THE COURT:  Well, before we move to that.  It

17  will be my intent and if this slips my mind, remind me.

18  It will be my intent shortly into the trial, shortly

19  after we get started, to set a date for the Daubert

20  hearing.  And I don't know that I can fairly nail that

21  down with any more certainty at this point than that.

22  Okay.  You were going to raise another matter.

23          MR. O'REILLY:  One scheduling request I have,

24  personally, but I am obviously mindful of the Court's

25  schedule is that we not do it on a Friday.  I'm actually

1   hopeful that we can -- I don't know how late the Court's

2   schedule usually is for trial days.

3          THE COURT:  We won't have the Daubert hearing on

4   a Friday.

5          MR. O'REILLY:  Great.  Because I'm hopeful that

6   I can catch a flight home for at least some weekends

7   during this trial.

8          THE COURT:  Very well.

9          MR. O'REILLY:  The other, different matter, and

10  based upon what Mr. Springer, Mr. Stilley, and as we

11  understand their evidence, we have a proposed

12  supplemental jury instruction that I've given copies to

13  the defense today.  I'd like to tender it to you now just

14  simply so that you have it before we meet.

15         THE COURT:  Do you have two copies per chance?

16         MR. O'REILLY:  I can get another copy, yes, sir.

17         THE COURT:  Well, over the noon hour, see if you

18  can get another copy run.  I need a copy and then I need

19  an extra copy.

20         MR. O'REILLY:  I do have another copy, Your

21  Honor.

22         THE COURT:  Okay.  Very well.  If you would give

23  two copies to the clerk.

24     By the way, in case anybody has not noticed, we have

25  started the pretrial conference.  And we'll address this

1  when we have our instructions conference which comes

2  after the pretrial conference.

3             MR. O'REILLY:  Understood, Your Honor.  Is there

4  anything else on this?

5             THE COURT:  Not at this point.  Okay.  We've got

6  -- yesterday I entered an order on an ex parte motion by

7  the government.  Has that ex parte motion -- has a copy

8  of that been provided to the defendants?

9             MR. O'REILLY:  No, it has not yet, Your Honor.

10 We were going to do that today once -- because, as of

11 right now, it is still sealed as to them.  We were going

12 to seek your permission to unseal it as to them.

13            THE COURT:  That would be Docket Entries 202 and

14 203, both entered yesterday and --

15            MR. O'REILLY:  Oh, I'm sorry.  Yes, Your Honor,

16 copies of those, I believe, were provided.  Let me

17 double-check if they've received them.  Your Honor,

18 you're referring to our request for another motion in

19 limine, correct, Your Honor?

20            THE COURT:  Well, let's take things one step at

21 a time.  Yesterday the government filed an ex parte

22 motion relating to witness Phillip Eugene Roberts.

23            MR. O'REILLY:  Okay.  We are talking about

24 Mr. Roberts.  That has not yet been provided to them.

25            THE COURT:  I understand why the motion was

 1  filed.  I understand why it was filed on an emergency

 2  basis.  Is there any cogent reason that this motion and

 3  order ought not to be immediately provided to the

 4  defendants.

 5            MR. O'REILLY:  No, Your Honor.

 6            THE COURT:  Very well.  Pam, over the noon hour

 7  can you print out 202 and 203 and give them to the

 8  defendants?

 9            COURTROOM DEPUTY:  Yes.

10            THE COURT:  Thank you.  Okay.  Now, we've got a

11  motion from the government -- if I brought it.  We'll

12  address it whether or not I brought it.  A motion for

13  leave -- motion for some relief relating to the -- and I

14  can't lay my hands on it immediately, but, anyway, it's a

15  motion for some relief relating to an erroneous court

16  record that apparently erroneously suggests or at least

17  at one time suggested that a potential government witness

18  had a child pornography conviction.  Has that been --

19  copies of that were not filed under seal, were they, or

20  were they?

21            MR. O'REILLY:  They were filed under seal, Your

22  Honor, but they were not ex parte.

23            THE COURT:  I'm going to inquire, first of all,

24  of Mr. Stilley and then Mr. Springer, do the defendants

25  intend in any way -- and what was that witness's name?

```
1            MR. O'REILLY:  I'm sorry, Your Honor.  The
2    witness is Mr. Mark Zokle.  And just so it's clear, what
3    the erroneous record reflected and, again, reflected
4    incorrectly, was an accusation.  It was not a
5    conviction.  It was a waiver of indictment on a child
6    pornography charge, that that reference to child
7    pornography was erroneous.
8            THE COURT:  Do either defendant intend to assert
9    otherwise?
10            MR. SPRINGER:  Your Honor, maybe Mr. Stilley
11    ought to address that first because Mr. Zokle is one of
12    the two people I believe the government was telling you
13    Mr. Shern would give you the name on about opening up
14    that can of worms with Mr. Stilley.  But I'm not aware of
15    what Mr. Zokle is going to testify about, so I can't tell
16    you.  I read that the government says that there is a
17    document that was entered in an agreement with Mr. Zokle
18    and the government on a plea deal where it references
19    child pornography.  I have no way in the world of telling
20    the Court how that would ever become relevant in this
21    case.  But having said that, if Mr. Zokle gets up there
22    and lies about something and it's impeachable to his
23    character or whatever, then I don't want to waive that
24    knowledge what I'm waiving.  And so I'll just tell the
25    Court, I have no plans of going into child pornography
```

1   during the trial.

2          THE COURT:  Do you have any evidence that he, in

3   fact, was even accused?

4          MR. SPRINGER:  When you say "any evidence,"

5   maybe it would be proper if we just put him on the stand

6   outside the jury and ask him and then when he says no --

7          THE COURT:  So as you stand here today, you have

8   no such evidence, I take it.

9          MR. SPRINGER:  No, I would have no evidence that

10  he had child pornography on his computer when he was

11  arrested or whatever.

12         THE COURT:  Very well.  Mr. Stilley.

13     Mr. Stilley, do you assert that it is a fact that

14  Mr. Zokle was even accused, court record notwithstanding,

15  that he was even accused of anything having to do with

16  child pornography?

17         MR. STILLEY:  Your Honor, my suggestion on that

18  is that there is sufficient evidence there that there is

19  a colorful issue on that.  And before I go further, let

20  me say that I think the best way to deal with this is

21  simply bar Mr. Zokle, that's the pronunciation of his

22  name, bar Mr. Zokle from testifying, because, as I

23  understand, he has no evidence that is directly related

24  to any of the counts of this complaint.  And to speak to

25  the issue about the child porn, there was -- I mean, in

1    the discovery provided by the government, there is

2    material where that Mr. Zokle rambled on at length

3    talking about his sexual escapades with Mr. Tom Baird,

4    his former CPA, who apparently stole nearly $400,000 from

5    him.  How that that could possibly be relevant to

6    anything is utterly beyond me.  But one of the reasons

7    that I think Mr. Zokle needs to be kept out is because he

8    came to Arkansas to testify against Oscar Stilley in the

9    disbarment proceeding.  He came in the liability phase,

10   but not to testify as to liability, to testify as to

11   punishment.  And the testimony was taken at that time and

12   preserved until later, was considered in the punishment

13   phase.  I say that to say that there is a big issue.

14        Clearly, Mr. Zokle has engaged in sexual conduct

15   that's just unacceptable.  He denies or at least at the

16   disbarment hearing denied that he was actually charged

17   with child pornography, which is understandable that he

18   would deny that, but for whatever reason, this was placed

19   on the record and when I went to get the information from

20   Mr. Zokle's case, I found it.  So that's my position on

21   it.

22        I don't think -- if the government insists on

23   bringing him in, I would respectfully contend that they

24   ought to deal with the problems that they've got to deal

25   with with his statements that he made in his plea bargain

1   deal and also the public-record documents that were, at

2   least for a period of time, on his public record in his

3   criminal case.

4       But as I said, we can just eliminate the whole

5   problem by leaving him out altogether.  And I think it

6   would be helpful for the determination of this matter for

7   the Court to inquire of the government whether they have

8   anything from Mr. Zokle except 404(b) evidence.

9           THE COURT:  Thank you.  Does the government have

10  a copy -- I got here without a copy of that motion.  Does

11  the government have a copy of that motion?

12          MR. O'REILLY:  Unfortunately, Your Honor, I

13  don't have -- I was just looking for one, and I don't

14  think I have a copy with us today.

15          THE COURT:  Okay.  That was -- that was actually

16  two motions, they were filed yesterday, I believe.  Pam,

17  can you print those and bring those in?

18          COURTROOM DEPUTY:  Yes.

19          THE COURT:  Thank you.  We'll address other

20  matters, then we'll return to that.  That's Docket Entry

21  206 and Docket Entry Number 20 -- my numbers may be off,

22  but it's maybe 204 and 205.  And while you're at it, I

23  got here without Mr. Stilley's motion to bar mention of

24  the testimony of Vikki Wiggins, 206.  If you would,

25  please, print that, Pam.  And so we'll come back to

1    those.

2         MR. O'REILLY:  Your Honor, I apologize.  I

3    misspoke.  I actually do have a copy.  I was far more

4    efficient than I realized.

5         THE COURT:  If you would give it to the clerk.

6         MR. O'REILLY:  Yes, Your Honor.

7         THE COURT:  And then there was an accompanying

8    motion.  There's two motions filed together, one was the

9    motion for relief from the schedule, the other one was

10   the motion in limine re: erroneous entry.

11        MR. O'REILLY:  That was -- this is the second

12   motion, Your Honor.

13        THE COURT:  Okay.  If you would, give that to

14   the clerk.  And, Pam, those are 204 and 205; is that

15   right?

16        COURTROOM DEPUTY:  Yes.

17        THE COURT:  The motion at Docket Entry Number

18   204 is granted.  The motion at Docket Entry Number 205,

19   namely motion in limine regarding an erroneous entry in

20   United States v. Mark James Zokle, is granted.  There

21   will be no reference at trial to the matters set forth in

22   the motion, unless the matter is raised, again, with the

23   Court outside the hearing of the jury, but short of that,

24   there will be no mention in the presence of the jury of

25   the matters set forth with respect to Mr. Zokle in the

1   motion.

2       Now, there are some other matters that I need to

3   cover, and I think probably we should cover these, then

4   take a lunch break and then talk about instructions after

5   lunch.  Let me see what we haven't covered here.  Just a

6   second.  Mr. Stilley, would you have -- I got over here

7   without your motion relating to Vikki Wiggins.  Do you

8   have a copy of that -- an extra copy of that?

9           MR. STILLEY:  Yes, Your Honor, if I may

10  approach?

11          THE COURT:  You may.  And give it to the clerk,

12  please.  Okay.  This is, I think, at Docket Entry Number

13  206; is that right?

14          COURTROOM DEPUTY:  Yes.

15          THE COURT:  Okay.  Mr. Stilley, what -- to your

16  understanding, what is the status of the transcript of

17  Ms. Wiggins' testimony.

18          MR. STILLEY:  My understanding is that it would

19  be available this Friday.  And my understanding, if I --

20  and the government will correct me if I'm wrong, but my

21  understanding is that I'm going to get an electronic copy

22  at the same time they get a copy, which means that I

23  should have it in hand on Friday, and I'll immediately

24  give a copy to Mr. Springer.

25          THE COURT:  And then at that point, once you

1  have the transcript of Ms. Wiggins' testimony in hand,

2  what do you plan to do?

3          MR. STILLEY:  File a motion that sets out and

4  documents from the transcript the fact that Ms. Wiggins

5  is not a competent witness to testify on these matters.

6  I've given a prelude to what I would be talking about

7  showing that it was not her money, that she didn't have

8  power to make the decisions, she didn't know what was

9  going on, somebody else had her stamp and she disavowed

10  knowledge as to whether her signature on documents was

11  her signature or somebody else using her stamp, et

12  cetera.

13          THE COURT:  It's really not necessary to argue

14  the matter at this point.  The issue is whether and how

15  you will have an opportunity to argue the matter.  And I

16  do understand your point.

17      I need to hear from the government now.  Mr. Snoke,

18  my inquiry is very simple.  This is certainly that

19  relatively unusual situation, unusual for a criminal

20  case, in which the testimony of a witness, in the

21  vernacular, is in the can before trial.  We know what her

22  testimony is.

23          MR. SNOKE:  Yes, Your Honor.

24          THE COURT:  And Mr. Stilley is apparently of the

25  opinion that there are some matters in that testimony

1    that are not admissible and ought to be excluded, which

2    is not terribly different from what the Court ordinarily

3    does in a civil case in which the Court rules on

4    objections to deposition testimony before the testimony

5    is presented to the jury.  To that extent, unless you

6    have some cogent reason that I ought to do otherwise, it

7    certainly appears to me, since the transcript will be

8    available shortly, that I ought to afford Mr. Stilley an

9    opportunity to make his proposed submission before her

10   testimony is presented to the jury.  But if I'm wrong

11   about that, this is your chance to tell me how or and why

12   I'm wrong.

13           MR. SNOKE:  Well, Your Honor, first of all, I

14   talked to the court reporters here on Tuesday, and I

15   believe we probably will have this -- at least we're

16   hoping to get our copy by tomorrow, at the latest Friday

17   the parties should have both the video and the transcript

18   portion of the transcript that was taken there a week ago

19   Friday on the 16th.  And no doubt they should have a

20   right to go over it.  There were numerous objections,

21   many by -- on my part to the questions during the course.

22   Mr. Stilley was, of course, there, as was Mr. Springer

23   was given adequate opportunity to cross-examine.  I

24   didn't hear any cross-examination on the issue that he's

25   alleging here in this petition here that she was not the

 1   source of funds herself.  My recollection is completely

 2   different from that, of course.

 3       I was objecting and some of the -- most of the

 4   objections were to the form of the question and not to

 5   that issue.  I would submit that it goes to the -- goes

 6   to the weight of the testimony.

 7           THE COURT:  You're making the same mistake

 8   Mr. Stilley did.  I'm not here to hear the merits of the

 9   matter, this is procedural.

10           MR. SNOKE:  I apologize, Your Honor.  The

11   question then is, I guess, is whether -- how much time is

12   going to be required other than the weekend, assuming we

13   all get it on Friday.  And we would also like to have the

14   Court, you know, decide on what portions of the

15   transcript are going to come in, which objections are

16   going to be sustained.  All that's going to take some

17   time during the course of the trial.  And I don't know --

18   I understood from his motion, principally, I mean, other

19   than he says he's going to challenge it, I heard it

20   differently that she said -- that she actually wrote a

21   lot of checks herself or caused them to be issued in

22   cashier check form from her bank.  So I disagree with all

23   of that, but as far as getting the time to do it, I don't

24   know what else to do except do it during the course of

25   trial, I guess, is the only time the Court is going to

```
 1   have time, I think, unless we do this also after picking
 2   the jury or something, if we would be ready on Monday.
 3       We have no -- we object to -- it's going to be
 4   difficult for me in my opening statement not to mention
 5   something about Ms. Wiggins.  I mean, I would normally
 6   say we're going to have a witness saying this and that
 7   and the other and --
 8           THE COURT:  How far into the trial do you
 9   anticipate she will actually be called as a witness?
10           MR. SNOKE:  Because it is in this format we can
11   do it anywhere.  Normally, we would do it fairly early
12   because she was one of the first persons who dealt with
13   Mr. Springer chronologically in 2000 and 2001, which is
14   the beginning of our time period in this indictment.  So
15   we would normally do it early on, but we can put her on
16   later if need be so that the Court would have time to
17   have a hearing with all of us and we could --
18           THE COURT:  Thank you, sir.  Mr. Stilley, I have
19   a question.
20       Are you seeking to exclude any of the testimony of
21   Ms. Wiggins by way of an argument that is not fairly
22   shown or will not fairly be shown by your objections in
23   the transcript?
24           MR. STILLEY:  Yes.
25           THE COURT:  And that's because of the matters
```

1  related to her knowledge or what?

2          MR. STILLEY:  On the grounds that she's an

3  incompetent witness.  That is the chief thing that I'm

4  trying to show is that she does not have personal

5  knowledge.  Under the rules of evidence, she does not

6  have the qualifications to give any testimony on at least

7  certain subjects.

8          THE COURT:  Well, surely her possession of

9  personal knowledge or lack of personal knowledge is shown

10  one way or the other by the transcript, is it not?

11          MR. STILLEY:  Oh, yeah, I think that I can show

12  her lack of personal knowledge, that's the source of my

13  information to show this Court.

14          THE COURT:  So you would be working from the

15  transcript, right?

16          MR. STILLEY:  Yes.

17          THE COURT:  Mr. Stilley's motion at Docket Entry

18  Number 206 is granted.  The transcript of Ms. Wiggins'

19  testimony, when received by the government, will be

20  immediately electronically transmitted to the courtroom

21  deputy so that I'll have that transcript almost as soon

22  as anyone else will.  And the courtroom deputy will make

23  a note -- notation in the docket sheet as to the date of

24  receipt of that transcript.  Although that transcript

25  itself will not be, at this point, made part of the

1   public record.  But whatever that docket note says as to

2   the date of receipt of the transcript, Mr. Stilley will

3   have three calendar days within which to file a motion to

4   suppress some or all of the testimony of Ms. Wiggins.

5   And at that point, I will determine the government's

6   response time.  And -- Mr. Springer.

7           MR. SPRINGER:  I was under the presumption I

8   would be getting that transcript tomorrow, before trial,

9   and so I had not joined Mr. Stilley's motion, but can I

10  be included in the order that I would have three days as

11  well to make any objections.

12          THE COURT:  Very well.  That applies to both

13  defendants.

14          MR. SPRINGER:  Thank you, Your Honor.

15          THE COURT:  And now I -- and I do plan to --

16  apparently both sides have objections.  I do plan to

17  promptly read that transcript and rule on the

18  objections.  And then apparently other matters are going

19  to be raised by way of these motions to suppress all or

20  part of her testimony.  And I will address that as

21  promptly as I can, but obviously I have to have the

22  motion in hand before I can do that, the motion and a

23  response.  And I have to have both of those in hand

24  before I do that.

25      I will say, in the very same breath, that once I

```
 1    have the transcript and the motion, if I conclude that
 2    the matter can be adequately addressed in open court
 3    without extensive briefing by way of a response by the
 4    government, why, then, perhaps we'll address it that
 5    way.  We'll just have to see what happens once we get the
 6    transcript and the motion or motions from one or the
 7    other, if not both of the defendants.  But the motion
 8    at -- under the circumstances, the motion at Docket Entry
 9    206 is granted and we'll proceed as I have said.
10         Now, let me -- Mr. O'Reilly, yes.
11              MR. O'REILLY:  Your Honor, just for
12    clarification.  With respect to the granting of the
13    motion is that -- maybe we're not going to get opening
14    statements on Monday, in which case this should be moot.
15    But generally we will identify witnesses during our
16    opening statement.  Part of Mr. Stilley's motion and
17    really the part the government objected to and will file
18    an objection is to being precluded from mentioning her
19    name because we don't anticipate her entire testimony is
20    going to be ruled out.
21              THE COURT:  If we get the transcript this week,
22    I will be in a position to tell you on Monday whether you
23    can at least mention her name.
24              MR. O'REILLY:  Okay, Your Honor.
25              THE COURT:  I appreciate that concern.
```

1   Mr. O'Reilly, while you're up there, now that, obviously,

2   we're within a few days of trial, you gave me a number

3   some time back as to the number of witnesses you

4   anticipated.  Obviously, as we get closer to trial, it's

5   only natural that you over time get in a better position

6   to estimate the length of either your case or the whole

7   case, for that matter.  I sense perhaps that, to some

8   degree, the defendants' case is going to be presented on

9   cross during your case, but that is speculative on my

10  part.  Can you give me an updated estimate as to length

11  of trial?

12          MR. O'REILLY:  I am hoping we can put this trial

13  on within two weeks.  Obviously, that depends on the

14  length of cross-exam and how well the witnesses are able

15  to testify fairly succinctly, but our case is fairly

16  straightforward and simple.

17          THE COURT:  Very well.  For all concerned, we

18  will have no trial on Friday November 6th.  That would be

19  the Friday of the second week of trial.  And we will have

20  no trial -- so that week will be a four-day week.

21      Bearing in mind that the Court gets a vote on this,

22  Mr. O'Reilly, how long would you propose for opening

23  statement?

24          MR. O'REILLY:  May I confer with counsel,

25  please?

```
 1              THE COURT:  Surely.
 2              MR. O'REILLY:  We anticipate no more than 30
 3    minutes.
 4              THE COURT:  That would suggest 30 minutes for
 5    the government, 30 for Mr. Springer and 30 for
 6    Mr. Stilley.  And under the circumstances, I don't find
 7    that unreasonable.  I'll inquire now of the defendants as
 8    to whether the defendants have any objection to 30
 9    minutes apiece for opening statement?
10              MR. SPRINGER:  I do have an objection.
11    Because --
12              THE COURT:  Do you think that's too long or too
13    short?
14              MR. SPRINGER:  It's too short because I'm having
15    to slow down.  I could do it in 30 minutes, but you would
16    be very upset with me and so would the court reporter,
17    because I can talk fast.  On attention spans, I
18    understand how that works, but I would ask for 45
19    minutes.  There is a huge -- you know, Mr. O'Reilly says
20    this is a simple straightforward case, but yet he's never
21    done a case like it before in his life, so, you know,
22    that, in itself, seems to be interesting, but I have lots
23    of summary -- summarizing to do in an opening statement
24    because I don't really get to put on a defense until
25    after he closes, if he survives, you know, motions for
```

1   judgment of acquittal.  So there's not going to be really

2   a lot of me addressing the jury ten days or so, so I

3   would at least like to tell them where we're going to go,

4   how we're going to get there and so that they'll keep in

5   mind my words while they're going through the

6   government's case.  And 45 minutes would be plenty of

7   time, but 30 minutes seems to be a little short when I'm

8   going to have to dispute 30 minutes in the 30 minutes.

9         THE COURT:  The thing that worries me,

10  Mr. Springer, is the longer you go the more likely you

11  are to get into argument.  And I'm going to get your neck

12  in opening if you get into argument.

13        MR. SPRINGER:  I am going to do my best to make

14  you proud.

15        THE COURT:  Okay.  Everybody will have 30

16  minutes for opening statement.  We're going to take our

17  lunch break here momentarily, but there's one thing I'm

18  going to inquire of the government now and you can answer

19  me now or tell me that you want to answer me after

20  lunch.  Of course, I've read and reread the indictment.

21  I'm aware of the basic roles of the parties as asserted

22  by the government.  I'm also aware of the leeway the

23  government has in charging as a principal or as an aider

24  and abetter, but I'm as aware as I am of anything of the

25  fact that when time comes for me to instruct, the more --

1   and this is really from the standpoint of all parties and

2   not any one party in particular.  The more potential for

3   confusion that I can eliminate the better off all parties

4   will be, unless the parties relish the thought of trying

5   this lawsuit more than once.

6       And so -- and we're going to address this perhaps in

7   more detail and in other contexts, but on Counts 3 and 4

8   is Mr. Stilley charged as a principal or as an aider and

9   abetter or both?

10          MR. O'REILLY:  Both, Your Honor.

11          THE COURT:  Well, we'll discuss that.  And

12  obviously the Court has very limited, if any, control

13  over that.  I certainly acknowledge that, but that does

14  have some impact on the instructions.  We'll get into

15  that this afternoon.  And, again, I'm not going to

16  suggest that the Court necessarily can control that.  I

17  am concerned about the potential for confusion.  We'll

18  address that later.  You may be seated.

19          MR. O'REILLY:  Thank you, Your Honor.

20          MR. BURTON:  Your Honor, there were a couple of

21  procedural issues associated with standby counsel's

22  efforts to try to assist that we wanted to talk to you

23  about.  Now may not be the appropriate time to do that,

24  we can do that later in the day, but I'll defer to you.

25          THE COURT:  Do you need to do that on the record

1  or can we all get together in chambers?

2          MR. BURTON:  We can get together in chambers and

3  do that, Your Honor.

4          THE COURT:  That's what we'll do, unless anyone

5  objects.  That's what we'll do.

6          MR. BURTON:  Thank you, Your Honor.

7          THE COURT:  The last thing I'm going to do

8  before we take our lunch break is to run through some of

9  my usual docket call announcements, because I want

10 everyone to have a clear understanding what my

11 expectations will be at trial.

12     First of all, I'm sure you're all familiar with my

13 chambers procedures as found on my Web page at the

14 Western District Web site.  Even though those chambers

15 procedures, in part, relate only to civil cases, in part

16 they relate to both civil and criminal cases.  And I

17 would urge you to reread parts F and G of my chambers

18 procedures as found on my Web page.

19     I do expect both sides to have their witnesses lined

20 up and ready to go.  We will be getting in full days,

21 starting at nine in the morning with a relatively brief

22 mid-morning break, a lunch break no longer than necessary

23 and a relatively brief mid-afternoon break, and then

24 we'll go until five.  If there's a good reason to push a

25 little past five, then we may do that, but you can count

1  on long, good days of trial without interruptions.

2      Pam will need three copies of your witness list,

3  three copies of your exhibit list.  The form for your

4  index of exhibits is to be found on my Web page.

5      Now, as far as exhibit books are concerned, before I

6  mandate any particular approach the exhibit books tell me

7  what -- I would like to hear from the government as to

8  what the government plans to do by way of exhibit books

9  for the witness -- witnesses and for the Court.

10         MR. O'REILLY:  Your Honor, with respect to the

11  witnesses, what we anticipate using is an electronic

12  system, the sanction system, so that they don't have to

13  have a bunch of physical documents with them.  There may

14  be a couple of instances where we'll have more voluminous

15  documents that we're going to be going over and we'll

16  have a book available for them.

17      My understanding of the Court's preference is to

18  have notebooks and we will be providing those.  We're

19  trying to get them done by this Friday.  We will be

20  turning over copies of the exhibits to the defense today,

21  subject to, obviously, things sometimes change, but

22  those, in fact, should be copied and done by now.

23         THE COURT:  So you do anticipate having an

24  exhibit book for the Court.

25         MR. O'REILLY:  Yes, Your Honor.

```
 1              THE COURT:  Okay.  Very well.  Now, have you
 2   done a trial run on the AV equipment?
 3              MR. O'REILLY:  That we will -- I know that the
 4   person who is going to be handling that is hoping to do
 5   that tomorrow.
 6              THE COURT:  Okay.  Well, by all means, and this
 7   applies to all parties, in case the defendants intend to
 8   use the AV equipment, you should certainly do a trial run
 9   because the opportunity to rectify any problems during
10   the trial will be limited.  I've said before and I'm
11   going to say again, it's incumbent on one of the players,
12   and that happens to be me, to look out for the jury.  And
13   one of the ways I look out for the jury is to see to it
14   that their time is spent as productively as reasonably
15   possible.  So downtime because of SNAFUs relating to
16   exhibits doesn't count.  We will not have a great deal of
17   downtime on that account.
18        On the subject -- you may be seated.  On the subject
19   of exhibits, if the same document -- if each side wants
20   to get the same document in evidence it will not be
21   referred to by more than one exhibit number.  And,
22   obviously, a good many exhibits will be coming in through
23   the government.  The defendants may want to get the same
24   document in, and they may have their own number on it in
25   their exhibit book, but the same document will not be
```

1  referred to by more than one exhibit number.  If it comes

2  in as Government's Exhibit Number 20, then that's what it

3  will be.  In other words, naming rights go to the first

4  party to get the document in evidence.  If it comes in

5  during the government's case as a defendants' exhibit and

6  it happens to be Defendants' Exhibit 10, then that's what

7  it will be.  And among other reasons, and there are other

8  reasons, but among other reasons for that is the fact

9  that in this day and age of computerized transcript, if

10 you want to search for a given exhibit then it's

11 obviously got to be referred to consistently during the

12 trial, not as Government's Exhibit 20 sometimes and

13 Defendants' Exhibit 10 sometimes.

14     If we do have digital presentation of exhibits with

15 the assistance of a legal assistant or a computer

16 operator then, obviously, I do expect that that operator

17 will remain available to show exhibits at the instance of

18 the opposing party.  So the operator, to that extent,

19 will remain available to both sides if he or she is used

20 for the purpose of presenting exhibits during direct

21 examination.

22     Neither side should ask me to certify experts as

23 experts in the presence of the jury.  Obviously, I have

24 some duties with respect to admissibility of expert

25 testimony.  Once I do my duty, then it's up to the jury

1  to decide how much of the testimony of the witness to

2  accept or reject, and I do not certify experts as experts

3  in the presence of the jury, so don't ask.  You might not

4  like the answer.

5      I expect that you will -- also on the subject of

6  experts, I expect that you will cover the experts'

7  qualifications post haste.  If it would save any time

8  with respect to experts' qualifications to offer a CV,

9  then show the CV to the other side and perhaps that can

10  save some time, but I don't want the parties on either

11  side to spend inordinate amounts of time going through

12  experts' qualifications.

13      Obviously, both sides are going to have considerable

14  amounts of previous testimony available, previous

15  testimony in various contexts from witnesses called by

16  the government especially.  We will have no impeachment

17  with off-the-cuff summaries of testimony.  If you've got

18  a witness nailed dead to rights with in-court testimony

19  inconsistent with other testimony, then stick the witness

20  with the other testimony.  I don't want to hear somebody

21  say, well, didn't you testify ta-da-da-da-da-da

22  without -- and then give me your off-the-cuff summary of

23  deposition testimony or grand jury testimony or whatever

24  it might be, because it's never as good as you remember,

25  and so we stick to the grand jury testimony or the other

1   transcript rather than your off-the-cuff -- impeachment

2   with your off-the-cuff summary.

3       There will be no references in the hearing of the

4   jury to discovery disputes or discovery compliance.  If

5   there's any issues about that, they will be raised

6   outside the hearing of the jury.  But there will be no

7   reference in the hearing of the jury, prior to addressing

8   it outside -- with the Court, outside the hearing of the

9   jury to discovery disputes or discovery compliance.

10      I would also want everyone to bear in mind, although

11  this impacts more on the government than on the

12  defendants, Mr. Snoke is old enough to remember Judge

13  Fred Daughtery, and nobody else in the courtroom is, but

14  I'm a member of the Fred Daughtery school of rebuttal.

15  Rebuttal must be true rebuttal, and it must relate to

16  matters that could not reasonably have been anticipated

17  during your case in chief.  Rebuttal is not an

18  opportunity just to rehash your case in chief.  It must

19  be true rebuttal.  And I urge you to bear that in mind as

20  the trial progresses.

21      We'll take a one-hour break, we'll resume, guided by

22  the clock on the wall here, which appears to be pretty

23  accurate.  We'll resume at 1:30.  Court will be in

24  recess.

25      (RECESS HAD)

1    THE COURT:  The record will show that all

2  parties and counsel are present.  We don't very often get

3  to the stage of seriously addressing jury instructions

4  before the trial has even started but, for a variety of

5  reasons, it was my conclusion that it would be advisable

6  for us to get as far down that road as we reasonably can,

7  as early as we reasonably can, and that's the reason that

8  I sent you a draft of the jury instructions as they now

9  stand.

10    I also plan to and still intend to read a summary of

11  the indictment at the beginning of the trial.  The exact

12  verbiage of that will obviously depend a little bit on

13  some matters that we cover this afternoon, so there's no

14  need for us to specifically address the summary of the

15  indictment this afternoon.

16    And I will certainly reassure everyone that our

17  discussion of instructions this afternoon is certainly

18  not a speak-now-or-forever-hold-your-peace proposition.

19  As the trial unfolds, and as we get down to the point of

20  instructing the jury, if it does indeed get that far, we

21  will obviously have ample opportunity to revisit the

22  instructions, but I think it is entirely appropriate to

23  address the instructions if not early and often, at least

24  early.

25    And, for that reason, first of all -- let's skip the

1    introductory instruction and go to the actual

2    instructions.  They're not numbered because we don't know

3    how many instructions there will ultimately be.  The

4    pages are numbered, but the instructions are not

5    numbered.  For instance, there is an instruction that

6    presupposes that the defendants don't testify.  Well,

7    obviously, that's subject to change.  The defendants may

8    testify, they may not testify, that's absolutely their

9    call.  So, for that reason, among others, the

10   instructions are not numbered, although the pages are

11   numbered.

12       I'll inquire first of the government and then of the

13   defendants.  And I'm not, strictly speaking, calling for

14   objections as a matter of law, what I'm asking for is

15   anything that you, again, first the government and then

16   the defendants, believe is either legally incorrect or,

17   for any other good reason, inadvisable.

18       Now, on one hand, I don't have any particular pride

19   of authorship in this draft.  On the other hand, I'm not

20   here to engage in academic debate as to whether anything

21   is said just exactly the way other people might say it.

22   That's not the purpose of this exercise.

23       Having said that, what's the first of the

24   instructions that the government would care to address?

25           MR. O'REILLY:  Your Honor, for purposes -- you

1    want us to come up to the lectern, correct?

2            THE COURT:  Please.

3            MR. O'REILLY:  The first one that raised some

4    concern with us was the -- what is numbered Instruction

5    Number 6 on page 15, reasonable doubt.  It differs from

6    the Tenth Circuit pattern, and we felt it was a bit

7    unclear.

8            THE COURT:  So you'd rather go with the Tenth

9    Circuit pattern instruction?

10           MR. O'REILLY:  Yes, Your Honor.

11           THE COURT:  Okay.  Let's see, hold on just a

12   minute.  So you request the Tenth Circuit pattern

13   instruction on reasonable doubt?

14           MR. O'REILLY:  Your Honor, one word

15   clarification actually would actually address some of the

16   government's concern.  And it's just in the second to the

17   last line of the first paragraph in front of the word --

18   between the words "or hesitate" "or would hesitate."  But

19   I -- actually, the Tenth Circuit pattern has been tested,

20   we know it works.  That was just -- it was one we felt

21   that as we read it was -- we didn't see a reason not to

22   go with the Tenth Circuit pattern.

23           THE COURT:  Okay.  That's noted.  I -- this is

24   substantially the instruction I've used for eight years,

25   but there's always a first time, so that's noted.

1   Anything else?

2          MR. O'REILLY:  Yes, Your Honor.  In the next

3   one, on page 16, under "evidence," it indicates that the

4   evidence and stipulations -- it omits what -- the phrase

5   that's in the Tenth Circuit pattern, "facts judicially

6   noticed."  There may be none in this case, but if there

7   are, we feel that should be included.

8          THE COURT:  Okay.  That's noted.

9          MR. O'REILLY:  One concern we have on page 19 of

10  the proposed -- the Court's proposed jury instructions on

11  impeachment.  The -- having Tenth Circuit pattern jury

12  instructions on the credibility of witnesses addresses

13  all of this and it doesn't single out impeachment as

14  something separate, so that was just -- we thought --

15         THE COURT:  That's what page?

16         MR. O'REILLY:  Page 19, Your Honor.

17         THE COURT:  And now what is it?

18         MR. O'REILLY:  It's only because it's set aside

19  whereas the Tenth Circuit pattern that we proposed on our

20  pages 14 and 15 combines the credibility of witnesses

21  with the discussion of impeachment.

22         THE COURT:  What else?

23         MR. O'REILLY:  I apologize.  I'm just going

24  through and seeing -- in the Count 1 elements of the

25  offense that are on page 30, it's okay.  I mean, we're

1  not objecting to them at this point, but there's the

2  language with respect to "it must be dishonest" I believe

3  usually includes methods by deceit, craft, trickery or at

4  least means that are dishonest in Hammerschmidt and some

5  of the subsequent case law.  And there's also some --

6          THE COURT:  Now, that's in the second paragraph

7  up from the bottom or --

8          MR. O'REILLY:  Correct, Your Honor.  The last

9  two paragraphs where it discusses what defraud means,

10  yes.

11         THE COURT:  Now, tell me again the language that

12  you propose be inserted.

13         MR. O'REILLY:  If I may have a moment, Your

14  Honor, I'll grab --

15         THE COURT:  Sure.

16         MR. O'REILLY:  Your Honor, what it would be

17  is -- it would be the language from Hammerschmidt.  It's

18  -- it's -- and I wish I had it right in front of me so I

19  was quoting it directly, but it's -- to defraud means to

20  use deceitful or dishonest means or to act by craft,

21  trickery.  There's a certain language in there that it's

22  a little more broad than just dishonesty.

23         THE COURT:  Okay.  That's noted.

24         MR. O'REILLY:  And then on page 33 of the

25  Court's proposed, which is, I think, the last part of the

 1   Court's instruction on Count 1.  I believe, in the

 2   government's proposed instructions we have the language

 3   that indicated there that, "In order to return a guilty

 4   verdict, all 12 of you must agree upon which of the acts

 5   listed above, if any, the defendant committed and that

 6   the defendant committed at least one of the acts listed."

 7   This goes to identify those acts but doesn't, at this

 8   point, speak to the fact that the jury must unanimously

 9   agree on one of them, at least one of them.  I know that

10   the verdict form does indicate -- it does indicate that,

11   but we would recommend that it be included here as well.

12        MS. GILBERT:  Would you all look on page 31.

13   I'm not sure, but I think above -- in the last paragraph

14   before where the numbered overt acts start.  About

15   halfway through that paragraph.

16        MR. O'REILLY:  You know what, that's -- given

17   that it's there, you're probably fine.  We'll withdraw

18   that remark, Your Honor, it is covered, just elsewhere.

19        THE COURT:  Now, well, let's just stay just a

20   minute on the subject of the verdict form.  I did not

21   distribute verdict forms.  I am not particularly

22   attracted to the idea, but I'll certainly hear what

23   everybody has to say.  I'm not particularly attracted to

24   the idea of -- and I don't think it's legally required to

25   include in the verdict form all of the overt acts and

 1   require a designation as to those which the jury

 2   unanimously agrees on, but I don't want to certainly make

 3   a final decision on that until I have heard all parties.

 4   What says the government on that score?

 5          MR. O'REILLY:  Your Honor, in other courts that

 6   I've practiced in what we have done is simply had a line

 7   where the jurors have indicated which of the overt acts

 8   they unanimously agree on.  I'm not sure that it is

 9   required, but it is cleaner, it provides some assurance

10   that, in fact, they've all agreed on the same overt act.

11          THE COURT:  That would be -- so they would write

12   in the number of the paragraph of the overt act, then?

13          MR. O'REILLY:  Correct, Your Honor.

14          THE COURT:  Okay.  That's noted.  What else in

15   the instructions?

16          MR. O'REILLY:  Your Honor, I believe that

17   addresses our concerns.

18          THE COURT:  Very well.  Thank you.

19   Mr. Springer, it's your turn.

20          MR. SPRINGER:  Your Honor, on page 29 -- I'm

21   sorry, I just went through them once there.  And this is

22   not technically articulated from the indictment, so it

23   could have been an oversight, but the very last sentence

24   in paragraph 29 says, "In the ascertainment, computation,

25   assessment and collection of revenue, that is, federal

1   individual income taxes."  And I believe it should say,

2   "federal individual income taxes of Lindsey Springer."

3   Now, it doesn't say it in the indictment, it's as vague

4   and ambiguous as this phrase would appear, but the

5   government, in other pleadings and clearly has been their

6   evolutionary theory, that it's the tax liability of

7   Lindsey Springer and not the tax liability of Oscar

8   Stilley that is the subject of the conspiracy to

9   defraud.  And if I'm wrong, the government, you know, may

10  want to address that, but, anyway, that's the only issue

11  on page 29 that I had.

12      Let's see, now, page 30, which is dealing with the

13  elements of the offense of Count 1, and I am -- I'm not

14  trying to frustrate the note the Court just made with

15  Mr. O'Reilly, but I want to focus on the phrase "lawful

16  government function" that would obviously come after

17  "deceit, craft or trickiness or at least by means that

18  are dishonest," I believe is the Hammerschmidt quote, but

19  "lawful government functions" isn't specific enough per

20  the indictment.  Although you do tell the jury, in a

21  general way, what the four lawful functions are, which

22  was the -- to impede, obstruct and defeat the lawful

23  functions -- ascertainment, assessment, computation and

24  collection.  And that is very important in the manner and

25  means part of the government's theory.  If we leave it to

1   "lawful government function," the jury will not be honed

2   in on "it's got to be one of those four functions because

3   that's what the grand jury alleged."  And, of course, I

4   am an advocate of keeping the government boxed in, at

5   least when we start trial, to their theory.

6       And then the only other -- and this is just a minor

7   issue with the elements in Counts 2, 3 and 4, which will

8   begin on page 36, and I think it repeats itself in each

9   of the instructions for the three counts, is that it

10  makes a reference -- I'm sorry, just one second, Your

11  Honor, I'm trying to make this fast.

12          THE COURT:  Take your time.

13          MR. SPRINGER:  There's a place where it refers

14  to -- on the affirmative acts -- before the affirmative

15  acts of failing to file a tax return and it was for

16  Counts 2, 3 and 4, and I think it should say "willfully

17  failed to file tax returns," even though the grand jury

18  indictment actually just said what the Court put, which

19  is failed to file tax returns.  And I'm trying to find

20  that really fast.  I got kind of sidetracked with the

21  government there on their -- okay, if you look at page

22  38, on the bottom.  And I'm not trying to confuse the

23  jury here at all.  And I recognize that on the fourth

24  line from the bottom of page 38 it says, "Springer and

25  Stilley did willfully attempt to evade and defeat the

1 individual income taxes due and owing by Defendant

2 Springer to the United States of America for calendar

3 year 2005 by failing to file a United States individual

4 income tax return as required by law."  And I believe

5 that failing to file -- although is an accurate

6 reflection, in part, I believe "willfully" is required to

7 be there in the same sense that in the event that there

8 were a -- let's say for the phrase I've seen in the --

9 recently in the past from the Tenth Circuit was "a lesser

10 included offense," so I would think that if the "lesser

11 included offense" language is "willful failure to file a

12 tax return," then the jury should be told that the

13 "willful failure to file" should be the same in Counts 2,

14 3 and 4 as it is in 5 and 6 just so they don't get

15 confused on the test of willfulness.

16       And that's all that I have, Your Honor.

17          THE COURT:  Thank you.  Mr. Stilley.

18          MR. STILLEY:  Your Honor, I understand that

19 Mr. Springer did ask for the reading of the entire

20 indictment, but I think that there may be a little

21 problem with that for the simple fact that there are

22 statements attributed to -- well, actually there are some

23 statements attributed to Oscar Stilley and some to

24 Lindsey Springer.  And if those are read to the jury it

25 would seem to me to be rather difficult to keep that out,

 1   assuming that we get a favorable ruling with respect --

 2   or favorable consideration with respect to that question.

 3           THE COURT:  Well, I'm -- subject to what all

 4   concerned would have to say, I may not and, as a matter

 5   of fact, it's not my intent at this point to read the

 6   indictment verbatim at the beginning of the trial.  We're

 7   here in the instructions and what I'll probably do at the

 8   beginning of the trial is read a summary of the

 9   indictment, which is not going to get in, chapter and

10   verse, into all of the particulars of the indictment.

11   Unless one side or the other really wants me to read the

12   whole indictment, it's my inclination not to do so, but

13   rather to use a summary of the indictment.  So here,

14   addressing the instructions, obviously, if there's some

15   prejudicial statement in the overt acts or whatever, that

16   was, in fact, excluded from evidence, then that will

17   probably be stricken from that portion of the

18   instructions.

19           MR. STILLEY:  That would be satisfactory.  Very

20   good.

21           THE COURT:  Now, Mr. Springer, do you want me to

22   read the whole indictment at the outset of the trial?

23           MR. SPRINGER:  Your Honor, I've had an

24   awakening.  And I would be satisfied with a summary, once

25   we get to it.  I just have a couple of small issues in

1  the summary, once we get to it, that would satisfy me

2  that reading the summary would be much better and would

3  satisfy any problems Mr. Stilley or the government has.

4       THE COURT:  Okay.  Very well.  Anything further,

5  Mr. Stilley?

6       MR. STILLEY:  Yes, Your Honor.  Just a few

7  things.  On the Count 1 elements at page 30, it seems to

8  me that we can make it clearer that an overt act, even if

9  it is found, does not necessarily constitute an act in

10 furtherance of a conspiracy.  I know that there is

11 language to that effect, but it just seems that we might

12 be able to make that clearer.

13     On the elements, on the first element, the Court's

14 instruction says, first, the defendant agreed with at

15 least one other person -- well, wait a minute.  I'm

16 sorry.  "That the defendant agreed with at least one

17 other person to violate the law by defrauding the United

18 States."  But the Tenth Circuit pattern instructions

19 leave off the words "by defrauding the United States."

20 And it would seem to me if the government likes to go to

21 the Tenth Circuit instructions on reasonable doubt,

22 surely they wouldn't mind to use the exact language of

23 the Tenth Circuit instructions on the elements of the

24 conspiracy count.

25       THE COURT:  And that would be where in this page

```
1    30?
2          MR. STILLEY:  I believe that's correct.  Let me
3    look.  Yes, that is correct.
4          THE COURT:  Okay.  Where on page 30?
5          MR. STILLEY:  It's at the top of page 30 under
6    "first," it says "first."  It's not the -- the opening
7    paragraph is "Element Number 1," first element of the
8    offense.
9          THE COURT:  "That the defendant agreed with at
10   least one other person to violate the law by defrauding
11   the United States."
12         MR. STILLEY:  Yes.
13         THE COURT:  And what do you want that to say?
14         MR. STILLEY:  I just want to strike the words
15   "by defrauding the United States."
16         THE COURT:  That's noted.  What else?
17         MR. STILLEY:  In the list of overt acts, we have
18   the same situation of hearsay -- same hearsay and
19   confrontation issues that I discussed earlier that we
20   would need to take into account at the proper time.
21         THE COURT:  And bearing in mind, obviously, that
22   we won't be able to address this with finality until we
23   get down to this stage, what -- we've got paragraphs 15
24   through 39 reproduced here.  Which numerical paragraphs
25   involve this concern?
```

 1              MR. STILLEY:  It would be 15, 16, 17 and 39.

 2              THE COURT:  Thank you.  What else?

 3              MR. STILLEY:  In Counts 3 and 4 there's the

 4    bracketed language about being charged as a principal as

 5    opposed to an aider and abetter.  And, of course, I would

 6    take the position it should be aider and abetter only or,

 7    at the very least, one or the other.

 8              THE COURT:  One of the most eye-opening things I

 9    discovered as a young lawyer appointed to represent a

10    fellow who considered himself to have been unjustly

11    accused of bank robbery was that the government has what

12    was then to me an eye-opening amount of leeway on that

13    score.  I understand your concern, and I'll just -- we'll

14    address that with the government, but -- the beginning

15    point is the government, as I discovered 37 years ago,

16    has a fair amount of leeway on that.  Go ahead.  What

17    else?

18              MR. STILLEY:  Thank you, Judge.  Next would be

19    that I really didn't see what I considered an adequate

20    addressing of tax loss.  And it would seem to me that

21    under a case such as this, deficiency is an element of

22    the offense, and that it would be at least in this

23    Court's discretion to put that finding to the jury and

24    let the jury find the amount of tax loss in the event

25    that they find a tax evasion.

```
 1          THE COURT:  What page are we addressing now?
 2          MR. STILLEY:  That would be 39 and 41.  Of
 3   course, if we were allowed to have that that would have
 4   to come up on the verdict form, too, but, I mean, we're
 5   looking at the jury instructions right now.
 6          THE COURT:  And you -- now, say again what it is
 7   that you would want to be added?
 8          MR. STILLEY:  An element of tax loss.  Now, I
 9   know that it says here that it has to be a substantial
10   tax loss, but really what I'm looking for is the
11   opportunity to allow the jury to find tax loss in the
12   event that there is a conviction.
13          THE COURT:  Do you have any authority for that?
14          MR. STILLEY:  Well, the authority that I would
15   have, and I understand the Court's concerns because there
16   is a great deal of authority suggesting that courts have
17   the power to make this decision later on.  I think, for
18   the most part, that is on -- and maybe not all, but, for
19   the most part, that is on cases where that the tax loss
20   is a driver of the sentencing issue.  For example, on a
21   willful failure to file tax loss, you don't have to have
22   any tax loss, it's not an element of the offense.  On tax
23   evasion, a tax deficiency, which I would contend is, you
24   know, at least substantially the same as tax loss, is an
25   element of the offense.  And, furthermore, it has to be a
```

1  substantial deficiency.  So if the jury is instructed to

2  make a finding as to the amount of tax loss, then we

3  would at least have satisfactory record of the findings

4  of the jury and if the jury had found a tax loss to be

5  substantial when there would be no rational basis for

6  that conclusion.

7          THE COURT:  Thank you.  Anything else?

8          MR. STILLEY:  I didn't see a venue instruction,

9  and I really think that we would need a venue

10  instruction.  I understand and remember that we had a

11  little difficulties some months back about getting the

12  jury instructions in, but I think under the case law it

13  says that the defendant that raises that issue would be

14  entitled to have an instruction.  There is a different

15  burden of proof, it's a preponderance of the evidence as

16  opposed to beyond a reasonable doubt.  And it just seems

17  to me that it would greatly simplify and streamline

18  things if we would get that venue instruction ready as

19  soon as possible so that going into the trial everybody

20  knows what road we're going to go down, what is going to

21  be acceptable in the way of proof and what's not.

22          THE COURT:  Thank you very much.  Anything

23  else?

24          MR. STILLEY:  Yes.  I didn't see a good-faith

25  defense instruction.  And I think that might possibly be

1    necessary.

2            THE COURT:  Okay.  That's noted.

3            MR. STILLEY:  That would be all of the comments

4    that I would have at this time.

5            THE COURT:  Okay.  Now, let me inquire of you

6    and then of Mr. Springer.  The government has requested

7    some elaboration with what Mr. O'Reilly, for convenience,

8    refers to as the language out of Hammerschmidt on page

9    30, second paragraph.  Actually, it would be -- probably

10   second paragraph up from the bottom.  I don't know if you

11   are as sufficiently familiar with that verbiage at this

12   point to be able to comment confidently on that point or

13   not, but, if you are, I'll be happy to hear what you have

14   to say about that request by the government.

15           MR. STILLEY:  With respect to that instruction,

16   if I understand correctly the government's position, I

17   would resist that and join with Mr. Springer's request

18   that the term "lawful government functions" be

19   circumscribed so we don't go outside what the grand jury

20   charged.

21           THE COURT:  Thank you.

22           MR. STILLEY:  Thank you, Judge.

23           THE COURT:  Mr. Springer, before I go back to

24   Mr. O'Reilly, I want to hear from you as to whether

25   there's any problem with picking up that language from

```
 1    Hammerschmidt as suggested by Mr. O'Reilly.
 2            MR. SPRINGER:  If I may, Your Honor, and just
 3    one point, Mr. Stilley had an idea about tax loss, if the
 4    Court considers that, the Court could give the jury an
 5    instruction that asks them to find less than 30,000, less
 6    than 80,000, less than -- whatever the sentencing
 7    guideline tax loss table is at 2T14 -- 2T4, where they --
 8    and then, you know, it would be advisory only, but it
 9    would, in my opinion, it would satisfy the question that
10    Mr. Stilley raised.  Not saying there would be other
11    relevant conduct the government could attach in the event
12    that they wanted to go there.
13         And then to the question the Court asked me here.  I
14    believe the actual language is "lawful government
15    function" with the four added by means that are
16    deceitful, craftiness -- "deceitful, crafty, tricky or at
17    least by means that are dishonest," I believe is the
18    actual phrase.  And I have no problem with the
19    Hammerschmidt quote, Your Honor, as long as the lawful
20    functions precede it, the specific ones that are in Count
21    1 of the indictment and not the general phrase "lawful
22    government function."
23            THE COURT:  Thank you.  Okay.  Mr. O'Reilly, I
24    have a couple of questions.  Based on the -- my sense of
25    the matter -- and this is your chance to steer me in a
```

```
 1   different direction, but based on my sense of the matter,
 2   it may be that the Court will be required to instruct on
 3   a good-faith defense.  And, obviously, it's premature for
 4   anyone to be taking any final positions on that, much
 5   less the Court making a final decision on that, but I --
 6   based on matters I've read and heard, it seems to me that
 7   that is, at a minimum, a serious possibility.  What do
 8   you think?
 9        MR. O'REILLY:  Your Honor, if the evidence that
10   is elicited at trial merits it and if the jury
11   instructions that we finally agree on don't already cover
12   it, yes, a separate good-faith instruction may be
13   necessary.  Those actually are in the -- in some
14   instructions I've seen in the past good faith being
15   covered under willfully, where you do not need a separate
16   instruction, but if the appropriate good-faith
17   instruction is presented, and we'll work on making sure
18   we can craft one to present it to the Court for its
19   consideration, and if the evidence warrants it, we're not
20   going to be opposed to an instruction -- somewhere in the
21   instructions covering good faith, absolutely not.
22        THE COURT:  Well, I've got a duty to fairly
23   address both the government's theory and the defendants'
24   theories.  And I'm -- it may well be true that in a
25   run-of-the-mill case everything that a defendant might
```

1    intend to argue is fairly embraced within the concept of

2    willfulness and a stock instruction of willfulness -- or

3    a stock definition of willfulness.  In this case, which I

4    don't think is a run-of-the-mill case in some ways, I'm a

5    little concerned as to whether the defendants' theory,

6    recognized by the law that we've discussed, is adequately

7    covered within the context simply of "willfulness," but

8    we'll cross that bridge at a later stage.

9         The next question, on page 29.

10             MR. O'REILLY:  Yes, Your Honor.  Nature of the

11   offense.

12             THE COURT:  Yes.  Mr. Springer has suggested and

13   I -- offhand, I'm having a hard time with -- hard time

14   arguing with that because I think Count 1 goes to the

15   taxes of Lindsey Springer, right?

16             MR. O'REILLY:  I'm trying to think if in any way

17   it does not.  May I have a moment with counsel?

18             THE COURT:  Sure.

19             MR. O'REILLY:  Your Honor, while that is -- the

20   crux of this case is about how they cheated on

21   Mr. Springer's taxes, yes, but the indictment doesn't

22   read that way and we think it would not be a good idea to

23   be changing the jury instructions that effectively amend

24   the indictment.  So we would resist changing the jury

25   instruction to be inconsistent with how the indictment is

1    charged because that's what the grand jury brought.

2            THE COURT:  Well, I got reversed in the Skoshi

3    Farr case for doing that, but that was over the objection

4    of the defendant.  I understand your point.  This, in my

5    estimation, would not so much be an amendment of the

6    indictment as it would simply be -- an indictment is the

7    grand jury's document and the -- my leeway to tinker with

8    the verbiage of the grand jury's document is limited to

9    the point of being vanishingly small, so said Court of

10   Appeals in the Skoshi Farr case.  But the instructions

11   are my documents, not the grand jury's, and this

12   instruction on page 29 really is not intended to --

13   necessarily to parrot the indictment, so we'll -- we will

14   have time to revisit this, but I have some inclination to

15   add "of Lindsey Springer," we'll see.  I have that

16   inclination at the moment because the instructions, as my

17   document, must, at least equally with every other

18   purpose, give the jury all the clarity that I reasonably

19   can.  And that's the reason that Mr. Springer's

20   suggestion may be well taken, but we'll come back to

21   that.

22       Let's go to page 30.  Mr. O'Reilly, in the second to

23   the last paragraph, after the word "functions," or

24   effectively somewhere in that passage, Mr. Springer

25   suggested that I specify the functions as specified in

```
 1   the indictment, specifically "ascertainment, computation,

 2   assessment" and in this case it should probably be "or

 3   collection."  That also, subject to your comments, seems

 4   perhaps a bit hard to argue with, but I want to hear what

 5   you have to say about that.

 6            MR. O'REILLY:  Your Honor, I would have to see

 7   how it was actually drafted, but, I mean, my speculation

 8   is that we would be okay with that.

 9            THE COURT:  Okay.

10            MR. O'REILLY:  I mean, that's not a point of

11   contention.  That's what they did.

12            THE COURT:  We're almost through.  In a minute,

13   I'm going to give -- since this is a preliminary

14   instructions conference combined with a pretrial

15   conference, in a moment I'm going to give the government

16   or the defendants an opportunity to raise any other

17   matters that ought to be addressed at this point, but I

18   do want to take about a five-minute break, five or

19   ten-minute break to make sure that we have covered

20   everything we ought to cover with respect to the

21   instructions, so Court will be in recess, let's just call

22   it ten minutes.

23       (RECESS HAD.)

24            THE COURT:  Okay.  Couple of things that I

25   forgot to address.  Do I understand that, at least for
```

1  now, the government intends to stay with both principal

2  and aider and abetter as to Mr. Stilley?

3  　　　　MR. O'REILLY:  For right now we are, Your

4  Honor.  However, I will -- we will take that under

5  advisement and we will inform both the Court and the

6  defendants.

7  　　　　THE COURT:  Very well.  While you're there, on

8  page 38 -- go ahead.

9  　　　　MR. O'REILLY:  Yes, Your Honor.

10  　　　　THE COURT:  On page 28, Mr. Springer wanted me

11  to insert the word "willfully," two lines up from the

12  bottom right there in the middle so that it would say,

13  "Calendar year 2005 by willfully failing to file."  What

14  does the government have to say about that?

15  　　　　MR. O'REILLY:  We are opposed to that, Your

16  Honor.  It's an incorrect statement of the law.

17  　　　　THE COURT:  So the government's theory would be

18  that to have a 7201 violation -- failure to file as a

19  component of a 7201 violation does not have to have all

20  of the elements of a free-standing failure to file count;

21  is that right?

22  　　　　MR. O'REILLY:  Correct, Your Honor.  I could

23  give an example, not saying that this is this case in

24  this instance.  On April 15th a person could completely

25  forget that they had to file.  They are not guilty of

1  willfully failing to file if they in good faith just

2  forgot, but on the 16th they realized they didn't file

3  and start committing affirmative acts hiding the money,

4  making false statements and never filing a return, they

5  would still be able to be convicted, appropriately, of

6  willfully evading or attempting to evade their taxes, but

7  they never actually committed the underlying crime of

8  willfully failing to file.

9           THE COURT:  Very well.  That's noted.  We'll

10  address that at the appropriate point.  I have

11  distributed, during the break, a draft summary that is

12  subject, certainly, to being revised to make sure that we

13  accommodate the government's theory of the case as it now

14  stands, but I would certainly want you to -- all

15  concerned to carefully review that summary of the

16  indictment between now and Monday because it will likely

17  be used on Monday either in its present form or with

18  appropriate revisions.  But I'll make inquiry of the

19  parties and their counsel on Monday as to whether there

20  are any problems with it.  Okay.  You may be seated.

21           MR. O'REILLY:  Your Honor, I want to make sure

22  that you didn't need us to address some of the other

23  issues that were raised by Mr. Stilley, then.

24           THE COURT:  No.  We can address those at the

25  appropriate time during the trial.

1    MR. O'REILLY:  Thank you, Your Honor.

2    THE COURT:  Very well.  I think perhaps it might

3  be appropriate to give you a preview of how jury

4  selection will unfold.  There's more than one school of

5  thought as to what is the most efficient way to go about

6  it, but the way I will conduct jury selection is to start

7  with 28, and so we'll get 28 seated here.  We'll have to

8  get some portable chairs in front of the jury box.  We'll

9  start with 28, and we'll get 28 qualified for cause and

10  then -- what are the numbers, the defendants have ten and

11  the government has six.  And the defendants are going to

12  have to collaborate on their six (sic) and exercise their

13  six together.

14    I anticipate impaneling a jury of 12 with two

15  alternates.  I will invite the government and the

16  defendants to -- each to waive their last peremptory,

17  which would automatically and without further ado give us

18  two alternates, you're not -- you're certainly not

19  required to waive your last peremptory.  If you don't

20  waive your last peremptory, then no hard feelings, we'll

21  pull up four more people and pick two alternates, each

22  side getting one strike from those four people.  But, as

23  I say, I will give you the opportunity to waive your last

24  peremptory so that we automatically get two alternates

25  during the jury selection from the group of 28.  And rest

 1   assured, I do intend to conduct a very fair and a very

 2   thorough voir dire.  For that reason, you can rest

 3   equally assured that voir dire will be conducted entirely

 4   by the Court.  Does either side have any further

 5   questions about jury selection?

 6            MR. SPRINGER:  Your Honor, when you first spoke

 7   you said something about ten and six and then a few

 8   moments later you said Mr. Stilley and I would have to

 9   work on our six and I thought --

10            THE COURT:  Work on your ten.

11            MR. SPRINGER:  We get ten and the government

12   gets six, right?

13            THE COURT:  Right. I misspoke.

14            MR. SPRINGER:  So it's either six/four,

15   five/five, seven/three, you don't care, as long as it's

16   ten total.

17            THE COURT:  That's true.  Any other questions

18   about jury selection?

19       (No response)

20       Any other matters we ought to address this

21   afternoon?  What says the government?

22            MR. O'REILLY:  Can we have a moment?

23            THE COURT:  Sure.

24            MR. O'REILLY:  The government would request to

25   have an opportunity, obviously the defense as well, to

1  present you with proposed voir dire questions, either

2  tomorrow or Friday.

3          THE COURT:  Yeah, if you would, go ahead and

4  submit that by way of ECF and that way Pam can get those

5  to me without delay.

6          MR. O'REILLY:  Thank you, Your Honor.

7          THE COURT:  Very well.  And both between now

8  and -- anytime between now and Friday, both sides are

9  welcome to submit proposed voir dire questions.

10          MR. O'REILLY:  Thank you, Your Honor.

11          THE COURT:  Anything further this afternoon from

12  the defendants?

13          MR. SPRINGER:  Yes, Your Honor.  Just a couple

14  of things.  When Mr. O'Reilly spoke about Count 1 dealing

15  with whether or not the tax liability was of Lindsey

16  Springer, I would just point the Court to paragraphs 10

17  through 14 wherein each instance in the indictment it

18  names both Springer and Stilley and then it says

19  Springer's income and assets, Springer's personal

20  expenses, Springer's income, Springer's income, just

21  thoroughly through it, which should just leave without

22  any doubt that issue.

23     I believe standby counsel needs to speak with the

24  Court, I was informed, and they would ask me to suggest

25  that to the Court.  And then there's a timing issue about

1  trial.  Earlier, when we spoke about trial, we talked

2  about the government taking two weeks.  And I would like

3  to inform the Court I think, just on a summary basis, a

4  week, basically, would be what the defense would be and

5  maybe a little bit less.  Standby is wanting me to inform

6  the Court that I have five other witnesses coming in that

7  will be on my list, other than what the Court knows of,

8  that -- that's all I can say on that.

9           THE COURT:  Very well.

10          MR. SPRINGER:  Thank you.

11          THE COURT:  Let's see, what was the matter we

12  were going to be addressing in chambers?

13          MR. BURTON:  Your Honor, standby counsel, in

14  conferring with the parties, had some suggestions we

15  wanted to make to the Court in chambers to have more

16  efficient trial processes in terms of us communicating

17  with them.  And there's some issues that run afoul of the

18  current standing order of the Northern District with

19  regard to electronic communications within the Court.  We

20  wanted to talk to you about some options we had, get your

21  thoughts and guidance on that issue.

22          THE COURT:  You're not asking that I do that ex

23  parte, are you?

24          MR. BURTON:  Absolutely not.

25          THE COURT:  Okay.  Well, we'll reconvene

 1   momentarily, unless either side insists that this be on

 2   the record, it sounds to me like this is a matter --

 3          MR. BURTON:  No, Your Honor.

 4          THE COURT:  Very well.  We'll reconvene

 5   momentarily, then, and talk about that in chambers.

 6      Anything else this afternoon by way of pretrial

 7   conference from either side?

 8          MR. O'REILLY:  No, Your Honor.

 9          MR. SPRINGER:  No.

10          THE COURT:  Pam, what time Monday can we

11   reasonably expect to have a jury panel here ready to go?

12          COURTROOM DEPUTY:  I'll find out.

13          MR. BURTON:  The order said 9:30 is when we were

14   starting.

15          COURTROOM DEPUTY:  9:30.

16          THE COURT:  Very well.  Gentlemen, we'll

17   reconvene in chambers, but subject to that, look forward

18   to seeing you Monday.  Court will be in recess.

19      (COURT ADJOURNED)

20                    REPORTER'S CERTIFICATE

21      I HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND

22   CORRECT TRANSCRIPT OF PROCEEDINGS:

23

24                    S/Tracy Washbourne
                       Tracy Washbourne, RDR, CRR
                       United States Court Reporter
25                     Western District of Oklahoma