```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE NORTHERN DISTRICT OF OKLAHOMA

 3

 4   UNITED STATES OF AMERICA,

 5          Plaintiff,

 6   vs.                        Case No. CR-09-43-SPF

 7   LINDSEY KENT SPRINGER and
     OSCAR AMOS STILLEY,
 8
            Defendants.
 9
     ----------------------------
10

11

12

13

14

15            TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16          BEFORE THE HONORABLE STEPHEN P. FRIOT

17              UNITED STATES DISTRICT JUDGE

18                   OCTOBER 27, 2009

19                   VOLUME II OF XIV

20

21

22

23

24

25
```

244

```
 1

 2    APPEARANCES:

 3    FOR THE GOVERNMENT:
                          Mr. Charles Anthony O'Reilly
 4                        U.S. Department of Justice
                          PO Box 972
 5                        Washington, DC 20044

 6                        Mr. Kenneth P. Snoke
                          U.S. Attorney's Office (Tulsa)
 7                        110 W. 7th Street, Ste. 300
                          Tulsa, OK 74119
 8

 9    FOR DEFENDANT SPRINGER:
10                        Mr. Lindsey Kent Springer
                          5147 S. Harvard Ave.
11                        Ste. 116
                          Tulsa, OK 74135
12
                          Mr. Robert Scott Williams
13                        Taylor Ryan Schmidt & Van Dalsem
                          1437 S. Boulder Ave., Ste. 850
14                        Tulsa, OK 74119

15    FOR DEFENDANT STILLEY:
                          Mr. Oscar Amos Stilley
16                        7103 Race Track Loop
                          Fort Smith, AR 72901
17
                          Mr. Charles Robert Burton, IV
18                        Burton Law Firm, PC
                          320 S. Boston, Ste. 2400
19                        Tulsa, OK 74103

20

21

22

23

24

25
```

```
 1                    EXAMINATION INDEX

 2

 3   PHILIP ROBERTS
         DIRECT BY MR. O'REILLY            283
         CROSS BY MR. SPRINGER             318
 4       CROSS BY MR. STILLEY              330

 5   KENNETH DELOZIER
         DIRECT BY MR. O'REILLY            334
 6       CROSS BY MR. SPRINGER             351
         REDIRECT BY MR. O'REILLY          362
 7
     BRENDA FREDERIKSEN
 8       DIRECT BY MR. SNOKE               369
         CROSS BY MR. SPRINGER             387
 9
     MARTIN DINGMAN
10       DIRECT BY MR. SNOKE               393
         CROSS BY MR. SPRINGER             410
11       CROSS BY MR. STILLEY              421

12   BRUCE SMITH
         DIRECT BY MR. O'REILLY            427
13       CROSS BY MR. SPRINGER             428

14   CHRIS SIMPKINS
         DIRECT BY MR. O'REILLY            430
15       CROSS BY MR. SPRINGER             441

16   DEBRA BARHAM
         DIRECT BY MR. O'REILLY            442
17       CROSS BY MR. SPRINGER             467
         CROSS BY MR. STILLEY              475
18       REDIRECT BY MR. O'REILLY          481
         RECROSS BY MR. SPRINGER           482
19
     CARA WESTERFELD
20       DIRECT BY MR. O'REILLY            484
         CROSS BY MR. SPRINGER             490
21       REDIRECT BY MR. O'REILLY          495
         RECROSS BY MR. SPRINGER           495
22
     DANIEL SIVILS
23       DIRECT BY MR. O'REILLY            496

24

25
```

1            (THE FOLLOWING TOOK PLACE IN OPEN COURT, WITH ALL

2    PARTIES PRESENT, OUTSIDE THE PRESENCE OF THE JURY.)

3            MR. O'REILLY:  Excuse me, Your Honor.  Just

4    one -- I wanted to bring to the Court's attention that

5    Mr. Springer provided his proposed exhibits this

6    morning.  We have not had time to review them,

7    obviously.  And Mr. Springer made the court clerk

8    aware he intends to show a Form 1040 book to the jury

9    during opening.  We're not sure whether or not that will

10   actually be put into evidence or not.  I'm not sure if

11   that's an appropriate thing to do during opening.

12           THE COURT:  Well, if he wants to just hold it in

13   his hands or hold it up, that's innocuous.  We'll address

14   any other issues later.

15           MR. O'REILLY:  Thank you.

16       (JURY ENTERS THE COURTROOM)

17           THE COURT:  Good morning, members of the jury.

18   Welcome back.  And let me say without any further ado, I

19   do appreciate your punctuality.  As this trial

20   progresses, obviously, everybody has to be at the same

21   place at the same time before anything can happen and so

22   I sincerely do appreciate your punctuality.  I'm going to

23   give you a preliminary instruction at this point.  And

24   after this preliminary instruction, then we will have

25   opening statements.

         As I mentioned yesterday, the government goes first
with its opening statement.  The government goes first in
the presentation of evidence also because it is the
government that has the burden of proof.  After the
government presents its opening statement, then the
defendants may, if they choose to do so, present their
opening statements or they, one or the other of them, if
not both, may reserve opening statement until a later
stage of this trial.

         Now that you have been sworn, I will give you some
preliminary instructions to guide you as jurors in this
case.  You and I have a very sharply defined division of
responsibilities in this case and in this trial.  My
responsibility is to determine the rules of law that
apply in this case.  It will be your duty and
responsibility to find from the evidence what the facts
are.  You and you alone are the judges of the facts.  You
will then have to apply to those facts the law as I will
give it to you in my instructions.  You must follow that
law whether you agree with it or not.

         Now, nothing that I may say or do during the course
of this trial is intended to indicate and certainly
should not be taken by you as any indication of what I
think your verdict should be.  During the course of this
trial, you will hear witnesses.  The Court will receive

1    exhibits into evidence.  And the witnesses' testimony and

2    the evidence received, probably mostly in the form of

3    documents, will be the evidence from which you will find

4    the facts in this case.  Also, any facts that counsel and

5    the parties agree to or stipulate to will be facts for

6    your consideration in this case.

7        Certain things are not evidence and must not be

8    considered by you.  I will list those for you now.

9    First, statements, arguments, and questions by lawyers

10   are not evidence.  Objections to questions are not

11   evidence.  The lawyers, and in this case the pro se

12   defendants, have the opportunity to make objections if

13   they believe that evidence is being offered is or may be

14   improper under the rules of evidence.  You should not be

15   influenced by the objection or by my ruling on it.  If it

16   is overruled, then treat the answer like any other.  If

17   you are instructed that some item of evidence is received

18   for a limited purpose only, you must follow that

19   instruction.

20       Also, testimony that I have excluded or admonished

21   you to disregard is not evidence and must not be

22   considered.  Anything that you may have seen or heard

23   outside of the courtroom is not evidence and must be

24   disregarded.  You must decide this case solely on the

25   evidence presented here in the courtroom.

 1          Now, in this case, as we discussed yesterday, the

 2     defendants have invoked their right to represent

 3     themselves.  So at various times during the trial,

 4     including during opening statements, at such time as the

 5     defendants choose to make their opening statements, you

 6     will hear the defendants making statements to you.  The

 7     defendants will also have the opportunity at the

 8     appropriate stage in this trial, if they choose to do so,

 9     but without any obligation to do so, to take the stand

10     and be sworn and testify.  When they take the stand to be

11     sworn to testify and do testify, if they choose to do so,

12     then you will have the prerogative of evaluating their

13     testimony just as you would evaluate any other testimony.

14          However, short of that time, before the defendants,

15     if they choose to do so, take the stand and testify,

16     their statements here in open court are not evidence in

17     the strict sense and their statements here in open court

18     should be viewed by you on the same plane, if you will,

19     as statements by a lawyer.  Because until they take the

20     stand to testify, if they choose to do so, they are

21     acting, in essence, as their own lawyers.  And for that

22     reason, their statements before such time as they may

23     choose to testify should be viewed in that light.

24          It will be up to you to decide which witnesses to

25     believe, which witnesses not to believe, and how much of

1    any witness's testimony to accept or reject.  I will give

2    you some guidelines for evaluating the credibility of

3    witnesses at the end of this case.

4         As you know, this is a criminal case.  There are

5    three basic rules about a criminal case that you must

6    keep in mind.  First, these defendants are presumed

7    innocent until proven guilty.  The indictment against

8    these defendants, as I mentioned more than once

9    yesterday, is only an accusation and nothing more.  It is

10   not proof of guilt or anything else.  These defendants,

11   therefore, start out with a clean slate.  The burden of

12   proof is on the government to prove its case.  These

13   defendants have no burden to prove their innocence or to

14   present evidence or even to testify.

15        Since these defendants do have the right to remain

16   silent, the law prohibits you in arriving at your verdict

17   from considering that these defendants may have chosen

18   not to testify.  And, obviously, that is an individual

19   choice for each of the two defendants.  One of them may

20   choose to testify, the other one may not.

21        The government must prove the guilt of these

22   defendants, if it can, beyond a reasonable doubt.  I will

23   give you further instructions on this point later, but

24   bear in mind that in this respect, this case, as a

25   criminal case, is different from a civil case.

 1        I read a summary of the indictment yesterday.  I

 2   don't plan to read the indictment or a summary of the

 3   indictment again because in a few minutes you will have

 4   at least the government's summary of the evidence that it

 5   expects to present.  And I think, based on your

 6   recollection of my summary of the indictment yesterday,

 7   you will have a good understanding of the charges set

 8   forth in the indictment to which the defendants have

 9   entered their pleas of not guilty.

10        Now, a few words about your conduct as jurors.

11   First, I instruct you that during this trial you are not

12   to discuss this case with anyone or to permit anyone to

13   discuss it with you.  Until you retire to the jury room

14   at the end of this case to deliberate on your verdict,

15   you are simply not to talk about this case.  Also, you

16   must not have any conversations of any kind on any

17   subject with the parties or the attorneys or the

18   witnesses.

19        Now, if you're walking down the hall here in the

20   courthouse and you see one of the attorneys or one of the

21   defendants and the attorney or the defendants or one of

22   the agents walks the other way and seems to totally

23   ignore you, that is not a social snub.  They know that

24   they are not permitted even to get in a situation in

25   which it might appear that an inappropriate communication

1  or conversation had been had.  This prohibition on

2  communicating about the case includes communications

3  about the case or about any aspect of your work as jurors

4  by e-mail, texting, blogs, Twitter, whatever that is, and

5  all other methods of communication.  You must not

6  communicate about this case by any of those means or by

7  any other method until after you have been discharged

8  from your service as jurors in this case.

9      Second, do not read or listen to anything touching

10  on this case in any way.  I'm not aware of any media

11  coverage that there has been.  I don't have the foggiest

12  idea whether there will be.  But in the event that

13  there's any media coverage, you must not read or see it

14  or hear it.  In the event that there is media coverage,

15  just go on to the next page of the newspaper or change

16  the channel.  But you must not be exposed to any media

17  coverage of this case.

18      Do not do any research or make any investigation on

19  your own about this case or about any issues in this case

20  or about any person or organization involved in this

21  case.  This includes Internet research of any kind about

22  this case or the issues in this case or any individuals

23  involved in this case.  And no matter how curious you

24  might be and no matter how tempting it might be to

25  undertake any such research, that is flatly prohibited by

1  law and the consequences for any transgression of that

2  could be serious.

3      Finally, do not form any opinion about this case

4  until all the evidence is in and I have instructed you on

5  the law and the case has been given to you for your

6  deliberations and verdict.  Keep an open mind until you

7  start your deliberations at the end of the case.

8      Now, among the many reasons for which you should

9  keep an open mind about the issues in this case until it

10 has been given to you for your deliberations and verdict,

11 please consider this.  In this Court, jury verdicts must,

12 under the law, be unanimous.  Each juror must concur in

13 the verdict or there is no verdict.  For that reason, I

14 suggest to you that you should listen to the evidence in

15 this case with full awareness that in reaching your

16 unanimous verdict in this case it will be necessary for

17 you to consider the evidence from the point of view of

18 the other members of the jury.  So that is yet another

19 reason that you should keep an open mind until the case

20 has been given to you for your deliberations and verdict.

21     Now, one of the reasons that I introduced my staff

22 to you -- and today, instead of Pam Lynn, I have

23 Courtroom Deputy Cindy Smith -- is to see to it that if

24 there is anything that any of us can do to make your

25 service more pleasant, please let us know.  I know that

1    this is a very solemn and important occasion for everyone

2    involved and I know that your presence here, to put it

3    mildly, is a major interruption in your lives.  We will

4    make it as easy on you as we can.

5        You may have noticed that we have water pitchers at

6    the table.  If you want to bring a water bottle to the

7    jury box with a cap on it, that's fine.  I don't think it

8    would be fair for us to have something to drink and you

9    not to have anything to drink.  But if you choose to do

10   that, please bring your water in bottles with caps.

11       From time to time, you may -- I don't think this

12   will happen very often, and I don't expect it to happen

13   very often.  From time to time, you may see the parties,

14   the defendants and the counsel for the government, come

15   to the bench for what we call a bench conference.  When

16   we do that, you should feel entirely free, without any

17   further prompting, to stand up in place and take a

18   stretch break in the jury box when they're up here

19   discussing a matter at the bench.

20       The reason I say that is that I think it's fairly

21   well established that if you have an opportunity every

22   now and again to stand up and stretch, then it is easier

23   to pay attention to what is being presented here in the

24   courtroom.  So when they come up here, don't hesitate

25   just to stand up in place and take a stretch break.

1        If you would like to take notes during this trial,
2   you may do so.  On the other hand, you are certainly not
3   required to take notes if you choose not to do so.  That
4   is entirely up to you.  At the end of each day, you must
5   leave your notes, if you take notes, on the chair where
6   you are seated.  They will be safeguarded overnight by
7   the clerk and the confidentiality of your notes will not
8   be compromised.  At the end of your deliberations you
9   will be directed to leave your notes in the wastebasket
10  in the jury room, and they will promptly be destroyed.
11       During the trial, you may note some instances in
12  which I quickly review testimony on the screen here.  The
13  screen provides only a preliminary record of the
14  testimony, and any transcript which could be made
15  available at a later stage of this case for other persons
16  for any purpose would have to be a certified transcript.
17  The preparation of a certified transcript can and usually
18  does take a fair amount of time.  For that reason, it is
19  generally not practical to prepare transcripts for the
20  use of the jury in deliberations.  This is just one of
21  the many reasons you should listen very carefully to the
22  evidence as it is presented during the course of this
23  trial.
24       Our general plan during this trial will be to begin
25  at nine in the morning, we'll take a mid-morning break,

1    we will break for lunch at noon, we will take an

2    afternoon break, and we will normally recess at

3    approximately five o'clock.  Now, if any of you need a

4    break and you don't sense that we're coming up on a

5    mid-morning break or the noon break or the mid-afternoon

6    break, please get my attention or the attention of the

7    courtroom deputy and we will take a break.  Because if

8    any of you need to take a break, I assure you that that

9    will be honored.

10       When we take our recesses overnight, please assemble

11   where you assembled this morning so that you can return

12   as a body to the courtroom.

13       The trial will now begin.  First, the government

14   will make its opening statement.  The opening statement

15   of the government is not argument and the opening

16   statements of the defendants, if they choose to make them

17   at this point, are likewise not argument.  They are

18   simply the summary of each side of this dispute as to

19   what they expect the evidence will show.  The defendants

20   may, but are not required to, make their opening

21   statement at this time, as I have said.

22       The government will then present its witnesses and

23   the defendants may cross-examine them.  After the

24   government presents its case, the defendants may, if they

25   choose, present witnesses who the government may then

 1   cross-examine.  After all the evidence is in, I will

 2   instruct you on the law and then the attorneys will

 3   present their closing arguments -- the attorneys and the

 4   defendants will present their closing arguments to

 5   summarize and interpret the evidence for you.  After

 6   that, the case will be given to you for your

 7   deliberations and verdict.

 8        Does either party invoke the rule of exclusion of

 9   witnesses?

10             MR. O'REILLY:  Yes, Your Honor.

11             THE COURT:  Very well.  On both sides -- and,

12   obviously, there's an exception to that rule for the case

13   agent, we've addressed that, and the summary witness.

14   Both sides should watch very carefully as individuals

15   enter the courtroom so that we have no lapses from the

16   rule that witnesses who have not yet been released must

17   be excluded from the courtroom until after they have

18   testified.

19        We'll now have the government's opening statement.

20   And for the benefit of counsel and the parties, I

21   mentioned yesterday the reasons that it's important to

22   stay where the mike can pick you up during your opening

23   statement.  So, Mr. Snoke, if you want to turn that --

24   it's up to you, but if you want to turn that lectern to

25   face the jury, that would be appropriate.

 1          MR. SNOKE:  Thank you, Your Honor.  I was going

 2   to inquire of the Court about that.

 3          May it please the Court, ladies and gentlemen of the

 4   jury, counsel, and defendants, this is the prosecution's

 5   chance to tell you what we believe the evidence will show

 6   in this case, as the Court told you.  Before that, I'd

 7   like to re-introduce some of the people here who you are

 8   going to be dealing with that you're going to see on a

 9   daily basis in this trial.

10          My name is Kenneth Snoke and I'm an Assistant United

11   States Attorney, one of the prosecutors.  I'm joined by

12   Special United States Attorney Charles O'Reilly.  Also

13   with us at the prosecution table will be Saundra Burgess,

14   who will be working some of the media presentation here

15   with the exhibits that you're going to be seeing once

16   they're in evidence on the screen.  And also in the

17   courtroom will be fraud technical advisor Brian Miller.

18   And did I introduce Special Agent Brian Shern, who will

19   be sitting here at the counsel table?

20          During the jury selection yesterday, the Court

21   summarized the charges in the indictment, in that

22   document called an indictment.  First, let me say from

23   the outset that the government expects to prove each and

24   every allegation as charged in that document, in that

25   indictment.

1        The counts in that indictment charge violations of a

2  conspiracy and the other tax laws of the United States.

3  And you'll remember, the Court noted that Defendant

4  Springer is indicted on all six counts in the indictment,

5  while Defendant Stilley is charged only in Count 1, the

6  conspiracy count, and with aiding and abetting Defendant

7  Springer in Counts 3 and 4.

8        The government expects to prove that Defendant

9  Lindsey K. Springer was a resident of Kellyville in Creek

10  County, Oklahoma, at the time of this case and that

11  Defendant Oscar Stilley was a resident of Fort Smith,

12  Arkansas, and was an attorney.  The evidence will show

13  that Defendant Stilley, as an attorney, maintained an

14  Arkansas trust account that was used -- known as an IOLTA

15  account.  You'll see that term, which is I-O-L-T-A.  It

16  stands for "Interest on Lawyers Trust Account," but it's

17  really just a name of a lawyer's trust account, and that

18  that account was used to send and receive money received

19  from clients.

20        The evidence will show that -- excuse me while I

21  stop here and I'll get to it in a minute, but in this

22  case, that account was used also for some other means and

23  I'm going to get to those in a few minutes.  The evidence

24  will show that neither Defendant Springer nor Defendant

25  Stilley has filed tax returns since the late 1980s.

1      During the period before our indictment, the

2  evidence will show that Defendant Springer would give

3  seminars and host conference calls promoting various

4  income tax avoidance ideas.  Many of his clients met

5  Mr. Springer -- many of the clients that you're going to

6  hear here today and in ensuing days met Mr. Springer,

7  Defendant Springer, through some of these seminars or

8  conference calls that he did earlier.  Some of these

9  people will testify that they gave him money at the end

10 of these sessions.

11     During the period of our indictment, Defendant

12 Springer used the name Bondage Breakers Ministries to

13 solicit and receive money.  The stated purpose of Bondage

14 Breakers Ministries was to get rid of the IRS.  The

15 evidence will show that Bondage Breakers Ministries was

16 really only a name under which Defendant Springer

17 operated.  It was neither a charity, nor was it a

18 church.  Defendant Lindsey Springer was Bondage Breakers

19 Ministry.  The money he received in checks payable to

20 Bondage Breakers Ministry, just like the money he

21 received in the checks you will see payable to him

22 personally, was used entirely by him for personal

23 matters.

24     The evidence will show that beginning in at least

25 2000, the year 2000, which is the first year of our

1   indictment in Count 1 and Count 2, Defendant Springer and

2   Defendant Stilley began working together as a defense

3   team assisting individuals who were being investigated

4   for tax problems or who had been indicted and charged

5   with federal criminal tax violations.  I anticipate that

6   one of our witnesses will claim to have brought these two

7   defendants together to defend him on criminal tax charges

8   in the year 2000.

9       After that, Defendant Springer would refer new

10  clients to Defendant Stilley and both would then work

11  together on the cases in defending individuals around the

12  country in federal court who were charged with or about

13  to be charged with or about to be tried for criminal tax

14  violations.  The team of Defendants Springer and Stilley

15  also received income from representing an individual who

16  was not convicted of tax violations and assisted him in

17  his sentencing and on appeal in a non-tax case.

18      You will hear from a number of these clients who

19  were convicted when the Court and the jury rejected the

20  defenses put on by the Defendants Springer and Stilley in

21  their defense.  Nevertheless, they had paid for these

22  services and were ultimately convicted and most of them

23  sent to jail.

24      The evidence will show that most of these joint --

25  in most of these joint endeavors, Defendants Springer and

1  Stilley would send -- at least Defendant Stilley would

2  send the clients some sort of a billing, which is a

3  normal attorney thing, to show them not only the

4  documents that they were filing in order to bill them for

5  those services, but they would -- but Defendant Stilley

6  would show -- sent billing records showing the hourly

7  rate that he was charging and what he had done to earn

8  that money.  You will also note that Defendant Springer

9  never sent any of these billings to the clients.

10      Former clients will testify that instead Defendant

11  Springer would verbally agree to assist the clients.

12  There would be no contract between -- no written contract

13  between Defendant Springer and the client.  And he would

14  -- Defendant Springer would later verbally tell them how

15  much money he needed to represent them and how much

16  additional money he needed to continue representing them

17  as they got on in their joint relationship and got closer

18  to trial or in trial.  And they would send him this

19  money.

20      Defendant Springer would keep no ordinary business

21  records of the work that he did for the clients or the

22  money that he received from them.  The only records of

23  these payments in many cases are copies of the front of

24  these checks kept by a Tulsa check cashing business known

25  as Checks Cashed, or cancelled checks if the sender of

1  the checks and his bank kept those records on his own,

2  then we can go to the client himself in many cases if

3  they still had the records after a period of time, then

4  you will see some of those records that are actually

5  checks, front and back, and those are usually provided by

6  the client or the client's bank.  Otherwise, the check

7  cashing business only kept the front -- Xerox of the

8  front of the check that had been cashed in for Defendant

9  Stilley.

10      You will hear testimony from a number of those

11  clients that Defendant Springer requested that they make

12  their checks and payment for his services to Bondage

13  Breakers Ministry.  And you're going to hear that term

14  quite a bit in this case, even though Defendant Springer

15  did not have a bank account in the name of Bondage

16  Breakers Ministry, in fact, he had no bank account.

17      You will hear that Defendant Springer also requested

18  clients to write on their checks the word "donation."

19  And early on in our time period, he also requested that

20  payments for his services be in cashier's checks or in

21  money orders.  Defendant Springer then converted these

22  income payments to usable funds in several ways.

23      Most of the checks, as I said earlier, were cashed

24  at this particular Tulsa check cashing business, with

25  whom he had a rapport, called Checks Cashed, the owner of

1   which will be one of our witnesses.  You will hear that

2   this check cashing business cashed these checks for

3   Defendant Springer providing him with cash or money

4   orders in return.  Springer then used the cash and the

5   money orders for his personal expenses and to buy such

6   items as Mercedes or Lexus automobiles, other vehicles,

7   or jewelry at Bruce G. Weber in Utica Square.

8       However, you will hear from the -- from the owner of

9   Checks Cashed that the largest money order that he put

10  out was $350.  So you're going to hear evidence in many

11  of the purchases that Defendant Springer made with these

12  money orders that he got from incoming -- converting

13  incoming clients' payments to money orders that he had to

14  use a number, 20, 30, even more maybe money orders to

15  make the purchase work when he's purchasing vehicles or

16  other expensive items.

17      In support of Count 1 of the indictment, the

18  conspiracy count charged there, the evidence will show

19  that another way Defendant Springer received payments

20  from the clients was to have the client make the payments

21  to Defendant Stilley's IOLTA account in Arkansas.

22  Defendant Stilley would then use the new money in his

23  IOLTA trust account to purchase cashier's checks payable

24  to Defendant Springer or for his benefit, thus assisting

25  Defendant Springer to conceal his income, assets, and

1    personal expenses from the IRS and from anybody else for

2    that matter.

3        One of these transactions involved a client named

4    Eddy Patterson from whom you will hear, who was being

5    represented in a criminal trial in this district in

6    federal court here in Tulsa by these two defendants,

7    Defendant Springer and Defendant Stilley, and they

8    represented him throughout the entire trial and he was

9    convicted.

10       I anticipate that you will hear evidence that Eddy

11   Patterson caused a large sum of money on one occasion,

12   $375,000, to be wired to Defendant Stilley's IOLTA

13   account, some of which was for services that had been

14   provided by Defendant Springer or were to be provided as

15   the trial was ongoing or upcoming on -- against Defendant

16   Eddy Patterson at that point.

17       Defendant Stilley then withdrew $78,000 from that

18   IOLTA account and bought three cashier's checks for

19   $20,000 each and 18 $1,000 money orders, thus converting

20   the $78,000 to three cashier's checks and 18 money

21   orders.  Those were used then by Defendant Springer for

22   his personal expenses and to buy a vehicle without any

23   indication in the documents that this $78,000 was

24   actually for legal services provided -- or to be provided

25   by Defendant Springer to Mr. Patterson.

1     You will also be presented with evidence that

2  Defendant Springer used Defendant Stilley's credit card

3  to pay Defendant Springer's personal expenses.  You heard

4  me say earlier that the evidence will show that Defendant

5  Springer had no bank account, had no credit cards, so

6  this was a method of his use of Defendant Springer's

7  personal -- Defendant Stilley's credit card was a method

8  of him utilizing, making charges to that -- to buy items

9  that required perhaps the use of a credit card.

10     You will hear testimony that these methods of

11  conducting business without keeping ordinary business

12  records, having no credit cards or bank accounts, and

13  with the assistance of Defendant Stilley by routing

14  clients' payments for services through Defendant

15  Stilley's IOLTA trust account in Fort Smith, Arkansas,

16  and making large personal purchases with cash or money

17  orders impeded and obstructed attempts by the IRS to

18  determine how much Defendant Springer was paid by these

19  clients and to establish an income figure for Defendant

20  Springer, who did not file tax returns for the years

21  charged in the indictment.

22     Much of the government's evidence is in the form of

23  documents.  As I said, there's going to be checks, money

24  orders, bank records, vehicle and jewelry purchase

25  receipts, and some correspondence with clients.  These

1   documents, when admitted, will be displayed on the

2   monitors but will also be available to you once admitted

3   in hard copy form.

4        The evidence will show that in September 2005 and

5   again in January 2009, Defendant Springer made false

6   statements to the IRS about the source and nature of his

7   income.  The evidence will further show that in January

8   2006, Defendant Stilley made false statements about

9   Defendant Springer's income to IRS agents.  And in March

10  2006, Defendant Stilley made false representations about

11  the source and the nature of Defendant Springer's income

12  to a federal grand jury here in Tulsa.

13       As I introduced to you earlier, fraud technical

14  advisor Brian Miller, a summary witness sitting back

15  there in the front row, will be present during the entire

16  trial.  At the end of the government's case, revenue

17  agent Miller will testify about the sums that Defendant

18  Springer's unreported income were for the 2000, 2002,

19  2003, 2004, and 2005 tax years.

20       We anticipate that this summary witness will

21  conclude that Defendant Springer received income upon

22  which he owed substantial taxes for the years 2000, 2003,

23  and 2005 as charged in Counts 2, 3, and 4 of the

24  indictment and that Defendant Springer received gross

25  income in the years 2002 and 2004 in excess of the amount

1   that required him to file tax returns for those years as

2   charged in Counts 5 and 6 of the indictment.

3       At the end of the government's case, we will ask you

4   to find the defendants guilty as charged.  Thank you.

5           THE COURT:  At the end of all the evidence, I

6   take it.  The defendants do have the opportunity to

7   present evidence on their own behalf if they choose to do

8   so, so.  You said, "At the end of the government's case,

9   we will ask" --

10          MR. SNOKE:  Oh, I'm sorry.

11          THE COURT:  At the end of all the evidence,

12  after the Court --

13          MR. SNOKE:  At the end of all the evidence, yes,

14  sir.  I stand corrected.

15          THE COURT:  Very well.  Does the Defendant

16  Springer choose to make an opening statement at this

17  time?

18          MR. SPRINGER:  Absolutely, Your Honor.

19          THE COURT:  You may proceed.

20          MR. SPRINGER:  Your Honor, if it please the

21  Court.  Mr. O'Reilly, Mr. Shern, Mr. Snoke, ladies and

22  gentlemen, as you know by now, my name is Lindsey Kent

23  Springer and for the next several weeks you're going to

24  see things -- I believe the evidence is going to show

25  things that you've never even thought of seeing.

 1      Before I go any further, I would like to introduce
 2  at counsel's table over here, and the Court has told you
 3  that I am representing myself, is Robert Williams to my
 4  right and then Oscar Stilley to his right, and then
 5  Robert Burton to his right, turn 90 degrees.
 6      I told myself I wasn't going to respond to the
 7  government's opening statement.  The evidence is going to
 8  show that in 1990 that I was a corporate officer of a
 9  corporation that had 25 employees and that corporation
10  was shut down by a bankruptcy proceeding where a company
11  owed $100,000 to that corporation.  The company's name
12  was Progressive Acceptance Corporation.  They were a repo
13  and bank finance company.
14      I was doing everything I could, the evidence will
15  show, to start a company and to compete.  And I was not
16  the only one in that company.  There were several
17  corporate officers.  And when bankruptcy occurred,
18  withholding taxes were not able to be paid by the
19  corporation.  I was then held, as a corporate officer,
20  personally liable by the IRS.  I didn't know, as the
21  evidence will show, anything about the IRS.
22      The evidence will show that my mother is a CPA and
23  that she was the business manager at Hall & Hall School
24  for 35 years.  The evidence will show that my father
25  worked at Shell Oil Company for 36 years as a manager of

1    over 300 people.

2         The evidence will show that everybody in my family

3    but me has a college education or has some college.  The

4    evidence will show I'm twelfth-grade-educated.

5         And in 1990, when all this occurred, somebody

6    convinced me to go to church, and so I went to Grace

7    Fellowship Church; the evidence is going to show this.

8    And at that church, I accepted Jesus Christ as my Lord

9    and Savior.  But I have to tell you, the evidence will

10   show I did not know what that meant.

11        The evidence will show that I went in and tried to

12   figure out what to do about my life.  And the evidence

13   will show that an associate pastor said to me that the

14   difference now, as before, was before if you'd go to a

15   doctor for health-care issues, now you would go to

16   Jesus.  And if you had marriage problems, before you

17   would go to a marriage counselor, now you come to the

18   Holy Spirit, to Jesus.

19        And so I asked, the evidence will show, that

20   counselor what about problems with the IRS?  And the

21   evidence will show he told me, You need to hire an

22   accountant and a lawyer for that.

23        And therein begins, the evidence will show, the

24   beginning -- the beginning of Bondage Breakers Ministry,

25   because I wasn't willing to accept what that associate

1  pastor told me.  This is what the evidence will show.

2      And from there, I had to endure the IRS and my new

3  walk on the earth.

4      Lo and behold, the evidence will show that I got

5  married for a second time and that a day before my third

6  child was born the IRS called after I had endured a

7  relentless audit, a relentless pursuit.

8      The evidence will show I even had to endure a levy

9  on a bank account where the IRS took all the money out of

10  that account while checks that had been written were

11  still outstanding, which caused all those checks to

12  bounce.  I didn't understand that, the evidence will

13  show.

14      The evidence will show that the IRS asked me to come

15  back in for another round of audits.  My second wife's

16  water broke that night.  The IRS wanted me to bring

17  documents down that they already had and I expressed --

18  the evidence will show -- I expressed that they had.

19      And they said that the person that had done the

20  audit before was no longer with the service.  His name

21  was Reginald Terry.  And the lady who was calling me

22  now's name was Terry White.

23      I told Mrs. White I'd go to the bank on Friday, pick

24  up those records, and I would have them to her on Monday

25  morning, because I was serious about my relationship with

1   the IRS.

2       Again, I told you my wife's water broke, as the

3   evidence will show.  She's expected to testify.  So I

4   couldn't go down on Thursday to get the records.  I

5   called on Wednesday, water broke on Thursday, Friday I

6   was at the bank.  But the IRS had beat me to it, had

7   already summoned the records from the bank.

8       Aggravated and unsure, Monday morning I showed up

9   with a witness at the IRS's office, sat down, said I'm

10  here to help you with the audit.  The first thing

11  Mrs. White said to me, the evidence will show:  Did you

12  bring those records from the bank?

13      And I told that lady, the evidence will show, I

14  didn't know what game she was playing, but I know she had

15  already been to that bank, she knew I couldn't get those

16  records because she had them, and it was going to stop

17  right here.  This is what the evidence is going to show.

18      And I left that day, Bondage Breakers Ministries in

19  tow, and I set out to find out what God really wanted me

20  to do.  Why was all this stuff being shown to Lindsey

21  Springer?

22      In two years' time, I ended up being a court-ordered

23  spokesman for 78 people who had met and rallied together

24  and had decided to come into federal court and tried to

25  get the federal court to ask us -- to answer questions

1  that we had because we couldn't get the IRS to answer our

2  questions.

3      The evidence is going to show that in one case the

4  expert, Mr. Miller, that you've all been introduced to,

5  he testified in the Ernie Swisher case out of Little

6  Rock, Arkansas, and on the web site the IRS had, "There's

7  no stupid question but a question you don't ask," the

8  record is going to show.

9      Mr. Stilley was Mr. Swisher's lawyer.  Mr. Stilley

10  presented Mr. Swisher's questions to Mr. Miller.  And

11  Mr. Miller said on the record, and you're going to see

12  it -- Mr. Stilley said, "Are those questions stupid?"

13      And Mr. Miller said, "Yes, they are."

14      So there are questions that are stupid, but the IRS

15  invites every question -- the only stupid question is a

16  question you don't ask.

17      And here I am, two years, from '92 to '94, and I'm

18  on that same question watching the Ernie Swisher case in

19  2003.

20      Part of being able to understand your mission in

21  life is that sometimes you have to listen to places and

22  things that you've never done before.  And it was

23  prophesied over me, the evidence will show, that God had

24  asked me to help get rid of the IRS.  Not get rid of

25  income taxes, not get rid of the power to tax that

1   Congress has.

2       There was just, in my opinion, a lot of people

3   praying to God for help, and the facts are going to show

4   that I just channeled that into belief.

5       The Court told you yesterday:  It's not about what

6   you believe, it's about what I believe.

7       Now, the government is going to try to enter

8   evidence that Bondage Breakers Ministries was only set up

9   so it could go into a legal business of providing

10  services for people who get in trouble criminally with

11  the IRS.

12      The evidence is going to show that's what they're

13  intending to say, and you just heard their opening

14  statement.  But yet evidence is going to show that

15  Bondage Breakers Ministries goes back into 1992.  And the

16  records are going to show that in 1990 -- the evidence is

17  going to show, in 1997, a group of 10,000 people who

18  heard my calling formed through an organization called

19  the Infinity Group Company, which I had never heard of

20  before, but knew who their members were, the evidence

21  will show, some of them -- granted me a $3 million grant

22  to support my mission.  At the time that grant was made,

23  the commitment to that $3 million was to help me make you

24  aware of the things that I was learning and seeing

25  through my eyes.  This is about looking through my eyes.

1   You might not like everything that you see through my

2   eyes.  You might not.

3        But three weeks after I got the first installment of

4   that grant, the United States Securities & Exchange

5   Commission came in and brought an action against Bondage

6   Breakers Ministries and Lindsey Springer to take that

7   money from me.  They didn't say anything other than a

8   guess as to why they were doing it, and I had no clue as

9   to what they were saying or why they were saying it at

10  the time.

11       But after a lot of defense -- and, I again, in that

12  case -- you'll see the evidence -- that I represented

13  myself because I couldn't afford to represent -- have --

14  pay somebody in a civil case to represent me, especially

15  when the asset of $1.2 million was frozen, along with

16  everything else that was in my name, that the Court in

17  Philadelphia decided in their order, even though I did

18  several of the things that you're going to see in this

19  case over and over again, that I gave no consideration

20  for that $1.2 million and, therefore, I didn't have a

21  right to it.  Therein lies the beginning of my

22  understanding of consideration.

23       And the government told you I didn't have any bank

24  accounts during the period of 2000 through 2005.  Well,

25  if any of you have ever gone in and opened up a bank

1    account, you'll recognize it, I couldn't get a bank

2    account with the credit that I had based upon the IRS.

3    At least that was my understanding.  I had gone into a

4    bank and tried, but I was cautious, because after you

5    have all these checks bounce, the evidence will show,

6    when you had no control over it, you get a little leery

7    about exposing yourself like that.  And I was clearly

8    leery.

9        So the evidence is going to show I'm twelfth-grade-

10   educated and Bondage Breakers Ministry started in '92,

11   IRS issues with Lindsey Springer start in 1990 and they

12   come all the way through.

13       And during the way, there are things that became

14   very clear.  And you all recognize every year an

15   instruction booklet that the IRS puts out that's a

16   hundred-plus pages now.  Must be to read.  The evidence

17   is going to show I read it.

18       And it says in this booklet, and you're going to see

19   it on the computer screens in front of you, you're not

20   required to provide information on an information

21   collection request form subject to the Paperwork

22   Reduction Act unless the form displays a valid ONB

23   control number.

24       Now, those words don't actually appear in law

25   anywhere that I could find, the evidence will show.  But

1  the evidence is going to show through court orders that

2  are going to come in in this case, and the evidence will

3  show and you'll have no doubt that if I have a question,

4  I'll ask the Court, it's a substitute for other things

5  that don't work.

6      And the law that the Court is going to instruct you

7  about is called the public protection provision, which is

8  in the Paperwork Reduction Act.  And it says --

9          MR. SNOKE:  Your Honor, I think we're getting

10  far afield from the proper --

11          THE COURT:  Counsel and the defendants will

12  approach.

13      (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND

14  OUT OF THE HEARING OF THE JURY.)

15          THE COURT:  It's not appropriate at this time to

16  read from a document not in evidence.  So --

17          MR. SPRINGER:  Can I just look down without

18  seeing it and just read it.  It's the court order from

19  the Tenth Circuit, on August 31, 2009, it's a published

20  decision.  It's coming in the case.

21          THE COURT:  You need to move on to another

22  subject altogether.  Skip it.  Proceed.

23      (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

24  WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

25  PRESENCE AND HEARING OF THE JURY.)

1           MR. SPRINGER:  The evidence in this case is

2    going to show that I brought my questions to the court.

3    There are complaints that were filed, orders that were

4    issued, and in good faith, I both rely upon what is said

5    and try to determine what's not said in moving forward

6    with my mission.

7           The evidence is going to show that people did give

8    me money, and there are some, the evidence is going to

9    show, that also gave Mr. Stilley money.  But the evidence

10   is going to show there's a lot more people that gave me

11   money than just the few people that involve Mr. Stilley

12   and myself.

13          And the government clearly correctly stated, and the

14   evidence is going to show, that each one of these people

15   that takes the stand, that they expected a billing

16   statement from Mr. Stilley.  They all had experience with

17   lawyers, hourly rates, what they planned on doing for it,

18   a contract, if you will, whether it be in writing,

19   whether it be something that can be memorialized, but

20   with me, as the government told you, and as the evidence

21   is going to show, there is no contract.  There is no

22   billing statement.  There is no evidence that somebody

23   gave me a check and it bounced.  The evidence is going to

24   show I couldn't have sued them for nothing.  The evidence

25   is going to show this.  That I gained no rights by the

1   money that those people gave me.

2       And the evidence is going to show -- and they will

3   sit there and tell you under oath that they never told me

4   they were giving me this money for me representing them,

5   as the government said.  I'm twelfth-grade-educated; I

6   can't represent.

7       The evidence is also going to show that there are

8   two stories that are going to show up here.  One story is

9   if people have something to gain by getting out of jail

10  or getting something knocked off of their penalties or

11  whatever, they tell a different story than the one -- the

12  evidence will show -- that they told me or that we had.

13      But there's other people that are going to take the

14  stand who weren't in jail, but who gave me money, and

15  they will tell you that they expected and there were no

16  agreements of expectation in giving me that money.

17      Now, I will tell you that any time you give money --

18  the evidence will show, when you give money to a

19  ministry, you do expect them to do certain things.  And

20  my word, as I'm standing here today, the record is going

21  to show I'm still doing it.

22      The Court is going to instruct you about the meaning

23  of words.  And the evidence is going to show the

24  possibility that the definition the Court gives may not

25  have been the definition I knew or that I was privy to at

1   the time these exchanges took place.

2       The evidence is going to show that everything that I

3   did, to the best of my ability, was in good faith.

4       Evidence is going to show that in January 2009,

5   after four grand juries, the government invited me to

6   come and speak to them, and I did.

7       Mr. Snoke said the evidence is going to show that I

8   did meet with them.  And the evidence will show you in

9   that meeting that there were two competing theories that

10  were taking place:  Theirs and mine.

11      And the evidence is going to show I answered their

12  questions according to their theory, but always preserved

13  the rights to my theory.

14      Whether or not you come to the conclusion that in

15  some of the government's case you agree with them or not,

16  the Court is going to instruct you about willfulness and

17  good-faith defenses, and it's going to tell you that good

18  faith is a defense, a complete defense, to the claims in

19  Counts 1 through 6 against me.

20      The evidence is going to show that I did finally get

21  a credit card when prepaid cards came on the scene,

22  because you didn't have to have credit for those.  And

23  the records are -- the evidence is going to show that

24  you're going to see a cut-off line of any use -- minimal

25  use of Mr. Stilley's credit card.  And the evidence will

1  show that it was only used -- only -- when I had no other

2  choice.

3      The government says that their evidence is going to

4  show that Mr. Stilley and I entered into a conspiracy to

5  defraud the IRS by concealing transactions.  I will tell

6  you the evidence will not show that.  After being

7  investigated for four years, it's difficult in 30 minutes

8  to tell you how and why that is, and over the next three

9  weeks, I'll do my best to pull it out for you.  The

10 evidence is not -- is going to show there was no

11 conspiracy beginning in 2000.  The evidence is going to

12 show there was no attempt to commit tax evasion, as

13 Counts 2, 3, and 4 allege, and there was absolutely no

14 willful failure to file any tax returns for Count 5 and

15 Count 6.  Thank you very much.

16         THE COURT:  Thank you Mr. Springer, does the

17 Defendant Stilley choose to make his opening statement at

18 this time?

19         MR. STILLEY:  Your Honor, if it please the

20 Court, I'll reserve opening.

21         THE COURT:  Very well.  Defendant Stilley

22 reserves opening statement until a later stage of this

23 trial.  We'll now have the government's opening

24 statement -- I'm sorry, the government's first witness.

25         MR. O'REILLY:  Your Honor, should I move this

1  back facing you or leave it like this?

2          THE COURT:  Probably be best to orient it more

3  or less toward the witness stand.

4          MR. O'REILLY:  Thank you, Your Honor.  The

5  United States calls Mr. Philip Roberts.

6          COURTROOM DEPUTY:  Sir, if you would just --

7          MR. ROBERTS:  May I ask the judge a question,

8  first, ma'am, so I understand?

9          COURTROOM DEPUTY:  Of course.

10          MR. ROBERTS:  Sir, are you aware that I am here

11  without a consent?  That I've been detained without a

12  waiver of my immunities as a sovereign?

13          THE COURT:  I'm aware that you are here pursuant

14  to a court order of the United States District Court for

15  the Western District of Arkansas.  Please raise your hand

16  and be sworn.

17          MR. ROBERTS:  May I affirm rather than swear,

18  sir?

19          THE COURT:  You surely may.

20                    PHILIP ROBERTS,

21  (WITNESS AFFIRMED)

22          MR. ROBERTS:  I do so affirm.

23          MR. STILLEY:  Your Honor, may we approach?

24          THE COURT:  You may approach.

25      (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND

```
 1  OUT OF THE HEARING OF THE JURY.)
 2          MR. STILLEY:  I object to having this witness
 3  testify in jail garb.  I understand the problem.  I
 4  just -- I object to that and I think he should be allowed
 5  to have a suit and be in here without cuffs.
 6          THE COURT:  It's overruled.  We'll proceed.
 7      (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,
 8  WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE
 9  PRESENCE AND HEARING OF THE JURY.)
10                      DIRECT EXAMINATION
11  BY MR. O'REILLY:
12  Q.  Sir, could you please state your full name and your
13  occupation.
14  A.  My name is -- I'm sorry -- Philip Eugene of the
15  family Roberts and I am a chiropractor.
16  Q.  Are you a doctor of chiropractic?
17  A.  That would be correct.
18  Q.  So I guess I'll refer to you as Dr. Roberts.
19  Dr. Roberts, could you please -- well, first of all, do
20  you know Mr. Oscar Stilley?
21  A.  Yes, I do.
22  Q.  Could you please identify Mr. Stilley, if you see
23  him here in the courtroom?
24  A.  Well, he's hiding behind a beard and a goatee over
25  there.
```

PHILIP ROBERTS - DIRECT BY MR. O'REILLY                284

1          MR. O'REILLY:  May the record reflect that he

2  has identified the Defendant Mr. Stilley?

3          THE COURT:  The record will so reflect.

4  Q.  (BY MR. O'REILLY)  Do you know an individual by the

5  name of Mr. Lindsey Springer?

6  A.  Yes, I do.

7  Q.  Do you see Mr. Springer here in the courtroom?

8  A.  I do now that he is standing up, yes, I do.

9          MR. O'REILLY:  May the record reflect that

10 Dr. Roberts has identified the Defendant Mr. Springer?

11         THE COURT:  The record will so reflect.

12 Q.  (BY MR. O'REILLY)  Dr. Roberts, when did you first

13 meet Oscar Stilley?

14 A.  To the best of my recollection, about 1990.

15         MR. O'REILLY:  Your Honor, may I approach the

16 witness only to provide him with some exhibits given?

17         THE COURT:  You may.

18         MR. O'REILLY:  Thank you, sir.

19         THE WITNESS:  Your Honor, would it be acceptable

20 for him to identify himself so that I could speak to him

21 as a man?  I don't even know who he is.

22         THE COURT:  This is Mr. O'Reilly, who represents

23 the government in this case.

24         THE WITNESS:  Thank you.

25 Q.  (BY MR. O'REILLY)  Dr. Roberts, did you have any --

1   when did you first meet Mr. Springer?

2   A.   I couldn't recall an exact date, but it would

3   probably be '98 or '99, somewhere in that time.

4   Q.   In what connection did you meet Mr. Stilley?

5   A.   I actually approached Mr. Stilley in his office.  At

6   the time, I believe he was practicing in the Central Mall

7   there in Fort Smith because I had done two years of

8   research on the legality of the federal income tax law

9   and the requirement for filing and --

10  Q.   So you -- did you approach him as -- in his capacity

11  as an attorney?

12  A.   Just as a friend, and I just asked him some

13  questions.

14  Q.   And this is in approximately 1990?

15  A.   That's correct.

16  Q.   To your knowledge, was Mr. Stilley an attorney in

17  Fort Smith, Arkansas?

18  A.   I believe he was, yes.

19          THE COURT:  Excuse me, Mr. O'Reilly.  Are you

20  going to have the witness looking at some exhibits?

21          MR. O'REILLY:  I will, Your Honor.

22          THE COURT:  Okay.  Stand by just a moment.

23          MR. O'REILLY:  Thank you, Your Honor.  I should

24  have asked you.

25          THE COURT:  You may proceed.

 1            MR. O'REILLY:  Thank you, Your Honor.

 2   Q.  (BY MR. O'REILLY)  In what fashion did you come to

 3   meet Mr. Springer?

 4   A.  I met him through some acquaintances that said that

 5   he had some classes and information that he was sharing

 6   with people on constitutional issues.

 7   Q.  Did you attend any of those classes?

 8   A.  I did.

 9   Q.  Were some of the issues with respect to the income

10   tax?

11   A.  That was mentioned, yes.

12            COURTROOM DEPUTY:  Excuse me, Your Honor.

13   Dr. Roberts, if you could turn that microphone closer --

14            THE WITNESS:  Are you getting feedback?

15            COURTROOM DEPUTY:  -- we might not get so much

16   feedback.

17            THE WITNESS:  Is that better?

18            COURTROOM DEPUTY:  That is.  Thank you.

19            THE WITNESS:  Okay.

20   Q.  (BY MR. O'REILLY)  Do you know if when you met

21   Mr. Springer if Mr. Springer and Mr. Stilley knew each

22   other?

23   A.  I don't believe they did.

24   Q.  Why do you not believe that?

25   A.  Because I believe I introduced them.

PHILIP ROBERTS - DIRECT BY MR. O'REILLY                    287

```
 1   Q.   When would that have been?

 2   A.   Somewhere between '98 and 2000.

 3   Q.   In the year 2000, were you prosecuted for the crime

 4   of willfully failing to file income tax returns?

 5   A.   That is correct.

 6   Q.   Who represented you in that case?

 7   A.   Oscar Stilley.

 8   Q.   Did Mr. Stilley have any assistance?

 9   A.   No one that was allowed to sit at the table with him

10   during trial.

11   Q.   I understand.  But did anybody help him with respect

12   to your defense?  Not --

13   A.   Yes.

14   Q.   Who was that?

15   A.   That was Lindsey Springer.

16   Q.   Did your case, in fact, go to trial?

17   A.   Yes, it did.

18   Q.   What -- do you recall the result of your trial?

19   A.   Yes, I do.

20   Q.   What was it?

21   A.   I was found guilty.

22   Q.   Do you recall for what years?

23   A.   I believe 1993 and 1994.

24   Q.   Did you request or did you discuss Mr. Springer

25   helping in your criminal defense with Mr. Springer?
```

1   A.   I don't understand that question.

2   Q.   Did you and Mr. Springer discuss whether he would

3   help you in your criminal defense?

4   A.   Yes, we did.

5   Q.   Did Mr. Springer agree to help you?

6   A.   Yes, he did.

7   Q.   Did you pay Mr. Springer any money?

8   A.   Yes, I did.

9   Q.   Was there any written agreement for your services

10  that you received from Mr. Springer?

11  A.   There was no written agreement, I just donated

12  finances for his time.

13  Q.   Was there any written agreement with respect to

14  Mr. Stilley?

15  A.   I honestly cannot recall.

16  Q.   Did you pay Mr. Stilley for his assistance?

17  A.   I did.

18       (A CELL PHONE RANG IN THE COURTROOM)

19          MR. O'REILLY:  Your Honor, do you want me to

20  pause or --

21          THE COURT:  Go ahead.

22          MR. O'REILLY:  Thank you, Your Honor.

23  Q.   (BY MR. O'REILLY)  When you say you paid

24  Mr. Springer for his time, what did he spend his time

25  doing on your behalf?

1  A.   I believe he researched the law.

2  Q.   Why do you believe that?

3  A.   Because he presented information, I think, that was

4  ultimately used to put motions and things together in the

5  case.

6  Q.   From whom did you get that understanding?

7  A.   From Mr. Springer as well as Mr. Stilley.

8  Q.   How did it come to occur that Mr. Springer and

9  Mr. Stilley worked together on your defense?

10  A.   I believe I introduced them and they had a good

11  rapport and a good working knowledge, I thought, of the

12  constitutional issues and they just decided to work

13  together to help me.

14  Q.   Did you and Mr. Springer discuss the specifics of

15  what he would do on your behalf?

16  A.   I don't think we ever outlined any specifics, sir,

17  he just offered to help where he could.

18  Q.   How did you make payments to Mr. Stilley?

19  A.   Checks.

20  Q.   How about with respect to Mr. Springer?

21  A.   Checks.

22  Q.   Did Mr. Springer ever tell you how to describe the

23  payments that were made to him?

24  A.   Again, I don't understand your question.

25  Q.   Did Mr. Springer indicate how you should

1  characterize the payments that you made to him?

2  A.   I think he suggested that in the note section that I

3  put "donation."

4  Q.   What was your response, if you recall, to

5  Mr. Springer's request?

6  A.   I think on at least one I did.

7  Q.   With respect to a donation, what was this a donation

8  for?

9  A.   I donated funds for his time.

10 Q.   His time on what?

11 A.   Working on gathering information and working with

12 Mr. Stilley.

13 Q.   With respect to your case or what?

14 A.   With respect to my case, yes.

15 Q.   I'm going to ask you now and if you could take that

16 notebook out in front of you, if you could look at what

17 has been marked for identification as Government's

18 Exhibit 71.  Do you see that document, sir?

19 A.   Not yet.

20        THE COURT:  Mr. O'Reilly, I'm told we don't yet

21 have the screens working in the jury box, so how do you

22 plan -- if this exhibit is admitted, how do you plan to

23 present it?  Or, obviously, you don't need necessarily to

24 present it, but if you need to present it, I'm told that

25 the screens in the jury box don't work at this point.

PHILIP ROBERTS - DIRECT BY MR. O'REILLY                    291

```
 1            MR. O'REILLY:  In that case, Your Honor, we'll
 2   just talk about it.  We will have other witnesses that
 3   will discuss and maybe we'll present it then.  It's
 4   not --
 5            THE COURT:  Wait just a moment.
 6            COURT SECURITY:  You had a full computer screen
 7   like --
 8            THE COURT:  I can't hear you.
 9            COURT SECURITY:  You had a full computer screen
10   like someone was logging on to it.
11            THE COURT:  Okay.
12            MR. O'REILLY:  Are the monitors then working?
13   We'll try it.  And if it works, it works, Your Honor.  If
14   it doesn't, it doesn't.
15            THE COURT:  Very well.  Now, obviously, neither
16   this exhibit nor any other exhibit may be published until
17   it has been received in evidence.  You may proceed.
18   Q.   (BY MR. O'REILLY)  Dr. Roberts, do you recognize
19   Government's Exhibit 71?
20   A.   Yes.
21   Q.   How do you recognize it?
22   A.   It appears to be a photocopy of the check written
23   from my business.
24   Q.   And what is that business?
25   A.   At the time, it was Ortho/Neuro Medical Associates.
```

PHILIP ROBERTS - DIRECT BY MR. O'REILLY                    292

```
 1   Q.   Who was it written to?

 2   A.   Mr. Oscar Stilley.

 3   Q.   And the amount of that check is?

 4   A.   5,000.

 5   Q.   What was this check for?

 6   A.   Notation is "assistance of counsel."

 7   Q.   And is that your recollection?

 8   A.   That would be correct.

 9        MR. O'REILLY:  Your Honor, at this time, the

10   government would move Government's Exhibit 71 into

11   evidence.

12        MR. SPRINGER:  No objection, Your Honor.

13        MR. STILLEY:  No objection.

14        THE COURT:  It is received.

15        MR. O'REILLY:  And, Your Honor, we request -- we

16   attempt to publish this.

17        THE COURT:  Very well.

18   Q.   (BY MR. O'REILLY)  Dr. Roberts, I'm now going to ask

19   you to take a look at -- and you're going to have to page

20   (sic) it to a very different page -- page number 5,

21   Government's Exhibit Number 5.

22        THE COURT:  Members of the jury, is the document

23   on the screens?

24     (JURORS RESPOND IN THE AFFIRMATIVE)

25        THE COURT:  Okay.  Thank you.
```

1  Q.   (BY MR. O'REILLY)  Dr. Roberts, do you have a screen

2  in front of you as well?

3  A.   I do.

4  Q.   Can you see what the date is on that check?

5  A.   I believe 3/9/2000.

6  Q.   Now, I ask you to take a look at what has been

7  marked for identification as Government's Exhibit 5.

8  A.   I think I'm there.

9  Q.   Do you recognize that exhibit, sir?

10  A.   Again, it appears to be a copy of a check written

11  from my office.

12  Q.   Do you recognize and recall this check?

13  A.   I don't recall it, but I recognize it.

14  Q.   And what was this -- who was this paid to?

15  A.   Lindsey Springer.

16  Q.   On what date?

17  A.   3/15 of 2000.

18  Q.   What was this check for?

19  A.   Well, I don't have a notation.  It would have to be

20  for him providing me some services.

21          MR. O'REILLY:  Your Honor, at this time, the

22  government would move to admit Government's Exhibit 5.

23          MR. SPRINGER:  No objection, Your Honor.

24          THE COURT:  Be received.

25          MR. O'REILLY:  That may be published to the

1   jury.

2   Q.   (BY MR. O'REILLY)   Dr. Roberts, to your

3   recollection, this period of March of 2000, is that when

4   Mr. Stilley and Mr. Springer were assisting you?

5   A.   I honestly don't know what date that I put these two

6   individuals together.  And if I may clarify, my memory is

7   kind of coming back, I remember something about donating

8   him this amount of money to work on a bus to remodel and

9   refurbish a bus that he used in what he called his

10  ministry.

11  Q.   So did Mr. Springer ask you for that amount of money

12  to work on a bus?

13  A.   Yes, sir.  As I -- again, as I recall, I believe

14  that was what this amount of money was for.

15  Q.   Okay.   To your understanding, was that what

16  Mr. Springer told you he was going to use it for?

17  A.   That's my recollection.

18  Q.   I would ask you now to look at what has been marked

19  for identification as Government's Exhibit 6, ask you if

20  you recognize that item?

21  A.   Yes, I do.

22  Q.   What is this?

23  A.   Again, a photocopy of a check written from my

24  business.

25  Q.   And who is this check payable to?

```
 1  A.   Lindsey Springer.

 2  Q.   What was the date of this check?

 3  A.   4/30/2000.

 4  Q.   What was the purpose of this check?

 5  A.   Again, I don't have it noted on the check, but it

 6  would have to be for him providing some assistance and

 7  service to me.

 8         MR. O'REILLY:  Your Honor, at this time, the

 9  government would move Government's Exhibit 6 into

10  evidence.

11         MR. SPRINGER:  No objection, Your Honor.

12         THE COURT:  It will be received.

13         MR. O'REILLY:  May be published to the jury.

14  Q.   (BY MR. O'REILLY)  And I'm going to apologize, I'm

15  now going to ask you to move all the way down to

16  Government's Exhibit 73.  Oh, I'm sorry, before you do

17  that, what is the date of that check?

18  A.   4/30/2000.

19  Q.   Now, if you could go to Government's Exhibit 73,

20  sir.

21  A.   I will have to commend you on your organization.

22  I'm not near this organized at home.

23  Q.   Thank you, sir.

24  A.   Did you say 73?

25  Q.   Seventy-three, sir.
```

1  A.   Okay.

2  Q.   Sir, do you recognize this check?

3  A.   Yes.  Again, it's a photocopy of the check written

4  from my office.

5  Q.   To whom is it payable?

6  A.   Oscar Stilley -- well, actually, it's Oscar Still, I

7  didn't complete the spelling of the name.

8  Q.   Do you know if this check was, in fact, for

9  Mr. Stilley?

10  A.   Yes.

11  Q.   Does it indicate in the memo what this was for?

12  A.   Expenses.

13  Q.   Do you know or have any recollection of what that

14  meant?

15  A.   For him providing counsel.

16  Q.   Counsel to whom, sir?

17  A.   To me, sir.

18  Q.   And what is the date of this check?

19  A.   4/30/2000.

20  Q.   So it's the same day and, in fact, I think it's a

21  sequential check as Government's Exhibit 6.

22  A.   I would have to look for the sequence, but the same

23  date.

24       MR. O'REILLY:  Your Honor, at this point, the

25  government would move Government's Exhibit 73 into

```
 1  evidence.
 2          MR. SPRINGER:  No objection from me, Your Honor.
 3          MR. STILLEY:  No objection from me, Your Honor.
 4          THE COURT:  It is received.
 5  Q.  (BY MR. O'REILLY)  I'll now ask you to go back to
 6  Government's Exhibit 6, sir, please.  Take a look.  Did I
 7  say 6 or 7?
 8  A.  You said 6.
 9  Q.  I apologize.  I misspoke.  Because we already
10  discussed Number 6.  Government's Exhibit 7, please, sir.
11  A.  I'm there.
12  Q.  Sir, do you recognize this item?
13  A.  Yes, I do.
14  Q.  What is Government's Exhibit 7?
15  A.  Again, it's a photocopy of a check that appears to
16  have been written from my office.
17  Q.  To who?
18  A.  Lindsey Springer.
19  Q.  Does it have anything in the memo section?
20  A.  It says "donation."
21  Q.  Do you know why that word would appear there?
22  A.  I believe I was asked to put the word there.
23  Q.  Who asked you to put the word there?
24  A.  Mr. Springer.
25  Q.  What was this check for?
```

1  A.   Again, donated funds for his providing services as a

2  constitutional advisor and working on my case.

3  Q.   What is the date of this check?

4  A.   5/30/2000.

5        MR. O'REILLY:  Your Honor, the government would

6  move Government's Exhibit 7 into evidence.

7        MR. SPRINGER:  No objection, Your Honor.

8        THE COURT:  It is received.

9        MR. O'REILLY:  And if we could publish that to

10  the jury.

11  Q.   (BY MR. O'REILLY)  I'm going to ask you now just to

12  go to the next government exhibit, Number 8, sir.  Do you

13  have that in front of you?

14  A.   I do.

15  Q.   Do you recognize this item?

16  A.   Actually, I don't.

17  Q.   Okay.  Let's see if there is anything -- you do not

18  recognize this item.  Okay.  Do you recognize -- let me

19  ask you this:  In the top left, does it have an

20  indication of a remitter?

21  A.   Yes, it does.

22  Q.   And does it indicate who the remitter is?

23  A.   Again, my business name, Ortho/Neuro Medical

24  Associates.

25  Q.   I'm going to ask you if you recall if at some point

1  you had to have another -- a check -- does it have

2  anything else that it indicates?

3  A.   Just --

4  Q.   Above the remitter's name.

5  A.   That it's a replacement for check number 4347.

6  Q.   Does that in any way refresh your recollection about

7  this item?

8  A.   No, sir.  I don't know what the date is, but

9  probably ten years ago.  I don't recall the circumstances

10 of this remittance.

11 Q.   I'm going to ask you now to move to Government's

12 Exhibit 74.

13 A.   Okay.

14 Q.   Do you recognize Government's Exhibit 74, sir?

15 A.   Yes.  It, again, appears to be a photocopy of a

16 check written from my practice.

17 Q.   And on what date?

18 A.   7/13/2000.

19 Q.   To whom is it paid?

20 A.   Mr. Oscar Stilley.

21 Q.   What is the purpose of this check?

22 A.   Legal fees.

23 Q.   And, again, with respect to that, is that legal fees

24 for you?

25 A.   That would be correct.

PHILIP ROBERTS - DIRECT BY MR. O'REILLY                    300

```
1            MR. O'REILLY:  Your Honor, the government would
2   offer Government's Exhibit 74 into evidence.
3            MR. SPRINGER:  No objection here, Your Honor.
4            THE COURT:  It is received.
5   Q.  (BY MR. O'REILLY)  May I ask you now to take a look
6   at what has been marked for identification as
7   Government's Exhibit 76.  Do you recognize that, sir?
8   A.  Yes.
9   Q.  Could you please describe what Government's Exhibit
10  76 is?
11  A.  Again, a copy of a check written from my business.
12  Q.  To whom is it made out?
13  A.  Mr. Oscar Stilley.
14  Q.  And what is the date on that check?
15  A.  12/5/2000.
16  Q.  What is the amount?
17  A.  $5,000.
18  Q.  What was the purpose for writing this check?
19  A.  I did not write this check.  I believe I was
20  incarcerated at the time.
21  Q.  Do you know the purpose for this check?
22  A.  Yes.  Again, no notation, but for legal fees.
23            MR. O'REILLY:  Your Honor, the government would
24  move Government's Exhibit 76 into evidence at this time.
25            MR. SPRINGER:  No objection, Your Honor.
```

```
 1              THE COURT:  It is received.
 2    Q.  (BY MR. O'REILLY)  And, sir, you mentioned that you
 3    were incarcerated at that time.  For how long were you
 4    incarcerated?
 5    A.  My sentence was 16 months.
 6    Q.  And this was back in the year 2000?
 7    A.  That's correct.
 8    Q.  I'm going to ask you now to take a look at what has
 9    been marked for identification as Government's Exhibit
10    eight-zero, 80.
11    A.  808?
12    Q.  No, no.  Eight-zero, 80.  I didn't want any
13    confusion as to 18.
14    A.  Okay.
15    Q.  Do you recognize that check, sir?
16    A.  Again, yes.
17    Q.  What is this check?
18    A.  A check written from my practice account.
19    Q.  To whom?
20    A.  Mr. Oscar Stilley.
21    Q.  And what is this check for?
22    A.  Again, there's no notation, but I would assume in
23    this time frame for legal services.
24    Q.  Let me ask this:  Was there any other reason you
25    paid Mr. Stilley money?
```

PHILIP ROBERTS - DIRECT BY MR. O'REILLY                    302

```
 1   A.   None.
 2          MR. O'REILLY:  Your Honor, the government would
 3   move Government's Exhibit 80 into evidence.
 4          MR. SPRINGER:  No objection, Your Honor.
 5          THE COURT:  It will be received.
 6          MR. O'REILLY:  If that could be published to the
 7   jury.
 8   Q.   (BY MR. O'REILLY)  What is the date on that check?
 9   A.   3/19/01.
10   Q.   And what is the amount paid?
11   A.   $10,000.
12   Q.   Dr. Roberts, I'm going to ask you now to take a look
13   at what has been marked for identification as
14   Government's Exhibit 84.
15   A.   Okay.
16   Q.   Sir, do you recognize this check?
17   A.   Yes, I do.
18   Q.   What is Government's Exhibit 84?
19   A.   It is a photocopy of a check written from my
20   practice to Mr. Oscar Stilley.
21   Q.   What is the purpose of this check?
22   A.   It's noted as "retainer."
23   Q.   What does that mean?
24   A.   I believe -- I don't know, I believe I retained him
25   earlier than this, but for his legal services on my
```

```
 1   behalf.
 2   Q.   What is the date on this check?
 3   A.   8/20/01.
 4   Q.   At this point in time, as I understood your
 5   testimony earlier, you were already in jail?
 6   A.   In prison, that's correct.
 7   Q.   What was Mr. Stilley doing for you at this time?
 8   A.   Working on appeals.
 9   Q.   Was Mr. Springer continuing to assist you at this
10   time?
11   A.   I believe he was.
12   Q.   And now I am going to ask you to take a look at what
13   has been marked Government's Exhibit 18, one-eight.
14   A.   Okay.
15   Q.   Do you recognize this item?
16   A.   Yes, this is a check -- a copy of a check written
17   from my office.
18   Q.   And it's now -- it's a different name, Roberts
19   Chiropractic Center?
20   A.   That's correct.
21   Q.   But that's still your chiropractic practice?
22   A.   That's correct.
23   Q.   What was the purpose of this check?
24   A.   Again, there is no notation.  Did you ask me who it
25   was to?
```

1  Q.   No.   What was the purpose for this check?

2  A.   I would believe for the same services that have been

3  provided throughout my trial and incarceration for legal

4  advice and consulting.

5  Q.   To whom is it made out?

6  A.   Lindsey Springer.

7  Q.   What is the date on this check?

8  A.   8/3/01.

9  Q.   And what is the amount?

10  A.   $10,000.

11        MR. O'REILLY:   Your Honor, the government would

12  offer Government's Exhibit 18.

13        MR. SPRINGER:   Your Honor, I object on lack of

14  personal knowledge and lack of foundation.

15        THE COURT:   Bear with me just a moment.

16  Overruled.   It will be received.

17        MR. O'REILLY:   Your Honor, if I may have a

18  moment.

19        THE COURT:   You surely may.   Mr. O'Reilly, it's

20  -- this is a good time for our mid-morning break, so

21  we'll -- unless you have something that -- by way of an

22  immediate follow-up question, we'll go ahead and take our

23  break at this time.

24        MR. O'REILLY:   That would be fine, Your Honor.

25        THE COURT:   Very well.   Members of the jury,

1  we'll take our mid-morning break at this time.  Now, I

2  said yesterday that I was going to find you a better

3  place than the jury room to take your breaks, and I will,

4  but I haven't done that yet.  So please proceed as

5  directed by the court security officer for our

6  mid-morning break and she can show you the facilities and

7  so forth.

8      During this break, as during all breaks, and I will

9  get to the point that I will refer to this as my usual

10 admonition, but this time I'm going to give you the full

11 version.  Do not discuss this case, as I have said more

12 than once.  Do not undertake any independent

13 investigation of this case.  And certainly do not reach

14 any conclusions about any issue in this case until after

15 it has been given to you for your deliberations and

16 verdict.

17     So we'll resume here in the courtroom at 20 minutes

18 till eleven.  Again, we'll be guided by the clock on the

19 wall.

20     All persons in the courtroom will remain seated

21 while the jury departs.

22     (THE JURY EXITS THE COURTROOM)

23         THE COURT:  Okay.  The record will show the jury

24 has left the courtroom.  Before we take our mid-morning

25 break, I have one inquiry of Mr. Springer, which will

 1   help me to address issues that may arise, and it relates

 2   to the Paperwork Reduction Act contention that we had

 3   just briefly during your opening statement.  Obviously,

 4   that has been referred to in your briefs.  I do need some

 5   clarification.

 6        And my question at this point, Mr. Springer, is

 7   this:  There really are two ways that in some ways are

 8   legally different that I suppose you could assert the

 9   Paperwork Reduction Act argument.  On one hand, it may be

10   that you're asserting the Paperwork Reduction Act

11   argument as a substantive defense to the filing

12   requirement.  On the other hand, it may be that you're

13   asserting your Paperwork Reduction Act argument to

14   establish your state of mind, which is an entirely

15   different thing, to establish your state of mind for the

16   purpose of rebutting willfulness.

17        In order for the Court to prepare to address issues

18   relating to that argument, I would certainly appreciate

19   some clarification as to -- of those approaches.  Which

20   is it that you have adopted for purposes of your -- of

21   the trial of this case so far as your position relates to

22   and depends on the Paperwork Reduction Act argument?

23        MR. SPRINGER:  Your Honor, I believe the statute

24   says it's a complete defense, bar otherwise.  I think

25   Judge Anderson clearly said that in his unpublished

1   opinion in May of 2007.  And I also believe it's a good

2   faith defense, a willfulness -- to the charge of

3   willfulness, which is -- goes to intent.  And so I am

4   going -- I don't know how the complete defense comes in

5   through the government's case in chief.  I'm just going

6   to have to do my best to try to get it in depending on

7   what documents the government tries to bring in.

8        If not, then I'll have to bring both of those in on

9   the defense side post their close of the government's

10  case in chief.  But I do intend on demonstrating from

11  that seat right there where Dr. Roberts is to show the

12  jury what I relied upon, what's in my mind, and then what

13  I did to try to go into the court system to try to get

14  answers to that.  As the Court noted four different

15  times, I've given the Tenth Circuit Court of Appeals the

16  opportunity.  And, of course, the last one I got closer,

17  but it's just difficult, they said, they didn't get

18  closer to that.  So I'm going with both to the extent I

19  can get it in.

20       I realize that Mr. O'Reilly is going to do

21  everything he can to try to stop it.  So if a proper

22  foundation is not laid, then, you know, I'll have to just

23  do it on the willfulness side and good faith.

24           THE COURT:  So you're -- I take it in response

25  to the alternatives that I gave you -- and, obviously,

1  you're not required to choose between those two

2  alternatives.  But with respect to the alternatives that

3  I alluded to a moment ago, your answer is all of the

4  above.

5          MR. SPRINGER:  All of the above.  Although, I

6  will be telling the Court I do not know how it actually

7  will come in in the government's case in chief.  As soon

8  as a form comes in or, you know, any type of testimony

9  about the form, then I'm going to do my best to get it

10 into the record and, you know, that's all I know to do.

11         THE COURT:  Very well.  I may need to hear more

12 about that as we proceed, but I do appreciate that

13 clarification.

14         MR. SPRINGER:  Your Honor, if I could have a

15 moment -- second.  I wasn't trying to read from the

16 published opinion of the Tenth Circuit on August 31,

17 2009.  I just don't have all those words memorized and so

18 I was trying to grab something that had those exact words

19 because those are the words that I relied upon.

20         THE COURT:  Anything else that we ought to take

21 up before we take our mid-morning break?

22         MR. O'REILLY:  Briefly, Your Honor.  And one

23 thing, I would ask if Dr. Roberts could be removed from

24 the courtroom because it does discuss what we may or may

25 not be permitted to inquire.

1        THE COURT:  Very well.  Yes, go ahead.

2     (WITNESS REMOVED FROM THE COURTROOM)

3        MR. O'REILLY:  Your Honor, yesterday at the

4  close during the James hearing there were statements that

5  we had referred to that the Court had not yet determined

6  whether or not would be allowed and is in furtherance of

7  the conspiracy.  And, frankly, some of them are -- it's

8  not our position that they are in furtherance of the

9  conspiracy.  It's that they are admissions of each

10  individual defendant and that would be representations

11  made by the defendants to Dr. Roberts individually about

12  whether or not he had to file tax returns and pay taxes.

13     I believe the appropriate way to handle that would

14  be a limiting instruction with respect to those

15  statements that if he's speaking about what Mr. Stilley

16  told him, because this would have been, I believe, back

17  in the early '90s, that that is only to be used or

18  considered with respect to Mr. Stilley.  And with what

19  Mr. Springer told him, that that should be used only with

20  respect to Mr. Springer.

21        THE COURT:  Well, as I made clear yesterday,

22  that James hearing was conducted by the Court strictly as

23  a James hearing and the issue was the admissibility of

24  statements under the Bourjaily case and Rule 80 -- what

25  is it, 801(d)(2)(E)?  And for that reason, that was my

1   only focus at that point, which is a rather narrow

2   focus.  Statements of that kind -- we'll take it one

3   question at a time.  But statements of that kind may well

4   be admissible as appropriate 403(b) evidence.  We'll

5   see.  We'll just take it one question at a time.

6       But in this circuit, it's I think reasonably well

7   established that Rule 404(b) is a rule of inclusion

8   rather than exclusion and statements of that kind may

9   well be admissible under Rule 404(b).  So we'll address

10  that as we go.

11            MR. O'REILLY:  Thank you, Your Honor.

12            THE COURT:  Anything else we ought to take up

13  before we recess?

14            MR. SPRINGER:  Nothing from me, Your Honor.

15            MR. STILLEY:  Your Honor, I just wanted to state

16  that if it pleases the Court I will join in whatever

17  Mr. Springer says with respect to an exhibit unless I

18  have a disagreement, in which case I'll make myself

19  heard.

20            THE COURT:  Very well.  We'll resume at ten

21  minutes till the hour.

22       (A RECESS WAS HAD, AFTER WHICH THE FOLLOWING

23  PROCEEDINGS WERE HAD IN OPEN COURT AND WITHIN THE

24  PRESENCE AND HEARING OF THE JURY.)

25            THE COURT:  Thank you.  You may be seated.

```
 1        Mr. O'Reilly, you may continue.  We need to get a

 2   witness in here and then we'll continue.

 3        MR. O'REILLY:  Your Honor, may I approach the

 4   witness stand to put another binder up there?

 5        THE COURT:  Surely.  Members of the jury, let me

 6   take this little pause to enable me to mention one thing

 7   I should have mentioned yesterday.  We'll have a four-day

 8   week next week because on Friday, November 6th, we will

 9   not have court on Friday, November 6th.  And so you can

10   certainly plan accordingly for next week because we will

11   not be here Friday of next week.

12        MR. O'REILLY:  Your Honor, I have been informed

13   that I failed to move in Government's Exhibit 84, which

14   was authenticated and a foundation laid.  I would move it

15   in at this time.

16        THE COURT:  Let's see.  That --

17        MR. O'REILLY:  It was a check dated August 20,

18   2001, payable to Oscar Stilley with the word "retainer"

19   at the bottom.

20        THE COURT:  I'm showing that admitted.  But in

21   any event, is there any objection to Government's Exhibit

22   84?

23        MR. SPRINGER:  No, Your Honor.

24        THE COURT:  It will be received.

25        MR. O'REILLY:  And, Your Honor, there was one
```

PHILIP ROBERTS - DIRECT BY MR. O'REILLY                    312

 1   clarification.  I believe we moved Government's Exhibit
 2   71 into evidence.  However, there seems to be some
 3   confusion and it may have been 72 that was reflected by
 4   the court clerk.  I just wanted to make sure that --
 5          COURTROOM DEPUTY:  I show 72.  I don't know, 71
 6   makes more sense.
 7          THE COURT:  I think probably 71 has been
 8   admitted, but for the sake of clarity, is there any
 9   objection to Government's Exhibit 71?
10          MR. SPRINGER:  Only if there is no 72, Your
11   Honor.  I don't have a 72 down, so there would be no
12   objection to 71 with the proviso that 72 didn't sneak in
13   the back door and we don't know about it.
14          THE COURT:  Well, Government's Exhibit 71 will
15   be admitted.
16          MR. SPRINGER:  Thank you.
17          MR. O'REILLY:  Your Honor, just for
18   clarification, the government has not yet offered
19   Government's Exhibit 72.
20          THE COURT:  Very well.
21          MR. SPRINGER:  Thank you.
22          MR. O'REILLY:  I apologize for this delay.  Your
23   Honor, if I may approach the witness stand simply to put
24   the page I'm going to be asking about.
25          THE COURT:  Go ahead.

```
 1              MR. O'REILLY:  And, Your Honor, for
 2    clarification, I've been advised, though I'm pretty sure
 3    I did move Government's Exhibit 73 into evidence, if not,
 4    that was a check dated April 30th payable to Oscar
 5    Stilley.
 6              THE COURT:  It's in evidence.
 7              MR. O'REILLY:  That is in evidence, thank you.
 8              THE COURT:  Is the marshal aware that we're
 9    resuming?
10         COURT SECURITY:  Your Honor, I don't know, I'll
11    call him.
12      (WITNESS RETAKES THE STAND)
13              THE COURT:  Mr. O'Reilly, you may continue.
14              MR. O'REILLY:  Thank you, Your Honor.
15    Q.  (BY MR. O'REILLY)  Dr. Roberts, I'm going to ask you
16    again to return your attention to Government's Exhibit
17    Number 8, which is in front of you.  It was a check we
18    had briefly discussed earlier.  A few years back, did you
19    have an opportunity to testify before a grand jury?
20    A.  Yes, I did.
21    Q.  Were you asked questions about some of these checks
22    that we've discussed already in that grand jury?
23    A.  Yes.
24    Q.  Do you believe that it might be helpful to refresh
25    your recollection about whether or not that check is
```

PHILIP ROBERTS - DIRECT BY MR. O'REILLY                    314

```
 1  something you recognize to review your grand jury
 2  testimony from that hearing?
 3  A.   Again, I don't understand your question.
 4  Q.   Do you think it might be helpful -- I believe your
 5  testimony was that you don't remember that check.  Is
 6  that correct?
 7  A.   This remittance, Exhibit 8?
 8  Q.   Correct.  Yes, Your Honor -- yes, Dr. Roberts, the
 9  First National Bank of Fort Smith check payable to -- who
10  is it payable to?
11  A.   Lindsey Springer.
12  Q.   Do you think it would be helpful to review your
13  grand jury testimony to help refresh your recollection
14  about maybe what time you had a recollection of this
15  check?
16  A.   It possibly could.  I'm not aware -- remember what I
17  said then.
18  Q.   Fair enough.  What I'm going to ask you to do, if
19  you could, please, in the other binder that's up in front
20  of you and what has been marked for identification as
21  Government's Exhibit 706, page -- beginning on page 18 --
22  sorry, no, yes, on page 18 -- no, I'm sorry, on page 16
23  towards the bottom of the page, line 25, and if you
24  simply can read from there through line 15 on the
25  following page, if you can read that to see if that
```

1  refreshes your recollection.

2  A.   "And if you would make reference to" --

3  Q.   No, no.  Please do not -- read it to yourself.  I

4  apologize.

5  A.   Oh, I'm sorry.  I'm sorry.  Through line 15?

6  Q.   Yes, sir.

7  A.   Okay.  I'm finished.

8  Q.   Okay.  Does that refresh your recollection about

9  whether you at one time had knowledge of what this check

10 was for?

11 A.   Yes.

12 Q.   Okay.  What was this check for, sir?

13 A.   Services and legal work on my case.

14 Q.   Who was it paid to?

15 A.   Lindsey Springer.

16 Q.   And are you familiar with First National Bank of

17 Fort Smith?

18 A.   Yes, I am.

19 Q.   How are you familiar with that?

20 A.   I used to bank there.

21        MR. O'REILLY:  Your Honor, the government would

22 again move Government's Exhibit 8 into evidence.

23        MR. SPRINGER:  No objection, Your Honor.

24        THE COURT:  It is received.

25 Q.   (BY MR. O'REILLY)  Dr. Roberts, I believe you

1  earlier said how you first came to meet Mr. Stilley.  Was

2  that with respect to a question you had about whether or

3  not you had to file tax returns?

4  A.  Well, I've been a student of the truth my entire

5  life and I was aware that he had information and

6  knowledge that I didn't and I just took the opportunity

7  to listen to what he had to say -- or had to say and see

8  if I could apply any of his knowledge to my knowledge

9  base and enhance the truth in my life.

10 Q.  With respect to whether or not you were required to

11 file taxes, what did Mr. Stilley tell you?

12 A.  I don't remember him specifically saying that there

13 wasn't a requirement.  He's quite gifted in

14 constitutional and legal issues.  And to be -- quite

15 frankly, he overwhelmed me a lot.  So I couldn't actually

16 tell you definitively that I recall him making that

17 statement ever.

18 Q.  Okay.  Did you ever have a conversation with

19 Mr. Springer about whether or not you had to file tax

20 returns?

21 A.  Again, I cannot recall any specific conversation in

22 that regard.

23 Q.  Is it possible that in the past you had a

24 recollection that -- or that reference to this grand jury

25 transcript might assist you in remembering?

1   A.   Anything could help me with remembering.  It was a

2   long time ago.

3   Q.   Yes.  Yes, Dr. Roberts.  Let me ask you, if you

4   could, to look at page 9 of that same grand jury

5   transcript and simply look, I believe, from lines 9

6   through 11 and read it to yourself, sir.

7   A.   Page 9, lines 9 through 11?

8   Q.   I believe so, sir, yes.  Actually, line 6 through

9   12.  I apologize.  Have you read that, sir?

10  A.   Yes, I have.

11  Q.   Does that refresh your recollection?

12  A.   It certainly reflects what I said then, yes.

13  Q.   What did you say?

14  A.   At what part of this?

15  Q.   Actually, let me just ask, did Mr. Springer ever

16  tell you whether or not you had an obligation to pay

17  incomes taxes and file tax returns?

18  A.   Yes.  He stated that my conclusions were correct and

19  there was no requirement or liability to do those.

20          MR. O'REILLY:  Your Honor, if I may have a

21  moment.

22          THE COURT:  You may.

23          MR. O'REILLY:  Thank you, Dr. Roberts.  Your

24  Honor, the government ends its direct examination.

25          THE COURT:  Very well.  Cross-examination by

1   Mr. Springer.

2           MR. SPRINGER:  Your Honor, may we approach on

3   one question?

4           THE COURT:  You may.

5       (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND

6   OUT OF THE HEARING OF THE JURY.)

7           THE COURT:  Go ahead.

8           MR. SPRINGER:  Is it improper for me to ask him

9   why he's under arrest or why he's in that suit or would

10  the Court take exception to that if I did?

11          THE COURT:  Under all the circumstances, I think

12  it's probably not inappropriate for you to elicit a brief

13  explanation of the circumstances of his appearances here

14  in custody, but you need to touch on that very briefly

15  and then move on.

16          MR. SPRINGER:  Zippity fast.  Thank you, Your

17  Honor.

18      (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

19  WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

20  PRESENCE AND HEARING OF THE JURY.)

21          THE COURT:  You may proceed.

22                      CROSS-EXAMINATION

23  BY MR. SPRINGER:

24  Q.  Good morning -- or afternoon, Dr. Roberts, depending

25  on how you look at that.  Earlier you identified me as

1   Lindsey Springer; is that correct?

2   A.   To my knowledge, yes.

3   Q.   And could you explain to the Court and jury why you

4   came in here in handcuffs and why you're dressed in that

5   outfit that you're dressed in?

6   A.   Well, it's not because red is a good color for me.

7   Yes, I was detained because I returned a subpoena with an

8   incorrect name on it.

9   Q.   A subpoena to testify here today?

10  A.   There may have been two dates on there, but there

11  was a subpoena asking someone with a name similar to me

12  to present themself and I noted the defect on the

13  subpoena and returned it, was later -- received a letter

14  basically compelling me to present myself or be detained,

15  exactly as what happened.

16  Q.   And for no other reason are you detained; is that

17  correct?

18  A.   That is correct.

19  Q.   No other reason.  Okay.  Mr. O'Reilly just addressed

20  an issue about whether or not I told you that you were

21  required or not required to file tax returns or had

22  income tax liability.  Do you remember that question?

23  A.   I do.

24  Q.   Okay.  And your first response was you didn't

25  remember.  And then as you read the grand jury testimony,

1  did -- is it what you said earlier that you don't

2  remember whether that was actually said or not or is it

3  as you told the grand jury in 2007 with regard to the

4  statement that you read earlier?

5  A.   Certainly as my recollection today is I don't

6  remember.

7  Q.   Thank you.  Now, you testified that Mr. Stilley and

8  you met in 1990.

9  A.   I believe that's correct.

10 Q.   Okay.  You didn't know me in 1990; is that correct?

11 A.   No, I did not.

12 Q.   And you also testified -- is it true you testified

13 that you introduced Mr. Stilley and I, to the best of

14 your understanding?

15 A.   I believe I did.

16 Q.   Okay.  And was that at a Pizza Hut in Fort Smith,

17 Arkansas?

18 A.   I wouldn't know.

19 Q.   Okay.  Now, at the time that you introduced

20 Mr. Stilley and I, you had known me a couple of years; is

21 that correct?

22 A.   Mr. Springer, I really don't recall how long, it may

23 have been a year or less.

24 Q.   Okay.

25           THE COURT:  Stand by just a moment.  Cindy, can

1   you turn the witness's mike up just a little bit?

2          COURTROOM DEPUTY:  Yes.

3          THE COURT:  Proceed.

4   Q.  (BY MR. SPRINGER)  Dr. Roberts, when you were first

5   introduced to me, was that at a meeting at the old

6   Grandview Hotel at 81st and Lewis?

7   A.  That sounds very familiar, yes.

8   Q.  And was that a place where my ministry held

9   meetings?

10  A.  Yes, it was.

11  Q.  And to the best of your knowledge, was what drew you

12  to that meeting is that other people thought certain ways

13  with regard to taxes that you do?

14  A.  Well, as I stated earlier, I've lived my whole life

15  trying to glean the truth and I had come to conclusions

16  that I wanted to follow up on and get as much information

17  as I could.  And, yes, I was led to you as a person that

18  was quite well informed and could help me to understand.

19  Q.  And that was eight years after you had met with

20  Mr. Stilley, correct?

21  A.  That's correct.

22  Q.  And is it also true that the last tax return you had

23  filed previous to this was the 1990 1040 Form?

24  A.  That's correct.

25  Q.  Okay.  Now, when you say that you were trying to

1  understand the obligation to pay income taxes, what is it

2  that you needed to see that would have answered that

3  question definitively for you?

4  A.   Well, again, it's an issue that my entire life I've

5  heard there's two things you have to do, pay taxes and

6  die.  Well, if there was any reason to understand other

7  than death, which I did understand, again, I began to

8  research to find out why there was a requirement, how did

9  this happen.  I grew up in a very patriotic family.  My

10 father was retired military.  I spent my entire life,

11 less my high school years, on a military base both as a

12 child of a serviceman and then as a serviceman myself.

13 My father and brother fought in the Vietnam war.  A very

14 patriotic family.  But something never seemed right about

15 being forced to give up your earnings, your labor, wages,

16 so I began to research and my conclusions were --

17         MR. O'REILLY:  Objection, Your Honor.  His

18 conclusions are not relevant.

19         THE COURT:  Let's go by Q and A.  And the

20 relevance objection may well be meritorious, but let's

21 just have the next question.

22         MR. SPRINGER:  All right.

23 Q.   (BY MR. SPRINGER)  Why did you stop filing a tax

24 return in -- after 1990, why did you not file a 1040

25 form?

PHILIP ROBERTS - CROSS BY MR. SPRINGER                    323

1   A.   Well, I actually had information believing that

2   there was a separation, that sovereigns earning wages for

3   their labor were not required, and I addressed that in

4   letters to Internal Revenue Service in Washington, DC;

5   Memphis, Tennessee; and Little Rock.

6   Q.   Did you get that information from Mr. Stilley in

7   1990 or was that something you got from somewhere else?

8   A.   That was of my own.

9        COURTROOM DEPUTY:  Excuse me.  I'm very sorry.

10  Dr. Roberts, if you could move that microphone to the

11  center of the witness stand.

12       THE WITNESS:  I'll move this book.  Maybe that

13  will help.

14       COURTROOM DEPUTY:  I think it will.

15       THE WITNESS:  Does somebody want to collect

16  these or --

17       THE COURT:  Just set it up there.

18       THE WITNESS:  Okay.

19       COURTROOM DEPUTY:  We're getting some bad

20  feedback.

21       THE WITNESS:  Okay.

22       COURTROOM DEPUTY:  Thank you.

23       THE WITNESS:  Better?

24  Q.   (BY MR. SPRINGER)  Were you aware of Bondage

25  Breakers stated purpose?

PHILIP ROBERTS - CROSS BY MR. SPRINGER                              324

1  A.   I don't recall ever reading a mission statement.  I

2  have a recollection that may or may not be accurate, if

3  you want me to share that with you.

4  Q.   No, just if you know.  In 2000, when you introduced

5  Oscar Stilley and I, do you have any recollection of

6  Oscar and I having a conversation or entering into an

7  agreement whereby he and I from that day forward were

8  going to attempt to impede, impair, obstruct, and defeat

9  any lawful function of the IRS in the computation,

10  ascertainment, assessment, or collection of any income

11  tax owed by me?

12  A.   Never.

13  Q.   Was there ever even any conversation about taxes

14  that I would owe?

15  A.   Never.

16  Q.   Now, you had mentioned in your direct testimony that

17  you had given Lindsey Springer money.  Do you remember

18  that?

19  A.   That's correct.

20  Q.   And you identified several checks; is that true?

21  A.   Yes.

22  Q.   Okay.  And in each of those exhibits, you testified

23  that the checks were drawn from a business named

24  Ortho/Neuro Medical Association; is that correct?

25  A.   Associates.

1  Q.  Associates.  Now, it's a fact that that "associates"

2  word meant that you had a medical doctor in there with

3  you; isn't that true?

4         MR. O'REILLY:  Objection as to relevance, Your

5  Honor.

6         THE COURT:  Overruled.

7         THE WITNESS:  At one point I did.  It wasn't

8  consistent, but the name was the name of the clinic, just

9  a name.

10  Q.  (BY MR. SPRINGER)  Just a name.  Now, who set up

11  that clinic?

12  A.  I did.

13  Q.  And did you get legal advice on that?

14  A.  No, I did not.

15  Q.  Okay.  When you went to the bank and opened up the

16  checking account, did you have to give them evidence that

17  you were doing business under the name Oro/Neuro (sic)

18  Medical Associates?

19  A.  I don't recall what information they required.

20  Other than me opening the account, I don't know.

21  Q.  Would you have ever told me that Oro/Neuro (sic)

22  Medical Association was you individually?

23  A.  I don't know that there would be a reason that you

24  would ask.

25  Q.  Now, in your -- strike that.  I'm sorry.  Now, after

1   you were -- you served your 16 months in prison and you

2   came home, your troubles with the IRS weren't over, were

3   they?

4   A.   They continue to this day.

5   Q.   And who was the expert on the tax law that testified

6   at your trial?

7   A.   I believe a Brian Miller.

8   Q.   Okay.  Do you see him in this courtroom today?

9   A.   Oh, I believe I do.

10  Q.   And have you -- other than the trial testimony of

11  Mr. Miller, have you ever had occasion after that to have

12  any meetings with Mr. Miller?

13          MR. O'REILLY:  Your Honor, objection.  Beyond

14  the scope and relevance.

15          THE COURT:  That will be overruled at this

16  point.  We'll take it one question at a time.  Go ahead.

17  You may answer.

18          THE WITNESS:  Oh, thank you.  I believe one

19  other occasion that he presented himself in my office to

20  discuss the possible grand jury visit regarding you.

21  Q.   (BY MR. SPRINGER)  Okay.  And then from there that

22  led to a telephone call between Mr. Miller, Mr. Shern,

23  and yourself; is that true?

24  A.   I couldn't recall.  Possibly.

25  Q.   At the time that you wrote the checks in 2000 to

1  Lindsey Springer that were entered into evidence in your

2  direct testimony, was it your position or did you hold

3  the position that Oro/Neuro (sic) Medical Associates was

4  a separate business entity from you individually?

5  A.   No, it was not.

6  Q.   Okay.  It always was you and it, the same?

7  A.   That's correct.  And let me correct you, it's

8  Ortho/Neuro.

9  Q.   Ortho/Neuro.  Okay.

10         MR. SPRINGER:  Can I have just one second, Your

11  Honor?

12  Q.   (BY MR. SPRINGER)  Did somebody audit you with

13  regard to the IRS for those payments that you identified

14  in the exhibits, the checks written to Lindsey Springer?

15  A.   I don't recall.

16  Q.   Did anybody ever let you write those off as a tax

17  deductible expense for business?

18  A.   Not to my knowledge.

19  Q.   So it's safe to say that the money you gave me was

20  after tax dollars; is that true?

21  A.   I don't know how that's calculated, but that would

22  sound correct, yes.

23  Q.   When you scouted out Mr. Stilley in 1990, how many

24  lawyers, other than Mr. Stilley, did you talk to?

25  A.   He was the only one.

PHILIP ROBERTS - CROSS BY MR. SPRINGER                          328

```
 1   Q.   Did you try to talk to others?

 2   A.   After my indictment I did.

 3   Q.   Okay.  So is it safe to say that there were very few

 4   choices for lawyers in criminal tax cases?

 5           MR. O'REILLY:  Your Honor, objection as to

 6   relevance.

 7           THE COURT:  Be overruled at this point.

 8   Q.   (BY MR. SPRINGER)  You can answer that.

 9   A.   He was the only one I know that was -- that I felt

10   was knowledgeable and willing to present the case on my

11   terms.

12   Q.   In other words, present your defense?

13   A.   That is correct.

14   Q.   Not Oscar Stilley's beliefs?

15   A.   That is correct.

16   Q.   Not his defense, but your defense?

17   A.   That is correct.

18   Q.   All right.  You testified earlier about a $20,000

19   check that you gave me that was for redoing a bus.  Do

20   you remember that conversation?

21   A.   Yes.

22   Q.   Had you ever seen the bus?

23   A.   No, I have not.

24   Q.   Did you know how I traveled around the country?

25   A.   No, I do not.
```

1  Q.   Did you believe me when I said I would use that to

2  fix a bus?

3  A.   Yes.

4  Q.   Now, except for your testimony about sitting at the

5  trial, you testified earlier I was not allowed to assist

6  Mr. Stilley at your trial; isn't that true?

7  A.   That is correct.

8  Q.   Okay.  So -- and you also testified that I would

9  give Mr. Stilley ideas and then he and you would try to

10 put that in as a defense into your case; is that what you

11 testified to?

12 A.   That's my recollection, yes.

13 Q.   Okay.  And is it safe to say, Dr. Roberts, that as

14 far as actual time spent involving your case that I

15 manually and personally spent very little man hours on

16 your case other than sitting at the trial during your

17 trial?

18         MR. O'REILLY:  Objection.  Calls for

19 speculation, Your Honor.

20         THE COURT:  Overruled.  Answer to the extent you

21 know.  Go ahead.

22         THE WITNESS:  Yes, I have absolutely no

23 knowledge of the amount of effort you put in, other than

24 when I was either personally with you -- that's it.

25 Q.   (BY MR. SPRINGER)  And the person with you is

1  talking about when I sat at the trial?

2  A.   Yes, you didn't get to sit with us.  You sat --

3  Q.   I had to sit in the back of the room, didn't I?

4  A.   That's correct.

5           MR. SPRINGER:  Thank you, Your Honor.  Thank

6  you.

7           THE COURT:  Cross-examination by Mr. Stilley.

8                    CROSS-EXAMINATION

9  BY MR. STILLEY:

10  Q.   Good morning, Dr. Roberts.

11  A.   Good morning.

12  Q.   Is it not true that before you were indicted you had

13  filed certain litigation in U.S. District Court in the

14  Western District of Arkansas trying to get answers to

15  your questions?

16  A.   That is correct.

17  Q.   And isn't it true that you never got those answers?

18  A.   The only answer I got was an indictment.

19  Q.   Isn't it also true that you asked certain other

20  individuals with legal training to see if they had any

21  knowledge about a requirement to file a tax return?

22  A.   That is correct.

23  Q.   Does the name Beverly Stites (ph) ring a bell?

24  A.   Yes, it does.

25  Q.   And what's -- at the time that you asked the

PHILIP ROBERTS - CROSS BY MR. STILLEY                    331

1  question, what were the qualifications of Beverly Stites?

2  A.   She was a United States magistrate judge.

3  Q.   What question did you ask her?

4  A.   I shared with her my research and conclusions and

5  asked her if she could please tell me if I had erred in

6  my conclusions.  And her response --

7          MR. O'REILLY:  Objection, Your Honor.  Calls for

8  hearsay.

9          THE COURT:  Sustained.

10          MR. STILLEY:  Your Honor, I don't believe that

11  -- well, scratch that.

12  Q.   (BY MR. STILLEY)  Did you get a substantive response

13  from Ms. Stites?

14  A.   I don't know how you would qualify "substantive."  I

15  was told she could not go there.

16  Q.   And how was that communicated to you?

17  A.   Verbally, with her hand in my face, stating that she

18  could not go there.

19          MR. O'REILLY:  Your Honor, objection, hearsay.

20          THE COURT:  Overruled.

21  Q.   (BY MR. STILLEY)  Dr. Roberts, the government had

22  you testify and acknowledge that you were convicted,

23  right?

24  A.   That is correct.

25  Q.   The government has changed your behavior, has it

 1   not?

 2   A.   Yes, it has.

 3   Q.   Has the government changed your opinion?

 4   A.   No, it has not.

 5   Q.   You paid a terrible price financially for your

 6   beliefs, have you not?

 7   A.   I have.

 8   Q.   And that continues to this day, does it not?

 9   A.   Yes, it does.

10   Q.   Who did you support in the last presidential

11   primary?

12   A.   I didn't support anyone.

13          MR. O'REILLY:  Objection, Your Honor.

14          THE COURT:  Sustained.  Next question.

15          MR. STILLEY:  That's my last question.  Thank

16   you, Judge.  Pass the witness.

17          THE COURT:  Very well.  Any redirect?

18          MR. O'REILLY:  No, Your Honor.

19          THE COURT:  One inquiry to counsel and to the

20   defendants.  It's my understanding that counsel and the

21   defendants concur that this witness may be immediately

22   released.  Is that correct?

23          MR. O'REILLY:  Yes, Your Honor.

24          MR. SPRINGER:  At once, Your Honor.

25          MR. STILLEY:  Yes, Your Honor.  Thank you.

```
 1                THE COURT:  Very well.  The marshal is directed

 2     to effect the immediate release --

 3                THE WITNESS:  Thank you, gentlemen.

 4                THE COURT:  -- of this witness.  Very well.  And

 5     we'll have the government's next witness.

 6                MR. O'REILLY:  Your Honor, I'd like some

 7     direction on this, only because our next witness cannot

 8     stay after the lunch hour.  I anticipate being very brief

 9     with him.  What I would request is if for some reason he

10     extends that we be able to have a break in witnesses to

11     allow him to go and attend a funeral service.  I'm hoping

12     to be done with him very quickly.

13                THE COURT:  Well, I'm not sure I understand your

14     point.

15                MR. O'REILLY:  Your Honor, it may be necessary

16     if we put him on right now, and he is available to

17     testify, to ask for when we take our lunch break that

18     when we resume we put a different witness on and then

19     resume with Mr. Delozier, who we're talking about, we'll

20     come back and complete any testimony, if necessary.

21                THE COURT:  That may be feasible.  I hope we

22     don't have to do it out of order, but that may well be

23     feasible.

24                MR. O'REILLY:  Then, Your Honor, the United

25     States calls Kenneth Delozier.  Your Honor, may I
```

```
 1   approach the bench to rearrange the books?
 2          THE COURT:  You may.
 3                    KENNETH DELOZIER, JR.
 4   (WITNESS SWORN)
 5                    DIRECT EXAMINATION
 6   BY MR. O'REILLY:
 7   Q.   Sir, please state your name and occupation.
 8   A.   Kenneth Delozier, Jr.  I am a licensed apprentice
 9   embalmer and funeral director for Rice Funeral Service in
10   Claremore.
11   Q.   Did you previously own an establishment that
12   conducted check cashing?
13   A.   Yes, sir, I did.
14   Q.   When was that, sir?
15   A.   My first location opened here in Tulsa in about
16   1988.
17   Q.   For how long did you operate Checks Cashed?
18   A.   Until 2007.
19   Q.   And where were your locations in the Tulsa area?
20   A.   I had a location at 41st and Peoria, 31st and
21   Sheridan, 15th and Sheridan.
22   Q.   With respect to cashing checks, was there a fee that
23   you charged for that?
24   A.   Yes, sir, we did.
25   Q.   What was that fee?
```

KENNETH DELOZIER, JR. - DIRECT BY MR. O'REILLY                335

1   A.   Anywhere from 2 to 3 percent.

2   Q.   What made the difference?

3   A.   The size of the instrument being presented.

4   Q.   And when you say "instrument," do you mean check?

5   A.   Yes, sir.

6   Q.   Did Checks Cashed provide any other services for

7   customers?

8   A.   Yes, sir.  We did money order sales.  We did utility

9   payments.  At one point, we did Western Union services.

10  Q.   With respect to the money orders, what was the

11  largest denomination of money orders that you would sell

12  as an individual instrument?

13  A.   The limit that was placed was $350.

14  Q.   That didn't mean that somebody could only get $350,

15  did it?

16  A.   No, sir.  It would just be more than one money

17  order.

18  Q.   With respect to cashing checks for individuals, what

19  did you require?

20  A.   Each of the locations would have what we called our

21  information card that each customer would fill out.

22  There would also be the presentation of valid ID.

23  Typically, here in Oklahoma, an Oklahoma driver's

24  license.

25  Q.   Would you make a photocopy of that ID?

KENNETH DELOZIER, JR. - DIRECT BY MR. O'REILLY                336

1   A.   Yes, sir.

2   Q.   And I'm going to ask you now if you could take the

3   binder in front of you and look at what is marked for

4   identification as Government's Exhibit Number 1.  Do you

5   have that in front of you, sir?

6   A.   Yes, sir.

7   Q.   Do you recognize that?

8   A.   Yes, sir.

9   Q.   What is that?  What is Government's Exhibit Number

10  1?

11  A.   It is the information card for Lindsey Springer that

12  was filled out at one of our locations.

13          MR. O'REILLY:  Your Honor, at this point, the

14  government would move Government's Exhibit 1 into

15  evidence.

16          MR. SPRINGER:  No objection, Your Honor.

17          THE COURT:  It is received.

18  Q.   (BY MR. O'REILLY)  Do you know Mr. Springer?

19  A.   I know -- yes, sir.

20  Q.   In what context do you know him?

21  A.   I know him as a customer in my stores.

22  Q.   Do you see Mr. Springer in the courtroom today?

23  A.   I do now, yes, sir.

24  Q.   And would you please identify him for the Court?

25  A.   Mr. Springer is standing right there behind you.

KENNETH DELOZIER, JR. - DIRECT BY MR. O'REILLY                337

1              MR. O'REILLY:  May the record reflect he has

2   identified the Defendant Mr. Springer?

3              THE COURT:  The record will so reflect.

4   Q.  (BY MR. O'REILLY)  Mr. Delozier, prior to coming

5   into court today, were you asked to review a series of

6   documents in preparation for testimony?

7   A.  Yes, sir.

8   Q.  I'm going to ask you now if you could quickly go

9   through the exhibits, Government's Exhibits 2 through

10  25.  Just please advise me when you've had a chance to go

11  through those exhibits.  Well, I apologize, 3 through 25.

12  A.  I went through those.

13  Q.  Okay.  Mr. Delozier, what generally are -- what,

14  generally speaking, are Government's Exhibits 2 through

15  25?

16  A.  They're a variety of checks that were made payable

17  to either Lindsey Springer or Bondage Breakers

18  Ministries.

19  Q.  Do you know if these checks were negotiated at your

20  establishment?

21  A.  The ones that are clearly marked with a P, yes.  The

22  ones that were marked with an employee number, which

23  would be ten or the specific checks that I know myself I

24  cashed for Lindsey.

25  Q.  And with respect to Government's Exhibits 2 through

```
 1   -- I mean, 3 through 25, I apologize, are each of these

 2   checks that were, in fact, negotiated at your -- at

 3   Checks Cashed?

 4   A.   Yes, sir.

 5          MR. O'REILLY:  Your Honor, the government would

 6   move Government's Exhibits 2 through -- 3, I apologize --

 7   3 through 25 into evidence.

 8          MR. SPRINGER:  May we approach, Your Honor?

 9          THE COURT:  You may.

10      (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND

11   OUT OF THE HEARING OF THE JURY.)

12          MR. SPRINGER:  The government is talking about

13   Exhibit 2 and we don't have an Exhibit 2.

14          THE COURT:  He corrected that to say 3.

15          MR. SPRINGER:  Okay.

16          THE COURT:  And that's not a good reason to come

17   to the bench.  Return to your table.

18      (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

19   WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

20   PRESENCE AND HEARING OF THE JURY.)

21   Q.   (BY MR. O'REILLY)  Thank you, Mr. Delozier.

22   Mr. Delozier, I'm going to ask you to look at what has

23   been marked for identification as Government's Exhibits

24   27 through 32.

25   A.   You asked me to look at Exhibits 27 through 32; is
```

KENNETH DELOZIER, JR. - DIRECT BY MR. O'REILLY                    339

1   that correct?

2   Q.   Yes, sir.  Have you had a chance to do that?

3   A.   Yes, sir.

4   Q.   The name of your business once again?

5   A.   Checks Cashed.

6   Q.   With respect to your business practice when you

7   negotiated a check for a customer, did you just copy the

8   front of the check?

9   A.   Typically, we would have made a front-and-back copy

10  in some instances.  Mainly, we would just copy the front

11  of the check, yes, sir.

12  Q.   With respect to Government's Exhibits for

13  identification 27 through 32, are each of these copies of

14  checks negotiated at Checks Cashed?

15  A.   Yes, sir, they are.

16          MR. O'REILLY:  Your Honor, the government would

17  move Government's Exhibits 27 through 32 into evidence.

18          MR. SPRINGER:  No objection, Your Honor.

19          THE COURT:  They'll be received.

20  Q.   (BY MR. O'REILLY)  Mr. Delozier, I'm now going to

21  ask you to look -- I apologize, my pages got out of

22  order -- what is marked as Government's Exhibit 35.  Was

23  this instrument negotiated at Checks Cashed?

24  A.   Yes.  Exhibit Number 35 is what you said, right.

25          MR. O'REILLY:  And, Your Honor, the government

```
 1    would move Government's Exhibit 35 into evidence.
 2              MR. SPRINGER:  No objection, Your Honor.
 3              THE COURT:  It will be received.
 4    Q.  (BY MR. O'REILLY)  Mr. Delozier, I'm now going to
 5    ask you what has been marked for identification as
 6    Government's Exhibits 37 through -- just keep going for a
 7    while, it will be through 49 for now.  Sir, do you
 8    recognize if those checks were cashed at your
 9    establishment?
10    A.  Yes, sir.
11    Q.  With respect to all of the checks we discussed so
12    far, who cashed those checks?
13    A.  It could be employees that worked for me under my
14    direct supervision.
15    Q.  I guess I miss -- I miss -- I was unclear.  Who was
16    the customer from whom the checks were cashed?
17    A.  I'm sorry, for Lindsey Springer.
18              MR. O'REILLY:  Your Honor, the government would
19    move Government's Exhibits, I apologize, 37 through 49
20    into evidence.
21              MR. SPRINGER:  No objection, Your Honor.
22              THE COURT:  Thirty-seven through 49 will be
23    received.
24    Q.  (BY MR. O'REILLY)  Now, I'm going to ask you to look
25    at what has been marked for identification as
```

1  Government's Exhibits 50 through 60.  Have you had a

2  chance to review those, sir?

3  A.   Yes, sir.

4  Q.   Were all those checks cashed at Checks Cashed?

5  A.   Yes, sir.

6  Q.   For what customer were those checks cashed?

7  A.   For Lindsey Springer.

8         MR. O'REILLY:  Your Honor, the government would

9  move Government's Exhibits 50 through 60 into evidence.

10        MR. SPRINGER:  No objection, Your Honor.

11        THE COURT:  They'll be received.

12 Q.   (BY MR. O'REILLY)  Now, I'm going to ask you, with

13 respect to when you -- are there certain requirements

14 that currency transaction reports and the like be filed

15 at some times?

16 A.   Yes, sir.  We're required for any transaction over

17 $10,000 or for multiple transactions within one day that

18 would total $10,000.

19 Q.   May I ask you now to take a look at what has been

20 marked for identification as Government's Exhibit 61?

21 A.   I am unable to find Exhibit 61.

22        MR. O'REILLY:  May I have a moment, Your Honor?

23        THE COURT:  You may approach to help.

24        MR. O'REILLY:  Okay.  Let me check with -- oh, I

25 apologize.  My fault, sir.  You can just put the binder

 1  aside and let the record reflect the witness has been

 2  given Exhibit 61 for identification.

 3  Q.   (BY MR. O'REILLY)  Just generally, do you recognize

 4  what has been marked for identification as Government's

 5  Exhibit 61?

 6  A.   Yes, sir, I do.

 7  Q.   What is Government's Exhibit 61?

 8  A.   It's a currency transaction report that would have

 9  been prepared by my -- by my stores as to the transaction

10  that occurred.

11  Q.   Is it a single currency transaction report or is

12  that a whole series of them?

13  A.   There are multiple currency transaction reports

14  here.

15  Q.   With respect to these currency transaction reports,

16  who was the customer with respect to these transactions?

17  A.   With every one that I'm looking at, it would be

18  Lindsey Springer.

19  Q.   Do you recognize these as documents prepared by

20  Checks Cashed?

21  A.   Yes, sir.

22          MR. O'REILLY:  Your Honor, the government would

23  move Government's Exhibit 61 into evidence.

24          MR. SPRINGER:  No objection, Your Honor.

25          THE COURT:  It will be received.

1  Q.   (BY MR. O'REILLY)  Are you familiar with the name

2  Bondage Breakers Ministry?

3  A.   To the extent that I knew that that was a business

4  that Lindsey had.

5  Q.   How did you know that?

6  A.   Because some of the checks that were presented to be

7  cashed were made payable to that same company.

8  Q.   If somebody wants to make a check payable to someone

9  other than their own name, is there any documentation

10 that you require when that happens?

11 A.   Typically, we would ask for some type of

12 documentation that would associate that individual with

13 that company name, a business card, a telephone bill,

14 something like that.

15 Q.   Do you recall what, if any, documentation

16 Mr. Springer gave you?

17 A.   I don't recall what documentation Mr. Springer would

18 have given us.

19       MR. O'REILLY:  May have I have a moment, Your

20 Honor?

21       THE COURT:  You may.

22       MR. O'REILLY:  Your Honor, if I may approach to

23 put a different binder up for Mr. Delozier.

24       THE COURT:  Very well.

25 Q.   (BY MR. O'REILLY)  And just rest assured we're not

 1  going through all of those.  I'm going to ask you simply,

 2  if you could, if you could find Government's Exhibit 142

 3  for identification.  I think it might be in the first

 4  binder, 142.  Do you have 142 in front of you, sir?

 5  A.   Yes, sir, I do.

 6  Q.   Do you recognize what Government's 142 is?

 7  A.   There are multiple -- multiple copies of money

 8  orders that were given to Mr. Springer from one of our

 9  locations.

10          MR. O'REILLY:  Your Honor, I would move

11  Government's Exhibit 142 into evidence.

12          MR. SPRINGER:  No objection, Your Honor.

13          THE COURT:  It is received.

14  Q.   (BY MR. O'REILLY)  If you could set that one aside,

15  sir, please.  And I'm now going to ask you to look in a

16  different binder, Government's Exhibit 262 for

17  identification.

18          MR. O'REILLY:  May I approach the witness, Your

19  Honor?

20          THE COURT:  You may.

21          MR. O'REILLY:  Your Honor, with your permission

22  I will turn this over to the case agent so he can

23  reinsert it into the exhibit.

24          THE COURT:  Very well.

25  Q.   (BY MR. O'REILLY)  262, please.  Sir, just let me

KENNETH DELOZIER, JR. - DIRECT BY MR. O'REILLY                345

```
 1  know when you have 262 in front of you.
 2  A.   Yes, sir.
 3  Q.   Okay.  If you go a little bit ways into 262, about
 4  four pages, about five pages in, I'm going to ask you if
 5  you recognize any part of Exhibit 262.
 6  A.   Will you repeat for me how many pages in you asked
 7  me to go?
 8  Q.   About -- it was about six pages in, I believe.
 9          MR. O'REILLY:  Your Honor, may I approach the
10  witness?
11          THE COURT:  You may.
12  Q.   (BY MR. O'REILLY)  Just to repeat the question, sir,
13  do you recognize any part of Government's Exhibit 262?
14  A.   Yes, sir.  There are, once again, money orders that
15  were issued by the company that I owned to Lindsey
16  Springer.
17  Q.   Thank you.  Now, I'm going to ask you if you can
18  look at what has been marked for identification as --
19          MR. O'REILLY:  And, Your Honor, we are not
20  offering the exhibit at this time.
21  Q.   (BY MR. O'REILLY)  -- to look at what has been
22  marked for identification as Government's Exhibit 274
23  towards the end of that document.  It's in the last eight
24  to ten pages of that document.  Did you find anything
25  that looked familiar in Government's Exhibit 274?
```

1   A.   Yes, sir.  Once again, there are multiple money

2   orders that were given to Lindsey from one of my

3   locations.

4          MR. O'REILLY:  Your Honor, again, we do not

5   intend to introduce this exhibit at this time.

6   Q.   (BY MR. O'REILLY)  May I ask you to look at the very

7   next exhibit, which is Government's Exhibit 275, for

8   identification.  And really what I just want you to do is

9   take a look about seven pages in to the end.  I'm going

10  to ask if you recognize those documents.

11  A.   And may I make sure that I understand the question.

12  Are you asking me on the receipts that are here, is that

13  what you're asking me?

14  Q.   Yes.  The -- is there a series of documents that are

15  purchaser's receipts for money orders?

16  A.   Yes, sir, there are.

17  Q.   Do you recognize those?

18  A.   Yes, sir.

19  Q.   What are those?

20  A.   They're the receipt portion of money orders that

21  would have been issued once again by my -- by one of my

22  stores.

23         MR. O'REILLY:  Your Honor, again, we do not

24  intend to introduce that at this time.

25  Q.   (BY MR. O'REILLY)  Mr. Delozier, I'm now going to

1  ask you to look at what's marked for identification as

2  Government's Exhibit 278, about four pages into the

3  document.  Do you recognize any documents in Government's

4  Exhibit 278?

5  A.  Yes, sir.  They're, once again, money orders that

6  were issued to Mr. Springer through one of our locations

7  in Tulsa.

8  Q.  Now, I'm going to ask you to -- this one I may have

9  to --

10        MR. O'REILLY:  If I may approach, Your Honor?

11        THE COURT:  Approach the witness?

12        MR. O'REILLY:  Yes, Your Honor.

13        THE COURT:  Yes, you may.

14  Q.  (BY MR. O'REILLY)  Sir, handing you what has been

15  marked for identification as Government's Exhibit 288 and

16  actually turning to the page at issue.  Do you recognize

17  any of the documents contained in Government's Exhibit

18  288?

19  A.  Yes, sir.  They are, once again, money orders that

20  were issued from one of our locations.

21  Q.  Approximately -- what year were those money orders

22  issued?

23  A.  The date that is on them is June the 9th of 2003.

24  Q.  Thank you.  You can go ahead and set that aside.

25  I'm going to ask you to go back to Government's Exhibit

1   1.

2          MR. O'REILLY:  And, Your Honor, we are not

3   offering 288 at this time.

4          THE WITNESS:  To Government's Exhibit 1?

5   Q.  (BY MR. O'REILLY)  Yes.

6   A.  Yes, sir.

7   Q.  Is there a place on Government's Exhibit 1 -- and if

8   that could be published for the jury, please.  It's

9   already in evidence.  Is there a place in Government's

10  Exhibit 1 to provide for the -- first of all, what is

11  Government's Exhibit 1?

12  A.  It is, once again, the information card that would

13  have been filled out by Mr. Springer in one of our

14  locations.

15  Q.  Is there a place on this card for a customer to

16  place their social security number?

17  A.  Yes, sir, there is.

18  Q.  Is there any social security number included on this

19  card?

20  A.  No, sir, there isn't.

21  Q.  Now, I'm going to ask you to return your attention

22  to Government's Exhibit 61, which was the series of

23  currency transaction reports.  Do you have that in front

24  of you?

25  A.  Almost.

1          MR. O'REILLY:  May I approach the witness, Your

2     Honor?

3          THE COURT:  You may.

4          MR. O'REILLY:  I believe that one is in a

5     folder.

6     Q.   (BY MR. O'REILLY)  With respect to Government's

7     Exhibit 61, is there a place for the customer or the

8     person whose transaction is being reported for their

9     social security number to be reflected?

10    A.   Yes, sir, there is.

11    Q.   In reviewing this, do you see any social security

12    number indicated?

13    A.   No, sir, there's no social security -- they also

14    have the option of the Oklahoma driver's license as well

15    on them.

16    Q.   And is that number sometimes included?

17    A.   Yes, sir.

18         MR. O'REILLY:  May I have one moment, Your

19    Honor?

20         THE COURT:  You may.

21         MR. O'REILLY:  Thank you very much.  Nothing

22    further.

23         THE COURT:  Is Mr. Delozier the witness who has

24    a commitment right after lunch?

25         MR. O'REILLY:  Yes, Your Honor.  And what we

KENNETH DELOZIER, JR. - DIRECT BY MR. O'REILLY          350

```
 1   could do, with the Court's permission, but maybe we
 2   should approach the bench just to discuss timing of --
 3             THE COURT:  Counsel and parties will approach
 4   the bench.
 5      (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND
 6   OUT OF THE HEARING OF THE JURY.)
 7             THE COURT:  Is this witness the one who has a
 8   funeral to go to?
 9             MR. O'REILLY:  He is working at the funeral,
10   yes, Your Honor.
11             THE COURT:  Okay.  Do you anticipate he'll be
12   available late this afternoon or when?
13             MR. O'REILLY:  I believe so.  Certainly tomorrow
14   he would be available.  The other alternative, I don't
15   know how long cross is anticipated, it may be we could go
16   a little bit late and be done with him.
17             THE COURT:  Let me inquire of Mr. Springer
18   first, how long do you have?
19             MR. SPRINGER:  Fifteen at most.
20             THE COURT:  Mr. Stilley?
21             MR. STILLEY:  None at all.
22             MR. SPRINGER:  I can do it.
23             THE COURT:  Well, we'll go ahead with cross now
24   on that basis, 15 minutes at most.
25      (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,
```

KENNETH DELOZIER, JR. - CROSS BY MR. SPRINGER                    351

```
 1   WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

 2   PRESENCE AND HEARING OF THE JURY.)

 3           THE COURT:  Mr. Delozier, I anticipate that

 4   we'll recess in approximately 15 minutes.  In terms of

 5   the commitment that counsel has brought to my attention,

 6   does that put you in a bind if you're out of here in 15

 7   minutes?

 8           THE WITNESS:  No, Your Honor.  That's fine.

 9   Thank you.

10           THE COURT:  Very well.  Cross-examination by

11   Mr. Springer.

12                   CROSS-EXAMINATION

13   BY MR. SPRINGER:

14   Q.   Good afternoon, Ken.

15   A.   Good afternoon, Lindsey.

16   Q.   You just testified a moment ago about driver's

17   license or social security number; is that correct?

18   A.   Yes, sir.

19   Q.   And as long as you had one or the other you were in

20   compliance with all of your legal obligations; is that

21   right?

22           MR. O'REILLY:  Objection.  Calls for a legal

23   conclusion.

24           THE COURT:  Be overruled.

25   Q.   (BY MR. SPRINGER)  You can answer that question.
```

1   A.   Yes, sir.

2   Q.   Okay.  Now, Mr. Delozier, isn't it -- is it true

3   that you and I have had an almost 20-year business

4   relationship?

5   A.   I would say that would be very, very close to being

6   accurate, since approximately 1989.

7   Q.   You opened in 1988, correct?

8   A.   '87.

9   Q.   '87.  Okay.  So it was not long after that that you

10  and I met.  And you testified earlier about the

11  requirement to file a currency transaction report and you

12  stated, if I'm correct on this, that if it was -- if a

13  transaction was more than $10,000 in one day or there

14  were separate transactions totaling more than $10,000 in

15  one day, that it was your duty to fill out a currency

16  transaction report.  Am I getting that correct?

17  A.   Yes, sir.

18  Q.   Okay.  And was there ever any time when you had a

19  close call, like you had $10,000 in one transaction,

20  would you file the CTR or would you not file the CTR?

21  A.   If the proper procedures were being followed, the

22  CTR should have been filed.

23  Q.   And have you ever been cited by the IRS for not

24  filing the proper CTRs?

25  A.   No, sir.

1   Q.   If you would turn to Government's Exhibit Number 61,

2   you should be familiar with that.  Do you see 61 there?

3   A.   Yes, sir.

4   Q.   Okay.  Now, had you and I ever had any discussion

5   about when a CTR is required to be filed before just now?

6   A.   Never.

7   Q.   Did you ever have any reason to be suspicious about

8   checks that were given to me to report them as a

9   suspicious transaction?

10  A.   No, sir.

11  Q.   Now, if you would, I'm going to have to count in

12  pages in from page 61.  If you would turn to the third

13  page and on the bottom part of the third page it says, on

14  line 27, it says "cash out."  Do you see that?

15  "$10,000"?

16  A.   Lindsey, I just want to make sure that we're looking

17  at the same document.

18  Q.   Right.  It's 4789 and it has got a little 2

19  handwritten at the top of it.  It's the third page in on

20  Exhibit 621.  It's a currency transaction report.

21  A.   Yes.

22  Q.   And do you see where it says "cash out 10,000"?

23  A.   Yes, sir.

24  Q.   Now, isn't it true that you testified that that had

25  to be more than $10,000 to be required to fill out the

1   report?

2   A.   Any currency -- any currency transaction of $10,000

3   -- of $9,999.99 is under anything $10,000 and over.

4   Q.   And here we have a $10,000 amount, correct?

5   A.   That is correct.

6   Q.   Okay.  If you would keep going two more pages in and

7   this has a number 21 handwritten at the top with a circle

8   around it.  Do you see that right there?

9   A.   Yes, sir.

10  Q.   All right.  Now, could you -- do you see where it

11  says "received Austin, Texas, IRS" stamped on it?

12  A.   Yes, sir.

13  Q.   Did you put that stamp on there?

14  A.   No, sir.

15  Q.   How did you get this document with that stamp on

16  there?

17  A.   Well, these were currency transactions that we would

18  have filed.

19  Q.   With the IRS?

20  A.   Yes, sir.

21  Q.   Okay.  Now, was the IRS aware -- well, strike that.

22  Strike that.  In each currency transaction report that

23  the check was made out to Bondage Breakers Ministries,

24  you would fill out my name and Bondage Breakers

25  Ministries on the CTR as you just testified about that --

1  the page with the 21 and the circle on it.  It says

2  Lindsey K. Springer and Bondage Breakers Ministries.  Do

3  you see that?

4  A.   Lindsey, ask me that question one more time, please.

5  Q.   You cashed checks for Lindsey Springer both made out

6  to Lindsey Springer and to Bondage Breakers Ministries,

7  did you not?

8  A.   Yes, sir.

9  Q.   Okay.  And if you filled out a CTR on a check made

10  out to Lindsey Springer, would you include Bondage

11  Breakers Ministries on that CTR?

12  A.   I would assume that that was probably done because

13  we knew that was a business name.

14  Q.   So whether it was Lindsey Springer or Bondage

15  Breakers Ministry, your business was telling the IRS you

16  and I just did a currency transaction report, true?

17  A.   That would be true.

18  Q.   Do you know of any time when the IRS said you did

19  not fill out a currency transaction report on a

20  transaction that was required to be reported?

21          MR. O'REILLY:  Objection.  Excuse me, Your

22  Honor.  Objection, asked and answered.

23          THE COURT:  Overruled.

24  Q.   (BY MR. SPRINGER)  You can answer that.

25  A.   Will you ask me that question one more time?

KENNETH DELOZIER, JR. - CROSS BY MR. SPRINGER                    356

```
 1  Q.   Do you know of any claim by the IRS that you and I
 2  conducted a currency transaction, which was required to
 3  be reported to the IRS that they said to you you did not
 4  report?
 5  A.   There has been no instance of anything not being
 6  reported.
 7  Q.   Have I ever asked you not to report anything to the
 8  IRS?
 9  A.   No, sir, you have not.
10  Q.   Have you ever seen transactions done by me between
11  you which would look suspicious like I was trying to
12  structure them to keep the IRS from finding out about
13  them?
14  A.   No, sir.
15  Q.   Okay.  Now, I'm going to count these pages from the
16  back.  If you would go to the back of 61.  And then I
17  want you to count forward with me when we get -- and
18  we're going to go one, two, three, four, five, six,
19  seven, eight, nine, ten, 11, 12, 13, 14, 15, 16, 17, 18,
20  19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32,
21  33, 34, 35, and 36.  Could you get to page 36 from the
22  back, which is a copy of a United States Treasury check
23  made out to Lindsey Springer.  Do you see that check?
24  A.   Lindsey, I believe I have the right check.
25  Q.   It says United States, it's for $17,000.
```

1   A.   Yes, sir.

2   Q.   And did you -- did your company cash that check?

3   A.   Yes, sir.

4   Q.   All right.  And if you turn over to the next page

5   going back the other direction, what is this FINCEN Form

6   104?  Is this FINCEN 104 associated with the Treasury

7   check, if you know?

8   A.   I cannot -- I can't say that.

9   Q.   Would you have filled out a CTR form on that $17,000

10  check?

11  A.   Yes, sir, we would have.

12  Q.   All right.  Now, several of the documents in Exhibit

13  61 show IRS letters written to Checks Cashed about your

14  CTRs done by Lindsey Springer; is that correct?

15  A.   I have not seen any letters that were written,

16  Lindsey.

17  Q.   Sorry about that.  Trying to get you out of here.

18  Okay.  Would you turn to the sixth page in from the front

19  of Exhibit 61.  Do you see where it says Checks Cashed

20  attention CTR compliance officer?

21  A.   Yes, sir, I do.

22  Q.   Is that document from the IRS?

23  A.   Yes, sir, it is.

24  Q.   Is it involving Lindsey Springer?

25  A.   Yes, sir, it is.

1  Q.  All right.  And the IRS is in this letter basically

2  telling you that there's something wrong with the form

3  you filled out; isn't that what that document is saying?

4  A.  Yes, sir, it does.

5  Q.  What was the problem the IRS was having?

6  A.  There were actually three things that they were

7  requesting.  Item number 2, item number 5, and item

8  number 6.

9  Q.  They didn't like Bondage Breakers Ministries; is

10 that what you're saying?

11 A.  It just --

12        MR. O'REILLY:  Objection, Your Honor, whether

13 they liked or disliked.

14        THE COURT:  Sustained.  That will be stricken.

15 Q.  (BY MR. SPRINGER)  Were they taking exception to the

16 name Bondage Breakers Ministries?

17 A.  Lindsey, I can't say that they were taking

18 exception.  The CTR would have come back to us and it is

19 just telling us that the name and the social security

20 number did not match.

21 Q.  But you never got one of these letters on the CTR

22 that you did for the $17,000 United States Treasury check

23 that we just looked at a minute ago, did you?

24 A.  No, sir.

25 Q.  Now, you testified and identified many money

1   orders.  Now, isn't it true that sometimes I would come

2   in with a pretty large check, sometimes 10, 20, $30,000?

3   A.   Yes, sir.

4   Q.   Did you have 10, 20, or $30,000 in cash just sitting

5   at Checks Cashed?

6   A.   No, sir.

7   Q.   Isn't it true that what would you do is give me a

8   couple thousand dollars in cash and then we would pay --

9   collect a couple thousand dollars a day every other day

10  as you could do it until the whole check was satisfied?

11  A.   Yes, sir, that is correct.

12  Q.   And in some instances you offered to give me money

13  orders; isn't that true?

14  A.   In lieu of cash, yes, sir.

15  Q.   And sometimes I accepted that and sometimes I

16  didn't; isn't that true?

17  A.   That would be true.

18  Q.   Okay.  Did I have any control over the maximum

19  amount of money orders that you could issue through

20  Western Union?

21  A.   No, sir, you did not.

22  Q.   In fact, I worked with you on that, didn't I?

23  A.   Yes, sir.

24  Q.   And now you said you charged a 2 to 3 percent fee;

25  is that correct?

```
 1   A.   That is correct.
 2   Q.   Okay.  And that's your business, cashing checks,
 3   right?
 4   A.   Yes, sir, that's what I did at the time.
 5   Q.   And -- that's what you used to do, right.  Sorry.
 6   That's what you used to do.  Now, when was the first time
 7   that you were summoned by the IRS, if you remember,
 8   regarding Lindsey Springer?
 9           MR. O'REILLY:  Objection as to relevance, Your
10   Honor.
11           THE COURT:  Overruled.
12           THE WITNESS:  Your Honor?
13   Q.   (BY MR. SPRINGER)  If you know.
14   A.   Does that -- I really couldn't -- as far as -- when
15   you say "summoned," are you meaning a subpoena?
16   Q.   Well, no.  Have they ever came in and wanted to look
17   at your books and records about Lindsey Springer's
18   conduct with you?
19   A.   Yes, they have.
20   Q.   More than one occasion?
21   A.   I believe so, yes.
22   Q.   Safe to say there was no secret between you and I as
23   far as our currency transaction reports went with the
24   IRS?
25   A.   There were no secrets.
```

1   Q.   No secrets.  You did not know about any of the

2   purposes of the checks to which you were cashing,

3   correct?  You didn't know the intent behind the author of

4   the check?

5   A.   No, sir.

6   Q.   Okay.  Now, you talked about having to have some

7   kind of information on when you're dealing with a dba, a

8   Bondage Breakers Ministries, and you didn't -- you said

9   earlier that you didn't remember what you had, but you

10  knew you had to have something; isn't that true?

11  A.   Once again, a procedure was followed.  There was

12  something shown that would affirm that in somebody's

13  mind.

14  Q.   And, in fact, sometimes -- isn't it true that every

15  time you asked me to do something, I not only did it, but

16  I was knocking on your door to do it, whatever you asked

17  me to do?

18  A.   Yeah.  I mean, if you're asking me if you were

19  cooperative at all times, then my answer would be yes.

20  Q.   Even if checks bounced.  Is that true?  If checks

21  bounced, I would take care of it immediately; is that

22  right?

23  A.   That is correct.

24  Q.   Was that a rare occurrence?

25  A.   Lindsey, I can't remember but one check for $50 in

362

 1   20 years.

 2   Q.   And as you sit here today, your testimony is that

 3   every requirement that the IRS put upon you regarding

 4   Lindsey Springer that it was complied with and complied

 5   with to the fullest extent of the law?

 6   A.   Yes, sir, that would be correct.

 7           MR. SPRINGER:  No more questions, Your Honor.

 8           THE COURT:  Any cross, Mr. Stilley?

 9           MR. STILLEY:  No, Your Honor.

10           THE COURT:  Any redirect?

11           MR. O'REILLY:  Very brief, Your Honor.

12                    REDIRECT EXAMINATION

13   BY MR. O'REILLY:

14   Q.   Did the currency transaction forms call for a social

15   security number?

16   A.   Each currency transaction form has a place for a

17   social security number, yes, sir.

18   Q.   In Government's Exhibit 61, as reflected in your

19   records, did Mr. Springer ever provide you with his

20   social security number?

21   A.   Not that I'm aware of, sir.

22           MR. O'REILLY:  Nothing further, Your Honor.

23           THE COURT:  Any recross?

24           MR. SPRINGER:  No, Your Honor.

25           THE COURT:  You may step down.  Members of the

1  jury, we'll take our midday recess at this time.  As this

2  matter proceeds, we'll see what works in terms of a

3  workable length of time for the midday recess.  I'm going

4  to start out seeing if an hour and 15 minutes works.  So

5  if my math is right, we will resume at 25 minutes after

6  one.  Please be available for the court security officer

7  to accompany you back to the jury box just a little

8  before 25 minutes after one.  And during this recess, of

9  course, remember my usual threefold admonition, which I

10 will not repeat at this time.

11     All persons in the courtroom will remain seated

12 while the jury departs.

13     (JURY EXITS THE COURTROOM)

14          THE COURT:  Okay.  The jury has left the

15 courtroom.  I want to touch on one thing before we take

16 our break.  Mr. Springer, you're in danger of wearing out

17 your welcome at the bench.  We have to have a very good

18 reason for a bench conference and a little confusion

19 about an exhibit number is not a good reason.  And the

20 danger, of course, is that if you keep on coming to the

21 bench to quibble about an exhibit number, then I'm going

22 to start wondering whether you've got a good reason to

23 come to the bench, kind of like crying wolf.  So you have

24 to have a very good reason to have the interruption

25 inherent in a bench conference.  And I expect that you'll

 1  bear that in mind.

 2      Anything else that we ought to take up before we

 3  take our midday recess?

 4          MR. SNOKE:  Your Honor, I would just ask the

 5  Court, we had some discussion yesterday about the Court

 6  looking into the transcript on Vikki Wiggins regarding

 7  the motion.  And I left that out of my opening statement

 8  because we had not yet had a ruling on it, but the Court

 9  indicated it might get to that.  I don't know if it did

10  last night, but.

11          THE COURT:  Well, as promised, there was no ball

12  game, so I did.  Does either side have a problem if I

13  give you my rulings at this point?  In other words --

14          MR. SNOKE:  That's what I was asking for.

15          THE COURT:  Pardon me?

16          MR. SNOKE:  That's what I was asking for.

17          THE COURT:  Well, obviously, it's possible that

18  people could start feeling a little physical problem if

19  they don't get a meal, and I don't know if anybody here

20  has that problem, but everybody needs to get out their

21  pen because I'm going to write -- to write down my

22  rulings.  The vast majority of the objections by both

23  sides are overruled.  But I'm going to go through them

24  one by one.  There are two -- I think two exhibits as to

25  which I sustained the objection because Ms. Wiggins could

 1   not identify the document.  That obviously does not

 2   exclude the possibility that that exhibit may come in

 3   through some other witness, but we'll address that as

 4   appropriate.

 5        And for the most part, I will give you the page and

 6   line where the objection appears and I will tell you

 7   whether it's sustained or overruled.  So I think for now,

 8   the best thing for you to do is to just note the page and

 9   line as I state the page and line.

10        The objection at page 16, line 11, is overruled.

11   The objection at page 18, line 11, is overruled.  The

12   objection at page 18, line 22, is overruled.  The

13   objection at page 24, line 9, is overruled.  Page 26,

14   line 14, is overruled.  Page 33, line 23, is overruled.

15   Page 35, line 14, is overruled.  Page 36, line 22, is

16   overruled.  Page 37, line 5, is overruled.  Page 39, line

17   20, is overruled.  The motion to strike at page 40, line

18   1, is denied.  The objection at page 40, line 20, is

19   overruled.  The objection at page 41, line 5, is

20   overruled.

21        And Mr. Snoke is going to have equally bad luck when

22   I come to his, so just bear in mind.

23        The objection at page 53 by Mr. Snoke is overruled.

24   The objection at page -- that's page 53, line 7, and also

25   page 53, line 11, is overruled.  The objection at page

1 54, line 24, is overruled.  The objection at page 56,

2 line 9, is overruled.  The motion to strike at page 56,

3 line 10, is overruled.  Mr. Snoke's objection, page 56,

4 line 20, is overruled.  The objection at page 58, line

5 16, is overruled.  And Mr. Snoke's motion to strike is

6 denied.  The objection at page 60, line 17, that's

7 actually a motion to strike, is denied.  The objection at

8 page 61 by Mr. Snoke, line 20, is overruled.  The

9 objection at page 62, line 12, is overruled.  The

10 objection at page 66, line 24, is overruled.  The

11 objection at page 80, line 19, is overruled.  The

12 objection at page 82, line 6, is overruled.  The motion

13 to strike in the same line is denied.  The objection at

14 page 86, line 18, is overruled.  Eighty-six, line 23, is

15 also overruled.  The objection at page 96, line 9, is

16 overruled.

17     Okay.  Page 100, there's an objection to Defense

18 Exhibit Number 7.  That will be sustained.  She did not

19 recognize the document.  So it's sustained.  As I have

20 said, that may be identified through another witness.

21 We'll just have to see.

22     Page 102, line 4, there's an objection to Defense

23 Exhibit Number 8, which is sustained.  She could not

24 identify the document.  So the objection to Defense

25 Exhibit Number 8 will be sustained.  The objection to

 1   testimony, page 102, line 10, is overruled.  The

 2   objection at page 108, line 5, is overruled.  The

 3   objection at page 109, line 3, is overruled.

 4       The objection to Defendants' Exhibit 9 at page 111,

 5   line 6, is overruled.  Which is repeated.  That's an

 6   objection to an exhibit.  I'm sorry, it's sustained.

 7   Page 111, line 6, that is sustained to Defendants'

 8   Exhibit 9.  That objection is repeated at page 112, line

 9   14.  And that is sustained as an objection to Defendants'

10   Exhibit Number 9 for the same reason.

11       Mr. Snoke's objection at page 114, line 24, is

12   overruled.  The motion to strike at page 115, line 14, is

13   denied.  The objection by Mr. Snoke, page 118, line 11 is

14   overruled.  The objection at page 119, line 5, is

15   overruled.  The objection at page 119, line 7, is

16   overruled.  The objection at page 121, line 19, is

17   overruled.  The objection at page 124, line 9, is

18   overruled.  The objection at page 129, line 1, is

19   overruled.

20       The objection at page 130, line 17 and line 22, are

21   both overruled.  The objection at page 131, line 16 and

22   line 22, are both overruled.  The objection at page 134,

23   line 20, is overruled.  The objection at page 135, line

24   3, is overruled.  The objection at page 136, line 1, is

25   overruled.

1    I believe I'm accurate in saying that the only

2   objections that were sustained were the objections to

3   exhibits.  No objections to testimony were sustained.

4       Then I have the motion to quash testimony of Vikki

5   Wiggins, Docket Entry Number 210, which was filed on

6   October 24th, supported by a brief at Docket Entry Number

7   211.  The United States responded to it by a response

8   filed yesterday.  And Mr. Springer joined in that motion,

9   as indicated at Docket Entry Number 219.

10      So I'm treating this as two motions, specifically

11  Mr. Stilley's motion at Docket Entry Number 210 and

12  Mr. Springer's motion at Docket Entry Number 219.

13  Painting in perhaps just a bit of a broad brush, it is my

14  conclusion that Ms. Wiggins does not have to have been

15  the source of the funds involved in a transaction to

16  which she testified in order to be competent to testify

17  to what she knows about the transaction.

18      For that reason and as well as all of the other

19  reasons argued in the motion, the motion to quash at

20  Docket Entry Number 210 is denied and the motion at

21  Docket Entry Number 219 is likewise denied.

22      Anything further before we take our midday recess?

23          MR. O'REILLY:  Not from the government, Your

24  Honor.

25          MR. SPRINGER:  Yes, Your Honor, just one thing.

BRENDA FREDERIKSEN - DIRECT BY MR. SNOKE                          369

 1   I understood the sustaining of number 7, number 8, but

 2   you just said you sustained 9, but you didn't say what it

 3   was.

 4          THE COURT:  Same reason.

 5          MR. SPRINGER:  Thank you.

 6          THE COURT:  Court will be in recess.

 7      (A RECESS WAS HAD, AFTER WHICH THE FOLLOWING

 8   PROCEEDINGS WERE HAD IN OPEN COURT AND WITHIN THE

 9   PRESENCE AND HEARING OF THE JURY.)

10          THE COURT:  Good afternoon.  Please be seated.

11   Welcome back, ladies and gentlemen.  We'll have the

12   government's next witness.

13          MR. SNOKE:  Government would next call Brenda

14   Frederiksen.

15          THE COURT:  Say that name again.

16          MR. SNOKE:  Frederiksen.

17          THE COURT:  Very well.

18          COURTROOM DEPUTY:  If you would just come right

19   up here and be sworn, please.  Raise your right hand.

20                     BRENDA FREDERIKSEN,

21   (WITNESS SWORN)

22                     DIRECT EXAMINATION

23   BY MR. SNOKE:

24   Q.  Would you state your name and spell your last name

25   for the court reporter, please.

1   A.   It's Brenda Frederiksen and the last name is

2   F-R-E-D-E-R-I-K-S-E-N.

3   Q.   All right.  And where do you live, ma'am?

4   A.   I live in Van Buren, Arkansas.

5   Q.   Okay.  Do you know Lindsey Springer?

6   A.   Yes, sir, I do.

7   Q.   Do you see him in the courtroom here today?

8   A.   Yes, I do.

9   Q.   Okay.

10  A.   He stood up, though.

11  Q.   Okay.  Do you know Oscar Stilley?

12  A.   Yes, sir, I do.

13  Q.   All right.  See him in the courtroom today?

14  A.   Yes, sir.

15  Q.   All right.  Do you know Dr. Phil Roberts?

16  A.   Yes, sir, I do.

17  Q.   Okay.  Can you tell us what your relationship was

18  with Mr. Roberts -- Dr. Roberts?

19  A.   Dr. Roberts and I lived together for approximately

20  12 years.

21  Q.   All right.  And what years would those be?

22  A.   Like '93 throughout '05.

23  Q.   All right.

24  A.   And I also was his office manager in his

25  chiropractic practice.

BRENDA FREDERIKSEN - DIRECT BY MR. SNOKE                371

1   Q.   You were also the office manager at his business?

2   A.   Yes, sir.

3   Q.   And what business was that?

4   A.   Roberts Chiropractic.

5   Q.   Okay.  Was there something called an Ortho/Neuro

6   Chiropractic?

7   A.   Ortho/Neuro Medical Associates.

8   Q.   And what was that?

9   A.   It was also -- it was a trust that we had set up

10  that -- that Dr. Roberts had set up.  That's how we did

11  our billing through that trust company.

12  Q.   All right.  You say "we set up"?

13  A.   "He."  That was his -- it was his tax ID number for

14  that corporation.

15  Q.   All right.  Did you have something to do with the

16  setting up of that trust?  Is that why you said "we"?

17  A.   No.  I use that as a term of us being linked

18  together at that time, so --

19  Q.   I see.  All right.  And after you -- did you become

20  -- work for Dr. Roberts about the same time you were also

21  romantically involved with him?

22  A.   Yes, sir.

23  Q.   That whole time period?

24  A.   Yes, sir.

25  Q.   What was your job at the chiropractic clinic?

1   A.   I was the office manager, so I did the hiring and

2   firing.  I took x-rays.  Just any of the office duties.

3   Q.   Okay.  And during that whole time period or

4   practically that whole time period, was it set up as a

5   trust under the umbrella of this Ortho/Neuro --

6   A.   No.  We initially were just Roberts Chiropractic and

7   then at some point in time it went into Ortho/Neuro, but

8   I'm not sure of those dates or facts.

9   Q.   All right.  And what size was this business?  How

10  many people were involved in --

11  A.   You mean how many were employed?

12  Q.   How many employees or --

13  A.   Everybody was contract labor.  And there was

14  Dr. Roberts, he was the only -- when I initially went in

15  the practice, he was the only physician there.  And then

16  we would have, besides myself, one or two other ancillary

17  staff members.

18  Q.   During that time period, did you -- what were your

19  duties as office manager?

20  A.   I would hire staff members, I did staff training,

21  accounts payables, accounts receivables, just a myriad of

22  things.

23  Q.   All right.  At some time, then, after you became

24  employed there with Dr. Roberts -- by the way, where is

25  this clinic?

1    A.   It's in Fort Smith, Arkansas.

2    Q.   At some time after you became employed there, did

3    you become aware of or meet Lindsey Springer?

4    A.   Yes, sir.

5    Q.   And what were the circumstances -- what was the

6    first time you met Lindsey Springer?  What were the

7    circumstances?

8    A.   You know, it had to have been a couple of years

9    after I was in the practice and I know Dr. Roberts was in

10   pursuit of answers regarding tax law and some tax

11   issues.  So I'm not for sure -- I don't recall how he

12   actually became acquainted with Lindsey, but, you know,

13   we would -- on occasion came to meetings in Tulsa.  And I

14   think that might have been the first time I ever met

15   Lindsey.

16   Q.   All right.  The meetings were here in Tulsa?

17   A.   Yes.

18   Q.   Okay.  And who would -- that -- you say that's when

19   you first -- you think you met Lindsey Springer?

20   A.   That's my recollection that that was the first time,

21   yes.

22   Q.   All right.  And what were these meetings, as you

23   called them, in Tulsa?  What were they concerning?

24   A.   It was -- they were basically about tax law.  That,

25   you know, there's no law that requires you to file income

1  tax and that the tax system is basically voluntary.

2  Q.   All right.  And who -- who at these meetings would

3  be making statements of that nature?

4  A.   Lindsey.

5  Q.   All right.  Were there other lecturers besides

6  Mr. Springer?

7  A.   I don't ever recall anybody else, but there could

8  have been, but I don't recall that.

9  Q.   Is there, then, pretty much his meetings that you're

10  talking about?

11  A.   Yes.

12  Q.   Mr. Springer?

13  A.   Yes, sir.

14  Q.   At the -- at any of these meetings -- about how many

15  did you attend here in Tulsa with Dr. Roberts?

16  A.   You know, I can recall at least two and there may

17  have been more, but I know of at least two.

18  Q.   All right.  And -- all right.  Then, at some point

19  in time, did Dr. Roberts then have a visit by some IRS

20  criminal investigators there in Fort Smith?

21  A.   Yes.  Yeah, an investigation was taking place is

22  what we were -- what we found out.

23  Q.   Okay.  All right.  Are you aware of -- well, when

24  was it relative to that that you first met Oscar Stilley?

25         MR. SPRINGER:  Your Honor, I would object.  I

```
 1   need a time frame.
 2            THE COURT:  Clarify that.
 3            MR. SNOKE:  All right.
 4   Q.  (BY MR. SNOKE)  Can you tell us, first of all, about
 5   when was it that you became aware of some investigation
 6   of Dr. Roberts?
 7   A.   Dr. Roberts was indicted at approximately 1999
 8   through 2000 and it was before the indictment is when we
 9   found out the investigation was going on.
10   Q.   All right.  Then relative to that, finding that out
11   or the indictment, can you tell us about when you first
12   met Oscar Stilley?
13   A.   I may have met Oscar prior to Dr. Roberts'
14   arraignment, I don't recall.  I know that's when he and
15   Dr. Roberts started working together was when Dr. Roberts
16   went in for his arraignment.  And I may have met Oscar,
17   you know -- I think, obviously, I did because they were,
18   you know, preparing their case for arraignment.  But
19   prior to him helping Dr. Roberts with his case, I don't
20   recall meeting with him before that.
21   Q.   All right.  The arraignment, then, would have
22   followed the indictment; is that correct?
23   A.   Yes.
24   Q.   Do you remember about when he was indicted?
25   A.   It was somewhere in 1999 or 2000 because he went to
```

1   trial in 2001, I believe.

2   Q.   All right.  All right.  Prior to this arraignment

3   and your meeting of Oscar Stilley, did you have -- were

4   you present at any meetings discussing the case with

5   Mr. Springer?

6   A.   Prior to Dr. Roberts' arraignment?

7   Q.   The question now is prior to the arraignment.

8   A.   Yes.  Yeah.

9   Q.   All right.  And where would that have taken place?

10  A.   Those would have either been either phone calls or

11  there were occasions when Lindsey did come over to

12  Dr. Roberts' office.

13  Q.   All right.  And then after the arraignment, were

14  there other meetings that you were aware of?

15  A.   Yes.

16  Q.   Did you participate in any of these meetings or were

17  you just aware of when they came in the office or --

18  A.   No, I was usually present, so they were usually

19  after hours because we, you know, saw patients and so it

20  would be after hours.

21  Q.   All right.  And where did those -- the meetings

22  after the arraignment take place?

23  A.   They would have been either in our office and they

24  may have been at Mr. Stilley's office.  And I never did

25  go to Mr. Stilley's office.  So if Dr. Roberts ever went

1  there, he did go there by himself.  But they typically

2  were at our office.

3  Q.   All right.  Did they take place at your home or at

4  Dr. Roberts' home?

5  A.   I don't ever recall Lindsey or Oscar being in our

6  home, no.

7  Q.   Okay.  But at the office, after hours?

8  A.   Yes, sir.

9  Q.   And was there ever a meeting, then, when both Oscar

10 Stilley and Lindsey Springer were there for that purpose

11 and you?

12 A.   You know, I think there may have been one occasion

13 when they both would have been there and there may have

14 been more than those.  Just so far back.  But I -- I

15 think at least one.

16 Q.   Okay.  Now, did you have anything to do with the

17 preparation of checks to either Mr. Stilley or Mr. -- or

18 Oscar Stilley, that is, or Lindsey Springer?

19 A.   Yes.

20 Q.   Okay.  And I want to talk about that time period.

21 First of all, the time period before -- well, let's cover

22 this first.  At some point, there was a trial on these

23 charges?

24 A.   Yes, sir.

25 Q.   And were you present at any of the trial?

BRENDA FREDERIKSEN - DIRECT BY MR. SNOKE                 378

1   A.   I was present every minute of the trial.

2   Q.   All right.  And who represented Dr. Roberts at the

3   trial?

4   A.   Mr. Stilley, Oscar did.

5   Q.   All right.  And was Mr. Springer present at that

6   trial?

7   A.   Yes, he was there every minute also.

8   Q.   Okay.  And you say -- okay.  Where was -- was

9   Mr. Springer able to sit with Mr. Stilley at the counsel

10  table?

11  A.   No, he was not.  He was in the gallery.

12  Q.   Did you observe Mr. Springer providing any services

13  during the course of the trial to Dr. Roberts and his

14  defense?

15  A.   Sure.  He would occasionally pass up notes to

16  Oscar.  I don't know if they were questions or maybe just

17  thoughts, I'm not sure.  But, sure, he would pass up

18  notes.

19  Q.   Okay.  And what was the result of that trial?

20  A.   Dr. Roberts was convicted on willful failure to

21  file, a misdemeanor.

22  Q.   All right.  And he was sentenced to what, if you

23  recall?

24  A.   I don't recall what his actual sentence was, but I

25  know he served 12 or 13 months in federal prison and then

BRENDA FREDERIKSEN - DIRECT BY MR. SNOKE                    379

1   two months at a halfway house.

2   Q.   All right.  And while he was in prison, what did you

3   do?

4   A.   I continued to run the practice.  Another doctor was

5   hired in and it was business as usual.  And went and

6   visited Dr. Roberts every weekend.

7   Q.   Did you work with another chiropractic doctor, did

8   you say?

9   A.   Yes.  Yeah, we hired somebody in before he left

10   and --

11   Q.   You say "we."  That's you and --

12   A.   Dr. Roberts and I made that decision together.

13   Q.   Okay.

14   A.   And he came in that following Monday when

15   Dr. Roberts was gone.

16   Q.   All right.  Now, prior to his -- Dr. Roberts'

17   conviction and sentencing, did you have anything to do

18   with the preparation of or issuance of any checks of --

19   was that one of your jobs?

20   A.   Prior to?

21   Q.   Prior to.

22   A.   Yes, there were -- I had control of the checkbook

23   and I would, you know, pay our accounts.  You know,

24   whether it would be, you know, to the lighting company or

25   whoever.  Typically, I would write out the checks and

1  Dr. Roberts would sign all of those.  And there were some

2  months that he would write the checks and then bring them

3  to me and I would, you know, put them in the envelope.

4  So it was kind of a shared duty.  But, yeah, very well, I

5  could have written some of those checks prior to his

6  incarceration and he signed them.

7  Q.  All right.  And after Dr. Roberts was sentenced, who

8  prepared the checks, if any, for the Roberts Chiropractic

9  Center or the Ortho/Neuro Medical Associates?

10  A.  After his incarceration?

11  Q.  After he was incarcerated.

12  A.  I did.

13  Q.  All right.  So I'm going to show you just a couple

14  of checks here, if I may.  And, actually, they're pretty

15  close together, but -- or we actually have -- do we

16  have -- do we have that book?

17       MR. SNOKE:  May I approach?

18       THE COURT:  You may.

19  Q.  (BY MR. SNOKE)  If you would look at -- in that

20  book, open it up to Government's Exhibit 18.

21       MR. SNOKE:  I think it's in evidence.  Maybe we

22  can pull it up on the screen.

23  Q.  (BY MR. SNOKE)  Can you see that on the screen?

24  A.  Uh-huh, yes, I can.

25  Q.  All right.  Do you recognize that check?

1  A.   Yes, I do.

2  Q.   All right.  And did you have anything to do with the

3  preparation of that check or the sending of it?

4  A.   Yes, I did.

5  Q.   All right.  So tell us about the check, what was

6  that for?

7  A.   This is to Lindsey Springer and it's $10,000.

8  Q.   And what's the date on the check?

9  A.   8/3/01.

10  Q.   All right.  And this is several months after

11  Dr. Roberts has reported to the prison; is that correct?

12  A.   Uh-huh, yes.

13  Q.   And do you know for what purpose that check was

14  issued?

15  A.   It would have been for help with Dr. Roberts' case,

16  research, you know, whatever service Lindsey might

17  have --

18  Q.   All right.  Well, the trial is over and Dr. Roberts

19  is incarcerated.

20  A.   Okay.  So this would have been --

21  Q.   Do you know whether it was an appeal --

22  A.   Yes.

23  Q.   -- that anybody was pursuing?

24  A.   Yes.  If I'm not mistaken, I believe that there was

25  probably a habeas filed when he was -- after he reported

1  to Texarkana and then there was an appeal that went to

2  the Eighth Circuit.  And I believe there might have been

3  an appeal that tried to go to the Supreme Court.  I'm not

4  for certain about that.  But, yeah, this would have been

5  for appeal work and those services.

6  Q.  All right.  And if you can look at Exhibit 84.

7       MR. SNOKE:  Can you pull that up?

8  Q.  (BY MR. SNOKE)  It should be on the screen there.

9  A.  Yes, it is.

10 Q.  Do you recognize this check?

11 A.  Yes, I do.

12 Q.  And what was that for?

13 A.  This was also after Dr. Roberts was incarcerated, so

14 this would have been for, you know, work on his appeal.

15 Q.  All right.  This check is dated 8/20 of 01, which is

16 about three weeks or two and a half weeks after the other

17 one we just looked at.

18 A.  Right.

19 Q.  In August of '01.  And who is that payable to?

20 A.  This is to Oscar Stilley.

21 Q.  All right.  And do you recognize your handwriting on

22 that check?

23 A.  Yes, I do.

24 Q.  Okay.  Is there some handwriting on that check that

25 you don't recognize?

1   A.   In the note section, the "for" section, it says

2   "retainer" and that -- that doesn't really look like my

3   handwriting.

4   Q.   All right.  And that was for $5,000; is that

5   correct?

6   A.   Yes, sir.

7   Q.   All right.  Now, this is drawn on Ortho/Neuro

8   Medical Associates at the First National Bank.  Was that

9   one of the accounts that the business had?

10  A.   Yes, sir.

11  Q.   At that time?

12  A.   Yes, sir.

13  Q.   And the other one, if we have to go back to 18, was

14  drawn on a Roberts Chiropractic Center?

15  A.   Yes, sir.

16  Q.   On City National Bank?

17  A.   Right.

18  Q.   Did the business have an account there as well?

19  A.   Yes.

20  Q.   At that time?  After Dr. Roberts -- after

21  Dr. Roberts was convicted and sentenced, let's just say

22  after Dr. Roberts went off to jail, did you have any

23  conversations with either Mr. Springer or Mr. Stilley

24  concerning the payment of funds such as this?

25  A.   You know, I probably had those conversations with

1   Lindsey.  Oscar -- all payments that were made to him

2   were made off of a statement, so he would send in his

3   statement, hours worked, X number of dollars per hour,

4   or, you know, whatever the case may be, and so I would

5   pay off of that statement.  The other would have been a

6   verbal conversation with Lindsey about payment or from

7   Dr. Roberts telling me that he had spoken to Oscar or

8   Lindsey while he was in prison and asking me to, you

9   know, give them some money to --

10  Q.   All right.  Did -- with respect to Mr. Springer, did

11  you ever receive a bill or a statement?

12  A.   No, sir.

13  Q.   All right.  It was verbal then?

14  A.   Yes.

15  Q.   And when you would issue a check such as this to

16  Government's Exhibit 18 there to Mr. Springer, what would

17  prompt you to do that?

18  A.   That would have -- any check that was written to

19  Lindsey after Dr. Roberts was incarcerated would have

20  been a directive coming from Dr. Roberts.  Either he had

21  spoken with Lindsey on the phone or maybe I had spoken

22  with Lindsey and relayed to him what Lindsey had -- you

23  know, what our conversation was and then he would direct

24  me to, you know, give him some funds.

25  Q.   All right.  Either before or after or any time in

1   your dealings then with Mr. Springer and concerning

2   money, did you ever have any conversations when

3   Mr. Springer called you directly?

4   A.   Prior to Dr. Roberts' incarceration?

5   Q.   Well, prior or after.

6   A.   Prior, no, I never had one-on-one conversations with

7   him about that.

8   Q.   All right.  After Dr. Roberts was incarcerated?

9   A.   I believe afterwards I did.

10  Q.   All right.  And what would he say in those --

11  A.   You know, he would let me know, you know, what was

12  -- what kind of track we were taking, you know, what he

13  was going to do with Oscar in order to, you know, get the

14  appeal going or, you know, maybe it was for, you know,

15  research time or whatever.  So he would just kind of give

16  me an update of the game plan of what was going on with

17  Dr. Roberts' case and his hopeful release.

18  Q.   All right.  And if that occurred from Mr. Springer,

19  if he called you regarding money, then would you check

20  with Dr. Roberts before you issued a check?

21  A.   Yes, I would have always checked with him on paying

22  that type of bill.

23  Q.   Do you remember any discussion, either before --

24  well, it would have been before, I guess, Dr. Roberts

25  went to prison at any of these meetings you said you were

1  present at where Mr. Springer discussed how to

2  characterize the checks that he was getting for defending

3  Dr. Roberts?

4  A.   You mean what the checks would go for or -- I'm not

5  sure what the --

6  Q.   How to characterize the checks as payment for his

7  services?

8  A.   Like a donation, his ministry?

9  Q.   Is that what you would call some discussion of

10  donations?

11  A.   Yes, I've heard that.

12  Q.   What discussion did you hear from and from whom

13  regarding calling these payments for the defense work

14  donations?

15  A.   I don't recall that verbiage.

16           MR. SPRINGER:  Objection.

17           THE COURT:  State your objection.

18           MR. SPRINGER:  Hearsay.

19           THE COURT:  Overruled.

20           THE WITNESS:  I don't recall that verbiage maybe

21  being used once Dr. Roberts was, you know, convicted.

22  But, you know, when we would come to the meetings in

23  Tulsa, he certainly would say that, you know, we could

24  donate to his ministry.

25  Q.   (BY MR. SNOKE)  All right.  Were you still running

1  the -- or overseeing the chiropractic clinic when

2  Dr. Roberts returned from prison?

3  A.   Yes.

4  Q.   Okay.  And at some time after that did you have a --

5  did you sever your relationship with Dr. Roberts?

6  A.   Yes, I did.

7  Q.   And you now -- by the way, what name were you using

8  in those days when we're -- we've talking about here?

9  A.   Gray.

10  Q.   Gray?

11  A.   Uh-huh.

12  Q.   All right.  And your name now is Frederiksen.  So

13  you obviously remarried -- or married?

14  A.   I married, yes.

15        MR. SNOKE:  I don't believe I have any other

16  questions at this time, Your Honor.

17        THE COURT:  Cross-examination.

18        MR. SPRINGER:  Yes, Your Honor.  Thank you.

19                CROSS-EXAMINATION

20  BY MR. SPRINGER:

21  Q.   Brenda, I'm Lindsey Springer, as you testified.

22  Could you explain the difference about Roberts

23  Chiropractic, I think it's clinic, but it may have been

24  another word, versus Oro/Neuro (sic) Medical?

25  A.   The difference between those?

BRENDA FREDERIKSEN - CROSS BY MR. SPRINGER                388

1   Q.   Yes.  Are they the same or are they different?

2   A.   You know, they're the same in -- business-wise,

3   Ortho/Neuro provides chiropractic services and massage

4   therapy services and so does Roberts Chiropractic.  But

5   on -- I guess you could say on paper they were different.

6   Q.   They were different.  And you mentioned earlier that

7   the medical practice had its own federal ID number; is

8   that correct?

9   A.   Ortho/Neuro.

10  Q.   Had its own federal ID number?

11  A.   Yes.

12  Q.   Did you have anything to do with getting that

13  federal ID number issued by the IRS for that entity?

14  A.   You know, I could have filled out the form and

15  helped Dr. Roberts, you know, with that paperwork, yes.

16  Q.   Okay.  You testified earlier that during

17  Dr. Roberts' trial that I passed some notes and sat in

18  the back of the room.  Remember that testimony?

19  A.   Uh-huh.

20  Q.   And you also testified that on the $10,000 check

21  dated 8/3/01 that it was your understanding that was for

22  research services.  Is that a correct phrase?

23  A.   You know, it would have been pertaining to

24  Dr. Roberts' case, period, so --

25  Q.   And if I can just make this clear for the record,

1   Dr. Roberts would tell you what to do and you would do

2   what he asked; is that correct?

3   A.   When it came to paying for legal services or those

4   type of services, yes.

5   Q.   And with Bondage Breakers Ministry or Lindsey

6   Springer, would that also include when he wanted

7   donations to be given?

8   A.   Yes.

9   Q.   Okay.  And while he was in prison -- he wasn't able

10  to write checks while he was in prison, right?

11  A.   No, sir.

12  Q.   And is it true he left you some signed checks before

13  he went in or were you operating off of a rubber stamp

14  or --

15  A.   I don't believe he left any signed checks.  It was

16  -- I believe it was all a signature stamp.

17  Q.   Okay.  And at any time do you remember any

18  conversation between Dr. Roberts and I that you were

19  privy to where a discussion or any discussion was made

20  about the types of service that I was to render in

21  exchange for these checks that you testified about?

22  A.   Can you repeat that again?

23  Q.   You testified earlier that sometimes you all came

24  over to meetings, which was at the old Grandview Hotel,

25  right, which is now the Hilton?

BRENDA FREDERIKSEN - CROSS BY MR. SPRINGER                    390

1  A.   Right.

2  Q.   And then there was a few times where I drove over to

3  Fort Smith, Arkansas, you said; is that true?

4  A.   Yes.

5  Q.   Okay.  And the way the office was set up, there was

6  basically a back door and a front door; isn't that right?

7  A.   Right.

8  Q.   And isn't it true that usually I would come in or go

9  out the back door?

10 A.   I think you would usually come in the front door and

11 a lot of times would go out the back door because it

12 would --

13 Q.   Go out the back door.  Okay.  Right.  Now, when you

14 would walk into the room -- excuse me, would Dr. Roberts

15 and I meet in his office?

16 A.   Yes.

17 Q.   Okay.  And were you ever in those meetings in his

18 office?

19 A.   Yes.

20 Q.   Okay.  And how many times do you remember that we

21 met?

22 A.   In his Office?

23 Q.   Uh-huh.

24 A.   You know, I honestly don't recall -- numerous times.

25 Q.   And, generally, I would be over there during the

1    middle of the day; isn't that true?

2    A.   Yes.

3    Q.   Right when you were very busy?

4    A.   Yes.  Or sometimes right after hours, yes.

5    Q.   Okay.  And so I may be there 20, 30 minutes just

6    waiting for Dr. Roberts; isn't that true?

7    A.   Yes.

8    Q.   And I would be in his office by myself, wouldn't I?

9    A.   No, you couldn't have been in his office because

10   that's where he treated patients, so you would either

11   have had to have been in the front reception area or

12   there's a -- there was another office that we weren't

13   using at that time.

14   Q.   Waiting room in the back on the left side of the

15   office?

16   A.   Yes.  You were either in the front reception area or

17   the back reception area, yes.

18   Q.   And then when Dr. Roberts was ready to see me, then

19   he would call me into his office; is that true?

20   A.   Yes.

21   Q.   And you were going in and out of his office

22   practically all the time; isn't that true?

23   A.   Yes.

24   Q.   Okay.

25        MR. SPRINGER:  No other questions.  Thank you

```
 1   very much.

 2           THE COURT:  Mr. Stilley.

 3           MR. STILLEY:  No questions.

 4           THE COURT:  Very well.  Any redirect?

 5           MR. SNOKE:  I don't think so, Your Honor.  No.

 6           THE COURT:  You may step down.

 7           THE WITNESS:  Thank you.

 8           THE COURT:  And we'll have the government's next

 9   witness.

10           MR. SNOKE:  We would call Martin Dingman.  Your

11   Honor, do we need to request the Court that the witness

12   be excused, I mean, from the trial?  If so, I would ask

13   that this witness be excused so she can go back to

14   Arkansas.

15           THE COURT:  Well, does either side have any

16   objection to that?

17           MR. SPRINGER:  State that again.

18           MR. SNOKE:  I was asking that the witness be

19   excused.

20           MR. SPRINGER:  Ms. Gray, yes, no objection, Your

21   Honor.

22           MR. STILLEY:  That would be fine, Judge.

23           THE COURT:  Very well.  To counsel and the

24   parties, I would suggest unless there is an objection

25   that we have an understanding that every witness who
```

```
 1   steps down from the stand is released from his or her

 2   subpoena unless before the witness departs a request is

 3   made otherwise on the record.

 4       Is there any reason not to proceed that way?  What

 5   says the government?

 6           MR. SNOKE:  No, Your Honor.

 7           THE COURT:  What say the defendants?

 8           MR. SPRINGER:  Fine with me, Your Honor.

 9           MR. STILLEY:  That's fine with me, Your Honor.

10           THE COURT:  Very well.  We'll have that

11   understanding.  Every witness who steps down will be

12   considered released from subpoena unless a request for

13   different treatment is made before the witness leaves.

14                   MARTIN DINGMAN,

15   (WITNESS SWORN)

16                   DIRECT EXAMINATION

17   BY MR. SNOKE:

18   Q.  Would you state your name and spell your last name

19   for the court reporter, please, sir.

20   A.  My name is Martin Dingman and the last name is

21   spelled D-I-N-G-M-A-N.

22   Q.  And what's your business or occupation, sir?

23   A.  I'm in the men's leather goods business, men's

24   accessories and shoes.

25   Q.  And where do you live, sir?
```

1    A.    I live in Branson, Missouri.

2    Q.    Do you know Lindsey Springer?

3    A.    Yes, sir, I do.

4    Q.    And do you see him here in the courtroom today?

5    A.    Yes, right back there.

6    Q.    The man that just stood up there?

7    A.    Yes.

8    Q.    All right.  Can you tell the Court and the jury when

9    you first and under what circumstances you first met

10   Mr. Springer?

11   A.    Yes, sir.  I had moved to the Branson area and

12   joined the First Baptist Church there and not too long

13   thereafter I had become acquainted with a couple of

14   deacons and one of those deacons invited me to kind of a

15   local seminar that was being put on by a constitutional,

16   slash, tax expert.

17   Q.    All right.  And who put this seminar on?

18   A.    Who organized it or who spoke?

19   Q.    Who spoke at it?

20   A.    Mr. Lindsey Springer spoke at it.

21   Q.    All right.  And that was -- about when did this --

22   did you first begin going to these seminars and meet

23   Mr. Stilley?

24   A.    Probably mid to late 1996.

25   Q.    Okay.  And in these seminars, what was the -- what

1   did Mr. Springer -- was there a discussion about tax, the

2   tax law?

3   A.   Yes, there was.

4   Q.   And what did Mr. Springer state to the gathered

5   people at these seminars about the tax laws?

6   A.   Well, there were many different subjects, but all

7   pretty much pointed back to the fact that according to

8   the Constitution we were not legally required to file a

9   personal tax return.

10  Q.   Did Mr. Springer indicate whether or not income

11  taxes were voluntary?

12  A.   Yes, he did.

13  Q.   And did he suggest any course of action on behalf of

14  anybody at these seminars?

15  A.   He provided some documentation, pre-typed and

16  formatted documentation.

17          THE COURT:  Sir, if you could speak up just a

18  little bit, that would be very helpful.

19          THE WITNESS:  Sorry.  Okay.  He provided some

20  documentation that we could fill out and send in to

21  different governmental agencies unvolunteering from the

22  personal income tax.

23  Q.   All right.  Unvolunteering?

24  A.   Unvolunteering.  Because according to something we

25  had done earlier in our work lives, we had all

1   unknowingly volunteered when we weren't really required

2   to.  And once you volunteer, you're in.  So he provided

3   the forms to unvolunteer.

4   Q.   And that was because you had volunteered by

5   previously filing tax returns?

6   A.   Yes, that's correct.

7   Q.   And you say "all of us," you're talking about you

8   and who are we talking about here?

9   A.   No, all of us.  He spoke about all taxpayers

10  unknowingly filed their first tax return and that's when

11  they are in the system and then it's no longer an option,

12  it's no longer voluntary.

13  Q.   All right.  And did you complete such a document or

14  documents?

15  A.   Yes, sir.

16  Q.   All right.  And send them in?

17  A.   Yes, I did.

18  Q.   About when was that?

19  A.   That was most likely in the early part of 1997.

20  Q.   Now, was there any other -- any other topic at these

21  seminars that Mr. Springer was promoting at that time?

22  A.   There were numerous topics, the constitutionality of

23  taxes.

24          MR. SPRINGER:  Your Honor, may we approach?  I

25  object and I need to approach on this.

```
 1              THE COURT:  Counsel will approach and the
 2   defendants.
 3       (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND
 4   OUT OF THE HEARING OF THE JURY.)
 5              THE COURT:  Go ahead.
 6              MR. SPRINGER:  I'm under a motion in limine
 7   order where I can't raise any questions involving the
 8   constitutionality of anything, and Mr. Snoke is
 9   soliciting questions that would either put me in jeopardy
10   of violating this Court's order or not being able to
11   properly cross-examine this witness because he's now
12   testifying about constitutional issues which I cannot
13   speak of.
14              MR. SNOKE:  All he said was constitutionality in
15   general.  I'm not going to ask him of any specific --
16              MR. SPRINGER:  I'm fine.  If he didn't go any
17   further, I'm fine.
18              THE COURT:  We'll take it question by question.
19              MR. SPRINGER:  Thank you, Your Honor.
20       (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,
21   WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE
22   PRESENCE AND HEARING OF THE JURY.)
23   Q.   (BY MR. SNOKE)  Mr. Dingman, let me be a little more
24   specific.  Did the subject of asset protection or trusts
25   come up in any of your dealings with Mr. Springer?
```

1   A.   Yes, sir, they did.

2   Q.   All right.  What was the nature of that dealings?

3   A.   These were irrevocable asset protecting trusts that

4   would protect our assets in case of if my young daughter

5   got in a wreck, whoever she may hurt couldn't take my

6   entire business.  These trusts had different

7   beneficiaries all going to one main beneficiary.  And so

8   with our growing business and my name being a name that

9   is out in public because of my business, it seemed like a

10   good idea.

11   Q.   And was this something subject at seminars or

12   something outside the seminars?

13   A.   To the best of my knowledge, I don't believe there

14   was a lot of detail in the seminars.  There was reference

15   to them and then personal meetings set up later to

16   discuss the details.

17   Q.   All right.  And did you have meetings with

18   Mr. Springer on the setting up of trusts for yourself and

19   your family?

20   A.   Yes, sir, I did.

21   Q.   About how many meetings did you have and when?

22   A.   I don't recall specifically, two, three.

23   Q.   And when would this have been?

24   A.   Again, it would be between fall '96 and spring '97.

25   Q.   All right.  And in any of those conversations --

1  well, in those conversations, did Mr. -- did Mr. Springer
2  discuss any or did you inquire about any cost for
3  performing this service?
4  A.   Yes, sir.
5  Q.   And what was that?
6  A.   The cost was between 20 and $30,000 to set up the
7  family planning, slash, trust structure.
8  Q.   All right.  And who quoted that price?
9  A.   Mr. Springer.
10 Q.   And did you agree to that -- those circumstances,
11 those conditions?
12 A.   Yes, sir, I did.
13 Q.   All right.  Was there anything negotiated about how
14 that was to be done, how it was to be paid to him?
15 A.   Yes.  It seemed it was a large sum of money, but it
16 seemed like a good idea to take care of my estate and so
17 forth.  So I asked if we could pay in smaller
18 increments.  And so we ultimately agreed for us to pay
19 him $1,000 per month over an extended amount of time.
20 Q.   And did you make those payments?
21 A.   Yes, sir, we did.
22 Q.   You say "we."  We're talking -- who are we talking
23 about?  Who is "we"?
24 A.   I had a partner in the business at the time who also
25 was having trusts set up and everything taken care of by

1  Mr. Springer as well.

2  Q.   All right.  Well, I'm just talking about you now,

3  not what you know about your partners.  Did you

4  personally then make payments to him in thousand dollar

5  amounts for a period of time?

6  A.   Thousand dollar checks came out of our business once

7  a month for 20 to 24 months.

8  Q.   So the thousand dollars was for both you and your

9  partner?

10  A.   Correct.

11  Q.   And who is your partner?

12  A.   Shane Grady.

13  Q.   So it technically was only half of that was maybe

14  for your trust?

15  A.   That's correct.

16  Q.   And it was paid out of the business account?

17  A.   Yes, sir, it was.

18  Q.   And did Mr. Springer set up those trusts for you?

19  A.   Yes, he did.

20  Q.   Now, did Mr. Springer set up any other programs or

21  plans for your business either before or after this --

22  the trust agreement with him?

23  A.   Yes.  There was a very brief management agreement

24  that he drew up for my partner and myself.

25  Q.   And how did that work?

MARTIN DINGMAN - DIRECT BY MR. SNOKE                          401

1   A.   It had to do with social security withholdings.  And

2   after following that agreement for a few months, I don't

3   recall, maybe up to a year, our in-house CPA highly

4   advised that it was not appropriate.  And so, based on

5   his recommendation, we dissolved that and caught up the

6   social security withholdings.

7   Q.   What did this -- when did that social security, I

8   think you called it, what -- what did that do for your

9   company then?

10  A.   It was supposed to help us minimize social security

11  withholdings.

12  Q.   All right.  Now, did Mr. Springer talk to you at all

13  about how the payments that you were making for him

14  setting up your trust should be characterized?

15  A.   Characterized as far as who we should make the

16  payments to or --

17  Q.   Well, first of all, who did you make the payments

18  to?

19  A.   We made the payments to Bondage Breakers Ministry.

20  Q.   All right.  And who suggested that you do that?

21  A.   Mr. Springer.

22  Q.   All right.  And did he indicate at all how if you --

23  if they were going to be considered donations?

24  A.   Yes.

25  Q.   By him or --

```
 1   A.   Yes.

 2   Q.   Did you consider them donations?

 3   A.   I can't tell you specifically at that time.  I don't

 4   recall.

 5   Q.   Well, he was performing a service for you at the

 6   time, though?

 7   A.   He was performing --

 8        MR. SPRINGER:  Objection, Your Honor, as a

 9   leading question.

10        THE COURT:  Overruled.

11        THE WITNESS:  He was performing a service, yes,

12   but I also was under the complete belief system that he

13   was in a ministry.  I believed that his work was a

14   ministry at that time.  And so I felt like, yes, it was a

15   contribution toward that ministry.

16   Q.   All right.  Did you -- and what -- what brought you

17   to believe that he was in a ministry?

18   A.   He seemed to be a very Godly man.  He would many

19   times open or close the meetings with a prayer.  He was

20   very adamant about not breaking the law in the tax

21   recommendations.  He would say things like it's not

22   illegal to avoid and there was always some like Benjamin

23   Franklin or Thomas Jefferson statement, it's our duty to

24   avoid unnecessary taxes, but what his goal was to avoid,

25   not evade.  He was very adamant about that.
```

MARTIN DINGMAN - DIRECT BY MR. SNOKE                    403

1  Q.   At the same time, he was telling you, though, he was
2  making statements about the voluntariness of the tax?
3  A.   Right.  That's correct.
4  Q.   All right.  As a result of -- did you hear back
5  anything on when you sent in your unvolunteering
6  documents that you discussed?
7  A.   Many months went by, yes, and I believe I got a
8  one-page letter that basically said this -- we just don't
9  think this is a good idea and it could lead to future
10 problems.
11 Q.   And was that from -- from who was that letter from?
12 A.   I don't recall if it was the IRS or Department of
13 Justice.  I believe it was from the IRS.
14 Q.   All right.  At some time later were you contacted by
15 someone in the IRS in the criminal investigation
16 division?
17 A.   Yes, sir, I was.
18 Q.   All right.  About when was that, sir?
19 A.   It was more than likely about the mid-summer of
20 2001.
21 Q.   Incidentally, in connection with the trust that was
22 set up for you, did you file tax returns from the time
23 the trust was set up?
24 A.   No.
25 Q.   So you not only set up the trust, you ceased filing

MARTIN DINGMAN - DIRECT BY MR. SNOKE                    404

1   tax returns?

2   A.   That's correct.

3   Q.   And you said when, approximately, you were

4   contacted?

5   A.   Approximately middle of the year 2001.

6   Q.   All right.  And what happened on that occasion?

7   A.   Well, we had had --

8   Q.   You're saying "we" again.

9   A.   I'm sorry.  I had had irregular visits from the IRS,

10  kind of soft, a little letter here or there.  But then

11  one day an IRS -- a special agent from the CID came in

12  with a badge --

13  Q.   Uh-huh.

14  A.   -- and that's when I realized things were more

15  serious than I had been led to believe.  And that was in

16  the summer of '01.

17  Q.   Up to that time, what were you basing your belief

18  that things were not that serious on?

19  A.   Well, based on the seminars that I had attended and

20  the illegality of personal income tax.  I mean, during

21  that time, during those years that I did not file a

22  personal income tax, I filed and paid corporate income

23  tax regularly.

24  Q.   All right.

25  A.   So it wasn't -- and, again, that was -- that gave

1   credibility to his position, you know, let's don't break

2   the law here, file corporate incomes taxes.  But personal

3   income taxes -- and there were -- there were bits of case

4   law used and scripture and --

5   Q.   By who?

6   A.   By Mr. Springer.

7   Q.   All right.  So as a result of this visit by -- do

8   you remember who came to see you?

9   A.   Yes, Ms. Susan Prine.

10  Q.   All right.  And after that visit, what action, if

11  any, did you take?

12  A.   Well, one of the first things I did was called

13  Mr. Springer and said what is going on with these

14  badges.  I was very concerned, very shocked, did not

15  expect that to happen.  And at that point is when he told

16  me that he was working with an attorney from, I believe,

17  Fort Smith, Mr. Oscar Stilley, and recommended that I

18  call him.

19  Q.   All right.  And how would you characterize your

20  reception by Mr. Springer in the fall of 2001 when you

21  told him about the visit from CID?

22  A.   Well, it was a little more distant, not as helpful

23  and nurturing and supportive and all the comfort that I

24  had getting into this.

25  Q.   All right.  By the way, how much did you pay him --

1  you know, payments at $1,000 a month, how much did you

2  pay him?

3  A.   It was between 20 and $24,000.

4  Q.   All right.  And that was between like '97 and '99 or

5  something?

6  A.   Over a several-month period.

7  Q.   Twenty months anyway in there.  And as a result of

8  Mr. Springer's suggestion, did you call Oscar Stilley?

9  A.   Yes, I did.

10 Q.   And what happened when you called Oscar Stilley?

11 A.   He was very considerate, very kind and explained

12 that for he and Mr. Springer to take my case it would

13 require a $10,000 retainer.

14 Q.   All right.  And what did you do as a result of that

15 discussion?

16 A.   The bells and whistles really started going off.  I

17 felt almost like I was being taken advantage of at that

18 point.  And so that's when I first sought to gain other

19 counsel, to seek other counsel.

20 Q.   All right.  And you sought other counsel, so you

21 didn't take them up on the offer in 2001?

22 A.   No, sir.

23 Q.   Did you ultimately -- did you ultimately have -- get

24 into discussions or your attorney get into discussions

25 with the U.S. Attorney's Office covering your district

1   concerning your case?

2   A.   Yes, sir.

3   Q.   And what happened as a result of those discussions?

4   A.   Immediately when I realized that I had made a bad

5   choice, I caught up all my personal income tax within the

6   next six months and my attorney continued to work with

7   the IRS and the Department of Justice up until I pled

8   guilty to misdemeanor charges in January of 2008.

9   Q.   Did you do that under any kind of a plea agreement?

10  A.   Yes, sir.

11  Q.   All right.  And what, if anything -- were you

12  ultimately sentenced by the Court on that misdemeanor?

13  A.   Yes, 36 months probation.

14  Q.   All right.  And was there anything else included

15  that you needed to do in that sentence?

16  A.   I willingly agreed -- there was a -- some -- there

17  was some talk going around about how could I help others

18  avoid the pitfall that I fell in.  And so as my attorney

19  asked me about what would I be willing to do as far as

20  community service, I said to him I really was not

21  interested in community service if it required filing at

22  the local library, but if there was something I could do

23  that was meaningful, then I would be more than happy.

24  And so in speaking with the special agent, Ms. Prine, she

25  had had an idea for years that had never come to

 1  fruition, as far as we know there has never been one, she
 2  was instrumental in developing this consumer awareness
 3  program where I have made appearances on radio stations,
 4  been interviewed by news agencies.  I just spoke to 150
 5  at the Federal Reserve Building in Kansas City a couple
 6  of weeks ago on these types of tax schemes.
 7  Q.   Okay.  And did any of that -- any of those
 8  appearances involve an interview with a local newspaper
 9  there in Branson?
10  A.   A local newspaper in Springfield.
11  Q.   Oh, I'm sorry, in Springfield.
12  A.   I think it's called the Springfield Business
13  Journal.
14  Q.   And after your interview with the Springfield
15  Business Journal -- incidentally, what time are we
16  talking about now?  First of all, when were you
17  sentenced?  Do you recall that?
18  A.   That was January of 2008.  But I actually did some
19  things prior to that.  I told the IRS it doesn't matter
20  what my plea agreement, what it ends up -- I'm going to
21  go ahead and do it anyway.  I felt compelled to help in
22  any way I could.  So some of that community service was
23  actually done before sentencing.  And so it had to be
24  between '07 -- middle '07 and middle '08.
25  Q.   All right.  And before we get there, going back to

1  some of these meetings where you first were attending

2  back ten years earlier in '97, that time period, 96/97,

3  did you know some of the other people that were attending

4  this meeting or these meetings that Mr. Springer was

5  conducting?

6  A.   Yes, sir, I recognized other people in the seminar

7  rooms.

8  Q.   Okay.  As a result of this interview with the

9  Springfield newspaper, did Mr. Springer have any problem

10 with that?  Did he have any -- what, if anything, did he

11 do as a result of that?

12 A.   Shortly thereafter I was served papers that

13 instructed me that I was being sued for a million dollars

14 by Mr. Springer.  I don't recall the exact terminology,

15 but probably for slander, defamation of character, among

16 many other terms.

17 Q.   Had you mentioned Mr. Springer's name in that

18 interview?

19 A.   I did not.

20 Q.   All right.  At any rate, what, if anything, has

21 happened to that lawsuit?  I guess it was a lawsuit.

22 A.   Yes, the -- please forgive me, I don't have the

23 correct legal terminology, but the judge initially threw

24 it out and then I think he refiled to have another brief

25 and then we did another brief.  And so I think it's just

MARTIN DINGMAN - CROSS BY MR. SPRINGER                410

```
1   kind of hanging out there now.
2   Q.  All right.  So there's still a pending -- some
3   pending lawsuit?
4   A.  Yes.
5        MR. SNOKE:  May I have a moment, Your Honor?  I
6   don't believe I have any other questions of the witness
7   at this time.
8        THE COURT:  Cross-examination.
9        MR. SPRINGER:  Yes, Your Honor.
10                   CROSS-EXAMINATION
11  BY MR. SPRINGER:
12  Q.  Mr. Dingman, Lindsey Springer.  Now, as far as
13  drawing the timeline, you testified that you met me in
14  1996 or '97 or is it '96?
15  A.  '96.
16  Q.  Okay.  And when -- do you remember when was it that
17  I referred you to Mr. Stilley?
18  A.  That was after we had been contacted by the CID.
19  Q.  Now, as far as a timeline goes, is that around 2001,
20  2002 area?
21  A.  2000, 2001.  It's vague.  I don't recall that.
22  Q.  Okay.
23  A.  If I pinned it down, I probably wouldn't tell you
24  right.
25  Q.  Now, you discussed at the latter part of your
```

1  testimony that I had filed a lawsuit against you,

2  Mr. Grady -- is that correct?

3  A.   You filed one against me, yes, sir.

4  Q.   Do you know if Mr. Grady is also a defendant in that

5  case?

6  A.   I believe he is.

7  Q.   Do you know whether Springfield Business Journal is

8  a defendant?

9  A.   I believe they are, yes.

10 Q.   And is there somebody else that was a defendant in

11 that case, if you know?

12 A.   The journalist is a defendant and an IRS agent.

13 Q.   Do you know the IRS agent's name?

14 A.   I believe it was Bonnie McLoud (ph).

15 Q.   Did you ever meet Mrs. McLoud?

16 A.   Yes, sir.

17 Q.   Now, it's a fact, isn't it, that the Springfield

18 Business Journal wrote an article in their newspaper

19 based upon what they heard you say either on the radio or

20 that you told to them in person?

21 A.   They didn't hear me say anything on the radio and

22 write a report from it.  No, they wrote a report based on

23 an interview.

24 Q.   Okay.  And -- now, your attorneys -- you hired

25 attorneys to represent you in that case, correct?

MARTIN DINGMAN - CROSS BY MR. SPRINGER                    412

```
 1  A.   Correct.
 2  Q.   Same attorneys that helped you in the plea agreement
 3  with the United States Government?
 4  A.   One of them is, yes.
 5  Q.   And did they negotiate that plea for you?
 6  A.   Yes, they did.
 7  Q.   Okay.  Now --
 8          MR. SPRINGER:  Your Honor, may I approach the
 9  witness?
10          THE COURT:  You may.
11  Q.   (BY MR. SPRINGER)  Mr. Dingman, I handed you what
12  has been tentatively marked as Defendants' Exhibit Number
13  160.  Is that something that you recognize?
14  A.   Yes.
15  Q.   Okay.  And is --
16          THE COURT:  Mr. Springer, do I have that?
17          MR. SPRINGER:  No, you do not, Your Honor.  I'm
18  so sorry.
19          MR. SNOKE:  Your Honor, may we approach?  I'm
20  going to object to this.
21          THE COURT:  Well, let's hear what Mr. Springer
22  has to cover with the witness, then we'll see where we go
23  from there.
24      Let me make one preliminary inquiry, Mr. Springer.
25  Is this document that has been marked as Defendants'
```

```
 1   Exhibit 160, was it filed under seal?
 2           MR. SPRINGER:  No, sir.
 3           THE COURT:  Okay.  Go ahead.
 4           MR. SPRINGER:  Thank you.  First, I'd like to
 5   move it into evidence, Your Honor.
 6           MR. SNOKE:  To which we object.  It's
 7   irrelevant.  I don't see -- the specifics of this
 8   document --
 9           THE COURT:  First of all, Mr. Snoke, you're
10   going to have to speak up.  I think maybe I heard you,
11   but your objection goes to relevance; is that right?
12           MR. SNOKE:  Objection goes to relevance and the
13   specifics of punishment for crimes that may be alleged in
14   here that are not relevant in this matter.
15           THE COURT:  Okay.  Stand by just a moment,
16   Counsel.
17           MR. SNOKE:  To which I add this particular
18   document is hearsay --
19           THE COURT:  Mr. Snoke, you're going to have to
20   speak up.
21           MR. SNOKE:  To which I would add, Your Honor,
22   that this is -- particular document is hearsay in that
23   there's no stamps or anything on this for its
24   foundational --
25           COURTROOM DEPUTY:  Mr. Springer, do we have an
```

1   exhibit list of yours?

2          MR. SPRINGER:  No, I -- I didn't even know they

3   were putting him on.

4          THE COURT:  Paragraph 9 of the document makes it

5   relevant.  The objection will be overruled.  Defendants'

6   Exhibit 160 will be received.  Mr. Springer, this applies

7   to both of you.  If you haven't provided an exhibit list

8   to the clerk, that needs to happen pronto.

9          MR. SPRINGER:  Yes, sir.

10          THE COURT:  Proceed.

11          MR. SPRINGER:  And I apologize.

12  Q.  (BY MR. SPRINGER)  Mr. Dingman, would you turn to

13  page (sic) 9.  Mr. Dingman, on page 7 of 16, I just asked

14  you to turn to, does section 9 refer to cooperation

15  between you and the United States Government?

16  A.  Yes, mine does.

17  Q.  Okay.  And if you turn over to the next page, does C

18  -- look at your screen right there.  Does C say,

19  "Defendant agrees to testify as a witness before any

20  grand jury hearing or trial when requested to do so by

21  the United States"?

22  A.  Yes, it does.

23  Q.  All right.  Is that specifically referring to me?

24  A.  No, that was never made clear.

25  Q.  Have you ever testified against anybody else in any

1   other grand jury proceeding?

2   A.   Never have.

3   Q.   Mr. Dingman, who is Eddie Contin (ph)?

4   A.   He is a man who ran an organization in -- somewhere

5   in Florida by the name -- when I first got to know the

6   organization, the name was called American Rights

7   Litigators or ARL.  This organization employed, as far as

8   I know, two licensed attorneys, at least one licensed

9   CPA, and a number of paralegals.

10  Q.   And can you give us a time period on when you first

11  encountered ARL, as you called them?

12  A.   It would be a vague time period.  It would be after

13  I came to your seminars, after I got the trusts set up,

14  and probably when I first started getting letters from

15  the IRS, from the local revenue office.

16  Q.   Is it safe to say that's probably around 1998?

17  A.   In the neighborhood, probably, yes.

18  Q.   Okay.  So just so we're clear, your relationship

19  with me was from sometime at the end of 1996, early 1997,

20  and ended when you went to American Rights Litigators; is

21  that true?

22  A.   That's correct.

23  Q.   Okay.  And you went to American Rights Litigators

24  when CID agents came knocking on your door or was it IRS

25  revenue agents knocking on your door?

1    A.    Revenue agents.

2    Q.    All right.  And do you remember a man by the name of

3    Dennis Dazey?

4    A.    Yes, I do.

5    Q.    And what was Mr. Dazey, what did he do in this

6    relationship between you and him?

7    A.    The best I can recall, Mr. Springer, Dennis Dazey

8    was called in by Jim Robertson and his partner Roger

9    Davis in Branson as a special guest speaker.  And this

10   was sometime before I met you, I believe it was.  And he

11   was talking about some sort of investments or arbitrage

12   or some sort of way to make money.  I can't tell you

13   specifically what it was, but --

14   Q.    An investment scam?

15   A.    Could have been.  I can't say it was a scam.  I

16   don't know that.

17   Q.    Mr. Dazey deliver your trust to you?

18   A.    No, he didn't.

19   Q.    Are you sure?

20   A.    He didn't deliver them to me, no.

21   Q.    Did he deliver them to Mr. Grady.

22   A.    I don't know that.

23         MR. SNOKE:  I object to the relevancy of the

24   questions about Mr. Dazey.

25         THE COURT:  Overruled.

1  Q.   (BY MR. SPRINGER)   Is part of your plea agreement is

2  to go around saying about Lindsey Springer what you've

3  said here today?

4  A.   No, not at all.

5  Q.   Okay.  At one time -- excuse me, strike that.  When

6  you came to a meeting, I believe you testified in Branson

7  that I was speaking at but I wasn't the promoter, wasn't

8  that a meeting where a bunch of people in Missouri who

9  had filed a lawsuit in Springfield regarding whether or

10 not the word "voluntary" applied, isn't that what that

11 meeting was about?

12 A.   I do not recall that being the primary focus of the

13 meeting, but I do recall that during different meetings I

14 would hear that there were certain individuals, possibly

15 in that room as well as others around the midwest, that

16 you were representing in a class action lawsuit against

17 the IRS, but I don't recall a specific meeting that being

18 the main -- because I was not involved in that lawsuit.

19 Q.   So now in the libel slander case that I brought

20 against you, there was an article in the Springfield

21 Journal, you've already testified to that, correct?

22 A.   Yes.

23 Q.   You wouldn't take exception to that article actually

24 saying you went to meetings about those lawsuits, would

25 you?

```
1           MR. SNOKE:  Objection, relevance.
2           THE WITNESS:  No, I don't recall that
3    whatsoever, no.
4    Q.  (BY MR. SPRINGER)  Okay.  Now, you pled guilty in
5    2008 to failure -- willful failure to file tax returns,
6    correct?
7    A.  Yes.
8    Q.  And what you pled guilty to was for 2001 and 2002,
9    is that true, or is it 2002/2003?
10   A.  2001 -- I believe it was 2000/2001.
11   Q.  Okay.  So at the time that you did the acts that you
12   admitted that you did in your plea agreement, you were
13   under the direct supervision of two licensed attorneys
14   and a CPA from American Rights Litigators, correct?
15   A.  That's correct.
16   Q.  Okay.  So -- now, they weren't charismatic like I
17   was, correct?
18   A.  Yes, they were.
19   Q.  They were?
20   A.  Yes.
21   Q.  Okay.  Did they say the same things that I was
22   saying in those meetings up there in Branson?
23   A.  Many of the same things.
24   Q.  Many of the same things.  Is that what made it
25   validate to you that it was correct or --
```

1   A.   Partially, yes.  Those of us of faith, our faith is

2   a very emotional subject and we tend to believe and

3   trust, and when others send newsletters with scripture at

4   the bottom and advise that they're trying to do the right

5   thing, yes.

6   Q.   Do you believe American Rights Litigators was doing

7   the right thing?

8   A.   At the time I did, yes.

9   Q.   But you don't now?

10  A.   No, I do not whatsoever.

11  Q.   Okay.  Now, the CID shows up in 2001/2002, right?

12  A.   Right.

13  Q.   Okay.  Now, they're not investigating you for not

14  filing a tax return in 2001 or '02, correct?

15  A.   In 2001, I believe that the first connection was to

16  obtain corporate books and records.

17  Q.   And you testified earlier that the corporations all

18  paid all their taxes, right?

19  A.   That's correct.

20  Q.   And the real question is about providing information

21  that you had; isn't that true?  It's about answering

22  questions on a form?

23  A.   I don't know about answering questions on a form.

24  It was -- we didn't feel, based on information from

25  American Rights Litigators, that we were compelled to

1  give up those documents.

2  Q.  Okay.  But in your reasons why you didn't file

3  personal individual income tax returns to the IRS for

4  2000 and 2001 isn't it because you didn't believe that

5  you were required to answer their questions on their

6  request for information form?

7  A.  No.

8  Q.  What was the reason why in 2000 and 2001 you didn't

9  file tax returns?

10  A.  The reason was I was led to believe over the course

11  of those years that I wasn't legally required to file

12  because it wasn't constitutional.  There were parts of

13  the Constitution that were brought to our attention in

14  those meetings that spoke about the only two taxes that

15  the government can tax you on.  One is a poll tax and one

16  is a -- what is the other one -- a sales tax.  And that

17  if the government oversteps the Constitution, then the

18  government is being tyrannical and the government has

19  become our sovereign instead of our God being our

20  sovereign.  And as that applies to corporate, we pay

21  corporate sales tax because the state is the sovereign.

22  Q.  And so your testimony here today as far as I'm

23  concerned is not that I did anything in 2000 and 2001 or

24  any time after 1997 or at least early 1998; is that true?

25  A.  That's correct.

1  Q.   All right.  And at the time in 1998, I had not

2  referred you to Oscar Stilley, had I?

3  A.   No.

4  Q.   Okay.

5          MR. SPRINGER:  If I can have just one second,

6  Your Honor.

7  Q.   (BY MR. SPRINGER)  When you testified that you were

8  giving $1,000 a month to me, you testified that that was

9  for the purchase of trusts; is that true?

10 A.   I was paying $1,000 a month to Bondage Breakers

11 Ministries --

12 Q.   Thank you.

13 A.   -- for the trust that you prepared for us.

14 Q.   All right.  Now, have you ever heard of ministries

15 that provide trusts for people?

16 A.   I haven't thought about that.  No, I'm not aware of

17 any.

18         MR. SPRINGER:  Thank you, Mr. Dingman.

19         THE COURT:  Mr. Stilley.

20                   CROSS-EXAMINATION

21 BY MR. STILLEY:

22 Q.   Mr. Dingman, is it fair to say that you started out

23 by having some curiosity about what the law required of

24 you with respect to tax returns?

25 A.   Yes.

1   Q.   And the next thing you did, isn't it true, is to

2   make inquiry about what the law required you to do?

3   A.   I went to seminars to find out.

4   Q.   And you made inquiry, right, in good faith?

5   A.   (nodded head)

6   Q.   You'll need to answer out loud.

7   A.   Yes, sorry.  I'm sorry, yes.

8   Q.   And you also came to a conclusion, correct?

9   A.   That's correct.

10  Q.   And isn't it true that the conclusion you came to

11  was that you weren't required to make that return?

12  A.   That's correct.

13  Q.   And you made it in good faith?

14  A.   That's correct.

15  Q.   And you acted upon that good faith belief?

16  A.   Yes, I did.

17  Q.   And then when the criminal investigation officers

18  came to your door, you made a change?

19  A.   Not immediately.

20  Q.   But at some point in time you did make a change?

21  A.   Yes, at some point in time I did.

22  Q.   Did the government -- when the government came and

23  knocked on your door, did they satisfy your curiosity

24  about what law specifically requires you to make a tax

25  return?

1   A.   No, they didn't.

2   Q.   But you gave up that curiosity nonetheless, correct?

3   A.   Yes, after I did more research.

4   Q.   But the government did not tell you -- the

5   government did not show you any specific law requiring

6   the making of a return, correct?

7   A.   Yes, sir, that's correct.

8   Q.   And isn't it true also that you have no personal

9   knowledge that Oscar Stilley has done anything wrong?

10  A.   I have no knowledge of Oscar Stilley doing anything

11  wrong.

12          MR. STILLEY:  Pass the witness.

13          THE COURT:  Any redirect?

14          MR. SNOKE:  No redirect, Your Honor.

15          THE COURT:  You may step down.  We'll have the

16  government's next witness.

17          A JUROR:  Would we be allowed to have a break?

18          THE COURT:  Absolutely.  We'll take a break at

19  this time instead of getting started with the next

20  witness.

21      Members of the jury, it's now a quarter till three.

22  We'll take a break until five minutes after three.  And

23  so during this break, of course, please remember my usual

24  admonition, which I won't repeat at this time.  Please be

25  available by five after three so that everyone can be in

1    the courtroom ready to go at five minutes after three.

2        All persons in the courtroom will remain seated

3    while the jury departs.

4        (JURY EXITS THE COURTROOM)

5            THE COURT:  Okay.  The jury has left the

6    courtroom.  There's one matter I think it might be

7    appropriate to address at this point because I suspect

8    this may come up.  I certainly don't know that it will

9    come up, but I suspect it may come up again.

10       This witness Mr. Dingman signed a plea agreement.

11   It was filed in July of 2007.  In this plea agreement, he

12   gets a misdemeanor plea.  He's clearly not -- clear

13   agreement, he's not going to be charged with evasion.  He

14   says I'm going to cooperate completely, have testimony,

15   will travel, and so forth.  In effect, he trades that for

16   his misdemeanor plea, no tax evasion.  The government

17   agrees not to seek any specific sentence.

18       Mr. Snoke, on what theory is that not fair game for

19   cross-examination?  I mean, you objected because it was

20   irrelevant.  I've got a real hard time with that.

21           MR. O'REILLY:  Your Honor, if I may address the

22   Court on this.

23           THE COURT:  You may.

24           MR. O'REILLY:  We have absolutely no problem

25   with him being asked about this document, being cross-

1  examined about it, being beaten around the head with it,

2  if you will.  The problem is with putting the document

3  itself into evidence that we had an issue with.  And

4  that's what we objected to, not the line of questioning.

5          THE COURT:  It's public record.

6          MR. O'REILLY:  Your Honor, I understand that.

7  But part of the Court's admonition, and I think an

8  appropriate one, is there should be no discussion or

9  representation of punishment and that's actually

10  contained in here.  And this is really extrinsic evidence

11  that is not necessary to impeach the witness.  If he had

12  denied it, then I wouldn't be making this argument, Your

13  Honor, and we wouldn't have objected.  It was only to the

14  actual admission of the document absent Mr. Dingman

15  denying it.  If he had said, no, I didn't get any deal,

16  different issue.

17      But, you know, for him to be questioned, did you

18  have a plea agreement, did you agree to cooperate as part

19  of your -- that's absolutely a proper cross-examination

20  and we would -- we have no objection to that.  It's the

21  introduction of the plea agreement itself where there's

22  no indication or evidence of an inconsistency with the

23  testimony from the stand.

24          THE COURT:  Well, the document is the best

25  evidence of its own contents.  I don't foreclose that

1  argument should it come up again.  I'm not terribly

2  persuaded by it at this point, but I don't completely

3  foreclose that argument should it come up again.  Because

4  the document is the best evidence of its contents.  And

5  for that matter, the sentence that this man was exposed

6  to also goes directly to the -- or certainly is

7  encompassed by the fair area of cross-examination that

8  any defendant is entitled to.  So we'll cross that bridge

9  when we come to it.  But I was rather mystified by the

10  statement that this document is irrelevant.

11      Anything else before we take our mid-afternoon

12  recess?  Court will be in recess.

13      (A RECESS WAS HAD, AFTER WHICH THE FOLLOWING

14  PROCEEDINGS WERE HAD IN OPEN COURT AND WITHIN THE

15  PRESENCE AND HEARING OF THE JURY.)

16          THE COURT:  We'll have the government's next

17  witness.

18          MR. O'REILLY:  Your Honor, the United States

19  calls Mr. Bruce Smith.

20          THE COURT:  Very well.

21          COURTROOM DEPUTY:  If you would just stop right

22  there and raise your right hand.  Thank you.  Now, you

23  may be seated and you might want to -- well --

24                  BRUCE SMITH,

25  (WITNESS SWORN)

BRUCE SMITH - DIRECT BY MR. O'REILLY                    427

```
 1                     DIRECT EXAMINATION
 2   BY MR. O'REILLY:
 3   Q.   Mr. Smith, who do you work for?
 4   A.   I'm employed with the Oklahoma Tax Commission.
 5   Q.   What is the Oklahoma Tax Commission?
 6   A.   It's the revenue collection agency for the state of
 7   Oklahoma.
 8   Q.   What is the nature of your employment with the
 9   Oklahoma Tax Commission?
10   A.   Okay.  I'm currently the training and taxpayer
11   liaison for the communications division.  I do training,
12   outreach, education, things like that.
13   Q.   As part of your employment, do you actually
14   sometimes search records?
15   A.   Yes, I do.
16   Q.   Were you, in fact, asked to search for records with
17   respect to your appearance here today?
18   A.   Yes, I was.
19   Q.   What records were you asked to search?
20   A.   I searched the computer records of the Oklahoma Tax
21   Commission for income tax filing histories.
22   Q.   With respect to -- please explain briefly to the
23   jury how you did that.
24   A.   Okay.  At the Oklahoma Tax Commission, the income
25   tax returns are filed under a social security number, so
```

BRUCE SMITH - CROSS BY MR. SPRINGER                    428

1   I checked the income tax system under the social security

2   number I was given.  And then also usually every income

3   tax return that comes in is either a refund return or

4   they owe money with a return, so I also checked the

5   refund system and the accounts receivable system.

6   Q.   With respect to -- what taxpayer were you asked to

7   do this search?

8   A.   Lindsey Springer.

9   Q.   What years were you asked to search?

10  A.   I believe it was tax years 2000 through 2006.

11  Q.   What did you discover in the search of the records

12  of Oklahoma Tax Commission?

13  A.   Okay.  After searching the computer records of the

14  Oklahoma Tax Commission, I learned that we did not show

15  any income tax returns being filed under his social

16  security number for tax years 2000, 2001, 2002, 2003,

17  2004, 2005, or 2006.

18          MR. O'REILLY:  May I have a moment, Your Honor?

19          THE COURT:  You may.

20          MR. O'REILLY:  Nothing further.

21          THE COURT:  Cross-examination.

22                  CROSS-EXAMINATION

23  BY MR. SPRINGER:

24  Q.   Mr. Bruce (sic), when you said you typed into the

25  computer system, was that the federal computer system or

CHRIS SIMPKINS - DIRECT BY MR. O'REILLY                    429

```
 1   state computer system?
 2   A.   That was the computer records of the Oklahoma Tax
 3   Commission.
 4   Q.   Okay.  And do you also -- does that computer also
 5   have access to shared information with the United States?
 6   A.   For income tax filing histories, no.
 7            MR. SPRINGER:  Thank you very much.
 8            THE COURT:  Mr. Stilley?
 9            MR. STILLEY:  No questions.
10            THE COURT:  Any redirect?
11            MR. O'REILLY:  No, Your Honor.
12            THE COURT:  You may step down.
13            THE WITNESS:  Thank you.
14            THE COURT:  We'll have the government's next
15   witness.
16            MR. O'REILLY:  Your Honor, the United States
17   calls Mr. Chris Simpkins.
18       And, Your Honor, if I may approach the bench to put
19   some exhibits up for the next witness.
20            THE COURT:  You may approach the witness stand.
21            MR. O'REILLY:  Yes, sir.  Thank you.
22            COURTROOM DEPUTY:  Good afternoon.  Raise your
23   right hand.  Thank you.  Please be seated.
24                      CHRIS SIMPKINS,
25   (WITNESS SWORN)
```

CHRIS SIMPKINS - DIRECT BY MR. O'REILLY                    430

```
 1                    DIRECT EXAMINATION
 2   BY MR. O'REILLY:
 3   Q.    Sir, please state your name.
 4   A.    Chris Simpkins.
 5   Q.    Where do you work?
 6   A.    I work at Arvest Bank.
 7   Q.    What is the nature of your employment at Arvest
 8   Bank?
 9   A.    My current job position is Bank Secrecy Act Officer.
10   Q.    Generally detail what the duties are of that
11   position.
12   A.    It's a compliance position.  The Bank Secrecy Act is
13   a regulation that requires banks to monitor for money
14   laundering, terrorist financing, such as that.  I man a
15   department that's responsible for monitoring for that.
16   Q.    Were you asked to review documents prior to coming
17   in to testify?
18   A.    Yes, sir, I was.
19   Q.    I'm going to ask you now -- first, if you could look
20   at what has been marked for identification as
21   Government's Exhibit 141.  Hopefully, that's in that
22   binder.
23   A.    Yes, sir.
24   Q.    Do you recognize that document?
25   A.    Yes, sir, I do.
```

CHRIS SIMPKINS - DIRECT BY MR. O'REILLY                          431

1  Q.   How is it that you recognize that document?

2  A.   That is the document that my department furnished

3  off our imaging system.

4  Q.   With respect to -- what is this document?

5  A.   This document is a signature card.  This is a

6  signature card that was used by Superior Federal Bank for

7  the opening of an account.

8  Q.   And whose account or what kind of account was it?

9  A.   Based on the name, it was Arkansas IOLTA Foundation

10 Trust for Oscar Stilley.  The type of account appears to

11 have been a lawyer's trust account.

12 Q.   Is this a record that was kept and maintained by

13 Arvest Bank?

14 A.   Yes, sir.

15       MR. O'REILLY:  Your Honor, the government would

16 move Government's Exhibit 141 into evidence.

17       MR. STILLEY:  Your Honor, I have to object to

18 that on the grounds I didn't -- it sounded to me like he

19 testified that somebody else is the source of personal

20 knowledge on this document.

21       THE COURT:  Do you recognize that document as a

22 record of the bank?

23       THE WITNESS:  Yes, sir, I do.

24       THE COURT:  It is received.

25       MR. O'REILLY:  I'd ask that it be published.

```
1              THE COURT:  Surely.
2   Q.  (BY MR. O'REILLY)  Does this Government's Exhibit
3   141 contain a copy of a driver's license?
4   A.  Yes, sir, it does.
5   Q.  And is that on the second page of the document?
6   A.  That is correct.
7   Q.  Whose driver's license is included in this?
8   A.  That would be the driver's license of Oscar A.
9   Stilley.
10  Q.  With respect to Superior Bank, was that a bank that
11  Arvest Bank acquired at some point?
12  A.  That is correct.
13  Q.  Was it Superior Bank's practice to maintain a copy
14  of an identification card of some sort?
15  A.  Yes, sir.
16  Q.  Now, I'm going to ask you if you could to take a
17  look at what has been marked for identification as
18  Government's Exhibit -- and I'll give you -- I'll do it
19  one at a time unless they're in groups.  Government's
20  Exhibit 26, do you recognize that document?  Just let me
21  know when you get there.  I apologize.
22  A.  Yes, sir, I do.
23  Q.  How is it that you recognize this document?
24  A.  These are images that were obtained off our imaging
25  system.
```

CHRIS SIMPKINS - DIRECT BY MR. O'REILLY                    433

1    Q.    With respect to what account?

2    A.    With respect to the account Arkansas IOLTA

3    Foundation Trust account.

4    Q.    Is that the same account we were just referencing

5    with the signature card?

6    A.    Yes, sir, it appears so.

7              MR. O'REILLY:  Your Honor, the government moves

8    Government's Exhibit 26 into evidence.

9              MR. STILLEY:  Object on foundation.

10             THE COURT:  It will be received.

11             MR. O'REILLY:  And if that could be published

12   for the jury, please.

13             THE COURT:  Surely.

14   Q.    (BY MR. O'REILLY)  Mr. Simpkins, I'm now going to

15   ask you to look at what has been marked for

16   identification as Government's Exhibits 33, 34, and 36.

17   Actually, no, just 33 and 34.  I apologize.  If you'd let

18   me know when you've had a chance to review those.

19   A.    I have those.

20   Q.    Do you recognize those documents?

21   A.    Yes, sir.

22   Q.    What are these?

23   A.    Those are cashier's checks issued by Superior Bank.

24   Q.    Are these records that were maintained by Superior

25   Bank?

CHRIS SIMPKINS - DIRECT BY MR. O'REILLY                434

1   A.   Yes, sir.

2   Q.   And are they now maintained by Arvest Bank?

3   A.   That is correct, yes, sir.

4        MR. O'REILLY:  Your Honor, the government moves

5   Government's Exhibits 33 and 34 into evidence.

6        MR. SPRINGER:  No objection.

7        THE COURT:  They'll be received.

8        MR. O'REILLY:  And if we can publish those to

9   the jury as well, please.

10  Q.   (BY MR. O'REILLY)  Mr. Simpkins, I'm now asking you

11  to take a look at what has been marked for identification

12  as Government's Exhibit 36.

13  A.   Yes, sir.

14  Q.   Can you describe to the jury what is Government's

15  Exhibit 36?

16  A.   Government's Exhibit 36 is a receipt ticket

17  indicating a transaction that was performed at Superior

18  Federal Bank for cash out $18,000.  And the supporting

19  documents behind it, individual purchases of money orders

20  for $1,000 each.

21  Q.   And was this on November 7th of 2003?

22  A.   That is correct.

23  Q.   Is this a record that was maintained previously by

24  Superior Bank and now by Arvest Bank?

25  A.   Yes, sir.

1      MR. O'REILLY:  Your Honor, the government would

2  move Government's Exhibit 36 into evidence.

3      MR. SPRINGER:  No objection, Your Honor.

4      THE COURT:  It is received.

5  Q.  (BY MR. O'REILLY)  Now, I'm going to ask you to take

6  a look at a group of exhibits, Government's Exhibit 71

7  all the way through -- just go through 90 for the

8  moment.  Sir, if you would just look up when you've had a

9  chance to review them.

10 A.  Yes, sir.

11 Q.  Have you had a chance to review all of those

12 documents?

13 A.  Yes.

14 Q.  Do you recognize those documents?

15 A.  Yes, I do.

16 Q.  What generally are the documents I just asked you to

17 review, Government's Exhibits 71 through 90, inclusive?

18 A.  Copies of items negotiated at Superior Federal Bank.

19 Q.  Are these records that you recognize as having -- as

20 records of Arvest Bank?

21 A.  Yes, sir.

22      MR. O'REILLY:  Your Honor, the government would

23 move Government's Exhibits 71 through 90 into evidence.

24      THE COURT:  Well, 71, 73, 74 and 76 --

25      MR. O'REILLY:  Are already in evidence.

1           THE COURT:  -- 80 and 84 are already in

2    evidence, but any objection to the remainder?

3           MR. SPRINGER:  No, Your Honor.

4           THE COURT:  They'll be received.

5    Q.   (BY MR. O'REILLY)  Mr. Simpkins, I'm now going to

6    ask you to look at what has been marked for

7    identification as Government's Exhibits 91 through 103.

8    And just look up at me when you've had a chance to review

9    those.  Do you recognize those documents?

10   A.   Yes, sir, I do.

11   Q.   What, generally speaking, are these documents?

12   A.   Generally speaking, these are documents or

13   transaction checks that were negotiated at Superior

14   Federal Bank along with some checks drawn off of a

15   Superior Bank account.

16   Q.   Are all of these records of Arvest Bank?

17   A.   Yes, sir.

18          MR. O'REILLY:  Your Honor, the government moves

19   Government's Exhibits 91 through 103 into evidence.

20          MR. SPRINGER:  No objection, Your Honor.

21          THE COURT:  They'll be received.

22   Q.   (BY MR. O'REILLY)  Mr. Simpkins, I'm now going to

23   ask you to look at Government's Exhibits 104 through

24   114.  And just look up when you've had a chance to review

25   those.  Do you recognize the documents contained within

1  Government's Exhibits 104 to 114?

2  A.   Yes, I do.

3  Q.   What are, generally speaking, those documents?

4  A.   These are transactions that were negotiated at

5  either Superior Federal Bank or Arvest Bank, as well as

6  statements generated by either Superior Federal Bank or

7  Arvest Bank.

8  Q.   Are these all records of Arvest Bank?

9  A.   Yes, sir.

10        MR. O'REILLY:  Your Honor, the government would

11  move Government's Exhibits 104 through 114 into evidence.

12        MR. SPRINGER:  No objection, Your Honor.

13        THE COURT:  They'll be received.

14  Q.   (BY MR. O'REILLY)  I'm now going to ask you to take

15  a look at what has been marked for identification as

16  Government's Exhibit 116.  Do you recognize that

17  document?

18  A.   Yes, sir.

19  Q.   What is that document?

20  A.   That is an account statement generated by Arvest

21  Bank.

22  Q.   With respect to who or what?

23  A.   With respect to Oscar Stilley, Attorney at Law,

24  Client Trust IOLTA.

25  Q.   Is this a record of Arvest Bank?

CHRIS SIMPKINS - DIRECT BY MR. O'REILLY                    438

```
 1   A.   Yes, sir.
 2          MR. O'REILLY:  Your Honor, the government would
 3   move Government's Exhibit 116 into evidence.
 4          MR. SPRINGER:  No objection.
 5          THE COURT:  It will be received.
 6   Q.   (BY MR. O'REILLY)  Now, I'm going to ask you to look
 7   at what has been marked for identification as
 8   Government's Exhibits 118 through 126.  Do you recognize
 9   what has been marked for identification as Government's
10   Exhibits 118 through 126?
11   A.   Yes, sir.
12   Q.   What, generally speaking, are those documents?
13   A.   These are records of transactions conducted at
14   Arvest Bank, as well as statements generated by Arvest
15   Bank.
16          MR. O'REILLY:  Your Honor, the government moves
17   Government's Exhibits 118 to 126 into evidence.
18          MR. SPRINGER:  No objection.
19          THE COURT:  They'll be received.
20   Q.   (BY MR. O'REILLY)  I ask you now to take a look at
21   Government's Exhibits 127, 128, and 129, please.  Do you
22   recognize those documents?
23   A.   Yes, sir.
24   Q.   What, generally speaking, are Government's Exhibits
25   127 through 129?
```

CHRIS SIMPKINS - DIRECT BY MR. O'REILLY                    439

1  A.   Records of deposits performed at Arvest Bank.

2  Q.   Are these records maintained in the ordinary course

3  of business?

4  A.   Yes, sir.

5         MR. O'REILLY:  Your Honor, the government would

6  move Government's Exhibit 127, 128, and 129 into

7  evidence.

8         MR. SPRINGER:  No objection.

9         THE COURT:  They'll be received.

10 Q.   (BY MR. O'REILLY)  Mr. Simpkins, I'm now going to

11 ask you to look at what has been marked for

12 identification as Government's Exhibits 131 through 142

13 -- no, actually, through 140, please.  Do you recognize

14 those documents, sir?

15 A.   Yes, sir, I do.

16 Q.   Generally speaking, could you describe what they

17 are?

18 A.   They are records of transactions conducted at Arvest

19 Bank.

20        MR. O'REILLY:  Your Honor, the government would

21 move Government's Exhibits 131 through 140 into evidence

22 at this time.

23        MR. SPRINGER:  No objection, Your Honor.

24        THE COURT:  They'll be received.

25 Q.   (BY MR. O'REILLY)  And I'm now going to ask if we

1  can publish what's already in evidence, Government's

2  Exhibit 142.  And just take a look at your monitor, that

3  should come up there.  And, if necessary, you can go

4  ahead and look at the exhibit itself if that would be

5  helpful.  Do you recognize what Government's Exhibit 142

6  is?

7  A.   Yes, sir.

8  Q.   What is, generally speaking, Government's Exhibit

9  142?

10 A.   It's a record of a deposit transaction performed at

11 Arvest Bank.

12 Q.   What is the nature of the deposited items?

13 A.   It appears to be that they're money orders.

14 Q.   I'm going to ask you now if you could take a look at

15 what has been marked for identification as Government's

16 Exhibit 175.  Do you have that in front of you?  I'm

17 sorry.  Do you recognize Government's Exhibit 175?

18 A.   Yes, sir, I do.

19 Q.   What is Government's Exhibit 175?

20 A.   It is a copy of a check written off of an Arvest --

21 I'm sorry, a Superior Federal Bank account.

22 Q.   And is that in November of 2003?

23 A.   That is correct.

24 Q.   Do you recognize this as a record of the bank,

25 Arvest Bank?

```
 1  A.   Yes.
 2           MR. O'REILLY:  Your Honor, the government would
 3  move Government's Exhibit 175 into evidence.
 4           MR. SPRINGER:  No objection.
 5           THE COURT:  It is received.
 6           MR. O'REILLY:  May I have a moment, Your Honor?
 7           THE COURT:  You may.
 8           MR. O'REILLY:  No further questions, Your Honor.
 9           THE COURT:  Cross-examination.
10                        CROSS-EXAMINATION
11  BY MR. SPRINGER:
12  Q.   Do you have any firsthand knowledge with regard to
13  any of those checks that you just identified?
14  A.   Define "firsthand knowledge," please.
15  Q.   Do you know anything about them other than the fact
16  that they went through your bank?
17  A.   No, sir.
18           MR. SPRINGER:  Thank you.
19           THE COURT:  Mr. Stilley?
20           MR. STILLEY:  No questions.
21           THE COURT:  Any redirect?
22           MR. O'REILLY:  No, Your Honor.
23           THE COURT:  You may step down.  All right.
24  We'll have the government's next witness.
25           MR. O'REILLY:  Your Honor, the United States
```

1  calls Ms. Debra Barham.

2          THE COURT:  Spell that last name, please.

3          MR. O'REILLY:  B-A-R-H-A-M.

4          THE COURT:  Thank you.

5          MR. O'REILLY:  Your Honor, may I approach the

6  witness, please?

7          THE COURT:  You may.

8                      DEBRA BARHAM,

9  (WITNESS SWORN)

10                  DIRECT EXAMINATION

11 BY MR. O'REILLY:

12 Q.  Ms. Barham, where are you employed?

13 A.  I work for the Internal Revenue Service located in

14 Ogden, Utah.

15 Q.  How long have you been with the Internal Revenue

16 Service?

17 A.  I have worked there 23 years.

18 Q.  What is your current assignment with the Internal

19 Revenue Service?

20 A.  I am the court witness coordinator.

21 Q.  What does that mean?

22 A.  On a daily basis, I will review tax returns and

23 transcripts, I will conduct research, I prepare documents

24 that are used as exhibits in court, and I testify.

25 Q.  How long have you been a witness coordinator with

DEBRA BARHAM - DIRECT BY MR. O'REILLY                    443

 1  the IRS?

 2  A.   For approximately four years.

 3  Q.   Were you previously employed in a different position

 4  within the IRS?

 5  A.   Yes, I have been an investigative analyst, a tax

 6  examiner, and a clerk.

 7  Q.   You started as a clerk?

 8  A.   That is correct.

 9  Q.   Was that your first position within the IRS?

10  A.   Yes, it is.

11  Q.   How long ago is it that you began working for the

12  IRS?

13  A.   In January 1986.

14  Q.   Have you previously testified with respect to IRS

15  records in other courtrooms?

16  A.   Yes, I have.

17  Q.   Could you indicate how many times?

18  A.   Approximately 39 times.

19  Q.   Prior to your coming in to testify today, were you

20  asked to review certain records?

21  A.   Yes, I was.

22  Q.   Could you briefly explain how you review records.

23  A.   The records that we have, we will use a social

24  security number or an employer identification number to

25  pull the records and to review them.

1  Q.   Were you asked to review filing records with respect

2  to a Mr. Lindsey Springer for the years 1981 to the

3  present?

4  A.   Yes, I was.

5  Q.   Were you similarly asked to review filing records of

6  an individual by the name of Oscar Stilley for the years

7  1981 to the present?

8  A.   Yes, I was.

9  Q.   Were you asked to review any records with respect to

10 a Jeanne Springer?

11 A.   Yes, I was.

12 Q.   Was that for more recent years, for 2000 to the

13 present?

14 A.   That is correct.

15 Q.   Similarly, were you asked to review records for a

16 Ms. Julie Stilley for the years 2000 to present?

17 A.   Yes.

18 Q.   Were you asked to review records of gift tax returns

19 prior to your testimony today?

20 A.   Yes, I was.

21 Q.   With respect to that, were you asked -- I'll just

22 read a list of names and ask you if those were at least

23 some of the people you were asked to review records of:

24 Brian DiMercuiro, Martin Dingman, Guy Francis, Shane

25 Grady, Arthur Hawkins, Barbara Hodsden, James Lake,

DEBRA BARHAM - DIRECT BY MR. O'REILLY                    445

1   Lawrence Logsdon, Charles Looney, Andrew Ouwenga, Denny

2   Patridge, Eddy Patterson, Alan Richey, Philip Roberts,

3   Larry Simmons, Ernest C. Swisher, III, Patrick Turner,

4   Vikki Wiggins, and Ronald Young?

5   A.   Yes, I was.

6   Q.   Just briefly, not going into great detail, what did

7   you do to do a search for records of gift tax returns?

8   A.   Using the social security number, I conducted a

9   research of the computer system and found no record of

10  those forms being filed.

11  Q.   With respect to what time period?

12  A.   I believe it was 2000 through 2008.

13  Q.   Were you asked to review third-party filings with

14  respect to Mr. Lindsey Springer?

15  A.   Yes, I was.

16  Q.   And was that also for the years of 2000 through

17  2008?

18  A.   That is correct.

19  Q.   Were you asked to do a similar search with respect

20  to Mr. Stilley?

21  A.   Yes, I was.

22  Q.   Could you briefly explain to the jury what is meant

23  by the term "third-party filing"?

24  A.   "Third-party information" is information that is

25  provided to Internal Revenue Service by companies,

1  employers, banks.  It can include wages, non-employee's

2  compensation, annuities, interest earned, and mortgage

3  interest paid.

4  Q.   Would it include currency transaction reports?

5  A.   Yes, it would.

6  Q.   If there's no social security number included on a

7  form, is the IRS able to track that record to the

8  appropriate individual?

9  A.   No, they are not.

10 Q.   Why not?

11 A.   Because names can be duplicated; however, a social

12 security number is unique to that particular person and

13 so we need that number to be able to research and retain

14 that information.

15 Q.   As with respect to -- were you also asked to do a

16 record search of any Forms 1099 having been filed by a

17 Mr. Oscar Stilley?

18 A.   Yes, I was.

19 Q.   For what time period?

20 A.   For 2004 through 2008.

21 Q.   And is there a reason that the search was only in

22 2004 and not earlier?

23 A.   I was checking an on-line system and 2004 is the

24 latest year that is available on line.

25            THE COURT:  Latest or earliest?

DEBRA BARHAM - DIRECT BY MR. O'REILLY                    447

1          THE WITNESS:  Earliest, I'm sorry.

2          MR. O'REILLY:  Thank you, Your Honor.

3   Q.   (BY MR. O'REILLY)  With respect to your search of

4   the filings of Form 1099 by Mr. Stilley, did you have to

5   use his social security number for that?

6   A.   Yes, I did.

7   Q.   Was there any record of any filings of Forms 1099 by

8   Mr. Stilley?

9   A.   No, there was not.

10  Q.   Let me ask you now, speaking with respect to

11  Mr. Springer -- and if you need to refresh your

12  recollection, just let me know.

13  A.   Okay.

14  Q.   Was there any record of a return, tax return, being

15  filed for the year 1981?

16  A.    I would like to refresh my memory with those

17  records.

18  Q.   Did you prepare some records or review records and

19  have them available in front of you?

20  A.   Yes, I have.

21  Q.   I'm going to ask you if you could simply look at

22  what has been marked as Government's Exhibit 601.

23  A.   Okay.

24  Q.   Just take a look at that, and then when you're done,

25  look up and let me know if that refreshed your

1  recollection.

2  A.   Yes, it does.

3  Q.   Is there any record of the IRS records of

4  Mr. Springer filing a tax return for the year 1981?

5         MR. SPRINGER:  Your Honor, I have an objection.

6  May we approach?

7         THE COURT:  You may.

8     (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND

9  OUT OF THE HEARING OF THE JURY.)

10        MR. SPRINGER:  Mr. O'Reilly is asking the

11 witness about questions of documents that she did not

12 sign and she did not prepare and she's getting ready to

13 answer questions about the document that open up a can of

14 worms, per se, I mean, that I haven't filed tax returns

15 since 1981 or whatever, and she's not the person that

16 prepared this document, so I wouldn't be able to ever

17 take that back once it comes out.

18        THE COURT:  Give me just a preview of the

19 evidence that we'll have that will indicate that you did

20 file a return in '81.

21        MR. O'REILLY:  Your Honor, if I may be heard

22 briefly, actually, the evidence will be that he did file

23 a tax return in 1981 based upon the records of the IRS.

24 And what I'm trying to do, Your Honor, rather than put in

25 a bunch of records of tax items that really aren't

1  essential to the government's case is simply to elicit

2  that he did file returns in the past and stopped.  I can

3  introduce the records as IRS records and she can lay the

4  foundation, but all I was seeking to do was simply have

5  some testimony on that matter.  These are records of the

6  IRS.  I can lay a foundation, if that's what's

7  necessary.

8         MR. SPRINGER:  If that's as far as he's going,

9  I'll withdraw my objection.

10        THE COURT:  Very well.

11     (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

12  WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

13  PRESENCE AND HEARING OF THE JURY.)

14        MR. O'REILLY:  May I proceed, Your Honor?

15        THE COURT:  You may proceed.

16  Q.  (BY MR. O'REILLY)  Have you had a chance to refresh

17  your recollection based on looking at what has been

18  marked for identification as Government's Exhibit 601?

19  A.  Yes, I have.

20  Q.  Okay.  I'm going to ask you now what is your

21  recollection of whether or not the IRS records reflect a

22  tax return being filed by Mr. Springer for the year

23  1981.

24  A.  There is a tax return.

25  Q.  I'm going to ask you now with respect to 1982, do

1   you recall if the IRS records reflect whether or not

2   there was a tax return filed for Mr. Springer for that

3   year?

4   A.   Yes, there is.

5   Q.   Yes, there was a tax return filed?

6   A.   That is correct.

7   Q.   Ask you now with respect to year 1984 -- and, again,

8   what I want you to do is, if you don't recall, let me

9   know and then I'll ask you to refresh your recollection.

10  A.   Using the exhibit, I'm refreshing my recollection

11  for 1984.

12  Q.   And just for identification purposes, that's

13  Government's Exhibit 603?

14  A.   That is correct.

15  Q.   Okay.  Does that refresh your recollection?

16  A.   Yes, there is a tax return.

17  Q.   There was a tax return filed?

18  A.   That is correct.

19  Q.   Were you asked to look in the years 1985 and 1986 as

20  well?

21  A.   Yes, I was.

22  Q.   Were you able to determine, based upon the IRS

23  records, whether or not Mr. Springer filed a tax return

24  for those years?

25  A.   I was not able to.

1  Q.   Could you explain why not?

2  A.   For years in that age, I looked electronically and

3  there was not an active file for 1985 or '86.  It does

4  not mean there was not a tax return filed, I was just not

5  able to view that with current active information.

6  Q.   With respect to the year 1987, do you recall whether

7  or not the IRS records reflected if Mr. Springer filed a

8  tax return for that year?

9  A.   To recall my recollection using Exhibit 604, it

10  shows that there is not a tax return filed; however,

11  there are two extensions of time to file.

12  Q.   I'm going to ask you now with respect to the year

13  1988, do you recall whether or not Mr. Springer -- the

14  records reflect -- the IRS records reflect that

15  Mr. Springer filed a tax return?

16  A.   As I recall, that there was no return filed for

17  1988.

18  Q.   How about with respect to the year 1989, do you

19  recall if IRS records reflect whether or not Mr. Springer

20  filed a tax return for that year?

21  A.   Yes, there was a tax return filed for 1989.

22  Q.   And now I ask you -- I'm going to put a whole group

23  of them together, and if you need me to parse it out and

24  break it down, that's fine, but with respect to the years

25  1990 through 1999, did your review of the records

DEBRA BARHAM - DIRECT BY MR. O'REILLY                    452

1   indicate whether or not Mr. Springer filed a tax return

2   for any of those years?

3   A.   Yes, I reviewed the records and I found no returns.

4   Q.   Now I'm going to ask you, with respect to the year

5   2000, did you review the records of the IRS with respect

6   to Mr. Springer for that year?

7   A.   Yes, I did.

8   Q.   Did the records reflect whether or not Mr. Springer

9   filed a return for that year?

10  A.   I believe we have an exhibit that --

11  Q.   Would it help to refresh your recollection?

12  A.   Yes.

13  Q.   May I ask you, if you could, just take a look at

14  Government's Exhibit 606, and when you've had a chance to

15  review that, just look up.

16  A.   Yes.

17  Q.   Okay.  Does that refresh your recollection?

18  A.   It does.

19  Q.   What does the IRS -- do the IRS records reflect

20  whether or not Mr. Springer filed a return for that

21  year?

22  A.   Mr. Springer did not file a tax return for 2000.

23  Q.   And how about for the year 2001?

24  A.   There was no return for that year as well.

25  Q.   The IRS records don't reflect any return; is that

```
 1  correct?
 2  A.   That is correct.
 3  Q.   How about for the year 2000 -- I'll just do 2002
 4  through 2005, do the IRS records reflect -- or do you
 5  need me to break it down by year?
 6  A.   Can we break it down by year --
 7  Q.   I certainly can.
 8  A.   -- for each exhibit?
 9  Q.   With respect to the year 2002, do the IRS records
10  reflect whether or not Mr. Springer filed a tax return
11  for that year?
12  A.   There is no record of a tax return for 2002.
13  Q.   I'm going to ask you the same question with respect
14  to 2003.
15  A.   That is correct; the same.
16  Q.   What's the same?
17  A.   There's no tax return filed for 2003.
18  Q.   And with respect to the year 2004?
19  A.   There is no tax return.
20  Q.   And, again, we're speaking of Mr. Springer?
21  A.   That is correct.
22  Q.   And with respect to the year 2005?
23  A.   There is no tax return.
24  Q.   There's no record of a tax return being filed?
25  A.   That is correct.
```

1  Q.   And now I'm going to ask you if you could change

2  your perspective and be thinking of Mr. Stilley.

3  A.   Okay.

4  Q.   Do the IRS records reflect whether or not

5  Mr. Stilley filed a tax return for the year 1981?

6  A.   Can we use the exhibits to --

7  Q.   Would that be helpful in refreshing your

8  recollection of what the IRS records show?

9  A.   Yes, it would.

10  Q.   I'm going to ask you, if you could, to take a look

11  --

12         MR. STILLEY:  Object to foundation.

13         THE COURT:  Overruled.

14  Q.   (BY MR. O'REILLY)  If you could take a look at

15  Government's Exhibit 605, see if that refreshes your

16  recollection.

17  A.   Yes, it does.

18  Q.   Okay.  Do the IRS records reflect whether or not

19  Mr. Stilley filed a tax return for the year 1981?

20  A.   Yes, there is a tax return filed for 1981.

21  Q.   I'm going to ask you now with respect to the years

22  1982 through 1985, were you asked to look at those years

23  as well?

24  A.   Yes, I was.

25         MR. STILLEY:  Objection; foundation, personal

1   knowledge.

2           THE COURT:  Overruled.

3   Q.  (BY MR. O'REILLY)  With respect to the years 1982 to

4   1985, were you able to reach any conclusion?

5   A.  I don't believe -- those were records we weren't

6   able to review due to the current inactive data.

7   Q.  Were you also asked to review the IRS records with

8   respect to Mr. Stilley?

9       And when we're talking about filing them, for all

10  the ones we've just talked about, are we talking about

11  personal income tax returns?

12  A.  Yes, we're talking about the 1040 series.  That

13  would include a 1040, 1040-A or 1040-EZ.

14  Q.  I ask you now, with respect to Mr. Stilley for the

15  years 1986 to 1999, did you have an opportunity to review

16  the IRS records?

17  A.  Yes, I did.

18  Q.  What did those records reflect?

19  A.  Do we have exhibits in here that would refresh my

20  memory?

21  Q.  I have nothing to fresh your recollection.  You'll

22  have to search your brain.

23  A.  Then those are the years that I reviewed for active

24  information and there was no active information.

25  Q.  Please explain to the jury what you mean by "no

1  active information"?

2  A.   I accessed the computer system and there were no --

3  there was no information for those tax periods.

4  Q.   What does the fact that there's no information

5  reflect?

6  A.   Due to the dates of these, they could -- after a

7  certain period of time, if there's no activity, they will

8  go into a retention period, and then they will even go

9  into a microfilm, and without using those systems to

10  reflect that information, I cannot say whether or not tax

11  returns were filed for those periods.

12  Q.   We're talking about -- I'm talking about 19 -- let

13  me ask this.

14  A.   Okay.

15  Q.   The late nineties -- let's just start from 1995

16  through 1999.

17  A.   Okay.

18  Q.   Just limit it to those years.  Do you recall whether

19  or not in your review of the records there was anything

20  that allowed you to determine whether or not there were

21  tax returns filed with respect to Mr. Stilley for those

22  years?

23  A.   For 1995 through 1999, there were no tax returns.

24  Q.   Does that also include 1990 through 1994?

25  A.   That is correct.

1   Q.   Some of the earlier years, that's what you were

2   talking about when you said there was no activity, you

3   can't determine?

4   A.   That is correct.

5   Q.   Let me ask you now if you could draw your attention

6   to your review of third-party filings with respect to

7   Mr. Stilley.

8   A.   Okay.

9   Q.   For the year 2000, do you recall whether or not IRS

10  records reflect any third-party filings for those years?

11  A.   Can you tell me what exhibit number that is.

12  Q.   You could -- if you want to draw your attention to

13  Government's Exhibit 665, to see if that refreshes your

14  recollection.

15          MR. STILLEY:   Could you tell me what the exhibit

16  number is we're looking for?

17          MR. O'REILLY:   665.

18          MR. STILLEY:   Thank you.

19          THE WITNESS:   This is the year 2000, correct?

20  Q.   (BY MR. O'REILLY)   Yes, that's what I'm asking you

21  about.   All I want you to do right now is see if that

22  refreshes your recollection of what your review of the

23  IRS records revealed.

24  A.   It revealed there was no third-party information

25  reported.

DEBRA BARHAM - DIRECT BY MR. O'REILLY                           458

1    Q.   Let me ask you now with respect to the year 2001 --
2    and do you need to refresh your recollection?
3    A.   Yes, I do
4    Q.   Please take a look at what has been marked for
5    identification as Government's Exhibit 666.
6    A.   There is no third-party filing.
7    Q.   In the IRS records?
8    A.   That is correct.
9    Q.   I'm going to now ask you to take a look at what has
10   been marked for identification as Government's Exhibit
11   667.
12   A.   Okay.
13   Q.   Do you recognize that document?
14   A.   Yes, I do.
15   Q.   What is Government's Exhibit 667?
16   A.   667 has two reportings to the Internal Revenue
17   Service of third-party information.
18   Q.   With respect to whom?
19   A.   With respect to Oscar Stilley.
20   Q.   And are these records that are maintained by the
21   IRS?
22   A.   Yes, they are.
23   Q.   Are they made -- when made, are they made by a
24   person with knowledge?
25   A.   Yes, they are.

1           MR. O'REILLY:  Your Honor, the government would

2    move Government's Exhibit 667 into evidence.

3           MR. STILLEY:  Objection.  I don't think she

4    testified that she had personal knowledge.

5           THE COURT:  Overruled.  It will be received.

6           MR. O'REILLY:  You may publish that to the jury,

7    please.

8         Your Honor, I would ask for some direction on this.

9    With respect to these records presently, we have the IRS

10   certificate page on the first page.  We can leave that or

11   we can remove that for these exhibits.  I apologize for

12   not having thought of that earlier.  Specifically right

13   now I'm talking about Government's Exhibit 667.

14          THE COURT:  Well, is the --

15          MR. O'REILLY:  You can see it on that screen,

16   sir, if you take a look.

17          THE COURT:  Is there any objection to -- if the

18   remainder of the exhibit is received in evidence or is

19   determined by the Court to be admissible, is there any

20   objection from either of the defendants to receiving the

21   cover page?

22          MR. SPRINGER:  No, Your Honor, not the cover

23   page.

24          THE COURT:  The page that -- the page that says

25   down in the lower right-hand corner "Form 2866," are we

DEBRA BARHAM - DIRECT BY MR. O'REILLY                    460

```
 1  together on that?
 2          MR. SPRINGER:  Yes.
 3          THE COURT:  Okay.  Very well.  You need not
 4  remove those pages.
 5          MR. O'REILLY:  Thank you, Your Honor.  If we can
 6  show that.
 7  Q.  (BY MR. O'REILLY)  I guess it's the page that shows
 8  some payments.
 9      Okay.  Let me ask you if you were asked to review
10  IRS records with respect to third-party filings of
11  Mr. Stilley for the year 2003.
12  A.  Yes, I was.
13  Q.  What did your review of those -- let me ask you now
14  to draw your attention to Government's Exhibit 668.
15  A.  There is third-party reportings to Internal Revenue
16  Service.
17  Q.  With respect to whom?
18  A.  Oscar Stilley.
19  Q.  Is this a record maintained by the Internal Revenue
20  Service?
21  A.  Yes, it is.
22  Q.  And is the record one that when made was made by a
23  person with knowledge?
24  A.  Yes, it is.
25          MR. O'REILLY:  Your Honor, the government would
```

```
 1   offer Exhibit 668 into evidence.
 2          MR. STILLEY:  Hearsay and confrontation; object.
 3          THE COURT:  Pardon me?
 4          MR. STILLEY:  Hearsay and confrontation
 5   objection.
 6          THE COURT:  I heard the "hearsay" part.
 7          MR. STILLEY:  Confrontation.
 8          THE COURT:  That's 6 --
 9          MR. O'REILLY:  -- 68, Your Honor.
10          THE COURT:  Does the second part of your
11   objection go to the cover sheet only?
12          MR. STILLEY:  No, no, no.  It's the whole
13   thing.  If we're going to have it, I think we need to
14   have it all.
15          THE COURT:  Well, Mr. Stilley, are you telling
16   the Court that if I admit the second page, then you want
17   the first page in evidence also?
18          MR. STILLEY:  Sure.
19          THE COURT:  It will be received in its
20   entirety.
21          MR. O'REILLY:  Thank you, Your Honor.
22      Could I ask you if we could publish, I think, the
23   second which reflects the payment to the jury.
24   Q.  (BY MR. O'REILLY)  I'm going to ask you now, with
25   respect to the year 2004, were you asked to make a
```

1  similar search?

2  A.  Yes, I was.

3  Q.  What did your search reveal with respect to -- let

4  me ask this a different way.

5      Drawing your attention to Government's Exhibit 669,

6  does that reflect the records maintained by the IRS?

7  A.  Yes, it does.

8  Q.  What does that generally indicate?

9  A.  It indicates that there were payments made to

10 Mr. Stilley.

11         MR. O'REILLY:  Your Honor, the government --

12 Q.  (BY MR. O'REILLY)  Is this a record maintained by

13 the IRS?

14 A.  Yes, it is.

15 Q.  At the time the record was made, was it made by a

16 person with knowledge?

17 A.  Yes, it is.

18         MR. O'REILLY:  Your Honor, the government would

19 move Government's Exhibit 669 into evidence.

20         MR. STILLEY:  Your Honor, I want to maintain a

21 continuing objection to this entire line of exhibits with

22 respect to hearsay and confrontation.

23         THE COURT:  Well, Mr. Stilley, we're past that

24 on 668.  I asked you whether you wanted the first page in

25 evidence if the second page came in and you said "sure,"

1   so we're past that on 668.  Is that understood?

2            MR. STILLEY:  Yes.

3            THE COURT:  Okay.  Now, state your objection on

4   669.

5            MR. STILLEY:  Hearsay and confrontation.

6            THE COURT:  Well, again, Mr. Stilley, if the

7   second and third page come in, do you want the first page

8   in or not?

9            MR. STILLEY:  Yes, I do.

10           THE COURT:  Okay.  They'll be received in its

11  entirety.

12           MR. O'REILLY:  If we could publish the second

13  page.

14  Q.  (BY MR. O'REILLY)  Ms. Barham, I'm going to ask you

15  now if you did a similar search with respect to the year

16  2005.

17  A.  Yes, I did.

18  Q.  Drawing your attention to Government's Exhibit 670,

19  does that reflect the results of the IRS record search

20  that you -- the same records that you saw?

21  A.  Yes, it does.

22  Q.  What generally does that reflect?

23  A.  It reflects that there was third-party payments made

24  to Oscar Stilley.

25  Q.  During the year 2005?

1   A.   That is correct.

2   Q.   And is this a record that's maintained by the IRS?

3   A.   It is, yes.

4   Q.   And when this record was made initially, was it made

5   by a person with knowledge?

6   A.   Yes, it is.

7         MR. O'REILLY:  Your Honor, the government moves

8   Government's Exhibit 670 into evidence.

9         MR. STILLEY:  Same objection.

10         THE COURT:  Mr. Stilley, if the second page

11   comes in, do you want the first page in?

12         MR. STILLEY:  Yes, and it will be the same

13   throughout this line of documents.

14         THE COURT:  670 will be received.

15   Q.   (BY MR. O'REILLY)  Ms. Barham, were you also asked

16   to perform a similar search with respect to third-party

17   filings for Mr. Stilley for the year 2006?

18   A.   Yes, I was.

19   Q.   Do you recall whether or not your search revealed

20   whether there were any third-party filings in that year?

21   A.   I would have to use exhibits to refresh my memory.

22   Q.   If you could take a look at Government's Exhibit 671

23   for identification only.

24   A.   Yes, there were no reportings by a third party.

25   Q.   That refreshes your recollection?

1  A.   Yes, it does.

2  Q.   So the IRS records reflect no reportings by a third

3  party with respect to Mr. Stilley for the year 2006?

4  A.   That is correct.

5  Q.   I'm now going to ask you to turn your attention back

6  to Mr. Springer.  Did you perform similar searches as

7  we've just been discussing with respect to Mr. Springer?

8  A.   Yes, I did.

9  Q.   With respect to Mr. Springer, I'm going to ask you,

10  at least initially, for the years 2000 through 2006, the

11  same time period that we just discussed year by year with

12  Mr. Stilley, did your search and review of IRS records

13  reveal any third-party filings of information with the

14  IRS?

15  A.   I'd like to review exhibits to refresh my memory.

16  Q.   If you could -- what I'll draw your attention to

17  would be -- and just take a look through 656 through 662

18  for identification purposes only.  That's Government's

19  Exhibits 656 through 662.

20  A.   Okay.  I reviewed the records for the years 2000

21  through 2006.

22  Q.   Okay.  With respect to those years in total, are

23  there any records of third-party filings of information

24  with the IRS with respect to Mr. Springer?

25  A.   There is one reporting during the year 2003.

1  Q.   Okay.  I'm going to ask you now if you can take your

2  -- draw your attention to Government's Exhibit 659 and --

3  A.   Yes.

4  Q.   -- is that the -- does that document reflect a

5  third-party filing with respect to Mr. Springer?

6  A.   Yes, it does.

7  Q.   And is that a record that is maintained by the IRS?

8  A.   It is, yes.

9  Q.   And when made, is that a record made by someone with

10  personal knowledge?

11  A.   Yes, it is.

12        MR. O'REILLY:  Your Honor, the government would

13  move Government's Exhibit 659 into evidence.

14        MR. SPRINGER:  No objection, Your Honor.

15        THE COURT:  It will be received.

16        MR. O'REILLY:  And if we may publish -- I

17  believe it will be the second page of that.

18  Q.   (BY MR. O'REILLY)  Could you briefly describe what

19  is reflected in Government's Exhibit 659 as the third-

20  party transaction?

21  A.   The document reflects that this was the document

22  type 8300.

23  Q.   Just very briefly explain to the jury what an 8300

24  is.

25  A.   I don't know --

```
 1  Q.   Okay.

 2  A.   -- what that is.

 3       The payee is Lindsey K. Springer, the payor is Bruce

 4  G. Webber, Incorporated, and the amount of the

 5  transaction was $17,806.

 6  Q.   One last question:  Do you have any personal

 7  knowledge of any of these transactions?

 8  A.   No, I do not.

 9  Q.   Is your testimony limited solely to what is within

10  the IRS system of records?

11  A.   That is correct.

12       MR. O'REILLY:  Nothing further from the

13  government, Your Honor.

14       THE COURT:  Cross-examination.

15       MR. SPRINGER:  Thank you.

16                    CROSS-EXAMINATION

17  BY MR. SPRINGER:

18  Q.   Hi, my name is Lindsey Springer.

19       MR. O'REILLY:  Your Honor, I'd ask Mr. Springer

20  to keep his voice up or use the microphone.

21       MR. SPRINGER:  Got it.

22  Q.   (BY MR. SPRINGER)  You just testified with regard to

23  Government's Exhibit Number 606, if you could turn to

24  that.

25  A.   Yes.
```

1  Q.   Now, is this the -- basically for 2000 through 2006,

2  with the caveat of the 2003 Exhibit 659 that you just

3  testified for 2000 through 2006 it would be identically

4  the same as this document; is that correct?

5  A.   The 2000, you're talking about the --

6  Q.   Exhibit 606?

7  A.   Okay.  That's for the tax year 2000 only.

8  Q.   Okay.  And then 607 is for 2001?

9  A.   That is correct.

10  Q.   And then 6008 -- excuse me, 608 is for 2002?

11  A.   That is correct.

12        MR. O'REILLY:  Your Honor, it appears that

13  Mr. Springer is about to introduce this into evidence.

14  These were not put into evidence by the government.  It

15  was only used to refresh her recollection.

16        THE COURT:  If you want to publish the document,

17  then it needs to be offered and received.

18        MR. SPRINGER:  All right.

19  Q.   (BY MR. SPRINGER)  Turning to Government's 606 that

20  you have in front of you.  Now, this is -- this is a

21  document, 606, it purports to be a Certificate of

22  Assessment.  Is that true?

23  A.   It is a transcript.  We would refer to it in

24  layman's terms as a "transcript of account."

25  Q.   Right.  And this is the official record of the IRS?

```
 1   A.   That is correct.
 2   Q.   It would be the same information that would be
 3   reflected on the master file?
 4   A.   That is correct, on the individual master file.
 5   Q.   Right.  The human being master file, right?
 6   A.   The personal and individual master file.
 7   Q.   All right.  Now, on 606 it says right there
 8   "substitute for return for 2000."  Do you see that right
 9   there?
10   A.   I do, yes.
11   Q.   All right.  What does that mean?
12   A.   That means that the Internal Revenue Service
13   prepared and processed a tax return in anticipation of a
14   subsequent tax assessment.
15   Q.   Now, if you look across the line there to the other
16   side, there's a date there, isn't there, 3/28/05?
17   A.   That is correct.
18   Q.   Now, does that mean that an assessment took place on
19   that day?
20   A.   No.  It only means that the substitute for return
21   was prepared and processed.
22   Q.   Okay.  Isn't that date underneath the column
23   assessment date (23C, RAC 006)?
24   A.   That is the date in which that transaction was
25   posted.
```

DEBRA BARHAM - CROSS BY MR. SPRINGER                    470

1  Q.  Okay.  So a substitute for return, then, is a return

2  that the IRS files on behalf of the taxpayer?

3  A.  It is what we would consider a marker in the

4  computer system.  At the time that a substitute for

5  return is processed, there has been no tax calculations

6  made or determinations made at that time.

7  Q.  Now, when you did your record search for Lindsey K.

8  Springer, did you look at 1990 through 1999?

9  A.  Yes, I believe that I did.

10 Q.  Now, those documents aren't in here, are they?

11 A.  I don't believe that we have those records here,

12 that's correct.

13 Q.  As a matter of fact, there's a lengthy list of

14 information reported on that file on Lindsey Springer;

15 isn't it true?

16 A.  There was information on the master file, correct.

17 Q.  Right.  And that's why you left it out; isn't it

18 true?

19 A.  No, I did not leave it out for that reason.

20 Q.  Now, why is it -- if you would turn to 659,

21 Government's Exhibit -- hang on one second.  I'm sorry.

22 Give me one second.

23         MR. SPRINGER:  May I have one second, Your

24 Honor?

25         THE COURT:  You surely may.

1  Q.  (BY MR. SPRINGER)  If you would turn to Government's

2  Exhibit 668.

3          MR. SPRINGER:  And I do believe, Your Honor,

4  that has been published.

5          THE COURT:  It's in evidence.

6          MR. SPRINGER:  In the record.  Okay.

7          THE COURT:  You certainly may publish it.

8  Q.  (BY MR. SPRINGER)  Now --

9          MR. O'REILLY:  Mr. Springer, you might get a

10 better copy if you just asked Ms. Burgess to bring that

11 up for you.

12          MR. SPRINGER:  Oh, okay.  Could you do that,

13 Ms. Burgess?  It's 668.

14          MR. O'REILLY:  Which page, sir?

15          MR. SPRINGER:  Second page.

16 Q.  (BY MR. SPRINGER)  Now, the second page of 668 here

17 has Oscar Stilley's name on it and it has an address on

18 it, doesn't it?

19 A.  That is correct.

20 Q.  Now, could you tell the Court and me and the jury

21 why 606 does not have an address under the name Lindsey

22 Springer?

23 A.  The Certificate of Assessment says they come -- we

24 do not print the address of record.

25 Q.  Isn't it true, ma'am, that there is ongoing

DEBRA BARHAM - CROSS BY MR. SPRINGER                          472

1    litigation between Lindsey Springer and the IRS over an

2    address on a Certificate of Assessment?  Isn't that true?

3    A.   I have no knowledge --

4         MR. O'REILLY:  Objection, Your Honor.  Beyond

5    the scope of direct and beyond this witness's knowledge.

6         THE COURT:  Well, she has already said that, so

7    that will be overruled.

8    Q.   (BY MR. SPRINGER)  Now, isn't it true that a

9    Certificate of Assessment, in order to be qualified as

10   such, must identify the taxpayer to which it addresses?

11        MR. O'REILLY:  Objection, Your Honor, beyond the

12   scope of direct.  This witness was called as a records

13   custodian.

14        THE COURT:  Overruled.

15   Q.   (BY MR. SPRINGER)  You can answer the question.

16   A.   Okay.  Could you repeat your question, please?

17   Q.   In order for this to be a valid Certificate of

18   Assessment, isn't it required to identify the taxpayer in

19   order for it to be valid?

20        MR. O'REILLY:  Your Honor, objection.  I would

21   like her to be voir dired to determine whether or not she

22   actually has --

23        THE COURT:  Well, he changed the question and

24   the question, as changed, is objectionable.  And the

25   objection is sustained.

1   Q.  (BY MR. SPRINGER)  Isn't it true that Certificates

2   of Assessment must have addresses to identify the

3   taxpayer?

4         MR. O'REILLY:  Objection, Your Honor.  It's not

5   determined that this witness has that expertise nor was

6   she offered for that purpose.  It's well beyond direct

7   and it's not determined whether it's within her area of

8   knowledge.

9         THE COURT:  Bear with me just a moment,

10  Counsel.  Ms. Barham, do you know the answer to that

11  question?

12        THE WITNESS:  I believe the way he's posing the

13  question it's two different items.  That if we are making

14  an assessment of tax that it -- I don't know that he --

15        THE COURT:  I didn't ask you to answer it.  I

16  just asked you if you knew the answer to that question.

17        THE WITNESS:  I don't believe I know the answer

18  to his question.

19        THE COURT:  That settles it.  Next question.

20        THE WITNESS:  Thank you.

21  Q.  (BY MR. SPRINGER)  Now, for Exhibit Number 606, 607,

22  608, 609, and 610 and 611, did you print these documents

23  up?

24  A.   Through what number?

25  Q.   Through 611 for the year 2000 through 2005.

DEBRA BARHAM - CROSS BY MR. SPRINGER                474

```
 1  A.   No, I did not.

 2  Q.   So you wouldn't know if these documents were altered

 3  then, would you?

 4  A.   No, I would not.

 5  Q.   And you didn't alter them before they came into this

 6  Court, did you?

 7  A.   No, I did not.

 8  Q.   Now, you told the jury earlier and the Court about

 9  those third-party request forms.  Do you remember that

10  testimony?

11  A.   The results of the third-party information?

12  Q.   Uh-huh.

13  A.   Yes.

14  Q.   Now, the third-party request form doesn't come from

15  the taxpayer generally, does it?

16  A.   No, it does not.

17  Q.   And so by your testifying that there were no third-

18  party forms had nothing to do with whether or not a

19  taxpayer was required to or file a return; is that true?

20          MR. O'REILLY:  Your Honor, objection to the form

21  of the question.  I'm not quite sure what's being asked.

22          THE COURT:  Please rephrase it.

23          MR. SPRINGER:  I'll rephrase it.

24  Q.   (BY MR. SPRINGER)  Your testimony here today is, is

25  that Lindsey Springer or Oscar Stilley, for that matter,
```

DEBRA BARHAM - CROSS BY MR. STILLEY                    475

```
 1  were not required to file any third-party request forms
 2  with the IRS; is that true?
 3  A.   To my knowledge, I don't know that.
 4  Q.   Well -- okay.
 5          MR. SPRINGER:  Thank you.
 6          THE COURT:  Mr. Stilley.
 7                    CROSS-EXAMINATION
 8  BY MR. STILLEY:
 9  Q.   You said your name was Debra Barham, correct?
10  A.   That is correct.
11  Q.   Is that your legal name or is that a pseudonym?
12  A.   That's my legal name.
13  Q.   Do you sometimes go under a pseudonym?
14  A.   No, I do not.
15  Q.   Do you know Byron Endo?
16  A.   Yes, I do.
17  Q.   And how do you know him?
18  A.   He is a manager in our office that has a delegation
19  order to sign some of the transcripts that have been
20  submitted today.
21  Q.   Okay.  So he works in your office, correct?
22  A.   That is correct.
23  Q.   Is he on the same level with you?
24  A.   No, he is not.
25  Q.   Is he a supervisor?
```

1   A.    Yes.

2   Q.    Is he your direct supervisor?

3   A.    No, he is not.

4   Q.    How many levels above you is he?

5   A.    One level.

6   Q.    Okay.  But he's not directly above you; is that

7   correct?

8   A.    Within our office structure, I am managed by the

9   manager who will manage up to three levels of management,

10  and Mr. Endo is part of another group.

11  Q.    Did you talk to Mr. Endo before you came here to

12  testify in this case?

13  A.    Did I talk to him in regards to the transcripts?

14  Q.    Yes.

15  A.    They were submitted to him for signature.

16  Q.    Well, that's a little different question.  Did you

17  speak to Mr. Endo before you came here to testify?

18  A.    I spoke to him, yes.

19  Q.    When did you speak to him?

20  A.    I spoke to him throughout the week prior to coming

21  here.

22  Q.    Did he show you these documents?

23  A.    When these documents are prepared, they go through a

24  quality review process and then they are sent to Mr. Endo

25  for signature, and then after he signs them he gives them

1   back to me.

2   Q.   Okay.  So, technically, Mr. Endo doesn't do the

3   research to verify that these are true facts, correct?

4   A.   That is correct.

5   Q.   Somebody else does it, correct?

6   A.   Well, he reviews the research information that's

7   provided when the transcripts are prepared.

8   Q.   Who's the person that provides the information that

9   Mr. Endo relies on?

10  A.   I did.

11  Q.   You did that?

12  A.   Yes.  On the documents that we have that Mr. Endo

13  signed, I provided him that information.

14  Q.   Any particular reason you didn't just sign this

15  yourself?

16  A.   I do not have the delegation authority based on my

17  title.

18  Q.   Is that really important that you have the proper

19  authority?

20  A.   I would imagine so, yes.

21  Q.   How do you know that Mr. Endo has the authority?

22  A.   There's a delegation order 18 and it delegates the

23  individuals by their work title that they have the

24  authority to sign these documents.

25  Q.   And you've seen that, correct?

```
 1  A.    Yes, that is correct.

 2  Q.    Who signed that delegation order?

 3  A.    That, I don't recall.

 4        MR. O'REILLY:  Objection as to relevance.

 5        THE COURT:  Overruled.

 6  Q.    (BY MR. STILLEY)  You don't know?

 7  A.    I don't recall.

 8  Q.    Would that be a district director?

 9  A.    I don't recall.

10  Q.    Now, when you got this information, did you just do

11  queries on a computer?

12  A.    The third-party information?

13  Q.    Well, let's start with the third-party information,

14  that would be great.

15  A.    Yes, I used the social security numbers for

16  Mr. Stilley and Mr. Springer to conduct that research.

17  Q.    Okay.  So you typed in a query on the computer,

18  correct?

19  A.    That is correct.

20  Q.    Did it then come up on the screen?

21  A.    Yes, it did.

22  Q.    And then you saved that down?

23  A.    Then I printed that screen.

24  Q.    Okay.  So you printed it?

25  A.    Correct.
```

1   Q.   You didn't save it?

2   A.   No.

3   Q.   You printed it up and then I suppose you took it to

4   Mr. Endo?

5   A.   Yes.   Then a quality review is conducted and then it

6   is given to Mr. Endo for signature.

7   Q.   Okay.   So that's the basis upon which you're saying

8   that these documents would refresh your recollections,

9   correct?

10  A.   That is correct.

11  Q.   Now, some of these documents, some of this

12  information would simply be kept on computer, correct?

13  It's not kept anywhere except on computer?

14  A.   Not to my knowledge.

15  Q.   But some of this information should exist in hard

16  copy, correct?

17  A.   If it has been printed out and maintained in a

18  particular file, yes.

19  Q.   For example, an assessment would have to have a

20  signature on it, correct?

21  A.   An assessment by Internal Revenue Service?

22  Q.   Yes.

23  A.   To my knowledge, yes.

24  Q.   Are you -- do you have personal knowledge of the

25  legal requirements of an assessment?

DEBRA BARHAM - CROSS BY MR. STILLEY                     480

```
 1   A.   No, I do not.

 2   Q.   So you couldn't answer anything about that?

 3   A.   That is correct.

 4   Q.   And would it not be fair to say then that you

 5   couldn't testify about whether or not the records

 6   actually reflect that an assessment has been made?

 7   A.   If an assessment has been made, the record will show

 8   that that assessment has been made.

 9   Q.   But you wouldn't -- with your personal knowledge you

10   wouldn't be able to look at the computer and see whether

11   it has the elements of an assessment, would you?

12   A.   No, I would not.

13   Q.   Now, is it true that IRS agents often use stamps for

14   signatures?

15   A.   I don't know --

16        MR. O'REILLY:  Your Honor, objection as to

17   relevance.

18        THE COURT:  Overruled.

19        THE WITNESS:  I have no knowledge of that.

20   Q.   (BY MR. STILLEY)  Can I presume, then, that

21   Mr. Endo's signatures were done in ink?

22   A.   Yes, they were.

23        MR. STILLEY:  Your Honor, could I have a moment?

24        THE COURT:  You surely may.

25        MR. STILLEY:  Thank you.
```

DEBRA BARHAM - REDIRECT BY MR. O'REILLY                481

1   Q.   (BY MR. STILLEY)  You have no personal knowledge

2   that Oscar Stilley violated any law, do you?

3   A.   No, I do not.

4           MR. STILLEY:  Thank you.  Pass the witness.

5           THE COURT:  Any redirect?

6           MR. O'REILLY:  Yes, Your Honor.  If I may

7   approach the witness.

8           THE COURT:  You may.

9                    REDIRECT EXAMINATION

10  BY MR. O'REILLY:

11  Q.   Ms. Barham, you were just asked some questions about

12  third-party filings; is that correct?

13  A.   That is correct, yes.

14  Q.   I'm going to ask you to look at what's already in

15  evidence as Government's Exhibit 61 -- oh, I'm sorry.

16  Makes it easier, actually.

17          MR. O'REILLY:  Publish that to the jury.

18  Q.   (BY MR. O'REILLY)  Ms. Barham, if you could just

19  look through and again could you just describe what is

20  Government's Exhibit 61?

21  A.   It appears to be several Form 4789 currency

22  transaction reports for Lindsey Springer and then there

23  is attached checks.

24          MR. SPRINGER:  Your Honor, I would object,

25  relevance, knowledge, form.

1            THE COURT:  All he has done is ask her to say

2    what she thinks it is.  To that extent, it's overruled.

3    Go ahead.

4    Q.  (BY MR. O'REILLY)  Ms. Barham, based upon your

5    review of the records and your testimony, are any of

6    those forms that you see in that Exhibit 61 reflected in

7    the third-party filing history that you just testified

8    about?

9    A.   No, they are not.

10           MR. O'REILLY:  Nothing further, Your Honor.

11           THE COURT:  Any recross?

12                    RECROSS-EXAMINATION

13   BY MR. SPRINGER:

14   Q.   I asked you earlier about whether you prepared 606

15   through 611.  Do you remember that question?

16   A.   I don't recall that question.

17           MR. O'REILLY:  Objection, Your Honor, beyond the

18   scope of redirect.

19           THE COURT:  Overruled.

20   Q.  (BY MR. SPRINGER)  Do you remember me asking you,

21   did you prepare the Certificate of Assessments on

22   Government's Exhibit Number 606, 607, 608, 609, 610, and

23   611?

24   A.   I don't recall you asking me if I prepared them.

25   Q.   Will you look at them and answer the question of

DEBRA BARHAM - RECROSS BY MR. SPRINGER                    483

1  whether you prepared them or not?

2  A.   No, I did not prepare them.

3  Q.   Now, did you not just tell Mr. Stilley that in the

4  709 forms that you did prepare those forms, which that

5  would go into, for instance, like Exhibit 619 of the

6  Government's --

7  A.   There are three exhibits in which I did prepare.

8  Q.   Okay.  So you didn't do all of the Form 709

9  certificate for lack of records, you just did three of

10  them?

11  A.   And they weren't the certificate of lack of record.

12  They were the searches for third-party information.

13  Q.   Okay.  And is it your testimony here today that

14  third-party information all gets filed with Utah?

15  A.   The database in which is searched is a nationwide

16  database, so it wouldn't matter what state that that was

17  -- that that came from.

18  Q.   And the IRS right now is broke up into areas; isn't

19  that true?

20        MR. O'REILLY:  Objection, Your Honor, beyond the

21  scope of direct.

22        THE COURT:  Sustained.

23        MR. SPRINGER:  No further questions.

24        THE COURT:  Mr. Stilley?

25        MR. STILLEY:  No questions.

CARA WESTERFELD - DIRECT BY MR. O'REILLY                    484

```
 1            THE COURT:  You may step down.  Before we have
 2   the government's next witness, we took our mid-afternoon
 3   recess slightly early, do any jurors desire a short break
 4   at this point?  Very well.  We'll proceed with the
 5   government's next witness.
 6            MR. O'REILLY:  Your Honor, the United States
 7   calls Cara Westerfeld.
 8         Your Honor, if I may approach the witness to remove
 9   some exhibits.
10            THE COURT:  You may.
11                    CARA WESTERFELD,
12   (WITNESS SWORN)
13                    DIRECT EXAMINATION
14   BY MR. O'REILLY:
15   Q.   Please state your name.
16   A.   Cara Diane Westerfeld.
17   Q.   Ms. Westerfeld -- do you prefer Ms., Mrs.?  What do
18   you prefer?
19   A.   Cara.
20   Q.   Cara.  Well, I'm afraid the Court does not allow me
21   to do that.
22   A.   Okay.  I guess Mrs. Westerfeld.
23   Q.   Thank you, Mrs. Westerfeld.  Where do you live?
24   A.   Kansas City.  Well, Stillwell, Kansas.
25   Q.   How long have you lived there?
```

CARA WESTERFELD - DIRECT BY MR. O'REILLY                    485

```
 1   A.   Since '98.
 2   Q.   Where did you live before that?
 3   A.   I lived in Texas for six months and Tulsa before
 4   then.
 5   Q.   And how long -- what period of time did you live in
 6   Tulsa?
 7   A.   From '76 until '97.
 8   Q.   What is your level of education?
 9   A.   High school.
10   Q.   High school graduate?
11   A.   Yes.
12   Q.   Any post high school education?
13   A.   No.
14   Q.   What do you do to keep busy these days?
15   A.   I do a lot of volunteer work.
16   Q.   Are you a stay-at-home mom?
17   A.   Yes, I am.
18   Q.   Do you know an individual -- first of all, I'll ask
19   about Mr. Stilley.  Do you know who Mr. Stilley is?
20   A.   No, I don't.
21   Q.   Never met him?
22   A.   No.
23   Q.   How about Mr. Springer?
24   A.   Yes, I do.
25   Q.   How is it that you know Mr. Springer?
```

CARA WESTERFELD - DIRECT BY MR. O'REILLY                    486

```
 1   A.   I was married to him.

 2   Q.   When were you married to Mr. Springer?

 3   A.   In May of '87.

 4   Q.   And do you see Mr. Springer in the courtroom?

 5   A.   Yes, I do.

 6   Q.   And was he the gentleman just standing up behind me?

 7   A.   Yes, he was.

 8        MR. O'REILLY:  May the record reflect that she

 9   has identified Mr. Springer?

10        THE COURT:  The record will so reflect.

11   Q.   (BY MR. O'REILLY)  When did you stop being married

12   to Mr. Springer?

13   A.   In January of '90.

14   Q.   What was -- what was Mr. Springer's occupation when

15   you were married?

16   A.   He made custom golf clubs and he also worked in an

17   auto repair center, collision auto.  It was called One

18   Stop Auto Collision Repair Center or something like that.

19   Q.   With respect to when you got divorced, was there any

20   financial arrangement made with respect to Mr. Springer?

21   A.   Yes, there was.

22   Q.   What was that arrangement?

23   A.   He was to pay alimony and child support.

24   Q.   For what period of time did Mr. Springer have to pay

25   alimony?
```

1   A.   He paid it until I was remarried, the same year.

2   Q.   So that was a very brief --

3   A.   Yes.

4   Q.   How about the child support?

5   A.   The child support was until they turned 18.

6   Q.   And how many children did you have?

7   A.   Two.

8   Q.   When did the first child turn 18?

9   A.   Well, she was born in '87.  She -- he actually paid

10  beyond the time that she turned 18 because she was in

11  high school longer and so he continued to pay until she

12  graduated high school, which was in 2007.

13  Q.   In 2007.  So he was paying alimony for the older

14  child through 2007?

15          THE COURT:  You don't mean alimony.

16          THE WITNESS:  It wasn't alimony, it was child

17  support.

18          MR. O'REILLY:  I'm sorry.  Correct, Your Honor.

19  I apologize.  I don't -- never mind.

20  Q.   (BY MR. O'REILLY)  How much child support -- well,

21  let me ask, did Mr. Springer pay child support with

22  respect to the other child as well?

23  A.   Yes, he did.

24  Q.   For how long did Mr. Springer pay child support on

25  your second child?

CARA WESTERFELD - DIRECT BY MR. O'REILLY                      488

1    A.   Until he graduated high school, which was actually

2    six -- well, half a year early.  So Landon graduated in

3    December of 2006 and that's when he stopped paying child

4    support for Landon.

5    Q.   Just for clarification, then, for the years 2000

6    through 2005, inclusive, for all of that time he was

7    paying you child support for both children?

8    A.   Yes.

9    Q.   How much child support did Mr. Springer pay you?

10   A.   He paid me $700 a month.

11   Q.   In what form did Mr. Springer pay you?

12   A.   He paid me in money orders, two money orders of $350

13   apiece.

14   Q.   $350 money orders.  Did Mr. Springer pay any other

15   expenses either for you or for the children during -- now

16   I'm going to focus on the years of 2000 through 2005.

17   A.   Yes, he did.  He paid for a partial amount of

18   private schooling and also for some doctor's appointments

19   and eye doctor appointments like glasses and braces,

20   things like that.

21   Q.   Could you approximate about how much in addition,

22   excluding the child support of $700 a month that

23   Mr. Springer paid you during that time period?

24   A.   Not really.  That was a long time ago.

25   Q.   With respect to that, was that also -- was that

CARA WESTERFELD - DIRECT BY MR. O'REILLY                    489

1  something where you would incur a cost and he would

2  reimburse you or did he pay it directly?

3  A.   We just had an agreement per -- I mean, per instance

4  that would come up that we'd just talk about it and he

5  would just pay half after -- sometimes it was after the

6  fact, sometimes it was before.

7  Q.   I guess my question is, did he pay the provider?

8  A.   No.

9  Q.   He would reimburse you for your expenses?

10 A.   Right.

11 Q.   And, again, was that also made in the form of money

12 orders?

13 A.   Money orders or cash.

14 Q.   Did Mr. Springer ever write you a check during the

15 years 2000 through 2005?

16 A.   Not a personal check, no.

17 Q.   Did he give you a different type of check?

18 A.   No, I can't think of any checks other than money

19 orders.

20 Q.   Was Mr. Springer pretty good about keeping the

21 payments up?

22 A.   Yes, he was.  He paid more than he was supposed to

23 pay.

24 Q.   How much was he supposed to pay?

25 A.   He was supposed to pay $600 a month.

```
 1   Q.   So he actually paid more than that?

 2   A.   Yes.

 3   Q.   Do you know what the source of Mr. Springer's income

 4   was for the years 2000 through 2005?

 5   A.   I do not.

 6           MR. O'REILLY:  Your Honor, may I have a moment?

 7           THE COURT:  You may.

 8           MR. O'REILLY:  Nothing further.  Thank you very

 9   much.

10           THE COURT:  Cross-examination.

11                      CROSS-EXAMINATION

12   BY MR. SPRINGER:

13   Q.   Hi, Mrs. Westerfeld.  Thank you.  I'm Lindsey

14   Springer, as you know.  You testified that we were

15   married when?

16   A.   '87 to January of '90.

17   Q.   And did something happen to me in the latter part of

18   1990 that you remember?

19           MR. O'REILLY:  Objection, Your Honor, as a

20   source of foundation for the knowledge.

21           THE COURT:  Overruled.

22   Q.   (BY MR. SPRINGER)  Did I accept Jesus Christ as my

23   Lord and Saviour?

24   A.   Yes, you did.

25   Q.   And before that time, before we got divorced, I
```

```
 1   hadn't done that, had I?
 2   A.   No.
 3   Q.   And that would be the latter part of 1990; is that
 4   true?
 5   A.   Yes.
 6   Q.   And do you remember an instance when somebody broke
 7   into our garage over on South Lewis, 34th and Lewis, and
 8   stole my checkbook?
 9   A.   I do.
10   Q.   And do you remember what happened --
11            MR. O'REILLY:  Your Honor, Objection.  The time
12   period, please.
13            MR. SPRINGER:  Oh, I'm sorry.
14   Q.   (BY MR. SPRINGER)  When would we have been moving
15   out of the house on 34th and Lewis?
16   A.   October of --
17   Q.   '89?
18   A.   -- '89.
19   Q.   Okay.  And do you remember somebody broke in and
20   stole my checkbook?
21   A.   Uh-huh, I do.
22   Q.   And do you remember what that person did with that
23   checkbook?
24   A.   I believe they wrote some checks with the checkbook.
25   Q.   And then did law enforcement come after the person
```

```
 1  who wrote the check?

 2  A.   I don't recall.

 3  Q.   Do you remember whether law enforcement came after

 4  Lindsey Springer?

 5  A.   I don't recall that either.

 6  Q.   How do you -- do you remember how we became aware

 7  that checks were stolen and then cashed?

 8  A.   I don't recall that.

 9  Q.   Okay.

10  A.   Well, I do remember where they were located in the

11  house, but I don't remember anything other than them

12  being stolen and used.

13  Q.   Now, as far as the care for Landon, that went up a

14  little bit when he got diagnosed with type 1 diabetes,

15  right?

16  A.   Yes.

17  Q.   And that was around 13 years of age?

18  A.   Yes.

19  Q.   Which that would put him around the 2002/2001 time

20  period?

21  A.   It was eighth grade.

22  Q.   And then Sidney, she's a special needs child, is she

23  not?

24  A.   She is.

25  Q.   Okay.  And that's why it took her more time to get
```

```
 1  out of school than --
 2  A.   Yes.
 3  Q.   -- her brother?
 4  A.   Yes.
 5  Q.   She had to have a special brace for her back; isn't
 6  that true?
 7  A.   She did.
 8  Q.   And isn't -- when Sidney was born, she was diagnosed
 9  with Noonan Syndrome; isn't that true?
10  A.   Yes, it is.
11  Q.   It's safe to say our children had a lot of medical
12  needs; isn't that right?
13  A.   Yes.
14  Q.   And to some degree they still do, don't they?
15  A.   Yes.
16  Q.   And also in the divorce decree, do you remember who
17  -- if -- let's see, do you remember who was -- agreed to
18  the award of taking deductions for children in the event
19  tax returns were required to be filed?
20  A.   Yes.  Otto and myself.
21  Q.   And have you taken those every year?
22  A.   Yes.
23  Q.   Okay.  And you mentioned something about increasing
24  child support or paying more.
25  A.   Yes.
```

CARA WESTERFELD - CROSS BY MR. SPRINGER                    494

1  Q.   In the entire time of taking the best interest of

2  our kids into mind from the time we were divorced until

3  the time I stopped paying child support, did we ever have

4  to go to court for any issue?

5  A.   No.

6  Q.   We resolved everything, didn't we?

7  A.   Yes.

8  Q.   Almost like we could write a book about it, huh?

9  A.   Yes.

10 Q.   Now, can you verify that in early -- or excuse me,

11 around that November 1990 time period when I accepted

12 Jesus Christ, do you remember what church it was that I

13 went to that I did that at?

14 A.   I remember where I was attending at the time.

15 Q.   And where was that?

16 A.   It was Grace Christian Fellowship.

17 Q.   Okay.  And did you see me at that church?

18 A.   Yes, I did.

19 Q.   All right.  For some time; isn't that true?

20 A.   Yes.

21 Q.   Okay.  Could you tell a difference in me after that?

22 A.   Yes, I could.

23         MR. SPRINGER:  No more questions, Your Honor.

24         THE COURT:  Mr. Stilley?

25         MR. STILLEY:  No questions.

CARA WESTERFELD - RECROSS BY MR. SPRINGER                    495

```
 1              THE COURT:  Any redirect?
 2                    REDIRECT EXAMINATION
 3   BY MR. O'REILLY:
 4   Q.  Ms. Westerfeld, did I understand that you testified
 5   you filed tax returns?
 6   A.  Yes.
 7   Q.  And you took deductions with respect to your
 8   children -- with respect to the children that you and
 9   Mr. Springer shared?
10   A.  Yes.
11              MR. O'REILLY:  Nothing further, Your Honor.
12              THE COURT:  Any recross?
13                    RECROSS-EXAMINATION
14   BY MR. SPRINGER:
15   Q.  Have you and I ever had a discussion about filing
16   tax returns?
17   A.  A few times.
18   Q.  Did I ever tell you not to?
19   A.  No.
20   Q.  Ever try to convince you not to?
21   A.  No.
22   Q.  Did I ever try to convince you about my beliefs?
23   A.  No.
24   Q.  How about my children?
25   A.  Yes.
```

1    Q.   Which one?

2    A.   Sidney and Landon.

3    Q.   And is it because they asked what their daddy does?

4    A.   Yes.

5    Q.   They have a right to know, don't they?

6    A.   Yes, they do.

7            MR. SPRINGER:  No more questions, Your Honor.

8            THE COURT:  You may step down.  We'll have the

9    government's next witness.

10           MR. O'REILLY:  Your Honor, if I may have a

11   moment.

12           THE COURT:  You surely may.

13           MR. O'REILLY:  The United States calls

14   Mr. Daniel Sivils.

15           THE COURT:  Very well.

16           MR. O'REILLY:  Your Honor, I would ask

17   permission to let Special Agent Shern step out of the

18   room to retrieve something for me, please.

19           THE COURT:  Very well.

20           COURTROOM DEPUTY:  You can just raise your right

21   hand, please.

22                        DANIEL SIVILS,

23   (WITNESS SWORN)

24                     DIRECT EXAMINATION

25   BY MR. O'REILLY:

1  Q.   Could you please tell the jury your name.

2  A.   My name is Daniel Sivils.

3  Q.   Mr. Sivils, how are you employed?

4  A.   I'm a special agent with the IRS criminal

5  investigation.

6  Q.   How long have you been so employed?

7  A.   I was hired by the IRS in May of 2008.

8  Q.   Were you hired as a special agent?

9  A.   Yes, I was.

10 Q.   What is your educational background?

11 A.   I have a bachelor's degree in accounting from the

12 University of Arkansas in Fayetteville that I received in

13 May of 2001.

14 Q.   Have you received training with the IRS as well?

15 A.   Yes, I have.

16 Q.   Generally speaking, what type of training have you

17 received?

18 A.   After I was hired on in May of 2008, I was sent to

19 training in Glynco, Georgia, at the Federal Law

20 Enforcement Training Center where I received six months

21 of training that covered all sorts of types of

22 investigations that specifically about three months of

23 the training was tied into financial investigations with

24 the Internal Revenue Service.

25 Q.   Are you the special agent that is assigned as the

```
 1  case agent on this case?
 2  A.   No, I'm not.
 3  Q.   Is -- are you familiar with an individual by the
 4  name of Lindsey Springer?
 5  A.   Yes, I am.
 6  Q.   How is it that you became familiar with
 7  Mr. Springer?
 8  A.   When I was hired on and put in Tulsa's office in
 9  December of 2008, I was assigned to Agent Brian Shern as
10  my mentor on this job and we did -- we conducted an
11  interview with Mr. Springer on January 15, 2009, and that
12  was the first time I had met Mr. Lindsey Springer.
13  Q.   Do you see Mr. Springer in the courtroom today?
14  A.   Yes, I do.
15  Q.   Who besides you and Mr. Springer was present at this
16  meeting?
17  A.   At that meeting was Special Agent Shern; AUSA Ken
18  Snoke; yourself, their special assistant Charles
19  O'Reilly; there was another attorney, Scott Bradford; and
20  there was a court reporter.
21  Q.   And for clarification, Mr. Bradford, is he an
22  Assistant U.S. Attorney now in Oregon?
23  A.   I believe that's correct, yes, he is.
24  Q.   Do you know how the interview on January 15, 2009,
25  came to occur?
```

1  A.   Yes.  From what I understand there, Mr. Springer had

2  requested a chance to go before the grand jury and

3  testify on his behalf and then decided not to do that,

4  but he did agree to come speak to us that day.

5  Q.   During the interview, and now with respect to pretty

6  much all the rest of my questions, it's all going to be

7  with respect to the interview.

8  A.   Okay.

9  Q.   Did Mr. Springer make reference to having previously

10 met Special Agent Shern on September 16th of 2005?

11 A.   Yes, he did.

12 Q.   Did Mr. Springer say where he lived?

13 A.   He said he lived in Kellyville, Oklahoma.

14 Q.   Did -- was Mr. Springer asked whether or not he

15 worked?

16 A.   Yes, he was.  And during that interview, he did

17 indicate that he did not work.

18 Q.   During that interview, did Mr. Springer make

19 reference to a search warrant having been executed at his

20 home?

21 A.   Yes, he did.

22 Q.   Was Mr. Springer asked what Bondage Breakers

23 Ministry was?

24 A.   Yes, he was.

25 Q.   What did he say?

1   A.   He called it a dba or doing-business-as of Lindsey
2   Springer.
3   Q.   Did he say how he -- strike that.  Did he say what
4   Bondage Breakers' purpose was?
5   A.   He said that its mission was to eliminate the
6   Internal Revenue Service.
7   Q.   Did Mr. Springer indicate whether anyone else --
8   trying to think of the right word -- worked or was
9   involved with Bondage Breakers Ministries?
10  A.   He did indicate that he was just a one-man
11  operation.
12  Q.   Was Mr. Springer asked as part of that interview if
13  he could identify anybody he helped from the year 2000
14  through the present, that being in January, that had not
15  paid him money?
16  A.   Yes, he was asked, not that question.
17  Q.   What was Mr. Springer's response, if you recall?
18  A.   I believe that he responded where he stated that he
19  had quite a few individuals that met that criteria and
20  that he would provide a list of names to us after --
21  sometime following up that interview.
22  Q.   And this interview was in January of -- the middle
23  of January of 2009?
24  A.   That's correct.
25  Q.   Do you recall when the indictment was returned?

1   A.   I don't recall that for sure.

2   Q.   May I suggest -- was it sometime in March of 2009?

3   A.   I believe that's correct.

4   Q.   Did -- to your knowledge, did Mr. Springer ever

5   provide such a list?

6   A.   He did provide us a letter in response to our

7   meeting, which did at the bottom of it contain a list of

8   names, but I'm not familiar with exactly what that

9   list -- if that's what he was meaning by those names.

10  Q.   During the interview, was Mr. Springer -- how did

11  Mr. Springer respond to the question posed by Mr. Shern,

12  if I did some work for you and you paid me for it, would

13  that be considered income?

14  A.   I remember that Mr. Springer stated that in general

15  terms that would be accurate, it would be income, but

16  that would just be generally, yes, in most cases he said

17  that would be income.

18  Q.   Did Mr. Springer state whether -- was he asked if

19  somebody earned income, would they be required to report

20  that income and pay tax?

21  A.   Yes, he was asked that.

22  Q.   How did Mr. Springer respond?

23  A.   I'm not sure exactly his response about -- well, I'm

24  paraphrasing.

25       MR. SPRINGER:  Objection, Your Honor.  That's

 1  not responsive to the question.

 2         THE COURT:  Answer if you know.  It's not time

 3  to speculate.

 4         THE WITNESS:  Okay.  I do not recall his exact

 5  response on that.

 6  Q.  (BY MR. O'REILLY)  Is there something that might

 7  help you to refresh -- did at one point you have

 8  knowledge of that?

 9  A.  Yes.

10  Q.  Is there something that might help to refresh your

11  recollection?

12  A.  Yes, there is.

13  Q.  I'm going to ask, if you could, to look for

14  identification purposes only at Government's Exhibit 731,

15  specifically page 15, lines 11 through 23.

16         MR. O'REILLY:  If I may approach the witness,

17  Your Honor.

18         THE COURT:  You may.

19         THE WITNESS:  Could you tell me again which part

20  to refresh me?

21  Q.  (BY MR. O'REILLY)  What I think might help refresh

22  your recollection is on page -- Government's Exhibit 731.

23  A.  Yes.

24  Q.  Page 15, lines 11 through 23.  And what I want you

25  to do is simply read that to yourself and then look up

1  when you're done.  Does that refresh your recollection?

2  A.   Yes, sir, it does.

3  Q.   Let me just -- what, if anything, did Mr. Springer

4  say to the question if someone earned income, would they

5  be required to report that income and pay taxes?

6  A.   He said, yes, if it was income, they would

7  definitely be required to report it and pay taxes on it.

8  Q.   Did Mr. Springer have a term that he used to

9  describe people who don't file returns and for whom he

10  stated that he tried to convince that they were wrong?

11  A.   He generally called the -- well, he generally talked

12  to us that those people were "infected."

13  Q.   Was Mr. Springer asked when he had last filed a

14  federal income tax return?

15  A.   Yes, he was.

16  Q.   Do you recall his answer?

17  A.   Mr. Springer stated that it would have probably been

18  the late '80s, but he did not have a specific year.

19  Q.   Was Mr. Springer asked whether he had any income in

20  the year 2000 that would have required him to pay taxes?

21  A.   Yes, he was.

22  Q.   How did he respond?

23  A.   He did not believe that he had any income in the

24  year 2000 that would have required him to file a tax

25  return.

1    Q.   Was Mr. Springer asked how he got money?

2    A.   Yes.

3    Q.   What did he tell you?

4    A.   Mr. Springer said that he got money through gifts or

5    donations to his ministry, that he would ask people for

6    gifts and donations and some would send it, some would

7    not.

8    Q.   Was Mr. Springer asked if he performed work for the

9    money he got?

10   A.   Yes, he -- yes, he was.

11   Q.   And how did he respond?

12   A.   He did not work for the money that he received, it

13   was all gifts and donations.

14   Q.   That's what he told us?

15   A.   Yes, sir.

16   Q.   I'm going to ask you now what -- yes, if you could

17   look at what's in evidence as Government's Exhibit 3.

18          MR. O'REILLY:  If that could be published,

19   please.

20   Q.   (BY MR. O'REILLY)  And specifically I want to draw

21   your attention to the bottom check.  Was Mr. Springer

22   asked about this check?

23   A.   Yes, he was.

24   Q.   What did Mr. Springer say with respect to what this

25   check was for?

1  A.   Mr. Springer indicated that the check was a donation

2  from Garlin Ministries in support of Bondage Breakers

3  Ministry.

4  Q.   And this is a check dated January 24th of 2000 in

5  the amount of $8,000?

6  A.   Yes, sir.

7  Q.   Was he -- was Mr. Springer asked if he knew a woman

8  by the name of Vikki Wiggins?

9  A.   Yes, he was.

10 Q.   And was he asked if she had hired him for any

11 purpose?

12 A.   Yes.

13 Q.   How did he respond?

14 A.   Mr. Springer stated that he was not hired by

15 Ms. Wiggins, that he was trying to assist her ministry to

16 get some money back for its supporters.

17 Q.   I'm going to ask you now if you can take a look at

18 what's already in evidence as Government's Exhibit 4.

19 Was Mr. Springer asked about that check?

20 A.   Yes, he was.

21 Q.   And just -- and this is a $12,000 cashier's check

22 dated January 25th of 2000 in the amount of $12,000; is

23 that correct?

24 A.   That's correct.

25 Q.   I ask you now if you can take a look at what's in

1  evidence as Government's Exhibit 11.  Was Mr. Springer

2  asked about Government's Exhibit 11?

3  A.   Yes, he was.

4  Q.   With respect to the three checks we've just looked

5  at, did Mr. Springer indicate the source of -- the

6  general source of those checks?

7  A.   Could you rephrase the question?

8       MR. SPRINGER:  Objection, Your Honor, that's

9  vague.

10      MR. O'REILLY:  I'll try to rephrase the

11 question.

12      THE COURT:  Sharpen it up.

13 Q.   (BY MR. O'REILLY)  Did Mr. Springer indicate who had

14 caused these payments to be made?

15 A.   Yes.  I mean, he identified a Reverend Vikki

16 Wiggins.

17 Q.   And was Mr. Springer asked why Ms. Wiggins was

18 causing all this money to be paid to him in 2000?

19 A.   Yes, he -- I mean, he was asked about the reason

20 behind these checks, yes.

21 Q.   What did Mr. Springer indicate was the reason?

22 A.   Mr. Springer indicated that Garlin Ministries, I

23 believe it is, Ms. Wiggins was associated with Garlin

24 Ministries and these checks were donations, gifts from

25 Garlin Ministries to Bondage Breakers Ministries just to

1   support his mission.

2   Q.   At any time during the interview did Mr. Springer

3   acknowledge that he was paid for services?

4   A.   No, he did not.

5   Q.   I'm going to ask you now if you can take a look at,

6   collectively, if you can grab, if it's not already in

7   front of you, Government's Exhibits 5, 6, 7, and 8.  And

8   just briefly -- do you have those in front of you, sir?

9   A.   Yes, I do.

10  Q.   Just briefly, what generally are Government's

11  Exhibits 5, 6, 7, and 8?

12          MR. O'REILLY:  And if we could publish the first

13  one for the jury.

14          THE WITNESS:  Okay.  These are -- generally,

15  these are checks written from Ortho/Neuro Medical

16  Associates, which is Dr. Philip Roberts.  They're made

17  out to Lindsey Springer or possibly one would be Bondage

18  Breakers Ministry.

19  Q.   They're for different amounts?  Some for 25,000,

20  some for 10,000?

21  A.   Yes.

22  Q.   Was Mr. Springer asked why he had received these

23  checks?

24  A.   Yes, he was.

25  Q.   What did Mr. Springer say?

1  A.   Mr. Springer said that these checks were all

2  donations or gifts from Dr. Roberts to support his

3  ministry.

4  Q.   Was Mr. Springer asked if Dr. Roberts had paid him

5  and Mr. Stilley to assist Dr. Roberts in his criminal

6  case?

7  A.   Yes.

8  Q.   What did Mr. -- how did Mr. Springer respond?

9  A.   Mr. Springer said that he -- that Mr. Stilley helped

10  Dr. Roberts and that he would help Mr. Stilley, but he

11  never actually helped Dr. Roberts.

12  Q.   Was Mr. Springer asked about Government's Exhibit 7

13  and the word "donation" that appears on there?

14        MR. O'REILLY:  And if I could have that on the

15  board, please.

16  Q.   (BY MR. O'REILLY)  And that is a check dated May

17  30th in the amount of $10,000 payable to Lindsey

18  Springer?

19  A.   Yes.

20  Q.   Did Mr. Springer indicate why Dr. Roberts wrote that

21  word "donation" on the check?

22  A.   Yes, he did.

23  Q.   What did he say?

24  A.   He just said that that was the agreement that these

25  checks would be donations and so Dr. Roberts wrote

1   "donation" on that check.

2   Q.   During the interview with respect to Dr. Roberts,

3   did Mr. Springer state whether or not he told people how

4   much to give him?

5   A.   I don't remember if he specifically addressed that

6   when we were talking about Dr. Roberts' check, but he did

7   address the way he requests gifts or donations.

8   Q.   Please explain to the -- please tell the jury what

9   Mr. Springer said was his way of -- well, first of all,

10  did Mr. Springer state whether or not he asked for the

11  money?

12  A.   He said he does ask for donations.

13  Q.   Did Mr. Springer indicate whether he asked for a

14  particular amount?

15  A.   Yes.

16  Q.   What did he say?

17  A.   He said he -- he'll think about it, pray about it,

18  try to come up with a number that he needs and then he'll

19  double it because he realizes that, you know, usually

20  you're not going to get what you ask for.

21  Q.   Did Mr. Springer indicate what he took into account

22  when trying to reach that figure?

23  A.   He didn't indicate in an entirety what he takes into

24  account, but he did say that he, you know, does take into

25  account travel expenses and things like that, but he

1  didn't go into detail about everything that he takes into

2  account.

3  Q.   Did Mr. Springer make any representation about

4  whether or not he tried to get Dr. Roberts to file income

5  tax returns?

6  A.   I don't recall that.

7  Q.   Do you think a review of the interview transcript

8  might help refresh your recollection?

9  A.   Yes.

10  Q.   I'll ask you again to take a look at what has been

11  identified as Government's Exhibit 731, page 49, lines 17

12  through 24.  And please just review that to yourself and

13  then look up when you're done.  Does that refresh your

14  recollection of what Mr. Springer said?

15  A.   Yes, sir.

16  Q.   Please tell the jury what Mr. Springer said.

17  A.   He said that he tried to get everybody that he

18  worked with to file tax returns, that he didn't ever tell

19  anybody that it wasn't okay to file tax returns.

20  Q.   I'm going to ask you now to take a look at what has

21  been marked -- excuse me, what is in evidence as

22  Government's Exhibits 9, 10, and 14.

23        MR. O'REILLY:  And if we can just publish Number

24  9 to the jury, please.

25  Q.   (BY MR. O'REILLY)  Was Mr. Springer asked about

1  these checks?

2  A.   Yes, he was.

3  Q.   Did Mr. Springer acknowledge having received this

4  money?

5  A.   Yes, he did.

6  Q.   Did Mr. Springer indicate what the nature of these

7  payments were, whether they were income or donations or

8  what?

9  A.   Mr. Springer stated that these were all donations

10  from Eddy or Judy Patterson.

11  Q.   Was Mr. Springer asked what he had done for

12  Mr. Patterson with respect to Mr. Patterson's criminal

13  case?

14  A.   Yes.

15  Q.   What did he say?

16  A.   I don't believe he specifically named anything that

17  he had done.  He -- as far as helping Mr. Patterson, once

18  again, he stated that he would help Mr. Stilley or it was

19  a Mr. Barringer, I believe, who was also an attorney for

20  the Pattersons in their case.

21  Q.   Was Mr. Springer asked if he had done anything for

22  any of the money Mr. Patterson had given him?

23  A.   Yes.

24  Q.   Do you recall how he responded?

25  A.   Not exactly, but he just contended that these were

DANIEL SIVILS - DIRECT BY MR. O'REILLY                    512

1   all donations to his ministry.

2   Q.   May I ask you now to take a look at what has been

3   put into evidence as Government's Exhibit 26, which is a

4   $35,000 check.

5         MR. O'REILLY:  And if we could publish that to

6   the jury.

7   Q.   (BY MR. O'REILLY)  Was Mr. Springer asked about that

8   item?

9   A.   Yes, he was.

10  Q.   Did Mr. Springer explain what it was?  And just for

11  clarification, is a check negotiated from Mr. Stilley's

12  IOLTA account on July 21st of 2003.  Is that correct?

13  A.   Yes, it is.

14  Q.   And did Mr. Springer have an explanation for the

15  purpose of that check?

16  A.   Mr. Springer stated that this was a loan from

17  Mr. Patterson for him to purchase a car.

18  Q.   Did Mr. Springer explain why he was getting a loan

19  from Mr. Patterson through Mr. Stilley?

20  A.   Yes.  Mr. Springer just stated that he needed a

21  short-term loan to purchase a car, he had found a good

22  deal on one, he called up Mr. Stilley and Mr. Stilley

23  said let him make a couple of calls, and then apparently

24  he called Mr. Springer back and found the money as a

25  short-term loan through Mr. Patterson.

 1        MR. O'REILLY:  And, Your Honor, do we go to five

 2   or 5:30, sir?

 3        THE COURT:  We're going to quit at five o'clock,

 4   which is about two minutes from now.

 5        MR. O'REILLY:  Thank you, Your Honor.

 6        THE COURT:  Unless you're at a stopping point

 7   now, I bet you nobody will complain.

 8        MR. O'REILLY:  If nobody will complain, I don't

 9   want anybody to start complaining, Your Honor.

10        THE COURT:  Okay.  Very well.  You may be

11   seated.

12     Members of the jury, we'll take our overnight recess

13   at this time.  I've told you several times since

14   yesterday not to reach any conclusions about this case.

15   I suspect one conclusion you have reached is that being a

16   juror is hard work.  It is hard work.  And I want you to

17   know that I'm well aware of the close attention you've

18   paid and I'll be the first to agree with you that being a

19   juror is hard work.  I sincerely thank you for your day

20   of service to the Court.

21     You obviously have heard quite a few witnesses and I

22   commend counsel and the parties on both sides for moving

23   the matter along.  And it does take two to move a matter

24   along.  And I commend counsel and the parties on both

25   sides for moving the matter along at a good pace today.

DANIEL SIVILS - DIRECT BY MR. O'REILLY                    514

1   And, again, I sincerely thank you for your day of service

2   to the Court.  We will resume tomorrow morning at nine

3   o'clock.

4       Again, there's one thing that I must emphasize, and

5   I'm not going to give you the short version, and that is

6   that it is absolutely imperative that you not do anything

7   to independently investigate or find out anything about

8   any person or any issue or anything else about this

9   case.  That is absolutely imperative.

10      You must not discuss the case with anyone for any

11  purpose until it has been given to you for deliberations

12  and verdict.  And certainly you must not reach any

13  conclusions other than the fact being a juror is hard

14  work about this case until it has been given to you for

15  your deliberations and verdict.

16      Please be available in the same room tomorrow

17  morning by about a quarter till nine.  And that way we'll

18  be in the position to have everyone ready to go promptly

19  at nine o'clock.  And I do appreciate your punctuality

20  also.  So we'll recess until nine in the morning.  Please

21  be available about a quarter till nine.

22      All persons in the courtroom will remain seated

23  while the jury departs.

24      (JURY EXITS THE COURTROOM)

25          THE COURT:  You may step down.  Okay.  The jury

1   has left the courtroom.  Is there anything else we ought

2   to address before we take our overnight recess?  Hearing

3   nothing, court will be in recess till nine in the

4   morning.

5       (COURT ADJOURNED FOR THE EVENING.  FOR FURTHER JURY

6   TRIAL PROCEEDINGS, SEE VOLUME III.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25