516

```
 1              THE UNITED STATES DISTRICT COURT

 2          FOR THE NORTHERN DISTRICT OF OKLAHOMA

 3

 4   UNITED STATES OF AMERICA,

 5           Plaintiff,

 6   vs.                      Case No. CR-09-043-SPF

 7   LINDSEY KENT SPRINGER and
     OSCAR AMOS STILLEY,
 8
             Defendants.
 9
     ----------------------------
10

11

12          TRANSCRIPT OF JURY TRIAL PROCEEDINGS

13         BEFORE THE HONORABLE STEPHEN P. FRIOT

14            UNITED STATES DISTRICT JUDGE

15               OCTOBER 28, 2009

16               VOLUME III OF XIV

17

18

19

20

21

22

23

24

25
```

```
 1   APPEARANCES:
     FOR THE GOVERNMENT:
 2                           Mr. Charles Anthony O'Reilly
                             U.S. Dept. Of Justice (Box 972)
 3                           P.O. Box 972
                             Washington, DC 20044
 4
                             Mr. Kenneth P. Snoke
 5                           U.S. Attorney's Office (Tulsa)
                             110 W. 7th Street, Ste. 300
 6                           Tulsa, OK 74119

 7

 8   FOR DEFENDANT SPRINGER:
                             Mr. Lindsey Kent Springer
 9                           5147 S. Harvard Avenue
                             Ste. 116
10                           Tulsa, OK 74135

11                           Mr. Robert Scott Williams
                             Standby Counsel
12                           Taylor Ryan Schmidt & Van Dalsem
                             436 S. Boulder Ave., Ste. 850
13                           Tulsa, OK 74119

14

15   FOR DEFENDANT STILLEY:
                             Mr. Oscar Amos Stilley
16                           7103 Race Track Loop
                             Fort Smith, AR 73901
17
                             Mr. Robert Burton, IV
18                           Standby Counsel
                             Burton Law Firm, PC
19                           320 S. Boston, Ste. 2400
                             Tulsa, OK 74103
20

21

22

23

24

25
```

1              EXAMINATION INDEX

2

DANIEL SIVILS
3      DIRECT BY MR. O'REILLY              519
       CROSS BY MR. SPRINGER              563
4      CROSS BY MR. STILLEY               594
       REDIRECT BY MR. O'REILLY          595

5

ROBERT PUGH
6      DIRECT BY MR. O'REILLY             597

7  SHANTEL ETIENNE
       DIRECT BY MR. SNOKE               600
8      CROSS BY MR. SPRINGER             606

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            THE COURT:  Welcome back, members of the jury.

2    And again I do sincerely appreciate your punctuality.  I

3    spoke this morning with the clerk of the court, Phil

4    Lombardi, to see if I can get you a breakroom with a

5    little more elbow room because the jury assembly room

6    that is normally available in this courthouse is not

7    available.  And, for that reason, it's -- we're working

8    on getting some -- a room with a little more space.  And

9    Mr. Lombardi will be back in touch with me today.  Now,

10   it may be that the location of the alternative space that

11   we locate is such that it will be usable for you --

12   easily usable for you over the noon hour and perhaps in

13   the morning when you arrive, but it may not be convenient

14   for our 20-minute breaks, we'll see.  But I wanted you to

15   know that we're certainly working on that.

16        With that, let's see, we -- what witness -- were we

17   in the middle of a witness?

18            MR. O'REILLY:  Yes, Your Honor.

19            THE COURT:  That was my recollection.  You may

20   continue.

21            MR. O'REILLY:  Thank you, sir.

22                      DANIEL SIVILS,

23              DIRECT EXAMINATION CONTINUED

24   BY MR. O'REILLY:

25   Q.  Mr. Sivils, would you please reintroduce yourself

1  for the jury, simply stating what your job is and who you

2  work for.

3  A.   Yes.  My name is Daniel Sivils.  I'm a special agent

4  with the Internal Revenue Service Criminal Investigation.

5  Q.   And with respect to what we've been discussing to

6  this point, was this about a meeting you had that you

7  participated in with respect -- with Mr. Springer in

8  January of this year?

9  A.   That's correct.

10 Q.   I'm going to ask you if you discussed with

11 Mr. Springer or if Mr. Springer discussed, I should say,

12 an individual by the name of Mr. Patterson?

13 A.   Yes.

14 Q.   I'm going to ask you now if -- to draw your

15 attention to Government's Exhibit 25.  And, actually, if

16 we can publish that to the jury, and, I think, Mr. Sivils

17 you might be able to just look at your screen, because

18 this is already in evidence.  Do you see that in front of

19 you?

20 A.   Not yet.

21 Q.   Is it on the screen?  Do me a favor and just let me

22 know when it gets up on your screen.

23 A.   Okay.

24 Q.   While we're waiting for that, if you could go ahead

25 and pull up the document.

1          THE COURT:  Bear with me just a minute.  Go

2    ahead.

3    Q.  (BY MR. O'REILLY)  I think that's a great example of

4    a computer screen; is that correct?

5    A.  Yes.

6    Q.  Actually, do you have Exhibit 25 in front of you?

7    A.  I do.

8    Q.  Do you know if that particular check was discussed

9    with Mr. Springer?

10   A.  It was.

11   Q.  Was Mr. Springer asked whether that was his

12   signature on the back of it?

13   A.  Yes.  And he did identify that as his signature.

14   Q.  And what is Government's Exhibit 25?

15   A.  The one that Mr. Springer was discussing was the top

16   check on that exhibit.  It's check number 635 in the

17   amount of $14,539 from an Arkansas IOLTA Foundation Trust

18   Account of Oscar Stilley made out to Lindsey Springer.

19   Q.  Was Mr. Springer also asked about a check in

20   Government's Exhibit 26?

21   A.  Yes.

22   Q.  With respect to that item, did Mr. Springer indicate

23   whether or not that was his signature on it?

24   A.  Yes.  He did verify his signature on the back of

25   that check.

DANIEL SIVILS - DIRECT BY MR. O'REILLY                522

1  Q.   And what is Government's Exhibit 26?

2  A.   Once again, it's a check -- it's number 641 for

3  $35,000 from that same IOLTA account of Oscar Stilley to

4  Lindsey Springer --

5  Q.   Mr. Springer -- I'm sorry.

6  A.   -- for $35,000.

7  Q.   Did Mr. Springer indicate what he used the $35,000

8  to purchase?

9  A.   Yes.  He -- Mr. Springer stated that this was a loan

10 from Mr. Patterson, that he used that $35,000 to purchase

11 a car.

12 Q.   Did he indicate what kind of car?

13 A.   Yes.  It was a Lexus SUV.  I'm not sure exact model.

14 Q.   Did Mr. Springer discuss what types of -- during the

15 interview -- what types of cars he had purchased during

16 the time period 2000 to 2005?

17 A.   We discussed a variety of transactions and vehicles

18 that he had purchased, yes.

19 Q.   Can you indicate to the jury which -- what types of

20 cars Mr. Springer indicated he purchased during that time

21 period?

22 A.   He had purchased at least one Corvette and at least

23 two Lexuses.

24 Q.   And had he purchased any Mercedes?

25 A.   Yes.  He did mention a Mercedes G-Wagen.

```
 1   Q.   And with respect to -- let me ask this:  Was -- I'm
 2   going to actually now ask you to draw your attention to
 3   what is in evidence as Government's Exhibit 102.
 4        And if that could be published so Mr. Sivils could
 5   look at that.
 6        Was Government's Exhibit 102 -- first of all, what
 7   is that?
 8   A.   That's a cashier's check in the amount of $37,000
 9   made out to a Mr. Ed Bryson.  And it does indicate -- has
10   a notation on it from Lindsey Springer.
11   Q.   And what is the date of that check?
12   A.   It's July 31, 2003.
13   Q.   What bank is that drawn on?
14   A.   Superior Bank.  I believe that's in Ft. Smith,
15   Arkansas.
16   Q.   Did Mr. Springer indicate what this check was used
17   for?
18   A.   Yes, he did.  That's the check he used to purchase a
19   Corvette from Mr. Bryson.
20   Q.   And that, I think you said, was on that day of July
21   31, 2003?
22   A.   Yes.  That's the date -- the date of the check.
23   Q.   Did -- was Mr. Springer asked about what is in
24   evidence as Government's Exhibit 101, which is a $37,000
25   check payable to "cash" that was drawn on Mr. Stilley's
```

DANIEL SIVILS - DIRECT BY MR. O'REILLY                           524

1   IOLTA account dated the same date?

2   A.   Yes, he was.

3   Q.   Was Mr. Springer able to explain what that check was

4   for?

5   A.   There was some confusion during this discussion.

6   And initially he was trying to piece all this together.

7   In the end, he ended up stating that this would have been

8   the check he used to purchase the Corvette from

9   Mr. Bryson.

10       This would have actually been the loan from the

11  Pattersons and not the previous $35,000 check that we had

12  discussed.

13  Q.   Let me ask you now if I can draw your attention to

14  Government's Exhibits 33, 34 and 35, which are three

15  Superior Bank cashier's checks dated November 7, 2003,

16  and each in the amount of $20,000.  Do you have those in

17  front of you?

18  A.   Yes.

19  Q.   Were those checks discussed with Mr. Springer?

20  A.   Yes, they were.

21  Q.   How did Mr. Springer characterize those checks?

22  A.   Mr. Springer stated that these checks were all gifts

23  from the Pattersons to his ministry.

24  Q.   Was Mr. Springer asked whether he had encouraged the

25  Pattersons to file their income tax returns?

DANIEL SIVILS - DIRECT BY MR. O'REILLY                    525

```
 1   A.   Yes, he was.  And when the Pattersons themselves --
 2   he did say that he didn't necessarily encourage them to
 3   file their returns at this point, but he did make sure
 4   that they would get them prepared.  And I think later on
 5   he did encourage them to file those returns.
 6   Q.   Is that based on something he said?
 7   A.   He did talk about how he had gotten them in touch
 8   with somebody that would prepare the returns.
 9   Q.   Okay.  During the interview, was an individual by
10   the name of Mr. Lake discussed with Mr. Springer?
11   A.   Yes, it was.
12   Q.   I'm going to ask you now what is in evidence as
13   Government's Exhibits 12, 13 and 15.  Do you have those
14   in front of you, sir?
15   A.   Yes, I do.
16   Q.   Were those -- what are, generally speaking,
17   Government's Exhibits 12, 13 and 15?
18   A.   The first two, Exhibit 12 and 13, are cashier's
19   checks made out to Lindsey Springer from the
20   Manufacturers Bank.  And then Exhibit 15 is a check from
21   a different place, DVAT, and it's made out to Lindsey
22   Springer in the amount of $10,000.
23   Q.   Did Mr. Springer indicate whether he had received
24   those checks?
25   A.   Yes.  He did acknowledge receipt of these checks.
```

1  Q.   Did Mr. Springer indicate from whom he had received

2  these payments?

3  A.   Yes, these were from Mr. Lake.

4  Q.   Did Mr. Springer state whether he had assisted

5  Mr. Lake -- did Mr. Springer indicate whether he had

6  assisted Mr. Lake with matters relating to Mr. Lake's

7  criminal tax matters?

8  A.   According to Mr. Springer, the -- really the only

9  thing he did for Mr. Lake was get him in touch with

10  Mr. Stilley to represent him.  He did say -- mention that

11  he kind of laid a little bit of the ground work when the

12  case was in California, but he didn't go into any

13  specifics about what he did.

14  Q.   Was Mr. Springer asked what those checks that we

15  just discussed, Government's Exhibits 12, 13 and 15, were

16  for?

17  A.   Yes.

18  Q.   What did he say?

19  A.   He said these were all gifts or donations from

20  Mr. Lake in support of his ministry.

21  Q.   Did Mr. Springer indicate whether he had asked

22  Mr. Lake for gifts?

23  A.   Yes.

24  Q.   What did he say?

25  A.   He said he had asked Mr. Lake for gifts.

1   Q.   Was Mr. Springer asked why he would ask Mr. Lake for

2   any money at all?

3   A.   Yes.  And he basically -- well, Mr. Springer

4   indicated that when somebody would ask him how he

5   supported himself, he would feel like at that time he had

6   the right to let them know how to support him, so at that

7   time he would let them know how he supported himself and

8   that he would ask for gifts.

9   Q.   Was Mr. Springer asked whether he had ever told

10  Mr. Lake that it was okay for Mr. Lake to not file tax

11  returns?

12  A.   Yes, he was asked that.

13  Q.   How did Mr. Springer respond?

14  A.   He responded similar to all the others.  He never

15  told anybody that it was okay for them not to file

16  returns.

17  Q.   Was Mr. Springer asked if he understood what the

18  results were of the criminal trials of Mr. Roberts,

19  Mr. Patterson and Mr. Lake?

20  A.   Yes, he was.

21  Q.   What did he say?

22  A.   Mr. Springer indicated that all three of those

23  individuals, I believe one of them pled, but all were

24  convicted and ended up going to jail.

25  Q.   Was a Mr. Hawkins discussed with Mr. Springer?

1   A.   Yes, sir.

2   Q.   Was Mr. Springer asked if he ever asked Mr. Hawkins

3   for money?

4   A.   Yes.

5   Q.   Was Mr. Springer asked if Mr. Hawkins, in fact,

6   provided him money?

7   A.   Yes, he did.

8   Q.   What did he say?

9   A.   He said Mr. Hawkins had asked him at some point -- I

10  believe he asked him -- Mr. Stumpo how he supported

11  himself, and he asked Mr. Springer to write a letter kind

12  of explaining what he did and asked for -- in that letter

13  if he would include a request for a donation that

14  Mr. Hawkins would, in turn, provide one.

15  Q.   Did -- you mentioned the name "Stumpo," have you

16  ever met a Mr. Stumpo?

17  A.   No, I have not.

18  Q.   Have you ever spoken with him?

19  A.   No, I have not.

20  Q.   That was just a name that came up during the

21  conversation?

22  A.   Yes, sir.

23  Q.   Was Mr. Springer asked what if anything he had done

24  for Mr. Hawkins?

25  A.   Yes, he was.

1   Q.   What did he say?

2   A.   In the Hawkins' case, Mr. Springer did -- he helped

3   Mr. Stilley again with the -- it was an appeal situation,

4   and he helped Mr. Stilley with the appeal process.  He

5   did admit that the draft of the -- of Mr. Hawkins' appeal

6   went back and forth between Mr. Stilley and himself

7   several times.  And other than that he mentioned

8   reviewing, looking over the presentence report, that sort

9   of thing.

10  Q.   Was Mr. Springer asked whether or not Mr. Hawkins

11  had hired him?

12  A.   Yes, he was.

13  Q.   What did Mr. Springer say?

14  A.   Mr. Springer said that he was never hired by

15  Mr. Hawkins.

16  Q.   And I ask you with respect to a series of checks

17  that are in evidence.  Well, let me ask you this,

18  actually some of them are not in evidence, I believe.

19  Let me ask you first to look at what's been admitted in

20  evidence as Government's Exhibits 20, 22, 23 and 24, as

21  well as Government's Exhibits 31.  Do you have those

22  checks in front of you?

23  A.   Yes, sir.

24  Q.   Was Mr. Springer asked about those checks?

25  A.   Yes, he was.

1   Q.   Mr. Springer asked whether he had received those

2   checks?

3   A.   Yes.  He did acknowledge receipt of these checks.

4   Q.   And, just briefly, could you describe to the jury

5   what those checks are?

6   A.   These checks are -- they're multiple checks from

7   Chippewa Trail Lodge.  And then some of them are made out

8   by just a Cynthia Hawkins and they're all signed -- well,

9   they're signed by some member of the Hawkins family, and

10  they're all made out to Bondage Breakers Ministry or

11  Lindsey Springer.

12  Q.   Did Mr. Springer indicate that he had received these

13  checks?

14  A.   Yes, he did.

15  Q.   Did he indicate what these checks were for?

16  A.   He indicated that these checks were gifts or

17  donations from the Hawkins to his ministry.

18  Q.   Now I'm going to ask you to look at what's been

19  marked for identification as Government's Exhibit 201.

20  Do you have that in front of you, sir?

21  A.   Yes, sir

22  Q.   Do you recognize that check?

23  A.   Yes.  This check was discussed during this meeting.

24  Q.   Did Mr. Springer acknowledge whether or not he had

25  received this check?

 1   A.   Yes.  He did acknowledge receipt of this check.

 2   Q.   Did it -- and did he indicate from whom he received

 3   this check?

 4   A.   Right.  This was another check from Chippewa Trail

 5   Lodge, which was some sort of organization that the

 6   Hawkins were associated with.

 7        MR. O'REILLY:  The government would move

 8   Government's Exhibit 201 into evidence at this time.

 9        MR. SPRINGER:  No objection, Your Honor.

10        THE COURT:  201 will be received.

11   Q.   (BY MR. O'REILLY)  Just generally speaking, what is

12   Government's Exhibit 201, sir?

13   A.   It's a check made out from Chippewa Trail Lodge.

14   Looks like November 7, 2002, in the amount of $5,000 to

15   Lindsey Springer.

16   Q.   Let me ask you now if you can take a look at what's

17   been marked for identification as Government's Exhibit

18   203 for identification.  Do you have that in front of

19   you, sir?

20   A.   Yes, sir.

21   Q.   Do you recognize that check?

22   A.   Yes.  This check was also discussed during the

23   meeting.

24   Q.   What did Mr. Springer indicate about this check?

25   A.   This was also a gift or donation from the Hawkins'

1   organization, Chippewa Trail Lodge, to his ministry.

2            MR. O'REILLY:  The government would move

3   Government's Exhibit 203 into evidence at this time.

4            MR. SPRINGER:  No objection, Your Honor.

5            THE COURT:  It is received.

6   Q.  (BY MR. O'REILLY)  And, just generally speaking,

7   what is the amount of this check and the date?

8   A.   This check is for $7,000 and the date on it is

9   December 12, 2002.

10  Q.   Now I'm going to ask you, if you could, to please

11  draw your attention to Government's Exhibit 207 for

12  identification.  Do you recognize that check?

13  A.   Yes.  This check was also discussed during our

14  meeting.

15  Q.   Did Mr. Springer indicate what this check was?

16  A.   Yes.  This was another check from the Hawkins,

17  Chippewa Trail Lodge, a donation to Bondage Breakers

18  Ministry.

19            MR. O'REILLY:  Your Honor, the government would

20  move Government's Exhibit 207 into evidence.

21            MR. SPRINGER:  No objection, Your Honor.

22            THE COURT:  It is received.

23  Q.  (BY MR. O'REILLY)  And what is the date and amount

24  of this check?

25  A.   This check is for $8,000, and it's dated January 3,

```
 1   2003.
 2   Q.   And, finally, sir, I'm going to ask you to look at
 3   what's been marked for identification as Government's
 4   Exhibit 212.  Do you have that in front of you, sir?
 5   A.   Yes, I do.
 6   Q.   Do you recognize that check?
 7   A.   Yes.  This check was also discussed.
 8   Q.   What if anything did Mr. Springer indicate about
 9   this check?
10   A.   This was another check, this one actually came from
11   Cynthia Hawkins, but it was another check that was a
12   donation to Bondage Breakers Ministries.
13   Q.   And that's what Mr. Springer told you?
14   A.   That's correct.
15          MR. O'REILLY:  Your Honor, the government would
16   move Government's Exhibit 212 into evidence.
17          MR. SPRINGER:  No objection.
18          THE COURT:  It is received.
19   Q.   (BY MR. O'REILLY)  Was Mr. Springer asked if he had
20   assisted Mr. Stilley with the criminal prosecution of a
21   Mr. Ernest Swisher?
22   A.   Yes.
23   Q.   What did Mr. Springer say?
24   A.   He said he helped Mr. Stilley, but he did not help
25   Mr. Swisher.
```

1  Q.   Did Mr. Springer indicate whether or not he had

2  asked Mr. Swisher for money?

3  A.   Yes, he did.

4  Q.   What did he say?

5  A.   He indicated that he did ask Mr. Swisher for some

6  support whenever he could afford to donate some money to

7  him.

8  Q.   Did Mr. Springer indicate whether or not he had

9  actually assisted Mr. Stilley with Mr. Swisher's defense?

10 A.   He did indicate that he had helped Oscar Stilley,

11 but he did -- denied helping Ernest Swisher himself.

12 Q.   Was a Mr. Young discussed with Mr. Stilley -- I

13 mean, excuse me, with Mr. Springer?

14 A.   Yes, he was.

15 Q.   Did Mr. Springer indicate whether he had assisted

16 Mr. Stilley with respect to a Mr. Ronald Young?

17 A.   Yes.

18 Q.   And I'm going to ask you, if you could, look at

19 what's in evidence as Government's Exhibit 37.  Do you

20 have that?  Do you recognize that check?

21 A.   Yes.

22 Q.   Was that discussed with Mr. Springer?

23 A.   Yes, it was.

24 Q.   Did Mr. Springer indicate whether he had received

25 it?

1  A.   Yes.  He did acknowledge receipt of this check.

2  Q.   From whom was this check, according to Mr. Springer?

3  A.   According to Mr. Springer, this was from a third

4  party, it wasn't from Mr. Young that Mr. Stilley was

5  representing, it was actually from a third party.

6  Q.   Did Mr. Springer indicate who the third party was?

7  A.   I don't recall him specifically saying who it was.

8  Q.   Is it possible that you had that recollection

9  previously and then forgotten?

10  A.   Yes.

11  Q.   Do you think it might help you to refresh your

12  recollection to look at the transcript we discussed

13  yesterday?

14  A.   Yes.

15  Q.   I'll ask you if you could to look at what's been

16  marked for identification as Government's Exhibit 731.

17  On page 101, starting at line 12 and then continuing

18  through the next page, line 10.  And just look up when

19  you finish reading that.

20       Does that refresh your recollection?

21  A.   Yes.

22  Q.   Did Mr. Springer indicate who this third party was?

23  A.   It was the father of Mr. Young who Mr. Stilley was

24  representing.

25  Q.   Did Mr. Springer indicate whether he had helped in

1  Mr. Young, the son's, defense?

2  A.   He just indicated, once again, that he helped

3  Mr. Stilley become Mr. Young's attorney, but he didn't

4  help Mr. Young himself.

5  Q.   Was a Mr. Ouwenga discussed with Mr. Springer?

6  A.   Yes, it was.

7  Q.   Did Mr. Springer indicate whether he had assisted

8  Mr. Ouwenga in his trial?

9  A.   Yes, that was discussed.

10  Q.   And what did Mr. Springer indicate?

11  A.   According to Mr. Springer, he did acknowledge

12  helping -- it was actually a Mr. Barringer with

13  Mrs. Ouwenga's appeal, but he said he had very limited

14  input into Mr. Ouwenga's case because he was represented

15  by a public defender.

16  Q.   Did Mr. Springer indicate who Mr. Barringer was?

17  A.   It was another attorney that -- I'm not sure if he

18  had a previous relationship, but it was another attorney

19  during that case.

20  Q.   Did Mr. Springer -- I'm going to ask you now to look

21  at what's in evidence as Government's Exhibit 32.  Do you

22  have that, sir?

23  A.   Yes.

24  Q.   Was that check discussed?

25  A.   Yes, it was.

1  Q.   Did Mr. Springer indicate whether he had received

2  that check?

3  A.   Yes.  He acknowledged receipt of this check.

4  Q.   Did Mr. Springer indicate from whom he received the

5  check?

6  A.   Yes.  He stated this check was received by

7  Mr. Ouwenga's daughter Erica.

8  Q.   I guess for clarification was it received by his

9  daughter or --

10 A.   No, received from.  That's who gave Mr. Springer the

11 check.

12 Q.   Okay.  Did Mr. Springer indicate why he was -- oh,

13 what is Government's Exhibit 32?

14 A.   It's a check dated October 14, 2003, in the amount

15 of $50,000 to Lindsey Springer.

16 Q.   Did Mr. Springer indicate why Mr. Ouwenga's daughter

17 was giving him a $50,000 check?

18 A.   He -- I believe all the -- well, once again, all the

19 checks that he received from the Ouwengas were -- he

20 considered them to be donations or gifts to his

21 ministry.

22 Q.   Let me ask you now to look at what's in evidence as

23 Government's Exhibit 40.  Hopefully that can get pulled

24 up on the screen.  Was Government's Exhibit 40 discussed

25 with Mr. Springer?

1   A.   Yes, it was.

2   Q.   What is Government's Exhibit 40?

3   A.   It's a check from Lone Star Enterprises Holding

4   Trust dated June 23, 2004, in the amount of $25,000 made

5   out to Lindsey Springer.

6   Q.   And I'm going to ask you now to look at Government's

7   Exhibit 44.  And ask you if that check was discussed with

8   Mr. Springer?

9   A.   Yes, it was.

10  Q.   With respect to both Government's Exhibit 40 --

11  first of all, what is Government's Exhibit 44?

12  A.   It's a check dated October 28, 2004, from Lone Star

13  Enterprises for $15,000 made out to Lindsey Springer.

14  Q.   With respect to all three exhibits, the Government's

15  Exhibit 32, as well as Government's Exhibits 40 and 44,

16  did Mr. Springer indicate why he was given that -- why he

17  got those checks?

18  A.   Yes.  He indicated that these were all donations or

19  gifts from the Ouwengas or an organization of the

20  Ouwengas to his ministry.

21  Q.   Was a Ms. Hodsden discussed with Mr. Springer?

22  A.   Yes.

23  Q.   I'm going to ask you now to take a look at what's in

24  evidence as Government's Exhibit 38.  Was that check

25  discussed?

```
 1   A.   Yes, it was.

 2   Q.   What is Government's Exhibit 38?  And is that up on

 3   the screen?

 4   A.   Yes, it is.  It's a check from Mayberry 2000, and

 5   it's dated February 12, 2004, in the amount of $45,000

 6   made out to Bondage Breakers Ministries from a Barbara

 7   Hodsden.

 8   Q.   Did Mr. Springer indicate whether he had received

 9   that check?

10   A.   Yes.  He did acknowledge receipt of this check.

11   Q.   Did Mr. Springer state what he had done or agreed to

12   do for Ms. Hodsden?

13   A.   Yes.

14   Q.   What did he say?

15   A.   Mr. Springer stated that he had helped Ms. Hodsden

16   find an accountant who would prepare her returns and get

17   her back into the system.  And he reviewed the prepared

18   returns himself, but he did state that he's not a CPA and

19   not an accountant, but he did review her returns.

20   Q.   Was an individual or actually a couple by the name

21   of Patrick and Patricia Turner discussed with

22   Mr. Springer?

23   A.   Yes, they were.

24   Q.   I'm going to ask you if you could look at what's

25   marked for identification as Government's Exhibit 222.
```

```
 1   Do you have that in front of you?
 2   A.   Yes.
 3   Q.   Do you recognize that document?
 4   A.   Yes.  This is a multi-page document, do you want me
 5   to remove it?
 6   Q.   Well, if you need to look at the whole thing you
 7   can.  So you may pull it out of the sleeve if necessary.
 8   A.   Okay.  Yes.  Mr. Springer -- this document was
 9   discussed with Mr. Springer at the meeting.
10   Q.   Did Mr. Springer indicate whether or not he
11   recognized that document?
12   A.   Yes, he did.
13   Q.   What did he say?
14   A.   He said that he wrote this letter.
15   Q.   Did he indicate to whom he sent this?
16   A.   This was sent to a Mr. Pat Turner.
17          MR. O'REILLY:  Your Honor, at this time the
18   government would move Government's Exhibit 222 into
19   evidence.
20          MR. SPRINGER:  No objection.
21          THE COURT:  It is received.
22   Q.   (BY MR. O'REILLY)  Was Mr. Springer asked about
23   what's been marked for identification -- and if we can
24   just publish the first page of that.  I want you to look
25   at Government's Exhibit 225 for identification.  Was that
```

1  document discussed with Mr. Springer?

2  A.   Yes, it was.

3  Q.   Just -- can you briefly describe, generally, what is

4  Government's Exhibit 225?

5  A.   Yes.  Exhibit 225 is an acknowledgement receipt

6  signed by Lindsey Springer saying that he had received 36

7  numismatic coins.

8  Q.   Does Mr. Springer's signature appear on there?

9  A.   Yes, it does.

10  Q.   What is the date of this document?

11  A.   September 9, 2003.

12  Q.   Did Mr. Springer acknowledge that that was his

13  signature?

14  A.   Yes, he did.

15         MR. O'REILLY:  Your Honor, the government moves

16  Government's Exhibits 225 into evidence.

17         MR. SPRINGER:  No objection, Your Honor.

18         THE COURT:  225 is received.

19         MR. O'REILLY:  And if that could be published

20  for the jury.

21  Q.   (BY MR. O'REILLY)  Did Mr. Springer indicate whether

22  he received any money as a result of this?

23  A.   Yes, he did.

24  Q.   What did Mr. Springer say?

25  A.   He received these coins from Mr. Turner and then was

1  able to sell them here at the end, it was kind of a

2  complicated transaction, but at the end of it

3  Mr. Springer stated that he kept about $35,000 as a gift

4  from Mr. Turner.

5  Q.   And what did Mr. Springer indicate -- did

6  Mr. Springer indicate what he did with that $35,000?

7  A.   Yes, he did.

8  Q.   What did he say?

9  A.   He purchased a Lexus.

10 Q.   I'm going to ask you now if you could look at what's

11 been marked for identification as Government's Exhibit

12 226.  Actually, while you're at it, could you please look

13 at the following two exhibits, all for identification,

14 Government's Exhibit 227 and 228.  Generally speaking --

15 well, first of all, do you recognize these documents?

16 A.   Yes.  These checks were discussed during our

17 meeting.

18 Q.   Just general description of what are these checks?

19 A.   They are checks from Friendship Enterprises, which

20 is a Patricia -- Pat and Patricia Turner, and they're

21 made out to Bondage Breakers Ministries.

22 Q.   In what year?

23 A.   These are from 2004.

24 Q.   Did Mr. Springer indicate whether or not he had

25 received these checks?

1    A.   Yes.  He did acknowledge receipt of these checks.

2         MR. O'REILLY:  Your Honor, the government move

3    Government's Exhibit 226, 227 and 228 into evidence.

4         MR. SPRINGER:  No objection, Your Honor.

5         THE COURT:  They'll be received.

6    Q.   (BY MR. O'REILLY)  With respect to all of the money

7    and, I guess, coins or the benefits from the coins that

8    Mr. Springer received from the Turners, did he indicate

9    what those were?

10   A.   Yes.  He indicated these were all donations to his

11   ministry.

12   Q.   Did Mr. Springer indicate why the Turners were

13   giving him this money?

14   A.   Just as a support of his ministry.

15   Q.   Was Mr. Springer asked if he had done any work on

16   behalf of the Turners, either of them?

17   A.   Yes.

18   Q.   What did Mr. Springer say?

19   A.   He did -- he did acknowledge attending a meeting

20   with Mr. Turner that took place in Michigan, I believe,

21   with a Special Agent Ellory, who was looking into the

22   Turners' criminal tax situation.

23   Q.   I'm going to ask you if you could look at what's

24   been marked for identification as Government's Exhibit

25   229.  Do you recognize that document?

 1   A.   Yes, I do.

 2   Q.   Just generally -- well, let me ask this, did

 3   Mr. Springer -- does the signature, purported to be that

 4   of Mr. Springer, appear on page 2 of that document?

 5   A.   Yes, it does.

 6   Q.   Did Mr. Springer indicate whether or not he had

 7   signed this?

 8   A.   Yes.  He acknowledged signing this document.

 9            MR. O'REILLY:  Your Honor, the government would

10   move Government's Exhibit 229 in evidence.

11            MR. SPRINGER:  No objection, Your Honor.

12            THE COURT:  It is received.

13            MR. O'REILLY:  If we could publish that to the

14   jury.

15   Q.   (BY MR. O'REILLY)  Could you describe what

16   Government's Exhibit 229 is?

17   A.   It's a power of attorney form, Form 2848, from the

18   IRS that it's a power of attorney of Mr. Patrick Turner

19   and it has a representative of Lindsey Springer.

20   Q.   Ask you -- during the -- the address that appears

21   for Mr. Springer on there, 5147 South Harvard, do you see

22   that address?

23   A.   Yes, I do.

24   Q.   During the interview with Mr. Springer, do you

25   recall if that address came up?

1   A.   Yes, it did.

2   Q.   What is that address?

3   A.   That's his -- Mr. Springer's mail drop or mailbox

4   with the Mail Emporium of Tulsa.

5   Q.   Now I'm going to draw your attention to Government's

6   Exhibits -- for identification 230 and 231.  And,

7   actually, before I get to that, let me ask this, did

8   Mr. Springer indicate in the interview what that power of

9   attorney form, Government's Exhibit 229, allowed him to

10  do?

11  A.   Mr. Springer acknowledged that the IRS -- or,

12  actually, Special Agent Ellory wouldn't allow him to come

13  in and discuss the Turners' tax situations on behalf of

14  them or accompany them in discussing those without

15  signing this form.

16  Q.   Did Mr. Springer indicate whether or not he did in

17  fact accompany the Turners and discuss their criminal

18  matters with Special Agent Ellory, I think?

19  A.   Yes, he did.

20  Q.   During the interview, did Mr. Springer indicate

21  whether or not the Turners were ever criminally

22  prosecuted?

23  A.   Yes.

24  Q.   And what did he say?

25  A.   The Turners were not prosecuted.

1   Q.   That's what Mr. Springer told you?

2   A.   Yes.  And that's correct.

3   Q.   I'd ask you to look at Government's Exhibit 230 and

4   231 for identification.  Do you recognize those items?

5   A.   Yes.

6   Q.   Were those items discussed during the interview with

7   Mr. Springer?

8   A.   Yes, they were.

9   Q.   Just generally speaking, what are Government's

10  Exhibits 230 and 231?

11  A.   These are two more checks from Friendship

12  Enterprises, Patrick and Patricia Turner, from the year

13  2005, made out to Bondage Breakers.

14  Q.   Did Mr. Springer acknowledge receiving these items?

15  A.   Yes, he did.

16         MR. O'REILLY:  Your Honor, the government moves

17  Government's Exhibits 230 and 231 into evidence.

18         MR. SPRINGER:  No objection, Your Honor.

19         THE COURT:  230 and 231 will be received.

20  Q.   (BY MR. O'REILLY)  Was Mr. Springer asked the

21  question if he had ever assisted the Turners in any way?

22  A.   I don't recall that specific question, but he was

23  asked on every scenario or every person that we discussed

24  what he did to help them.

25  Q.   Well, let me ask this:  Did Mr. Springer indicate

1   whether he had, in fact, assisted the Turners?

2   A.   The only thing I recall Mr. Springer saying about

3   helping the Turners was when he accompanied Mr. Turner, I

4   believe, to talk to Special Agent Ellory about his

5   criminal tax situation.

6   Q.   Let me ask you, if I could, to look at what's been

7   marked for identification as Government's Exhibit 225.

8   Do you have that in front of you, sir?

9   A.   Yes, I do

10  Q.   Do you recognize that document?

11  A.   225 is -- once again, that's the receipt --

12  acknowledgement receipt of the coins.

13  Q.   I'm sorry, that's the wrong --

14       MR. O'REILLY:  One moment, Your Honor.

15  Q.   (BY MR. O'REILLY)  I'm sorry.  Drawing your

16  attention to Government's Exhibit 233 for

17  identification.  Do you recognize that document?

18  A.   Yes.

19  Q.   Just generally speaking, what is Government's

20  Exhibit 233?

21  A.   This is an e-mail.  At the top it indicates Lindsey

22  Springer to Pat, who is -- Mr. Springer acknowledged Pat

23  Turner, that provides some bank account information.

24  Q.   Was Mr. Springer asked about this exhibit?

25  A.   Yes, he was.

1  Q.   Did Mr. Springer indicate whether he recognized it?

2  A.   Yes.  He acknowledged that he did recognize this

3  document.

4        MR. O'REILLY:  Your Honor, the government would

5  move Government's Exhibit 233 in evidence.

6        MR. SPRINGER:  No objection, Your Honor.

7        THE COURT:  233 is received.

8        MR. O'REILLY:  And if we can publish that to the

9  jury.

10 Q.   (BY MR. O'REILLY)  Did Mr. Springer indicate what

11 that bank account information -- whose bank account

12 information that corresponded to?

13 A.   Yes, he did.

14 Q.   What did he say?

15 A.   This bank account information -- Mr. Springer stated

16 that this information is for Mr. Stilley's IOLTA trust

17 account at Arvest Bank.

18 Q.   And did Mr. Springer indicate why he was sending

19 that information to the Turners?

20 A.   Yes.

21 Q.   What did he say?

22 A.   Mr. Springer stated that he was expecting a loan

23 from the Turners.  And he was -- he had gotten permission

24 from Mr. Stilley to use his trust account to receive the

25 loan.

1  Q.   Did Mr. Springer indicate what the size of this,

2  what he called a loan, was?

3  A.   Yes, he did indicate that it was $250,000.

4  Q.   And was Mr. Springer asked if, in fact, 250,000 had

5  been transferred from the Turners to Mr. Stilley's IOLTA

6  account?

7  A.   Yes.

8  Q.   And did he tell you whether or not it happened?

9  A.   Yes.  He acknowledged that it had been received into

10  Mr. Stilley's IOLTA account.

11  Q.   Did Mr. Springer, in the interview, discuss -- state

12  what he did with the quarter-million dollars?

13  A.   Yes, he did.

14  Q.   What did he say?

15  A.   He -- Mr. Springer stated that he purchased an RV

16  from a Mr. Sam Snyder.  And he also used approximately

17  $45,000 to remodel the inside of the RV to kind of turn

18  it into a home for himself and his family.

19  Q.   Did he use the money -- did he indicate whether he

20  used the money for anything else?

21  A.   Yes.  He did state that he also purchased a car with

22  some of the money.

23  Q.   What kind of car?

24  A.   It was also a Lexus.

25  Q.   Let me ask you now to take a look at what's been

1  marked for identification as Government's Exhibit 232.

2  Do you have that in front of you?

3  A.   Yes, I do.

4  Q.   Do you recognize that document?

5  A.   Yes.  This was discussed during the meeting.

6  Q.   Did Mr. Springer indicate whether he recognized this

7  document?

8  A.   Yes.  He did acknowledge that he had recognized this

9  document.

10  Q.   Did he indicate whether or not it was his signature

11  on the document?

12  A.   Yes.  He did acknowledge that was his signature on

13  page 2.

14        MR. O'REILLY:  Your Honor, the government would

15  move Government's Exhibit 232 into evidence.

16        MR. SPRINGER:  No objection, Your Honor.

17        THE COURT:  232 is received.

18  Q.   (BY MR. O'REILLY)  Did Mr. Springer indicate what

19  this document -- and it's titled a "contract loan/gift

20  agreement" -- was?

21  A.   Yes.  Mr. Springer stated that this was a loan from

22  the Turners to his ministry.

23  Q.   Was Mr. Springer asked if there was any interest on

24  the loan?

25  A.   Yes, he was.

DANIEL SIVILS - DIRECT BY MR. O'REILLY                    551

1  Q.   What did Mr. Springer say?

2  A.   Mr. Springer said that the interest on this loan

3  would have been 6 percent.

4  Q.   If I could ask -- if we could focus on the second

5  paragraph on page 1.  Was Mr. Springer's statement

6  consistent with the loan -- this agreement, Government's

7  Exhibit 232, specifically the last sentence of the second

8  paragraph?

9  A.   No, that was inconsistent.

10  Q.   What does this document appear to provide?

11  A.   This Exhibit 232 states there that the loan is a

12  gift and there will be no interest charged.

13  Q.   Was Mr. Springer asked during the interview about

14  this apparent inconsistency?

15  A.   Yes, he was.

16  Q.   What did Mr. Springer say?

17  A.   Mr. Springer stated that the 6 percent that he was

18  referring to was going to be interest actually paid by

19  the Turners, so he was actually going to pay that

20  interest so that the Turners weren't footing the bill for

21  the interest on the loan.

22  Q.   Did Mr. Springer indicate whether or not the Turners

23  had borrowed money in order to give him $250,000?

24  A.   Yes, he did.

25  Q.   What did he say?

1   A.   He acknowledged that he had found out they were

2   borrowing the money to loan to him.

3   Q.   Did Mr. Springer indicate during the interview with

4   you where or how they had borrowed -- how the Turners had

5   borrowed the money?

6   A.   Yes, he did.

7   Q.   What did Mr. Springer say?

8   A.   Mr. Springer said that the Turners had borrowed the

9   money against two houses that they had sitting side by

10  side, that they borrowed money on both of them.

11  Q.   Was Mr. Springer asked how much of this loan he had

12  paid back as of the date of the interview?

13  A.   Yes, he was.

14  Q.   What did Mr. Springer say?

15  A.   Mr. Springer didn't have an approximate amount.  He

16  did state that he had paid the Turners 1,400 to $1,500 a

17  month.

18  Q.   Let me ask you if Mr. Springer was asked whether or

19  not he had ever used Mr. Stilley's credit card for any

20  reason?

21  A.   Yes, he was asked.

22  Q.   What did Mr. Springer indicate?

23  A.   He indicated that he had used Mr. Stilley's credit

24  card with his permission.

25  Q.   Did Mr. Springer indicate for what purpose he would

1  use the card?

2  A.   Mr. Springer didn't really state a specific

3  purpose.  He said you'd just have to look at the billing

4  records.

5  Q.   Was Mr. Springer asked whether or not he had a debit

6  card?

7  A.   Yes, he was.

8  Q.   What did Mr. Springer say?

9  A.   Mr. Springer stated that he did have a debit card,

10  although it's a prepaid debit card.  It's attached to no

11  bank account.

12  Q.   During that interview, was Mr. Springer asked to

13  review documents that had been seized during a search

14  warrant executed at his home?

15  A.   Yes, he was.

16  Q.   Could you please explain to the jury what

17  Mr. Springer was asked to do with respect to those

18  documents?

19  A.   Okay.  Mr. Springer was provided a box of

20  documents.  They were separated into folders by --

21  categorized by who they were paid to, and Mr. Springer

22  was asked to review these and try to determine which

23  expenses or expenditures would have been in the course of

24  him assisting or helping people with legal or tax issues

25  or that he would have -- expenses he would have incurred

1  in the course of his ministry.

2  Q.   And was he asked -- what was he supposed to do with

3  the -- how were the other expenses characterized?

4  A.   Personal expenses he put in one stack.  And then the

5  ones that would have come during his ministry, he put in

6  a separate stack.

7  Q.   And were you present while he did this?

8  A.   Yes, I was.

9  Q.   With respect to -- while that was going on, was

10 Mr. Springer asked questions to clarify why he was

11 putting -- characterizing documents as either personal or

12 non-personal?

13 A.   Yes, he was.

14 Q.   Did Mr. Springer do this?

15 A.   Yes, he did.

16 Q.   And before we get into that, was Mr. Springer asked

17 whether during 2003 he had spent any money remodeling his

18 home?

19 A.   Yes.

20 Q.   Did Mr. Springer indicate whether, in fact, he had?

21 A.   He did.  He stated that he had spent, I believe it

22 was approximately $48,000 remodeling his garage and

23 turning it into a home.

24 Q.   Okay.  Now I'm going to ask you if -- excuse me one

25 second.  In the government's exhibits that have been

1  prepared, have those been organized consistent with the

2  way that Mr. Springer categorized the personal or

3  non-personal expenses during that interview?

4  A.   Yes, they have.

5  Q.   Could you please explain to the jury how.

6  A.   The government exhibits starts with Number 301, I

7  believe, and it goes down to Exhibit Number 520, those

8  would be expenses that Mr. Springer indicated he would

9  have incurred during his ministry.  And then Government's

10 Exhibits 521 down to 573 were expenses that Mr. Springer

11 acknowledged were personal in nature.

12 Q.   And with respect to what's in -- what's been marked

13 for identification as Government's Exhibits 301 through

14 520, each of those are from the stack or the organization

15 of documents that Mr. Springer identified as expenses he

16 believed were related to what he did with his ministry?

17 A.   That's correct.

18       MR. O'REILLY:  Your Honor, the government would

19 move Government's Exhibits 301 through 520 into evidence

20 at this time.

21       MR. SPRINGER:  I have an objection.  Can we

22 approach on this?

23       THE COURT:  You may.

24    (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND

25 OUT OF THE HEARING OF THE JURY.)

```
 1              THE COURT:  Okay.  Go ahead.
 2              MR. SPRINGER:  My understanding is that these
 3   are all the exhibits that I went through that I
 4   identified.  And that these are not any of the exhibits
 5   that I did not identify.  Is that true, Mr. O'Reilly?
 6              MR. O'REILLY:  I'm not quite sure what you're
 7   asking.
 8              MR. SPRINGER:  In other words, there were some
 9   things that I didn't know about and there's some things
10   --
11              MR. O'REILLY:  Anything that you -- there is
12   nothing in here that you said you did not recognize.
13              MR. SPRINGER:  And that's all I'm concerned
14   about is if something comes up in an hour, because this
15   is, like, 300 documents and I just got this list here in
16   this order today or last night, and I just wanted to make
17   sure I could preserve an objection if something did come
18   up that I did not agree to while at the same time putting
19   all this stuff in because I don't want to waste anybody's
20   time.  There may be one document or maybe two and if
21   there is I'll point it out.
22              THE COURT:  Well, the witness has -- I think
23   that's a good basis on which to proceed and here is what
24   I mean by that.  The bar under Rule 101 is really low and
25   this witness has cleared the bar in his testimony.  But
```

1    here we've got 220 documents which is a record for me

2    and --

3            MR. SPRINGER:  I'm willing to do it.

4            THE COURT:  If there's -- if it should appear

5    that there's one or two in there then you can move to

6    strike it and I think that's a realistic way to approach

7    it.

8            MR. O'REILLY:  Your Honor, only for

9    clarification.  While in this format of the courts -- you

10   only received it yesterday it's the same order as you

11   received last week.

12           MR. SPRINGER:  But I just haven't had the time

13   to go and put them side by side and check and that was my

14   only concern.  That was the only concern I had, Your

15   Honor.

16           THE COURT:  I'm concerned about one thing you

17   said, you just got this list last night.

18           MR. SPRINGER:  This specific list.  They've

19   given me other lists, but I haven't had the time to go

20   through and set them side by side and make sure there's

21   no changes and it's just out of a cautionary position

22   I've taken.

23           THE COURT:  They'll be admitted, but if it

24   should turn out there's any errors by way of inclusion of

25   any particular items in this set, then you will

1  certainly -- the Court will certainly entertain a motion

2  to strike.

3          MR. SPRINGER:  Should I then stand up when I get

4  back to my table and say no objection other than what we

5  said at the table?

6          THE COURT:  Just say subject to our

7  understanding at the bench, there's no objection.

8          MR. SPRINGER:  Thank you, Your Honor.

9      (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

10  WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

11  PRESENCE AND HEARING OF THE JURY.)

12          THE COURT:  Mr. Springer, any objection?

13          MR. SPRINGER:  No objection, subject to the

14  discussion we had at the bench, Your Honor.

15          THE COURT:  Very well.  Exhibits 301 through 520

16  will be received on that basis.  I'll have to say 220

17  exhibits in one fell swoop, that's a record for me.  Go

18  ahead.

19  Q.  (BY MR. O'REILLY)  Mr. Sivils, just for

20  clarification, the exhibits, how did Mr. Springer

21  characterize, generally, all of these documents that are

22  in, what's now in evidence, as Government's Exhibits 301

23  through 520?

24  A.   Generally those were expenses or expenditures he

25  would have incurred as part of his ministry when he was

1  doing his ministry.

2  Q.   I'm now going to ask you to -- with respect to the

3  remaining documents in -- that we previously touched

4  upon, which is Government's Exhibits 521 through 573.

5  A.   Yes.

6  Q.   With respect to those, had Mr. Springer

7  characterized those in a different light?

8  A.   Yes, he had.

9  Q.   What did Mr. Springer say with respect to those

10  documents -- with what is in Government's Exhibit 521

11  through 5 -- excuse me -- 73?

12  A.   Those documents were the ones that Mr. Springer

13  identified as being personal in nature.

14  Q.   And with respect to those, this was from the

15  documents Mr. Springer himself, after some discussion,

16  had segregated and put into a different pile?

17  A.   That's correct.

18         MR. O'REILLY:  Your Honor, the government would

19  move Government's Exhibits 521 through 573 into evidence.

20         MR. SPRINGER:  No objection, Your Honor, subject

21  to the same statement we made at the bar earlier.

22         THE COURT:  That will be understood.  And on

23  that basis Exhibits 521 through 573 are received.

24  Q.   (BY MR. O'REILLY)  I'm now going to ask you to draw

25  your attention specifically to what's now in evidence,

1   Government's Exhibits 541.  And could you -- is that up

2   on the screen yet?

3   A.   No.

4   Q.   Is Government's Exhibit 541 a handwritten receipt?

5   A.   Yes, it is.

6   Q.   From whom?

7   A.   Exhibit 541 is a handwritten receipt from Mr. Ed

8   Bryson.

9   Q.   Did Mr. Springer indicate what that was for?

10  A.   Yes.  He acknowledged that this was for the 2003

11  Corvette that he purchased from Mr. Bryson.

12  Q.   Is that the same Corvette we discussed earlier?

13  A.   Yes, it is.

14  Q.   Okay.  Now I'm going to ask you with respect to

15  what's in evidence as Government's Exhibit 490.  Do you

16  have that in front of you, sir?

17  A.   Yes.

18  Q.   And was this document discussed with Mr. Springer?

19  A.   Yes, it was.

20  Q.   What is, generally speaking, Government's Exhibit

21  490?

22  A.   It's a handwritten note by Mr. Springer discussing a

23  deposit of a -- and I don't know how to pronounce -- the

24  Kingsley Coach that he was going to purchase.

25  Q.   Okay.  Does it also contain money orders to a

1   Mr. Sam Snyder?

2   A.   Yes.

3   Q.   And these documents were discussed specifically with

4   Mr. Springer?

5   A.   Yes, they were.

6   Q.   Did Mr. Springer indicate what the money orders to

7   Sam Snyder were for?

8   A.   Yes.  Those were for the RV that he ended up

9   purchasing from Mr. Snyder.

10  Q.   Was that a different RV -- based upon your

11  conversation with Mr. Springer, did you understand that

12  to be a different RV than the one mentioned in the

13  letter?

14  A.   That's correct.

15  Q.   Now I'll draw your attention to Government's Exhibit

16  473, which is in evidence.  Do you have that in front of

17  you, sir?

18  A.   Yes, sir.

19  Q.   Was -- were these discussed with Mr. Springer?

20  A.   Yes, they were.

21  Q.   What are Government's Exhibits 473?

22  A.   These are credit memos from First United Bank in

23  Sapulpa, Oklahoma.  They're receipts of Mr. Springer

24  paying his mortgage.

25  Q.   Is that how Mr. Springer characterized that?

DANIEL SIVILS - DIRECT BY MR. O'REILLY                   562

1   A.   Yes.

2   Q.   Let me ask you now if you can look at what's in

3   evidence as Government's Exhibit 539.  Do you recognize

4   that document?

5   A.   Yes, sir.

6   Q.   Was that document discussed with Mr. Springer?

7   A.   Yes, it was.

8   Q.   How did Mr. Springer initially characterize this

9   document, as a personal or ministry expense?

10  A.   I believe, initially, this was one of the ones that

11  was in the ministry related.

12  Q.   After some discussion, did Mr. Springer indicate

13  whether or not it was, in fact, a ministry-related

14  expense?

15  A.   Yes, he did.

16  Q.   What did he say?

17  A.   He said this was actually a personal expense.  It

18  was jewelry for his wife.

19  Q.   Ask you now if you can take a look at what's in

20  evidence as Government 526.  Let me ask you if you

21  recognize that document?

22  A.   Yes.

23  Q.   And what -- Number 526.  Generally speaking, was

24  this discussed with Mr. Springer?

25  A.   Yes, it was discussed.

DANIEL SIVILS - CROSS BY MR. SPRINGER                    563

```
 1  Q.   What is Government's Exhibit 526?

 2  A.   It's a receipt or invoice from a Rainwater Jewelry

 3  to Mr. Springer.  This is from 2001.  There's also a

 4  money order along -- in this exhibit.

 5  Q.   Did Mr. Springer indicate whether or not this was a

 6  personal expense?

 7  A.   Yes, this was a personal expense.

 8  Q.   Actually he acknowledged that?

 9  A.   Yes, he did.

10         MR. O'REILLY:  If I may have a moment, Your

11  Honor?

12         THE COURT:  You may.

13         MR. O'REILLY:  Thank you, Your Honor.  Nothing

14  further from Mr. Sivils.

15         THE COURT:  Cross-examination.

16               CROSS-EXAMINATION

17  BY MR. SPRINGER:

18  Q.   Agent Sivils, good morning.  My name is Lindsey

19  Springer.

20  A.   Good morning.

21  Q.   You and I have met on a few occasions; isn't that

22  true?

23  A.   That's correct.

24  Q.   Have I always been willing to answer your questions?

25  A.   Yes, you have.
```

DANIEL SIVILS - CROSS BY MR. SPRINGER                    564

1  Q.   Other than the characterization of why people would

2  give me money and with the one exception of the $179

3  O'Hare receipt from the airport in Chicago, did you find

4  everything else that I said was true and correct,

5  generally?

6  A.   Generally, yes.

7  Q.   Generally.  Sorry.  I didn't mean to be so

8  specific.

9  A.   Yes.  In general terms, yes.

10  Q.   Other than the characterization of money that people

11  gave me, I'm saying that.

12  A.   I believe -- well, when you asked me if you would

13  always answer our questions -- I guess this is an

14  opinion, but you were answering the questions, in your

15  opinion, truthfully and straightforward.

16  Q.   Thank you.  Now, isn't it true that the receipts

17  that we just made a record in the United States in, which

18  I'll take that interesting, entering exhibits in, that

19  those were receipts that were seized per a raid on my

20  home in 2005 by Agent Shern and ten other agents; isn't

21  that true?

22  A.   Those were receipts that were seized during a search

23  warrant at your house in September of 2005, that's

24  correct.

25  Q.   And would those be characterized as records?

1  Whether they were expenses or a business nature --

2  ministry nature or personal?

3  A.   Yes, they're definitely records.

4  Q.   So it's safe to say, then, I did keep some records,

5  didn't I?

6  A.   Yes, you did.

7  Q.   Now, from -- do you remember the date that the

8  search warrant occurred?  If I reminded you -- if I said

9  September 16, 2005, would that be something that you

10 remember?

11 A.   Yes, that sounds correct.

12 Q.   And so -- and the meeting that you just

13 characterized that we had was dated January 15, 2009; is

14 that true?

15 A.   That's true.

16 Q.   And so from August 15th -- excuse me, September 16,

17 2005, to January 15, 2009, I had not seen any of these

18 documents, had I?

19 A.   I don't know on that, Mr. Springer.

20 Q.   Do you know in your file -- or had there ever been

21 any other interview with me other than either on

22 September 16, 2005, or on January 15, 2009?

23 A.   Not since I came on and that was in December of

24 2008.

25 Q.   Would you have reviewed any prior interviews that

1  had taken place between me and the IRS before the January

2  15, 2009, meeting?

3  A.   Mr. Springer, I don't think I would have.  There

4  might have been a review of that, but since I'm not the

5  case agent I would not have done that.

6  Q.   When you first testified earlier, and it's just a

7  small discrepancy, did you begin with the CID in May of

8  2008 or December of 2008?

9  A.   Okay.  May of 2008 I was hired and went to training,

10 so I was hired on in May of 2008.  I was assigned to the

11 Tulsa CID office in December upon completion of that

12 training.

13 Q.   So Atlanta was six months between May and December,

14 have I got that right?

15 A.   Yes, it's east coast of Georgia, but, yes, that's

16 correct.

17 Q.   Gotcha.  As you sit here today, you don't personally

18 know whether any of the statements that I made regarding

19 the characterization of the money that was given to me

20 that you outlined in your direct testimony was true or

21 not, do you?

22 A.   No, I have no personal knowledge.

23 Q.   And, in fact, the only witness that you probably

24 ever -- or that you ever were involved in in any type of

25 interview, wouldn't that be with Ms. Wiggins' testimony?

1  A.   Yes.  I was in attendance at that interview.

2  Q.   And that would be the first time you heard any other

3  characterization from a person who gave me money other

4  than me -- excluding agents that work for the government

5  or the lawyers that work for the government?

6  A.   I had attended a meeting one other time with a

7  Mr. Patterson.

8  Q.   Okay.  And could you tell me when that was?

9         MR. O'REILLY:  Your Honor, objection.  Beyond

10 the scope of direct and relevance.  It was a very limited

11 purpose this witness is offered for.

12        THE COURT:  That will be overruled at this

13 point.  We'll take it one question at a time.

14        THE WITNESS:  Could you restate the question,

15 Mr. Springer?

16 Q.   (BY MR. SPRINGER)  Besides Ms. Wiggins, when her

17 deposition was taken, or her trial testimony was taken,

18 has there been any other witness or any other person who

19 gave me money that was discussed in that January 15,

20 2009, meeting, at the U.S. Attorney's Office -- other

21 than Mrs. Wiggins, is there any other person that you

22 presented checks to me about that you testified earlier

23 about that you've spoken to personally?

24 A.   I sat in with a meeting with Mr. Eddy Patterson.

25 Q.   And when was that?

```
 1  A.   I don't recall the exact time of that meeting, but

 2  it would have been after our interview on January 15th.

 3  Q.   All right.  So it would be after -- and would it be

 4  before March 9, 2009?

 5  A.   No.  It would have been after March 9th.

 6  Q.   All right.  There we go.  In the January 15th

 7  interview, you stated that I stated the characterization

 8  of the mind of people who I dealt with in my ministry

 9  was -- you characterized it as I said "infected."

10  A.   That's correct.

11  Q.   Did you ever ask me what that meant?

12  A.   I did not.

13  Q.   Did you see anybody else in the room ask me what it

14  meant?

15  A.   No.  I don't believe that term was discussed.

16  Q.   Now, you testified earlier that Mr. Snoke was in the

17  room for the interview, but isn't it true that Mr. Snoke

18  left the room right after I got there?

19  A.   He did leave.  I'm not sure if he -- I believe he

20  came back in at some point, but he did leave for a

21  portion of your interview, that's correct.

22  Q.   And then the other people in the room were agent

23  Shern, who was asking the questions, correct?  And he

24  sits at counsel's table.

25  A.   Yes.
```

1  Q.   And Mr. O'Reilly, who also is the prosecutor in this

2  case; is that correct?

3  A.   Yes.

4  Q.   And then yourself.  And then there was another U.S.

5  Attorney, who now I believe -- is it Mr. Bradford?

6  A.   Yes.

7  Q.   And he no longer is working here.  He moved to Utah;

8  is that correct?

9  A.   Oregon.

10 Q.   Oregon?

11 A.   Yes, sir.

12 Q.   Okay.  So we had five people in the room.  And I was

13 trying to explain my relationship with these people who

14 would give me money and people who wouldn't.  And I

15 described it as an infection and nobody in the room ever

16 asked me any more questions about that, did they?

17 A.   Not that I recall.

18 Q.   Did you ever have any discussions with anybody that

19 was in that room after that day about what that answer I

20 gave you meant?

21 A.   No, I did not.

22 Q.   As you stand here today, do you care about what that

23 meant?

24 A.   I would be interested to know what you meant by

25 that, but, you know, that's about the end of it.

DANIEL SIVILS - CROSS BY MR. SPRINGER                          570

1   Q.   You're not really -- you're not really here

2   testifying concerning about the characterization of the

3   money people gave me, are you?

4   A.   I'm here to testify about what you told us during

5   that interview.

6   Q.   Thank you.  Now, you also testified that I said --

7   and I don't know if it was on more than one occasion, but

8   just in a general way you said that I said I was not

9   "hired" by somebody?

10  A.   That's correct.

11  Q.   Now, do you know what I meant by "hired"?

12  A.   No, Mr. Springer.  There was a -- we always got hung

13  up on certain words during that interview, so I didn't

14  always understand your interpretation of certain words

15  and "hired" would have been one of them, "hired, worked,

16  employed."

17  Q.   So you weren't misled by my word "hired," were you?

18  A.   No.  But I -- I wasn't really asking the questions,

19  so I kind of left that to the other agents and attorneys

20  in the room.

21  Q.   What was your purpose for being in the room?

22  A.   Just to assist Mr. Shern if he needed any assistance

23  during the interview, basically there -- I was there to

24  help him if he needed anything.

25  Q.   Now, I could have asked for you not to be in that

 1  room, couldn't I?

 2  A.    Sure.

 3  Q.    And I didn't, did I?

 4  A.    No, you didn't.

 5  Q.    As a matter of fact, the only thing I asked before

 6  it started was that Mr. O'Reilly present evidence that he

 7  was authorized to be in this district, didn't I?

 8  A.    Yes.  There was a discussion about that.

 9  Q.    And I'm the one that opened up the Federal Rules of

10  Procedure; isn't that true?

11  A.    You did.

12  Q.    And all of a sudden, somebody named Brad left the

13  room and came back with a letter that he had that said

14  that purportedly that he was allowed to represent the

15  United States in Tulsa; isn't that true?

16  A.    That's correct.

17  Q.    And so -- as I came in the room I wanted to make

18  sure that everybody in the room had a right to be in the

19  room, didn't I?

20  A.    Yes.

21          MR. O'REILLY:  Objection, Your Honor.  Calls for

22  speculation.

23          THE COURT:  Overruled.

24  Q.    (BY MR. SPRINGER)  Did you think that was odd that I

25  would ask the U.S. Attorneys that were going to ask me

```
 1   questions under oath if they had the right to ask me

 2   those questions?

 3           MR. O'REILLY:  Objection, Your Honor.  Relevance

 4   to whether he thinks it's odd or not.

 5           THE COURT:  Overruled at this point.

 6           THE WITNESS:  Did I think it was odd,

 7   Mr. Springer, was that the question?

 8   Q.  (BY MR. SPRINGER)  Uh-huh.

 9   A.  I did think it was a little odd at first, but there

10   was some sticking points that we had during the interview

11   and I guess that was just one of them to start things

12   off.

13   Q.  And now Mr. Bradford, he originally was going to ask

14   the questions, wasn't he?

15   A.  That's correct.

16   Q.  But then Mr. Shern had to turn to ask the questions,

17   didn't he?

18   A.  Yes.  He ended up asking the majority of the

19   questions.

20   Q.  Do you remember why that happened?

21   A.  It was along the lines of this discussion we had at

22   the beginning where I believe you wanted Mr. Bradford to

23   take an oath or show you some sort of documentation that

24   he had taken an oath to ask you questions here in the

25   Northern District of Oklahoma.
```

1   Q.   And he couldn't produce that, could he?

2   A.   He did not.  I don't know if he could have.

3   Q.   He did not produce it?

4   A.   He came back with some sort of letter, but I didn't

5   see the letter myself, so I don't know what the document

6   was that he brought back.

7   Q.   Then I turned and agreed to allow, in this

8   interview, Mr. Shern to ask me questions, didn't I?

9   A.   Yes, you did.

10  Q.   I could have left right there on the spot because

11  the question-asker was not authorized in his own mind --

12  scratch that.  I did not leave.  I kept trying to find a

13  way to get in there and answer your questions, didn't I?

14  A.   You had the right to leave at any time and you chose

15  to answer our questions.

16  Q.   And I tried to find a way -- isn't it true I tried

17  to find a way to where I could get in there and answer

18  those questions?  I wasn't trying to find a way to get

19  out the door, I was trying to work with you guys to stay

20  in the room, wasn't I?

21          MR. O'REILLY:  Objection, Your Honor, calls for

22  speculation and relevance.

23          THE COURT:  Overruled at this point.

24          THE WITNESS:  Mr. Springer, could you rephrase

25  or state the question again, please?

1  Q.  (BY MR. SPRINGER)  Earlier you testified -- I'll

2  come back to that in a minute.  Earlier you testified

3  that I -- in 2005 when they -- when Mr. Shern and the

4  other ten agents raided my home that I told Mr. Shern

5  that I would be willing to answer questions of the grand

6  jury, who was authorizing the raid of my home, do you

7  remember that?

8          MR. O'REILLY:  Objection, Your Honor, I don't

9  recall that testimony.

10          THE COURT:  Well, the witness can respond, then,

11  one way or the other.

12          THE WITNESS:  Mr. Springer, I don't remember

13  testifying that at the time of the search warrant there

14  was any discussion about you testifying before a grand

15  jury.

16  Q.  (BY MR. SPRINGER)  Do you remember at some time that

17  somebody said that I was -- and you testified that

18  somebody said I was willing to testify before the grand

19  jury when you were explaining why instead I met at the

20  office with the U.S. Attorneys?

21  A.  Yes.  You had indicated a desire, I belive, to

22  testify before the grand jury.  And I don't know exactly

23  your reasonings for not, but you ended up not testifying,

24  but you agreed to meet with us instead.

25  Q.  Under oath?

DANIEL SIVILS - CROSS BY MR. SPRINGER                    575

1   A.   Under oath, yes, sir.

2   Q.   Now, at the time I met with you on September 15,

3   2009, at the U.S. Attorney's Office here in Tulsa, had

4   anybody -- did anybody in that room tell me that the

5   grand jury investigating me was the fourth grand jury?

6          THE COURT:  Mr. Springer, I don't think you

7   meant to say September 15, 2009.

8          MR. SPRINGER:  I'm sorry, January 15, 2009.

9          THE WITNESS:  I don't remember hearing anything

10  about how many grand juries.

11  Q.   (BY MR. SPRINGER)  Now, before that day, January 15,

12  2009, you, Mr. Shern and Mr. Snoke, Mr. Bradford,

13  Mr. O'Reilly, you had all met and prepared for this

14  meeting; isn't that true?

15  A.   That's true.

16  Q.   And I had no idea about the specific questions you

17  were going to be asking me when I walked in, did I?

18          MR. O'REILLY:  Objection.  Calls for

19  speculation, what Mr. Springer knew.

20          THE COURT:  Answer, if you know.

21          THE WITNESS:  I have no knowledge of what you

22  knew you were going to be answering questions about.

23          THE COURT:  Mr. Springer, I've allowed you to

24  bring out a fair amount of testimony about the

25  circumstances of this interview, and I intend to do so

1  within reasonable limits, but we're getting close to the

2  point that it's time to move on.

3              MR. SPRINGER:  Got you.

4  Q.  (BY MR. SPRINGER)  You made comments regarding my

5  statements about trying to convince people to take a

6  different course or different route than the route they

7  were on when I met them, do you remember that?

8  A.   That's correct.

9  Q.   Okay.  And do you remember me telling you that

10  Mr. Stumpo, Mr. Turner and Mr. Burt, came up to Michigan

11  and sat through an entire criminal trial?

12  A.   Yes.

13  Q.   Okay.  And do you remember what the -- what I said

14  the result of that was?

15  A.   The result of the trial?

16  Q.   Yeah, affecting Mr. Burt, Mr. Turner and Mr. Stumpo?

17  A.   Mr. Turner, I know, was not prosecuted and Mr. Burt

18  was.

19  Q.   Okay.  And as you sit here today, you don't know

20  whether Mr. Burt changed his mind as a result of that --

21  watching that trial, do you?

22  A.   Not at all.

23  Q.   Now, we talked earlier about the $35,000 from

24  Mr. Stilley that said "Patterson" in the footnote.  Do

25  you remember that check?

DANIEL SIVILS - CROSS BY MR. SPRINGER                    577

```
 1  A.   Yes, sir.
 2  Q.   And initially when we --
 3            MR. O'REILLY:  Objection, Your Honor, if we
 4  could have the exhibit identified.
 5            MR. SPRINGER:  Oh, I'm sorry.
 6            THE COURT:  Let's do it that way.
 7            MR. SPRINGER:  That would be Number 26, please.
 8  If you could publish 26.
 9  Q.   (BY MR. SPRINGER)  Now, initially, I answered your
10  question that was for the purchase of a Corvette?
11  A.   That's correct.
12  Q.   But I was wrong, wasn't I?
13  A.   Yes, sir.
14  Q.   But I wasn't trying to mislead you when I said that,
15  was I?
16            MR. O'REILLY:  Objection.  Calls for
17  speculation.
18            THE COURT:  That will be sustained.
19  Q.   (BY MR. SPRINGER)  Isn't it true at that meeting
20  that this $35,000 check was something that I said at the
21  end of the meeting that I would leave and go try to
22  figure out because I didn't quite remember the
23  circumstances behind that check?
24  A.   Yes.
25  Q.   Okay.  And were you -- were you present when I came
```

DANIEL SIVILS - CROSS BY MR. SPRINGER                              578

1   back and met Mr. O'Reilly a second time for a second

2   meeting at the U.S. Attorney's Office?

3   A.   I don't recall attending another meeting that took

4   place between you and Mr. O'Reilly.

5   Q.   That you would have sat in?

6   A.   That's correct.

7   Q.   Do you know whether I ever provided a written

8   statement after that day to Mr. O'Reilly?

9   A.   After January 15th?

10  Q.   Uh-huh.

11  A.   Yes.  You did provide, I believe, it was around a

12  four-page letter in response to our interview.

13  Q.   Did I also provide to you copies of a $30,000

14  cashier's check made out from the bank in Ft. Smith,

15  Arkansas, that that $35,000 check was from made out to

16  Tulsa Sales & Rental?

17  A.   If you provided it I haven't seen it.

18  Q.   Okay.

19       MR. SPRINGER:  Exhibit Number 25, please.

20  Q.   (BY MR. SPRINGER)  Do you have on your screen before

21  you Exhibit Number 25?

22  A.   Yes, sir.

23  Q.   Do you know what that check was for?

24  A.   Not at all.

25  Q.   You said you met with Mr. Patterson after the grand

DANIEL SIVILS - CROSS BY MR. SPRINGER                        579

 1  jury indictment in this case.  Did you ask him about --

 2          MR. O'REILLY:  Objection, Your Honor.  It's

 3  beyond the scope of direct.  He's asking what

 4  Mr. Patterson said, it's hearsay.

 5          THE COURT:  Well, the mere fact of the meeting

 6  I'm going to allow the witness to answer.  And then we'll

 7  take it one question at a time from there.

 8          THE WITNESS:  What was your question again,

 9  Mr. Springer?

10  Q.  (BY MR. SPRINGER)  When you met with Mr. Patterson

11  after the indictment was issued in this case -- I believe

12  that was your testimony just a short time ago; is that

13  correct?

14  A.  Yes, sir.

15  Q.  And did you ask him about what the purpose of that

16  $14,000 check, Exhibit Number 25, that's on the screen in

17  front of you?

18  A.  I did not ask him about that.

19  Q.  What was your purpose in meeting with

20  Mr. Patterson?

21          MR. O'REILLY:  Objection, Your Honor.

22  Relevance.

23          THE COURT:  Don't come to the bench, but just

24  tell me what your theory of relevance is for that.

25          MR. SPRINGER:  The government's theory is that

1  that was income.  Income to me, personally.  Goes to the

2  heart of --

3          THE COURT:  The question is, what was this

4  witness's purpose in meeting with Mr. Patterson.  And I

5  need to ascertain the relevance.

6          MR. SPRINGER:  Okay.  All right.  All right.  I

7  withdraw my question, Your Honor.

8  Q.  (BY MR. SPRINGER)  Now, your testimony earlier was

9  that I had stated to you that the $37,000 check was a

10 loan from Mr. Stilley to buy a Corvette.  Do you remember

11 that?

12 A.  It was actually a loan from Mr. Patterson, I

13 believe, is the way you phrased it.

14 Q.  Right.  Thank you.  Do you have any reason to

15 believe that's not true?

16 A.  I myself do not, but I don't know any of the

17 background as to that transaction.  But I'm just going

18 off of what you stated.

19 Q.  You do understand the nature of the charges in the

20 conspiracy in Count 1, correct?

21         MR. O'REILLY:  Objection, Your Honor.

22 Relevance.

23         THE COURT:  Overruled.

24         THE WITNESS:  Understand the nature of the

25 charges of the conspiracy?

DANIEL SIVILS - CROSS BY MR. SPRINGER                   581

1  Q.   (BY MR. SPRINGER)  Yes.

2  A.   Yes, I do.

3  Q.   And you understand Mr. Stilley and I stand charged

4  at some point in time entering into an agreement to

5  defraud the Internal Revenue Service, right?

6  A.   Yes.

7  Q.   And as you sit here today, you have no evidence to

8  present to this Court that that $37,000 was something

9  that was paid for services to Lindsey Springer; is that

10  true.

11        MR. O'REILLY:  Objection, Your Honor.  This

12  witness is called only for a limited purpose.  His direct

13  was very limited.

14        THE COURT:  That's sustained.

15  Q.   (BY MR. SPRINGER)  You testified that I had stated

16  to you I had encouraged the Pattersons to file returns.

17  Do you remember that?

18  A.   Mr. Springer, I know for a fact that you told --

19  that you told Mr. Patterson to have the returns prepared,

20  whether you actually had them get them filed or not I'm

21  not certain.

22  Q.   Thank you.  Now, you testified about Exhibit Number

23  12 -- if you could pull that up.  Now, do you know who

24  DVAT is?

25  A.   Personally, I do not know who -- what that stands

 1  for, but I believe it's an organization.

 2          MR. O'REILLY:  Objection, Your Honor.  Calls for

 3  hearsay testimony.  He doesn't know.

 4          THE COURT:  Well, he can say what he knows or

 5  not and then we'll go from there.

 6          THE WITNESS:  I do not know what the

 7  organization DVAT -- I don't know exactly what that is.

 8  Q.  (BY MR. SPRINGER)  Doesn't spell "James Lake," does

 9  it?

10  A.  No, it does not.

11  Q.  Thank you.  Did you ever have any conversations with

12  Mr. or Mrs. Hawkins in regard to Exhibits Number 20, 22,

13  23, 24, 2001, 2003 -- excuse me -- 201, 203, 207, 212?

14          MR. O'REILLY:  Your Honor, objection.  Beyond

15  the scope of direct.  What he had discussions with other

16  witnesses -- it's all going to elicit hearsay.

17          THE COURT:  Counsel and the parties will

18  approach.

19      (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND

20  OUT OF THE HEARING OF THE JURY.)

21          THE COURT:  What do you expect his answer is

22  going to be?

23          MR. SPRINGER:  No.

24          THE COURT:  Okay.  And then what would be the

25  upshot of that for this case?

DANIEL SIVILS - CROSS BY MR. SPRINGER                    583

```
 1            MR. SPRINGER:  Because that's at least one
 2   employee of the IRS who I did not impede, even in his own
 3   lips his own mouth I didn't try to obstruct.
 4            THE COURT:  We're not going to go there.  That's
 5   inappropriate.  The objection is sustained.  And I've
 6   given you some latitude, but --
 7            MR. SPRINGER:  I appreciate it.
 8            THE COURT:  It's not unlimited and we're getting
 9   to the point that you need return to what was covered
10   with this witness on direct.
11            MR. SPRINGER:  You got it.
12        (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,
13   WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE
14   PRESENCE AND HEARING OF THE JURY.)
15            THE COURT:  Mr. Springer, about how much more do
16   you have on cross?
17            MR. SPRINGER:  Twenty minutes.
18            THE COURT:  We'll take our mid-morning break at
19   this time.  You may be seated.  Members of the jury,
20   we'll take our mid-morning break at this time.  And we'll
21   make that -- we'll resume at ten minutes till 11, again,
22   guided by the clock on the wall.
23        Please remember during this break my usual
24   admonition not to discuss the case, not to undertake any
25   independent investigation of any aspect of the case and
```

1    not to reach any conclusions until the case has been

2    given to you for your deliberations and verdict.  Now,

3    the security officer will lead you to the same room that

4    you have been using, which you probably don't need to be

5    led to it.  I'm pleased to tell you that Mr. Lombardi has

6    probably located another room a little more accommodating

7    with some vending machines and a refrigerator and so

8    forth, but it's not quite ready yet, so for this break it

9    will be necessary to use the same room you've been

10   using.  So let's resume at 10 minutes till the hour.

11        All persons in the courtroom will remain seated

12   while the jury departs.

13        (JURY EXITS THE COURTROOM.)

14           THE COURT:  Anything we ought to address before

15   we take our mid-morning break?

16           MR. SPRINGER:  No.

17           MR. O'REILLY:  Your Honor, just for -- our

18   understanding is, is that the entire testimony of

19   Ms. Wiggins can be played.  It's only some of the

20   exhibits that were excluded; is that correct?

21           THE COURT:  I believe as I went through the

22   transcript, I did not sustain a single objection by

23   either side to testimony.  I think the only thing I

24   sustained was two exhibits for lack of identification.

25           MR. SPRINGER:  Your Honor, it was three.  I'm

1  sorry.  It was three.

2         THE COURT:  Three.  So you can just put it on

3  and let it run.

4         MR. O'REILLY:  That was our intention, Your

5  Honor.  Thank you.

6     (A RECESS WAS HAD, AFTER WHICH THE FOLLOWING

7  PROCEEDINGS WERE HAD IN OPEN COURT AND WITHIN THE

8  PRESENCE AND HEARING OF THE JURY.)

9         THE COURT:  Before we resume and before I forget

10  it, members of the jury, I went down over the break and

11  looked at the room that is available for you to use or

12  will be made available for you to use during your breaks

13  and I think you will find it a little more accommodating

14  than the deliberation room, so it will be available

15  today.  It's got a refrigerator and a sink and a

16  microwave, big table, and we're going to move the coffee

17  maker down there.  So I think you will find that a little

18  more accommodating.

19     Mr. Springer, you may continue.

20         MR. SPRINGER:  Thank you, Your Honor.  Would you

21  publish, please, Number 25, Government's Exhibit Number

22  25.

23  Q.  (BY MR. SPRINGER)  Do you have any personal

24  knowledge, other than what you testified here today,

25  regarding Government's Exhibit Number 25?

1   A.   About the reason behind Exhibit Number 25?

2   Q.   Any personal knowledge.

3   A.   No, I do not.

4        MR. SPRINGER:  Could you please publish

5   Government's Exhibit Number 26, please.

6   Q.   (BY MR. SPRINGER)  Would your testimony be the same

7   with regard to Government's Exhibit Number 26?

8   A.   Yes, it would.

9        MR. SPRINGER:  Could you please publish

10  Government's Exhibit Number 33.

11  Q.   (BY MR. SPRINGER)  Is your testimony the same with

12  regard to Government's Exhibit Number 33?

13  A.   Yes.

14       MR. SPRINGER:  Could you please publish

15  Government's Exhibit 34, please.

16  Q.   (BY MR. SPRINGER)  And, again, on Number 34, other

17  than what you've testified, you have no personal

18  knowledge of Government's Exhibit Number 34?

19  A.   That's correct.

20       MR. SPRINGER:  Could you please publish Exhibit

21  Number 35 of the government's exhibits.

22       MR. O'REILLY:  Your Honor, for purpose of this,

23  the government will stipulate Mr. Sivils has no personal

24  knowledge other than what he was told by Mr. Springer on

25  any of this evidence.

```
 1              THE COURT:  Does that solve it?

 2              MR. SPRINGER:  That'd solve it.

 3              THE COURT:  Very well.  Proceed.

 4              MR. SPRINGER:  Could you please publish

 5   Government's Exhibit Number 32.

 6   Q.  (BY MR. SPRINGER)  Do you know whether Government's

 7   Exhibit Number 32 is from the same checking account as --

 8   if you would please publish Government's Exhibit Number

 9   40.  If you know.

10   A.  I don't know.  They have the same bank, but I don't

11   know if they're the same account.

12   Q.  And Exhibit Number 40 does say on it "donation,"

13   does it not, on the bottom memo line?

14   A.  That's correct

15   Q.  Do you know who wrote that?

16   A.  I do not.

17   Q.  Now, you testified --

18              MR. SPRINGER:  Could you please pull up Exhibit

19   Number 38, please, of the government's exhibits.

20   Q.  (BY MR. SPRINGER)  You testified about Government's

21   Exhibit Number 38.  Do you remember that?

22   A.  Yes.  There it is.  I do remember that,

23   Mr. Springer.

24   Q.  And you said that that was from money given to me by

25   way of Ms. Hodsden.  Do you remember that testimony?
```

DANIEL SIVILS - CROSS BY MR. SPRINGER                    588

```
1            MR. O'REILLY:  Your Honor, objection.

2  Clarification.  Mr. Sivils testified to what he was told

3  by Mr. Springer, not under any personal knowledge.

4            THE COURT:  That's an important point.  That

5  will be sustained.

6  Q.  (BY MR. SPRINGER)  Do you have any knowledge that

7  what I told you with regard to Exhibit Number 38 was true

8  or not?

9  A.   No.  I have no personal knowledge whether it was

10  true.  I just know what you told us during that meeting.

11  Q.  And that it was my testimony that the --

12  Government's Exhibit Number 38 for $45,000 came from an

13  LLC named Mayberry 2000?

14  A.   That's correct.

15            MR. SPRINGER:  Could you please pull up

16  Government's Exhibit Number 222, please.

17  Q.  (BY MR. SPRINGER)  Now, it is your testimony that I

18  answered questions regarding Exhibit Number 222; is that

19  true?

20  A.   That's true.

21  Q.  And the Government's Exhibit 222 is actually not

22  signed except by one person; is that true?

23  A.   That's correct.

24  Q.   Okay.  And at no time did I dispute that I had

25  entered into that agreement; is that true?  Even though
```

```
 1  my signature is not on that.

 2  A.   Can I reference the one in the book?

 3         MR. SPRINGER:  I'm sorry.  Government's Exhibit

 4  Number 222.  I'm sorry.  I misspoke.

 5         THE WITNESS:  That's just a letter,

 6  Mr. Springer.

 7         MR. SPRINGER:  May I have just one second, Your

 8  Honor?

 9  Q.   (BY MR. SPRINGER)  It is true, though, as you

10  testified earlier, that there was a discussion between

11  myself and Mr. Shern and you and Mr. Bradford and

12  Mr. O'Reilly that I was asked if I could find my copy of

13  that loan agreement that I would -- I was asked to

14  produce it; isn't that true?  Do you remember that?

15  A.   That's true.

16  Q.   Thank you.  But I never disputed at that meeting

17  that I had actually signed my name on that agreement; was

18  that true?

19  A.   Which exhibit are you referring to?

20  Q.   Excuse me.  To the loan agreement.

21  A.   That's correct.

22  Q.   I'm sorry.  Now, you had mentioned about --

23         MR. SPRINGER:  If you could please pull up

24  Exhibit Number 229, please.

25  Q.   (BY MR. SPRINGER)  You had spoke about an IRS Form
```

1   2848.  Do you remember that?

2   A.   Yes, sir.

3   Q.   And your testimony was that I stated the reason for

4   that was so that I could attend a meeting with Special

5   Agent Ellory; is that correct?

6   A.   That's correct.

7   Q.   And the reason why I had to have the 2848, isn't it

8   true, I said, because he wouldn't speak with me or allow

9   me into the room with him?

10  A.   That's correct.  That's what you told us during our

11  interview.

12  Q.   Now, during our conversation, do you remember having

13  a discussion or that we had a discussion about me meeting

14  with other IRS people in Detroit?

15  A.   I don't recall you specifically addressing any other

16  IRS people that you met with in Detroit.

17  Q.   You don't recall me expressing the opportunity to

18  get to meet with the national office and explain to them

19  what I'm trying to do with 3,000 different people who are

20  all infected?

21  A.   I don't recall that but it may have taken place.

22  Q.   Do you remember the discussion we had about how I

23  met Mr. Turner?

24  A.   I don't remember exactly that discussion.

25  Q.   Fair enough.  Mr. O'Reilly asked you questions

1   involving Government's Exhibit Number 490, please.  A

2   deposit that I had placed on a Kingsley Coach.  I think

3   you had difficulty -- originally maybe it was my writing,

4   I don't know.

5   A.   Yes, sir.

6   Q.   It's kind of scribble-ish.  Mr. O'Reilly said or

7   asked you a question regarding that I never really

8   actually ended up buying a Kingsley Coach; is that true?

9   A.   Not that I'm aware of.

10  Q.   Okay.  And the date on Exhibit Number 490 is July

11  25, 2005; is that true?

12  A.   That's correct.

13  Q.   Okay.  You also testified that when we met I had

14  discussion with the government, with you and Mr. O'Reilly

15  and Mr. Shern and Mr. Bradford, that when debit cards

16  became available that I acquired one.  Do you remember

17  that?

18  A.   Yes, that was discussed.

19  Q.   And the significance of that was it was a -- my

20  discussion with you was that it was a prepaid debit

21  card.  I think you used the phrase "prepaid."

22  A.   Yes, sir.

23  Q.   And I believe the conversation that we had, I stated

24  that it was because I did not need to have credit to get

25  that type of card; isn't that true?

1  A.   I don't recall exactly your reasoning behind the

2  card, but that's -- I do remember you mentioning that you

3  had a prepaid card that wasn't attached to a bank

4  account.

5  Q.   And do you know at any time after I received a

6  prepaid debit card, do you have any evidence or are you

7  aware of any evidence that I ever used Mr. Stilley's

8  credit card again?

9        MR. O'REILLY:  Objection, Your Honor, beyond the

10  scope of direct.

11        THE COURT:  Sustained.

12  Q.   (BY MR. SPRINGER)  Had you stated with regard to

13  Mrs. Ouwenga that I had identified the name of a Jerold

14  Barringer?

15  A.   I believe that's correct.

16  Q.   Do you remember that?

17  A.   Yes.

18  Q.   And that I had stated that with the Ouwenga -- with

19  the Ouwengas that Mr. Barringer was brought on board to

20  represent Mrs. Ouwenga?

21  A.   That's correct.

22  Q.   And that Mr. Ouwenga had a standby or a public

23  defender; is that right?

24  A.   That's what you told us.

25  Q.   Okay.  And is it also -- it's true also that I

1  stated that the money that I was being asked at that

2  meeting on January 15, 2009, that came from -- that if it

3  would be asked if it came from the Ouwengas, I actually

4  responded, I believe it came from a trust account that

5  the children had.  Isn't that what I said?

6  A.   I don't remember if you actually talked about the

7  children's trust account.  You just made reference that

8  the daughter, Erica, gave you that first check.

9  Q.   And I also stated that at the time that that check

10 was given to me that Mr. Ouwenga was actually

11 incarcerated; isn't that true?

12 A.   That's true.

13 Q.   Right.  And that somehow his name got on those

14 checks, didn't I tell you that?

15 A.   I don't know if you told us that, but you

16 acknowledged that Mr. Ouwenga's name was on the checks.

17 Q.   Right.  And that -- but I dealt with the children

18 and not with Mr. Ouwenga with regard to those checks.

19 Isn't that what I said?

20 A.   I believe that's correct.

21 Q.   Okay.  Do you have any evidence otherwise that you

22 know of?

23         MR. O'REILLY:  Your Honor, objection.

24         THE COURT:  Sustained.

25 Q.   (BY MR. SPRINGER)  As you sit here today, do you

DANIEL SIVILS - CROSS BY MR. STILLEY                594

```
 1  have any facts and information that either Oscar Stilley
 2  or myself joined in a conspiracy to impede any function
 3  of the IRS?
 4         MR. O'REILLY:  Your Honor, objection.
 5         THE COURT:  Sustained.
 6         MR. SPRINGER:  Pass the witness, Your Honor.
 7         THE COURT:  Mr. Stilley.
 8                  CROSS-EXAMINATION
 9  BY MR. STILLEY:
10  Q.  Now, you recognize that Count 1 is the conspiracy
11  count in this case, correct?
12  A.  That's correct.
13  Q.  And part of the reason that Oscar Stilley is charged
14  in this count is because he expressed his belief to the
15  grand jury that these -- the monies that were conveyed to
16  Mr. Springer were donations, correct?
17         MR. O'REILLY:  Objection, Your Honor.  Beyond
18  the scope of direct.
19         THE COURT:  Counsel will approach and the
20  parties.
21      (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND
22  OUT OF THE HEARING OF THE JURY.)
23         THE COURT:  Okay.  One thing both defendants
24  need to understand is that just because the government
25  put on a witness to testify to statements and admissions
```

```
 1   made by Mr. Springer and identify documents that were

 2   identified by Mr. Springer does not turn him in to just a

 3   one-size-fits-all whipping boy for any point you want to

 4   make for your side of the case.  We're not going to go

 5   there.  I mean, you could call any IRS agent that has

 6   touched this case topside or bottom and make him your

 7   whipping boy to cover anything you want to about what he

 8   doesn't know.  There's a whole raft of things that they

 9   don't know and we're just not going to go there.  And as

10   far as the specific objection is concerned, that

11   objection is sustained.  We've got to move on to another

12   subject, Mr. Stilley.

13            MR. STILLEY:  Sure.

14       (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

15   WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

16   PRESENCE AND HEARING OF THE JURY.)

17   Q.  (BY MR. STILLEY)  You don't have any personal

18   knowledge that Oscar Stilley committed any crime at all,

19   do you?

20   A.  I don't have personal knowledge of that myself,

21   that's correct.

22            MR. STILLEY:  Pass the witness.

23            THE COURT:  Any redirect?

24            MR. O'REILLY:  Briefly, Your Honor.

25                 REDIRECT EXAMINATION
```

DANIEL SIVILS - REDIRECT BY MR. O'REILLY                    596

```
 1   BY MR. O'REILLY:
 2   Q.   Mr. Sivils, Mr. Springer asked you about some of the
 3   expenses and the statements he had made with respect to
 4   those, correct?
 5   A.   Yes, he did.
 6   Q.   Did you personally verify or characterize any of
 7   those or were you simply, when you were testifying,
 8   relying on what you were told by Mr. Springer?
 9   A.   That's correct.  I was relying on what Mr. Springer
10   did to categorize those expenses.
11   Q.   Mr. Springer asked you questions with respect to
12   some of the checks that were made payable that he
13   admitted receiving?
14   A.   Yes.
15   Q.   During that entire interview, other than saying that
16   he didn't receive income, did Mr. Springer indicate any
17   other reason he had not filed tax returns?
18   A.   No, he did not.
19            MR. O'REILLY:  Nothing further, Your Honor.
20            THE COURT:  Any recross, limited to the scope of
21   redirect?
22            MR. SPRINGER:  None at this time, but I would
23   reserve this witness.
24            THE COURT:  Any recross from Mr. Stilley?
25            MR. STILLEY:  No, Your Honor.
```

ROBERT PUGH - DIRECT BY MR. O'REILLY                    597

1          THE COURT:  Very well.  You may step down

2   subject to recall.  We'll have the government's next

3   witness.

4          MR. O'REILLY:  The United States calls

5   Mr. Robert Pugh.

6                    ROBERT PUGH,

7   (WITNESS SWORN)

8                DIRECT EXAMINATION

9   BY MR. O'REILLY:

10  Q.   Would you please explain to the jury where you work

11  and what you do for a living.

12  A.   I'm an auditor with the compliance branch of the

13  Department of Finance Administration for the state of

14  Arkansas.

15  Q.   Could you please explain in that position what is it

16  that you do?

17  A.   We audit and review individual tax returns.

18  Q.   With respect to -- prior to your coming in to

19  testify today, were you asked to perform any type of

20  record search?

21  A.   We were supplied the social security number for an

22  individual, and we were asked to see if they had filed

23  tax returns for 2000 to the present.

24  Q.   Who was the individual for whom you were asked to do

25  that search?

1   A.   Oscar Stilley.

2   Q.   Did you, in fact, perform that search?

3   A.   Yes, sir.

4   Q.   Just briefly, could you explain to the jury how you

5   performed that search?

6   A.   It includes typing in the social security into our

7   computer system to see if any accounts come up.  And when

8   that search was done we did not see any accounts.

9   Q.   Okay.  How were the records maintained by the state

10  of Arkansas with respect to the income tax returns?  And

11  I'm speaking now, I understand, of individual income tax

12  returns.

13  A.   Yes, sir.

14  Q.   How were those records maintained?

15  A.   On a database, computer database.

16  Q.   Did you type in the social security number that was

17  given to you?

18  A.   Yes, sir.

19  Q.   Did any information for the years 2000 to the

20  present come up?

21  A.   Yes.  His spouse filed separately from him, which is

22  status filed.  There is none of his -- the only

23  information on her returns for him was his social

24  security number and his name.

25  Q.   Did the records indicate what her status was with

ROBERT PUGH - DIRECT BY MR. O'REILLY                          599

```
 1  respect to that filing?
 2  A.   Married filing separately.
 3  Q.   And was that for each of the years you looked at
 4  that and that would have been the year 2000 through 2008?
 5  A.   Well, the years that popped up were for, I believe,
 6  2006 through 2008.
 7  Q.   Okay.  So the earlier years didn't come up at all?
 8  A.   I believe the 1998 return also came up as married
 9  filing separately on different returns.
10  Q.   With the exception of -- and I think you indicated
11  the records showed that it was Mrs. Stilley?
12  A.   Yes.
13  Q.   With the exception of Mrs. Stilley's tax returns
14  that were filed married filing separately, was there any
15  record in the state of Arkansas, tax records, indicating
16  whether Mr. Stilley had filed a tax return for the state
17  of Arkansas?
18            THE COURT:  For what period?
19            MR. O'REILLY:  For the periods 2000 to the
20  present.
21            THE WITNESS:  No, sir.
22  Q.   (BY MR. O'REILLY)  When you say no, sir, what --
23  A.   There were no returns for Mr. Stilley.
24            MR. O'REILLY:  Nothing further, Your Honor.
25            THE COURT:  Cross-examination.
```

```
 1              MR. SPRINGER:  None from Lindsey Springer, Your

 2    Honor.

 3              THE COURT:  Mr. Stilley.

 4              MR. STILLEY:  No questions.

 5              THE COURT:  You may step down.  We'll have the

 6    government's next witness.

 7              MR. SNOKE:  Your Honor, we called Shantel

 8    Etienne.

 9              THE COURT:  Spell that, please.

10              MR. SNOKE:  I have it E-T-I-E-N-N-E, I believe

11    that's correct.

12                        SHANTEL EITENNE,

13    (WITNESS SWORN)

14                       DIRECT EXAMINATION

15    BY MR. SNOKE:

16    Q.  Would you state your name and spell your first and

17    last name, I think, in this case.

18    A.  Shantel Etienne.  S-H-A-N-T-E-L, last name,

19    E-T-I-E-N-N-E.

20    Q.  Thank you, ma'am.  What is your business or

21    occupation?

22    A.  Banker.  Bank of America banking center manager.

23    Q.  And where are you employed?

24    A.  Bank of America.

25    Q.  No, I mean what location of the bank?
```

1    A.   Downtown Tulsa.

2    Q.   So you're right here as opposed to --

3    A.   I am.

4    Q.   -- the rest of the bank.  All right.  I am going to

5    look at a couple of exhibits here, Government's Exhibit

6    288 and 289.

7              MR. SNOKE:  Excuse me, Your Honor.

8              MR. O'REILLY:  Your Honor, may I assist

9    Mr. Snoke?

10             THE COURT:  You may.

11   Q.   (BY MR. SNOKE)  Ask you to look at those, if you

12   will, please.  And have you seen both those exhibits

13   before?

14   A.   Yes, I have.

15   Q.   Okay.  And, actually, on more than one occasion; is

16   that correct?

17   A.   Yes, that's correct.

18   Q.   Okay.  And you had occasion to go through all those?

19   A.   Absolutely.

20   Q.   At my request?

21   A.   Yes.

22   Q.   Okay.  Now, can you tell me, first, with respect to

23   Exhibit 288, what that is?

24   A.   The top page is what we call a signature card or

25   signature sheet, which is pretty much used when we're

1  establishing an account relationship with a customer or

2  doing a name change.

3  Q.  All right.  And that's just the first page of that

4  or the first couple pages?

5  A.  Yes.

6  Q.  Just generally, can you tell us, is that some sort

7  of an account with Bank of  America?

8  A.  Yes, it is.

9  Q.  And for who is that account?

10  A.  It's in the name of a Jeanie Lee Rush.  The name was

11  changed on the 1st of June, 2004, to Jeanie L. Springer.

12  Q.  All right.  And the rest of the records in there are

13  -- do they pertain to that account?

14  A.  Yes, they do.

15  Q.  And what time period do they cover?

16  A.  These actually begin July of 2003, July 14, 2003.

17  Q.  Are the records there -- in there that go through

18  some months in the 2005 time period?

19  A.  Yes.  Actually 2006.

20  Q.  All right.  And are these records -- these are

21  records of Bank of  America?

22  A.  Yes, sir

23  Q.  Kept in the ordinary course of business of Bank of

24  America?

25  A.  That's correct.

1  Q.  And were these records generated by an employee who

2  had knowledge at the time that these records were

3  prepared?

4  A.  Yes.

5        MR. SNOKE:  We'd move into evidence 288 at this

6  time.

7        MR. SPRINGER:  Your Honor, I would have an

8  objection as to relevance.

9        THE COURT:  Pardon me?

10       MR. SPRINGER:  Relevance.

11       THE COURT:  Counsel will approach.  And the

12  parties.

13     (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND

14  OUT OF THE HEARING OF THE JURY.)

15       THE COURT:  What's the relevance of 288?

16       MR. SNOKE:  Your Honor, the relevance is that

17  there were payments and deposits made into this account

18  and at the time the defendant's wife did not work and the

19  government's position is that these were expenditures

20  going towards money that he used for personal -- on

21  expenditures basis for tax purposes that were

22  calculations.

23       MR. O'REILLY:  Cash deposits.  Don't the records

24  reflect cash deposits?

25       MR. SNOKE:  Yeah, cash deposits and money

SHANTEL EITENNE - DIRECT BY MR. SNOKE                    604

```
1   orders.
2          MR. O'REILLY:  Kenny Delozier previously
3   testified that some of the money orders purchased by
4   Mr. Springer were deposited in this account, they ended
5   up being deposits into this account.
6          THE COURT:  Yesterday he did identify 288, in
7   part, as being some of his money orders, but anyway -- so
8   your theory is basically it's part of your tracing then?
9          MR. SNOKE:  Yes, Your Honor.
10         MR. SPRINGER:  Your Honor, if it's part of a
11  theory of tracing they said that this was a specific item
12  case when we were in pretrial exchanges.  And I don't
13  believe the tracing has anything to do with that.  The
14  money that they just said part of Delozier's 288 was that
15  that money came from somebody else, so it's not relevant
16  whether it came to me and then just deposited into an
17  account that my wife had before we were married and now
18  she changed her name.  And I believe they were actually
19  trying to bring this in to prejudice me by suggesting to
20  the jury that she went and opened and account in her last
21  name which is mine and trying to suggest that my name
22  wasn't on that account and therefore I was trying to
23  somehow hide that money.  And even if they say right here
24  now that's not the point, it is a point and it's more
25  prejudicial than anything.  It's just not income.  They
```

1    have never even -- this is why they should have alleged

2    the amount in the indictment.

3             THE COURT:  The objection will be overruled.  I

4    do find that relevance has been established balancing the

5    probative value versus the potential prejudicial effect.

6    I find that the probative value substantially outweighs

7    the prejudicial effect of the Exhibit 288.  And 288 is

8    received.

9             MR. SPRINGER:  Thank you.

10        (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

11   WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

12   PRESENCE AND HEARING OF THE JURY.)

13            MR. SNOKE:  Thank you.

14   Q.  (BY MR. SNOKE)  Would you look at 289, ma'am.  Tell

15   me what that is.

16   A.   These are credit card statements.

17   Q.   And are they records of Bank of America?

18   A.   Yes, that's correct.

19   Q.   And for what account are those records?

20   A.   For a Jeanie L. Springer, account referenced is

21   ending in 5307.

22   Q.   All right.  And for what period of time did those

23   records cover?

24   A.   The first one here, December 2004 through April

25   2007.

1   Q.   Can you tell us with respect to these records if

2   these are kept in the ordinary course of business at Bank

3   of America?

4   A.   Yes, that's correct.

5   Q.   And the Bank of America keeps these records as part

6   of its business in the credit card area?

7   A.   Yes.

8   Q.   And were these records kept by someone who had

9   knowledge at the time the records were kept -- were

10  produced?

11  A.   Yes.

12         MR. SNOKE:   We will move into evidence

13  Government's Exhibit 289.

14         MR. SPRINGER:   Objection as to relevance.

15         THE COURT:   Same basis as before?

16         MR. SPRINGER:   Same basis, Your Honor.

17         THE COURT:   289 is received.

18         MR. SNOKE:   I have no other questions.

19         THE COURT:   Cross-examination.

20                 CROSS-EXAMINATION

21  BY MR. SPRINGER:

22  Q.   Good morning.

23  A.   Good morning.

24  Q.   My name is Lindsey Springer.  Could you please put

25  up Government's Exhibit Number 288, please.  You

1  testified just a moment ago that the account that this

2  signature card represents is an account that originally

3  was in the name of Jeanie Rush; is that correct?

4  A.   Yes.

5  Q.   Okay.  And then in June of 2004, Jeanie Rush came

6  in, keeping the same bank account, but just changed the

7  name on the account?

8  A.   Right.

9  Q.   Okay.  And do you know whether this account remains

10  active or open at this time?

11  A.   No, I don't know that.

12  Q.   Okay.  And prior to Exhibit Number 288 being filled

13  out by Jeanie Rush -- or by Jeanie Springer, it was

14  Jeanie Rush, that was your testimony, correct?

15  A.   That's correct.

16  Q.   And at that time, before she signed Document Number

17  288, the name "Springer" did not appear anywhere on that

18  account; is that correct?

19  A.   No, it doesn't appear so.

20          MR. SPRINGER:  No more questions, Your Honor.

21          THE COURT:  Mr. Stilley.

22          MR. STILLEY:  No questions.

23          THE COURT:  Any redirect?

24          MR. SNOKE:  No, Your Honor.

25          THE COURT:  Very well.  You may step down.

SHANTEL EITENNE - CROSS BY MR. SPRINGER                608

1  Thank you.  We'll have government's next witness.

2          MR. O'REILLY:  Your Honor, the government's next

3  witness is the deposed witness.

4          THE COURT:  Vikki Wiggins?

5          MR. O'REILLY:  Yes, Your Honor.  I don't know if

6  Your Honor wants to explain to the jury why it's in this

7  fashion.

8          THE COURT:  I will in just a moment.  I need

9  standby counsel to approach, please.

10     (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND

11  OUT OF THE HEARING OF THE JURY.)

12          THE COURT:  It's too early for me to recess.

13  We're going to have to get into this CD of Wiggins, but

14  do you all still want to go to the --

15          MR. BURTON:  If we could, Your Honor, yes.

16          THE COURT:  I'm going to push it till quarter

17  till 12 and then we'll recess promptly at quarter till

18  12.

19          MR. BURTON:  We've conferred with our

20  individuals and they have indicated that during the

21  presentation of this deposition trial testimony to the

22  jury that it's okay if we're not here.

23          THE COURT:  That's a good point.  Good point.

24  Bear with me just a moment.  Stay right here.

25          (IN OPEN COURT)

```
 1              THE COURT:  The defendants and government

 2    counsel will please approach.

 3       (THE DEFENDANTS AND GOVERNMENT COUNSEL APPROACH THE

 4    BENCH. THE FOLLOWING TOOK PLACE AT THE BENCH, OUTSIDE THE

 5    HEARING OF THE JURY.)

 6              THE COURT:  Okay.  The government is getting

 7    ready to play Vikki Wiggins's CD.  Obviously it's in the

 8    can, everybody knows what's there.  Do the defendants

 9    have any objection to their standby counsel departing at

10    their convenience for the -- a special luncheon with

11    other judges?

12              MR. SPRINGER:  No objection, Your Honor.

13              MR. STILLEY:  No objection.

14              THE COURT:  Very well.  Gentlemen, you can just

15    get up and leave at your convenience and I'll explain

16    why.

17              MR. BURTON:  Thank you, Your Honor.

18       (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

19    WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

20    PRESENCE AND HEARING OF THE JURY.)

21              THE COURT:  Okay.  Members of the jury, two

22    things that perhaps should be covered at this time.

23    First of all, you're about to view the recorded testimony

24    of a government witness by the name of Vikki Wiggins.

25    This was made -- this was taken a week or ten days ago, I
```

1  think the -- you will hear the date, earlier this month,

2  this testimony was taken out in California with

3  government counsel, I think Mr. Snoke was there and the

4  defendants were there and their standby counsel were

5  there.

6      Ms. Wiggins apparently had some physical problems

7  that would have made it hazardous to her health for her

8  to travel to Tulsa to give testimony, so her testimony

9  was taken in California earlier this month.  And it was

10 taken under oath and you will obviously see her testimony

11 and be able to evaluate her testimony pretty much as if

12 she were a live witness.  Obviously, there are some

13 differences, but you will be able to see and hear what

14 she has to say.

15     Secondly, because all concerned know what this

16 testimony consists of and because the standby counsel do

17 have a very good reason to participate in a luncheon

18 downtown with other federal -- with some federal judges

19 and other lawyers, I have authorized standby counsel to

20 depart at their convenience, so don't be surprised when

21 they get up and leave.

22     With that, you may proceed with the -- to present

23 the deposition testimony of Vikki Wiggins.

24          MR. O'REILLY:  Yes, Your Honor.

25     (VIDEO DEPOSITION OF VIKKI WIGGINS PLAYED.)

VIKKI WIGGINS - VIDEO DEPOSITION                          611

```
 1          MR. O'REILLY:  Your Honor, when asked, you had
 2  made rulings with respect to the objections.  The jury is
 3  hearing the objections, if you could advise them for
 4  their clarification.
 5          THE COURT:  Members of the jury, I reviewed the
 6  transcript of the testimony of Ms. Wiggins and both the
 7  defendants and government counsel made objections to
 8  testimony during the deposition.  I have overruled all
 9  those objections, so as that testimony comes in that was
10  objected to, you should listen to it and evaluate it just
11  as you would any other testimony, because I overruled all
12  the objections to testimony.
13      Now, there were some exhibits offered as to which I
14  sustained objections, but, obviously, that's different
15  than the testimony.  I did overrule all the objections to
16  the testimony.  You may continue.
17          MR. O'REILLY:  Thank you, Your Honor.
18      (VIDEO DEPOSITION OF VIKKI WIGGINS CONTINUED
19  PLAYING.)
20          MR. O'REILLY:  Your Honor, I notice the sound
21  quality changed.  I'll ask the court --
22          PROSPECTIVE JUROR:  Better.
23          THE COURT:  It did just change and let me just
24  simply inquire of the members of the jury, do you like it
25  better that way?
```

VIKKI WIGGINS - VIDEO DEPOSITION                           612

1          (POSITIVE RESPONSE FROM JURY)

2          THE COURT:  Okay.  We'll proceed.

3          MR. O'REILLY:  Thank you, Your Honor.

4     (VIDEO DEPOSITION OF VIKKI WIGGINS CONTINUED

5  PLAYING.)

6          MR. O'REILLY:  Your Honor, I notice it's the

7  lunch hour.  This might be a good point.

8          THE COURT:  Members of the jury, we will

9  interrupt the presentation of this testimony for the --

10  take our midday break.  We'll make it -- did an hour and

11  15 minutes work all right for you yesterday?

12     (JURORS RESPOND IN THE AFFIRMATIVE.)

13          THE COURT:  Okay.  Good.  That's what we'll do

14  again today.  We'll resume at 1:15, guided, as always, by

15  the clock on the wall here in the courtroom.  During this

16  midday break, please remember my usual threefold

17  admonition that I will not repeat at this time.  Is the

18  room downstairs available now?

19          COURT SECURITY OFFICER:  Yes.

20          THE COURT:  You'll get a chance to take a look

21  at that.  So I look forward to seeing you back here in

22  the courtroom at 1:15, so please be available for the

23  security officer just a little before 1:15.  All persons

24  in the courtroom will remain seated while the jury

25  departs.

```
 1        (JURY EXITS THE COURTROOM.)

 2        THE COURT:  The record will show the jury has

 3  left the courtroom.  I need to inquire as to when might

 4  be an appropriate time for the Daubert hearing.  I'm not

 5  inclined -- unless we get well down the line this week,

 6  I'm not inclined to conduct that Daubert hearing this

 7  week.  We'll have to pick a day and, as I say, we'll do

 8  it at 5:30.  My inclination would be to set the Daubert

 9  hearing probably for 5:30 on Tuesday of next week, unless

10  the government thinks that we may, by that time, have

11  gotten to the point that Mr. Miller would need to be

12  called before then.

13        MR. O'REILLY:  Your Honor, Tuesday at 5:30

14  should be fine.  But we are going to be faster than we

15  had anticipated.  If for some reason by Friday we realize

16  we're ahead of schedule, we could move it up 24 hours.

17        THE COURT:  Let's tentatively plan on the

18  Daubert hearing, then, Tuesday next week at 5:30.  If we

19  need to move it up to Monday at 5:30, we can do that.

20     So that everyone understands, we call this a Daubert

21  hearing.  At the pretrial conference we discussed what

22  would be in play at that hearing in part -- and these are

23  certainly interrelated.  In part, it's a Daubert hearing

24  and in part it is a hearing to test the foundation under

25  Rule 1006 and so -- but that goes hand-in-hand with the
```

1  Daubert issue.

2      So we'll plan tentatively for that Daubert hearing

3  to be conducted at 5:30 on Tuesday.  Anything further

4  before we take our midday break?

5          MR. SPRINGER:  Yes, Your Honor.  If that Daubert

6  hearing is to change from Tuesday by -- can we put some

7  burden on the government to give us at least 24 hours

8  notice that they're running faster so that we're not

9  sandbagged at the last minute, within 20 minutes we're

10  doing a Daubert hearing?

11          THE COURT:  Well, I understood Mr. O'Reilly to

12  say that he thinks that by the end of this week, by the

13  end of the day this Friday we will have a good read on

14  that and that's my assumption.

15          MR. SPRINGER:  Thank you.

16          MR. O'REILLY:  There's one other item I would

17  make inquiry.  If it would be permitted by the Court --

18  we should have thought of this earlier, is to make copies

19  of the Government's Exhibits that Ms. Wiggins is making

20  reference to and since unlike with a normal witness we

21  can't have both them looking at it on the screen and

22  listening to the witness, if we could pass out copies of

23  those exhibits for the jury to have during Ms. Wiggins'

24  videotaped testimony.

25          THE COURT:  That's the ones that are in

1  evidence?

2          MR. O'REILLY:  Correct, Your Honor.

3          THE COURT:  Any objection to that?

4          MR. SPRINGER:  Yes, Your Honor.  If I may?  The

5  entire reason why we went out to California to do the

6  video was because Ms. Wiggins couldn't be here.  It

7  was -- understanding the Sixth Amendment, it was my right

8  to cross-examine the witness.  Now the government is

9  taking a video and now they're adding something to it

10  that would be as if she's in the courtroom without giving

11  me the benefit of cross-examination in front of the

12  jury.  The impact of these words on a camera versus being

13  able to hand something to them where they see the

14  person.  And so I think it's prejudice and unfair for the

15  government to actually force us three days before trial

16  to go out to California, do this, and now they're wanting

17  to pull something out and let the jury see it.

18     Now, I agree, if she was here they would be able to

19  see this, but they elected to do this this way and now to

20  make it personal and different just continues to make

21  Ms. Wiggins' testimony stand out.  And it needs to be

22  treated in the same way as all the other evidence.

23          THE COURT:  That objection is overruled.

24  Mr. Stilley, do you care to be heard on this point?

25          MR. STILLEY:  Only to say that based on the

1   Court's ruling just handed down, it seems that it would

2   be an easier way to proceed to simply have the assistant

3   put this information on the screen at appropriate times,

4   that way the jury wouldn't have to deal with papers.

5          THE COURT:  The government will be permitted to

6   duplicate the exhibits and distribute them to the jury at

7   the appropriate time.

8      Court will be in recess.

9      (THE FOLLOWING TOOK PLACE IN THE LIBRARY.)

10         THE COURT:  First of all, on the record.  The

11  hold-up -- it's now 1:30, we were due to resume at 1:15,

12  the hold-up is because of the elderly lady on the jury,

13  I'm told that she has to go home and let her dogs out at

14  noon and that may be the problem with her getting back

15  here on time, but in any event she has also indicated

16  apparently that her car has broken down and that she

17  "won't be able to stay the rest of the afternoon."  I

18  don't really know what that means, but my inquiry now is

19  of counsel and the parties as to whether they -- anyone

20  has any objection to my having a private conversation

21  with that juror in my office on the record, but confined

22  entirely to that subject, her timeliness and her problem,

23  if any, this afternoon.  I think it would be probably

24  preferable for me to have that conversation on the record

25  in my office but with just me and the reporter and this

 1   juror present.  Does the government have any objection to

 2   that?

 3          MR. O'REILLY:  No, Your Honor.

 4          THE COURT:  How about the defendants?

 5          MR. SPRINGER:  My concern is based upon what

 6   would happen in that meeting, would she hold animosity

 7   towards us.  That's the only thing that's going through

 8   my head and I've never been here.  If I could just have a

 9   few minutes to think about what I said.  If I could have

10   one minute anyway just trying to --

11          THE COURT:  Be quick.

12          MR. SNOKE:  This is the lady on the front row

13   closest to you?

14          COURTROOM DEPUTY:  Since I wasn't here for jury

15   selection I'm having to poll the jury to see who they are

16   because I didn't get to do that on jury selection.

17          MR. SPRINGER:  I'm ready, Your Honor.

18          THE COURT:  Go ahead.

19          MR. SPRINGER:  I would have no objection.

20          THE COURT:  Mr. Stilley.

21          MR. STILLEY:  Fine.

22          THE COURT:  First of all, I'll ask the reporter

23   to go to my office and then I'll ask -- well, I think

24   I'll actually do it in here.  I think it might be better

25   to do it in here rather than in my office.  So I'll ask

1    the reporter to remain in place and I'll ask Cindy to --

2    as soon as counsel and the parties return to the

3    courtroom to bring that juror back in here.

4          MR. SPRINGER:  May I inquire one thing, Your

5    Honor?  Did somebody have to come back and pick her up or

6    did --

7          MR. O'REILLY:  Your Honor, there is one

8    unrelated matter we've brought to the defense's

9    attention.  There was a witness on our list of Robert

10   Cavins who is a prisoner.  We are not going to be calling

11   him, decided we don't need that area of testimony.  I

12   have made known to them and the reason I'm, you know

13   advising, both you and counsel is if we don't call him,

14   if they don't need him, he can be sent back to

15   Springfield.  He's in a halfway house.  Presently he is

16   incarcerated at one of the facilities here, just wanted

17   you to be aware of that.  And Mr. Springer said that he

18   would and Mr. Stilley would confer on the side as soon as

19   they could whether or not they need him for their case

20   before we have him sent back to Springfield.

21         THE COURT:  Let me know as soon as you can.

22         MR. SPRINGER:  Thank you.

23         THE COURT:  Very well.  I'll start up with that

24   juror in here just as soon as we get her in here.

25         (THE ATTORNEYS AND PARTIES EXIT THE LIBRARY. THE

1    CLERK ENTERS WITH MS. LOAYZA.)

2              THE COURT:  Have a seat right there.  That will

3    be fine.

4              COURTROOM DEPUTY:  Do you want me to stay?

5              THE COURT:  No.  And I pronounce that Loayza?

6              JUROR LOAYZA:  L-O-A-Y-Z-A.

7              THE COURT:  Okay.  I'm here in my conference

8    room or my library with you with the permission of the

9    lawyers and the defendants so that we can touch on your

10   logistical problem.  Am I to understand that you have had

11   a little problem with your car?

12             JUROR LOAYZA:  Yes.

13             THE COURT:  Please tell me about that.

14             JUROR LOAYZA:  Well, I just went out to it today

15   and it was dead and the reason why is because I left my

16   lights on this morning.  I guess that was the reason.

17             THE COURT:  Okay.  Were you able to get the car

18   started?

19             JUROR LOAYZA:  No, I had to have it turned over

20   by -- well, by an agency that I have, you know, helps me

21   with my car sometimes.  And then he was going to -- he

22   put it out there so -- they're going to come by and help

23   me with it now.

24             THE COURT:  Okay.  Well, of course, it's

25   necessary -- did you get a ride with somebody to the

```
1   court?

2          JUROR LOAYZA:  No -- oh, I'm right next to the

3   court where I parked.

4          THE COURT:  Well, I mean, how did you get to the

5   courthouse this morning?

6          JUROR LOAYZA:  Oh, I walked.  I parked there and

7   then I walked.

8          THE COURT:  How did you get to the court -- to

9   the courthouse from your home this morning?  In that

10  car?

11         JUROR LOAYZA:  Yes.

12         THE COURT:  So you managed to get it started?

13         JUROR LOAYZA:  Yes.

14         THE COURT:  Okay.  And then where is your car

15  now?

16         JUROR LOAYZA:  It's in the garage at West -- I

17  think it's called West Park, it's this little garage

18  that's right next to the post office.

19         THE COURT:  Right here in downtown?

20         JUROR LOAYZA:  Yes.

21         THE COURT:  Okay.  Do you know when that garage

22  closes?

23         JUROR LOAYZA:  Probably 6:30, but I don't know

24  for sure.

25         THE COURT:  Okay.  Well, of course, we will need
```

```
 1  you here all afternoon, but I will arrange for you, if
 2  you feel that it would otherwise be necessary, for you to
 3  be attending to your car problem before five, I will
 4  arrange for court personnel to accompany you to your
 5  car.  Do you think you're going to have a problem getting
 6  your car started tonight?
 7          JUROR LOAYZA:  Oh, yes, I'm going to have to
 8  have help this afternoon getting it into a garage.
 9          THE COURT:  Because of a dead battery?
10          JUROR LOAYZA:  Yeah.
11          THE COURT:  Okay.  But your car did start so you
12  got down here today.
13          JUROR LOAYZA:  I got down here, but that was
14  before I left the lights on.
15          THE COURT:  So you left your lights this
16  morning?
17          JUROR LOAYZA:  Yes.
18          THE COURT:  And the lights were on all morning?
19          JUROR LOAYZA:  Yes.
20          THE COURT:  I will arrange for you to get a jump
21  start when we recess at five.
22          JUROR LOAYZA:  Okay.
23          THE COURT:  So you won't need to worry about
24  getting your car started.  I will arrange for you to get
25  a jump start when we recess at five.
```

1           JUROR LOAYZA:  But that won't get me home

2   probably.

3           THE COURT:  Well, we'll just have to see.  If

4   your battery is totally dead, then you probably still

5   will have a problem.

6           JUROR LOAYZA:  Yeah, I will.

7           THE COURT:  But I will see to it that we get you

8   some help so that you'll be able to remain here all -- be

9   with us all afternoon.

10          JUROR LOAYZA:  Oh.

11          THE COURT:  And I will see to it that you get

12  some help getting a jump start.  And if your battery is

13  totally dead, then I will see to it that you have a way

14  to get home and we will be able to provide any logistical

15  help we can.

16          JUROR LOAYZA:  Okay.  Judge, thank you.

17          THE COURT:  How far away do you live --

18          JUROR LOAYZA:  I live less than 2 miles.

19          THE COURT:  -- away.

20          JUROR LOAYZA:  Uh-huh.  The thing about it is I

21  just thought it would be better for me if I could get my

22  car into a garage this afternoon.

23          THE COURT:  Well, that is simply not possible

24  because we -- we are in a trial in which --

25          JUROR LOAYZA:  Yeah.

1          THE COURT:  In which about 25 or 30 people have

2     to be at the same place at the same time before anything

3     can happen.

4          JUROR LOAYZA:  Right.

5          THE COURT:  So that will not be possible this

6     afternoon, but I will be working on it this afternoon.

7     We will get you the help you need so that you --

8          JUROR LOAYZA:  I appreciate it.

9          THE COURT:  -- you'll be protected.

10         JUROR LOAYZA:  I appreciate it.

11         THE COURT:  And, of course, and this is

12    something that we should all bear in mind in that case it

13    is important for us to be on time.

14         JUROR LOAYZA:  I didn't come over here just with

15    the second thought of leaving, telling you all I had to

16    go and I was going to leave, but I did think that I knew

17    what I had to do, you know.

18         THE COURT:  We'll -- I'll get you some help this

19    afternoon.  Very well.  We'll continue in the courtroom.

20      (THE FOLLOWING TOOK PLACE IN OPEN COURT WITH ALL

21    PARTIES PRESENT AND WITHIN THE PRESENCE AND HEARING OF

22    THE JURY.)

23         THE COURT:  Please be seated.  Members of the

24    jury, it is necessary to take an additional recess at

25    this time.  I would hope that we can resume in 15 minutes

 1  or thereabouts.  But it is necessary for us to take an

 2  additional recess at this time, so I will ask the

 3  security officer to show the jury to the deliberation

 4  room except for one member who does have a matter to be

 5  attended to and as soon as that can be a attended to,

 6  then we will resume.  So rather than recess for a

 7  specific period of time, we'll stand in recess subject to

 8  call.  Court will be in recess.

 9      (RECESS HAD.  THE FOLLOWING TOOK PLACE IN THE

10  LIBRARY, WITH ALL PARTIES PRESENT, OUTSIDE THE PRESENCE

11  AND HEARING OF THE JURY.)

12          THE COURT:  Okay.  We're back on the record in

13  the library outside the presence of the jury with the

14  parties and government counsel and one of our standby

15  counsel present.  The juror -- say her name.

16          COURTROOM DEPUTY:  Loayza.

17          THE COURT:  Loayza.  I thought I had ironed out

18  with her that we were going to get her some help to make

19  sure that her car would start and that I would have that

20  help for her available at five o'clock this afternoon,

21  that may still be necessary, but now she says that

22  because of her car problems she was unable to go home and

23  let her dogs out and she was unable to check on her

24  90-year-old mother.  And I need to have a brief

25  conversation with her under the same circumstances in the

```
 1   same setting to make sure I understand what's going on
 2   and what her needs are.  I'm not inclined to force her to
 3   sit before that need is taken care of if, in fact, that
 4   need exists, because I think she would be -- it would be
 5   very difficult for her to pay attention this afternoon.
 6   And all parties are certainly entitled to the full
 7   attention of the jury.
 8        For that reason, my inquiry at this point is whether
 9   any parties have any objection to my further conversation
10   under the same circumstances and in the same setting with
11   this juror to inquire as to what her immediate need is
12   that may require her to go home for the purpose that she
13   has stated.  I'll say that she apparently lives within
14   two miles of the courthouse so that may -- that may not
15   be as debilitating a situation from a scheduling
16   standpoint as it might otherwise appear.  What says the
17   government?
18             MR. O'REILLY:  Your Honor, the government is
19   fine.  There's a different matter I would like to take up
20   before we stop here.
21             THE COURT:  What say the defendants?
22             MR. SPRINGER:  No objection with me, Your Honor.
23             MR. STILLEY:  No objection at all.
24             THE COURT:  Let me get her on her way, then
25   we'll take up our other matter.  And I'm going to ask
```

1  Cindy to bring the juror back in here on the record, and

2  I will address the -- her next concern.

3         MR. O'REILLY:  Did you want us in here or not in

4  here?

5         THE COURT:  Not in here.

6         MR. BURTON:  Again, thank you for letting us

7  attend that luncheon.  It was very informative and

8  helpful.

9     (THE PARTIES AND COUNSEL LEAVE THE LIBRARY.  JUROR

10  LOAYZA ENTERS THE LIBRARY.)

11         JUROR LOAYZA:  My dog has got to be aired.  It's

12  just an absolute necessity.

13         THE COURT:  Well, did your car get locked all

14  right?

15         JUROR LOAYZA:  Yes, it got locked.

16         THE COURT:  How long -- and I take it you were

17  unable to go home at lunch because of your car problem.

18         JUROR LOAYZA:  Right.  I wasn't able to go home.

19         THE COURT:  Okay.  How long is it -- would it

20  take you to do that?

21         JUROR LOAYZA:  To air my dog?

22         THE COURT:  Yes.

23         JUROR LOAYZA:  I don't know.  I don't have a

24  car.

25         THE COURT:  Well, if we get somebody to take

1  you, how long would it take you?

2       JUROR LOAYZA:  Oh, very short time, very short

3  period of time.

4       THE COURT:  I'm going to permit to you do that,

5  but we really do have to have a very clear understanding,

6  as I said before that this trial requires 25 or 30 people

7  to be at the same place at the same time before anything

8  can proceed.

9       JUROR LOAYZA:  I couldn't think of an excuse to

10 get out.  I tried to get out, you know, I'm -- I tried to

11 get my doctor to get me -- to get me a written excuse

12 because I shouldn't even be doing it.

13      THE COURT:  Well, Ms. Loayza, we're going to

14 solve your problem this afternoon.  But it is imperative

15 and probably some of the other jurors may be willing to

16 help you day to day to get here and so forth.  And it's

17 probably a good thing that you live close to the

18 courthouse, but it really is imperative that everybody be

19 here when required.  I'm going to recess long enough to

20 permit you to go home and take care of your dog, we will

21 find somebody who can take you.  And the clerk of the

22 court, Mr. Lombardi, will take you and so that will not

23 result in any more than minimal delay, I anticipate, and

24 then if you need a jump start, if you need a jump start

25 at five, we will see to it that you get a jump start.  If

 1   your battery is totally dead, then I will also have court

 2   personnel see to it that your needs are taken care of.

 3          JUROR LOAYZA:  Okay.

 4          THE COURT:  Thank you very much.

 5      (THE FOLLOWING TOOK PLACE IN OPEN COURT, WITH ALL

 6   PARTIES PRESENT, OUTSIDE THE PRESENCE AND HEARING OF THE

 7   JURY.)

 8          THE COURT:  Good afternoon again, please be

 9   seated.  The record will show that we're here without the

10   jury.  All parties are present.  And the clerk of the

11   court, Mr. Lombardi, is assisting Ms. Loayza with her

12   logistical problem.  And I think -- I hope I'm not being

13   too optimistic in saying that perhaps with some help this

14   afternoon the problem we have had with this particular

15   juror is only a temporary problem.  I hope that's true

16   and I think that may well be true.

17      In any event, I'm informed that there are some

18   matters that we can profitably address outside of the

19   hearing of the jury rather than having to take up jury

20   time to address these.  And so, with that, I'll invite

21   any announcements that counsel may have.

22          MR. O'REILLY:  Yes, Your Honor.  After speaking

23   with defendants, both Mr. Stilley and Mr. Springer, I

24   believe we've reached an agreement that Government's

25   Exhibit 294, which are TDS Telecom records of

1  Mr. Springer's residential phone, that the witness who

2  would be called, who is Mr. Roger Palk, would be able to

3  testify that they are in fact records maintained in the

4  ordinary course of business, they were made

5  contemporaneously with the information they purport to

6  receive, that they were made with a person with knowledge

7  and that under the business record rules, subject to the

8  -- it's a hearsay exception, they are admissible.  So I

9  believe that's --

10         MR. SPRINGER:  And, Your Honor, that we will

11  still reserve the same reservation of relevance in the

12  event they try to be used as exhibits, but for purposes

13  of authenticity and identity we are in full agreement.

14         THE COURT:  Well, we've got two different

15  things, then.  Mr. O'Reilly proposes a stipulation as to

16  their admissibility and what I hear you saying is that

17  you are not contesting identification and authentication.

18         MR. SPRINGER:  Right.  That's correct.

19         THE COURT:  And those are two entirely different

20  matters.  Now, I can probably -- with identification and

21  authentication waived, then I can probably look at the

22  exhibit and determine its relevance.

23         MR. SPRINGER:  I would be fair with that, Your

24  Honor.

25         THE COURT:  If that is acceptable to the

```
1    government.
2           MR. O'REILLY:  Yes, Your Honor.
3           THE COURT:  Very well.  Then we'll have a clear
4    understanding on the record that identification and
5    authentication are waived and that the business records
6    requirements are met.  And that the Court, then, will be
7    left to determine whether the exhibit is relevant under
8    Rule 402.  Is that correct, Mr. Springer?
9           MR. SPRINGER:  That is correct, Your Honor.
10          THE COURT:  Mr. Stilley, do we have that
11   understanding?
12          MR. STILLEY:  Yes.  Same understanding.
13          THE COURT:  Very well.  I will now, as long as
14   -- let's see, come on in.  Come on in.  As long as we
15   still have the jury in the deliberation room minus one
16   juror, I will take a look at that record and will
17   determine whether it will be admitted.  And that's 294;
18   is that right?
19          MR. O'REILLY:  Yes, Your Honor.
20          THE COURT:  Okay.
21          MR. O'REILLY:  Your Honor, given that --
22   anything that this next witness, Mr. Palk, could testify
23   to has been stipulated to, may I ask that he be
24   released?
25          THE COURT:  He may be excused, yes.  Okay.
```

1    Mr. Springer, I'll hear you on your relevance objection.

2         MR. SPRINGER:  I'm not certain exactly how the

3    government intends to use the documents.  Can I reserve

4    my relevance challenge until they try to rely on them for

5    some type of direct testimony?

6         THE COURT:  Well, I tell you what, let me hear

7    the government on the issue of relevance and then perhaps

8    you'll be in a position to respond or perhaps the issue

9    should be deferred.

10        MR. O'REILLY:  Your Honor, the Government's

11   Exhibit 294 are business records with respect to

12   Mr. Springer's residential telephone reflecting payments

13   received for his personal phone, also reflecting all the

14   calls, telephone calls, not all of them, but many of the

15   telephone calls made from that telephone.  And both the

16   telephone calls themselves and the payments showing

17   expenditures which the government would then be able to

18   argue reflects that he had income of some sort because

19   he's spending personal funds to pay for his personal

20   phone bill.

21        THE COURT:  Well, do you -- is there going to be

22   testimony that -- well, let's put it this way:  If there

23   is indeed testimony that repeated calls were made at

24   certain times or during certain periods of time to

25   numbers -- the appropriate telephone number for given

1  individuals that the government asserts Mr. Springer was

2  providing services to, then it is certainly conceivable

3  that at least minimal relevance is, by that, established

4  in the sense that that would support the inference as

5  asserted by the government, that services were in fact

6  being rendered.  Is that -- is that where you're going on

7  relevance or --

8        MR. O'REILLY:  That is part of it, Your Honor,

9  yes.  Also phone calls reflect -- the records would

10  appear to reflect phone calls between Mr. Springer and

11  Mr. Stilley as well.

12        THE COURT:  Very well.  I'll hear --

13  Mr. Springer, I'll hear you on your relevance objection.

14  You may wish to argue it now or if you want to reserve it

15  I'll permit you to reserve it.  But I'll have to say, if

16  these records have any appreciable number of -- show any

17  appreciable number of conversations by you with

18  individuals who paid you money and especially calls

19  between you and Mr. Stilley's number, it may be

20  problematic to successfully assert a relevance objection,

21  but I'll hear you now or later, whichever you prefer.

22        MR. SPRINGER:  May I clarify my objection and

23  then go to the answer to your question?

24        THE COURT:  Surely.

25        MR. SPRINGER:  Based upon what Mr. O'Reilly

1   said, my objection is not to whether or not the records

2   show who I called.  My objection was to the generality of

3   the introduction of the documents to show I had a phone

4   and I called people and I paid the bill.  Those don't

5   show crimes, those don't go to elements of crime

6   whatsoever, but if their use is to try to tie in me

7   communicating to people like Mr. Stilley or in some type

8   of foundation like that, if they lay that foundation,

9   then I will not have an objection.  But at this time I

10   would like to defer that until they so try to do that

11   because at this time they haven't laid any foundation for

12   that.

13          THE COURT:  Well, what more foundation would be

14   necessary than to have some evidence of what

15   Mr. Stilley's phone number is?

16          MR. SPRINGER:  Tying in the timing of the phone

17   call to their theory of their specific item theory that

18   they're prosecuting us on, on the aiding and abetting

19   side or in the conspiracy side, just generally calling

20   Mr. Stilley, I mean, if that's where they're going to go,

21   you know, I'll deal with that when --

22          THE COURT:  Well, the government asserts that

23   you had an agreement with Mr. Stilley beginning in 2000

24   and ending January 15, 2009.  It seems to the Court, and

25   I'll permit you to certainly respond to this, but it

 1  seems to the Court that if the government asserts and the
 2  defendants deny that there was an agreement between the
 3  two defendants during that period, then one circumstance,
 4  inconclusive though it may be, that the government is
 5  entitled to prove is the degree of communication between
 6  individuals to whom these phone numbers are listed.
 7          MR. SPRINGER:  We definitely are denying that
 8  there was an agreement, that's beyond question.  And if I
 9  could just defer my objection until such time as the
10  issue arises.  And I will sit on my hands, I will not
11  object, unless I see the very thing that caused me to
12  rise in the first place.
13          THE COURT:  Well, I'll wait until -- we're past
14  -- we are past the technical prerequisites to
15  admissibility, I'll wait until it's offered, but at such
16  time 294 is offered it may well summarily be received.
17          MR. SPRINGER:  Thank you, Your Honor.
18          THE COURT:  Anything else we can or should
19  address while we're waiting for the jury problem to be
20  resolved?
21          MR. O'REILLY:  Your Honor, the only concern I
22  have is I want to make sure I don't forget.  I was
23  intending to offer Government's Exhibit 294 through the
24  witness we were calling, having laid the foundational
25  grounds and maintaining the minimal standard for

```
1   relevance.  And I understand he wants to reserve that.
2   We would offer it at this time.
3              THE COURT:  Does either side have anything more
4   on the issue of the admissibility of Government's Exhibit
5   294?
6              MR. SPRINGER:  Just reserving the right to make
7   any objection at a time when it becomes appropriate.
8              THE COURT:  This is that time.
9              MR. SPRINGER:  This is that time?
10             THE COURT:  Yes.
11             MR. SPRINGER:  You know what?  No, Your Honor.
12  I don't have any objection.
13             THE COURT:  Mr. Stilley.
14             MR. STILLEY:  Same as Mr. Springer.
15             THE COURT:  Exhibit 294 is received.  Anything
16  more that we ought to address while we're waiting on the
17  jury?
18             MR. O'REILLY:  No, Your Honor.
19             THE COURT:  Very well.  Court will be in recess
20  subject to call.
21      (COURT IN RECESS.)
22      (THE FOLLOWING TOOK PLACE IN OPEN COURT, WITH ALL
23  PARTIES PRESENT AND WITHIN THE HEARING AND PRESENCE OF
24  THE JURY.)
25             THE COURT:  We will continue with the viewing of
```

1    the testimony of Ms. Wiggins.

2         MR. O'REILLY:  Your Honor, prior to that, may I

3    have permission to approach the jurors and pass out the

4    exhibits we discussed?

5         THE COURT:  On the basis that we previously

6    discussed, you surely may.  Yes.

7         MR. O'REILLY:  Thank you, Your Honor.

8      (MR. O'REILLY PASSED OUT EXHIBITS THAT GO TO THE

9    VIDEO DEPOSITION OF MS. WIGGINS.)

10        MR. O'REILLY:  Your Honor, may I briefly

11   describe or would the Court care to describe what's just

12   been handed to them?

13        THE COURT:  Pardon me?

14        MR. O'REILLY:  May I briefly describe to the

15   jurors what's just been handed to them or would the Court

16   prefer to do that?

17        THE COURT:  Just identify the exhibits.  I don't

18   want any -- don't go any further than just identify the

19   exhibits.

20        MR. O'REILLY:  Yes, Your Honor.  What has been

21   provided to the jury are simply the exhibits,

22   government's and the defendants', that are referenced in

23   this video deposition and are admitted into evidence.

24        THE COURT:  Very well.

25      (VIDEO DEPOSITION OF VIKKI WIGGINS CONTINUED.)

VIKKI WIGGINS - VIDEO DEPOSITION                          637

```
 1        MR. O'REILLY:  Your Honor, I would like to note
 2  now that Ms. Wiggins is on cross-examination.
 3     (VIDEO DEPOSITION OF VIKKI WIGGINS CONTINUED.)
 4        MR. SPRINGER:  Your Honor, there is one exhibit,
 5  Exhibit Number 10, that for some reason, and we don't
 6  know why, did not get in the documents sent back to us
 7  from the trial deposition.  And I believe I have that.  I
 8  did not -- no one caught that and so we'd just like to
 9  let the Court maybe instruct the jury that they're not
10  going to be able to turn to an Exhibit 10 when they see
11  her talking about an Exhibit 10, which is why I stood up.
12        THE COURT:  We'll proceed with that
13  understanding.  And if the document can be made available
14  later it will be.
15        MR. O'REILLY:  Your Honor, just for
16  clarification, other exhibits that are referred to, with
17  the exception of Defendant's 10, are the exhibits that
18  you sustained the objections to.
19        THE COURT:  That was 7, 8 and 9, I believe.
20        MR. O'REILLY:  Yes, Your Honor.
21        THE COURT:  Very well.
22     (VIDEO DEPOSITION OF VIKKI WIGGINS CONTINUED.)
23        MR. O'REILLY:  We have next an hour and 15
24  minutes more.  This might be a good time for a brief
25  break for the jury.
```

1          THE COURT:  Members of the jury, I intend to

2    recess at five, but if you would like to take a short

3    break now, we can.  Would that be your preference?  I

4    don't see any indication -- they want to continue, so we

5    will continue.

6        (VIDEO DEPOSITION OF MS. WIGGINS CONTINUED.)

7          MR. O'REILLY:  Yes, Your Honor.  Excuse me, Your

8    Honor, I know there's some confusion on the jury, if

9    you'll remind them the exhibit is not there, what the

10   Court's ruling was.

11         THE COURT:  The Court did not admit Exhibits 7,

12   8 and 9 in this deposition.

13         MR. O'REILLY:  Thank you, Your Honor.

14       (VIDEO DEPOSITION OF MS. WIGGINS CONTINUED.)

15         THE COURT:  Mr. O'Reilly, this is where we'll

16   recess for the night.  Members of the jury, we'll take

17   our overnight recess at this time.  Overnight, please, by

18   all means, remember my usual admonition and it remains

19   important, even though you're used to it by now, not to

20   discuss the case, not to undertake any independent

21   investigation of any issue, thing or person having

22   anything to do with this case and not to reach any

23   conclusions about the case until it's been given to you

24   for your deliberations and verdict.

25       I sincerely thank you for your day of service to the

 1   Court.  We will resume at nine in the morning, so please

 2   be available for the security officer at about quarter

 3   till nine in the morning.  Thank you again for your day

 4   of service to the Court.  Mr. O'Reilly.

 5            MR. O'REILLY:  I would simply ask the jurors to

 6   leave the exhibits in their chairs, Your Honor.

 7            THE COURT:  That would be appropriate.  You can

 8   leave your exhibits and, of course, your notebooks in the

 9   chairs.

10       All persons in the courtroom will remain seated

11   while the jury departs.

12       (JURY EXITS THE COURTROOM.)

13            THE COURT:  Okay.  The record will show the jury

14   has left the courtroom.  Is there anything -- let's see,

15   we've got, what, about another hour; is that right?

16            MR. O'REILLY:  Approximately, Your Honor.

17            THE COURT:  Okay.  Another hour of the recorded

18   testimony.  Anything further we ought to take up before

19   we recess overnight?

20            MR. O'REILLY:  Not from the government, Your

21   Honor.

22            MR. SPRINGER:  Nothing here, Your Honor.

23            THE COURT:  Very well.  I hope -- and if things

24   smooth out with the one juror, Phil Lombardi will be due

25   some of the credit.  It's a combination of car trouble

1    and problems with her dogs and problems with her mother.

2    And Phil -- and I think, perhaps, all of you know Phil

3    well enough to know that whatever needs to be done, he

4    will do very appropriately, I emphasize, and very

5    attentively.  So I think the situation with the juror is

6    likely to be ironed out and I know I speak for everybody

7    when I say I certainly hope so.

8        Court will be in recess until nine in the morning.

9        (COURT ADJOURNED FOR THE EVENING RECESS.  FOR

10   FURTHER JURY TRIAL PROCEEDINGS, SEE VOLUME IV.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25