1            IN THE UNITED STATES DISTRICT COURT

2           FOR THE NORTHERN DISTRICT OF OKLAHOMA

3

4   UNITED STATES OF AMERICA,

5          Plaintiff,

6   vs.                        Case No. CR-09-43-SPF

7   LINDSEY KENT SPRINGER and
    OSCAR AMOS STILLEY,
8
           Defendants.
9
    -----------------------------
10

11

12

13

14

15         TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16       BEFORE THE HONORABLE STEPHEN P. FRIOT

17          UNITED STATES DISTRICT JUDGE

18              OCTOBER 29, 2009

19             VOLUME IV OF XIV

20

21

22

23

24

25

642

```
 1  APPEARANCES:

 2  FOR THE GOVERNMENT:
                            Mr. Charles Anthony O'Reilly
 3                          U.S. Department of Justice
                            PO Box 972
 4                          Washington, DC 20044

 5                          Mr. Kenneth P. Snoke
                            U.S. Attorney's Office (Tulsa)
 6                          110 W. 7th Street, Ste. 300
                            Tulsa, OK 74119
 7

 8
    FOR DEFENDANT SPRINGER:
 9                          Mr. Lindsey Kent Springer
                            5147 S. Harvard Ave.
10                          Ste. 116
                            Tulsa, OK 74135
11
                            Mr. Robert Scott Williams
12                          Taylor Ryan Schmidt & Van Dalsem
                            1437 S. Boulder Ave., Ste. 850
13                          Tulsa, OK 74119

14  FOR DEFENDANT STILLEY:
                            Mr. Oscar Amos Stilley
15                          7103 Race Track Loop
                            Fort Smith, AR 72901
16
                            Mr. Charles Robert Burton, IV
17                          Burton Law Firm, PC
                            320 S. Boston, Ste. 2400
18                          Tulsa, OK 74103

19

20

21

22

23

24

25
```

```
1                    EXAMINATION INDEX

2   VIKKI WIGGINS - CONT'D VIDEO DEPOSITION      644

3

    EDDY PATTERSON
4        DIRECT BY MR. SNOKE . . . . . . . . .  649
         CROSS BY MR. SPRINGER . . . . . . . .  712
5        CROSS BY MR. STILLEY  . . . . . . . .  783
         REDIRECT BY MR. SNOKE . . . . . . . .  806
6        RECROSS BY MR. SPRINGER . . . . . . .  807

7   JUDITH PATTERSON
         DIRECT BY MR. SNOKE . . . . . . . . .  810
8        CROSS BY MR. SPRINGER . . . . . . . .  818
         CROSS BY MR. STILLEY  . . . . . . . .  821
9
    JAMES LAKE
10       DIRECT BY MR. SNOKE . . . . . . . . .  822
         CROSS BY MR. SPRINGER . . . . . . . .  859
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE COURT:  Thank you.  Please be seated.
2   Welcome back, members of the jury.  Let's see.  We were
3   in the presentation of the video testimony of Vikki
4   Wiggins, as I recall.  Mr. Springer.
5          MR. SPRINGER:  Yes, Your Honor.  I just wanted
6   to point out to the Court that I did discover Exhibit 10,
7   and through the courtroom deputy I have given each juror
8   a stack on their seat, a copy of Exhibit 10.
9          THE COURT:  Very well.  We'll proceed with the
10  completion of the presentation of video testimony.
11     (THE VIDEO DEPOSITION OF VIKKI WIGGINS PLAYED.)
12         THE COURT:  Mr. O'Reilly, I need to interrupt
13  for just a moment.
14         MR. O'REILLY:  Sorry, Your Honor.  Yes.
15         THE COURT:  Did I exclude Defendants' Exhibit
16  Number 9?
17         MR. O'REILLY:  Yes, you did, Your Honor.
18         THE COURT:  Well, that -- I don't want to be
19  doubly in error, but there was no objection to it at the
20  deposition, and she identified it.
21         MR. O'REILLY:  Yes, Your Honor.
22         THE COURT:  And that was an -- excluding it was
23  apparently an oversight on my part.  Now, I'm going to
24  give you an opportunity to be heard on that, but there
25  was no objection to it and she did identify it.  Plus,

1   we've heard most of it.

2           MR. O'REILLY:  There was no objection at the

3   time it was offered, Your Honor, so --

4           THE COURT:  Okay.  Defendants' Exhibit Number 9

5   will be received.  Now, I did sustain the objections to 7

6   and 8, and that stands because there was no

7   identification.  Now, they could conceivably come in at a

8   later stage, but 7 and 8 will be excluded.  Number 9 is

9   admitted.

10          MR. O'REILLY:  Your Honor, one concern I have

11  with respect to Defendants' Exhibit 9 is we have not --

12  we do not have a copy of that.  I'm not sure there's been

13  one presented to the Court.  It is not in what was

14  presented in the -- that was retained by Mr. Springer, I

15  believe.

16          THE COURT:  Well, we can address that at the

17  appropriate time and come up with something that perhaps

18  all parties can agree on is a true copy of the document,

19  but I just wanted to clear up that one point.  Since the

20  testimony of Ms. Wiggins is now turning to a little

21  different subject, I wanted to clear up that one point.

22  So you may resume.

23      (VIDEO DEPOSITION OF VIKKI WIGGINS RESUMED.)

24      (VIDEO DEPOSITION OF VIKKI WIGGINS CONCLUDED.)

25          THE COURT:  The record will show we have now

1  completed the testimony of Vikki Wiggins.  We will now

2  have the government's next witness.

3          MR. SPRINGER:  Your Honor, may we approach for

4  just a moment?

5          THE COURT:  You may.

6      (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND

7  OUT OF THE HEARING OF THE JURY.)

8          THE COURT:  Okay.  Go ahead.

9          MR. SPRINGER:  Two days ago Mr. O'Reilly handed

10 us a copy of Mrs. Patterson's testimony before the grand

11 jury.  In October of 2004, the targets of the

12 investigation were Lindsey Springer and Oscar Stilley.

13 And this Court ruled two or four months ago, based upon

14 Mr. O'Reilly's representation, that Oscar was only a

15 target, that dismissal wasn't appropriate and also that

16 his statements could come in in this case to prosecute

17 him.  And now they're getting ready to bring

18 Mr. Patterson in and Mrs. Patterson after that, and

19 there's just no question they never read him his rights,

20 they never told him.

21         THE COURT:  I think this is a matter we need to

22 take up at this point outside --

23         MR. SPRINGER:  Because Mrs. Patterson is coming

24 in next is the reason why I thought I would bring it up.

25         THE COURT:  Who is your next witness?

```
 1          MR. SNOKE:  Eddy Patterson, followed by his
 2   wife.
 3          THE COURT:  Well, I -- for one thing, I'm -- I
 4   don't know what ruling you're referring to.  You may be
 5   right, you may be wrong, but I'm having trouble --
 6          MR. SPRINGER:  I'll wait.  I just -- I'm just
 7   concerned about the prejudicial nature of Mrs. Patterson
 8   coming in, if that was the case, because maybe the whole
 9   case would be saved.
10          MR. O'REILLY:  Your Honor, there is one other
11   matter.  Your Honor, we have reviewed the defendants' --
12   proposed Defendants' Exhibits with respect to
13   Mr. Patterson, and one of the things they have put in as
14   proposed relates to a 1979 matter --
15          MR. SNOKE:  '79.
16          MR. O'REILLY:  -- with respect to Eddy Patterson
17   for potential impeachment.  We are moving in limine, we
18   just found out about this and were reviewing it last
19   night, to keep out anything that is that old.  He's had
20   convictions since then.  He was convicted for tax
21   violations and that's fine, but going back to something
22   30 years old seems --
23          MR. SNOKE:  It wasn't a conviction, Your Honor.
24   He was indicted in Dallas, Texas, on a -- with a
25   partner -- along with a partner, and he -- it was
```

1   ultimately dismissed.

2           THE COURT:  And you've got -- then you've

3   provided the government with an exhibit.

4           MR. SPRINGER:  Five months ago I gave it to

5   them.

6           THE COURT:  Yes or no?

7           MR. SPRINGER:  Yes, sir, I did.

8           THE COURT:  We're not up here to argue.

9           MR. SPRINGER:  I'm sorry.

10          THE COURT:  Okay.  Bring me a copy of the

11  exhibit.  I'll be looking at it, and for the time being

12  there will be no reference to it.  I'll be looking at it

13  and we'll address it later.

14          MR. SPRINGER:  Okay.

15     (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

16  WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

17  PRESENCE AND HEARING OF THE JURY.)

18          THE COURT:  We'll have the government's next

19  witness.

20          MR. SNOKE:  The government would next call Eddy

21  Patterson.

22          MR. O'REILLY:  Your Honor, should I collect the

23  exhibits that had been distributed to the jury?

24          THE COURT:  I think that would be a good idea.

25  You and your assistant may collect the exhibits.  Very

```
 1   well.
 2                        EDDY PATTERSON,
 3   (WITNESS SWORN)
 4                      DIRECT EXAMINATION
 5   BY MR. SNOKE:
 6   Q.   Would you state your name and spell your last name
 7   for the court reporter, please, sir.
 8   A.   Eddy Patterson, P-A-T-T-E-R-S-O-N.
 9   Q.   And where do you live, Mr. Patterson?
10   A.   7318 South Canton, here in Tulsa.
11   Q.   All right.  Do you live there with anyone else?
12   A.   Yes, with my wife.
13   Q.   All right.  And what's her name?
14   A.   Judy.
15   Q.   Official name Judith?
16   A.   Yes.
17   Q.   Mr. Patterson, do you know the -- an individual
18   named Lindsey Springer?
19   A.   Yes, I do.
20   Q.   And do you see him here in the courtroom today?
21   A.   Yes.
22           MR. SNOKE:  Let the record reflect he's
23   identified Mr. Springer, who stood up.
24           THE COURT:  The record will so reflect.
25   Q.   (BY MR. SNOKE)  When did you first -- when and under
```

1  what circumstances did you first come in contact with
2  Mr. Springer or meet Mr. Springer?
3  A.   It was in the spring of 2000, I believe.
4  Q.   And what prompted you to be meeting Mr. Springer in
5  the spring of 2000?
6  A.   I had been contacted by the IRS criminal
7  investigation division, had come to see me and had some
8  questions about some tax returns that I had not filed.
9  And I had been given his name by another friend of mine,
10  Richard Clark, that said that Mr. Springer was fighting
11  the IRS and knew my type of situation and --
12  Q.   All right.  Prior to that time, had you -- had you
13  been in a situation where you were not filing tax
14  returns?
15  A.   Yes.  I had sent letters to the IRS and had withheld
16  funds for '96 through 2000.
17  Q.   All right.  So there's about four or five years
18  there that --
19  A.   Four years, right.
20  Q.   Four years.  And so when did -- did you then contact
21  Mr. Springer or meet him, or what happened when you first
22  came in contact with him?
23  A.   I called him, and he set up a time to come to my
24  office on a Saturday morning to discuss the situation.
25  Q.   All right.  And where was your office at that time?

```
 1  A.   It was on 61st Street, out in east Tulsa.

 2  Q.   Okay.  And what was the -- was there a name of the

 3  company that you were involved with?

 4  A.   Yes, it was called NESCO.

 5  Q.   That's N-E-S-C-O?

 6  A.   Right.

 7  Q.   Who else was at that meeting?

 8  A.   Oscar Stilley and Mr. Springer's wife or

 9  girlfriend.  I'm not sure if they were married or not.

10  Q.   Okay.  And had you met Oscar Stilley before that

11  time?

12  A.   No, sir.

13  Q.   All right.  Why was Oscar Stilley at the meeting,

14  then?

15  A.   Well, he was the one that I contacted about

16  discussing my situation, and so he came and brought

17  Mr. Stilley with him.

18  Q.   All right.  I'm sorry.  I meant to ask you, why was

19  Oscar Stilley at the meeting?

20  A.   Well, he was the attorney that Mr. Springer worked

21  with in these type of cases, I understood.

22  Q.   All right.  And what did Mr. Springer tell you

23  before the meeting, if anything, about Mr. Stilley?

24  A.   Well, I just remember him telling me that

25  Mr. Stilley was qualified to handle my type of a case.
```

EDDY PATTERSON - DIRECT BY MR. SNOKE                    652

1   Q.   All right.  And did Mr. Springer tell you whether or

2   not he was an attorney?

3   A.   He told me he was not an attorney.

4   Q.   Did he express any knowledge in your area or were

5   you basing meeting with him on what Mr. Clark said or

6   what?

7   A.   No, he -- he had a lot of knowledge in that area.

8   In fact, I had heard that he had meetings where he

9   prepared tapes and sent them to other people explaining

10  different aspects of his fight against the Internal

11  Revenue Service.

12  Q.   All right.  While we're on it, do you see Oscar

13  Stilley in the courtroom here today?

14  A.   Yes, I do.

15  Q.   Will you tell me where he's sitting and what he's

16  wearing?

17  A.   He's sitting at that table over there in about the

18  middle, with a dark suit and a little growth on his face.

19  Q.   All right.

20          MR. SNOKE:  Let the record reflect that the

21  witness has identified Mr. Stilley.

22          THE COURT:  The record will so reflect.

23          MR. SNOKE:  Thank you.

24  Q.   (BY MR. SNOKE)  When you say that -- when you had

25  this meeting with the two defendants, did they have the

1  facial hair that you see now that you just commented on?

2  A.   No, sir.

3  Q.   Neither one of them?

4  A.   No, sir.

5  Q.   All right.  And that meeting was in about what -- it

6  was in --

7  A.   I believe it was in March of 2000.

8  Q.   All right.  At that meeting -- what was said, then,

9  by the parties at that meeting regarding whether or not

10 they could assist you with the IRS inquiries?

11 A.   Well, I explained what was happening with my

12 situation and what I had done, and they said that they

13 could help me with that.

14 Q.   All right.  And did Mr. Springer or Mr. Stilley, at

15 that point, indicate any experience they had in that

16 area?

17 A.   Yes.  They told me that they had handled similar

18 situations with other clients.

19 Q.   All right.  Did they imply that those were

20 successful handlings?

21 A.   I don't remember that specifically.

22 Q.   Uh-huh.  Was -- did you have any discussions at that

23 meeting regarding compensation that Mr. Springer would

24 want for representing you with the IRS?

25 A.   I'm not sure if it was at that meeting, but it was

1  -- if it wasn't, it was shortly thereafter when I talked

2  to him.  And he told me that he needed $45,000 for his

3  part in handling the case.

4  Q.  All right.  And did he ask you to do anything else

5  with respect to the payments of this $45,000 to him?

6  A.  I told him I'd have to pay him over a short period

7  of time, which was agreeable.  And he asked me to write

8  donation on the bottom of my check when I sent it to him.

9  Q.  And was that okay with you?

10  A.  Yes, it was fine with me.

11  Q.  Did you have any discussion at that meeting or

12  shortly thereafter with Mr. Stilley, Oscar Stilley, about

13  any fees he might be charging you?

14  A.  Mr. Stilley and I had agreed that he would just bill

15  me on an hourly rate, and I would -- I gave him a

16  retainer to start with of like $5,000, and then he was

17  going to bill against that on an hourly basis.

18  Q.  All right.  And you say this meeting was prompted by

19  an IRS agent named Arsenault that you said --

20  A.  That's right.  Tim Arsenault and another agent came

21  to my office.

22  Q.  Did you understand that those were criminal CID

23  agents of the IRS?

24  A.  I did.

25  Q.  Had you had prior dealings with the IRS in the civil

```
 1   area?
 2   A.   No.  I had sent them letters and I expected to have
 3   a civil hearing, but that never occurred.
 4   Q.   All right.  So the first you had any personal
 5   contact with the IRS was when the criminal agents came
 6   out to talk to you?
 7   A.   That's right.
 8           MR. SNOKE:  Can we call up Plaintiff's Exhibit
 9   9.
10   Q.   (BY MR. SNOKE)  You have a screen in front of you.
11   I can -- I was going to maybe -- can you see that well
12   enough or would you like to see a written --
13   A.   No, it's fine.
14   Q.   -- document?  We have the documents also, if you
15   need them.  Can you identify Exhibit 9?
16   A.   Yes, it's a check from me to Mr. Springer for
17   $10,000.
18   Q.   And can you tell us what that had to do with what
19   you've been explaining to us in your testimony?  And this
20   check is dated 8/25 of 2000?
21   A.   Yes, sir.  It was part of the $45,000 payment.
22   Q.   All right.  And what was the purpose -- what was
23   Mr. Springer going to do in return for getting this
24   45,000 or at least this 10,000 that you're paying him
25   here?
```

1   A.   Well, he was going to help me with my case against

2   the IRS.

3   Q.   All right.  Did he tell you anything in specific he

4   was going to do for you?

5   A.   Well, he was going to be the liaison, if you will,

6   between -- or with the attorney.

7   Q.   All right.  And at some point in here -- well, let's

8   go to Government's Exhibit 10.  Do you recognize that

9   check?

10  A.   Well, it's not on the screen now.

11  Q.   Oh.

12  A.   Okay.  Yes, I do.

13  Q.   Do you recognize that check now that it's on the

14  screen?

15  A.   Yes, sir.

16  Q.   What is that check?

17  A.   It's another check to Mr. Springer from me for

18  $10,000.

19  Q.   All right.  And that's dated --

20  A.   9/25.

21  Q.   -- 9/25/00.  And it also, as the previous exhibit,

22  shows donation down there.  You wrote that on there?

23  A.   Yes.

24  Q.   Why did you write donation on there?

25  A.   Because he asked me to.

1   Q.   Let's look at Government's Exhibit 14 next.  Now,
2   before we get to this check, did -- did you receive a
3   subpoena to testify in front of the -- a federal grand
4   jury in this district at about this time in 2000?
5   A.   I didn't receive a subpoena.  I just had agreed to
6   do that.
7   Q.   Oh, you had agreed to do that.  Okay.  Had you
8   discussed that with -- had you discussed that with either
9   Mr. Springer or Mr. Stilley?
10  A.   Yes.  In fact, they are the ones who told me of the
11  grand jury convening and that I should go and tell my
12  side of the story to them.
13  Q.   Okay.  So -- and did you actually do that in -- at
14  sometime here in 2000?
15  A.   Yes, sir.
16  Q.   Do you remember when you --
17  A.   I don't remember the date.
18  Q.   Okay.  Was it sometime after you had engaged
19  Mr. Springer and Mr. Stilley to help you with the IRS
20  dealings and the criminal dealings?
21  A.   Yes, it was.
22  Q.   All right.  Did they -- did either one of those
23  individuals go with you when you went to the grand jury?
24  A.   They both met me there in the building.
25  Q.   All right.  So they were there outside the grand

1  jury room to advise you if you needed it?

2  A.   Yes, sir.

3  Q.   All right.  Now let's look at Government's Exhibit

4  14.  Do you recognize that check?

5  A.   Is that the one on the screen now?

6  Q.   Yeah, the one on the screen.

7  A.   It's another check to Mr. Springer for $10,000 dated

8  November the 9th of 2000.

9  Q.   All right.  So we've had three checks here a month

10  or so apart -- actually, this one is two months later.

11  And what was this check for, to Mr. Springer?

12  A.   It was for the same purpose.

13  Q.   All right.  Is this part of the 45,000 that you

14  indicated --

15  A.   Yes, sir.

16  Q.   -- that he said he -- all right.  After your

17  testimony at the grand jury in the year 2000, did

18  anything happen in your case for a period of time?

19  A.   No, there was a quiet time there for a while.

20  Q.   All right.  And when did you next -- when did -- if

21  it did, when did things heat up again, if you will, in

22  your criminal investigation by the IRS?

23  A.   Well, they had told me again later, and I'm not sure

24  what the time frame was, that there was another grand

25  jury that had been convened in the matter and that I

1  should go and visit with them again, tell them my side of

2  the story.

3  Q.   All right.  And did you pay -- in addition to these

4  three checks for $10,000, did you pay the rest of that

5  $45,000 back in the year 2000 to Mr. Springer?

6  A.   Yes, I believe I did.

7  Q.   I would like you to look at -- oh, let's look at

8  Exhibit 72.  Do you recognize the check that is part of

9  Exhibit 72?

10  A.   I recognize the check and the signature, but it

11  doesn't -- it's blacked out where the name would go.

12  Q.   I see that it's a bad copy.

13          MR. SNOKE:  May I approach the witness with the

14  hard copy?

15          THE COURT:  You may.  And, of course, both sides

16  are entitled to go low tech and use the ELMO there.

17          MR. SNOKE:  May I approach and see if I can find

18  it?

19          THE COURT:  You may.

20          MR. O'REILLY:  I think I have a better copy.

21  Q.   (BY MR. SNOKE)  Is that a better copy, sir?

22  A.   Yes, sir.

23  Q.   That is a better copy?

24  A.   Yes, sir.

25  Q.   Tell me what that is.

EDDY PATTERSON - DIRECT BY MR. SNOKE                    660

1   A.   It's a check for $5,000 from me to Mr. Stilley.

2   Q.   All right.  What's the date of that check?

3   A.   March 17, 2000.

4   Q.   All right.  And what was that -- what was the

5   purpose of your writing that check for a deposit for?

6   A.   It was for a retainer.

7        THE COURT:  Wait just a minute, Mr. Snoke.  Turn

8   that up a little bit.  Okay.  Go ahead.  I'll tell you

9   what, Mr. Snoke, why don't you work from the little

10  lectern, and Mr. O'Reilly can handle the exhibit at the

11  ELMO.  Go ahead.

12       MR. SNOKE:  I have copies of them at the podium,

13  Your Honor, if I could go back and forth.  It was only

14  the witness that didn't have --

15       THE COURT:  Proceed.

16  Q.   (BY MR. SNOKE)  Would you look at Government's

17  Exhibit 77, the next -- which -- you recognize that check

18  as --

19  A.   I can see that it's another check for $5,000 to

20  Mr. Stilley from me, but I can't read the date on it.

21  Q.   All right.  And what does it say down there in the

22  bottom left-hand corner?

23  A.   Says retainer.

24  Q.   All right.  And is that your signature on that

25  check?

1   A.   Yes, sir.

2   Q.   Okay.  All right.  Now, I want to fast forward here

3   for a minute -- oh, first of all, let me show you a

4   couple of other exhibits before we leave the 2000 time

5   period.

6          MR. SNOKE:  If I could have Exhibit 176.  Is

7   that in that book?  It may not go that far.  I don't

8   think that's in there.

9          THE WITNESS:  No, it doesn't go that far.

10          MR. SNOKE:  May I approach, Your Honor?

11          THE COURT:  You may.  I don't show it in

12   evidence.  It's not in evidence yet, so you'll need to

13   address that first.

14          MR. SNOKE:  Yes, Your Honor.

15          THE COURT:  Next question.

16   Q.   (BY MR. SNOKE)  Have you found 176?

17   A.   Yes, sir.

18   Q.   Do you recognize the document that's Exhibit 176?

19   A.   Yes, sir.

20   Q.   What is that?

21   A.   It's a letter that I sent to Mr. Springer along with

22   one of the checks.

23   Q.   All right.  And --

24          MR. SNOKE:  We'd move it into evidence --

25   Q.   (BY MR. SNOKE)  What's the date of the letter?

1    A.   August 25, 2000.

2    Q.   Is that the same date that was on Government's

3    Exhibit 9, the $10,000 check, the first one I showed

4    you?

5    A.   I believe it was.

6           MR. SNOKE:  We move into evidence Government's

7    Exhibit 176.

8           THE COURT:  Any objection?

9           MR. SPRINGER:  No objection, Your Honor.

10          THE COURT:  It will be received.

11   Q.   (BY MR. SNOKE)  Can you tell us why you wrote that

12   letter?

13   A.   Why I wrote it?

14   Q.   Well, it says, Please find enclosed our donation

15   check as a continuation -- or encouragement for you to

16   continue your fight against anti-constitutional issues

17   endorsed, et cetera.

18   A.   Yes.

19   Q.   For some reason you wrote that in sending

20   Mr. Stilley the first check that you did?

21   A.   Well, it was --

22   Q.   I mean Mr. Springer.  I'm sorry.

23   A.   It was just a letter of encouragement to him with

24   his fight against the IRS.

25   Q.   All right.  And if you will look next at 177, which

1    is also not in evidence at this point, the next one

2    there.

3    A.   Yes, sir.

4    Q.   Do you recognize that?

5    A.   I do.

6    Q.   All right.  And who is that to?

7    A.   To Mr. Springer, dated September 25, 2000.

8    Q.   All right.  Is that the same date as Government's

9    Exhibit 10, the check for $10,000, the second one I

10   showed you?

11   A.   Yes, sir.

12   Q.   Can you tell us why you wrote --

13            MR. SNOKE:  Well, first of all, I would move

14   into evidence 177.

15            MR. SPRINGER:  No objection, Your Honor.

16            THE COURT:  It is received.

17   Q.   (BY MR. O'REILLY)  And it says at the bottom there,

18   "We are also enclosing herewith a donation for your

19   cause."  Do you recall that?

20   A.   Yes.

21   Q.   All right.  And why were you putting that on there

22   as well as on the check?

23   A.   Well, he had asked me to do that, Mr. Springer had.

24   Q.   Okay.  But the checks -- were the checks a donation

25   or were they for services?

1   A.   Well, I felt like they were for his services.

2   Q.   You can put that down, the book.  All right.

3   Getting into -- I show you the next exhibit -- well,

4   before we do that.  How long did it go before you next

5   required services from -- or any other contact with

6   Mr. Springer or Mr. Stilley in this investigation that

7   was going on by the grand jury and whatnot?

8   A.   I believe it was at that second grand jury when --

9   Q.   All right.  And do you remember when that was?

10  A.   No, I'm sorry, I don't.

11  Q.   All right.  Now, was -- was a grand jury -- was the

12  grand jury here investigating other than tax violations?

13  A.   The second one was.

14  Q.   Okay.  And the second one, what were they

15  investigating?

16  A.   They were investigating bank fraud and securities

17  violations.

18  Q.   All right.  And at some time -- at some time after

19  the -- then these first checks -- what happened next?

20  Did you receive -- were you indicted at some point here?

21  A.   Yes, sir.

22  Q.   All right.  Prior to that, had you had any contact

23  with any other attorneys in any -- in connection with

24  your SEC or any other kind of investigation that was

25  going on?

```
 1              MR. SPRINGER:  Objection, Your Honor, time
 2   frame.
 3              THE COURT:  Your objection?
 4              MR. SPRINGER:  He just said before that.
 5              THE COURT:  Clarify the time frame.
 6   Q.  (BY MR. SNOKE)  Before your indictment is what I
 7   meant to say.  Before your indictment, had you had any --
 8   had you retained anybody else besides Mr. Stilley or
 9   Mr. Springer to handle your tax matters and your SEC
10   matters or the other matters that were being
11   investigated?  Had you hired any other kind of counsel to
12   assist you with those prior to your indictment?
13   A.  Well, prior to my meeting with Mr. Stilley and
14   Mr. Springer, I had hired Tony Graham to represent me
15   just for a few days until I had talked to Mr. Springer.
16   And then I changed from Mr. Graham to Mr. Springer and
17   Mr. Stilley.
18   Q.  Was this before or after you were indicted?
19   A.  Before, long before.
20   Q.  Okay.  All right.  What year are we talking about,
21   then?
22   A.  This was back in 2000.
23   Q.  Oh, all right.  I think -- well, let's move ahead
24   here to sometime in late 2002, early 2003.  Were you
25   indicted at some point in this?
```

```
 1   A.   Yes.
 2   Q.   All right.  And what did the indictment consist of?
 3   I mean, was it just tax charges or were there other
 4   charges?
 5   A.   No, there were bank fraud charges and Securities and
 6   Exchange Commission charges.
 7   Q.   And do you remember about when that was?
 8   A.   It was in 2003.
 9   Q.   All right.  Was it early in 2003?
10   A.   Yes, sir, in the spring time, I believe, March or
11   April.
12            THE COURT:  Mr. Snoke, before we get into this
13   line of questioning, we'll take our mid-morning break.
14   You may be seated.
15            Members of the jury, we'll take our mid-morning
16   break at this time.  We'll resume at 15 minutes till
17   eleven, so please be available just a little before that
18   for the security officer to escort you back to the
19   courtroom.  Since this is the first time today, I'll give
20   you the full treatment.
21            Please remember not to discuss the case at all
22   until it's been given to you for your deliberations and
23   verdict, not to reach any conclusions about the case
24   until it's been given to you for your deliberations and
25   verdict, and certainly not to undertake any independent
```

1  investigation of any aspect of this case.  So I look

2  forward to seeing you at quarter till eleven.

3          All persons in the courtroom will remain seated

4  while the jury departs.

5      (JURY EXITS THE COURTROOM.)

6          THE COURT:  Okay.  The record will show that the

7  jury has left the courtroom.  Let's address the issue

8  that was raised at the bench.  And Mr. Patterson, you are

9  excused.  If you would, obviously stay handy, but you are

10 excused from the courtroom.

11         Okay.  Now, as I understand it, Mr. O'Reilly,

12 the concern that you raised in limine at the bench was

13 with respect to evidence relating to the admissibility of

14 a 19 -- or admissibility apparently of cross-examination

15 relating to a 1979 indictment that was dismissed; is that

16 correct?

17         MR. O'REILLY:  Yes, Your Honor.

18         THE COURT:  Okay.  That brings me to a question

19 of Mr. Springer.  Mr. Springer, Rules 608(b) and 609

20 address this, and tellingly enough, Rule 609 imposes very

21 clear restrictions on impeachment by evidence even of

22 conviction of a crime.  So we've got a dismissed

23 indictment from 30 years ago.  I need very concisely to

24 hear your theory of admissibility of that.

25         MR. SPRINGER:  Your Honor, Mr. Patterson filed a

1   lawsuit in 2005 against myself, Mr. Stilley and

2   Mr. Barringer for RICO, fraud and misrepresentation.  And

3   in that complaint, which is in the exhibits that I have

4   given to the government, which they're aware of, he

5   specifically stated that before he met me, he had never

6   had any trouble with the law, never been in any criminal

7   trouble, had always complied with it, and that it was not

8   until after he met me that he -- on my advice he stopped

9   filing tax returns and all of his troubles came in.

10          And that was a false statement.  It was known

11  false at the time it was put into that complaint.  And

12  the law firm of Richardson, Richardson and Boudreaux have

13  already said that it was by Mr. Patterson's statements to

14  them that they relied upon in filing that complaint.

15          And so it is by that basis that I am going after

16  Mr. Patterson's credibility.  I have plenty to go after

17  there, Your Honor, but the 404(b) is something that

18  clearly establishes that in the complaint he filed in

19  2005 against us, that he falsely stated that as a reason

20  to file the complaint.  And --

21          THE COURT:  You have -- do you have a copy of

22  that complaint?

23          MR. SPRINGER:  Yes, sir, I do.  Just one

24  moment.  Your Honor, it is in the book that I handed

25  you.  One second.  It is 105, which you may not go to 105

1   yet.  Yes, sir, I do.  105.  May I approach, Your Honor?

2         THE COURT:  You may approach the clerk.

3         MR. SPRINGER:  Yes.  105, and this is 106, where

4   they refiled it in 2008, uttering the exact same

5   statement.

6         THE COURT:  What paragraph do I need look at?

7         MR. SPRINGER:  The second page at the bottom,

8   where it states that they were living the American dream

9   and enjoying the success.

10        THE COURT:  Okay.  And had never been in

11  criminal trouble.

12        MR. SPRINGER:  Yes, sir.

13        THE COURT:  And that's repeated in 106.  Okay.

14  And so now, obviously, the evidence as to the dismissed

15  1979 indictment would be relevant to a determination of

16  the truth of the statement whether they had ever been in

17  criminal trouble.  And I understand that to be your

18  contention?

19        MR. SPRINGER:  That is my contention.

20        THE COURT:  Very well.  Anything else on the

21  admissibility of testimony by way of cross-examination

22  about this 1979 indictment?

23        MR. SPRINGER:  May I have just a moment, Your

24  Honor?

25        THE COURT:  You may.

 1              MR. SPRINGER:  That would be all I have on that

 2    part of the 404(b).

 3              THE COURT:  Well, that's the only part that's in

 4    issue at the moment.  I'll hear from the government.

 5              MR. SPRINGER:  Thank you.

 6              MR. O'REILLY:  Your Honor, the federal rules

 7    caution very strongly against something this old.  The

 8    term "criminal trouble," given that it was dismissed, he

 9    was never convicted of this --

10              THE COURT:  Do you consider these defendants to

11    be in criminal trouble as we speak?

12              MR. O'REILLY:  I think they're in very grave

13    criminal trouble, and I understand that.

14              THE COURT:  Okay.  And they haven't been

15    convicted.

16              MR. O'REILLY:  However, it's not 30 years old.

17              THE COURT:  Well, I'm going to have to take this

18    one step at a time, because it would be, I think, a clear

19    case for exclusion of cross-examination relating to that

20    '79 indictment that was dismissed absent this allegation

21    in this lawsuit that was filed in '05 and then refiled in

22    '08.

23         Now, I'm just going to have to see how this plays

24    out.  There's no foregone conclusion one way or the

25    other, but the matter certainly is complicated just a bit

1    by the fact that he alleges in a lawsuit against these

2    defendants, among others, that he had never been in

3    criminal trouble.

4        Now, again, there's no automatic logical connection

5    between that allegation and the matters that are being

6    litigated here, but -- and we have to remember that the

7    issue is whether this logically goes to Mr. Patterson's

8    credibility.  That may also -- that may also be a matter

9    that is addressed through other evidence.  We'll just

10   have to see.  Mr. Springer, we will not get into this

11   point on cross of Mr. Patterson until you have covered

12   your other impeaching material.  And then if you still

13   want to get into this, then I'll address it at that

14   point.

15           MR. SPRINGER:  May I add one more point to this,

16   Your Honor?

17           THE COURT:  You may.

18           MR. SPRINGER:  Mr. Patterson also alleges in his

19   complaint that it wasn't until I existed, which we all

20   now know was 2000, in his life that the tax troubles

21   started.  And we can all read -- which the indictment of

22   Mr. Patterson I had also given to the government, and it

23   alleges false tax returns in '93, '95, '90 -- and then

24   false -- no return in '96, '97, '98 and '99.

25       And so there's another false statement in that

1    complaint that just shows the general nature of his

2    testimony, along with the fact that he had received a

3    four-year reduction from his eight-year sentence, which

4    is a plea agreement that definitely is hopefully coming

5    in, and then his wife also got time served with four

6    months.  And I had asked for the memorandum of interview

7    and so forth on that case, and the government never

8    produced it, which we're obviously going to deal with in

9    that grand jury testimony.  But there's more than just

10   he lied about he had no criminal trouble.  There's a

11   series of lies there, and I just wanted to point out.

12          THE COURT:  In football they call that piling

13   on.  We'll address that as we come to it.

14          MR. SPRINGER:  May I have back the two

15   exhibits?

16          THE COURT:  You surely may.  And here's your

17   book.

18          MR. SPRINGER:  Okay.  Thank you.

19          THE COURT:  Court will be in recess.

20      (A RECESS WAS HAD, AFTER WHICH THE FOLLOWING

21   PROCEEDINGS WERE HAD IN OPEN COURT AND WITHIN THE

22   PRESENCE AND HEARING OF THE JURY.)

23          THE COURT:  Mr. Snoke, you may continue.

24   Q.  (BY MR. SNOKE)  Mr. Patterson, I'd like to fast

25   forward here to the time period of the indictment, which

1  your recollection was you were indicted approximately

2  when?

3  A.   I think it was in March or April of 2003.

4  Q.   All right.  How did you find out about being

5  indicted?

6  A.   I was arrested.

7  Q.   Okay.  And did you contact someone, then, after you

8  were apprehended on the indictment?

9  A.   Yes.  I had my son get in touch with Mr. Springer

10  and Mr. Stilley.

11  Q.   All right.  And after -- did you remain in custody

12  long after you were indicted and arrested?

13  A.   It was several hours, but then they had an

14  arraignment the same day.

15  Q.   And you were released on bond?

16  A.   Yes, sir.

17  Q.   At that point, did you have any meetings with --

18  well, did Mr. Springer or Mr. Stilley show up at your

19  first appearance there to represent you or --

20  A.   Yes, I believe they were both there.

21  Q.   All right.  And after that, did you have any other

22  -- did you have any conversations with either

23  Mr. Springer or Mr. Stilley or both of them concerning

24  your case?

25  A.   Yes, quite a number of times we talked.

1  Q.   By the way, was anyone indicted besides you in this

2  case?

3  A.   Yes, my wife, Judy, was.

4  Q.   All right.  And what were the charges against her?

5  A.   The charges were tax evasion, willful failure to

6  file returns.

7  Q.   All right.  Willful failure to file?

8  A.   Yes, sir.

9  Q.   And do you remember for what years -- period you

10  were indicted for failure to file?

11  A.   I believe it was 1996 through 2000.

12  Q.   All right.  Which is the same years you talked about

13  earlier?

14  A.   Right.

15  Q.   Was your wife charged with anything else besides the

16  tax crimes?  Was she charged with any of the other

17  offenses that --

18  A.   No, sir.

19  Q.   But you were; is that correct?

20  A.   Yes.

21  Q.   All right.  And you said that earlier it was --

22  A.   Bank fraud and securities --

23  Q.   Securities fraud cases -- I mean, security fraud?

24  A.   Right.

25  Q.   All right.  Did you have -- you and your wife have

1   any meetings with Mr. Springer or Mr. Stilley after your

2   indictment?

3   A.   Yes.

4   Q.   And can you tell us what you were -- well, first of

5   all, let's take -- did you have any with both of them or

6   did you have -- and your wife or did you have one with

7   just either one of those people, Mr. Springer,

8   Mr. Stilley, or did you have any meetings with you, your

9   wife and all people present?

10  A.   Well, most of the times both of them were present,

11  but I remember maybe once or twice that I met with

12  Mr. Springer alone -- or, I mean, without Mr. Stilley.

13  Q.   All right.  And --

14  A.   And one time I went to Fort Smith and met with

15  Mr. Stilley without Mr. Springer.

16  Q.   Well, I'm talking about in the time period

17  immediately after you were indicted.  Did you have any

18  discussions with them about representation, either one of

19  them?

20  A.   Well, it was just --  as far as representing me?

21  Q.   Yes, whether they were going to represent you on --

22  in the indictment.

23  A.   Yes, they had already agreed to do that.

24  Q.   All right.  And was there any discussion with --

25  let's take Mr. Springer first, about any -- any monetary

1  compensation he would require for representing you in the

2  trial or the -- of the upcoming case?

3  A.   Well, not at that time.

4  Q.   All right.  How about with Mr. Stilley?  Did he

5  talk --

6  A.   We just continued the arrangement that we had made,

7  that he would bill me on an hourly rate and I would keep

8  enough funds in his account to take care of that.

9  Q.   All right.  And did Mr. Stilley send you any kind of

10 written billing statements regarding his fees he was

11 going -- was charging you?

12 A.   Yes, sir.

13 Q.   And about how often would he do that?

14 A.   I believe it was monthly.

15 Q.   All right.  Did you ever get any kind of a statement

16 from Mr. Springer about any monies that -- any services

17 he had provided to you, any kind of written statement

18 from him?

19 A.   No, all of that information would have been on

20 Mr. Stilley's statements.

21 Q.   All right.  I'd like you to --

22       MR. SNOKE:  If I may approach, Your Honor.  I

23 have some other exhibits.

24       THE COURT:  You may.

25 Q.   (BY MR. SNOKE)  If you would look at this book on

1  the corner here -- I think the other one we can push over

2  there a bit to your right.  That's the one on your left

3  that I want you to take a look at there.  And the very

4  next few exhibits, ask you to look through these.  Let's

5  start with Exhibit 178.  Do you recognize that?

6  A.   Yes, sir.

7  Q.   And what is that?

8  A.   It's a billing to me from Mr. Stilley dated in --

9  for the month of October of 2002.

10 Q.   All right.  Now, this is before the indictment; is

11 that correct?

12 A.   Yes.

13 Q.   All right.  And if you look at 179, do you recognize

14 that exhibit?

15 A.   Yes, sir, this is for -- a billing from Mr. Stilley

16 for the month of November of 2002.

17 Q.   All right.  If you'll look at 180?

18 A.   This one is for the month of December of 2002.

19 Q.   All right.  181?

20 A.   This one is for January of 2003.

21 Q.   182?

22 A.   February 2003.

23 Q.   183?

24 A.   March of 2003.

25 Q.   184?

1    A.   April 2003.

2    Q.   By now you're indicted; is that correct?

3    A.   I think so.  I don't remember the exact day, but I

4    think it was.

5    Q.   All right.  185?

6    A.   May of 2003.

7    Q.   All right.  It actually goes only part of May, does

8    it not?

9    A.   Yes, sir, through May 7th.

10   Q.   All right.  Then 186?

11   A.   May 15th through May 24th of 2003.

12   Q.   All right.  Look at 186, at the back page.  I think

13   there are some dates after that.  On 186 are there some

14   dates after May 15th or May 20th, whatever you said in

15   May?

16   A.   Yes, sir.  It goes from -- these other sheets are

17   May 24th through June 24th and June 24th through July 3rd

18   and July 7th through July 14th, July 14th through July

19   21st, July 21st through July 30th, July 31st through

20   August 6th and August 6th --

21   Q.   I think that may be the last date.

22   A.   Right.

23   Q.   But August 6th -- it goes at least to August 6th, so

24   there's several months in that particular document?

25   A.   Yes, sir.

1  Q.   And if you'll look at 187?

2  A.   This says for August and September of 2003.

3  Q.   All right.  Up at the top there it may say exactly

4  what period it covers.  Top of the first page.

5  A.   It says August and September.

6  Q.   Okay.

7  A.   August to September 3, 2003.

8  Q.   And 188?

9  A.   September 3rd through September 24th of 2003.

10 Q.   All right.  Now, these are all billing statements of

11 Oscar Stilley regarding your case?

12 A.   Yes, sir.

13 Q.   All right.  189?

14 A.   September 24th through October 21st of 2003.

15 Q.   190?

16 A.   October 21st through November 7th of '03.

17 Q.   And 191?

18 A.   November 7th through December 2nd of '03.

19        MR. SNOKE:  We'd move into evidence at this time

20 Government's Exhibits 178 through 191 inclusive.

21        THE COURT:  Any objection?

22        MR. SPRINGER:  Yes, Your Honor, just personal

23 knowledge.  I didn't hear anything about him recognizing

24 the document.

25        THE COURT:  Mr. Patterson, is it your testimony

1   that these are, in fact, bills that you received from

2   Mr. Stilley in connection with his services?

3           THE WITNESS:  Well, I could say, Your Honor,

4   that these are representative of the bills that I

5   received through this period of time.  I don't know if

6   these are the exact ones.

7           THE COURT:  You say you don't know that these

8   are the exact ones.  Tell me more about that.  I'm not

9   sure I understand that.

10          THE WITNESS:  Well, I recognize them as typical

11  of the invoices that I received from him during that

12  time, but --

13          THE COURT:  But not necessarily all of them?

14          THE WITNESS:  Well, not necessarily -- I mean, I

15  don't know that these are the exact ones that I received,

16  I guess is what I'm saying.

17          THE COURT:  Do you need to take a little more

18  time to look them over to satisfy yourself on that

19  score?

20          THE WITNESS:  No, I mean, I don't know that

21  these are the exact statements that I received.

22          THE COURT:  You're thinking they may have been

23  altered?

24          THE WITNESS:  No, I'm just saying they may be

25  copies or maybe -- maybe they changed.  I don't know.  I

```
 1  just --
 2          THE COURT:  Well, they clearly are copies.  And
 3  under the law of evidence, that is not ordinarily a
 4  problem.  So don't worry about the fact that they may be
 5  copies, because they probably are copies.  Do you need to
 6  take some time to look those over to satisfy yourself one
 7  way or the other as to whether they at least at this
 8  point appear to you to be the bills you received from
 9  Mr. Stilley?
10          THE WITNESS:  They do appear to me to be the
11  bills received from Mr. Stilley.
12          THE COURT:  They'll be admitted.
13  Q.  (BY MR. SNOKE)  Now, you said before, Mr. Patterson,
14  that -- I think in answer to my question -- well, never
15  mind.  I'll start over.  What was your payment
16  arrangement with Mr. Springer after you were indicted?
17  A.  Well, I didn't have a payment arrangement.  He did
18  ask for additional funds.
19  Q.  And who would he ask for additional funds?
20  A.  Either Mr. Stilley or to me directly.
21  Q.  Were there occasions when Mr. Springer would talk to
22  you directly?
23  A.  Yes.
24  Q.  About that subject?
25  A.  Yes.
```

1   Q.   And do you remember any of those conversations as to

2   amounts or anything that he asked for?

3   A.   I remember on one occasion when he came to my home

4   and he asked for an additional $90,000.

5   Q.   All right.  And was anybody else present when he

6   made that request?

7   A.   Yes, my wife was at home at the time.

8   Q.   Do you remember about when that was?

9   A.   No, I don't.

10  Q.   Okay.  Was it before or after the trial, if you

11  recall?

12  A.   It was before the trial, I believe, or maybe during

13  the trial.  I'm not sure.

14  Q.   When did the trial actually commence?

15  A.   In -- I believe it was in November of '03.

16  Q.   November of 2003?

17  A.   Yes, sir.

18  Q.   All right.  Getting back to this conversation, do

19  you recall if Mr. Springer told you what anything -- any

20  particulars as to why he needed another $90,000?

21  A.   Well, he said that he needed it to handle the rest

22  of this case and also for the securities part of it.  And

23  if he didn't handle the civil part of the securities,

24  that he would give me back 60,000.

25  Q.   All right.  So this is before the trial on the

1  criminal matter?

2  A.   Right.

3  Q.   Was there some sort of a civil action going on at

4  that time?

5  A.   Yes.  The SEC had filed civil charges -- a civil

6  case at that time.

7  Q.   All right.

8  A.   -- at that time.

9  Q.   All right.  And was -- prior to this conversation

10 with Mr. Springer, did you have any other representation

11 on the SEC that -- the civil part of the securities

12 matter?

13 A.   Well, we were -- our company was using Hall Estill

14 as our attorneys, and I had talked to them about that

15 part of the case.

16 Q.   All right.  And -- and had you -- were anybody from

17 Hall Estill going to represent you in the criminal

18 matter?

19 A.   Well, we had talked about that, but Mr. Springer

20 actually talked me out of using them and separating the

21 case.  Hall Estill wanted to separate the securities and

22 the bank fraud from the tax part of the case.

23 Q.   Hall Estill didn't want to represent you on the tax

24 part of the case?

25 A.   Correct.

EDDY PATTERSON - DIRECT BY MR. SNOKE                684

1   Q.   This is the criminal case now we're talking about?
2   A.   Right.
3   Q.   Was Hall Estill at that point already representing
4   you or your company on the civil part of the securities
5   matter?
6   A.   Well, there had just been a deposition with the SEC,
7   I'm not sure, that had gone -- I mean, I'm not sure --
8   but this was before the indictment.
9   Q.   All right.
10  A.   They didn't represent us after the indictment, if
11  that's what you're asking.
12  Q.   Yeah.  All right.  All right.  Then were payments
13  then made after the indictment to -- well, first of all,
14  did you provide Mr. Springer with this $90,000 that --
15  A.   Mr. Stilley paid him out of the trust fund that he
16  had set up with the funds that I had sent him.
17  Q.   Okay.  Explain, then, how you would pay Mr. Springer
18  after the indictment.
19  A.   Well, Mr. Springer received his money from
20  Mr. Stilley's trust account.
21  Q.   All right.  And then, before he received that from
22  Mr. Stilley, did you have to make some payment, then, to
23  Mr. Stilley's IOLTA account?
24  A.   Well, yes, we had already done that.  I had sent him
25  a check that I'd received for the sale of some stocks.  I

```
 1   had sent him a check for 112,500 for that, and then I had
 2   liability insurance with the company.  And they settled
 3   with me for $470,000, and 375,000 of that was sent to
 4   Mr. Stilley's account for him to hold and to use for the
 5   trial and then to -- if there was anything left over,
 6   he'd give it back to me.
 7   Q.   All right.  I think we need to look at some other
 8   exhibits, then.  First, if we could look at 98, and I
 9   don't know if that's in evidence or not.  98?  I think 98
10   is in evidence.
11              COURTROOM DEPUTY:  It's in evidence.
12              MR. SNOKE:  Can we pull that up on the --
13   Q.   (BY MR. SNOKE)  You recognize Exhibit 98?
14   A.   It's not on my screen.  Oh, here it comes.
15   Q.   It's up there now.
16   A.   Yes, it's a check to Mr. Stilley for $5,000.
17   Q.   And what's the date of that check?
18   A.   It's dated 5/8 of 2003.
19   Q.   All right.  Now, this is drawn on -- as opposed to
20   the earlier ones we looked at, this one is drawn on Tulsa
21   Sales and Rental?
22   A.   Yes, sir.
23   Q.   And what is Tulsa Sales and Rental?
24   A.   It was a company that my son, my middle son, and my
25   wife had participation in.
```

1   Q.   All right.  And were you -- were you able to issue a

2   check on Tulsa Sales and Rental in May of 2003?

3   A.   Yes.  I had signature rights on that account.

4   Q.   And that's your signature there on that?

5   A.   It is.

6   Q.   And what was that purpose of that check?

7   A.   It was just a pay --

8           THE COURT:  It wasn't anything you said, so

9   don't worry about that.

10          THE WITNESS:  It was just a payment to

11  Mr. Stilley, but I don't remember exactly the details.

12  Q.   (BY MR. SNOKE)  All right.  All right.  Date wise,

13  is this -- this is after the indictment?

14  A.   It is.

15  Q.   All right.  All right.  If you would look next at

16  Exhibit 99.

17  A.   This is a check from a Mr. Albin for the stock sale

18  that I was talking about earlier for --

19  Q.   All right.  You mentioned before some check for

20  $112,500.  Tell us about this check, which is in

21  evidence.

22  A.   This is the sale of the stock that I had.

23  Q.   What prompted the sale of the stock in June of 2003?

24  A.   Well, we needed the funds to -- for the legal fees

25  for the trial, and so I sold the stock to get the funds

1    to send to Mr. Stilley to handle that.

2    Q.   All right.  So you sold some stock to -- presumably

3    to this individual named Albin?

4    A.   Right.

5    Q.   And then what did you do with the check after

6    Mr. Albin gave it to you in return for your stock?

7    A.   Just endorsed it and sent it to Mr. Stilley.

8    Q.   All right.  And was that -- is that your endorsement

9    there on the back of that?  We have the back of this

10   check.

11   A.   It is.

12   Q.   All right.  Now, then what -- did you have any

13   conversations with Mr. Stilley regarding sending him this

14   check?

15   A.   Well, I remember having conversations with

16   Mr. Springer that -- I mean, I was just going to cash the

17   check and pay him as I had been.  And he indicated that I

18   needed to go ahead and set up a -- an account with

19   Mr. Stilley so that the government wouldn't take the --

20   take those funds out of my other account if I deposited

21   them in my bank account.

22   Q.   All right.  Okay.  Mr. Springer talked to you about

23   -- had this conversation with you?

24   A.   Yes.

25   Q.   And he said what?

1   A.   He said that if I deposited it in my account that

2   the government might take those funds, and so that's why

3   we just endorsed the check and sent it on to Mr. Stilley.

4   Q.   All right.   Did Mr. Springer say why you couldn't

5   just endorse the check and give it to him?

6   A.   Well, he said that they needed to put it in a trust

7   account to pay the -- their fees out of.

8   Q.   And this is the IOLTA account of Mr. Stilley over

9   there -- the trust account of Mr. Stilley in Arkansas?

10  A.   Yes, sir.

11  Q.   And you did that?

12  A.   Yes.

13  Q.   All right.   You can look at the -- I don't know.

14  All right.   Next I would like to go back to the -- well,

15  let's move to Exhibit 107.   Do you have that in front of

16  you?

17  A.   Yes, sir.

18  Q.   Actually, I think you'd better look at the hard copy

19  of that, because I want you to look at the third page of

20  that first, of that exhibit.   You said before there was

21  some money that came from an insurance company to Hall

22  Estill.   Can you explain what that was all about?

23  A.   It was an officers and directors liability policy

24  that the company had.

25  Q.   All right.

1    A.   And the insurance company had been paying Hall

2    Estill directly for their work in talking to me about

3    handling my securities part of the case.

4    Q.   All right.

5    A.   And then, as we got further along, they offered a

6    settlement.   They offered -- through Hall Estill, they

7    offered to pay me a lump sum settlement on the case if I

8    would accept it.

9    Q.   On the policy?

10   A.   Right.   So I talked to Mr. Springer about it, and he

11   agreed that if we could get $470,000, that that would be

12   a good number, so that's what we agreed to.

13   Q.   And this was for continued representation for you at

14   the trial?

15   A.   Yeah, it was for, I guess, whatever I used it for.

16   I mean, it was not restrictive.

17   Q.   But this conversation with Mr. Springer, originally,

18   you're saying?

19   A.   Right.   Yes.

20   Q.   And what did Mr. Springer indicate that you should

21   do with the proceeds, whatever was left of the proceeds

22   of this insurance settlement check?

23   A.   Well, he again advised me to have it sent directly

24   to Mr. Stilley's trust account, which I asked Hall Estill

25   to do that.

1  Q.  All right.  And I think you said before -- was Hall

2  Estill -- did they take some money out of this original

3  check --

4  A.  They did.

5  Q.  -- for fees that they had earned?

6  A.  Yes, they took about 95,000.  And they sent the

7  balance, which was about 375,000, to Mr. Stilley's

8  account.

9  Q.  All right.  So then what did you do with respect to

10 the $375,000 that was left -- what did you do with it, or

11 did you ask somebody to do something with it?

12 A.  Well, I asked Mr. -- I asked Hall Estill to send it

13 directly to Mr. Stilley, which they did.  They contacted

14 him, and he gave them account information and they wired

15 it, I believe.  I'm not sure if they wired it or sent him

16 a check, but, anyway, they sent it directly to him.

17 Q.  All right.  And did they give you advice that they

18 had done that?

19 A.  Yes.

20 Q.  And looking at the third page of that exhibit, do

21 you recognize that information on that page?

22 A.  Yes.  It's verification that Hall Estill had sent

23 that.

24 Q.  All right.  And then can you tell us, up there at

25 the top left on that exhibit, the amount that was wired

1   over to --
2   A.   $375,059.90.
3   Q.   All right.  And the -- the date of the wire, which I
4   think is about the second entry on the -- the second
5   entry in the middle column there?
6   A.   I believe it's November 6th of 2003.
7   Q.   All right.  All right.  Then -- when -- at sometime
8   the trial came to an end; is that correct?
9   A.   Yes, sir.
10  Q.   All right.  And were you convicted on the counts in
11  the indictment?
12  A.   I was.
13  Q.   And about when was that, that a verdict came back?
14  A.   December the 16th of 2003.
15  Q.   All right.  And were you taken into custody at that
16  time?
17  A.   Yes.
18  Q.   All right.  Now, I want to get to the billing
19  statements again, going back to -- if you could go back
20  to Plaintiff's Exhibit 170 -- let's start with 178.
21  Actually, let's start with 179.  And if you would -- if
22  we could pull up the -- actually, on the first page there
23  of Exhibit 179, this is -- there's an entry down there
24  for November 13th that mentions Lindsey.  And who did you
25  understand Lindsey was when it was mentioned in the

1   billing statement?

2   A.   Mr. Springer.

3   Q.   All right.  And another entry there on November 15th

4   .2 hours, phone call with Lindsey on strategy,

5   Patterson's concerns and communications, do you see that?

6   A.   Yes, sir.

7   Q.   On Exhibit 180, on December 3, 2002 -- I'm sorry, I

8   said 2003, I think, before.  This is 2002.  See about the

9   second major entry down there, "Calls to and from Lindsey

10  regarding e-mails"?

11  A.   Yes, sir.

12  Q.   Okay.  December 5th, billing some time, one hour,

13  review letter with Lindsey?

14  A.   Right.

15  Q.   December 5th, later, "Worked on letter and e-mail,

16  talked to Lindsey, he'll call back tonight"?

17  A.   Yes, sir.

18  Q.   All right.  There's some other entries on there

19  regarding -- in which you were billed for communications

20  between Mr. Springer and Mr. Stilley?

21  A.   Yes, sir.

22  Q.   All right.  Getting back to the trial of -- by the

23  way, before we -- well, we're not there yet on these

24  documents, but we're talking about it.  Was your wife on

25  trial also with you?

 1  A.   Yes, sir.

 2  Q.   Who defended her?

 3  A.   Jerry Barringer.

 4  Q.   And how did you find Mr. Barringer?

 5  A.   Mr. Springer brought him in.

 6  Q.   All right.  During the course of the trial and the

 7  preparations for the trial for you and your wife in the

 8  latter part of 2003, as between Mr. Stilley, Mr. Springer

 9  and Mr. Barringer, did you have observations during the

10  trial as to who was providing the -- who was calling the

11  shots, for the want of a better word?

12  A.   Yes.  It was obvious that Mr. Springer was running

13  the show.

14  Q.   All right.  Was he allowed to sit at counsel table

15  during your trial?

16  A.   No, sir.  He sat in the first row behind the

17  counselor's table.

18  Q.   How would he communicate, then, with --

19  A.   Well, he started out communicating by passing notes

20  to Mr. Stilley and Mr. Barringer.  And then after the

21  judge stopped that, he used his computer for a while.

22  And then I think that was also prohibited, so.

23  Q.   They sent him like e-mails on the computers?

24  A.   I'm not sure how they -- or what he passed, but I

25  know he was using a computer to communicate with

1  Mr. Stilley.

2  Q.   All right.  By the way, your wife convicted as well?

3  A.   Yes.

4  Q.   All right.  Let's look at Exhibit 181, the same

5  question in mind.  Do you see references on that billing

6  statement to communications and discussions back and

7  forth between Mr. Stilley and Mr. Springer on which you

8  were being billed for time?

9  A.   Yes, sir.

10 Q.   And you can just look quickly through some of the

11 others, I think, without belaboring the point.  But 182,

12 similar entries on Exhibit 182?

13 A.   Yes, sir.

14 Q.   Exhibit 183?

15 A.   Yes, sir.

16 Q.   And on 184 at the bottom of the first page there, I

17 think?

18 A.   Yes, sir.

19 Q.   And what's the date on that particular --

20 A.   April 22, 2003.

21 Q.   All right.  So the indictment is filed, but we

22 haven't been tried yet?

23 A.   Right.

24 Q.   Were there some delays between the first trial

25 setting and when you actually got trial -- got to trial?

1  A.   Yes.  It was originally in Judge Cook's court, then

2  it was changed.

3  Q.   It was put off, in other words, continued?

4  A.   Right.

5  Q.   A couple times?  Same question with respect to 185,

6  186?

7  A.   Yes, sir.

8  Q.   Now, on page -- on Exhibit 186, if you would -- I

9  think it's the -- it's the ninth page in on that

10 exhibit.  There's an entry down there under the heading

11 of total out-of-pocket expenses -- no, the next category

12 is "Description of paid direct IOLTA expenses," and it

13 mentions a -- on June 27th, it mentions a check to

14 Lindsey Springer there that's voided?

15 A.   Yes, sir.

16 Q.   All right.  And that's number 633?

17 A.   Right.

18 Q.   And then at the bottom there's a June 30th.  That

19 one was voided, I guess, but the entry for June 30, 2003,

20 it says to Lindsey Springer, check number 635, $14,539?

21          MR. SPRINGER:  Objection, Your Honor.  Is there

22 a question?

23          MR. SNOKE:  I'm just asking if he sees that.

24          THE WITNESS:  Yes.

25          MR. SNOKE:  I guess I'm publishing the --

```
 1            THE COURT:  Next question.
 2   Q.  (BY MR. SNOKE)  All right.  Were you aware of that
 3   -- I guess you were when you got this statement, but did
 4   you have any discussions with Mr. Springer or Mr. Stilley
 5   before that check was issued in June of 2003 that you
 6   recall?
 7   A.  Not that I recall.
 8   Q.  Okay.  On Exhibit 187, again, are there any
 9   references to calls back and forth between Mr. Springer,
10   Mr. Stilley that you were being billed for there?
11   A.  Yes.
12   Q.  That's the -- and Exhibit 188, same question?
13   A.  Yes, sir.
14   Q.  And 189?
15   A.  Yes, sir.
16   Q.  190?
17   A.  Yes, sir.
18   Q.  All right.  On 190 --
19            THE COURT:  Stand down for just a moment,
20   Mr. Snoke.  Go ahead.
21   Q.  (BY MR. SNOKE)  On Exhibit 190, if you'll go to the
22   next to last page of that exhibit.  Down near the bottom,
23   there's an entry for November 6, 2003.  And it talks
24   about -- there's an entry there for -- says, "Eddy
25   Patterson, check 688, 115,000"?
```

```
 1   A.   Yes, sir.

 2   Q.   Do you know what that had to do with?

 3   A.   Yes, they were -- they had sent me -- Mr. Stilley

 4   had sent me back 115,000 out of the funds that we had

 5   sent him so I could handle other expenses.

 6   Q.   And this is November 6th -- this is before the

 7   trial, then, I gather?

 8   A.   Just before, right.

 9   Q.   All right.  And the payment -- if you look at -- I

10   don't know if you have 107 in front of you there, but we

11   can call it up on the screen.

12          MR. SNOKE:   107 in evidence?

13          THE COURT:   107 is in.

14          MR. SNOKE:   All right.

15   Q.   (BY MR. SNOKE)   107 pertain to the $375,000

16   transfer, the third page of it?

17   A.   Yes.

18   Q.   Yeah.  And that's -- and the date on that, you said,

19   was November 6th of 2003?

20   A.   Right.

21   Q.   So that's the same date that he's indicating he cut

22   you a check from -- Mr. Stilley indicated he cut you a

23   check in his billing statements for 115,000?

24   A.   Right.

25   Q.   So that came out of the 375, not the 112 or whatever
```

1  you had paid him before that?

2  A.   Right.

3  Q.   And on the -- actually, it shows you, if you turn to

4  the next page of this exhibit I'm having you look at,

5  190.  I think they show the receipt of the 375,059.90.

6  Do you see that there?

7  A.   I'm sorry, what was that exhibit?

8  Q.   The last page of that exhibit you were looking at,

9  Number 190.

10  A.   Sorry, I put that up.

11  Q.   No, I'm running you back and forth.  I'm sorry.

12  A.   Okay.

13  Q.   So on the last page of that exhibit is -- there's an

14  entry there where Mr. Stilley is crediting you on a

15  statement for that time period, on Exhibit 190 for the

16  375,059.  Do you see that, the second entry up?

17  A.   Yes, sir.

18  Q.   And then that leaves a balance of what?

19  A.   He shows a retainer remaining of $227,947.50.

20  Q.   All right.  Now, with respect to -- I'm not going to

21  go through all the other exhibits, except I would have

22  you look at Exhibit 191, which is the next one in line

23  here.  And if you'll look at the last page of that

24  exhibit, please, or the next to last page, I guess it

25  is.  Page that has 60,430.25 at the bottom of it.

1    A.   Yes, sir.

2    Q.   All right.  Up there opposite November 7th, which

3    is, I guess, the next day, there's an entry that says,

4    Lindsey Springer 90,000 less 12,000 LS02 IOLTA, with a

5    line over there of $78,000.  Can you tell us about what

6    you know about that particular transaction?

7    A.   Well, I believe this is the 90,000 that Mr. Springer

8    had talked to me about that he -- that Mr. Stilley was

9    sending to him.

10   Q.   All right.  This is the 90,000 that you had -- you

11   talked about earlier you had a meeting with Mr. Springer

12   about?

13   A.   Yes, sir.

14   Q.   And what was the purpose -- what was going to happen

15   to that 90,000?

16   A.   Well, it was going to go to Mr. Springer.

17   Q.   All right.  Did you say something about the civil

18   securities case?

19   A.   Yeah, he -- Mr. Springer told me that it was going

20   to require more than he had originally thought and that

21   -- but that if he didn't handle the civil part of the

22   securities case, that he would give me back 60 of that

23   90.

24   Q.   All right.  Now, if you would -- if you would look

25   at -- at Government's Exhibit 26 for a moment.  The top

1    check in that exhibit is a $35,000 check from the IOLTA

2    trust account of Mr. Stilley to Lindsey Springer, which

3    has down there in the memo column Patterson.  Do you have

4    any independent knowledge of why that check was issued

5    from Mr. Stilley to Mr. Springer?

6    A.   No, sir, I don't recall.

7    Q.   All right.  Did you have any discussions with

8    Mr. Springer about this time, this is in July of 2003,

9    concerning a loan to Mr. Springer from you?

10   A.   I don't remember that, no.

11   Q.   All right.  After you were convicted and taken into

12   custody, did Mr. Springer or Mr. Stilley continue to

13   perform services for you prior to your sentencing?

14   A.   For a short period, they had -- they were going to

15   file the appeal for me.

16   Q.   Okay.  Well, I'm talking about now before you're

17   sentenced.  You discussed the appeal before your

18   sentencing?

19   A.   We had discussed it after the conviction.

20   Q.   All right.  And -- all right.  And about when was

21   your sentencing scheduled for after you were convicted in

22   December of 2003?

23   A.   I think originally it was scheduled for like March

24   of 2004.

25   Q.   All right.

EDDY PATTERSON - DIRECT BY MR. SNOKE                     701

```
1   A.   But it didn't occur until September.
2   Q.   All right.  And getting up to March of 2004, it got
3   continued from that date, did it?
4   A.   Well, it was in January, I believe, when I dismissed
5   Mr. Stilley and Mr. Springer and I hired Mr. Stephen Knor
6   to represent me.
7   Q.   All right.  Tell me about what happened in that
8   regard, in January of 2004.
9   A.   Well, Mr. Stilley had asked for another $20,000 for
10  the -- to buy the transcript for the trial and to prepare
11  the appeal also for my wife, and so --
12  Q.   Actually that -- was that money paid?
13  A.   It was.
14  Q.   All right.  If you'll look at Exhibit 108, and I
15  don't know if that's in or not.  I think it is.
16       COURTROOM DEPUTY:  It is.
17  Q.   (BY MR. SNOKE)  Is it in that book?
18  A.   Yes, it's a check from --
19  Q.   Is that the 20,000 you were talking about?
20  A.   It is.
21  Q.   Now, at some point in there, you're saying you
22  dismissed Mr. Springer and Mr. Stilley, who had
23  represented you through the trial of this case?
24  A.   Yes.
25  Q.   Tell me what happened in that regard.
```

1   A.   Well, I just determined that that was not my -- in

2   my best interest for them to represent me any longer, so

3   I talked to Mr. Knor, and he --

4   Q.   Who is Mr. Knor?

5   A.   He's an attorney that I hired to represent me after

6   I dismissed Mr. Stilley and Mr. Springer.

7   Q.   All right.  And with respect to your wife, who was

8   still facing sentencing in March, what did you do with

9   respect to her and Mr. Barringer, who -- I guess

10  Mr. Barringer represented her at the trial as well?

11  A.   He did.

12  Q.   And what did you do with respect to Mr. Barringer?

13  A.   Well, that was between him and my wife.  I wasn't

14  directly involved in that.

15  Q.   All right.  All right.  She was not incarcerated at

16  that point?

17  A.   No, she wasn't.

18  Q.   But you were; is that right?

19  A.   Right.

20  Q.   Did you communicate with Mr. Springer and

21  Mr. Stilley that you no longer wanted them to represent

22  you?

23  A.   Yes.

24  Q.   All right.  After that -- and in connection with

25  your being represented by Mr. Knor, then what happened

1  that may have continued your sentencing there from the

2  March date that it was originally set for?

3  A.   Well, he had asked me why -- he said he wanted to

4  ask me why I hadn't accepted an offer from the

5  prosecutor's side; a plea agreement, if you will.

6  Q.   All right.

7  A.   And that was the first I had heard of an agreement

8  being given, so --

9  Q.   All right.  Of course, by now you're convicted and

10  facing sentencing?

11  A.   Right.

12         THE COURT:  Mr. Snoke, stand by just a moment.

13  I'm told it's still raining hard.  And I'm also told by

14  the clerk that I cannot order lunch for jurors unless

15  they are deliberating; however, if I order it on the

16  record, it can be done.  I'm ordering it on the record.

17  But I need to find out how many of you brought your

18  lunch, if any?  Okay.  One, two, three, four, five, six,

19  seven.  Okay.  Cindy, that will be seven miscellaneous

20  sandwiches, then, for the other seven.  And are there any

21  of you who will need to leave the courthouse -- assuming

22  that we have the sandwiches brought in, are there any of

23  you who will need to leave the courthouse for any reason

24  during the lunch hour?

25         JURY PANEL:  No response.

EDDY PATTERSON - DIRECT BY MR. SNOKE                              704

1          THE COURT:  Cindy, then if you would, see to it

2   that that happens, then.  And we -- because it takes time

3   to get the sandwiches, we may go a little after noon

4   before we take our lunch break, but we'll just take that

5   as it comes.  You may continue.

6          MR. SNOKE:  Thank you, Your Honor.

7   Q.  (BY MR. SNOKE)  What happened after that in

8   connection with any dealings with our office here in the

9   U.S. Attorney's Office?

10  A.  Well, Mr. Knor had talked to me a couple times after

11  that and suggested that I consider --

12         MR. SPRINGER:  Your Honor, I would object.  This

13  is definitely hearsay.

14         THE COURT:  Bear with me just a moment.  That's

15  going to be sustained.

16         MR. SNOKE:  All right.

17  Q.  (BY MR. SNOKE)  Without getting into what Mr. Knor

18  may have told you, what happened -- did something happen

19  that -- in connection with your sentencing that put --

20  caused it to be put off?

21  A.  Yes.  I agreed to cooperate with the government in

22  exchange for --

23  Q.  In exchange for what?

24  A.  For consideration for a lesser sentence later and

25  also that my wife would be released from prison.

1  Q.   When you made that agreement, had your wife been

2  sentenced already?  Was this agreement after the May --

3  March, I'm sorry, date?

4  A.   Yes, it was like the first of September.

5  Q.   All right.  And --

6  A.   Or the end of August, somewhere in that time frame.

7  Q.   When you were sentenced or when an agreement was

8  made -- or what happened in September?

9  A.   Well, in September was my sentencing date.  I think

10 was the first of September, but --

11 Q.   And this would have been 2004?

12 A.   2004.

13 Q.   All right.  Prior to that, was your wife sentenced

14 on the March date or whenever you said it was originally

15 set for?

16 A.   Yes.

17 Q.   All right.  And what was her sentence?

18 A.   Her sentence was 18 months.  She had served four

19 months when -- the day that I was sentenced.

20 Q.   All right.  And what did you do in connection with

21 this agreement to cooperate with the government?

22 A.   I just agreed that if requested later, that I would

23 cooperate with the government.

24 Q.   All right.  Pursuant to that agreement, did you

25 testify in front of a grand jury?

```
 1   A.   Yes, I did.
 2   Q.   All right.  And give statements to maybe IRS agents
 3   or prosecutors?
 4   A.   Yes, that was much later that they brought me back
 5   from Oklahoma City to speak to the grand jury.
 6   Q.   All right.  Then prior -- then prior to -- and in
 7   2004, you didn't appear before a grand jury in 2004?
 8   A.   No, sir.
 9   Q.   But you did give a statement to somebody, I guess,
10   concerning what it is that -- were you asked some
11   questions and give a statement to anybody in connection
12   with this agreement?
13   A.   Well, I had -- yes, I had talked to the prosecutor's
14   office and we had come to terms on the agreement, what we
15   would agree to.
16   Q.   All right.  And were any questions asked of you
17   regarding your relationships with Mr. Springer or
18   Mr. Stilley?
19   A.   Yes, that was what it was about.
20   Q.   All right.  It wasn't myself or Mr. O'Reilly that
21   were at that time inquiring of you; is that right?
22   A.   No.
23   Q.   All right.  At some point, then, you were sentenced;
24   is that correct?
25   A.   Correct.  Yes.
```

1   Q.   And you said you thought that was around September?

2   A.   The first of September.

3   Q.   All right.  And were -- if you know, were any -- as

4   a result of your plea agreement -- or your agreement, it

5   wasn't a plea agreement, but an agreement with the

6   government to cooperate, were any representations made by

7   the government on your behalf at your sentencing?

8   A.   Not at the sentencing.

9   Q.   Well, did you get a lesser sentence than you were

10  scheduled to get?

11  A.   I didn't at that time, no.  I received 110 months.

12  Q.   The agreement called for some sort of a motion to be

13  filed by the government at a later time?

14  A.   It was contingent upon things happening later.

15  Q.   All right.

16  A.   There was an opportunity there to have a lesser

17  sentence.

18  Q.   All right.  And did -- ultimately, was a motion

19  filed by the government on your behalf?

20  A.   Yes.

21  Q.   Was that before or after you testified in front of

22  the grand jury?

23  A.   It was after.

24  Q.   And do you remember when you testified in front of

25  the grand jury?

1   A.   I believe that it was in 2006.

2   Q.   All right.  And what was your original sentence?

3   A.   110 months.

4   Q.   All right.  And what was your sentence after the

5   government made this motion?

6   A.   It was 40 months, is what I ended up serving.

7   Q.   And it wasn't this court that that was in; is that

8   correct?

9   A.   No.

10  Q.   Do you remember what judge?

11  A.   Judge Eagan.

12  Q.   Judge Eagan?

13  A.   Yes.

14  Q.   Now, in the course of your meetings with Mr. Stilley

15  and Mr. Springer, and we may have to go back to 2002 here

16  again, was there any conversation with -- let's take them

17  one at a time, unless they were both present at the same

18  time -- any discussion with Mr. Springer about whether or

19  not he filed tax returns?

20  A.   I asked both Mr. Springer and Mr. Stilley if they

21  filed returns, and they both told me they had not.

22  Q.   All right.  Do you remember when that conversation

23  took place in this spectrum we've just talked about?

24  A.   No.  It was fairly early, though, because I wanted

25  to see if they were sincere in their representation of my

1  situation with the way that they felt about their

2  returns.

3  Q.   All right.  And at that point, you were being

4  investigated for doing the same thing; is that correct?

5  A.   Well, it was after that time.  I believe it was even

6  after the indictment.

7  Q.   Oh, after the indictment?

8  A.   I'm not sure, but I think it was.

9  Q.   All right.  Well, you were indicted for doing the

10 same thing, then, among other things?

11 A.   Right.

12 Q.   That is for '96 through 2000, willful failure to

13 file tax returns?

14 A.   Yes.

15 Q.   I mean, among other charges.  When you met -- you

16 said you had a meeting, I think, at one time with your --

17 where your wife was present and you were talking about --

18 with Mr. Springer, Mr. Stilley.  Do you recall such a

19 meeting?

20 A.   I remember when my wife was there when Mr. Springer

21 came to our house to ask me about the 90,000.  There were

22 other meetings that my wife was present at.

23 Q.   All right.  At any of the meetings between you and

24 Mr. Springer or Mr. Stilley or both of them, were you

25 given any assurances regarding the upcoming trial?  This

1  would have been before the trial, I guess?

2  A.   Well, they assured me that there would certainly be

3  no jail time for either one of us and that they didn't

4  feel that we would be convicted.

5           MR. SNOKE:  May I have a moment, Your Honor?

6           THE COURT:  You may.

7  Q.   (BY MR. SNOKE)  Mr. Patterson, after you -- well,

8  let me ask you, first of all, you got out -- you said you

9  served 40 months; is that right?

10  A.   Yes, sir.

11  Q.   And that began in about September of -- well, no,

12  they gave credit for the time you'd been in jail since

13  the conviction in December of 2003?

14  A.   Right.

15  Q.   Now, after talking to Mr. Knor, terminating the

16  services of Mr. Stilley and Mr. Springer, which I think

17  you said was in January of 2004, did you have any -- did

18  you cause any kind of a lawsuit to be filed against

19  Mr. Springer, Mr. Stilley or anybody else?

20  A.   I didn't cause one at that time.  Later -- much

21  later my wife was approached by another law firm, and

22  they filed a lawsuit on our behalf, a civil suit.

23  Q.   What law firm was that?

24  A.   Richardson Law Firm.

25  Q.   All right.  That's here in Tulsa?

```
 1   A.   Yes.
 2   Q.   All right.  In -- and what was -- what was that
 3   lawsuit against Mr. Springer -- was it both Mr. Springer
 4   and Mr. Stilley involved in that --
 5   A.   I believe so.
 6   Q.    -- as defendants?
 7   A.   Yes.
 8   Q.   Were you still in jail at this time?
 9   A.   Yes.
10   Q.   So you were getting knowledge of this from?
11   A.   From my wife.
12   Q.   Okay.  Or did you have any conversations with the
13   attorney that --
14   A.   I did talk to him one time.  He was going to come
15   over to Oklahoma City, but that didn't happen before I
16   got out.
17   Q.   All right.  After you got out, you were on some sort
18   of supervised release?
19   A.   Yes.
20   Q.   Are you still on supervised release?
21   A.   Yes.
22   Q.   What was the basis, if you know, of the lawsuit that
23   was filed while you were still in jail by your -- I guess
24   your wife consented to it?
25   A.   Yeah.  I think it was for malpractice.
```

```
1   Q.   Was that involved with the -- your and your wife's
2   representation at this trial?
3   A.   Yes.
4          MR. SNOKE:  I believe that's all the questions I
5   have of the witness.
6          THE COURT:  We will continue -- let me confer
7   just a moment with Cindy, but we'll start momentarily
8   with cross-examination.  Stand by.  Go ahead with cross-
9   examination.
10         MR. SPRINGER:  Thank you, Your Honor.
11                        CROSS-EXAMINATION
12  BY MR. SPRINGER:
13  Q.   Mr. Patterson, I'm Lindsey Springer.  You testified
14  earlier that -- I want to get this correct.  That you're
15  here today testifying per a contract agreement that you
16  entered into with the United States government; is that
17  true?
18  A.   Yes.
19  Q.   Okay.  And as part of that agreement, you received a
20  substantial reduction in the prison sentence that Judge
21  Eagan handed down upon you; is that correct?
22  A.   Yes.
23         MR. STILLEY:  Your Honor, could we get the book
24  set down so that we could have a little better
25  visibility?
```

```
 1            THE COURT:  Mr. Springer, you may approach the
 2  witness for the purpose of moving those exhibit books.
 3            MR. SPRINGER:  Thank you, Your Honor.  Your
 4  Honor, may I leave the exhibit list there?
 5            THE COURT:  You may.
 6            MR. SPRINGER:  Thank you.
 7  Q.  (BY MR. SPRINGER)  So you had mentioned that you had
 8  hired Stephen Knor in -- I think you said January of
 9  2004; is that right?
10  A.  I think that's right, yes.
11  Q.  Okay.  How did you meet Mr. Knor?
12  A.  He came to the Tulsa County jail to see me.
13  Q.  Did he introduce himself to you as the former head
14  of the probation department -- or the public defender's
15  office in Tulsa, Oklahoma?
16  A.  I don't remember that.
17  Q.  Okay.  So you had -- you didn't contact him; he just
18  showed up at the jail?
19  A.  No, we contacted him.  Yeah, his name had been given
20  to me by someone else.  And my wife had contacted him,
21  and he agreed to come and talk to me about my situation.
22  Q.  Was that someone else William Widell?
23  A.  No, I don't believe so.
24  Q.  Was it your jail cellmate?
25  A.  It could have been somebody in there.  I just don't
```

1  remember.

2  Q.   Now --

3        MR. SPRINGER:  Could you please pull up

4  Government's Exhibit Number 9, please?

5        COURTROOM DEPUTY:  You're waiting for the

6  screen?

7        MR. SPRINGER:  Yes.

8        COURTROOM DEPUTY:  It's set.

9  Q.   (BY MR. SPRINGER)  Mr. Patterson, your testimony

10 earlier was that Tim Arsenault met you in March of 2000

11 at your -- to come to tell you that you were being

12 criminally investigated; is that correct?

13 A.   I believe it was in March.

14 Q.   March of 2000?

15 A.   I believe it was.

16 Q.   And you testified, I think, before -- or right after

17 that you hired a guy for a very short period of time.  Do

18 you remember the testimony of that?

19 A.   Yes, Tony Graham.

20 Q.   All right.  And how long did you -- had you hired

21 him?

22 A.   Just a few days.

23 Q.   From the moment that Mr. Arsenault knocked on your

24 door, you hired him just right thereafter?

25 A.   Well, it wasn't right after, but it was sometime

```
 1  after.
 2  Q.   Did you hire him before you met with me in March?
 3  A.   Yes, just before.  The week before, I believe.
 4  Q.   All right.  And did he go to the government and
 5  communicate with the government on your behalf?
 6  A.   I don't know.  I don't think he had time do anything
 7  because it was just a few days.
 8  Q.   Do you remember any conversations with me regarding
 9  that he said that Doug Horn would offer you a two count
10  plea deal and that you said you weren't going to plead
11  guilty?
12  A.   No, I don't remember that.
13  Q.   Okay.  Now, you stated that you -- you hired me at
14  that meeting in March of 2000; is that true?
15  A.   Yes.
16  Q.   Now, how did you hire me?  What did you do that
17  makes you think I owed you some duty as of March of 2000?
18  A.   I didn't think you owed me any duty.  I just think
19  we came to an agreement that you would represent me.
20  Q.   Represent you?
21  A.   Yes.
22  Q.   Now, you testified earlier I'm not a lawyer.
23  A.   Right.
24  Q.   That you knew that?
25  A.   Exactly.
```

1  Q.   Right?  Now, you have heard the ministry -- Bondage

2  Breakers Ministry, correct?

3  A.   I hadn't at that time, but I did later.

4  Q.   How long later?

5  A.   I believe it was much later when I heard about that

6  ministry.

7            MR. SPRINGER:  All right.  Could you please pull

8  up the Government's Exhibit 161, please?  Could you make

9  it a little wider.

10  Q.   (BY MR. SPRINGER)  Now, you testified just a little

11  while ago, did you not, that you authored what's been

12  marked as Government's Exhibit Number 176, accompanying a

13  check for $10,000; is that true?

14  A.   Yes.

15  Q.   And was that check the same check that we just

16  looked at, Government's Exhibit Number 9, for $10,000?

17  A.   I believe it was.

18  Q.   And they're both dated the same day, aren't they?

19  A.   Yes.

20  Q.   Okay.  Now, you said to Mr. Snoke in his question I

21  directed you to write donation on the check?

22  A.   Yes.

23  Q.   Okay.  Did I direct you to write this letter?

24  A.   No.

25  Q.   Okay.  So what did you mean here in this letter when

1    you said, "Please find enclosed our donation check,

2    hopefully as an encouragement to you to continue your

3    fight against the anti-Constitutional issues endorsed,

4    encouraged and policed by our government"?  What did you

5    mean by that?

6    A.   I guess just what it says.

7    Q.   So why did you not say please accept my check as a

8    down payment of my commitment when I hired you back in

9    March of 2000?

10   A.   Because you had asked me to put donation on the

11   check, and I felt like that the reason was -- is because

12   you didn't want to show it as income.

13   Q.   That's highly speculation on your part; is that

14   correct?

15   A.   No, it's what I thought at the time.

16   Q.   All right.  Now, at the time in March when we met,

17   did we have a discussion about a bus I was remodeling?

18   A.   Yes.

19   Q.   All right.  And did I ask you only for support in

20   the remodeling of that bus?

21   A.   As I remember, you said you needed $45,000 to

22   complete the renovation of the bus.

23   Q.   To finish it; that's right.  Thank you.

24        MR. SPRINGER:  Now, if would you please pull up

25   Government's Exhibit Number 10.

1  Q.   (BY MR. SPRINGER)   Now, did you intend this $10,000

2  on 9/25/2000 to be towards that agreement on the $45,000

3  to help me complete my bus?

4  A.   Yes.

5        MR. SPRINGER:   Could you please pull up

6  Government's Exhibit Number 14, please.

7  Q.   (BY MR. SPRINGER)   Is your testimony the same with

8  respect to Government's Exhibit Number 14 that's before

9  you right now, which says $10,000 donation?

10  A.   It was toward the 45,000.

11  Q.   Which was for the -- asked for by me to finish

12  remodeling a bus, right?

13  A.   That's what you said, yes.

14  Q.   All right.

15        MR. SPRINGER:   Could you please pull up

16  Government's Exhibit Number 72, please.

17  Q.   (BY MR. SPRINGER)   Mr. Patterson, on your screen is

18  a very bad example of Exhibit Number 72, but does the

19  bottom right corner clearly say retainer on it?

20  A.   Yes.

21  Q.   And this was a check, you testified, for $5,000

22  sometime you gave Oscar Stilley; isn't that true?

23  A.   Yes.

24  Q.   And is it true that that happened in 2000?

25  A.   Yeah, I believe so.

EDDY PATTERSON - CROSS BY MR. SPRINGER                          719

1   Q.   I believe your testimony earlier was March 17,
2   2000.  Do you remember that?
3   A.   I think on the other one that was a clearer copy
4   that's what it said, yeah.
5   Q.   Now, here, you're contracting with Oscar Stilley to
6   hire him as an attorney to represent you in some tax
7   matter; is that true?
8   A.   Yes, at your recommendation.  Right.
9   Q.   At my recommendation?
10  A.   Right.
11  Q.   Now, Tony Graham, was he my recommendation?
12  A.   No.
13  Q.   Okay.  And why would you want to come and ask me to
14  help you find a lawyer if you had Tony Graham?  I mean,
15  wasn't he a very high priced lawyer?
16  A.   I don't know how high priced he was.
17  Q.   Why would you hire him?
18  A.   I hired him before I had heard about you.
19  Q.   How did you find out about him?
20  A.   I'm not sure, but I think that maybe Mr. Arsenault
21  gave me his name.
22  Q.   Mr. Arsenault?
23  A.   I think so, yeah.
24  Q.   And Mr. Arsenault is who?
25  A.   He's the CID agent from the IRS.

EDDY PATTERSON - CROSS BY MR. SPRINGER                    720

1  Q.   So a special agent of the IRS shows up at your

2  office over on 61st and 129th on March 1, 2000, and says

3  hi, you're under criminal investigation, here's a lawyer,

4  go talk to him?

5  A.   No.

6  Q.   Okay.

7  A.   It was later I asked him -- I was trying to

8  cooperate with him, and I asked him if they knew somebody

9  that I could hire to represent me in this matter.  And I

10 believe that's how I got Mr. Graham's name.

11 Q.   All right.

12         THE COURT:  Mr. Springer, let me know when you

13 get to a convenient stopping point.  We'll take our

14 mid-day break.

15         MR. SPRINGER:  I'm there now, Your Honor.

16         THE COURT:  Very well.  Members of the jury,

17 we'll take our mid-day break at this time.  We'll resume

18 at -- let's call it 20 after one, again being guided by

19 the clock on the wall.  And during this mid-day break, of

20 course, please remember my usual admonition, which I will

21 not repeat at this time.  So please be available just a

22 little before 20 after one so that we can resume promptly

23 at 20 after one.  All persons in the courtroom will

24 remain seated while the jury departs.

25         (JURY EXITS THE COURTROOM.)

1          THE COURT:  The record will show the jury has

2   left the courtroom.  I have had an opportunity to review

3   the issue of the admissibility of cross-examination about

4   the dismissed -- Mr. Patterson, you're excused from the

5   courtroom.

6          (MR. PATTERSON EXITS THE COURTROOM.)

7          THE COURT:  Okay.  I've had an opportunity to

8   review the question of the admissibility of cross-

9   examination about that dismissed 1979 indictment.

10  Reference was made to the 2005 or thereabouts lawsuit on

11  direct, which is entirely understandable, because if it

12  had not been raised on direct it certainly would have

13  been raised on cross.

14          Anything that Mr. Patterson alleged in that

15  lawsuit against Mr. Stilley and Mr. Springer would

16  certainly be fair game on cross because it would have a

17  bearing on this witness's motive and animus and other

18  inclination to color his testimony.  I'm not saying he

19  did or didn't, but it certainly is fair game for that

20  purpose.

21          So as a beginning point, anything that's alleged

22  in that lawsuit is fair game for cross-examination,

23  although I will assure all concerned we are not going to

24  dwell on it at great length.

25          So that comes -- that brings us to the

1  allegation in that lawsuit and in the refiled version of

2  the lawsuit that allegation by the plaintiffs, including

3  Mr. Patterson, that they had never been in legal

4  trouble.  Well, legal trouble includes being indicted, no

5  matter what happens to the indictment.

6          My conclusion is this.  If Mr. Patterson admits

7  on the stand on cross that the allegation about no

8  previous legal trouble was not true, then that will be

9  the end of it.  Period.  And I do mean period.  If he

10 never -- if he maintains, though, that that was a true

11 statement, then he can be asked about the dismissed 1979

12 indictment.

13          Anything further we ought to take up before we

14 recess for lunch?

15          MR. O'REILLY:  Yes, Your Honor.  I'll turn this

16 over, so -- Your Honor, there are two matters with

17 respect to witnesses.  As a first matter, Mr. Cavins, who

18 was a detained witness, a prospective witness for the

19 government, we no longer need him.  Defendants wanted to

20 consider whether they might want to call him in their

21 defense.  My understanding from the defendants is they no

22 longer need him as a witness, and he can be sent back to

23 where he is incarcerated.

24          MR. SPRINGER:  That is true, Your Honor.

25          THE COURT:  Mr. Stilley?

```
 1              MR. SPRINGER:  Yes, Your Honor.

 2              THE COURT:  Very well.  He'll be released.

 3              MR. O'REILLY:  Well, not -- he'll get to go back

 4   to his facility.  The other matter, Your Honor, has to do

 5   with --

 6              THE COURT:  Return to his gated community.

 7              MR. O'REILLY:  Yes, Your Honor.  Special Agent

 8   Daniel Sivils had testified previously.  The defendants

 9   reserved the possibility of recalling him as a witness in

10   their case.  I had made inquiry of the defendants, if

11   they had no objection, the government certainly would

12   not, if Mr. Sivils would nevertheless, in spite of the

13   rule of witnesses that was invoked by the government, be

14   permitted to come in purely because he is, as indicated,

15   a very new special agent.  This is an excellent

16   opportunity for him to see what it is his work product

17   goes towards.  And it would be helpful for him.  They

18   indicated they had no objection.

19              THE COURT:  Well, he is not a percipient

20   witness, and that was made very clear during his

21   testimony.  So I certainly see no problem with that if

22   the defendants see no problem with that.

23              MR. SPRINGER:  I do not, Your Honor.

24              MR. STILLEY:  No objection, Your Honor.

25              THE COURT:  Very well.  That will be permitted.
```

EDDY PATTERSON - CROSS BY MR. SPRINGER                    724

```
 1              MR. O'REILLY:  Thank you very much, Your Honor.
 2              THE COURT:  Anything else from either side
 3   before we take our mid-day recess?
 4              MR. O'REILLY:  No, Your Honor.
 5              MR. SPRINGER:  Yes, Your Honor.  I have one
 6   quick question, one just point of reference to what you
 7   just stated about if he says yes, he was, that's the end
 8   of it.  I'm also going into the indictment involving
 9   Mr. Patterson, which had to do with the failure to file
10   tax returns, false returns and tax evasion.  My
11   understanding is that the objection the government has on
12   the table only goes to the '79 indictment and it's open
13   game as far as the rest of that.
14              THE COURT:  That's true.
15              MR. SPRINGER:  Thank you, Your Honor.
16              THE COURT:  Court will be in recess.
17   (A RECESS WAS HAD, AFTER WHICH THE FOLLOWING PROCEEDINGS
18   WERE HAD IN OPEN COURT AND WITHIN THE PRESENCE AND
19   HEARING OF THE JURY.)
20              THE COURT:  Please be seated.  Mr. Springer, you
21   may continue.
22              MR. SPRINGER:  Thank you, Your Honor.
23   Q.  (BY MR. SPRINGER)  Mr. Patterson, before you hired
24   Mr. Graham, did you have a long time relationship with a
25   man by the name of Dick Clark?
```

```
 1   A.   Yes.

 2   Q.   Okay.  And was he a friend of yours?

 3   A.   Yes.

 4   Q.   Was he also an advisor to you?

 5   A.   I guess you could say that with regards to the IRS

 6   situation.

 7   Q.   All right.  And is it true that Mr. Clark wrote a

 8   pretty lengthy book?

 9   A.   That is true.

10   Q.   And that regarded how to respond to IRS problems?

11   A.   Yes.

12   Q.   And that you were an owner of one of those books; is

13   that true?

14   A.   No, I wasn't.

15   Q.   You've never had a book?

16   A.   No.  I saw one at the trial.  That's the first time

17   I'd seen one.

18   Q.   Now, how long had you been friends with Mr. Clark?

19   A.   Since about 1974.

20   Q.   So you've been friends -- do you know about when he

21   wrote the book?

22   A.   No, I don't.

23   Q.   Now, did you ever tell CID Agent Tim Arsenault in

24   March of 2000 that Mr. Clark was your advisor?

25   A.   I may have.  I'm not sure.
```

1   Q.   Would that be something that you probably would have

2   said at that time?

3   A.   I just don't remember.

4   Q.   Okay.  Do you remember your testimony earlier with

5   respect to, as of March 2000, before Mr. Arsenault came

6   and introduced him to you at NESCO, that you had just had

7   some back and forth letters and responses with the IRS;

8   is that true?

9   A.   I think that's true.

10  Q.   Had you ever sued the IRS?

11  A.   I don't remember doing that.

12  Q.   Don't remember doing that?  If you would look in the

13  exhibit book in front of you and open it up to the --

14  there will be a little tab that says 83 on it.  Could you

15  take a look at that, please?

16          THE COURT:  This is a Defendants' Exhibit?

17          MR. SPRINGER:  This is a Defense Exhibit Number

18  83, yes.

19          THE COURT:  Do I have your exhibit list?

20          MR. SPRINGER:  Yes.

21          THE COURT:  Okay.

22          THE WITNESS:  Okay.

23  Q.   (BY MR. SPRINGER)  Have you seen what's been marked

24  as Defendants' Exhibit 83 before?

25  A.   Yes, I remember it now.

1  Q.   Okay.  Could you tell me what Defendants' Exhibit

2  Number 83 is?

3  A.   It's a petition to squash (sic) request for a

4  meeting and motion for writ of mandamus to be given to

5  Jay Bryce and the Internal Revenue Service to establish

6  claim against plaintiffs.

7  Q.   And is this you and your wife against Mr. Bryce?

8  A.   Yes.

9       MR. SPRINGER:  All right.  Your Honor, I move

10 for the entrance of Exhibit Number 83 for the record.

11      MR. SNOKE:  To which I object as being -- it's

12 irrelevant and it's impeachment --  I guess attempted

13 impeachment of a collateral matter.

14      THE COURT:  Counsel will approach.

15   (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND

16 OUT OF THE HEARING OF THE JURY.)

17      THE COURT:  Okay.  What's the relevance of 83?

18      MR. SPRINGER:  Government tried to establish

19 that all of his problems were because of me, and that is

20 not true.  And here is an example before he ever met me

21 suing the IRS.  There's exhibits he attached to this

22 document where he was letting -- and it's just completely

23 inconsistent with what the government characterizes as

24 his relationship prior to knowing me.

25      THE COURT:  Go ahead.

1          MR. SNOKE:  We haven't said that -- I don't

2   think this witness -- and we certainly haven't elicited

3   from this witness or attempted to that Mr. Springer was a

4   source of any of his problems.  The whole lawsuit, which

5   is the only --

6          THE COURT:  You mean Mr. Patterson.

7          MR. SNOKE:  No, that Mr. Stilley or Mr. Springer

8   were the root of Mr. Patterson's problem.

9          THE COURT:  Right.

10          MR. SNOKE:  The only thing he sued them for

11  afterwards was what they did in handling his trial.

12  Nobody has ever said that he wasn't a tax avoider, if not

13  a protester, before he ever met Mr. Springer, and I think

14  I brought that out in the early parts of his testimony.

15          THE COURT:  Well, the premise given by

16  Mr. Springer for relevance is not supported by the

17  record.  The objection will be sustained.

18      (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

19  WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

20  PRESENCE AND HEARING OF THE JURY.)

21  Q.  (BY MR. SPRINGER)  Mr. Patterson, eventually you did

22  dismiss your complaint against Mr. Bryce; is that true?

23  A.  Yes.

24  Q.  Okay.  And that would be in late 1999, if you

25  remember?

1    A.   I think that's right.

2    Q.   Okay.  And at this time, you did not know Lindsey

3    Springer, did you?

4    A.   No, sir.

5    Q.   Personally -- I -- let me rephrase that.  You did

6    not know me personally; isn't that true?

7    A.   That's true

8    Q.   You had heard about me, though, hadn't you?

9    A.   I'm not sure if it was at this time or not.  I don't

10   remember when I heard about you.

11   Q.   Do you -- excuse me.  I'm sorry, strike that.  Is

12   there a man by the name of Richard Hatch that you know?

13   A.   I know a Richard Hackler (ph).

14   Q.   Hackler.  I'm sorry.

15   A.   Right.

16   Q.   How do you know Mr. Hackler?

17   A.   He's a Gideon.

18   Q.   He's a Gideon?

19   A.   Yes.

20   Q.   Okay.  And did he ever --

21          MR. O'REILLY:  Excuse me, Your Honor.  I just --

22   with this on --

23          MR. SPRINGER:  I'm sorry.  Can we turn that

24   off?  Thank you very much.

25   Q.   (BY MR. SPRINGER)  Did Mr. Hackler ever share any

1  tapes of ministry meetings that he attended where I was

2  putting on a meeting of some sort?

3  A.   I don't remember him sharing any tapes, no.

4  Q.   Okay.  Did he ever share any written material that

5  he may have gathered from any of those meetings?

6  A.   Not that I remember.

7  Q.   So it's safe to say that everything that you did

8  prior to meeting me in 2000 was between you and

9  Mr. Clark; is that true?

10 A.   Yes, I'd say that's true.

11 Q.   All right.  Now, as of May of -- March of 2000, is

12 it true you had not actually filed a federal income tax

13 return since 1996?  Federal.  I said federal income tax

14 return.

15 A.   Yes, I think that's right.

16 Q.   And isn't it true, though, that you did file state

17 income tax returns?

18 A.   Yes.

19 Q.   And you paid all your state incomes taxes, didn't

20 you?

21 A.   Yes.

22 Q.   And isn't it true that you -- you took the money

23 that you thought you would have owed for '96 through 2000

24 and you put it into a savings account in a bank, didn't

25 you?

```
1   A.   Yes.
2   Q.   And the reason why you did that, isn't it true, is
3   because you had some questions for the IRS and you wanted
4   some answers?
5   A.   Yes.
6   Q.   Did you ever get those answers?
7   A.   No.
8   Q.   To this day you sit here in this courtroom and
9   you've never gotten those answers?
10  A.   I don't think so.
11  Q.   Thank you.  Now, also, isn't it true that in the
12  charging -- the charges that you had to defend against in
13  2003, which ultimately led to your conviction, they also
14  included, not only willful failure to file, but false tax
15  return charges and tax evasion, is that true?
16  A.   Yes.
17  Q.   Okay.  And at the same time -- isn't it true at the
18  same time that you were not filing tax returns for '96
19  through '99, neither was your wife?
20  A.   That's right.
21  Q.   And she was doing that at your direction; is that
22  true?
23  A.   Yes.
24  Q.   All right.  Not at my direction, correct?
25  A.   Correct.
```

EDDY PATTERSON - CROSS BY MR. SPRINGER                    732

1  Q.   Okay.  Not at Mr. Stilley's direction, correct?

2  A.   No, I didn't know you then.

3  Q.   Now, the two false tax return charges that were

4  levied against you had to do with you had already filed

5  '93 and '95 tax returns; isn't that true?

6  A.   Yes.

7  Q.   And then because of something that Mr. Clark had

8  shared with you, he suggested you could ask for a refund

9  of all the money you had paid; is that true?

10 A.   Yes.

11 Q.   Okay.  And you followed his advice exactly the way

12 he told you to do it; is that true?

13 A.   Yes.

14 Q.   Okay.  Did you ever get any money back on that

15 request for refund?

16 A.   No.

17 Q.   But you did get indicted for it, didn't you?

18 A.   Yes.

19 Q.   Now, when you got indicted in 2003, I believe it was

20 April of 2003; is that around your memory?

21 A.   Yes.

22 Q.   Okay.  Did you know at that time that you were being

23 investigated for false tax returns and tax evasion?

24 A.   I didn't know the specifics.

25 Q.   Is it not fair to say that you believed you were

1  being investigated for not filing tax returns for '96

2  through '99?

3  A.   That was part of it, yes.

4  Q.   Now -- and the rest of the charges had to do with,

5  if I'm correct on this, securities fraud charges, bank

6  fraud charges; is that correct?

7  A.   Yes.

8  Q.   Okay.  And the total number of counts that you had

9  in the indictment that was levied against you was 28

10 counts; is that true?

11 A.   I think that's right.

12 Q.   And that when you -- when you went in 2002 to the --

13 to testify before the grand jury, did you know you were

14 being investigated for securities fraud and bank fraud?

15 A.   No.

16 Q.   At that time, isn't it true that the only thing you

17 believed that you were being investigated for simply was

18 your issues with filing tax returns?

19 A.   I think that's right.

20 Q.   Okay.  And you had mentioned earlier about the Hall

21 Estill firm.  They -- when did they begin to represent

22 you; do you remember?

23 A.   It was like 2001.

24 Q.   2001.  And in 2002, when you testified before the

25 grand jury, do you remember being asked questions and

```
 1  answering questions relating to your abnormal giving that

 2  was reported on previous tax returns?

 3          MR. SNOKE:  Your Honor, point of clarification.

 4  We're talking about something in 2002, and I don't

 5  remember that date being associated with the grand jury

 6  testimony.

 7          THE COURT:  I'm not sure that's what

 8  Mr. Springer is referring to.

 9          MR. SNOKE:  I'm objecting to the relevancy.

10          THE COURT:  If it's an objection, it's

11  overruled.  Continue.

12          MR. SPRINGER:  Thank you.

13  Q.  (BY MR. SPRINGER)  Would you like me to ask that

14  again?

15  A.  Please.

16  Q.  Okay.  In 2002 you testified that you -- I believe

17  you referred to that you had been before two different --

18  or you had two different grand juries that had

19  investigated you; is that correct?

20  A.  Yes.

21  Q.  And the grand jury that indicted you in 2003 is not

22  the same grand jury that you went and testified to in

23  front of in 2002; is that correct?

24  A.  I think that's right.

25  Q.  And at the time that you went in to the 2002 grand
```

1   jury, you only knew that you were being investigated for

2   failure to file tax returns; is that true?

3   A.   I think that's right.

4   Q.   Before you went in there?

5   A.   Yes.

6   Q.   Right?

7   A.   Right.

8   Q.   But when you came out of there, it was a different

9   story; is that correct?

10  A.   Yes.

11  Q.   Okay.  And while you were in front of that grand

12  jury, were you not asked questions by the government

13  about the excessive deductions that you had claimed

14  giving to ministries and charities and so forth in the

15  previous tax returns that you had filed?

16  A.   I don't remember that.

17  Q.   Okay.  Have you ever given money to anybody that had

18  a mission or was on a mission or in a ministry or a

19  church or any of those types of examples?

20  A.   Yes.

21  Q.   Okay.  Did you ever ask anybody if they were a

22  501(c)(3) corporation before you ever gave them any

23  money?

24  A.   No.

25  Q.   Isn't it true that when you give money to somebody,

1  that what you're saying to them is here, take my money
2  and do what you would do; I can't do what you're going to
3  do, but you can.  Isn't that what you're saying?
4  A.   I guess you could put it like that.
5  Q.   Have you ever been on a mission trip to Mexico?
6  A.   Not to Mexico.
7  Q.   Where to?
8  A.   Several other countries.
9  Q.   All right.  And have you ever supported people who
10  went there instead of you?
11  A.   Yes.
12  Q.   All right.  And it's because they couldn't afford to
13  go; isn't that true?
14  A.   Probably.
15  Q.   And if you could have gone, you would have gone,
16  wouldn't you have?
17  A.   Maybe.  I'm not sure.
18  Q.   And you were very active in your church before you
19  went to prison; isn't that true?
20  A.   Yes.
21  Q.   Okay.  Now, in March of 2000, when you testified you
22  and I first met, had you ever heard of the name Bondage
23  Breakers Ministries before that date?
24  A.   No.
25  Q.   Did you know what my mission was?

1    A.    I knew what you told me.

2    Q.    What did I tell you?

3    A.    You told me that your mission was to destroy the

4    IRS.

5    Q.    And if I said that it was -- a better phrase would

6    be to get rid of the IRS, would you say that you would

7    agree with that as well?

8    A.    I don't remember the exact words.

9    Q.    Thank you.  Now, do you agree with that mission?

10   A.    To do what?

11   Q.    Get rid of the IRS.

12   A.    Well, I'd like to see that happen.

13   Q.    You'd like to see that happen.  Thank you.  Did you

14   ever tell me that you'd like to see that happen?

15   A.    Probably.

16   Q.    Now, you testified earlier about a $5,000 retainer

17   that you gave Oscar Stilley in May of 2003.  Do you

18   remember that testimony?

19   A.    I don't remember the date, but I think it was March

20   is the first one.

21   Q.    Okay.  I'm sorry.  March of 2000, that would be

22   correct -- okay.  Do you remember after you got indicted

23   that you testified that you gave Oscar Stilley $5,000

24   right after you got indicted?

25   A.    Yes.

1  Q.   Okay.  And did you write me a check for $5,000?

2  A.   No.

3  Q.   Did you write me a check for any amount?

4  A.   Not at that time.

5  Q.   Did I ask for anything?

6  A.   At the same time?

7  Q.   At any time after you got indicted up until you gave

8  Oscar Stilley a check in May of 2000.

9  A.   Well, yeah, when you asked me for the 90,000.

10 Q.   When was that; do you remember?

11 A.   It was like June maybe or July.

12 Q.   Okay.  Now, Mr. Patterson, you testified earlier

13 that you got a wire transfer of $375,000 in November of

14 2003.  Do you remember that testimony?

15 A.   I didn't get the wire transfer.

16 Q.   I'm sorry.  A wire was received on your behalf; is

17 that true?

18 A.   Yes.

19 Q.   All right.  And that originally was $475,000; is

20 that true?

21 A.   I think it was 470.

22 Q.   470.

23 A.   Right.

24 Q.   And that was in November of 2003, correct?

25 A.   I think that's right.

1   Q.   All right.  Now, when you first were indicted,

2   wasn't trial set to be like August or September of 2003?

3   A.   I don't remember the exact dates, but it was earlier

4   than November.

5   Q.   Earlier -- it was scheduled before Judge Eagan got

6   assigned, do you remember that?

7   A.   Yes.

8   Q.   Okay.  And it was Judge Cook who was assigned; is

9   that correct?

10  A.   Right.

11  Q.   All right.  And at the time that you were heading

12  for trial in May and June and July of 2003, did you have

13  any idea that the insurance company was going to try to

14  buy your errors and omissions insurance policy from you?

15  A.   No.  I knew they were paying it, but I didn't know

16  they were going to offer me a settlement, if that's what

17  you're --

18  Q.   And who were they paying?

19  A.   They were paying Hall Estill.

20  Q.   And were they paying Hall Estill a lot of money?

21  A.   I don't know how much it was.

22  Q.   Several hundred thousand dollars?

23  A.   I don't remember.

24  Q.   Okay.  So the reason why -- isn't it true that the

25  reason why that Hall Estill was not representing you in

1  the tax side of the grand jury indictment was because

2  your insurance company would not pay for that?

3  A.   No, I don't think that's true.

4  Q.   You think you had insurance that covered you in your

5  errors and omissions insurance for NESCO to pay for your

6  tax charges?

7  A.   No, but they told me they wouldn't handle a tax case

8  like this.

9  Q.   You sure they didn't tell you that the insurance

10 company wouldn't pay for it?

11 A.   No.  No, they wouldn't handle a tax case.  That's

12 why they wanted me to split the case, to split the SEC

13 and bank charges away from the tax charges.

14 Q.   Do you know if the insurance company ever offered to

15 pay for your tax charges?

16 A.   No, I don't know.

17 Q.   Did you ever have any discussion with an insurance

18 company about whether they would pay for your tax charges

19 -- the tax charge as part of your indictment?

20 A.   No, I don't remember ever having any discussions

21 with the insurance company about anything.

22 Q.   Why were you having the insurance company pay Hall

23 Estill?

24 A.   That's the way they deemed to handle it.

25 Q.   Who is they?

1   A.   The insurance company.

2   Q.   Why didn't you just pay for it yourself?

3   A.   Because the insurance company was paying for it.

4   Q.   So it's safe to say that if an insurance company

5   would pay for your defense, then you would -- you'd turn

6   that claim in, wouldn't you?

7   A.   I guess I would.

8   Q.   And did you ever turn a claim in to the insurance

9   company on your tax charges?

10  A.   No.

11  Q.   Now, as -- just walking through the pieces here,

12  please, if you will, you -- you told the jury you hired

13  me in March of 2000, but you didn't give me any money

14  until August of 2000; is that right?

15  A.   No, that's when the first check that we looked at.

16  I'm not sure that I didn't give you some money before

17  that.

18  Q.   Okay.  As you sit here today, do you have any

19  evidence that you gave me any money before August 25,

20  2000?

21  A.   I have no evidence to that.

22  Q.   If you gave me money, would you have given it in any

23  other form than the same way you gave me the three

24  $10,000 checks?

25  A.   No, it would be in the same form.

1  Q.   And is it your testimony here today that you turned

2  over every record you had with regard to your

3  relationship with Lindsey Springer or Oscar Stilley for

4  the years that the government asked you to turn over?

5  A.   You're asking me if I did turn them over?

6  Q.   Yes.

7  A.   Yes, I did.

8  Q.   You didn't hold anything back, did you?

9  A.   No.

10  Q.   It was part of the deal, wasn't it?

11  A.   I don't know about that.

12  Q.   You did enter into a deal with the government, did

13  you not?

14  A.   Yes.

15  Q.   All right.  We've already discussed that.  Now, you

16  said that I asked for 45,000, correct?

17  A.   Yes.

18  Q.   And that was to complete a conversion on a '55 bus,

19  right?

20  A.   That's what you told me, yes.

21  Q.   All right.  Do you have any reason to believe that

22  that wasn't true?

23  A.   I don't have any reason to know what it was used

24  for.

25  Q.   And are those the conditions by which you agreed to

```
1   give me that money?
2   A.   I agreed to give you the money for helping me.
3        MR. SNOKE:  Your Honor, this has been asked and
4   answered before.
5        THE COURT:  Overruled.
6   Q.   (BY MR. SPRINGER)  Did you ever tell me that you
7   were giving me that money so I would help you?
8   A.   I don't know.
9   Q.   Did you ever say, Lindsey, I'm giving you $45,000.
10  I'm going to give you 30 of it in August, September and
11  October.  I'm not going to give you the other 15, and
12  it's for services.  Did you ever tell me that?
13  A.   I don't know.  I just assumed that it was our
14  agreement.
15  Q.   Is it an agreement that you remember that we had
16  orally?
17  A.   Yes.
18  Q.   And we sat down and how did that agreement go?
19  A.   You said you would help me and you needed $45,000.
20  Q.   Did I condition anything on helping you with the
21  $45,000?
22  A.   I assume that's what the services were for -- the
23  amount of the services were.
24  Q.   You assumed it was for the services?
25  A.   I didn't think you would work for free.
```

1  Q.   Now, what did you expect me to do?

2  A.   You were going to handle the case.

3  Q.   Handle what case?

4  A.   The tax case.

5  Q.   The tax case that didn't get indicted until 2003?

6  A.   Right.

7  Q.   Did you know you were going to get indicted three

8  years from March of 2000?

9  A.   No, but the tax case started much earlier than that.

10  Q.   When did the tax case start?

11  A.   It started before we had our meeting.

12  Q.   Did I know that your tax case started before we had

13  our meeting?

14  A.   You knew at the meeting.

15  Q.   I knew at the meeting?

16  A.   Yes.

17  Q.   Right.  So when you called me up and you said, hey,

18  Lindsey, come on over here, I've got to talk to you, did

19  you tell me what I was coming over to talk to you about?

20  A.   I think so.

21  Q.   What did you tell me?

22  A.   I told you what the situation was, that the IRS had

23  come to see me and I need somebody to represent me.

24  Q.   And isn't it true that I told you to call Oscar

25  Stilley?

EDDY PATTERSON - CROSS BY MR. SPRINGER                    745

```
 1   A.   I don't remember that.

 2   Q.   98.

 3          MR. SPRINGER:  Your Honor, may I approach just

 4   to refresh memory?

 5          THE COURT:  Pardon me?

 6          MR. SPRINGER:  May I approach to refresh memory

 7   only?

 8          THE COURT:  You may.

 9          MR. O'REILLY:  Your Honor, may we see what's

10   being refreshed?

11          MR. SPRINGER:  Sure.

12   Q.   (BY MR. SPRINGER)  Mr. Patterson, earlier today in

13   direct examination you identified what you thought were

14   copies of billing records of Oscar Stilley.  Do you

15   remember that?

16   A.   Yes.

17   Q.   Does the document that you have in your hands right

18   now look to be similar to copies that you testified

19   earlier about?

20          MR. SNOKE:  Your Honor, I'm going to object to

21   the form of the question.  This is supposed to be

22   something to refresh the witness's recollection.

23          THE COURT:  Well, that's overruled.  We'll see

24   where we go.

25          MR. SPRINGER:  Thank you.
```

```
 1            THE WITNESS:  It's in the same format.
 2   Q.  (BY MR. SPRINGER)  All right.  Does it -- does the
 3   document before you refresh your memory about March 2000,
 4   March 18, 19 and 20, 2000?
 5   A.  I'm sorry, I don't follow you.
 6   Q.  Okay.  Does this look like the same type of billing
 7   records that you would receive from Oscar Stilley on
 8   other billing records that you testified earlier about?
 9   A.  It looks like it's in the same format.
10   Q.  So would you have any objection if Oscar billed you
11   for an hour's time of talking with me on March 19 of
12   2000?
13            MR. SNOKE:  Object to the relevance of that
14   question.
15            THE COURT:  Overruled.
16            THE WITNESS:  I'm sorry?
17   Q.  (BY MR. SPRINGER)  Would you have any objection to
18   this -- what you have in your hands right now stating
19   that on March 19 and 20, 2000, that Oscar Stilley had a
20   phone call with Lindsey Springer?
21   A.  Would I object to that?
22   Q.  Yes.
23   A.  No.
24   Q.  You paid the bill, didn't you?
25   A.  Yes.
```

```
1            MR. SPRINGER:  May I approach, Your Honor?
2            THE COURT:  You may.
3    Q.  (BY MR. SPRINGER)  So you called me up, had me come
4    over and meet you at NESCO, told me that you needed an
5    attorney.  Am I right so far?
6    A.  Well, I remember calling you up and you said you
7    would come over to visit with me on Saturday.
8    Q.  And I did, didn't I?
9    A.  And you brought Mr. Stilley.
10   Q.  I brought Mr. Stilley?
11   A.  That's the way I remember it, yes.
12   Q.  You don't remember us having to call Mr. Stilley
13   first and then Mr. Stilley came over?
14   A.  I don't remember that.
15   Q.  Okay.  So you called me, and then you think that I
16   showed up at your office on a Saturday with Mr. Stilley
17   and we sat down and away we went?
18   A.  That's the way I remember it.
19   Q.  Okay.  Now, do you also remember retaining Jerold
20   Barringer for your wife?
21   A.  Yes.
22   Q.  Now, was Jerry there at that meeting?
23   A.  No.
24   Q.  Where was Jerry?
25   A.  I don't know.
```

1    Q.   Did you write him a check?

2    A.   Not then.

3    Q.   When did you write him a check?

4    A.   After you hired him.

5    Q.   After I hired him.   So I paid and hired Jerry

6    Barringer?

7    A.   No, I paid him.

8    Q.   So you paid him and I hired him?

9    A.   I paid him at your direction.

10   Q.   So your statement of my direction is I hired him; is

11   that right?

12   A.   Yes, basically that's right.

13   Q.   But I never gave him any money, did I?

14   A.   No.

15   Q.   Did I ever sign any contracts with him?

16   A.   I don't know.

17   Q.   Did you?

18   A.   No.

19   Q.   Did he ever do anything for you from March of 2000

20   to March of 2003?

21   A.   He represented my wife.

22   Q.   And what did he represent your wife on?

23   A.   On those tax charges.

24   Q.   Did he ever come to Tulsa?

25   A.   Yes.

1   Q.   Before she got indicted or after she was indicted?

2   A.   I don't remember the timing.  I think it was after.

3   Q.   Thank you.  So from 2000 March to 2003 March,

4   Mr. Barringer didn't earn a dime of that $5,000 retainer,

5   did he?

6   A.   The retainer I paid to Mr. Stilley?

7   Q.   No, the retainer that you paid to Mr. Barringer.

8   A.   I paid him that after -- after he was engaged,

9   right?

10  Q.   Do you remember in March of 2003 asking

11  Mr. Barringer to return the retainer that he had because

12  you didn't think you were going to get indicted?

13  A.   I don't remember that.

14  Q.   Did you think in March of 2003 that you were going

15  to get indicted?

16  A.   I don't remember what I was thinking in March of

17  2003.

18  Q.   Well, isn't it true that you had just gotten home

19  from a trip when they came out and arrested you?

20  A.   Yes.

21  Q.   You and your wife had been out of town; isn't that

22  true?

23  A.   Well, not my wife.  I had been to Ireland on a

24  mission trip, yes.

25  Q.   All right.  So did you call the government up and

EDDY PATTERSON - CROSS BY MR. SPRINGER                          750

1  ask them if it was okay to go to Ireland because you

2  thought you might be getting indicted while you were

3  gone?

4  A.   Well, I think Mr. Stilley did call Melody Nelson and

5  asked her if it was okay if I left the country.

6  Q.   Do you have a billing record on that?

7  A.   It may be in one of these billings.  I don't know.

8  Q.   You're just speculating on that?

9  A.   No, I'm not speculating.  He told me that he talked

10 to her to make sure it was all right if I went.

11 Q.   So you thought you were going to be getting indicted

12 when you came back home?

13 A.   Didn't know I was going to be indicted, but I knew I

14 was under investigation.

15 Q.   All right.  Now, who is Tulsa Sales and Rental?

16 A.   Who is it now?

17 Q.   Who was it in 2000 through 2003?

18 A.   It was Tim Patterson and my wife.

19 Q.   Your wife, Judy Patterson, right?

20 A.   Right.

21 Q.   And is it safe to say that during the three-year

22 time period that you were being investigated that the IRS

23 put a financial pinch on your finances?

24 A.   I don't know what you're asking me.

25 Q.   Okay.  Before you got indicted, were you living the

1   American dream?

2   A.   I guess.  I don't know.

3   Q.   Were you financially in trouble in March of 2003?

4   A.   No.

5   Q.   So hadn't you already spent the $200,000 that you

6   had set aside in the -- to pay the taxes, the federal

7   taxes that you were holding, waiting for an answer from

8   the IRS?

9   A.   I'm not sure what time frame.

10  Q.   So you got indicted in April of 2003, and you had

11  given Mr. Stilley one $5,000 check sometime in May, and

12  then you didn't give Mr. Stilley any more money until you

13  got that $112,000 check that you cashed some stock in you

14  testified about earlier; is that right?

15  A.   There may have been one other $5,000 check.  I'm not

16  --

17  Q.   All right.  So let's get this straight.  You got a

18  grand jury indictment.  You got 28 charges.  You got an

19  insurance company paying Hall Estill thousands of

20  dollars.  And is it true you've only -- at this point in

21  June of 2003 only had to give $5,000 twice to either

22  Oscar Stilley or Mr. Barringer?

23  A.   I think that's right.

24  Q.   So it's safe to say you didn't take the tax charges

25  very seriously at that point?

1  A.   No.

2  Q.   Well, why had you only given him $5,000?

3  A.   I gave him whatever he asked me to give him at that

4  time.

5  Q.   And is your testimony you did not turn any claims in

6  with the insurance company on the tax case, correct?

7  A.   I didn't turn in any claims to them for anything.

8  Q.   And if you could have claimed -- if you could have

9  had the insurance company pay for your representation in

10 the tax case, you would have done it, wouldn't you?

11 A.   If I would have known that.

12 Q.   Okay.  Now, there was a -- do you remember giving

13 testimony about a $35,000 check earlier?

14 A.   I remember Mr. Snoke asking me about it.

15 Q.   But you didn't remember what it was for, did you?

16 A.   No.

17 Q.   Would it refresh your memory -- excuse me.  Strike

18 that.  At the time that you got the $112,500 check, isn't

19 it true that you gave $30,000 of that money to Tulsa

20 Sales and Rental?

21 A.   I sent the check to Mr. Stilley.

22 Q.   And didn't Mr. Stilley give me a check for $35,000

23 and didn't I get a cashier's check for you for Tulsa

24 Sales and Rental for $30,000?

25 A.   I don't remember the exact amount.

EDDY PATTERSON - CROSS BY MR. SPRINGER                    753

1   Q.   And didn't I bring you $5,000 in cash?

2   A.   I don't remember that.

3   Q.   But you're not saying it's not true; is that right?

4   A.   I don't remember that.

5        MR. SPRINGER:  Could you pull up Government's

6   Exhibit 190, please.  190.  I'm sorry, go back one page

7   from that first.  I'm sorry, that's the right -- there

8   you go.  Thank you very much.

9   Q.   (BY MR. SPRINGER)  Mr. Patterson, you have before

10  you Exhibit 190, the second to last page.  And do you see

11  on November 6, 2003, an entry of $115,000?  Do you see

12  that right there?

13  A.   Yes.

14  Q.   Do you remember what that was for?

15  A.   That was for other expenses.  That's what money I

16  got back from Mr. Stilley out of the --

17  Q.   Whose expenses?

18  A.   My expenses.

19  Q.   So you got $115,000 from Mr. Stilley just right

20  before your trial?

21  A.   Yes.

22  Q.   Now, Mr. Patterson, isn't it true that when the

23  insurance company tried to offer to buy this contract

24  out, their initial offering was $100,000?

25  A.   I don't remember that.

1  Q.  Do you remember that you had to negotiate with the

2  insurance company?

3  A.  I remember it going back and forth some, yes.

4  Q.  Do you remember that they came in low and you went

5  high and you guys ended up in the middle?

6  A.  Something like that, yeah.

7  Q.  And so isn't the amount of money that you got here

8  on November 6th from Oscar Stilley more than their

9  initial offer to you for the total policy?

10  A.  I'm sorry, I don't remember.

11           MR. SNOKE:  Objection.

12           THE COURT:  Overruled.

13           THE WITNESS:  I don't remember the initial

14  offering.

15  Q.  (BY MR. SPRINGER)  Do you remember that Hall Estill

16  got over $100,000 out of the check that you got from the

17  insurance company?

18  A.  I think it was a little less than 100,000.

19  Q.  And that was just for one month's services, wasn't

20  it?

21  A.  I don't remember what --

22  Q.  Wasn't the insurance company paying them monthly?

23  A.  No, they didn't pay them monthly.  They paid them

24  periodically.

25  Q.  Okay.  Mr. Patterson, when you were being examined

1  by the government, you told this court that the reason

2  why you sent the $375,000 wire to -- had it sent to Oscar

3  Stilley's IOLTA account was because I told you to do

4  that.  Do you remember that testimony?

5  A.   Yes.

6  Q.   Now, did I have anything to do whatsoever with the

7  negotiations between you and Hall Estill and the

8  insurance company?

9  A.   Yes.

10 Q.   What did I have to do with that?

11 A.   I talked to you about it.  You're the one that told

12 me what figure we should agree on.

13 Q.   Really?

14 A.   Yes.

15 Q.   I'm the one that told you, or did Oscar tell you?

16 A.   You did.

17 Q.   What is the amount that I told you that you should

18 agree on?

19 A.   You told me that if we could get 470, you thought

20 that was a fair settlement.

21 Q.   Really?

22 A.   Yes.

23 Q.   Did you ever give me a copy of the policy?

24 A.   I think I did one time.

25 Q.   Really?

1    A.   I think I did.  I don't remember for sure, but I

2    think you asked for it.

3    Q.   Thank you.  Now, all of a sudden, you're sending

4    $375,000 to Mr. Stilley's account, and your testimony was

5    that I told you to do it because I -- you said I told you

6    that if you sent it to Oscar Stilley's IOLTA account,

7    then the government couldn't get it, right?

8    A.   That's right.

9    Q.   Well, then, why did ask you for $115,000 to be sent

10   back to you?

11   A.   For expense -- for things that I needed to buy.

12   Q.   So the government could get that, couldn't they?

13   A.   They could have.

14   Q.   Did I tell you not to do it?

15   A.   No.

16   Q.   Did I even know you were getting $115,000 back?

17   A.   I don't know.

18   Q.   Do you have any evidence that I knew that you were

19   getting $115,000?

20   A.   No.

21   Q.   Did I ever tell you don't do that because the

22   government will get it?

23   A.   I don't remember that.

24   Q.   And you also testified about a $112,500 check that

25   you cashed in some stock.  Do you remember that

1  testimony?

2  A.   Yes.

3  Q.   What kind of stock was that?

4  A.   What kind of stock?

5  Q.   Yeah.

6  A.   It was stock in an oil and gas company.

7  Q.   Was it a high risk stock?

8  A.   I don't know.

9  Q.   When did you first find out that you were going to

10  get $112,500 for that stock?

11  A.   When I asked for it.

12  Q.   When did you ask for it?

13  A.   Sometime before the check was written.

14  Q.   Now, Mr. Patterson, you got indicted in 2003, 28

15  counts, and you didn't get $375,000 until November 6,

16  2003; is that correct?

17  A.   Yes.

18  Q.   And you had a $112,000 check that you got in June,

19  late June 2003; is that correct?

20  A.   Yes.

21  Q.   Okay.  And you needed $115,000 out of that money

22  that Oscar Stilley was holding in his IOLTA account for

23  you, right; is that in your testimony?

24  A.   In November.

25  Q.   Right.  Because you needed it because you were

EDDY PATTERSON - CROSS BY MR. SPRINGER                    758

1   broke, weren't you?

2   A.   Basically.

3   Q.   Right.  Now -- and you needed the $112,500 check

4   because you were broke too; isn't that true?  Isn't that

5   why you cashed the stock in, because you needed the

6   money?

7   A.   I guess.

8   Q.   Okay.  So you weren't doing very well off, were you?

9   A.   Not at that time.

10  Q.   Thank you.

11  A.   I mean, I didn't have any income at that time.

12  Q.   Why didn't you have any income at that time?

13  A.   I wasn't working.

14  Q.   What happened to your job?

15  A.   I had resigned at the company in August of 2001.

16  Q.   Safe to say that because of your IRS and security

17  problems, the business that you were the president and

18  CEO of failed?

19  A.   No.

20  Q.   Why did it fail?

21  A.   It was after I left that it failed.

22  Q.   After you stepped down or after you left?

23  A.   It was the same day.

24  Q.   Same day?

25  A.   I mean, I stepped down and left the same day, I

1  guess, is what I'm saying.

2  Q.   Now, in part of your charges by the grand jury, they

3  charged you with securities fraud.  That was your

4  testimony earlier, correct?

5  A.   Yes.

6  Q.   And you had borrowed -- was it $3 million from a

7  bank to buy all the stock of NESCO; is that right?  To

8  buy a large portion of stock?

9  A.   I bought my ex-partner's shares back in 2000, I

10 think it was.

11 Q.   And weren't you getting ready to go public with an

12 -- you were doing a PPO; is that right?

13 A.   Well, we were public.

14 Q.   You were public.  What was getting ready to happen

15 that made an advantage to you by having $3 million worth

16 of stock in NESCO?

17 A.   Nothing I know of.

18 Q.   Were you going to get $5 a share on opening day?

19 A.   We were already public.  We were public before I

20 bought the shares.

21 Q.   So what was it that the -- that you were trying to

22 get the SEC to do in 2001 and 2002 that drew their

23 attention to you?

24 A.   Nothing.  We weren't trying to do anything with the

25 SEC.

1  Q.   You weren't getting ready to get $5 a share for that

2  stock?

3  A.   No.

4  Q.   And you didn't tell the grand jury you were going to

5  give all of that to charity?

6  A.   I may have if I'd have sold it.

7  Q.   Would it have been worth $5 a share at the time that

8  you owned it?

9  A.   It may have been from time to time.

10 Q.   Would you have ever said to me that you at some

11 point in time were going to have $15 million?

12 A.   I don't remember that.

13 Q.   Did you ever ask Oscar Stilley to slow down the

14 government on their subpoenas so that you could get those

15 stocks sold so that you could get $15 million?

16 A.   I don't remember that.

17 Q.   Did you and I ever have any conversation prior to

18 you being indicted about anything related to securities?

19 A.   I don't know.

20 Q.   Did we ever talk about tax evasion?

21 A.   Probably.

22 Q.   You and I had a discussion about tax evasion?

23 A.   Well, that's what the charges were.

24 Q.   No, before you were indicted.  Before you were

25 indicted, did you and I ever have a conversation related

1   to tax evasion?

2   A.   I don't remember.

3   Q.   You testified earlier that the only charges that you

4   thought you were being investigated for was failure to

5   file tax returns; isn't that true?

6   A.   Failure to file tax returns and to pay taxes.

7   Q.   But tax evasion was a separate charge in your

8   indictment, wasn't it?

9   A.   In the indictment it was.

10  Q.   And so was filing false returns; isn't that true?

11  A.   Yes.

12  Q.   And isn't it true that you had 1040 forms prepared

13  by a CPA?

14  A.   Yes.

15  Q.   Same CPA that did NESCO's corporate returns?

16  A.   Yes.

17  Q.   And he also did the state tax returns that you

18  turned in; isn't that true?

19  A.   That's right.

20  Q.   But you didn't turn the federal ones in, right?

21  A.   No.

22  Q.   But you did use them to get a loan at a bank, didn't

23  you?

24  A.   I don't remember.

25  Q.   Wasn't that part of the false -- the bank fraud

1  charges against you?

2  A.   No, the bank charge was because I didn't show an IRS

3  liability on my financial statement.

4  Q.   And what liability was that?

5  A.   The liability that they said I would have had --

6  the tax liability I would have had for those years.

7  Q.   Now, in 2004, January, you testified that you fired

8  me, you fired Oscar and you hired Mr. Knor; is that true?

9  A.   Yes.

10 Q.   Did you ever send me a fired letter?

11 A.   I sent it to Mr. Stilley.

12 Q.   Did you?

13 A.   Yes.

14 Q.   It said, I fire Lindsey?

15 A.   I said, I'm terminating our agreement.

16 Q.   Whose agreement?

17 A.   Our agreement between you and Oscar and myself.

18 Q.   Okay.  You terminated our agreement?

19 A.   Yes.

20 Q.   And that agreement, did you bring that here today

21 with you?

22 A.   No.

23 Q.   Is it in writing?

24 A.   I wrote it by hand from the Tulsa County jail.

25 Q.   No, no, no.  I mean the agreement that you were

1  terminating.  Did you have an agreement in writing that

2  you terminated?

3  A.   No.

4  Q.   So what you're saying is you sent a handwritten

5  document to Oscar that told him orally that you didn't

6  want him to represent you as his (sic) attorney anymore?

7  A.   I told him I didn't want either of you representing

8  me anymore.

9  Q.   When you say represent, you have a history of --

10  with lawyers, correct?

11  A.   I don't know what you mean.

12  Q.   Well, you had Hall Estill representing you in the

13  securities case, right?

14  A.   Yes.

15  Q.   And wasn't Hall Estill representing you in several

16  civil lawsuits that were filed against you?

17  A.   Probably.

18  Q.   And they had a whole team of lawyers fighting for

19  you, didn't they?

20  A.   Yes.

21  Q.   And you know that was all done by contract, right?

22  A.   No, I never did sign a contract with them that I can

23  remember.

24  Q.   You had an insurance contract the insurance company

25  was paying, right?

1  A.   They even represented me before the insurance

2  company.

3  Q.   So you had a history with lawyers, correct?

4  A.   Yes.

5  Q.   Okay.  So you know what it means to have a lawyer

6  represent you, don't you?

7  A.   I think so.

8  Q.   Now, how is it that a person who is not a lawyer can

9  represent you?

10 A.   I guess the same way you're representing yourself

11 today.

12 Q.   Really?  You think that I could have walked into a

13 courtroom and represented you?

14 A.   That's why you got Mr. Stilley.

15 Q.   I got Mr. Stilley so I could walk into a courtroom

16 and represent you?

17 A.   So that he could represent me under your direction.

18 Q.   Under my direction?

19 A.   Yes.

20 Q.   Now, Mr. Patterson, you've said that several times.

21 Was it something that you wanted me to do?  Did you want

22 me to talk to Oscar Stilley?

23 A.   Yes.

24 Q.   Did you ever dispute anything on his bill when it

25 said talked to Lindsey, one hour?

1  A.   No.

2  Q.   Why?

3  A.   Because I knew that you were heading up the

4  representation.

5  Q.   But you never got a bill from Oscar Stilley that

6  said talked to Lindsey for one hour and then one hour

7  charge for Lindsey, one hour charge for Oscar, did you?

8  A.   I don't remember that.  There may have been some of

9  those charges on there.  I don't remember.

10  Q.   Now, you testified earlier that you had given me

11  three $10,000 checks, but you also testified that you

12  gave me $45,000 before the $90,000.  Do you remember

13  that?

14  A.   Yes.

15  Q.   All right.  Do you know where the other 15,000 is?

16  A.   No.  I think I gave that to you with a cashier's

17  check, but I don't remember that for sure.

18  Q.   So if you didn't give it to me, do you still owe it

19  to me?

20  A.   No, you owe me 60,000.

21  Q.   Now, where does that 60,000 that I owe you come

22  from?

23  A.   It came from the 90,000 that Oscar Stilley gave you.

24  Q.   So the IRS has me on trial today because I owe taxes

25  on $60,000 that you say I owe you?

 1          MR. SNOKE:  Objection to the form of the

 2   question, Your Honor.

 3          THE COURT:  Overruled.

 4   Q.  (BY MR. SPRINGER)  Can you explain that?

 5   A.  I don't know about what they have you on trial for.

 6   I just know that you owe me $60,000.

 7   Q.  Did you ever file a complaint against me for that

 8   $60,000?

 9   A.  I think that's part of the civil situation.

10   Q.  Is that what more than $10,000 means?

11   A.  I think so.

12   Q.  Now, you are currently being represented by

13   Mr. Knor; is that correct?

14   A.  Yes, sir.

15   Q.  All right.  And the government is paying his tab

16   because you can't afford to pay; is that right?

17   A.  That's right.

18   Q.  Okay.  And Mr. Knor represented you, you testified,

19   in January of 2004, correct?

20   A.  Yes.

21   Q.  Did you hire him at that time?

22   A.  Yes.

23   Q.  All right.  And did you sign a contract with him?

24   A.  I don't remember.

25   Q.  Okay.  And at some point in time did he also get

```
 1  hired for you and your wife?
 2  A.   No.  He just represented me.
 3  Q.   And eventually, though, you gave him a $10,000
 4  retainer; is that right?
 5  A.   Yes.
 6  Q.   And eventually that money ran out, didn't it?
 7  A.   Eventually.
 8  Q.   And so then he asked the court in 2005 if the court
 9  would pay for his services for you in relation to the
10  plea agreement that you entered into with the government;
11  isn't that true?
12  A.   I think that's right.
13  Q.   And at the same time in 2005, isn't it true you
14  hired the Richardson Law Firm to sue me, Oscar Stilley
15  and Jerold Barringer for RICO?
16  A.   No.
17  Q.   Okay.
18  A.   They approached my wife and said they would handle
19  it on a contingency basis.  There was no charges for them
20  handling it.
21  Q.   Could you tell us who they are?
22  A.   Richardson Law Firm.
23  Q.   They just walked up to you and said, hey,
24  Mr. Patterson, we want to sue Lindsey Springer?
25  A.   To my wife, yes.
```

EDDY PATTERSON - CROSS BY MR. SPRINGER                    768

1   Q.   Do you know the name of the person at the Richardson
2   Law Firm that said that?
3   A.   One of them was a man named Richard Marrs.
4   Q.   What about Mr. Stoops?
5   A.   He was one involved originally, I think.  They
6   approached my wife.
7   Q.   Mr. Stoops, did he used to work for the United
8   States Government?
9   A.   I don't know.
10  Q.   Mr. Knor, he used to work for the United States
11  Government too; isn't that true?
12  A.   That's what you said.
13  Q.   He never told you that?
14  A.   No.
15  Q.   Now, your fine in your criminal case was what, $30
16  million?
17  A.   No.
18  Q.   What was it?
19  A.   3.9 million.
20  Q.   3.9?
21  A.   Was restitution.  The fine was $20,000.
22  Q.   3 million of it was the loan from the bank?
23  A.   Yes.
24  Q.   Okay.  Mr. Patterson, that book in front of you
25  there, if you'd turn to Number 103, Defendants' Exhibit

 1  Number 103.  And I have not published anything yet.

 2          MR. SNOKE:  Your Honor, may we approach?

 3          THE COURT:  You may.

 4      (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND

 5  OUT OF THE HEARING OF THE JURY.)

 6          MR. SNOKE:  Your Honor, what I've been given is

 7  103, and I think the Court has the same one, is something

 8  that apparently was signed by somebody that -- named

 9  Robert James Fox and filed somewhere, I guess, in this

10  district.  But it doesn't show the defendant had anything

11  to do with this -- just somebody in the movement or

12  whatever these people consider themselves decided to file

13  in his behalf a -- this document -- in fact, I got a copy

14  of one just like this here in connection with this case,

15  and it was sent to the U.S. Attorney in similar type of

16  language.

17          THE COURT:  Mr. Springer, do you plan to offer

18  103?

19          MR. SPRINGER:  All I wanted to do is ask him if

20  he was aware of it and was this guy representing him,

21  then I'm going straight to my complaint --  or his

22  complaint.

23          THE COURT:  If you want to ask him about that

24  very briefly, that's fine, but I don't see anything about

25  103 that touches this case top, side or bottom.

1           MR. SNOKE:  Mr. Patterson is in jail when this

2    is filed.

3           THE COURT:  First of all, what's the relevancy

4    of any mention of it?

5           MR. SPRINGER:  I just want to ask him if this

6    guy also represented him at the August 13th, 2004, time

7    frame.  It appears that he did.  It's out of Dallas

8    County.  It's out of this court.

9       (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

10   WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

11   PRESENCE AND HEARING OF THE JURY.)

12   Q.  (BY MR. SPRINGER)  Mr. Patterson, do you have

13   Defendants' Exhibit Number 103 open there?

14   A.  Yes, sir.

15   Q.  Have you ever seen Defense Number 103 before?

16   A.  I don't think so.

17   Q.  Do you know who a Robert James Fox is?

18   A.  Yes.

19   Q.  How do you know him?

20   A.  I talked to him on the phone a couple of times.  He

21   was friends with Mr. Clark.

22   Q.  Okay.  And did he file something on your behalf and

23   at your direction in your criminal case?

24   A.  I don't remember this at all.  I don't remember

25   talking to him about filing anything.  I was incarcerated

 1   at this time.

 2   Q.   Now, isn't it true that the document before you has

 3   an August 13th, 2004 date on it?

 4   A.   Yes, sir.

 5   Q.   And is it true that your plea agreement was dated

 6   September 1, 2004?

 7   A.   I think that's right.  I mean, the sentencing was

 8   September 1st.

 9   Q.   September 1st.  Thank you very much.  If you would

10   turn to Defendants' Exhibit Number 105, please.

11   A.   Okay.

12   Q.   Do you have that there in front of you?

13   A.   Yes, sir.

14   Q.   Have you seen Defendants' Exhibit Number 105 before

15   today?

16   A.   I don't remember seeing it.

17   Q.   You don't remember seeing the petition that you

18   filed against me?

19   A.   No, I didn't file it.  I was incarcerated when this

20   was filed.

21   Q.   Okay.  Mr. Patterson, would you take a look through

22   Exhibit 105 and just briefly look at it and become

23   familiar with it for me?

24        MR. SPRINGER:  Your Honor, may I have one second

25   while he's reading?

```
 1              THE COURT:  Surely.
 2   Q.  (BY MR. SPRINGER)  Mr. Patterson, now that you've
 3   had a chance to look at Defendants' Exhibit Number 105,
 4   did you have -- are the statements made in Defendants'
 5   Exhibit Number 105 statements that you would have
 6   presented or made with respect to the Richardson Law
 7   Firm?
 8              MR. SNOKE:  Objection to relevance.
 9              THE COURT:  Overruled.
10              MR. SNOKE:  I --
11              THE COURT:  Go ahead.  I'm sorry.
12              MR. SNOKE:  It's speculative.  He's asking him
13   what he would have done.  It's speculative as well as
14   relevant at this point.
15              THE COURT:  Overruled.
16              THE WITNESS:  Well, I haven't had enough time to
17   really digest this to know what I would have done or not
18   done, but as I remember this, I was incarcerated.  They
19   approached my wife to represent her, and she agreed that
20   they would under a contingency fee basis.  And they
21   contacted me later in the Oklahoma County -- or in
22   Oklahoma facility that I was in in Oklahoma City and --
23   but I had -- I had never seen anything that they had
24   filed.
25              MR. SNOKE:  To which I object.  The questions
```

1  about this document, Your Honor, he said he doesn't -- he

2  doesn't recognize it, hasn't seen it and it's improper

3  for it to come into evidence.  We would object to that.

4          THE COURT:  It hasn't been offered yet.

5          MR. SNOKE:  But we're asking questions and

6  publishing the document.

7          THE COURT:  He's working on it.  Next question.

8  Q.  (BY MR. SPRINGER)  Mr. Patterson, isn't it true that

9  you authorized Richardson Law Firm, you and your wife, to

10 sue Oscar Stilley, Jerold Barringer and myself based upon

11 your claim that you were living the American dream, that

12 you had never been in any criminal trouble with the law

13 before you met Lindsey Springer?

14 A.  I'm sorry.  You're going to have to ask me that

15 again.

16 Q.  Isn't it true that you hired -- you and your wife

17 hired the Richardson Law Firm to represent you in a civil

18 lawsuit against me, Mr. Stilley and Mr. Barringer, and in

19 it you claim that before you met me, you were living the

20 American dream, had never had any criminal trouble

21 whatsoever with the law?

22 A.  I never talked to them about this.  I'm not familiar

23 with this.  They were talking strictly with my wife when

24 I was incarcerated.  I didn't hire them to do anything.

25 Q.  If this complaint said that you had never had any

```
 1   trouble with the law, that would be false, wouldn't it?

 2            MR. SNOKE:  Objection.

 3            THE COURT:  Sustained.

 4   Q.  (BY MR. SPRINGER)  Mr. Patterson, have you ever had

 5   any trouble with the law?

 6            MR. SNOKE:  Objection.

 7            THE COURT:  Sustained.  Counsel will approach.

 8       (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND

 9   OUT OF THE HEARING OF THE JURY.)

10            THE COURT:  Okay.  The entire basis for my

11   ruling when we took our lunch break presupposed that you

12   were going to get this document in.  He hasn't bought

13   into the document yet.

14            MR. SPRINGER:  I know it.

15            THE COURT:  So this question about have you ever

16   had trouble with the law is not teed up and that's the

17   reason why I sustained the objection.

18            MR. SPRINGER:  I'm sorry.

19            THE COURT:  Okay.

20       (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

21   WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

22   PRESENCE AND HEARING OF THE JURY.)

23   Q.  (BY MR. SPRINGER)  Mr. Patterson, does Exhibit

24   Number 105 show you and your wife's name on the front

25   page?
```

1   A.   It does.

2   Q.   And does it show that you sued Lindsey Springer

3   individually and Lindsey Springer d/b/a Bondage Breakers

4   Ministries?  Does it say that?

5   A.   Yes.

6   Q.   Now, earlier today you testified that you didn't

7   know who Bondage Breakers was -- Bondage Breakers

8   Ministry and that you dealt with Lindsey Springer; isn't

9   that true?

10  A.   Well, when we first started, yes.

11  Q.   So eventually you started dealing with Bondage

12  Breakers Ministry?

13  A.   I didn't deal with them.  I just found out about

14  them later.  I didn't know about them earlier.

15  Q.   So you just thought I was Lindsey Springer's

16  ministry and not Bondage Breakers Ministry; is that what

17  you're saying?

18  A.   I'm just saying I didn't know about Bondage Breakers

19  until much later after you and I had met.

20  Q.   Isn't it true that the reason why I asked you for a

21  donation or a gift is because you asked me how I support

22  myself?

23  A.   I don't remember.  I may have; I just don't

24  remember.

25  Q.   And isn't it true that I told you that the only way

EDDY PATTERSON - CROSS BY MR. SPRINGER                    776

1   that I could ever receive any money from you or anybody

2   else is if it was a gift?

3   A.   I'm sorry.  I don't remember that.

4   Q.   Isn't it true, then, that I also said -- used the

5   word -- term gift and donation interchangeably?

6   A.   I don't remember discussing that.

7   Q.   And isn't it true, Mr. Patterson, that what I said

8   was as long as it was a gift, that it was excluded from

9   the calculations of gross income; isn't that what I said?

10  A.   I don't remember discussing that.

11  Q.   But you remember writing donation on the check?

12  A.   Yes.

13  Q.   And you remember writing letters that said use this

14  for God's work?

15  A.   Yes.

16  Q.   Which you also said, isn't it true, that you gave it

17  to me when I asked for it to finish a bus I was redoing?

18  A.   That's when I gave it to you.

19          THE COURT:  Let's clear one thing up.  Was this

20  your bus or his bus?

21          MR. SPRINGER:  My bus.

22          THE COURT:  Okay.  Go ahead.

23          MR. SPRINGER:  Is that clean enough?

24          THE COURT:  That's clean enough.

25          MR. SPRINGER:  All right.

1   Q.   (BY MR. SPRINGER)  You testified that your wife met

2   with Richardson Law Firm and she's the one that directed

3   them on all the facts alleged in the complaint; is that

4   what you're saying?

5   A.   No, I'm saying that she's the one that talked to

6   them.  As far as what went on between them, I don't have

7   information.  I just have what they told me.

8   Q.   Were you --

9   A.   I wasn't around.

10  Q.   Were you supposed to show up for a civil deposition

11  last week in that case?

12  A.   No.

13  Q.   Richardson Law Firm never told you that?

14  A.   I haven't heard anything on this case in over two

15  years.

16  Q.   When was the last time Mr. Marrs called you?

17  A.   About two years ago.

18  Q.   Did you know that I had sued the Richardson Law

19  Firm?

20  A.   No.

21  Q.   They never told you that?

22  A.   No, we just got a letter this week that he wasn't

23  there anymore.

24  Q.   Wow.

25  A.   Was the first I'd heard about -- anything about this

1  for two years, a couple years.

2  Q.  Now, earlier you talked about I asked for $90,000 in

3  June, I believe it was, and then later on the $9,000

4  (sic) came up in relation to a $375,000 insurance

5  settlement that appears in November of 2003.  Do you

6  remember that?

7  A.  I don't remember the first date that you mentioned.

8  Q.  Do you remember the November date?

9  A.  I remember that it was paid in November.

10 Q.  Okay.  And, now, when did you first find out that

11 you were going to get $375,000 from the insurance

12 company, in relation to the date of November 2003?

13 A.  I don't remember what day we found out.

14 Q.  Just short, though, wasn't it; it wasn't a very

15 long-term --

16 A.  I don't think it took very long, no.

17 Q.  So maybe late October would be a good --

18 A.  Could be, yeah.

19 Q.  Could be.  Now, I wouldn't have asked for $90,000

20 out of that money in June because you didn't know you

21 were going to be getting it in June, did you?

22 A.  I don't think so.

23 Q.  Okay.  Now, you mentioned that $60,000 of it was

24 never earned; is that what you testified about?

25 A.  Yes.

1  Q.   And that the other 30,000 was payment for what?

2  A.   For your services.

3  Q.   What was my services?

4  A.   Overseeing the -- overseeing the problem that I had.

5  Q.   So your trial starts in mid November, you get an

6  insurance settlement in earlier November and your problem

7  extended backwards from November to April of 2003; isn't

8  that true?

9  A.   Yes.

10 Q.   Okay.  So what was the 30,000 for?

11 A.   It was for more services than what you thought the

12 45 would handle, was what I understood.

13 Q.   And you had given 30 of the 45, right?

14 A.   Well, no, I think I gave all of the 45.

15 Q.   But you don't have any evidence of that, right?

16 A.   No, I don't have any of the records.

17 Q.   Okay.  All right.

18 A.   I don't have any records.

19 Q.   Okay.  And again you never told me -- you never used

20 the words, I hired you, Lindsey, correct?

21         MR. SNOKE:  Your Honor, asked and answered.

22         THE COURT:  Overruled.

23         THE WITNESS:  I don't know if I used those exact

24 words or not.

25 Q.   (BY MR. SPRINGER)  But you did hire Oscar Stilley,

1  didn't you?

2  A.   Well, I thought I hired you too.

3  Q.   Thank you.  You never asked me to send you a bill,

4  correct?

5  A.   No.

6  Q.   You never questioned, when I asked for more money,

7  what did I do for the last money that you gave me, right?

8  A.   I don't remember discussing it.

9  Q.   Do you remember at one time in mid June Dick Clark

10  and I raising $3,800 for your criminal defense?

11        MR. SNOKE:   Objection.  Could we have a year?

12  Q.   (BY MR. SPRINGER)  2003 June.  I'm sorry.

13  A.   No, I remember Dick Clark saying that he was going

14  to try to raise some money from some friends to help me.

15  Q.   All right.  Now, isn't that because you didn't have

16  any money?

17  A.   In June?

18  Q.   Whenever Dick Clark was going to help you raise

19  money.

20  A.   No, he never asked me if I needed -- he was just

21  offering to help.  He never asked me if I needed it.  He

22  just said, I'm going to try to help you.

23  Q.   Did he ever tell you that he and I were trying to

24  raise money for you?

25  A.   No.

1   Q.   He never told you that he raised, with my help,

2   $3,800?

3   A.   I don't remember that number, I'm sorry.

4   Q.   You do remember him testifying at your trial,

5   correct?

6   A.   Yes.

7            MR. SPRINGER:  Would you pull up Exhibit 176

8   again?  And I'm just about through, Your Honor.

9   Q.   (BY MR. SPRINGER)  Now, earlier I read to you the

10  first sentence of Exhibit Number 176, and I'm going to

11  start the second sentence, where it says, "If we had more

12  Christians standing up for God's laws and for the rights

13  of the American people, this would once again be a

14  country of the people, by the people and for the people,

15  endowed and blessed by its creator."  Does that sound

16  like you hired me when you wrote that sentence or that I

17  was standing up and fighting for God's laws?

18  A.   Same thing.

19  Q.   So you hired me to stand and fight for God's laws?

20  A.   No, I hired you to fight for me.

21  Q.   You hired me to fight for you?

22  A.   Right.

23  Q.   All right.  Do you see anywhere on this letter where

24  it says, I'm hiring you to fight for me?

25  A.   Not on this letter, no.

1  Q.   And the last sentence, if you would read along, see

2  if this is correct.  "Thank you for being willing to

3  suffer persecution to do that which is right."  Did you

4  write that?

5  A.   Yes.

6  Q.   And then in closing, "Please don't forget to call

7  Eric Lynch to discuss the issues he's working on."  Now,

8  could you tell the Court what Eric Lynch was working on?

9  A.   I would if I could.

10 Q.   Do you know who Eric Lynch is?

11 A.   I don't offhand.

12 Q.   But yet you wrote the letter?

13 A.   I did write the letter, but I don't remember him

14 now.

15 Q.   Is it possible that you have Eric Lynch confused

16 with Lindsey Springer?

17 A.   I don't think so, no.

18 Q.   Doesn't it say here that, "In closing, please don't

19 forget to call Eric Lynch to discuss the issues he's

20 working on"?

21 A.   Yes, that's what it says.

22 Q.   But it doesn't say anything about what Lindsey's

23 working on, does it?

24 A.   No.

25 Q.   And you wrote another letter in September of 2000 --

EDDY PATTERSON - CROSS BY MR. STILLEY                    783

1    September of 2000 as well, didn't you, with the second

2    check, Exhibit Number 10; isn't that true?

3    A.   Yes.

4    Q.   And you wrote donation on that check as well, didn't

5    you?

6    A.   I did.

7    Q.   With a letter that said donation on it, right?

8    A.   Yes.

9    Q.   So we've got two letters, 176 and 177, thanks for

10   suffering persecution, go work with somebody I'm working

11   with, this is a donation and thank you; is that right?

12   A.   What's the question?

13   Q.   That's what they said, don't they?

14   A.   Beg your pardon?

15   Q.   That's what both those exhibits say, thank you?

16   A.   They say thank you, yes.

17        MR. SPRINGER:  No more questions, Your Honor.

18        THE COURT:  Very well.  Members of the jury, I'm

19   going to -- my preference would be to run until a little

20   closer to 3:00 before we take our mid-afternoon break,

21   but if any of you would prefer to take a break at this

22   point, we certainly will.  We'll get a little closer to

23   3:00.  We'll have cross-examination by Mr. Stilley.

24                    CROSS-EXAMINATION

25   BY MR. STILLEY:

EDDY PATTERSON - CROSS BY MR. STILLEY                784

1    Q.   Mr. Patterson, what is your current employment?

2    A.   I'm retired.

3    Q.   How old are you?

4    A.   68.

5    Q.   And so you're drawing social security?

6    A.   Yes, sir.

7    Q.   Any other income?

8    A.   No.

9    Q.   What's your current address?

10   A.   7318 South Canton in Tulsa.

11   Q.   Now, apparently at sometime in the 1990s you began

12   to have some questions about the requirement to file a

13   tax return, correct?

14   A.   Yes.

15   Q.   So would it be fair to say that you got some

16   curiosity about that?

17   A.   No, I had had that for a long time.

18   Q.   Okay.  So that started long before the '90s?

19   A.   Well, in the '90s, I would say.

20   Q.   But then you did some research on that, correct?

21   A.   Right.

22   Q.   And you came to a certain conclusion, correct?

23   A.   Yes.

24   Q.   In good faith?

25   A.   Yes.

1   Q.   And then you acted on that conclusion?

2   A.   I did.

3   Q.   And then you got a call from the IRS, correct?

4   A.   Well, they came to see me, yes.

5   Q.   And we've heard about your trial and conviction,

6   correct?

7   A.   Yes.

8   Q.   The government has changed your behavior, have they

9   not?

10   A.   I don't know what you mean.

11   Q.   You file tax returns now, correct?

12   A.   Yes.  It's a requirement.

13   Q.   And you didn't file tax returns in the mid 1990s,

14   correct?

15   A.   Correct.

16   Q.   You said now it's a requirement, correct?

17   A.   Yes.

18   Q.   You couldn't find that in the law in the 1990s,

19   correct?

20   A.   Correct.

21   Q.   Apparently you believe that's there now, correct?

22   A.   Well, I believe it's in my agreement.

23   Q.   Okay.  But did the government show you the laws that

24   you actually broke by not filing returns?

25   A.   No.

1  Q.   Has anybody shown you the laws that you broke by not

2  filing returns?

3  A.   No.

4  Q.   Do you honestly believe that you broke some specific

5  law by not filing returns?

6  A.   I do now because I spent 40 months in prison for it.

7  Q.   Well, but that's punishment, correct?

8  A.   Yes.

9  Q.   Does that then make you believe that there is a law

10  requiring the filing of returns?

11  A.   No.

12  Q.   Now, you've testified that you received billings

13  from Oscar Stilley, correct?

14  A.   Yes.

15  Q.   And you would, as a general rule, review those

16  billings when you got them, correct?

17  A.   Usually, yes.

18  Q.   And you never disagreed with any of the items on

19  those billings, did you?

20  A.   Not that I recall.

21  Q.   And you were satisfied with the rates shown on those

22  billings, too, correct?

23  A.   Well, I really didn't have anything to say about

24  that.

25  Q.   Do you remember what the rates were, the hourly

1  rates for Oscar Stilley were?

2  A.   No, I don't.

3  Q.   But you wouldn't disagree with the amounts shown on

4  the lines where that there were bills for amounts of time

5  spent, correct?

6  A.   I didn't disagree with them.

7  Q.   Okay.  Now, and you also agree that -- scratch

8  that.  If these billing records showed that there was a

9  balance due and owing toward the latter part of the

10 representation, you wouldn't disagree with that, correct?

11 A.   I'm sorry.  I don't understand.

12 Q.   Well, if the billing that's in evidence today shows

13 that there was money due that was not covered by your

14 balance in IOLTA, you wouldn't disagree that that money

15 was owed to Oscar Stilley, would you?

16 A.   Probably not.

17 Q.   Okay.  And then you also told us that you discharged

18 Oscar Stilley as your lawyer in early 2004, correct?

19 A.   Right.

20 Q.   But, now, your wife had a separate lawyer, correct?

21 A.   Yes.

22 Q.   And you love your wife very much, correct?

23 A.   I do.

24 Q.   And you wouldn't do anything intentionally to hurt

25 her interests, would you?

1   A.   No.

2   Q.   And you wanted her to continue to partake of

3   whatever legal resources that she felt was appropriate

4   for her, correct?

5   A.   Whatever she felt was appropriate.

6   Q.   So you wouldn't have any objection to her continuing

7   to get legal assistance from either Oscar Stilley or

8   Jerry Barringer?

9   A.   Well, no, from Jerry Barringer.  That was her

10  attorney.

11  Q.   Correct, but -- well, that's satisfactory.  But what

12  you're saying is that you don't have any objection to the

13  billings concerning legal services rendered by

14  Ms. Patterson -- your wife, Judy Patterson, for legal

15  services that she received, do you?

16  A.   I don't have any knowledge of those.

17  Q.   One way or another, correct?

18  A.   No.

19  Q.   Now, I believe that you said that you didn't know

20  anything about this complaint that was filed on your

21  behalf about five years ago, correct?

22  A.   Which complaint is that?

23  Q.   The complaint that is styled Judy --

24          MR. SNOKE:  Objection, Your Honor.  I think that

25  misstates.

```
 1            MR. STILLEY:  Scratch that, Judge.  Let me
 2   rephrase that.
 3   Q.   (BY MR. STILLEY)  Can you tell the jury what
 4   knowledge that you have as you sit there about the
 5   complaint that was filed against -- styled Eddy and Judy
 6   Patterson v. Lindsey Springer and others?
 7   A.   My wife told me that she was approached by these
 8   attorneys with the Richardson Law Firm to represent her
 9   in a civil matter against you -- the three of you for
10   malpractice.  And they were going to do that on a
11   contingency basis.  And that's what I was told.
12   Q.   Did you ever read the complaint?
13   A.   No.
14   Q.   So you didn't know what that complaint said?
15   A.   I didn't even know it included me until I got home.
16   Q.   Okay.  So you'd really have to say that that was an
17   unauthorized lawsuit?
18   A.   I just didn't know that it included me at that time.
19   Q.   Well, isn't it fair to say -- you're a sophisticated
20   businessman, correct?
21   A.   Not -- well, I don't know.
22   Q.   Well, you've had a lot of experience in business?
23   A.   Yes.
24   Q.   You've been the head of a big company, correct?
25   A.   Yes.
```

1  Q.   And you realize that ordinarily a lawyer has to have

2  permission to sue for somebody, correct?

3  A.   I guess, yeah.

4  Q.   Well, did this firm ever get a contract from you to

5  represent your interests in this lawsuit?

6  A.   No.

7  Q.   Do you know how much the contingent fee was?

8  A.   No.

9  Q.   So isn't it fair to say that you have little or no

10 knowledge about the complaint that was filed on your

11 behalf in 2005?

12 A.   That's correct.

13 Q.   Now, did you realize that that complaint was later

14 dismissed without prejudice for failure to prosecute?

15 A.   I assume that it was because I hadn't heard anything

16 on it for a long time.

17 Q.   Did you realize that that lawsuit was later refiled

18 against Oscar Stilley and Lindsey Springer and Jerry

19 Barringer?

20 A.   No, I'm not familiar with that.

21 Q.   You didn't realize that took place, did you?

22 A.   No.

23 Q.   And you didn't realize that service of process was

24 effectuated upon Oscar Stilley, Jerry Barringer and

25 Lindsey Springer, did you?

1  A.   Well, I had heard from my wife that they were going

2  to refile it back some time ago.

3  Q.   How long ago was that?

4  A.   I don't remember.  It was several years ago.

5  Q.   So you haven't heard anything for the last few

6  years?

7  A.   The last two years, I haven't heard anything.

8  Q.   So if somebody said that they had arranged for you

9  to be at a deposition, that wouldn't be true, would it?

10 A.   Well, I haven't heard that.

11 Q.   And for you to be at the deposition, somebody would

12 have to tell you, correct?

13 A.   Yes.

14 Q.   Do you know who your lawyer is now?

15 A.   My lawyer?

16 Q.   Who your lawyer is with respect to the lawsuit

17 against Oscar Stilley, Lindsey Springer and Jerry

18 Barringer?

19 A.   No.  As I mentioned earlier, I just saw a copy of a

20 letter to my wife from Richardson Law Firm saying that

21 they were sending the case to Mr. Marrs, who was not with

22 the firm anymore.

23 Q.   Now, did you authorize that change?

24 A.   I haven't authorized -- no.

25 Q.   So that change of attorneys was totally without your

1   permission, correct?

2   A.   Well, Mr. Marrs had been handling it while he worked

3   for Richardson, and now he was with another firm.

4   Q.   Well, now, let's make sure we get this straight.

5   Had you, in fact, authorized a change --

6          MR. SNOKE:  Your Honor, I would object to the

7   relevancy of this line of questioning.

8          THE COURT:  What is the relevance of this?

9          MR. STILLEY:  I'm just trying to show that the

10  -- that somebody has filed a lawsuit in his name and has

11  been prosecuting it without his permission.  And it

12  relates to the matters that are alleged against Oscar

13  Stilley and Lindsey Springer, and I was wanting to hook

14  that up with respect to the $60,000.

15         THE COURT:  Well, if that's what you're going to

16  do, then go ahead.  That will be overruled for now.  Go

17  ahead.

18  Q.   (BY MR. STILLEY)  Okay.  If I can remember what I

19  was asking.  I believe I was asking about the -- asking

20  you to agree that you had not authorized any change of

21  attorneys in this litigation.

22  A.   No.

23  Q.   Now, you said something in cross-examination about

24  your belief that Lindsey Springer owed you $60,000,

25  correct?

1  A.   Correct.

2  Q.   Has anybody told you anything about whether or not

3  that $60,000 was claimed in this lawsuit?

4  A.   No.

5  Q.   Wouldn't it be reasonable, if a lawyer was

6  representing you and you really thought that you were

7  entitled to $60,000, that you would make sure that that

8  claim was included in the lawsuit?

9           MR. SNOKE:   Objection, relevance.

10          THE COURT:   I'm going to overrule it at this

11  point.  But, Mr. Stilley, we're getting pretty close to

12  the end of this line of questioning, I'll assure you of

13  that.

14          MR. STILLEY:   I agree, Judge.

15  Q.   (BY MR. STILLEY)   Do you remember the question?

16  A.   No.

17  Q.   Wouldn't it be fair to say that if you really,

18  honestly thought that you were entitled to $60,000 from

19  Lindsey Springer, that you should be informed about the

20  lawsuit so you could make sure that your rights were

21  protected with respect to that claim?

22  A.   I guess.  I don't know.  I didn't even look at the

23  lawsuit as being mine, as far as that goes.  It was my

24  wife that they approached and agreed to represent her

25  basically.

EDDY PATTERSON - CROSS BY MR. STILLEY                    794

1   Q.   Now, you remember the conviction, correct?  You

2   remember that day?

3   A.   Yes, I do.

4   Q.   That was one of the most momentous days of your

5   life, correct?

6   A.   Yes.

7   Q.   Do you remember discussions in which Oscar Stilley

8   told you that you would be entitled to a sentence not to

9   exceed six months?

10  A.   No, I don't remember that.

11  Q.   You don't remember anything about that?

12  A.   No.

13  Q.   Do you remember anything about a case from the

14  United States Supreme Court suggesting that unless the

15  facts were found by a jury, that they couldn't be used

16  for purposes of a sentence?

17  A.   I remember hearing jailhouse talk about things like

18  that.

19  Q.   Did you make inquiry of Oscar Stilley about how that

20  might impact you?

21  A.   I don't remember.  I don't remember discussing that.

22  Q.   Did you have any understanding of the amount of time

23  that you might have been facing at sentence -- at

24  sentencing?

25  A.   Yes.

1  Q.   And what was your understanding of that?

2          MR. SNOKE:  Your Honor, could we establish a

3  time when he had this understanding?

4          THE COURT:  Clarify.

5  Q.   (BY MR. STILLEY)  We're talking about the month

6  following your conviction.

7  A.   I didn't know how much at that time.

8  Q.   Okay.  And do you remember how long after the

9  conviction it was before you hired a new attorney?

10  A.   Yeah, I believe it was in January that I hired

11  Mr. Knor.  And he's the one that came and went through

12  the sentencing guidelines to show me where I would fall

13  in those guidelines.

14  Q.   Okay.  What understanding did you come to at that

15  point in time?

16  A.   We didn't come to an understanding.

17          MR. SNOKE:  I object.  No discussion about an

18  understanding.

19          THE WITNESS:  It was just that he's showing me

20  the book where it had the sentencing guidelines.  And he

21  showed me where he thought I would fall in those

22  guidelines.

23  Q.   (BY MR. STILLEY)  Where did he think you would fall?

24  A.   It was somewhere in that range of 100 to 121 months

25  or somewhere in there.

1   Q.   Do you remember a meeting much earlier saying the --

2   long before the criminal trial in which you and Oscar

3   Stilley and Doug Horn and Lindsey Springer met in a room

4   in the courthouse while a grand jury proceeding was

5   underway?

6   A.   I remember the -- that I testified at that grand

7   jury and I remember you being there, yes.

8   Q.   Do you remember a discussion in a room in which Doug

9   Horn spoke to you?

10  A.   Yes.

11  Q.   Do you remember him telling you that unless you

12  fired Oscar Stilley and got another lawyer, you were

13  facing the prospect of life in prison?

14  A.   Yes.

15  Q.   You remember testifying about the $115,000 that you

16  took out of the IOLTA account for expenses, correct?

17  A.   Yes.

18  Q.   Is it fair to say that you invested a substantial

19  part of that into an investment that didn't pay off?

20  A.   Some of it.

21  Q.   About how much?

22  A.   I don't remember the exact amount.

23  Q.   And isn't it true that that was really in the nature

24  of a Ponzi scheme, something like a Bernie Madoff

25  investment?

1  A.   I didn't know anything at the time except that it

2  was an opportunity that I could get into, and if it

3  worked out, I would be able to pay everybody what I owed

4  them.

5  Q.   And how much did they promise you in return for the

6  -- approximately how many dollars did you invest?

7  A.   I don't remember that number.

8  Q.   How many dollars were promised in return for this

9  investment?

10  A.   There wasn't any dollar amount, as I remember.

11  Q.   Were you told anything about a percentage?

12  A.   No.

13  Q.   Were you told anything about any basis for

14  calculating how much you'd get back?

15  A.   No.

16        MR. SNOKE:  Your Honor, I'm going to object to

17  this line of questioning as being irrelevant.

18        THE COURT:  I didn't hear your objection.

19        MR. SNOKE:  I'm sorry.  I object to the line of

20  questioning as being irrelevant.

21        THE COURT:  Overruled.  Thank you.

22  Q.   (BY MR. STILLEY)  Did you get any information giving

23  you any basis for having an understanding of how much

24  that investment would pay?

25  A.   I may have.  I just don't remember that much about

1   it now.

2   Q.   Isn't it true that you were promised a return

3   several times the amount that you invested?

4   A.   It may have been.

5   Q.   And that's rather unreasonable; is it not?

6   A.   Well, yeah, looking in hindsight.

7   Q.   In hindsight, you realize it was a Ponzi -- it was a

8   scam, wasn't it?

9   A.   Yes, it was.

10  Q.   But Oscar Stilley gave you the money because you

11  asked for it, correct?

12  A.   Right.

13  Q.   And because it was your money?

14  A.   Right.

15  Q.   So Oscar Stilley simply followed your instructions,

16  correct?

17  A.   Yes.

18  Q.   And isn't it also true that with respect to every

19  transaction that is shown in the records introduced by

20  the government, you authorized the transaction?

21  A.    I don't remember authorizing each and every one, but

22  I do remember some, yes.

23  Q.   And you would have gotten all those billings?

24  A.   Yes.

25  Q.   And if there was a problem with any transaction, you

1  would have brought it to the attention of Oscar Stilley,

2  correct?

3  A.   Correct.

4  Q.   And that never happened?

5  A.   No.

6  Q.   So it's fair to say that the financial transactions

7  engaged in were authorized by you, correct?

8  A.   Well, after I received the bills, there's nothing I

9  could do about them at that time.

10 Q.   Well, isn't it fair to say that you had an

11 understanding that you could call Oscar Stilley if you

12 had a problem with something?

13 A.   I guess.

14 Q.   At the very least, you wouldn't want an unauthorized

15 transaction to be repeated the following month, would

16 you?

17 A.   No.

18 Q.   And your experience in business tells you that if

19 you see something you disagree with, you need to say

20 something sooner rather than later, correct?

21 A.   Yes.

22 Q.   And you never said anything, right?

23 A.   Not that I remember.

24 Q.   Now, you became concerned about Oscar Stilley's

25 representation and also Mr. Barringer's representation

1  based on somebody telling you that you were not provided

2  copies of a plea agreement; is that correct?

3  A.   No, I was concerned about it when the trial started.

4  Q.   About a plea agreement?

5  A.   No, about the representation.

6  Q.   Okay.  Well, let's focus on what we're talking about

7  here.  Didn't you testify in this courtroom from where

8  you're sitting that you believed Oscar Stilley had failed

9  to communicate a plea offer to you?

10 A.   No, I don't believe that's what I testified to.

11 Q.   Well, let's -- what did you say?

12 A.   Mr. Springer asked me if I was given an opportunity

13 for a plea agreement by Tony Graham, and I told him that

14 I had not.  And I told Mr. Knor when he came and asked me

15 that I had not seen a plea agreement from anybody.

16 Q.   Okay.  Let's -- maybe we can clear this up, then.

17 If you can tell the jury that you don't suspect that

18 Oscar Stilley failed to communicate a plea offer, that

19 would be satisfactory.  Can you honestly and truthfully

20 say that?

21 A.   I don't know.  All I know is what Mr. Knor told me

22 when he came to see me, that there was a plea agreement

23 offered.  And I told him that I had never received a plea

24 agreement.

25 Q.   And you're presuming that it was Oscar Stilley that

1   got the plea agreement from the government, correct?

2   A.   I'm assuming that my attorneys must have gotten it,

3   yes.

4   Q.   And that would have been Oscar Stilley, not

5   Mr. Graham, correct?

6   A.   Well, it didn't -- yeah, because you were

7   representing me.

8   Q.   And do you know what time this took place?

9   A.   No.

10  Q.   Did --

11  A.   He just asked me why I didn't accept it.

12  Q.   Did Mr. Knor ever provide you a copy of it so you

13  could see it?

14  A.   No.

15  Q.   Did you ever ask for a copy?

16  A.   I don't remember.

17  Q.   Are you curious about a copy?

18  A.   Well, not now.

19  Q.   You wouldn't want to see it?

20  A.   No, it's too late now.

21  Q.   Well, now, isn't it true that also the allegation is

22  that Jerry Barringer committed the same offense in

23  failing to communicate a plea offer to your wife, Judy

24  Patterson?

25  A.   I don't know about that.

1  Q.  Mr. Knor didn't say anything about that?

2  A.  He just said that there was a plea agreement offered

3  and the government had asked him why I didn't accept it.

4  And I told him I didn't know anything about one.  That's

5  all I remember about it.

6  Q.  So you don't know anything about Jerry Barringer's

7  conduct in that regard, do you?

8  A.  No, I don't.

9        THE COURT:  How much more do you have on cross?

10        MR. STILLEY:  Just a short amount, not very

11  much.

12  Q.  (BY MR. STILLEY)  Now, do you remember, then --

13  after Mr. Knor started representing you, do you remember

14  a threat being made to you that if you did not enter a

15  plea and take a sentence, that you would be charged again

16  with new counts, new criminal counts?

17  A.  I remember that that was a possibility.

18  Q.  Now, do you remember if that was done on Oscar

19  Stilley's watch or was it done on somebody else's watch?

20  A.  I don't -- I think Mr. Knor -- I think he's the one

21  that mentioned that to me.

22  Q.  And that threat was very frightening to you,

23  correct?

24  A.  Not that I would be charged with something else.

25  Q.  You weren't worried about that?

```
 1    A.   No.
 2    Q.   And you -- at the time, you realized that you were
 3    entitled to a jury determination of certain facts
 4    impacting your sentence, correct?
 5              MR. SNOKE:  Your Honor, could we establish what
 6    time he's talking about?
 7              THE COURT:  Clarify that.
 8              MR. STILLEY:  We're talking January 2004 or
 9    perhaps a little bit thereafter.
10              THE WITNESS:  No, I didn't know the jury had
11    anything to do with it.
12    Q.   (BY MR. STILLEY)  You were never informed about
13    anything of that nature?
14    A.   Not that I remember.
15    Q.   You did enter -- you did enter into a plea agreement
16    with the government, correct?
17    A.   Yes.
18    Q.   And you realize that you're responsible for the
19    representations made in that document, correct?
20    A.   I guess.
21    Q.   Now, we looked at some checks in this case, did we
22    not?
23    A.   Yes, sir.
24    Q.   And these checks said donation on them, correct?
25    A.   Yes.
```

EDDY PATTERSON - CROSS BY MR. STILLEY                      804

1  Q.   But your position -- what you're trying to tell this

2  jury is that it was really payments on a contract, right?

3  A.   It was my understanding it was payment for him --

4  for his services.

5  Q.   And in addition to these -- to writing donation on

6  these checks, you had also written letters in which you

7  indicated that these transfers of money were donations,

8  correct?

9  A.   Yes.

10 Q.   Don't you agree that that would be rather misleading

11 to someone else that might take a look at those and rely

12 on those documents?

13 A.   I wrote donation on there because he asked me to.

14 And I understood why he asked me to.

15 Q.   You realized that somebody else might rely on your

16 words, didn't you?

17 A.   I didn't think about anybody else -- I didn't think

18 about anybody else as far as that goes.  I just did what

19 he asked me to do.

20 Q.   As you sit here today, you don't have any evidence

21 whatsoever that Oscar Stilley entered into any kind of

22 illegal agreement with Lindsey Springer, do you?

23        MR. SNOKE:  Objection to the form of the

24 question.

25        THE COURT:  Overruled.

EDDY PATTERSON - CROSS BY MR. STILLEY                         805

```
 1              THE WITNESS:  I have no evidence.
 2   Q.  (BY MR. STILLEY)  You have no evidence that Oscar
 3   Stilley committed any crime whatsoever, do you?
 4   A.  I have no evidence.
 5              MR. STILLEY:  Pass the witness.
 6              THE COURT:  Members of the jury, we'll take our
 7   mid-afternoon recess at this time.  We'll resume at 20
 8   minutes after three, so please be available for the
 9   security officer to return with you to the courtroom just
10   a little before 20 minutes after three.  During this
11   break, of course, please do remember my usual admonition,
12   which I will not repeat at this time.  All persons in the
13   courtroom will remain seated while the jury departs.
14       (JURY EXITS THE COURTROOM.)
15              THE COURT:  Anything we ought to address before
16   we take our mid-afternoon break?
17              MR. O'REILLY:  No, Your Honor.
18              MR. SPRINGER:  Nothing, Your Honor.
19              MR. STILLEY:  No, Your Honor.
20              THE COURT:  Very well.  Court will be in recess.
21       (A RECESS WAS HAD, AFTER WHICH THE FOLLOWING
22   PROCEEDINGS WERE HAD IN OPEN COURT AND WITHIN THE
23   PRESENCE AND HEARING OF THE JURY.)
24              THE COURT:  I take it there's no redirect?
25              MR. SNOKE:  There is.
```

```
 1              THE COURT:  Pardon me?

 2              MR. SNOKE:  Yes, there is.

 3              THE COURT:  Okay.

 4                     REDIRECT EXAMINATION

 5  BY MR. SNOKE:

 6  Q.   Mr. Patterson, what did you understand was the

 7  reason that Lindsey Springer asked you to write donation

 8  on these checks?

 9  A.   So that he wouldn't have to show it as income.

10  Q.   Is that something that was communicated to you or is

11  this your supposition?

12  A.   My supposition.

13  Q.   Why did you say Mr. Springer owes you $60,000?

14  A.   He agreed to give that back to me out of the 90,000

15  if he didn't handle the civil part of the securities

16  case, which there never was a civil case, so I felt he

17  owed me 60,000 back like he agreed.

18  Q.   And you hadn't received -- you haven't received it

19  to this day; you haven't received that 60,000 back?

20  A.   No.

21  Q.   You said you were concerned about your

22  representation, I think you said, at the beginning of the

23  trial.  What was that concern?

24  A.   Well, I saw how things were going when the trial

25  started and how Mr. Stilley was not making the decisions
```

1    as the attorney, that they were being made by

2    Mr. Springer telling him what questions to ask and what

3    to do, and just the way they were handling the case.  My

4    wife and I talked that first night that we didn't have a

5    chance.

6    Q.   From the evidence that was going on or the

7    statements that were being --

8    A.   Just the way they were handling it, yes.

9            MR. SNOKE:  No further questions.

10           THE COURT:  Any recross?

11           MR. SPRINGER:  Yes, Your Honor.

12                        RECROSS-EXAMINATION

13   BY MR. SPRINGER:

14   Q.   You said $60,000 to handle the securities case,

15   right?

16   A.   Yes.

17   Q.   And is that 60,000 to come out of the money that you

18   got from Hall Estill, the 470,000 that you testified?

19   A.   It was to come out of the 90,000 that you got.

20   Q.   Which came out of the 470,000 that you got from

21   the --

22   A.   Yes.

23   Q.   Right?

24   A.   Right.

25   Q.   And so you found out you were getting that money

1  about, what, first week in November 2003?  That's what

2  you testified.

3  A.   No, I didn't remember exactly.

4  Q.   But around the first week of November?

5  A.   I know that it was sent to Mr. Stilley the first

6  week of November.

7  Q.   Okay.  Now --

8  A.   But I'm not sure what the time frame was when you

9  and I discussed it.

10 Q.   It would have been after you got the money, though,

11 right?

12 A.   No.  No, you knew the money was coming too.

13 Q.   I did?

14 A.   Yes.

15 Q.   And how many days between when you found out you

16 were getting the money and when the money arrived?

17 A.   I don't remember.

18 Q.   Less than a week?

19 A.   I don't remember.

20 Q.   Okay.  And prior to the time that you got the check

21 for Hall Estill's insurance policy, had Oscar Stilley

22 ever represented you in any security matter?

23 A.   No.

24        MR. SNOKE:  Objection, beyond the scope of

25 redirect.

```
 1              THE COURT:  Sustained.
 2   Q.  (BY MR. SPRINGER)  How much time between when you
 3   gave the $90,000 and when your trial began, do you know
 4   -- do you remember how much time there was between that?
 5   A.   No.
 6   Q.   Less than two weeks?
 7   A.   I don't remember.  It was during the same time frame
 8   of some time.  A couple weeks, maybe, yeah.  Three weeks,
 9   I don't know, something like that.
10              MR. SPRINGER:  No further questions, Your Honor.
11              THE COURT:  Mr. Stilley?
12              MR. STILLEY:  No further questions.
13              THE COURT:  Very well.  You may step down.
14              MR. SPRINGER:  Your Honor, may I reserve
15   Mr. Patterson?
16              THE COURT:  I take it you may wish to call him
17   at a later stage?
18              MR. SPRINGER:  Yes, Your Honor.
19              THE COURT:  Mr. Patterson, you are excused from
20   court today.  You are not released from your subpoena;
21   you are subject to call.  Just as soon as that may
22   change, if it does change, I'll see to it that you are
23   notified.
24              Very well.  We'll have the government's next
25   witness.
```

```
 1              MR. SNOKE:  Next call Judith Patterson.

 2                      JUDITH PATTERSON,

 3   (WITNESS SWORN)

 4                   DIRECT EXAMINATION

 5   BY MR. SNOKE:

 6   Q.  Would you state your full name, please, and spell

 7   your last name for the court reporter?

 8   A.   Judith Ann Ray Patterson, P-A-T-T-E-R-S-O-N.

 9   Q.   And are you related to Eddy Patterson?

10   A.   Yes, I am.  I'm his wife.

11   Q.   And where do you live now, currently, ma'am?  Just a

12   city and state.

13   A.   Tulsa.

14   Q.   Do you know a Lindsey Springer?

15   A.   Yes, sir, I do.

16   Q.   And do you see him here in the courtroom today?

17   A.   Yes, sir, I do.

18   Q.   Okay.  Now, do you know Oscar Stilley?

19   A.   Yes, sir, I do.

20   Q.   Do you see him in the courtroom?

21   A.   Yes, sir.

22   Q.   All right.  Will you tell me where he's sitting and

23   what he's wearing, Mr. Stilley, that you see?

24   A.   Mr. Stilley is standing up, and he's got on a --

25   yeah.
```

1  Q.  Okay.  All right.  Now, when you were -- well, let

2  me ask it this way.  When did you first become acquainted

3  with Lindsey Springer?

4  A.  I don't know the exact date.  I can't tell you that.

5  Q.  All right.  Ultimately, can you tell us where you

6  first met and under what circumstances you met

7  Mr. Springer?

8  A.  I met Mr. Springer and Mr. Stilley --

9          MR. SPRINGER:  Time?

10          MR. SNOKE:  I'm sorry, I didn't hear.

11          THE COURT:  Well, he may clarify that.  We'll

12  have an answer to this question, then we'll see if she

13  can clarify it as to approximately when.  Go ahead.

14  Q.  (BY MR. SNOKE)  Can you tell us where and under what

15  circumstances you met Mr. Springer first?

16  A.  I met Mr. Springer -- we met at a Golden Corral

17  restaurant along with Mr. Stilley and my husband.

18  Q.  All right.  And do you know when that was relative

19  to the trial of your case?

20  A.  I'm going to say at least a month before.  I don't

21  know the date.

22  Q.  And that trial took place in -- it began in -- when,

23  if you recall?

24  A.  I believe it was '02, '03.

25  Q.  All right.  And what time of year did the trial

1  start?  Do you know when the trial started?

2  A.   No.

3  Q.   All right.  What was the purpose of the meeting of

4  you and Mr. Stilley -- was that the first time you had

5  met Mr. Stilley also?

6  A.   Yes, it was.

7  Q.   And what was the purpose of that meeting, if you

8  know?

9  A.   They -- Mr. Stilley and Mr. Springer had opted to

10 help my husband and myself through with this trial, to be

11 attorneys for us on our end.

12 Q.   So this was after the indictment, after you were

13 indicted?

14 A.   I don't remember if it was before or after, sir.

15 Q.   All right.  Do you remember -- you remember it was

16 before the trial, though?

17 A.   Yes.

18 Q.   All right.  And what -- what, if anything, was said

19 at the -- at that meeting at the Golden Corral about your

20 defense?

21         MR. SPRINGER:  Objection, Your Honor.  All we

22 got is one month.

23         THE COURT:  Overruled.

24 Q.   (BY MR. SNOKE)  What, if anything, was said at that

25 meeting about your defense, yours and your husband's

1  defense?

2  A.   Well, basically at that time it was just regarding

3  my husband, and I was there just to listen, because I

4  knew that I was going to be involved eventually.   And

5  they had stated to us -- Mr. Springer, Mr. Stilley had

6  stated to us that they had done several of these cases.

7  And they'd gone into detail about them.   I don't remember

8  the exact details, but that they could promise us that we

9  would never see -- spend a day in jail and that they have

10 done this many times.

11 Q.   Did they indicate they had done it successfully many

12 times?

13 A.   Yes, that was my understanding.

14 Q.   All right.   And did either Mr. Stilley or -- well,

15 strike that.   Did Mr. Stilley ultimately represent you at

16 the trial?

17 A.   No, Mr. Stilley did not.

18 Q.   All right.   Who did represent you at the trial?

19 A.   A Jerold Barringer.

20 Q.   All right.   And who -- how did you get in touch with

21 Mr. Barringer the first time?

22 A.   Mr. Stilley did that.

23 Q.   Who did?

24 A.   Oscar Stilley and Lindsey Springer.   Basically

25 Lindsey did.

1    Q.   All right.  Lindsey, you're talking about Lindsey

2    Springer?

3    A.   Lindsey Springer, yes, sir.

4    Q.   Okay.  Did -- all right.  So then at trial -- you

5    went to trial, and what was the defense team for you and

6    your husband at the trial?

7    A.   I don't understand the question.

8    Q.   Who was there on your side of the courtroom at the

9    trial?

10   A.   Jerry Barringer, Lindsey Springer, Oscar Stilley.

11   Q.   All right.  Did Mr. Springer sit up there with the

12   attorneys at the table?

13   A.   No, sir, I believe he sat back behind the rail.

14   Q.   All right.  And during the course of the trial, did

15   you have occasion to observe what part Mr. Springer,

16   Lindsey Springer, was playing in your defense of your

17   case, yours and your husband's case?

18   A.   Basically it was the fact that there was a lot of

19   e-mailing going on during the defense between he and

20   Mr. Stilley.  And then there was quite a -- there was a

21   couple of times that the e-mails were going on and note

22   passing between Mr. Springer and Mr. Barringer.

23   Q.   All right.  And as between Mr. Barringer,

24   Mr. Stilley and Mr. Springer, did you have an opinion at

25   the end of the trial, or maybe before then, as to who was

1    calling the shots in your defense?

2    A.   I had a good indication who was calling the shots,

3    and I believe it was Lindsey Springer.

4    Q.   Now, prior to the trial, did you have any other

5    meetings with Lindsey Springer prior to the trial?

6    A.   There were several meetings that we had met with

7    him, Oscar and Jerold Barringer before the trial just

8    periodically.  There was a time that Lindsey came to the

9    house, I guess to discuss things with my husband.

10   Q.   All right.  Were you present at that meeting at your

11   house --

12   A.   Yes, I was.

13   Q.   -- with Mr. Springer and your husband?

14   A.   Yes.

15   Q.   All right.  What happened in that meeting?

16   A.   I was in the kitchen and they were in the den, and

17   they were discussing basically a little bit about the

18   case and about finances.  And my husband had told

19   Mr. Springer that he had -- that there was $60 that he --

20   $60,000 that he knew of that he would like for Lindsey to

21   hold for him in case we needed it for legal expenses

22   later on.

23   Q.   All right.  And did anything happen as a result of

24   that that you're aware of?

25   A.   Well, as far as I know, he gave Lindsey the money.

1   And then when I went to ask him if I could get the money

2   back, he said that he did not have it, that it was a

3   donation to his ministry.

4   Q.   And when was it that you tried to get the $60,000

5   back?

6   A.   It was right after that -- my husband went to jail

7   in December of '04.

8   Q.   Your husband was incarcerated after the jury

9   verdict; is that correct?

10  A.   That is correct.

11  Q.   But before the sentencing?

12  A.   Yes.

13  Q.   So that was in?

14  A.   December of '06, I believe.

15  Q.   December --

16  A.   '04.

17  Q.   '04.   After your husband went to -- was

18  incarcerated, was -- well, at the time of the conviction,

19  you were still represented by Mr. Barringer?

20  A.   Yes, I was.

21  Q.   Did that change after -- at some point after your

22  husband was incarcerated and after the jury verdict?

23  A.   Yes, sir, it did.

24  Q.   And what happened?

25  A.   I just did not feel comfortable with Mr. Barringer,

JUDITH PATTERSON - DIRECT BY MR. SNOKE                817

1    and I had asked to have him dropped as an attorney and
2    have a local attorney picked up.
3    Q.  All right.  Now, at some point after -- I guess
4    we're in 2005 now that you were sentenced?
5    A.  Yes, sir.
6    Q.  And when was that?
7    A.  It was in May.
8    Q.  All right.  And what sentence did you receive?
9    A.  18 months.
10   Q.  And did you serve that whole 18 months?
11   A.  No, sir, I did not.
12   Q.  How much of it did you serve?
13   A.  About four and a half months.
14   Q.  When you got out of incarceration, then you were
15   still on some sort of supervised release?
16   A.  Yes, sir, I was.
17   Q.  Are you still on some supervised release?
18   A.  No, sir, I'm not.
19   Q.  Was your husband, Eddy Patterson, in jail when you
20   got out?
21   A.  Yes.
22   Q.  Now, with respect to the -- with respect to this
23   $60,000 you testified to, were there any instructions on
24   how that -- or did you hear of any other -- were you
25   privy to any other instructions from Lindsey Springer as

```
 1   to how to make out checks to him?
 2   A.   I don't know.  I believe he made it out -- I believe
 3   my husband --
 4           MR. SPRINGER:  Objection, Your Honor.
 5           MR. SNOKE:  Okay.  Withdraw the question.
 6   Q.   (BY MR. SNOKE)  I'm only asking you what you heard
 7   said by anybody.  Did you ever have any -- overhear any
 8   conversations from Mr. Springer, Mr. Stilley or
 9   anything -- either of those two gentlemen concerning how
10   checks should be made out to -- in payment for Lindsey
11   Springer's helping your husband and you?
12           MR. SPRINGER:  Objection, Your Honor, hearsay.
13           THE COURT:  Overruled.
14           THE WITNESS:  No, sir, I did not.
15           MR. SNOKE:  May I have just a minute, Your
16   Honor?
17           THE COURT:  You may.
18           MR. SNOKE:  Pass the witness.
19           THE COURT:  Cross-examination.
20                      CROSS-EXAMINATION
21   BY MR. SPRINGER:
22   Q.   Mrs. Patterson, is it safe to say that you didn't
23   know me until -- had never met me until at least 2003,
24   right before you got indicted?
25   A.   If that's when we saw you at Golden Corral.
```

1    Q.    But certainly not in 2000, correct?

2    A.    I don't remember the dates.

3    Q.    Do you remember what your charges were in the

4    indictment that was brought against you?

5    A.    Vaguely.

6    Q.    Do you remember there was two false tax return

7    charges and then two willful failure to file charges?

8    A.    I don't remember.

9    Q.    Do you remember what years those were for?

10   A.    No, I don't.

11   Q.    Was it for in the '90s?

12   A.    I don't remember.

13   Q.    Have you filed a lawsuit against Oscar Stilley,

14   Jerold Barringer and myself?

15   A.    I don't remember doing that.

16   Q.    Do you know anybody by the last name of Stoops?

17   A.    Yes.

18   Q.    And who is he?

19   A.    He's an attorney.

20   Q.    And how do you know him?

21   A.    I met with him once before.

22   Q.    Where did you meet with him at?

23   A.    At his office.

24   Q.    And was that to file a lawsuit against Oscar

25   Stilley, Jerold Barringer and Lindsey Springer?

1  A.   I don't believe so.

2  Q.   Okay.  You're here today testifying based upon an

3  agreement you had entered into with the government; is

4  that correct?

5  A.   That is correct.

6  Q.   You testified that you were given 18 months of a

7  prison sentence; is that right?

8  A.   Yes.

9  Q.   And then it was reduced to four months of a prison

10 sentence; is that correct?

11 A.   Yes.

12 Q.   And did you -- prior to getting that reduction, did

13 you give substantial assistance to the United States?

14 A.   Prior to that?

15 Q.   Yes, ma'am.

16 A.   No, I did not.

17 Q.   Had you ever met with anybody prior to the day that

18 William Widell drove down and got you out of jail?

19 A.   No.

20 Q.   Had you ever talked to anybody on the phone before

21 William Widell drove down and got you out of jail?

22 A.   No.

23 Q.   Had you ever -- prior to September 1, 2004, ever

24 asked Mr. Barringer to stop representing you on your

25 appeal at the Tenth Circuit Court of Appeals?

```
 1  A.    I don't remember what date.

 2  Q.    Okay.  Was it before or after you got out of prison?

 3  A.    It was before I ever went in.

 4  Q.    Before you ever went in.  Okay.  And do you remember

 5  it being the day before you went in to prison that you

 6  met with Melody Nelson, Doug Horn and the IRS criminal

 7  investigator, Tim Arsenault?

 8  A.    I don't remember what date that was.

 9  Q.    But you do remember that you did meet with them

10  before you went in?

11  A.    I don't remember.

12          MR. SPRINGER:  Thank you.

13          THE COURT:  Mr. Stilley.

14          MR. STILLEY:  Your Honor, may I have just a

15  moment?

16          THE COURT:  You surely may.

17                    CROSS-EXAMINATION

18  BY MR. STILLEY:

19  Q.    Mrs. Patterson, you don't have any evidence

20  whatsoever that Oscar Stilley committed any crime, do

21  you?

22  A.    I guess not.

23          MR. STILLEY:  Pass the witness.

24          THE COURT:  Any redirect?

25          MR. SNOKE:  No, Your Honor.
```

JAMES LAKE - DIRECT BY MR. SNOKE                            822

```
 1              THE COURT:  You may step down.

 2              We'll have the government's next witness.

 3              MR. SNOKE:  James Lake.

 4              THE COURT:  Say that name again, please.

 5              MR. SNOKE:  Lake, L-A-K-E.

 6                          JAMES LAKE,

 7  (WITNESS SWORN)

 8                    DIRECT EXAMINATION

 9  BY MR. SNOKE:

10  Q.   Would you state your name and spell your last name

11  for the court reporter, please, sir?

12  A.   James Lake, L-A-K-E.

13  Q.   And what's your business or occupation, sir?

14  A.   I'm retired.

15  Q.   All right.  Retired from what?

16  A.   Delta Airlines.

17  Q.   All right.  And where do you live, sir?  Just the

18  city.

19  A.   California.

20  Q.   Okay.  Which city in California?

21  A.   Newport Beach.

22  Q.   Okay.  Do you know Lindsey Springer?

23  A.   Yes.

24  Q.   Do you see him in the courtroom here today?

25  A.   I didn't recognize him.  Yes, I do.
```

1   Q.   All right.  Does he look different than the last

2   time you saw him?

3   A.   Yes, he does.

4   Q.   In what way?

5   A.   He has a beard.  He's a little grayer.

6   Q.   All right.  Do you know Oscar Stilley?

7   A.   Yes, I do.

8   Q.   Okay.  Do you see him in the courtroom?

9   A.   Yes, I do.

10  Q.   All right.  Now, under what circumstances did you

11  first meet or come in contact with Lindsey Springer?

12  A.   I had been given his telephone number by someone in

13  -- I apologize.  It was so many years ago, I just don't

14  recall how I got his telephone number.  And I called him

15  up on the telephone.

16  Q.   All right.  And can you tell us what year this was?

17  A.   Yes.  That was in October -- I believe it was

18  October or the end of October of 2000.

19  Q.   All right.  And what was the purpose of you calling

20  Mr. Springer on that occasion?

21  A.   I got a notice from the IRS that I had failed to

22  file tax returns, and he was referred to me to help in

23  that matter.

24  Q.   Okay.  And -- all right.  Was this -- was this that

25  you -- you got a notice from the IRS or you got the

```
 1  notice from a court?
 2  A.   I guess technically it was from a court, yes.
 3  Q.   You -- you actually got charged with something?
 4  A.   Yes, yes.
 5  Q.   Criminal charges?
 6  A.   It was a criminal information that I failed to file
 7  income tax return, yeah.
 8  Q.   All right.  And for what years were you charged with
 9  failure to file?
10  A.   '94, '95 and '96.
11  Q.   And where -- where was that court?
12  A.   Atlanta, Georgia.
13  Q.   All right.  And where were you living at that time?
14  A.   I was in California at the time.
15  Q.   All right.  And can you tell us why, then, the
16  Atlanta, Georgia court would have been --
17  A.   I was in Florida in '94, '95 and '96, and the way I
18  understand it, I filed my returns in Atlanta, Georgia.
19  So I guess that was why the Atlanta, Georgia court.
20  Q.   All right.
21  A.   The address when I sent in my income tax returns was
22  Atlanta, Georgia, from Florida.
23  Q.   I see.  Or when you didn't send them in?
24  A.   Right.  Exactly.
25  Q.   So you got the name of Lindsey Springer from some
```

1  acquaintance or friend or something?

2  A.   Yes, uh-huh.

3  Q.   All right.  So you called him up, and what happened

4  in that call?

5  A.   Well, I told him that I was referred to him, and I

6  explained that I got this criminal information and that I

7  understood he could help me with that, and he said he

8  could.

9  Q.   All right.  Did he explain at that point anything

10  about his background that would lead you to believe that

11  he could help you with your criminal information?

12  A.   Yes, he had said that he was a legal -- I don't know

13  whether he used the word actually legal expert or legal

14  scholar on this matter, and that he has handled many

15  cases and that he had just won a case in Illinois and he

16  expected to win one with a dentist.  I can't remember if

17  it was Alabama or Tennessee.  And that he worked with two

18  different attorneys, either a Mr. Stilley or a

19  Mr. Barringer, and that he would decide how -- which

20  attorney he would use to present the case to help me.

21  Q.   And at that time -- did he make that decision in

22  that first communication or --

23  A.   No, I don't believe he did.  But he did explain to

24  me that his fee was anywhere -- it was $30,000, but it

25  could be a little bit more.  And then the attorney that

1  he selected would get with me and tell me what he charged

2  per hour for the services that he handled.  So there was

3  two separate charges actually, I guess.

4  Q.  All right.  And at some point did you agree to

5  employ Mr. Springer to do this for you?

6  A.  Yeah, I'm pretty sure I did right then because, you

7  know, I didn't know where to go and what to do and --

8  Q.  All right.  What was the time frame on which you had

9  -- when you had to make some decision?  This is in

10  October, you said, of 2000?

11  A.  Yes.  And I had a court date in November to appear

12  again.

13  Q.  In Atlanta?

14  A.  In Atlanta, yes, for an arraignment.  So I needed

15  somebody.

16  Q.  And can you tell us about how much after that it is

17  that you came in contact with -- for the first time with

18  Oscar Stilley?

19  A.  I think very shortly after that Mr. Springer said

20  that Mr. Stilley would be the attorney because I think

21  Mr. Barringer was not available, or for whatever reason

22  he selected Mr. Stilley, and that we did a conference

23  call and talked on the phone.  And then --

24  Q.  Wait, wait, wait.  Let's slow down here.

25  A.  I'm sorry.

1  Q.  We did a conference call.  Who did a conference

2  call?

3  A.   Mr. Springer, Mr. Stilley and myself, and talked

4  about a strategy and that I would appear in court in

5  Atlanta.  And that was the first time I met Mr. Stilley.

6  Q.  All right.  So you didn't actually meet Mr. Stilley

7  until the next month, that is, November, when you

8  appeared in Atlanta?

9  A.   Correct.

10  Q.  When you appeared in Atlanta, that was November, you

11  said?

12  A.   Yes.

13  Q.   Of 2000?

14  A.   2000, uh-huh.

15  Q.   Had you met Mr. Springer in person at that point?

16  A.   No.

17  Q.  All right.  Had you paid Mr. Springer any -- did you

18  pay Mr. Springer any money prior to your appearing -- or

19  Mr. Stilley, I guess, for that matter, any money prior to

20  your first appearances in November of 2000?

21  A.   Yes.  I believe I paid him 20,000 of the first

22  30,000 by that time.  Two cashier's checks.

23  Q.  All right.  I'm going to --

24          MR. SNOKE:  12 and 13, are they in?  May I

25  approach the book?

```
 1              THE COURT:  You may.
 2  Q.  (BY MR. SNOKE)  All right.  You got 12 on the screen
 3  there?
 4  A.  Yes.
 5  Q.  All right.  Go ahead and look at the screen.  If
 6  you'll look at Exhibit 12 and -- first let's look at 12,
 7  I guess.  And tell me what that is.
 8  A.  That's a copy of the -- that's a copy of the
 9  cashier's check that I sent to Mr. Springer.
10  Q.  All right.  And the date on there is November 7,
11  2000?
12  A.  Yes.
13  Q.  $10,000?
14  A.  Yes.
15             MR. SNOKE:  Then if you would pull up
16  Government's Exhibit 13, please.
17             THE WITNESS:  And that, again, is a cashier's
18  check for 10,000 to Mr. Springer.
19  Q.  (BY MR. SNOKE)  All right.  Also dated November 7,
20  2000?
21  A.  Yes.
22  Q.  Is that correct?
23  A.  Yes.
24  Q.  All right.  So looks like -- were you banking at
25  Manufacturers Bank there in Newport Beach?
```

1   A.   Yes.

2   Q.   It looks like you sent him both these checks, or had

3   them issued, at least, on the same day?

4   A.   Yes.

5   Q.   All right.  Then if we can look at Government's

6   Exhibit -- well, let's kick the arraignment for a minute.

7   You said Mr. Springer was not at your arraignment;

8   Mr. Stilley was?

9   A.   Right.

10  Q.   Was the trial set, then, at that date or sometime

11  after that?

12  A.   It was a -- we requested a probable cause hearing,

13  and at that time -- I remember that.  And then the

14  government said that that was not required, and I don't

15  recall whether there was a trial date set or not.  There

16  might have been.  In fact, I think there was in

17  December.  I think there was going to be one in December.

18  Q.   All right.

19  A.   I just don't recall, because then it changed.  So I

20  never appeared in December.

21  Q.   All right.  This is in November of 2000?

22  A.   Correct.

23  Q.   All right.  What -- what kind of -- did you have a

24  probable cause hearing?

25  A.   I beg your pardon?

1  Q.   Did you have a probable cause hearing?

2  A.   No.   The government said that it was a petty offense

3  and according to the rules, a probable cause hearing

4  wasn't required for a petty offense.

5  Q.   All right.  And did you discuss that with

6  Mr. Springer or Mr. Stilley?

7  A.   I don't recall -- I think -- I think -- I do recall

8  that that -- I don't know whether it was right on that

9  day or afterwards on the phone, we discussed the fact

10 that it shouldn't have been a petty offense.  It was a --

11 I think a class 1 misdemeanor, which was different than a

12 petty offense, and they were going to argue that point,

13 that there should have been a probable cause hearing

14 under that issue and then they were going to file papers

15 with the court.

16 Q.   Who is they?

17 A.   I guess it would have to be -- the way I understood

18 the system worked was that Mr. Springer prepared the

19 documents and Mr. Stilley as the attorney would actually

20 file them.  So that was kind of the sequence of events

21 throughout the whole process.

22 Q.   All right.  Then what happened next in your

23 relationship there with --

24 A.   Then I was contacted and the court date was set for

25 January 10 of 2001.

1   Q.   All right.  What happened -- did you go to Atlanta,

2   then, on January 2001?

3   A.   Yes, I went to Atlanta for that hearing, and it was

4   a very interesting, I guess, for lack of a better word,

5   day that day.  The first thing was that the court said

6   that Mr. Stilley, for that day, could represent me;

7   however --

8   Q.   And that was because Mr. Stilley was from another

9   state?  He was --

10  A.   Correct.  He was coming in from Arkansas, and we

11  were in Georgia.  And typically you're either a Georgia

12  attorney or I guess the rules say you have to have a

13  Georgia attorney with you because they know the local

14  rules.  And that was the idea there.

15          MR. SPRINGER:  Your Honor, I have an objection.

16  This is narrative.

17          THE COURT:  Well, let's go a little more by Q

18  and A.  Go ahead.

19          THE WITNESS:  Okay.  Oh, I see.  So your

20  question?

21          THE COURT:  Next question.

22  Q.   (BY MR. SNOKE)  Yes.  And did you meet Mr. Springer

23  on that occasion?

24  A.   Yes.

25  Q.   All right.  So he and Mr. Stilley were both

1   representing you?

2   A.   Right.

3   Q.   All right.  Was there a -- a -- was there a

4   disagreement that affected your case between Oscar

5   Stilley on that occasion and the court?

6   A.   Yes, there was.

7   Q.   What was that?

8   A.   Mr. Stilley did not want to have a local counsel

9   from Georgia, and the judge -- they went back and forth,

10  and there was a pretty big argument back and forth about

11  that.  And the judge said, you know, we've been doing

12  things for 200 years this way and we're not going to

13  change the rules for you, and you're now no longer able

14  to represent Mr. Lake.  And, Mr. Lake, now you're

15  representing yourself.  And Mr. Stilley got up and argued

16  with the judge, and he did everything but shoot his dog

17  to keep him -- I mean, to anger this judge.  It was just

18  -- it was really, you know, upsetting to see, because I

19  didn't know what to do now.  I didn't have an attorney

20  and now I was representing myself and, you know, I didn't

21  know what to do.

22  Q.   All right.  So what did happen after that?

23  A.   The judge set another hearing date.  And we left,

24  and then Mr. Stilley and Mr. Springer decided they were

25  going to now go to the Eleventh Circuit Court of Appeals

1   to appeal that ruling so that he didn't have to have a

2   local counsel.

3   Q.   All right.  And did either one of them discuss with

4   you who was going to finance that appeal to the 11

5   Circuit?

6   A.   It would be -- yeah, I was going to pay for it.

7   Q.   If you would look at -- we covered Government's

8   Exhibit 15.  Would you pull that up, please?  Do you

9   recognize that check?

10  A.   Yes, that's a $10,000 check on December 27th to

11  Lindsey Springer.  And at that date, if you look in the

12  lower left, there's a note there, 30,000, which

13  represents that I've paid him at that date 30,000, the

14  two 10,000 already and then this 10,000.

15  Q.   All right. And this seems to be paid out of a

16  different account, DVAT.  What was DVAT?

17  A.   That was a trust account that I had at the same

18  bank, Manufacturers Bank.

19  Q.   All right.  And what was the purpose of paying

20  Lindsey Springer $10,000 on 12/27 of 2000?

21  A.   I thought that was going to be the last payment I

22  had to make for the $30,000 fees that he said he charged

23  to arrange everything for my court date -- court case.  I

24  ended up paying him some more later on.

25  Q.   All right.  If you would look at Government's

```
 1   Exhibit 78.
 2   A.   That looks like a $15,000 check that I sent to Oscar
 3   Stilley for fees in 2001.
 4   Q.   All right.  It looks like the date is February --
 5   A.   1st.
 6   Q.   Something in February.
 7   A.   Yeah, looks like February 1, 2001.
 8   Q.   All right.  And would Oscar Stilley send you any
 9   kind of a statement or billing to -- for which you were
10   making these payments or --
11   A.   I believe he did.  I don't recall exactly.  I know
12   that he communicated to me that periodically I was -- my
13   retainer was getting low and I needed to send him more
14   money.
15   Q.   Do you remember any kind of payment to Oscar Stilley
16   prior to this check that I've just shown you there,
17   Government's Exhibit 78?
18   A.   I'm not sure.  I don't recall right off the top of
19   my head.
20   Q.   All right.  But this -- this one was for that
21   purpose for --
22   A.   For legal fees.
23   Q.   -- refurbishing the retainer fund?
24   A.   Correct.
25   Q.   Government's Exhibit 79, also drawn on the same DVAT
```

JAMES LAKE - DIRECT BY MR. SNOKE                              835

1   account.  What was this check for?  February 14th, looks

2   like?

3   A.   Yeah, looks like another $5,000 to Oscar Stilley for

4   legal fees on February 14, 2001.

5   Q.   All right.  If you would look at Government's

6   Exhibit 159.  Okay.

7          MR. SNOKE:  May I approach?

8          THE COURT:  You may.

9   Q.   (BY MR. SNOKE)  That book starts at 151.  If you

10  could turn to Exhibit 159.

11  A.   Yes, this is another check.  This one is to Lindsey

12  Springer on --

13  Q.   All right.  Wait.  Wait.  We haven't got this in

14  evidence yet, so the date of that check is?

15  A.   February 19, 2001.

16  Q.   All right.  And it's payable to whom?

17  A.   Lindsey Springer.

18  Q.   All right.

19          MR. SNOKE:  We would move into evidence

20  Government's Exhibit 159.

21          MR. SPRINGER:  No objection, Your Honor.

22          THE COURT:  It is received.

23  Q.   (BY MR. SNOKE)  What's the amount of that check?

24  A.   $5,000.

25  Q.   All right.  Now, see down there in the memo column,

1  or the for column, whatever they call it, what's written

2  down there?

3  A.   I wrote 40, so I -- I'm assuming that I just totaled

4  up to that point I had paid $40,000.

5  Q.   All right.  And what was the purpose of this check?

6  A.   These were fees to Lindsey Springer for the legal

7  work that he did for my case.

8  Q.   How would you know when to write one of these checks

9  to Lindsey Springer?

10 A.   We would talk about it over the phone.

11 Q.   And during this time period, would you have

12 telephone conversations with Mr. Springer about your

13 case?

14 A.   Yes, I talked to Mr. Springer.  I talked to

15 Mr. Stilley.  Sometimes the three of us would talk at the

16 same time on a three-way call.

17 Q.   All right.  And who would organize the three-way

18 calls when you had them?

19 A.   I would initiate the calls, but either I would talk

20 to Mr. Springer or Mr. Stilley and they would say, Let's

21 bring in the other party, whoever I wasn't talking to at

22 the time, and so I would make the three-way call on my

23 phone.

24 Q.   All right.  And who would pay for the three-way

25 calls?

1   A.   I paid for the three-way calls.  I typically paid

2   for hotels, for food in the location we were in, Atlanta,

3   or if we were in California, because they came to

4   California also, and also for airline fare.

5   Q.   All right.  We'll get to that here more in a minute

6   as we march through the year 2001.  All right.  Did this,

7   then, this appeal -- did the appeal take place to the

8   Eleventh Circuit on that issue?

9   A.   Yes, they appealed to  Eleventh Circuit and the

10  Eleventh Circuit ruled that they had to have local

11  counsel, so we got local counsel.  The other thing that

12  was argued in that time frame was that instead of a

13  magistrate judge, Mr. Springer and Mr. Stilley wanted a

14  district court judge instead of a magistrate judge.

15  Q.   To try the --

16  A.   To try this --

17  Q.   -- misdemeanor case?

18  A.   Right.

19  Q.   All right.  And did that happen?

20  A.   Yes.

21  Q.   The district court judge got assigned?

22  A.   Right.

23  Q.   All right.  Now, how long did all this take?  Did

24  this delay the trial?

25  A.   We were probably mid 2001 by this time.

1  Q.   All right.  Did you look at 160?  It's in the book

2  there.

3  A.   Yes.

4  Q.   Not in evidence yet.  I guess.  And can you -- do

5  you recognize this exhibit, this check, front and back?

6  A.   Yes.

7  Q.   And what is that?

8  A.   It's a check to Lindsey Springer on April 9, 2001

9  for $3,000.

10 Q.   All right.  And what was that check drawn for?

11 A.   The same purpose.  They're all for the same purpose,

12 legal work to help in my case.

13 Q.   All right.

14       MR. SNOKE:  Move into evidence Government's

15 Exhibit 160 at this time.

16       MR. SPRINGER:  No objection, Your Honor.

17       THE COURT:  It is received.

18       MR. SNOKE:  May I approach and get him another

19 book, if I may?

20 Q.   (BY MR. SNOKE)  Now, if you'll look in that book at

21 Government's Exhibit 81, which is in evidence, I believe,

22 but it's not a real good copy.

23 A.   Yes.

24 Q.   All right.  Do you recognize that exhibit?

25 A.   Yes.

1  Q.   And who is that a check to?

2  A.   That's a check on 7/31/01 for $5,000 to Oscar

3  Stilley.

4  Q.   All right.  And what would have precipitated that

5  check?

6  A.   That I owed him more legal fees to date.

7  Q.   Would this have been verbal or would he send you

8  something in writing?

9  A.   He may have sent something in writing.  I don't

10  recall, but I do know that we would have talked about it

11  over the phone probably.

12  Q.   Did you ever get anything in writing from

13  Mr. Lindsey Springer about what you owed him?

14  A.   No, it's all verbal.

15  Q.   If you'll look at Government's Exhibit 82.  Can you

16  tell us what this is?

17  A.   Yes, this is a check to Oscar Stilley for $1500 in

18  2001, it looks like.  The eighth month, seventh day of

19  2001.

20  Q.   Again, the purpose of this check?

21  A.   This would be for legal fees.  I'm assuming that's

22  what it would be for.

23  Q.   These expenses you talked about earlier, were they

24  over and above what we're going through here in these

25  checks?

1  A.   Yes.  Typically what would happen was that we would

2  say, okay, there's a court date coming up.  I would

3  arrange for the airline tickets.  And they were first

4  class tickets because they said they -- that it was

5  easier for them to talk about my case on the airplane

6  sitting next to each other.  So I would purchase those

7  tickets.  I don't think I purchased every ticket, because

8  at the very beginning we hadn't discussed how we were

9  going to set that up.  So it would be probably in 2001 I

10  bought tickets.  And then when we arrived, we typically

11  arrived around the same time.  I would have the hotel

12  reservations already arranged, and then when we left, I

13  paid the hotel bill and typically the meals that we would

14  have during the meetings or whatever.

15  Q.   All right.  So you would pay the hotel bill for the

16  three of you that you would --

17  A.   Yeah.

18  Q.   Did Mr. Barringer ever come into this picture?

19  A.   I never met Mr. Barringer.  I don't remember him.

20  Q.   All right.  If you'll look at Government's Exhibit

21  83.  Tell us what that is.

22  A.   That's a check for $3,000 to Oscar Stilley.  It

23  looks like it's 8/10/2001.

24  Q.   All right.  Exhibit 85?

25  A.   Oscar Stilley, 9/1/2001, for $1,000 sent to him.

1   Q.   All right.   This seems to be drawn on the Delta

2   Employees Credit Union?

3   A.   Yes.

4   Q.   Did you have an account there as well?

5   A.   Yes.

6   Q.   Purpose of this check, sir?

7   A.   I would say that was probably for legal fees also.

8   That's the only thing I can recall.

9   Q.   Now, as to any of these checks to -- that you had

10  written to Mr. Springer, were any of those donations?

11  A.   No.

12  Q.   Did he ever discuss making these checks donations or

13  anything but fees?

14  A.   Not the checks.   I do remember, during one of the

15  times we were in Atlanta, that either he or Mr. Stilley

16  brought up the fact that he had a church.   And I was kind

17  of curious about that because --

18  Q.   I'm sorry, who had a church?

19  A.   Mr. Springer had a church.   And I was curious about

20  that to myself because I knew churches were usually not

21  taxed.   And what was upsetting to me at the time was that

22  -- and I, again, was going through my head about this,

23  that if I didn't have to file taxes and if they each said

24  that they didn't have to file taxes, why would you have a

25  one-man church?   It didn't make sense.   So that made me a

1    little nervous.  But that was the only time it happened

2    to be mentioned, so --

3    Q.  All right.  This was about what time in the

4    continuum here?

5    A.  I think it was mentioned somewhere either at a meal

6    or on their way to or from the airport.  It was just a

7    kind of a casual conversation.

8    Q.  All right.  Now, you said something about thinking

9    that they didn't have to pay taxes.  What do you base

10   that on?  Was there something said about --

11   A.  Yes.  For example, Mr. Stilley said, I'm an

12   attorney.  I haven't paid taxes in ten years.  You don't

13   understand; you don't have to file taxes, you know.  In

14   other words, the message I was receiving was that you're

15   in good hands.

16   Q.  When was that conversation, about?

17   A.  It was numerous times.  It was reinforced numerous

18   times.

19   Q.  What about Mr. Springer?  Did he indicate whether he

20   paid taxes?

21   A.  I don't remember a conversation specifically where

22   he --

23           MR. SPRINGER:  Objection, Your Honor.

24           THE WITNESS:  -- didn't object.

25           MR. SPRINGER:  He said he didn't remember.

```
 1            THE COURT:  Just testify what you do recall.  Go
 2   ahead.
 3            THE WITNESS:  Okay.  I recall Mr. Springer being
 4   there and seemed to concur with the same thing, because
 5   he said --
 6            MR. SPRINGER:  Objection, Your Honor.
 7            THE WITNESS:  -- that's what we're here for.
 8            MR. SPRINGER:  Objection, Your Honor, seemed to
 9   concur.
10            THE COURT:  Overruled.
11   Q.  (BY MR. SNOKE)  What did Mr. Springer say?
12   A.  Mr. Springer told me that we've won cases in
13   Illinois, we're working on this dentist, you don't have
14   to pay taxes, and that's the law.  And what I was
15   learning was that a lot of the early cases that they --
16   Mr. Springer and Mr. Stilley showed me hundreds of years
17   old may have been the fact, but what I've learned since
18   then was that sometimes those laws change.  For example,
19   slavery may have been legal, but now it's not anymore.
20   The law has changed.  And I think where I was naive and
21   gullible and dumb, to tell you the truth, was that I
22   would read these things that they would give me --
23            THE COURT:  Let's go by Q and A.
24   Q.  (BY MR. SNOKE)  Who is they?
25   A.  I'm sorry.  Mr. Springer and Mr. Stilley would show
```

1   me material in the process of their preparation of my

2   case, the filings in my case, and support their positions

3   with case law, which they would suggest that I read,

4   which I did, which supported their position going back

5   to, you know, 1800s or whatever, very long time ago.  And

6   --

7           THE COURT:  Okay.  That's enough narrative.

8   Let's have another question.

9           MR. SNOKE:  All right.

10  Q.  (BY MR. SNOKE)  All right.  If you would look at --

11  I'd show you Government's Exhibit 86.

12  A.  That's a November 10, 2001, $6,000 to Oscar Stilley,

13  probably for legal fees.

14  Q.  This is drawn on DVAT?

15  A.  Yes.

16  Q.  And the purpose of that, again?

17  A.  I believe it's legal fees also.

18  Q.  All right.  About that time, do you remember when

19  your trial was set?

20  A.  Yeah, my trial was set for December 6th or December

21  7th.  I believe it was December 7 of 2001.

22  Q.  All right.  Then if you'll look at Government's

23  Exhibit 87.

24  A.  That was December 5, 2001, $5,000 to Oscar Stilley.

25  Q.  And what was the purpose of that?

```
 1   A.   For legal fees to date.
 2   Q.   I think you've said, but let me ask again.  When you
 3   would send this check, it was a result of what?
 4   A.   A request for more legal fees.
 5   Q.   By Mr. Stilley?
 6   A.   Mr. Stilley, yes.
 7   Q.   All right.  Now, this one appears to be a few days,
 8   then, before you -- you just said your trial was set on
 9   the 7th of December in 2001?
10   A.   Yes.
11   Q.   All right.  Now, at some point in here, did you make
12   a decision relative to the representation -- continued
13   representation at the trial by Mr. Stilley and
14   Mr. Springer?
15   A.   Yes.  Several months before that time, I also
16   invited a civil attorney who was going to help support
17   the case.  And his position was that I was charged with a
18   misdemeanor for failing to file.  On the 1040 instruction
19   booklet that the IRS mails out, it says file a Form 1040
20   or you could file a letter.
21   Q.   Uh-huh?
22   A.   So we thought, well, I did continually keep the IRS
23   updated with letters about, you know, where I was on
24   this.  So he said, well, maybe that would be technically
25   you did, you know, stay in touch with them and you did
```

1  follow the instructions.  So that was kind of the

2  argument, and at the same time, they said let's calculate

3  what you owe, which was never any question that, you

4  know, was brought up at that point.  So Mr. --

5  Q.  Wait, wait, wait.  The matter of what you owed had

6  not been brought up prior to the point --

7  A.  Prior to this point.

8  Q.  -- when the other attorney, the civil attorney --

9  A.  Yeah.  And Mr. Stilley and Mr. Springer's position

10  was you don't --

11        THE COURT:  Let's have another question.

12  Q.  (BY MR. SNOKE)  All right.  Let me ask you.

13  A.  Okay.

14  Q.  All right.  What did you understand, then, would be

15  your defense, then, at the upcoming trial?

16  A.  My understanding at that point, right up to the

17  night of the trial, was going to be that I had responded

18  according to the instructions in the 1040 book.  There

19  had not been a 1040 form, there had been letters, and

20  that we calculated my income tax that was owed, and I

21  didn't owe anything if I had sent in a 1040.  So that was

22  kind of our defense at that point.  And we -- I had --

23  Q.  All right.  Before we go on here on a narrative, did

24  Mr. Springer or Mr. Stilley agree to work with this civil

25  attorney in that defense?

1  A.   Yes.  He was a civil attorney, so, therefore, he

2  needed a criminal attorney, which was Mr. Stilley, to be

3  there to ensure that he followed criminal procedure

4  versus just civil procedure.  But he was going to make

5  the presentation to the jury and so on and so forth, ask

6  the questions and so on.

7  Q.   All right.  And then what happened then?

8  A.   Well, the night before the trial, Mr. Stilley said,

9  you know what, I can't support this position.  And let me

10  point out that I paid for a specialist to do a mock jury,

11  presented in Atlanta --

12  Q.   We're backing up here.  Prior to the trial you had

13  done this?

14  A.   Yes, prior to the trial I did that, which was

15  important because the jury said, well, technically he

16  followed the instructions, so technically he didn't, you

17  know, file -- not file.  So they said not guilty.  So

18  that was very encouraging to me, so that's why it

19  supported the argument on how we would proceed.  The

20  night before the trial, Mr. Stilley said, I can't support

21  this way of presenting it.  You should go into court

22  tomorrow, put a toothbrush in your shirt pocket and say,

23  if anybody can show me where in the law it says you have

24  to file, then I'll go to jail; if you can't, then you

25  have to say I'm not guilty.  And that was --

1  Q.  This was on the eve of trial?

2  A.  The eve of trial.  And I said that I couldn't go

3  along with that; that's suicide.  So I said, I have to

4  fire you.

5  Q.  All right.  And did you?

6  A.  The next morning, I -- you know, I went to court.

7  And I asked the judge, I said, I can't support this

8  position my attorney is going for.  And the judge at this

9  point, again, was so frustrated with all that had

10  happened all year, he said, we're going to have a trial

11  in two weeks.  You can represent yourself, you can have

12  Mr. Stilley represent you or you can get another

13  attorney, those are your three options, but we're not

14  delaying this any further.

15  Q.  And the trial at that point was set for when?

16  A.  January, I believe, 9th, somewhere right --

17  Q.  All right.  So you had a few weeks --

18  A.  Yeah.

19  Q.  -- over Christmas?

20  A.  Right.

21  Q.  Did you find another trial -- another attorney?

22  A.  Yes, I did.  I felt bad for him.  He said he'd help

23  me as best he could.  He only had a few weeks to prepare

24  and, like you said, it was over the Christmas holidays.

25  But he did the best he could.

1   Q.   All right.  And you were convicted ultimately?

2   A.   I had a hung jury, and then the court said that they

3   were going to try -- or the government said they would

4   try it again.  And my new attorney suggested that I just

5   plead guilty and -- because when they calculated, I

6   didn't owe any taxes, so that would reduce the sentence

7   and so on and so forth.  So that's what I decided to do,

8   just do that.  What I did find out was after it was all

9   over with, the new attorney said that the prosecutor

10  said --

11          MR. SPRINGER:  Your Honor, objection.

12          THE COURT:  That will be sustained.

13          MR. SNOKE:  I'll withdraw.

14          THE WITNESS:  Okay.

15  Q.   (BY MR. SNOKE)  It wasn't in answer to a question

16  anyway.

17  A.   Okay.

18  Q.   Prior to your dismissing Mr. Stilley as your

19  attorney and Mr. Springer, I guess, got dismissed at the

20  same time, had either of them brought to your attention

21  any kind of a plea bargain offer by the prosecutor?

22  A.   No.

23  Q.   And did you ultimately find out one had been made?

24  A.   Yes.  My new attorney said there was a plea bargain

25  made -- offer that was evidently told to Mr. Stilley,

JAMES LAKE - DIRECT BY MR. SNOKE                               850

1   that if I just had pled guilty a year earlier, they would

2   have just given me probation.

3   Q.   And you don't recall that ever being relayed to you

4   by Mr. Stilley?

5   A.   No.

6   Q.   If you would look at Government's Exhibit 161.  I

7   may have to show you that.  I don't think that's in

8   there.

9          MR. SNOKE:  If I may approach, Your Honor?

10         THE COURT:  You may.

11  Q.   (BY MR. SNOKE)  Do you recognize this exhibit?

12  A.   Yes.

13  Q.   What is that, sir?

14  A.   It's just a note to Lindsey Springer.

15  Q.   All right.  Just leave it at that.  And about -- can

16  you tell from the second page about when that was sent?

17  A.   April of 2001.

18  Q.   All right.

19         MR. SNOKE:  We would move into evidence

20  Government's Exhibit 161.

21         THE COURT:  Any objection?

22         MR. SPRINGER:  No objection.

23         THE COURT:  It is received.

24  Q.   (BY MR. SNOKE)  All right.  So will you tell us what

25  this is, again?

1   A.   Just a note to Mr. Springer about a payment that he

2   had evidently asked me to pay, so I needed to pay him in

3   increments.  The first one was $3,000 that I Federal

4   Expressed to him.

5   Q.   All right.  Now, this says something about not being

6   served and this is in April of 2001.

7          MR. SPRINGER:  Objection, Your Honor.  Could we

8   get a time period on this exhibit?

9          THE COURT:  The examiner just said April of '01,

10  but perhaps that should be confirmed by the witness.  Go

11  ahead.

12  Q.   (BY MR. SNOKE)  I thought he did confirm it a minute

13  ago.  Can you --

14  A.   April 11, 2001 --

15  Q.   That's what the --

16  A.   I mean -- yeah, April 11, 2001.

17  Q.   Which is a FedEx air bill or something?

18  A.   Yes.

19  Q.   Would you do that rather than mail things?

20  A.   Yes, if that would -- you know, they said they

21  needed the money, and I was concerned they would not

22  represent me if I didn't pay them.

23  Q.   All right.  And it's to Dear Lindsey, I guess?

24  A.   Yes.

25  Q.   Sent to Lindsey Springer here at an address in

1  Tulsa.  And it talks about first installment of $3,000.

2  We had a $3,000 check there --

3  A.  Yes.

4  Q.  -- in the other exhibit.  Did the $3,000 check have

5  any connection with this note and FedEx package?

6  A.  Yes.  The $3,000 check was included in the FedEx

7  package for legal fees for Lindsey Springer.

8  Q.  That would be Exhibit 160, I believe.

9       MR. SNOKE:  Can you pull up 160?

10 Q.  (BY MR. SNOKE)  All right.  That check is dated 4/9

11 of '01, so this was sent 4/11 of '01 apparently?

12 A.  Yes.

13 Q.  All right.  Then what is this --

14      MR. O'REILLY:  It's in evidence.  It's not in

15 the computer.

16      THE COURT:  If there's any debate about whether

17 160 is in evidence, it's in evidence.

18      MR. O'REILLY:  Your Honor, I'm sorry.  I

19 apologize.  It's in evidence.  I understand that it's not

20 in our computer system.

21      THE COURT:  Okay.

22      MR. O'REILLY:  We'll have to use the ELMO if we

23 want to show it.

24      MR. SNOKE:  All right.  I will do that, then, if

25 I may.

1  Q.   (BY MR. SNOKE)  Do you recognize the 160?

2  A.   Yes, that's the April 9, '01, $3,000 check for

3  Lindsey Springer.

4  Q.   All right.  Now, getting back to this letter,

5  Exhibit 161 -- and did I move that into evidence?  I did.

6          MR. SNOKE:  161?

7          COURTROOM DEPUTY:  Yes, that's already in.

8  Q.   (BY MR. SNOKE)  What are we talking about here?

9  What are you talking about when you're talking about,

10  I've not been served?

11  A.   Well, in January, when the magistrate judge fired

12  Mr. Stilley as my attorney and made me my own attorney, I

13  had not -- the government had gone from a criminal

14  information to a grand jury and indictment.  So I had not

15  been served on that indictment, and we communicated that

16  to the judge.  The judge then ordered the government to

17  personally serve me in California, which they had not

18  done at that point.  And I found out later they had

19  mailed something; it just never -- I never received it.

20  And because I wasn't served personally and I didn't

21  receive the mail, the judge ruled that I should be

22  arrested and taken into custody.  So at six o'clock in

23  the morning shortly after that, my door was pounded in

24  and they arrested me for not appearing in Atlanta.

25  Q.   Had you been conferring with Mr. Stilley and

```
 1   Mr. Springer about this issue?
 2   A.   Yes.  I told them on the phone and then, as you see
 3   on this note, they told me just sit at home and wait for
 4   them to serve you.  And they did, but with guns.
 5   Q.   All right.
 6   A.   And then arrested me for not appearing in court.
 7   Q.   All right.  Is this the same time when you were
 8   having an appeal on the issue of -- to the Eleventh
 9   Circuit?
10   A.   I would say that's probably right in that time
11   frame, maybe afterwards.  I'm not sure of the exact dates
12   of the appeal.  The appeal was started right shortly
13   after that January court date.
14   Q.   Did you not appear in Atlanta about -- on this
15   service issue in April of 2001 based on the advice of
16   anybody?
17           MR. STILLEY:  Objection.
18           THE COURT:  Hold on just a minute.
19           THE WITNESS:  That's correct.
20           THE COURT:  Wait.
21           THE WITNESS:  Oh.  I didn't know you meant me.
22           THE COURT:  That will be sustained.  Next
23   question.
24           MR. STILLEY:  Move to strike.
25           THE COURT:  That will be granted.  Jury will
```

1  disregard the last response.  Next question.

2  Q.  (BY MR. SNOKE)  Well, at the point that you -- at

3  the point that you terminated the services of

4  Mr. Springer and Mr. Stilley just prior to your trial,

5  tell us why you did that at that time.

6  A.  Yes, because I felt that the way they wanted to

7  proceed with my defense was flawed and that I thought it

8  would fail and that I would lose immediately.

9  Q.  All right.  And about -- before you made the

10  termination there, and I haven't -- we add up these

11  checks, but do you have any idea how much you paid to

12  Mr. Springer?

13  A.  I would say around $38,000 to Mr. Springer.

14  Q.  And how much to Mr. Stilley?

15  A.  Probably between 65,000 and $70,000.

16  Q.  All right.  And was any of those payments -- were

17  any of those payments supposed to be donations to

18  either --

19  A.  Not that I was aware of.

20          MR. SPRINGER:  Objection, asked and answered.

21          THE COURT:  Overruled.

22          THE WITNESS:  Not that I was aware of.

23  Q.  (BY MR. SNOKE)  What were the purpose of those

24  payments?

25  A.  I was told the payments were for legal fees.

1   Q.   You knew that Mr. Springer was not an attorney,

2   however?

3   A.   Correct.

4   Q.   Subsequent to your -- well, at the hearing in --

5   when the trial started, you said it was sometime in

6   January of '02?

7   A.   Yes.

8          THE COURT:  Counsel will approach.

9      (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND

10  OUT OF THE HEARING OF THE JURY.)

11         THE COURT:  Okay.  I'm beginning to feel like

12  this washcloth has been rung out until it's just bone

13  dry.  Do you have something substantial you're going to

14  be covering?

15         MR. SNOKE:  Just one or two quick questions

16  regarding that.

17         THE COURT:  Okay.

18     (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

19  WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

20  PRESENCE AND HEARING OF THE JURY.)

21         THE COURT:  Go ahead.

22  Q.   (BY MR. SNOKE)  Now, getting to the day of your

23  trial started, did you see Oscar Stilley again at about

24  that time?

25  A.   Yes.

1  Q.   Where was that?

2  A.   That was right -- just outside the courtroom.  He

3  had served me with a -- papers because he said I owed him

4  another $25,000.

5           MR. STILLEY:  Objection, relevance.

6           THE COURT:  Overruled.

7  Q.   (BY MR. SNOKE)  All right.  I'll have you look at

8  Government's Exhibit 162.

9  A.   Yes.

10 Q.   You may have to look at that in the book there.

11 A.   Do you want me to pull this out of this thing?

12 Q.   I'm sorry?

13 A.   I didn't see a -- am I supposed to pull this out of

14 this --

15           THE COURT:  Just look at Number 162.

16 Q.   (BY MR. SNOKE)  Yeah, there's a multi-page exhibit

17 there.  Yeah, you can pull it out of the plastic if you

18 need to look at the other pages of it.

19 A.   Okay.

20 Q.   Now, other than the front sheet, which is an

21 envelope -- but looking at the rest of that, can you tell

22 us what that exhibit is?

23 A.   Yes, this is the lawsuit that Oscar Stilley filed

24 against me for the additional money he claimed I owed

25 him.

```
 1   Q.   All right.  What --
 2   A.   For legal fees.
 3   Q.   Is that lawsuit still --
 4   A.   No, it was settled out of court.
 5   Q.   So that's not pending at this time?
 6   A.   Correct.
 7   Q.   And was that -- that attachment to that -- I think
 8   it's marked Exhibit 1 to that complaint.  Was that part
 9   of the complaint when you were served with it?
10   A.   It may have been.  I don't recall.  I'm assuming it
11   was because he was trying to show why I owed him that
12   money, so those were his billing statements.  And then I
13   countersued --
14        MR. SPRINGER:  Objection, Your Honor.  He said
15   assumed.
16        THE WITNESS:  I countersued for malpractice.
17   That's what was settled, the countersuit.
18   Q.   (BY MR. SNOKE)  Oh, you sued for malpractice,
19   countersued?
20   A.   Yes.
21   Q.   All right.  If you will look at those -- the charges
22   on that.
23   A.   Those are the charges that were the bills for his
24   legal services to date, to that date, December, when he
25   was -- I fired him.
```

JAMES LAKE - CROSS BY MR. SPRINGER                                859

```
 1  Q.   All right.
 2           MR. SNOKE:  Pass the witness.  Oh, I move into
 3  evidence Government's Exhibit 162.
 4           MR. SPRINGER:  No objection, Your Honor.
 5           THE COURT:  It is received.  Cross-examination.
 6           MR. SPRINGER:  Your Honor, may I remove those
 7  books from the counter there?
 8           THE COURT:  You may.
 9                     CROSS-EXAMINATION
10  BY MR. SPRINGER:
11  Q.   Good afternoon, Mr. Lake.  You testified before a
12  grand jury in a different courthouse, but in the same
13  city, correct --
14  A.   Yes.
15  Q.   -- in this case?  And when you testified, did you
16  not tell the grand jury that Oscar represented you at
17  trial and then you fired him, or is it as you said today,
18  that you fired him two weeks before the trial?
19  A.   No, I didn't fire him two weeks before the trial.  I
20  don't understand.
21  Q.   Okay.  At the trial that you -- excuse me.  You
22  testified that you were at a trial and the jury hung; is
23  that correct?
24  A.   That was after Mr. Stilley was fired.
25  Q.   Okay.  So --
```

1   A.    There was two trials.

2   Q.    There was two trials?

3   A.    Right.

4   Q.    Okay.

5   A.    Well, the December 7, 2001, I believe is the correct

6   date.  That was a Monday, whatever December -- the Monday

7   2001, first week in December.  We showed up in trial, in

8   which I had to ask the court to fire Mr. Stilley.  I had

9   to ask permission to fire Mr. Stilley.  At that time, the

10  judge said, You can -- I'm not going to delay this any

11  longer.  You can have Mr. Stilley as your attorney, you

12  can represent yourself or you can hire another attorney,

13  but we're going to proceed with this trial January 2002.

14  Q.    So you only had one trial, though; is that correct?

15  A.    Well, I showed up for a court date which was for the

16  trial.  That's the date I'm talking about.  I fired him.

17  I'm not sure I understand your question.

18  Q.    Mr. Lake, are you currently studying law?

19  A.    Yes.

20  Q.    To be what?

21  A.    I'm studying law to be an attorney because I learned

22  from listening to you and Mr. Stilley -- I was duped, I

23  was naive, I was dumb, and from now on I'm not going to

24  make that same mistake again.  I'm going to know the

25  letter of the law myself and hopefully help other people

1   so they don't get duped the same way I did.  So I'm

2   adamant about that.

3   Q.   Do you know what a trial is?

4   A.   Yes.

5   Q.   What is a trial?

6   A.   A trial is where people come to court and each have

7   their turn at presenting their evidence, and there's a

8   ruling at the end.

9   Q.   Did you have two of those or one of those?

10  A.   I had one of those.

11  Q.   And Mr. Stilley never represented you at any trial,

12  did he?

13  A.   No, I fired him before -- the day -- the first day

14  of trial, I fired him.  I had to ask permission of the

15  court at the first day of trial to fire him, because I

16  couldn't fire him without permission from the court.

17  Q.   And did you already have a lawyer ready to fill in

18  for Mr. Stilley when that happened?

19  A.   No.  I was hoping for a continuance so I could find

20  an attorney, but the judge was so angry at this taking a

21  year plus that he wasn't going to give me any more time.

22  I took the damage, the collateral damage for Mr. Stilley

23  at this point in time.

24  Q.   Mr. Lake, you testified earlier that you had hired a

25  mock jury.  Do you remember that testimony?

JAMES LAKE - CROSS BY MR. SPRINGER                          862

```
 1   A.   Yes.
 2   Q.   And that you presented a mock trial to a mock jury;
 3   is that true?
 4   A.   Well, I didn't.  It was with Mr. Stilley's help, and
 5   you were, I know, involved somehow, and we presented that
 6   to a mock jury, yes.
 7   Q.   So I was -- where was this mock trial at, Mr. Lake?
 8   A.   It was in Atlanta.
 9   Q.   And I was at a mock trial with a mock jury in
10   Atlanta; is that what you're saying?
11   A.   I don't recall what part you played, but I know
12   Mr. Stilley was there.
13   Q.   Do you ever remember, if you do, a trip to
14   California that Mr. Stilley and I took?
15   A.   Yes.
16   Q.   Okay.  And do you remember what that trip was for?
17   A.   To discuss the case.
18   Q.   Do you remember being videotaped, Mr. Lake?
19   A.   Yes.
20   Q.   Who is on that videotape besides you?
21   A.   I don't recall.
22   Q.   Mr. Lake?
23   A.   Mr. Stilley asked me the questions, but I was being
24   videotaped.  And that was for the purpose --
25   Q.   Is that what you remember, Mr. Stilley was asking
```

JAMES LAKE - CROSS BY MR. SPRINGER                                863

```
 1   you the questions?
 2   A.   I'm pretty sure Mr. Stilley was asking me the
 3   questions, yes.
 4   Q.   Did you hire a jury consultant in California at
 5   least a month before your trial?
 6   A.   Yes.
 7   Q.   And what was the purpose of that jury consultant?
 8   A.   To see whether the case would have a chance to an
 9   Atlanta jury.
10   Q.   What case, the case Mr. Stilley was trying to
11   present for you?
12   A.   No, the case that Mr. Stilley and the jury
13   consultant and the other attorney, the civil attorney,
14   that sat down and we all agreed that that was the better
15   strategy than the one that Mr. Stilley had thought up.
16   Q.   And that was at least a month before the trial?
17   A.   I don't remember the exact date.
18   Q.   Did anybody that was at that mock jury consulting
19   trial in California, did they represent you in Atlanta?
20   A.   Yeah, they presented it to two separate Atlanta
21   jurors that they selected in their process.  I don't know
22   exactly the mechanics of how it works, but they flew to
23   Atlanta, hired people to sit in a mock jury twice,
24   presented that material, and they both pled not guilty.
25   Q.   And how much did that cost you, Mr. Lake?
```

1   A.   I don't know.  It was thousands of dollars.

2   Q.   Thousands of dollars?

3   A.   That was why, when I spent all that money and that

4   jury came back with a not guilty plea and Mr. Stilley

5   said at the last minute the night before the trial, I'm

6   not going to go that way, I thought, well, that's crazy.

7   We just spent all that money.  We just proved that the

8   presentation that we made to the mock jury would be

9   successful.  Why would you throw all that out and change

10  it to say the only thing we're going to go in and do is

11  say there is no tax law that says you have to file taxes.

12  Q.   Mr. Lake, was this jury trial mock that you

13  presented with these two different verdicts, was that the

14  same defense that you presented in Atlanta during the

15  real trial?

16  A.   Yes, there was a portion of that.  There was a

17  combination of that and other things.  I don't remember

18  the exact details of the presentation in the Atlanta

19  trial.

20  Q.   Did you stack up a stack this high of receipts in

21  your mock jury trials and try to sell the jury on that

22  you didn't think you had to file tax returns because all

23  your expenses exceeded your gross income?

24  A.   We didn't have to, no.

25  Q.   But you did that in your trial down there in Atlanta

1   on the real trial, didn't you?

2   A.   Well, that was the new attorney.  He was the

3   attorney and he was calling the best strategy.

4   Q.   And isn't it true that that attorney included

5   Victoria's Secret receipts in those expenses and stacked

6   them up on the table for the jury to see but never

7   entered them into the evidence into the case?  Isn't that

8   true, Mr. Lake?

9   A.   No, that's not true at all.  We made it very clear

10  that there were lists of certain expenses that were

11  business expenses, certain were personal expenses.  So

12  that was made very clear.  If you read the testimony in

13  the trial, it will say that.

14  Q.   You entered all those exhibits into the record

15  during your trial; is that true?

16  A.   I don't know.  I don't know what the mechanics of

17  that were, whether they were entered or not.  But I do

18  remember that that was -- that point was brought up by

19  the government, and we clarified that to the court.

20  Q.   Mr. Lake, isn't it true that after you hung that

21  jury, the government came back and told you that they

22  were going to charge you with an additional count of

23  obstructing justice because you misled that jury with

24  that stack of exhibits on the counsel table?

25  A.   No, that's not true at all.  Where would that come

```
 1   from?  If you read the plea agreement --
 2            THE COURT:  Next question.  Next question.
 3            THE WITNESS:  Okay.
 4   Q.  (BY MR. SPRINGER)  Mr. Lake, isn't it true that
 5   Mr. Stilley and you had a disagreement because he
 6   wouldn't present your false defense to that jury trial
 7   down there that you did to the two mock juries; isn't
 8   that true?
 9   A.  Why was it a false defense?  I don't understand.
10   No, that's not true.  He told me he didn't want to
11   present that, and that his -- his argument was, let's go
12   to trial -- and he told me this the night before the
13   trial.  If he disagreed, why would he sit through all
14   those mock juries and agree with the fact that it was not
15   guilty?  He never said a word.
16   Q.  Mr. Lake, you just said the night before trial, but
17   you've also said that you fired Mr. Stilley two weeks
18   before trial.
19   A.  That's not correct.  If that's -- I don't recall
20   that.  You can -- if it was something I said just now, it
21   was a misspoke.  I fired him -- the night before the
22   trial is when he came to me and said, We're throwing out
23   everything we've done and we're just going to go there.
24   You're going to take a toothbrush and put it in your
25   pocket and say we don't -- nobody can prove that there's
```

1  any requirement to file taxes.  And that's going to be

2  what we're going to present, because they will not be

3  able to show us one thing in the law that says you have

4  to file taxes.

5  Q.   Mr. Lake, 30 days before trial you hired a jury

6  consultant?

7  A.   Right.

8  Q.   A lawyer that ended up representing you in Atlanta,

9  Georgia, correct?

10 A.   No.

11 Q.   Who represented you in Atlanta, Georgia, at the

12 trial?

13 A.   An Atlanta attorney.

14 Q.   Who represented you in California during the mock

15 juries?

16 A.   A California attorney, who was a civil attorney.

17 And Mr. Stilley was going to sit next to him, who was a

18 criminal attorney, and he was going to ensure that the

19 civil attorney, who was going to present everything to

20 the jury, also ask the questions, made sure -- he said --

21 the civil attorney said, I have to have a criminal

22 attorney sit next to me because I don't know the

23 procedure, and Mr. Stilley agreed.

24 Q.   So at 30 days --

25 A.   Right up till the night before.

1  Q.   So 30 days before the trial in Atlanta, Mr. Stilley

2  is sitting next to a civil attorney in California.

3  You've hired a jury consultant, two different mock juries

4  and Stilley is sitting there listening to your new civil

5  lawyer's mock defense of your case; is that true?

6  A.   Yes.

7  Q.   Now, if that's the case, then when did Mr. Stilley's

8  defense come back into the scene?

9  A.   The night before the trial.  That's what I'm trying

10 to say.  He said on Sunday night, Sunday -- actually,

11 Sunday afternoon.  And then I went to the civil attorney

12 from California and I said, Hey, we can't go to court

13 tomorrow morning because Mr. Stilley refuses to do it.

14 He gave me an ultimatum, either you go with my case and

15 how I'm going to present it, or I'm not going to sit next

16 to that civil attorney and defend you the way that whole

17 mock jury read it and the whole works.  And so I went

18 across the hall in the hotel to the attorney and said,

19 Mr. Stilley refuses to support you at trial tomorrow.  He

20 says, Well, I guess I'm going to have to go home, because

21 I don't have a -- I can't represent you.

22 Q.   And, in fact, isn't it true that Mr. Stilley stayed

23 down there and watched your trial --

24 A.   Stayed where?

25 Q.   At the regular trial in Atlanta.

```
 1  A.   I don't know.
 2  Q.   You didn't get served with a summons and complaint
 3  down there that you testified a little bit ago?
 4  A.   The first day of trial, he caught me before I went
 5  into court and handed me a subpoena -- or a -- whatever,
 6  a summons, the complaint for the additional legal fees,
 7  yeah.  I don't know what he did after that.  I went into
 8  court.
 9  Q.   And it is your testimony here today that after you
10  were -- you hung the jury?
11  A.   Yes.
12  Q.   That the Department of Justice did not come back and
13  tell you that you were going to be charged with one more
14  count of obstruction of justice on Monday?
15  A.   The Department of Justice talked to my attorney.  My
16  attorney came back to me and said they would like to do a
17  plea agreement, they're going to cut the misdemeanors
18  from three to two, and that they would agree in good
19  faith to look at all the taxes that I owe or don't owe
20  and calculate that.
21  Q.   Mr. Lake, please just answer my question.
22  A.   That's what happened.  You asked me what happened.
23  Q.   No.  Mr. Lake, who is Kimberly Somerville?
24  A.   She's an IRS agent.
25  Q.   Okay.  And you testified earlier that I told you you
```

1  didn't have to file tax returns and you didn't have to

2  pay any income tax; is that your testimony?

3  A.   Yes.

4  Q.   And before you said I told you that, were you filing

5  tax returns and paying taxes?

6  A.   Up till 1995 -- '94.

7  Q.   And when did you meet Lindsey Springer?

8  A.   Somewhere in January -- was it January 2001.

9  Q.   So you'd not been filing tax returns or paying taxes

10 on money that you were making from Northwest Airlines for

11 six years?

12 A.   No.  First of all, it's Delta Airlines.  Second of

13 all, I --

14 Q.   Excuse me.  Delta Airlines.

15 A.   -- the only reason why I didn't file returns in '94

16 and '95 was because I filed a request for administrative

17 review with the IRS.  And they said you don't have to

18 file a return yet until you complete this court case.  So

19 it went through a trial and then it went through the

20 Eleventh Circuit Court of Appeals, which took three

21 years, '94, '95 and '96.  So those are the years I didn't

22 file because there had not been a ruling.  So --

23 Q.   So why were you communicating with Mrs. Somerville?

24 A.   Mrs. Somerville was the IRS agent that arrested me

25 for failing to appear in court.

1   Q.   Was she also somebody that you served an affidavit

2   and notice on?

3   A.   Yes.  Yes, as a matter of fact.

4   Q.   And do you remember the substance of that affidavit?

5   A.   No.  The people that helped me in '94, '95 and '96

6   prepared that affidavit in response to her request for

7   information.

8   Q.   So as you sit here today, your troubles of why you

9   were charged with crimes in Atlanta had nothing to do

10  with anything that I told you; is that true?

11  A.   Wait a minute.  Repeat the question.

12  Q.   Your crimes that you were charged with in Atlanta,

13  Georgia --

14  A.   Yes.

15  Q.   -- had nothing to do with anything that I ever said

16  to you; isn't that true?

17  A.   Absolutely.  I was totally wrong.  I was totally

18  wrong, totally incorrect.  I thought I didn't owe any

19  taxes, so I didn't file.  And that's absolutely correct.

20  Q.   You weren't the only Northwest Airlines pilot that

21  believed that; isn't that true, Mr. Lake?

22  A.   I don't know.

23  Q.   Now, Mr. Lake, you had testified earlier about three

24  checks for $10,000 each.

25  A.   Right.

JAMES LAKE - CROSS BY MR. SPRINGER                            872

```
1   Q.   Two of them were handwritten checks from DVAT?

2   A.   Right.

3   Q.   Can you tell me who DVAT is?

4   A.   That's a disabled veteran trust.

5   Q.   Right.  And how was that set up?

6   A.   I went to a company, then they gave me the forms,

7   and I filled it out and I set up the trust.

8   Q.   And the first check that you testified to was a

9   cashier's check; is that correct?

10  A.   Yeah, you had asked me for a cashier's check.

11  Q.   And that cashier's check was drawn out of the same

12  DVAT checking account, wasn't it?

13  A.   Probably, yeah.

14  Q.   And are you still using DVAT to this day?

15  A.   No.

16  Q.   Okay.  And what was the source of the money that

17  went into DVAT?

18  A.   Money that I earned.

19  Q.   From where?

20  A.   From Delta, from, you know, odd jobs here and there,

21  consulting.

22  Q.   So you'd take a paycheck from Delta Airlines and

23  deposit it into a trust account?

24  A.   Sometimes I would, sometimes I would leave it in my

25  credit union account.  It was a trust set up that -- my
```

1  understanding was that it was, you know, set up to where

2  until you pulled it out, you had to be responsible for

3  taxes.

4  Q.   Mr. Lake, you testified that you called me.  I

5  didn't call you; is that right?

6  A.   Right.

7  Q.   Right.  And you've also testified that you hired me

8  for legal services?

9  A.   Right.

10 Q.   Did those words ever come out of your mouth in a

11 conversation with me prior to you giving me any money?

12 A.   I'm not sure I understand the question.

13 Q.   Did you ever tell me that you were hiring me for

14 legal services?

15 A.   Well, of course.  I told you I had a case for -- tax

16 case and --  what -- what else would I be hiring you

17 for?

18 Q.   Well, right, Mr. Lake.  That's a great question.

19 Now, didn't you and I have a conversation when you first

20 called me?

21 A.   Yeah.

22 Q.   And at that time we had that conversation, you'd

23 never given me any money, had you?

24 A.   No, I explained to you what my situation was and

25 could you help me.

1  Q.   And what were you asking for help for?

2  A.   To respond to this criminal information for failing

3  to file income tax returns.

4  Q.   And isn't the only thing that you were trying to

5  find was a lawyer?

6  A.   Sure.

7  Q.   And, Mr. Lake, didn't I tell you on the phone that

8  the -- that -- when you asked -- did you ask me how I get

9  money?  Did you ask me that question?

10  A.   I don't recall asking you that question.

11  Q.   So what you are saying is you called me up, said,

12  hey, Lindsey, I want to hire you for legal services, and

13  how much do you charge?  And I said, oh, I charge 30 to

14  $40,000; is that your testimony here today?

15  A.   Yeah.

16  Q.   On a telephone conversation?

17  A.   Right.

18  Q.   Was it the first one or the second one?

19  A.   The first one.

20  Q.   Now, Mr. Lake, did you ask me if I was a lawyer?

21  A.   No, you explained to me that you weren't a lawyer,

22  that you had two lawyers that you work with, either Oscar

23  Stilley or Mr. Barringer, and that you would select which

24  one depending on when they were available and that you

25  would support them and that you did all the legal work.

1   Q.   No, no.  Mr. Lake, why would we be having a

2   conversation about lawyers if you called me to find a

3   lawyer?  Why would I be talking to you about the lawyers

4   I have if you're the one that needed the lawyer?

5   A.   Because that was the purpose of the call, to call

6   you for help on how to respond to this criminal

7   information, and that you were -- you were referred to me

8   to handle my case and to introduce me to a lawyer.

9   Q.   Introduce you to a lawyer.  And I'll -- Mr. Lake,

10  how did you get my name?

11  A.   I don't recall.  Somebody somewhere along the line

12  had given me your name and number.  I don't remember

13  exactly who it was.

14  Q.   Was it Vikki Wiggins?

15  A.   No, I've never heard that name.

16          MR. SPRINGER:  Your Honor, is this a good time

17  to stop for the day?

18          THE COURT:  How much more do you have on cross?

19          MR. SPRINGER:  I would say ten to 15 minutes.

20          THE COURT:  Okay.  Well, it would be about 15

21  after nine in the morning when you finish, then.

22          MR. SPRINGER:  Thank you.

23          THE COURT:  Very well.

24      Members of the jury, we'll take our overnight recess

25  at this time.  We'll resume at nine o'clock tomorrow

JAMES LAKE - CROSS BY MR. SPRINGER                    876

1  morning.  One thing I know I said two days ago, and I
2  don't think I thought to say yesterday; I'll say it very
3  sincerely today.  I appreciate very much your day of
4  service to the court.  You are full partners in the
5  administration of justice, and I appreciate your
6  attentiveness, your perseverance.  Again, we've covered a
7  fair amount of ground today, and I do sincerely thank you
8  for your day of service to the court.
9      Overnight -- there's a ball game tonight.  Maybe it
10 will be a little better than the one last night.  And so
11 that's something else to think about and talk about.
12 Obviously, my suggestion to you is to think about and
13 talk about anything other than this case.  Undertake no
14 independent investigation of any aspect of this case and
15 keep an open mind until the case has been given to you
16 for your deliberations and verdict.
17     Thank you again for your day of service to the
18 court.  All persons in the courtroom will remain seated
19 while the jury departs.  And, of course, please be
20 available about quarter till nine tomorrow morning.
21     (JURY EXITS THE COURTROOM.)
22         THE COURT:  Okay.  Mr. Lake, you may step down.
23 And, of course, Mr. Lake, you're due back here at 9:00 in
24 the morning.
25         THE WITNESS:  All right, sir.

```
 1              THE COURT:  Very well.  There's a couple of --
 2    or at least one matter that I should address that I
 3    should have addressed at the end of our James hearing.
 4    The James hearing involved issues that were also
 5    addressed by the motions at Docket Entry Number 145 and
 6    149.  One of those was Mr. Springer's motion to exclude
 7    co-conspirator statements by Mr. Stilley.  The other one
 8    was Mr. Stilley's mirror image motion of that.  And I
 9    think perhaps Mr. Springer's was 145 and Mr. Stilley's
10    was 149.  But whichever they were, that's what those
11    motions are about.
12         Because of my ruling at the conclusion of the James
13    hearing, I don't think it comes as any surprise that I
14    implicitly denied those motions, but they were -- I did
15    not explicitly address them.  And for that reason, I
16    think it is appropriate to address them squarely now and
17    to state that the motions at Docket Entry Number 145 and
18    149 are denied.
19         Anything further we ought to address before we take
20    our overnight recess?
21              MR. O'REILLY:  Very briefly, Your Honor, if I
22    may have one brief moment?
23              THE COURT:  Sure.
24              MR. O'REILLY:  Your Honor, I do have one matter
25    I wanted to ask the Court for direction on.  We had
```

```
 1   presented a few days back, anticipating what might be the
 2   defense, a proposed jury instruction with respect to
 3   income and the treatment of monies that are paid in.
 4   Given the direction the defense has taken, we think it
 5   obviously is an appropriate jury instruction.  The
 6   direction I have is do you want us to file it
 7   electronically through the court system as we normally
 8   would, or is what we provided sufficient?
 9           THE COURT:  What you've provided is sufficient.
10   And obviously I have not made any decisions on it, but
11   I've taken it and thoroughly mangled it in some ways, and
12   it's been retyped.  And I emphasize I have not made any
13   final decision.  But I will tell you that if I do give an
14   instruction that addresses the issue of payments to a
15   minister and gifts and what is a gift and how is a jury
16   to determine what a gift is, in addition to -- I'm going
17   to give everybody a couple of citations in addition to
18   the Terrell case.  Obviously, everybody needs to have an
19   understanding of the Terrell case, but -- and I'm not
20   saying that any of the cases that I'm -- cites that I'm
21   about to give to you are necessarily dispositive of
22   anything, but I think they at least warrant a look --
23   they have gotten a look from me and they will perhaps
24   warrant a look from the parties.
25       The first one is United States v. Parshall,
```

```
 1   P-A-R-S-H-A-L-L, an 8th Circuit case, 757 F.2d 211.

 2   That's a 1985 8th Circuit case.  And then United States

 3   v. Plitman, P-L-I-T-M-A-N, 194 F.3d 59.  That's 194 F.3d

 4   59.  That's a 2nd Circuit case from 1999.  And then --

 5   let's see here.  Bear with me just a moment.  United

 6   States v. Shelton, 588 F.2d 1242.  So in addition to the

 7   Terrell case, those cases may be relevant.

 8           MR. SPRINGER:  Do we have a circuit cite on that

 9   one, Your Honor?

10           THE COURT:  That would be -- Shelton case is a

11   9th Circuit case from 1978.  That's 588 F.2d 1242.

12       And so, again, obviously, if I intended to present

13   an instruction on these points to you as a fait accompli,

14   I would just do it without giving you these citations.  I

15   give you these citations because when and if I seriously

16   consider an instruction covering these points, I'm

17   certainly going to give it to the parties.  I will

18   certainly give it to the parties in plenty of time for

19   you to address the issues.

20       I suspect -- tomorrow is Friday.  I suspect I will

21   give this some more research over the weekend, and if I

22   decide to provide the parties with a possible instruction

23   covering these issues, that I will do so Monday.  And

24   then both sides will certainly have an opportunity to

25   submit anything that they might have by way of objection
```

```
 1   to or other cogent comments with respect to such an

 2   instruction.

 3          Also, tomorrow -- and this will -- do you want

 4   to recess at 4:30 tomorrow; is that right?

 5          MR. O'REILLY:  Yes, Your Honor.

 6          THE COURT:  I strongly suspect that will be

 7   feasible.  Tomorrow, though, I -- as the day progresses

 8   tomorrow, Mr. O'Reilly, I will expect you to be taking a

 9   look at what you've covered and what you have yet to

10   cover so that we can get just a little bit of a

11   prognostication as to whether you think there's any

12   likelihood that the government will complete presenting

13   its case next week.  And I don't need any sort of an

14   indication from you on that today, but by the end of the

15   day tomorrow, at about 4:29, I'll probably ask that

16   question as to whether you think there's any substantial

17   possibility of the government finishing presenting its

18   case next week.

19       Anything further we ought to address before we take

20   our overnight recess?

21          MR. O'REILLY:  No, Your Honor.

22          MR. SPRINGER:  No, Your Honor.

23          THE COURT:  Court will be in recess.

24       (COURT ADJOURNED FOR THE EVENING RECESS. FOR FURTHER

25   JURY TRIAL PROCEEDINGS, SEE VOLUME V.)
```