1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF OKLAHOMA

3

4   UNITED STATES OF AMERICA,

5          Plaintiff,

6   vs.                         Case No. CR-09-43-SPF

7   LINDSEY KENT SPRINGER and
    OSCAR AMOS STILLEY,
8
           Defendants.
9
    ------------------------------
10

11

12

13

14

15          TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16          BEFORE THE HONORABLE STEPHEN P. FRIOT

17             UNITED STATES DISTRICT JUDGE

18                 OCTOBER 30, 2009

19                 VOLUME V OF XIV

20

21

22

23

24

25

882

```
 1   APPEARANCES:

 2   FOR THE GOVERNMENT:
                              Mr. Charles Anthony O'Reilly
 3                            U.S. Department of Justice
                              PO Box 972
 4                            Washington, DC 20044

 5                            Mr. Kenneth P. Snoke
                              U.S. Attorney's Office (Tulsa)
 6                            110 W. 7th Street, Ste. 300
                              Tulsa, OK 74119
 7
     FOR DEFENDANT SPRINGER:
 8                            Mr. Lindsey Kent Springer
                              5147 S. Harvard Ave.
 9                            Ste. 116
                              Tulsa, OK 74135
10
                              Mr. Robert Scott Williams
11                            Taylor Ryan Schmidt & Van Dalsem
                              1437 S. Boulder Ave., Ste. 850
12                            Tulsa, OK 74119

13   FOR DEFENDANT STILLEY:
                              Mr. Oscar Amos Stilley
14                            7103 Race Track Loop
                              Fort Smith, AR 72901
15
                              Mr. Charles Robert Burton, IV
16                            Burton Law Firm, PC
                              320 S. Boston, Ste. 2400
17                            Tulsa, OK 74103

18
                         EXAMINATION INDEX
19

20   JAMES LAKE
          CONTINUED CROSS BY MR. SPRINGER         887
21        CROSS BY MR. SPRINGER                   887
          REDIRECT BY MR. SNOKE                   888
22
     SALVATORE PIZZINO
23        DIRECT BY MR. O'REILLY                  892
          CROSS BY MR. SPRINGER                   901
24        CROSS BY MR. STILLEY                    908
          REDIRECT BY MR. O'REILLY               910
25        RECROSS BY MR. SPRINGER                 912
```

```
 1   W.T. SMITH
          DIRECT BY MR. SNOKE              914
 2        CROSS BY MR. SPRINGER            922

 3   CLAUDIA REYNOLDS
          DIRECT BY MR. SNOKE              924
 4        DIRECT BY MR. O'REILLY           932
          CROSS BY MR. SPRINGER            951
 5        REDIRECT BY MR. O'REILLY         981

 6   TIFFINI BERMAN
          DIRECT BY MR. O'REILLY           982
 7        CROSS BY MR. SPRINGER            999

 8   MICHAEL BURT
          DIRECT BY MR. O'REILLY          1004
 9        CROSS BY MR. SPRINGER           1019
          CROSS BY MR. STILLEY            1025
10        REDIRECT BY MR. O'REILLY        1026

11   HAMLET BENNETT
          DIRECT BY MR. O'REILLY          1026
12        CROSS BY MR. SPRINGER           1038
          CROSS BY MR. STILLEY            1041
13
     RUSSELL LOCKE
14        DIRECT BY MR. O'REILLY          1043
          CROSS BY MR. SPRINGER           1047
15        REDIRECT BY MR. O'REILLY        1048
          RECROSS BY MR. SPRINGER         1048
16        RECROSS BY MR. STILLEY          1049

17   CANDIDA GIBSON
          DIRECT BY MR. O'REILLY          1050
18
     MARCUS BOHN
19        DIRECT BY MR. O'REILLY          1057

20   MATT THOMAS
          DIRECT BY MR. SNOKE             1061
21        CROSS BY MR. SPRINGER           1069
          CROSS BY MR. STILLEY            1072
22
     REGINA HICKS
23        DIRECT BY MR. O'REILLY          1075

24   PAUL PITTS
          DIRECT BY MR. O'REILLY          1080
25        CROSS BY MR. SPRINGER           1082
```

```
 1   DARREN MURDOCK
          DIRECT BY MR. O'REILLY              1085
 2        CROSS BY MR. STILLEY                1091

 3   DENICE HOLM
          DIRECT BY MR. O'REILLY              1091
 4        CROSS BY MR. SPRINGER               1095

 5   JASON CARTER
          DIRECT BY MR. O'REILLY              1096
 6        CROSS BY MR. SPRINGER               1102
          CROSS BY MR. STILLEY                1103
 7
     JOHN WEST
 8        DIRECT BY MR. SNOKE                 1104

 9   KIP KARN
          DIRECT BY MR. SNOKE                 1108
10        CROSS BY MR. SPRINGER               1114

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1            THE COURT:  Welcome back, members of the jury.
 2    Good to see you.  Mr. Springer.
 3            MR. SPRINGER:  Your Honor, I have no further
 4    questions for this witness at this time.
 5            THE COURT:  Very well.  Mr. Stilley.
 6            MR. STILLEY:  No questions.
 7            THE COURT:  Very well.  Now, counsel and the
 8    parties will approach.  I need to address one matter.
 9       (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND
10    OUT OF THE HEARING OF THE JURY.)
11            THE COURT:  Where is this witness from?
12            MR. O'REILLY:  California.
13            THE COURT:  Okay.  I'm a little concerned
14    about -- you're entitled to have him subject to recall,
15    but how sure are you that you're going to have -- that
16    you're going to have something more for this witness?
17            MR. SPRINGER:  I have an entire video, Your
18    Honor, it will be completely impeachable, but I have to
19    get it transcribed, I have to get copies to the
20    government.  I had no clue he was going to say what he
21    said yesterday, I was completely surprised.  And I will
22    turn the video over to them as soon as I get out of this
23    courtroom.
24            THE COURT:  What's on this video?
25            MR. SPRINGER:  Me asking him questions and him
```

 1   answering those questions and they're completely

 2   different answers than the ones he gave up there.

 3          THE COURT:  This is the mock trial video?

 4          MR. SPRINGER:  No, this is where I was asking

 5   him questions before they did the mock trial.  This was

 6   me sitting down and him answering questions as he would

 7   answer them in the mock trial.  He was answering

 8   truthfully and it's very clearly opposite of what he said

 9   yesterday and I'm the question asker.

10          THE COURT:  When was this video taken?

11          MR. SPRINGER:  2001, late 2001.

12          THE COURT:  And in what respect does it

13   impeach -- just I'm not sure in what respect does it

14   impeach this witness's testimony?

15          MR. SPRINGER:  He told the jury that Oscar and I

16   told him he didn't have to file tax returns, that that

17   was something that he was going to law school over to try

18   to, you know, defeat us on and it's just completely false

19   and the video shows it.

20          THE COURT:  Well, that sounds to me like cross-

21   examination rather than recall material.  You proceed at

22   your own risk.  I'm not going to guarantee you that we'll

23   call him back a week or ten days from now for more cross-

24   examination.  That sounds more like cross-examination

25   than recall material.  Now, I'll let the government have

```
 1   a say on that also.

 2         MR. O'REILLY:  Actually, Your Honor, pursuant to

 3   your request yesterday, we've done a calculation of when

 4   we think we'll be finished.  We anticipate we could be

 5   finished on Tuesday.  Which means, one, obviously, we

 6   need to move the Daubert hearing to Monday.  But, two, I

 7   mean, Mr. Lake needs to go home and continue on with his

 8   life.

 9         THE COURT:  Okay.  Mr. Springer, I'm not going

10   to guarantee you that he will be recalled, so if you've

11   got anything that you need to cover with him, you need to

12   carefully consider whether to do it now.  I'm not going

13   to guarantee you that he's going to be recalled for what

14   sounds for all the world to me like cross-examination

15   material as opposed to anything.

16         MR. SPRINGER:  Okay.  I got an idea.  Can I go

17   back up and ask him a few questions?  I can get the video

18   in through me.

19      (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

20   WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

21   PRESENCE AND HEARING OF THE JURY.)

22         THE COURT:  Mr. Springer, you may proceed.

23      (THE FOLLOWING IS THE CONTINUED CROSS-EXAMINATION OF

24   JAMES LAKE.)

25                    CROSS-EXAMINATION
```

```
 1   BY MR. SPRINGER:
 2   Q.   Mr. Lake, do you remember sitting across from me at
 3   a table in California at a law office?
 4   A.   It was nine years ago, it may have happened, I don't
 5   remember.
 6   Q.   Do you remember me acting as a prosecutor and asking
 7   you questions that was videotaped?
 8   A.   I don't remember, you may have.
 9            MR. SPRINGER:  Thank you, Mr. Lake.
10            THE COURT:  Mr. Stilley, anything further?
11            MR. STILLEY:  No, Your Honor.
12            THE COURT:  Any redirect?
13            MR. SNOKE:  Just briefly, Your Honor.
14                      REDIRECT EXAMINATION
15   BY MR. SNOKE:
16   Q.   Mr. Lake, I think there was a little confusion
17   yesterday as to your reference to two different dates,
18   December 7th or about there of '01 and January 9th of
19   '02.  You, I think, referred to both of them at one time
20   or another as a trial date.  What happened on December
21   7th of '01 -- what happened with respect to the trial?
22   Did you go to trial on December 7th?
23   A.   Yes, that was the scheduled trial date and we showed
24   up in court.  And as I said, the day before, that's
25   why --
```

1   Q.   Yeah, I don't want to get into the whole thing

2   again, but that's the day that you --

3   A.   The trial was supposed to start.

4   Q.   -- Mr. Stilley?

5   A.   The trial was supposed to start that day and then

6   since I discharged Mr. Stilley, the judge then said,

7   okay, we're going to continue it till January 9th as the

8   next date, so.

9   Q.   Okay.

10  A.   I don't know which is trial or not trial.  It was

11  supposed to be a trial that day and there would have been

12  a trial that day if Mr. Stilley didn't change his

13  position.

14  Q.   The actual trial date when it actually started then

15  was on January 9th or thereabouts of 2002?

16  A.   Right.  So I may have misspoke on the definition of

17  a trial or not trial.  It was supposed to start then.

18  Q.   That was the only trial you had then that started on

19  January 9th of 2002?

20  A.   Right.  Right.

21          MR. SNOKE:  Thank you.

22          THE COURT:  Any recross?

23          MR. SPRINGER:  No, Your Honor, and I will not be

24  recalling Mr. Lake.

25          THE COURT:  Very well.  Mr. Stilley.

 1            MR. STILLEY:  No, Your Honor.

 2            THE COURT:  Mr. Lake, you may step down.  And

 3   we'll have the government's next witness.

 4            MR. O'REILLY:  May I have a brief moment?

 5            THE COURT:  You surely may.

 6            MR. O'REILLY:  Your Honor, what I would actually

 7   like to do at this time is to offer Government's Exhibits

 8   581, which is a transcribed copy of Mr. Oscar Stilley's

 9   grand jury testimony in March of 2006.

10            THE COURT:  That's 581?

11            MR. O'REILLY:  Yes, Your Honor.  And

12   Government's Exhibit 582, which is the response that

13   Mr. Stilley provided at that grand jury testimony.  And

14   the parties have stipulated that Mr. Buck, who

15   transcribed that, would authenticate that, lay the

16   foundation for it, and testify that it's a true and

17   accurate copy of both the transcript and what was

18   provided at that grand jury hearing.

19            THE COURT:  Do the defendants so stipulate?

20            MR. SPRINGER:  I stipulate, Your Honor.

21            THE COURT:  Pardon me?

22            MR. SPRINGER:  Yes, Your Honor, I stipulate.

23            MR. STILLEY:  We are stipulating to the

24   authenticity, certainly reserve the arguments previously

25   made with respect to other issues.

 1          THE COURT:  Well, counsel will approach.

 2      (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND

 3  OUT OF THE HEARING OF THE JURY.)

 4          THE COURT:  Arguments previously made with

 5  respect to other issues could cover a lot of ground.

 6  What's the issue?  What's the problem?

 7          MR. STILLEY:  It's the hearsay issue where --

 8  that we took up in the James hearing.

 9          THE COURT:  Okay.  Okay.

10          MR. STILLEY:  I just didn't want the record to

11  appear that I had waived that argument.

12          THE COURT:  Okay.  And we're talking about 581

13  and 582?

14          MR. SPRINGER:  Yes, Your Honor.

15          THE COURT:  Very well.  They'll be admitted.

16          MR. O'REILLY:  Your Honor, if I may just briefly

17  publish the first page of 581 to the jury.

18          THE COURT:  You surely may.  581 and 582 are

19  admitted.

20          MR. O'REILLY:  582.  Thank you very much.

21      (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

22  WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

23  PRESENCE AND HEARING OF THE JURY.)

24          MR. O'REILLY:  The United States calls

25  Dr. Salvatore Pizzino.

SALVATORE PIZZINO - DIRECT BY MR. O'REILLY                    892

```
 1        And, Your Honor, if I may approach the witness
 2   simply to remove the piece of paper that's up there.
 3             THE COURT:  You may.
 4                       SALVATORE PIZZINO,
 5   (WITNESS SWORN)
 6                       DIRECT EXAMINATION
 7   BY MR. O'REILLY:
 8   Q.  Good morning, sir.  Would you please introduce
 9   yourself to the jury.
10   A.  My name is Salvatore Pizzino.
11   Q.  And what city and state do you live?
12   A.  Fairfield, Connecticut.
13   Q.  How long have you lived there?
14   A.  I've lived there since 1997.
15             THE COURT:  Please spell your last name,
16   please.
17             THE WITNESS:  P, as in Peter, I-Z-Z-I-N-O.
18   Q.  (BY MR. O'REILLY)  What is your level of education,
19   sir?
20   A.  I'm a doctor of dental surgery.
21   Q.  How long have you been a doctor of dental surgery?
22   A.  Since 1994.
23   Q.  Are you currently a practicing dentist?
24   A.  Yes.
25   Q.  Where do you practice?
```

```
 1   A.   Southport, Connecticut.

 2   Q.   Do you have a specialty?

 3   A.   No, I do not, general dentist.

 4   Q.   Were you previously involved in a criminal tax

 5   investigation?

 6   A.   Yes.

 7   Q.   Approximately when?

 8   A.   I think it was 2002 or 2003, I don't remember

 9   exactly.

10   Q.   Is that the year that you found out about it or is

11   that --

12   A.   It was somewhere around there, yes.

13   Q.   How did you find out that you were under criminal

14   investigation?

15   A.   A letter was put on my doorstep at my residence from

16   the IRS.

17   Q.   After you received that letter, what did you do?

18   A.   I called up a gentleman by the name of Larry.  He

19   was in Las Vegas.  I don't remember his last name.

20   Q.   How did you locate this individual named Larry?

21   A.   I had the phone number because I got books

22   previously from this man, Irwin Schiff.

23   Q.   And with respect to Mr. Schiff, what were these

24   books about generally?

25   A.   How not to pay taxes.
```

1   Q.   After speaking with Larry, what did you do?

2   A.   Well, he informed me of Lindsey Springer and -- I

3   forget his name right now, the attorney.

4   Q.   Okay.  Is there something that might refresh your

5   recollection?

6   A.   Okay.

7   Q.   I'm going to ask you to look at what's already in

8   evidence as Government's Exhibit 100, which should come

9   up on the screen right now, and ask if you recognize

10  that.

11  A.   Yes.

12  Q.   Does that refresh your recollection of the name of

13  the attorney?

14  A.   Oh, yes, Oscar Stilley.

15  Q.   And what did Larry tell you with respect to

16  Mr. Springer and Mr. Stilley?

17  A.   He said that they -- he had heard of them and this

18  -- the attorney I should seek out for help.

19  Q.   But he identified both Mr. Springer and Mr. Stilley?

20  A.   Yes.  Wait.  I think it was Oscar that he gave me

21  the name of and then -- I just don't remember, I don't

22  remember who came first.

23  Q.   As a result of that information, did you call

24  Mr. Stilley?

25  A.   Yes.

SALVATORE PIZZINO - DIRECT BY MR. O'REILLY                          895

1   Q.   After speaking with Mr. Stilley, what -- did you

2   decide whether or not to retain his services?

3   A.   Yes, I did.

4   Q.   And, in fact, then did you -- does that check have

5   any bearing or relationship to that?

6   A.   Yes.

7   Q.   What is that check?  What was that check for?

8   A.   I don't remember if it was for travel or for the

9   beginning of a retainer or something like that.

10  Q.   Okay.  Did you pay for Mr. Stilley to come see you?

11  A.   To come up to work with me?

12  Q.   That's the question, yes.

13  A.   Yes.

14  Q.   Okay.  I'm going to ask you now, what is the date of

15  that check?

16  A.   July 24, '03.

17  Q.   And what is the check number?

18  A.   568.

19  Q.   Okay.  Did you -- I'm going to ask you now to take a

20  look at what's in evidence as Government's Exhibit 27.

21  May I ask you if you recognize that check?

22  A.   Yes.

23  Q.   And is that check dated the same date?

24  A.   July 24, '03.

25  Q.   Is it, in fact, the check immediately preceding the

1   other check we just looked at, 567?

2   A.   567.

3   Q.   Who was this check made payable to?

4   A.   Lindsey Springer.

5   Q.   In what amount?

6   A.   $6,500.

7   Q.   Why did you pay Lindsey Springer $6,500?

8   A.   Again, I think it was for travel or whatever he had

9   to do to get up to help me or something like that.

10  Q.   And when you say "to help you," what were they going

11  to do to help you, if you know?

12  A.   I think Oscar was the attorney and Lindsey was like

13  a helper, I think that's how it went.

14  Q.   I guess my question is, what were they going to do

15  to help you?

16  A.   They were going sit with me when I had to go to --

17  because I was -- oh, I was, like, subpoenaed to go to the

18  Bridgeport IRS place.

19  Q.   Okay.  Were they going to go with you to attend

20  that?

21  A.   Yes.

22  Q.   Did they?

23  A.   Yes.

24  Q.   I'm going to ask you, if you could, to look at

25  what's already in evidence as Government's Exhibit 155

 1   and specifically the middle two checks on that exhibit.

 2           THE COURT:  I'm not showing that in evidence.

 3           MR. O'REILLY:  Oh, I apologize, Your Honor.

 4   Take that down.  I'm sorry, Your Honor.  I thought that

 5   was moved in with Mr. Simkins.  May I have a moment?

 6           THE COURT:  You may.

 7           MR. O'REILLY:  Your Honor, may I approach the

 8   witness?

 9           THE COURT:  You may.

10           MR. O'REILLY:  I apologize, Your Honor.

11   Q.  (BY MR. O'REILLY)  If you could take a look at what

12   has been marked for identification as Government's

13   Exhibit 155 and specifically the middle two checks.  Do

14   you recognize those?

15   A.  Yes.

16   Q.  What are those?

17   A.  Two checks.

18   Q.  Please describe what those two checks are, the ones

19   in the middle that you recognize.

20   A.  I'm writing out a check for -- to Oscar Stilley for

21   2,500, check 545, and then a second one, 541, same

22   amount.

23   Q.  Same amount?

24   A.  Same amount.

25   Q.  Both payable to Oscar Stilley?

SALVATORE PIZZINO - DIRECT BY MR. O'REILLY                    898

```
 1   A.   Yes.

 2   Q.   Were these -- what were these checks for?

 3   A.   One says "attorney retainer fee" --

 4   Q.   I'm sorry.  I'm not asking you what they read.  Why

 5   were you writing the checks?

 6   A.   For the retainer.

 7   Q.   Okay.

 8            MR. O'REILLY:  Your Honor, I would move

 9   Government's Exhibit 155 into evidence.

10            MR. SPRINGER:  No objection, Your Honor.

11            THE COURT:  155 is received.

12            MR. O'REILLY:  I'd ask it be published to the

13   jury.

14   Q.   (BY MR. O'REILLY)  And those are two checks both in

15   June of 2003; is that correct, sir?

16   A.   Yes.

17   Q.   So this was actually about a month prior to the

18   other checks we discussed?

19   A.   Yes.

20            MR. O'REILLY:  If I may have a brief moment,

21   Your Honor?

22            THE COURT:  You may.

23   Q.   (BY MR. O'REILLY)  Now, I'm going to ask you, if you

24   would, sir, to please look at what's in evidence as

25   Government's Exhibit 113.  Do you see that, sir, the
```

1    bottom check?

2    A.   It's real small.  I think it says Oscar Stilley

3    again.

4    Q.   Is that better?

5    A.   Yes.

6    Q.   Do you recognize that check?

7    A.   Yes.

8    Q.   What was this check for?  Why did you write this

9    check to Oscar Stilley?

10   A.   For a retainer.

11   Q.   And was this in February -- actually, what was the

12   date on this check?  Can you make it out?  Was it

13   sometime in 2005?

14   A.   I don't know where to look for the date.  I don't

15   see it on the upper right.

16   Q.   Okay.  But this was a check you made payable to

17   Oscar Stilley for what purpose?

18   A.   A retainer.

19   Q.   Did -- what did -- to your knowledge, what did

20   Mr. Stilley and Mr. Springer do on your behalf?

21   A.   They reviewed the stuff that I needed to hand in.

22   Q.   Excuse me.  When you say "to hand in," hand in to

23   who?

24   A.   Oh, to the IRS.

25   Q.   What else did they do?

```
 1   A.    They came with me on that day to that building.

 2   Q.    That was the building with the IRS?

 3   A.    Yes, the IRS agents.  They did whatever they needed

 4   to do to prepare for that meeting.

 5   Q.    As a result -- let me ask you this.  At that -- what

 6   did they tell you to tell the IRS, if anything?

 7   A.    The truth.

 8   Q.    And what was the truth?

 9   A.    That I was -- I was informed of this gentleman,

10   Irwin Schiff, and then from those books, I read and kept

11   calling him back and forth like how do you do this, back

12   and forth.  And then it was pretty much cookbook.  And I

13   got a check back from the IRS and then they wanted to --

14   then they -- they wanted the money back, so --

15   Q.    Excuse me, sir.  When you say "they," who wanted the

16   money back?

17   A.    The IRS.  The IRS wanted the money back.  So then

18   there was this letter about, you know, you're going to be

19   brought up on criminal charges and all this stuff.  And

20   they helped me out.  I mean, they came with me and they

21   talked stuff and I talked to the IRS agents and that was

22   it.  Kind of --

23   Q.    Did you ever get charged criminally?

24   A.    No.

25             MR. O'REILLY:  If I may have one moment, Your
```

1   Honor.

2           THE COURT:  You surely may.

3           MR. O'REILLY:  Nothing further from this

4   witness.

5           THE COURT:  Cross-examination.

6                    CROSS-EXAMINATION

7   BY MR. SPRINGER:

8   Q.   Good morning, Mr. Pizzino.

9   A.   Good morning.

10  Q.   Can you identify Lindsey Springer in the courtroom

11  today?

12  A.   You're in front of me.

13  Q.   Can you identify Oscar Stilley for the Court?

14  A.   He's standing.

15  Q.   Thank you.  Mr. Pizzino, you testified that you

16  first became aware of Oscar Stilley and I believe you

17  said me at the -- when you called a guy named Larry in

18  Las Vegas.  Do you remember that testimony?

19  A.   That's correct.

20  Q.   Did Larry mention me by name or did he mention just

21  Oscar, if you remember?

22  A.   I don't remember.

23  Q.   Okay.

24  A.   Lindsey, I think that you did say Oscar.  And then

25  when I first talked to Oscar, he said he knows someone

1   that he's just going to help and stuff like that.

2   Q.   Thank you.  Now, you called me as a result of that

3   conversation you had with Oscar, correct?

4   A.   That's right.

5   Q.   Okay.  And did I ask you to pay me money when you

6   called me the first time?

7   A.   No.

8   Q.   How about the second time?

9   A.   I don't remember.

10  Q.   Did we have several conversations before --

11          MR. SPRINGER:  Can you pull up Government's

12  Exhibit Number 27, please.  Yes, Number 27.

13  Q.   (BY MR. SPRINGER)  Now, that check is dated 7/24/03,

14  correct?

15  A.   Yes.

16  Q.   And you and I had spoken on numerous occasions

17  before that time; isn't that true?

18  A.   Yes.

19  Q.   Now, you identified that you received a refund check

20  from the IRS; is that right?

21  A.   Two.

22  Q.   Two refund checks?

23  A.   Yes.

24  Q.   Now, isn't it true that how you learned about Irwin

25  Schiff was through your father?

```
 1  A.   That's correct.
 2  Q.   And isn't it true that your father told you that you
 3  need to listen to this guy?
 4  A.   That's correct.
 5  Q.   And when you went to listen to this guy, he told you
 6  this story about how many people he had been getting
 7  refund checks for?
 8  A.   Yes.
 9  Q.   And wasn't his theory or what he was selling to you
10  that you didn't owe any taxes whatsoever?
11  A.   Yes.
12  Q.   And as a result, isn't it true the refund check that
13  you received was you asking for money back on a previous
14  year's tax return?
15  A.   That's correct.
16  Q.   And isn't it true that you followed in great detail
17  what Mr. Schiff and Larry directed you to do?
18  A.   Yes.
19  Q.   Now, you and I had a conversation one time about --
20  did we have a conversation one time about how you got
21  into believing Irwin Schiff's story?
22  A.   Numerous, yes.
23  Q.   Numerous.  And did I give you the analysis of you
24  can't read the tax code like you learned to become a
25  doctor?
```

SALVATORE PIZZINO - CROSS BY MR. SPRINGER                904

1   A.   Yes.

2   Q.   And did I give you an example that if you had a

3   judge as a patient and he came in to the dental chair and

4   he sat down and he asked you how you learned to become a

5   dentist and you said to him I first learned to read the

6   tax code before I did, go ahead and sit in my chair, do

7   you remember that conversation?

8   A.   Yes.

9            MR. O'REILLY:  Your Honor, objection.  Calls for

10  hearsay.

11           THE COURT:  At this point, that will be

12  overruled.  Go ahead.

13  Q.   (BY MR. SPRINGER)  Do you remember a conversation

14  like that?

15  A.   Yes.

16  Q.   And isn't it true that what I was trying to do was

17  explain how to get you back to where you were before you

18  met Irwin Schiff?

19  A.   Yes.

20  Q.   And did I refer to that as an "infection"?  Do you

21  remember if I ever said that to you?

22  A.   Yes.  Yeah.

23  Q.   And, first of all, at any time, did I ever tell you

24  that you are not required to file tax returns or pay

25  taxes?

```
 1  A.   No.
 2  Q.   Isn't it true that I said to you that the problem
 3  was is that I just wasn't willing to say I could find
 4  where that was in the law?  Isn't that what I said?
 5          MR. O'REILLY:  Objection, Your Honor.  Calls for
 6  hearsay.  This is what the defendant has said.
 7          THE COURT:  Overruled.
 8  Q.   (BY MR. SPRINGER)  If you remember?
 9  A.   I don't remember that part, sorry.
10  Q.   You had gone from filing tax returns and paying
11  taxes on money you received from insurance companies;
12  isn't that true?
13  A.   Yes.
14  Q.   And you had gone from that to asking for all that
15  money back that you had paid in; isn't that true?
16  A.   Yes, for a certain year.
17  Q.   And isn't it safe to say that the majority of the
18  time you and I spent together talking on the phone was
19  bringing you back to the place that you were before?
20  A.   Yes.
21  Q.   Okay.  Now, when you first got that refund check,
22  did you want to give it back?
23  A.   I really didn't know what to do with it, because I
24  couldn't believe it was there.
25  Q.   You were actually shocked, weren't you, that
```

 1   actually what Mr. Schiff had told you would happen, would

 2   happen?  Isn't that true?

 3   A.   Yes.

 4   Q.   Okay.  And even though you may have had difficulty

 5   believing it, there had to be something about it that was

 6   true because there you were staring at this huge check,

 7   right?

 8   A.   Right.

 9   Q.   But it still was too good to be true, wasn't it?

10   A.   Yes.

11   Q.   Even your wife took that -- your wife at the time

12   took that same position; isn't that true?

13   A.   Yes.

14   Q.   But what Schiff told you would happen, would happen;

15   isn't that true?

16   A.   It did happen.

17   Q.   Larry too, right?

18   A.   Yes.

19   Q.   Okay.  Now, you said that Oscar and I attended a

20   meeting with you where you met with criminal

21   investigative agents of the IRS; is that true?

22   A.   Yes.

23   Q.   Now, Mr. Stilley was the attorney that you had hired

24   for that meeting, correct?

25   A.   Yes.

1   Q.   I was not in that room representing you in front of

2   the IRS, was I?

3   A.   I don't remember.

4   Q.   Do you remember if they would let me represent you?

5   A.   I don't remember that part.

6   Q.   Okay.

7   A.   Sorry.

8   Q.   That's fine.  Do you remember ever having any

9   discussion with me where you asked me how do I support

10  myself?

11  A.   Yes.

12  Q.   And do you remember whether or not I told you that I

13  cannot receive money except as an unconditional gift?  Do

14  you remember that?

15  A.   Yes, I do.

16  Q.   And you actually had a conversation with your wife

17  about that, didn't you?

18  A.   Yes.

19  Q.   And she wrestled with that, didn't she?

20  A.   Yes.

21  Q.   But in the end, isn't it true that the money that

22  you gave me you agreed to those conditions when you gave

23  it to me?

24  A.   Yes.

25         MR. SPRINGER:  Your Honor, may I have one

SALVATORE PIZZINO - CROSS BY MR. STILLEY                    908

```
 1   second?
 2           THE COURT:  You may.
 3   Q.  (BY MR. SPRINGER)  Were you glad I was there?
 4   A.  Yes.
 5   Q.  Is that so you could still be with your daughter?
 6   A.  Yes.
 7           MR. SPRINGER:  Thank you, Dr. Pizzino.
 8           THE COURT:  Mr. Stilley.
 9                    CROSS-EXAMINATION
10   BY MR. STILLEY:
11   Q.  You said you got the information about Mr. Schiff
12   from your dad, right?
13   A.  Correct.
14   Q.  That made you curious, right?
15   A.  Yes.
16   Q.  So you investigated, correct?
17   A.  Yes.
18   Q.  You came to a certain conclusion, correct?
19   A.  Yes.
20   Q.  And then you acted in good faith on that conclusion,
21   right?
22   A.  Yes.
23   Q.  Now, you made a claim for refund for two years,
24   correct?
25   A.  Yes.
```

1   Q.   And you actually called the IRS about that several

2   times, right?

3   A.   Yes.

4   Q.   And each time you called they would tell you that it

5   was just going to take a little longer, right?

6   A.   Yes.

7   Q.   Now, you remember the meeting with the IRS at the

8   criminal department when we went in to talk to them,

9   right?

10  A.   Yes.

11  Q.   Do you remember looking at the sticky notes in the

12  file?  Or do you remember anything about the notes

13  whereby that the IRS agents basically stated that they

14  were leading you on?

15  A.   I don't remember that part, but I remember that was

16  the gist of it while we were talking.  I don't remember

17  looking at anything saying that.

18  Q.   Okay.  Well, do you remember conversations from

19  Oscar Stilley in which Oscar Stilley got incensed about

20  the fact that they were deliberately trying to mislead

21  you?

22  A.   Yes, yes.

23  Q.   The government changed your behavior, did they not?

24  They caused you to go back to filing tax returns and to

25  give up your refunds, correct?

SALVATORE PIZZINO - REDIRECT BY MR. O'REILLY          910

```
 1  A.   Yes.

 2  Q.   Did they ever show you what law you violated,

 3  allegedly?

 4  A.   No.

 5          MR. STILLEY:  Pass the witness.

 6          THE COURT:  Redirect.

 7                    REDIRECT EXAMINATION

 8  BY MR. O'REILLY:

 9  Q.   Dr. Pizzino?

10  A.   Yes.

11  Q.   Are you an attorney?

12  A.   No.

13  Q.   Have you made a career out of studying the tax laws?

14  A.   No.

15  Q.   You were asked about Mr. Schiff, correct?

16  A.   Yes.

17  Q.   Do you know what happened to Mr. Schiff?

18  A.   He's in jail.

19  Q.   Why?

20  A.   I don't know why he went to jail.  I know he's in

21  jail.

22  Q.   I mean, generally why.  I'm not asking for a

23  specific.

24  A.   Oh.

25          MR. SPRINGER:  Objection, Your Honor, personal
```

SALVATORE PIZZINO - REDIRECT BY MR. O'REILLY                911

1  knowledge.

2          THE WITNESS:  I don't know why he went to jail.

3  Just general knowledge?

4          THE COURT:  Well, on the objection, I'm going to

5  overrule the objection.  Doctor, if you have a clear

6  understanding, at least clear to you, as to generally why

7  Mr. Schiff is incarcerated, then you may answer.  If you

8  don't really have a clue, then the answer is I don't

9  know.  Whichever one works for you should be the answer

10 you give.

11         THE WITNESS:  I don't know exactly why he's in

12 jail.

13 Q.  (BY MR. O'REILLY)  Do you know if it has anything to

14 do with promoting the type of filings that you yourself

15 did?

16 A.  Yes, yes.

17 Q.  Was that why?

18 A.  Yes.

19 Q.  Okay.  Do you appreciate and are you thankful for

20 the help that Mr. Springer gave you?

21 A.  Yes.

22 Q.  Do you appreciate and are helpful(sic) for the

23 assistance that Mr. Stilley gave you?

24 A.  Yes.

25 Q.  Is that why you paid them?

```
 1  A.   Yes.

 2           MR. O'REILLY:  Nothing further, Your Honor.

 3           THE COURT:  Any recross?

 4           MR. SPRINGER:  Yes, sir.

 5                      RECROSS-EXAMINATION

 6  BY MR. SPRINGER:

 7  Q.   Now, you weren't thankful for Lindsey Springer until

 8  I changed your mind; isn't that true?

 9  A.   Yes.

10  Q.   But when you hired Mr. Stilley, you hired him to

11  represent you as an attorney; isn't that true?

12  A.   Yes.

13  Q.   Okay.  And, again, you and I had several

14  conversations, but one of which was that I could not

15  receive any money from you unless you gave it as an

16  unconditional gift.

17           MR. O'REILLY:  Objection.  Calls for hearsay,

18  asked and answered, and beyond the scope.

19           THE COURT:  Go ahead and answer.  Overruled.

20           THE WITNESS:  Yeah, that was a very clear

21  conversation I had with Mr. Springer.  You said, you're

22  not paying me for being here, you just -- you make a

23  donation or something to that effect.

24  Q.   (BY MR. SPRINGER)  Do you ever remember the name

25  Bondage Breakers Ministry?
```

1   A.   Yes.

2   Q.   Did you ever ask me what the purpose of my ministry

3   was?

4   A.   Yes.

5           MR. O'REILLY:  Objection.  Beyond the scope.

6           THE COURT:  That will be sustained.

7   Q.   (BY MR. SPRINGER)  Did Mr. Schiff put the refund

8   check that you got from the IRS on his Web site?

9   A.   Yes, that's what I was made aware of.

10  Q.   Didn't he act like that was the first one he ever

11  got?

12  A.   I don't remember.

13  Q.   Were there any others on his Web site besides yours?

14  A.   No, I believe there were.

15  Q.   You believe there were?

16  A.   Yeah.  Yes.

17  Q.   Your knowledge about Mr. Schiff, again, came from

18  your father through a radio advertisement?

19          THE COURT:  Sustained.

20          MR. SPRINGER:  Okay.  Thank you very much.

21          THE COURT:  Mr. Stilley?

22          MR. STILLEY:  No further questions.

23          THE COURT:  You may step down.

24          THE WITNESS:  Thank you.

25          THE COURT:  We'll have the government's next

```
 1   witness.
 2                          W.T. SMITH,
 3   (WITNESS SWORN)
 4                     DIRECT EXAMINATION
 5   BY MR. SNOKE:
 6   Q.   Would you state your name and spell your last name
 7   for the court reporter, please, sir.
 8   A.   Name and what?
 9   Q.   And spell your last name for the Court reporter.
10   A.   Oh.  W.T. Smith, S-M-I-T-H.
11   Q.   All right.  And does that stand for William Thomas?
12   A.   Yes, sir.
13   Q.   All right.  And -- all right.  I guess we don't have
14   to spell Smith.  That's -- where do you live, sir?
15   A.   Sapulpa.
16   Q.   Okay.  And do you know Mr. Lindsey Springer?
17   A.   Yes, sir.
18   Q.   Okay.
19   A.   Occasionally.
20   Q.   All right.  Do you see Mr. Springer in the courtroom
21   today?
22   A.   Yes, I do.
23   Q.   And will you tell -- oh, he's standing.
24   A.   He's standing.
25   Q.   Okay.  All right.  Did you have any kind of business
```

1  dealing with Mr. Smith (sic)?  Have you had a business

2  dealing with Mr. Smith (sic) in the past?

3            THE COURT:  You mean with Mr. Springer.

4  Q.  (BY MR. SNOKE)  I'm sorry, with Mr. Springer in the

5  past.

6  A.  Yes, we have.

7  Q.  I'm sorry.  And what was that, sir?

8  A.  It was on some real estate.

9  Q.  All right.  Can you look at -- in this book in front

10 of you there at an exhibit marked Exhibit 291 in this

11 notebook here.

12 A.  I find the name, but then it goes to eight-six.

13            MR. SNOKE:  May I approach, Your Honor?

14            THE COURT:  You may.

15            THE WITNESS:  For the numerical --

16 Q.  (BY MR. SNOKE)  Do you recognize the documents that

17 make up Government's Exhibit 291?  Do you recognize the

18 documents that make up Exhibit 291?

19 A.  Some are stuck together.  Yes, I do, sir.

20 Q.  All right.  And what do those documents pertain to?

21 A.  The real estate that Mr. Springer had bought from

22 us.

23 Q.  All right.

24            MR. SNOKE:  We will move into evidence -- oh,

25 yeah, we move into evidence the Exhibit 291 at this time.

W.T. SMITH - DIRECT BY MR. SNOKE                                916

1           MR. SPRINGER:  I do have an objection and may we

2   approach?

3           THE COURT:  You may.

4           THE WITNESS:  Let me back up just a minute, if

5   I may -- okay.

6       (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND

7   OUT OF THE HEARING OF THE JURY.)

8           MR. SPRINGER:  Number 291 is to SLCA Family

9   Trust, it's not to Lindsey Springer.  This man has no

10  personal knowledge of anything related to Lindsey

11  Springer in this document other than I signed it.  That

12  would be the only knowledge.  No element of the crime, no

13  intent, no nothing.

14          MR. SNOKE:  Your Honor, this -- there's several

15  pages into this document, there's an assumption agreement

16  where -- and this witness will explain.  That's all as to

17  how Mr. Springer assumed -- assumed the mortgage on

18  this.  He has testified he recognized it.  We get it into

19  evidence, I will explain why the agreed on is on here.

20          THE COURT:  This assumption agreement doesn't

21  even have a signature page.

22          MR. SPRINGER:  Exactly.

23          THE COURT:  Wait a second.  Maybe the pages are

24  out of order.

25          MR. SPRINGER:  That's the deed.

1          THE COURT:  Okay.  Well, we've got in the

2    plaintiff's exhibit page 1518, 1519, 1520 and 1521 and --

3    okay.  Then on 1520, it's signed by Lindsey K. Springer,

4    co-trustee of the SLCA Family Trust and Regina Springer.

5    Tell me where you're going with this.

6          MR. SNOKE:  This is just to establish the

7    purchase of the property and then we have a payment

8    schedule is set up and we have the bank where the

9    payments were made over about -- well, over our time

10   period between 2002 and 2008 payments were made on this

11   mortgage and we're just showing --

12         MR. O'REILLY:  Your Honor, if I may be heard.

13   This trust is the underlying basis for the mortgage

14   interest deduction credit that will be allowed in the tax

15   calculations that we'll offer in the government's case.

16         THE COURT:  Okay.  Now, Mr. Springer, in light

17   of that, do you still maintain that this exhibit is

18   irrelevant?

19         MR. SPRINGER:  Yes, Your Honor, I do.

20         THE COURT:  Okay.  It will be admitted.

21     (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

22   WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

23   PRESENCE AND HEARING OF THE JURY.)

24         THE COURT:  Exhibit 291 is received.

25   Q.   (BY MR. SNOKE)  Mr. Smith, looking at that document,

1  the first page of it indicates it's a general warranty

2  deed?

3  A.   Yes, sir.

4  Q.   And it indicates the seller as a William D. Greenhaw

5  and Linda F. Greenhaw and it being sold to an SLCA Family

6  Trust dated 3/18/94; is that correct?

7  A.   That's true and that's what I wanted to correct.

8  Q.   And I'm going to get to that.  Just let me ask

9  questions and I think we'll be better off.

10  A.   Okay.

11  Q.   Thank you.  Can you tell us then now why -- well,

12  first of all, was the SLCA Family Trust, to whom this

13  property was being sold or being deeded, did that have

14  any connection with Lindsey Springer?

15  A.   I have no idea.  I suppose -- I think that's the way

16  he took title to it later.  We didn't sell him the

17  property.

18  Q.   All right.  That's what I wanted to ask you.  Then

19  who is Mr. Greenhaw and Mrs. Greenhaw?

20  A.   That's the party we sold the property to.

21  Q.   All right.  And what happened?  How did Mr. -- you

22  get to know Mr. Springer and tell us if you ultimately

23  sold it to him?

24  A.   Well, I think it was in '94 that the Greenhaws

25  bought the property and about two years later, they had

1  some other business arrangements that they wanted to go

2  back to their hometown, Coweta, and they put the property

3  up for sale for a realtor here in Tulsa.

4  Q.   All right.

5  A.   And Mr. Springer bought the property through the

6  realtor from the Greenhaws.

7  Q.   All right.  Then what -- what is your connection

8  with the transaction?  And you said "we," is there

9  somebody besides you involved in this?

10  A.    Mr. Moore, partner.

11  Q.    Partner of yours?

12  A.    Yes, W.T. Moore.

13  Q.   All right.  Then what was the -- then what happened

14  then when Mr. Springer bought the property, in whatever

15  name, from the Greenhaws?

16  A.    The Greenhaws had a -- we had a mortgage with the

17  Greenhaws.

18  Q.    Okay.

19  A.    And Mr. Springer wanted to assume the mortgage.

20  Q.    All right.

21  A.    And through our attorney and Mr. Moore, we agreed to

22  accept the assumption.

23  Q.   All right.  If you'll turn to the fourth page.  I'm

24  sorry, let's start with the -- let's start with the third

25  page of this exhibit.  And I think at the bottom there it

1  has number 1521 on it, on that particular page, third

2  page of that exhibit.

3  A.   Okay.

4  Q.   Do you see the number 1521 down in the lower right-

5  hand corner of that page?

6  A.   One-five --

7  Q.   -- two-one.

8  A.   Yes, sir.

9  Q.   All right.  Now, up at the top there, does it -- it

10  talks about Lindsey K. Springer and Regina M. Springer,

11  co-trustees of the SLCA Family Trust, and it's talking

12  about, executed the foregoing assumption agreement as

13  their free and voluntary act.  Do you see those -- in

14  that first paragraph.

15  A.   (witness nodded)

16  Q.   All right.  And then on the next page, if you'll

17  turn the page to the fourth page of the exhibit, there is

18  an assumption agreement there; is that correct?

19  A.   Yes.

20  Q.   All right.  So then what -- what were the terms,

21  without reading -- without reading every word in this

22  document, what did the assumption agreement call for

23  generally for Mr. Springer to do on behalf of the SLCA

24  Family Trust?  What did you agree to when he assumed this

25  mortgage?

1   A.   He agreed to make the payments as the Greenhaws had

2   been doing.

3   Q.   Okay.  And about what were those payments?

4   A.   I think they were $360 and a few cents a month, I

5   don't know.

6   Q.   And you and Mr. Moore were partners in this?

7   A.   Yes, sir.

8   Q.   Okay.  So did -- what was the arrangement between

9   you and Mr. Moore as far as how you -- how you split up

10  the payments?

11          MR. SPRINGER:  Objection, Your Honor, relevance.

12          THE COURT:  Overruled.

13          THE WITNESS:  The payments were $360.30.  The

14  payments were made to the First United Bank.

15  Q.   (BY MR. SNOKE)  All right.  And they took care of it

16  after that?

17  A.   They charged us a fee of $2.50 for the collection.

18  They charged Mr. Moore a dollar and a quarter, myself a

19  dollar and a quarter.  They put Mr. Moore's account into

20  his savings account and deposited mine into a checking

21  account and mailed me a deposit slip.

22  Q.   All right.  All right.  And going back to the first

23  page of this exhibit, it looks like this occurred in --

24  in -- on July 30th of 1996, approximately.

25  A.   Lost the page number.

```
 1   Q.   At the bottom of the first page here.

 2   A.   Yes, sir.

 3   Q.   Yeah.

 4        MR. SNOKE:  I don't believe I have any other

 5   questions of the witness.

 6        THE COURT:  Cross-examination.

 7        MR. SNOKE:  Oh, wait a minute.  Wait a minute,

 8   Your Honor.  May I --

 9        THE COURT:  Surely.

10   Q.   (BY MR. SNOKE)  The description of the property is

11   on this exhibit, where was the property located?

12   A.   You want the legal or --

13   Q.   No, no, just approximately -- what county is it in?

14   A.   It's in Creek County.

15   Q.   Okay.

16   A.   On Highway 33 a mile and a quarter west of the --

17   mile and a half west of the 66/33 junction.

18   Q.   Thank you.

19        THE COURT:  Cross-examination.

20                   CROSS-EXAMINATION

21   BY MR. SPRINGER:

22   Q.   Good morning.

23   A.   Good morning.

24   Q.   Do you recall what permanent fixtures were already

25   erected on the property at the time that SLCA Family
```

1  Trust assumed the mortgage?

2  A.   When we sold the property, it was raw land.  And the

3  best of my remembrance, they had built a slab for a house

4  and constructed the garage on it and was living in the

5  garage section when you acquired the property.

6  Q.   And is that slab still there, as best you know?

7  Strike that.  Has the house ever been finished on that

8  slab that you know of?

9  A.   I think you've made some improvements on it.

10  Q.   To the garage, right?  Improvements to the garage

11  and then built the garage on the slab?

12  A.   I'm not --

13  Q.   Not sure?

14  A.   I have not taken a physical examination of the

15  property, but --

16  Q.   And you don't --

17  A.   I thought there was quite a bit of improvement made

18  on the property.

19  Q.   The -- as far as the payments at the bank, you don't

20  know the source of that money, you just -- the money at

21  the bank was just deposited by somebody at the bank and

22  then you got it credited to your account; is that right?

23  A.   That's true.

24  Q.   Okay.  Thank you very much.

25          THE COURT:  Mr. Stilley.

CLAUDIA REYNOLDS - DIRECT BY MR. SNOKE                924

```
 1              MR. STILLEY:  No questions.

 2              THE COURT:  Any redirect?

 3              MR. SNOKE:  No, Your Honor.

 4              THE COURT:  You may step down.  Thank you.

 5              MR. SNOKE:  Claudia Reynolds.

 6              THE COURT:  We'll have the government's next

 7  witness.

 8              COURTROOM DEPUTY:  Mr. Snoke, did you say who

 9  the next witness was?

10              MR. SNOKE:  Claudia Reynolds.

11              COURTROOM DEPUTY:  Thank you.

12              MR. O'REILLY:  Your Honor, may I approach to

13  help?

14              THE COURT:  You may.

15              COURTROOM DEPUTY:  Ms. Reynolds, if you would

16  just come up here and be sworn.

17                      CLAUDIA REYNOLDS,

18  (WITNESS SWORN)

19                      DIRECT EXAMINATION

20  BY MR. SNOKE:

21  Q.  Would you state your name and spell your last name

22  for the court reporter, please.

23  A.  Claudia Reynolds, R-E-Y-N-O-L-D-S.

24  Q.  And what's your business or occupation, ma'am?

25  A.  I'm a teller at First United Bank in Sapulpa.
```

CLAUDIA REYNOLDS - DIRECT BY MR. SNOKE                925

1   Q.   All right.  And at that bank is W.T. Smith one of

2   your customers?

3   A.   Yes, he is.

4   Q.   All right.  And are you familiar with an individual

5   named Lindsey Springer?

6   A.   Yes, sir.

7   Q.   And do you see him in the courtroom here today?

8   A.   Yes, sir.  He's right there behind you.

9   Q.   All right.  He stood up, I guess.

10  A.   Yes, sir.

11  Q.   And under what circumstances do you know

12  Mr. Springer?

13  A.   He paid his land payments at the bank.  Mr. Smith

14  owned the property and Mr. Springer paid his payments

15  there at the bank and I wrote up the receipts and gave

16  him his copy and then distributed the money into

17  Mr. Smith's account.  And then at the time when I was

18  doing it, there was also Mr. Moore and the money was

19  divided up between their two accounts.

20  Q.   All right.  And that was the instructions you had

21  from Mr. Smith and Mr. Moore?

22  A.   Yes, sir.  And the bank made $2.50.

23  Q.   Okay.  On each of the payments; is that correct?

24  A.   Well, you took the 2.50 and you divided it up and

25  1.25 went to Mr. Moore and 1.25 was subtracted out of --

CLAUDIA REYNOLDS - DIRECT BY MR. SNOKE                    926

1   Q.   Okay.

2   A.   In other words, if he gave me $1,000 and I did his

3   interest and principal and I took 2.50 from that and the

4   difference all went to their accounts.  That's all I did.

5   Q.   Would you look at Government's Exhibit 292, which is

6   in that folder right in front of you there?

7   A.   Yes, sir.

8   Q.   And I realize there's several pages there, but --

9   A.   It's the first one.

10   Q.   You've seen some of those --

11   A.   Yes.

12   Q.   -- before, have you not?

13   A.   Uh-huh.

14   Q.   All right.  Are those -- do those records -- are

15   those records of First United Bank there?

16   A.   Yes, these are.

17   Q.   And are the -- do they pertain to what you've been

18   talking about?

19   A.   Yes, sir.

20   Q.   The payments made by Mr. Springer?

21   A.   Uh-huh.

22   Q.   All right.  And are they kept in the ordinary course

23   of business of First United Bank?

24   A.   Yeah, I kept --

25   Q.   All right.  Let's just stop there.  I'll get to you.

CLAUDIA REYNOLDS - DIRECT BY MR. SNOKE                927

1    A.   Okay.  I'm sorry.

2    Q.   Just the question, these records that are in this

3    exhibit, they were kept in the ordinary course of the

4    business of First United Bank?

5    A.   Yes, sir.

6    Q.   And they were made out by either you or somebody

7    else at the time that the payments were made?

8    A.   Yes, sir.

9         MR. SNOKE:  We'd move into evidence Exhibit 292

10   at this time.

11        MR. SPRINGER:  No objection, Your Honor.

12        THE COURT:  292 is received.

13   Q.   (BY MR. SNOKE)  Now, I see without going too far

14   into there that the first group of documents in that

15   exhibit -- why don't you just tell me what that first

16   group is.

17   A.   I see 292, the first page.  These are just the

18   receipts that we filled out breaking down on there the

19   principal and the interest that went towards the purchase

20   of the land.  And then you subtract all that total -- see

21   at the bottom where it says $1,440.24?  That was how much

22   money he brought in that day.

23   Q.   All right.

24   A.   And, normally, it would have on there what month it

25   was.  If you look at the one right next to it where it

1  says March, April, and May, that means that he paid the

2  payments for those three months all at one time.

3  Q.   All right.

4  A.   And then that would be the balance that was due and

5  then when the next due date would be.

6  Q.   All right.  So like the one on the right there on

7  that first page, you said it pertains to like four

8  months' worth of payments?

9  A.   Yes, sir.

10  Q.   And what -- all right.  And that came to $1,440.24?

11  A.   Uh-huh.  The other side, the one that says May 31st

12  of 2000, that one would have been three payments also.

13  Q.   All right.  Actually, four payments, I guess.

14  They're both --

15  A.   Yeah, four.  There would be March, April, May, and

16  June, so four payments.

17  Q.   All right.  Was it usual or unusual for Mr. Springer

18  to make several payments in arrears at once?

19  A.   He usually made several at once.  This was normal.

20  Q.   All right.  And in what form did the payments

21  Mr. Springer made on this usually take?

22  A.   Most of the time, it would be cash.  Once in a

23  while, it would be a money order.  But most the time when

24  I waited on him, it was cash.

25  Q.   All right.  And how often would you be the one that

1  he would make the payments to there at the bank?

2  A.   Well, up until I went to our branch location in --

3  well, three years ago, whatever that would be, I was the

4  one that took the payments all the time up to that point.

5  Q.   All right.  Up to three years ago?

6  A.   Uh-huh.

7  Q.   Which would have been '06?

8  A.   Yes, sir.

9  Q.   All right.

10 A.   I was going to say '06 and I didn't know if I'd be

11 --

12 Q.   All right.  If you would turn back there to -- I

13 counted the number of pages.  I'm getting tired of

14 counting here.  Can you turn back in that exhibit about

15 28, 30 pages and we come to some pages with a bunch of

16 numbers in columns?

17 A.   Are you talking about where there's a stamp at the

18 top like it might have a date and it's got, what, five

19 columns across?

20 Q.   Yes.

21 A.   Yeah, I'm --

22 Q.   All right.  And then there's about four or five

23 pages of that.

24 A.   Yeah.

25 Q.   Can you tell me what that is?

1  A.   What that is, is just kind of like a ledger keeping

2  track of when he paid.  And then it's just another record

3  that's easier to look at to see when he paid, how much he

4  paid, and so on.  That's all it is, just a record of

5  that.

6  Q.   And did that cover the time period between 5/31 of

7  2000?

8  A.   Yes, sir.

9  Q.   Which you said covered four months, I guess, which

10  would be --

11  A.   Yeah, do you see where it says --

12  Q.   -- 4, 3, 2 -- 2, 3, 4, and 5, I guess, of 2000 --

13  A.   Uh-huh.

14  Q.   -- in that first payment on the first page and then

15  it goes up through February 11, 2008.

16  A.   Yes, sir.

17  Q.   All right.  Would there have been any payments then

18  on that after 2/11 of 2008?

19  A.   No, sir.  This -- that's where it ended.

20  Q.   All right.  The rest of the records in that exhibit

21  there, there are some -- at the back of that exhibit,

22  there's some other documents besides this type of credit

23  memorandum for the discount department is what it's

24  titled on those first pages.  If you go to the very last

25  page of the exhibit and then kind of work forward there,

1   there's some different type of documents there.  Can you

2   tell us what those are?  Start with the last page of the

3   exhibit.  Let's just turn to the last page of the exhibit

4   as an example.

5   A.   What that is, is there should be like a deposit slip

6   with it, that is where we would have deposited into

7   Mr. Smith's account.

8   Q.   All right.

9   A.   And then --

10  Q.   And the very last page there -- I don't know if you

11  can see it, but it's for $1,800 -- $1,800.30.

12  A.   Uh-huh.

13  Q.   And what that is document?

14  A.   Okay.  Like I said, there should be -- that's the

15  back side of the deposit slip.

16  Q.   Okay.

17  A.   And then the thing right above it -- well, actually,

18  on the top, let me -- that where it says, that's a cash-

19  in ticket right there.

20  Q.   Okay.

21  A.   So where it says 279 on it, that's a cash-in ticket

22  that ran with the deposit ticket which was going into the

23  savings account of Mr. Moore.  One of them is.  Then

24  there should be a deposit there showing going into

25  Mr. Smith.  That's what it is.

1  Q.   All right.

2  A.   They're just deposit slips and then a cash-in ticket

3  from the teller.

4  Q.   All right.  All right.  All right.  Thank you.  Does

5  that document then indicate that that particular payment

6  was made in cash?

7  A.   Yes, sir.

8  Q.   All right.

9        MR. SNOKE:  No further questions.

10        THE COURT:  Cross-examination.

11        MR. SPRINGER:  None for me, Your Honor.

12        THE COURT:  Mr. Stilley.

13        MR. STILLEY:  No questions.

14        THE COURT:  You may step down.  We'll have the

15  government's next witness.

16        MR. O'REILLY:  Your Honor, the United States

17  calls Ms. Regina Carlson.  Your Honor, if I may approach

18  the witness stand to pull an exhibit out for her.

19        THE COURT:  You may.

20                    REGINA CARLSON,

21  (WITNESS SWORN)

22                    DIRECT EXAMINATION

23  BY MR. O'REILLY:

24  Q.   Could you please state your name and spell your

25  first and last names for the court reporter.

```
 1   A.   Regina Carlson, R-E-G-I-N-A, C-A-R-L-S-O-N.
 2   Q.   Where do you currently live?  Just your city and
 3   state, please, Ms. Carlson.
 4   A.   Sapulpa, Oklahoma.
 5   Q.   How long have you lived in Sapulpa approximately?
 6   A.   Fifteen years.
 7   Q.   Thirteen years?
 8   A.   Thirteen to 15.
 9   Q.   What is your level of education?
10   A.   High school graduate.
11   Q.   Do you have any post high school education?
12   A.   No.
13   Q.   What is your current occupation?
14   A.   Stay-at-home mom.
15   Q.   Have you always been a stay-at-home mom?
16   A.   Yes.
17   Q.   Do you know the name Oscar Stilley?
18   A.   Yes.
19   Q.   How is it that you first came to learn of the name
20   Oscar Stilley?
21   A.   I saw it on the Caller ID when Lindsey would call
22   me.
23   Q.   I'm sorry?
24   A.   I saw it on the Caller ID when Lindsey would call
25   me.
```

REGINA CARLSON - DIRECT BY MR. O'REILLY                                934

1    Q.    And Lindsey would be?

2    A.    My ex-husband.

3    Q.    His last name?

4    A.    Springer.

5    Q.    Have you ever -- prior to 2005, had you ever met

6    Mr. Stilley?

7    A.    No.

8    Q.    Okay.  Would you identify Mr. Springer in the

9    courtroom, please?

10   A.    Right there (indicating).

11   Q.    Is it the gentleman standing up --

12   A.    Yes.

13   Q.    -- with the beard?

14   A.    Yes.

15        MR. O'REILLY:  May the record reflect she has

16   identified the defendant?

17        THE COURT:  The record will so reflect.

18   Q.    (BY MR. O'REILLY)  Do you recall when your Caller ID

19   started reflecting the name Oscar Stilley on your

20   telephone?

21   A.    No.

22   Q.    Was it within the last year or was it years ago?

23   A.    More than a year, but I don't know that I would say

24   years.

25   Q.    Just sometime in the past?

1   A.   Uh-huh.

2   Q.   Does it still reflect that?

3   A.   I don't think so.

4   Q.   So it no longer has that name come up on Caller ID?

5   A.   (shook head)

6   Q.   When were you married to Mr. Springer?

7   A.   1992 through 1999.

8   Q.   How old were you when you got married to him?

9   A.   Twenty.

10  Q.   Approximately how old was Mr. Springer?

11  A.   Twenty-six, I think.

12  Q.   During the time that you were married to

13  Mr. Springer, did you have any independent source of

14  income?

15  A.   Did I?  No.

16  Q.   You were a stay-at-home mom?

17  A.   Yes.

18  Q.   How many children did you have?

19  A.   Two.

20  Q.   When were your children born?

21  A.   '92 and '95.

22  Q.   Did you ever try to get a job while you were married

23  to Mr. Springer?

24  A.   No.

25  Q.   Why not?

```
 1  A.   I wanted to be a stay-at-home mom.

 2  Q.   Was there ever any discussion -- when you got

 3  divorced, did you consult a divorce attorney?

 4  A.   No.

 5  Q.   Who handled the paperwork in the divorce?

 6  A.   Lindsey.

 7  Q.   Did you have any input into it?

 8  A.   I don't recall.

 9  Q.   Where did you live immediately prior to your

10  divorce?

11  A.   In the house that he's in now.

12  Q.   Is that in or near Kellyville?

13  A.   Near Kellyville.

14  Q.   Is that in Creek County?

15  A.   Yes.

16  Q.   Did he keep the house?

17  A.   Yes.

18  Q.   Was that part of the divorce agreement?

19  A.   Yes.

20  Q.   You had purchased the house while you were married;

21  is that correct?

22  A.   Yes.

23  Q.   Was your home held in the name of SLCA Family Trust?

24  A.   Yes.

25  Q.   Was that your decision?
```

```
1    A.   Not my decision.

2    Q.   Whose decision was it?

3    A.   Lindsey's.

4    Q.   When you first got married to Mr. Springer, what did

5    he do for a living?

6    A.   He owned a used car lot.

7    Q.   How long did he continue in that occupation?

8    A.   Less than a year, I think.

9    Q.   After -- what did he do with respect to the used car

10   lot?  Did he sell it or what?  If you know.

11   A.   I don't know.  I don't think that he owned it, so --

12   Q.   Oh, I'm sorry.  I thought --

13   A.   I don't remember.  Well, I think it was a

14   partnership kind of thing, I think.  I think.

15   Q.   That's fine.  It has been a long time.

16   A.   It has been a long time and it's not something that

17   I was concerned with or I needed to be concerned with, so

18   --

19   Q.   And let me just ask, after Mr. Springer was no

20   longer working or owning or whatever it was he was doing

21   with the used car lot, how did he provide for your

22   family?

23   A.   That's not an easy question to answer.  I don't -- I

24   don't know specifics of it.

25   Q.   Well, let me ask this.  I think you've already said
```

1  you did not have any independent income.  Is that

2  correct?

3  A.   Right.

4  Q.   Did you have any independent savings that you were

5  drawing upon?

6  A.   No.

7  Q.   Who was the source of money in your household?

8  A.   Lindsey.  Lindsey paid the bills, provided for the

9  family.

10  Q.   And after you were divorced, did he continue to pay

11  -- did he begin to pay child support?

12  A.   Yes.

13  Q.   Was that part of the divorce agreement?

14  A.   Yes.

15  Q.   How much did he pay?

16  A.   In the beginning, I believe it was 300 per child.

17  Q.   Excuse me?

18  A.   In the beginning, I believe it was 300 per child.

19  Q.   So that would have been $600 each month?

20  A.   Yes.

21  Q.   Did that change?

22  A.   He increased it, I'm not sure when, to 350 per

23  child.

24  Q.   Did Mr. Springer make any other payments on behalf

25  of the children following your divorce?

```
 1   A.   Yes.

 2   Q.   What general types of payments would he make?

 3   A.   Any medical expenses, doctors' appointments,

 4   prescriptions, dental.  There was a clothing allowance.

 5   He helped out with lessons.

 6   Q.   With respect to the payments, is that something that

 7   he would make directly or would he reimburse you?

 8   A.   Both.

 9   Q.   In what form of payment would he give you the money

10   both for the child support payments and for the

11   reimbursements?

12   A.   Cash.

13   Q.   Was it always cash?

14   A.   I believe there were a few times that it was money

15   orders, but generally cash.

16   Q.   Did you have to sign any type of receipt when you

17   were receiving these payments?

18   A.   Always.

19   Q.   I'm going to ask you now if you could look at what

20   should be in that binder in front of you and is already

21   in evidence as Government's Exhibit 562.  And if you need

22   any assistance in finding it, please let me know.

23   A.   Is it before the number or after?

24        MR. O'REILLY:  May I approach the witness, Your

25   Honor?
```

```
 1              THE COURT:  You may.

 2              THE WITNESS:  There's nothing in here for 562.

 3              MR. O'REILLY:  I apologize.

 4              COURTROOM DEPUTY:  Mr. O'Reilly, could you move

 5    the mike to the center over there?  I think we're getting

 6    some feedback.  Thank you.  That's good.

 7    Q.  (BY MR. O'REILLY)  Do you recognize Government's

 8    Exhibit 562?

 9    A.   Yes.

10    Q.   What are those?

11    A.   Receipts.

12    Q.   And what are these receipts for?

13    A.   Child support, insurance, anything that was paid to

14    me.

15    Q.   And who did you receive these receipts from?  Or let

16    me -- who asked you to sign these receipts?

17    A.   I generally filled out the receipt, signed it, and

18    gave it to Lindsey.

19    Q.   Why?

20    A.   To show that he had paid me.

21    Q.   Was this something you did on your own or were you

22    asked to?

23    A.   I was asked to.

24    Q.   By who?

25    A.   Lindsey.
```

1   Q.   During your marriage, did you handle the money?

2   A.   No.

3   Q.   Who did?

4   A.   Lindsey.

5   Q.   Would Mr. Springer, during your marriage, take

6   trips?

7   A.   Yes.

8   Q.   Frequently or infrequently?

9   A.   Frequently towards probably the middle to end.

10  Q.   Okay.  And when you say from "towards the middle to

11  end," what time period are you discussing?

12  A.   Honestly, I can't remember when.

13  Q.   That's fine.  But it was sometime during the '90s,

14  obviously, because that was the scope of your marriage.

15  A.   Yes.

16  Q.   Would Mr. Springer bring money back from these

17  trips?

18  A.   Yes.

19  Q.   What did you understand that Mr. Springer was doing

20  when he took these trips?

21  A.   He would do meetings to educate people on the fact

22  that you didn't need to pay your taxes.  I don't know.

23  It's very difficult to explain.  I never could really

24  explain it to anyone, so --

25  Q.   Well, during the time you were married to

1   Mr. Springer, did you file tax returns?

2   A.   No.

3   Q.   Do you know if Mr. Springer, in these trips, was

4   involved with any court cases?

5   A.   Personally himself?

6   Q.   Not him -- either?

7   A.   Not that I'm aware of for himself, no.  I know that

8   some of the people that he was involved with was involved

9   in court cases.

10   Q.   Do you recall any names?

11   A.   No.

12   Q.   Now, you mentioned that when you first got married

13   he owned a used car lot.  Did Mr. Springer enjoy cars?

14   A.   Yes.

15           MR. SPRINGER:  Objection, Your Honor.

16   Mischaracterization of what she testified on.

17           THE COURT:  Say that again.

18           MR. SPRINGER:  Your Honor, she said that I was

19   in a partnership with somebody and he just asked her the

20   used car dealership that I owned.

21           MR. O'REILLY:  I'll rephrase the question, Your

22   Honor.

23           THE COURT:  Rephrase.

24   Q.   (BY MR. O'REILLY)  Did Mr. Springer enjoy cars?

25   A.   Yes.

1   Q.   What made you -- what makes you believe that

2   Mr. Springer enjoyed cars?

3   A.   I guess it seemed to me as a general question.  I

4   enjoy cars.  I don't like to walk.  Do you like to walk?

5   I mean, who doesn't enjoy cars?

6   Q.   I guess the question -- what kind of cars did you

7   have while you were married?

8   A.   Oh, we had very nice cars sometimes, sometimes we

9   had very crappy cars.

10  Q.   Did you own a Yugo?

11  A.   No.

12  Q.   What kind of nice cars did you have?

13  A.   Mercedes, Lexus.

14  Q.   Do you know if Mr. Springer had tax problems?

15  A.   Yes.

16  Q.   When you first married Mr. Springer, do you know if

17  he had any tax problems?

18  A.   When I first married him, I did not know.

19  Q.   Do you know if -- do you now know if at that point

20  in time he was already having tax issues?

21  A.   Yes.

22  Q.   How do you know that?

23  A.   It wasn't very long after we got married that it

24  came up and it was from the past.  I don't know that I

25  saw the documentation or anything.  I could have, I don't

1    remember.

2    Q.   Do you know just generally what the problem was?

3    A.   No.  Non-payment, non-filing, I don't know.

4    Q.   Are you speculating when you say "non-payment"?

5    A.   Yes.

6    Q.   So the answer is you don't know?

7    A.   Yes.

8    Q.   You just know there was some tax problem.  Was it a

9    federal tax problem?  The IRS?

10   A.   IRS, yes.

11   Q.   During -- when you first married Mr. Springer, was

12   there anything called Bondage Breakers Ministries of

13   which you were aware?

14   A.   No.

15   Q.   Is that something that you learned of while you were

16   married to Mr. Springer?

17   A.   Yes.

18   Q.   Who or what was Bondage Breakers Ministries to your

19   understanding?

20   A.   Lindsey was Bondage Breakers Ministries.

21   Q.   During the time you were married to Mr. Springer,

22   did you see any of the -- do you know if he received any

23   checks?

24   A.   I believe so.

25   Q.   How do you know that?

1   A.   Because he would go to a check cashing agency.

2   Q.   Did you ever see any of the checks?

3   A.   Probably.

4   Q.   Do you have any recollection of seeing them or

5   just --

6           MR. SPRINGER:  Objection, Your Honor.  That's

7   asked and answered.

8           THE COURT:  Overruled.

9           THE WITNESS:  I'm sure I did.  I mean, I can't

10  sit here and think, let's see, yes, I saw a check then.

11  I'm pretty sure I did, but --

12  Q.   (BY MR. O'REILLY)  I guess my question, and if you

13  don't know the answer to this, fine, do you recall to

14  whom the checks were made payable, if you saw any?

15  A.   No.

16  Q.   Do you know what check cashing place Mr. Springer

17  used?

18  A.   I know where it was, I don't know the name.

19  Q.   Where was it?

20  A.   On Peoria, about 42nd and Peoria.

21  Q.   Here in Tulsa?

22  A.   Yes.

23  Q.   Do you know why Mr. Springer used a check cashing

24  establishment?

25  A.   Because we did not have a bank account.

1   Q.   Prior to your marriage to Mr. Springer, have you had

2   a bank account personally?

3   A.   Yes.

4   Q.   You did not maintain that after you were married?

5   A.   No.

6   Q.   Why not?

7   A.   I'm not sure initially if I was told to close it or

8   not.  So, initially, I'm not sure.

9   Q.   Okay.  You say "initially you're not sure."  Could

10  you please explain what you mean by that?

11  A.   I don't remember closing it out.  I don't remember

12  why I closed it out.

13  Q.   Do you know why you never opened one during the time

14  you were married to Mr. Springer?

15  A.   Well, didn't need to because he provided the money

16  and it was not allowed.

17  Q.   Who didn't allow you to open a bank account?

18  A.   Lindsey.  It's not something -- I don't recall that

19  I said can I open a bank account and he said, no, you may

20  not, but it just --

21  Q.   Well, then, please explain why you say that

22  Mr. Springer would not allow you to open a bank account.

23  A.   That's hard to explain.  Like I said, I don't -- I

24  don't recall saying can I open a bank account and he said

25  no.  So I don't know that it was something that I wanted

1  to do.  But I didn't pay the bills.  And he gave me cash

2  if I needed to go buy groceries or go buy clothes for the

3  kids, so I didn't need one.

4  Q.   Well, whenever you go out -- obviously, you had the

5  clothing, groceries.  You paid that in cash?

6  A.   Yes.

7  Q.   From whom did you receive that cash?

8  A.   Lindsey.

9  Q.   When your children were born, did you get social

10 security numbers for them?

11 A.   No.

12 Q.   Why not?

13 A.   Because Lindsey didn't want them to have social

14 security numbers.

15 Q.   Did you have an opinion on this?

16 A.   Yes.

17 Q.   What was your opinion?

18 A.   I thought that they should have them.

19 Q.   So why didn't you do it?

20 A.   Because he didn't want them to.

21          MR. O'REILLY:  If I may have a moment, Your

22 Honor.

23          THE COURT:  You may.

24          MR. O'REILLY:  Your Honor, this may be a time

25 for a mid-morning break.

```
 1              THE COURT:  Members of the jury, we'll take our
 2    mid-morning break at this time.  We'll resume at ten
 3    minutes till eleven.  And so please be ready just a
 4    little before that time for the security officer to
 5    accompany you back into the courtroom.
 6         And since this is the first time today, I'll give
 7    you all three parts of it.  Don't discuss the case, don't
 8    undertake any independent investigation, and don't reach
 9    any conclusions about this case until it has been given
10    to you for your deliberations and verdict.
11         All persons in the courtroom will remain seated
12    while the jury departs.
13         (JURY EXITS THE COURTROOM)
14              THE COURT:  Okay.  The jury has left the
15    courtroom.  In light of the preliminary guidance that
16    counsel for the government gave at the outset this
17    morning as to when the government may complete its
18    presentation --
19              MR. O'REILLY:  Can Ms. Carlson be --
20              THE COURT:  You may step down.  Ms. Carlson,
21    we'll resume here, of course, with you on the stand at
22    ten minutes till the hour.
23              THE WITNESS:  Okay.
24              THE COURT:  In light of the comments made by the
25    government when we began this morning about when the
```

 1   government may complete its presentation, I would like,

 2   at least in a guarded and tentative way, to give the jury

 3   some guidance as to how the matter might unfold next

 4   week.  And, obviously, the government is not held to this

 5   and the defendants are not held to any particular

 6   prediction, but if the government completes its

 7   presentation on Tuesday, I'll invite the defendants to

 8   give me just some overview of how you think the case

 9   might unfold in terms of total time next week after that.

10           MR. SPRINGER:  You know, Your Honor, that's hard

11   to predict because we started with 72 witnesses on

12   Monday, we dropped to 62 on Tuesday, and I just don't

13   know what else is coming in.  I haven't decided whether I

14   will take the stand or not based upon what I haven't seen

15   yet.  So I just -- my original calculation was that if I

16   was to take the stand that I would be on the stand for at

17   least a day myself.  And I would anticipate on the

18   recalls, at this point, no more than a half of a day and

19   then my witnesses I would anticipate one to two days

20   based upon where I was on Monday.  But I can't tell you

21   with any degree of certainty right now whether any of

22   that is going to change.  If it does, how so.  I'm just

23   giving you as honest an answer as I can give you.

24           THE COURT:  I understand and you're certainly

25   not required to be precise at this point because you

```
 1   can't possibly know all you need to know.

 2           MR. SPRINGER:  Thank you.

 3           THE COURT:  Mr. Stilley, aside from anything

 4   that Mr. Springer may have to present, I'll invite you to

 5   give me your non-binding prognostication.

 6           MR. STILLEY:  I would think that if the

 7   government was correct about finishing their case in

 8   chief on Tuesday that surely we could have this to the

 9   jury by Friday.  But that's a guesstimate, obviously.

10           THE COURT:  Okay.  Well, we won't be holding

11   court Friday of next week.

12           MR. STILLEY:  Oh, I'm sorry, you're right.

13   Well, it would probably be then by Monday.  That's my

14   guesstimate.

15           THE COURT:  Very well.  I appreciate that and,

16   obviously, nobody is held to any of these predictions.

17      By the end of the day today, I may tell the jury

18   that it appears that the case will not go very far into

19   that following week.  I think I can probably give them

20   that equally non-binding prediction.

21      Anything further we ought to take up before we take

22   our mid-morning recess?

23           MR. STILLEY:  No, Your Honor.

24           MR. SPRINGER:  No, Your Honor.

25           MR. O'REILLY:  No, Your Honor.
```

```
 1              THE COURT:  Court will be in recess.
 2      (A RECESS WAS HAD, AFTER WHICH THE FOLLOWING
 3  PROCEEDINGS WERE HAD IN OPEN COURT AND WITHIN THE
 4  PRESENCE AND HEARING OF THE JURY.)
 5              THE COURT:  Let's see, direct examination had
 6  been completed.  Is that right or --
 7              MR. O'REILLY:  Well, Your Honor, it had not;
 8  however, it is now.
 9              THE COURT:  Very well.
10              MR. O'REILLY:  I am done with this witness.
11              THE COURT:  Cross-examination.
12                      CROSS-EXAMINATION
13  BY MR. SPRINGER:
14  Q.  Mrs. Carlson, you and I met in 1991; is that
15  correct?
16  A.  Yes.
17  Q.  And at that time that we met I never stated anything
18  to you about that I had any previous tax problems with
19  the IRS; is that correct?
20  A.  Correct.
21  Q.  And then we got married February 29, 1992; is that
22  correct?
23  A.  Yes.
24  Q.  Okay.  And at that time, I had never explained to
25  you any of my history with the IRS; is that correct?
```

1  A.   Correct.

2  Q.   Okay.  And then you subsequently then got pregnant

3  with Clayton; is that correct?

4  A.   Yes.

5        THE COURT:  Ms. Carlson, for reasons that are

6  absolutely not your fault, the microphone on the witness

7  stand has quit working altogether, so I'm going to have

8  to ask you use your outside voice.

9        THE WITNESS:  My outside voice.

10  Q.   (BY MR. SPRINGER)  So Clayton was born on December

11  23, 1992; is that correct?

12  A.   Yes.

13  Q.   And the day before he was born, do you remember me

14  getting a phone call from the IRS?

15  A.   No.

16  Q.   Do you remember --

17  A.   I remember -- that kind of refreshes a little bit.

18  I don't know when it was.

19  Q.   Okay.

20  A.   Especially if it was the day before he was born.

21  Q.   Do you remember whether around that time was the

22  first time you had ever heard of anything regarding the

23  IRS?

24  A.   Yes.

25  Q.   Okay.  And it shocked you, didn't it?

```
 1   A.   Yes.

 2   Q.   Was I shocked at that time?

 3   A.   I don't remember.

 4   Q.   Okay.  Do you remember the IRS asking me to go get

 5   records for them and show up on the following Monday.

 6           MR. O'REILLY:  Objection, Your Honor.  Simply

 7   clarify how she would know the foundation of her

 8   knowledge.

 9           THE COURT:  Clarify that, please.

10   Q.   (BY MR. SPRINGER)  December 23rd was a -- was the

11   day Clayton was born you testified.  And you carried

12   Clayton full term, did you not?

13   A.   Yes.

14   Q.   And we were on red alert that you were going to have

15   a child at any time around the time that Clayton was

16   born; isn't that true?

17   A.   Yes.

18   Q.   And isn't it true that you actually had came down to

19   the car lot, you testified to earlier about, with me the

20   day before Clayton was born?

21   A.   I don't remember that it was the day before, but I

22   remember going down there.

23   Q.   Okay.  And -- okay.  In 1993, do you remember me

24   telling you the name Bondage Breakers Ministries for the

25   first time?
```

REGINA CARLSON - CROSS BY MR. SPRINGER                954

```
1   A.   No.

2   Q.   Do you remember in 1994 Bondage Breakers Ministries?

3   A.   No.  I don't remember -- I've tried to think about

4   when it started and I can't remember.

5   Q.   Do you remember me holding meetings at the Grandview

6   Hotel, presently the Hilton Hotel out next to -- across

7   the street from Oral Roberts University?

8   A.   Yes.

9   Q.   And that was a frequent occurrence; isn't that true?

10  A.   Yes.

11  Q.   Was it every two weeks, if you remember?

12  A.   I think so.

13  Q.   Large groups of people would show up, wouldn't they?

14  A.   I believe so.

15  Q.   Okay.  And at that time, do you remember whether or

16  not that they were coming there based upon Bondage

17  Breakers Ministries or not?

18  A.   Yes.

19        MR. O'REILLY:  Objection, Your Honor.  Calls for

20  her speculation as to why people were attending the

21  meeting.

22        THE COURT:  Overruled.

23  Q.   (BY MR. SPRINGER)  That answer was yes, correct?

24  A.   Yes.

25  Q.   Now, you testified earlier that you thought I
```

1   traveled around the country telling people not to pay

2   taxes and file tax returns.  Do you remember that

3   testimony?

4   A.   Yes.

5   Q.   Now, you've given a previous deposition, have you

6   not?

7   A.   Yes.

8   Q.   Just recently?

9   A.   February.

10  Q.   And in that deposition, didn't you say that that was

11  purely your speculative position?

12        THE COURT:  Mr. Springer, you remember our

13  pretrial conference we said that you don't give off-the-

14  cuff summaries of deposition testimony.

15        MR. SPRINGER:  Oh, I'm sorry.  I'm sorry, Your

16  Honor.  I apologize.  I apologize, Your Honor.

17  Q.   (BY MR. SPRINGER)  Is your statement about not

18  paying taxes and not filing tax returns purely a

19  speculation on your part?

20  A.   Yes.

21  Q.   Did you and I ever have any discussions about not

22  paying taxes or filing tax returns that would have led

23  you to that speculation?

24  A.   Yes.

25  Q.   Okay.  And what were those conversations that we

1  had?

2         MR. O'REILLY:  Objection, Your Honor.  Calls for

3  hearsay, defendant's own statements.

4         THE COURT:  Counsel will approach.

5     (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND

6  OUT OF THE HEARING OF THE JURY.)

7         THE COURT:  Okay.  I'm having a lot of trouble

8  understanding the government's objections to the

9  defendants' statements as hearsay during the period of

10 the conspiracy.

11        MR. O'REILLY:  If it's offered.

12        THE COURT:  One at a time.

13        MR. O'REILLY:  Sir, if the statements are

14 offered by the government, it's admissible as

15 non-hearsay, but offered by the own defendant for his own

16 -- offered for the truth, that hearsay party can't offer

17 their own statements under the rules.

18        THE COURT:  You can give me a brief on that on

19 Monday, but that objection will be overruled.

20    (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

21 WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

22 PRESENCE AND HEARING OF THE JURY.)

23        THE COURT:  Overruled.

24 Q.  (BY MR. SPRINGER)  I'm going to strike that

25 question.  Okay?  Do you remember living in a condominium

1  with me and Clayton after he was born on 71st Street

2  between Riverside and Lewis in Tulsa, Oklahoma?

3  A.   Yes.

4  Q.   And do you remember me having a very old bus that I

5  traveled around in?

6  A.   Yes.

7  Q.   That was parked outside?  Thank you.  And isn't it

8  true that one day you came home and you were surprised by

9  several IRS agents?  Do you remember that?

10 A.   I don't remember them being there.  I think I just

11 came home and things were already gone.

12 Q.   So they weren't -- so at the time that you came home

13 you don't remember the agents being there?

14 A.   No.

15 Q.   But you came home and what did you find when you

16 came home?

17 A.   That our furniture was gone.

18 Q.   Our furniture was gone.  Is that all that was gone?

19 A.   No.  But I don't remember what all was gone.

20 Q.   Had pictures been taken off the walls?

21      MR. O'REILLY:  Your Honor, we would ask the

22 witness to speak up.  We can't hear her.

23      THE COURT:  Yes, if you would do your best,

24 please.

25      THE WITNESS:  I can't remember what all was

1  gone.  I think all that was left was the baby things and

2  clothing.

3  Q.  (BY MR. SPRINGER)  And the cars were gone?

4  A.  Yes.

5  Q.  And when you found out, wasn't I doing a meeting at

6  71st and Lewis?

7  A.  I don't remember.

8  Q.  Okay.  Did you subsequently find out that the IRS

9  was taking that property based upon me owing withholding

10  taxes on former employees?

11  A.  I found out that the IRS took it, I don't remember

12  why.

13  Q.  You said earlier that -- you first said I owned a

14  car lot and then you said I had partners.  Do you

15  remember that testimony?

16  A.  Yes.

17  Q.  Was former Senator Warren Green one of my partners?

18  Do you remember?

19  A.  The name sounds familiar.

20  Q.  What about a Vernon Pittman?

21  A.  Sounds familiar.  I think he was a financial backer.

22  Q.  Safe to say he was the corporate officers?

23  A.  The money behind it.

24  Q.  Money-wise?

25  A.  Yes.

REGINA CARLSON - CROSS BY MR. SPRINGER                    959

```
 1   Q.   I did not have -- scratch that.  Now, at the time
 2   that you find out that they had taken everything but
 3   clothes and a couple of baby items out of the house and
 4   the cars, did you also find out that they had cleared out
 5   a checking account that we had?
 6   A.   We had a checking account?
 7   Q.   If you don't remember, you don't remember.
 8   A.   I don't remember.
 9   Q.   Okay.  Isn't it safe to say that when we got married
10   how I lived my life was different than after the IRS came
11   along?
12   A.   Yes.
13   Q.   Dramatically changed, didn't it?
14   A.   Yes.
15   Q.   In fact, you testified earlier about sometimes we
16   had nice cars and sometimes we had crappy ones.  Do you
17   remember that?
18   A.   Yes.
19   Q.   But we always had a car to get around in, right?
20   A.   Yes.
21   Q.   And that was important, wasn't it?
22   A.   Yes.
23   Q.   Sometimes I would buy a car for $500 and spend hours
24   getting it really as good as I could, wouldn't I?
25   A.   Yes.
```

1   Q.   One time I even bought a hearse, didn't I?

2   A.   Yes.

3   Q.   Cut the back of it off?

4   A.   Yes.

5   Q.   Turned it into a truck?

6   A.   Yes.

7   Q.   We went to garage sales with it, didn't we?

8   A.   Yes.

9   Q.   That was our garage sale truck, wasn't it?  Strike

10  that question.  Now, you testified earlier that you

11  didn't know where I got money, specifically, but you did

12  know that people gave me donations, didn't you?

13         MR. O'REILLY:  Objection, Your Honor, basis of

14  knowledge.

15         THE COURT:  Answer if you know.

16         THE WITNESS:  Yes.

17  Q.   (BY MR. SPRINGER)  And, in particular, isn't it true

18  that I would go to a meeting and come back with money

19  from the meeting?

20  A.   Yes.

21  Q.   And isn't it true that most of the time the money

22  that was gathered at those meetings was in cash?

23  A.   Yes.

24  Q.   Now, you testified that I traveled around a lot, but

25  more at the end of our marriage than at the beginning of

```
 1   the marriage.
 2   A.   Yes.
 3   Q.   Do you remember that?  Is it safe to say that the
 4   travel started increasing after the IRS came and took the
 5   cars and cleaned the stuff out of the house?
 6   A.   Yes.
 7   Q.   Now, in 1995, we had Abigail; is that correct?
 8   A.   Yes.
 9   Q.   And after we had recovered from all the cars being
10   gone, we started moving back up out of the crappy cars
11   into the better cars; isn't that safe to say?
12   A.   Eventually.
13   Q.   Eventually.  It was a slow progression, wasn't it?
14   A.   Yes.
15   Q.   Now, for a short time in 1995, we had assumed a loan
16   on a house in Branson, Missouri; is that true?
17   A.   I believe so.
18   Q.   Okay.  And we were there for -- that house was there
19   for a little over a year, right, that we lived in it?
20   A.   Yes.
21   Q.   Of course, I traveled a lot at this time too; isn't
22   that true?
23   A.   Yes.
24   Q.   And I would leave in a bus that I had and I would
25   come back and I would have a whole bunch of money,
```

```
 1   wouldn't I?
 2   A.   You had money.  I never knew how much.
 3   Q.   Okay.
 4   A.   More than when you left.
 5   Q.   Thank you.  More than when I left.  Now, after 1994,
 6   I couldn't have afforded to buy barely a crappy car, let
 7   alone a bus; isn't that true?
 8   A.   Yes.
 9   Q.   But there were people that you know specifically,
10   isn't it true, that gave me money to buy a bus?
11   A.   Yes.
12   Q.   And was one of those ladies Barbara Sparks?
13   A.   Yes.
14   Q.   But there were other people who chipped in on that
15   too, right?
16   A.   Yes.
17   Q.   And in 1996, isn't it true that those same group of
18   people felt concerned about your and my well-being and
19   our children and came up with almost $40,000 to help us
20   try to get a home in the Tulsa area or in the Sapulpa
21   area.  Do you remember that?
22   A.   Yes.
23   Q.   And at first we were looking at buying some land and
24   putting a trailer on it.  Do you remember that?
25   A.   Yes.
```

1   Q.   But instead we settled on Mr. Moore and Mr. Smith's

2   property out there in Kellyville; isn't that true?

3   A.   Yes.

4   Q.   Now, we never purchased that property in our own

5   name, did we?

6   A.   No.

7   Q.   In fact, the SLCA Family Trust was set up for the

8   sole purpose of acquiring that piece of property; isn't

9   that true?

10        MR. O'REILLY:  Objection, Your Honor, basis of

11   knowledge.

12        THE COURT:  Why don't you establish certain

13   knowledge before you get into that.

14   Q.   (BY MR. SPRINGER)  Are you familiar with the name

15   SLCA Family Trust?

16   A.   Yes.

17   Q.   Okay.  And do you remember whether or not that trust

18   was established prior to acquiring property out in

19   Kellyville?

20   A.   No, it was -- that was the sole purpose of it was

21   for the house.

22   Q.   And do you know what SLCA stands for?

23   A.   Yes.

24   Q.   Could you tell the Court?

25   A.   Sidney, Landon, Clayton, Abigail.

1   Q.   And those are my two children from a previous

2   marriage and then your and my two children; is that

3   correct?

4   A.   Yes.

5   Q.   Couldn't have had that established in -- before Abby

6   was born, could we have?

7   A.   No.

8   Q.   And so the people who gave us money gave us money to

9   use through this trust to buy a piece of property; is

10  that correct?

11  A.   Yes.

12  Q.   And isn't it true that the reason why that that had

13  to be done that way or the reason why the people who gave

14  the money wanted it done that way was so that no matter

15  what the IRS could never take that home from us?

16  A.   I guess.  I don't remember talking with them about

17  it or them telling me exactly why, so --

18  Q.   Wasn't it your concern that if something happened to

19  me where would you live and who would take care of you

20  and the kids?

21  A.   Yes.

22  Q.   Okay.  Did we -- did we -- excuse me, strike that.

23  So as of 1996, a piece of property with -- a piece of

24  property out in Kellyville was purchased directly by SLCA

25  Family Trust.  Do you remember that?

```
1   A.   Yes.

2   Q.   And do you remember who the trustees to that trust

3   were?

4   A.   Yes.

5   Q.   Who are they?

6   A.   You and I.

7   Q.   And do you know who the beneficiaries are?

8   A.   Yes.

9   Q.   Who are they?

10  A.   Sidney, Landon, Clayton, and Abigail.

11  Q.   And as far as you know, there's nothing going on on

12  that property -- there's no rent being charged on that

13  property or any crops being grown on it or anything that

14  would generate income off of that property, as far as you

15  know?

16        MR. O'REILLY:  Objection only to relevance to

17  this line of cross-exam.

18        THE COURT:  How much more do you have along this

19  line?

20        MR. SPRINGER:  None.  None.

21        THE COURT:  Be overruled.  We'll hear an answer,

22  then we'll move on.

23        THE WITNESS:  Not to my knowledge.

24  Q.   (BY MR. SPRINGER)  Now, when we first saw the

25  property, there was just a garage there, right?
```

1    A.    A garage and a foundation.

2    Q.    And a foundation.  And they're separate, aren't

3    they?

4    A.    Yes.

5    Q.    And isn't it true instead of buying a trailer and

6    some land we decided to get this -- take this garage and

7    turn it into a three-bedroom house?

8    A.    Yes.

9    Q.    And so in addition to acquiring the property, we

10   also spent quite a bit of money making it a three-bedroom

11   house?

12   A.    Yes.

13   Q.    And isn't it true that the same source of that money

14   is the same source of the money that was used to acquire

15   the property?

16   A.    I don't know.

17   Q.    Other than money that people would give me when I

18   would speak or travel, as far as the ministry goes, do

19   you know of any other source of money that I would have

20   had, if you know, other than these people giving money?

21   A.    No.

22   Q.    And you had had several or at least a few meetings

23   with some of the people who gave us money, had you not?

24   A.    Yes.

25   Q.    So you were aware that they were giving money for

REGINA CARLSON - CROSS BY MR. SPRINGER                          967

```
 1   that purpose?
 2          MR. O'REILLY:  Your Honor, objection, time frame
 3   of when she had meetings with these people.
 4          THE COURT:  That's appropriate.
 5          MR. SPRINGER:  Okay.  Got it.
 6   Q.  (BY MR. SPRINGER)  After 1994, when the IRS came in
 7   and took everything that we had, did you begin to develop
 8   relationships with, like, for instance, Mrs. Sparks we
 9   spoke of earlier?
10   A.  Yes.
11   Q.  And, specifically, you'd actually go by her house
12   and see her on your own, wouldn't you?
13   A.  Yes.
14   Q.  And up until maybe let's say 1997, would you say
15   that you developed at least somewhat of a relationship
16   with Mrs. Sparks?
17   A.  Yes.
18   Q.  And Mrs. Davenport, do you know who she is?
19   A.  Yes.
20   Q.  Same type of relationship with her?
21   A.  Yes.
22   Q.  There are others, aren't there?  Just hard to
23   remember their name?
24   A.  I can't remember anybody else.
25   Q.  Times when you would visit meetings that I was
```

1  putting on, would you notice that there were lots of

2  people there?

3  A.   Yes.

4  Q.   Generally speaking, do you know whether the people

5  that were at those meetings shared in the mission of

6  Bondage Breakers Ministry?

7  A.   Yes.

8  Q.   Isn't it true that mission is to help get rid of the

9  Internal Revenue Service?

10  A.   Yes.

11  Q.   Not incomes taxes, correct?

12  A.   Yes.

13  Q.   Thank you.  Now, in 1997, you and I were already

14  having marriage problems, correct?

15  A.   Yes.

16  Q.   And it's because I was basically spending so much

17  time away from home; is that right?

18  A.   Yes.

19  Q.   And I was spending time living in a bus, correct?

20  A.   Yes.

21  Q.   Now, when we first acquired through SLCA Family

22  Trust the pieces of property and the -- you testified the

23  garage that turned into a house, we couldn't move into

24  that house right away; isn't that true?

25  A.   Right.

REGINA CARLSON - CROSS BY MR. SPRINGER                      969

1  Q.   And so for a few months anyway while they were

2  turning the garage into a house, we lived in a bus,

3  didn't we?

4  A.   Yes.

5          MR. O'REILLY:  Your Honor, objection, relevance

6  of this line of cross-examining.

7          THE COURT:  Overruled at this point.

8  Q.   (BY MR. SPRINGER)  And, now, in 1997, do you

9  remember me showing you a $100,000 gift from the Infinity

10  Group Company?

11  A.   No.

12  Q.   Do you remember opening up a savings account with me

13  over at Security Bank at 51st and Harvard?

14  A.   Yes.

15  Q.   Do you remember the source of the deposit was the

16  Infinity Group Company's money they gave to me?

17  A.   I don't remember.

18  Q.   Do you not remember the Infinity Group Company?

19  A.   No.

20  Q.   Okay.  But you do remember somebody gave me a lot of

21  money?

22  A.   Yes.

23  Q.   And it wasn't -- it wasn't normal, was it?

24  A.   No.

25  Q.   We had gone from getting 10, 20, 50, and $100 gifts

1  to six-digit figures, right?

2  A.   Yes.

3  Q.   Now, prior to opening up that savings account, do

4  you remember why I wouldn't open up a checking account?

5  A.   I don't remember you giving me the exact reason

6  why.  I assume it had --

7          MR. O'REILLY:  Objection, Your Honor.

8          THE COURT:  We won't have assumptions.

9          MR. SPRINGER:  Right.  You got it.

10 Q.   (BY MR. SPRINGER)  In 1994, after the IRS raided the

11 home -- the condominium that we lived in, do you remember

12 them also taking any money that we or I had in a checking

13 account?

14 A.   I don't remember.

15         MR. O'REILLY:  Objection.  Asked and answered.

16 She said she didn't remember a checking account.

17         MR. SPRINGER:  I got it.

18 Q.   (BY MR. SPRINGER)  We opened up the savings account

19 at the Security Bank and wasn't it solely to receive the

20 money that this organization that you don't remember the

21 name of had committed to giving us?

22 A.   Yes.

23 Q.   And prior to that time period, had you ever heard me

24 mention that organization whatsoever?

25 A.   No.

1  Q.   Even though you don't remember the name today, it

2  was a new source of revenue, wasn't it?

3  A.   (nodded head)

4  Q.   And do you remember whether or not they gave us over

5  a million dollars?

6  A.   It seems like that.

7  Q.   And do you also remember whether or not -- or also

8  remember within three weeks the United States Government

9  had frozen that account?

10 A.   Yes.

11 Q.   I believe -- scratch that.  And at that point, when

12 that money was taken, do you remember whether I fought to

13 get that money back?

14 A.   Yes.

15 Q.   And do you remember what state I had to travel in to

16 fight to get it back?

17 A.   No.

18       MR. O'REILLY:  Your Honor, objection.  Beyond

19 the scope of direct and relevance.

20       THE COURT:  Counsel will approach.

21    (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND

22 OUT OF THE HEARING OF THE JURY.)

23       THE COURT:  As Mr. O'Reilly will no doubt

24 attest, I have been pretty liberal with you.  But it

25 strikes me that what we're getting into now is, if it's

 1   relevant at all, it's -- and I emphasize "at all" -- it's

 2   relevant during your case, and it certainly doesn't have

 3   anything to do with the direct examination of this

 4   witness.

 5       Now, I don't want to -- I don't want to

 6   unnecessarily inconvenience you and I don't want to

 7   unnecessarily inconvenience the witness, so give me

 8   just -- without arguing relevance, because it's not

 9   relevant at this point, give me at least some

10   understanding of how much more you've got along this

11   line.

12            MR. SPRINGER:  A couple more minutes on this

13   line and then --

14            THE COURT:  And then what?

15            MR. SPRINGER:  Then I'm going to go into 2000 to

16   2005, which is what Mr. O'Reilly asked her on direct

17   examination about the children, subsistence, how much

18   money I gave her, all the -- cash, why I paid in cash.

19            THE COURT:  That's probably fair game.

20            MR. SPRINGER:  Can I say one more thing about --

21   just so the Court can know where I'm going on the other?

22   I told the jury in opening at the same time there was a

23   reason why I didn't have a checking account, and I'm

24   trying to establish with a very credible witness that

25   Mr. O'Reilly opened the door on when he started asking

1    her about why I spent -- paid her in cash or why I gave

2    her cash to go buy groceries.  And I told the jury that I

3    would show them that those were -- there was a legitimate

4    reason for that, and I'm just about done doing that.

5           THE COURT:  Well, you're going to -- I'll

6    probably hold you to the two minutes and then you need to

7    come back up into the --

8           MR. SPRINGER:  2000.

9           THE COURT:  Now, while you're all here, on the

10   conversation I had a little while ago with Mr. O'Reilly,

11   my problem was then and is now that with respect to the

12   government's objections to statements made by these

13   defendants as hearsay is that if it could possibly go to

14   the defendants' state of mind, and the question on the

15   floor at that time certainly could because it went to

16   discussions about paying taxes or filing tax returns, if

17   it could possibly go to the defendants' state of mind

18   during the relevant period, then it's not hearsay.  And I

19   was and am thoroughly perplexed by a hearsay objection to

20   that.  Now, I may be right, I may be wrong, but I think

21   all parties deserve some understanding of what my

22   reasoning is for your continuing guidance.

23          MR. SPRINGER:  Thank you.

24          THE COURT:  You may resume.

25          MR. O'REILLY:  Thank you, Your Honor.

```
 1        (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,
 2   WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE
 3   PRESENCE AND HEARING OF THE JURY.)
 4   Q.  (BY MR. SPRINGER)  So when we got married, as far as
 5   you knew, there were no tax problems?
 6   A.  As far as I knew.
 7   Q.  As far as you knew.  Right before Clayton was born,
 8   you found out that at least the IRS thought we had a tax
 9   problem.
10        MR. O'REILLY:  Objection.  Asked and answered,
11   Your Honor.
12        THE COURT:  Well, he's just setting the stage.
13   Go ahead.
14   Q.  (BY MR. SPRINGER)  Then we went through the
15   beginning of Bondage Breakers Ministry and then we had
16   everything cleaned out of our condominium by the IRS and
17   then we had --
18        MR. O'REILLY:  Objection.  The defendant is
19   testifying from counsel table.
20        THE COURT:  Mr. Springer, in this sort of a
21   situation I think it's especially necessary for you to
22   chop up your questions into pieces rather than give your
23   own narrative.
24        MR. SPRINGER:  Sorry, Your Honor.
25   Q.  (BY MR. SPRINGER)  After 1997, when the government
```

```
 1  came and took all the money in the savings account, we
 2  were under a freeze order by a court, were we not?
 3  A.   I don't remember.
 4  Q.   Okay.  Was it safe to say that after that occurrence
 5  took place, whatever -- whatever position we were in in
 6  our marriage, within a year and a half or so, we were
 7  getting divorced?
 8  A.   Yes.
 9  Q.   Okay.  And Mr. Snoke (sic) asked you questions about
10  you didn't hire a lawyer, correct?
11  A.   Correct.
12  Q.   And it --
13          MR. O'REILLY:  Just for the record, Your Honor,
14  it was Mr. O'Reilly that asked --
15          MR. SPRINGER:  I'm sorry.  Mr. Snoke.  I'm
16  sorry.  Mr. O'Reilly was --
17  Q.   (BY MR. SPRINGER)  Now, he also told you that I kept
18  the house -- or asked you did I get to keep the house and
19  you said yes.  You really meant -- isn't it true you
20  meant that I'm still in possession of the house?
21  A.   Yes.
22  Q.   That you and I are still trustees over that house?
23  A.   Yes.
24  Q.   Our children are still beneficiaries to that
25  property?
```

```
 1   A.   Yes.
 2   Q.   And that in 1999 when we got divorced that you were
 3   allowed to take everything that you wanted out of the
 4   house; isn't that true?
 5   A.   Yes.
 6   Q.   In fact, there was very little left in the house;
 7   isn't that true?
 8   A.   True.
 9   Q.   Do you remember whether you left me a fork or not?
10   A.   Probably not.
11   Q.   But it was your choice not to live in the house;
12   isn't that correct?
13   A.   Yes.
14   Q.   Now, as part of the agreement, the divorce agreement
15   that we accomplished without attorneys, that you
16   testified we accomplished without an attorney, did you
17   get alimony in there as well?
18   A.   Yes.
19   Q.   And you testified earlier child support, correct?
20   A.   Yes.
21   Q.   And then you testified also too that we didn't have
22   to go -- I increased the child support, correct?
23   A.   Yes.
24   Q.   I didn't make you take me to court over that, did I?
25   A.   No.
```

1   Q.   As a matter of fact, I offered it before you asked

2   for it, didn't I?

3   A.   Yes.

4   Q.   And isn't it true that as far as the care of Abby

5   and Clayton go, that child support doesn't just conclude

6   at $300 or $350 per month per child, does it?

7   A.   No.

8   Q.   There's also $150 a month for insurance; isn't that

9   true?

10  A.   Yes.

11  Q.   And now, Clayton, he at about a year old, he -- we

12  don't know why -- scratch that.  Clayton is Type 1

13  diabetic, is he not?

14  A.   Yes.

15  Q.   And just right after he got his second DPT shot,

16  didn't he go into a coma?

17  A.   No.  He almost did.

18  Q.   Almost did.  And when he emerged out of that almost

19  coma, he was a Type 1 diabetic; isn't that true?

20  A.   Yes.

21  Q.   Well, we didn't have any insurance for Clayton, did

22  we?

23  A.   No.

24  Q.   Now, alimony in the divorce decree or the agreement

25  was contingent upon you not being remarried, correct?

REGINA CARLSON - CROSS BY MR. SPRINGER                    978

```
 1  A.   Correct.
 2  Q.   So as soon as you were to get remarried, the alimony
 3  would stop, but the child support would never stop, isn't
 4  that true, until they turned 18 years of age?
 5  A.   Yes.
 6  Q.   Okay.  And you testified earlier that I think you
 7  said dance lessons I paid for?
 8  A.   Partial.
 9  Q.   Partial.  Piano lessons?
10  A.   No.
11  Q.   Who bought the piano?
12  A.   Oh, you bought the piano, but not the lessons.
13  Q.   Okay.  So it's safe to say that anything that Abby
14  and Clayton would need that you and I would sit down and
15  make a decision about what we were going to do and then
16  we'd do it; isn't that right?
17  A.   Yes.
18  Q.   We continue to be, to this day, the parents of
19  Abigail and Clayton; isn't that right?
20  A.   Yes.
21  Q.   Now, during 2000 through 2005, Clayton and Abigail
22  lived with you, correct?
23  A.   Yes.
24  Q.   But we shared joint custody; isn't that correct?
25  A.   Yes.
```

REGINA CARLSON - CROSS BY MR. SPRINGER                          979

1    Q.   Okay.  Now, when you got married, which is where
2    Carlson comes from; is that correct?
3    A.   Yes.
4    Q.   That was within about a year or so of our divorce;
5    is that right?
6    A.   Yes.
7    Q.   Now, when you moved into a rental house in Sapulpa,
8    it needed some carpet and so forth, didn't it?
9    A.   I don't remember.
10   Q.   Do you remember whether I --
11   A.   When I bought?
12   Q.   When you bought, I'm sorry.
13   A.   Yes.
14   Q.   Do you remember who paid for Abby and Clayton's
15   carpet?
16   A.   You.
17   Q.   And what about furniture?  That you didn't get from
18   the divorce?  Sorry.
19   A.   Yes, Clayton.
20   Q.   Right.  So anything that would go on in their two
21   bedrooms or in their two lives, if you needed it and you
22   needed to involve me in it, all you had to do was ask; is
23   that right?
24   A.   Yes.
25   Q.   If I ever said no, it's a rare occurrence, isn't it?

1  A.  Yes.

2        THE COURT:  Mr. Springer, you've adequately

3  covered these family members.  Unless there's something

4  I'm missing, I think it's time to move on.

5  Q.  (BY MR. SPRINGER)  So in 2000, you testified --

6  excuse me.  You testified that the entire time I've given

7  you child support or alimony I've always asked for a

8  receipt.

9  A.  Yes.

10  Q.  Is that true?  And isn't it so there's evidence the

11  payment was made?

12  A.  Yes.

13  Q.  And it helps both of us, doesn't it?

14  A.  Yes.

15  Q.  In 1997, when we opened up that savings account, do

16  you remember going and buying a used Lexus and a new

17  Mercedes with me?

18  A.  I remember buying the Lexus.

19  Q.  The Lexus from Lexus of Tulsa?

20  A.  I don't know.

21  Q.  Okay.  And do you remember at some point in time

22  that the government came and took those cars?

23  A.  Yes.

24  Q.  Were you ever told why they took them?

25        MR. O'REILLY:  Excuse me, Your Honor.  I didn't

```
 1   understand the question.
 2           THE COURT:  It was, was she ever told why they
 3   took them.
 4           MR. O'REILLY:  I'm sorry.
 5           THE WITNESS:  Yes.
 6   Q.  (BY MR. SPRINGER)  Why did they take them?
 7   A.  I believe it was because they were purchased with
 8   the money that was from the --
 9   Q.  Infinity Group Company?
10   A.  -- Infinity Group.  Am I wrong?  That's just what I
11   remember.
12           MR. SPRINGER:  No further questions, Your Honor.
13           THE COURT:  Mr. Stilley.
14           MR. STILLEY:  No questions.
15           THE COURT:  Redirect.
16                     REDIRECT EXAMINATION
17   BY MR. O'REILLY:
18   Q.  Ms. Carlson, with respect to your children for the
19   years -- after you divorced Mr. Springer, since that
20   point in time, have you filed tax returns?
21   A.  Yes.
22   Q.  Do you declare your children as dependents on your
23   tax returns?
24   A.  Yes.
25   Q.  During the time that you were married to
```

```
 1   Mr. Springer, did you file state income tax returns?

 2   A.   No.

 3            MR. O'REILLY:  Nothing further, Your Honor.

 4            THE COURT:  Any recross limited to redirect?

 5            MR. SPRINGER:  May I have a moment, Your Honor?

 6            THE COURT:  You may.

 7            MR. SPRINGER:  No redirect (sic), Your Honor.

 8            THE COURT:  Mr. Stilley?

 9            MR. STILLEY:  No questions.

10            THE COURT:  You may step down.  We'll have the

11   government's next witness.

12            MR. O'REILLY:  Your Honor, the United States

13   calls Ms. Tiffini Berman.

14            THE COURT:  Very well.  And for the benefit of

15   all concerned, we're going to take our lunch recess at

16   about ten minutes till twelve today.  For the jury, does

17   an hour and 15 minutes still seem workable?  Okay.  Very

18   well.

19            MR. O'REILLY:  I apologize, Your Honor.  Your

20   Honor, if I may approach the witness simply to take an

21   exhibit down.

22            THE COURT:  You may.

23                      TIFFINI BERMAN,

24   (WITNESS SWORN)

25                    DIRECT EXAMINATION
```

```
 1   BY MR. O'REILLY:
 2   Q.   Please state your name and spell your first and last
 3   name for the court reporter.
 4   A.   It's Tiffini, T-I-F-F-I-N-I, Berman, B-E-R-M-A-N.
 5   Q.   How old are you, Ms. Berman?
 6   A.   I am 31.
 7   Q.   Where do you live?
 8   A.   Here in Tulsa.
 9   Q.   How long have you lived in Tulsa?
10   A.   Oh, maybe 12 years or so.
11   Q.   What is your level of education?
12   A.   Completed high school and went to cosmetology
13   school.
14   Q.   Are you currently employed?
15   A.   No, stay-at-home mom.
16   Q.   How long have you been a stay-at-home mom?
17   A.   Oh, a little over a year, I would suppose, about a
18   year and a half.
19   Q.   Do you know an individual by the name of Lindsey
20   Springer?
21   A.   Yes.
22   Q.   Do you see Mr. Springer in the courtroom today?
23   A.   Yes.
24   Q.   Could you identify him, please?  Just point him out,
25   what's he wearing.  Or is he the one standing up?
```

```
 1  A.    Yeah, right there.

 2             MR. O'REILLY:  May the record reflect

 3  Mr. Springer has been identified by the defendant (sic)?

 4             THE COURT:  I think you need to say that again.

 5             MR. O'REILLY:  Has been identified by the

 6  witness.  Thank you, Your Honor.

 7             THE COURT:  The record will so reflect.

 8             MR. O'REILLY:  No, actually, he did stand up, so

 9  --

10  Q.   (BY MR. O'REILLY)  How did you first meet

11  Mr. Springer?

12  A.    We met at an airport, I believe in St. Louis.

13  Q.    When was this?

14  A.    Back in 1999.

15  Q.    Do you recall when during the year it was, what

16  month or --

17  A.    I believe it was summer, June, July.

18  Q.    What was the occasion that led to your meeting

19  Mr. Springer?

20  A.    Well, I was in the airport to travel to see my

21  family in Minnesota and we were actually coming back, so

22  we, I believe, had the same flight.

23  Q.    For a return flight here to Tulsa?

24  A.    Yes, I believe.

25  Q.    And how is it that you actually were introduced to
```

```
 1  Mr. Springer?
 2  A.   It's kind of vague, but from what I remember, he had
 3  offered to help with my grandmother and I's luggage and I
 4  had a three-month-old at the time, and I think we had
 5  nicely refused and handled it ourselves.  Got on the
 6  plane and then we had to de-plane because of mechanical
 7  problems.  And then afterwards he had offered again and
 8  made some conversation with us and my grandmother said,
 9  okay, and so he helped us.
10  Q.   Your grandmother was traveling with you?
11  A.   Yes.  And so we walked to the concourse, whatever
12  way across the airplane, of course, or on the opposite
13  side of the airport.
14  Q.   Because you had to switch planes?
15  A.   Yes.  So we conversated then.
16  Q.   How old were you at the time?
17  A.   I was 21.
18  Q.   Did Mr. Springer indicate what he did?
19  A.   Yes.  He said he was in the ministry.
20  Q.   Did you get in touch with Mr. Springer after that
21  flight?
22  A.   Yes.  I believe he gave my grandmother and I his
23  phone number because we were discussing on the plane and
24  as we were walking, too, about churches and local
25  churches and I think we were going to either try his
```

1  church or he was going to try ours, so --

2  Q.   And so did you telephone him?

3  A.   I think that he had telephoned me.

4  Q.   When was that?

5  A.   Within maybe a week's time of this meeting.

6  Q.   Did you develop a relationship with respect to

7  Mr. Springer?

8  A.   Yes.

9  Q.   What was the nature of that relationship?

10  A.   I'm sorry?

11  Q.   What was the nature of that relationship?

12  A.   Well, I think within a few months of us meeting he

13  had offered for me to do his tape ministry.

14  Q.   Let me just -- you said he had offered for you to do

15  what?

16  A.   His tape ministry.

17  Q.   And what do you mean by that?

18  A.   Duplicating recorded sessions that he would hold

19  here in Tulsa.  I would just get the tape and it would be

20  silent on the machine and I would record it and then

21  distribute it.

22  Q.   Is that something you did just -- why did you do

23  this?

24  A.   Why did I do this?  Well, I was a stay-at-home mom

25  and the company that I had previously worked for had gone

1  bankrupt and they had allowed several severance pays and

2  whatnot, which allowed me to stay home for a while, but

3  that was coming to an end shortly.  And he was aware of

4  that and he had offered because a lady that was doing it

5  previously was no longer going to be doing it and this

6  would be, you know, a perfect position for me to do to

7  allow me to stay home with my son.  So I said, okay, and

8  I did that.

9  Q.   So did you do this for free?

10 A.   No, huh-uh.

11 Q.   Did Mr. Springer pay you?

12 A.   Yes.  Yes.

13 Q.   Do you recall how much, roughly?

14 A.   You know, to this day, no, I -- honestly, I don't

15 remember.  I don't remember.

16 Q.   Okay.  Do you remember the form of payment?

17 A.   I believe it was cash, uh-huh.

18 Q.   And you received that cash from whom?

19 A.   From Mr. Springer.

20 Q.   Now, did you have a personal relationship with

21 Mr. Springer?

22 A.   Yes.  Within, I would say, maybe six to nine months

23 or so after meeting, yes, we became boyfriend/girlfriend

24 and then shortly thereafter engaged.

25 Q.   So you started doing the tape duplicating before you

1  were dating?

2  A.   Yes, we were solely friends.

3  Q.   While you were dating did -- from what period of

4  time did you date Mr. Springer?

5  A.   I would say just roughly off the top of my head,

6  maybe January, February, March of 2000 up until either

7  2003 or 2004.

8  Q.   During that time period while you were dating, did

9  Mr. Springer buy you anything?

10  A.   Oh, yes, uh-huh.  Sure, uh-huh.

11  Q.   What types of things would Mr. Springer buy you?

12  A.   Well, an engagement ring, clothes, you know,

13  jewelry, furnishings for the home that we would

14  eventually move into together.

15  Q.   Where were you living at this time?

16  A.   When I met him, I had my own apartment.  And then

17  when we had developed into a relationship and then within

18  maybe a few months of an engagement, I moved into a condo

19  here in Tulsa.

20  Q.   Who paid for -- was it a condo that you owned or

21  that you rented?

22  A.   Rented.

23  Q.   Who paid the rent?

24  A.   Lindsey did because that would be the condo we would

25  eventually move into.

1  Q.   Do you recall how much the rent was?

2  A.   A thousand a month, I believe.  A thousand to 1,200

3  maybe.

4  Q.   Did you ever go shopping with Mr. Springer?

5  A.   Uh-huh.

6  Q.   When Mr. Springer made purchases, what form of

7  payment would he use?

8  A.   Always cash.

9  Q.   Who paid the rent in terms of physically handing the

10  rent over to the landlord for your condo?

11  A.   You know, I don't remember.  I don't remember if it

12  was myself or him or maybe a -- you know, a combo of both

13  of us.

14  Q.   Do you recall if you ever paid the rent?

15  A.   Yes.  Yes, I'm sure I did.

16  Q.   And in what form would you pay the rent?

17  A.   Always cash.

18  Q.   Where would you receive this cash?

19  A.   From either, you know, payment from making the tapes

20  or from Mr. Springer himself.  But I believe it was from

21  himself.  I think that was maybe in addition to the

22  payment for duplicating the tapes.

23  Q.   During the time that you were dating Mr. Springer,

24  which would have been the years 2000, 2003, 2004,

25  something like that, do you know what Mr. Springer did to

1  support himself?

2  A.   Well, he did this so-called ministry of wanting to

3  get rid of the IRS, federal taxes.

4  Q.   Do you know how that supported him, how that got him

5  money?

6  A.   You know, just people hearing his tapes and meeting

7  with different people, their support, I know that they

8  sent in money.

9  Q.   Do you know if Mr. Springer would attend criminal

10  trials?

11  A.   I'm sorry.  Say that again.

12  Q.   Do you know if Mr. Springer would attend criminal

13  trials?

14  A.   Yes.  Yes, I remember a couple.

15  Q.   Do you recall if Mr. Springer would assist people

16  who had problems with the IRS?

17  A.   Yes, I believe so.

18  Q.   Do you recall if Mr. Springer received money for

19  that?

20  A.   I believe -- I believe on some, maybe some not.

21  Q.   Okay.  Do you recall meeting an individual by the

22  name of Oscar Stilley?

23  A.   Uh-huh.

24  Q.   And when did you meet Mr. Stilley?

25  A.   I don't know, somewhere in the relationship, to be

1  honest with you.  I maybe met him once or twice and it

2  was very vague.

3  Q.  Do you recall what he looks like?  Do you see him in

4  the courtroom today?

5  A.  I think that's him.  Like I said, it was very brief,

6  so --

7  Q.  Okay.  How did it come to pass that you met

8  Mr. Stilley?

9  A.  How did it come to pass?

10  Q.  That you met Mr. Stilley.

11  A.  Maybe meeting lunch, having a lunch, you know,

12  meeting with him, either here or out of state.

13  Q.  Do you recall which state if he were out of state?

14  A.  No, huh-uh.

15  Q.  Do you know  if Mr. Springer knew Mr. Stilley?

16  A.  Yes, uh-huh.

17  Q.  How do you know that?

18  A.  I know that I would hear several conversations

19  between the two of them all the time, just being around

20  Lindsey, him on the phone with him, and I remember

21  seeing, you know, court cases with his name on it.

22  Q.  Who would show you the court cases?

23  A.  Lindsey, uh-huh.

24  Q.  When you say "he would have several conversations

25  all the time," I mean, are you saying -- what do you mean

1  by that?

2  A.    Probably, I would say close to every day or every

3  other day, throughout the day.

4  Q.    Was this throughout the time period that you were

5  dating and engaged to Mr. Springer?

6  A.    Uh-huh.

7  Q.    Is that a yes?

8  A.    Yes.  Yes.

9  Q.    I'm sorry.  You have to give yes or no answers.

10  A.    Yes.

11  Q.    "Uh-huh" doesn't work.

12  A.    And I'm not sure if he knew him when I had met

13  Lindsey.  I know it was sometime in the relationship, so

14  -- I don't know if it was prior.

15  Q.    Just so I'm clear, do you know whether before you

16  met Mr. Springer, which would have been in 1999, do you

17  know whether or not they knew each other?

18  A.    No.

19  Q.    Okay.  But after you started dating and throughout

20  that time period, is that when you're saying you know

21  whether or not they knew each other?

22  A.    Yes.

23  Q.    Do you know whether or not Mr. Springer filed

24  individual income tax returns with the IRS?

25  A.    I believe not during the time of us knowing each

1   other.

2   Q.   And why is it that you believe not?

3   A.   Because that was his sole mission, his ministry.

4   Q.   Do you know whether or not he filed income tax

5   returns with the Oklahoma Tax Commission for state income

6   taxes?

7   A.   I do not know for sure.

8   Q.   Did Mr. Springer ever make any representation to you

9   about whether or not or did you hear him speak about

10  whether or not people had to pay federal income taxes?

11  A.   Well, sure.  It's by law and he talked about that.

12  Q.   Just for clarity, what would he say?

13  A.   It has been so long.

14  Q.   I understand.  If you don't recall, don't -- but if

15  you do recall, that's what we're looking for.

16  A.   I just -- I do remember him saying that, you know,

17  by law we are to do this, but in his own opinion and as

18  representation of his ministry, he would like to have --

19  or would like to get rid of the IRS or federal income

20  taxes.

21  Q.   Okay.  So with respect to Bondage Breakers

22  Ministries, and correct me if I'm wrong, his mission was

23  to abolish the Internal Revenue Service; is that correct?

24  A.   I would say that he solely wanted to get rid of

25  federal income taxes.

TIFFINI BERMAN - DIRECT BY MR. O'REILLY                    994

```
 1   Q.   Oh, federal income taxes, not just the IRS?
 2   A.   Not just the IRS.
 3   Q.   Did you ever hear him speak about whether or not
 4   people had to pay state income taxes?
 5   A.   I'm sure he did, but I don't remember his words.
 6   Q.   You mentioned those tapes that you were duplicating
 7   for Mr. Springer.
 8   A.   Uh-huh.
 9   Q.   Did Mr. Springer charge for the tapes?
10   A.   Did he charge for tapes?
11   Q.   Yes.
12   A.   Meaning did he take a form of credit card for tapes?
13   Q.   No, did he take payment?
14   A.   Oh, did he take payment for tapes?  Yes.
15   Q.   How much payment did he take?
16   A.   I believe at the time they were $10 per tape.
17   Q.   How long did you keep duplicating tapes for
18   Mr. Springer?
19   A.   It was -- I think it was up until close to the end
20   of our relationship.  Maybe -- maybe six to nine months
21   before we had broken up, so that would be in 2003.
22   Q.   How many tapes a day on average would you duplicate?
23   A.   Oh, I would say anywhere from ten to 50.
24        MR. O'REILLY:  May I have a moment, Your Honor?
25        THE COURT:  Was that ten to 15 or ten to 50?
```

```
 1              THE WITNESS:  Fifty.

 2              THE COURT:  Fifty.

 3              THE WITNESS:  Five-zero.

 4              THE COURT:  Okay.  You may.

 5   Q.  (BY MR. O'REILLY)  Did you ever take any vacations

 6   with Mr. Springer?

 7   A.   Yes.

 8   Q.   Did you ever go to visit your parents?

 9   A.   My father, yes.

10   Q.   Where does he live?

11   A.   In Minnesota.

12   Q.   How did you get there?

13   A.   By airplane.  I should say maybe by airplane once,

14   but I know once we drove in his motor home.

15   Q.   To your knowledge, did Mr. Springer keep cash inside

16   his home?

17   A.   Yes.

18   Q.   How much?

19   A.   I have no idea.

20              THE COURT:  How much more do you have on direct?

21              MR. O'REILLY:  Just a couple more minutes, Your

22   Honor.

23              THE COURT:  We'll finish up after lunch.

24   Members of the jury, we'll take our lunch recess at this

25   point.  Please remember my usual admonition during the
```

1  luncheon recess.  We will resume at five minutes after

2  one.  And so please be available here for the security

3  officer to show you to the courtroom just a little before

4  five after one.  We'll call that one o'clock.

5      All persons in the courtroom will remain seated

6  while the jury departs.

7      (JURY EXITS THE COURTROOM)

8          THE COURT:  Ms. Berman, you may step down and,

9  of course, we'll see you at five after one.

10     Let's see, there's one thing I was going to

11 mention.  As I mentioned before, I do plan to give the

12 jury some guidance at the end of the day as to what we

13 might expect next week.  It seems to me that, as

14 Mr. Stilley mentioned, it is perhaps -- there's perhaps a

15 chance that we'll get all the evidence in next week and

16 then finish with the ensuing stages of the trial on

17 Monday of the following week, but we'll just see.  And I

18 will inquire of counsel when we recess today at 4:30 as

19 to whether there's any more thinking on that.

20     And by the way, Mr. Snoke, you'll have to forgive me

21 for snapping at you at the bench here.  The reason I did

22 is that Mr. O'Reilly is not a bad lawyer.  And if you'll

23 let him get a word in edgewise, I suspect he will

24 adequately represent the government.  Although I don't

25 want to dictate who speaks for the government, as long as

```
 1  you don't speak both at once.  And that was the problem.
 2          MR. SPRINGER:  Your Honor, earlier today,
 3  Mr. O'Reilly made you aware of the possibility of Tuesday
 4  being the close of the government's case.  And originally
 5  you had set the Daubert hearing Tuesday afternoon.  You
 6  made mention of it as being moved to Monday, but there
 7  has been nothing other than that.  And are we on a wait-
 8  and-see basis?  Because we are Friday at 4:30, within
 9  just a few hours.
10          THE COURT:  It now seems more likely than not
11  that we'll be doing the Daubert hearing Monday at 5:30.
12          MR. SPRINGER:  At 5:30.  Thank you, Your Honor.
13          THE COURT:  Court will be in recess.
14      (A RECESS WAS HAD, AFTER WHICH THE FOLLOWING
15  PROCEEDINGS WERE HAD IN OPEN COURT AND WITHIN THE
16  PRESENCE AND HEARING OF THE JURY.)
17          THE COURT:  Let's see, we were in cross-
18  examination, as I recall.
19          MR. O'REILLY:  No, Your Honor, I have not cross-
20  examined Ms. Berman.  Direct, sir.
21          THE COURT:  Direct.  Very well.
22  Q.  (BY MR. O'REILLY)  Ms. Berman, during the time that
23  you were -- was there a time you weren't living with
24  Mr. Springer?
25  A.  No.
```

1   Q.   Okay.  Were you -- during the time you were engaged

2   to or dating Mr. Springer, did he have a bank account?

3   A.   No.

4   Q.   Do you know if he utilized a check cashing

5   establishment?

6   A.   Yes.

7   Q.   Do you know where that was?

8   A.   Yes.  Where, you asked?

9   Q.   Yes, where was it?

10  A.   Around 41st and Peoria here in Tulsa.

11  Q.   Do you know the name of it?

12  A.   I don't remember.

13  Q.   Did Mr. Springer ever tell you while you were dating

14  and engaged if he paid money for child support?

15  A.   Yes.

16  Q.   What did he say about that?

17  A.   Just that he paid both of his wives and I believe it

18  was always on time, but I don't know the amount.

19  Q.   Did Mr. Springer ever make any representation to you

20  about how much money he earned?

21  A.   Yes.  During conversation with my grandmother and I

22  and him, she was inquiring as to how much he made.

23           MR. SPRINGER:  Objection, Your Honor, hearsay.

24           THE COURT:  Overruled.

25  Q.   (BY MR. O'REILLY)  Please continue.

1  A.   She was inquiring as to how much he made because it

2  was near our wedding and she wanted to make sure that he

3  was going to be a good provider for my son and I.  So he

4  said that he made well over 300,000 a year.

5  Q.   And when was it that this conversation occurred?

6  A.   I would guess probably in -- let's see, maybe 2000,

7  2001.

8  Q.   So it was early on?

9  A.   I'm sorry?

10 Q.   It was early on in your engagement?

11        MR. O'REILLY:  If I may have a moment, Your

12 Honor.

13        THE COURT:  You may.

14        MR. O'REILLY:  Nothing further from this

15 witness.

16        THE COURT:  Cross-examination.

17                  CROSS-EXAMINATION

18 BY MR. SPRINGER:

19 Q.   Good afternoon, Mrs. Berman.  You testified earlier

20 that there was a condominium that after a period of time

21 I rented for you to live in; is that correct?

22 A.   Uh-huh, yes.

23 Q.   And isn't it true that I actually moved my office

24 into that condominium on a little loft area?

25 A.   Yes, uh-huh.

1  Q.   And also isn't it true that where you duplicated the

2  tapes for the ministry that you also did that in that

3  condominium as well?

4  A.   Yes, uh-huh.

5  Q.   Okay.  Now, you testified earlier that you were

6  given charge over sending tapes out to people that were

7  asking for tapes from Bondage Breakers Ministry; is that

8  correct?

9  A.   Uh-huh, yes.

10  Q.   Okay.  And do you remember -- excuse me, strike

11  that.  Was it a requirement that people pay for a tape in

12  order to get one?

13  A.   I am not quite sure.  I believe that they had to pay

14  $10, but very well could have possibly been if they were

15  like valued as continual donators that sometimes tapes

16  were automatically sent to them because they donated sums

17  of money.

18  Q.   And do you remember ever the phrase "suggested

19  donation"?

20  A.   Yes.  Uh-huh, yes.

21  Q.   Okay.  And isn't it true that when you would send

22  the tapes out -- excuse me, strike that.  You said ten to

23  50, correct?

24  A.   Uh-huh, yes.

25  Q.   Now, in one week's time did it go from ten to 50 and

1  then back to ten?

2  A.   I don't remember.

3  Q.   Do you ever remember it reducing, it going down?

4  A.   Under ten?

5  Q.   Well, let's say that at whatever time you were at,

6  if you were at ten, did it ever go under ten?

7  A.   It very well could have, but I don't think so.  I

8  think I averaged at least ten.

9  Q.   Now, the money that was given to you for doing these

10 tapes, that was directly from me; is that correct?

11 A.   Yes.

12 Q.   And it did not hinge on whether the person you were

13 sending the tape to had actually given any money; is that

14 true?

15 A.   That was your business, but, yes, I didn't handle

16 that business directly.

17 Q.   Thank you.  And you did keep basically a little

18 receipt book that showed who all you were -- as a matter

19 of fact -- strike that.  You had a receipt book, did you

20 not, that had the address of every person on it?

21 A.   Yes.

22 Q.   Okay.  And every week you would just send out the

23 same amount of tapes basically that you had sent out --

24 or two weeks that you had sent out the week before?

25 A.   Like I said, it was anywhere from ten to 50.

TIFFINI BERMAN - CROSS BY MR. SPRINGER                          1002

```
 1  Q.   So how much were you getting per tape?
 2            MR. O'REILLY:  Objection, Your Honor.  She has
 3  testified she was --
 4            THE WITNESS:  Think about how to answer that --
 5            THE COURT:  Wait just a minute.  Go ahead.
 6  State your objection.
 7            MR. O'REILLY:  Her testimony is she got paid to
 8  duplicate the tapes, not paid based on sending them out.
 9  I believe that's what her testimony was.
10            THE WITNESS:  Right.
11            THE COURT:  Clarify that, Mr. Springer.
12            MR. SPRINGER:  Sure.
13  Q.   (BY MR. SPRINGER)  How was the amount of money that
14  you were to get every week calculated?  How was it
15  determined?
16  A.   I don't remember.  I just remember you paying me.
17  Q.   Was it a fixed amount?
18  A.   I don't remember.
19  Q.   Okay.  And you testified that at one time we took a
20  trip to Minnesota in a bus; do you remember that?
21  A.   Uh-huh.
22  Q.   Okay.  And that was a bus that had been completely
23  renovated; do you remember that?
24  A.   Uh-huh, yes.
25  Q.   Do you remember that it took quite a while to do
```

1   that?  Do you remember that?

2   A.   Yes.  Maybe a year.

3   Q.   Maybe a year, okay.  Now, when you said that your

4   grandmother asked me how much I made, was it fair to say

5   that the question was how much money did I receive yearly

6   instead of the word "made"?

7   A.   I don't think she would have said it in that term.

8   I think she said how much, you know, did you make,

9   meaning yearly.  If you knew my grandmother, you would

10  know that she would mean that, but I don't think she

11  would specifically say that.

12  Q.   You testified that you had met Oscar Stilley at one

13  or two different times; do you remember that?

14  A.   Uh-huh, yes.

15  Q.   At any time that you met with Oscar Stilley and

16  myself, do you ever remember any conversations where

17  Oscar and I were talking about attempting to defraud the

18  IRS?

19  A.   I just -- well, I just remember you wanting to get

20  rid of the IRS in terms of getting rid of federal taxes.

21  Q.   Thank you very much.

22        MR. SPRINGER:  Your Honor, may I have just one

23  second?

24        THE COURT:  You may.

25        MR. SPRINGER:  No further questions, Your Honor.

MICHAEL BURT - DIRECT BY MR. O'REILLY                                    1004

```
 1              THE COURT:  Mr. Stilley.

 2              MR. STILLEY:  No questions.

 3              THE COURT:  Any redirect?

 4              MR. O'REILLY:  No, Your Honor.

 5              THE COURT:  You may step down.  We'll have the

 6   government's next witness.

 7              MR. O'REILLY:  Your Honor, the United States

 8   calls Michael Burt.

 9              THE COURT:  Spell that last name, please.

10              MR. O'REILLY:  B-U-R-T.

11              THE COURT:  Thank you.

12              MR. O'REILLY:  Your Honor, this is a witness who

13   is incarcerated.  He's being brought up.  We thought he

14   was in there already.

15              THE COURT:  Very well.  Surely they'll just be a

16   few moments.

17              COURT SECURITY OFFICER:  Yes.

18              THE COURT:  Okay.

19                          MICHAEL BURT,

20   (WITNESS SWORN)

21                      DIRECT EXAMINATION

22   BY MR. O'REILLY:

23   Q.  Mr. Burt, where do you currently reside?

24   A.   I -- is that too low?  Should I back up?  I can't

25   tell.
```

1  Q.   Go ahead, sir.

2  A.   I am living at the Okmulgee County jail right now.

3  Q.   Prior to being at the Okmulgee County jail, where

4  were you?

5  A.   I was at the FCI Milan facility.

6  Q.   Where is that?

7  A.   In Milan.  Milan.

8  Q.   Italy or -- Milan where?

9  A.   Michigan, the state of Michigan.  Actually, it's in

10 the Eastern District of Michigan.

11 Q.   What was it that led you to being incarcerated in

12 that facility?

13 A.   I was defrauded by the federal government.

14 Q.   Were you prosecuted for tax evasion?

15 A.   I was -- I was prosecuted -- I'm not sure what --

16 the only charge was a penalty clause, 7201, which is a

17 penalty for tax evasion.  I have no idea what I evaded.

18 I evaded a -- what I evaded was a refund based on the

19 evidence in the trial.

20 Q.   Nevertheless, that's -- you're in jail right now

21 because of a conviction on that charge?

22 A.   I'm in jail for evading my refund.

23 Q.   When were you convicted?

24 A.   The -- are you talking about the conviction -- where

25 you explain the conviction, is the -- where the jury made

```
 1  their decision or are you defining it as when the judge
 2  court -- where the Court ordered an opinion?
 3  Q.   When the jury returned the verdict, sir, was that
 4  sometime --
 5  A.   The jury verdict was in May of 2008.
 6  Q.   And were you sentenced in December of that year?
 7  A.   Yes.  On December 3rd, the Court denied me an
 8  evidentiary hearing, which proved that the government
 9  lied and committed perjury in the trial, they denied the
10  hearing and ordered me to be incarcerated.
11  Q.   For what period of time were you incarcerated, sir?
12  A.   What period of time was I incarcerated?
13  Q.   How long?
14  A.   Since February of this year -- actually, March.
15  Q.   Okay.  And what was the total sentence that you were
16  -- that was imposed upon you?  How may months?
17  A.   For evading a refund, I am serving 27 months.
18  Q.   Who represented you in that trial?
19  A.   I did have counsel -- I've had three counsels all
20  together.  The first one was Alan Richey, who was
21  threatened for defending me.
22  Q.   Excuse me, sir, but just try to restrain yourself
23  and just answer the questions.
24          THE COURT:  Mr. Burt, you do have a tendency to
25  elaborate beyond the question that was asked.  If any
```

1  elaboration is appropriate, I'm confident that it will be

2  covered by other examiners, such as the defendants.  For

3  that reason, it is necessary that you listen carefully to

4  the question, answer the question that was asked, only

5  the question that was asked, and then wait for the next

6  question.

7  Q.   (BY MR. O'REILLY)  During your trial, sir, who was

8  your attorney?

9  A.   Alan Richey.

10  Q.   How did you come to find Alan Richey?

11  A.   I came to find Alan Richey because I was looking for

12  an attorney.  I had reviewed several transcripts.  I had

13  originally worked with a man named Oscar Stilley.  And

14  Oscar Stilley was not able to do the trial so I had to

15  find someone else.  I was trying to find someone who was

16  competent in income tax stuff because I was concerned

17  about what happened would happen.  And I believe -- I'm

18  trying to remember how I came across Alan Richey.  It was

19  in a trial in Connecticut that I had read some

20  transcripts or some briefings or motions, something like

21  that.  I can't remember the name of the lady in

22  Connecticut that -- I had read her stuff and I thought

23  that was good.  Same thing with Oscar, when I hired him,

24  I had asked him --

25  Q.   Actually, sir, we'll take it one step at a time.

MICHAEL BURT - DIRECT BY MR. O'REILLY                    1008

```
 1   A.   Okay.
 2   Q.   With respect to Mr. Stilley, and now I will ask you,
 3   how is it that you came to learn about Mr. Stilley?
 4   A.   I'm not sure.  Same process, when, you know, the IRS
 5   appeared at my home with a gun and asked me for a summons
 6   to come down, they wouldn't answer any questions, I
 7   thought I needed someone to represent me.  I was looking
 8   for someone -- again, I can't remember the exact
 9   process.  I remember talking to Oscar Stilley on the
10   phone.
11   Q.   I'm sorry, sir, but I guess my question was, how did
12   you even know that Oscar Stilley was somebody you should
13   call?
14   A.   Just from talking to people about who would be
15   someone who would be competent in the area.
16   Q.   Was --
17   A.   And I can't tell you who that was.  You know, I
18   don't know.  That was about ten years ago.  I guess not
19   that long ago.  About five years ago, half a decade ago.
20   Q.   You had me puzzled, sir.  With respect to
21   Mr. Stilley -- first of all, let's step back a second.
22   When was it that the IRS came to your home and served the
23   summons?
24   A.   They came in the middle of the night around the
25   middle of March of 2002, I believe.
```

1  Q.   And I'm going to ask you, if you could --

2          MR. O'REILLY:  If we could have Government's

3  Exhibit 93 that's already in evidence.

4  Q.   (BY MR. O'REILLY)  And that should come up on your

5  screen momentarily, sir.  Do you see that?

6  A.   Yes, uh-huh.

7  Q.   Do you recognize that?

8  A.   It's a check that you had showed me a week ago drawn

9  on the Somerset Ranch of Bank One in Michigan, Florida,

10  for $5,000.

11  Q.   With respect to that check, what was this check for?

12  A.   It was a retainer fee for Oscar.

13  Q.   And was this because of the situation you were

14  facing with respect to the IRS?

15  A.   Well, I didn't know what I was facing, but I thought

16  it would be wise to have counsel at that time, yes, and

17  that's what this check was for.

18  Q.   Now, I'm going to ask you if you could take a look

19  at what's in evidence as Government's Exhibit 110, which

20  is a check dated June 20, 2004, payable to Oscar Stilley

21  in the amount of $2,100.  May I ask you if you recognize

22  that check?

23  A.   Were all four of those things part of this document

24  or was this -- looks like there were four things on it.

25  This is just one piece of it.

1  Q.  Well, if you can not blow it up -- the only thing I

2  need you to look at is the only thing I think you'll

3  recognize is the actual check itself.

4  A.  Okay.  What's the rest of the stuff?

5          MR. O'REILLY:  Un-blow it up so he can take a

6  look at all of it.

7  Q.  (BY MR. O'REILLY)  Do you recognize the check number

8  138 in which appears to be a check from Michael P. Burt

9  to Oscar Stilley, Government's Exhibit 110?

10  A.  Okay.  So probably the top part is a deposit from

11  another account or something.  The fourth item, I

12  recognize it appears to be a check that I wrote, yes, to

13  Oscar Stilley.

14  Q.  And what was this check for, sir?

15  A.  Oscar had -- I had given him a $5,000 retainer on

16  the first check and after that I had had a couple of

17  letters from the IRS.  I hadn't heard from the IRS for

18  five years after that.

19  Q.  Well, actually, sir, excuse me, this check is only

20  dated two years later.

21  A.  Yes.  And two years later, I had replaced what I had

22  spent him to do.  I had not had any contact with the IRS

23  at that point.  There had been no questions or anything.

24  But I had asked him some questions and that was basically

25  just to replace the retainer that had been used.

1  Q.   So just for clarification and so I understand, you

2  were paying Mr. Stilley for legal services that he was

3  providing for you?

4  A.   Uh-huh.  That's correct.

5  Q.   I'm going to now ask you, if you could, to take a

6  look at what's in evidence as Government's Exhibit 28.

7  That should come up on the screen momentarily.  I'm going

8  to ask you if you recognize that check.

9  A.   I think this is the one that we looked at the other

10 day.  Can you blow that up, because I'm not sure.  It's a

11 check to Bondage Breakers Ministries.

12 Q.   How much is it for?

13 A.   It's for 7,500.

14 Q.   And what was the date on this check?

15 A.   It's marked August 6, 2003.

16 Q.   And is this a check that you wrote?

17 A.   I believe it is.

18 Q.   Okay.  In the memo portion, does it indicate "on

19 behalf of Posely"?

20 A.   This was a donation on behalf of the Poselys; that's

21 correct.

22 Q.   What did you understand -- had anybody given you any

23 indication of the Posely -- of whoever this Posely person

24 is needing assistance?

25 A.   The Poselys were -- actually, there was a group of

MICHAEL BURT - DIRECT BY MR. O'REILLY                    1012

```
 1  people in Phoenix, Arizona, and these were a group of
 2  people who had been indicted by the Internal Revenue
 3  Service or the Department of Justice probably and they
 4  were going through something that I was hoping I would
 5  never have to go through.  And it's a very painful
 6  process to sit in this chair in your own trial.  And I
 7  thought they needed some ministry.  I had some funds at
 8  the time to help.  And the purpose of this check was to
 9  help them through the process as I was being helped
10  through by the ministry myself.
11  Q.  But this check is sent to Bondage Breakers
12  Ministry.  What did you understand -- first of all, who
13  or what did you understand Bondage Breakers Ministry was?
14  A.  I understand and believe that Bondage Breakers
15  Ministry was a ministry to help people who are being
16  oppressed by illegal cases, very difficult playing
17  fields.  I know how difficult that can be because I've
18  been through it.  And at that time, I hadn't been through
19  it, and I knew it was bad.  Now, having been through it,
20  I know how really bad it is.  And there were times -- I
21  could not be here today without the help I got from
22  Bondage Breakers Ministry to get through this process.
23  And it was very, very helpful to me and I thought that
24  these were people who needed it as well.  I think there
25  were nine -- nine people altogether who were in the
```

1  trial, and that's what this was for.

2  Q.   My question is, what made you think that Bondage

3  Breakers Ministry had anything to do with Posely?

4  A.   What made me think -- I don't think that I -- I

5  didn't think that.  I don't think that Bondage Breakers

6  Ministries had anything to do with Poselys.  It was a

7  donation to Bondage Breakers Ministries to provide

8  ministerial support for the Poselys.

9  Q.   By "ministerial support," what did you understand

10 that -- well, first of all, who do you know that is

11 affiliated with Bondage Breakers Ministry?

12 A.   I know with Bondage Breakers Ministry, the only

13 person I know is Lindsey Springer.

14 Q.   Okay.  And let me just ask you right now, do you see

15 Mr. Springer in the courtroom today?

16 A.   Yes, I do.

17 Q.   And is he the gentleman standing up behind me?

18 A.   Yes, that's correct.

19         MR. O'REILLY:  May the record reflect that

20 Mr. Burt has identified the defendant?

21         THE COURT:  The record will reflect that he has

22 identified the Defendant Springer.

23         MR. O'REILLY:  Thank you, sir.

24 Q.   (BY MR. O'REILLY)  And do you see Mr. Stilley in the

25 courtroom today?

```
 1  A.   I haven't seen Mr. Stilley in a long time.   I
 2  believe that's Mr. Stilley, correct.
 3           MR. O'REILLY:  May the record reflect Mr. Burt
 4  has identified the Defendant Mr. Stilley?
 5           THE COURT:  The record will so reflect.
 6           THE WITNESS:  Is it possible to get some water?
 7           THE COURT:  Surely.
 8           MR. O'REILLY:  May I approach the witness, Your
 9  Honor?
10           THE COURT:  You may.  Actually, Mr. O'Reilly is
11  taking care of it.
12           MR. O'REILLY:  We're in a room with no water.
13           THE WITNESS:  Thank you.
14  Q.   (BY MR. O'REILLY)  Mr. Burt, when you described that
15  the Poselys would be receiving -- or was it a single
16  Posely?  You said there were multiple people --
17  A.   Uh-huh.
18  Q.   -- would be receiving ministerial support.  Was that
19  going to be of some assistance in this criminal matter
20  that they were facing?
21  A.   No, I think it's primarily in terms of -- primarily
22  in terms of just getting through the process.  And I
23  think when we talked, I had mentioned to you what that
24  means to me.
25  Q.   What I need you to do is just don't talk about what
```

1   you or I said outside the courtroom, just testify here as

2   to address the answers.

3   A.   Okay.  Well, what it means to me, I think probably

4   the easiest thing for me to understand what I've gotten

5   from Bondage Breakers Ministry is an example from

6   scripture from Matthew, 22nd chapter, also Mark 14.  And

7   that was at a time when there was some people who wanted

8   to crucify my Lord and Saviour and they were trying to

9   figure out how to do that.  So they went to -- they first

10  sent a group of people called the Herodians and they were

11  trying to trap him.  And he -- the first question they

12  asked was, is it lawful to pay taxes to Caesar?  That was

13  the first question.  And they talked about that.  And, of

14  course, the Lord said you should pay everything to Caesar

15  that belongs to Caesar.  And I believe in that.  Not one

16  cent less.  And equally important in Hebrew is not one

17  cent more.  And certainly not to give things to Caesar

18  that belong to God.

19       The Herodians failed, so they sent in the Sadducees,

20  and the Sadducees asked a question about the

21  resurrection.  Which is a fascinating story because they

22  don't believe in resurrection.  They were kind of like

23  undercover guys, I guess.  And that didn't pass either.

24  So they finally sent in the Pharisees.  And the Pharisees

25  sent in a lawyer.  And the lawyer asked, what is the

1  greatest commandment the law?

2      And those are the -- this is a ministry that my Lord

3  and Saviour Jesus Christ had.  This is very similar to

4  the ministry of Bondage Breakers Ministries.  With

5  Lindsey, I have talked about scripture.  I have --

6  Q.  Sir?

7  A.  -- talked about the law.

8  Q.  Okay.  I think that addresses the question.  Has

9  Mr. Springer ever told you that you shouldn't file tax

10 returns?

11 A.  Mr. Springer can -- I could go to Matthew 17 here,

12 but I'll skip that.  Mr. Springer had told me to file tax

13 returns.

14 Q.  Did Mr. Springer ever tell you not to pay taxes?

15 A.  Mr. Springer has never told me not to pay taxes.

16 Q.  Has he told you, in fact, precisely the opposite?

17 A.  Mr. Springer has told me two things, I think.  One

18 -- actually, I have to go to Matthew 17 because I think

19 that's important.  In Matthew 17 --

20 Q.  Actually, sir, I want to know what Mr. Springer told

21 you, not --

22 A.  Mr. Springer said many things.  It's hard to

23 summarize it in a yes-or-no answer, which can't be done,

24 it's not a yes-or-no answer.  But it's hard to summarize

25 because we've had several discussions.

1   Q.   Fair enough.

2   A.   Let me try to make it as concise as possible.

3   Q.   Mr. Burt, hold on.

4   A.   Okay.

5            THE COURT:  Let's start over with a fresh

6   question.  Presumably, a very focused question.

7            MR. O'REILLY:  Yes, Your Honor.

8            THE COURT:  Okay.

9   Q.   (BY MR. O'REILLY)  When did Mr. Springer tell you

10  that you should file tax returns?

11  A.   Well, Mr. Springer -- when I should file tax

12  returns -- he has never said I should file tax returns.

13  He said I should file them because the IRS had a gun to

14  my head so they should be filed.  We talked about the

15  fact that they don't comply with the law.  But

16  notwithstanding all of that, to not be here in these

17  clothes, I should provide something to the IRS that

18  they've asked for.

19           THE COURT:  Mr. Burt, the question went to time

20  and not the content of a communication.  The question

21  was, "When did Mr. Springer tell you that you should file

22  tax returns?"  Now, if the factual premise for the

23  question is something you disagree with, you can very

24  concisely say that.  Otherwise, the answer to the

25  question is to give us a time.

1       THE WITNESS:  Well, I don't disagree with the

2  question, but I'm not quite sure it's the right question,

3  the right words of the question.

4       THE COURT:  Well, nor does --

5       THE WITNESS:  To say that -- one of the first

6  things we talked about was how to do that.  And that

7  would have been around the time of 2002, I would imagine.

8  Q.  (BY MR. O'REILLY)  Let me ask you this.

9  A.  Sometime in 2002 probably.

10 Q.  Was this conversation shortly after the IRS had come

11 to your home?

12 A.  It was probably many months after that because I was

13 trying to figure out what to do with that question.

14 Probably in that same year.

15 Q.  And had you reached out and found Mr. Springer as a

16 result of the IRS coming to your home?

17 A.  I had been reaching out for a long time before the

18 IRS coming to my home because I had a situation that was

19 very unusual, I didn't know what to do with it.  And

20 nobody else did.  So I was reaching out a long time

21 before that.  But after the IRS came to my home in the

22 middle of the night and pulled the guns and said I had to

23 do this stuff, I was looking for, you know, the right

24 person to work with, I guess.  I was also having some

25 need of -- I was in need of help.  I was very distressed.

```
 1   And that's when Bondage Breakers Ministry --

 2            THE COURT:  Next question.  Go ahead.

 3   Q.   (BY MR. O'REILLY)  Did you know Mr. Springer before

 4   the IRS came to your home?

 5   A.   I don't believe so.

 6            MR. O'REILLY:  If I may have a moment, Your

 7   Honor?

 8            THE COURT:  You surely may.

 9            MR. O'REILLY:  No more questions, Your Honor.

10            THE COURT:  Cross-examination.

11       Now, Mr. Burt, the same ground rules apply.  I want

12   you to listen very carefully to Mr. Springer's or perhaps

13   Mr. Stilley's questions.  Answer only the question that's

14   asked and then wait for the next question.  Is that

15   understood?

16            THE WITNESS:  (no response)

17            THE COURT:  I need an audible answer for the

18   record.

19            THE WITNESS:  Yes, Your Honor.

20            THE COURT:  Very well.  You may proceed.

21                      CROSS-EXAMINATION

22   BY MR. SPRINGER:

23   Q.   Mr. Burt, isn't it true that you first heard of

24   Lindsey Springer on either an IFC conference call or from

25   Paul Stumpo?
```

1         MR. O'REILLY:  Objection to the form of the

2   question, Your Honor.  It's compound.

3         THE COURT:  Overruled.

4         THE WITNESS:  I think that's likely.  I can't

5   tell you exactly for sure, but that's possible I do

6   remember both of those events.  I remember talking to

7   Paul about you.  I do remember the conference calls with

8   IFC.  I can't tell you which came first or if either of

9   those were the most important one or the one.  I

10  certainly remember both of those things in that time

11  frame.

12  Q.  (BY MR. SPRINGER)  Yes or no, were you a member of

13  IFC?

14  A.  I had asked them to create a trust for me, so I knew

15  them, yes.

16  Q.  But you were not a member of their organization?

17  A.  I have no idea how I would be a member of them.  I

18  don't know -- I don't believe I'm a member.

19  Q.  You were curious, though, as to why the government

20  had brought charges against IFC, were you not?

21  A.  Absolutely, because I was not aware of any reason

22  why that would have happened.

23  Q.  And isn't it true that you became aware of IFC and

24  its promotions through a letter called -- commonly known

25  as a "Karl Letter"?

MICHAEL BURT - CROSS BY MR. SPRINGER                    1021

```
 1   A.   I'm very familiar with the Karl Letter, yes.

 2            MR. O'REILLY:  Objection.  Beyond the scope of

 3   direct and I'm not sure how this line of cross is

 4   appropriate.

 5            THE COURT:  Counsel will approach.

 6       (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND

 7   OUT OF THE HEARING OF THE JURY.)

 8            THE COURT:  That is beyond the scope of direct,

 9   and it could be excluded for that reason alone.  I have

10   discretion to allow you to go outside of the scope of

11   direct, but in order for me to do so, I need to hear a

12   pretty good reason to do that.

13            MR. SPRINGER:  How he met me, that's all I'm

14   trying to get to because that answer is not clear on the

15   record.

16            THE COURT:  Okay.  Well, he's, in some ways,

17   being slippery with you as he is with the government, so

18   you're going to have to be very focused.

19            MR. SPRINGER:  I'll go on.  I'll go on.

20       (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

21   WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

22   PRESENCE AND HEARING OF THE JURY.)

23   Q.   (BY MR. SPRINGER)  Mr. Burt, did you learn of Alan

24   Richey after reading about Nadine Griffin's case?

25   A.   Yes, Nadine Griffin was the lady I was trying to
```

1  think of.

2  Q.   Okay.  And isn't it true that after -- or that --

3  strike that.  Prior to IFC's principles being indicted,

4  they held weekly conference calls where thousands of

5  people came in and listened to them; is that correct?

6  A.   That's correct.

7  Q.   And after they were indicted, they were put under a

8  court order that they could not communicate with their

9  members or their customers; is that true?

10 A.   That's correct.

11          MR. O'REILLY:  Your Honor, objection, beyond the

12 scope of direct.

13          THE COURT:  Well, it has been answered so that

14 will be overruled.  But the same concerns apply,

15 Mr. Springer.

16          MR. SPRINGER:  I'm right there.

17 Q.   (BY MR. SPRINGER)  And isn't it true that I am the

18 person who started speaking on those conference calls?

19 A.   That's correct.

20 Q.   And does that refresh your memory about when you

21 first started hearing about the name Lindsey Springer and

22 Bondage Breakers Ministries?

23 A.   It was right back in the beginning of time --

24 beginning of that time, yes.  I think I had known

25 something before that, I can't recall.

1    Q.   Isn't it true -- excuse me, strike that.

2          MR. SPRINGER:  Could you pull up Government's

3    Exhibit Number 28, please.

4    Q.   (BY MR. SPRINGER)  Mr. Burt, isn't it true that

5    Government's Exhibit Number 22 was a --

6          THE COURT:  Is that 22 or 28?

7          MR. SPRINGER:  I mean, excuse me, 28.  I'm

8    sorry, Your Honor.

9    Q.   (BY MR. SPRINGER)  Twenty-eight was part of an

10   agreement that you and Paul Stumpo and Pat Turner and

11   Larry Simmons had agreed to give Bondage Breakers

12   Ministry?

13   A.   That's correct.  We had talked about what to do and

14   that was something that we agreed to do.

15   Q.   And this money -- this $7,500 was given because I

16   asked for it, correct?

17   A.   I'm not sure I would say that you had asked for it,

18   but I would say that we recognized that you needed to

19   spend time.  And, you know, like donating to a church,

20   ministers do things and they need to be paid for their

21   time to do that.  But it's a donation because it's what

22   you do to a minister, that's what you do to a ministry.

23   Q.   Mr. Burt, I made it very clear to you and everybody

24   else that I could not receive any money unless it was

25   unconditionally a gift; isn't that true?

```
 1    A.   Absolutely.

 2    Q.   Mr. Burt, do you know who Arthur Hawkins is?

 3    A.   Yes, I do.

 4         MR. SPRINGER:  No further questions, Your Honor,

 5    and I reserve Mr. Burt.

 6         THE COURT:  Say that again, Mr. Springer.  You

 7    reserve what?

 8         MR. SPRINGER:  I would reserve Mr. Burt on the

 9    other side as a defense witness.

10         THE COURT:  Counsel will approach.  I don't want

11    this man to stay in the Okmulgee County jail any longer

12    than necessary, so I need to hear from you.

13    (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND

14    OUT OF THE HEARING OF THE JURY.)

15         THE COURT:  As I mentioned in our last bench

16    conference, I do have the discretion to allow you to go

17    outside the scope of direct if there's something that's

18    relevant that you would like to go into with him and --

19         MR. SPRINGER:  What I told him, I can do it

20    right now, but my standby said I needed to wait and call

21    him back.

22         THE COURT:  So what is it you're going to cover

23    with him?

24         MR. SPRINGER:  Just our entire relationship that

25    the government didn't open about what we learned, what we
```

MICHAEL BURT - CROSS BY MR. STILLEY                    1025

```
 1  did, our communications, it's an intent, belief,
 2  knowledge.
 3         THE COURT:  I think we're probably going to have
 4  to wait to do that.  He'll have another wonderful
 5  weekend.
 6      (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,
 7  WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE
 8  PRESENCE AND HEARING OF THE JURY.)
 9         THE COURT:  We'll have cross-examination by
10  Mr. Stilley.
11                      CROSS-EXAMINATION
12  BY MR. STILLEY:
13  Q.  Mr. Burt, we did most of our business over the
14  telephone, correct?
15  A.  That's correct.  The first time I met you was in
16  Chicago many years after we had worked together.
17  Q.  And I believe that -- was that the only time that we
18  ever personally met?
19  A.  It could be.  No, we had met another time in Grand
20  Rapids, Michigan.
21  Q.  Now you said something -- a little something on
22  direct about threats against Alan Richey.  Can you tell
23  us what those were?
24  A.  Threats against Alan Richey, yeah, the opening, the
25  very first thing in my trial was Alan Richey was
```

1  threatened with losing -- was being sanctioned for

2  representing me, for defending me.

3          MR. STILLEY:  Pass the witness.

4          THE COURT:  Any redirect?

5                    REDIRECT EXAMINATION

6  BY MR. O'REILLY:

7  Q.  Mr. Burt, do you have any idea how Mr. Springer

8  spent the money that was sent to him?

9  A.  I have absolutely no idea.

10          MR. O'REILLY:  Nothing further.

11          THE COURT:  Any recross?

12          MR. SPRINGER:  Not at this time, Your Honor, no.

13          THE COURT:  You may step down, Mr. Burt.  You

14  remain under subpoena.  We'll have the government's next

15  witness.

16          MR. O'REILLY:  Your Honor, the United States

17  calls Mr. Hamlet Bennett.

18          THE COURT:  Very well.

19                    HAMLET BENNETT,

20  (WITNESS SWORN)

21                    DIRECT EXAMINATION

22  BY MR. O'REILLY:

23  Q.  Mr. Bennett, would you please spell your first and

24  last names for the court reporter.

25  A.  Hamlet Bennett, H-A-M-L-E-T, B-E-N-N-E-T-T.

1    Q.    Where do you currently live, sir?

2    A.    I currently live in Oregon.

3    Q.    Okay.  And is that in a correctional institution

4    there?

5    A.    Yes.

6    Q.    Where did you live prior to that?

7    A.    Hawaii.

8    Q.    Where in Hawaii?

9    A.    On the big island.

10   Q.    What is your level of education, sir?

11   A.    I have a BA.

12   Q.    In what field?

13   A.    Industrial design.

14   Q.    How long have you been incarcerated?

15   A.    About a year and a half.

16   Q.    Prior to being incarcerated, how were you employed?

17   A.    I'm a self-employed architect.

18   Q.    What type of architecture did you do?

19   A.    Mostly residential, but some commercial office

20   buildings, that sort of thing.

21   Q.    When were you incarcerated?  When did that occur?

22   A.    Well, it would have been about a year and a half

23   ago.

24   Q.    Approximately is good.  I'm not looking for --

25   A.    Yeah, well, it must have been in -- let's see, this

1   is '09, so '08, midway through '07, I guess.

2   Q.   Were you prosecuted in Hawaii?

3   A.   Yes.

4   Q.   What were the charges in that case?

5   A.   Income tax evasion.

6   Q.   And you were convicted, correct?

7   A.   After two trials, yes.

8   Q.   Was it a hung trial at the first trial?

9   A.   Yes.

10  Q.   Who represented you during that case?

11  A.   Those two trials were Larry Becraft.

12  Q.   Prior to that, had you had different attorneys?

13  Prior to Mr. Becraft?

14  A.   Yes.

15  Q.   Who was your attorney prior to Mr. Becraft?

16  A.   Alan Richey.

17  Q.   How was it that you came to learn of -- do you know

18  where Mr. Alan Richey is from?

19  A.   Seattle.

20  Q.   How is it that you came to learn of Mr. Richey?

21  A.   He had been the attorney on a case which turned out

22  very favorably for the -- in that particular case, and so

23  his name became well known, shall we say.

24  Q.   How did you find out personally about him?

25  A.   You know, I'm not really sure.  I think it -- I'm

```
 1  sure it wasn't on -- maybe it was on the Internet.  Could
 2  have been.
 3  Q.  Could have been?
 4  A.  Uh-huh.
 5  Q.  You're not sure, though?
 6  A.  Not really.
 7  Q.  Okay.  Did you have an attorney before Mr. Richey?
 8  A.  Yes.
 9  Q.  Who was that?
10  A.  I think that was Oscar.
11  Q.  And by Oscar, do you mean Oscar Stilley?
12  A.  Yes, uh-huh.
13  Q.  Did you actually ever meet Oscar Stilley?
14  A.  Oh, yes.
15  Q.  How is it that you came to learn of Mr. Stilley?
16  Because Mr. Stilley was not from Hawaii, was he?
17  A.  No, he -- I think I got this wrong.
18  Q.  Do you need to correct something, sir?
19  A.  I sure do.  I think so.
20  Q.  Okay.  Please do so.
21  A.  Was it not -- was it not -- let me just think about
22  that for a second.  I'm unclear.
23  Q.  Okay.  You're not clear on how you met or learned of
24  Mr. Stilley?
25  A.  (no response)
```

HAMLET BENNETT - DIRECT BY MR. O'REILLY                    1030

1  Q.   That was the question, sir, how you came to learn of

2  Mr. Stilley.

3  A.   How did I come -- that's really odd that I cannot

4  figure that out.

5  Q.   Well, let me suggest this, sir:  If as we're talking

6  your memory comes back to you, simply give me an

7  indication and then we'll address it at that time.

8  A.   Okay.  Great.

9  Q.   Let me ask this:  Do you know of a name -- well,

10 first of all, I guess, I'm not sure if I got an answer to

11 this already, did you ever actually meet Mr. Stilley?

12 A.   Oh, yes.

13 Q.   Okay.  Did you ever meet an individual by the name

14 of Lindsey Springer?

15 A.   I never met him, only spoke to him on the phone.

16 Q.   So you've never actually met him personally?

17 A.   No.

18 Q.   How is it that you came to speak to Mr. Springer on

19 the phone?

20 A.   Well, I must apologize.  My life was a little bit in

21 a great deal of turmoil at the time and so things, events

22 were happening, I'm not quite sure, and there's -- as you

23 may be aware, there's lots of communication amongst

24 people who are having the problem that I was having at

25 the time and --

1   Q.   Just for clarification, sir.

2   A.   Sure.

3   Q.   What was the problem you were having at that time?

4   A.   This pending -- or the indictment for income tax.

5   Q.   Okay.  At this point in time, you had been indicted

6   for income tax evasion?

7   A.   Yes.

8   Q.   Okay.  And after -- so before you were indicted for

9   income tax evasion, had you ever met or spoke with

10  Mr. Springer?

11  A.   No.

12  Q.   Had you ever met or spoke with Mr. Stilley?

13  A.   No.

14  Q.   After you were indicted, was that what led you to

15  reach out and try and contact Mr. Springer?

16  A.   Yes.

17  Q.   Do you know how it was that you came to learn of

18  Mr. Springer?

19  A.   Well, it could have been --

20  Q.   I don't want you to speculate, sir.

21  A.   Okay.

22  Q.   If you remember, you remember.  If not, that's okay.

23  A.   Okay.

24  Q.   Do you remember or not?

25  A.   I'm going to say what comes to mind is I probably

 1   learned of Mr. Springer from Mr. Stilley.

 2   Q.   So you think you actually learned of Mr. Stilley

 3   first?

 4   A.   That's the only thing I can -- I mean that's what

 5   come to mind.

 6   Q.   Do you recall what, if anything, Mr. Stilley told

 7   you about Mr. Springer?

 8   A.   He -- it was my understanding that Mr. Springer had

 9   information and ideas that would be helpful to my case.

10   Q.   And by your case, you mean your criminal case?

11   A.   Yes.

12   Q.   I'm going to ask you, if you would, to take a --

13           MR. O'REILLY:  And, Your Honor, if I may have

14   just a brief moment.

15   Q.   (BY MR. O'REILLY)  I'm going to ask you, if you

16   could, to take a look at what's in evidence as

17   Government's Exhibit 134, hopefully on your screen and

18   blown up.  Do you see that, sir?  It should be blown up

19   in just a minute.  Can you see that, sir?

20   A.   I do.

21   Q.   Is that -- what is that, sir?

22   A.   That is a cashier's check on American Savings Bank

23   made out to Oscar Stilley.

24   Q.   Is that on July 26th of 2006?

25   A.   Yes.

1  Q.   In what amount, sir?

2  A.   $175,000.

3  Q.   Is this a check that you caused to be issued?

4  A.   Yes.

5  Q.   What was the purpose of this check?

6  A.   It was the retainer for Oscar representing me.

7  Q.   For him to represent you in your criminal case?

8  A.   Uh-huh.

9  Q.   I'm going to ask you now, sir, if you could take a

10 look -- let me ask this, sir.  Just for clarification,

11 for how long was Mr. Stilley your attorney?  And if

12 there's something that would help refresh your

13 recollection, I can -- if you saw a copy of your docket

14 sheet that indicates the different dates, would that

15 possibly help refresh your recollection?

16 A.   I'm sure it would.  I was going to say probably two

17 or three months, something like that.

18 Q.   Okay.  Two or three months?

19 A.   Uh-huh.

20 Q.   Okay.  So sometime from July of that check till

21 sometime maybe in September or October; does that sound

22 about right?

23 A.   Could be right.

24 Q.   I'm going to ask you now if you can look at what's

25 in evidence as Government's Exhibit 135.  And I do not

1  actually expect you to recognize that check, sir.  It's a

2  check drawn on the Arkansas IOLTA Foundation Trust

3  Account for Oscar Stilley payable to Bondage Breakers in

4  the amount of $25,000 on August 3rd of 2006, so about ten

5  days after the check you had sent to Mr. Stilley.  In the

6  memo portion it says "Donation Bennett."  Do you see

7  that, sir?

8  A.   I do.  Yes.

9  Q.   Were you making -- do you know if any payments were

10 made either by you or on your behalf to Mr. Springer or

11 Bondage Breakers Ministries?

12 A.   Well, I'm sure if this check was made to -- I mean,

13 the way it is, I must have agreed to it.  I'm sure that's

14 what happened, I guess.

15 Q.   Do you know what Bondage Breakers Ministries was?

16 A.   Yes.  I believe that's Mr. Springer's foundation or

17 whatever you call it.  I guess it's a ministry, yes.

18 Q.   Why did you authorize the payment of money to

19 Mr. Springer?

20 A.   I presume that that has to do with his compensation

21 for this information that I was seeking.

22 Q.   Were you led to understand by Mr. Stilley or

23 Mr. Springer that Mr. Springer was going to be helping

24 Mr. Stilley with your criminal case?

25 A.   My thought was that he was going to be helping me,

1  but what their relationship was, I wasn't sure.

2  Q.   Okay.  But when you say "he" was going to be helping

3  you, "he" being who?

4  A.   Mr. Springer.

5  Q.   So both Mr. Springer and Mr. Stilley were going to

6  be helping you?

7  A.   Yes.

8  Q.   I'm going to ask you now if you can look at what's

9  in evidence as Government's Exhibit 139.  And do you have

10  that in front of you, sir?

11  A.   Yes.

12  Q.   And, again, I don't expect that you will recognize

13  the check, but it's a check, again, drawn on the IOLTA

14  Foundation Account dated September 29, 2006, payable to

15  Alan Richey in the amount of $25,000 and in the bottom

16  left memo portion it indicates your name.

17  A.   Correct.

18  Q.   Do you know what this check was for?

19  A.   It was to -- part of the refund that Mr. Stilley was

20  going to -- that was refunded to me after he wasn't able

21  to continue as my representative.

22  Q.   And when you say he was refunding it to you, was he

23  forwarding it to your next attorney?

24  A.   This was part of that, yes.

25  Q.   Did Mr. Stilley also remit money to you directly?

1  A.   Yes, he did.

2  Q.   And was that a wire in the amount of approximately

3  $50,000?

4  A.   Yes.

5  Q.   And was that on the same date?

6        MR. O'REILLY:  If we could have Government's

7  Exhibit 138, which is already in evidence.

8  Q.   (BY MR. O'REILLY)  Does that refresh your

9  recollection, sir?  There's a date and time at the top

10  right, sir.

11  A.   Yeah, 9/25.

12  Q.   9/29?

13  A.   9/29, yes, uh-huh.

14  Q.   Did you also cause the issuance of some cashier's

15  checks to Bondage Breakers Ministries, to your knowledge?

16  A.   I believe there's -- I think I did.

17  Q.   Okay.  I'm going to ask you now if you can look at

18  what's in evidence as Government's Exhibit 56, which is

19  dated October 5th of 2006.  Specifically, the check to

20  the left or it should be on the top once it gets turned.

21  Hopefully, we can blow that up.  Do you see that, sir?

22  A.   I do.

23  Q.   Is that a cashier's check that you sent -- well,

24  first of all, to whom did you send this check?

25  A.   Well, it's one of the checks that would have come

1  from my bank and it's to Bondage Breakers Ministry, so I

2  presume that's to whom it was sent or to it.

3  Q.  Well, who was the person that you associated with

4  Bondage Breakers Ministry?

5  A.  Well, that would have been Lindsey Springer.

6  Q.  And this is dated October 5, 2006?

7  A.  It is.

8  Q.  What is the amount of this check?

9  A.  $45,000.

10  Q.  Why did you send $45,000 to Mr. Lindsey Springer

11  after you no longer had Mr. Stilley as your attorney,

12  please?

13  A.  At this moment, I really can't tell you.  I have no

14  idea.

15  Q.  Well, why would you send any money to --

16  A.  Well, the only thing I can -- I mean, what comes to

17  mind is that I was --

18          MR. SPRINGER:  Your Honor, I object.  A specific

19  answer to a specific question.

20          THE COURT:  Overruled.

21  Q.  (BY MR. O'REILLY)  Please answer, sir.

22  A.  I presume that I was having the information that I

23  was seeking from Mr. Springer continuing on regardless of

24  my representation.

25  Q.  Did Mr. Springer continue to help you as far as you

1  know after Mr. Stilley was no longer your attorney?

2  A.   I don't recall.

3  Q.   You don't have a specific recollection?

4  A.   Huh-uh.

5  Q.   Did you pay Mr. Springer any money for any reason

6  other than to help you with your criminal case?

7  A.   No, I would have no other reason.

8  Q.   And now I'm going to ask you to look at what's in

9  evidence as Government's Exhibit 57, the middle check on

10  that.  And that's a check dated October 17, 2006, about

11  12 days later in the amount of $5,000 made payable to

12  Bondage Breakers Ministries.  And is that, again, a check

13  that you would have sent to Mr. Springer?

14  A.   Yes, and I would characterize it the same way as the

15  other one.

16          MR. O'REILLY:  May I have a moment, Your Honor?

17          THE COURT:  You surely may.

18          MR. O'REILLY:  Nothing more from this witness,

19  sir.

20          THE COURT:  Cross-examination.

21          MR. SPRINGER:  May I have just one second, Your

22  Honor?

23          THE COURT:  You surely may.

24                  CROSS-EXAMINATION

25  BY MR. SPRINGER:

1    Q.   Mr. Bennett, I'm Lindsey Springer.

2    A.   Well, how about that?

3    Q.   How about that.

4    A.   It's nice to see you.

5    Q.   Nice to see you.  Are you aware of the mission of

6    Bondage Breakers Ministries is to get rid of the Internal

7    Revenue Service?

8    A.   Am I aware of the --

9    Q.   That that's Bondage Breakers Ministries' mission?

10   A.   Okay.  I believe that you had mentioned that to me

11   on the phone.

12   Q.   Okay.  Did I also ever mention to you on the phone

13   that I could not receive any money from you unless it was

14   considered a gift or a donation?

15   A.   Yes, you may have said that to me.

16   Q.   Okay.  Now, you had mentioned Larry Becraft as the

17   lawyer that represented you in the two trials that you

18   had in Hawaii, correct?

19   A.   Yes.

20   Q.   Now, isn't it true that you first started with

21   Robert Burnhoff (ph) when you were indicted?

22   A.   Yes, the first attorney.

23   Q.   And isn't it true that how you learned about Oscar

24   Stilley was because of the dismissal with prejudice the

25   government filed in the Bob Lawrence case?

1   A.   That was where I was confused.  I got the wrong guy

2   with the right thing.  That was exactly right.

3   Q.   Okay.  And that went all over the --

4   A.   Thank you for clearing that up.

5   Q.   That went all over the Internet, didn't it?

6   A.   It did.

7   Q.   Made you curious as to why, didn't it?  Why would

8   the government dismiss Bob Lawrence's case with

9   prejudice?

10  A.   Well, sure.  I wanted to find out for sure.

11       MR. SPRINGER:  Could you pull up Government's

12  Exhibit Number 135, please.

13  Q.   (BY MR. SPRINGER)  Mr. Bennett, you've never seen

14  this actual check before, have you?

15  A.   Is this the one I was just looking at a while ago?

16  Q.   Yes, sir.

17  A.   That's the first time.

18  Q.   Thank you.  And you encourage and support getting

19  rid of the Internal Revenue Service, don't you?

20  A.   I think it has a -- it has a purpose.  I think that

21  it's a little out of hand.  But, you know, what are you

22  going to do?

23  Q.   And the series of lawyers that you had went from Bob

24  Burnhoff in Wisconsin to Oscar Stilley in Ft. Smith,

25  Arkansas, to Alan Richey in Washington, and then to Larry

1   Becraft in Alabama; is that true?

2   A.    Uh-huh.

3   Q.    Okay.

4          MR. O'REILLY:  Objection, clarification.  I

5   think Mr. Dickstein was also --

6          THE COURT:  You can cover that in redirect.  Go

7   ahead.

8          MR. SPRINGER:  Thank you, Mr. Bennett.

9          THE COURT:  Mr. Stilley.

10                    CROSS-EXAMINATION

11  BY MR. STILLEY:

12  Q.   Hi there.

13  A.   Hi.

14  Q.   Mr. Bennett, have you had some discussions with the

15  government, government lawyers in the last few days?

16  A.   Yes.

17  Q.   Okay.  So I presume then that you're aware that

18  Oscar Stilley is in the same hot seat that you were in a

19  couple of years ago, correct?

20  A.   Yes.

21  Q.   Okay.  So you realize that Oscar Stilley is on trial

22  for various alleged crimes, right?

23  A.   Yes.  And to clarify, I'm not sure what your charges

24  are or what the story is, but, yes, I'm aware that

25  you're, you know, doing the best you can.

HAMLET BENNETT - CROSS BY MR. STILLEY                    1042

1   Q.   Thank you.  Now, I want to go back just a little bit

2   in time.  Isn't it true that there was a time in your

3   life when you became curious about what the law really

4   said about the income tax?

5   A.   Yes.

6   Q.   And you made some inquiry as to -- to try to find

7   out the truth, right?

8   A.   Yes.

9   Q.   In good faith?

10  A.   Yes.

11  Q.   And you came to certain conclusions, correct?

12  A.   Yes.

13  Q.   In good faith?

14  A.   Yes.

15  Q.   You acted on those conclusions, correct?

16  A.   Yes.

17  Q.   Now, the government has convicted you and put you in

18  prison, right?

19  A.   Yeah.

20  Q.   Did you go back and file tax returns?

21  A.   Well, I have had no income, no reason or anything

22  else since all this happened.

23  Q.   Okay.  During any of these -- your criminal

24  proceedings or at any other time, has the government

25  shown you what specific law that you allegedly violated?

```
 1  A.   No.

 2  Q.   You don't have any information that would suggest

 3  that either Lindsey Springer or Oscar Stilley have

 4  committed any crime whatsoever, do you?

 5  A.   No, I do not.

 6          MR. STILLEY:  Pass the witness.

 7          THE COURT:  Any redirect?

 8          MR. O'REILLY:  No, Your Honor.

 9          THE COURT:  You may step down.

10          THE WITNESS:  Thank you.

11          THE COURT:  And we'll have the government's next

12  witness.

13          MR. O'REILLY:  Your Honor, the United States

14  calls Mr. Russell Locke.

15      May I have a moment to approach the witness?

16          THE COURT:  You may.

17                      RUSSELL LOCKE,

18  (WITNESS SWORN)

19                    DIRECT EXAMINATION

20  BY MR. O'REILLY:

21  Q.   Sir, could you please spell your first and last

22  names for the court reporter.

23  A.   Russell, R-U-S-S-E-L-L, Locke, L-O-C-K-E.

24  Q.   Sir, where are you employed?

25  A.   Employed by Chase Credit Card Fraud Investigations,
```

```
 1  JP Morgan Chase, San Antonio, Texas.
 2  Q.   And is that where you're from?
 3  A.   That is.
 4  Q.   Sir, were you asked to review what has been marked
 5  for identification as Government's Exhibit 287, which is
 6  right in front of you?
 7  A.   Yes, I have.
 8  Q.   Have you had an opportunity to go through and review
 9  all of those documents?
10  A.   I have not looked at every single one of them, but
11  I've looked through them.
12  Q.   Sir, do you recognize those documents?
13  A.   Yes, I do.
14  Q.   Why is it that you recognize them?
15  A.   These are documents of account information or credit
16  card accounts I am accustomed to working with and using
17  documents of this type every day in my job.
18  Q.   And is there a customer that's affiliated with this
19  account, sir?
20  A.   Yes, the records are for an Oscar A. Stilley.
21  Q.   And is the time frame for these accounts 2001
22  through 2005?
23  A.   Yes, sir.
24  Q.   Are these records that are maintained by your
25  financial interest institution?
```

1   A.   Yes, they are.

2   Q.   Are they kept in the ordinary course of business?

3   A.   Yes are.

4   Q.   At the time, were they made by a person with

5   knowledge of what they purport to report?

6   A.   Yes, sir.

7          MR. O'REILLY:  Your Honor, the government moves

8   Government's Exhibit 287 into evidence.

9          MR. SPRINGER:  Your Honor, I do have an

10  objection, and can we approach, please?

11          THE COURT:  You may.

12     (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND

13  OUT OF THE HEARING OF THE JURY.)

14          THE COURT:  Tell me your objection.

15          MR. SPRINGER:  First one is, is he said he

16  hasn't seen all the documents in the exhibit and the next

17  open-ended question from Mr. O'Reilly was, did somebody

18  put these together, and he said yes, but he didn't say he

19  was and under -- I mean, there's only one way for that

20  stuff to come in there unless he has got personal

21  knowledge of it.  He has seen it and, I mean, maybe we

22  need to voir dire him again.

23          THE COURT:  He does not have to be the one who

24  compiled it nor does he have to be the one who has

25  personal knowledge of the entries as long as he can

 1   confirm that he recognizes these and that to the best of

 2   his knowledge they represent transactions that were

 3   recorded at or near the time of the transaction.  He did

 4   say -- he did stop short of saying that he had looked at

 5   every single page and, apparently, Mr. O'Reilly, we're

 6   going to have to go back and have him --

 7             MR. O'REILLY:  Let me ask, Mr. Springer, you

 8   want him to take the time to look through every single

 9   page right now?  If you do --

10             MR. SPRINGER:  No.  If it's coming in, yes.

11             MR. O'REILLY:  I will ask him to go through

12   every single page.

13             MR. STILLEY:  Your Honor --

14             THE COURT:  You may want to go talk to your

15   standby counsel about that.

16             MR. SPRINGER:  Can I have a second to do that?

17             THE COURT:  Stay right here.  Okay.  Go ahead.

18             MR. SPRINGER:  My objection, Your Honor, is that

19   these are credit card records.  He has not established

20   personal knowledge of each one of those records and I

21   would ask the Court to ask him to -- at least to enter

22   them into evidence.  He needs to be fully aware of them.

23             THE COURT:  He doesn't have to have personal

24   knowledge of each one of these records.  All he has got

25   to do is say he recognizes them as records of the

```
 1   Constitution.  Do you want him to go through every one of
 2   those?
 3           MR. SPRINGER:  If that's what your ruling is,
 4   then, no.
 5           THE COURT:  Very well.
 6           MR. O'REILLY:  Thank you, Your Honor.
 7       (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,
 8   WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE
 9   PRESENCE AND HEARING OF THE JURY.)
10           THE COURT:  Exhibit 287 is received.
11           MR. O'REILLY:  Nothing further, Your Honor.
12           THE COURT:  Cross-examination.
13           MR. SPRINGER:  Yes, Your Honor.
14                       CROSS-EXAMINATION
15   BY MR. SPRINGER:
16   Q.  Do you have still 287 before you?
17   A.  Yes, I do, sir.
18   Q.  Is what you have before you the entire record of the
19   company that you work for regarding Oscar Stilley's
20   account?
21   A.  I would believe that it is not.
22           MR. SPRINGER:  Thank you, Your Honor.  I have no
23   further questions.
24           THE COURT:  Mr. Stilley.
25           MR. STILLEY:  No questions.
```

```
 1              THE COURT:  Any redirect?

 2              MR. O'REILLY:  Very briefly, Your Honor.

 3                    REDIRECT EXAMINATION

 4  BY MR. O'REILLY:

 5  Q.   This indicates the last record in these exhibits is

 6  from the year 2005; is that correct?

 7  A.   I'm sorry.  Would you restate?

 8  Q.   Is the last record in Government's Exhibit 287 the

 9  business records of the Providian credit card in the name

10  of Oscar Stilley from the year 2005, is that what is in

11  Government's Exhibit 287?

12  A.   Yes, it is a statement for December 2005 statement

13  of the transaction records of the -- that account.

14  Q.   Okay.  There's nothing indicating in that statement

15  or in those records that this credit card stopped being

16  used as of that date?

17  A.   No, there's nothing.

18              MR. O'REILLY:  Nothing further, Your Honor.

19              THE COURT:  Recross limited to redirect.

20                    RECROSS-EXAMINATION

21  BY MR. SPRINGER:

22  Q.   Sir, for the year 2005, as you stand here today, is

23  that a complete record of Oscar Stilley's account?

24  A.   This is a record of the transactional history of the

25  account through December of 2005.
```

1  Q.   Is it a complete account?

2  A.   To the best of my knowledge.

3            MR. SPRINGER:  Thank you, Your Honor.

4            THE COURT:  Mr. Stilley.

5                         RECROSS-EXAMINATION

6  BY MR. STILLEY:

7  Q.   Can you explain how that you know that fact?

8            MR. O'REILLY:  Your Honor, objection.  What

9  fact?

10 Q.   (BY MR. STILLEY)  The fact that that is a complete

11 transactional record.

12 A.   Well, sir, it is what it is and that is a statement

13 of the account for that period of time.  There may be

14 other records of this account, but this is a statement of

15 the -- of the transactional history for that account.

16 That is what it is.

17 Q.   Certainly.  And I'm not trying to argue with you,

18 I'm just asking for your basis of knowledge, basically

19 how you know that.

20 A.   Well, it's my job to work with these documents,

21 documents of this type on a daily basis, and this is, in

22 my experience, the record of those transactions.  It is a

23 first and second apparent pages of the document.  I don't

24 see any other -- any gap or any other records that would

25 -- for that period of time.

1  Q.   You're saying it's --

2  A.   Based on what I see here.

3  Q.   You're saying it's apparent, then, correct?

4  A.   Yes, sir.

5  Q.   Did you look through these pages before?

6  A.   Yes, sir.

7  Q.   When did you do that?

8  A.   Approximately three hours ago.

9  Q.   Okay.  So you looked through all of the pages at

10 that time?

11 A.   As I earlier said, I didn't look at each individual

12 page.  I looked through the pages to determine what was

13 here and that was the extent of it.

14         MR. STILLEY:  Pass the witness.

15         THE COURT:  You may step down.  Well, first of

16 all -- I guess that was recross, wasn't it?  You may step

17 down.  We'll have the government's next witness.

18         MR. O'REILLY:  Your Honor, the United States

19 will call Ms. Candida Gibson.  Your Honor, if I may

20 approach the witness to provide her an exhibit.

21         THE COURT:  You may.

22                     CANDIDA GIBSON,

23 (WITNESS SWORN)

24                  DIRECT EXAMINATION

25 BY MR. O'REILLY:

1   Q.   Could you please spell your first name and your last

2   name for the court reporter.

3   A.   C-A-N-D-I-D-A, G-I-B-S-O-N.

4   Q.   What city and state do you live in, ma'am?

5   A.   Union City, Georgia.

6   Q.   What is your educational background?

7   A.   I have a Bachelor's of Science in computing and

8   management.

9   Q.   Where do you currently work?

10  A.   Earthlink, Inc.

11  Q.   How long have you worked at Earthlink?

12  A.   Nine years.

13  Q.   What is your job at Earthlink?

14  A.   I'm a paralegal.

15  Q.   I'm going to ask you if you could take a look at

16  what has been marked for identification as Government's

17  Exhibit 293.  Do you have that in front of you?

18  A.   Yes.

19  Q.   Have you had a chance to review this previously?

20  A.   Yes.

21  Q.   Do you recognize this?

22  A.   Yes.

23  Q.   What is Government's Exhibit 293?

24  A.   It is Earthlink's records for subscriber account

25  belonging to Lindsey Springer.

CANDIDA GIBSON - DIRECT BY MR. O'REILLY                    1052

1   Q.   Does it have an address on the account?

2   A.   Yes.

3   Q.   What is the address?

4   A.   5147 South Harvard Avenue, Suite 116, Tulsa,

5   Oklahoma 74135.

6   Q.   Does it have an e-mail address associated with this

7   account?

8   A.   Yes.

9   Q.   What is that e-mail account?

10  A.   Gnutella@mindspring.com.

11  Q.   Does this indicate when the account was opened or

12  when this account record began?

13  A.   Yes.  It was opened on July 27, 2001.

14  Q.   And does this -- what period of time does this

15  record cover?

16  A.   It would be from that date and the account is still

17  open.

18  Q.   Through?

19  A.   Through today.

20  Q.   Still open today?

21  A.   Yes.

22  Q.   Well, at least as of when this record was created?

23  A.   As of -- yes, October 14, '09.

24  Q.   Does this record --

25          MR. O'REILLY:  Well, first of all, Your Honor,

1  the government would move Government's Exhibit 293 into

2  evidence.

3           THE COURT:  Any objection?

4           MR. SPRINGER:  Objection to relevance, Your

5  Honor.

6           THE COURT:  Without coming to the bench, unless

7  you really need to, what's the relevance of it?

8           MR. O'REILLY:  Your Honor, there are payments

9  made towards this and this record reflects that.  Plus,

10 there are other payments on other purchases that reflect

11 this e-mail address.

12          THE COURT:  It is received.

13 Q.  (BY MR. O'REILLY)  And, ma'am, does this record of

14 account -- how would you describe what we are looking at

15 in Government's Exhibit 293?

16          MR. O'REILLY:  Would you publish that for the

17 jury.

18          THE WITNESS:  These are screen shots from

19 Earthlink's subscriber database that show the account

20 information for Lindsey Springer.  It gives basic

21 subscriber information, the address, phone number.  It

22 also gives billing information going back to 2001.

23 Q.  (BY MR. O'REILLY)  And does it indicate how the

24 payments were made?

25 A.  Yes.  Some were made by check, some by VISA, and

CANDIDA GIBSON - DIRECT BY MR. O'REILLY                    1054

```
 1   some by Discover.
 2   Q.   Is there anything on this record that indicates
 3   whose credit card was used?
 4   A.   I just see the credit card number -- well, the last
 5   four digits of the credit card number.
 6   Q.   What are the last four digits of the credit card
 7   number?
 8   A.   The last four digits of the Discover card is 9900
 9   and the VISA card is 3504.
10   Q.   Thank you.
11             MR. O'REILLY:  If I may have a moment, Your
12   Honor.
13             THE COURT:  You may.
14             MR. O'REILLY:  Nothing further from Ms. Gibson.
15             THE COURT:  Cross-examination.
16             MR. SPRINGER:  None, Your Honor.
17             THE COURT:  Mr. Stilley.
18             MR. STILLEY:  No questions.
19             THE COURT:  Thank you, ma'am.  You may step
20   down.  We'll have the government's next witness.
21             MR. O'REILLY:  The United States calls
22   Mr. Marcus Bohn.
23             THE COURT:  Spell that last name, please.
24             MR. O'REILLY:  B-O-H-N, sir.
25             MR. SPRINGER:  Your Honor, may we approach?
```

1          THE COURT:  You may.

2       (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND

3   OUT OF THE HEARING OF THE JURY.)

4          MR. SPRINGER:  I'm not sure what the relevance

5   is of this.  I've asked Mr. O'Reilly and he has never

6   told me what is the relevance of this document, this

7   Paycom coming in.

8          MR. O'REILLY:  You're paying for stuff that has

9   nothing to do with the ministry.  This is personal

10  expenses.  If you want to stipulate that these records

11  can come in, I've got no issue.

12         MR. SPRINGER:  I'm asking the Court right now to

13  determine whether that record comes in.  Whether I have

14  an expense or not doesn't go to an item that the theory

15  of per item tax evasion.  It doesn't go to a theory and

16  there's no deduction.  Remember, before he claimed it was

17  a deduction or an expense here, he's saying it's not

18  either and he's trying to bring it.

19         MR. O'REILLY:  Actually, Your Honor, it does

20  show he's using Mr. Stilley's credit card to make

21  personal expenses to hide the fact he's making personal

22  expenses from the IRS.

23         THE COURT:  Mr. Springer, when it's offered, it

24  will likely be received.  There's nothing pending before

25  me right now that requires me to make a decision, but

 1   it's likely to be received.

 2            MR. O'REILLY:  Mr. Springer and Mr. Stilley, if

 3   you want to stipulate, he'll authenticate this record and

 4   we move it in.  I don't have to publish it right now, I

 5   mean.

 6            MR. SPRINGER:  I'm not taking exception that

 7   it's a record.  I'm asking the relevance of the record

 8   for this trial.

 9            THE COURT:  Sounds to me like it's going to be

10   quicker to call the witness.

11            MR. O'REILLY:  Thank you, Your Honor.

12        (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

13   WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

14   PRESENCE AND HEARING OF THE JURY.)

15            MR. O'REILLY:  Mr. Marcus Bohn.  Your Honor, may

16   I go see what the delay is?

17            THE COURT:  I think perhaps Mr. Miller is.

18        Members of the jury, during this pause, let me

19   remind you that next week will be a short week.  We're

20   just going to go Monday through Thursday of next week.

21   And it may well be -- we're going to recess today at

22   4:30, two hours from now.  It may well be, I don't know

23   this with any certainty, but it may well be that all

24   parties will complete the presentation of their evidence

25   next week even though next week will be only a four-day

1   week.  We'll have to see.

2        And if that's -- if that's the way it unfolds, that

3   will be actually just somewhat shorter than what we

4   discussed at the beginning of this trial.  But it may

5   well be that all the evidence will be in by the end of

6   the day on Thursday of next week.  We'll just have to see

7   how that goes.

8              MR. O'REILLY:  If I may approach the witness

9   simply to get the right exhibit up.

10             THE COURT:  You may.

11                       MARCUS BOHN,

12  (WITNESS SWORN)

13                     DIRECT EXAMINATION

14  BY MR. O'REILLY:

15  Q.   Sir, could you tell the jury where you live.

16  A.   Phoenix, Arizona.

17  Q.   How long have you lived in Phoenix?

18  A.   Approximately ten years.

19  Q.   What is your level of education?

20  A.   I have a double master's and a JD.

21  Q.   What is your double master's in?

22  A.   Corporate law and master's of business

23  administration.

24  Q.   How are you currently employed?

25  A.   General counsel, CWIE Holding Company, Inc.

MARCUS BOHN - DIRECT BY MR. O'REILLY                           1058

1   Q.   What, if any, relationship does CWIE Holding

2   Company, Inc., have with CC Bill, LLC?

3   A.   CWIE is the parent company of CC Bill.

4   Q.   How long have you held the position you currently

5   have?

6   A.   About two years.

7   Q.   Are you familiar with the records of CC Bill?

8   A.   I am.

9   Q.   How is it that you're familiar with them?

10  A.   I see these from time to time when we have fraud

11  investigations from law enforcement.

12  Q.   And I'm going to ask you if you would look at what

13  has been marked for identification as Government's

14  Exhibit 281.

15  A.   Okay.

16  Q.   Do you have those in front of you, those pages?

17  A.   I do.

18  Q.   What generally -- just a general description, what

19  are those?

20  A.   This is a transaction record for one of our clients

21  and consumer.

22  Q.   Is this a record that is maintained by CC Bill?

23  A.   Yes, it is.

24  Q.   Is it maintained in the ordinary course of business?

25  A.   Yes, it is.

1    Q.   Does this have a customer information identified

2    with it?

3    A.   It has customer information that's inputted, yes.

4    Q.   Who is the customer, according to this?

5    A.   One of them, it says Oscar Stilley.  On the other,

6    same same (sic).

7    Q.   With respect to -- does it have an address

8    associated with it?

9    A.   It does.

10   Q.   And what is that address?

11   A.   5111 Rogers Avenue, Suite 520, Ft. Smith, Arkansas

12   72903.

13   Q.   Is that true for both of them?

14   A.   That's correct.

15   Q.   Does it have an e-mail address associated with this?

16   A.   It does.

17   Q.   What is the e-mail address associated with this?

18   A.   It looks like gnutella@mindspring.com.

19   Q.   Is that G-N-U-T-L-L-A?

20   A.   G-N-U-T-E-L-L-A.

21   Q.   I dropped the E.  Thank you.  And is that on both of

22   them as well?

23   A.   That's correct.

24   Q.   For what year and date are these records?

25   A.   Sign-up information was October 27, 2004.

MARCUS BOHN - DIRECT BY MR. O'REILLY                    1060

1    Q.   Does it reflect whether a payment was used for this?

2    A.   It does.

3    Q.   And what is the type of payment used?

4    A.   Credit card, VISA.

5         MR. O'REILLY:  Your Honor, the government would

6    offer Government's Exhibit 281 into evidence at this

7    time.

8         THE COURT:  Any objection?

9         MR. SPRINGER:  Same objection with additional of

10   it's more prejudicial than probative.

11        THE COURT:  It is received.

12        MR. O'REILLY:  Nothing further from this

13   witness, Your Honor.

14        THE COURT:  Cross-examination.

15        MR. SPRINGER:  None, Your Honor.

16        THE COURT:  What was that exhibit number?

17        MR. O'REILLY:  281, Your Honor.

18        THE COURT:  Okay.  Very well.  Mr. Stilley.

19        MR. STILLEY:  No questions.

20        THE COURT:  You may step down.  We'll have the

21   government's next witness.

22        MR. SNOKE:  The government would next call Matt

23   Thomas.

24        THE COURT:  That's Matt Thomas?

25        MR. O'REILLY:  Your Honor, for scheduling, what

MATT THOMAS - DIRECT BY MR. SNOKE                     1061

1  time do you anticipate taking a mid-afternoon break

2  because I know we started a little earlier.

3          THE COURT:  We'll probably take a mid-afternoon

4  break at three or thereabouts.

5          MR. O'REILLY:  Thank you, Your Honor.

6                          MATT THOMAS,

7  (WITNESS SWORN)

8                      DIRECT EXAMINATION

9  BY MR. SNOKE:

10 Q.   Sir, would you state your name and spell your last

11 name for the court reporter.

12 A.   Yes.  My name is Matt A. Thomas.  That's

13 T-H-O-M-A-S.

14 Q.   And where do you live, Mr. Thomas?

15 A.   In Norman, Oklahoma.

16 Q.   All right.  And what is your business or occupation?

17 A.   I buy and sell automobiles and dismantle automobiles

18 for recycling of auto parts.

19 Q.   All right.  And you operate -- or have you operated

20 under the name of Oklahoma Foreign Auto Sales or Oklahoma

21 Foreign, Inc.?

22 A.   Yes, sir.  That's my wife's family's business.

23 Q.   I'd like you to look at Government's Exhibit 278.

24 It's in that notebook right there in front of you, sir.

25 A.   Yes, sir.

MATT THOMAS - DIRECT BY MR. SNOKE                              1062

1  Q.   And I don't know, that may be 279 that's turned

2  there.

3  A.   This is 279.

4  Q.   All right.  Would you turn then back a page or

5  whatever it takes?

6  A.   Okay.  Yes, sir, I have it.

7  Q.   Okay.  And you can take -- if there's multiple pages

8  there, you can take that out of the little plastic --

9  A.   Yeah, I'm familiar with the document.

10 Q.   Okay.  Would you tell me if you recognize that

11 document?

12 A.   Well, yes, sir.

13 Q.   What is that?

14 A.   On the top of this first --

15 Q.   No.  Before you -- just generally can you describe

16 it for me?

17 A.   Yeah, it's just kind of a bill of sale or a receipt

18 for the purchase of an automobile, standard document we

19 used at the time.

20 Q.   All right.  And to whom was this automobile sold?

21 A.   Lindsey Springer.

22 Q.   All right.

23         MR. SNOKE:  We move into evidence at this time

24 Government's Exhibit 278.

25         MR. SPRINGER:  No objection, Your Honor.

1    THE COURT:  278 is received.  Mr. Snoke, if you

2  would pull back a little bit from the microphone.

3    MR. SNOKE:  Yes, sir.

4  Q.  (BY MR. SNOKE)  All right.  Then now you can look at

5  it and tell me if -- do you recall this sale?

6  A.  It has been a long time, sir, but I do remember the

7  car, I do remember the sale.

8  Q.  All right.  And did you meet Mr. Springer during the

9  course of the sale?

10  A.  Yes, sir.

11  Q.  Do you recognize Mr. Springer in the courtroom

12  anywhere today?

13  A.  Yes, sir.  Yeah, I do.

14  Q.  The man standing up and smiling?

15  A.  Yes, sir.

16  Q.  All right.  What kind of a vehicle was this, sir?

17  A.  The car was a Porsche 911.  It was in -- you know,

18  it was in disrepair.  I had bought it from an insurance

19  company, it was a totaled vehicle, and it was more of a

20  project car.

21  Q.  All right.  And what was the -- the sale price on

22  that?

23  A.  From my documents, which are much better than my

24  memory, it shows $15,300.

25  Q.  All right.  Now, it shows there a deposit 1,050 and

MATT THOMAS - DIRECT BY MR. SNOKE                    1064

1  then a balance of 14,250; is that correct?

2  A.   Yes, sir.

3  Q.   All right.  If you would next look at Exhibit 279.

4  A.   Yes, sir.

5  Q.   And you can take that out if you need to because

6  there's, I think, several documents in that exhibit.

7  A.   Yes, sir, I have it.

8  Q.   And you recognize the documents in that exhibit,

9  Exhibit 279, as being connected with this transaction?

10 A.   Yes.  Yes, I do.  Yes, I do.  Except for the very

11 last few pages.

12 Q.   All right.

13 A.   Looks like a Department of Treasury form.  I have

14 never seen this.

15 Q.   Okay.  The first document in that exhibit is a --

16 what we call a cash transaction report?

17 A.   Yes, sir.

18 Q.   Form 8300?

19 A.   Uh-huh.

20 Q.   All right.

21      MR. SNOKE:  We would move into evidence

22 Government's Exhibit 279.

23      THE COURT:  Any objection?

24      MR. SPRINGER:  Our objection is based upon the

25 last documents in 279, he said he didn't know anything

1   about those.

2          MR. SNOKE:  We can remove the last two pages,

3   Your Honor, from the exhibit.

4          THE COURT:  Okay.  If that's removed, is there

5   any objection?

6          MR. SPRINGER:  Fine.

7          THE COURT:  It is received subject to the

8   removal of those last two pages.

9   Q.  (BY MR. SNOKE)  All right.  Now, that 8300 form,

10  what is that, sir?

11  A.  This is a federally -- I guess federally mandated

12  form.  I guess that's the right term.  I hope so.  That

13  if you receive cash payments of 10,000 or more, you're

14  required to file this document.

15  Q.  All right.

16  A.  If someone purchases something from us --

17  Q.  And did you or somebody at your Oklahoma Foreign

18  Auto Sales then do that in this transaction?

19  A.  Yes.  This is my sister-in-law Melissa that filed

20  this document.  Usually, her or my mother-in-law handle

21  such things for us.

22  Q.  Kind of a family operation?

23  A.  Yes, sir.

24  Q.  Turning back there past the second page or the third

25  page there, is that a copy of a driver's license of the

```
 1  person purchasing it?
 2  A.   Yes.  We were -- I was always instructed that when
 3  receiving large payments like this that you should always
 4  get a copy of a driver's license and then photocopy every
 5  money order and/or dollar bill used in the transaction,
 6  which is a painful process, but that's what we do.
 7  Q.   All right.  Now, turning back to the first page of
 8  the exhibit for just a second, I notice that there's
 9  nothing in the social security number block there on the
10  cash transaction report.
11  A.   Yes, sir.
12  Q.   You do have a driver's license, I guess, number down
13  there as well as you said a copy of the driver's license
14  for your records.
15  A.   Yes.
16  Q.   Did Mr. Springer not provide you with a social
17  security number?
18  A.   I doubt he was asked for one, sir.
19  Q.   Okay.  You get by with a driver's license, is that
20  adequate?
21  A.   Yes.  This is rare -- this type of transaction is
22  rather rare.  And we're not really experts on this
23  document.  And I never -- I never get a social security
24  number from anybody buying a car from me.  It's not
25  something I think to ask for.
```

MATT THOMAS - DIRECT BY MR. SNOKE                    1067

1   Q.   Okay.  Even if they paid cash and you have to file

2   an 8300 report?

3   A.   Well, my mother-in-law and sister-in-law always fill

4   these forms out.  And they told me once, and I'm not sure

5   it's accurate, but it's an either/or -- we understood it

6   to be an either/or.

7   Q.   Okay.  All right.  So you had either/or, if you

8   needed --

9   A.   Yes.

10  Q.   Was there something -- well, let's go to the rest of

11  the pages of that exhibit behind the driver's license,

12  then.  What are those?

13  A.   Those are money orders.

14  Q.   All right.  And was the transaction then -- were

15  they used in payment of the balance due here on this car

16  of 14,250?

17  A.   Yes, they were, sir.  I don't remember on the

18  deposit -- I know this is not your question, but I don't

19  remember on the deposit which method of payment was used,

20  but this was what was used on the balance, sir.

21  Q.   On the final payment was these money orders?

22  A.   Yes, sir.

23  Q.   And looks like you made copies of all the --

24  A.   Yeah, we just wanted to, you know, put as many as we

25  can on the copier and move to the next pile, so that way

1   we've done it.

2   Q.   And who has the job of filling in Oklahoma Foreign

3   Auto Sales on the money orders?

4   A.   On the money orders?  That is -- that is not my

5   handwriting and I don't know -- you know, I don't

6   definitively, sir, who would have written that in on

7   these.

8   Q.   Do you know how many $350 money orders there are in

9   this exhibit?

10  A.   I mean, I can add it up, I mean, but it was a lot

11  because I had to sit there and photocopy them.  But I

12  would have to sit here and add them up, sir.

13  Q.   All right.  Then I assume Mr. Springer then when he

14  paid you the money orders then took the liberty of the

15  vehicle?

16  A.   Yes.

17  Q.   And that was on -- what date did he make this

18  transaction?  The front sheet said says 2/9 of '02.

19  Would that be about right?

20  A.   That would probably be the initiation of the

21  agreement to purchase the car.  I don't have in front of

22  me the date he picked up the car, although I have it in

23  the witness room.  I have a file that may have that

24  information, sir, but I don't have it in my memory.  We

25  typically don't hold a car for very long.  We don't do a

```
 1   deposit and then give people weeks and weeks to come back
 2   for the vehicles.  But I don't have the date in mind,
 3   sir.
 4   Q.  Okay.  The second page of Exhibit 278 -- well, it --
 5   actually, we need 279 because there's a date down there
 6   at the bottom of -- the date signed of the 8300 form down
 7   at the bottom, appears to say 2/11.
 8             THE COURT:  Stand by just a moment, Mr. Snoke.
 9             THE WITNESS:  Yes, I see that, sir.  That
10   would -- that would make sense.  It's about nine days
11   from the original agreement.  Probably about right, sir.
12             MR. SNOKE:  No further questions of this
13   witness.
14             THE COURT:  Cross-examination.
15                       CROSS-EXAMINATION
16   BY MR. SPRINGER:
17   Q.  Good afternoon.
18   A.  Hello.
19   Q.  If you could turn to the first page of Exhibit 278.
20   A.  Yes, sir.
21   Q.  Now, under the odometer reading, it says "exempt"
22   right there.  Do you see that?
23   A.  Yes, I do, sir.
24   Q.  And that happens to all cars in Oklahoma after a
25   certain amount of years, right?
```

1    A.   It's a federal law, ten years.

2    Q.   If it had 20,000 on it, it would still say "exempt"

3    on it, right?

4    A.   Yeah, that's it.

5    Q.   Now, you also said it was in disrepair.

6    A.   Yes, it was.

7    Q.   Now, aren't most of the cars that come through your

8    salvage yard branded salvage or rebuilt?

9    A.   Well, we sell both types of titles, both types of

10   automobiles.  You know, some are from the insurance

11   salvage, you know, totaled cars and cars that need

12   repair, and then we sell a percentage of cars that are

13   just used cars with no repairs needed.

14   Q.   And is this car one of those cars that was in

15   disrepair but was under an original title condition?

16   A.   I would have to research the title condition on this

17   particular car, but it was a car that needed repair.

18   Q.   Can you see on Exhibit Number 278 on the right side

19   of the title just under the date issued, can you see the

20   word that says "type of title"?

21        MR. SPRINGER:  Could you please publish 278 for

22   me.

23        THE WITNESS:  This document covers over it here.

24        MR. SPRINGER:  May I approach with my copy, Your

25   Honor?

```
 1              THE COURT:  You may.
 2              THE WITNESS:  I have copies as well, but they're
 3    in the witness room.
 4    Q.  (BY MR. SPRINGER)  Okay.
 5    A.  Yes, this -- this does say type of title original.
 6    Q.  Thank you.  So to the average person, $15,000 for a
 7    '91 Porsche with an original title, disrepair is a good
 8    deal, isn't it?
 9    A.  Yeah, the car market value of that car was far more.
10    Q.  Thank you.
11    A.  For a car in, you know, good readied condition, that
12    is.
13    Q.  Thank you.  And it did drive, didn't it?
14    A.  It did drive.
15    Q.  Thank you.  Now, if you could turn to Exhibit Number
16    279.
17              MR. SPRINGER:  Put that back up.
18              THE WITNESS:  Yes.
19    Q.  (BY MR. SPRINGER)  Now, the date on this Exhibit
20    279, it says 2/11/02 and then there's a 20 written over
21    that.  Does that mean anything to you?
22    A.  Well, it looks like an attempt to clarify the '02
23    into being 2002.
24    Q.  2002?
25    A.  Yeah.
```

MATT THOMAS - CROSS BY MR. STILLEY                    1072

1  Q.   Okay.  And as far as you know, because of the money

2  order transaction, that was considered a cash transaction

3  and therefore this form was required to be filed?

4  A.   Yes.  I find it still to this day a little confusing

5  how those could be considered the same as cash.  To me,

6  they look more like a check equivalent.  But that's what

7  we were taught and told.  And just on the side of

8  caution, you know.  That's the way it's done.  And I

9  believe now it has been clarified to me that they are

10  considered cash.

11  Q.   And as far as you know, this Exhibit Number 279 was

12  filed with the Internal Revenue Service as it was

13  required to be filed?

14  A.   Yes.  I believe so, sir.

15           MR. SPRINGER:  No further questions, Your Honor.

16           THE COURT:  Mr. Stilley.

17                      CROSS-EXAMINATION

18  BY MR. STILLEY:

19  Q.   Do you know where you acquired a blank copy of

20  Exhibit 279?

21  A.   Well, it's in our file.  We keep a file on every

22  vehicle.  Whether it's parts or a car that's for resale,

23  we keep an office file on every vehicle.  And I have a

24  copy of this in my file.

25  Q.   Okay.  But I'm talking about a blank copy for you to

MATT THOMAS - CROSS BY MR. STILLEY                        1073

```
 1  fill in.
 2  A.   My sister-in-law keeps them in our office.  Because,
 3  you know, it's rare we need them, but we realize it's a
 4  required document.  We keep them in our offices.
 5  Q.   Do you know when that your office acquired the blank
 6  copy that was used for --
 7  A.   No, I do not, sir.
 8  Q.   Could you get close at all?
 9  A.   No, sir.  I have no idea how long she has been
10  keeping those documents, the blank documents on hand in
11  our office.  I don't know the answer, sir.
12  Q.   How long has your business been in operation?
13  A.   About 1972.
14  Q.   Do you know whether that blank copy would have been
15  there for more than five years or less than five years?
16  A.   It would be speculation, sir.  I have no idea.
17          MR. STILLEY:  Pass the witness.
18          THE COURT:  Any redirect?
19          MR. SNOKE:  No, Your Honor.
20          THE COURT:  Very well.  You may step down.
21      Members of the jury, we'll take our mid-afternoon
22  recess a little early because we're going to be recessing
23  for the day a little early.  We'll resume at ten minutes
24  after three, which makes it just a little under a
25  20-minute recess.
```

```
 1      During this recess, please remember my usual
 2  admonition, which I will not repeat at this time.  And
 3  just a little before ten after three, please be available
 4  for the security officer to return with you to the
 5  courtroom.
 6      All persons in the courtroom will remain seated
 7  while the jury departs.
 8      (JURY EXITS THE COURTROOM)
 9          THE COURT:  Is there anything we need to take up
10  before we take our mid-afternoon break?
11          MR. O'REILLY:  No, Your Honor.  We will make
12  sure the two pages in the back are removed from the
13  exhibit.
14          THE COURT:  Very well.
15          MR. SPRINGER:  Nothing at this point, Your
16  Honor.
17          MR. STILLEY:  No, Your Honor.
18          THE COURT:  Court will be in recess.
19      (A RECESS WAS HAD, AFTER WHICH THE FOLLOWING
20  PROCEEDINGS WERE HAD IN OPEN COURT AND WITHIN THE
21  PRESENCE AND HEARING OF THE JURY.)
22          THE COURT:  Let's see, we had finished with
23  Mr. Thomas; is that right?
24          MR. O'REILLY:  Yes, sir.
25          THE COURT:  Okay.  We'll have the government's
```

 1   next witness.

 2          MR. O'REILLY:  Your Honor, the United States

 3   calls Ms. Regina Hicks.  Your Honor, if I may approach

 4   the witness stand.

 5          THE COURT:  You may.

 6                      REGINA HICKS,

 7   (WITNESS SWORN)

 8                  DIRECT EXAMINATION

 9   BY MR. O'REILLY:

10   Q.   Good afternoon.  Would you please state your first

11   and last name and spell your names for the court

12   reporter.

13   A.   It's Regina Hicks, R-E-G-I-N-A, H-I-C-K-S.

14   Q.   Ms. Hicks, where do you work?

15   A.   Security Bank.

16   Q.   What is your role at Security Bank?

17   A.   I'm the operations officer.

18   Q.   Are you familiar with the books and records and

19   computerized records of Security Bank?

20   A.   Yes, sir.

21   Q.   I'm going to ask you, if you could, to take a look

22   at what has been marked for identification as

23   Government's Exhibit 156, which should be right up in

24   that binder in front of you.  And if you need to take it

25   out, you certainly may.  I think that's a one-page

REGINA HICKS - DIRECT BY MR. O'REILLY                           1076

```
 1  exhibit, though.

 2  A.   Yes, sir, one page.

 3  Q.   156?

 4  A.   Uh-huh.

 5  Q.   Do you see that?

 6  A.   Yes, sir.

 7  Q.   Do you recognize that?

 8  A.   Yes, sir.

 9  Q.   Just could you give a general description of what is

10  Government's Exhibit 156?

11  A.   It is a check issued by one of our customers to a

12  Lindsey Springer.

13  Q.   Is this a record maintained by Security Bank?

14  A.   Yes, sir

15  Q.   Was it maintained in the ordinary course of

16  business?

17  A.   Yes, sir.

18  Q.   At the time the record was made, was it made by a

19  person with knowledge?

20  A.   Yes, sir.

21            MR. O'REILLY:  Your Honor, the government moves

22  Government's Exhibit 156 into evidence.

23            MR. SPRINGER:  No objection, Your Honor.

24            THE COURT:  It will be received.

25  Q.   (BY MR. O'REILLY)  Ms. Hicks, you have no idea what
```

1  that check is for, do you?

2  A.   No.

3  Q.   Do you recognize the customer?

4  A.   Yes.  My customer, uh-huh.

5  Q.   And what is -- who is your customer?

6  A.   Carter Numismatics.

7  Q.   What is Carter Numismatics?

8  A.   I believe they're a coin dealer.

9  Q.   I would now ask you if you would take a look at what

10 has been marked for identification -- and this, I think,

11 you may need to take out of the sleeve -- Government's

12 Exhibit 157.

13         MR. O'REILLY:  And if we could publish

14 Government's Exhibit 156, please.

15         THE COURT:  156?

16         MR. O'REILLY:  I did move that into evidence,

17 correct?

18         THE COURT:  Yes.

19         THE WITNESS:  Okay.

20 Q.   (BY MR. O'REILLY)  Do you see Government's Exhibit

21 157?  Do you recognize Government's Exhibit 157?

22 A.   Yes, sir.

23 Q.   Just generally, can you describe what is in

24 Government's Exhibit 157?

25 A.   I have two cashier's checks that are drawn on my

1  bank, one payable to Lexus of Tulsa for 47,000 and one to

2  Lindsey Springer for 9,000.

3  Q.   Okay.  With respect to -- is this the same date,

4  September 9th of 2003, as Government's Exhibit 156?

5  A.   Yes, it is.

6  Q.   Are these -- and you said these are two different

7  cashier's checks?

8  A.   Yes, sir.

9  Q.   Are these each records that are maintained by

10  Security Bank?

11  A.   Yes, sir.

12  Q.   Are these records maintained in the ordinary course

13  of business?

14  A.   Yes, sir.

15  Q.   When the record was made, was it made by a person

16  with knowledge?

17  A.   Yes, sir.

18       MR. O'REILLY:  Your Honor, the government would

19  move Government's Exhibit 157 into evidence

20       MR. SPRINGER:  No objection, Your Honor.

21       THE COURT:  It is received.

22  Q.   (BY MR. O'REILLY)  And if we could just take a quick

23  look at the third page.  It's a cashier's check payable

24  to Lindsey Springer; is that correct?

25       MR. O'REILLY:  May I approach, Your Honor?

REGINA HICKS - DIRECT BY MR. O'REILLY                      1079

1   Q.   (BY MR. O'REILLY)  Well, actually, just look at the

2   screen.

3   A.   I was going to say there were two checks in that

4   one.

5   Q.   Sorry.  Not the third check, the third page.

6          MR. O'REILLY:  May I approach, Your Honor?

7          THE COURT:  You may.

8          THE WITNESS:  I'm sorry.

9          MR. O'REILLY:  And, Your Honor, if I may quickly

10  make use of the Elmo.

11         THE COURT:  You may.

12  Q.   (BY MR. O'REILLY)  That's reasonably clear.  This is

13  a cashier's check payable to Mr. Springer, correct?

14  A.   Yes, sir.

15  Q.   Do you have any idea what he did with this money?

16  A.   No, sir.

17         MR. O'REILLY:  If I may have a moment, Your

18  Honor.

19         THE COURT:  You may.

20         MR. O'REILLY:  Nothing further from Ms. Hicks,

21  Your Honor.

22         THE COURT:  Cross-examination.

23         MR. SPRINGER:  No questions, Your Honor.

24         THE COURT:  Mr. Stilley.

25         MR. STILLEY:  No questions.

PAUL PITTS - DIRECT BY MR. O'REILLY                    1080

```
 1            THE COURT:  You may step down.

 2            THE WITNESS:  Thank you.

 3            THE COURT:  We'll have the government's next

 4  witness.

 5            MR. O'REILLY:  Your Honor, the United States

 6  would call Mr. Wayne Pitts.  May Mr. Snoke be excused

 7  from the courtroom for just a moment?

 8            THE COURT:  Surely.

 9            MR. O'REILLY:  He just needs to get something

10  for me.

11            THE COURT:  Very well.

12                      PAUL PITTS,

13  (WITNESS SWORN)

14                   DIRECT EXAMINATION

15  BY MR. O'REILLY:

16  Q.   Could you please state your full name.

17  A.   Paul Wayne Pitts.

18  Q.   And could you spell your first and last name for the

19  court reporter.

20  A.   P-A-U-L, P-I-T-T-S.

21  Q.   Mr. Pitts, where do you work?

22  A.   Lexus of Tulsa.

23  Q.   What is your role at Lexus of Tulsa?

24  A.   Controller.

25  Q.   As the controller of Lexus of Tulsa, are you
```

```
 1  familiar with the records of your company?

 2  A.   I am.

 3  Q.   And --

 4        MR. O'REILLY:  Your Honor, if I may approach.

 5        THE COURT:  You may.

 6  Q.   (BY MR. O'REILLY)  Mr. Pitts, I would ask you to

 7  take a look at what has been marked for identification as

 8  Government's Exhibit 276.  I'm going to ask you just to

 9  look through those documents, please.  Do you recognize

10  those documents?

11  A.   Yes.

12  Q.   Could you please generally describe to the jury what

13  are those documents?

14  A.   The first document is a --

15  Q.   Just the whole collection, what is it a set of?

16  A.   It's for the purchase of a vehicle, an RX330.

17  Q.   Who was the purchaser?

18  A.   Lindsey Springer.

19  Q.   When was the Lexus purchased?

20  A.   9/9/2003.

21        MR. O'REILLY:  Your Honor, the government would

22  move Government's Exhibit 276 into evidence.

23        MR. SPRINGER:  No objection, Your Honor.

24        THE COURT:  It is received.

25  Q.   (BY MR. O'REILLY)  Now, sir, I'll ask you if you can
```

PAUL PITTS - CROSS BY MR. SPRINGER                          1082

1   set that one down and look at what has been marked for

2   identification as Government's Exhibit 277.  Do you

3   recognize that?

4   A.   I do.

5   Q.   Just could you give another general description of

6   what is Government's Exhibit 277?

7   A.   Purchase documents for a 2006 Lexus GS430.

8   Q.   Who was the purchaser?

9   A.   Lindsey K. Springer and Jeanie Springer.

10  Q.   And what is the date on that purchase?

11  A.   August 31, 2005.

12  Q.   Does it indicate a home address for the purchaser?

13  A.   5147 South Harvard, Number 116.

14  Q.   Is that here in Tulsa?

15  A.   Yes.

16       MR. O'REILLY:  Your Honor, the government would

17  move Government's Exhibit 277 into evidence.

18       MR. SPRINGER:  No objection, Your Honor.

19       THE COURT:  It is received.

20       MR. O'REILLY:  Your Honor, the government has

21  nothing further to ask of Mr. Pitts.

22       THE COURT:  Cross-examination.

23                 CROSS-EXAMINATION

24  BY MR. SPRINGER:

25  Q.   Mr. Pitts, you said you were the controller for

```
 1   Lexus; is that right?

 2   A.   Right.

 3   Q.   So basically you're in charge of making sure that

 4   all federal and state forms that are required to be

 5   filled out by the car dealership have been filled out; is

 6   that true?

 7   A.   That's true.

 8   Q.   In either of these two transactions, were all

 9   federal and state forms that were required to be filled

10   out filled out?

11   A.   Yes.

12           MR. SPRINGER:  Thank you.  No further questions.

13           THE COURT:  Mr. Stilley.

14           MR. STILLEY:  No questions.

15           THE COURT:  Any redirect?

16           MR. O'REILLY:  Briefly, Your Honor.  If I may

17   approach the witness?

18           THE COURT:  Surely.  Redirect limited to cross.

19           MR. O'REILLY:  Yes, Your Honor.  Your Honor, no

20   redirect.

21           THE COURT:  You may step down.  We'll have the

22   government's next witness.

23           MR. O'REILLY:  Your Honor, the United States

24   calls Mr. Darren Murdock.

25           MR. SPRINGER:  Your Honor, may we approach just
```

PAUL PITTS - CROSS BY MR. SPRINGER                                      1084

```
 1   for a moment?
 2       (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND
 3   OUT OF THE HEARING OF THE JURY.)
 4           THE COURT:  Go ahead.
 5           MR. SPRINGER:  Mr. Murdock was not on their
 6   witness list and we just got these memos of interview
 7   this morning.
 8           MR. O'REILLY:  Yes.
 9           MR. SPRINGER:  And on that basis, I object
10   only --
11           THE COURT:  What's he being called for?
12           MR. O'REILLY:  Your Honor, we were trying to get
13   ahold of Mr. Murdock.  He's being called to testify
14   regarding the purchases of the Lexus that, in fact,
15   Mr. Springer is the one that made the purchases and
16   statements Mr. Springer made that we only learned of
17   yesterday with respect to his source of income.
18   Mr. Springer was advised that there would be somebody
19   from Lexus of Tulsa testify at this trial.
20           THE COURT:  Is this witness with Lexus?
21           MR. O'REILLY:  Yes, he is, Your Honor.
22           THE COURT:  So he's the salesperson that dealt
23   with -- presumably dealt with Mr. Springer at Lexus?
24           MR. O'REILLY:  He will testify that he was the
25   salesman for both the sales that were just introduced
```

```
 1   plus the sale in the late '90s.
 2           THE COURT:  Is there any Jencks materials for
 3   this witness?
 4           MR. O'REILLY:  The only thing we have is this,
 5   Your Honor, we handed them -- it was prepared last night
 6   at my direction once Sivils had a chance to speak with
 7   him.
 8           MR. SPRINGER:  Can I be heard?
 9           THE COURT:  You surely may.
10           MR. SPRINGER:  The best evidence has already
11   come in in this case, which shows that I was the
12   purchaser by the comptroller of Lexus.  And this is, I
13   believe, a phrase you used earlier called "piling on."
14   And because I wasn't given notice of it, I'm really not
15   prepared.
16           THE COURT:  The objection will be denied.
17       (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,
18   WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE
19   PRESENCE AND HEARING OF THE JURY.)
20                       DARREN MURDOCK,
21   (WITNESS SWORN)
22                       DIRECT EXAMINATION
23   BY MR. O'REILLY:
24   Q.  Please state your first and last names and spell
25   them for the court reporter.
```

```
1   A.   My name is Darren Murdock, D-A-R-R-E-N.  Last name

2   Murdock, M-U-R-D-O-C-K.

3   Q.   Where do you work?

4   A.   Lexus of Tulsa.

5   Q.   What is your -- what do you do for Lexus of Tulsa?

6   A.   Sales representative.

7   Q.   How long have you been a sales representative?

8   A.   My 15th year this month.

9        COURTROOM DEPUTY:  Could you sit a little closer

10  to the microphone.

11       THE WITNESS:  How about I pull the microphone to

12  me?

13       COURTROOM DEPUTY:  Thank you.

14  Q.   (BY MR. O'REILLY)  In the course of your employment

15  as a car salesman, have you sold cars to an individual by

16  the name of Mr. Lindsey Springer?

17  A.   Yes, I have.

18  Q.   And do you see Mr. Springer in the courtroom today?

19  A.   Yes, I do.

20  Q.   Is he the individual standing behind me?

21  A.   He is.

22       MR. O'REILLY:  Your Honor, may the record

23  reflect that Mr. Murdock has identified Mr. Springer?

24       THE COURT:  The record will so reflect.

25  Q.   (BY MR. O'REILLY)  Mr. Murdock, how is it that you
```

1  became acquainted with Mr. Springer?

2  A.   As -- just as a customer that came in the door.

3  Q.   With respect to him coming in the door, what was --

4  what did Mr. Springer tell you he wanted to do?

5  A.   To look at and potentially purchase a car.

6  Q.   When was this?

7  A.   The first time I met Mr. Springer, the best of my

8  recollection was 1997 or '98.

9  Q.   Do you know or recall what type of car Mr. Springer

10  was looking at purchasing at that time?

11  A.   Back then, he purchased a Lexus LX450.

12  Q.   Can you generally describe for the jury what it is

13  or was a Lexus LX450?

14  A.   A Lexus LX450 is the large SUV.

15  Q.   How much would those cost, if you recall?

16  A.   At the time -- at the time of that purchase, plus or

17  minus, 50.

18  Q.   Plus or minus, $50,000?

19  A.   $50,000.

20  Q.   Do you have any recollection of the form of payment

21  you received from Mr. Springer?

22  A.   On that particular purchase, I don't remember.

23  Q.   I'm going to ask you if you could take a look at

24  what's in evidence as Government's Exhibit 276, which is

25  in front of you.  Does that reflect another -- a

1   different purchase made by Mr. Springer?

2   A.   Yes.

3   Q.   When was that?

4   A.   This one was 9/9 of 2003.

5   Q.   What did Mr. Springer purchase on that transaction

6   A.   A 2004 Lexus RX330.

7   Q.   And could you describe for the jury what is a Lexus

8   RX330?

9   A.   Sport utility vehicle, all-wheel drive.

10  Q.   And how much did that cost?

11  A.   This car's total price was $48,508.

12  Q.   How did Mr. Springer pay for that?

13  A.   Mr. Springer paid for that in a -- in a form of a

14  cashier's check.

15  Q.   Let me ask you now if you could take a look at

16  what's in evidence as Government's Exhibit 277.

17  A.   Okay.

18  Q.   Does that memorialize and is that a contract for

19  another purchase of a Lexus?

20  A.   Yes, it does.

21  Q.   When was this purchased?

22  A.   This purchase was 8/31 of 2005.

23  Q.   What did Mr. Springer purchase on that date?

24  A.   A 2006 Lexus GS430.

25  Q.   And what is a 2006 Lexus G -- excuse me, what was

1  the name of it?

2  A.   A Lexus GS430.

3  Q.   I'm sorry.  What is that kind of car?

4  A.   A luxury sport sedan.

5  Q.   How much did that cost?

6  A.   That car was $57,788.

7  Q.   How did Mr. Springer pay for that particular car?

8  A.   This particular car was a -- partially funded from a

9  third-party check from Trader Jack's, which was a result

10 of the money that he received from the trade-in of the

11 previous car -- of the car he previously owned.

12 Q.   Okay.  How much did that cover?

13 A.   That covered $31,000.

14 Q.   So if I understand you correctly, Mr. Springer had

15 sold or traded in the 2004 Lexus and gotten about $31,000

16 for it?

17 A.   Yes.  He sold -- he sold -- he sold the previous car

18 that I sold him to Trader Jack's for $31,000 and brought

19 us that check, signed that check over to us.

20 Q.   How did Mr. Springer make up the remaining roughly

21 $26,000?

22 A.   A wire transfer.

23 Q.   Where did the wire transfer come from?

24 A.   Arkansas IOLTA Foundation Trust for Oscar Stilley.

25 Q.   What was the date of that?

DARREN MURDOCK - DIRECT BY MR. O'REILLY                    1090

1   A.   The date of this wire transfer was 9/1/2005.

2   Q.   Did you ever have any discussions with Mr. Springer

3   about what he did that allowed him to afford these cars?

4   A.   Was a representative advocate, to a certain degree,

5   to relieve people -- to help relieve people from their

6   debt to the IRS.

7   Q.   When did you have that conversation with him?

8   A.   To the best of my recollection, during one of these

9   two car deals.

10  Q.   So either at the sale of the 2004 Lexus or the 2006

11  Lexus during one of those sales?

12  A.   Yes.

13  Q.   Had Mr. Springer ever brought you anything for you

14  to listen to?

15  A.   Yes.

16  Q.   What did he bring?

17  A.   Some cassette tapes that was during the 1997

18  transaction.

19  Q.   Did you ever listen to them?

20  A.   No.

21          MR. O'REILLY:  May I have a moment, Your Honor?

22          THE COURT:  You may.

23          MR. O'REILLY:  Nothing further from Mr. Murdock.

24          THE COURT:  Cross-examination.

25          MR. SPRINGER:  No questions, Your Honor.

DENICE HOLM - DIRECT BY MR. O'REILLY                         1091

```
 1            THE COURT:  Mr. Stilley.
 2                    CROSS-EXAMINATION
 3   BY MR. STILLEY:
 4   Q.   Did you come here today pursuant to subpoena?
 5   A.   I'm sorry?
 6   Q.   Did you come because you were subpoenaed here?
 7   A.   Yes.
 8   Q.   When did you receive that subpoena?
 9   A.   Day before yesterday.
10            MR. STILLEY:  Pass the witness.
11            THE COURT:  Any redirect?
12            MR. O'REILLY:  No, Your Honor.
13            THE COURT:  You may step down.  We'll have the
14   government's next witness.
15            MR. O'REILLY:  Your Honor, the United States
16   calls Ms. Denice Holm.
17            THE COURT:  H-O-L-M-E?
18            MR. O'REILLY:  Your Honor, I was hoping you
19   wouldn't ask me that.  I'll ask the witness.
20        And, Your Honor, if I may approach the witness to
21   remove those exhibits and put what she needs to see.
22            THE COURT:  You may.
23                    DENICE HOLM,
24   (WITNESS SWORN)
25                    DIRECT EXAMINATION
```

```
 1   BY MR. O'REILLY:
 2   Q.   Ma'am, could you please state your first and last
 3   names and spell both for the court reporter.
 4   A.   Denice Holm, D-E-N-I-C-E, H-O-L-M.
 5   Q.   Ms. Holm, what city and state do you live in?
 6   A.   Coweta, Oklahoma.
 7   Q.   What is your educational background?
 8   A.   Bachelor's degree in accounting.
 9   Q.   And I am going to ask you to please speak up.  What
10   was your degree in?
11   A.   Accounting.
12   Q.   How are you currently employed?
13   A.   I'm the manager at Gibson Homes.
14   Q.   What is Gibson Homes?
15   A.   We build residential homes.
16   Q.   How long have you been there?
17   A.   Seven years.
18   Q.   I'm going to ask you, if you could, to take a look
19   at what has been marked for identification as
20   Government's Exhibit 272.  Do you recognize that?
21   A.   Yes.
22   Q.   What is Government's Exhibit 272?
23   A.   It's a commercial lease for warehouse space.
24   Q.   In whose name?
25   A.   Lindsey Springer.
```

1   Q.   And Gibson Capital?

2   A.   Yes.

3   Q.   And is Gibson Capital another name for --

4   A.   It's like a subsidiary of Gibson Homes.

5   Q.   Is this a record with which you are familiar?

6   A.   Yes.

7   Q.   Is it a business record of Gibson Homes?

8   A.   It's a record of Gibson Capital.

9   Q.   I'm sorry.  Are you familiar with the records of

10  Gibson Capital?

11  A.   Yes.

12  Q.   Is this a record that's kept and maintained in the

13  ordinary course of business?

14  A.   Yes.

15  Q.   And does it, on the last page, have signatures for a

16  Mr. David Gibson?

17  A.   Yes.

18  Q.   Does it also have the signature of another person?

19  A.   Yes.

20  Q.   Whose signature is that, if you know?

21  A.   Lindsey Springer.

22        MR. O'REILLY:  Your Honor, the government would

23  move Government's Exhibit 272 into evidence.

24        MR. SPRINGER:  No objection, Your Honor.

25        THE COURT:  272 is received.

1   Q.   (BY MR. O'REILLY)   What was this lease for?

2   A.   Warehouse space.

3   Q.   Do you know what this warehouse space was used for

4   with respect to this particular lease?

5   A.   He housed an RV type -- it was like a semi-truck RV.

6   Q.   Let me ask this:  Was it a semi-truck or was it more

7   of a motor home?

8   A.   Well, more of a motor home.  It looked like a semi

9   in the front and then more of a motor home in the back.

10  Q.   Fairly large vehicle?

11  A.   What I recall, yes.

12  Q.   Did you want to have to drive it?

13  A.   No.

14  Q.   How much were the payments on the lease?

15  A.   $599 a month.

16  Q.   And for what period of time was Mr. Springer leasing

17  that space?

18  A.   It was the end of August of '05 through November of

19  '06.

20  Q.   Did Mr. Springer have to put down a deposit?

21  A.   $300.

22  Q.   With respect to the deposit and the monthly lease

23  payments, what form were those received in?

24  A.   Cash.

25          MR. O'REILLY:  If I may have a moment, Your

```
 1  Honor?

 2          THE COURT:  You may.

 3          MR. O'REILLY:  Nothing further, Your Honor.

 4          THE COURT:  Cross-examination.

 5                      CROSS-EXAMINATION

 6  BY MR. SPRINGER:

 7  Q.  Good afternoon.

 8  A.   Hello.

 9  Q.  You're testifying that the warehouse that was rented

10  was capable of housing an RV in it; is that correct?

11  A.   Yes.  I believe it's about 50 feet in length.

12  Q.  Those are rare spaces in the area where you have

13  your buildings; is that correct?

14  A.  I really don't know.  I don't know the other, you

15  know, sizes or anything of the other warehouse spaces.

16  Q.  Do you remember whether or not I had to make certain

17  that the rig that I was working on could fit in there

18  before I could rent the space?

19  A.   No, I don't recall that.

20  Q.  Okay.

21          MR. SPRINGER:  No further questions, Your Honor.

22          THE COURT:  Mr. Stilley.

23          MR. STILLEY:  No questions.

24          THE COURT:  Any redirect?

25          MR. O'REILLY:  No, Your Honor.
```

```
 1            THE COURT:  You may step down.  We'll have the
 2   government's next witness.
 3            MR. O'REILLY:  Your Honor, the United States
 4   calls Mr. Jason Carter.  And if I may approach the stand
 5   to remove --
 6            THE COURT:  You may.
 7                      JASON CARTER,
 8   (WITNESS SWORN)
 9                   DIRECT EXAMINATION
10   BY MR. O'REILLY:
11   Q.   Could you please state your first and last names and
12   spell your names for the court reporter.
13   A.   Jason Carter, J-A-S-O-N, C-A-R-T-E-R.
14   Q.   What city and state do you live in, sir?
15   A.   Tulsa, Oklahoma.
16   Q.   How are you employed?
17   A.   Self-employed.  I own my own company.
18   Q.   What is that company?
19   A.   Carter Numismatics.  We buy and sell rare coins.
20   Q.   How long have you owned and operated Carter
21   Numismatics?
22   A.   Thirteen years.
23   Q.   That would be from about '96, '97?
24   A.   June '96, I believe it started.
25   Q.   Where is Carter Numismatics?
```

1   A.   We're located here in Tulsa in the Brookside area.

2   Q.   I'm actually giving you an opportunity to

3   advertise.  What's your street address?

4   A.   1218 East 33rd Street.

5   Q.   With respect to the services you provide, what is it

6   that Carter Numismatics does?

7   A.   We deal in U.S. coins from the colonial era up

8   through about the 1940s, rare gold, silver, copper, and

9   nickel coins.  And I'm primarily a wholesaler, so I

10  supply other dealers or retailers with coins.  And we

11  also deal with collectors who are looking for specific

12  coins for their collection.

13  Q.   Are you familiar with an individual by the name of

14  Mr. Lindsey Springer?

15  A.   Yes.

16  Q.   Do you see him in the courtroom today?

17  A.   I believe so.  He has a beard now.

18  Q.   Is he the individual standing behind me?

19  A.   Uh-huh.

20  Q.   Let me ask you this:  Would you have recognized him

21  but for him standing up?

22  A.   No.

23  Q.   How many -- on how many occasions have you dealt

24  with Mr. Springer?

25  A.   One.

1    Q.   When was that, sir?

2    A.   September 2003.  I forget the exact date.

3    Q.   That's fine.  How did it come to pass that you had

4    occasion to deal with Mr. Springer?

5    A.   I had an acquaintance with someone who worked at

6    Lexus of Tulsa, a salesman.

7    Q.   Who was that?

8    A.   Darren Murdock.

9    Q.   And explain how that led to you meeting

10   Mr. Springer, please?

11   A.   Darren called me at work one day, he knew that I

12   dealt in rare coins, and said that he had a customer who

13   had some coins to sell.  And that happens with me a lot,

14   I'll get referrals from people who know -- have friends

15   or relatives or acquaintances that have coins.  So he

16   asked if I would be willing to take a look at a list of

17   the coins to buy them.  I said yes.  And he faxed the

18   list over, which ended up belonging to Mr. Springer

19   and --

20   Q.   Well, let me ask you -- I know it's tempting to keep

21   talking, but try to make sure you answer my question and

22   then give me a chance to do something.

23   A.   Okay.

24   Q.   I believe Government's Exhibit 224, for

25   identification, is in that binder.  Will you take a look

1  and see if -- first, just look at the cover and make sure

2  I gave you the right one.

3  A.   Okay.

4  Q.   If you could look at Government's Exhibit 224 for

5  identification.

6  A.   I'm sorry.  This isn't the right one.

7          MR. O'REILLY:  Your Honor, may I approach the

8  witness?

9          THE COURT:  You may.

10  Q.   (BY MR. O'REILLY)  And if you would please take it

11  out of the sleeve so you can take a look and see if you

12  recognize that document.

13  A.   Yes.

14  Q.   Is that the fax you just mentioned?

15  A.   Yes.

16  Q.   And it's addressed to you?

17  A.   Yes.

18  Q.   Does it have a signature on it that appears to be

19  from a Lindsey K. Springer dated 9/9/03?

20  A.   Yes.

21          MR. O'REILLY:  Your Honor, the government would

22  move Government's Exhibit 224 into evidence.

23          MR. SPRINGER:  No objection.

24          THE COURT:  It is received.

25  Q.   (BY MR. O'REILLY)  So just so that it's clear, you

1  were faxed this list of coins?

2  A.   Yes.

3  Q.   And in this there's a list of -- a large number of

4  different U.S. coins; is that correct?

5  A.   Yes.

6  Q.   All of which appear to be in very good condition,

7  either BU or proof?

8  A.   Correct.

9  Q.   And could you just briefly explain to the jury what

10 does "BU" mean and what does "proof" mean?

11 A.   "BU" is an abbreviation for brilliant uncirculated,

12 which relates to the condition of the coin, which means

13 it's in the same state of preservation as it was when it

14 was minted.  It never entered circulation.

15 Q.   And what about "proof"?

16 A.   "Proof" is essentially the same thing, but those

17 coins are specially produced for collectors at the time,

18 even a hundred years ago, and they're double-struck for

19 extra detail and have mirrored surfaces.  So those

20 usually did not enter circulation.

21 Q.   And is there also some that indicate "MS" under

22 their grade?  Is that correct?

23 A.   Correct.  "MS" is mint state, in the same state as

24 when they left the Mint.  Essentially the same thing as

25 BU, just a different level.

1  Q.   So all these coins appear to be extremely high

2  quality collectable coins?

3  A.   Yeah, these are fairly high-grade coins.

4  Q.   Did you make an offer of how much you would pay for

5  these coins?

6  A.   Yes.

7  Q.   And is that the prices that are reflected in the

8  right-hand column of these?

9  A.   Yes.

10        MR. O'REILLY:  And, Your Honor, I don't recall

11  if I've offered this exhibit yet, Government's Exhibit

12  224, into evidence.  If I didn't do it just now, I

13  haven't yet.

14        COURTROOM DEPUTY:  You have.  It's in.

15        MR. O'REILLY:  Okay.  I apologize.  If we could

16  publish the third page of this document.

17  Q.   (BY MR. O'REILLY)  How much did you end up paying

18  for this collection of coins?

19  A.   $56,000.

20  Q.   How did you reach that price?

21  A.   When the list was first faxed to me and I hadn't

22  seen the coins in person, I put an estimate of what I

23  would pay.  I can usually guess based on the grade.  And

24  when Mr. Springer came to my office and I actually viewed

25  the coins, you can see we crossed some out and changed

```
 1   some prices and came up with a final price.  And I don't
 2   remember the day, but, apparently, we reached -- we
 3   negotiated a total of 56,000 for the group, which is
 4   slightly more than the individual pieces appeared to add
 5   up to.
 6   Q.   In what form did you make payment to Mr. Springer?
 7   A.   With a company check.
 8   Q.   And I'm going to ask you, if you would look at the
 9   screen, Government's Exhibit 156 that is in evidence.  Do
10   you see that in front of you, sir?
11   A.   Yes.
12   Q.   Is that the check that you issued to Mr. Springer?
13   A.   Yes.
14   Q.   Did Mr. Springer indicate to you where he got these
15   coins?
16   A.   Not that I recall.
17   Q.   Did Mr. Springer indicate to you what he was going
18   to do with the money he got from these coins?
19   A.   Not that I know of, sir.
20          MR. O'REILLY:  If I may have a moment, Your
21   Honor?
22          THE COURT:  You may.
23          MR. O'REILLY:  Nothing further.  Thank you.
24          THE COURT:  Cross-examination.
25               CROSS-EXAMINATION
```

1  BY MR. SPRINGER:

2  Q.   Good afternoon.

3  A.   Good afternoon.

4  Q.   You did say that Darren Murdock was the one who

5  called you and asked if you would look at the coins; is

6  that correct?

7  A.   Correct.

8  Q.   You had some indication when he called you that

9  there was some transaction involving a car that was

10  taking place; is that true?

11  A.   I assumed so, yes.

12        MR. SPRINGER:  Thank you.

13        THE COURT:  Mr. Stilley.

14                    CROSS-EXAMINATION

15  BY MR. STILLEY:

16  Q.   Did I understand correctly that you deal only in

17  numismatic coins?

18  A.   Yes.

19  Q.   And can you explain to the jury what that term

20  means?

21  A.   Essentially, numismatic coins are going to be U.S.

22  coins which trade at a premium over the face value or the

23  content.  So, you know, a rare gold coin that may have

24  $1,000 worth of actual gold could be worth $10,000 as a

25  rare numismatic coin, so those have collectable value.

1  Q.   Okay.  Now, there are some coins such as recently

2  minted gold coins that would trade at about spot price,

3  correct?

4  A.   Correct.

5  Q.   And what do we mean when we say "spot price"?

6          MR. O'REILLY:  Your Honor, objection.  Beyond

7  the scope of direct.  I'm not sure of the relevance of

8  his cross.

9          THE COURT:  What's the relevance of this?

10          MR. STILLEY:  I'm just trying to establish that

11  we're talking about coins that are worth considerably

12  more than the metallic content.

13          THE COURT:  He has already said that.

14  Sustained.

15          MR. STILLEY:  Pass the witness.

16          THE COURT:  Any redirect?

17          MR. O'REILLY:  No, Your Honor.

18          THE COURT:  You may step down.  We'll have the

19  government's next witness.

20          MR. SNOKE:  The government next will call John

21  West.

22                         JOHN WEST,

23  (WITNESS SWORN)

24                      DIRECT EXAMINATION

25  BY MR. SNOKE:

 1   Q.   Yes, sir.  Would you state your name and I guess

 2   from force of habit spell your last name.

 3   A.   John West, spelled W-E-S-T.

 4   Q.   Thank you.  What is your business or occupation,

 5   sir?

 6   A.   I am with Metro Builder Supply here in Tulsa.

 7   Q.   Okay.  And how long have you been with Metro

 8   Builder?

 9   A.   1975.

10   Q.   Okay.  A long time.

11   A.   A while.

12   Q.   In front of you, I think, is a book that --

13           MR. SNOKE:  If I can approach, Your Honor.

14           THE COURT:  You may.

15   Q.   (BY MR. SNOKE)  If you would look in that book I

16   just placed in front of you there, sir, at Exhibit 286.

17   A.   Yes, sir.

18   Q.   And would you look at the documents contained in

19   that exhibit, sir.

20   A.   Take them out of the folder, I guess.

21   Q.   Yeah, you can take them out of that plastic folder

22   because there's more than one.

23   A.   Yes, sir.

24   Q.   Can you tell us if those documents are business

25   records of Metro Builder Supply?

1   A.   They are, in fact.   They are a record of a

2   transaction -- a single transaction which actually had

3   two different customer pick-up dates.

4   Q.   All right.   And what's the name of the customer?

5   A.   Customer would be Lindsey Springer.

6   Q.   All right.   Can we -- hold up just a second.

7           MR. SNOKE:   I'd like to move into evidence

8   Government's Exhibit 286 at this time.

9           MR. SPRINGER:   No objection, Your Honor.

10          THE COURT:   286 is received.

11  Q.   (BY MR. SNOKE)   Did you have anything to do with

12  this sale, sir?

13  A.   I did not.

14  Q.   All right.   Can you tell us what happened in this

15  sale from the documents?

16  A.   Looking at the document, I've got a sale of a Fisher

17  & Paykel DishDrawer and a Frigidaire electric range and a

18  Frigidaire built-in microwave.

19  Q.   All right.   And were those items purchased or picked

20  up on different dates?

21  A.   That's correct.   It appears that initial purchase

22  was made September 8th; first two items were picked up on

23  the next day, September 9th; a final item picked up on

24  September 30th.

25  Q.   All right.   And what was the total purchase price

1   for, I guess, the three items?

2   A.   Total purchase price looks to be $2,576.19.

3   Q.   All right.  And how was that purchase paid for?

4   A.   Shows that it was purchased with a VISA card.

5   Q.   All right.  And the last four digits of that VISA

6   card were what?

7   A.   Last four digits would be -- I believe it is 1583.

8   Q.   Okay.  Can you look down at the bottom there where

9   somebody, apparently on your records there, has written

10  the entire VISA card number?

11  A.   That is correct.

12  Q.   And what are the last four digits of that VISA card

13  number?

14  A.   That is 1503.

15  Q.   All right.  With an expiration date there, I guess.

16  A.   Yeah, expiration date would be 5 of 2007.

17  Q.   Okay.  And then there's -- I guess that's a check

18  digit next to that or something, the three-digit --

19  A.   That actually is a security code on the card, sir.

20  Q.   All right.

21          MR. SNOKE:  I don't believe I have any other

22  questions at this point.

23          THE COURT:  Cross-examination.

24          MR. SPRINGER:  May I have one second, Your

25  Honor?

```
 1              THE COURT:  You may.

 2              MR. SPRINGER:  No questions, Your Honor.

 3              THE COURT:  Mr. Stilley.

 4              MR. STILLEY:  No questions.

 5              THE COURT:  You may step down.  We'll have the

 6  government's next witness.

 7              MR. SNOKE:  The government would next call Kip

 8  Karn, K-I-P, K-A-R-N.

 9                        KIP KARN,

10  (WITNESS SWORN)

11                     DIRECT EXAMINATION

12  BY MR. SNOKE:

13  Q.   Would you state your name and spell your last name

14  for the court reporter, please, sir.

15  A.   Name is Kip Karn and last name is spelled K-A-R-N.

16  Q.   And where do you live, sir?

17  A.   I live in Wagoner, Oklahoma.

18  Q.   Okay.  And by whom are you employed?

19  A.   Joe Cooper Ford of Tulsa.

20  Q.   How long have you been with Joe Cooper Ford, sir?

21  A.   Twenty-three years.

22  Q.   What is your position there at Joe Cooper Ford after

23  23 years?

24  A.   General manager.

25  Q.   Okay.  If you would look in that book I've just
```

1  placed in front of you there, sir, at Government's

2  Exhibit 274.  Do you recognize the documents?  You can

3  take them out of the plastic there so you can see all of

4  them.  And after you've had a chance to look at them, I'm

5  going to ask you a couple of questions.

6  A.   Okay.

7  Q.   Do you recognize those documents as business records

8  of Joe Cooper Ford?

9  A.   Yes, sir.

10  Q.   Do they pertain to a particular transaction?

11  A.   Yes, they do.

12  Q.   Okay.  And is this the sale of a vehicle?

13  A.   Yes.

14  Q.   To whom was the vehicle sold?

15  A.   To a Lindsey Springer.

16  Q.   All right.

17       MR. SNOKE:  We'd move into evidence Government's

18  Exhibit 274 at this time.

19       MR. SPRINGER:  No objection, Your Honor.

20       THE COURT:  274 is received.

21  Q.   (BY MR. SNOKE)  Can you tell me from looking at the

22  documents -- first of all, what vehicle was sold?

23  A.   It's a 2004, looks like a one-ton crew cab four-

24  wheel drive F350.

25  Q.   That's an F350 4-by-4; is that what it says up at

1  the top there?

2  A.   Uh-huh.

3  Q.   Of the --

4        MR. SNOKE:  Let's go to the -- is it the third

5  page of the exhibit?  Do we have -- it's not up.  May I

6  move back to the --

7        THE COURT:  You may.

8        MR. SNOKE:  Thank you.

9  Q.   (BY MR. SNOKE)  All right.  Did you have anything to

10  do with the sale of this vehicle?

11  A.   I didn't have anything to do with the sale.  I -- I

12  had met Mr. Springer perhaps prior to the sale just

13  shaking a hand, but I spent most of my time after the

14  sale, just remembering him bringing his vehicle in for

15  service.

16  Q.   Okay.  And -- well, let's take the transaction

17  first.  What is the -- what was the ultimate sale price

18  of this vehicle?  I think there's several pages in there.

19  A.   Right.  It looks like the original selling price was

20  40,500 and then we had a processing fee of 169, so a

21  total of 40,669.

22  Q.   All right.

23  A.   And looks perhaps that there was a $2,000 -- on the

24  buyer's order, it shows -- it's on the program line,

25  which would be a rebate.  So the total due would have

1  been 38,669.

2  Q.   All right.  And can you tell from the other

3  documents in the exhibit how that was paid for?

4  Actually, if you look at maybe the -- is there a cash

5  transaction report in there, a Form 8300?

6  A.   Yes, sir.

7  Q.   If you look down on the left-hand side, block 32 of

8  the cash transaction report, I think you can probably get

9  the breakdown there.

10 A.   It looks like we were paid $1,000 in cash or U.S.

11 currency, $30,701.99 in the form of a cashier's check,

12 and then $6,967.01 in money orders.

13 Q.   All right.  And then are the checks -- the check

14 then, if you turn back -- well, first of all, before you

15 leave that, is there an entry on that 8300 form for the

16 social security number or taxpayer identification number

17 for Mr. Springer?

18 A.   I don't see one.

19 Q.   All right.  If you look at block 6 over there of the

20 same document, 8300 form.

21 A.   It's blank in this form.

22 Q.   All right.  There is a driver's license number down

23 there shown there on -- below there; isn't that correct?

24 A.   That's correct.

25 Q.   And it says occupation, Bondage Breakers Ministry?

1   A.   Bondage Breakers Ministry, yeah.

2   Q.   All right.  Then let's turn to the back of the

3   exhibit there and I think the first thing I see is a

4   check for -- a cashier's check for $30,701.99.

5   A.   Correct.

6   Q.   Which apparently was used in payment as noted on the

7   8300 form?

8   A.   Right.

9   Q.   Who does it say for the remitter on that check?

10  A.   Steve McBride.

11  Q.   All right.  And then following that, there are what

12  appears to be copies of a number of money orders in $350

13  amounts.

14  A.   That's correct.

15  Q.   At least most of them are in 350.  And at the very

16  end of the exhibit I have is an Oklahoma driver's license

17  for Mr. Springer, a copy of it.

18  A.   Yes, uh-huh.

19  Q.   Front of it.

20  A.   Right.

21  Q.   Okay.  So would that then represent the payment that

22  was made -- other than the thousand dollars cash, I guess

23  you have copies of the -- of almost everything else in

24  the transaction.

25  A.   Yes, sir.

1  Q.   And when was the date of that sale?

2  A.   Looks like November 13th of 2005, perhaps the 12th.

3  There's a buyer's order --

4  Q.   I'm sorry.  If you would look maybe at the 8300 form

5  on -- block 23 of the 8300 form has a date.  I don't know

6  if any of your records have a date.

7  A.   Shows the date cash received would be November 12th

8  of '04.

9  Q.   Now, you said you met Mr. Springer at some later

10 time when he brought this truck in for service, I think

11 you said.

12 A.   Right.

13 Q.   In that meeting, did you have any discussions with

14 him about what he did?

15 A.   I did.

16 Q.   All right.  And what did he -- what did you

17 understand from what he told you that he did?  I mean for

18 a living is what we're talking about here, I guess.

19 A.   My understanding was some form of seminars regarding

20 how to not pay the IRS.

21 Q.   Did he -- other than that one statement, did he talk

22 to you any further about that or encourage you in any

23 way, shape, or form?

24 A.   Not -- I don't recall that, no.

25 Q.   Okay.

 1   A.   Not that I remember.

 2   Q.   Thank you.

 3            MR. SNOKE:   No further questions.

 4            THE COURT:   Cross-examination.

 5                         CROSS-EXAMINATION

 6   BY MR. SPRINGER:

 7   Q.   Good afternoon.

 8   A.   Hi.

 9   Q.   Now, when you just said "not pay taxes" in the

10   answer to Mr. Snoke's question, you're just speculating,

11   you don't remember those exact words, do you?

12   A.   I don't, no.

13   Q.   Thank you.  But you do remember that it had

14   something to do with the IRS, right?

15   A.   Yes, sir.

16   Q.   Now, if you could turn to Exhibit Number 274 for me,

17   and I'm specifically going to ask you without counting

18   pages, but I believe it's six, if you could go to the

19   8300 form, on the front page of it.

20   A.   Okay.

21   Q.   Now, at the top of this report or this form, doesn't

22   it say "report of cash payments over $10,000," received

23   in trade or business, at the very top of it in big bold

24   letters?

25   A.   Correct.  "Report of cash payments over $10,000."

1  Q.   Okay.  Now, if you could look down at Section 32 --

2          MR. SPRINGER:  Could you -- do you have that up

3  on the screen?  Okay.

4  Q.   (BY MR. SPRINGER)  Now, you have that cashier's

5  check for $30,701.  Now, that is not considered to be

6  cash, is it?

7  A.   Well, I'm not sure if that's defined as cash or

8  not.  But being that it says cashier's check, I would

9  have to say no.

10 Q.   So then the money orders, though, you do treat as

11 cash; is that correct?

12 A.   I'm not sure of the question.

13 Q.   Well, okay.  Does -- you see the thousand dollars in

14 U.S. currency up on the top of line 32A there.

15 A.   Correct.

16 Q.   And then if you add the 6,967, that doesn't go over

17 $10,000 in U.S. currency, does it?

18 A.   On line A?

19 Q.   Yeah, line A with line D.

20 A.   Line A and line D, they do not.  That would be

21 7,967.

22 Q.   And as far as you know, the 8300 form here in

23 Exhibit 274 was filed with the IRS and timely?

24 A.   As far as I know.

25 Q.   Thank you very much.

1116

```
 1           MR. SPRINGER:  No further questions, Your Honor.

 2           THE COURT:  Mr. Stilley.

 3           MR. STILLEY:  Your Honor, if I may have just a

 4  second.

 5           THE COURT:  Surely.

 6           MR. STILLEY:  No questions.

 7           THE COURT:  You may step down.

 8           THE WITNESS:  Can I just leave this here?

 9           THE COURT:  You may.  Counsel will approach.

10      THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND

11  OUT OF THE HEARING OF THE JURY.)

12           THE COURT:  Do you have a short one?

13           MR. O'REILLY:  No.

14           THE COURT:  Okay.  I'm going to let you off the

15  hook then.

16           MR. O'REILLY:  Thank you, Your Honor.

17           THE COURT:  Very well.  Do you have anybody here

18  who is going to be seriously inconvenienced by not

19  testifying today?

20           MR. O'REILLY:  Actually, Your Honor, we are flat

21  out of witnesses, so --

22           MR. SNOKE:  This is perfect timing.

23           THE COURT:  Very well.  I could kind of read

24  your face.

25      (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,
```

1   WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

2   PRESENCE AND HEARING OF THE JURY.)

3           THE COURT:  Members of the jury, I don't think

4   I'm going to get any argument out of you when I say we're

5   going to recess.  By my count, you have heard 33

6   witnesses since Tuesday.  It would certainly be an

7   understatement for me to say that I sincerely appreciate

8   your week of service to the Court.

9        And I should certainly add that I do applaud the

10  parties on both sides for taking really pretty seriously

11  my comments at the beginning of this trial that we were

12  going to move it along.  We have moved it along.  At some

13  points, it may not have seemed that way, but by most

14  standards, yes, we have really moved it along.  And that

15  has been my intent and I applaud the parties on both

16  sides for proceeding in accordance with that intent on my

17  part.

18       So we will resume at nine o'clock Monday morning.

19  Over the weekend, again, please do think and talk about

20  things other than this case.  I think it is more than a

21  passing chance that all the evidence will be received

22  from both sides by the end of the day Thursday of next

23  week, which will be our last day of court next week.

24       So over the weekend, please do remember not to

25  discuss the case, not to investigate anything or anybody

 1    having to do with the case at all for any reason over the

 2    weekend, and don't reach any conclusions about the case

 3    until it has been given to you for your deliberations and

 4    verdict.

 5        So please be available Monday by about a quarter

 6    till nine in the usual place so that everybody can start

 7    on time at nine o'clock Monday morning.  Thank you very

 8    much again for your week of service to the Court.

 9        All persons in the courtroom will remain seated

10    while the jury departs.

11        And please leave your notebooks either on your

12    chairs or in the jury room.

13        (JURY EXITS THE COURTROOM)

14            THE COURT:  Okay.  The record will show the jury

15    has left the courtroom.  I, obviously, haven't made any

16    final decisions with respect to the instructions, but I

17    have been working on an instruction that addresses some

18    of the issues in the case as it has unfolded to this

19    point.  And, obviously, all concerned, but perhaps

20    especially the Court, are a little more conversant now

21    with the precise contours of the case than we were at the

22    outset.  I consider it to be my duty to the jury and more

23    abstractly my duty as the judge to instruct the jury in a

24    way that does conform the instructions to the issues in

25    the case as much as is reasonably possible.

 1    To that end, I have prepared an instruction.  I'm
 2  going to give Cindy six copies of this instruction and
 3  she can give four copies to the defendants and their
 4  standby counsel and two copies to the government.  Here
 5  you are, Cindy.
 6         MR. SPRINGER:  May I approach, Your Honor,
 7  because I know her foot hurts?
 8         THE COURT:  Pardon me?
 9         MR. SPRINGER:  May I approach and hand them to
10  everybody?
11         THE COURT:  No, you may not.  This instruction
12  is based partly on the Terrell case that the government
13  called to the Court's attention.  It's partly based on
14  the other cases that I addressed yesterday, I believe it
15  was, that I cited yesterday.  Also, to the extent that
16  this instruction addresses gifts, it is drawn from -- in
17  part from what we used to call the Devitt & Blackmar set
18  on federal jury practice.  I don't know what that's
19  called now, but it's from what we used to call the Devitt
20  & Blackmar set on federal jury instructions.
21     Any parties wishing to cogently and with authority
22  object to this instruction may do so by brief filed not
23  later than 8:30 in the morning this Tuesday.  And the
24  reason I say "cogently and with authority" is that there,
25  obviously, are two levels at which we can discuss

instructions.  One is as to whether there is, in fact, anything legally incorrect about an instruction.  The other issue is whether beyond that there are any niceties about the instruction.

And what I'm interested in now more than the niceties is whether there is anything legally incorrect with this instruction.  And any parties wishing to bring any such matters to my attention may do so by supplemental trial brief to be filed not later than 8:30 in the morning this Tuesday.

Mr. Springer, there's one other matter I need to address.  You had a Rule 403 objection to Government's Exhibit 281 and I want to make sure your -- I believe your objection was articulated not only that it was perhaps irrelevant, but that it was more prejudicial than probative.  I want to make sure that that receives appropriate consideration.  And so I'll hear you in support -- obviously, 281 has not yet been published to the jury.  It can always be stricken.  And I'll hear you in support of your argument that 281 is more prejudicial than probative.

MR. SPRINGER:  Your Honor, there is absolutely no doubt what this document says and the government has not identified it as being something that would be an expense that should have showed up on a tax return.  Even

1  if they said I used Mr. Stilley's credit card, it doesn't

2  mean that that hid something from the IRS.  And, quite

3  frankly, I really don't know -- other than a spiritual

4  motive, I don't really know what it is that the document

5  is even coming in for and I haven't heard yet and I've

6  asked, so --

7           THE COURT:  Okay.  Well, you've argued that it

8  has little or no probative value and that it's

9  irrelevant.

10          MR. SPRINGER:  Right.

11          THE COURT:  I need to hear you -- 403 requires

12  me to balance probative value versus prejudice.  What's,

13  prejudicial about it?

14          MR. SPRINGER:  It's not all of it.  For

15  instance, it says host name, assparade.bangbrothers.com

16  on page 282, which is -- they're trying to connect 281 to

17  282, it's obvious.  And I just don't know how that's

18  relevant.

19          THE COURT:  Well, you're talking relevance again

20  in response to my last question.  You apparently --

21          MR. SPRINGER:  Probative, I'm sorry.

22          THE COURT:  No, we're not talking about whether

23  it's probative.  You've told me that it has little or no

24  probative value.  You've told me that it's either

25  entirely or substantially irrelevant.  Rule 403 requires

1  me to balance probative value versus prejudicial effect.

2  What is prejudicial about it?

3       MR. SPRINGER:  You know, Your Honor, I'm just

4  going to withdraw my motion.  I would like to go ahead

5  and let it come in.

6       THE COURT:  Very well.

7       MR. SPRINGER:  Thank you.

8       THE COURT:  You bet.

9       MR. STILLEY:  Your Honor, could I be heard on

10 that?

11      THE COURT:  You surely may.

12      MR. STILLEY:  Whether Mr. Springer objects or

13 not, I highly object to this.  This is on my credit

14 card.  At the period of time that this was being done, I

15 had somebody in my office -- or not in my office.  Well,

16 you can say.  I mean, he worked for me to keep my books

17 and check up with things.  And he would ordinarily tell

18 me if there was a questionable charge.  And I don't

19 remember anything about this.  And, certainly, if such a

20 charge had shown up on my credit card and I had known

21 about it, I would have objected and put an immediate halt

22 to it.

23     Now, I think we all know that frequently when things

24 of this nature are charged it's put on with an innocuous

25 sort of name so you won't -- it won't jump out at

1   somebody, so that other people can't tell what's going

2   on.

3         THE COURT:  Well, the charge is associated --

4   the status of the evidence so far is that even though it

5   was on your card, the charge is associated only with

6   Mr. Springer.  But even at that, what's prejudicial about

7   this?

8         MR. STILLEY:  This is prejudicial because we've

9   got a man that's saying he's a minister.  He's telling

10  everybody around here "I'm a minister."

11        THE COURT:  And?

12        MR. STILLEY:  And now they're coming in with

13  evidence to say, well, look what you've been subscribing

14  to.

15        THE COURT:  Okay.  The first page says

16  femalecelebrities.com.  The second page is

17  www.shiningangels.net.  And the e-mail address associated

18  with that is Mr. Springer's e-mail address.  So how does

19  this touch you topside or bottom?

20        MR. STILLEY:  This touches me because I am --

21  basically, the reason that I am involved in this case is

22  that they're saying you associated with Mr. Springer.

23  Now, I know they're saying, well, you made transfers and

24  you did other such things.  But a big part of this case

25  is that they're saying Mr. Stilley, for example, didn't

1  file his tax returns for 20 years and Mr. Springer didn't

2  too and there's an association there.

3          THE COURT:  Well, are you concerned that the

4  jury is going to infer from these papers that

5  Mr. Springer patronized a porn Web site?

6          MR. STILLEY:  That's what I suspect and I don't

7  see any other reason for putting it in.  It's a

8  relatively small amount of money.  And it's going to --

9  and let me explain why I think it's so harsh for Oscar

10 Stilley.  If Oscar Stilley raises it, he just waves it in

11 front of the jury, which is the whole thing I'm trying to

12 get away from.  If I don't say anything about it, the

13 jury is going to take that back to the room and they're

14 going to look at it and say, oh, my goodness, do you see

15 this?  And they might not look and say that's

16 Mr. Springer.

17         THE COURT:  Well, you'll have every opportunity

18 to make that clear.  My ruling admitting Exhibit 281

19 stands.  There's really two levels of analysis.

20     Number one, even if it had some prejudicial

21 effect -- and for the present purposes, I'm going to

22 assume that there may be some people on the jury that

23 will not take kindly to evidence that Mr. Springer

24 frequented a couple of porn sites -- it still has

25 probative value, which I quite easily conclude does

 1   outweigh its prejudicial effect.

 2       Number two -- and here we have the principle of

 3   opening the door.  We do have a defendant here who has

 4   presented himself to the jury as a fine Christian man.

 5   And that does make relevant some matters that might not

 6   otherwise be relevant.  And he can explain to the jury

 7   why, as a fine Christian man, he was frequenting these

 8   Web sites.  So Government's Exhibit 281 will be received.

 9       Anything further we ought to take up before we

10   recess for the weekend?

11           MR. SPRINGER:  Yes, Your Honor.  There becomes

12   an issue next week in relation to me testifying and/or

13   possibly this may include Mr. Stilley in his course of

14   testimony, if he decides to testify and if I decide to

15   testify, and this may be a curve ball to the Court, but

16   what procedure would the Court want us to follow in

17   considering how we would prepare to present that

18   testimony if we're representing ourself in the matter?

19   Is there guidance that the Court could give us on what

20   the Court would prefer?

21           THE COURT:  Well, I would suggest, first of all,

22   one source of hooks, if you will, to hang your testimony

23   on and to give the Court and opposing counsel a way to

24   evaluate your testimony and its relevance as it comes in

25   is to use admissible or, better yet, admitted exhibits as

```
1   reference points during your testimony.  That will help
2   you to break it up and avoid a complete narrative.
3             MR. SPRINGER:  Okay.
4             THE COURT:  To the extent that you're not
5   progressing from one exhibit to the next exhibit with the
6   natural break points that that gives us, then you, I
7   think, inevitably, unless somebody has a little different
8   suggestion, are inevitably going to be testifying in
9   narrative form.  But, again, it's going to have to be in
10  a way that affords the government the reasonable
11  opportunity to interject and interpose any objections
12  that it may have.  And for that matter, it gives the
13  Court an opportunity to have some sense of what is being
14  said and perhaps even what is about to be said so that I
15  can evaluate the appropriateness of your testimony as it
16  comes in.
17      But the only thing I know of that gives you a real
18  good hook, if you will, with which to cause your
19  testimony to address clearly relevant things is to use
20  exhibits, your exhibits as weigh points, if you will,
21  during your testimony.  And then, obviously, that won't
22  give you a format for all of your testimony, but it will
23  give you a format and a way to break up your testimony to
24  some degree.  So I would urge you to prepare with that in
25  mind.
```

1     Beyond that, unless government counsel has some

2  other suggestion or Mr. Stilley, I really think that it's

3  going to have to be pretty much a narrative, but it will

4  certainly have to be a narrative that affords all

5  concerned the opportunity to evaluate the admissibility

6  and relevance of your testimony as we proceed.  Now, does

7  the government have any different suggestion?

8         MR. O'REILLY:  Your Honor, one thing that I had

9  earlier asked the Court for some guidance is if this

10  happened, perhaps standby counsel could take the

11  questions that Mr. Springer provides to them, be asked

12  the questions, it would allow the government the

13  opportunity or Mr. Stilley the opportunity to object.

14  Because a narrative, by it's very nature, makes that

15  impossible.  We have no idea what's coming.

16     And, frankly, more so in some ways from

17  Mr. Stilley's perspective and certainly from the

18  government's side as well, we think that is a better way

19  to proceed, whether it's standby counsel or -- I don't

20  know who else would be able to ask the questions --

21         THE COURT:  I understand that.  And that's

22  tempting in a way, but I really don't think it would be

23  workable.  Because as soon as standby counsel gets a half

24  a dozen questions into it, then follow-up questions would

25  be a natural thing.  And if standby counsel is working

1  from a list of questions provided by Mr. Springer, and

2  all he's doing is reading those questions, that's one

3  thing.  But, then, as I say, it's inevitable that follow-

4  up questions would be necessary.  That calls on standby

5  counsel to use their own independent judgment as

6  advocates for these pro se defendants, which gets us into

7  a hybrid representation situation.  And that, we are not

8  going to have.  So I appreciate your suggestion, but I

9  really don't think that would be workable.

10          MR. O'REILLY:  There is a way to work a little

11  bit around that, Your Honor, which is without --

12          COURTROOM DEPUTY:  Could you use the microphone.

13          MR. O'REILLY:  Oh, I apologize.  Usually, I'm

14  always way too loud.  Standby counsel could take periodic

15  breaks to confer with Mr. Springer and/or Mr. Stilley, if

16  Mr. Stilley takes the stand to testify as well.  I'm just

17  very concerned about a narrative being simply addressed

18  to the jury in a fashion that allows us the opportunity

19  and the other defendant the opportunity to make timely

20  objections to potentially impermissible testimony.

21          THE COURT:  Well, that's a legitimate concern.

22  And we can all think more about how we address it.  That

23  certainly is a legitimate concern.  Under the Willie case

24  and other similar cases, before we get off into some

25  areas of contention on the defendants' part, they're

1 going to have to persuade me that this is fair game.  And

2 even at that -- or perhaps especially with respect to

3 that, the narrative approach gives me serious concern.

4 But everybody can think about it over the weekend.  But

5 beyond what I have already said, I have no great insights

6 to give either side as to how we approach this.

7 　　　　MR. SPRINGER:  May I ask one more question, Your

8 Honor?  In the event that as it stands now we stay there,

9 and I would be -- if I was to testify, it would be under

10 oath, would I be authorized by the Court to give that

11 narrative with those exhibits from either this position

12 or back and forth to these two positions here versus

13 being up in that chair?

14 　　　　THE COURT:  I would want you to be on the

15 witness stand.

16 　　　　MR. SPRINGER:  Okay.  There may be documents

17 that are not electronically held but documents that --

18 　　　　THE COURT:  Your standby counsel can be a

19 paralegal for you.

20 　　　　MR. SPRINGER:  That's what I wanted to know.

21 　　　　THE COURT:  Very well.  Anything further before

22 we recess until nine o'clock Monday morning?

23 　　　　MR. STILLEY:  Yes, Your Honor.  Just a couple of

24 questions.  First, if Mr. Springer was to call me as a

25 witness and I objected, do you know what the ruling would

1130

 1   be on that?

 2          THE COURT:  I certainly don't.

 3          MR. STILLEY:  I'm talking about a Fifth

 4   Amendment objection.

 5          THE COURT:  Well, obviously, the Court has to

 6   address that in the context that exists at the time it

 7   arises.

 8          MR. STILLEY:  Okay.  The other thing is that I

 9   somewhat have a tendency sometimes -- actually, in casual

10   conversation, I will probably more often than not refer

11   to myself as Oscar instead of the personal pronoun "me"

12   or "I".  Is that going to be a problem?

13          THE COURT:  I'm not going to brad you down that

14   tight.  If you want to refer to yourself as Oscar, as

15   long as it's not confusing, and I don't see how it would

16   be, I don't know that that's particularly objectionable.

17          MR. STILLEY:  Thank you, Judge.

18          THE COURT:  Very well.  Court will be in recess.

19       (COURT ADJOURNED FOR THE EVENING RECESS.  FOR

20   FURTHER JURY TRIAL PROCEEDINGS, SEE VOLUME VI.)

21

22

23

24

25