```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE NORTHERN DISTRICT OF OKLAHOMA

 3

 4   UNITED STATES OF AMERICA,

 5          Plaintiff,

 6   vs.                         Case No. CR-09-43-SPF

 7   LINDSEY KENT SPRINGER and
     OSCAR AMOS STILLEY,
 8
            Defendants.
 9
     ----------------------------
10

11

12

13

14

15          TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16        BEFORE THE HONORABLE STEPHEN P. FRIOT

17            UNITED STATES DISTRICT JUDGE

18                 NOVEMBER 2, 2009

19                 VOLUME VI OF XIV

20

21

22

23

24

25
```

```
 1   APPEARANCES:

 2   FOR THE GOVERNMENT:
                          Mr. Charles Anthony O'Reilly
 3                        U.S. Department of Justice
                          PO Box 972
 4                        Washington, DC 20044

 5                        Mr. Kenneth P. Snoke
                          U.S. Attorney's Office (Tulsa)
 6                        110 W. 7th Street, Ste. 300
                          Tulsa, OK 74119
 7

 8
     FOR DEFENDANT SPRINGER:
 9                        Mr. Lindsey Kent Springer
                          5147 S. Harvard Ave.
10                        Ste. 116
                          Tulsa, OK 74135
11
                          Mr. Robert Scott Williams
12                        Taylor Ryan Schmidt & Van Dalsem
                          1437 S. Boulder Ave., Ste. 850
13                        Tulsa, OK 74119

14   FOR DEFENDANT STILLEY:
                          Mr. Oscar Amos Stilley
15                        7103 Race Track Loop
                          Fort Smith, AR 72901
16
                          Mr. Charles Robert Burton, IV
17                        Burton Law Firm, PC
                          320 S. Boston, Ste. 2400
18                        Tulsa, OK 74103

19

20

21

22

23

24

25
```

1    EXAMINATION INDEX

2

3    TROY CAMPBELL
          DIRECT BY MR. SNOKE                  1134
          CROSS BY MR. SPRINGER               1141
4
     DENISE KOHLER
5         DIRECT BY MR. O'REILLY              1143
          CROSS BY MR. STILLEY               1149
6         REDIRECT BY MR. O'REILLY           1156

7    DENNY PATRIDGE
          DIRECT BY MR. SNOKE                 1157
8         CROSS BY MR. SPRINGER              1180
          REDIRECT BY MR. SNOKE              1199
9         RECROSS BY MR. SPRINGER           1201

10   ANDREW OUWENGA
          DIRECT BY MR. O'REILLY             1202
11        CROSS BY MR. SPRINGER             1223

12   LAUREL GARDNER
          DIRECT BY MR. O'REILLY             1235
13
     BRIAN MILLER - DAUBERT HEARING
14        DIRECT BY MR. O'REILLY             1268
          CROSS BY MR. SPRINGER             1274
15        CROSS BY MR. STILLEY              1304
          REDIRECT BY MR. O'REILLY           1307
16

17

18

19

20

21

22

23

24

25

```
 1          THE COURT:  Welcome back, members of the jury.
 2   It's good to see you and I hope you had a good weekend.
 3   If you were a Philly's fan, it was not a particularly
 4   good weekend, but, nevertheless, I hope you had a good
 5   weekend.
 6       We'll have the government's next witness.
 7          MR. SNOKE:  The government would call Troy
 8   Campbell.
 9          THE COURT:  Very well.
10          MR. SNOKE:  May I approach the witness stand to
11   get an exhibit ready?
12          THE COURT:  You may.
13                     TROY CAMPBELL,
14   (WITNESS SWORN)
15                  DIRECT EXAMINATION
16   BY MR. SNOKE:
17   Q.  Would you state your name and spell your last name
18   for the court reporter, please, sir.
19   A.  Troy Campbell, C-A-M-P-B-E-L-L.
20   Q.  And where you do you live, sir?
21   A.  Bowling Green, Kentucky.
22   Q.  Are you associated with any business there in
23   Bowling Green?
24   A.  We've owned a Chevrolet dealership there locally for
25   the past 30 years.  Be 30 years in May.
```

1   Q.   All right.   In front of you there, sir, is a book,

2   if you would open that to exhibit -- Government's Exhibit

3   273.   And I think there's a number of documents in that

4   exhibit, so you may have to take them out of the plastic

5   sleeve.

6   A.   Yes, sir.

7   Q.   All right.  Would you look those over for a minute,

8   I'm going to ask you some questions about them.

9           THE COURT:  Say the exhibit number again,

10  please.

11          MR. SNOKE:   273.

12          THE WITNESS:  Yes, sir.

13  Q.   (BY MR. SNOKE)  Do you recognize the documents that

14  make up Exhibit 273 as business records of Campbell

15  Chevrolet?

16  A.   Yes, sir, I do.

17  Q.   Kept in the ordinary course of business of Campbell

18  Chevrolet?

19  A.   Yes, sir.

20  Q.   And they were completed on or about the dates that

21  are indicated on the documents themselves there?

22  A.   Yes, sir.

23          MR. SNOKE:  We would move into evidence --

24  Q.   (BY MR. SNOKE)  Oh, first, who is -- what are these

25  documents then?

1   A.   Normally, on an everyday sale of a car, these are

2   all of are documents that we use from the bill of sale to

3   the sales order --

4   Q.   All right.  Just generally, though.  They're

5   just documents connected with a sale?

6   A.   Correct.

7   Q.   All right.  And to whom was that sale made?

8   A.   It was made to Mr. Lindsey Springer.

9   Q.   All right.

10          MR. SNOKE:  We'd move into evidence Exhibit 273

11  at this time.

12          MR. SPRINGER:  No objection, Your Honor.

13          THE COURT:  273 will be received.

14          MR. SNOKE:  All right.  We don't have this up.

15          MR. O'REILLY:  Put it on the Elmo.

16  Q.   (BY MR. SNOKE)  I'm turning to the first page of

17  this document and I think I see your name up there in the

18  upper right-hand corner.

19  A.   Yes, sir, that is correct.

20  Q.   All right.  Did you have something to do with this

21  particular transaction?

22  A.   I did.

23  Q.   All right.  And can you tell us -- well, let's just

24  march through it.  What vehicle was sold to Mr. Springer

25  there?

1   A.   He bought a '99 Mercedes G500.

2   Q.   All right.  And as we scroll down here, I think we

3   see the sales price there is $40,000.  Is that correct?

4   A.   Yes, sir, it is.

5   Q.   Okay.  And Mr. Springer's address there that he gave

6   you, 5147 South Harvard, number 116, Tulsa, Oklahoma; is

7   that correct?

8   A.   Yes, sir.

9   Q.   All right.  Can you tell us, if you recall, and I'm

10  going to -- I'm going to turn to the third page, I

11  think.  It seems to be a letter from Mr. Springer to

12  you.  Can you explain to us what part you played in this

13  transaction?

14  A.   Well, a lot of times for really good clients we, if

15  they sell something on eBay and a customer really wants

16  it to run through a dealership and not through just

17  through two individuals, they want the security, so a lot

18  of times we do that for really good customers of ours,

19  and this was one of those transactions, so --

20  Q.   All right.  And so did Campbell Chevrolet do the

21  advertisement or did Mr. Anastario do the --

22  A.   No, sir.  Campbell Chevrolet did not do the

23  advertisement.  This was done by Mr. Anastario.

24  Q.   All right.  And you handled the paperwork, did you,

25  for your customer, Mr. Anastario?

1   A.   Yes, sir.  Once a transaction happens like this, I

2   physically have to buy the vehicle from Mr. Anastario and

3   then do all the paperwork through Campbell Chevrolet

4   selling it to Mr. Springer.

5   Q.   All right.  And did you do that in this case?

6   A.   I did, sir.

7   Q.   All right.  Now, this letter -- first of all, we

8   have to go back to the first page, maybe we have to.

9   What -- can you give us a date of the sale of this

10  vehicle from that first page of the exhibit?

11  A.   Showing the bill of sale of 12/19.

12  Q.   Of what year?

13  A.   Of '03.

14  Q.   All right.  Now -- and going to this letter in that

15  -- in that -- on the third page of the exhibit and it

16  talks in the third paragraph about Mr. Springer agreeing

17  to pay 44,500 for the '99 G-Wagen and -- but goes into

18  what other conditions he's assuming exist.  The ultimate

19  sales price was not $44,500, was it?

20  A.   Yes, sir, that's correct.  When Mr. Springer showed

21  up, he met with me and Bobby and took the vehicle out for

22  a drive and, if I'm not mistaken, found some problems

23  with the wheels or whatnot and proceeded to let Bobby

24  know that there was problems with the wheels and how much

25  he thought they would cost.  And so they negotiated

1   the -- down to the $40,000.

2   Q.   All right.

3   A.   So Bobby had taken that off of the price.

4   Q.   If you would turn to what would be the fifth page of

5   the exhibit, sir.  And --

6   A.   Okay.

7   Q.   Do you recognize the -- these two cashier's checks?

8   A.   Yes, sir, I do.

9   Q.   All right.  What was -- what part did they play in

10  the purchase?

11  A.   Well, Mr. Springer had sent this to me before he had

12  come to pick up the vehicle, so that way we would have

13  ample time to run them through our bank and for them to

14  clear before he came to pick up the vehicle.

15  Q.   All right.  And there's some notes there over on the

16  left side of that exhibit.  Do you know who --

17  A.   That handwriting is done -- yeah, that handwriting

18  is done by Rod Carter.  He's my finance manager.  He has

19  been with me 25 years.

20  Q.   All right.  And that indicates that there was some

21  checking, I guess, done on --

22  A.   Correct.  Any time we get cashier's checks, we

23  always follow up with the bank to make sure that the

24  funds are there and whatnot.  So that's the reason those

25  notes are made there.

TROY CAMPBELL - DIRECT BY MR. SNOKE                    1140

1   Q.   All right.  And what -- those two $20,000 checks are

2   made payable to Lindsey Springer; is that correct?

3   A.   Yes, sir.

4   Q.   And they are drawn on what appears to be Superior

5   Bank?

6   A.   Yes, sir.

7   Q.   In Ft. Smith, Arkansas?

8   A.   Yes, sir.

9   Q.   Cashier's check.  All right.  Now, the next page is

10  the, I guess, the certificate of title for the vehicle

11  and some other documents associated with the sale; is

12  that correct?

13  A.   Yes, sir.

14  Q.   And at the very back there's a -- actually, a Xerox

15  of an Oklahoma driver's license, is that normal for one

16  of your transactions?

17  A.   We always make a copy of everyone's driver's license

18  that we do business with just in case we ever may need

19  it.

20  Q.   All right.  Did -- then you said Mr. Springer then

21  ultimately came to pick up the vehicle?

22  A.   Yes, sir.

23  Q.   Did you have any -- did you meet him then at that

24  time?

25  A.   That was my first time to meet him, other than

TROY CAMPBELL - CROSS BY MR. SPRINGER                    1141

1   receiving his letter.

2   Q.   All right.  And -- okay.  And you -- was

3   Mr. Anastario there or your other customer -- your

4   customer that -- was he there also?

5   A.   Yes, sir, he was there.

6   Q.   Okay.  And then you said then Mr. Springer then

7   ultimately took delivery of the vehicle in December there

8   of '03 and the payment final payment was $40,000; is that

9   correct?

10  A.   Yes, sir.

11        MR. SNOKE:  I don't believe I have any other

12  questions.

13        THE COURT:  Cross-examination.

14                    CROSS-EXAMINATION

15  BY MR. SPRINGER:

16  Q.   Good morning.

17  A.   Morning.

18  Q.   Was there any documents related to the sale and

19  transaction of the '99 Mercedes that you were required to

20  fill out for federal or state purposes that you did not

21  fill out?

22  A.   Not that I'm aware of, no, sir.

23  Q.   And isn't it true as of 2003 there were some new

24  guidelines that car dealerships had to go with as far as

25  selling cars because of the 9/11 situation?  Do you

TROY CAMPBELL - CROSS BY MR. SPRINGER                    1142

```
 1  remember?
 2  A.   The only one that I'm familiar with -- like I said,
 3  I'm trying to do this all by memory -- is the terrorist
 4  deal, but we've got a book there at the dealership for
 5  that.  And also we pay -- well, at that time, it was
 6  Reynolds & Reynolds, but now it's ADP.  ADP does that for
 7  us.  We don't even have to do that.
 8  Q.   And you didn't cut any corners with Lindsey Springer
 9  as far as that goes either, did you?
10  A.   It was six years ago.  I can't answer that.
11  Q.   And you testified earlier that you believed that
12  this transaction actually was a transaction that occurred
13  on eBay; is that right?
14  A.   That was my understanding of it.
15  Q.   Thank you very much.
16           MR. SPRINGER:  No further questions, Your Honor.
17           THE COURT:  Mr. Stilley.
18           MR. STILLEY:  No questions.
19           THE COURT:  Any redirect?
20           MR. SNOKE:  No, Your Honor.
21           THE COURT:  You may step down.  We'll have the
22  government's next witness.
23           MR. O'REILLY:  Your Honor, the United States
24  calls Ms. Denise Kohler.  And if I may approach the bench
25  to --
```

```
 1              THE COURT:  You may.

 2              MR. O'REILLY:  Thank you.

 3                        DENISE KOHLER,

 4  (WITNESS SWORN)

 5                   DIRECT EXAMINATION

 6  BY MR. O'REILLY:

 7  Q.   Could you please state your full name and spell your

 8  first and last name for the court reporter.

 9  A.   Yes.  My name is Denise Kohler.  D-E-N-I-S-E,

10  K-O-H-L-E-R

11  Q.   Ms. Kohler, what city and state do you live in?

12  A.   I live in Huntington, Arkansas.

13  Q.   Where do you work?

14  A.   Farmers Bank of Greenwood, Arkansas.

15  Q.   What is you position at Farmers Bank?

16  A.   I am vice president of operations.

17  Q.   In that position, have you become familiar with the

18  record keeping of Farmers Bank?

19  A.   Oh, yes, sir.

20  Q.   In what way?

21  A.   In what way?  That is one of my primary functions,

22  duties, I am in charge of making sure that all of our

23  records are archived.

24  Q.   I'm going to ask you, if you would, to take a look

25  at what is in the binder in front of you and what has
```

DENISE KOHLER - DIRECT BY MR. O'REILLY                1144

1   been marked for identification as Government's Exhibit

2   151, 152, 153, and 154.  Those should be right in front

3   of you.

4   A.  Okay.

5        MR. O'REILLY:  And, Your Honor, at this time, I

6   would also like to publish what's already in evidence as

7   Government's Exhibit 155.

8        THE COURT:  Well, you certainly may publish 155.

9        THE WITNESS:  Okay.

10  Q.  (BY MR. O'REILLY)  Do you recognize those documents?

11  A.  I certainly -- yes, sir.

12  Q.  Just as a general description, what are those

13  documents?

14  A.  Okay.  The documents are images of deposit slips and

15  checks that were -- had been deposited at Farmers Bank

16  that are archived on the day that they are presented.

17        THE COURT:  Hold on just a minute.  Pam, can you

18  turn that down just a little bit.  Go ahead.

19  Q.  (BY MR. O'REILLY)  Into whose account or what

20  account are they deposited?

21  A.  Okay.  In the account of Julie and Oscar Stilley.

22  Q.  Are these documents business records of Farmers

23  Bank?

24  A.  Yes.

25  Q.  Are they kept in the ordinary course of business?

DENISE KOHLER - DIRECT BY MR. O'REILLY                    1145

1   A.   Yes, they are.

2   Q.   I think you've already described this, but just for

3   clarification, were they -- these records made at or near

4   the time of the event that they purport to record

5   occurred?

6   A.   Yes.

7   Q.   And were they made by a person with knowledge of the

8   event?

9   A.   Yes.

10          MR. O'REILLY:  Your Honor, the government would

11  move Government's Exhibits 151, 152, 153, and 154 into

12  evidence.

13          THE COURT:  Any objection?

14          MR. STILLEY:  Objection, relevance.

15          THE COURT:  What's the relevance of these,

16  Mr. O'Reilly?

17          MR. O'REILLY:  Your Honor, part of the

18  indictment is, is that Mr. Stilley did not file tax

19  returns.  These show he had income, which --

20          THE COURT:  The objection will be overruled.

21  151 through 154 will be received.

22          MR. O'REILLY:  And if I could ask 151 to be

23  published.

24  Q.   (BY MR. O'REILLY)  And, Ms. Kohler, if you could

25  please describe what is, in more particular detail,

 1  Government's Exhibit 151.

 2  A.   151 is a copy of deposit slips, checks that were

 3  deposited, and there's a cash-out, there was cash that

 4  was given out on that deposit on the day of the deposit.

 5          MR. O'REILLY:  And, Your Honor, if I may have a

 6  moment.

 7          THE COURT:  You may.

 8          MR. O'REILLY:  That way I can actually see what

 9  I'm talking with Ms. Kohler about.

10  Q.   (BY MR. O'REILLY)  I'm going to ask you if I can

11  draw your attention to the third item.

12  A.   Okay.

13          MR. O'REILLY:  And if we could blow that one up.

14  Q.   (BY MR. O'REILLY)  And does that appear to be a

15  check payable to Oscar Stilley by Eddy Patterson?

16  A.   That is correct.

17  Q.   And if we could look at -- actually, okay, does that

18  appear to be dated January 3, 2003?

19  A.   Yes, sir.

20  Q.   In the amount of $2,275?

21  A.   Correct.

22  Q.   And this was deposited into the bank account of

23  Julie and Oscar Stilley?

24  A.   That is correct.

25  Q.   And now I'm going to ask you to look at what is in

1    evidence as Government's Exhibit 152.

2          MR. O'REILLY:  And if we could blow up the

3    second item.

4    Q.  (BY MR. O'REILLY)  And, Ms. Kohler, could you

5    describe to the jury -- actually, does this appear to be

6    another check from Eddy Patterson and Judy Patterson the

7    following month?

8    A.  Yes, that is correct.

9    Q.  And it's in the amount of -- is it $1,815?

10   A.  That is correct.

11   Q.  And if we could now look at what is in evidence as

12   Government's Exhibit 153.  And if we can look at the --

13         MR. O'REILLY:  Let's see if we can blow up both

14   of those items, please.

15   Q.  (BY MR. O'REILLY)  And does this appear to be a

16   deposit and a check again into the joint account of Oscar

17   and Julie Stilley?

18   A.  Yes.

19   Q.  And is this also from Mr. Eddy Patterson and

20   Mrs. Judy Patterson?

21   A.  That is correct.

22   Q.  And it looks like it's in March of 2003.

23   A.  Yes.

24   Q.  And this one is a little bit less, it's for $852.50.

25   A.  Yes, sir, that is correct.

1  Q.   And, finally, if I could ask you to take a look at

2  what's in evidence as Government's Exhibit 154.   And if I

3  can ask you to take a look at the third item.   Does that

4  appear to be a check from Mr. Patterson to Mr. Oscar

5  Stilley in June of 2003?

6  A.   Yes, sir, that is correct.

7  Q.   And, again, all of these checks that we're talking

8  about were deposited into a personal bank account held in

9  the name of Julie and Oscar Stilley; is that correct?

10 A.   That is correct.

11 Q.   And, actually, I do have one more check that's

12 already in evidence.   I'm going to ask you to look at

13 what is in evidence as Government's Exhibit 155.   And,

14 specifically, I think the two middle -- the second and

15 third items, please.   And, again, were these two checks

16 deposited into the personal bank account of Julie Stilley

17 and Oscar Stilley?

18 A.   Yes, sir.

19 Q.   And are they both checks from a Salvatore Pizzino

20 and a Melissa Pizzino in June of 2003?

21 A.   That is correct.

22 Q.   It looks like they add up to around exactly $5,000.

23 A.   Yes, sir.

24 Q.   And in the memo of the check 541, does that appear

25 to say "attorney retainer"?

```
 1   A.   That is correct.
 2          MR. O'REILLY:  If I may have a moment, Your
 3   Honor?
 4          THE COURT:  You may.
 5          MR. O'REILLY:  Nothing further, Your Honor.
 6          THE COURT:  Cross-examination.
 7          MR. SPRINGER:  No questions from me, Your Honor.
 8                    CROSS-EXAMINATION
 9   BY MR. STILLEY:
10   Q.   Isn't it true that the account that this money was
11   deposited into is in the name of Julie Stilley only?
12   Could you just take a look there and verify that?
13   A.   Okay.  Take a look on --
14   Q.   I want you to take a look and see what account that
15   this money was being deposited into and see if it was the
16   joint account of Oscar and Julie or if it was just
17   Julie's account.
18   A.   Okay.  You want me to verify off of --
19   Q.   Off of the exhibits that you've been looking at.
20   A.   Okay.  Okay.  I am looking at a copy of a deposit
21   slip and it says Oscar Stilley.
22   Q.   Okay.  Now, which one are you looking at?
23   A.   Okay.  Exhibit 154, the very first item.
24   Q.   Okay.  Now, that would be Oscar Stilley's account,
25   correct?
```

DENISE KOHLER - CROSS BY MR. STILLEY                          1150

```
 1   A.   Yes.
 2   Q.   So Oscar Stilley had an account with your bank for a
 3   period of time, correct?
 4   A.   Correct.
 5   Q.   Do you know whether that account is still active?
 6   A.   I believe it is not active at this time.
 7   Q.   Now, there's other deposits that are shown to go
 8   into Julie Stilley's account, correct?
 9   A.   Yes.
10   Q.   Do you see any account there that is in the name of
11   both Oscar and Julie Stilley?
12   A.   Okay.  I would need to look at the -- the account
13   numbers with the signature cards to verify that
14   information.
15   Q.   So you wouldn't be able to discover that from
16   looking at these documents?
17   A.   I'm looking at records that will have who they're
18   payable to or on a deposit ticket it will give a name.  I
19   need to verify the account number against the signature
20   card to verify, you know, without a shadow of a doubt.  I
21   do not have the account numbers memorized.
22   Q.   Oh, certainly, I understand that.
23   A.   Okay.
24   Q.   Now, maybe we could go at this a little different
25   way.  How is it that you understand this money to be
```

1  going into Julie Stilley's account as opposed to Oscar

2  Stilley's account?

3  A.   Okay.  On these documents here, I'm only able to

4  verify Oscar -- by looking at the deposit ticket,

5  verifying it against who it is payable to.  I do know

6  that there was a joint account.  But to verify it, again,

7  that which account that it's going into, I would need to

8  verify the account number.

9  Q.   Now, you said that you knew that there was a joint

10  account, but what's your basis of knowledge there?

11  A.   My basis of knowledge that there is a joint account?

12  Q.   Right.

13  A.   Because I have looked at the records.

14  Q.   Okay.  That would be your personal recollection?

15  A.   Yes.

16  Q.   Most of these documents simply show that Oscar

17  Stilley gave some money to Julie Stilley; is that fair to

18  say?

19  A.   I wouldn't be able to verify that just based on

20  looking at this.  See, I'm looking at a deposit ticket

21  and then I'm looking at blank checks.  Without looking at

22  the deposit ticket, I don't know which account this went

23  into.  Just, you know, I can't go off of memory because

24  there are a lot of records.

25  Q.   Certainly, that's very understandable.  But what I'm

1  trying to establish is that these records would seem to

2  indicate that Oscar Stilley gave money to his wife.

3         MR. O'REILLY:  Objection.  Asked and answered

4  and calls for speculation of the witness.

5         THE COURT:  Answer, if you know.

6         THE WITNESS:  I cannot tell you if he -- you

7  know, by just based on -- that question that you're

8  asking me, based on what I'm looking at, I can't verify

9  that.  I'd have to, you know, look a little further into

10 it.  I mean, it's possible.

11 Q.  (BY MR. STILLEY)  A husband giving money to his wife

12 wouldn't be suspicious at all to the bank, would it?

13 A.  Well, I'm not going to say that it would be

14 suspicious, but our pattern of practice is if someone --

15 an individual is on an account, money should only be

16 deposited into that account belonging to that person.

17 Q.  How long has that procedure been in effect?

18 A.  Well, it's just a pattern of practice.

19 Q.  How long has that pattern of practice --

20 A.  Oh, it's -- I've been involved in operations now for

21 ten years.

22 Q.  You think it has been in effect for the whole time?

23 A.  I'm not saying that we -- that a teller would not

24 allow someone to put a check into an account with that

25 person's name not on there.  I'm just saying that is our

1  pattern and practice to not do that.

2  Q.   Why do you have that pattern and practice?

3  A.   Well, because of -- there is no withdrawal rights.

4  If I give you -- if you give me a check made payable to

5  yourself and I put it into my account, the money belongs

6  to you, then you have no withdrawal rights to that money.

7  Q.   But it's not injurious to the bank, is it?

8  A.   I'm sorry?

9  Q.   That fact would not have any bearing on the bank's

10 interests, would it?  If the bank took a check that was

11 made payable to someone other than the person in whose

12 account the money was deposited, it doesn't make any

13 difference to the bank, does it?

14 A.   Oh, it could, yes.

15 Q.   How could it?

16 A.   How could it?  Because how do I know that that check

17 that you are depositing, which is payable to someone

18 else, really belongs to you, that you have rights to that

19 money?  It could be fraud.  It could be embezzlement.  It

20 -- you know, there's a lot of things that we look --

21 factors that we look into.

22 Q.   Did you ever wait on Oscar Stilley?

23 A.   No, I did not.

24 Q.   Okay.  The tellers that would ordinarily wait on

25 Oscar Stilley would know Oscar Stilley, right?

```
 1   A.   I cannot verify that.

 2   Q.   Well, if there was -- most people that patronize

 3   your bank will spend most of their time going to a

 4   certain branch, right?

 5   A.   We do have customers that do patronize certain

 6   branches and then we have some that patronize all of

 7   them.  We do have 11 locations.

 8            THE COURT:  Ma'am, if you would, move the

 9   microphone a little further away from you.

10            THE WITNESS:  Okay.

11   Q.   (BY MR. STILLEY)  And so as a general rule, a bank

12   wants to get to know its customers, right?

13   A.   Well, that is our -- you know, we're a community

14   bank and we like to know our customers, but that normally

15   -- you know, I can't say without verifying.  I can look

16   at documents and tell you which locations that they --

17   the deposits were made.  But I cannot sit here on the

18   stand and tell you that whoever took these deposits knew

19   him personally.

20   Q.   Well, but at the same time, I believe you've already

21   testified that the bank formerly had an account in the

22   name of Oscar Stilley.

23   A.   Yes.

24            MR. O'REILLY:  Objection.  Asked and answered

25   and relevance to this line of cross, Your Honor.
```

1          THE COURT:  Well, it has been asked and answered
2    again.  Next question.
3    Q.   (BY MR. STILLEY)  So the bank wouldn't have any
4    concerns about Oscar Stilley being a fraud since the bank
5    already knew Oscar Stilley, right?
6    A.   Okay.  That --
7          MR. O'REILLY:  Objection to the form of the
8    question.
9          THE COURT:  Overruled.
10         THE WITNESS:  That question there, I mean, we
11   don't set out to say that our customers are going to
12   defraud us.  But it's just our pattern and practice for
13   sound prudent banking that we -- unless, you know, it has
14   been approved by an officer, we -- our pattern and
15   practice is that we -- in an account, we want the checks
16   that -- the owner of the account, the checks made payable
17   to that person to go into that account unless otherwise
18   it has been approved.
19       And, like I said, sometimes with this many locations
20   and as teller turnover, sometimes we do have cases where
21   things do get slipped by.  Or, for instance, you know, a
22   teller -- if it belongs to a spouse, they will go ahead
23   and deposit that.  It's a training, you know, issue, a
24   new person.  But, you know, we don't set out to say that
25   any particular person is going to try to defraud the bank

1  or do something illegal.

2          THE COURT:  Mr. Stilley, it's time to move on to

3  another subject.

4  Q.  (BY MR. STILLEY)  I've just got one more question.

5  Isn't it true you have no evidence that Oscar Stilley has

6  committed any crime whatsoever?

7          MR. O'REILLY:  Objection.

8          THE COURT:  Overruled.

9  Q.  (BY MR. STILLEY)  I'm just asking you to agree with

10 me that you don't have any evidence that Oscar Stilley

11 has committed any crime.

12 A.  I'm here to testify -- I was asked to testify on

13 bank records, and I'm just here to testify.

14         MR. STILLEY:  Your Honor, that's all I've got

15 with this witness.  I do have a motion that -- could I

16 move to strike this testimony on the grounds that Oscar

17 Stilley is not charged with willful failure to file tax

18 returns as counts?

19         THE COURT:  That will be denied.  Any redirect?

20         MR. O'REILLY:  Yes, Your Honor.

21                    REDIRECT EXAMINATION

22 BY MR. O'REILLY:

23 Q.  For clarification, with respect to the deposits and

24 items that we just looked at, into what type of bank

25 account were they deposited?

DENNY PATRIDGE - DIRECT BY MR. SNOKE                                    1157

1    A.   What type?  It was a personal.

2            MR. O'REILLY:  Nothing further, Your Honor.

3            THE COURT:  Recross limited to redirect.

4            MR. SPRINGER:  None for me, Your Honor.

5            MR. STILLEY:  No, Your Honor.

6            THE COURT:  You may step down.  We'll have the

7    government's next witness.

8            MR. SNOKE:  The government would next call Denny

9    Patridge.

10           THE COURT:  Say that name again.

11           MR. SNOKE:  Denny Patridge, P-A-T-R-I-D-G-E.

12                         DENNY PATRIDGE,

13   (WITNESS SWORN)

14                      DIRECT EXAMINATION

15   BY MR. SNOKE:

16   Q.   Would you state your full name and spell your last

17   name for the court reporter, please.

18   A.   Denny R. Patridge.  It's P-A-T-R-I-D-G-E.

19   Q.   And, sir, are you currently serving a federal

20   sentence?

21   A.   Yes, I am.

22   Q.   All right.  When were you sentenced?

23   A.   September of 2006.

24   Q.   And what was that sentence, sir?

25   A.   Sixty months.

1    Q.   Sixty months?

2    A.   Yes, sir.

3    Q.   And what charges were you convicted of, sir?

4    A.   Evasion of payment, evasion of assessment, wire

5    fraud, money laundering.

6    Q.   Where did you reside before you were convicted, sir?

7    A.   Strasburg, Illinois.

8    Q.   All right.  when were you indicted on those charges,

9    sir?

10   A.   I believe June 2, 2004.

11   Q.   Do you know Lindsey Springer?

12   A.   Yes, sir.

13   Q.   Do you see him in the courtroom here today?

14   A.   Yes, sir.

15   Q.   And would you tell me what he's wearing and where

16   he's sitting?

17   A.   Right there with the blue sports coat.

18   Q.   Or standing in this case.  Thank you.

19        MR. SNOKE:  The record will reflect he has

20   identified Mr. Springer?

21        THE COURT:  The record will so reflect.

22   Q.   (BY MR. SNOKE)  How did you -- or did you -- did you

23   have contact with Mr. Springer after you were indicted?

24   A.   I'm sorry.  Could you --

25   Q.   Did you have contact with Mr. Lindsey Springer after

1   you were indicted in that case?

2   A.   Yes, sir.

3   Q.   All right.  And how did you -- what was the

4   circumstances under which you were contacting

5   Mr. Springer after your indictment?

6   A.   A local attorney contacted Lindsey for me.

7   Q.   All right.  And who was that?

8   A.   His name was Brent Winters.

9   Q.   All right.  And who was representing you at that

10  time in your criminal case?

11  A.   I believe Michael Minns.

12  Q.   All right.  And you had several attorneys during the

13  course of your trial; is that correct?

14  A.   Yes, I did.

15  Q.   Okay.  And one of them was Mr. Minns, I gather?

16  A.   Right.

17  Q.   And also Mr. Winters, did you say, was he also

18  representing you?

19  A.   Mr. Winters represented me before I was indicted.

20  Q.   All right.  So you had some contact with

21  Mr. Springer before you were indicted or was it only

22  after?

23  A.   I believe my contact with him was after.

24  Q.   Okay.  After you were indicted.

25  A.   To the best of my --

1   Q.   And after Mr. Minns, who represented you?

2   A.   Yes.

3   Q.   I'm sorry?

4   A.   Yes.

5   Q.   Okay.  Let me reask that again.  After you had

6   Mr. Minns, did you have another attorney after that?

7   A.   Yes.

8   Q.   Okay.  And who was that?

9   A.   Mr. Barringer.

10  Q.   All right.  And did Mr. Barringer represent you at

11  the time you actually went to trial?

12  A.   Yes, he did.

13  Q.   Okay.  Was Mr. Barringer familiar with Mr. Lindsey

14  Springer?

15  A.   Yes, he was.

16  Q.   When you contacted Mr. Springer, after you were

17  indicted, what did you understand that he was going to do

18  for you in connection with your criminal case?

19          MR. SPRINGER:  Your Honor, I object.  I believe

20  the witness testified that Mr. Winters contacted me.  The

21  question was, what did you --

22          THE COURT:  Reask it, if you would.

23          MR. SNOKE:  All right.

24  Q.   (BY MR. SNOKE)  Now, you said you -- all right.

25  When Mr. Springer -- when you contacted Mr. Springer in

1   connection with your case, did you have a conversation

2   with him?

3   A.   Yes, after Mr. Winters had talked to him.

4   Q.   All right.  Did you -- and you personally talked to

5   him?

6   A.   Yes, on the phone.

7   Q.   All right.  And from those conversations, what did

8   you understand that Mr. Springer was going to do for you

9   in connection with your criminal case?

10  A.   My understanding was that he did research to help

11  the attorneys who represented me.

12  Q.   All right.  He did legal research?

13  A.   Yes.

14  Q.   And at some point, did you -- well, who was

15  representing you at the time that -- you first got in

16  touch with Mr. Springer in connection with your case?

17  A.   Mr. Minns.

18  Q.   Okay.  Did you discuss Mr. Springer with Mr. Minns?

19  A.   Yes, I did.

20  Q.   All right.  And then when you hired Mr. -- at some

21  point, I gather you parted ways with Mr. Minns and hired

22  Mr. Barringer?

23  A.   That's right.

24  Q.   All before you actually were going to trial?

25  A.   Yes.

1   Q.   Did you discuss Mr. Springer with Mr. Barringer?

2   A.   Yes.

3   Q.   All right.  And what did you -- then at some point

4   here, did Mr. Springer join this defense team either with

5   Mr. Minns or Mr. Barringer?

6   A.   He did with Mr. Barringer, yes.

7   Q.   He did with -- okay.  So you were using

8   Mr. Barringer when Mr. Springer actually joined the

9   defense team; is that --

10  A.   I was using Mr. Minns --

11  Q.   Okay.

12  A.   -- when I first came in contact with Lindsey.

13  Q.   Okay.  Did Mr. Springer -- did you have an agreement

14  with Mr. Springer then to join the defense team, that he

15  would help you?

16  A.   Yes, a verbal agreement.

17  Q.   All right.  And did Mr. Springer then, after that

18  point, do any legal research for you?

19  A.   I don't really remember when he first started.

20  Because I went through, as you know, a number of

21  attorneys, so I can't remember exactly when he started.

22  Q.   All right.  Well, prior to your trial, were motions

23  filed by Mr. Minns or Mr. Barringer on your behalf?

24  A.   Yes.

25  Q.   And do you know if Mr. Springer had anything -- any

1  input in those motions that were filed on your behalf

2  before trial?

3  A.  The ones that Mr. Barringer filed, if they were

4  filed before trial, yes.

5  Q.  They were what?

6  A.  If Mr. Barringer filed them.

7  Q.  All right.  If Mr. Barringer filed them, you're

8  telling me that Mr. Springer had something to do with

9  them?

10  A.  I would say he did something.  I don't know exactly

11  what he did.

12  Q.  All right.  Well, in any of these, did you ever --

13  well, we'll move on.  And when did your case go to trial?

14  A.  In June of 2005.

15  Q.  Okay.  And you said by that time -- well, who was

16  representing you then at the time you actually went to

17  trial?

18  A.  Mr. Barringer.

19  Q.  Had you met Mr. Lindsey Springer in person prior to

20  the time you went to trial?

21  A.  Yes, I had.

22  Q.  Okay.  And what kind of a -- when was that or

23  approximately relative to the trial?  Was it some court

24  appearance or was it just --

25  A.  I believe the first time I met Lindsey in person was

DENNY PATRIDGE - DIRECT BY MR. SNOKE                    1164

1   when I fired Minns and hired Barringer at Urbana.

2   Q.   All right.

3   A.   That was in January of 2005.

4   Q.   All right.

5            THE COURT:  And you say that was in Urbana,

6   Illinois?

7            THE WITNESS:  Yes, sir.

8   Q.   (BY MR. SNOKE)  And Urbana is where the federal

9   court was?

10  A.   Yes, sir.

11  Q.   Was there some court function that precipitated your

12  firing Mr. Minns or --

13  A.   Are you asking why I fired Mr. Minns?

14  Q.   No.  I'm asking if it was -- if it occurred on

15  January -- in January of 2005 while you were all there at

16  Urbana for some court appearance or was it just a

17  meeting?

18  A.   No, there was a court appearance.  He had to make an

19  appearance.  And at that time, I asked that he be

20  replaced.

21  Q.   All right.  And you told the Court actually that you

22  wanted --

23  A.   Right.

24  Q.   Okay.  And at that time, did you hire -- was that

25  when you hired or at some other time after that that you

1   hired Mr. Barringer?

2   A.   I really don't remember.  I may have already hired

3   him before I released Mr. Minns.

4   Q.   But you recall that Mr. Springer was there at that

5   proceeding?

6   A.   Yes.

7   Q.   All right.  And the case went to trial, you said, in

8   June of 2005, so were there any motions then filed by

9   Mr. Barringer between his -- between the time he was

10  taken on board and as your attorney and the June trial

11  date?

12  A.   I assume so.  I don't really remember everything

13  that was filed.

14  Q.   Okay.  Now, let's talk about the trial a little

15  bit.  Was Mr. Lindsey Springer present at your trial in

16  Urbana?

17  A.   Yes, he was.

18  Q.   All right.  And where was he located?  Was he there

19  on a daily basis?

20  A.   Yes, he was.

21  Q.   All right.  And where was he -- where would he be

22  present in the courtroom during your trial?

23  A.   He was sitting at the table with Mr. Barringer and

24  myself.

25  Q.   All right.  So he was allowed to sit at counsel

1  table there with Mr. Barringer during your trial?

2  A.   Yes, sir.

3  Q.   All right.  Did Mr. Springer ever show you any of

4  the legal papers he was doing for you in your case?

5           MR. SPRINGER:  Objection, Your Honor.  I don't

6  believe the testimony reflects that he said I did any

7  legal papers.

8           THE COURT:  Back up and establish that.

9           MR. SNOKE:  I'll rephrase that.

10 Q.   (BY MR. SNOKE)  Did Mr. Springer ever show you any

11 of the papers or documents that he had prepared for you

12 in your case?

13 A.   Yes, but I believe those -- I believe I saw those

14 after those were -- after he had contacted

15 Mr. Barringer.  I'm not sure about that, the way it

16 happened.

17 Q.   All right.  How long did the trial go, sir?

18 A.   I think it lasted three weeks.  I'm not sure.

19 Q.   All right.  And -- all right.  And then after you

20 were convicted, I think you said, after the conviction,

21 was there a period of time before you were actually

22 sentenced?

23 A.   Almost 16 months.

24 Q.   All right.  And so do you know what your sentencing

25 date was?

DENNY PATRIDGE - DIRECT BY MR. SNOKE                    1167

1   A.   I just know it was in September of 2006.  I don't

2   really actually remember the --

3   Q.   September of 2006?

4   A.   Right.

5   Q.   That's right, you did say that.  All right.  I would

6   like to show you some exhibits here.

7            MR. SNOKE:  And if I can move back to the --

8            THE COURT:  You may.

9            THE WITNESS:  Your Honor, could I have a glass

10  of water?

11           THE COURT:  You surely may.  Pam, if you would

12  help him with that.

13           THE WITNESS:  Thank you.

14           MR. SNOKE:  Your Honor, can we approach for a

15  minute?

16           THE COURT:  You may.

17     (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND

18  OUT OF THE HEARING OF THE JURY.)

19           THE COURT:  Go ahead.

20           MR. O'REILLY:  I apologize, Your Honor, but

21  there's two people in the gallery behind us that I don't

22  recognize but are perhaps witnesses.  I don't know if you

23  know who they are.

24           MR. SPRINGER:  I do not, Your Honor.  I'm sorry.

25           THE COURT:  Can you tell me for a fact that

1  they're not on your witness list?

2            MR. SPRINGER:  Yes, sir, I can.

3            THE COURT:  Mr. Stilley, can you tell me for a

4  fact they're not on your witness list?

5            MR. STILLEY:  Yes.  I don't recognize them.

6            THE COURT:  Okay.  They're just interested

7  citizens.

8            MR. STILLEY:  Could I apologize?  I'm sorry for

9  violating your rules.  I realize now that I violated your

10 rule.  I went back and reread your rules.  I'm sorry and

11 it won't happen again.

12           THE COURT:  What rules was that other than being

13 on time for court?

14           MR. STILLEY:  I made a motion in front of the

15 jury.

16           THE COURT:  Well, that didn't relate to

17 discovery that I know of.  Don't worry about it.  More

18 important rule is the rule requiring you to be on time

19 for court.  And, of course, we do have ways to assure

20 that, but I'm sure you will bear that in mind.

21           MR. O'REILLY:  Your Honor, there's one more

22 thing.  Just -- and I don't know if Your Honor has seen

23 that Mr. Springer filed a motion yesterday, we filed a

24 very brief response this morning.  The primary concern I

25 have, as indicated in our response, is that there are

1   three pleadings -- at least three of the attachments that

2   should be sealed.

3             THE COURT:  I'll direct that it be

4   preliminarily -- at least that it be put under seal and

5   if there's anything more necessary to that motion, we'll

6   address that promptly.

7             MR. O'REILLY:  Thank you.

8       (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

9   WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

10  PRESENCE AND HEARING OF THE JURY.)

11            THE COURT:  You may proceed.

12  Q.  (BY MR. SNOKE)  Mr. Patridge, I'd like you to look

13  at Plaintiff's Exhibit 42, which is in evidence here.

14  The top of the two items on that, which we've just blown

15  up here for you.  Can you see that on the screen?

16  A.  Yes, sir.

17  Q.  Do you recognize that exhibit?

18  A.  Yes, I do.

19  Q.  And did you cause that cashier's check to be issued

20  and paid out to Lindsey Springer?

21  A.  Yes, I did.

22  Q.  Okay.  And the date on that is August 27th of 2004;

23  is that correct?

24  A.  That's right.

25  Q.  $6,000?

```
1   A.   Yes, sir.

2   Q.   And there's the word -- appears to be written the

3   word "donation" after Denny Patridge up there as the

4   remitter?

5   A.   Yes, sir.

6   Q.   And did you write that on there?

7   A.   Yes, I did.

8   Q.   Okay.  Was that after discussing -- discussing that

9   donation with Mr. Springer?

10  A.   I'm sorry.  What do you mean "discussing"?

11  Q.   Did you just write that on there by your -- of your

12  own volition or did you --

13  A.   Yes.

14  Q.   -- have some discussion with someone about doing

15  that?

16  A.   Well, my understanding was that's the way

17  Mr. Springer operated was on donations or contributions,

18  so I wrote that on there after the bank had typed up the

19  check.

20  Q.   All right.  Now, this is August 27th of '04, which

21  is several months before your trial in June of '05; is

22  that correct?

23  A.   Yes, it is.

24  Q.   Do you remember any checks written to Mr. Lindsey

25  Springer before that date of August 27th?
```

1   A.   I really don't remember.

2   Q.   All right.  Let's go on to Exhibit 40 -- I'm sorry.

3   Before we move on to the next one, was this check issued

4   after Mr. Springer had joined your defense team?

5   A.   I'm assuming so.

6   Q.   Do you know if or not -- whether or not Mr. Springer

7   had done any research for you or for Mr. Minns at the

8   time this check was issued?

9   A.   I really don't know.  I don't remember because I

10  don't remember exactly when he started.

11  Q.   All right.  Did Mr. Springer -- did you ever have a

12  conversation with Mr. Springer concerning whether or not

13  you could -- you could deduct these checks that you were

14  writing "donation" on to him?

15  A.   Yes, we did have a discussion.  He said that I

16  couldn't deduct --

17  Q.   You could not deduct?

18  A.   Could not deduct the contributions.

19  Q.   So you never tried to deduct those?

20  A.   No, I didn't.

21  Q.   Let's go to Exhibit 46 next.  It's a check -- do you

22  recognize this check, sir?

23  A.   Yes, sir.

24  Q.   And did you cause this check also to be issued and

25  sent to Mr. Lindsey Springer?

DENNY PATRIDGE - DIRECT BY MR. SNOKE                          1172

1   A.   Yes, I did.

2   Q.   And the date on that check is about January 18,

3   2005; is that correct?

4   A.   Yes, it is.

5   Q.   $3,500.  This -- I think you said that you hired

6   Mr. Barringer and fired Mr. -- well, at least you fired

7   Mr. Minns about January of 2005?

8   A.   That's right.

9   Q.   Was that right about the same time this check is

10  issued to Mr. Springer?

11  A.   Approximately, yes.

12        MR. SPRINGER:  Objection, Your Honor.  I don't

13  believe Exhibit Number 46 has been admitted into evidence

14  yet.

15        MR. SNOKE:  It is, Your Honor.

16        MR. SPRINGER:  Withdraw the objection, Your

17  Honor.

18        THE COURT:  It has been received.

19  Q.   (BY MR. SNOKE)  Let's go next to Exhibit 48.

20  Exhibit 48, do you recognize that check in that exhibit?

21  A.   Yes, sir.

22  Q.   I'm sorry?

23  A.   Yes, sir.

24  Q.   Okay.  And did you issue this what appears to be a

25  personal check?

DENNY PATRIDGE - DIRECT BY MR. SNOKE                          1173

1  A.   That's -- that's actually a credit card check and,
2  yes, I did.
3  Q.   Oh, a credit card check, okay.  It's drawn on some
4  account of yours, though; is that correct?
5  A.   Yes.
6  Q.   And that's dated 8/25 of '05.  Would that have been
7  about the time you issued this check or caused it to be
8  issued?
9  A.   Yes, sir.
10 Q.   How would you know when to send a check to
11 Mr. Springer?
12 A.   Basically, I gave Lindsey donations or gifts when I
13 had the money.  And at that time, I still had some money.
14 Q.   Did you have any conversation with him about -- from
15 time to time about that subject?
16 A.   I'm not quite sure what you're asking.
17 Q.   Well, I mean --
18 A.   I gave him what I could afford to give him at the
19 time and what I was comfortable with.
20 Q.   All right.  And how would -- how would the subject
21 come up then?  Would you just send him a check or would
22 you have some conversation with him about it prior to
23 sending it?
24 A.   Well, we never discussed -- as far as I remember,
25 I don't think we discussed amounts.  I just knew that

1  he -- at times he needed money because he worked on

2  donations and some people couldn't pay him and at the

3  time I could, so -- I was the one who determined what I

4  was going to pay him.  You can see they were never the

5  same amounts or there was no rhyme nor reason for the

6  amounts, just what I could do.

7  Q.   Prior to sending some check such as this one, would

8  Mr. Springer indicate the mission needed money, or the

9  ministry?

10 A.   I don't think so.  Again, I was the one who

11 determined what I was going to pay him and when I was

12 going to pay him.

13 Q.   All right.  Now, this check is apparently after the

14 commencement of the trial; is that correct?

15 A.   Right.

16 Q.   And -- okay.  Let's go to Exhibit -- Exhibit 49

17 next.  During this period after the trial and before

18 sentencing, you said it was approximately a 16-month

19 period.

20 A.   Right.

21 Q.   Did Mr. Springer continue to help your -- help

22 Mr. Barringer or help your case?

23 A.   Yes, he did.

24 Q.   Can you tell us what -- if you recognize Exhibit 49?

25 A.   Yes, I do.

DENNY PATRIDGE - DIRECT BY MR. SNOKE                          1175

1   Q.   What is Exhibit 49?

2   A.   It is a check from a client -- clients Herb and

3   Charlene Mott, had been clients for about ten years at

4   this time, and they wanted to help me.  I'm in the

5   insurance business.  And, personally, I couldn't take a

6   check or borrow money from a client.  I'm not allowed

7   to.  And they had asked several times if they could help,

8   and I said if you want to help, you can make a gift to

9   Mr. Springer, and that's the check that you see right

10  there.  They wrote a check for $10,000.

11  Q.   All right.  February 7th of '06 --

12  A.   Right.

13  Q.   -- apparently that was written.  All right.  And so

14  you're saying that you talked to Mrs. Mott there?

15  A.   Right.

16  Q.   About -- and the Motts or Mrs. Mott wanted to assist

17  you in this trial that you were in?

18  A.   She just wanted to help.

19  Q.   But she wanted to help you?

20  A.   Yes.

21  Q.   All right.  All right.  Now, this is, again, before

22  the actual sentencing date but after your conviction; is

23  that correct?

24  A.   Yes, it is.

25  Q.   Exhibit 50, please.  Do you recognize this check?

1   A.   Yes, I do.

2   Q.   Okay.  And did you cause this one to be issued?

3   A.   Yes, that's another credit card check.

4   Q.   All right.  It looks similar to the other one I

5   guess we just looked at.  All right.  This is dated April

6   26, 2006, in the amount of $5,000 payable to Lindsey

7   Springer.

8   A.   Right.

9   Q.   I don't see a memo or notation on this particular

10  check.

11  A.   No, because I was probably getting sloppy by that

12  time.

13  Q.   All right.  How about -- let's look at Exhibit 53.

14  Do you recognize this check?

15  A.   Yes.

16  Q.   All right.  And this is apparently payable to

17  Lindsey Springer for $5,000 in July, looks like 8th of

18  2006; is that correct?

19  A.   Right.  That's another credit card check.

20  Q.   And this is payable through -- well, what kind of a

21  check is this?  Is this another credit card check?

22  A.   Yes.

23  Q.   A different credit card, I guess, or something.

24  Now, is Mr. Springer -- we're still here in July of 2006,

25  you haven't yet been sentenced; is that correct?

1  A.   That's right.

2  Q.   Is Mr. Springer still providing research efforts on

3  your behalf at this time?

4  A.   Yes.  For Mr. Barringer, yes.

5  Q.   Let's look at Plaintiff's Exhibit 55.  Do you

6  recognize that check also?

7  A.   Yes, sir.

8  Q.   Is that -- did you cause that to be issued?

9  A.   Yes, sir.

10 Q.   And this -- there's no day in there, but would this

11 have been issued just before or after your sentencing in

12 September of '06?

13 A.   It had to be because I was sentenced in September.

14 Q.   All right.  Were you -- were you incarcerated, then,

15 when you were sentenced?

16 A.   No, I was not.

17 Q.   You had some time to report?

18 A.   I reported on December 1st of 2006.

19 Q.   Okay.  So it could have been written -- since

20 there's no date in there, we can't tell whether it was

21 written before or after, I guess, the sentencing date?

22 A.   Right.

23 Q.   All right.  But at this time this check was written,

24 was Mr. Springer still providing you with services?

25 A.   Yes, he was still providing research for

1   Mr. Barringer.

2   Q.   All right.   In addition to the checks that we've

3   looked at here that were payable to Mr. Springer, did you

4   pay any money to Mr. Barringer for his part in defending

5   you in this case?

6   A.   Are you asking did I pay Mr. Barringer legal fees.

7   Q.   I'm asking you if you paid Mr. Barringer any --

8   yeah, any money in connection with defending you.

9   A.   Sure.

10  Q.   And in your payments to Mr. Barringer, did you get

11  some sort of a billing statement?

12  A.   Yes.

13  Q.   Did you ever get any kind of a billing statement

14  from Mr. Springer?

15  A.   Never.

16  Q.   Do you know Mr. Oscar Stilley?

17  A.   No, I don't.

18  Q.   Since you've arrived in Tulsa this time, you've had

19  occasion to be interviewed by me; isn't that correct?

20  A.   Yes, sir.

21  Q.   Have you spoke to Mr. Springer?

22  A.   Since I've arrived in Tulsa?

23  Q.   I'm sorry?

24  A.   Since I've been in Tulsa?

25  Q.   Yeah.

1  A.   No.

2  Q.   Okay.  Either in person or on the phone?

3  A.   No, sir.

4  Q.   Okay.  Have you talked with anyone else about the

5  case besides me since coming to Tulsa?

6  A.   Michael Burt, he's my cell mate.

7  Q.   Oh, okay.  Now, you were called in to testify in

8  front of the grand jury here about a little over a year

9  ago; isn't that right?

10  A.   Yes, sir.

11  Q.   September of '08.  And after that appearance here in

12  Tulsa, did you have occasion to talk to Mr. Springer?

13  A.   Yes, I talked to him on the phone.

14  Q.   Okay.  On one occasion or more than one occasion?

15  A.   Several occasions.

16         MR. SNOKE:  May I have a moment, Your Honor?

17         THE COURT:  You may.

18  Q.   (BY MR. SNOKE)  How did you locate Mr. Barringer?

19  A.   Brent Winters, the attorney, contacted Mr. Barringer

20  and introduced him to me, for me to meet with him.

21  Q.   This Mr. Winters is, I think you said, was also the

22  one that had -- had contacted Mr. Springer also --

23  A.   Right.

24  Q.   -- earlier.  All right.  And Mr. Winters was -- he

25  said he was a local attorney; is that correct?

1   A.   Right.

2   Q.   All right.  Was he something to you more than just

3   an attorney?

4   A.   Actually, he was somebody I met through a person in

5   the insurance business and he had worked with the Aegis

6   Company, the company that sold the trust documents to me.

7   Q.   All right.  And the trust documents had something --

8   that were sold to you had something to do with your --

9   the case they had that they convicted you of?

10  A.   They had everything to do with it.

11  Q.   Other than the ones -- other than the checks that

12  I've shown you today, did you make any other payments to

13  Mr. Springer?

14  A.   I don't really remember if I did or not, I could

15  have, but that has been quite a while ago and I don't

16  remember.

17          MR. SNOKE:  I don't believe I have any other

18  questions of the witness, Your Honor.

19          THE COURT:  Cross-examination.

20                  CROSS-EXAMINATION

21  BY MR. SPRINGER:

22  Q.   Mr. Patridge, before you hired Mr. Winters in a

23  timeline that was around 2000; is that correct?

24  A.   That's when I first had discussions with him.

25  Actually, I don't -- -- well, I didn't actually hire him,

1  but he helped me with some investments, I would say.

2  When the IRS told me to quit using the trust, he helped

3  me.  But I wasn't paying him a fee.  I didn't have him on

4  a retainer until 2002.

5  Q.  Is that part of your criminal charges that he helped

6  you with?

7  A.  Yes, they are.

8  Q.  Was he allowed to testify at your trial?

9  A.  No, he wasn't.

10  Q.  The Court protect his rights?

11  A.  Well, supposedly, yeah.

12  Q.  Who's Mr. Rivera?

13  A.  Mr. Rivera is an attorney who I hired in 2000.

14  Q.  Out of California?

15  A.  Yes.

16  Q.  Why did you hire Mr. Rivera?

17         MR. SNOKE:  Objection, Your Honor, to the line

18  of questioning.

19         THE COURT:  Overruled.

20         THE WITNESS:  Why did I hire Mr. Rivera?

21  Q.  (BY MR. SPRINGER)  Yes, sir.

22  A.  Because the company who I purchased the trust

23  documents for wouldn't provide attorneys, even though

24  they said they would, and they eventually referred me to

25  Mr. Rivera.  And I couldn't find anybody locally.

DENNY PATRIDGE - CROSS BY MR. SPRINGER                    1182

1  Q.   Okay.  So then after Rivera coming forward, did you

2  go to Minns or did you go to McPherson?

3  A.   McPherson and Winters.

4  Q.   McPherson and Winters?

5  A.   Right.

6  Q.   All right.  So it goes Rivera, McPherson and

7  Winters, now then it goes to Michael Minns?

8  A.   No, actually, it went to Carol Dyson of the

9  Beckett --

10 Q.   Carol Dyson, that's right.

11 A.   -- group in Urbana, Illinois, who worked closely

12 with the Attorney General's Office -- or I mean the U.S.

13 Attorney's Office.

14 Q.   So then after Carol Dyson, then it went to Michael

15 Minns?

16 A.   Michael Minns.

17 Q.   And then I believe you testified that there was a

18 hearing in Urbana before you fired Michael Minns that

19 Mr. Barringer came into; is that right?

20 A.   Right.

21 Q.   And so it's safe to say at one time you had hired

22 four different lawyers in the case at the same time; is

23 that right?

24 A.   The day that I released Mr. Minns, Mr. Minns and his

25 assistant were there, Carol Dyson was there, and Jerry

1   Barringer was there.

2   Q.   And then on top of that, isn't it true that --

3   excuse me, strike that.  Where did the -- where did the

4   trust documents come from?  Was it Chicago?

5   A.   Right.

6   Q.   And what was that company's name?

7   A.   Aegis, A-E-G-I-S.

8   Q.   And at the time you joined Aegis, you had gotten

9   legal advice, hadn't you?

10  A.   Sure.

11  Q.   You had surrounded yourself with legal advice,

12  hadn't you?

13  A.   Yes, I had.

14  Q.   Did you know me at that time?

15  A.   No, I did not.

16  Q.   Did Aegis have lawyers in its firm?

17  A.   Yes, they did.

18  Q.   And isn't it true that none of the people that you

19  just testified to were allowed to testify at your trial?

20  A.   That's true.

21  Q.   Because they were all protected?

22        MR. SNOKE:  Objection.

23        THE COURT:  State your objection again.

24        MR. SNOKE:  Your Honor, we need to approach.

25        THE COURT:  Counsel will approach.

DENNY PATRIDGE - CROSS BY MR. SPRINGER                    1184

```
 1        (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND
 2   OUT OF THE HEARING OF THE JURY.)
 3             THE COURT:  Go ahead.
 4             MR. SNOKE:  Your Honor, my understanding from
 5   the record is that the people that he's now getting into,
 6   which has little relevance, I don't believe, into the
 7   case, that they took the Fifth Amendment and that's why
 8   they weren't able to testify.  I don't know whether they
 9   did testify or didn't testify is relevant to the case
10   here or to the direct examination in this case.
11             THE COURT:  Mr. Springer, it sounds like we're
12   getting into a postmortem on that trial, and I'm having a
13   very hard time seeing how that's relevant.  What's the
14   relevance of this?
15             MR. SPRINGER:  I'm just establishing he has a
16   history of hiring people, gets -- they brought it up, not
17   me -- and to demonstrate how then I come into the scene
18   of his life, which is what they opened.
19             THE COURT:  Okay.  Go right to that point.
20   There's no need to do a postmortem in this trial on who
21   came or who didn't.
22             MR. SPRINGER:  I'm sorry.  I got it.
23             THE COURT:  And if I may make a suggestion.  You
24   need to make that relevance of your lines of questioning
25   more apparent earlier in your questioning and you'll have
```

DENNY PATRIDGE - CROSS BY MR. SPRINGER                    1185

```
 1   better luck.
 2           MR. SPRINGER:  Okay.  Thank you.
 3       (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,
 4   WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE
 5   PRESENCE AND HEARING OF THE JURY.)
 6   Q.  (BY MR. SPRINGER)  Now, isn't it true that there was
 7   a time before you met me in 2000 where you and Brent
 8   Winters called me together on a conference call?
 9   A.  That's true.
10   Q.  This is something you forgot, isn't it?
11   A.  Yeah.  In fact, he called speaker phone from his
12   office.  That was in summer of 2000.
13   Q.  Now, you are a strong supporter of getting rid of
14   the Internal Revenue Service, are you not?
15   A.  Sure.
16   Q.  Have you been a strong supporter of that for a long
17   time?
18   A.  Since my case, yes.
19   Q.  And you and I -- at some point in time in our
20   relationship, you asked me a question about how I support
21   myself; isn't that true?
22   A.  That's true.
23   Q.  And didn't I tell you that I cannot receive any
24   money if there are any conditions attached to that money?
25   A.  That's true.
```

DENNY PATRIDGE - CROSS BY MR. SPRINGER                1186

```
 1  Q.  Now, when you testified before the grand jury that
 2  Mr. Snoke had mentioned earlier, did you say these words,
 3  "No" --
 4          THE COURT:  Give him -- give the page and the
 5  line.
 6          MR. SPRINGER:  I'm sorry.
 7  Q.  (BY MR. SPRINGER)  It's Government's Exhibit 723 and
 8  it would be --
 9          MR. SPRINGER:  May I approach then, Your Honor?
10          THE COURT:  You may.
11          MR. SNOKE:  Your Honor, I'm going to object to
12  the form of the question.
13          THE COURT:  What's the matter with the form of
14  the question?
15          MR. SNOKE:  Your Honor, I don't think it's the
16  proper method for -- in trying to impeach the defendant,
17  if that's what he's trying to --
18          THE COURT:  Well, if he's doing what we covered
19  at the pretrial conference, he's going to cover an exact
20  question and the exact answer.  What's the matter with
21  that?
22          MR. SNOKE:  Nothing, Your Honor.
23          THE COURT:  Okay.  Proceed.
24  Q.  (BY MR. SPRINGER)  Did you say, "I appreciate any
25  donations you can give, you know" --
```

DENNY PATRIDGE - CROSS BY MR. SPRINGER                    1187

```
 1              THE COURT:  Excuse me, Mr. Springer.  What pages
 2    are you on?
 3              MR. SPRINGER:  I'm sorry.  Your Honor, it's
 4    Government's Exhibit Number 723.
 5              THE COURT:  Page?
 6              MR. SPRINGER:  And it's going to be page 10 at
 7    the top or page -- grand jury 405 at the bottom.
 8              THE COURT:  Proceed.
 9              MR. SPRINGER:  Thank you, Your Honor.
10    Q.  (BY MR. SPRINGER)  You were asked a question, "Did
11    Mr. Springer tell you at any time that before he did any
12    more for you or before he even started, that you needed
13    to give a donation to a particular ministry?"  Do you
14    remember that question?
15    A.   Not really.
16    Q.   Do you remember this answer?  "No.  He just -- the
17    way he always operated was he said, he would say, you
18    know, I appreciate any donation you can give, you know,
19    and he never asked for a fee as such as it got to be this
20    amount or whatever."  Do you remember that?
21    A.   Yes.
22    Q.   Okay.  That's consistent with what you remember in
23    our entire relationship; is that true?
24    A.   That's true.
25    Q.   Now, you testified that you gave money when you
```

DENNY PATRIDGE - CROSS BY MR. SPRINGER                    1188

1  could; is that right?

2  A.   Right.

3  Q.   And at some point in time, you were unable to give

4  any more money; isn't that true?

5  A.   That's true.

6  Q.   Now, you testified earlier that your anticipation

7  was that I would be speaking or helping Mr. Barringer,

8  were your words; is that correct?

9  A.   That's true.

10 Q.   Now, when you said "research," can you get more

11 specific than just "research"?  Is there something

12 specific that you thought I may be doing with

13 Mr. Barringer?

14 A.   (no response)

15 Q.   And if you don't know, that's fine.

16 A.   No, that's the way I looked at it was you were doing

17 research for him.

18 Q.   Now --

19 A.   Gathering information for him so he could put

20 everything together.

21 Q.   And sometimes that involved reviewing and looking at

22 documents that Mr. Barringer was considering filing;

23 isn't that true?

24 A.   That's true.

25 Q.   And Mr. Snoke asked you earlier in a question, he

DENNY PATRIDGE - CROSS BY MR. SPRINGER                    1189

1  used the word "services."  Did you and I ever have a

2  discussion about me providing you for any services?

3  A.   No.

4         MR. SPRINGER:  Could you pull up Government's

5  Exhibit Number 42, please.

6  Q.   (BY MR. SPRINGER)  Do you see Government's Exhibit

7  Number 42?

8  A.   Yes.  Yes.

9  Q.   And you testified that you wrote "donation" on that

10 check; is that correct?

11 A.   Yes, I did.

12 Q.   At the time that you wrote that check out, did you

13 know what my mission was?

14 A.   Yes.

15 Q.   What is my mission?

16 A.   To get rid of the IRS.

17 Q.   Now, did I ever tell you I wanted to get rid of

18 taxes in general?

19 A.   No.

20        MR. SPRINGER:  Could you please pull up

21 Government's Exhibit Number 46, please.

22 Q.   (BY MR. SPRINGER)  When you joined Aegis, do you

23 remember how many members were involved in that

24 organization?

25 A.   About 650.

DENNY PATRIDGE - CROSS BY MR. SPRINGER                    1190

1  Q.   And there were lots of smart people in there,

2  weren't there?

3  A.   Sure.

4  Q.   Do you see Government's Exhibit Number 46 before

5  you?

6  A.   Is that the check for 3,500?

7  Q.   Yes, sir.

8  A.   Okay.

9  Q.   Do you see the bottom notation under cashier's

10 check?

11 A.   Yes, sir.

12 Q.   What does "donation BBM" mean?

13 A.   Donation --

14 Q.   Is that Bondage Breakers Ministry?

15 A.   -- Bondage Breakers Ministry, yes.

16        MR. SPRINGER:  Would you please pull up

17 Government's Exhibit Number 49.

18 Q.   (BY MR. SPRINGER)  Now, when you got sentenced in

19 September 2006, that was just the beginning of your

20 fight; isn't that true?

21 A.   Right.

22 Q.   In fact, truthfully speaking, you hadn't even gotten

23 into the fight yet, had you?

24 A.   No.

25 Q.   Now, you're going to go to the Seventh Circuit Court

1  of Appeals; is that right?

2  A.   That's right.

3  Q.   And didn't Mr. Barringer try to raise a Paperwork

4  Reduction Act defense for you?

5  A.   Yes, sir.

6  Q.   And didn't the district court, not understanding

7  what that meant, not allow you to do that?

8           MR. SNOKE:   Objection.   Calls for a conclusion

9  of --

10          THE COURT:   Sustained.

11          MR. SPRINGER:   Okay.

12  Q.   (BY MR. SPRINGER)   Now, you told Mr. Snoke -- do you

13  see Exhibit 49 for 10,000 for Lindsey Springer?

14  A.   Yes.

15  Q.   Did you write the word "gift" on there?

16  A.   I actually don't know if I did or not.   I don't

17  think that's my writing, but it could be.   I'm assuming

18  it's Char's -- Mrs. Mott's.

19          MR. SNOKE:   Objection to his speculating.

20          THE COURT:   Overruled.

21  Q.   (BY MR. SPRINGER)   You testified earlier that they

22  gave that to me for you; do you remember that testimony?

23  A.   Yeah, they wanted to help me so that's the one way

24  they thought they could help.

25  Q.   Was there some expectation that they had or that you

1    had with respect to that check?

2    A.   Not really.

3    Q.   Then you went to the Seventh Circuit Court of

4    Appeals and you had to have a lawyer on that appeal;

5    isn't that right?

6    A.   That's right.

7    Q.   And then you had to go petition for rehearing en

8    banc, right?

9    A.   Right.

10   Q.   And then you petitioned to the Supreme Court of the

11   United States, correct?

12   A.   Right.

13   Q.   And at some point along the lines after September

14   '06, you basically ran out of what you stated was money,

15   right?

16   A.   Yes, I did.

17   Q.   But you continued to have a lawyer represent you in

18   your case, did you not?

19   A.   Yes, I did.

20   Q.   Was that Mr. Barringer?

21   A.   Yes, it was.

22   Q.   Now, you had hired a lot of lawyers, right?

23   A.   Yes.

24   Q.   And what is it that made you settle with

25   Mr. Barringer?  Why did you pick him over Michael Minns

1  or Brent Winters or Ed Rivera or Mr. McPherson or Carolyn

2  Dyson?  What was special about Mr. Barringer?

3  A.   Well, honestly, what was special --

4            MR. SNOKE:  Objection, irrelevant.

5            THE COURT:  I'll overrule it at this point.

6  There's only going to be about one or two more questions

7  on this line.

8            THE WITNESS:  What made him special was the fact

9  that I knew of a couple of situations where you had

10 worked with him and I liked the idea of you guys working

11 together and people who would stand up for me.  Because

12 in that profession, it's hard to find people who will

13 stand up for you, especially against the IRS.  They --

14 attorneys usually tuck their tails and run.

15 Q.  (BY MR. SPRINGER)  Now, when you say "stand up for

16 you," the lawyer is standing up for you, right?

17 A.   Uh-huh.

18 Q.   I couldn't go in and talk to the IRS on your behalf,

19 could I?

20 A.   No.

21 Q.   I couldn't stand up and make any objections on your

22 behalf, could I?

23 A.   No.

24 Q.   I couldn't sign pleadings on your behalf, could I?

25 A.   No.

DENNY PATRIDGE - CROSS BY MR. SPRINGER                    1194

1   Q.   I couldn't make you do anything, could I?

2   A.   No.

3   Q.   And I certainly couldn't make Mr. Barringer do

4   anything, could I?

5   A.   No.

6              THE COURT:  How much more do you have cross?

7              MR. SPRINGER:  That's all I have, Your Honor.

8              THE COURT:  Very well.  Members of the jury,

9   we'll take our mid-morning recess at this time.  We'll

10  again be guided by the clock on the wall.  Let's see, I'm

11  pretty proud they got around to changing the clock over

12  the weekend.  We'll resume at ten minutes till eleven.

13       And during this recess, of course, please remember

14  my usual admonition not to discuss the case, not to

15  undertake any independent investigation of the case, and

16  not to reach any conclusions about the case until it has

17  been given to you for deliberations and verdict.

18       All persons in the courtroom will remain seated

19  while the jury departs.

20       (JURY EXITS THE COURTROOM)

21              THE COURT:  The record will show the jury has

22  left the courtroom.  Over the weekend, I gave some

23  thought to the question that we addressed last Friday

24  about the direct testimony of the defendants.  And as a

25  matter of fact, over the weekend I discussed the matter

DENNY PATRIDGE - CROSS BY MR. SPRINGER                    1195

 1  with one of my --

 2          MR. O'REILLY:  Your Honor, I don't know if you

 3  want the witness in here or not.

 4          THE COURT:  You may be excused.  Over the

 5  weekend I also, as it happens, discussed it with one of

 6  my colleagues.  And, Mr. O'Reilly, I would like to have a

 7  brief ex parte conversation with the defendants and their

 8  standby counsel on that score with a view to perhaps

 9  arriving at a more workable approach to the defendants'

10  direct testimony.

11      It's not going to be a long conversation and, as a

12  matter of fact, it would be my intent just to have that

13  brief conversation ex parte with the defendants and their

14  counsel here at the bench.  Again, the purpose being to

15  arrive at as workable an approach to their direct

16  testimony as possible.

17      So, Mr. O'Reilly, with that understanding, does the

18  government have any objection to my having a brief ex

19  parte conversation on that subject with the defendants

20  and their standby counsel?

21          MR. O'REILLY:  No objection, Your Honor.

22          THE COURT:  Very well.  The defendants and their

23  standby counsel will approach.

24          MR. O'REILLY:  Your Honor, should we leave?

25          THE COURT:  No.  I'm just going to do it right

1   here at the bench.

2       (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND

3   OUT OF THE HEARING OF THE JURY.)

4           THE COURT:  Okay.  The record will show that the

5   defendants and their standby counsel are at the bench and

6   no one else is at the bench.  This -- the idea that I am

7   going to suggest will not be implemented unless in the

8   case of Mr. Springer he and his standby both concur and

9   in the case of Mr. Stilley he and his standby both

10  concur.  And the reason I say that this would require the

11  concurrence of each defendant and his respective standby

12  counsel is that, in fairness, this is not anything that

13  the standby counsel signed on for or have been required

14  to do.

15      Anyway, what we discussed last Friday, I can't

16  remember who floated this idea, but it was a non-starter

17  with me, and I gathered it was a non-starter with the

18  defendants, was that standby counsel would simply read a

19  list of questions.  I don't think that's workable because

20  inevitably there would be follow-up questions that

21  require exercise of judgment and questions to cope with

22  objections and rulings by the Court and so forth.  So

23  that's not workable.  That approach would simply have had

24  standby counsel basically do what anybody off the street

25  could do, that is read a bunch of questions.  But it

 1   would inevitably require, if it were done right, it would

 2   require follow-up questions and other adjustments during

 3   the direct examination.

 4        The approach that occurs to me now is that I relax

 5   my restrictions on hybrid representation and permit the

 6   defendants to work with their standby counsel to actually

 7   present what would be a normal direct examination, Q and

 8   A with standby counsel being authorized to do what's

 9   necessary that any good lawyer would do on direct, to

10   shape the examination, to ask any necessary follow-up

11   questions and so forth.  And I'm not going to require

12   that that be done, certainly, and in each case, and the

13   defendants don't have to be consistent between each other

14   on it.  In other words, if one defendant elects to

15   proceed on this basis, it wouldn't matter what the other

16   defendant chooses to do.

17        But, anyway, I want you to take an opportunity, I

18   don't want an answer now, but I want you to take an

19   opportunity to discuss that what would basically be one

20   exception to the hybrid representation prohibition and so

21   that each of you could have your standby counsel do your

22   direct examination just as if they had been your

23   courtroom counsel all along.  So please give that some

24   thought.

25        I'm not going to require that it be done unless each

DENNY PATRIDGE - CROSS BY MR. SPRINGER                    1198

1   respective defendant and his respective standby counsel

2   concur that it be done.  So give that some

3   consideration.  Do either of you have any questions?

4         MR. SPRINGER:  I do.  I just have one.  The

5   thought process of having to prepare the standby for all

6   of the information that would come out in my -- and I'm

7   obviously going to be the heavier load that may require

8   at least three or four, maybe even five hours of

9   preparation time.  I know he's familiar with the exhibits

10  to a certain extent, but I don't know if he understands

11  them well enough to do the follow-up questions without

12  preparation.  And with the government coming in and

13  saying that now they're going to be done by tomorrow, you

14  know, and I see Friday on the chart as a free day.

15      If I structure all of my defense to put that off

16  till let's say I get to Thursday and I'm ready to take

17  the stand, can we -- in this consideration discussion can

18  we consider that at that point we suspend trial on

19  Thursday, take the rest of -- to Friday so counsel and I

20  could spend preparing, then bring that back in on

21  Monday?

22        THE COURT:  That's not likely.  I'm not

23  attracted to stretching it out that way.

24      (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

25  WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

DENNY PATRIDGE - REDIRECT BY MR. SNOKE                    1199

```
 1   PRESENCE AND HEARING OF THE JURY.)
 2          THE COURT:  Court will be in recess.
 3      (A RECESS WAS HAD, AFTER WHICH THE FOLLOWING
 4   PROCEEDINGS WERE HAD IN OPEN COURT AND WITHIN THE
 5   PRESENCE AND HEARING OF THE JURY.)
 6          THE COURT:  We're to Mr. Stilley.  You may
 7   proceed.
 8          MR. STILLEY:  No questions, Your Honor.
 9          THE COURT:  Any redirect?
10          MR. SNOKE:  Briefly, Your Honor.  If I could do
11   it from here, Your Honor.
12          THE COURT:  You may.
13          MR. SNOKE:  If we could call up Exhibit 46.
14                    REDIRECT EXAMINATION
15   BY MR. SNOKE:
16   Q.  Mr. Patridge, do you see the Exhibit 46 there?
17   A.  Yes, sir.
18   Q.  And counsel asked you about the little note down
19   there at the bottom of that cashier's check.
20   A.  Yes, sir.
21   Q.  Is that your writing?
22   A.  No, it's not.  As we discussed before, I think it
23   might be my wife's because the handwriting is kind of
24   backwards or slanted backwards, but it's not mine.
25   Q.  It's not your writing, then.  You didn't write
```

1  "donation BBM" on that?

2  A.   No.

3  Q.   With respect to the Motts, did you tell the Motts

4  about what Mr. Springer was doing for you in your case?

5  A.   Yes.

6  Q.   Counsel asked you, sir, about the -- my use of the

7  word "services."  Do you recall that question?

8  A.   Yes.

9  Q.   All right.  Isn't in your definition of services,

10  isn't providing research and assistance, isn't that

11  providing services to you?

12  A.   I don't know.  I just thought he was -- I looked at

13  it as help because that's what I needed at the time.

14  There was no service contract.  There was no written

15  contract.  There were no agreements on any certain

16  amounts.  So, normally, if you have a service, you're

17  going to have an agreed-upon amount.  So I guess it just

18  depends on your definition of service.

19  Q.   Mr. Springer did provide you with help, using your

20  vernacular?

21  A.   Yes.

22  Q.   And sat with you -- sat with Mr. Barringer in the

23  defense of you at the trial?

24  A.   I'm sorry, what?

25  Q.   He sat with Mr. Barringer at the trial?

```
 1   A.   Yes, he did.

 2   Q.   Provided advice to Mr. Barringer during the trial?

 3   A.   I don't know if he provided advice, but I'm sure he

 4   pointed out when people made mistakes, that type of

 5   thing.

 6   Q.   Well, you were sitting at the trial.  Did

 7   Mr. Springer and Mr. Barringer converse during the trial

 8   about issues?

 9   A.   Sure.  Sure.

10            MR. SNOKE:  No further questions.

11            THE COURT:  Any recross?

12            MR. SPRINGER:  Yes, Your Honor.

13                     RECROSS-EXAMINATION

14   BY MR. SPRINGER:

15   Q.   I wasn't obligated to do anything for you, was I?

16   A.   No.

17   Q.   Could have left at any time, couldn't I?

18   A.   Sure.

19   Q.   Didn't have to take your calls, did I?

20   A.   No.

21   Q.   No obligation to do anything?

22   A.   Nothing.

23   Q.   Benevolent gift?

24   A.   (no response)

25            MR. SPRINGER:  No further questions, Your Honor.
```

 1              THE COURT:  You may step down.

 2              THE WITNESS:  Thank you.

 3              THE COURT:  We'll have the government's next

 4    witness.

 5              MR. O'REILLY:  Your Honor, the United States

 6    calls Mr. Andrew Ouwenga.

 7              THE COURT:  Very well.

 8              MR. O'REILLY:  Your Honor, if I may approach and

 9    remove the binder.

10              THE COURT:  You may.

11                        ANDREW OUWENGA,

12    (WITNESS AFFIRMED)

13              MR. O'REILLY:  Your Honor, the only concern I

14    have was that -- and maybe it's because he had to --

15    Mr. Ouwenga raised his left hand, not his right.  I don't

16    know if the Court is concerned about that or not.

17              THE COURT:  Mr. Ouwenga, you're under oath, you

18    understand that, by way of affirmation.  Are we together

19    on that?

20              THE WITNESS:  Yes.  That's all I want to say.

21              THE COURT:  Very well.  You may proceed.

22              MR. O'REILLY:  Thank you, Your Honor.

23                        DIRECT EXAMINATION

24    BY MR. O'REILLY:

25    Q.  Sir, would you please state your full name and spell

ANDREW OUWENGA - DIRECT BY MR. O'REILLY                1203

```
 1   your last name for the court reporter.
 2   A.   Andrew, and O-U-W-E-N-G-A.
 3   Q.   Are you married, sir?
 4   A.   Yes, I am.
 5   Q.   What is your wife's name?
 6   A.   Karen.
 7   Q.   Do you have any children?
 8   A.   I have nine children.
 9   Q.   Do you have a daughter by the name of Laurel?
10   A.   Yes.
11   Q.   What is Laurel's last name?
12   A.   Gardner.
13   Q.   Do you also have a daughter by the name of Erika?
14   A.   Yes.
15   Q.   What is Erika's last name?
16   A.   Dertien.
17   Q.   Where do you currently reside, sir?
18   A.   You mean in Michigan?  You mean my Michigan address
19   or in Kentucky?
20   Q.   I guess, are you -- you're presently in custody; is
21   that correct?
22   A.   Yes, I am.
23   Q.   Okay.  In custody, where have you been -- where have
24   you been in custody?
25   A.   Ashland, Kentucky.
```

ANDREW OUWENGA - DIRECT BY MR. O'REILLY                    1204

```
 1   Q.   How long have you been there, sir?
 2   A.   Just a little less than a year.  December, I think
 3   it was, I got there.  So a little less than a year.
 4   Q.   Prior to being placed in Ashland, Kentucky, where
 5   did you live?
 6   A.   Howard City, Michigan.
 7   Q.   Roughly where in Michigan is that?
 8   A.   It's 40 miles north of Grand Rapids, Michigan.
 9   Q.   How long did you live in Howard City, Michigan?
10   A.   I would imagine close to 30 years.
11   Q.   What is your level of education?
12   A.   I have a high school diploma and a trade school
13   diploma.
14   Q.   Are you having trouble hearing me, sir?
15   A.   (no response)
16            THE COURT:  Test it out again.
17            THE WITNESS:  This is good.  Thank you.
18            THE COURT:  Not anymore.  Go ahead.
19   Q.   (BY MR. O'REILLY)  What type of trade school did you
20   have, sir?
21   A.   Commercial photography, one year in Chicago.
22   Q.   How were you employed prior to being incarcerated?
23   A.   I owned a studio.  I was an employee -- I was self-
24   employed -- or I owned a business.
25   Q.   Okay.  What did you do for a living prior to being
```

ANDREW OUWENGA - DIRECT BY MR. O'REILLY                              1205

```
 1  incarcerated?
 2  A.   Commercial photography.
 3  Q.   How long have you been doing commercial photography?
 4  A.   About 35 years.
 5  Q.   When you were in prison, what charges were you -- I
 6  assume you were convicted of some crimes?
 7  A.   Yes.
 8  Q.   What crimes were you convicted of?
 9  A.   The alleged crime.
10  Q.   There was a conviction, correct, sir?
11  A.   It doesn't really give solidity to the accusation,
12  but --
13  Q.   What was the accusation?
14  A.   Crimes -- alleged crimes against 7201.
15  Q.   And is that tax evasion?
16  A.   Tax evasion.
17  Q.   And were you the only one charged in your
18  indictment?
19  A.   In my indictment, yes.  They separated my indictment
20  out.  I was -- my wife had her own, I had my indictment.
21  Q.   So your wife was also charged, but you're saying it
22  was in a separate indictment?
23  A.   Yeah, uh-huh.
24  Q.   Was she charged with the same crime?
25  A.   Yes.
```

1   Q.   Did you take this case to trial?

2   A.   Yes.

3   Q.   Did your wife -- was her case tried with yours?

4   A.   Yeah.  Yes.

5   Q.   Do you recall when you were indicted, approximately?

6   A.   2004.

7   Q.   And is that the same time approximately that your

8   wife was indicted?

9   A.   Yes.

10  Q.   When did your case go to trial?

11  A.   In 2004 -- oh, excuse me.  You asked me about the

12  indictment -- the first question you asked me I said yes

13  to, what was that first question you just gave me?

14  Q.   I asked if your wife was also indicted in about the

15  same time in 2004.

16  A.   Yes, correct, yes.

17  Q.   Then I asked -- the next question was, when did your

18  case go to trial?

19  A.   It was in '04.

20  Q.   Do you know an individual by the name of Lindsey

21  Springer?

22  A.   Yes.

23  Q.   When -- how did it come to pass that you met or

24  became in contact with Mr. Springer?

25  A.   Well, it was -- it came by a third party.

ANDREW OUWENGA - DIRECT BY MR. O'REILLY                    1207

1   Q.   Where are you living at the time?

2   A.   In Howard City.

3   Q.   So this is before you were incarcerated?

4   A.   I'm sorry, no, that was -- no, it was after I was

5   incarcerated.

6   Q.   Now, were you incarcerated before your trial?

7   A.   Yes.

8   Q.   And so it was at this point in time that you learned

9   of the name Lindsey Springer?

10  A.   Yeah, I was originally under -- incarcerated for --

11  it's called contempt of court.

12  Q.   Did that have to do with some pretrial hearing or

13  something?

14  A.   Yes.

15  Q.   And while you were incarcerated, is that where you

16  learned of the name Lindsey Springer?

17  A.   Yeah.

18  Q.   Did you contact Mr. Springer?

19  A.   Yes.

20  Q.   Did you ever meet Mr. Springer?

21  A.   Yes.

22  Q.   And do you see Mr. Springer in the courtroom today?

23  A.   Yes, I guess I do.

24  Q.   And could you point out where Mr. Springer is and

25  describe what he is wearing?  Or is he standing up behind

ANDREW OUWENGA - DIRECT BY MR. O'REILLY                    1208

1   me now?

2   A.   Well, the gentleman is -- looks a little different

3   because there's something growing out of his face that I

4   don't recognize.

5   Q.   Okay.  Do you recognize him now that you've looked

6   at him?

7   A.   Yeah.

8   Q.   Is there any doubt in your mind that's Lindsey

9   Springer?

10   A.   I would say it is.  I'd have to talk to him again to

11   confirm that, but, yes.

12          MR. O'REILLY:  May the record reflect that

13   Mr. Ouwenga has identified Mr. Springer?

14          THE COURT:  The record will so reflect.

15   Q.   (BY MR. O'REILLY)  For what purpose did you -- well,

16   let me ask this:  Did you reach out and try to contact

17   Mr. Springer?

18   A.   Yes.

19   Q.   For what purpose?

20   A.   To assist my wife, actually, because she was like --

21   I was attempting to handle the case on my own, pro se,

22   and I was not able to give her any assistance, so -- and

23   she was without any other, you know, source.

24   Q.   In what way were you hoping that Mr. Springer could

25   help your wife?

ANDREW OUWENGA - DIRECT BY MR. O'REILLY                    1209

1   A.   Well, to overcome the alleged tax obligation.

2   Q.   Did you, in fact, speak with Mr. Springer?

3   A.   Yes.

4   Q.   Did Mr. Springer make any representations to you

5   about what he could or could not do for your wife?

6   A.   Well, yeah.  It was -- you know, gave certain

7   amounts of encouragement based on his past records, past

8   cases he won.

9   Q.   And what did Mr. Springer tell you about these past

10  cases?

11  A.   Well, it had to -- many years ago, that's all it was

12  -- my memory doesn't -- isn't fine-tuned that far back,

13  but it led me to believe that the -- his track record did

14  give credibility to his occasion to try and help me.

15  Q.   To your understanding, what was Mr. Springer going

16  to do for your wife?

17  A.   Well, to give her the best defense that I could get.

18  Q.   Do you know or did Mr. Springer make it understood

19  to you whether or not he was an attorney?

20  A.   No, he never said he was an attorney.

21  Q.   So in what way did Mr. Springer tell you he would be

22  able to help your wife?

23  A.   Well, there's -- he associated himself with, at that

24  time, Mr. Stilley and I understand that Mr. Stilley

25  wasn't able to get into Michigan to do any practice.

ANDREW OUWENGA - DIRECT BY MR. O'REILLY                    1210

1   Q.   Well, let me just ask you a very short question on

2   that.  With respect to Mr. Stilley, did Mr. Springer

3   indicate whether or not he was going to try and have

4   Mr. Stilley represent your wife?

5   A.   At that point, I was left to believe that he was,

6   but I think that's -- that proved different.

7   Q.   Did Mr. Springer indicate what, if anything, he

8   would do for your wife other than try to find an attorney

9   for her?

10  A.   No.

11  Q.   Did you pay Mr. Springer any money?

12  A.   Do you want me -- the absolute truth?

13  Q.   Let me ask the question a little different way.

14  A.   Okay.

15  Q.   Did you cause checks to be issued payable to Lindsey

16  Springer?

17  A.   Obligations of the United States, yes.

18  Q.   And I'm going to ask you, if you could, to take a

19  look at what's in evidence as Government's Exhibit 32,

20  which should come up on that screen in just a minute.  Do

21  you recognize that document, sir?

22  A.   Yes, uh-huh.

23  Q.   What is Government's Exhibit 32?

24  A.   Well, it's a check dated October 14, '03, to

25  Lindsey, $50,000.

ANDREW OUWENGA - DIRECT BY MR. O'REILLY                    1211

1  Q.   Why -- did you cause this check to be issued?

2  A.   Yes.  I think -- that's one of the -- I think that's

3  the one I signed.

4  Q.   This is one you personally signed?

5  A.   Yes.

6  Q.   Did you send this check to Mr. Springer or did you

7  give this check to Mr. Springer?

8  A.   It was mailed to him.

9  Q.   Why did you mail this check to Mr. Springer?

10  A.   For his help in the legal service for my wife.

11  Q.   I'm going to ask you now if you could take a look at

12  what's -- and that is dated October 14th of 2003; is that

13  correct, sir?  That was dated October 14th of 2003?

14  A.   Yes.  It came back, yes.  Uh-huh.

15  Q.   I'm going to ask you now to take a look at what's in

16  evidence as Government's Exhibit 104.  Please let me know

17  when that comes up on your screen.

18  A.   Yeah, it's here.

19  Q.   Do you recognize this check?

20  A.   Yes, uh-huh.

21  Q.   What is Government's Exhibit 104?

22  A.   I want to clarify one thing when I say "I recognize

23  it."

24  Q.   Okay.  Please do.

25  A.   Because it wasn't a check that I made out.

ANDREW OUWENGA - DIRECT BY MR. O'REILLY                     1212

1   Q.   All right.

2   A.   So from your statement --

3   Q.   Well, let me ask my question a different way then,

4   sir.  Did you cause this check to be issued?

5   A.   That's true.

6   Q.   And when I ask that question and you give that

7   answer, what do you mean when you say you caused a check

8   to be issued such as Government's Exhibit 104?

9   A.   My daughter has power of attorney.

10  Q.   Which daughter?

11  A.   It was Laurel.  And she made that check out for me.

12  Q.   And if you caused the check to be issued, would you

13  then have asked her to write this check?

14  A.   Write the check, yeah.

15  Q.   Did you ask her to write this check?

16  A.   Yes, uh-huh.

17  Q.   And this is a check dated October 2, 2003, about 12

18  days before Government's Exhibit 32 for the same amount,

19  $50,000?

20  A.   Yes.

21  Q.   Payable to Oscar Stilley

22  A.   That's correct.

23  Q.   Why did you cause this check to be issued to Oscar

24  Stilley?

25  A.   To satisfy the -- an obligation I had to him under

ANDREW OUWENGA - DIRECT BY MR. O'REILLY                    1213

1    contract to facilitate his services for my wife.
2    Q.   And at this point in time, it was your intent and
3    understanding that Mr. Stilley would be representing your
4    wife Karen Ouwenga?
5    A.   No.
6    Q.   Oh, I'm sorry.  What was your understanding about
7    what Mr. Stilley was going to do?
8    A.   Mr. Stilley -- oh, excuse me.  Excuse me.  This is
9    Oscar Stilley.  I'm sorry.  I was thinking of Mr. Lindsey
10   there.  I was looking over your shoulder and I was
11   thinking of him.  I'm sorry.  But repeat your question.
12   Q.   Was it your understanding -- what was your
13   understanding of why you caused -- let me rephrase that.
14   Why did you cause this check for $50,000 to be issued to
15   Oscar Stilley on October 2nd of 2003?
16   A.   All right.  My understanding under a contract I had
17   with Mr. Lindsey is that this was part of our contract we
18   had together for the services that he was going to offer
19   me.  I paid one check to him for this amount and one
20   check to Mr. Stilley.
21   Q.   And at the point in time that you had written these
22   two checks, had you spoken with Mr. Stilley?
23   A.   You know, I'm having a hard time remembering back
24   when I originally spoke with Mr. Lindsey and I'm trying
25   to think, was that Mr. Stilley with Mr. Lindsey at our

1    first meeting?  And I'm having a hard time remembering if

2    it was or not.  Other than that, I don't recall meeting

3    Mr. Stilley.

4    Q.   Just so I'm clear, because I was a little -- I'll

5    confess, I got a little lost on that.  Did you ever meet

6    Mr. Stilley?

7    A.   That's my puzzlement here.  Because my first meeting

8    with Mr. Lindsey, he came in with another gentleman, and

9    I believe that gentleman was Oscar, but I'm not positive.

10   Q.   Of the two people you met on that date -- well,

11   first of all, were you in prison at that time?

12   A.   Yes.

13   Q.   Of the two people you met on that date, who did most

14   of the talking of those two?

15   A.   Mr. Lindsey.

16   Q.   Okay.  And by Mr. Lindsey, you mean Lindsey

17   Springer?

18   A.   Yes.

19   Q.   Well, I'm going to ask if you recognize Mr. Oscar

20   Stilley?

21   A.   Well, I tell you, it has been a long time ago.

22   Q.   And if you don't, that's fine.

23   A.   I don't really recognize him, but I -- again,

24   just --

25   Q.   I'm going to ask you now if you could take a look at

ANDREW OUWENGA - DIRECT BY MR. O'REILLY                    1215

1   what's in evidence as Government's Exhibit 109.  And let

2   me know when that comes up on the screen.

3   A.   Yes, sir.

4   Q.   Do you recognize that?

5   A.   Yes.

6   Q.   First of all, this is from -- the first two checks

7   were drawn on Paragon Bank and Trust, but they had no

8   identification of what account in the top left; is that

9   correct?  Do you recall?

10  A.   Yes.

11  Q.   This check seems to be drawn on something called

12  Lone Star Enterprises Holding Trust.  Was that a bank

13  account you controlled?

14  A.   Yes.

15  Q.   Did you cause this check to be issued to Oscar

16  Stilley?

17  A.   Yes, uh-huh.

18  Q.   And this is May 20th of 2004; is that correct?

19  A.   Yeah, uh-huh.

20  Q.   What was your purpose of causing this check to be

21  issued?

22  A.   It was a continuing obligation that was requested

23  from Mr. Stilley for services.

24  Q.   And what type of services?

25  A.   Mr. Stilley was going -- at that point, my

1  understanding Mr. Stilley was going to represent my wife

2  while she was at trial.

3  Q.   And this is in the tax evasion case we talked about

4  earlier?

5  A.   Yeah.

6  Q.   Did you ever enter into a written contract with

7  Mr. Stilley?

8  A.   No, I did not.

9  Q.   Did you ever enter into a written contract with

10  Mr. Springer?

11  A.   No, I didn't.

12  Q.   Earlier you referenced a contract.  What type of

13  contract did you enter?

14  A.   Well, under contract law there's many different

15  contracts.

16  Q.   I just want to clarify, this is your understanding,

17  correct?

18  A.   From what the law says, yeah.

19  Q.   Okay.  What is your understanding of what kind of

20  contract you entered?

21  A.   A verbal -- verbal contracts, uh-huh.

22  Q.   I'm going to ask you now -- and that was a check

23  dated on May 20, 2004.  I'm going to ask you to look at

24  Government's Exhibit 40, four-zero.  Let me know when

25  that comes up.

ANDREW OUWENGA - DIRECT BY MR. O'REILLY                    1217

```
 1   A.   It's there.
 2   Q.   Okay.  Is this a check that you caused to be issued
 3   to Mr. Lindsey Springer on June 23rd of 2004?
 4   A.   Yes, uh-huh.
 5   Q.   What was your purpose in causing this check to be
 6   issued?
 7   A.   It would be for the -- the same obligations.
 8   Q.   And those obligations again were for what?
 9   A.   For Lindsey, his consult, his research, and whatever
10   was needed for giving the right material for the attorney
11   at court.
12   Q.   This is on behalf of your wife?
13   A.   Yeah, uh-huh.
14   Q.   Do you see in the bottom left corner of your memo
15   the word "donation"?
16   A.   Yes, uh-huh.
17   Q.   Do you recognize the handwriting on that?
18   A.   Well, it's -- would be my daughter's handwriting, I
19   think -- I would think, but I'm not positive.
20   Q.   Okay.  So you're speculating?
21   A.   No, I don't know for sure.
22        MR. SPRINGER:  Objection, Your Honor.  Which
23   daughter?
24        THE COURT:  Which daughter were you referring to
25   just now?
```

```
 1              THE WITNESS:  Laurel Gardner.
 2              THE COURT:  Go ahead.  Next question.
 3   Q.  (BY MR. O'REILLY)  Just for clarity, is that your
 4   speculation as to that's her handwriting?
 5   A.  That's only a presumption.
 6   Q.  Okay.
 7   A.  Yeah, it's a presumption.
 8   Q.  Is that her handwriting on the rest of the check as
 9   well, other than the signature?
10   A.  Correct, uh-huh.
11   Q.  I'm going to now ask you to look at what's in
12   evidence as Government's Exhibit 44, which is a check
13   payable to Lindsey Springer on October 28th of 2004 in
14   the amount of $15,000.  Do you see that, sir?
15   A.  Yes, uh-huh.
16   Q.  Did you cause this check to be issued?
17   A.  Yes.
18   Q.  Was your purpose in causing this check to be issued
19   the same as the other checks to Lindsey Springer you've
20   already testified to?
21   A.  That's correct.
22   Q.  And, again, with the handwritten word "donation" in
23   the memo section, do you know whose handwriting that is?
24   A.  No.  I can't -- I wouldn't say.  I don't know.
25   Q.  I'm going to now ask you to look at what's in
```

ANDREW OUWENGA - DIRECT BY MR. O'REILLY                    1219

1   evidence as Government's Exhibit 111.  And if we could

2   draw your attention to the check that's on the bottom,

3   which is check number 1024 dated October 31st of 2004

4   payable to Oscar Stilley in the amount of $10,000.  Do

5   you see that check, sir?

6   A.   Yes, I do.

7   Q.   Did you cause this check to be issued?

8   A.   Yes, uh-huh.

9   Q.   What was your purpose in causing this check to be

10  issued?

11  A.   Well, at this time, the evidence was that

12  Mr. Stilley -- well, to Barringer -- well, I tell you,

13  you're going back a little bit far.

14  Q.   Let me ask this in a different way, sir.  Was your

15  purpose in causing this check to be issued to secure the

16  continued legal services for your wife?

17  A.   Correct.

18  Q.   Okay.  And there is a memo with the word

19  "Berringer," B-E-R-R-I-N-G-E-R (sic), in the lower left?

20  A.   Yes.

21  Q.   Do you recognize that handwriting?

22  A.   That looks like it could be my daughter's.

23  Q.   And by your daughter, you mean which daughter?

24  A.   Laurel Gardner.

25  Q.   Okay.  Do you know -- who was it that represented

ANDREW OUWENGA - DIRECT BY MR. O'REILLY                    1220

```
 1   your wife at trial?
 2   A.   Mr. Barringer.
 3   Q.   Do you know how it came to be that Mr. Barringer
 4   became her attorney?
 5   A.   Evidently, Mr. Stilley wasn't --
 6   Q.   And, actually, Mr. Stilley stopped being her
 7   attorney; is that correct?
 8   A.   That's correct.
 9   Q.   Did anybody make a referral to you of Mr. Barringer?
10   A.   I believe, yeah, Mr. Lindsey did some research and
11   came up with Mr. Barringer as a placement -- replacement
12   for Mr. Stilley.
13   Q.   I'm now going to ask you to look at what's in
14   evidence as Government's Exhibit 112.  And the check at
15   the bottom from an entity Casabella Enterprises
16   Non-Domestic Mail.  First of all, did you cause this
17   check to be issued?
18   A.   Yes.
19   Q.   And with respect to Casabella Enterprises
20   Non-Domestic Mail, was this a bank account that you
21   controlled?
22   A.   Correct.
23   Q.   And did you cause this payment to Oscar Stilley in
24   the amount of $10,000 on January 13th of 2005?
25   A.   Yes.
```

ANDREW OUWENGA - DIRECT BY MR. O'REILLY                    1221

1    Q.   Was your purpose in causing the issuance of this

2    check the same as for the other checks that were made

3    payable to Oscar Stilley?

4    A.   I believe it was, uh-huh.

5    Q.   Was your wife also convicted at trial?

6    A.   Yes.

7    Q.   And approximately when was that?

8    A.   Oh, this goes back six, seven, six years ago, six

9    and a half years ago, 1994 -- excuse me, '04.

10   Q.   About 2004?

11   A.   '04, yeah.

12   Q.   Following both your and her conviction, did

13   Mr. Springer continue to do any work on her behalf?

14   A.   Yes.

15   Q.   What did he do for your wife after she was

16   convicted?

17   A.   Technically, you know, all the different things he

18   did, I don't have a -- you know, I can't say specifically

19   because I didn't see all the documents.

20   Q.   Well, let me ask the question a different way.  Did

21   you have any discussions with Mr. Springer about what he

22   would do after she was convicted?

23   A.   Yeah, there was appeals he was going to do for my

24   wife.

25   Q.   Was there anything else?

ANDREW OUWENGA - DIRECT BY MR. O'REILLY                    1222

```
 1   A.   Right now I -- you know, I'm not sure.
 2   Q.   We saw that the word "donation" was on a couple of
 3   the checks, you weren't sure who had written those.  Did
 4   you have any discussions with Mr. Springer about how
 5   payments to him should be characterized?
 6   A.   Yeah, he asked me to put "donations" on the checks.
 7   Q.   Did you understand why he wanted you to put
 8   "donations" on the checks?
 9   A.   Well, because he operates out of a ministry.
10   Q.   Excuse me?
11   A.   He operates from a ministry.
12   Q.   Do you know what that ministry was?
13   A.   I don't recall.  I think you referred to it at our
14   meeting.  I don't recall the name of it.
15   Q.   Was it anything that you had any personal knowledge
16   of other than your discussions with Mr. Springer?
17   A.   That's all I knew.
18   Q.   Do you know what Mr. Springer's ministry's purpose
19   was?
20   A.   I would -- from my perspective, it was to correct
21   the IRS illusion.
22   Q.   Okay.
23            MR. O'REILLY:  If I may have a moment, Your
24   Honor?
25            THE COURT:  You may.
```

1          MR. O'REILLY:  Nothing further, Your Honor.

2          THE COURT:  Cross-examination.

3          MR. SPRINGER:  Yes, Your Honor.

4                    CROSS-EXAMINATION

5    BY MR. SPRINGER:

6    Q.   Good morning, Mr. Ouwenga.

7    A.   Good morning.

8    Q.   Now, you testified that you first met me over the

9    telephone; is that correct?

10   A.   Uh-huh.

11   Q.   And at the time --

12         MR. O'REILLY:  Your Honor, we need verbal

13   responses.  I'm sorry.

14         THE COURT:  Yes, if you would, give a verbal

15   response, sir.  Proceed.

16         THE WITNESS:  Yes.

17   Q.   (BY MR. SPRINGER)  And at the time you were

18   incarcerated, you said for contempt of court; is that

19   right?

20   A.   My original time in court or behind bars was for

21   contempt, uh-huh.

22   Q.   Isn't it true that the reason why you were put in

23   jail was because you didn't show up to an arraignment

24   proceeding?

25   A.   I didn't show up because within the four corners of

ANDREW OUWENGA - CROSS BY MR. SPRINGER                    1224

```
 1   the document that I received there was no address given
 2   to show up at.
 3   Q.   And that is the reason why the judge had the
 4   marshals come out and bring you in; is that correct?
 5   A.   That's correct.
 6   Q.   Okay.
 7   A.   It was a fraud issue, a fraudulent issue.
 8   Q.   And your wife, she was just doing what you told her
 9   to do, right?
10   A.   Correct, uh-huh.
11   Q.   And one of your charges was the contempt of court;
12   is that what you said?
13   A.   Yes.
14   Q.   And that was for not testifying before a grand jury;
15   is that right?
16   A.   Not appearing, correct.
17   Q.   Not appearing, okay.  And your family --
18           MR. O'REILLY:  Objection, Your Honor.
19   Misstates, I believe it was not appearing for his
20   arraignment, not for grand jury, but I --
21           THE COURT:  Clarify that.
22           MR. SPRINGER:  Sure.
23   Q.   (BY MR. SPRINGER)  One of your charges was for not
24   appearing before a grand jury, correct?
25   A.   You know, I would have to do some research on that.
```

ANDREW OUWENGA - CROSS BY MR. SPRINGER                    1225

```
 1   Q.   Fine.  That's fine.  Did you have a co-defendant
 2   besides your wife?
 3   A.   There was a Judy.
 4   Q.   Judy.
 5   A.   Uh-huh.
 6   Q.   And --
 7   A.   Kohlmere (ph).
 8   Q.   Kohlmere.  And have you had lots of discussions with
 9   your children about how you were going to handle your
10   defenses in the charges that you were in jail over?
11   A.   I don't think I had a lot of discussion with them
12   about it.  I think they understood that my perspective
13   was is that the IRS issue that I was facing was based on
14   prima facie law and it was something I was holding the --
15   trying to attempt to hold the government accountable to
16   the strict context of a code that did not have
17   legislative power from Congress that gave it any validity
18   within Michigan.
19   Q.   And as far as your wife goes, she did not really
20   have those same beliefs that you did.
21   A.   No.
22   Q.   She just was doing what you told her to do; isn't
23   that right?
24   A.   Uh-huh, yeah.
25   Q.   And she was locked up at the same time you were
```

ANDREW OUWENGA - CROSS BY MR. SPRINGER                    1226

```
 1  locked up, correct?

 2  A.   Right.

 3  Q.   For the same reasons, true?

 4  A.   Uh-huh.

 5  Q.   And now you testified that you contacted me on the

 6  phone or did I contact you on the phone, if you remember?

 7  A.   No, I would think that contact -- I was in prison or

 8  in jail, I would be contacting you.

 9  Q.   Okay.  Now, in order for you to call out of jail,

10  don't you have to have somebody's number on a list --

11  A.   Yes.

12  Q.   -- to be approved?

13  A.   I think so, uh-huh.

14  Q.   Now, how would -- how would my number have gotten on

15  your approval list?

16        MR. O'REILLY:  Objection, Your Honor.

17  Q.  (BY MR. SPRINGER)  If you know.

18        THE COURT:  Wait.

19        MR. O'REILLY:  Objection to the relevance to

20  this line of questioning.

21        THE COURT:  I'm going to hear a little more of

22  it.  We'll see.  Go ahead.

23        THE WITNESS:  Well, if I would have called you

24  originally, I would have gotten your number from a friend

25  of mine.
```

ANDREW OUWENGA - CROSS BY MR. SPRINGER                    1227

1   Q.   (BY MR. SPRINGER)   And do you know who that friend

2   would have been?

3   A.   Yes, uh-huh.

4   Q.   What was the name?

5   A.   His name was -- or is -- you're going to have to

6   come back to me on that.

7   Q.   Okay.

8            MR. SPRINGER:   Could you please pull up

9   Government's Exhibit Number 32, please.

10  Q.   (BY MR. SPRINGER)   Do you have recollection of

11  having three-way calls with me and Erika and you on the

12  phone?

13  A.   I believe we did, uh-huh.   I believe we did.

14  Q.   Now, before you is Government's Exhibit 32 and it's

15  a temporary check, is it not?

16  A.   It was what kind of a check?

17  Q.   It's a temporary check.

18  A.   Yes, because it was the original -- original release

19  checks from Paragon until I had my name put on them.

20  Q.   So is this basically the opening of a new checking

21  account?

22  A.   That's correct.

23  Q.   Okay.   And if you could turn to Government's Exhibit

24  Number 104.   Now, these are the same identifying numbers,

25  493 and then 3 on the bottom as the check we just looked

ANDREW OUWENGA - CROSS BY MR. SPRINGER                    1228

```
 1  at; is that true?
 2  A.   I would imagine, yeah.  I don't have the other one
 3  in front of me.
 4  Q.   So is this --
 5        MR. SPRINGER:  Okay.  Please -- if you would
 6  pull up Number 109, please.
 7  Q.   (BY MR. SPRINGER)  Now, Government's Exhibit Number
 8  109, it also has this same checking account numbers on
 9  the bottom, doesn't it?
10  A.   Uh-huh.
11  Q.   Now, isn't it true that the first two checks that
12  you looked at, Number 32 and Number 104, are out of Lone
13  Star Enterprise Holding Trust account?
14  A.   That's correct.
15  Q.   That's true?
16  A.   That's correct.
17        MR. SPRINGER:  And would you please pull up
18  Number 40 again, please.
19  Q.   (BY MR. SPRINGER)  And, again, same holding trust
20  account with this check; is that right?
21  A.   That's correct.
22  Q.   All right.  Now, in each of the checks that you've
23  identified, your signature appears to be identical on
24  each one of them.
25  A.   That's correct.
```

1    Q.    Can you explain that?

2    A.    These were put together by my daughter.

3    Q.    By your daughter.

4    A.    Uh-huh.

5    Q.    Did she have a stamp that was authorized to sign

6    your name on a check?

7    A.    That's correct.

8    Q.    Okay.  And is that -- your testimony the same on all

9    the checks?

10   A.    That's right.

11   Q.    Okay.  No one came to the jail where you were at and

12   said, here, sign a check for Lindsey Springer for

13   $50,000, did they?

14   A.    No.

15   Q.    Now --

16           MR. SPRINGER:  Thank you.

17   Q.   (BY MR. SPRINGER)  Now, you mentioned contract.

18   Now, you didn't know Oscar Stilley before you met me; is

19   that true?

20   A.    Huh-uh.

21   Q.    Okay.

22           THE COURT:  What was your answer?

23           THE WITNESS:  No, correct.  No.

24           THE COURT:  Well, that's ambiguous.  He said is

25   that true and you said no.  So let's start over again.

ANDREW OUWENGA - CROSS BY MR. SPRINGER                    1230

1       MR. SPRINGER: I'll start again. Strike that.
2  I'm sorry.
3  Q.  (BY MR. SPRINGER)  Before you met me, you did not --
4  you had never met Oscar Stilley, correct, you did not
5  know who he was?
6  A.  I did not know who he was, correct.
7       MR. SPRINGER: Can you pull up 104 again.
8  Q.  (BY MR. SPRINGER)  Now, isn't Government's Exhibit
9  Number 104 dated October 2, 2003?
10  A.  Uh-huh.
11  Q.  Okay.
12       MR. SPRINGER: Now, if you would pull up
13  Government's Exhibit Number 32, please, again.
14  Q.  (BY MR. SPRINGER)  And 12 days later you gave
15  Lindsey Springer a check for $50,000; is that your
16  testimony?
17  A.  Yes.
18  Q.  Okay. Now, when you made contact with me, you
19  testified that you wanted me to help you find a lawyer
20  for your wife; is that true?
21  A.  Yes, uh-huh.
22  Q.  Now, were you having some difficulties finding a
23  lawyer for your wife?
24  A.  Yes.
25  Q.  Okay. And -- but you had never met me before, true?

```
 1   A.   Correct.

 2   Q.   Okay.  Now, you testified earlier that Oscar Stilley

 3   originally tried to come into your wife's case and was

 4   not allowed in.  Do you remember that testimony?

 5   A.   That's correct.

 6   Q.   And as a result of that, there became a need to get

 7   another lawyer because that one wasn't working, right?

 8   A.   Yes.

 9   Q.   Now, you -- this entire time, you're in jail, right?

10   A.   Correct.

11   Q.   And so most of the communications that are taking

12   place involving me and helping get a lawyer for your wife

13   were going on between me and your daughter Erika; isn't

14   that true?

15   A.   Erika or Laurel.

16   Q.   Or Laurel, right?  Now, Laurel is the one who

17   actually stamps the check; is that correct?

18   A.   That's correct.

19   Q.   But Laurel isn't the one who gave me the check, is

20   she?

21   A.   I don't believe -- I don't know.

22        MR. O'REILLY:  Calls for speculation.

23        THE COURT:  Answer if you know.

24        THE WITNESS:  I don't know.

25   Q.   (BY MR. SPRINGER)  Isn't the first phone call that
```

1  you and I had where you heard my voice, where you called

2  Erika and she three-way called to me?

3  A.   That seems to be the way it happened, yeah.

4  Q.   Because her phone number was on your call list,

5  wasn't it?

6  A.   Yeah, there was a -- that's how we got together

7  then, yeah.

8  Q.   All right.  And, in fact, every call you made from

9  the county jail that you were in came through Erika, did

10 it not?

11 A.   That's correct, uh-huh.

12 Q.   Okay.  Now, who is --

13         MR. SPRINGER:  If you would pull back up

14 Government's Exhibit Number 44, please.

15 Q.   (BY MR. SPRINGER)  Could you tell us who Lone Star

16 is?

17 A.   It's one of the trusts that I manage.

18 Q.   That you manage?

19 A.   Uh-huh.

20 Q.   Okay.  Now, who owns Lone Star Enterprise Holding

21 Trust?

22 A.   Who owns it?

23 Q.   Yeah, who are the owners?  Strike that.  Who are the

24 beneficiaries?

25 A.   That's --

 1              MR. O'REILLY:  Your Honor, object to the

 2   relevance of this line of questioning.

 3              THE COURT:  Counsel will approach.

 4       (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND

 5   OUT OF THE HEARING OF THE JURY.)

 6              THE COURT:  What's the relevance of this?

 7              MR. SPRINGER:  Establishing that the daughters

 8   and the money came from a trust that was not owned by

 9   Mr. Ouwenga and it was not approved by him, it was

10   approved by the daughters, inconsistent testimony, and I

11   never did anything for this trust whatsoever.

12              THE COURT:  Well, you've already established

13   that the checks were stamped by Laurel.  What more is

14   there to establish?

15              MR. SPRINGER:  That he did not believe that that

16   money that came to me was from him, it was from a

17   separate entity called a trust.

18              THE COURT:  So --

19              MR. SPRINGER:  Well, he just --

20              THE COURT:  What's the relevance of that?

21              MR. SPRINGER:  He kept saying -- his entire

22   testimony here this morning has been that he was paying,

23   he was hiring me, he hired me for services, he contracted

24   with me, and that's not true.

25              THE COURT:  I'm going to give you about two more

1  questions to accomplish that and then we're going to move

2  on.

3       MR. O'REILLY:  The last question actually asked

4  who the beneficiaries of the trusts were, that is an

5  irrelevant line of questioning.

6       THE COURT:  That's sustained.  Ask him whose

7  money he thought it was that he was paying.

8       MR. SPRINGER:  Thank you.

9    (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

10  WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

11  PRESENCE AND HEARING OF THE JURY.)

12  Q.  (BY MR. SPRINGER)  Whose money was conveyed to

13  Lindsey Springer by way of each of the checks that you've

14  testified here to today?  Whose money was that?

15  A.  It was trust money.

16  Q.  Trust money.

17  A.  Uh-huh.

18  Q.  You testified earlier about what you thought my

19  mission was.

20  A.  Uh-huh.

21  Q.  Do you remember it being to get rid of the IRS?

22  A.  It seems to ring a bell, uh-huh.

23  Q.  Do you agree with that?

24  A.  Well, I can agree with you.  That --

25  Q.  Thank you.

LAUREL GARDNER - DIRECT BY MR. O'REILLY                    1235

```
 1  A.   That part I can agree with.

 2  Q.   Thank you very much.

 3            THE COURT:  Mr. Stilley.

 4            MR. STILLEY:  No questions.

 5            THE COURT:  Any redirect?

 6            MR. O'REILLY:  No, Your Honor.

 7            THE COURT:  You may step down.  We'll have the

 8  government's next witness.

 9            MR. O'REILLY:  Your Honor, the United States

10  calls Ms. Laurel Gardner.

11                    LAUREL GARDNER,

12  (WITNESS SWORN)

13                    DIRECT EXAMINATION

14  BY MR. O'REILLY:

15  Q.   Would you please state your full name and spell both

16  your first and last names for the court reporter?

17  A.   Laurel Lynn Gardner, L-A-U-R-E-L, G-A-R-D-N-E-R.

18  Q.   Ms. Gardner, where do you live?

19  A.   In Michigan.  Newaygo, Michigan.

20  Q.   Newaygo?

21  A.   Newaygo.

22  Q.   Could you please spell that for the court reporter?

23  A.   N-E-W-A-Y-G-O.

24  Q.   How long have you lived in Newaygo?

25  A.   About three years.
```

1    Q.   So sometime in 2006?

2    A.   Yes.

3    Q.   Where did you live before that?

4    A.   Howard City.

5    Q.   Is that the same city that your parents resided in?

6    A.   Yes.

7    Q.   Who are your parents?

8    A.   Andrew and Karen Ouwenga.

9    Q.   What is your level of education?

10   A.   High school.

11   Q.   Do you have any -- well, are you a high school

12   graduate?

13   A.   Yes.

14   Q.   Do you have any post high school training or

15   education?

16   A.   No.

17   Q.   How are you currently employed?

18   A.   I work at a meat market part time.

19   Q.   What do you do at the meat market?

20   A.   I wrap meat.

21   Q.   How long have you had this position?

22   A.   A little over a year.

23   Q.   During the years 2003 through 2005, how were you

24   employed during that time?

25   A.   I worked at a taxidermy studio in Mecosta, Michigan.

```
 1  Q.   In a what kind of studio?

 2  A.   Taxidermy.

 3  Q.   Oh, taxidermy.  Were you a taxidermist?

 4  A.   Yes.

 5  Q.   Was that your job throughout that time period?

 6  A.   I believe so.

 7  Q.   Do you have a power of attorney with respect to

 8  being able to sign certain checks?

 9  A.   I did.

10  Q.   And you used the past tense.  Is that what you used

11  to have?

12  A.   Yes.

13  Q.   That no longer exists?

14  A.   No.

15  Q.   During what period of time did you have that power

16  of attorney?

17  A.   I'm going to say about six years ago.

18  Q.   Just approximately -- is that approximately?

19  A.   Approximately.  It was for my father.

20  Q.   Was there a reason that you received power of

21  attorney?

22  A.   Because my father was incarcerated.

23  Q.   So prior to him being incarcerated, did you have a

24  power of attorney?

25  A.   No.
```

1   Q.   When your father was initially incarcerated, why was

2   he incarcerated?

3   A.   It had to do with him not paying taxes.

4   Q.   Was your mother also incarcerated?

5   A.   Yes.

6   Q.   Was it for the same type of reason?

7   A.   Yes.

8   Q.   And your father still is incarcerated?

9   A.   Yes, he is.

10  Q.   Is your mother still incarcerated?

11  A.   No.

12  Q.   When did she get out of jail?

13  A.   I don't --

14  Q.   Roughly.

15  A.   I'm going to say at least maybe three years, three

16  years she has been home.

17  Q.   She has been home for three years?

18  A.   Uh-huh, right around there.

19  Q.   So her term of incarceration was much less than your

20  father's?

21  A.   Yes.

22  Q.   Do you recall what term of imprisonment your father

23  received?

24  A.   It was -- I think it was five years.

25  Q.   He's about due to get out then; is that right?

```
 1   A.   Pardon?
 2   Q.   Is he about due to be released from prison?
 3   A.   In November sometime.
 4   Q.   So this month?
 5   A.   Yes.
 6   Q.   How do you -- well, let me ask this:  Have you ever
 7   heard the name Oscar Stilley?
 8   A.   Yes.
 9   Q.   How is it that you first heard the name Oscar
10   Stilley?
11   A.   It was through finding someone for my mother, a
12   lawyer for my mother.
13   Q.   From whom did you hear this name for the first time?
14   A.   The first time was I think my sister was looking on
15   the Internet or something to do with that.
16   Q.   Was that -- what's your sister's name?
17   A.   Erika.
18   Q.   What's Erika's last name?
19   A.   Dertien.
20   Q.   And does she spell both her first and last names?
21   A.   E-R-I-K-A, D-E-I -- I'm not even sure unless I write
22   it.
23   Q.   You didn't know there would be a spelling test
24   today, did you?
25   A.   No.
```

LAUREL GARDNER - DIRECT BY MR. O'REILLY                    1240

1   Q.   Is Erika your older or younger sister?

2   A.   Younger sister.

3   Q.   So Erika was looking for a lawyer for your mom?

4   A.   Yes, uh-huh.

5   Q.   And I'm afraid it has to be a yes or no.

6   A.   Yes.

7   Q.   Or an answer, but not -- did you ever meet

8   Mr. Stilley?

9   A.   No.

10  Q.   Did you ever speak with him on the phone?

11  A.   I don't really remember.  I don't think I did.

12  Q.   Do you recall if Mr. Stilley ended up representing

13  your mother at trial?

14  A.   No, I never seen Mr. Stilley.

15  Q.   Okay.  Because you attended the trial?

16  A.   We attended -- I know I was in Lansing and I think

17  we went to one of the trials in Grand Rapids, Michigan.

18  Q.   Okay.  Do you know who represented your mother at

19  trial?

20  A.   Barringer.

21  Q.   Do you know how your mother found Mr. Barringer to

22  be her attorney?

23  A.   It was through Oscar.  I don't really know.  I

24  didn't set up the whole thing.  It had to do with Oscar

25  and Lindsey and Barringer.

1   Q.   And when you say "Lindsey," who was "Lindsey"?

2   A.   Lindsey Springer.

3   Q.   Did you ever meet Lindsey Springer?

4   A.   I believe I met him one time for sure.

5   Q.   And where was that?

6   A.   I think it was in Lansing.

7   Q.   Was that at the courthouse?

8   A.   At the courthouse.

9   Q.   Do you see Mr. Springer in the courtroom today?

10  A.   (no response)

11  Q.   And if you --

12  A.   Yeah.

13  Q.   -- if you recognize him.

14  A.   I recognize him, yes, without the beard.

15          MR. O'REILLY:  May the record reflect that

16  Ms. Gardner has identified Mr. Springer?

17          THE COURT:  The record will so reflect.

18  Q.   (BY MR. O'REILLY)  What was the occasion that led

19  you to actually meet Mr. Springer at the courthouse?

20  A.   It was during one of the breaks, I ended up meeting

21  him through my sister.

22  Q.   Was this at the trial then?

23  A.   At the trial.

24  Q.   Do you recall when the trial started?

25  A.   I don't.

LAUREL GARDNER - DIRECT BY MR. O'REILLY                    1242

1    Q.   Do you recall roughly what -- at least what year?

2    A.   It was when they were actually going to prison,

3    whatever that year was.

4    Q.   Is there something that might help refresh your

5    recollection as to a year?  Maybe a check that you would

6    have written?  Did you write checks?

7    A.   Yes, I did.

8    Q.   Would that help you in refreshing your recollection

9    as to approximately when?

10   A.   The year?

11   Q.   Yes.

12   A.   Yes.

13           MR. O'REILLY:  Your Honor, if I actually -- for

14   purposes of this, if I may approach the witness and just

15   show her.

16           THE COURT:  You may.

17           MR. O'REILLY:  Thank you.

18   Q.   (BY MR. O'REILLY)  I am handing the witness what are

19   marked Government's Exhibits 32, 40, 44, 104, 109, 111,

20   and 112, all of which are in evidence.

21       Ms. Gardner, if you could just look through those

22   checks and see if that refreshes your recollection to at

23   least what year your parents' trial occurred.

24   A.   It would be 2003.

25   Q.   Do you think it was as early as 2003 and not 2004?

LAUREL GARDNER - DIRECT BY MR. O'REILLY                    1243

1   A.   I'm thinking it was 2003.  They were held for quite

2   a long time, I believe, in 2002, which lapped over into

3   2003.  It all just kind of got muddled together.

4   Q.   And, again, this is quite some time back?

5   A.   Yes, it is.

6   Q.   In addition to meeting Mr. Springer in person during

7   the trial, did you speak with him on the telephone?

8   A.   Yes, I did.

9   Q.   Approximately how many times?

10  A.   I remember one time.

11  Q.   Just one time?

12  A.   Uh-huh.

13  Q.   Was that towards the beginning or towards the end of

14  your parents' trial and --

15  A.   I think it was -- it was somewhere in the middle,

16  toward the end.

17  Q.   Let me ask you, if you would --

18        MR. O'REILLY:  And if we can have Government's

19  Exhibit 32, which is in evidence, up on the screen.

20  Q.   (BY MR. O'REILLY)  Tell me when you can see that,

21  Ms. Gardner.

22  A.   I see a check made out to Lindsey Springer.

23  Q.   Okay.  And has it got your -- does it have your

24  father's name on it?

25  A.   Yes, it does.

LAUREL GARDNER - DIRECT BY MR. O'REILLY                1244

1  Q.   Okay.  Is this a check that your father actually
2  wrote?
3  A.   No.
4  Q.   Is this a check that you wrote?
5  A.   This is a check I wrote.
6  Q.   What was your purpose in writing this check?
7  A.   It was to represent my mother in court.  He needed
8  money for filing papers and doing the leg work.
9  Q.   Who asked you to write this check?
10 A.   It was -- a lot of it went through my sister Erika,
11 and then Erika would ask me, and then I would write the
12 checks out.
13 Q.   Who was the person who was determining whether or
14 not the checks were being written?
15 A.   I think a lot of it did go through my father.  I
16 know a lot of times we would -- she would call him or
17 somehow in contact with him to find out how it worked.
18 Q.   When you say "she," meaning Erika?
19 A.   Erika.
20 Q.   Thank you.  And did you cause this check to be
21 written?
22 A.   I did write this check.
23 Q.   Government's 32.  What did you do after you wrote
24 this check?
25 A.   What do you mean?

1   Q.   Did you mail it or cause it to be mailed?

2   A.   I'm not really sure, really.

3   Q.   Okay.  Let me ask this:  Did you write any other

4   checks for -- first of all, what was this account that

5   we're looking at?  Is that the Lone Star Holding Trust

6   account, if you know?

7   A.   I think that was Paragon.

8   Q.   It was Paragon Bank; is that correct?  Is that check

9   still up there?

10  A.   It was --

11  Q.   Thirty-two.  And it's a check drawn on Paragon Bank

12  and Trust?

13  A.   Yes.

14  Q.   And where you usually would have an indication of

15  whose account it was, it has just got a handwritten 007

16  (sic) in there, I believe; is that correct?

17  A.   I -- yes.

18  Q.   0007.

19  A.   Uh-huh.

20  Q.   Let me ask you to take a look at what is in evidence

21  as Government's Exhibit 40, which is a check payable to

22  Lindsey Springer in the amount of $25,000 dated June 23rd

23  of 2004.

24  A.   Uh-huh.

25  Q.   And that's drawn on something called Lone Star

1   Enterprises Holding Trust; is that correct?

2   A.   Yes.

3   Q.   Did you cause -- did you write this check?

4   A.   Yes, I did.

5   Q.   Why did you write this check?

6   A.   That was another portion of money that he needed to

7   further help my mother.

8   Q.   And when you say "he," who do you mean?

9   A.   Lindsey.

10  Q.   Do you see the handwritten notation in the memo

11  line, "donation"?

12  A.   Yes.

13  Q.   Did you write that?

14  A.   Yes.

15  Q.   Why did you write that?

16  A.   I was asked to write that.

17  Q.   Who asked you to write that?

18  A.   Through my sister Erika by Lindsey.

19  Q.   Do you know -- were you told why you should write

20  "donation" this check?

21  A.   Way back when, I remember someone saying it was for

22  a ministry that Lindsey was doing.

23  Q.   What was your purpose in writing this check to

24  Mr. Springer?

25  A.   Was the purpose for him to keep working on my

1   mother's case.

2   Q.   And I'm going to ask you now if you could look at

3   what's in evidence as Government's Exhibit 44, which is a

4   check dated October 28th, about two weeks -- about a year

5   and two weeks later, in the amount of $15,000, payable to

6   Lindsey Springer, and, again, with the word "donation" in

7   the memo portion.  Do you see that check?

8   A.   Yes.

9   Q.   Is that your handwriting on that check?

10  A.   Yes, it is.

11  Q.   Is it your handwriting that wrote "donation"?

12  A.   Doesn't really look like my handwriting, this one

13  doesn't.

14  Q.   Okay.  Why did you write this check on October 28,

15  2004?

16  A.   It was to help my mother.  It was like segments.

17  They would go so far in the court and then he would ask

18  for more money.

19  Q.   When you say "he," who is "he"?

20  A.   Lindsey would ask for more money.  And that was how

21  the whole court -- the whole time he was working for my

22  mother, this was how it went.  Every time we got to a

23  certain part, he would request for more money because no

24  one has ever gotten this far, I guess.

25  Q.   What do you mean "no one has ever gotten this far"?

1  A.   As far as being able to go that far into the

2  courts.  He was trying to get some charges dropped for my

3  mother, so that would require him to have more paperwork

4  drawn up, and so he would ask for some more money.

5  Lindsey would ask for some more money.

6  Q.   Do you understand -- were charges dropped with

7  respect to your mother?

8  A.   They weren't dropped.  They were -- three of them, I

9  guess, were dismissed.

10 Q.   Did you also cause checks to be issued in the name

11 of Oscar Stilley?

12 A.   I did.

13 Q.   For what purpose did you cause checks to be issued

14 in the name of Oscar Stilley?

15 A.   I know the original check, we thought we were going

16 to have Oscar Stilley represent our mother.  And then

17 through the lines of, I don't know how it all worked, we

18 got Barringer and Lindsey instead.

19 Q.   To your knowledge, did you ever have to write a

20 check to Mr. Barringer?

21 A.   I don't think I did.  Not that I remember.  I know

22 that one -- at one time, they needed money for flights to

23 come to town.

24 Q.   Who is "they"?

25 A.   Lindsey and Barringer needed money for that and for

LAUREL GARDNER - DIRECT BY MR. O'REILLY                    1249

```
 1   their hotel expenses.
 2   Q.   Did you forward money for that?
 3   A.   I remember writing a check for $10,000.  And I
 4   believe that was to Oscar.
 5   Q.   Let me ask you, if you could, to take a look at what
 6   is in evidence as Government's Exhibit 111.  Do you
 7   recognize that check?
 8   A.   Yes.
 9   Q.   And in memo section, the word "Barringer" or the
10   name "Barringer," is that your handwriting?
11   A.   Pardon?
12   Q.   Is that your handwriting?
13   A.   Yes, it is.
14   Q.   Is this the check you were just referring to?
15   A.   I believe it is.
16   Q.   And that's on October 31, 2004, for $10,000?
17   A.   It could very well be.
18   Q.   Is that what -- what could be -- very well be?
19   A.   Yes, I think that is the check.  It was a long time
20   ago.
21   Q.   Okay.  Do you recall how much in total you've paid
22   to Mr. Springer to help your mother?
23   A.   It was a lot of money.
24   Q.   And let me ask this:  Did you ever have any
25   discussion with Mr. Springer with respect to that?
```

1   A.   On one occasion, that would be the occasion that I

2   talked to him on the telephone.  My sister Erika had

3   requested that he needed more money and we had just given

4   him a lot of money and I wasn't in agreement with it.  So

5   I said, no, I don't think he needs any more money, he's

6   not showing us what he's even doing.  You know, wasn't

7   accomplishing anything.  So my sister said that Lindsey

8   would be calling me, which he did, and threatening that

9   if I wasn't going to pay he would put a lien on my

10  parents' property.

11          MR. O'REILLY:  Your Honor, if I may have a

12  moment?

13          THE COURT:  You may.

14  Q.   (BY MR. O'REILLY)  Could you please explain -- your

15  father's name appeared on all of these checks we looked

16  at; is that correct?

17  A.   Yes.

18  Q.   How was that put there?

19  A.   How was his name put on the checks?

20  Q.   Yes.

21  A.   I had a stamp.  He had a stamp made.

22  Q.   And had your father, through the power of attorney,

23  authorized you to use that stamp?

24  A.   Yes.

25  Q.   For the very purpose of signing checks on his

LAUREL GARDNER - DIRECT BY MR. O'REILLY                    1251

```
 1   behalf?
 2   A.   Yes.
 3   Q.   There was one other -- do you know what Lone Star
 4   Enterprises Holding Trust was?
 5   A.   It was just a trust that I know of where they kept
 6   some money.
 7   Q.   And when you say "they kept some money" --
 8   A.   My parents.
 9   Q.   And I'm going to ask you now if you can look at
10   what's in evidence as Government's Exhibit 112, a check
11   from Casabella Enterprises dated January 13th of 2005
12   payable to Oscar Stilley in the amount of $10,000.  And
13   is this -- do you recognize this?
14   A.   I do.
15   Q.   And was this, again, a check that you had used the
16   stamp to sign your father's name?
17   A.   Yes.
18   Q.   What is Casabella Enterprises non-domestic mail.
19   A.   What was it?
20   Q.   Yes.
21   A.   Another trust.
22   Q.   And what was in the trust, if you know?
23   A.   It was just money.  I don't -- what do you mean what
24   was in it?
25   Q.   Whose money was in it?
```

```
 1  A.   My parents' money.

 2            MR. O'REILLY:  Nothing further, Your Honor.

 3            THE COURT:  Thank you.  Members of the jury,

 4  we'll take our midday recess at this time.  We'll be

 5  guided by the clock on the wall and we'll resume at

 6  1:15.  During this lunch recess, please do remember and

 7  comply with my usual admonition, which I will not repeat

 8  at this time.  So please be available for the security

 9  officer to bring you to the courtroom so that we may

10  resume promptly at 1:15.

11      All persons in the courtroom will remain seated

12  while the jury departs.

13      (JURY EXITS THE COURTROOM)

14            THE COURT:  You may step down.  Is there

15  anything we need to address before we take our midday

16  recess?

17            MR. O'REILLY:  No, Your Honor.

18            MR. WILLIAMS:  Your Honor, I have a quick

19  clarification on our ex parte meeting up at the bench.

20            THE COURT:  Okay.  Does that need to be on the

21  record?

22            MR. WILLIAMS:  Probably should, Your Honor.

23            THE COURT:  Okay.  Okay.  The defendants and

24  their standby counsel will approach.  Mr. O'Reilly, this

25  will be a little continuation of our ex parte
```

```
 1   conversation from this morning.
 2       (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND
 3   OUT OF THE HEARING OF THE GOVERNMENT.)
 4           MR. WILLIAMS:  Your Honor, I just had a quick
 5   really point of clarification question.  Now, I know that
 6   Mr. Springer is going to be on the stand during his
 7   direct examination, but if there are -- there probably
 8   will be objections that possibly some evidentiary things
 9   that have to be argued.  Redirect -- obviously, this is
10   Mr. Springer's trial, he gets to kind of direct the ship
11   on where we're going.  But during that point, will I have
12   an opportunity to meet with Mr. Springer and discuss this
13   or is this completely my judgment I get to do?
14           THE COURT:  My inclination would be to play that
15   by ear and find the most workable approach.  And what I
16   mean by that is that I'm willing to be a bit unorthodox
17   to facilitate this.  As you all probably know by now, my
18   tender spot is when it gets to the point that it's really
19   killing a lot of time.  But short of that, again, I would
20   have some inclination to be flexible, even to the point
21   of being somewhat unorthodox if it were necessary to have
22   the two consult.  I wish I could give you more solid
23   guidance than that, but I think maybe that will give you
24   a pretty fair read what my approach would be.
25           MR. WILLIAMS:  Thank you, Your Honor.
```

```
 1            THE COURT:  You bet.

 2       (A RECESS WAS HAD, AFTER WHICH THE FOLLOWING

 3  PROCEEDINGS WERE HAD IN OPEN COURT OUTSIDE THE PRESENCE

 4  AND HEARING OF THE JURY.)

 5            MR. O'REILLY:  Ms. Gardner is in the --

 6            THE COURT:  She can stay right there.

 7            MR. O'REILLY:  Thank you, Your Honor.

 8            THE COURT:  Okay.  Right when we took the noon

 9  recess, I was informed by Juror Steve Remington that he

10  had just been informed that his wife had had an apparent

11  heart attack and was being transported to the hospital.

12  He is the one in the front row in the second seat in the

13  front row next to Ms. Loayza.  I just spoke to him by

14  telephone.  He's at Saint Francis Hospital.  His wife had

15  not yet arrived, but he thought perhaps that she would be

16  arriving momentarily.  And I told him that we would wait

17  just a bit and see how the matter develops and then take

18  things one step at a time from that point.

19       I asked him to give me a call in about 20 minutes,

20  if possible.  But I also told him that I would certainly

21  understand if it turned out not to be feasible for him to

22  give me a call in about 20 minutes.  So we're going to

23  stand by for just a bit to see how that develops.

24       Here we are in week number two with two alternates.

25  It may be necessary to excuse Mr. Remington because of
```

 1    that family situation, but I'm certainly not reaching any

 2    conclusion on that score.  And I certainly did get the

 3    impression from my very brief conversation with

 4    Mr. Remington that if it should turn out to be, in

 5    essence, a false alarm or something less serious than a

 6    heart attack that he does desire to continue.  So we'll

 7    just have to stand by for the time being and see how it

 8    goes.

 9         If the situation remains uncertain, that's one

10    thing, or if it clarifies itself one way or the other,

11    then we'll just address that at that time.  Obviously,

12    I'm not terribly inclined to let the matter hang

13    indefinitely, but I think perhaps another 20 minutes or

14    thereabouts may give us some clarification.

15         So everyone will just need to be ready to proceed as

16    soon as we get some additional information from

17    Mr. Remington.  And I have asked the security officer

18    to -- or will ask the security officer to inform the

19    other 13 jurors that we're going to stand by for just a

20    little while.

21         Court will be in recess.

22         (THE FOLLOWING TOOK PLACE IN THE LIBRARY, WITH

23    PARTIES AND COUNSEL PRESENT.)

24              THE COURT:  We're on the record in the library.

25    I just got another call from Mr. Remington in which he

1256

 1    said he's still at the hospital.  There may actually have

 2    been some confusion or uncertainty about what hospital

 3    she was going to, so he's right now at the stage of

 4    attempting to make sure that she was headed for the

 5    hospital where he is.  And he said that it would -- he

 6    thought that it would not be any time real soon before

 7    they had any clarification because, first of all, she

 8    needs to get to the hospital and then, obviously, they

 9    need to determine how serious the problem is.  I told him

10    to stand by and that I would consult with counsel.

11        I'm not ready, yet out of hand, to excuse him and I

12    would hate to excuse him and then find out in another 30

13    minutes or an hour that he could resume.  It won't be too

14    terribly long, though, before I think excusing him

15    becomes a definite possibility.

16        To shed a little bit more light on the matter from

17    the Court's perspective, let me inquire of -- and let me

18    preface this question by saying one thing we could do is

19    quit for the day.  That is not a very attractive option,

20    but I wouldn't rule it out.  So let me inquire of

21    government counsel as to what more we have to do -- I

22    suppose we could quit for the day but go into the Daubert

23    hearing, but let me inquire of government counsel as to

24    what more we have in the government's case.

25            MR. O'REILLY:  In terms of additional witnesses?

```
 1            THE COURT:  Right.
 2            MR. O'REILLY:  We have Ms. Dulic from -- do you
 3   want just the numbers?
 4            THE COURT:  Tell me how many -- what would be
 5   your -- if we were to start now, when would you finish?
 6            MR. O'REILLY:  Depending on cross, we could
 7   finish tomorrow afternoon.
 8            THE COURT:  Okay.  If we were to recess for the
 9   day, then we'd be into Wednesday.
10            MR. O'REILLY:  Yes, Your Honor.  I fully expect
11   that even if we have a recess for the day, we would
12   finish by the close of business Wednesday.  And one
13   thing, even unless we were going to excuse him and
14   continue to expect him to be able to come back here and
15   be focused on the trial when his wife, no matter how
16   serious it is, is in the hospital may not be fair to the
17   juror.
18            THE COURT:  It would have to be -- it would have
19   to be -- it would have to be pretty unequivocal
20   information to the effect this was a false alarm and that
21   everything is back on an even keel before I require
22   Mr. Remington to return.
23       So what would -- assuming that we don't get -- let's
24   just assume for the moment that we're not going to have
25   clarification for another -- at least another hour, I'm
```

1  going to let each side tell me what they would suggest as

2  to what we do, one option being to excuse Mr. Remington

3  immediately and then go in and resume the trial,

4  obviously, with the first alternate being pressed into

5  service as an active juror.  Another option being to

6  recess for the day.  Another option being to wait a while

7  and see how this situation plays out.

8       What says the government?

9            MR. O'REILLY:  Your Honor, the only concern I

10  have is some of the witnesses are from out of town, but

11  we will get them out of here first thing in the morning

12  if we don't resume today.  So I am hesitant to excuse a

13  juror unless we have to.  So maybe we can wait a half-

14  hour and see if it is truly a false alarm and then bring

15  Mr. Remington back, if that's possible, and resume and

16  get -- what we'll do is we'll juggle our witnesses so we

17  get as many out of here today as possible.

18            THE COURT:  So you're saying -- your suggestion

19  is let's wait about 30 minutes and see where we stand?

20            MR. O'REILLY:  Yes, Your Honor.

21            THE COURT:  We still may have stark uncertainty

22  in another 30 minutes.  We'll just have to see.  What do

23  the defendants have to say?

24            MR. SPRINGER:  Your Honor, could I have just a

25  couple of minutes on my expert counsel on that question?

```
 1          THE COURT:  Surely.
 2      (DEFENDANTS CONFER WITH STANDBY COUNSEL)
 3          MR. SPRINGER:  It is my opinion that we should
 4  let the jury go home.  We'll know by in the morning
 5  whether or not Your Honor's concerns, whether they're
 6  satisfied or not.  We won't keep the jury sitting here
 7  waiting and cooling their heels and we could do the
 8  Daubert hearing as well.  And I'm really reluctant as the
 9  Court is and as the government is to release a juror, but
10  at the same time, I don't want to put him in any
11  hardship.  That is my basic concern.
12      I think the hour -- waiting the hour or waiting the
13  half-hour leaving them all just -- I mean, they're all
14  talking on the phone right now.  They're all trying to do
15  things they would not normally be doing, as we walked out
16  we saw them being ushered in.  And so that concerns me a
17  little bit that they're just sitting there waiting doing
18  nothing.  And that's my opinion on the subject, Your
19  Honor.
20          THE COURT:  What -- recognizing that obviously
21  you've got some witnesses who will be here if required no
22  matter what, although it won't be convenient for them and
23  they might not like it, what would -- would there be any
24  serious detriment to the government's ability -- the
25  government counsel's ability to do their job
```

1  professionally and adequately if we were just to recess

2  so far as the jury is concerned and start up with the

3  Daubert hearing in another 15 or 20 minutes?

4        MR. O'REILLY:  That's not a problem, Your

5  Honor.  My only concern is if it's possible to resume the

6  trial today and get some of these witnesses who are from

7  out of the area to be able to go home.  I'd like to be

8  able to do that.

9        THE COURT:  Okay.  My inclination is to give --

10  it's probably going to be 30 minutes just down the drain,

11  but my inclination is give it another 30 minutes and see

12  what we hear and then recess if we don't have some very

13  significant clarification.  Saint Francis is only a

14  couple of miles down the street, isn't it?

15        MR. SNOKE:  Saint Francis is at 61st and Yale.

16  It's a ways away.  I heard you say this may be her second

17  stop.  Because I was commenting about how it is that he

18  beat her to the hospital with the ambulance, supposedly

19  taking her code three.

20        THE COURT:  I don't know if the ambulance would

21  have been coming from -- I can't remember where he's

22  from.

23        MR. SNOKE:  That may be something too.

24        MR. SPRINGER:  Seems to me just from everything

25  I'm gathering that if we dismissed after you go through

```
1   the 30 minutes or whatever, if we dismiss the jury for

2   the day, this would take the pressure off of him.  He

3   could see that his wife is in good health and all that

4   worry is off his mind.  And he would also be able to tell

5   us whether or not he can actually come back and be a

6   juror.  Whereas in 30 minutes or an hour, just seems like

7   that's a lot of pressure on a guy with us coming on one

8   side and his wife going the other while at the same time

9   I'm like the government and, Your Honor, I think we

10  should preserve the jury as best we --

11          THE COURT:  Well, Mr. Springer may have a

12  point.  Maybe I'll just send them home and --

13          MR. O'REILLY:  Again, Your Honor, the only

14  concern I have is if it truly turns out to be a complete

15  false alarm and we can resume even as late at 3:30 that

16  would give us an hour and a half to get a couple of

17  witnesses out of here.  That's -- I don't know if that

18  will happen.  I'll be frankly surprised if it's a

19  complete false alarm.  But if it is, for the convenience

20  of these witnesses who have come in from out of town and

21  actually for the jurors as well, we're already down here.

22          MR. SPRINGER:  Just two witnesses; is that

23  right?

24          MR. O'REILLY:  No.  Ms. Gardner, Ms. Dulic, and

25  Mr. Snyder are all from out of town, as well as
```

```
 1   Mr. Turner, but Mr. Turner will not get off today.
 2   Mr. Turner will be --
 3             MR. SPRINGER:  These are record custodians.
 4             MR. O'REILLY:  Not Mr. Snyder.
 5             MR. SPRINGER:  Oh, yeah, the RV.
 6             MR. O'REILLY:  Mr. Bolthouse as well.  That's
 7   the concern is that, I mean, they're very quick
 8   witnesses, but they're still from out of town.
 9             THE COURT:  I'm going to tell the jury if we
10   don't have clarification by 2:30, then we're going to
11   recess for the day.  And does either side have an
12   objection to my simply sticking my head in the jury room
13   and telling them that much?
14             MR. O'REILLY:  Not from the government, Your
15   Honor.
16             THE COURT:  What say the defendants?
17             MR. SPRINGER:  I am so sorry about this, I was
18   listening to expert counsel.
19             THE COURT:  Does either side have any objection
20   to my just sticking my head in the jury room where they
21   are and telling them that much, that we're going to wait
22   until 2:30 and see if we have any clarification?
23             MR. SPRINGER:  No objection on that.
24             THE COURT:  If we don't have it then, then I'm
25   going to recess until nine in the morning.
```

```
 1          MR. SPRINGER:  No objection.  And if there could
 2   be one other issue here involving the Daubert hearing.
 3   We've been trying to get that issue resolved as best we
 4   can and we think we're really close on that just for Your
 5   Honor's understanding.
 6          THE COURT:  Very well.  If it works out that
 7   way, so much for the better.  Okay.  You may return to
 8   the courtroom.
 9      (THE FOLLOWING TOOK PLACE IN OPEN COURT WITH PARTIES
10   AND COUNSEL PRESENT, OUTSIDE THE PRESENCE AND HEARING OF
11   THE JURY.)
12          THE COURT:  We've still got no clarity at all.
13   I've talked to Mr. Remington and I told him, as per our
14   conversation, that we're going to recess until tomorrow
15   morning.  We'll start up here in just a little while on
16   the Daubert hearing.
17          MR. SPRINGER:  Thank you, Your Honor.
18          MR. STILLEY:  Thank you, Your Honor.
19          THE COURT:  Does anybody object if I just go
20   tell the jury that we're recessed until tomorrow morning?
21          MR. SPRINGER:  No objection, Your Honor.
22          MR. O'REILLY:  No objection.
23          THE COURT:  Very well.
24      (RECESS HAD)
25      (THE FOLLOWING TOOK PLACE IN OPEN COURT WITH ALL
```

```
 1   PARTIES AND COUNSEL PRESENT, OUTSIDE THE PRESENCE AND
 2   HEARING OF THE JURY.)
 3           THE COURT:  Okay.  We're resuming in the absence
 4   of the jury and awaiting word on Juror Remington for
 5   purposes of a hearing pursuant to Daubert and Rule 104
 6   and 702.  And let me give -- for the benefit of all
 7   concerned, let me give you this -- the setting in which
 8   at least as far as this Court is concerned this matter is
 9   before the Court.  The government has announced its
10   intent to call a summary witness.  As I recall, his name
11   is Brian Miller.  Is that right?
12           MR. O'REILLY:  Yes, Your Honor.
13           THE COURT:  Okay.  At the outset of the case,
14   the announcement was made that his testimony would not be
15   as a percipient witness in the sense of a witness who had
16   substantive testimony to give as to matters that he
17   personally observed outside of the courtroom but rather
18   would be based entirely on the matters as it unfolded at
19   trial together with, obviously, his compilation of
20   information from the voluminous financial records that
21   are in evidence.
22       So the area that is fair game for contest
23   preliminarily is twofold.  First of all, the
24   qualification of any summary exhibits or for that matter,
25   Rule 1006 also applies to verbal summaries, which is a
```

 1    little bit unusual.  But the qualification of his

 2    testimony and any exhibits under Rule 1006, I, frankly,

 3    don't think that there will be any room for serious

 4    contest about the voluminousness of the records relied

 5    upon by the witness under Rule 1006.

 6         But if there are other grounds for contest of the

 7    admissibility of his testimony or any related exhibits,

 8    why, then this is the time for that to be addressed.  So

 9    the government carries the initial burden of qualifying

10    his summary exhibits, if any, and summary testimony under

11    Rule 1006.

12         It should also be noted that summaries of admitted

13    evidence, whether oral or documentary, are also in the

14    Court's discretion admissible under Rule 611(a).  So

15    anyway, we've got that preliminary set of issues.  And

16    then we've got what you might call the conventional

17    Daubert issues.  And I'll address those in more detail at

18    the conclusion.  But suffice it to say that for -- to the

19    extent that this is what we colloquially call a Daubert

20    hearing, the Court's focus is on the witness's

21    qualifications and his methodology.

22         The basic principles that govern a Daubert challenge

23    are well known to all concerned and I suspect they are

24    well known to both of the defendants, but we should all

25    bear in mind that the Court's focus is more on the

1  witness's qualifications and methodology than they are on

2  his substantive conclusions.  And for that reason, it's

3  not necessary at this stage to walk the witness through

4  his expert testimony in its entirety.  To the contrary.

5  What the Court should hear at this point is testimony as

6  to his qualifications to testify to the specific matters

7  to which he proposes to testify, testimony as to the

8  methodology that he employed, together with enough of the

9  substance of his proposed testimony, if you will, that I

10 will at least have a reasonable understanding of the

11 matters to which he professes to be qualified to testify

12 and so that I will at least have some understanding of

13 how his methodology squares with the actual substantive

14 content of his testimony.

15      So I do not contemplate that our hearing this

16 afternoon will be anything like a full dress rehearsal of

17 his testimony.  That's not the purpose.  Rather, it will

18 be the -- first of all, since the government has the

19 burden under Rule 104, the government's opportunity to

20 call the witness and cover his qualifications and his

21 methodology, as I have said, together with enough of his

22 -- the actual substantive content of his testimony to

23 give me a setting, if you will, in which to assess his

24 qualifications and methodology, following which the

25 defendants will have an opportunity to undertake such

1  cross-examination as they may consider necessary to

2  support their challenges to Mr. Miller as an expert

3  witness -- or as a summary witness.

4      With that explanation, does either side have any

5  comments or concerns before we proceed directly with the

6  hearing?  What says the government?

7          MR. O'REILLY:  No, Your Honor.

8          MR. SPRINGER:  Point of clarification, Your

9  Honor.  You just used the word "expert" and "summary" in

10 two separate ways there and he is being offered as an

11 expert, going to give a summary, correct?

12         THE COURT:  Well, it's my understanding at this

13 point that there may be some aspects of his testimony

14 that are offered in reliance on Rule 702, which is expert

15 testimony.  I think the -- it's also my understanding,

16 we'll find out, but it's also my understanding that for

17 the most part, the bulk of his testimony is what we would

18 call conventional summary witness testimony as opposed to

19 being predominantly an opining expert.  But I would not

20 be surprised if there was some opinion testimony woven

21 in.  So in addition to Rule 1006 and Rule 611(a), we may

22 also have Rule 702 in play in the traditional expert

23 sense.

24         MR. SPRINGER:  Thank you, Your Honor.

25         THE COURT:  With that, the government may

 1 | proceed.
 2 |         MR. O'REILLY:  Your Honor, the United States
 3 | calls Mr. Brian Miller.
 4 |                         BRIAN MILLER,
 5 | (WITNESS SWORN)
 6 |                    DIRECT EXAMINATION
 7 | BY MR. O'REILLY:
 8 | Q.   Mr. Miller, where are you employed?
 9 | A.   For the Internal Revenue Service.
10 | Q.   How long have you been with the Internal Revenue
11 | Service?
12 | A.   Twenty-two years.
13 | Q.   What is your current position with the Internal
14 | Revenue Service?
15 | A.   I'm a fraud technical advisor.
16 | Q.   Please explain to the Court what that means.
17 | A.   Any time an auditor in the states of Arkansas or
18 | Oklahoma has a case that they feel has a potential to
19 | become a fraud case, they will contact me and I will
20 | provide assistance in that case to determine if, in fact,
21 | fraud does exist and, if so, how to proceed with the
22 | case.
23 | Q.   How long have you held this position?
24 | A.   Only about five months.
25 | Q.   What was your employment with the IRS prior to that?

BRIAN MILLER - DIRECT BY MR. O'REILLY                          1269

```
 1   A.   I was a revenue agent.

 2   Q.   Could you give a general description of what your

 3   duties were as a revenue agent?

 4   A.   To examine income tax returns for their accuracy.

 5   And if they weren't accurate, then I would make them

 6   accurate with the cooperation of the taxpayer.

 7   Q.   How would you make them accurate with the

 8   cooperation of a taxpayer?

 9   A.   Typically, the taxpayer and I would work together.

10   We would look at books and records and their receipts.

11   And if their income reductions were not accurate, we

12   would either agree or agree to disagree, and then I would

13   prepare a report and assess additional tax or give a

14   refund to make an accurate reflection.

15   Q.   What is your educational background?

16   A.   I have a BBA in accounting.

17   Q.   When did you get that degree?

18   A.   I graduated in May of 1987.

19   Q.   Do you have any other certifications after college?

20   A.   Yes.  I'm a certified public accountant, inactive

21   CPA, and also a certified fraud examiner.

22   Q.   How long have you been a certified public

23   accountant?

24   A.   Since 1989.

25   Q.   How long have you been a certified fraud examiner?
```

 1  A.   Yes, I believe that was since 1999, I think.

 2          THE COURT:  What agency or entity issues that

 3  certified fraud examiner certification?

 4          THE WITNESS:  I'm sorry.  What was the question

 5  again?

 6          THE COURT:  What entity or organization issues

 7  the certified fraud examiner certification?

 8          THE WITNESS:  It's the Association of Certified

 9  Fraud Examiners out of Austin, Texas.

10          THE COURT:  Thank you.  Proceed.

11  Q.   (BY MR. O'REILLY)  Is that a nationwide

12  organization?

13  A.   Yes, it is.

14  Q.   How do you achieve that status?

15  A.   For the certified fraud examiner?

16  Q.   Yes, sir.

17  A.   I believe you have to have a certain number of years

18  of experience, plus you also take an exam similar to the

19  CPA exam.

20  Q.   And how does one become a CPA?

21  A.   Same way, you have to have a certain amount of time

22  and experience, plus you take the CPA exam, which is four

23  parts.

24  Q.   In the course of both your college education and --

25  well, let me ask this:  Did you have training after

1    college in financial matters?

2    A.   Yes.  The IRS provides frequent training, continuing

3    professional education, I guess you would call it,

4    annually on-line, some classroom setting to keep us up to

5    date with current tax laws and examination techniques.

6    Q.   Did you take these courses?

7    A.   Yes.

8    Q.   Have you ever taught any of these courses?

9    A.   I've taught a few, yes.

10   Q.   Which courses have you taught?

11   A.   I've taught some training courses on how to teach

12   others.  I've taught some tax law on -- for example, the

13   built-in gains tax on S corporations.  I've taught fraud

14   investigation techniques to new hires at the IRS, that

15   sort of thing.

16   Q.   As part of your training and experience, have you --

17   what is your level of expertise in terms of going through

18   and assessing income and expense items?

19   A.   That's basically all I've done for the last 22 years

20   at the IRS.

21   Q.   Have you ever testified as a summary witness in

22   previous criminal trials?

23   A.   Yes, I have.

24   Q.   How many times?

25   A.   I'm going to guess eight to ten probably.

1  Q.   Have you testified here in the Northern Judicial

2  District of Oklahoma?

3  A.   Yes, I have.

4  Q.   Where else have you testified?

5  A.   I have testified in the Western District of

6  Arkansas, the Eastern District of Arkansas, and the

7  Northern District of Georgia.

8  Q.   Is there a general description you can give to what

9  type of analysis you did in those -- when you worked as a

10 summary witness?

11 A.   I would say I had two main functions.  The first

12 would be to look at the evidence that was presented as

13 far as the calculation for the summary of the income and

14 expenses that were related to the taxpayer's tax

15 computation.  Then I would compute the tax liability

16 based on the income and expenses that were presented.

17 And then my second primary function would be to explain

18 those computations and summarize that for the jury.

19 Q.   What methodology do you use -- how do you determine

20 whether an item is a deductible or a non-deductible item?

21 A.   Just the application of the tax law and my

22 understanding what a particular expense would have been

23 for.

24 Q.   And as part of that consideration, the documents

25 themselves if you had documents?

BRIAN MILLER - DIRECT BY MR. O'REILLY                    1273

```
 1  A.   Absolutely.

 2  Q.   And part of that would be witness testimony if that

 3  was available?

 4  A.   Yes.

 5  Q.   Similarly, how do you make a determination whether

 6  or not an item of payment is income?

 7  A.   Very similarly.  Look at the document itself, listen

 8  to witness testimony, and then use my understanding of

 9  the tax law and apply it to that particular set of facts.

10  Q.   And have you been present throughout this trial?

11  A.   Yes, I have.

12  Q.   Without going into the specific details of what your

13  testimony will be, what generally have you been asked to

14  do in preparing to testify in this case?

15  A.   I was asked to listen to the testimony of all the

16  witnesses who dealt with Mr. Springer and Mr. Stilley,

17  look at the exhibits, primarily the cancelled checks that

18  were payments to those two individuals, and then listen

19  to the witnesses' testimony to gain an understanding of

20  the nature of those payments to Mr. Stilley and

21  Mr. Springer, and then basically break those down by

22  year.  And those payments that, based on the law should

23  be treated as income, I categorized as income, broke down

24  by year.  And then I'll use those summaries to calculate

25  an income tax deficiency.
```

BRIAN MILLER - CROSS BY MR. SPRINGER                        1274

1    Q.   Have you reached a final conclusion as you sit here

2    today?

3    A.   No, I've not heard all the witnesses yet.

4           MR. O'REILLY:  If I may have a moment, Your

5    Honor?

6           THE COURT:  You may.

7           MR. O'REILLY:  Nothing further from the United

8    States, Your Honor.

9           THE COURT:  Cross-examination.

10          MR. SPRINGER:  Your Honor, may I have one

11   moment?

12          THE COURT:  You may.

13                    CROSS-EXAMINATION

14   BY MR. SPRINGER:

15   Q.   Good afternoon, Mr. Miller.

16   A.   Good afternoon, Mr. Springer.

17   Q.   Have you offered --

18          THE COURT:  You're going to have to pull that

19   microphone --

20          MR. SPRINGER:  I'm sorry.  Sorry about that,

21   Your Honor.

22   Q.   (BY MR. SPRINGER)  Have you offered any expert

23   opinions in cases other than the ones that you've sat in

24   and watched as you've testified here today?

25   A.   You mean -- which cases are you talking about?

BRIAN MILLER - CROSS BY MR. SPRINGER                    1275

1  Q.   Well, you said you were in the Western District of
2  Arkansas, correct?
3  A.   Yes.
4  Q.   That was the Roberts case; is that right?
5  A.   That's one that I testified in.
6  Q.   Okay.  And then Northern District of Georgia, that
7  was Mr. Lake's case; is that right?
8  A.   Yes.
9  Q.   One of them anyway.  And then the Northern District
10 of Oklahoma, that was Blackstock and that was also
11 Patterson, right?
12 A.   Right.
13 Q.   And then there are probably some others.  Now, have
14 you ever given a written opinion about the things that
15 you've been testifying at these trials to have other
16 people look at your opinion and critique it?
17 A.   I have not.  I've not presented an expert opinion
18 outside the courtroom setting.
19 Q.   Now, I heard the government use the word
20 "methodology."  Is that a familiar term to you?
21 A.   Yes.
22 Q.   Now, what does that term mean to you?
23 A.   I think it was used in the context of the method or
24 methodology used to compute income or calculate a tax
25 deficiency would be my understanding of that term in this

BRIAN MILLER - CROSS BY MR. SPRINGER                    1276

 1   context.

 2   Q.   Okay.  So when you -- when you're doing what you do,

 3   you're looking at an amount of -- you said income, I

 4   believe; is that correct?

 5   A.   Yes.

 6   Q.   Now, just because something is income, that doesn't

 7   make it taxable, does it?

 8          MR. O'REILLY:  Your Honor, objection.  This is

 9   about his qualifications, not a preview of his testimony

10   at trial.

11          THE COURT:  Well, that's overruled.

12          MR. SPRINGER:  Thank you.

13          THE COURT:  The fact that his direct testimony

14   in response to Mr. O'Reilly's questions was concise

15   really doesn't put much of a limit on the matters that

16   the defendants are entitled to go into as long as they do

17   go to the issues that I outlined at the outset.  And, in

18   essence, this is the defendants' opportunity to address

19   matters which if they're adequately addressed and if the

20   Court permits the witness to testify in front of the

21   jury, might even not have to be repeated in front of the

22   jury unless there's some good reason to do that.

23      In saying that, I certainly don't mean to limit the

24   defendants or to put them at risk of not being able to

25   cover matters in front of the jury.  But be that as it

1   may, the defendants have a fairly wide field of play, if

2   you will, still within the confines of the issues as I

3   outlined them.

4       I suppose, in the vernacular, we could just call

5   this the defendants' free shot at the witness where they

6   can pretty much take any approach they want to without

7   fear of something blowing up in their face in front of

8   the jury.  That's my approach to it and that's what we'll

9   do.  You may proceed.

10          MR. SPRINGER:  Thank you, Your Honor.

11  Q.   (BY MR. SPRINGER)  Now, are you familiar in this

12  case -- and I'm going to strike my question.  I'm going

13  to try to fix that a little better.

14  A.   Okay.

15  Q.   Are you familiar in this case with the theory that

16  the government has presented to this Court?

17  A.   By "theory," if you mean our method for determining

18  a tax due and owing, then yes.

19  Q.   Now, isn't it true that before we get to a tax due

20  and owing we've got to make a determination of whether a

21  return is required to be filed?

22  A.   Not necessarily.  I think they're two completely

23  separate matters.  You make an income determination and

24  then you make a level of income determination to decide

25  whether or not a return should be filed.

BRIAN MILLER - CROSS BY MR. SPRINGER                    1278

1  Q.   So you first determine whether there's an income

2  level and then that determines whether you're required to

3  file a return.  Is that what you just said?

4  A.   Generally, yes.

5  Q.   All right.  Now, doesn't Section 61 of the code

6  define gross income?

7  A.   It gives a description of what is included in gross

8  income.

9  Q.   Okay.  And is gross income, in your opinion,

10 different than just regular income, without the word

11 "gross" on it?

12 A.   I think gross income has a more specific connotation

13 for purposes of the Internal Revenue Code.

14 Q.   Which word triggers the requirement to file a tax

15 return?  Income or gross income?

16 A.   Gross income.

17 Q.   All right.  So just because somebody has income

18 under your expert opinion doesn't trigger the requirement

19 to file a return; is that true?

20 A.   That's exactly right.

21 Q.   All right.  Now, are you familiar -- excuse me,

22 strike that.  Have you ever written any opinions related

23 to how gifts should be determined?

24 A.   Not to my recollection, no.

25 Q.   Have you ever given any testimony in any of the

BRIAN MILLER - CROSS BY MR. SPRINGER                    1279

1   cases that you -- I've identified where you gave your

2   summary testimony where you were called upon to make a

3   determination of the tax treatment of what may or may not

4   have been correctly characterized but characterized,

5   nonetheless, as a gift?

6   A.   I do not believe I have done that, no.

7   Q.   Have you ever attended any special training in

8   relation to how you could either say or show others to

9   treat such items?

10  A.   I have had no special training just on gifts, no.

11  Q.   Now, isn't it true that Section 102 of the tax code

12  specifically excludes gifts from the calculation of gross

13  income?

14  A.   Yes.

15  Q.   Okay.  And isn't it true that as far as you know,

16  "gift" is not defined in the tax code.

17  A.   To my knowledge, it is not.

18  Q.   And you said earlier that you were aware of the

19  government's theory in this case; is that true?

20  A.   The theory as to the computation of income and tax

21  due, yes, I believe so.

22  Q.   Isn't it true also that there are no regulations

23  that define the meaning of the term "gift" by the

24  treasury department?

25  A.   I could not answer that.  I don't know.

BRIAN MILLER - CROSS BY MR. SPRINGER                    1280

1    Q.   Okay.  Now, as you stand here today, do you believe

2    that -- is it your expert opinion that your conclusions

3    on how to treat items of income would be based not only

4    upon Internal Revenue Code statutes but also regulations

5    that interpret those statutes?

6    A.   I think in some situations the regulations are

7    required to gain understanding of those statutes.  In

8    this case, I can't think of an instance in which I would

9    have to go to the regulations to come up with the

10   conclusions that I need to reach.

11   Q.   So is it your testimony here today that you would

12   solely make the decision based upon comparing Section

13   102's statutory language with Section 61's gross income

14   definition?

15   A.   I would review Sections 102 and 61 to make sure that

16   there were no special exceptions or requirements or

17   something out of the unusual that might apply in this

18   case.

19   Q.   Now, how will you determine -- if you're allowed to

20   testify, how would you determine whether something that

21   said "gift" on it or said "donation" on it as a specific

22   item was treated under Section 102 by you, in your

23   opinion, as a gift?  How will you make that decision?

24   A.   I guess I would use the principle of substance

25   versus form.  Although the check itself may say

BRIAN MILLER - CROSS BY MR. SPRINGER                    1281

1   "donation," I would actually have to look at the purpose

2   for the payment.  I would try to look and see what the

3   intent of the donor was or the giver of the funds to

4   determine exactly the reason for the payment.

5   Q.   Now, you didn't get what you just said, in your

6   opinion, you did not derive that from Section 102, did

7   you?

8   A.   Derive what from 102?

9   Q.   What you just said about how you would conclude

10  whether or not something was, in fact, a gift or not.

11  A.   That's correct, I did not derive that from 102.

12  Q.   Where did you derive that from?

13  A.   I guess just a general understanding that the giver

14  of the funds typically would have an understanding of why

15  they were paying the funds and that -- and their

16  understanding would generally rule as far as the

17  character of the payment.

18  Q.   And that's not based upon any training that you

19  have, though, correct?

20  A.   I would say that's -- yes, I would say I had no

21  specific training on that.

22  Q.   And you clearly are aware of the government's theory

23  in the case on that subject, are you not?

24  A.   Yes, I am.

25  Q.   Okay.  Now, you said you were a fraud

BRIAN MILLER - CROSS BY MR. SPRINGER                    1282

1  investigator -- or you're certified as a fraud

2  investigator now, is that right, or a fraud technician?

3  A.   That's right, fraud technical advisor.

4  Q.   And you've been that for six months -- or four

5  months, right?

6  A.   Five or six.

7  Q.   Five or six months.

8  A.   Something like that.

9  Q.   Now, you're not asked to -- you're not giving

10 testimony here today about fraud, are you?

11 A.   No, I'm not.

12 Q.   Okay.  Now, in your previous expert testimony, have

13 you -- or summary, slash, expert testimony -- I guess you

14 become an expert on summarizing for a jury.  Is that the

15 best way of saying it?

16 A.   That's --

17 Q.   That's hard, I know.  Have you also given testimony

18 on the filing requirements?

19 A.   Yes, I have.

20 Q.   Okay.  And how do you determine what the filing

21 requirements are for a person to file a Form 1040, let's

22 say?

23 A.   Simply, I would determine the amount of gross income

24 that the individual had for a particular year and then I

25 would take that amount and look at code Section 6012 to

BRIAN MILLER - CROSS BY MR. SPRINGER                    1283

1   see if they met the threshold for filing.

2   Q.  And now when you get to 6012, you don't stop there,

3   do you?

4   A.  No.

5   Q.  There's a triggering mechanism in 6012, isn't there,

6   that has to be triggered and it's not called threshold

7   amount, is it?  Is it called exempt amount?

8   A.  I guess you could call it that.  Typically, it's the

9   exemption amount, plus the standard deduction is --

10      (A CELL PHONE RINGS IN THE COURTROOM.)

11         THE COURT:  Stand by, Counsel.  I'm violating

12  the court rules because I'm expecting a call from

13  Mr. Remington.  But this is not it.  You may proceed.

14         MR. SPRINGER:  Thank you, Your Honor.

15  Q.  (BY MR. SPRINGER)  So, now, your testimony hasn't

16  always considered the exempt amount and the standard

17  deduction; isn't that true?  It has just been in the last

18  three or four years that your testimony has added the

19  standard deduction to the exempt amount that triggers a

20  requirement?  Is that not --

21  A.  I'm not sure that's true.  I don't remember a

22  specific case.

23  Q.  Okay.  Now, as you look at 6012, it just basically

24  gives you the generic statement a return is required if a

25  certain amount is exceeded.  Is that basically your

BRIAN MILLER - CROSS BY MR. SPRINGER                    1284

1  understanding?

2  A.   Yes.  If the income amount exceeds the exemption

3  amount, plus a standard deduction amount, a person is

4  required to file.

5  Q.   Now, the amounts that trigger that are not in 6012,

6  are they?

7  A.   No, they are not.

8  Q.   And there is a reference in 6012 to a Section

9  151(d); isn't that true?

10  A.   Yes.

11  Q.   And -- but now what would be your testimony for,

12  say, as you stand here today, what would be the amount

13  that triggers the requirement of 6012 for let's say the

14  year 2005?

15  A.   I do not have that number off the top of my head.

16  Q.   And where would you go get that number if you needed

17  to get that number?

18  A.   If I wanted to get the number, I would go to a

19  publication.

20  Q.   Okay.  What would be that publication?

21  A.   Any number of publications.  I could go to --

22  Q.   Instruction booklet?

23  A.   -- the instruction booklet.

24  Q.   All right.

25  A.   Publication 9 -- is it 917 or 915?  I haven't looked

1   at it in a while.

2   Q.   Now, 151(d) doesn't tell the public to do that, does

3   it?  It doesn't say go look at publication 915 or 917,

4   does it?

5   A.   No.  The code section actually gives the law on how

6   to compute the amounts.

7   Q.   When you say "code section," you mean 151(d)?

8   A.   151(d) is a part of that computation, yes.

9   Q.   And so we've got to come out of 6012 and we've got

10  to go into 151(d) and we're looking for this exempt

11  amount and then there's another statute, is there not,

12  that tells what the standard deduction is?

13  A.   That's right.  Sixty-three, I believe.

14  Q.   Okay.  And, now, you don't just go to the

15  regulations for 151(d) or 63 -- you go to revenue

16  procedure, do you not?

17  A.   I typically don't go to any of those.  I -- I know

18  what the formula is for calculating those year to year

19  and I trust that those who prepare those publications

20  have done their math accurately and that the numbers that

21  are in the publications are accurate.

22  Q.   So as we -- as we go to 151(d), which is referenced

23  by Section 6012 --

24  A.   Yes.

25  Q.   -- we don't actually find the exempt amount in

1  151(d), we find a formula; is that correct?

2  A.    That's correct.  I mean, they're -- otherwise, the

3  Internal Revenue Code would have to be rewritten every

4  single year just to make an allowance for inflation.  And

5  instead of doing that, they simply have a formula in

6  there that you can use to make the computation.

7  Q.    All right.  And then just because you determine that

8  you're now in the position to have to file a return, how

9  do you determine what form of return you're supposed to

10 use?

11 A.    Typically, most people simply use a Form 1040.  It's

12 the simplest.  It's certainly accepted by the Internal

13 Revenue Service.  And I guess if someone wanted to use

14 another form, then I would have to take a look at that

15 form and look at the specific rules regarding the matter

16 that the presentation is made to see if it was

17 acceptable.

18 Q.    So is it your testimony --

19          THE COURT:  Wait.  Wait a minute.

20          MR. O'REILLY:  Your Honor, given that there are

21 no tax returns filed in this case, I'm not quite sure

22 what relevance the forms that could have been filed might

23 be.  But I know Your Honor is going to be --

24          THE COURT:  Right.  Mr. Springer, this

25 proceeding does have to be within the outer limits of the

1   issues that I outlined at the outset.  In other words, if

2   I were you, I would be sorely tempted to elicit testimony

3   for the purpose maybe of laying a foundation for my

4   defense when your turn comes, but that's not really what

5   this is about.  This does need to be directed to the

6   issues that I outlined at the beginning.

7           MR. SPRINGER:  May I have one moment, Your

8   Honor?

9           THE COURT:  You may.  As a matter of fact, we'll

10  take about a five-minute recess at this time.

11      (RECESS HAD)

12          THE COURT:  Mr. Springer, you may continue.

13          MR. SPRINGER:  Thank you, Your Honor.

14  Q.  (BY MR. SPRINGER)  If you've given no opinions, then

15  you've never had any opinions subject to peer review; is

16  that correct?

17  A.  That's correct.

18  Q.  Okay.  And when you're looking at an item in this

19  case specifically, let's take, for instance, a $10,000

20  check from Mr. Patterson in 2000.  Does that help you?

21  A.  Okay.

22  Q.  And Mr. Patterson writes "donation" on the check and

23  he says I told him to do that and then comes a letter

24  that comes in and says, you know, use this suffering

25  persecution, you saw the letter; is that correct?

1  A.    I did.

2  Q.    Now, what scientific methodology would you use to

3  determine the tax consequence of that item as an example?

4  A.    That particular item would have to be -- could not

5  be taken just by itself in a vacuum.  I would have to

6  look at that item as part of or alongside Mr. Patterson's

7  testimony, the other payments that were made to

8  Mr. Patterson, other treatments of payment by people like

9  Mr. Patterson to you, and make a decision based on the

10  entire package and not just that one single item.

11  Q.    And under that theory -- it's an all-or-none theory

12  that you're using, correct?  You're using the 10,000

13  either goes in one column or another column.  There's no

14  in between on that, right?

15  A.    I don't think there would have to be an all-or-none

16  column.

17  Q.    And why would that be?

18  A.    Theoretically, it's possible that a portion of the

19  payment could be a gift and a portion of the payment

20  could be compensation, but -- so I would have to take

21  each one on a case-by-case basis.

22  Q.    And when you say "each one," you're meaning each

23  item, not just each person who gave the item, right?

24  A.    That's correct.

25  Q.    Okay.  Now, where did you learn to do that?  Where

BRIAN MILLER - CROSS BY MR. SPRINGER                    1289

1    did that explanation come from?

2    A.   Common sense.

3    Q.   Just common sense.  Isn't that the IRS's position?

4    A.   I would assume so.

5           MR. O'REILLY:  Objection as to what is the IRS's

6    position and you should use common sense.

7           THE COURT:  Don't go there.  That will be

8    overruled.

9           MR. SPRINGER:  I'm sorry, Your Honor.

10   Q.   (BY MR. SPRINGER)  So for your testimony here in

11   this case, it is your testimony, at this point, you've

12   had no special training on how to conclude whether or not

13   an item that says "gift" on it or an item that has been

14   stated as "gift" by a witness is, in fact, a gift.

15   You've had no testimony to that -- or no training for

16   that; is that correct?

17   A.   No training on that specifically, but that -- I have

18   had significant training on that principle.

19   Q.   Okay.  Where did you get that training?

20   A.   Just training on how to look at substance versus

21   form and what's a real transaction, what's a sham

22   transaction, the difference between the two, and how to

23   recognize that difference and principle that I think

24   would apply in this situation.

25           THE COURT:  Stand by just a moment,

```
 1   Mr. Springer.  Go ahead.
 2   Q.   (BY MR. SPRINGER)  So if an item says that it's a
 3   gift or it doesn't, that doesn't begin or end your
 4   inquiry, correct, it has nothing to do with your
 5   methodology?
 6   A.   It's a consideration, but, like you said, it's not
 7   the beginning or the end of my determination.
 8   Q.   It's just one of several factors that you take into
 9   consideration, right?
10   A.   That's exactly right.
11   Q.   And then you mentioned earlier the "donor's intent."
12   Do you remember that phrase you used?
13   A.   Yes.
14   Q.   Where did you get that specific training to
15   determine what donor intent was?
16   A.   Again, just common sense that the feelings of the
17   donor -- you know, if a donor intended a particular
18   payment to be compensation for services, then that would
19   be treated as income.  If the person making the payment
20   intended it to be a gift, then that would also have to be
21   considered in the determination.
22   Q.   Now, you said "services" and that is key to your
23   scientific methodology, correct?
24   A.   That's a significant part of it, yes.
25   Q.   And you grabbed that word from Section 61 of the tax
```

1    code; is that correct?

2    A.   That's right.

3    Q.   Now, that word is not defined in Section 61, is it?

4    A.   Compensation or services?

5    Q.   No, services.

6    A.   To my knowledge, it's not defined.

7    Q.   And as you stand here today, have you ever had any

8    special training on what was and what was not considered

9    services under Section 61?

10   A.   Personally, I would have a hard time thinking of a

11   scenario how you could break it down into more simple

12   than just saying "services."

13   Q.   Saying "services."  Have you ever read the

14   regulations that have been cited by the government in

15   their second bill of particulars dealing with Section 61,

16   I think it was 1.61-1?

17   A.   I'm sure I've read that, but it doesn't come to mind

18   at the moment.

19   Q.   So I take that as an answer, no, you have not read

20   those?

21           MR. O'REILLY:  Objection.  Misstates what he

22   said.

23           THE COURT:  He just said that he had read them.

24           MR. SPRINGER:  Oh, had read them, okay.

25           THE WITNESS:  I have read them, but I don't

BRIAN MILLER - CROSS BY MR. SPRINGER                    1292

```
 1  recall specifics at the moment.
 2  Q.   (BY MR. SPRINGER)  You don't recall what they said
 3  is what you're saying?
 4  A.   That's correct.
 5  Q.   So do you have -- besides thinking everything is a
 6  service, do you have any opinions or treatises that
 7  helped you to come to that conclusion, that all things
 8  that look like a service are a service?
 9  A.   I would just have to use my life experiences and my
10  common sense to come to that conclusion, I guess.
11  Q.   So now, for instance, as an example, lawyers provide
12  a service, right?
13  A.   Yes, they do.
14  Q.   And they charge an hourly rate, correct?
15  A.   Typically.
16  Q.   Okay.  But you're not -- you're not thinking about
17  an hourly rate in your methodology or scientific
18  methodology with how to treat these items of income, are
19  you?
20  A.   I'm not thinking about any particular rate.  I'm
21  just thinking of work done in exchange for a payment.
22  Q.   Okay.  Exactly.  How do you determine how to put a
23  value on the work done versus the payment?  How do you
24  come up with that conclusion?
25        MR. O'REILLY:  Your Honor, objection.  There is
```

1    no -- nothing in Mr. Miller's testimony will be valuing

2    the services provided by the defendants.  That's not what

3    he is offered for.  Only to determine whether the

4    payments made were, in fact, income or not.  The

5    valuation is something that was -- valuation is not

6    something he'll be testifying to.

7          THE COURT:  Doesn't that resolve that aspect of

8    it, Mr. Springer?

9          MR. SPRINGER:  Close.  Maybe I could just

10   clarify this for the Court just so you can understand why

11   I'm standing up and opposing that.  It's beyond

12   comprehension how this expert could say this item of

13   income -- and we'll use the example we've used here, the

14   $10,000 check from Mr. Patterson on August 25th of 2000

15   for the letter that said here is a donation.  And this

16   witness is saying he's going to testify that that entire

17   item is an item of gross income.  And he just now said

18   that he looks at the services.

19      And so what I'm trying to do is get more into that,

20   at least a little closer, because -- and I take objection

21   to what Mr. O'Reilly just said because it goes to the

22   heart of the matter.  I mean, it is the heart of the

23   matter.

24          THE COURT:  Well, okay.  What I hear you arguing

25   is more an allocation issue than a valuation issue.

BRIAN MILLER - CROSS BY MR. SPRINGER                    1294

1           MR. SPRINGER:  Okay.

2           THE COURT:  If I hear you right, I hear you

3    saying that perhaps some of these sizable checks are

4    subject to allocation between income and gift.

5           MR. SPRINGER:  Yeah, the Christiansen --

6           THE COURT:  I anticipate instructing the jury

7    that it's going to be either fish or fowl.

8           MR. SPRINGER:  One or the other.

9           THE COURT:  There are not going to be any

10   $25,000 checks that the jury will be called upon to

11   determine are part income and part gift.  That, I do not

12   anticipate instructing the jury.  So that objection will

13   be sustained.

14          MR. SPRINGER:  My question is over, Your Honor,

15   on that.

16   Q.  (BY MR. SPRINGER)  So you have no standard methods;

17   is that correct?

18   A.  Standards methods for what?

19   Q.  Of determining whether or not something is or is not

20   gross income, dealing with the specific item of

21   calculation that we're dealing with in this case here,

22   right, there's no standard methods for that?

23   A.  I'm not -- you might want to clarify that question

24   for me just a little, if you would, please.

25   Q.  Okay.  Let's go a different -- strike that.  You

1   take determination of each item in this case on an item-

2   by-item basis, correct?

3   A.   That's right.

4   Q.   And there is no standard by which you're going to

5   compare that item other than was there any statement of

6   service under the theory that you've offered here or not,

7   once that you think that there is a service standard

8   established, the entire item -- in your position, the

9   entire item becomes gross income?

10  A.   In this particular case, I clearly think if the item

11  is income -- let me back up just a little, if you don't

12  mind

13  Q.   Sure.

14  A.   In this case, I think it's a little bit different

15  than in some cases in which you could have -- you know,

16  you could easily have a payment for service and a gift at

17  the same time.  For example, you could pay your -- the

18  person who mows your lawn $40 for mowing the lawn and

19  then give them an extra 20 bucks at Christmastime for a

20  total payment of $60 and the total would not be income.

21  Q.   It would not be gross income.  It would still be a

22  gift of income, it's just not gross income, right?

23  A.   Right.

24  Q.   Okay.

25  A.   But I think your -- the situation in this case is

BRIAN MILLER - CROSS BY MR. SPRINGER                    1296

```
 1  different, because whether the payment can be for
 2  specific services that you provide in legal defense or
 3  legal research or whatever, and there could also be
 4  another portion that is not for your specific services on
 5  behalf of the payor that may be payment to you for your
 6  promotion of the ministry for you to carry on the work
 7  that you're doing.  In which -- and in either case, I
 8  believe that would be gross income to you.  So, you know,
 9  in a way, in a sense, whether it's a gift or compensation
10  for services is almost a moot point in this case.
11  Because I think in all the cases I've heard thus far, all
12  the payors have expected something from you, whether it
13  was personal legal services or work by you on behalf of
14  the ministry to promote that ministry.
15  Q.   And that is the sole determination -- the sole
16  determining factor that you rely upon to move the column
17  -- the item out of the income column and into the gross
18  income column; is that correct?
19  A.   I guess if you want to put it that way.
20  Q.   Even though you don't have any clue as to what I
21  would have done for any of those items; is that right?
22  A.   I have a general understanding of the work you
23  performed based on our paths crossing in the past but no
24  specific knowledge, no.
25  Q.   Right.
```

1           MR. SPRINGER:  Your Honor, may I approach just a
2    second out of the context of the witness?  I just want to
3    ask a question before I -- I'm almost done.  I just want
4    to ask a question I can ask before I do it.
5           THE COURT:  Sure.
6       (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND
7    OUT OF THE HEARING OF THE JURY.)
8           MR. SPRINGER:  If this witness is not going to
9    be testifying about filing requirements, then I've
10   satisfied every question I have, but I don't know that --
11   I believe he's going to be testifying about filing
12   requirements and, therefore, I wanted to know whether I
13   could go into some of the issues that we're dealings with
14   on the filing requirements because that is a part of
15   every one of the charges, even the 25-year charge in
16   Count 1.  And I didn't know what you think, so --
17          THE COURT:  Okay.  Well, he just heard every
18   word you said.
19          MR. SPRINGER:  He has got good ears.
20          THE COURT:  Let me suggest that your next
21   question be do you expect to be testifying about filing
22   requirements and then be guided by that.
23          MR. SPRINGER:  Thank you.
24      (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,
25   WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

BRIAN MILLER - CROSS BY MR. SPRINGER                    1298

1   PRESENCE AND HEARING OF THE JURY.)

2   Q.   (BY MR. SPRINGER)  Mr. Miller, you plan on

3   introducing summary -- summaries of what you've seen in

4   this -- during this trial; is that correct?

5   A.   Yes.

6   Q.   Okay.  And have you not prepared those summaries,

7   correct?

8   A.   I have worked on those summaries based on the

9   testimony and evidence presented thus far, but I have not

10  finished them.

11  Q.   And are you planning on giving testimony in this

12  trial about the filing requirements?

13  A.   It's my understanding that I will testify as to the

14  amount of gross income that would have to be earned by an

15  individual to require the filing of a tax return.

16  Q.   And that is as far as your testimony will go is just

17  establishing the amount that has to be exceeded and

18  that's it?

19  A.   I'm not sure what I'll be asked, to be honest, but I

20  know -- I believe that's a part of it.

21  Q.   Okay.  I would like to inquire a little bit about

22  that.

23          MR. O'REILLY:  Your Honor, this is getting into

24  trying to determine what the prosecution's case is, which

25  is not appropriate.  Simply to inquire as to his

 1   expertise and how he would reach whatever conclusions he

 2   reaches.  But asking what the government plans to do

 3   seems to be beyond the scope of this hearing.

 4            THE COURT:  Well, I think Mr. Springer is

 5   entitled to get into -- to some degree, and we may be

 6   reaching the end of that rope, but I think he's entitled

 7   to some degree to get into the substance of this

 8   witness's testimony to the extent that in any real sense

 9   it may embrace the concept of what we call expert

10   testimony.  And I think this question, for that reason,

11   is fair game.

12       Now, how much further down this road we go is

13   another question, but -- and the posing of a question to

14   this witness as to what he expects to testify to on that

15   particular point or any similar point is really a matter

16   different than what the government's theory is.  He's

17   entitled to test this witness and I intend to let him do

18   so within reason.  And that is really a matter separate

19   from what the government's theory is.  For that reason,

20   the objection will be overruled.

21   Q.   (BY MR. SPRINGER)  Do you have a methodology on the

22   requirement to file a tax return?

23   A.   Yes.

24   Q.   Could you please tell us what that is?

25   A.   The methodology will be to determine the gross

1  income for a given year.  And then if that amount of

2  gross income exceeds what I would call the threshold

3  amount based on the law in 6012, then a return is

4  required to be filed.  And I guess you could say that is

5  my methodology.

6  Q.  And, again, the threshold amount, which I believe

7  you actually take an exempt amount and standard deduction

8  and merge them together; is that right?

9  A.  That's right.

10 Q.  That's what becomes the threshold amount?

11 A.  Yes.

12 Q.  The threshold amount is not actually mentioned in

13 6012, is it?

14 A.  The term "threshold amount"?

15 Q.  Yeah, threshold amount.

16 A.  Not to my knowledge.

17 Q.  It's exempt amount and standard deduction, correct?

18 A.  That's right.

19 Q.  And those numbers that you're going to rely upon

20 that trigger this requirement you don't find in Section

21 6012, do you?

22          MR. O'REILLY:  Your Honor, objection.  Asked and

23 answered.

24          THE COURT:  Overruled.

25          THE WITNESS:  The specific number is not found

1   in 6012, but the definitive numeric value, I would say,

2   can be found in 6012.

3   Q.   (BY MR. SPRINGER)   The definitive numeric value

4   could be found in 6012?

5   A.   Yes.

6   Q.   So if I say, for instance, the -- if the amount that

7   you had to exceed was $10,000 for a given year, let's say

8   that that was your methodology and your understanding, is

9   $10,000 written in that statute?

10  A.   The number itself isn't, but that particular numeric

11  value, a number of -- a group of numbers that can be

12  combined, added and multiplied together to arrive at that

13  $10,000 number, in my opinion, are not -- not in my

14  opinion.   It's a fact that that numeric value is defined

15  in 6012.

16  Q.   Okay.   So not the number, the numeric value, right?

17  A.   And maybe I'm splitting hairs, but that's my --

18  Q.   And you're really testifying that 151(d) is your

19  saviour on that, right?   It's 151(d) that you guys get to

20  out of 6012?

21  A.   I've got to get to 151(d) and I've got to get to 63

22  and then I've got to get to Section 1 that computes the

23  cost of living increase for inflation to adjust the

24  number each year.

25  Q.   Now, as far as just determining whether or not a

1  form is required to be answered or filled out doesn't

2  complete the requirement to file a return, does it?

3  A.   Could you say that again.

4  Q.   So let's say -- and I guess I'm borrowing from Judge

5  Pannell a little bit on adjusted gross income in the Lake

6  case.  If you fill out all the answers on a 1040 form,

7  you never -- a taxpayer never concludes what their gross

8  income is by looking at the last line on the form, do

9  they?  Because it says adjusted gross income on the

10 bottom, doesn't it?

11 A.   It does at the bottom of that form, yes.

12 Q.   And now filing requirement doesn't just involve

13 determining whether or not you're required to make a

14 return, you also have to determine what form you have to

15 make it in and where you have to file it; isn't that

16 true?

17 A.   That's part of it, yes.

18 Q.   Okay.  And under your testimony in the past, as far

19 as your methodology on the requirement to file, it

20 doesn't go into those parts of the requirement to file,

21 does it, like where you're supposed to file?

22 A.   Not in that particular section, no, it does not.

23 Q.   All right.  And is it your testimony here today that

24 once you determine you're required to answer questions on

25 a form, then you go answer the questions, and then after

```
 1   you got all those answered, then you've still got more
 2   work to do; isn't that right?
 3   A.   That's fair, yes.
 4   Q.   Okay.  And are you familiar with Section 6151?
 5   A.   Probably.  The number doesn't ring a bell, but I'm
 6   sure I've looked at it.
 7   Q.   Is it true that you only have to pay a tax that is
 8   shown to be owed on a return?
 9   A.   I'd hate to agree with that -- I would hate to agree
10   with that without time for a reflection.
11   Q.   Would you like to look at 6151?
12   A.   Not particularly.
13            MR. SPRINGER:  May I approach him, Your Honor?
14            MR. O'REILLY:  Your Honor, objection to the
15   relevance for this hearing.
16            THE COURT:  I'm having a lot of trouble with the
17   relevance of this, Mr. Springer.
18            MR. SPRINGER:  It's the requirement I was on,
19   Your Honor.  Other than that, I pass the witness.  I'm
20   sorry.  May I?
21   Q.   (BY MR. SPRINGER)  Your summary charts that you're
22   going to prepare are solely based upon the evidence that
23   you believe came in and was admitted from where you sit
24   right now; is that true?
25   A.   Yes.
```

BRIAN MILLER - CROSS BY MR. STILLEY                    1304

```
 1              MR. SPRINGER:  Thank you, Your Honor.
 2              THE COURT:  Mr. Stilley.
 3                      CROSS-EXAMINATION
 4  BY MR. STILLEY:
 5  Q.  I believe I heard you say that you were an expert
 6  but only as far as testifying in court; is that fair to
 7  say?
 8  A.  I said that I had testified as an expert witness in
 9  court before.
10  Q.  Right.  Have you ever done any expert work in any
11  other capacity such as consulting, writing, other things?
12  A.  No, sir, I have not.
13  Q.  And you were in Georgia in James Lake's case,
14  correct?
15  A.  That's right.
16  Q.  And you heard Judge Pannell say that the important
17  number there was adjusted gross income, correct?
18  A.  I don't remember him saying that.  He may have.
19  Q.  Well, if he did, in fact, say that, would you agree
20  with him that that is the important number that you have
21  to look at to determine the filing requirement?
22  A.  No, I would not.
23  Q.  You would think that that judge was wrong then,
24  correct?
25  A.  If he said adjusted gross income is the number to
```

1  look at to determine a filing requirement, then, yes, I

2  think he was wrong.

3  Q.   Now, it sounded to me like from your testimony so

4  far here today that you don't have any specialized

5  knowledge that would help the jury determine whether or

6  not a particular transfer of funds was a gift or gross

7  income; is that fair to say?

8  A.   I think I have a pretty good understanding of what

9  constitutes gross income and what would be categorized as

10 compensation for services probably better than the

11 average juror, so I think I might be able to provide a

12 little insight into that distinction.

13 Q.   You sound a little bit tentative there; is that fair

14 to say?

15 A.   I sound tentative because I have not had any

16 significant specialized training in the difference

17 between a gift and a compensation or income.  But I feel

18 like my general understanding of income tax law and my

19 experience in dealing with income taxes and services and

20 compensation puts me in a position to where I could

21 provide some insight.

22 Q.   As a matter of fact, this is your first case where

23 the issue of gift versus gross income would arise,

24 correct?

25 A.   That's right.

1  Q.  And didn't you testify that a big part of the IRS's

2  approach to that was to use common sense?

3  A.  Yes.

4  Q.  The 12 jurors would have just as much common sense

5  as any other person, presumably, correct?

6  A.  They would have as much common sense generally, but

7  common sense related to specifics of tax law and income

8  tax related matters would not be as extensive as mine.

9        MR. STILLEY:  Your Honor, could I have a moment?

10        THE COURT:  You may.

11  Q.  (BY MR. STILLEY)  I didn't hear any suggestion that

12  you intended to possibly offer any exhibits with respect

13  to Count 1 conspiracy; is that correct?

14  A.  To the best of my knowledge, at this point, I don't

15  think I intend to introduce anything related to the

16  conspiracy itself.

17  Q.  And the same question with respect to Counts 3 and 4

18  concerning aiding and abetting, is that also true?

19        MR. O'REILLY:  Your Honor, objection.  And I'll

20  state for the record that actually some of the exhibits

21  that probably will be introduced through Mr. Miller will

22  impact on those counts.

23        MR. STILLEY:  And at this point in time, we're

24  talking about Counts 3 and 4?

25        MR. O'REILLY:  And Count 1.

```
 1          THE COURT:  Mr. Stilley, I certainly don't want
 2   to read Mr. O'Reilly's mind, but if this witness has an
 3   exhibit that shows flow of funds in which Mr. Springer
 4   was beneficially interested or ultimately became the
 5   beneficiary of that involves in any way your financial
 6   affairs, then, yes, that goes to Count 1 and it goes to
 7   aiding and abetting.
 8          MR. STILLEY:  Thank you, Judge.  Let me rephrase
 9   that question a little bit and I think maybe I can narrow
10   the focus here.
11   Q.  (BY MR. STILLEY)  Mr. Miller, with respect to Count
12   1, do you have any intention to offer any evidence with
13   respect to the mental state or head knowledge of Oscar
14   Stilley?
15   A.  No.
16   Q.  Same question, Counts 3 and 4, aiding and abetting?
17   A.  As far as -- what was -- could you repeat the
18   question?
19   Q.  Mental state or head knowledge of Oscar Stilley.
20   A.  No, the exhibits will show strictly transactions
21   that occurred.
22          MR. STILLEY:  Pass the witness.
23          THE COURT:  Any redirect?
24                    REDIRECT EXAMINATION
25   BY MR. O'REILLY:
```

1   Q.   In the cross-examination, some discussion was done

2   on training that you've had and a little bit on your

3   experience.   How many audits have you been involved with

4   in the course of your 20-plus years were the IRS?

5   A.   I'm going to guess between a thousand to 1,200

6   probably.

7   Q.   About 1,200 you said?

8   A.   Somewhere between a thousand and 1,200.

9   Q.   Is your experience as part of being involved in

10  those audits something you will draw upon in reaching the

11  determinations that you present here?

12  A.   Absolutely.

13          MR. O'REILLY:  Nothing further, Your Honor.

14          THE COURT:  Any recross limited to redirect?

15          MR. SPRINGER:  Not this -- no, Your Honor.

16          MR. STILLEY:  No, Your Honor.

17          THE COURT:  Very well.  I know the parties and

18  their counsel have thoroughly familiarized themselves

19  with the -- you may step down -- with the relevant rules

20  and the relevant decisions of the Supreme Court and the

21  Court of Appeals.  I do think, though, that it would be

22  appropriate to get those rules firmly fixed in mind.

23      The two cases that, of course, provide our beginning

24  point are the Daubert case decided in 1993 and the Kumho

25  case decided in 1999.  The latter case is at 526 U.S.

1  137.   Those cases establish the district court's

2  gatekeeper function under Rule 702.

3      This is elaborated on in the Goebel case -- one of

4  several Goebel cases in the Court of Appeals.  This one

5  is the Goebel opinion at 215 F.3d 1083.  And here I have

6  in mind the discussion at page 1087.  As was said by the

7  Court of Appeals at that page, the gatekeeper function

8  "requires the judge to assess the reasoning and

9  methodology underlying the expert's opinion and determine

10  whether it is scientifically valid and applicable to a

11  particular set of facts."

12      Now, as was made clear by the Court of Appeals, and

13  there's really no room for doubt about this, there may

14  have been at one time, but there's no longer any room for

15  doubt as was made clear by the Court of Appeals in its

16  opinion in United States v. Turner, 285 F.3d 909, a

17  decision in 2002, the Daubert and Kumho principles do

18  apply as fully in criminal cases as in civil cases.

19      As was noted by the Court of Appeals in Turner, a

20  Daubert challenge raises a preliminary question of

21  admissibility of proposed expert testimony.  The Court's

22  task accordingly is governed by Rule 104, which casts

23  upon the government the burden of establishing the

24  admissibility of the proposed testimony and Rule 702 as

25  well as the applicable case law.

 1      Now, the question of how the Court performs its

 2 gatekeeping function is a discretionary matter for the

 3 trial court.  The Court may conduct a hearing, as we have

 4 done; it may perform its gatekeeping function by ruling

 5 on a motion in limine; or, for that matter, on an

 6 objection at trial or even in ruling on a post-trial

 7 motion.  This latter approach is not favored, but it's

 8 clear that that is one approach.  It's not an approach

 9 that I favor either.

10      When the trial judge is called upon to address a

11 challenge under Daubert and Kumho and their progeny to

12 proposed testimony, the Court must adequately demonstrate

13 by specific findings on the record that the Court has

14 indeed performed its duty as gatekeeper.  This is clear

15 from page 1088 of the Goebel decision.

16      It should be also borne carefully in mind, of

17 course, that even though the Court may delve deeply into

18 the minutia of the proposed expert's opinion while

19 conducting a Daubert and Kumho analysis, the Court must

20 always remain mindful that its focus "must be solely on

21 principles and methodology, not on the conclusions that

22 they generate."  That's from page 595 of the Daubert

23 opinion.

24      The ultimate objective of Daubert scrutiny is to

25 ascertain whether the proffered expert testimony is "not

1    only relevant but reliable," so said the Daubert court at

2    page 589.  And it must be emphasized that the evaluation

3    for reliability cannot be permitted to evolve into an

4    assessment of the ultimate persuasiveness of the

5    proffered expert testimony.

6        Now, one of the most important aspects of the

7    relevance determination is the question of fit, as the

8    Supreme Court called it.  The Court must determine

9    whether the expert testimony proffered in the case is

10   sufficiently tied to the facts of the case that it will

11   aid the jury in resolving a factual dispute.  That was

12   the explanation given by the Court in Daubert at page

13   591.

14       In explaining the 2000 amendment to Rule 702, the

15   Advisory Committee expressed the fit requirement by

16   stating that "the testimony must be the product of

17   reliable principles and methods that are reliably applied

18   to the facts of the case."

19       Now, we had Daubert on the books.  Everybody

20   wondered whether Daubert involved epidemiology.

21   Everybody wondered whether the Daubert principle applied

22   outside the realm of pure science.  Any doubt about that

23   was eliminated by the Kumho decision because the Kumho

24   decision established very clearly that the Daubert

25   scrutiny does apply to expert testimony outside of the

1    classical realm of science.

2         The Court emphasized that even where the proposed

3    expert testimony is not scientific in nature in the

4    classical sense, the trial judge is nevertheless required

5    to ascertain whether the expert "employs in the courtroom

6    the same level of intellectual rigor that characterizes

7    the practice of an expert in the relevant field."  That's

8    from page 152 of the Kumho opinion.

9         Now, it's clear in our circuit that the Daubert and

10   Kumho gatekeeping function is undertaken by means of a

11   two-step analysis.  This is clear from the Ralston

12   decision, 275 F.3d 965 at page 969.  The first step is to

13   determine whether the proposed expert is qualified.  This

14   requires an assessment of his "knowledge, skill,

15   experience, training, or education."  This is clear from

16   Rule 702 and from page 969 of the Ralston opinion.

17        Secondly, if the proposed expert is determined to be

18   sufficiently qualified, the Court must determine whether

19   his or her opinions are "reliable" in the sense required

20   by Daubert and Kumho.

21        Now, as I've said, the Daubert opinion involved a

22   classic scientific discipline and that was epidemiology.

23   It's nevertheless appropriate, I think, to bear in mind

24   the non-exclusive list of five factors that were provided

25   by the Daubert court.  In Daubert, the Court said that

1  the trial judge should, one, assess whether the expert's

2  technique or theory can be or has been tested; two,

3  determine whether the technique or theory has been

4  subject to peer review and publication; three, evaluate

5  the known or potential rate of error of the technique or

6  theory when applied; four, ascertain the existence and

7  maintenance of standards and controls; and, five,

8  determine whether the technique or theory has been

9  generally accepted in the scientific community.  This is

10  covered at pages 590 through 594 of the Daubert opinion.

11  And, of course, that must be read in light of the fact

12  that the Daubert case was a pure science case and

13  predated the decision in Kumho.

14      In Kumho, the Court made it clear that -- and Kumho

15  was a product liability case involving a tire.  Although

16  the ultimate task of the trial judge as gatekeeper

17  remains the same, it's clear from Kumho that the factors

18  that were included in the non-exclusive list in Daubert

19  are to be used only to the extent that they are logically

20  applicable, as discussed by the Court in Kumho at page

21  149.

22      For instance, it has been noted that the factors

23  mentioned by the Court in Daubert do not neatly apply to

24  expert testimony from a sociologist, as was discussed in

25  Tyus v. Urban Search Management, 102 F.3d 256, and that

1  lack of peer review or publication is not dispositive

2  where the expert's opinion is supported by widely

3  accepted scientific knowledge, as was discussed in the

4  Kannankeril case, 128 F.3d 802, at page 8009.

5      Also, as was noted by the Advisory Committee in

6  commenting on the 2000 amendments to Rule 7202, courts

7  both before and after Daubert have found other factors

8  relevant in determining whether expert testimony is

9  sufficiently reliable to be considered by the jury.

10 Those additional factors which may be relevant, depending

11 on the circumstances, include, one, whether the expert

12 proposes to testify about matters growing naturally and

13 directly out of his research independent of the

14 litigation or whether he has developed his opinion

15 expressly for the purpose of testifying; two, whether the

16 expert has unjustifiably extrapolated from an accepted

17 premise to an unfounded conclusion; three, whether he has

18 adequately accounted for obvious alternative

19 explanations; four, whether he is being as careful as he

20 would be in his regular professional work outside of his

21 litigation consulting; and, five, whether the field of

22 expertise claimed by the expert is known to reach

23 reliable results for the type of opinion the expert would

24 give.  And in that respect, I rely not only on the notes

25 to the 2002 amendments but on the cases that are cited

1    there.

2        As to the qualifications of Mr. Miller, he testified

3    that he has for about five months been a fraud technical

4    advisor.  The remainder of his 22 years or at least a

5    substantial part of it has been service as a revenue

6    agent.  He has a bachelor's degree in accounting, that's

7    a BBA, and he got that in 1987.  He has been a CPA since

8    1989.  He has been a certified fraud examiner since

9    1999.  He has been a summary witness eight or ten times.

10   He acknowledges no special expertise or study with

11   respect to analysis of gifts, but he has said that his

12   approach to analyzing the matter of whether a given item

13   is a gift or income is to focus, among other things, on

14   the substance of the transaction as opposed to its form

15   and on the intent of the purported donor.

16       I conclude quite readily that Mr. Miller does have

17   the necessary expertise to provide the testimony that I

18   anticipate he will present and to provide the testimony

19   that has been, in a very general way, outlined here

20   today.

21       We get here into a slippery slope in one sense and

22   that is this:  To what extent does his proposed expert

23   testimony address matters that to the extent that it's a

24   matter of common sense are within the normal

25   understanding of a juror unaided by expert testimony?  It

1  is my finding that Mr. Miller has a good deal of

2  testimony to give that certainly is outside of the normal

3  experience and normal understanding of a lay juror.  And

4  I'm not excluding any of his proposed testimony, but I am

5  commenting fairly confidently that there will be limits

6  to the extent to which I'm going to let him sit there and

7  expound on particular transactions as gifts or income.

8      I think for reasons that I'll explain here in a few

9  minutes it is fair game for him to address that.  But to

10 the extent that his testimony on that score slops over,

11 if you will, into what is within the normal common sense

12 understanding of the average lay juror, there will be

13 limits on the amount of time we're going to take talking

14 about gifts versus income.  But that's not a matter that

15 I'm going to address by way of preliminary ruling.

16     On the substance of his testimony, I do have at

17 least an overview of his proposed methodology.  By way of

18 methodology, he told me that he will have two main

19 functions as a witness.  First of all, he will evaluate

20 the evidence that has been presented and make

21 calculations summarizing the income and expense items

22 that are disclosed by the evidence and then compute tax

23 liability based on the income and expenses.

24     His second primary function would be to explain

25 those computations and summarize them for the jury.  And

1    in so doing he has said he will take into account both

2    the testimony that has been received and the documents

3    that are in evidence for classification purposes.

4        With respect to documents, he has said that he has

5    examined the relevant documents in this case and has

6    listened to the testimony of the witnesses about those

7    documents and he will take his understanding of the tax

8    law and apply his understanding of the tax law to that

9    particular set of facts disclosed by the evidence and the

10   documents.

11       He testified that he was asked to listen to the

12   testimony of all the witnesses who had dealings with the

13   defendants and that he has, in fact, done so.  And that

14   this is for the overall objective of determining the

15   gross income for a given year at least with respect to

16   the failure to file issues which are relevant not only to

17   the last two counts, but to the other counts.  He'll

18   determine the gross income for a given year and then

19   determine if that gross income exceeds the threshold

20   amount based on the Internal Revenue Code and from that

21   conclude whether a return is required to be filed.

22       Now, there has been an issue raised, and quite

23   understandably so, as to the extent to which Mr. Miller

24   has resolved doubts in favor of income as opposed to

25   classifying transactions as gift transactions.  That's an

1 understandable concern on the part of the defendants.

2      Mr. Miller is a CPA.  He has looked at the financial

3 affairs of taxpayers for a good many years.  I hold him

4 to the standard that applies within the profession in

5 which he holds his primary certification and that is the

6 profession of accounting as practiced by certified public

7 accountants.  And in this respect, in determining what

8 standard I would hold him to in that regard, I am

9 informed to some degree, not in any dispositive or

10 determinative way, but to some degree by the commentary

11 provided in a book by Peter Frank, Michael Wagner, and

12 Roman Weil entitled Litigation Services Handbook, the

13 Role of the Accountant as an Expert Witness, published by

14 John Wiley and Sons in 1993.

15      In that book, at page 7, the authors state, "As a

16 consultant, the CPA may resolve doubt in favor of the

17 client as long as the position can be supported."

18      As to the payments to these defendants, and in

19 particular as to the payments to Defendant Springer,

20 although we do have checks that are marked "donation,"

21 for instance, on the basis of the totality of the

22 circumstances surrounding those transactions, the evident

23 expectations of the individuals who paid the money and

24 the circumstances under which the money was paid, I

25 conclude quite easily that the position that these

1  payments constituted income can be supported.  Whether

2  they were, in fact, income will be a matter for the jury

3  to determine.

4      But based on the standard that I have articulated as

5  set forth in the Frank, Wagner, and Weil book, I conclude

6  quite readily that the position that those payments were

7  income and not gift can be supported.  That means it's

8  certainly fairly within the four corners of the evidence

9  that has been received, even if the jury should

10  ultimately determine that these were gifts.

11      And in that connection, the supportability of that

12  classification or that categorization of payments as

13  income instead of gifts is a result of the analysis

14  undertaken by this witness using all of his professional

15  credentials.  I should add -- and perhaps this goes

16  without saying.  I should add, again, staying within the

17  realm of the profession practiced by certified public

18  accountants, this witness is not purporting to provide

19  what CPAs call attest services.  And the difference

20  between attest services and other services is addressed

21  at page 1240 of my order in the Williams case, 496

22  F.Supp. 1195, at page 1240.

23      This witness does not purport to be providing an

24  attest service.  By its very nature, the testimony that

25  this witness is providing is not an attest service.  And

1    I certainly would not permit the jury to be -- any

2    suggestion to that effect to be made by the government to

3    the jury in any event.

4        For that reason, examining the proposed testimony of

5    Mr. Miller in light of those standards, it is my

6    conclusion that the government has met its burden under

7    Rule 104 and that Mr. Miller's methodology is sufficient

8    to satisfy the requirements of Daubert and Kumho and

9    their progeny as well as Rule 702 in that the proposed

10   testimony of Mr. Miller is the product of reliable

11   principles and methods that are reliably applied to the

12   facts of this case.

13       In saying that, and I will emphasize in the very

14   same breath, nothing I have said forecloses cross-

15   examination, nothing that I have said will preclude the

16   defendants from vigorously attacking this witness's

17   testimony on cross-examination.  And indeed, if you will,

18   the window is not shut on my gatekeeper role.  If

19   something were to be made evident to me on cross-

20   examination that requires me to limit his testimony or

21   exclude his testimony or for that matter, strike his

22   testimony, that will still be fair game.  But to the

23   extent that the witness's testimony has been put in play

24   this afternoon as tested under the rules to which I have

25   alluded, I do find that his testimony has been

1  demonstrated by a preponderance of the evidence under

2  Rule 104 to be admissible.

3      And there is no room for doubt that any summary

4  exhibits that he may have provided that the necessary

5  showing is made that satisfies my expectation that his

6  summary exhibits are based on voluminous documents.

7  There is no room for doubt based on the sheer volume of

8  exhibits that we have here that the requirements of Rule

9  1006 will be satisfied.

10     Again, once his exhibits are trotted out, if there

11  is any basis, even an arguable basis for undermining the

12  reliability of those exhibits as faithful summaries of

13  the financial transactions that are shown by the

14  documents that are in evidence, that's fair game for the

15  defendants.  But I fully expect that the requirements of

16  Rule 1006, at least in terms of the voluminousness of the

17  underlying documents, will be satisfied.

18     Anything further this afternoon before we recess

19  until nine in the morning?

20         MR. O'REILLY:  Not from the government, Your

21  Honor.

22         MR. SPRINGER:  Yes, Your Honor.  Just one

23  issue.  The summaries, we would like to have the

24  summaries at least one day in advance of them being

25  presented to the jury.  Can we get an order from the

1322

```
 1   Court on that or some guidance on that?
 2            THE COURT:  What does the government have to say
 3   about that?
 4            MR. O'REILLY:  Your Honor, that's frankly
 5   impossible.  We have given them draft summaries already.
 6   Those are included in the Court's exhibits as well as the
 7   ones provided to the defendants.  The problem is, is that
 8   Mr. Miller will be testifying shortly after the last
 9   witness.
10            THE COURT:  Okay.  Let me take a look at the
11   drafts.  What exhibits are those?
12            MR. O'REILLY:  Your Honor, it's Government's
13   Exhibit 675 through 688.
14            THE COURT:  675 through 88?
15            MR. O'REILLY:  688.
16            THE COURT:  Okay.
17            MR. SPRINGER:  Your Honor, if I may too,
18   wouldn't it be Mr. Miller's summary and not
19   Mr. O'Reilly's summary that we're wanting to see?
20            THE COURT:  I doubt Mr. O'Reilly is going to
21   raise his hand and swear to this.
22            MR. O'REILLY:  Your Honor, I apologize.  It was
23   also brought to my attention it will also include the
24   flow charts 689 through 695.
25            THE COURT:  Well, I was going to ask about
```

1   that.  Because the last time we had an exercise like

2   this, Agent Arsenault showed up with all kinds of pretty

3   pictures and I was wondering where -- okay.

4           MR. SPRINGER:  I believe maybe it was 685 to

5   695.

6           THE COURT:  Okay.  Now, what is -- Mr. O'Reilly,

7   if you need to consult with Mr. Miller on this, I'll

8   certainly understand.  On the tabular exhibits, if you

9   will, not the graphic exhibits, but the tabular exhibits

10  that begin with 675, what's the vintage of these?  Are

11  these the state-of-the-art as of a couple of weeks ago

12  or --

13          MR. O'REILLY:  Your Honor, I believe for the

14  most part these are actually the state of the evidence

15  with respect to when the case was indicted.  But it is

16  pretty close to -- I mean, we haven't gone hugely far

17  astray from where we were at this point.  There has been

18  some evidence introduced at trial reflecting additional

19  income.  And, specifically, off the top of my head, I'm

20  thinking of Ms. Berman who testified that they were

21  selling the tapes up to -- I forget how many she said,

22  but there's -- and there's also some witnesses who may

23  not be coming in to testify for a variety of reasons.

24  And I'm not -- I'm not sure.  May I have a moment?

25          THE COURT:  Surely.  And while you're taking

1324

1  that moment, what I'm looking for in my inquiry, and this
2  doesn't necessarily -- is not necessarily determinative
3  of anything, but my inquiry is basically whether we may
4  anticipate any radical departure from what we have here
5  in these tabular exhibits.  With that thought in mind,
6  you surely may take a moment.
7       MR. O'REILLY:  If that's all Your Honor is
8  inquiring about, I can tell you there is not going to be
9  any radical departure from what's in these tabular
10 exhibits.  They are pretty close to what we expect.
11 Where there may be some more significant adjustments
12 would be in the tax calculations as to whether or not
13 things are, in fact, income and what expenses he is given
14 credit for.
15      THE COURT:  And how long have the defendants had
16 these draft exhibits?
17      MR. O'REILLY:  I will --
18      MR. SPRINGER:  Your Honor, I can tell you I've
19 seen these.  So if that's -- the ones he's talking about
20 right now, if he's staying with those, my objection is --
21      THE COURT:  Well, he's not necessarily staying
22 with these.  Mr. Springer, how long have you had these
23 draft exhibits?
24      MR. SPRINGER:  I would say given to us in the
25 first set, probably April or May probably.

```
 1            THE COURT:  Well, I've heard enough --
 2            MR. SPRINGER:  I'm sorry, Your Honor.  These we
 3   just got recently.  But I've seen similar -- that's the
 4   point I'm trying to make.  I've seen similar -- I'm
 5   sorry, Your Honor.  I've seen similar to these.  And in
 6   looking at these drafts, I can tell you they look to be
 7   the same exact numbers that Mr. Shern gave me originally,
 8   so --
 9            THE COURT:  Well, if we end up with any radical
10   departure from what's shown by these, I will expect the
11   government to promptly provide the updated version.  It
12   would seem like we're probably there anyway.  It's
13   conceivable Mr. Miller could go on the stand tomorrow.  I
14   don't know how likely it is, but it's at least
15   conceivable.
16            MR. O'REILLY:  It's possible, Your Honor, and
17   that will create some need to do some fancy footwork.
18   I'm hoping that we'll have overnight between the last
19   witness and putting Mr. Miller on the stand so he can
20   finalize the exhibits.
21            THE COURT:  I understand the practicalities of
22   that.  We'll address that appropriately.  With that, I
23   think under all the circumstances, the Court is not in a
24   position to impose any more onerous requirements on the
25   government.  But I do expect that as soon as it should
```

1  become apparent, if it does become apparent that there is

2  any radical departure from what has been provided, that

3  the defendants will at least be so informed.  That

4  doesn't really go to admissibility.  But what it does go

5  to is fairness.  And I do have a duty to see to it that

6  to the extent possible that the matter proceeds as fairly

7  as possible for all concerned.

8      Anything further until we recess until nine in the

9  morning?  Mr. Stilley.

10          MR. STILLEY:  Your Honor, would it be

11  appropriate for me to adopt and join in Mr. Springer's

12  motion that he filed Sunday night?  If that's a problem,

13  I'll do it on -- in a writing.  But I just want to join

14  that as easily as possible.

15          THE COURT:  Well, if you want to do that, do

16  that.  The reason I say it that way is that

17  Mr. Springer's motion is substantially couched in terms

18  of his individual posture in this case and his contention

19  as to how his rights were violated.  His motion does not

20  automatically conform itself to your situation.  So if

21  you'll pardon the expression, be your own counsel.

22          MR. STILLEY:  Thank you, Judge.  Glad to.

23          THE COURT:  Anything further before we recess

24  overnight?

25          MR. SPRINGER:  No, Your Honor.

1    MR. O'REILLY:  No, Your Honor.

2    THE COURT:  Court will be in recess.

3    (COURT ADJOURNED FOR THE EVENING RECESS.  FOR

4    FURTHER JURY TRIAL PROCEEDINGS, SEE VOLUME VII.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25