1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF OKLAHOMA

3

4    UNITED STATES OF AMERICA,

5          Plaintiff,

6    vs.                          Case No. CR-09-43-SPF

7    LINDSEY KENT SPRINGER and
     OSCAR AMOS STILLEY,
8
          Defendants.
9    _____

10

11

12

13

14

15          TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16          BEFORE THE HONORABLE STEPHEN P. FRIOT

17          UNITED STATES DISTRICT JUDGE

18          NOVEMBER 3, 2009

19          VOLUME VII OF XIV

20

21

22

23

24

25

```
 1  APPEARANCES:

 2  FOR THE GOVERNMENT:
                             Mr. Charles Anthony O'Reilly
 3                           U.S. Department of Justice
                             PO Box 972
 4                           Washington, DC 20044

 5                           Mr. Kenneth P. Snoke
                             US Attorney's Office (Tulsa)
 6                           110 W. 7th Street, Ste. 300
                             Tulsa, OK 74119
 7


 8
    FOR DEFENDANT SPRINGER:
 9                           Mr. Lindsey Kent Springer
                             5147 S. Harvard Ave.
10                           Ste. 116
                             Tulsa, OK 74135
11
                             Mr. Robert Scott Williams
12                           Taylor Ryan Schmidt & Van Dalsem
                             1437 S. Boulder Ave., Ste. 850
13                           Tulsa, OK 74119

14  FOR DEFENDANT STILLEY:
                             Mr. Oscar Amos Stilley
15                           7103 Race Track Loop
                             Fort Smith, AR 72901
16
                             Mr. Charles Robert Burton, IV
17                           Burton Law Firm, PC
                             320 S. Boston, Ste. 2400
18                           Tulsa, OK 74103

19
                        EXAMINATION INDEX
20

21  LAUREL GARDNER
         CROSS BY MR. SPRINGER              1331
22
    ADRIANA DULIC
23       DIRECT BY MR. O'REILLY             1332
         CROSS BY MR. SPRINGER              1338
24       REDIRECT BY MR. O'REILLY           1341

25  DENNIS PARRISH
         DIRECT BY MR. SNOKE                1343
```

```
 1          CROSS BY MR. SPRINGER              1351

 2    LIBBY MEYER
           DIRECT BY MR. SNOKE               1355
 3         CROSS BY MR. SPRINGER             1360

 4    WALTER BOLTHOUSE
           DIRECT BY MR. SNOKE               1365
 5         CROSS BY MR. SPRINGER             1369
           CROSS BY MR. STILLEY              1373
 6
      SHELLY BYRNE
 7         DIRECT BY MR. SNOKE               1373
           CROSS BY MR. SPRINGER             1383
 8
      SAMUEL SNYDER
 9         DIRECT BY MR. O'REILLY            1392
           CROSS BY MR. SPRINGER             1398
10         REDIRECT BY MR. O'REILLY          1403
           RECROSS BY MR. STILLEY            1404
11
      PATRICK TURNER
12         DIRECT BY MR. O'REILLY            1405
           CROSS BY MR. SPRINGER             1477
13         CROSS BY MR. STILLEY              1514
           REDIRECT BY MR. O'REILLY          1522
14         RECROSS BY MR. SPRINGER           1526

15    RONALD YOUNG
           DIRECT BY MR. SNOKE               1530
16         CROSS BY MR. SPRINGER             1539
           CROSS BY MR. STILLEY              1540
17
      RUSSELL YOUNG
18         DIRECT BY MR. SNOKE               1541
           CROSS BY MR. SPRINGER             1544
19
      LAWRENCE LOGSDON
20         DIRECT BY MR. O'REILLY            1545
           CROSS BY MR. SPRINGER             1568
21         CROSS BY MR. STILLEY              1576
           REDIRECT BY MR. O'REILLY          1579
22         RECROSS BY MR. SPRINGER           1580

23    BARBARA HODSDEN
           DIRECT BY MR. O'REILLY            1580
24         CROSS BY MR. SPRINGER             1590

25
```

```
 1          THE COURT:  Welcome back, members of the jury.
 2  Let's see, we had just finished direct examination of
 3  this witness; is that correct?
 4          MR. O'REILLY:  Yes, Your Honor.
 5          THE COURT:  Very well.  Cross-examination.
 6                      LAUREL GARDNER,
 7  (PREVIOUSLY SWORN)
 8                  CROSS-EXAMINATION
 9  BY MR. SPRINGER:
10  Q.   Good morning.
11  A.   Good morning.
12  Q.   In each of the conversations that you and I -- you
13  testified that you and I spoke in --
14  A.   We have.
15  Q.   -- your sister was also on that call; is that
16  correct?
17  A.   I don't believe it was a three-way call.
18  Q.   Okay.  So how many times would you say you and I
19  spoke directly?
20  A.   I'm not even sure.  Over the phone maybe -- I know
21  for sure one time.
22  Q.   And then I believe your testimony was you also met
23  one time at the courthouse; is that correct?
24  A.   Yes.
25  Q.   Okay.  And you have had conversations with Erika,
```

ADRIANA DULIC - DIRECT BY MR. O'REILLY                    1332

```
 1   your sister, regarding Lindsey Springer, is that correct?
 2   A.   Yes.
 3   Q.   Okay.
 4          MR. SPRINGER:  Thank you very much.  Pass the
 5   witness, Your Honor.
 6          THE COURT:  Mr. Stilley?
 7          MR. STILLEY:  No questions.
 8          THE COURT:  Any redirect?
 9          MR. O'REILLY:  No, Your Honor.
10          THE COURT:  Very well.  You may step down.
11   We'll have the government's next witness.
12          MR. O'REILLY:  Your Honor, the United States
13   calls Adriana Dulic.
14          THE COURT:  Spell that last name, please.
15          MR. O'REILLY:  D-U-L-I-C, I believe, sir.  I
16   will inquire of the witness.
17          THE COURT:  Thank you.
18                        ADRIANA DULIC,
19   (WITNESS SWORN)
20          MR. O'REILLY:  Your Honor, before I begin, may I
21   approach to put some exhibits in front of the witness?
22          THE COURT:  You may.
23                     DIRECT EXAMINATION
24   BY MR. O'REILLY:
25   Q.   Could you please state your full name and spell your
```

```
 1  first and last names for the court reporter.
 2  A.   Yes.  My name is Adriana Dulic, A-D-R-I-A-N-A, last
 3  name D-U-L-I-C.
 4  Q.   Ms. Dulic, in what city and state do you reside?
 5  A.   I reside in Los Angeles, California.
 6  Q.   How long have you resided in Los Angeles?
 7  A.   Since 1999.
 8  Q.   What is your level of education?
 9  A.   I have a Juris Doctorate.  I'm a lawyer, so master's
10  degree.
11  Q.   Where did you get your Juris Doctorate?
12  A.   At Pepperdine University School of Law.
13  Q.   That's in California as well?
14  A.   Malibu, California, yes.
15  Q.   When did you get your J.D.?
16  A.   In 2001.
17  Q.   How are you currently employed?
18  A.   I am an in-house counsel for Epoch.com, LLC.
19  Q.   How long have you been in-house counsel for
20  Epoch.com, LLC?
21  A.   Since May of 2004.
22  Q.   What is Epoch.com, LLC?
23  A.   We are an Internet payment service provider, which
24  means that we process on-line credit card and electronic
25  check transactions.
```

ADRIANA DULIC - DIRECT BY MR. O'REILLY                      1334

1    Q.    For whom do you process these transactions?

2    A.    We process for thousands of Web sites.  Basically,

3    if you're a Web site owner and you want to be able to

4    sell something on the Internet, you can enter into an

5    agreement with us to provide on-line payment processing

6    services for you.

7    Q.    Is there a predominant type of business, one

8    business, that uses your Internet services?

9    A.    Well, I mean, a lot of them are adult Web sites, but

10   there are also non-adult Web sites for which we process

11   transactions.

12   Q.    When you say "adult Web sites," do you mean adult

13   entertainment?

14   A.    Correct.

15   Q.    Ms. Dulic, I'm going to ask you, if you could, to

16   take a look at what's been marked for identification as

17   Government's Exhibit 282.  Could you generally describe

18   what is Government's Exhibit 282?

19   A.    These are our customer records that show purchases

20   made by a customer.

21   Q.    Okay.  And you used the term "customer."  What does

22   that term, "customer," mean for you?

23   A.    It would be somebody that went on-line on the

24   Internet and browsed different Web sites, and when they

25   decided to make a purchase was redirected to our payment

ADRIANA DULIC - DIRECT BY MR. O'REILLY                    1335

```
1   page to place the order.
2   Q.   And previously you mentioned you had thousands of
3   clients, or I don't know if you used that term --
4   A.   Web sites.
5   Q.   -- Web sites.  And is there a different term you use
6   for them?
7   A.   Yes.  Those would be considered clients, the Web
8   site owners, yes.
9   Q.   Do you have any idea how many different customers
10  you have?
11  A.   Millions probably.  I have no idea.
12  Q.   Do you recognize what's been marked for
13  identification as Government's Exhibit 282?
14  A.   Yes, I do.
15  Q.   Are these business records maintained by Epoch?
16  A.   Yes, they are.  Correct.
17  Q.   Are they made at or near the time that the customer
18  makes the purchase?
19  A.   Yes, they are made at the exact same point when they
20  make the order.
21  Q.   Is it important that these records be accurate?
22  A.   Yes.
23  Q.   Why?
24  A.   Because, number one, we have to forward the money to
25  the client, the Web site owner, that we have collected
```

1    from the customer.  And we also have to keep track of any

2    credits and charge-backs that may come in from the

3    customer if they're claiming fraud or whatever else.  So,

4    yes, they have to be accurate.

5    Q.   With respect to -- is there a name that's associated

6    with this customer on these records?

7    A.   Yes, Oscar Stilley.

8    Q.   Is there an e-mail address associated with these

9    records?

10   A.   Yes.  Appears to be GNutella@mindspring.com.

11   Q.   And generally what are the dates that these records

12   indicate these Web site accesses were purchased?

13   A.   2005 and 2004 and -- that's it, 2005, 2004.

14        MR. O'REILLY:  Your Honor, the government move

15   Government's Exhibit 282 into evidence.

16        MR. SPRINGER:  No objection, Your Honor.

17        THE COURT:  It'll be received.

18   Q.   (BY MR. O'REILLY)  Ms. Dulic, does this indicate

19   whether in fact payments were charged with respect to

20   these purchases?

21   A.   Yes.

22   Q.   Does it indicate how it was paid for?

23   A.   Yes.

24   Q.   How does it indicate it was paid for?

25   A.   With a credit card.

```
 1   Q.   Is that a Visa card?

 2   A.   Visa card, yes.

 3   Q.   Ending in 1503?

 4   A.   Correct.

 5   Q.   If we -- if I could have page -- it's page 6

 6   published to the jury.  No, page 7, please, of this

 7   exhibit, which should reflect an order dated October 26

 8   of 2004?

 9   A.   Yes.

10   Q.   What is being purchased with this particular

11   transaction?

12   A.   Internet Eraser Pro, which is a software.

13   Q.   Do you know what this software is?

14   A.   Based upon what I found in the Way Back Machine,

15   which is an Internet archive, it appears to be a software

16   that assists someone to erase records from their

17   computer.

18   Q.   How much was the charge for this particular

19   purchase?

20   A.   It was for $86.20.

21   Q.   Just generally speaking, with respect to the other

22   purchases, what types of purchases were made -- what was

23   the nature of the Web sites for which access was

24   purchased with respect to the other purchases reflected

25   in Government's Exhibit 282?
```

1   A.   The others were all adult entertainment, I believe.

2   I can double-check.  Yes, others are all adult

3   entertainment.

4   Q.   Okay.  I'm going to ask if I could have Government's

5   Exhibit 447 published to the jury.  And, Ms. Dulic, I'm

6   going to ask you if you could take a look and see if on,

7   I think, the third item -- in the first and third and

8   last item, does that reflect payments made from a

9   statement, a Providian credit card statement, for

10  purchases from your company with some handwriting there

11  on it as well?

12  A.   Yes.

13          MR. O'REILLY:  If I may have a moment, Your

14  Honor?

15          THE COURT:  You may.

16          MR. O'REILLY:  Nothing further.

17          THE COURT:  Cross-examination.

18                  CROSS-EXAMINATION

19  BY MR. SPRINGER:

20  Q.   Good morning.

21  A.   Good morning.

22  Q.   It doesn't matter to your company the name on the

23  credit card; is that correct?

24  A.   The items that get verified is the credit card

25  number, the expiration date and the CV number on the back

1  of the card, which is the security code.

2  Q.   So as far as the exhibits that you just entered

3  into, you connect the user name on the e-mail as the

4  person using the card and not the name on the card; is

5  that right?

6  A.   The name would be whatever the customer provided at

7  the time when they placed the order, correct.

8  Q.   So you don't necessarily know whether Oscar Stilley

9  had anything to do with any of these purchases; is that

10  correct?

11  A.   Other than the name that was provided to us at the

12  time of the order, yes.

13  Q.   Now, can you tell by looking at the exhibits -- if

14  you'd turn to page 282, can you tell how long any of

15  these accounts were used on any of these Web sites?

16  A.   Well, it would depend -- I think that they'd differ,

17  but on the first one it was for a month.

18  Q.   Now, when you say it was for a month, that's how

19  long you allowed the customer to have access; is that

20  right?

21  A.   Right.  He cancelled.

22  Q.   Cancelled.  Right.

23  A.   Uh-huh.  Within the month --

24  Q.   And do you know how soon he cancelled after he

25  joined?

```
 1   A.   Let's see.  20th -- actually, I'm not entirely sure.

 2   Q.   So as far as you're concerned --

 3   A.   Actually, it looks like, based upon an active date,

 4   I would say it was cancelled within 12 days or so.

 5   Q.   Okay.

 6   A.   Because the order was placed on the 20th of

 7   December.  Looks like it was inactive on January 2nd.

 8   Q.   And is that the same testimony generally that you

 9   would say -- third page in on Exhibit 282?

10   A.   That one, let's see --

11   Q.   That's the third page in.

12   A.   No, looks like the second one was placed on February

13   23, and it looks to be cancelled 21st of March.  So it

14   was almost a month.

15   Q.   Almost a month?

16   A.   Yeah.

17   Q.   And then is that the same for Exhibit 282, the fifth

18   page?

19   A.   That one, looks like it was placed on November 2nd,

20   and it was cancelled on January 5th, so about two months.

21   Q.   Month and a half?  Okay.  Now, if you turn to the

22   seventh page, Internet Eraser?

23   A.   Uh-huh.

24   Q.   What would somebody buy that for?

25   A.   Again, based upon what I found on the Internet
```

1  archive, it seems to be something that assists someone to

2  erase the records on their computer.

3  Q.   So if they were ashamed of what they had looked at

4  or what they had done, this would be something that could

5  help them clean that out of their computer; is that

6  right?

7  A.   I mean, the intention could be various reasons.

8  Q.   That's the purpose why it's sold?

9  A.   The purpose is to erase the records, yes.

10         MR. SPRINGER:  Thank you very much.  I'll pass

11  the witness.

12         THE COURT:  Mr. Stilley?

13         MR. STILLEY:  No questions.

14         THE COURT:  Any redirect?

15         MR. O'REILLY:  Yes, Your Honor.

16                  REDIRECT EXAMINATION

17  BY MR. O'REILLY:

18  Q.   Ms. Dulic, would a product such as Internet Eraser

19  allow someone to destroy records, financial records, on

20  their home computer?

21  A.   I don't provide the product, but, I mean, I would

22  guess that it would erase anything on the computer,

23  whatever it may have been, financial records or any

24  other.

25         MR. SPRINGER:  Your Honor, I object.  She said

ADRIANA DULIC - REDIRECT BY MR. O'REILLY                    1342

```
 1   she guesses.
 2          THE COURT:  Ms. Dulic, obviously, it's necessary
 3   that you testify only to the things that you know.  So
 4   I'm going to have Mr. O'Reilly pose the question again,
 5   and if you can answer it without using the word "guess,"
 6   you may do so.  Otherwise, the appropriate answer is that
 7   you don't know.  Now, Mr. O'Reilly, you may ask the
 8   question again.
 9   Q.  (BY MR. O'REILLY)  Would the product Internet Eraser
10   allow someone to delete not just -- would it allow the
11   user to delete financial records that are stored on their
12   computer?
13   A.   Based upon what I found on Internet archive, I would
14   say it would delete anything on a computer.
15          MR. O'REILLY:  Nothing further.
16          THE COURT:  Further cross?
17          MR. SPRINGER:  No, Your Honor.
18          THE COURT:  Mr. Stilley?
19          MR. STILLEY:  No, Your Honor.
20          THE COURT:  Very well.  You may step down.  And
21   we'll have the government's next witness.
22          MR. O'REILLY:  Your Honor, may I approach to
23   return these to the binder?
24          THE COURT:  You may.
25                      DENNIS PARRISH,
```

1   (WITNESS SWORN)

2                        DIRECT EXAMINATION

3   BY MR. SNOKE:

4   Q.   Good morning, sir.  Would you state your name and

5   spell your last name for the court reporter, please,

6   sir.

7   A.   It's Dennis Parrish, P-A-R-R-I-S-H.

8   Q.   And where do you live, sir?

9   A.   Mobile, Alabama.

10  Q.   All right.  And what is your occupation presently?

11  A.   I'm retired.

12  Q.   All right.  From what are you retired?

13  A.   I was in commission sales.

14  Q.   All right.  Did you work for a particular company in

15  that capacity?

16  A.   I sold automobiles.

17  Q.   All right.  Had you -- have you previously worked

18  for LCM Motor Cars, LLC?

19  A.   I did.

20  Q.   How long did you work for them?

21  A.   Three or four years.

22  Q.   All right.  Were you there in January of 2003?

23  A.   Yes.

24  Q.   I'm going to have you turn in that book there to

25  exhibit -- Government's Exhibit 275.  And there's a

DENNIS PARRISH - DIRECT BY MR. SNOKE                          1344

1   number of documents that make up that exhibit, so you may

2   have to take them out of the little plastic wrapper or

3   the plastic sleeve.

4   A.   Okay.  275?

5   Q.   275.

6   A.   Okay.  Do you want me to take them out?

7   Q.   Yes, so you can look at them, because I'm going to

8   ask you some questions about them.

9   A.   All right, sir.

10  Q.   Got them?

11  A.   Yep.

12  Q.   Take a look at them, then, with an eye to telling me

13  if you recognize those documents.

14  A.   Yes.

15  Q.   You've seen those before here recently?

16  A.   Yes.

17  Q.   All right.  What are those documents?

18  A.   Well, the first one --

19  Q.   Not one by one.  Let's just take it -- I'll rephrase

20  the question.

21  A.   Okay.

22  Q.   Are those documents records of a transaction at LCM

23  Motor Cars?

24  A.   Yes.

25  Q.   All right.  And are they business records at LCM

DENNIS PARRISH - DIRECT BY MR. SNOKE                          1345

1  Motor Cars of Mobile, Alabama that are kept in the
2  ordinary course of business of that company?
3  A.   They're copies of those.
4  Q.   And do they pertain to a particular sale?
5  A.   Yes.
6  Q.   Of a vehicle?
7  A.   Yes.
8  Q.   Were you involved in that sale?
9  A.   I was.
10 Q.   All right.  to whom was that sale made?
11 A.   Lindsey Springer.
12        MR. SNOKE:  We'd move into evidence at this time
13 Government's Exhibit 275.
14        MR. SPRINGER:  No objection, Your Honor.
15        THE COURT:  It is received.
16 Q.   (BY MR. SNOKE)  All right.  Let's go through that.
17 I'm going to move back, if I may, Your Honor.
18        THE COURT:  You may.
19 Q.   (BY MR. SNOKE)  All right.  After looking at these
20 documents, can you tell me something about this
21 transaction and what you -- what part you played in it?
22 A.   Yes.  I placed an ad in Auto Trader magazine about a
23 vehicle that I had for sale -- that the LCM Motor Cars
24 had for sale.  I got a response from Mr. Springer about
25 that, and we negotiated a price over the telephone.  And

DENNIS PARRISH - DIRECT BY MR. SNOKE                    1346

1  these are the documents that finalized the sale of this

2  Mercedes.

3  Q.   All right.  Let's turn -- the front -- first page of

4  that document down in the lower right-hand corner, I

5  think, has your name on it, doesn't it?

6  A.   Yes.

7  Q.   As salesman?

8  A.   Yes.

9  Q.   And this is -- indicates a -- what is the sale date?

10 A.   The 31st of January, 2003.

11 Q.   All right.  And what kind of a vehicle was it?

12 A.   It was a Mercedes G-Wagen, 1994.

13 Q.   All right.  That's a G300 model?

14 A.   Yes.

15 Q.   All right.  And what was the -- the sales price on

16 that?

17 A.   $34,000 total.

18 Q.   All right.  Then if you'll turn to the second page,

19 this is another document connected with the sale?

20 A.   Yes.  That is a retail buyer's order for which the

21 vehicle invoice is made from.

22 Q.   All right.  And this says "as is," a used vehicle;

23 is that --

24 A.   Yes.

25 Q.   And Mr. Springer then signed this there down at the

1   bottom, I guess, in a couple of places?

2   A.   Correct.

3   Q.   All right.   Then if you'll turn to -- the third page

4   is what?

5   A.   Certificate of title, state of Alabama, for the

6   vehicle.

7   Q.   All right.   Then we have the fourth page, again, is

8   -- bears Mr. Springer's signature there and initials.

9   That's like a four-page document or five-page document,

10  looks like?

11  A.   Well, actually that's a one-page document.

12  That's -- when you sell a vehicle --

13  Q.   I'm sorry.

14  A.   When you sell a vehicle and you're not receiving --

15  when you're receiving funds for the vehicle that may not

16  clear -- if I received cash for the vehicle, that would

17  be -- would not have to have one of these agreements.

18  But since I received money orders as payment, I asked

19  that he sign this agreement that in case the money orders

20  weren't real or that the money orders didn't clear, that

21  I could come back and get my vehicle.

22  Q.   All right.   That added sentence down there at the

23  end of the first paragraph, is that your writing or

24  somebody else's?

25  A.   That's not my writing.

DENNIS PARRISH - DIRECT BY MR. SNOKE                    1348

1  Q.   Okay.  But you signed that down at the bottom, and

2  he -- looks like it was initialed there, that change to

3  the document?

4  A.   Yeah, by both of us.

5  Q.   Okay.  All right.  The next then multi-page

6  document, if we turn over --

7  A.   That is in arbitration agreement.  It's a three-page

8  document.

9  Q.   Okay.  Can we go to the next page?  All right.  And

10 then there's something written there also which is

11 initialed by you, I guess?

12 A.   By both of us, yes.

13 Q.   And it says, "Buyer does not understand how a

14 vehicle is interstate vehicle in commerce"?

15 A.   Correct.

16 Q.   Is that something that you put into the agreement?

17 A.   No.  No, the buyer was -- he didn't understand

18 coming down to Alabama and buying a vehicle and taking it

19 back to Oklahoma wasn't interstate.

20 Q.   All right.  Then if we can turn to about four pages

21 over from that page -- no, back.  Let's go back.  Can we

22 go back?  All right.  Right there.  All right.  This is a

23 letter apparently from Mr. Springer there describing the

24 transaction?

25 A.   Yes, that's --

DENNIS PARRISH - DIRECT BY MR. SNOKE                              1349

1  Q.   And you have -- down at the bottom there, someone

2  has written after the enclosed $2,000 deposit, the --

3  some money order numbers?

4  A.   Correct.

5  Q.   All right.  Was a deposit then paid with money

6  orders as well?

7  A.   Correct.

8  Q.   And then we have after that a number of money

9  orders.  After you received the letter and the down

10 payment, did Mr. Springer complete the transaction?

11 A.   Yes.  He flew in to Mobile.

12 Q.   Okay.

13 A.   I picked him up at the airport.

14 Q.   All right.

15 A.   Took him to my dealership, which is just a few miles

16 away.

17 Q.   All right.

18 A.   We did the paperwork, exchanged the funds and he

19 drove off.

20         THE COURT:  If you would, sir, please pull the

21 microphone a little closer to you.

22 Q.   (BY MR. SNOKE)  Yeah, I don't think everybody heard

23 all that.  All right.  You picked him up at the airport?

24 A.   Yes.

25 Q.   And drove him to the dealership?

DENNIS PARRISH - DIRECT BY MR. SNOKE                    1350

1   A.   Yes.

2   Q.   And then what happened?

3   A.   We signed the documents to finalize the agreement,

4   and he gave me the money orders.  We took an hour or so

5   to fill those out, complete them, leave them with me, and

6   he drove off in his new vehicle.

7   Q.   All right.  The rest of this exhibit is -- consists

8   of a bunch of money orders?

9   A.   Yes.

10  Q.   And they all -- or almost all of them are in

11  denominations of $350; do you recall that?

12  A.   Yes, that's correct.

13  Q.   When you were talking to Mr. Springer, did you have

14  any conversation with him coming from the airport or

15  while during the transaction concerning the money orders?

16  A.   Well, yes.  I wondered why we were doing money

17  orders, and Mr. Springer told me that he did not believe

18  in the U.S. currency.

19  Q.   I guess the first money orders that he sent as

20  deposit --

21  A.   Yes.

22  Q.   -- cleared?

23  A.   Yes.

24  Q.   So you weren't concerned about these additional

25  money orders clearing?

DENNIS PARRISH - CROSS BY MR. SPRINGER                      1351

```
1   A.   No.
2          MR. SNOKE:  I don't believe I have any other
3   questions of the witness, Your Honor.
4          THE COURT:  Cross-examination.
5                      CROSS-EXAMINATION
6   BY MR. SPRINGER:
7   Q.   Good morning.
8   A.   Good morning.
9   Q.   Can you point Lindsey Springer out in the courtroom
10  today?
11  A.   I can.
12  Q.   Without the beard, right?
13  A.   Correct.
14  Q.   All right.  Now, you've sold a lot of cars, right?
15  A.   Yes.
16  Q.   All right.  And American-made cars depreciate pretty
17  fast, don't they?
18  A.   Yes.
19  Q.   As a matter of fact, a $40,000 brand-new American
20  car is probably only worth about 25 when you drive it off
21  the showroom floor; isn't that true?
22  A.   Pretty much.
23  Q.   Now, this Mercedes G-Wagen here, now, the contract
24  said it was for 34,000; do you remember that?
25  A.   Yes.
```

DENNIS PARRISH - CROSS BY MR. SPRINGER                    1352

1  Q.   Now, that was a good deal on that car, wasn't it?

2  A.   Yes.

3  Q.   In fact, wasn't that car brand-new about $125,000?

4  A.   Yes.

5  Q.   And it had been doctor-owned, huh?  Is that true?

6  A.   It what?

7  Q.   Been doctor-owned?

8  A.   Yes.

9  Q.   Doctor-owned.  Had low miles on it, didn't it?

10 A.   Yes.

11 Q.   And you were having trouble selling it locally,

12 right?

13 A.   Yes.

14 Q.   Okay.  And as far as the interstate commerce

15 question, do you remember that the discussion I had with

16 you was that it was the vehicle that had to cross state

17 line and not the person that was buying the vehicle on

18 that agreement?

19 A.   No, I don't remember that.

20 Q.   Okay.  But you were selling a vehicle, right?

21 A.   Correct.

22 Q.   And it was the vehicle that was the issue of that

23 document that you were asking me to sign my name to,

24 isn't that right, the arbitrary agreement?

25 A.   I'm not sure I can answer that.

DENNIS PARRISH - CROSS BY MR. SPRINGER                    1353

1  Q.   Were you asking me to sign an arbitrary agreement?

2  A.   Arbitration agreement.

3  Q.   Arbitration agreement?

4  A.   Yes.

5  Q.   What was an arbitration agreement?

6  A.   That basically is an agreement between you and LCM

7  Motor Cars that should we have any difficulty with the

8  transaction or you had any difficulty with us in the

9  transaction that we agreed to go to binding arbitration

10 rather than to be put into a court.

11 Q.   And that's something that the state of Alabama

12 suggests that dealers in the state of Alabama do on every

13 transaction?

14 A.   It is.

15 Q.   All right.  Now, I wasn't from Alabama, right?

16 A.   No.

17 Q.   Okay.  And you also said that you advertised the

18 vehicle on -- I believe you said --

19 A.   Auto Trader.

20 Q.   -- Auto Trader?

21 A.   Uh-huh.

22 Q.   Now, in reference to the statement that you say I

23 made about I didn't believe in United States currency?

24 A.   Yes.

25 Q.   Wasn't the conversation about why I wasn't bringing

1   a cashier's check or writing a check versus bringing

2   money orders?

3   A.   I don't recall.

4   Q.   Okay.  And isn't it true that before I came down to

5   pick that vehicle up and bring those money orders that

6   you had agreed to accept money orders in the purchase of

7   that vehicle?

8   A.   That's correct.

9   Q.   Okay.  And, in fact, I believe the deposit was money

10  orders; isn't that true?

11  A.   Yes, that's correct.

12  Q.   All right.  And did you ever have any problem with

13  those money orders?

14  A.   No.

15  Q.   Was there any document that the state of Alabama or

16  the United States required you as a car dealer to fill

17  out and report that I asked you not to fill out and

18  report?

19  A.   No.

20  Q.   Is there any information you asked for from me as a

21  licensed dealer in the state of Alabama that I refused to

22  give you?

23  A.   No.

24          MR. SPRINGER:  Pass the witness, Your Honor.

25          THE COURT:  Mr. Stilley?

```
 1              MR. STILLEY:  No questions.

 2              THE COURT:  Any redirect?

 3              MR. SNOKE:  No, Your Honor.

 4              THE COURT:  You may step down.

 5              MR. SNOKE:  We would call Libby Meyer.

 6              THE COURT:  Very well.  While the witness is

 7   coming, I have an amended page 7 of the government's

 8   exhibit list.  Is that amended to do anything other than

 9   add Exhibit 215?

10              MR. SNOKE:  No, Your Honor.

11              THE COURT:  Okay.  Very well.

12                        LIBBY MEYER,

13   (WITNESS SWORN)

14                    DIRECT EXAMINATION

15   BY MR. SNOKE:

16   Q.  Would you state your name and spell your last name

17   for the court reporter, please, ma'am?

18   A.  Libby Meyer, M-E-Y-E-R.

19   Q.  All right.  And where do you live, ma'am?

20   A.  I live in Tulsa.

21   Q.  All right.  And what is your business or occupation?

22   A.  General manager, MeadowBrook Country Club.

23   Q.  That's MeadowBrook here in Tulsa?

24   A.  Yes.

25              MR. SNOKE:  I need to approach, Your Honor.  I'm
```

LIBBY MEYER - DIRECT BY MR. SNOKE                     1356

```
 1   sorry.
 2           THE COURT:  You may.
 3           MR. SNOKE:  Switch books here.
 4   Q.  (BY MR. SNOKE)  If you would look in this book I
 5   just placed up there, ma'am, Exhibit 283, 283.
 6   A.  There's nothing in 283.
 7           MR. SNOKE:  May I approach, Your Honor?
 8           MR. O'REILLY:  Your Honor, may I assist?
 9           THE COURT:  You may.
10   Q.  (BY MR. SNOKE)  I need you to look at that exhibit I
11   just placed in front of you in the folder marked 283.
12   A.  Yes.
13   Q.  All right.  And thumb through those documents.  Let
14   me know when you're through.
15   A.  Okay.  Okay.
16   Q.  All right.  Can you tell me if those are business
17   records of the MeadowBrook Country Club?
18   A.  Yes.
19   Q.  Kept in the ordinary course of business of
20   MeadowBrook Country Club?
21   A.  Yes.
22   Q.  And they were completed, were they, by somebody who
23   had knowledge at the time they were completed on the
24   dates indicated on the documents?
25   A.  Yes.
```

LIBBY MEYER - DIRECT BY MR. SNOKE                                    1357

1   Q.   And what do they pertain to?

2   A.   It's a new membership application, and then the

3   membership documents that we maintain when somebody is a

4   member of the club.

5   Q.   All right.  And the name of that member?

6   A.   Lindsey Springer.

7           MR. SNOKE:  We'd move into evidence at this time

8   Exhibit 283, Your Honor.

9           MR. SPRINGER:  No objection, Your Honor.

10          THE COURT:  283 is received.

11  Q.   (BY MR. SNOKE)  All right.  Can I move back to

12  the --

13          THE COURT:  You surely may.

14          MR. SNOKE:  Thank you.

15  Q.   (BY MR. SNOKE)  All right.  We have -- is that the

16  first page?  No, let's come up with the -- the first

17  page, please.  Oh, that is the first page.  All right.

18  Let's move in here -- oh, here is the application.  All

19  right.  I was looking at the application.  All right.  So

20  this is the application -- the actual application form?

21  A.   Yes.

22  Q.   And do we know what -- does it indicate when the

23  application was made?  Is there a date there somewhere?

24  A.   When the application was completed?  Was on March

25  11, 2004.

1    Q.   All right.  That's on the third page of that?

2    A.   Yes.

3    Q.   Okay.  And -- all right.  Going back to the first

4    page of that application, if we can for a moment, what

5    residence address did Mr. Springer list in his

6    application?

7    A.   5147 South Harvard, Number 116, Tulsa, Oklahoma.

8    Q.   All right.  And down there below that he -- it looks

9    like he has put a -- in the employment information, that

10   he has crossed out the word "business" and put

11   "ministry"?

12   A.   Yes.

13   Q.   Bondage Breakers Ministry; is that correct?

14   A.   Yes.

15   Q.   And that business address is the same one on South

16   Harvard?

17   A.   Yes.

18   Q.   And his position is "big cheese"?

19   A.   That's what it says, yes, sir.

20   Q.   That apparently didn't deter anybody at the club.

21   What's the e-mail address on the application there?

22   A.   G-N-u-t-e-l-l-a@mindspring.com.

23   Q.   All right.  And the rest -- as we thumb through

24   there, there's various charges indicated on some of those

25   following documents.  Was Mr. Springer sent any kind of

1  billing statement or something on a regular basis, or did

2  the club do that?

3  A.   All members are sent monthly statements at the end

4  of the month.

5  Q.   Okay.  And then you have some correspondence with

6  him after he joined, which you said, I think, was in

7  March of '04?

8  A.   Yes.

9  Q.   And some of those other documents.  If we get in

10  there about 10 or 15 pages, there's -- there starts to be

11  a bunch of receipts in there.  Can you tell us what those

12  are?

13  A.   The certified mail receipts would have been --

14  Q.   No, past that.

15  A.   I have receipts --

16  Q.   Keep going.

17  A.   They were for payments on account.

18  Q.   Keep going.  Keep going.  Keep going.  There we go.

19  Do you see that on the screen?

20  A.   Payments on account.

21  Q.   Okay.  And then -- and the records go through

22  additional goings-on through 2004 and on.  If we go to

23  the end of the exhibit, I guess we figure out when the --

24  when the -- his membership ended, which I think was on

25  the first page of what I saw up here on the screen.

1   A.   Resignation letter was received on the 25th of

2   October, and his resignation effective date was 10/31.

3   Q.   Of what year?

4   A.   2006.

5   Q.   All right.  So he was -- from March of '04 to

6   October of '06, he was a member of the club?

7   A.   Yes, sir.

8   Q.   All right.

9          MR. SNOKE:   No further questions.

10         THE COURT:   Cross-examination.

11                      CROSS-EXAMINATION

12  BY MR. SPRINGER:

13  Q.   Good morning.

14  A.   Good morning.

15  Q.   Can you identify Lindsey Springer in the courtroom

16  here today?

17  A.   Yes, I can.

18  Q.   Can you point him out?

19  A.   (Witness pointed.)

20  Q.   Thank you very much.  Without the beard, correct?

21  A.   Yes.

22  Q.   Now, isn't it true that from time to time the

23  MeadowBrook Golf and Country Club runs specials when

24  they're trying to have a membership drive?

25  A.   That's correct.

LIBBY MEYER - CROSS BY MR. SPRINGER                    1361

1   Q.   And when the membership is full, it's a lot more

2   expensive to get into the MeadowBrook Country Club, isn't

3   it?

4   A.   Yes.

5   Q.   And isn't it true that when I joined MeadowBrook

6   Country Club, it was very inexpensive to join?

7   A.   Let's see what you paid, then I can tell you that.

8   Q.   I think if you go to the first page of 283 after the

9   application, if you'd look at the second page, it's got a

10  bunch of zeros at the top.  Do you see that?

11  A.   That's for a waiting list deposit.

12  Q.   Right.  Could you pull up 283, second page, please.

13  Can you tell by the second page how much money you got

14  out of Lindsey Springer when he joined MeadowBrook

15  Country Club?

16  A.   I cannot.

17  Q.   It was very little, right?

18  A.   On the second page, it does not say what you paid.

19  Q.   Is it true that usually you run the membership

20  drives before winter starts, or late fall or early

21  winter, if you remember?

22  A.   It depends month to month.

23  Q.   Depends on membership, correct?

24  A.   Yes.

25  Q.   And isn't it also true that the owner of MeadowBrook

LIBBY MEYER - CROSS BY MR. SPRINGER                    1362

1  Country Club is also the owner of Golf Club of Oklahoma?

2  A.   At the time, yes, they had -- actually, they had

3  different owners but the same management company.

4  Q.   Same management company?

5  A.   Yes.

6  Q.   And do you remember you and I having a conversation

7  about why I was canceling my membership at MeadowBrook?

8  A.   No.

9  Q.   You don't remember that I transferred to Golf Club

10 of Oklahoma?

11 A.   I remember you transferred to Golf Club of Oklahoma,

12 yes.

13 Q.   Now, isn't it true that MeadowBrook has one of the

14 finest driving ranges in the state of Oklahoma?

15 A.   I'd like to think so, yes.

16 Q.   It's all natural grass, isn't it?

17 A.   Yes.

18 Q.   And as somebody who would hit 500 golf balls a day,

19 that could get pretty expensive at a driving range,

20 couldn't it?

21 A.   Yes.

22 Q.   And so if somebody hit that many golf balls in a day

23 and let's say a couple times a week, MeadowBrook would be

24 a real cheap date on the expense of driving range --

25 hitting driving range golf balls?

LIBBY MEYER - CROSS BY MR. SPRINGER                    1363

1  A.   Yes, it's a very good value.

2  Q.   And then on top of that, isn't it true that

3  MeadowBrook has one of the finest golf courses in the

4  state of Oklahoma?

5  A.   Yes.

6  Q.   Meticulously MeadowBrook takes care of its greens,

7  do they not?

8  A.   Yes.

9  Q.   And their fairways?

10 A.   Yes.

11 Q.   And, in fact, it's been around for a long time;

12 isn't that true?

13 A.   Since the late '50s.

14 Q.   And it's also in a very convenient location on South

15 Memorial at 81st between Mingo and Memorial; is that not

16 true?

17 A.   That is correct.

18 Q.   You also have facilities for swimming and

19 restaurant; is that true?

20 A.   Yes, sir.

21 Q.   And a golf club house where you can buy golf balls

22 and things of that nature?

23 A.   Yes, sir.

24 Q.   And was it unusual for a member to pay their dues in

25 cash?

```
 1  A.   No.
 2  Q.   In fact, we had a conversation about that, didn't
 3  we, if you remember?
 4  A.   I don't remember.
 5  Q.   Okay.  Any reports or documents that you were
 6  required to file with the state or the federal
 7  government, did you -- have you filed all those
 8  documents?
 9  A.   We have a management company that takes care of the
10  filings.
11  Q.   Do you know of -- at any time when anybody notified
12  you that there were required documents to be filed by
13  MeadowBrook Country Club that were not involving Lindsey
14  Springer?
15  A.   Not to my knowledge.
16  Q.   Do you know whether Lindsey Springer ever asked you
17  not to report any information on any documents required
18  by MeadowBrook Country Club to any state or federal
19  agency?
20  A.   Absolutely not.
21          MR. SPRINGER:  Pass the witness, Your Honor.
22          THE COURT:  Mr. Stilley?
23          MR. STILLEY:  No questions.
24          THE COURT:  Any redirect?
25          MR. SNOKE:  No questions.
```

```
 1              THE COURT:  You may step down.  We'll have the
 2    government's next witness.
 3              MR. SNOKE:  Your Honor, we'll next call Walter
 4    Bolthouse.
 5                       WALTER BOLTHOUSE,
 6    (WITNESS SWORN)
 7                       DIRECT EXAMINATION
 8    BY MR. SNOKE:
 9    Q.   Good morning, sir.  Would you state your name and
10    spell your last name for the court reporter, please.
11    A.   Walter James Bolthouse.  Last name is spelled
12    B-O-L-T-H-O-U-S-E.
13    Q.   And where do you live, sir?
14    A.   I live in Jackson, Michigan.
15    Q.   All right.  And do you know a Lindsey Springer?
16    A.   Yes, I do.  I've met him.
17    Q.   Do you think you would be able to identify him here
18    today?
19    A.   Yes.
20    Q.   Okay.  Could you tell me where he's sitting, what
21    he's wearing?
22    A.   Sitting behind you directly.
23    Q.   He's now standing?
24    A.   Yes, now standing.  Was sitting.
25              MR. SNOKE:  May the record reflect he has
```

1  identified Mr. Springer.

2        THE COURT:  The record will so reflect.

3  Q.  (BY MR. SNOKE)  What was the occasion on which you

4  met or became aware of Mr. Springer?

5  A.  I purchased a GMC bus from Lindsey back in late

6  2006, December.  Early December.

7  Q.  Okay.  And how did that transaction come about?

8  A.  Just generally or --

9  Q.  Well, I mean, how did you learn about the bus?  Let

10 me put it that way.

11 A.  It was advertised -- he had it advertised on eBay,

12 an auction Web site, and I ended up then purchasing that

13 from him.

14 Q.  All right.  And you've said, I think, that this

15 transaction took place in late 2006?

16 A.  I believe so.

17 Q.  Could it have been a year earlier?

18 A.  Yeah, I guess it would have been 2005.  That's

19 correct.

20 Q.  And did you -- well, you told us, I guess, how you

21 learned about the bus; is that correct?

22 A.  Yes.  It was advertised -- he had it advertised on

23 eBay.

24 Q.  Yes.  And did you look at the bus before you

25 purchased it?

1   A.   Yeah, I did.  I flew down to Tulsa here and looked

2   at it before I bought it.

3   Q.   Okay.  And where in -- what were the circumstances

4   in which you saw the vehicle?

5   A.   Lindsey personally showed the bus to me.

6   Q.   Where was it located?

7   A.   Had it stationed at a storage facility.

8   Q.   Okay.  And was there any -- is this the only bus

9   that he had in that storage facility?

10  A.   That was the only bus that he had.  He did have

11  another vehicle, a converted truck type of motor home

12  that he also had storage there at the same facility.

13  Q.   That was somewhere here in Tulsa?

14  A.   Yeah, I don't -- I couldn't tell you exactly where

15  it was because he picked me up and so on.  But it was

16  within, you know, 10 miles or so, I would say, of the

17  airport.

18  Q.   All right.  And after you looked at the bus, what

19  happened?

20  A.   I went ahead and purchased it.  I had -- I had

21  placed some funding to make the purchase ahead of time

22  into escrow with Mr. Stilley, who's an attorney.

23  Q.   All right.  Now, let's back up here a bit, then.

24  How -- whose idea was that?

25  A.   The idea about putting the money in escrow or using

```
 1   Mr. Stilley?

 2   Q.   Well, how did you learn about Mr. Stilley?

 3   A.   Lindsey suggested Mr. Stilley as a -- you know, an

 4   attorney, a licensed attorney that could facilitate the

 5   transaction in an honest manner and hold the money in

 6   escrow until I decided whether or not I actually wanted

 7   to purchase the merchandise, the bus.

 8   Q.   All right.  So before you came out to Tulsa here to

 9   look at the bus, you'd actually sent some money?

10   A.   I had transferred -- a wire transfer for $50,000 to

11   Oscar Stilley to be placed into an escrow account in my

12   name to be held --

13   Q.   All right.

14   A.   -- until we decided to -- like I say, whether or not

15   I would make a transaction to purchase the bus.

16   Q.   All right.  And from whom did you get the

17   coordinates to transfer the $50,000 to Mr. Stilley's --

18   A.   From Mr. Stilley.  I had spoken with him on the

19   phone and, you know, done a little research to make sure,

20   you know, he was a legitimate licensed attorney.  And

21   then I went ahead and transferred the money to him.

22   Q.   All right.  Did Mr. Stilley tell you -- did

23   Mr. Stilley tell you where he practiced law at that

24   point?

25   A.   I believe he was in Arkansas.  I want to say Little
```

1   Rock, but I couldn't say that with certainty.

2   Q.   And what was your agreement with Mr. Stilley, then,

3   before you transferred the $50,000 to his --

4   A.   The agreement was that he would hold that money into

5   an escrow account in my name until I decided what I

6   wanted to do with it.

7   Q.   All right.  And then -- and then you said you

8   decided to buy the bus, so then did you get in touch with

9   Mr. Stilley at that point?

10  A.   Yes, I did.

11  Q.   All right.

12  A.   And then I gave him authorization to transfer the

13  funds to Mr. Springer.

14  Q.   Okay.  And did you do that before you actually left

15  town?

16  A.   Yes, I did.  Yeah, because I drove the bus back to

17  Michigan at that point.

18  Q.   Okay.

19          MR. SNOKE:  I don't believe I have any

20  questions.

21          THE COURT:  Cross-examination.

22                    CROSS-EXAMINATION

23  BY MR. SPRINGER:

24  Q.   Good morning, Mr. Bolthouse.  You said that you flew

25  in and I picked you up; is that correct?

1   A.   I flew in to Tulsa International here, and you

2   picked me up at the airport.

3   Q.   At the airport?

4   A.   Yeah.

5   Q.   And then isn't it true that we went over and we

6   looked at the bus, and you at that time decided that you

7   didn't want the bus.  And I drove you out to the airport,

8   and you were getting out of my car when you changed your

9   mind and decided you wanted the bus?

10   A.   That's true.

11   Q.   Now, as far as the escrow account goes, whose idea

12   was it to want to escrow funds?

13   A.   How much?

14   Q.   No.  I'm sorry.  Scratch that.  I'll start -- I'll

15   go -- isn't it true you did not want to pay for the bus

16   until after you looked at it and checked it out and so

17   forth?

18   A.   Correct.

19   Q.   And were you the high bidder on an eBay auction; is

20   that what you said?

21   A.   I believe so.

22   Q.   And did you put a deposit on the bus when you first

23   won the auction, or do you remember?

24   A.   I don't believe so, because I believe there was some

25   question about whether, you know, who had won the auction

1   or that --

2   Q.   So --

3   A.   It wasn't real clear at that point that I had any

4   contract to purchase the bus.  It was only, yeah, you

5   know, I'll consider it and look at it.

6   Q.   And so the problem became you didn't -- you didn't

7   want to pay me for the bus until after you knew what it

8   was you were buying, right?

9   A.   Correct.

10  Q.   At the same time, you didn't want me to keep the bus

11  for sale or allow somebody else to buy the bus; isn't

12  that correct?

13  A.   That's correct.

14  Q.   And so we came to an agreement that you would be

15  satisfied if the money was put into a third party's hands

16  and I would be satisfied if I knew who the third party

17  was and what the agreement was going to be; is that

18  correct?

19  A.   Correct.

20  Q.   And I suggested you contact Oscar Stilley; isn't

21  that correct?

22  A.   That's correct.

23  Q.   You didn't know him before that time?

24  A.   No, sir.

25  Q.   But you still called and spoke with him and checked

1   him out on the Internet, I think, is your testimony; is

2   that correct?

3   A.   Correct.

4   Q.   And you became satisfied that he could act as the

5   third party for this transaction as far as you were

6   concerned?

7   A.   Correct.

8   Q.   And I told you I also implicitly trusted

9   Mr. Stilley, and therefore, you and I had fixed a problem

10  that we had ran into as far as buying the bus; isn't that

11  right?

12  A.   I guess that's a way you could put it.

13  Q.   And then within a period of time, you came down and

14  that's where you -- I picked you up at the airport,

15  right?

16  A.   Correct.

17  Q.   And then how this transaction completed, I think you

18  testified, that you called Mr. Stilley and told him

19  release the money to Mr. Springer; is that correct?

20  A.   Correct.

21  Q.   Okay.  And at the same time, that's when you took

22  title and possession -- I think you got possession and

23  title of the bus first; isn't that correct?  Or at the

24  same time?

25  A.   About the same time, yeah

1  Q.   About the same time, uh-huh.  As far as you know,

2  did I or Mr. Stilley ever ask you to do anything illegal

3  that you know of?

4  A.   No, sir.  As far as I know.

5          MR. SPRINGER:  Your Honor, may I have just one

6  second?

7          THE COURT:  You may.

8          MR. SPRINGER:  Nothing further, Your Honor.

9  Pass the witness.

10         THE COURT:  Mr. Stilley.

11                  CROSS-EXAMINATION

12  BY MR. STILLEY:

13  Q.   Isn't it true that Oscar Stilley simply followed

14  your instructions?

15  A.   I would say so.

16         MR. STILLEY:  Pass the witness.

17         THE COURT:  Any redirect?

18         MR. SNOKE:  No, Your Honor.

19         THE COURT:  You may step down.  We'll have the

20  government's next witness.

21         MR. SNOKE:  Government next calls Shelly Byrne.

22                    SHELLY BYRNE,

23  (WITNESS SWORN)

24                  DIRECT EXAMINATION

25  BY MR. SNOKE:

SHELLY BYRNE - DIRECT BY MR. SNOKE                           1374

1  Q.   Would you state your name and spell your last name

2  for the court reporter, please, ma'am.

3  A.   Shelly Byrne, B-Y-R-N-E.

4  Q.   And where do you live, ma'am?  Where do you live?

5  A.   Tulsa.  4611 --

6  Q.   Ma'am, I don't need the street address, just the

7  city.

8  A.   Tulsa, Oklahoma.

9  Q.   Okay.  And by whom are you employed?

10  A.   Bruce G. Weber Precious Jewels.

11  Q.   And where is that located?

12  A.   Utica Square.

13  Q.   And how long have you worked for Bruce G. Weber?

14  A.   Twelve years.

15  Q.   Do you know an individual named Lindsey Springer?

16  A.   I met him one time when I -- when he paid cash to us

17  and I filled out the Form 8300.  I'd never met him any

18  other time than that.

19  Q.   Okay.  Would you look at -- well, do you think you'd

20  be able to identify him here in court today?

21  A.   I think he's the gentleman with the beard, standing,

22  yes.

23           THE COURT:  There's more than one that answers

24  that description.

25           MR. SNOKE:  I'm sorry.

1     THE WITNESS:  The gentleman with the beard.

2     THE COURT:  The one with the beard sitting or

3  the one with the beard standing?

4     THE WITNESS:  Standing.  Sorry.  I didn't see

5  the one behind him.

6     THE COURT:  Very well.

7  Q.  (BY MR. SNOKE)  All right.  Would you look -- in

8  front of you, there's a book there.  If we can -- I want

9  you to look at a few exhibits there.  And starting with

10  Exhibit 261.  If you will also look at Exhibit 262, 263,

11  264, 265, 266, 267 and 268.

12  A.   261?

13  Q.  Starting with 261, yes.  If you need to take some of

14  those out of the sleeves to look at them, that's okay

15  too.  All right.  I'd like to kind of do this -- have you

16  look at all of them, then I've got a couple questions

17  here --

18  A.   Okay.

19  Q.   -- before we go on.  So will you look at 262, 263,

20  264?  And you can pull them all out of there, if you need

21  to, but if you can do it without pulling them out, that's

22  fine.

23  A.   Okay.  263.  Okay.

24  Q.   65, 66, 67 and 68?

25  A.   67.

```
 1   Q.   And 268.  Okay?

 2   A.   Okay.  Okay.

 3   Q.   With respect to all of those documents, 261 through

 4   268 inclusive, can you tell me if those are records of

 5   Bruce G. Weber Precious Jewels?

 6   A.   Yes, they are.

 7   Q.   And were they kept in the ordinary course of the

 8   business of Bruce G. Weber?

 9   A.   Yes, sir.

10   Q.   And were they completed by someone who had knowledge

11   at the time indicated on the documents of the

12   transactions?

13   A.   Yes.

14   Q.   And is there a particular customer involved in those

15   documents?

16   A.   Lindsey Springer.

17   Q.   All right.

18           MR. SNOKE:  We'd move into evidence at this

19   time, Your Honor, Plaintiff's Exhibit 261 through 268.

20           MR. SPRINGER:  No objection, Your Honor.

21           THE COURT:  261 through 268 will be received.

22           MR. SNOKE:  Yes, Your Honor.  And if I could

23   move back to the other podium?

24           THE COURT:  You may.

25   Q.   (BY MR. SNOKE)  All right.  Let's take, first,
```

1    Exhibit 261.  What is that exhibit -- actually, there's a

2    two-page exhibit, but what does the first page of that

3    exhibit indicate?

4    A.  It's a sales ticket for an item that Lindsey

5    Springer purchased at our store.  It is an Eva watch sold

6    to him by Mr. Bruce Weber.

7    Q.  And what's the date of that purchase?

8    A.  7/21/2003.

9    Q.  And how was it paid for?

10   A.  Cash.

11   Q.  All right.  And the second page of that exhibit, is

12   that something to do with the transaction as well?

13   A.  This is an insurance appraisal that we provide to

14   our customers when they purchase items that are over

15   $1,000.  It just has a description of the item and the

16   date purchased.

17   Q.  All right.  And we can't really see it on the

18   screen, but there's a picture of the item, I guess, in

19   the --

20   A.  Yes.

21   Q.  All right.  Let's turn to Exhibit 262.  Again, what

22   is the -- what does this document indicate?

23   A.  It's a sales ticket for an item sold to Lindsey

24   Springer.  It's a diamond ring containing a 1.24 carat

25   Alara cut stone purchased on 7/10/2003.

1  Q.  All right.  And there's a notation down there at the

2  bottom of something about cash down 3,000, layaway?

3  A.  Yes.  He paid cash at the time of the purchase of

4  $3,000, and then we allowed him to charge the remaining

5  balance, which was 14,806.31, and that's my handwriting

6  that says "store charge" beside it.

7  Q.  All right.  If you would look at Exhibit 268.  Do

8  you recognize this document?

9  A.  Yes, this is the Form 8300 that I filled out on the

10  day that he brought in the balance of the payment.

11  Because he brought in money orders and he had paid cash,

12  so it exceeded the $10,000 in cash and money orders.

13  Q.  All right.  Now, I see -- and did you send this form

14  in?

15  A.  Yes, I filed it with the IRS.

16  Q.  All right.  And it pertains to the same transaction

17  we just talked about in Exhibit 262?

18  A.  Yes, this was filed in conjunction with the diamond

19  ring on 262.

20  Q.  All right.  And it -- if you go down there to about

21  the middle of the page to line 32, have you listed there

22  how the purchase of this ring was made?

23  A.  Yes, we received $8,706 in cash and $9,100 in money

24  orders.

25  Q.  All right.  And on this particular exhibit, Exhibit

SHELLY BYRNE - DIRECT BY MR. SNOKE                    1379

1  268, are the money orders attached in that exhibit?

2  A.   Yes.

3  Q.   And there's several of them making this up -- this

4  transaction; is that correct?

5  A.   Yes, there were several money orders all in the

6  amount of $350.

7  Q.   All right.  Can we get the second page of that?  All

8  right.  All right.  Let's move on to Exhibit 263.  And

9  what does this receipt on the first page of that exhibit

10 show?

11 A.   It was an item purchased by Lindsey Springer on

12 December 23, 2003.  It is actually a pair of diamond

13 earrings.  He paid, including tax, $2,956.93.  And that

14 was paid in money orders.

15 Q.   All right.  It was paid for with money orders?

16 A.   Well, it could have been cash and money orders

17 because she circled "cash" and then wrote "money orders,"

18 so --

19 Q.   All right.  And the second page of that exhibit, is

20 that again an insurance document?

21 A.   The insurance appraisal for the items purchased.

22 Q.   All right.  What address did Mr. Springer list on

23 that exhibit, the first page of that exhibit?

24 A.   5147 South Harvard.

25 Q.   All right.  Is that the same address he listed on

1380

```
 1  Exhibit 268 that you filled in the cash transaction
 2  report?
 3  A.   Yes, sir.
 4  Q.   If we could go to Exhibit 264 -- oh, did we cover
 5  the date -- what was the date of that purchase in 263?
 6  A.   December 23, 2003.
 7  Q.   All right.  Let's go to Exhibit 264.  What's the
 8  date of that purchase?
 9  A.   May 5, 2004.
10  Q.   All right.  And what was purchased on that occasion?
11  A.   It was two items.  One is a bracelet and one is a
12  necklace.  Total purchase $3,718.88.
13  Q.   And does it indicate down there how this purchase
14  was made?
15  A.   Yes.  Money orders, $3,000; cash, $720.
16  Q.   Again, the address that Mr. Springer left with you
17  on that purchase?
18  A.   5147 South Harvard.
19  Q.   Okay.  Let's go to Exhibit 265.  Before we leave
20  264, you indicated the -- we have pictures of them there
21  on the appraisal report; is that correct?
22  A.   That's correct.
23  Q.   265, is that one item or two items?
24  A.   That's one item.
25  Q.   All right.  And what's the date of that purchase?
```

1  A.   December 23, 2004.

2  Q.   And what was the item purchased?

3  A.   It's a diamond necklace.

4  Q.   All right.  And the purchase price with tax was

5  what?

6  A.   $3,808.95.

7  Q.   And how was that paid for?

8  A.   Cash.

9  Q.   And, again, the address Mr. Springer wrote on the

10 receipt, or was written, I guess, for him?  I don't

11 know.

12 A.   5147 South Harvard.

13 Q.   All right.  Exhibit 266.  What does that show

14 purchased?

15 A.   Item purchased by Lindsey Springer on May 11, 2005.

16 It was diamond earrings -- well, no.  These are pearl

17 earrings.  The total amount purchased is $2,604.41, paid

18 in cash.

19 Q.   All right.  And at a second page there, it actually

20 says "White Gold black pearl earrings"; is that --

21 A.   Yeah, White Gold French wire earrings with a black

22 pearl dangle.

23 Q.   All right.  Now, do you know what is -- up above

24 Mr. Springer's name, there's the name "Jeanie" up there,

25 written by somebody?

1  A.   Yes, that was written by the salesperson to possibly

2  mean that Jeanie came in and purchased it.  I wasn't

3  there at the time of the purchase, so I don't know.

4  Q.   All right.  Let's go to -- actually, on that last

5  one, they actually wrote both names.  Is it possible that

6  they both went in there?

7  A.   Possibly, yes.

8  Q.   All right.  Let's go to Exhibit 267, which indicates

9  Jeanie Springer, I think?

10  A.   That's correct.

11  Q.   Same address?

12  A.   Jeanie Springer, 5147 South Harvard, on October 30,

13  2006.  It's a David Yurman bracelet, and total purchase

14  amount is $1,171.98, paid in cash.

15  Q.   $1,171.98?

16  A.   Yes.

17  Q.   That -- down there the sticker says "cable pave

18  buckle" something.

19  A.   That's a description of the bracelet.  Silver, seven

20  millimeter cable bracelet with pave diamonds, .22 carat

21  total weight.

22  Q.   So is that a buckle or what is that?

23  A.   It's just the design on the bracelet.  Looks like it

24  has a buckle, then the diamonds are around the buckle.

25  Q.   Okay.  Is the -- the only time you dealt personally

1  with Mr. Springer is the time that the 8300 form, the

2  cash transaction report, was filled out there in

3  connection with the purchase of that --

4  A.   Yes, that's correct.

5  Q.   -- diamond ring?

6          MR. SNOKE:  I don't believe I have any other

7  questions at this time.

8          THE COURT:  Cross-examination.

9          MR. SPRINGER:  May I have one second, Your

10  Honor?

11          THE COURT:  You may.

12          THE WITNESS:  Hello.

13                    CROSS-EXAMINATION

14  BY MR. SPRINGER:

15  Q.   Good afternoon.

16          MR. SPRINGER:  Could you please pull up

17  Government's Exhibit Number 263, please.

18  Q.   (BY MR. SPRINGER)  Is it common for a wife to come

19  in to Bruce G. Weber's and buy jewelry?

20  A.   Yes.

21  Q.   And is it common for Bruce G. Weber's to put the

22  receipt in the husband's name, if you know, if asked?

23  A.   Possibly, yes.

24  Q.   And you have before you Government's Exhibit Number

25  263, dated December 23, 2003.  Do you see that?

SHELLY BYRNE - CROSS BY MR. SPRINGER                    1384

```
1   A.   Yes.

2   Q.   It's just a couple days before Christmas, isn't it?

3   A.   Uh-huh.

4   Q.   Do you get a lot of people coming in right before

5   Christmas?

6   A.   Yes, sir.

7   Q.   Especially if they love their wife?

8   A.   Uh-huh.

9   Q.   Now, you don't know whether or not -- or excuse me.

10  Strike that.  Have you had occasion to meet Jeanie

11  Springer?

12  A.   I've never met her, sir.

13  Q.   And that's because you don't stand at the counter

14  and sell jewelry; isn't that true?

15  A.   That's correct.  I'm the accountant.

16  Q.   All right.

17           MR. SPRINGER:  Could you please post

18  Government's Exhibit Number 262, please.

19  Q.   (BY MR. SPRINGER)  Now, if you turn to the -- look

20  at the first page there, where it describes the ring in

21  the middle of the page that you have before you, says

22  "lady's platinum ring containing Alara cut diamond"?

23  Now, isn't that a very unique brand that only Bruce G.

24  Weber sold at that time?

25  A.    That's correct.  I believe we were the only jeweler
```

1  in --
2  Q.  So if somebody was demanding their husband get them
3  an Alara ring for a wedding ring, then they got to go to
4  Bruce G. Weber; isn't that right?
5  A.  That's correct.
6  Q.  Or they've got to travel to the next state or city
7  that sells it.  And you also said that the transaction,
8  Number 262, appeared to be done directly with Bruce G.
9  Weber; is that correct?
10 A.  That's correct.  That's his handwriting on the top
11 of the sales ticket.
12 Q.  It's unmistakable, isn't it?
13 A.  Yes.  I've seen it many times.
14 Q.  Now, if you would -- I notice on the bottom of 262,
15 where it says "cash, $3,000," now, hasn't there been some
16 issue about whether or not money orders and cash are the
17 same as far as Bruce G. Weber's is concerned?  You treat
18 them both the same -- do you treat money orders as cash,
19 as if it was cash?
20 A.  We would collect them -- we deposit them like a
21 check.  We don't count them as cash, but --
22 Q.  Okay.  Would you turn to -- would you please post
23 Government's Exhibit Number 268, please.  Now, do you see
24 at the very top of Government's Exhibit Number 268 it
25 says "report of cash payment over $10,000"?  Do you see

1  that up there?

2  A.   That's correct.

3  Q.   And then do you see the highlighted area, the yellow

4  in the middle, where it says "U.S. currency 8706 and

5  money orders 9100"?

6  A.   That's correct.

7  Q.   So isn't it safe to say that Bruce G. Weber, at

8  least during this transaction, treated currency and money

9  orders as currency?

10 A.   Yes, as required by the law and reported in 8300, if

11 we receive money orders, we're to count them as cash.

12 Q.   So the sales clerk, though, at the front counter,

13 when they're filling out -- when they fill out the

14 ticket, for instance, like on -- if you'd pull back up to

15 262, please -- would they treat money orders and cash as

16 cash or would they know not to do that?

17 A.   I'm not sure I understand your question, but --

18 Q.   Does the person who writes the receipts out, for

19 instance, like let's say, for Exhibit Number 262, would

20 they -- would Bruce G. Weber know whether or not he was

21 receiving actual currency or whether he was receiving

22 money orders as this $3,000 down payment?

23 A.   Yes, he would.

24 Q.   He would know that, wouldn't he?

25 A.   He would know, yes.

1    Q.   Now, if you'd turn to 263, please.  Now, in 263, you

2    don't recognize Bruce Weber's handwriting, do you?

3    A.   No.  This item was sold by Michelle.

4    Q.   By Michelle.  And, now, up at the top it has circled

5    "cash," and then underneath it it's got written "money

6    order."  Do you see that right there?  Now, you testified

7    that you didn't know whether it was cash or money orders

8    based upon the way that document, 263, looked; is that

9    correct?

10   A.   That's correct.

11   Q.   Could be some money orders?

12   A.   It could have been a combination.

13   Q.   Could be both, okay.  Now, if you would look at

14   Government's Exhibit Number 264.  Do you also notice

15   Bruce G. Weber's handwriting on this document?

16   A.   Actually, this one is not Mr. Weber's handwriting.

17   Q.   And at the bottom, doesn't it say 3,000 in money

18   order and 720 in cash?

19   A.   That's correct.

20   Q.   All right.  But at the top, it's got check marked

21   under the "cash" column, and then it also has "other" and

22   says "money order" on the right side, right?

23   A.   That's correct.

24   Q.   All right.  And is that the same for government --

25   if you'd please pull up Government's Exhibit 265.  Now,

1   Government 265 shows a check mark with "cash" by it,

2   right?

3   A.   Yes, and the salesperson wrote "cash" at the --

4   Q.   And this is Michelle, isn't it?

5   A.   She wrote the ticket, but it looks to me like the

6   other part of the receipt was written by someone else.

7   Q.   So you don't know for sure as you're standing here

8   whether or not the cash means there were money orders

9   involved, do you?

10  A.   It appears to be full cash since she wrote down here

11  at the bottom "$3,820 cash."

12  Q.   All right.   Now, if you would go back to

13  Government's Exhibit 268 for me.   If you would look at

14  the box number 6 up at the top right side, where it says

15  "taxpayer identification number"?

16  A.   Yes.

17  Q.   Would you read that to the jury, please?

18  A.   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.

19  Q.   And do you know what that number represents?

20  A.   A social security number.

21  Q.   And is it something that Bruce G. Weber would ask

22  their customers for in filling out a currency transaction

23  report?

24  A.   Yes, we're required to ask that.

25  Q.   And even though the customer may have said, hey,

1  there's not $10,000 worth of currency there, because

2  there's $9,100 worth of money orders, you don't remember

3  Lindsey Springer raising any ruckus about that, do you?

4  A.   No, he had no problem with filling it out.

5  Q.   In fact, isn't it true that every question that

6  Bruce G. Weber ever asked Lindsey Springer that he

7  answered, that you know of?

8  A.   Yes.

9  Q.   Do you know of any federal or state forms required

10 by any federal or state agency that Bruce G. Weber's was

11 required to report that Lindsey Springer asked Bruce G.

12 Weber's not to report?

13 A.   No, sir.

14 Q.   Now, if you would turn to the very last page of

15 Exhibit Number 268, please.

16        MR. SPRINGER:  Is that your last page?  Okay.

17 It's the next one, right there.  Could you blow that up

18 for us?

19 Q.   (BY MR. SPRINGER)  Now, have you ever -- excuse me.

20 Have you ever seen a document like what's on your screen

21 right now?

22 A.   No, sir.

23 Q.   Have you ever received responses from the IRS in

24 regard to Form 8300 that you would fill out for Bruce G.

25 Weber?

```
 1   A.   No, sir.
 2   Q.   Okay.  Did you know that this specific document was
 3   located in Exhibit Number 268 that you offered through
 4   the government you testified to earlier?
 5   A.   I don't recall seeing that, no.
 6   Q.   Does -- does the last page of Exhibit Number 268 in
 7   front of you say "to Deborah Cox, IRS Detroit computing
 8   center"?
 9   A.   Yes, sir.
10   Q.   Does it have "L.K. Springer" just above that on
11   "case file information"?
12   A.   Yes, sir.
13   Q.   Even says a "temporary loan record" on there,
14   doesn't it?
15   A.   Yes, sir.
16   Q.   Is there any other documents that you know of that
17   exist with Bruce G. Weber's that you haven't produced in
18   response to the government's subpoena in this case?
19   A.   No, sir.
20           MR. SPRINGER:  Pass the witness, Your Honor.
21           THE COURT:  Mr. Stilley.
22           MR. STILLEY:  No questions.
23           THE COURT:  Any redirect?
24           MR. SNOKE:  No, Your Honor.
25           THE COURT:  You may step down.
```

```
 1        Members of the jury, we'll take our mid-morning
 2   break at this time.  We'll resume at ten minutes till the
 3   hour as shown by the clock here in the courtroom.  During
 4   this break, please remember, of course, not to discuss
 5   the case with anyone for any purpose, not to undertake
 6   any independent investigation of any aspect of the case
 7   and not to reach any conclusions about any aspect of the
 8   case until it's been given to you for your deliberations
 9   and verdict.  So please be available just a little before
10   ten minutes till the hour for the security officer to
11   return with you to the courtroom.  All persons in the
12   courtroom will remain seated while the jury departs.
13        (JURY EXITS THE COURTROOM.)
14            THE COURT:  Jury has left the courtroom.  Is
15   there anything we ought to address before we take our
16   mid-morning break?
17            MR. O'REILLY:  Nothing from the government, Your
18   Honor.
19            MR. SPRINGER:  Not at this time, Your Honor.
20            THE COURT:  Very well.  Court will be in recess.
21        (A RECESS WAS HAD, AFTER WHICH THE FOLLOWING
22   PROCEEDINGS WERE HAD IN OPEN COURT AND WITHIN THE
23   PRESENCE AND HEARING OF THE JURY.)
24            THE COURT:  We'll have the government's next
25   witness.
```

```
 1              MR. O'REILLY:  United States calls Mr. Sam
 2    Snyder.
 3              COURTROOM DEPUTY:  Please come forward and be
 4    sworn.
 5                          SAMUEL SNYDER,
 6    (WITNESS SWORN)
 7                       DIRECT EXAMINATION
 8    BY MR. O'REILLY:
 9    Q.   Would you please state your first and last names and
10    spell your last name for the court reporter.
11    A.   Samuel Snyder, S-N-Y-D-E-R.
12    Q.   Sir, in what city and state do you live?
13    A.   Granite Falls, North Carolina.
14    Q.   How long have you lived there?
15    A.   Since 1965.
16    Q.   Are you familiar with an individual by the name of
17    Lindsey Springer?
18    A.   Yes, sir.
19    Q.   And do you see Mr. Springer in the courtroom?
20    A.   Yes, sir.
21    Q.   Can you identify him for the court, please?
22    A.   That fellow behind you there.
23    Q.   The one that's standing up?
24    A.   Yes.
25              MR. O'REILLY:  May the record reflect Mr. Snyder
```

SAM SNYDER - DIRECT BY MR. O'REILLY                           1393

```
 1   has identified Mr. Springer?
 2            THE COURT:  The record will so reflect.
 3   Q.   (BY MR. O'REILLY)  What was it that caused you to
 4   meet Mr. Springer?
 5   A.   He bought a motor home off of me.
 6   Q.   When was this?
 7   A.   2005, I believe.
 8   Q.   Was this your motor home?
 9   A.   Correct.
10   Q.   Would you please explain to the jury how it came to
11   pass that -- were you selling a motor home?
12   A.   Yes.  It was on eBay, and Mr. Springer called my
13   niece's husband that had put it on, and then he got in
14   contact with me and came and looked at it.
15   Q.   When you say "he" contacted you, is "he" being
16   Mr. Springer?
17   A.   Yes.
18   Q.   How did he contact you?
19   A.   By phone.
20   Q.   How much were you asking for your motor home?
21   A.   I think it was 167,000.
22   Q.   How much had you invested in your motor home at that
23   time?
24   A.   I had somewhere -- something over 170 in it.
25   Q.   Did Mr. Springer agree to buy the motor home over
```

SAM SNYDER - DIRECT BY MR. O'REILLY                    1394

```
 1  the phone?
 2  A.   He actually sent a deposit and came to look at it.
 3  Q.   In what -- how much of a deposit did Mr. Springer
 4  send?
 5  A.   I think it was $1,000.
 6  Q.   In what form of payment did Mr. Springer send the
 7  $1,000?
 8  A.   I think it was a money order with FedEx.
 9  Q.   Money order via FedEx?
10  A.   Correct.
11  Q.   Did Mr. Springer, in fact, come to North Carolina
12  and look at your motor home?
13  A.   Yes.
14  Q.   Approximately when was that?
15  A.   That was February of 2005, maybe.
16  Q.   Let me ask this:  Would it help to refresh your
17  recollection as to the date to look at any document; for
18  example, a receipt that you might have received, a wire
19  to your bank account?
20  A.   Yes.
21  Q.   I'm going to ask you, if you could, to look at
22  what's in evidence as Government's Exhibit 114, which
23  should come up on your screen.  Specifically just look
24  and see if in the middle of that page roughly --
25  A.   There's nothing on the screen.
```

1   Q.   Oh, I'm sorry.  It usually comes up faster than

2   that.  And if you could just take a look at the date on

3   that and see if that refreshes your recollection of --

4   A.   I can't tell the date there.

5   Q.   It will be blown up in a minute.  Is that hard to

6   read on the screen, sir?

7   A.   Yes, I can read where it's 166,000.

8   Q.   And do you see a date on that?

9   A.   8/31.

10  Q.   Is that of the year 2005?

11  A.   I don't see the -- oh, yeah.  8/31/2005, yes.

12  Q.   Does that refresh your recollection of approximately

13  when Mr. Springer would have come to see you?

14  A.   Yes.

15  Q.   And was that about the same time as this receipt of

16  $166,000?

17  A.   Correct, yes.

18  Q.   What does that $166,000 wire to you -- what is that?

19  A.   That was wired to my bank from his.  My banker

20  confirmed -- when it was confirmed that it was

21  transferred, then she signed the title and -- or I signed

22  the title and she notarized it.

23  Q.   Why did Mr. Springer pay you $166,000?

24  A.   To purchase the motor home.

25  Q.   Okay.  And the purchase price was -- I think you

1  were asking 167,000?

2  A.   Yes.

3  Q.   But had you already received $1,000?

4  A.   Correct, yes.

5  Q.   So did Mr. Springer pay you the full price that you

6  were asking?

7  A.   To the best of my recollection, yes.

8  Q.   I'm going to ask you now to look at what's in

9  evidence as Government's Exhibit 490.  And specifically

10 not -- I think there's a letter, which is the first

11 item -- do you see that, sir?  Referencing a Ventresca

12 Kingsley coach?

13 A.   No, that's not mine.

14 Q.   Okay.  That's not yours.  And just -- Government's

15 Exhibit 490 was found during the search of Mr. Springer's

16 home.  But that --

17        MR. SPRINGER:  Your Honor, I object.  This has

18 nothing to do with this witness.

19        THE COURT:  490?

20        MR. O'REILLY:  Yes, Your Honor.

21        MR. SPRINGER:  Yes, Your Honor.  He said he

22 didn't know anything about it.

23        MR. O'REILLY:  Your Honor, the next couple

24 questions will clear this up.

25        THE COURT:  Subject to that, we'll take it one

SAM SNYDER - DIRECT BY MR. O'REILLY                    1397

```
 1  question at a time.  Go ahead.
 2         MR. O'REILLY:  Actually, Your Honor, if I may
 3  approach the witness and show him the hard copy of the
 4  exhibit.
 5         THE COURT:  You may.
 6  Q.   (BY MR. O'REILLY)  Mr. Snyder, actually, I was
 7  mistaken.  It's the first page of the exhibit.  Do you
 8  recognize that?
 9  A.   This page here?
10  Q.   Yes, sir.
11  A.   Yes.
12  Q.   What is the first page of Government's Exhibit 490?
13  A.   That's the deposit that was sent to me, I think.
14  Q.   And it has your name on there?
15  A.   Correct.
16  Q.   What is the date on that?
17  A.   Is that 9/5/2005?
18  Q.   Is it possibly July of 2005?
19  A.   Yeah.
20  Q.   When was the last time you saw Mr. Springer prior to
21  coming into court today?
22  A.   When he left with the motor home.
23  Q.   During your conversation with him while he was there
24  to buy the motor home, did you have any discussion of
25  what Mr. Springer was going to do with this motor home?
```

```
 1   A.   He said he was going to use it to go play on the

 2   PGA, I think, to stay in while he was playing golf.

 3           MR. O'REILLY:  If I may have a moment, Your

 4   Honor?

 5           THE COURT:  You may.

 6           MR. O'REILLY:  Nothing further, Your Honor.

 7           THE COURT:  Cross-examination.

 8                    CROSS-EXAMINATION

 9   BY MR. SPRINGER:

10   Q.   Good morning, Mr. Snyder.

11   A.   Hello.

12   Q.   Now, the vehicle to which you were just describing

13   that -- involved in the transaction between you and I, it

14   was a 2001 Freightliner; is that right?

15   A.   Correct, yes.

16   Q.   And had you just gone and purchased that for

17   $170,000?

18   A.   I had had it built in Texas, and it was actually --

19   Coach Hauler's Unlimited was the name of it, something.

20   Q.   So you started with a Freightliner front and you had

21   Freightliner make you a custom 40-foot frame, didn't you?

22   A.   Well, they already had it out there at the --

23   Q.   They already had it out there.  And then you had

24   them put two 150-gallon fuel tanks on both sides, didn't

25   you?
```

1    A.   That actually came from Freightliner also.

2    Q.   So you ordered that that way?

3    A.   Well, it was ordered -- I didn't order it.  It was

4    ordered that way.

5    Q.   And it was red when you first got it, wasn't it?

6    A.   I think so, yes.

7    Q.   And then you painted it white; isn't that right?

8    A.   I think so.

9    Q.   And then you built a 40-foot box on the back of it,

10   didn't you?

11   A.   Correct.

12   Q.   And the standard height size of most RVs inside is

13   six foot, isn't that right, or roughly six, six and a

14   half foot?

15   A.   I think so, yes

16   Q.   Now, what was abnormal about the box that you built

17   was that it had eight-foot ceilings in it; isn't that

18   true?

19   A.   Yes, I think so.

20   Q.   And you also had two slide-outs put into it, didn't

21   you?

22   A.   Correct.

23   Q.   And when that slide-out in the front's out, that

24   almost looked like a big living room, didn't it?

25   A.   Correct.

SAM SNYDER - CROSS BY MR. SPRINGER                                    1400

1   Q.   Now, you designed this because you were thinking

2   about going out on the NASCAR circuit again; isn't that

3   right?

4   A.   No, I was actually going to drag race.

5   Q.   Drag race.  And you have a history with racing cars,

6   don't you?

7   A.   Yes.

8   Q.   Going back to the '60s?

9   A.   No, no, I'm not that old.

10  Q.   '70s?

11  A.   Yes.

12  Q.   In North Carolina; is that right?  Now, do you

13  remember how many miles was on this rig at the time that

14  you sold it to me?

15  A.   I think it was less than 5,000.

16  Q.   Less than 5,000.  And you'd been building it for

17  almost four years; isn't that true?

18  A.   No, it was approximately two years old.

19  Q.   Two years.  Okay.  So you started building it in

20  2003 and then in 2005, you -- sometime in late August you

21  sold it to me; is that right?

22  A.   Correct.

23  Q.   Okay.  And when you put it on eBay, you really

24  didn't have control over exactly how that was -- the ad

25  was placed on eBay except for the amount, right?

```
 1   A.   Yes.
 2   Q.   You knew how much you were not -- you weren't going
 3   to sell it for any less than a certain number; isn't that
 4   right?
 5   A.   Uh-huh.
 6   Q.   Now, it did not ever get any bids --
 7           THE COURT:  Mr. Snyder, it's necessary for you
 8   to answer audibly and, Mr. Springer, it's necessary for
 9   you to give him time to answer audibly.
10           MR. SPRINGER:  Sorry, Your Honor.  I apologize.
11   Q.   (BY MR. SPRINGER)  Isn't it true that when you had
12   your -- I believe you said your nephew, is that right, or
13   son-in-law?
14   A.   To do --
15   Q.   Put the RV on the eBay listing?
16   A.   It was my niece's husband.
17   Q.   Niece's husband.  And the starting bid on it that
18   they placed on that ad was $167,000; isn't that right?
19   A.   I guess.  I don't remember that for sure.
20   Q.   Is that the amount that you wanted for it?
21   A.   Correct.
22   Q.   Okay.  And isn't it true that by me sending you the
23   thousand dollars deposit, that you directed whoever had
24   placed the ad to pull the ad off of eBay?
25   A.   I think so, yes.
```

1    Q.   And when I arrived in North Carolina, there were

2    some things that didn't work, like plumbing, for

3    instance; isn't that right?

4    A.   I don't recall that.

5    Q.   You don't recall that.  But you do recall that there

6    were some little things that it needed from sitting; is

7    that right?

8    A.   No, I don't recall anything being wrong with it.

9    Q.   Okay.  Inside, isn't it true that the basic kitchen

10   was a very small bowl and a gas stove top and that was

11   about it?

12   A.   Correct.

13   Q.   And I told you I was going to turn it into a home

14   for my family while I was on the road, didn't I?

15   A.   You said you was going to go -- you was going to

16   have you -- to keep -- take your family with you to play

17   golf.

18   Q.   To play golf.  And did I provide to you all the

19   information you or your bank ever requested of me

20   involving in the transaction of me purchasing and you

21   selling this 2001 Freightliner?

22   A.   As far as I know, yes.

23   Q.   Okay.  Now, isn't the reason why you decided to

24   build one from scratch instead of going and buying one

25   off the street was because you thought you would get more

```
 1   vehicle for the money?
 2   A.   Partially, but there was other reasons also.
 3   Q.   Okay.  And at some point in time, there became a
 4   reason why you put the rig for sale; isn't that true?
 5   A.   Yes.
 6   Q.   And what was that reason?
 7   A.   I had decided not to race at that time.
 8   Q.   Were you shocked that I was willing to pay your
 9   price for the RV?
10   A.   No.
11   Q.   It was a good deal, wasn't it?
12   A.   Yes.
13           MR. SPRINGER:  Pass the witness, Your Honor.
14           THE COURT:  Mr. Stilley.
15           MR. STILLEY:  No questions.
16           THE COURT:  Any redirect?
17           MR. O'REILLY:  Yes, Your Honor.
18                   REDIRECT EXAMINATION
19   BY MR. O'REILLY:
20   Q.   Mr. Snyder, Mr. Springer asked you if he provided
21   you all the information with respect to the money coming
22   into you for this transaction?
23   A.   Yes, as far as I know.
24   Q.   I'm going to ask you if you could to take another
25   look at Government's Exhibit 114.  And just -- that
```

```
 1  should come up on the screen.  Could you please indicate
 2  whose bank account this is from which the money was wired
 3  to you?
 4  A.   No.
 5  Q.   Can you make that out, sir, or --
 6  A.   I don't know -- I mean, all I know is it came to my
 7  bank, First Citizens, in Granite Falls.
 8  Q.   Correct.  And whose bank account is reflected on the
 9  statement from which this payment was made?
10  A.   Oscar Stilley, attorney at law.
11           MR. O'REILLY:  Nothing further, Your Honor.
12           THE COURT:  Any recross?
13           MR. SPRINGER:  Never mind, Your Honor.
14           THE COURT:  Mr. Stilley.
15                     RECROSS-EXAMINATION
16  BY MR. STILLEY:
17  Q.   You don't recognize Oscar Stilley, do you?
18  A.   No, sir.
19  Q.   And you don't have any evidence or reason to believe
20  that Oscar Stilley has committed any criminal act, do
21  you?
22           MR. O'REILLY:  Objection, Your Honor, beyond the
23  scope of redirect.
24           THE COURT:  Overruled at this point.  You may
25  answer.
```

1     THE WITNESS:  Can you ask that again?

2  Q.  (BY MR. STILLEY)  You don't have any evidence or

3  information that would show that Oscar Stilley committed

4  any crime, do you?

5  A.  No, I don't.

6     MR. STILLEY:  Pass the witness.

7     THE COURT:  Very well.  You may step down.

8  We'll have the government's next witness.

9     MR. O'REILLY:  Your Honor, the United States

10  calls Mr. Patrick Turner.

11     PATRICK TURNER,

12  (WITNESS SWORN)

13     MR. O'REILLY:  Your Honor, if I may approach the

14  witness to remove one of the binders.

15     THE COURT:  You may.

16     DIRECT EXAMINATION

17  BY MR. O'REILLY:

18  Q.  Could you please state your full name and spell your

19  first and last names for the court reporter.

20  A.  Patrick Ryan Turner, P-A-T-R-I-C-K, T-U-R-N-E-R.

21  Q.  In what city and state do you live?

22  A.  Davisburg, Michigan.

23  Q.  How long have you lived there?

24  A.  Since 1984.

25  Q.  What is your level of education?

1   A.   I have a master's degree.

2   Q.   In what subject?

3   A.   Mechanical engineering.

4   Q.   Where did you get your master's degree?

5   A.   From MIT.

6   Q.   Do you have any post-master's training?

7   A.   Yes.  I've spent a year at -- well, doing a distance

8   learning at Lehigh University, and I'm currently enrolled

9   in the Moody Bible Institute in Chicago, Illinois.

10  Q.   In what subject was this additional education or

11  training?

12  A.   Basically just introductory ministerial studies in

13  the New and Old Testament, moving on to things like Bible

14  study and hermeneutics.

15  Q.   What was the last one?

16  A.   Hermeneutics.  It's basically the methodology for

17  studying and interpreting the Bible.

18          THE COURT:  Could you spell that for the

19  reporter, please?

20          THE WITNESS:  H-E-R-M-A-N-E-U-T-I-C-S (sic), I

21  think.

22  Q.   (BY MR. O'REILLY)  How long have you been engaged in

23  this course of study?

24  A.   I'm guessing, I think, about four or five years.

25  Q.   How are you currently employed, sir?

1   A.   I work for a company called Web Elite.  It's a

2   software company, and they also have a computer hosting

3   center, of which I work with as well.

4   Q.   What is your position at Web Elite?

5   A.   Chief technology officer.

6   Q.   How long have you been the chief technology officer

7   for Web Elite?

8   A.   Since about 2002.

9   Q.   In what city and state is Web Elite located?

10  A.   Pleasant Ridge, Michigan.

11  Q.   Roughly speaking, where within the state of Michigan

12  is it that you live and work?

13  A.   Southeastern Michigan, in the -- I live -- work in

14  Detroit metro, and then the far reaches of the Oakland

15  County suburb is where we live.

16  Q.   What are your responsibilities as the chief

17  technology officer for Web Elite?

18  A.   I'm responsible for basically all the technical

19  aspects of the company with regard to software

20  development, specifying and procuring equipment, and

21  responsible for the technical staff.

22  Q.   Did you previously work for General Motors?

23  A.   Yes, I did.

24  Q.   For how long?

25  A.   A little over five years, I believe.

1   Q.   When was that?

2   A.   Starting in 1981, and about 1986 is when I left

3   there.

4   Q.   When you first went to GM, was that on a fellowship?

5   A.   No, I was hired out of my bachelor's degree to

6   Pontiac Motor Division, their engineering facility, and

7   then I went to MIT on a General Motors fellowship.

8   Q.   So your master's in mechanical engineering was

9   through a General Motors fellowship?

10  A.   That's correct.

11  Q.   When did you receive that?

12  A.   1985.

13  Q.   After General Motors, did you work for a company

14  called Mechanical Dynamics?

15  A.   Yes, but not directly after General Motors.  I

16  worked for a company called Schlumberger CAD/CAM,

17  formerly known as Applicon, prior to going to Mechanical

18  Dynamics.

19  Q.   In what period of time did you work for Schlumberger

20  CAD/CAM?  And I will also ask you to spell Schlumberger.

21  A.   Oh.  Schlumberger is S-C-H-L-U-M-B-E-R-G-E-R, I

22  think.  I'm pretty sure.  And I left General Motors, and

23  I'm guessing now, around 1986-87 and worked there for

24  approximately two years, and went to Mechanical Dynamics,

25  I believe, in 1989.  I think that's correct.

1   Q.   What was your position at Mechanical Dynamics?

2   A.   First I was hired in as an engineering supervisor,

3   and then ultimately was promoted to vice president of

4   product development.

5   Q.   During the time you were at Mechanical Dynamics, did

6   that company go public?

7   A.   Yes, it did.

8   Q.   Were you involved in that?

9   A.   Yes, I was.

10  Q.   What was your role in that?

11  A.   I was just a company officer, so I did get involved

12  in some of the vetting.  At the time that they were going

13  public, they were also seeking to be acquired privately.

14  And so when underwriters or other companies would come

15  in, I would be part of the interview process, I guess, if

16  you would call it that.

17  Q.   Was Mechanical Dynamics a corporation?

18  A.   Yes.

19  Q.   To your knowledge, did it have a tax identification

20  number?

21  A.   I believe it did.

22  Q.   After -- when did you leave Mechanical Dynamics?

23  A.   1998, I think.

24  Q.   Where did you go after leaving Mechanical Dynamics?

25  A.   I, for all intents and purposes, tried to retire and

1   became a private consultant.

2   Q.   How old were you in 1998 when you tried to retire?

3   A.   Forty years old.

4   Q.   How was it that you at least had the apparent

5   opportunity to retire at such a young age?

6   A.   Having worked for Mechanical Dynamics for nearly ten

7   years, I had acquired stock through stock options and

8   various other things, and then just general investing.

9   Q.   Had you been able to amass a fair amount of savings

10  as a result?

11  A.   Yes.

12  Q.   Approximately how much?

13  A.   It varied and fluctuated with the stock exchange,

14  but at times it was on the order of $2 million.

15  Q.   Approximately how much of that was tied up in stock

16  in Mechanical Dynamics?

17  A.   Probably three-quarters.  At least three-quarters.

18  And I'm guessing at that.

19  Q.   Did there come a time that you needed to return to

20  work?

21  A.   Yes.

22  Q.   When was that, approximately?

23  A.   Probably 2001, around about.

24  Q.   About how long were you in retirement, if you will?

25  A.   So about two or three years.

1  Q.   Are you familiar with something called Neighborhood

2  Holdings?

3  A.   Yes.

4  Q.   Please explain to the jury what Neighborhood

5  Holdings is.

6  A.   Neighborhood Holdings is a pure trust organization

7  that was formed based on an affiliation with a company

8  called Innovative Financial Consultants.

9  Q.   Let me just -- we'll take it one step at a time in

10  pieces.

11  A.   Okay.

12  Q.   You mentioned Innovative Financial Consultant?

13  A.   Yes.

14  Q.   Was that also called IFC?

15  A.   Yes.

16  Q.   When did you first become aware of IFC?

17  A.   I think late -- sometime in the time frame -- the

18  end of 1998 and in 1999.

19  Q.   Would that about -- be about the same time as when

20  you were retiring?

21  A.   It was a few months after that, several months after

22  that, in fact.  Maybe up to ten months, maybe.

23  Q.   What was it that IFC purported to sell or have?

24  A.   They helped people do estate restructuring and

25  helped people structure their -- their claim was to help

1  people structure their estates in a means that would be

2  favorable from a tax standpoint.

3  Q.   And in what sense did they say it would be favorable

4  from a tax standpoint?

5  A.   That you could legally transition your life into the

6  use of pure trust organizations and then legally avoid

7  paying taxes.

8  Q.   Was there anything about whether or not you would be

9  individually filing tax returns with respect to IFC?

10 A.   I don't understand the question.

11 Q.   As part of moving your assets into a pure trust

12 organization, were any representations made about whether

13 or not the individual would have to continue filing tax

14 returns?

15 A.   If the individual had assets or income that required

16 them to do that, then, you know, that was the whole point

17 of the pure trust organization, is to structure your life

18 in such a way that that would not be a necessity.

19 Q.   Did you follow their advice?

20 A.   Yes, I did.

21 Q.   Did you believe the information that the people from

22 IFC told you?

23 A.   Not immediately.  I did my own investigation based

24 on the information that was presented, and I came to that

25 belief, yes.

1    Q.   Do you know what happened to IFC?

2    A.   The principals of that company were indicted for

3    defrauding the U.S.

4    Q.   Do you know what happened after the indictment?

5    A.   They were -- I think they were all convicted on a

6    variety of counts from that indictment.

7    Q.   Do you recall where the principal -- first of all,

8    do you recall any of the names of the principals?

9    A.   Poseleys were involved, I believe.  John, Dennis,

10   Mark, and then there were other individuals that worked

11   for them.

12   Q.   Are you familiar -- let me ask this:  Does

13   Neighborhood Holdings still exist?

14   A.   The contract still exists, yes.

15   Q.   Is there anything still in Neighborhood Holdings?

16   A.   Nothing substantial.  I mean, I don't believe that

17   there was -- the process was concluded to remove

18   absolutely everything, but it was like inconsequential

19   things, like household furniture and things like that.

20   Q.   When is the last time you had anything to do with

21   the entity Neighborhood Holdings?

22   A.   That probably would have been around 2004-2005 time

23   frame.

24   Q.   I'll ask you now if you're familiar with an entity

25   by the name of Global Prosperity?

PATRICK TURNER - DIRECT BY MR. O'REILLY                    1414

1    A.   Yes.  That was the mechanism through which I was
2    introduced to IFC.
3    Q.   Did you end up losing money as a result of IFC?
4    A.   Oh, yes.
5    Q.   How much?
6    A.   Pretty much all of my retirement, all of my liquid
7    assets.  I wouldn't say that it was all.  That's
8    inaccurate to say that it was all based on the
9    association with IFC.  It's more accurate to state that
10   it was based on the association with Global Prosperity
11   and the entities that they represented.
12   Q.   What entities did Global Prosperity represent other
13   than IFC?
14   A.   Global Prosperity brought in a variety of different
15   investment vehicles and other products, if you will, that
16   people could learn about and then participate in if they
17   so chose.  So the majority of the assets that were lost
18   were based on investments and other vehicles that were
19   not associated with IFC.
20   Q.   Instead, they were associated with Global
21   Prosperity?
22   A.   Or at least given venue to present themselves
23   through Global Prosperity.
24   Q.   Do you know what -- did you go to any of the Global
25   Prosperity presentations?

1    A.   Oh, yes.  Several of them, in fact.

2    Q.   Did you believe what was presented at the Global

3    Prosperity meetings?

4    A.   To a large extent.  I mean, there were things there

5    that were not credible after, you know, looking at them

6    closely.  But there were -- global seminars, there were

7    literally several thousand people that went to these

8    events.  And so, you know, to a person who'd been just an

9    engineer, that in and of itself lended credibility to

10   many of these offerings.

11   Q.   Do you know what, if anything, happened to the

12   principals at Global Prosperity?

13   A.   I believe they were indicted.  That's less clear to

14   me.  I know that they were in trouble; let's put it that

15   way.

16   Q.   Do you know what they were in trouble for?

17   A.   Not with any certainty, sir.  I'm sorry.

18   Q.   Do you know an individual by the name of Lindsey

19   Springer?

20   A.   Yes.

21   Q.   Do you know an individual by the name of Oscar

22   Stilley?

23   A.   Yes.

24   Q.   Okay.  And just to be clear, neither Mr. Stilley nor

25   Mr. Springer got you into IFC, did they?

1   A.   No, absolutely not.

2   Q.   They didn't get you into Global Prosperity either,

3   did they?

4   A.   They did not, no.

5   Q.   Do you recall approximately when -- well, do you

6   recall which of those two names first became familiar to

7   you?

8   A.   Lindsey Springer first became.

9   Q.   Do you recall approximately when Mr. Springer's name

10  became familiar to you?

11  A.   It was about mid 2003, about the same time that the

12  IFC principals were indicted.

13  Q.   How did you first learn of the name Lindsey

14  Springer?

15  A.   The IFC group had Thursday night conference calls to

16  support managing directors.  And managing directors is a

17  position that is held by people who utilize the pure

18  trust organizations.  And after the IFC principals became

19  -- were indicted, there was a bit of disarray, even

20  though the calls were still being made.  And a friend of

21  mine told me about this guy that started talking on the

22  IFC conference calls and that I should listen to him.

23  Q.   And was the name that was mentioned to you Lindsey

24  Springer?

25  A.   Yes.  Yes.

PATRICK TURNER - DIRECT BY MR. O'REILLY                    1417

1   Q.   You used the term "managing director"?

2   A.   Yes.

3   Q.   Could you please explain to the jury, what was a

4   managing director?

5   A.   The structure of a pure trust organization included

6   several important positions, and managing director was

7   one of them.  There was typically two or more trustees, a

8   protector trustee, and then a managing director who

9   managed the day-to-day activities of the pure trust.

10  Q.   Were you a managing director?

11  A.   Yes.

12  Q.   For what entity or entities were you a managing

13  director?

14  A.   Neighborhood Holdings and Friendship Enterprises.

15  Q.   As a result of your friend's recommendation, did you

16  listen to Mr. Springer on these teleconference calls?

17  A.   Yes, I did.

18  Q.   Would that have been about the same time, middle of

19  2003?

20  A.   Yeah, right around the middle of 2003.

21  Q.   With respect to the people that had been involved

22  with IFC that were managing directors or whatever their

23  affiliation was, was it somewhat of a common theme that

24  they had not filed individual income tax returns?

25  A.   That would be speculation on my part, but, I mean --

1  so probably -- I really -- that was something that was

2  assumed but never talked about.  Okay?  I mean, that's as

3  direct an answer as I can give.

4  Q.   When you say "assumed but never talked about," can

5  you please explain what you mean by that?

6  A.   Well, one of the major tenets of what IFC presented

7  was that it allowed you to legally not have to pay taxes.

8  Q.   And was part of that also, according to IFC, legally

9  not having to file tax returns?

10 A.   Yes.

11 Q.   Did you follow that advice yourself?

12 A.   I did.

13 Q.   For what years?

14 A.   '99, 2000 and 2001, I believe.

15 Q.   Did Mr. Springer speak with respect to what people

16 had been told by IFC and that they didn't have to file

17 tax returns?

18 A.   He did speak to that topic.

19 Q.   What did Mr. Springer say?

20 A.   That he advised people to get back to the

21 relationship that they had with the government prior to

22 being introduced to IFC.  Not that he disagreed with what

23 they were doing or what they were doing was bad, but what

24 IFC did not do was prepare people on what they were in

25 for by following that advice.

1  Q.   But Mr. Springer, I think you said, said get back to

2  what you were doing before IFC?

3  A.   Right.

4  Q.   What did you understand that to mean?

5  A.   It meant -- for me personally, it meant if you were

6  filing tax returns before you met IFC, you should file

7  them again.

8  Q.   Approximately, and I realize it's been a long time,

9  how many or how often -- let's strike that.  How many of

10 these teleconference calls did you listen to?

11 A.   Oh, geez.  Well, frankly they've never stopped, so

12 to this day we still have a Thursday night conference

13 call.

14 Q.   Are you still participating?

15 A.   Yes, I am.  They at one point did stop becoming --

16 being affiliated with anything to do with IFC or managing

17 directors for IFC.

18 Q.   When did the telephone conference calls -- first of

19 all, let me ask this:  With respect to Mr. Springer, what

20 was his role in these teleconference calls?

21 A.   At first he was just a participant, someone that was

22 there trying to make some sense out of the chaos that was

23 happening as a result of the indictment of IFC.  And,

24 frankly, it turned in to "Let's Pick on Lindsey Show"

25 because he was advocating something that most of the

1   people or many of the people on that call completely

2   disagreed with.

3   Q.   What was Mr. Springer advocating that most of the

4   people on the calls disagreed with?

5   A.   As I stated, getting your relationship with the

6   government back to the way it was prior to meeting IFC.

7   Now, if that was filing taxes, then file taxes.  If that

8   wasn't filing taxes, then just basically -- and, again, I

9   want to emphasize, you know, and he emphasized at the

10  time that it wasn't that he disagreed with what IFC was

11  saying or what they asked people to do, but it was more

12  that the people were for the most part inadequately

13  prepared and that the IFC people were no longer going to

14  be there to be able to support them.

15  Q.   What were the people inadequately prepared for?

16  A.   The reaction of the government for taking the

17  posture of -- that IFC advocated.

18  Q.   During the -- these teleconference calls, I guess

19  they continue to this day?

20  A.   Right.  But, again, now they're more affiliated

21  directly with Lindsey -- well, no.  They are affiliated

22  directly with Lindsey and not with IFC.

23  Q.   When did they cease to be affiliated with IFC?

24  A.   I don't remember a specific date, but it was months

25  after -- or a couple of months after I originally heard

1   him speak on that conference call.

2   Q.   So that still would have been in the year 2003, but

3   later in the year?

4   A.   That's my recollection, yes.

5   Q.   During these teleconference calls -- and

6   specifically I want your focus during the years 2003

7   through 2005.

8   A.   Okay.

9   Q.   Would Mr. Springer ask people for money?

10  A.   He would ask for donations for his ministry, yes.

11  Q.   Did Mr. Springer explain what he was going to do

12  with the money?

13  A.   He -- the mission of his ministry was to get rid of

14  the IRS.

15  Q.   Did Mr. Springer explain on the phone calls how he

16  would get rid of the IRS?

17  A.   Yes.  And this kind of goes to why he gave people

18  the advice -- the IFC people the advice he did.  He said

19  basically you have to do it from the inside.  You have to

20  basically be involved in what the IRS is and what it

21  represents.  You can't just defy and walk away and expect

22  that to change anything in a productive manner.

23  Q.   And you said you recognized the name Oscar Stilley?

24  A.   Yes.

25  Q.   How is it that you recognize the name Oscar Stilley?

1   A.   When I asked Lindsey for a reference, Oscar's name

2   was one of the names that he gave me.  And I have

3   since --

4   Q.   Let me just ask this:  When did that happen?

5   A.   That would have been about that same time, mid 2003.

6   Q.   And I'm sorry.  I interrupted you.  What were you

7   going to say?

8   A.   And then I had been at court proceedings where Oscar

9   was an attorney and spoke briefly with him at that time.

10  And then when we set up the loan with Lindsey, Oscar was

11  involved.

12  Q.   And we'll get to the loan in a minute.  Did

13  Mr. Stilley ever speak on those teleconference calls, to

14  your recollection?

15  A.   If he did, it was only just brief -- maybe once, but

16  much later.

17  Q.   Approximately when?

18  A.   And, again, this is just a recollection.  It may --

19  I may not -- it may have been someone else.  But I -- it

20  was within the last couple years.  And it was to talk

21  about a specific case that was currently going on or had

22  just transpired or whatever.

23  Q.   You said that you went and saw Mr. Stilley in court?

24  A.   Yes.

25  Q.   Do you recall what trial or trials?

1  A.   I'm sure it either had to do with him personally or

2  it had to do with -- probably was just when it had to do

3  with him personally, because I believe he wasn't --

4  Q.   Okay.  I don't want you to go into any details of

5  what it was.

6  A.   Okay.  Okay.

7  Q.   Did you ever see him representing anybody in court?

8  A.   I don't think so.  I don't think so.

9  Q.   Did you ever go to any trials where Mr. Springer was

10  present?

11  A.   Yes.

12  Q.   Which trials?

13  A.   The Ouwenga trial.  That's the one I recollect

14  primarily, was the Ouwenga trial.

15  Q.   Where -- was that of the husband and wife, Andrew

16  and Karen Ouwenga?

17  A.   Yes, it was.

18  Q.   What was Mr. Springer doing while you were present

19  during the Ouwenga trial?

20  A.   What I could determine, performing his ministry.

21  Q.   What was he doing, not -- I don't want you to

22  characterize.  I mean, was he talking to the attorney?

23  What was he doing?

24  A.   Yes, he would confer with the attorney.

25  Q.   Which attorney?

1  A.   Jerry Barringer.

2  Q.   And who was Jerry Barringer to your understanding?

3  A.   Jerry Barringer was and is an attorney that

4  represents people specifically in tax cases.

5  Q.   Who was he representing in that case?

6  A.   Mrs. Ouwenga.

7  Q.   Do you know what Mr. Springer does to put food on

8  the table?

9  A.   He has a ministry called Bondage Breakers Ministry.

10  Q.   How is it you know that?

11  A.   Basically that was what was described when I first

12  met him in 2003.

13  Q.   Who described that?

14  A.   He did.

15  Q.   What was your understanding of what Bondage Breakers

16  Ministry purported to do?

17  A.   As I mentioned before, the mission was largely in --

18  you know, working with people that had issues with the

19  IRS.  And the ultimate mission of the ministry is to get

20  rid of the IRS.

21  Q.   Would Mr. Springer, as part of that, help people who

22  had particular problems with a tax case, for example?

23  A.   Yes, he would.

24  Q.   In fact, did there come a time that you were

25  concerned about tax problems for yourself?

1   A.   Yes.  As a result of not filing in '99, 2000, 2001,

2   I came under criminal investigation by the IRS.

3   Q.   How did you learn that?

4   A.   The CID agent, criminal investigation division

5   agent, came to my home, sent me a letter and told me that

6   I was under investigation.

7   Q.   When you say came to your home, did he knock on the

8   door, or what happened?

9   A.   Actually, I wasn't there at the time; my wife was.

10  But he left his business card with my wife.

11  Q.   I just want to step back to Bondage Breakers

12  Ministry for a minute.

13  A.   Okay.

14  Q.   Do you know if Bondage Breakers Ministry is a

15  501(3)(c) organization?

16  A.   I don't -- no, I know that it is not.

17  Q.   How do you know that it is not?

18  A.   Because when I provided donations to the ministry,

19  Lindsey specifically told me that they were not tax

20  deductible.

21  Q.   Are you familiar with a case involving an individual

22  by the last name of Hovind?

23  A.   Yes.

24  Q.   How did you become familiar with that case?

25  A.   On the Thursday night conference calls that Lindsey

```
 1   held.
 2   Q.   Did Mr. Springer speak about that?
 3   A.   Yes.
 4   Q.   Did Mr. Springer indicate whether or not he was
 5   assisting the Hovinds?
 6   A.   It's hard to say.  I know that, you know, he spoke
 7   about certain documents and things like that, writing
 8   certain documents, but the level of his direct
 9   involvement was not clear.  But he would discuss in fair
10   amount of detail what was happening with the case and the
11   circumstances that happened at various steps in the case.
12   Q.   Did Mr. Springer seem to have a fairly high
13   knowledge of what was going in that case?
14   A.   Absolutely.
15   Q.   And if I could have Government's Exhibit 57, which
16   is already in evidence, published to the jury, and
17   specifically the one -- the check that's related to the
18   Hovinds.  The bottom one.  Are you familiar with the name
19   Creation Science Evangelism?
20   A.   I believe that that was the organization that
21   Mr. Hovind was -- represented or was part of or --
22   Q.   How much is that check for?
23   A.   $10,000.
24   Q.   What is the date on that check?
25   A.   11/1/2006.
```

1   Q.   When you first reached out -- let me ask this a

2   different way.  After listening to the teleconference

3   calls, did you actually reach out and try to speak with

4   Mr. Springer directly?

5   A.   Yes.  Yes, I did.

6   Q.   When was that?

7   A.   Probably June, around the time of -- yeah, June

8   2003.

9   Q.   Was this before or after the IRS special agent left

10  a business card on your door, if you recall?

11  A.   I can find out.  I can refer to a note that I have

12  here.

13  Q.   You have a note up there that might help refresh

14  your recollection?

15  A.   Yes.

16        MR. O'REILLY:  Your Honor, may I have a brief

17  moment?  Is that okay?

18        MR. SPRINGER:  No objection with me, Your Honor.

19        MR. O'REILLY:  Yes, you may take a look.  Simply

20  read it and then see if that refreshes your recollection,

21  sir.

22  Q.   (BY MR. O'REILLY)  And while you're looking at that,

23  is that some notes that you have personally?

24  A.   Yes.

25  Q.   Is that anything I've seen?

1  A.   Probably not, because I wrote them at the hotel last

2  night.  Yeah, that was 9 --

3  Q.   No, what I want you to do -- does that refresh your

4  recollection?

5  A.   Yes, it does.

6  Q.   When was that, sir?

7  A.   9/18/02 is when Ellory visited my home.  So it was

8  after Ellory had visited my home and after Ellory had

9  sent me a letter telling me I was under investigation.

10 Q.   Were you guided in reaching out to Mr. Springer based

11 upon listening to the teleconference calls?

12 A.   Yes.

13 Q.   When you called Mr. Springer, did you explain the

14 situation you were in?

15 A.   To the extent that I could on the phone, yes.

16 Q.   Was it a relatively brief conversation on the phone?

17 A.   Yes, I would say so.

18 Q.   Did you follow that up by taking any additional

19 steps to meet with Mr. Springer?

20 A.   Yes.  Well, first thing I did is I created a box of

21 stuff, all my correspondence with the IRS, all the

22 information that I had been provided from -- with IFC and

23 Global, and I sent that to Mr. Springer.  And then I made

24 an arrangement to meet him.  I was flying out to

25 California, so I made arrangements to meet him after that

1    in Oklahoma at the Oklahoma airport.

2    Q.   Did you, in fact, meet with Mr. Springer at the

3    Oklahoma airport?

4    A.   Yes, I did.

5    Q.   Was that here in Tulsa?

6    A.   Yes, it was.

7    Q.   Do you recall approximately when that was?

8    A.   That was August 8, in fact, of 2003.

9    Q.   Okay.  I'm going to ask you now -- and you should

10   have in front of you a binder that contains Government's

11   Exhibit 221 for identification.

12   A.   Just leaf through this?

13          MR. O'REILLY:  Your Honor, if I may approach?

14          THE COURT:  You may.

15   Q.   (BY MR. O'REILLY)  Okay.  And, sir, I think you

16   stated that you believe that the meeting with

17   Mr. Springer was on August 8 of 2003 at the Tulsa

18   airport?

19   A.   Correct.

20   Q.   Do you recognize what's been marked for

21   identification as Government's Exhibit 221?

22   A.   Yes.  It's a check that we wrote, my wife and I, to

23   Lindsey Springer for $1,000, and it's dated 8/7/2003.

24   Q.   Did you provide that check to Mr. Springer?

25   A.   I did.

PATRICK TURNER - DIRECT BY MR. O'REILLY                    1430

1        MR. O'REILLY:  Your Honor, the government move
2  Government's Exhibit 221 into evidence.
3        MR. SPRINGER:  No objection, Your Honor.
4        THE COURT:  221 is received.
5  Q.  (BY MR. O'REILLY)  Did you provide Mr. Springer with
6  this check when you met with him?
7  A.   No.
8  Q.   Was that something you provided earlier or later?
9  A.   Yes, it was in the box of information that I had
10 sent to him prior to leaving on my trip.  I mean, I sent
11 it the day before.
12 Q.   Okay.  I was trying to figure out how it could have
13 been that -- so it was the day before?
14 A.   The day before.  I mean, I was going to be away for
15 an extended business trip, and I wanted to get that
16 information in his hands as quickly as possible.
17 Q.   I'm now going to ask if you could look at what's in
18 evidence already as Government's Exhibit 222, which is a
19 letter, I believe, dated August 8 of 2003.  Do you
20 recognize that letter?
21 A.   Yes.  I -- well --
22 Q.   If you need to take it out of the folder, you may,
23 if it's --
24        MR. O'REILLY:  Your Honor, may I approach?
25        THE COURT:  You may.

1   Q.   (BY MR. O'REILLY)  Do you recognize that document,

2   sir?

3   A.   Yes.

4   Q.   Just generally, can you describe what that document

5   is to the jury?

6   A.   Lindsey had been talking that he thought that --

7   Q.   Just -- where was he talking?

8   A.   On the conference calls.

9   Q.   Okay.

10  A.   Had been talking that he thought that his mission

11  had reached as far as it was going to reach and that he

12  wanted to move kind of to the next phase of his ministry,

13  and that was being able to impact the same kinds of

14  topics in a more-public venue.

15  Q.   Was that more-public venue by playing golf?

16  A.   Yes.

17  Q.   Is this a draft of a letter that he had sent to you?

18  A.   Yes.

19  Q.   Why had he sent you this letter?

20  A.   He wanted me to read it over and tell him what I

21  thought.

22  Q.   Did you have a discussion with respect to that?

23  A.   Only brief discussions that basically I expressed my

24  opinions about it in what was this edited copy.

25  Q.   What was your purpose in stopping at the Tulsa

1   airport to meet with Mr. Springer?

2   A.   Basically Judge Rizzo and Dennis Poseley --

3   Q.   Let me just -- for -- please identify for the jury

4   who those people are.

5   A.   These are the people that had helped me get myself

6   into the position that I was in that caused the criminal

7   investigation.  And basically they said that they would

8   be there in that eventuality and help navigate that

9   situation and be of support.  Well, the first thing that

10  happened is that they started fighting amongst

11  themselves, and the last eventuality was, is that they

12  just left me high and dry to deal with the situation

13  as -- on my own.

14  Q.   So why is it that you were meeting -- what did

15  Mr. Springer have to do with Judge Rizzo and Mr. Poseley?

16  A.   By the time I had heard him on the conference call,

17  he was basically talking about the people that had, you

18  know, subscribed to what they had provided and that

19  strategies for dealing with that situation, exactly what

20  I had been hoping, praying -- literally praying for.  So

21  he was really an answer to a prayer, quite frankly.

22  Q.   When you met with him, were you hoping that

23  Mr. Springer could help you?

24  A.   Yes.

25  Q.   I'm going to ask you now to take a look --

1           MR. O'REILLY:  Your Honor, if I may approach the

2   witness?

3           THE COURT:  You may.

4   Q.   (BY MR. O'REILLY)  Mr. Turner, I'm going to ask you

5   to take a look at what's been marked for identification

6   as Government's Exhibit 223.  Do you see that?

7   A.   Yes.

8   Q.   Do you recognize that document?

9   A.   Yes, I wrote it.

10  Q.   You wrote it.  When did you write it?

11  A.   The morning -- that morning, August 8, 2003.

12  Q.   What was the purpose of writing this letter?

13  A.   I knew that I only had a brief time to meet with

14  Lindsey at the airport, and so I wanted to document the

15  things that I wanted to talk to him so that he had a

16  chance to basically absorb it and to reflect upon it so

17  that our meeting would be a productive one.

18  Q.   Did you provide this document to Mr. Springer?

19  A.   Yes, I did.

20          MR. O'REILLY:  Your Honor, the government move

21  Government's Exhibit 223 into evidence.

22          MR. SPRINGER:  No objection, Your Honor.

23          THE COURT:  223 is received.

24  Q.   (BY MR. O'REILLY)  On August 8, 2003, what did you

25  consider the $1,000 that you were giving to Mr. Springer?

1  A.   At that -- on that morning, on that day, I wanted to

2  make sure that he took the time to actually look at the

3  documents that I sent him.  And you have to understand

4  that everybody I had spoken to up to that point had their

5  hand out; it was all about the money.  And with

6  Mr. Ellory knocking at my door and issuing 20-some

7  summonses, I was in a pretty frantic state.  So I put

8  that check in there, basically unsolicited, to make sure

9  that he would take serious -- I mean, it was literally a

10 2-by-2-by-2 box of documents that he would look at.  And

11 so that, you know, we could get moving and --

12 Q.   I'll ask the question maybe a little bit different

13 way because I'm not quite sure you got to an answer to

14 the question.  On the morning that you -- on the day you

15 gave him the check for $1,000 that's in evidence as

16 Government's Exhibit 221 --

17 A.   Right.

18 Q.   -- what did you consider that payment to be with

19 respect to Mr. Springer?

20 A.   To look at the documents that I had put in the box.

21 Q.   So just for clarification, you were paying him

22 $1,000 so he would take the time to look through and

23 decide whether he could help you?

24 A.   But I want to make it clear, he didn't ask for that

25 money.

1  Q.   I understand.

2  A.   Okay.

3  Q.   In Government's Exhibit 223, the letter that you had

4  written that you gave to Mr. Springer?

5  A.   Yes.

6  Q.   I'm going to ask you to look at the second page of

7  that document, and specifically the first paragraph.  Had

8  Mr. Springer indicated that he would like you to give him

9  $32,500?

10  A.   Actually, yes, but for two different purposes of his

11  ministry.

12  Q.   Did you indicate in this letter that if you were to

13  give him money like that, that you expected something in

14  return?

15  A.   At the time, yeah, that's exactly what I said.

16  Q.   What did you expect in return?

17  A.   His assistance.

18  Q.   His assistance with what?

19  A.   My tax situation.

20  Q.   Did Mr. Springer provide you with assistance in your

21  tax situation?

22  A.   Not before clarifying the basis upon which he was

23  going to do that.

24  Q.   Mr. Turner, I'm going to ask you to answer the

25  questions, please, and not try to interject other

1  things.

2  A.   I'm just trying to be clear, sir.

3  Q.   Did Mr. Springer provide you assistance with your

4  criminal tax investigation?

5  A.   Yes, he did.

6  Q.   Did you end up giving Mr. Springer $32,500?

7  A.   Approximately.

8  Q.   In fact, you ended up giving Mr. Springer a lot more

9  money than that, did you not?

10 A.   No, sir.

11 Q.   With respect to --

12 A.   Well, maybe I didn't understand the question.  No.

13 No, that's an accurate answer.  No, I did not give him a

14 lot more than that.

15 Q.   Did you give Mr. Springer a quarter-million dollars?

16 A.   No, sir.

17 Q.   You did not cause a quarter-million dollars to be

18 transferred to Mr. Springer through Mr. Stilley's

19 attorney-client trust account?

20 A.   I loaned Mr. Springer.  I didn't give him anything

21 associated with that quarter-million dollars.  There is a

22 loan document that defines that relationship, so --

23 Q.   Did you cause a quarter-million dollars to be

24 transferred from you to Mr. Springer?

25 A.   Yes.

1  Q.   Did that go through Mr. Stilley's attorney-client

2  trust account?

3  A.   Yes, it did.

4  Q.   I'm going to step back to the $32,500.

5  A.   Yes.

6  Q.   Did you pay Mr. Springer $32,500?

7  A.   I donated Mr. Springer 32,000 -- well, on that

8  order.

9  Q.   Where did you first hear the term "donation" with

10 respect to payments or transfers of funds or assets to

11 Mr. Springer?

12 A.   On August 8, 2003.

13 Q.   Who told you that that's how it would be

14 characterized?

15 A.   Mr. Springer did.

16 Q.   And that was at the Tulsa airport?

17 A.   Yes, sir.  He made it very clear that that was the

18 only basis upon which he would have a relationship with

19 me.  And that's why there's no other document or contract

20 with regard to that money.

21 Q.   In what form did you get $32,500 to Mr. Springer?

22 A.   Yeah, that wasn't easy.  I had been trying to sell a

23 coin portfolio and was getting offers of much less than

24 50 percent of what I had originally had invested in that

25 portfolio.  But knowing what was coming from the activity

1  of Mr. Ellory, I knew that I would have to liquidate that

2  portfolio.

3  Q.   Why would you have to liquidate that portfolio, sir?

4  A.   Because I was going to need to defend myself in some

5  manner.

6  Q.   So what did you think you would need in order to

7  defend yourself?

8  A.   A lawyer, help of some kind.

9  Q.   So let me just -- so I understand this correctly,

10 you wanted to liquidate your coin portfolio so that you

11 would have money to hire an attorney?

12 A.   That was the initial rationale for trying to

13 liquidate the portfolio, yes.

14 Q.   With respect to that portfolio, how did Mr. Springer

15 come into the picture?

16 A.   Once I became clear of who he was and what he was

17 about and how he was -- worked with me, I mentioned -- I

18 told him of my willingness to support his ministry and

19 that that would be the means by which I would provide

20 funds to that.  And basically was expressing my

21 frustration at the loss that I was going to take on that

22 portfolio.

23 Q.   You said how "he" was going to work with me, "he"

24 being Mr. Springer?

25 A.   Yes.

1   Q.   How was Mr. Springer going to work with you?

2   A.   Basically, I would be part of his ministry.  It all

3   revolves around the fact that anything that I gave to him

4   had to be an unqualified donation.

5   Q.   Who said that?

6   A.   He did.

7   Q.   Why was that important to Mr. Springer, if you know?

8   A.   I didn't know then, but I understand now.

9   Q.   When did you learn?

10  A.   Basically throughout the conference calls and my

11  interaction with Mr. Springer.

12  Q.   Did you, in fact, send a portfolio of coins to

13  Mr. Springer?

14  A.   I did.  I did.

15  Q.   Did he, in fact, sell them?

16  A.   Yes, he did.

17  Q.   Do you know how much he got for them?

18  A.   Approximately 55,000 -- 50 to $55,000, something

19  like that.

20        MR. O'REILLY:  Your Honor, if we may have

21  Government's Exhibit 156 on the screen, which is already

22  in evidence.

23  Q.   (BY MR. O'REILLY)  I'm going to see if that

24  refreshes your recollection, sir.

25  A.   Okay.

1  Q.   Is that how much he got for the coins, $56,000?

2  A.   You know, sir, that's the first time I've seen that

3  check.

4  Q.   I'm just asking if it refreshes your recollection

5  about how much.

6  A.   Yeah.  That's approximately what it was, yes.

7  Q.   Let me just ask if we could show the witness what is

8  in evidence as Government's Exhibit 225, which is a

9  certificate of receipt of 36 numismatic coins.  I'm going

10  to ask you to take a look at that and see if those are

11  the coins that Mr. Springer liquidated on your behalf.

12  A.   Yes, they are.

13  Q.   Now, this was in September of 2003; is that correct?

14  A.   That's correct.

15  Q.   How much of the 56,000 did Mr. Springer keep?

16  A.   Approximately 32 -- between 32 and $33,000.

17  Q.   How did he get it back to you?

18  A.   He actually came to my home and provided the balance

19  of the money.

20  Q.   Did he give you a check?

21  A.   He gave me cashier's checks and cash.

22  Q.   Cashier's checks or money orders?

23  A.   I don't recall.

24       THE COURT:  Mr. O'Reilly, let me know when you

25  get to a convenient stopping point.

1      MR. O'REILLY:  Just one more question and then

2  I'll be.

3  Q.  (BY MR. O'REILLY)  In that same time period of 2003,

4  were you having financial problems?

5  A.  Yes.  Yes.  We were making ends meet, but, I mean,

6  from going from having a very large portfolio to having

7  it nearly exhausted, so, yeah, I guess we were in dire

8  straits.  Were my kids eating?  Yes, they were.

9  Q.  When you say "we," you mean you and your wife and

10  family?

11  A.  That's correct.

12  Q.  And your wife's name is Patricia?

13  A.  Yes, that's correct.

14  Q.  Could you please explain to the jury why, if you

15  were having financial trouble in 2003 and you were a

16  little stretched, you would give $32,500 to Mr. Springer,

17  who you've only met a few months before?

18  A.  Well, sir, to put it very bluntly, my family would

19  be better off to have me with them than in prison.

20      MR. O'REILLY:  This is a good time to stop, Your

21  Honor.

22      THE COURT:  Members of the jury, we'll take our

23  midday recess at this time.  Again, guided by the clock

24  on the wall, we will resume at 15 minutes after 1:00.  So

25  please be available just before 15 after 1:00 for the

```
 1   security officer to return with you to the courtroom.
 2   During this recess, of course, please do remember my
 3   usual admonition, which I will not repeat at this time.
 4   All persons in the courtroom will remain seated while the
 5   jury departs.
 6         (JURY EXITS THE COURTROOM.)
 7         THE COURT:  You may step down.  Exhibit 222 is
 8   in evidence, and for that reason, I don't suppose this is
 9   anything that it's absolutely necessary to address.  But
10   as the document indicates, this apparently is a version
11   of a letter initially drafted by Mr. Springer that
12   Mr. Snyder then -- or Mr. Turner, rather, then edited or
13   otherwise revised and sent back.  And at the top of the
14   first page, he says -- Mr. Turner says that he asked --
15   he has asked several questions that are highlighted in
16   yellow -- well, I'm assuming that those questions, or at
17   least most of them, are -- well, he asked -- there are
18   several places here where there's a question.  And down
19   about a quarter of the way down on the second page,
20   there's a suggestion, not a question, in brackets.  And
21   in roughly the same position on the next page, there's a
22   suggestion in brackets, and then there's some -- a
23   suggestion near the top of the next page in brackets.  Is
24   the bracketed information -- is that the information --
25   so far as the government understands, is that the
```

1   information that Mr. Turner added?

2           MR. O'REILLY:  That is the government's

3   understanding, Your Honor.  I can clarify that if the

4   Court feels I should.

5           THE COURT:  Well, I -- since this is a

6   communication back to Mr. Springer that apparently is a

7   revised version of something that Mr. Springer wrote, my

8   sense of it is that Mr. Springer should be accountable

9   only for that part that represents his comments,

10  thoughts, beliefs and so forth.  So perhaps that deserves

11  some clarification.  Anything else we ought to take up

12  before we recess?

13          MR. O'REILLY:  Nothing from the government, Your

14  Honor.

15          MR. SPRINGER:  Not at this time, Your Honor.

16          THE COURT:  Court will be in recess.

17      (A RECESS WAS HAD, AFTER WHICH THE FOLLOWING

18  PROCEEDINGS WERE HAD IN OPEN COURT AND WITHIN THE

19  PRESENCE AND HEARING OF THE JURY.)

20          THE COURT:  Let's see, have we just finished

21  direct examination or were you still in direct

22  examination?

23          MR. O'REILLY:  We are still in direct

24  examination.

25          THE COURT:  You may continue.

1  Q.   (BY MR. O'REILLY)  Mr. Turner, I'm going to ask you,

2  if you could, to take a look at what we've -- a document

3  we've already discussed, Government's Exhibit 222.  It

4  should come up on the screen for you, but you can also

5  look at it in there, whatever's easier for you.

6  A.   It's hard to see on there, so I'm going to pull this

7  copy out.

8  Q.   Could you just again describe to the jury, what is

9  Government's Exhibit 222?

10 A.   This was a proposed letter that Lindsey wrote and

11 asked me to take a look at it and give some feedback on

12 with -- and he was proposing to take his ministry into

13 the next phase, I guess, for lack of a better way of

14 stating it.

15 Q.   In this document, some of the material is in

16 brackets?

17 A.   Yes.

18 Q.   Specifically, I can draw your attention to the

19 second page, a statement that says, "Need more detail

20 about the circumstances of the stress."  Do you see that,

21 sir?

22 A.   What page is it on, sir?

23 Q.   I believe it's the second page.

24 A.   Yes.

25 Q.   My general question is, if the material is in

 1   brackets, was that something that you had added and were

 2   sending back to Mr. Springer with a request for

 3   additional material?

 4   A.   Yes.   Yeah, I mean, without going through and

 5   reading the whole document, I'll just -- but generally,

 6   yes.

 7   Q.   And if the material is not in brackets, was that

 8   material that came from Mr. Springer?

 9   A.   I'm going to say I assume so.

10   Q.   Please, sir, I do not want you to assume.   Take your

11   time and go through the document.

12   A.   Okay.   Should I read it, then?

13   Q.   Not read it out loud, but read it to yourself, yes.

14          THE COURT:   Or just scan it for the bracketed

15   items so that you can tell the jury whether the bracketed

16   items are yours or his.

17          THE WITNESS:   Well, I believe the bracketed

18   items, Your Honor, are mine.   But what I cannot

19   completely recollect is whether any unbracketed text in

20   here were things that I may have written.   But in

21   general, I would say that my comments were limited to the

22   bracketed items.

23   Q.   (BY MR. O'REILLY)   And if it wasn't in brackets,

24   generally that was from Mr. Springer?

25   A.   Correct.   That's correct.

1    Q.   Just put it back, yes, please, sir.

2         MR. O'REILLY:  Your Honor, may I approach?

3         THE COURT:  You may.

4    Q.   (BY MR. O'REILLY)  Mr. Turner, after you had met

5    with Mr. Springer, did there come an occasion that you

6    met with the special agent from the IRS?

7    A.   Yes.

8    Q.   What was your understanding of the purpose for

9    meeting -- first of all, let me ask this:  Do you recall

10   that special agent's name?

11   A.   Yeah, it was Joseph Ellory.

12   Q.   What was your purpose in meeting with Mr. Ellory?

13   A.   The purpose was to -- basically, all the documents

14   that I had previously given to Lindsey, plus additional

15   financial records, were packaged together and provided to

16   Mr. Ellory.  And so it was a meeting -- I believe it was

17   a meeting for -- in response to a summons.

18   Q.   Do you recall approximately when that meeting

19   occurred?

20   A.   I can tell you here.

21   Q.   Do you have something that will refresh your

22   recollection?

23   A.   Yes.  10/31/03.

24   Q.   Was that the first time that you had met with

25   Special Agent Ellory?

```
 1   A.    I believe it was, yes.

 2   Q.    Did you meet with Special Agent Ellory alone?

 3   A.    No, Mr. Springer was with me.

 4   Q.    And you said that you provided the same box of

 5   materials that -- to Mr. Ellory that you had gone over

 6   with Mr. Springer?

 7   A.    Right, plus additional.  Plus quite a bit

 8   additional.  I think there was actually two boxes of

 9   material provided to Mr. Ellory.

10   Q.    Just to refresh our recollections, what was in the

11   first box that you had gone over with Mr. Springer,

12   generally?

13   A.    Generally, it was the material that was provided to

14   me by Judge Rizzo, or former-Judge Rizzo.

15   Q.    Just for clarification, who was Judge Rizzo

16   affiliated with?

17   A.    Judge Rizzo had an organization.  I can't remember

18   the name of it, but he provided a package called the

19   Reliance Defense as well as another package called the

20   Millennium Package.

21   Q.    Was the individual you identify as Judge Rizzo

22   affiliated with IFC?

23   A.    No.

24   Q.    Was he affiliated with Global Prosperity?

25   A.    Only in the fact that it was that venue that allowed
```

1    him to present his, quote, unquote, products.

2    Q.   Do you know what, if anything, ever happened to

3    Mr. Judge Rizzo?

4    A.   The last thing I heard is that he was either

5    indicted or about to be indicted, and then I didn't hear

6    any more about him.

7    Q.   So, again, go a little bit more in detail of what

8    types of materials were in that box that you had

9    initially gone over with Mr. Springer.

10   A.   Okay.  So all the -- what I mentioned of the

11   Reliance Defense material, the Millennium Package

12   material, the trust handbooks and all of the summonses

13   that I had received from Mr. Ellory, and bank and credit

14   card financial information, as well as information about

15   the many investments that I had made with individuals

16   affiliated with Global Prosperity.  Basically, all

17   documents associated with what would be needed to prepare

18   tax returns.

19   Q.   And you said that when you met with Special Agent

20   Ellory, you had additional documents?

21   A.   Yes.

22   Q.   What -- can you describe generally what those were?

23   A.   They were more the financial stuff, the bank

24   records, the credit card records, et cetera.

25   Q.   Why did you provide all that material to Special

```
 1  Agent Ellory?
 2  A.   He requested it through a summons.
 3  Q.   You had received the summons prior to your meeting
 4  with Mr. Springer, correct?
 5  A.   Well, there was -- I'm sorry.  I can't -- there was
 6  like 20-some summonses, so when various ones came and
 7  didn't come, I don't have direct recollection.
 8  Q.   Was -- well, let me ask this:  For how long did your
 9  interaction with Special Agent Ellory continue, from what
10  time period?
11  A.   It went from -- first summons was on March 1, 2002,
12  and my last meeting with him was in January of 2006.
13  Q.   At your last meeting with Special Agent Ellory, did
14  he indicate whether or not you were going to be
15  criminally prosecuted?
16  A.   In fact, he had called me and asked me what I wanted
17  him to do with all the material I had given him, whether
18  I wanted it back or whether he wanted to just destroy
19  it.  And that really confused me, and I said -- I asked
20  him why would he be asking me such a question.  And he
21  said, You haven't received the letter yet?  Question
22  mark?  And I said, What letter?  And he said, Well, we
23  have ended our criminal investigation of you.  And so
24  that meeting was to get back all the material that I had
25  given him.
```

1   Q.   And that was in January of 2006?

2   A.   It was -- yes.  Yes.

3   Q.   And up to and through that point, had Mr. Springer

4   been helping you in your interaction with Special Agent

5   Ellory?

6   A.   In general, yes.

7   Q.   I'm going to ask you now if you can look at what's

8   in evidence as Government's Exhibit 226, which is a check

9   from Friendship Enterprises, check number 1422.  It

10  should come up on the screen, sir.  It's already in

11  evidence.  Payable to Bondage Breakers and dated April 8,

12  2004.  Do you see that check, sir?  It's in the amount of

13  $500?

14  A.   Okay.  Now that she's blown it up, yes.

15  Q.   Is that a check that you gave to Mr. Springer?

16  A.   It was a donation, yes.

17  Q.   Was this check given to Mr. Springer while he was

18  assisting you in your interactions with IRS criminal

19  investigations?

20  A.   I'm trying to make out the date.  2004?  It was in

21  that time frame, yes.

22  Q.   Now I'm going to ask you to look at what's in

23  evidence as Government's Exhibit 227, which is a check

24  from Friendship Enterprises, number 1446, payable to

25  Bondage Breakers, dated June 17 of 2004 in the amount of

1   $550.

2   A.   Yes.

3   Q.   Did you give this check to Mr. Springer?

4   A.   Yes, it was a donation.

5   Q.   Was this check given to Mr. Springer during the time

6   he was assisting you with your problem with the IRS?

7   A.   Yes.

8   Q.   Could you please explain to the jury what Friendship

9   Enterprises was?

10  A.   Friendship Enterprises was one of the trusts for

11  which I was a managing director.

12  Q.   Is that something that had to do with IFC?

13  A.   IFC was the group that helped me form that trust,

14  yes.

15  Q.   And is that -- was that trust formed based upon what

16  you understood from IFC when you formed it?

17  A.   Correct.

18  Q.   Did Friendship Enterprises have a tax ID number?

19  A.   We attempted to get one, but the IRS wrote us and

20  said that they wouldn't give us one.  I can't remember

21  the exact verbiage of why, but we did attempt to get one,

22  yes.

23  Q.   But there was no tax ID number ever associated with

24  --

25  A.   That's correct.

PATRICK TURNER - DIRECT BY MR. O'REILLY                    1452

1   Q.   I'm going to ask you now to look at what's in
2   evidence as Government's Exhibit 41, which is a
3   Friendship Enterprises check number 1472 payable to
4   Bondage Breakers in August of 2004 for $500.  Do you see
5   that check, sir?
6   A.   Yep.  Yes.
7   Q.   Did you give that check to Mr. Springer?
8   A.   Yes.
9   Q.   Was this a check you gave to him during the time
10  period he was helping you with your problems with the
11  IRS?
12  A.   That's correct.
13  Q.   I'm going to ask you now to look at Government's
14  Exhibit 228, which is a Friendship Enterprise check
15  number 1498 payable to Bondage Breakers in the amount of
16  $500 dated November 14 of 2004.  Do you see that check,
17  sir?
18  A.   Yep.
19  Q.   Did you give this check to Mr. Springer?
20  A.   Yes, I did.
21  Q.   Was this check given to Mr. Springer during the time
22  he was assisting you with your problems with the IRS?
23  A.   Yes.
24  Q.   Let me ask you now to take a look at what's in
25  evidence as Government's Exhibit 230, which is Friendship

1  Enterprises check number 1539, payable to Bondage

2  Breakers in the amount of $1,000 dated March 9 of 2005.

3  Do you see that check, sir?

4  A.   Not yet.  Yes.

5  Q.   Do you recognize that?

6  A.   Yes.

7  Q.   Is that a check that you gave to Mr. Springer?

8  A.   Yes.

9  Q.   Was this a check you gave to him while he was

10 assisting you with your problems with the IRS?

11 A.   Yes.

12 Q.   Let me ask you now to take a look at what's in

13 evidence as Government's Exhibit 231, which is a

14 Friendship Enterprises check number 1548, payable to

15 Bondage Breakers in the amount of $1,000, dated April 5

16 of 2005.  Do you see that check, sir?

17 A.   Yes.

18 Q.   Is this a check that you gave to Mr. Springer?

19 A.   Yes, it is.

20 Q.   Was this a check that you gave to him while he was

21 helping you with your problems with the IRS?

22 A.   Yes.

23 Q.   Were you required to sign a form for the special

24 agent to allow Mr. Springer to come and sit with you in

25 front of Special Agent Ellory?

1  A.   Actually, I think it was signed the day of the

2  meeting, yes.

3  Q.   And I'm going to ask you -- yeah, it's in evidence.

4  Government's Exhibit 229, which is a power of attorney --

5  IRS Form 2848, power of attorney, declaration of

6  representative.  And I believe it's dated December 20 of

7  2004.  Do you see that, sir?

8  A.   Okay.  I don't think this was with Ellory.  I think

9  that one was --

10  Q.   Is that for a different meeting with the IRS?

11  A.   Yes.

12  Q.   Okay.  But is this a form you signed?

13  A.   Yes, it is.

14  Q.   Why did you sign this form?

15  A.   Because the agents involved said that Mr. Springer

16  couldn't be in the room if I didn't fill one of these

17  out.

18  Q.   And you wanted Mr. Springer in that room?

19  A.   Actually, he requested to be there.

20  Q.   Who requested?

21  A.   Mr. Springer did.

22  Q.   Did you want him to be in there?

23  A.   Sure.  Absolutely.

24  Q.   And did you fill out a similar form with respect to

25  Special Agent Ellory?

1   A.   Yes.

2   Q.   Would that have been before or after this one?

3   A.   That would have been before this one.

4   Q.   During the time period that you were under criminal

5   investigation, which I think you said was as early as

6   2002?

7   A.   Correct.

8   Q.   Up to January of 2006, when you were aware that it

9   was over?

10  A.   Correct.

11  Q.   How much did you pay to Mr. Springer?

12  A.   I don't --

13  Q.   If you recall.

14  A.   I don't have the total in my head.  I could -- it

15  would take me a minute, but I could add it up.

16  Q.   Well, let me ask this:  We've already looked at a

17  number of checks?

18  A.   Yes.

19  Q.   And we looked at the coins that were sold.  Is there

20  any other payments that you recall that you would have

21  made during that time period?

22  A.   No.  And characterizing them as payments is -- kind

23  of bristles with me.  They were donations.

24  Q.   Was Mr. Springer helping you?

25  A.   Yes, he was, sir.

1  Q.   Okay.  Did you want him to help you?

2  A.   Yes.

3  Q.   Were you giving him money so that he would be able

4  to help you?

5  A.   I was giving him money to support his ministry.  And

6  so as a part of that, he helped me, but he also helped

7  many other people.  And Mr. Springer wasn't the only

8  group or individuals that I was giving money to.

9  Q.   Was there anybody else that you gave money to during

10  that time that was assisting you with the IRS criminal

11  investigation?

12  A.   Not to my recollection.

13  Q.   Let me ask you now if you can take a look --

14  A.   Oh, I'm sorry.  I'm wrong about that.  I paid an

15  accountant.

16  Q.   Well, you paid the accountant to prepare tax returns

17  for you, correct?

18  A.   Correct.  And provide advice.

19  Q.   Who suggested that you go to an accountant?

20  A.   Mr. Springer.

21        MR. O'REILLY:  Your Honor, may I have a moment?

22        THE COURT:  You may.

23  Q.   (BY MR. O'REILLY)  Let me ask you now to take a look

24  at what's in evidence as Government's Exhibit 232.  And,

25  actually, I'll ask you if you can to go in and get the

```
 1  hard copy of it.
 2          MR. O'REILLY:  And may I approach the witness,
 3  Your Honor?
 4          THE COURT:  You may.
 5          THE WITNESS:  232?  I'm going too far.
 6  Q.  (BY MR. O'REILLY)  Mr. Turner, is this a document
 7  entitled "contract loan gift agreement"?
 8  A.  Yes, it is.
 9  Q.  When was this document created?
10  A.  In July of 2005.
11  Q.  Whose idea was it to create this document?
12  A.  To create the -- it was a combination of mine and
13  Lindsey's.
14  Q.  Do you recognize that document?
15  A.  Yes, I do.
16  Q.  Is that, in fact, a copy of the agreement that was
17  between you and Mr. Springer memorializing the transfer
18  of a quarter-million dollars to you?
19  A.  Yeah.
20  Q.  I mean from you to him?
21  A.  Yep, loan agreement.
22  Q.  Was it July of 2005, sir?
23  A.  Yes.
24  Q.  In July of 2005, did you have a quarter-million
25  dollars in the bank?
```

1   A.   No, sir, I did not.

2   Q.   How did you come up with the wherewithal to loan or

3   give Mr. Springer a quarter-million dollars?

4   A.   I had to refinance my homes.

5   Q.   So you took out extra money against your homes?

6   A.   That's correct.

7   Q.   And it's homes, plural?

8   A.   There is a rental property that is adjacent to my

9   home.

10  Q.   So this is a loan -- were there one or two loans?

11  A.   Two.

12  Q.   So if I understand you correctly, there was a loan

13  taken out against your personal residence?

14  A.   Correct.

15  Q.   And another loan taken about against the rental

16  property that's immediately adjacent to your residence?

17  A.   Correct.   They were -- one was a refinance.

18  Q.   Why were you taking out a quarter-million dollars

19  more in -- against your homes in July of 2005?

20  A.   Seems pretty weird, huh?   Okay.   I can explain.

21  Once I met Lindsey and basically he advised me to get

22  right with Special Agent Ellory's investigation, I

23  proceeded to hire an accountant and have tax returns

24  filed.   And during that time, there were two or three

25  instances, even after some of the tax returns had been

1  filed, that Special Agent Ellory indicated that they were

2  still going to proceed with prosecution, which I told him

3  concerned me a great deal, but nonetheless, I was going

4  to, you know, proceed on the path that I had with getting

5  all the tax returns filed.

6  Q.   Let me just ask a quick question.  The tax returns

7  that you had prepared were for what years?

8  A.   '99, 2000, 2001 and 2002.

9  Q.   Do you recall how much income tax was reported on

10  those tax returns that you had prepared?

11  A.   Round number -- income?

12  Q.   Income tax.

13  A.   Income tax.  On the order of $125,000 or something

14  like that.  And, again, I'm just --

15  Q.   No, I understand, sir.  That's an approximation.

16  A.   Yeah.

17  Q.   And you filed those returns --

18  A.   I filed the returns, and so I want to get back to

19  answering your other question.

20  Q.   I'm sorry.  Let me ask you this, and then I will --

21  A.   Okay.

22  Q.   Were you able to pay the money that was reported as

23  owed when you filed those tax returns?

24  A.   There was a dispute on the amounts, so, no, I did

25  not pay the amounts on the tax returns.

1  Q.   Okay.  And then you said you wanted to finish your

2  answer on the other question?

3  A.   Yes.

4  Q.   Please do so.

5  A.   So on two occasions, I received letters from -- one

6  from Mr. Ellory, and then it was in June 17 of 2005 I

7  received a letter from the IRS stating that they were

8  making a criminal referral to the Department of Justice,

9  that they were going to recommend to the DOJ that I be

10 prosecuted criminally, even though all the tax returns

11 were in and current.  Now, during that same time frame, I

12 -- as I've previously testified --

13 Q.   Excuse me.  When you say "previously testified," are

14 you talking about here in this courtroom?

15 A.   Today.

16 Q.   Okay.  Thank you.

17 A.   I was going to criminal trials to understand what

18 happens to a person, what they go through.  And on two

19 occasions, I was in the hallway and U.S. Attorney Don

20 Davis made this comment:  "We left them with too much

21 money."  And that scared me to my very core.

22 Q.   Did you discuss that situation or that fear with

23 anybody?

24 A.   Yes.

25 Q.   Who?

1   A.   My wife, my accountant, Mr. Springer, my pastor.

2   Q.   Did any of those individuals -- well, let me ask it

3   this way:  Did Mr. Springer come up with an idea for a

4   course of action to take?

5   A.   No, sir.  I did.  I said that there has to be a

6   legal -- I had -- at that time, I had no tax liens or

7   anything like that on any of my assets.  And I said --

8   Q.   Were you concerned that you would have tax liens

9   placed on your assets?

10  A.   Based on the comment from Don Davis, absolutely,

11  sir.  Absolutely.

12  Q.   Do you know as you sit here today how much you owe

13  in taxes, specifically for the years '99, 2000 and 2002

14  and 2003?

15  A.   The amounts vary based on what document from the IRS

16  you look at.  So, frankly, no.

17  Q.   Do you have a rough idea of how much?

18  A.   The only consistent answer that I can give are the

19  amounts that were shown on the returns themselves.

20  Q.   But you still haven't paid those amounts?

21  A.   Because they are --

22  Q.   Have you paid those amounts?

23  A.   No, I have not.

24  Q.   Okay.

25  A.   They are still in litigation, sir.

PATRICK TURNER - DIRECT BY MR. O'REILLY                         1462

1   Q.   So while you owed the IRS admittedly, according to

2   the returns you filed, how much money?

3   A.   On the order of $125,000.

4   Q.   And this was before you entered into this agreement

5   with Mr. Springer; is that correct?

6   A.   That's correct.

7   Q.   You then agreed with Mr. Springer to do something

8   about this; is that correct?

9   A.   Right.   That's correct.

10  Q.   When you applied to the mortgage company for these

11  -- the refinancing --

12  A.   Yes.

13  Q.   -- did you indicate why you were refinancing the

14  homes?

15  A.   Absolutely, sir.

16  Q.   What did you indicate?

17  A.   I told them that I had a potential tax issue that I

18  was going to have to deal with and I needed to take

19  equity out of the houses.

20  Q.   And what date did you take the equity out of the

21  houses?

22  A.   It was on the order of the time frame of this loan,

23  within the month or two prior to it.   Well, it was

24  probably about exactly that time, within a month, because

25  that's when the criminal referral came from the IRS.

```
 1  Q.   Let me ask you if you can --
 2            MR. O'REILLY:  Your Honor, may I approach the
 3  witness?
 4            THE COURT:  You may.
 5  Q.   (BY MR. O'REILLY)  Mr. Turner, I've handed you
 6  what's been marked for identification as Government's
 7  Exhibit 241.  Do you recognize that?
 8  A.   Yes, sir.
 9  Q.   Just generally, can you describe to the Court, what
10  is Government's Exhibit 241?
11  A.   It's a loan application.
12  Q.   Is it a loan application with respect to what we've
13  been talking about earlier?
14  A.   Yes.
15            MR. O'REILLY:  Your Honor, the government would
16  move Government's Exhibit 241 into evidence.
17            MR. SPRINGER:  No objection, Your Honor.
18            THE COURT:  It is received.
19  Q.   (BY MR. O'REILLY)  Does this indicate that the loan
20  was taken out on July 5 of 2005?
21  A.   Yes.  Yes.
22  Q.   What -- was it a finance company or what was it that
23  extended the loan to you?
24  A.   Finance company.
25  Q.   Did they charge interest on that?
```

1   A.   Yes, they did.

2   Q.   What was the interest rate, if you recall?

3   A.   I don't recall offhand, sir.

4   Q.   Just an approximate figure.  I don't --

5   A.   Six or 7 percent, something like that.

6   Q.   Have you been making the payments on the loan?

7   A.   Absolutely.

8   Q.   Is the loan still outstanding?

9   A.   Yes, it is.

10  Q.   After you had borrowed the money and taken the

11  equity out of your homes --

12  A.   Yes.

13  Q.   -- what did you do with the funds that you received?

14  A.   I transferred them -- we wanted to make this as out

15  in the open as possible.

16  Q.   Who is "we"?

17  A.   Lindsey and I.

18  Q.   Okay.

19  A.   Wanted to make this as out in the open as possible.

20  So we thought we would put a lawyer, Oscar, in the middle

21  of the transaction and do a funds transfer from me into

22  an escrow account with Oscar that has legal scrutiny

23  placed on it.

24  Q.   Let me ask this:  When you say an escrow account,

25  was it an escrow account or was it an attorney-client

1  trust account?

2  A.   That was my terminology.  Quite frankly, I didn't

3  know exactly how to characterize it.

4  Q.   Whose idea was it to send it to Mr. Stilley?

5  A.   I don't recollect.  I'm sorry.

6  Q.   Let me ask this:  Did sending it to Mr. Stilley, who

7  is an attorney, make it appear that the payment was, in

8  fact, an attorney retainer?

9  A.   No, sir.  Not to me, it didn't, because of the loan

10 contract.

11 Q.   Was the loan contract filed in any public forum?

12 A.   No, sir.

13 Q.   If somebody simply looked at the transfer, what

14 would it appear to them?

15 A.   I couldn't speculate, sir.  I'm sorry.

16 Q.   How did you find out the bank account information to

17 send these funds to?

18 A.   It was sent to me by Mr. Springer.

19 Q.   Okay.  I'm going to ask you if you could look at

20 what's in evidence as Government's Exhibit 233, which

21 should come up on the screen.  Is that a copy of the

22 e-mail account?

23 A.   Yes, sir, it is.

24 Q.   And that's in -- about one month later, August of

25 2005?

1  A.   Yes, it is.

2  Q.   Why didn't you simply send the money directly to

3  Mr. Springer?

4  A.   As I mentioned, my fear was that this was not an

5  out-in-the-open transaction, and so I wanted to make sure

6  that the loan company -- and there was somebody else

7  involved, preferably a lawyer, that was involved to make

8  sure that there was -- I mean, it's weird enough in and

9  of itself, just the reasons why I decided to do this.

10 But I wanted to make sure that it could not be cast as

11 something devious or hidden or something like that.

12 Q.   But if this is a loan from Patrick Turner to

13 Mr. Lindsey Springer, doesn't sending it to an attorney,

14 Mr. Stilley, hide what is really going on?

15 A.   Not in my mind.

16 Q.   Well, you were a part of the transaction, though,

17 sir; isn't that right?

18 A.   Yes, sir, I was.

19 Q.   Any third party standing outside of this, how would

20 it appear to them?

21 A.   Again, sir, I can't speculate.  I mean, that's

22 between them and their God.  I mean, what it looks like

23 to other people -- I did my best with the information and

24 the knowledge I had to make it as transparent as

25 possible.

1    Q.   Who did you rely on in getting advice to make it as
2    apparent and transparent as possible?
3    A.   Primarily Mr. Springer.
4    Q.   Why did Mr. Springer need a loan of a quarter-
5    million dollars in August of 2005?
6    A.   I don't believe he did.
7    Q.   Then why were you giving him a quarter-million
8    dollars?
9    A.   Because of the criminal referral, I was concerned
10   that my assets would be frozen, as indicated by Don
11   Davis, and that I would not have the ability to defend
12   myself in that criminal trial.  And I felt that Lindsey
13   had a much, much better chance of keeping those funds
14   available in the eventuality of a criminal prosecution of
15   me than I did, and that is exactly why I did it.
16   Q.   So if I understand you correctly, you were counting
17   on Mr. Springer to keep these funds liquid for you so
18   that if you needed them, you could get them?
19   A.   That was my intention, yes.
20   Q.   As of the time you transferred these funds, and to
21   the best of your recollection, do you know how much in
22   taxes, interest and penalties you thought you owed to the
23   IRS?
24   A.   No, I wouldn't be able to recollect that.
25   Q.   So it would just be the taxes you already talked

1   about that you had self-reported on the tax returns you

2   had filed?

3   A.   Okay.   Maybe this will help.   At one point I felt

4   that with interest and penalties as reported on one or

5   more documents from the IRS, it could have totaled on the

6   order of a couple hundred-thousand dollars.

7   Q.   So roughly about the amount of money that you had

8   taken out of your homes and sent over to Mr. Springer?

9   A.   Sure.

10  Q.   I'm going to ask you now if you can look --

11       MR. O'REILLY:   And, Your Honor, may I approach

12  the witness?

13       THE COURT:   You may.

14  Q.   (BY MR. O'REILLY)   Mr. Turner, I'm going to ask you

15  if you could look at what's been marked for

16  identification as Government's Exhibit 234.   Do you

17  recognize that?

18  A.   Yes, sir, I do.

19  Q.   What is Government's Exhibit 234?

20  A.   It's a wire transfer transcript, a request.

21  Q.   Does that have anything to do with what we've been

22  talking about?

23  A.   Yes.   A portion of the funds were transferred to

24  Oscar's account through this transaction.

25  Q.   And is this dated August 18 of 2005?

1   A.   Yes.

2         MR. O'REILLY:  Your Honor, the government would

3   move Government's Exhibit 234 into evidence.

4         MR. SPRINGER:  No objection, Your Honor.

5         THE COURT:  234 is received.

6   Q.   (BY MR. O'REILLY)  And this represents 58,000 of the

7   250,000 that you transferred to Mr. Stilley's IOLTA

8   account; is that correct?

9   A.   That's correct.

10  Q.   Was this from one of the properties, if you recall?

11  A.   I would assume so.  I don't directly recollect.

12  Q.   I'm going to ask you if you could take a look at

13  what's in evidence as Government's Exhibit 114, which is

14  an Arvest IOLTA bank account statement reflecting the

15  receipt of $192,000 wire transfer.  Do you see that, sir?

16  A.   Roughly.  It's very small.

17  Q.   Give Ms. Burgess a second; she'll blow it up.

18  A.   Okay.

19  Q.   Would have been on August 11th, 2005?

20  A.   Yes.

21  Q.   And, sir, is that the remaining 192,000 of this

22  $250,000 transfer?

23  A.   Yes, sir.  Yes, it is.

24  Q.   Now, all this occurred in August of 2005; is that

25  correct?

1   A.   That's correct.

2   Q.   At this point in time, did you have -- when you sent

3   this money to Mr. Springer, was it your understanding he

4   was going to hold it for you?

5   A.   That's what my -- yes and no.  That's not the way

6   the loan agreement was written, but that was my

7   assumption.

8   Q.   Did you, in fact, find out that something very

9   different happened?

10  A.   Correct.  Yes.

11  Q.   What did you find out had happened to the $250,000

12  that you sent to Mr. Springer?

13  A.   In December I received a lien on a motor home.  That

14  kind of surprised me, so I called Lindsey and -- because

15  he -- his name was on it.  And that's when he told me

16  that he had purchased a bus.

17  Q.   Okay.  And I'm going to ask you if you could to look

18  at what's marked for identification -- I apologize.

19  You'll have to look in the binder, sir, because it's not

20  in evidence yet.  Government's Exhibit 235.  Should be

21  the very next document.

22  A.   Yeah.

23  Q.   Is that the document you were just referring to?

24  A.   Yes.

25  Q.   And that is an Oklahoma Tax Commission record

1  basically showing a lien?

2  A.   Right.

3  Q.   And that's what Mr. Springer sent a copy of to you?

4  A.   Actually, it came from the company that produced the

5  lien.  It didn't come directly from Mr. Springer.

6  Q.   But it was sent to you?

7  A.   Yes.

8        MR. O'REILLY:  Your Honor, the government would

9  move Government's Exhibit 235 into evidence.

10        MR. SPRINGER:  No objection, Your Honor.

11        THE COURT:  It will be received.

12  Q.   (BY MR. O'REILLY)  What is the date of that

13  document?

14  A.   December 23, 2005.

15  Q.   Do you know when Mr. Springer bought the vehicle

16  that is subject to this lien?

17  A.   No.

18  Q.   Do you know if Mr. Springer used the funds that you

19  had provided to purchase anything else?

20  A.   I don't know that directly, no.  I would assume.

21  Q.   Why would you assume?  I mean, has anybody told you

22  whether or not Mr. Springer bought anything else with the

23  money?

24  A.   I think there was a car.

25  Q.   Who told you this?

1   A.   Oh, boy.  You know what, sir?  I don't recollect.

2   Maybe it came up in general conversation on the

3   conference calls.  I don't remember.

4   Q.   Given that you were counting on having access to

5   these funds -- let me ask this:  In December of 2005, did

6   you still fear that you were going to be indicted?

7   A.   Yes.

8   Q.   When you learned that a quarter-million dollars that

9   you were relying on to hire an attorney had been spent on

10  a bus and a car, did you have any reaction?

11  A.   Confusion.  Disappointment.  I called Mr. Springer.

12  We talked about it.

13  Q.   With respect to this -- and as you sit here today,

14  you're saying that you loaned Mr. Springer $250,000; is

15  that your statement?

16  A.   That is absolutely true.

17  Q.   But you've also, I think, stated, and correct me

18  where I'm missing something, that you were actually

19  asking him to hold your money for you so that if you were

20  indicted and had to hire an attorney, you'd have money to

21  hire one?

22  A.   Well, that's not quite correct.  And the reason it's

23  not quite correct is because I knew, based on the way the

24  transaction had to be set up as a loan, that he could

25  conceivably do whatever he wanted with that money.  And

1  so I had to put my trust in him that when the money was

2  needed or at the end of the term of the loan, that he

3  would repay it.

4  Q.   What was the term of the loan?

5  A.   A year.

6  Q.   Did Mr. Springer repay it after a year?

7  A.   He started making payments, actually, before the end

8  of the year.

9  Q.   When did Mr. Springer start making payments?

10  A.   I believe in May of 2006.

11  Q.   Why did Mr. Springer only start making payments in

12  May of 2006 if you had lent him the money in August of

13  2005?

14  A.   Because one of the terms of the contract was that in

15  the eventuality that the criminal investigation ended,

16  then that would trigger the return of the funds, or

17  something to that effect.  We'd have to go back to the

18  agreement to find the actual wording.

19  Q.   With respect to the termination of the criminal

20  investigation, you learned about that in January of 2005?

21  A.   In January of 2006.  And then there was some --

22  there was discussions about the term being a year, which

23  would take it to August, and that triggering mechanism.

24  And things started in May.

25  Q.   And, again, you trusted Mr. Springer?

```
 1  A.   Absolutely.

 2  Q.   You believe as you sit here today that Mr. Springer

 3  kept you from going to jail, don't you?

 4  A.   Yes.  Yeah, for all intents and purposes.

 5  Q.   I'm going to ask you if you could just to look at a

 6  couple more documents.  If I could ask you to look at

 7  what's been marked for identification as Government's

 8  Exhibit 236, which should be the very next document.  Do

 9  you recognize that document?

10  A.   Yes.

11  Q.   Could you generally describe what that is?

12  A.   Another donation check to Lindsey's ministry.

13  Q.   What's the date of that check?

14  A.   12/30/2005.

15  Q.   Was this a check that you made out prior to learning

16  that the criminal investigation had been discontinued?

17  A.   Yes.

18       MR. O'REILLY:  Your Honor, the government would

19  move Government's Exhibit 236 into evidence.

20       MR. SPRINGER:  No objection, Your Honor.

21       THE COURT:  It is received.

22  Q.   (BY MR. O'REILLY)  Have you ever had any

23  conversations with Mr. Stilley with respect to how much

24  money Mr. Springer goes through?

25  A.   Yeah.  Yes, I have.
```

1   Q.   What has Mr. Stilley said?

2   A.   That Lindsey goes through a lot of money.  That was

3   actually prior -- that was prior to me actually meeting

4   Mr. Springer.  That was back in 2003.

5   Q.   Oh.  You said Mr. Springer has made some payments on

6   the loan?

7   A.   Yes.

8   Q.   What do those payments represent?

9   A.   Repayment of the loan.

10  Q.   Aren't they simply to cover the interest that you've

11  been paying on the loan?

12  A.   They're of the same amount that I pay monthly, yes.

13  Q.   So with respect to the principal, has Mr. Springer

14  paid back any of the loan?

15  A.   In one manner of speaking, yes.  That's a -- as you

16  may know, is an accounting issue.  I leave that to my

17  accountant.

18  Q.   How much, as you sit here today, do you understand

19  Mr. Springer still owes you on this loan?

20  A.   $250,000.

21  Q.   So in other words, he's paid nothing of the

22  principal on that loan?

23  A.   With -- there is interest accruing at this point,

24  yes.

25  Q.   So, in fact, now he's not making any payments?

 1  A.   Yeah.  Don Davis strikes again.

 2  Q.   With respect to Mr. Springer, do you think he's ever

 3  going to repay you?

 4  A.   Yes, sir, I do.

 5  Q.   Because you trust him?

 6  A.   Yes, sir, I do.

 7           MR. O'REILLY:  If I may have a moment, Your

 8  Honor?

 9           THE COURT:  You may.

10  Q.   (BY MR. O'REILLY)  Since you extended this loan to

11  Mr. Springer, have you borrowed any money?

12  A.   I don't believe so.  Not to my recollection.

13  Q.   Have you completed any financial statements, either

14  for a credit card application or something like that?

15  A.   Not that I'm aware of, sir.  The only thing that --

16  I think we had to fill out something for my son, a

17  statement for college scholarships or something like

18  that.

19  Q.   When you filled out the statement for a college

20  scholarship, did you include as an asset the money that

21  Mr. Springer owed you?

22  A.   I don't recollect.

23  Q.   Think hard, please, sir.

24  A.   I actually didn't do the filling out, so I can't say

25  with any certainty yes or no.

1    Q.   What is your best recollection, sir?

2            MR. SPRINGER:  Your Honor, I object.  Guess.

3            THE COURT:  If you have a recollection in which

4    you have any confidence, this is the time to tell the

5    jury about it.  If you don't, then that's what you need

6    to say.

7            THE WITNESS:  Yeah, I don't have any confidence

8    in an answer to that question.

9    Q.   (BY MR. O'REILLY)  To the best of your knowledge and

10   understanding, when -- was it your wife that filled this

11   out?

12   A.   Yes.

13   Q.   When she filled this out --

14   A.   With the help of my daughter.

15   Q.   Okay.  With the help of your child.

16   A.   Yeah.

17   Q.   To the best of your knowledge and understanding, the

18   loan that you have outstanding to Mr. Springer, as far as

19   you know, was not included; is that correct?

20   A.   Again, sir, I can't answer one way or the other.  I

21   don't know.

22            MR. O'REILLY:  Nothing further, Your Honor.

23            THE COURT:  Very well.  Cross-examination.

24                        CROSS-EXAMINATION

25   BY MR. SPRINGER:

PATRICK TURNER - CROSS BY MR. SPRINGER                    1478

1  Q.   Good afternoon, Mr. Turner.

2  A.   Good morning.  How are you?  Good.

3  Q.   When you made the loan -- gift agreement in July of

4  2005, did you know I was being criminally investigated by

5  the Internal Revenue Service?

6  A.   I don't know at what time frame I -- I always assume

7  that you're being criminally investigated, so there was

8  no reason for me to chronicle a date.

9  Q.   Did something significant happen in September of

10 2005?

11 A.   Yes, your home was raided.

12 Q.   Do you know who they were raided by?

13 A.   Twelve IRS agents, to the best of my recollection.

14 Q.   And you testified earlier that you had participated

15 in several conference calls from 2003 to present; is that

16 correct?

17 A.   That's correct.

18 Q.   And was the subject of that raid ever discussed on

19 the conference calls?

20 A.   Yes, it was.

21 Q.   Did I ever tell you in regard to --

22      MR. O'REILLY:  Objection, Your Honor.  Beyond

23 the scope of direct.  We did not discuss the search

24 warrant at all with this witness.

25      THE COURT:  Sustained.

1   Q.   (BY MR. SPRINGER)  You testified that you are a

2   chief officer for Web Elite; is that correct?

3   A.   Chief technology officer.

4   Q.   Technology officer, right.  And so as a part of your

5   business, you service Web addresses or set up Web

6   accounts?

7   A.   Yes.

8   Q.   Okay.

9   A.   We have several entities that do that.

10  Q.   And most of those -- would you say that people you

11  set up Web accounts for are customers of yours?

12  A.   Yes.

13  Q.   Is Bondage Breakers Ministry a customer of yours?

14  A.   No.

15  Q.   But isn't it true that you have set up a Web site

16  for Bondage Breakers Ministry?

17  A.   Yes.  I set it up with a different company just to

18  make sure there was no conflict.

19  Q.   Okay.  Now, you said you retired in 1998?

20  A.   Correct.

21  Q.   And soon thereafter you learned about IFC and Global

22  Prosperity?

23  A.   Yes.  I was investigating estate restructuring.  I

24  had been working with Smith Barney.  An acquaintance of

25  mine introduced me to a gentleman that was involved in

1  some of the loan -- or I'm sorry, some of the investment

2  vehicles from Global Prosperity, and then it went from

3  there.

4  Q.   And that's what basically led you to these IFC

5  conference calls; is that true?

6  A.   That's correct.

7  Q.   Okay.  And prior to the Poseleys and others being

8  indicted in Phoenix, were you a regular participant in

9  the weekly conference calls?

10 A.   Yes.  Not every week, but regularly, yes.

11 Q.   Now, at the time that you were there -- before the

12 indictment -- excuse me.  Prior to the indictment of the

13 Poseleys, were you attending the conference calls because

14 you were still believing what they were saying or were

15 you attending the conference calls because you were

16 suspicious about what was going on?

17 A.   Well, I was also having -- "suspicious" would more

18 characterize it because of the criminal investigation.  I

19 was actually having direct contact outside of the

20 conference calls with IFC, its support people, the

21 trustees, et cetera, trying to resolve these issues.

22 Q.   Now, you had already caught the eye of Special Agent

23 Ellory in late 2002; is that correct?  Is that what your

24 testimony was?

25 A.   That's correct, yes.

1   Q.   Okay.  And after IFC was indicted, which I believe

2   was around April of 2003; is that correct?

3   A.   Yeah, around that time frame, yeah.

4   Q.   You didn't meet me right away on those conference

5   calls, did you?

6   A.   No.

7   Q.   Isn't it true that Paul Stumpo was the one that

8   asked me to come out and listen in?

9   A.   Yes.  He said, You got to hear this guy.

10  Q.   And isn't it true that week after week the interest

11  in that conference call was listening to me fight with a

12  bunch of people who were telling people to do things that

13  I believed were illegal?

14  A.   That's correct.

15  Q.   In fact, weren't they telling them to try to find

16  another reason to justify doing what they did?

17  A.   Correct.

18  Q.   Now, have you ever heard of the phrase "the Karl

19  letter"?

20  A.   Yes.

21  Q.   And is the Karl letter -- what is "the Karl

22  letter"?

23        MR. O'REILLY:  Objection, Your Honor.  Beyond

24  the scope of direct, relevance.

25        THE COURT:  Counsel will approach.

```
 1        (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND
 2   OUT OF THE HEARING OF THE JURY.)
 3            THE COURT:  What's the relevance of this
 4   testimony about the Karl letter?
 5            MR. SPRINGER:  It demonstrates my communications
 6   on those telephone calls, telling people why not to go by
 7   that Karl letter and why Mr. Turner began to shape the
 8   reasons why he was willing to listen to me.  And it was
 9   because that letter was the thing that caused him to
10   think he didn't have to file returns, and after I showed
11   him that that was in error, then he changed his way.  And
12   that is just part of what -- I mean, I'm going down the
13   same list, Your Honor.  I mean, I just took huge notes,
14   and I'm following the same trail that they started.
15   They're the ones that brought up why he did what he did.
16   They brought up Global Prosperity and IFC, and the jury
17   doesn't know who any of those are.  Right now all they
18   know is Mr. Turner stopped filing tax returns and then he
19   started because of me.
20            THE COURT:  So the point to be made, then, about
21   the Karl letter, very concisely, is what?
22            MR. SPRINGER:  Is that it wasn't until after he
23   spoke to me and a prefiling unit letter he got from the
24   IRS that he changed the direction he was going.  It
25   wasn't me.  It was the prefiling unit letter from the IRS
```

1    that told him he was misled.

2           THE COURT:  Is that what you're calling "the

3    Karl letter"?

4           MR. SPRINGER:  It's the response to the Karl

5    letter.  There's two letters.  Mr. Turner can testify

6    about them immensely.  He's fully aware of what I'm

7    asking him.

8           THE COURT:  Do you have that marked as an

9    exhibit?

10          MR. SPRINGER:  No.  It's the government's

11   witness, Your Honor, and that's why I wasn't going to

12   spend much time on it.  I was just going to ask him based

13   upon, you know, the prefiling -- I'm going Karl,

14   prefiling, and then I'm getting out of it.

15          THE COURT:  Mr. O'Reilly, it sounds like this,

16   perhaps, has some peripheral relevance.  I'm inclined

17   to -- on the basis of Mr. Springer's assurance that he's

18   about to move on to something else, I'm inclined to let

19   it come in unless you have some cogent reason that I

20   should proceed otherwise.

21          MR. O'REILLY:  The concern the government has,

22   Your Honor, is that the Karl letter is something that was

23   shipped around for -- since we're not doing this in front

24   of the jury, the tax protest community, where the IRS had

25   written a poorly worded letter indicating that a trust

PATRICK TURNER - CROSS BY MR. SPRINGER                    1484

```
 1   should not have a tax ID number.  And it was used to
 2   mislead people like Mr. Turner.
 3            MR. SPRINGER:  Exactly.
 4            MR. O'REILLY:  I just have a concern about the
 5   Karl letter being referenced.  I don't think we need to
 6   reference it.
 7            MR. SPRINGER:  Okay.  I can handle that.  If you
 8   could -- that will satisfy the government.
 9            THE COURT:  And you don't intend to offer it as
10   an exhibit?
11            MR. SPRINGER:  No.  No.
12            THE COURT:  We'll proceed on that basis.
13       (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,
14   WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE
15   PRESENCE AND HEARING OF THE JURY.)
16   Q.  (BY MR. SPRINGER)  Was there something that you
17   remember that was written by the IRS to an accountant
18   that gave you a reason to believe what IFC was telling
19   you in regard to trusts and so forth?
20   A.  Oh, absolutely.  There are actually many things, but
21   the Karl letter was specifically written to a Mr. Karl,
22   and it basically said that --
23            MR. O'REILLY:  Objection, Your Honor.
24            THE COURT:  The contents of the letter -- first
25   of all, the contents of the letter are hearsay unless
```

1   you've got some non-hearsay reason.

2          THE WITNESS:  I've read it.

3          MR. SPRINGER:  That wasn't my question.  Your

4   Honor, I'm sorry.  I'll go on.

5          THE COURT:  Okay.  Mr. Springer, next question.

6   Q.  (BY MR. SPRINGER)  Did you and I subsequently have

7   conversations about how relying upon those words in that

8   document were in error?

9   A.  I'm trying to recollect -- I don't recollect.

10  Q.  Did you ever receive a letter from the IRS from the

11  prefiling unit?

12  A.  Oh, yes.

13  Q.  Okay.  And had we had discussions about what that

14  letter meant?

15  A.  Yes.  In fact, it actually stated that IFC was

16  falsely telling its clients that they could legally avoid

17  paying taxes by forming trusts.

18  Q.  And isn't it true that your wife is the one that got

19  that letter?

20  A.  That's true.

21  Q.  You did not get that letter?

22  A.  Correct.  I have a copy of it here.

23  Q.  And didn't we have -- on several of the conference

24  calls, didn't we have discussions about that letter?

25  A.  Yes.

1   Q.   And wasn't I the only one out of hundreds of people

2   on that conference call who was defending the IRS's

3   position on that letter?

4   A.   Correct.

5   Q.   Nobody else; isn't that true?

6   A.   That's correct.

7   Q.   And basically, the way you understood the letter to

8   operate, was it -- if you went ahead and filed all your

9   tax returns that IFC had somehow caused you not to file,

10  that the IRS would wipe the slate clean for you?

11  A.   Right.  They would assume that we were a victim of

12  their fraud.

13          MR. O'REILLY:  Your Honor, just for

14  clarification, "their fraud" being IFC?

15          THE WITNESS:  That's correct.

16  Q.   (BY MR. SPRINGER)  Now, during the original

17  conference calls that you heard my voice on that you

18  testified earlier about, wasn't there discussion

19  regarding how the federal court in Arizona was treating

20  you as a victim of IFC?

21  A.   Yes.  Yes.

22  Q.   And wasn't it statements that I made on that

23  conference call that how could you be a victim in Arizona

24  and be a criminal being investigated in Michigan over the

25  same conduct; wasn't that what got your attention?

PATRICK TURNER - CROSS BY MR. SPRINGER                    1487

1   A.   Right.  And that was discussed in great detail.

2   Q.   And had you not heard that type of communication

3   from me -- scratch that.  Sorry.  Scratch that.  Strike

4   it.  You testified that you lost all your retirement in

5   the Global Prosperity investment?

6   A.   All liquid assets, yes.

7   Q.   All liquid assets.  You had a couple houses with

8   some equity?

9   A.   Right.

10  Q.   And in Michigan, that's saying something, isn't it?

11  A.   Used to be.

12  Q.   Used to be.  Now, isn't it true that after several

13  conference calls, some of us decided that I would call up

14  the conference call company and see how I could obtain

15  the right to continue those conference calls because they

16  were getting ready to stop using it for non -- or stop

17  being allowed to use the number for non-payment?

18  A.   Correct.

19  Q.   And wasn't the motive behind that, that we all had

20  discussed, was so that we could keep getting people out

21  there who were infected by IFC stuff and give them an

22  alternative to what they were being offered?

23  A.   That's exactly right.

24  Q.   And there were several of us who had entered into

25  that agreement to do that; isn't that true?

```
 1  A.   Correct.
 2  Q.   Now, you heard me say the -- you've heard me say the
 3  word "infected" before, have you not?
 4  A.   Yes.
 5  Q.   And you testified that you attended a hearing where
 6  Oscar showed up, Oscar Stilley showed up?
 7  A.   Correct.
 8  Q.   But you also attended a trial, didn't you, of
 9  Mr. and Mrs. Ouwenga?
10  A.   Yes, I did.
11  Q.   Now, wasn't the reason why you came to that trial
12  because I told you that if you would come and watch a
13  trial and you would see what all you have to go
14  through --
15  A.   Yes.
16  Q.   -- that that would convince you that my position
17  that I'm telling everybody on those conference calls is
18  with a lot of wisdom?
19  A.   That's correct.
20  Q.   And after you attended the Ouwenga trial, were you
21  disappointed in what you learned?
22  A.   Very.
23  Q.   Were you disappointed with me?
24  A.   No, sir.
25  Q.   What were you disappointed in?
```

1   A.   In our system of justice.

2   Q.   You also attended the oral argument at the Sixth

3   Circuit Court of Appeals of Mrs. Ouwenga, didn't you?

4   A.   Yes.

5   Q.   It's difficult, wasn't it?

6           MR. SPRINGER:  May we have a moment, please,

7   Your Honor?

8           THE WITNESS:  I'll be okay.  (Witness crying)

9   Q.   (BY MR. SPRINGER)  Mr. Turner, you testified earlier

10  you sent me a boxful of stuff; isn't that right?

11  A.   Yes.

12  Q.   And in that box, wasn't there a tape recording?

13  A.   Yeah.  Yes, there was.

14  Q.   And that tape recording, was it you and your wife

15  meeting with CID agents of the United States Internal

16  Revenue Service?

17  A.   Actually, revenue agents, yes.

18  Q.   Revenue agents?

19  A.   Yes.

20  Q.   And you didn't know me at that time, did you?

21  A.   No.

22  Q.   I listened to that tape, didn't I?

23  A.   Yes, you did.

24  Q.   You asked me to listen to that tape, didn't you?

25  A.   Yeah.  I learned the word "infected" then.

PATRICK TURNER - CROSS BY MR. SPRINGER                     1490

1  Q.   Did you hire me to listen to that tape?

2  A.   No.

3  Q.   At the time that you sent me that box with that

4  tape, I believe you testified you enclosed a $1,000 check

5  in there?

6  A.   I did.

7  Q.   Now, isn't it true that how you came to understand

8  about donations and how I operated in my ministry was

9  based upon the conference calls?

10 A.   Well, that and the meeting that we had subsequent to

11 sending the box of stuff.

12 Q.   Now --

13 A.   It was very -- I'm sorry.  It was very unusual, your

14 position on ministry, and it took me a long time to wrap

15 my head around that.  And so, you know, I carried over a

16 lot of assumptions and impressions on how these kinds of

17 things get done.

18 Q.   Isn't it true that you concluded that there's no

19 other way to get it done?

20 A.   That's true.

21 Q.   And haven't we had discussions -- and -- discussions

22 about ministry that involved around that it was a

23 mission?

24 A.   Absolutely.  And I've spent a lot of time thinking

25 about that, and I think the -- can I use an analogy?

1    THE COURT:  Well, let's wait for a question

2  first.  Next question, Mr. Springer.

3  Q.   (BY MR. SPRINGER)  How would you compare ministry

4  and mission in relation to Bondage Breakers Ministry?

5    MR. O'REILLY:  Objection to relevance and beyond

6  the scope.

7    THE COURT:  Overruled at this point.  Go ahead.

8    THE WITNESS:  The only way that I've been able

9  to justify it or understand it is I'm currently a member

10 of a church that has over 5,000 members.  And the

11 mission -- the direct mission of that church is to lead

12 as many people as possible to believe in the Lord Jesus

13 Christ as their Lord and Savior.  That's their mission.

14 Now, they do that through many, many ministries.  They

15 take donations of all different kinds of sizes, tithes,

16 et cetera, and they have prison ministries, they have

17 addiction ministries, they have services on Sunday, they

18 have Bible studies, they have a food ministry, a clothing

19 ministry, all led by lay people.  And -- but in the end,

20 all those different activities are meant to lead people

21 to Christ.  Now, in your case, your mission is to get rid

22 of the IRS.

23    MR. O'REILLY:  Objection to the narrative form

24 of the response.

25    THE COURT:  Let's go by Q and A.

1   Q.   (BY MR. SPRINGER)   Thank you.

2   A.   Okay.

3   Q.   Now, you were asked -- or were asked about a check

4   that you wrote to Bondage Breakers Ministry in 2006 --

5   strike that.  Strike that.  I'm sorry.  In our conference

6   calls that you testified about, the subject came up of

7   Creation Science Evangelism; is that true?

8   A.   Yes.

9   Q.   And do you know who the human being is behind that

10  ministry?

11  A.   Hovind.

12  Q.   First name, if you know it?  Be Kent Hovind?

13  A.   Yes, Kent Hovind.

14  Q.   You testified earlier that, although you were giving

15  basically essentially me money, that you thought that I

16  was helping lots of different people who didn't have any

17  ability to support my mission?

18  A.   That's what I was getting to in my previous answer.

19  Q.   And do you know of anybody that has ever contacted

20  me and because they could not or had not supported my

21  mission, that I refused to try to figure out what I could

22  do to help them?

23  A.   I know of no one in that situation.

24  Q.   Now, isn't it true that in discussions that we've

25  about how I asked for money, that usually I waited until

1  somebody asked me how I survived before I would have a

2  discussion with them about giving me money?

3  A.   That's correct.

4        MR. O'REILLY:  Objection, calls for speculation,

5  unless he's been around him all the time.

6        THE COURT:  Mr. Turner, your answer needs to be

7  based on things you heard as opposed to things you assume

8  may be true.  You may answer on that basis.

9        THE WITNESS:  Okay.  In my -- what I have seen

10 and heard, correct, you wait until you hear somebody's

11 circumstance before any discussion of donation or

12 whatever.

13 Q.   (BY MR. SPRINGER)  And isn't that, in fact, in a

14 real difficult way, the way you first started approaching

15 me?

16 A.   True.  Yes.

17 Q.   In fact, the letter that you wrote me that outlined

18 all these things that you heard was your attempt at

19 trying to understand what was going on in front of you at

20 that time; isn't that true?

21 A.   That's exactly right.  That letter was an attempt to

22 kind of figure out what you were, what your ministry was

23 about.

24 Q.   In fact, isn't it true that you said that at the

25 time you met me, you had been praying for help?

1   A.   Absolutely.

2   Q.   Now, haven't we had discussions in the past about

3   how God answers prayers through people?

4   A.   Yes.  God puts people in your path when they need to

5   be there to help you.

6   Q.   Now, when you met me at the airport, I believe your

7   testimony was -- do you remember that?

8   A.   Yes.

9   Q.   You took a picture of me, didn't you?

10  A.   I did.

11  Q.   And I thought that was odd, didn't I?

12  A.   Yes, you did.

13  Q.   And what was the purpose of why you took the

14  picture?

15  A.   Because I wanted to know how to go after you if you

16  weren't what you said you were.

17  Q.   Did I have any hesitation about you taking my

18  picture?

19  A.   No, which surprised me.

20  Q.   Because other people you had tried that same thing

21  on to intimidate them or --

22  A.   Would not -- thought I was undercover, thought I was

23  many things.

24        MR. SPRINGER:  Could you pull up Government's

25  Exhibit Number 223, please.

1   Q.   (BY MR. SPRINGER)   Now, Mr. Turner, you've testified

2   about writing -- or you're the author of Government's

3   Exhibit Number 223; is that true?

4   A.   Yes.

5   Q.   And this is the first written communication that you

6   ever sent to me; isn't that true?

7   A.   The first one that you received, yes.  I mean, there

8   was one in a box on its way to you when I wrote this.

9   Q.   When you wrote this.  And you say, "I've begged God

10  for wisdom and peace about you and am honestly

11  struggling."

12  A.   Yes.

13  Q.   What were you struggling about?

14  A.   Believing that what you were saying that you were

15  about was real.

16  Q.   What was I saying I was about?

17  A.   Well, helping people, but -- yes.  I mean, basically

18  helping people that find themselves in circumstances with

19  the government that they're unable to handle themselves.

20  Q.   Have we ever had discussions about me saying that

21  I'm the last person that I would think God would pick to

22  do what I'm doing?

23  A.   Yes; "12th-grade-educated" is what you used to say.

24  Q.   And isn't it true that I've always stated that I'm

25  -- I'm not perfect?

1  A.   True.

2  Q.   And that I don't want to judge others because I

3  don't want to be a hypocrite?

4  A.   You go way out of your way not to judge.

5  Q.   And when you say in the third paragraph of Exhibit

6  Number 223, "Why, I don't know, and I thank God for them

7  because sometimes they're the only reason I continue down

8  this path."  You were speaking about your family?

9  A.   Yes.

10  Q.   What about your family are you running down this

11  path for?

12  A.   They need a dad and a husband.

13  Q.   You were concerned that they were going to lose

14  their dad?

15  A.   Yes.

16  Q.   And didn't we have discussions about it wasn't fair

17  that there were letters that were written that you had

18  received that had the appearances of being endorsed by

19  the United States that you were relying on, when in fact

20  even the United States was saying that they weren't

21  reliable sources of information?

22  A.   That's true.  And on top of that, reading many

23  sections of the tax code that said one thing, but

24  regardless you were still pursued.

25  Q.   We've also had discussions about how I proposed,

1  prior to 2005, that we can try to convince the Congress

2  of the United States to fix this problem; is that true?

3  A.   Yes.  Yeah.

4  Q.   And we have some solutions, don't we?

5  A.   Yes, we do.

6  Q.   But they're not easy solutions, are they?

7  A.   No, they're not.

8  Q.   And aren't the solutions from within the system that

9  we have, instead of where I found you, outside the

10 system?

11 A.   Right.  You said anything else -- when you just

12 disappear and kind of stick your thumb in the eye of the

13 government creates chaos, and so it is this venue that we

14 have to really change things.

15         MR. SPRINGER:  Could you please pull up

16 Government's Exhibit Number 222, please.

17         Your Honor, may I have just one second?

18         THE COURT:  You may.

19 Q.   (BY MR. SPRINGER)  Earlier you testified that you

20 had received Government's Exhibit Number 222.  Do you

21 remember that?

22 A.   Yes.

23         MR. O'REILLY:  Objection, Your Honor.  Just for

24 clarification, he received it and then added to it.  This

25 reflects his --

1      THE COURT:  Clarify that.

2  Q.  (BY MR. SPRINGER)  Government's Exhibit Number 222

3  is an edited version of an e-mail that I sent to you; is

4  that true?

5  A.  That's true.

6  Q.  And doesn't it contain additions that were based

7  upon your opinion in editing of what I had said?

8  A.  That's correct.

9  Q.  Now, at the time that I sent you Government's

10  Exhibit 222, isn't it true that we were having

11  discussions about me taking a tremendous turn away from

12  where you met me and going down an attempt to try to play

13  professional golf?

14  A.  Yes.

15  Q.  And in our discussions, isn't it true that the topic

16  came up about if I won money playing golf or had

17  endorsements playing golf, that I would treat that as

18  gross income?

19  A.  Yes.

20  Q.  And isn't it true that many of our discussions hinge

21  on the difference between income and gross income?

22  A.  Yes.

23  Q.  And isn't it true that at all times I had maintained

24  gifts and donations were income but not gross income?

25  A.  Correct.  I mean, we -- specifically we would talk

1   about Section 102.

2   Q.   And what would be the discussion of Section 102 that

3   was relevant to you?

4   A.   Well, it just said that gifts were not includable in

5   gross income.

6   Q.   It didn't say gifts were not includable in income,

7   did it?

8   A.   No.

9   Q.   It said specifically gross income?

10  A.   Correct.

11  Q.   Now, you've had occasion to want to go learn about

12  that because of your support for my ministry; isn't that

13  true?

14  A.   Absolutely.

15  Q.   In fact, when you testified -- did you testify

16  before one of the grand juries in this case?

17  A.   Yes.

18          MR. O'REILLY:  Objection.  Beyond the scope of

19  direct.

20          THE COURT:  Counsel will approach.

21     (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND

22  OUT OF THE HEARING OF THE JURY.)

23          MR. SPRINGER:  Withdraw the question.

24          THE COURT:  Okay.

25     (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

```
 1   WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE
 2   PRESENCE AND HEARING OF THE JURY.)
 3   Q.   (BY MR. SPRINGER)  Now, you have some concern, do
 4   you not, about whether or not an amount of money you give
 5   to somebody is considered a gift by the IRS or not, don't
 6   you?
 7   A.   Yeah, I think it's a very fine line, and I tried
 8   very hard to understand that.
 9        MR. O'REILLY:  Objection.  Mr. Turner's
10   testimony in this part, I don't think, is -- it's been
11   asked and answered and cumulative.
12        THE COURT:  Well, as a predicate for something
13   that may be relevant, I'll overrule the objection.  But
14   you must understand, Mr. Springer, this witness's
15   understanding of the law has little or nothing to do with
16   the issues in this case.  Proceed.
17   Q.   (BY MR. SPRINGER)  Mr. Turner, did the IRS ever ask
18   you why you did not fill out a gift tax return?
19   A.   No.  They would ask my accountant.  They wouldn't
20   ask me.
21   Q.   If somebody had asked you to file a gift tax return
22   on the money that you gave me, would you?
23   A.   I would look into it before -- I wouldn't just take
24   it at face value.  I'd have to understand what that
25   meant.
```

1   Q.   You mean you would need to understand about the

2   form?

3   A.   Yes.

4   Q.   Making sure it was in compliance with federal law?

5   A.   Absolutely.

6   Q.   To your understanding?

7   A.   To my understanding.

8   Q.   But if everything checked out there, would you have

9   had any problem?

10  A.   Not at all.

11  Q.   Thank you.  Now, you testified about that your

12  motive for contacting me was that you wanted help?

13  A.   Correct.

14  Q.   But you've also testified that you were asking God

15  to direct you to help, right?

16  A.   That's correct.

17  Q.   And you testified that you -- I believe that you

18  sent me just a very small receipt that recognized a

19  series of coins; is that correct?

20  A.   That's correct.

21  Q.   And at the time that you sent those coins to me,

22  isn't it true that you had tried to get a fair market

23  value for those coins in Michigan and were unable to do

24  that?

25  A.   That's correct.

1    Q.   And do you remember about how much money you were

2    being offered in Michigan for those coins?

3    A.   Between 35 and $40,000.

4    Q.   So by you putting them in a mailbox and sending them

5    to Lindsey Springer, those coins brought between 21 and

6    $16,000 in Tulsa, Oklahoma, more than they would in

7    Michigan?

8    A.   I can't do the math that fast, but, yes, a great

9    deal more.

10   Q.   Now, had I only been able to get 35 or $40,000

11   offered on them, isn't it true that you would have had me

12   send them back to you?

13   A.   Yes.

14   Q.   Because you weren't willing to sell those coins for

15   35 or $40,000; isn't it true?

16   A.   That's correct.

17   Q.   Now, we've had discussions about the loan gift

18   agreement on numerous occasions, haven't we?

19   A.   Yes, we have.

20   Q.   And do you know why the lien entry on the motor home

21   is in December of 2005?

22   A.   No.

23   Q.   Now, you said earlier that it was within -- within

24   the contract agreement, I had the right to use that money

25   for whatever I chose to use it for?

1  A.   Yes, for purposes of your ministry.

2  Q.   Right.  And you knew that my ministry was turning a

3  different direction, did you not?

4  A.   That's correct.

5  Q.   And as you stand here today, you testified that

6  there's -- there's a loan agreement and then there's a

7  gift agreement contained within that contract; is that

8  right?

9  A.   That's correct.

10 Q.   That was a very difficult document to draft, wasn't

11 it?

12 A.   Yes, it was.

13 Q.   Trying to keep it simple?

14 A.   That's right.

15 Q.   Had we had to do it over again, we'd probably write

16 it a little bit differently?

17 A.   Probably, yes.

18 Q.   Probably have all the lawyers get involved with it?

19 A.   I don't know about that.

20 Q.   It needs some more legalese in it, doesn't it?

21 A.   Yeah.

22 Q.   Now, you understand in this case that -- is it true

23 that you understand that I'm having to defend against

24 whether or not the $250,000 that you loaned me was income

25 -- gross income taxable to Lindsey Springer?  Do you

1    understand that as you sit here today?

2            MR. O'REILLY:  Objection to relevance of what

3    Mr. Turner's understanding of the accusation is.

4            THE COURT:  Overruled.

5            THE WITNESS:  Yes, I understand that.

6    Q.  (BY MR. SPRINGER)  And haven't we had discussions

7    about how difficult that is for me, on the one side

8    having to owe you payments at least of interest every

9    month, while at the same time having to defend against

10   owing taxes on that money?

11   A.   Yes.  It almost seems ridiculous that you're paying

12   on something that you're supposed to be -- you know,

13   making payments against something that you're supposed to

14   owe taxes against.

15   Q.   Now, at the time you made that loan to me, you had a

16   -- you had a concern that the government was going to do

17   to you what you heard Don Davis say in the hallway in

18   eastern Michigan; is that right?

19   A.   That's absolutely correct.

20   Q.   That wasn't me telling you Don Davis said that?

21   A.   No, I heard him directly myself.

22   Q.   And that was during the Ouwenga case, wasn't it?

23   A.   Yes.

24   Q.   And at the time, you weren't the only one that sat

25   there through the whole trial of Mr. Ouwenga; isn't that

1   true?

2   A.   That's correct.

3   Q.   And there were actually three other people infected

4   from the Eastern District of Michigan that had decided to

5   come and watch this trial?

6   A.   Yes, that's true.

7   Q.   And Paul Stumpo was one of them?

8   A.   Yes, he is.

9   Q.   Michael Burt one of them?

10  A.   Yes.

11  Q.   And then you, and then who was the fourth gentleman?

12  A.   Michael Hennessey.

13  Q.   I didn't have much success with Mr. Hennessey, did

14  I?

15  A.   No.

16  Q.   So your concern was that if you were to get

17  indicted, that there would be money available to defend

18  yourself?

19  A.   That's correct.

20  Q.   And at the time, isn't it true that Oscar Stilley

21  and Jerold Barringer were the only two lawyers that I had

22  discussed with you about?

23  A.   I believe at that time, yes.

24  Q.   As you sit here today, you don't -- you're not aware

25  of -- scratch that.   Strike that.   Sorry.   You've stated

1  several times that I helped you?

2  A.   Yes.

3  Q.   Is that what you expected for the money that you

4  gave me?

5  A.   I wasn't allowed to have an expectation.  It was my

6  prayer.

7  Q.   Am I the one that told you about your -- you are not

8  going to be able to expect anything from me?

9  A.   Over and over again.

10 Q.   In fact, isn't it something that I would say

11 routinely on the conference calls if somebody asked me a

12 question about it?

13 A.   That's correct.  Which is a very difficult thing to

14 get your head around initially.

15 Q.   It's odd, isn't it?

16 A.   It is.  At that time, outside of my experience.

17 Q.   Now, when you and I had discussions about how to try

18 to uninfect you, you testified earlier that you have a

19 pretty good college education?

20 A.   Yes.

21 Q.   And pretty respected in your community, right?

22 A.   I hope so.

23 Q.   And you were really hung up on words in the tax

24 code, weren't you?

25 A.   Oh, man, absolutely.

1   Q.   Now, when you reached out to the IRS to try to get

2   help on that, did they try to help you?

3   A.   No.   They said, We don't have to answer your

4   questions.

5   Q.   Did you find that odd after paying taxes for however

6   many years?

7   A.   I did, very much so.

8   Q.   Now, you testified earlier to Mr. O'Reilly about

9   help -- about help?

10  A.   Help?

11  Q.   Help, that you did get help from me?

12  A.   Yes.

13  Q.   Okay.   Now, you also testified that you -- you

14  sponsor a Web site for Bondage Breakers Ministry; is that

15  true?

16  A.   That's correct.

17          MR. O'REILLY:   Objection.   There was no

18  testimony about him sponsoring a Web site, and it is

19  beyond the scope of direct.

20          THE COURT:   There is testimony now.   That will

21  be overruled.   We'll take it for a little while and see

22  where it goes.

23          MR. SPRINGER:   May we approach on that?

24          THE COURT:   You may.

25      (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND

 1  OUT OF THE HEARING OF THE JURY.)

 2          MR. SPRINGER:  A lot of it -- a lot -- a lot of

 3  the documents the Web site is very critical to my

 4  defense.  Mr. Turner has personal knowledge of them.  He

 5  posted them and he is very familiar with them.  They're

 6  also things that not only he will say I told him about,

 7  but he then read them and then determined for himself

 8  that they were reliable.  And on that basis, I'm trying

 9  to go there.  But if you tell me I can't, I will not go

10  any further on that issue.

11          THE COURT:  Well, tell me a little more about

12  these documents.

13          MR. SPRINGER:  It explains rulings with the

14  Paperwork Reduction Act.  It -- it posts the tax return

15  forms for people to download just so if somebody didn't

16  want to go to the IRS Web site for whatever fears they

17  have they could get them from my Web site, or instruction

18  booklets, all of which were part of me uninfecting

19  Mr. Turner.

20          THE COURT:  Okay.  Here is the problem.  Number

21  one, and this is not directly at issue now, but it's a

22  beginning point.  The Paperwork Reduction Act is not

23  going to be a substantive defense in this case.  I don't

24  rule out the possibility that testimony about the

25  Paperwork Reduction Act may be admissible to the extent

1  that you can make a showing consistent with cases like

2  the Willie case that it plausibly had some impact on your

3  state of mind.

4          MR. SPRINGER:  It does.

5          THE COURT:  But it's not going to be a

6  substantive defense in this case.  My concern with this

7  witness and his proclivity to make speeches is we're

8  going to get into testimony about his state of mind or

9  his understanding of the law, and we're not going there.

10         MR. SPRINGER:  Could I go to what I told him or

11 showed him since they're trying to say I provided him

12 help?

13         THE COURT:  You propose to examine this witness

14 with respect to what you told him about what?

15         MR. SPRINGER:  About violations of the Paperwork

16 Reduction Act.  And I would say, Your Honor, he is a

17 witness on my list and he's from out of state, and you

18 said the other day I could have some -- you had the

19 discretion to give me some latitude there.  Now, I'll

20 abide by what you tell me.  He is an important witness.

21         THE COURT:  We'll have to cover this during your

22 case and, as a matter of fact, there is -- there are some

23 ground rules we probably ought to take up outside the

24 hearing of the jury at the appropriate time that in

25 fairness you should understand during your case.  But

PATRICK TURNER - CROSS BY MR. SPRINGER                    1510

1  that's something you will need to cover in your case.

2  The government did not march this witness through the

3  Paperwork Reduction Act, and we're not going to go there

4  until your case.

5           MR. SPRINGER:  And just for the record -- never

6  mind.

7           THE COURT:  Very well.

8      (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

9  WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

10  PRESENCE AND HEARING OF THE JURY.)

11          THE COURT:  Members of the jury, I'm going to

12  see if we can get a little closer to 3:00 before we take

13  our mid-afternoon break, but, of course, if anyone needs

14  a break, why, we'll certainly take one.  You may proceed,

15  Mr. Springer.

16  Q.   (BY MR. SPRINGER)  Now, Mr. Turner, there were

17  discussions between you and Mr. O'Reilly regarding

18  payments that I was making to you?

19  A.   Correct.

20  Q.   And those were $1,400 payments?

21  A.   Yes.

22  Q.   And isn't it true that the reason why those payments

23  began because we both could see that the one year of the

24  loan agreement was coming to a conclusion and that, based

25  upon the current situation of the investigation of

1  Lindsey Springer, that it was going to be at least

2  difficult to satisfy that loan agreement?

3  A.   Correct.

4  Q.   And so you agreed to extend that loan under the

5  conditions that I pay $1,400 a month, which is the

6  interest that you would owe?

7  A.   It's equal to that amount.

8  Q.   Equal to that amount.  And on numerous occasions,

9  we've had discussions about how -- isn't it true that

10  we've had discussions about how, when the IRS

11  investigates you and they go and speak to all the people

12  that support you, that that makes it a little difficult

13  to gather more support?

14  A.   Right.  The timid start to fall away.

15  Q.   And then on top of that, isn't it true that the

16  economy started getting really difficult?

17  A.   Correct.

18  Q.   And one of the things to suffer at that time, isn't

19  it true, is those ministries that you spoke about at your

20  church?

21  A.   Yes, they are all suffering.

22  Q.   So if you do live off of whether somebody wants to

23  give you money or not, it -- in this instance, it got

24  really difficult for me, didn't it?

25  A.   Correct.

1   Q.   Now, for at least a couple of years, or two and a

2   half years, isn't it true that I paid you $1,400 a month

3   every month at the first of the month?

4   A.   I don't recollect the exact length of time, but

5   something on that frame, yes.

6   Q.   But at some point in time, those payments stopped,

7   didn't they?

8   A.   That's correct.

9   Q.   Now, did we continue to have discussions about that?

10  A.   Oh, yes.

11  Q.   And you and your wife have been making those

12  interest payments every month, have you not?

13  A.   We have.

14  Q.   Now, when you and I came to this short-term loan

15  agreement, this one-year agreement, Mr. O'Reilly asked

16  you why you didn't send it to an account that I had, or

17  something -- I'm sorry.  Strike that.

18  A.   Didn't send it directly to you.

19  Q.   Isn't it true that the reason why that loan

20  agreement -- the proceeds of the loan were sent to

21  Mr. Stilley's account was because in your discussions

22  with him and I, you had learned that he had a type of an

23  account that allowed him to hold money for persons that

24  he agreed to hold money for?

25  A.   That's correct.

1   Q.   Whether or not you were his client?

2   A.   That was my understanding, yes.

3   Q.   As you stand here today, do you know whether the

4   money was put into an account other than that type of an

5   account?

6   A.   No.

7   Q.   You testified earlier that when you had received the

8   lien notice in the mail, that you were disappointed?

9   A.   Yes.

10  Q.   And after you and I spoke about that lien notice

11  that you received on -- I believe you referred to it as

12  Ground Force 1?

13  A.   Yes.

14  Q.   Did you become satisfied with what I was doing after

15  the disappointment?

16  A.   Yes.

17  Q.   At the time that we had the discussion that lifted

18  you up out of disappointment, as far as to your

19  knowledge, do you know whether you or I or anyone in our

20  meetings that we had ever considered whether or not the

21  IRS would investigate me for four years?

22  A.   No.

23  Q.   Have we had discussions regarding what I possibly

24  could have done in helping you to merit receiving a

25  payment --

PATRICK TURNER - CROSS BY MR. STILLEY                    1514

1   A.   Right.

2   Q.   -- of $250,000?

3   A.   Yes, we did.

4   Q.   And if you were standing in front of a jury and you

5   had to answer that question, what did Lindsey Springer do

6   for $250,000, what would you tell them?

7   A.   I couldn't rationalize that to them.

8   Q.   As you sit here today, do I owe you $250,000?

9   A.   Absolutely.

10  Q.   Have you and I ever had any dispute about that?

11  A.   No.

12  Q.   Do you have any evidence as you sit here today that

13  I ever entered into any agreement to defraud the United

14  States of anything with regard to Mr. Stilley?

15  A.   No.

16  Q.   In fact, isn't it true, although they don't

17  recognize it, I'm trying to help them?

18  A.   Yes, in fact.

19           MR. SPRINGER:  Thank you, Mr. Turner.

20           THE COURT:  Mr. Stilley.

21           MR. STILLEY:  Your Honor, may I take just a

22  moment?

23           THE COURT:  You may.

24                     CROSS-EXAMINATION

25  BY MR. STILLEY:

PATRICK TURNER - CROSS BY MR. STILLEY                          1515

1   Q.   Oscar Stilley just followed orders, correct?

2   A.   Yes.

3   Q.   And you don't have any evidence that Oscar Stilley

4   committed any crime either, do you?

5   A.   I do not.

6           MR. STILLEY:  Pass the witness.

7           THE COURT:  Any redirect?

8           MR. O'REILLY:  Yes, Your Honor.

9           THE COURT:  Give me a time estimate on your

10  redirect.

11          MR. O'REILLY:  Ten minutes or so, Your Honor.

12          THE COURT:  We'll take our midafternoon recess

13  at this time.  Members of the jury, as I mentioned, we'll

14  take our midafternoon recess at this time.  We'll resume

15  at quarter after 3:00.  So just before quarter after

16  3:00, please be available for the security officer to

17  return with you to the courtroom.  And during this

18  recess, please remember my usual admonition, which I will

19  not repeat at this time.  All persons in the courtroom

20  will remain seated while the jury departs.

21      (JURY EXITS THE COURTROOM.)

22          THE COURT:  Okay.  The jury has left the

23  courtroom.  I think counsel and the parties should -- and

24  you may step down.  Counsel and the parties should bear

25  in mind -- or plan on us having a conference.  I don't

 1   know for sure one way or the other whether it will be our

 2   final conference, but a conference to discuss jury

 3   instructions at 5:30 tomorrow, Wednesday.

 4        Oh, by the way, Mr. Turner?

 5             THE WITNESS:  Yes.

 6             THE COURT:  Unless you are informed otherwise,

 7   you will not be released from your subpoena when you're

 8   through here today.  It may be necessary -- if the

 9   defendants so desire, it may be necessary for you to

10   return when they present their case.  So I've taken this

11   opportunity just to make it very clear to you that when

12   you finish your testimony today, unless you are

13   explicitly told otherwise by the Court, you will not be

14   released from your subpoena.

15             THE WITNESS:  What implications does that have?

16             THE COURT:  Pardon me?

17             THE WITNESS:  What implications does that have?

18             THE COURT:  That means that you may be

19   required -- if the defendants so desire, you may be

20   required to return to give additional testimony.

21             THE WITNESS:  I see.

22             THE COURT:  One more thing while you're here,

23   Mr. Turner.  I'm not going to be harshly critical at this

24   point, but I'm going to tell you one more time, it is

25   necessary for you to give a responsive answer to a

1    question and then quit.  And if any more follow-up

2    questions are in order or if any clarification is

3    appropriate, then whoever is asking the questions will

4    cover that with you.  Do we have that understanding?

5            THE WITNESS:  Yes, sir.

6            THE COURT:  Very well.  And you can stay or go

7    as you please, but we'll expect you back at quarter after

8    3:00.

9        I do plan to meet with counsel and the parties at

10   5:30 tomorrow to have what may or may not be our final

11   conference on instructions.  That's not your Rule 30

12   record on instructions, I hasten to add, but that will be

13   my opportunity to cover some ground that we have already

14   touched on in some ways with respect to the instructions,

15   to put the matter in a posture for me to finalize the

16   instructions to the extent possible so that you'll then

17   be in a position at the appropriate time to make your

18   Rule 30 record on the instructions.  So plan on that,

19   please, for 5:30 tomorrow.

20       That need not be on the record, obviously, but

21   before we do that at 5:30 tomorrow, it is possible that

22   we will on the record cover some ground rules for the

23   defendants' presentation of their case.  This is

24   irrespective of how the defendants' direct testimony is

25   presented.  That's another matter altogether.  But I

 1  think in fairness, so that the defendants will have an

 2  opportunity to think their case through with a little bit

 3  of lead time as opposed to having to do it on the fly, it

 4  would be appropriate for the Court to at least articulate

 5  some tentative ground rules for the defendants'

 6  presentation of their case.

 7      As I have said, the Paperwork Reduction Act is not

 8  going to be a substantive defense in this case.  If an

 9  appropriate showing is made, then testimony about the

10  Paperwork Reduction Act may be admitted to the extent

11  that it may have a bearing on one or the other, if not

12  both, of the defendants' state of mind.  We'll just have

13  to see.  But I plan to cover that in more detail.

14      Anything further before we recess until quarter

15  after 3:00?

16          MR. O'REILLY:  Your Honor, would it be possible

17  to get an electronic copy of the Court's proposed

18  instructions before tomorrow?

19          THE COURT:  I'll check on that.  The only thing

20  that gives me pause is that that suggests that both sides

21  are going to start from scratch, or that somebody wants

22  to start from scratch, and I'm not of a mind to start

23  from scratch.

24          MR. O'REILLY:  No, Your Honor.  It simply makes

25  it easier for us to share it and to get some ideas.

 1          THE COURT:  Okay.  I'll give that some thought.
 2   Anything else before we take our mid-afternoon break?
 3          MR. SPRINGER:  Yes, Your Honor.  Mindful of what
 4   the Court just said at the bench about the Paperwork
 5   Reduction Act, which at this point I'm -- that's not what
 6   I recollect the original court order was, but I'm -- in
 7   understanding it and now trying to adjust my defense
 8   accordingly, the Court --
 9          THE COURT:  Now, what order are you referring
10   to?
11          MR. SPRINGER:  What the Court just said about
12   it's not going to come in as a substantive defense, but
13   you'll just have to wait and see based upon intent and
14   state of mind.  And the thing --
15          THE COURT:  You said that's not consistent with
16   some order of mine.  What order --
17          MR. SPRINGER:  Well --
18          THE COURT:  Mr. Springer, don't interrupt.  What
19   order do you refer to?
20          MR. SPRINGER:  There was an order of the Court
21   issued denying the government's motion in limine.
22          MR. O'REILLY:  Your Honor, just -- Mr. Turner is
23   still in the courtroom.  I don't know if this is --
24          THE COURT:  You are excused.  Go ahead.
25          MR. SPRINGER:  In the Court's order denying the

1  government's motion in limine on the Paperwork Reduction

2  Act, the Court told the government that the Paperwork

3  Reduction Act was coming in in their case in chief and it

4  was coming in as a good faith defense, or you were

5  allowing it on both sides.  Now, accepting what the Court

6  just said as its order, which it's not going come in as a

7  substantive defense now, this leaves only good faith

8  or -- or lack of willfulness.

9          THE COURT:  I don't think I ever ruled as a

10  matter of law that the Paperwork Reduction Act was going

11  to come in as a substantive defense.  If I did, I'll

12  invite you to show me that order pronto.

13          MR. SPRINGER:  Actually, it was just oral on

14  the bench, Your Honor, and I'll just have to ask to buy a

15  copy of it --

16          THE COURT:  Well, it's neither here nor there.

17          MR. SPRINGER:  Exactly.  And that's why I'm

18  putting that aside.  But now I'm faced with on Thursday

19  possibly beginning my defense, and I'm in two spots here

20  that I'm having to adjust.  One is, how do I present that

21  defense with the Court's instruction and permission, and

22  then two now is, how do I do that showing what the Court

23  just said was if it goes to willfulness or intent, the

24  Court will consider it.  That has me stuck at the moment,

25  based upon the idea that the government is going to close

```
 1   tomorrow and we're going into Thursday.  And we still
 2   don't even know how I'm going to give testimony or how
 3   I'm going to do a narrative, with the Court's
 4   permission.  And whatever the Court tells me to do,
 5   obviously I'm going to do, and I will -- as the Court has
 6   seen, I'm doing my best with it.  But there's plenty of
 7   evidence on the Paperwork Reduction Act, Your Honor,
 8   that's going to come in that shows I relied upon it
 9   heavily in regard to this case.  Heavily.
10           THE COURT:  Well, don't presuppose anything is
11   going to, quote, come in.
12           MR. SPRINGER:  Oh, I mean -- I mean I'll try --
13   try to come in.  But I need to know now or at least soon,
14   Your Honor, how I'm going to be -- or what's the
15   procedure I follow to stay within the Court's order.
16           THE COURT:  Well, it may be that we can cover
17   that a little earlier than 5:30 tomorrow.  We'll see.
18           MR. SPRINGER:  Very good.
19           THE COURT:  Very well.
20           MR. SPRINGER:  Thank you, Your Honor.
21           THE COURT:  Court will be in recess.
22       (A RECESS WAS HAD, AFTER WHICH THE FOLLOWING
23   PROCEEDINGS WERE HAD IN OPEN COURT AND WITHIN THE
24   PRESENCE AND HEARING OF THE JURY.)
25           THE COURT:  Mr. O'Reilly, you may proceed.
```

1          MR. O'REILLY:  It will be rather difficult, Your

2   Honor.

3          THE COURT:  Oh.

4      (WITNESS RETAKES THE STAND.)

5                    REDIRECT EXAMINATION

6   BY MR. O'REILLY:

7   Q.   Mr. Turner, you were asked by, I believe it was

8   Mr. Springer, if $250,000 seemed like an awful lot of

9   money for you to pay for anything Mr. Springer could have

10  done for you; is that -- do you recall that question and

11  answer?

12  A.   I think he said what he did for me.

13  Q.   How much would it be worth to you to stay out of

14  jail?  Isn't that priceless?

15  A.   Well, I guess that would be up to the individual,

16  and I don't know how to put a price on that.  Other than

17  the fact that doing some research and finding out what a

18  criminal trial would cost a particular accused.

19  Q.   My question, sir, is:  How much would you pay, if

20  you could, to stay out of jail?

21  A.   I don't -- I don't see the point of the question.

22  Everything.  I mean, I don't know what you want me to

23  say.

24  Q.   Also, you were asked if you were aware of any

25  evidence that Mr. Springer and Mr. Stilley entered into a

1  conspiracy to defraud the IRS.  Do you recall that

2  question?

3  A.   Not in that phraseology.

4  Q.   It was one of the last questions Mr. Springer asked

5  you.

6  A.   Okay.  I remember the question.

7  Q.   You were afraid that the IRS might come and take --

8  put a lien on your homes, the two properties; is that

9  correct?

10  A.   All the assets.  All of our assets, yes.

11  Q.   To forestall that, you put the money through

12  Mr. Stilley's account and had it -- what you understood

13  being held by Mr. Springer; is that correct?

14  A.   Per the -- yes, per the terms of the loan gift

15  agreement.

16  Q.   And part of why you did that was so that the IRS

17  couldn't take the money?

18  A.   Correct.

19  Q.   And if someone were to simply look at the paperwork,

20  it appeared that you had paid Mr. Stilley a $250,000

21  retainer fee on its face, didn't it?

22  A.   I'm sorry.  I didn't hear that.

23  Q.   Didn't it appear that, just to look at the financial

24  transaction itself, that you had paid Mr. Stilley a

25  $250,000 fee?

PATRICK TURNER - REDIRECT BY MR. O'REILLY                    1524

1  A.   I can't speculate on what other people would think

2  looking at something.  I know what my intent was and I

3  can speak to that.  But if you're asking me what it would

4  look like to another person, I was too mired in the

5  circumstances to be able to give a reasoned view of that.

6  Q.   You were worried, concerned, dreaded the fact that

7  you might be indicted?

8  A.   Absolutely.

9  Q.   You relied on Mr. Springer to give you advice; is

10 that true?

11 A.   Correct.

12 Q.   When it comes to financial matters, matters of

13 money, do you consider yourself somewhat gullible?

14 A.   I'll let the history speak for itself, sir.

15 Q.   And that history would seem to indicate that you

16 are; is that correct?

17 A.   Yes.  You know what?  I'm going to disagree with

18 that.  I spend a fair amount of time doing due diligence,

19 and have I been caught up in some pretty elaborate

20 schemes in my time?  Yes.  And it -- it surprises me the

21 lengths to which people will go to take your money.

22 Q.   People like IFC?

23 A.   Not specifically IFC.  I was more referring to some

24 of the investment vehicles that I got into.

25 Q.   And that was the ones through -- either directly or

1  through Global Prosperity?

2  A.   Exactly.  I was -- this is not my first criminal

3  trial that I testified in.  Some of those resulted in

4  criminal indictments as well, so -- very elaborate

5  schemes.

6          THE COURT:  You're both digressing.  Let's move

7  on.

8          MR. O'REILLY:  Your Honor, if I may.

9  Q.   (BY MR. O'REILLY)  Is it your experience that people

10 will say almost anything to get money out of you?

11 A.   Yes.

12 Q.   After a year with the loan agreement -- the loan

13 gift agreement you had with Mr. Springer, did

14 Mr. Springer pay off the loan?

15 A.   He did not pay off the loan.

16 Q.   Did you enter into a verbal agreement to extend the

17 loan with Mr. Springer?

18 A.   Yes.

19 Q.   Were you aware that in December of 2005, about four

20 months after you lent Mr. Springer the $250,000, that

21 Mr. Springer sold a motor home for $50,000?

22 A.   I knew that he had another motor home, yes.  I was

23 not -- I don't recollect that I was aware that he had

24 sold it.

25 Q.   Did you receive any of that $50,000?

1    A.    I did not.

2    Q.    Mr. Springer had asked you about a gift tax return?

3    A.    Yes.

4    Q.    Did Mr. Springer ever tell you you should fill out a

5    gift tax return?

6    A.    No.

7    Q.    To your knowledge, did you ever fill out a gift tax

8    return?

9    A.    Not to my knowledge, no.

10   Q.    I believe in your cross-examination testimony you

11   stated you were disappointed with our system of justice?

12   A.    Yes.

13   Q.    You were investigated by the IRS; is that correct?

14   A.    Yes.

15   Q.    Were you ever indicted?

16   A.    No.

17   Q.    Were you ever informed of why you were not indicted?

18   A.    No.

19   Q.    I assume you're not disappointed in that result?

20   A.    No.

21          MR. O'REILLY:  If I may have a moment, Your

22   Honor?  Nothing further.

23          THE COURT:  Any recross limited to redirect?

24          MR. SPRINGER:  Yes, Your Honor.

25               RECROSS-EXAMINATION

```
1    BY MR. SPRINGER:
2    Q.   Whose idea was it to borrow money on two houses?
3    A.   Mine.
4    Q.   Whose idea was it to borrow an amount of $250,000 on
5    those two houses?
6    A.   It was collaboration, but ultimately it was my
7    decision.
8    Q.   Who else was involved in that decision?  Who else
9    was involved in that decision besides you?
10   A.   My wife.
11   Q.   You and your wife?
12   A.   Yeah.
13   Q.   Is it safe to say that if -- without you and your
14   wife deciding to borrow money on your houses that there
15   would be no loan gift agreement between you and me?
16   A.   That's correct.
17   Q.   Did I ever call you up and say, Pat, I would like
18   you to go borrow $250,000 on your houses?
19   A.   No.
20   Q.   Did I say, send it to me as a loan gift agreement?
21   A.   No.
22   Q.   Mr. O'Reilly asked you about -- I believe he
23   continues to ask you about how it looks?
24   A.   Yes.
25   Q.   You and I have had several discussions on that, have
```

1   we not?

2   A.   Yes.

3   Q.   And if we had to do it all over again, we'd do it a

4   little differently, wouldn't we?

5   A.   A little differently, yes.

6   Q.   In fact, haven't I said I'd do it a lot differently?

7   A.   Yes.

8   Q.   And isn't the basis of that is, as far as our

9   conversations went with me, was if I had known I was

10  being criminally investigated, I would never have --

11  A.   Bought the bus.

12  Q.   -- bought the bus in the first place?

13  A.   That's correct.

14  Q.   Mr. O'Reilly talked about your experience with bad

15  investments?

16  A.   Yes.

17  Q.   Now, of all the investments that you made, did you

18  ever have any collateral that was secured?

19  A.   In a couple instances, yes.

20  Q.   In this instance, though, you have at least an RV

21  with 17,000 miles on it?

22  A.   Correct.

23  Q.   Have you seen that RV?

24  A.   Yes.

25  Q.   Did you see it at the Ouwenga oral argument in 2006?

1   A.    I did.

2   Q.    Mr. O'Reilly said you were gullible; do you remember

3   that?

4   A.    Yes.

5   Q.    You first agreed with him and then you changed your

6   mind?

7   A.    Yes.

8   Q.    Could you explain that?

9   A.    It goes to my experience with the investments at

10  Global Prosperity.  As I previously testified, you go

11  to -- you know, I was a recently retired engineer who did

12  nothing but invest with Smith Barney in traditional

13  instruments.  You go to one of these things, and there

14  are 2,000 people in an auditorium and four screens, and

15  people are made presentations to and there are breakout

16  sessions that have hundreds of people in them, all

17  discussing these investment options.  Then you're given

18  opportunity to speak individually with the investment

19  sponsors.  With all that and all the documentation that

20  they provide you and all the research that I did, they

21  seemed legitimate at the time.  And nearly all of them

22  didn't perform as promised.

23  Q.    They had no oversight by the federal government, did

24  they?

25  A.    That's correct.

RONALD YOUNG - DIRECT BY MR. SNOKE                                    1530

1    Q.   That's why we have a federal government, isn't it?

2    A.   Yes, it is.

3    Q.   If you walked into a room with 2,000 people and all

4    that that you just explained, you'd see a different

5    picture today than you did when you first did that,

6    right?

7    A.   I sure would, yes.

8             MR. SPRINGER:  No further questions, Your Honor.

9             THE COURT:  Mr. Stilley.

10            MR. STILLEY:  No further questions.

11            THE COURT:  You may step down.  As I explained,

12   Mr. Turner, you are subject to recall.  You may step

13   down.  We'll have the government's next witness.

14            MR. O'REILLY:  Ronald Young.

15            THE WITNESS:  I don't swear, but I do affirm.

16            THE COURT:  Very well.  That's entirely

17   appropriate.  Do you affirm that the testimony you're

18   about to give will be the truth, the whole truth and

19   nothing but the truth?

20            THE WITNESS:  Yes, I do.

21                       RONALD YOUNG,

22   (WITNESS AFFIRMED)

23            THE COURT:  Very well.  Thank you, sir.  You may

24   be seated.

25                     DIRECT EXAMINATION

```
 1   BY MR. SNOKE:
 2   Q.   Please state your name and spell your last name for
 3   the court reporter, please.
 4   A.   Ronald Edward Young, Y-O-U-N-G.
 5   Q.   Where do you live currently, Mr. Young?
 6   A.   In New York.
 7   Q.   All right.  And before that, where did you live,
 8   sir?
 9   A.   Miami, Florida.
10   Q.   And do you know the name Lindsey Springer?
11   A.   Yes, I do know the name Lindsey Springer.
12   Q.   All right.  How about the name Oscar Stilley?
13   A.   Yes, I also know that name.
14   Q.   All right.  Have you talked with those individuals?
15   A.   Yes, I did, on the phone.
16   Q.   All right.  And you've never met either of them?
17   A.   No, I did not.
18   Q.   Now, sir, directing your attention back to the year
19   2003, did you have a criminal indictment in a trial?
20   A.   Yes, I did.
21   Q.   And where was that?
22   A.   That was down in Miami, Florida.
23   Q.   All right.  At that time, or prior to that time,
24   what was your occupation?
25   A.   I was a police officer with Miami Dade Police
```

1    Department.

2    Q.   All right.  And the nature of the charges that were

3    brought against you were what?

4    A.   Attempting to evade and defeat taxes.

5    Q.   And did you have an attorney that represented you in

6    that trial?

7    A.   Yes, I did.

8    Q.   Okay.  And what was his name?

9    A.   Andre Rouviere.

10   Q.   All right.  And at some time -- now, were you

11   convicted of the charges?

12   A.   Yes, I was.

13   Q.   Or some of them, at least?

14   A.   Yes.

15   Q.   At some point at -- after you were convicted, did

16   you have occasion to try and find somebody to assist you

17   with what was going to happen after that -- after your

18   conviction?

19   A.   Yes.  When I was found guilty, I attempted to locate

20   an attorney to handle my appeal.

21   Q.   All right.  And why was Mr. Rouviere not able to

22   help you?

23   A.   Well, he was -- he said federal law is different and

24   he never handled appeals before, so I should find another

25   attorney to handle the appeals.

1  Q.  And how did you go about doing that?

2  A.  First I went to several attorneys, and then I was

3  also checking on the Internet.

4  Q.  All right.  And did Mr. Springer's name come up on

5  the Internet?

6  A.  Yes, it did.

7  Q.  All right.  And then what happened?

8  A.  And then I gave him a call and I explained to him my

9  situation, and he said he can help me.

10  Q.  Did he tell you anything that -- what did he tell

11  you about what -- why he could help you?

12  A.  Well, he said that him and his partner usually

13  handle these types of cases and he can help me fight

14  them -- you know, help me with the appeal.

15  Q.  All right.  And did he say who his partner was?

16  A.  His name was Oscar Stilley.

17  Q.  All right.  Did you talk to Oscar Stilley at any

18  time after Mr. Springer had mentioned his name?

19  A.  At this time I can't recollect.  It's been over

20  seven years, I would say.

21  Q.  All right.  Did -- did Mr. Springer indicate any

22  charge that would be -- that he would want from you in

23  return for handling your appeal?

24  A.  Yes, he did.  He wanted -- he said I should pay two

25  checks, one to him and one to Oscar Stilley.

RONALD YOUNG - DIRECT BY MR. SNOKE                                1534

1   Q.   All right.  And did you do that?

2   A.   Yes, I did.  I sent him a check for 17,500 and the

3   other check was sent to Oscar Stilley.

4   Q.   And do you remember how much that one was for?

5   A.   Offhand, I don't, but I remember it was about --

6   offhand about 7,000, I would say.  I don't remember.

7   Q.   All right.  Less than the amount that you paid to

8   Mr. Springer?

9   A.   Yes.

10  Q.   And did you actually yourself -- well, let me have

11  -- put in front of you -- it will come up on the screen

12  there, Government's Exhibit 37, and I'll have you look at

13  that.  It's already in evidence.  Do you recognize that

14  exhibit?

15  A.   Yes, that looks like one of the checks that, yes, my

16  father gave me and it was sent to Mr. Springer.

17  Q.   All right.  Now, you -- you yourself did not draw

18  this check out of Citibank; is that correct?

19  A.   No, I did not.

20  Q.   All right.  Who actually did this check?

21  A.   My father did.

22  Q.   All right.  And what's his name?

23  A.   Russell Young.

24  Q.   All right.  Is that Russell A. Young it says there

25  on the check?

RONALD YOUNG - DIRECT BY MR. SNOKE                              1535

1    A.   Yes, it is.

2    Q.   Okay.  And why did your father, then, cause this

3    cashier's check to be issued to Mr. Lindsey Springer for

4    $17,500 in December of '03?

5    A.   Because I was totally broke and I had no money.

6    Q.   All right.  Did you request your father to do that,

7    then, for you?

8    A.   Yes, I did.

9    Q.   And what was Mr. Springer going to do in return for

10   this check that you issued to him in December of -- or

11   caused to be issued, anyway, to him in December?

12   A.   Him and his partner was supposed to handle my

13   appeal.

14   Q.   All right.  And what happened on that?

15   A.   On the -- on the sentencing -- well, he wasn't

16   there.  And he did write a motion, and after that I was

17   sentenced to go to prison.

18   Q.   All right.  Let's back up here a bit.  If you know,

19   Mr. Springer wrote some sort of a motion that was used at

20   your sentencing?

21   A.   Yes.

22   Q.   All right.  And did you know whether or not he had

23   any communications with your attorney, Mr. Rouviere?

24   A.   I don't remember, but I can say that they

25   probably --

1    MR. SPRINGER:  Objection, Your Honor.

2    THE WITNESS:  -- did speak.  I don't --

3    MR. SPRINGER:  He said he did not remember.

4    THE COURT:  One at a time.  State your

5  objection.

6    MR. SPRINGER:  He said he did not remember.

7    THE COURT:  Repeat the question.

8  Q.  (BY MR. SNOKE)  I said, if you know, do you know

9  whether Mr. Springer had any communications with

10  Mr. Rouviere about this -- your sentencing?

11  A.  I can't remember at this time.  Sorry.

12  Q.  All right.  You were at your sentencing; is that

13  correct?

14  A.  Yes, I was.

15  Q.  Presumably.

16  A.  Yes.

17  Q.  And at that sentencing, had Mr. Springer -- did

18  Mr. Springer's motion get presented to the court?

19  A.  Yes, it did.

20  Q.  All right.  Other than that motion, then, after you

21  were sentenced -- well, let's back up a bit here.  Did it

22  have any effect on your sentence, do you believe, the

23  motion that was filed on your behalf by Mr. Springer?

24  A.  My opinion?  Yes, I believe so.

25  Q.  And what effect was that?

1   A.   Well, from what the attorney had -- correction, the

2   judge had said, my attorney should have been here.

3   Q.   Meaning Mr. Springer?

4   A.   Yes.

5   Q.   Did Mr. Springer indicate he was an attorney?

6   A.   No, he never did say he was an attorney.

7   Q.   All right.  After you were sentenced, if you know,

8   did Mr. Springer -- or what, if you know, did

9   Mr. Springer do after you were sentenced?

10  A.   I don't know, because I was in prison.

11  Q.   All right.

12  A.   I -- I'm sorry.

13  Q.   Did you have any communication with Mr. Springer

14  after that?  I mean after you were sentenced.

15  A.   No.

16  Q.   All right.  Were you taken into custody, then, at

17  your sentencing?

18  A.   Yes.

19  Q.   Do you know if an appeal was ever filed for you by

20  Mr. Springer?

21  A.   I was told another motion was filed, but I don't

22  know if the appeal was filed.

23  Q.   All right.  And if it had been filed -- well, strike

24  that.  Did you ever have any -- any communications

25  indicating that an appeal was filed, either from the

1  court or the appeals court or any other source?

2  A.   From what I was told, no, it wasn't.

3  Q.   Did you -- after you were sentenced and had been in

4  jail for -- well, after you were sentenced, did you have

5  any -- did you make any attempts to contact Mr. Springer

6  to discuss your appeal or --

7  A.   Yes, I did.

8  Q.   And did you have any success in doing that?

9  A.   No, I did not.

10  Q.   After you were released from your sentence -- wait.

11  What was your sentence?

12  A.   Twenty-seven months.

13  Q.   And what -- did you do all that, but less good time

14  or whatever?

15  A.   No, I spent my 27 months in jail.

16  Q.   All right.  And did you attempt to contact

17  Mr. Springer, then, after you got out?

18  A.   Yes, I did.

19  Q.   And how did you go about doing that?

20  A.   By phone.  And my brother also tried by phone while

21  I was in prison, and by fax.

22  Q.   All right.  And did either you or your brother,

23  either your brother while you were in prison or you after

24  you got out of prison, have any success in contacting

25  Mr. Springer?

1  A.   I believe after I got out I spoke to him, I think,

2  once.

3  Q.   Uh-huh.  And what did you talk about when you talked

4  to Mr. Springer after you got out of prison?

5  A.   Well, the conversation, I don't remember.  I'm so

6  sorry.

7  Q.   All right.  Did you talk about whether or not he had

8  filed an appeal for you?

9  A.   Yes, I -- I'm sure -- word for word, I don't

10 remember, but I would believe we talked about the case.

11          MR. SPRINGER:  Objection, Your Honor.  He says

12 he doesn't remember, then he says he believed.

13          THE COURT:  Overruled.

14          MR. SNOKE:  I don't believe I have any other --

15 hang on a second.  I have no other questions.

16          THE COURT:  Cross-examination.

17                    CROSS-EXAMINATION

18 BY MR. SPRINGER:

19 Q.   Good afternoon, Mr. Young.

20 A.   Good afternoon.

21 Q.   My name is Lindsey Springer.  You said you were

22 broke at the time that you were going to sentencing,

23 right?

24 A.   Yes.

25 Q.   And you also said that when you called me, you were

1   talking about appeal, correct?

2   A.   Yes.

3   Q.   And as far as you know, do you know whether your

4   father and I or your brother and I ever had any

5   discussions related to you, if you know?

6   A.   If you did, I don't remember.

7   Q.   Thank you very much.

8            MR. SPRINGER:  Pass the witness, Your Honor.

9            THE COURT:  Mr. Stilley.

10                     CROSS-EXAMINATION

11   BY MR. STILLEY:

12   Q.   Did anyone from the government ever tell you what

13   law you allegedly violated?

14   A.   They said -- no.  What I was charged with was

15   attempting to evade and defeat taxes, but the real charge

16   is attempting to evade or defeat taxes.

17   Q.   Were you shown what laws required you to do the acts

18   you allegedly failed to do?

19   A.   No.

20            MR. SNOKE:  Objection.  Beyond the scope of

21   direct.

22            THE COURT:  Sustained.

23   Q.   (BY MR. STILLEY)  Did the government succeed in

24   changing your behavior?

25   A.   Excuse me, sir?

```
 1  Q.   Did the government succeed in changing your behavior
 2  so you did your affairs in the way that the government
 3  approved of it?
 4          MR. SNOKE:  Objection, relevance.
 5          THE COURT:  Sustained.
 6          MR. STILLEY:  Your Honor, could I have a moment?
 7          THE COURT:  You may.
 8          MR. STILLEY:  No further questions.
 9          THE COURT:  Any redirect?
10          MR. SNOKE:  No, Your Honor.
11          THE COURT:  Very well.  You may step down.  And
12  we'll have the government's next witness.
13          MR. SNOKE:  We would call Russell Young.
14                      RUSSELL YOUNG,
15  (WITNESS SWORN)
16                    DIRECT EXAMINATION
17  BY MR. SNOKE:
18  Q.   Would you state your name and spell your last name
19  for the court reporter, please, sir.
20  A.   Russell Edward Young, Y-O-U-N-G.  Russell Young.
21  Q.   All right.  And where do you live, sir?
22  A.   I live in the Bronx in New York.
23  Q.   All right.  And how old are you, sir?
24  A.   Oh, I'm sorry you asked me that.  Next month I'm
25  going to be 84.
```

1   Q.   All right.  Are you employed?  Are you working?

2   A.   I am working.

3   Q.   All right.  And for whom do you work?

4   A.   New York City Transit, the MTA, Metropolitan Transit

5   Authority, a state agency in New York.

6   Q.   All right.  Now, I'm going to put up on the screen

7   here -- and I can actually show you a copy of this.

8            MR. SNOKE:  Can I approach, Your Honor?

9            THE COURT:  You may.

10  Q.   (BY MR. SNOKE)  Mr. Young, if you would look in that

11  notebook, please, and turn to tab number 37, which will

12  be Government's Exhibit 37.

13  A.   Yes, I'm there.

14  Q.   All right.

15           THE COURT:  Mr. Young, you may also be able to

16  -- your suit is rubbing against the microphone.  If you

17  would, have a seat.

18           THE WITNESS:  Oh, I was just looking at that.

19           THE COURT:  Okay.  Now, do you see a screen in

20  front of you?

21           THE WITNESS:  Yes, it's there.

22           THE COURT:  And that may be an easier way for

23  you to look at that exhibit.  It's entirely up to you.

24           THE WITNESS:  Yeah, it's the same thing, it

25  seems.  Yeah, identical thing.  Same thing.

1   Q.   (BY MR. SNOKE)   The same exhibit is on the screen.

2   Could you see the screen all right?

3   A.   Same exhibit.

4   Q.   All right.  Will you look at the check on that

5   screen and tell me if you recognize that check?

6   A.   Yes, I do.

7   Q.   All right.  And did you cause that check to be

8   issued there from Citibank in December 16 of 2003?

9   A.   Yes, I do.

10  Q.   All right.  And why did you send that check to

11  Mr. Lindsey Springer, then?

12  A.   Because my son, Ronald Young, asked me to make out

13  that amount of check and send it to Mr. --

14  Q.   All right.  Did you -- in connection with that --

15  sending that check at your son's request, did you have

16  any personal conversations yourself with Mr. Lindsey

17  Springer?

18  A.   On the telephone.

19  Q.   Okay.  And what was that conversation about?

20  A.   I don't quite remember, but I just wanted to know

21  why did he want it from what he was going to do.

22  Q.   Oh, all right.

23  A.   I don't remember what he told me, but I did not

24  quite agree with him, that's all.  But my son asked me to

25  send a check to him to let him get his service.  That's

1  why I did it, to satisfy my son.

2  Q.  All right.  And when you talked to Mr. Springer, did

3  you ask Mr. Springer what he was going to do for your

4  son?

5  A.  He said he was going to appeal some court decision.

6  Q.  Okay.  You knew at that time that your son had been

7  convicted of a tax offense?

8  A.  Yes, I knew what it was.

9          MR. O'REILLY:  I don't believe I have any more

10  questions.

11          THE COURT:  Cross-examination.

12          MR. SPRINGER:  Could I have a moment, Your

13  Honor?

14          THE COURT:  You may.

15                  CROSS-EXAMINATION

16  BY MR. SPRINGER:

17  Q.  Good afternoon, Mr. Young.

18  A.  Good afternoon, sir.

19  Q.  My name is Lindsey Springer.

20  A.  Nice seeing you.

21  Q.  Nice to meet you.  You testified just a moment ago

22  that you don't really remember the conversation that we

23  had because it was so long ago; is that correct?

24  A.  I don't remember all of it, but I remember I said

25  something I didn't understand why and hope (sic).  But I

```
 1   don't remember what you said.
 2           MR. SPRINGER:  Thank you very much.  Pass the
 3   witness, Your Honor.
 4           THE COURT:  Mr. Stilley.
 5           MR. STILLEY:  No questions.
 6           THE COURT:  Any redirect?
 7           MR. SNOKE:  No, Your Honor.
 8           THE COURT:  Thank you very much, sir.  You may
 9   step down.
10           THE WITNESS:  Thank you so much.
11           THE COURT:  We'll have the government's next
12   witness.
13           MR. O'REILLY:  United States calls Mr. Lawrence
14   Logsdon.
15                        LAWRENCE LOGSDON,
16   (WITNESS SWORN)
17           MR. O'REILLY:  Your Honor, if I may approach the
18   witness and remove the binder?
19           THE COURT:  You may.
20                        DIRECT EXAMINATION
21   BY MR. O'REILLY:
22   Q.  Sir, could you please state your first and last name
23   and spell them both for the court reporter?
24   A.   Lawrence M. Logsdon, L-A-W-R-E-N-C-E, middle initial
25   M., last name L-O-G-S-D-O-N.
```

```
 1              THE COURT:  Mr. Logsdon, if you would, turn the
 2  -- pull the microphone just a little closer to you.
 3  Thank you.
 4              THE WITNESS:  Uh-huh.
 5  Q.  (BY MR. O'REILLY)  What city and state do you live,
 6  sir?
 7  A.  I live in Laguna Niguel, California.
 8  Q.  How long have you lived there?
 9  A.  Approximately 15 years.
10  Q.  What is your level of education?
11  A.  Four years college.
12  Q.  Did you graduate, sir?
13  A.  I did not.
14  Q.  Did you have a primary course of study in college?
15  A.  Yes.
16  Q.  What was that?
17  A.  Nutrition.
18  Q.  How are you currently employed?
19  A.  I'm not.
20  Q.  Are you self-employed?
21  A.  Yes.
22  Q.  In what way are you self-employed?
23  A.  I'm in business.
24  Q.  What is your business?
25  A.  Oh, I have a company.  We make nutrition products.
```

1   Q.   What types of nutrition products do you make?

2   A.   We make nutritional juice and elixir-type products.

3   Q.   What is the name of your company?

4   A.   Name of our company is Tahiti Trader.

5   Q.   Is that a corporation, or what kind of entity is it?

6   A.   It's an LLC.

7   Q.   And is -- excuse me.  It's been a long day.  Is an

8   LLC also called a limited liability corporation?

9   A.   It is.

10  Q.   That's what LLC stands for, correct?

11  A.   I believe so.

12  Q.   Do you own any other businesses?

13  A.   I do.

14  Q.   What are those?

15  A.   We have a corporation called Beach Fire Corporation,

16  and we are trustees in some family trusts.

17  Q.   Is Foremost Labs one of those family trusts?

18  A.   It is.

19  Q.   When was that formed?

20  A.   In the early '90s.

21  Q.   Are you familiar with the name Oscar Stilley?

22  A.   I am.

23  Q.   How is it that you became familiar with that name?

24  A.   He was my attorney.

25  Q.   When was it that he became your attorney?

1    A.    I believe we hired Oscar sometime in 2005.  I can't

2    recall when.

3    Q.    So you said "we," who is "we"?

4    A.    My wife and I.

5    Q.    Do you know where Mr. Stilley was licensed to

6    practice law?

7    A.    In Arkansas.

8    Q.    How is it -- you're from California, correct?

9    A.    Uh-huh.

10   Q.    How is it that you found an Arkansas attorney?

11   A.    I was recommended to him.

12   Q.    Who recommended him to you?

13   A.    I don't recall the exact person.  Several persons

14   recommended him.

15   Q.    Do you recall any of the people that recommended

16   him?

17   A.    Off the top -- no, I don't remember who it was that

18   recommended it.

19   Q.    For what purpose did you hire Mr. Stilley?

20   A.    To help us resolve issues with IRS.

21   Q.    Were these criminal or civil matters?

22   A.    I think they were civil.

23   Q.    Were you ever charged with any crime?

24   A.    No.

25   Q.    Was this simply something to resolve a tax liability

1  the IRS said you owed?

2  A.   Alleged, yes.  Alleged liability, yeah.

3  Q.   With respect to this matter, did it have anything to

4  do with the trusts?

5  A.   It did.

6  Q.   And just generally speaking, without going into

7  great detail, what was it that the IRS was concerned

8  about with the trust, if you know?

9          MR. SPRINGER:  Your Honor, I would object.

10  Trust in general?  For the family trust?  Is there a

11  specific trust we're talking about?

12          THE COURT:  We'll get an answer to this, and

13  then he can get more specific if need be.  You may

14  answer.

15          THE WITNESS:  I'm sorry.  What's the question,

16  sir?

17  Q.   (BY MR. O'REILLY)  What, if you know, was the IRS's

18  concern?

19  A.   They didn't like the trusts.  They wanted to break

20  the trusts.

21  Q.   Now, had you been filing trust tax returns?

22  A.   Yes, sir.

23  Q.   Had you been filing individual income tax returns?

24  A.   Yes, sir.

25  Q.   Did the IRS produce an assessment alleging that you

1  owed a certain amount of money?

2  A.   I believe so.

3  Q.   And, again, what time frame are we talking about

4  here?

5  A.   I don't recall.  It's a blur.  I can't remember the

6  time period for anything anymore.

7  Q.   Well, let me ask this:  Did the IRS -- is it the IRS

8  matter that led you to contact Mr. Stilley?

9  A.   Yes.

10  Q.   So this would have at least initially come up prior

11  to your hiring Mr. Stilley; is that correct?

12  A.   IRS came first; that's correct.

13  Q.   I'm going to ask you if you can take a look in that

14  book and see if you can look for what's been marked for

15  identification Government's Exhibit 256.  Do you see

16  that, sir?

17  A.   Yes, sir.

18  Q.   Do you recognize that document?

19  A.   I think so, uh-huh.

20  Q.   What is that document?

21  A.   This is a request to have our bank make a transfer.

22  Q.   Excuse me?

23  A.   This is a request for the bank to make a transfer.

24  Q.   To who?

25  A.   Account payee is IOLTA Foundation trust account.

1  Q.   What is the date on that?  I apologize.

2  A.   Can I hold this?

3  Q.   You can.

4  A.   September 1, 2005.

5           MR. O'REILLY:  Your Honor, the government would

6  move Government's Exhibit 256 into evidence.

7           THE COURT:  Any objection?

8           MR. SPRINGER:  Yes, Your Honor.  And may we

9  approach on this?

10          THE COURT:  You may.

11     (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND

12  OUT OF THE HEARING OF THE JURY.)

13          THE COURT:  Okay.  What's your objection?

14          MR. SPRINGER:  My first document says "page 5 of

15  7" on the bottom, and I don't have any pages before it,

16  which means there are at least four pages missing.  And

17  he's asking this man to identify this exhibit as a

18  complete exhibit, and I see 7 of 7, 4 of 7, 3 of 7.  I

19  don't see 1 of 7 or 2 of 7.

20          THE COURT:  You do see 4 of 7 and --

21          MR. SPRINGER:  You have to go backwards.  Five

22  of 7, I've got 4 of 7 and 3 of 7, then I go to the next

23  exhibit.  I'm missing two pages.

24          THE COURT:  That would be 1 of 7 and 2 of 7.

25  Can you shed any light on that?

```
1            MR. O'REILLY:  It wasn't relevant to what we're

2    going to be asking this witness about.  They've received

3    the documents in discovery that include those pages.

4            THE COURT:  Okay.  We don't have any documents

5    here that on their face are partial documents.  There may

6    be other documents, for instance, 1 of 7 and 2 of 7, that

7    are separate from these, but, for instance, we don't have

8    any documents that go to the bottom of one page and then

9    what would obviously be the next page is missing.  So my

10   next question, Mr. Springer, is, do you have any reason

11   to believe that 1 of 7 and 2 of 7 have anything to do

12   with what you perceive to be the reason for 256 and, for

13   that matter, 257 are offered?

14           MR. SPRINGER:  No, Your Honor.  I do not know

15   what 1 and 2 look like, so I do not know.

16           THE COURT:  Okay.  256 will be received.  And to

17   save everybody a trip, my ruling will likely be the same

18   as to the other ones in the same series.

19       (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

20   WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

21   PRESENCE AND HEARING OF THE JURY.)

22           THE COURT:  256 is received.  Was that 256?

23           MR. O'REILLY:  Yes, Your Honor.

24           THE COURT:  Okay.  256 is received.

25   Q.   (BY MR. O'REILLY)  Mr. Logsdon, what is Government's
```

1   Exhibit 256?

2   A.   Where do I look, here?  It looks like a copy of a

3   document that was a request to our bank to make a bank

4   transfer.

5   Q.   And was that for a wire to pay Mr. Stilley?

6   A.   Yes.  More than likely, yes.

7   Q.   Why were you paying Mr. Stilley?

8   A.   He sent me a bill.

9   Q.   What was the bill for?

10  A.   For services.

11  Q.   What type of services?

12  A.   Legal services.

13  Q.   I'm going to ask you now -- do you know if you made

14  other payments to Mr. Stilley?

15  A.   Sure.

16  Q.   And I'm going to ask you now if you can -- first of

17  all, if we can just have Government's Exhibit 116 pulled

18  up, which is an Arvest Bank statement showing a receipt

19  of that wire transfer, $5,000, on September 2 of 2005.

20  Do you see that, sir?

21  A.   Am I supposed to look at this, sir?  I can't read

22  that.

23  Q.   It will come up, sir.

24  A.   Very nice.

25  Q.   Does that reflect the receipt of the wire payment we

LAWRENCE LOGSDON - DIRECT BY MR. O'REILLY                    1554

1   just discussed from something called Wipeout Trust?

2   A.   I assume so.

3   Q.   What was Wipeout Trust?

4   A.   It's not a past tense, sir.

5   Q.   I'm sorry.  What is Wipeout Trust?

6   A.   It's a trust that was created to hold patent and

7   trademark.

8   Q.   Did you cause this transfer of funds?

9   A.   I asked my wife to do it, yes.

10  Q.   I'm going to ask you now to take a look at what's in

11  evidence as Government's Exhibit 118, which is a Foremost

12  Labs check payable to IOLTA Foundation for $5,000 dated

13  October 7 of 2005.  Do you see that, sir?

14  A.   Yes, I see that.  Yes.

15  Q.   What is that check for?

16  A.   That payment, since I don't have the ledgers before

17  me, I will assume is another payment for Oscar Stilley's

18  services.

19  Q.   Well, I don't want you to assume, sir.  Is there any

20  other reason that you would have been sending money to

21  Mr. Stilley?

22  A.   No.  No, when he sent us a bill, we paid him.

23  Q.   I'll ask you now if you can take a look at

24  Government's Exhibit 119, which is a Foremost Labs check

25  payable to IOLTA Foundation for $6,000 dated October 30

1   of 2005.  Do you have that in front of you, sir?

2   A.   I really can't tell what it says.  Oh, there it is.

3   Okay.  Very good.

4   Q.   What is this check, sir?

5   A.   Another check payable to Mr. Stilley's foundation

6   for payment of services.

7   Q.   Is it your understanding that the IOLTA Foundation

8   is Mr. Stilley's foundation?

9   A.   He directed us to pay it there.  I don't know any

10  more than that.

11  Q.   Okay.  So you don't know what IOLTA is?

12  A.   I have no idea what it means.

13  Q.   Who asked you to make the check out payable to IOLTA

14  Foundation?

15  A.   It's on his statement, sir.

16  Q.   "His" is whose?

17  A.   Mr. Stilley.

18  Q.   Thank you.  With respect to each -- let me ask you

19  this.  If we could have Government's Exhibit 120, which

20  is a check from Foremost Labs payable to IOLTA Foundation

21  for $5,000 dated November 12 of 2005.

22  A.   Uh-huh.

23  Q.   Do you see that check, sir?

24  A.   I do, sir.

25  Q.   And I know this sounds like a repetitive question,

1  but what was this check for?

2  A.   Again, sir, it's another check for Mr. Stilley's

3  services.

4  Q.   And those would be his services as an attorney

5  helping you with this tax matter?

6  A.   Representing us, sir.

7  Q.   Yes.  As an attorney?

8  A.   Yes, sir.

9  Q.   Ask you now if you could take a look at what's in

10 evidence as Government's Exhibit 121, which is Foremost

11 Labs check payable to IOLTA, I believe the word

12 "foundation" may have been dropped, for $5,000.  Do you

13 see that, sir?

14 A.   I do, sir.

15 Q.   Is this also a check for payment for Mr. Stilley's

16 legal services on your behalf?

17 A.   I believe so.

18 Q.   Is there any other reason you would have been

19 sending money to Mr. Stilley?

20 A.   No, sir.

21 Q.   I'm going to ask you now to take a look at what's in

22 evidence as Government's Exhibit Number 125, which should

23 come up on your screen, which is another Foremost Labs

24 check payable to IOLTA Foundation for $2,000 dated

25 January 10th of 2006.  Do you see that, sir?

```
 1  A.   Yes, sir.
 2  Q.   Is this also another payment for Mr. Stilley's legal
 3  services?
 4  A.   I believe so, sir.
 5  Q.   Again, is there any other reason you would be
 6  sending Mr. Stilley money?
 7  A.   No, sir.
 8  Q.   You've said "I believe so," is there any reason
 9  you're saying that rather than simply yes?
10  A.   Awful lot of things have gone on, sir.  This has
11  been awhile.  I don't recall everything.  But this
12  appears to be a payment for Mr. Stilley's services.
13  Q.   I'm going to ask you now to take a look at what's in
14  evidence as Government's Exhibit 127, which is a Foremost
15  Labs check payable to IOLTA Foundation for $3,000 dated
16  March the 6th of 2006.  Do you see that, sir?
17  A.   Awful small.
18  Q.   Is that better?
19  A.   It looks like another payment, yes, sir.
20  Q.   And that is another payment for Mr. Stilley's legal
21  services?
22  A.   Yes, sir.
23  Q.   Do you know what Mr. Stilley was doing during this
24  time period to be earning these type of fees?
25  A.   A lot for us.
```

1  Q.   Okay.  What was he doing generally?  I mean, I don't

2  want the minutiae, but what was he attempting to do?

3  A.   I believe that's attorney-client privilege, sir.

4  Q.   You want to assert attorney-client privilege?

5  A.   I believe that is attorney-client privilege --

6  Q.   Let me ask the question.

7  A.   -- what he was doing for us.

8  Q.   I don't want the details of what he was doing.  Was

9  he working to help you resolve matters with the IRS?

10  A.   Absolutely.  Tirelessly.

11  Q.   Let me ask you now to take a look at what's in

12  evidence as Government's Exhibit 128, which is a Foremost

13  Labs check payable to IOLTA Foundation for $3,000 dated

14  March 13 of 2006.  Do you see that, sir?

15  A.   I really can't tell what it says.

16  Q.   Is that better, sir?

17  A.   That's much better, thank you.  Yes, another

18  payment.  Yes, sir.

19  Q.   Another payment for Mr. Stilley's legal services?

20  A.   Yes, sir.

21  Q.   I'm going to ask you now to draw your attention to

22  Government's Exhibit 129, which is the Logsdon Family

23  Trust check payable to IOLTA Foundation for $2,000 dated

24  April 3 of 2006.  Do you see that, sir?

25  A.   Yes, sir, I do see that.

LAWRENCE LOGSDON - DIRECT BY MR. O'REILLY          1559

1   Q.   As an initial matter, what was or is the Logsdon
2   Family Trust?
3   A.   It is just that, a family trust.
4   Q.   How many different trusts did you have?
5   A.   We have three.
6   Q.   Was this a check for Mr. Stilley's legal services on
7   your behalf?
8   A.   Yes, sir.
9   Q.   I'm going to ask you now to take a look at what's in
10  evidence as Government's Exhibit 131, which is a Beach
11  Fire Corporation dba Tahiti Trader check, check number
12  06-601, payable to Oscar Stilley for $10,000 dated May 9
13  of 2006.  Do you see that, sir?
14  A.   I do.
15  Q.   What was this check for?
16  A.   His legal services.
17  Q.   All of the previous checks indicated either IOLTA or
18  IOLTA Foundation, and this one actually has his name.  Do
19  you recall why or if there was any reason for a change?
20  A.   This check was written three days after the IRS
21  seized half a million dollars from me.  We scrambled to
22  get money to Oscar.  And I should have made it out to
23  IOLTA, but I did not.  I believe it was for his services,
24  though.
25  Q.   And I guess from what you just commented on, the IRS

1   seized assets of yours around this time?

2   A.   They seized assets from another company.

3   Q.   Which company?

4   A.   Seized assets from Tropical Functional Laboratories.

5   Q.   Was that a corporation?

6   A.   It's an LLC.

7   Q.   That was the LLC you mentioned initially earlier?

8   A.   Correct.  And it did not owe the money.

9   Q.   Is it an LLC that you owned?

10  A.   Yes.

11  Q.   Is there any other owner of that company besides

12  you?

13  A.   No.

14  Q.   When you say the IRS seized it, are you saying they

15  put a hold on the bank accounts?

16  A.   Sir, they took the money.

17  Q.   Out of the bank accounts?

18  A.   Yes, sir.

19  Q.   Okay.  And that occurred on what date?

20  A.   The sixth day.

21  Q.   May the 6th?

22  A.   Correct, sir.

23  Q.   I'm going to ask you now to take a look at what's in

24  evidence as Government's Exhibit 51, which is another

25  check, the next check sequentially from the Beach Fire

1   Corporation account, payable to Bondage Breakers for

2   $20,000.

3   A.   Uh-huh.

4   Q.   Why did you write this check?

5   A.   I gave a donation -- we gave a donation to the

6   Bondage Breakers Ministry.

7   Q.   To your understanding, was Bondage Breakers Ministry

8   a charity?

9   A.   Pardon, sir?

10   Q.   To your understanding, was Bondage Breakers Ministry

11   a charity?

12   A.   By what definition, sir?

13   Q.   Was it a charity?

14   A.   Well, it's a ministry, sir.  A charity, I'm not sure

15   of.

16   Q.   From whom did you get the understanding that it was

17   a ministry?

18   A.   I was told it's a ministry.  I believe it to be a

19   ministry.

20   Q.   By whom?

21   A.   By me.

22   Q.   Who told you, sir?

23   A.   I don't recall the number of people who told me

24   this, but I learned that it was a -- he had a ministry,

25   and we were called to make a donation.

1  Q.  You were called to make a donation?  And how were

2  you called to make a donation?

3  A.  We prayed on it.

4  Q.  And who is "we"?

5  A.  My wife and I.

6  Q.  Did Mr. Stilley tell you it was a ministry?

7  A.  Mr. Stilley had mentioned it before, but it wasn't

8  the one that had stuck with me, I don't believe.

9  Q.  Do you know the name Lindsey Springer?

10  A.  Pardon?

11  Q.  Do you know the name Lindsey Springer?

12  A.  I do know the name Lindsey Springer, yes.

13  Q.  Who -- have you ever met Lindsey Springer?

14  A.  I've met him once.

15  Q.  Have you ever met Oscar Stilley?

16  A.  Of course I've met him.

17  Q.  Do you see Mr. Stilley in the courtroom?

18  A.  There he is, yeah.

19  Q.  Is he the one standing behind me?

20  A.  Yes, sir.

21          MR. O'REILLY:  May the record reflect that

22  Mr. Logsdon has identified Mr. Stilley?

23          THE COURT:  The record will so reflect.

24  Q.  (BY MR. O'REILLY)  Do you see Mr. Springer in the

25  courtroom?

```
 1   A.   Right.  Yes, I recognize him now, with a beard.

 2   Q.   The beard is a new addition?

 3             MR. O'REILLY:  May the record reflect --

 4   Q.   (BY MR. O'REILLY)  Well, please describe where

 5   he's -- where he is and what he's wearing or standing.

 6   A.   Well, he's standing approximately behind you in the

 7   nice blue jacket.

 8   Q.   Is he standing right now?

 9   A.   Yeah, that's him.

10             MR. O'REILLY:  May the record reflect

11   Mr. Logsdon has identified Mr. Springer?

12             THE COURT:  The record will so reflect.

13   Q.   (BY MR. O'REILLY)  Did Mr. Springer tell you that he

14   had a ministry?

15   A.   I'm sorry?

16   Q.   Did Mr. Springer tell you that he had a ministry?

17   A.   Well, I had learned of it -- yeah, I found his Web

18   site, so I learned he had a ministry.

19   Q.   Did you have any understanding of whether or not

20   Mr. Springer was assisting Mr. Stilley with respect to

21   your civil tax matters with the IRS?

22   A.   I had learned that, yes.

23   Q.   Who did you hear that from?

24   A.   From several people, including Oscar Stilley.

25   Q.   When you sent this $20,000 to -- when you made out
```

LAWRENCE LOGSDON - DIRECT BY MR. O'REILLY                    1564

1   this -- had this check made out to Bondage Breakers for

2   $20,000, did you send it to Mr. Springer?

3   A.   We sent it to Bondage Breakers Ministry with the

4   address that we were given.  I don't know where he lives,

5   so I don't know if it went to his house.  I don't know.

6   Q.   Did you file a gift tax return with respect to this

7   check?

8   A.   No, sir.

9   Q.   Did you write it off on your tax returns as a

10  charitable donation?

11  A.   No, sir.

12  Q.   What, to your understanding, was Mr. Springer doing

13  as Bondage Breakers Ministry?

14  A.   Helping attorneys navigate their way through dealing

15  with IRS matters.

16  Q.   Matters such as your own?

17  A.   Such as mine, yeah.

18  Q.   I'm going to ask you now if you could -- to look at

19  Government's Exhibit 133, which is a Beach Fire

20  Corporation dba Tahiti Trader check payable to Oscar

21  Stilley for $10,000 dated June 8 of 2006.  Do you

22  recognize that check, sir?

23  A.   I do.

24  Q.   Is that a check you paid Mr. Stilley for legal

25  services?

1    A.    It is.

2    Q.    May I ask you now to take a look at Government's

3    Exhibit 54, which is a Beach Fire Corporation dba

4    Tropical Fruit Company, I believe, dba Tahiti Trader

5    Company?

6    A.    Okay.

7    Q.    And maybe I'm mangling it, but do you recognize that

8    check, sir?

9    A.    Yes.

10   Q.    And is this dated July 27 of 2006?

11   A.    It is, sir.

12   Q.    Is it payable to Bondage Breakers Ministry in the

13   amount of $5,000?

14   A.    Is that a five or a six?

15   Q.    You tell me, sir.

16   A.    Oh, 5,000.

17   Q.    5,000?

18   A.    Yes, sir.

19   Q.    Are your -- are the issues with respect to this tax

20   matter resolved with the IRS now?

21   A.    Almost.

22   Q.    When did they come close to closure?

23   A.    I'm not quite sure I understand the question.

24   Q.    You say "almost," maybe I should ask you what you

25   mean by "almost."

1    A.   Well, we've done everything we're supposed to do.

2    We're in the waiting stage for them to complete whatever

3    they need to complete.

4    Q.   When did you finish everything you were supposed to

5    do?

6    A.   Oh, my.  I'm going to -- first of the year,

7    probably, we finished everything.

8    Q.   The first of this year?

9    A.   Yeah.

10   Q.   Of 2009?

11   A.   I believe so.

12   Q.   Is Mr. Stilley still assisting you with this case?

13   A.   No, sir.

14   Q.   Do you have an attorney from California now?

15   A.   We do.

16   Q.   I'm going to ask you now to take a look at what's

17   been marked for identification as Government's Exhibit

18   257, and you'll have to look in the binder for that,

19   sir.  Tell me when you have a chance to look at that.

20   A.   All right.

21   Q.   Do you recognize that document?

22   A.   I see it, yeah.

23   Q.   Do you recognize it, sir?

24   A.   Well, yeah.  I can read it, yeah.

25   Q.   Do you recognize it as something you've seen before?

1  A.   A long time ago, yeah, but I've seen this before.

2  Q.   Just generally speaking, what is that document?

3  A.   Looks like a cover letter, a cover note or

4  something, for a payment.

5  Q.   To whom?

6  A.   To Oscar Stilley and his foundation.

7  Q.   And is it dated October of 2005?

8  A.   October 7, 2005.

9       MR. O'REILLY:  Your Honor, the government would

10  move Government's Exhibit 257 into evidence.

11       MR. SPRINGER:  Your Honor, I object because I

12  don't believe he's actually identified it.  Did he say --

13  maybe I couldn't hear.  Maybe it was too quiet.

14       THE COURT:  It is received.

15  Q.   (BY MR. O'REILLY)  Now I'm going to ask you to look

16  at what's been marked for identification, Mr. Logsdon, as

17  Government's Exhibit 258.  You'll have to look in the

18  binder for this one.  This is not yet in evidence, so

19  you'll have to look in the binder.  258.  Do you see

20  Government's Exhibit 258, sir?

21  A.   Uh-huh.  I do.

22  Q.   You'll have to give an affirmative yes or no.

23  A.   Yes.  I see it, yes.

24  Q.   Do you recognize Government's Exhibit 258?

25  A.   Yes.

1  Q.   Would you please give the jury a general description

2  of what is Government's Exhibit 258?

3  A.   Payment to Oscar Stilley, his IOLTA Foundation, done

4  with postal money orders.

5  Q.   Is this a letter from you?

6  A.   It is.

7  Q.   And it's a letter to Mr. Stilley?

8  A.   Yes.

9  Q.   What is the date of that letter?

10  A.   February 1, '06.

11          MR. O'REILLY:  Your Honor, the government would

12  move Government's Exhibit 258 into evidence.

13          MR. SPRINGER:  No objection, Your Honor.

14          THE COURT:  It is received.

15          MR. O'REILLY:  If I may have a moment, Your

16  Honor?

17          THE COURT:  You may.

18          MR. O'REILLY:  Nothing further, Your Honor.

19          THE COURT:  Cross-examination.

20                  CROSS-EXAMINATION

21  BY MR. SPRINGER:

22  Q.   Good afternoon, Mr. Logsdon.

23  A.   How are you?

24  Q.   Doing fine.  Besides Oscar Stilley telling you about

25  Bondage Breakers Ministries, you said there were others

LAWRENCE LOGSDON - CROSS BY MR. SPRINGER          1569

1  that told you about it as well, correct?

2  A.   Yes.

3  Q.   You also said that you learned about Bondage

4  Breakers Ministry on the Internet; is that true?

5  A.   That's true.

6  Q.   Could Mike Meadors have told you about Bondage

7  Breakers Ministry?

8  A.   Mike Meador, John Dunn, Bob Swan, several others

9  that I don't even know.

10 Q.   Safe to say there's a large network of people?

11 A.   Yeah.

12 Q.   True?

13 A.   It's quite large.

14 Q.   And we're all trying to help our country, aren't we?

15 A.   Yes, sir.

16 Q.   Now, do you support the mission of getting rid of

17 the Internal Revenue Service?

18 A.   I do, sir.

19 Q.   Did you support that mission or the idea of that

20 mission prior to your problems with the IRS?

21 A.   No, sir.

22 Q.   Is it your relationship with the IRS that drew your

23 attention into why you now agree we need to get rid of

24 the IRS?

25 A.   Yes, sir.

LAWRENCE LOGSDON - CROSS BY MR. SPRINGER                    1570

```
 1   Q.  Now, the government asked you questions about a
 2   $20,000 check that you made out to Bondage Breakers
 3   Ministry.  Do you remember that?
 4   A.  Yes, sir.
 5           MR. O'REILLY:  Your Honor, for the record, the
 6   government exhibit number, please?
 7           MR. SPRINGER:  I'm sorry.  Can you pull up
 8   Number 256?  I'm sorry, pull that back off.  Can I have
 9   just a second, Your Honor?
10           THE COURT:  You may.
11           MR. SPRINGER:  Government's Exhibit Number 51,
12   please.
13   Q.  (BY MR. SPRINGER)  Mr. Logsdon, you testified that
14   this $20,000 check, Government's Exhibit Number 51, that
15   that was a gift or a donation to Bondage Breakers
16   Ministry; is that correct?
17   A.  That's correct.
18   Q.  And while at the same time, isn't it true you
19   testified that you were also writing checks to Oscar
20   Stilley for his services?
21   A.  That's true.
22   Q.  Now, can you explain to the jury why you would be
23   writing a check to Oscar Stilley for services and writing
24   a check to Bondage Breakers Ministries as a gift?
25   A.  Well, Mr. Stilley was doing the work, actually doing
```

1   the work of representing us.  And it turns out that

2   Mr. Springer and his Bondage Breakers Ministry was doing

3   an awful lot of background work, supporting Mr. Stilley

4   and enabling him to be able to be effective.  And once I

5   realized that this was really how it worked, I said,

6   Well, gosh, doesn't anybody pay this man?  He says, No.

7   Q.   Now, at no time did you get a billing statement from

8   Oscar Stilley where he charged you for anything that I

9   did in relationship to you; isn't that true?

10  A.   Never, huh-uh.

11  Q.   Now, you were in a position at the time when -- I

12  believe you said that the IRS had frozen Tahiti Trader's

13  account; is that correct?

14  A.   They took all the money.

15  Q.   Took all the money?

16  A.   And it didn't owe any money.

17  Q.   Now, isn't it true that right after you hired

18  Mr. Stilley in May of 2006 for those services, that he

19  left to Russia for a period of time?

20  A.   That's correct.

21  Q.   And so you were left without anybody from

22  Mr. Stilley's office to help you; isn't that true?

23  A.   That's true.

24  Q.   Now, didn't you go find and hire a lawyer in

25  California?

1  A.   We did.

2  Q.   And when you hired that lawyer, did he agree to

3  represent you where Mr. Stilley was originally supposed

4  to represent you?

5  A.   That's correct.

6  Q.   And from that time forward, did you ever go back to

7  get services from Mr. Stilley?

8  A.   No, sir.

9  Q.   But on several occasions, you asked me to speak with

10  that lawyer, did you not?

11  A.   We did.

12  Q.   Did I ever send you a bill for the time that you

13  asked me to speak with him?

14  A.   No, sir.

15  Q.   Did I ever enter into contract with you in

16  relationship to speaking with this lawyer?

17  A.   No.

18  Q.   Did you ever ask me for a billing statement on what

19  I had done with the May 10, 2006, $20,000 that you had

20  given me?

21  A.   No.

22  Q.   And, in fact, isn't it true that we had a discussion

23  about that the only way that I could ever receive money

24  from anybody, not just you, but anybody that you knew,

25  was that if it was an unconditional gift?

LAWRENCE LOGSDON - CROSS BY MR. SPRINGER                    1573

```
 1  A.   That's true.
 2  Q.   Now, as far as you know, in -- you said your tax
 3  returns are all current presently with the IRS; is that
 4  right?
 5  A.   That's true.
 6  Q.   Now, did the IRS ever give you a tax deduction of
 7  $20,000 for what you gave Bondage Breakers Ministries?
 8  A.   No, sir.
 9  Q.   So any money that you gave Bondage Breakers
10  Ministries was after-tax money, correct?
11  A.   That's correct.
12  Q.   And isn't it also true that I told you that you --
13  that the IRS would not recognize any deduction as a gift
14  or a charitable donation because Bondage Breakers
15  Ministries was really just a name with Lindsey Springer?
16  A.   Yes.
17  Q.   And did I also not tell you that if you didn't have
18  an actual receipt that acknowledged a tax exempt
19  organization number that the IRS would not accept any
20  deduction or a charitable deduction?
21  A.   That's true.
22  Q.   Now, we weren't trying to hide anything from the
23  IRS, though, were we?
24  A.   No, sir.
25  Q.   As a matter of fact, we were trying to get them
```

1   everything they were supposed to have and then move from

2   there; isn't that true?

3   A.   Yes.

4   Q.   Now, do you remember having any conversation with me

5   regarding you being infected with a belief system, let's

6   say?

7   A.   I don't know.

8   Q.   And isn't that -- it's safe to say that at the time

9   you met me, you didn't have any personal income tax

10  return problems with the IRS; isn't that right?

11  A.   No.  No, we had no problems.  No.

12  Q.   Now, at the time that you hired Mr. Stilley, isn't

13  it true that he and John Dunn were trying to direct you

14  to a different course or path than the one that you were

15  then on?

16  A.   That's true.

17  Q.   And didn't I all but beg you not to listen to either

18  of them?

19  A.   Yes.

20  Q.   And did you listen to me?

21  A.   Eventually.

22  Q.   Are you glad you listened to me?

23  A.   Oh, Lord, yes.

24  Q.   Now, you testified earlier that you didn't know

25  whether you were under criminal investigation; is that

1   correct?

2   A.   Yes, sir, I didn't know.

3   Q.   But you did know that you were being pursued hot and

4   heavy by the civil revenuers, didn't you?

5   A.   Oh, yes.

6   Q.   But you testified earlier that there really -- there

7   was no tax liability owed with Tahiti Trader; is that

8   correct?

9   A.   That's true.  It didn't owe any money, no.

10  Q.   And yet the IRS had frozen and taken $500,000?

11  A.   That's true.

12  Q.   Did you have a difficult time trying to find

13  somebody that could even explain that to you?

14  A.   Oh, my, yeah.

15  Q.   Are you still trying to understand why they did what

16  they did?

17  A.   Yes.

18  Q.   And you have an attorney right now in California

19  that is a very competent attorney, is he not?

20  A.   He is.

21  Q.   Now, besides the two checks you testified here

22  today, you have continually supported Bondage Breakers

23  Ministry; isn't that true?

24  A.   I have, yes.

25  Q.   Plan on stopping?

```
 1  A.   No.
 2          MR. SPRINGER:  No further questions, Your Honor.
 3          THE COURT:  Mr. Stilley.
 4                     CROSS-EXAMINATION
 5  BY MR. STILLEY:
 6  Q.   Mr. Logsdon, is it fair to say it's been a few years
 7  since we talked?
 8  A.   Yes, sir.
 9  Q.   And it's been a few years since these checks were
10  written too, correct?
11  A.   Yes, sir.
12  Q.   So there's a possibility it might be just a little
13  difficult to remember some things sometimes?
14  A.   Absolutely.  Oh, my gosh, yes.
15  Q.   Now, do you recall the summonses that originally
16  started some issue with the IRS?
17  A.   I do.
18  Q.   And do you remember that you were trying to resolve
19  your differences or determine what was going on in the
20  litigation that was initiated about those summons?
21  A.   Yes.
22  Q.   And I believe that was you that filed the motion to
23  quash the summons, correct?
24  A.   We did, yes.
25  Q.   And isn't it true that the government was alleging
```

1  that there were assessments?

2  A.   That's true.

3  Q.   And isn't it true also that the government had

4  hearsay testimony called 4340 saying that they were

5  assessments?

6  A.   That's true.

7  Q.   And isn't it true that the government never showed

8  you those assessments?

9  A.   Not once.

10 Q.   And isn't it true that if the government had shown

11 you an assessment that was on its face valid that you

12 would have promptly paid it?

13 A.   We told them that, yes.

14 Q.   And it was the truth too, right?

15 A.   It was, yes.

16 Q.   And if you disagreed with that assessment, isn't it

17 true that you would have filed an action in federal

18 court, an appropriate venue, to litigate such amounts of

19 that assessment as you might disagree with?

20 A.   That's true.

21 Q.   You never got that chance, did you?

22 A.   No, sir, I didn't.

23 Q.   Isn't it true that the -- and it's already been

24 discussed about the seizure of your money -- that would

25 have destroyed you financially, correct?

LAWRENCE LOGSDON - CROSS BY MR. STILLEY                    1578

```
 1   A.   Nearly did, sir.

 2   Q.   And isn't it -- do you recall the name Mike Raines

 3   (ph)?

 4   A.   Oh, yes.

 5   Q.   Was that a real name or a fake name?

 6          MR. O'REILLY:  Objection to relevance, Your

 7   Honor.

 8          THE COURT:  Sustained.

 9          THE WITNESS:  I think it was fake.

10          MR. O'REILLY:  Objection.

11   Q.   (BY MR. STILLEY)  Who was Mike Raines?

12          THE COURT:  The objection has been sustained.

13   Move on.

14          MR. STILLEY:  Certainly, Judge.

15   Q.   (BY MR. STILLEY)  What position did Mike Raines

16   hold?

17          THE COURT:  Mr. Stilley.

18          MR. STILLEY:  Oh, I'm --

19          THE COURT:  The objection has been sustained.

20   Move on to an entirely different subject.

21          MR. STILLEY:  I'm sorry.  I didn't understand

22   what you were saying there.

23   Q.   (BY MR. STILLEY)  The government changed your

24   behavior, did they not?

25   A.   Oh, boy.
```

1   Q.   But they didn't change your mind, did they?

2   A.   No.

3   Q.   As you sit here today -- scratch that.  You and

4   Oscar Stilley parted ways on good terms, correct?

5   A.   I believe so.

6   Q.   And isn't it true, as you sit here today, you have

7   no evidence whatsoever that either Oscar Stilley or

8   Lindsey Springer committed any crime?

9   A.   No.

10          MR. STILLEY:  Could I have a moment?

11          THE COURT:  You may.

12          MR. STILLEY:  Thank you.

13  Q.  (BY MR. STILLEY)  Do you recall the government ever

14  telling you or suggesting to you that maybe you willfully

15  failed to file a gift tax return?

16  A.   No.

17          MR. STILLEY:  Pass the witness.

18          THE COURT:  Any redirect?

19                  REDIRECT EXAMINATION

20  BY MR. O'REILLY:

21  Q.   When is the last time you sent Mr. Springer any

22  money?

23  A.   Recently, in the last couple weeks.

24  Q.   How much did you send him?

25  A.   I believe $1,000.

```
 1    Q.   In what form?

 2    A.   Cash.

 3            MR. O'REILLY:  Nothing further, Your Honor.

 4            THE COURT:  Any recross?

 5                      RECROSS-EXAMINATION

 6    BY MR. SPRINGER:

 7    Q.   Did you send that money to me so that the government

 8    couldn't find out about it?

 9    A.   No, sir.

10    Q.   Thank you.

11            THE COURT:  Mr. Stilley?

12            MR. STILLEY:  No further questions.

13            THE COURT:  You may step down.

14            THE WITNESS:  Thank you.

15            THE COURT:  We'll have the government's next

16    witness.

17            MR. O'REILLY:  Your Honor, United States calls

18    Barbara Hodsden.

19                      BARBARA HODSDEN,

20    (WITNESS SWORN)

21            MR. O'REILLY:  Your Honor, may I approach the

22    witness and remove the binder?

23            THE COURT:  You may.

24                      DIRECT EXAMINATION

25    BY MR. O'REILLY:
```

1   Q.   Could you please state your full name and spell your

2   last name for the court reporter?

3   A.   Barbara Ann Hodsden, H-O-D-S-D-E-N.

4   Q.   Ms. Hodsden, in what city and state do you live?

5   A.   Lockport, New York.

6   Q.   How long have you lived there?

7   A.   Two years.

8   Q.   Prior to living in Lockport, where did you live?

9   A.   Oh, in Raleigh, North Carolina, and Island Pond,

10  Vermont.

11  Q.   Where did you live during the years -- the early

12  2000s, 2000 to 2005?

13  A.   2000, I lived in Kernersville, North Carolina.  And

14  then in 2001 or late 2001, I was in Michigan City,

15  Indiana.  And I left there December 19 of 2003, returning

16  only when we had the sale of a home in Michigan City,

17  Indiana, in June of '04.

18  Q.   Are you employed?

19  A.   Self-employed.

20  Q.   And how are you self-employed?

21  A.   Veterinary practice.

22  Q.   Are you a veterinarian?

23  A.   No, my husband is, and I just back it up, support.

24  Q.   You help your husband in his veterinary practice?

25  A.   Yes, I do.

1   Q.   How long have you been helping your husband with his

2   veterinary practice?

3   A.   This practice is two years, but throughout our

4   business life, I've been working with him.

5   Q.   And how long has that been?

6   A.   Since 1974.

7   Q.   Are you familiar with the name Lindsey Springer?

8   A.   Yes.

9   Q.   Have you ever met Lindsey Springer?

10  A.   Yes.

11  Q.   Do you see Mr. Springer in the courtroom today?

12  A.   Yes.

13  Q.   And could you identify him by where he is or -- or

14  is he the gentleman standing behind me?

15  A.   Yes.

16          MR. O'REILLY:  May the record reflect that

17  Ms. Hodsden has identified Mr. Springer?

18          THE COURT:  The record will so reflect.

19  Q.   (BY MR. O'REILLY)  How is it that you first became

20  familiar with the name Lindsey Springer?

21  A.   His name was mentioned regarding conference calls as

22  a possible way of helping me with our tax problem.

23  Q.   And when you say "our tax problem," is that yours

24  and your husband's?

25  A.   Yes.

```
 1   Q.   Generally speaking, what was your tax problem?
 2   A.   We had stopped paying taxes.
 3   Q.   When was that?
 4   A.   2000.
 5   Q.   Why had you stopped paying taxes?
 6   A.   Because we had been guided to investing money in
 7   trusts and LLCs.
 8   Q.   Who had guided you to doing this, what company?  Or
 9   if you know a person, that's fine.
10   A.   I cannot bring up the name of that group.  David was
11   one of the people.
12   Q.   Let me ask you, does the name Innovative Financial
13   Consultants ring a bell?
14   A.   Yes.
15   Q.   Is that the group you were trying to think of?
16   A.   Pardon?
17   Q.   Is that the group you were trying to think of?
18   A.   Yes.
19   Q.   Was it also called IFC?
20   A.   Yes.
21   Q.   When did -- was it both you and your husband that
22   were -- got involved with IFC?
23   A.   Yes.
24   Q.   When did that begin?
25   A.   I don't recall actually, exactly.
```

1   Q.   Would it have been sometime before 2000?

2   A.   No.

3   Q.   Was it about 2000?

4   A.   No, it was after that.  Maybe 2002.

5   Q.   Okay.  Early 2000s?

6   A.   2002 or '3, I don't recall.

7   Q.   Do you know the name Oscar Stilley?

8   A.   No.

9   Q.   Okay.  To be clear, Mr. Springer did not get you

10  involved with IFC, did he?

11  A.   No.

12  Q.   What was it that IFC told you or recommended that

13  you do with respect to taxes?

14  A.   They -- I don't recall.  They were just showing us

15  ways to invest or to manage our monies.

16  Q.   Did you invest and manage your monies consistent

17  with their recommendations?

18  A.   I tried.

19  Q.   You mentioned conference calls and that that was

20  where you think you first heard the name Lindsey

21  Springer?

22  A.   Exactly.

23  Q.   Did you listen to some of these calls?

24  A.   Very few.  They were always at a time when I was

25  getting dinner after working all day and -- maybe 5:00.

```
1  4:00 or 5:00, whatever.
2  Q.   Do you have any specific recollection of those
3  calls?
4  A.   Not specific, no.
5  Q.   Generally, what was discussed on those calls?
6  A.   Cases in which Lindsey was working on and the laws
7  that were relevant to those cases, which was over my
8  head.
9  Q.   Were these cases dealing with taxes, if you know?
10  A.   No, not specific that I can -- I wouldn't say that,
11  no.
12  Q.   Did there come a time that you wanted to get out of
13  IFC?
14  A.   Exactly.  Yes.
15  Q.   When did you reach the decision that you wanted to
16  get out of IFC, if you can recall?
17  A.   Not very long after I became involved.
18  Q.   Did you turn to anybody to help you get out of IFC?
19  A.   I didn't know of anyone to turn to.
20  Q.   So what did you do?
21  A.   I don't know how, but somebody mentioned Lindsey and
22  the conference call, that I should listen to a conference
23  call and that he might be somebody who could help me.
24  Q.   Did you, in fact, listen to a conference call after
25  getting that recommendation?
```

```
 1  A.   Yes, but as I said, very few.

 2  Q.   Did you reach out and try to speak with Mr. Springer

 3  directly?

 4  A.   Yes.

 5  Q.   Do you recall approximately when?

 6  A.   No.

 7  Q.   Did you ever get to meet Mr. Springer?

 8  A.   Yes.

 9  Q.   How did that come about?

10  A.   He contacted us and said he would be coming through

11  our area and that he would like to stop just to meet us.

12  Q.   Where were you living at the time?

13  A.   Michigan City, Indiana.

14  Q.   So what time frame would this have been, then?  When

15  would this have been?

16  A.   When?

17  Q.   Yes, ma'am.

18  A.   I really cannot recall when that was.  I can

19  remember the breezes were coming through the sliders and

20  it was a nice day, but other than that -- I would say

21  late summer, early fall.

22  Q.   Let me ask --

23  A.   I don't know.  I really can't pin that down.

24  Q.   Would it help to look at a check that you wrote that

25  was payable to Bondage Breakers Ministries?  Would that
```

1   help refresh your recollection?

2   A.   I don't know that that could help me pin down the

3   date he came to my house.  I don't know that.

4   Q.   Okay.  Well, when he came to your house, when

5   Mr. Springer came to your house, what generally did you

6   discuss with him?

7   A.   It was a brief meeting, and he went over some of our

8   documents.

9   Q.   Which documents?

10  A.   We had -- excuse me.  We had amortization schedules

11  and contracts with prior businesses that we had financed,

12  and he wanted to see how those documents were laid out,

13  the accuracy and whatever.

14  Q.   And after that, did you have any further contact

15  with Mr. Springer?

16  A.   Only telephone.

17  Q.   What was the purpose of your telephone contacts with

18  Mr. Springer?

19  A.   He was going to help me find an accountant that

20  would help me get back into filing tax returns.

21  Q.   Did you give Mr. Springer any money?

22  A.   Yes.

23  Q.   I'm going to ask you if you could look at what's in

24  evidence as Government's Exhibit 38, if you could pull

25  that up on the screen.  I'm going to ask you if you

1    recognize that document.

2    A.   Yes, I do.

3    Q.   What is Government's Exhibit 38?

4    A.   You're asking me?

5    Q.   Yes, ma'am.

6    A.   It's our check to Bondage Breakers Ministries,

7    $45,000, dated 2/12/04.

8    Q.   It's drawn on a Mayberry 2000, LLC account; is that

9    correct?

10   A.   That was the veterinary, the LLC.

11   Q.   Why did you make the check payable to Bondage

12   Breakers Ministries?

13   A.   Because he felt that would be a fair gift or

14   donation.

15   Q.   I'm sorry, ma'am.  I didn't ask about the amount.

16   Why did you make the check payable to Bondage Breakers

17   Ministries as opposed to Lindsey Springer?

18   A.   He told us to make it out to that.

19   Q.   How did you come up with the figure $45,000?

20   A.   I -- my impression or my thinking was that it was

21   for helping us to get back into tax returns from the year

22   2000 through 2003.

23   Q.   Did you originally suggest $45,000?

24   A.   No.

25   Q.   Who -- did anybody suggest that figure?

1   A.    Lindsey did.

2   Q.    Did Mr. Springer make any representations about what

3   he would do for you with respect to that $45,000?

4   A.    Before he mentioned this amount, he was talking

5   about finding me an accountant that would help us to do

6   this and do it well, and the one -- that would be open-

7   minded about it and be thorough about it and be

8   efficient.

9   Q.    Did Mr. Springer help you find such an accountant?

10  A.    Yes.

11  Q.    Did you ever have any other conversation with

12  Mr. Springer where he asked for any additional money?

13  A.    He didn't.

14  Q.    Was Mr. Springer going to do anything for you with

15  respect to your tax returns?

16  A.    He had said he would be able to -- once they were

17  drafted and drawn up, that he would be able to proofread

18  them for any red flags that might be there.

19  Q.    To your knowledge, did Mr. Springer ever do that?

20  A.    No, not to my knowledge.

21          MR. O'REILLY:  If I may have a moment, Your

22  Honor?

23          THE COURT:  You may.

24  Q.    (BY MR. O'REILLY)  Did Mr. Springer make any

25  representation about whether he would work with your

```
 1  accountant for you?
 2  A.   I believe he met with her once, but I cannot
 3  document that.
 4  Q.   Why did you pay Mr. Springer $45,000?
 5  A.   Because I guess I don't believe anybody does
 6  anything for me without me doing something for them.
 7  Q.   What was it that you wanted Mr. Springer to do for
 8  you?
 9  A.   Find me somebody to take care of my accounting.
10  Q.   And with respect to your taxes?
11  A.   Yes.
12          MR. O'REILLY:  Nothing further, Your Honor.
13          THE COURT:  Cross-examination.
14                      CROSS-EXAMINATION
15  BY MR. SPRINGER:
16  Q.   Good afternoon, Ms. Hodsden.
17  A.   Hi, Lindsey.
18  Q.   You testified that right after you joined IFC you
19  became very skeptical about it, correct?
20  A.   Correct.
21  Q.   But you were really only half of this equation;
22  isn't that true?  Your husband was the other half?
23  A.   Well, we do everything together, exactly.
24  Q.   And is he the one that drew you to IFC or did you
25  take him to IFC?
```

1  A.   I think we both made the same move.

2  Q.   Same time?  Okay.  And you testified that I -- oh,

3  excuse me.  Strike that.  Did you find a wonderful CPA?

4  A.   I did.  You did.

5  Q.   I found her and then you found her, right?  I mean,

6  I told you where to go, right?

7  A.   You told me about her and you made a conference call

8  between Cynthia and you and I.

9  Q.   Right.  Now, there were some problems, though, with

10 Cynthia at first, because she was ill; isn't that true?

11 A.   Exactly.  She had had surgery, I believe.

12 Q.   Yeah.  And so things at the beginning did not go

13 quite as fast as you really wanted them or needed them to

14 go; isn't that true?

15 A.   True.

16 Q.   But you kept a steady hand with her, and finally you

17 got the outcome that you were looking for; is that right?

18 A.   Yes, we did.

19 Q.   Now, when I asked for the money that you gave me, we

20 had a discussion, did we not, about that it had to be a

21 gift or a donation?

22 A.   Exactly.

23 Q.   Okay.  And are you current with all of your tax

24 returns?

25 A.   Yes, I am.

1   Q.   And are you happy about that?

2   A.   Yes.

3           MR. SPRINGER:  Thank you very much, Your Honor.

4           THE COURT:  Mr. Stilley.

5           MR. STILLEY:  No questions.

6           THE COURT:  Any redirect?

7           MR. O'REILLY:  No, Your Honor.

8           THE COURT:  You may step down.  Counsel will

9   approach.

10     (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND

11  OUT OF THE HEARING OF THE JURY.)

12          THE COURT:  Okay.  We just finished number 49.

13  How much more do you have?

14          MR. O'REILLY:  We have Mr. Hawkins and

15  Mrs. Hawkins and we have Special Agent Beckner with

16  respect to the computer records, Special Agent Shern and

17  then, I believe, Brian Miller.

18          THE COURT:  Is that basically going to be, oh,

19  what?  Two-thirds of a day?  Maybe a day?

20          MR. O'REILLY:  For the government's direct, far

21  less than that.  I don't know how long the cross will be,

22  though.

23          THE COURT:  Okay.  Well, do you have anybody out

24  there for whom there is a compelling need to call and get

25  them out of here tonight?

1     MR. O'REILLY:  The only thing I would say, Your

2  Honor, is that the marshals will be really upset with us

3  that Mr. Hawkins didn't get on at all today, but --

4     THE COURT:  That's why we pay them the big

5  bucks.  Okay.  We'll recess for the night.

6     (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

7  WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

8  PRESENCE AND HEARING OF THE JURY.)

9     THE COURT:  Members of the jury, you have put in

10  another long day, and it's time to call it a day and

11  resume at nine o'clock tomorrow morning.  And I think

12  it's predictable that the government will complete

13  presentation of its evidence tomorrow, and we'll

14  obviously just take it one step at a time from there.

15  But by my count, we just finished witness number 49, and

16  so you have put in another hard day.  Being a juror is

17  hard work.  I want you to know that it is very much

18  appreciated, as I have said, and I sincerely thank for

19  your continuing service to the court.  You've got a

20  little over a week invested in this matter now.

21     So we will recess until 9:00 in the morning.

22  Overnight, please remember not to discuss or investigate

23  the case in any way and not to reach any conclusions

24  until the case has been given to you for your

25  deliberations and verdict.  Please be available in the

1    usual place just a little before 9:00 so that the

2    security officer may come to court with you.  Thank you

3    again for your day of service to the court.  All persons

4    in the courtroom will remain seated while the jury

5    departs.

6         (JURY EXITS THE COURTROOM.)

7         THE COURT:  Okay.  Further to our conversation

8    that we had earlier this afternoon, I'm going to take --

9    we're going to take about a ten-minute break, and we'll

10   resume at ten minutes after the hour.  Again, in fairness

11   to the defendants, I think perhaps the defendants ought

12   to be informed of at least my starting point with respect

13   to some matters relating to their presentation of their

14   case and -- so that they won't -- at least to the extent

15   that it's avoidable, they won't have to guess about how

16   that will proceed.  So we'll resume at ten minutes after

17   5:00 for that purpose.  Court will be in recess until

18   then.

19        (A RECESS WAS HAD, AFTER WHICH THE FOLLOWING

20   PROCEEDINGS WERE HAD IN OPEN COURT, OUTSIDE THE PRESENCE

21   AND HEARING OF THE JURY.)

22        THE COURT:  Okay.  I, obviously, am not

23   intimately familiar with the defendants' approach to

24   their defense of this case.  It's by any standard not

25   even appropriate that anybody other than the defendants

1    and their standby counsel have a thorough understanding

2    of their approach to their defense.  But I certainly have

3    read enough by way of the defendants' filings and other

4    sources that are available to all of us to have some at

5    least high level of generality understanding of the

6    defendants' approach.

7         I suppose most of the things that I'll be focusing

8    on will relate in the first instance predominantly to

9    Mr. Springer, but because of the conspiracy charge and

10   because of other aspects of the case with which we are

11   all familiar, why, it's -- I think it's equally true that

12   most of the considerations that may apply in the first

13   instance predominantly to Mr. Springer also directly or

14   indirectly do affect Mr. Stilley.

15        So I think in fairness, with two pro se defendants,

16   it is appropriate that I provide some preliminary

17   thoughts as to the ground rules, for lack of a better

18   word, that will govern the defendants' presentation of

19   their evidence.  And I hasten to add that to some degree,

20   certainly we're going to have to remain flexible and

21   adjust as need be as the defendants' presentations

22   proceed.  So the comments that I'm about to make really

23   should be taken as nothing more than a starting point.

24        Now, to be sure, it's a starting point that I have

25   arrived at after a considerable amount of thought and

1  research, but this is still a starting point.  And if

2  either side wants to move in to a little different

3  direction, why, you'll certainly have that opportunity.

4      That said, my starting point for evaluation of some

5  aspects of the defendants' contemplated presentation of

6  their case is the Supreme Court's decision in Cheek v.

7  United States 498 U.S. 192.  Obviously, there was a good

8  deal of case law before Cheek came along that dealt with

9  some of these issues.  I think Cheek served to, among

10 other things, just pull together various considerations

11 and give the lower federal courts the benefit of the

12 Supreme Court's evaluation and analysis and certainly

13 definitive pronouncement as to how trial courts are to

14 handle some of these evidentiary problems in tax cases

15 where willfulness is very much in issue and the

16 defendants are making assertions with respect to their

17 understanding of the law as it may bear on the issue of

18 willfulness.

19     At page 201 of the Cheek decision, the Supreme Court

20 said, and I quote, "Willfulness, as construed by our

21 prior decisions in criminal tax cases, requires the

22 government to prove that the law imposed a duty on the

23 defendant, that the defendant knew of this duty and that

24 he voluntarily and intentionally violated that duty.  We

25 deal first with the case where the issue is whether the

1    defendant knew of the duty purportedly imposed by the

2    provision of statute or regulation he is accused of

3    violating, a case in which there is no claim that the

4    provision at issue is invalid.  In such a case, if the

5    government proves actual knowledge of the pertinent legal

6    duty, the prosecution, without more, has satisfied the

7    knowledge component of the willfulness requirement, but"

8    -- and now we're over on page 202 -- "but carrying this

9    burden requires negating a defendant's claim of ignorance

10   of the law or a claim that because of a misunderstanding

11   of the law, he had a good faith belief that he was not

12   violating any of the provisions of the tax laws," close

13   quote.

14       So the Supreme Court gave us that decision in

15   January of 1991, which, as I have said, I think gave --

16   provided the lower federal courts a good deal of

17   clarity.  I don't know if the Tenth Circuit addressed

18   issues of this kind any earlier than the Willie case, but

19   the Willie case came along in August of '91, about eight

20   months later.  And I'm not going to -- everybody has read

21   the Willie case, and I'm not going to read the whole

22   thing, but there are some passages that certainly do have

23   a bearing on my evaluation of the appropriate way to

24   proceed.

25       The Willie case is at 941 F.2d. 1384.  At page 1391,

1  the Court wrote, and I quote again, "Willie next contends

2  that the trial court erred in prohibiting him from

3  introducing exhibits to show the basis for his belief

4  that he was not required to file tax returns.  Willie

5  argues that the exhibits were relevant to show the

6  sincerity of his good faith belief that he need not file

7  a tax return and thereby were relevant to his defense;

8  that because of that belief, he did not willfully violate

9  the tax law -- the tax laws.  He further argues that

10 Cheek v. United States requires admission of the exhibits

11 for that purpose," close quote.

12      And I left out the full citation to Cheek in that

13 quote.  And then over on page 1393, the Court wrote,

14 quote, "As a result, the precise purpose for which the

15 evidence is offered becomes crucial to the trial court's

16 determination of admissibility, particularly in cases of

17 this nature where the careless admission of evidence

18 supporting both relevant and irrelevant types of belief

19 could easily obfuscate the relevant issue and tempt the

20 jury to speculate that the mere existence of documentary

21 support for the defendant's position negates his

22 independent knowledge that he has a legal duty.  Citing

23 Rigby, R-I-G-B-Y, v. Beach Aircraft Company, 548 F.2d.

24 288, parens, proof showing defective design of main tanks

25 could easily mislead or confuse jury regarding relevant

1   issue of defect in auxiliary tank, close parens.  The

2   defendant must therefore persuasively show the trial

3   judge that the evidence is being offered for a

4   permissible purpose by making a proffer of great

5   specificity regarding the type of belief he seeks to

6   prove.  A mere statement that the evidence is submitted

7   to show sincerity of belief is not enough.  Without a

8   particularized explanation, the trial judge will likely

9   focus on the impermissible aspects of the proffered

10  material and will be unaware of the possible limited

11  purpose available to the offering party.  This places the

12  trial judge in an unfair predicament with respect to a

13  ruling," close quote.

14      That's an unusual display of sympathy from the Court

15  of Appeals.  And then finally, in Willie on page 1395 and

16  1396 -- actually just on page 1395, the Court wrote, with

17  respect to Rule 403 in an alternative ruling, as follows,

18  quote, "Although our holding on inadequate proffer

19  grounds is dispositive, we hold alternatively that the

20  exhibits were properly excluded under Federal Rule of

21  Evidence 403 because they were confusing, because of the

22  danger of the jury's misuse of the evidence for an

23  improper purpose was great and because the relevant point

24  was provable by other evidence."

25      Okay.  That's fine as far as it goes, but then the

1  question becomes, okay, what is an appropriate means fair

2  to all concerned for the defendants to make their point.

3  And there are some later cases, and for that matter one

4  earlier case, that shed light on that and from which I

5  have derived considerable guidance.

6      About a year after -- a little over a year after

7  Willie, in October of 1992, the Tenth Circuit handed down

8  its decision in United States v. Payne, P-A-Y-N-E, 978

9  F.2d. 1177, dealing with similar issues and in an attempt

10  to offer various materials in support of a willfulness

11  defense.  On page 1181, the Court said, quote, "Finally,

12  defendant contends that the district court erroneously

13  excluded documentary evidence relating to his asserted

14  good faith belief that he had no legal duty to file

15  income tax returns," close quote.

16      And then after a citation, the Court goes on to say,

17  still on page 1181, quote, "The district court permitted

18  defendant to testify extensively about his

19  misunderstanding of the tax laws.  Defendant, a retired

20  psychiatrist who up until at least 1978 had annually

21  filed a tax return, testified that he did not file tax

22  returns for 1984 through '87 due to his honestly held

23  belief that the Internal Revenue Code did not require

24  persons to annually file an income tax return.  After

25  receiving information from a tax protestor organization,

1   defendant researched the tax law," close quote.

2        It goes on to discuss a little bit more about how

3   that particular defendant reached his conclusions.  And

4   then the Court says, quote, "Defendant sought to

5   introduce into evidence his underlined copy of the Flora,

6   F-L-O-R-A, opinion, his marked-up copy of the Schiff,

7   S-C-H-I-F-F, book and the 1984 and 1987 Internal Revenue

8   Codes, as well as his handwritten legal research notes.

9   The district court rejected the admission of these

10  exhibits, recognizing a danger of prejudice that

11  outweighed any evidentiary purpose that could be served

12  with regard to the issue of willfulness.  However, the

13  district court permitted defendant to physically possess

14  the exhibits on the witness stand, to display them to the

15  jury and to read all pertinent portions to the jury and

16  explain their impact on his alleged misunderstanding of

17  the tax laws," close quote.  That's on page 1182.

18       A little later on the same page, the Court says,

19  quoting Cheek, "Forbidding the jury to consider evidence

20  that might negate willfulness raises a serious question

21  under the Sixth Amendment's jury trial provision.

22  Nevertheless, Cheek does not require the admission of any

23  and all evidence showing a basis for the defendant's

24  belief," close quote.

25       Finally, in the Payne case, over on page 1182, the

1  Court said, and I quote, "Moreover, permitting legal

2  materials into the jury room creates the potential for

3  undue jury confusion concerning the governing law," close

4  quote.  They cited Willie.  And then they concluded,

5  quote, "Given that defendant was permitted to testify

6  extensively concerning the basis for his claimed good

7  faith misunderstanding of the tax laws and was permitted

8  to read the pertinent excerpts of the materials on which

9  he allegedly relied, we find no abuse of discretion by

10  the district court in refusing to accept the proffered

11  exhibits into evidence."

12       Finally, and this is kind of a -- in terms of in

13  point of time, this is going back a good many years, but

14  I think the Harrold decision, H-A-R-R-O-L-D, 796 F.2d.

15  1275, is still informative.  At page 1285 -- and this

16  obviously is pre-Cheek and pre-Willie, but nevertheless

17  informative.  On page 1285, the Court said, quote,

18  "Several courts have held that Supreme Court opinions or

19  other evidence on which a defendant relied to reach an

20  erroneous conclusion on tax obligations properly are

21  excluded," close quote.  And the Court cites cases from

22  several circuits, one involving exclusion of Supreme

23  Court opinions, one from the Fifth Circuit involving

24  exclusion of expert testimony concerning the plausibility

25  of a theory that wages are not income, another one

1  concerning exclusion of federal court opinions and

2  another one concerning exclusion of a letter appearing in

3  the Congressional Record, the IRS training manual and

4  Supreme Court opinions.

5      So I conclude from these authorities, every one of

6  which is from a higher court than this one, that the

7  first thing that Mr. Springer needs to do is to make a

8  particularized showing -- or the particularized showing

9  contemplated by the Willie case.  Mr. Springer, this will

10 be your choice.  You can do that outside the presence of

11 the jury, if you prefer, or you can do it on a designed

12 bill basis in the presence of the jury.  That will be

13 your call.

14     But the ground rules are these:  The Paperwork

15 Reduction Act is not a substantive defense.  You can take

16 that straight to the Court of Appeals.  The Paperwork

17 Reduction Act is not a substantive defense, but if you

18 can make a particularized showing that will support the

19 admissibility of materials which caused you in good faith

20 to believe that you had no obligation to file tax returns

21 because of the Paperwork Reduction Act, why, then, it is

22 conceivable -- I don't reach any conclusion now, but it

23 certainly is conceivable that you will be permitted to

24 make that sort of a presentation.

25     It is -- and, again, in keeping with the spirit in

1   which I began my comments, namely that you probably ought

2   not to consider these comments to be final, but perhaps

3   to represent the result of considerable thoughts on my

4   part.  You should probably proceed on the basis that a

5   whole raft of materials, written materials about the

6   Paperwork Reduction Act, are not going to be received in

7   evidence for the reasons discussed in the cases that I

8   just cited.

9        With that, and with the benefit of advice from

10  whatever source you choose to get advice, you can give

11  some thought to the timing and content of the showing

12  that you will be required to make in order to support the

13  introduction of evidence of your Paperwork Reduction Act

14  theory, or for that matter, any other theory of a similar

15  kind that goes to the issue of willfulness.  I think

16  we've probably covered about all we can cover on that

17  score.

18       Remember, counsel, that we will meet at 5:30

19  tomorrow to have what would be either a final or a semi-

20  final, at least, conference on instructions.  Is there

21  anything further we ought to address before we recess?

22          MR. O'REILLY:  With respect to tomorrow at 5:30,

23  we will not be discussing venue at that time.  I believe

24  the Court said you wanted our suggestions by Friday

25  morning; is that correct, Your Honor?

1         THE COURT:  Yeah, we'll leave the venue

2    instruction on hold for the time being until Friday

3    morning.

4         MR. O'REILLY:  Okay.

5         MR. SPRINGER:  If I just may, Your Honor.  In

6    understanding what you just read there with the Willie

7    case where he was permitted to be on the witness stand,

8    show the jury what he relied upon, but the court didn't

9    enter it into evidence of the case, but it was taken in

10   his testimony, I guess in chief, when the Court was

11   making its preliminary ruling, and I understand the

12   leeway that it's not final, as you said, is the Court

13   going to allow me -- if it doesn't receive the Paperwork

14   Reduction Act documents into evidence, is it still going

15   to allow me to establish why I relied upon what this

16   court case said or what this treatise said or --

17        THE COURT:  Okay.  That -- if -- yes.  Let's cut

18   to the chase.

19        MR. SPRINGER:  Yes.

20        THE COURT:  If you have made a particularized

21   showing.  And, again, let's cut to the chase.  I'll use

22   the vernacular.  You've got to show me that your reliance

23   on the Paperwork Reduction Act was in some way arguably,

24   plausibly, perhaps remotely plausibly, something other

25   than poppycock.

```
 1            MR. SPRINGER:  Great.  Now --
 2            THE COURT:  To use a legal term.
 3            MR. SPRINGER:  I understand with that
 4   definition.  And the reason why I rise on this issue,
 5   Your Honor, is -- to give an example, there are words
 6   that this Court is wrestling with defining, like the word
 7   "gift," for the jury.  And only one sentence in the
 8   current proposed jury instruction by the Court comes out
 9   of the law.  And so what I --
10            THE COURT:  You and I differ on that.
11            MR. SPRINGER:  I understand.
12            THE COURT:  There's about 50 pages that come out
13   of the law.
14            MR. SPRINGER:  And -- but when the Court is
15   saying "law," I'm -- if I'm mistaken, and I'm sure I'm
16   not, you're talking about like the decisions that
17   establish gift over a period of time.  And that's where I
18   ran into problem with how do I present like I relied upon
19   the Dawes decision or -- and that became the point of, I
20   think, what the lawyers are concerned about, in how we
21   present that as the Court is instructing us to possibly
22   give us some guidance on presenting that defense.  And
23   then the other issue that came at the very end of the
24   Court's not final position was whether or not I could
25   present it to the Court first to make that showing or I
```

1    could just try my best in front of the jury, and I'd like

2    to know, could I try to show that to the Court first and

3    when could I do that?

4            THE COURT:  That will be your call.  We'll have

5    to address the timing.  And I --

6            MR. SPRINGER:  Would I be subject to cross-

7    examination if I did it just in front of the Court as

8    well?

9            THE COURT:  Yes, that's a Rule -- that would, in

10   effect, be a Rule 104 type of proceeding.  You certainly

11   would be.

12           MR. SPRINGER:  The reason why, Your Honor, and I

13   just don't want to come across to the jury like -- you

14   know, if I say something and I'm not supposed to, I want

15   to make sure I stay within the four corners of what you

16   tell me I can say and do.  And I'm afraid if I sit up on

17   that stand, and some things are going to come into

18   evidence and some things aren't, that, you know, I don't

19   want to come across to the jury like I'm doing something

20   wrong.  Because I want to present it exactly the way it

21   is, that I know it in my heart it is, and so that's why I

22   was concerned.  And I just need to understand the ground

23   rules.  I've never been here before.  I've never seen

24   this before.  And I just want to make sure I do it right,

25   Your Honor.  I've got one shot at it, and I want to do it

1   right.

2          THE COURT:  That's understood.  Court will be in

3   recess.

4      (COURT ADJOURNED FOR THE EVENING RECESS.  FOR

5   FURTHER JURY TRIAL PROCEEDINGS, SEE VOLUME VIII.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25