1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE NORTHERN DISTRICT OF OKLAHOMA

3

4  UNITED STATES OF AMERICA,

5         Plaintiff,

6  vs.                        Case No. CR-09-43-SPF

7  LINDSEY KENT SPRINGER and
   OSCAR AMOS STILLEY,
8
          Defendants.
9  -----------------------------

10

11

12

13

14

15         TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16       BEFORE THE HONORABLE STEPHEN P. FRIOT

17          UNITED STATES DISTRICT JUDGE

18             NOVEMBER 4, 2009

19            VOLUME VIII OF XIV

20

21

22

23

24

25

*Tracy Washbourne, RDR, CRR*
United States Court Reporter
U.S. Courthouse, 200 N.W. 4th St.
Oklahoma City, OK 73102 * 405.609.5505

```
 1   APPEARANCES:

 2   FOR THE GOVERNMENT:
                         Mr. Anthony O'Reilly
 3                       U.S. Department of Justice
                         PO Box 972
 4                       Washington, DC 20044

 5                       Mr. Kenneth P. Snoke
                         U.S. Attorney's Office (Tulsa)
 6                       110 W. 7th Street, Ste. 300
                         Tulsa, OK 74119
 7

 8
     FOR DEFENDANT SPRINGER:
 9                       Mr. Lindsey Kent Springer
                         5147 S. Harvard Ave.
10                       Ste. 116
                         Tulsa, OK 74135
11
                         Mr. Robert Scott Williams
12                       Taylor Ryan Schmidt & Van Dalsem
                         1437 S. Boulder Ave., Ste. 850
13                       Tulsa, OK 74119

14   FOR DEFENDANT STILLEY:
                         Mr. Oscar Amos Stilley
15                       7103 Race Track Loop
                         Fort Smith, AR 72901
16
                         Mr. Charles Robert Burton, IV
17                       Burton Law Firm, PC
                         320 S. Boston, Ste. 2400
18                       Tulsa, OK 74103

19

20

21

22

23

24

25
```

```
1                    EXAMINATION INDEX

2

3    KATHY BECKNER
          DIRECT BY MR. O'REILLY              1612
          CROSS BY MR. SPRINGER               1620
4
     ARTHUR HAWKINS
5         DIRECT BY MR. SNOKE                 1623
          CROSS BY MR. SPRINGER               1661
6         CROSS BY MR. STILLEY                1706
          REDIRECT BY MR. SNOKE               1717
7         RECROSS BY MR. SPRINGER             1723

8    CYNTHIA HAWKINS
          DIRECT BY MR. SNOKE                 1742
9         CROSS BY MR. SPRINGER               1783
          CROSS BY MR. STILLEY                1795
10        REDIRECT BY MR. SNOKE               1797
          RECROSS BY MR. SPRINGER             1798
11        RECROSS BY MR. STILLEY              1801

12   BRIAN SHERN
          DIRECT BY MR. O'REILLY              1806
13        CROSS BY MR. SPRINGER               1824
          CROSS BY MR. STILLEY                1844
14        REDIRECT BY MR. O'REILLY            1859
          RECROSS BY MR. SPRINGER             1862
15
     LINDSEY SPRINGER
16        PROFFER TO THE COURT                1874

17

18

19

20

21

22

23

24

25
```

1      THE COURT:  Good morning, members of the jury.

2  Welcome back.  We'll have the government's next witness.

3      MR. O'REILLY:  Your Honor, the United States

4  calls Ms. Kathy Beckner.  Ms. Beckner.

5                    KATHY BECKNER,

6  (WITNESS SWORN)

7                 DIRECT EXAMINATION

8  BY MR. O'REILLY:

9  Q.   Could you please state your first and last name and

10 spell your last name and your first name for the court

11 reporter.

12 A.   Kathy, K-A-T-H-Y, Beckner, B-E-C-K-N-E-R.

13 Q.   Where do you work, ma'am?

14 A.   I work for the Internal Revenue Service criminal

15 investigation division.

16 Q.   What is your position there?

17 A.   I'm a special agent computer investigative

18 specialist.

19 Q.   How long have you been a computer investigative

20 specialist?

21 A.   Almost five years, since February of 2005.

22 Q.   Of what year, ma'am?

23 A.   2005.

24 Q.   Prior to becoming a computer investigative

25 specialist, how were you employed?

```
 1   A.   As a special agent.
 2   Q.   Could you briefly describe to the jury what you did
 3   in that capacity?
 4   A.   As a special agent?
 5   Q.   Yes, ma'am.
 6   A.   Conducted investigations of criminal allegations
 7   of --
 8   Q.   Of the internal revenue laws?
 9   A.   Yes, Title 26, the internal revenue laws.
10   Q.   How long were you a special agent prior to taking
11   over the duties of computer investigative -- what was the
12   last part of the title?
13   A.   Computer investigative specialist.
14   Q.   Thank you.  For how long were you a special agent
15   before assuming that duty?
16   A.    Ten years, so a total of 15 years as a special
17   agent, the last almost five as the computer investigative
18   specialist.
19   Q.   So you're still considered a special agent?
20   A.   Yes.
21   Q.   With respect to your current position as a computer
22   investigative --
23   A.   Specialist.
24   Q.   -- specialist.  I'm sorry.  Not enough coffee this
25   morning.  Have you received any training in that field?
```

1  A.    I have.

2  Q.    Could you just generally and briefly describe the

3  nature of that training?

4  A.    Initially, there are a basic -- there's a basic

5  computer recovery training and a primary -- an additional

6  class that's conducted by the national -- at the federal

7  law enforcement training center.  It's a class that's put

8  on by the Secret Service and ICE, Immigration, Customs,

9  and IRS.

10 Q.    What is the primary focus, if you will, of the

11 course and the training you've received for your current

12 position?

13 A.    The use of forensic tools, hardware issues,

14 procedural things that are related to forensics.

15 Q.    To what end?

16 A.    Excuse me?

17 Q.    To what end?  For what purpose?  What are you trying

18 to do?

19 A.    For the recovery and analysis of electronic

20 evidence, electronic data.

21 Q.    Would that include evidence that would be stored on

22 a computer?

23 A.    Oh, yes.

24 Q.    Did you participate in a search warrant conducted on

25 September 16th of 2005?

```
1   A.   I did.

2   Q.   Where was that search warrant executed?

3   A.   At Mr. Lindsey Springer's residence in Kellyville.

4   Q.   Kellyville, Oklahoma?

5   A.   Yes.

6   Q.   Did you have a specific role or task that you were

7   assigned for that day?

8   A.   Yes.  I was there as the computer specialist.  My

9   job was to identify and secure and seize any electronic

10  evidence.

11  Q.   Did you do that?

12  A.   I did.

13  Q.   Could you briefly describe for the jury what it was

14  you did during the search warrant on September 16th of

15  2005?

16  A.   Well, I would locate whatever electronic media or

17  evidence is at the site, secure it.  Meaning that I would

18  prevent any additional input or access to that data and

19  then seize that using forensic tools that were available

20  to me that would keep it in a preserved state as it were

21  at that moment.

22  Q.   Did you, in fact, obtain records and materials off

23  of computers during that search?

24  A.   I did.

25  Q.   How many computers were searched on that date in
```

KATHY BECKNER - DIRECT BY MR. O'REILLY                    1616

1  that location?

2  A.   There were a total of five computers at the

3  location.   Two of those were not seized.   The data from

4  two of those computers were not seized, because after a

5  discussion with Mr. Springer, it was determined that

6  those had not been used in years and weren't relevant.

7       There were three other computers.   Those three

8  computers contained four hard drives.   I imaged -- made a

9  copy of three of those hard drives and those images were

10 seized.   In addition, the third computer was

11 disassembled, so the hard drive had already been removed,

12 and I seized the actual hard drive and took it back to my

13 office and made the copy of it at my office.

14 Q.   What did you do with the physical hard drive that

15 you had actually seized after you had made the image at

16 your office?

17 A.   As I recall, the search warrant took place on a

18 Friday and I returned the hard drive -- the actual

19 physical hard drive to Special Agent Shern the following

20 Monday.

21 Q.   Is that the last time you saw the physical hard

22 drive?

23 A.   Yes.

24 Q.   Did you obtain records off of the computers you

25 seized?

```
 1  A.   I did.
 2  Q.   I'm going to ask you to look at what has been marked
 3  for identification as Government's Exhibit 575.  Do you
 4  see that, ma'am?
 5  A.   Yes.
 6  Q.   And if you need to, you can take it out of the
 7  sleeve, because I think it's a two-page document.
 8  A.   Okay.
 9  Q.   Do you recognize that document?
10  A.   Yes.
11  Q.   How is it that you recognize that document?
12  A.   These two pages appear to be parts of two separate
13  documents or two separate e-mails that I extracted from
14  one of the hard drives that were from Mr. Springer's
15  residence.
16  Q.   These were attachments to e-mails?
17  A.   Yes.
18  Q.   From whom were the e-mails sent based upon the
19  computer records?
20  A.   They were sent to Mr. Springer.
21  Q.   And from whom were they sent?
22  A.   One of them was from morris@oscarstilley.com and the
23  other was from denise@oscarstilley.com.
24  Q.   And do you recall the dates for the e-mails at
25  issue, approximately the years?
```

1  A.   I think one was May of '04, 2004, and the other was

2  July of 2004, something like that.

3  Q.   And without getting into the specifics, what

4  generally does Government's Exhibit 575 reflect?  What

5  type of information?

6  A.   Looks like records of payments between Mr. Springer

7  and Mr. Stilley.

8           MR. O'REILLY:  Your Honor, the government would

9  move Government's Exhibit 575 into evidence.

10           THE COURT:  Any objection?

11           MR. SPRINGER:  May I have one moment, Your

12  Honor?

13           THE COURT:  You may.

14           MR. SPRINGER:  No objection, Your Honor.

15           THE COURT:  575 is received.

16  Q.   (BY MR. O'REILLY)  In your search of these

17  computers, did you come across any compilation or ledger-

18  type information of payments received by Mr. Springer?

19  A.   No.

20  Q.   Did you come across any evidence of expenses made by

21  Mr. Springer?

22  A.   Yes.

23  Q.   I'm going to ask you if you found evidence of adult

24  entertainment on the computers?

25  A.   Yes.

1   Q.   On which computers did you find that?

2   A.   I remember specifically that there was a lot of --

3   there were lots of those files on a computer that came

4   from an office above the garage at Mr. Springer's

5   residence.

6   Q.   I'm going to ask you -- oh, go ahead.

7   A.   There may have been on the others too, but I don't

8   remember those specifically and I didn't go back to look

9   at that again.

10  Q.   I'm going to ask you if you could look at what's in

11  evidence as Government's Exhibit 281 and 282, which

12  should come up on the screen.  Is what's reflected in

13  Government's Exhibit 281 and 282 consistent in content or

14  seem to reflect consistent content with what you just

15  described?

16  A.   Yes.

17  Q.   Are you familiar with the e-mail address

18  gnutella@mindspring.com?

19  A.   Yes.

20  Q.   How is it you became familiar with that e-mail

21  address?

22  A.   It's one of those that I found on Mr. -- on the

23  computers that were at Mr. Springer's residence.

24  Q.   With respect to those records, do they indicate

25  whose e-mail address that is?

```
 1  A.   Yes, Mr. Springer's.

 2         MR. O'REILLY:  May I have a moment, Your Honor?

 3         THE COURT:  You may.

 4         MR. O'REILLY:  Nothing further, Your Honor.

 5         THE COURT:  Cross-examination.

 6         MR. SPRINGER:  If you could post 575, please,

 7  Government's Exhibit 575.

 8                     CROSS-EXAMINATION

 9  BY MR. SPRINGER:

10  Q.   Good morning, Ms. Beckner.

11  A.   Hello.

12  Q.   The Government's Exhibit Number 575 in front of you,

13  it was taken off of an e-mail; is that correct?

14  A.   Yes.

15  Q.   Okay.  And other than Government's 575, there were

16  no other documents like what you testified to on 575?

17  A.   Not that I recall.

18  Q.   And -- okay.

19         MR. SPRINGER:  Your Honor, may I approach?

20         THE COURT:  You may.

21     (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND

22  OUT OF THE HEARING OF THE JURY.)

23         MR. SPRINGER:  Ms. Beckner did a criminal

24  investigation in 1998 against Lindsey Springer.  She's

25  also a defendant -- a defendant in the Bivens.  I have
```

1  two memorandums of interview that were provided to the

2  government by me with her name on it that are relevant

3  but not necessarily has the door been opened by the

4  government in her direct testimony.

5      The Court said earlier that it had some latitude or

6  discretion and I was wondering if I could get those two

7  memorandums of interview through her.  It's her name,

8  she'll recognize them, she prepared them, and then I'll

9  leave them alone.

10          THE COURT:  Any objection to that?

11          MR. O'REILLY:  Yes.  The memorandum should not

12  come in.  He can ask her about them if he's trying to

13  establish bias or something like that.  We have no

14  objection to him, you know, challenging her credibility

15  based upon prior experience with Mr. Springer.  Our

16  statements outside of her testimony are irrelevant and we

17  do have copies to provide to the Court that were just

18  provided to us.

19          MR. SPRINGER:  I have copies too.

20          MR. O'REILLY:  Your Honor, just to be clear,

21  it's the introduction of these documents we absolutely

22  object to.  Asking her questions that would establish

23  whether or not she has a bias against Mr. Springer,

24  that's totally permissible.

25          MR. SPRINGER:  I wanted to introduce them to

```
 1   show that the IRS was aware in 1998 when she did the
 2   criminal investigation that I dealt with Kenny at Checks
 3   Cashed or Checks Cashed, the company, and she also
 4   interviewed the other person in that interview too, which
 5   is relevant to the investigation.
 6            THE COURT:  Well, the memorandum are not going
 7   to -- I've looked at them and they are not going to come
 8   in, at least at this point during the government's case.
 9            MR. SPRINGER:  Okay.
10            THE COURT:  I'm a little dubious as to whether
11   they will come in at any point, but I'm not foreclosing
12   addressing that again during the defendants' case.  But
13   they're not going to come in, at least at this point,
14   during the government's case.
15       Now, if you have any cross that goes to credibility
16   or bias, in the usual sense, why, you're certainly
17   welcome to do that.  Although it seems to me that this
18   witness's testimony is predominantly technical, I don't
19   know if you -- I doubt that you take issue with the fact
20   she took -- that she found five computers, seized three,
21   and took pictures of four hard drives.  That's pretty cut
22   and dried, it seems to me.
23            MR. SPRINGER:  I just didn't want to call her
24   back for two questions on those two memos.
25            THE COURT:  We'll have to cross that bridge
```

```
 1  during your case.
 2          MR. SPRINGER:  Thank you.
 3      (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,
 4  WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE
 5  PRESENCE AND HEARING OF THE JURY.)
 6          MR. SPRINGER:  No further questions, Your Honor.
 7          THE COURT:  Mr. Stilley.
 8          MR. STILLEY:  No questions.
 9          THE COURT:  Doesn't seem like there would be any
10  redirect, then.
11          MR. O'REILLY:  Hours of it -- no, Your Honor.
12          THE COURT:  You may step down.  We'll have the
13  government's next witness.
14          MR. SNOKE:  The government would next call
15  Arthur Hawkins.
16          THE COURT:  Let's take the cuffs off.  Before we
17  do that, take the cuffs off.
18      (OFF-THE-RECORD DISCUSSION BETWEEN THE JUDGE AND THE
19  MARSHAL)
20          THE COURT:  You may be seated.
21          THE WITNESS:  Thank you, sir.
22                      ARTHUR HAWKINS,
23  (WITNESS SWORN)
24                      DIRECT EXAMINATION
25  BY MR. SNOKE:
```

1  Q.   Mr. Hawkins, would you state your name and spell

2  your last name for the court reporter, please.

3  A.   Yes, sir.  My name is Arthur Hawkins, H-A-W-K-I-N-S.

4  Q.   Okay.  And, Mr. Hawkins, I think you speak loud

5  enough that you can kind of sit back there.  I think

6  everybody can hear you.  And I see you're currently in

7  the custody of the federal bureau of prisons; is that

8  correct?

9  A.   I am.

10  Q.   All right.  And where are you incarcerated when

11  you're not here in Tulsa?

12  A.   I'm in Ashville, Kentucky, in the camp.

13  Q.   All right.  And that's a minimum security camp?

14  A.   It's a -- I'm in community custody.  I circulate

15  through community from the camp.

16  Q.   And what do you do that has you doing that

17  particular function?

18  A.   Currently, I'm a tutor in education, which I have

19  been for four and a half years.  I've also been the town

20  driver, which is why I said that I circulate throughout

21  the community.  I drive people to the hospital, to

22  medical institutions, to the bus station, to the train

23  station, and so forth.

24  Q.   All right.  Can you tell the jury and the Court what

25  you're in custody for?

ARTHUR HAWKINS - DIRECT BY MR. SNOKE                              1625

1   A.   I'm -- I'm serving a ten-year sentence for wire

2   fraud and conspiracy to commit wire fraud, but in

3   layman's terms it's for bribing a buyer at Sears for a

4   $125 million contract.

5   Q.   And where did you suffer that conviction, sir, and

6   when?

7   A.   In 2002, in June of 2002 at the Southern District of

8   Illinois.

9   Q.   All right.  Before you were convicted and sentenced

10  on that offense, sir, and -- had you had any other

11  trouble with the law?

12  A.   No, sir, never.

13  Q.   All right.  What was your -- what was your

14  profession at that time?

15  A.   I was the chairman, chief executive officer, and

16  president of Exide Battery Corporation, about $3.2

17  billion in sales.

18  Q.   All right.  And I gather Exide then sold batteries

19  to Sears, among other places?

20  A.   Exide made the Sears DieHard batteries, the vast

21  majority of them.

22  Q.   Okay.

23  A.   As we made them for NAPA, K-Mart, Wal-Mart.  We're

24  the -- Exide was and probably still is the largest lead

25  acid battery supplier in the world.

1  Q.   And you were the CEO of that company?

2  A.   I was, sir.

3  Q.   Where did you live at that time?  Where did you

4  live?

5  A.   I lived in -- just outside of Detroit in a small

6  community called Bloomfield Hills.

7  Q.   Okay.  And so I gather from what you've said that

8  your conviction was connected to your occupation there as

9  CEO of Exide battery?

10 A.   It was, sir.  That's correct.

11 Q.   All right.  Now, did you go to -- obviously, you

12 went -- either went to trial or pled guilty.  Did you go

13 to trial in that case?

14 A.   I did.  We were at trial for three months, sir.

15 Q.   All right.  And who represented you at that trial?

16 A.   The lead attorney was a gentleman named Tom McQueen,

17 who was the head attorney on the legal side for Jenner &

18 Block, one of the largest legal firms in Chicago.

19 Q.   All right.  And the case, you've told us what the

20 case was for.  Did the case have anything to do with the

21 tax laws of the United States?

22 A.   No, sir, not at all.  I've always paid my taxes.

23 Q.   At some point, sir, did you come in contact with a

24 man known as Lindsey Springer?

25 A.   I did, sir.

ARTHUR HAWKINS - DIRECT BY MR. SNOKE                    1627

1   Q.   All right.  Do you see him in the courtroom here
2   today?
3   A.   I do, sir.
4   Q.   Could you tell me where he is sitting and what he's
5   wearing?
6   A.   Well, he's wearing a beard now.  When I knew him, he
7   was not wearing a beard.  But that's him standing now.
8   Q.   All right.
9        MR. SNOKE:  May the record reflect he has
10  identified the defendant?
11       THE COURT:  The record will so reflect.
12       MR. SNOKE:  Thank you.
13  Q.   (BY MR. SNOKE)  Now, did you also come in contact
14  with an individual named Oscar Stilley?
15  A.   I also did that, sir, yes, sir.
16  Q.   Do you see him in the courtroom today?
17  A.   I do.  He's standing now, yes.  He's also sporting a
18  beard, I see.
19  Q.   All right.  I gather he didn't have a beard when you
20  knew him?
21  A.   Not to the best of my recollection.  Although it's
22  over seven years ago.
23  Q.   By the way, what was your sentence?
24  A.   My sentence was ten years, sir.
25  Q.   And how much do you have left on that?

1   A.   I have 17 months still to go, sir.

2   Q.   Okay.  You don't need to call me sir, by the way.

3   A.   All right.

4   Q.   All right.  So at what point, then, in your legal

5   situation there in the Southern District of Illinois did

6   you come in contact with either Mr. Springer or

7   Mr. Stilley?

8   A.   We lost at trial in June.  While I was at trial, my

9   lead attorney was fired by his company Jenner & Block.

10  That certainly is a difficult situation, as you can

11  imagine.  They agreed that they would continue to keep

12  him until the end of the trial because it was in the

13  midst of the trial and he had been working on it for

14  about a year.

15          THE COURT:  What year was this, sir?

16  Q.   (BY MR. SNOKE)  What year was the trial?

17  A.   2002, sir.  Started in late March of 2002, concluded

18  toward the latter part of June 2002.

19  Q.   All right.  Go ahead.

20  A.   Once you've been found guilty, there's a period of

21  time where the probation department puts together what's

22  called a PSR.  It's a presentence report that designates

23  what they're recommending you should be sentenced to.

24  It's very difficult when you don't have a lawyer who is

25  employed at that time, your lead lawyer is not employed,

1  but he assured me that he would find alternative

2  employment.  But it took some time for him to do that.

3  Q.   Wait a minute.  Who is "he"?

4  A.   I'm sorry.  Tom McQueen.  I apologize.

5  Q.   Your attorney, Mr. McQueen.

6  A.   My attorney of record at that time.

7  Q.   All right.  And did -- had you been made any

8  assurances by your defense team before or during the

9  trial as to what you could expect if you were convicted

10 after that trial?

11 A.   Yes, sir.  Both -- sorry.  Both my wife and I asked

12 the question, what was the worst scenario if we were

13 found guilty, and we were told that it would be a maximum

14 of three years.

15 Q.   You say "we were found guilty," your wife wasn't

16 charged.

17 A.   No, no, just myself and my other two co-defendants.

18 When I said "we," I wasn't -- my wife was never involved

19 in any of this.

20 Q.   All right.  And at some point there in 2002, did a

21 presentence investigation report issue on -- relative to

22 your sentencing?

23 A.   It did.  In September, I received the presentence

24 report and the recommendation was a sentence of ten

25 years.

ARTHUR HAWKINS - DIRECT BY MR. SNOKE                    1630

1  Q.   All right.  Was this a bit of a shock to you?

2  A.   I would say that it was good for many, many

3  sleepless nights and obviously a lot of tears and sorrow,

4  of course.

5  Q.   All right.  Now, and as a result of that, what

6  action did you take that may have involved Mr. Springer?

7  A.   I had discussed this with some of the members of my

8  church -- Paul Stumpo, John Stumpo, Michael Burt -- and

9  they had mentioned the fact they knew a lawyer operating

10  out of Oklahoma, out of Tulsa, named Mr. Lindsey Springer

11  and that there should be some contact made with that

12  individual.  And as a result of that, in late September

13  or early October, I had a phone call from Mr. Springer

14  offering his services.

15  Q.   All right.  Do you know how he got in touch with

16  you?

17  A.   By telephone, sir.  I think the individuals had

18  given him my telephone number.

19  Q.   All right.  And then what happened in that phone

20  call?  Did you have some discussion with him about your

21  case?

22  A.   Very lengthy discussions and it went on over a

23  period of time.  He said that he had two cases that were

24  at the Supreme Court level, that he was extremely well

25  qualified, knew the law backwards and forward, assured me

1   that he would do a much better job than had been done by
2   the lawyers that I had had in court, and asked me if he
3   could have a copy of the PSR, the presentence report,
4   which I duly faxed to him.  And he then began to send a
5   tremendous amount of information regarding each of the
6   issues on the PSR report, which were -- which were rather
7   interesting, to be perfectly frank.
8   Q.  All right.  And about when was this that this phone
9   call and your first association with Mr. Springer?
10  A.  The latter part of September, early October, sir.
11  Q.  Of 2002?
12  A.  Yes, sir.
13  Q.  All right.  Then in that conversation or those
14  series of conversations there in -- at that time, did you
15  ask Mr. Springer to do anything specific for you?  I
16  mean, you've been convicted now.  What did you want him
17  to do for you at that point?
18  A.  Well, the issue that I was having with my current
19  representation, Tom McQueen, was that he was just in the
20  process of being hired by another law firm called
21  Sonnenschein Nath & Rosenthal and he was trying to get
22  his feet on the ground.  And when I talked to him about
23  my PSR, it was obvious to me that he was unfocused in
24  terms of going forward.  He had said that it was going to
25  be a three-year sentence, now they were recommending a

ARTHUR HAWKINS - DIRECT BY MR. SNOKE                    1632

1   ten-year sentence.  I couldn't understand it.  And a PSR

2   is a very, very onerous document that takes a tremendous

3   amount of legal work on it because you have to answer

4   every issue that's on the PSR.  On my PSR, there were

5   40-some issues that had to be addressed.  And if they

6   weren't addressed point by point, I was looking at a

7   ten-year sentence.

8   Q.   All right.  So at that point, are you saying that

9   you wanted Mr. Springer to address your sentencing?

10  A.   Well, what we --

11  Q.   PSR?

12  A.   Well, what we agreed do at that particular -- first

13  of all, we had to agree on the financial side of it

14  also.  May I bring that out at this point?

15  Q.   All right.  I'm going to get to that here in just a

16  -- that will be my next question.  In any of those early

17  questions, in any of those early discussions with

18  Mr. Springer you're now talking about, did you discuss

19  finances and what he would charge you for performing

20  these services for you?

21  A.   Right.  The rate that he had told me was that he

22  would charge $200 an hour.  The first check that I sent

23  to him, which was made out to Lindsey Springer, was for

24  $5,000, which represented 25 hours of work.  As you all

25  know, lawyers are expensive.

ARTHUR HAWKINS - DIRECT BY MR. SNOKE                            1633

1  Q.  All right.  You had spent a considerable amount of

2  money on your defense team up to that point; is that

3  correct?

4  A.  Very much so, yes, sir.

5  Q.  All right.  And at some point in your discussions

6  with Mr. Springer, did Mr. Stilley's name come up?

7  A.  Not at that particular point.  It was later on as

8  the situation with Tom McQueen continued to deteriorate

9  that Mr. Springer suggested that we bring another

10 attorney in, another lawyer in who was familiar with

11 the -- more familiar with the Southern District of

12 Illinois.  And that's when Mr. Stilley's name was offered

13 forth.

14 Q.  All right.  I'm going to call up here a -- Exhibit

15 201, which I believe is in evidence.  Can you see that on

16 the screen?

17 A.  I can now.  Yes, it has been blown up.  Thank you.

18 Q.  Do you recognize that check, sir?

19 A.  I do, sir.

20 Q.  What is that check?

21 A.  The check is made out to Lindsey Springer for

22 $5,000, which is the 20 hours or the 25 hours of work.

23 Q.  All right.  As far as you recall, is that the check

24 you were just talking about -- the first check you

25 issued, then, to Mr. Springer?

ARTHUR HAWKINS - DIRECT BY MR. SNOKE                          1634

1   A.   It is, sir.

2   Q.   Okay.  If you will look at -- next at Government's

3   Exhibit 204.

4        MR. SNOKE:  And I'm going to have to go up and

5   approach, if the Court will allow me to do that.

6        THE COURT:  You may.

7        MR. SNOKE:  That one is not in evidence.

8   Q.   (BY MR. SNOKE)  Before we get to that -- when you

9   talked to Mr. Springer about doing this for you --

10  working for you in the -- responding to the PSR,

11  presentence investigation report; is that correct?

12  A.   Right.

13  Q.   And did you discuss your concerns with Mr. McQueen

14  with Mr. Springer?

15  A.   I did.  And, in fact, we agreed -- Mr. McQueen and I

16  agreed that I would have Mr. Springer come to Chicago to

17  meet with myself and Mr. McQueen to ensure that

18  Mr. McQueen was totally on board to work in conjunction

19  with Mr. Springer on the PSR.

20  Q.   All right.  And if you will look in that book in

21  front of you, sir, at Exhibit 205.  I discussed 204 a

22  minute ago, but I'm going to go to 205 first.

23  A.   Ah, yes.  Right.

24  Q.   All right.  Do you recognize the documents?  There

25  may be -- you may have to take those out, there may be

ARTHUR HAWKINS - DIRECT BY MR. SNOKE                              1635

1   more than one in that plastic envelope there.

2   A.   Yeah, this is the flight log for my aircraft.

3   Q.   All right.  And does that pertain to flights you

4   made in connection with your relationship with

5   Mr. Springer?

6   A.   This one is actually for December and it was --

7   Q.   If you'll take it out there.  I think there's

8   another page --

9   A.   Oh, there's another one there?  All right.  I'm

10  sorry.

11  Q.   That's why I suggested you take it out.

12  A.   You're right.  I apologize.

13  Q.   All right.  The second page of that exhibit.  And

14  we'll get back to the first page in a minute.  But both

15  of those, can you just -- before we get to them

16  specifically, can you tell us, are those flight logs that

17  you kept during the course of this relationship with

18  Mr. Springer?

19  A.   Yes, sir, they are.  They're my flight logs.

20  Q.   All right.  And you are a licensed pilot, then, I

21  gather?

22  A.   I am.  I'm an instrument-rated pilot, yes, sir.

23  Q.   And do one of those pertain to the time period there

24  around early November of 2002?

25  A.   It does, sir.  In fact, November --

ARTHUR HAWKINS - DIRECT BY MR. SNOKE                    1636

```
1   Q.   All right.  Okay.  Just answer --

2   A.   Yes, it does.  I'm sorry.

3   Q.   We'll get there.  We'll get there.

4        MR. SNOKE:  We would move into evidence at this

5   time Government's Exhibit 205.

6        MR. SPRINGER:  I have no objection, Your Honor.

7        THE COURT:  205 is received.

8   Q.   (BY MR. SNOKE)  All right.  Now, you can look and

9   we'll go through those.  Specifically, the second page of

10  that exhibit shows a pilot log for the time -- for

11  November of 2002, does it?

12  A.   Yes, sir, it does.

13  Q.   Okay.  And how does that pertain to what you were

14  just testifying to about?

15  A.   It's the flight that I made from -- from Detroit

16  over to Chicago to meet with Lindsey Springer for our

17  meeting with Tom McQueen at Sonnenschein Nath &

18  Rosenthal.

19  Q.   And what was the date of that flight?

20  A.   The 12th of November, 2002.

21  Q.   All right.  And you say to meet with Mr. Springer.

22  Was that prearranged with Mr. Springer that he would get

23  up to Chicago and meet with you?

24  A.   It was agreed.  He would fly in from Oklahoma and we

25  would meet in the offices of Tom McQueen.  And, in fact,
```

1  we did do that.

2  Q.   All right.  And was anybody with -- it was just the

3  three of you at this meeting?

4  A.   Yes.  This was just Mr. Springer, myself, and Tom

5  McQueen in that meeting, sir.

6  Q.   All right.  And what was discussed at that meeting

7  relative to how you were going to all proceed towards

8  your sentencing at that point?

9  A.   Tom McQueen agreed that he would work with Lindsey

10 Springer as attorneys on the PSR on responding to the

11 PSR.

12 Q.   All right.  And did Mr. Stilley agree to do that

13 also?

14 A.   He did, sir.

15 Q.   All right.  At some point after this, was there some

16 discussion -- strike that.  Let me start again.  When in

17 this scenario did you first hear about Mr. Stilley?

18 A.   It would have been the latter part of November, sir.

19 Q.   All right.

20 A.   2002.

21 Q.   All right. And from whom did you hear about

22 Mr. Stilley?

23 A.   From Mr. Springer.

24 Q.   All right.  And what did he tell you about

25 Mr. Stilley?

1   A.   That he was extremely well qualified, had excellent

2   relations with the Southern District of -- with the

3   courts in the Southern District of Illinois and would be

4   an absolute asset to us in our defense.

5   Q.   At this point, sir, did you know whether or not

6   Mr. Springer was an attorney?

7   A.   I believed him to be so.

8   Q.   If you will look at Exhibit 204 now, which is the

9   next one in that notebook in front of the one you just

10  pulled out.  And that's just a one-page document, I

11  believe, so you probably don't have to take it out of the

12  -- do you recognize this document?

13  A.   I do, sir.

14  Q.   And did you receive that sometime around the same

15  period of time when you're dealing with Mr. Springer?

16  A.   I did, sir.

17  Q.   All right.  And from whom did you receive that?

18  A.   This was a joint letter from Oscar Stilley and

19  Lindsey Springer.

20  Q.   To you?

21  A.   Yes, sir, to me.

22        MR. SNOKE:  We would move into evidence at this

23  time Government's Exhibit 204.

24        MR. SPRINGER:  Just one second, Your Honor.  No

25  objection.

```
 1              THE COURT:  204 is received.
 2              MR. SNOKE:  All right.  Can we put that up?
 3    Q.  (BY MR. SNOKE)  Now, kind of reading through this,
 4    without reading every word, it -- it seems to be a letter
 5    imploring you to hire Mr. Springer and Mr. Stilley and to
 6    either fire or put in the back seat, as they say up here
 7    in the first sentence, I think, Mr. McQueen.
 8    A.  That is precisely what the document represented.
 9    Q.  All right.  After getting this document, did you
10    discuss any of this with Mr. Springer or Mr. Stilley?
11    A.  I'm sorry.  Could you repeat --
12    Q.  After getting this document, after receiving this
13    letter, did you discuss these points with Mr. Springer
14    and Mr. Stilley?
15    A.  Well, we had actually -- we had actually traveled to
16    Chicago to meet with Tom McQueen and we went through
17    every issue on -- that's in these letters where they were
18    recommending that not only Tom take a back seat but that
19    Tom be discharged from his position.
20    Q.  All right.  So this letter was relative to a later
21    trip to Chicago?
22    A.  It was, sir.
23    Q.  Okay.  If we could look next at Exhibit 94, which is
24    in evidence.  It's up on your screen there, sir.
25    A.  Yes, sir, it is.
```

ARTHUR HAWKINS - DIRECT BY MR. SNOKE                           1640

1   Q.   Do you recognize the check depicted in Exhibit 94?

2   A.   I do, sir.

3   Q.   And what is that?

4   A.   It's a check made out to Oscar Stilley for $4,445.

5   Q.   All right.  And what's the date on that check?

6   A.   The date on this check is November 26th of 2002.

7   Q.   Okay.  And it says in the memo column there --

8   actually, it's "Oscar Stilley-IOLTA."  Do you see that

9   there?  Where did you get the instructions on this

10  particular check?  Or do you remember?

11  A.   I have no idea.  It's just the name that he uses,

12  "IOLTA."

13  Q.   All right.  And it says down in the memo column "as

14  per contract"?

15  A.   That's correct.  That was the contract that we had.

16  Q.   "We" meaning you and who?

17  A.   Myself and Stilley at this point, yes, sir.

18  Q.   Now, if you'll look at Exhibit 95.

19          MR. SNOKE:  In fact, if we could put those on a

20  split screen.  It's also in evidence.

21  Q.   (BY MR. SNOKE)  Do you recognize this -- this check

22  also?

23  A.   I do, sir, yes.

24  Q.   All right.  And this, again, is dated, what, 12/2 of

25  '02?

ARTHUR HAWKINS - DIRECT BY MR. SNOKE                           1641

1    A.   That's correct, sir, 12/2 of '02.

2    Q.   So a week or so later after the previous check?

3    A.   Correct.  This was the other half of -- to make up

4    the $10,000 in total.

5    Q.   All right.  Yeah, I'm going to get to that here.

6    These two checks together add up to $10,000; is that

7    correct?

8    A.   Yes, sir, that is correct.

9    Q.   Why -- why did you issue this in the form of two

10   different checks of less than $10,000?

11   A.   The first check was as per contract that was entered

12   into between myself and Stilley.  And, again, it was

13   based on the $200 per hour fee which represented

14   approximately 25 hours of work.  But I wanted

15   statements.  Being a businessman, I wanted statements

16   that literally showed the hours being billed and what was

17   being worked on.  I run major corporations and that's how

18   we do it in business.

19   Q.   Had you received -- had you received statements from

20   Mr. McQueen when he was representing you?

21   A.   Absolutely.  In detail, yes.

22   Q.   All right.  So explain, then, how the 10,000 got

23   broken up into --

24   A.   So I expected statements to be forthcoming.  I was

25   assured that they were coming to me.  So I wrote the

1 second part of the check for $5,555, based on the

2 assumption that I was going to be provided with the

3 statements that backed it up.  In total, they represented

4 about 50 hours of legal work.

5 Q.   All right.  And that went off -- that's your

6 signature on that check?

7 A.   It is, sir.

8 Q.   And that got sent off to Mr. Stilley?

9 A.   It is, sir.  That's made out to Mr. Stilley.

10 Q.   Now, beginning in -- if you will look at the other

11 document contained in Exhibit 205, the other pilot log.

12 A.   Yes, sir, I have it in front of me.

13 Q.   Before we do that, let me show you -- if you would

14 get out Exhibit 202, we'll look at that for a minute.

15 It's in that notebook there.  And it's a -- looks like a

16 two-page document, so you may have to get it out.

17 A.   Yes, sir, I have it.

18 Q.   Do you recognize that document?

19 A.   I do, sir.

20 Q.   What is that document, just generally speaking?

21 A.   This is the attorney/client contract that was sent

22 and -- yes, it is.

23 Q.   All right.  And that was between you and Oscar

24 Stilley?

25 A.   That's correct.

1  Q.   All right.

2          MR. SNOKE:   We would move into evidence at this

3  time Government's Exhibit 202.

4          MR. SPRINGER:   No objection, Your Honor.

5          THE COURT:   It is received.

6  Q.   (BY MR. SNOKE)   Now, the date on the second page of

7  that, at least with your signature there, that is your

8  signature at the bottom of the second page?

9  A.   It is mine, sir, that's correct.

10  Q.   And that's 11/26 of '02; is that correct?

11  A.   That's correct.

12  Q.   And if I'm not mistaken, that's the same date as the

13  check I just had in front of you, Exhibit 94, for $4,445?

14  A.   That is correct, sir.

15  Q.   Now, I think we can go -- what did you -- before we

16  do that, the contract, I guess, is pretty clear as to

17  what Mr. Stilley was going to represent you on.  Which at

18  that point was not so much the defense of the case, but

19  the preparation of a presentence investigation and

20  appearing on your behalf at your sentencing.

21  A.   That is correct.

22  Q.   Was that your understanding?

23  A.   That is correct.

24  Q.   And what was Mr. Springer going to do for you at

25  that point?

1    A.   He was doing the same thing.  He was -- he was my

2    attorney representing me also in this same matter.

3    Q.   All right.  And Mr. Springer, when he brought

4    Mr. Stilley into the case, did he indicate why he needed

5    to bring in another attorney if you still thought he was

6    an attorney?

7    A.   Because of the relationship that Mr. Stilley had

8    with the Southern District of Illinois.

9    Q.   All right, then.  Did there come a time, then, when

10   you and -- I think you indicated in the pilot logs when

11   you and Mr. Springer and Mr. Stilley all had a visit with

12   Mr. McQueen?

13   A.   Yes, that took place on December the 16th of 2002.

14   Q.   All right.  And is that the other page in your pilot

15   log that indicates that flight to Chicago also?

16   A.   Yes, it is.

17   Q.   All right.  So you're flying up to Chicago and

18   meeting with Mr. Springer and Mr. Stilley.  Did they all

19   then go in and meet with Mr. McQueen on that occasion?

20   A.   Well, unfortunately, Mr. McQueen kept us waiting in

21   the lobby for four hours and then ultimately only agreed

22   to meet with myself.

23   Q.   I see.

24   A.   He would not meet with either Mr. Stilley or

25   Mr. Springer.

ARTHUR HAWKINS - DIRECT BY MR. SNOKE                              1645

1  Q.   All right.   So you had four hours there to discuss

2  your case with Mr. Springer and Mr. Stilley there in the

3  waiting room?

4  A.   Absolutely.

5  Q.   All right.

6  A.   Certainly did.

7  Q.   All right.   Did you -- did you compensate or pay any

8  travel in connection with that flight for Mr. Springer or

9  Mr. Stilley, if you can recall?

10 A.   Yes, that was our responsibility and would be taken

11 from the -- from the monies that I had already paid them.

12 Q.   All right.   And did you get billing then statements

13 ultimately from Mr. Stilley?

14 A.   I did not.

15 Q.   Did you ever get any billing statements from

16 Mr. Springer?

17 A.   I did not.

18 Q.   What happened on December, I guess you said 16th?

19 A.   Yes, sir.

20 Q.   All right.   And what happened after you discussed,

21 waited in the waiting room, and then ultimately saw

22 Mr. McQueen on that occasion?

23 A.   Right.   This is -- this was the nature of the letter

24 that I received on that same date and I terminated Tom

25 McQueen.

1  Q.  Oh, all right.  Now, we were talking then at that
2  point about the letter which is Exhibit 204.
3          MR. SNOKE:  Is that in evidence?
4          COURTROOM DEPUTY:  Yes.
5          THE WITNESS:  Yes, that's the letter, sir.  Yes,
6  it is.
7  Q.  (BY MR. SNOKE)  All right.  So you're saying that it
8  was close to this meeting time in December of 2002 that
9  you received this letter from Mr. Stilley and
10 Mr. Springer?
11 A.  That is correct.  And it was -- it was basically
12 summarizing the discussions that we had while we sat out
13 waiting on Mr. McQueen.
14 Q.  Okay.  And it says, "reasons to consider
15 substitution of counsel, no motion to dismiss for lack of
16 jurisdiction was filed, no understanding of federal nexus
17 jurisdiction regarding federal offense including
18 conspiracy."  Did you understand what they were talking
19 about there?
20 A.  At that particular time, my acquaintance with the
21 laws of our land were somewhat less than they should have
22 been.  I've since learned what they now mean.
23 Q.  All right.
24 A.  They were listing down all of the things that
25 pertained to my case that Tom McQueen should have done

1  and didn't.

2  Q.  All right.  And did you -- your relationship with

3  Mr. McQueen change at the end of that meeting?

4  A.  It did.  I terminated him.

5  Q.  All right.  So when was sentencing set for at that

6  particular time?  Do you recall when you were supposed to

7  be sentenced relative to December 16th of 2002?

8  A.  The 19th was my sentencing date.

9  Q.  All right.  So it was coming right up?

10  A.  Three days later.

11  Q.  If you would look at Exhibit 20, which is in

12  evidence, I believe.

13  A.  Did you say two, zero, sir?

14  Q.  Two, zero, yes.  Exhibit two, zero.  It's on the

15  screen there.

16  A.  Oh, okay.  Very good, sir, yes.

17  Q.  There's actually two checks on Exhibit 20, but the

18  one we've got up there on the screen is the one I'm

19  talking about.  You recall signing and providing this

20  check?

21  A.  I do, sir.

22  Q.  All right.  Now, this one is addressed to -- rather

23  to Lindsey Springer, your first one was.  This one says

24  Bondage Breakers Ministry.

25  A.  Yes, sir.

ARTHUR HAWKINS - DIRECT BY MR. SNOKE                     1648

1  Q.   Can you tell us why you made this check payable to

2  Bondage Breakers Ministry on December 4th of '02?

3  A.   That's what he requested, that the checks be made

4  payable to Bondage Breakers Ministries, as Stilley had

5  requested that his checks be made payable to Oscar

6  Stilley IOLTA.

7  Q.   All right.  And did you -- did Mr. Springer tell you

8  or did you understand why you were making it payable to

9  Bondage Breakers Ministries at that point, in December of

10 '02 as to why you were doing that?

11 A.   That was the name of his legal representation or his

12 firm Bondage Breakers Ministries.  I didn't find that to

13 be extraordinary.

14 Q.   All right.  And why is that?

15 A.   Because myself, I have companies, for example,

16 limited liability companies called Sign Art, called

17 HalArt.  We put different names on them, they have

18 different connotations.

19 Q.   All right.  And these checks that we've looked at

20 here seem to be coming from a Chippewa Trail Lodge, Inc.,

21 in Bloomfield Hills.  What was that account?

22 A.   One of my companies.

23 Q.   All right.  And was your wife also a signatory on

24 this Chippewa Trail Lodge?

25 A.   Yes, she was.

ARTHUR HAWKINS - DIRECT BY MR. SNOKE                              1649

```
 1   Q.   What's your wife's name?  What is your wife's name?
 2   A.   Cindy.  Cindy Hawkins.  Cynthia Lou Hawkins to be
 3   precise.
 4   Q.   Okay.  All right.  I have another exhibit to show
 5   you, Exhibit 203.
 6          MR. SNOKE:  Which I think is in evidence.
 7          COURTROOM DEPUTY:  Yes, it is.
 8          MR. SNOKE:  All right.  Call that up, please.
 9   Q.   (BY MR. SNOKE)  All right.  Do you recognize that
10   check also?
11   A.   I do, sir.
12   Q.   And did you sign and issue that check to Bondage
13   Breakers Ministry also?
14   A.   I did, sir.
15   Q.   And what prompted you to issue that check to Bondage
16   Breakers Ministry?
17   A.   It was another demand for money.  I was demanding
18   financial statements, he was demanding money.
19   Q.   All right.  Now, that one and the previous one for
20   $13,000, are there a short time apart there in early
21   December totaling about $20,000?
22   A.   That's correct, sir, yes.
23   Q.   All right.  "He" being who as demanding money at
24   that point?
25   A.   The $13,000 check was for Mr. Stilley.
```

ARTHUR HAWKINS - DIRECT BY MR. SNOKE                    1650

1  Q.  All right.

2          MR. SNOKE:  Let's go back to 20 -- Exhibit 20.

3          THE WITNESS:  No, I'm sorry.  Mr. Stilley was

4  the $10,000.  That one was for Mr. Springer.

5  Q.  (BY MR. SNOKE)  Yeah, we just covered the one I'm

6  just talking about a minute ago.  The $13,000 check was

7  to Bondage Breakers Ministry, we just talked about that.

8  A.  That's correct.

9  Q.  And then this one a few days later is to -- for

10  $7,000 also to Bondage Breakers Ministry?

11  A.  $20,000, that's correct.

12  Q.  So that came at whose request or demand, as you

13  said?  Who asked you to send that money to Bondage

14  Breakers Ministry?

15  A.  That was Lindsey Springer.

16  Q.  All right.  And this -- if your pilot log is correct

17  and you tell me that you actually flew up and terminated

18  Mr. McQueen on the 16th of December.

19  A.  Correct.

20  Q.  So these checks came just in -- were issued then

21  just a few days earlier in December to Bondage Breakers

22  Ministry?

23  A.  Yes, sir.

24  Q.  All right.  So you have three days, then, and you

25  have terminated Mr. McQueen's services.  Throughout this

*Tracy Washbourne, RDR, CRR*
United States Court Reporter
U.S. Courthouse, 200 N.W. 4th St.
Oklahoma City, OK 73102 * 405.609.5505

ARTHUR HAWKINS - DIRECT BY MR. SNOKE                          1651

1   time period, leading up to your sentencing, and I think
2   you touched on it earlier, did Mr. Springer show you or
3   Mr. Stilley or anybody show you any of the documents or
4   filings that they were preparing to -- that rebut the
5   things in the presentence investigation report?
6   A.   Absolutely.   They provided volumes and volumes of
7   response to the PSR.
8   Q.   Okay.
9   A.   In detail.
10  Q.   And do you know if any of that got actually filed
11  with the Court, any of those documents?  Do you know if
12  any of those documents actually got filed in the Court so
13  they had it before you were sentenced?
14  A.   They were absolutely used in court.   Those documents
15  were the documents that they used in court --
16  Q.   Okay.
17  A.   -- for my -- for a response to my sentencing.
18  Q.   Okay.  Now, if you will look -- the next thing that
19  came up, I guess, then, was your sentencing.   And were
20  either Mr. Springer or Mr. Stilley present at your
21  sentencing?
22  A.   They were.  Both of them, yes, sir.
23  Q.   Okay.  And you had some co-defendants who were also
24  being sentenced that day; is that right?
25  A.   I did, sir, yes.  Douglas Pearson.

1   Q.   Okay.  And two other individuals were being

2   sentenced?

3   A.   One other individual was sentenced that particular

4   day.

5   Q.   Oh, okay.

6   A.   Yes, sir.

7   Q.   Did -- where did Mr. Springer sit for his

8   participation in your sentencing that day?

9   A.   He sat beside me as defense attorney.

10  Q.   Okay.  And Mr. Stilley was also there at the table?

11  A.   He sat right alongside him.

12  Q.   All right.  Was anybody else of your family present

13  at that sentencing of yours in December 19th, you said,

14  in 2002?

15  A.   Yes, sir, 2002.  All of my family was there, yes,

16  sir, my wife and my children.

17  Q.   All right.  And then -- was there some presentation

18  then made by Mr. Springer or Mr. Stilley to the Court?

19  A.   To the best of my recollection, about six hours

20  worth.

21  Q.   All right.  And were they arguing some of the things

22  that they had in that document we just looked at and the

23  reasons why you should go with them instead of

24  Mr. McQueen?

25          MR. SPRINGER:  Objection.

ARTHUR HAWKINS - DIRECT BY MR. SNOKE                              1653

```
 1              THE WITNESS:  They argued every single item on
 2    the PSR.
 3              THE COURT:  Wait just a minute.  Hold on.
 4              MR. SPRINGER:  He asked were "they" and "we" and
 5    it's not clear who.
 6              THE COURT:  It would be appropriate, Mr. Snoke,
 7    to differentiate.
 8              MR. SNOKE:  All right.
 9    Q.  (BY MR. SNOKE)  Did Mr. Stilley make arguments to
10    the Court?
11    A.  Yes, he did.
12    Q.  All right.  And were those arguments in line with
13    what we read here a minute ago -- or what were the
14    arguments?  Why don't you just tell me -- as many as you
15    recall of the arguments.
16    A.   Each of the -- on a PSR, they enhance the sentence
17    by issuing additional issues that were brought up during
18    the trial.  It doesn't mean that you were indicted for
19    that and it doesn't mean that you were convicted of it by
20    the jury, but they're additional enhancements that are
21    placed on your PSR for your sentencing.  And so you have
22    to argue each one of those issues that are put on it.
23         For example, one of the claims that were made was
24    that I was a leader in the conspiracy and that enhanced
25    my sentence by three additional points, for example.  So
```

ARTHUR HAWKINS - DIRECT BY MR. SNOKE                                1654

1  you have to argue each one of those issues through and
2  they certainly did that.
3  Q.   All right.  And so that -- would you say that they
4  -- well, at least Mr. -- well, Mr. Springer was there
5  also with -- assisting Mr. Stilley at that argument?
6  A.   Absolutely.
7  Q.   And did they cover all the relevant points on the
8  presentence investigation report?
9  A.   Every single one of them.  I think the judge was --
10 with all due respect, Your Honor, the judge was having an
11 out-of-body experience.
12 Q.   Okay.  And as a result of whatever they argued to
13 the judge at your sentencing, did it change anything from
14 the ten year that -- the ten years that was in the
15 presentence investigation report?
16 A.   I think when they finished, it guaranteed I was
17 going to get ten years.
18 Q.   And why do you say that?
19 A.   Because of the attitude -- when my co-defendant Doug
20 Pearson's attorneys --
21 Q.   All right.  Wait.  Just from your perspective, then,
22 you're saying that you didn't believe that they did the
23 job that you were expecting in answering these paragraphs
24 of the PSI?
25 A.   I was very disappointed.  Although in their defense,

ARTHUR HAWKINS - DIRECT BY MR. SNOKE                              1655

1   their claim was they had such a short amount of time.  In

2   Stilley's case, certainly, a short amount of time to work

3   on the case.

4   Q.  All right.  Were you taken into custody then after

5   you were sentenced there on December 19th?

6   A.  I was immediately.

7   Q.  All right.  Now, did you have -- well, if you will

8   look at Exhibit 21, which is in evidence, will come up on

9   the screen there, I think.  Do you recognize that check?

10  A.  I do, sir.

11  Q.  Now, is -- now, this is dated 12/27 of '02, which

12  was actually after you were taken into custody; is that

13  correct?

14  A.  That's correct.  It was a postdated check.

15  Q.  All right.  So you left a postdated check then made

16  out to Bondage Breakers Ministries after your sentencing?

17  A.  I did because I kept demanding financial statements

18  showing the hours that were being worked and the cost per

19  hour.  I wasn't receiving them and so I went to that

20  point.  They kept demanding additional funds for the

21  hours that they were supposedly working.  And as a

22  result, I postdated the checks based on the fact that I

23  was going to get financial statements that showed me the

24  hours they were working.

25  Q.  All right.  Well, at least from Mr. Springer, you

ARTHUR HAWKINS - DIRECT BY MR. SNOKE                    1656

1  never received any -- as far as you know, you never

2  received any -- before you went off to prison, you never

3  received any -- any statements of the hours that --

4  A.   I did not.

5  Q.   All right.  Then who would have completed this check

6  -- I mean, you say you left it -- they weren't giving you

7  statements, but, nonetheless, you left a postdated check

8  to Bondage Breakers Ministries.  Was there some

9  prescription -- proscription (sic) put on the issuance of

10  this check?

11  A.   Well, when I was locked up on December the 19th,

12  they just processed the check through on the 27th and the

13  bank paid it.

14  Q.   Well, the check is actually dated the 27th on the --

15  A.   Sure.  So from that date on, all they had to do was

16  to put the check into their bank account and my bank --

17  Q.   Oh, I see.  You signed the check, then, in blank

18  then and just left it?

19  A.   No, it was postdated.  I put the date December 27th

20  on it.

21  Q.   Okay.

22  A.   Which meant that after December 27th they could cash

23  that check.  I had anticipated getting statements to the

24  hours that they had worked and the money that was owed to

25  them, but I had postdated the check on that basis.  Since

1    I was locked up on December the 19th, all they had to do

2    was submit the check and they got the money.  That's how

3    it worked.

4    Q.   Yeah.  Well, after you were -- you were incarcerated

5    then, did someone take over the task of dealing with

6    Mr. Springer and Mr. Stilley on your behalf?

7    A.   My darling wife did.  Yes, she did.

8    Q.   Did she have authority, then, to issue checks drawn

9    on Chippewa Trail Lodge or your other accounts then to

10   pay them?

11   A.   Everything.

12   Q.   All right.  What did you understand -- after your

13   incarceration, was there any discussion or even before

14   you were incarcerated was there any discussion with

15   Mr. Springer or Mr. Stilley about what they would do for

16   you if you did get sentenced or after you got sentenced?

17   A.   Well, they were adamant that they would get the

18   charges dismissed, that I wouldn't have to worry about

19   being sentenced, et cetera, et cetera, at sentencing.

20   And it was left basically on that premise that they would

21   go forward on that basis.  If we lost at sentencing,

22   which they assured me that wasn't going to happen, but if

23   we lost at sentencing, then, of course, they would be

24   prepared to take it to the next step.  Because you have

25   to file within ten days notice of appeal.  Otherwise, you

ARTHUR HAWKINS - DIRECT BY MR. SNOKE                    1658

1    lose your ability to appeal your sentence.
2    Q.   All right.  And did you have any agreement with them
3    to handle an appeal for you?
4    A.   At that point, yes.
5    Q.   All right.  And this occurred, then, as you're
6    getting close to or after you were sentenced or as you
7    were being sentenced?
8    A.   Correct.
9    Q.   Do you know if they made any motions to have you
10   released on bond after you were sentenced that day,
11   December 19th?  I say "they."  Mr. Springer, Mr. Stilley,
12   or either of them?
13   A.   I believe they did and they did it again with the
14   appellate court.  They did the same thing, yes.
15   Q.   All right.  So they made some motions on your
16   behalf?
17   A.   Yes, they did.
18   Q.   Which this check on the 27th would have been some
19   compensation for doing that, I guess?
20   A.   Of course.
21   Q.   Did you have any -- did you have communication then
22   after you were incarcerated and on into the first part of
23   the next year, which would have been 2003, did you have
24   any conversation with Mr. Springer, Mr. Stilley about
25   what they were doing for you at that point in time?

1  A.   Not directly.  To the best of my knowledge, my

2  conversations then were limited to my wife, through my

3  wife.

4  Q.   All right.  Now, the checks that you've issued here

5  that we've talked about here this morning, were any of

6  those checks issued as a -- to Mr. Springer or

7  Mr. Stilley, either one of them, as a donation or a gift?

8  A.   As a donation?

9  Q.   Yeah.  Did you give any of these checks, these

10  payments in these checks to Mr. Springer as a gift or a

11  donation?

12  A.   Absolutely not.  They were paid for services

13  rendered, legal services.

14  Q.   How about to Mr. Stilley?

15  A.   Exactly the same, for legal services, services

16  rendered.

17  Q.   After you were incarcerated, then, you said that you

18  didn't hear directly from Mr. Springer or Mr. Stilley?

19  A.   I did not.

20  Q.   All right.  And did you try to contact them at all

21  by phone or did you --

22  A.   It would have been very, very difficult, sir.  The

23  next 40 days I spent in a county jail.  Communication was

24  very, very limited, specifically to my wife.  So any

25  communications that would have taken place would have

```
 1  been through her.
 2  Q.   All right.  And then eventually you made it to
 3  Ashland?
 4  A.   Actually, I made it through the system to Loretto,
 5  Pennsylvania.
 6  Q.   Okay.  And then so how long have you been actually
 7  at Ashland?
 8  A.   I've been in Ashland now for about six years.
 9  Q.   And before that, you were in Loretto, you say,
10  Loretto, Pennsylvania?
11  A.   Yes, sir.
12  Q.   That's another facility of the federal system?
13  A.   That's a federal correctional institution.  At that
14  point, you're behind the wires, they call it.
15  Q.   All right.  But now for the last six years you've
16  been in a camp setting?
17  A.   That's correct, sir.
18          MR. SNOKE:  May I have a moment, Your Honor?
19          THE COURT:  You may.
20          MR. SNOKE:  I have no further questions at this
21  time.
22          THE COURT:  Cross-examination.
23          MR. SPRINGER:  Your Honor, may I approach the
24  courtroom deputy for some exhibits?
25          THE COURT:  You may.
```

```
 1                    CROSS-EXAMINATION
 2  BY MR. SPRINGER:
 3  Q.   Good morning, Mr. Hawkins.
 4  A.   Mr. Stilley (sic).
 5  Q.   Now, in the beginning of your testimony, you stated
 6  that you learned about Lindsey Springer from Paul Stumpo,
 7  I think you said John Stumpo, Michael Burt, and is there
 8  anybody else?
 9       THE COURT:  Excuse me.  Let's get some -- why
10  don't you identify yourself to the witness first.
11       MR. SPRINGER:  I'm sorry.
12  Q.   (BY MR. SPRINGER)  Mr. Hawkins, my name is Lindsey
13  Springer.
14  A.   There may have been.  Those were the ones that come
15  to mind seven years later.
16  Q.   Okay.  So is it safe to say that you're having a
17  little difficulty remembering stuff from back seven years
18  ago?
19  A.   I just stated that those are the ones that come to
20  mind.
21  Q.   Before you testified here today, did you review
22  previous given testimony that you had given to the grand
23  jury in this case?
24  A.   I did not.  I have not reviewed that testimony ever.
25  Q.   Now, Mr. Hawkins, isn't it true that in your home
```

1   you had established a war room?

2   A.   Can you repeat the question?

3   Q.   Isn't it true that during your trial you had

4   established a war room in your house?

5   A.   Not to the best of my recollection.

6   Q.   Mr. Hawkins, have you ever performed marriage

7   ceremonies before?

8   A.   Have I ever what?

9   Q.   Have you ever performed marriage ceremonies before?

10          MR. SNOKE:  Objection, Your Honor, relevance.

11          THE COURT:  I'm going to overrule it at this

12   point.  You may answer.

13          THE WITNESS:  Have I ever performed a marriage

14   ceremony?

15   Q.   (BY MR. SPRINGER)  Yes, sir.

16   A.   Me personally?

17   Q.   Yes, sir.

18   A.   Not to the best of my recollection.

19   Q.   Did Michael Burt get married in your house?

20   A.   (no response)

21   Q.   Did Michael Burt get married in your house?

22   A.   Michael Burt did, but I didn't perform the ceremony.

23   Q.   Okay.  So --

24   A.   That was your question, wasn't it, did I perform the

25   ceremony?

1  Q.   Yes, sir.  Yes, sir.  Yes, sir.

2  A.   And I certainly did not perform that ceremony.

3  Q.   And so it's safe to say that you were very close

4  friends with Michael Burt; is that true?

5  A.   Very much so.

6  Q.   And is it also true that you were friends with Paul

7  Stumpo?

8  A.   I was.

9  Q.   Okay.  You're no longer friends because you're in

10 prison or because you don't want to be friends with them

11 anymore?

12 A.   Why would I not want to be friends with them?

13 Q.   I just asked you, sir, are you still friends with

14 them?

15 A.   Of course.

16 Q.   Okay.

17 A.   They have both visited -- Paul Stumpo and John

18 Stumpo have both visited me in prison.

19 Q.   Now, do you have a minister named Warwick that

20 visits you regularly or has visited you regularly?

21 A.   Absolutely.  Warwick Potts, yes.

22 Q.   Warwick Potts.  And is he from Australia?

23 A.   He is.

24 Q.   And was he on the plane trip that you and I rode on

25 that you just testified about earlier?

ARTHUR HAWKINS - CROSS BY MR. SPRINGER                    1664

```
 1  A.   Absolutely.
 2  Q.   Okay.  You've been on several plane trips with
 3  Warwick; isn't that true?
 4  A.   Many.
 5  Q.   A lot of mission trips?
 6  A.   (no response)
 7  Q.   Is that a yes or a no?
 8  A.   I don't understand the question.
 9  Q.   Have you been on mission trips with Warwick before?
10  A.   No.
11  Q.   Never any mission trips?
12  A.   Never.
13  Q.   Okay.  Now, when I met you, wasn't it true that you
14  had never seen the original grand jury indictment that
15  was brought against you?
16  A.   That's correct.
17  Q.   And could you tell the jury when the first time was
18  that you actually laid your eyes on the original charges
19  that were brought against you?
20  A.   When I was indicted.
21  Q.   So you did see the original indictment when you were
22  indicted?
23  A.   I saw the superseding indictment.
24  Q.   Yes.  Now, my question is when did you see the
25  original indictment?
```

1    A.   After I was incarcerated.

2    Q.   So let's get this straight.  You first saw the

3    original indictment against you after you had gone

4    through a three-month trial; is that true?

5    A.   That's correct.

6    Q.   After you --

7           MR. SNOKE:  Your Honor, I object to this line of

8    questioning.  It's irrelevant.  And the witness said he

9    saw the superseding and I think that's what he was tried

10   on, not --

11          THE COURT:  Overruled.

12   Q.   (BY MR. SPRINGER)  And then isn't it true that when

13   you went to sentencing, you also had never seen the

14   original indictment against you?  Isn't that right?

15   A.   Absolutely correct.

16   Q.   Now, isn't it true that you first found out that you

17   could see the original indictment after your opinion from

18   the Seventh Circuit Court of Appeals on your appeal had

19   been issued?

20   A.   That's correct.

21   Q.   And isn't it true that Oscar Stilley -- or excuse

22   me, strike that.  Isn't it true that it was ordered

23   unsealed by one of the three judges on the three-judge

24   panel?

25   A.   That's also correct.

1  Q.  Now, Mr. Hawkins, when you received the original

2  indictment, after you had been sentenced and after you

3  had been all the way through the appellate process, did

4  you learn that there were other people that were indicted

5  with you?  For instance, did you know that Sears had been

6  indicted?

7  A.  Correct.

8  Q.  Did you know that Exide had been indicted?

9  A.  Correct.

10  Q.  And did you also learn that the United States had

11  created new corporations for that indictment?

12  A.  Of course.

13  Q.  So that the existing corporations could continue

14  because they had contracts with the government, didn't

15  they?

16          MR. SNOKE:  Your Honor, may we approach?

17          THE COURT:  You may.

18     (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND

19  OUT OF THE HEARING OF THE JURY.)

20          THE COURT:  What's your objection?

21          MR. SNOKE:  Your Honor, I object to the line of

22  questioning being beyond the scope of the direct.  But

23  it's also irrelevant what -- because I think the length

24  of trial on a superseding indictment, what the original

25  indictment had and what I believe what he's trying to get

1  into here is a bunch of stuff that happened after the --

2  after he was sentenced, if it did happen at all.  And I

3  don't see the relevance of what happened in an earlier

4  indictment and whether he knows about it or not.

5          THE COURT:  Mr. Springer, where are you going

6  with this?

7          MR. SPRINGER:  Well, if the trial here is about

8  what I did for Mr. Hawkins, can't I ask Mr. Hawkins what

9  I did?

10          THE COURT:  You surely may do that.

11          MR. SPRINGER:  That's what I'm getting into.

12          THE COURT:  You need to come to it.  I mean,

13  obviously, this witness's direct examination gave you

14  quite a bit to chew on, but you haven't even really begun

15  to chew it.  And we're not going to -- we're not going to

16  retry the underlying merits of the Exide case.

17          MR. SPRINGER:  I will not.

18          THE COURT:  And maybe, because you were there,

19  you did it, it's only natural to have a lot of trails you

20  want to run down, but we're not going to chase those

21  rabbits.

22          MR. SPRINGER:  I will not, Your Honor.

23          THE COURT:  I want you to keep in mind the ways

24  this witness hurt you and go after that and stay on --

25  stay focused.

```
 1              MR. SPRINGER:  Thank you.
 2         (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,
 3    WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE
 4    PRESENCE AND HEARING OF THE JURY.)
 5              MR. SPRINGER:  I'll start a new question, Your
 6    Honor.
 7    Q.  (BY MR. SPRINGER)  You testified that when I met
 8    with Jenner & Block that it was you and I, Mr. McQueen --
 9    or excuse me, strike that.  You testified that when you
10    and I met with Mr. McQueen, that it was only you and I
11    and him there.  Is that your testimony?
12    A.   That's correct.
13    Q.   Is it possible that you've forgotten that
14    Mr. Stilley was in the room?
15    A.   No.
16    Q.   You don't remember that?
17    A.   No, I do not.
18    Q.   Okay.  Now, do you have a belief that involves the
19    meaning of numbers?
20    A.   I don't understand the question.
21    Q.   Okay.  So did you and I ever have discussions about
22    what it meant for somebody to be born on a certain day?
23    A.   Not that I can recall.
24    Q.   Have we ever had discussions about how that you
25    believe spiritually that numbers play a significant role
```

1  in what the future holds or what things mean?

2  A.   Are you referring to a Biblical number like 666?

3  Q.   Yes, sir.

4  A.   Oh, I think that most people are familiar with the

5  Biblical number 666, but I can't recall those

6  conversations, with all due respect.

7  Q.   So if you found out that I was born on September 11,

8  1965, that would just be a birthday and means nothing to

9  you; is that right?

10 A.   Well, considering what 9/11 means to most Americans,

11 it would have significance.  But until you just mentioned

12 it, I did not know you were born on September the 11th.

13 Q.   Okay.  Is it possible that you just forgot that?

14 A.   All things are possible, I just can't recall ever

15 having that discussion.

16 Q.   Okay.  Now, Mr. Stumpo and Mr. Burt are close

17 friends of yours.

18 A.   They are.

19 Q.   Now, at trial -- at your trial, you had four

20 attorneys with you the entire trial; is that correct?

21 A.   Three attorneys and a paralegal.

22 Q.   All right.  And I believe your testimony was you

23 spent several million dollars on that defense; is that

24 right?

25 A.   That's correct.

ARTHUR HAWKINS - CROSS BY MR. SPRINGER                         1670

1   Q.   And isn't it also true that you said that at the

2   beginning that your -- your bribery involved an amount of

3   money given to somebody to obtain a $125 million contract

4   with Sears; is that right?

5   A.   That was the allegation, correct.

6   Q.   Was that true?

7   A.   That's what I was found guilty for.

8   Q.   Do you believe that you were guilty of that?

9   A.   I pleaded not guilty.

10  Q.   As you stand here today, do you believe that you're

11  not guilty?

12  A.   Of the exact accusations, I was not guilty.  But of

13  the overall crime, I was certainly a party to it.

14  Q.   And is that the conspiracy charge?  Is that what you

15  mean when you said "the overall crime"?

16  A.   If one could refer to the coverup as being part of

17  the conspiracy, then that would be true.

18  Q.   Now, you also said or mentioned that Exide was a $3

19  billion company; is that correct?

20  A.   Currently about $3.2 billion in sales, correct.

21  Q.   And just briefly, did Exide have a contract with the

22  United States Government?

23  A.   Many.

24  Q.   Now, you had mentioned earlier -- make sure I get

25  that right.  You were asked about check number 94.

ARTHUR HAWKINS - CROSS BY MR. SPRINGER                    1671

```
1              MR. SPRINGER:  Could you put Government's
2   Exhibit Number 94 up, please.
3   Q.  (BY MR. SPRINGER)  Do you see on the screen there,
4   the check in the amount of $4,445?
5   A.  Correct.
6   Q.  Now, at the time that you were identifying that
7   check, you made a statement to the jury, "I'm a
8   businessman, I ran corporations, and I've received
9   statements from lawyers."  Do you remember that?
10  A.  I do.  I don't remember it being -- was referenced
11  to that check, but go ahead.
12  Q.  Now, the statement was being made in reference to
13  whether Mr. Stilley had sent you a bill or not; isn't
14  that right?
15  A.  That may well have been the case.
16  Q.  And with the four lawyers -- three lawyers and the
17  paralegal that you had at your criminal trial, did you
18  always get written statements from them?
19  A.  Absolutely.
20  Q.  Okay.  So is it safe to say that you wouldn't write
21  another check until you got a statement showing that you
22  had already spent the money you had already given the
23  lawyers?
24  A.  Repeat that question again, please.
25  Q.  When you hired -- or hire an attorney, in your
```

ARTHUR HAWKINS - CROSS BY MR. SPRINGER                    1672

1  experience, do you retain them?

2  A.   You normally start off with a retainer up front.

3  Q.   Okay.  And then you get a receipt for that in some

4  form or fashion?

5  A.   Not necessarily.  You start getting billed

6  statements.

7  Q.   You start getting billed statements?

8  A.   Of course.

9  Q.   All right.  And then if your retainer gets spent,

10  then you're asked to replenish it in some capacity; isn't

11  that right?

12  A.   No, you're normally asked to pay the bill.

13  Q.   Okay.  So in that instance, then, the lawyer does

14  the work, sends you a bill, and then you pay it?

15  A.   Correct.

16  Q.   And that has been your experience in every instance;

17  is that right?

18  A.   There are certainly cases where the lawyers request

19  additional funds, waiting on the billing coming through.

20  Q.   Was it just in anticipation of the possibility there

21  was going to be a lot of money that's going to be needed

22  and therefore they want to make sure they're going to get

23  it when it's needed?

24  A.   No.  What it normally means is they don't have the

25  billing complete yet, but they have already earned the

1    hours and they're looking for the funds to support it.

2    Q.   Now, did Jenner & Block have a lien against a piece

3    of property that Chippewa Trails owned?

4    A.   During the time I used them?

5    Q.   During the time you used them.

6    A.   Not at all.  No, they did not.

7    Q.   So they had no interest in any property that you or

8    any of your organizations owned at the time that you used

9    them?

10   A.   Correct.

11   Q.   Is it safe to say that that's the best of your

12   memory only?

13   A.   No, that's --

14   Q.   Or emphatically there is none?

15   A.   There was none.  What you're referring to came up

16   afterwards because some of the bills had not been paid.

17   That's what you're referring to.  That was way after I

18   was incarcerated.

19   Q.   All right.  And you gave them a lien interest to

20   secure the fact you couldn't pay the bills at that time;

21   is that right?

22   A.   I gave them nothing.  You're asking me the

23   question.  I'm responding to your question.

24   Q.   Did your wife give that to them?

25   A.   She did.

1   Q.   She didn't or did?

2   A.   She did.

3   Q.   She did, okay.  Thank you.

4   A.   Correct.

5   Q.   And your wife was Cindy that you had mentioned

6   earlier, right?

7   A.   Absolutely.

8   Q.   Okay.  Mr. Snoke asked you why you would write

9   checks to Bondage Breakers Ministries.  Do you remember

10  those questions?

11  A.   Yes, I do.

12  Q.   Okay.

13          MR. SPRINGER:  And could you pull up

14  Government's Exhibit Number 20, please, for the witness

15  to look at.

16  Q.   (BY MR. SPRINGER)  You testified that on December

17  4th you wrote a check to Bondage Breakers Ministries for

18  $13,000.  Do you remember that?

19  A.   Yes, I did.

20  Q.   Did you get a billing from Bondage Breakers Ministry

21  for that $13,000 that you just wrote the check for?

22  A.   You know I didn't.

23  Q.   Now, is it your testimony that I should have been

24  giving you a billing statement?

25  A.   Absolutely, you know you should have.

ARTHUR HAWKINS - CROSS BY MR. SPRINGER                    1675

1   Q.   All right.

2            MR. SPRINGER:   Now, would you pull up

3   Government's Exhibit Number 203.

4   Q.   (BY MR. SPRINGER)   Now, eight days later you

5   testified about Exhibit Number 203; isn't that true?

6   A.   That's correct.

7   Q.   And eight days later, 12/12/02, you write another

8   check for $7,000 to Bondage Breakers Ministries.

9   A.   Absolutely correct.

10  Q.   Did you get any billing statement before you did

11  that?

12  A.   No, I did not.  And you know full well why that

13  check was written.

14           THE COURT:  Mr. Hawkins --

15           THE WITNESS:  You were demanding --

16           THE COURT:  Mr. Hawkins, it's necessary to avoid

17  commentary in addition to a direct answer to the

18  question.  Next question.

19           MR. SPRINGER:  May I approach the witness, Your

20  Honor?

21           THE COURT:  You may.

22  Q.   (BY MR. SPRINGER)  Mr. Hawkins, I've just handed you

23  what has been marked as Defendants' Exhibit Number 170.

24  Have you seen -- if you would read Exhibit 170 and

25  familiarize yourself and see if you remember Defendants'

1  Exhibit Number 170.  Do you recognize Defendants' Exhibit

2  Number 170, Mr. Hawkins?

3  A.   I've never seen the document before.

4  Q.   Never seen it before.  Okay.

5          MR. SPRINGER:  May I grab it back from him, Your

6  Honor?

7          THE COURT:  You may.

8  Q.   (BY MR. SPRINGER)  Do you remember any conversation

9  or any other document similar to the one that you just

10 read?

11 A.   Never.

12 Q.   It is your testimony, though, that around November

13 15, 2002, you and I were already communicating; isn't

14 that correct?

15 A.   Absolutely correct.

16 Q.   And, in fact, we had already taken an airplane trip

17 together, hadn't we?

18 A.   I had already paid you $5,000 too.

19 Q.   Now --

20         THE COURT:  Mr. Springer, let me know when you

21 get to a convenient stopping point.  We'll take our

22 mid-morning recess.

23         MR. SPRINGER:  It's fine right now, Your Honor.

24         THE COURT:  You may be seated.

25         MR. SPRINGER:  Thank you.

```
 1            THE COURT:  Members of the jury, we'll take our
 2   mid-morning recess at this time.  Again, guided by the
 3   clock on the wall, we will resume at ten minutes to the
 4   hour.  During this recess, please remember my usual
 5   admonition not to discuss or investigate the case and not
 6   to reach any conclusions about the case until it has been
 7   given to you for your deliberations and verdict.
 8       All persons in the courtroom will be seated and
 9   remain seated while the jury departs.
10       (JURY EXITS THE COURTROOM.)
11            THE COURT:  Court will be in recess.
12       (A RECESS WAS HAD, AFTER WHICH THE FOLLOWING
13   PROCEEDINGS WERE HAD IN OPEN COURT AND WITHIN THE
14   PRESENCE AND HEARING OF THE JURY.)
15            THE COURT:  Before we resume cross-examination,
16   the defendants and counsel and the deputy will please
17   come to the bench.
18       (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND
19   OUT OF THE HEARING OF THE JURY.)
20            THE COURT:  It's my understanding that all of
21   the in-custody witnesses may be released and returned to
22   their place of incarceration except two.  Is that right?
23            MR. SPRINGER:  That's true, Your Honor.
24            THE COURT:  And those two are?
25            MR. SPRINGER:  Burt and Patridge.
```

```
 1          THE COURT:  Burt and Patridge.  So I'll inquire
 2   of the deputy, then, I take it you're prepared to return
 3   all except Burt and Patridge where they came from.
 4          COURT SECURITY:  And Mr. Hawkins may be returned
 5   if he finishes his testimony today.
 6          MR. SPRINGER:  No, I have not made that
 7   conclusion on Hawkins just because I'm not through with
 8   what I'm going to get at, but if I can tell the Court
 9   right after he finishes testifying on that answer.  And I
10   was thinking it was all the people still in custody, I
11   wasn't thinking Mr. Hawkins.  I didn't know if the
12   government was going to block me.
13          THE COURT:  We'll need some clarification on
14   Hawkins when he's through with his testimony today.
15          MR. SPRINGER:  Can I just say, Your Honor, after
16   I'm done, when I go to sit down, can I just stand up and
17   say I do release him or I do not -- I withhold him?  Is
18   that what would you like me to do?
19          THE COURT:  Yes.
20          COURT SECURITY:  At this point, we'll make the
21   arrangements for Mr. Ouwenga and Mr. Bennett.
22          THE COURT:  Very well.
23      (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,
24   WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE
25   PRESENCE AND HEARING OF THE JURY.)
```

ARTHUR HAWKINS - CROSS BY MR. SPRINGER                    1679

1          THE COURT:  You may proceed.

2   Q.  (BY MR. SPRINGER)  Mr. Hawkins, as far as the

3   $13,000 check on December 4, 2002, and the December 12,

4   2002, check for $7,000, were those signature stamps?

5   Were they pre-signed by you?  Could you clarify that?

6   A.  Can you refer to which checks you're referring to?

7   I'm having difficulty hearing you and I apologize.

8          MR. SPRINGER:  If the government would pull

9   Government's Exhibit Number 20, please.

10         THE WITNESS:  I signed it.

11  Q.  (BY MR. SPRINGER)  That was your signature, correct?

12  A.  (no response)

13  Q.  Is that better?

14  A.  Yes.

15  Q.  Okay.  You did sign the check dated 12/4/2002 for

16  $13,000?

17  A.  I did, sir.

18  Q.  Okay.

19         MR. SPRINGER:  And then if you could please pull

20  up Government's Exhibit Number 203, please.

21  Q.  (BY MR. SPRINGER)  Do you recognize the signature on

22  that check?

23  A.  I also signed that check.

24  Q.  Thank you, sir.  And isn't it true that after you

25  were sentenced you were taken away into custody right

```
 1   away?  Isn't that true?

 2   A.   That is also correct.

 3   Q.   Now, do you remember signing any checks after that

 4   day to Bondage Breakers Ministries or Lindsey Springer,

 5   if you remember?

 6   A.   Can you bring the check back up again, please.

 7   Q.   I'll strike the question.  Now, Mr. Hawkins, you

 8   testified earlier that you remembered you had testified

 9   before a grand jury investigating myself and Oscar

10   Stilley.  Do you remember that?

11   A.   Yes, sir.

12   Q.   Okay.  And you also said that you did not review

13   your grand jury testimony before your testimony here

14   today.  Do you remember that as well?

15   A.   I actually testified that I've never seen it.

16   Q.   Never seen the grand jury -- thank you.

17   A.   Correct.

18   Q.   Now, prior to your testimony in 2006 before the

19   grand jury, did you have on occasion to meet with any

20   Internal Revenue Service criminal investigators?

21   A.   I did, sir.

22   Q.   Did you meet with a Brian Shern?

23   A.   I did, sir.

24   Q.   Do you see him in the courtroom today?

25   A.   I do.
```

ARTHUR HAWKINS - CROSS BY MR. SPRINGER                    1681

```
 1  Q.   Could you point him out, please.

 2  A.   That handsome young man sitting there (indicating).

 3  Q.   Thank you.  Did you also meet with a Don Shoemake?

 4  A.   I honestly can't recall his name, sir.

 5  Q.   Do you remember whether or not you just met with

 6  Mr. Shern once or twice or more?

 7  A.   (no response)

 8       MR. SPRINGER:  Your Honor, may I approach and

 9  maybe we could refresh his memory?

10       THE COURT:  You may.  How many memoranda have

11  you given him?

12       MR. SPRINGER:  I'm sorry, Your Honor.  This is

13  defense --

14       THE COURT:  Just how many memoranda have you

15  given him?

16       MR. SPRINGER:  I only gave him one.

17       THE COURT:  Only one?

18       MR. SPRINGER:  Right.

19       THE COURT:  Okay.  Proceed.

20       MR. SNOKE:  Can we know which one he's --

21       MR. SPRINGER:  168 and 170.  May I approach him

22  again, Your Honor?

23       THE COURT:  You may.  Now, what does he have

24  now?

25       MR. SPRINGER:  He has Defendants' Exhibit Number
```

ARTHUR HAWKINS - CROSS BY MR. SPRINGER                    1682

1  168 and Defendants' Exhibit Number 170, Your Honor.

2          THE COURT:  Now, I've got two 170s.

3          MR. SPRINGER:  And I have the other.  I'm sorry.

4  Q.  (BY MR. SPRINGER)  Mr. Hawkins, does Defendants'

5  Exhibit Number 170 that you have in front of you, does

6  that refresh your memory as far as when you might have --

7  when you did meet with Mr. Shern?

8          THE COURT:  Excuse me, Mr. Springer.  Before we

9  took our break, you gave the witness a document labeled,

10 at least on my copy, Defendants' Exhibit 170 that he was

11 completely unable to identify.

12         MR. SPRINGER:  Right.

13         THE COURT:  Now, you're referring to a

14 completely different document as Defendants' Exhibit

15 170.  And the record needs to be very clear and I frankly

16 don't know whether -- when you referred to this before we

17 took our break, this was, in fact, referred to as 170,

18 but the sticker says 170.

19         MR. SPRINGER:  Yes.  And I never got it in,

20 so --

21         THE COURT:  Well --

22         MR. SPRINGER:  You're right.  You're correct.

23         THE COURT:  We're not going to have two Exhibits

24 170.

25         MR. SPRINGER:  I can fix that, Your Honor.  May

```
 1   I approach the witness, Your Honor?
 2          THE COURT:  You may.  You can make it 170A or
 3   170.1, whichever, but it needs to be differentiated in
 4   the record.
 5          MR. SPRINGER:  Right.  I'll make that 170A.
 6          THE COURT:  And that's the 2/16/06 memo?
 7          MR. SPRINGER:  Yes, sir, that is correct.  And
 8   that would be dated February 16, 2006.
 9   Q.  (BY MR. SPRINGER)  Mr. Hawkins, you have before you
10   Defendants' Exhibit Number 170A.  Does that refresh your
11   memory about when maybe the first time it was that you
12   met with Mr. Shern?
13   A.   It does.  And I didn't need my memory refreshed on
14   that meeting.  Go ahead.
15   Q.   Okay.  Now, you also have before you Defendants'
16   Exhibit Number 168.  Do you see that?
17   A.   I can.
18   Q.   And does it also help refresh your memory about when
19   you met Mr. Shern for either a second or an additional
20   time?
21   A.   It does.
22   Q.   Are these the only two times that you met with
23   Mr. Shern that you remember?
24   A.   To the best of my recollection, that's the only two
25   times I can recall.
```

```
 1  Q.   Okay.  Thank you.  Now --
 2          MR. SPRINGER:  Your Honor -- scratch that.
 3  Q.   (BY MR. SPRINGER)  Mr. Hawkins, did you tell
 4  Mr. Shern on May 2, 2006, that you had the impression
 5  that Springer was an attorney during the time Springer
 6  performed legal services for him?  Do you remember saying
 7  that?
 8  A.   You have to -- you have to repeat it again.  I'm
 9  having real difficulty understanding.
10  Q.   I'm sorry.  Do you remember telling Mr. Shern on May
11  6, 2006, that at all times that you believed I was an
12  attorney?
13  A.   That's true, yes, correct.
14          MR. SNOKE:  Your Honor, excuse me.  The document
15  talks about May 2nd.  He said May 6th.
16  Q.   (BY MR. SPRINGER)  I'm sorry, May 2, 2006.  You said
17  that's true, sir?
18  A.   That's what I've contended all the way along, yes.
19  Q.   And that from the moment you met me that you
20  believed I was an attorney?
21  A.   Absolutely.
22  Q.   And that I charged $200 an hour?
23  A.   That's correct.
24  Q.   Okay.  Now, if you would take a look at Defendants'
25  Exhibit Number 170A.  If you would, look at the first
```

1    full paragraph.

2    A.    170A.

3    Q.    Did you say to Mr. Shern that you met Lindsey

4    Springer through your church, Restoration Bible Church,

5    the church is located in Detroit off 11 mile road, the

6    church has 60 to 70 members?

7            MR. SNOKE:   Your Honor, I --

8    Q.    (BY MR. SPRINGER)   Do you remember saying that?

9            MR. SNOKE:   -- object as being compounded.

10           THE COURT:   Overruled.

11   Q.    (BY MR. SPRINGER)   Do you remember that?

12   A.    Understand that this is not written by myself.   This

13   is not my document.

14   Q.    So did you say to Mr. Shern those words,

15   Mr. Hawkins?

16   A.    The words that I said to him were to the effect that

17   I met -- I was introduced to you or you called me as a

18   result of people like Paul Stumpo, John Stumpo, Michael

19   Burt.   That's what I've testified to again here today.

20   It's exactly the same.

21   Q.    So answer yes or no to this question:   Did you tell

22   Mr. Shern that you remembered Springer held seminars at

23   the church about tax topics?   Did you say that to him?

24   A.    I don't recall saying that.

25   Q.    Did you ever tell Mr. Shern that you never attended

1   any of those seminars?

2   A.   That, I definitely said, correct.

3   Q.   Did you tell Mr. Shern that you weren't sure who

4   invited me to your church?

5   A.   Can you refer me to the paragraph?

6   Q.   Be on the fifth line down, first paragraph.  First

7   numbered paragraph, fifth line down.  See where it says

8   "Hawkins"?

9   A.   Where does it say that I invited you to the church?

10  Q.   Actually, it says, "Hawkins" -- I asked you -- does

11  it say, "Hawkins was not sure who invited Springer to the

12  church"?

13  A.   That's what it says, that's correct.

14  Q.   Do you remember saying that?

15  A.   I can't recall whether I issued that particular

16  statement at that time.

17  Q.   If you'll follow along.  Did you also say, "But he

18  mentioned names of individuals that he thought knew

19  Springer" -- that "he" being you -- "that probably

20  invited him"?  That being me.  Did you tell Mr. Shern

21  that?

22  A.   Well, if he said that, then, obviously, that's what

23  was stated.

24  Q.   And did you tell him the name of Jory Brooks?

25  A.   Jory Brooks is a pastor at that church.

1  Q.   Did you tell him the name of Paul Stumpo?

2  A.   I did.  Paul Stumpo, John Stumpo, Michael Burt, yes.

3  Q.   Now, if you look at the second paragraph, did you

4  tell him that Springer told him he had a ministry called

5  Bondage Breakers Ministries?  Do you remember telling

6  Mr. Shern that?

7  A.   I think it was in relation to the checks were being

8  made out to Bondage Breakers Ministries.

9  Q.   Do you remember saying Springer said that the

10 ministry was to help people that couldn't afford to

11 defend themself?

12 A.   I can't recall the exact words, to be perfectly

13 frank.  I haven't written this document.

14 Q.   Do you have any reason, as you sit here today, to

15 believe that those statements that Mr. Shern wrote on the

16 document, Defendants' Exhibit Number 170A, are not

17 something that you said?

18 A.   No, I have no reason to think they wouldn't be.

19 Q.   Did you also tell Mr. Shern that Springer -- he was

20 not a lawyer?  Did you tell Mr. Shern that, the fourth

21 line down on paragraph 2?

22 A.   I know that that statement is not correct.

23 Q.   So are you saying here today that Mr. Shern

24 incorrectly wrote down your statement on his interview of

25 you?

 1   A.   You're referring to where it says "Springer told

 2   Hawkins that he was not a lawyer"?

 3   Q.   Yes, sir.  I'm asking you that specifically.

 4   A.   And I can assure you that that's not a statement

 5   I've ever made.  Because my understanding was up until I

 6   learned otherwise that you were a lawyer.

 7   Q.   Did you ever tell Mr. Shern that I was an expert on

 8   IRS issues?

 9   A.   I can't recall that statement either.

10   Q.   Did you ever tell Mr. Shern on the last sentence,

11   "Hawkins said that he thought Springer helped provide

12   legal counsel to people that could not afford it"?

13   A.   You're misquoting what the letter says.  The letter

14   says, "Springer told Hawkins he was not a lawyer and that

15   his expertise is with IRS issues."  That's your

16   statement, not mine.

17   Q.   So did you tell Mr. Shern that I told you I was not

18   a lawyer?

19   A.   That's not what the letter says.

20   Q.   Does the letter say, "Springer told Hawkins that he

21   was not a lawyer?"  Does Defendants' Exhibit Number 170A

22   at the beginning of the sentence say, "Springer told

23   Hawkins he was not a lawyer"?

24   A.   "That his expertise is with IRS issues."  And I'm

25   saying that that's not my statement.

1    Q.   You're saying you didn't say that to Mr. Shern?

2    A.   To the best of my recollection, I can't recall

3    saying it.

4    Q.   Did you tell Mr. Shern that you paid your attorneys

5    from Chicago $2 million for representation during your

6    criminal trial?

7    A.   I did.

8    Q.   Did you tell Mr. Shern that you -- that your lawyers

9    in Chicago told you that your maximum sentence would be

10   no more than three years?

11   A.   That's correct.

12   Q.   And those are statements that are on the interview

13   -- Defendants' Exhibit Number 170A that you have before

14   you right now; isn't that true?

15   A.   That's correct.

16   Q.   And isn't it true that you told Mr. Shern that once

17   you received the presentence report you realized --

18           THE COURT:   Mr. Springer, you're going to have

19   to read more slowly.

20           MR. SPRINGER:   I'm sorry, Your Honor.

21   Q.   (BY MR. SPRINGER)   Isn't it true that Defendants'

22   Exhibit Number 170, you said that once you received the

23   presentence report that you realized the recommendation

24   sentence was going to be ten years?

25           THE COURT:   Wait just a minute.

1          MR. SNOKE:  Objection.  It's 170A.  We're

2   getting it confused.

3          MR. SPRINGER:  170A.  I'm sorry, Your Honor.

4          THE WITNESS:  Yes.

5   Q.  (BY MR. SPRINGER)  Okay.  Now, if you would turn to

6   the second page of Defendants' Exhibit 170A.  Can you

7   please identify any other words on the second page of

8   Defendants' Exhibit 170A that Mr. Shern wrote that you

9   did not tell him?

10          MR. SNOKE:  Objection to the form of the

11   question, Your Honor, this is being used.

12          THE COURT:  Overruled.

13          MR. SPRINGER:  Your Honor, while he's reading,

14   may I?

15          THE WITNESS:  Would you like to start with the

16   first paragraph?

17   Q.  (BY MR. SPRINGER)  Yes, sir.  I'd like to know on

18   the first paragraph on page 2 what it is that you did not

19   tell Mr. Shern that's written in that first paragraph.

20   A.  I think that quite possibly Mr. Shern is combining

21   two meetings that we had, the two meetings that we went

22   to Tom McQueen with, because he says -- he said,

23   "Springer met him there but stayed in the lobby during

24   the meeting."  That was in the second meeting.  In the

25   first meeting, you met with McQueen and myself.  So it

1  appears that you might be combining the two meetings.

2  Q.   Do you know, Mr. Hawkins, how far apart the two

3  meetings were?

4  A.   We had the dates on the sheets.  We can pull up the

5  exact dates they were.  They were about a month apart.

6  We can go pull --

7  Q.   So are you testifying here today that you met with

8  Mr. McQueen twice about your sentencing report?

9  A.   I did.

10 Q.   And it was a month apart?

11 A.   That's what I've just testified to.

12 Q.   Okay.  Now, you testified that you met me around the

13 first of November for the first time; is that right?

14 A.   No, that's not what I testified to.  I testified

15 that we had communications beginning in -- the end or

16 latter part of September or early October and then that

17 we flew together to Chicago to meet with McQueen around

18 the middle part of November.

19 Q.   Now, when you say --

20 A.   That's why I say the two meetings were about a month

21 apart.

22 Q.   When you say "we flew together," where were you

23 coming from and where was I coming from?

24 A.   When I say "flew together," you flew up from

25 Oklahoma, I've already testified to that, and I flew over

```
 1   from Detroit.
 2   Q.   Okay.  So we didn't fly together, did we?  On that
 3   one, we didn't fly together?
 4   A.   My use of the term "together" was you were flying
 5   and I was flying at the same time.
 6   Q.   All right.  And is it true, then, that we -- under
 7   your testimony here today, we met sometime in
 8   mid-November to meet with Mr. McQueen, which was formerly
 9   of Jenner & Block?
10   A.   No, it was with Sonnenschein Nath & Rosenthal.
11   We've never met with Jenner & Block.
12   Q.   Was Mr. McQueen the same lawyer for both?
13   A.   Mr. McQueen was the lawyer at Jenner & Block during
14   my trial, but he was fired, as I've already testified to,
15   at Jenner & Block and re-employed by Sonnenschein Nath &
16   Rosenthal.
17   Q.   Do you remember the lawyer that you employed with
18   that -- the latter law firm that you just talked about?
19   A.   Tom McQueen.
20   Q.   Okay.  So it's the same lawyer, just different law
21   firm, right?
22   A.   Right.  But you said Jenner & Block and I'm just
23   correcting you because it was -- you never went to Jenner
24   & Block.
25   Q.   And that would be sometime in the middle of
```

1  November, is that fair to say, of 2002?

2  A.   The flight log we've already testified to gives you

3  the exact date.

4  Q.   Now, why would that flight log show the exact date

5  when you and I met with Mr. McQueen?

6  A.   Correct.

7  Q.   Why would that show that?  What does the flight log

8  prove?

9  A.   That I flew to Chicago on that date because I have a

10  notation in there "met with Tom McQueen."

11  Q.   Okay.  And then you said 30 days later we met again

12  with Mr. McQueen; is that right?

13  A.   I said approximately a month later.

14  Q.   Okay.

15  A.   Correct.

16  Q.   Okay.  Now, you were sentenced on December 19th;

17  isn't that true?

18  A.   That's correct.

19  Q.   All right.  And you also testified that Mr. Stilley

20  had been brought on about the first of the month; isn't

21  that true?

22  A.   In that time frame.

23  Q.   Because that's when the first check you wrote

24  Mr. Stilley was dated; isn't that true?

25  A.   Let's go back to the check that I wrote.  The check

1  gives you the exact date.

2          MR. SPRINGER:  Could you please pull up

3  Government's Exhibit Number 94.

4  Q.  (BY MR. SPRINGER)  Do you see the date of November

5  26, 2002?

6  A.  Correct.

7  Q.  All right.  Now, the flight log you said would show

8  when we first met with Mr. McQueen; isn't that true?

9  A.  That's correct.

10  Q.  All right.

11          MR. SPRINGER:  Could you please pull up

12  Government's Exhibit Number 205, please.

13  Q.  (BY MR. SPRINGER)  Do you see the date of the flight

14  that you were referring to on Government's Exhibit Number

15  205?

16  A.  That's not the first meeting, that's the second

17  meeting.  That's the point I've been trying to get across

18  to you.  That's the second meeting.  That's the December

19  meeting on 12/16 where you and Mr. Stilley and I waited

20  outside McQueen's office for four hours before we could

21  meet with him.  And you never did meet with him.  Only I

22  went in.

23  Q.  Okay.  So three days before your sentencing,

24  Mr. Stilley and I and you went to see Mr. McQueen?

25  A.  That's correct.

1   Q.   All right.  Now, when was the first time -- what's

2   the date of the first time we met with Mr. McQueen?

3   A.   You and I met with Mr. McQueen?

4   Q.   Yes, as your testimony has said.

5   A.   A month prior to that in November, approximately.

6   Q.   Do you have a flight log on that flight?

7   A.   I do.  We've already submitted that, yes.

8   Q.   Is it on Number 205?

9   A.   It is.  It's the second page.

10        MR. SPRINGER:  Could you please turn to the

11  second page of 205.

12        MR. SNOKE:  May he look at the hard copy here?

13        THE WITNESS:  I've got it here.

14        THE COURT:  Surely.

15        THE WITNESS:  The date is 11/12 on that flight

16  log right there.

17  Q.   (BY MR. SPRINGER)  All right.  So 11/12, you and I

18  flew to Chicago to meet with Mr. McQueen.  Is that your

19  testimony?

20  A.   That's what I've testified to three times now.

21  Q.   Okay.  Now, when you met with Mr. Shern, did you

22  tell him that we had met twice?

23  A.   It may have been just an overall discussion on it.

24  I can't recall.  It's seven years ago.  The man has

25  written down what he believed it to be and I accept that.

1  Q.   On the third sentence on the first paragraph of page

2  2 of Defendants' Exhibit Number 170A, did you tell

3  Mr. Shern that I was in town on other business?

4  A.   I can't recall.

5  Q.   Do you have any reason to believe -- disbelieve what

6  Mr. Shern wrote here?

7  A.   I have no reason to disbelieve.  It may well have

8  been.  You may have gone to see someone else while you

9  were there.  That may well have been the case.  I can't

10 recall.

11 Q.   Did you tell Mr. Shern on June -- excuse me,

12 February 16, 2006, did you tell him that the attorneys

13 didn't do any work on his presentence report, yours, and

14 they didn't seem to be prepared to represent you at

15 sentencing?

16 A.   That's correct.

17 Q.   Now, were you discussing this meeting that we had

18 had under your testimony December 16, 2005 (sic)?

19 A.   May well have been.

20 Q.   That's three days before you're supposed to

21 sentenced?

22 A.   That may well have been, sure.

23 Q.   You testified earlier that you said that Mr. Stilley

24 -- you didn't hold it against him that he couldn't do

25 much at sentencing because you just brought him on board;

1  is that right?

2  A.   That's not what I testified to.

3  Q.   What did you say, sir?

4  A.   I said that was the reason that I was given that the

5  performance was, in my opinion, substandard at sentencing

6  because Mr. Stilley only had a few days to work on the

7  case.

8  Q.   A few days meaning three?

9  A.   No, no.  Definitely not a few days.  I sent you

10 7,700 pages of transcripts, which, to this day, you've

11 never read, for example.  And he had plenty of time to do

12 it because I had brought him on board a month in

13 advance.  It shows on the checks.  It shows on the

14 contract.  Those are all entered in the record.

15 Q.   Mr. Hawkins, you testified earlier that you had no

16 tax problems with the IRS.  Do you remember that

17 testimony?

18 A.   Correct.

19 Q.   Now, is your wife --

20 A.   What I testified to was I testified that I paid my

21 taxes.

22 Q.   So it is true that you have -- you were being

23 audited by the IRS at the same time that you were going

24 through your criminal case; is that not true?

25 A.   Not that I'm aware of.

ARTHUR HAWKINS - CROSS BY MR. SPRINGER                              1698

1   Q.   Would your wife be aware of that?

2   A.   She may well have been.

3   Q.   If you would look at paragraph 6 on Defendants'

4   Exhibit 170, please.

5   A.   The whole paragraph or which sentence?

6   Q.   Well, let's start with -- we'll just start at the

7   top.  Okay?  And if you would go to the seventh line,

8   paragraph 6.  Do you see where it says "Hawkins

9   believes"?

10          MR. SNOKE:  Your Honor, I'm going to object to

11   the form of the question here, reading the document

12   rather than asking questions and getting answers.

13          THE COURT:  Start by asking him a question about

14   the substance of the sentence and then we'll take it one

15   step at a time from there.

16   Q.   (BY MR. SPRINGER)  Mr. Hawkins, did you ever tell

17   Mr. Shern that money you gave me was a donation?

18   A.   I can't ever recall making that statement.  And by

19   the way, if you look at my check writing history, I would

20   have written "donation" on the bottom of the check,

21   but --

22   Q.   Did you tell Mr. Shern that you believe you donated

23   some money to Springer and that this would have occurred

24   prior to your sentencing and appeal?

25   A.   I can't recall making that statement.

1  Q.  So just for clarity, you file all your tax returns,

2  but you don't know whether you were under IRS audit.  Is

3  that true, yes or no?

4  A.  When I was -- when I was at home before I was locked

5  up, I was not under IRS audit.

6  Q.  And --

7  A.  Let me finish off the statement.  Many years I made

8  over a million dollars, paid the taxes on it.  In fact,

9  one year I paid a million dollars in taxes.  So,

10 therefore, you're obviously subject to audit by the IRS

11 when you make that kind of money.

12 Q.  And then you read what Mr. Shern wrote, which said

13 that you told him I told you I was not an attorney, and

14 you stand here today and say that's not true, correct?

15 A.  What I've stated, I'll state again.

16          MR. SNOKE:  Objection.

17          THE COURT:  That will be sustained.

18          THE WITNESS:  I'll state again, I did not --

19          THE COURT:  Wait.  Mr. Hawkins, I sustained an

20 objection to the question.  Mr. Springer, we'll have the

21 next question.

22          MR. SPRINGER:  Now, could you pull up

23 Government's Exhibit Number 202, please.

24 Q.  (BY MR. SPRINGER)  Now, Mr. Hawkins, isn't it true

25 that you stated that you're a businessman, that you ran

1    many corporations, you received statements from lawyers,

2    you're familiar with that?  Isn't that true?

3    A.   Yes, I am.  That's correct.

4    Q.   Now, you entered into a contract agreement with

5    Attorney Oscar Stilley.  And if you would please turn to

6    the second page of 202.  On 11/26/02, is that what

7    Government's Exhibit Number 202 on the second page says?

8    A.   It has already been submitted to the record, yes.

9    Q.   And you stated that you wrote me a $13,000 check to

10   Bondage Breakers Ministries on January 4, 2002; isn't

11   that correct?  That would be check number 203 -- or

12   excuse me, check number -- sorry, Government's Exhibit

13   Number 20.

14   A.   I don't recall that check being submitted.

15             THE COURT:  Wait.  Mr. Snoke.

16             MR. SNOKE:  I object.  He just said something

17   about January 2002.

18             MR. SPRINGER:  I'm sorry.

19             MR. SNOKE:  I don't think we've had any

20   testimony on that.

21             MR. SPRINGER:  December 4, 2002.  And I'm so

22   sorry.

23   Q.   (BY MR. SPRINGER)  On Government's Exhibit Number

24   20 --

25             MR. SPRINGER:  Would you please post that again.

ARTHUR HAWKINS - CROSS BY MR. SPRINGER                    1701

```
 1   Q.   (BY MR. SPRINGER)  You wrote a check --
 2            THE COURT:  Wait just a minute.  Mr. Snoke, if
 3   you perceive a factual mistake in the question, let's
 4   just hear the question and see if the witness can handle
 5   it.  If it needs to be clarified, it can be clarified.
 6   Go ahead.
 7            MR. SPRINGER:  Government's Exhibit Number 20.
 8   Q.   (BY MR. SPRINGER)  On eight days later, after you
 9   signed an attorney/client contract with Oscar Stilley,
10   isn't it true that you made a check out for $13,000 to
11   Bondage Breakers Ministries?
12   A.   That's correct.
13   Q.   And then again eight days later you wrote another
14   check for $7,000 to Bondage Breakers Ministries?
15   A.   Yes.
16   Q.   Now, where is the attorney/client contract,
17   Mr. Hawkins?
18   A.   You mean between you and I?
19   Q.   Yes.
20   A.   We had a verbal contract dating back two months
21   prior to that.  That's why I kept demanding the
22   statements.
23   Q.   Do you have --
24   A.   And you kept demanding money.
25   Q.   Do you have any documents that you've presented or
```

ARTHUR HAWKINS - CROSS BY MR. SPRINGER                    1702

```
 1   directed to be presented to the United States that shows
 2   that you ever demanded any statement from me ever?
 3   A.   I do not.  That was the contention between you and
 4   I.
 5   Q.   What was the contention?
 6   A.   The fact that you weren't providing statements.
 7   Q.   But you kept writing checks?
 8   A.   What alternative did I have?  Tell the Court what
 9   you used to say, you wouldn't do any more work.
10        THE COURT:  Mr. Hawkins, it's necessary to
11   answer the question directly and not go beyond the
12   question because there will be other opportunities for
13   further questions.
14        THE WITNESS:  Yes, sir, Your Honor.
15        THE COURT:  Next question.
16   Q.   (BY MR. SPRINGER)  Mr. Hawkins, on Defendants'
17   Exhibit 170A, paragraph 6, and if you would drop down to
18   the tenth line, did you ever say that the money -- did
19   you ever say to Mr. Shern on February 16, 2006, that you
20   were not certain as to which checks that were written to
21   Bondage Breakers Ministries were, in fact, donations?
22   A.   I'm sorry.  You have to repeat that question again.
23   Q.   Did you tell Mr. Shern on February 16, 2006, as he
24   presented you checks that had been written to Bondage
25   Breakers Ministry, did you tell him that you were not
```

1   certain which of those checks were donations?

2   A.   I have never said that.  I don't know where this

3   letter says that.  Show me where it says that in the --

4          THE WITNESS:  I'm sorry, Your Honor.

5   Q.   (BY MR. SPRINGER)  Mr. Hawkins, beginning on the

6   ninth sentence of paragraph 6, doesn't it say, "Hawkins

7   said he was not sure what checks, if any, represent the

8   donations he paid to Springer"?

9   A.   I see where you're referring to now.  "Hawkins said

10  that he was not sure what checks" -- I can't recall

11  making this statement, to be perfectly frank with you.

12  Q.   And, Mr. Hawkins, on the third -- excuse me, fourth

13  line from the bottom of paragraph 6, did you tell

14  Mr. Shern that if you knew I was using the money that you

15  gave me for personal expenses that you would not have

16  donated money to me?

17  A.   I can't recall that conversation either.  And I have

18  no idea what you used the money for, none.

19          MR. SPRINGER:  Your Honor, may I have just one

20  moment?

21          THE COURT:  You may.

22  Q.   (BY MR. SPRINGER)  Mr. Hawkins, did you ever have

23  any discussions with your wife about the first time that

24  she met Brian Shern?

25  A.   I did not.

1  Q.   Did your wife ever convey any statements to you that

2  she was told she was under criminal investigation as a

3  co-conspirator with Lindsey Springer?

4  A.   Never.

5  Q.   You testified, I believe, that you -- that you got a

6  ten-year sentence and you've served seven years of that;

7  is that right?

8  A.   With my good time, I've served over eight.

9  Q.   Over eight.  Okay.  And you also testified that you

10 have about 17 months left; is that right?

11 A.   Correct.

12 Q.   Okay.  And have you -- in agreement with testifying

13 here today, have you had any discussions with any

14 employee of the United States regarding a reduction in

15 your sentence after you testify?

16 A.   Unfortunately, none.

17 Q.   Unfortunately, none.  Have you had any lawyers

18 communicating on your behalf to the United States during

19 the time periods that you were meeting with Mr. Shern or

20 anybody else for the government of the United States?

21 A.   From the initial meeting with Mr. Stern (sic), I

22 contacted my lawyers and I've worked through my lawyers

23 ever since.

24 Q.   And could you identify who the lawyers were?

25 A.   Joe McLean, who is in the courtroom with us now, and

1  Susan -- another one of our attorneys.

2  Q.   Do you remember Susan's last name?

3  A.   (no response)

4  Q.   If you don't remember, it's okay.  Do you know

5  whether that your lawyers have been in communication with

6  the government about your testimony here today?

7  A.   Oh, they've been in communication today because I'm

8  here.

9  Q.   Do you know about any -- to the extent of any of

10  those communications between your lawyers and the United

11  States Government?

12  A.   They have received absolutely no promises whatsoever

13  from the state.

14  Q.   Now, did Mr. Shern or any other employee of the IRS

15  ever ask you about gift tax returns that you -- that they

16  thought maybe you were required to file?

17  A.   None.

18  Q.   And do you know if they ever had any conversation

19  with your wife over whether or not she was required to

20  file gift tax returns in relation to the money that she

21  gave Bondage Breakers Ministries?

22  A.   Not that I'm aware of.

23  Q.   Now, Mr. Hawkins, you're not aware, as you sit here

24  today, of any agreement that Oscar Stilley and I could

25  have entered into trying to defraud the United States of

ARTHUR HAWKINS - CROSS BY MR. STILLEY                              1706

```
 1  anything, do you?
 2  A.   Not that I'm aware of.  Why would I have any
 3  knowledge of that?
 4         MR. SPRINGER:  Just one more second, Your Honor.
 5  I pass the witness, Your Honor.
 6         THE COURT:  Mr. Stilley.
 7                      CROSS-EXAMINATION
 8  BY MR. STILLEY:
 9  Q.   Mr. Hawkins, you recognize Oscar Stilley from the
10  courtroom today, correct?
11  A.   I do.
12  Q.   And that's who is speaking to you right now?
13  A.   To be perfectly frank with you, with the beard on,
14  I'm not exactly sure.
15  Q.   You recognize the voice, don't you?
16  A.   I can't even admit to that.
17  Q.   Now, you recall back at your sentencing, you recall
18  that day fairly well, correct?
19  A.   I recall the day, it's seven years ago, but go
20  ahead.
21  Q.   Well, seven -- for many things, it's difficult to
22  remember what went on seven years ago, right?
23  A.   Correct.
24  Q.   You can remember that day fairly well, correct?
25  A.   Not necessarily so.  It's another day in one's life.
```

1  Q.   But it was a very momentous day for you, correct?

2  A.   I've had many, many momentous days.

3  Q.   Isn't it true that at the sentencing only Oscar

4  Stilley stood up and spoke to the Court?

5  A.   That I do not recall.

6  Q.   Isn't it true that during the sentencing Oscar

7  Stilley -- well, scratch that.  Isn't it true that the

8  government would first get up and address one of these

9  points that you were talking about and then Oscar Stilley

10 would get up and he would make the opposing statement?

11 A.   To the best of my recollection, Mr. Springer did

12 most of the talking, but go ahead.

13 Q.   Well, Mr. Stilley did some of the talking, correct?

14 A.   Pardon me?

15 Q.   In open court, isn't it true that Mr. Stilley did

16 most of the talking, at least?

17 A.   In our relationship, what comes to mind is Springer

18 doing most of the talking.

19 Q.   You don't remember -- do you remember Oscar Stilley

20 getting up and saying anything in open court in the

21 Southern District of Illinois?

22 A.   Well, of course.

23 Q.   Okay.  So you remember some, right?

24 A.   Right.

25 Q.   And you remember that Oscar Stilley spoke more than

1   once, don't you?

2   A.   Oscar Stilley spoke, sure.

3   Q.   And then he would sit down?

4   A.   That's normally what happens.

5   Q.   And you had a chance to poke Oscar Stilley in the

6   ribs and say, "tone it down a little bit," right?

7   A.   That probably happened.

8   Q.   And Oscar Stilley followed all your instructions,

9   correct?

10  A.   What was that last one?

11  Q.   Oscar Stilley followed all your instructions,

12  correct?

13  A.   That's a really strong statement.

14  Q.   Well, answer if you can.

15  A.   I can't.  What do you want me to say?

16  Q.   The truth.

17  A.   The truth is I can't recall if you followed the

18  instructions or not.  You would go on, so would

19  Lindsey -- so would Springer.  You went on and on and on

20  and on and on and on, went on for six hours.  I can

21  recall that very vividly.  Time after time, point after

22  point, both of you talking continuously.

23  Q.   You would have had many chances to give Oscar

24  Stilley some guidance and direction about what you wanted

25  done, right?

1  A.   That's not true at all.  That's not true at all.

2  You know that we cannot speak -- as a defendant, I can't

3  speak in open court.  You know that.

4  Q.   Well, I'm not talking about speaking in open court,

5  I'm talking about whispering to your lawyer.

6  A.   That's not nudging and whispering and ordering.

7  That's the education you're trying to give to the jury

8  and that's not what happens in open court.  In open

9  court, only your lawyers can speak.  I couldn't speak.  I

10 could only pass little notes, et cetera, et cetera.

11 Q.   Well, you did pass the little notes, correct?

12 A.   Of course.

13 Q.   And we had some breaks?

14 A.   Correct.

15 Q.   And you talked to Oscar Stilley at breaks?

16 A.   And Lindsey Springer at break, yes.

17 Q.   We even had a lunch break?

18 A.   Correct.

19 Q.   And you spoke to Oscar Stilley then?

20 A.   What's the point?  The answer is yes.  I'm sorry,

21 yes.  Sorry.

22 Q.   And the actual cost of that particular hearing for

23 Oscar Stilley -- for Oscar Stilley's bill was relatively

24 small, correct?

25 A.   I never saw the bill.  I was locked up, if you'll

1   recall, December 19th.

2   Q.   Yes.  Well, now, let's make sure we get this clear

3   for the jury.  Isn't it true that Oscar Stilley was

4   standing and talking to the judge and while Oscar Stilley

5   was standing and talking to the judge, you were led out

6   by the marshals into custody?

7   A.   I recall -- I recall Oscar Stilley and Lindsey

8   Springer talking to the judge as I was being led out,

9   but, yes.

10  Q.   So --

11  A.   That's my recollection, because both of you were

12  talking continuously.

13  Q.   So Oscar Stilley didn't even get a chance to say

14  goodbye to you, correct?

15  A.   That part is true.  Neither did my wife or anyone

16  else.

17  Q.   And isn't it true that Oscar Stilley continued to

18  represent you for about nine months?

19  A.   You mean after that?

20  Q.   Yes.

21  A.   Yes, that's correct.

22  Q.   And isn't it true that you either paid or caused to

23  be paid about $115,000 to Oscar Stilley?

24  A.   That's correct.

25  Q.   And isn't it true that as of the date of the

1  sentencing, you had only written, I think, two relatively

2  small checks?

3  A.   That's correct.

4  Q.   So for some reason, you chose to trust Oscar Stilley

5  for an extensive period of time after this sentencing?

6  A.   What alternative do we have at that point?  I was

7  locked up, my wife was on her own --

8           THE COURT:  Mr. Hawkins, it's necessary --

9           THE WITNESS:  I'm sorry.

10           THE COURT:  -- to give a direct answer to the

11  question.

12           THE WITNESS:  Yes.

13  Q.   (BY MR. STILLEY)  Now, I believe you testified on

14  direct that somebody had told you that Oscar Stilley was

15  a great expert and well known in the Southern District of

16  Illinois, correct?

17  A.   Yes.

18  Q.   You knew that Oscar Stilley had an office in Fort

19  Smith, Arkansas, right?

20  A.   That's correct.

21  Q.   And you know your geography well enough to know

22  that's a long ways from the Southern District of

23  Illinois, right?

24  A.   Sure.

25  Q.   And you also knew that Oscar Stilley was billing you

ARTHUR HAWKINS - CROSS BY MR. STILLEY                    1712

1    $125 an hour, correct?

2    A.   No, that's what the contract said.  I didn't see the

3    billings.  I never saw the billings from you.  I had the

4    same issue with you that I had with him, "him" being

5    Springer.

6    Q.   How about this?  Since you don't know about that, I

7    won't ask you any questions, is that fair enough, about

8    that issue?

9         THE COURT:  Next question, Mr. Stilley.

10   Q.   (BY MR. STILLEY)  Isn't it true, that -- well, based

11   on your experience in hiring lawyers, isn't it somewhat

12   strange that you would find someone with a great deal of

13   experience in the Southern District of Illinois out of

14   Fort Smith, Arkansas?

15   A.   I'm going by what I was told by your counterpart --

16   Q.   Wouldn't be credible --

17   A.   -- Mr. Springer.

18   Q.   Wouldn't be credible, would it?

19   A.   That's what he said.

20   Q.   How much were you paying your previous legal team?

21   How much did an hour of courtroom time cost you with your

22   previous legal team?

23   A.   It depended on the individual.  Each lawyer had his

24   own billing rate.  You know that.

25   Q.   Tell the jury what it was.

ARTHUR HAWKINS - CROSS BY MR. STILLEY                    1713

```
 1   A.   I'm sorry?
 2   Q.   Tell the jury -- give the names of the lawyers and
 3   tell the jury how much you were paying?
 4   A.   Tom McQueen was at $300 an hour.  The two lesser
 5   attorneys, male and female, were around -- one was $180
 6   and the other one was around $200 an hour.  The paralegal
 7   was about $60 an hour.
 8   Q.   So comparatively speaking, Oscar Stilley was a cheap
 9   date?
10   A.   Yes.
11   Q.   And nobody had given you any specifics to indicate
12   to you that Oscar Stilley had done any other legal work
13   in the Southern District of Illinois, correct?
14   A.   I never checked that, I have no idea.
15   Q.   Now, isn't it true at sentencing there was a
16   suggestion that maybe that your sentence should be
17   enhanced based on harm to the buyers of these batteries?
18   A.   Based on what?
19   Q.   Based on harm to the buyers of the batteries.  In
20   other words, the person that would go to Sears or
21   Wal-Mart and buy an Exide battery, there was a suggestion
22   that these people had been harmed by your conduct, right?
23   A.   No, there was no victims in the crime.  It's clear
24   in the PSR.  It's a victimless crime.  My indictment had
25   no victims.  It says that clearly in the indictment.
```

ARTHUR HAWKINS - CROSS BY MR. STILLEY                    1714

1   Q.   Well, we clearly know that that is a fact, but isn't

2   it true that the PSR indicated that you should have many

3   millions of dollars added to the loss against you because

4   of bad batteries?

5   A.   No.

6   Q.   That's not true?

7   A.   No.   That's not in the enhancements, no.

8   Q.   You don't remember the judge listening to the

9   arguments of Oscar Stilley and saying, Mr. Stilley, your

10  client is just going to get that one?

11  A.   My client is going to what?

12  Q.   Your client will just get the benefit of that and

13  whereupon the judge said that enhancement will not be

14  allowed.

15  A.   I never saw one enhancement that you got taken off,

16  not one.

17  Q.   So you don't remember that, then?

18  A.   Absolutely not.   I ended up with 38 points, which is

19  what I started with.

20  Q.   Now, there was some discussion about a previous --

21  an indictment against you that you never saw until after

22  your sentencing, correct?

23  A.   That's true.

24  Q.   And that was important because of a statute of

25  limitations issue, correct?

ARTHUR HAWKINS - CROSS BY MR. STILLEY                          1715

1   A.   That's why the superseding indictment was issued,

2   but that's not abnormal.

3   Q.   But the superseding indictment left out Sears and

4   Exide as defendants, correct?

5   A.   That's correct.

6   Q.   And isn't it true that Sears created a new

7   corporation, funded it with $60 million, and caused that

8   $60 million to be paid to the government as a means of

9   getting a deferral so that Sears and its executives

10  wouldn't be charged?

11  A.   I can't comment on that.

12          MR. SNOKE:   Objection, Your Honor, relevance.

13          THE COURT:   Overruled.

14  Q.   (BY MR. STILLEY)   Answer if you know.

15  A.   I don't.

16  Q.   You don't know anything about that?

17  A.   I don't know if what you're saying is correct.

18  Q.   Well, you heard the allegation, correct?

19  A.   I've heard those allegations.   I don't know if

20  they're substantiated or not.

21  Q.   Well, you heard it from a reliable source, did you

22  not?

23  A.   No, I heard that from you.

24  Q.   And isn't it true that you caused certain legal

25  pleadings to be filed for the purpose of trying to

1  explore the possibilities with respect to that conduct?

2  A.   I didn't file them, you did.

3  Q.   Well, you -- the question is, isn't it true that you

4  caused pleadings to be filed?

5  A.   That's probably technically true.

6  Q.   Isn't it true that none of the Sears executives ever

7  went to prison for their role in the conduct?

8  A.   I honestly don't know.

9  Q.   You have no knowledge, as you sit here today, of a

10  single Sears executive going to prison for their conduct,

11  do you?

12  A.   Not that I have personally, no.

13          MR. SNOKE:   Objection, relevance, Your Honor.

14          THE COURT:   Overruled.

15  Q.   (BY MR. STILLEY)  Mr. Hawkins, isn't it true that

16  the gentleman that you gave money to that was allegedly a

17  bribe, isn't it true that he never went to prison either?

18  A.   That I do know is true, correct.

19  Q.   And isn't it true that as a general rule, it takes

20  two to tango on an alleged bribe?  Answer if you can.

21  A.   Obviously, there's a giver and a recipient.  That's

22  true, it takes two.

23  Q.   And don't you remember Oscar Stilley arguing that

24  this money was given after the contract; therefore, it

25  couldn't have been a bribe because the contract was

1    already done?

2    A.   True.

3    Q.   And do you also remember the judge perhaps you would

4    say scoffing this argument saying that when you go to the

5    restaurant you pay the tip afterwards?  Do you remember

6    that?

7    A.   I don't recall that statement.

8            MR. STILLEY:  Could I have a moment, Your Honor?

9            THE COURT:  You may.

10           MR. STILLEY:  Thank you.

11   Q.   (BY MR. STILLEY)  Mr. Hawkins, isn't it true that

12   you have no knowledge of any facts that would suggest

13   Oscar Stilley committed any crime?

14   A.   I don't know that.  I have no facts, no.

15           MR. STILLEY:  Pass the witness.

16           THE COURT:  Any redirect?

17           MR. SNOKE:  Yes, Your Honor.

18                    REDIRECT EXAMINATION

19   BY MR. SNOKE:

20   Q.   Mr. Hawkins, we've talked about two indictments in

21   your case.  Which indictment did you go to trial on?  The

22   initial one or the superseding?

23   A.   Superseding, sir.

24   Q.   All right.  And I think you covered this, but you

25   were asked about the meetings in Chicago with Mr. McQueen

1  and you referred to the pilot logs that are in Exhibit

2  205.  Did you fill those logs out, then, at about the

3  time that you made those trips?

4  A.   You make them out the same day that you do the

5  trip.  That's the rule.

6  Q.   All right.  And at the first meeting, who was

7  present at the first meeting on November 12th in Chicago?

8  A.   On November 12th was Mr. Springer and myself and Tom

9  McQueen.

10 Q.   All right.  And at that time, did you know whether

11 or not Mr. Springer was an attorney?

12 A.   Absolutely, he was an attorney.  My lawyer Tom

13 McQueen thought exactly the same thing.

14 Q.   At the second meeting on December 16th, that was the

15 meeting where you said you just went in, but they had

16 been out there -- you had all been out there for four

17 hours in the waiting room?

18 A.   That's correct.

19 Q.   All right.  As of the date of that meeting, did you

20 know whether or not Mr. Springer was an attorney?

21 A.   I believed him to be an attorney, absolutely.

22 Q.   All right.  Had anybody at that point told you

23 anything to disabuse you of that?

24 A.   No, sir.

25 Q.   As you -- counsel showed you that memorandum of

1    interview, which he marked as Defendants' Exhibit 170A.

2    A.   Yes, sir.

3    Q.   Do you still have that up there?

4    A.   Right in front of me.

5    Q.   All right.  Where did that interview take place?

6    A.   February 16, 2006.

7    Q.   No, where?  I said where.

8    A.   Oh, where.  In Ashland, Kentucky, in the prison.

9    Q.   All right.  Was that the first time you had been --

10   was that the first time you were interviewed by anybody

11   from the IRS about Mr. Springer?

12   A.   Absolutely.  I was absolutely amazed when the IRS

13   showed up.  I had no idea.

14   Q.   All right.

15   A.   Thought I was going to the hole.  I'm sorry.  Sorry.

16   Q.   And you had other interviews that were referred to

17   by defense counsel.  He asked you about Exhibit 168, I

18   think he put in front of you also, a later interview?

19   A.   Right.

20   Q.   As you sit here today, sir, do you know whether or

21   not Mr. Springer is an attorney?

22   A.   I have since learned that he is not an attorney.

23   Q.   All right.  And did you know that, then, that he was

24   not an attorney when you had that first interview in

25   Ashland, Kentucky, with Brian Shern?

ARTHUR HAWKINS - REDIRECT BY MR. SNOKE                    1720

```
 1  A.   I did not.

 2  Q.   You didn't know it then?

 3  A.   (shook head)

 4  Q.   When did you find out that he was --

 5  A.   It's interesting you're making the point because I

 6  can recall meeting with Mr. Shern and he -- I kept

 7  referring to him as being my attorney.  And he said,

 8  well, are you aware that he wasn't an attorney?  I asked

 9  my wife about it after we had had the conversation and

10  she said, oh -- she said I learned about it after the --

11  after the appellate court where we lost at the appellate

12  court.  And that's when she terminated their services.

13            THE COURT:  Okay.  Next question.

14            THE WITNESS:  I'm sorry about the confusion on

15  that.  I'm just giving you the best of my recollection.

16  Q.   (BY MR. SNOKE)  Counsel -- Mr. Springer asked you

17  about making payments and getting billings from him and

18  you said, I think, that he did not provide you with any

19  billing statements.  Mr. Springer, that is.

20  A.   That's correct.

21  Q.   Why did you continue to pay Mr. Springer even though

22  he was not getting you -- in your confrontations you said

23  with him he was not giving you the billing statements

24  that you were requesting?

25  A.   For two reasons, sir.  He said that the billing
```

1   statements were coming, number one.  And, number two, he

2   refused -- he was refusing to do any further work unless

3   he had compensation for the work that he had already

4   done.

5   Q.   Now, counsel asked you about any promises from

6   anybody in the federal government that you had or were

7   considering at this time or had been told about by your

8   attorney.  Do you remember those questions?

9   A.   I sure do.

10  Q.   All right.  Now, you do have a pending action in the

11  Southern District of Illinois, do you not?

12  A.   I do.

13  Q.   All right.  And is Mr. -- is your attorney here

14  handling that for you?

15  A.   No, absolutely not.

16  Q.   No, I mean, is he representing you in that action?

17  A.   Yes, Joe McLean is.

18  Q.   Joe McLean, yes.  Okay.

19  A.   That's correct.

20  Q.   All right.  Now, to your knowledge, has Mr. McLean

21  been dealing with an Assistant U.S. Attorney in the

22  Southern District of Illinois regarding that case?

23  A.   Yes, he has.  My 2255, that's what he's dealing

24  with, yes.

25  Q.   Okay.  And as a matter of fact, sir, you have -- you

1   do have some hopes that there will be some favorable

2   action on that 2255 and the rest of your 17-month

3   sentence, do you not, as a result of cooperating with the

4   government in this matter?

5   A.   I have hope for the 2255 because a 2255 is based

6   on --

7   Q.   Sir, you don't have to explain to the jury what a

8   2255 --

9            THE COURT:  Listen carefully to his question.

10  Next question.

11  Q.   (BY MR. SNOKE)  All right.

12  A.   Sorry.

13  Q.   All right.  And but you do have one pending there in

14  which your attorney Joe McLean is dealing with the

15  assistant there in the Southern District?

16  A.   Yes.  Yes, sir.

17  Q.   All right.  Other than that hope, sir, have you been

18  promised anything by anybody in our office --

19  A.   Unfortunately --

20  Q.   -- for your testimony here?

21  A.   No, nothing.

22  Q.   Now, you testified at a grand jury here in --

23  previously in this matter, in this district, did you not?

24  A.   Correct.

25  Q.   All right.

```
 1            MR. SNOKE:  I don't believe I have any other
 2    questions, Your Honor.
 3            THE COURT:  Recross limited to redirect.
 4                       RECROSS-EXAMINATION
 5    BY MR. SPRINGER:
 6    Q.  So when I asked you had you cooperated with the
 7    United States in the opportunity of getting a reduction
 8    in your sentence and you said, no, you were completely
 9    here voluntarily and on your own without any incentive,
10    that wasn't true, was it?
11            MR. SNOKE:  Objection to the form of the
12    question.  I don't think that states the question.
13            THE COURT:  Sustained.  It didn't look to me
14    like he arrived here voluntarily.
15    Q.  (BY MR. SPRINGER)  Mr. Hawkins, do you remember me
16    asking you whether or not you had worked any agreement
17    out with the United States for your testimony here today?
18    A.  Yes.
19    Q.  And you said?
20    A.  No.
21    Q.  And then I asked you had your lawyers been in
22    negotiation with the United States on your behalf and you
23    said?
24    A.  No.
25    Q.  And then during cross-examination -- redirect by
```

1  Mr. Snoke, you identified a 2255 that you had filed for a

2  reduction of sentence; isn't that true?

3  A.   Correct.

4  Q.   And isn't the only group of people standing in your

5  way on that motion is the United States Attorney for

6  whichever -- Southern District of Illinois?

7  A.   The 2255 is for incompetent counsel.  That's what

8  it's filed for.  That's what a 2255 is.

9  Q.   And is it the -- is it the United States Attorney's

10 Office who you are having to argue against that you had

11 incompetent counsel?

12 A.   Well, it's the justice system.  It's not just the

13 attorney's office, it's the U.S. justice system.

14 Q.   Sir, isn't it true that if they have no objection,

15 that you anticipate that that 2255 would be granted?

16 A.   Of course.

17 Q.   And that as a result of that, you would get out of

18 prison; isn't that true?

19 A.   Of course.

20 Q.   Now, did Mr. Stumpo ever tell you about Bondage

21 Breakers Ministries?

22 A.   I can't recall.

23        MR. SNOKE:  Your Honor, objection, beyond

24 redirect.

25        THE COURT:  It is.  Mr. Springer, we'll go just

1   a little bit into it if you've got a good point to make

2   and to make quickly, but it is beyond the scope of

3   redirect.  Proceed.

4   Q.  (BY MR. SPRINGER)  Did Mr. Stumpo ever tell you I

5   was an attorney?

6   A.  I can't recall.

7   Q.  So then I take it by your answer that you can't

8   recall whether he told you I wasn't an attorney?

9   A.  I would agree, I can't.

10  Q.  And does that same answer hold true for Michael

11  Burt?

12  A.  I can't recall.

13  Q.  Now, if your wife testifies after you today, which

14  anticipation that that's the case, in my question, and if

15  she tells this jury that I never said one word during

16  your sentencing hearing and that Mr. Stilley said every

17  word at your sentencing hearing, would you say that she

18  would be correct and that her memory should be relied

19  upon greater than yours?

20          MR. SNOKE:  Objection to the form of the

21  question.

22          THE COURT:  Overruled.

23          THE WITNESS:  I can only tell you what I saw and

24  witnessed at sentencing.

25  Q.  (BY MR. SPRINGER)  And is it true you saw me

1   standing up and making argument on your behalf in front

2   of a federal judge in the Southern District of Illinois?

3   A.   What I've said specifically --

4          MR. SNOKE:  Objection, beyond the scope of

5   redirect.

6          THE COURT:  It is, but we're going to hear it

7   and then we're going to get on to something else.

8          MR. SPRINGER:  Can he answer?

9          THE COURT:  You may answer.

10          THE WITNESS:  Thank you.  Thank you, Your Honor.

11     What I saw was you continually talking at

12   sentencing, continuously.  That's the statement I've made

13   before and I make it again.  Now, whether you were

14   standing or sitting, I can't recall.  People were moving

15   up and down in that courtroom.  There was a lot of people

16   in the courtroom.  The whole stands were packed.  People

17   were up and down.  So I can't remember whether you were

18   standing up or sitting down or whatever.  I don't know

19   what that means technically anyway.

20   Q.   (BY MR. SPRINGER)  Was I speaking on your behalf in

21   that Court?

22   A.   Absolutely.

23   Q.   For six hours you saw me speaking on your behalf?

24   A.   Absolutely.

25   Q.   Okay.  Now, you -- in redirect, there was a

1   discussion regarding the first meeting that we had in

2   November.

3           MR. SPRINGER:  And could you put up Government's

4   Exhibit Number 20 again.

5   Q.   (BY MR. SPRINGER)  Now, do you remember that check

6   again?

7   A.   I've seen it for the fifth time, yes.

8   Q.   And that's dated 12/4/2002, correct?

9   A.   Correct.

10  Q.   And the first meeting we had, you testified, with

11  Mr. McQueen was in the middle of November 2002; is that

12  correct?

13  A.   That's correct.

14  Q.   And you wrote this $13,000 check because that's what

15  you owed me at that time; is that what your testimony is

16  here today?

17  A.   What I testified to was that's what you claimed I

18  owed you.  I had not seen any billings from you.

19  Q.   And so then --

20          MR. SPRINGER:  If you could please pull up again

21  Government's Exhibit Number 203.

22  Q.   (BY MR. SPRINGER)  And, again, is that same

23  testimony true for the $7,000 check that -- Government's

24  Exhibit Number 203?

25          MR. SNOKE:  Objection.  Beyond the scope of

```
 1   redirect.
 2          THE COURT:  We'll have an answer to this
 3   question and then I'm going to have a question for you,
 4   Mr. Springer.  But we'll have an answer to this question.
 5          MR. SPRINGER:  Okay.
 6          THE WITNESS:  Yes.
 7          THE COURT:  Okay.  Mr. Springer, how much more
 8   do you have on recross?
 9          MR. SPRINGER:  I have one more question.
10          THE COURT:  Ask it.
11          MR. SPRINGER:  Just looking for the exhibit
12   number, Your Honor.  Please pull up Number 202, please,
13   Government's Exhibit 202.
14   Q.  (BY MR. SPRINGER)  And it's in between those two
15   checks that you signed a contract for Oscar Stilley to
16   represent you; is that true?
17          MR. SNOKE:  Objection.  Beyond redirect.
18          THE COURT:  Overruled.
19   Q.  (BY MR. SPRINGER)  Is that true?
20   A.  True.
21   Q.  Thank you.
22          THE COURT:  Mr. Stilley.
23          MR. STILLEY:  Your Honor, may I have just a
24   moment?
25          THE COURT:  You may.
```

 1            MR. STILLEY:  No questions.

 2            THE COURT:  You may step down.

 3            THE WITNESS:  Thank you, Your Honor.

 4            MR. SPRINGER:  Your Honor, may we preserve him

 5    just for now?

 6            THE COURT:  Mr. Hawkins, hold on just a minute.

 7    I expect to have some word for you shortly as to whether

 8    you are released from your required appearance here in

 9    this district for this proceeding.  I am not at the

10    moment in a position to give you a definitive release

11    from your required appearance here.  As soon as I am able

12    to do so, I will.

13            THE WITNESS:  Thank you, Your Honor.

14            THE COURT:  Very well.  Members of the jury,

15    we'll take our lunch recess at this time.  Again, as

16    always, guided by the clock on the wall, we will resume

17    at 15 minutes after one.  So please be available just a

18    little before that for the security officer to return

19    with you to the courtroom.  And, of course, during this

20    lunch break, please do remember my usual admonition,

21    which I will not repeat at this time.  So please have a

22    good lunch and be available just a little before quarter

23    after one.

24        All persons in the courtroom will be seated and

25    remain seated while the jury departs.

```
 1        (JURY EXITS THE COURTROOM.)

 2            THE COURT:  Mr. Springer, my hat is off to you.

 3   I've gone 38 years without hearing an attorney say one

 4   more question and then sticking to it.  You stuck to it.

 5        Court will be in recess.

 6        (RECESS HAD.  THE FOLLOWING PROCEEDINGS WERE HAD OUT

 7   OF THE HEARING OF THE JURY.)

 8            THE COURT:  We're here without the jury and I'm

 9   told there's a matter that one of the defendants would

10   like to address relating to witnesses.

11            MR. SPRINGER:  I would, Your Honor.  It was my

12   understanding originally that on all the witnesses that

13   were both on my list and the government's list, that if I

14   was to reserve them, the Court would so reserve them, and

15   that the government would make certain that they were

16   back here at a certain time.  There are two witnesses,

17   Mr. Turner, who was here yesterday, who has now flown and

18   gone home and needs to be brought back, along with

19   Mr. Lake.  These are out-of-custody witnesses on that

20   list and --

21            THE COURT:  Let me interrupt there.  I'd have to

22   check the record, I think our understanding was that when

23   they stepped down they were to be considered released

24   unless they were specifically informed otherwise.

25            MR. SPRINGER:  Very accurate, Your Honor.
```

ARTHUR HAWKINS - RECROSS BY MR. SPRINGER                1731

1  That's the way I remember it too.  And both Mr. Lake and
2  Mr. Turner were both directed by the Court that they were
3  not released from their subpoena obligations as they
4  stepped down.  And so the question becomes now, how do we
5  get them back here?  Both of them traveled home,
6  Mr. Turner yesterday, Mr. Lake obviously last week.  And
7  in talking with the U.S. Attorney's Office, they're
8  saying it is the U.S. Marshals that need to bring them
9  back.  Even though it's not my subpoena, it's the
10  government's subpoena that they were held under
11  originally.
12       So we got to a point where what do we do and the
13  marshals, obviously, could do it with a court order and
14  the government could, obviously, bring them back as well
15  because it's their subpoena that they were held under.
16  But we needed guidance from the Court on how the Court
17  wanted to handle that.
18          THE COURT:  So was Mr. Lake specifically told he
19  was remained --
20          MR. SPRINGER:  Yes, sir.  Yes, Your Honor.
21          THE COURT:  I'll simply have to rely on your
22  recollection.  And that was also true of Mr. Turner?
23          MR. SPRINGER:  Yes.  That was yesterday on
24  Mr. Turner.
25          THE COURT:  Well, number one, I certainly do

1  expect full cooperation from the government and that

2  includes the U.S. Marshal's Office.  I don't think it's

3  going to be necessary and it certainly was not my

4  assumption that the U.S. Marshal's Office would "bring

5  them back."  That obviously applies to individuals that

6  are in custody as opposed to people like Mr. Lake.

7  Mr. Turner is not in custody.

8          MR. SPRINGER:  No.

9          THE COURT:  Okay.  So if they were served with a

10  subpoena by the government and they were not released,

11  then I'm not aware of anything that's necessary for you

12  to do other than to tell them when to be back.  Now, I'll

13  invite the government to gainsay that.  But if they don't

14  come back, then we send the marshal after them.

15      And let me preface this for the benefit of all

16  concerned.  When I used the term "government," I'm

17  including the Department of Justice, which includes the

18  United States Marshal Service, and I'm not attracted to

19  foot-dragging or any lack of full cooperation.  So with

20  that backdrop, you're invited to address the matter.

21          MR. O'REILLY:  Your Honor, we just received a

22  note stating, and I'll quote, "Please have Mr. Turner and

23  Mr. Lake return -- returned" -- I believe is the word --

24  "for Thursday's trial," i.e., tomorrow.  Giving notice at

25  this late date, I don't know that, you know, what -- if

```
 1   we can do it.  We can try.
 2       I think that Mr. Springer should have some
 3   responsibility to show how these witnesses can give any
 4   testimony that is relevant to his defense that is
 5   admissible.  Because I speculate, but it is speculation,
 6   I don't know what his defense is, that basically he just
 7   wants to jerk these people around and especially
 8   Mr. Lake, bringing testimony that is utterly irrelevant
 9   simply to impeach the man's character, which he could
10   have done on the stand.  As he discussed the potential to
11   need to recall Mr. Lake with the Court previously, it
12   seemed, and I believe the Court said that sounded like
13   cross-examination material.
14           THE COURT:  Well, I think that makes
15   Mr. Springer's point and that is to the extent that I
16   limited them in cross-examination when they were called
17   by the government to matters that in any sense of orderly
18   process would be brought up during their case rather than
19   on cross during your case, then I foreclosed further
20   cross-examination on some subjects with some witnesses.
21   Offhand, I have no recollection of whether that occurred
22   or to what extent, if any, that occurred with either of
23   these two witnesses.  But there has been more than once
24   that I have foreclosed further cross-examination on some
25   subjects because it very clearly struck me as material
```

1    for the defendants to present during their case.

2        Now, I don't know if that's, again, the case with

3    respect to Mr. Lake or Mr. Turner.  And you're really

4    raising two issues.  One is relevance.  The other one is

5    whether they can be gotten back here tomorrow.  And those

6    are two entirely distinct issues.

7        Since that has only been raised -- the return of

8    these witnesses has only been raised today, it would not

9    surprise me at all if it were impossible to get them back

10   here tomorrow.  Now, Mr. Lake is a retired Delta pilot.

11   Maybe he can make things happen in his case.  But it

12   would not strike me by surprise at all if we can't get

13   them back here tomorrow.

14       If we can't get them back here tomorrow, then the

15   next day of this trial will be Monday.  And I am much

16   less worried about catering to the defendants' preferred

17   order of witnesses than I am about getting them back here

18   one way or another.  And it does not compromise the

19   confidentiality of our Rule 17(b) hearing last month for

20   me to remind the defendants that at the end of that

21   hearing I told you to get right after your paperwork.

22   And I remember that vividly.  So any delay on the

23   defendants' part is part of the equation here.

24       So with that understanding, Mr. O'Reilly, is it your

25   suggestion that I should preclude the recall of these

 1  witnesses before Mr. Springer makes some showing of

 2  relevance?

 3          MR. O'REILLY:  Well, yes, Your Honor, I think

 4  there should be some showing of relevance, but -- and

 5  maybe I misspoke earlier.  With respect to Mr. Lake in

 6  particular, when we -- there was an objection, we

 7  approached the bench, and Mr. Springer started describing

 8  what he wanted to go into with respect to Mr. Lake.  And

 9  we actually had Mr. Lake brought back the next day.  He

10  wanted to go over a video with him.  And my recollection

11  of what Your Honor said was that sounds like cross-

12  examination, not -- there were other witnesses, and

13  Mr. Turner being one of them, that the Court precluded

14  continued examination because it sounded, as the Court

15  said, as if it was the defendants' case and they should

16  be brought back for that.  I do not believe that applied

17  to Mr. Lake.

18          THE COURT:  Let me ask a question of

19  Mr. Springer.  This talk about this video is ringing a

20  bell.

21          MR. SPRINGER:  Thank you.

22          THE COURT:  Tell me more about this video.

23          MR. SPRINGER:  First of all, Your Honor, I did

24  not know it was necessary to have the video originally

25  until Mr. Lake testified.  Second of all, Mr. Greg

1  Eustice (ph) has the video currently and it's being

2  transcribed and he's going to be done this evening with

3  it.  He's frequently used by this Court, at least the

4  Northern District.  And he said he would have it this

5  evening.

6      The video demonstrates me sitting across the table

7  and asking Mr. Lake questions and him answering them

8  based upon his understandings and his beliefs, which was

9  totally inconsistent with what he -- and when I cross-

10  examined him what he told the jury.  And it's so

11  overwhelmingly clear that I was not doing what Mr. Lake

12  told the jury I was doing.

13          THE COURT:  Well, you cannot -- it seems rather

14  clear to me that if that video is admissible at all, and

15  I'm not saying whether it is or is not, that you can

16  identify it --

17          MR. SPRINGER:  Oh, yes, sir.

18          THE COURT:  -- and play it during your case, if

19  it's admissible.

20          MR. SPRINGER:  Yes, sir.  And for that basis, I

21  contemplated whether I could bring that in or not and I

22  conferred with expert counsel on the subject.  And the

23  question about whether I wanted to let Mr. Lake go was

24  the question that was on the table.  And I chose not to

25  until I knew there was no reason for me to bring him

```
 1   back.
 2          THE COURT:  Well, do you need him back, assuming
 3   that you can identify the video?
 4          MR. SPRINGER:  No, I would not need him back,
 5   assuming I can -- and I am speaking on the video.  So
 6   there's no question I can directly get the tape in, in my
 7   understanding.
 8          THE COURT:  Now, Mr. O'Reilly, I'm not ruling on
 9   whether the video is admissible, but it seems to me that
10   as per my conversation just now with Mr. Springer that if
11   Mr. Springer can identify the video, the government would
12   be in a poor position, at least on identification or
13   authentication grounds, to say, no, the video ought not
14   to come in.  Are we together on that?
15          MR. O'REILLY:  Yes, Your Honor.  Subject to
16   authentication and identification, I doubt that would be
17   the basis for the government opposing it.
18          THE COURT:  Relevance is another matter and
19   neither side is raising that.
20       Mr. Springer, I have not -- on that basis, I'm not
21   inclined to speak pointedly to the government, which I do
22   do when I perceive the need, but I'm not inclined to
23   speak pointedly to the government about getting Mr. Lake
24   back here.
25          MR. SPRINGER:  If I may on just one point on
```

 1   that.  In Mr. Miller's Rule 16, I believe it was his

 2   expert curriculum vitae, if you will, he stated that he

 3   was the expert or the summary witness in the Lake case.

 4   And so it is very possible that -- and I did have

 5   Mr. Miller on my witness list as a fact witness.  And it

 6   is very possible that Mr. --

 7             THE COURT:  Brian Miller?

 8             MR. SPRINGER:  Brian Miller, yes, sir.

 9             THE COURT:  Go ahead.

10             MR. SPRINGER:  It is very possible that

11   Mr. Miller will recollect Mr. Lake's trial, as he has

12   said as a summary for the government in this case, and

13   will recall what he said on the witness stand and will

14   give me everything that I need without having to bring

15   Mr. Lake back.  The concern was Mr. Lake remembering

16   certain things beyond this videotape that I have.  And

17   the videotape will definitely refresh Mr. Lake's memory.

18   And so it was on that basis that I had asked him.

19             THE COURT:  Well, okay.  Unless I'm missing

20   something, you've flip-flopped within the last five

21   minutes.

22             MR. SPRINGER:  No, I --

23             THE COURT:  I heard you say about five minutes

24   ago that if the video came in, then you wouldn't need

25   Mr. Lake back.

 1            MR. SPRINGER:  Okay.  But I thought I heard the

 2  government -- there was a conversation about relevance.

 3            THE COURT:  Well, that's always subject to my

 4  determination at the appropriate time of whether it's

 5  relevant.

 6            MR. SPRINGER:  Okay.  That's the only reason why

 7  I was saying if I needed him for establishing relevance,

 8  then that's the reason why --

 9            THE COURT:  I remember his testimony.

10            MR. SPRINGER:  Okay.

11            THE COURT:  And there's nothing more that he can

12  say that makes the video any more or less relevant.

13            MR. SPRINGER:  Agreed.

14            THE COURT:  So the status of the matter as we

15  speak, then, as to Mr. Lake is that he's not coming back

16  unless you re-raise it and show me a good reason.

17            MR. SPRINGER:  Fair enough.

18            THE COURT:  Okay.  Now, what do you anticipate

19  with Mr. Turner?

20            MR. SPRINGER:  Mr. Turner is the Web master to

21  my Web site.  Mr. Turner testified yesterday he has spent

22  a lot of time discussing with me things that I've

23  demonstrated for him or showed him that relate to my

24  understandings and my intents and my beliefs.  And, in

25  fact, he has firsthand knowledge of many of the exhibits

1    that I gave Your Honor in my original list, I believe it

2    was 13 through 81 or 82.

3            THE COURT:  Okay.  I remember Mr. Turner quite

4    well and not just because it was yesterday.  I think,

5    Mr. O'Reilly, that Mr. Turner is still fair game.

6            MR. SPRINGER:  Thank you.

7            THE COURT:  Now, whether we can get him back

8    here tomorrow is not of any great consequence, given the

9    lateness of this issue being raised.  But I distinctly

10   recall telling Mr. Turner as he departed that, in

11   substance, that he was still fair game.  And one way or

12   another in cooperation with the defendants, the marshal's

13   office, and perhaps the defendants' standby counsel, I do

14   expect that that individual will, at least by Monday, be

15   back in Tulsa, Oklahoma.

16           MR. O'REILLY:  Your Honor, I would request some

17   guidance and maybe some scheduling guidance because

18   simply -- if we're going to bring Mr. Turner back

19   tomorrow and he's not going to finish tomorrow, then he's

20   going to -- and I'm looking at his convenience and plus

21   the expense of bringing him back Monday.  And perhaps the

22   defense can indicate whether or not bringing him Monday

23   would be adequate and satisfy what they need.

24           MR. SPRINGER:  May I have one moment on that?

25           THE COURT:  You surely may.

1          MR. SPRINGER:  Your Honor, it seems to me like

2   Monday morning would be great with one proviso, one side

3   issue.  It may be that depending on how things go

4   tomorrow, and, of course, this is all contingent on the

5   government actually finishing today, that I may not -- he

6   may be my last witness under those conditions.  And if he

7   is, you know, I can't tell the Court for sure whether or

8   not I'm going to actually be able to fill that clock up

9   tomorrow until five o'clock.  It's just a guess.  I think

10  I can.  I mean, in fact, it's very highly possible.  But

11  that's the only concern that I would have under bringing

12  him back on Monday.

13         THE COURT:  Well, if we've had all the evidence

14  from both of the defendants by sometime before five

15  tomorrow, then you're not going to get any argument out

16  of me in recessing until Monday.

17         MR. SPRINGER:  Thank you, Your Honor.  Then I

18  would agree with Monday would be great and we have no

19  problem on that.

20         THE COURT:  Okay.  Very well.  We'll proceed on

21  that basis.

22         MR. O'REILLY:  Thank you, Your Honor.

23         THE COURT:  And if you would -- I'm going to

24  stay right here on the bench.  If you would, Pam, bring

25  in the jury.

1     (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

2  WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

3  PRESENCE AND HEARING OF THE JURY.)

4         THE COURT:  Welcome back, members of the jury.

5  We had an unavoidable 15-minute delay.  It was

6  unavoidable, but it certainly did relate to the case and

7  keeping it moving.  We'll have the government's next

8  witness.

9         MR. SNOKE:  Thank you, Your Honor.  We would

10  call Cynthia Hawkins.

11                    CYNTHIA HAWKINS,

12  (WITNESS SWORN)

13                  DIRECT EXAMINATION

14  BY MR. SNOKE:

15  Q.  Would you state your name and spell your last name

16  for the court reporter, please, ma'am.

17  A.  Yes.  It's Cynthia Hawkins, H-A-W-K-I-N-S.

18  Q.  And where do you live, ma'am?

19  A.  I live in Lake Orion, Michigan, currently.

20  Q.  Okay.  Where did you live before that?

21  A.  I lived in Bloomfield Hills, Michigan.

22  Q.  Okay.  And are you related to Arthur Hawkins?

23  A.  Yes.

24  Q.  How is that?

25  A.  He was my husband.

1  Q.   All right.  Were you present during the course of

2  your husband's legal problems in -- that related in his

3  being sentenced to prison for ten years?

4  A.   Yes, I was.

5  Q.   All right.  Do you know a Lindsey Springer?

6  A.   I do.

7  Q.   Okay.  Do you see him in the courtroom today?

8  A.   I do.

9  Q.   Okay.  Can you tell me who he is or where he is?

10  A.   He's standing right in front of me --

11  Q.   All right.

12  A.   -- with a yellow shirt on.

13  Q.   Okay.

14        MR. SNOKE:  May the record reflect she has

15  identified the defendant?

16        THE COURT:  The record will so reflect.

17  Q.   (BY MR. SNOKE)  Do you also know Mr. Oscar Stilley?

18  A.   I do.

19  Q.   Do you see him in the courtroom?

20  A.   I do.  He's standing right there (indicating).

21  Q.   All right.

22        MR. SNOKE:  May the record reflect she has

23  identified Mr. Stilley?

24        THE COURT:  The record will so reflect.

25  Q.   (BY MR. SNOKE)  When did you first become acquainted

1   with Mr. Springer?

2   A.   I believe it was in November of 2002.  My husband

3   had just been convicted and he had just received a

4   presentence report from the government and it said that

5   he was facing ten years in prison.  And we had friends

6   that spoke to my husband about Mr. Springer who was

7   representing them I think in some other legal issues and

8   they asked for us to meet him and he came to our home.

9   Q.   All right.  And Mr. Springer came to your home there

10  in Bloomfield Hills?

11  A.   Yes, he did.

12  Q.   Was he the only one at that time who came to your

13  home?

14  A.   Yes, he was.

15  Q.   And when was that approximately?

16  A.   It was in -- I believe it was in the beginning of

17  November of 2002, the best of my recollection.

18  Q.   Were you present at any of the discussion,

19  particularly things that Mr. Springer said at your home

20  there at that meeting in November of 2002?

21  A.   I was present during some of the time and some of

22  the time I was not.  I was very distraught over what my

23  husband was facing.  And so they had talked about the

24  presentence report and --

25  Q.   Who is "we" now?

1  A.   Mr. Springer and my husband and at times myself.

2  And he had reviewed a lot of it with Art and --

3  Q.   "He" being Mr. Springer?

4  A.   Yes, Mr. Springer.

5  Q.   Okay.

6  A.   And talked about the different issues that he faced

7  in his enhancements and how they really were not -- I

8  want to say legal and that he would be able to fight

9  those for Art and Art should not be facing the sentence

10 that he was.

11 Q.   At that meeting, was there any discussion of

12 Mr. Springer providing any services beyond the

13 sentencing?

14 A.   Yes.  Well, not at that meeting, no.

15 Q.   That's what I meant, at that meeting.

16 A.   No, at that meeting it was just his services for the

17 sentencing.

18 Q.   All right.  And when did you first meet Mr. Stilley?

19 A.   On the day of sentencing.

20 Q.   At the sentencing?

21 A.   Yes.

22 Q.   And when was that?

23 A.   That was on December 19, 2002.

24 Q.   All right.  Now, between the meeting with

25 Mr. Springer in November of 2002 at your home and the

1  sentencing, did you have any other meetings with

2  Mr. Springer?

3  A.   I don't recall that I did, no.

4  Q.   All right.  Were there any -- and you said the first

5  time you met Mr. Stilley was at the sentencing on

6  December 19th?

7  A.   Yes, correct.

8  Q.   Did you have any, you personally have any other

9  discussions with Mr. Springer or Mr. Stilley between or

10 before the sentencing?

11 A.   I had discussions with Mr. Springer.  I don't recall

12 any conversations with Mr. Stilley.  Mr. Springer and I

13 had conversations after he had gone to Chicago to meet

14 with my husband's current attorney, Tom McQueen.

15 Q.   All right.  And what were those discussions?

16 A.   Well, they had had a meeting at Mr. McQueen's

17 office.  And after they had left, the feeling was that

18 Mr. McQueen was really not capable of representing my

19 husband at the sentencing and that it would be in our

20 best interest to terminate his services.

21 Q.   And who made that representation to you?

22 A.   It was my conversation with Mr. Springer.

23 Q.   All right.  Now, this is by telephone, I gather?

24 A.   Yes, it was.

25 Q.   And, ultimately, did that happen after that meeting

1    with Mr. McQueen?

2    A.   It did.

3    Q.   Any other conversations you recall Mr. Springer --

4    by the way, did Mr. Springer in his conversations with

5    you ever indicate what his background was or what his

6    expertise was as far as representing your husband in his

7    sentencing matter?

8    A.   No, we never had that conversation.  I just assumed

9    that he was --

10   Q.   I don't need to know what -- the answer is, no,

11   right?

12   A.   Correct.

13   Q.   Okay.  All right.  Did you ever have any

14   conversations with -- prior to the sentencing with

15   Mr. Stilley or Mr. Springer concerning payment?

16   A.   Prior to the sentencing, the majority of that was

17   handled with my husband.

18   Q.   All right.  Let's skip forward to the sentencing,

19   then, I guess, which is the next event that you testified

20   about.  You were present at the sentencing?

21   A.   I was.

22   Q.   All right.  And who else -- who was representing

23   your husband at that point in time on December 19th?

24   A.   Oscar Stilley.

25   Q.   Okay.  And how about Mr. Springer?

1  A.   Mr. Springer was at the defense table.  He did not

2  speak on Art's behalf, but he was sitting at the defense

3  table with him.

4  Q.   Okay.  And was there discussion at the table between

5  Mr. Springer and Mr. Stilley and your husband?

6  A.   I believe that at certain times they were having

7  discussions.  I was not party to them.

8  Q.   All right.  Were you party to any of the meetings on

9  breaks or anything?

10  A.   No, not really because I was just really too

11  distraught about that day.

12  Q.   All right.  Other members of your family present at

13  the -- also at the sentencing?

14  A.   Yes, my children were present and my mother-in-law,

15  they were present, we had friends present also.

16  Q.   All right.  And was Mr. -- your husband Arthur

17  Hawkins, was he -- well, first of all, how long did the

18  sentencing go on, if you know?

19  A.   It was the majority of the day.  It started at nine

20  o'clock in the morning.  And then about four o'clock in

21  the afternoon, just out of the blue, the United States

22  marshals came and they took my husband.

23  Q.   Yeah.  Now, did you listen to any of the

24  presentation, then, that was going on here?

25  A.   It was really difficult to follow.  It was somewhat,

 1  in my opinion, chaotic.

 2  Q.   All right.  All right.  Okay.

 3  A.   And I could not follow it.

 4  Q.   Not expressing an opinion -- you observed the

 5  presentation that went on?

 6  A.   I did.

 7  Q.   All right.  And what -- Mr. Springer was making --

 8  I'm sorry, Mr. Stilley was making comments to the Court,

 9  I guess the prosecutor was; is that correct?

10  A.   That's correct.

11  Q.   All right.  And were they basically going over

12  points in the presentence investigation report?

13  A.   They were going over the same point over and over

14  again.

15  Q.   And what was that point?

16  A.   They were discussing legal nexus.

17            THE COURT:  Legal what?

18            THE WITNESS:  Nexus.  Nexus.

19  Q.   (BY MR. SNOKE)  All right.

20  A.   They came back to that all the time.

21  Q.   All right.  And -- all right.  And -- all right.

22  And at the end of that session, then, was your husband

23  taken into custody?

24  A.   He was.

25  Q.   All right.  From that time on, then, who -- who

1   dealt on his behalf with Mr. Springer and Mr. Stilley?

2   A.   I did.

3   Q.   Did you talk to them at all after your husband was

4   taken into custody that day?

5   A.   I did.  They met with me at the hotel and told me

6   that they would have him out of the facility and back

7   home within 24 hours.

8   Q.   All right.  They were going to file some sort of

9   motions or something?

10  A.   Yes.

11  Q.   Okay.  Was there any discussion at that point of any

12  additional money to be paid to them?

13  A.   Not that day, no.

14  Q.   Okay.  Had either of Mr. Springer or Mr. Stilley

15  indicated at the meeting in your home -- I'm sorry,

16  Mr. Stilley wasn't at that meeting, but had anybody,

17  either of these gentlemen, indicated to you prior to the

18  sentencing what the likely outcome was if they got in and

19  helped your husband?

20  A.   Yeah, that he would come home.  That he -- they

21  would be able to have Art home.

22  Q.   And this was before the day of the sentencing?

23  A.   It was before the day of the sentencing.

24  Q.   All right.  And then you said after the sentencing

25  they made some remarks of a similar nature to you?

1   A.   Yes, they did.

2   Q.   All right.  And did that happen?

3   A.   No, it did not.

4   Q.   Okay.  I'm going to have you look at --

5           MR. SNOKE:  If I may approach and get a book

6   out.

7           THE COURT:  You may.

8   Q.   (BY MR. SNOKE)  If you would look in that book,

9   there's tabbed exhibits in there, and I would like you to

10  turn to Exhibit 210, two, one, zero.

11  A.   Yes.  Yes.

12  Q.   Do you recognize that document?

13  A.   I guess.  Yes, I do.

14  Q.   And what's the date of that?  It looks like it's an

15  e-mail.

16  A.   It's 12/26/2002.

17  Q.   I'm sorry?

18  A.   12/26, December 26, 2002.

19  Q.   All right.  12/26 of 2002?

20  A.   Correct.

21  Q.   And is that to you?

22  A.   It is.

23  Q.   From whom?

24  A.   From Oscar Stilley.

25  Q.   All right.

CYNTHIA HAWKINS - DIRECT BY MR. SNOKE                            1752

```
 1              MR. SNOKE:  We'd move into evidence Exhibit 210
 2    at this time.
 3              MR. SPRINGER:  No objection, Your Honor.
 4              THE COURT:  It is received.
 5    Q.  (BY MR. SNOKE)  What is Exhibit 210?  It's a multi-
 6    page exhibit.  You can take it out of there -- of the
 7    sleeve because I think it's more than one page.
 8    A.   It is a description of his services rendered from
 9    November 19, 2002.
10    Q.   All right.  And it goes through -- on the last page,
11    there's some entries there.  Actually, the next to the
12    last page, there's an entry there.  Can you tell us the
13    last date on that statement?
14    A.   December 17, 2002.
15    Q.   All right.  Well, there's some out-of-pocket
16    expenses down there further down the page too, are there
17    not?
18    A.   Yes, there is out-of-pocket expenses, December 19th.
19    Q.   I'm sorry?
20    A.   December 19, 2002.
21    Q.   Okay.  Farther down the page we've got some of
22    out-of-pocket expenses that go down to December 21st.
23    A.   December 21st.
24    Q.   All right.  So this is kind of an all-encompassing
25    one-month statement; is that correct?
```

```
 1    A.   Correct.
 2    Q.   As far as you know, is this the first billing
 3    statement that you or your husband received from
 4    Mr. Stilley?
 5    A.   It is.
 6    Q.   And by now he's -- your husband has been
 7    incarcerated for about a week; is that correct?
 8    A.   It is.
 9    Q.   Now, if -- if we next -- if you would next turn to
10    -- well, I'll have you look at Exhibit 21, which is in
11    evidence, if we could call it up.  This will be on your
12    screen there.  You don't have to take it out of that.
13    A.   Yes.
14    Q.   Do you see it on the screen there?
15    A.   Yes.
16    Q.   Do you recognize that check?
17    A.   I do.
18    Q.   And is that your husband's signature there on the
19    bottom there?
20    A.   It is.
21    Q.   Okay.  But this check was actually issued on the
22    27th of -- of December of 2002; is that correct?
23    A.   That's the date on the check.
24    Q.   Or the date on the check?
25    A.   Yes.
```

1  Q.  Okay.  All right.  And did you have anything -- any

2  conversation with Mr. Stilley or Mr. Springer or

3  particularly Mr. Springer concerning the issuance of this

4  check?

5  A.  No, I did not.

6  Q.  All right.  If you'll next turn in that book again

7  to Exhibit 206, two, zero, six.

8  A.  Yes.

9        MR. SPRINGER:  Your Honor, is it Exhibit Number

10  206?  And I'm sorry.

11        THE COURT:  Is it 206?

12        MR. SNOKE:  206.

13        MR. SPRINGER:  Thank you.

14  Q.  (BY MR. SNOKE)  Do you recognize the document?

15  A.  I do.

16  Q.  Okay.  And what is that?

17  A.  It is a check made payable to the IOLTA Oscar

18  Stilley account January 2, 2003, signed by me for Art's

19  legal expense.

20  Q.  All right.  And prior to issuance -- why did you

21  issue that check in January 2nd of 2003?

22  A.  For legal services.  They were going to file some

23  motions on Art's behalf with the District Court in

24  Illinois with the hopeful release of Art.

25  Q.  And did you have discussion with either Mr. Springer

1   or Mr. Stilley concerning what they were going to do that

2   -- or whether -- when you should issue this check?

3   A.   I'm sorry?

4   Q.   First of all -- well, let me rephrase that.  That

5   was a bad question.  Prior to issuing this check, did you

6   have any discussions with Mr. Springer about what they

7   were going to do in return for issuing this check?

8   A.   I had conversations with Mr. Springer and he just

9   would update me on the next step that we needed to take

10  in order for Art to come home.

11  Q.   All right.  How would you know, then, to make out an

12  $11,000 check to Mr. Stilley then on January 2nd of 2003?

13  A.   Mr. Springer told me to make the check payable to

14  Mr. Springer (sic).

15  Q.   All right.  Did you have more discussions with

16  Mr. Springer and Mr. Stilley, then, after you came into

17  the picture in December of 2002?

18  A.   All of my conversations were with Mr. Springer.

19  Q.   All right.  And then did you write down there at the

20  bottom "Art Hawkins legal"?

21  A.   I did.

22  Q.   Next, if we could -- I think Exhibit 207, 207 is in

23  evidence, I believe.

24        MR. SNOKE:  Did I move in 206?  I would move

25  into evidence 206 at this time.

```
1              MR. SPRINGER:  No objection, Your Honor.
2              THE COURT:  It is received.
3   Q.  (BY MR. SNOKE)  All right.  207, I believe, is in
4   evidence.  Is that on your screen?  Do you recognize that
5   check?
6   A.  I do.
7   Q.  All right.  And that's a check to Bondage Breakers
8   Ministries for $8,000; is that correct?
9   A.  It is.
10  Q.  January 3rd of '03.  Which, if we put it up in split
11  screen, I believe the previous check I showed you was the
12  day before, January 2nd.  All right.  And for what
13  purpose did you issue this check for $8,000 to Bondage
14  Breakers Ministry?
15  A.  I didn't.  My husband had issued it to Mr. Springer
16  prior to his sentencing.
17  Q.  Oh, all right.  So this is one that your husband had
18  signed?
19  A.  Yes.
20  Q.  Did he sign -- if you know, did he sign more than
21  one check in advance?
22  A.  I think he did, yes.
23  Q.  All right.  All right.  Were you familiar -- did you
24  write -- well, we'll get to them here in a minute.  All
25  right.  Did you have any discussion -- well, strike
```

1   that.  Did you have any discussion with Mr. Springer

2   concerning this check that you recall?

3   A.   No.

4           MR. SNOKE:  Move into evidence -- oh, it's in

5   evidence.  I'm sorry.  All right.  Let's go to Exhibit 22

6   next, please, which is in evidence, I believe.  Call that

7   one up.

8   Q.   (BY MR. SNOKE)  Do you recognize that check?

9   A.   I do.

10  Q.   And who wrote that check?

11  A.   I wrote the check on January 14th.

12  Q.   All right.  Now, we're now in 2003; is that right?

13  A.   It is.

14  Q.   And this one appears a little different than the

15  other ones, previous checks were drawn on Chippewa Trail

16  Lodge, Inc.  Was that a company that you were familiar

17  with?

18  A.   Yes.  It was one of our companies.

19  Q.   All right.  And this check is -- I can't tell what

20  it -- what account it's drawn on, but it's at Charter One

21  Bank?

22  A.   Yes, that's where my personal account was.

23  Q.   Oh, your personal check.  Okay.  So you're writing

24  this out of your personal account?

25  A.   Yes.  We had just opened this account.

1   Q.   Okay.  So this is an early check in series, I guess?

2   A.   It is.

3           MR. SPRINGER:  Objection, Your Honor.  "We" just

4   opened?  "We"?

5           THE COURT:  Clarify that.

6           THE WITNESS:  I.

7   Q.   (BY MR. SNOKE)  I'm sorry?

8   A.   I opened that account.

9   Q.   I can't hear you.

10  A.   I said I opened that account.

11  Q.   Oh, you opened the account.  Okay.  What was the

12  purpose of writing a $30,000 check to Bondage Breakers

13  Ministries on January 14th of 2003?

14  A.   It was for additional legal services going forward

15  for appeals.

16  Q.   And before you wrote this check, were you asked to

17  write it by anybody?

18  A.   By Mr. Springer.

19  Q.   And how would he go about doing it?

20  A.   We would be discussing where we were going legally

21  on Art's case.  And whatever the next phase was he would

22  tell me the fee, the cost, and then what he needed, and I

23  would write the check before he would perform the

24  services.

25  Q.   And did you have any discussion with Mr. Springer

1  yourself, that is, about why you were writing the check

2  to Bondage Breakers Ministries?

3  A.   No.   That's just where I was told to write the

4  check.

5  Q.   All right.   And who told you to write it to Bondage

6  Breakers Ministries?

7  A.   Mr. Springer.

8  Q.   Okay.   When you -- after you wrote this check, then

9  how do you get it to Mr. Springer?

10 A.   I would overnight it by FedEx.

11 Q.   All right.   Is there some reason you would send it

12 by FedEx versus the U.S. Mails?

13 A.   So he would get it the next day.

14 Q.   All right.   And did anyone indicate to you that you

15 should do it that way?   I mean, was that your idea or

16 somebody else's idea?

17 A.   It was Mr. Springer.   He wanted to get the check the

18 next day.   The only way to get it there was by Federal

19 Express.

20 Q.   Okay.

21      MR. SNOKE:   If we could call up Exhibit 23,

22 which is also in evidence.

23 Q.   (BY MR. SNOKE)   Do you recognize that exhibit?

24 A.   I do.

25 Q.   And did you have anything to do with that check?

1  A.   I wrote the check.

2  Q.   All right.  And this is a check for $37,000 on

3  January 30, 2003, also to Bondage Breakers Ministry?

4  A.   Yes.

5  Q.   And what, if any, conversation did you have with

6  anybody concerning the writing of this check?

7  A.   It was from Mr. Springer, it was additional funds,

8  and he asked me to make the check for $37,000.

9  Q.   All right.  At that point now we had a check there

10  on the 14th, which you just looked at, for 30,000 and

11  this is -- and a check on the 3rd of January for 8,000,

12  and this is the third check this month and this is for

13  37,000; is that correct?

14  A.   It is.

15  Q.   All right.  In connection with this check, what did

16  you understand Mr. Springer was going to be doing in

17  return for this check?

18  A.   Again, it was for legal services.  I don't recall

19  whether we were still filing motions at the district

20  level or if this was the beginning of his appeal to the

21  circuit court.

22  Q.   All right.  Did you and Mr. Springer about this time

23  discuss the possibility of -- or what was going to happen

24  with respect to the appeal for your -- filing of an

25  appeal on your husband's behalf?

```
 1   A.   Yes.
 2   Q.   And what did you understand he was going to do in
 3   connection with that?
 4   A.   He was going before the circuit court and they were
 5   trying to get my husband's sealed indictment unsealed and
 6   they were --
 7   Q.   What?  I'm sorry.
 8   A.   My husband had a sealed indictment that he had never
 9   seen.  So one of the objectives that they were trying to
10   achieve was to get the indictment unsealed to see if
11   there was any irregularities between the two
12   indictments.  So that was part of the filing and all of
13   the rest was being prepared to fight the appeal at the
14   circuit court level.
15   Q.   Okay.  And that's what you understood?
16   A.   Yes.
17   Q.   All right.  Did they discuss how that was going to
18   affect your husband's case when he was tried on the
19   superseding indictment and not the original sealed
20   indictment?
21   A.    I was under the belief that they told me that my
22   husband would be coming home.  My daughter was getting --
23   our daughter was getting married May 31st.  And
24   Mr. Springer told me to have his tuxedo ready because he
25   would be coming home after the appeal at the circuit
```

```
 1   level on May 28th.
 2   Q.   All right.  The next exhibit I would like you to
 3   look at, and it's in the book there in front of you, is
 4   Exhibit 209.  I'm sorry.  Before we go to that, let's go
 5   to Exhibit 211, which is also in that book in front of
 6   you.
 7   A.   Yes.
 8   Q.   And that's a multi-page document.  You've taken it
 9   out, I see, of the sleeve.  Do you recognize the pages
10   that make up that exhibit, Exhibit 211?
11   A.   Yes, I do.
12   Q.   All right.  And just generally, what is that?
13   A.   It's a description of services that Mr. Stilley
14   provided.
15   Q.   All right.
16        MR. SNOKE:  And we would move into evidence
17   Exhibit 211 at this time.
18        MR. SPRINGER:  I have no objection, Your Honor.
19        THE COURT:  It will be received.
20   Q.   (BY MR. SNOKE)  What's the -- there's a cover letter
21   -- I mean, a cover sheet on that exhibit, I guess, that
22   -- and what's the date that that was apparently sent to
23   you?
24   A.   January 24, 2003.
25   Q.   All right.  And you recall getting that statement of
```

CYNTHIA HAWKINS - DIRECT BY MR. SNOKE                    1763

1  services of Mr. Stilley there apparently in the month of

2  January up until that point?

3  A.   Yes.

4  Q.   All right.  It looks like to me like the first date

5  on it is January 2nd and it says 2002 to start with, but

6  it's -- I think it's obviously 2003.  And then it goes

7  through January -- about January 16th or something.

8  Anyway, later on in January.  Do you see that?

9  A.   I do.

10 Q.   Okay.  Now, again, did you receive this about the

11 date on there, about January 24th of 2003?

12 A.   I did.

13 Q.   Again, did you -- in conjunction with this, did you

14 ever get any billing statements from Mr. Springer?

15 A.   No.

16 Q.   Now, let's go to -- well, let's see.  I'm sorry.  At

17 the bottom -- at the bottom of the last page of that

18 exhibit, it appears that according to the statement the

19 -- your account with or your husband's account with

20 Mr. Stilley is a minus $4,826.54.  Do you see that?

21 A.   I do.

22 Q.   Did you make any payments to Mr. Stilley based on

23 receiving this statement?

24 A.   I don't recall if I made them based on this

25 statement.

1  Q.   Okay.  When you would make payments to Mr. Stilley,

2  would it be Mr. Stilley's statements or verbal requests

3  or would it be somebody else that would tell you to make

4  payments to Mr. Stilley?

5  A.   To the best of my recollection, all of my

6  conversations about payments to Mr. Stilley were through

7  Mr. Springer.

8  Q.   Okay.  If you could turn in the book there to

9  Exhibit 209, please, 209.

10 A.   Yes.

11 Q.   Do you recognize the check that's depicted in that

12 exhibit?

13 A.   I do.

14 Q.   All right.  Is that a check you wrote?

15 A.   It is.

16 Q.   All right.  In connection with this case?

17 A.   It was.

18 Q.   Or your husband's case rather?

19 A.   Correct.

20        MR. SNOKE:  We'd move into evidence Exhibit 209.

21        MR. SPRINGER:  I have no objection, Your Honor.

22        THE COURT:  It is received.

23 Q.   (BY MR. SNOKE)  All right.  You can see it now on

24 the screen, I guess.  It appears to be -- again, this is

25 an account -- I guess this is the same account only now

1   we have your name up there in the left block of the

2   check; is that correct?

3   A.   It is.

4   Q.   All right.  On February 3, 2003, a check to Oscar

5   Stilley in the amount of $27,000; is that right?

6   A.   It is.

7   Q.   And why did you write this check for $27,000 on

8   February 3rd to IOLTA-Oscar Stilley?

9   A.   It was the amount that was requested to continue

10  with the legal issues relating to my husband's case.

11  Q.   All right.  Who requested this check?

12  A.   From Mr. Springer.

13  Q.   If we next look at Exhibit 212, which is in

14  evidence, I believe.  Do you see that on your screen?

15  A.   I do.

16  Q.   Do you recognize the check on that one?

17  A.   I do.

18  Q.   And what -- what -- this is a check on February 21,

19  2003, to Bondage Breakers Ministries, again, issued on

20  your account for $8,000.  And why did you issue this

21  check?

22  A.   For legal services for my husband.

23  Q.   And prior to issuing this, would you have had a

24  conversation with Mr. Springer?

25  A.   Yes.

CYNTHIA HAWKINS - DIRECT BY MR. SNOKE                    1766

```
1   Q.   In these conversations, other than asking you to
2   send additional funds, would he tell you the amount to
3   send?
4   A.   Yes, he told me the amount of how much to send and
5   what it was going to cost and that portion of what he was
6   working on.
7   Q.   All right.  And this check also you would have sent
8   to him in some fashion; is that correct?
9   A.   Yes, overnight, Federal Express.
10  Q.   Next let's go to Exhibit 96, which is in evidence.
11  Do you recognize that check?
12  A.   Yes.
13  Q.   And what is that check?
14  A.   It is a check made payable to IOLTA Oscar Stilley
15  for the amount of $8,000 on March 25th.
16  Q.   And that's March 25th of 2003?
17  A.   Yes.
18  Q.   And prior to issuing that check, would someone have
19  directed you to do that or asked you to do that?
20  A.   Yes, Mr. Springer.
21  Q.   All right.  And at that point in time, what is
22  Mr. Springer doing or Mr. Stilley or both of them doing
23  for you with respect to Mr. Hawkins, your husband's case?
24  A.   They were preparing for the appeal before the
25  district -- circuit court in Chicago on his case.
```

1  Q.   All right.  And when did that case get argued?

2  A.   On May 28, 2003.

3  Q.   All right.  We have a few more to go through.  If

4  you would look at Exhibit 97.  Do you recognize that

5  exhibit, which is in evidence?

6  A.   I do.

7  Q.   And what is that?

8  A.   It's a check made payable to IOLTA Oscar Stilley for

9  the amount of $20,000, April 30, 2003.

10 Q.   All right.  $20,000 to Oscar Stilley's IOLTA

11 account; is that correct?

12 A.   Yes.

13 Q.   Again, same questions, I guess, prior to issuing

14 this one, did somebody ask you to issue the check in this

15 amount to Mr. Stilley?

16 A.   Mr. Springer.

17 Q.   All right.  And it says, "On account-A. Hawkins."

18 Is that your writing?

19 A.   It is.

20 Q.   We're still before the argument on the appeal?

21 A.   That's correct.

22 Q.   And for what purpose were these checks, 96 and 97,

23 issued?

24 A.   It was towards the legal services for my husband's

25 appeal.

```
 1   Q.   Okay.  Next, if you would look at Exhibit 24, which
 2   is in evidence.
 3             MR. SNOKE:  And if we could put up 97 on a split
 4   screen there.
 5   Q.   (BY MR. SNOKE)  Well, first of all, let me have you
 6   identify that.  Can you identify that check?
 7   A.   I can.  It's a check I wrote on April 30, 2003, to
 8   Bondage Breakers Ministry for $35,000.
 9   Q.   All right.
10             MR. SNOKE:  If we could put that up side by side
11   with 97, please.
12   Q.   (BY MR. SNOKE)  Now, these checks, these two checks
13   appear to have been written on the same day?
14   A.   Yes.
15   Q.   All right.  And they -- we're back with the Chippewa
16   Trail Lodge account here, I guess.  Prior to writing this
17   check in -- well, did you talk to Mr. Springer then
18   before writing this check to Bondage Breakers Ministry
19   also?
20   A.   I did.
21   Q.   All right.  And since they're written on the same
22   day, were you -- did you talk to Mr. Springer about both
23   these checks at the same time or do you recall?
24   A.   Well, the cost going forward was $55,000 and so 35
25   was to be written to Bondage Breakers Ministry and the
```

1  other 20 was to go to Mr. Stilley's account.

2  Q.   And who gave you those numbers?

3  A.   Mr. Springer.

4  Q.   And what was that -- at that point in time, on April

5  30, 2003, what was that supposed to be -- what was he

6  going to do for you or Mr. Stilley and he going to do for

7  you for these two checks?

8  A.   They were working on the briefs for the appeal.

9  Mr. Springer wrote a lot of the briefs and that's really

10 who my dealing was with and then Mr. Stilley would put

11 them in the form to submit to the Court.

12 Q.   All right.  And you were told this by Mr. Springer?

13 A.   Yes.

14 Q.   All right.  Then you said the oral argument took

15 place sometime in May of 2003?

16 A.   On May 28, 2003.

17 Q.   And were you present at the oral argument?

18 A.   I was not.  I left when Mr. Stilley got up to argue

19 the case.

20 Q.   Oh, you were up in Chicago, but you didn't watch the

21 argument?

22 A.   No, I couldn't.

23 Q.   All right.  Did you talk to Mr. Springer or

24 Mr. Stilley up there at the oral argument?

25 A.   I talked to them before they went into the

CYNTHIA HAWKINS - DIRECT BY MR. SNOKE                    1770

```
1   courtroom.
2   Q.   I see.  All right.  And did either of them in that
3   conversation or in these other conversations you had
4   prior to that indicate any -- anything positive to you in
5   connection with the appeal?
6   A.   Yes.  They felt that it was very successful and they
7   believed that Art -- they told me that Art would be
8   coming home.
9   Q.   All right.  Now, at some time after that, did you --
10  were you made aware of the ruling of the circuit court in
11  Art's case?
12  A.   After that, yes.  It was denied.
13  Q.   All right.  Did you have conversation with
14  Mr. Springer after the appeal was denied?
15  A.   Yes, we did.
16  Q.   All right.  You say "we did."  I'm asking if you --
17  A.   I did, yes.  I did.  I'm sorry.  I did.
18  Q.   Are you passing any of this information on to your
19  husband during this time period because he's incarcerated
20  somewhere?
21          MR. SPRINGER:  Objection, Your Honor.  What are
22  we passing on?
23          THE COURT:  Information about the appeal and the
24  status of the case.
25          MR. SPRINGER:  Okay.
```

1          THE WITNESS:  We talked about it briefly, but we

2   could not discuss it on telephone calls.  Our calls were

3   very short.  And when I visited him, most of it, we

4   touched on it, but he really -- I did what I needed to do

5   for him.

6   Q.   (BY MR. SNOKE)  Where was he -- during this time

7   period, where was he being held?

8   A.   For eight weeks, when he left on the 19th, he was in

9   Vandalia, Illinois, at a county facility.  And then from

10  there, he was transferred to Loretto, Pennsylvania.  And

11  in September of 2003, he was transferred to Ashland,

12  Kentucky, where he is currently.

13  Q.   All right.  So we're not to September yet.  Well,

14  we're just about to September.  So he is at Loretto --

15  Loretto, did you say?  Or in Pennsylvania?

16  A.   He was.  He's not there now.

17  Q.   At that time.

18  A.   Yes.

19  Q.   When the appeal was argued, I mean.

20  A.   When the appeal -- he was in Loretto, yes.

21  Q.   Loretto.  All right.  I'll next have you look at

22  Exhibit 103.  And Exhibit --

23  A.   Yes.

24  Q.   Do you recognize that check?

25  A.   I do.

1    Q.   And also if you would look at Government's Exhibit

2    31, which I think is in evidence, 31.  Do you recognize

3    that check?

4    A.   I do.

5    Q.   All right.  Now, those two checks both apparently

6    are dated August 26, 2003.  Exhibit 103 is to IOLTA-Oscar

7    Stilley for $7,500.  And the other one is -- Exhibit 31

8    is to Bondage Breakers Ministry for $12,500.  Do you

9    recall writing both those checks on August 26th of '03?

10   A.   I do.

11   Q.   And what was the purpose of writing those two

12   checks?

13   A.   It was to further go forward on appealing Art's

14   case.

15   Q.   All right.  By now had you received the opinion

16   turning down his appeal from the circuit court?

17   A.   Yes.  I believe so, yes.

18   Q.   What was -- what were you told by Mr. Springer or

19   Mr. Stilley, whoever -- well, let's just leave it with

20   Mr. Springer since you said most of your conversations

21   were with him.  With Mr. Springer, what were you told, if

22   anything, by Mr. Springer about why he needed you to send

23   these two checks out on August 26th?

24   A.   We were going -- he was going to, I believe at this

25   time, file another motion at the circuit court level

1    related to the denial of his -- of Art's appeal.  And the

2    next step after that would be before the Supreme Court.

3    Q.  All right.  And with whom would you have had

4    conversations concerning what amounts and who to send

5    them to with respect to these two checks?

6    A.  All my conversations were with Mr. Stilley -- I

7    mean, I'm sorry, Mr. Springer.

8    Q.  Okay.  Mr. Springer then would have directed the

9    amounts and to who got each one?

10   A.  Yes.  Yes.

11         MR. SNOKE:  If we could look now at Exhibit 105

12   and 106, which are both in evidence.  Pull those up.

13   Q.  (BY MR. SNOKE)  If you would look at those two

14   exhibits and tell me if you recognize those checks.

15   A.  I do.

16   Q.  And these are, again, looks to be on your personal

17   account?

18   A.  Yes.

19   Q.  October 3, 2003, one check to Bondage Breakers

20   Ministries for $25,000, Number 106.  And a similar

21   $25,000 check to IOLTA-Oscar Stilley on October 3, 2003,

22   which is Exhibit 105.  Is that correct?

23   A.  It is.

24   Q.  And what was the purpose of these two checks?

25   A.  It was related to Art's legal defense.  And at this

1   point, I don't even know where we were at that point,

2   where we were headed.

3   Q.   All right.  And did someone direct you to make these

4   checks out in these amounts to these people?

5   A.   Yes, Mr. Springer.

6   Q.   All right.  And what was the purpose -- what was he

7   going to do for you or what was he and Mr. Stilley going

8   to do for you in return for these two checks?

9   A.   Continuing to appeal Art's sentence and try and

10  bring him home.

11  Q.   All right.  Did there come a time here about the

12  time of these last two checks when something occurred in

13  your relationship with the -- Mr. Springer and

14  Mr. Stilley?

15  A.   Yes.

16  Q.   What was that?

17  A.   Well, it was right prior to this time I had become

18  aware of the fact that the prosecution in Illinois, the

19  prosecutor had --

20  Q.   I don't need to have the whole thing, but did you

21  have some discussions with Mr. Springer or Mr. Stilley

22  about doing some additional legal work?

23  A.   Yes.

24  Q.   All right.  And -- all right.  Was that additional

25  legal work, was there a price quoted for that legal work?

```
 1   A.    Yes.
 2   Q.    And who quoted the price to you?
 3   A.    Mr. Springer.
 4   Q.    And what did he indicate it would cost to do some
 5   additional legal work?
 6   A.    $500,000.
 7   Q.    Did you discuss that with your husband?
 8   A.    I don't recall.
 9   Q.    Okay.  Did you go ahead with that?
10   A.    No.
11   Q.    All right.  At some point here in -- well, at any
12   point in any of these checks that I've showed you, were
13   any of these checks for a donation or a gift to Bondage
14   Breakers Ministry or Mr. Springer?
15   A.    No, they were for legal services.
16   Q.    How about the checks that were written to Oscar
17   Stilley?
18   A.    No, they were for legal services.
19   Q.    In any of these dealings with Mr. Springer in these
20   conversations you've discussed, did Mr. Springer ever
21   indicate that -- ever indicate that he could not do work
22   for you unless you paid him?
23   A.    Correct.  I had to pay him for the work that he was
24   going to do and I had to pay it in advance before the
25   work was done.
```

CYNTHIA HAWKINS - DIRECT BY MR. SNOKE                           1776

1   Q.   All right.   And what did he say to you in that

2   regard?

3   A.   He said I can't do that.   This is what you have to

4   pay to me, this is what goes to Mr. Stilley, and when I

5   receive it, we can go forward.

6   Q.   All right.   Did you ever discuss with him that you

7   were having any difficulties in making -- meeting these

8   demands?

9   A.   I did at one point, yes.   But he needed to have the

10  money, so I managed to get it and pay him.

11  Q.   Do you know approximately how much that you and your

12  husband paid Mr. Springer in the course of the payments

13  that you made with him -- to him?

14  A.   I don't recall the exact amount, but I know it was

15  about 200 and some thousand dollars, I believe, for

16  Mr. Springer.

17  Q.   Did you pay -- did you make some payments -- do you

18  know how much approximately that you -- you and your

19  husband paid to Mr. Stilley in the course of your --

20  A.   I don't remember offhand.

21  Q.   Okay.   Did there come a time when you severed your

22  relationships with Mr. Springer and Mr. Stilley?

23  A.   Yes.

24  Q.   That is, your relationship, but it was really on

25  behalf of your husband; is that correct?

```
 1   A.   Yes.

 2   Q.   And when -- about when was that?

 3   A.   It was after October.  It was in --

 4   Q.   Of 2003?

 5   A.   2003.

 6   Q.   All right.  And after you severed your -- did you

 7   discuss that with your husband before you did that?

 8   A.   Yes, I did.

 9   Q.   At -- after you did that, of these last checks for

10   $25,000 each that we just looked at, was any of that

11   money returned to you?

12   A.   I believe there was somewhere around 20,000

13   something that was left on the account was returned.

14   Q.   How much?

15   A.   I think it was around 20, 21,000.  I don't recall

16   the exact amount.

17   Q.   All right.  And what was the reason for the return

18   of that money?

19   A.   Because I -- we had terminated -- I had terminated

20   their services and was hiring another attorney to

21   represent him.

22   Q.   And did you do that, you hired another attorney?

23   A.   I did.

24   Q.   All right.  And on behalf of your husband?

25   A.   Correct.
```

1  Q.  And was one of the attorneys that you hired Joe

2  McLean?

3  A.  Yes.  But that was some time after I had hired --

4  the initial attorney was Susan James from Alabama.

5          MR. SNOKE:  May I have a moment, Your Honor?

6          THE COURT:  You may.

7  Q.  (BY MR. SNOKE)  Mrs. Hawkins, given the lack of

8  success up to October of 2003, why did you keep giving

9  Mr. Springer and Mr. Stilley the monies requested by

10  Mr. Springer?

11  A.  Because I had no other attorney at that time.  I had

12  nowhere to turn, I didn't know what to do, and I was

13  really desperate.  I really wanted my husband home and

14  they convinced me that they could bring him home.

15  Q.  Now, how much time does your husband have left on

16  his sentence currently?

17  A.  His release date is September 11, 2011.

18  Q.  All right.  So about 17 months, I think has been

19  said?

20  A.  Correct.

21  Q.  Have you been keeping in touch with your husband's

22  attorneys about what's going on in his case in

23  Springfield -- or in the Southern District of Illinois,

24  anyway?

25  A.  I talk to both Susan and Joe periodically.

CYNTHIA HAWKINS - DIRECT BY MR. SNOKE                    1779

1   Q.   All right.  And are you -- are you aware of any of

2   the -- are you aware of any of the discussions that are

3   going on in the Southern District of Illinois with

4   respect to Art's case there?

5   A.   I know that they have had -- that Joe and Susan have

6   had some discussions, but I don't know what resulted from

7   them.  Art has a 2255 currently pending.

8   Q.   All right.  From your discussions with Mr. McLean or

9   is Susan -- what's her last name?

10  A.   James.

11  Q.   Susan James.  Regarding your husband's remaining 17

12  months that he needs to serve here on his ten-year

13  sentence, are you hopeful that the government will help

14  to -- will provide some help to your husband in

15  connection with his cooperation in this case?

16  A.   They filed for, hopefully, a downward departure, but

17  we don't know if that would ever be possible.  And I'm

18  always hopeful for anything.

19  Q.   Do you know anything else about any agreement he has

20  with the -- these --

21  A.   None.

22  Q.   Southern District of Illinois?

23  A.   No.  I don't know anything, no.

24  Q.   If he was granted a departure, then he would -- or

25  whatever you said that they're thinking about filing or

CYNTHIA HAWKINS - DIRECT BY MR. SNOKE                    1780

1   have filed, are you hopeful that then that he would be

2   able to get out of jail then and not serve the remaining

3   17 months?

4   A.   I don't know what that would involve, no, I don't

5   know.

6            MR. SPRINGER:  Objection, Your Honor.  Who is

7   filing?

8            MR. SNOKE:  I don't know.  She said --

9            THE COURT:  Clarify that.

10  Q.   (BY MR. SNOKE)  Can I clarify that?

11  A.   You can.

12  Q.   Who filed what?

13  A.   Susan James filed a 2255 motion.

14  Q.   All right.

15  A.   And later filed a motion 35.  Which, honestly, I

16  don't know all the ramifications of that.  And also Joe

17  McLean is also one of Art's attorneys and Susan and Joe

18  worked together on that issue.

19  Q.   All right.  Do you communicate more with Susan James

20  or Joe McLean?

21  A.   Probably equal, I would imagine.

22  Q.   All right.  So your understanding, there's something

23  filed in the Southern District of Illinois that could

24  result in a favorable treatment to your husband; is that

25  correct?

1  A.   It could possibly, but I have not been part of those

2  discussions.

3  Q.   Uh-huh.

4       MR. SNOKE:  I don't believe I have any other

5  questions of this witness, Your Honor.

6       THE COURT:  Cross-examination.

7       MR. SPRINGER:  May I have a moment, Your Honor?

8       THE COURT:  You may.

9       MR. SPRINGER:  Your Honor, may we approach just

10 a moment on one question?

11       THE COURT:  You may.

12    (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND

13 OUT OF THE HEARING OF THE JURY.)

14       MR. SPRINGER:  Mr. Snoke asked her about

15 $500,000, something having to do with bringing a lawsuit

16 against the U.S. Attorney's in the Southern District of

17 Illinois and then he stopped.  But what he did is he got

18 out the prejudicial impact of me saying $500,000.  And I

19 need to go into that a little bit with this witness, but

20 I needed the Court's guidance on that to see if it's

21 okay.  Because if it's not, I won't.

22       THE COURT:  Was there any mention of a lawsuit

23 against --

24       MR. SNOKE:  No, Your Honor.  I asked him -- I

25 asked her if there was a -- if Mr. Springer had suggested

1  further action to assist her husband.

2        MR. SPRINGER:  And she said $500,000.

3        MR. SNOKE:  We didn't talk anything about a

4  lawsuit, it just had to do with filing something that

5  would help her assist her husband in his case.

6        MR. SPRINGER:  What happened is --

7        THE COURT:  Bear with me just a moment.  There

8  wasn't any mention of any lawsuit against anybody.

9        MR. SPRINGER:  Can I go into the $500,000

10  testimony that she has given because he cut her off?

11        THE COURT:  What do you expect to get out of

12  that line of questioning?

13        MR. SPRINGER:  What her answer is going to be

14  when he cut her off about what that statement was for and

15  why -- that just seems completely prejudicial.

16        THE COURT:  That's fair follow-up.

17        MR. SPRINGER:  Thank you.

18        THE COURT:  Were you watching your standby

19  counsel when they started talking about 500,000?

20        MR. SPRINGER:  Yeah.  Your Honor, one more

21  thing.  We did not get a Rule 35 on Art Hawkins today.

22  We had never seen it.  And even in my direct examination

23  of him, he said it didn't exist, that 35, any cooperation

24  and now we have testimony of a 35(b) and we don't even

25  know what it says.  Can we get the government at least by

1   this evening because I haven't released Hawkins yet.  Can

2   we get the government to turn that over to us yet?

3          MR. SNOKE:  The witness's statements, first of

4   all, the government files a Rule 35.  They don't.  There

5   has been no Rule 35 filed.  I'm trying to explore what

6   her understanding of the deal was that her husband may

7   not have picked up on because she's doing most of the

8   conversations with the attorney because he's in jail.

9          THE COURT:  So your representation is that

10  there's no Rule 35 pending?

11         MR. SNOKE:  There is no Rule 35 filed, there has

12  been discussions.

13         THE COURT:  There's that.

14         MR. SPRINGER:  I'm fine.

15     (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

16  WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

17  PRESENCE AND HEARING OF THE JURY.)

18                     CROSS-EXAMINATION

19  BY MR. SPRINGER:

20  Q.  Good afternoon, Ms. Hawkins, Lindsey Springer.  I

21  would like to try to see if I can get the rest of the

22  answer you were giving to a question Mr. Snoke asked you

23  about what you had discovered in the prosecution in the

24  Eastern (sic) District of Illinois about something that

25  happened that you had discovered and that you may have

CYNTHIA HAWKINS - CROSS BY MR. SPRINGER                    1784

1   wanted to do something about.  Do you remember what you

2   were talking about there?

3   A.    I do.

4   Q.    What was that?

5   A.    I had been informed that the prosecutor who

6   prosecuted my husband's case had been dismissed or she

7   had resigned as United States District Attorney.  I had

8   called you and given you that information and we

9   discussed if that would have any benefit to my husband's

10  case.

11  Q.    Very good.  And did you subsequently learn by a

12  private investigator what the reasons were, why she was

13  dismissed or removed?

14  A.    To be honest, I don't remember.

15  Q.    Okay.  Do you remember sending me an article, a

16  statement about a judge had made a statement publicly

17  about her?

18  A.    I don't remember that either.

19  Q.    Okay.  Thank you.  Now, you do know who Paul Stumpo

20  is, correct?

21  A.    I do.

22  Q.    Still friends with him?

23  A.    I am.

24  Q.    And how about Michael Burt?

25  A.    I am.

1  Q.   All right.  In fact, Michael Burt was married in

2  your house, wasn't he?

3  A.   He was married in my home.

4  Q.   And you testified that you were present at the

5  sentencing hearing of Art Hawkins.

6  A.   I was.

7  Q.   That wasn't one of those that you left before the --

8  it started, correct?

9  A.   No, I was there.

10  Q.   And at all times, isn't it true that Mr. Stilley was

11  the one who was arguing on Art's behalf to the Court and

12  against the government?

13  A.   Mr. Stilley was, yes.

14  Q.   Thank you.  Have you noticed in any of your

15  communications with Art Hawkins in the last few years

16  that he has some difficulty in remembering certain

17  things?

18  A.   No.

19  Q.   No?  So if he told this jury that he remembers me

20  doing most of the arguing to the Court during that

21  sentencing hearing, would he be incorrect?

22         MR. SNOKE:  Objection to the form of the

23  question.

24         THE COURT:  Overruled.

25         THE WITNESS:  Would he?

1  Q.   (BY MR. SPRINGER)  Yes, ma'am.

2  A.   To the best of my knowledge?

3  Q.   Yes, ma'am.

4  A.   Mr. Stilley was arguing when I was present.

5  Q.   Okay.

6         MR. SPRINGER:  Now, could you pull up

7  Government's Exhibit Number 211, please.  And could you

8  go to the next page of that exhibit.  Thank you.

9  Q.   (BY MR. SPRINGER)  Do you see Government's Exhibit

10  Number 211 on the second page in front of you?

11  A.   I do.

12  Q.   Now, if Art Hawkins told this jury today that he

13  never got a billing statement from Oscar Stilley for any

14  of his charges, Exhibit Number 211 would demonstrate

15  otherwise; wouldn't that be true?

16  A.   No, Mr. Hawkins never received a billing statement

17  from him, I did.

18  Q.   All right.  Did you ever tell Mr. Hawkins that you

19  had received a billing statement from Oscar Stilley?

20  A.   No.

21  Q.   And you testified earlier that it was Mr. Hawkins

22  that told you what checks to give Lindsey Springer or to

23  Oscar Stilley; is that correct?

24  A.   No, Mr. Hawkins never told me to give any checks.

25  The only checks that were written is when Mr. Hawkins was

1  home.

2  Q.  All right.  Now, you testified earlier that he went

3  to prison or got put in custody on the 19th of December,

4  right?

5  A.  Correct.

6  Q.  All right.

7          MR. SPRINGER:  Could you pull up Government's

8  Exhibit Number 21, please.

9  Q.  (BY MR. SPRINGER)  Now, you testified that this

10 check was dated on the 27th of December, 2002, correct?

11 A.  Correct.

12 Q.  And you just said that Mr. Hawkins was in prison at

13 this time, correct?

14 A.  That's correct.

15 Q.  Okay.  Did you write this check to Lindsey Springer

16 or Bondage Breakers Ministries for $5,000?

17 A.  No, Mr. Hawkins wrote that check to you prior to his

18 incarceration.

19 Q.  Okay.  And you would be the only one that would ever

20 know that; isn't that true?

21 A.  Other than you.

22 Q.  I would have known he wrote a check before he went

23 into prison for $5,000?

24 A.  Yes, because he wrote some of them at our home when

25 you were there.

1  Q.   So you're saying that he gave this check to me for

2  $5,000 before he went in?

3  A.   He gave you checks at our house.

4  Q.   Is this one of those checks that you're talking

5  about?

6  A.   I can't answer that.  I didn't write the check.

7  Q.   You testified that one of the main issues that you

8  and I had discussed had to do with that you had never

9  seen the original indictment in Art's case.  Is that

10 true?

11 A.   I think, yes, we had discussed that.

12 Q.   And at some point in time, did that become important

13 to you or to Art?

14 A.   Yes, obviously, it would.

15 Q.   Okay.  And isn't it true that you had spent at least

16 $2 million with whatever law firm Mr. McQueen was with

17 during the trial of this case?

18 A.   I don't exactly remember the amount that it was, but

19 it was substantial.

20 Q.   And did you ever ask Mr. McQueen if he would try to

21 get the Court to give you a copy of the original

22 indictment in the case?

23 A.   I don't remember having conversations with

24 Mr. McQueen.

25 Q.   Do you remember whether Art had conversations about

1   getting the original indictment, if you remember?

2   A.   I don't remember.   I wasn't present during his

3   trial, so I don't know.

4   Q.   Now, at any time during any of the checks that you

5   wrote to Bondage Breakers Ministry, did you ever ask for

6   an itemized billing from Bondage Breakers Ministry?

7   A.   I never did.   I was too concerned about getting Art

8   home.

9   Q.   Okay.   And you're still concerned about getting him

10  home; isn't that true?

11  A.   At this point, I'm used to him being away.

12  Q.   Okay.

13         MR. SPRINGER:   If I could just have a second,

14  Your Honor.

15         THE COURT:   You may.

16  Q.   (BY MR. SPRINGER)   Now, you characterized the money

17  that you identified for Mr. Snoke continually as legal

18  services.

19  A.   Correct.

20  Q.   Did you ever tell me that you were giving that money

21  to me for legal services?

22  A.   No, I didn't have to because that's what you

23  provided.

24  Q.   Okay.   But you never said that, true?

25  A.   Why would I say it?   You gave me services and you

1  asked for money and I gave you the money.

2  Q.  Now, did you -- did you give -- after Art Hawkins

3  was incarcerated, did you give each of these checks to

4  Bondage Breakers Ministries with Art Hawkins' consent?

5  A.  I can't tell you that Art had any consent.  I was

6  home, I was working on his behalf.  And at that point, if

7  Art had said no, I would have written the check anyway

8  because you convinced me that he was coming home.

9  Q.  So as you sit here today, you do not know whether he

10 directed you to give that money to Bondage Breakers

11 Ministries or not?

12 A.  After he left?

13 Q.  Yeah, when he was in prison.  I'm sorry.  When he

14 was in prison.

15 A.  After he left, I wrote checks.  We may have talked

16 about it, I don't recall, but I wrote the checks.

17 Q.  Okay.  Now, if -- excuse me, strike that.  You

18 testified that you did not know whether I was or was not

19 an attorney; is that correct?

20 A.  Not today I didn't.

21 Q.  Have you ever made that statement before?

22 A.  I did.

23 Q.  Did you say it to Mr. Shern?

24 A.  No.

25 Q.  Who did you say it to?

1   A.   I said it to Loretta.

2   Q.   Oh, Mrs. Radford?

3   A.   Yes, and I -- yes.

4   Q.   Okay.  And have you ever had any conversations with

5   Art Hawkins regarding whether or not he was giving

6   donations to Bondage Breakers Ministries?

7   A.   Art never gave donations to Bondage Breakers

8   Ministries.

9   Q.   So if he said that he had, that would be an error?

10  A.   He would never say it, because if he made a

11  donation, it would have been on my income tax, and I can

12  assure you that no money was ever given as a donation.

13  Q.   And when you -- when did you first learn that the

14  government of the United States was investigating me,

15  Lindsey Springer, criminally?

16  A.   I had received a subpoena and I don't remember when

17  that was.  I don't remember.  I think it was 2006 maybe.

18  Q.   Were you at all times with -- when you met with the

19  United States Government in the investigation, criminal

20  investigation of Lindsey Springer, were you at all times

21  represented by counsel?

22  A.   No.  I was -- I only met with them one time.

23  Q.   And did you meet with them in Oklahoma or did you

24  meet with them in Michigan?

25  A.   In Oklahoma.

1  Q.   Okay.  And did anybody ever tell you that you were

2  being criminally investigated with Lindsey Springer?

3  A.   Never.

4  Q.   And did you ever make any statements about that you

5  were being investigated with Lindsey Springer to either

6  Paul Stumpo or Michael Burt?

7  A.   Never.

8  Q.   Did anybody ever ask you why you did not file gift

9  tax returns by the United States -- did the United States

10 Government -- anybody with the United States Government

11 ever ask you why you did not file gift tax returns in

12 respect to the money that Bondage Breakers Ministries

13 received from either you or Chippewa Trails?

14 A.   No, because it was never a gift.

15 Q.   So the answer is, no, they did not ask you?

16 A.   No, they did not, no.

17 Q.   Okay.  You had also testified that you were limited

18 in the kind of discussions you could have with Art on the

19 phone because the phone calls were monitored at the

20 prison; is that a true statement?

21 A.   Phone calls are monitored and were limited on time.

22 Q.   Limited on time.  So would you be careful about what

23 you would say when you were talking to him on the phone?

24 A.   No.

25 Q.   Now, eventually, you did get to see a copy of the

1  indictment, isn't that true, the original indictment?

2  A.   I did.

3  Q.   And that was after his appeal was concluded at the

4  Seventh Circuit; isn't that true?

5  A.   Correct.

6  Q.   Now, during the time prior to sentencing and after

7  sentencing, was there -- what does the phrase "war room"

8  mean to you?

9  A.   After Art left and I returned home, I was left with

10  a multitude of issues.  Our loan was called in our

11  business.  Jenner & Block sued me and tried to attempt to

12  take property to get the balance owed.  And a month

13  later, I was faced with an IRS tax audit.  And so the war

14  room was dubbed that by my friends because I spent 14

15  hours a day trying to work through all of the problems

16  and the issues, so it became known as a war room.

17  Q.   Now, did you -- did you get your IRS tax audit

18  successfully concluded?

19  A.   It was.

20  Q.   How long ago was that?

21  A.   It was in 2003.

22  Q.   Now, is Art, in relationship to numbers, is he

23  peculiar with respect to numbers?  Do numbers mean

24  something to him?

25  A.   I don't know what you mean.

1          MR. SNOKE:  Objection.  Irrelevant, Your Honor.

2          THE COURT:  Probably was.  We'll see if he stays

3   with that subject.

4          MR. SPRINGER:  I got her answer, so that's fine.

5   Q.  (BY MR. SPRINGER)  You testified earlier that you

6   received $28,000 back from Oscar Stilley; is that true?

7   A.  I don't recall what the amount was back then, but I

8   know that once there was money left on an account and I

9   did receive a check.  I want to say it's around 20,

10  21,000, but I don't recall the exact amount.

11  Q.  Now, did you call me and I go tell Oscar Stilley to

12  send you that money back?

13  A.  I don't remember who I talked to.  I don't believe I

14  talked to Oscar Stilley.  I believe I talked to you.

15  Most of my conversations were with you.

16  Q.  About getting the money back that you had given him

17  in the latter part of 2003?

18  A.  I believe so, but I'm not --

19         MR. SPRINGER:  May I have just a moment, Your

20  Honor?

21         THE COURT:  You may.

22  Q.  (BY MR. SPRINGER)  As you sit here today, were you

23  ever -- do you have any evidence that either Oscar

24  Stilley or Lindsey Springer together entered into an

25  agreement to defraud the United States of anything?

1    A.   Do I have any knowledge?

2    Q.   Yes, ma'am.

3    A.   Why would I?  Why would I?  I don't know.

4    Q.   It's just yes or no.

5    A.   No, not today.

6           MR. SPRINGER:  Thank you very much, Your Honor.

7    Pass the witness.

8           THE COURT:  Mr. Stilley.

9                    CROSS-EXAMINATION

10   BY MR. STILLEY:

11   Q.   Ms. Hawkins, you had a contract with Oscar Stilley,

12   correct?

13   A.   My husband had a contract with you, I believe.

14   Q.   Beg your pardon, that is exactly correct.  Did you

15   ever have a chance to look at that?

16   A.   I don't believe I did.

17   Q.   Did you have a chance to look at the statements that

18   were sent concerning services rendered?

19   A.   When you faxed them over to me, I took a look at

20   them.

21   Q.   Did you ever calculate those up?

22   A.   No.

23   Q.   But you did have a realization that any money that

24   was not used up by Oscar Stilley would come back,

25   correct?

1    A.    No.

2    Q.    You didn't realize that?

3    A.    No.

4    Q.    Well, now, there must have been some reason that you

5    asked for the approximately 20-some-thousand dollars

6    back, correct?

7    A.    Yes.

8    Q.    And what was that reason?

9    A.    Because I was really tired of spending money for

10   promises that never occurred.

11   Q.    Well, but you didn't expect to get the money back

12   when it had already been used up, did you?

13   A.    No, I didn't.  When it was used up, I would not

14   expect it to get back.

15   Q.    You just expected the unused portion of the amount

16   in the IOLTA account to be given back?

17   A.    Correct.

18   Q.    Okay.  And as far as you know, that's exactly what

19   you got back, correct?

20   A.    As far as I know.

21   Q.    And it wasn't exactly, for example, 21,000.  It

22   was -- even had a few cents on the end probably, correct?

23   A.    Well, you know what, it could, but it was in 2003,

24   so I don't really recall.

25   Q.    But you didn't get anything back from Lindsey

```
 1   Springer, did you?
 2   A.   No.
 3            MR. STILLEY:  Your Honor, could I have a moment?
 4            THE COURT:  You may.
 5            MR. STILLEY:  Pass the witness.
 6            THE COURT:  Any redirect?
 7            MR. SNOKE:  Just briefly.
 8                     REDIRECT EXAMINATION
 9   BY MR. SNOKE:
10   Q.   Mrs. Hawkins, why did you think Lindsey Springer was
11   an attorney?
12   A.   Why did I think he was?
13   Q.   Yeah.
14   A.   He never told me he wasn't and my husband is facing
15   ten years in a federal prison and Mr. Springer came in
16   and told me that -- he quoted cases and law, that he had
17   sued people, he was successful when he came into
18   courtrooms, everyone got nervous because he was such a
19   whatever -- I thought he was a lawyer.  And I would never
20   have hired someone who wasn't a lawyer in such a serious
21   manner.  It was serious.
22   Q.   And at some point, did you learn that he was not an
23   attorney?
24   A.   I learned he was not an attorney when we were going
25   to Art's appeal at the circuit -- at the circuit court.
```

1    And Mr. Springer had been going over the briefs and the

2    arguments.  And, finally, I said to him, why are you not

3    arguing this case?  Why do you have Mr. Stilley doing

4    this when you're doing all the work?  Why are you not

5    doing it?  And he said, well, Cindy, I'm not a lawyer.

6    And I was totally shocked.

7    Q.   This was in May of --

8    A.   It was in May, yes.

9    Q.   -- 2003 at the circuit?

10   A.   2003, yes.

11           MR. SNOKE:  I don't believe I have any more

12   questions.

13           THE COURT:  Any recross limited to redirect?

14                   RECROSS-EXAMINATION

15   BY MR. SPRINGER:

16   Q.   Do you believe that you're testifying today in a

17   criminal case that -- where I've been accused of

18   misrepresenting myself as an attorney?

19   A.   I'm sorry.  I don't understand that question.

20   Q.   Do you know why you're here today?

21   A.   Yes, I'm testifying.

22   Q.   And do you know what the charges are against Lindsey

23   Springer?

24   A.   I do not.

25           MR. SPRINGER:  No further questions, Your

1  Honor.  And I do reserve this witness.

2          THE COURT:  Counsel and the parties will

3  approach.

4     (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND

5  OUT OF THE HEARING OF THE JURY.)

6          THE COURT:  I'm a little concerned about that.

7  I want to be fair to everybody and humane to everybody,

8  including the witness.  And for that reason, I want to

9  explore whether there's anything further you have to go

10 into with this witness that might be covered this

11 afternoon.

12         MR. SPRINGER:  There are two witnesses coming

13 in, Paul Stumpo and Michael Burt.  Both of them have been

14 identified as knowing the Hawkins, good friends with the

15 Hawkins, and they will testify that the Hawkins knew at

16 all times that I was not an attorney.  They were giving

17 donations.  They were in the war room.  Just a host of

18 things that have been testified falsely.  And my concern

19 is if I bring back Mr. Hawkins or I bring back her after

20 I have them testify so that the jury can see this, that

21 if I let one of them go, it's always going to be the

22 other one that will say, well, the other person did

23 that.  And so I'm just trying to make -- reserve my right

24 and my defense to make certain that the truth comes out.

25         THE COURT:  Well, she went with you on the war

 1  room.
 2          MR. SPRINGER:  But that's as far as I can go on
 3  the war room.  Now, I need to establish what the war room
 4  is from another person's perspective, not hers.  Her
 5  perspective is that she has testified as legal services
 6  the whole time kept running, running, running on it.
 7          THE COURT:  That being the case, why would you
 8  need to conceivably recall her?
 9          MR. SPRINGER:  I'm not certain that I need to,
10  but I don't want to give my right up right now just to
11  make certain of it.  Because once I let that go, Your
12  Honor, I can't bring it back.
13          THE COURT:  She has already gone with you on the
14  war room.  What else would you cover with her on recall?
15          MR. SPRINGER:  Whatever Michael Burt and Paul
16  Stumpo had said that the jury would have heard them say
17  and then I could ask her now Paul Stumpo and Michael Burt
18  just said this jury, would you say that was false, and
19  then go down that list.  I don't favor her as a witness,
20  Your Honor, I'm just trying to preserve my right.  I just
21  don't know yet.
22          THE COURT:  I'm going to tell her she's subject
23  to recall, but I want you to notify the Court in open
24  court at such times as you elect to do that and we'll see
25  where we go from there.

1        MR. SPRINGER:  So I should tell you when I want
2  to recall her just to be -- I'm just trying to be clear.
3        THE COURT:  At such time you decide you need her
4  back I want you to notify the Court in open court so we
5  can address that.
6        MR. SPRINGER:  Clear.
7     (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,
8  WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE
9  PRESENCE AND HEARING OF THE JURY.)
10       THE COURT:  Mrs. Hawkins, you may step down.
11 You remain under subpoena and possibly subject to
12 recall.  I cannot tell you with any --
13       MR. O'REILLY:  Excuse me, Your Honor.
14 Mr. Stilley is still up.
15       THE COURT:  Oh, I'm sorry.  Go ahead.
16                    RECROSS-EXAMINATION
17 BY MR. STILLEY:
18 Q.  Ms. Hawkins, there were pleadings in this case,
19 correct?
20 A.  Yes.
21 Q.  Did you receive copies of those pleadings?
22 A.  Oh, there's pleadings in this case?
23 Q.  No, no, no.  I'm talking about in Art Hawkins'
24 case.  I'm sorry.
25 A.  Probably.  I don't really recall.

CYNTHIA HAWKINS - RECROSS BY MR. STILLEY                    1802

1   Q.   Do you remember receiving any pleadings?

2   A.   I don't remember, no.

3   Q.   So if you don't remember receiving any pleadings,

4   you wouldn't remember seeing who signed their name to

5   that pleading, would you?

6   A.   I don't understand the question.  What are you

7   asking?

8   Q.   Well, I'm trying to see if you would have had

9   occasion to look at a pleading and see that on that

10  pleading the attorney of record was Oscar Stilley only.

11  A.   Yes, you were the only attorney on record.

12  Q.   Okay.  And how soon did you know that?

13  A.   When I went into the courthouse at his sentencing.

14  Q.   Okay.  So that would be in, what, December of 2002?

15  A.   Correct.

16  Q.   That would be almost as soon as Oscar Stilley came

17  into the picture, correct?

18  A.   Oscar Stilley came in in November of 2002, to the

19  best of my recollection.

20  Q.   Okay.  So then within a month, you knew that Oscar

21  Stilley was the only attorney of record in the case,

22  correct?

23  A.   At Mr. Springer's decision, yes.

24         MR. STILLEY:  Pass the witness.

25         THE COURT:  Any redirect?  I guess that -- was

```
1   that recross?

2           MR. SNOKE:  That was recross.

3           THE COURT:  Okay.  I'm sorry.  I lost track.

4   Very well.  Ms. Hawkins, you may step down.  There is a

5   possibility that it will be necessary to recall you.

6           THE WITNESS:  Okay.

7           THE COURT:  You remain under subpoena.  And

8   beyond that, I can't give you any firm guidance, but you

9   must understand that you do remain under subpoena and

10  subject to recall.

11          THE WITNESS:  I understand.

12          THE COURT:  You may step down.

13          THE WITNESS:  Thank you.

14          THE COURT:  Members of the jury, we'll take our

15  mid-afternoon break at this time.  We will resume at 20

16  minutes after three.  So please be available just a

17  little before 20 after for the security officer to return

18  with you to the courtroom.  During this break, of course,

19  please do remember my usual admonition, which I will not

20  repeat at this time.

21      All persons in the courtroom will remain seated

22  while the jury departs.

23      (JURY EXITS THE COURTROOM.)

24          THE COURT:  Is there anything further we ought

25  to address before we take our mid-afternoon break?
```

1    MR. SPRINGER:  Yes, Your Honor.  There is an

2 issue about having an ex parte discussion preparing for

3 defense and also the discussion or at least an identity

4 of time on when to make a presentation to the Court on my

5 defense.

6    THE COURT:  On the particularized showing that

7 we talked about yesterday?

8    MR. SPRINGER:  Yes, sir.  I'm sorry.

9    THE COURT:  Okay.  Well, does the government

10 still plan on concluding today?

11    MR. O'REILLY:  Your Honor, we will have

12 Mr. Shern on I suspect less than 20 minutes.  I do not

13 know how much cross the defense will try to do.  And then

14 we will be calling Mr. Miller.  I suspect that

15 Mr. Miller's direct could well finish today.  I don't

16 know that we would get --

17    THE COURT:  I take it, Mr. Springer, you have

18 elected to make a preliminary showing in support of some

19 aspect of your defense outside the hearing of the jury

20 then?

21    MR. SPRINGER:  I have, Your Honor.

22    THE COURT:  We will likely do that then after we

23 conclude at five o'clock.  Now, without divulging

24 anything along the lines that we discussed with the

25 government's consent ex parte a day or two ago, do you

1 have a further need to have an ex parte conference with

2 the Court?

3          MR. SPRINGER:  Yes.  And it's because of that

4 showing at five o'clock today and at how that's going to

5 be handled.

6          THE COURT:  Well, we'll probably resume the ex

7 parte conference briefly after we recess at five and then

8 we'll proceed with your preliminary showing.

9          MR. SPRINGER:  Excellent, Your Honor.

10          THE COURT:  Very well.  Anything else we ought

11 to take up before we take our mid-afternoon recess?

12          MR. O'REILLY:  Your Honor, very briefly.  We did

13 file an extremely brief response to the defendants'

14 motion.  I just want to make sure if the Court needs

15 additional guidance.  We can provide it with respect to

16 the motion to dismiss and motion for mistrial.

17          THE COURT:  I have carefully reviewed that and I

18 have concluded, first of all, that it's -- that there's

19 not going to be a mistrial.  And having so concluded, I

20 have also concluded that it is not necessary to address

21 the motion pre-verdict.  And for that reason -- and I

22 haven't entered an order requiring the government to

23 respond yet because one of the conceivable results of the

24 case would moot the motion.  So I have not -- I have not

25 entered an order requiring the government to respond.  In

BRIAN SHERN - DIRECT BY MR. O'REILLY                    1806

```
 1   the event that the verdict is such that the motion
 2   remains alive, then I will likely enter an order
 3   requiring the government to respond within a specified
 4   time.
 5       With that, court will be in recess.
 6       (A RECESS WAS HAD, AFTER WHICH THE FOLLOWING
 7   PROCEEDINGS WERE HAD IN OPEN COURT AND WITHIN THE
 8   PRESENCE AND HEARING OF THE JURY.)
 9           THE COURT:  Before we have the next witness, I'm
10   going to give some papers to the clerk to distribute to
11   the parties and counsel, four for that table and two for
12   that table.  Come on up and get those.  We'll be talking
13   about this at five o'clock or thereafter.  Okay.  We'll
14   have the government's next witness.
15           MR. O'REILLY:  Your Honor, the United States
16   calls Special Agent Brian Shern.
17                       BRIAN SHERN,
18   (WITNESS SWORN)
19                   DIRECT EXAMINATION
20   BY MR. O'REILLY:
21   Q.  Could you please state your first and last name and
22   spell both names for the court reporter.
23   A.  Yes.  Brian Shern.  B-R-I-A-N, S-H-E-R-N.
24   Q.  Mr. Shern, what is your level of education?
25   A.  I have a master's degree in accounting.
```

```
 1  Q.   From where?

 2  A.   Oklahoma State University.

 3  Q.   When did you get your master's degree?

 4  A.   2000.

 5  Q.   How are you employed?

 6  A.   I'm a special agent with IRS Criminal Investigation.

 7  Q.   How long have you been a special agent?

 8  A.   A little over five years.

 9  Q.   When did you start?

10  A.   August of 2004.

11  Q.   In August of 2004, were you working here in Tulsa?

12  A.   No.  I went to training in Glynco, Georgia.

13  Q.   When did you start working here in Tulsa, Oklahoma?

14  A.   February of 2005.

15  Q.   What are your current responsibilities as a special

16  agent?

17  A.   As a special agent, I investigate potential criminal

18  violations of the Internal Revenue Code and other

19  financial violations.

20  Q.   Are you the what's called the "case agent" with

21  respect to the case against Mr. Springer and Mr. Stilley?

22  A.   Yes, I am.

23  Q.   When were you initially assigned to this

24  investigation?

25  A.   I believe it was April of 2005.
```

BRIAN SHERN - DIRECT BY MR. O'REILLY                    1808

1  Q.   And when you were assigned, were you the lead case

2  agent?

3  A.   Yes.

4  Q.   Had there been a different case agent before?

5  A.   No.

6  Q.   So that was the initial start-up of the

7  investigation as far as you understood it?

8  A.   Yes, April or May 2005.

9  Q.   Have you been the lead case agent since that date?

10 A.   Yes.

11 Q.   It's a pretty long time?

12 A.   Yes.

13 Q.   It's kind of like the Tom Hanks character in "Catch

14 Me If You Can"?

15 A.   Yes.

16 Q.   In the course of the investigation, have you become

17 familiar with the records obtained in this investigation?

18 A.   Yes, I have.

19 Q.   I'm going to ask you, if you could, to look at

20 what's marked as Government's Exhibit 271.  It should be

21 in the binder in front of you.

22 A.   Okay.

23 Q.   Do you recognize that document?

24 A.   Yes, I do.

25 Q.   How do you recognize that document?

```
 1   A.   It's a document that I -- they're records that I
 2   subpoenaed from Arvest Bank.
 3   Q.   And just generally speaking, what is what's marked
 4   for identification as Government's Exhibit 271?
 5   A.   They're bank records from Mr. Stilley's IOLTA
 6   account.
 7   Q.   From what bank?
 8   A.   Arvest Bank.
 9   Q.   What kind of records are they?  What do they
10   reflect?
11   A.   They reflect the purchase of two $20,000 cashier's
12   checks by Mr. Stilley made payable to Mr. Springer.
13   Q.   On what date?
14   A.   December 13, 2005.
15   Q.   Does Mr. Springer's signature appear anywhere in
16   this document?
17   A.   Yes.
18   Q.   And where does Mr. Springer's signature appear?
19   A.   He endorsed both of the $20,000 checks.
20        MR. O'REILLY:  Your Honor, the government would
21   move Government's Exhibit 271 into evidence at this time.
22        MR. SPRINGER:  No objection, Your Honor.
23        THE COURT:  It will be received.
24   Q.   (BY MR. O'REILLY)  Was there testimony today with
25   respect to these two checks?
```

```
 1   A.   Not today.

 2   Q.   Was it in this trial?

 3   A.   Yes.

 4   Q.   And was that Mr. Walter Bolthouse?

 5   A.   Yes.

 6   Q.   Was that yesterday?

 7   A.   I think it was yesterday.

 8   Q.   What was the purpose of these two checks or what was

 9   the purpose of this $40,000?

10   A.   The testimony yesterday was that Mr. Bolthouse

11   bought a motor home from Mr. Springer off of eBay and

12   paid him $50,000.

13   Q.   And was that in December of 2005?

14   A.   Yes.

15   Q.   Did you, as part of this investigation, participate

16   in a search warrant in Kellyville, Oklahoma?

17   A.   Yes, I did.

18   Q.   What address or whose home did you execute the

19   search warrant at?

20   A.   Mr. Springer's residence.

21   Q.   In what county is Kellyville, Oklahoma?

22   A.   Creek County, Oklahoma.

23   Q.   How is it that you became familiar with that

24   address?

25   A.   When I was assigned the investigation, I didn't know
```

1  for sure where Mr. Springer lived, and one of the revenue

2  officers with the collection division of IRS knew where

3  Mr. Springer's address was, and he actually drove me out

4  there to look at it.

5  Q.   Were you familiar with another address associated

6  with Mr. Springer?

7  A.   Yes.

8  Q.   Is that the 5147 South Harvard address?

9  A.   Yes, it is.

10  Q.   What is 5147 South Harvard?

11  A.   It is a mailbox rental location.

12  Q.   When did you execute the search warrant at

13  Mr. Springer's residence?

14  A.   September 16, 2005.

15  Q.   Could you generally -- let me ask this:  What was

16  your role in that search warrant?

17  A.   I was the affiant of the search warrant affidavit,

18  but during the search warrant, I conducted the interview

19  of Mr. Springer.

20  Q.   Were documents and other items seized as part of

21  that search warrant?

22  A.   Yes.

23  Q.   I'm going to ask you now if you can take a look at

24  the other binder at what has been marked for

25  identification as Government's Exhibit 574.

```
 1   A.   Okay.

 2   Q.   Do you recognize that document?

 3   A.   Yes.

 4   Q.   What is Government's Exhibit 574?

 5   A.   It's a business card for Oscar Stilley.

 6   Q.   Where was that found?

 7   A.   In the search warrant of Springer's residence.

 8          MR. O'REILLY:  Your Honor, the government would

 9   move Government's Exhibit 574 into evidence.

10          MR. SPRINGER:  No objection, Your Honor.

11          THE COURT:  It is received.

12   Q.   (BY MR. O'REILLY)  As part of the search of

13   Mr. Springer's home, was any cash found?

14   A.   Yes.

15   Q.   How much cash was found at Mr. Springer's home?

16   A.   $17,000.

17   Q.   Where was the cash found?

18   A.   In Mr. and Mrs. Springer's bedroom in the top

19   dresser drawer.

20   Q.   Were you present in the room when that cash was

21   found?

22   A.   No, I was not.

23   Q.   What were you doing at that time?

24   A.   We were conducting an interview of Mr. Springer.

25   Myself and another special agent were conducting an
```

1   interview of Mr. Springer in one of the upstairs rooms.

2   Q.   Were you present in the room when the cash was

3   counted at the home?

4   A.   No, I wasn't.

5   Q.   Was that handled by some different special agents?

6   A.   Yes.

7   Q.   Are you aware if there was any dispute with respect

8   to how much cash was seized?

9   A.   Yes, there was.

10  Q.   Could you generally describe to the jury what is the

11  nature of the dispute?

12  A.   Yes.  When we seized the cash, we reflected on the

13  inventory that there was approximately $19,000 seized.

14  And when we took the cash to the bank to be counted,

15  there was only $17,000.  We, as in the multiple special

16  agents that were present during the search, and

17  Mr. Springer disputed the amount of the cash seized.

18  Q.   Was the 17,000 returned to Mr. Springer?

19  A.   Yes.

20  Q.   How long after the search was that money returned?

21  A.   About four months.

22  Q.   Is there a lawsuit pending with respect to this?

23  A.   Yes.

24  Q.   Without going into the details, who initiated the

25  lawsuit?

BRIAN SHERN - DIRECT BY MR. O'REILLY                    1814

```
 1   A.   Mr. Springer.

 2   Q.   Are you a defendant in that lawsuit?

 3   A.   Yes.

 4   Q.   Are there other defendants?

 5   A.   Yes.

 6   Q.   In the course of that search, did you find any books

 7   or compilation of some type of records indicating

 8   payments received by Mr. Springer?

 9   A.   No.

10   Q.   I believe you indicated that you interviewed

11   Mr. Springer on that date.

12   A.   Yes, I did.

13   Q.   Did you ask Mr. Springer whether Bondage Breakers

14   Ministry was a 501(c)(3) corporation?

15   A.   Yes, I did.

16   Q.   How did he respond?

17   A.   He said it was not a 501(c)(3) business.

18   Q.   And this is on September 16th of 2005?

19   A.   Yes.

20   Q.   In the course of your interview of Mr. Springer, did

21   you ask him about monies that he would receive?

22   A.   Yes, I did.

23   Q.   What did -- how did Mr. Springer characterize the

24   monies he received?

25   A.   He said all the monies he received from 2000 forward
```

BRIAN SHERN - DIRECT BY MR. O'REILLY                        1815

```
 1  were gifts or donations.
 2  Q.   Did Mr. Springer represent whether he had any
 3  income?
 4  A.   Yes, he did.
 5  Q.   What did he say?
 6  A.   He said he did not have any income.
 7  Q.   Did Mr. Springer indicate whether he provided any
 8  services to people in exchange for payment?
 9  A.   Yes.
10  Q.   What did he say?
11  A.   He said he never provided any services for people in
12  exchange for payment.
13  Q.   Were these statements by Mr. Springer misleading?
14  A.   I believe they were.
15  Q.   In what way?
16  A.   The evidence in my investigation indicates that
17  those statements were untrue.
18  Q.   If you had taken Mr. Springer at his word, would
19  there have been any reason to continue the criminal
20  investigation?
21  A.   No.
22  Q.   Let me ask you if you in January of 2006 -- and this
23  was in 2005, correct, the search warrant?
24  A.   Yes.
25  Q.   In January of 2006, did you have a reason to meet
```

```
1   with Mr. Stilley?

2   A.   Yes.

3   Q.   I want to stop here.  First of all, do you see

4   Mr. Springer in the courtroom today?

5   A.   Yes, I do.

6   Q.   And is he the gentleman standing behind me now?

7   A.   Yes.

8   Q.   And do you see Mr. Stilley in the courtroom today?

9   A.   Yes.

10  Q.   And is he the one that just stood up?

11  A.   Yes.

12       MR. O'REILLY:  May the record reflect that

13  Special Agent Shern has identified each defendant?

14       THE COURT:  The record will so reflect.

15  Q.   (BY MR. O'REILLY)  Did you have occasion to meet

16  with Mr. Stilley in January?

17  A.   Yes.

18  Q.   What was the reason for that meeting?

19  A.   We went to his residence to serve him with a grand

20  jury subpoena.

21  Q.   Where was that residence?

22  A.   In Fort Smith, Arkansas.

23  Q.   Did you meet with Mr. Stilley?

24  A.   Yes.

25  Q.   And what date was that?
```

BRIAN SHERN - DIRECT BY MR. O'REILLY                    1817

```
 1   A.   January 20, 2006.

 2   Q.   Did you interview Mr. Stilley on that date?

 3   A.   Yes.

 4   Q.   Did Mr. Stilley make any representations about the

 5   money Mr. Springer received?

 6   A.   Yes.

 7   Q.   What did Mr. Stilley say about that money?

 8   A.   He said that Mr. Springer receives money from people

 9   for his ministry and that he expects no services -- or he

10   expects no payment in return for his services.

11   Q.   Did Mr. Stilley make any representation about

12   whether the people giving Mr. Springer money expected any

13   services in return for the payment?

14   A.   Yes.  He said they did not expect any services in

15   return for payment.

16   Q.   Was this statement misleading?

17   A.   Yes, it was.

18   Q.   In what way?

19   A.   Again, the evidence in my investigation indicates

20   that that statement was untrue as well.

21   Q.   If you had taken Mr. Stilley at his word, would

22   there have been any reason for you to continue the

23   criminal investigation of Mr. Springer?

24   A.   No.

25   Q.   With respect to the statements made to you by
```

BRIAN SHERN - DIRECT BY MR. O'REILLY                    1818

1   Mr. Springer during the search warrant execution on

2   September 16th of 2005 and Mr. Stilley when you served

3   him with a subpoena on January 20th of 2006, were they

4   similar or dissimilar?

5   A.    They were similar.

6   Q.    How were they similar?

7   A.    They both said generally the same thing.

8   Q.    And what was it that they both said generally?

9   A.    That Mr. Springer only receives gifts and donations

10  and that the people that he receives this money from

11  expect no services in return.

12  Q.    Were these similar statements consistent or

13  inconsistent with the evidence you had been uncovering in

14  your investigation?

15  A.    Inconsistent.

16  Q.    In response to the grand jury subpoena, did

17  Mr. Stilley appear before a grand jury?

18  A.    Yes.

19  Q.    And was that on March 9th of 2006?

20  A.    Yes.

21  Q.    On that date, did Mr. Stilley provide the grand jury

22  with a document entitled Response to Subpoena?

23  A.    Yes, he did.

24  Q.    I'm going to ask you -- and Government's Exhibit 582

25  is already in evidence, if we could publish that -- is

BRIAN SHERN - DIRECT BY MR. O'REILLY                    1819

1   Government's 582 the document that Mr. Stilley provided

2   to the grand jury on that date?

3   A.   Yes.

4   Q.   What does Government's Exhibit 582 purport to be?

5   A.   It is Mr. Stilley's response to the documents

6   requested in the grand jury subpoena he was issued.

7   Q.   Do you recall how many copies of Government's

8   Exhibit 582 Mr. Stilley provided to the grand jury?

9   A.   It was enough for all the grand jurors, like a whole

10  box full.

11  Q.   So that would be 20 or more?

12  A.   Yes.

13  Q.   Is Government's Exhibit 582, the Response to

14  Subpoena provided to the grand jury by Mr. Stilley,

15  misleading?

16  A.   Yes, it is.

17  Q.   In what way is Government's Exhibit 582 misleading?

18  A.   In a few different ways.

19  Q.   Okay.  Let me ask this:  Does it indicate whether or

20  not Mr. Springer charges for his services?

21  A.   Yes.  It says, "Lindsey Springer does not charge for

22  his services."

23  Q.   Is that on the first page?

24  A.   Yes.

25  Q.   As part of the compliance with the grand jury

BRIAN SHERN - DIRECT BY MR. O'REILLY                    1820

1  subpoena, was Mr. Stilley supposed to provide records

2  reflecting whether Mr. Springer appeared in his billing

3  records?

4  A.    Yes, he was.

5  Q.    Did he purport to do that?

6  A.    He did purport to do that.

7  Q.    And is that what is included in the response to

8  subpoena on page -- page 7 of that document?

9  A.    Yes.

10  Q.    Does what Mr. Stilley provided on March 9, 2006,

11  provide a complete listing of Mr. Springer's appearance

12  in the records -- the billing records that he issued to

13  clients?

14  A.    No, it is not a complete list.

15  Q.    In fact, with respect to evidence that has been

16  introduced in this trial, aren't there a lot more records

17  reflecting Mr. Springer's name in the billing records of

18  Mr. Patterson?

19  A.    Yes.

20  Q.    Are those found in Government's Exhibits 179, 181,

21  182, and 183 through 189?

22  A.    Yes.

23  Q.    Similarly, does Mr. Stilley's response to subpoena,

24  Government's Exhibit 582, purport to show all references

25  to Mr. Springer in the billing records for Mr. Lake?

1    A.    Yes.

2    Q.    Does a comparison of what Mr. Stilley provided with

3    Government's Exhibit 162, which is Mr. Lake's billing

4    records that have been introduced in this trial, show

5    something different?

6    A.    Yes.  There are much fewer references to Lindsey

7    Springer in what he provided -- pursuant to the subpoena

8    than there was in what we received from Mr. Lake.

9    Q.    Similarly, with respect to Mr. Hawkins, is that a

10   similar story?

11   A.    Yes.

12   Q.    And is that the billing records for Mr. Hawkins are

13   what's in evidence as Government's Exhibit 210 and 211?

14   A.    Yes.

15   Q.    And are there a lot more references to Mr. Springer

16   there than in what Mr. Stilley provided to the grand

17   jury?

18   A.    Yes.

19   Q.    Is there anything else that was omitted with respect

20   to payments or anything for -- in what Mr. Stilley

21   provided to the grand jury?

22   A.    Yes.  The quarter of a million dollars that

23   Mr. Turner paid to Mr. Springer was omitted by

24   Mr. Stilley.

25   Q.    With respect to that $250,000, did you have a

1  discussion with Mr. Springer at his interview the day

2  that the search warrant was executed?

3  A.   Yes.

4  Q.   And that discussed the $250,000 that Mr. Springer

5  had received from Mr. Turner?

6  A.   Yes.

7  Q.   Could you tell the jury what did Mr. Springer say

8  with respect to when he would repay that loan?

9  A.   He said that the loan was for a term of one year and

10 that he was going to pay the money back to Turner by

11 selling his old motor home that he owned.

12 Q.   As of today, has Mr. Springer made any of the

13 principal payments on that loan?

14 A.   Based on the testimony I've heard in this trial, he

15 has not.

16 Q.   When did Mr. Springer sell the motor home he spoke

17 to you about?

18 A.   In December of 2005.

19 Q.   And is that what's memorialized in Government's

20 Exhibit 271?

21 A.   Yes.

22 Q.   Did Mr. Springer use any of that money to repay

23 Mr. Turner?

24 A.   No.

25         MR. O'REILLY:  May I have a moment, Your Honor?

```
 1              THE COURT:  You may.
 2   Q.  (BY MR. O'REILLY)  Just for clarification, the
 3   so-called loan was the payment from Mr. Turner to
 4   Mr. Springer through Mr. Stilley's IOLTA account?
 5   A.  Yes.
 6              MR. O'REILLY:  Nothing further, Your Honor.
 7              THE COURT:  Cross-examination.
 8              MR. SPRINGER:  Your Honor, may we approach for
 9   just a moment?
10              THE COURT:  You may.
11      (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND
12   OUT OF THE HEARING OF THE JURY.)
13              MR. SPRINGER:  Mr. Shern, I believe, opened the
14   door about cross-examining him on the lawsuit about the
15   money in my house, and I'm going to try to vigorously go
16   after that, but I needed to know from you -- I didn't
17   want to get shut down in front of the jury -- how far I
18   can go with that.  I mean, he did say he didn't steal the
19   money, he knew it was counted, 17,000, I sued him.  So,
20   you know, I realize that it's a sticky subject, but I
21   just wanted to make sure I was a green light on that.
22              THE COURT:  Well, you're asking me to give you
23   an advisory ruling and obviously it was addressed in
24   direct and for that reason it's fair game on cross.  At
25   some point, a rule of reason comes into play and it's
```

1   unfortunate for all concerned that I'm the sole judge of

2   reasonability, and we'll just have to take it one

3   question at a time.

4            MR. SPRINGER:  Thank you, Your Honor.

5       (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

6   WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

7   PRESENCE AND HEARING OF THE JURY.)

8                       CROSS-EXAMINATION

9   BY MR. SPRINGER:

10  Q.   Mr. Shern, you testified that at the time that

11  currency was found in my house that you were upstairs

12  with me and another agent; is that correct?

13  A.   Yes.

14  Q.   And we were up there about three hours; isn't that

15  right?

16  A.   Yes.

17  Q.   And was I at all times willing to answer your

18  questions?

19  A.   Yes.

20  Q.   Okay.  And other than the characterization of the

21  money that people gave me, whether it be a gift, a

22  donation, or for services rendered, is there anything

23  else that you found that I had told you that was

24  misleading?

25  A.   I'd have to review my memo, but I think that's the

BRIAN SHERN - CROSS BY MR. SPRINGER                          1825

1    primary --

2    Q.   Okay.

3    A.   -- thing.

4    Q.   And you were not in the discovery of the currency;

5    isn't that true?

6    A.   No.

7    Q.   Okay.  And --

8              THE COURT:  That's an ambiguous question and

9    answer.  You had a positive and a negative and you got a

10   negative answer.  Ask it again.

11             MR. SPRINGER:  Okay.

12   Q.   (BY MR. SPRINGER)  You are not the agent who

13   discovered the currency during the search warrant; is

14   that correct?

15   A.   Yes, that's correct.

16   Q.   And do you know who did?

17   A.   I believe it was your wife showed a couple of agents

18   where the currency was.

19   Q.   Was that Agent Shoemake and Anderson?

20   A.   No, I think it was Agent Taylor and Anderson.

21   Q.   Agent Taylor and Anderson.  Now, from the very

22   beginning, I wanted that money back after you took it;

23   isn't that true?

24   A.   You inquired of me as why we seized the money.

25   Q.   Was I calling you the very first day asking for that

 1  money back?

 2  A.   Yes, the money and some car titles.

 3  Q.   And now when did you discover that the,

 4  quote/unquote, approximately $19,000 became, in fact,

 5  $17,000?

 6  A.   That day.

 7  Q.   At the bank?

 8  A.   Yes.

 9  Q.   When they counted it?

10  A.   Yes.

11  Q.   Okay.  Now, you actually had never counted the

12  currency, had you?

13  A.   No.

14  Q.   So your answer as to the $17,000 that you gave to

15  Mr. O'Reilly was based upon somebody else's statements;

16  isn't that true?

17  A.   It was based on the count that the bank -- because I

18  was present when we brought the money to the bank and

19  that's the count that they came up with.  That's what

20  that answer was based on.

21  Q.   Okay.  So it's not -- your testimony is not the

22  amount of money that was taken from my home was $17,000,

23  your testimony is more accurately described as when the

24  money got to the bank it was $17,000; isn't that true?

25           MR. O'REILLY:  Objection to the form of the

BRIAN SHERN - CROSS BY MR. SPRINGER                                    1827

```
 1   question, Your Honor.
 2            THE COURT:  Overruled.
 3            THE WITNESS:  My belief is that at all times it
 4   was $17,000.
 5   Q.  (BY MR. SPRINGER)  So now you testified -- strike
 6   that.  So when I called you and asked you after the money
 7   was taken, which I believe you testified that the money
 8   was taken on September 16, 2005; is that correct?
 9   A.  Yes.
10   Q.  And then you brought it -- you brought the check for
11   17,000 to me on January 10, 2006, roughly; is that
12   correct?
13   A.  Yes.
14   Q.  And you also walked into the house where you
15   delivered the check and you had a waiver in your hand,
16   didn't you?
17   A.  Yes.
18   Q.  And you wanted me to waive my right to sue the
19   United States over the return of that $17,000; isn't that
20   true?
21   A.  I can't remember exactly what the waiver said.
22   Q.  Do you know who put the waiver in your hand?
23   A.  I think our asset forfeiture person told me that I
24   needed to take that and a receipt or something else to
25   your house when I gave you the check for $17,000.
```

1  Q.   Now, you agree that I was trying to get that money

2  back from September 16, 2005, until the day you brought

3  the check for 17,000, right?

4          THE COURT:  Just a minute.

5          MR. O'REILLY:  Objection.  Asked and answered

6  and relevance.

7          THE COURT:  Overruled at this point.  Go ahead.

8          THE WITNESS:  Yes.

9  Q.   (BY MR. SPRINGER)  And you and I either exchanged

10 messages or phone calls on several occasions?

11 A.   Yes.

12 Q.   Did you ever tell me that when you got to the bank

13 there was only $17,000?

14 A.   No.

15 Q.   Can you tell me why not?

16 A.   I think you had just mentioned that you wanted the

17 cash back and I told you that you needed to talk to the

18 Assistant U.S. Attorney about -- about that.

19 Q.   Would I have known that you only had $17,000 when

20 you got to the bank?

21 A.   I don't know if you knew how much money there was

22 there.

23 Q.   And I was with you upstairs, wasn't I?

24 A.   Yes.

25 Q.   So I'm in the same position you are as far as who

BRIAN SHERN - CROSS BY MR. SPRINGER                    1829

1   counted the money and how much was there; isn't that

2   true?

3   A.   Correct.

4   Q.   And you don't deny that the receipt that was given

5   to me at the end of the day says approximately $19,000 on

6   it, do you?

7   A.   No.

8   Q.   Now, are you familiar with the pleadings in the

9   case?

10  A.   The pleadings in what case?

11  Q.   Are you familiar that you've been sued by Lindsey

12  Springer?

13  A.   Oh, yes.

14  Q.   And are you familiar with who your lawyers are?

15  A.   Yes.

16  Q.   Robert D. Metcalf?

17  A.   Yes.

18  Q.   James Strong?

19  A.   Yes.

20  Q.   Okay.  Now, are you familiar with the arguments

21  they've made on your behalf in federal court?

22          THE COURT:  Mr. Springer, you've adequately

23  covered that.  Unless I'm missing something, if you want

24  to come to the bench and tell me what I'm missing, that's

25  fine.  Otherwise, it's time to move on.

BRIAN SHERN - CROSS BY MR. SPRINGER                    1830

```
1           MR. SPRINGER:  I'd like to come to the bench,
2   Your Honor.
3      (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND
4   OUT OF THE HEARING OF THE JURY.)
5           MR. SPRINGER:  Exhibit 68, which I've given to
6   the Court and the government, is a pleading just filed in
7   the Tenth Circuit Court of Appeals that said they admit
8   that the money was stolen, but they didn't steal it until
9   after they left my house.  And the only two people that
10  took the money to the bank was Mr. Shern and the driver
11  of the car.  And it's on that basis that I am going.
12          THE COURT:  Whatever this document is it says,
13  "Taking that allegation as true."
14          MR. SPRINGER:  Right.
15          THE COURT:  We're not going there.
16          MR. SPRINGER:  Okay.
17     (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,
18  WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE
19  PRESENCE AND HEARING OF THE JURY.)
20  Q.  (BY MR. SPRINGER)  Mr. Shern, you are the only
21  person who testified before the grand jury on March 9,
22  2009; is that true?
23  A.  I think so.
24  Q.  And you were the summary witness then for the
25  indictment; isn't that true?
```

BRIAN SHERN - CROSS BY MR. SPRINGER                    1831

1           MR. O'REILLY:  Your Honor, beyond the scope of

2   direct.

3           THE COURT:  Overruled.

4           THE WITNESS:  Yes.

5   Q.  (BY MR. SPRINGER)  Okay.  And you testified -- or

6   the grand jury alleges several overt acts that you claim

7   are in furtherance of a conspiracy to defraud the United

8   States; is that true?

9           MR. O'REILLY:  Objection, Your Honor.  The grand

10  jury charged it, not Mr. --

11          THE COURT:  Just put it in terms of what is in

12  the indictment.

13          MR. SPRINGER:  Right.

14  Q.  (BY MR. SPRINGER)  Does the indictment contain overt

15  acts that you were responsible for -- excuse me, strike

16  that.  Does the indictment contain overt acts, alleged?

17  A.  Yes, it does.

18  Q.  And are those overt acts alleged in furtherance of a

19  conspiracy to defraud the United States allegedly by

20  Oscar Stilley and myself?

21  A.  Yes.

22  Q.  All right.  Now, did you tell the grand jury --

23  excuse me.  I'm sorry.  Does the indictment allege that

24  Oscar Stilley caused to be deposited a check for $112,500

25  into his IOLTA account?

```
1   A.   Yes.
2   Q.   Could you explain why you believe that that claim is
3   an act in furtherance of a conspiracy to defraud the
4   United States?
5           THE COURT:  Hold on just a minute.
6           MR. O'REILLY:  Objection, Your Honor.  I'm
7   tempted to let him answer.  It's well beyond the scope of
8   direct.
9           THE COURT:  Well, Mr. O'Reilly, surely we're
10  going to cover this either now or later.
11          MR. O'REILLY:  Very well, Your Honor.
12          THE COURT:  Okay.  Overruled.
13          THE WITNESS:  Mr. Stilley had that $112,500
14  check from Mr. Patterson deposited into his account and
15  then directed the funds from that check to you -- some of
16  the funds.  And I think that was an intent to hide
17  your -- or conceal money that was going to you.
18  Q.   (BY MR. SPRINGER)  So the mere act of a check for
19  $112,500 going from Mr. Patterson to Mr. Stilley's IOLTA
20  account is an act to conceal money that was given after
21  that fact to Lindsey Springer?
22  A.   I think if Mr. Patterson wanted to pay you for
23  services, he would have just given you money rather than
24  make the check go through Stilley's account.
25  Q.   Okay.  Now, didn't Mr. Patterson testify that he
```

1  just endorsed a check that had made payable to him over

2  to Mr. Stilley's IOLTA account?

3  A.   Yes.

4  Q.   Okay.  So in order for Mr. Patterson to write me a

5  check out of $112,500, wouldn't he need to deposit that

6  into his checking account?

7  A.   Yes.

8  Q.   Okay.  Did you ever hear him testify that he was

9  thinking about doing that and decided because of me that

10 he would deposit it in Oscar Stilley's account so I could

11 get some money?

12       MR. O'REILLY:  Objection, Your Honor, beyond the

13 scope of direct.  Mr. Patterson has testified.

14       THE COURT:  Overruled.

15       THE WITNESS:  I don't think he testified exactly

16 to that end.

17 Q.   (BY MR. SPRINGER)  Thank you.  Now, the grand jury

18 also alleges that on or about June 30, 2003, Defendant

19 Stilley caused to be written a check for $14,359 from his

20 IOLTA account to Defendant Springer.  Do you remember

21 those words?

22 A.   Yes.

23 Q.   Now, he just wrote a check, right?

24 A.   Yes.

25 Q.   How is Mr. Stilley writing me a check for $14,359 to

1   Lindsey Springer an overt act in furtherance of a

2   conspiracy to defraud the United States?

3   A.   Again, that was money from Mr. Patterson that went

4   through Mr. Stilley's IOLTA account before it went to

5   you.

6   Q.   Do you remember Mr. Patterson testifying that he

7   directed Mr. Stilley to give me that money?

8   A.   Yes.

9   Q.   The grand jury also alleges as an overt act that

10  Defendant Stilley caused to be written a check for

11  $35,000 from his IOLTA account to Defendant Springer.  Do

12  you remember that?

13  A.   Yes.

14  Q.   And that ended up being a check that was -- resulted

15  in a check for $30,000 made out to Tulsa Sales and

16  Rental.  Do you remember that?

17  A.   I'm not sure how the $30,000 got back to Patterson,

18  but I know there has been testimony to say that, yes.

19  Q.   So now this check for -- that Stilley wrote to

20  Lindsey Springer for $35,000, how is that an act in

21  furtherance of a conspiracy to defraud the United States

22  government?

23           MR. O'REILLY:  Object.  May we approach?

24           THE COURT:  You may.

25        (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND

BRIAN SHERN - CROSS BY MR. SPRINGER                    1835

```
1   OUT OF THE HEARING OF THE JURY.)

2        THE COURT:  Before we have any comments from

3   Mr. Springer or the parties let me give you one ground

4   rule because this may have a bearing on what the parties

5   have to say and that is this:  I've obviously given you

6   some leeway to get outside the scope of direct and cover

7   some matters that are charged in the indictment.  We're

8   only going to do this once.  To the extent that we do it

9   today with Agent Shern you're not going to do it next

10  week with Agent Shern and you need to have that very

11  clear understanding, that still -- that still doesn't

12  necessarily mean that we're just going spend the rest of

13  the day going across the entire width and breadth of this

14  indictment.  So that's a beginning point.

15      With that, I'll hear what Mr. O'Reilly has to say.

16        MR. O'REILLY:  Your Honor, Mr. Miller will be

17  testifying as a summary witness and going into this type

18  of asking how it's in furtherance really that is where it

19  would be more appropriate.  Mr. Shern in no way testified

20  anywhere to these types of materials.

21        THE COURT:  Okay.  I mean, every time the

22  question is asked, basically, Mr. Shern gets to give part

23  of your closing argument under oath.

24        MR. O'REILLY:  I understand that, Your Honor,

25  and it's tempting to just sit on my hands, but I'm sorry.
```

```
 1              THE COURT:  Okay.  How much more?

 2              MR. SPRINGER:  I'd like to just recall him.

 3              THE COURT:  Okay.

 4              MR. SPRINGER:  I'll finish my -- on what he

 5    testified about, then I'll call him in my case in chief.

 6              THE COURT:  Very well.

 7         (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

 8    WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

 9    PRESENCE AND HEARING OF THE JURY.)

10              MR. SPRINGER:  Your Honor, may I have one

11    moment?

12              THE COURT:  You may.

13              MR. SPRINGER:  Just one more moment, Your Honor,

14    I'm processing.

15    Q.  (BY MR. SPRINGER)  Mr. Shern, you testified that

16    Mr. Bolthouse sent money to Oscar Stilley's IOLTA account

17    in payment for a bus that he purchased from me off of

18    eBay.  Do you remember that?

19    A.  Yes.

20    Q.  And isn't it true that Mr. Bolthouse actually had

21    not paid for the bus at the time he sent the money to

22    Mr. Stilley's IOLTA account?

23    A.  I believe he testified to that, yes.

24    Q.  Was that different than what you knew at the time

25    you testified -- or that the grand jury indictment was
```

BRIAN SHERN - CROSS BY MR. SPRINGER                              1837

1   brought?

2   A.   Yes, I think it was.

3   Q.   So your position on whether or not Mr. Bolthouse's

4   wire to Mr. Stilley is an overt act in furtherance of the

5   conspiracy charge, you withdraw that position at this

6   point?

7           MR. O'REILLY:  Your Honor, objection.  It's the

8   grand jury that indicted Mr. Springer and Mr. Stilley,

9   not Special Agent Shern.

10          THE COURT:  Sustained.

11  Q.   (BY MR. SPRINGER)  You stated that the home that you

12  searched is in Creek County.  Do you remember that?

13  A.   Yes.

14  Q.   Now, it's also called the County of Creek in the

15  county recorder's office, isn't it?

16  A.   I don't know.

17  Q.   Have you ever looked at the deed on the property

18  that you searched before you searched it?

19  A.   Yes.

20  Q.   Just didn't see that part?

21  A.   I don't remember if it said County of Creek or Creek

22  County.

23  Q.   Okay.  Did you ever find that I used any other

24  address for receiving mail other than 5147 South Harvard,

25  Number 116, Tulsa, Oklahoma 74135?

1   A.   I think you had told me that you had received some

2   utility bills at your residence address in Kellyville.

3   Q.   I had received -- did I say that the bill had the

4   address on it?

5   A.   Yes.

6   Q.   Okay.  You didn't see a mailbox when you searched

7   the house, did you?  If you remember.

8   A.   I know there was a mailbox at the edge of the road

9   leading up to your house.  I don't know if it was your

10  mail -- I think it was your mailbox, maybe not.

11  Q.   Do you know whether it was my neighbor's mailbox?

12  A.   No, I don't.

13  Q.   Now, you testified we had a discussion about me not

14  being a 501(c)(3) corporation.  Do you remember that?

15  A.   Yes.

16  Q.   Do you also remember any other conversations that

17  you were a part of with me on the same subject matter of

18  501(c)(3) corporation?

19  A.   We may have got into that on your meeting, the one

20  where you came to the U.S. Attorney's Office.

21  Q.   Is that January 15, 2009?

22  A.   Yes.

23  Q.   And do you remember me being asked about why I don't

24  just become a 501(c)(3) corporation?

25          MR. O'REILLY:  Objection.  It's beyond the scope

```
 1   of direct.  We didn't cover the January meeting.
 2           THE COURT:  Sustained.
 3   Q.   (BY MR. SPRINGER)  When you asked the question about
 4   whether I was a 501(c)(3) corporation, did you already --
 5   whether I operated through a 501(c)(3) corporation, did
 6   you already know I was not operating through a 501(c)(3)
 7   corporation?
 8   A.   Yes.
 9   Q.   What was the purpose of the question?
10   A.   We ask a lot of questions we already know the
11   answers to.
12   Q.   Okay.  501(c)(3), is that Code Section 501,
13   subsection C, subsection 3, of the Internal Revenue Code,
14   if you know?
15   A.   I don't know.
16   Q.   You testified that the records that Oscar Stilley
17   turned over to the grand jury appeared to be different
18   than the records that Oscar Stilley had turned over to
19   his clients with regard to your subpoena; is that true?
20   A.   I don't think that they were different, but they
21   excluded a bunch of stuff.
22   Q.   And what was the exclusion?  What did they exclude?
23   A.   It excluded all the references to your name in his
24   billing statements.
25   Q.   All the references?
```

BRIAN SHERN - CROSS BY MR. SPRINGER                    1840

1  A.   Not all, most.  Well, I don't know -- I can't say

2  that it was most, but a lot.

3  Q.   Some?

4  A.   A lot.

5  Q.   A lot?  Okay.  And -- now, you testified that you

6  were the first person to begin in this -- in the criminal

7  investigation of Lindsey Springer.  Do you remember that

8  testimony?

9  A.   Yes.

10  Q.   And do you remember that you were -- excuse me, when

11  did you become working with Doug Horn and Melody Nelson?

12  A.   Actually, I want to re-clarify that.  I said I was

13  the first person to investigate you criminally for this

14  investigation that we're currently assigned to.

15  Q.   Now, you are aware that there was a -- that Oscar

16  Stilley and Lindsey Springer were the target of a grand

17  jury at least as early as October 6th of 2004; isn't that

18  true?

19  A.   Yes, I now am aware of that.

20  Q.   Did you become aware of that on October 28, 2009,

21  during this trial?

22  A.   No.

23  Q.   When did you become aware of that?

24  A.   Sometime -- I couldn't pinpoint the exact date, but

25  it was sometime after we already opened the IRS

1    investigation of Mr. Stilley, and I was working with one

2    of the tax division attorneys, I don't remember which

3    one, but sometime well into the investigation.

4    Q.   So, basically, you learned after 2007 but before the

5    indictment was issued?

6    A.   I would say that's accurate.

7    Q.   Okay.  And how was the redaction of the name Lindsey

8    Springer on some of the entries that you compared between

9    let's say Mr. Stilley and Mr. Patterson, how is that

10   relevant to your investigation?

11   A.   Can you ask that again?

12   Q.   What significance did you place on the comparison

13   between the billing records that you testified that

14   Mr. Stilley gave his clients and the billing records that

15   you turned over to the grand jury in March of 2006?

16   A.   I think Mr. Stilley was trying to hide how extensive

17   his relationship with you was.

18   Q.   Okay.  Now, did you notice in any of his billing

19   records that were turned over to the clients where the

20   client was charged an amount of money for something that

21   Mr. Stilley and I did?  Did you ever see anything like

22   that?  Like hour 25, Lindsey Springer, pay to Lindsey

23   Springer?

24   A.   Some of the Patterson billing statements there was

25   amounts of money that were paid to you and it didn't

BRIAN SHERN - CROSS BY MR. SPRINGER                    1842

1  really explain why those amounts were paid to you.  It

2  just said "Lindsey Springer" and then it had an amount

3  next to it.

4  Q.  So if Mr. Patterson called up Mr. Stilley and said

5  send Lindsey Springer $30,000 and then Oscar Stilley did

6  what his client asked him to do, wouldn't that type of

7  entry be consistent in Mr. Stilley's records with what

8  the client asked him to do?

9  A.  If the client asked him to do that, yes.

10 Q.  Have you heard any testimony in this trial or are

11 you aware of any evidence otherwise?

12 A.  What's the question again?

13 Q.  I'll try it again.  Has anybody testified or do you

14 know of any evidence where they told Mr. Stilley to do or

15 not to do something and he did or didn't do the opposite

16 of what he was asked?

17        MR. O'REILLY:  Objection to the form of the

18 question.

19        THE COURT:  I don't understand the question.

20 You're going to have to rephrase it.

21        MR. SPRINGER:  I'm sorry.

22 Q.  (BY MR. SPRINGER)  Do you have any evidence that

23 Mr. Stilley ever failed to do what his clients asked him

24 to do with regard to billing?

25 A.  Not with regard to billing.

BRIAN SHERN - CROSS BY MR. SPRINGER                    1843

1   Q.   Thank you.  You testified that I told you on

2   September 16, 2005, that when I sold the 55 Scenic

3   Cruiser that I planned on using that money to pay off the

4   loan that I had made to Mr. Turner.  Do you remember that

5   testimony?

6          MR. O'REILLY:  Objection.  It was the loan from

7   Mr. Turner, not to Mr. Turner.

8          MR. SPRINGER:  I'm sorry.

9   Q.   (BY MR. SPRINGER)  Payment to Mr. Turner, loan from

10  Mr. Turner.

11  A.   Yes, I remember.

12  Q.   Okay.  Now, do you have any evidence that prior to

13  September 16, 2005, that I would have been aware that I

14  was under criminal investigation by you or anyone else in

15  the United States of America?

16  A.   I don't think so.

17  Q.   So anything I would have said to you that day would

18  have been based upon a plan that I had prior to that day;

19  isn't that true?

20          MR. O'REILLY:  Objection.  Calls for

21  speculation.

22          THE COURT:  Answer if you know.

23          THE WITNESS:  I don't know.

24          MR. SPRINGER:  If I could have just one moment,

25  Your Honor.

BRIAN SHERN - CROSS BY MR. STILLEY                                    1844

```
 1              THE COURT:  You may.
 2   Q.  (BY MR. SPRINGER)  Did you enter -- I'm sorry,
 3   scratch that.
 4              MR. SPRINGER:  If I could have one second, Your
 5   Honor.  Your Honor, subject to the order from the bench
 6   on recalling Mr. Shern, I have nothing further at this
 7   time.
 8              THE COURT:  Very well.  That's understood.
 9   Mr. Stilley.
10              MR. STILLEY:  Your Honor, if I may have a
11   moment.
12              THE COURT:  You surely may.
13                   CROSS-EXAMINATION
14   BY MR. STILLEY:
15   Q.  Mr. Shern, when did you say you started this
16   investigation?
17   A.  The investigation of Mr. Springer I started around
18   April or May of 2005 and I think you were -- the grand
19   jury was expanded to include you I think maybe December
20   of 2006, January '07, that time frame.
21   Q.  Were there multiple criminal investigations of Oscar
22   Stilley?
23              MR. O'REILLY:  Objection, Your Honor, time
24   frame.
25   Q.  (BY MR. STILLEY)  Within the period 2003 through
```

1   2009?

2   A.   Yes.

3   Q.   And -- okay.  Let's -- how many criminal

4   investigations of Oscar Stilley were there?

5           MR. O'REILLY:  Objection.  May we approach?

6           THE COURT:  You may.

7      (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND

8   OUT OF THE HEARING OF THE JURY.)

9           THE COURT:  Go ahead.

10          MR. O'REILLY:  Your Honor, my concern is, is

11  that I don't know how much Special Agent Shern knows, but

12  even to disclose the existence of another grand jury

13  investigation or a tax investigation is actually

14  potentially a violation of law.  So he's -- Mr. Stilley

15  is putting him in a position he can't be in.

16          THE COURT:  Anything besides Rule 6?

17          MR. O'REILLY:  Yeah, 6103, Your Honor, 26 USC

18  Section 6103.

19          THE COURT:  Seems to me that if there's a point

20  to be made, and I don't know if there is or isn't on the

21  merits of this indictment, but if there is a point to be

22  made, Mr. Stilley, it can be addressed by you simply

23  inquiring in general terms as to, A, whether there was a

24  separate investigation, and, B, very generically what the

25  subject matter was, and then you go on to the next

1    subject.  Do you have a problem with that?

2            MR. STILLEY:  Your Honor, if I could be heard on

3    this.  There's two other criminal investigations that I

4    know of and I think they need to be dealt with separately

5    for purposes of this bench conference.  One is the -- one

6    is the 2004 criminal investigation which is demonstrated

7    by the caption on grand jury proceedings involving Eddy

8    Patterson in which it says Oscar Stilley and Lindsey

9    Springer as targets.  Furthermore, we know that Mr. Shern

10   either knew or should have known about this because

11   Mr. Shern caused to be issued a subpoena.  And on the

12   subpoena request, it was specifically stated that the

13   reason that Oscar Stilley was not directly contacted is

14   because he was a target.

15       Now, we've already been down the road and he claims

16   that there was -- you know, that he didn't -- he forgot

17   about it or something to that nature.  But if Mr. Shern

18   is telling the truth, if the investigation started much

19   later, then there has to be another criminal

20   investigation.  Furthermore, that criminal investigation

21   would have to be closed at this point in time because it

22   was under the auspices of the Patterson case.  And the

23   Patterson case is long gone.  Trying to impeach him

24   showing Oscar Stilley was under criminal investigation at

25   the time, the criminal investigation had not stopped, it

1  was one and the same and that he had uttered falsehoods

2  in order to get the subpoena.

3          THE COURT:  How does that disprove any charges

4  in the indictment?

5          MR. STILLEY:  It impeaches his testimony.  It

6  proves he lied on direct when he said he was there when

7  the grand jury investigation started when he knows good

8  and well it wasn't.  Here is another reason we know he

9  knows it wasn't because he used IOLTA records obtained in

10 2004 to talk to the jury and say that Oscar Stilley had

11 done first one thing and another, so he had to have known

12 about it.  And now he's getting on the stand and telling

13 the jury that the investigation started at a much later

14 time.

15         THE COURT:  The objection will be sustained.

16 Move on to another subject.

17         MR. STILLEY:  I don't understand that.

18         THE COURT:  No.  Go back to your table.

19    (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

20 WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

21 PRESENCE AND HEARING OF THE JURY.)

22 Q.  (BY MR. STILLEY)  Mr. Shern, the law requires that a

23 citizen be given notice of what conduct is prohibited,

24 correct?

25         MR. O'REILLY:  Objection, Your Honor, well

```
 1  beyond the scope of direct.
 2          THE COURT:  Sustained.
 3  Q.  (BY MR. STILLEY)  Mr. Shern, what -- when you
 4  started this investigation, what offense did you think
 5  that you were investigating?
 6  A.  Tax evasion.
 7  Q.  Okay.  And did you think that there might be some
 8  other crime that had been committed?
 9  A.  By you or Mr. Springer?
10  Q.  By Oscar Stilley.
11  A.  Yes.
12  Q.  And what did you think that was?
13  A.  Aiding and abetting Mr. Springer with his evasion.
14  Q.  Okay.
15  A.  And also possibly looking at you for evasion,
16  although we didn't have venue for that charge.
17  Q.  And this jury is here only to decide the actual
18  accusations of this indictment, correct?
19          MR. O'REILLY:  Objection.  The Court will direct
20  the jury.
21          THE COURT:  That's overruled.
22          THE WITNESS:  What's the question again?
23  Q.  (BY MR. STILLEY)  This jury is charged only with
24  deciding the accusations in this indictment?
25  A.  That's correct.
```

1   Q.   If anything else is to be decided, it would be

2   decided somewhere else, correct?

3   A.   Yes.

4   Q.   Isn't it true also that there is a conspiracy charge

5   in this indictment?

6   A.   Yes.

7   Q.   And -- now, isn't it true that the law provides many

8   substantive offenses that make it a crime to do things?

9          MR. O'REILLY:  Your Honor, objection.  Beyond

10  the scope of direct.

11         THE COURT:  I'm going to sustain it, but for a

12  different reason.  Go on to the next question.

13  Q.   (BY MR. STILLEY)  It's also illegal to make an

14  agreement to commit a crime, another crime, correct?

15  A.   I don't think it's necessarily illegal just to make

16  the agreement.

17  Q.   Oh, you don't think it's illegal to make an

18  agreement to commit some other crime?

19         MR. O'REILLY:  Your Honor, objection as to

20  relevance and beyond the scope.

21         THE COURT:  Members of the jury, the law is

22  going to be covered in my instructions to you at the end

23  of this case.  And, Mr. Stilley, that will supersede any

24  questions and answers about the law.  For which reason

25  the objection is sustained.

1  Q.   (BY MR. STILLEY)  Well, was there some underlying

2  offense with respect to Count 1 in this case, the

3  conspiracy charge, was there some underlying offense that

4  your investigation led you to believe had been committed?

5           MR. O'REILLY:  Objection, Your Honor.  Relevance

6  and beyond the scope of direct.

7           THE COURT:  Sustained.

8  Q.   (BY MR. STILLEY)  All the charges involving Oscar

9  Stilley say that Oscar Stilley either agreed or assisted

10  somebody else to do something wrong, correct?

11  A.   Yes.

12  Q.   Do you know what that agreement was?  Scratch that.

13  Let me back up.  Let me focus on Count 1.  Do you know

14  what the agreement was?

15  A.   The conspiracy charge?

16  Q.   Yes.

17  A.   Yes, I think you guys -- based on the evidence in

18  this investigation, I think you and Mr. Springer had an

19  agreement to help Mr. Springer hide his income.

20  Q.   And when do you think that took place?

21  A.    I couldn't nail down the exact moment, but I think

22  it was from when you guys first met each other.

23  Q.   Do you know the year?

24  A.    Mr. Roberts testified that he thought that he

25  introduced you in 2000.

BRIAN SHERN - CROSS BY MR. STILLEY                          1851

1   Q.   So is it 2000?  Scratch that.  Isn't it true that

2   the indictment says 2000?

3   A.   Yes.

4   Q.   And we're stuck with what the indictment says,

5   right?

6            MR. O'REILLY:  Your Honor, objection.

7            THE COURT:  Sustained.

8   Q.   (BY MR. STILLEY)  Well, you did an investigation,

9   correct?

10  A.   Yes.

11  Q.   Your investigation led you to conclude that the year

12  was 2000, correct?

13  A.   Yes.

14  Q.   And the first overt act alleged in the indictment

15  happened in what, 2003?  And if you need something to

16  refresh your recollection, that can be arranged.

17  A.   I think that's correct, 2003.

18  Q.   Does it make any sense that somebody would make an

19  unlawful agreement and not do anything in support of it

20  for between two and three years?

21  A.   What's the question again?

22  Q.   It does not make any sense that two individuals

23  would make an agreement to violate the law and then do

24  nothing in support of it for between two and three years,

25  does it?

1   A.   I guess it would depend on the circumstances.

2   Q.   Well, circumstances of this case.

3   A.   I think once that you saw the amount of money that

4   Mr. Springer could bring in to your business that's when

5   you started committing the overt acts.

6   Q.   But you still think that the agreement took place in

7   2000?

8           MR. O'REILLY:  Objection.  Statute of

9   limitations and other issues may have played a part in

10  the grand jury's decision on what to indict.

11          MR. STILLEY:  If he knows.

12          THE COURT:  If you know.

13          THE WITNESS:  What was the question again?

14  Q.   (BY MR. STILLEY)  You're still trying to tell this

15  jury that the unlawful agreement was made in 2000, right?

16  A.   That's what the indictment says.

17  Q.   Well, do you agree with it?

18  A.   Yes.

19  Q.   You've been in this case the whole time and heard

20  all the evidence, right?

21  A.   Yes.

22  Q.   What witness put forth evidence that you heard that

23  you think supports the theory that an unlawful agreement

24  was made in 2000?

25  A.   I think Dr. Roberts and Mr. Lake both testified that

BRIAN SHERN - CROSS BY MR. STILLEY                    1853

1  you told them that you didn't file tax returns, that

2  Mr. Springer told both of those witnesses that you didn't

3  file tax returns.

4  Q.   That doesn't help prove an unlawful agreement,

5  though, does it?

6            MR. O'REILLY:  Objection, Your Honor.  That's

7  for the jury to decide.

8            THE COURT:  We're not going to have Q and A

9  about the believability of other witnesses' testimony.

10  That will be sustained.

11            MR. STILLEY:  Your Honor, could I just have a

12  moment to get a document?

13            THE COURT:  Surely.

14            MR. STILLEY:  Thank you.

15  Q.   (BY MR. STILLEY)  Mr. Shern, you implied Oscar

16  Stilley was not forthcoming to the grand jury, did you

17  not?

18  A.   Yes.

19  Q.   Isn't it also -- well, scratch that.

20            MR. STILLEY:  Your Honor, I've got a page 30 of

21  the grand jury transcript.  Can I show that to him at

22  this point in time?

23            THE COURT:  You may.

24            MR. STILLEY:  Thank you, Judge.

25            MR. O'REILLY:  Your Honor, the question should

1   be asked to see if he needs to refresh his recollection.

2          THE COURT:  I've already said he can't show it

3   to the jury.

4          MR. O'REILLY:  I'm sorry.

5   Q.  (BY MR. STILLEY)  What specific facts do you think

6   were not provided to the grand jury that should have been

7   provided?

8   A.  There were facts I think that were untrue that were

9   provided to the grand jury.

10  Q.  Oh, you think there were falsehoods stated?

11  A.  Yes.

12  Q.  And what would that be?

13  A.  That Lindsey Springer does not charge for his

14  services.  And I think in -- when you referred to Exhibit

15  1, you put on that document that it reflected donations

16  to Lindsey Springer and I think the evidence from my

17  investigation indicates that those were not donations.

18  Q.  Well, isn't it true, though, that Oscar Stilley

19  would be entitled to his opinion as to the character of

20  these payments?

21  A.  I think the evidence indicates that you knew that

22  these weren't donations or that Lindsey Springer does not

23  charge for his services, so I don't think it's an

24  opinion.  I think you knew that these monies from these

25  people to Lindsey Springer were for work and not

1  donations of any kind.

2  Q.   Isn't it true that an attorney would be entitled to

3  argue such a thing in a court of law?

4        MR. O'REILLY:  Objection, Your Honor, misstates

5  what an attorney is allowed to do.

6        THE COURT:  Sustained.

7  Q.   (BY MR. STILLEY)  Numerous other witnesses said the

8  same thing, correct?

9  A.   The same thing about what?

10 Q.   They said that the money given to Lindsey Springer

11 was donations.

12 A.   Some of the witnesses did.

13 Q.   Many of the witnesses did, correct?

14 A.   Yes.

15 Q.   As you sit there today, you don't have any knowledge

16 that any person told Oscar Stilley that this money was

17 anything other than a donation before he went on the

18 witness stand at the grand jury, correct?

19 A.   I have evidence that -- can you ask that question

20 again?

21 Q.   Isn't it true that you have no facts or evidence to

22 show that Oscar Stilley was told before his appearance at

23 the grand jury that payments to Lindsey Springer were for

24 services rather -- as a contract rather than as

25 donations?

1  A.   I think some of the witnesses testified that you

2  would have had to known that the money was for services.

3  Q.   And who would that be?

4  A.   I think Mr. Patterson, Mr. Lake, Mr. Ouwenga,

5  Mrs. Hawkins, Mr. Hawkins, Mr. Young, Mrs. Hodsden.

6  Q.   What else did you think was false in statements to

7  the grand jury?

8  A.   That you left out the Turner $250,000 payment that

9  went through your account.

10 Q.   But isn't it true that at the time of that grand

11 jury hearing that -- those monies were well known to the

12 government?

13 A.   Yes.

14 Q.   And isn't it true that Oscar Stilley made it clear

15 that other persons had prepared this information?

16 Correct?

17 A.   Say that again.

18 Q.   Oscar Stilley made it clear at the grand jury that

19 he had asked some of the personnel in his office to

20 prepare a set of documents to take to the grand jury,

21 correct?

22 A.   Yes.

23 Q.   And isn't it true also that Oscar Stilley testified

24 about Sam Snyder?

25 A.   It's true that you testified about Sam Snyder, but

1  the facts surrounding that testimony suggests that you

2  meant Mr. Bolthouse.

3  Q.   Well, now, but then the government came to the

4  conclusion that maybe Oscar Stilley needed to supply more

5  information, correct?

6  A.   Yes.

7  Q.   And so the government issued a new subpoena,

8  correct?

9  A.   Yes.

10 Q.   And isn't it true that while that subpoena was

11 pending in a case called U.S. v. Blackstock the

12 government objected to Oscar Stilley representing the

13 defendant on the grounds that Oscar Stilley was under

14 criminal investigation?

15            MR. O'REILLY:  Your Honor, objection as to the

16 relevance and beyond the scope.

17            THE COURT:  Sustained.

18            MR. STILLEY:  Can I approach on that?

19            THE COURT:  You may.

20    (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND

21 OUT OF THE HEARING OF THE JURY.)

22            THE COURT:  Go ahead.

23            MR. STILLEY:  Your Honor, here is the fact that

24 I'm trying to show.  The government did not like the

25 documents that I gave to them and said that they were

1   going to issue a new subpoena and did.  When it became

2   apparent to all concerned that they had lied to me and

3   gotten me to -- lied to me about -- I'm sorry, claiming

4   that I was not under criminal investigation, they

5   withdrew the subpoena and now they're trying to criticize

6   Oscar Stilley and say that he didn't adequately perform

7   to the grand jury when they withdrew the subpoena.  And

8   we all know the reason why they did that is because they

9   were in a compromised situation having told Oscar Stilley

10  a falsehood.  And, furthermore, Oscar Stilley being under

11  criminal investigation, he would have had the right to

12  plead the Fifth on all of that anyway.

13          THE COURT:  Mr. O'Reilly.

14          MR. O'REILLY:  First of all, what Mr. Stilley

15  has said is absolutely false.  The reason the subpoena

16  was withdrawn was it became quite apparent based upon his

17  grand jury misrepresentations that he should be indicted

18  and it was decided because he became a subject or target

19  of the investigation that the subpoena should be

20  withdrawn.  I will agree that -- and this has been

21  previously litigated -- there were some issues with --

22  early in the investigation with Mr. Patterson.

23  Initially, they were looking at both of them.  However,

24  the evidence, as has already been brought out in previous

25  litigation within this case, is that neither Special

BRIAN SHERN - REDIRECT BY MR. O'REILLY                    1859

 1  Agent Shern nor Mr. Snoke nor I were aware of that until

 2  after the Eddy Patterson sentencing agreement was

 3  unsealed.  At which point, we immediately notified

 4  Mr. Stilley.  But that is not why the second subpoena was

 5  withdrawn.

 6          THE COURT:  This line of questioning is

 7  irrelevant and I easily conclude that it's irrelevant.

 8  However, if it had some marginal relevance the potential

 9  for prejudice confusion and waste of time far outweighs

10  any marginal relevance it might have.  The objection will

11  be sustained.  We'll move on to another subject.

12      (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

13  WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

14  PRESENCE AND HEARING OF THE JURY.)

15          MR. STILLEY:  Pass the witness.

16          THE COURT:  Any redirect?

17          MR. O'REILLY:  May I have a moment, Your Honor?

18          THE COURT:  You surely may.

19                    REDIRECT EXAMINATION

20  BY MR. O'REILLY:

21  Q.  Special Agent Shern, Mr. Stilley was asking you

22  about why if the grand jury had alleged the agreement was

23  reached in 2000 no overt acts were alleged until, I

24  believe, 2003.  Do you recall that question?

25  A.  Yes.

1    Q.   That line of questions?

2    A.   Yes.

3    Q.   Did you draft the indictment?

4    A.   No.

5    Q.   Are you familiar with the concept of a statute of

6    limitations?

7    A.   Yes.

8    Q.   Can you just briefly explain to the jury what that

9    is, if you can?

10   A.   Statute of limitations, if you commit a crime at a

11   certain point in time, there's a certain statute of

12   limitations that prohibit you from charging that crime

13   after the statute of limitations runs.  So, for instance,

14   in tax evasion has a six-year statute of limitations.

15   And so from the time the acts of evasion occur, after six

16   years, you can't charge -- charge that.

17   Q.   Was this case indicted in this year 2009?

18   A.   Yes.

19   Q.   Weren't there -- isn't there evidence in this case

20   of checks being cashed by Mr. Springer during the year

21   2000?

22   A.   Yes.

23   Q.   And isn't there evidence even in Government's

24   Exhibit 582, and specifically page 8, and this was

25   actually provided by Mr. Stilley to the grand jury

1   showing that as early as March 7th of 2000 with respect

2   to Mr. Roberts, who testified, that he was engaging in

3   phone calls with Mr. Springer?

4   A.   Is that -- yes.

5   Q.   So when Mr. Stilley tried to imply that nothing had

6   occurred on this conspiracy until 2003, was that

7   misleading?

8   A.   Yes.

9   Q.   Mr. Springer had asked you some questions about why

10  payments from Mr. Stilley's IOLTA account to him, how

11  that could be in furtherance of a conspiracy.  Do you

12  remember those questions?

13  A.   Yes.

14  Q.   Did Mr. Springer report any of the income he earned

15  on any tax return filed with the Internal Revenue

16  Service?

17  A.   No.

18  Q.   Did Mr. Stilley report any of the income he earned

19  during these years to the Internal Revenue Service?

20  A.   No.

21  Q.   Did Mr. Stilley report any of the payments he made

22  to Mr. Springer from his IOLTA account on any Forms 1099

23  filed with the Internal Revenue Service?

24  A.   No.

25          MR. O'REILLY:  May I have a moment, Your Honor?

```
 1              THE COURT:  You may.

 2              MR. O'REILLY:  Nothing further.

 3              THE COURT:  Recross limited to redirect.

 4              MR. SPRINGER:  May we approach, Your Honor?

 5  I'll try.  Never mind.

 6                     RECROSS-EXAMINATION

 7  BY MR. SPRINGER:

 8  Q.   What is a 1099?

 9  A.   It's a form that reports payments to the IRS.

10  Q.   Who fills it out?

11  A.   Usually the person that pays the money.

12  Q.   And in this case, are you alleging that Mr. Stilley

13  was required to fill out 1099s and put Lindsey Springer's

14  name on it?

15  A.   I don't know.

16  Q.   Isn't it true that Mr. Stilley was only giving me

17  money in a couple of instances where his client directed

18  me to receive the money?

19  A.   No.

20  Q.   You think Mr. Stilley paid me directly out of his

21  own money for anything?

22  A.   No.

23  Q.   Now, you also said that neither myself or

24  Mr. Stilley had filed tax returns.  Do you remember that

25  testimony?
```

1    A.   Yes.

2    Q.   What is a tax return?

3    A.   It's a form that you submit to the government that

4    shows how much income you had and how much tax you owe.

5    Q.   Which form are you referring to when you say "tax

6    return"?

7    A.   Typically, when I think of tax return, I think of

8    the Form 1040.

9    Q.   Thank you.

10            MR. SPRINGER:  Could you pull up government's

11   582, please.

12   Q.   (BY MR. SPRINGER)  Now, didn't you testify that

13   Mr. Stilley did not tell the grand jury about

14   Mr. Turner's money that he loaned to me that was sent to

15   Mr. Stilley's IOLTA account?

16            MR. O'REILLY:  Your Honor, beyond the scope of

17   redirect.

18            THE COURT:  Sustained.

19            MR. SPRINGER:  May I have a moment, Your Honor?

20            THE COURT:  You may.

21            MR. SPRINGER:  No further questions at this

22   time, Your Honor.

23            THE COURT:  Mr. Stilley, recross limited to

24   redirect.

25            MR. SPRINGER:  No questions.

```
 1              THE COURT:  You may step down.  Counsel will
 2   approach.
 3         (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND
 4   OUT OF THE HEARING OF THE JURY.)
 5              THE COURT:  Who else do you have?
 6              MR. O'REILLY:  Your Honor, the only one we have
 7   now is Mr. Miller.
 8              THE COURT:  Okay.  We'll start with him in the
 9   morning because we've got some other matters we have to
10   cover and so we'll start with him in the morning.  You
11   may return to your tables.
12         (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,
13   WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE
14   PRESENCE AND HEARING OF THE JURY.)
15              THE COURT:  Members of the jury, there are some
16   matters that I need to address with counsel and the
17   parties today.  And the government has only one more
18   witness, so we will begin with that witness at nine
19   o'clock tomorrow morning.  So we're going to take our
20   overnight recess at this time even though it's a little
21   before the time that we ordinarily do it.
22         During this overnight recess, of course, as I have
23   said more than once, and I know that you probably have it
24   just about memorized, but don't discuss or investigate
25   the case in any way.  Don't reach any conclusions about
```

1  the case until it has been given to you for your

2  deliberations and verdict.

3      There's a ball game on tonight.  I highly recommend

4  that to you.  In any event, we will resume at nine

5  o'clock tomorrow morning.  So please be available a

6  little before nine in the jury room for the security

7  officer to return with you to the courtroom.  Thank you

8  very much for your day of service to the Court.

9      All persons in the courtroom will remain seated

10  while the jury departs.

11      (JURY EXITS THE COURTROOM.)

12          THE COURT:  Okay.  First of all, do the

13  defendants desire to have any further ex parte conference

14  with the Court?

15          MR. SPRINGER:  Yes, Your Honor, just on how

16  we're going to handle the five o'clock.

17          THE COURT:  This would certainly relate to the

18  same subject as to which I had ex parte -- an ex parte

19  conference or, as I recall, perhaps two ex parte

20  conferences, but maybe it was only one, about two days

21  ago with the defendants and their counsel.  For the

22  government's benefit, I found that to be a useful way to

23  resolve some matters that are potentially difficult.  But

24  I will certainly inquire at this point of the government

25  as to whether the government has any objection to the

 1   Court having a brief ex parte conference with the

 2   defendants and their standby counsel for the very same

 3   limited purpose.

 4           MR. O'REILLY:  No, Your Honor.

 5           THE COURT:  Very well.  We'll resume with that

 6   in my library on the record ex parte at five o'clock.

 7   And then aside from that, there are two matters that we

 8   need to discuss, one of which is any preliminary showing

 9   that either or both of the defendants would care to make

10   further to my comments yesterday about the Willie case

11   and other similar cases.  And, secondly, I do intend to

12   at least briefly address some additional matters relating

13   to instructions.

14      So we'll recess until five.  We will resume at five

15   on the record ex parte in the library with the defendants

16   and their counsel.

17           MR. O'REILLY:  Your Honor, what time do you want

18   us back here?

19           THE COURT:  Probably not more than about ten or

20   15 minutes after five.

21           MR. O'REILLY:  Yes, Your Honor.

22           THE COURT:  I think you can safely assume it

23   will be at least ten after five, but likely not much

24   longer than that.

25           MR. O'REILLY:  Thank you, Your Honor.

1    THE COURT:  Court will be in recess.

2    (THE FOLLOWING TOOK PLACE IN THE LIBRARY WITH THE

3  DEFENDANTS AND STANDBY COUNSEL ONLY.)

4    THE COURT:  We're having our ex parte conference

5  in my library, obviously on the record, but without the

6  government present.  The defendants and their standby

7  counsel are present.  So I'll be happy to hear where you

8  all stand with respect to our discussion about

9  presentation of your direct testimony.

10   MR. WILLIAMS:  Your Honor, I asked Mr. Springer

11  to request the ex parte with the Court.  Essentially,

12  Your Honor, I have some concerns, especially right now,

13  with Mr. Springer giving his proffer in accordance with

14  the Court's instruction and direction yesterday.

15  Obviously, I don't believe that I can effectively do a

16  direct examination on Mr. Springer's proffer, just time

17  constraints, and we have some fundamental differences on

18  the direction.

19   I know Mr. Springer has been driving the boat and he

20  is reluctant to let me have the rudder, so to speak.  And

21  so for purposes of the proffer, I believe that it would

22  be more to Mr. Springer's benefit if he did that in

23  narrative form to the Court.  As far as his direct

24  examination testimony goes, my grave concerns are the

25  same.  It, you know, would have some -- we've had some

1  heated discussions about where I think that the direction

2  needs to go and, you know, it has been spirited.  But,

3  again, he's rowing the boat, so to speak.  And the way

4  it's shaping up, it looks like tomorrow is going to be

5  the time when Mr. Springer would definitively decide if

6  he's going to take the stand or not.  And if -- with that

7  short of a time, I don't believe that we would be able to

8  effectively put together a cogent direct examination that

9  would facilitate his best interest.

10         THE COURT:  Well, your heart has got to be in it

11 and I think --

12         MR. BURTON:  Can I add one thing, though?

13         THE COURT:  Sure.

14         MR. BURTON:  However, with regard to the Rule

15 104 proceeding this afternoon and that proffer, we think

16 -- I've been part of this as well, that Mr. Springer is

17 in the best position to make that proffer to the Court

18 through his narrative, through what exhibits he wants to

19 interject through this wonderful proffer.  However, if as

20 we anticipate the trial day tomorrow concludes where it

21 is the time for Mr. Springer to take the stand for

22 purposes of his case in chief and his testimony, because

23 of the balance of a full Friday and the weekend and then

24 coming back on Monday, we are certainly very hopeful and

25 will endeavor to keep -- to work very hard that we may be

 1   in an ample format for direct tomorrow or when we come

 2   back on Monday.

 3          MR. WILLIAMS:  I concur with Mr. Burton's

 4   caveat.

 5          THE COURT:  Let me clarify one thing.  And that

 6   is that my concerns relate really entirely or almost

 7   entirely and I think as a practical matter entirely to

 8   proceedings in front of the jury.  So if Mr. Springer

 9   wants to make his preliminary showing this afternoon in

10   narrative format without direct examination in the

11   conventional sense, I certainly have no problem with that

12   and that does not foreclose another approach to his

13   direct examination in front of the jury.  But as I have

14   -- as I mentioned, both defendants could tell me that

15   they want to do it in the conventional way with direct

16   examination by their standby counsel and I would not

17   require standby counsel to do that because that's not

18   what you signed on for.  Unless or over the objection of

19   either one of you.  So it's going to take, in

20   Mr. Springer's case, it's going to take the concurrence

21   of Mr. Springer and Mr. Williams.  And in Mr. Stilley's

22   case it's going to take the concurrence of Mr. Stilley

23   and Mr. Burton.  I think that's just a matter of

24   fundamental fairness.  And I think I certainly do have

25   the discretion, based on the cases in addressing hybrid

1   representation, to approach it in that way.

2        But perhaps for immediate purposes, the most

3   important point is that if either of the defendants care

4   to make a preliminary showing consistent with my comments

5   yesterday when we were through for the day, they need not

6   do so by Q and A in the conventional way.  Because my

7   concerns really do go to the proceedings in the presence

8   of the jury.

9        Now, it seems -- I don't know how long Mr. Miller's

10  testimony is going to take, but it seems to me that the

11  defendants will be at a decision point at some time

12  tomorrow, perhaps by midday, and I think in any event not

13  too long after midday as to how they will proceed.  This

14  would be a good time for me to emphasize for the benefit

15  of the defendants that your decision as to what sort of a

16  case you put on and as to whether to take the stand is,

17  in the final analysis, a peculiarly personal decision for

18  each of you.  I urge you to -- both to listen very

19  carefully to your standby counsel and to carefully

20  evaluate any recommendations your standby counsel would

21  have to make as to whether you take the stand at all.

22  But at the end of the day, that is a uniquely personal

23  decision for each of you.

24       Obviously, each of you have the right to take the

25  stand, each of you have the right to decline to testify.

```
 1   And you can get advice on that from the top 20 defense

 2   lawyers in the state of Oklahoma and it's still your

 3   personal decision after all is said and done.

 4        Is that understood, Mr. Springer?

 5             MR. SPRINGER:  It is understood, Your Honor.

 6             THE COURT:  Is that understood, Mr. Stilley?

 7             MR. STILLEY:  Yes, Your Honor.

 8             THE COURT:  Very well.  So I take it -- and

 9   correct me if I'm wrong, I take it that now that we have

10   established that you can proceed by narrative this

11   evening without precluding a different approach during

12   your direct testimony, do I understand that you are

13   simply going to defer the final call on that subject

14   until you're required to make that final call?

15             MR. WILLIAMS:  I believe that's correct, Your

16   Honor.

17             MR. BURTON:  Yes, Your Honor, that's correct.

18             THE COURT:  Is that the defendants'

19   understanding of the status of it?

20             MR. SPRINGER:  Yes, Your Honor.

21             THE COURT:  Mr. Stilley?

22             MR. STILLEY:  Yes, Your Honor.  Now, let me make

23   sure I understand this right.  That means that his

24   proffer would be sometime tomorrow if at all, correct?

25             MR. SPRINGER:  No, it's today.
```

```
 1          THE COURT:  It will be just within a few
 2   minutes.
 3          MR. STILLEY:  Are we going to also do the jury
 4   instructions conference tonight then?
 5          THE COURT:  We will briefly address some
 6   instructions issue, I doubt that conversation will take
 7   more than, oh, 15 to 20 minutes at the outside, so
 8   we'll --
 9          MR. SPRINGER:  May I ask.  As far as the
10   narrative, and this is why I -- my interest in this
11   conference at the moment.  When you say "narrative," I'm
12   just going to go under oath and then I'm just going to
13   start explaining the evidence that I would like to tender
14   that demonstrates that I relied upon and I believe the
15   Court said it was a minimal bar I had to achieve and
16   that's what I needed to know, where is the bar that the
17   Court is trying to get me to where I can satisfy it for
18   the purposes of holding over to the -- I don't want to
19   show the government any more than I have to.
20          THE COURT:  Well, what you are required to make
21   is a particularized showing that will enable me to
22   conclude that the contentions that you would have that go
23   to your state of mind and your willfulness are supported
24   in at least in some plausible way and in a way that would
25   justify my ruling that these arguments and perhaps your
```

1  references to exhibits.  As I have said, I'm dubious

2  about exhibits coming in.

3          MR. SPRINGER:  Right.

4          THE COURT:  And these exhibits and perhaps your

5  references to documents would be probative of something

6  that is fair game for the jury as opposed to being

7  prejudicial in the sense of unduly confusing or for that

8  matter involving needless waste of time within the

9  meaning of Rule 403.  And I should add that it's almost a

10  no loss proposition for you tonight in this sense.  I may

11  hear enough to tell you that you're going to proceed

12  perhaps with some limits.

13          MR. SPRINGER:  Okay.

14          THE COURT:  It seems less likely that I would

15  close the door on your proceeding on the basis on what we

16  do this evening.

17          MR. SPRINGER:  Okay.

18          THE COURT:  But I want to hear enough to give me

19  a sufficient confidence level that proceedings in the

20  presence of the jury are not a prejudicial and confusing

21  waste of time, and I'm not going sit here and call that a

22  low bar because the cases say what they say.

23          MR. SPRINGER:  Right.

24          THE COURT:  But I'll tell you that I'm going to

25  have to feel pretty bullish about it before I just close

1    the door tonight.

2             MR. SPRINGER:  Okay.

3             THE COURT:  Very well.  We'll resume back in the

4    courtroom.

5        (THE FOLLOWING TOOK PLACE IN OPEN COURT, OUTSIDE THE

6    PRESENCE OR HEARING OF THE JURY.)

7             THE COURT:  The record will show that the

8    defendants and standby counsel and government counsel are

9    present in the courtroom.  We have completed an ex parte

10   conference.  And, as the government will soon see, I

11   think it's fair to say, without breaching the

12   confidentiality of our ex parte conference, that I have

13   told Mr. Springer that he may, under oath, make his

14   proffer pursuant to Rule 104 and the authorities that we

15   discussed at the close of the day yesterday for the

16   purpose of enabling the Court to evaluate the

17   admissibility of some matters that I anticipate

18   Mr. Springer will urge ought to be admitted into evidence

19   by way of his defense.

20       So with that, the clerk will please administer the

21   oath to Mr. Springer.

22                       LINDSEY SPRINGER,

23   (DEFENDANT SPRINGER AFFIRMS OATH)

24            THE COURT:  If you choose to do so, you may work

25   from the lectern for this purpose.

1          MR. SPRINGER:  Thank you, Your Honor.

2          THE COURT:  That doesn't necessarily determine

3    how it would be done if the jury were here, but you may

4    work from the lectern for this purpose.

5                      DIRECT EXAMINATION

6          MR. SPRINGER:  Your Honor, just a point of

7    procedure, what I plan on doing is going item by item in

8    the narrative on exhibits beginning on Number 13 of my

9    exhibit list and then concluding -- with some skips,

10   concluding around 81 or 82, anyway.

11       In 1992, Bondage Breakers Ministries began, and over

12   a period of three or four years, the only money that I

13   received, generally, is from individuals.  I know there

14   has been some testimony about Mr. Dingman, but in 1997, I

15   received what I was told was a grant of $3 million from

16   an organization called The Infinity Group Company.

17       And the testimony I'm giving now is to establish my

18   beliefs, my good-faith beliefs, as to the character of

19   money that people would give me which, in this case,

20   generically, has been referred to as "donation" or

21   "gift."

22       In August of 1997, I had received 1 --

23          THE COURT:  Let me interrupt there.  And I'm

24   going to -- I'll give Mr. O'Reilly an opportunity to

25   comment on this, but my beginning point on the gift or

1   donation side of it is that you're entitled to take the

2   stand and look the jury in eye and say all day, as far as

3   you were concerned, these are donations.

4           MR. SPRINGER:  Right.

5           THE COURT:  And I don't think -- unless

6   Mr. O'Reilly wants to argue otherwise, I don't think

7   you're at risk of my precluding you from doing that.

8       Mr. O'Reilly?

9           MR. O'REILLY:  There will be no objection from

10  the government of him telling the jury that he believed

11  they were gifts.

12          THE COURT:  So --

13          MR. SPRINGER:  Okay.  May I?

14          THE COURT:  You've won on that score.

15          MR. SPRINGER:  But there is a couple --

16          THE COURT:  I'm not going to tell to you quit

17  while you're ahead, but I'm going to tell you that you've

18  won on that score.

19          MR. SPRINGER:  Do I get to read from the

20  decision of SEC v. The Infinity Group to the jury what

21  the Court told me when they took the $1.265 million from

22  me?  Because they characterized it as the reason why they

23  could take it -- the reason why it wasn't mine is because

24  it was a donation.  And, Your Honor, I spent nine months

25  of my life --

1           THE COURT:  That money you received when?

2           MR. SPRINGER:  In 1997.  And Bondage Breakers

3    Ministries is a relief defendant in that case, and it's a

4    published case that went to the Third Circuit with Judge

5    Alito as one of the three judges in the panel.  And he

6    specifically identified in his published opinion that it

7    was the donation that was allowing the government to keep

8    the money.

9        And, Your Honor, I presented so much evidence at

10   that time as to what I was doing and my role or

11   involvement in The Infinity Group Company, and they said

12   it didn't matter.  Because I didn't have a contract, they

13   were going treat it as a donation.  And I not only had to

14   disgorge the money that they gave me, but some of it had

15   been spent on helping Infinity Group Company and they

16   made me stand good for that money as well.

17       And the basis, the sole basis -- and there's two

18   orders, the citing SEC v. Infinity, which I'm a relief

19   defendant in, is 212 F.3d at 180 at page 185.  And also,

20   Your Honor, I put the district court decision in my

21   exhibits, which is Exhibit 107, and it's at page 9 of

22   that exhibit where District Court Judge Dalzell

23   explained, because I had given no consideration for that

24   money that it was not something that I could keep.

25       And, now, arguably, down the road it was determined

LINDSEY SPRINGER - PROFFER BY MR. SPRINGER                    1878

1  that there was some misrepresentations and unregistered

2  securities conduct of the defendants of which I was not

3  alleged to be one.

4      However, this begins my understanding about what

5  "donation" means and what "ministry" means and this is

6  partially about why I filed my objections as I have to

7  the "gift" definition.

8              THE COURT:  Do you have a copy of the Third

9  Circuit opinion available?

10             MR. SPRINGER:  I do on my computer, but I don't

11 have it printed.

12             THE COURT:  Okay.  That's 212 F.3d 180?

13             MR. SPRINGER:  At page 185, Your Honor.  And,

14 actually, Judge Alito -- the other two judges are quoting

15 Judge Dalzell, which is at page 9 of Exhibit 107, or

16 they're directing to it.  At one moment, they call it --

17 they gave it no consideration, and then Judge Alito, in

18 the two-judge panel, refers to it -- three-judge panel

19 refers to it as a donation.

20             THE COURT:  What district is that?

21             MR. SPRINGER:  That was in the -- Philadelphia,

22 the Eastern District.

23             THE COURT:  And the primary defendant was?

24             MR. SPRINGER:  Benson and -- it's Infinity Group

25 Company, Jeff Benson, another Jeff, and then there was

```
 1  several relief defendants, and I was one of the relief
 2  defendants and so was Bondage Breakers Ministry.
 3             THE COURT:  What was your connection with
 4  Infinity Group?
 5             MR. SPRINGER:  Well, initially, they sent me a
 6  check for $5,000 with no -- I didn't know anything, and I
 7  was so shocked by it because I had never had received
 8  just a check in the mail like that.  And so I made
 9  contact with them and I had learned that the 10,000
10  people that they had in their membership pool, some of
11  those people were also supporters of my ministry.
12             THE COURT:  I'm looking at page 185.  What was
13  TIGC?
14             MR. SPRINGER:  The Infinity Group Company.
15             THE COURT:  And what language on page 185 do you
16  rely on in support of your contention here?
17             MR. SPRINGER:  It's from the quote, Your Honor,
18  where the district court's order -- it begins, "Jack
19  McDonald used over 2 million" --
20             THE COURT:  Now, don't speed.
21             MR. SPRINGER:  I'm sorry.
22       It says, "In addition, Jeffrey Benson made an
23  undisclosed donation of $1.265 million in investor funds
24  to Lindsey Springer, d/b/a Bondage Breakers Ministries."
25  That's the Third Circuit's decision.
```

1    If I could just have a moment, Your Honor.

2    And then my Exhibit 107, page 9, which is the

3    district court decision being referred to by the Third

4    Circuit.  On page 9, I highlighted the actual quote where

5    they said, "Relief Defendant Lindsey Springer, d/b/a

6    Bondage Breakers Ministries, admits he received 1.265

7    million of TGIC's unlawfully obtained investor funds,

8    which he received no consideration at all and to which he

9    has no legitimate claim.  Accordingly, we order him to

10   disgorge those funds."

11        THE COURT:  Well, did any party to that case

12   assert that that $1.265 million was, in fact, income to

13   you or earnings?

14        MR. SPRINGER:  Well, that becomes the question,

15   because I had done a lot of stuff, so I did.  I did.

16        THE COURT:  You asserted that it was income to

17   you?

18        MR. SPRINGER:  I asserted that it was a grant to

19   me, which I would have treated as income under the

20   conditions -- gross income -- under the conditions it was

21   given, but then three weeks after I received it, it was

22   frozen.  And then I spent four years of my life, you

23   know, having to battle with no lawyer, no money, while

24   they were spending $2 million giving all the other people

25   in the case lawyers to represent themselves.

```
 1          THE COURT:  I'm having a hard time seeing any
 2  reasonable similarity between that transaction and your
 3  receipt of those funds, and for that matter, any
 4  characterization of those funds and any issue in this
 5  case, so you're going have to help me on that.
 6          MR. SPRINGER:  Okay.  That's where I'm at.  I
 7  believe the testimony will be a Mr. Miller -- I believe
 8  it will be clear to the Court -- and as the Court said
 9  the other day, this is an all-or-none-item case, that
10  there's no -- there's no letting the jury decide that I
11  received $50,000 but I only did ten hours worth of
12  possible anything that the government could say I would
13  then have earned some money on.
14          THE COURT:  Well, you're essentially correct as
15  to what my comment was and is, but for the sake of
16  clarity, as far as the Court is concerned, any given item
17  of receipt for either you or Mr. Stilley, for that
18  matter, is either fish or fowl.  It's either a gift or an
19  income.  There are no issues in this case of allocation
20  between gift and income within any one item of receipt.
21          MR. SPRINGER:  So, Your Honor, in continuing
22  with this narrative, under that analysis, if I had
23  received $1.2 million and it was earmarked "grant" or
24  "gift," the theory here would be if I did anything --
25  under the government's theory, if I did anything, all of
```

 1   that is gross income.

 2        And I did hold that position at that time and is

 3   why -- is why I fought so vigorously.  And at one time --

 4   and this is what I will tell the jury -- at one moment in

 5   time prior to the -- there was a temporary restraining

 6   order hearing and then there was a preliminary injunction

 7   mini trial, basically, and between those two times, the

 8   government came to me and said, We will give you a

 9   certain amount of that money back if you'll stop fighting

10   us.

11        And I took the time to consider what they were

12   saying.  And what I told them was either the money

13   belongs to me and I'm supposed to have it or I don't want

14   any of it.

15        And, Your Honor, this is not -- the same issues that

16   you see going on in witness by witness by witness in this

17   case is the same exact stuff that was going then in that

18   case, but there they said, okay, because it's not by

19   contract, that I can't keep it.  And in this instance, in

20   this case, they're saying it's taxable.  "Gross income"

21   is the basic terminology.

22        And so my wish is to present to the jury how I

23   arrived at why I said to Agent Shern or to Mr. O'Reilly

24   on January 15, 2009, why I took the position that these

25   monies were not gross income, that they were the same

1  type of donation that was at issue in that case up there

2  and the United States government, although with a

3  different agency, the same organization, that they took a

4  different position up there at that time, which is what

5  formed my beliefs, than the position they're taking in

6  this case.

7            THE COURT:  What was the purpose of the payment

8  in The Infinity Group case that was characterized as a

9  grant?

10           MR. SPRINGER:  To allow me to move all over the

11 country in a Learjet and to learn all the issues that

12 needed to be learned in all the different cases that were

13 being brought.  The SEC had numerous filings and was

14 fully aware of my involvement in every one of those

15 cases, every one of them.

16           THE COURT:  Did you ever provide any services to

17 Jeffrey Benson?

18           MR. SPRINGER:  Well, under the definition that I

19 had at that time, yes, but the definition that I

20 developed from that day forward, the answer would be no

21 based upon the fact that they were able to take that

22 money.

23      Now, I agree with the Court, but that shaped my

24 beliefs.

25           THE COURT:  What did you do for Jeffrey Benson?

1       MR. SPRINGER:  Gosh, I couldn't begin.  Met with

2   him, met with ten different state securities agencies,

3   contracted jets to fly to ten different state injunctive

4   hearings all at the same time, found him lawyers, found

5   him CPAs, the very same stuff that you hear in this

6   case.

7       THE COURT:  And the $1.265 million was

8   compensation to you for those services?

9       MR. SPRINGER:  Supposed to be $3 million, Your

10  Honor.

11      THE COURT:  Well --

12      MR. SPRINGER:  That was just what I had received

13  was the 1.265.

14      THE COURT:  And that was to be compensation to

15  you for those services?

16      MR. SPRINGER:  Yes, Your Honor, at that time,

17  under my definition.

18      THE COURT:  Proceed.

19      MR. SPRINGER:  Thank you.

20    So, obviously, the testimony is that I have a sheer

21  desire and a calling and -- I claim a calling to change

22  things and one of those things is to get rid of the IRS.

23     And in traveling all over the nation, no less than a

24  million miles on two different buses, Your Honor, I began

25  to listen to questions that people had in the

1  mid-nineties that they were raising in regard to tax

2  issues, and the recurring question was:  What law

3  required them to do anything?  And I didn't have the

4  answer.

5      My mother, a CPA at Hall & Hall School for 36

6  years.  My family is all-around numbers:  Dad at Shell

7  Oil Company.  But I was concerned and I have a compassion

8  in that area.

9      So I told them -- I gave them my word I would go and

10 try to look up everything they were saying.  And whether

11 I looked at a bankruptcy filing or an indictment or a

12 notice of deficiency by the IRS, they all had this

13 evidence that the government would always cite to the law

14 that supported the interest and penalty claims that they

15 were making, but they'd never cite to the law that

16 required the individual to do something.

17      And I had not signed on to this; I was just trying

18 to defeat it.  And that exposed me to many things.

19      And one of the things that I have learned is about

20 the Paperwork Reduction Act of 1980.  And Congress, I

21 learned, intended for the IRS to comply in their request

22 for information form with certain federal laws.

23          MR. O'REILLY:  Your Honor, may we have a time

24 frame when Mr. Springer allegedly learned this?

25          MR. SPRINGER:  1995 is when I began learning

 1    about the Paperwork Reduction Act to my current knowledge

 2    today.

 3         I had become aware of the Paperwork Reduction Act in

 4    1992 based upon the instruction booklet for 1992, and how

 5    that arrived was by a recurring question.

 6         In the instruction booklet for 1992, which I have

 7    included in my exhibit list, which would be at page --

 8    Defendants' Exhibit Number 16, there was a note on the

 9    front page that everybody had in their hand when I would

10    show up to do a meeting, and this would be 1994 when I

11    would be doing these meetings, and it would read, "Thank

12    you on behalf of the government of the United States and

13    every American citizen.  Without your taxes, we cannot

14    defend ourselves, fund scientific and health care

15    research.  Thank you for paying your taxes.  You're among

16    the millions of Americans who comply with the tax law

17    voluntarily."

18         And to people outside of this courthouse and out of

19    legalese, farmers and just people that I was meeting,

20    they got confused by that.  Because just two more or

21    three more pages in on the instruction booklet, it said,

22    "A question:  Do I have to file?"  This applies to all

23    U.S. citizens and resident aliens.

24         And so as part of the attention that I was being

25    drawn to by these people, I went inside and out that 1992

1    instruction booklet and I went back to the 1040 form and

2    I started doing a study, because I wanted to explain to

3    them more that they were wrong than they were right, but

4    what I learned was that most of the questions that they

5    had in relation to filing a tax return was answered by

6    the Paperwork Reduction Act of 1980, so it became a

7    question for me.

8        Now, at this time, I'm not looking at the Paperwork

9    Reduction Act as a reason why I wasn't filing a tax

10   return in 1993, because the money I was receiving in 1993

11   was money that I considered to be to Bondage Breakers

12   Ministries, most generally in $25, $50, $75 hat-pass-

13   around-the-room-type gatherings.

14       But as it continued, and, of course, opening myself

15   up to thousands of people and their experiences -- and I

16   learned a lot from them -- that I came to the conclusion

17   that the answer could be easily accomplished for them if

18   the form complied with the Paperwork Reduction Act.

19       And this drew me to do word searches.  And this is

20   before -- before I got a computer program that allowed me

21   to do word searches in all the cases in the country in

22   the last hundred years.

23       And I believe my ex-wife testified about the time

24   that I would spend at the law library at TU, which I

25   became a member, and I would have to do this by books.

1      And I became aware of the Dole decision in 1990 by

2  the Supreme Court, which said that tax forms were typical

3  information collection request forms subject to the 1980

4  Paperwork Reduction Act, while at the same time, there

5  were other cases at the appellate level that were

6  distancing themselves from that holding.

7      And what became very important to me as I went into

8  these cases -- and there are several of them, and I've

9  listed them out as exhibits just for the Court to see

10  their names.  Beginning on Defendants' Exhibit Number 73

11  and carrying all the way over to Defendants' Exhibit

12  81 -- and I will premise what I am getting ready to say

13  based upon something that the Tenth Circuit said on

14  August 31, 2009, and these are words that after four

15  times I'm trying to get them to tell me if I'm right or

16  wrong and I'm getting closer, but they said,

17  "Mr. Springer raises difficult issues between the tax

18  statutes and the Paperwork Reduction Act."

19          THE COURT:  No, the Tenth Circuit said you

20  raised difficult issues in your briefs and then the

21  Supreme Court -- or the circuit didn't go -- did not

22  elucidate one bit about what particular issues in your

23  brief --

24          MR. SPRINGER:  That's true.  That's true.  But

25  in my brief are those issues that they were meaning were

```
 1   difficult.  And those are the same issues in that brief.
 2         THE COURT:  But they didn't say which ones they
 3   considered difficult, did they?
 4         MR. SPRINGER:  Agreed, Your Honor, and I wish
 5   they would, and I don't know why they won't.  I've
 6   tried.  And I'm not alone in this.  There are several
 7   cases where we're trying to get the IRS to comply with
 8   the Paperwork Reduction Act, and in the process -- and
 9   I'm going to go back to the cases that I learned after
10   Dole.  I first became aware of the Dawes decision, which
11   was actually not the first case after Dole, but it's the
12   one that was relevant to me because it was Tenth Circuit
13   and it was published.
14         THE COURT:  Well, let's cut to the chase.  I
15   need you to cite me a decision by an Article III judge
16   that says that a statutory requirement of filing a Form
17   1040 is subject to the Paperwork Reduction Act.
18         MR. SPRINGER:  Well, the Lewis court published
19   in 2007 by the Tenth Circuit said it's clear the
20   Paperwork Reduction Act -- the filing of a tax return is
21   subject to the Paperwork Reduction Act.
22         THE COURT:  Let me go get my copy of that.
23   Court will be in recess subject to call.
24      (SHORT RECESS)
25         THE COURT:  Okay.  I've got the Lewis case.  I'm
```

1    looking at the part that Mr. Springer would naturally

2    emphasize under headnote 3.  I also am looking at the

3    discussion on page 1,276 where the court said that Form

4    1040 does have a valid OMB control number and,

5    accordingly, that the IRS has complied with the PRA with

6    respect to the Form 1040.

7         Now, your point is?

8              MR. SPRINGER:  All right.  I -- in my appeal to

9    the Tenth Circuit -- now, we're off of what my good-faith

10   belief was at the time where I didn't file a tax return

11   and now we're on a question about what case has ever held

12   that the PRA applies to the statutory requirement to file

13   a tax return, if I'm correct -- am I correct on that?

14             THE COURT:  That was my question.  My next

15   question was going to be what Article III judge of any

16   court at any level has said that in light of that

17   statutory requirement or, for that matter, taking the

18   first holding in Lewis at face value, what Article III

19   judge has said that the Form 1040, in fact, violates the

20   PRA?

21             MR. SPRINGER:  No court has ever actually --

22   they've been presented with the question, and including

23   the case of August 31, 2009 by Springer, where the

24   Commissioner tried to argue something that the Tenth

25   Circuit said they were frivolous in arguing, which was

1    accurate, in that case, I was actually taking Lewis head-

2    on.

3              THE COURT:  Remember you're under oath.

4              MR. SPRINGER:  That's right.

5              THE COURT:  The frivolous finding by the Tenth

6    Circuit was the government's characterization of previous

7    holdings of court, right?

8              MR. SPRINGER:  Right.  Which was the merits.

9              THE COURT:  Okay.  So it's time to be careful.

10             MR. SPRINGER:  Okay.  It was the merits.  They

11   were arguing in their pleadings, in their briefs, that

12   the Paperwork Reduction Act had been determined to be

13   frivolous by Judge Eagan in the district court here,

14   citing to Dawes, and they were also saying that every

15   other court citing to the cases I'm relying upon -- every

16   other court that has ever addressed it, said it didn't

17   apply to the instruction booklets or the regulations.

18        And so in the Lewis decision, they said because

19   Mr. Lewis did not challenge whether the claims Lewis made

20   in -- on the violations of the Form 1040, they found that

21   those claims he made could be satisfied in the

22   instruction booklet, and it was on that basis that they

23   made a determination that his claim -- that they didn't

24   accept his claim.

25        However, when you go into my briefs, based upon the

1   August 31, 2009 order, I showed the Court not only is

2   it -- does it -- does the number stop at valid, the

3   statute actually says "valid and issued in accordance

4   with this subchapter," and when the Court looks at the

5   questions that I was raising about that none of the

6   things under 3506, none of the things in 3507, none of

7   the things in 3512 appear in the instruction booklet, and

8   that was in my brief, and that was what they meant when

9   they said I raised difficult issues.  And there's no

10  question --

11          THE COURT:  So you're purporting to tell me what

12  the Tenth Circuit meant when it said you raise difficult

13  issues.

14          MR. SPRINGER:  I can only imagine it's the

15  issues I raised.  I raised two.

16          THE COURT:  Okay.  You're free to tell me what

17  you imagine --

18          MR. SPRINGER:  I'm sorry.  I imagined that of

19  the two issues I raised -- and that they used the word

20  the issues I -- I raised difficult issues, in the plural,

21  that they were including both of the issues I raised as

22  to meaning the difficult issue -- issues that I raised.

23      And, of course, you know, Your Honor, my study on

24  this doesn't stop or start right here, but I cannot tell

25  you, other than the Chisholm decision published by the

1   Tenth Circuit in 2007, where they clearly said that had

2   Mr. Chisholm's charges been predicated on failing to file

3   returns, he could raise the Paperwork Reduction Act as a

4   defense, but because his charges were predicated on

5   filing false returns, that he was not given any

6   protection by the Paperwork Reduction Act.

7        And that same analysis holds true in the Tenth

8   Circuit's opinion on August 31, 2009, where they said

9   that my issues are not raised about the filing of a tax

10   return, but about penalties and interest.  And they

11   decided -- in their opinion they said that the PRA does

12   not apply -- the Paperwork Reduction Act protection does

13   not apply to interest or penalties for failure to pay,

14   and they continue to maintain, as they explained in the

15   Lewis decision, and they cited in their August 31st

16   decision, 2009, that it does apply to the Form 1040.

17        And, Your Honor, I did not raise just the -- I don't

18   even believe I touched on the issue that Lewis raised to

19   which they addressed through a 2003 Form 1040 when they

20   said the instruction booklet contains all the necessary

21   -- accompanying instruction booklet contains all the

22   necessary information that is required by 3506.

23        And if you go into my brief, you will see how I

24   addressed that and how it was very clear that I did not

25   accept that the Form 1040 and the instruction booklet

1   were accompanying, because they actually disassociate

2   with each other by -- on the instruction booklet, it

3   says, "Note:  There are no tax forms contained within

4   this booklet."

5        And so I'm not saying the IRS could not have

6   satisfied the Paperwork Reduction Act by putting the

7   information that they swore is certified to OMB on their

8   83-I that they would put on there.  The operative word in

9   their application is "it."  It will say, it will do

10  this.  But the fact is that they didn't do any of the

11  things that they certified that they would do.

12          THE COURT:  Okay.  You're long on argument and

13  short on things that had a bearing on your state of mind

14  at the relevant time.

15          MR. SPRINGER:  I'm sorry, I was dealing with

16  Chisholm.

17          THE COURT:  Obviously, the Lewis decision in '08

18  did not have any impact on your state of mind --

19          MR. SPRINGER:  No.

20          THE COURT:  -- in 2002 and 2004, correct?

21          MR. SPRINGER:  No, that's correct.

22          THE COURT:  Okay.  I need you to make a

23  particularized showing of those items that plausibly

24  affected your state of mind at the times relevant to this

25  indictment.

1              MR. SPRINGER:  Excellent.

2         So I started with the Dawes decision, Your Honor,

3    and I -- and when you're in the law library, it's more

4    difficult than doing word searches.  You have to go look

5    up, I'm sure as the Court knows from previous experience,

6    so I started with the Dawes decision learning how to

7    Shepardize and finding out where the Dole case had been

8    cited by the Tenth Circuit, and I found the Dawes case,

9    that it had been cited, and what they said in the Dawes

10   decision that I relied upon --

11             THE COURT:  Give me your cite on that.

12             MR. SPRINGER:  Certainly, Your Honor.  If you

13   could just hold one second.  It's US v. Dawes, 951 F.2d

14   1189 at -- and I rely on the entire opinion of the court,

15   but in particular on page 1193.

16        And, again, I emphasize what I'm -- how my state of

17   mind is and what I'm reading here is that the question

18   before the Court is whether the Paperwork Reduction Act

19   applies to the 1040 Form.

20        And the Dole case, which I've cited to and is cited

21   in the Dawes decision, it clearly says that the Supreme

22   Court held typical information collection forms --

23             THE COURT:  Bear with me just a moment.  Let me

24   just take a look at page 1193.  I'm having a real hard

25   time seeing how the Dawes decision gave you any comfort

```
 1   under the PRA.
 2           MR. SPRINGER:  Well, Your Honor, you can't just
 3   take Dawes.  Again, at this point that I'm discovering
 4   Dawes, I haven't made any determinations, I'm just moving
 5   forward.
 6           THE COURT:  Well, if I had read Dawes with the
 7   thought in mind of finding some relief under the PRA, I
 8   would have gone limp.
 9           MR. SPRINGER:  Well, Your Honor, I would rely
10   upon these words, and the jury would get to understand
11   that I'm trying to answer a question relating to what
12   particularly does the law and the regulations encompass
13   on the requirement to file a return.  I, like everybody
14   else, just believed that it was understandable, it was
15   there, and I just took my mother and father's word for
16   it.
17      But in this instance, I'm now meeting in front of
18   thousands of people and I'm having to deal with these
19   questions that they're asking me to raise.
20           THE COURT:  You're walking me through the cases
21   that plausibly give you a state of mind negates
22   willfulness.
23           MR. SPRINGER:  Yes, sir.
24           THE COURT:  And the first case you want me to
25   take a hard look at, because it's the first one that
```

1  comes along at the right time, is Dawes.  Read me the

2  language in Dawes that gave you comfort under the PRA.

3          MR. SPRINGER:  Starting at paragraph 11, "We

4  would be inclined to follow the general analysis of

5  Wunder and Hicks and hold that the operation of the PRA

6  in these circumstances did not repeal the criminal

7  sanctions" --

8          THE COURT:  What page are you on?

9          MR. SPRINGER:  I'm sorry, Your Honor.  It's

10 paragraph 11.  I've just got it in my book.  But it would

11 be on page 1193, and then there would be a paragraph 12

12 notation at the beginning.  Starts out, "We would be

13 inclined" --

14         THE COURT:  I'm there.

15         MR. SPRINGER:  Okay -- "to follow the general

16 analysis of Wunder and Hicks and hold that the operation

17 of the PRA in these circumstances did not repeal the

18 criminal sanction for failing to file an income tax

19 return because the obligation to file is a statutory

20 one.  However, we are not compelled to rest our opinion

21 on the statutory origin theory because we find the

22 analysis of other courts which have considered the issue

23 to be persuasive."

24     So now, at this point, I'm seeing the statutory

25 origin theory and not really knowing what they mean by

1  that at this point, but I'm following the next paragraph,

2  which leads me to the Collins case after it cites to the

3  Dole case.

4      And on paragraph 12, it says, "As noted above,

5  Section 3502(11) of the PRA defines an information

6  collection request as a written report form, application

7  form, schedule, questionnaire, reporting or recordkeeping

8  requirement, collection of information requirement or

9  other similar method calling for the collection of

10  information."

11      And then they write, "While we acknowledge that tax

12  forms are information collection requests (see Dole),"

13  and gives the page number, and "see Collins at footnote

14  13 dictum) we are not persuaded that either the

15  instruction booklets or the regulations fit under

16  statutory definition."

17      So this case led me to the Collins decision in

18  footnote 13.  And I have also included that in my

19  exhibits, which is 74, and I'll give you -- the Collins

20  cite is there in the Dawes, so -- and, Your Honor, I did

21  read the entire Collins decision, but I'm only showing

22  the Court how I, in good faith, arrived at what I

23  maintain today.

24          THE COURT:  Tell me where footnote 13 in the

25  Collins decision talks about the application of PRA to

1   the Form 1040.

2        MR. SPRINGER:  Okay.  Actually, Your Honor, you

3   got to go to footnote 12 first, and here is -- here is

4   the answer to the Court's question on what Article III

5   judge has ever said that the PRA applies dealing with

6   statutes versus some other obligation, and in footnote

7   12, it says, in United States v. Tedder, Tenth Circuit

8   1986, "This court held that tax forms were not

9   information collection requests subject to the Paperwork

10  Reduction Act because the filing of an income tax return

11  was obligatory.  This holding is superceded by the

12  Supreme Court's analysis in Dole v. Steelworkers, which

13  included federal income tax forms within the category of

14  information requests under the act -- collection requests

15  under the act.  Dole would appear to call into question

16  the holdings in Snyder, Cameron, both of which held the

17  Paperwork Reduction Act inapplicable to IRS forms."

18       So here they talked about their holding in Tedder

19  and they're telling me, Lindsey Springer, that the Dole

20  decision has overturned that obligatory decision that

21  they made in this 1986 case.

22       Now, Your Honor, I didn't just stop here.  This

23  wasn't good enough for me.  So what I did, in continuing

24  to follow what the law library offered -- and I'm not

25  educated in anything as far as how to figure that stuff

1   out, and I just had to figure out how to do it, but this

2   case, the Collins case, took me back to what the Dawes

3   case was saying, and then that led me backwards to Wunder

4   -- the Wunder decision from the Sixth Circuit and the

5   Hicks decision from the Ninth Circuit.

6        And it's going to become apparent to anybody who

7   sees it, that other than the Tenth Circuit Court of

8   Appeals, all the other courts that are addressing

9   instruction booklets and regulations, and whether they

10  have to comply with the Paperwork Reduction Act, that

11  most of them agree that -- to a statutory origin-type

12  theory that the Dawes court from the Tenth Circuit

13  rejected and -- at least my opinion is that they rejected

14  it.

15       And so when I went to the Wunder case, I learned

16  that obviously the Tenth Circuit doesn't agree with the

17  Wunder decision.  And I tried to understand why.

18       And what I found out was is that the Sixth Circuit

19  was arguing that the requirement came from Section 6012

20  and 7203.

21       So I didn't just stop there, but it seemed odd that

22  Section 7203 would be a requirement and 6012 would be a

23  requirement -- I went and read 6012 and 7203, very

24  clearly I did.  The jury will know that I've read those

25  two sections of law.  I understand the risk -- the

1   caution the Court gave me earlier on that, but it's the

2   truth, Your Honor.  And that's what this jury has a right

3   to hear.

4       And when I read 6012, I ran into some difficulties

5   with the meaning of "return."  What did "exempt amount"

6   mean?  Where was that in 151(d).  But I pushed those

7   aside for the moment because they seemed to be quagmires.

8   I did come back to them, but not for the purposes of the

9   Paperwork Reduction Act.

10      I looked at Section 7203 and it said, "When required

11  by this title or by regulation promulgated thereunder any

12  person willfully who fails to make a return."

13      And I came to the conclusion the way I'm supposed to

14  read this "stop sign" is that there had to be some --

15  something else besides 7203.

16      Now, at that moment, I wondered -- I put 6203 --

17  7203 and 6012 aside and I went to the Hicks decision,

18  because in the Dawes decision, the paragraph above the

19  statement by the Dawes court, that we would be inclined

20  to accept the analysis of Hicks and Wunder, so I went to

21  Hicks to see what they were inclined to do but had

22  decided not to adopt, and Hicks joined the Sixth Circuit

23  in citing the Section 6012 and 7203 as a statutory

24  requirement.

25      But I wasn't through yet.  And so I also learned at

```
1  the TU law library of the Salberg decision which was from

2  the Seventh Circuit in 1992.  And I have that as Exhibit

3  Number 78, Your Honor.  And that cite is 969 F.2d 379,

4  and I believe it's 383 -- and I'm sorry, I don't have

5  that in that format but I have cited it in my briefs.

6            THE COURT:  What exhibit number?

7            MR. SPRINGER:  It's at 969.

8            THE COURT:  No, what exhibit number.

9            MR. SPRINGER:  Sorry, Exhibit Number 78 of the

10 defense exhibits.

11           THE COURT:  Now, is this the copy that you

12 printed out when you read this back in the early

13 nineties?

14           MR. SPRINGER:  No, Your Honor, it's not.  It's a

15 copy that I have in putting together this defendants'

16 exhibit.

17           THE COURT:  And take me to the language --

18           MR. SPRINGER:  Paragraph -- I'm going to start

19 at paragraph 18, Your Honor.  "Salberg contends that

20 although the Form 1040" --

21           THE COURT:  Now, remember, you're on the record,

22 so read slowly.

23           MR. SPRINGER:  I'm sorry.

24      "Salberg contends that although" --

25           THE COURT:  Wait, wait, Mr. Springer.  You said
```

```
 1   you're in paragraph 18.

 2           MR. SPRINGER:  Yes.

 3           THE COURT:  You're not reading from paragraph 18

 4   of my Exhibit 76.

 5           MR. SPRINGER:  Seventy-eight, Your Honor.  It's

 6   Exhibit 78.  It's the Salberg decision from the Seventh

 7   Circuit.

 8           THE COURT:  Okay.  Instead of you reading it

 9   into the record, let me just read it.

10           MR. SPRINGER:  All right.  Just 18, 19, and --

11   full paragraph 19, Your Honor.

12           THE COURT:  Okay.  I've read paragraphs 18 and

13   19.

14           MR. SPRINGER:  So it became apparent in my

15   understanding that the Seventh Circuit was -- without

16   saying they were going against the Dawes decision from

17   1991 Tenth Circuit, they were saying the requirement came

18   from solely Section 7203 and didn't involve any

19   regulation, and so I -- I categorized that one.

20       And then I went to the --

21           THE COURT:  You understand that you're on trial

22   for statutory violation.

23           MR. SPRINGER:  Yes, Your Honor.  But I'm also

24   presenting why I didn't believe I was violating -- and to

25   the degree that it has to be characterized as a mistake,
```

1   that's the way I will characterize it.  It's a good-faith

2   belief that I didn't believe that I was violating the

3   law.

4          THE COURT:  What is it in Salberg, paragraphs

5   18, 19, or otherwise, that gave you comfort that you

6   don't have to file and report income as required by

7   statute?

8          MR. SPRINGER:  The comfort wasn't from Salberg,

9   but it demonstrated that -- to me, it demonstrated that

10  the Seventh Circuit didn't agree with the Tenth Circuit.

11  And this was consistent with lots of the information that

12  I had gathered traveling all over the country.  It was

13  consistent that there is -- there is a known

14  requirement -- statutory requirement, but that it -- when

15  different judges considered the issue, they were not all

16  speaking on the same statutory theory, as the Tenth

17  Circuit in Dawes said, statutory origin theory that they

18  did not subscribe to.

19      And so I was trying understand what the statutory

20  origin theory was as I went to Salberg, and discovered

21  that in the Seventh Circuit they didn't accept Wunder or

22  Hicks, although they cite to it here, because Wunder and

23  Hicks did cite to 7203, but they did not cite to Section

24  6012.

25      And so then, Your Honor, the -- there are two cases

1  that go past this issue, one is the Neff decision from

2  the Eleventh Circuit, and in that case, they simply cited

3  it was section -- and I cited this in my briefs, Your

4  Honor.  The Eleventh Circuit's Neff decided that the

5  statutory requirement to file came from 6012 by itself.

6      And then I went to the Kerwin case from the Fifth

7  Circuit and they just cited to Wunder, and said, "See the

8  statutes that require it."  They never cited to a

9  specific statute.

10      And so I was now gaining some understanding -- and,

11  Your Honor, putting this in perspective, this is about

12  1995, 1996, that I'm starting to spend a lot of time at

13  the TU law library on this.

14      And, now, I will admit that after 1992, there wasn't

15  much -- there wasn't any cases, actually, at all to go by

16  to further my investigation, but I did find and agreed

17  with the Tenth Circuit's position in the Dawes case, as

18  cited to the Collins decision in footnote 12 and 13, that

19  the Supreme Court had said that the Paperwork Reduction

20  Act applies to the IRS's Form 1040 request forms and that

21  it applied to the obligation to file a return and it --

22  it was --

23          THE COURT:  Now, wait a second.  It's one thing

24  for the PRA to apply to a given form, it's another thing

25  for a given form to violate the PRA.  Are we together on

1  that?

2          MR. SPRINGER:  Yes, sir, I'm on that 100

3  percent, and I'm with you on that.

4          THE COURT:  Now, are you telling me that the

5  Court of Appeals -- our Court of Appeals has said that a

6  violation -- that there is, in fact, a violation of the

7  PRA applicable to the 1040 that absolves you of the

8  obligation to file?

9          MR. SPRINGER:  I presented those questions to

10  the Tenth Circuit, and on August 31st, and this is

11  outside of the scope of when I began my beliefs, but this

12  is what they've said, August 31, 2009, that that was

13  within the difficult issues that I had raised between the

14  tax statutes and the Paperwork Reduction Act.

15          THE COURT:  Well, that circles us back, then --

16  and I certainly do applaud your reference to the relevant

17  time period.  That circles us back to some sort of

18  definitive material that would provide a basis for your

19  good-faith belief that the Form 1040 violated the PRA.

20          MR. SPRINGER:  All right.

21          THE COURT:  My ears are still perked.

22          MR. SPRINGER:  Well, I had to lay the foundation

23  for it, Your Honor, because I'm taking it the way it did

24  happen and not trying to --

25          THE COURT:  So now you're getting ready to give

```
 1  me your killer.
 2          MR. SPRINGER:  Yes, I'm going to give you my
 3  killer.
 4          THE COURT:  Okay.
 5          MR. SPRINGER:  All right.  After I became aware
 6  of all these cases and they were all dividing on the
 7  requirement whether it was statutory and regulation --
 8  and I did become aware of a case from the Tenth Circuit,
 9  which I've cited in my briefs, where the Tenth Circuit
10  said it was 6011 and 6012, which did involve, when
11  required by regulation, prescribed by the secretary,
12  which was also cited by the government in their bill of
13  particulars.
14          THE COURT:  Now, this is 6011 and 6012?
15          MR. SPRINGER:  Yes.
16          THE COURT:  Do you have copies of those handy?
17          MR. SPRINGER:  I do, Your Honor.  Yeah, they're
18  in there.  Hang on just one second.  I'll tell you where
19  I put them.  6011 would be my Exhibit Number 142 and 6012
20  would be Defendants' Exhibit Number 144.
21          THE COURT:  I don't have a 144.  I've got 142,
22  but 144 has nothing in it.
23          MR. SPRINGER:  And I will fix that, Your Honor.
24  I do have the Internal Revenue Code, if you would like to
25  have that to look at 6012, if that would help you.
```

```
 1              THE COURT:  Well, go ahead.  Forgive the
 2    interruption.  Go ahead.
 3              MR. SPRINGER:  So I'm establishing here at 6011,
 4    which I'm taking the direction of the Tenth Circuit and
 5    why they didn't subscribe to the statutory origin theory
 6    when required by regulation prescribed by the secretary
 7    every person made liable, and so what I did I went in and
 8    gathered and was able to gather -- and I will just say,
 9    Your Honor, that I got three of these from an attorney
10    named Larry Becraft.
11              MR. O'REILLY:  Your Honor, three of what?
12              MR. SPRINGER:  I'm sorry, I'm getting ready to
13    tell you.  Just a minute.
14         Your Honor, if you -- Exhibit Number 47 is called --
15    and it's really not an 83-I, as I have listed, it's an
16    SF-83 for 1987, and that is Exhibit Number 47.
17              MR. O'REILLY:  Your Honor, we would request when
18    did Mr. Becraft allegedly provide these to the
19    defendant.
20              THE COURT:  That's a fair question.
21              MR. SPRINGER:  Yeah.  Your Honor, I don't really
22    remember exactly the time, but it would be sometime in
23    the mid to late -- I would say '96 or '97 time period on
24    the first one, and, actually, quite frankly, he had -- he
25    had several documents -- several application forms in the
```

1    eighties and he was a prominent person who had actually

2    litigated some of those appellate cases that I had

3    mentioned to you earlier, but I particularly began my

4    investigation into the application by the IRS to get

5    approval from OMB to display an OMB number on the Form

6    1040, which in my understanding was to tell the public

7    this form has been approved.

8        And I first noted on the Exhibit 47 on line 5, where

9    it said, "Legal authority for information collection

10   request," and the IRS placed on there "6011" and "6012,"

11   just like the Tenth Circuit said when they rejected the

12   Wunder and Hicks decision, the statutory origin theory,

13   and how they had said in other cases that 6011 and '12

14   should be taken together and not separated.

15       And if the Court will note further, on the next page

16   of Exhibit 47, the IRS also cited to regulatory authority

17   for the information collection and they cited to -- at

18   the bottom of the second page, on paragraph 27, they

19   cited to 26 CFR 1.6011-1 and 1.6012-1, and then they

20   wrote at the bottom there, through 1.601-1A8 (ph).

21       And so it is my testimony here today that I did go

22   and look at those to try to understand the distinction

23   about what was being asked -- and once I did look at it,

24   Your Honor, I will admit I understood what "required by

25   regulation, prescribed by the secretary" meant.  I did

1   not stumble there at all.

2       But what I had difficulty with is the next page,

3   page 3.  And if the Court will notice, on the very first

4   paragraph, the IRS's own explanation is, "IRS Sections

5   6011 and 6012 require individuals to prepare and file

6   income tax returns annually.  Form 1040 is used by

7   individuals to report their income subject to tax and

8   computes their correct tax liability."

9       Now, the reason why I had difficulty with that was

10  because in all actuality --

11          THE COURT:  And when did you first lay eyes on

12  this?

13          MR. SPRINGER:  I would say this is late '96 or

14  early '97 when I first laid my eyes on it.

15          THE COURT:  Okay.

16          MR. SPRINGER:  Now, at the exact same time that

17  I'm noticing this application, I'm also aware of the fact

18  that the Congress of the United States had changed the

19  Paperwork Reduction Act from 1980 to 1995, but what I had

20  not recognized at this exact time was the significance,

21  the difference, why they did it.

22      And so as I agree with what the IRS is saying on

23  this -- on this application 87, there's not much more I

24  can do on this issue until 1998.

25      And in fact, I will admit I did not get the 1998

1   application until early 1999, and I have attached that as

2   an exhibit, Exhibit 49.

3        And, Your Honor, I can tell you that Exhibit 48 and

4   Exhibit 49, I had copies of both of those and had

5   thoroughly marked all over them, but I have only provided

6   the copies that I have been able to print off of my Web

7   site that I posted.  I do not have the original ones

8   because I had -- I had marked all over them at some

9   time.

10       And I'm -- I'm not blaming Mr. Shern for this

11  because I'm not really sure, but there -- seems to me to

12  be there is a couple of boxes that are missing in the

13  discovery in this case irrelevant to the government's

14  side of the case, but quite relevant to this.  Now, I'm

15  not saying it's there or it's not there, I'm just saying

16  I can't find the one that I had marked up on.

17       But if the Court will go to 49, which is what I did,

18  there becomes a significant change in the 1980 Paperwork

19  Reduction Act and the 1995 Paperwork Reduction Act.

20  Also, too, we go from an SF-83 application, what I just

21  showed the Court, to an 83-I application.

22       And on this application, on the second page -- and

23  note, Your Honor, that the IRS is still going in and

24  trying to get approval for an OMB number from the Office

25  of Management and Budget.  But if you look at the second

1  page -- and this is what is significant about the change

2  that Congress implemented against the IRS.  It's called

3  Certification for Paperwork Reduction Act Submissions.

4  And it says, "The following is a summary of the topics"

5  -- and this is on my Exhibit 49, second page.  "The

6  following is a summary of the topics regarding the

7  proposed collection of information that the certification

8  covers."  And it says, "It is necessary for the proper

9  performance.  It avoids unnecessary duplication."

10      And you can just pass on down to G, Your Honor,

11  because this is where I'm at.  It informs respondent of

12  the information called for under 5 CFR 1320.8(b)(3).  And

13  it says, one, why the information is being collected;

14  two, use of the information; three, burden estimate;

15  four, nature of response.  Is it voluntary, required for

16  a benefit, or mandatory?  And then, five, nature and

17  extent of confidentiality; and, six, need to display a

18  current valid OMB control number.  And, again, I

19  emphasize that Title 44 Section 3512 says, "Valid issued

20  in accordance with this subchapter."

21      Now, if you'll notice at the bottom of the page,

22  Your Honor, there are some asterisk words here and this

23  appears on every 83-I, and the reason why there's no '95

24  when the new law came in is because the government was

25  closed down.  It was the Clinton battle with Congress and

1   so there was no application in '95.

2       And so in the -- and by the way, the application is

3   good for three years and they have to file an 83-C every

4   second and third year to change things like the year on

5   the form or any other words that they need to change

6   because the law says that if they get a form approved and

7   they want to make a change, they got to get new approval

8   for it.

9       And so here it is on the bottom of the 83-I for 1998

10  and it says, "If you are unable to certificate compliance

11  with any of these provisions," which is everything above,

12  "identify the item below and explain the reason in Item

13  18 of the supporting statement," and they leave it

14  blank.

15      So now all we have to do is go look at a 1040 form

16  for 1998, which I have provided Your Honor.  This is

17  exactly what I did.  And -- excuse me.  I'm sorry.  I

18  didn't provide the '98 yet.  I did -- I did look at the

19  '98, Your Honor, but this one -- this actually covers --

20  this application actual covers from '98 to 2001 and I

21  think the Court will find that I also included the same

22  83-I for 2001, but if you just pull up any 1040 form, and

23  let's just start with Number 23, Defendants' Exhibit

24  Number 23, which is the 2000 form, and just try and

25  locate where any of that information is on the form.

1    And, again, it says "it."  "It informs."

2        So if we go to Exhibit Number 24 -- and, actually,

3    Your Honor, it would be Exhibit 23, I believe, is the

4    1040 form itself, and I looked at -- and, again, this

5    form is the same form approved for 1998, except it's been

6    modified to change from the year '98 to '99 to 2000.  And

7    I'm sorry I don't have it in there and I will have it in

8    there by tomorrow.  I will make sure I have that fixed.

9    I'm doing the best I can with all of this, Your Honor.

10        But I went through and I looked at where did they

11    say on the Form 1040 why the information was being

12    collected and I couldn't find it.  And it was the same

13    for everything listed there.

14        And one of the issues that was so compelling here

15    was all these people were telling me that they couldn't

16    find the law that required them to file a return and I

17    definitely --

18            THE COURT:  Excuse me, Mr. Springer.  So you're

19    telling me that the face of the 1040 was required to

20    contain the information set forth in subparagraphs A

21    through J on the second page of your Exhibit 49?

22            MR. SPRINGER:  Yes, under -- actually,

23    specifically, Your Honor, this certification is under 5

24    CFR 1320.9, which is the OMB regulations on the topic.

25    And, yes, that is what exactly -- OMB would never have

1    allowed IRS to have approval if the IRS did not sign this

2    certification.  They would have denied it.

3        In fact, in -- there has been a couple of times

4    where the IRS did not file their application timely and

5    couldn't get approval, which is another interesting topic

6    that I discovered later down the road.  Yes, I'm telling

7    you, Your Honor --

8            THE COURT:  Well -- excuse me.  So just taking

9    that, then, as a case in point, was there a year that the

10   1040 didn't even go out?

11           MR. SPRINGER:  2006, the form went out, but it

12   was 30 days delayed because OMB denied the IRS their

13   application at that point, and the reason why, Your

14   Honor, they changed their methodology.  After I filed

15   05-466 in the Western District, which Your Honor was the

16   judge, the IRS went in and took all the OMB numbers off,

17   212 forms, and put the 1040 OMB number on all those forms

18   and had to get approval to do it.  Didn't get the

19   approval at first, then had to explain it, and then OMB,

20   leaving it up to you and I to decide whether that's

21   acceptable or not under the Paperwork Reduction Act as

22   citizens, said, okay, try it.

23           MR. O'REILLY:  Objection.  We're now into 2006,

24   which makes it irrelevant.

25           THE COURT:  Well, he was responding to a

 1   question.

 2          MR. SPRINGER:  I was answering the question.

 3          MR. O'REILLY:  Okay, Your Honor.

 4          MR. SPRINGER:  For all the years at issue in

 5   this case, the form was always at the first of the year

 6   except for -- with one change.  On the 2005 year, this is

 7   the year which -- your Honor, I have included in exhibits

 8   to explain this and I have identified the 2005 as Exhibit

 9   Number 33.  The 2005 form is a prospective -- is a form

10   issued after the fact, all right?  It comes in January of

11   '06.  And in January of '06 is when the IRS first changed

12   their methodology.  They did not have approval for it,

13   but they took all of their numbers for 25 years they've

14   been applying to OMB for each individual request form,

15   whether it be 1099, 941, they all had separate approval

16   numbers.  And as soon as I showed them what they were

17   doing, they took all those numbers and threw them in the

18   trash can.  And now all those forms, and there's 212 of

19   them, they all carry one OMB number.

20      Now, that's only for 2005 that that becomes

21   relevant.  But from my understanding, and what I'm seeing

22   the government do in response to what I am saying -- I

23   mean, the Court knows I've received several written

24   responses from the Department of Justice in pleadings,

25   both at the district court and the appellate court level

1  and in tax court, so I'm pretty familiar with their only

2  argument that they've made.

3      And it is my testimony here today that what I

4  discovered in 1999 in relation to these 5 CFR 1320.9 and

5  1320.8(b)(3) violations, that I found that was consistent

6  all the way through.  And every year --

7          THE COURT:  Let me interrupt.  Because I want to

8  bring you back to an important point.

9          MR. SPRINGER:  Okay.

10          THE COURT:  You are very articulately giving me

11  your theory.

12          MR. SPRINGER:  Right.

13          THE COURT:  I want you to very articulately cite

14  me to something that supports your theory as a basis for

15  a good-faith belief that the Form 1040 violated the PRA.

16          MR. SPRINGER:  That the form did not contain any

17  of the information required by their certification that

18  they applied to OMB for and also it did not contain any

19  of the information under 3506 of the Paperwork Reduction

20  Act, which in part says that they must tell you why

21  they're asking the questions, citing to statutes and

22  regulations.

23      I agree they put on their application, but they're

24  supposed to tell the public that.  That's why Congress

25  says, on Section 3512 -- it's labeled "public

1  protection."

2      And so -- and this is what I raised in the August

3  31, 2009 decision from the Tenth Circuit, which was

4  basically going against the Lewis decision, where they

5  found -- Lewis didn't challenge the instruction booklet,

6  which I'm not challenging the instruction booklet.  I'm

7  staying as far away from that as I can.  But I would rely

8  on the instruction booklet and I will agree that if I can

9  find the information in the instruction booklet that is

10  certified here to exist on it, then I probably would not

11  have the issues that I have now and could have zoomed in

12  on my target.

13      I'm not trying to tell the jury to stop filing tax

14  returns.  In fact, Your Honor, you haven't heard anybody

15  testify to anything like that.  But what I am saying is

16  I'm not supposed to be subject to any penalty.  I

17  determined I wasn't subject to any penalty.

18      But it gets a little more interesting when you look

19  at what the IRS said in the instruction booklet.  And,

20  Your Honor, staying on 2000, if I could take the Court to

21  the 2000 instruction booklet, which is my Number 24, and

22  the bottom of the page, Your Honor, denotes -- that I'm

23  wanting to take the Court to is page 56 of the

24  instruction booklet.

25      And the testimony I'm giving now is the same no

 1   matter whether this is a 1996 1040 form and instruction

 2   booklet, or all the way up through the present.

 3        And I just -- I would add just a little preface here

 4   for my own suspicion, that in 1992, when the IRS was

 5   complying with the Paperwork Reduction Act, they would

 6   put the notice on page 4 and refer to it as instruction

 7   booklet on page 4 in the '92 booklet.  By 1993, they had

 8   stopped referencing instruction booklet on the 1040 form

 9   and just said "see page" whatever, and that is consistent

10   on the 2000 form, where at the bottom of it, it just says

11   "see page 56."

12        But on page 56, it says these words:  "The IRS" --

13             THE COURT:  Now, I can read it.  Let's have some

14   mercy on the reporter.  You just tell me what paragraphs

15   you want me to read.

16             MR. SPRINGER:  I'd like you to read the fourth

17   paragraph, Your Honor, on the left column, beginning,

18   "You are not required."

19             THE COURT:  Okay.  Okay.  Go ahead.

20             MR. SPRINGER:  All right.  Now, already having

21   the information -- and by the way, as I said earlier,

22   this is the same statement in the '98 booklet.  It's the

23   same.  So in comparison, my testimony is the same whether

24   it be -- as I was learning this in '99 or as I go through

25   in each of the years present.

1          THE COURT:  So do I hear you telling me, then,

2    that everything that's on page 56 of your Exhibit 24 --

3          MR. SPRINGER:  Yes.

4          THE COURT:  -- should have been contained on the

5    Form 1040?

6          MR. SPRINGER:  Not only that everything on that

7    page, but there's so many things that should have been

8    here based upon the certification that are not here.

9          THE COURT:  Okay.  Go ahead.

10         MR. SPRINGER:  And -- but more -- and,

11   particularly -- it gets a little bit better or more

12   specific -- the statute actually doesn't tell the agency

13   to tell the public you're not required to provide

14   information, the actual statute at 44 USC 3512 from the

15   1995 act says, "No person shall be subject to any

16   penalties."  It doesn't tell the public, hey, don't

17   provide the information, it tells the public you can't be

18   penalized for failing to provide the information.

19      Now, this paragraph here doesn't actually --

20         THE COURT:  That brings up an interesting

21   point.  Section 3512(b) --

22         MR. SPRINGER:  Yes.

23         THE COURT:  And I -- I'm certainly not ready to

24   reach any conclusions about this, but my eye was

25   certainly caught by Section 3512(b), because it says that

 1   if -- in substance, that if there's a violation, it's a

 2   complete defense or bar and may be raised as such.

 3            MR. SPRINGER:  Right.

 4            THE COURT:  "At any time during the agency

 5   administrative process or judicial application --

 6   judicial action applicable thereto."

 7            MR. SPRINGER:  Yes.

 8            THE COURT:  Which doesn't sound to me like a

 9   criminal prosecution.

10            MR. SPRINGER:  Well, now, if the Court would

11   just turn to the published Chisholm decision from 2007,

12   the Court will get its answer on that question, because

13   they clearly said it did apply to a criminal charge of

14   failure to file, but it does not apply to a criminal

15   charge of filing information that's false.

16            THE COURT:  But Chisholm still didn't say that

17   the 1040 violates the PRA.

18            MR. SPRINGER:  That is true.  And I'm only

19   stating in good faith.  Your Honor, I'm not asking you to

20   tell the jury the 1040 form does not comply with the

21   Paperwork Reduction Act.  I am trying to present to the

22   jury why I, in good faith, believed the 1040 did not

23   comply with the Paperwork Reduction Act.

24            THE COURT:  And I don't want to cut you off, but

25   I'm going to ask you how much more you have.  We may have

```
 1   cross-examination, we may have argument, so --

 2           MR. SPRINGER:  Your Honor, my testimony here

 3   with regard to the Paperwork Reduction Act would remain

 4   the same for each of the years at issue in Counts 2, 3,

 5   4, 5, and 6, and to the extent it would matter in the

 6   last manner and means claim of Count 1, it would at least

 7   apply from 1999 forward, because at that moment in time,

 8   I had definitely made a conclusion.  Although the Court

 9   has already told the government, I believe, in at least

10   one instance that an omission is not going to be the

11   object of the conspiracy, so having said that --

12           MR. O'REILLY:  Your Honor, just for

13   clarification, I don't recall the Court saying

14   "omission."  I mean, I don't think that was ever

15   discussed.  Perhaps Mr. Springer is thinking of that the

16   omission cannot be an overt act of a conspiracy, which we

17   don't dispute.

18           MR. SPRINGER:  Can't be the object of a

19   conspiracy, I think that's what you said.

20           THE COURT:  Well, there's no need to debate

21   that.  I don't have any recollection at the moment one

22   way or the other.

23           MR. SPRINGER:  Your Honor, I have also --

24           THE COURT:  Although it seems unlikely that I

25   would have said that an omission cannot be the object of
```

 1   a conspiracy, but I'm certainly not quoting the record on

 2   that.

 3         MR. SPRINGER:  Okay.  That's the way I took it,

 4   Your Honor.

 5      Now, Your Honor -- and I believe you touched on this

 6   in the Cheek decision when you read page 201, 498 U.S. --

 7   page 201 dealing with the three-part test of

 8   willfulness.

 9      The first one was that the law imposed a duty.  The

10   second one was that I was aware of that duty.  And the

11   third one was that I voluntarily and intentionally

12   violated that duty.

13      And not only am I going to tell -- would like to

14   tell the jury that I relied upon Section 102 of the tax

15   code, I also intend to tell the jury about extensive

16   discussions that I've had with Mr. Shern's lawyer in the

17   Bivens case over the last 15 years, when after the

18   government took the $1.265 million from me, I needed to

19   understand how that happened and -- because I didn't

20   agree with it.

21      And then after I had to accept it, not agreeing with

22   it, I then established or structured my life based upon

23   not only the district court judge's decision, not only

24   the discussions I had had with the United States and the

25   Department of Justice lawyers, but also I got to do oral

1   argument in front of the Third Circuit Court of Appeals,

2   and I was told I was the first non-attorney to ever get

3   to do that, and so I got to look those judges in the eyes

4   and I got to understand where they were coming from with

5   respect to their questions that they had for me, and I

6   gave them every opportunity and they had zero.

7        Now, I understand it's how I interpreted that.  But

8   if you look at their opinion and if you look at the steps

9   that they took to keep me out of oral argument, that they

10  kept me from having anybody -- I couldn't take any money

11  to hire a lawyer to represent me and Bondage Breakers

12  Ministries in that case, while everyone else were

13  released with millions of dollars to hire huge law teams

14  and I had to fight all of them, and in each of those

15  instances, I came to the conclusion that if they were

16  going to say I couldn't have that money, then that meant

17  that if somebody gave me money under those same

18  conditions, that -- if it was not something that they

19  could say I gave consideration for in light of all the

20  circumstances, then that meant that I could do the same

21  thing I did in the Infinity Group case with everybody, as

22  long as I made it clear that the money that they were

23  giving me was something they couldn't sue me for, they

24  couldn't sue me for expectation.  If I did something,

25  they couldn't say -- I'll give you another example:  If

 1   the check bounced, I couldn't sue them.  These were the

 2   things that were discussed during '97 and '98 in that

 3   case.

 4        And the last thing that I relied upon, Your Honor,

 5   and I had to deal with this extensively, is the meaning

 6   of "regulation" or meaning of "services" -- "services

 7   rendered."  And I will admit that it may not be the

 8   standard definition that everyone thinks exists, but

 9   under 1.61-2 of the -- of Title 26 -- 26 CFR,

10   compensation for services is specifically addressed, and

11   it says that the meaning is compensation for services by

12   a distribution of profits.  And I had to deal with that.

13   I had to deal with that when I was dealing with all these

14   lawyers who were trying to tell me why at the time that I

15   couldn't keep this money.

16        And, specifically, I ended up with this problem that

17   I had no contract, I had no agreement, and, therefore,

18   the money was disgorgeable regardless of what I had

19   done.

20        And at the same time, I was watching all these

21   lawyers get paid and all these trustees get money and it

22   didn't make any sense to me.

23        And I tried to make sense out of the regulations and

24   the statutes, and I came to the conclusion that "service"

25   is not defined in Section 61, and that "service," if

1   anything, is intended to mean at 1.61-1, that you must --

2   if you receive a service from somebody, you must attach a

3   value to that.

4       And then when you get to 1.61-2 -- and I attempted

5   to ask Mr. Miller about it, and he didn't remember, but

6   he thought he looked at it, it clearly never says

7   "services rendered" or "legal services to be rendered."

8       Now, I'm not arguing that the court and I'm not

9   arguing that the government's position was wrong.  I have

10  never made argument.  But I do believe that if they're

11  going to be allowed to take money from me on that

12  condition and basis in 1998, that they should have to

13  live with that decision in every other aspect of my life

14  with Bondage Breakers Ministries that that would apply.

15      And that's why I'm coming from in this case.  It's a

16  secondary issue about the Paperwork Reduction Act.  First

17  issue is why did I tell people why I could only receive

18  donations and gifts.

19      Now, I'm not telling you that some of the witnesses

20  have said otherwise, because there's three in particular

21  that I know of that have completely stated on the record

22  that they never had any discussions with me about

23  donations.

24      And there are two people who are going to testify in

25  my defense who will demonstrate that that's just simply

```
 1  not true.
 2      And the third one, I have a videotape, I don't know,
 3  you know, how I can go any further with that one, but
 4  it's insignificant in relation to the rest of the
 5  government's case.
 6      So in summary, Your Honor, I relied upon what
 7  happened in Philadelphia in 1997 and 1998, the fact that
 8  Bondage Breakers Ministries was a party in that case,
 9  that I was allowed to represent that Bondage Breakers
10  Ministries as a d/b/a, that money was allowed to be taken
11  because it was a donation instead of something that was
12  contracted, and then I also relied upon -- and the
13  evidence will show I expressed this to Mr. Shern when I
14  met with him and Mr. O'Reilly on the second meeting, not
15  the first, that I solely relied upon the Paperwork
16  Reduction Act, the words of the Commissioner of the IRS,
17  the decision from the Tenth Circuit in Dawes, the Supreme
18  Court in Dole, and also the legislative history of the
19  1995 Paperwork Reduction Act, which clearly says that
20  whatever doubt there was left after the courts all tried
21  to -- like the Tedder decision in 1986 from the Tenth
22  Circuit -- if there was any doubt that the Paperwork
23  Reduction Act applied to the request for income tax
24  information on any form, which is the definition of
25  "return," that they were saying that there was no doubt
```

```
 1   it should apply to the IRS and every one of their

 2   requests, and just by the fact the IRS asked for

 3   permission to ask the public that information on that

 4   form by their application should be enough to satisfy

 5   anybody that at least the IRS thinks they have to

 6   comply.

 7        And if you have any questions for me or any cross-

 8   examination, how would you like me to do that?

 9             THE COURT:  Cross-examination.

10             MR. SPRINGER:  Would you like me to sit up

11   there?

12             MR. O'REILLY:  Your Honor, I'm going to have no

13   cross-examination of Mr. Springer today.  However, I do

14   want to bring to the Court's attention that I do intend

15   to, on cross, inquire of his prior criminal convictions.

16             THE COURT:  Well, that's not what we're

17   addressing.

18             MR. O'REILLY:  I understand, Your Honor, but I

19   wanted to make sure he was aware of that.

20             MR. SPRINGER:  It is what it is, Your Honor.

21             THE COURT:  Okay.  Does the government have any

22   response by way of argument bearing in mind the issue is

23   not whether he's right about the PRA --

24             MR. SPRINGER:  And I'm not trying to say that.

25             THE COURT:  Mr. Springer.
```

1      But whether he has articulated a basis upon which

2  the Court ought to -- whether as a matter of caution or

3  as a matter of right -- permit Mr. Springer to articulate

4  for the benefit of the jury the basis upon which he

5  thought that the PRA excused him from compliance with

6  requirements that otherwise might be applicable.  That's

7  the issue.  If the government cares to address that, I'll

8  be happy to hear you.

9          MR. O'REILLY:  Excuse me, Your Honor?

10         THE COURT:  I said that is the issue.  If the

11  government cares to address that by way of argument, I'll

12  be happy to hear you.  As a matter of fact, I'll be happy

13  to hear you either tonight or in the morning before we

14  resume, whichever you prefer.

15         MR. O'REILLY:  Your Honor, it's very brief.

16      To the extent that Mr. Springer wants to try to

17  persuade the jury that he has a good-faith belief that

18  the Paperwork Reduction Act meant he didn't have to file,

19  we don't have an opposition to that.  I do not believe

20  that any of this material should actually be presented to

21  the jury in its documented form.  And there are excerpts

22  -- part of the problem I have with Mr. Springer's

23  presentation tonight was I didn't see what it is he's

24  actually intending to want to introduce through testimony

25  by reading -- that was in support of this.  As long as

1   it's limited to that, we're not going to have a problem.

2   I don't want -- and I think the Court has already given

3   us this guidance -- an introduction of law being made in

4   this case.

5           THE COURT:  Okay.  Okay.  Very well.  I'm ready

6   to rule.

7       Mr. Springer, I'm pushing the bar lower than I think

8   it actually exists, and I'm pushing the bar lower than I

9   think a fair reading of the Willie case suggests I ought

10  to push it, but I'm going to push the bar low enough for

11  you, within certain limits, to tell your story to the

12  jury.

13          MR. SPRINGER:  Okay.

14          THE COURT:  And when you start repeating

15  yourself, we're going to go on to something else.

16          MR. SPRINGER:  Okay.

17          THE COURT:  And then there is a limit in terms

18  of overall time.  Now, you've walked me through your

19  theory in a little less than an hour and a half.  We're

20  not going to spend an hour and a half on this, I promise

21  you, so you're going to have to think of how you're going

22  to hone it down.

23      I'm very dubious as to how the Infinity Group case

24  touches this top, side or bottom.  I really am.  I don't

25  see anything in that Infinity Group case that has any

 1   even arguable or analogous relationship to the

 2   transactions involved in this case.  I'll have to think

 3   about that.  And it may -- I'm just going to have to

 4   think about that.

 5       But beyond that, bearing in mind that the issue is

 6   whether you have a basis for a good-faith belief that the

 7   Form 1040 violated the Paperwork Reduction Act, I'll tell

 8   you, you would be in trouble if it was up to me, but it's

 9   not up to me, it's up to those 12 good people.  And I'm

10   going to let you tell your story.

11       We're not going have all these -- for the reasons

12   discussed by the cases that I -- that I referred to at

13   some length last night, we're not going to have legal

14   materials, as such.

15       Now, I'll reserve judgment as to whether Forms 1040

16   from the relevant years are or are not admissible.  I'm

17   not going to decide that tonight.  But one thing I will

18   tell you, for the reasons covered by the Courts in the

19   cases that I referred to after we were finished for the

20   day with the jury yesterday, is that we're not going to

21   have in evidence extraneous legal materials, cases and so

22   forth.

23       To the extent that you are permitted to cover this,

24   and as I have said, you will be permitted within the

25   outer bounds of reason to cover this, your reference to

1  those materials is simply going to have to be by way of

2  concise reference to the passages of -- that you want to

3  tell the jury affected your state of mind.

4          MR. SPRINGER:  Okay.

5          THE COURT:  And so we'll have to take it one

6  step at a time.  And I think although the hour is late,

7  this is -- this has probably been time well spent in the

8  sense that you have been provided an opportunity to make

9  your showing.

10      I have pushed the bar down to the rock bottom and

11  have said, okay, I am going to permit you to proceed on

12  this basis, but there will still be limits.  But you have

13  established in this proceeding tonight that you will be

14  permitted to proceed with respect to this theory.

15      Anything more we ought to cover before we recess?

16          MR. SPRINGER:  Yes, Your Honor.  On the Form

17  1040, you said you were going to be considering that.

18  Does that also include consideration of the instruction

19  booklet as well, the paragraph that you read where it

20  said you're not required to provide?

21          THE COURT:  That's a little more likely to be

22  actually admitted, but in fairness, I want to hear what

23  both sides have to say about that.

24          MR. SPRINGER:  Also, too, as far as a point of

25  procedure, even though the cases or whatever doesn't come

1  in, am I allowed to put them up here and let the jury

2  read along with me as I've highlighted them or should I

3  just read them and hold it up and say the government

4  doesn't object to what I just said, or how would I

5  approach that?

6            THE COURT:  Mr. O'Reilly?

7            MR. O'REILLY:  I certainly do not want

8  Mr. Springer making representations about what we do or

9  don't object to.

10           MR. SPRINGER:  Exactly.

11           THE COURT:  You're going to have to do it from

12 the stand, just telling the jury about what you relied

13 on.

14           MR. SPRINGER:  Will I be able to read, like, a

15 paragraph in that decision that you mentioned just a

16 moment ago word for word?

17           THE COURT:  Subject to some outer limits, that's

18 true.  We're not going to go on and on and on about this.

19           MR. SPRINGER:  Very good.

20           THE COURT:  Very well.

21     Anything further from either side before we leave?

22           MR. BURTON:  Your Honor, we did have the jury

23 instruction issue.  The hour may --

24           THE COURT:  Oh, yes.  Well, let's -- thank you

25 for bringing that up.  Bear with me just a minute.  We'll

1   -- I want to thank you for reminding me on that.  I will

2   address some instruction issues very briefly.

3        Before we get to the gift instruction, let me

4   address matters in other instructions that we ought to

5   touch on to let you know what my intentions are.  Let me

6   get organized here.

7        Okay.  Mr. Stilley, you may be seated.

8        On the draft of November 2, and it says that in the

9   upper left-hand corner -- now, Mr. Stilley, do you have a

10  physical problem or a health problem?

11       MR. STILLEY:  What I was going to say is that

12  I'm feeling really tired, and if this requires much brain

13  power, I'm just fading.

14       THE COURT:  We'll resume at quarter after eight

15  in the morning.  Court will be in recess.

16       (COURT ADJOURNED FOR THE EVENING RECESS.  FOR

17  FURTHER JURY TRIAL PROCEEDINGS, SEE VOLUME IX.)

18

19

20

21

22

23

24

25