1            IN THE UNITED STATES DISTRICT COURT

2           FOR THE NORTHERN DISTRICT OF OKLAHOMA

3

4    UNITED STATES OF AMERICA,

5           Plaintiff,

6    vs.                         Case No. CR-09-43-SPF

7    LINDSEY KENT SPRINGER and
     OSCAR AMOS STILLEY,
8
            Defendants.
9    ------------------------------

10

11

12

13

14

15           TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16         BEFORE THE HONORABLE STEPHEN P. FRIOT

17            UNITED STATES DISTRICT JUDGE

18              NOVEMBER 5, 2009

19              VOLUME IX OF XIV

20

21

22

23

24

25

```
 1    APPEARANCES:

 2    FOR THE GOVERNMENT:
                                Mr. Charles Anthony O'Reilly
 3                              U.S. Department of Justice
                                PO Box 972
 4                              Washington, DC 20044

 5                              Mr. Kenneth P. Snoke
                                U.S. Attorney's Office (Tulsa)
 6                              110 W. 7th Street, Ste. 300
                                Tulsa, OK 74119
 7
      FOR DEFENDANT SPRINGER:
 8                              Mr. Lindsey Kent Springer
                                5147 S. Harvard Ave.
 9                              Ste. 116
                                Tulsa, OK 74135
10
                                Mr. Robert Scott Williams
11                             Taylor Ryan Schmidt & Van Dalsem
                                1437 S. Boulder Ave., Ste. 850
12                             Tulsa, OK 74119

13    FOR DEFENDANT STILLEY:
                                Mr. Oscar Amos Stilley
14                             7103 Race Track Loop
                                Fort Smith, AR 72901
15
                                Mr. Charles Robert Burton, IV
16                             Burton Law Firm, PC
                                320 S. Boston, Ste. 2400
17                             Tulsa, OK 74103

18
                           EXAMINATION INDEX
19

20    BRIAN MILLER
          DIRECT BY MR. SNOKE                    1963
21        CROSS BY MR. SPRINGER                  2022
          CROSS BY MR. STILLEY                   2115
22        REDIRECT BY MR. SNOKE                  2137
          RECROSS BY MR. SPRINGER                2146
23
      ERIKA DERTIEN
24        DIRECT BY MR. SPRINGER                 2162
          CROSS BY MR. O'REILLY                  2182
25        REDIRECT BY MR. SPRINGER               2184
```

1  (THE FOLLOWING TOOK PLACE IN OPEN COURT AT 8:15

2  A.M., OUTSIDE THE PRESENCE AND HEARING OF THE JURY.)

3       THE COURT:  Okay.  We're here with all the usual

4  parties present outside the hearing of the jury to cover

5  some matters relating to the instructions.  You all have

6  the November 2 draft and I, frankly, in some ways or in

7  some respects, I am uncertain as to at what stage and

8  what iteration of the draft instructions various changes

9  were made, but -- and I have given you a draft of the

10 gift minister instruction that we'll address momentarily.

11     But on the November 2 draft that you have, I first

12 certainly noted the government's objection on page 32 to

13 the addition, which was my addition in that November 2nd

14 draft of the last four words of the instruction,

15 specifically "of Lindsey Kent Springer."  That caused me

16 to go back and review the indictment.  And although the

17 indictment clearly -- Count 3 clearly relates only to

18 Mr. Springer's taxes.  The same is true of Counts 4, 5,

19 and 6.  Count 1 is not so limited, per the words within

20 the four corners of the indictment.

21     For that reason, it is my intent to delete the words

22 "of Lindsey Kent Springer."  The defendants' objection to

23 that is noted.  But it is my intent to delete the words

24 "of Lindsey Kent Springer" because that would effectively

25 narrow the indictment beyond its own text.

1    Okay.  Over on page 33, as you already saw in the

2  November 2nd draft, I added what we will, in the

3  vernacular, call the Hammerschmidt language.  On page 34,

4  as you saw in the November 2 draft, I added language

5  making it, I believe, unmistakably clear that the jury in

6  deliberating and returning its verdict on Count 1 must

7  unanimously find beyond a reasonable doubt that at least

8  one, and they must all agree on at least one and the

9  same, if you will, overt act.  I think that should be

10  made abundantly clear in the instructions and has been

11  with that additional language in paragraph 34.

12    In other words, the overt acts are not like a

13  Chinese menu where one juror can pick one and another

14  juror can pick another one.  They have to unanimously

15  agree on one.  And I think that should be made clear and

16  has been made clear.

17    Okay.  That brings us to the gift minister

18  instruction and my first inquiry of the parties and

19  counsel is this:  I believe it's Mr. Springer says that

20  when we refer to income we should refer to gross income.

21  Which, of course, is a term of art, if you will, for

22  taxation -- for some purposes.  On page 8, referring to

23  the indictment, on -- I'm sorry, not to the indictment,

24  but to the other instructions.  On page 8, in paragraph

25  41, where it repeats the indictment, the instructions

```
 1  and, obviously, the indictment refer to taxable income.
 2       In Count 3, the indictment also refers to taxable
 3  income.  In Counts 5 and 6, the indictment refers to
 4  gross income.  Then when we get over into the
 5  instructions themselves, on page 39, relating to Count 2,
 6  the instructions refer to taxable income.  On page 41,
 7  the instructions refer simply to income.  On page 42, the
 8  instructions, with respect to Counts 3 and 4, refer to
 9  taxable income.  On page 44, the instructions refer
10  simply to income.  Then on page 50, as you might expect,
11  with respect to Counts 5 and 6, the instructions refer to
12  gross income.
13       Well, the gift minister instruction is one that, as
14  we all know, applies to more than one count.  And I don't
15  think in instructing, for instance, as is set forth in
16  the second grammatical paragraph of the gift minister
17  instruction, I don't think I need to be wedded to any
18  particular statutory language.  So we could talk about
19  gross income, we talk about taxable income, or we could
20  talk about income.
21       For this purpose, and because the concepts -- I
22  think the relevant concepts are made abundantly clear in
23  the other substantive instructions.  For this purpose, my
24  inclination, subject to what the parties have to say, is
25  to simply refer to income.  What does the government have
```

1   to say about that?

2           MR. O'REILLY:  United States agrees, Your Honor.

3           THE COURT:  Mr. Springer.

4           MR. SPRINGER:  Well, Your Honor --

5           THE COURT:  By the way, before I forget it, I'm

6   going to make -- and forgive the interruption,

7   Mr. Springer, but I'm going to make a copy of this draft,

8   which is obviously a working draft because of the

9   bracketed language and so forth, Court's Exhibit Number

10  1, and direct the clerk to attach it as a pdf to the

11  minutes of today's proceedings.

12          MR. SPRINGER:  When you say Exhibit 1, I'm

13  confused on that, Your Honor.

14          THE COURT:  This draft I gave you --

15          MR. SPRINGER:  Oh, yes, I got that.  I was in

16  the -- actually was in the instructions --

17          THE COURT:  -- is going to be Court's Exhibit

18  Number 1.

19          MR. SPRINGER:  Got you, okay.  Your Honor,

20  Section 102 of the tax code says, "All gifts, bequeaths,

21  inheritance are not included within the calculation of

22  gross income."  And it doesn't mean -- and as very

23  clearly I'm going to testify, I did not believe and what

24  I said to Mr. Shern as well was it wasn't that I didn't

25  have any income, it's that I didn't have any gross

1   income.

2       And I also believe that in each of the charges,

3   Count 1 through 6, they are all premised upon the failure

4   to file or willful failure to file a tax return.  And as

5   the Court notes in the last two instructions dealing with

6   the willful failure to file on Count 5 and 6, it does say

7   "gross income."  And so, to me, I believe that it is very

8   confusing to the jury to have three different terms of

9   art and then try to merge them all together up against my

10  defense that says that the gifts that were given to me I

11  considered not to be gross income, as Section 102 says.

12  And that is my objection as to why we should be

13  consistent with the jury.  Because not only is it to my

14  defense, but it's also to the government's theory.

15      I do agree for the element in tax evasion of

16  substantial tax deficiency, it would make sense that the

17  jury for Count 2, 3, and 4 should be told taxable income

18  for that part of the crime, the element as alleged.  But

19  it still doesn't take away from the fact, as Section 6151

20  cited by the government in their first bill of

21  particulars says, that the only time you have to pay a

22  tax is if you're required to file a return.  And that's

23  what they said in their theory in response to the Court's

24  order and I don't believe that the Court should allow

25  them to change that theory at this -- I think it's very

1 prejudicial to me and my defense and confusing to the

2 jury when we start giving them three different words.

3     And I would ask the Court that if the Court does

4 decide to give those three words, am I going to be

5 allowed to explain to the jury my understanding of the

6 difference between those three phrases?  And that's all I

7 would have to say.

8         THE COURT:  You mean by way of closing argument

9 or by way of testimony?

10         MR. SPRINGER:  Well, it's about what I intended

11 -- testimony, Your Honor.

12         THE COURT:  Well, we'll take that one question

13 at a time.

14         MR. SPRINGER:  That's great.

15         THE COURT:  The instruction on Counts 5 and 6

16 clearly, and I think quite properly, is couched

17 specifically in terms of gross income.  Given the purpose

18 for the gift minister income -- or instruction rather,

19 and given the fact that it applies to most if not all the

20 counts, and it probably applies to every single count in

21 the indictment, and given the fact that the gift minister

22 instruction does not purport to state the elements of any

23 of the offenses, I'm going to use for the sake of

24 simplicity simply the word "income."

25     Now, the next matter I wish to address is

```
 1  Mr. Springer would suggest that we use the word "evade"
 2  rather than "avoid" in the second line of the second
 3  paragraph.  What does the government have to say about
 4  that?
 5          MR. O'REILLY:  May I have a moment, Your Honor?
 6          THE COURT:  You may.
 7          MR. O'REILLY:  Government has no -- excuse me,
 8  Your Honor, not enough coffee -- no opposition to
 9  changing it to "evade."
10          THE COURT:  Mr. Stilley.  I skipped Mr. Springer
11  because this is Mr. Springer's request.  But,
12  Mr. Stilley, you're certainly entitled to tell me if you
13  object to it.
14          MR. STILLEY:  No.
15          THE COURT:  Very well.  I'll use "evade" rather
16  than "avoid."  Then in the bottom line of the second
17  paragraph we're going to go with "income," as I have
18  said.
19      Okay.  Now, over on the second page, I don't think
20  any of the changes -- the changes on the second page are
21  underscored and the words that would be deleted are in
22  brackets.  Does anyone want to be heard on those changes?
23          MR. SPRINGER:  Your Honor -- can I have just one
24  moment?
25          THE COURT:  Surely.
```

 1          MR. O'REILLY:  Your Honor, just -- I'm assuming
 2  the Court will do this.  There's a couple of places
 3  where -- with the words being changed and we have no
 4  opposition to the changes.  Words like "at" would need to
 5  be removed.  For example --
 6          THE COURT:  That's true.  Instead of "look to,"
 7  it will say "consider."  Instead of "look at," it will
 8  say "consider."
 9      Anything else on the second page of this instruction
10  from the government's perspective?
11          MR. O'REILLY:  No, Your Honor.
12          THE COURT:  Very well.  Mr. Springer.  And we're
13  not in the numbered paragraphs yet.
14          MR. SPRINGER:  Right.  I'm just above it with
15  the brackets and the word "considered" underlined, I see
16  that.  No, Your Honor, I -- notwithstanding my overall
17  objection to the instruction under Duberstein, then I
18  have no secondary problem with that, Your Honor.
19          THE COURT:  Very well.  Mr. Stilley.
20          MR. STILLEY:  Could I have just a moment?
21          THE COURT:  You surely may.
22          MR. STILLEY:  Thank you.  Your Honor, I would
23  join in what -- I would join in Mr. Springer's position
24  except to say that I also would request that the
25  underlined language "or for another" at the middle of the

1    page be removed.

2             THE COURT:  That's noted.  Thank you.

3             MR. SPRINGER:  Your Honor, may I, just one more

4    point just to make the record clear on this subject.  It

5    is my contention, if I haven't been clear about this,

6    that I believe Duberstein clearly says that the trier of

7    fact should determine whether the -- under the mainstream

8    of society whether these transfers of money were, in

9    fact, gifts.  And I just wanted to make the record clear

10   on that, that I object on that --

11            THE COURT:  And I certainly understand that.

12   Okay.  Now, we get into the numbered paragraphs.  The

13   government may not like what I did with the numbered

14   paragraphs, but here's my reasoning.  I did go back and

15   read the Duberstein opinion.  My first draft of this

16   instruction basically lifted the numbered paragraphs from

17   the Terrell decision and that's the Fifth Circuit's

18   decision, 754 F.2d 1139.  And in footnote -- on pages --

19   the relevant passage from the Terrell opinion is at pages

20   1148 and 1149 in the main text and in footnote 3.

21       In footnote 3, the Court gives a verbatim quote of

22   an instruction on gifts.  That verbatim quote includes

23   the numbered paragraphs.  At the end of that footnote,

24   the Fifth Circuit says, "We find that the Court's

25   instructions were complete and accurate in all respects

1    and reject all of appellant's objections to them as

2    lacking in merit."

3        Now, from the standpoint of a district judge, it

4    doesn't get much better than that as a security blanket.

5    But, frankly, reading Duberstein -- what's that Justice

6    Frankfurter's opinion, he kind of -- the Court in that

7    case kind of endorses what, for lack of a better word, we

8    might call a "Gastalt" approach to determining whether a

9    payment is a gift.  I think in -- to be true to that

10   opinion, I think what the Terrell court did may well be

11   exactly right, but I think it rubs up against the opinion

12   in Duberstein to some degree perhaps.

13       It takes some -- what they call factors, they call

14   them factors, but they actually lay them down as hard and

15   fast rules.  Consistent with Duberstein and

16   Mr. Springer's argument about Duberstein is to this

17   extent well taken.  I really think that it is appropriate

18   and more appropriate to articulate these in terms of what

19   the Terrell court called them and that is "factors."  We

20   say whether you consider how the defendant made his

21   living and what was the initial sentence in paragraph 1

22   has been deleted because the issue of whether it was a

23   gift or for services is already quite adequately covered

24   up above in the instructions.  So I deleted that from

25   paragraph 1.

```
 1      So paragraph 1 says the jury will take into account
 2 how the defendant made his living, whether the person
 3 making the payment expects to receive anything in return,
 4 whether the person making the payment felt he had a duty
 5 or obligation, whether the person making the payment did
 6 so out of fear or intimidation and so forth.
 7      I don't expect the government to be elated with
 8 that, but my best judgment at this point is that that is
 9 a more appropriate way to address that under all the
10 circumstances.  With that understanding, first of all,
11 what says the government with respect to that revision?
12      MR. O'REILLY:  Your Honor, the government has no
13 opposition to the changes.  When we presented it, we
14 lifted it directly from the Terrell opinion because we
15 didn't want to be changing what had been approved.  But,
16 Your Honor, we have no objection.
17      THE COURT:  Okay.  Addressing now the numbered
18 paragraphs.  And, Mr. Springer, bearing in mind that you
19 object overall to the scope and breadth of this
20 instruction, what do you have to say about the numbered
21 paragraphs?
22      MR. SPRINGER:  I'm proud to be an American, Your
23 Honor, and I'll take that instruction as the alternative.
24      THE COURT:  Mr. Stilley.
25      MR. STILLEY:  I would join Mr. Springer on that.
```

```
 1            THE COURT:  Very well.  Now, with no pride of
 2   authorship, I have drafted a -- and, first of all, on the
 3   subject of limiting instructions, the defendants may rest
 4   assured that when Mr. Miller takes the stand, either
 5   initially or at the appropriate place during his direct
 6   examination, I'm going to give the jury a limiting
 7   instruction with respect to summary witness -- summary
 8   witness and charts and summaries, and then perhaps at the
 9   appropriate time, if it should become appropriate, expert
10   testimony.  Those are three perhaps interrelated matters,
11   at least two of which will certainly become fair game for
12   limiting instructions.  So the defendants may rest
13   assured that at the appropriate time I will give those
14   limiting instructions.
15        And while I'm at it, and so that I won't burden the
16   record and take the jury's time on this score, on the
17   question of the admissibility of summary witness
18   testimony and summary exhibits, in addition to the
19   considerations that I articulated Monday night, I am also
20   informed by the Tenth Circuit's decision in United States
21   v. Ray, 370 F.3d 1039, particularly the discussion on
22   pages 1046 and 1047 where both as to summary testimony
23   and exhibits the Court of Appeals for the Tenth Circuit
24   adopted the approach taken by the Fourth Circuit in a
25   case cited in that passage.  And I do find that the
```

1   factors to be considered as articulated in that passage

2   are quite well satisfied here.

3       Now, assuming that the defendants or at least

4   Defendant Springer's case unfolds as we discussed last

5   night, I intend to give the jury what might properly be

6   called a clarifying instruction.  I suppose, in our

7   language, it is typically called a limiting instruction.

8   It's partly limiting and partly clarifying.  And I'm

9   going to read it to you.  I only have the copy that I

10  typed out.  I'm going to read it to you and give all

11  concerned an opportunity to be heard on it.

12      The premise for it is -- and there's no need for

13  further argument on this premise.  The premise is that

14  the Form 1040 did not violate the Paperwork Reduction

15  Act.

16      So the instruction will read as follows:  "Members

17  of the jury, the Court has ruled that the Form 1040 did

18  not and does not violate the Paperwork Reduction Act.

19  However, I am going to permit testimony with respect to

20  the defendants' assertions as to his understanding of the

21  Paperwork Reduction Act to be introduced for a limited

22  purpose on one issue and that is the issue of

23  willfulness.  Proof of the crimes charged in the

24  indictment must include proof beyond a reasonable doubt

25  of an element known in law as willfulness, as will be

1   explained in my final instructions to you.  I will admit

2   evidence as to the defendants' understanding of the

3   Paperwork Reduction Act at the times relevant to the

4   indictment for your consideration with respect to the

5   issue of willfulness."  And that's the sum and substance

6   of it.

7       What does the government have to say about that

8   limiting instruction?

9           MR. O'REILLY:  Your Honor, just having listened

10  to it, it sounds fine.  No opposition at this time.

11          THE COURT:  Mr. Springer.

12          MR. SPRINGER:  With all due respect, I will be

13  making an objection to the form of the instruction for

14  the purposes of the record.  That overall I object to the

15  first sentence.  However, I understand where the Court is

16  coming from.  And over that objection, I have no problem

17  with that instruction, Your Honor.

18          THE COURT:  Mr. Stilley.

19          MR. STILLEY:  Your Honor, I would join in

20  Mr. Springer's comments, but I would also say that on the

21  basis of the proceedings here it seems to me that we

22  haven't sufficiently explored the Paperwork Reduction Act

23  so that we could actually make a ruling on it.  And so

24  that -- but in saying that, I'm joining Mr. Springer in

25  suggesting that we just take out the language that says

1    that there's a finding.

2            THE COURT:  Well, it has been briefed to a fare-

3    thee-well in this case, but let me simply inquire.  My

4    conclusion is rather categorical that the Form 1040 did

5    not and does not violate the Paperwork Reduction Act.  I

6    don't want to try this lawsuit twice, however.  Does the

7    government have any misgivings about the Court's

8    categorical conclusion on that score?

9            MR. O'REILLY:  None, Your Honor.

10           THE COURT:  Very well.  Thank you, Mr. Stilley.

11   Anything further we ought to take up before we recess for

12   another 15 minutes?

13           MR. O'REILLY:  Yes, Your Honor.  Mr. Springer

14   has indicated that he intends to call Mr. Stilley as a

15   witness and I think we need some guidance based upon my

16   brief discussion with each of them regarding that to

17   ensure that there's not something that would create an

18   appellate issue with respect to that.

19           MR. SPRINGER:  May I?  If I said "called," which

20   I think is the hanging word here, I'm not intentionally

21   standing up and going to say, Oscar Stilley, will you

22   please take the stand?  Mr. Stilley has presented to me

23   that he wishes to take the stand.  So when he says

24   "call," I'm not wanting to get up so Mr. Stilley can say

25   Fifth Amendment on the witness stand.  I'm only

1  presenting that Mr. Stilley has said he would testify.

2  And under that basis, I have put him on my witness list.

3  But "called" is the wrong word overall.

4         THE COURT:  Well, I appreciate that

5  clarification because -- and this is not new law to

6  anyone, but it's clear that calling a witness when you

7  know that all he will do is invoke his rights under the

8  Fifth Amendment is improper.  And that is clear under

9  cases such as United States v. Guzman, which is a Second

10  Circuit case from last June; also, Tenth Circuit decision

11  in United States v. Kerr, 711 F.2d 149; another Tenth

12  Circuit case, United States v. Crawford, 707 F.2d 447.

13  So it's improper to call a witness knowing that all he

14  will do is take the Fifth Amendment.

15     Okay.  The flip side of that is what if the

16  defendant -- or perhaps not the flip side but an

17  extension of that is what if the co-defendant says, no,

18  I'm not going to testify, I'm not going to testify if

19  called by my other co-defendant, and I'm not going to

20  testify in my own defense?  And I certainly don't make

21  any predictions as to how that will unfold in this

22  courtroom in this case.  But on that issue, I'm guided by

23  the decision of our Court of Appeals in United States v.

24  Rivas Macias, 537 F.2d 1271, and United States v.

25  Serrano, 406 F.3d 1208.  And on the Rivas case, I should

 1   have said 537 F.3d 1271.

 2       In both of those cases, to cut to the chase, the

 3   Court of Appeals said that a defendant who wishes to call

 4   his co-defendant, who then in turn takes the Fifth

 5   Amendment, has a problem, because the Fifth Amendment

 6   will trump the defendant's right to call that

 7   co-defendant.  So that is, quite clearly, by virtue of

 8   those two opinions, among others, the law of this

 9   circuit.

10       So Mr. Springer and Mr. Stilley certainly have had

11   ample opportunity to consult with each other on those

12   points, but I am guided by the -- on these two issues,

13   I'm guided by the decisions that I have cited.

14       Is there anything further that we ought to address

15   before we recess to await nine o'clock?

16           MR. SPRINGER:  Yes, Your Honor, just one issue.

17   The government has offered a summary chart that

18   Mr. Miller is going to testify about, which is

19   Government's Exhibit Number 680.  And, originally, and I

20   believe consistently, the government has claimed that

21   this has been a specific item case.  And on Count 5, the

22   theory was Mr. Turner gave me -- paid me $250,000 and in

23   two $1,000 checks, which are Exhibit Number 230 and 231.

24   And on the new Government's -- or Government's 680, they

25   have omitted Mr. Turner's $250,000 loan, but they've now

1  added a specific item from Denny Patridge of $10,000.

2  And it is true that Mr. Patridge did testify about

3  $10,000.

4          THE COURT:  You're looking at 680?

5          MR. SPRINGER:  Yes, sir, Your Honor, 680 that

6  the government gave us.  I don't know if they've given

7  you --

8          THE COURT:  Is there a new version of it?

9          MR. O'REILLY:  I'm sorry, Your Honor.  My guess

10 is that you -- we may not have updated the Court's

11 version.

12         THE COURT:  The bottom line, on my 680, is

13 252,000.

14         MR. O'REILLY:  May I approach and give you

15 what's --

16         THE COURT:  You may.

17         MR. O'REILLY:  -- going to be placed in

18 evidence?  I think what happened, Your Honor, is we

19 updated the exhibits, we updated yours, I think we failed

20 to give you the updated copy.  680, correct?

21         THE COURT:  680.

22         MR. O'REILLY:  I apologize, Your Honor.

23         THE COURT:  Well, it's not a problem.

24         MR. O'REILLY:  Your Honor, I actually see what

25 Mr. Springer is pointing to and actually he has indicated

```
 1   an error on this -- it's not an error.  Let me explain
 2   this, if I may, Your Honor.
 3              THE COURT:  I'll hear you on that.
 4              MR. O'REILLY:  In the course of this trial,
 5   there has been evidence that Mr. Turner basically gave
 6   money to Mr. Springer to hold, that was his testimony,
 7   and there was a gift loan agreement that was prepared
 8   contemporaneously or about the same time that appeared to
 9   support that.
10              THE COURT:  There's a word for that under some
11   other statutes, as I recall.  But anyway, go ahead.
12              MR. O'REILLY:  What Mr. Miller has done is he
13   prepared two summaries with respect to 2005, one which is
14   referenced as Government's Exhibit 680 in which
15   Mr. Miller would have treated that as a loan, as a
16   bona fide loan.  The other is Government's Exhibit 681 in
17   which he treats it as income because it is the
18   government's theory, and I think the evidence has
19   elicited Mr. Turner has been duped.  Mr. Springer stole
20   the money from him back in 2005, had no intention of
21   repaying it, and that's what the evidence has shown.  And
22   that is the government's theory.
23        Government 680 is what it would be -- what the
24   income items that have been introduced into evidence
25   would be if, in fact, it was a loan that -- with intent
```

```
 1  to be repaid.  Government's Exhibit 681 shows what the
 2  government believes the true characterization is.
 3             THE COURT:  Puts it back in.  Okay.
 4  Mr. Springer, I'll hear you.
 5             MR. SPRINGER:  The entire theory from before
 6  just now has never been a stole theory, but a gross
 7  income services rendered theory, which means we're now in
 8  the ditch a little bit on that.  But on 680, they never
 9  ever alleged in their theory -- on any chart at any time
10  that $10,000 check from Mr. Patridge on 680, which is
11  their new adjustment.
12      And so because they avoided several legal arguments
13  at pretrial because of this specific item theory that
14  they were operating under and that because Mr. Patridge's
15  $10,000 check wasn't alleged as one of those specific
16  items, I believe that it would be improper for Mr. Miller
17  to testify that that $10,000 check under any scenario is
18  something the jury should be allowed to consider in the
19  government's theory of the case.
20      Now, their stolen theory that they just alerted us
21  all to at this moment is something I'm going to have to
22  swirl around in my head for a little bit, Your Honor.
23             THE COURT:  Well, on that point, the new 680
24  moves the ball your way --
25             MR. SPRINGER:  Yes, sir, that's what I'm saying,
```

1  a swirling in my head --

2          THE COURT:  -- to the tune of a quarter of a

3  million dollars.

4          MR. SPRINGER:  Yes, sir.

5          THE COURT:  Okay.

6          MR. SPRINGER:  Yes, sir.  But the 10,000 is what

7  I rose for because I think that, one, 680 is the more

8  accurate picture minus the $10,000 from Mr. Patridge and

9  I don't believe the government should be allowed to have

10 Mr. Miller -- although I don't believe it exceeds the

11 exempt amount anyway under Mr. Miller's testimony, but

12 the idea that that $10,000 check is now within their

13 specific item theory is something that I rise in

14 opposition to.

15         THE COURT:  Well, I haven't heard -- I haven't

16 heard any of the testimony leading up to that.  I've

17 heard a brief presentation by Mr. O'Reilly and we'll take

18 it one step at a time.  But I certainly do understand

19 your objection and I do appreciate your having

20 articulated it without taking the jury's time.

21         MR. SPRINGER:  Thank you, Your Honor.

22         MR. O'REILLY:  Your Honor, very briefly.  The

23 summary charts provided to Mr. -- to the defendants were

24 drafts.  These are based upon the evidence that has been

25 introduced at this trial and that is why the $10,000 is

1  now in.

2         THE COURT:  Right.  Now, on that score, charts

3  and summaries are not never, but rarely actually

4  introduced into evidence and that will be my supposition

5  in this case.  I may well tell the jury that -- or give

6  the jury a little forewarning that they are not actually

7  going to be received as exhibits.  If either side has a

8  serious problem with that, now is the time to tell me

9  about it.

10         MR. O'REILLY:  May I have a moment, Your Honor?

11         THE COURT:  You may.

12         MR. O'REILLY:  Your Honor, we think that they

13  are appropriately introduced as 1006 summaries.

14         THE COURT:  As --

15         MR. O'REILLY:  1006 summaries.

16         THE COURT:  I'll address that at the appropriate

17  time.  That may be true as to the tabular exhibits.  I'll

18  address that at the appropriate time.

19         MR. O'REILLY:  Thank you, Your Honor.

20         THE COURT:  Very well.  I'll give this exhibit

21  book back and we'll recess to await the jury.

22     (RECESS HAD)

23     (THE FOLLOWING TOOK PLACE IN THE LIBRARY, OUTSIDE

24  THE PRESENCE AND HEARING OF THE JURY.)

25         THE COURT:  Okay.  It's 18 minutes after nine

1 and, once again, we're having a problem with Juror
2 Loayza. She's not here. We're going to -- we're now
3 checking on her to find out where she is or what her
4 status is, but we'll have to address that here in more
5 detail if she doesn't show pretty quickly.
6     And, obviously, the record will show that Juror
7 Loayza is the one with whom we had some problems last
8 week. I have entered an order and I direct the clerk to
9 file this order in open court. If you would pass this to
10 her. And I'll direct the government to get this order to
11 the marshal service immediately after we recess here
12 directing that Michael Burt and Denny Patridge be
13 produced in open court forthwith.
14     I thought we had these logistics ironed out.
15 Frankly, I'm getting a little bit impatient with the
16 marshal service. And perhaps this calls more for the
17 attention of the local AUSA Mr. Snoke and your
18 relationship with the marshal service. They need to know
19 I'm not happy with these hoops. Anything that smacks of
20 foot-dragging could have consequences. And I would hate
21 to see anything be done that would be irremediable or
22 irreversible. But the marshal service needs to know that
23 anything that smacks in any way of foot-dragging, and
24 that's about where I am now, is not going to be welcomed
25 at all by the Court.

1    As I say, I thought we had all these matters ironed

2  out a couple of days ago, but apparently not so.  I've

3  entered this order on Burt and Patridge.

4    Now, Mr. Snoke, is there any doubt in your mind as

5  to what my intent and desires are?

6         MR. SNOKE:  None, Your Honor.

7         THE COURT:  Very well.  We'll be in recess,

8  then, to await further word.

9         MR. O'REILLY:  Your Honor, if we may have right

10 now -- I know Mr. Stilley had a concern about if he were

11 to testify, and I'm not sure when that would actually

12 occur, but that I guess he wanted some ground rules and

13 understanding of what would be permissible cross and what

14 would not.  And it's the government's intention we would

15 be able to impeach him with anything that affected his

16 credibility including his sanctions and Bar history if he

17 elects to put his credibility in issue.  But can I --

18         MR. BURTON:  As standby counsel with regard --

19         COURTROOM DEPUTY:  I have an address and phone

20 number for Ms. Loayza.  I called the number and it's

21 busy.

22         THE COURT:  Okay.  That's not too far away, is

23 it?  Can we get somebody headed there from the clerk's

24 office?  Let's do that.

25         COURTROOM DEPUTY:  Okay.

1    MR. BURTON:  In regard to this issue, what
2  Mr. Stilley did was indicate to counsel for the
3  government that his intention, at the present time, based
4  upon conversing with his co-defendant, is to testify.
5  And at that point if you open your mouth then anything
6  with respect to your sanctions, your Bar issues will be
7  subject to cross-examination.  Because by taking the
8  stand, you're putting your credibility at issue.  We have
9  not had time to discuss this issue, for him to ask
10 questions yet, so I think it's a little premature.
11 Nevertheless, that sets the stage for where we are
12 currently right now.
13     THE COURT:  Well, I'll have to consider that
14 when it comes up.  Nobody should regard it as a forgone
15 conclusion either way.  The Bar disciplinary proceedings
16 are non-final and I would have to carefully consider the
17 potential that the prejudicial effect would outweigh the
18 probative value.  I'm not reaching a conclusion on that
19 either way, but those would be very serious
20 considerations.  And I really don't think that I can
21 provide any guidance at this time at this juncture.
22   Any more word, Pam?  Could you go check and see if
23 she's here?  Mr. Stilley.
24     MR. STILLEY:  If I could be heard just briefly
25 on that.  The biggest concern that I have about this is

1   the possibility of making an opening statement that does

2   not mention any of these things and then having these

3   things be brought out on cross-examination and make it

4   appear that Oscar Stilley didn't give a full picture of

5   his life.  So I'm just trying to give you a heads-up

6   about what is a very serious concern to me and if we do

7   go down that road how we can ameliorate that so there's

8   not further prejudice.

9            THE COURT:  Well, that's a dilemma that I cannot

10  relieve for you at this point.  You're just going to have

11  to use your own judgment.  I'll say this:  There's more

12  than ramifications of your opening statement and the fact

13  that you reserved opening, the fact you may not have made

14  a final decision about whether you're going to take the

15  stand that has some impact on your opening statement.

16  This is actually one of the more minor dilemmas that you

17  face with respect to your opening statement, but I --

18  beyond what I've said, Mr. Stilley, unfortunately, I

19  don't think it would be appropriate for me to provide an

20  advisory ruling.

21           MR. SPRINGER:  (nodded head)

22           THE COURT:  I'm told Ms. Loayza is here, so

23  we'll resume in the courtroom as soon as everybody can

24  get in place.

25       (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

BRIAN MILLER - DIRECT BY MR. SNOKE                    1963

```
 1  WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE
 2  PRESENCE AND HEARING OF THE JURY.)
 3         THE COURT:  Welcome back, members of the jury.
 4  We'll have the government's next witness.
 5         MR. SNOKE:  Your Honor, the government would
 6  next call Brian Miller.
 7         THE COURT:  Very well.
 8                   BRIAN MILLER,
 9  (WITNESS SWORN)
10                 DIRECT EXAMINATION
11  BY MR. SNOKE:
12  Q.  Would you state your name and spell your last name
13  for the court reporter, please, sir.
14  A.  My name is Brian Miller, M-I-L-L-E-R.
15  Q.  And where do you live, sir?
16  A.  Pardon me?
17  Q.  Where do you live, sir?
18  A.  I live in Searcy, Arkansas.
19  Q.  Mr. Miller, where are you employed?
20  A.  With the Internal Revenue Service.
21  Q.  All right.  And how long have you been employed by
22  the Internal Revenue Service?
23  A.  A little over 22 years.
24  Q.  What is your current position with the Internal
25  Revenue Service?
```

BRIAN MILLER - DIRECT BY MR. SNOKE                              1964

1   A.   I'm a fraud technical advisor.

2   Q.   All right.  And what do you do in that capacity,

3   sir?

4   A.   We have, obviously, lots of employees that do audits

5   on various entities and individuals.  And any time in the

6   midst of their audit, if they're in a case where they

7   think fraud may be present, they will typically contact

8   me and I'll provide guidance to them on how to proceed in

9   their case.

10  Q.   And prior to that, what was your position with the

11  Internal Revenue Service?

12  A.   I was a revenue agent.

13  Q.   And how long have you been -- how long have you been

14  a fraud technical advisor as opposed to a revenue agent?

15  A.   I've just been a fraud technical advisor a few

16  months.  And my entire time at the IRS prior to that was

17  as a revenue agent.

18  Q.   All right.  What type of training and experience is

19  required to become an Internal Revenue agent?

20  A.   You have to have an accounting degree.

21  Q.   All right.  And do you have that?

22  A.   I do.

23  Q.   A college degree?

24  A.   Yes, a Bachelor of Business Administration in

25  accounting from Harding University.

BRIAN MILLER - DIRECT BY MR. SNOKE                          1965

```
 1   Q.    All right.  Is Harding in Arkansas?

 2   A.    It is.

 3   Q.    In addition to that, sir, do you have any -- or in

 4   the course of getting that degree, did you take

 5   accounting courses?

 6   A.    Several accounting courses, yes.

 7   Q.    All right.  And business law?

 8   A.    Business law, economics, management, marketing,

 9   taxes.

10   Q.    What type of training did you get when you joined

11   the Internal Revenue Service?

12   A.    The IRS has a pretty extensive training program.

13   When you first start out, it consists of several phases

14   that starts with basic individual income taxation and

15   then goes to corporate tax law and partnership, escrow

16   tax law, and then the more advanced corporate mergers and

17   acquisitions and that sort of thing.

18   Q.    All right.  And how long did that initial training

19   program last with the Internal Revenue Service?

20   A.    All those phases together was probably 20 weeks, I

21   would gather, spread out over the first couple of years

22   of my IRS experience.

23   Q.    And do you take -- do you take any continuing

24   training since you first became a revenue agent?

25   A.    Right.  The IRS offers and expects all of its agents
```

1    to get around 40 hours a year of continuing education.

2    We get some of that in the classroom and then we take

3    some courses on line.

4    Q.   All right.  Do you have any license or professional

5    certification?

6    A.   I'm a certified public accountant and a certified

7    fraud examiner.

8    Q.   All right.  And when did you get your certified

9    public accountant certificate?

10   A.   I passed the exam in, I believe, May of 1989.

11   Q.   All right.  And how about the certified fraud

12   examiner?

13   A.   I believe that was 1999.

14   Q.   What do you do to become a certified public

15   accountant?

16   A.   Two parts.  Generally, you have to pass a pretty

17   rigorous exam and then you also have to have, I believe,

18   two or three years experience in the field of accounting.

19   Q.   How about to become a certified fraud examiner?

20   A.   That too requires passing a pretty rigorous exam as

21   well as some experience in the field.

22   Q.   Have you ever taught any courses with respect to tax

23   matters?

24   A.   I've taught some courses at the IRS and I'm

25   currently teaching a course at the local university, so,

1   yes.

2   Q.   In your current position or even in your previous

3   position as a revenue agent and certainly in your current

4   position as fraud technical advisor, do you do

5   instruction and give advice to agents?

6   A.   I do.   Throughout my career I've taught several

7   courses on various aspects of the income tax law.   And

8   now in my new position as a fraud technical advisor, I

9   routinely teach revenue agents, both new and experienced,

10  on how to recognize fraud and indicators of fraud and how

11  to pursue and follow up on those indicators.

12  Q.   All right.   Did you have -- have you taught any kind

13  of a course in accounting?

14  A.   The course I'm teaching at the local university is

15  an accounting class.

16  Q.   And what is it?

17  A.   It's called forensic accounting.

18  Q.   All right.   And what kind -- what does forensic

19  accounting mean?

20  A.   Forensic accounting is a specialty within the

21  accounting field.   Forensic accountants typically examine

22  books, records, tax returns, ledgers, financial matters

23  of individuals with the eye toward verifying the

24  existence or lack thereof of some sort of fraudulent

25  activity.

BRIAN MILLER - DIRECT BY MR. SNOKE                          1968

```
 1  Q.   All right.  When you were -- during your tenure as a
 2  revenue agent, did you participate in audits?
 3  A.   I did.  That's what I did basically all day every
 4  day.
 5  Q.   All right.  And approximately how many audits would
 6  you say you've done in your career with the IRS?
 7  A.   It would have to be over a thousand.
 8  Q.   Have you previously testified as a summary or expert
 9  witness?
10  A.   Yes, I have.
11  Q.   In court?
12  A.   Yes.
13  Q.   Federal court, I gather.  And about how many times
14  have you done that?
15  A.   I'm going to say ten, maybe 12 times.
16  Q.   All right.  Have you testified as a summary or
17  expert witness in this district?
18  A.   Yes, I have.
19  Q.   About how many times have you testified as an expert
20  in this district?
21  A.   I believe three times.
22  Q.   And where else -- what other districts have you
23  testified as a summary or expert witness?
24  A.   There are two districts in Arkansas, I've testified
25  in both of those numerous times, and I also testified
```

BRIAN MILLER - DIRECT BY MR. SNOKE                    1969

1   once in the Northern District of Georgia.
2   Q.   Are you familiar with the "specific item method of
3   proof"?
4   A.   Yes, I am.
5   Q.   All right.  And will you describe that method of
6   proof -- that's used by the IRS in conducting audits?
7   A.   It is.
8   Q.   And your testimony?
9   A.   It is.  It's by far the most common method that we
10  use to --
11  Q.   All right.  Would you tell the jury what that means,
12  what "specific item of proof" means?
13  A.   There are two general ways to compute, I guess, a
14  tax liability.  One would be an indirect method and one
15  would be a direct method.  The indirect method generally
16  just compares a person's -- maybe their net worth from
17  one year to the next or their bank account balance from
18  one year to the next.  Those are all indirect methods.
19  The specific item method is a direct method where we look
20  at specific checks, specific expenditures, and just use
21  those specific items, hence that name, to calculate an
22  income tax liability.
23  Q.   How often or how many times would you say you've
24  used the specific item method of proof in doing your
25  audit?

BRIAN MILLER - DIRECT BY MR. SNOKE                           1970

 1  A.   I would say 95 percent of the time would be a

 2  specific item method of proof.

 3  Q.   All right.  And in this case, you've been present

 4  throughout the testimony in this case from the very

 5  beginning?

 6  A.   Yes, I have.

 7  Q.   All right.  And in the specific item method of

 8  proof, have you -- what have you considered that has been

 9  introduced here in this case?

10  A.   I have looked at -- or looked at on the screen at

11  all the exhibits that were presented, all the checks that

12  were written to Mr. Springer, Bondage Breakers, or

13  Mr. Stilley and then also considered the expenses, their

14  invoices that I think Mr. Sivils testified to and other

15  expenditures that occurred.  So I considered all of

16  those, plus -- in addition to the testimony of the

17  witnesses that were here.

18  Q.   And is the specific item the method you used in

19  calculating the income and taxes about which you're going

20  to be testifying here?

21  A.   That's correct.

22  Q.   Have you had an opportunity to review, then, all the

23  evidence that has been accepted by the Court as

24  admissible in the case?

25  A.   Yes, I have.

BRIAN MILLER - DIRECT BY MR. SNOKE                          1971

1   Q.   And you said you had listened to all the testimony

2   of all the witnesses up to this point?

3   A.   Yes.

4   Q.   And is your testimony today as a summary or expert

5   witness going to be based on and limited to that evidence

6   that you -- has heard -- the testimony you've heard and

7   the exhibits and other evidence that has been accepted by

8   the Court?

9   A.   Yes.

10  Q.   All right.  I would like to show you some exhibits

11  here and ask you about them.

12          MR. SNOKE:  May I approach, Your Honor?

13          THE COURT:  The witness?

14          MR. SNOKE:  To get the exhibits.

15          THE COURT:  You may.

16  Q.   (BY MR. SNOKE)  If you will turn to Exhibit 689.

17  A.   I'm there.

18  Q.   What is that, sir?

19  A.   It's a summary in a flow chart form of a transaction

20  between Cynthia Hawkins and Lindsey Springer.

21  Q.   All right.  It's actually written to Bondage

22  Breakers Ministries?

23  A.   That's correct.

24  Q.   All right.

25          MR. SNOKE:  Your Honor, we would move into

BRIAN MILLER - DIRECT BY MR. SNOKE                        1972

```
 1   evidence 689 to the extent that the witness can utilize
 2   it in his testimony.
 3              THE COURT:  Any objection?
 4              MR. SPRINGER:  May we approach, Your Honor?
 5              THE COURT:  You may.
 6      (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND
 7   OUT OF THE HEARING OF THE JURY.)
 8              THE COURT:  Go ahead.
 9              MR. SPRINGER:  What they gave us, I only got to
10   688.  Standby counsel can't find 689.
11              MR. SNOKE:  No, they were after that.  You've
12   gotten all of these.
13              MR. SPRINGER:  Is that what you e-mailed to us
14   the other day?
15              MR. SNOKE:  No.
16              MR. SPRINGER:  This must be an e-mail then.
17              MR. SNOKE:  This one you've had for a long time.
18              MR. SPRINGER:  I just don't remember.
19              MR. SNOKE:  You have to look at your exhibits.
20      (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,
21   WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE
22   PRESENCE AND HEARING OF THE JURY.)
23              THE COURT:  Any objection to 689?
24              MR. SPRINGER:  No, Your Honor.
25              THE COURT:  689 is received.  Mr. Snoke, stand
```

```
 1  by for just a moment, there's one or two things I need to

 2  cover with the jury.

 3      Members of the jury, you have heard the testimony

 4  that has been given by Agent Miller thus far, so you

 5  understand the capacity in which he appears.  Mr. Snoke

 6  has referred to Mr. Miller as a summary witness and, to

 7  some degree, as an expert witness.  I am going to permit

 8  Mr. Miller to testify as a summary witness.  There are

 9  some important ground rules, however, that you must bear

10  in mind both as you hear the testimony of Mr. Miller and

11  as you consider his testimony during your deliberations.

12      Mr. Miller does not profess to have personal

13  firsthand knowledge of the transactions which he will

14  summarize and which certain exhibits will summarize.  So

15  Mr. Miller should not be understood by you as having

16  firsthand knowledge of those transactions, obviously, all

17  of which occurred sometime previous to the indictment in

18  this case.

19      For that reason, and consistent with what I have

20  just said, Mr. Miller should not be understood by you as

21  giving independent evidence as to the matters that are in

22  controversy in this trial.  For that reason, if you are

23  not satisfied that the summary testimony from Mr. Miller

24  is supported by the evidence that the Court has received

25  in this case, then you should to that extent disregard
```

1   the testimony of the summary witness.

2       On the other hand, to the extent that the summary

3   testimony is supported by evidence that the Court has

4   received, then you may give the summary testimony such

5   consideration as you may find that it deserves by way of

6   explanation or clarification of the factual contentions

7   made by the government in this case.

8       Now, to some degree, Mr. Miller may also testify as

9   an expert witness, which in some ways is a bit different

10  than being a summary witness.  In many cases, including

11  cases like this one, expert witnesses may be helpful to

12  the jury in its evaluation of the issues.

13      On the other hand, it is also appropriate for you to

14  bear in mind that unlike an eyewitness or a bystander

15  witness who is called as a witness because he or she just

16  happened to see or hear something relevant to the case,

17  an expert witness is a person specially selected by the

18  party calling him and he is called because the party

19  calling him anticipates that his testimony will support

20  their side of the case.

21      You may consider the testimony of an expert witness

22  and give it such weight as you think it should have.  But

23  the value to be given to the testimony of an expert

24  witness is for you and you alone to determine.  For that

25  reason, it is for you and you alone to assess the

BRIAN MILLER - DIRECT BY MR. SNOKE                    1975

 1   objectivity and professional candor with which an expert

 2   witness brings to bear in completing his assigned task.

 3   That will be an important aspect of your evaluation of

 4   the persuasive effect of the testimony of any expert

 5   witness who may testify in this case.

 6        You are not required to surrender your own judgment

 7   to that of any person testifying as an expert or

 8   otherwise.  The testimony of an expert witness like that

 9   of any other witness is to be given such value as you

10   think it is entitled to receive.  And in that connection,

11   of course, important to your evaluation of the credit to

12   be given to the testimony of an expert witness is the

13   extent to which you find the expert witness's testimony

14   to be supported by other evidence in the case.

15        Finally, the Court has received and may yet receive

16   additional summary exhibits.  And if I don't receive them

17   in evidence, they will still nevertheless be presented to

18   you.  We will determine the extent to which they will be

19   received in evidence.  One has been received in evidence,

20   will be available for you in the jury room, and perhaps

21   more will be.

22        Regardless of whether any summary exhibits or charts

23   and graphs that you see are or are not received in

24   evidence, those that you do see will simply be regarded

25   by you as summaries of matters that are in evidence from

BRIAN MILLER - DIRECT BY MR. SNOKE                    1976

 1   the underlying documents if you are so satisfied that

 2   they are, in fact, summaries, accurate summaries based on

 3   the testimony of this witness and based on your

 4   understanding of the evidence that has already been

 5   received.

 6       Now, some of these exhibits may have labels on them,

 7   the labels on these exhibits, you must understand, were

 8   selected by the government and the defendants are not

 9   bound by any labels that are placed on these exhibits.

10   And you, as jurors, are certainly not bound by any labels

11   that are on these exhibits.

12       You are instructed that the government's choice of

13   words for these summary exhibits is not independent

14   evidence of any facts in this case and does not tend in

15   any way to constitute independent proof of any

16   allegations in the indictment.  If the matters shown by

17   these summary exhibits are to be proven at all, they must

18   be proven to your satisfaction by evidence independent of

19   the summary exhibits to which Mr. Miller will testify.

20       You may continue, Mr. Snoke.

21           MR. SNOKE:  Thank you, Your Honor.

22   Q.  (BY MR. SNOKE)  Agent Miller, looking at

23   Government's Exhibit 689, does this depict a transaction

24   involving a check from Cynthia Hawkins to Bondage

25   Breakers Ministries?

1   A.   Yes.   There are actually three pages -- three parts

2   to an overall transaction, yes.

3   Q.   All right.  And this check was issued to Bondage

4   Breakers Ministry, but does it depict the fact that the

5   Bondage Breakers Ministry check was ultimately spent by

6   Mr. Springer to buy personal items?

7   A.   Yes.

8   Q.   Let's walk the jury through the transaction.  What

9   does the first page show?

10  A.   Okay.  The first page simply shows the payment being

11  made through the vehicle of Bondage Breakers Ministries

12  with that check.

13  Q.   In the amount of $37,000?

14  A.   $37,000 dated January 31, 2003.

15  Q.   All right.

16  A.   So that money went, you know, effectively to Lindsey

17  Springer through Bondage Breakers Ministries.  And then

18  moving to the second page, on the left, Lindsey Springer,

19  following the arrow up, took that check for $37,000 to

20  the Checks Cashed location in Tulsa, which is on the

21  right-hand side.  And then following the arrow down,

22  while he was at Checks Cashed, he exchanged a check to

23  Bondage Breakers Ministries for 92 money orders that

24  totaled $31,650.

25  Q.   These are those $350 money orders he was getting?

```
 1   A.   That's correct.  So those money orders went back to

 2   Mr. Springer.  He walked out of Checks Cashed.  And then

 3   going to the third page, Mr. Springer, on the left-hand

 4   side, took those 92 money orders that totaled the 31,000,

 5   he took those to LCM Motor Cars in Mobile, Alabama, and

 6   exchanged those money orders for a 1994 Mercedes.

 7   Q.   All right.  Can we look next at Government's Exhibit

 8   690?  Are you familiar with Government's Exhibit 690?

 9   A.   Yes, I am.

10   Q.   Do you find it there?

11   A.   I'm having a hard time getting this one back in the

12   sleeve.  Okay.  I'm at 690.

13   Q.   You've got it out of the sleeve?

14   A.   Yeah, once it comes out, it doesn't want to go back

15   in.  I am at Exhibit 690 now.

16   Q.   All right.  Did you cause this exhibit to be made?

17   A.   Yes, I did.

18   Q.   And what does this exhibit -- what does it depict?

19   A.   Okay.  It begins with funds from Mr. Patterson.

20   Q.   All right.  And --

21        MR. SNOKE:  We would move, at this time,

22   Government's Exhibit 690 into evidence.

23        THE COURT:  Any objection?

24        MR. SPRINGER:  Yes, Your Honor, I would have an

25   objection under Rule 106 (sic).
```

1              THE COURT:  Counsel will approach.

2          (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND

3      OUT OF THE HEARING OF THE JURY.)

4              THE COURT:  Tell me about your Rule 106.

5              MR. SPRINGER:  It's 1006, I'm sorry, yeah, I'm

6      sorry.

7              THE COURT:  Oh, 1006.  Tell me your objection

8      under Rule 1006.

9              MR. SPRINGER:  These charts are not summarizing

10     the extensive evidence in the case.  I actually don't

11     even know what they are.  I have seen them just recently,

12     I was reminded of them, but they're not depicted (sic) of

13     the evidence in this case.  And under Rule 1006, it

14     clearly says records and photographs which cannot

15     conveniently be examined in court may be presented in the

16     form of a chart summary or calculation and the jury is

17     the one that's decided -- to decide what -- they decide

18     what the facts of the case are and these are just no

19     good.

20             MR. SNOKE:  Your Honor, we are submitting these

21     in support of -- most these -- not maybe the first one,

22     but the other ones are in support of the overt acts, many

23     of the overt acts in the indictment.  I submit that these

24     particular transactions would be very difficult for the

25     jury to put together from the testimony and the

```
 1   individual checks that were introduced during the time

 2   period.  Because we needed to tie them through the

 3   testimony of maybe two or three witnesses for each

 4   transaction as to how this money flowed from one account

 5   from a customer to Mr. Springer or to Bondage Breakers or

 6   to the IOLTA account of Mr. Stilley and from then back to

 7   Mr. Springer.  And then he, in turn, utilized either

 8   Checks Cashed or the money then to purchase an item of

 9   personal use item which we think was -- is difficult for

10   the jury to put together.

11          MR. SPRINGER:  There has been no evidence, Your

12   Honor, that that was a personal use item.  There has been

13   no testimony solicited on that.  The only thing is I did

14   buy a vehicle and that's it.

15          THE COURT:  Well, to that extent, your objection

16   I find to be entirely without merit.  But there is a more

17   fundamental issue under Rule 1006.  Some of these

18   exhibits in this series individually might be borderline

19   from the standpoint of whether they, in fact, summarize

20   voluminous documents.  But if the government were to

21   combine these exhibits into a single exhibit

22   collectively, they certainly would summarize voluminous

23   documents and probably a good many of them, if not most

24   of them, individually summarized voluminous documents.

25       The defendants will have full opportunity to
```

1  challenge any characterization implied by these

2  exhibits.  The defendants will likewise have full

3  opportunity to challenge the accuracy of these exhibits

4  in terms of their faithfulness of the underlying

5  documents.

6      But under the circumstances, I do find that these

7  exhibits -- and we'll take them one at a time, of course,

8  but looking now at 690, that it is appropriate as a

9  summary under Rule 1006.  And as I have said, if the

10 government wanted to, they could staple them all together

11 and offer them as a single exhibit, which would

12 unquestionably satisfy the requirements of Rule 1006.  I

13 find no prejudice from the government's decision to offer

14 these one at a time.

15     Now, Mr. Snoke, let me inquire.  I'm a little

16 surprised that you're offering the purely graphic

17 exhibits before you offer the summary, the charts and

18 summaries, the tabular exhibits.  Do you intend to offer

19 the tabular exhibits?

20          MR. SNOKE:  After I get through with these.

21          THE COURT:  Okay.  That -- in a roundabout way,

22 that may also support the graphic exhibits.  I was a

23 little bit surprised at that, but the objection will be

24 overruled.

25          MR. SPRINGER:  Thank you, Your Honor.

1        (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

2    WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

3    PRESENCE AND HEARING OF THE JURY.)

4            THE COURT:  Exhibit 690 is received.

5    Q.  (BY MR. SNOKE)  Mr. Miller, will you explain to the

6    jury and the Court what is depicted there in Government's

7    Exhibit 690?

8    A.  Yes.

9    Q.  Starting with the first page.

10   A.  It begins with Mr. Eddy Patterson on the left.  I

11   believe he testified that he sold some stock in oil and

12   gas wells or oil and gas property or something like that

13   and received a check from that entity in the amount of

14   112,500.  He endorsed that check over to Mr. Stilley.  So

15   those funds went across the right to Mr. Stilley's IOLTA

16   account.

17       And then going to the second page, immediately after

18   that, a large portion of those funds went from Oscar

19   Stilley's IOLTA account to Lindsey Springer.  There were

20   two checks, one on 6/30/2003 for 14,539 and then another

21   check on July 21st of 2003 for 35,000 that moved to

22   Lindsey Springer.

23   Q.  All right.  And the first check from Mr. Patterson

24   over to the IOLTA account of Oscar Stilley, what was the

25   date on that?

1    A.   That was June 24, 2003.

2    Q.   All right.  And if you'll look at Government's

3    Exhibit 691.  Can you tell me what that is?

4    A.   It's additional transactions made between

5    Mr. Stilley and Mr. Springer for the purchase of a

6    vehicle.

7    Q.   All right.  Let's -- did you cause this exhibit to

8    be made up?

9    A.   I did.

10   Q.   All right.  And this is a flow chart then showing

11   the movement of money in this case?

12   A.   That's correct.

13   Q.   As per the testimony and the exhibits in this

14   case -- I guess the exhibits in this case; is that right?

15   A.   Yes.

16   Q.   All right.

17        MR. SNOKE:  The government would move into

18   evidence Government's Exhibit 691.

19        MR. SPRINGER:  I maintain the same objection,

20   Your Honor.  I just say it one time and other than that,

21   I have no objection.

22        THE COURT:  You will have the same objection.

23   It will be received.

24   Q.   (BY MR. SNOKE)  All right.  And this is like a four-

25   page exhibit, looks like; is that correct?

1   A.   Yes.

2   Q.   And do you want to walk us through the transaction

3   then?

4   A.   Okay.  Beginning on the left, Mr. Stilley caused to

5   be prepared a cashier's check in the amount of $37,000,

6   funds to be taken from his IOLTA account, made payable to

7   Ed Bryson.  That was on July 31st of 2003.  He gave that

8   check to Mr. Springer.

9        And then moving to the second page, Mr. Springer

10  took that check, that cashier's check for $37,000, took

11  it to Ed Bryson and purchased a 2003 Chevy Corvette.

12  Q.   All right.

13  A.   And then in order to repay those funds to

14  Mr. Stilley's IOLTA account that went out to

15  Mr. Springer, there was a check dated October 3, 2003,

16  and payable to Bondage Breakers Ministries.  And those

17  funds, instead of going to Lindsey Springer, went to

18  Oscar Stilley's IOLTA account as partial repayment of

19  that $37,000 loan.

20        And then the final page of that exhibit,

21  Mr. Patterson evidently had owed Mr. Springer $90,000.

22  That was deposited into Oscar's IOLTA account.  But

23  instead of paying the full $90,000 to Lindsey, only

24  $78,000 was paid to Lindsey.  Oscar Stilley kept the

25  remaining $12,000.

1        So when you combine the $12,000 that Mr. Stilley

2   kept of that 90,000 in addition -- plus the 25,000 that

3   Mr. Stilley kept from Cynthia Hawkins, those two funds

4   repaid the loan that, in essence, Lindsey borrowed from

5   Mr. Stilley to purchase the Corvette.

6   Q.   And the loan was paid out by Mr. Stilley -- paid out

7   of his IOLTA account to Mr. Springer?

8   A.   Yes.

9   Q.   Or in the case of the first check, it was made

10  directly payable from Mr. Stilley's IOLTA account to the

11  seller of the vehicle, apparently, Mr. Ed Bryson?

12  A.   Correct.  Both transactions went through the IOLTA

13  account.

14  Q.   Look at Government's Exhibit 692 next, please.

15  A.   Okay.

16  Q.   Now, at 692, what does it depict?  First of all, is

17  this a chart that -- summary chart that you caused to be

18  completed or made up?

19  A.   Yes.

20  Q.   What does this flow chart show?

21  A.   It centers around the transfers of some coins from

22  Mr. Turner to Mr. Springer that were then sold to

23  purchase a vehicle.

24  Q.   All right.  And that was in September of 2009 -- I'm

25  sorry, 2003?

```
 1   A.   That's correct.

 2          MR. SNOKE:  We'd move into evidence at this time

 3   Government's Exhibit 692.

 4          MR. SPRINGER:  Same objection, Your Honor.

 5          THE COURT:  That's understood and it will be

 6   received.

 7   Q.  (BY MR. SNOKE)  All right.  Starting with the first

 8   page, sir, will you walk us through this chart on this

 9   transaction, series of transactions?

10   A.   Yes.  Mr. Patrick Turner had some rare coins that he

11   was trying to sell evidently.  And seemed like through

12   Jason Carter, they were made aware of -- or through the

13   Lexus dealer, I believe, they were made aware of Carter

14   Numismatics as an entity that might be able to handle

15   that.  So Mr. Turner transferred those coins or gave

16   Lindsey Springer some control over their disposition, I

17   think, or -- based on the testimony.

18          The coins went from Mr. Turner to Mr. Springer.  And

19   then on the second page, Mr. Springer took the coins to

20   Carter Numismatics.  I believe they reached an agreement

21   that Carter Numismatics would purchase those coins for

22   $56,000.

23   Q.   And when was that?

24   A.   That was on September 9, 2003.

25   Q.   All right.
```

1   A.   So Mr. Springer walked out of Carter Numismatics

2   with a check for $56,000.

3   Q.   All right.  Payable to whom?

4   A.   I believe it was payable to Lindsey Springer.

5   Q.   All right.  Then do we go to the third page then?

6   A.   Yes.  On the third page, Mr. Springer took that

7   check from Carter Numismatics to the Security Bank in

8   Tulsa and got a couple of cashier's checks.  He got one

9   for $47,000 that was payable to Lexus of Tulsa.  Then he

10  got a second cashier's check in the amount of $9,000 that

11  was payable to Lindsey Springer.

12  Q.   And do you recall from the testimony, was

13  Mr. Springer a customer at Security Bank?

14  A.   I don't believe he was.

15  Q.   Do you know if Carter Numismatics was a customer of

16  Security Bank?

17  A.   I think they were, yes.

18  Q.   All right.  Then we go to the -- the next page, the

19  fourth page of the exhibit.

20  A.   Right.  The fourth page shows what happened to that

21  $47,000 cashier's check.

22  Q.   All right.  And that was the same day, September 9th

23  of '03, all this occurred?

24  A.   That's right.  Mr. Springer took the cashier's check

25  to Lexus of Tulsa and purchased the 2004 Lexus RX330.

1   Q.   If we would look at Government's 692 next.   Again,

2   is this a chart that you caused to be prepared?

3   A.   Yes.

4   Q.   Now, that was from the evidence in the case?

5   A.   Yes.

6   Q.   And what is this -- is depicted -- what transaction

7   is depicted in this?

8   A.   Transfer of funds from Eddy Patterson through

9   Mr. Stilley's IOLTA account, a large portion of which

10  went to Mr. Springer for the --

11  Q.   This is Exhibit 693?

12  A.   693.

13  Q.   All right.

14          MR. SNOKE:   We move into evidence Government's

15  Exhibit 693 at this time.

16          MR. SPRINGER:   Your Honor, may we approach

17  again?

18          THE COURT:   You may.

19     (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND

20  OUT OF THE HEARING OF THE JURY.)

21          MR. SPRINGER:   The issue here is that under 1006

22  that the evidence is not voluminous and it's just one or

23  two or three checks and now one or two or three checks is

24  now turning in to a summary chart.   I mean, if there were

25  50 checks or 25 transactions or whatever Mr. Snoke said

 1  up here a little while ago were true, then over my

 2  objection, the Court's position was taken well.  But here

 3  now we're just -- the last one we had was just one or

 4  two.  Now, we have three.

 5          THE COURT:  Do you dispute the accuracy of 695?

 6          MR. SPRINGER:  No, Your Honor, I do not.  As far

 7  as the chart goes, I do -- obviously cross-examination

 8  will go a different route, but as far as what he's saying

 9  here, I'm not saying the money didn't go -- it did go to

10  Mr. Stilley's IOLTA account and some of that money

11  obviously came to me.

12          THE COURT:  It is received.

13      (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

14  WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

15  PRESENCE AND HEARING OF THE JURY.)

16          THE COURT:  Exhibit 693 is received.

17  Q.  (BY MR. SNOKE)  Agent Miller, can you walk the Court

18  and the jury through what's depicted in 693?

19  A.  Yes.  I believe Mr. Patterson testified that he had

20  received some sort of insurance settlement and that those

21  funds had gone to the Hall Estill law firm.  And

22  Mr. Patterson ordered to be conducted a wire transfer of

23  $375,059.90 to be transferred on November 6, 2003, that

24  amount to Oscar Stilley's IOLTA account.

25  Q.  All right.

1  A.   Moving to the second page, on the following day,

2  Mr. Stilley had created, looks like, three cashier's

3  checks and 18 money orders for the benefit of Lindsey

4  Springer that were transferred to Mr. Springer the

5  following day for a total of $78,000.

6       Then Mr. -- on the following page, Mr. Springer took

7  two of those cashier's checks for $20,000 each to

8  Campbell Chevrolet in Bowling Green, Kentucky, and bought

9  a 1999 Mercedes G500.

10      Then the following page is a reflection of that

11 billing statement that we talked about a minute ago, you

12 know, where instead of getting the full 90,000,

13 Mr. Springer only got the 78,000, which was the 90,000

14 reduced by the 12,000 that Mr. Springer owed Mr. Stilley

15 from that loan previously to buy the Corvette.  I believe

16 that was reflected in Mr. Patterson's billing statement.

17 Q.   All right.  Going back to the second page of this

18 exhibit, when monies are passed through Oscar Stilley's

19 IOLTA account, what effect, if any -- and converted then

20 and withdrawn from that account, not by check, but by a

21 withdrawal and a purchase of one or more cashier's checks

22 or money orders, how does that affect the ability of the

23 IRS to investigate and determine income flow to -- or

24 expenses on the part of Mr. Springer?

25 A.   Well, it makes it much more difficult.  Not only

BRIAN MILLER - DIRECT BY MR. SNOKE                              1991

```
 1  could we not find the transaction in a review of
 2  Mr. Springer's records, you know, if we were to look at
 3  Mr. Stilley's bank records, we still would not have been
 4  able to find the transfer of those funds from Mr. Stilley
 5  to Mr. Springer.  If he had just used a regular personal
 6  or a company check, a review of Mr. Stilley's records
 7  would have revealed that transaction with Mr. Springer.
 8  But the fact that he used cashier's checks just made it
 9  that much more difficult for the IRS to trace that money.
10  Q.   I'd like you next to look at 694.  Can you tell us
11  -- is this another chart that you have caused to be made
12  up?
13  A.   Yes.
14  Q.   Is that from the evidence in this case so far?
15  A.   Yes, it is.
16  Q.   And does this depict another transaction in this
17  case?
18  A.   It does.
19  Q.   That went through Oscar Stilley's IOLTA account?
20  A.   Correct.
21          MR. SNOKE:  We'd move into evidence Government's
22  Exhibit 694.
23          MR. SPRINGER:  Same objection, Your Honor.
24          THE COURT:  On that understanding, it is
25  received.
```

1    Q.    (BY MR. SNOKE)  Can you walk the Court and the jury

2    through this particular transaction flow?

3    A.    Yes.  The Turners, Patrick and Patricia, took out a

4    mortgage on the two properties that they owned, had

5    equity in.  I believe they took out a mortgage on their

6    home, basically a home equity loan, I guess you would

7    say, using their residence for collateral, in the amount

8    of $192,000.  Then a few days later, they took a mortgage

9    on their rental property in the amount of $58,000.  Then

10   they wire-transferred those two amounts to Mr. Stilley.

11   Q.    And that's a total of $250,000 there?

12   A.    That's correct.

13   Q.    All right.  The second page?

14   A.    On the second page, Mr. Stilley --

15   Q.    And, incidentally, this -- we're going to have more

16   discussion of this, I guess, but the $250,000 was not

17   sent to Mr. Springer, it was sent to Mr. Stilley's IOLTA

18   account; is that correct?

19   A.    Yes.  Mr. Springer did not have a bank account,

20   really did not have a way, I think, to receive these

21   funds, so Mr. Stilley got in the middle of it and, you

22   know, helped facilitate this transaction.

23   Q.    All right.  And we have then the second page?

24   A.    Yes.  The second page reflects three wire transfers

25   in the middle of -- mid-August to September of 2005.  The

1  first one was for $166,000.  That was a wire transfer to

2  Sam Snyder.  A few days later, there was a wire transfer

3  of $5,560 to Oklahoma Truck and Trailer Sales.  And then

4  just four or five days after that, there was a third wire

5  transfer of $25,813 to Lexus of Tulsa.

6  Q.  All right.  And what was the wire transfer of

7  $166,000 on August 15th, what was that for, to Sam

8  Snyder?

9  A.  That was for the purchase of a motor home.  The

10 third page kind of shows --

11 Q.  All right.  Wait.  Before we get to the third, I

12 want to walk you through this for a minute.  Mr. Snyder

13 was selling the motor home to whom?

14 A.  To Lindsey Springer.

15 Q.  All right.  And looking at Mr. Stilley's IOLTA

16 account, trust fund account, is there any indication in

17 that wire transfer to Mr. Snyder that is actually

18 Mr. Springer who is the purchaser of the motor home?

19 A.  No.  A review of the record would not reveal

20 Mr. Springer's involvement at all.

21 Q.  Is the same true of the other two wire transfers for

22 the -- to the Lexus of Tulsa and to the Oklahoma Truck

23 and Trailer Sales?

24 A.  That's correct.  By structuring the transaction this

25 way, Mr. Stilley was able to completely keep Mr. Springer

```
1   out of the record.
2   Q.   All right.  Let's look at the third page then.  You
3   have -- this is the other end of the transactions?
4   A.   Yes.
5   Q.   After the recipients of Mr. Snyder and Lexus of
6   Tulsa and OK Truck and Trailer Sales have received these
7   wire transfers?
8   A.   Yes.  I might add that these are not the actual
9   items.  The motor home was actually, I think, much larger
10  than this one, but these are the only pictures we could
11  find that were close, and the trailer was obviously much
12  nicer than this one, but --
13  Q.   You're saying the actual motor home purchase for
14  166,000 was actually bigger than this one?
15  A.   It was bigger than this one and I think the witness
16  testified that it was actually maybe white in color
17  instead of this color.  I don't want to mislead anybody.
18  Q.   We have a reasonably accurate picture of the
19  GS430 --
20  A.   Yes.
21  Q.   -- Lexus --
22  A.   That's the actual make and model of that car.
23  Q.   All right.  This was -- these were done in -- these
24  purchases were done in September -- well, the Lexus was
25  done September 1st of '05?
```

BRIAN MILLER - DIRECT BY MR. SNOKE                    1995

1   A.   Yes, they were all done in August and September of

2   2005.

3   Q.   All right.  And the trailer was the other one?

4   A.   That's right.

5   Q.   All right.  Going to the -- and that's the last page

6   of the exhibit.

7   A.   Yes.

8   Q.   Let's go to Exhibit 695 next, please.  And what --

9   this is a single-page, I guess, chart on this

10  transaction?

11  A.   That's right.

12  Q.   Again, did you cause this chart to be made up from

13  the evidence received in the case?

14  A.   I did.

15  Q.   And what transaction does this depict?

16  A.   It depicts the sale of a motor home by Lindsey

17  Springer to Walter Bolthouse.

18  Q.   All right.  Does this also involve Oscar Stilley's

19  IOLTA account there in Fort Smith, Arkansas?

20  A.   Yes.  Just like the others, the money runs through

21  the IOLTA account.

22  Q.   All right.

23          MR. SNOKE:  We'd move into evidence, at this

24  time, Government's Exhibit 695.

25          MR. SPRINGER:  Same objection, Your Honor.

1       THE COURT:  On that understanding, it will be

2  received.

3  Q.   (BY MR. SNOKE)  Can you then walk us through this

4  transaction.  This is with Mr. Bolthouse, who we heard

5  testify about purchasing a motor home from Lindsey

6  Springer; is that correct?

7  A.   Yes.  I guess this transaction actually starts in

8  the lower left-hand -- lower right-hand corner of the

9  page, sorry, with Mr. Bolthouse.  He transfers via wire

10 $50,000 on December 9, 2005, to Mr. Oscar Stilley's IOLTA

11 account.  And then that $50,000, Mr. Stilley takes that

12 four days later, prepares -- or has prepared two

13 cashier's checks that are payable to Lindsey Springer.

14 And then those two cashier's checks totaling $40,000 go

15 to Lindsey Springer.  And Mr. Springer then gives the

16 motor home to Mr. Bolthouse.

17 Q.   All right.  Is this another relative --

18 representative motor home or is this a picture of the

19 actual?

20 A.   Just representative.

21 Q.   All right.  Again, with respect to the manner in

22 which this transaction occurred through Oscar Stilley's

23 IOLTA account with withdrawals and then purchases of

24 cashier's checks, rather than issuing a check out of the

25 IOLTA account to Mr. Springer, does that cause problems,

1  impede or impair in any way the investigation of the --

2  of the IRS of Mr. Springer's sources of income?

3  A.   Obviously, it would have been --

4  Q.   And expenses?

5  A.   It would have been a whole lot simpler for

6  Mr. Bolthouse to wire transfer a $50,000 amount to

7  Mr. Springer.  Or even if Mr. Springer, you know, had no

8  bank account, at least wire $50,000 -- or do a cashier's

9  check of $50,000 straight to Mr. Springer.  The fact that

10 they went through the IOLTA account of Mr. Stilley and

11 then created cashier's checks out of that IOLTA account

12 made it much more difficult for the IRS to track that

13 transaction.

14 Q.   If you would next look at Exhibit 675.  What does

15 this exhibit depict?

16 A.   It's a summary of the payments made by various

17 individuals or entities to Mr. Springer during the year

18 2000.

19 Q.   All right.  And did you cause this chart to be made

20 up?

21 A.   Yes, I did.

22 Q.   And did you do that from the testimony and the

23 evidence that you observed here in the trial to date?

24 A.   Yes.

25 Q.   Does this also show the -- the corresponding

```
 1  exhibits with exhibit numbers matching what you've put on
 2  this chart for the year 2000?
 3  A.   That's right.
 4       MR. SNOKE:  We would move into evidence
 5  Government's Exhibit 675 at this time.
 6       THE COURT:  Any objection?
 7       MR. SPRINGER:  No objection, Your Honor.
 8       THE COURT:  675 is received.
 9  Q.  (BY MR. SNOKE)  Do you want to -- want to walk the
10  Court and the jury through this exhibit for the year 2000
11  as to the income items that you've listed thereon?
12  A.   Yes.  Basically, two main parts of this exhibit.  I
13  listened to the testimony of the witness and I reviewed
14  the exhibits and I had to make myself comfortable that
15  the purpose of the payment was, in fact, to compensate
16  Mr. Springer for work that he had done.  If it -- if I
17  felt certain that it was income and it was paid in the
18  year 2000 to Mr. Springer, I put it on this exhibit.  And
19  this is basically a summary of all the income amounts
20  paid to Mr. Springer during the year 2000.
21       It lists the type of the payment, whether it was a
22  cashier's check or a check, the date on the check, check
23  number, and then who made the payment.  For example, some
24  were from Vikki Wiggins, some were from Dr. Roberts, some
25  from Eddy and Judith Patterson, some from James Lake.
```

 1  Those payments were then made, the amount is shown in the

 2  payee column, either Bondage Breakers Ministries or

 3  Lindsey Springer, and then it shows the amount.  And the

 4  final column shows the corresponding exhibit number for

 5  that particular check.

 6      And then at the bottom, I added up all the checks,

 7  all the payments.  And in this case, $160,000 is the

 8  amount of gross income that I attributed to Mr. Springer.

 9  Q.  All right.  Move to Exhibit 676.  What is this?

10  A.  A form very similar to the previous one we just

11  discussed, except it's for the year 2001 instead of the

12  year 2000.

13  Q.  All right.  And this is a chart you made up?

14  A.  I did.

15  Q.  All right.

16          MR. SNOKE:  We would move into evidence Exhibit

17  676 at this time.

18          MR. SPRINGER:  No objection, Your Honor.

19          THE COURT:  It is received.

20  Q.  (BY MR. SNOKE)  What is depicted again on this

21  chart?

22  A.  During the year 2001, looks like two witnesses

23  testified, Ms. Wiggins and Dr. Roberts, that they paid

24  Lindsey Springer for services that he performed on their

25  behalf.  Three checks were paid to him during that year

1   for that purpose.  The next to the last column shows two

2   checks for 17,500 and a final payment of 10,000 totaling

3   total gross income, based on the testimony and exhibits,

4   of $45,000 for the year 2001.

5   Q.   All right.  Again, this is taken from the testimony

6   you heard here in this case?

7   A.   That's correct.

8   Q.   Let's look at Exhibit 677.  What is this -- what

9   year is this chart for?

10  A.   It's the same chart.  The only difference is that

11  it's for the year 2002.

12  Q.   And this is, again, taken from the evidence in this

13  case?

14  A.   That's correct.

15  Q.   And you had -- you caused this chart to be made or

16  made it up yourself?

17  A.   I did.

18          MR. SNOKE:  We move into evidence 677.

19          MR. SPRINGER:  No objection, Your Honor.

20          THE COURT:  It is received.

21  Q.   (BY MR. SNOKE)  All right.  For the year 2002, looks

22  like this chart shows these -- all these checks were from

23  Arthur Hawkins, isn't it?

24  A.   That's right.  The only evidence that I saw

25  presented was four checks from Arthur Hawkins to Lindsey

1    Springer or Bondage Breakers Ministries in amounts

2    totaling $30,000.

3            THE COURT:  Mr. Snoke, let me know when you get

4    to a convenient stopping point and we'll take our

5    mid-morning break.

6            MR. SNOKE:  One more question, Your Honor.

7    Q.  (BY MR. SNOKE)  For the year 2002, is $30,000 of

8    gross income, does that meet the filing threshold?

9    A.  Yes, it does.

10           THE COURT:  Members of the jury, we'll take our

11   mid-morning recess at this time, again, guided by the

12   clock on the wall.  We will resume at ten minutes till

13   the hour.  Please remember during this recess and at all

14   times until the case has been submitted to you for your

15   deliberations and verdict not to discuss the case, not to

16   undertake any independent investigation of any aspect of

17   the case and certainly not to reach any conclusions until

18   the case has been given to you for your deliberations and

19   verdict.  Please be available just a little before ten

20   minutes till eleven for the security officer to return

21   with you to the courtroom.

22       All persons in the courtroom will remain seated

23   while the jury departs.

24       (JURY EXITS THE COURTROOM)

25           THE COURT:  The record will show the jury has

BRIAN MILLER - DIRECT BY MR. SNOKE                    2002

1   left the courtroom.  Mr. Snoke, during this break, please

2   check to make sure the marshal is attending to business.

3   Will you do that?

4           MR. SNOKE:  Yes, Your Honor.

5           THE COURT:  Very well.  Court will be in recess.

6       (A RECESS WAS HAD, AFTER WHICH THE FOLLOWING

7   PROCEEDINGS WERE HAD IN OPEN COURT AND WITHIN THE

8   PRESENCE AND HEARING OF THE JURY.)

9           THE COURT:  Mr. Snoke, you may continue.

10  Q.  (BY MR. SNOKE)  Agent Miller, would you look next at

11  Government's Exhibit 678.

12  A.  I have it.

13  Q.  All right.  And tell me what that is.

14  A.  It's the same form that we've talked about

15  previously, except this particular form is for the year

16  2003.

17  Q.  All right.  And this shows the source of gross

18  income totaled at the bottom there for that year for

19  Mr. Springer?

20  A.  It does.  I looked at all the checks that came in as

21  exhibits from the various witnesses, listened to their

22  testimony, and came up with a total figure for the amount

23  of income that Mr. Springer received in 2003.

24  Q.  All right.  As to some --

25          MR. SNOKE:  Well, we'll move into evidence, at

1    this time, Government's Exhibit 678.

2            MR. SPRINGER:  Same objection, Your Honor.

3            THE COURT:  With that understanding, it is

4    received.

5    Q.   (BY MR. SNOKE)  Now, some of these checks had

6    "donation" on them written -- or maybe "gift" written on

7    the check itself.

8    A.   Right.

9    Q.   Can you tell us, if that was the case, why you

10   included those checks with those words written on them in

11   your calculations, if you did, on this particular exhibit

12   for 2003?

13   A.   Well, I listened to the testimony of the witness to

14   see what their intent was when they made that payment.

15   If they intended it to be for services, then I treated it

16   as income.  If all you had to do to keep it from being

17   income is write "donation" on the check, I'd venture to

18   say that we'd all be writing "donation" on every check we

19   received.

20           THE COURT:  Members of the jury, bear in mind

21   that the characterization of these transactions

22   ultimately will be for you and you alone to determine.

23   For the reasons that I stated earlier, I am permitting

24   this witness, subject, of course, to cross-examination,

25   to testify in part as a summary witness and in part as an

1  expert witness and also in part as a sponsor of these

2  charts and summaries.

3      But the guidelines I gave you at the outset are very

4  important.  To some degree, they will be repeated in my

5  final instructions to you.

6      The bottom line is that both with respect to these

7  charts and with respect to the conclusions that

8  Mr. Martin (sic) is expressing, that those matters, in

9  the final analysis, will be resolved by you in the jury

10  room and not by the witness in the courtroom.

11      You may proceed.

12  Q.  (BY MR. SNOKE)  And what is the total gross income

13  for 2003 that you came up with in your calculations?

14  A.  $380,039.

15  Q.  Look next at Exhibit 679.

16  A.  I see it.

17  Q.  Tell us what that is.

18  A.  It has the same format as the previous ones we've

19  discussed showing the gross income of Lindsey Springer.

20  This particular form is for the year 2004.

21  Q.  All right.  And this is a chart you made up?

22  A.  Yes, I did.

23  Q.  From the evidence you've heard in this courtroom?

24  A.  That's right.

25  Q.  Both testimony and documentary evidence?

```
 1  A.   Yes.
 2           MR. SNOKE:  We'd move in evidence, at this time,
 3  Exhibit 679.
 4           MR. SPRINGER:  Same objection, Your Honor.
 5           THE COURT:  With that understanding, it is
 6  received.
 7  Q.   (BY MR. SNOKE)  All right.  Tell us -- tell the
 8  Court and the jury what the entries are in this exhibit.
 9  A.   For the year 2004, the checks that were exhibited
10  accompanied by the testimony of the witnesses
11  demonstrated gross income to Mr. Springer of $93,050.
12  Q.   All right.  It depicts the exhibit number as did the
13  other exhibits; is that correct?
14  A.   Yes, it does.
15  Q.   And the payee of the check?
16  A.   Yes.  In each case, it's either Mr. Springer or
17  Bondage Breakers.
18  Q.   All right.  Now, this is for the year 2004.  Does
19  this gross income amount for 2004 listed there, $93,050,
20  does that exceed the threshold for a filing requirement
21  in that year?
22  A.   Yes, it does.
23  Q.   Next look at Exhibit 681.
24  A.   680 or 681?
25  Q.   681.
```

1    A.   Okay.

2    Q.   Tell me what that is, sir.

3    A.   Yes.   This is the same forms we've been discussing,

4    except the only difference is that this year is for the

5    year 2005 showing Mr. Springer's gross income for that

6    year based on the exhibits and the testimony.

7    Q.   All right.

8         MR. SNOKE:   We would move into evidence

9    Government's Exhibit 681.

10        MR. SPRINGER:   Same objection, Your Honor.

11        THE COURT:   With that understanding, it is

12   received.

13   Q.   (BY MR. SNOKE)   Can you walk us through the entries

14   in this exhibit, sir?

15   A.   For the year 2005, based on the testimony of the

16   Turners and the other witnesses, we determined that the

17   gross income for 2005 was $265,500.

18   Q.   Now, this chart indicates that you included in there

19   the two payments that we just alluded to in the previous

20   flow charts of $192,058 totaling $250,000 in August of

21   2005 that went from Oscar Stilley's IOLTA account to

22   Lindsey Springer; is that correct?

23   A.   Yes.

24   Q.   Or, actually, he received them in those amounts into

25   his IOLTA account.   They actually went out in checks to

1  buy other items.

2  A.   That's right.

3  Q.   And those were received from Patrick Turner -- I

4  guess his wife may have actually signed the check; is

5  that correct?

6  A.   Yes.

7  Q.   Can you tell the --

8          THE COURT:  Now, this is the substituted 681?

9  Because I've got a 681 that has no resemblance to the one

10 that's up now.

11         MR. SNOKE:  Yes.  I'm sorry.  You do not have

12 the --

13         THE COURT:  So this is the substituted 681?

14         MR. SNOKE:  Yes.

15         THE COURT:  Okay.  Now, are you going to

16 renumber the original 681?

17         MR. SNOKE:  Yes.  The one in your right hand

18 marked "draft" has been done away with.

19         THE COURT:  Okay.  Okay.  Very well.  Proceed.

20         MR. SNOKE:  I'm sorry.

21 Q.   (BY MR. SNOKE)  Now, this chart includes this

22 $250,000 payment from Mr. Turner in your chart as income

23 that year; is that correct?

24 A.   Yes, it does.

25         MR. SPRINGER:  Your Honor, objection.  He said

BRIAN MILLER - DIRECT BY MR. SNOKE                    2008

```
 1  payment to Mr. Turner.
 2         MR. SNOKE:  I'm sorry.  From Mr. Turner.  I
 3  misspoke.
 4  Q.  (BY MR. SNOKE)  It includes that as income in this
 5  year, is that right, 2005?
 6  A.  Yes.  The $250,000 that was paid by the Turners to
 7  the IOLTA account of Mr. Stilley and then transferred to
 8  Mr. Springer, that was included on this exhibit as income
 9  to Mr. Springer.
10  Q.  All right.  And can you tell us why you included
11  that as income?
12  A.  Initially, I felt like it might have been a loan,
13  based on the testimony of Mr. Turner, but then I heard
14  the testimony of other witnesses, saw some other
15  exhibits, that led me to believe in all likelihood the
16  $250,000 would never be repaid by Mr. Springer and that
17  Mr. Springer felt he had complete control over that money
18  for his own uses and would therefore be treated as income
19  to him.
20  Q.  All right.  Did that include the testimony of
21  Mr. Turner that he had originally sought to shield that
22  money from the IRS seizing it?
23  A.  Yes.  Mr. Turner indicated in his testimony that he
24  transferred that money to the IOLTA account so that they
25  would simply hold those funds for him to protect those
```

```
 1  funds from the IRS basically.  You know, he had equity in
 2  his residence and the rental house and he had concern
 3  that the IRS might seize those properties, so he took out
 4  huge loans on both of them to take the equity out and
 5  transferred that money to the IOLTA account.
 6      And according to the somewhat ambiguous contract,
 7  that money was just to be held by Mr. Springer.  You
 8  know, it wasn't -- it wasn't a loan to Mr. Springer to be
 9  used by Mr. Springer for whatever he wanted it to.  It
10  was money to be held by the IOLTA account, Mr. Springer,
11  to protect it from the IRS and, secondly, to be used in
12  the event that he was under criminal prosecution or civil
13  prosecution and could be used at that time for those
14  purposes for legal and administrative representation
15  during Mr. Turner's own legal or tax issues.
16      I found that, you know, the money was not held for
17  that purpose.  The money -- a huge portion of the money
18  was immediately spent.
19  Q.  Was that the Bolthouse transaction with the $50,000?
20  A.  No.  It was the -- I believe it was the Sam Snyder
21  transaction.
22  Q.  Sam Snyder transaction, I'm sorry.
23  A.  $166,000 motor home, plus the new car and trailer.
24  Q.  The new Lexus --
25  A.  Yes.
```

BRIAN MILLER - DIRECT BY MR. SNOKE                                    2010

1   Q.   -- that we saw on the flow chart?

2   A.   That's right.

3   Q.   All right.  Did you consider also the timing of the

4   commencement of interest payments by Mr. Springer?

5   A.   That was another part of it.  There were actually a

6   couple other things I considered.  The fact that there

7   were no repayments, no interest repayments until after

8   the IRS got involved with Mr. Springer and Mr. Springer

9   was, you know, aware of his criminal -- potential

10  criminal prosecution that payments of interest started

11  being made back to Mr. Turner that caused me to discount,

12  if you will, the importance or validity of those interest

13  payments.

14       Another factor I considered was the fact that I

15  think Mr. Springer testified --

16  Q.   Mr. Springer didn't --

17            MR. SPRINGER:  Objection, Your Honor.

18            THE WITNESS:  I'm sorry.  According to the

19  statements --

20            THE COURT:  Wait.  State your objection.

21            MR. SPRINGER:  He said, "Mr. Springer

22  testified."

23  Q.   (BY MR. SNOKE)  I'm sorry.  Do you want to correct

24  that?

25  A.   Yes, I'd like to.  According to Mr. Shern's

1   testimony, who I believe was quoting Mr. Springer,

2   Mr. Springer stated that he would use the $50,000 from

3   the sale of that first motor home to begin repayment of

4   that loan to Mr. Turner.  But, in fact, after that

5   $50,000 was received by Mr. Springer, instead of starting

6   to repay that loan, he simply bought another new car.

7   Q.   Will you look next at Government's Exhibit 683.  Can

8   you tell me what this chart is?

9   A.   I took the gross income that we've discussed the

10  last few minutes and using that and deductions to which

11  Mr. Springer would be entitled and I calculated an

12  additional tax due and owing by Mr. Springer for the

13  years 2000 through 2005.

14  Q.   All right.  2000 through 2005?

15  A.   Yes.

16  Q.   All right.

17          MR. SNOKE:  We would move into evidence

18  Government's Exhibit 683 at this time.

19          THE COURT:  Wait just a minute.  We've still got

20  a numbering problem.

21          MR. SNOKE:  May we approach, Your Honor?

22          THE COURT:  You may.

23      (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND

24  OUT OF THE HEARING OF THE JURY.)

25          MR. O'REILLY:  Your Honor, may I be heard

```
 1  briefly?

 2          THE COURT:  Yes.

 3          MR. O'REILLY:  What we did, we eliminated what

 4  had been the Court's 67 of 681 through 686 I believe what

 5  the Court has as 687 is now 683 and there was just a

 6  compilation of all the years.  And the thing is it is

 7  somewhat modified, but it is, in essence, the same chart.

 8          THE COURT:  That would be this?

 9          MR. SNOKE:  No.

10          MR. O'REILLY:  Yes, Your Honor.  But can he have

11  this copy?  Your Honor, if we give you -- this is the

12  final draft that was presented to the defendants.

13          THE COURT:  So the version of 683, then, that

14  has columns for 2000 through 2005 with gross income, AGI

15  taxable income tax, self-employment tax and additional

16  tax due and owing a bottom line of 175,245, then, is the

17  current version and the offered version of 683.  Is that

18  right?

19          MR. SNOKE:  Yes, Your Honor, that's correct.

20          THE COURT:  Okay.

21          MR. SNOKE:  What we had done is we eliminated

22  the individual years in those other exhibits and put it

23  all in one -- all five years -- six years, excuse me, in

24  one chart.

25          THE COURT:  Okay.  And there's an offer of 683
```

BRIAN MILLER - DIRECT BY MR. SNOKE                          2013

1    pending at this time.  Is there any objection to 683?

2            MR. SPRINGER:  No, Your Honor, except, I'm

3    sorry, except for the original objection that I have.

4            THE COURT:  Very well.  On that understanding,

5    683 will be received.

6            MR. SPRINGER:  Thank you, Your Honor.

7        (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

8    WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

9    PRESENCE AND HEARING OF THE JURY.)

10           THE COURT:  Government's Exhibit 683 will be

11   received.

12   Q.  (BY MR. SNOKE)  Agent Miller, now that we have this

13   exhibit, can you take us through this with the various

14   entries?  Looks like we have columns there for the years

15   2000 through 2005; is that correct?

16   A.   That's right.

17   Q.   And the various entries show gross business income,

18   which I think picks up from those totals that we've just

19   seen in the previous charts shown to the jury here today?

20   A.   That's right.  The top line that's identified as

21   gross business income, the 160,000, 45,000, 30,000, those

22   amounts tie directly to the exhibits we just looked at

23   where those numbers were computed.

24   Q.   All right.  Tell us about, it says, "less business

25   expenses."  How did you calculate business expenses?

1   A.   Right.   Went through all the expense receipts that

2   were obtained, that were presented into evidence earlier

3   this week, plus the evidence presented about, I think,

4   Internet connections and that sort of thing.   And those

5   were computed, totaled, and allowed to Mr. Springer as a

6   deduction.

7   Q.   All right.   Now, you're talking about the business

8   expense receipts that Agent Sivils testified that he had

9   shown to Mr. Springer?

10  A.   Yes, that was a large portion of it.

11  Q.   And Mr. Springer had confirmed these were business

12  expenses or personal expenses?

13          MR. SPRINGER:   Objection, Your Honor.   I don't

14  believe that was the testimony of Mr. Shern.

15          MR. SNOKE:   Well --

16          THE WITNESS:   What was the question again?

17  Q.   (BY MR. SNOKE)   Did you give Mr. Springer in this

18  calculation all the business expenses that he claimed in

19  his discussions with -- that Agent Sivils testified to

20  about his -- in his interview when he was shown receipts?

21  A.   We gave him credit for every -- yes, every one that

22  he identified as business-related.   Then, in fact, we

23  actually gave him some additionally that we thought had

24  any chance of being business-related, we went ahead and

25  gave him just to make sure that, you know, if we were to

1  err, we wanted to err on the side of conservatism.

2  Q.   If this was like a civil audit, would you have given

3  him all of the expenses that you gave him in this chart?

4  A.   I would not be nearly so generous.

5  Q.   Then we have the next total is net business income?

6  A.   Yes.  That's simply a -- well, right before that, on

7  the year 2005, we did give Mr. Springer a deduction for a

8  depreciation on that $166,000 motor home that he

9  purchased.  That's the $24,900 deduction in 2005.

10 Q.   All right.  And that's because you included the

11 motor home in the gross business income because he

12 used --

13 A.   That's right.

14 Q.   -- some of that 250 to buy the $166,000 motor home?

15 A.   Right.  Then, as you mentioned, the net business

16 income is simply the gross reduced by the expenses.

17 Q.   All right.  What's the next line there?

18 A.   The next line is a reduction from the business

19 income deduction for alimony paid, as was found in a

20 review of the exhibits.  And then the line under that was

21 a computational adjustment or a deduction allowed to

22 taxpayers who pay self-employment tax, the SE adjustment.

23 Q.   What does "SE" stand for?

24 A.   Self-employment.

25 Q.   All right.  And that -- the next line then comes to

1   what?

2   A.   The line below that is adjusted gross income, a

3   number that's -- a subtotal that you'll find on the

4   income tax return.

5   Q.   All right.  And then the next line is?

6   A.   The two lines below that are for the standard or

7   itemized deductions and the exemptions.  In most of the

8   years, the standard deduction was greater than the

9   itemized.  In which case, we would have allowed the

10  standard deduction.

11       In 2001, 2002, I believe that the itemized

12  deductions were larger, so we allowed the itemized

13  deductions to be taken by Mr. Springer.  Then the line

14  below that is for exemptions.  The first three years

15  you'll see the 2,800, 2,900, and 3,000.  Mr. Springer was

16  single, no kids, no spouse, so he only got his own

17  exemption for those years.

18       In 2004 and 2005, I think he was married and there

19  was a child in the home, so they got a total of three

20  exemptions in those two years.

21  Q.   What about 2003?

22  A.   2003, there is no deduction for exemptions.

23  Congress made the law that if a person's income exceeded

24  a certain amount, then they would lose their deduction

25  for exemptions.  And once your income reaches a certain

1   point, the exemptions start phasing out.  Mr. Springer's

2   adjusted gross income was so high in the year 2003 that

3   his exemption was completely phased out, so he did not

4   get a deduction for that.

5   Q.   All right.  The next line?

6   A.   The next line is taxable income.  That's simply a

7   computation.  It's the adjusted gross income reduced by

8   the standard deduction -- itemized deductions less

9   exemptions.

10  Q.   And then you have self-employment tax coming back,

11  you just had an adjustment for it, and then there's

12  another line that says self-employment tax.

13  A.   Right.  There's two taxes that are being charged

14  here.  The first is income tax, just a general income tax

15  as established by law.  And, secondly, the self-

16  employment tax, which is a separate tax imposed on

17  individuals who are self-employed.

18       Most of us are employees of someone else and we pay

19  our social security, our Medicare.  Self-employed people

20  don't contribute that way, don't have employers who pay

21  their half, so the self-employed people have to pay the

22  entire amount themselves.  And that's the purpose of the

23  self-employment tax is to cover their social security and

24  their Medicare.

25  Q.   That makes up for the -- for not having it withheld

1  from your salary or your wages?

2  A.   That's correct.

3  Q.   All right.   Then we have down at the bottom then

4  additional tax due and owing; is that correct?

5  A.   Yes.   Additional tax due and owing for each year is

6  simply the sum of the income tax and self-employment tax

7  for each year.   And then the very bottom line is simply a

8  sum of all five years, total tax due and owing for the

9  entire period, $175,245.

10 Q.   All right.   Now, that includes zero tax for the year

11 2001, which is not substantively charged in this case; is

12 that correct?

13 A.   That's right.

14 Q.   It also seems to include zero additional tax due and

15 owing for 2002 and only -- for 2004 only $3,854 too; is

16 that correct?

17 A.   Right.   The testimony and exhibits that were

18 presented were not sufficient in this case to result --

19 well, in 2002, they resulted in no actual tax due.   In

20 2004, the testimony and exhibits presented resulted in a

21 fairly small amount of tax due and owing.

22 Q.   How does that affect, if it does, the charges

23 against Mr. Springer in -- for the years 2002 and the

24 2004 in which he's charged with failure to file?

25          MR. SPRINGER:   Your Honor, I object.   May we

1  approach?

2          THE COURT:  You may.

3      (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND

4  OUT OF THE HEARING OF THE JURY.)

5          MR. SPRINGER:  His question is how does it

6  affect the charges of Mr. Springer and I don't want to

7  stand up and say that in front of the jury, but I don't

8  understand why he's saying -- this witness now is going

9  to now say how the charges are affected.  The Court is

10  the one who gives the jury an instruction.

11          THE COURT:  Were you essentially driving at the

12  issue of how does that affect the filing requirement?

13          MR. SNOKE:  Yes, basically.  I may need to

14  rephrase it.

15          MR. SPRINGER:  That's fine.

16          THE COURT:  Rephrase it.

17      (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

18  WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

19  PRESENCE AND HEARING OF THE JURY.)

20  Q.  (BY MR. SNOKE)  Let me rephrase the question.  As to

21  the years 2002 and 2004, how do your additional tax due

22  and owing figures affect the filing requirement for those

23  two years, if they do at all?

24  A.   The filing requirement is not based on additional

25  tax due and owing.  The requirement to file a return is

 1   based on your gross income.  So the fact that for 2002
 2   the gross income was $30,000 and for 2004 the gross
 3   income was $93,000, even though the tax due and owing may
 4   be small or zero, certainly a return was still required.
 5   Q.   And we look next at Exhibit 687 -- I'm sorry, 688.
 6   A.   Okay.
 7   Q.   And tell me what that chart depicts.
 8   A.   This is a summary chart or graph to illustrate the
 9   amount of gross income that's required for an individual
10   to have to file a return.  And then it also shows the
11   amount of income received by Mr. Springer showing that he
12   is indeed required to file a return for each of these
13   years.
14   Q.   That's for the six years between 2000 and 2005?
15   A.   That's right.
16   Q.   And did you make this chart?
17   A.   I did.
18   Q.   Is that from the evidence in this case, documentary
19   and testimonial?
20   A.   Yes, it is.
21        MR. SNOKE:  We'd move in evidence, at this time,
22   Government's Exhibit 688.
23        MR. SPRINGER:  Same objection, Your Honor.
24        THE COURT:  With that understanding, it will be
25   received.

```
 1    Q.   (BY MR. SNOKE)  All right.  For the year -- for the
 2    year 2000, what was the threshold requiring the threshold
 3    gross income --
 4    A.   What year again?
 5    Q.   -- filing of a tax return that year?
 6    A.   I'm sorry, for what year?
 7    Q.   For the year 2000, starting with the left side of
 8    the chart.
 9    A.   For the year 2000, if an individual had gross income
10    more than $7,200, he would have been required to file.
11    And Mr. Springer had gross income of 160,000.
12    Q.   In the year 2001?
13    A.   The filing threshold would have been 7,450.  And the
14    gross income of Mr. Springer was $45,000.  And those are
15    the same amounts from those summary charts we looked at a
16    few minutes ago.
17    Q.   And in 2002?
18    A.   2002, the filing threshold would have been 7,700.
19    And the testimony here showed gross income to
20    Mr. Springer of 30,000, thus requiring the filing of a
21    return.
22    Q.   And the year 2003?
23    A.   2003, the filing threshold would have been 7,800.
24    Mr. Springer's gross income was -- looks like 380,039.  I
25    apologize, these numbers are a little bit hard to read.
```

BRIAN MILLER - CROSS BY MR. SPRINGER                          2022

1   But, clearly, there was a filing requirement in that
2   year.
3   Q.   All right.  And for the year 2004?
4   A.   For the year 2004, the filing threshold, and for
5   2005, for that matter, increased substantially and that
6   was due to the fact that he was married in those two
7   years.  But the filing threshold in '04 was 15,000 or
8   15,900, I can't see it very well.  But the gross income
9   was over 93,000, certainly requiring the filing of a
10  return.
11       And then in 2005, 16,400 is the threshold.  Gross
12  income, 265,000.  Again, a return certainly required to
13  be filed.
14  Q.   All right.  It looks like it changed quite a bit
15  there in 2004 and 2005.  Was there something that
16  triggered that or just the Congress formula?
17  A.   No, the fact that he was married caused the
18  exemption amount, the standard deduction amounts to go up
19  so that the filing threshold is larger based on that.
20           MR. SNOKE:  I don't believe I have any other
21  questions of the witness at this time.
22           THE COURT:  Cross-examination.
23                   CROSS-EXAMINATION
24  BY MR. SPRINGER:
25  Q.   Mr. Miller.

BRIAN MILLER - CROSS BY MR. SPRINGER                    2023

```
 1   A.   Good morning.
 2   Q.   Lindsey Springer.  You testified about specific item
 3   method.  Do you remember that?
 4   A.   Yes.
 5   Q.   Which is the method that you used in trying to
 6   determine a filing requirement in this case; is that
 7   correct?
 8   A.   Yes.
 9   Q.   Okay.  And is there another method besides the
10   specific item method?
11   A.   There are several other methods.
12   Q.   Which method involves the Bureau of Labor
13   Statistics?
14   A.   I think the Bureau of Labor Statistics would come
15   into play in an indirect method.
16   Q.   An indirect method?
17   A.   I believe so, yes.
18   Q.   All right.
19   A.   I haven't used it in a long, long time, but that's
20   my memory.
21   Q.   Is that because in 1998 Congress made it a lot more
22   difficult to use in passing the Reform and Restructuring
23   Act in 1998?
24   A.   No.  They, in fact, did make it a little bit harder
25   then, but we typically don't like to rely on an indirect
```

1  method.  We certainly would rather use the most direct

2  method that we can to come to our conclusions.

3  Q.   There are several indirect methods, one of which --

4  isn't this true, one of which is the use of the Bureau of

5  Labor Statistics?

6  A.   Using the BLS is not an indirect method of its own.

7  It would be a portion or a component that could be used

8  in several different indirect methods.

9  Q.   Okay.  Now, several times you testified about the

10  way in which transactions between myself and Mr. Stilley

11  unfolded made it more difficult for the IRS to follow

12  it.  Is that basically what you were saying?

13  A.   That's right.

14  Q.   Okay.  Now, why would the IRS need to be following a

15  certain transaction between, let's say, Mr. Patterson's

16  wire transfer from Hall Estill to Oscar Stilley's IOLTA

17  account?  What interest does the IRS have in that

18  transaction?

19  A.   We would have interest -- if money was going from

20  Mr. Patterson to Mr. Stilley, the IRS would want to know

21  if that amount of money was income.

22  Q.   Okay.  Now, when would they want to know it?

23  A.   I would assume if Mr. Patterson or Mr. Stilley were

24  being audited, we would want to know that.

25  Q.   All right.  So then if somebody was being audited

1  would be the only reason why you would say that the

2  transaction in this example was something that was

3  difficult to follow?

4  A.   Audited or any other type of investigation of those

5  two individuals for whatever reason, I guess.

6  Q.   So in an audit, the person being audited then would

7  know they were being audited; isn't that true?

8  A.   If a person is being audited, they typically know

9  that, yes.

10  Q.   And so, for instance, if the IRS issued summons to

11  banks, would they also notify the person being audited

12  that they were sending those notices to the bank?

13  A.   Absolutely.

14  Q.   So the taxpayer would also know that the IRS was

15  looking at the bank records, true?

16  A.   Yes.

17  Q.   Okay.  So now if you had at the same time the

18  opportunity to look at the item, for instance, in this

19  case, the wire transfer of $375,000 from Hall Estill to

20  the IOLTA account, then wouldn't Mr. Stilley or Hall

21  Estill be made aware that at the same time the IRS was

22  looking at that transaction that the taxpayer on both

23  sides would also be aware of that?

24  A.   Yes.

25  Q.   Okay.  So at the same time you're looking at an

BRIAN MILLER - CROSS BY MR. SPRINGER                    2026

1   item, you are open at that exact moment to also talk to

2   either the sender of the wire or the recipient of the

3   wire; isn't that true?

4   A.   I would generally say that's true, yes.

5   Q.   And isn't it really -- what you intended to mean was

6   is if criminal investigators were secretly doing a grand

7   jury investigation and they looked at the wire between

8   Hall Estill and the IOLTA account of Oscar Stilley, that

9   they, the criminal investigators, would not have been

10  readily able to detect the purposes of that wire or where

11  it was distributed solely by looking at the transaction

12  between Hall Estill and Oscar Stilley's IOLTA account?

13  A.   No, I think the point is that if a person was

14  auditing you or you were being investigated, the IRS

15  would not be able to find your involvement in the

16  transaction or your financial ownership in that

17  transaction because it was controlled by Mr. Patterson

18  and Mr. Stilley and your name was not included.

19  Q.   But you would absolutely be asking either

20  Mr. Patterson or Hall Estill in this case or Mr. Stilley

21  about that item, wouldn't you?

22  A.   It's hard to say, probably.

23  Q.   Is it possible that you would look at a $375,000

24  wire while you're letting everybody involved in the

25  transaction know there's an audit taking place and you

1   would simply not ask a question of anybody about it?

2   A.   If I were auditing Mr. Springer -- Mr. Stilley or

3   Mr. Patterson, I would ask about it.  But if I were

4   auditing you, I would have no reason to think about that

5   because I would not have anything to base my finding on.

6   Q.   Well, isn't --

7   A.   I would not have seen it.

8   Q.   Isn't that the same with just about every check that

9   everybody would ever write that without being able to ask

10  them something that you wouldn't be able by the face of

11  the document to understand what its purpose was?

12  A.   I wouldn't even know to ask you about that

13  transaction.

14  Q.   So would you have just sent a bill to Mr. Stilley

15  for income taxes for $375,000?

16  A.   If I were auditing Mr. Stilley, I would have asked

17  about it.

18  Q.   You would?

19  A.   If I were auditing you, I wouldn't have because I

20  wouldn't have been able to find it.  I would have seen

21  nothing to say that there was a transaction.

22  Q.   So you did do the audit of Dr. Roberts, did you not?

23  A.   Yes.

24  Q.   Ran into three checks from -- I think you

25  testified -- or other checks have been entered that you

1  put on the charts here from Dr. Roberts?

2  A.   What about those checks?

3  Q.   Did you ask Dr. Roberts about them?

4  A.   I think at that time I already knew about those

5  checks.

6  Q.   Okay.

7  A.   The audit was not done on Dr. Roberts until after

8  the criminal --

9  Q.   How did you know about them?

10  A.   Because I was involved in the criminal case of

11  Dr. Roberts.

12  Q.   Okay.  So you knew about the checks that Dr. Roberts

13  gave me in 2000 because you were involved in Dr. Roberts'

14  criminal case?

15  A.   I don't remember the checks specifically, but I do

16  know that I was involved in Dr. Roberts' criminal case

17  and I knew that you were involved.

18  Q.   So by looking at the checks during the criminal case

19  and without ever talking to Dr. Roberts, you were clear

20  on the reason why he gave that money to Lindsey Springer;

21  is that what your testimony is here today?

22        MR. SNOKE:   Your Honor, I object to being beyond

23  the scope of direct.

24        THE COURT:   Overruled.

25        THE WITNESS:   I believed that I understood the

1    reasons he gave you those checks.

2    Q.   (BY MR. SPRINGER)   Without ever asking him a

3    question?

4    A.   I don't know if I would say that.  I don't remember

5    during the criminal case if I specifically said,

6    Dr. Roberts, did you pay this money to Lindsey Springer

7    for your representation or not.

8    Q.   So your conclusions that you've given for this jury

9    to consider, your methodology, your scientific testing

10   about whether or not each of these transactions was made

11   difficult to follow is based solely upon the IRS looking

12   at the item and nothing else, no other questions being

13   asked by anybody else; is that your testimony here today?

14   A.   My testimony is that based on the testimony of

15   Dr. Roberts and the others that you structured

16   transactions to make it more difficult for the IRS to

17   find those transactions.

18   Q.   All right.

19            MR. SPRINGER:  Could you please pull up

20   Government's Exhibit Number 675, please.

21   Q.   (BY MR. SPRINGER)  So now you just said it's your

22   opinion, am I correct, that I structured transactions?

23   A.   There's a couple different definitions of

24   structuring.  I don't mean to imply that you structured

25   in the illegal sense of the word that you tried to avoid

1  the requirement, like the Form 8300 where you instead of

2  doing it for $10,000, you did it for 9,999.  It was a

3  common term used in legal circles.  But I think the form

4  of your transactions was done in such a way in order to

5  conceal the nature of the transactions.

6  Q.   Now, if I could not maintain a checking account or

7  if I could not manage a checking account, if I had

8  difficulties over and over again with checking accounts,

9  would you say, then, the other only alternative that I

10 had is what you've seen me do in this case?

11 A.   I would not agree with that, no.

12 Q.   What were my other alternatives?

13 A.   There weren't -- there were occasions where you

14 would not have always had to receive a cashier's check

15 from Mr. Stilley.  You could have -- Mr. Stilley could

16 have paid you with personal checks and you could have

17 taken those to the check cashing place and cashed those.

18 That's one example that comes off the top of my head that

19 you didn't have to do it the way you did.

20 Q.   Let's explore that scientific methodology.  Now,

21 let's just say for a moment and let's use, for example,

22 one of the $20,000 checks that Mr. Stilley gave to me at

23 the direction of Eddy Patterson in 2003.  Remember the

24 three checks for $20,000?

25 A.   Yes.

BRIAN MILLER - CROSS BY MR. SPRINGER                    2031

1   Q.   Is this an example of the type that you were just

2   explaining that he could have just wrote me a check and I

3   could have gone and cashed it at Checks Cashed instead of

4   getting a cashier's check?

5   A.   Yes.

6   Q.   Tell me, what would have been the difference to the

7   IRS whether I had done it the way I did it or I did it

8   the way that you just said?

9   A.   Well, if you had done it -- doing it the way you did

10  it, I could have looked at Mr. Stilley's bank records and

11  not have seen your name anywhere.

12  Q.   Oh, by the cashier's checks, you mean?   Okay.

13  A.   If you did it the way I just suggested and he had

14  written you a check out of his company account, then a

15  review of his ledger or a review of his check stubs would

16  have revealed your name and I would have known much more

17  easily where that money went.

18  Q.   So now under that methodology that you're speaking

19  of, if you were auditing Mr. Stilley's bank account,

20  Mr. Stilley would know that; isn't that true?

21  A.   Yes, he would know that.

22  Q.   Okay.   And if he knew that, you would probably,

23  after getting the checking account records from the bank,

24  you would probably have a lot of questions for

25  Mr. Stilley, wouldn't you?

1  A.   I might or I might not.  I might have had a cutoff

2  where I would have said I'm going to look at every

3  cashier's check over 30,000.  In that case, the fact that

4  you did two $20,000 cashier's checks, I might not have

5  looked at it.  And maybe -- I mean, maybe that's why you

6  did two $20,000 cashier's checks instead of one $40,000

7  cashier's check.  Maybe you thought it would be less

8  noticeable to the IRS to do smaller amounts.

9  Q.   Isn't it true that the only thing that the public is

10 supposed to not do is structure a transaction of greater

11 than $10,000 in amounts of less than $10,000?  You

12 mentioned 8300 forms earlier, did you not?

13         MR. SNOKE:  Objection, Your Honor, beyond the

14 scope of direct.  It's confusing because we're talking

15 about a different law that he's not --

16         THE COURT:  Clarify what requirement you're

17 talking about.

18 Q.   (BY MR. SPRINGER)  You used the word "structured"

19 earlier, correct?

20 A.   I did.

21 Q.   And you mentioned 8300; is that correct?

22 A.   That's right.

23 Q.   And is that a form that business entities who are

24 involved in receiving money of greater than $10,000 are

25 required to report to the IRS?

BRIAN MILLER - CROSS BY MR. SPRINGER                          2033

1   A.   It's either 10,000 or greater or go over 10,000, I

2   forget, but generally that's correct.

3   Q.   And also isn't there a FinCEN Form 104 for a

4   taxpayer or a person receives cash in more than $10,000

5   increments?  Is that correct?

6   A.   Yes.

7   Q.   All right.  Now, you've seen the currency

8   transaction reports in this case, have you not?

9   A.   Yes.

10  Q.   Would you say there's a lot of them?

11  A.   Several.

12  Q.   An unusual amount for your cases that you've been

13  involved in as a summary expert?

14  A.   Unusual for the tax evasion cases I've been in?  Not

15  particularly.  Unusual for all the other audits I've

16  done.

17  Q.   Maybe?

18  A.   Very few taxpayers deal in the amount of currency

19  that you and the other cases I've been involved in deal.

20  Q.   Okay.  Now, in the other cases you've been involved

21  in, were they all dealing with money where they had

22  written a check to either Lindsey Springer or to the

23  person themselves or an entity known by the IRS as an

24  entity for that person or were they hidden transactions

25  in the names of like trusts or corporations or things

BRIAN MILLER - CROSS BY MR. SPRINGER                    2034

1   that would -- you know, you wouldn't know by looking at

2   Chippewa Trail Lodge, Inc., that that was actually

3   possibly one of the Hawkins?

4   A.   I believe some of those were handled that way.

5   Q.   Okay.  Now, if you look at a $20,000 cashier's check

6   that comes out of -- and what I'm trying -- scratch

7   that.  You said that it would have been better for me to

8   have had Oscar Stilley write me one check for the total

9   amount of money than it would have been to get three

10  checks for $20,000 as I did it; is that correct?

11  A.   I didn't say it would be better.  I just said it was

12  -- I didn't exactly understand the reasoning and I

13  thought that there could possibly be an ulterior motive

14  for that.

15  Q.   And that's just a guess on your part.  You have no

16  way to fill in that gap on that guess; is that true?

17  A.   I'm just combining that information along with

18  everything else I've heard and seen during the trial and

19  that's --

20  Q.   If I wanted the IRS not to find out about it,

21  wouldn't it have been wiser for me to get, what, five or

22  six checks at $7,500 apiece and then stretch them out

23  over a period of days so that no one would ever know

24  about it?

25  A.   I couldn't answer that.

BRIAN MILLER - CROSS BY MR. SPRINGER                    2035

1  Q.   You do know or you saw in this case here that two of

2  the $20,000 checks bought a Mercedes in Tennessee from

3  Campbell Chevrolet; did you see that?

4  A.   I did.

5  Q.   Campbell filled out a currency transaction report

6  when that transaction was done, correct?

7  A.   That's true.

8  Q.   Let's just suppose for the moment I had a checking

9  account or a savings account and I had taken that --

10 those two $20,000 checks and instead of doing that, let's

11 say Oscar Stilley wrote me one check for $40,000.

12 A.   Okay.

13 Q.   And then let's say I deposited that check into a

14 checking account that I had and then I wrote a check to

15 Campbell Chevrolet for the car -- for the Mercedes that

16 you've seen was brought into evidence in this case.

17 A.   Okay.

18 Q.   Now, is that the way you wished it should have been

19 done?

20 A.   Well, to make it clear to the IRS and to anyone else

21 involved, I wouldn't have thought it would have gone

22 through Mr. Stilley's account at all.  I would have

23 thought that Mr. Bolthouse -- and in all my experience in

24 financial matters, you know, typically, the purchaser

25 will write a check or a cashier's check to the seller,

1   the purchaser will take the money out of his account, and

2   the seller will deposit the money into their account.

3   So, typically, Mr. Bolthouse would have written you a

4   check or a cashier's check and you would have deposited

5   that into your account to use for whatever you wanted.

6   Q.   Did you hear Mr. Bolthouse's testimony that he

7   wanted to have the funds held where I couldn't get them

8   until after he made sure that the bus was what I had

9   described on eBay?

10  A.   I think you -- he did mention you had some

11  discussion together about that.

12  Q.   And so your position was that Mr. Bolthouse should

13  have handled his transaction with me differently; isn't

14  that true?

15  A.   I guess it's the fact that when I look at that

16  transaction coupled with all the others and the fact that

17  I had already seen where Mr. Stilley had already been

18  involved in several other transactions, if you hadn't --

19  if you had dealt with a third party who was a little more

20  objective or separated from you personally, you know, I

21  think it would have been much more appropriate rather

22  than someone whose account you used day after day and

23  basically almost have complete control over.

24  Q.   Fair enough.  Fair enough.  That's not what happened

25  in this case, is it?  We can't go back and change the

1   facts as they are brought into this court, correct?

2   A.   Correct, the fact that all the money went through

3   Oscar's account to you.

4   Q.   Right.  Now, besides Oscar's account, do you see any

5   other lawyer's -- any other lawyer's trust accounts, any

6   other IOLTA accounts, or any other types of transactions

7   similar to what was done as described here with anybody

8   else?

9   A.   Did you use any other attorneys?  Is that the

10  question?

11  Q.   Yeah.

12  A.   To my knowledge, Mr. Stilley's IOLTA account is the

13  only account that you used to funnel your funds.

14  Q.   But you do know that I have dealt with many lawyers;

15  isn't that true?

16  A.   I assume so, yes.

17  Q.   You've seen me with many lawyers at many of the

18  venues that you testified as a summary witness on; isn't

19  that true?

20  A.   That's right.

21  Q.   All right.  Do you know whether any of those lawyers

22  have trusts, IOLTA, or other type of escrow accounts

23  available to them?

24  A.   I believe most attorneys have an escrow account for

25  their use for their clients.

```
 1   Q.   But you don't know whether any of the ones that I
 2   have been seen with have; is that correct?
 3   A.   I do not know specifically, no.
 4   Q.   Okay.  Now, if you -- if the government was
 5   investigating Lindsey Springer in transactions involving
 6   Oscar Stilley and the government of the United States was
 7   aware that I was seen with other lawyers, wouldn't that
 8   become just a little bit of an interest to the IRS to go
 9   look at and see whether there were other transactions
10   like that?
11   A.   I'm sorry.  You're going to have to say that one
12   more time.  You lost me in there.
13   Q.   I'll scratch that question.  Now, you heard
14   Mr. Patterson testify that an insurance company purchased
15   his errors and omissions insurance policy.  Do you
16   remember that?
17   A.   I believe that's right, yes.
18   Q.   And do you remember that that was where the $375,000
19   wire came from -- was from the proceeds of that --
20   A.   Insurance settlement?
21   Q.   I believe his testimony was they purchased the
22   contract.
23   A.   Okay.  I remember that --
24   Q.   You remember that?
25   A.   -- generally, yes.
```

BRIAN MILLER - CROSS BY MR. SPRINGER                    2039

1   Q.   And do you remember that it was for much more than

2   the amount of the wire that was sent to Oscar Stilley's

3   office?  Do you remember that testimony?

4   A.   What was much more than the amount --

5   Q.   Than the 375,000 that was actually wired to Oscar

6   Stilley.  The contract purchase price, I believe he said,

7   was 475,000.  Do you remember that?

8   A.   I don't, I'm sorry.

9   Q.   Do you remember him saying that he -- Hall Estill

10  took out over a hundred thousand dollars of the money

11  first?

12  A.   That does sound right.

13  Q.   Okay.  And now at the time that Mr. Patterson was

14  negotiating with the insurance company for them to buy

15  out his insurance contract, did you hear any testimony

16  about any rights that Lindsey Springer had with regard to

17  that contract?

18  A.   No, I don't believe I did.

19  Q.   So it is your understanding that the moment Lindsey

20  Springer had any rights with regard to that $375,000

21  under your methodology, your scientific methodology and

22  your theory is the moment that Mr. Patterson told

23  Mr. Stilley to give me $90,000; is that true?

24  A.   I'm not sure of the specifics, but that's going to

25  be close.

1  Q.   I mean, the moment the IRS could say that I was

2  trying to keep them in the dark on the $90,000 would have

3  to happen after I found out I was going to be getting

4  $90,000; wouldn't that be safe to say?

5  A.   Absolutely, that's fair.

6  Q.   Okay.  So I had nothing to do with the wire transfer

7  of $375,000 in any way misleading the IRS about anything;

8  isn't that true?

9  A.   Well, I don't know whether or not you instructed

10 Mr. Patterson to wire that money to Mr. Stilley or not.

11 Q.   Isn't it true that -- testimony from that seat right

12 there that you're in is that Hall Estill wired the money?

13 A.   Hall Estill was instructed to wire the money is my

14 understanding.

15 Q.   By Mr. Patterson?

16 A.   By Mr. Patterson.  But I'm not sure who told

17 Mr. Patterson to wire it to Oscar Stilley's account.

18 Q.   Now, as you sit here today, you have no evidence

19 that I told him to do that; isn't that true?

20 A.   I can't remember the specifics of Mr. Patterson's

21 testimony.

22 Q.   Okay.  Do you remember Mr. Patterson saying at the

23 time that he made the settlement and first received

24 notice that they were going to pay $475,000 that he

25 instantly said, all right, I can pay Lindsey the $90,000

1  I owe him?  Do you remember him saying that?

2  A.   I don't.

3  Q.   In all the records that you've looked at, did you

4  ever see any evidence that at the time that that wire was

5  made from Hall Estill to Oscar Stilley that Mr. Patterson

6  thought he owed me $90,000?

7  A.   I believe Mr. Patterson did say that he owed you --

8  Q.   $90,000.

9  A.   I don't remember if he said specifically $90,000 at

10  that moment, but I do recall as a part of the billing

11  records that there was the $90,000 that was supposed to

12  go to you that -- remember that Mr. Stilley withheld the

13  $12,000 from for the amount that you owed him.  So at

14  some point, there was a discussion about $90,000 that was

15  to go to you.

16  Q.   Right.  But as far as the theory that you have that

17  the way that $90,000 transaction took place was not done

18  correctly, the involvement that I would have in that

19  transaction as far as keeping the IRS in the dark would

20  be the moment that I had a right to that money; isn't

21  that true?

22  A.   Yes.

23  Q.   Okay.  So now it is your testimony that I kept the

24  IRS from learning about Mr. Stilley doing what

25  Mr. Patterson told him to do with $90,000 by the way

1   Mr. Stilley went and got three cashier's checks for

2   $20,000, got 18 $1,000 money orders, and paid off a

3   $12,000 balance on a loan, I believe your testimony was,

4   for $37,000 to Ed Bryson on a Corvette.  Am I clear on

5   that?

6   A.   You have a lot of information in that sentence.

7   Q.   That's a lot of information.

8   A.   Could you break it down?

9   Q.   Do you remember the $12,000 of the 90 was to pay off

10  the balance of the Corvette loan?

11  A.   Yes.

12  Q.   All right.  So now we're at 78,000 now, correct?

13  A.   Yes.

14  Q.   Do you remember the 18 $1,000 money orders?

15  A.   I do.

16  Q.   All right.  So now we're at 60,000, right?

17  A.   We've got three $20,000 cashier's checks, $18,000

18  worth of $1,000 money orders, and the $12,000 that you

19  owed Mr. Stilley.

20  Q.   And what I should have done differently is tell

21  Mr. Stilley write Lindsey Springer a check for $90,000?

22  A.   There were so many things you should have done

23  differently.

24  Q.   I'm talking about this particular transaction.

25  A.   I know.  I am too.

1    Q.   All right.

2    A.   First of all, you never should have run your money

3    for services like that through an escrow account is my

4    understanding of escrow accounts.  My understanding is

5    that those funds are typically for attorneys to hold

6    client funds for -- you know, should they need to go to a

7    third party in a settlement or something like that.

8    Q.   That's your understanding.  You could be wrong, but

9    it's your understanding, correct?

10   A.   I could be wrong, yes.

11   Q.   All right.  And if you are wrong, then your position

12   here that you're stating would be in error, wouldn't it?

13   A.   Yes, it would.

14   Q.   All right.

15   A.   But you asked me why I thought it was wrong.

16   Q.   I got you.  Okay.  So now you say I ran the money

17   through Mr. Stilley's IOLTA account.  And we're just

18   using examples so the jury gets an understanding of your

19   methodology here.

20   A.   Yes.

21   Q.   That what should have happened was Mr. Stilley kept

22   the $90,000 out of the IOLTA account to Mr. Patterson and

23   then Mr. Patterson write Lindsey or Bondage Breakers

24   Ministries a check; is that what you're saying?

25   A.   The cleanest way to have handled it would have been

1  for Mr. Patterson to send Oscar Stilley a wire for

2  whatever he wanted to give Mr. Stilley for his work and

3  to send you a wire or a cashier's check for whatever work

4  you did.

5  Q.   Okay.

6  A.   That would have been the simplest, cleanest, and all

7  my experience, you know, that's the way it's ordinarily

8  done.

9  Q.   So the beginning of the problem is that Hall Estill

10 got the money from the insurance company and sent the

11 wire directly to Oscar Stilley instead of Hall Estill

12 wiring it to Eddy Patterson.  Is that what you're saying?

13 A.   That's part of the problem.

14 Q.   Okay.  And as you sit here today, you don't know

15 whether I had any control over whether or not Hall Estill

16 did anything with that money; isn't that true?

17 A.   That's true.

18 Q.   And, in fact, my name wasn't even on the insurance

19 policy, was it?

20 A.   I have no idea.

21 Q.   Now, let's just say that you're correct, hindsight

22 being what it is, and Mr. Patterson received the $375,000

23 wire and he puts it in his bank account.

24 A.   Okay.

25 Q.   And then let's say he writes a check to Mr. Stilley

1  for whatever he and Mr. Stilley are going to deal with

2  and he decides to, for whatever reason he tells me, gives

3  me a check for $90,000 made out to Lindsey Springer or

4  Bondage Breakers Ministry.

5  A.   Okay.

6  Q.   All right.  Now, at this point, where is the IRS in

7  this picture?

8  A.   We're nowhere in this picture, I guess, under your

9  scenario.

10 Q.   All right.  So at this point, the IRS would -- if

11 they ever came into this transaction and looked at it and

12 Eddy Patterson was being audited and they looked at the

13 $375,000 deposit into his checking account and they would

14 see this, then the next step is that you would see a

15 check to Bondage Breakers Ministries or Lindsey Springer

16 coming out, right?

17 A.   Yes.

18 Q.   All right.  And, again, by you, the IRS, being able

19 to do these audits, you really do have to have

20 cooperation of the taxpayer, isn't that true, on most

21 cases?

22 A.   Well, we don't have to have the cooperation of the

23 taxpayer to get an audit done.  We can be clear on that.

24 We can do it with or without their cooperation.

25 Q.   But you try to get it?

1   A.   Certainly.   Cooperation makes everything go more

2   smoothly for the IRS as well as for the taxpayer.

3   Q.   Now, at the time this $375,000 transaction was done,

4   the insurance company was purchasing an insurance

5   contract out that was belonging to Eddy Patterson; is

6   that true?

7   A.   I'm not real sure about the details about that.

8   Q.   But it was a significant amount of money for

9   something, wasn't it?

10  A.   There was a large amount of money that went to

11  Mr. Patterson.

12  Q.   All right.   And he was under -- I believe getting

13  ready to go to his second scheduled trial at the time in

14  November.   Do you remember the timeline, November of

15  2003?

16  A.   I believe that's the time he was getting ready to go

17  to trial, yes.

18  Q.   So if you had walked up to Mr. Patterson that day

19  and said, hey, I'm with the IRS and I want to look at

20  that transaction, you couldn't have done that as long

21  as -- as long as he was under this criminal trial

22  setting, you were forbidden from trying to civilly

23  contact him; isn't that true?

24  A.   It is IRS practice for the civil side not to get

25  involved when a criminal investigation is being

1    conducted.

2    Q.   So now at the point that he writes a check to Oscar

3    Stilley and writes a check to me --

4    A.   We're talking hypothetically?

5    Q.   Hypothetically.  I'm trying to find out under your

6    methodology how it should have been done.

7    A.   Okay.

8    Q.   All right.  I believe the jury needs to understand

9    the logicalness -- the logic of your analysis.  So now

10   under your theory, I have a check for $90,000.  Now, can

11   I go over to Checks Cashed and cash it?  Is it okay under

12   your methodology for me to do that?

13          MR. SNOKE:  Your Honor, I object.  I don't think

14   it's relevant, "can he," asking this agent.

15          THE COURT:  Overruled.

16          THE WITNESS:  Again, this would be a little --

17   this isn't as bad as the way it was actually done, but

18   taking the check and cashing it at a check cashing

19   location still makes it a little less transparent.

20   Q.   (BY MR. SPRINGER)  A little less.  Making the IRS's

21   job maybe a little harder if they want to do something

22   without anybody knowing they're doing it, right?

23   A.   Maybe I shouldn't have said "a little less."  Maybe

24   significantly less transparent.

25   Q.   You said earlier on the $20,000 check that Oscar

1   gave me a cashier's check on, hypothetically, that if I

2   had had a check written out to me, Lindsey Springer, and

3   cashed it at Checks Cashed that would have been more

4   transparent and you would have been able to see that by

5   the records if you audited Oscar Stilley, correct?

6   A.   It would have been more transparent, yes.

7   Q.   All right.  Now, you do know that in this case the

8   government's theory is as an affirmative act and as a

9   part of an overt act in furtherance of the conspiracy, by

10  mere use of a single check cashing business is considered

11  to be in furtherance of these alleged crimes that are

12  alleged against me.  Are you aware of that?

13  A.   I believe that's right, yes.

14  Q.   All right.  So you're not suggesting that -- well,

15  strike that.  And I'll emphasize here that my questions

16  are based upon the idea that I either will not have a

17  checking account, cannot have a checking account, or

18  refuse to have a checking account just to be clear on

19  that.

20          MR. SNOKE:  Objection, Your Honor, to the

21  hypothetical which is not in evidence.

22          THE COURT:  I think all he was doing was

23  clarifying the premise for his line of questioning.  It

24  will be overruled.

25          MR. SPRINGER:  Thank you, Your Honor.

1  Q.   (BY MR. SPRINGER)  So now you heard Kenny Delozier

2  testify, did you not, from Checks Cashed?

3  A.   I did.

4  Q.   And he actually -- Checks Cashed is not a very

5  favorable business to the IRS, is it?

6  A.   I don't know if I would say it's not a favorable

7  business.  It does make it easier for some taxpayers to

8  avoid, again, that transparency and an obvious reporting

9  reflection of their income and expenses.

10 Q.   But it also gives a citizen at least some option as

11 far as how to survive for their life in the event that

12 the IRS has made it very difficult for them to do the

13 normal things that normal people do; isn't that true?

14 A.   Are you saying that using a check casher makes it

15 easier for an individual taxpayer to hide their actions

16 from the IRS?

17 Q.   No, I'm saying --

18 A.   I think that's what you said.

19 Q.   If a person gets a paycheck -- let's just say that

20 they get a paycheck and they've had problems with banks

21 and, for instance, an IRS levy came in and made several

22 checks to bounce and made them liable for those checks,

23 so they're very skittish about trusting checks, because

24 it costs them a lot, and so, in turn, they decide that

25 they are just going to take their paycheck every week and

1  instead of going and depositing it in a bank where it

2  could bounce or all kinds of crazy things can happen,

3  they go over to a check cashing place and cash it and get

4  the money in their hands to where nobody can mess that

5  up.   Now, isn't that an option for anybody who is in that

6  situation?

7  A.   If a person has reason to believe that the IRS may

8  be after their money or they may owe the IRS and instead

9  of taking their money to the bank and depositing it like

10 most people would, they say I don't want the IRS to find

11 this money because I don't want them to get it because I

12 owe the IRS, so I'm going to run down to the check

13 cashing place and I'm going to cash that check so the IRS

14 won't have any knowledge about it, that's a problem.

15 Q.   That's a problem.   Is it a crime?

16 A.   It's an indication of a crime.

17 Q.   Indication of a crime.   What if the person didn't

18 believe that they owed any money?  What if the person

19 believed the IRS was wrong and just didn't know how to

20 follow the procedures or educated?

21 A.   Then that person should figure out the procedures,

22 contact the IRS and try to work it out through the

23 system, not go off on their own and try to hide things

24 from the IRS.

25 Q.   Not go off on their own and try to hide things.

1  What if they were actually cashing a check at a check

2  cashing place who reports those transactions to the IRS?

3  A.   That still may or may not result in the IRS finding

4  out about that.

5  Q.   So --

6  A.   Sometimes those two things are not connected.

7  Q.   So the actual issue here is if you cannot maintain,

8  qualify, or have a checking account at a bank for

9  whatever reason, for whatever your reasons are, that

10 anything else you do with any money you get is a crime or

11 has a problem, as you just said; is that true?

12 A.   Well, I would have to look at the basis for not

13 having a checking account.  I mean, under your scenario,

14 if you're saying you can't have a bank account because

15 the IRS will come and get the money they owe, then that's

16 not right.  But if you're -- if you want to talk

17 hypothetically --

18 Q.   I am.

19 A.   -- and we're living in a world where there are no

20 banks or all the banks have shut down, then maybe that

21 would be a different situation.  Of course, that's

22 obviously not the situation.

23 Q.   Do you know since 2001 whether or not banks have

24 changed their policy on opening up checking accounts

25 because of September 11th?

1   A.   There have been federal laws and regulations changed

2   since 9/11.

3   Q.   And isn't there credit checks now on checking

4   accounts where there may not have been prior to September

5   11th?

6   A.   I am not aware of whether or not banks do credit

7   checks before you open a checking account.

8            THE COURT:   Mr. Springer, let me know when you

9   get to a convenient stopping point.

10           MR. SPRINGER:   Ready for lunch, Your Honor.

11           THE COURT:   Very well.   Members of the jury,

12  we'll take our midday recess at this time.   We'll resume

13  at 15 minutes after one.   During this lunch recess,

14  please do remember my usual admonition, which I will not

15  repeat, and please be available just a little before

16  quarter after one to return to the courtroom with the

17  security officer.

18      All persons in the courtroom will remain seated

19  while the jury departs.

20      (JURY EXITS THE COURTROOM)

21           THE COURT:   Okay.   The jury has left the

22  courtroom.   Before we recess, I want to get some

23  clarification so that I can fairly and correctly address

24  matters that may come up during cross-examination of

25  Mr. Springer.   And my first inquiry is of government

1   counsel and that is of the particulars as to the criminal

2   convictions of Mr. Springer that the government may

3   offer.

4           MR. O'REILLY:  As far as what they are, Your

5   Honor?

6           THE COURT:  Yes.  And also obviously under Rule

7   609 the timing is also --

8           MR. O'REILLY:  Yes, Your Honor.  One of them, I

9   believe, is the late 1980s and it was for a felony

10  conviction with respect to placing a -- removing a VIN

11  number from a salvaged vehicle and placing it on a stolen

12  vehicle.  And then the other one was in the early 1990s

13  with respect to a -- I believe it was an insufficient

14  fund check, a criminal matter on that.  I believe that's

15  -- may I have a moment, Your Honor?

16          THE COURT:  You may.

17          MR. O'REILLY:  It may have been more than one of

18  the bad check charges, Your Honor, but that's the extent

19  of it.

20          THE COURT:  Okay.  Well, obviously, those are

21  both under 609(a) -- or not exclusively under 609(a)(2),

22  but they are governed by 609(a)(2) and 609(b).  There's a

23  couple of problems -- or at least I shouldn't say

24  problems.  I'll say issue.  If you want the -- if you

25  want the automatic admissibility under 609(a)(2), then it

```
 1   must be readily determinable -- and the word "readily" is
 2   in the rule.  If it readily can be determined that
 3   establishing the elements of the crime required proof or
 4   admission of an act of dishonesty or false statement by
 5   the witness.  So I certainly don't have the VIN number
 6   statute in front of me nor do I have the criminal hot
 7   check statute in front of me, but that's issue number
 8   one, and the burden certainly is on the government to
 9   establish that threshold proposition.
10       Okay.  Then we get to the ten-year rule of 609(b).
11   And there is -- under 609(b), there are two requirements
12   if it's more than ten years old.  Number one, I have to
13   determine whether the probative value outweighs its
14   prejudicial effect, which, interestingly enough, is
15   exactly the opposite of the Rule 403 analysis.  And I
16   have to also be shown that the adverse party was provided
17   sufficient advance written notice of intent to use the
18   evidence.
19       So apart from -- Mr. O'Reilly, apart from the
20   balancing that I would have to undertake as to these
21   convictions that apparently go back 20 years or more, did
22   the government provide written notice?
23           MR. O'REILLY:  Your Honor, we provided these in
24   discovery to the defendants.
25           THE COURT:  Pardon me?
```

BRIAN MILLER - CROSS BY MR. SPRINGER                    2055

 1              MR. O'REILLY:  We provided these documents, the
 2    records of conviction to the defendants in discovery.
 3              THE COURT:  How long ago would that have been?
 4              MR. O'REILLY:  I believe it was April of this
 5    year, Your Honor.
 6              THE COURT:  Okay.  And are those -- are those
 7    documents marked as exhibits?
 8              MR. O'REILLY:  No, Your Honor, because unless
 9    the defendant testified, we were not going to be
10    introducing the documents themselves, only make an
11    inquiry of them.  And even if he testifies, it is not the
12    intent of the government to submit the documents
13    themselves as evidence in this case.  It's not evidence
14    in this case.  It's just to impeach a witness's
15    credibility.
16              THE COURT:  Okay.  Well, the burden still rests
17    squarely with the government.  Removing a VIN number
18    could be a strict liability crime for all I know.  If
19    it's a strict liability crime, then it would not satisfy
20    609(a)(2).
21          And I would also want to see -- I would want to get
22    some understanding of the statutory basis for the hot
23    check prosecution.  I realize that usually the state
24    prosecutors don't get interested in hot check situations
25    unless there is truly some criminal intent, but I would

BRIAN MILLER - CROSS BY MR. SPRINGER                    2056

1   want to take a look to see whether the elements of the

2   crime required proof or admission of an act of dishonesty

3   or false statement.  It's not enough just in the abstract

4   to have been a paperhanger.  And it must be readily

5   determinable, burden on the government, that the elements

6   of the crime required proof or admission of an act of

7   dishonesty or false statement.

8        So I don't want to ruin your lunch, but that's where

9   we are.  And I'm not ruling on anything either, but this

10  is an aspect of the case that behooves the trial court to

11  take a very sure-footed approach and I intend to take a

12  very sure-footed approach.

13       Is there anything else that we ought to address

14  before we recess?

15            MR. SPRINGER:  Not at this time, Your Honor.

16            THE COURT:  Court will be in recess.

17       (A RECESS WAS HAD, AFTER WHICH THE FOLLOWING

18  PROCEEDINGS WERE HAD IN OPEN COURT AND WITHIN THE

19  PRESENCE AND HEARING OF THE JURY.)

20            THE COURT:  Mr. Springer, you may continue.

21            MR. SPRINGER:  Thank you, Your Honor.

22  Q.  (BY MR. SPRINGER)  Mr. Miller?

23  A.  Yes.

24  Q.  Just to take one step back a second so I can come

25  back forward.  If Oscar Stilley had written me a check

1  out of his IOLTA account for $20,000 and I cashed that at

2  the Checks Cashed place that you've seen testimony here

3  today or throughout the trial versus the way it was

4  actually done, which was Oscar Stilley went to his bank

5  and got a cashier's check made to Lindsey Springer for

6  $20,000, now, tell me what -- to the IRS, what the

7  difference would have been in relation to doing it the

8  way it was done versus the way that you were suggesting

9  it could have been done.

10 A.   Okay.  I think -- first of all, I think the fact it

11 was run through the -- I think that, first of all, the

12 fact that the IOLTA account was used was part of the

13 problem.  But then, secondly, it has been my experience

14 that if a cashier's check were written that there would

15 not be any record of your name in the bank statement or

16 cancelled checks on Oscar's account.  But if a company

17 check or a personal check was written by him to you, that

18 would be -- there would be another indicator to clarify

19 the transaction.

20         THE COURT:  Hold up just a minute.  Are you

21 going to point the microphone -- okay.  Proceed.

22 Q.   (BY MR. SPRINGER)  So under what you just said, the

23 fact that my name was on a cashier's check means nothing?

24 A.   It still makes it harder for us to find a

25 transaction than it would if a company check or a

BRIAN MILLER - CROSS BY MR. SPRINGER                              2058

1   personal check had been written.

2   Q.   But you're saying it makes it harder for you when

3   you discover the item or you're doing an audit, right?

4   A.   It would make it harder for me to discover it --

5   make it harder for me to discover your involvement in the

6   transaction.

7   Q.   So is it safe to say it would make it harder for you

8   to discover if you were doing an audit and you did not

9   have a cooperating taxpayer?

10  A.   Yes.

11  Q.   Okay.  Now, in this case, have you seen any evidence

12  that either myself or Mr. Stilley were uncooperative with

13  the IRS?

14  A.   Absolutely.

15  Q.   In what regard?

16  A.   One thing that comes to mind was the grand jury

17  testimony or presentation by Mr. Stilley where he was

18  asked to provide, I think, a list of all the transactions

19  in which you were involved in it.

20  Q.   Now, did the IRS have any -- was the IRS doing an

21  audit and using the grand jury to do that?

22  A.   You asked if there was any occasion where either of

23  you were not cooperative in this investigation.  I

24  thought --

25  Q.   Oh, I'm sorry, I didn't mean investigation.  I meant

1  as far as if the IRS wanted to do an audit.

2  A.   Okay.  That's not what you said.

3  Q.   I'm sorry, I meant audit.  I meant if the IRS was

4  doing an audit or wanted to do an audit of Lindsey

5  Springer or Oscar Stilley, is there any evidence that you

6  know of that either -- strike that.  Are you aware that

7  the IRS audited Lindsey Springer?

8  A.   No, I don't know anything about that.

9  Q.   Are you aware that Donna Meadors -- do you know who

10 Donna Meadors is?

11 A.   I do.

12 Q.   And you actually worked side by side with her in the

13 Eddy Patterson case, didn't you?

14 A.   Yes.

15 Q.   Okay.  And at the time that you were working side by

16 side with her in the Patterson case, did you know she was

17 also doing a civil audit on Lindsey Springer?

18 A.   I did not.

19 Q.   Okay.  And since that time, have you ever learned

20 that Donna Meadors did a civil audit on Lindsey Springer?

21 A.   I vaguely know of some sort of financial

22 investigation.  I wasn't -- I'm not sure if it was

23 actually an audit of you individually or not.

24 Q.   Now, in relationship to this case, have you seen any

25 evidence in this case where Donna Meadors says that I did

1  not cooperate with her fully in her civil investigation

2  of Lindsey Springer?

3          MR. SNOKE:  Your Honor, objection.  There has

4  been no evidence in this case about Donna Meadors.

5          THE COURT:  There's about to be.  Overruled.

6          THE WITNESS:  Donna Meadors and I had no

7  discussion about any audit of you.

8  Q.   (BY MR. SPRINGER)  But you are aware that she did

9  audit me?

10 A.   I'm aware.  And she may have said something like,

11 you know, something is going on, but she and I did not

12 have a discussion about the type of investigation, the

13 extent of the investigation, or the character or nature

14 or anything like that.

15 Q.   Thank you.  So if you had evidence that I didn't

16 cooperate with her in her civil audit of Lindsey

17 Springer, you would be aware of that at this point in the

18 case, wouldn't you?

19 A.   Not necessarily.  That's two completely different

20 things and I've not been privy to any information about

21 that affair.  I'm just involved in this particular

22 investigation.

23 Q.   Now, have you ever had any discussions with

24 Mr. Shern about Donna Meadors' civil investigation?

25 A.   No, not that I remember.

BRIAN MILLER - CROSS BY MR. SPRINGER                    2061

1   Q.   Have you reviewed all the evidence in this case that

2   has been brought into this courtroom?

3   A.   I have seen all the exhibits that have been

4   presented.

5   Q.   Have you looked at evidence prior to this -- the

6   trial that we're in today that the government had?

7   A.   I looked at a small amount -- before it was

8   presented, I looked at some of the potential -- or I

9   guess most of the potential exhibits trying to do some

10  work on flow charts and that sort of thing that I was

11  going to present, but I have not gone through all the

12  evidence that was obtained in this investigation.

13  Q.   Do you remember seeing in the evidence that you did

14  go through letters written to Donna Meadors involving her

15  civil investigation of Lindsey Springer?

16  A.   No, sir, I don't.  I didn't see those.

17  Q.   Now, as you've sat here -- and you listened very

18  carefully yesterday to Mr. Turner's testimony; isn't that

19  true?

20  A.   Was that yesterday?  Yes.

21  Q.   Excuse me.  I'm sorry, day before yesterday.  I

22  misspoke.

23  A.   Whichever day it was, yes, I listened carefully to

24  his testimony.

25  Q.   And did you ever hear him say that I rendered any

BRIAN MILLER - CROSS BY MR. SPRINGER                    2062

```
1   service to him in exchange for $250,000?
2   A.   No.
3        MR. SPRINGER:  If I may have just a moment, Your
4   Honor.
5        THE COURT:  You surely may.
6   Q.   (BY MR. SPRINGER)  Now, when you -- you're familiar
7   with the charts that the government provided to us prior
8   to today, which is, in part, what you've testified about
9   prior to our lunch break; is that true?
10  A.   Yes, I am.
11  Q.   All right.  And are you aware that the government
12  offered two charts for the year 2005, one chart included
13  the $250,000 as gross income and the other chart left it
14  off completely?
15  A.   I am aware of that.
16  Q.   Are you the sole reason why the $250,000 chart was
17  used instead of the one that excluded it from the chart?
18  A.   I prepared both charts.
19  Q.   Why did you prepare the one that was without the
20  $250,000?
21  A.   When I first heard the testimony of Mr. Turner and
22  saw the contract related -- or the contract between you
23  and Mr. Turner related to that 250,000, I initially felt
24  like that was a valid loan and that his testimony was
25  true and that the contract was legitimate.
```

BRIAN MILLER - CROSS BY MR. SPRINGER                    2063

1   Q.   A valid loan; is that what you said?

2   A.   Yes.

3   Q.   Okay.  Please continue.

4   A.   Yes, I felt that way initially.  Subsequent to that,

5   I changed my mind.

6   Q.   So as you stand here today, if Mr. Turner was here,

7   you would tell him that I don't owe him $250,000; is that

8   true?

9   A.   I would tell him that you owe him $250,000 but that

10  he will never get his money back.

11  Q.   So did you also hear testimony that there was a lien

12  placed on the $167,000 RV?

13  A.   I vaguely remember something about that, yes.

14  Q.   So is your testimony here today that that lien is no

15  good on that RV?

16  A.   I don't know.  I'm not convinced that it is.

17  Q.   But you're not convinced that it isn't, correct?

18  A.   I believe that it's not a valid lien.

19  Q.   So you believe that he has no interest in a motor

20  home that was specifically purchased with money that came

21  from him?

22  A.   I believe either one of two things, either that it's

23  not a valid lien or that he'll never call in the lien, I

24  guess.

25  Q.   Okay.  So now you're saying he won't ever want the

```
 1  money; is that true?
 2  A.   I'm saying he'll want the money and I'm saying that
 3  I think he would be entitled to the money, but as you
 4  like to say, as I sit here today, I believe that he is a
 5  big fan of yours and would never ask you for the money.
 6  Q.   Have you ever attended any of the telephone calls
 7  between he and I and his wife?
 8  A.   I have not.
 9  Q.   Did you ever tell Mr. Turner what you just said to
10  this jury?
11  A.   No, I've never spoken to Mr. Turner.
12  Q.   And the sole reason why you think that the lien is
13  not valid is because why?
14  A.   I would have to see the lien again.  I don't
15  remember even looking at that document, to be honest,
16  very closely.
17  Q.   Do you know what a lien is?
18  A.   Pardon me?
19  Q.   Do you know what a lien is?
20  A.   Generally, yes.
21  Q.   What is it?
22  A.   Basically, I guess when a person owns some
23  collateral or owns an interest potentially in an asset
24  maybe, something like that.
25  Q.   So as you stand here today, you came to the
```

BRIAN MILLER - CROSS BY MR. SPRINGER                2065

1  conclusion and you're telling this jury that the lien
2  that is placed on the RV that was purchased with the
3  money that came from Mr. Turner is not a valid lien, but
4  you don't know why?
5  A.   I do not believe it's a valid lien just like I don't
6  believe that the check that says "donation" was a
7  donation and just like I don't believe that that contract
8  between you and he was a legitimate contract.
9  Q.   Are you familiar with contract law?
10 A.   Barely.
11 Q.   Certainly you've heard of oral contracts, have you
12 not?
13 A.   I have.
14 Q.   I think you even heard Mr. Ouwenga begin to talk
15 about that, didn't you?
16 A.   I believe so.
17 Q.   Okay.  As far as you know, two people still have the
18 right to contract in this country, don't you believe
19 that?
20 A.   I do.
21 Q.   Okay.  Now, you testified that tax returns were
22 required because the threshold amount was exceeded.  Do
23 you remember that?
24 A.   Yes.
25 Q.   And isn't it true that the phrase "threshold amount"

```
 1   is not in any information that you've ever read before
 2   that is written by Congress or -- that's a term that the
 3   IRS uses; isn't that true?
 4   A.   I'm not even sure if the IRS uses it.  Brian Miller
 5   uses it.
 6   Q.   Isn't Brian Miller actually by meaning threshold
 7   amount meaning exempt amount plus standard deduction
 8   equals threshold amount?
 9   A.   Yes.
10   Q.   Okay.  And I was noticing on your chart --
11            MR. SPRINGER:  And if you could pull up
12   Government's Exhibit Number 682, please.
13   Q.   (BY MR. SPRINGER)  Do you see it there in front of
14   you?
15   A.   I don't yet.
16   Q.   Do you see it now?
17   A.   I do.
18   Q.   Now, if you would look across the line there, it's
19   the sixth line down, adjusted gross income line.
20   A.   Yes.
21   Q.   Now, isn't it true that that's the last -- the last
22   line on a tax return is adjusted gross income?
23   A.   That's the bottom line on the first page, yes.
24   Q.   But you don't have it as the bottom --
25            MR. SNOKE:  Your Honor, may we -- this exhibit
```

```
 1   is not in evidence.
 2             MR. SPRINGER:  Oh, I thought you put it in.  I'm
 3   sorry.
 4             THE COURT:  There's one --
 5             MR. SPRINGER:  683.
 6             THE COURT:  There's one with a little different
 7   spots on it that's in evidence.
 8             MR. SPRINGER:  I'm sorry.  Could you pull up
 9   683, please.  I apologize.
10   Q.  (BY MR. SPRINGER)  Do you see the adjusted gross
11   income line is in the middle of your chart?
12   A.  I do.  Can I make one comment real quick?
13   Q.  Please.
14   A.  I need to fix something.
15   Q.  Okay.
16   A.  In my haste to do this form, there's one slight
17   error and that is that the SE adjustment should actually
18   be below the adjusted gross income figure instead of
19   above it.
20   Q.  Okay.
21   A.  It has absolutely no impact on any of the tax due or
22   anything like that, but it should have been deducted --
23   Q.  Before.
24   A.  -- before adjusted income.
25   Q.  And that was just a mistake, right?
```

1  A.    No, I stand corrected, it is right the way it is.

2  Q.    Okay.

3  A.    I thought I was wrong, but --

4  Q.    Now, if you look at adjusted gross income and just

5  below that you have less standard deduction and then for

6  2000 you have 4,400 and then for 2001, 7,242.  And then

7  the next year it says 8,152.  And then the next year

8  9,291.  And the next year 97.  And the next year 10,000.

9  Now, did the law change every year between 2000 and 2005

10  with regard to the standard itemized deduction amount?

11  A.    The law did not change except for the fact that the

12  numbers changed within the law.

13  Q.    So is it safe to say that the United States Congress

14  didn't change the numbers, the IRS did?

15  A.    The IRS changed the number under the instruction of

16  Congress.

17  Q.    Instruction of Congress?

18  A.    Congress said change the number every year to allow

19  for inflation.

20  Q.    Congress told the IRS to change the law every year;

21  is that what you're saying?

22  A.    If you call changing the number changing the law,

23  then I guess that would be accurate.  Congress didn't

24  tell us to change the law, but they told us what the

25  dollar amount should be each year for the exemption and

1   standard deduction.

2   Q.   Now, actually, they didn't actually tell you what

3   the dollar amount should be, did they?  They told you a

4   formula; isn't that true?

5   A.   They told us the dollar amount for a specific year

6   and they told us to adjust that dollar amount each year

7   to allow for inflation.

8   Q.   So it's each year thereafter, correct?

9   A.   Right.

10  Q.   And then is your testimony the same on the exemption

11  amount, that it changes every year from 2000 to 2005, but

12  the actual law itself doesn't change, it's just that

13  Congress directs the IRS to change it?

14  A.   Congress directs the IRS to change the amount based

15  on inflation.

16  Q.   Okay.  Now, you noticed all the currency transaction

17  reports that Checks Cashed testified about; do you

18  remember that?

19  A.   I did, yes.

20  Q.   Okay.  And you actually had a problem with the way

21  Checks Cashed had filled out the currency transaction

22  reports, didn't you?

23  A.   I don't recall any significant problem I had with

24  that.

25  Q.   So you were happy about those were done the way they

```
 1  were supposed to be done?
 2  A.   It has been a long time since I've looked at that
 3  law and I'm not real clear on the social security number
 4  versus driver's license number requirement, but I think
 5  other than that, it was fine.  And there might have been
 6  one time when they filed one that they didn't need to
 7  file one, I think.  But generally speaking, I personally
 8  was satisfied with what they had tried to do.
 9  Q.   Do you remember that the requirement on the form was
10  form of identification?
11  A.   That's what I was just saying, I don't -- it has
12  been a long time since I've looked at it closely.
13  Q.   Social security cards don't have pictures on them,
14  do they?
15  A.   They do not, no.
16  Q.   Can't get on an airplane with a social security
17  card, can you?
18  A.   That's right.
19  Q.   All right.  Now, isn't it also true in your
20  experience as a revenue agent before you were in fraud --
21  A.   Okay.
22  Q.   -- that the state -- that each of the 50 states and
23  the IRS have a reciprocal exchange agreement where they
24  exchange information with each other really just on a
25  continual basis?
```

1    A.   I'm not involved in that process, but that is my

2    understanding, yes.

3    Q.   And if the IRS wanted to know more about Lindsey

4    Springer and they had received a document that had

5    designated on it driver's license number by the third

6    party who filled it out, that the IRS could easily find

7    out who that is by their reciprocal agreement with the

8    state of Oklahoma?

9    A.   I would say that's a fair statement.

10   Q.   So by me asking the state to put a number -- assign

11   a number to me for driver's license purposes that was not

12   my social security number, you're not claiming that that

13   was somehow an act to hide from the IRS, true?

14   A.   If that were the only event or only indication that

15   I saw in regard to you that -- where you didn't report

16   your SSN, then I would think, no, it's no big deal, not a

17   problem.  But when you couple that with this thing and

18   this thing and this thing, when you look at the overall

19   picture, it is an indicator that -- indication of an

20   overall scheme.

21   Q.   Now, let's go with this thing and this thing and

22   this thing for a minute.

23   A.   Okay.

24   Q.   And what you're referring to again is if the IRS

25   wanted to ascertain the circumstances or characteristics

BRIAN MILLER - CROSS BY MR. SPRINGER                    2072

1  surrounding a certain transaction, that's what you mean
2  by this certain transaction and this certain transaction
3  and this certain transaction; is that correct?
4  A.   I'm talking about all the different ways that you
5  conducted your business to try to, for lack of a better
6  term, fly under the radar.
7  Q.   Fly under the radar.  There is no radar, is there?
8  A.   It's just a --
9  Q.   It's just the IRS going out and ascertaining
10  information from taxpayers; isn't that true?
11  A.   It's just that when the IRS needs information or
12  needs to conduct an audit or needs to collect taxes, the
13  taxpayers are expected to cooperate and pay the taxes
14  they owe.  And when the taxpayer tries to thwart that or
15  keep that from happening, then that's a problem.
16  Q.   Now, have you -- are you familiar with the
17  indictment in Count 1 in this case?
18  A.   I've read it, but I'm --
19  Q.   Are you aware that the charges of the grand jury are
20  that Mr. Stilley and I took certain steps to combine,
21  conspire, confederate, and agree together to defraud the
22  United States by impeding, impairing, obstructing, and
23  defeating the lawful government functions of the Internal
24  Revenue Service, an agency of the United States, in the
25  ascertainment, computation, assessment, and collection of

1   revenue, that is federal income taxes?  Are you aware of

2   that?

3   A.   I have read that in the indictment, yes.

4   Q.   All right.  Now, you've also testified you haven't

5   talked to Donna Meadors in any detail about a civil audit

6   that she did on Lindsey Springer in 2004, correct?

7   A.   That is right.

8   Q.   Now, setting Donna Meadors aside for the moment, do

9   you know of anybody else on the civil side of the IRS who

10  was trying to ascertain, compute, assess, or collect that

11  ran into this information that you're talking about and

12  either was or could have been misled by looking at the

13  items that you've identified?

14          MR. SNOKE:  Your Honor, we would object.  The

15  witness has been testifying about what he observed in

16  this trial.  This is beyond the scope of direct asking

17  him to reach out into other things he may know which are

18  not relevant and he's not supposed to be testifying about

19  in this case.

20          THE COURT:  Well, given the breadth of the

21  allegations in Count 1, that will be overruled.

22          MR. SPRINGER:  Thank you, Your Honor.

23          THE COURT:  You may proceed.  You may answer.

24          THE WITNESS:  As you know, I --

25          THE COURT:  Excuse me.  Not only the breadth,

 1   but the time covered.  This question relates to events

 2   during the conspiracy period and that's important.  You

 3   may answer.  Go ahead.

 4             THE WITNESS:  As you know, I live in Arkansas,

 5   so I do not interact with revenue agents in Oklahoma.  I

 6   have no knowledge of the results of audits.

 7   Q.  (BY MR. SPRINGER)  You've sat in this whole trial

 8   with everybody; isn't that correct?

 9   A.   I have, yes.

10   Q.   Seen any revenue agent testify?

11   A.   Not yet.

12   Q.   Seen any evidence come in that says otherwise?

13             THE COURT:  Otherwise to what?

14             MR. SPRINGER:  Oh, sorry.  Strike that.

15   Q.  (BY MR. SPRINGER)  Have you seen any evidence in any

16   other form that has been entered into the record of this

17   case that would demonstrate that the examples that you've

18   talked about which was in an overall scheme had any

19   impact on impeding, impairing, obstructing, or defeating

20   any lawful government function?

21   A.   I'm trying to remember -- and this -- I'm trying to

22   remember whether or not there was information presented

23   that shows that you owe the IRS an amount of money.  And

24   I can't -- I'm sure I have probably seen it, but I cannot

25   remember off the top of my head whether or not you owe

1  the IRS at this point any money.  And if you do, if there

2  is a balance due, then, yes, I would say that what we're

3  talking about is applicable.

4  Q.   Are you aware on August 23, 2007, that the IRS

5  released certified any liability that Lindsey Springer

6  could have owed because of improper procedures that they

7  had followed?

8  A.   I know nothing about that.

9  Q.   Are you aware of extensive litigation that Lindsey

10 Springer has been in with the IRS for at least the last

11 15 years?

12 A.   I know there has been litigation, but I don't know

13 any details about it.

14 Q.   Have you seen any other evidence in this case that

15 shows an address that Lindsey Springer used every time

16 any information was required to be reported to the IRS on

17 any request form asked of Lindsey that was other than

18 5147 South Harvard?

19 A.   That's the only address I've seen.

20 Q.   Now --

21 A.   Is that the mail -- that's the mailbox?

22 Q.   Yes.  Yes.  Now, you testified that you had seen the

23 RV, but it wasn't like the picture that you had on the

24 chart, you said it was white?

25 A.   I thought that's what I heard the witness testify

BRIAN MILLER - CROSS BY MR. SPRINGER                    2076

1   to.

2   Q.   You haven't actually been out to my house and seen

3   the RV, correct?

4   A.   I have not, no.

5   Q.   Wouldn't be wise, would it, to live out in the

6   country --

7   A.   Wouldn't be wise to go to your house?

8   Q.   It wouldn't be wise, though, for me being in the

9   ministry and people sending me money in the mail to have

10  a mailbox just out in the country where if I was gone

11  people could just come by and take money out or mail out

12  of my box that had money in it, would there be?

13  A.   You know, that could go either way.  You know, in

14  combination with all the other things, that could be an

15  indicator that you were trying to hide your true

16  residence.  But on the other hand, what you just said is

17  also very valid.

18  Q.   Thank you.  In fact, at post offices, people can

19  actually get a post office box, can't they?

20  A.   Yes, they can.

21  Q.   All right.  And isn't it true that even the

22  government sometimes uses post office boxes in lieu of

23  addresses?

24  A.   I don't know anything about the government address.

25  Q.   Do you use a post office box for the IRS?

1   A.   No, I don't.

2   Q.   Okay.  Now, on the $112,500 check, do you remember

3   that check, that instrument?

4   A.   Yes.  Is that where Mr. Patterson sold some stock --

5   or oil and gas interest?

6   Q.   Yes.  Now, is it your opinion that that check --

7   that that check was or should not have been deposited in

8   Oscar Stilley's IOLTA account?

9   A.   You know, I think -- personally, I think that it

10  should have been deposited into Lindsey Springer's

11  account since Lindsey was actually running the show, if

12  you will.  But since Lindsey didn't have an account,

13  Lindsey instructed Mr. Patterson to deposit it into Oscar

14  Stilley's account.

15  Q.   Now, you're not saying that Mr. Patterson wasn't

16  Oscar Stilley's client, correct?

17  A.   No, I'm not saying that at all.

18  Q.   You testified earlier that the IOLTA account you

19  thought, to the best of your knowledge, was for client

20  funds; isn't that true?

21  A.   For client -- for client funds.

22  Q.   Right.

23  A.   Not for receipts of income of the attorney.  For

24  client funds to be held on behalf of the client, not to

25  report the income and expenses of the attorney.

BRIAN MILLER - CROSS BY MR. SPRINGER                    2078

1   Q.   So --

2   A.   That's my understanding.

3   Q.   So if Mr. Patterson deposited a $112,000 check --

4        MR. SPRINGER:  Could you pull up Government's

5   Exhibit Number 690, please.  Thank you.

6   Q.   (BY MR. SPRINGER)  If Mr. Patterson deposited a

7   $112,500 check into Mr. Stilley's IOLTA account, then

8   what you're saying is Mr. Stilley should not be allowed

9   to bill his IOLTA account for money he is owed by

10  Mr. Patterson and take that money out of any balance he

11  holds in Mr. Stilley's account?

12  A.   I don't know.

13  Q.   Okay.  But if the IOLTA account allowed clients to

14  deposit money as one of the factors of which the IOLTA

15  account could be used, then you would then say that the

16  $112,500 check could properly be deposited into that

17  IOLTA account; is that fair to say?

18  A.   I'm saying it would have been better for Lindsey

19  Springer's share to go straight to Lindsey Springer and

20  Oscar Stilley's share to go straight to him.  But other

21  than that, I'm not an attorney, so I can't really claim

22  to have great knowledge on the function of the escrow

23  account or IOLTA account.

24  Q.   We are where we are.  Now, do you remember that just

25  -- excuse me.

 1          MR. SPRINGER:  I'm sorry, Number 99.  I'm

 2   sorry.  Your Honor, may I have a moment?

 3          THE COURT:  You may.  We're going to take a

 4   short break at this time.  We'll try to keep it -- it may

 5   require a little longer than ten minutes, but we'll see

 6   if we can keep it to a ten-minute break resuming at two

 7   o'clock in the afternoon.  During this break, all jurors

 8   should bear in mind my usual admonition.  So please be

 9   ready to go at two o'clock or as soon thereafter as

10   possible.

11      All persons in the courtroom will remain seated

12   while the jury departs.

13      (JURY EXITS THE COURTROOM)

14          THE COURT:  The jury has left the courtroom.  I

15   was informed that one of the jurors got something in his

16   or her eye and so I think that can probably be resolved

17   in pretty short order.  So we'll resume at two o'clock or

18   as soon thereafter as is feasible.

19      Mr. Springer, how much more do you have on cross?

20          MR. SPRINGER:  I'd say 30 minutes or so.

21          THE COURT:  Court will be in recess till two

22   o'clock or subject to call.

23      (A RECESS WAS HAD, AFTER WHICH THE FOLLOWING

24   PROCEEDINGS WERE HAD IN OPEN COURT AND WITHIN THE

25   PRESENCE AND HEARING OF THE JURY.)

BRIAN MILLER - CROSS BY MR. SPRINGER                    2080

```
 1              THE COURT:  Mr. Springer, you may continue.
 2              MR. SPRINGER:  Thank you, Your Honor.
 3    Q.   (BY MR. SPRINGER)  Were you aware that there was at
 4    one time on the government's witness list in this case an
 5    expert being brought in dealing with the IOLTA account
 6    from Arkansas?
 7    A.   No.
 8    Q.   Okay.  Now, do you remember identifying a $37,000
 9    check that was written out of Oscar Stilley's IOLTA
10    account to Lindsey Springer that was used for the
11    purchase of a Corvette?
12    A.   If I remember correctly, it was made out to Ed
13    Bryson.  I may be wrong.  I thought it was made out to Ed
14    Bryson.  Is that not right?
15    Q.   The cashier's check, I'm sorry -- I believe that
16    you're correct on that.  Now, did you treat that $37,000
17    as taxable income to Lindsey Springer?
18    A.   The $37,000 was treated as income, but it was
19    treated as income because it was reimbursed or replaced
20    or repaid, I guess, by the $25,000 from Cynthia Hawkins
21    and the $12,000 from Mr. Patterson.  So although that
22    amount was actually a loan, the repayment of that loan by
23    those other individuals made it income to you.
24    Q.   Now, what makes you so certain that was a loan?  Is
25    it because there was evidence that said it was a loan?
```

1    A.   I don't remember.  I think it was because the money

2    was coming out of Oscar's account without a corresponding

3    influx of money from someone else.  It may have just been

4    a gift from Oscar to you.

5    Q.   But you just testified a moment ago that you thought

6    it was a loan and had been repaid back.

7    A.   That is what I think, yes.

8    Q.   Okay.  Did you see any loan agreement?

9    A.   I don't recall seeing one at the moment, no.  But it

10   makes -- it seems like I've seen something.

11   Q.   Could you --

12   A.   It has something to do with -- I know I've seen the

13   12,000.  The 12,000 was a loan because I think there was

14   a billing statement that said to repay Oscar for the

15   12,000.

16   Q.   Was that in Oscar Stilley's records?

17   A.   Either Oscar Stilley's or Mr. Patterson's.  Yeah,

18   that may have been Mr. Stilley's.

19   Q.   Now, isn't it true that all the IRS had to do was

20   issue a summons to Oscar Stilley and ask to meet with him

21   and go through his office records and you would have got

22   the same information that the clients got on their

23   billing records?

24   A.   I don't know if that's true or not.  I mean, I do

25   know that he was requested to bring all those records, or

1    I think he was, to the grand jury and did not do so.

2    Q.   Are you aware that Mr. Stilley and I were under

3    investigation in 2004?

4    A.   I'm not -- I don't remember exactly when the

5    investigation started.  I know Mr. Shern stated that, but

6    I don't remember the exact date he gave.

7    Q.   Do you remember Mrs. Patterson testifying?

8    A.   I remember her testifying.

9    Q.   Do you remember her testifying that she testified

10   before a grand jury on October 6, 2004?

11   A.   I don't remember that, but you very well may be

12   right.

13   Q.   So from October 6, 2004, forward, could the IRS have

14   ever contacted Mr. Stilley or Lindsey Springer, told them

15   they were doing a civil audit, and then asked them

16   questions about certain items that, either one, myself or

17   Mr. Stilley had been involved in?

18   A.   I guess theoretically they could.  But, typically,

19   if the criminal investigation side of the house has

20   enough evidence that criminal actions or activities are

21   taking place, then they would go ahead and initiate the

22   investigation and the civil side would not get involved.

23   Q.   So basically from October 4, 2004, forward, no one

24   was able to ask Mr. Stilley or Lindsey Springer anything

25   about those items from the civil side of the IRS based

1  upon the policy of the IRS?

2  A.   That's absolutely right.

3  Q.   So then that only left the criminal side of the IRS;

4  isn't that true?

5  A.   Yes, sir.

6  Q.   All right.  Now, the criminal side of the IRS, they

7  don't have to tell anybody that they're looking at bank

8  records and so forth; isn't that true?

9  A.   I believe so, but I'm not sure about how they work.

10 Q.   You've testified at several criminal trials, have

11 you not?

12 A.   Yes, I have.

13 Q.   As a summary witness?

14 A.   Yes.

15 Q.   Okay.  And you've seen lots of grand jury subpoenas

16 come in in cases where people have -- or where evidence

17 was obtained through a grand jury subpoena, have you not?

18 A.   I have.

19 Q.   And, in fact, in this case, isn't it true that

20 you've seen evidence come in from what the grand jury

21 asked Oscar Stilley to provide in March of 2006?

22 A.   I'm not sure about the date, but, yes.

23 Q.   So now anything from 2000 forward, there would be no

24 civil side of the IRS attempting to ascertain any

25 information with regard to any transaction that

```
 1  Mr. Stilley participated in or Lindsey Springer
 2  participated in, isn't that true, on policy grounds?
 3  A.   You said 2000.  Did you mean 2004?
 4  Q.   2004, yes.  Is that true?
 5  A.   Based on 2004, yes, I would agree with that.
 6  Q.   All right.  Good deal.  Did you hear Mr. Patterson
 7  testify that he -- he said that I owed him $60,000?
 8  A.   Yes.
 9  Q.   Did you see me ask him questions about whether or
10  not he had sued me or not?
11  A.   Seems like you did ask questions about that.
12  Q.   Now, is it the IRS civil side position that I owe
13  Mr. Patterson $60,000 and I also owe taxes on the
14  $60,000?
15          MR. SNOKE:  Your Honor, we would object.  The
16  witness is testifying to the criminal side and what he
17  has seen in this trial.  The civil side of the IRS is
18  irrelevant.
19          THE COURT:  Counsel will approach.
20      (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND
21  OUT OF THE HEARING OF THE JURY.)
22          THE COURT:  I have permitted cross-examination
23  as to cooperation or non-cooperation on investigations by
24  the civil side because I think, broadly speaking, it's
25  fairly encompassed by Count 1.  But now when we get into
```

1  specific tax liability and positions taken by the civil

2  side, I'm having a problem on relevance.  What's the

3  relevance of this?

4          MR. SPRINGER:  Mr. Patterson said that $60,000

5  was owed to him, he sued me, and this man is testifying

6  as a civil employee of the IRS in a criminal case,

7  testifying about tax liability, and so I'm asking him,

8  under his expertise, how does the $60,000 be considered

9  owed to Mr. Patterson while at the same time Lindsey

10  Springer owes taxes on it?  That's my only question about

11  that.

12          THE COURT:  Well, there's no problem with you

13  asking him about tax liability.  The thing that makes the

14  question objectionable and the objection is sustained is

15  couching it in terms of the position of the civil side of

16  the IRS.

17          MR. SPRINGER:  I'm sorry.

18          THE COURT:  All right.  Now, so that objection

19  will be sustained.  If you want to ask him straight up

20  about tax liability during the relevant period, then

21  that's fair game.

22          MR. SPRINGER:  Thank you.

23      (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

24  WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

25  PRESENCE AND HEARING OF THE JURY.)

BRIAN MILLER - CROSS BY MR. SPRINGER                    2086

```
1              MR. SPRINGER:  Would you pull up Government's
2    Exhibit Number 678, please.
3    Q.   (BY MR. SPRINGER)  Do you see Government's Exhibit
4    Number 678 in front of you?
5    A.   Yes, sir.
6    Q.   All right.  And do you see towards the bottom of the
7    page where it says, "Superior Bank, (Oscar Stilley
8    remitter on behalf of Eddy Patterson) Lindsey Springer
9    20,000, Exhibit Number 33"?
10   A.   Yes.
11   Q.   All right.  Now, do you remember that that was part
12   of the $90,000 that Mr. Patterson said he gave me?
13   A.   Yes.
14   Q.   And do you remember that it was that $90,000 that he
15   said I owed him $60,000?
16   A.   I believe that's correct.
17   Q.   And do you remember him saying that he knew he had
18   sued me over it, but he just didn't remember the
19   specifics about it?
20   A.   I think that's right, but I don't remember those
21   specifics.
22   Q.   So why have you not given Lindsey Springer credit
23   for that $60,000 since he allegedly owes it to
24   Mr. Patterson?
25   A.   Because I don't think there's any intent by Mr. --
```

1  repeat the question.

2  Q.   Why haven't you given -- why haven't you considered

3  Mr. Patterson's testimony that I owe him $60,000 and that

4  he has sued me to recover that $60,000 in your $90,000

5  calculations here on 2003?

6  A.   I guess because I don't have any confidence that he

7  will ever get that money back.

8  Q.   Same answer that you gave on Pat Turner?

9  A.   Generally, yes.

10 Q.   Okay.  Do you know how much time I have to pay

11 Mr. Turner back?

12 A.   Based on what?

13 Q.   I'm just asking you, do you know how much time I

14 have to pay Mr. Turner back?

15 A.   I know what the contract said.  It said a year

16 and -- I believe it said you had a year to pay it back

17 and then if you all agreed, you could have another year.

18 Q.   Do you remember Mr. Turner testifying that we orally

19 amended that contract?

20 A.   Seems like he may have said something about that.

21 Q.   Now, have you taken into consideration in your

22 testimony that the impact of being criminally

23 investigated by the IRS would have on a person like me in

24 my life?

25 A.   What do you mean "taking it into account"?  It has

1  had no effect on my use of numbers or exhibits or -- I'm

2  just trying to come up with what's accurate.

3  Q.   You do know that Mr. Turner wired that money to

4  Mr. Stilley's IOLTA account and there's a loan gift

5  agreement that was in August of 2005, correct, around

6  that time period?

7  A.   Yes.

8  Q.   And that you also know that there was an RV bought

9  on August 31, 2005, from Mr. Sam Snyder, correct?

10  A.   Yes.

11  Q.   And, incidentally, you did say that my name wasn't

12  on the wire transaction between Oscar Stilley's IOLTA

13  account and Mr. Sam Snyder, correct?

14  A.   I don't remember if I said that or not.

15  Q.   Did you know whether it was or wasn't involved in

16  the transaction?

17  A.   I don't remember.

18  Q.   But you do know there's a lien on a motor home

19  against Lindsey Springer and in favor of Pat Turner,

20  which is the same motor home that Mr. Snyder sold to

21  Lindsey Springer, correct?

22  A.   To be perfectly honest, I do not remember seeing

23  that document come into evidence.  It may have just

24  been -- I may have had a brief lapse, but I don't

25  remember looking at that document.  I'm sorry.

1   Q.   Fair enough.  But you have heard testimony about it?

2   A.   Yes.

3   Q.   Now, at the time that that was all taking place, I

4   had not been notified yet by Mr. Shern and the other ten

5   agents that came out to my house on September 16, 2005,

6   now, had I?

7   A.   Prior to what happening?

8   Q.   Prior to -- did I -- is there any evidence that you

9   know of that at the time I entered into that agreement

10  with Mr. Turner and bought that RV that I was aware that

11  I was being criminally investigated by the IRS and

12  Mr. Shern?

13  A.   I know you said you've been -- you know you've been

14  investigated by the IRS for the last 15 years, I'm not

15  sure about the criminal investigation at that time.

16  Q.   And I believe my statements were that I've been in

17  litigation with them also for the last 15 years, right?

18  A.   That's what you said, that's right.

19  Q.   But that doesn't mean you're being criminally

20  pursued by the IRS special agents, right?

21  A.   Absolutely.

22  Q.   Okay.  So isn't it fair to say that whatever I had

23  done, planned, and entered into agreements on prior to

24  September 15, 2005, those could have been dramatically

25  altered by the revelation on September 16, 2005, that I

1  was being criminally investigated by the IRS?

2  A.   I would say so.

3  Q.   Okay.  So if I had told Mr. Shern that I was going

4  to take whatever money I got out of the bus that was for

5  sale and apply it to the amount of money that I owed

6  Mr. Turner, I could have sincerely planned on doing that

7  prior to September 15 -- or 16, 2005, couldn't I have?

8  A.   It is possible, yes.

9  Q.   But things dramatically changed, as you just said,

10 on September 16, 2005, correct?

11 A.   I don't know if I said September 16, 2005, but --

12 Q.   Okay.  The day that I was raided would be a good

13 starting point for a change, right?

14 A.   Yes.

15 Q.   Okay.  In fact, isn't it just by the fact that the

16 IRS tells you that you're being criminally investigated

17 that they're trying to exact some type of behavioral

18 change at that point?

19 A.   That's true.

20 Q.   Okay.  Now, you testified that -- or at least you

21 answered on direct examination about the Bolthouse

22 $50,000 transaction and that that played a role in that I

23 did not pay down the loan that I owed Mr. Turner, that

24 played a role in your determination that the money

25 Mr. Turner gave me was actually not a loan?

BRIAN MILLER - CROSS BY MR. SPRINGER                    2091

1  A.   That was one of the factors I considered, yes.

2  Q.   Okay.  Did you consider the factor that we just

3  discussed about the game changer on September 16, 2005?

4  A.   I did.

5  Q.   Okay.  Did you take into consideration for the year

6  2005 all the money that was spent in addition to the

7  $167,000 on Mr. Snyder's RV, the upgrades that I had made

8  over the course of the next three months?

9  A.   Every expense that I could find that I thought in

10 any way might be related to the bus, I believe I tried to

11 give you a deduction for.

12 Q.   How did you go about determining whether there were

13 expenses in all those boxes of exhibits that Mr. Shern

14 took on September 16, 2005, how did you know how to go

15 through all of those and determine which ones were and

16 which ones were not expenses related to that RV?

17 A.   Well, first of all, the only period we looked at was

18 2005 and you bought the RV in the latter part of the

19 year, so that narrowed it down to just a few-month time

20 frame.  It's not like we had to look through 2003 to 2005

21 to find expenses.

22 Q.   Right.  Now, on your chart where you included the

23 $250,000 as gross income to Lindsey Springer, on your

24 chart, you gave a $24,000 depreciation.  Do you remember

25 that?

```
 1   A.   Yes.

 2   Q.   Why did you do that?

 3          MR. SPRINGER:   And if you would pull up

 4   Government's 683, please.

 5   Q.   (BY MR. SPRINGER)   Why did you give Lindsey Springer

 6   a $24,900 depreciation on a motor home?

 7   A.   Because I believe you are in the business of getting

 8   rid of the IRS and as a part of that business you used

 9   that motor home in furtherance of that business, so

10   therefore I think you would be entitled to a deduction.

11   Q.   You don't doubt that?

12   A.   I do not doubt that.

13   Q.   If you were doing -- I believe you testified earlier

14   that sometimes the numbers that you testify to about in a

15   criminal case are more lenient than numbers that you

16   would do in a normal IRS audit.

17   A.   That's right.

18   Q.   Would that number change in a normal IRS audit?

19   A.   Yes.   I would demand that you show me the business

20   use.   I think -- you know, there was a little bit of

21   testimony that suggested you may have used the motor home

22   some personally, but I think I allowed you 100 percent

23   business use on it.   But if it was a civil audit, then I

24   would expect to see mileage logs and calendars to show me

25   where you went and why you went there.
```

BRIAN MILLER - CROSS BY MR. SPRINGER                          2093

1          MR. SPRINGER:  Could you pull that same exhibit
2   up again.
3   Q.   (BY MR. SPRINGER)  Now, for 2000, I don't see any
4   depreciation for a motor home.  How come?
5   A.   I'm not sure you had one that year and I'm not sure
6   what you paid for one.
7   Q.   Do you remember Mr. Bolthouse testifying he bought a
8   bus from me?
9   A.   Yes.
10  Q.   Do you remember Mr. Patterson testifying in 2000
11  that the money he gave me was asked by me so that I could
12  complete the remodeling of my bus?
13  A.   I do believe I recall that.
14  Q.   Did you ever go looking through all the receipts
15  that the government took from me on September 16, 2005,
16  to see whether there was over a hundred thousand dollars
17  in the year 2000 spent on that bus?
18  A.   We looked.  I don't recall us finding a hundred
19  thousand dollars in expenses on the bus.
20  Q.   Do you remember a $25,000 engine that was put into
21  it out of Ozark Engine in Springfield, Missouri?
22  A.   I do not -- we did the best we could with what we
23  had.  You obviously weren't, you know, providing a ledger
24  or anything of those expenses, so --
25  Q.   Isn't it true that the numbers that you testified to

1   are solely the numbers that Mr. Shern, Mr. O'Reilly,

2   Mr. Bradford presented to me on January 15, 2009, and

3   asked me, under their theory, would I agree whether or

4   not these were business expenses or not?

5   A.   That's a portion.  But I think we also allowed, for

6   example, your EarthLink expenses and there were a couple

7   other entities.  Plus, I also believe we allowed all the

8   expenses on your wife's credit card.  Actually, I'm

9   pretty confident that we did allow all of those.

10  Q.   In the calculation of what and for which year?

11  A.   For every year -- to the best of my recollection,

12  for every year we had evidence.  I guess that would be

13  2004 and 2005 probably where we had access to your wife's

14  credit card.  Rather than go through and try to determine

15  exactly which expenses on that credit card, and there

16  were a lot, were business or personal, we just let you

17  have them all.  And I can tell you that there were some

18  personal, and I'm sure you know that, but we gave you all

19  of them.

20  Q.   And did you think when you were going through my

21  wife's credit card expenses, did you think that I was

22  trying to hide from the IRS those expenses?

23  A.   Expenses on your wife's credit card?

24  Q.   Yes.

25  A.   No, I don't think you were trying to hide those from

BRIAN MILLER - CROSS BY MR. SPRINGER                           2095

1   the IRS.

2          MR. SPRINGER:  Your Honor, before we took our

3   break, you asked me about how much time I needed and I

4   believe I misspoke, and I apologize, but I'm going to

5   need about 30 more minutes from this point.

6          THE COURT:  Continue.

7          MR. SPRINGER:  Thank you.

8   Q.  (BY MR. SPRINGER)  Now, you testified about the

9   Bolthouse $50,000 transaction that led to two $20,000

10  cashier's checks from Oscar Stilley directly to Lindsey

11  Springer.  Do you remember that?

12  A.  Yes.

13  Q.  Do you remember what happened to the other 10?

14  A.  I do not.

15  Q.  Do you remember that those checks were cashed at

16  Checks Cashed or -- if you remember?

17  A.  I don't remember.  That flow chart shows, I think,

18  but I don't remember.

19  Q.  Now, isn't it true that Checks Cashed would have to

20  have a bank account to be in the business of cashing

21  checks?

22  A.  Yes.  I can't think of a scenario by which they

23  wouldn't have to have.

24  Q.  And you heard the testimony that I had dealt with

25  Mr. Kenny Delozier for 19 years approximately?

```
 1   A.   Yes, I did.
 2   Q.   And you've seen a lot of checks cashed through his
 3   business; isn't that right?
 4   A.   Yes.
 5   Q.   With Lindsey Springer or Bondage Breakers
 6   Ministries' name on them, right?
 7   A.   That's right.
 8   Q.   Is it your position that his bank should not have
 9   been doing that?
10   A.   His bank should not have been cashing checks for
11   you?
12   Q.   Well, for Kenny.  Isn't it true that I'm paying
13   Kenny a fee and he's basically buying my check and then
14   depositing it over into his bank account?
15   A.   That's what he's doing, yes.
16   Q.   And he pays taxes on the 3 percent that he makes off
17   of every one of those checks; is that true?
18   A.   I have no idea.  I assume so.
19   Q.   Did you give me 3 percent credit for the expense of
20   selling those checks to Kenny on each of these years from
21   2000 to 2005?
22   A.   I certainly did not and I'm not really convinced
23   that you would be entitled to that.
24   Q.   Thank you.  Now, you're letting me write off $24,000
25   as a business -- as a depreciation on a bus because it
```

1   has got some business relationship, correct?

2   A.   That's right.

3   Q.   And you're telling this jury that all of these

4   checks that are given to me are for services -- legal

5   services rendered.  Do you remember that?

6   A.   That's right.

7   Q.   Or to be rendered; isn't that true also?

8   A.   Yes.

9   Q.   Now, those are business tones, aren't they, as far

10  as you're concerned?

11  A.   Yes.

12  Q.   So if I took a business check given to a business

13  and I took it over to another business to cash it and

14  they charged me money that they then paid income taxes to

15  the IRS on, wouldn't I be entitled to the cost of cashing

16  that check as a business expense?

17  A.   I'm going to say -- at this point, I'm going to say

18  no.  And the reason I'm going to say that is because to

19  be a deductible business expense, it would have to be

20  ordinary and necessary.  And it would not be necessary

21  for you to do that.  All you would have to do is go get

22  you a bank account and put that money in your bank and

23  you wouldn't have to pay that 3 percent fee.  That's not

24  a necessary expense that you incurred.  It's an expense

25  you chose to incur to avoid having a bank account.

BRIAN MILLER - CROSS BY MR. SPRINGER                    2098

1   Q.   If I couldn't get a bank account, then would it be?

2   A.   If you had no other means by which you could get

3   access to those funds, then, yes, I would allow that as a

4   deduction for you.

5   Q.   So if I deposited all these checks that were written

6   to me in Mr. Stilley's IOLTA account and waited for those

7   to clear, then are you saying at that point that it

8   wouldn't be a business expense because I had another

9   source in which to do that with?

10  A.   I didn't know you had -- I didn't know you had to

11  pay Mr. Stilley money to deposit --

12  Q.   I didn't say that I did.  I'm just asking under your

13  analysis.  Under your analysis --

14  A.   If you paid Mr. Stilley money for letting him -- for

15  letting you use his account, yes, I would not allow --

16  Q.   No, no.  I strike that.  I strike that.  Let's start

17  over again.  The only way you would allow that to be a

18  business expense, you just said, correct me if I'm wrong,

19  is if I had no other means by which to deposit those

20  checks; safe, fair, or not?

21  A.   I would allow that expense as a deduction if it was

22  ordinary and necessary.  And if you had no other way --

23  Q.   No other way.

24  A.   -- to get that money, then I would agree that that

25  would be necessary and I would allow it.

1  Q.  So if I couldn't get a checking account in my own

2  name, then what would be the other ways in which I could

3  receive money and deposit those checks besides the way I

4  did it?

5  A.  I would have to think about it.

6          MR. SNOKE:  Your Honor, I object because this

7  has been asked and answered a couple of times already.

8  It's also --

9          THE COURT:  Go ahead.

10         MR. SNOKE:  It's also irrelevant.

11         THE COURT:  Overruled.  We're going to finish up

12  on this pretty soon, but that objection is overruled.

13         THE WITNESS:  Could you ask me one more time?

14  Q.  (BY MR. SPRINGER)  Besides me being able to have a

15  checking account, you said that you would not allow it as

16  a deduction unless there was no other way that I could

17  have negotiated those checks without encompassing that --

18  enduring that 3 percent expense.  Am I fair on that?  No

19  other way?

20  A.  Are you asking me if there is any other way?

21  Q.  I'm asking now.

22  A.  I would think there would be another way.  I mean,

23  I'm not intimately familiar with all the details of your

24  case, but I would imagine if you're doing business as

25  Bondage Breakers Ministry, if that entity wanted to go to

1  a local bank and set up an account, I can't imagine why a

2  bank wouldn't let Bondage Breakers Ministry have a bank

3  account.

4  Q.   Okay.  But let's -- my question presumes that's not

5  an option.

6  A.   Well, you didn't say that wasn't an option.  You

7  said Lindsey Springer couldn't get a bank account.

8  Q.   Okay.

9  A.   I'm going to say --

10  Q.   Lindsey Springer, dba Bondage Breakers Ministries,

11  couldn't get a bank account.

12  A.   So, in other words, you couldn't get -- you or

13  anybody, any of your family or nobody could get any bank

14  -- you had no access to any bank anywhere whatsoever?

15          MR. SNOKE:  Your Honor, I'll object.

16          MR. SPRINGER:  That's my question.

17          MR. SNOKE:  It calls for speculation.

18          THE COURT:  Overruled.

19          THE WITNESS:  You know, I'm going to say off the

20  top of my head that would probably be okay, but I'm sure

21  once I step off the stand I would come up with another

22  answer.  At this moment, I can't think of anything.

23  Q.   (BY MR. SPRINGER)  All right.  Now, are you also

24  aware that the grand jury alleges that I used cashier's

25  checks, money orders, cash, and other means to avoid

1  usual records and to conceal income?  Are you familiar

2  with that phrase?

3  A.   Yes.

4  Q.   All right.  And if we move away cashier's checks for

5  the moment, because the IRS has said they didn't like

6  that one, were money orders okay?

7  A.   Mr. Springer, it's just the fact that you went to a

8  whole lot of trouble to keep things in very generic

9  non-Lindsey Springer ownership terms and status.  That's

10 the problem.

11 Q.   So cashier's checks are okay; is that true?  Yes or

12 no?

13 A.   Pardon me?

14 Q.   Are cashier's checks okay?  Are they legitimate

15 business transactions, yes or no?

16       MR. SNOKE:  I don't understand what "okay"

17 means.

18       MR. SPRINGER:  Sorry, Your Honor.

19 Q.   (BY MR. SPRINGER)  Are they -- are cashier's checks

20 -- okay.  Strike that.  Besides cashier's checks, money

21 orders, and cash, what other means is there for a person

22 in my situation to transact anything with anybody?  What

23 -- what's other means -- what other means are available

24 to me?

25 A.   Besides --

BRIAN MILLER - CROSS BY MR. SPRINGER                    2102

```
 1            THE COURT:  Wait just a minute.
 2            MR. SNOKE:  Your Honor, I don't understand what
 3   he means "in his situation."  There has been no
 4   evidence --
 5            THE COURT:  If the witness doesn't understand,
 6   the witness can say.  Mr. Snoke, the grounds rules are
 7   that on direct examination this witness testified to such
 8   matters as impairment and concealment and impeding and so
 9   on, which is fair game for wide-ranging cross-
10   examination, and that's what we're doing.  Proceed.
11   Q.  (BY MR. SPRINGER)  So I'll help you.  Other than
12   cashier's checks, money orders, and cash, the grand jury
13   alleged the phrase "other means to avoid usual records
14   and to conceal income."  What other means are there
15   available to anybody?
16   A.   Did you say personal checks and company checks?
17   Q.   That was not listed.  So I'm asking you, is that
18   what "other means" means?
19   A.   I would think that would have been a method that
20   could have been used.
21   Q.   Could have been used.  But the allegation says using
22   cashier's checks, money orders, cash, and other means to
23   avoid usual records and to conceal income.
24   A.   Okay.  Those are -- yes, cashier's checks, cash,
25   money orders are the three means -- three primary means
```

BRIAN MILLER - CROSS BY MR. SPRINGER                    2103

1  that I believe the indictment alleges that you used to

2  hide your income.

3  Q.   But you've also seen several personal checks written

4  to Lindsey Springer, haven't you?

5  A.   There were some, yes.

6  Q.   There were many, weren't there?

7  A.   There were several.

8  Q.   Now, are those checks okay?  Is that a good way for

9  people to give me money is through a check?

10 A.   Yes.

11 Q.   Okay.  Now, if we've got checks, we got money

12 orders, cashier's checks, and cash, is there any other

13 way that anybody could give me money?

14 A.   I can't think of any other way.

15 Q.   Thank you.  Now, other than the testimony that you

16 heard where people would generically say things like "I

17 would expect him to help me find a lawyer" or the phrase

18 "legal services" came up a few times, do you have any

19 specific knowledge of any specific detail on what I would

20 have either done or what these people who testified

21 anticipated or expected that I would be doing other than

22 the generic phrase "to help them"?

23 A.   The only testimony I remember, other than what you

24 said by finding them a lawyer in town, is work on their

25 case, seemed like I heard at least one witness say file

1  motions on their behalf or represent them before the

2  Court.

3  Q.   I believe that was Mr. Hawkins -- Mr. and Mrs.

4  Hawkins?

5  A.   That seems right.

6  Q.   But you don't know which one of the checks was for

7  any of that, do you?

8  A.   I don't know which check was for what,

9  specifically.  Other than working on your case, that's

10 all I know.

11 Q.   You just took all the checks and said because of

12 that testimony every check belongs in the gross income

13 column, right?

14 A.   If the witness said "this money I paid Lindsey to

15 work on my case or represent me," then I put it in there.

16 Q.   Thank you.

17 A.   Or by "put it in there," I mean treated it as

18 income.

19 Q.   You testified earlier that you thought that I owed

20 some taxes, but you didn't really know the specifics

21 about it, correct?

22 A.   Yes.

23 Q.   Now, in each instance that a car was purchased and

24 put in my or my and my wife's name, with no liens on it,

25 the moment that those cars were purchased, didn't those

BRIAN MILLER - CROSS BY MR. SPRINGER                    2105

1  become assets that the IRS could seize at will if they

2  chose to?

3  A.   I'm not real familiar with the workings of

4  collections and I know sometimes the collection division

5  will stay away during a criminal investigation just like

6  the civil side will.

7  Q.   But if I had taken all this money that people gave

8  me and I really intended on attempting to evade taxes,

9  would I have logically gone over and purchased a brand

10 new car, put me and my wife's name on it with no liens

11 whatsoever, and just drove it around so the IRS could see

12 I had a fancy new car?  Does that make any logical sense?

13 A.   I don't know.

14 Q.   You've seen cases before, have you not, where the

15 person would try to hide the money that they had received

16 from somebody so the IRS couldn't find it?

17 A.   That's right.

18 Q.   But in this instance, it's when the money comes out

19 of Mr. Stilley's IOLTA account to Lindsey Springer that

20 the IRS is taking issue with, isn't that true, with

21 respect to the IOLTA transactions?

22 A.   Whenever the money is put at your disposal or

23 whenever you had control over that money, it becomes

24 income to you.

25 Q.   So if Mr. Stilley gives me a cashier's check for

BRIAN MILLER - CROSS BY MR. SPRINGER                    2106

1   $20,000, let's say, and I just go bury it in the back

2   yard, how can the IRS do anything with that?

3   A.   Because it's your money.  You earned it.

4   Q.   But can they find it?

5   A.   Maybe they can, maybe they can't.  It has no effect

6   on whether it's income or not.

7   Q.   But if I put it in a new car for my wife, they can

8   find it, can't they?

9   A.   That would be easier to find than having it in your

10  back yard, yes.

11  Q.   And if CTR --

12       THE COURT:  Mr. Springer, you've adequately

13  covered this.  It's time to move on.

14       MR. SPRINGER:  Okay, Your Honor.

15  Q.   (BY MR. SPRINGER)  When you calculated for the year

16  2005 -- strike that.  You are aware that there is

17  litigation involving whether or not money was improperly

18  taken from me, correct?

19  A.   I heard that testimony, yes.

20  Q.   And isn't that amount $2,000?

21  A.   I believe so --

22  Q.   Did you consider that on the 2005 calculations that

23  you've given?

24  A.   If I believed that $2,000 was stolen from you, I

25  would have given you credit for a $2,000 casualty loss.

BRIAN MILLER - CROSS BY MR. SPRINGER                    2107

1   But in your case, the standard deduction was more than

2   that anyway, so, unfortunately, you would not be entitled

3   to a deduction for that.

4   Q.   But that's only if you include the RV -- the loan

5   from Mr. Turner as gross income, correct?

6   A.   What?  If you don't include the RV from Mr. Turner,

7   then I don't believe there would have been any tax

8   liability anyway.

9   Q.   Did you hear any testimony, except Ms. Wiggins'

10  testimony on the videotape, regarding Exhibit Number 4,

11  which is a $12,000 check written from the Nation of

12  Levites to Lindsey Springer?

13            MR. SPRINGER:  Could you post that up, please.

14  Q.   (BY MR. SPRINGER)  It's not up there yet?

15  A.   Now, it is.  I see it.

16  Q.   See it now?

17  A.   Uh-huh.

18  Q.   Other than Ms. Wiggins' statements on the video,

19  you've never heard any testimony from the person who

20  wrote that check to Lindsey Springer; isn't that true?

21  A.   I relied on the testimony of Ms. Wiggins, yes.

22  Q.   Now, Mr. Roberts said he was supporting my mission;

23  is that true?

24  A.   Supporting it now or supporting it --

25  Q.   Supporting it in 2000 when he wrote Exhibit Number

1    5, please.

2    A.   I don't recall specifically if Mr. Roberts said, "I

3    wrote this check to support his ministry," or if he said,

4    "I wrote this check to get Lindsey to help me with my

5    case."

6    Q.   So you automatically just put that over in his

7    column because of what you think I did, correct?

8    A.   No, if I put it in income, it's because the witness

9    said it belonged in income and it was for work that you

10   did for them.  That's the only scenario under which I

11   would put it in income is if the witness clearly said, "I

12   paid this money to Mr. Springer because he did work for

13   me, performed services for me, tried to keep me out of

14   jail," whatever it was.

15   Q.   So if you have $70,000 there on Exhibit Number 675

16   for the year 2000 that came from Dr. Roberts and that's

17   all solely based upon your conclusion that I did work for

18   him, period?

19   A.   I believe that's true.  But even if he had said it

20   was work for -- for you to do general work on behalf of

21   the ministry, it still would have belonged in income.

22   Q.   The whole thing.  Now, as far as Eddy and Judy

23   Patterson now, Exhibit 9 and Exhibit --

24          MR. SPRINGER:  Exhibit 9, first, please.

25   Q.   (BY MR. SPRINGER)  You noticed that Mr. Patterson

1  wrote a letter to me, did you not, that said, "Please use

2  this as a donation"?  Do you remember that statement?

3  A.   I do.

4  Q.   Okay.  And did Mr. Patterson tell you I did anything

5  in 2000 for him other than introduce him to Oscar Stilley

6  and Jerold Barringer?

7  A.   I don't remember the specific testimony, but I feel

8  confident that he said that you were there at the trial

9  and helped in the case.

10 Q.   Now, he said that was 2003, correct?  That's when he

11 was at trial was in 2003?

12 A.   Okay.  My mistake, I'm sorry.

13 Q.   And isn't that what the 90,000 originally that you

14 had determined that was for that trial, correct?

15 A.   Yes.

16 Q.   Okay.  So we're now in 2000 and in 2001 -- you

17 really don't have much interest in 2001 because there's

18 nothing charged for 2001 in this case; isn't that true?

19 A.   That is true.

20 Q.   And, in fact, isn't it true that the $35,000 from

21 Garlin Associated Ministries in May of 2001 that

22 Mrs. Wiggins testified about, that has no bearing on any

23 of the charges in this case?

24 A.   That is true.

25 Q.   Thank you.  And as you stand here today, your

1   position with regard to the checks that Mr. and Mrs.

2   Turner would give me, a thousand or 500 or whatever the

3   case would be, you're treating those as gross income as

4   well, correct?

5   A.   Yes.

6   Q.   Okay.  And you testified that you knew that I -- or

7   you said that I sold coins for Mr. Turner.  Do you

8   remember that statement?

9   A.   On behalf of Mr. Turner?

10   Q.   On behalf.

11   A.   I believe so.

12   Q.   At the time that I had the coins and I sold them,

13   they weren't my coins, correct, under that assumption?

14   A.   I'm not sure at which point, but it's my

15   understanding that at some point you and Mr. Turner

16   reached an agreement that said, Mr. Springer, here is the

17   coins, you keep 32,500, I want the rest.

18   Q.   Okay.  So you did not hear on the -- strike that.

19   On Government's Exhibit 678, on line 13, you bring the

20   $56,000 in and then you take out the 23,500 that

21   Mr. Turner said that he received back; is that what

22   you've done?

23   A.   That's correct.  It was my understanding that you

24   were to receive 32,500.  To be honest, I don't have any

25   evidence that you paid back the 23,500 other than his

1    statements.  But based on his -- I think he did provide

2    testimony that you paid some back.  So based on that,

3    yes, I gave you credit.  Actually, it's the last line of

4    that document where I gave you credit for the 23,500.

5    Q.   Okay.

6    A.   And while we're there, just to make sure we're

7    clear, there was also $30,000 that Mr. Patterson

8    testified to that he said you gave back.  So that's why

9    that $30,000 amount is right above that, giving you

10   credit for that also.

11   Q.   But you haven't given me credit for the $60,000

12   because it hasn't -- he hasn't won his lawsuit yet,

13   right?

14   A.   That's right.  And under tax law, you know, I would

15   -- I have no idea or no basis upon which to assume that

16   he would win.  So at this point, it's still income to

17   you.

18   Q.   Even though he said that it wasn't.  He didn't say I

19   did anything for that money; isn't that what he said?

20   A.   No, I'm not sure he said -- said that you didn't do

21   anything for the 90,000?

22   Q.   No.  Excuse me, I'm sorry.  What did he say I did

23   for the $60,000?

24   A.   I thought there was the agreement that he would pay

25   you $90,000 and you would represent him and help him with

BRIAN MILLER - CROSS BY MR. SPRINGER                2112

1   his legal work and something like if there were no SEC

2   charges or there was not something else that you would

3   repay him $60,000 if you didn't have to do additional

4   work.

5   Q.   Were you here when Mrs. Patterson testified?

6   A.   I was.

7   Q.   Do you remember what she said about the 60,000?

8   A.   I don't remember specifically.

9   Q.   You don't remember her saying that she overheard

10  that I was just to hold it for Mr. Patterson?

11  A.   I don't remember that, I'm sorry.

12  Q.   And just to be clear, as far as the form in which

13  you believe I was required to report all of these

14  transactions on would be the Form 1040?

15  A.   That's correct.  That is -- that's the form most

16  commonly used by individuals and that's a form that the

17  IRS recognizes as a valid form to report your income and

18  your taxes.

19  Q.   Is that the only form I was required to use?

20  A.   Was that the only form you could use or is that the

21  only form you were required to use?

22  Q.   Is it your testimony here today that I was required

23  to file a return?

24  A.   That is my testimony, yes.

25  Q.   Because the income -- the gross income exceeded the

```
 1  threshold amount?
 2  A.   That's absolutely right.
 3  Q.   What form was I required to file?
 4  A.   You were required to make a return.
 5  Q.   I wasn't required to file a Form 1040?
 6  A.   The form -- it has been a while since I've looked at
 7  that.  I know that the Form 1040 is an accepted form for
 8  making a return, but it seems like -- the law says you
 9  have to make a return.
10  Q.   So as far as you're concerned, the law doesn't
11  specify what the form is supposed to be for the word
12  "return"?
13  A.   No, the law does specify what the form has to be.
14  It has been a long time since I've looked at that.  The
15  law does require a particular format or form, but I'm --
16  Q.   So --
17            THE COURT:  Let him finish.
18            MR. SPRINGER:  Sorry.
19            THE COURT:  Go ahead.
20            THE WITNESS:  That's the best of my recollection
21  at this moment.
22  Q.   (BY MR. SPRINGER)  So what you're saying here today
23  is, is that the 1040 form was an optional -- it was an
24  optional form, but I wasn't specifically required by law
25  to file that specific form.  Is that your testimony here
```

1  today?

2  A.   It's my testimony that you were required to make a

3  return that reported all the elements that are present on

4  the 1040.  And I'm not -- there's something like a 1040

5  or 1040 equivalent, it has been a long time since I've

6  looked, but I am very, very clear that you are -- you

7  were required to make a return and file it with the IRS.

8  Q.   Now, as far as 1099s in this case, you're aware that

9  there is some allegations in the grand jury indictment

10  that Mr. Stilley or I or both were required to report on

11  1099s transactions?

12  A.   I don't think it was ever stated that you were

13  required to file 1099s.

14  Q.   Do you see any evidence in this case where

15  Mr. Stilley and I would have been required by law to file

16  a Form 1099 with the IRS?

17  A.   If there were any -- if in any of the cases that

18  we've looked at, if Mr. Stilley was the attorney and you

19  worked for him, then you would have been required to --

20  or he would have been required to file one on your

21  behalf, but I have not heard that testimony here.

22          MR. SPRINGER:  May I have just one moment, Your

23  Honor?

24          THE COURT:  You may.

25          MR. SPRINGER:  Pass the witness, Your Honor.

BRIAN MILLER - CROSS BY MR. STILLEY                    2115

```
 1              THE COURT:  Mr. Stilley.
 2                    CROSS-EXAMINATION
 3  BY MR. STILLEY:
 4  Q.   Mr. Miller, I believe you testified you were a fraud
 5  investigator, correct?
 6  A.   I'm a fraud technical advisor.  I assist other
 7  agents in their investigations and audits.
 8  Q.   Okay.  But this is not a fraud case here today, is
 9  it?
10  A.   If this isn't a fraud case, I've never seen one
11  before.  So, yes, this is a -- I would call this a -- I
12  would call this a tax fraud investigation, I guess.
13  Q.   You would call it a tax fraud investigation?
14  A.   Yes, I would consider tax evasion to be a tax
15  fraud.  I mean, the general understanding of tax fraud
16  means that a person fraudulently violates their tax
17  obligations, so.
18  Q.   Well, now, the charge is 7201, correct?
19  A.   Absolutely.  Or that's my understanding, yes.
20  Q.   That's tax evasion, right?
21  A.   Tax evasion, yes.
22  Q.   And there's another statute called 26 USC 7206,
23  correct?
24  A.   There is a Section 7206, yes.
25  Q.   And that's tax fraud, right?
```

BRIAN MILLER - CROSS BY MR. STILLEY                    2116

1   A.   Tax fraud is just a general term to include all
2   tax-related fraud.
3   Q.   As a legal term, this is not a tax fraud case then,
4   correct?
5          THE COURT:  Excuse me, Mr. Stilley.  Is it your
6   position that the indictment nowhere alleges fraud?
7          MR. STILLEY:  That's my position.
8          THE COURT:  Well, move on to another subject.
9   You need to read Count 1.  Next question.
10  Q.   (BY MR. STILLEY)  You do realize that your job as a
11  summary witness is to summarize the specific evidence
12  related to the specific alleged offenses, correct?
13  A.   I believe that's fair, yes.
14  Q.   Now, you testified a little bit about the IOLTA
15  account, correct?
16  A.   I did.
17  Q.   But isn't it true that you don't know what the rules
18  concerning the IOLTA account is?
19  A.   I'm not an attorney and don't pretend to be.
20  Q.   Okay.  So you wouldn't be able to testify about that
21  particular matter, correct?
22  A.   Other than just a general understanding of what I
23  thought or what I think IOLTA accounts are for.
24  Q.   You're trained to detect -- scratch that.  You're
25  trained to help other people detect dishonesty, correct?

BRIAN MILLER - CROSS BY MR. STILLEY                    2117

1   A.   In my regular job?

2   Q.   Yes.

3   A.   I am trying to assist IRS agents and auditors in the

4   evaluation of their cases when fraud potentially exists

5   and to determine if it does exist how to follow up and

6   continue that case.

7   Q.   You remember Jim Lake or James Lake testifying in

8   this case, correct?

9   A.   Yes.

10  Q.   You also remember James Lake testifying in Atlanta,

11  correct?

12  A.   I remember his case.  I can't say that I

13  specifically recall his testimony.

14  Q.   Do you remember what his theory was?

15  A.   I remember that theory changed.  I cannot remember

16  any more specifics than that.

17        MR. SNOKE:   I'm going to object as being outside

18  the scope of direct and outside the scope of this crime.

19        THE COURT:   Mr. Stilley, I'm going to sustain

20  that.  The reason is that -- to the extent that this

21  witness is a summary witness as to testimony, the

22  relevant testimony is testimony about transactions, which

23  we have already had a fair amount of, as opposed to

24  testimony about matters that don't touch any transactions

25  involving these two defendants.

BRIAN MILLER - CROSS BY MR. STILLEY                    2118

1      And I want you to have a clear understanding of the

2  basis for my sustaining that objection because I

3  certainly do not rule out cross-examination as to this

4  witness's testimony about other witnesses' testimony

5  about transactions.  So the objection will be sustained.

6  You may proceed.

7  Q.   (BY MR. STILLEY)  Did I understand you correctly to

8  testify to the effect that it might have been better if

9  Oscar Stilley had put -- had used a personal check?

10  A.   Company check is what I was trying to say.

11  Q.   Okay.  So were you saying that the personal check

12  should have come out of IOLTA?

13  A.   I'm saying a regular check drawn on one of your

14  accounts that was payable to Lindsey Springer that would

15  have been reflected so that Mr. Springer's name would

16  have been reflected in the transaction to make it more

17  obvious who you were dealing with and who you were

18  transacting business with.

19  Q.   But I still don't quite understand.  Are you saying

20  that this money should have come out of a check in the

21  personal -- either a business or a personal check for

22  Oscar Stilley or for the IOLTA account?

23  A.   I'm not going to -- again, I'm not going to speak

24  like I'm an expert on attorneys' bank accounts, but it

25  was my understanding that Oscar Stilley's income should

BRIAN MILLER - CROSS BY MR. STILLEY                    2119

1  go into Oscar Stilley's business account and that

2  expenses you incurred in your business would be paid out

3  of that business account and that that separate IOLTA

4  account was held separately for a very specific limited

5  purpose.  That's my understanding.  And that's, again,

6  very limited.

7  Q.   You recognize that it wouldn't be proper for a

8  lawyer to commingle his client funds with his own

9  personal funds, correct?

10 A.   That sounds right.  That makes sense to me.

11 Q.   Now, before the money was given or -- scratch that.

12 Let's take Eddy Patterson's money.  Until Eddy Patterson

13 made a decision to convey that money to somebody else, it

14 was Eddy Patterson's money, right?

15 A.   Well, if the money was coming from Eddy Patterson

16 with the understanding that this money should go to

17 Mr. Springer, then I wouldn't see a reason to put it into

18 the IOLTA account and hold it.  I would think it would go

19 straight to the business account and then go straight to

20 Mr. Springer.  Because if the money was coming straight

21 from Eddy Patterson with the intention of going straight

22 to Mr. Springer, it seems like it would no longer be

23 Mr. Patterson's money, it wouldn't need to be held in a

24 special account for him for his benefit.

25 Q.   But assuming that the money was simply sent -- well,

BRIAN MILLER - CROSS BY MR. STILLEY                    2120

1   scratch that.  There was $375,000 approximately wired to
2   Oscar Stilley's account, correct?
3   A.   That's right.
4   Q.   When that money hit the account, all that money
5   belonged to Eddy Patterson, correct?
6   A.   I wouldn't necessarily agree with that, not if he
7   had already earmarked a portion of that to go for your
8   benefit or Mr. Springer's benefit.  If you had already
9   done work and he said this ought to go to Lindsey, then
10  it wasn't still Eddy's money when it got into your
11  account.  It was your money or Mr. Springer's money.
12  Q.   Well, regardless, even assuming that this money
13  later became Lindsey Springer's money, Oscar Stilley
14  wouldn't have the right to appropriate Lindsey Springer's
15  money to his own personal use either, correct?
16  A.   It didn't later become Lindsey Springer's money.  It
17  was Lindsey Springer's money from the moment it was being
18  wired.
19  Q.   The point I'm driving at is that Oscar Stilley did
20  not have the legal right to misappropriate someone else's
21  funds, whether it was Mr. Springer's or Mr. Patterson's,
22  correct?
23  A.   Absolutely not, right.
24  Q.   Now, you recognize too that there's -- there's two
25  individuals on trial here, correct?

BRIAN MILLER - CROSS BY MR. STILLEY                    2121

```
 1  A.   Yes.
 2  Q.   And Oscar Stilley has -- or had materially different
 3  information available to him at the time of these
 4  transactions as opposed to Mr. Springer, right?
 5  A.   I doubt that's the case, but I don't know.
 6  Q.   Well, you do realize that a number of these
 7  transactions are directly from someone who supported
 8  Mr. Springer's mission, correct?
 9  A.   Right.  I also know that you and Mr. Springer were
10  on the phone all the time.  So, I mean, why would I
11  assume that you don't know?  I would think the logical
12  assumption would be that you two were very involved in
13  each other's financial affairs and you would understand
14  the money coming into your account how it related to
15  Mr. Springer.
16  Q.   But in a criminal case, we cannot just assume or
17  speculate that Oscar Stilley maybe had knowledge, can we?
18  A.   That's a fair statement.
19  Q.   We would have to have proof of it, right?
20  A.   I can say I have proof generally that you and
21  Mr. Springer were very well aware of each other's
22  financial transactions.  I cannot sit here and say that
23  you knew of every single -- you knew the details of every
24  one of his transactions that went into your account, that
25  is absolutely right.
```

BRIAN MILLER - CROSS BY MR. STILLEY                          2122

```
1   Q.   Now, I believe you testified that you thought that
2   Oscar Stilley was transgressing on certain gray areas.
3   Is that correct?
4   A.   I never used the word "transgressing" and I never
5   said "gray areas."
6   Q.   You didn't say "gray area"?
7   A.   No.  I would not have said "gray area."
8   Q.   Well, what do you think it was when Oscar Stilley
9   was following the directives of his clients?
10  A.   You think that makes it -- I'm sorry.  That doesn't
11  make it okay and that doesn't make it a gray area.
12  Q.   Oh, so do you think it was illegal for Oscar Stilley
13  to transfer money to -- for example, the money from
14  Patterson to Springer, was that illegal?
15  A.   In this case, I believe it was, yes.
16  Q.   What specific law prohibited it?
17  A.   The law that Mr. Springer quoted to me a few minutes
18  ago that talks about when two or more people are working
19  together to aid or assist in the -- in hiding or evading
20  or the collection of the IRS funds, something like that.
21  I don't have it memorized like Mr. Springer does, but
22  that's the law that you violated.
23  Q.   That's Count 1, correct?
24  A.   I believe so, the conspiracy.
25  Q.   Conspiracy.  And conspiracy requires that there be
```

BRIAN MILLER - CROSS BY MR. STILLEY                         2123

1  an underlying offense or an underlying statute that there

2  was an agreement to violate, correct?

3            THE COURT:  Wait a second.

4            MR. SNOKE:  Objection, Your Honor.  He's getting

5  into the law, which is the Court's --

6            THE COURT:  Sustained.  Members of the jury,

7  since we had a short break about an hour ago, I'm going

8  to push a little closer to 3:30 before we take our

9  regular mid-afternoon break.  But as always, if any of

10 you need a break before then, we certainly will do that.

11 You may continue.

12 Q.  (BY MR. STILLEY)  You said the activities of Oscar

13 Stilley and Lindsey Springer made the IRS's job harder,

14 correct?

15 A.  The actions of Mr. Stilley and Mr. Springer were

16 attempts to hide income or to -- to conceal, evade, hide,

17 make more difficult the assessment, collection,

18 enforcement of the IRS laws, yes.

19 Q.  It's not illegal to simply make the IRS's job

20 harder, is it?

21 A.  You would have to clarify that a little bit more

22 before I would say yes or no to that.

23 Q.  There has to be other factors present before making

24 the IRS's job harder becomes a crime?

25 A.  Sometimes making the IRS's job harder is a crime,

BRIAN MILLER - CROSS BY MR. STILLEY                    2124

```
 1  sometimes I would say that it's not.  For example -- can
 2  I give you an example?
 3  Q.   Beg your pardon?
 4  A.   Can I give you an example?
 5  Q.   Sure, please.
 6  A.   Like, for example, if I asked you to verify your
 7  business receipts and you put them in a box and gave them
 8  to me, that would make my job harder but that wouldn't be
 9  illegal.  If you put your assets in somebody else's bank
10  account or tried to use money orders and cashier's checks
11  and things like that and did other things to where I
12  couldn't find your money and you were concealing it from
13  the IRS and trying to prevent us from getting to it, in
14  that case, that would be illegal.
15  Q.   There has to be some sort of dishonesty, correct?
16  A.   For what?
17  Q.   For making the job -- the IRS's job harder to become
18  a crime.
19  A.   For it to be a crime, there would have to be some --
20  you would have to be doing it intentionally.  You would
21  have to be dishonest about it, I guess.  That sounds
22  fair.
23  Q.   You don't have any evidence of dishonesty in this
24  case, do you?
25  A.   Absolutely, I do.
```

BRIAN MILLER - CROSS BY MR. STILLEY                    2125

```
1   Q.   You think that there is evidence of dishonesty?

2   A.   Yes.

3   Q.   Can you tell us what that is?

4   A.   Are you talking about you or Mr. Springer?

5   Q.   Oscar Stilley.

6   A.   You told the grand jury that Mr. Springer doesn't

7   receive any compensation for work he does.  That was an

8   outright lie.

9   Q.   Got that.  Anything else?

10  A.   You helped Mr. Springer hide his income.  You helped

11  funnel the income through your account for his personal

12  benefit to make -- again, to make it more difficult for

13  the IRS to carry out its functions.  You allowed

14  Mr. Springer to use your credit card to further hide and

15  conceal his activities.

16  Q.   You know Oscar Stilley is a lawyer, correct?

17  A.   I do know that.

18  Q.   If he made the legal argument that this money that

19  was received by Mr. Springer was not compensation for

20  services, he would have a legal right to do that,

21  correct?

22  A.   It would be --

23          THE COURT:  Wait just a minute.

24          MR. SNOKE:  Objection.  This goes beyond the

25  scope of direct, Your Honor.  It gets into the law again.
```

BRIAN MILLER - CROSS BY MR. STILLEY                    2126

```
 1              THE COURT:  Bear with me just a moment.  My
 2    problem is I don't understand the question.  You'll have
 3    to repeat it, then we'll see where we go from there.
 4              MR. STILLEY:  Sure.
 5    Q.  (BY MR. STILLEY)  Isn't it true that lawyers -- for
 6    example, a lawyer could advocate on behalf of someone
 7    like Mr. Springer arguing that at least some of this
 8    money was donations?
 9              THE COURT:  Wait just a minute.  Go ahead.
10              MR. SNOKE:  To which I object because there's no
11    evidence in this case that this was an advocation.  We're
12    talking about a grand jury appearance by Mr. Stilley.  I
13    think that's what the basis of his question is.
14    Otherwise, it's not in the case at all.
15              THE COURT:  Sustained.
16    Q.  (BY MR. STILLEY)  Let's move for just a little bit
17    to the hiding of income.  Basically, it was, shall we
18    say, hid in plain sight?  Correct?
19    A.  I wouldn't characterize it that way.
20    Q.  It went into the form of automobiles, correct?
21    A.  Yes, it did do that.
22    Q.  The ownership of that automobile becomes public
23    record, right?
24    A.  It does.  I have not seen the titles on the
25    vehicles, so I'm not going to speak one way or the other
```

BRIAN MILLER - CROSS BY MR. STILLEY                           2127

1  as to how they were titled.

2  Q.  It's very easy for the IRS to get that information,

3  correct?

4  A.  Pretty easy, yes.  But I haven't seen it, so I'm not

5  ready to make a statement on whether or not

6  Mr. Springer's automobiles were titled in his name.

7  Q.  Car titles are public record, right?

8  A.  I'm not sure that's true.  I don't believe --

9  they're not in Arkansas, I don't believe.

10 Q.  And didn't -- I heard you asked by Mr. Springer if

11 you could name any particular person who was impaired in

12 their activities because of what Oscar Stilley or Lindsey

13 Springer did, and I didn't hear any names.  Have you

14 thought of any names?

15 A.  No, I have not.

16 Q.  Were you aware that the second subpoena to Oscar

17 Stilley was later withdrawn?

18 A.  I don't know anything about that.

19 Q.  If there was testimony to the effect that the second

20 subpoena to Oscar Stilley was withdrawn, would that

21 satisfy your concerns about Oscar Stilley's failure to

22 give certain information to the grand jury?

23         MR. SNOKE:  Objection.  We're outside the scope

24 of this witness's knowledge or testimony.

25         THE COURT:  That's overruled at this point.

```
 1   We'll see where this goes.  You may answer.
 2             THE WITNESS:  I don't understand the question.
 3   Q.  (BY MR. STILLEY)  If you heard testimony, let's say,
 4   from Brian Shern -- if you heard Brian Shern testify that
 5   the second grand jury subpoena to Oscar Stilley was
 6   withdrawn, would that satisfy your concerns that Oscar
 7   Stilley allegedly didn't make full compliance with the
 8   requests by the grand jury?
 9   A.  I don't think the withdrawal of a second subpoena
10   would negate the untruths that were told in response to
11   the first subpoena, no.
12   Q.  Do you have a specific untruth that you can point to
13   and tell this jury that there was a specific untruth in
14   the first grand jury?
15   A.  Is that the grand jury that Mr. Shern testified to?
16   Q.  And Oscar Stilley.
17   A.  Show it to me and I'll show you the statement.
18   Q.  Sure.  I draw your attention to Exhibits 581, which
19   is the grand jury testimony, and 582, which is the
20   information provided to the grand jury.  Do you have a
21   copy of that?
22   A.  Okay.  I see it now.  The specific untruth you asked
23   about --
24             THE COURT:  Let's have the page and line.
25             THE WITNESS:  I'm sorry.  Whatever page is on
```

BRIAN MILLER - CROSS BY MR. STILLEY                              2129

```
 1  the screen.  I don't know specifically what that is.
 2          THE COURT:  Well, that's not grand jury
 3  testimony on the screen.
 4          THE WITNESS:  I'm sorry.  Response to the
 5  subpoena.  I misspoke when I said the grand jury
 6  testimony.
 7          THE COURT:  You may continue.
 8  Q.  (BY MR. STILLEY)  Okay.  Can you tell us what you
 9  contend to be false testimony?
10  A.  Under item 2, second paragraph, "Lindsey Springer
11  does not charge for his services."
12  Q.  Okay.  That's the falsehood you're talking about?
13  A.  That's one of them.  That's the most glaring to me.
14  Q.  Well, can you tell us what else that you think is
15  false?
16  A.  I don't have a list in front of me.  I believe there
17  has been testimony in the second -- or that contradicts
18  the second sentence that says -- that there's never any
19  estimates made for services with respect to any work or
20  services performed by Lindsey Springer.  I think there
21  has been testimony here that has said that witnesses have
22  said that Mr. Springer demanded so much more money to
23  accomplish a certain task.  So I would think that is a
24  clear contradiction to the testimony you provided in
25  response to this subpoena.
```

BRIAN MILLER - CROSS BY MR. STILLEY                                    2130

1   Q.   Okay.  So you think that's an estimate when there's

2   a demand for more money or a request for more money?

3   A.   I would -- generally, I would categorize when it

4   says there were never any estimates made for services,

5   whenever Mr. Springer would say I need $30,000 to do

6   this, I would call that an estimate made for services to

7   be performed.

8   Q.   You're talking about oral statements, correct?

9   A.   I'm talking about just what I heard from the

10  witnesses sitting in this seat.

11  Q.   And the last part of that sentence says "in the

12  possession of or available to Oscar Stilley," correct?

13  A.   That's what it says, yes.

14  Q.   And you don't have any knowledge that Oscar Stilley

15  had possession of any such phone conversations or any

16  transcripts of that or any other evidence of that, do

17  you?

18  A.   That's a fact, I don't have that.  So I guess I'll

19  just have to stick with the first sentence that I would

20  consider to be the untruth.

21  Q.   All right.  Now, you -- let me make sure I

22  understand correctly.  You're not saying that any of the

23  oral testimony given to the grand jury was

24  demonstratively false, are you?

25  A.   The testimony you gave to the grand jury?

BRIAN MILLER - CROSS BY MR. STILLEY                              2131

1    Q.   Yes.

2    A.   I don't know.  When I said grand jury testimony a

3    minute ago, I misspoke.  So I'm not going to categorize

4    that as true or untrue one way or the other without

5    taking a look at it.  I was talking about this statement

6    right here.

7    Q.   Okay.

8         MR. STILLEY:  Let's -- can we just highlight the

9    one that we've still got left here, the first sentence,

10   drop the highlighted of the other two, and just leave

11   highlighted "Lindsey Springer does not charge for his

12   services."

13   Q.   (BY MR. STILLEY)  Do you see that?

14   A.   I do.

15   Q.   Didn't you testify to this jury that you became

16   convinced that initially that Mr. Turner's transfer of

17   $250,000 to Lindsey Springer was a donation?

18   A.   Okay.  That's wrong on two or three levels.  First

19   of all, I was never convinced it was a donation.

20   Secondly, I was never convinced that it was a loan.  I

21   was not -- a correct categorization would be initially I

22   was not strongly enough convinced to call it income and,

23   therefore, I called it a loan just because I wasn't quite

24   comfortable enough with it being income to call it income

25   until a little bit later on.  I was never convinced or

1   confident that it was a loan.  And I was certainly never

2   -- I certainly never characterized it as a donation.

3   Q.   I beg your pardon.  I misspoke.  I meant to say that

4   you had been convinced that it was a loan.

5   A.   Okay.  I was not convinced it was a loan.  I just

6   wasn't convinced enough that it was income to call it

7   income.

8   Q.   Well, isn't it fair to say that Oscar Stilley, back

9   at the time that this transaction took place, did not

10  have the benefit of hindsight or any of the evidence here

11  in this case, correct?

12  A.   Okay.  I'm not going to say that you knew that every

13  single time Mr. Springer got paid that you knew it was

14  income.

15  Q.   Well, let me ask this:  Would Oscar Stilley be

16  entitled to rely on representations of Mr. Turner and

17  Mr. Springer concerning the character of this

18  transaction?

19  A.   I would think you would have to use your own

20  independent judgment just like you would have to use your

21  own independent judgment if a cancelled check said

22  "donation," even though you knew good and well that

23  Mr. Springer performed services to get that donation,

24  then I would think that, no, you should not rely on what

25  they call it or what they say.  You should know what the

1  essence of that transaction actually is and use your

2  judgment and make a determination.

3  Q.   Do you think it's a crime to believe the words

4  "donation" on a check?

5  A.   I believe in certain situations it's a crime to put

6  "donation" on a check when the intent of doing that is to

7  do, again, what Mr. Springer said, conspire or to conceal

8  or even not conspire, conceal, but when it's done in an

9  attempt to evade your income taxes, absolutely, it's a

10  crime.

11  Q.   Do you think it was a crime to state to the grand

12  jury the same thing that had been stated to Oscar Stilley

13  by many of these individuals who have been in the witness

14  stand there?

15  A.   Say that again.

16  Q.   Do you think it was a crime for Mr. Stilley to tell

17  the grand jury the same story that Lindsey Springer and

18  Mr. Patterson and various other people told Oscar Stilley

19  to the effect that these transfers were either loans or

20  donations?

21  A.   Mr. Stilley should have told the truth to the grand

22  jury.

23  Q.   Well, that doesn't answer the question.

24  A.   Sure, it does.

25  Q.   You're saying -- so what you're saying is that you

1  think it is a crime for Oscar Stilley to repeat what his

2  own clients told him?

3  A.   If he knows that that's not the truth.

4  Q.   Well, you don't have any reason to believe that

5  Oscar Stilley disbelieved his own clients, do you?

6  A.   Absolutely, I do.

7  Q.   You do?

8  A.   Absolutely.  You're a smart man, Mr. Stilley.  You

9  know that work was being done by Mr. Springer

10         THE COURT:  Let me know when you get to a

11  convenient stopping point, we'll take our mid-afternoon

12  recess.

13         MR. STILLEY:  Sure.  Thank you.

14         THE COURT:  Members of the jury, we'll take our

15  mid-afternoon recess at this time.  We'll resume at 20

16  minutes till four, again, guided by the clock on the

17  wall.  During this recess, please remember my usual

18  admonition, which I will not repeat at this time.

19     All persons in the courtroom will be seated and

20  remain seated while the jury departs.

21     (JURY EXITS THE COURTROOM)

22         THE COURT:  You may step down.  The jury has

23  left the courtroom.  The clerk has received some

24  communications from the marshal's office inquiring as to

25  where the matter stands at this point because the

1  marshal's office has some responsibility for coordinating

2  transportation and so forth.  Here we are almost 3:30 in

3  the afternoon and we're not going to resume after we

4  recess today.  We will not resume until Monday.

5      Mr. Springer, what witnesses are in town now?

6          MR. SPRINGER:  Your Honor, I have -- Ms. Dertien

7  and Mr. Stumpo are flown in from Michigan.  And they're

8  the only two that -- you know, other than Mr. Burt and

9  Mr. Patridge, who are in custody by U.S. marshals.  The

10 rest of them, Mr. Marrs is here, he can come back Monday

11 he said, so --

12         THE COURT:  How long are those first two that

13 you mentioned, Ms. -- is it Dertien?

14         MR. SPRINGER:  Dertien.

15         THE COURT:  And Stumpo, how long are they?

16         MR. SPRINGER:  Twenty minutes apiece probably,

17 not very long.

18         THE COURT:  Well, we may or may not get to them

19 today.  They were flown in here by the marshal service?

20         MR. SPRINGER:  Yes, last night.

21         THE COURT:  Okay.  And they're under subpoena?

22         MR. SPRINGER:  Yes, sir, they are.

23         THE COURT:  Do you have any reason to be

24 concerned about their responsiveness to a requirement

25 that they return Monday?

1           MR. SPRINGER:  None whatsoever.

2           THE COURT:  Okay.  Well, do you have the name of

3    the deputy U.S. marshal who is coordinating these

4    logistics?

5           MR. SPRINGER:  Pam does.

6           THE COURT:  Well, during this break, I will

7    expect that the defendants and perhaps their standby

8    counsel and Mr. Snoke and the clerk coordinate so that we

9    can at least keep the marshal service up to date on the

10   status of the matter.  And if we don't get to them today

11   and they return and then they return once again to

12   Oklahoma on Sunday, that's where we are, because we

13   simply cannot proceed tomorrow.  But the better part of

14   the solution to this sort of a problem is communication

15   and I do expect that there will be communication, as I

16   have said.

17      Anything else we ought to address before we take our

18   midday break?

19          MR. O'REILLY:  Very briefly, Your Honor.  It's

20   just a question of how does the Court want us to preserve

21   and put in for the record Ms. Wiggins' deposition

22   testimony?

23          THE COURT:  My thought, subject to any comment

24   that the clerk would have, would be to make it Court's

25   Exhibit Number 2 and then it would be retained in the

```
 1   custody of the court clerk as an exhibit in this case for

 2   possible use by a reviewing court.

 3        Does that work, Pam?

 4            COURTROOM DEPUTY:  Yes.

 5            THE COURT:  We'll make that CD Court's Exhibit

 6   Number 2.

 7            MR. O'REILLY:  And it's the CD, Your Honor, not

 8   the transcript itself.

 9            THE COURT:  I would -- I believe my colleagues

10   in Denver would be appreciative of both, so why don't you

11   get a clean copy of the transcript and make it -- and

12   make that Court's Exhibit 2A.

13            MR. O'REILLY:  Very well, Your Honor, we will.

14            THE COURT:  Okay.  Court will be in recess.

15        (A RECESS WAS HAD, AFTER WHICH THE FOLLOWING

16   PROCEEDINGS WERE HAD IN OPEN COURT AND WITHIN THE

17   PRESENCE AND HEARING OF THE JURY.)

18            THE COURT:  Mr. Stilley, you may continue.

19            MR. STILLEY:  Pass the witness.

20            THE COURT:  Any redirect?

21                    REDIRECT EXAMINATION

22   BY MR. SNOKE:

23   Q.   Mr. Miller, is there any evidence that you've seen

24   in this case that Mr. Springer could not handle a bank

25   account?
```

BRIAN MILLER - REDIRECT BY MR. SNOKE                    2138

1    A.   I've not seen any evidence to suggest that, no.

2    Q.   The -- I think you discussed in cross-examination

3    the 8300 forms, the cash transaction reports filed by --

4    filed by the check cashers.

5    A.   Yes.

6    Q.   Were there any -- did any of those contain

7    Mr. Springer's social security number?

8    A.   I don't believe so.

9    Q.   And in addition to your discussion with Mr. Springer

10   here in cross-examination concerning the lien that was

11   placed on the recreational vehicle purchased with the

12   166,000 of the 250,000 of Mr. Turner --

13   A.   Yes.

14   Q.   Do you recall that?  What were your reasons for

15   listing that as income in the 2005 income report?

16   A.   Why did I list the $250,000 as income?

17   Q.   Yes.

18   A.   There were several reasons.  One is that

19   Mr. Springer made representations that he would begin

20   repaying that with the sale of the RV that Mr. Bolthouse

21   owned -- or that he sold to Mr. Bolthouse.  There was

22   also the fact that although Mr. Turner understood the

23   arrangement to be that they would simply hold that money

24   for him basically in trust until such time as he would

25   need it.  But despite that, immediately after he got the

1  money, Mr. Springer immediately went and bought a new

2  motor home and a new trailer and a new Lexus to begin his

3  travels on the PGA Golf Tour.

4  Q.   This was all in 2005?

5  A.   Yes.  The thing that -- I guess the thing that put

6  me over the edge, if you will, was the fact I had never

7  really thought that Mr. Springer would simply take all

8  that money from Mr. Turner and not pay it back until I

9  heard the testimony of Ms. Hawkins, who stated that in

10 addition to Mr. Springer asking for what I considered to

11 be a very large amount of money in a very short amount of

12 time, the testimony that, you know, we had a very

13 distraught woman who was overcome with trying to get her

14 husband out of prison, to have Mr. Springer expect a

15 payment of $500,000 to carry on the appeal was so

16 egregious to me that I felt like if he would take

17 advantage of her -- and I felt like that was a huge or

18 egregious taking advantage of had she paid that.  And

19 based on that, I felt if he would do that to

20 Mrs. Hawkins, then it was very likely that he would do

21 the same thing to Mr. Turner.

22 Q.   Did you consider the -- what he -- what Mr. Springer

23 did with the proceeds of the sale of his other motor home

24 to Mr. Bolthouse?

25 A.   Right.  That was part of it.

BRIAN MILLER - REDIRECT BY MR. SNOKE                    2140

1   Q.   All right.  Now, Mr. Springer asked you about the

2   statement he made to Brian Shern at his -- at the day

3   they were executing the search warrant on his premises.

4   A.   Can you refresh my memory about which statement he

5   made?

6   Q.   Well, do you recall Mr. Springer asking you about --

7   about that statement that he made to Mr. Shern?

8   A.   Oh, that he would immediately pay it back, part of

9   the loan with the proceeds from --

10  Q.   All right.  And what was the date of that statement?

11  A.   If that was the day of the search warrant, I'm --

12  Q.   Same day as the search warrant.  All right.  And did

13  you consider the fact that Mr. Springer, when he's making

14  that statement to Mr. Shern on that day, he knows at that

15  time he's under criminal investigation, does he not?

16  A.   Absolutely.

17  Q.   And that statement in September of 2005 is followed

18  by what activity with respect to the return of the

19  proceeds from the sale of the old motor home to

20  Mr. Bolthouse?

21  A.   I think instead of paying back part of the loan, he

22  goes out and buys another vehicle, if I remember

23  correctly.

24  Q.   And did he do that?

25  A.   Yes, I believe so.

```
 1   Q.   He paid back --
 2   A.   Oh, no --
 3   Q.   -- Mr. Turner the --
 4   A.   Oh, no, he didn't pay back Mr. Turner.  I think he
 5   -- I thought he used some of the funds to buy another
 6   vehicle, but I could be mistaken about it.
 7   Q.   Well, at any rate, he didn't -- he did not -- he
 8   took $50,000 from --
 9   A.   He took $50,000 from Mr. Bolthouse.  He got two
10   $20,000 cashier's checks.  And none of that money went to
11   Mr. Turner.
12   Q.   Did you consider that action also in your decision
13   that the original $250,000 to purchase the -- used to
14   purchase the motor home was income?
15   A.   That definitely played a part in my decision.
16   Q.   Now, you were asked about those checks from Eddy
17   Patterson in 2000.  I think there's two of them in the
18   year 2000 that you included in your calculations there
19   for that year.  Do you recall those questions by
20   Mr. Springer?
21   A.   Not specifically, no.
22   Q.   Do you recall him asking you about the letters that
23   accompanied the statements from Mr. Patterson?
24   A.   Yes, the letter and that first check.
25   Q.   And whether you considered that in with the checks
```

```
 1  that I think he called up for you on the --

 2  A.   That's right.  I remember now.

 3  Q.   A couple of $10,000 checks, at least one he called

 4  up.

 5  A.   That's right.

 6  Q.   All right.  Now, do you recall Mr. Patterson's

 7  testimony in this case about being before a grand jury,

 8  being called before a grand jury in the year 2000?

 9  A.   I generally recall that.

10  Q.   And did Mr. Patterson indicate he had any assistance

11  in that appearance before the grand jury?

12  A.   Yes, I believe he did.

13  Q.   And who --

14          MR. SPRINGER:  Objection, Your Honor.

15          THE COURT:  Go ahead.

16          MR. SPRINGER:  I believe the testimony was 2002

17  grand jury, not the 2000.

18          THE COURT:  What year did you intend to refer

19  to, Mr. Snoke?

20          MR. SNOKE:  I'm sorry.  I thought we had

21  testimony about a 2000 grand jury, Your Honor.  I was

22  referring to a 2000 grand jury, but --

23          THE COURT:  That's what he apparently intends to

24  refer to.  Proceed.

25          MR. SPRINGER:  Okay.
```

BRIAN MILLER - REDIRECT BY MR. SNOKE                    2143

1          THE WITNESS:  I believe that was the year, to
2     the best of my recollection.
3     Q.   (BY MR. SNOKE)  Anyway, did Mr. Patterson testify at
4     all about any assistance he had or any contact he had
5     with Mr. Springer leading to those $10,000 checks that he
6     issued that you were asked about on cross-examination?
7     A.   I'm sure that -- yes, he did say there were some
8     contacts and conversations.
9     Q.   With respect to the $60,000 that you were asked
10    about that figured into the Patterson equation there that
11    you've taken into some consideration in your
12    calculations?
13    A.   Yes.
14    Q.   And then you were asked about any comments
15    Mrs. Patterson said.  Do you recall any of her testimony
16    regarding that transaction?
17    A.   I don't remember specifically, no.  I simply
18    remember that if the witnesses said it was income, I
19    would have put it in income.  But I would not have put it
20    there had it not belonged there.
21    Q.   All right.  I'd like to have you look at
22    Government's Exhibit 107, please, for a minute.
23    A.   Okay.  I see it.
24    Q.   You were asked extensively, I think, about this
25    transaction in which $375,000, more or less, was wire

1  transferred over to -- by the Hall Estill law firm over

2  to Mr. Stilley's IOLTA account.

3  A.   That's right.

4  Q.   All right.  Now, is this the -- this exhibit

5  demonstrate a -- is this a copy of the IOLTA trust

6  account for Mr. Stilley that indicates the receipt of

7  that $375,000?

8  A.   It does.  It is, yes.

9  Q.   All right.  And as to those -- the activities that

10 resulted in the -- in your chart that we just talked

11 about here on direct examination, in that flow chart in

12 which you showed that the money coming back -- will you

13 look down here at the entries down below there where it

14 says "cash withdrawal 20,000, cash withdrawal 20,000,

15 cash withdrawal 20,000, cash withdrawal 18,000."

16 A.   I see those.

17 Q.   All right.  Do those pertain to the ultimate

18 cashier's checks that were received by Mr. Springer as

19 depicted in your flow chart?

20 A.   Yes.  I think three of those were actually the

21 cashier's checks and I think the last one was used to buy

22 18 $1,000 money orders.  Yes, that's the figures there

23 that were used in that flow chart.

24 Q.   All right.  If an investigator had subpoenaed the

25 trust account records of Oscar Stilley, as exhibited here

 1   in Government's 107, would the investigator for the IRS

 2   or would you, for that matter, as an auditor, have been

 3   able to see Mr. Springer's connection with that

 4   transaction?

 5           MR. SPRINGER:  Objection, Your Honor.  Is it

 6   civil or criminal investigator in that question?

 7           THE COURT:  Overruled.

 8           THE WITNESS:  It would have made it much more

 9   difficult.  That's the point I was -- probably did a poor

10   job of making earlier that the fact that these were

11   treated in the way they were rather than just a check,

12   there's no way to know what that money had gone for.

13   And, you know, an auditor very well may have thought,

14   well, this is in their IOLTA account, it must be going

15   back to a client or it must be going to pay something

16   else for a client rather than being used to funnel funds

17   for Mr. Springer.  Because looking at this, there's no

18   way to know it had anything to do with Mr. Springer.

19   Q.   (BY MR. SNOKE)  If all these activities that you

20   were asked about on cross-examination by Mr. Springer and

21   Mr. Stilley with respect to the conspiracy and the

22   transfers of this money back and forth --

23   A.   Yes.

24   Q.   -- did those transactions occur in a vacuum?

25   A.   No, it wasn't just one thing.  It was just -- it was

1    one piece to a very large puzzle and it all fit together.

2    Q.   If Mr. Springer and Mr. Stilley had filed returns

3    and paid taxes, would the IRS care how Mr. Springer

4    structured his finances?

5    A.   Not if he reported all his income and paid all the

6    tax that he was liable to pay.

7            MR. SNOKE:  No further questions.

8            THE COURT:  Recross.

9                    RECROSS-EXAMINATION

10   BY MR. SPRINGER:

11   Q.   You testified that after I sold or accepted the

12   money from Mr. Bolthouse after he accepted the bus in

13   December of 2005 that I went out and bought a brand new

14   car.

15   A.   I testified I thought that's what you did with that

16   money, but all these transactions are -- they kind of run

17   together sometimes.  So I'm not going to sit up here and

18   promise you that that's what happened with those

19   particular funds.  I may have been mistaken.

20   Q.   Thank you.  Now, Mr. Snoke asked you if I had filed

21   a tax return and reported all the income, but, really,

22   the correct question is gross income, right?

23   A.   If you had reported all the income, you would have

24   reported all the gross income.

25   Q.   All right.  Now, I think Mr. Snoke said if I had

1 filed a return, but you didn't specify the form of the

2 return, what form of return were you responding to when

3 you state I should have -- if I had supplied all of my

4 income on that I wouldn't be having any problems here

5 today?  What form would that have been that I was

6 required by law to file?

7 A.   What's commonly described as a 1040.

8 Q.   And that's what the law requires is a Form 1040?

9 A.   I think we went through all of this before.  It's a

10 Form 1040 or let me just call it a 1040 equivalent.

11 Q.   1040 equivalent.

12 A.   And I apologize that I haven't looked at that in a

13 long time.  The law is kind of vague in my memory.

14 Q.   Do you know where an average citizen could get a

15 1040 equivalent?

16 A.   I do not.

17        MR. SPRINGER:  No further questions, Your Honor.

18        THE COURT:  Mr. Stilley?

19        MR. STILLEY:  Your Honor, could I have just a

20 moment?

21        THE COURT:  You may.

22        MR. STILLEY:  Thank you.  No questions.

23        THE COURT:  You may step down.  We'll have the

24 government's next witness.

25        MR. O'REILLY:  Your Honor, the United States

1 rests.

2          THE COURT:  Very well.  Counsel and the parties

3 will approach.

4     (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND

5 OUT OF THE HEARING OF THE JURY.)

6          THE COURT:  Okay.  The government has rested, do

7 the defendants have any concise motions?

8          MR. SPRINGER:  Your Honor, if we have a few

9 moments to talk with expert counsel on the Rule 29 motion

10 that would be greatly appreciated in light of all the

11 circumstances.

12          THE COURT:  Let's see, how long did I allow for

13 opening statements at the beginning?

14          MR. O'REILLY:  Thirty minutes, Your Honor.

15          THE COURT:  Thirty minutes on a side.

16 Mr. Stilley, how long do you plan on taking in your

17 opening statement?

18          MR. STILLEY:  Fifteen, 20 minutes.

19          THE COURT:  Okay.  And then, Mr. Springer, do

20 you have a witness ready to go?

21          MR. SPRINGER:  Two.

22          THE COURT:  Ready to go this afternoon?

23          MR. SPRINGER:  Yes, sir.

24          THE COURT:  Okay.  We'll see what we can do by

25 way of making progress until five o'clock or thereabouts

1  and I will -- I will allow you to confer very briefly

2  with your standby counsel, but all you need to do is move

3  for judgment of acquittal, and we're not going to take

4  any appreciable amount of time for the motion, but if you

5  would like to confer very briefly with your standby

6  counsel, you may do so.

7          MR. O'REILLY:  Your Honor, may I make a quick

8  suggestion?

9          THE COURT:  Wait.  Mr. Springer.

10         MR. O'REILLY:  Your Honor, if we could, for the

11 benefit of the witnesses, if they want to reserve making

12 their motion for judgment of acquittal until after five

13 o'clock, the government has no opposition to that.

14         THE COURT:  Seems like a pretty good practical

15 approach to it.

16         MR. SPRINGER:  I agree.

17         MR. STILLEY:  I would still like to have just a

18 little time to talk about the opening statement, if I

19 could.

20         THE COURT:  I'll give you a little time to do

21 that.  I don't mean more than a minute or two.  Proceed.

22      (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

23 WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

24 PRESENCE AND HEARING OF THE JURY.)

25         THE COURT:  Members of the jury, we have reached

1   a milestone, if you will, in the progress of this case

2   and in the process of getting the case submitted to you

3   for your deliberations and verdict.  The government has

4   concluded its presentation of its case.  As you may

5   recall from the opening -- the beginning of this trial,

6   let's see, what was that, a week ago on Tuesday, I

7   believe, the government made its opening statement,

8   Mr. Springer made his opening statement and, then

9   Mr. Stilley, as was his right, reserved opening

10  statement.  So the next step in the process of getting

11  this case submitted to you for your deliberations and

12  verdict will be the opening statement of Mr. Stilley.

13       I'm going to give Mr. Stilley a moment to consult

14  and then we will proceed with Mr. Stilley's opening

15  statement.

16            THE COURT:  Mr. Stilley, you may proceed.  And

17  before you begin, Mr. Stilley, let me cover some ground I

18  briefly covered at the beginning of this trial, but

19  perhaps it bears repeating.  I think at the beginning of

20  the trial I told you what the order of the trial would be

21  and what the various steps were and you will recall that

22  I referred to opening statements and closing argument.

23  Opening statement is not argument and, for that reason,

24  opening statement is simply a summary of the expected

25  evidence as the individual making the opening statement

1  expects that it will unfold.

2      You may proceed, Mr. Stilley.

3          MR. STILLEY:  Thank you, Judge.  Ladies and

4  gentlemen, as the judge told you, this is my time to tell

5  you briefly what I think that the evidence is going to

6  show for the defendants' case.  You've heard -- heard

7  some testimony about various things.  You've heard

8  testimony about cars and about wives, et cetera.  I want

9  to tell you a little background about myself in order to

10  help you understand what's going on in Oscar Stilley's

11  mind and, more importantly, what went on in Oscar

12  Stilley's mind during the time of these transactions.

13      I think that the evidence is going to show that

14  Oscar Stilley, when he was growing up, grew up in a very

15  different world than he lives in today.  When Oscar

16  Stilley was a child, he grew up in a family of five.  We

17  were very poor.  We grew a garden.  We hunted raccoons.

18  We would sell the pelts and eat the raccoon.  We canned

19  our own food, had a few cows, had very little.  Oscar

20  Stilley did not understand this sort of world.

21      Oscar Stilley only went through the eighth grade

22  initially.  The reason for that is that my mother was

23  raised Amish.  And in their tradition, you went through

24  the eighth grade.  She convinced my father and that is

25  the way that that was done.  I did, however, later go

1  back at the age of 22 -- well, scratch that.  I went to

2  -- I got a GED at the age of 17 and later at the age of

3  22 went to college and got a degree.  I spent -- it took

4  three years to get a degree at the University of

5  Arkansas.  And then I proceeded on and went on to law

6  school and got a degree and began to practice.

7      Now, I'm going to tell you a little bit about my

8  life.  You've already heard the government say that Oscar

9  Stilley has not filed tax returns since the mid-1980s.

10  You've heard that and you've heard evidence from the

11  witnesses about that.

12      Now, I'm sure you all know, you all heard that is

13  not a specific charge against Oscar Stilley.  However,

14  evidence was put in on that issue and it was put in for a

15  purpose, to try to make certain suggestions against Oscar

16  Stilley.

17      I want to tell you how that Oscar Stilley came to

18  that conclusion, when he came to that conclusion, and

19  why.  It's for you to judge the sincerity of Oscar

20  Stilley whether Oscar Stilley is a credible witness and

21  that he should be believed.

22      I think that the evidence is going to show that

23  Oscar Stilley had -- Oscar Stilley planted trees starting

24  in 1983, planted two years for one company, moved to a

25  company called Kingston Forestry, planted a couple of

1   years there, and here's what happened.  That company had

2   been paying us $40 per day per diem and the IRS came in

3   much later and said that that was -- that was wrong,

4   assessed additional taxes and ruined his company, so I

5   had to find another job.

6        That didn't change my ideas at that point in time,

7   but later while I was planting trees for another

8   gentleman, someone gave Oscar Stilley a copy of a book

9   called "How Anyone Can Stop Paying Income Taxes."  That

10  was in the spring of either 1986 or 1987.  Oscar Stilley

11  read that book in one sitting, started -- he was given it

12  one day, started reading it that night, finished about

13  1:30 in the morning.  And from that day and henceforth to

14  the present day, Oscar Stilley has been of the opinion

15  that the law does not require Oscar Stilley to file

16  federal income tax returns.

17       And you're also going to hear about Oscar Stilley's

18  pattern and practice about telling other people about

19  this.  In the early days, when Oscar Stilley first came

20  to this conclusion, he would tell anybody.  He would tell

21  people at college and at law school without reservation.

22  But later Oscar Stilley began to realize how powerful

23  that the government is and how bad things can happen to

24  people whether or not the law actually requires the

25  making of a return, so he ceased to publicly make those

1  statements.

2      However, at the time, Oscar Stilley was an attorney

3  and Oscar Stilley's practice developed into a tax

4  practice about ten years ago and has continued as a tax

5  practice to this day.  I think you're going to hear in

6  the evidence of the reasons why that Oscar Stilley

7  continues to believe the same thing that he has told you

8  up to the present day.  And I won't go into it.  This is

9  not the proper time.  But I want you to understand the

10  evidence that is coming your way in that regard.

11      You're also going to hear a little bit about the

12  background, the general background of Oscar Stilley that

13  would assist you in determining is Oscar credible, is he

14  believable, why did he do the things that he did.

15      You're going to hear that Oscar Stilley got married

16  at the age of 33 to the former Julie Moore, who was 31,

17  first marriage for both individuals, and continues to be

18  married to this day.  We have a family.  We have two

19  biological children, six and eight; two adopted children,

20  19 and 21, that were adopted from Russia.  And it might

21  seem that that doesn't have a whole lot of relevance

22  until you consider the substance of the accusations in

23  this case.

24      You're going to hear a story about Oscar Stilley and

25  his wife going to Russia to adopt these children and when

1   we went to the orphanage we spent ten days one time and

2   about 30 days another time and we met various people.  We

3   made friends.  It's a small town called Bogachar (ph),

4   Russia, and we kind of developed a connection there.

5   There was a gentlemen there by the name of Anatoliy

6   Collott (ph), who was a Baptist preacher.  And Baptists

7   are not common in Russia.  That's not their common faith

8   tradition there.

9       He had a partly-built church that he was trying to

10  get built.  Oscar Stilley gave Mr. Collott $5,000, but he

11  gave Mr. Collott specific instructions through an

12  interpreter, don't use this money for your church, use it

13  for your own subsistence.  Therefore, you're going to get

14  some idea why that would not be suspicious to Oscar

15  Stilley that other people were giving Lindsey Springer

16  money and doing things and asking Mr. Springer to use

17  that for his own subsistence.

18      Part of this comes from the fact that Oscar

19  Stilley's Amish heritage.  In the Amish code faith

20  tradition, there are no churches.  There is no paid

21  church ministers or staff or anything of that nature.

22  It's a very different situation.  And when money is taken

23  up, it is taken up specifically either for someone's

24  subsistence or medical needs or other things of that

25  nature.  Therefore, in Oscar's mind, that was not

1  unreasonable.

2      What you're further going to hear is a complete

3  rebuttal to what the indictment has -- alleges that

4  Lindsey Springer made deals orally and got paid for his

5  services.  Just as an example of what you're going to

6  hear, while Oscar Stilley was in Russia, in 2006, Oscar

7  Stilley and his wife picked a rather bad time to go to

8  Russia, because shortly before that trip, Oscar Stilley

9  had had a case called USA v. Robert Lawrence.  And in

10  that case, Oscar Stilley, who was being assisted by

11  Mr. Springer, raised the Paperwork Reduction Act.

12      The government on the Friday before the trial was

13  supposed to start -- well, actually, a couple of days

14  before that, a day or two before that, they said that

15  they were going to write a brief to try to stop the

16  defendant from using that defense.  And on Friday, they

17  made a telephone call and said we're dismissing this case

18  with prejudice so we can't bring this case back.

19      Well, when that became public knowledge, there was a

20  huge influx of legal business for Oscar Stilley.  And

21  over the protestations of Lindsey Springer, Oscar Stilley

22  decided he was going to go to Russia for 30 days to adopt

23  these kids.  And while Oscar Stilley was gone for I think

24  about two weeks, he didn't have any reasonable means of

25  reaching his clients by telephone.  Lindsey Springer did

1   that work.  He didn't charge any money for it.  And Oscar

2   Stilley knew better than to offer any money for it.

3   Because what the testimony that you're going to hear is

4   that over the entire relationship of Oscar Stilley and

5   Lindsey Springer, Lindsey Springer has made it abundantly

6   clear that he does not charge for his services, will not

7   accept money for his services, would take it as an insult

8   if Oscar Stilley had suggested that he might do that.

9        Now, you're also going to hear that -- you've heard

10  about the jet-set crowd that has helped Lindsey

11  Springer.  You probably haven't heard -- well, you

12  haven't heard about the down-and-out people that Lindsey

13  Springer would help.  And he would not only use his own

14  money and his own time to help people that didn't have

15  the wherewithal to help themselves, if he felt it was

16  appropriate, he would call Oscar Stilley and say, Oscar,

17  I need to call in a favor for you.  I would like for you

18  to do this, just do it pro bono, just help these people

19  out.

20       He made it very clear that it was his ministry.  And

21  he was consistent in his behavior certainly so far as

22  Oscar Stilley could perceive and that's the only thing

23  that Oscar Stilley, of course, could testify to.  If

24  somebody else's perceptions are to come in, somebody else

25  would have to put that evidence in.  But that was Oscar

1    Stilley's perception over a long period of time.  And,

2    therefore, Oscar Stilley, in good faith, believed that to

3    be the truth.

4        That's why you heard testimony that Oscar Stilley

5    told the grand jury that Lindsey Springer does not charge

6    for his services.  Oscar Stilley absolutely believed that

7    to be the truth and to this day absolutely believes that

8    to be the truth.  And I believe that you're going to hear

9    testimony from the stand that will establish that.

10       Now, you heard the government raise an issue that

11   Oscar Stilley allowed Mr. Springer to use his credit

12   card.  Well, you've already heard the story of why

13   Lindsey Springer used the credit card and you'll probably

14   hear some more about that.  You've also heard evidence

15   about an inappropriate use of the credit card.  What

16   you're going to hear about that is that Oscar Stilley had

17   no knowledge about the use of the credit card for such

18   purpose.  And had he known, he would have stopped it much

19   in the way that he stopped the improper use of the

20   Internet by a young man named Jordan Blair.

21       I won't tell you that story in detail, but I want

22   you to know you're going to hear this about a young man

23   that Oscar Stilley represented in a case in Missouri.

24   And Jordan Blair stayed in our home because he didn't

25   have another place that was safe for him so that he could

 1   actually have a place to live.  He stayed there for many

 2   months.  He knew the house rules, you don't look at porn.

 3        One day I found on the printer some documents

 4   showing that he had been looking at porn.  So I got those

 5   documents in my hand and walked out to the shop to where

 6   Mr. Blair -- Jordan Blair was at.  I said, "Jordan, have

 7   you been looking at things on the Internet you shouldn't

 8   be looking at?"  He said, "No, I haven't."  I just held

 9   those documents out to him and I said, "What's this?  I

10   found it on the printer."  And by the look on his face he

11   knew he had been had.  And I said, "Is this going to

12   happen again?"  He said, "No."  It didn't happen again.

13        And, ladies and gentlemen, if I had known anything

14   about that, I would have done the same thing with

15   Mr. Springer and said, Mr. Springer, do you realize what

16   you're doing, that you're jeopardizing Oscar Stilley's

17   family?  And I'm absolutely confident that Mr. Springer

18   would have apologized and never done it again.

19        I'm going to tell you about some other people that

20   have come through our lives, my wife -- the life of my

21   wife and I.  One example would be Stacy Keller.  And let

22   me say this:  One of our favorite movies is something

23   called "Sea Biscuit."  And our favorite line from that

24   movie is "you don't throw away a life just because it has

25   been banged up a little bit."

 1          Stacy Keller was another client also suing the same

 2    abusive boarding school in Missouri because of their

 3    treatment of her.  She had also come and sought and found

 4    refuge in our house.  And her mental state had gotten so

 5    bad she cut, she was a cutter, all up and down her arms.

 6    You could see that she used a razor blade and she cut.

 7    It's a strange phenomenon, but she did it.  We worked

 8    with her, tried to help her, and we got the cutting way,

 9    way down from where it was, improved her mental state.

10          While she was in our house -- probably -- not

11    certainly but probably while she was in our house, she

12    got pregnant.  We didn't reject her.  We didn't

13    appreciate that, we didn't approve of it, but we didn't

14    reject her.  We didn't run her off.  We didn't say she

15    was bad.  She knew we disapproved -- I mean, we had

16    already said it.  We continued to love her and do the

17    best that we could for her.

18          The expert in that case testified that she had at a

19    point in her life spent 80 percent of her time in one

20    mental facility or another.  At some level, she was in a

21    mental facility 80 percent of the time.  The last I

22    heard, she was in college, nearly completed, doing well

23    in her classes, had actually been president of her class,

24    and I understand that she has been accepted for medical

25    school.

1      If I had known about any bad thing, not saying it's
2  a bad thing, but knowing about that maybe Mr. Springer
3  had been involved in some immorality, I would have
4  treated him the same way and say, look, I don't approve
5  of that, I don't think you should do that, but I would
6  not have rejected him.

7      Now, you've heard about the witnesses, various
8  witnesses saying certain things, and I don't want to take
9  too much time, but you're going to hear testimony about
10 that puts these things in perspective.  Let me give you
11 an example.  Jim Lake got up here and said that Oscar
12 Stilley just dumped me right before trial, it just felt
13 really bad.  That's not true.  That's not what happened.
14 Mr. Lake, 100 percent false testimony and, in addition,
15 unbelievable testimony.

16     Whether it was believable or not, it's unethical for
17 a lawyer to knowingly present false testimony.  So Oscar
18 Stilley made it clear that's not going to be done.
19 Mr. Lake chose to find somebody else to present that
20 testimony, put himself into a corner, but it was his
21 corner that he made.

22     Now, I'll go through the rest of them.  I don't
23 think it's necessary to talk to you about that.  I just
24 want you to see how we're going to go down this road.
25 And certainly there will be other things that will be

```
 1   stated to you and certainly I will state.  And I will

 2   testify under oath that at no time did I certainly not

 3   intentionally do any act that would violate any law.

 4       Thank you so much for your kind attention.

 5           THE COURT:  Thank you Mr. Stilley.

 6   Mr. Springer, we'll have your first witness.

 7           MR. SPRINGER:  Your Honor, I'd call Erika

 8   Dertien.

 9           THE COURT:  Very well.

10           MR. SPRINGER:  May I go get her, Your Honor?

11           THE COURT:  You may.

12                     ERIKA DERTIEN,

13   (WITNESS SWORN)

14                   DIRECT EXAMINATION

15   BY MR. SPRINGER:

16   Q.  Good afternoon.

17   A.  Good afternoon.

18   Q.  I'm Lindsey Springer.

19   A.  Uh-huh.

20   Q.  Would you please state your name for the record.

21   A.  Erika Dertien.

22   Q.  And could you -- where are you from, where do you

23   live?

24   A.  Spring Lake, Michigan.

25   Q.  Okay.  And --
```

1          THE COURT:  Please spell your last name.

2          THE WITNESS:  D-E-R-T-I-E-N.

3   Q.  (BY MR. SPRINGER)  And are you the proud daughter of

4   Andy Ouwenga and Karen Ouwenga?

5   A.  Yes, I am.

6   Q.  And do you also have a loving sister named Laurel?

7   A.  Uh-huh, I do.

8   Q.  Now, do you know Lindsey Springer?

9   A.  I do.

10  Q.  Okay.  And how -- do you see him in the courtroom

11  today?

12  A.  I do.

13  Q.  Please identify him for the record.

14  A.  You are standing talking to me.

15  Q.  And how did you first come to know Lindsey Springer?

16  A.  I believe it was through an acquaintance of my dad.

17  Q.  And could you name that acquaintance, please?

18  A.  Paul Van Couvering (ph).

19  Q.  And, specifically, Paul and your father had some

20  very interesting beliefs involving taxes, did they not?

21  A.  Yes, they did.

22  Q.  And at the time -- do you remember about what time

23  Paul first made contact with you?

24  A.  It would have been after my dad was detained.

25  Q.  After he was detained.  So it would be after he was

1  indicted?

2  A.   Yes.

3  Q.   Okay.  And as a result of Paul, did you and I have a

4  telephone conversation?

5  A.   Yes.

6  Q.   And as a result of that telephone conversation, did

7  Andy Ouwenga call you and you call me and did he, you,

8  and I have a three-way initial phone call?

9  A.   Yes, we did.

10 Q.   Okay.  And at the time of that telephone call, was

11 the purpose to find somebody who could represent your

12 mother in the criminal case that he and her were in?

13 A.   Yes, it was.

14 Q.   And the reason why that was something to be

15 considered, isn't it true, is because whatever Andy was

16 doing trying to represent her on his own was determined

17 by the family not to be in your mother's best interest,

18 correct?

19 A.   Correct.

20         THE COURT:  Hold on just a minute.

21         MR. O'REILLY:  Objection, Your Honor, leading.

22         THE COURT:  Sustained.

23 Q.   (BY MR. SPRINGER)  Your mother and your father were

24 both indicted for tax evasion, correct?

25 A.   Correct.

1   Q.   And your father owned a photography business; is

2   that correct?

3   A.   Yes.

4   Q.   And what did your mother do?

5   A.   She's a homemaker.

6   Q.   She stayed at home?

7   A.   Uh-huh.

8   Q.   And she was raising children; is that correct?

9   A.   Correct.

10  Q.   Did she also have two adopted children?

11  A.   She did.

12  Q.   Still does, does she not?

13  A.   She still does, uh-huh.

14  Q.   And -- but yet she was indicted for tax evasion?

15  A.   Yes.

16  Q.   Now, at some point in time, do you remember whether

17  in that three-way conversation or any three-way

18  conversation with Andy, you, and I, did the discussion

19  come up about how to hire an attorney?

20  A.   Yes.

21  Q.   And do you remember whether or not in the initial

22  conversation the intent was to hire Oscar Stilley?

23  A.   Yes, it was.

24  Q.   Have you ever met Oscar Stilley?

25  A.   No.

1  Q.  And at some point in time, hiring Oscar Stilley did

2  not appear to be something that was going to work; isn't

3  that true?

4  A.  True, yes.

5  Q.  And so did we have more conversations involving what

6  we were going to do, because if Oscar was not going to be

7  able to come in, we still needed to find a lawyer for

8  your mother, correct?

9  A.  Yes.

10  Q.  Now, in any of these conversations that we were

11  having to try to do this, did I ever ask you to pay me

12  for the service of trying to find a lawyer for your

13  mother or as your father was asking on those conference

14  calls?

15  A.  No.

16  Q.  Okay.  And as far as you know, at that time, there

17  had been no money give to Lindsey Springer by -- I

18  believe it was a trust account that your sister was

19  signature over; is that correct?

20  A.  Uh-huh.

21  Q.  Okay.  And eventually, then, isn't it true that

22  money was allocated for Mr. Barringer to come in and

23  represent your mother in her criminal case?  Is that

24  correct?

25  A.  Correct.

1           MR. O'REILLY:  Objection, Your Honor, basis of

2   knowledge.

3           THE COURT:  Was that last answer based on

4   matters that you know of your own personal knowledge?

5           THE WITNESS:  Could you rephrase that question

6   before I answer?

7   Q.  (BY MR. SPRINGER)  Are you aware of a conversation

8   between you and I, without Andy on the phone, where the

9   decision was to try to contact and hire Mr. Barringer?

10  A.   Yes.

11  Q.   And that was because Mr. Stilley was having

12  difficulty getting into court, correct?

13  A.   Correct, yes.

14  Q.   And at that time, there became a discussion about

15  how to pay Mr. Barringer; is that true?

16  A.   Yes.

17  Q.   And was it agreed -- first of all, who -- in the

18  event that money was needed for hiring Mr. Barringer,

19  explain to the jury the beginning process of how that

20  would work.

21  A.   To pay Mr. Barringer?

22  Q.   Yeah.  How would money go from somewhere that you

23  know of to Mr. Barringer's hands?

24  A.   It was more or less through conversations with my

25  dad that, yes, he wanted to hire Mr. Barringer to

```
 1  represent my mom.  My sister Laurel had the authority to
 2  write out a check for Mr. Barringer.  I was sort of the
 3  in-between person communicating all of this.
 4  Q.   And Laurel wasn't involved in any of those
 5  conversations --
 6  A.   No --
 7  Q.   -- that you know of, correct?
 8  A.   -- she wasn't.
 9  Q.   So basically all she would do is you would go to her
10  and say dad said Mom said and then --
11  A.   Right.
12           THE COURT:  Hold up just a minute.
13           MR. O'REILLY:  Leading, Your Honor.
14           THE COURT:  Sustained.
15           MR. SPRINGER:  Okay.
16  Q.   (BY MR. SPRINGER)  So is it true that in order to
17  get money to Mr. Barringer your dad would tell you the
18  amount of money to give Mr. Barringer?
19  A.   Uh-huh.
20           MR. O'REILLY:  Objection, leading.
21           THE COURT:  Sustained.
22           MR. SPRINGER:  May I have a moment, Your Honor?
23           THE COURT:  You may.
24  Q.   (BY MR. SPRINGER)  What would be the reason why you
25  would wish to get money to pay Mr. Barringer?
```

1   A.   To represent my mom.

2   Q.   And how would you do that?

3   A.   Through -- how would I get the money?

4   Q.   How would you get the money?

5   A.   I had continued conversations with my dad keeping

6   him up to date on conversations that I had had both with

7   you and Laurel.  More or less would have the A-okay from

8   my dad.  And I would proceed and call Laurel and let her

9   know what the amount was that was agreed upon.  And it

10  would go from there, I guess.

11  Q.   Did Lindsey Springer ever ask for any money?

12  A.   No.  No.

13  Q.   Okay.  Did there -- have we ever had, that you

14  participated in, any conversations with Andy involving

15  giving money to Bondage Breakers Ministries or Lindsey

16  Springer?

17          MR. O'REILLY:  Objection.  It appears to call

18  for hearsay.  I'm not sure, Your Honor.

19          THE COURT:  Bear with me just a moment.

20  Overruled.

21  Q.   (BY MR. SPRINGER)  You can answer the question.

22  A.   Your question was whether or not conversations were

23  done -- or conversations --

24  Q.   Did your father and you and I ever have any

25  conversation about giving any donations or gifts to

```
 1  Lindsey Springer of Bondage Breakers Ministries?
 2  A.   Yes, yes.
 3  Q.   And during those conversations, do you remember --
 4  strike that.  Did I clarify to your father the terms and
 5  conditions by which I would accept any money?
 6  A.   Yes.
 7         MR. O'REILLY:  Objection to the form of the
 8  question, Your Honor.  She can't testify whether he
 9  clarified it to her father.
10         THE COURT:  Well, you're talking about
11  conversations that you were a party to as well as your
12  father and Mr. Springer?
13         THE WITNESS:  Three-way conversations that we
14  had, yes.
15         THE COURT:  Explaining those conversations is
16  appropriate.  That's overruled.  And it has been
17  answered.  Next question.
18         MR. SPRINGER:  Thank you.  Could you pull up
19  Government's Exhibit Number 32, please.
20  Q.   (BY MR. SPRINGER)  Do you see Government's Exhibit
21  Number 32?
22  A.   Uh-huh, I do.
23  Q.   Have you seen that check before?
24  A.   I don't know if I personally saw it or not, I don't
25  know.
```

```
 1   Q.   Did you cause it to be issued?

 2   A.   I did.

 3            MR. O'REILLY:  Objection, Your Honor.  She said

 4   she hasn't seen the check.  How would she know if she

 5   caused it to be issued?

 6            THE COURT:  Overruled.

 7   Q.   (BY MR. SPRINGER)  Do you remember causing a check

 8   to be issued on October 14, 2003?

 9   A.   Yes, yes.

10   Q.   And do you remember what Andy told you -- or excuse

11   me, that Andy, you, and I had a conversation on a three-

12   way call had about what the purpose of this $50,000 was?

13   A.   Yes.

14   Q.   And what was that?

15   A.   It was for your help.

16   Q.   For my help?

17   A.   Yes.

18   Q.   And at that time, was there conversations about

19   Bondage Breakers Ministry?

20   A.   Yes.  I believe there was, yes.

21   Q.   Okay.  And do you remember Andy agreeing that the

22   money that he was giving or authorizing to be given here

23   was without any strings attached?

24   A.   Uh-huh.

25   Q.   And do you remember that that conversation -- those
```

ERIKA DERTIEN - REDIRECT BY MR. SPRINGER                    2172

1   conversations were -- excuse me, strike that.  Do you

2   remember that specific conversation was overly stated to

3   him on the phone call?

4   A.  Yes, it was given --

5         MR. O'REILLY:  Objection, Your Honor.  That's

6   about as leading as you can get.

7         THE COURT:  Sustained.

8         MR. SPRINGER:  Could you please put Government's

9   Exhibit Number 104 up, please.

10  Q.  (BY MR. SPRINGER)  Now, do you ever -- or excuse

11  me.  Did your father direct you to issue a check for

12  $50,000 on October 2, 2003, to Oscar Stilley?

13  A.  Yes.  Through my sister, yes.

14  Q.  And was that check to hire Oscar Stilley for his

15  legal representation of your mother?

16  A.  Yes, it was.

17        MR. SPRINGER:  Could you pull up Government's

18  Exhibit Number 109, please.

19  Q.  (BY MR. SPRINGER)  Would you have caused to be

20  issued a check for $25,000 on May 20, 2004, to Oscar

21  Stilley?

22  A.  Yes.

23  Q.  Was that also for hiring Oscar Stilley to

24  represent --

25  A.  My mom.

1  Q.   -- your mother?

2  A.   Uh-huh.

3  Q.   Now, at some point in time, you testified that Oscar

4  was not allowed to represent your mother, correct?

5  A.   Yes.

6            THE COURT:  Counsel will approach.

7       (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND

8  OUT OF THE HEARING OF THE JURY.)

9            THE COURT:  What testimony are you referring to?

10           MR. SPRINGER:  Testimony I referred to to her?

11           THE COURT:  You asked her and quoted at what

12  some point you testified.

13           MR. SPRINGER:  I thought she already said that

14  earlier that Oscar Stilley was not allowed to represent

15  her mother.

16           THE COURT:  So you're referring to her earlier

17  testimony today?

18           MR. SPRINGER:  Today, yes, sir.

19           MR. O'REILLY:  About ten minutes ago, Your

20  Honor.

21           THE COURT:  Okay.  Okay.  The reason I called

22  you up here is I thought this was an off-the-cuff

23  reference to grand jury testimony or other testimony.

24  You may proceed.

25           MR. SPRINGER:  Thank you, Your Honor.

```
 1        (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,
 2   WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE
 3   PRESENCE AND HEARING OF THE JURY.)
 4        THE COURT:  Proceed.
 5   Q.  (BY MR. SPRINGER)  Why did money continue to be sent
 6   to Oscar Stilley if he was no longer representing your
 7   mother, if you know?
 8   A.  I'm not positive of the dates exactly anymore.  At
 9   some point, knowing that we had -- an attorney had to be
10   in place for my mom and then at some -- during this time,
11   we did not know where Oscar sat in Michigan in the court.
12   Q.  Did Mr. Barringer, then, get paid from Oscar Stilley
13   for representing your mother?
14        MR. O'REILLY:  Objection, Your Honor.  How would
15   she know?
16        THE COURT:  Establish whether she knows or not.
17   Q.  (BY MR. SPRINGER)  Do you know whether Mr. Barringer
18   was paid to represent your mother from Oscar Stilley's
19   office?
20   A.  That is what had been explained, yes, is that even
21   though the check was made out initially to Oscar, if --
22        THE COURT:  Wait just a minute.
23        MR. O'REILLY:  Your Honor, she said that's what
24   was explained to her, which means it's hearsay, Your
25   Honor.
```

```
 1              THE COURT:  Sustained.
 2              MR. SPRINGER:  Okay.
 3   Q.  (BY MR. SPRINGER)  Do you know how Mr. Barringer
 4   received payment for his services for your mother?
 5   A.  As far as beyond that point?
 6   Q.  At that point.
 7   A.  At that point?
 8   Q.  Uh-huh.
 9   A.  It was from Oscar Stilley.
10   Q.  Do you remember having any conversation about that
11   subject with Lindsey Springer?
12   A.  Yes.
13   Q.  And what do you remember?
14   A.  Well, I remember because Oscar, we weren't sure of
15   his status in Michigan.  Even when the check was made out
16   to Oscar, it was with the understanding that if he could
17   not represent my mom that the funds would be transferred
18   to Barringer so that he could represent my mom.
19   Q.  Do you know whether Mr. Barringer was paid
20   representing your mother?
21   A.  I was --
22              MR. O'REILLY:  Objection.  Asked and answered.
23              THE COURT:  Overruled.
24              THE WITNESS:  I can answer?  I'm assuming that
25   Barringer came to represent my mom.
```

```
 1            MR. SPRINGER:  Could you pull up Government's
 2   Exhibit Number 40, please.
 3            MR. O'REILLY:  What number?
 4            MR. SPRINGER:  Forty.
 5            MR. O'REILLY:  Four, zero.
 6   Q.  (BY MR. SPRINGER)  Now, did you cause to be issued
 7   to Lindsey Springer a check for $25,000 on June 23, 2004?
 8   A.  Yes.
 9   Q.  And did you write "donation" on that check, if you
10   know?
11   A.  Did I -- I'm sorry?
12   Q.  Did you write "donation" on that check?
13   A.  Did I write "donation"?
14   Q.  Do you see Government's Exhibit Number 40 in front
15   of you?
16   A.  I do not recall writing that on there.
17   Q.  Is Government's Exhibit Number 40 dated June 23,
18   2004, intended to be a donation?
19   A.  Yes, it was.
20            MR. SPRINGER:  Could you please pull up
21   Government's Exhibit Number 44, please.
22   Q.  (BY MR. SPRINGER)  Did you cause on October 28,
23   2004, to have a check issued to Lindsey Springer in the
24   amount of $15,000?
25   A.  Yes.
```

1  Q.  Was Government's Exhibit Number 44 that's before you

2  on the screen, was that also intended to be a donation?

3  A.  Yes.

4  Q.  Now, did paying attorney's fees for your mother

5  eventually become difficult with your -- in getting your

6  father's approval?

7  A.  Yes.

8  Q.  And as a result of that, what happened?

9  A.  There came a point where my dad wasn't sure in which

10 direction for his own case which way he was going to go,

11 which then, of course, reflected him to decide which way

12 he wanted my mom's case to go.  When he had stated to

13 me --

14         MR. O'REILLY:  Objection, Your Honor.  Calls for

15 hearsay at this point.

16         THE COURT:  Sustained.

17 Q.  (BY MR. SPRINGER)  Did your dad direct you to -- did

18 you direct -- did you have anything to do with not paying

19 any more attorney's fees for your mother?  Did you have

20 anything to do with it?

21 A.  Did I have anything to do with it?

22 Q.  Yes.

23 A.  Well, I guess indirectly, yes.

24 Q.  Were you doing what you were told to do?

25 A.  Yes, uh-huh.

 1   Q.   Now, have you had conversations with your sister

 2   Laurel in regard to issuance of checks?

 3   A.   Uh-huh.

 4   Q.   Okay.

 5   A.   Yes.

 6   Q.   And did you ever participate in any conversation

 7   with me and anyone else -- excuse me, strike that.  Have

 8   you ever participated in a conversation with Lindsey

 9   Springer regarding me demanding to be paid and, if I

10   didn't get paid, I had threatened to put a lien on your

11   sister's house?

12   A.   No.

13   Q.   Do you know how that situation arose?

14   A.   I do.

15   Q.   Could you please explain it to the Court and the

16   jury.

17           MR. O'REILLY:  Objection.  I'd like to know the

18   basis of knowledge, Your Honor, if it's hearsay.

19           THE COURT:  Testify only on the basis of your

20   firsthand knowledge.  Go ahead.

21           THE WITNESS:  Okay.  Because of -- okay.

22   Because of my dad not thinking he wanted to pay Barringer

23   anymore for his services to proceed in my mom's case the

24   -- my mom wanted to proceed even in spite of my dad.  And

25   so we were trying to figure out how to proceed, even as a

```
 1  family trying to decide how to proceed if Dad didn't want
 2  to pay, he wouldn't agree to it.  The only possible
 3  solution that we could come up with was we would have to
 4  somehow show that she couldn't pay for Barringer.  I
 5  don't know, you know, to the degree of details --
 6  Q.  (BY MR. SPRINGER)  Okay.  Let me stop you there.
 7  Was your mother -- excuse me, strike that.  Was the issue
 8  that you were considering to have to fill out an
 9  affidavit?
10  A.  Right.
11  Q.  Which stated that your mother was impoverished?
12  A.  Right.  We would have to --
13          MR. O'REILLY:  Objection, leading.
14          THE COURT:  Sustained.
15  Q.  (BY MR. SPRINGER)  Was your mother impoverished at
16  the time that your father directed no more money to be
17  paid?
18  A.  Well, I will say yes and no.  Yes from the
19  standpoint that my mom had no financial, up until that
20  point, say on where the money went.
21  Q.  Okay.
22  A.  Was there money there to be used?  Yes.
23  Q.  Okay.  Was there quite a bit of money?
24  A.  You know, even now I don't know exactly how much
25  money was there because, again, I didn't see the books,
```

```
 1  Laurel did.
 2  Q.   Okay.  And was your sister confused about the -- me
 3  stating that I would put a lien on her house?
 4          MR. O'REILLY:  Objection, Your Honor.  How would
 5  Ms. Dertien know if Ms. Gardner was confused?  She was
 6  here, she testified, that was the opportunity to cross.
 7          THE COURT:  Sustained.
 8  Q.   (BY MR. SPRINGER)  Did you have a disagreement with
 9  your sister over the threat of putting a lien against her
10  house?
11  A.   Yes.
12  Q.   And what was that disagreement about?
13  A.   Through our conversations she had a misunderstanding
14  of what was actually said -- at least from what I think
15  was actually said.
16  Q.   And what did you know that was said?
17  A.   What I --
18          MR. O'REILLY:  Objection.  If what Ms. Dertien
19  understood was said, I have no objection.
20          THE COURT:  Well, the question is, what did this
21  witness know was said.  That's an appropriate question.
22  That objection will be overruled.  You may answer.
23          THE WITNESS:  Through the course of trying to
24  decide how to pay for Mom's attorney, it was presented
25  that if an affidavit -- even if an affidavit was drawn up
```

```
 1  to show that she was indigent and the Court might
 2  perceive that as not being truthful because of the trust
 3  money or the money that was in the trust, the concern was
 4  then how would -- gosh, I don't -- my thoughts are going.
 5  Q.   (BY MR. SPRINGER)  Do you know a government attorney
 6  by the name of Don Davis?
 7  A.   Yes.
 8  Q.   Was he involved in the concern that you had?
 9  A.   Yes.  It was -- the concern was that the government
10  would look at my mom as not being truthful and by --
11  because of the money in the account.  But the -- it
12  came -- I don't know how to explain how it came out with
13  the understanding that if it was proven that she had the
14  money but didn't use it that the government would
15  actually then put the lien on the property.
16  Q.   On Karen Ouwenga's property?
17  A.   Yes, my parents' property.
18  Q.   Not your sister's house?
19  A.   Not my sister's property.  It was -- it was with
20  the -- the fear, I guess, was is that if that was done,
21  it would be perceived -- the government would want to get
22  paid for paying for Barringer.  And so the lien would be,
23  I guess, the government's -- I don't know how -- what you
24  would call that, whatever that is -- interest.
25  Q.   Has your father Andy been the source of a lot of
```

ERIKA DERTIEN - CROSS BY MR. O'REILLY                    2182

```
 1  difficulty in regard to your family in the last five or

 2  six years?

 3  A.   Uh-huh.

 4        MR. O'REILLY:  Your Honor, we need a verbal

 5  response.

 6        THE WITNESS:  Yes.  I'm sorry.

 7  Q.   (BY MR. SPRINGER)  Have you noticed his behaviors

 8  have changed since he met me?

 9  A.   Yes.

10  Q.   Before you met me, had you all -- had you and your

11  family concluded that he may be -- and he may be beyond

12  help?

13  A.   Yes.

14        MR. O'REILLY:  Objection, Your Honor, leading.

15        THE COURT:  Sustained.

16        MR. SPRINGER:  I have no more further questions,

17  Your Honor.

18        THE COURT:  Mr. Stilley.

19        MR. STILLEY:  No questions.

20        THE COURT:  Cross-examination.

21               CROSS-EXAMINATION

22  BY MR. O'REILLY:

23  Q.   Good afternoon, Ms. Dertien.

24  A.   Good afternoon.

25  Q.   Could you spell your first name for the court
```

```
 1   reporter as well.
 2   A.   Uh-huh.  E-R-I-K-A.
 3           THE WITNESS:  Could I get a glass of water,
 4   please?
 5           MR. O'REILLY:  Absolutely.
 6           THE COURT:  You surely may.
 7           THE WITNESS:  Thank you.
 8           THE COURT:  Pam, can you help with that.  Go
 9   ahead.
10   Q.   (BY MR. O'REILLY)  Ms. Dertien, you testified that
11   you were -- it wasn't so much that you were running out
12   of money, but you had gone through a lot of money and
13   needed to have more money to pay Mr. Barringer for your
14   mother?
15   A.   Yes.
16   Q.   Do you have any idea how much you had paid, and I
17   should say that Laurel and your father had paid, to
18   Mr. Springer by that time?
19   A.   No.  I hadn't tallied it up, no.
20   Q.   Would it surprise you to know that it was $75,000?
21   Actually, I think I'm understating that.  I think it was
22   $90,000.
23   A.   You asked me if I knew?
24   Q.   Did you know that?
25   A.   No, I didn't.
```

```
 1   Q.   Did you want Mr. Springer to help your mom?

 2   A.   Uh-huh.

 3   Q.   How was Mr. Springer going to help your mom?

 4   A.   I guess the best way to answer that would be advice,

 5   just talking with them.

 6   Q.   Helping her attorney, Mr. Barringer or Mr. Stilley?

 7   A.   Yeah, uh-huh.

 8   Q.   How is it that you found Mr. Stilley, if you know?

 9   A.   Through Lindsey, Mr. Springer.

10   Q.   Okay.

11   A.   Mr. Springer.

12   Q.   And do you know how you found Mr. Barringer?

13   A.   Through Mr. Springer.

14           MR. O'REILLY:  If I may have a moment, Your

15   Honor.

16           THE COURT:  You may.

17           MR. O'REILLY:  Nothing further.

18           THE COURT:  Recross limited to redirect -- or

19   I'm sorry, redirect limited to cross.

20                    REDIRECT EXAMINATION

21   BY MR. SPRINGER:

22   Q.   Are you glad Bondage Breakers Ministries exists?

23   A.   Yes.

24           MR. SPRINGER:  No further questions, Your Honor.

25           THE COURT:  Mr. Stilley.
```

```
 1            MR. STILLEY:  No questions.

 2            THE COURT:  Very well.  Any recross?

 3            MR. O'REILLY:  No, Your Honor.

 4            THE COURT:  You may step down.

 5            THE WITNESS:  Thank you.

 6            THE COURT:  Counsel and the parties will

 7  approach.

 8       (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND

 9  OUT OF THE HEARING OF THE JURY.)

10            THE COURT:  Who else do you have here?

11            MR. SPRINGER:  Paul Stumpo.

12            THE COURT:  Where is he from?

13            MR. SPRINGER:  Michigan.

14            THE COURT:  Nine minutes till five, I'm a little

15  dubious about getting started with him.

16            MR. SPRINGER:  Forty-five minutes.

17            THE COURT:  We just can't do that.  We can't do

18  that today.  Very well.

19       (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

20  WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

21  PRESENCE AND HEARING OF THE JURY.)

22            THE COURT:  Members of the jury, we're going to

23  recess at this point, being about eight minutes until

24  five.  Of course, I'm sure I don't need to remind you of

25  what I told you a few days ago about the fact that we
```

```
 1   will not be holding court tomorrow, so tomorrow is a day
 2   for you to go on about your day jobs, if you will, your
 3   regular business, and I know that there's probably not
 4   much objection to that.  We will resume promptly at nine
 5   o'clock Monday morning.
 6       Let me give you a preview of one thing I know for
 7   certain about next week and that is that Wednesday is
 8   Veterans Day.  I don't know that this case will still be
 9   in progress on Wednesday.  We'll see.  That's not a
10   matter within my control.  But another matter that is
11   regrettably absolutely not within my control is that even
12   if we all wanted to, we could not hold court on Wednesday
13   of next week because under the law this courthouse is
14   closed for Veterans Day.
15       So we will certainly be here Monday.  I expect we
16   will be here Tuesday.  Whether we will be required to be
17   back here on Thursday depends on a number of matters that
18   are simply not knowable at this point.
19       I think I can safely say that this case will be
20   finished up next week.  But whether it's finished up
21   before Wednesday or after Wednesday really does depend on
22   some matters that are beyond my control and which
23   probably no one can really have a good handle on at this
24   point.
25       So I will expect, of course, everyone to be back
```

1    here ready to go nine o'clock Monday morning.  Please do

2    your very best to be punctual and to be available for the

3    security officer to return to the courtroom with you a

4    little before nine o'clock Monday morning.

5        Now, you've got three days and you have three days

6    to think about other things.  And I emphasize that.  As

7    tempting as it may be even to think about the case, as

8    tempting as it may be to undertake independent

9    investigation, as tempting as it may be to reach

10   conclusions about this case, the next three days are

11   great days just to think about other things and do other

12   things.  And I certainly do repeat with emphasis those

13   three bedrock rules that apply to your service as jurors.

14       You've got close to two weeks invested in this case

15   now.  I sincerely appreciate and, on behalf of the Court,

16   do sincerely thank you for your days of service to this

17   Court.  I hope you have a great three days.  Look forward

18   to seeing you back promptly at nine o'clock on Monday.

19       All persons in the courtroom will remain seated

20   while the jury departs.

21       (JURY EXITS THE COURTROOM)

22           THE COURT:  Okay.  The jury has left the

23   courtroom.  If one or the other or both of the defendants

24   have a Rule 29 motion, I will entertain that at this

25   time.  I expect you to be concise.

```
 1              MR. SPRINGER:  Your Honor, I move under Rule 29
 2   for a directed verdict or judgment of acquittal as to
 3   Count 1.  The government has entered evidence that
 4   Mr. Stilley and I knew each other, communicated a lot but
 5   don't really know what the communications were about and
 6   that Mr. Stilley did what he was directed to do.  And
 7   they have, in my opinion, and I believe the record shows,
 8   that they have failed to establish that Mr. Stilley and I
 9   entered into an agreement to defraud the IRS out of any
10   information that they could say was impeding, impairing,
11   obstructing, or defeating any lawful function of the IRS
12   in the computation, ascertainment, assessment, and
13   collection of income taxes.  In fact, I believe the
14   testimony is that other than Mr. Shern's grand jury
15   investigation there has been no evidence that anybody was
16   looking for anything.  And I do realize --
17              THE COURT:  I take it you, at least, acknowledge
18   that the indictment alleges fraud.
19              MR. SPRINGER:  Oh, yes, sir.  I -- no comment
20   except, yes, sir.
21              THE COURT:  Okay.  Go ahead.
22              MR. SPRINGER:  Yes, sir.  By "craftiness,
23   trickiness, or dishonest means," I believe is the phrase
24   the Court added to the jury instruction last night,
25   Hammerschmidt.  But they failed to identify who it was
```

1    crafty to or what was crafty about it.  I mean, I heard
2    what Mr. Miller said, but he based a lot of his testimony
3    off of his lack of knowledge of what an IOLTA account is
4    and clearly said at the end that he actually doesn't know
5    how that whole system works, which in itself seems to be
6    interesting.
7         And when you get to the overt acts that they've
8    alleged, and I heard what Mr. Miller's summary was, but
9    what they failed to do is demonstrate -- and beginning in
10   2000 is where they stated, but they failed to show any
11   evidence other than Mr. Miller's testimony that Oscar and
12   I talked on the phone that we had any agreement to do
13   anything, let alone whether it was an agreement to
14   defraud the United States.  And that becomes, in my
15   opinion, the heart of their theory of the case.
16        Now, again, Mr. Miller relied solely on the IOLTA
17   account and what its purpose should be for to suggest
18   that the transactions were not done the way they should
19   have been done.
20             THE COURT:  Now, bear in mind, Mr. Miller's
21   testimony under the ground rules under which he
22   testified, his testimony, per se, is almost completely
23   meaningless for Rule 29 purposes.
24             MR. SPRINGER:  Well, yes, but it does highlight
25   the evidence, Your Honor, and I agree with -- when he

 1   said he didn't know about what the IOLTA account was for,

 2   I believe the government never established anything about

 3   that IOLTA account.  In fact --

 4            THE COURT:  Now, Mr. Springer, I'm not going to

 5   cut you off.  I'm going to let you go as long as you

 6   want, but bear in mind the standard by which I evaluate

 7   the evidence at this point under a Rule 29 motion is that

 8   I am required to view the evidence in the light most

 9   favorable to the government.

10            MR. SPRINGER:  I understand.

11            THE COURT:  So this is not time for your closing

12   argument.

13            MR. SPRINGER:  Okay.  Very good.

14            THE COURT:  Secondly, and I don't know if you're

15   going to return to this subject, but lest you return to

16   this subject, let me remind you that the cases are legion

17   that say that a conspiracy need not be proven by direct

18   evidence, that it can be inferred from all the

19   circumstances, which I am required under Rule 29 to do,

20   viewing the evidence in the light most favorable to the

21   government.

22            MR. SPRINGER:  Then --

23            THE COURT:  So, please, if you want your motion

24   to be cognizable under Rule 29, you need to bear in mind

25   those fundamental rules.

 1           MR. SPRINGER:  Okay.  Your Honor, I would just

 2   stand on my argument on Count 1.  And now as far as to

 3   Count 2, 3, and 4, I will start with Count 4 because it

 4   is the year of 2005 that the government has alleged that

 5   there was gross income earned by Lindsey Springer for

 6   services rendered -- for services to be rendered, as the

 7   Court has modified that instruction, and the only sole

 8   testimony in this case about that transaction has been

 9   Mr. Turner from that seat, and he testified that it was a

10   loan.

11           However, the government doesn't like how it was

12   crafted or the ambiguity of it.  And although Mr. Turner

13   said he was disappointed, he still said that I had every

14   right under the loan agreement to do what I did.  And at

15   no time did he say he was paying me or did pay me for

16   anything on that transaction, and that is the sole basis

17   originally up until the $10,000 addition last night that

18   we discussed, it's the sole basis by which Count 4 was

19   brought.

20           And even if the Court allows the government to

21   modify and add a $10,000 check, the chart that they've

22   proposed before Mr. Miller changed his mind suggested it

23   didn't even get over the threshold amount.  There wasn't

24   even a requirement to file a return as long as the

25   $250,000 is a loan.  And that in itself should end Count

1    4 if -- especially if we're not taking Mr. Miller's

2    characterization of how he decided that I was not going

3    to pay it back because of how I -- how Mrs. Hawkins

4    decided that I asked for -- I think she said $500,000 or

5    something for bringing a lawsuit.  And so I believe the

6    government has not entered any evidence, let alone find

7    in the light most favorable to them, as to whether or not

8    that that transaction was a loan or not.

9         Now, going back to Count 2, the government has an

10   initial burden on Count 2, which is for the year 2000.

11   They must demonstrate an affirmative act in furtherance

12   of a conspiracy to -- excuse me, furtherance of the

13   attempt to evade taxes within six years.  And they never

14   even established by any direct testimony when any of the

15   returns for -- a return for 2000 would even have been

16   required to be filed, let alone did they ever say what

17   return was required by law to be filed.  They never

18   tendered a document that purports to be a request from

19   Lindsey Springer for the year 2000 to answer questions on

20   the form.

21        But setting that aside, what act did they allege in

22   Count 2 that they have at least presented some colorable

23   argument to the jury that they could hang their hat on

24   within the last six years?  Now, they do have an aiding

25   and abetting charge against Oscar Stilley and I believe

1   Count 2 splits that apart and I believe the only

2   statement that has been made with regard to that is the

3   false statement that I allegedly made to Mr. Shern on

4   September 16, 2005, and Mr. Stilley stated to the grand

5   jury on March 6, 2006.

6       And, quite frankly, Your Honor, there is no way that

7   transactions in cashier's checks or money orders or IOLTA

8   business in 2001, 2002, 2003, 2004, or 2005 can have any

9   bearing on a tax evasion theory for 2000.  The only way

10  that they can extend Count 2 is by some alleged

11  affirmative act that they've presented evidence to this

12  Court of specifically.

13      There are no charts of affirmative acts that the

14  government presented in their summary witness or through

15  Mr. Shern or any other witness that could say here is the

16  act Springer did within the last six years attempting to

17  evade the tax for 2000, the substantial tax liability for

18  2000.  Not one.  And although they've entered evidence

19  for the year 2001, that's not charged in the indictment,

20  so --

21          THE COURT:  What is the applicable period of

22  limitations for the 7201 count in Count 2?

23          MR. SPRINGER:  There is a division among the

24  circuits on that, but from my argument, I accept the

25  Tenth Circuit's position, which is six years, Your Honor.

1          MR. O'REILLY:  Your Honor, there's no division

2    in the circuits.  It is six years.

3          THE COURT:  Okay.  Well, you'll get your turn if

4    need be.

5          MR. SPRINGER:  Okay.  So as far as Count 2 goes,

6    we're needing to have some act that I took to evade the

7    taxes in 2000, specifically, to evade the taxes alleged

8    in 2000 that the jury can consider as an affirmative act

9    to evade the tax that was owed in 2000.  And the

10   government rested and not one witness, not one shred of

11   evidence, no chart that says here they are, nothing.

12       And then I go to Count 3, Your Honor.  And Count 3

13   is a tax evasion charge for the year 2003.  And I don't

14   have a statute of limitations dog in that count.  That

15   count definitely has been brought within six years of the

16   allegation.

17       But here is the key to follow on the affirmative act

18   side of Count 3:  The government needs to establish that

19   I committed some act in furtherance of an attempt to

20   evade a tax or substantial tax liability that is owed

21   from the calendar year 2003.  And, again, they didn't

22   offer a scintilla of evidence that said here is the money

23   that Mr. Springer for 2003 received and here are the acts

24   of attempted evasion of us trying to collect that money

25   or trying to ascertain that money.  And, remember, from

1  my perspective, it's an attempt to evade and not the fact

2  of evasion itself.

3           THE COURT:  So I take it you're telling me that

4  we don't have any evidence that you directed individuals

5  to make checks payable to Bondage Breakers Ministry or

6  any evidence that you used a check cashing business to

7  cash checks or any evidence that you were involved with

8  disposing of the coins as payment for your services.

9  You're saying --

10          MR. SPRINGER:  No, I did not say that.  But they

11  never said that those -- they never were able to show by

12  any direct testimony how those acts in and of themselves

13  furthered or attempted -- remember, I'm coming from the

14  affirmative act position of the tax evasion charge --

15  that furthered the attempt to evade the tax.

16          THE COURT:  Mr. Springer, I really don't want to

17  be rude to you, but you have entirely misconceived the

18  standard which I am required to apply on this motion.

19  That's the law whether I like it or not.  And it's the

20  law whether you like it or not.  I'm required to view the

21  evidence in the light most favorable to the government

22  and to resolve all doubts at this stage in favor of the

23  government.  And it really doesn't help your cause for me

24  to be sitting here listening to your closing argument.

25          MR. SPRINGER:  I apologize, Your Honor.  I'll

1   finish with the last two and then I'll sit down.  And
2   really the last two do have a way of reaching back into
3   all the charges because Counts 5 and 6 are willful
4   failure to file a tax return as required by law.  And the
5   government has not tendered any evidence to this Court of
6   any specific tax return form that I was required by law
7   to file for any of the years alleged in the indictment.
8   We all saw Mr. Miller's expert testimony on that.
9        So in that respect, I believe the government has
10  failed to establish that the conduct which I have been
11  charged for, which is willful failure to file a U.S.
12  individual income tax return, I believe those are the
13  words, and Mr. Miller even testified that there was a
14  1040 -- there's plenty of other documents, but he just
15  couldn't specifically remember what they were.  So they
16  have no testimony that I was specifically required to
17  file a U.S. individual income tax return for any of the
18  years as alleged by the grand jury in the indictment of
19  each count.  Thank you, Your Honor.
20           THE COURT:  Thank you, Mr. Springer.
21  Mr. Stilley.
22           MR. STILLEY:  Your Honor, I'd start with the
23  premise that an attorney would have a right to believe
24  the assertions by its own clients that money was a
25  donation or a loan to rely on that and make the

1  distributions as his clients directed.  Now, I'm not

2  going to argue about what might happen in another case,

3  whether there was evidence of a wink-wink and a nudge-

4  nudge, you know, the lawyer was told that this was

5  subterfuge.  But the government has not put any evidence

6  on that somebody -- that there's a fact that impinged on

7  Oscar Stilley's consciousness indicating that these

8  transfers were anything but bona fide in good faith.

9      Now, you know about the withdrawn subpoena.  And I'm

10  presuming, as I think that you expect me to, that you

11  have a good grasp on the facts of this case and,

12  obviously, you don't want me to regurgitate things that

13  are already out there.

14      The indictment lists a lot of acts, but as your

15  instructions say, they have to be in furtherance of a

16  conspiracy.  And what I would say to this Court and argue

17  is that the acts weren't illegal and there's not evidence

18  sufficient to show that Oscar Stilley entered into an

19  agreement with anybody else to violate any law.  And it

20  seems to me that you would have to have one of the two,

21  either an illegal act or an agreement to violate some of

22  the law.

23          THE COURT:  Is it your contention that the acts

24  in furtherance must be in and of themselves illegal?

25          MR. STILLEY:  Not per se, Your Honor.  I

1    understand what the law says on that.

2         THE COURT:  Continue.

3         MR. STILLEY:  Certainly.  And with respect -- of

4    course, I'm not dropping the legal arguments that I've

5    made previously, but this Court well knows those legal

6    arguments.

7        Moving on to Counts 3 and 4, I would also say there

8    that -- well, the witness -- and I understand the

9    significance of Mr. Miller, but it's clear that there's

10   no evidence that Oscar Stilley got -- helped Mr. Springer

11   evade his tax.  In other words -- or -- well, actually,

12   that's the way that I would put it, I do not see any

13   evidence that whereby a reasonable fact-finder could say

14   Oscar Stilley committed an affirmative act to help

15   Mr. Springer evade his taxes.  Thank you, Judge.

16        THE COURT:  Thank you.  In considering a motion

17   for judgment of acquittal, the Court views the evidence

18   in the light most favorable to the government.  Judgment

19   of acquittal is proper only if the evidence and all

20   inferences to be drawn from it is insufficient to permit

21   a rational trier-of-fact to find the essential elements

22   of the offenses charged to have been proven beyond a

23   reasonable doubt.  I also bear in mind that the evidence

24   must be substantial and not raise a mere suspicion of

25   guilt.

1       The defendants' Rule 29 motions are in all things

2   denied.  So, obviously, we'll continue with the

3   defendants' presentation of evidence Monday morning.

4       I would invite -- so that I can, if nothing else,

5   give the jury a little more guidance to the extent that

6   that's reasonably possible, I would invite the defendants

7   to give me just an overview of what we might expect.  You

8   don't necessarily have to identify your witnesses as

9   such, but give me an overview, if you would, of what we

10   might expect the first of the week so that as soon as

11   it's reasonable to do so I can give the jury some

12   guidance as to whether they can expect the matter to go

13   past Tuesday.

14          MR. SPRINGER:  I am definitely trying to keep

15   everything by Tuesday close for my defense.  There are a

16   couple of things I can see that may go longer or that may

17   get cut depending on how things go, but I would

18   anticipate that two good days of evidence -- if I take

19   the stand, Your Honor, I anticipate I'll be on the stand

20   for quite some time, so that may have some bearing on

21   whether I did go over past Tuesday or whether I did not.

22   As it stands right now, that's about as close as I think

23   I can get.

24          THE COURT:  I certainly understand that and I

25   would not want anyone to understand the Court to be

```
 1   imposing limits.  That would be entirely inappropriate.
 2   I'm simply, at this point, asking questions.
 3       Now, I will give you one piece of friendly advice,
 4   Mr. Springer, and that is you've got three days within
 5   which to hone the Paperwork Reduction Act part of your
 6   case down to 30 or 45 minutes.  If it consumes much more
 7   than that, then I think I will have a responsibility to
 8   intervene.  So you've got some time to work on that.
 9   You've got three days to get that honed, if you will, and
10   I think you would be well-advised to take advantage of
11   that opportunity.
12       Mr. Stilley, again, certainly without any obligation
13   on your part to tell me the particulars of the case you
14   intend to present, I'll invite you to give me some
15   overall guidance as to what we might expect the first of
16   the week timewise.
17           MR. STILLEY:  Your Honor, I really think that
18   Mr. Springer is speaking for both of us when he says that
19   he anticipates finishing up within two days.  I think
20   that the testimony that I would intend to present -- and
21   I'm inclined to -- well, I think that the way that this
22   is probably going to proceed is that Lindsey Springer
23   would call Oscar Stilley and do Q and A.  So -- and I
24   don't mean to belabor the point.  I'm thinking two days
25   should work.
```

 1          THE COURT:  Okay.  Very well.  Now, if it's all
 2    in by the latter part of the day Tuesday, I may well on
 3    Monday forewarn the jury that we may run long on
 4    Tuesday.  I tend to be guided by the desires of the jury
 5    on that score.  If the case goes to the jury the latter
 6    part of the day Tuesday, they may want to work late.  And
 7    that will be their choice.
 8       Anything else we ought to take up before we recess
 9    until nine o'clock Monday morning?
10          MR. O'REILLY:  Yes, Your Honor.  The Court
11    requested we have a suggested venue instruction by
12    tomorrow morning.  Given that we aren't going to be
13    finishing up until like Tuesday at the earliest, could we
14    push that off until Monday, Monday morning at 8:30?  I
15    just want to make sure we get it right.
16          THE COURT:  Well, I need to be working on this
17    this weekend.
18          MR. O'REILLY:  Your Honor, if we could do it
19    tomorrow afternoon, that's --
20          THE COURT:  Both sides have until Sunday after
21    church to submit your proposed venue instructions.  And
22    what I mean by that is I don't plan to lift a finger on
23    this until Sunday afternoon.  I do plan to focus on
24    finalizing the instructions on Sunday afternoon.  So one
25    o'clock Sunday for both sides will be just fine.

1          MR. SPRINGER:  Thank you, Your Honor.

2          THE COURT:  Anything further we ought to take up

3    before we recess until Monday morning?

4          MR. O'REILLY:  No, Your Honor.

5          MR. SPRINGER:  No, Your Honor.

6          THE COURT:  Very well.  Court will be in recess.

7       (COURT ADJOURNED FOR THE EVENING RECESS. FOR FURTHER

8    JURY TRIAL PROCEEDINGS, PLEASE SEE VOLUME X.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25