1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE NORTHERN DISTRICT OF OKLAHOMA

3

4    UNITED STATES OF AMERICA,

5             Plaintiff,

6    vs.                         Case No. CR-09-43-SPF

7    LINDSEY KENT SPRINGER and
     OSCAR AMOS STILLEY,
8
              Defendants.
9    _____

10

11

12

13

14

15            TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16          BEFORE THE HONORABLE STEPHEN P. FRIOT

17             UNITED STATES DISTRICT JUDGE

18                 NOVEMBER 9, 2009

19                 VOLUME X OF XIV

20

21

22

23

24

25

*Tracy Washbourne, RDR, CRR*
United States Court Reporter
U.S. Courthouse, 200 N.W. 4th St.
Oklahoma City, OK 73102 * 405.609.5505

```
 1   APPEARANCES:

 2   FOR THE GOVERNMENT:
                           Mr. Charles Anthony O'Reilly
 3                         U.S. Department of Justice
                           PO Box 972
 4                         Washington, DC 20044

 5                         Mr. Kenneth P. Snoke
                           U.S. Attorney's Office (Tulsa)
 6                         110 W. 7th Street, Ste. 300
                           Tulsa, OK 74119
 7

 8
     FOR DEFENDANT SPRINGER:
 9                         Mr. Lindsey Kent Springer
                           5147 S. Harvard Ave.
10                         Ste. 116
                           Tulsa, OK 74135
11
                           Mr. Robert Scott Williams
12                         Taylor Ryan Schmidt & Van Dalsem
                           1437 S. Boulder Ave., Ste. 850
13                         Tulsa, OK 74119

14   FOR DEFENDANT STILLEY:
                           Mr. Oscar Amos Stilley
15                         7103 Race Track Loop
                           Fort Smith, AR 72901
16
                           Mr. Charles Robert Burton, IV
17                         Burton Law Firm, PC
                           320 S. Boston, Ste. 2400
18                         Tulsa, OK 74103

19

20

21

22

23

24

25
```

```
 1                       EXAMINATION INDEX

 2
    PAUL STUMPO
 3       DIRECT BY MR. SPRINGER          2209
         CROSS BY MR. O'REILLY           2238
 4       CROSS BY MR. STILLEY            2250
         REDIRECT BY MR. SPRINGER        2251
 5       RECROSS BY MR. O'REILLY         2257

 6  PATRICK TURNER
         DIRECT BY MR. SPRINGER          2258
 7       CROSS BY MR. O'REILLY           2290
         REDIRECT BY MR. SPRINGER        2307
 8       RECROSS BY MR. STILLEY          2311

 9  RICHARD MARRS
         DIRECT BY MR. SPRINGER          2320
10       CROSS BY MR. STILLEY            2329
         CROSS BY MR. SNOKE              2330
11       REDIRECT BY MR. SPRINGER        2335

12  MICHAEL BURT
         DIRECT BY MR. SPRINGER          2338
13
    DENNY PATRIDGE
14       DIRECT BY MR. SPRINGER          2351
         CROSS BY MR. SNOKE              2355
15       REDIRECT BY MR. SPRINGER        2357

16  BRIAN SHERN
         DIRECT BY MR. SPRINGER          2360
17       CROSS BY MR. STILLEY            2383
         CROSS BY MR. O'REILLY           2388
18       REDIRECT BY MR. SPRINGER        2390
         RECROSS BY MR. STILLEY          2394
19
    OSCAR STILLEY
20       DIRECT BY MR. SPRINGER          2404

21

22

23

24

25
```

```
 1        (PROCEEDINGS HAD NOVEMBER 9, 2009, WITHOUT THE
 2   PRESENCE OF THE JURY, AS FOLLOWS:)
 3           THE COURT:  Welcome back, everyone.  There was
 4   one matter I wanted to address briefly outside the
 5   hearing of the jury, and that relates to the instruction
 6   on venue.  I've looked at Mr. Springer's and the
 7   government's filings on that from yesterday and I will
 8   continue to look at both of them, and certainly haven't
 9   reached any conclusions as to the matters in those
10   filings, and I emphasize that.  But in the event that I
11   do give an instruction on venue that includes the concept
12   expressed in the first sentence of the second paragraph
13   of the government's instruction, then I have one matter
14   that I need to look at more, perhaps, and that's the
15   reason for my inquiry this morning.
16        The first sentence of the second paragraph of the
17   government's proposed instruction states as follows:
18   "Venue for the crime of failure to file as charged in
19   Counts 5 and 6 lies in any district in which the duty
20   could have been performed."  And then it cites some
21   cases.
22        Does that require evidence -- my inquiry is first to
23   Mr. O'Reilly:  Does that proposition require evidence
24   during the government's case that there is an IRS office
25   in the district where the "duty could have been
```

1  performed"?

2          MR. O'REILLY:  Actually, Your Honor, that

3  would.  And I think there was a miscommunication between

4  Mr. Snoke and myself, we don't want that first sentence

5  in there, we just want that -- the second one which

6  relates simply to the venue is appropriate in the legal

7  residence.

8          THE COURT:  Okay.  The final sentence is --

9  other than a cite -- is:  "Venue may lie in the judicial

10  district in which the Defendant Springer resided."

11  That's the one you're focusing on?

12          MR. O'REILLY:  Yes, Your Honor, that's what we

13  have evidence in this case.

14          THE COURT:  Now, were you saying "may" just to

15  be nice or do you mean "does"?

16          MR. O'REILLY:  We were being nice, Your Honor.

17  It does lie and "does" would be appropriate.

18          THE COURT:  We'll continue to look at that, but

19  that's one matter I wanted to address.

20      And let me give you a heads up on one other thing

21  that is totally inconsequential, but certainly might

22  trigger curiosity or concern, and that is several of the

23  jurors have indicated a desire for a demo of how Tracy's

24  machine works.  They're fascinated by it.  And it most

25  assuredly will not disrupt the proceedings in any way,

```
 1  but if at some point you see one or two jurors or perhaps
 2  more looking over Tracy's shoulder here for a demo at the
 3  desk, at the bench, or wherever, that's the only reason
 4  that's happening.  And I personally am amazed every time
 5  that I see her real time skill in action, 99 percent
 6  accuracy or 95 percent accuracy at 300 words a minute
 7  coming across my screen with about a 2-second delay, so
 8  the jurors have the same sense of awe, and so if you see
 9  her doing a demo, that's the only reason that it's being
10  done.
11       Anything else we ought to take up before we bring in
12  the jury?
13            MR. SPRINGER:  Yes, Your Honor, may I step out
14  of the courtroom for just a moment and make sure that my
15  witnesses are in the waiting room?
16            THE COURT:  You surely may.  Because we're going
17  to take a recess while Pam gets the jury ready to come on
18  in.
19            MR. SNOKE:  Since we've gotten to this point,
20  I'm -- Your Honor, I need to advise the Court that if
21  this case for some reason is still going next Monday, the
22  16th, that I have an appointment in Denver to argue the
23  2255 appeal of Mr. Redcorn and Frost that was ruled by
24  this Court.  Up until now, I haven't brought it up
25  because I thought we were going to get through, but I
```

```
 1  don't know.
 2          THE COURT:  Well, we'll address that at the
 3  appropriate time.  I wouldn't presume to interfere with
 4  that; on the other hand, that doesn't necessarily mean
 5  that we would have to interrupt whatever is taking place
 6  at that time.  It's certainly my sense at the moment that
 7  we'll complete this case this week, but we'll just have
 8  to see how it goes.  But you can reassure my colleagues
 9  in Denver that I'm not going to upset their apple cart.
10          MR. SPRINGER:  May I, Your Honor?
11          THE COURT:  Yes.  Court will be in recess.
12      (A RECESS WAS HAD, AFTER WHICH THE FOLLOWING
13  PROCEEDINGS WERE HAD IN OPEN COURT AND WITHIN THE
14  PRESENCE AND HEARING OF THE JURY.)
15          THE COURT:  Welcome back, members of the jury.
16  I do appreciate your punctuality and I hope you all had a
17  very enjoyable and relaxing weekend.  We'll have the
18  Defendant Springer's next witness.
19          MR. SPRINGER:  The Defendant Lindsey Springer
20  calls Paul Stumpo, Your Honor.
21          THE COURT:  Very well.
22                      PAUL STUMPO,
23  (WITNESS SWORN)
24                  DIRECT EXAMINATION
25  BY MR. SPRINGER:
```

1   Q.   Good morning, Mr. Stumpo.  I'm Lindsey Springer.

2   A.   Good morning.

3   Q.   Would you please state your name for the record,

4   please.

5   A.   It's Paul Joseph Stumpo.

6   Q.   And, Mr. Stumpo, where do you currently live?

7   A.   Harrison Township, Michigan.

8   Q.   And is that outside of Detroit?

9   A.   Yes, it's a suburb.

10  Q.   Okay.  And how long have you lived there?

11  A.   Four or five months.  Since May, whatever that is.

12  Q.   Since May?

13       Where did you live before that?

14  A.   In Eureka.

15  Q.   And how long were you there?

16  A.   Five, six years.

17  Q.   Do you recognize Lindsey Springer in the courtroom

18  today?

19  A.   Yes, I do.

20  Q.   Could you please identify him.

21  A.   That would be you.

22  Q.   Okay.  Do you know a person by the name of Oscar

23  Stilley?

24  A.   Yes, I do.

25  Q.   Have you ever met him before?

1   A.   Yes, I have.

2   Q.   Can you recognize -- or can you identify him for the

3   court today and the jury.

4   A.   He's right behind you.  That's him standing up, yes.

5          MR. SPRINGER:  Let the record reflect he's

6   identified Lindsey Springer and Oscar Stilley.

7          THE COURT:  The record will so reflect.

8   Q.   (BY MR. SPRINGER)  So how did you first come to know

9   Lindsey Springer?

10  A.   I connected with your information or your contact

11  information when I was in Las Vegas at a bio-energetic

12  alternative health conference, a doctor there -- don't

13  know if I remember her name.  She's a doctor out of

14  California.  I think her name might have been Lisa -- a

15  sports medicine doctor gave me your information.

16  Q.   Could her last name have been Hosbein?

17  A.   Yes, that's possible, yes.

18  Q.   And am I understanding correctly, it's Dr. Lisa

19  Hosbein?

20  A.   That's sounds correct.

21  Q.   And what did she tell you about Lindsey Springer?

22         MR. O'REILLY:  Objection; calls for hearsay,

23  Your Honor.

24         MR. SPRINGER:  I'm sorry.

25  Q.   (BY MR. SPRINGER)  What about Lindsey Springer that

1  got your attention?

2  A.   Well, she made reference to two different things.

3          MR. O'REILLY:  Objection, Your Honor.

4          THE COURT:  Counsel will approach.

5      (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND

6  OUT OF THE HEARING OF THE JURY.)

7          THE COURT:  It's necessary for me to determine

8  whether this response is being offered for the truth of

9  the matter asserted or not, and if so, if it comes within

10  any hearsay objection.  So what does the Defendant

11  Springer have to say on that score?

12          MR. SPRINGER:  Establishing a basis of

13  relationship between Lindsey Springer and Paul Stumpo

14  which leads to Art Hawkins.

15          THE COURT:  Why don't you have the testimony --

16  or the witness testify directly to the inception of the

17  relationship, then, without offering hearsay statements.

18          MR. O'REILLY:  Your Honor, one thing we did -- I

19  meant to bring this up before and I apologize, last week,

20  and so far it hasn't been a problem, but today -- but

21  last week with Ms. Dirtien, the government was forced to

22  object to a number of blatantly leading questions, and I

23  would ask the Court to try to -- I don't want to look

24  like a Jack in the box.

25          THE COURT:  Well, that's -- and, Mr. Stilley,

1  Mr. Springer had some coaching on that after the problem

2  arose.  Obviously, one of the predominant, if not the

3  most predominant problem for a beginning direct examiner

4  is how to ask a question in a non-leading way.  And I'm

5  sure Mr. Springer has now had about three days to think

6  about that, and usually if a question begins with "what"

7  or "tell me" or "tell the jury," it's not going to be

8  leading; on the other hand, it's always tempting to even

9  unconsciously ask a question in a leading way, that is a

10 problem.

11     I'm going to apply the rules fairly for both sides

12 and, for that reason, it's necessary for both defendants

13 to ask their questions on direct in a non-leading way

14 unless or until it is made to appear that adverse style

15 question is appropriate, which it certainly was not in

16 the case of Ms. Dirtien, so I trust that both defendants

17 will take that to heart.  You may proceed.

18          MR. SPRINGER:  Okay.

19     (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

20 WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

21 PRESENCE AND HEARING OF THE JURY.)

22 Q.  (BY MR. SPRINGER)  Tell the jury, after you met with

23 Dr. Hosbein and learned of Lindsey Springer, what did you

24 do next?

25 A.  The next thing -- well, she gave me your information

1  written in one of the company's brochures, Lindsey

2  Springer, Bondage Breakers Ministry, and your two phone

3  numbers on there, I think your cell phone and your

4  national phone number.  And I just took it home with me.

5  That was March 2002, March 16th, I believe.

6  Q.   You say March 16, 2002?

7  A.   Yeah, yeah.

8       And it was probably two or three months later that a

9  friend of mine in Springfield, Missouri, her daughter was

10 having issues with a child custody case, she had gotten

11 pregnant, had a child with this gentleman, and he was

12 suing her -- or taking her to court for full custody for

13 her child, and one of the two things that Lisa said

14 concerning how you helped people is one with folks with

15 tax issues and another one with child custody cases so I

16 called you up, and we spent about an hour on the phone

17 just kind of discussing who Lindsey Springer was and I

18 was discussing with you this particular case.

19      We ended up calling them in Springfield, Heather,

20 Heather Boles was her name, and Becky.  And I think we

21 started with Becky and we had a conference with Becky

22 just to see if there was any way you could help them

23 understand how to go about their proceeding and their

24 custody battle.

25 Q.   What made you think that I would be someone that

1    would be worth the time to speak to about child custody
2    matters?
3    A.   At that point, I had no idea, yeah, that's the
4    reason why I called.
5    Q.   Tell the jury what your impression was of my
6    communication with Becky after I had communicated with
7    her.
8    A.   Well, our conversation was extremely genuine and how
9    you related to them was very good to help settle them in
10   their view on how to go forward.  I think she was
11   generally trying to get full custody and you were trying
12   to help explain to her that that's really not how -- that
13   wasn't the best way it was going to work and that she
14   should consider looking at it as a joint custody thing.
15        And so you did a very good job at helping to settle
16   them and try to direct them.  I don't think,
17   specifically, going forward, you spent much time with
18   them.  I think that situation ended up being resolved
19   from there on out without much of your participation, to
20   my knowledge, to my recollection.
21   Q.   Tell the jury what level of education that Lindsey
22   Springer has, if you know.
23        MR. O'REILLY:  Objection; calls for hearsay,
24   Your Honor.
25        THE COURT:  Overruled.

1           THE WITNESS:  Well, you have told me and Lisa

2   told me that basically you were twelfth-grade-educated.

3   Q.   (BY MR. SPRINGER)  Okay.  Was -- strike that.

4        After the conversations that you've testified to

5   about with Becky and the child custody issues, what other

6   conversations -- excuse me -- what other people or

7   persons did you and I speak to together?

8   A.   Well, I think the next event was with Michael Burt

9   and he had a couple of CID agents, criminal investigators

10  from the IRS, show up at his front door and he didn't

11  know what to do with them and I didn't know how to help

12  him.  And so I went to his house one day.  And I think

13  that was in September, in the fall, either late, late

14  summer or early fall in September of that year, 2002.

15  And basically said, you know, I don't know if he can help

16  you, but let's talk to him and see if he can help you.

17  Q.   What was his current state of mind -- excuse me --

18  what were you concerned about with Michael Burt?

19  A.   Michael was extremely depressed.

20  Q.   Was he suicidal?

21  A.   Yes, he was.  In fact, he related to me later that

22  that particular day I showed up he had already planned

23  committing suicide.

24  Q.   Tell the jury what your observation of Michael Burt

25  was after he had spoken with me.

1  A.   Quite a blessing.  You picked him up, dusted him

2  off, gave him, you know, hope in himself to live and

3  going on.  And so the difference between Michael in 2002

4  and Michael, you know, seven years later is dramatically

5  different.

6  Q.   Tell the jury -- tell the jury if you are aware of

7  what the mission of Bondage Breakers Ministry is.

8  A.   It was -- it was very specific:  To get rid of the

9  IRS.  And most people didn't know that -- the other side

10 of helping out with child custody.  I don't think you

11 mentioned that too often.  But those were the two things

12 that I understood.

13 Q.   So after Michael Burt, was there any other people

14 that you and I -- excuse me, strike that.

15     Was there any other people that you told about

16 Lindsey Springer?

17 A.   Cindy and Arthur Hawkins.

18 Q.   And about what time would that have been, if you

19 remember?

20 A.   It's going to be summer 2002 the first time.  Art

21 wasn't particularly interested.  He didn't think he

22 needed any help, and so he wasn't interested in talking

23 to you at that point.

24 Q.   Now, tell the jury what kind of weekly meetings or

25 monthly meetings that you would attend involving also

```
1   people like Art Hawkins and Michael Burt?

2   A.   Bible study.   Sometimes you would consider it a

3   church service.

4   Q.   And was that weekly?

5   A.   For the most part, yes.

6   Q.   And was there prayer going on in those groups or

7   group meetings?

8   A.   Sure.   Sure.

9   Q.   Did you introduce the name Lindsey Springer to that

10  group or people in that group?

11  A.   Yes.

12  Q.   Did you ask that group to pray for Lindsey Springer

13  and Bondage Breakers Ministries?

14  A.   I don't know if I specifically did, but we certainly

15  did, yeah.

16  Q.   Okay.   When was the first time you spoke to Art

17  Hawkins regarding Lindsey Springer?

18  A.   Probably summer 2002.

19  Q.   What did you tell Mr. Hawkins about Lindsey

20  Springer?

21  A.   Basically, your name, that, you know, you are

22  Bondage Breakers Ministries, and you help people that are

23  in trouble, and had perhaps a different point of view to

24  the conflicts that they're in, and basically that you

25  minister to people in those situations.
```

PAUL STUMPO - DIRECT BY MR. SPRINGER                    2219

1    Q.   Did you make Art Hawkins and Cindy Hawkins aware of

2    my level of education?

3    A.   Sure.

4    Q.   On more than one occasion?

5    A.   At least one.  I don't know how many times.  It was

6    very clear to me and it was clear to anybody that I

7    presented your contact information to -- that you were

8    twelfth-grade-educated and that, you know, you were a

9    minister.

10   Q.   Did you ever tell Art Hawkins or Cindy Hawkins that

11   Lindsey Springer was an attorney?

12   A.   No, absolutely not.

13   Q.   Have you ever told anybody else that -- in this

14   group of people that Lindsey Springer was an attorney?

15   A.   No.

16   Q.   What is Gematria?

17   A.   Gematria.

18   Q.   What is Gematria?

19   A.   Gematria is basically the study of ancient languages

20   and their numerical sequencing.  Ancient languages, like

21   Hebrew and Greek, don't have alphanumeric.  Each

22   character is a letter, is a number, is basically a word.

23   So in ancient Hebrew and ancient Greek, a character is a

24   number, place holder, as well as the letter.

25            THE COURT:  Spell that word, please.

1          MR. SPRINGER:  I have it G-I-M-I-T-R-I-A (sic)

2   and I'm sorry if that spelling is not correct.

3          THE COURT:  Proceed.

4   Q.  (BY MR. SPRINGER)  Now, tell the jury at these

5   weekly church meetings, would this reading of numbers be

6   a part of that?

7   A.  Sure.

8          MR. O'REILLY:  Objection, Your Honor;

9   relevance.  And may we approach, please?

10          THE COURT:  You may.

11      (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND

12   OUT OF THE HEARING OF THE JURY.)

13          THE COURT:  What's the relevance of this?

14          MR. SPRINGER:  Art Hawkins testified that

15   September 11th didn't mean anything to him, that numbers

16   didn't mean anything to him.

17          THE COURT:  Wait just a minute.

18          MR. SPRINGER:  Art Hawkins testified September

19   11th didn't mean anything to him, numbers didn't mean

20   anything to him, why would it he said.  And this man is

21   directly getting ready to testify that Mr. Hawkins spent

22   $3 million based upon thinking Jesus Christ was born on

23   September 11 in 1999.  And I'm establishing this as a

24   motive for why he gave me money and not what Mr. Hawkins

25   lied about on that witness stand, Your Honor.  It's just

1  overwhelmingly true.

2          THE COURT:  Now, run that by again.

3          MR. SPRINGER:  Mr. Hawkins testified -- I asked

4  him:  Does September 11th mean anything to you?  He said

5  no, why would it?  I said, Did you and I ever have any

6  discussions about me being born on September 11th?  No,

7  why would I care?  And this witness is going to testify

8  and was just about to testify that September 11th is a

9  very important date to Art Hawkins and this Gematria

10  stuff and then I'm going to establish with my testimony

11  why he gave me that money.  This witness is going to

12  say --

13          THE COURT:  Well, do you anticipate that this

14  witness's testimony -- now, first of all, he -- "he"

15  being who, Art Hawkins?

16          MR. SPRINGER:  Art Hawkins, yeah, Art Hawkins

17  lied, Your Honor.

18          THE COURT:  Now, let's not argue that.  So this

19  witness is going to testify that this numbers -- this

20  numbers principle has something to do with why Hawkins

21  paid money to you?

22          MR. SPRINGER:  Why he would have wanted to

23  support my ministry, yes, Your Honor.

24          THE COURT:  Why he would have wanted to

25  support your ministry or why he did pay money?

1          MR. SPRINGER:  Why he did, I believe that's what

2   his testimony is going to be.

3          THE COURT:  Well, I'll hear about a minute's

4   worth of questioning on that.

5          MR. O'REILLY:  Your Honor, this is impeachment

6   on a collateral issue.  Mr. Springer, if he want --

7   there's no way this witness can testify as to what's in

8   Mr. Hawkins' head unless they're going to try to do it

9   through hearsay, which would be Mr. Hawkins' statement to

10  him, which would be hearsay.

11         THE COURT:  Well, it would be, and it may well

12  be impeachment on a collateral issue, unless it's --

13  unless it leads to admissible testimony as to the reason

14  Mr. Hawkins paid money to Mr. Springer.  I'm dubious as

15  to whether he'll get there, but I'm going to give him

16  that chance.

17         MR. O'REILLY:  Your Honor, my concern is

18  Mr. Stumpo is likely to say anything for this man, and

19  Mr. Hawkins was on the stand, he testified to exactly why

20  he paid him, which was for services.

21         THE COURT:  And that testimony was given and the

22  jury may well believe it, if -- but what I'm going to

23  give Mr. Springer an opportunity to do is present

24  admissible testimony as to some other reason that

25  Mr. Hawkins paid the money.  I doubt that he can get

1  there, but I'm going to give him a chance.

2         MR. O'REILLY:  Your Honor, I want to make sure

3  that they're not going to try to introduce hearsay

4  testimony from Mr. Hawkins basically saying what

5  Mr. Hawkins told Mr. Stumpo, which would be inadmissible

6  hearsay.

7         MR. SPRINGER:  It is my testimony, Your Honor,

8  that I will make when I take the stand.  I will fill in

9  the gaps on what is lacking in this trail of whatever.

10        THE COURT:  We'll take it one question at a

11  time.  The question that's pending the -- the objection

12  to the pending question is overruled.  We'll take it one

13  question at a time.

14     (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

15  WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

16  PRESENCE AND HEARING OF THE JURY.)

17  Q.  (BY MR. SPRINGER)  Do you refer to Gematria as a

18  science?

19  A.  Yes, it could be.

20  Q.  Thank you.  In that science, tell the jury what

21  September 11, 1999 means.

22  A.  Well, 911, 911, it's a number, so using the concept

23  of Gematria, every word is also a number, and that's what

24  makes it into a science is you have a sequence of numbers

25  and you have an algorithm, and you can have an algorithm

```
 1  that you can decipher or learn about, and so, like, one

 2  of the words is -- in 911 is the word "grace," to my

 3  knowledge, I could be wrong, but what I understood it to

 4  be the word "grace" in Greek.  And so from that term,

 5  from Gematria, that's what "911" would mean -- I mean,

 6  911 -- September '99 has other significances or had other

 7  significances in the group, many of the -- or several of

 8  -- that you would consider historians, Biblical

 9  historians --

10          THE COURT:  That's enough narrative, we'll go

11  back to Q and A.

12          MR. SPRINGER:  Thank you.

13  Q.  (BY MR. SPRINGER)  Did you attend a gathering on

14  September 11, 1999?

15  A.  Yes.

16  Q.  Do you know who the host of that gathering was?

17  A.  Art Hawkins.

18  Q.  And do you know at that time where Art Hawkins was

19  employed?

20  A.  In '99, probably still Exide, but --

21  Q.  Do you know what position he held at Exide?

22  A.  He was the CEO.

23  Q.  Do you know how much money was spent on the

24  gathering on September 11, 1999?

25          MR. O'REILLY:  Objection; relevance, source of
```

1   knowledge.

2          THE COURT:  Sustained.

3          MR. SPRINGER:  Okay.

4   Q.  (BY MR. SPRINGER)  Did you ever participate in any

5   conversations with either Art Hawkins or Cindy Hawkins

6   regarding the day that Lindsey Springer was born?

7   A.  Yes.

8   Q.  Do you know what that day is?

9   A.  September 11.

10  Q.  What significance did you place upon knowing that

11  Lindsey Springer was born on September 11?

12  A.  Well, in the light of the potential relevance of

13  1999, September 11th being Jesus' 2000th birthday,

14  because that's what the celebration was, I found that

15  connection to be highly significant, without really

16  knowing exactly that it was Jesus' birthday, it's just --

17  I don't believe in coincidences, so it did speak a lot

18  that you -- with your involvement with Art and Cindy did

19  seem to be coinciding.

20  Q.  And are you aware of whether Art or Cynthia Hawkins

21  knew Lindsey Springer was born on September 11?

22  A.  Yes.

23  Q.  Did you ever have any conversations with Art Hawkins

24  or Cynthia Hawkins regarding how Lindsey Springer or

25  Bondage Breakers Ministries received money?

1   A.   Yes.  It was all donations.

2   Q.   And you told them that?

3   A.   Yeah, absolutely they knew that.

4   Q.   Was there ever any question -- when you mentioned

5   that Lindsey Springer only receives donations, was there

6   ever any question raised between you and them regarding

7   the characterization of money that I would receive or be

8   asking for?

9   A.   I think the only time that I can recall is the

10  pastor Warrick Potts, who actually was a pastor from

11  Australia that Art brought over to head up the Bible

12  college in Port Austin, where this gathering was at,

13  called me up one day with regard to the donation you had

14  requested --

15        MR. O'REILLY:  Objection, Your Honor; hearsay

16  testimony.

17        THE COURT:  Well, we had an answer to that

18  question, that the telephone call was made, we'll take it

19  one step at a time.  Next question.

20  Q.   (BY MR. SPRINGER)  Regarding that telephone call,

21  was there a discussion that you had regarding the

22  character of donations that were being asked for or given

23  to Lindsey Springer?

24  A.   Well, in the conversation, there was no question it

25  was a donation.  It wasn't a concept or something that

1  was unclear, it was just simply the amount of the

2  donation that was being requested.  I don't specifically

3  remember the amount size.  It was just that a donation

4  had been requested and it was unusual to two-part, and

5  Warrick was calling me up to ask my opinion or impression

6  about it, in which I wasn't sure what to tell him, so I

7  called you up to talk to you about it.

8            MR. SPRINGER:  Your Honor, may I have one

9  second?

10           THE COURT:  You may.

11  Q.   (BY MR. SPRINGER)  What do you know about the manner

12  and means in which Art Hawkins would determine how much

13  money he would give Lindsey Springer?

14           MR. O'REILLY:  Objection, Your Honor; source of

15  knowledge, seems to call for hearsay.

16           THE COURT:  Well, establish his source of this

17  knowledge first, then we'll take it one step at a time.

18  Q.   (BY MR. SPRINGER)  Have you ever witnessed -- or

19  have you ever had any communications with Art Hawkins

20  regarding how he would determine how much money he would

21  give to people in general?

22  A.   Yes.

23  Q.   Have you ever had conversations with him about how

24  he would determine how much money he would be giving to

25  Bondage Breakers Ministries or Lindsey Springer?

1  A.   You know, I'm not certain we had a specific

2  conversation about your ministry, but it was in general,

3  that's how Art operated, period.

4  Q.   And then if you could tell the jury how would he

5  generally determine how he decided how much money he was

6  going to give.

7          MR. O'REILLY:  Objection; hearsay, Your Honor,

8  also relevance because this witness has said he has no

9  specific recollection of discussing --

10         THE COURT:  I'm going to hear the answer to that

11 question.  That will be overruled, then we'll see where

12 we go from there.

13         THE WITNESS:  Could you repeat that question.

14 Q.   (BY MR. SPRINGER)  How did -- excuse me.

15         THE COURT:  The question was:  How would Art

16 Hawkins generally determine how he decided how much money

17 he was going to give?  You may answer that question.

18         MR. SPRINGER:  Thank you.  Thank you.

19         THE WITNESS:  He would pray with his wife with

20 regard to that and come back with an answer.

21 Q.   (BY MR. SPRINGER)  Have you ever heard of the phrase

22 "war room" with respect to either Cynthia Hawkins or Art

23 Hawkins?

24 A.   I think it was commonly held as his office area.

25 Q.   Thank you.

1      And is that phrase something that was being used at

2 the same time that you identified before as in the summer

3 of 2002 forward?

4 A.   Yes, I would believe so.

5 Q.   And do you know what -- why the name war room was

6 given to Art Hawkins's office?

7 A.   I believe for --

8           MR. O'REILLY:  Your Honor, objection; relevance

9 and impeachment on a collateral matter.

10           THE COURT:  Overruled.

11           THE WITNESS:  Well, one was in a criminal trial

12 at the time and so basically fighting -- you know,

13 fighting that trial, as well as just the general concept

14 of the spiritual warfare that we believe exists on the

15 planet.

16 Q.   (BY MR. SPRINGER)  Was Art Hawkins' office in his

17 house?

18 A.   Yes.

19 Q.   Is it safe to -- how would you describe Art Hawkins'

20 house if you were standing at the front door?

21 A.   Unbelievable.

22 Q.   Thank you.

23      Did you ever tell Lindsey Springer what you thought

24 the value of Art Hawkins' home was?

25 A.   I don't know if we specifically talked about its

```
 1  value.
 2  Q.   That's fine.
 3       Has there ever been a number -- a dollar amount that
 4  you would use to refer to the value of Art Hawkins'
 5  home?
 6  A.   Yeah, somewhere between $10- and $13 million.  It
 7  was a very large house.
 8  Q.   Were you a member of Innovative Financial Services?
 9  A.   I bought one of the trust packages, yes.
10  Q.   When did you buy the trust package?
11  A.   2000, August.
12  Q.   Did you regularly attend conference calls that IFC
13  would host?
14  A.   Actually, no, the only time I actually called the
15  conference call was in 2002 when I couldn't get ahold of
16  the trustees, and then through the grapevine had learned
17  that they had been indicted and arrested and the phone
18  line was shut down, so I called the conference line to
19  see if I can figure out what was going on.
20  Q.   Did you ever call Lindsey Springer in regard to
21  those conference calls?
22  A.   Yes, I did.
23  Q.   What did you ask Lindsey Springer to do?
24  A.   Well, after I got off of the conference call, and
25  one of the gentlemen, I don't fully remember his name, it
```

1  was down in Florida, his first name was Jim, had a copy

2  of the indictment and I asked him to fax me a copy of the

3  indictment for the trustees at IFC, and I read the

4  indictment and I realized something was really, really

5  wrong, and that's when I recognized I needed help, and so

6  I called you and faxed you the indictment.

7  Q.   Did you ask Lindsey Springer to come out to the

8  conference calls -- conference call and listen?

9  A.   Yes.

10 Q.   Do you know whether Lindsey Springer did that or

11 not?

12 A.   Yes, you did.

13 Q.   Did Lindsey Springer to the -- excuse me, strike

14 that.

15      Did Lindsey Springer only attend one conference call

16 or did he attend numerous conference calls?

17 A.   There were numerous.

18 Q.   Is it safe to say every week?

19 A.   It started off with the IFC group every week, yes.

20 Q.   Do you know how long that occurred?

21 A.   With that particular group, I think it lasted two or

22 three months.

23 Q.   Do you know who was paying for the conference call?

24 A.   Initially, I think it was IFC's conference call.

25 Q.   What do you mean "initially"?  What happened?

PAUL STUMPO - DIRECT BY MR. SPRINGER                    2232

1   A.   Well, that was their conference call line.  That's

2   where they would come on every -- I think every Thursday

3   night at six o'clock and they would give updates or views

4   of latest and greatest of whatever was going on in the

5   world.  I don't really know what they were talking about

6   because I never went to one of theirs.  But those

7   specific were a group of people trying to figure out what

8   they were going to do with the fact that all the trustees

9   had been indicted and arrested.

10  Q.   Do you know whether Lindsey Springer took over the

11  payment for that conference call line?

12  A.   Yes, you did.

13  Q.   Could you describe for the jury the nature of the

14  conference calls.

15  A.   Well, generally speaking, folks were on the

16  conference call line -- well, some of them were on the

17  conference call line trying to figure out what their next

18  steps were supposed to be or could be or what they should

19  do to try to repair or fix the situation that they were

20  now in, and so basically somewhat mass confusion, for the

21  most part, initially.

22  Q.   Were you in a situation just like what you heard on

23  the conference call?

24  A.   Oh, yeah, right, exactly.

25  Q.   Explain to the jury what that situation is.

PAUL STUMPO - DIRECT BY MR. SPRINGER                    2233

1   A.   Well, the trustees were indicted for conspiring to

2   commit fraud.  I think the charge is impair, impede,

3   obstruct the lawful assessment, collection, and

4   ascertainment of taxes.  That was one of the counts

5   against the trustees.  I mean, at that time, I read it,

6   but I didn't -- I read the indictment, but I didn't

7   understand it.

8   Q.   Do you remember whether the tone of the conference

9   calls were combative?

10  A.   Oh, extremely.

11  Q.   And do you remember who was being attacked on those

12  conference calls?

13  A.   Well, anybody that would suggest -- including

14  yourself, that would suggest that perhaps a need to go

15  back to where they were before they met IFC was the

16  appropriate thing to do, and so you took a great deal of

17  grief when you made such statements, and anybody that

18  said anything along those lines.

19  Q.   And as you testify here today, it was two to three

20  months, to the best of your recollection, that I was --

21  A.   Right.  Well, that's -- yeah, I don't know the

22  specific period of time, but somewhere in there.

23  Q.   Did you ever receive a prefiling unit letter from

24  the IRS?

25  A.   Yes, I did.

PAUL STUMPO - DIRECT BY MR. SPRINGER                    2234

1    Q.   Could you please tell the jury what that letter was

2    or meant to you?

3    A.   Well, it was basically saying that -- you know, that

4    you were involved with IFC and they had determined that

5    those trust organizations were something that the

6    government didn't like and we should not be really using

7    them.  I don't remember the specific language, but if I

8    saw that document, I could recognize it, that you need to

9    do something about where you were because it wasn't in

10   the right spot, basically.

11   Q.   Are you familiar with the name Andy Ouwenga or Karen

12   Ouwenga?

13   A.   Yes, I am.

14   Q.   How do you know Andy Ouwenga and Karen Ouwenga?

15   A.   Well, one of the gentlemen on the conference call,

16   on the IFC conference call, knew Andy and basically

17   called you up, and then we end up having some

18   conversations with him, conference calls with him and his

19   daughter Erika, initially, to see if there was any way

20   that you could help -- help Andy.

21   Q.   Did you attend Andy Ouwenga's trial?

22   A.   Yes, I did.

23   Q.   And would that be around 2004, if you remember?

24   A.   That sounds right.

25   Q.   And what was the purpose for why you attended Andy

PAUL STUMPO - DIRECT BY MR. SPRINGER                    2235

```
 1   Ouwenga's trial?
 2   A.   To learn, learn more about the legal system and the
 3   laws that required me to file a tax return and how to
 4   best do that.
 5   Q.   Did Lindsey Springer ask you to come witness that
 6   trial?
 7   A.   No, you did not.
 8   Q.   What about -- do you remember -- strike that.
 9        Do you remember anybody else that attended the trial
10   besides yourself?
11   A.   Pat Turner, Michael Burt, Mike Hennessey.
12   Q.   And do you remember whether I, Lindsey Springer, sat
13   with you during that trial in the back of the courtroom?
14   A.   Yes.
15   Q.   For the entire trial?
16   A.   Yes.
17   Q.   Do you remember -- strike that.
18        Did you attend oral argument in a case in the Sixth
19   Circuit Court of Appeals?
20   A.   Yes.
21   Q.   Could you tell the jury who was with you on that
22   date.
23   A.   I believe Mike Hennessey, Michael Burt.  I'm not
24   sure if Pat was with us or not.  You were there.  There
25   was another gentleman, I don't remember his name.  Of
```

PAUL STUMPO - DIRECT BY MR. SPRINGER                           2236

```
1    course, Jerry Barringer, who was doing oral arguments.
2    Q.   And Mr. Barringer, you mean Attorney Jerold
3    Barringer?
4    A.   Yes.
5    Q.   And do you remember what case the oral argument was
6    regarding?
7    A.   Mr. Ouwenga's.
8    Q.   Mr. or Mrs.?
9    A.   You're right.  He had dropped his appeal, it was
10   Mrs. Ouwenga.  He was representing Mrs. Ouwenga.
11   Q.   Have you currently -- are you currently up to date
12   with all of your -- with all the information that the IRS
13   has asked to you provide them?
14   A.   I believe so.
15   Q.   Are you still in some litigation with them?
16   A.   2000, I believe I have a CEP hearing that is still
17   outstanding.  And in 2001, '02, and '03, I'm on appeal
18   from a decision that they had made on those years.
19   Q.   What are the issues to which you and the IRS are
20   having an objection over?
21   A.   Well, I had questions, and the first of which was
22   the exemption amount that would be the triggering
23   mechanism to file a 1040 -- if you could consider the
24   1040 form to be valid.
25        And the second issue was the challenge to the OMB
```

1   number or the legality of the 1040 form itself,-- whether

2   or not it was a valid form for a request for

3   information.

4   Q.   Have you yourself tried to find where the exempt

5   amount comes from?

6   A.   For the last eight years, yes.

7   Q.   Have you also tried to learn about -- strike that.

8        How did you become aware of the Paperwork Reduction

9   Act of 1995?

10  A.   Through discussions with you.

11  Q.   Was it just with me or were there other people also?

12  A.   Well, yeah, there was a group of us that were

13  seeking to learn.

14  Q.   And what is your objection to the OMB number issue

15  related to the 1040 form?

16       MR. O'REILLY:  Objection; relevance as to

17  Mr. Stumpo's objections.

18       THE COURT:  Sustained.

19  Q.   (BY MR. SPRINGER)  Would it be fair to say -- excuse

20  me, strike that.

21       Is your objection over taxes or penalties?

22  A.   Penalties.

23  Q.   Was Warrick Potts in the war room?

24  A.   Yes.

25  Q.   Have you ever given Lindsey Springer any money?

PAUL STUMPO - CROSS BY MR. O'REILLY                    2238

```
 1   A.   Yes.

 2   Q.   Were you hiring Lindsey Springer?

 3   A.   Oh, no, it was just donations.

 4   Q.   What is your college education?

 5   A.   Degree in electrical engineering.

 6           MR. SPRINGER:  May I have one second, Your

 7   Honor?  I pass the witness, Your Honor.

 8           THE COURT:  Cross-examination.

 9                    CROSS-EXAMINATION

10   BY MR. O'REILLY:

11   Q.   Good morning, Mr. Stumpo.

12   A.   Good morning.

13   Q.   Mr. Stumpo, you said you have an EE degree; is that

14   correct?

15   A.   Yes.

16   Q.   When did you get your degree?

17   A.   1986.

18   Q.   How were you employed after you graduated?

19   A.   I worked for the government for five years and then

20   in private industry.

21   Q.   Private industry after five years?

22   A.   Yes.

23   Q.   So that would have been as of what, 1991?

24   A.   Ninety-two.

25   Q.   How are you currently employed?
```

PAUL STUMPO - CROSS BY MR. O'REILLY                    2239

```
 1   A.   I'm not.

 2   Q.   How long have you not been employed?

 3   A.   About five months, four months.  June -- I mean,

 4   pardon me, July.

 5   Q.   Prior to -- during the year 2008, how were you

 6   employed?

 7   A.   How was I employed?

 8   Q.   In 2008.

 9   A.   From April through to the end.

10   Q.   Doing what?

11   A.   Working in the engineering field.

12   Q.   Excuse me?

13   A.   Working in the engineering field.

14   Q.   Were you paid for that?

15   A.   Yes.

16   Q.   Did you file a tax return for 2008?

17   A.   I'm not aware of a duty to do so.

18   Q.   Did you file a tax return for 2008?

19   A.   What form?

20   Q.   Did you file any form reporting your income with the

21   IRS for the year 2008?

22   A.   The company filed a W-2.

23   Q.   Sir, are you having difficulty understanding my

24   question?

25   A.   Did I file a form?  No.
```

PAUL STUMPO - CROSS BY MR. O'REILLY                    2240

1   Q.   Thank you.  Did you file a form for 2007?

2   A.   No.

3   Q.   2006?

4   A.   Well, no -- I mean, strike that.

5   Q.   Strike what, sir?  Just to be clear, what are you

6   striking?

7   A.   If I had filed a form, yes, I filed both 1065s and

8   1041s for those years.

9   Q.   1065s, and what was the other one?

10  A.   1041s.

11  Q.   And what were those for?

12  A.   Well, the 1041 is for the trust and the 1065 is for

13  an L.L.C.

14  Q.   Okay.  And with respect to the trust, is that the

15  same trust that you referred to that you had purchased

16  from IFC?

17  A.   Yes.

18  Q.   Did you pay income taxes for the year 2008?

19  A.   I'm not sure how to answer that question.  Can you

20  describe what that means, "to pay income taxes"?  Can you

21  describe based on what it says in the law that that --

22  Q.   Did you pay any income taxes, sir, to the federal

23  government on your income?

24        THE COURT:  Don't interrupt him, Mr. Stumpo.

25  Let him finish the question.

```
 1              THE WITNESS:  Thank you, sir.  Again.
 2  Q.  (BY MR. O'REILLY)  Did you pay any federal income
 3  taxes on the income you earned in 2008 to the Internal
 4  Revenue Service?
 5  A.  I believe what I did was I signed a W-4 form that
 6  made me agree to pay the company's payroll taxes for
 7  those checks that they gave me.  That's what I think I
 8  agreed to.
 9  Q.  Did you have money withheld from your wages?
10  A.  Yes.
11  Q.  Was that just on your payroll taxes or did that
12  include also the estimated withholding, if you know?
13  A.  I do not know.
14  Q.  Sir, one thing you said previously puzzled me, you
15  said you met Mr. Springer through a doctor in Las Vegas?
16  A.  Yes.
17  Q.  Do you recall meeting with IRS agents in March of
18  2004 with respect to an investigation of Mr. Michael
19  Burt?
20  A.  Oh, yes, Mr. Baker.
21  Q.  Do you recall telling special agent -- was it
22  Baker?
23  A.  Yes.
24  Q.  Do you recall telling Special Agent Baker that
25  Mr. Springer was referred to you by Oscar Stilley?
```

PAUL STUMPO - CROSS BY MR. O'REILLY                              2242

```
 1  A.   Absolutely not.
 2            MR. O'REILLY:  Your Honor, may I approach the
 3  witness?
 4            THE COURT:  You may.
 5  Q.   (BY MR. O'REILLY)  Mr. Stumpo, all I'm going to ask
 6  you to do is take a look at what's -- a memorandum of
 7  interview, specifically paragraph 5.  Read that to
 8  yourself and let me know when you're done.
 9  A.   Yes, I see that it says that there.
10  Q.   Okay.  And does that refresh your recollection of
11  how you met Mr. Springer?
12  A.   I didn't write this and I never said that.
13  Q.   So you did not tell the special agent in March of
14  2004 that Mr. Springer was referred to you by
15  Mr. Stilley?
16  A.   I couldn't have been.  I didn't know Mr. Stilley in
17  2002.
18            MR. O'REILLY:  May I approach the witness, Your
19  Honor?
20            THE COURT:  You may.
21  Q.   (BY MR. O'REILLY)  You spoke about IFC and that the
22  IFC promoters, I think was the term you used -- I
23  apologize, maybe you said owners -- you found out they
24  were indicted?
25  A.   I said "trustees," but "promoters" is just as good,
```

1   I think.  They were indicted.

2   Q.   Do you recall the names of those individuals?

3   A.   The Poseleys, right, Dennis, Mark, John, Eddie, I

4   think all their last names were Poseleys.  Not all of

5   them, I don't remember all of them.  There were nine

6   people, I think, that were indicted.

7   Q.   But Poseleys were one of them?

8   A.   Yes.

9   Q.   A couple of them that you recall?

10  A.   I think most of them were indicted.

11  Q.   No, I mean, the name "Poseley" was --

12  A.   Oh, yeah.

13  Q.   After you found out that the trustees at IFC had

14  been indicted, did you and Mr. Burt and some other IFC

15  clients begin having weekly meetings?

16  A.   Yes.

17  Q.   Was the purpose of these meetings to figure out a

18  way to avoid any potential problems with the government?

19  A.   The purpose was to figure out how to fix the issue.

20  Q.   What was this issue that you needed to fix?

21  A.   Well, first of all, the issue was my understanding

22  of what to do, right?  I didn't know what to do with

23  their indictments, I didn't know what to do with the

24  prefiling unit.  And so basically Lindsey helped me to

25  understand that to get an EIN for the trust was probably

1   a really good thing.

2   Q.   Well, let me just ask this:  So prior to the

3   indictment of IFC, the trust that you had had set up did

4   not have an employment identification number?

5   A.   No.

6   Q.   That's what you meant by "EIN"?

7   A.   Yes.

8   Q.   And that was because you were relying on IFC to deal

9   with this stuff; is that correct?

10  A.   The Carol letter, which is what was the initiator to

11  the whole IFC concept, the Carol letter from the IRS --

12  Q.   That was a letter that was basically sent out by

13  IFC -- basically it's supportive of what they were

14  telling people to do, correct?

15  A.   Right.  Without the Carol letter, what they were

16  saying didn't mean anything.

17  Q.   And as a result, you sought out Mr. Springer to help

18  you and others get things right?

19  A.   I felt his opinion on the matter and his viewpoint

20  on the matter would be of help, yes.

21  Q.   And this was in -- sometime in 2002?

22  A.   That would be 2003.

23  Q.   When in 2003?

24  A.   I'm saying -- thinking like May or -- May time frame

25  of 2003.

1   Q.   May, June, sometime in the early summer, the summer

2   of 2003?

3   A.   Could have been April.  I don't remember

4   specifically.  April, May.

5   Q.   Who are Catherine and James Stumpo?

6   A.   Catherine is my mom and James is my brother.

7          MR. O'REILLY:  May I approach the witness, Your

8   Honor?

9          THE COURT:  You may.

10  Q.   (BY MR. O'REILLY)  Showing you what's been marked

11  for identification as Government's Exhibit 64.

12  A.   Yes.

13  Q.   Do you see that, sir?

14  A.   Yes, I do.

15  Q.   Could you just generally describe to the jury what

16  is Government's Exhibit 64.

17  A.   It's a check for $3,750 to Bondage Breakers Ministry

18  written by my mom.

19  Q.   And in the memo line, does it say "for Paul Stumpo"?

20  A.   It does.

21  Q.   And is this dated August 13th of 2003?

22  A.   Yes.

23          MR. O'REILLY:  Your Honor, the government moves

24  Government's Exhibit 64 into evidence.

25          MR. SPRINGER:  No objection, Your Honor.

```
 1            THE COURT:  Government's Exhibit 64 is received.
 2   Q.  (BY MR. O'REILLY)  Was Mr. Springer helping you at
 3   this time?
 4   A.  I would say my involvement with Mr. Springer started
 5   in 2002 and that every conversation I had with him was
 6   helping me.
 7   Q.  Was one of the concerns you had at this time your
 8   situation or potential situation with the Internal
 9   Revenue Service?
10   A.  Yes.
11   Q.  Was Mr. Springer helping you deal with that and
12   resolve that?
13   A.  Yes, he was.
14   Q.  I think you did mention that you knew Oscar Stilley;
15   is that correct?
16   A.  Well, I would have met Oscar Stilley for the first
17   time 2002 at oral arguments for Art Hawkins.  I believe
18   that was December 2002.
19   Q.  But my question was:  You do know Mr. Stilley?
20   A.  Yes -- well, I know of him.  I don't know him
21   personally.
22   Q.  Have you ever paid Mr. Stilley any money?
23   A.  No.
24   Q.  Other than this $3,750 check in August 13th of 2003
25   -- let me step back a minute, I'm sorry.
```

1     Do you know why your mother, Catherine Stumpo, would

2  have written a check payable to Mr. Springer in the

3  amount of $8,000 in February of this year?

4  A.   Yes, I would.

5  Q.   Why did your mother do that?

6  A.   To help me purchase a vehicle.

7  Q.   What vehicle did you buy from -- I assume you bought

8  it from Mr. Springer?

9  A.   Uh-huh.

10 Q.   What did you buy?

11 A.   It's a 1998 Rodeo Isuzu.

12        MR. O'REILLY:  May have I have a moment, Your

13 Honor?

14        THE COURT:  You may.

15 Q.  (BY MR. O'REILLY)  In your direct examination, you

16 testified that you believed you were current with the

17 IRS?

18 A.   Yes.

19 Q.   But you didn't file a tax return for the last

20 several years?

21 A.   Please define "tax return."

22 Q.   Did you file a tax return in the last several years

23 with the IRS?

24 A.   Did I provide information to the IRS?  In which

25 year?

1  Q.   In the year 2008.

2  A.   Yes, I did.

3  Q.   And how did you provide the information to the IRS?

4  A.   Well, 1041, 1065, and the W-2 that the company sent

5  to the IRS.

6  Q.   You mean, that the company sent to the IRS?

7  A.   Uh-huh.

8  Q.   But you did not file a Form 1040 or any other report

9  of your individual income; is that correct?

10  A.   Yes, I'm not aware of a requirement to do so.

11  Q.   How many people have you seen convicted for failing

12  to file tax returns, sir?

13  A.   I was at Mr. Ouwenga's trial and the judge in that

14  particular case --

15  Q.   Mr. Stumpo, I just asked you for a number.  How many

16  people have you seen convicted for willfully failing to

17  file tax returns?

18  A.   I don't know if that was part of his charge or not.

19  It was a conspiracy charge, I believe, in his case, so I

20  don't personally know if I've seen any.  You certainly

21  can -- if it was a willful failure in his case, then I

22  would have seen his.

23  Q.   Did Mr. Springer ever tell you not to file a

24  personal income tax return?

25  A.   Oh, absolutely not.

1            MR. O'REILLY:  Nothing further, Your Honor.

2            THE COURT:  Any redirect?

3            MR. SPRINGER:  May we approach, Your Honor?

4            THE COURT:  You may.

5        (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND

6    OUT OF THE HEARING OF THE JURY.)

7            THE COURT:  Go ahead.

8            MR. SPRINGER:  Before I start redirect in here,

9    I wanted to make sure what my borders were, so

10   Mr. O'Reilly doesn't have to jump up every time I ask a

11   question.  But he asked him specifically why he hadn't

12   filed tax returns, what his reasons were, and I believe

13   he opened the door up for something that I was not

14   allowed to ask on my direct.  And before I go back up

15   there and try to get Mr. Stumpo to explain what he meant

16   by the things that he said, I wanted to make sure I had

17   the Court's permission to do so.

18           THE COURT:  If it involves the Paperwork

19   Reduction Act and this witness's understanding of that

20   legislation, it will not be admitted.

21           MR. SPRINGER:  Okay.  And then I didn't

22   understand.  Is Mr. Stilley supposed to ask questions

23   before I go back up or do I just go back up because we

24   jumped over him on the --

25           THE COURT:  Well, that was my oversight.  I'll

1  give Mr. Stilley an opportunity on your witnesses.  I

2  will, and in this instance, certainly should have offered

3  Mr. Stilley the first opportunity and that was my

4  oversight, but I will certainly rectify that by giving

5  Mr. Stilley the opportunity to ask questions at this

6  point.

7           MR. SPRINGER:  He will go first, then?

8           THE COURT:  Right.

9           MR. SPRINGER:  Thank you, Your Honor.

10     (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

11  WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

12  PRESENCE AND HEARING OF THE JURY.)

13           THE COURT:  Members of the jury, I got the

14  question -- further questioning of this witness slightly

15  out of order.  I should have invited Mr. Stilley to ask

16  any questions that he may have before offering that

17  opportunity to Mr. O'Reilly, so this is now Mr. Stilley's

18  opportunity to cross-examine the witness.

19                       CROSS-EXAMINATION

20  BY MR. STILLEY:

21  Q.  Mr. Stumpo, do you have any facts or evidence that

22  would tend to show that Oscar Stilley committed any

23  crime?

24  A.  Not to my knowledge.

25           MR. STILLEY:  Pass the witness.

```
 1              THE COURT:  Redirect.
 2                   REDIRECT EXAMINATION
 3  BY MR. SPRINGER:
 4  Q.   Mr. Stumpo, I believe you were handed a memorandum
 5  of interview, do you still have that up there, March 9,
 6  could you please look at paragraph 5.
 7  A.   Oh, no, I don't have that.  Paragraph 5.
 8  Q.   Yes.  Mr. Stumpo, at the time this memorandum was
 9  taken, was somebody besides you being interviewed?  Was
10  Michael Burt present?
11  A.   No, Michael Burt wasn't present -- well, maybe he
12  was.  If you can help me understand where this was at,
13  where was this interview at.  I was in the restaurant
14  Rolla (sic), so, no, Michael Burt was not present, Pat
15  Turner was.
16  Q.   Apologize.  Pat Turner was present at the time of
17  the interview that you're --
18  A.   Yes.
19  Q.   Okay.  And is it possible that you would have
20  said --
21              MR. O'REILLY:  Objection, Your Honor.
22              THE COURT:  I want to hear the rest of the
23  question first.
24  Q.   (BY MR. SPRINGER)  On paragraph 5, is it possible
25  that you would have said, "Stumpo stated Springer
```

1   referred them to Oscar Stilley"?

2   A.   Yes, very possible, because I believe Oscar at that

3   time was Michael's attorney.

4   Q.   Now, you never hired Oscar Stilley, correct?

5   A.   And there is a two in the document -- no, I did not.

6   Q.   Now, you were also handed Government's Exhibit

7   Number 64.

8        MR. SPRINGER:   Could you please pull that up.

9   Q.   (BY MR. SPRINGER)   Could you tell the jury why a

10  check for you came out of Catherine or James J. Stumpo's

11  checking account.

12  A.   I was basically taking out a loan from mom because I

13  wanted to donate money to your ministry and I was paying

14  her back.

15  Q.   Did you pay her back?

16  A.   I did.

17  Q.   Now, Government's Exhibit 64 shows August 13th,

18  2003, correct?

19  A.   Yes, it does.

20  Q.   Is that about the same time that those conference

21  calls were taking place with IFC?

22  A.   Yes.   It was probably about the time -- maybe a

23  month later -- that it -- mostly IFC folks stopped

24  attending.

25  Q.   Do you know why they stopped attending?

PAUL STUMPO - REDIRECT BY MR. SPRINGER                    2253

1   A.   They --

2          MR. O'REILLY:  Objection, Your Honor; calls for

3   speculation as to why other people did something.

4          THE COURT:  Sustained.

5   Q.  (BY MR. SPRINGER)  Have you ever spoken to any

6   participant on a conference call that you just testified

7   about that would have given you some indication as to why

8   they stopped?

9          MR. O'REILLY:  Objection, Your Honor; beyond the

10  scope of cross.  We didn't discuss the conference calls.

11         THE COURT:  It's also hearsay.  That's

12  sustained.

13         MR. SPRINGER:  Okay.

14  Q.  (BY MR. SPRINGER)  You had mentioned the Karl

15  letter?

16  A.   Yes.

17  Q.   And without that Karl letter, you would have never

18  bought into IFC; is that correct?

19  A.   That's correct.

20  Q.   What was the significance of the Karl letter that

21  led you down the path that were you on.

22  A.   To --

23         MR. O'REILLY:  Objection, Your Honor; relevance

24  and potential to confuse the jury.  And if we may

25  approach, we've had this discussion already.

```
 1            THE COURT:  Counsel will approach.
 2       (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND
 3   OUT OF THE HEARING OF THE JURY.)
 4            THE COURT:  Okay.  What's the relevance of
 5   this?
 6            MR. SPRINGER:  I'm redirecting based upon the
 7   questions that were raised by Mr. O'Reilly about the Karl
 8   letter and he tried to give a descriptive type of
 9   narrative what that letter was and I'm going into ask
10   Mr. Stumpo what he believed that that letter was.
11            THE COURT:  Mr. O'Reilly.
12            MR. O'REILLY:  Your Honor, I don't recall making
13   any inquiry of the Karl letter, I do remember Mr. Stumpo
14   pointed out the Karl letter and I moved on.  The Karl
15   letter we discussed before with the previous witness was
16   a letter that was being sent out, it had been sent by the
17   IRS with respect to some trusts in which the IRS said
18   to -- I believe his name was Gregory Karl, an EIN is not
19   appropriate for this thing, this item and the IFC and
20   others misused that letter to basically fool people, like
21   Mr. Stumpo, into buying into the concept that they could
22   hide income and assets in trusts without employment
23   identification numbers.  The relevance of this is
24   marginal, at best.  Its potential to confuse the jury is
25   significant.
```

PAUL STUMPO - REDIRECT BY MR. SPRINGER                    2255

1          THE COURT:  The objection will be sustained

2     under Rule 402 and 403.

3          Next question.

4          (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

5     WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

6     PRESENCE AND HEARING OF THE JURY.)

7     Q.   (BY MR. SPRINGER)  Tell the jury how many years on a

8     weekly basis that you've been attending conference calls

9     with Lindsey Springer?

10    A.   It was since 2002, May.

11    Q.   To present; is that correct?

12    A.   To present, yes.

13    Q.   You were asked about an $8,000 check written in

14    2008; do you remember that?

15    A.   Yes.

16    Q.   Wasn't it 2009?

17    A.   Oh, yeah, February this year, right.

18    Q.   Now, why would a 1998 Rodeo cause you to give

19    Lindsey Springer $8,000?

20          MR. O'REILLY:  Objection; relevance.  He bought

21    the car.

22          THE COURT:  Overruled.

23          THE WITNESS:  Well, I knew you needed me to buy

24    it from you.

25    Q.   (BY MR. SPRINGER)  Thank you.

1      Mr. O'Reilly asked you about how many criminal

2  trials had you attended; do you remember that?

3  A.   Yes.

4  Q.   What about your experience of the Ouwenga criminal

5  trial impacted your decisions that you made regarding the

6  IRS after that trial?

7  A.   Well, when -- the question that I had brought into

8  tax court was the exemption amount that's the triggering

9  mechanism for a return, a return is not defined.  That

10  came up in the Ouwenga trial and they could not find an

11  exemption amount written in the law.  And as many times

12  as I've asked, there's no -- there's no exemption amount

13  which is the triggering mechanism written in the law --

14          MR. O'REILLY:  Objection, Your Honor; move to

15  strike.

16          THE COURT:  The objection will be sustained.

17      Next question.

18  Q.   (BY MR. SPRINGER)  After the Ouwenga trial, did you

19  -- did you direct Pat Turner to do anything --

20          THE COURT:  Sustained.

21          MR. O'REILLY:  Objection.

22          MR. SPRINGER:  No further questions, Your Honor.

23          THE COURT:  Mr. Stilley.

24          MR. STILLEY:  No questions.

25          THE COURT:  Any recross?

```
 1              MR. O'REILLY:  Just a moment, Your Honor.

 2              THE COURT:  You may.

 3              MR. O'REILLY:  Could we have Government's

 4   Exhibit 64, please.

 5                        RECROSS-EXAMINATION

 6   BY MR. O'REILLY:

 7   Q.   You borrowed almost $4,000 from your mother so that

 8   you could pay this to Mr. Springer?

 9   A.   Yes.

10              MR. O'REILLY:  Nothing further.

11              THE COURT:  You may step down.

12         We'll have Mr. Springer's next witness.

13              MR. SPRINGER:  Your Honor, I call Richard Marrs,

14   please.

15              THE COURT:  Richard Marrs.  Spell that last

16   name.

17              MR. SPRINGER:  M-A-R-R-S.

18              MR. SNOKE:  Your Honor, may we approach?

19              THE COURT:  Pardon me?  Well, let's get the

20   witness in the courtroom and on the stand, then you may

21   approach.

22              MR. SPRINGER:  Your Honor, I'm told he's not

23   here yet so I would call Patrick Turner.

24              THE COURT:  Mr. Turner, you're reminded you're

25   still under oath.  Welcome back.
```

```
 1                          PATRICK TURNER,
 2          (WITNESS PREVIOUSLY SWORN)
 3                          DIRECT EXAMINATION
 4   BY MR. SPRINGER:
 5   Q.   Good morning, Mr. Turner.
 6   A.   Good morning.
 7   Q.   Mr. Turner, please tell the jury just in a short
 8   reminder what business that you currently are employed
 9   with or by.
10   A.   I work for a company called Web Elite and I am their
11   chief technology officer.  And the primary business of
12   that company is to help companies put business processes
13   on the web, create web sites, and they also have a
14   hosting center.
15   Q.   Are you currently hosting a web site for Lindsey
16   Springer?
17   A.   Not at that company, but, yes.
18   Q.   Could you please explain.
19   A.   To avoid any conflict with the company that I work
20   for, I host your site at another company called A2
21   Hosting.
22   Q.   Now, could you tell the jury what -- the web site
23   that you do host, what kind of material, just in general,
24   appears on the web site.
25   A.   There are documents -- it's mostly a document
```

1  reference site that contains many PDFs of court-related

2  documents for different cases, as well as complaints that

3  you have filed in court, and it has also a couple of

4  video and audio files on the site as well.

5  Q.   Audios from conference calls?

6  A.   Yes, and presentations that you have made.

7  Q.   Besides being the host, have you personally reviewed

8  all the material that you've placed on that web site?

9  A.   Oh, yes.

10  Q.   More than one time?

11  A.   Yes.

12  Q.   Do you direct people to the web site?

13  A.   Yes, on occasion.

14  Q.   Did you cause to have 1040 forms for the years 2000

15  through 2005 be placed on that web site?

16  A.   Yes, I did.

17  Q.   Did you also have instruction booklets for those

18  same years placed on the same web site?

19  A.   Yes, I did.

20  Q.   Did you also cause a General Accountability Office

21  report dated May of 2005 to be placed on the web site?

22  A.   Yes, I did.

23  Q.   Why did you decide -- excuse me -- did you decide

24  that those documents that you just identified were

25  relevant to be on that web site?

PATRICK TURNER - DIRECT BY MR. SPRINGER                    2260

 1  A.   No.

 2  Q.   Who made that decision?

 3  A.   You did

 4  Q.   Now, tell the jury what the general purpose of

 5  putting those forms and instruction booklets on the web

 6  site was for.

 7          MR. O'REILLY:  Objection, Your Honor.  Given

 8  that it was apparently Mr. Springer that decided what

 9  forms to be placed there, this witness does not seem to

10  be able to answer that question without hearsay

11  testimony.

12          THE COURT:  Sustained.

13  Q.   (BY MR. SPRINGER)  Mr. Turner, you have in front of

14  you --

15          MR. SPRINGER:  May I approach, Your Honor?

16          THE COURT:  You may.

17  Q.   (BY MR. SPRINGER)  Mr. Turner, could you turn to

18  Defendant's Exhibit Number 14, please.  Can you identify

19  Exhibit Number 14, please.

20  A.   It's the instruction booklet for the Form 1040 for

21  the year 1990.

22  Q.   Have you seen this instruction booklet before?

23  A.   Yes.

24  Q.   Have you read the contents of this instruction

25  booklet generally?

```
 1   A.    Generally, portions of it.
 2            MR. SPRINGER:  Your Honor, I move the admission
 3   of Defendant's Exhibit 14.
 4            MR. O'REILLY:  Objection; relevance, Your Honor.
 5            THE COURT:  Sustained.
 6   Q.    (BY MR. SPRINGER)  Mr. Turner, could you turn to
 7   Number 13, please, Defendant's Exhibit Number 13.  Do you
 8   recognize Defendant's Exhibit Number 13?
 9   A.    Yes, it's the Form 1040 for the year 1990.
10   Q.    Okay.  Could you please turn to Exhibit Number 15,
11   please.  Do you recognize that document?
12   A.    Yes, I do.
13   Q.    What document is that?
14   A.    The Form 1040 for 1992.
15   Q.    And then could you please turn to Exhibit Number
16   16.  Do you recognize Defendant's Exhibit Number 16?
17   A.    Yes, it's the instruction booklet for Form 1040 for
18   the year 1992.
19   Q.    Could you please turn to Exhibit Number --
20   Defendant's Exhibit Number 17.  Do you recognize that
21   document?
22   A.    Yes.  It's the Form 1040 for the year 1994.
23   Q.    Have you seen that document before today?
24   A.    Yes.
25   Q.    Is that on our web site?
```

1   A.   Yes, it is.

2   Q.   Could you please turn to Defendant's Exhibit Number

3   18.

4   A.   Yeah.

5   Q.   Have you seen Defendant's Exhibit Number 18 before?

6   A.   Yes.

7   Q.   And could you please tell the jury what that is.

8   A.   It's the instruction booklet for Form 1040 for the

9   year 1994.

10  Q.   Could you please turn to Defendant's Exhibit Number

11  19.

12       Do you need some water?

13  A.   I'm good.

14  Q.   Could you please tell the jury what Defendant's

15  Exhibit Number 19 is.

16  A.   It's the Form 1040 for the year 1995.

17  Q.   Could you please turn to Defendant's Exhibit Number

18  20, please.  Have you seen Defendant's Exhibit Number 20

19  before today?

20  A.   Yes.

21  Q.   Could you please tell the jury what Defendant's

22  Exhibit Number 20 is.

23  A.   It's the instruction booklet for Form 1040 for the

24  year 1995.

25  Q.   Could you please turn to Defendant's Exhibit Number

1  21.  Could you please tell the jury what Defendant's
2  Exhibit Number 21 is.
3  A.   It's the Form 1040 for the year 1996.
4  Q.   Have you seen that Defendant's Exhibit Number 21
5  before today?
6  A.   Yes.
7  Q.   Could you please turn to Defendant's Exhibit Number
8  22.  Could you please tell the jury what that is.
9  A.   It's the instruction booklet for the Form 1040 for
10 the year 1996.
11 Q.   Could you please turn to Defendant's Exhibit Number
12 23, please.  Could you please tell the jury what
13 Defendant's Exhibit Number 23 is.
14 A.   It's the Form 1040 for the year 2000.
15 Q.   Have you seen Defendant's Exhibit Number 23 before?
16 A.   Yes.
17        MR. SPRINGER:  Your Honor, I would move to enter
18 Exhibit Number 23.
19        MR. O'REILLY:  Objection; relevance, potential
20 to confuse the jury.  The law should be coming from the
21 court, not from the documents.
22        THE COURT:  Let's take our mid-morning break at
23 this time.  You may be seated.
24    Members of the jury, we'll take our midmorning
25 recess at this time.  Again, guided by the clock on the

```
 1  wall, we'll resume at 10 minutes till 11:00.  During this
 2  recess, please remember my usual admonition not to
 3  discuss or investigate the case and not to reach any
 4  conclusions about the case until it's been given to you
 5  for your deliberations and verdict.  So if you would be
 6  ready to return to the courtroom with the security
 7  officer just a little before ten minutes before 11:00.
 8      All persons in the courtroom will remain seated
 9  while the jury departs.
10      (JURY EXITS THE COURTROOM.)
11          THE COURT:  You may step down.
12      Okay.  The pending offered is a series of returns,
13  blank, I guess, in some instances, instructions, and in
14  some instances, Form 1040, for several years ending with
15  the Form 1040 for the year 2000.
16      Now, Mr. Springer, my beginning point for addressing
17  this is -- and I would emphasize that my beginning point
18  for addressing the admissibility of these exhibits and
19  perhaps others is my ruling on the Paperwork Reduction
20  Act.  Bear in mind, it is not -- the Paperwork Reduction
21  Act is out of this case as a substantive defense.
22          MR. SPRINGER:  Correct.
23          THE COURT:  Okay.  So the -- to the extent that
24  testimony or other evidence about the Paperwork Reduction
25  Act is admissible at all, it is only to the extent that
```

 1  it goes to willfulness, and that's not just anybody's

 2  willfulness, that is your willfulness.

 3          MR. SPRINGER:  Right.

 4          THE COURT:  So I need to hear from you as to how

 5  this series of forms mostly from the 1990s goes to the

 6  issue of your willfulness based on testimony in evidence,

 7  not testimony that you might give when you take the

 8  stand, but based on testimony that the Court has received

 9  in evidence as a predicate.

10          MR. O'REILLY:  Very briefly, I understood

11  Mr. Springer only to be offering the 2000 form.  He just

12  had Mr. Turner identify all of those prior ones up until

13  23, I believe.

14          THE COURT:  Well, that point is well-taken.  The

15  pending offer is Exhibit 23, the 2000 Form 1040.

16          MR. SPRINGER:  Right.  After the Court sustained

17  objection on the forms that were outside of the years at

18  issue in the case, then I just zoomed in on just bringing

19  in the forms that are relevant to the years of tax

20  evasion or willful failure to file.

21      The reason why I went to the other years, Your

22  Honor, but stopped trying to move them in, I recognized I

23  was going have to bring them in myself or try to, but the

24  charges in Count 1, in one of the manner and means

25  sections of the conspiracy was that I did not file tax

1  returns from 1985 to the present, so that was the reason

2  why -- Mr. Turner was the host of the web site, I

3  directed him to put those on the web site, so I was

4  entering those as evidence, public documents that are on

5  my web site.

6      There's been no objection by the government as to

7  whether those documents are not accurate or not.  And I

8  was not going to solicit any Paperwork Reduction Act

9  information from the documents until I took the stand,

10 but I was going to attempt to get those documents into

11 the record because Mr. Turner is the one who actually

12 placed them on my web site and he gave direct testimony

13 as to that fact.

14         THE COURT:  Well, let's take this one step at a

15 time.  Is the version that's on your web site any

16 different from the officially published IRS Form 1040 for

17 the year 2000?

18         MR. SPRINGER:  No.

19         THE COURT:  Then what -- I'm having difficulty

20 with the relevance of couching this in terms of whether

21 it was posted on your web site.

22         MR. SPRINGER:  Just because he had knowledge

23 that I directed him to put that on there, that he did

24 what I asked him to do.

25     I am not going to be able to take the stand and tell

1  the jury on my web site that I put those forms on my web

2  site, because I didn't do it.  I directed him to do it,

3  but I did not do it.  There's a chain, a flow, between

4  where I asked him to do it and where he did it.

5          THE COURT:  Well, if it's relevant -- when your

6  turn comes, if it's relevant, you can tell the jury that

7  you caused a given document to be published on your web

8  site, but the pending objection to Exhibit 23 is

9  relevance.

10         MR. SPRINGER:  Okay.  Relevance is to

11  discussions that I've had with Mr. Turner about this

12  form, whether it complied or didn't comply with certain

13  laws, without mentioning the phrase, and then what was

14  his conclusions that he drew from the conversations that

15  we had, the investigation that he participated in

16  himself, to check out whether the things that I told him

17  were, in fact, you know, smoke and mirror, or whatever.

18         THE COURT:  We're not going to dissect

19  Mr. Turner's misconceptions or notions about the

20  Paperwork Reduction Act.

21         MR. SPRINGER:  I wasn't --

22         THE COURT:  We're not going to go there.

23         MR. SPRINGER:  Okay.

24         THE COURT:  And, you know, I'm tempted to let

25  this 1040 in.  And, frankly, once one of these 1040s

1  comes in from what -- the relevant years and the

2  instruction books, you're cutting your throat.  I mean,

3  the jury is going to get those and read them and I just

4  -- it's inconceivable to me that you would want the jury

5  to be in the jury room poring over the instructions for

6  the 1040, with one of the grounds rules being that the

7  Paperwork Reduction Act is not a defense.  But you can

8  try your own lawsuit as long as you show me some

9  relevance.

10         MR. SPRINGER:  Okay, Your Honor.  The relevance,

11  though, to all of this is good faith, on what I relied

12  upon, why I would have came to the conclusions that I

13  came to.  And to that degree, I need the jury to have

14  those forms, to have those instruction booklets, so they

15  can measure whether I was -- and there are other

16  documents too, Your Honor, the General Accountability

17  Report from 2005 clearly supports my position.

18         THE COURT:  Well, they can come in when you, by

19  your testimony, make them relevant.  The objection will

20  be sustained.

21     Court will be in recess.

22     (A RECESS WAS HAD, AFTER WHICH THE FOLLOWING

23  PROCEEDINGS WERE HAD IN OPEN COURT AND WITHIN THE

24  PRESENCE AND HEARING OF THE JURY.)

25         THE COURT:  Mr. Springer, you may continue.

1   Q.   (BY MR. SPRINGER)  Could you please tell the jury

2   whether you and I have had conversations regarding the

3   Form 1040 in general?

4   A.   Oh, quite a bit, yes.

5   Q.   Could you tell them the nature of those

6   conversations.

7   A.   Basically, it centered around the Paperwork

8   Reduction Act, obligations to file, the --

9            MR. O'REILLY:  Your Honor, objection.

10            THE WITNESS -- disclosures.

11            THE COURT:  Go ahead.

12            MR. O'REILLY:  Relevance and subject to this

13   Court's prior rulings.

14            THE COURT:  Counsel will approach.

15      (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND

16   OUT OF THE HEARING OF THE JURY.)

17            THE COURT:  Now, from the -- my first inquiry is

18   to Mr. O'Reilly.  The ground rules are that -- and this

19   was in the context really, I'll be the first to admit, of

20   Mr. Springer's proffer as to his own testimony, but the

21   ground rules are that to some degree, at least, evidence

22   about the Paperwork Reduction Act will be admissible as

23   it goes to the issue of willfulness.  And my concern at

24   this point is that I can't categorically rule out the

25   possibility that testimony could be elicited from this

1  witness that goes to Mr. Springer's willfulness as to

2  what Mr. Springer might have purportedly sincerely

3  believed about the Paperwork Reduction Act at some point

4  in time, so with respect to the relevance objection,

5  Mr. O'Reilly, that's my concern.  I'll give you an

6  opportunity to address that, and then I'll hear anything

7  that Mr. Springer would have to say.

8         MR. O'REILLY:  Your Honor, just so long as it is

9  clearly elicited that Mr. Turner is not stating either

10 his understanding of the law or what the law is, then

11 we're not going to have an objection -- or what some

12 other person thought the law was.  If it is very clear

13 that what he has testified to is what Mr. Springer said,

14 not what Mr. Springer believed, because Mr. Turner cannot

15 testify to what Mr. Springer believed.

16        THE COURT:  Right.

17        MR. O'REILLY:  But certainly he can -- he would

18 be permitted to go into the state of mind to testifying

19 what Mr. Springer said because it's not offered for its

20 truth, it's offered for his state of mind.

21        THE COURT:  Mr. Springer, that probably is a

22 pretty accurate place to draw the line, given my

23 rulings.

24        MR. SPRINGER:  Right.  "Said" is the key

25 phrase.  And I'm just trying to stay within the

```
 1   statements of the party opponent.  The government

 2   introduced statements that I gave to Mr. Shern and

 3   Mr. Dan Sivils in their direct testimony.  And Mr. Turner

 4   is no different in that regard.

 5           THE COURT:  Okay.  Well, while you're here, it's

 6   probably timely for me at this point to clear the air

 7   with my limiting instruction that we discussed on the

 8   Paperwork Reduction Act.  Does the government have any

 9   objection to that?

10           MR. O'REILLY:  No, Your Honor.

11           THE COURT:  Mr. Springer?

12           MR. SPRINGER:  No.

13           THE COURT:  We'll -- I think we have some

14   clarity as to the ground rules now.  And I frankly -- I

15   can't remember what the pending question is, let me take

16   a look here.  So the objection -- the objection to the

17   pending question specifically, "Could you please tell the

18   jury whether you and I have had conversations regarding

19   the Form 1040 in general," that's overruled based on the

20   ground rules as they now exist.  But it can't to go the

21   witness's state of mind, it can't go directly to your

22   state of mind because he is incompetent to testify to

23   that, but it can go to what you said about what you

24   believed and -- but first I'll give the jury the limiting

25   instruction.
```

1           MR. O'REILLY:  Your Honor, there's one other

2    matter with respect to Mr. Marrs, who was Mr. Patterson's

3    attorney, and I am -- we're unclear as to whether the

4    questions Mr. Springer or Mr. Stilley intend to elicit

5    will impinge upon attorney-client privilege issues.  And

6    that's one thing we did want to raise prior to Mr. Marrs

7    taking the stand.

8           THE COURT:  I'll be conscious of that.  And if

9    we get to lunch, remind me when we get to the noon recess

10   and we'll explore that outside of the hearing of the

11   jury.

12          MR. SPRINGER:  Thank you, Your Honor.

13      (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

14   WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

15   PRESENCE AND HEARING OF THE JURY.)

16          THE COURT:  Members of the jury, it's time for

17   me to clear the air just a bit and give you, I think,

18   better framework, for your -- to facilitate, I think,

19   your understanding of some of the evidence that I will

20   admit and so that you can -- can have a good

21   understanding of the issues as they have unfolded and

22   will unfold in this trial.

23      Now, you've heard several references to the

24   Paperwork Reduction Act and you have heard some

25   objections to some of that questioning be sustained and

 1  some objections to some of that questioning be

 2  overruled.

 3      I have ruled in this case that the Form 1040 did not

 4  and does not violate the Paperwork Reduction Act.  That

 5  is not going to be what we call a substantive defense in

 6  this case.

 7      However, I am going to permit testimony with respect

 8  to Mr. Springer's assertions as to his understanding of

 9  the Paperwork Reduction Act to be introduced for a

10  limited purpose on one issue and that one issue is the

11  issue of willfulness.

12      Proof of the crimes charged in the indictment in

13  this case must include proof beyond a reasonable doubt of

14  an element known in law as "willfulness," as will be

15  explained in more detail in my final instructions to you

16  at the end of this case.

17      I am going to admit evidence as to Mr. Springer's

18  understanding of the Paperwork Reduction Act, perhaps in

19  some instances evidenced by what he had to -- what he

20  himself had to say about the Paperwork Reduction Act at

21  the times relevant to the indictment in this case for

22  your consideration with respect to the issue of

23  willfulness.

24      What is relevant will be not any given witness's

25  understanding of the Paperwork Reduction Act, other than

1  Mr. Springer, if he chooses to testify, and what is
2  relevant is what you may ultimately find about the
3  willfulness with which Mr. Springer may have done or not
4  have done matters that you are satisfied from the
5  evidence have occurred or not occurred.
6       For that reason, and on that one issue of
7  willfulness, I'm going to permit some questioning with
8  respect to matters relating to the Paperwork Reduction
9  Act, and, in particular, perhaps with respect to this
10  witness, questioning as to statements that may at
11  relevant times, at least, have been made by
12  Mr. Springer.
13       You may proceed.
14            MR. SPRINGER:  Your Honor, may I approach?
15  These are more exhibits.
16  Q.  (BY MR. SPRINGER)  Do you remember the question that
17  I asked you?
18  A.  Our discussions with regard to the Form 1040?
19  Q.  Yes.  Have we had discussions regarding the 1040?
20  A.  Yes.
21            MR. O'REILLY:  Objection, Your Honor.  We need a
22  time reference.
23            THE COURT:  That would be reasonable.
24  Q.  (BY MR. SPRINGER)  Mr. Turner, when did you first
25  meet Lindsey Springer?

1    A.   In mid 2003.

2    Q.   When would you tell this -- please tell the jury

3    when you believe we first had conversations regarding the

4    Form 1040.

5    A.   Almost immediately.

6    Q.   And have those conversations been an ongoing

7    dialogue for several years?

8    A.   Yes.

9    Q.   What did I say to you regarding the Form 1040 for

10   the years 1996 through 2004?

11   A.   That the Form 1040 in and of -- well, many things,

12   but the biggest characteristic was that at that time or

13   during that time frame the Form 1040 had the same OMB

14   number but it was only on the Form 1040 but -- and not on

15   any of the ancillary forms.

16   Q.   Now, did we also have discussions regarding the

17   instruction booklets?

18   A.   Yes.

19   Q.   And I believe before the break you had identified

20   that you had seen the Form 1040 for 2000?

21   A.   Yes, that's correct.

22   Q.   And could you please turn to the 1040 instruction

23   booklet for 2000, which is Defendant's Exhibit 24.

24   A.   Okay.

25   Q.   And do you recognize this instruction booklet?

 1  A.   I do.

 2  Q.   Okay.  And is there something in this instruction

 3  booklet that I told you supported what you stated just a

 4  moment ago that I told you the form did not comply with

 5  the Paperwork Reduction Act?

 6  A.   Yes, there's actually various things.  First and

 7  foremost, on the cover, it says the booklet does not

 8  contain --

 9        MR. O'REILLY:  Your Honor, objection; he's

10  speaking from a document that's not in evidence.

11        THE COURT:  Sustained.

12  Q.   (BY MR. SPRINGER)  Without speaking from the

13  document --

14  A.   Right.

15  Q.   -- could you tell the jury what you remember I said

16  with regard to the 1040 instruction booklet for the year

17  2000.

18  A.   That the disclosures for the Paperwork Reduction Act

19  were in the instructions and they needed to be on the

20  form, and that it did not contain an OMB number.

21  Q.   Do you remember whether I said -- scratch that.

22       Did our conversations ever go into what was said in

23  the instruction booklet?

24  A.   Yes.

25  Q.   Did our conversations ever -- did I ever say to you

```
 1  that the obligations that the IRS had for the form

 2  actually did not appear in the instruction booklets?

 3  A.   That's true too, yes.

 4          MR. SPRINGER:  Your Honor, may I have one

 5  second?

 6          THE COURT:  You may.

 7  Q.  (BY MR. SPRINGER)  When these conversations took

 8  place regarding the instruction booklet and the Form 1040

 9  for the year 2000, is it also true that the conversations

10  involved 2001 and 2002 and 2003?

11  A.   Yes.

12  Q.   And --

13          THE COURT:  Mr. Springer, you need to bear in

14  mind the Court's discussion with you about leading

15  questions.

16          MR. SPRINGER:  Sorry about that, Your Honor.

17  Q.  (BY MR. SPRINGER)  Mr. Turner, did we have

18  conversations regarding the Form 1040 and instruction

19  booklet for 2001?

20  A.   Yes.

21  Q.   Mr. Turner, did we have discussion and conversation

22  regarding the 1040 and instruction booklet for 2002?

23  A.   Yes, we did.

24  Q.   Mr. Turner, did we have discussion or conversation

25  regarding the 1040 Form for 2003?
```

1  A.   Yes, we did.

2  Q.   Isn't it true that in conversations every year

3  thereafter, you and I would discuss the most recent form

4  and instruction booklets that came out?

5  A.   Yes, that's correct.

6  Q.   What was my demeanor with respect to these

7  conversations and showing you this information?

8  A.   Well, up until the 2005 and 2006 transition, it was

9  that, you know, pretty much status quo, things were not

10  changing very much, and then there was a drastic change

11  in the behavior of the IRS with regard to those forms and

12  those instruction booklets.

13  Q.   And did our conversations involve that occurring

14  somewhere in the 2005 year?

15  A.   Yes, that's correct.

16  Q.   Did I share with you the General Accountability

17  Office's report involving the IRS's non-compliance with

18  the Paperwork Reduction Act?

19  A.   Yes, you did.

20       MR. O'REILLY:  Objection, Your Honor; it

21  misstates what that report is.

22       THE COURT:  Sustained.  That will be stricken.

23  Q.   (BY MR. SPRINGER)  Did I share with you a report

24  from the General Accountability Office?

25  A.   Yes, you did.

1  Q.   And do you remember what the date of that report

2  was?

3  A.   May 2005.

4  Q.   What did I show you with regard to that report?

5  A.   We basically went through the report and various

6  places it discussed the GAO's objections to the handling

7  of certain forms in -- relative to --

8           MR. O'REILLY:  Objection; calls for hearsay.

9           THE COURT:  Well, the objection --

10          MR. O'REILLY:  Also relevance.

11          THE COURT:  The objection will be sustained.

12  Q.   (BY MR. SPRINGER)  Did what you heard me say become

13  supported by that report?

14  A.   Yes, it did.

15  Q.   Thank you.

16       Did you post a filed complaint that -- excuse me,

17  strike that.

18       Did I ever tell you about a complaint I had filed in

19  the United States District Court involving the Paperwork

20  Reduction Act?

21  A.   Yes.

22  Q.   Okay.  Did you put that on the web site?

23  A.   I did.

24  Q.   With all the exhibits?

25  A.   That's correct.

1           MR. O'REILLY:  Your Honor, just for

2  clarification, when did this occur?

3           THE COURT:  That would be fair.

4  Q.  (BY MR. SPRINGER)  When did you post the complaint

5  that I had filed with regard to the Paperwork Reduction

6  Act?

7  A.  I'm only going to speculate here because there was

8  an --

9  Q.  No, don't speculate.  Would you have --

10 A.  I would know approximately when it was.

11 Q.  When approximately?

12 A.  In the 2006 time frame.

13 Q.  2006.  And did I tell you that that complaint was

14 filed in 2006?

15 A.  I believe so.

16 Q.  Have you seen a stamp-filed copy of that complaint?

17 A.  Yes.

18 Q.  Do you know whether it said it was stamp-filed in

19 2006?

20 A.  I believe so.

21 Q.  Would that be in February of 2006?

22          MR. O'REILLY:  Your Honor, objection; leading.

23          THE COURT:  Sustained.

24 Q.  (BY MR. SPRINGER)  Did I show you in the General

25 Accountability Office report, the GAO report, did I show

1   you both what the IRS had told GAO and what GAO said in

2   response to what the IRS said?

3   A.   Yes, you did.

4   Q.   In our conversations that we had in the beginning of

5   our relationship, did we ever speak about what specific

6   code section or regulation required a person to answer

7   questions on a Form 1040?

8   A.   We attempted to find one, yes, and we had

9   discussions about it, yes.

10  Q.   And what did I tell you about that?

11  A.   That there wasn't a code section that specifically

12  made a person responsible for filing.

13  Q.   Did I tell you to file tax returns?

14  A.   Yes, you did.

15  Q.   Do you remember why I said for you to do that?

16  A.   Yes, I do.

17        MR. O'REILLY:  Objection, Your Honor.  How can

18  he speculate as to why Mr. Springer would do something?

19        THE COURT:  Sustained.

20  Q.   (BY MR. SPRINGER)  Did I tell you why you should

21  file returns?

22  A.   Yes.

23  Q.   Could you please tell the jury why.

24  A.   In very colorful language, you said that if you are

25  pursued criminally and you get convicted, the big

1   difference is that if you stay on the civil side of

2   things and you're convicted of a civil issue, you can go

3   home and eat ice cream afterwards, but if you got

4   convicted of a criminal action, you would lose your

5   liberty and you told me I needed to be a dad.

6   Q.   And at the time that you and I met, you were working

7   for this web company; is that correct?

8   A.   Yes.

9   Q.   And you were paid with a -- there were W-4s issued

10  to you; is that correct?

11  A.   There was a transition during the time I was with

12  that company from being a consultant and getting 1099s

13  and then a transition to being employed and getting

14  W-4s -- or W-2s.

15  Q.   And anything that I said to you regarding the Form

16  1040 for the year 2000 through 2003 during those

17  conversations?

18  A.   Yeah.

19  Q.   Did you ever find anything that I said to you was

20  inaccurate?

21  A.   No.

22  Q.   Did I -- excuse me, strike that.

23       Did our conversations during this same time period

24  involve the application of penalties?

25  A.   Yes, it did.

PATRICK TURNER - DIRECT BY MR. SPRINGER                    2283

1  Q.  Did I ever show you in the instruction booklets for

2  2000 through 2003 a statement made by the IRS in the

3  instruction booklet with regard to the Paperwork

4  Reduction Act?

5  A.  Yes, you did.

6  Q.  After you read what I had showed you, how did that

7  impact your beliefs about -- about what I had said.

8          MR. O'REILLY:  Objection; relevance, Your

9  Honor.

10          THE COURT:  Sustained.

11  Q.  (BY MR. SPRINGER)  Is what I showed you consistent

12  from 1996 to the present as far as you know with regard

13  to the instruction booklets?

14  A.  Yes, it is.

15  Q.  Did I show you whether the instruction booklets

16  referenced the Paperwork Reduction Act?

17  A.  Yes, you did.

18  Q.  Did I show you whether or not -- or did I show you

19  that the reference to the Act was the 1980 Act?

20  A.  Yes.

21  Q.  Did I also show you that there was a 1995 Act?

22  A.  Yes, you did.

23          MR. O'REILLY:  Objection; leading.

24          THE COURT:  Sustained.

25          THE WITNESS:  Can I say what he showed me?

1          MR. SPRINGER:  May I ask one question, Your

2    Honor?

3          THE COURT:  You may.

4    Q.  (BY MR. SPRINGER)  Mr. Turner, as you sit here

5    today, are you aware of any agreement that Oscar Stilley

6    and I entered into to defraud the United States?

7    A.  No.

8    Q.  Your previous testimony, Mr. Turner, was in regard

9    to a $250,000 loan; do you remember that?

10   A.  Yes.

11   Q.  And that occurred sometime in August of 2005; is

12   that correct?

13   A.  July, August, yes.

14   Q.  Did Paul Stumpo have anything to do with why you

15   went and borrowed $250,000 against your houses?

16   A.  Yes, he -- we had several conversations about that

17   situation.

18   Q.  Did I, Lindsey Springer, have anything to do with

19   why you went and borrowed $250,000 from somebody on a

20   house or whatever it was?

21   A.  No.

22   Q.  At the time that you and I entered into that loan

23   agreement, as you testified earlier about, was it

24   understood that I could use that money between you and I

25   for anything that I wanted to?

1  A.   For the purposes of the ministry, that's correct.

2  Q.   For a period of one year?

3  A.   That's correct.

4  Q.   Is that true?

5  A.   Yes, it is.

6  Q.   And at some point in time, did the contract get

7  orally amended?

8  A.   Yes.

9  Q.   And what was the reason why it got orally amended?

10 A.   The IRS and the Department of Justice ended their

11 criminal investigation of me.

12 Q.   And that was in January of 2006?

13 A.   That's correct.

14 Q.   And at that time you were also aware that you had a

15 lien against a very expensive motor home; isn't that

16 true?

17 A.   That's correct.

18       MR. O'REILLY:  Objection to the form of the

19 question.

20       THE COURT:  Sustained.

21    Mr. Springer, if the question is a declarative

22 sentence with a question mark at the end of it, then it's

23 impermissibly leading.

24       MR. SPRINGER:  Got you.

25 Q.   (BY MR. SPRINGER)  Is the $250,000 that you loaned

```
 1  Lindsey Springer secured by any property?
 2  A.   Yes, it is.
 3  Q.   Could you tell the jury what that property is?
 4  A.   A large, expensive motor home.
 5  Q.   Have you seen that large, expensive motor home?
 6  A.   Yes, I have, on a couple of occasions.
 7  Q.   Have you ever seen any other motor homes besides
 8  that one?
 9  A.   I don't think -- no, no.
10         MR. O'REILLY:  Objection; clarity.  I'm sure
11  Mr. Turner has seen many motor homes.
12         THE COURT:  Clarify the question.
13  Q.   (BY MR. SPRINGER)  What made you think the motor
14  home was expensive?
15  A.   Just the accoutrements and the size of it and the
16  nature.  It was like a Greyhound bus; it was of that
17  nature.
18  Q.   As far as you're concerned -- excuse me, strike
19  that.
20      Was Oscar Stilley within -- was he permitted to send
21  any of the $250,000 that you wired to his IOLTA account
22  to wherever I asked him to send that money?
23  A.   Yes.
24  Q.   Did I ever start making interest payments to you and
25  your wife?
```

```
 1   A.   Yes.
 2   Q.   Did I ever tell you I was trying to sell the RV?
 3   A.   Yes.
 4   Q.   Did I ever tell you why I couldn't sell it?
 5   A.   Because the economy had crashed and the value of the
 6   bus had -- on the open market had declined to such a
 7   point that people were actually just trying to steal it
 8   for, like, $40,000.
 9   Q.   Did you and I have conversations about whether to
10   sell it at a reduced price or to wait out the market?
11   A.   Yes.
12   Q.   Did you and I decide that we would wait out the
13   market?
14   A.   Yes.
15   Q.   At the time those conversations were taking place,
16   was diesel around $5 a gallon?
17   A.   That's correct.
18   Q.   Have you visited my home before?
19   A.   Yes, I have.
20   Q.   Would you consider it to be a very small home?
21   A.   Very small; it's a converted garage.
22   Q.   Have you visited my office before?
23   A.   Yes.
24   Q.   Do you have to walk up a ladder?
25   A.   Yeah, an attic ladder.
```

1  Q.   Could you tell the jury where the attic is.

2  A.   In his garage.

3          MR. O'REILLY:  Objection as to relevance.

4          THE COURT:  Overruled at this point.

5  Q.   (BY MR. SPRINGER)  Do you remember whether you and I

6  ever had any conversations about Bondage Breakers

7  Ministry or Lindsey Springer receiving gifts?

8  A.   Yes, many.

9  Q.   Did I, Lindsey Springer, ever say to you how I

10  believed and considered -- excuse me, strike that.

11      How I -- I'm there, hang on.

12      Did I ever show you how I supported the

13  determination (sic) money people gave me was a gift?

14  A.   Yes, you did.  You showed me Code Section 102, Title

15  26.

16  Q.   Did you ever go look at that for yourself?

17  A.   Yes, I printed it out.

18  Q.   Did you ever have any conversations with Robert D.

19  Metcalf involving Mr. Benson?

20  A.   Oh, yes, yes, Mr. Metcalf was investigating

21  Mr. Benson, yes.

22  Q.   How did you get directed to Mr. Metcalf?

23          MR. O'REILLY:  Your Honor, objection;

24  relevance.

25          THE COURT:  Sustained.

1  Q.   (BY MR. SPRINGER)  So as you sit here today, please

2  tell that jury that that $250,000 that you wired to Oscar

3  Stilley's IOLTA account was a loan to Lindsey Springer.

4  A.   Yes, it was.

5          MR. O'REILLY:  Objection, Your Honor; form of

6  the question.

7          THE COURT:  That's the worst leading question

8  that I've heard in a long, long time, Mr. Springer.

9          MR. SPRINGER:  Sorry, Your Honor.

10         THE COURT:  Well, if we have much more of it,

11 you're just going to have to sit down, and it doesn't

12 matter whether it's this or any other witness, do you

13 understand?

14         MR. SPRINGER:  Yes, sir.

15         THE COURT:  That will be stricken and the jury

16 is admonished not to consider that answer.  And,

17 Mr. Springer, I just can't emphasize that too much.

18 We're not going to have consistent leading questions.

19         MR. SPRINGER:  Yes, Your Honor.  I'm sorry.

20 Q.   (BY MR. SPRINGER)  Mr. Turner, is there any service

21 that I provided to you -- excuse me, strike that.

22      Do you know of any service I ever provided to you?

23 A.   I don't know what you mean by the word "service."

24         MR. SPRINGER:  I have one last question, Your

25 Honor, but I need to ask one question.

```
 1              THE WITNESS:  In reference to your last
 2  question --
 3              THE COURT:  We'll wait for the next question.
 4              MR. SPRINGER:  I pass the witness, Your Honor.
 5              THE COURT:  Mr. Stilley.
 6              MR. STILLEY:  No questions.
 7              THE COURT:  Mr. O'Reilly.
 8              MR. O'REILLY:  May I approach the witness, Your
 9  Honor?
10              THE COURT:  You may.
11                      CROSS-EXAMINATION
12  BY MR. O'REILLY:
13  Q.  Mr. Turner, I want you to take a look at what's been
14  marked for identification as Exhibit 591.  I'm going to
15  ask you if you recognize what that is.
16  A.  I don't.  No.
17  Q.  I believe you testified you've been to
18  Mr. Springer's home?
19  A.  Yes.
20  Q.  And you've seen Mr. Springer's home?
21  A.  Yes, I did.
22  Q.  Does that picture refresh your recollection at all?
23  A.  This -- okay.
24  Q.  Do you recognize what that is?
25  A.  I believe it is a picture of Mr. Springer's home.
```

1   Q.   The home you just referenced as being very small?

2   A.   Correct.

3           MR. O'REILLY:  Your Honor, the government moves

4   Government's Exhibit 591 into evidence.

5           MR. SPRINGER:  No objection, Your Honor.

6           THE COURT:  It's not in my book.  Do we have a

7   --

8           MR. O'REILLY:  We had copies made this morning.

9           THE COURT:  Okay.  That's fine.  It will be

10  received.  591 is received.

11          MR. O'REILLY:  And if we may publish that for

12  the jury, please.

13  Q.   (BY MR. O'REILLY)  How many times have you been to

14  Mr. Springer's home?

15  A.   Once or twice.

16  Q.   When was the last time you were there?

17  A.   When I came to testify to the grand jury.

18  Q.   So that would have been, I believe, in 2006, does

19  that sound about right?

20  A.   It sounds right.

21  Q.   When is the last time you saw the motor home upon

22  which you have a lien?

23  A.   That same time, I believe.

24  Q.   It's been over three years?

25  A.   To the best of my recollection.

1  Q.   And I believe you told Mr. Springer in direct that

2  the value of this motor home -- the offers he was getting

3  on it were only around $40,000?

4  A.   That was at one point one of the offers that he

5  received.  I believe he's received other offers.

6  Q.   What is your basis for that belief?

7  A.   Discussions with him.

8  Q.   So this is what Mr. Springer has told you?

9  A.   Yeah.

10 Q.   Do you know if there's any other ways Mr. Springer

11 could have repaid you?

12 A.   Not that I believe were open to him.

13 Q.   None that you were aware of as you sit here today?

14 A.   That's correct.

15 Q.   Now, I believe you testified in direct that the IRS

16 ended its criminal investigation of you, at least you

17 were notified of it and were aware of it in January of

18 2006?

19 A.   That's correct.

20 Q.   Is that the point in time that you would have, if

21 you could have, gotten the 250,000 back?

22 A.   That's correct.  Well, can I clarify my answer, Your

23 Honor?

24             THE COURT:  You may.

25             THE WITNESS:  The letter said that they were

1  ending their activity at that time but didn't preclude

2  the fact that the investigation could be reopened at a

3  later date, and so I went through a little bit of a

4  cooling-off period trying to figure out what they were

5  going to do next.

6  Q.   (BY MR. O'REILLY)  But you would have liked to have

7  gotten a quarter of a million dollars back, wouldn't

8  you?

9  A.   Yes.

10 Q.   Pay off the refinancing on your two houses?

11 A.   That's correct.

12 Q.   I'm sure your wife would have liked to have gotten

13 that quarter of a million dollars back as well?

14 A.   You would have to ask her.

15 Q.   I'm sure you have some idea.  Strike that.

16      Well, let me ask you this:  I'm going ask you take a

17 look at what's in evidence -- under Government's Exhibit

18 61, which is a check -- on page 130 of that exhibit, it

19 should be a check from Herbert L. Mott and Shirley Mott,

20 it's also Government's Exhibit 49.  Do you see that

21 check, sir?

22 A.   Yes, I do.

23 Q.   And that check is dated February 13 of 2006, so

24 after the IRS had notified you it was no longer

25 criminally investigating you --

1            MR. SPRINGER:  Objection, Your Honor.  That said

2    2004.

3            MR. O'REILLY:  Oh, is this the 2004 one?  I

4    apologize.

5            THE WITNESS:  It did.  It said 2004.

6            MR. O'REILLY:  That would be the incorrect

7    check, I apologize, Your Honor.

8            THE COURT:  The objection will be sustained.

9    Q.  (BY MR. O'REILLY)  Let's instead take a look at what

10   I believe is check on page 132.

11           MR. O'REILLY:  If I may have a moment, Your

12   Honor?

13           THE COURT:  You may.

14   Q.  (BY MR. O'REILLY)  And that is a check dated

15   February 9, 2006, in the amount of $30,000 payable to

16   Lindsey Springer, and, again, this is in Government's

17   Exhibit 61, indicates in the memo section "Mercedes G."

18           MR. O'REILLY:  One moment, Your Honor, if I

19   may.  Your Honor, I apologize.

20           THE COURT:  Let's wait until the train goes by.

21           MR. O'REILLY:  It appears I'm going to have to

22   use the ELMO because the numbering in our system is off.

23           THE COURT:  Very well.  As long as you're

24   referring to an exhibit that's in evidence and refer to

25   it by the number with which it is in evidence.

1              MR. O'REILLY:  Yes, Your Honor, all of the

2    documents I'm going to be talking about are all in

3    evidence as Government's Exhibit 61.

4              THE COURT:  Very well.  I don't know if any

5    members of the jury have ever been to the Fort Gibson

6    Stockade.  A few years ago, I went with my scout troop

7    and slept at the Fort Gibson Stockade, and in the middle

8    of the night, I thought a freight train was going to come

9    right straight through it.  Those tracks go about 20 feet

10   away from the Fort Gibson Stockade, and the trains we

11   have here bring that to mind.

12        Go ahead.

13   Q.   (BY MR. O'REILLY)  And, actually, I am showing you

14   the first check I referenced, which was from the Herbert

15   L. Mott and Shirley Mott dated February 7, 2006, payable

16   to Lindsey Springer and the memo indicates "gift."  This

17   is also in evidence as Government's Exhibit 49 for

18   $10,000.  Do you see that, sir?

19   A.   Yes.

20   Q.   Did Mr. Springer use any of this $10,000 to pay back

21   the principal on your $250,000 loan?

22             MR. SPRINGER:  Objection, Your Honor.

23             THE COURT:  Pardon me?

24             MR. SPRINGER:  May we approach?

25             THE COURT:  You may.

```
 1        (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND
 2   OUT OF THE HEARING OF THE JURY.)
 3            MR. STILLEY:  How would this witness know what I
 4   used to pay anything, interest or anything to Mr. Turner,
 5   how would he know that?
 6            THE COURT:  Because he is Mr. Turner.
 7            MR. SPRINGER:  How would he know it would have
 8   came from that check?  That's what his question was, was
 9   that check.
10            THE COURT:  Well, if that is your precise
11   objection, it will be sustained, but the -- the
12   permissible question is at or about this time did you get
13   any money from Mr. Springer, which would be appropriate.
14            MR. SPRINGER:  Fine, but he was reading the
15   check to him and saying --
16            THE COURT:  Okay.
17        (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,
18   WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE
19   PRESENCE AND HEARING OF THE JURY.)
20   Q.  (BY MR. O'REILLY)  On or after February 7, 2006, and
21   around that date, did Mr. Springer pay you any of the
22   principal on the $250,000 he owes you?
23   A.  In May, he started making payments.
24   Q.  But you've already testified those are interest only
25   and you testified previously, sir, that all of the
```

PATRICK TURNER - CROSS BY MR. O'REILLY                                  2297

1   $250,000 is still owed to you, so the question is --

2   A.   But, sir -- and I have to be clear about this.  My

3   accountant has told me that he will handle how interest

4   and principal on that loan are accounted for, so, yes,

5   there were $1,400 payments made, but relative to whether

6   they're applied to principal or that they're interest,

7   I'm not going to go there because I let him decide those

8   things.

9   Q.   Mr. Turner, didn't you testify the other day that

10  Mr. Springer still owed you a quarter million dollars?

11  A.   Yes.

12  Q.   And as you sit here today, is that not still your

13  testimony?

14  A.   No, that is my testimony, sir, but there are -- it's

15  actually more than that because interest is accruing.

16  Q.   How much does Mr. Springer owe you as you sit here

17  today?

18  A.   I don't know.

19  Q.   To the best of your knowledge?

20  A.   I don't know.

21  Q.   Approximately?

22  A.   More than $250,000.

23  Q.   As of February of 2006, Mr. Springer hasn't started

24  making any payments to you, had he?

25  A.   As I mentioned, we were going through a cooling-off

1   period.  I wasn't ready for those funds to come back yet

2   because I didn't know what was next, okay?  And if -- we

3   went through a very arduous process to get that money in

4   a position where it was and just because of a letter that

5   said we've stopped for now but we may start again, I

6   wasn't about to immediately terminate the condition of

7   that loan.

8   Q.   What was arduous about the process of refinancing

9   two homes and sending a quarter million dollars to

10  Mr. Stilley?

11  A.   Maybe it's not arduous for you, sir, but it took

12  quite a toll on me.

13  Q.   Now, I'm going to ask you about later in February of

14  2006, did you receive any payments towards what was owed

15  to you by Mr. Springer?

16  A.   I think I've already answered that question, sir, he

17  started making payments in May per our agreement, per an

18  agreement between he and I.  How he was managing his

19  personal finances was not something I was privy to nor

20  even asked him about.

21  Q.   But, sir, I believe you testified the other day that

22  the reason you guys had put this money into

23  Mr. Springer's control was so that you would have access

24  to it if you needed a lawyer.

25  A.   That's correct.

PATRICK TURNER - CROSS BY MR. O'REILLY                    2299

1  Q.  As of January, I believe you testified, but correct
2  me if I'm wrong, you believed that that need was gone?
3  A.  I did not completely believe that.  I had been
4  informed, as I instructed you, about what the letter
5  said, and I was going through a process of trying to
6  determine exactly what that meant.
7  Q.  Let me ask you this, sir:  When did you come to the
8  decision that you would like the money back?
9  A.  We started discussing it in May or maybe a little
10 late in April.
11 Q.  April or May of 2006?
12 A.  That's correct.
13 Q.  And "we" would be you and Mr. Springer or you and
14 your wife and Mr. Springer?
15 A.  The latter, my wife and I and Mr. Springer.
16 Q.  So at least as of May of 2006, you would have liked
17 to have gotten the money back that Mr. Springer owed
18 you?
19 A.  That's correct, sir.
20 Q.  I show you now what's in evidence in Government's
21 Exhibit 61 on page 139.  It's also Government's Exhibit
22 51, which is a check --
23         MR. O'REILLY:  Actually, I don't believe it's in
24 evidence as 61, Your Honor -- as I don't believe it's yet
25 in evidence -- it is -- I apologize.  I was correct the

1  first time.

2  Q.  (BY MR. O'REILLY)  In May of 2006, did you receive

3  anywhere near $20,000 in repayment of the monies

4  Mr. Springer owed you?

5  A.  No, sir.

6  Q.  And this is a check that's in evidence in

7  Government's Exhibit 61 on page 141 from Believers

8  Broadcasting Corp payable to Lindsey Springer in the

9  amount of $20,000 with a memo "donation."  Did you in

10 June of 2006 receive anywhere near $20,000 in repayment

11 on the loan that you say Mr. Springer owed you?

12         MR. STILLEY:  Objection; waste of time, it's all

13 in evidence.

14         THE COURT:  Overruled.

15         THE WITNESS:  No, sir.

16 Q.  (BY MR. O'REILLY)  Mr. Springer -- I mean, excuse

17 me, Mr. Turner, in August of 2006 -- this is Government's

18 Exhibit 61 on page 143.  It's also Government's Exhibit

19 135, which is an Arkansas IOLTA Foundation trust account

20 for Oscar Stilley, check number 2042, in the amount of

21 $25,000 with a memo donation, "Bennett."

22     In August, did you receive anywhere near $25,000 in

23 repayment on the monies Mr. Springer owed you?

24 A.  No, sir.

25 Q.  I show you what's in evidence as Government's

PATRICK TURNER - CROSS BY MR. O'REILLY                    2301

1   Exhibit 61, which is a cashier's check dated August 24 of

2   2006 in the amount of $20,000.  Again, you received no --

3   nothing near $20,000 in August of 2006 from Mr. Springer,

4   did you?

5   A.    No, just the regular payment.

6   Q.    Regular payment was $1,400?

7   A.    That we agreed to, yes.

8   Q.    And I believe you testified previously that that was

9   essentially to cover the interest you and your wife were

10  having to pay; is that right?

11  A.    We've discussed that, sir, I don't know.

12  Q.    That is what you testified to --

13  A.    Oh, yes, that -- I agreed -- after trying to clarify

14  it several times to her and people keeping and insisting

15  that it was the same as the interest would be, I agreed,

16  having felt that I had already clarified myself

17  sufficiently prior to those questions.

18  Q.    In October of 2006, did you receive -- and this is

19  Government's Exhibit 61, page 147 -- did you receive

20  anywhere near $10,000 in repayment of the monies

21  Mr. Springer owed you?

22  A.    No, sir.

23            THE COURT:  How much more do you have along this

24  line?

25            MR. O'REILLY:  Just a few more, Your Honor.

```
 1              THE COURT:  Proceed.
 2   Q.  (BY MR. O'REILLY)  In Government's Exhibit 161 on
 3   page 159, there's a check dated January 22, 2007 in the
 4   amount of $100,000 paid to Bondage Breakers Ministries.
 5   In January of 2007, did you receive anywhere near
 6   $100,000 in repayment of the monies Mr. Springer owed
 7   you?
 8   A.  No, sir.
 9   Q.  You were asked, I believe, in direct by Mr. Springer
10   if you were aware of any agreement between Mr. Stilley
11   and Mr. Springer to defraud the Internal Revenue Service
12   and the United States; do you recall that question?
13   A.  Yes, substantially that was the question.
14   Q.  With respect to this money, the $250,000 that you
15   sent to Mr. Stilley's IOLTA account, wasn't that designed
16   to keep the IRS from getting it?
17   A.  I'm sorry?
18   Q.  Wasn't that designed to keep the IRS from seizing
19   that money, placing a lien on the property?
20   A.  Yes, sir.  But that was all done out in the open,
21   everybody was informed exactly what was happening and
22   why.
23   Q.  You informed the IRS personally of why you were
24   doing this?
25   A.  Not personally, no, sir.
```

1  Q.    Then how can you tell the jury that everybody was

2  informed?  Who is "everybody"?

3  A.    I believe the IRS -- I believe that they were

4  watching me very closely, and they have records of every

5  credit card transaction I've ever made back to I don't

6  know how long, so when I made declarations to the loaning

7  institution and to anyone else involved, I believe that

8  that was informing them of exactly what I was doing.  And

9  anybody that asked me why I was doing what I was doing, I

10 told them exactly the reasons why.

11      So I believe that those transactions were in the

12 clear and I made no bones with the loaning institution as

13 to what it was for and why I was doing it.

14      So are you telling me I had an obligation to call

15 the IRS and personally write them a letter or something

16 like that?  I don't believe I had that obligation.

17 Q.    Did you send this monies to Mr. Stilley, you know,

18 an attorney, so it would look like it was an attorney

19 retainer?

20 A.    No, I did not.

21 Q.    Why didn't you just send the money in a cashier's

22 check to Mr. Springer directly?

23 A.    Because I wanted it to have an intermediary, as I

24 previously testified to -- again, try to keep it so that

25 it didn't look like it was going to some obscure

1   account.  I believe that those accounts are monitored in

2   some fashion, I don't know if it's by the bar, but those

3   accounts are tracked.

4   Q.   Mr. Turner, is that just speculation on your part?

5   A.   Yes -- well, no, in my discussions with putting this

6   whole thing together, that was one of the reasons why we

7   selected that account.

8   Q.   Who is "we," sir?

9   A.   Me and Mr. Springer, and to a lesser extent,

10  Mr. Stilley.

11  Q.   I thought earlier you testified that it was all

12  Mr. Stumpo's idea and you didn't discuss this --

13  A.   I did not say that, sir.

14  Q.   Okay.  What was Mr. Springer's role in getting this

15  money?

16  A.   Once I decided what I was going do, I expressed that

17  exact same concern with Mr. Springer, that this be as out

18  in the open and clear as possible and how could we do

19  that, and he said we should probably -- we can get a

20  third party involved.

21       And I asked him for a suggestion and he said that

22  Oscar has an account that is tracked and monitored all --

23  he said all lawyers have them and so that would be a

24  means by which we could make sure that this was

25  aboveboard.

1   Q.   That's what Mr. Springer told you?

2   A.   Yes, sir.  And Mr. Stilley confirmed that.

3   Q.   But Mr. Springer didn't tell you he was going to

4   spend this money on a motor home beforehand, did he?

5   A.   I don't know that he knew that at the time.

6   Q.   Before he bought the motor home, did he tell you?

7   A.   No, sir.

8   Q.   Before he bought the Lexus, did he tell you?

9   A.   I didn't know that he bought a Lexus, sir.

10          MR. O'REILLY:  If I may have a moment, Your

11   Honor?

12          THE COURT:  You may.

13   Q.   (BY MR. O'REILLY)  In your direct testimony, you

14   indicated that Mr. Springer told you he was trying to

15   sell you -- excuse me -- sell the motor home in order to

16   repay you; is that correct?

17   A.   Yes.

18   Q.   Did Mr. Springer ever tell you why he didn't take

19   any of those checks that we just looked at and use some

20   of that to repay you?

21   A.   No, sir.

22   Q.   As you sit here today, you don't think -- you don't

23   think you're ever going to get your money back, do you?

24   A.   I believe that that loan will be repaid, sir.

25   Q.   If Mr. Springer goes to prison, do you think that

```
 1    will happen?
 2              MR. SPRINGER:  Objection, Your Honor.
 3              THE COURT:  Sustained.
 4              MR. O'REILLY:  Briefly, Your Honor?
 5    Q.  (BY MR. O'REILLY)  You testified that you had a
 6    significant number of discussions with Mr. Springer about
 7    the Form 1040 and the accompanying instruction book,
 8    specifically with respect to the years 2000 through
 9    2005.
10    A.  That's true.
11    Q.  Doesn't -- and you've reviewed these books yourself,
12    correct?
13    A.  That's correct.
14    Q.  Doesn't the instruction book for each of those forms
15    contain the language that states, "If you do not file a
16    return, do not provide the information we ask for, or
17    provide fraudulent information, you may be charged
18    penalties and be subject to criminal prosecution"?
19    A.  It also says that if it doesn't have a valid OMB
20    number that you don't have to fill out the form.
21         So, yes, it does say that, but, sir, let's -- if
22    we're going to open that door, let's open it very wide.
23    Q.  Mr. Turner, you've seen people that Mr. Springer has
24    worked and Mr. Stilley has worked with that tried to
25    raise that defense and they went to jail, correct, sir?
```

```
 1   A.   Yes, sir.

 2          MR. O'REILLY:  Nothing further, Your Honor.

 3          THE COURT:  Redirect.

 4          MR. SPRINGER:  May we approach?  I got a

 5   question.

 6          THE COURT:  Let's get into redirect.

 7                   REDIRECT EXAMINATION

 8   BY MR. SPRINGER:

 9   Q.   Do you know who Bob Lawrence is?

10   A.   Yes, I do.

11   Q.   Did he go to jail?

12   A.   No.

13   Q.   Did his case get dismissed?

14   A.   Yes, it did.

15   Q.   With prejudice?

16   A.   Yes, it did.

17   Q.   Do you know who dismissed it?

18   A.   The government.

19   Q.   You testified that in May of 2006 that we orally

20   amended the loan agreement; do you remember that?

21   A.   Yes, I do.

22   Q.   Did you agree to accept $1,400 a month from Lindsey

23   Springer and extend that loan agreement for at least a

24   year?

25   A.   I don't remember the exact term, but, yes, we made
```

1    that agreement.

2    Q.   Was that with your wife's permission as well?

3    A.   Yes.

4    Q.   Mr. O'Reilly showed you some checks earlier during

5    his cross-examination; do you remember those checks?

6    A.   I remember that he showed them to me.

7    Q.   Do you know whether Tahiti Trader directed me to

8    give you the $20,000 that they gave me?

9    A.   No.

10   Q.   Do you know whether Believers Broadcasting

11   Corporation directed me to give you the $20,000 that they

12   gave me?

13   A.   No.

14   Q.   Do you know whether Lucky Bennett directed me to

15   give you the $25,000 that he gave me?

16   A.   No.

17   Q.   Do you know whether Donald Dupree directed me to

18   give you the $20,000 that he gave me?

19   A.   No.

20   Q.   Do you know whether Believers Broadcasting wanted me

21   to give you any part of a $100,000 gift that they gave

22   me?

23   A.   No.

24   Q.   Now, you testified about $40,000 at one time was

25   offered on the coach; is that correct?

```
 1  A.   That's correct.
 2  Q.   Do you also remember it being listed on eBay?
 3  A.   Yes, I do.
 4  Q.   And wasn't that listing -- excuse me -- do you
 5  remember whether the listing was before or after the
 6  $40,000 offer?
 7  A.   I thought it was about the same time.
 8  Q.   Do you remember whether or not eBay -- that there
 9  was an eBay bid of $175,000 on the RV?
10  A.   Yes.  That was much later than the occurrence I was
11  speaking of.
12  Q.   And did you and I have a conversation regarding
13  whether to accept that 175,000?
14  A.   Yes, we did.
15  Q.   Would you have received all of that $175,000?
16           MR. O'REILLY:  Objection; calls for
17  speculation.
18           THE COURT:  Sustained.
19           THE WITNESS:  That was our agreement.
20           THE COURT:  Wait just a minute.  Next question.
21  Q.   (BY MR. SPRINGER)  Did we have an agreement that if
22  you were willing to accept the $175,000 that the check
23  would be made out to you?
24  A.   Right.  I mean, that's -- it can't be sold unless I
25  sign the lien agreement, so I'm in control of when it
```

1   gets sold.

2   Q.   And did you and I agree not to sell the RV at that

3   time for $175,000?

4   A.   Yes, we did.

5   Q.   Did you and I agree that --

6          MR. O'REILLY:  Objection, Your Honor.  We'd like

7   a time reference as to what we're talking about.

8          THE COURT:  That's fair.

9   Q.   (BY MR. SPRINGER)  Was the time period that the RV

10  was put on eBay during the year 2006 or 2007?

11  A.   Yes.

12  Q.   In that time period?

13  A.   Yes, it was.

14  Q.   Do you know whether several attempts were made to

15  sell the RV?

16  A.   Yes, it was put on eBay more than one time.

17  Q.   Do you remember having discussions after we turned

18  down the 175,000 that the economy had really affected the

19  value?

20  A.   Yes.

21  Q.   That it wasn't even worth -- do you remember

22  conversations that --

23          MR. O'REILLY:  Objection; leading.

24          THE COURT:  That's sustained.

25  Q.   (BY MR. SPRINGER)  Did at some point in time it

```
 1   appear to you that the value of the RV was well under
 2   what it actually was worth?
 3              MR. O'REILLY:  Your Honor, objection; asked and
 4   answered, relevance.
 5              THE COURT:  You asked him whether the value was
 6   less than what it was worth?  I don't understand.  We'll
 7   have the next question.
 8              MR. SPRINGER:  Okay.  Got you.
 9         No further questions, Your Honor.
10              THE COURT:  Mr. Stilley, recross limited to
11   redirect.
12                         RECROSS-EXAMINATION
13   BY MR. STILLEY:
14   Q.  Mr. Turner, do you know what the principal defense
15   was in the Robert Lawrence case?
16   A.    The Paperwork Reduction Act.
17              MR. O'REILLY:  Objection, Your Honor; calls for
18   hearsay, speculation.
19              THE WITNESS:  I read the cases.
20              THE COURT:  Well, you can get into that at a
21   later juncture, if need be, Mr. O'Reilly.  That will be
22   overruled.  We've had the answer.  Next question.
23              MR. STILLEY:  Pass the witness.
24              MR. O'REILLY:  No questions, Your Honor.
25              THE COURT:  You may step down.
```

```
 1              THE WITNESS:  Am I done?
 2              THE COURT:  You may step down.
 3          Members of the jury, we'll take our midday recess at
 4    this time, but before we do that, there's one matter I
 5    need to address with counsel at the bench because it may
 6    relate to some information that it would be appropriate
 7    for me to give to you.  Stand by just a moment.
 8          (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND
 9    OUT OF THE HEARING OF THE JURY.)
10              THE COURT:  Okay.  I need to get some idea as to
11    how the defendants feel with where they stand time-wise
12    as we go through today and tomorrow, because if there's
13    any chance that the case would go to the jury tomorrow, I
14    want to tell the jury over the noon hour they need to be
15    discussing whether they want to stay late tomorrow, since
16    we can't hold court Wednesday.  So I'll invite the
17    defendants to give me just a bird's eye view, if you
18    will, of how they think things might go through today and
19    tomorrow.
20              MR. SPRINGER:  I believe that it's possible that
21    we would be concluded tomorrow, but I do not think that
22    it's possible that it would occur early.  And I'm more
23    inclined to -- based upon certain testimony, I'm more
24    inclined to suggest that it might go into Thursday
25    morning versus leaning toward midday Tuesday and then
```

1   giving things to the jury -- I just don't see how that

2   can possibly happen.

3            THE COURT:  Well, I'll discuss it with them in

4   terms of a remote possibility.

5            MR. SPRINGER:  Sure.  I'll try.

6        (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

7   WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

8   PRESENCE AND HEARING OF THE JURY.)

9            THE COURT:  Members of the jury, there is a

10  possibility, albeit a remote possibility, that this case

11  could be given to you tomorrow.  It's more likely to be

12  given to you on Thursday, but as I say, there's -- there

13  is some possibility, albeit much less than the

14  probability that the case could be given to you

15  tomorrow.

16       If it is, it certainly would not be early in the day

17  and the reason I mention that at this time is that you

18  may want to discuss among yourselves whether you are

19  prepared to go late tomorrow.  I really don't think it's

20  terribly likely but it would be appropriate for you to

21  discuss among yourselves whether it would be feasible to

22  go late tomorrow in the event that the case is given to

23  you tomorrow.

24       And along that line, I would suggest that if it's

25  not really feasible for every one of you, then don't

1    count on going late tomorrow in fairness to all the

2    jurors.

3        So with that, we'll take our mid day recess.  We'll

4    resume at 20 minutes after 1:00.  Please be available

5    just a little before that time to return to the courtroom

6    with the security officer.  And during this break, of

7    course, please remember my usual admonition, which I will

8    not repeat at this time.

9        All persons in the courtroom will remain seated

10   while the jury departs.

11       (JURY EXITS THE COURTROOM.)

12          THE COURT:  The jury has left the courtroom.

13       Mr. Springer, you may have noticed I've quit being

14   nice about leading questions.  There are some

15   consequences that go with a decision to represent

16   yourself, and as I sit here at the bench, one of the most

17   difficult things for a novice examiner is to ask a

18   non-leading question.  I have cut you a fair amount of

19   slack during this trial, I've cut you more slack than I

20   would have given to a lawyer, but the extent to which it

21   is appropriate for me to cut slack is really pretty

22   limited.

23       At the beginning of this case, you had a

24   conversation with a magistrate judge who walked you

25   through all the risks that go with representing yourself,

1    and then a little later you had a conversation with me in

2    which we covered all of the risks that go with

3    representing yourself.  One of those risks is that you

4    will have difficulty, as most novice examiners do, with

5    leading questions.  But a leading question of your own

6    witness is highly unfair and that's the reason that I --

7    although I have cut you some slack, there's very much a

8    limit on the amount of slack that I'm going to cut you on

9    that score, especially when you do it again and again and

10   again.

11        And I want to you bear in mind that, in all

12   fairness, and both sides -- all three sides of this

13   lawsuit are entitled to have a fair trial -- in all

14   fairness, we just simply cannot have leading questions.

15        Now, I have seen you at the lectern pondering your

16   question before you ask it and I would surmise that

17   you're probably trying to figure out how to ask a

18   question in a non-leading way and I applaud that, but to

19   the extent that you're unsuccessful in asking non-leading

20   questions, the result is going to be the same.

21        Anything further we ought to take up before we

22   recess?

23        MR. SPRINGER:  Yes, Your Honor.  This Court

24   ordered the government and the defendants never to

25   mention the word "imprisonment" ever in front of this

1   jury, and Mr. O'Reilly specifically did that, knowing
2   this Court's order.  And I would ask the court to please
3   make certain that Mr. O'Reilly complies with the same
4   rules, because we're not allowed to mention the word
5   "prison" to this jury.
6           THE COURT:  Well, we're not going to have
7   reference to possible punishment, but let me elaborate on
8   that just a bit.
9       The references to possible punishment I think --
10  regardless of whether they have been made relevant, and
11  in a sense, that reference was made relevant, but even if
12  they have been made relevant, the potential for prejudice
13  and confusion that goes with getting that whole issue in
14  play is just not worth going there.
15      Well, the questioning with Mr. Turner flowed in a
16  way that questioning as to possible imprisonment became
17  arguably relevant, even though ordinarily the only reason
18  that it should be -- that it would be mentioned is to
19  appeal to sympathy.
20      Well, I don't think it was made relevant enough for
21  us to get -- go into that briar patch and we're not going
22  to go into that briar patch.  That's the reason I
23  sustained the objection, even though it became arguably
24  relevant during the testimony of Mr. Turner.
25      So the ground rule remains for the reasons I have

1  explained.  We're just not going to go there.

2     Anything -- well, obviously if it should come up in

3  a stark way, as this case unfolds, and somebody wants to

4  get into it, then you can come to the bench; otherwise,

5  we're just not going to go there.

6     Anything further from either side?

7          MR. O'REILLY:  Yes, Your Honor, with respect to

8  I believe the next witness is Mr. Marrs.

9          MR. SPRINGER:  Yes.

10          MR. O'REILLY:  And there are some issues with

11  respect to whether or not there's attorney-client issues

12  that should be raised outside the presence of the jury.

13          THE COURT:  Okay.  Yeah, let's take a minute to

14  address that.

15          MR. O'REILLY:  Yes, Your Honor, he was the

16  attorney for, I believe, Mr. Eddy Patterson and Judy

17  Patterson.

18          THE COURT:  And what's his first name?

19          MR. O'REILLY:  Richard.

20          THE COURT:  Where is he from?

21          MR. SPRINGER:  Tulsa, Oklahoma.

22          THE COURT:  Pardon me?

23          MR. SPRINGER:  Tulsa, Oklahoma.

24          THE COURT:  Okay.  I'm looking back for my notes

25  on the Pattersons, were they more toward Number 54 or

 1    were they more toward Number 1?

 2            MR. SPRINGER:  More toward Number 1, probably

 3    around the 10s or 12s.

 4            THE COURT:  Hold on here.  First of all,

 5    gentlemen, let me just get a fix on the Pattersons.  Just

 6    a second here.  Okay.  Mr. Eddy Patterson was Number 13.

 7    Just bear with me just a minute.  Now, did he represent

 8    just Mr. Patterson?

 9            MR. SPRINGER:  No, Your Honor, he represents

10    both Mr. and Mrs.  Patterson.

11            THE COURT:  And you're speaking in the present

12    tense, to this day?

13            MR. SPRINGER:  This moment right now; that's

14    correct.

15            THE COURT:  Okay.  Hold on just a minute.  Oh,

16    yeah, this is the 375,000.  It's all coming back to me.

17    Okay.  Where are you going with Mr. Marrs?

18            MR. SPRINGER:  Mr. Patterson and Mrs. Patterson,

19    neither one, recognize the complaint that they filed

20    against myself, Oscar Stilley and Jerold Barringer.  That

21    complaint was filed by Mr. Marrs.  In the complaint, it

22    states that Eddy Patterson never had any prior trouble

23    with the law, that he was a law-abiding citizen until he

24    met me, and that by being able to get the complaint into

25    the record through Mr. Marrs, then I can then call

 1  Mr. Eddy Patterson back and ask him questions, did he

 2  tell Mr. Marrs this and so forth, with respect to --

 3          THE COURT:  Now, is the complaint itself in

 4  evidence at this point?

 5          MR. SPRINGER:  No, I couldn't get it in because

 6  he couldn't identify it.  He said he didn't know about

 7  it.  And Mrs. Patterson said she didn't know about it.

 8          THE COURT:  Okay.  Well, the only thing that we

 9  can perhaps address by way of anticipation is the

10  possibility of a privilege objection.  Given where you're

11  headed with that, it's entirely possible that you can

12  make your point without having privilege problems, but

13  that gives you something to visit with your standby

14  counsel with over the noon hour.

15          MR. SPRINGER:  Thank you, Your Honor.

16          THE COURT:  Anything else we ought to address

17  before the noon recess?

18          MR. O'REILLY:  No, Your Honor.

19          THE COURT:  Court will be in recess.

20     (A RECESS WAS HAD, AFTER WHICH THE FOLLOWING

21  PROCEEDINGS WERE HAD IN OPEN COURT AND WITHIN THE

22  PRESENCE AND HEARING OF THE JURY.)

23          THE COURT:  And we'll have the Defendant

24  Springer's next witness.

25          MR. SPRINGER:  Your Honor, I'd call Richard

RICHARD MARRS - DIRECT BY MR. SPRINGER                         2320

```
 1   Marrs to the witness stand.
 2          THE COURT:  Very well.
 3                        RICHARD MARRS,
 4   (WITNESS SWORN)
 5                    DIRECT EXAMINATION
 6   BY MR. SPRINGER:
 7   Q.  Good afternoon, Mr. Marrs.  Could you please -- I'm
 8   Lindsey Springer.  Could you please state your name for
 9   the record, please.
10   A.  Richard David Marrs.
11   Q.  Mr. Marrs, what is your occupation?
12   A.  I'm an attorney.
13   Q.  And where do you live?
14   A.  I live in Tulsa, Oklahoma.
15   Q.  Do you also work out of Tulsa, Oklahoma?
16   A.  Yes, sir.
17   Q.  Okay.  Do you know Eddy and Judy Patterson?
18   A.  Yes, sir.
19   Q.  Are they clients of yours?
20   A.  They were clients of mine and they may be again at
21   some point in the future.
22   Q.  Were they clients of yours as of December 15, 2005?
23   A.  I believe so.
24   Q.  In or on or around December 15, 2005, were you an
25   attorney for a law firm?
```

1   A.   Yes.  I was a partner in the Richardson Law Firm

2   here in Tulsa, Oklahoma.

3   Q.   How did you first meet Judy and Eddy Patterson?

4   A.   I met Judy Patterson first.  She was referred to me

5   by an attorney, William Widell, who apparently had been

6   local counsel to both the Pattersons in some criminal

7   proceeding.

8   Q.   And would the time period in which you met Judy and

9   Eddy Patterson be just before the petition was filed on

10  December 15, 2005?

11  A.   Probably.

12  Q.   Okay.  If you could -- --

13          MR. SPRINGER:  Your Honor, may I approach the

14  witness?

15          THE COURT:  You may.

16  Q.   (BY MR. SPRINGER)  Mr. Marrs, I've presented to you

17  Defendant's Exhibit Number 105.  Do you recognize

18  Defendant's Exhibit Number 105?

19  A.   Yes, sir.  That's the petition that was filed on

20  their behalf by me at the Richardson Law Firm.

21  Q.   And if you would turn to the last page of

22  Defendant's Exhibit Number 105.  Do you recognize the

23  signature on the line just above your name?

24  A.   That's my signature.

25          MR. SPRINGER:  Your Honor, I would move to enter

 1  Defendant's Exhibit Number 105.

 2          MR. SNOKE:  Your Honor, I'll object on relevancy

 3  grounds.  Can we approach?

 4          THE COURT:  You may.

 5      (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND

 6  OUT OF THE HEARING OF THE JURY.)

 7          THE COURT:  Go ahead.

 8          MR. SNOKE:  Your Honor, this document is -- I

 9  guess where we are going with this is the allegation

10  about whether Mr. Patterson lived, whatever the term was,

11  an "error-free life" or something to that effect.  I

12  understand this witness will testify at the time this was

13  filed Mr. Patterson was incarcerated and he just said a

14  minute ago that he met Mr. Widell and Mrs. Patterson in

15  connection with filing this document.  I suspect he will

16  testify that Mrs. Patterson and Mr. Widell, her attorney,

17  provided him the information from which he filed this

18  document, but the whole thing is relevant (sic), an

19  attempt to impeach on a collateral matter, because

20  it's -- they're going to try to bring back in here some

21  proof that Mr. Patterson then actually had this problem

22  in Dallas 15 or 18 years earlier or whatever it was and

23  was indicted and then it was dismissed.  And we think

24  that's impeachment of a collateral matter and this whole

25  thing is irrelevant in the testimony of this witness.

1          THE COURT:  It's my conclusion that given the

2  way the issue unfolded during the government's case that

3  there is a substantive basis, not just impeachment, for

4  admission of the exhibit and the reference to paragraph 9

5  and therefore the objection is overruled and 105 is

6  received.

7          MR. SPRINGER:  Thank you, Your Honor.

8      (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

9  WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

10  PRESENCE AND HEARING OF THE JURY.)

11          THE COURT:  Exhibit 105 is received.

12  Q.  (BY MR. SPRINGER)  Did you ever have Defendant's

13  Exhibit Number 105 served on the people that you were

14  suing in the case?

15  A.  I don't recall.

16  Q.  Do you know who exactly you were suing on behalf of

17  the Pattersons?

18  A.  It's listed Lindsey K. Springer, Lindsey K.

19  Springer, d/b/a Bondage Breakers Ministries, Oscar

20  Stilley, and Jerold W. Barringer.  Those would have been

21  the defendants and would have been the people to serve.

22  Q.  Now, do you remember whether -- excuse me, strike

23  that.

24      Did you file a second successive complaint with

25  regard to the same allegations and the same parties?

```
 1  A.   We did.  And I believe the reason we did that --
 2            THE COURT:  Wait.
 3            THE WITNESS:  I'm sorry.
 4            THE COURT:  Take it one question at a time.  Go
 5  ahead.
 6  Q.   (BY MR. SPRINGER)  Could you explain why you filed a
 7  second complaint.
 8  A.   Yes.  The first complaint, Eddy Patterson was in
 9  prison, was not able to cooperate in the prosecution of
10  this lawsuit, and so we waited, and we -- I think we had
11  an extension within which to serve it and it was never
12  served because he was still in prison, due to get out.
13  Q.   So could you please turn to Defendant's Exhibit
14  Number 106, please, which would be the next over.
15  A.   Yes, sir.
16  Q.   Do you recognize Defendant's Exhibit Number 106?
17  A.   It appears to be a complaint by Eddy L. Patterson,
18  Judith L. Patterson, against Lindsey Springer, Lindsey
19  Springer, d/b/a Bondage Breakers Ministries, Oscar
20  Stilley, and Jerold Barringer.
21  Q.   And if you could turn to the last page of
22  Defendant's Exhibit Number 106.  And is that your
23  signature on the back page of Defendant's Exhibit 106?
24  A.   It is.
25            MR. SPRINGER:  Your Honor, I move for the
```

1   entrance of exhibit -- of Defendant's Exhibit Number 106

2   in the record.

3           MR. SNOKE:   Same objection, Your Honor.

4           THE COURT:   Overruled.   It is received.

5   Q.   (BY MR. SPRINGER)   Now -- excuse me, strike that.

6        You sued Bondage Breakers Ministries, correct?

7   A.   Correct.

8   Q.   Okay.   Who was Bondage Breakers Ministries to you at

9   the time you filed this complaint?

10  A.   I don't recall at this time.

11  Q.   If you could turn to the second page of the

12  complaint.   This is Defendant's Exhibit Number 105.   And

13  do you see this section that reads, "Facts pertaining to

14  all claims"?

15  A.   Yes, sir.

16  Q.   And on paragraph 9, where it says -- strike that.

17       Did you write paragraph 9 of this complaint?

18  A.   Either myself did or Diane Hinkel, I don't recall

19  who.

20  Q.   At the time that you wrote this complaint or with

21  the assistance of Ms. Hinkel, were you aware that Eddy

22  Patterson had been indicted previously?

23  A.   I don't recall.

24  Q.   You stated that you filed the second complaint

25  because Mr. Patterson was in prison and you couldn't

1  prosecute the first one, correct?

2  A.   That's correct.

3  Q.   Did you ever have on -- any conversations with Eddy

4  Patterson, either prior to the filing of this complaint

5  or while this complaint was pending in district court?

6  A.   Probably not.

7  Q.   So is it your testimony here today that you only had

8  conversations with Mrs. Patterson and William Widell?

9  A.   True.

10  Q.   And is William Widell a client of the Richardson Law

11  Firm?

12  A.   No, sir.

13  Q.   Did you know at the time that you brought the

14  lawsuit -- this lawsuit against Oscar Stilley, Jerry

15  Barringer, Lindsey Springer and Bondage Breakers

16  Ministries, that Eddy Patterson had been indicted by a

17  federal grand jury in 2003?

18  A.   I don't recall.

19  Q.   As you sit here today, do you know whether that's

20  true or not?

21  A.   I don't know.

22  Q.   Subsequent to Defendant's Exhibit Number 106, were

23  you sued by Lindsey Springer for libel and slander?

24  A.   Yes.

25  Q.   And was that lawsuit also naming Diane Hinkel?

```
 1   A.   I believe so.

 2   Q.   Did the lawsuit also name Kevin Adams?

 3   A.   I believe that it did.

 4   Q.   And does it also name the Richardson Law Firm?

 5   A.   Yes, sir.

 6   Q.   Are you -- were you served with that complaint?

 7   A.   Yes, sir.

 8   Q.   Did you read the complaint?

 9   A.   I did.

10   Q.   Did you read the exhibits attached to that

11   complaint?

12   A.   Probably did.

13   Q.   As you sit here today, do you remember the gist of

14   that complaint?

15   A.   Some of it.  Some of it.

16   Q.   Do you remember what the basis for the libel and

17   slander claim was?

18   A.   It's been some time, I don't.

19   Q.   And as you sit here today, you're saying that you've

20   never had a conversation with Eddy Patterson or Judy

21   Patterson about their previous criminal charges or

22   convictions?

23           MR. SNOKE:  I don't believe that's what the

24   witness said.

25           THE COURT:  Well, he can correct it if it's
```

1    not.  Go ahead.  Overruled.

2             THE WITNESS:  On the basis of attorney/client

3    privilege, I would prefer not to answer that question

4    unless ordered by this Court.

5    Q.  (BY MR. SPRINGER)  Are you still the attorney for

6    Eddy and Judy Patterson?

7    A.   No, sir.

8    Q.   When did you cease being the attorney for Eddy and

9    Judy Patterson?

10   A.   When I dissolved our partnership in June of 2009, I

11   ceased being the attorney for Judith and Eddy Patterson.

12   Q.   Since June of 2009, have you had any conversations

13   with Eddy and Judy Patterson in regard to either

14   Defendant's Exhibit Number 105 or Defendant's Exhibit

15   Number 106?

16   A.   Only conversations with Eddy Patterson with regard

17   to 106 were before June of 2009, not after.

18   Q.   And would this answer be the same with regard to

19   Ms. Patterson as well?

20   A.   Yes.

21   Q.   When was the last time that you spoke with William

22   Widell?

23   A.   I don't recall.  It's been some time, probably a

24   year and a half, two years.

25   Q.   So on page 3 of Defendant's Exhibit Number 105,

 1  where it says, "The Pattersons did not pay their income

 2  taxes for the years '96, '97, '98, '99, relying upon the

 3  advice of Springer, Stilley, and Barringer" -- do you

 4  remember writing that?

 5  A.   I do not.  As I said before, it was either myself or

 6  Diane Hinkel that wrote that.

 7  Q.   Okay.

 8          MR. SPRINGER:  No further questions, Your Honor.

 9          THE COURT:  Mr. Stilley.

10                    CROSS-EXAMINATION

11  BY MR. STILLEY:

12  Q.   Mr. Marrs, are you familiar with the term "IOLTA

13  account"?

14  A.   Yes.

15  Q.   Do you have one of those accounts?

16  A.   I don't recall -- our law firm does.

17  Q.   Okay.  Do you know what that -- that is an acronym,

18  correct?

19  A.   Yes.

20  Q.   Do you know what that acronym stands for?

21  A.   I believe that that acronym stands for either an

22  interest or a non-interest-bearing Oklahoma legal trust

23  account, I believe.

24  Q.   And do you know what the -- scratch that.

25       Do you know where that the applicable rules for

```
 1   IOLTA accounts is found?

 2   A.   Yes.

 3          THE COURT:  Under the laws of what

 4   jurisdiction?

 5   Q.   (BY MR. STILLEY)  Under the laws of Arkansas.

 6   A.   No, sir.

 7   Q.   Do you have knowledge of the IOLTA rules in the

 8   state of Oklahoma?

 9   A.   Very general.

10          MR. SNOKE:  We would object to that because it's

11   irrelevant.

12          THE COURT:  Overruled.

13          THE WITNESS:  Very general knowledge of it.

14   Q.   (BY MR. STILLEY)  Do you have personal knowledge of

15   whether Oklahoma's IOLTA rule is the same as Arkansas's?

16   A.   I do not.

17          MR. STILLEY:  Your Honor, could I have a moment?

18          THE COURT:  You may.

19          MR. STILLEY:  Pass the witness.

20          THE COURT:  Cross-examination.

21                      CROSS-EXAMINATION

22   BY MR. SNOKE:

23   Q.   Mr. Marrs, prior to filing Defendant's Exhibit 105,

24   which you -- I think you have in front of you there a

25   copy of, bearing the date December 15, 2005 --
```

```
 1  A.   Yes, sir.

 2  Q.   -- who -- at that time, was Mr. Patterson in

 3  prison?

 4  A.   I believe that he was, yes.

 5  Q.   All right.  And you said, I think, that you dealt

 6  with Mrs. Patterson, Judith -- that would be Judith

 7  Patterson?

 8  A.   Yes, sir.

 9  Q.   And Mr. Widell?

10  A.   Yes, sir.

11  Q.   In getting the information to file this petition?

12  A.   Yes, sir.

13  Q.   And anybody other than those two?

14  A.   Yes, I believe there was a Mr. Steve Canora, who I

15  believe did some of the work for Eddy and Judith

16  Patterson, a lawyer here in Tulsa, Oklahoma.

17  Q.   Okay.  Another lawyer besides Mr. Widell?

18  A.   Yes.

19  Q.   And then you had, I think you said, an E. Diane

20  Hinkel, which is on, I guess, the last page there; is

21  that correct?

22  A.   Yes, sir.

23  Q.   And was she also working with you at the Richardson

24  Law Firm at that time?

25  A.   Yes, I was a partner in the law firm and she was an
```

1    associate who was assigned partial responsibility for
2    this case file.
3    Q.   All right.  And did she help craft the language of
4    this petition?
5    A.   I believe that she did.
6    Q.   And so directing your attention there to paragraph
7    9, do you know -- do you recall who may have provided the
8    information that went into paragraph 9 of this petition?
9    A.   I believe, except for the phrase "had never been in
10   criminal trouble before," it would have been then either
11   Judy Patterson, who had very limited knowledge of the
12   case, or William Widell, who was the local counsel in the
13   criminal proceedings against both of them.
14   Q.   You said with respect to that sentence?
15   A.   No, with respect to the -- it would have been either
16   Judith Patterson or William Widell that provided all of
17   the information in paragraph 9, with regard to the phrase
18   "had never been in criminal trouble before," I don't
19   know.
20   Q.   You don't know who provided that?
21   A.   No.
22   Q.   And the information in paragraph 10 that counsel
23   asked you about and, in particular, the first sentence
24   there, in paragraph 10, that counsel asked you about, do
25   you know who provided you with that information, for you

1  and Ms. Hinkel?

2  A.   I do not know who provided that information.

3  Q.   All right.  But at this time, at the time of the

4  first filing of the petition, did Mr. Eddy Patterson, who

5  was in prison, provide you with any of this information?

6  A.   No.  We had no contact with him.

7  Q.   All right.  Now, this second petition, it appears

8  that Defendant's Exhibit 106 appears to have a date in

9  2008?

10 A.   Yes, sir.

11 Q.   But other than the filing date, all the other

12 paragraphs in that petition appear to be exactly the same

13 as the previous petition?

14 A.   It does appear that way.

15 Q.   All right.  Did you cause the second petition to be

16 filed also?

17 A.   I believe so.

18 Q.   All right.  And did you make any changes based on

19 anything anybody told you to -- from the first petition

20 to the second petition as far as you recall?

21 A.   I don't recall, but I don't believe so.

22 Q.   All right.  Is -- is -- the first petition,

23 obviously, is no longer outstanding, is the second

24 petition still active or -- is this still a lawsuit

25 that's pending somewhere?

1   A.   Actually, I don't really know.

2   Q.   All right.  And why is it that you don't know the

3   answer to that?

4   A.   Because I haven't been involved in the Patterson --

5   the Patterson matter since June of 2009, though I have

6   been asked to get reinvolved in it.

7   Q.   All right.  Well, when you got -- when you -- in

8   June of this year, right?  In June of this year, when you

9   severed your relationship with the Richardson Law Firm,

10  did they retain, then, the -- at that point, did they

11  retain the Patterson suit?

12  A.   They did.

13  Q.   All right.  Well, up until that point, sir, was it

14  still an active lawsuit?

15  A.   Yes, sir.

16         MR. SNOKE:  May I have a minute, Your Honor?

17         THE COURT:  You may.

18  Q.   (BY MR. SNOKE)  And what was the basis of the

19  lawsuit, sir, when you first filed it -- that would be

20  105, I guess, Defendant's 105.

21  A.   I believe the general basis of it was that the

22  Bondage Breakers Ministries and the defendants consulted

23  and advised the Pattersons not to pay their taxes in

24  return for an almost promise that they would never, ever

25  be convicted of a criminal offense.

```
 1   Q.   That's what you understood?

 2   A.   That's part of it.  And also that I believe and --,

 3   again, it's in general terms, I believe in general terms

 4   that there was a plea arrangement or something to be made

 5   with Judith Patterson that was never related to her by

 6   Mr. Stilley or Mr. Barringer, which would have kept her

 7   out of federal prison, and she went to federal prison.

 8           MR. SNOKE:  I don't believe I have any other

 9   questions.

10           THE COURT:  Redirect.

11                   REDIRECT EXAMINATION

12   BY MR. SPRINGER:

13   Q.   Do you know who made the plea offer to keep

14   Mrs. Patterson out of prison?

15   A.   I do not.

16   Q.   Is that something that William Widell told you?

17   A.   Yes, sir.  And I believe that one of the Assistant

18   U.S. Attorneys also told me that.

19   Q.   Would his name be Doug Horn?

20   A.   Would be.

21   Q.   Was the agreement between the Pattersons and the

22   Richardson Law Firm a contingency agreement?

23   A.   Again, without -- I believe that that would be

24   protected by attorney/client privilege, and I haven't

25   spoken with the Pattersons since June, so I don't know
```

1   whether they would want to assert that privilege, which

2   is theirs, but in the event this Court orders me to

3   answer that question, I will.  I prefer not to.

4   Q.   You mentioned the name Steve Knor.

5   A.   Yes, sir.

6   Q.   What role did he play in providing the information

7   that is alleged in the complaint?

8   A.   He either provided information prior to the filing

9   of the second complaint, I don't believe with regard to

10  the first one, so with regard to the first complaint, I

11  don't believe he provided me any information.  With

12  regard to the second one, I believe he did, but I don't

13  know whether it was before suit or after suit was filed.

14  Q.   Mr. Snoke asked you about whether the complaints

15  were identically the same.

16  A.   Yes, sir.

17  Q.   And you thought, to the best of your knowledge, that

18  they were?

19  A.   Without sitting here and reading them, my

20  recollection was we simply refiled the first complaint a

21  second time.

22  Q.   If you would look at Defendant's Exhibit Number 106.

23  A.   Yes, sir.

24  Q.   Do you see the name Kevin D. Adams on the fifth

25  paragraph?

RICHARD MARRS - REDIRECT BY MR. SPRINGER                    2337

```
1   A.   I do. I do.
2   Q.   If you would look at Defendant's Exhibit Number 105,
3   do you see his name anywhere in there?
4   A.   No, sir.
5           MR. SPRINGER:  I pass the witness, Your Honor.
6           THE COURT:  Mr. Stilley.
7           MR. STILLEY:  No questions.
8           THE COURT:  Any recross?
9           MR. SNOKE:  No, Your Honor.
10          THE COURT:  You may step down.
11          THE WITNESS:  Thank you.
12          THE COURT:  And we'll have the defendant's next
13  witness.
14          MR. SPRINGER:  Your Honor, I would call Michael
15  Burt.
16          THE COURT:  Say that name again, please.
17          MR. SPRINGER:  Michael Burt.
18          THE COURT:  Very well.
19          MR. SPRINGER:  Your Honor, while we're waiting,
20  can we approach on one question?
21          THE COURT:  You may.
22     (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND
23  OUT OF THE HEARING OF THE JURY.)
24          MR. SPRINGER:  Mr. Burt has a tendency to be
25  long-winded, and with me already fighting to question
```

MICHAEL BURT - DIRECT BY MR. SPRINGER                    2338

1  properly, if I'm going to do a good job on him, I need

2  him instructed to specifically answer my questions, if

3  you don't do that, then, you know --

4          THE COURT:  Well, as is the case with all the

5  other witnesses we've had where we've had that problem,

6  I've got to give them enough rope to hang themselves,

7  then I'll intervene.

8          MR. SPRINGER:  Thank you.

9      (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

10 WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

11 PRESENCE AND HEARING OF THE JURY.)

12                      MICHAEL BURT,

13 (WITNESS PREVIOUSLY SWORN)

14                   DIRECT EXAMINATION

15 BY MR. SPRINGER:

16 Q.  Good afternoon, Mr. Burt.

17 A.  Good afternoon.

18 Q.  Do you know when you and I first met?

19 A.  I don't know specifically, but I believe it was

20 sometime in -- I'm going to guess around 2002.

21 Q.  How did you first hear of the name Lindsey Springer?

22 A.  I really can't tell you, other than the fact I was

23 doing -- looking for someone who could assist me with

24 some questions that I had and I can't tell you exactly

25 how I came across the name.

1    Q.   What were the questions you were trying to get

2    answered?

3    A.   Well, I had had an individual come to my home in the

4    middle of the night and had came armed and had asked me

5    that -- to complete some information request forms and I

6    was having a problem with him.  I asked him some

7    questions and he said he didn't have to answer any

8    questions, I just had to do what he said.

9         And I still had some questions and so I was looking

10   for some answers to those questions, and I had talked to

11   several people, no one knew the answers, and that's when

12   I was looking for someone to help.  I thought -- you

13   know, I was trying to figure out what was required, it

14   was very important for me to do the right thing, I didn't

15   want to have any difficulties, and I was looking for

16   somebody for that purpose.

17   Q.   Who first told you of the name Lindsey Springer?

18   A.   I really can't tell you.  I'm not sure that I know.

19   I think it was -- it may have been -- I would have to

20   guess it would be Paul Stumpo, but I'm not positive.

21   Q.   Were you a member of IFC?

22   A.   How do you define "member"?

23   Q.   I'm sorry, were you a client of IFC?

24   A.   I had retained IFC to create some trusts.

25   Q.   Are you familiar with a person by the name of Paul

MICHAEL BURT - DIRECT BY MR. SPRINGER                    2340

 1  Stumpo?

 2  A.   Yes, I am.

 3  Q.   Are you familiar with a person by the name of Pat

 4  Turner?

 5  A.   Yes, I am.

 6  Q.   Since 2002, have you and I had several hundred

 7  conversations?

 8  A.   I think that's quite possible.  It's been many

 9  conversations, I don't know if it would be several

10  hundred, but I would suspect it probably could be.

11  Q.   Okay.  And what generally would the conversation --

12  would the topic of the conversation be?

13  A.   I would say the most general description of those

14  conversations would be questions, discussions, interest

15  in what does the law say.

16  Q.   And when you say what law -- specifically what do

17  you mean?

18  A.   We've talked about Biblical law, we've talked about

19  constitutional law, we've talked about tax law, we've

20  talked about statutory law and common law and all kinds

21  of things.

22  Q.   Prior to your -- scratch that.

23       Are you currently employed?

24  A.   No.  I was employed until I came here to Okmulgee.

25  Q.   Where were you previously employed?

1    A.   Well, before, you know, I -- before Mylan(sic), I

2    was -- I worked with Corporate Tax Services, actually

3    corporate appraisal management would be the correct name,

4    and that's in Troy, Michigan.

5    Q.   What would you do for Corporate Tax Services?

6    A.   Actually there were several related companies and I

7    did fraud investigations, I did forensic accounting, I

8    did tax consulting, general business consulting,

9    appraisals of machinery and equipment, furnitures and

10   fixtures, and I believe that covers most of the different

11   areas.

12   Q.   How long had you been in that profession?

13   A.   I've been doing some of those things all of my life,

14   but I've been working with corporate appraisal management

15   and corporate tax services for 15 years, and as an

16   appraiser, I had been specifically appraising with a

17   designation of an appraiser before I lost it, as the

18   conviction was -- probably about 10 or 12 years.

19   Q.   Would part of our discussions center around the law

20   that requires a person to answer questions on a Form

21   1040?

22   A.   Absolutely.  As did my practice in law consulting as

23   well.

24   Q.   Did I ever instruct you not to file a Form 1040?

25   A.   No, you never instructed me not to.  We certainly

1  talked about the requirements of that form and filing it

2  but you never instructed me not to do it.

3  Q.   Have you and I ever had conversations regarding the

4  propriety of penalties in relation to IRS taxes?

5  A.   Repeat the question again.

6  Q.   Have you and I ever had a conversation related to

7  penalties?

8  A.   Penalties about providing information on an

9  information request form?  Absolutely.

10 Q.   Have we had discussion about the Paperwork Reduction

11 Act?

12 A.   Absolutely.  That was one of the things that I was

13 looking at when I first met you.

14 Q.   Did you look into what I had told you with regard to

15 the Paperwork Reduction Act?

16 A.   Yes.

17 Q.   Did you use the same techniques and skills that you

18 rely upon being a fraud investigator for the tax company

19 that you worked for?

20       MR. O'REILLY:  Objection.  Mr. Burt's opinions

21 with respect to this law are not relevant to this case.

22       THE COURT:  Well, we haven't gotten to that

23 point yet, so that will be overruled.

24 Q.   (BY MR. SPRINGER)  You may answer the question.

25 A.   Yes, it does.

```
 1        Could I ask a question, could I get a glass of
 2   water?
 3             THE COURT:  Sure.  Pam, if you'll get him a
 4   glass of water.
 5             MR. SPRINGER:  Your Honor, may I have one
 6   second?
 7             THE COURT:  You may.
 8   Q.  (BY MR. SPRINGER)  Specifically regarding
 9   conversations involving the Paperwork Reduction Act, what
10   did I say to you?
11             THE COURT:  Would you sharpen this up on time,
12   what point in time?
13             MR. SPRINGER:  Oh, I'm sorry.  Right.
14   Q.  (BY MR. SPRINGER)  You and I began -- did you and I
15   begin to have conversations around 2002?
16   A.  Yes, I believe so.
17   Q.  At that time, did our conversations involve the
18   Paperwork Reduction Act?
19   A.  It's hard to know what we talked about in 2002, but
20   I would say yes, because at the time, at that time, and
21   before I met you, I was reviewing the Paperwork Reduction
22   Act.
23   Q.  During those conversations, during the time period
24   of 2002 and forward, did you and I specifically discuss
25   the application of the Paperwork Reduction Act?
```

```
 1   A.   Yes.

 2   Q.   What did I tell you?

 3   A.   I think, as I recall, we certainly talked about 44

 4   USC 3500, the requirements of that act for information

 5   and collection, which include --

 6            THE COURT:  Mr. Burt, it's important to couch

 7   your answer in terms of what Mr. Springer told you, as

 8   opposed to your conception of how the act works or more

 9   generally what you talked about.  It needs to be couched

10   in terms of what Mr. Springer told you.

11            THE WITNESS:  Okay.  I would say -- because

12   everything we talked about, I went back and looked at it

13   anyway, but I would say it would have to be in relation

14   to the form itself, the information collection request

15   form has to comply with the law, it has to say when it's

16   mandatory, voluntary or required to obtain a benefit, it

17   has to have an expiration date, it can't have any changes

18   unless it goes through an 83-I form or some other form,

19   it has to be in conformance with the clearance

20   requirements of 44 USC 3507.  There's about seven or

21   eight --

22            THE COURT:  Slow down, sir.

23            THE WITNESS:  Okay.

24            THE COURT:  Why don't we just go by Q and A.

25   Q.   (BY MR. SPRINGER)  Did I ever show you what I
```

1  thought was wrong with the Form 1040?

2  A.   I would say yes.

3  Q.   Did you ever attempt to verify what I told you?

4  A.   Absolutely.

5         MR. O'REILLY:  Your Honor, objection.

6  Mr. Burt's verification of Mr. Springer's statements is

7  not relevant.

8         THE COURT:  Sustained.

9  Q.   (BY MR. SPRINGER)  Did I ever show you in the

10  instruction booklets for the Form 1040 any specific

11  information relevant to our conversations?

12  A.   I would say -- I would say yes.

13  Q.   Did I show you a statement in the instruction

14  booklets for the Form 1040 that directed all taxpayers to

15  consider the Paperwork Reduction Act in their filing of

16  the tax return?

17  A.   On the -- there is a statement on the form, as well

18  as -- was in an instruction book, yes, and we would have

19  talked about that.

20  Q.   What did I tell you that that meant?

21  A.   I -- trying to differentiate between what you may

22  have told me and what I may have --

23         MR. SPRINGER:  May I refresh his memory on

24  something, Your Honor?

25         THE COURT:  You may certainly refresh his memory

```
 1  if it goes to things you said or did.

 2          MR. SPRINGER:  Yes, sir.

 3          THE COURT:  And it would be necessary to provide

 4  a copy to the government.

 5          MR. SPRINGER:  May I approach the witness, Your

 6  Honor?

 7          THE COURT:  You may.

 8  Q.  (BY MR. SPRINGER)  Mr. Burt, what I've handed you is

 9  Defendant's Exhibit Number 29.  Do you recognize what

10  that is?

11  A.  Yes, this is the information collection request form

12  for 2003, 15450074.

13  Q.  Do you recognize on the bottom of this form any

14  information that might help you refresh your memory?

15  A.  Yeah, this is -- in each year that I'm familiar

16  with, since 1980, says, "For Disclosure Privacy Act and

17  Paperwork Reduction Act known as" --

18          MR. O'REILLY:  Objection.  Its' just to refresh

19  his recollection, as I understood it, without getting

20  into the form.

21          THE COURT:  That's correct.  Mr. Burt, it's not

22  appropriate to read from the form.  The question is

23  whether there's anything that he has -- Mr. Springer has

24  directed your attention to that refreshes your

25  recollection.
```

MICHAEL BURT - DIRECT BY MR. SPRINGER                          2347

```
 1              THE WITNESS:  Okay.  Yes.
 2  Q.  (BY MR. SPRINGER)  So where would you turn to in the
 3  instruction booklet based upon the Form 1040 for 2003
 4  relevant to our conversations?
 5  A.  In this year, I would turn to page 77.
 6  Q.  Okay.  Now, would you turn to Defendant's Exhibit
 7  Number 30, please.  Are you familiar with page 77 of
 8  Defendant's Exhibit Number 30?
 9  A.  Yes, I am.
10  Q.  And would this be one of the pages that you and I
11  had discussions during the 2002 -- actually, this would
12  have been 2004, but 2002 to 2007, let's say?
13  A.  Uh-huh, this is 2003, actually.
14  Q.  And this is 2003?
15      And if you could look at the last paragraph on the
16  left side of the page to refresh your memory.  Do you see
17  that paragraph?
18  A.  That begins "New tax rate," that paragraph?
19  Q.  Begins, "You're not."
20  A.  Are you talking about the first page of this
21  exhibit?
22  Q.  Page 77.  Do you have page 77?
23  A.  Oh, okay.  No, I don't have that yet.
24  Q.  Do you recognize page 77?
25  A.  Yes.
```

1  Q.  Now, on the left column on page 77, do you recognize

2  the last paragraph?

3  A.  Yes, I do.

4  Q.  And would that have been -- the words in that

5  paragraph, would that have been part of a conversation

6  you -- I would have had regarding the 2003 Form 1040?

7  A.  Yes, it would have.

8  Q.  What did I tell you about this paragraph in the

9  instruction booklet during the same time period?

10  A.  What would -- you told me about this paragraph and I

11  can't read this paragraph, but what we would have talked

12  about -- what you would have told me about would be that

13  based on this statement in the instruction book, the

14  form -- the specific form would not be required.

15  Q.  Unless what?

16  A.  Unless it conformed to the act.

17  Q.  And those are words that you read in the instruction

18  booklet?

19  A.  Yes.

20  Q.  And those are words that I showed you in the

21  instruction booklet, correct?

22  A.  Yes.

23  Q.  And is your testimony the same with regard to 2003

24  for any other year we would have had a discussion about?

25  A.  Yes.

1   Q.   When you were here earlier, you testified about you

2   had an appeal pending?

3   A.   That's correct.

4   Q.   I believe you said something about a refund?

5   A.   That's correct.

6   Q.   Have you and I ever had discussions regarding your

7   criminal case that is currently pending on appeal?

8   A.   Yes, we have.

9   Q.   During your district court case, were you

10  represented by a lawyer?

11  A.   Yes, I was.

12  Q.   And what was his name?

13  A.   Alan Richey.

14  Q.   Do you know where he's from?

15  A.   He's from Port -- I can't remember the name, it's in

16  Washington.  I'll have -- it will come to me.

17  Q.   Now, on appeal, you are not represented by a lawyer;

18  is that true?

19  A.   That's correct.

20  Q.   Did you and I ever have any conversation regarding

21  the withholding that your employer withheld from your

22  paycheck?

23  A.   Yes, we did.

24  Q.   And did your employer ever turn that money over to

25  the IRS?

MICHAEL BURT - DIRECT BY MR. SPRINGER                    2350

1   A.   They are making payments against the lien that was

2   placed.

3   Q.   But the money was taken from your paycheck, correct?

4   A.   That was the conclusion of the IRS.

5   Q.   And as you sit here today -- strike that.

6        Is part of the reason why you were convicted because

7   of the employer not paying that money in?

8             MR. O'REILLY:  Your Honor, objection as to

9   relevance.

10            THE COURT:  Sustained.

11   Q.   (BY MR. SPRINGER)  Have you and I had conversations

12   about your employer not paying the money in to the IRS?

13   A.   You and I have a conversation?

14   Q.   Yes.

15   A.   Yes.

16            MR. SPRINGER:  May I have one second, Your

17   Honor?

18            THE COURT:  You may.

19   Q.   (BY MR. SPRINGER)  Have you ever drawn any

20   conclusions regarding my sincerity with what I've shared

21   with you or told you?

22   A.   I think you're very sincere and I've always checked

23   everything out and have rarely disagreed with you on

24   anything.

25   Q.   You never took my word for it, did you?

```
 1  A.   Never.
 2  Q.   You did attend -- excuse me, strike that.
 3       Did you attend the Ouwenga trial?
 4  A.   Yes.
 5  Q.   Did you also attend oral argument at the Sixth
 6  Circuit Court of Appeals for Mrs. Ouwenga?
 7  A.   Yes, I did.
 8            MR. SPRINGER:  I pass the witness, Your Honor.
 9            THE COURT:  Mr. Stilley.
10            MR. SNOKE:  No questions, Your Honor.
11            THE COURT:  Cross-examination.
12            MR. O'REILLY:  No questions, Your Honor?
13            THE COURT:  We'll have Defendant Springer's next
14  witness.
15            MR. SPRINGER:  The defense calls Denny Patridge.
16            THE COURT:  Very well.
17       Welcome back, Mr. Patridge, you're reminded you're
18  still under oath.
19            THE WITNESS:  Thank you.
20                      DENNY PATRIDGE,
21  (WITNESS PREVIOUSLY SWORN)
22                      DIRECT EXAMINATION
23  BY MR. SPRINGER:
24  Q.   Good afternoon, Mr. Patridge.
25  A.   Hello.
```

1   Q.   Do you remember during your previous testimony

2   during -- the government called you as a witness; do you

3   remember that?

4   A.   Yes.

5   Q.   Several times -- do you remember -- do you remember

6   using the word "helped" when you described your

7   relationship with Lindsey Springer?

8   A.   Yes.

9   Q.   Was -- when you first made contact with Lindsey

10  Springer, you were looking for help, weren't you?

11  A.   Sure.

12  Q.   Were you looking to hire somebody to provide a

13  service to you?

14  A.   No, I was looking for somebody to help -- actually,

15  not only with the financial stuff, but -- with the case,

16  but emotionally because I really couldn't find anybody.

17  Q.   And you and I -- did we have several conversations

18  in that regard?

19  A.   Yes.

20  Q.   As you sit here today, have you been offered any

21  promises by the government for your testimony in this

22  case?

23  A.   No, I haven't.

24  Q.   Did you and I -- strike that.

25       Do you remember around when you first spoke to

1  Lindsey Springer on the phone?

2  A.   Yes, that was the time from -- that Brent Winters

3  called on the speaker phone in the summer of 2000.

4  Q.   And then after that, when was the next time that you

5  spoke with Lindsey Springer?

6  A.   I believe it was in 2004.

7  Q.   And why did you contact Lindsey in 2004?

8  A.   Basically, because I had heard good things about you

9  and I had gone through a series of attorneys who couldn't

10  or wouldn't help or I felt I couldn't tell which side

11  they were on, so based on what I had heard, I contacted

12  you.

13  Q.   Did you contact Mr. Barringer before or after you

14  had contacted me in 2004?

15  A.   I really don't remember.

16  Q.   Did you ever draw any conclusions with regard to

17  whether I was sincere about information I shared with

18  you?

19        MR. SNOKE:   Your Honor, objection; relevance.

20        THE COURT:   Sustained.

21  Q.   (BY MR. SPRINGER)   Did Mr. Barringer help you

22  present your side of the case the way you wanted it?

23  A.   Yes, he did.

24  Q.   And how many lawyers did you go through before you

25  got to Mr. Barringer?

1   A.   I'd say six.

2   Q.   And --

3   A.   That's not counting the Aegis company lawyers.

4           THE COURT:  Say that again, sir.

5           THE WITNESS:  That's not counting the Aegis

6   company lawyers, the people who sold me the trust

7   documents.

8   Q.   (BY MR. SPRINGER)  How many lawyers did Aegis

9   employ, if you know?

10  A.   They had numerous attorneys, but I had contact with

11  three of them.  They had people all over the United

12  States.

13  Q.   Did you and I ever have any conversations related to

14  the Paperwork Reduction Act?

15  A.   Yes, we did.

16  Q.   And would that be time frame around 2004 forward?

17  A.   Yes.

18          THE COURT:  Mr. Patridge, if you would, please

19  pull the microphone a little closer to you.  Thank you.

20  Q.   (BY MR. SPRINGER)  And you just said yes?

21  A.   Yes.

22  Q.   And in answer, you just said yes?

23  A.   Yes.

24  Q.   Prior to conversations with me related to the

25  Paperwork Reduction Act, had anybody else ever showed you

DENNY PATRIDGE - CROSS BY MR. SNOKE                    2355

```
 1   -- showed you the Paperwork Reduction Act or how it
 2   operated?
 3   A.   No.
 4   Q.   Did Mr. Barringer affirm to you what you and my
 5   conversations were about involving the Paperwork
 6   Reduction Act?
 7   A.   Yes.
 8           MR. SNOKE:  Objection; relevance.
 9           THE COURT:  Next question.  Other individuals'
10   perceptions are not admissible.
11           MR. SPRINGER:  Okay.  May I have one second,
12   Your Honor?
13           THE COURT:  You may.
14           MR. SPRINGER:  No further questions, Your Honor.
15           THE COURT:  Mr. Stilley.
16           MR. STILLEY:  No questions.
17           THE COURT:  Cross-examination.
18                      CROSS-EXAMINATION
19   BY MR. SNOKE:
20   Q.   Mr. Patridge, you said Mr. Barringer represented you
21   during the trial of this case; is that correct?
22   A.   That's right.
23   Q.   All right.  Of your case, I guess.  And when did
24   that trial take place?
25   A.   June of 2005.
```

1   Q.   All right.  Was Mr. Springer involved at all in the

2   -- in assisting Mr. Barringer in that presentation?

3   A.   Yes.

4   Q.   And one of the defenses that Mr. Barringer presented

5   was the Paperwork Reduction Act, was it not?

6   A.   Yes.

7   Q.   And that defense didn't fly, you got convicted,

8   right?

9   A.   Yes.

10  Q.   All right.  And then Mr. Barringer handled the

11  appeal for you to the Seventh Circuit, did he not?

12  A.   Yes.

13  Q.   And he argued, among other things -- well, let's

14  strike that.

15       He raised some 19 issues, did he not, on your

16  appeal?

17  A.   Yes.

18  Q.   And the Seventh Circuit Court of Appeals in 2007

19  came down with an opinion on those 19 issues, did they

20  not?

21  A.   Yes.

22  Q.   And they affirmed your conviction?

23  A.   Yes.

24  Q.   And one of the issues he was raising was the

25  Paperwork Reduction Act?

```
 1   A.   Yes.

 2   Q.   And isn't it true, sir, that the Seventh Circuit

 3   found all those 19 issues "frivolous," in their words?

 4   A.   Yes, they did.

 5   Q.   In addition -- and, additionally, did they not say,

 6   sir, in that opinion, that "Jerold W. Barringer

 7   represented Patridge at trial in the tax court and during

 8   three appeals to this court.  He," meaning Mr. Barringer,

 9   "has performed below the standard of a pro se litigant.

10   We have serious doubt about his fitness to practice law.

11   The problem is not simply his inability to distinguish

12   between plausible and preposterous arguments, it is his

13   disdain for the norms of legal practice, 19 issues indeed

14   and the Rules of Procedure."

15        Is that not part of the opinion of the Seventh

16   Circuit court in your case?

17   A.   Yes, it is.  They can say anything they want.

18             MR. SNOKE:  Pass the witness.

19             THE COURT:  Any redirect?

20             MR. SPRINGER:  Yes, Your Honor.

21                      REDIRECT EXAMINATION

22   BY MR. SPRINGER:

23   Q.   Was the judge who wrote the opinion that Mr. Snoke

24   just mentioned Chief Judge Easterbrook?

25   A.   Yes, he was.
```

DENNY PATRIDGE - REDIRECT BY MR. SPRINGER                2358

1   Q.   Did he also tell you about the requirement to file a

2   Form 1040 in that opinion?

3   A.   Yes, he did.

4   Q.   What did he say?

5   A.   He said it was -- I believe it was 7203, which was a

6   criminal statute.

7   Q.   Did he say that no one need file an official Form

8   1040?

9   A.   That's exactly what he said.

10  Q.   In the same opinion that he sanctioned Mr. Barringer

11  in?

12  A.   That's right.

13  Q.   Do you remember whether they were -- the Seventh

14  Circuit was attempting to disbar Mr. Barringer?

15  A.   Yes, they were.

16  Q.   Did they withdraw their rule to show cause on that

17  count?

18  A.   Yes.

19         MR. SPRINGER:   May I have one second, Your

20  Honor?

21         THE COURT:   You may.

22  Q.   (BY MR. SPRINGER)   Did I ever tell you that I was a

23  lawyer?

24  A.   No.

25         MR. SNOKE:   Leading; beyond the scope.

1               THE COURT:  Overruled.

2    Q.   (BY MR. SPRINGER)  Just to be clear, the Seventh

3    Circuit opinion said -- published opinion said to you no

4    one need file any official Form 1040; is that true?

5    A.   Right.

6               MR. SPRINGER:  No further questions, Your Honor.

7               THE COURT:  Mr. Stilley.

8               MR. STILLEY:  No questions.

9               THE COURT:  Recross.

10              MR. SNOKE:  No, Your Honor.

11              THE COURT:  You may step down.

12        And we'll have the Defendant Springer's next

13   witness.

14        Hold on just a minute.

15        (DISCUSSION OFF RECORD BETWEEN THE COURT AND

16   MARSHALS.)

17              THE COURT:  Are these last two witnesses

18   released for all purposes?

19              MR. SPRINGER:  For all purposes, Your Honor.

20              MR. O'REILLY:  Yes, Your Honor.

21              THE COURT:  Well, they are permitted to go.

22              THE WITNESS:  May I ask a question about being

23   released?  Is there any way we can make sure this time

24   that they get with the marshals and get us out of the

25   county jail instead of sitting there?

1          THE COURT:  We'll ask the marshals to proceed as

2    expeditiously as reasonably possible.

3          THE WITNESS:  Thank you, sir.

4          THE COURT:  We'll have the Defendant Springer's

5    next witness.

6          MR. SPRINGER:  Your Honor, may I have one second

7    with standby?

8          THE COURT:  You may.

9          MR. SPRINGER:  Your Honor, I would call Special

10   Agent Brian Shern to the stand.

11         THE COURT:  Very well.

12                    BRIAN SHERN,

13   (WITNESS PREVIOUSLY SWORN)

14         MR. SPRINGER:  Your Honor, may I approach to put

15   a set of exhibits up there?

16         THE COURT:  You may.

17                  DIRECT EXAMINATION

18   BY MR. SPRINGER:

19   Q.  Good afternoon, Mr. Shern.

20   A.  Good afternoon.

21   Q.  Did I hear you correctly when you were being

22   examined by Mr. O'Reilly, "Catch me if you can"?  Did you

23   say those words?

24   A.  No.

25   Q.  Did Mr. O'Reilly say those words?

```
 1   A.   Yes, I think so.

 2   Q.   Did you agree with him?

 3   A.   I don't remember exactly what he asked me about it.

 4            MR. O'REILLY:  Objection; relevance and form of

 5   the question.

 6            THE COURT:  Overruled.

 7   Q.   (BY MR. SPRINGER)  Now -- excuse me, strike that.

 8        Mr. Shern, you -- did you give an affidavit to

 9   obtain a search warrant to search my house?

10   A.   Yes.

11   Q.   And in that affidavit, did you mention that you had,

12   prior to the day you filed the affidavit, that you had

13   reviewed several bits of information that had been

14   obtained by the IRS?

15   A.   Yes.

16   Q.   Did that include Agent Donna Meadors's civil

17   investigation?

18   A.   Yes, it did.

19   Q.   Did it include her notes that she had taken when she

20   spoke with me?

21   A.   I don't believe it did.

22   Q.   Did it include the letters that she had received

23   from all the people who sent her letters in response to

24   her letters?

25   A.   The information from now-Special Agent Meadors, she
```

```
 1  was a revenue agent then, was partially incomplete
 2  because they -- I had trouble finding the civil -- her
 3  entire civil case file, so I just had piecemeal
 4  information from that 6700 investigation.
 5  Q.   So did she turn over to you all of her files?
 6              MR. O'REILLY:  Objection; relevance.
 7              THE COURT:  That will be overruled at this
 8  point.  I want to hear where this is headed.
 9              THE WITNESS:  I don't believe she was in
10  possession of those files because she was, I think, at
11  the time, training in Georgia to become a special agent.
12  Q.   (BY MR. SPRINGER)  I have in front of you a
13  defendant's exhibit book.  Could you turn to Defendant's
14  Exhibit Number 203, please.
15  A.   Okay.
16  Q.   Do you see Defendant's Exhibit Number 203?
17  A.   Yes.
18  Q.   Do you recognize the stamp on the bottom that says
19  "Meadors" and then some numbers on it?
20  A.   Yes.
21  Q.   Now, how did those numbers -- how did "Meadors" and
22  those numbers get on Defendant's Exhibit 203?
23  A.   I put them on there.
24  Q.   So do you recognize Defendant's Exhibit 203?
25  A.   Yes.
```

```
 1              MR. SPRINGER:  Your Honor, I would move into

 2    evidence Defendant's Exhibit Number 203.

 3              MR. O'REILLY:  Objection as to relevance.

 4              THE COURT:  Counsel will approach.

 5         (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND

 6    OUT OF THE HEARING OF THE JURY.)

 7              THE COURT:  What's the relevance of 203?

 8              MR. SPRINGER:  I met with Donna Meadors; these

 9    are her notes.  I told her I helped people, which is

10    completely inconsistent with the theory that I told Agent

11    Shern in 2005 that I didn't help people.  His question,

12    which is a technical term of art, whether I was being

13    paid for services or not is what they've alleged, and

14    here I've worked as hard as I could with the IRS and

15    Donna Meadors wrote everything down, there's people in

16    there that have testified in this case that she could

17    have only got their names from me, I gave them to her, I

18    told them why they gave me money and she wrote it down.

19              THE COURT:  So what specific part of 203 do you

20    refer to when you say that?

21              MR. SPRINGER:  First of all, all the names I

22    provided to the IRS, that's the first thing.  The second

23    thing is like on the third one, Check 567, Sal Pizzino.

24    "Springer got Pizzino to file tax returns and get

25    straight with the IRS."  If you turn over, next one is
```

BRIAN SHERN - DIRECT BY MR. SPRINGER                    2364

```
 1   check -- Stumpo, it says, Donation to Bondage Breakers
 2   Ministry because Lindsey was helping --
 3              THE COURT:  Slow down.
 4              MR. SPRINGER:  -- because Lindsey was helping
 5   their son.  Those are her notes from me on the second
 6   page, Your Honor.  With the Ouwengas, it says -- it's the
 7   third one, 0007, says, "Jerry Barringer is their attorney
 8   and their children are supporting Bondage Breakers
 9   Ministry because Lindsey is helping their parents."
10      He knew about all of that before he got the search
11   warrant, before he raided my home, and my answers to his
12   questions are either taken out of context or not
13   understood, but clearly the IRS knew I was helping these
14   people in 2004.  And I was telling them that during their
15   6700 investigation.  It goes on on Dr. Roberts on the
16   bottom of page 2, Your Honor.
17              THE COURT:  You need to come to a conclusion.
18      Mr. O'Reilly, let me hear from you.
19              MR. O'REILLY:  Your Honor, first of all, the
20   mystery number of Meadors 56 is simply a Bates Number
21   that was provided in discovery.
22              THE COURT:  I understand.
23              MR. O'REILLY:  These people have testified, and
24   to the extent that, you know, it's unclear who Special
25   Agent Shern can say who prepared this, it's hearsay
```

1   testimony to the extent it's offered for its truth.

2          THE COURT:  It's excluded.  It will not be

3   received.  The fact that there may be a piece of paper

4   with somebody else's name on it indicating that

5   Mr. Springer said something to somebody else at another

6   time arguably at odds with something Mr. Shern might have

7   put in a search warrant affidavit is completely

8   irrelevant.  It will be excluded.

9       (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

10  WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

11  PRESENCE AND HEARING OF THE JURY.)

12  Q.  (BY MR. SPRINGER)  Mr. Shern, prior to -- strike

13  that.

14         MR. SPRINGER:  May I have one second, Your

15  Honor?

16         THE COURT:  You may.

17         MR. SPRINGER:  May I approach the witness for

18  another exhibit?

19         THE COURT:  You may.

20  Q.  (BY MR. SPRINGER)  Mr. Shern, if you would turn --

21  scratch that.

22      Mr. Shern --

23         MR. SPRINGER:  I'm sorry, may I approach, Your

24  Honor, to get it back?

25         THE COURT:  You may.

1  Q.  (BY MR. SPRINGER)  Mr. Shern, I believe you

2  testified that you were the only one that testified in

3  front of the grand jury on March 9, 2009, prior to the

4  indictment being returned; is that correct?

5  A.  I think so.

6  Q.  Okay.  Are you familiar with the grand jury charges

7  in the indictment?

8  A.  For the most part, yes.

9  Q.  Okay.  On -- did you and I have a long discussion on

10  September 16, 2005?

11  A.  Yes.

12  Q.  Almost three hours?

13  A.  Yes.

14  Q.  Okay.  And just to be clear, you weren't involved in

15  the finding of the currency that was seized, correct?

16  A.  Correct.

17  Q.  And did you say that I told you that all funds that

18  I receive are gifts and donations and that I do not have

19  any income and that I do not provide any services for

20  payment?

21  A.  Yes.

22  Q.  At the time that you made that conclusion, were you

23  aware --

24      MR. O'REILLY:  Objection, Your Honor.  That's

25  not a conclusion, he's simply stating what Mr. Springer

1  said.

2          THE COURT:  The question to which the witness

3  answered "yes" was did he say that Mr. Springer had said

4  something to him on another date specifically, as I

5  perceive it, at least, the date the search warrant was

6  executed, so I don't know whose conclusion you're

7  referring to, but that was an unclear question.

8          MR. SPRINGER:  Sorry.

9  Q.  (BY MR. SPRINGER)  Do you remember Mr. O'Reilly

10  asking you, had you believed my answers that day, that

11  your investigation would have ended right then and there;

12  do you remember that?

13  A.  Yes.

14  Q.  And at the time that you were at my home, raiding my

15  home, did I have any warning that you were coming?

16  A.  We didn't warn you.

17  Q.  And you came early in the morning, did you not?

18  A.  I think it was around eight o'clock or so --

19  Q.  At all times during our conversation, did I ever

20  deny helping people?

21  A.  No, I don't think so.

22  Q.  But wasn't the questions that you were asking more

23  towards whether somebody was giving me a specific payment

24  for a specific thing?

25  A.  I just remember saying -- maybe, like, what did you

1   do for Mr. Roberts or how do you know Mr. Lake?  I think

2   it was pretty general questions.

3   Q.   Did I ever tell you that I helped lawyers, like

4   Oscar Stilley, Alan Richey, and Jerold Barringer?

5   A.   I can't remember.

6   Q.   Do you remember trying to find billing records at my

7   home?

8   A.   I remember that was part of what the search warrant

9   was asking for, yes.

10  Q.   So as far as taking my word based upon your

11  statement to Mr. O'Reilly, I never denied these people

12  gave me money, did I?

13  A.   No.

14  Q.   And I never denied that I helped their lawyers, did

15  I?

16  A.   I don't think so.

17  Q.   In fact -- strike that.

18       Do you remember me handing you a statement in

19  February of 2009 when I came back and met with you and

20  Mr. O'Reilly and Dan?  Do you remember that day?

21  A.   I think you handed us a whole package of materials.

22  Q.   Did I also give you a written statement?

23  A.   Yes, I think so.

24  Q.   Did you read that written statement?

25  A.   Yes.

BRIAN SHERN - DIRECT BY MR. SPRINGER                          2369

1   Q.   Did I ever say in there that I did not help anybody?

2   A.   I don't remember specifically what the statement

3   said.

4           MR. SPRINGER:  Just one second, Your Honor.

5   Q.   (BY MR. SPRINGER)  Could you turn to Defendant's

6   Exhibit Number 199, please.

7   A.   Okay.

8   Q.   Do you recognize Defendant's Exhibit Number 199?

9   A.   Yes.

10  Q.   Would this be the written statement that I handed

11  you on that second meeting?

12  A.   Yes.

13  Q.   Now, do you remember testifying about asking me what

14  people that I had helped who never gave me any money?

15  A.   Yes, we asked you to provide a list of people that

16  you had helped that hadn't paid you anything.

17  Q.   Right.  And at the time you asked me that, wasn't

18  that -- that was January 15, 2009, correct?

19  A.   I think we asked you that from the interview during

20  the search warrant as well.

21  Q.   You asked me to provide -- are you saying you asked

22  me to provide you information during the search warrant?

23  A.   I think we asked you if you had ever helped anybody

24  for free.

25  Q.   Okay.  But at the search warrant time, you never

1  asked me to provide any information, did you?

2  A.   I think we just asked you the question.

3  Q.   Right.  But now on January 15, 2009, you did ask me

4  specifically to provide information relating to people

5  that I had helped; isn't that correct?

6  A.   Yes.

7  Q.   Okay.  And that was after a very long day, was it

8  not?

9  A.   Yes.

10  Q.   Okay.  Now --

11       MR. SPRINGER:  Your Honor, I would move to admit

12  Defendant's Exhibit Number 199.

13       MR. O'REILLY:  Objection, Your Honor; hearsay.

14  Party's own statement offered for its truth made in

15  February of this year while he was aware of the

16  investigation.

17       THE COURT:  Be sustained.

18  Q.   (BY MR. SPRINGER)  Did you read Defendant's Exhibit

19  Number 199?

20  A.   Just now or at the time?

21  Q.   No, no, when I gave it to you.

22  A.   Yes.

23  Q.   Do you remember whether I attached -- or did I give

24  you any other documents besides Defendant's Exhibit

25  Number 199?

1   A.   I know you gave me other documents.

2   Q.   If you look at Defendant's Exhibit Number 200, I

3   think that may refresh your memory.

4   A.   Yes, I remember you did hand us some tax forms.

5   Q.   Did I also hand you the IRS's application for an OMB

6   number?

7   A.   I think so.

8   Q.   To refresh your memory, look at the third page of

9   Defendant's Exhibit Number 200.

10  A.   Yes.

11  Q.   Okay.  And if you would look at the fourth page of

12  that exhibit, Exhibit Number 200, do you remember this

13  page?

14  A.   I can't say that I remember it specifically, but I

15  don't deny that you gave it to me.

16  Q.   Would you have put "Springer 494" on the bottom of

17  it?

18  A.   Yes.

19  Q.   Okay.  So would that tell you that I received this

20  document from you?

21  A.   Yes, that's the Bates Number that we put on all the

22  documents, so, yes, we would have received this.

23  Q.   Did I tell you at that meeting that I believed the

24  Form 1040 did not comply with the Paperwork Reduction Act

25  of 1995?

1   A.    I don't remember.

2   Q.    Do you remember you and Dan and Mr. O'Reilly and

3   me -- and I was showing you on the table where we all

4   kind of leaned in as I was showing you the information?

5   A.    Oh, Daniel?

6   Q.    Yeah, Daniel, I'm sorry.

7   A.    Can you ask the question again.

8   Q.    Do you remember me -- scratch that.

9         If you would look at the fifth page of Defendant's

10  Exhibit Number 200, please.  Do you recognize what's been

11  marked at the bottom as Springer 522?

12  A.    My copy says "Springer 495."

13  Q.    I'm sorry, one more page over, I'm sorry.

14  A.    Yes.

15  Q.    And do you know what this marked "Springer 522," do

16  you know what that check is?

17  A.    It's a check made out to Lindsey Springer for

18  $35,000 from Mr. Stilley.

19  Q.    And do you know whether on this same day a check was

20  made out to Tulsa Sales and Rental for Mr. Patterson for

21  $30,000?

22  A.    I don't know based on any documents, but I know

23  Mr. Patterson and you said that there was 30,000 of

24  this -- this dollar amount returned to Mr. Patterson.

25  Q.    And that was on the same day, June 21 -- I mean,

BRIAN SHERN - DIRECT BY MR. SPRINGER                           2373

```
 1   July 21st?
 2   A.   I don't remember if it was the same day or not.
 3   Q.   Okay.  Could you please turn to Defendant's Exhibit
 4   198, please.
 5   A.   Okay.
 6   Q.   Do you recognize Defendant's Exhibit Number 198?
 7   A.   The copy is not real good.
 8   Q.   Can you read "July 21"?
 9   A.   Yes.
10   Q.   Same day as the day on Springer 522, which was
11   Exhibit Number 200, Defendant's Exhibit Number 200?
12   A.   Yes.
13   Q.   So do you know who Tulsa Sales and Rental is?
14   A.   Yes.
15   Q.   Who is that?
16   A.   That's Mr. -- or was Mr. Patterson's company.
17   Q.   Thank you.
18        At the time that you began the investigation against
19   Lindsey Springer, I believe you testified that was April
20   -- end of April 2005; is that correct?
21   A.   Yes.
22   Q.   Had you met with now-Special Agent, prior-Revenue
23   Agent, Donna Meadors between that day and September 16,
24   2005?
25   A.   I don't think so, but I don't recall, actually.
```

1   Q.  So you just may have just -- are you saying that --

2   excuse me, scratch that.

3       Did you review -- how would you have obtained the

4   file that Donna Meadors had made on Lindsey Springer?

5             MR. O'REILLY:  Your Honor, objection; asked and

6   answered as to this area.  Relevance.

7             THE COURT:  Sustained.

8   Q.  (BY MR. SPRINGER)  Did I tell you, on September 16,

9   2005, that I had no gross income?

10  A.  I don't remember.

11  Q.  Whether -- scratch -- strike that.

12      Are donations and gifts income to your understanding

13  at the time you and I had this conversation in 2005?

14            MR. O'REILLY:  Objection.  Mr. Shern is not an

15  expert on tax law.

16            THE COURT:  Overruled.

17            THE WITNESS:  No, I don't believe donations or

18  gifts, if they were donations or gifts, would be

19  considered income.

20  Q.  (BY MR. SPRINGER)  Would it be -- okay.  And that is

21  the point to which you or the grand jury asserted with

22  your testimony that was a false statement to you,

23  correct?

24            MR. O'REILLY:  Your Honor, objection; unclear as

25  to what statement.

1          THE COURT:  Clarify what statement.

2    Q.   (BY MR. SPRINGER)  The statement that is alleged in

3    paragraph 15 in the overt acts of the grand jury

4    indictment that says, "He does not have income and he

5    does not provide any services for payment."  That

6    statement.  Is that what you mean to allege as was

7    false?

8          MR. O'REILLY:  Objection; the grand jury alleged

9    that was false.

10          THE COURT:  Put it in terms of the grand jury.

11   Q.   (BY MR. SPRINGER)  That the grand jury alleged that

12   was false?

13   A.   I think there were several false statements during

14   that interview.

15   Q.   Okay.  Could you tell me what other alleged false

16   statement that the grand jury alleged that came from that

17   day?

18   A.   I'm not sure if I can tell you exactly what the

19   grand jury alleged, but I can tell you what I construed

20   as false during that interview.

21   Q.   Okay.  Please tell me.

22   A.   I think you specifically -- we specifically talked

23   about each witness.  We talked about Mr. Roberts, we

24   talked about Mr. Lake, we talked about Mr. Hawkins, and

25   over and over again I believe that you said that you

1  worked or -- maybe not worked, but did something for

2  these individuals but the payments from these individuals

3  were not payment for services, these were just donations,

4  and the same thing with many of the other witnesses who

5  have testified.

6  Q.   Since that day, have I ever denied that I said that?

7  A.   No.

8  Q.   And everything that you just said, doesn't it relate

9  back to the statement, "He does not have any income and

10 that he does not provide any services for payment,"

11 whether it be Ouwenga or whoever.

12         MR. O'REILLY:  Objection, Your Honor; unclear.

13 Mr. Springer is on trial for several charges that are

14 much broader than just those statements.

15         THE COURT:  Sustained.

16         MR. SPRINGER:  Okay.

17 Q.   (BY MR. SPRINGER)  How were you misled by my answers

18 on September 16, 2005?

19 A.   How was I misled?

20 Q.   Right.

21 A.   I guess by you telling me that all that income was

22 -- I guess I wasn't necessarily misled, but I think you

23 -- your statements may be intended to mislead me.

24 Q.   Were you aware, as of September 16, 2005, that I had

25 provided a list to the IRS with names like Andy Ouwenga,

1  Dr. Roberts, and the money that they had given me?

2  A.   I think you provided a list in response to

3  Ms. Meadors' investigation; is that right?

4  Q.   Right.  And -- okay.  So you weren't -- you just

5  said you weren't misled, but you believe I was trying to

6  mislead you; is that what you just said?

7  A.   Yes.  I think the whole notion of Bondage Breakers

8  Ministry, I think as -- you characterize it as a ministry

9  and claim that all this money is donations and gifts,

10  when you know full well that you're just working like

11  everybody else and earning income for services.

12  Q.   Did you also get to review Kathy Beckner's

13  investigation of Lindsey Springer?

14  A.   There wasn't a whole lot of files related to that

15  investigation that I reviewed, but I did review, I think,

16  a small amount of the information and I reviewed the

17  closing report for the investigation.

18  Q.   Did you read about where Bondage Breakers Ministries

19  had received $1.2 million from the Infinity Group

20  Company?

21  A.   Yes.

22  Q.   Did you also note that that money was taken from me

23  three weeks after it was given?

24  A.   Yes.

25  Q.   Did you ever read the complaint that was filed by

1   the United States in that case?

2   A.   I know what I read, that it was an investment scam

3   where many investigators were defrauded by the -- by

4   Mr. Benson and a lot of the money from the defrauded

5   investors -- or a million-two went to you.

6   Q.   Now, at the time that money was given to Lindsey

7   Springer, isn't it true that there had been no complaint

8   filed by the SEC at that time?

9           MR. O'REILLY:  Your Honor, objection.  This

10  witness's knowledge is -- first of all, the indictment

11  covers 2000 to the present, and this is well before that

12  date.

13          THE COURT:  He can answer if he knows.

14  Overruled.

15          THE WITNESS:  I don't know.

16          THE COURT:  How much more do you have on

17  direct?

18          MR. SPRINGER:  Probably 20 minutes or so, 20 or

19  25 minutes.

20          THE COURT:  Very well.  You may be seated.

21     Members of the jury, we'll take our mid-afternoon

22  break at this time.  We'll resume at 20 minutes after the

23  hour.  During this break, please remember my usual

24  admonition, which I will not repeat at this time, so

25  please be available just a little before 20 after to

1  return to the courtroom with the security officer.

2      All persons in the courtroom will remain seated

3  while the jury departs.

4      (JURY EXITS THE COURTROOM.)

5          THE COURT:  You may step down.

6      Mr. Springer.  Exhibit 199, it's conceivable that

7  there could be an appropriate showing made at some point

8  under some other theory to support the admissibility of

9  Exhibit 199, for instance, to rebut a charge of recent

10  fabrication, which has not happened yet, so I would not

11  want to you misconstrue my ruling on it as being that 199

12  would not ever, under any theory, be deemed admissible,

13  but I'll have to say in the very same breath it's pretty

14  rare that a document of this sort generated under these

15  circumstances is admissible, but you can certainly

16  consult with your standby counsel.

17      I've given you all the advice I'm going to give you,

18  but you can consult with your standby counsel and see if

19  there might be some basis under some other circumstances

20  on which 199 might be admissible.

21      Anything further before we take our mid-afternoon

22  break?

23          MR. O'REILLY:  No, Your Honor.

24          THE COURT:  Court will be in recess.

25      (A RECESS WAS HAD, AFTER WHICH THE FOLLOWING

BRIAN SHERN - DIRECT BY MR. SPRINGER                    2380

```
 1   PROCEEDINGS WERE HAD IN OPEN COURT AND WITHIN THE
 2   PRESENCE AND HEARING OF THE JURY.)
 3            THE COURT:  Mr. Springer, you may continue.
 4            MR. SPRINGER:  Thank you, Your Honor.
 5   Q.  (BY MR. SPRINGER)  Mr. Shern, are you aware of the
 6   charges in Counts 2, 3, and 4 related to attempted tax
 7   evasion?
 8   A.  Yes.
 9   Q.  And are you aware that there's an affirmative act
10   alleged as providing false statements to Internal Revenue
11   Service employees?
12   A.  Yes.
13   Q.  And as you sit here today, are you that Internal
14   Revenue Service employee that the false statements are --
15   allegedly were made to?
16   A.  One of them, yes.
17   Q.  Who is the other one?
18   A.  Special Agent Shoemake and Special Agent Sivils.
19   Q.  Shoemake, is that from the 2005 search warrant?
20   A.  Yes.
21   Q.  Is he the gentleman that was upstairs with you and
22   me?
23   A.  Yes.
24   Q.  And then Daniel was I believe -- strike that.
25        Was Daniel in the room on January 15, 2009?
```

```
 1              MR. O'REILLY:  Your Honor, just for
 2    clarification, "Daniel" is Special Agent Sivils.
 3    Q.  (BY MR. SPRINGER)  I'm sorry, Special Agent Sivils.
 4    A.  Yes.
 5    Q.  And he was also -- was he also in the room when I
 6    came back a second time and met with you and
 7    Mr. O'Reilly?
 8    A.  Yes.
 9    Q.  Okay.  And on the false -- the alleged false
10    statements, for Counts 2, 3 and 4, are they basically the
11    same false statements alleged by the grand jury in Count
12    1?
13    A.  Without looking at Count 1, I couldn't tell you
14    exactly.
15    Q.  Is the basis of the false statement allegation for
16    2, 3, and 4, that I said I only received gifts and
17    donations, I didn't have any income and that I did not
18    provide any services for payment, is that basically the
19    same for all those charges?
20    A.  Yes.
21    Q.  Okay.  So -- okay.  When you asked the question to
22    me on September 16, 2005, related to payment for
23    services, did you have a definition for services that you
24    were trained to go by or was that just generically
25    services?
```

BRIAN SHERN - DIRECT BY MR. SPRINGER                          2382

1   A.   It was just generally what "services" means to me.

2   Q.   Did you ever ask me what "services" meant to me?

3   A.   No.

4   Q.   When you first were assigned to investigate Lindsey

5   Springer, were you working with Doug Horn and Melody

6   Nelson?

7   A.   No.

8   Q.   When did you first become working with Doug Horn --

9   Assistant U.S. Attorney Doug Horn and Assistant U.S.

10  Attorney Melody Nelson?

11  A.   I don't remember exactly.  I know AUSA Nelson,

12  Melody Nelson, was the attorney that I worked with when I

13  was preparing the search warrant affidavit and having her

14  review it.  AUSA Horn, I remember having some discussion

15  with him, but I don't recall the time frame.

16  Q.   You said earlier, before the break, that you were

17  aware of the $1.2 million that was taken -- was given to

18  me and then taken from me; do you remember that?

19  A.   Yes.

20  Q.   And did you ever look into why that money was taken

21  from me initially?

22  A.   I read some materials related to that, but I don't

23  -- I don't exactly remember if it was the -- what

24  materials they were, if it was the -- I can't remember

25  exactly what it was, but I know I read some case synopsis

BRIAN SHERN - CROSS BY MR. STILLEY                           2383

```
 1   materials on that case.
 2          MR. SPRINGER:  Your Honor, may I have one
 3   second?
 4          THE COURT:  You may.
 5          MR. SPRINGER:  I misspoke five seconds and I
 6   pass this witness.
 7          THE COURT:  Mr. Stilley.
 8                    CROSS-EXAMINATION
 9   BY MR. STILLEY:
10   Q.   You testified that if you had believed Mr. Springer,
11   the investigation would have been over, correct?
12   A.   Yes.
13   Q.   Would you concede that Oscar Stilley might have in
14   good faith believed Mr. Springer?
15   A.   No.
16   Q.   You recall Oscar Stilley being subpoenaed to the
17   grand jury, correct?
18   A.   Yes.
19   Q.   And do you recall when Oscar Stilley first testified
20   at the grand jury?
21   A.   Yes.
22   Q.   When was that?
23   A.   I believe it was March 9 of 2006.
24   Q.   And you were not satisfied with the testimony of
25   Oscar Stilley, correct?
```

1   A.   I think it was the AUSA -- AUSA Radford wasn't

2   satisfied with the testimony.

3   Q.   Do you recall whether there was a statement on the

4   record stating that Oscar Stilley would be subpoenaed

5   again?

6   A.   I don't remember if there was a statement on the

7   record.  I can't remember.

8   Q.   Sure.  Do you recall if there was actually a

9   decision to subpoena Oscar Stilley again?

10  A.   Yes.

11  Q.   And was that subpoena issued?

12       MR. O'REILLY:  Your Honor, objection as to

13  relevance as to whether a second subpoena was issued and

14  whether or not it was withdrawn.

15       THE COURT:  I'm going to hear it and see where

16  it's going, so for that reason, at this point, it will be

17  overruled.

18       Proceed.

19  Q.   (BY MR. STILLEY)  That subpoena was actually

20  issued,correct?

21  A.   Yes.

22  Q.   And Oscar Stilley waived service and allowed the

23  government to send that to him by fax; is that correct?

24  A.   Yes.

25  Q.   And that subpoena was never -- there was never

BRIAN SHERN - CROSS BY MR. STILLEY                    2385

```
1   another hearing in which Oscar Stilley gave testimony,
2   correct?
3   A.   Correct.
4   Q.   And what was the reason for that?
5          MR. O'REILLY:  Objection; there's various number
6   of reasons that are not relevant.
7          THE COURT:  Sustained.
8          MR. STILLEY:  Your Honor, might we approach?
9          THE COURT:  You may.
10     (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND
11  OUT OF THE HEARING OF THE JURY.)
12         THE COURT:  Okay.  What's the -- well, before I
13  ask what the relevance of this is, both of you need to
14  understand that if there's any reason to do a postmortem
15  on an investigation it is usually not -- there's usually
16  not a reason to do it in front of the jury.  There could
17  be reasons to do it before trial, there could be reasons
18  to do it after trial, but it is -- typically doing a
19  postmortem on an investigation leading to an indictment
20  is usually not relevant material for the proceedings in
21  the presence of the jury.  So with that beginning point,
22  Mr. Stilley, tell me what the relevance of this is.
23         MR. STILLEY:  Part of the reason Oscar Stilley
24  is alleged to have committed a wrongful act is the claim
25  that he did not turn over all the documents.  And, in
```

1  fact, the second subpoena was issued and the grand jury

2  testimony shows that it actually -- the AUSA stated, on

3  the record, that he would ask for additional

4  information.  That additional information did not come

5  because the subpoena was withdrawn.

6       Now, then, on the next grand jury, the grand jury --

7  not the next, but the grand jury that indicted us told

8  that Oscar Stilley had not been forthright and

9  forthcoming with his performance, but there was no

10 mention of the fact that the second subpoena had been

11 withdrawn and the same error is being performed in this

12 case, in that it is made to look like Oscar Stilley

13 didn't perform, when, as a matter of fact, the second

14 subpoena was withdrawn.

15      And just one other little small thing.  It's plain

16 from the face of the '06 grand jury testimony that Oscar

17 Stilley was mistaken about the source of certain funds,

18 but --

19           THE COURT:  Is that relative to this objection?

20           MR. SPRINGER:  No, probably not.

21           THE COURT:  Okay.  What does the government

22 say?

23           MR. O'REILLY:  Your Honor, Mr. Stilley was --

24 the basis of the charge in the indictment is he made a

25 false representation on the material that was in

1  Government's Exhibit 582, the response to subpoena.  In

2  fact, I don't believe there's anything about his

3  testimony, and he had the opportunity to comply with the

4  subpoena the first time.  And him doing, as the Court

5  indicated, a postmortem in front of the jury, serves no

6  purpose other than to confuse the jury.

7         THE COURT:  Mr. Stilley, are you contending that

8  you were, as a result of the withdrawal of the subpoena,

9  relieved of an obligation to produce documents?

10        MR. STILLEY:  Yes.  And simply for the fact that

11 I had at that point in time been made aware that I was

12 under criminal investigation, therefore, I couldn't be

13 compelled to be a witness against myself.

14        THE COURT:  Okay.  Well, I'm not going to permit

15 questioning about why a subpoena was withdrawn, but if

16 you wanted to inquire as to the fact that the subpoena

17 was withdrawn, that will be permissible.  We'll take it

18 one step at a time from there.

19        MR. STILLEY:  I think it might be productive if

20 I could ask whether or not I will be permitted to ask

21 Mr. Shern what he told me was the reason.  He said I was

22 not under criminal investigation when I was.

23        THE COURT:  No.  We're not going to go there,

24 that doesn't have anything to do with the jury --

25 anything to do with the jury issues.

BRIAN SHERN - CROSS BY MR. O'REILLY                          2388

1            MR. STILLEY:  I can ask him if it was withdrawn,

2    then, correct?

3            THE COURT:  You can ask him if the subpoena was

4    withdrawn.

5            MR. STILLEY:  Thank you, Judge.

6        (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

7    WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

8    PRESENCE AND HEARING OF THE JURY.)

9    Q.  (BY MR. STILLEY)  So there was a second subpoena

10   issued, correct?

11   A.   Yes.

12   Q.   What happened to that subpoena?

13   A.   I faxed it to you.

14   Q.   What happened after that?

15   A.   Nothing happened after that.

16   Q.   Was that subpoena withdrawn?

17   A.   I think AUSA Radford, I think, told you that you

18   didn't have to comply with it if -- that's the best of my

19   recollection.

20           MR. STILLEY:  Your Honor, could I have a moment?

21           THE COURT:  You surely may.

22           MR. STILLEY:  Pass the witness.

23           THE COURT:  Mr. O'Reilly.

24                        CROSS-EXAMINATION

25   BY MR. O'REILLY:

1   Q.   Special Agent Shern, with respect to the 1.2 million

2   that Mr. Springer referenced, I believe that was in,

3   what, 1997?

4   A.   I believe so.

5   Q.   Was that order disgorged because the source of the

6   funds was defrauded investor funds that were an attempt

7   by the Court to return the money to the investors?

8   A.   Yes.

9   Q.    Mr. Springer also asked you with respect to the

10   false statement as it applies to the tax evasion counts,

11   Counts 2, 3, and 4 -- do you recall that question?

12   A.   Yes.

13   Q.   Is the false statement the only affirmative act of

14   evasion alleged in the indictment?

15   A.   No.

16   Q.   What are the affirmative acts alleged in the

17   indictment?  Generally, not specifically.

18   A.   Many affirmative acts:  The fact that he uses a mail

19   drop, that he deals in cash and cashier's checks, that he

20   didn't file tax returns.

21   Q.   Let me ask you this:  Is the failure to file --

22   that's not alleged as an affirmative act, is it, if you

23   know?

24   A.   I don't know.

25   Q.   Okay.  Is the use of Mr. Stilley's IOLTA account

```
 1  alleged as an affirmative act?

 2  A.   Yes.

 3  Q.   In Mr. Stilley's examination, he asked you if you

 4  would concede that he had perhaps a good-faith belief in

 5  what Mr. Springer was doing; do you recall that

 6  question?

 7  A.   Yes.

 8  Q.   You indicated no?

 9  A.   Yes.

10  Q.   Please tell the jury why you indicated no.

11  A.   Because I think he's a lawyer and he understands

12  what his IOLTA account is to be used for and I think he

13  knowingly assisted Mr. Springer to hide Mr. Springer's

14  income, as well as Mr. Turner, to hide his income from

15  the Internal Revenue Service.

16             MR. O'REILLY:  May I have a moment, Your Honor?

17             THE COURT:  You may.

18             MR. O'REILLY:  No further questions.

19             THE COURT:  Any redirect?

20             MR. SPRINGER:  Yes, Your Honor.

21                      REDIRECT EXAMINATION

22  BY MR. SPRINGER:

23  Q.   Do you know what an IOLTA account is?

24  A.   Yes.

25  Q.   What is it?
```

```
 1   A.   It's an interest on lawyer's trust account.

 2   Q.   Do you know how a lawyer uses an IOLTA account?

 3   A.   Yes.

 4   Q.   Did you ever -- strike that.

 5           MR. SPRINGER:  May I have one moment, Your

 6   Honor?

 7           THE COURT:  You may.

 8   Q.   (BY MR. SPRINGER)  Did you ever read the rules of

 9   the IOLTA account for Oscar Stilley?

10   A.   I believe I read some of them.

11           MR. SPRINGER:  May I approach the witness, Your

12   Honor?

13           THE COURT:  You may.

14   Q.   (BY MR. SPRINGER)  And I apologize, I only have one

15   here.  Have you ever seen what I just handed you?

16           MR. O'REILLY:  Excuse me, Your Honor, the

17   government should see this before it's presented to the

18   witness.

19           THE COURT:  Why don't you let Mr. O'Reilly look

20   at it and then give it back to Mr. Shern.

21   Q.   (BY MR. SPRINGER)  Do you know whether Oscar Stilley

22   has ever been charged or sued over any -- other than this

23   case here, over any transaction that went through his

24   IOLTA account?

25   A.   I don't know.
```

BRIAN SHERN - REDIRECT BY MR. SPRINGER                    2392

```
1   Q.   Do you know of any complaints by IOLTA that were

2   made against Oscar Stilley in relation to how he handled

3   his IOLTA account?

4   A.   No, I don't know.

5   Q.   You told Mr. O'Reilly that using 5147 South

6   Harvard -- I believe you called it a mail drop?

7   A.   Yes.

8   Q.   That that's an affirmative act?

9   A.   Yes.

10  Q.   To attempt to evade taxes?

11  A.   Yes.

12  Q.   Why would that be an affirmative act to attempt to

13  evade taxes?

14  A.   When coupled with all the other affirmative acts.

15  Taken by itself, I don't know -- like if that was the

16  only thing that you did with regards to affirmative acts,

17  it may not be viewed as an affirmative act, but taken as

18  a whole with all the other acts of concealment that

19  you've engaged in, I believe it's another attempt for you

20  to hide location of assets and income, in general, from

21  the government.

22  Q.   So are you aware that the IRS issued notice of

23  deficiencies to Lindsey Springer in 1996?

24       MR. O'REILLY:  Your Honor, this is beyond the

25  scope of cross.
```

1          THE COURT:  We'll hear it.  Overruled.

2          THE WITNESS:  I think so, yes.

3   Q.  (BY MR. SPRINGER)  Do you know what address they

4   used?

5   A.  No.

6   Q.  Did you ever look at the notice of deficiencies that

7   the IRS filed against Lindsey Springer?

8   A.  I don't think I looked at the actual notices, I just

9   saw on your filing -- on your transcript that they were

10  filed.

11  Q.  So if I had a checking account and if I had a mail

12  box where I live and all of these transactions that have

13  been testified in this case used that address and that

14  checking account, would there be any other act that could

15  you say here today is an attempt to evade payment of tax

16  for 2000, 2003, and 2005?

17         MR. O'REILLY:  Objection, Your Honor; calls for

18  a hypothetical.

19         THE COURT:  Overruled.

20         THE WITNESS:  Yes.

21  Q.  (BY MR. SPRINGER)  And what would those be?

22  A.  The fact that you told us it was donations, that you

23  formed Bondage Breakers Ministries, that you didn't file

24  your tax returns.  I'm trying -- without looking at the

25  indictment, in particular, I couldn't list all of them.

BRIAN SHERN - RECROSS BY MR. STILLEY                    2394

1  Q.  As you sit here today, is it your position that

2  Bondage Breakers Ministries was created to attempt to

3  evade taxes?

4  A.  I don't know if it was created to attempt to evade,

5  but I think that's the purpose that you're using it for

6  now.

7  Q.  Okay.  Do you know when Bondage Breakers Ministries

8  and Lindsey Springer first became associated together as

9  the same person?

10         MR. O'REILLY:  Objection, Your Honor.

11         THE COURT:  That will be sustained.  Now it's

12  time to bring it back within the scope of cross.

13         MR. SPRINGER:  Sorry.  Pass the witness, Your

14  Honor.

15         THE COURT:  Mr. Stilley.

16                 RECROSS-EXAMINATION

17  BY MR. STILLEY:

18  Q.  What did you read to learn about IOLTA accounts?

19  A.  I think I participated in an interview with AUSA

20  Snoke with an attorney that we were planning on calling

21  that was an expert on IOLTA accounts.

22  Q.  And what was that lawyer's name?  Would it be Nate

23  Coulter?

24  A.  Yes.

25  Q.  Nate Coulter was on the witness list, right?

BRIAN SHERN - RECROSS BY MR. STILLEY                    2395

1   A.   Yes.

2   Q.   But he didn't come testify, did he?

3   A.   No.

4   Q.   And do you --

5        MR. O'REILLY:  Objection; beyond the scope, what

6   witnesses were or were not on the --

7        THE COURT:  Sustained.

8   Q.   (BY MR. STILLEY)  As you sit here today, can you

9   tell the court and jury what rule in Arkansas governs

10  IOLTA accounts?

11  A.   No, I can't point to a specific rule.

12  Q.   And would it be fair to also say that you could not

13  summarize the requirements of lawyers on IOLTA accounts?

14  A.   That is correct.  I'm not an expert on IOLTA

15  accounts.

16        MR. STILLEY:  Could I have just a moment,

17  please?

18        THE COURT:  You may.

19        MR. STILLEY:  Thank you.  Pass the witness.

20        THE COURT:  Anything further?

21        MR. O'REILLY:  No, Your Honor.

22        THE COURT:  You may step down.

23     We'll have the Defendant Springer's next witness.

24        MR. SPRINGER:  Your Honor, may we approach?

25     (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND

1    OUT OF THE HEARING OF THE JURY.)

2          MR. WILLIAMS:  Your Honor, this is really a

3    request more on my behalf than anything else.  It's my

4    understanding that we've come to a point where the

5    defendants themselves would either have to testify or

6    rest.  That being said, I would like the opportunity to

7    at least discuss with them, again, before they make that

8    decision, the best, at least in my opinion, Mr. Burton

9    can agree or not, how the methodology and the manner in

10   which that testimony would take place pursuant to the

11   Court's earlier guidance, of course.  And, that being

12   said, if we have a little bit of time before the

13   defendants make that decision, it would be --

14          MR. BURTON:  I'd also request that -- if the

15   government has an objection to an ex parte conference

16   with the court on this subject.

17          THE COURT:  So the issues that are in play on

18   the defense side are whether the defendants will testify,

19   and, if so, how they'll go about it?

20          MR. BURTON:  Correct.

21          MR. WILLIAMS:  Yes, Your Honor.

22          MR. BURTON:  And it's just out of an obligation

23   I have not only to the Court but to the defendants.

24          MR. WILLIAMS:  And I fully concur in that

25   regard.

```
 1            THE COURT:  Mr. O'Reilly, this is probably an
 2   appropriate time for a brief and apparently the final ex
 3   parte conference to address these matters.  And my
 4   personal view of the matter, based on my experience in
 5   our previous ones, that it is not being done in any way
 6   that is unfair to the government, aside from the inherent
 7   unfairness of not being invited to participate.  But,
 8   that said, I'll inquire of the government as to whether
 9   you have any objection to a final ex parte conference.
10            MR. O'REILLY:  The government has no objection,
11   Your Honor.  However, I understood there were a couple
12   more witnesses on the defense list, Mr. Barringer and
13   Mr. Patterson.  I understood Ms. Hawkins has been
14   released as has Mr. Hawkins.  Has Mr. Patterson also been
15   released?
16            MR. SPRINGER:  I'm going to be releasing him.
17   This is something we just discussed.
18            THE COURT:  So now we're down to the
19   defendants?
20            MR. SPRINGER:  Yes.
21            MR. O'REILLY:  So Mr. Barringer would not be
22   called?
23            MR. SPRINGER:  No, I'm not going to call him.
24            MR. O'REILLY:  Well, then, Your Honor --
25            MR. SNOKE:  Your Honor, I have no objection to
```

1    that procedure.  I do want to talk -- have a bench
2    conference with respect to Mr. Patterson.
3             MR. O'REILLY:  He's not being called.
4             MR. SNOKE:  Oh, he's not being called.  I didn't
5    hear that.
6             THE COURT:  Okay.  You may return to your
7    tables.  We'll take a short recess.
8        (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,
9    WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE
10   PRESENCE AND HEARING OF THE JURY.)
11            THE COURT:  Members of the jury, the case has
12   progressed to a point that it is necessary for the Court
13   to address some matters of potential significance with
14   the parties outside the presence of the jury, and I am
15   mindful of the promise I made to you on day one of this
16   trial, so in telling you that we're going to take a short
17   recess, I will assure you, number one, it is very
18   necessary, and, number two, it will not be very long, but
19   we're going to take a short recess, perhaps as short as
20   ten minutes, and in any event, not much longer than ten
21   minutes, and, again, for reasons which I assure you are
22   very good reasons.
23       So we'll stand in recess and please proceed with the
24   security officer to the jury room so that we can take up
25   some important matters relating to the progress of the

 1   case.

 2       (JURY EXITS THE COURTROOM.)

 3          THE COURT:  The jury has left the courtroom.

 4   Let's give them just a short time to get back there.  And

 5   then the defendants and their standby counsel and the

 6   reporter will please proceed to the library.

 7       Court will be in recess.

 8       (PROCEEDINGS HAD IN LIBRARY AS FOLLOWS:)

 9          THE COURT:  Okay.  We're in my library with no

10   one present other than the reporter and a law clerk,

11   standby counsel and the defendants.

12          MR. BURTON:  Your Honor, on behalf of both

13   Mr. Stilley and Mr. Springer, we want to thank you for

14   your very careful deliberation with regard to issues that

15   relate to their testimony in this case.  After extensive

16   discussion, debate, upside down, all over the lot, both

17   Mr. Springer and Mr. Stilley have decided not to utilize

18   either myself or Mr. Williams with regard to their

19   testimony before this jury and the court.  They have

20   decided to proceed on their own behalf and at this time

21   we wanted to advise you of that and they both have

22   different views in terms of what they want to do with

23   each other.

24       Mr. Springer wants to call Mr. Stilley in his case

25   in chief and Mr. Stilley does not have any objection to

1    that and that is their next plan with regard to their

2    case.

3        Then with regard to Mr. Springer, his plan is to

4    testify in narrative, using the exhibits as some sort of

5    cornerstone for discussion and that's where we are.

6            THE COURT:  That's where we are.  What if -- and

7    the -- I certainly am not going to gainsay the decision

8    by the defendants not to be examined by their standby

9    counsel, that was a bit of an out-of-the-box idea to

10   begin with, and I certainly understand how that could be

11   thought of by the defendants as being inconsistent with

12   their invocation of their right to represent themselves,

13   so I -- I do appreciate all four of you giving

14   consideration to that, but I'm certainly not going to

15   second guess the decision to proceed in the way that

16   you've mentioned.

17       So Mr. Springer's intended next witness would be

18   Mr. Stilley?

19           MR. BURTON:  Yes, that's right.

20           MR. SPRINGER:  Yes, Your Honor.

21           THE COURT:  And then what if -- and I'm just

22   throwing this out without directing that this be done

23   this way, what if Mr. Springer calls Mr. Stilley and then

24   Mr. Stilley is allowed to call Mr. Springer out of order

25   as his witness so with the net effect that you both cover

1   most of your direct examination by Q and A from each

2   other.

3           MR. SPRINGER:  We're prepared to do that from

4   Lindsey Springer, Lindsey Springer asking the questions

5   and Oscar Stilley answering, but we didn't prepare for

6   that, although we could be by tomorrow, which looks like

7   we get anyway based upon him being on the stand, but I'm

8   prepared to testify in narrative.

9           THE COURT:  Okay.  Well, we'll -- so your next

10  witness is going to be Mr. Stilley?

11          MR. SPRINGER:  And he should be on there until

12  the end of the day.

13          THE COURT:  Well, we'll get started on that,

14  then, frankly, I think -- and your -- I want you to rely

15  on your own instincts and your standby counsel's advice

16  rather than anything I say.  I frankly think it's more

17  effective from the standpoint of persuasion to go by Q

18  and A than it is by giving a soliloquy.

19      Now, you have invoked your right to give a

20  soliloquy if that's the way it turns out, I'm just

21  exploring alternatives to a soliloquy, and so let's go

22  ahead with Mr. Springer calling Mr. Stilley, then you can

23  think overnight as to whether the very next witness ought

24  to be Mr. Stilley calling Mr. Springer out of time.  And

25  it would seem to me that that might be at least a

2402

1   reasonably effective, if not totally effective, way to go

2   about it and would ameliorate some of the disadvantage

3   inherent in a narrative form of testimony, not the least

4   of which is losing the jury's attention.

5         MR. SPRINGER:  Right.  That's a concern.

6         THE COURT:  I want to you bear in mind two more

7   things:  Number one, the amount of time we're going to

8   spend on -- as I mentioned last Thursday, the amount of

9   time we're going to spend with you expounding on the PRA

10  is not unlimited.

11        MR. SPRINGER:  Sure.

12        THE COURT:  Number two, in the final analysis,

13  both of your decisions to take the stand are personal

14  decisions, and if you decide to take the stand, it will

15  certainly be my conclusion that you have made your own

16  free and independent and personal choice to do that,

17  notwithstanding any possible advice to the contrary.

18     Anything further we ought to cover before we

19  resume?

20        MR. BURTON:  Only that, Your Honor, earlier

21  today, we advised the jury that there was a remote

22  possibility we would be done with the case tomorrow.  I

23  think in light of circumstances and some change of

24  strategy as a result of today's events, and discussions

25  with us as standby counsel, we very well probably will

1  get the case to the jury tomorrow and that's the only

2  other issue.

3        THE COURT:  Okay.  Very well.  We'll take it one

4  step at a time.

5     Hold on just a second.

6     Okay.  Go ahead.

7        MR. STILLEY:  If Mr. Springer decides that he

8  does want to go by Q and A, what's going to be the rule

9  if he decides that Oscar Stilley's questions are not

10 sufficient and wants to go on narrative afterwards?

11       THE COURT:  I'm not going to foreclose that, but

12 you fellows know each other pretty well and you know the

13 case pretty well, so I'm going to assume that there would

14 not in any event be a whole lot that would have to be

15 covered some other way, but I'm not going to foreclose

16 that.

17       MR. SPRINGER:  That goes far with me, agreeing

18 to do that, that was very important to me.

19       THE COURT:  I'm not going to foreclose that.

20 You all may not agree with the -- how I have applied a

21 general rule of reason in this case, but that's what I

22 have tried to do is apply a general rule of reason and

23 that's what I plan to continue to do.

24       MR. SPRINGER:  Thank you.

25       THE COURT:  Okay.  Let's go on and resume with

OSCAR STILLEY - DIRECT BY MR. SPRINGER                    2404

 1   the jury.

 2       (A RECESS WAS HAD, AFTER WHICH THE FOLLOWING

 3   PROCEEDINGS WERE HAD IN OPEN COURT AND WITHIN THE

 4   PRESENCE AND HEARING OF THE JURY.)

 5           THE COURT:  We'll have Mr. Springer's next

 6   witness.

 7           MR. SPRINGER:  Your Honor, I would call Oscar

 8   Stilley.

 9           THE COURT:  Very well.

10                   OSCAR STILLEY,

11   (WITNESS SWORN)

12                   DIRECT EXAMINATION

13   BY MR. SPRINGER:

14   Q.  Mr. Stilley, could you please state your name for

15   the record.

16   A.  Oscar Stilley.

17   Q.  Where do you currently live?

18   A.  Fort Smith, Arkansas.

19   Q.  What year were you born in?

20   A.  1963.

21   Q.  And where were you born?

22   A.  Eureka Springs, Arkansas.

23   Q.  What is your current profession?

24   A.  Attorney.

25   Q.  Are you married?

1  A.   Yes.  I married Julie Moore in 1998 at the age of

2  35.  She was 32.  First and only marriage for both of us.

3  Q.   Have you had any children as a result of that

4  marriage?

5  A.   Yes.  We have two biological children.  Samantha is

6  six.  Gayla is eight.  And we adopted two children from

7  Russia in 2006.  And that would be Roman, who is 19 years

8  old; and a daughter, Zhenya, who is 21 years old.

9  Q.   And as far as Roman and Zhenya -- is that how you

10 pronounce it?

11 A.   Zhenya.

12 Q.   What country did you adopt them from?

13 A.   We adopted them from Russia.  And they came from a

14 small town called Boguchar, Russia, which is about ten

15 hours south of Moscow in Voronezh region.

16 Q.   Are you Amish?

17 A.   I am not Amish.  My mother was raised Amish up to I

18 think it was late teens and I still have a very strong

19 connection with the Amish -- a major -- Amish faith and

20 practice has been a major influence in my life, although

21 I do not specifically follow that religion.

22 Q.   Could you describe briefly the conditions by which

23 you grew up as a child?

24 A.   Certainly.  We lived in a house that was 24-by-24

25 feet with a little addition on the back that had

1    facilities for washing clothes.  We did not have pipe

2    running water.  There was a barrel that we got water out

3    of.  We had an outhouse as opposed to indoor plumbing.

4    We didn't have a television set.  For our livelihood, we

5    would grow vegetables in the summertime with horse-drawn

6    equipment.  And later on, probably when I was in my

7    teens, we got a tractor for that.  But we raised

8    vegetables and sold the vegetables.

9        In the fall, we would make molasses from sorghum

10   cane, pick up walnuts.  In the wintertime, we would hunt

11   fur bearers, mostly raccoons, and we would sell those

12   pelts and we would -- often we would also eat the raccoon

13   or use that for dog food or other purposes.

14   Q.   How old were you when you got your first TV?

15   A.   I was 18.

16   Q.   How old were you when you got your first job?

17   A.   I was 13.

18   Q.   And what was that job?

19   A.   I worked at a saw mill for a gentleman named Elbert

20   Cruz, who lived about two miles away.  Because a little

21   bit -- I think it was about when I was ten or 11 my

22   father got a job there, so when I quit school after

23   eighth grade, I had an opportunity to work there at the

24   saw mill and also in the woods getting the logs for the

25   saw mill.

1  Q.  Now, you said eighth grade, do you have a high

2  school diploma?

3  A.  I don't.  I have a GED that I got when I was 17.

4  Q.  So how old were you when you dropped out of school

5  in the eighth grade?

6  A.  I was 13, almost 14.

7  Q.  Okay.  Now, your mother came from -- excuse me.

8  What part of your mother and father or did either of them

9  come from an Amish family?

10  A.  My father was not from an Amish background, but my

11  mother was.  She was born and raised up through her late

12  teen years in Illinois.  There was a family tragedy and

13  her mother packed up their belongings and came south and

14  landed up in an area nearby to Eureka Springs, Arkansas.

15  Q.  Is there a reason why you dropped out of school in

16  the eighth grade?

17  A.  Yes.  My mother was from Amish background and in the

18  Amish tradition, eighth grade is sufficient.  She

19  convinced my father.  And that is the way that it was

20  done at our house.

21  Q.  What did you do from the age of 14 to 17 as far as

22  jobs or work?

23  A.  I worked at the saw mill, I think, for a couple of

24  years.  When I got to where I could drive, I went to town

25  and got a job.  I worked for a place called Biju

OSCAR STILLEY - DIRECT BY MR. SPRINGER                    2408

1   Builders.  And I also worked for individuals just like

2   cutting brush or doing other things that they might want

3   me to do.

4   Q.   When did you start going to college?

5   A.   I started college at the age of 22, 1985.

6   Q.   So you got your GED at 17 and then what did do you

7   from 17 years of age to 22 years of age?

8   A.   I lost my job at Biju Builders when I was -- I had

9   just turned 17.  It was a little after I had turned 17.

10  And I went to the employment office to see about a job

11  and they suggested that I might want to go to Job Corps

12  so I could learn how to weld.  And I decided that was a

13  good idea.  So I went to Gary Job Corps in San Marcos,

14  Texas, spent the next nine months there.  And from that

15  point, I went -- I got a job just before my 18th birthday

16  at Todd Shipyards in Galveston, Texas.

17  Q.   What was your first run-in with the IRS?

18  A.   While I was working at Todd Shipyards in Galveston,

19  I bought a car.  And I decided that since I had to pay

20  interest on that money, I could do an exempt W-4 so I

21  would get more of my money and then I would pay my taxes

22  at the end of the year.  And soon thereafter the IRS sent

23  me a notice and said that I could be fined $500 for doing

24  that.  And I didn't know any better.  I thought that

25  there was a law requiring everyone to file tax returns

1  and pay, so I immediately changed that back to have the

2  money withheld.

3  Q.   Now, at some point in time did you meet a person by

4  the name of Irwin Schiff?

5  A.   Actually, that was -- I don't think I've ever

6  actually met Irwin Schiff, but it was considerably after

7  this period of time that I came to know Irwin Schiff.

8  Q.   How did you come to know Irwin Schiff?

9  A.   Well, I got a job planting trees in 1983 for Bill

10  Reed, because there was a recession at that point in time

11  and I lost my job at the shipyard.  So I worked there for

12  two years making 3 cents per tree.  And I could plant

13  about 200,000 trees a year, so I would make about $6,000.

14      And then after two seasons -- now the season is only

15  about four months long.  So you work in the spring.

16  After two seasons, I went to another place called

17  Kingston Forestry.  And Kingston Forestry had a little

18  bit better deal, they would give the tree planters 75

19  percent of the money.  And I worked there for a couple of

20  years.

21      But the owner of Kingston Forestry was Charlie

22  Stockton.  And it was his practice to give the tree

23  planters $40 a day per diem.  And what that meant was the

24  tree planters didn't have to have taxes withheld out of

25  that, that was just their money for subsistence because

1   they were on the road.  And the IRS came in after he had

2   done this for a long period of time and told him that he

3   had to pay all that money himself.  Well, he was on a

4   very tight budget, giving us 75 percent of the total

5   contract price, so he couldn't sustain that hit and he

6   went out of business.

7   Q.   Did -- did you have any -- strike that.  Did you

8   form any opinion about whether the IRS was correct or not

9   in holding him liable for those $40 per day per diems?

10  A.   I was very angry, but at that time I did not have a

11  basis for thinking that the IRS did not have a specific

12  law that required people to file returns and pay taxes

13  and the whole tax system in general.

14  Q.   Now, when you say "returns," do you mean the Form

15  1040?

16  A.   Yes.  And at that point in time, I knew very little

17  about it because I was not -- I mean, I was in college,

18  actually, at the time, but I knew very little about the

19  tax code and the only thing I knew was 1040.  That's what

20  I filed.

21  Q.   So when did you begin college?

22  A.   I began college in 1985, in the fall of 1985.

23  Q.   Did you work while you went to college?

24  A.   I worked while I went to college.  I would work in

25  the fall at whatever jobs that I could get.  And in the

1   spring of '86 and in the spring of '87, I didn't enroll

2   in college for those semesters, I would go plant trees,

3   but at night I would study the text for various college

4   courses and I took something called CLEP, which stands

5   for College Level Examination Program, and I also did

6   some departmental exam, which is basically the same thing

7   done a little different way and got, I think, 50 hours of

8   credit by that means.

9   Q.   So how many years did it take you to go through

10  college?

11  A.   Three years.

12  Q.   And did you ever take a summer break?

13  A.   The first two years, I only did the fall semester.

14  In other words, I went the fall of 1985, the fall of

15  1986, and then I believe I started in summer 1987 and

16  went 50 -- I think it was 55 weeks straight to finish up

17  the studies and get my degree, and immediately thereafter

18  I went to law school.

19  Q.   And what year was that that you went to law school?

20  A.   I started law school in 1988.

21  Q.   Now, when you graduated -- strike that.  How long

22  did you go to law school?

23  A.   Two and a half years.  I graduated in the fall of

24  1990.

25  Q.   And where did you go to law school?

OSCAR STILLEY - DIRECT BY MR. SPRINGER                    2412

1   A.    University of Arkansas at Fayetteville.

2   Q.    How did you pay for law school?

3   A.    I planted trees, as I've told you.  I -- when I was

4   actually in college, I discovered that I could work -- I

5   could get a job as a security guard and I worked at a

6   place called Campbell Soup as a security guard and I

7   would work 40 hours a week, but it was in the evening, I

8   think, about -- well, it was eight hours a day in the

9   evening and I could study during that period of time and

10  basically kill two birds with one stone, make some money

11  and get my studies done too.

12  Q.    When did you first meet Dr. Phillip Roberts?

13  A.    I met him in -- I think it was 1999.

14  Q.    1999?

15  A.    I think that's correct.  It would be about that time

16  period.

17  Q.    When did you become aware of Irwin Schiff's book?

18  A.    I -- after I lost the job for -- well, after

19  Kingston Forestry South went out of business, there was a

20  gentleman in Houston, Mississippi, named Jerry Walls, and

21  he had a little tree planting crew, so I started working

22  for him.  There was a couple and their son from Iowa and

23  I think it was their son that gave me a book by Irwin

24  Schiff called "How Anyone Can Stop Paying Income Taxes."

25  And I read the entire book that night.  And as a matter

1  of fact, from the time I started it, I didn't put it down

2  until I finished it at about one or 1:30 in the morning.

3  Q.   And did that -- the reading of that book shape your

4  beliefs about what you've testified here today regarding

5  income tax?

6  A.   I immediately believed what Irwin Schiff had to say

7  and promptly went to Jerry Walls and asked him for a W-4

8  so I could claim exempt.

9  Q.   Would you say that was a little naive?

10 A.   It's --

11        MR. SNOKE:  Your Honor, I'm going to object to

12 the leading nature of the question.

13        THE COURT:  Overruled.

14        THE WITNESS:  I would confess to being somewhat

15 naive sometimes or possibly even you could say gullible,

16 but I wouldn't consider that to be naive or gullible

17 because I read what Irwin Schiff had to say, he seemed to

18 be honest and forthright and told about his prior

19 conviction, and he recited the case law and he made a

20 very, very convincing argument to me that I believed at

21 the time and believe to this day.

22 Q.   (BY MR. SPRINGER)  Did you ever go check all those

23 citations by Irwin Schiff out?

24 A.   Actually, I did.  I got the law books and began to

25 study.  Of course, I went to law school and that was a

1  very important part of the reason that I went to law

2  school, and I studied that as much as I could.

3  Q.   So after reading Irwin Schiff's book, that played a

4  role in shaping your college years; is that --

5  A.   Oh, yes.  After I read that book, at college, I

6  would tell anybody that asked that there was no law

7  requiring filing of an income tax return.  I didn't file

8  income tax returns.  And I would try to persuade people

9  that I was correct.

10 Q.   Are you aware that the government of the United

11 States, specifically the Internal Revenue Service, claims

12 that there is a law?

13 A.   Yes.  Yes, sir.

14 Q.   Why isn't that good enough for you?

15 A.   Well, that's -- there's a lot of reasons that that's

16 not good enough for me.  I've seen a lot of people ask

17 the question and I've never seen it answered for any of

18 these people.  I've had a lot of clients that have asked

19 the question.  I've advised a lot of people who ask me

20 that it was -- not only would you not get an answer, it

21 was dangerous to ask, and especially dangerous to file

22 lawsuits.

23      I've seen the government choose to bring criminal

24 charges against people rather than simply put the

25 authority for their information request on the form.

OSCAR STILLEY - DIRECT BY MR. SPRINGER                    2415

1  I've seen the IRS use hearsay claims of assessments on

2  which -- and various other documents on which they would

3  cite their authority for the penalty but make no citation

4  of authority for the tax itself.  And by no means is that

5  a complete list.  I mean, the list can go on.  And I'm

6  certainly happy to give the major reasons.

7  Q.   When you opened up your law practice, was it your

8  intention to practice in tax law?

9  A.   Oh, certainly, I absolutely intended to do that.

10 Q.   Did you intend on practicing criminal federal tax

11 law?

12 A.   Well, federal tax law is what I wanted to practice

13 and I didn't really care whether it was criminal or

14 civil.  I simply wanted to practice that area of law.

15 Q.   Did you find there was a lot of competition in

16 practicing law in federal tax law areas?

17 A.   Actually, I discovered that I couldn't get any

18 business.  It was a difficult situation starting this

19 practice.  And advertising is not effective, wasn't

20 effective for me anyway.  And until you get some

21 experience and demonstrate that you have some competence

22 in that area, people really don't pay a lot of attention.

23      But if you're asking about how many -- what I know

24 about how many people practice in this area at this point

25 in time, I will tell you it's very difficult to find a

1    lawyer who has some experience with the legal issues

2    involved in the requirement to file returns, to pay

3    taxes, and determining what taxes, if any, are required.

4    Q.   Did Irwin Schiff's book explain to you why he had

5    concluded people in general were not required to file tax

6    returns?

7    A.   Yes, it did in great detail.

8    Q.   Did he specifically mention the Form 1040?

9    A.   At that point in time -- that was 1980, either 1986

10   or 1987, and I don't remember anything about the Form

11   1040, I could be wrong, but I don't remember anything

12   about that in that book.

13   Q.   What conclusions did you draw after reading his book

14   and --

15   A.   I drew the conclusion that the Internal Revenue Code

16   was intentionally drafted to obfuscate and conceal and

17   deceive and that the tax code and related documents were

18   set up to make it appear that people were required to,

19   for example, file returns, swear under penalty of perjury

20   that they were liable for taxes, and other such things

21   that really didn't appear in the law.

22   Q.   Now, when you say "the law," do you mean the

23   Internal Revenue Code?

24   A.   Yes, that's correct.

25   Q.   In your practice, did you also have to deal with

1   regulations corresponding to the Internal Revenue Code?

2   A.   To be perfectly frank with you, from 1991, when I

3   was admitted to the Bar, until about 1999 I had very

4   little dealings with federal income tax cases.  From 1999

5   until the present, I began to have a -- at first, a

6   modest practice and then it became a very busy practice.

7   And during -- I'll put it like this:  For the last ten

8   years, I have had occasion on a routine basis to study

9   the statutes, the regulations, the forms, the

10  instructions, various other forms that go along with

11  that.

12  Q.   Do you remember around when you met Lindsey

13  Springer?

14  A.   I think that was at a Pizza Hut in Fort Smith,

15  Arkansas, with Dr. Phillip Roberts.  And I think that was

16  -- if memory serves, I think that was 1999, but I could

17  be wrong about the year.

18  Q.   Was Dr. Roberts your first federal tax case?

19  A.   Yes, he was.  He was my chiropractor.  And when this

20  issue came up, he inquired of me about that and I think

21  he also inquired of you.

22  Q.   Do you know whether you have ever been investigated

23  by the IRS other than in this case specifically for

24  failure to file tax returns?

25  A.   Until about just a few days ago, I had no knowledge

1  of any such investigation.  I came to -- I asked,

2  actually, Mr. O'Reilly and was informed that there was

3  apparently an investigation at the present time in the

4  Western District of Arkansas, but I have no knowledge

5  what it's about.  That was the first I heard of it.

6  Q.   Okay.  Did your practice also involve other types of

7  taxes besides federal income taxes?

8  A.   In the early years, I did mostly taxpayer class

9  actions in Arkansas, which is a method whereby one

10  citizen or taxpayer can sue for the benefit of all

11  similarly-situated taxpayers to enjoin and recover back

12  either illegal taxes or illegal expenditures being made

13  of taxpayers' money.

14      I also did -- I did a few other things at that point

15  in time, but that would be the main part of the practice

16  from 1991 to 1999.  Actually, scratch that.  I also spent

17  a large portion of my time helping individuals with the

18  initiative and referendum process and actually there was

19  two attempts to abolish the property tax in the state of

20  Arkansas.  And on my own, in 2000, I made an attempt to

21  abolish the used car tax and actually to do a number of

22  other things by constitutional amendment.

23  Q.   Have you ever publicly declared your beliefs

24  involving the requirement to file a Form 1040?

25  A.   I did until the early or mid-1990s.  At which point

1  in time, I began to realize how dangerous that can be and

2  my advice could cause harm to other people and I decided

3  that it was not my place to do that and quit doing it.

4  Q.   What was it -- what specifically was it that caused

5  you to withdraw from that public position?

6  A.   It became very obvious that the government is very

7  good at getting convictions and taking away people's

8  liberty and I didn't want to be involved in helping

9  someone or encouraging someone to make that decision

10 without knowing the risks.  And I could see no way that I

11 could publicly make such statements and adequately inform

12 the individual about the risk that would be inherent

13 based on their individual situation.

14 Q.   Are you saying that the United States is just wrong

15 about the filing requirement?

16 A.   Yes, sir.

17 Q.   Why do you say that they're wrong?

18 A.   Because -- well, there's so many different things

19 that lead me to the conclusion that there is no such

20 requirement.  I've told you about the Paperwork Reduction

21 Act and I've -- here is the facts on the Paperwork

22 Reduction Act.  It says that the laws requiring the

23 citizen to give information must be placed on the form.

24 Those laws are not placed on the form.  When you look at

25 the instruction booklet, the instruction booklet says

OSCAR STILLEY - DIRECT BY MR. SPRINGER                    2420

1  that you must file a return for any tax that you are

2  liable for.

3      Now, there are many statutes that say that, for

4  example, certain manufacturers or importers, et cetera,

5  of things like alcohol, tobacco, tires, and various other

6  products are liable for the tax, but there is no statute

7  that says who, if anyone, is liable for the income tax.

8      Furthermore, the statutes purport to tax income, but

9  there is no statute that defines income.  Furthermore, I

10  see such things -- I see things in my practice and also

11  outside of my practice, for example, there was an

12  incident involving the Amish in which the IRS went to an

13  Amish man's farm, went into the field and took away -- in

14  springtime and planting time and took away his horses to

15  try to make him pay the social security tax.  And the end

16  result of that incident was that the Amish people didn't

17  have to pay social security tax.  Yet Oscar Stilley, as a

18  Baptist, has to pay social security tax.

19      When I looked in the law, I found nothing that

20  required anyone to pay social security tax.  And I

21  certainly found no basis whereby that some people would

22  be required to pay these taxes and other people would not

23  be required to be -- to pay these taxes simply based upon

24  their religious practice or faith.

25  Q.   Is it part of your practice today to direct people

1  to file tax returns?

2  A.   That is the principal part of my practice and that

3  is to help people who have gotten into a difficult

4  situation with the IRS so that they would be able to

5  restore peace to their life and so they could protect

6  themselves and so that they could protect their families.

7  Q.   So why if you don't believe there's a requirement to

8  file a tax return would you then turn and tell your

9  clients to file tax returns?

10  A.   It's a pragmatic matter.  It's a matter of self-

11  preservation.  I have seen too many times what the IRS

12  has done.  They have done very, very cruel things to a

13  lot of people who have asked questions and who have shown

14  indicia that they are dissidents.  And my clients come to

15  me asking for advice and counsel.  So I will discuss

16  matters with my client and determine what -- between the

17  two of us, what is the best and most intelligent course

18  for them, and then I make it very clear to the client

19  that it's their choice.  They choose whether or not to

20  file tax returns.  If they choose to file the tax

21  returns, I assist.  If they choose some other course, I

22  assist.  I provide them with information and they make

23  the decision.  And very often, a great majority of the

24  time, their decision is to file the tax returns.

25  Q.   Now, you saw in this trial Mr. Miller testify,

OSCAR STILLEY - DIRECT BY MR. SPRINGER                    2422

1   correct?

2   A.   Yes, I did.

3   Q.   Do you remember him telling the jury that you were a

4   smart guy?

5   A.   I do.

6   Q.   And have you been the lawyer in any case where you

7   represented the defendant where Mr. Miller was the

8   expert?

9   A.   Yes, I believe that was -- would be true in the

10  Roberts case; if memory serves, in the Patterson case; if

11  memory serves, it would also be in the Blackstock case.

12  I had the Lake case for a period of time.  I did not try

13  that case, but my recollection is that Mr. Miller was the

14  expert there.  And if memory serves, there was a case

15  called United States v. Swisher in which Mr. Miller was

16  the expert.

17  Q.   Is part of your belief involving the requirement to

18  file a tax Form 1040 involve the absence of a specific

19  exempt amount in Section 6012?

20  A.   That is correct.  And it's my understanding and my

21  perception from reading the law is that there is no

22  exempt amount in the law.  And, thus, the law does not

23  command anyone to do any -- anything and certainly not to

24  file a tax return.

25  Q.   Does your beliefs also involve what you read in

1   Section 6011?

2   A.   Oh, yes, it does.   Section 6011 says any person

3   liable for any tax would be required to file a tax return

4   based on that liability.   And that was cited by the

5   government in their bill of particulars as one of the

6   statutes.

7       The problem with that theory that is there is no

8   statute that specifies who, if anybody, is liable for the

9   income tax.   This has been made very clear to the

10  government on numerous occasions.   And to my knowledge,

11  neither the IRS nor the DOJ nor anyone else has attempted

12  to get Congress to change the law to declare who is

13  liable for that tax, if anyone.

14  Q.   In Dr. Roberts' case, he was found guilty, correct?

15  A.   Yes, sir.

16  Q.   And was he charged with not filing tax returns?

17  A.   Yes, sir, three counts.

18  Q.   Why didn't that change your mind as far as the

19  requirement to file a tax return?

20  A.   Because the government refused to identify the laws

21  that required the filing of that return because the

22  government chose rather than to simply identify the law

23  and give Dr. Roberts a chance to comply with the law,

24  they chose to undertake a very expensive investigation

25  and then convict him and send him to prison without ever

1  telling him what law required the conduct that he

2  omitted.  Because Dr. Roberts had filed lawsuits which

3  attempt to obtain a judicial resolution and he was unable

4  to obtain a judicial resolution of the questions that he

5  had raised.  Because Dr. Roberts had also sent letters to

6  the IRS, raised these questions, tried to get answers,

7  apparently in good faith, and could not get those

8  answers.  And on the basis of all those facts, that did

9  not -- the fact that he may have been convicted did not

10  convince me that there was actually a law requiring the

11  filing of a tax return.

12  Q.   I believe you mentioned Mr. Lake.

13  A.   Yes.

14  Q.   You saw him testify in this case, correct?

15  A.   Yes, I did.

16  Q.   All right.  And initially were you hired by

17  Mr. Lake?

18  A.   Yes, I was.

19  Q.   To represent him?

20  A.   Yes, I was.

21  Q.   Prior to his trial, did Mr. Lake fire you?

22  A.   Yes, he did, just before trial.

23  Q.   What reasons did he give you for firing -- for him

24  firing you?

25  A.   I don't recall that he gave any reasons.  He simply

1  fired me and hired some local attorneys there in Atlanta,

2  Georgia.

3  Q.   Prior to him firing you, did you and him have a

4  falling out?

5  A.   Well, Mr. Lake came up with some ideas that he could

6  tell the jury that his entire salary as a Delta airline

7  pilot -- or enough of that salary had been used up on

8  legitimate business expenses, that therefore he didn't

9  have to file the tax return.  And I knew that not to be

10  true.  And one of the requirements of a lawyer is that

11  you do not knowingly present false testimony to a court,

12  either a court or a jury or both, you cannot ethically do

13  that.  And I explained to Mr. Lake that it was morally

14  and ethically wrong for me to do that and I would not do

15  that and he would have the opportunity to present his

16  good faith argument, but I would not be party to any

17  attempt to present false testimony to a court.

18  Q.   I believe you also stated you represented

19  Mr. Swisher; is that correct?

20  A.   Yes, I did.

21  Q.   And where was the trial of Mr. Swisher held?

22  A.   That was in Little Rock, Arkansas.

23  Q.   Was Mr. Swisher convicted?

24  A.   Yes, sir.  He was charged with willful failure to

25  file, I think three counts, and also a felony.  The

1  felony was dismissed, but he was convicted of the

2  misdemeanor counts.

3  Q.   Did you win him a directed verdict on the felony?

4  A.   Yes, sir.

5  Q.   And did you say that Mr. Miller was also the expert

6  that testified in that case?

7  A.   Yes, sir.

8  Q.   Now, what made -- what -- was there anything

9  peculiar during the Swisher case that had an impact on

10  your beliefs about the requirement to file a tax return?

11  A.   Yes.  My recollection is that there was a great

12  dispute about whether the exempt amount or the threshold

13  amount, however you would put it, requiring the filing of

14  a tax return was in the law.  The question being, is that

15  amount in the law?  And my recollection is that one

16  evening we were arguing this to Judge Wilson and Judge

17  Wilson ordered the government to provide the law that

18  would make a complete law requiring the filing of this

19  tax return and suggested that if it was not produced the

20  revolution would begin at nine o'clock in the morning.

21      And the next morning this question was not raised.

22  And I said, wait a minute, what's going on?  And the

23  judge said we'll take this up later.  And I think he also

24  said but don't get your hopes up.  And what I later

25  determined and found out was that Judge Wilson had made

1   inquiry of certain individuals at the Eighth Circuit

2   Court of Appeals, which --

3           MR. SNOKE:  Your Honor, I'm going to object.

4   It's calling for huge amounts of hearsay.

5           THE COURT:  Sustained.

6   Q.  (BY MR. SPRINGER)  Did anything you learned during

7   the Swisher trial change your mind as to why you were not

8   required to file a tax return under your beliefs?

9   A.  No, it only solidified my beliefs.

10  Q.  Did you represent Mr. Patterson during his criminal

11  case?

12  A.  Yes, I did.

13  Q.  When did you first meet Mr. Patterson?

14  A.  If memory serves, it was 2000.

15  Q.  Who introduced you to Mr. Patterson?

16  A.  I think that was Lindsey Springer.

17  Q.  Do you remember meeting Mr. Patterson with Lindsey

18  Springer?

19  A.  Actually, that has been a long time back and the

20  memories of that would actually be rather dim.

21  Q.  In March of 2000, did Mr. Patterson hire you?

22  A.  That's my recollection.

23  Q.  Okay.  Were you also hired to represent his

24  corporations?

25  A.  There was a point later on where that there was --

1    we actually did a contract represent, I believe it was

2    NESCO, with respect to certain subpoenas.  There was, I

3    believe, a motion to quash certain subpoenas.  Therefore,

4    there was a contract entered into in which Oscar Stilley

5    was given the authority to represent the company.

6    Q.   Was I involved with you in the investigation of

7    NESCO and Mr. Patterson?

8    A.   What time frame?

9    Q.   Well, when did -- you said you were hired in March

10   of 2000, correct?

11   A.   That is correct.

12   Q.   When did the NESCO investigation begin?

13   A.   Well, now, I'm not necessarily certain that these --

14   these subpoenas had to do with an investigation of NESCO

15   as opposed to an investigation of Eddy Patterson.

16   Q.   Were you hired to represent NESCO?

17   A.   At one point in time, yes.

18   Q.   Okay.  So you represented -- excuse me, strike

19   that.  Did you represent Eddy Patterson from March of

20   2000 until the day he was indicted?

21   A.   I would say yes, although there were extended

22   periods of time during which there was no activity.

23   Q.   Okay.  When Eddy Patterson was indicted, were you

24   hired to represent him?

25   A.   I considered Mr. Patterson to be a client at that

OSCAR STILLEY - DIRECT BY MR. SPRINGER                    2429

1  point in time and I didn't consider that it would be

2  necessary to enter into a new or a different agreement,

3  although my rate did change from 100 per hour to 125 per

4  hour, it had changed in the interim.  But I just had the

5  understanding that he was my client and when -- and he

6  apparently had the same thing.  He -- there was no

7  question that he wanted me to represent him in that case.

8  Q.   Now, at the time -- excuse me, strike that.  When

9  Mr. Patterson was indicted, did he retain you?

10 A.   I don't recall any formal written contract at the

11 time, but he -- I was certainly retained counsel for

12 purposes of that proceeding.

13 Q.   In your experience, are criminal tax cases

14 expensive?

15 A.   Certainly.

16 Q.   At the time that you began representing

17 Mr. Patterson in the indicted case, did you know how you

18 were going to get paid?

19 A.   Mr. Patterson was in serious financial difficulties

20 at that point in time and there was not a reasonable

21 basis for expectation of being paid the customary rate.

22 Q.   You have heard the testimony at this trial that he

23 had an insurance policy, did you not?

24 A.   Yes, I did hear that.  And also, just to be clear,

25 my understanding was that he had a very substantial

1   amount of NESCO stock with -- but my understanding was

2   that because he was a high ranking officer, that was a

3   very liquid stock and there were certain rules about

4   disposing of that stock and also market conditions that

5   could make it very difficult to dispose of that stock.

6   Q.   Had you determined at the time that Mr. Patterson

7   was indicted that he was unable at that time to pay you

8   to represent him in a criminal tax case?

9   A.   I knew he didn't have the funds at that point in

10  time to handle that case by any stretch of the

11  imagination.

12  Q.   Was the first trial for Mr. Patterson scheduled in

13  September of 2003?

14  A.   That is my recollection.

15  Q.   And was Eddy Patterson indicted in April of 2003?

16  A.   That sounds correct to me.

17  Q.   When did you first learn that an insurance policy

18  existed paying Eddy Patterson's criminal securities fraud

19  charge defense?

20  A.   If memory serves, I think it was sometime -- I think

21  it was sometime late summer, because it would have had to

22  have been after it became revealed that there was

23  investigation also of NESCO and irregularities at NESCO.

24  I know it was very short -- shortly before the trial, but

25  in order to give an exact answer, I would have to have my

1   memory refreshed.

2   Q.   Were the charges against Eddy Patterson in 2003

3   including securities fraud and bank fraud charges?

4   A.   That is correct.

5   Q.   In addition to the tax charges; is that true?

6   A.   That is correct.

7   Q.   Now, did Eddy Patterson ask you to deposit a

8   $112,000 check, personal check made out to him in July of

9   2003?

10  A.   I think that's correct.  And I think that check is

11  also in evidence in this case.

12  Q.   Why did Eddy Patterson -- excuse me.  Why did you

13  accept that check and deposit it into your IOLTA account?

14  A.   Actually, I really didn't think about that because

15  it's customary for lawyers to accept funds of this

16  nature.  And certainly with his legal situation, it made

17  sense to put that money in the account.  He asked me to

18  do it, so I did it.

19  Q.   At the time that Mr. Patterson gave you that

20  $112,000 check, was it understood that Mr. Patterson was

21  going to need some of that money given back to him?

22  A.   My recollection is that some of the money went back

23  to him.  The exact -- the specifics of that I would

24  probably need my memory refreshed on that.

25  Q.   Do you remember a $35,000 check written out of your

1   IOLTA account to Lindsey Springer with the memo says

2   "Patterson" on it?

3   A.   Oh, yes, I remember that.  And my recollection would

4   be that I think that was -- that's the only time that I

5   can remember that you actually made a trip to my house

6   there in Fort Smith, Arkansas, to get -- I believe it was

7   a cashier's check and 5,000 in cash for him.

8   Q.   Do you know why Eddy Patterson was unable to go do

9   that himself?

10  A.   No.

11       MR. SNOKE:  Your Honor, I object.  It calls for

12  a conclusion.

13       THE COURT:  Well, he answered it.  Go ahead.

14  Q.   (BY MR. SPRINGER)  At the time that you -- in July

15  of 2003, was Mr. Patterson on travel restrictions?

16  A.   Oh, I think that's correct.  I think that he was on

17  travel restrictions from the Northern District of

18  Oklahoma.

19  Q.   Is it your understanding that he would have had to

20  get permission to leave the Northern District of

21  Oklahoma?

22  A.   That refreshes my recollection, that would be the

23  reason.

24  Q.   In your experience, does that usually take more than

25  a couple of hours to get permission?

1   A.   Well, since I've had to do it a time or two, I would

2   say yes.

3   Q.   You have paid me before, haven't you?

4   A.   As a matter of fact, I paid you a dollar and I think

5   it was in the Swisher case and I was trying to get you

6   permission to sit up at counsel table.  And I might have

7   the case wrong, but I do remember paying you one dollar

8   to try to persuade the Court that you were my assistant

9   and that there's good basis that you ought to be allowed

10  to sit at counsel table.

11  Q.   Did Judge Wilson see you hand my that one dollar?

12  A.   I think he did.

13  Q.   Did that satisfy him?  Strike that.  Was I allowed

14  to sit at that table?

15  A.   I think that you were.  But you know what?  I'm very

16  sorry to not have an exact knowledge of that.  But I

17  think so.

18  Q.   Did Mr. Patterson go to trial in November of 2003?

19  A.   That's my recollection, yes.

20  Q.   When did you become the lawyer for the securities

21  and bank fraud charges in that case?

22  A.   There was another firm, Hall Estill, that handled

23  this matter.  Up until that there was a settlement, there

24  was a settlement of an insurance policy -- actually, the

25  insurance company bought out that insurance policy.  And

1  when that insurance policy was bought out, there was a

2  wire transfer from Hall Estill, which is in evidence in

3  this case.  And at that point in time, I took over the

4  entire defense for Eddy Patterson.

5  Q.   Was that just a couple of weeks before trial?

6  A.   It was very close before trial.

7  Q.   Have you seen the evidence in this case about the

8  time period of when that wire took place?

9  A.   Yes, I have.

10 Q.   Do you remember whether it was early November?

11 A.   Honestly, I'm sorry, but you would have to refresh

12 my recollection to get that close, going that far back.

13 Q.   Had you ever tried a security case prior to Eddy

14 Patterson's case?

15 A.   No, that was the first case of that sort that I had

16 tried.

17 Q.   Had you ever tried a bank fraud case -- other than

18 Mr. Swisher's one charge, had you ever tried any other

19 bank fraud case?

20 A.   No, sir.

21 Q.   Did Mr. Patterson know that?

22 A.   I think so.  I'm reasonably certain, I mean, and

23 certainly if he had asked, I would have told him.

24 Q.   Who originally called you -- excuse me, strike

25 that.  How did you find out that an insurance company

1  wanted to buy an insurance policy that Eddy Patterson

2  owned?

3  A.   There were discussions --

4         MR. SNOKE:  I object.  The answer will

5  necessarily call for hearsay.

6         THE COURT:  State your objection again.

7         MR. SNOKE:  Your Honor, I said the answer will

8  necessarily call for hearsay.  We would object.

9         THE COURT:  Well, he can testify from what

10  source he received this information, then we'll take it

11  one question at a time.  That will be overruled.

12         THE WITNESS:  I'm really sorry but my memory is

13  a little fuzzy on that.  I thought it was Mr. Patterson,

14  but I could be wrong.

15  Q.   (BY MR. SPRINGER)  If it wasn't Mr. Patterson, who

16  else could it have been?

17  A.   It would have been the lawyers at Hall Estill.

18  Q.   Do you remember ever calling Lindsey Springer in

19  regard to the purchase of that insurance contract?

20  A.   That is correct.  And it is actually quite possible

21  that that is the first place that I found out about it.

22  Q.   Was through Lindsey or through Eddy Patterson?

23  A.   It's possible that it was through Lindsey Springer.

24  But I'll just be honest with you, and I'm very sorry, but

25  my memory is fuzzy going that far back.

1  Q.   Do you remember ever having a conversation with

2  Lindsey Springer about the offer that the insurance

3  company had made?

4  A.   We had a number of conversations, I remember that

5  distinctly.

6  Q.   Do you remember what the insurance company's first

7  offer was to buy that insurance policy?

8  A.   It was a relatively modest amount.  Don't hold me to

9  this, but I'm thinking it was 75,000 or something of that

10  nature.

11  Q.   Do you remember whether Eddy Patterson authorized

12  you to take that on his behalf?

13  A.   He did not authorize me to take that offer on his

14  behalf.

15  Q.   Did Eddy Patterson ask you to have the insurance

16  company make a counteroffer?

17  A.   Yes.  Yes, he did.

18  Q.   Did you?

19  A.   Yes, I did.

20  Q.   Did that -- were there several offers back and

21  forth?

22  A.   I know that there were at least three and there may

23  have been more.

24  Q.   What was the first offer that Eddy Patterson asked

25  you or directed you that you could accept?

1          MR. SNOKE:  Your Honor, I would object as it

2    being irrelevant to this proceeding and calling for

3    hearsay.

4          THE COURT:  I tell you what, we'll resolve that

5    not on the jury's time.  We'll take our -- you may be

6    seated.  We'll take our overnight recess at this time.

7    So we'll resume at nine o'clock tomorrow morning.  Please

8    be available in the jury room to resume promptly at nine

9    o'clock, which means I think Pam would appreciate it if

10   you get here by, say, ten till nine at the latest.  And I

11   know that a good many of you have been arriving even

12   earlier than that and that is certainly appreciated.  But

13   in any event, I do appreciate your punctuality this

14   morning and I will appreciate your punctuality again

15   tomorrow.

16       Again, I sincerely thank you for your day of service

17   to the Court.  Please overnight remember not to discuss

18   the case with any person for any purpose, not to

19   undertake any independent investigation of any person,

20   thing, or issue relating to this case, and not to reach

21   any conclusions until the case has been given to you for

22   your deliberations and verdict.  Thank you again for your

23   day of service to the Court.

24       All persons in the courtroom will remain seated

25   while the jury departs.

1          (JURY EXITS THE COURTROOM)

2          THE COURT:  You may step down.  Okay.  The

3  pending question is, what was the first offer that Eddy

4  Patterson asked you or directed you that you could

5  accept?  In the government's case, we had some testimony

6  about that insurance policy and the settlement of the

7  insurance policy and the payment of the money that is

8  documented by the exhibits that are in evidence.  So

9  certainly some testimony about those transactions is fair

10  game, if the defendants think that it will move the ball

11  their way.

12     But it's one thing to go through it in some way that

13  actually does move the ball or might move the ball.  It's

14  another thing just to get into the minutia of that policy

15  buy-out and I think we're on the verge of getting into

16  the minutia of that policy buy-out without really serving

17  any useful purpose from the standpoint of either the

18  government or the defendants.  So this would be --

19  whichever defendant wishes to address it, this will be

20  the defendant's opportunity to articulate some basis for

21  relevance of that.

22          MR. SPRINGER:  Your Honor, Mr. Patterson

23  received over $100,000 from Mr. Stilley's IOLTA account

24  after that contract settlement occurred.  And in the

25  initial amounts of money that were offered, Mr. Patterson

1    tried to get Mr. Stilley to accept that amount and

2    eventually they did not accept that amount.  Had

3    Mr. Stilley accepted Mr. Patterson's offer in the first

4    place, he would have gotten no money.

5        The motive behind Mr. Patterson to fire Mr. Stilley

6    -- I mean, fire Hall Estill and hire Mr. Stilley is

7    because he saw how much money that he was going to have

8    if he hired Oscar Stilley.  Whereas, Hall Estill was

9    going to eat up all of that money and he wouldn't have

10   any of that money.  And that's why it's relevant.

11            THE COURT:  How does that prove or disprove any

12   of the charges in the indictment?

13            MR. SPRINGER:  Part of the charges of why the

14   $375,000, it's one of the overt acts, Your Honor, wired

15   to Mr. Stilley's IOLTA account.  The purpose of that wire

16   was so that Mr. Patterson could then get some money back

17   from Mr. Stilley just like he did on the $112,000 check.

18            THE COURT:  I'm aware of what the indictment

19   says and I'm aware of what the evidence was during the

20   government's case, but I'm still having a lot of

21   difficulty with the relevance of the play-by-play on the

22   offer and counteroffer.  The question pending is, what

23   was the first offer?  What's the relevance of that?

24            MR. SPRINGER:  That my understanding was from

25   Mr. Stilley before he said he didn't remember, Your

1   Honor, that Mr. Patterson called him and asked him if he

2   wanted to take a certain amount that Hall Estill told him

3   about, Oscar Stilley called Lindsey, Lindsey answered

4   Oscar's question, Oscar went back to Mr. Patterson.  And,

5   of course, at this point, I did not know Mr. Stilley was

6   all of a sudden going to not remember that.  And so I was

7   trying to find what transaction Mr. Stilley remembered.

8   Because he all of a sudden didn't remember --

9           THE COURT:  Well, work with him overnight on

10  what he remembers.

11          MR. SPRINGER:  I will.  I will, Your Honor.

12          THE COURT:  Let's see, it's now five after

13  five.  I want to distribute copies of one instruction in

14  about 15 minutes and perhaps two.  We'll just have to

15  see.  And given the fact that the case may be moving

16  along more crisply and at a faster pace than we had

17  thought it might move today and tomorrow, I really do

18  want to distribute these this evening.  Because it's

19  entirely possible that I will distribute the final copy

20  and allow the parties to make their Rule 30 objections

21  tomorrow, at some point during the day tomorrow, perhaps

22  at the lunch hour or at the end of the lunch hour.

23      So we'll resume at about 20 minutes after the hour

24  or as soon as I can get back here with the venue

25  instruction and perhaps one other revised instruction.

1    Court will be in recess.

2        (A RECESS WAS HAD, AFTER WHICH THE FOLLOWING

3    PROCEEDINGS WERE HAD IN OPEN COURT AND OUTSIDE THE

4    PRESENCE AND HEARING OF THE JURY.)

5            THE COURT:  Please be seated.  I have two

6    instructions, two draft instructions to distribute, and I

7    think I've got enough copies for all concerned.  I'll

8    give them both to Pam.  And you may come up and get your

9    copies from Pam.

10       Okay.  We have had a little conversation, of course,

11   about the venue instruction.  I have distributed a new

12   venue instruction.  I want to hear any comments or

13   objections anyone has about the venue instruction in

14   about ten minutes.  Since that's a very short period of

15   time in a very important case to all concerned, I'm not

16   going to foreclose any objections that you might think of

17   overnight, but I sure do want to hear any objections that

18   occur to anyone with the benefit of ten minutes to look

19   at the venue instruction in about ten minutes.  And then

20   we'll see where we go from there.

21       Then you have another instruction that just is

22   simply headed "Income."  I likewise want to hear from

23   anyone who would have any objection to this instruction,

24   which I would -- if I give it, I would intend to insert

25   this immediately ahead of the gift minister instruction.

1          So we'll resume in ten minutes and I'll hear what

2    the parties have to say about these two instructions.

3    Court will be in recess.

4          (A RECESS WAS HAD, AFTER WHICH THE FOLLOWING

5    PROCEEDINGS WERE HAD IN OPEN COURT AND OUTSIDE THE

6    PRESENCE AND HEARING OF THE JURY.)

7               THE COURT:  We'll address the venue instruction

8    first.  Does the government have any objections or

9    serious concerns or other comments about the venue

10   instruction?

11              MR. O'REILLY:  Yes, Your Honor, only one, which

12   is the last paragraph on the first page.  For purposes --

13   this is discussed in Count 1, the conspiracy.  I think

14   that -- the aiding and abetting does not need to be

15   there.  It is appropriate where the Court has placed it

16   on the next page and we have no objection otherwise.

17              THE COURT:  Okay.  Now that I revisit the

18   overall instruction, I understand your point.  Very

19   well.  Still on the venue instruction, what says

20   Mr. Springer?  Bearing in mind I've read your brief.

21              MR. SPRINGER:  Right.  So you don't want me to

22   reargue what I've already stated, correct?

23              THE COURT:  Well, why don't you give me the

24   short version as applied to this particular instruction.

25              MR. SPRINGER:  Certainly.  With respect to the

1  second page or page 54, the first top paragraph, I

2  believe that it should say on the last sentence where it

3  says, "Therefore, as to these counts, venue is proper in

4  any judicial district where any affirmative acts -- in

5  furtherance of an attempt to evade taxes was began,

6  continued, or completed." Because there is -- there's --

7  I think the Court has given the jury a four-element

8  instruction on the attempt to tax evasion. And willful

9  is obviously a state of mind. Tax liability, from this

10 perspective, doesn't bring any act into a judicial

11 district. So the only one left are the affirmative acts

12 which are listed in Counts 2, 3, and 4.

13      I would also generally have an objection because the

14 internal revenue laws apply in internal revenue districts

15 and I believe that notwithstanding that objection, that I

16 pleaded already with the Court involving the issue of

17 internal revenue districts, then the changes I just

18 articulated in the first paragraph would be my only

19 objections, Your Honor.

20      Now, in the second paragraph, I believe that under

21 the aiding and abetter theory that it should also be

22 acts -- affirmative acts in the same manner in which the

23 aiding and abetting is alleged in Counts 3 and 4. So it

24 should not be simply defendant acts because that brings

25 in a host of other acts besides acts that would have

1   occurred in this judicial district.  And so there are

2   many acts at play, but venue is going to be limited to

3   acts within this judicial district.

4            THE COURT:  Thank you.  Mr. Stilley.

5            MR. SPRINGER:  I have --

6            THE COURT:  I'm sorry.  Go ahead.

7            MR. SPRINGER:  Yeah, I've got one more.  Then I

8   have on the third paragraph, venue as to -- and it should

9   say "willful failure to file."  I'm objecting to it

10  saying "failure to file."  Because the Court in other

11  instructions is telling the jury over and over again it's

12  willful failure to file.

13       And then in the first sentence with respect to

14  Counts 5 and 6 which charge the crime of willful failure

15  to file, not failure to file.  And then the Court says

16  "You are instructed that venue is proper in the judicial

17  district in which Defendant Springer resided."  And I

18  believe it should say "in the internal revenue district

19  in which Defendant Springer resided."  And then the jury

20  should then be allowed to consider whether that internal

21  revenue district is in the judicial district in which

22  Defendant Springer resides.

23       And other than that, those objections and the ones

24  I've stated I, have no other objections at this time.  At

25  this time.

```
 1            THE COURT:  Let's see.  Okay.  Bear with me just
 2   a moment here.  Okay.  Mr. Stilley.
 3            MR. STILLEY:  I would simply join in
 4   Mr. Springer's argument with respect to venue.
 5            THE COURT:  Okay.  Thank you.  There's one other
 6   -- it just occurred to me, for the sake of clarity, and
 7   sometimes it's really impossible to have too much
 8   clarity.  Sometimes clarity can lead to the instructions
 9   being arguably too verbose.  But subject to that, it is,
10   in my view, just about impossible to have too much
11   clarity.
12      At the end of the venue instruction on page 54, as
13   an additional sentence in that paragraph that is below
14   the line, I think I should add the following sentence:
15   "This judicial district includes all of the counties just
16   listed."  And the reason I want to add that is that I'm
17   not going to go with the internal revenue district
18   approach to venue.  And it should be made quite clear to
19   the jury that this judicial district includes all of the
20   counties listed there below the line.  Does any party
21   have any objection to that?
22            MR. O'REILLY:  No, Your Honor.
23            THE COURT:  Mr. Springer.
24            MR. SPRINGER:  May I have just one second, Your
25   Honor?
```

1          THE COURT:  You surely may.

2          MR. SPRINGER:  Just for clarification, after the

3   sentence, you're then going to say "all of these counties

4   are within the northern judicial district of Oklahoma"?

5          THE COURT:  No.

6          MR. SPRINGER:  Okay.  Sorry.

7          THE COURT:  After the sentence that's there

8   below the line, I intend to add one short simple sentence

9   as follows:  "This judicial district includes all of the

10  counties just listed."  And that's shy, Mr. Springer, of

11  saying Mr. Springer lives in Creek County, Creek County

12  is in this judicial district.

13         MR. SPRINGER:  I understand.  I was discerning

14  that, Your Honor.  I would only ask the Court to -- well,

15  I would object -- I'm not going to say I'd ask the

16  Court.  I would object to that on this ground only, that

17  the jury needs to be instructed as to what county -- or

18  what internal revenue district Lindsey Springer lives

19  in.  And other than that, I would have no objection to

20  the Court's changes.

21         THE COURT:  Thank you.  With respect to

22  Mr. Springer's first objection, and that is at the top of

23  page 54, venue with respect to Counts 2, 3, and 4, I'm

24  not inclined to go with "affirmative acts" because I

25  don't want the jury to confuse affirmative acts with

1   overt acts, which are two entirely different concepts

2   relating to two entirely different portions of the

3   indictment.

4       However, subject to what all parties would have to

5   say, I'm inclined to do this:  At the beginning of the

6   end of the third line at the top of page 54, where it

7   says, "In any judicial district where the," to

8   accommodate Mr. Springer's objection to the extent

9   reasonably possible, I'm inclined to revise that to read,

10  "In any judicial district where the acts constituting the

11  attempt to evade taxes were begun, continued, or

12  completed."

13      Again, that would -- after the word "the" at the end

14  of that line, I would simply be adding "acts constituting

15  the."  So it would read, "Where the acts constituting the

16  attempt to evade taxes were begun, continued, or

17  completed."

18      Does the government have any problem with that?

19          MR. O'REILLY:  No, Your Honor.

20          THE COURT:  Does the government have any problem

21  with inserting the word "willful" in front of "failure"?

22          MR. O'REILLY:  Actually, Your Honor, I was going

23  to join Mr. Springer in that recommendation.

24          THE COURT:  Okay.  Mr. Springer, that does not

25  accommodate your suggestion completely, but,

1    nevertheless, I'll inquire as to whether you object to

2    the revision at the top of page 4 inserting "acts

3    constituting the."

4          MR. SPRINGER:  I think my only objection, Your

5    Honor, and why I raise that objection in the first place

6    is because I don't agree with the premise that all tax

7    evasion cases are continuing offenses.  And then in this

8    case, I believe whether or not it's continuing, the jury

9    would at least need to know where are the places that it

10   continued.  And when we -- and the reason why I brought

11   up the acts issue is because my understanding of venue

12   was that the acts had -- the acts that they do find by a

13   preponderance of the evidence had to occur in this

14   judicial district.

15        And so although I can agree that the tax evasion

16   attempt can be a continuing offense in general terms, but

17   I believe the jury needs to be instructed that if an act

18   occurred in Fort Smith, Arkansas, in furtherance of

19   attempting to evade a tax, that does not trigger venue in

20   this judicial district.  That it must be the acts proven

21   and unanimously agreed to by a preponderance of the

22   evidence there must be an act in this judicial district.

23   And I don't have any problem with removing the

24   affirmative part.

25        As a consolation, I do agree with the court's

1    modification, but I believe that the jury when we at the

2    end of the sentence say was begun, continued, or

3    completed, the jury still needs to know, whatever that

4    act is, that they unanimously have to agree that act or

5    those acts had to have occurred in this judicial

6    district.

7           THE COURT:  I think that's what it says.

8           MR. SPRINGER:  Okay.

9           THE COURT:  And so I'm going to give it with

10   that revision.  Okay.  Now, first, from the government on

11   the income instruction, I intend to -- subject to

12   comments from the parties, I intend to insert this in

13   front of the gift minister instruction.  Does the

14   government have any objection to this instruction?

15          MR. O'REILLY:  Yes, Your Honor.  Only a mild

16   change in the word to be consistent with 26 USC Section

17   61.  And it would be under the internal revenue code

18   gross income and instead of the word "includes," and it's

19   right out of the statute, "means all income from whatever

20   source derived, including but not limited to the

21   following items."  Which is directly out of Section 61.

22   We have no problem with the quotation of Section 102,

23   which is the last paragraph.

24          THE COURT:  Okay.  Let me look at Section 61.

25   Okay.  That's noted.  Mr. Springer.

 1          MR. SPRINGER:  I would only have an objection to

 2   what the government wants the Court to add.  Other than

 3   -- I apologize, Your Honor.  I would only have an

 4   objection to what the government is asking the Court to

 5   add from Section 61.  Other than that, I believe this

 6   instruction adequately reflects both gross income and the

 7   exclusion under 102.

 8          THE COURT:  Thank you.  Mr. Stilley.

 9          MR. STILLEY:  I would simply request that the

10   Court include in the definition the full sentence that

11   starts off, Section 61, which says, "Except as otherwise

12   provided in this subtitle, gross income means all income

13   from whatever source derived, including but not limited

14   to the following items."

15          THE COURT:  Well, what exception in this

16   subtitle would you rely on as being relevant to this

17   case?

18          MR. STILLEY:  What exception?

19          THE COURT:  Right.  In other words, what you're

20   asking me to add is the language that recognizes that

21   there may be and probably are exceptions in this

22   subtitle.  What exception is relevant to this case?

23          MR. STILLEY:  Well, I would say that 102.

24          THE COURT:  Well, 102 is there.  What else?

25          MR. STILLEY:  That is true, but my position on

 1  this is that it doesn't say that gross income includes

 2  certain items.  It says --

 3          THE COURT:  Well, I'm going to take "includes"

 4  out and it's going to say "gross income means all income

 5  from whatever source derived, including (but not limited

 6  to) the following items.  So "includes" is going to be

 7  removed.

 8          MR. STILLEY:  Thank you, Judge.

 9          THE COURT:  Any objection on that basis then?

10          MR. STILLEY:  I'm satisfied now.

11          THE COURT:  Okay.  Very well.  This will go

12  right in front of the gift minister instruction.

13      We will have -- shortly after eight o'clock tomorrow

14  morning, we will have a full copy of the instructions

15  for -- two copies for the government, four copies for the

16  defendants, which will include these changes, this one

17  new instruction.  And that will likely be the

18  instructions as they will be given at an appropriate time

19  tomorrow, perhaps at midday.  I will give the parties and

20  the opportunity to object, make their Rule 30 record with

21  respect to instructions.

22      So it's now just a little before six.  Is there

23  anything important enough to take up at this hour?

24          MR. O'REILLY:  Extremely briefly, Your Honor,

25  only for scheduling.  Mr. Springer is indicating he

1   expects to take all of tomorrow with both Mr. Stilley and

2   with himself.  I'm just trying to find out, if for some

3   reason, it's less than that, would the Court want us to

4   be closing tomorrow afternoon or are we going to carry

5   over in any event until Thursday?

6            THE COURT:  Everybody needs to be prepared to do

7   closing tomorrow afternoon.  Now, I'm not going to push

8   it.  If it looks like -- and by the way, I instruct and

9   then argue.  And under the rules, I've got the discretion

10  to instruct and then argue or argue and then instruct.

11  And I instruct and then argue.  That keeps everybody from

12  having to say, "I anticipate that His Honor will instruct

13  you."  Because His Honor will have instructed.

14      So I may get -- we'll just have to see.  The jury

15  has responded to my inquiry by indicating that they do

16  not desire to stay late tomorrow night.  Which means I'm

17  not going to push it in the sense of getting the final

18  phase of the trial about half done late tomorrow

19  afternoon and then come back Thursday.  But beyond that,

20  we'll just have to see how it flows.  If this thing can

21  have a bow tied around it and put in the jury's lap

22  before we get too far into the afternoon, then that might

23  be a different story.  That still seems pretty iffy to

24  me.  But if that's the way it works, why, then we'll see

25  how far the jury can get with it by way of deliberations

```
 1   tomorrow.  So we'll just have to see how that unfolds.
 2   And I will emphasize for the benefit of all concerned,
 3   even though perhaps it's natural for everybody to want to
 4   wrap this up before another one-day break and before we
 5   get -- before the matter goes over to Thursday, I'm well
 6   aware of the fact that the matter is very significant to
 7   all concerned and so I'm not going to be breathing down
 8   everybody's neck to get the thing done tomorrow.  If it
 9   works out that way, fine.  If it does not, why, then, I
10   think it's reasonably apparent that with the day off on
11   Wednesday that it will be very much in the hands of the
12   jury on Thursday.  And beyond that I really can't give
13   you much of a prediction.
14           MR. O'REILLY:  I guess, Your Honor, one of the
15   questions was unclear.  Are you going to want all the
16   closings to be done on the same day or would you do the
17   government's and then --
18           THE COURT:  I'm not going to have closing
19   argument on two different days.
20           MR. O'REILLY:  Thank you, Your Honor.
21           THE COURT:  All right.  Anything further from
22   the defendants?
23           MR. SPRINGER:  Not at this time, Your Honor.
24           THE COURT:  Very well.  Court will be in recess.
25        (COURT ADJOURNED FOR THE EVENING RECESS.  FOR
```

1    FURTHER JURY TRIAL PROCEEDINGS, SEE VOLUME XI.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25