1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE NORTHERN DISTRICT OF OKLAHOMA

3

4   UNITED STATES OF AMERICA,

5           Plaintiff,

6   vs.                        Case No. CR-09-043-SPF

7   LINDSEY KENT SPRINGER and
    OSCAR AMOS STILLEY,
8
            Defendants.
9
    ------------------------------
10

11

12            TRANSCRIPT OF JURY TRIAL PROCEEDINGS

13          BEFORE THE HONORABLE STEPHEN P. FRIOT

14             UNITED STATES DISTRICT JUDGE

15                NOVEMBER 10, 2009

16               VOLUME XI OF XIV

17

18

19

20

21

22

23

24

25

```
1    APPEARANCES:
     FOR THE GOVERNMENT:
2                               Mr. Charles Anthony O'Reilly
                                U.S. Dept. Of Justice (Box 972)
3                               P.O. Box 972
                                Washington, DC 20044
4
                                Mr. Kenneth P. Snoke
5                               U.S. Attorney's Office (Tulsa)
                                110 W. 7th Street, Ste. 300
6                               Tulsa, OK 74119

7

8    FOR DEFENDANT SPRINGER:
                                Mr. Lindsey Kent Springer
9                               5147 S. Harvard Avenue
                                Ste. 116
10                              Tulsa, OK 74135

11                              Mr. Robert Scott Williams
                                Standby Counsel
12                              Taylor Ryan Schmidt & Van Dalsem
                                436 S. Boulder Ave., Ste. 850
13                              Tulsa, OK 74119

14

15   FOR DEFENDANT STILLEY:
                                Mr. Oscar Amos Stilley
16                              7103 Race Track Loop
                                Fort Smith, AR 73901
17
                                Mr. Robert Burton, IV
18                              Standby Counsel
                                Burton Law Firm, PC
19                              320 S. Boston, Ste. 2400
                                Tulsa, OK 74103
20

21                      EXAMINATION INDEX

22
     OSCAR STILLEY
23        CONTINUED DIRECT BY MR. SPRINGER      2462
          CROSS BY MR. SNOKE                    2514
24        REDIRECT BY MR. SPRINGER              2573
          RECROSS BY MR. SNOKE                  2592
25
```

```
 1        (THE FOLLOWING TOOK PLACE IN OPEN COURT, WITH ALL
 2   PARTIES PRESENT, OUTSIDE THE PRESENCE AND HEARING OF THE
 3   JURY.)
 4             THE COURT:  All parties are present.  We're here
 5   without the jury.  I'm told that there was some matter
 6   that the parties desire to address outside the hearing of
 7   the jury.
 8             MR. SPRINGER:  May I, Your Honor?
 9             THE COURT:  You may.
10             MR. SPRINGER:  After Mr. Stilley gets through
11   with his examination and I am anticipating taking the
12   stand and there became a question of procedure.  The
13   Court had earlier, I believe, if I'm not misspeaking,
14   stated that I could speak to the jury about documents
15   that I had relied upon and the question -- the question
16   became am I allowed to publish the document on Elmo?  If
17   I can't get it in as an exhibit, am I at least allowed to
18   show the jury or am I not allowed to show the jury if it
19   doesn't come in as an exhibit?
20             THE COURT:  You can read to the jury any portion
21   of a document that you are willing to say under oath goes
22   to your state of mind or, as the instructions call it,
23   your willfulness.  There won't be very many, if any, that
24   I will permit to be published to the jury unless they're
25   received in evidence.  And there will not be very many,
```

1    if any, that are in fact received in evidence on the

2    basis of the lengthy discussions that we had earlier in

3    the trial on those issues.

4         MR. SPRINGER:  For the purpose of the record,

5    how would the Court like me to preserve that?  Outside

6    the presence of the jury or as each document I try to

7    bring in?  Because I don't want to sit there and go back

8    and forth, you know.

9         THE COURT:  Preserve what?

10        MR. SPRINGER:  Like, if I want to move into

11   exhibits the Court is suggesting more than likely would

12   not come in as exhibits, I still would like to make the

13   record for the Court of Appeals that I attempted to get

14   those documents into the record.

15        THE COURT:  That's a matter of the practice of

16   law that you'll just have to rely on yourself or your

17   standby counsel.

18        MR. SPRINGER:  I'll just -- point of order, Your

19   Honor.

20        THE COURT:  Very well.

21        MR. O'REILLY:  I also understood Mr. Springer

22   wanted to introduce the Forms 1040 from his direct.  If

23   Mr. Springer lays a foundation that makes those

24   admissible we want the instruction books as well from

25   years 2000 to 2005.

1          THE COURT:  We'll address that at the

2    appropriate point in time.

3          MR. O'REILLY:  One other matter, Your Honor --

4          THE COURT:  Please work from the lectern.

5          MR. O'REILLY:  I'm sorry.  I apologize.  -- with

6    respect to Mr. Stilley has put his credibility at issue.

7    We do intend, without going into the details, to inquire

8    in cross of the fact that he is presently not a

9    practicing attorney and in fact is suspended pending

10   disbarment.

11         THE COURT:  I'm not likely to admit that into

12   evidence.  I have reviewed attachments to Mr. Stilley's

13   response to the Rule 404(b) notice and I know it's

14   tempting and I know that I warned Mr. Stilley early on

15   that there's a lot of things he could do that would open

16   the door, but I am reasonably well satisfied on the basis

17   of my review of those proceedings and on the basis of my

18   review of filings relating to those proceedings that,

19   first of all, given the nature of those proceedings and

20   the basis for the imposition of the suspension, that the

21   probative value would not outweigh the potential

22   prejudicial effect of admission of that evidence.

23        And, secondly, and this is perhaps even a weightier

24   consideration, if I were to admit evidence of the fact of

25   the suspension, then it is highly likely that we would be

```
 1   here for an additional considerable period of time
 2   hearing evidence as to Mr. Stilley's purported objections
 3   to the process by which that suspension was imposed and
 4   other aspects of those proceedings which, frankly, have
 5   no place in this trial of this federal criminal tax case.
 6        For all those reasons, it is quite unlikely that I'm
 7   going to admit testimony as to Mr. Stilley's suspension.
 8             MR. O'REILLY:  With all due -- Your Honor,
 9   Mr. Stilley has represented to this jury that he is
10   currently practicing law.  That is a false statement.
11             THE COURT:  Well, you can ask him if he's
12   currently practicing -- if he is, in fact, currently
13   practicing law and he can set the record straight.
14             MR. O'REILLY:  Okay.  And with respect to the
15   Court's position, that does not go to misrepresentations
16   Mr. Stilley has made to other courts about his ability to
17   practice law, i.e., when he appeared before Hawaii and
18   made representations that he was authorized to practice,
19   which was false.
20             THE COURT:  Well, did he represent to a Hawaii
21   court that he was admitted in Hawaii or --
22             MR. O'REILLY:  No, Your Honor.  He represented
23   to the Hawaii court that he was authorized to practice
24   law and was in good standing in the state of Arkansas.
25   And at the time he made that statement, it was false.
```

```
 1            THE COURT:  Well, we'll address that one step at
 2  a time.  That's new information to me.  What I don't
 3  intend to do is get into the briar patch of relitigating
 4  Arkansas disciplinary proceedings.
 5            MR. O'REILLY:  Your Honor, there was no
 6  intention to do that by us.
 7            THE COURT:  That's precisely the point.  There's
 8  every intention to do that by Mr. Stilley.  And he has
 9  got at least some superficially plausible pegs to hang
10  his hat on in terms of taking up the time of this Court
11  and jury relitigating Arkansas Bar disciplinary
12  procedure.  We're not going to do that.
13            MR. O'REILLY:  Yes, Your Honor.
14            THE COURT:  Now, this Hawaii thing is new
15  information to me.  Perhaps I should have read it in some
16  filing.  But this will just simply not be mentioned
17  without first taking it up, again, outside the hearing of
18  the jury.  And there was another -- and I'm surprised
19  there was another thing you didn't mention, Mr. O'Reilly,
20  and that is yesterday Mr. Stilley in his testimony
21  presented himself, going back to my earlier expression,
22  as being pure as the driven snow ethically, when he said
23  it wouldn't have been ethical for me to do this or that.
24  Well, that arguably opened the door too.
25            MR. O'REILLY:  Yes, Your Honor.
```

1              THE COURT:  I'm not going to let him rattle that

2    door very many more times before I'm going to swing it

3    wide open, but we're not there.

4              MR. O'REILLY:  Okay.  Your Honor.

5              THE COURT:  Court will be in recess.

6         (RECESS HAD.  THE FOLLOWING TOOK PLACE IN OPEN COURT

7    WITH ALL PARTIES PRESENT AND WITHIN THE PRESENCE AND

8    HEARING OF THE JURY.)

9              THE COURT:  Welcome back, members of the jury.

10       Mr. Springer, you may continue.

11             MR. SPRINGER:  Thank you, Your Honor.

12                  CONTINUED DIRECT EXAMINATION

13   BY MR. SPRINGER:

14   Q.   Mr. Stilley.  Who is Anatoly Kolot?

15   A.   He is a pastor in Boguchar, Russia, of a Baptist

16   church.

17   Q.   Have you ever supported him?

18   A.   Yes.  Yes, I did.  I gave him $5,000 that I

19   specifically directed him to use for his subsistence.  I

20   knew that he was building a church, there was a partially

21   constructed church.  And through an interpreter, I told

22   him that I didn't want the money used for that purpose, I

23   wanted it to be used for his subsistence.  And I wanted

24   that to enable him to mentor the orphans at the Boguchar

25   orphanage.

1  Q.   What time frame would that have been in?

2  A.   That would have been in 2006.  That would have been

3  in, I think, July 2006.

4  Q.   Who is Gennadiy --

5  A.   Gennadiy Petrov.  Gennadiy Petrov is a member of the

6  Baptist church in Voronezh, Russia, and he's one of the

7  individuals that helped us a lot.  He has a ministry

8  whereby he goes to various different orphanages and does

9  camps and has various other activities for orphans and

10 widows and other disadvantaged persons.

11 Q.   What does the word "ministry" mean to you?

12 A.   The word "ministry," to me, means helping other

13 people.  And that definition is really colored by my

14 background.  My mother being Amish -- because in the

15 Amish faith there are no church buildings at all, there

16 is no paid clergy.  And money, if money is taken up, it

17 is only taken up for needs, which is someone's

18 subsistence or someone has large medical bills or some

19 other specific purpose.  And therefore when I think of a

20 ministry, I think of something that is assisting people

21 in need.

22 Q.   When you use the word "assist," could you also say

23 help?

24 A.   Oh, certainly.  Yes.

25 Q.   Beginning in the year 2000, did Lindsey Springer

1  ever help you in regard to issues that arose in your

2  practice?

3  A.   Certainly.  On a routine basis.

4  Q.   Have you ever denied that fact?

5  A.   No, sir.

6  Q.   Other than the one dollar you testified about

7  yesterday, have you ever paid Lindsey Springer for any of

8  that help?

9  A.   No, sir.

10  Q.   What kind of help would Lindsey Springer give you?

11  A.   Basically, any time that I had a question about a

12  case, usually it would be a tax case, but not

13  necessarily, if I had a question or I needed someone that

14  I felt was qualified to bounce that off of, I would call

15  Lindsey Springer and ask about that.

16  Q.   Did Lindsey Springer always have an answer for you?

17  A.   No, but if Lindsey Springer didn't have an answer,

18  he would say so.

19  Q.   If Lindsey Springer didn't give you an answer, what

20  would you do next?

21  A.   I would perhaps go to another resource, perhaps call

22  another lawyer, perhaps do legal research, find other

23  ways to get the answer.  And frequently when I would ask

24  Lindsey Springer, I would get information from other

25  sources as well and try to weave that all together for

1  the benefit of the client.

2  Q.   Personally, do you support the mission of getting

3  rid of the IRS?

4  A.   One hundred percent.

5  Q.   In -- excuse me, strike that.  Please tell the jury

6  why $375,000 was wired to your -- or transmitted to your

7  IOLTA account from Hall Estill.

8  A.   Mr. Patterson was a director with NESCO,

9  Incorporated, and there was a policy with Royal Insurance

10 that provided indemnity for him for defense of his

11 actions taken as director.  There were negotiations and

12 the result of those negotiations was a settlement.  And

13 out of that settlement, first, Hall Estill was paid and

14 the remaining funds were transferred to the IOLTA account

15 of Oscar Stilley when the Hall Estill bill was paid.

16 Q.   When did you -- when were you told to give $90,000

17 to Lindsey Springer?

18 A.   That would have been about November 6th or November

19 7th of 2003.

20 Q.   When did the Patterson trial begin?

21 A.   November 15, 2003.

22 Q.   When did you first learn the insurance company had

23 agreed to purchase the insurance contract for

24 Mr. Patterson?

25 A.   That was a result of negotiations that extended over

OSCAR STILLEY - DIRECT BY MR. SPRINGER                     2466

1   a period of time.  And I went back last night and

2   refreshed my recollection based on my billing statement

3   and the first that I --

4           MR. SNOKE:  Your Honor, I'm going to object to

5   the fact this was asked and answered yesterday.

6           THE COURT:  Well, it's my perception that it is

7   a backdrop for further questioning perhaps on some other

8   related subject.  On that basis, it will be overruled.

9   Go ahead.

10          THE WITNESS:  I refreshed my recollection and,

11  based on that refreshment, the negotiations started about

12  September 26, 2003, and continued on until a few days

13  before November 6, 2003.

14  Q.  (BY MR. SPRINGER)  When was the first Patterson

15  trial scheduled to begin?

16  A.  My recollection of that would have been in

17  September.

18  Q.  Would it be -- was it in the first part of September

19  or towards the last?

20  A.  I'm really sorry, but I couldn't get quite that

21  close.  If I looked at the documents, I could refresh my

22  recollection, but not off the top of my head.

23  Q.  Prior -- excuse me, scratch that.  Who told you to

24  give $90,000 to Lindsey Springer in November of 2003?

25  A.  Eddy Patterson.

OSCAR STILLEY - DIRECT BY MR. SPRINGER                    2467

1   Q.   Did you have a personal discussion with him

2   regarding that $90,000?

3   A.   Yes, I did.

4   Q.   Did you give Lindsey Springer $90,000?

5   A.   Yes, sir.

6   Q.   Did Mr. Patterson tell you how to give Lindsey

7   Springer $90,000?

8   A.   No, he did not.

9   Q.   Do you know how you gave Lindsey Springer $90,000?

10  A.   Yes.  It's just as the -- is shown by the record in

11  this case, three $20,000 checks and 18 $1,000 money

12  orders and a credit to account.

13  Q.   What was the credit for the account?

14  A.   My recollection would have been that that was to

15  satisfy the remaining part of a loan.

16  Q.   Had Lindsey Springer received a loan, then, prior to

17  that day?

18  A.   That is correct.

19  Q.   Were you aware of the source of that loan?

20  A.   Yes.  Yes, I was.

21  Q.   Who was that source?

22  A.   Eddy Patterson.

23  Q.   How much money did you return to Eddy Patterson from

24  the $375,000 that was wired to your account?

25  A.   There was no money to be refunded.  And, as a matter

1  of fact, at the conclusion of the representation, my bill

2  was approximately 17 -- a little over $17,000 unpaid and

3  Jerry Berringer had almost $2,000 of unpaid bills

4  outstanding.

5  Q.   Did you return $100,000 of that money to Tulsa Sales

6  and Rental?

7  A.   I did make -- I did return $100,000 previously to

8  the conclusion of the representation because

9  Mr. Patterson asked me to do that.  And it was his money.

10 Q.   Was it his settlement from the insurance contract?

11 A.   Yes, that is correct.

12 Q.   Thank you.  Do you remember writing a check to

13 Lindsey Springer for $35,000?

14 A.   Yes, I do.

15 Q.   Do you remember what is written in the memo on that

16 check?

17 A.   Patterson.

18 Q.   Do you know who received the money from that

19 $35,000?

20 A.   Eddy Patterson.

21 Q.   Did Eddy Patterson ask you to do that?

22 A.   He directed me to do that and he explained why, that

23 he needed the money and needed it very quickly.

24 Q.   Did that money come out of the $112,500 check that

25 we've seen in this trial?

1   A.   Yes, that's where that money came from.

2   Q.   How do you believe an individual becomes liable for

3   a tax on income?

4   A.   I believe that an individual becomes liable for a

5   tax on income only when the sovereign passes a law

6   through the legislative body and publishes that and makes

7   it known to the world, specifically that there is a tax

8   that is imposed and that a specific person is liable for

9   it.

10   Q.   Do you separate the liability from the tax itself?

11   A.   Yes, I do.  Principally, because the statutes, the

12   Internal Revenue Code, does the same thing.

13   Q.   Do you remember yesterday testifying about Section

14   6011?

15   A.   Yes, I do.

16   Q.   Did 6011 play a role in your beliefs?

17   A.   Certainly it did, along with many other provisions.

18   Q.   When would you have first become aware of Section

19   6011?

20   A.   1986 or 1987 because that was part of Irwin Schiff's

21   book.

22   Q.   Did the government ever ask you, during the

23   investigation of Lindsey Springer, whether or not you

24   provided a service for payment?

25   A.   I don't think so.  I don't remember any such

1    question.  It seemed to me that it was understood that I

2    was an attorney and I provided services and I billed

3    people.

4    Q.  Have you ever seen Lindsey Springer give anyone a

5    bill for any money that they gave Lindsey Springer?

6    A.  Absolutely not.  And it was made very clear to me

7    that that was not going to happen because that was not

8    the way that you operated.

9    Q.  Have you represented clients in civil tax matters?

10   A.  Many times.

11   Q.  How many criminal cases have you gone to trial with

12   your clients?

13   A.  My recollection is that I have actually been trial

14   counsel on five criminal cases.  And when I say "five,"

15   I'm talking about cases that actually went to trial that

16   I was the lawyer.  There were other cases in which, for

17   example, Lake, I'm not counting that in the number.

18   Q.  Is that because you did not represent him at trial?

19   A.  That is correct.

20   Q.  How many civil cases have you represented clients?

21   A.  A great number, but I couldn't tell you how many.

22   Q.  Do you consider your representation of Robert

23   Lawrence one of those five?

24   A.  No, because I didn't try that case.

25   Q.  Why didn't you try that case?

1  A.   There was information that was provided to the

2  government suggesting that there would be a Paperwork

3  Reduction Act defense, there was discussions with counsel

4  for the government in which he said that he was going to

5  file a motion in limine to try to prohibit discussion of

6  that defense.  And shortly thereafter, counsel for the

7  government called and said that the criminal charges

8  would be dismissed with prejudice.

9  Q.   And who did they call?

10 A.   They called Oscar Stilley.  I was counsel of record.

11 Q.   What impact did that decision by the Department of

12 Justice have on your beliefs?

13 A.   That was a very -- had a very powerful impact.

14 Because when you took that together with the things that

15 had happened in the Patterson case, such that the PRA

16 argument had not been addressed in the Patterson case and

17 then in a subsequent case where the Paperwork Reduction

18 Act was front and center, the government didn't want to

19 try the case.  That suggested to me that it was a strong

20 argument that the government had a fear of.

21 Q.   Did you need Lawrence's case to be dismissed to

22 believe the Paperwork Reduction Act means what it says?

23 A.   Absolutely not.  I already fervently believed the

24 Paperwork Reduction Act defense.  I was actually the one

25 that drafted the brief for Judy Patterson, and

1   Mr. Berringer read and signed it.  I had studied that and

2   briefed it and educated myself on it and fully believed

3   it.

4   Q.   Were you involved in asking for Judy Patterson's

5   release from prison?

6   A.   No, I was not her counsel of record.  I only

7   provided assistance to Mr. Berringer by drafting the

8   brief.

9   Q.   Did you help Mr. Berringer draft a motion to get

10  Mrs. Patterson out of jail?

11  A.   I may have assisted on -- I know he did a motion

12  asking to get her out of jail.  My involvement with that,

13  I would have to refresh my recollections.

14  Q.   Did you hear Mrs. Patterson say you were trying to

15  keep her in jail?

16  A.   I heard her testimony and I knew that she had that

17  understanding, but certainly there was no -- neither

18  Jerry Berringer nor Oscar Stilley ever had any desire to

19  keep her in jail for another day.

20  Q.   What is client confidentiality?

21  A.   That is a rule for lawyers that lawyers are not

22  permitted to disclose the confidences of their clients.

23  And in this case, we heard Richard Marrs talking about

24  that and -- but it's a rule that lawyers are expected to

25  obey.

1   Q.   Was Lindsey Springer ever a client of Oscar Stilley?

2   A.   No, sir.

3   Q.   Then -- strike that.  What are the rules under IOLTA

4   regarding your possession or holding of money for

5   somebody else?

6   A.   Basically there are four principal rules.  The rule

7   that governs this is Rule 1.15.  It's part of the model

8   rules that most states have adopted.  And that those

9   rules require, number one, that you keep current records

10  that go back at least five years.

11       Number two, you cannot commingle your money or your

12  property with money or property belonging to a client or

13  a third person.

14       Number three, when you hold property that someone

15  else is -- money or property that someone else is

16  entitled to, you must surrender that money or property

17  promptly upon a lawful demand.

18       And, number four, you must hold money or property as

19  a fiduciary whether or not the person entitled to the

20  money is a client.

21  Q.   Could you please pull up Defendant's Exhibit Number

22  219, please.

23  A.   Certainly.  Yes, sir.

24  Q.   Do you recognize Defendant's Exhibit Number 219?

25  A.   Yes, I do.

1  Q.   What is Defendant's Exhibit Number 219?

2  A.   It is Rule 1.15 of the Arkansas Model Rules entitled

3  "Safekeeping Property and Trust Accounts."

4  Q.   When you opened up your account with IOLTA, did you

5  rely upon Rule 1.15 that you have just testified about

6  here?

7  A.   Yes.  And to -- let me explain that.  Lawyers are

8  required to have an IOLTA account except under very

9  limited circumstances.  It's mandatory that the attorney

10  get this account and cause that the interest will be paid

11  to the IOLTA foundation for the betterment of the law and

12  various other good purposes.

13  Q.   Prior to 2003, had you read Rule 1.15?

14  A.   Yes.  I'm sorry, yes.

15  Q.   Did you rely upon Rule 1.15 from 2003 forward?

16        MR. SNOKE:  Your Honor, we object on leading.

17        THE COURT:  Say that again, please.

18        MR. SNOKE:  Objection, leading.

19        THE COURT:  Well, in that instance, I'm going to

20  overrule it.

21        MR. SPRINGER:  Your Honor, I would move to enter

22  Defendant's Exhibit 219.

23        THE COURT:  Any objection?

24        MR. SNOKE:  Objection, irrelevant, Your Honor,

25  to this proceeding.

```
 1              THE COURT:  It is received.  Overruled.
 2              MR. SPRINGER:  Your Honor, may I publish?
 3              THE COURT:  You may.
 4  Q.  (BY MR. SPRINGER)  Mr. Stilley, could you please
 5  tell the jury what the name of Rule 1.15 is?
 6  A.  Yes.  Safekeeping property and trust accounts.
 7  Q.  And does Section 1 say, "A lawyer shall hold
 8  property of clients or third persons, including
 9  perspective clients"?  Is that what that says?
10  A.  That's what that says.  And other provisions related
11  to IOLTA make it very clear that that is a proper purpose
12  of an IOLTA account.
13  Q.  Would you consider Mr. Bolthouse a third person or a
14  client?
15  A.  He would unquestionably be a third person and the
16  money that was deposited in that case would be considered
17  an escrow of money.
18  Q.  What about Mr. Turner?  Would you consider him a
19  client or a third party -- third person?
20  A.  Honestly, I would consider him a potential client
21  based on the information that I received.  With respect
22  to -- and, well, if that doesn't answer your question,
23  refresh further.
24  Q.  So Mr. Turner being a prospective client -- excuse
25  me, strike that.
```

OSCAR STILLEY - DIRECT BY MR. SPRINGER                    2476

1     When you first received the wire or the transmission

2 from Mr. Turner, was he a third person?

3 A.   I would say either a third person or a client -- or

4 potential client.  You could make the argument either

5 way, I would think.

6 Q.   Are you telling the jury, then, that Mr. Turner fit

7 within client and third person?

8 A.   Potential client and third person.  And if I could

9 elucidate on that.  As such time that he told me that he

10 had loaned that money to you, I would put him in a

11 category of a third party with whom I would have a

12 fiduciary responsibility.

13 Q.   Is that what IOLTA is for?

14 A.   That is specifically what it is for, according to

15 the rules.

16 Q.   Was Mr. Patterson a client of yours --

17 A.   Yes, he was.

18 Q.   -- in 2003?

19 A.   Yes, sir.

20 Q.   Was it appropriate for you to put money

21 Mr. Patterson gave you into an IOLTA account?

22 A.   Very clearly.

23 Q.   Okay.  Are you aware of the aider and abetter charge

24 that involves you and I in Counts 3 and 4 of the grand

25 jury indictment?

1  A.   Yes, sir.

2  Q.   Are you aware the grand jury alleges in 2003 using

3  the IOLTA account to write Lindsey Springer checks is

4  alleged as an affirmative act of attempting to evade

5  Lindsey Springer's tax liability for 2003?

6  A.   Yes, sir.

7  Q.   Have you and I had several discussions about that,

8  about Count 3?

9  A.   Certainly.

10 Q.   In 2003, when -- scratch that.  Who asked you to put

11 Lindsey Springer's name on the three $20,000 checks that

12 you have seen entered in the record in this case from

13 November of 2003?

14 A.   That was Lindsey Springer.  You requested that the

15 money be provided in a certain way and the money was

16 provided in precisely that way.

17 Q.   Did Mr. Patterson ever give you any direction about

18 that?

19 A.   He didn't say.  And to my knowledge didn't care one

20 way or another.

21 Q.   Did you ever ask Mr. Patterson why he was giving

22 Lindsey Springer $90,000?

23 A.   There were discussions about that.

24      MR. SNOKE:  Objection.  Hearsay.  It's going to

25 call for hearsay.

OSCAR STILLEY - DIRECT BY MR. SPRINGER                2478

```
 1            THE COURT:  Repeat the question.
 2  Q.  (BY MR. SPRINGER)  Did Mr. Patterson ever tell him
 3  why he was giving me $90,000?
 4            THE COURT:  The objection is overruled.
 5            THE WITNESS:  Yes.  There were discussions and
 6  it was made very clear that the purpose was a donation to
 7  Lindsey Springer or Bondage Breakers Ministries.
 8            MR. SNOKE:  Do I need to object now that he has
 9  answered the question yes?  Because the answer --
10            THE COURT:  I'm not going to tell you when to
11  object, but the ruling is that the objection is
12  overruled.
13            MR. SNOKE:  Okay.
14  Q.  (BY MR. SPRINGER)  Please tell the jury why you
15  would have believed Mr. Patterson telling you it was a
16  donation.
17  A.  Well, I had no reason to believe otherwise.  And I
18  had had occasion to deal with you for a long period of
19  time and I knew that you wouldn't accept anything else.
20  And Mr. Patterson told me that he wanted to give a gift
21  and I simply believed him.
22  Q.  At the time that Mr. Patterson directed you to give
23  me the $90,000, was I helping you involving his case?
24  A.  You had been helping me since long before that
25  period of time.
```

1   Q.   Did you ever see me do anything for Mr. Patterson?

2   A.   No, I saw you help me, but I was not -- except at

3   times where that we would perhaps meet, all three of us,

4   I did not have the occasion to observe interaction

5   between you and Mr. Patterson.

6   Q.   Had you seen Lindsey Springer help you in other

7   cases prior to the Patterson case?

8   A.   Absolutely.  You helped me on cases and I didn't

9   make it any business to inquire about your arrangement,

10  your business, or anything like that.  But I knew that

11  you would help me on all manner of legal situations,

12  including legal situations where that you might not even

13  know the name of the person that was in trouble.

14  Q.   Did I ever reject answering your questions because

15  somebody had not given me any money?

16  A.   Absolutely not; never.

17  Q.   Did you, on January 20, 2006, did you tell Brian

18  Shern, "Lindsey Springer does not charge for his

19  services"?

20  A.   On -- I put that on the response to the grand jury

21  subpoena.  There was discussions in January, but --

22  Q.   I'm sorry.

23  A.   That's okay.

24  Q.   On January 20th, did you state to Brian Shern,

25  People give me, Lindsey Springer, money for my ministry

1   and expect no services in return?

2   A.   I would certainly have said words to that effect

3   because that was my perception, my understanding.  Seemed

4   very reasonable to me that you had never, to my

5   knowledge, ever charged anybody for helping, although you

6   did take donations for your ministry.

7   Q.   Is it your understanding or belief that Lindsey

8   Springer and Bondage Breakers Ministries are one in the

9   same?

10  A.   I really didn't -- at the time, didn't really have

11  occasion to think about it.  I knew that you were using

12  that name and it was no concern of mine.  So, basically,

13  I would follow a client's instructions about how to make

14  a check out.

15  Q.   Did Mr. Patterson ever tell you, when he directed

16  you to give me $90,000, that he expected something from

17  Lindsey Springer?

18  A.   No, it was made clear to the opposite.

19  Q.   Are you aware that the grand jury in paragraph 37 of

20  Count 1 alleges that you caused a deposit of a $175,000

21  check to be deposited into your IOLTA account?

22  A.   Yes, I know that.

23  Q.   At the time that you received that $175,000 check --

24  excuse me, scratch that.

25       Who was that $175,000 check from?

1   A.   Hamlet Bennett, who testified in this case.

2   Q.   Did Hamlet Bennett ever mention -- did he ever tell

3   you that he was sending that $175,000 check to you so he

4   could give Lindsey Springer $25,000?

5   A.   No, sir.

6   Q.   What were the terms by which Mr. Bennett and you

7   agreed to in regard to that transaction?

8   A.   Mr. Bennett sought my services and, pursuant to my

9   request, he put $175,000 in my IOLTA account for his use.

10  Q.   Are you aware of the grand jury's claim in Count 1

11  of paragraph 38 that it is alleged that you caused a

12  check for $25,000 to be written from your IOLTA account

13  to Bondage Breakers Ministry?

14  A.   Yes, I'm aware of that allegation.  And it is true

15  that the $25,000 was sent at the direct request of Hamlet

16  Bennett.

17  Q.   Do you remember the check from Mr. Patterson being

18  made out in November of 2003 to Lindsey Springer?

19  A.   It would be better if I could refresh my

20  recollection on that.  I'm sorry.

21  Q.   Did Mr. Bennett tell you who to make the $25,000

22  check out that's alleged in paragraph 38 of Count 1 of

23  the grand jury indictment?

24  A.   I don't recall specifically if he said so or not,

25  but if he told me to make it out a certain way, that

1  would have been the way that I would have done it.  I

2  would have followed his orders as precisely as I could.

3  Q.   Do you know who you made the $25,000 check out to

4  alleged in paragraph 38 of Count 1 by the grand jury?

5  A.   It would be best if I could refresh my recollection

6  on that.  That is in evidence.

7  Q.   Before Mr. Bennett testified at this trial, were you

8  aware that he had sent me additional money after the

9  $25,000 alleged in paragraph 38, Count 1, of the grand

10  jury indictment?

11  A.   No, sir.  I had no knowledge of that.

12  Q.   So that 49,000 didn't come from the IOLTA account,

13  correct?

14  A.   Certainly not.  I knew nothing about that.

15  Q.   Okay.  Did Mrs. Hawkins ever tell you about any

16  money that either her or her husband had given to Lindsey

17  Springer?

18  A.   No.

19  Q.   Did you -- were you ever directed to give Lindsey

20  Springer money out of your IOLTA account from the money

21  you were holding for the Hawkins?

22  A.   No, sir.

23  Q.   Did you tell James Lake to put a toothbrush in his

24  pocket?

25  A.   I need to explain that.  I did -- I told him the

OSCAR STILLEY - DIRECT BY MR. SPRINGER                    2483

1    story about Whitey Harrell in Illinois, who won a case of

2    willful failure to file, and that he went to court with a

3    toothbrush in his pocket.  The purpose of making that

4    statement was not so much to literally suggest putting a

5    toothbrush in your pocket but to let him know that

6    sincerity is very important when you go and you try to

7    present a case and really your -- basically your only

8    defense is your good faith.

9    Q.   Do you know who represented Mr. Harrell in that case

10   that you just described?

11   A.   Yes.  It was Jerry Berringer.

12   Q.   And is that the same Jerry Berringer that

13   represented Ms. Patterson in her criminal case?

14   A.   Yes, he did.

15   Q.   Did you ever deposit money in your IOLTA account

16   from Andy or Karen Ouwenga?

17   A.   Yes, I did.

18   Q.   Did that money actually come from a business entity?

19   A.   Oh, yes, I'm sorry.  My mistake.  It came from some

20   other entity.

21   Q.   Did the Ouwengas ever tell you to give me any money

22   out of the IOLTA account from the funds that you were

23   holding for them?

24   A.   No, sir.

25   Q.   Did you tell Eddy Patterson you had never tried a

```
 1  security case before?
 2  A.   I would have explained to him my history and my
 3  background on that at the point that he was having to
 4  make a decision whether he would try to continue with
 5  Hall Estill or find another lawyer or proceed with Oscar
 6  Stilley.
 7  Q.   Could you tell the jury how many business days you
 8  had to prepare for the Patterson securities and bank
 9  fraud case, not the tax case, but the bank fraud and
10  securities fraud case in 2003.
11  A.   It was a very short period of time because the
12  negotiations over who was going to actually take that
13  case went up through approximately November 6th, at which
14  time that the money was turned over and the files that
15  Hall Estill had were turned over to Oscar Stilley to
16  continue with the defense.
17  Q.   Was it a voluminous case?
18  A.   Very.
19  Q.   Were you reluctant to take it?
20  A.   No.  No, I was pleased to have the opportunity to
21  represent the client.  And I'm not saying that to say
22  that it was not a daunting task, certainly it was a
23  daunting task, but I was ready and willing.  And there
24  was another attorney, Jerry Berringer, to help carry the
25  load and I was ready to try that case.
```

OSCAR STILLEY - DIRECT BY MR. SPRINGER                    2485

1   Q.   Have you heard testimony during this trial that

2   suggested that Lindsey Springer was in charge of the

3   show?

4   A.   I've heard testimony to that effect.

5   Q.   Did you think that that trial was a show?

6   A.   Well, I thought it was a serious proceeding and one

7   that deserves respect.  I would not call it a show.

8   Q.   Did Mr. Patterson ever ask you to ask me to give him

9   a bill for the $90,000 that he told you to give to me?

10  A.   Oh, no.  No.  He clearly understood at the time that

11  it was a donation; he knew that.

12  Q.   Did I, Lindsey Springer, ever give money to you from

13  me to deposit in an IOLTA account to hold for me until

14  such other further time as I would ask for it back?

15  A.   Certainly not.

16  Q.   Do you remember testifying about where you and I

17  first met?

18  A.   Yes.

19  Q.   Do you remember where that was?

20  A.   Pizza Hut in Fort Smith is my recollection.

21  Q.   And do you remember who was there that day besides

22  you?

23  A.   Dr. Roberts would have been the individual -- other

24  individual.  And I think that there may have been some

25  other people too.

OSCAR STILLEY - DIRECT BY MR. SPRINGER                    2486

1   Q.   And that was in Fort Smith, Arkansas, correct?

2   A.   Yes.

3   Q.   Are you aware of the claims by the grand jury in

4   Count 1 regarding when this -- the alleged conspiracy

5   began?

6   A.   Yes, sir, I've read that.

7   Q.   And when, to the best of your understanding, did the

8   grand jury allege the conspiracy began?

9   A.   2000.

10  Q.   Have you and I ever had any discussion about trying

11  or attempting to defraud the United States of any income

12  taxes?

13  A.   Absolutely not.  And such an idea never entered my

14  mind.

15  Q.   Are you aware that there are charges in Counts 1, 3,

16  and 4 that you gave me cash?

17  A.   Yes, sir.

18  Q.   Have you seen any evidence presented during this

19  trial where you gave me cash?

20  A.   No, sir, I have not.

21  Q.   Have I ever given you cash?

22  A.   You have given me cash on occasion, I mean --

23  Q.   What would the cash have been for?

24  A.   Oh, just -- I'm talking small amounts, like -- oh,

25  to go buy something, to go to Kinko's, or little things

OSCAR STILLEY - DIRECT BY MR. SPRINGER                    2487

1  like that.  I mean, that's my recollection of that.  I

2  mean --

3  Q.   More than $500, if you know?

4  A.   I don't recall that ever happening.

5  Q.   Are you aware that in Count 1, paragraph 13 of the

6  grand jury indictment, that it is alleged that you

7  misrepresented to the IRS the source and nature of

8  Defendant Springer's income?

9  A.   I'm aware of that allegation.

10  Q.   Do you understand -- do you have an understanding of

11  what the word "source" means?

12  A.   Well, I think that they're saying where that the

13  money came from.

14  Q.   How many people that you knew were you aware of

15  giving me or Bondage Breakers Ministries any money?

16  A.   I knew of the transfers of funds that were involved

17  with my IOLTA.  With respect to other people, it was not

18  my business and I didn't make it my business and I didn't

19  know about that.  I may have known generally a certain

20  person was a supporter, but I had no idea whether they

21  were one of the people that sent the 25, 50, or $100

22  checks or whether they were a substantial donor.

23  Q.   Was Patterson a source?

24  A.   Yes.  And I was aware -- and in that case, I was

25  aware of the amounts.

```
 1   Q.   Was Turner a source?
 2   A.   Well, that depends on how you call it a "source."  I
 3   mean, if you're talking about where the money came from.
 4   In the ordinary sense, I would say that that was the
 5   source of the funds.
 6   Q.   Was Mr. Bolthouse a source?
 7   A.   In the ordinary sense as an ordinary person would
 8   conceive "source of funds," I would say yes.
 9   Q.   Did you ever fail -- excuse me, strike that.
10        Did you ever misrepresent the source of the money
11   from Mr. Bolthouse?
12   A.   No.  No, I didn't.
13   Q.   Did you ever misrepresent the source of the money
14   from Mr. Patterson?
15   A.   No, I certainly didn't.
16   Q.   Prior to receiving the transmission from Mr. Turner,
17   were you aware a wire or transmission was coming to you?
18   A.   I generally had knowledge of that because of a
19   request for the information from the face of my check,
20   that is the account number and wiring number.
21   Q.   Did you know the source of those funds?
22   A.   Shortly before the wire, yes.
23   Q.   Okay.  Did you get confused about who Sam Snyder
24   was?
25   A.   Yes, I did.  At the grand jury proceeding in March
```

OSCAR STILLEY - DIRECT BY MR. SPRINGER                    2489

1   of '06, I got confused, and I thought that the money had

2   come from Sam Snyder instead of going to Sam Snyder.  A

3   mistake of the head, not of the heart.

4   Q.   Did you try to fix that?

5   A.   Actually, no -- what happened on that situation is

6   later Mr. Snoke jumped up in the proceeding and objected

7   to Oscar Stilley representing Mr. Blackstock in a

8   criminal case on grounds that Oscar Stilley was under

9   criminal investigation.  And that caused me great alarm

10  because I had asked Mr. Shern previously, specifically if

11  I was under criminal investigation.

12          MR. SNOKE:  Your Honor, I object getting into

13  this.  Can we approach?

14          THE COURT:  You may.

15    (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND

16  OUT OF THE HEARING OF THE JURY.)

17          THE COURT:  Go ahead.

18          MR. O'REILLY:  Mr. Springer is not here, Your

19  Honor.

20          THE COURT:  Okay.  Hold on.  Go ahead.

21          MR. SNOKE:  Your Honor, first of all, we're

22  getting into a collateral matter here and we're getting

23  into a point where I may have to become a witness here in

24  a case.  But the representation that the defendant just

25  testified to in the Blackstock case has no relevance to

1  anything that has come up in this trial to date except

2  through the mouth of the defendant.  And the

3  representation was to the magistrate that Mr. Blackstock

4  needed to be advised that there may be a conflict of

5  interest because the defendant was under investigation by

6  our office, Mr. Stilley was under investigation by our

7  office.

8      Mr. Blackstock then took counsel for five or ten

9  minutes and informed the magistrate that he would waive

10  any conflict that that might cause.  That was the sum and

11  substance of what the defendant has testified to, which

12  was not a notification by me, per se, that he -- that a

13  motion by me to not have him represent Mr. Blackstock,

14  which is what he implied, but rather just a notification

15  to the Court that Mr. Blackstock needed to be advised of

16  his possible conflict of interest.

17          THE COURT:  Even before that objection was made

18  by Mr. Snoke, I was thinking to myself that this is very

19  much out on the ragged edge, I mean, very ragged edge of

20  relevance.  So the first thing I need to hear from either

21  one of you or both, if you so desire, is what is the

22  relevance of this.

23          MR. SPRINGER:  The reason why Mr. Stilley did

24  not go back, and as he was in there the second time to

25  answer further questions that were not covered by the

1  first subpoena, the reason why he didn't actually

2  complete that is because they withdrew the subpoena after

3  they had disclosed to Mr. Stilley in the Blackstock case

4  that he was under criminal investigation as a manner to

5  keep him from representing Mr. Blackstock in that case.

6      So it's our position that any misrepresentation the

7  government would opine is based upon the fact they

8  subpoenaed and asked for more information and then

9  Mr. Stilley was properly told he was under investigation

10  and then he declined to answer the questions and they

11  withdrew the subpoena and so --

12      THE COURT:  Okay.  Well, what if, Mr. Snoke, if

13  by Q and A, if Mr. Springer covers those bare-bones

14  facts, and nothing more, with this witness and then moves

15  on, do we have a problem?

16      MR. SNOKE:  There is no relevance.  And we're

17  getting into that area where we've already had some

18  pretrial motions in respect to what Mr. Horn's warnings

19  may have been at the grand jury.  We aren't alleging that

20  he didn't comply with any subpoena, we've already had

21  testimony through Mr. Shern, through questions of

22  Mr. Shern that the -- that the testimony that was -- the

23  second subpoena was not enforced, it was dropped.  We're

24  not alleging that he did not produce any records at the

25  second session.  All the allegations in the indictment,

```
 1   Your Honor --

 2            THE COURT:  Okay.  Okay.  Okay.

 3            MR. O'REILLY:  Your Honor, there was nothing

 4   brought out on direct or through cross of any witness by

 5   the government about the mistaken, you know,

 6   representation about who -- which way the money went in

 7   the Snyder transaction.  It's not alleged in the

 8   indictment as anything.

 9            MR. SPRINGER:  I'll withdraw the question if

10   that's their representation, Your Honor.

11            THE COURT:  It is, so we'll consider it

12   withdrawn.

13            MR. SPRINGER:  I'll take it.

14            THE COURT:  Proceed.

15       (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

16   WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

17   PRESENCE AND HEARING OF THE JURY.)

18   Q.   (BY MR. SPRINGER)  Other than Mr. Patterson,

19   Mr. Turner, and Mr. Bolthouse, are you aware of any other

20   IOLTA transaction where the source of the funds to

21   Lindsey Springer was from your IOLTA account where you

22   were asked about the source of funds?

23   A.   No, sir.

24   Q.   Are you aware regarding -- excuse me, strike that.

25       Do you have an understanding or belief regarding
```

1   what the meaning of the word "nature" is?

2   A.   Well, I would just take it in the ordinary sense,

3   kind of the circumstances surrounding it.  That's the

4   best that I could do on that.

5   Q.   Okay.  Did you ever misrepresent to Mr. Shern or any

6   employee of the IRS the nature of Mr. Bolthouse's $50,000

7   transmission to you?

8   A.   Certainly not.

9   Q.   At the time you received Mr. Bolthouse's money, the

10  transmission of 50,000, as far as your understanding, who

11  was the current owner of those funds?

12  A.   That would be Mr. Bolthouse, until he gave

13  instructions that the money should belong to somebody

14  else.

15  Q.   Regarding Mr. Turner, at the time that you received

16  that transmission into your IOLTA account, what was the

17  nature of that transaction?

18  A.   I understood that he was putting a certain amount of

19  money, I believe it was 192,000, into the account for

20  purposes that he would make clear to me and expect me to

21  follow his instructions.

22  Q.   Subsequent to that transmission, did you become

23  aware of instructions from Mr. Turner?

24  A.   Yes.  I obtained instructions from Mr. Turner just

25  as he testified in his testimony.

OSCAR STILLEY - DIRECT BY MR. SPRINGER                    2494

1  Q.   Were you aware of the nature of Mr. Patterson's

2  money that in 2003, November, he directed you to give to

3  me?

4  A.   My understanding of the nature of that would be a

5  donation to the ministry of Lindsey Springer or Bondage

6  Breakers Ministries.

7  Q.   Did Mr. Patterson put any conditions on the nature

8  of that transaction?

9  A.   He certainly did not.

10 Q.   If he had, would you have disclosed those to Lindsey

11 Springer?

12 A.   If he had given me information that I felt was

13 relevant to you, and certainly that would have been, I

14 would have disclosed that to you.

15 Q.   Would you have also made a notation in your billing

16 records?

17 A.   Yes, I think that that would be necessary that I

18 would make a notation of something of that character.

19 Q.   Did you tell a federal grand jury on March 9, 2006,

20 "Lindsey Springer does not charge for his services"?

21 A.   I did that in writing.

22 Q.   You didn't say it during your grand jury appearance

23 in March 9 of 2006?

24 A.   It's very possible that I would have also said it,

25 but I do know that I put that on the document that I

1   provided to the grand jury.  And precisely what I said at

2   the grand jury, I would need my recollection refreshed to

3   state that.

4   Q.  What did you mean by, "Lindsey Springer does not

5   charge for his services"?

6   A.  Precisely what I said, that Lindsey Springer doesn't

7   charge anybody for what he does.  Donations certainly are

8   accepted, but I had -- over the years, I had seen Lindsey

9   Springer work for people that didn't have anything,

10  didn't have any money, no way to give a donation now of

11  any substantial amount or to give that later and to pour

12  his heart out for that and do little things for other

13  people, do things for people that he didn't even know and

14  probably would never know and wouldn't even recognize

15  their name, that and other factors and the sincerity that

16  I had seen out of you.

17  Q.  Please keep it slow, please.

18  A.  I'm sorry.  Thank you.  All that led me to the

19  conclusion that Lindsey Springer did not charge for his

20  services.

21  Q.  But you charge for your services, don't you?

22  A.  I make that very clear.

23  Q.  What did you mean when you just said you've seen me

24  "work for people"?  What did that mean?

25  A.  Well, I use that in the sense that Oscar -- through

OSCAR STILLEY - DIRECT BY MR. SPRINGER                          2496

1   Oscar's eyes and what -- I understand that Lindsey
2   Springer would, for example, help Oscar Stilley or Jerry
3   Berringer and various other attorneys.  My understanding
4   is that the purpose of that was to help people that had
5   problems, had great needs in their lives and great
6   threats to their property or their liberty.
7   Q.   Was it also true that those people had very few
8   choices?
9   A.   Very frequently that was the case, they were in
10  difficult straits.
11  Q.   If Mr. Patterson had told you to give Lindsey
12  Springer $90,000 on November 7, 2003, and you did not do
13  it, what would be the consequence to you for doing -- for
14  not doing what he asked you to do?
15  A.   My understanding, based on the rule, Rule 1.15, it
16  would be that that would be a breach of my -- either my
17  fiduciary obligation to the person owning the funds or a
18  breach of the requirement that the funds be disbursed
19  promptly to a person that was entitled to the money.
20  Q.   In Count 1, are you aware that there are several
21  allegations where it says Defendant Stilley caused a
22  check to be written and then an amount?  Are you aware of
23  that?
24  A.   Yes, sir.
25  Q.   Were all of those checks, if written, written in

OSCAR STILLEY - DIRECT BY MR. SPRINGER                           2497

 1  Fort Smith, Arkansas?

 2  A.   Yes.  Yes, sir.

 3  Q.   Do you know the wire from Mr. Bolthouse, where it

 4  came from?

 5  A.   I thought it was from a state up north.

 6  Q.   Was it from Michigan?

 7  A.   That's what I thought.

 8  Q.   Didn't ever come through Oklahoma, did it?

 9  A.   Not to my knowledge.

10  Q.   Lucky Bennett's 175,000, did that come from Hawaii?

11  A.   Yes, it did.

12  Q.   It jumped right over Oklahoma and landed in Fort

13  Smith, Arkansas?

14  A.   I don't know what state it crossed, but it came from

15  Hawaii to Arkansas.

16  Q.   Do you have a checking account for IOLTA in

17  Oklahoma?

18  A.   No, sir.

19  Q.   Are you aware generally of the charges in Count 3?

20  A.   Yes, sir.

21  Q.   You're not charged with attempting to evade taxes of

22  Oscar Stilley, are you?

23  A.   That is correct, I am not.

24  Q.   That's your understanding.

25  A.   That is correct.  From the face of the indictment.

OSCAR STILLEY - DIRECT BY MR. SPRINGER                          2498

1  Q.   Are you aware of what alleged acts are against you

2  in relation to Count 3?

3  A.   Yes.  I have read the indictment and I have seen

4  that.

5  Q.   Are you aware that one of the alleged acts is in

6  2003 you used your IOLTA account?

7  A.   Yes, sir.

8  Q.   Okay.  And as you sit here today, are the only

9  transactions in 2003 involving Eddy Patterson and the

10 transactions that have been identified in the record in

11 this case?

12 A.   That would be correct.

13 Q.   And that was a check for 37,000, which was a loan,

14 correct?

15 A.   Yes.

16 Q.   And then a 35,000 which was -- I think you said it

17 was money from Mr. Patterson; is that correct?

18 A.   Yes.

19 Q.   And the 90,000 that you were told to give to Lindsey

20 Springer, correct?

21 A.   Yes.

22 Q.   Okay.  Now, in 2003, are you aware that you are also

23 charged as an aider and abetter for allowing me to use

24 your credit card in 2003 for Lindsey Springer's personal

25 expenses?

OSCAR STILLEY - DIRECT BY MR. SPRINGER                    2499

1  A.   Yes, I'm aware of that.

2  Q.   Are you aware of what those personal expenses for

3  2003 are?

4  A.   Honestly, no.  Because although I did allow you to

5  use the credit card, the way that that operated in my

6  office is that I had someone else that did the finances

7  and kept the books and they would -- with any discussions

8  that might be necessary, they would determine what

9  charges were yours, ask you to pay, and would it get

10 paid, so I didn't concern myself with what specifically

11 you might have bought.

12 Q.   What is a personal expense, if you know?

13 A.   Well, my understanding is it would be an expense

14 that did not have any relationship to -- scratch that.

15      I would say it was an expense that was not a

16 business expense.

17 Q.   As far as you know -- excuse me, strike that.

18      Would Lindsey Springer have owed any taxes on a

19 personal expense?

20 A.   No.

21 Q.   You're also charged -- do you know you're also

22 charged in Count 3 as an aider and abetter using

23 cashier's checks, money orders, cash and other means?

24 A.   Yes, I've read that.

25 Q.   And, as far as you know, the check for 35,000 and

OSCAR STILLEY - DIRECT BY MR. SPRINGER                      2500

1   37,000 in 2003 was not a cashier's check, was it?

2   A.   I'm really sorry about that, but specifically what

3   that was you would have to refresh my recollection.  I

4   think that is in the record, and I'm certain if it's in

5   the record that the jury could take a look and see

6   exactly what it is.

7   Q.   Do you remember the three $20,000 cashier's checks?

8   A.   Yes.  And I distinctly remember those being

9   cashier's checks.

10  Q.   And do you also remember the 18 money orders for

11  $1,000 each --

12  A.   Yes, sir.

13  Q.   -- in 2003?  Do you know of any other money orders

14  besides those?

15  A.   I don't remember any.

16  Q.   In Count 4, are you aware you're also alleged to be

17  an aider and abetter to Lindsey Springer's attempt to

18  evade taxes for the calendar year 2005?

19  A.   Alleged attempt.

20  Q.   Are you aware of the main transaction alleged in

21  Count 5?

22  A.   Certainly, that would be the Turner loan.

23  Q.   Are you aware that you are alleged as an aider and

24  abetter to -- says using Defendant Stilley's account,

25  IOLTA account?

1  A.   Yes.

2  Q.   In 2005, is the money from Mr. Turner the only money

3  that you're aware of that either came into IOLTA or was

4  distributed out to various places at Lindsey Springer's

5  direction?

6  A.   Yes.

7  Q.   And is your -- are you aware that in Count 4, for

8  year 2005, you're also alleged as an aider and abetter in

9  allowing Lindsey Springer to use your credit card for

10  personal expenses?

11  A.   Yes.

12       MR. SPRINGER:  Your Honor, may I approach the

13  Elmo?

14       THE COURT:  You may.

15  Q.   (BY MR. SPRINGER)  Mr. Stilley, I put on the Elmo

16  what has been marked Government's Exhibit Number 675.

17  Have you seen that?

18  A.   Yes, sir.

19  Q.   Did you have anything to do with the number -- the

20  first item -- it says, "Cashier's check to Lea County

21  State Bank, Vikki Wiggins"?

22  A.   I didn't know anything about that.

23  Q.   When is the first time you met Mrs. Wiggins or heard

24  of her name?

25  A.   There is a small possibility that you mentioned her

OSCAR STILLEY - DIRECT BY MR. SPRINGER                    2502

1  name back during the time contemporaneously with the

2  transaction, I couldn't say for sure one way or another.

3  Otherwise, it would have been during this case.

4  Q.   You had nothing to do with $8,000 --

5          MR. SPRINGER:  Your Honor, is what I have on the

6  Elmo in front of the jury?

7          THE COURT:  It is.

8          MR. SPRINGER:  Thank you.

9          THE COURT:  And by the way, the ground rules are

10 that if you want the government's operator to show the

11 exhibit so that it's more easily seen, why, you can

12 certainly do that also.

13         MR. O'REILLY:  Your Honor, just for the record,

14 that was exactly the note I passed to Mr. Springer.

15         MR. SPRINGER:  Could you please pull up

16 Government's Exhibit Number 675, please.  Can you move it

17 over just a little bit for me.  Is that as far as you can

18 go?

19 Q.   (BY MR. SPRINGER)  Mr. Stilley, do you see line 2

20 where it also says, "Cashier's check, Bank of America,

21 Vikki Wiggins"?

22 A.   Yes, I do.

23 Q.   Did you have anything to do with that transaction?

24 A.   No, sir.

25 Q.   What about line 3, Ortho-Neuro Medical for 25,000?

OSCAR STILLEY - DIRECT BY MR. SPRINGER                    2503

1    Did you have anything to do with that transaction?

2    A.   I didn't have anything to do with any of the

3    transactions related to Ortho-Neuro or Phil Roberts, nor

4    did I have knowledge of it.

5    Q.   What about DVAT and James Lake?

6    A.   No, I didn't have anything to do with that.

7    Q.   Did you have anything to do with the Eddy Patterson

8    checks for $10,000 which, I believe, is line 7, 8, and

9    12?

10   A.   No, I didn't.

11        MR. SPRINGER:  Could you pull up Government's

12   Exhibit Number 676, please.

13   Q.   (BY MR. SPRINGER)  Mr. Stilley, do you see

14   Government's Exhibit Number 676?

15   A.   Yes, I do.

16   Q.   Did you have anything to do with the $17,500 listed

17   on line 1 to Lindsey Springer?

18   A.   No, I didn't have anything to do with any of these

19   checks that are up on the screen.

20   Q.   None of those ran through your IOLTA account?

21   A.   No, sir.

22   Q.   That is the same with the third transaction as well

23   to Dr. Roberts there listed 10,000?

24   A.   Yes, I didn't have knowledge about those things.

25        MR. SPRINGER:  Would you please pull up

1  Government's Exhibit Number 677.

2      Your Honor, may I approach standby for just a

3  second?

4          THE COURT:  You may.

5  Q.  (BY MR. SPRINGER)  Mr. Stilley, you have in front of

6  you Government's Exhibit Number 677.  Do you recognize

7  that?

8  A.  Yes, I do.

9  Q.  Can you just take a look at each of the items listed

10  there, 1 through 4, and tell the jury whether you had

11  anything to do with any of those transactions?

12  A.  No, that was -- no, that was not -- I didn't have

13  anything to do with those.

14  Q.  Now, Mr. Stilley, you did get money from Chippewa

15  Trails, did you not?

16  A.  I certainly did.

17  Q.  But the money listed on Government's Exhibit Number

18  677 did not come from those funds that you had received,

19  correct?

20  A.  Certainly did not.

21  Q.  And there's nothing here from the IOLTA account

22  either; is that correct?

23  A.  That is correct.

24          MR. SPRINGER:  Could you please pull up

25  Government's Number 678, please.  I need to get the

OSCAR STILLEY - DIRECT BY MR. SPRINGER                                    2505

 1   number.  Can you broaden it out a little bit to its
 2   original, without shrinking it down.  Yeah, right there.
 3   Q.   (BY MR. SPRINGER)  Now, Mr. Stilley, did you have
 4   anything to do with line 1 on Government's Exhibit Number
 5   678, Chippewa Trails to Bondage Breakers Ministries?
 6   A.   No, sir.
 7   Q.   Is that the same for -- is it the same answer for
 8   lines 2, 3, and 4 from Cynthia Hawkins?
 9   A.   That is correct.
10   Q.   Is it the same for 5?
11   A.   Yes, it is.
12   Q.   Now, on line 6 and 7, you are aware of those
13   transactions, are you not?
14   A.   Yes, sir, I am.
15   Q.   And, again, your testimony is that these
16   transactions were done at the direction of Eddy
17   Patterson?
18   A.   Yes, that's correct.
19   Q.   And would the same be for line 9, it says, "Ed
20   Bryson Corvette to Springer 37,000"?
21   A.   I had knowledge of that.
22   Q.   Were you directed by Mr. Patterson that you could
23   make that loan?
24   A.   Yes, certainly.
25   Q.   Did you contact Mr. Patterson before that loan was

1  made and ask him whether that was okay?

2  A.   I'm not sure who contacted who, but during a

3  conversation that came up, and I was directed to make

4  that disbursement.

5  Q.   You had permission from Mr. Patterson before you did

6  it; is that correct?

7  A.   More than permission.  I was directed to do it.

8  Q.   Now, as far as line 10 on Government's Exhibit 678,

9  do you know anything about that transaction from Michael

10  Burt?

11  A.   I don't know anything about that.

12  Q.   How about line 11 with Patrick Turner and $1,000?

13  A.   I didn't know anything about that.  Oh, wait a

14  minute, wait a minute.  Now, scratch that.  Let me look

15  at this again.  The -- no, the $1,000, I would not have

16  known about that.

17  Q.   Okay.  Is that answer the same, then, for line 11,

18  12, and 13?

19  A.   Can we make that a little bit bigger so I could see

20  that a little bit -- I'm sorry, that's a little small.

21  Q.   Okay.  I just lose the numbers is all.

22  A.   Okay.

23  Q.   I got you, I know what I can do.  Do you see line

24  11 -- excuse me, line 12, where it says, "Cynthia

25  Hawkins, $12,500"?

OSCAR STILLEY - DIRECT BY MR. SPRINGER                              2507

1   A.   I see that.

2   Q.   Do you have any knowledge of line 13 on Government's

3   Exhibit Number 678?

4   A.   Are you talking about Cynthia Hawkins?

5   Q.   Line 13.

6   A.   Or Carter Numismatics?

7   Q.   Yeah, I believe it was line 13, Mr. Stilley.  Can

8   you see line 13?

9   A.   Actually, I don't see the line.  If you go by the

10  exhibit on the other side, I can see the exhibit number.

11  Q.   Mr. Stilley, is there any other transaction on

12  Government's Exhibit 678 that you either have personal

13  knowledge of or that came through your IOLTA account?

14  A.   The only ones that I have personal knowledge of are

15  the ones that came through the IOLTA account.

16  Q.   Is that line 15 -- the cashier's check from Eddy

17  Patterson, which is Exhibit Number 33, 34, and 35?

18  A.   The ones that say, Superior Bank, Oscar Stilley

19  remitter on behalf of Eddy Patterson, those are the ones

20  that I have knowledge about.

21           THE COURT:  Mr. Springer, how much more do you

22  have on direct?

23           MR. SPRINGER:  Ten minutes.

24           THE COURT:  You may be seated.  Members of the

25  jury, we'll take our mid-morning break at this time.

OSCAR STILLEY - DIRECT BY MR. SPRINGER                    2508

 1   Since this is the first time, I'll give you the full

 2   version.

 3        You are not to discuss or investigate the case

 4   during this break or at any time before it's given to you

 5   for your deliberations and verdict nor are you to reach

 6   any conclusions about the case until it is given to you

 7   for your deliberations and verdict.

 8        We will resume at 15 minutes till eleven, again,

 9   guided by the clock on the wall.  So please be available

10   just a little before then for the security officer to

11   return with you to the courtroom.

12        All persons in the courtroom will remain seated

13   while the jury departs.

14        (JURY EXITS THE COURTROOM)

15             THE COURT:  Is there anything else we ought to

16   address before we take our mid-morning break?

17             MR. SPRINGER:  Yes, Your Honor.  Briefly, with

18   regard to the jury instructions that we were handed this

19   morning, we had a hearing on the record -- hearing last

20   night and I failed to raise an issue with regard to

21   materiality.  I had attached it to my motion that I had

22   filed giving the Court my proposal on venue, but I failed

23   to raise it last night and I didn't know what the Court

24   wanted me to do about that, whether I should wait till

25   the Rule 30 or what I should do.

OSCAR STILLEY - DIRECT BY MR. SPRINGER                                      2509

```
 1            THE COURT:  Well, no harm done.  And you
 2   certainly haven't waived anything.
 3            MR. SPRINGER:  Okay.
 4            THE COURT:  I'm going to have to think about
 5   this a little more.  I anticipate that perhaps about 15
 6   minutes, 15 or maybe 20 minutes short of the end of our
 7   lunch recess we will go on the record here without the
 8   jury for the parties to lodge their Rule 30 objections.
 9   My thought on that point is that obviously we've gone
10   over and over and over the instructions.  That's not a
11   criticism of anyone perhaps other than myself.  But I
12   only get one chance to get them right.  And so I think
13   perhaps the time is ripe now for the parties to lodge
14   their -- any final objections they may have.
15       Mr. O'Reilly, that brings an immediate frown to your
16   face.
17            MR. O'REILLY:  Your Honor, I apologize, Your
18   Honor.  I would ask that we do this, if possible, at the
19   end of the lunch hour rather than the beginning.
20            THE COURT:  That would be my intent.
21            MR. O'REILLY:  I'm sorry, I misunderstood.
22            THE COURT:  I wouldn't want to pass up the
23   chance to ruin anybody's lunch and so we'll do it at the
24   end of -- at the end of the lunch hour.  Court will be in
25   recess.
```

OSCAR STILLEY - DIRECT BY MR. SPRINGER                    2510

1          (A RECESS WAS HAD, AFTER WHICH THE FOLLOWING

2    PROCEEDINGS WERE HAD IN OPEN COURT AND WITHIN THE

3    PRESENCE AND HEARING OF THE JURY.)

4               THE COURT:  Mr. Springer, you may continue.

5               MR. SPRINGER:  Thank you, Your Honor.

6    Q.  (BY MR. SPRINGER)  Do you still have on the screen

7    678?

8    A.  Yes.

9    Q.  Do you see lines 15, 16, 17, and 18?

10   A.  Yes, I do.

11   Q.  And are each of those transaction listed

12   transactions that Eddy Patterson directed you to transmit

13   to Lindsey Springer?

14   A.  He directed me to transmit the sum of $90,000.  He

15   didn't direct me specifically how to do that.

16   Q.  Did you do what he asked you to do?

17   A.  Yes, sir.

18   Q.  Mr. Stilley, you have in front of you Government's

19   Exhibit Number 679.  Do you see that?

20   A.  Yes, I do.

21   Q.  Did you have any -- anything to do with the first

22   transaction listed?

23   A.  I can just help you out and tell you I didn't know

24   anything about any of these transactions on this form.

25   Q.  And none of these transactions came through your

```
 1   IOLTA account?
 2   A.   No, sir, certainly not.
 3   Q.   Mr. Stilley, do you see Government's Exhibit Number
 4   680?
 5   A.   Yes, I do.
 6   Q.   Do you know who Denny Patridge is?
 7   A.   Yes, I do.  Well, I didn't know him personally, but
 8   I know him.
 9        THE COURT:  Hold on just a minute.
10     (JUROR STOOD UP TO THROW SOMETHING AWAY.)
11        THE COURT:  You may continue.
12   Q.   (BY MR. SPRINGER)  Are you aware of the transaction
13   listed on line 1?
14   A.   No, I had no knowledge at all of that.
15   Q.   Is your testimony the same for line 2, 3, and 6?
16   A.   That is correct.
17   Q.   Do you know why there's no 4 and 5 there?
18   A.   I have no idea.  Well --
19        THE COURT:  Next question.
20   Q.   (BY MR. SPRINGER)  When you allowed -- excuse me,
21   scratch that.
22        Did you allow me to use your credit card?
23   A.   Yes, sir.
24   Q.   Did you ever ask me whether I had a credit card?
25   A.   Don't think so.  You may have told me.
```

OSCAR STILLEY - DIRECT BY MR. SPRINGER                    2512

```
 1  Q.   Did you think it was odd that I didn't have a credit
 2  card?
 3  A.   No.  No, it did not seem odd to me.
 4  Q.   Were you -- scratch that.
 5       Do you have any firsthand knowledge of any of the
 6  transactions that the government has identified that
 7  Lindsey Springer used your credit card for?
 8  A.   No, sir.  And the reason for that is I had someone
 9  else in my office that handled the finances and they went
10  over the statements and they only brought things to my
11  attention if they felt that it required my attention.  So
12  other than that, I would not have had occasion to know
13  about it or to look at it.  Well -- and I'm not saying
14  that I didn't look at my credit card statements, that's
15  not true, but I would simply look and see what was --
16            MR. SNOKE:  I object to the narrative form of
17  the answer.
18            THE COURT:  I think he's about through.
19  Overruled.
20  Q.   (BY MR. SPRINGER)  You may finish.
21  A.   I'm just saying that I'm not trying to tell the jury
22  that I don't look at my credit card statements.  That
23  wouldn't be the truth.  What I'm saying is --
24            THE COURT:  Okay.  Now, it's time for the next
25  question.
```

```
 1            MR. SPRINGER:  May I have just a moment, Your
 2  Honor?
 3            THE COURT:  You may.
 4  Q.  (BY MR. SPRINGER)  Mr. Stilley, out of all the
 5  transactions at issue in this case that you've seen --
 6  A.  Yes.
 7  Q.  -- is it true that only the transactions involving
 8  Turner --
 9            THE COURT:  Wait, wait, wait.  You've been doing
10  great on not leading, but I'm going to stop that one in
11  mid-question.
12            MR. SPRINGER:  Thank you.  May I have a second,
13  Your Honor?
14            THE COURT:  Plow up and plant over.
15  Q.  (BY MR. SPRINGER)  Other than Bolthouse, Turner, and
16  Patterson, are you aware of any other transactions that
17  came through your IOLTA account involving Lindsey
18  Springer?
19  A.  I couldn't think of any, no.
20  Q.  Do you have any knowledge of what Lindsey Springer
21  did with any of the money that you gave Lindsey Springer
22  from those transactions?
23  A.  Only to the extent that it's obvious from the -- for
24  example, where it shows where that the money went and it
25  was for a certain purpose.  In other words, if -- I would
```

```
 1  have knowledge that the check, for example, went to a
 2  certain car dealership.
 3          MR. SPRINGER:  No further questions, Your Honor.
 4          THE COURT:  Cross-examination.
 5          MR. SNOKE:  Your Honor, can I work from there?
 6          THE COURT:  You surely may.
 7          MR. SNOKE:  We're going to go off the Elmo, Pam.
 8                    CROSS-EXAMINATION
 9  BY MR. SNOKE:
10  Q.  Mr. Stilley, you said you read Irwin Schiff's book
11  in about 1983.  Is that what you said?
12  A.  No, it was either '86 or '87.
13  Q.  Whenever you read it --
14          THE COURT:  If you would, pull the microphone a
15  little closer to you, Mr. Snoke.  Thank you.
16  Q.  (BY MR. SNOKE)  Whenever you read it, sir, it -- you
17  said it convinced you that you didn't have to file
18  federal tax returns; is that correct?
19  A.  Yes, sir.
20  Q.  And I think you've testified that Mr. Schiff didn't
21  have anything in his book that said anything about the
22  Paperwork Reduction Act; is that correct?
23  A.  Well, don't hold me to that.  I don't remember
24  anything in the book about the Paperwork Reduction Act,
25  but I could be wrong.
```

OSCAR STILLEY - CROSS BY MR. SNOKE                    2515

1   Q.   In fact, Mr. Schiff's theories that at that time

2   that he wrote the book were that the filing of tax

3   returns was voluntary.  That was one of his theories,

4   wasn't it?

5   A.   Yes, sir.

6   Q.   And that income only included corporate profit.  It

7   did not include wages, salaries, and things of that

8   nature?

9   A.   Yes.  And, I mean, he went into detail to explain

10  his reasons for that, but that is a reasonably fair

11  summary of it.

12  Q.   Now, didn't Mr. Irwin Schiff himself file tax

13  returns with zero listed on the tax return?

14  A.   Well, at different times Mr. Schiff did different

15  things.  He did not file tax returns for a period of time

16  and then he decided that the proper thing to do was to

17  file zero returns, so he filed zero returns.  And,

18  actually -- well, I think that answers your question.

19  Q.   All right.  Were you aware then at the time that you

20  say now that you read the book in about 19 --

21  A.   '86 or '87.

22  Q.   '86 or '87.

23  A.   And that would have been in the spring of the year

24  during tree planting.

25  Q.   Were you aware that Mr. Irwin Schiff was convicted

OSCAR STILLEY - CROSS BY MR. SNOKE                                    2516

1   of tax evasion in 1985?

2   A.   I was aware at the time.  When I read the book, I

3   was aware that he had been convicted at that time.  And

4   I've later come to be aware that he has been convicted I

5   think twice more.

6   Q.   All right.  And before you read the book, Mr. Schiff

7   was convicted of willful failure to file for the 1974 and

8   '75 years; you were aware of that too?

9   A.   That's my understanding.

10  Q.   And you were aware that Mr. Schiff is currently

11  serving a 12-plus year sentence for a conviction he

12  suffered in 2005?

13  A.   My understanding is he's scheduled to get out, I

14  think, in 2016.

15  Q.   So at least three juries and courts and appellate

16  courts disagree with Mr. Schiff's theories; isn't that

17  correct, sir?

18  A.   Based on the evidence that was presented at those

19  trials, I cannot dispute the fact that the verdict of

20  conviction came back.

21  Q.   All right.  So you were unswayed by the convictions

22  of Irwin Schiff?

23  A.   Totally.

24  Q.   And you were unswayed by the convictions of the

25  defendants that you represented from whom we've heard

OSCAR STILLEY - CROSS BY MR. SNOKE                          2517

1   testimony in this case in which you raised such defenses

2   as the Paperwork Reduction Act and the -- and the

3   unnecessary -- the non-necessity of filing tax returns

4   under the law.  You're unswayed by the fact that any of

5   those things occurred; is that correct?

6              MR. SPRINGER:  Objection, Your Honor.  Which

7   case is he talking about?

8              THE COURT:  It's a compound question.  Why don't

9   you take those one at a time.

10             MR. SNOKE:  All right.

11  Q.  (BY MR. SNOKE)  You represented Dr. Roberts?

12  A.  Yes, sir.

13  Q.  Eddy Patterson?

14  A.  Yes, sir.

15  Q.  Mr. Swisher, you said?

16  A.  Yes, sir.

17  Q.  And in those cases, those -- in those cases, the

18  defendants -- you raised on behalf of the defendants

19  these type of defenses, did you not?

20  A.  Yes, sir.

21  Q.  And the juries in those cases as well as the juries

22  in Irwin Schiff's cases disagreed with you?

23  A.  They convicted, I would say that.

24  Q.  Got convicted.  And you also were aware of the --

25  you were also aware of the other -- the defendants that

1  you were also associated with, Mr. Burt and -- for a time

2  and the cases -- and the other defendants that were

3  represented by Mr. Berringer?

4  A.   Yes, sir.  Generally speaking.

5  Q.   You followed the outcome of Ouwenga when it -- after

6  you got out of the trial for Mrs. Ouwenga, did you not

7  follow the -- that trial and the outcome of that trial?

8  A.   Yes, sir.

9  Q.   And that was Mr. Berringer that represented

10  Mrs. Ouwenga?

11  A.   Yes, sir.

12  Q.   And Denny Patridge?

13  A.   Yes, sir.

14  Q.   And his trial and Mr. Burt, Michael Burt, and his

15  trial?

16  A.   Yes, sir.

17  Q.   And you followed the results of those?

18  A.   Yes, sir.

19  Q.   And the same defenses were raised by Mr. Berringer

20  in those cases that you were raising in Dr. Roberts and

21  Patterson and the other cases that you tried, are they

22  not?

23        MR. SPRINGER:  Objection, Your Honor.  He said

24  defenses.  He didn't say which defenses he was speaking

25  of.

```
 1            THE COURT:  Overruled.
 2            THE WITNESS:  I'm aware of the general nature of
 3   the defenses, but on those other cases, I would not be
 4   aware of the specific defenses in which defenses were
 5   actually presented based on the decisions between the
 6   attorney and their client.
 7   Q.  (BY MR. SNOKE)  You didn't discuss any of those with
 8   Mr. Springer then, the results of those trials for -- in
 9   the Ouwenga case or the Burt case or Patridge cases?
10   A.  That would be a false statement.  I did discuss with
11   Mr. Springer other cases, including but not limited to
12   those.
13   Q.  All right.  And if you didn't follow the results,
14   then surely Mr. Springer in his conversations with you
15   gave you the results of those trials and told you what
16   the defenses had been raised by Mr. Berringer in those
17   cases?
18   A.  I'm not denying that I kept my ear to the ground and
19   became aware of the results and often had at least some
20   general knowledge of the nature of the defense.
21   Q.  And the results of all those cases were that the
22   defendants were convicted; is that correct?
23   A.  That's not true.  Whitey Harrell was acquitted in
24   his case.
25   Q.  I'm sorry, who?
```

```
 1  A.   Whitey Harrell.
 2  Q.   All right.  Well, I didn't mention Whitey Harrell.
 3  I mentioned -- well, let's just keep it to the ones I
 4  mentioned then.  Mr. Burt was convicted, Michael Burt,
 5  correct?
 6  A.   Yes.
 7  Q.   Mr. Patridge was convicted?
 8  A.   Yes, sir.
 9  Q.   All right.  And Mrs. Ouwenga was convicted?
10  A.   Yes, sir.
11  Q.   Mr. Ouwenga was convicted too, but he wasn't
12  represented by -- he represented himself in that case,
13  did he not?
14  A.   That's my understanding.
15  Q.   All right.  Now, also there was Mr. Pizzino?
16  A.   Yes, sir.
17  Q.   You remember Mr. Pizzino testifying here.  Didn't
18  Mr. Pizzino testify that you and Lindsey Springer got him
19  off by telling the IRS that he had been misled by
20  following the advice of Irwin Schiff?
21  A.   You could -- you could couch it that way if you
22  wanted to.
23  Q.   All right.  Well, assuming that's what he said,
24  isn't that a contradiction in your philosophy that Irwin
25  Schiff -- Irwin Schiff's ideas you still hold and you
```

OSCAR STILLEY - CROSS BY MR. SNOKE                    2521

1   held at the time you dealt with in 2003 with Mr. Pizzino?

2   A.   No, sir.  I can explain if you ask.

3   Q.   How much have you been paid representing defendants

4   in concert with Mr. Springer beginning with Dr. Roberts

5   in 2000, sir?

6   A.   Substantial sums, but I could not, as I sit here,

7   tell you the total.

8   Q.   And most of these clients with the possible

9   exception of Dr. Roberts were steered to you by

10  Mr. Springer, were they not?

11  A.   Some were, some weren't.

12  Q.   And those would -- you had in addition to

13  Mrs. Ouwenga, Mr. Burt, you testified you also

14  represented Mr. Lake up -- up to a point before the

15  trial; is that correct?

16  A.   Yes, sir.

17  Q.   And as you said, Mr. Pizzino, a matter that was

18  handled before that was in the indictment in

19  Mr. Pizzino's case; is that correct?

20  A.   Yes, sir.

21  Q.   But you were paid money for that.  Mr. Lake paid you

22  money for what you did for him.

23  A.   I don't deny receiving payment.  And I think it's

24  actually in evidence, at least as to some.

25  Q.   Were you aware that Mr. Lake was also paying

OSCAR STILLEY - CROSS BY MR. SNOKE                                    2522

```
 1   Mr. Springer?
 2   A.   I didn't realize that at the time.
 3   Q.   Didn't Mr. Springer bring Mr. Lake to you?
 4   A.   May have.  I couldn't dispute that.
 5   Q.   He testified he got in touch with you through
 6   Lindsey Springer, did he not?
 7   A.   He may have.
 8   Q.   How about Mr. Burt?  Did Mr. Burt, Michael Burt,
 9   come to you through Mr. Springer?
10   A.   I couldn't say for sure on that.  To be frank with
11   you, it's a distinct possibility.
12   Q.   How about Mr. Bennett, Hamlet Bennett?  Did
13   Mr. Springer bring Mr. Bennett to you?
14   A.   No, sir.  Mr. Bennett found out about me on the
15   Internet.
16   Q.   How about -- how about identifying for the Court
17   what clients you recall that Mr. Springer did bring to
18   you?
19   A.   This is over a long time period and, to be honest
20   with you, I don't think that I could just go through and
21   say who was whose, and sometimes I didn't even know.
22   People would pick up the telephone and call me and I
23   might or might not later learn that Lindsey Springer told
24   me about that.  Obviously, I'm not denying that
25   frequently Lindsey Springer would have conversations with
```

OSCAR STILLEY - CROSS BY MR. SNOKE                              2523

 1  me about it, about representations.  Sometimes I would
 2  call him, sometimes he would call me, sometimes it just
 3  came up in some other conversation.
 4  Q.  Mr. Stilley, this working with the help of Lindsey
 5  Springer, working in partnership with Lindsey Springer on
 6  these cases that I've just gone through, some of these
 7  people we've just talked about, it was a very lucrative
 8  situation for you, wasn't it?
 9  A.  I would deny your use of the term "partnership,"
10  sir.  And as to the lucrative nature of it, there is
11  evidence in this case as to what Oscar Stilley was
12  charging and the jury can decide that for themselves.
13  Q.  And in these cases you're saying -- you're telling
14  us, the jury, that you didn't hire Mr. Stilley -- you
15  didn't have him as an employee --
16          THE COURT:  You mean Mr. Springer.
17          MR. SNOKE:  I mean, Mr. Springer, I'm sorry.
18  Q.  (BY MR. SNOKE)  You didn't hire Mr. Springer as an
19  employee; is that correct?
20  A.  No, I never hired him as an employee.  The only time
21  that I ever gave him money was for his services was the
22  dollar that I previously talked to you about.
23  Q.  Let's explore that a bit.  You testified that you
24  gave Mr. Springer a dollar so you could have him sit at
25  the counsel table with you in Mr. Swisher's case; is that

OSCAR STILLEY - CROSS BY MR. SNOKE                                2524

1   your testimony?

2   A.   That was my testimony.

3   Q.   All right.   Wasn't that kind of misleading the

4   Court, trying to tell the Court that he was an employee

5   so he should sit at the table, when he really wasn't an

6   employee?

7   A.   There certainly never was any intent to mislead the

8   Court.   And as a matter of fact, I was a little concerned

9   that maybe that last night that I had misremembered of

10  which case that was on and I went back and looked at the

11  transcript to see.   And the judge just flat out said,

12  Mr. Springer, with all the power, the DOJ against the

13  defendant, it's just fine for Mr. Springer to sit at

14  counsel table.

15  Q.   So you didn't -- as you testified yesterday, you

16  didn't pay Mr. Springer a dollar just so you could tell

17  the Court that he was actually an employee and could sit

18  at the table?

19  A.   I distinctly remember giving him the dollar, but I

20  could be mistaken that it was in that case.   It's not

21  apparent from the record in that case that that was

22  specifically when it happened.

23  Q.   Well, do you remember giving Mr. Springer a dollar

24  in some case, even if it wasn't Mr. Swisher's case?

25  A.   Distinctly, yes.

OSCAR STILLEY - CROSS BY MR. SNOKE                          2525

1   Q.   Okay.  But that wasn't for the purpose of fooling

2   the Court in that case?

3   A.   Absolutely not.

4   Q.   Why do it then?

5   A.   Simply for the purposes of satisfying the Court that

6   there's a basis to have Mr. Springer sit at counsel table

7   to assist.  I know what -- it sounds like you're implying

8   that there was an attempt to mislead the Court.  We were

9   always very open and up front about that and let the

10  Court make the decision.

11  Q.   And you told the Court that you had just given him a

12  dollar?

13  A.   That would be my recollection, yes.

14  Q.   Now, your first joint meeting with joint client was

15  Dr. Roberts I think you said was between you and

16  Mr. Springer?

17  A.   Yes, sir.

18  Q.   And that occurred in about March of 2000; is that

19  correct?

20  A.   No, it was 1999.

21  Q.   It was what?

22  A.   1999.

23  Q.   Oh, you actually met him in 1999?

24  A.   Yes.

25  Q.   Okay.  All right.  And when -- you met him with

OSCAR STILLEY - CROSS BY MR. SNOKE                          2526

1  Mr. Springer, you're saying, in 1999?

2  A.   Yes.

3  Q.   Oh.  All right.  And did he retain you and

4  Mr. Springer or did he ask you to represent him in 1999?

5  A.   Too much water under the bridge.  I couldn't say

6  that that was -- that there was any agreement at that

7  specific time concerning representation.

8  Q.   All right.  In Dr. Roberts' case, when he did get

9  indicted, did you and Mr. Springer jointly help him in

10  his trial?

11  A.   I would disagree with your statement of "joint

12  help."  I represented the client.

13  Q.   All right.

14  A.   Mr. Springer assisted me.

15  Q.   All right.  He assisted you, you're saying he was

16  not an employee, but he was assisting you, he was also

17  assisting the client?

18  A.   Could have been.

19  Q.   Could have been.  And you're saying that you didn't

20  know whether or not Dr. Roberts was paying Lindsey

21  Springer any money in connection with that case?

22  A.   I had no knowledge of the transfers.  I knew

23  generally, or thought I knew generally, had some idea

24  that he was a supporter of Lindsey Springer and agreed

25  with his purpose.  But as far as knowing when or how much

1  was paid, I had absolutely no knowledge of that.

2  Q.   And you're telling this jury that you had no

3  knowledge of the monies paid by Mr. Lake to Mr. Springer?

4  A.   Yes, sir.

5  Q.   With respect to Mr. Swisher, who you brought up

6  yesterday and we are discussing today, in that case,

7  whether or not it involved a dollar being paid to

8  Mr. Stilley -- I mean, to Mr. Springer, you also paid

9  some other money to Mr. Springer from your IOLTA account

10 in that case, did you not?

11 A.   Possibly.  Could you refresh my recollection on

12 that?

13 Q.   Because you -- Mr. Swisher was not amongst the

14 people that you just answered to counsel that you had

15 paid IOLTA account monies to?

16 A.   Well, I didn't think I did, but, I mean, if there's

17 -- if you --

18          MR. SNOKE:   All right.  Can we call up first

19 Plaintiff's Exhibit 91.

20 Q.   (BY MR. SNOKE)  This is a check that you received

21 from Mr. Swisher, is that correct, in connection with

22 representing him?

23 A.   Yes, sir.

24 Q.   $65,000 on June 27th of 2002?

25 A.   Yes, sir.

1  Q.   Okay.
2          MR. SNOKE:  If we can call up Exhibit 92.
3  Q.   (BY MR. SNOKE)  And the same day a $9,436 check goes
4  from your IOLTA account to Lindsey Springer.  Do you
5  recall that transaction?
6  A.   No, but I certainly don't deny that and that is my
7  handwriting.
8  Q.   Well, would Mr. Swisher have asked you to pay
9  Lindsey Springer that money on the same day that he
10 received his?
11 A.   That is distinctly possible.  That is distinctly
12 possible.
13 Q.   Now, counsel asked you and you went over with
14 counsel a number of the transactions that you entered
15 into with Mr. Patterson.  Do you remember Eddy Patterson?
16 A.   Yes, sir.
17 Q.   And his wife who testified.  I'd like to go over a
18 few of those transactions with you.  The first of which I
19 think you said that one of the transactions in which you
20 paid money out of your IOLTA account to Mr. Springer was
21 a $35,000 check that you issued to him.  Do you remember
22 that?
23 A.   Yes, sir.
24 Q.   And I think you said that that was -- I'm sorry, I
25 think you said that that was authorized by Mr. Patterson;

OSCAR STILLEY - CROSS BY MR. SNOKE                    2529

1   is that correct?

2   A.   Yes, sir.

3   Q.   And you did that in cashier's check form?

4   A.   I think that's correct.

5   Q.   And it was your understanding that Mr. Patterson

6   himself was going to get some of that money?

7   A.   I thought he was going to get all of it.

8   Q.   I'm sorry?

9   A.   I thought he was going to get all of it.

10  Q.   Why is it -- why is it that you didn't just issue

11  the check to Mr. Patterson?

12  A.   He was under indictment, had travel restrictions and

13  needed the money immediately, so he asked -- my

14  understanding was that he asked Lindsey Springer to make

15  a special trip over to Fort Smith, Arkansas, to pick it

16  up and take it back.

17  Q.   But you couldn't make it payable to Eddy Patterson,

18  you had to make it payable to Lindsey Springer?

19  A.   Well, if I had over-nighted it to Eddy Patterson,

20  obviously, I could make it payable to Eddy Patterson.

21  But my understanding is that he wanted it that day, which

22  would be the only reason for Lindsey Springer to spend

23  five hours driving to Fort Smith to pick it up and take

24  it back.

25  Q.   Unless Lindsey Springer kept the money?

OSCAR STILLEY - CROSS BY MR. SNOKE                2530

1   A.   My clients all had an understanding that when they

2   got the bill they were to go over it and to let me know

3   if there were problems with it and Mr. Patterson never

4   said anything that he had any problem about any of those

5   transactions.

6           MR. SNOKE:   Can we look at the $37,000

7   transaction.

8   Q.   (BY MR. SNOKE)   Now, that one you testified that

9   Mr. Patterson authorized a $37,000 loan to Mr. Springer

10  on that occasion?

11  A.   Yes.

12  Q.   All right.

13          MR. SNOKE:   I need -- and I don't find.

14  Q.   (BY MR. SNOKE)   Who told you -- who gave you

15  directions to handle the transaction in the way you

16  handed it?

17  A.   The 37,000?

18  Q.   Yeah.

19          MR. SNOKE:   Can we call up Government's Exhibit

20  --

21  Q.   (BY MR. SNOKE)   I'm sorry, did you have an answer

22  for that one before I move on?  The $37,000,

23  Mr. Patterson, you're saying, called and said he wanted

24  you to make a loan to Lindsey Springer in the amount of

25  $37,000; is that what occurred?

1  A.   I wouldn't be able to testify today who originated

2  the phone call or the precise specifics of that, but I

3  know that Mr. Patterson did direct me to make the loan.

4  Q.   All right.  You're not saying that Mr. Patterson

5  told you to make a cashier's check payable to Ed Bryson

6  for the purchase of a vehicle?

7  A.   No, certainly not.  He just directed that the loan

8  be made and left it up to, I guess, me and Mr. Springer

9  to work out the details.

10  Q.   All right.  And did you and Mr. Springer work out

11  the details?

12  A.   I asked him how he wanted it and he told me and so I

13  did it.

14  Q.   All right.  And what did he tell you how to handle

15  the transaction?

16  A.   He told me to do it exactly the way I did it, so

17  that's the way I did it.

18  Q.   Okay.

19       MR. SNOKE:  Let's look at Exhibit 102, please.

20  Call that one up.

21  Q.   (BY MR. SNOKE)  The bottom --

22       MR. SNOKE:  I'm sorry, let's go to 101, please.

23  The bottom check on 101 if we can call that one up.

24  Bottom transaction.

25  Q.   (BY MR. SNOKE)  And this is how you handled the

1  transaction, you wrote a check from the IOLTA foundation

2  to cash; is that correct?

3  A.   Yes, sir.

4  Q.   And then with that cash -- and, incidentally, this

5  is what shows up on your IOLTA bank account, isn't it, a

6  cash withdrawal or a withdrawal for cash?

7  A.   That looks to me like a check.  I thought I wrote

8  the check to purchase the cashier's checks.

9  Q.   Purchase the what?

10 A.   Cashier's checks.  I could be wrong, but this looks

11 like --

12 Q.   Yes, that's what I'm saying.  But if a third party

13 or an investigator was looking at your IOLTA account, it

14 would show a withdrawal, show this check as a check to

15 cash, that's all it would show; is that correct?

16 A.   Yes.  You would see what you see on the face and you

17 would see what you see on the -- well, what you call it,

18 the bank statements.  That would be what --

19 Q.   Doesn't say Lindsey Springer on there?

20 A.   No.  And Oscar Stilley wrote that check.

21 Q.   It doesn't say Eddy Patterson on that check?

22 A.   No, sir.

23 Q.   Doesn't say loan to Lindsey Springer on that check?

24 A.   No, sir.

25 Q.   All right.  Let's look at 102.  This is a cashier's

OSCAR STILLEY - CROSS BY MR. SNOKE                                    2533

1  check to purchase with the money from cashing the IOLTA

2  outgoing check that we just looked at?

3  A.   Yes.

4  Q.   And that you made payable at Mr. Springer's

5  direction to an Ed Bryson?

6  A.   Yes, sir.

7  Q.   And Mr. Springer's name is not on that check either,

8  is it?

9  A.   No, sir.

10 Q.   And then you presented that check to Mr. Springer,

11 that cashier's check; is that correct?

12 A.   Yes, sir.

13 Q.   And you -- did you discuss with Mr. Springer what he

14 was going to use it for?

15 A.   I couldn't say for certain about that.  I knew where

16 it was going.  I mean, I knew who it was payable to

17 certainly.

18 Q.   Talk about the $37,000 wire transfer in from -- into

19 your account from Mr. Patterson.

20 A.   Yes, sir.

21 Q.   In November -- around November 6th of 2003; is that

22 correct?

23 A.   We've still got the $37,000 instrument on the

24 screen.

25 Q.   Yeah, we can take that down.  I'm shifting to the

OSCAR STILLEY - CROSS BY MR. SNOKE                          2534

1   other check.

2   A.   Sure.  Let me take a moment.

3   Q.   Some other checks that came out of that

4   transaction.  And you testified on direct yesterday and

5   today about that transaction, the $37,000 and the efforts

6   that you put in on behalf of Mr. Patterson in getting

7   that settlement check.  Or that wasn't a check, it was a

8   wire transfer, was it not?  The $37,000 that came in, the

9   $37,059 that came in, came in by wire transfer, did it

10  not?

11  A.   Can you show that to me?  I'm sorry.

12  Q.   We can show 107.

13          THE COURT:  Are you referring to 37,000 or 375?

14          MR. SNOKE:  I'm sorry?

15          THE COURT:  What dollar amount did you --

16          MR. SNOKE:  Exhibit 107.  We can come down here.

17  Q.   (BY MR. SNOKE)  All right.  This is the copy of your

18  Arkansas IOLTA foundation trust account statement?

19  A.   Yes, sir.

20  Q.   And you see the entry down there for $37,059.90?

21  A.   That's why it didn't ring a bell.  It's 375 --

22  Q.   I'm sorry, 375,000, I'm sorry, my fault.

23  $375,059.90.

24  A.   Now, you've rang the bell loud and clear, yes, sir.

25  Q.   Okay.  And that's money that came in by wire

1  transfer?

2  A.   Yes, sir.

3  Q.   On the date indicated on that exhibit?

4  A.   Yes, sir.

5  Q.   All right.  And you testified, as I said yesterday

6  and earlier today, about the efforts that you put in on

7  Mr. Patterson's behalf that resulted in that buyout or

8  settlement, whatever it was, with the insurance company?

9  A.   Yes, sir.

10  Q.   And then there was a -- they paid -- the insurance

11  company paid the initial money to Hall Estill?

12  A.   Yes, sir.

13  Q.   Took out what they were owed and you were aware of

14  the balance that was coming -- both from discussions with

15  Hall Estill and with Mr. Patterson you were aware there

16  was going to be a balance that was going to be wire

17  transferred to your account; is that correct?

18  A.   Yes, sir.

19  Q.   And Mr. Patterson was giving you that money because

20  the trial was coming right up and he, at that point, owed

21  you some money; is that correct?

22  A.   Yes, for that and other reasons.

23  Q.   And he would owe you money if you followed through

24  and represented himself at trial?

25  A.   Yes.  And also it was a very hectic time of getting

OSCAR STILLEY - CROSS BY MR. SNOKE                                    2536

1   ready, prepared for trial with a lot of expenditures that

2   needed to be made promptly.

3   Q.   And he previously paid you some other monies that

4   you discussed also, the $212,500 amount had been paid to

5   you earlier by Mr. Patterson?

6   A.   Yes, sir.

7   Q.   And then you indicated that, I guess, on the next

8   day or at least the transaction --

9        MR. SNOKE:  You can leave that exhibit up, 107

10  up.

11  Q.   (BY MR. SNOKE)  -- that Mr. Patterson directed you

12  to pay $90,000 to Mr. Springer?

13  A.   Yes, sir.

14  Q.   All right.  And are you saying that he directed you

15  to pay $90,000 as a gift or donation to Mr. Springer?

16  A.   Yes, sir.

17  Q.   Did you hear Mr. Patterson say that he told you that

18  that was supposed to be a gift or a donation?

19  A.   In 2003, I certainly did.

20  Q.   You did?

21  A.   Yes, sir.

22  Q.   Okay.  Well, the jury will remember that.  Did

23  Mr. Patterson tell you to handle the transaction as you

24  had handled the -- in the manner in which you handled it

25  with cashier's checks and money orders?

1   A.   No, sir.  He simply directed that $90,000 be

2   transferred as a donation to Lindsey Springer and the

3   manner of providing it to Lindsey Springer was told to be

4   -- to me by Mr. Springer.

5   Q.   Mr. Patterson told you that he wanted you to pay

6   Lindsey Springer $90,000?

7   A.   To donate $90,000 to Mr. Springer.

8   Q.   All right.  And Mr. Springer told you how to break

9   up that transaction?

10  A.   Yes, sir.

11  Q.   All right.  And he directed you to do it in three

12  $20,000 cashier's checks?

13  A.   That's what Mr. Springer told me to do.

14  Q.   And 18 $1,000 money orders?

15  A.   Yes, sir.

16  Q.   Can you look at the entries there right after the

17  one we just looked at for the $375,059.90?

18  A.   Yes, sir.

19  Q.   And what does your IOLTA foundation trust account

20  show for anybody who happens to be looking at it for

21  payments to Lindsey Springer?  What does it show as to

22  this transaction?  Shows cash withdrawal four different

23  times there, does it not?

24  A.   Are you talking about the -- what are you talking

25  about?

1  Q.   This down here, these other entries that are

2  highlighted in yellow here, other than the $375,059.90.

3  A.   Are you talking about what my IOLTA shows or what

4  the bank statement shows?

5  Q.   Wait a minute.  I'll ask the questions here.  What

6  does the bank account show as to the carrying out of

7  getting Mr. Lindsey Springer $90,000 on November 7, 2003?

8  A.   You're looking at it.  That's it right there.

9  Q.   It shows cash withdrawal four different times,

10  doesn't it?

11  A.   Yes, sir.

12  Q.   It doesn't have Mr. Springer's name on there

13  anywhere, does it?

14  A.   No, sir.

15  Q.   Doesn't have Mr. Patterson's name on there for that

16  matter, does it?

17  A.   No, sir.

18  Q.   Doesn't indicate what the purpose of the payment was

19  to Mr. Springer on that occasion of $90,000?

20  A.   No, sir.

21  Q.   But that was not done with the intent of concealing

22  income going to Lindsey Springer, was it?

23  A.   Certainly not.

24  Q.   Counsel asked you about the statement you made to

25  the grand jury in March of 2009.  Do you recall those

1  questions?

2  A.   Yes, sir.

3  Q.   And what actually happened there, sir, was that you

4  brought in that document that we've referred to here as

5  "Response to Subpoena" and you brought in a number of

6  copies of that in response to the subpoena and you

7  presented that, which is, I believe, Exhibit 582.

8          THE COURT:  Was that a question?

9          MR. SNOKE:  I'm sorry.

10  Q.   (BY MR. SNOKE)  You presented that to the grand

11  jury; is that correct?

12  A.   Yes, sir.

13  Q.   Or copies of it?

14  A.   Yes, sir.

15  Q.   And enough copies that all the grand jurors could

16  have one; is that correct?

17  A.   Yes, sir.

18  Q.   All right.  And is this Exhibit 582 is that what

19  we're referring to here as your response to the subpoena

20  in that case?

21  A.   Yes, sir.

22  Q.   And on the -- and you started that by actually

23  reciting what the subpoena that you had received, asked

24  for in that case; is that correct?

25  A.   Yes, sir.

OSCAR STILLEY - CROSS BY MR. SNOKE                              2540

1   Q.   And the first item on there is "any and all client

2   billing records, contracts, description of services, fee

3   schedules, and estimates for services referencing the

4   name Lindsey Springer"?

5   A.   Yes, sir.

6   Q.   And then it says, "See attached Exhibit 1, two

7   pages"?

8   A.   Yes, sir.

9   Q.   All right.  If we can go back in there to -- it's

10  going to be the seventh page and the eighth page.  And

11  this is marked down in the lower right-hand corner

12  Exhibit 1; is that correct?

13  A.   Yes, sir.

14  Q.   And that's the first page of what you presented to

15  the grand jury that day in response to the subpoena

16  calling for any and all client billing records,

17  contracts, description of service, fee schedules, and

18  estimates for services referencing the name Lindsey

19  Springer?

20  A.   Yes, sir.  I mean, I think there's two pages.

21  Q.   All right.  Well, I'm going to show you the second

22  page.

23          MR. SNOKE:  Can we turn over to the next page,

24  please.  No, the next page after the one you were on,

25  which would be the eighth page of that document.  There

OSCAR STILLEY - CROSS BY MR. SNOKE                               2541

1  we go.

2  Q.   (BY MR. SNOKE)  All right.  Is that the -- is that

3  the second page of that?

4  A.   Yes, sir.

5  Q.   And that talks about Mr. Hawkins, Mr. Ouwenga,

6  Mr. Young, Pizzino, LaRuffa, Burt, Lake, and Roberts?

7  A.   Yes, sir.

8  Q.   Let's go back to the first -- the previous page,

9  please.  I didn't really go through those.  You've got

10 Logsden, Zokle, Henson, Patterson, and Swisher on that

11 first page?

12 A.   Yes, sir.

13 Q.   Now, with respect to that page and Mr. Patterson,

14 you have a number of entries there which include checks

15 in the amount -- or payments, I guess, in the amount of

16 14,539, 35,000, and 78,000; is that correct?

17 A.   Yes, sir.

18 Q.   And those -- and those -- the 35,000 we talked about

19 here, that was a check you said you gave to Lindsey

20 Springer to get it to Mr. Patterson?

21 A.   Yes, sir.

22 Q.   All right.  And the $78,000, is that the net amount

23 of the $90,000 that Mr. Patterson told you to give to

24 Lindsey Springer?

25 A.   Yes, sir.

OSCAR STILLEY - CROSS BY MR. SNOKE                                    2542

1   Q.   That you gave to him in the form of three $20,000

2   cashier's checks and 18 $1,000 money orders?

3   A.   Yes, sir.

4   Q.   All right.  When you were doing this and giving him

5   -- making cash withdrawals and converting it to cashier's

6   checks or money orders and then giving it to Mr. Springer

7   at his direction, you were aware that he didn't have a

8   bank account, were you not?

9   A.   Honestly, I didn't think about that, and I can't say

10  for certain, but I don't think I knew that at the time.

11  Q.   You weren't aware in 2003 that Mr. Springer was

12  dealing exclusively with a check cashing service for the

13  checks that you were giving him?

14  A.   I'm not saying for certain.  I'm just saying there

15  has been a lot of water under the bridge, and I don't

16  recall knowing that at the time.  I might have, but I

17  don't recall it.

18  Q.   Now, this list that you gave the grand jury there

19  was a little short on the facts as far as your -- as far

20  as your billing statements to Mr. Patterson in dealings

21  with Lindsey Springer, wasn't it?

22  A.   The way that I did that, I told Marcus Coker, who

23  worked for me, to go pull everything that had

24  Mr. Springer's name on it and put that together for me

25  and he did that.  And --

OSCAR STILLEY - CROSS BY MR. SNOKE                          2543

1   Q.   And then he gave it to you to review, did he not?

2   A.   Yes.

3   Q.   And you presented it to the grand jury?

4   A.   Yes.

5   Q.   All right.  Well, I see on there there's actually

6   two entries --

7           MR. SNOKE:  If we can come down here to the next

8   entry under what you have in yellow now.

9   Q.   (BY MR. SNOKE)  -- appear to be two entries on

10  7/7/03 for Mr. Springer, one down here at the bottom just

11  before we go on to Mr. Swisher.  Seem to be the same

12  thing.  But if we will look at some other exhibits here,

13  there seem to be a lot of entries there as to

14  Mr. Patterson that you did not include in it or

15  Mr. Marcus didn't, Marcus Coker, Mr. Coker.

16  A.   Yes.

17          MR. SNOKE:  Can we pull up Exhibit 189.

18  Q.   (BY MR. SNOKE)  Now, on Exhibit 189, there's an

19  entry there for September 25, 2003, teleconferences with

20  Lindsey Springer on all issues of the case on filing

21  another motion, asking for reconsideration of all old

22  motions, speedy trial, et cetera.  Do you see that entry

23  on Exhibit 189?  It's about the -- it's the third line on

24  the left there, September 25th.

25          MR. SNOKE:  Can we blow that up?

OSCAR STILLEY - CROSS BY MR. SNOKE                          2544

```
 1            THE WITNESS:  Excuse me.  I can see that.  Just
 2   give me -- thank you.
 3   Q.  (BY MR. SNOKE)  What I was suggesting is that that
 4   entry is the only one on Exhibit 189 that is listed on
 5   the report that you made to the grand jury.  If you look
 6   at Exhibit -- at the page over here, you'll see that same
 7   entry, 9/25 of '03, 2.1 hours for $262.50.  Do you see
 8   that?
 9   A.  Yes.
10   Q.  But as we go down Exhibit 189, we have also on
11   September 25th, working our way down Exhibit 189, call to
12   Lindsey about the motions he's working on, .2 hours, $25;
13   call to Lindsey about speedy trial strategy on renewing
14   motions or making new motions, .2 hours, $25; September
15   29th, about halfway down the page, call to Lindsey about
16   recusal and motions to file today, .3 hours, $37.50;
17   September 29th, calls to Lindsey and work on other
18   motion, old motion, one hour, $125; call from Lindsey
19   about motion by government for a status conference.
20            MR. SPRINGER:  Your Honor, I'd object.  Do we
21   have a question here?
22            THE COURT:  Are you going to put a question mark
23   at the end of that?
24            MR. SNOKE:  Yes, Your Honor.
25   Q.  (BY MR. SNOKE)  Do you see those entries?
```

1  A.   Yes, sir, and I don't dispute that those are my

2  billing records, neither do I dispute that that other

3  item is the item that was presented to the grand jury.

4  Q.   All right.

5           MR. SNOKE:   Let's pull up the second page of

6  Exhibit 189.

7  Q.   (BY MR. SNOKE)   Look at that page.   And on your

8  report to the grand jury in response to subpoenas, sir,

9  were there any -- any responses to that subpoena calling

10  for the records regarding -- billing records referencing

11  the name Lindsey Springer, are any of the ones on there

12  for October 9th through October 21st on the second page

13  of that exhibit, are any of those relayed on your report

14  to the grand jury?

15  A.   I don't see them there, no.

16  Q.   All right.   So we have in October, September and

17  October, on the report you made to the grand jury, an

18  entry on September 25th for $262.50 and an entry on

19  October 3rd for $37.50.   Are those the only two that you

20  reported to the grand jury then in response to the

21  subpoena on -- in March of 2006?

22  A.   I don't dispute that these documents say what they

23  say.

24  Q.   So on that one billing statement alone, you missed

25  about a dozen entries that would have fit the description

OSCAR STILLEY - CROSS BY MR. SNOKE                          2546

1   of what's called for by the subpoena; isn't that correct?

2   A.   I'm not disputing that those -- that the name

3   Lindsey Springer was showed -- showed up on that and that

4   it doesn't show up on the other one.  Can I take a look

5   back at the actual request?

6   Q.   You want to see the first page of this exhibit?

7   A.   Yes.  And I'm a little puzzled.  I'm just -- I'm

8   just being frank with you, I'm a little puzzled about why

9   this is this way.

10          MR. SNOKE:  Highlight Number 1.  And can we blow

11  it up rather than highlight it?

12  Q.   (BY MR. SNOKE)  Okay.  It says, "any and all client

13  billing records, contracts, description of services, fee

14  schedules, and estimates for services referencing the

15  name Lindsey Springer."

16  A.   Yes, sir.

17  Q.   To which you reply, "See attached Exhibit 1."

18  A.   Yes, sir.

19  Q.   And in the case of Mr. Patterson, you put down two

20  entries for the time period I've just gone over with you

21  where there are, in fact, probably 20.

22  A.   Yes, sir.  I'm not disputing that.

23  Q.   But you didn't do that to deceive the grand jury in

24  any way --

25  A.   No, sir.

1    Q.   -- about your association with Mr. Springer?

2    A.   Certainly not.

3    Q.   Let's go to -- do you agree that the response you

4    made to the subpoena is misleading to a grand jury?

5    A.   Well, I agree that it does not have the records that

6    I certainly would have thought should have been there and

7    I'm trying to -- I'm struggling to figure out why that

8    they didn't show up there.

9    Q.   Let's go to Exhibit 188.  Do you recognize Exhibit

10   188 as a billing statement to Eddy Patterson from your

11   offers for September time period, September 3rd through

12   September 4th -- 24th?

13           MR. SPRINGER:  Objection, Your Honor.  This

14   witness has said -- he didn't prepare these documents.

15           THE COURT:  Well, he can answer the question.

16   Either he does or he doesn't recognize it.  Go ahead.

17   Overruled.

18           THE WITNESS:  Yes, sir.

19   Q.   (BY MR. SNOKE)  And in that time period, looking at

20   your response to the grand jury subpoena, do you see any

21   entries in response to Query Number 1 in that subpoena,

22   at least Query Number 1 as you understood it and repeated

23   it in your response, covering the time period between

24   September 3rd and September 23rd of 2003?

25   A.   No, sir, I don't see -- I don't see any of those.

OSCAR STILLEY - CROSS BY MR. SNOKE                    2548

1    Q.  All right.

2           MR. SNOKE:  Can we call up starting with

3    September 4, 2003, call from --

4    Q.  (BY MR. SNOKE)  Do you see that on the Exhibit 188?

5           MR. SNOKE:  We can blow -- start -- blow some of

6    these up.

7    Q.  (BY MR. SNOKE)  All right.  Where are we?  September

8    4, 2003, under supervised document preparation, call from

9    Lindsey, he will start a motion concerning local counsel

10   .2 hours, $25; September 5th, call to Springer; further

11   down the page, September 5th, show cause motion to

12   Springer, calls to Springer.

13   A.  Yes, I see all those.

14   Q.  September 8th, call from Lindsey about continuance;

15   September 8th, call from Lindsey about 83.3; September

16   8th, call from Lindsey; September 8th, call from Lindsey,

17   he's heading to the courthouse.  Those entries on the

18   first page of 188.

19   A.  I see all those.

20   Q.  All right.  And on the second page of Exhibit 188,

21   and would you agree that there's two or three entries

22   there mentioning Lindsey Springer on that page in this

23   time period that does not show at all on the response to

24   the grand jury subpoena?  September 9th, call from

25   Lindsey about Friday, .2 hours; call to Lindsey, .2 hours

OSCAR STILLEY - CROSS BY MR. SNOKE                              2549

1   on September 10th; conference call with Springer and

2   Patterson, September 10th; call from Lindsey concerning

3   our to-do list, .2 hours; and on the third page of that

4   exhibit, about four more entries.

5   A.   I don't dispute that all those are there.

6   Q.   And none of those found their way -- do you agree

7   that none of those were on what you made as your response

8   to that subpoena?

9   A.   I don't dispute that.

10            THE COURT:   How much more do you have on cross?

11            MR. SNOKE:   Quite a bit, Your Honor.

12            THE COURT:   Very well.   You may be seated.

13   Members of the jury, we'll take our midday recess at this

14   time.   There's one matter that I need to address with the

15   parties before we get started with further testimony this

16   afternoon, so we'll take just a little longer recess than

17   we ordinarily do.   We'll resume at 25 minutes after the

18   hour.

19       Now, that may seem kind of leisurely, but there are

20   some matters that it's important for me to address with

21   the parties to get the case ready to be submitted to you

22   for your deliberations and verdict.   So please be

23   available just a little before 25 minutes after one to

24   resume promptly at 25 minutes after one.   And, of course,

25   during this recess, please remember my unusual

 1  admonition, which I will not repeat at this time.

 2      All persons in the courtroom will remain seated

 3  while the jury departs.

 4      (JURY EXITS THE COURTROOM)

 5          THE COURT:  Okay.  The jury has left the

 6  courtroom.  We'll start back up in the courtroom at ten

 7  minutes after one for the parties' final objections with

 8  respect to the jury instructions.  Anything else we ought

 9  to address before we recess?

10          MR. O'REILLY:  No, Your Honor.

11          MR. SPRINGER:  No, Your Honor.

12          THE COURT:  Court will be in recess.

13      (A RECESS WAS HAD, AFTER WHICH THE FOLLOWING

14  PROCEEDINGS WERE HAD IN OPEN COURT AND OUTSIDE THE

15  PRESENCE AND HEARING OF THE JURY.)

16          THE COURT:  We're here outside the presence of

17  the jury for the Rule 30 record on objections to

18  instructions.  I'll hear first from the government.

19          MR. O'REILLY:  Your Honor, with respect to --

20  I'm going to start with what's on page 20, which is an

21  instruction with respect to the non-testifying defendant.

22          THE COURT:  Yes.  That will either be testifying

23  defendant or non-testifying defendant, one or the other.

24          MR. O'REILLY:  And, Your Honor, there is in the

25  pattern instructions the language that would just be

1  added to the credibility of witnesses instruction.  And

2  that would be the government's recommendation is that the

3  testimony of the defendants should be weighed and their

4  credibility evaluated in the same way as that of any

5  other witness out of the Tenth Circuit pattern

6  instruction.

7            THE COURT:  Thank you.

8            MR. O'REILLY:  And then, Your Honor, I thought

9  we had addressed this before.  And if not, I apologize.

10  On page 35, which is the second page of the elements of

11  Count 1, the first paragraph, and it's the last line,

12  "and willfully acted in a manner that," and the Court has

13  "was dishonest," and I thought we had discussed and the

14  Court was going to put in the Hammerschmidt language,

15  which reads as I follow, "After any manner that" --

16            THE COURT:  Wait, wait, wait.  Where are you

17  now?

18            MR. O'REILLY:  The --

19            THE COURT:  Page 35.

20            MR. O'REILLY:  Page 35, the very first paragraph

21  and the last line, "and willfully acted in a manner

22  that."

23            THE COURT:  Are you reading to me from it?

24            MR. O'REILLY:  Yes, Your Honor.  Right now from

25  page 35.  I'm assuming I have the same page number.  It's

```
 1   the second page of the instruction for Count 1, elements
 2   of the offense.
 3           THE COURT:  Okay.  What does the very first line
 4   at the top of the page say.
 5           MR. O'REILLY:  The top of the page says, "To
 6   find a defendant guilty of" --
 7           THE COURT:  Okay.  Then what paragraph are you
 8   reading from?
 9           MR. O'REILLY:  The very first paragraph, Your
10   Honor, the last line of that paragraph.  And it begins
11   "and willfully acted in a manner that," and it says "was
12   dishonest," and I thought we had raised this and
13   discussed, and I don't think there was any objection from
14   the defendants, that we should include the full language
15   from the Hammerschmidt, which would instead read "and
16   willfully acted in a manner that involved deceit, craft,
17   trickery, or at least by means that were dishonest."
18           THE COURT:  Okay.  Well, that's on the
19   immediately preceding page.
20           MR. O'REILLY:  Okay.  And that's -- okay.
21   That's what my confusion was.  And I'm not sure why we
22   would have it differently here than -- it appears that
23   we're being inconsistent, Your Honor.
24           THE COURT:  Okay.  Let me read those two
25   paragraphs.  That language obviously was added at the
```

1   bottom of the preceding page.

2            MR. O'REILLY:  And, Your Honor, the government's

3   concern is, is that the intent must be with -- you know,

4   by deceit, craft, trickery, or at least by means that are

5   dishonest.  The act itself can be entirely legal of the

6   overt act.  And I don't want the jury to be confused that

7   the overt act itself --

8            THE COURT:  Well, what if that reads -- again,

9   over at the top of page 35 -- "knowingly and willfully

10  acted in the manner set forth in the preceding

11  paragraph"?

12           MR. O'REILLY:  The government would be fine with

13  that, Your Honor.

14           THE COURT:  Mr. Stilley -- or I'm sorry,

15  Mr. Springer?

16           MR. SPRINGER:  I would have no problem with

17  that, Your Honor.

18           THE COURT:  Mr. Stilley?

19           MR. STILLEY:  No, Your Honor, no problem.

20           THE COURT:  Okay.  Okay.  So that we're all

21  clear then, in the third line at the top of page 35,

22  beginning after the word "in," it will read "in the

23  manner set forth in the preceding paragraph."  Okay.

24      What else does the government have to say?

25           MR. O'REILLY:  Nothing, Your Honor.  That was

```
 1   it.
 2            THE COURT:  Okay.  I'll hear from the Defendant
 3   Springer.
 4            MR. SPRINGER:  I would start with page 29, but I
 5   believe it's to be Instruction Number 20 in regard to
 6   gift and minister.  And my objection, Your Honor, is to
 7   -- is, in general, to giving this instruction.  I believe
 8   the instruction before it adequately sets forth what
 9   Section 102 says of the tax code on page 28 defining the
10   word "income."  And I believe it is the -- under the
11   Duberstein decision --
12            THE COURT:  Okay.  We're not here for argument.
13   We're here just to state your objections.
14            MR. SPRINGER:  Okay.  My objection is I object
15   to the Court offering a gifts and minister instruction,
16   in general.
17            THE COURT:  That's noted.
18            MR. SPRINGER:  And then I also object to page
19   34, the venue instruction.  And you do not want me to
20   explain that again?
21            THE COURT:  Page 34?
22            MR. SPRINGER:  I'm sorry, no, Instruction 34,
23   which is going to be on -- mine aren't numbered, Your
24   Honor, so I'm sorry about that.  One second.  It was at
25   the very back if I remember correctly.  Yeah, it would be
```

OSCAR STILLEY - CROSS BY MR. SNOKE                                    2555

 1   page 53.  And my objection is only to the Counts 2, 3, 4,

 2   and 5 and 6 and the aider and abetter, but not to Count 1

 3   in that regard.  And I believe I also have an objection

 4   just to a phrase I believe dealing with willful failure

 5   to file.  Instead of saying "income tax return," it

 6   should say "U.S. individual income tax return."  And that

 7   would be -- I'm sorry, Your Honor.

 8            THE COURT:  That would be page 52?

 9            MR. SPRINGER:  Yes.  Yes, Your Honor.  Where it

10   would say -- every time it says to file -- "failing to

11   file the tax return," it should say "the U.S. individual

12   tax return" everywhere that phrase appears, because

13   that's the language right out of the grand jury

14   indictment.

15       And then my final objection, Your Honor -- well,

16   actually, there's two objections left.  I misspoke.  One

17   is there's no materiality instruction in the

18   instructions.  And I believe under Neder and the

19   subsequent Supreme Court cases, the false allegation must

20   be material and the jury must find that materiality.

21       And then I would also ask the Court involving the

22   verdict form that the Court give the jury a specific

23   interrogatory asking them, because this is a specific

24   item case, asking them to find the specific tax -- at

25   least out of the items that they claim are part of their

1    finding or a specific tax loss that they could be asked

2    to find.

3            THE COURT:  Very well.  I'm going to leave the

4    verdict form as it is.  And on a related subject, the

5    verdict form -- or one reason I'm very well satisfied

6    with the verdict form is that the instructions make it

7    unmistakably clear that the -- for instance, with respect

8    to Count 1, that the jury must unanimously concur on at

9    least one of the overt acts and they cannot pick and

10   choose some going for one and others going for another.

11   So that's abundantly clear from the instructions, which

12   leaves me quite content with the verdict form.

13       Now, very concisely, what says the government on

14   this issue of materiality?

15           MR. O'REILLY:  Your Honor, I believe the

16   elements as laid out by the Court adequately address

17   materiality.  I would have to take a look at the proposed

18   additional instruction, but I don't think there's an

19   issue on materiality in this case.

20           THE COURT:  Very well.  I take it that covers

21   everything either side has to say about the instructions

22   and the verdict form.

23           MR. SPRINGER:  No, Your Honor, I have one more

24   issue and it has to do with the overt act.  With the

25   overall alleged theory in the case versus the overt act,

```
 1  the jury must find was committed within this judicial
 2  district for venue.  And --
 3          THE COURT:  Now, I want you to object to
 4  specific instruction language, not argue.
 5          MR. SPRINGER:  Okay.  I would just then ask the
 6  Court to give the jury an instruction asking them to find
 7  the specific overt act or acts they agreed upon so that
 8  we could understand which act they found in this judicial
 9  district.
10          THE COURT:  Very well.  That will be denied.
11  We, obviously, are going to have to go either with a
12  testifying or non-testifying defendant, or perhaps both,
13  depending on how it unfolds.  So the final version will
14  have the draft language at the top of the first page
15  removed, it will be modified as needed to conform to the
16  status of the case based on whether both of the
17  defendants testify or not, and it will have the revision
18  we noted at the top of page 35.  Anything further?
19          MR. STILLEY:  Yes, Your Honor.  I just want to
20  make it clear for the record that I join in the
21  objections by Mr. Springer pursuant to Rule 30.
22          THE COURT:  That's understood.
23          MR. STILLEY:  Thank you.
24          THE COURT:  Court will be in recess subject to
25  call.  We'll bring the jury in.
```

OSCAR STILLEY - CROSS BY MR. SNOKE                                2558

```
 1          (JURY ENTERS THE COURTROOM)
 2              THE COURT:  Mr. Snoke, you may continue.
 3              MR. SNOKE:  Thank you, Your Honor.
 4   Q.  (BY MR. SNOKE)  Mr. Stilley, when we broke for
 5   lunch, we were talking about -- I was at least asking you
 6   questions about the -- what document you called --
 7   entitled "Response to Subpoena" that was presented to the
 8   grand jury in March of 2006.  Do you recall that?
 9   A.  Yes, sir.
10   Q.  And without going through the balance of the billing
11   statement documents for Mr. Patterson, would you agree
12   that there was dozens of Lindsey Springer billing entries
13   in those billing statements for Mr. Patterson that were
14   not mentioned on your response to the grand jury subpoena
15   for Mr. Patterson alone?
16   A.  Sir, there's a document that I would really need to
17   refresh my recollection about that.
18   Q.  All right.  We can go through them.
19   A.  No, no, no, no.
20   Q.  We had gone through a couple of exhibits before
21   lunch.
22   A.  I know what you went through.  The document that I
23   would need to refresh my recollection about this is the
24   attachment to the second subpoena.  If I could get that.
25              MR. SNOKE:  Your Honor --
```

1  Q.  (BY MR. SNOKE)  No.  The answer is at this point,

2  Mr. Stilley, you're going to be answering my questions.

3  A.  Sure.

4  Q.  And I don't know --

5           THE COURT:  Mr. Snoke, that will be quite enough

6  of instructions from you to the witness.  Now, when he

7  said he wants to refresh his recollection, you can either

8  let him do that or go on to the next question.

9           MR. SNOKE:  I'm going to go on and show him

10 these exhibits because we're talking about not the first

11 subpoena and not the second subpoena, but the first

12 subpoena.

13 Q.  (BY MR. SNOKE)  This response was to a subpoena that

14 was given to you prior to March of 2006 when you

15 appeared; isn't that correct?

16 A.  Yes, sir.

17 Q.  All right.  The subpoena you're talking about was

18 given to you for an appearance later on in the year,

19 September or October of that year; isn't that correct?

20 A.  Yes, sir.

21 Q.  All right.

22           MR. SNOKE:  Can we put up Government's Exhibit

23 582, please.

24 Q.  (BY MR. SNOKE)  Again, on the paragraph 1, I think

25 we established that this is your document you wrote in

OSCAR STILLEY - CROSS BY MR. SNOKE                    2560

1  paragraph number 1 at the top of that first page.  Can

2  you see that on the screen?  I know it's a little

3  smaller.

4  A.   Yes, sir.

5  Q.   You wrote what you understood the subpoena called

6  for that you were going in there to testify in front of

7  that grand jury in March of 2009; isn't that correct?

8  A.   I repeated what was on the subpoena, correct.

9  Q.   Well, and you took the language from the subpoena

10 and put it on this document before answering the

11 questions.  You went question 1, 2, 3 for the requests

12 that were on the subpoena; isn't that correct?

13 A.   That is correct.  And, actually, it was on the

14 attachment to the subpoena.

15 Q.   All right.  On the attachment to subpoena.  But this

16 is your understanding of what that subpoena requested?

17 A.   Yes, sir.

18 Q.   And I assume that you made it fairly accurate as to

19 what was actually on the request the attachment to

20 subpoena that you received?

21 A.   As I explained earlier, I told Marcus Coker to go

22 and search for Lindsey Springer.

23 Q.   I'm not asking you that, Mr. Stilley.  I'm asking

24 when you put this language on this document in paragraph

25 1, that language -- you copied that language from the

1   subpoena as best you could; is that correct?

2   A.   From the attachment, yes.

3   Q.   From the attachment to subpoena on it.  And then you

4   proceeded to put the answer in there that "See attached

5   Exhibit 1, two pages."

6   A.   Yes, sir.

7   Q.   Which we've been going over?

8   A.   Yes, sir.

9   Q.   All right.  Let's go to page 2 of that exhibit,

10  which is the -- going to be the eighth page, I think, of

11  the document.  All right.  Now, as I talked to you about

12  before, this page has other clients other than

13  Mr. Patterson which we talked about on the first page;

14  isn't that right?

15  A.   Yes, sir.

16  Q.   All right.  And this is in response to that inquiry

17  about any billing records for any client involving

18  reference -- or referencing, I think it said, Lindsey

19  Springer?

20  A.   Yes, sir.

21  Q.   And on -- as to Mr. Hawkins, there are three entries

22  there, the bottom of which is, I guess, numerically or

23  chronologically first, 11/20 of '02, .6 hours, $75?

24  A.   Yes, sir.

25  Q.   And that's the only entry for '02 that you gave the

1  grand jury that day in response to that subpoena request;

2  isn't that correct?

3  A.   Yes, sir.

4  Q.   As to Mr. Hawkins, that is.  All right.  And then

5  there's two entries for the 2003 year both in January,

6  January 13th and 14th, where it says call from Lindsey

7  Springer and a total of three references in response

8  given to the grand jury that day with respect to

9  Mr. Hawkins in answer to that inquiry; isn't that

10 correct?

11 A.   Yes, sir.

12 Q.   All right.

13        MR. SNOKE:  If we could pull up Exhibit 210.

14 Q.   (BY MR. SNOKE)  Mr. Stilley, this has been

15 identified and in evidence by Cindy Hawkins as a billing

16 statement that you sent her looks like the day after

17 Christmas of 2002 encompassing the time period before

18 that date in the year 2002.  Can you look at that and

19 there's a second page to that exhibit, I think.

20 A.   Yes, sir.

21 Q.   And is there a third page?  I think there's just the

22 two pages.  All right.  And look at that and go back to

23 the first page.

24        MR. SNOKE:  Can you blow up the first page?

25 Q.   (BY MR. SNOKE)  All right.  Can we agree,

1  Mr. Springer (sic), that there are considerably more

2  references to Lindsey Springer in that billing statement

3  than that one entry for the year 2002 that you placed on

4  the -- your response to the grand jury subpoena?

5  A.   It says what it says and I don't disagree.  I see

6  Lindsey, Lindsey, Lindsey Springer, Lindsey Springer.

7  That's what I see on that page.

8  Q.   All right.  Let's go to Government's Exhibit 211.

9  And let's go to the next page.  Next page of the exhibit,

10  please.  Mr. Stilley, you recall that Cindy Hawkins also

11  identified this exhibit as a -- as a billing statement

12  she received from you relative to billings for her

13  husband Arthur Hawkins beginning in January of 2003, it

14  should be, I think.  Although the first entry, couple of

15  entries on there say January of '02.  They probably are

16  some sort of an error.  But you would agree this covers

17  the period starting in January 2, 2002, with respect to

18  Arthur Hawkins?

19  A.   Well, actually, I would think that that would have

20  been -- should have been a 2003, but maybe --

21  Q.   Yes.  I'm saying you agree that it should be 2003,

22  I'm sorry, rather than 2002?

23  A.   Yes.

24  Q.   Yes, I'm sorry.  Looked like a misprint there on the

25  first couple of entries.

1  A.   Probably somebody just hadn't gotten used to the new

2  year, I would say.

3  Q.   Which happens to all of us, right?

4  A.   Yes.

5  Q.   Getting more to the point, will you look at that for

6  the references to Lindsey Springer in your billing

7  statement there to Arthur Hawkins?

8  A.   I see Lindsey, Lindsey.

9  Q.   January 3rd, call from Lindsey about handling the

10 attempt to collect against Chippewa Trails; January 4th,

11 call from Lindsey to discuss letter; couple of entries on

12 January 5th down there?

13 A.   Yes, sir.

14 Q.   All right.  And second --

15        MR. SNOKE:  Next page, please.  Next page,

16 please.

17 Q.   (BY MR. SNOKE)  All right.  And on this page

18 references to January 6th, call from Lindsey; January

19 6th, call to Lindsey about threat to Chippewa's dog;

20 January 6th, call from Lindsey regarding dealing with --

21 looks like --

22        MR. SPRINGER:  Your Honor, I would object.  Is

23 there a question?

24        THE COURT:  Sustained.

25 Q.   (BY MR. SNOKE)  Do you see the entries on here?

1   A.   Yes, sir.  And I'm not denying that any of those

2   were made.

3   Q.   All right.  And can we go on to the next page,

4   entries on that page also to Lindsey Springer.

5   A.   I see Lindsey -- I see Lindsey.

6   Q.   There's more than one reference to Lindsey on that

7   page as well, right?

8   A.   I see three references to Lindsey.  There's seven

9   references to Lindsey by my count.

10  Q.   All right.  Without going through all these

11  documents, I mean, the rest of the pages of this

12  document, would you agree, sir, that the response that

13  you gave to the grand jury in March of 2006 in your

14  response to subpoena document, Exhibit 582, that that

15  document misstated the number of contacts with Lindsey

16  Springer that were in your billing records for

17  Mr. Hawkins and Mr. Patterson?

18  A.   My recollection is that Mr. Coker did a search for

19  Lindsey Springer and therefore that these weren't picked

20  up and that the second subpoena was designed to remedy

21  that.  But if you could get me the document that I need

22  to refresh my recollection, I would much -- be much

23  obliged.

24        THE COURT:  That will be stricken as entirely

25  non-responsive.  The question is whether that document

OSCAR STILLEY - CROSS BY MR. SNOKE                          2566

1   misstated the number of contacts with Lindsey Springer.

2          THE WITNESS:  Yes.  It under-reported the

3   contacts with Lindsey Springer considerably.

4   Q.  (BY MR. SNOKE)  Which you're telling the grand jury

5   you didn't do that intentionally to mislead the grand

6   jury about how serious your contacts with Mr. Springer

7   were in this case?

8   A.   No, sir, I did not.

9   Q.   Mr. Stilley, before we broke for lunch -- strike

10  that.  Let me -- let me show you another exhibit here.

11  Exhibit 142.  I don't know, we might have to zero in

12  on each one of those individually.  I don't know.

13  Exhibit 142, it's in evidence, is -- no, start with the

14  one below that.  All right.  This is a $350 money order.

15  The next one below that, a $350 money order.

16         MR. SPRINGER:  Objection, Your Honor.  Is there

17  a question?

18         THE COURT:  You need to be sneaking up on a

19  question.

20  Q.  (BY MR. SNOKE)  Mr. Stilley, I want you to look at

21  these and answer the question for me, is why did you

22  receive $900 in money orders from Lindsey Springer in

23  April of 2000 as evidenced by Government's Exhibit 142,

24  two $350 money orders and one $200 money order?

25  A.   I'm not positive, but I think I may have loaned him

```
 1  some money.  I mean -- can you blow that up a little bit
 2  and see if there's anything on that?
 3  Q.  Do you want to zero in on them?  Is that what you
 4  said?
 5  A.  If there's something there that might refresh my
 6  recollection about what the reason is for these.
 7  Q.  Well, would you have been working with Mr. Springer
 8  on a case in April of 2000?
 9          MR. SNOKE:  May I have a moment, Your Honor?
10          THE COURT:  You surely may.
11  Q.  (BY MR. SNOKE)  I think we have the one that -- I
12  think we have the $200 one up there now.  It bears the
13  date April 17th of 2000.  Do you recall -- does that
14  refresh your recollection as to what you might have
15  received money orders from Mr. Springer for totaling $900
16  on that date?
17  A.  No, sir, sorry, I don't remember what that situation
18  was.
19          MR. SNOKE:  You can take that down.
20  Q.  (BY MR. SNOKE)  Mr. Stilley, I think I asked you
21  before lunch to identify the clients that you recall
22  getting from Mr. Springer.  Mr. Springer referred you
23  some clients, some of whom have testified in this case;
24  is that correct?
25  A.  Yes, sir.
```

1  Q.   Can you tell us the ones you remember getting from

2  Mr. Springer?

3  A.   The ones that I remember --

4  Q.   Clients that you received through Mr. Springer.

5  A.   I can't go back over nine or ten -- nine or ten

6  years and tell you how that my clients came to me.  Some

7  of them it's very clear, it's easy.  And others I just

8  don't have the memory to go back and give an accurate

9  list of who was associated with Lindsey Springer and who

10  wasn't.

11  Q.   Can you recall any of them?

12  A.   Well, there's some that it's clear --

13          MR. SPRINGER:  Your Honor, asked and answered.

14          THE COURT:  Overruled.

15          THE WITNESS:  There's some that it's clear and

16  we've already talked about some of them.  Now, if you've

17  brought up a name, then there's a good chance I might be

18  able to recall.

19  Q.   (BY MR. SNOKE)  In that -- continuing on in the

20  response to subpoena, sir, that you presented to the

21  grand jury in March of 2009.

22          MR. SPRINGER:  Objection, Your Honor.  I believe

23  it was 2006.

24          MR. SNOKE:  I'm sorry, 2006.  Can we call up

25  582?

1   Q.   (BY MR. SNOKE)  The second paragraph of that

2   response calls for any and all client billing records,

3   contracts, descriptions of services, fee schedules, and

4   estimates for services related to any work performed for

5   any client where Lindsey Springer helped, assisted,

6   consulted or provided advice.  Isn't that correct?

7   A.   Yes.

8   Q.   And that, again, was copied by you from the

9   attachment to the subpoena as accurately as you could

10  copy it, I gather; is that correct?

11  A.   Yes, sir.

12  Q.   And your answer there to that question was, "Lindsey

13  Springer does not charge for his services.  There are no

14  client billing records, contracts, descriptions of

15  services, fees, fee schedules, or estimates for services

16  with respect to any work or service performed by Lindsey

17  Springer in the possession of or available to Oscar

18  Stilley.  Therefore, there are no documents responsive to

19  this request."  That was your answer to that question?

20  A.   Yes, sir.

21  Q.   And in the Question Number 3, then, it goes on.

22  "Documentation of any money paid, given, transferred or

23  provided to Lindsey Springer for any purpose."  Which

24  again is copied from the request on the subpoena.

25  A.   Yes, sir.

OSCAR STILLEY - CROSS BY MR. SNOKE                                    2570

1  Q.  And your answer to that was, was it not, as follows

2  there on that document:  "In addition to the amount shown

3  in Exhibit 1 relating to donations to Lindsey Springer or

4  Bondage Breakers Ministries, the following amounts are

5  reflected on the records of the witness showing the

6  following transfers."  Whereupon, there are two columns

7  there in which you list various transfers in response to

8  that subpoena; is that correct?

9  A.  Yes, sir.

10  Q.  And then it continues, which, I guess, is your

11  wording, is it not, "These payments do not include wire

12  transfer fees, postage, shipping costs, or other payments

13  or expenditures made for the benefit of Lindsey

14  Springer"?

15  A.  Yes, sir.

16  Q.  All right.  Is there anywhere in here, sir -- any

17  reference to the Turner transaction?

18  A.  In -- the testimony has -- testimony concerning

19  amounts to Sam Snyder, which came from Mr. Turner.  Does

20  that answer your question?

21  Q.  So you told the grand jury in your testimony that --

22  about Mr. Turner?

23  A.  No, I never mentioned the name Mr. Turner.  I said

24  Sam Snyder.

25  Q.  All right.  And what did you tell the grand jury

OSCAR STILLEY - CROSS BY MR. SNOKE                                      2571

```
 1   about Mr. Snyder?
 2   A.   I was confused.  I thought money had come from Sam
 3   Snyder.  And, as a matter of fact, it went to Sam Snyder.
 4   Q.   Uh-huh.  And did you tell the grand jury in that
 5   transcript in the testimony that you had received -- you
 6   told them you received the $250,000 from Mr. Turner in
 7   your transcript -- I mean, in the testimony?
 8   A.   Yes, sir.
 9   Q.   But you attribute it to Mr. Snyder?
10   A.   Well, no.  And you can see from the transcript what
11   I attributed to Mr. Snyder.  But -- what's your question?
12   Q.   I asked you if you told the grand jury in your
13   testimony there that day that you received $250,000 from
14   Mr. Turner or Mr. Snyder if you thought it was from him
15   and then transferred it to buy a motor home, a Lexus, and
16   a trailer.
17   A.   I didn't testify about either the 192 or the $58,000
18   transfers.
19   Q.   I see.  So the answer, then, is you did not tell the
20   grand jury about any --
21           THE COURT:  Mr. Snoke, you've heard me say more
22   than once we have no off-the-cuff summaries of grand jury
23   testimony.  Next question.
24   Q.   (BY MR. SNOKE)  Mr. Springer -- you testified
25   Mr. Springer told you all the money he received was from
```

OSCAR STILLEY - CROSS BY MR. SNOKE                          2572

1   gifts and donations; is that correct?

2   A.   Except the loan from Turner, I believe that's

3   correct.

4   Q.   All right.  And are you saying that's why you made

5   the answer in your response to subpoena that Lindsey

6   Springer does not charge for his services?

7   A.   Well, I made that answer because I believe that

8   answer to be truth.

9   Q.   Now, you've been here throughout this trial and

10  heard the witnesses?

11  A.   Yes, sir.

12  Q.   And based on the testimony and evidence presented in

13  the case, have you changed your understanding of

14  Mr. Springer's --

15          MR. SPRINGER:  Objection, Your Honor.  Calls for

16  a legal conclusion.

17          THE COURT:  Pardon me?

18          MR. SPRINGER:  Calls for a legal conclusion.

19          THE COURT:  Overruled.

20          THE WITNESS:  My opinion has not changed in the

21  slightest.

22  Q.   (BY MR. SNOKE)  Did you keep detailed records of the

23  $250,000 deposit subsequent transfer of those funds from

24  Mr. Turner?

25  A.   Yes, sir.

1   Q.   But you didn't provide those to the grand jury in

2   response to this subpoena in March of 2006, did you?

3   A.   That's not on this -- the 192, 192,000 and the

4   58,000 are not on this that I can see anywhere.

5   Q.   Mr. Stilley, based on the testimony of the witnesses

6   in this case that Mr. Springer did charge for his

7   services, isn't it true that your representation to Brian

8   Shern in your January 20, 2006, interview and that your

9   representations to the grand jury in March of 2006 were

10  false?

11  A.   They were not false.

12          MR. SNOKE:  Pass the witness.

13          THE COURT:  Redirect.

14          MR. SPRINGER:  May I have just one moment, Your

15  Honor?

16          THE COURT:  You may.

17                  REDIRECT EXAMINATION

18  BY MR. SPRINGER:

19  Q.   What does the word "partnership" mean to you?

20  A.   Partnership -- partnership has a technical legal

21  meaning and generally when I hear that term, that's what

22  I apply to it.  It is a legal structure whereby some

23  person has a formal arrangement to do business together,

24  but it's not a corporation or other business entity.

25  Q.   Did you ever form a partnership with Lindsey

OSCAR STILLEY - REDIRECT BY MR. SPRINGER                    2574

1   Springer?

2   A.   Absolutely.

3          MR. SPRINGER:  Your Honor, may I use the Elmo?

4          THE COURT:  You surely may.

5   Q.  (BY MR. SPRINGER)  Mr. Stilley, could you pull up

6   Defendant's Exhibit Number 200, please.  And we'll turn

7   to the sixth page.

8   A.   Yes, sir.

9          MR. SNOKE:  Your Honor, we object to this

10  exhibit.  Well, it's not offered yet, I guess.

11         THE COURT:  Proceed.

12         MR. SNOKE:  The questions about it, however, is

13  beyond the scope of cross-examination.

14         THE COURT:  Overruled.  Proceed.

15  Q.  (BY MR. SPRINGER)  Mr. Stilley, have you seen what

16  is in the sixth page of what has been marked as

17  Defendant's Exhibit Number 200, please?

18  A.   Yes, sir.

19  Q.   Did you actually produce this specific page?

20  A.   I don't think that I did.

21  Q.   Do you know where this document came from?

22  A.   My understanding is that this -- this document was

23  received from Arvest Bank pursuant to subpoena.

24  Q.   Did you ever receive a copy of page 6 from Arvest

25  Bank?

 1            THE COURT:  This is Defendant's Exhibit 200?

 2            MR. SPRINGER:  Yes.  And it's the sixth page,

 3  Your Honor.  In that, it begins with a Form 1040.

 4            MR. SNOKE:  Your Honor, could we approach?

 5            THE COURT:  You may.

 6      (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND

 7  OUT OF THE HEARING OF THE JURY.)

 8            THE COURT:  Mr. Snoke, you're up.

 9            MR. SNOKE:  Your Honor, not only is it beyond

10  anything I got into, but we're getting into some

11  document, I guess, that he said he didn't -- he didn't

12  have anything to do with -- has nothing to do with the

13  case and it is getting us into the Paperwork Reduction

14  Act, I guess, submission.  I haven't heard any relevance

15  to this document.

16            THE COURT:  Okay.  The first question,

17  Mr. Springer, is what's the relevance of this document?

18            MR. SPRINGER:  Page 6 of it, this entire

19  document I gave to Mr. Shern, but I'm not trying to

20  introduce that, but because Mr. Snoke raised issues about

21  the $35,000 check which I did get from Mr. Stilley, I did

22  give to Mr. Shern on February whatever 2009, that this is

23  dated 7/21 of '03, it's the same day as the cashier's

24  check that was purchased for Tulsa Sales and Rental.  So

25  what I was going to do is have Mr. Stilley identify this,

```
 1  give it a separate exhibit mark, and move for its
 2  admission if he has seen the document before.
 3            THE COURT:  Well, page 6 of 200.
 4            MR. SPRINGER:  No, maybe it's page 5 there, Your
 5  Honor.  I'm sorry.
 6            MR. O'REILLY:  That is what you're --
 7            MR. SPRINGER:  No, no, no, just this document.
 8            MR. O'REILLY:  That's this.  That's already in
 9  evidence.
10            THE COURT:  This $35,000 check dated July 21st
11  is already in evidence, is it not?
12            MR. SPRINGER:  Okay.  I'll pull it up that way.
13            THE COURT:  Very well.
14            MR. SPRINGER:  If I could have just a second,
15  Your Honor.
16        (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,
17  WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE
18  PRESENCE AND HEARING OF THE JURY.)
19  Q.  (BY MR. SPRINGER)  Would you pull up Government's
20  Exhibit Number 26, please.  Mr. Stilley, do you recognize
21  Government's Exhibit Number 26?
22  A.  Yes, I do.
23  Q.  Would you please turn to Defendant's Exhibit Number
24  198?
25            MR. SPRINGER:  Which I do not believe has been
```

1  offered into evidence, Your Honor.

2  Q.   (BY MR. SPRINGER)  Do you see Defendant's Exhibit

3  Number 198, Mr. Stilley?

4  A.   Yes, I do.

5  Q.   Can you see what the name of that -- or what is

6  Defendant's Exhibit Number 198?

7  A.   That is the check for $30,000 payable to Tulsa Sales

8  and Rental.

9  Q.   And what is the date of that check?

10  A.   That is July 21, 2003.

11  Q.   And if you would look on your screen in front of

12  you, can you see Government's Exhibit Number 26 and tell

13  the jury what the date on that check is?

14  A.   July 21, 2003.

15  Q.   Have you seen Defendant's Exhibit Number 198 before?

16  A.   Yes, I have, on multiple occasions.

17  Q.   Did you produce Defendant's Exhibit Number 198?

18  A.   Yes.  I obtained that from my bank so that you would

19  have that available so that you could provide it to the

20  government.

21          MR. SPRINGER:  Your Honor, I move to enter

22  Defendant's Exhibit Number 198.

23          THE COURT:  Any objection?

24          MR. SNOKE:  I have no objection to 198.

25          THE COURT:  Defendant's Exhibit 198 is received.

1        MR. SNOKE:  Your Honor, excuse me.  If it's

2   already in evidence under the Court's ruling, we probably

3   ought to continue using the number --

4        THE COURT:  Well, the state of the record at

5   this point is that it's not already in evidence.  If it

6   is, we all need to be mindful of the fact that the ground

7   rules are that we refer to it by its original exhibit

8   number.

9   Q.  (BY MR. SPRINGER)  You testified in cross-

10  examination regarding a $37,000 loan; do you remember

11  that?

12  A.  Yes, sir.

13  Q.  Did Eddy Patterson give you permission to make that

14  loan?

15  A.  Yes, sir.

16  Q.  Did you do what he directed you to do?

17  A.  Yes, sir.

18        MR. SPRINGER:  Could you please pull up

19  Government's Exhibit Number 101, please.  Could you make

20  that a little larger, please, the whole thing.

21  Q.  (BY MR. SPRINGER)  Mr. Stilley, do you remember

22  being asked extensively about Government's Exhibit Number

23  101 on the bottom?

24  A.  Yes, I do.

25  Q.  Did you write this check?

1  A.   Yes, sir, that's my handwriting.

2  Q.   How come you didn't write on here "loan to Lindsey

3  Springer for Corvette from Eddy Patterson out of Tulsa,

4  Oklahoma"?

5  A.   It didn't occur to me to do that.  I kept those

6  records otherwise in my IOLTA records.

7  Q.   So anybody who would ask you about -- strike that.

8  I believe you were asked about how anybody who just

9  looked at this check wouldn't have known what it was for.

10 A.   Oh, yes, I would agree with that.

11 Q.   But you -- did you keep substantial records

12 involving this transaction?

13 A.   Yes, I kept the records that were required and

14 necessary for my purposes, so it would show whose balance

15 the money was taken from and where that the money went.

16 Q.   Did Brian Shern ever ask you about this $37,000

17 check?

18 A.   I don't recall any questions about that.

19        MR. SPRINGER:  Could you please pull up

20 Government's Exhibit Number 107, please.  Could you

21 please expand that just a little bit.

22 Q.   (BY MR. SPRINGER)  Mr. Stilley, do you remember

23 testifying in respect to Government's Exhibit Number 107?

24 A.   Yes, I do.

25 Q.   And do you remember specifically testifying with

1  regard to the phrase "cash withdrawal" that appears on

2  Government's Exhibit Number 107?

3  A.   Yes, sir.

4  Q.   Now, you didn't testify below that about transfer

5  withdrawal, did you?

6  A.   No, sir, I did not.

7  Q.   Now, could you tell the jury what transfer

8  withdrawal was on 11/14?

9          MR. SNOKE:  Your Honor, beyond the scope of

10  cross-examination.

11         THE COURT:  Well, I think it probably is.  I'm

12  going to hear it and then we'll take it one step at a

13  time.

14         MR. SPRINGER:  Thank you.

15         THE WITNESS:  Can you make that a little bit

16  bigger, by any chance?  Oh, you wouldn't be able to tell

17  anything about those transfer withdrawals either unless

18  you looked at some other document that actually

19  referenced it.  I wouldn't have any way to say what the

20  purposes of those transfers was.

21  Q.   (BY MR. SPRINGER)  And would that be the same for

22  the cash withdrawals on this document as well?

23  A.   Yes, sir.

24         MR. SPRINGER:  Could you please pull

25  Government's Exhibit Number 190 up, please.  And could

OSCAR STILLEY - REDIRECT BY MR. SPRINGER                    2581

1   you go to the second to the last page, please.  One page

2   -- I'm sorry, yeah, there you go.

3   Q.   (BY MR. SPRINGER)  Mr. Stilley, do you remember

4   answering questions during cross-examination regarding

5   Government's Exhibit Number 190 on the second to the last

6   page?

7             MR. SNOKE:  Your Honor, I asked the witness no

8   questions about Exhibit 190.  Beyond the scope of cross.

9             THE COURT:  Hold on just a minute.  Sustained.

10            MR. SPRINGER:  May I have a moment, Your Honor?

11            THE COURT:  You may.

12            MR. SPRINGER:  Could you please pull up

13  Government's Exhibit Number 191, please.  Second to the

14  last page, please.

15            MR. SNOKE:  Same objection, Your Honor, 191.

16            THE COURT:  That has not been mentioned in

17  Mr. Snoke's questions.

18            MR. SPRINGER:  May I?

19            THE COURT:  You surely may.

20  Q.   (BY MR. SPRINGER)  Mr. Stilley, do you remember

21  testifying in cross-examination with Mr. Snoke regarding

22  the $375,000 that you received from Hall Estill?

23  A.   Yes, sir.

24  Q.   Do you remember answering questions in regard to how

25  that appeared in your billing statement?

OSCAR STILLEY - REDIRECT BY MR. SPRINGER                    2582

1    A.    Yes, sir.

2    Q.    Do you remember answering or telling Mr. Snoke that

3    you were directed to give Lindsey Springer $90,000?

4    A.    Yes.

5    Q.    Do you also remember how much money you actually

6    gave Lindsey Springer?

7    A.    Yes, sir.

8    Q.    How much was that?

9    A.    90,000, precisely what I was instructed to give.

10   Q.    Do you remember testifying regarding three cashier's

11   checks for $20,000 and 18 money orders?

12   A.    Yes, sir.

13   Q.    Do you remember how much that totaled?

14   A.    78,000.

15   Q.    What happened to the other 12,000?

16   A.    My recollection is that was applied as a credit to

17   make up the difference between the 25,000 and the 37,000

18   that was previously loaned.

19   Q.    Would you have made a record in your billing

20   reflecting what you just said?

21   A.    Yes.

22   Q.    Would you please look at Government's Exhibit Number

23   191, please.

24         MR. SPRINGER:  I believe 191 is already in

25   evidence, Your Honor.  Could you please pull up 191 for

OSCAR STILLEY - REDIRECT BY MR. SPRINGER                    2583

1   me.

2   Q.   (BY MR. SPRINGER)  Do you have it in front of you?

3   On the second to the last page, does that reflect your

4   memory as far as how you recorded the $12,000 and the

5   $90,000 transaction?  One back.  One page back.  Does it

6   say November 7, 2003?  Could you read that to the jury,

7   please?

8   A.   Oh.  "Lindsey Springer, 90,000 less 12,000 LS owed

9   to IOLTA."

10  Q.   Who is LS?

11  A.   Lindsey Springer.

12  Q.   Now, if you did a word search for Lindsey Springer

13  on a computer, would it pull up LS?

14  A.   No, sir.

15  Q.   Mr. Stilley, did you testify that you had previously

16  given testimony to a federal grand jury?

17  A.   Yes, sir.

18  Q.   Could you look at Government's Exhibit 581.  Do

19  not -- and I'm not posting it.  Government's Exhibit

20  Number 581.

21  A.   Yes, sir.

22  Q.   If you would look at page 5.

23  A.   Yes, sir.

24  Q.   In answering a question regarding a subpoena, did

25  you say, now, sir, it's asking in the subpoena for

1   specific records pertaining to Lindsey Springer, did you

2   say that to the grand jury?

3   A.   Actually, I didn't.  That was the question and my

4   response was --

5   Q.   I'm sorry.  That is correct?

6   A.   Yes.

7   Q.   I'm sorry.  Would you turn to page 6, please.

8   A.   Yes, sir.

9        MR. SPRINGER:  May I have a moment, Your Honor?

10       THE COURT:  You may.

11       MR. SPRINGER:  Could you please pull up

12  Government's Exhibit Number 581.  Could you please turn

13  to the sixth page, please.

14  Q.   (BY MR. SPRINGER)  Mr. Stilley, do you recognize on

15  line 3 the question, "What cases have you worked with

16  Mr. Springer on"?

17  A.   Yes, sir.

18  Q.   Did you tell the grand jury that Lindsey Springer

19  and you did not work on any cases together?

20  A.   Certainly not.  I gave the response that I gave at

21  that point in time, which it's very clear, you can see

22  what I was saying.

23  Q.   Did you say, let me put it like this, just about any

24  time I have a case that involves tax and also if it

25  involves tax or securities, federal cases, you can just

1   about count on it that I'm going to discuss it with

2   Lindsey Springer?

3   A.   Yes, sir, I did.

4   Q.   Now, do you also remember answering Mr. Snoke's

5   question about Lindsey Springer does not charge for his

6   services?

7   A.   Yes, sir.

8   Q.   Could you please explain to the jury what the

9   difference is between Lindsey Springer doesn't charge for

10  his services and here where you were saying you work with

11  me all the time?

12  A.   Yes.  I didn't see any inconsistency with that

13  because that was the truth of the matter that you did

14  assist in cases, just as I testified here.  But at the

15  same time, my personal knowledge was that you helped

16  people who didn't give you any money, you helped people

17  that you didn't even know their name, and you also helped

18  people who had given you substantial contributions.

19  Q.   Would you please turn to page 8 of Government's

20  Exhibit Number 581.  Mr. Stilley, do you remember at the

21  time that you testified before the grand jury whether or

22  not you were moving your office?

23  A.   I said I had just moved.

24  Q.   Is moving your office a difficult job?

25  A.   Big job for me.

OSCAR STILLEY - REDIRECT BY MR. SPRINGER                    2586

1   Q.   Just to be clear, at the time you were moving, were

2   you also being asked to answer a grand jury subpoena?  Is

3   that correct?

4   A.   Yes.  And that was also about the time that I was

5   going to Russia to spend 30 days.

6   Q.   Would you turn to page 9, please.

7   A.   Yes, sir.

8   Q.   And in response to a question, "Where do you keep

9   those billing records," did you say "on a computer, I

10  have a server"?

11  A.   Yes, sir, I did.

12  Q.   Could you please turn to page 10?  Could you please

13  look at line 16 where it says, "Question:  Well, let's go

14  through here."  Did you answer and say, "It says any and

15  all client billing records, contracts, descriptions of

16  services, fee schedules, and estimate for services

17  referencing the name Lindsey Springer"?

18  A.   Yes, sir, I did.

19  Q.   At this grand jury meeting, did it become aware to

20  you that there was some confusion regarding compliance

21  with the grand jury subpoena?

22  A.   Yes, sir.

23  Q.   Could you please turn to page 13.

24         MR. SPRINGER:  May I, Your Honor?

25         THE COURT:  You may.

1  Q.   (BY MR. SPRINGER)  Was there some confusion at the

2  time that you were moving your office?

3  A.   Oh, yes.

4  Q.   Was it uncommon for you to ask Marcus Coker to

5  gather information for you?

6  A.   I would have asked him to gather that information

7  regardless of whether there was a move or any other

8  circumstance.

9  Q.   Did you direct Marcus Coker to go in and do a word

10 search on the phrase "Lindsey Springer" in your billing

11 records?

12 A.   Yes, sir, I did.

13 Q.   Did you ever ask him to do the initials "LS"?

14 A.   No, sir.

15 Q.   Did you ever ask him to do the word "Lindsey"?

16 A.   No, sir.

17 Q.   Could you turn to page 17, please.

18 A.   Yes, sir.

19 Q.   If you would look at line 15 of page 17.  Was there

20 a question asked of you, "All right.  So if the subpoena

21 was asking you to provide from January 1, 2003, through

22 the present, which we're saying is February 2006, all

23 those records of your business would be on the server

24 that you asked Mark -- Mr. Coker to run against," and did

25 you answer, "Correct"?

OSCAR STILLEY - REDIRECT BY MR. SPRINGER                 2588

 1  A.   Yes, I did.

 2  Q.   How did -- when you concluded your grand jury

 3  testimony on March 6, 2006, did they release you from

 4  your subpoena obligation?

 5  A.   Actually, what they said on page 30 was that, ladies

 6  and gentlemen, I think that we're going to have to

 7  reissue some additional --

 8          MR. SNOKE:  Your Honor, I object.  This is

 9  beyond the scope.

10          THE COURT:  Sustained.

11          MR. SPRINGER:  Will you please pull up

12  Government's Exhibit Number 142, please.

13  Q.   (BY MR. SPRINGER)  Mr. Stilley, do you remember

14  testifying regarding questions related to Government's

15  Exhibit 142?

16  A.   Yes, sir.

17  Q.   Have I ever given you money to hold for me?

18  A.   Certainly not.

19  Q.   Is it true that you just don't remember exactly why

20  I gave you money orders in April of 2000?

21          MR. SNOKE:  Objection, leading.

22          THE COURT:  Sustained.

23  Q.   (BY MR. SPRINGER)  Mr. Stilley, do you recognize

24  Government's Exhibit 142?

25  A.   I recognize the -- I see what's there.

1    Q.   If you know.

2    A.   I see a number of money orders.

3    Q.   You don't have any memory of these money orders, do

4    you?

5    A.   No, I don't.

6    Q.   Mr. Stilley, would you look at Government's Exhibit

7    582, please.  Do you recognize Government's Exhibit 582?

8    A.   Yes, sir.

9    Q.   Did you testify that you provided this document to

10   the government?

11   A.   Yes, sir.

12   Q.   Okay.  How come you didn't tell the grand jury what

13   each one of these transactions was for?

14   A.   I read the attachment to the subpoena and took that

15   to mean that I should list those off and then I would

16   come to the grand jury to answer any questions that might

17   arise out of it.

18   Q.   So you weren't asked if the subpoena to actually

19   produce the information about what these document -- or

20   what these transactions were for?

21   A.   I didn't take it that way.

22   Q.   Okay.  Mr. Stilley, do you remember --

23        MR. SPRINGER:  Please, if you would pull that

24   back up just a little bit wider.

25   Q.   (BY MR. SPRINGER)  I believe you testified you got

1  Sam Snyder and Pat Turner confused?

2  A.   Yes, sir.

3  Q.   Is Sam Snyder -- how do you know Sam Snyder as you

4  remember today?

5  A.   He was the seller of the recreational vehicle who

6  received the money that was the proceeds of the loan from

7  Mr. Turner.

8  Q.   Mr. Stilley, do you see the bottom entry, 12/12/05,

9  $40,000?

10 A.   Yes, sir.

11 Q.   Did that money come out of the $250,000 loan from

12 Pat Turner?

13 A.   My recollection is that that is correct.

14 Q.   Do you see the fourth from the bottom line, 9/19/05,

15 for 20,000?

16 A.   Yes, I do.

17 Q.   Did that money come from that loan?

18 A.   My recollection is the same on that one too.

19 Q.   Would your recollection be the same for the next two

20 entries on 11/9 and 11/29 of 2005?

21 A.   I think that's correct.

22 Q.   Do you, as you sit here today, know what Lindsey

23 Springer was doing or did do with those funds?

24 A.   As I sit here today, clearly, I know what those

25 funds were used for, at least as to the recreational

 1  vehicle.

 2  Q.   Mr. Stilley, would you pull back up to 581 again,

 3  please.

 4      (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND

 5  OUT OF THE HEARING OF THE JURY.)

 6          THE COURT:  Okay.  Unless I'm missing something,

 7  and this is your chance to tell me that I am, if I am,

 8  the only reason to go back to grand jury testimony is to

 9  pop him with inconsistent testimony or rebut a charge of

10  recent fabrication.  To go back and just cover facts that

11  he was not previously challenged on or to show that his

12  grand jury testimony was consistent with his in-court

13  testimony is not only improper, it's really killing

14  time.  So what's the purpose of this?

15          MR. SPRINGER:  Just to demonstrate that he did

16  testify about Sam Snyder.  And the jury can see that he

17  just got the name wrong.  But the rest of the information

18  he provided to the grand jury, which has been alleged to

19  be false, was, in fact, true.  That's the only reason why

20  I'm there.

21          THE COURT:  I'm going to give you about 30

22  seconds to cover that, then we're going to go on, but

23  that --

24          MR. SPRINGER:  I'm done on it.

25          THE COURT:  Okay.  And I want you to come to the

1    bench before you get out that grand jury transcript

2    again.

3            MR. SPRINGER:  Sorry, Your Honor.

4        (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

5    WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

6    PRESENCE AND HEARING OF THE JURY.)

7    Q.  (BY MR. SPRINGER)  Mr. Stilley, do you remember

8    testifying before the grand jury?

9    A.  Certainly.

10   Q.  Do you remember testifying on cross-examination of

11   Mr. Snoke that you got Mr. Snyder confused with

12   Mr. Turner?

13   A.  Yes, I did.

14   Q.  So is it safe to say that everything else you said

15   to the grand jury with respect to Mr. Snyder was, in

16   fact, what you meant about Mr. Turner?

17   A.  Yes.

18           MR. SPRINGER:  I have no further questions, Your

19   Honor.

20           THE COURT:  Any recross?

21           MR. SNOKE:  May I have a minute, Your Honor?

22           THE COURT:  You surely may.

23           MR. SNOKE:  Give me a minute, Your Honor, I'm

24   trying to --

25                    RECROSS-EXAMINATION

```
 1   BY MR. SNOKE:
 2   Q.   Mr. Stilley, do you have Plaintiff's Exhibit 581 --
 3   you don't have a copy, just have the screen in front of
 4   you; is that correct?
 5   A.   No, I actually have a copy so you can reference a
 6   page.
 7   Q.   All right.  Would you -- would you agree that
 8   Mr. Turner, by name, is not referenced anywhere in either
 9   your response to the subpoena or in your grand jury
10   testimony?
11   A.   I would agree with that.
12   Q.   Now, in answer to counsel's question, you said that
13   the -- Mr. Snyder -- you confused Mr. Snyder with
14   Mr. Turner in your testimony before the grand jury?
15   A.   Yes, I was confused about where the funds were
16   coming from as opposed to where they were going to.
17   Q.   All right.  Would you look at page 21 of the -- in
18   fact, let's start on page -- we can start on page 20 and
19   read over into page 21.  Actually, if you'll skip down to
20   line 21 on page 21.  Line 20 and 21 on page 21.  And on
21   line 19, do you see Sam Snyder mentioned there?
22   A.   Yes, sir.
23   Q.   All right.  Now, would you back up, please, a couple
24   of questions, and at the top of that page, on page 21,
25   there's a question about "and are they all part of this
```

1  escrow that you were holding all these four amounts?"

2  Which is why I started you actually on page 20.  But,

3  "Answer:  No, there was only $50,000 of an escrow.  There

4  was other monies that -- well, you could call the rest of

5  it -- no, it was not an escrow, it was money that was

6  held.  I think at that point in time, Lindsey was

7  thinking of someone going to want me to do some things

8  and so the money was put into my account.  And then later

9  I sent it to him."  "And you provided that -- who

10  provided you with the money, the $20,000 of September

11  19th?"  "I can't say for sure who did that."  "You don't

12  remember who provided you the $20,000 and that you

13  provided to Lindsey Springer?"  "He told me that I think

14  it may have been Sam Snyder.  There was a transfer of

15  money to my account."

16          THE COURT:  Please slow down, Mr. Snoke.

17          MR. SNOKE:  I'm sorry.  "There was a transfer of

18  money to my account.  I think that may have been Sam

19  Snyder.  I don't think it was a check.  I think it was a

20  wire transfer.  But he called me and told me that to

21  expect the money and the money would show up as he said."

22  "Did Mr. Snyder give you authorization to give this

23  $20,000 to Lindsey Springer?"

24          THE WITNESS:  No.  And the reason for that is

25  the money didn't come from Sam Snyder.  I was mistaken.

1    The money came from Mr. Turner.

2    Q.   (BY MR. SNOKE)  But you're talking about $50,000

3    here, Mr. Stilley, isn't that correct, on page 21?

4    Didn't you confuse Sam Snyder with the Bolthouse

5    transaction where you received $50,000 to hold and then

6    pay Mr. Springer?

7    A.   No, sir.  We were talking about different things,

8    but I never got confused about the Bolthouse situation

9    because it was $50,000 even that went out in an even

10   $50,000 amount when I was instructed to do that.  The

11   20,000 is entirely separate from the 50.

12   Q.   All right.  So you're saying this testimony on page

13   20, 21, and 22 of your grand jury transcript is what

14   you're referring to when you said that you really did

15   mention the transaction, but you got it confused with

16   Mr. Snyder?

17   A.   Yes, sir.

18   Q.   Who was actually the recipient of about a $116,000

19   cashier's check from you to buy the motor home?

20   A.   $166,000.

21   Q.   I'm sorry.  $166,000 check from your IOLTA account

22   to purchase a motor home?

23   A.   Yes, sir.

24   Q.   And that check and transaction came up nowhere in

25   either your responses to grand jury request -- response

OSCAR STILLEY - RECROSS BY MR. SNOKE                    2596

1   to the grand jury subpoena or in your testimony here

2   before the grand jury on March 9th of 2006; is that

3   correct?

4   A.   I think that's correct.

5          MR. SNOKE:  No further questions.

6          THE COURT:  You may step down.

7          MR. SPRINGER:  Your Honor -- oh.

8          THE COURT:  You may step down.

9          MR. SPRINGER:  Your Honor, I would call myself.

10         THE COURT:  Very well.

11              LINDSEY KENT SPRINGER,

12      (WITNESS SWORN AND AFFIRMED)

13         THE COURT:  Members of the jury, I'm going to

14  explain to you or elaborate just a bit on what you are

15  about to see and hear.  Obviously, as you know, these two

16  defendants have elected to represent themselves, as is

17  their right.  And having elected to do so, they certainly

18  do have a fair amount of leeway as to how they proceed

19  and how they will present their cases and their

20  testimony.

21      In this instance, Mr. Springer has elected to take

22  the stand and he has also elected to give his testimony

23  in the narrative form, if you will.  And, that, under the

24  circumstances, is also appropriate.

25      There may well be instances during Mr. Springer's

 1  narrative testimony in which he will be interrupted
 2  either by other parties or by the Court and you'll need
 3  to understand that it's because of the practicalities of
 4  giving testimony in narrative form that it may indeed be
 5  necessary for other parties or the Court to interrupt
 6  Mr. Springer as he proceeds.  I hope that the need for
 7  that is minimal, but we'll take it one step at a time.
 8      With that, Mr. Springer, you may proceed.
 9                   DIRECT NARRATIVE
10      MR. SPRINGER:  Thank you, Your Honor.  Thank
11  you.  First of all --
12      THE COURT:  Mr. Springer, you need to speak
13  where the mike can pick you up.
14      MR. SPRINGER:  I'm sorry.
15   First of all, my problems with the IRS began when I
16  was a corporate officer to One Stop Collision Repair
17  Center.  I had no money, but I had connections.  And a
18  man with money began a corporation and he and I together
19  tried to make money in 1987.
20   For a year and a half, I did everything I could.
21  The company lost money and the CPAs who owned -- who were
22  helping do the books on the corporation, they decided
23  that it would be better to treat the money that I lived
24  on as a loan than as income, because the company had not
25  only lost money, but an organization called Progressive

1   Acceptance Corporation had pled -- or had filed

2   bankruptcy, over $100,000 of which was owed.

3        This became devastating to the corporation.  As a

4   result, there was a decision to close that corporation

5   down.  And I'm at this point in my life -- I'm born in

6   1965, twelfth-grade-educated, I'm just trying to find a

7   way just to survive and take care of my family at this

8   point, and I believed I had an opportunity to do that and

9   I took it.

10       When the company lost its money, the other corporate

11  -- the person who helped me start the corporation decided

12  he did not want to put any more money in the

13  corporation.  So over a period of three or four months,

14  we decided to close that corporation down, and we went

15  from 35 employees to five.

16       The company closed, but there was issues related to

17  taxes that still remained with the corporation.  And as a

18  result of that, me being a corporate officer, I was sent

19  letters to that address, which had been closed down,

20  telling me that I was liable as a corporate officer for

21  withholding taxes that the other corporate officers were

22  actually involved in withholding.

23       And thinking I had no money, it didn't make sense to

24  me that they would come after me when they could go after

25  the person who actually funded the corporation from Fort

1   Smith, Arkansas, and his name was Vernon Pittman.

2       As a result of these transactions -- and, yes, I did

3   have a lawyer that I could contact, his name was Grant

4   Cheadle.  Currently, he's Cheadle & Associates.  And I

5   went to him and I said, what do I do, the IRS is asking

6   for me to be held liable for $100,000.  And he told me

7   anything he could do, I could do; just go meet with the

8   IRS and work it out.  And I did that.

9       I went in, I sat across the table from an agent by

10  the name of Reginald Terry.  And Mr. Terry went through

11  all of my books and records, found out that -- concluded

12  that I was not the one who withheld the money from the

13  pay.  Never told me that there was another law, which I

14  now know is Section 6672, that I could be held liable as

15  a corporate officer under a penalty provision, where they

16  penalize corporate officers for liabilities of the

17  corporation.

18      Didn't have any money, so I didn't know what to do.

19  He had concluded I had no money.  He told me everything

20  was fine.  Just next time you have more than five

21  employees in any business that you're associated with,

22  you need to get the IRS involved.  I took him at his

23  word, I went on with my life, a very slow process.

24      By 1990 and '91, I had met -- which you met my

25  second wife, which is -- her name is now Regina Carlson.

1  I had divorced in 1989 from my first wife.  You need to

2  know that the reason why I got married is because my

3  first wife got pregnant and because I didn't want her to

4  have an abortion and because she told me that she would

5  if I didn't marry her -- actually, she said she wanted an

6  abortion and I then said, Well, if I married you, would

7  you go ahead and have the child?  And she said yes.

8      So I got married not really understanding what

9  marriage was.  And over a period of time, within a couple

10  of years, we had another child on the way, I was going

11  through this corporation battle with the IRS on whether I

12  was liable or not, and that tore apart that marriage.

13      To this day, as you could tell, I hope you could

14  tell, that she and I remained and have a wonderful

15  relationship in raising two children, which was the

16  ultimate goal, if we were not able to succeed together.

17      I then met and married Regina Carlson.  And had no

18  clue that the IRS was getting ready to come after me on

19  this 6672 penalty, because they had told me they were not

20  coming after me.

21      As a result of this, my then-wife, Regina, got

22  pregnant.  A day before she had Clayton, my third son, I

23  get a call from an agent by the name of Terry White.  She

24  tells me that she is reopening an audit on me and this

25  corporation.  And I was shocked.  But I was, Okay, what

1    would you like me to do?  She told me come in on Monday.

2    She said, Bring your records.  I said, I don't have the

3    records.  Mr. Terry never gave me those records back.  I

4    said, Do you have access to his file?  She said no.  She

5    said -- I said, Well, can you contact him?  She said,

6    he's no longer with the agency, we can't have any contact

7    with him.

8         Thinking as I would at that time -- well, I told her

9    I could go to the bank and I would get copies of all the

10   bank records and I would come in on the Monday that she

11   asked.

12        Now, at this time, I did not know my wife-at-that-

13   time's water was going to break that night.  The

14   following Thursday, Clayton was born.  On Friday morning,

15   I was at the bank.

16        And when I got to the bank, I went straight to the

17   person I knew.  And it was Triad Bank, and the vice

18   president there was David -- and I forget the last name

19   at the moment, and I'm sorry.  But he said that the IRS

20   had been there on Thursday with the summons and he had

21   already gathered all of the records.

22        So I decided that although I was a little

23   frustrated, I wondered why they didn't tell me that, if

24   they wanted me to go to the bank and get the records.

25        I decided on Monday morning to go on into the

1   meeting with the IRS.  I sat down with them, but I

2   brought a witness with me, because I just wanted to be

3   sure that there was no -- nothing wrong going on or

4   something underhanded.  I didn't really quite

5   understand.  I had never been through it before and -- so

6   this is what I chose to do.

7        When I sat down in the room, Mrs. White said, Now,

8   Mr. Springer, did you go to the bank and get the records

9   that I asked you to get that you said you would get?

10       And I turned to her and I said, I don't know what

11  game you're playing, but that game just stopped right

12  here.  I don't know how long you've been doing this, but

13  you're not going to do it to me.

14       And from that moment on, she said, Don't get

15  hostile.  I said, I will not get hostile, but you're

16  going to be honest with me.  If you expect me to turn

17  square corners with you, you need to turn square corners

18  with me.  She asked me to leave.

19           MR. O'REILLY:  Objection.  If Mr. Springer could

20  make it clear who is making what statement.

21           MR. SPRINGER:  The agent's name that I met with

22  on that Monday was Terry White.  There is a Reginald

23  Terry that originally I had contact with, an audit, and

24  then there's a Terry White.

25       And at this time, I didn't know what to do.  I was

1   really kind of at a loss.  My mother is a CPA.  She was a

2   business manager at Hall & Hall School for 36 years.  She

3   didn't know what to tell me to do.  My family has

4   economist majors.  Everyone in my family has gone to

5   college but me.  And not knowing what to do was not the

6   answer I was looking for.

7        So I began to ask questions and I met some people

8   who were not CPAs but seemed to have an understanding

9   about something that was wrong with the IRS.  No way can

10  I at that time connect what I was going through with what

11  they were telling me.

12       The first thing that got my attention was the

13  instruction booklet that had just came out in January of

14  1993 that the IRS had published.

15       And if you'll bear with me, I have to go back and

16  forth in exhibits to do this.

17       The first thing I ever read in relationship to this

18  -- or to my relationship with the IRS after this moment

19  was a note from the Commissioner of the IRS in the 1992

20  instruction booklet.  And it said, "As the Commissioner

21  of the Internal Revenue, I want to thank you on behalf of

22  the government of the United States and every American

23  citizen.  Without your taxes, we could not provide

24  essential social services, we could not defend ourselves,

25  we could not fund scientific and health care research.

1    Thank you for paying your taxes.  You are among the

2    millions of Americans that comply with the tax law

3    voluntarily."

4        And just a couple of pages over -- actually, the

5    next page over in the 1992 instruction booklet, there was

6    a Privacy Act and Paperwork Reduction Act notice.  And

7    I -- at this time, I wasn't willing just to accept the

8    first page what these people were showing me, I've got to

9    go look at the rest of the story, was the way that I

10   approached it, because I was now learning something.  I

11   had never read the instruction booklet.

12       I asked my mother, she had never read the

13   instruction booklet.  It was just shocking to find out

14   that people who we would think were aware of all this

15   information, in fact, they weren't going -- they weren't

16   going by -- or their knowledge wasn't based upon

17   instruction booklets.

18       And the very next page said, "Privacy Act and

19   Paperwork Reduction Act notice."  And that, again, got my

20   attention.  And it said to me -- the Privacy Act of 1974

21   and the Paperwork Reduction Act of 1980 say that when we

22   ask you for information, we must first tell you our legal

23   right to ask for the information, why we are asking for

24   it, and how it will be used.  We must also tell you what

25   could happen if we do not receive it and whether your

1  response is voluntary, required to obtain a benefit, or

2  mandatory under the law.

3      Now, this seemed to me to be contradictory in some

4  degree to the Commissioner's note where it said that

5  you're being thanked for voluntarily complying with the

6  tax law.

7      And as I went further, just a couple more pages

8  in -- and, actually, it's page 6 of Defendant's Exhibit

9  Number 16, which is the instruction booklet for 1992, it

10 actually has a phrase that says "Filing Requirements" on

11 it.  And it says the rules under "Do I have to file?"

12 And that completely contradicted "thank you," the phrase

13 from the Commissioner, to me, at least the way I thought,

14 that I was being thanked for voluntarily complying, and

15 here I am being told I have to do something.

16     And it said, on the Commissioner's letter, "Thank

17 you on behalf of the government of the United States and

18 every American citizen."  But when I got to Section 2, it

19 said that this rule applied to all U.S. citizens and

20 resident aliens.  At the time, I did not know there was a

21 difference between a United States citizen and the United

22 States of America citizen.

23     For instance, as I learned, a person who lives in

24 Puerto Rico doesn't live in one of the 50 states, a

25 person who lives in the District of Columbia doesn't live

1   in one of the 50 states, and when you look at the stars

2   on the flag, there are 50 stars on the flag, but Puerto

3   Rico wasn't represented.

4          MR. O'REILLY:  Objection as to relevance, Your

5   Honor.

6          THE COURT:  Overruled at this point.

7          MR. SPRINGER:  From here, I began -- I went to

8   church.  I was at the time attending Grace Fellowship

9   Church.  And I went in and I sat down with an associate

10  pastor and I asked him, what should I do?  What would God

11  have me do?  And he told me -- before he gave me the

12  answer, he said, Lindsey, you used to have trouble with

13  marriage -- or if you had trouble with marriage, you

14  would go to a marriage counselor.  Now, you would go to

15  Jesus.  If you -- you used to have health problems, you

16  would go to a doctor.  Now, you go to Jesus.

17      And I asked him, Well, what should I do when I have

18  tax issues with the IRS?  And he said, You need to go

19  hire an accountant and a lawyer for that.  And I had

20  already been to that road and now I was being told there

21  was no answer for me here either.

22      So I began to meet with people in Tulsa, Oklahoma.

23  I met several people.  There was actually a group of

24  people, hundreds, in fact.  And at the beginning of the

25  meetings, I would just sit in the back room and listen.

1  But pretty soon I started asking questions, questions

2  that other people had that wanted to ask but they just

3  didn't have the voice or didn't want to actually ask it.

4       And this led in 1993 to me meeting a man by the name

5  of Jerry Richey, who was a pipefitter, eight-grade-

6  educated, rheumatoid arthritis.  His testimony was, as I

7  met him, as he came to speak to 300 people at a library

8  in south Tulsa, his testimony was that he was bedridden

9  and that they couldn't figure out why he had rheumatoid

10  arthritis.  He said that the Holy Spirit spoke to him and

11  asked him if he would go out on a mission.  And if he

12  agreed to do it, he said, there's something that he

13  thought would be able to heal him.

14       They eventually found out that he had mercury

15  poisoning in his mouth, that the mercury fillings were

16  leaking into his mouth and that was causing him to have

17  the rheumatoid arthritis.  University of Indiana pulled

18  his teeth out; I met him four months later.

19       And what he said to me and the others in the room

20  made perfectly good sense, that it's time that we start

21  understanding why the tax system is something that is out

22  of control and -- from his perspective.  My perspective

23  was I did not agree I should be held liable for something

24  I did not do.

25       In early '93, I received a tax lien notice from the

 1    IRS.  I received a notice of a federal tax lien dated

 2    December 29, 1993, for 6672 penalties totaling $103,898.

 3    And I later learned that I had a right to object, but

 4    because the business had closed down and they had sent

 5    whatever notice I had a right to that address, that my

 6    time to respond to that notice had expired and now,

 7    therefore, I owed the money, and that the only way that I

 8    could ever challenge this money they said I owed was if I

 9    paid it first, which was just not an option, absolutely

10    not an option.

11        And so -- and the address that the IRS used on

12    Defendant's Exhibit Number 179 was 1718 Timberton in

13    Sapulpa, Oklahoma.  The address of the corporation that

14    was -- I was held liable for the 6672 penalties on that

15    notice was 5943 East 13th Street, and that becomes very

16    important very soon.

17        I began traveling basically across the country,

18    there's no doubt that I'm -- people have said I'm

19    charismatic, I'm passionate about what I believe or what

20    I say.  Doesn't mean I'm perfect.  In fact, it means

21    quite the opposite.

22        And, in 1994, there was approximately 800 of us and

23    we all had different problems with the IRS.  Some of them

24    were income tax; some of them were like me; some of them

25    were issues that they didn't even understand.

1        And eight lawsuits were filed in six different

2   federal -- in six different states in federal court, and

3   the basic premise of that lawsuit was how is it

4   voluntary?  And if it is voluntary, we don't want to

5   volunteer anymore if the result is that we all end up

6   owing money we'll never be able to pay back.

7        And by about mid-1994, the IRS had decided that they

8   were going to levy me.  They went into a bank account --

9   and this was the second time they had done this.  The

10  first time they had done it, in 1990, to One Stop

11  Collision Repair Center, Inc.'s checking account, which

12  left several checks outstanding and I had to go one by

13  one and try to make those checks good.

14       The second time they were making it personal through

15  this lien that they had filed and they cleaned out a

16  checking account again.

17       They also -- I believe you will remember the

18  testimony of my then-wife Regina Carlson where she

19  testified about how she remembered that they had came in

20  and levied us.

21            MR. O'REILLY:  Objection, Your Honor.

22  Ms. Carlson made no such statement in her testimony.  She

23  testified she didn't remember any bank account they ever

24  had.

25            THE COURT:  The jury will recall the testimony.

1    You may proceed.

2          MR. SPRINGER:  She did not remember the checking

3    account, but she did remember they came in and took all

4    the furniture from the house, that they had taken the

5    cars.  As a matter of fact, I believe she said they left

6    only my brand new baby's furniture in his room.  All

7    right?

8          And what had happened was we were trying to serve a

9    lawsuit in Oklahoma City on the IRS.  There was 80 -- I

10   believe there was 82 of us in Tulsa who had all joined in

11   one lawsuit.  And at that time, service of process on the

12   United States could be perfected through the U.S. Marshal

13   Service.

14         The United States Marshal Service was hired to serve

15   that lawsuit, and Oklahoma City stalled accepting -- the

16   District Director's Office in Oklahoma City stalled

17   accepting service, got a levy together, had a judge in --

18   a United States judge in this district, in the Northern

19   District, sign a levy to come into my home and take

20   everything that the government decided that they wanted

21   to take.  Three days later, they finally accepted service

22   in Oklahoma City.

23         By -- within a couple of weeks, we had received some

24   furniture that people had that was extra and we started

25   over again.  This would be the third time I actually had

1   started over.

2        But I continued.  I wanted an answer to the question

3   in the complaint.  I wanted to know how I could be held

4   liable and why that number was so high and, really,

5   basically, how I even got in that situation.

6        And by September of 1994, the Court -- a district

7   judge in the suit that we had brought made me the

8   spokesman for the group when we would come into federal

9   court for hearings and that was something that the Court

10  did with the consent of everybody involved.

11       We actually convinced the Court to enter -- with the

12  government's agreement -- to stop collecting any property

13  or taxes from anybody in the lawsuit.

14       The first time -- we were told by Robert Metcalf

15  with the U.S. Department of Justice, it was the first

16  time that had ever happened, that the government was

17  restraining itself.

18            MR. O'REILLY:  Your Honor, objection.  I would

19  request a limiting instruction that statements that

20  Mr. Springer is referring to are offered not for their

21  truth but for his state of mind.

22            THE COURT:  Members of the jury, in this

23  narrative, you have heard Mr. Springer quote statements

24  made out of court by other individuals.  That obviously

25  implicates a rule that you've heard us refer to known as

1  the "hearsay rule."  Sometimes those statements are

2  testified to for the purpose of relying or establishing

3  the truth of the matter asserted by the out-of-court

4  individual; sometimes they're not.

5      In this particular instance, you are instructed that

6  I'm permitting Mr. Springer to refer to Mr. Metcalf's

7  statements not to establish the truth of the matter

8  asserted, but for whatever impact those statements, when

9  made, and if made, may have had on Mr. Springer's chosen

10  course of action.

11      You may continue.

12          MR. SPRINGER:  Thank you, Your Honor.

13      In an order dated September 22, 1994, the Court

14  said, "On September 19, 1994, the telephone conference

15  was held.  Present for plaintiffs is Mr. Lindsey

16  Springer, the contact person for all party plaintiffs,

17  while Ms. Carolyn Jones appears for the government.

18  Ms. Jones indicated that the government is willing to

19  'suspend all non-vital enforcement proceedings against

20  all party plaintiffs during the course of this litigation

21  provided plaintiffs individually agree not to transfer,

22  encumber, alienate, conceal, or otherwise affect the

23  current status of their assets."

24      Now, soon after, Ms. Jones was removed from the case

25  and Mr. Robert D. Metcalf took over in the case.  And

1  eventually this case in Oklahoma was dismissed.

2  Mr. Metcalf came in and argued that because we had not

3  filed treasury claims obtaining a waiver of sovereign

4  immunity of the United States, which is their legal right

5  to do, that the Court could not reach our claims, so each

6  of us went in, as the Court instructed, and we all filed

7  treasury claims.

8      And we spelled out in our treasury claim exactly

9  what we had put in our complaint; therefore, anything we

10  put in the treasury claim we could then sue in federal

11  court once we obtained a waiver of sovereign immunity.

12      The government of the United States, where we had

13  been told to serve those claims, they decided to remain

14  silent.

15      We had learned that after six months a silence by

16  the United States is a waiver of sovereign immunity.  So

17  after the six months expired, we filed a second lawsuit.

18  This time we brought in our claims that we had filed,

19  attached them to our complaint, and then Robert D.

20  Metcalf for the United States Department of Justice, he

21  came in representing the United States, and he actually

22  filed an answer -- instead of a motion to dismiss, he

23  actually came in and said we deny or we admit to each of

24  our allegations.

25      And the district court eventually decided to reject

1   his answer, find that there still was no waiver of

2   sovereign immunity.

3       And then the district court gave what I considered

4   to be a turning point in my walk in this area, which

5   was -- the Court said we needed to be mindful that we are

6   not able to revoke previously given testimony.  The

7   consideration was that if you sign a tax form and you

8   swear under penalty of perjury, this is my income, these

9   are my expenses, or whatever, that you can amend it, but

10  you could not revoke it.  You basically could not say you

11  never did it.  You could change it, but you couldn't

12  revoke it.

13      And the premise of the lawsuit was based upon a word

14  that we found on the 1040 form and -- for the 1992 1040

15  form, there was the word "label" that appeared three

16  times in one square inch on the Form 1040.  It appeared

17  by itself.  It appeared in the sentence "label here" and

18  used the IRS label.

19      I really wouldn't have thought much about that until

20  somebody actually brought out a Black's Law Dictionary

21  and showed me what the definition of "label" was.  And it

22  said, "Appended to a greater writing as a codicil."  I

23  didn't know what a "codicil" was.

24      So then they had at one of the meetings a definition

25  of a "codicil" and it said, "A codicil is a supplement to

 1   a will that can explain, modify, add to, subtract from,

 2   qualify, restrain, or revoke provisions in an existing

 3   will."

 4       And this is what led to the judge in the federal

 5   case, which I agreed with him, once I --

 6            MR. O'REILLY:  Objection.  Mr. Springer needs to

 7   state that that is his belief that's why the judge did

 8   something.

 9            THE COURT:  Sustained.

10            MR. SPRINGER:  It is my belief that when the

11   judge stated to us that we could not revoke previously

12   given testimony, that that was very accurate.  There were

13   many people that were in the lawsuit who did not agree,

14   but I did.

15       I believe if you're going to amend a tax return,

16   that's different than trying to say you never filed it,

17   or stated statements on it.  This is the way I construed

18   those words meaning.

19       So as of 1996, I had spent a lot of time reading

20   briefs, cases, traveling all over the country.  I believe

21   my ex-wife, Regina, testified I was rarely home, and it

22   wasn't because I didn't want to be home.

23       While I was traveling, my son -- my third child,

24   Clayton, got a DPT shot -- I'm sorry -- and five days

25   later he was almost dead.  Had I been there, I would have

```
 1   asked what they were putting in my son.  I didn't know

 2   that the pertussis part of that shot could do what it

 3   did.

 4          MR. O'REILLY:  Your Honor, I apologize, but

 5   Mr. Springer needs to speak into the microphone.

 6          MR. SPRINGER:  I'm sorry.

 7       And in each instance, including that one, I kept

 8   moving forward.

 9       Beginning in 1993, I started referring to what I was

10   doing as Bondage Breakers Ministries.  It was always just

11   Lindsey Springer, but based upon my affiliation with

12   church, whether you had a food ministry, that you needed

13   to have a name, something that people could associate you

14   with beyond your name.  And I didn't make the name

15   Bondage Breakers Ministries up.  That was given to me.

16       In 1996, I turned a different direction.  I had

17   listened to these people who were very intelligent, had

18   lots of education, something I did not have, and each one

19   of them was starting to complain about why they couldn't

20   get any answers to their questions.

21       I never got past the 1992 booklet about how it could

22   say "thank you for doing this voluntarily" and then "but

23   you have to do it."  It was a contradiction.  It didn't

24   make sense.

25       And if I was the only one that thought that, I would
```

LINDSEY SPRINGER - DIRECT BY MR. SPRINGER                    2617

1   never have said a word, but there were people who had

2   eight years of education who I was meeting with who were

3   seeing the same thing, and some of them would pay the

4   taxes that they would owe, some of them would file

5   returns, some of them wouldn't file returns, but,

6   together, they all were trying to get something changed.

7        I had spent three years in the TU Law Library, so if

8   I wasn't on the road -- and after I got home, I was down

9   reading one case after another, whether the government

10  would give it in a pleading, whether another case would

11  come out that would be something that would attract my

12  attention to the issues -- I didn't have the tools that I

13  have today.  Today, we can do word searches.  We can find

14  anything that has ever been uttered in any case in the

15  last 200 years.  If it's published and on the Internet or

16  in a database, we can find it.  So we know those little

17  differences that may have been hidden opinions back in

18  the '90s are no longer hidden, something that electronics

19  has helped us with.

20       I began in 1996 to further investigate the Paperwork

21  Reduction Act.  I had read cases like the Dole decision

22  from the Tenth Circuit -- I mean, from the Supreme Court

23  and --

24       Your Honor, may I get a Kleenex?

25            THE COURT:  You may.

1          MR. SPRINGER:  You've heard me ask questions

2    during this trial about what my ministry's mission is.

3    And, at first, I didn't know what that mission was or

4    what it meant.  I just thought I wanted to change

5    things.

6          Eventually, I learned that it was to get rid of the

7    IRS.  Not to get rid of income taxes or other taxes.  But

8    you have to understand the difference.  And that's what's

9    difficult.  It's why nobody changes anything.

10         I became aware of the Paperwork Reduction Act

11   through not only cases, not only that 1992 instruction

12   booklet, but also from people who would come to meetings

13   across the country that I would travel to, and each one

14   of them saw something different, but between all of them,

15   they saw something complete.

16         And you have heard references in this trial to the

17   Paperwork Reduction Act of 1980 and the Paperwork

18   Reduction Act of 1995.  I wasn't immediately aware of the

19   Paperwork Reduction Act of 1995.  And the common

20   explanation for that is that the IRS still to this day

21   does not put in the instruction booklets recognizing the

22   1995 Paperwork Reduction Act, they continue to reference

23   the 1980.

24         But there was some information that was presented at

25   one of the meetings that a Larry Becraft, an attorney out

1  of Alabama, had presented.  And I obtained copies of

2  that.

3      And what he was saying was that if the instruction

4  booklets and regulations by the IRS do not display an OMB

5  number, that then you and I, as American citizens, could

6  not be penalized for not providing timely information to

7  the IRS based upon their failure to comply with the law.

8  And he had his legal arguments for why he thought the

9  instruction booklet needed to display an OMB number.

10     And what happened was he lost on that argument.

11 They had determined that instruction booklets were not

12 collections of information, that they didn't add to any

13 information gathering on the form.  And immediately after

14 the --

15          MR. O'REILLY:  Your Honor, objection.  I need to

16 have a time reference for when this was.

17          MR. SPRINGER:  1995 at this point.  And that's

18 just roughly.

19     So what happened, as I listened to what they had to

20 say about the instruction booklet and the form and how

21 that the instruction booklet did not have an OMB number

22 on it and how the court system said it didn't actually

23 need one because the instruction booklet was not

24 requesting anything from anyone, and I agreed with that,

25 then the next thing I saw is I went backwards the year

1   after that decision was issued, which would be 1991 in

2   the Dawes case, all of a sudden the instruction booklet

3   for the 1040 form started saying there are no tax forms

4   contained in this booklet.

5       Prior to that, the Form 1040 was tabbed on the

6   inside of the instruction booklet, and so you would just

7   tear it out of the inside.

8       And one of the cases that was in the material was

9   this Dole case, and specifically on page 33, there had

10  became a huge question regarding whether or not the

11  Paperwork Reduction Act applied to tax forms.  And many

12  courts at the lower level had determined that because the

13  requirement to file was obligatory, that the form did not

14  have to comply with the Paperwork Reduction Act.

15      And so in 1990, in a generic sense, on page 33 of

16  the Dole decision, the Supreme Court said -- I read what

17  the Supreme Court said -- "Typical information collection

18  requests include tax forms, Medicare forms, financial

19  loan applications, job applications, questionnaires,

20  compliance reports and tax or business records.  These

21  information requests share at least one characteristic:

22  The information requested is provided to a federal agency

23  either directly or indirectly."

24      Now, at this time, on those cases that that lawyer

25  had shared the information with, he actually lost based

1    upon the instruction booklets not being required to

2    comply.  But now here the Supreme Court is now saying, to

3    my understanding, that typical information collection

4    requests covered by the Paperwork Reduction Act were tax

5    forms, and this gave me -- okay.  I see that.  Now,

6    what's wrong with the form?

7        So I went in and I looked at the Paperwork Reduction

8    Act of 1980 and I went through and read what the form was

9    supposed to tell the public.  Not the instruction

10   booklets, but the forms themselves.

11       And the best way I can characterize how I saw it was

12   that a request for information from the federal

13   government is them asking you -- they're knocking on the

14   door, like a census bureau, and they're saying, please

15   tell us the answers to these questions, and you have to

16   determine whether or not you are required to answer those

17   questions.  And if they tell you you are required to

18   answer those questions and cite their authority, then you

19   have the legal right to go make certain what they've said

20   is true.

21       So I read that they were required to tell you on the

22   Form 1040 why they were asking the questions on the

23   form.  How they were going to use the information once

24   you gave it to them, whether your response to the

25   questions on any form was voluntary, required to receive

 1   a benefit, or mandatory.

 2       And "voluntary" stuck out because of the booklet

 3   from 1992, and then why you were asking the questions

 4   also stood out to me, because so many people were saying

 5   -- so many well-educated people were saying that they

 6   could not find the specific law that required them to

 7   file a Form 1040, what made them obligated to file the

 8   Form 1040.

 9       This position that I had gathered, I continued to

10   build on.  I did read the Dawes decision from 1991 from

11   the Tenth Circuit Court of Appeals.  My understanding of

12   this case was where a man was trying to claim he wasn't

13   required to file a tax Form 1040 because the instruction

14   booklets didn't comply with the Paperwork Reduction Act.

15   And the Tenth Circuit is one of several circuits in the

16   United States.  We actually live -- in Oklahoma, any

17   appeals that would come from a federal court in Tulsa,

18   for instance, would go to the Tenth Circuit Court of

19   Appeals.  That's covered by Kansas and Colorado and

20   Oklahoma, maybe New Mexico.  I don't remember.

21       And in this decision, the -- my understanding of the

22   decision was that the Tenth Circuit was wrestling with

23   whether or not the Form 1040 needed to comply.

24       And they said, "We would be inclined to follow the

25   general analysis of Wunder and Hicks and hold that the

1   operation of the PRA in these circumstances did not

2   repeal the criminal sanctions for failure to file an

3   income tax return because the obligation to file is a

4   statutory one.  However, we're not compelled to rest our

5   opinion on the statutory origin theory because we find

6   the analysis of other courts which have considered the

7   issue to be persuasive."

8        This told me that the requirement to file a tax

9   return was not based upon a statutory theory, statutory

10  origin theory.  And, in fact, as I went further, I

11  determined that the requirement to file, at best, could

12  be made by a regulatory requirement.

13       And if you examine Section 6011, like I did, that

14  statute says, "When required by regulation prescribed by

15  the secretary every person made liable for any tax

16  imposed by this title shall use the forms -- shall make

17  the forms and statements provided by the secretary."

18       And the question then becomes:  How does that form

19  get into existing?  And we all just -- in my view of it,

20  we all had just become so accustomed to it that no one

21  was challenging it.

22       And from 1997, I started watching criminal cases and

23  I was watching civil cases.  In late 1996, the IRS sent

24  me a notice of deficiency for six years, from 1990 to

25  1996, and in the notice of deficiency, they decided that

1    they could use what's called the Bureau of Labor

2    Statistics to calculate a tax liability on Lindsey

3    Springer.  The hundred thousand dollars under the 6670 --

4           MR. O'REILLY:  Objection, Your Honor.  Just want

5    clarification that this is on his individual income taxes

6    for those years, not --

7           MR. SPRINGER:  Oh, sorry.  On Lindsey Springer

8    personally.  This is a new -- a new tax liability.

9        You've heard testimony about me using an address

10   called 5147 South Harvard.  In 1996 -- on September 3,

11   1996, the IRS sent Lindsey Springer a notice of

12   deficiency for six years' worth of tax liability based

13   upon the Bureau of Labor Statistics at 5147 South

14   Harvard, Number 116, Tulsa, Oklahoma 74135.

15       Now, if the IRS is using that address and accepting

16   that address, then it should be good enough for

17   everybody.

18       And I did object to this notice of deficiency.  I

19   actually claimed it was involuntary servitude, because at

20   the time, the money that I was gathering was at meetings,

21   where there would be a hat passed after I spoke for

22   whatever period of time.  During 1990 and '91, there was

23   no hat passed, there was no money, there was nothing but

24   debt.

25       But beginning in early '93, there began to be some

1  movement and I started having a little money come in from

2  traveling or speaking.  I actually wasn't aware that I

3  was going to be able to actually travel the country and

4  speak to people about this.  I didn't have any clue about

5  that.

6            THE COURT:  Mr. Springer, let me know when you

7  get to a convenient stopping point, we'll take our

8  mid-afternoon break.

9            MR. SPRINGER:  Right now would be great, Your

10  Honor.

11            THE COURT:  Very well.

12       Members of the jury, we'll take our mid-afternoon

13  break at this time.  Again, as always, guided by the

14  clock on the wall, we will resume at ten minutes till the

15  hour, so please be ready and available just a little

16  before ten till so that we can resume here in the

17  courtroom.

18       And during this break, of course, please do remember

19  my usual admonition, which I will not repeat at this

20  time.

21       All persons in the courtroom will remain seated

22  while the jury departs.

23       (JURY EXITS THE COURTROOM)

24            THE COURT:  Okay.  The jury has left the

25  courtroom.

1      Mr. Springer, I just want to give you -- obviously,

2 you have not been keeping time on yourself and that's

3 entirely understandable.  I do want you to bear in mind

4 the general time limitations I mentioned yesterday.

5      You started in on your Paperwork Reduction Act

6 commentary at 2:51, it's now 3:31, and the clock is

7 ticking, so we're not going to hear about the Paperwork

8 Reduction Act for the rest of the day; I assure you of

9 that.

10      I'm not going to cut you off as soon as we get

11 started, but there are limits on the extent to which

12 we're going to sit and hear you talk about the Paperwork

13 Reduction Act.  And so just bear in mind that the clock

14 is ticking.

15      Anything further we ought to address before we take

16 our recess?

17           MR. O'REILLY:  Your Honor, very briefly, with

18 respect to cross-exam and then redirect, will

19 Mr. Springer be objecting from the stand?  Obviously,

20 Mr. Stilley -- I guess the format of this is unique to

21 me.

22           THE COURT:  Well, Mr. Springer is on his own in

23 terms of contending with you by way of cross-

24 examination.  Given the nature of the case, and I suppose

25 depending, in part, on the breadth of the matters that

1    Mr. Springer covers in the remainder of his testimony, in

2    the remainder of the case, or in the remainder of his

3    testimony, I anticipate he'll cover ground -- or may well

4    cover ground that creates an equally broad scope of

5    cross-examination.  So I don't really have much of an

6    idea how many problems there will be during cross and how

7    many situations may arise which might call for objections

8    on his part.  But if Mr. Springer's direct testimony is

9    as broad as I anticipate it may well be, then the scope

10   of cross-examination would be equally broad.

11        Anything more we ought to address before we recess?

12        MR. SPRINGER:  Yes, Your Honor.  In the 50

13   minutes that the Court identified, what I was doing was

14   setting a timeline.  I haven't actually spent but maybe

15   ten minutes on the Paperwork Reduction Act.  And I just

16   want to know is that what the Court's understanding was

17   or am I wrong on that?

18        THE COURT:  Well, you took the stand at 2:45,

19   you got into the instruction booklet and the Paperwork

20   Reduction Act notice at 2:51.  And I just want you to

21   bear in mind what we discussed yesterday.  The Court does

22   have the discretion, under Rule 403, to regulate the

23   presentation of testimony on any issue, and your

24   testimony with respect to the Paperwork Reduction Act

25   obviously has to go to the issue of willfulness.  The

 1  Court has emphatically rejected any substantive defense

 2  based on the Paperwork Reduction Act.  And so -- and,

 3  again, let me emphasize, I'm not -- I did not yesterday

 4  nor am I today imposing a rigid time limit, but there is

 5  an amount of time beyond which we will not go and you

 6  need to -- as I have, I think, mentioned more than once

 7  on more than one day, you need to bear that in mind as

 8  you prepare your testimony.

 9          THE COURT:  Court will be in recess.

10      (A RECESS WAS HAD, AFTER WHICH THE FOLLOWING

11  PROCEEDINGS WERE HAD IN OPEN COURT AND WITHIN THE

12  PRESENCE AND HEARING OF THE JURY.)

13          THE COURT:  Mr. Springer, you may continue.

14          MR. SPRINGER:  My testimony is into three

15  different areas and I want to make certain I'm clear

16  about that.

17      There is a general good-faith defense that I'm

18  presenting to you involving my beliefs of the Paperwork

19  Reduction Act.

20      There is another defense as to why I believe the

21  money people gave me was a gift or donation as opposed to

22  being payment for services rendered or compensation for

23  services.  And I am going to try to keep those separate.

24  So I may go from now forward on one issue, and then when

25  I come back to gifts and donations, I may have to begin a

LINDSEY SPRINGER - DIRECT BY MR. SPRINGER                2629

1  timeline again.

2      Okay.  Defendant's Exhibit Number 82 says -- is an

3  article from The Daily Oklahoman dated August 19, 1996,

4  and it's written by Diane Baldwin, a staff writer.

5      She says, "Lindsey Springer warns his followers they

6  must remove the enemy.  'God called me to get rid of the

7  IRS and the government fraud.'"

8      Now, the first sentence was not a quote.  That was

9  the writer's opinion.  But I did say, as of 1996, that's

10  what I believed that my ministry's mission was for.  Not

11  in 2000, as alleged in the grand jury indictment.

12          MR. O'REILLY:  Objection, Your Honor.  The

13  indictment does not allege that that was as stated.

14          THE COURT:  Bear with me just a moment,

15  Mr. Springer.  The objection will be sustained.  Proceed.

16          MR. SPRINGER:  It is my testimony with regard to

17  my beliefs that the Form 1040 did not, in the year 2000,

18  2001, 2002, 2003, 2004, and 2005, comply with the

19  Paperwork Reduction Act requirements that the IRS and the

20  United States Treasury Department were required to comply

21  with.  It's the law that polices the IRS.  This is the

22  way I understand it.

23      In 1999, the IRS placed a notice of federal tax lien

24  against me based upon the notice of deficiency that I had

25  spoke about from 1996.  When they put that lien against

1  me, there was a new tax law that had come into play in

2  the Restructuring and Reform Act of 1998 where Congress

3  had overhauled the IRS, had addressed some of, even, my

4  concerns.  I worked with liaisons to Senator Nickles

5  involving showing the abuse that the IRS was putting

6  people through that I had seen firsthand.

7      And in 1999, the new law said that all people who

8  have a notice of lien filed against them, they have a

9  right to a collection due-process hearing before levy.

10  Not a law that existed in 1994 when they came in, showed

11  up one day, and took all the stuff except my son's

12  furniture, which was then a surprise.  No longer will

13  that ever happen to any American because of not only my

14  efforts, but the efforts of many, many people.

15      I did not know that they had put a lien against me

16  in 1999 because they didn't send it to the address that

17  they used on the notice of deficiency, which was 5147

18  South Harvard, Number 116, Tulsa, Oklahoma 74135.

19      What they did, they didn't use the address on the

20  1993 lien notice for the $100,000 in 6672 penalties,

21  which was 1718 Timberton in Sapulpa.  They decided, in

22  1999, to go back and use the address from the corporation

23  in 1989, which I would obviously never have received.

24      I did not hear anything from the IRS from this point

25  forward until 2004, and it began with a letter on January

1  26, 2004, by a then-Revenue Agent Donna Meadors.

2      I had met Agent Meadors during the Eddy and Judy

3  Patterson trial.  She was the revenue agent who had

4  calculated the tax liability for Eddy and Judy

5  Patterson.  The Pattersons' trial had concluded December

6  15, 2003.

7      On January 26, 2004, I received a letter that says,

8  "Dear Mr. Springer" -- and the address is 5147 South

9  Harvard, Suite 116, Tulsa, Oklahoma 74135 -- "we have

10  reviewed certain material with respect to your tax

11  shelter promotion.  We are considering possible action

12  under Section 6700, 7804 of the Internal Revenue Code,

13  relating to penalties and an injunction action for

14  promoting abusive tax shelters."

15          MR. O'REILLY:  Your Honor, objection to the

16  relevance of this line of testimony.

17          THE COURT:  The parties will approach.

18      (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND

19  OUT OF THE HEARING OF THE JURY.)

20          THE COURT:  Just fill me in on how this is

21  relevant.

22          MR. SPRINGER:  I answered all Mrs. Meadors'

23  questions, I provided names, money people gave me, I

24  never told her I didn't help anybody.  And Mr. Shern

25  already testified before this jury that he relied upon

1  information he gathered from Ms. Meadors before he raided

2  my home.

3           MR. O'REILLY:  If that's the basis for it, I'll

4  withdraw the objection.  I just don't want, as the Court

5  said before, a postmortem on another investigation.

6           MR. SPRINGER:  No, Your Honor.

7           THE COURT:  On that understanding and only on

8  that understanding, the objection will be overruled.

9           MR. SPRINGER:  Thank you, Your Honor.

10      (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

11  WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

12  PRESENCE AND HEARING OF THE JURY.)

13           MR. SPRINGER:  "In addition, we plan to consider

14  issuing prefiling notification letters, and this is

15  Defendant's Exhibit 217, to the investors who have

16  invested in this promotion.  You are requested to meet

17  with the examiner at the above date and time and

18  location.  Enclosed is a list of documents, books, and

19  records that you have available and questions you should

20  be prepared to reply to at that time.  If we conclude

21  that penalties, injunction, and/or prefiling notification

22  action is appropriate, you will be afforded an

23  opportunity to present any facts or legal arguments that

24  you feel indicate such action should not be taken."

25       I immediately contacted Ms. Meadors.  I cooperated

1  fully with her investigation.  I answered every question

2  that she asked me, including who had given me money.  I

3  told her that I helped them.  She never asked me did I

4  provide services for payment.  That never was even a

5  question.

6      And Ms. Meadors made contact with several people of

7  which you have seen during this trial testify.  You also

8  heard Mr. -- Agent Shern testify that he relied upon some

9  of the work that Agent Meadors had done during her

10 investigation.

11     This was January 26, 2004, that I received this

12 letter.  After I gave her everything that she had asked,

13 at least to my knowledge, on December 2, 2004, which is

14 Defendant's Exhibit Number 218, she wrote me another

15 letter, and it says, "Dear Mr. Springer, we've reviewed

16 materials regarding your participation in a tax-avoidance

17 transaction" --

18         MR. O'REILLY:  Objection.  At this point, this

19 is irrelevant.

20         THE COURT:  Sustained.

21         MR. SPRINGER:  My understanding of the letter

22 that Ms. Meadors sent me was that even though I had not

23 been found to have done anything that violated 6700, that

24 she had been made aware of thousands of dollars that had

25 been given to me and my ministry and that she was either

1   furthering an investigation as to whether there were tax

2   consequences associated with the money that people had

3   given me.  There was never a question about whether I had

4   not disclosed to her information that I had ever been

5   asked.

6        In 2005, I received a business card on my front door

7   out in Kellyville, Oklahoma, and it was from a revenue

8   officer named Fred Rice, and he had asked me to call him,

9   so I did.

10        And when I called him, he told me he had sent a

11   notice of levy and my right to a collection due-process

12   hearing under the new law to the 5943 East 13th address

13   in Tulsa, Oklahoma.

14        I asked him why he did that.  He said that was the

15   only address that they had.

16        I asked him if he knew Agent Meadors.  He said yes.

17   I said, Did you know that she had used the 5147 South

18   Harvard address?  He said no.  I said, Were you working

19   with Mrs. Meadors?  He said yes.

20        And so he sent me the notice of levy to 5147 South

21   Harvard four days later.  Within a 15-day period of time,

22   I filed a complaint in the United States District Court

23   for the Western District of Oklahoma where -- excuse me.

24   Strike that.

25        I filed a request for a collection due-process

1  hearing with Mr. Rice in Oklahoma City, and I did it

2  timely, within the 30-day period that the new law had

3  allowed me.

4      The day before the hearing on that request of mine

5  was to be held, I received a phone call telling me I

6  wasn't going to get a hearing.  The agent's name was

7  Penny.

8      Knowing what I knew about the Restructuring Act of

9  1998, my participation with Senator Nickles' office and

10  its overhaul in 1998, I knew that that was wrong.  So I

11  filed a complaint in the United States District Court for

12  the Western District of Oklahoma where -- and this is on

13  April 26, 2005.

14      And in that complaint, I asked the Court to get

15  involved because of the rights that I had in that

16  statute.  My collection due-process hearing raised

17  protections of the Paperwork Reduction Act of 1995.  The

18  notice of levy that they had decided to send to 5943 13th

19  Street was based upon those Bureau of Labor Statistics

20  taxes from 1996's notice of deficiency.  That number now

21  had grown to $300,000.  This is not the $100,000 for the

22  6672 penalties, this is the Bureau of Labor Statistics'

23  tax liability that the IRS claimed that I owed.

24          MR. O'REILLY:  Objection, Your Honor.  The taxes

25  owed were by Mr. Springer, not by the Bureau of Labor

1    Statistics.

2              THE COURT:  Clarify that, please.

3              MR. SPRINGER:  Yes.  The notice of deficiency

4    that had been issued to me by the IRS claimed I owed a

5    tax on income based upon statistical-gathered

6    information, not based upon whether I had received W-2

7    income or 1099 income, but solely based upon statistics.

8         And, again, I had not heard in 1999, when they filed

9    the notice of federal tax lien with the right to the

10   first collection due-process hearing because they sent it

11   to 5943 East 13th Street.  Didn't learn that until 2005.

12        And in 2005, when they wouldn't give me the hearing,

13   where I was raising the Paperwork Reduction Act as a

14   defense to their hundreds of thousands of dollars in

15   penalty and interest additions, then I filed a lawsuit in

16   the Western District of Oklahoma in the United States

17   District Court asking the federal court to get involved.

18        And this was based upon my understanding of how the

19   new Restructuring Reform Act was to operate.

20        Now, the same day or the day after I filed that

21   complaint, Brian Shern testified he was appointed to

22   investigate me criminally.  It was either the day --

23             MR. O'REILLY:  Objection.  Just for

24   clarification, Mr. Shern testified here not the same day

25   that Mr. Springer filed this lawsuit.

1          THE COURT:  Is that agreed, Mr. Springer?

2          MR. SPRINGER:  Yes, that's agreed, Your Honor.

3   I'm sorry about that.  I'll take care of that.

4      I believe you heard testimony that I was in a

5   lawsuit pending currently against Agent Shern and

6   others --

7          MR. O'REILLY:  Excuse me.  We need to have the

8   microphone turned on or something.

9          MR. SPRINGER:  Oh, sorry.

10     I believe you've heard testimony that I am in a

11  lawsuit where I sued the agents who searched my home

12  because when they counted money while I was upstairs in

13  my house, they counted it in front of my wife, they

14  counted $19,000, they counted individual notes, and

15  somehow, when the money got to the bank that day, the

16  amount the bank gave the United States credit for was

17  $17,000.  And I didn't learn that until January 9, 2006,

18  when Agent Shern came out to my house to return what I

19  thought was all $19,000, when, in fact, it was only

20  $17,000.

21     I asked Agent Shern what happened to the other

22  $2,000.  He said he didn't know.  At first, they thought

23  my wife may have took it, but then they realized that

24  that was not possible because she had had an agent

25  attached to her every move while they were searching the

```
 1  home and --
 2          MR. O'REILLY:  Objection.  This is hearsay and
 3  is not going to good faith.
 4          THE COURT:  Sustained.
 5          MR. SPRINGER:  In that case, Agent Shern signed
 6  a declaration that states, "On or about April 26" --
 7          MR. O'REILLY:  Objection.  This is hearsay.
 8          THE COURT:  Counsel and the parties will
 9  approach.
10      (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND
11  OUT OF THE HEARING OF THE JURY.)
12          THE COURT:  What is it -- what exhibit number is
13  that?
14          MR. SPRINGER:  It is 62, Your Honor.
15          THE COURT:  Okay.  Hold on.
16          MR. SPRINGER:  Defendant's Exhibit 62.  And it's
17  the second page, paragraph 5.
18          THE COURT:  Okay.  First of all, why are you
19  offering this paragraph 5?
20          MR. SPRINGER:  Actually, I haven't actually
21  offered the exhibit into evidence.
22          THE COURT:  Why do you want to read it?
23          MR. SPRINGER:  To demonstrate that the day I
24  filed my Paperwork Reduction Act complaint in Oklahoma
25  City, he was assigned to investigate me criminally.
```

1            THE COURT:  What's the relevance of that?

2            MR. SPRINGER:  To demonstrate the response that

3    I was getting from the government, the way I believed

4    that I was getting responded to with me raising the

5    Paperwork Reduction Act.

6            THE COURT:  The objection will be sustained on

7    relevance grounds.

8            MR. O'REILLY:  Your Honor, if Mr. Springer wants

9    to put into evidence that he filed a lawsuit and

10   Mr. Shern was assigned the next day, I'm not going to

11   have an objection to that.

12           MR. SPRINGER:  That's all it was.

13           MR. O'REILLY:  What I don't -- this is hearsay

14   testimony offered for anything other than his good faith,

15   which this is not, is not permissible, and that's what we

16   want kept out.

17           THE COURT:  Well, my -- then in that event, I'll

18   let Mr. Springer testify to that, but you can testify

19   based on your own knowledge.

20           MR. SPRINGER:  Reading from the document?

21           THE COURT:  Without reading from the document.

22   But this is -- I suppose my hat is off to Mr. O'Reilly

23   for saying, okay, fine, let it in.  But we're only going

24   to sit through so much of this.  This is very, very

25   peripheral.

1              MR. O'REILLY:  Your Honor, the only thing is it

2     may be Mr. Springer's theory for argument that the

3     government brought this whole lawsuit, this criminal

4     case, simply because of this and that's why I'm not --

5              THE COURT:  Okay.

6         (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

7     WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

8     PRESENCE AND HEARING OF THE JURY.)

9              MR. SPRINGER:  In the case where I had sued them

10    over the theft of the $2,000, I received electronically,

11    through the court system, a declaration that had been

12    signed by Agent Shern, which stated that he had --

13             MR. O'REILLY:  Objection, Your Honor.

14             THE COURT:  The objection is sustained.

15             MR. SPRINGER:  I thought he just --

16             THE COURT:  Mr. Springer, you're permitted -- as

17    we discussed just a moment ago, you're permitted to tell

18    the jury what happened on day one and what happened on

19    day two based on your own knowledge.

20             MR. SPRINGER:  In August of 2005, while that

21    collection due-process request was pending, the IRS

22    issued a determination letter, two of them, in fact.  And

23    in September of that year, 2005, I had 30 days to appeal

24    their determination where they were refusing to consider

25    anything about the Paperwork Reduction Act.  And I filed

1  a complaint, the second one, in the Western District of

2  Oklahoma.

3       While the first case was still pending, they

4  wouldn't give me the hearing that I was entitled to.  The

5  second case was challenging the determination that they

6  had made where they gave me no hearing and made a

7  decision based upon nothing that they heard from me in a

8  hearing.

9       And they sent -- they issued the notice of

10 determinations on August 16, 2005.  That gave me 30 days

11 to file a complaint in the district court or I would have

12 to agree with their determination.

13      On September 15, 2005, my wife and I went to

14 Oklahoma City and filed that complaint, filed it at about

15 one o'clock.  At four o'clock that same day, a United

16 States magistrate signed a warrant to -- search warrant

17 for my house and the next morning is when 11 agents

18 showed up to search my house.

19      And as I'm going through these steps that I'm

20 watching, I'm not seeing anybody address my Paperwork

21 Reduction Act claims, but I'm seeing the government

22 respond, as I had heard so many times in the past that

23 they had done.

24      And at this time in my life, I was trying to go a

25 different direction.  I had gotten married.  I believe

1  that I had done all I could do in helping the public in

2  this area.

3       And so I had started a rigorous physical change.

4  Some days I would hit over 500 golf balls.  If it wasn't

5  for what I'm doing here, that's the place that I should

6  be.  My understanding of golf clubs in themselves is from

7  early on in my life.  When I was in high school, I built

8  golf clubs.  I learned weights and measures.

9       And so when in August of 2005 I was told that -- by

10 a gentleman that I was going to get $250,000 and the bus

11 that I had at that time that I had spent a lot of money

12 on in 2000 and 2001, it was an old Scenicruiser that had

13 been redone with a whole new shell.  But you couldn't

14 pull a car with it because the engine in the cradle in

15 the back was held in by two bars, so it would only

16 handle, like, 300 pounds of ton weight.

17      And I knew that if I was going to go out and play

18 golf that I needed to have a trailer and a car and a golf

19 shop and all the need -- tools that I would need to do

20 that.

21      And then when I learned that Mr. Turner was going to

22 make a loan to me for a period of time, I used that loan,

23 intended short-term, not long-term, because I knew I was

24 going to be getting this money from a man with the last

25 name of Hassebrock.  And then, actually, I was supposed

1   to get $300,000, but it ended up being $250,000 as our

2   discussions went further.  And that money was not a loan,

3   that money was to be given to me under the same

4   conditions that you had heard in this trial.

5       I was going to buy a coach called a Ventrisca (sic).

6   I don't know if you remember that conversation, I had put

7   a deposit on a Kingsley Coach, which is a very well-built

8   coach, something that I would put my family in in a

9   tornado if I had to.

10      And this coach had 180,000 miles on it.  When I put

11  the deposit on it, I never stopped looking, and one day

12  Mr. Snyder's 7,000-mile coach came out on eBay, and it

13  was less than the money I was paying for the Kingsley

14  Coach from Mr. and Mrs. Ventrisca.

15      And I noticed that the eBay ad said that there was

16  no reserve.  So that meant whoever bid the highest bid

17  was going to get that vehicle.  So I contacted Mr. Snyder

18  and we worked a deal out.  And I only intended to borrow

19  the money out of Oscar Stilley's IOLTA account for that

20  RV purchase until August 31st, when I was told I was

21  going to get $250,000.  And if you look at the timeline

22  of how that all transpired, it's within two weeks of

23  itself.

24      What I was told on August 31st from Mr. Hassebrock

25  was that I was not --

1          MR. O'REILLY:  Objection, Your Honor.  This is

2    all hearsay from Mr. Hassebrock.

3          THE COURT:  Sustained.

4          MR. SPRINGER:  I became aware I was not going to

5    get $250,000 from Mr. Hassebrock.  I had received

6    $20,000, but I had not received the rest.

7       And at this point in time, I really didn't know what

8    to do.  I -- I really wasn't changing my plans at the

9    moment, September 1, 2005, I just was kind of sitting

10   idle at the first of the month.  But it wasn't within

11   just a couple of weeks that my home was raided for the

12   search warrant that was levied on my home.

13      And at this point, I'm still intending to go

14   forward.  I believe this is what I'm supposed to be

15   doing.  I'm transforming my life, I'm building a trailer

16   into a golf shop, where I can put a car in it, which

17   you'll -- one of the alleged overt acts in Count 1 is

18   that Oscar Stilley's IOLTA account transferred $5,655 to

19   Oklahoma Trailer around the 1st of September 2005.

20   That's the trailer that I was then building into this

21   golf shop in the front that could pull a car inside.

22      And after September 16, 2005, when they took the

23   $19,000, they didn't leave any money in my house for me

24   to live on.  And, again, I didn't know what to do.  I

25   thought about it for three days before I actually called

```
 1  up Oscar Stilley and said, Will you send me two $10,000
 2  checks out of that money that Mr. Turner had sent that
 3  was the loan to Lindsey?  And I didn't want to do it, but
 4  I didn't know what else to do.
 5      I first called Agent Shern and asked him if he would
 6  bring me the money back.  He told me to call -- excuse
 7  me.  Strike that.
 8      I then called Melody Nelson within one day of them
 9  taking the money and she told me that she could keep --
10          MR. O'REILLY:  Your Honor, objection.
11          THE COURT:  Sustained.
12          MR. SPRINGER:  Sorry.  I became aware I wasn't
13  going to get that money back very quickly and so that --
14  under those conditions is why I went in and you'll see
15  there's two acts of pulling two $10,000 cashier's checks
16  out of IOLTA on September 19, 2005, and that's what those
17  two were for.  That was just to get me back to the road I
18  was on before the raid, which was I had to take this Sam
19  Snyder coach that was -- I believe the purchase price was
20  167 and I paid $1,000 down and then the wire transaction
21  from Oscar Stilley's IOLTA to Mr. Snyder was 166, and
22  this RV -- semi-truck-looking RV, it did not have a
23  kitchen in it.  It had a refrigerator, a table, and a
24  little, bitty stove.  And I knew that if I was going to
25  be on the road with my family, that we were going to have
```

1  to cook meals and I knew that we were going to have to do

2  laundry.

3      And so besides those issues, also the entire

4  plumbing system in this truck had been frozen while

5  Mr. Snyder had it and all the copper tubing had burst.

6  So I had my work cut out for me getting this unit done by

7  the first of the year, and that was my plan.

8      I rented a building, which I believe the lady who

9  was the landlord testified here that I had rented a

10  building that a 50-foot RV could fit in.  That's the

11  building that I rented.  And day in and day out I

12  converted that RV to almost a home inside for what my

13  family could use.

14      I spent between 40 and $50,000 on that RV between

15  the time period of September 16, 2005, and January 10,

16  2006, when I was made aware that $2,000 had turned up

17  missing by the IRS when they -- when Mr. Shern brought

18  the 17 --

19          MR. O'REILLY:  Objection.  Asked and answered.

20          THE COURT:  Sustained.

21          MR. SPRINGER:  On January 4, 2006, a significant

22  situation occurred in my life.  And one was I learned

23  about the money issue from the raid and the other was

24  that the IRS had decided to take all the Office of

25  Management and Budget numbers off of 212 IRS forms.

```
 1   Which prior to that day, each had contained their own
 2   approval number.  And they decided to take the 15450074
 3   number that's on the 1040 form and they decided to take
 4   that number that was only approved in their theory for
 5   that form and they put it on all 212 forms.
 6            MR. O'REILLY:  Objection.  If this occurred on
 7   January 4th of 2006, the false return -- I mean, excuse
 8   me -- the failure-to-file counts and tax-evasion counts
 9   are limited to 2000 to 2005, so this would be
10   irrelevant.
11            MR. SPRINGER:  Your Honor, the --
12            THE COURT:  Parties and counsel will approach.
13      (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND
14   OUT OF THE HEARING OF THE JURY.)
15            THE COURT:  How is this relevant?
16            MR. SPRINGER:  The return would not have been
17   due until April 15th, as the indictment alleges, and this
18   came out in January '06.  The '05 form would have been
19   due by April 15, 2006, and, therefore, it was within the
20   time period.
21            THE COURT:  Well, your willful-failure-to-file
22   years are '02 and '04.  You -- in Count 4, there's a
23   charge of evasion for your '05 taxes.  Are you telling me
24   that your PRA theory applies to the willfulness element
25   of the -- of Count 4?
```

 1           MR. SPRINGER:  Of Count -- yes, Your Honor --

 2    Counts 2, 3, 4, 5, and 6, each one of those charges has

 3    an element -- an alleged claim that I failed to file or

 4    willfully failed to file a U.S. individual income tax

 5    form.  And Mr. O'Reilly gave this Court a bill of

 6    particulars that cited to Section 6151 that said the only

 7    way you would be required to pay is if you were required

 8    to file the return.  And so it's on that basis that I

 9    relied upon the 2006 events that I was just now

10    testifying.

11           THE COURT:  Mr. O'Reilly.

12           MR. O'REILLY:  Actually, sir, if Mr. Springer is

13    going to testify that he didn't file for 2005 because of

14    this act, he can testify to that.  Though, I don't think

15    -- I think any changes made on that date would have

16    applied to later years, not to the year 2005 returns.

17    But I can't testify -- I don't know that right now.

18           THE COURT:  Okay.

19           MR. O'REILLY:  But, Your Honor, also, the

20    evasion counts are independent of whether or not he filed

21    a return because of all the affirmative acts.  Really,

22    we're talking about, for the PRA defense, to the extent

23    that there is, is for the failure-to-file counts which

24    are before that.

25           THE COURT:  Well, I'm going to overrule the

 1  objection on the basis we just -- that but the relevance

 2  of developments with respect to the PRA after April 15th

 3  of '06 becomes very, very tenuous.

 4          MR. SPRINGER:  And as far as I'm watching the

 5  clock there, Your Honor, I haven't mentioned the PRA

 6  since we went back on the clock.  Is that the way you see

 7  it?

 8          THE COURT:  You're right in the middle of it.

 9          MR. SPRINGER:  Okay.  I hadn't even mentioned --

10          THE COURT:  You've talked about the OMB number.

11          MR. SPRINGER:  Just started that.

12          THE COURT:  We're right in the middle of it.

13          MR. SPRINGER:  Okay.

14          THE COURT:  All right.

15     (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

16  WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

17  PRESENCE AND HEARING OF THE JURY.)

18          THE COURT:  You may proceed.

19          MR. SPRINGER:  When I became aware that money

20  was taken from me when Mr. Shern showed up at my house, I

21  knew that if I was going to -- I was going to have to

22  make a decision whether I was going to just turn my cheek

23  the other way or whether I was going to fight that

24  issue.  And I wasn't going to turn a cheek the other way.

25     And then when I found out that all these OMB numbers

1   had been removed from all these forms -- and my

2   understanding of, for instance, the 2005 form is that it

3   doesn't appear until 2006 for the year 2005, a phrase I

4   would call is a perspective -- the form comes after the

5   year, and so when I noticed that OMB had -- or IRS had

6   decided to throw 211 forms -- numbers off that they had

7   for 24 years had -- they had sought approval for or tried

8   to use, and then all of a sudden they were aborting

9   those, then that got my attention.

10       And with just in a few days of this happening,

11  Mr. Turner found out that he was no longer under --

12           MR. O'REILLY:  Your Honor, objection.

13  Mr. Turner -- it would have to be hearsay testimony.

14           THE COURT:  Sustained.

15           MR. SPRINGER:  Okay.  I found out that

16  Mr. Turner was no longer going to be criminally

17  investigated.

18       And I had spent some time in 2003, 2004, and early

19  2005 trying to convince the national office of the IRS

20  that things needed to change.  And most notably, the

21  issue that I had was that I believed the IRS needed to

22  comply with the Paperwork Reduction Act, and in

23  particular, to tell people on the tax forms themselves

24  what laws and regulations encompass the request for

25  information so that everyone can all see the exact same

 1    information.  And if we all have an agreement or

 2    disagreement, we have all the right to make -- take those

 3    disagreements or not.

 4         And so between those three events, I used that to

 5    change the course that I was on.  I decided I wasn't

 6    going to go play golf, I was going to put that on hold.

 7    And then I was going to come back in and try to

 8    understand why, although in every case I brought, the IRS

 9    was trying to say that they wouldn't consider the

10    Paperwork Reduction Act, but the evidence showed me that

11    they were considering it.

12         And so during the -- during the late summer of 2005,

13    I had also received -- and this is because I have

14    thousands of people on an e-mail list.  I have had

15    conference calls weekly or biweekly throughout the

16    country for quite a while, and it became apparent --

17    excuse me.  Strike that.

18         I became aware of a General Accountability Office

19    report that was dated in May of 2005, where the General

20    Accounting Office had -- got into a discussion with four

21    federal agencies involving their failure to comply with

22    the Paperwork Reduction Act of 1995.

23         And in this report, there were statements being made

24    between the General Accountability Office and the IRS

25    that were as if I was saying them, and although I could

```
 1   not show how they were speaking as if I were speaking,
 2   but they were basically taking words right out of my
 3   complaints that I had filed --
 4           MR. O'REILLY:  Objection, Your Honor.  There's
 5   no way he knows where those words came from.
 6           THE COURT:  Sustained.
 7           MR. SPRINGER:  My understanding of the working
 8   of the Paperwork Reduction Act is that IRS agent, C
 9   (sic), must certify to Office of Management and Budget
10   that the request for information that they're going to
11   distribute to the public contains all of the necessary
12   information that the Paperwork Reduction Act and
13   regulations require.
14       And this is what my issues were when I received the
15   business card on the front door.  This is what my issues
16   were when they increased the penalties to 300,000.  These
17   are the issues that I had in opposition to the notice of
18   determination the IRS had issued.  Which I had filed a
19   complaint on September 15, 2005, and here I had received
20   a report that -- although at the time I received it, I --
21   I was not actively pursuing what this report said,
22   because I was ready to go play golf, but the report says,
23   "Government-wide, agency CIOs" -- that's collection
24   information officer -- "generally reviewed information
25   collections before they were submitted to OMB and
```

1  certified that ten standards in the act were met.

2  However, in our 12 case studies, CIOs provided these

3  certifications despite often missing or partial support

4  from the program offices sponsoring the collection.

5  Further, although the law requires CIOs to provide

6  support for certification, agency files contained little

7  evidence that CIO reviewers had made efforts to improve

8  the support."

9       "The four agencies" -- and this is on page 6 of the

10  report -- "The four agencies did not consistently ensure

11  that collection forms on agency Web sites included the

12  public scrutiny information required by the Paperwork

13  Reduction Act.  Specifically, an estimated 41 percent of

14  the forms" -- 41 percent of the forms -- "on the four

15  agencies' Web sites, ranging from" --

16          MR. O'REILLY:  Objection.  He's speaking to four

17  different agencies, which obviously encompasses more than

18  the IRS and it's not relevant, even to Mr. Springer's

19  good faith.

20          THE COURT:  Counsel and the parties will

21  approach.

22      (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND

23  OUT OF THE HEARING OF THE JURY.)

24          THE COURT:  Is there -- does this passage direct

25  criticisms specifically at the IRS?

1          MR. SPRINGER:  Yes.  All of the things that I'm

2   going to read, the Treasury Department and the IRS are

3   one of the four agencies.  I will not be reading from HUD

4   or any of the other agencies that are addressed, the

5   other three agencies that are addressed in this report,

6   only that I relied upon and confirmed what I had already

7   relied upon in relation to the IRS's position.

8          THE COURT:  Okay.  Now, Mr. O'Reilly --

9          MR. O'REILLY:  I will actually withdraw my

10  objection, Your Honor, to the extent that it is limited

11  to that, but Mr. Springer better be ready for the

12  response.

13         THE COURT:  Very well.

14      (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

15  WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

16  PRESENCE AND HEARING OF THE JURY.)

17         THE COURT:  You may continue.

18         MR. SPRINGER:  Thank you.

19      My understanding of this report is that there are

20  four agencies who were involved in the study by the

21  General Accountability Office of the United States.  One

22  of those four agencies is the Internal Revenue Service.

23  So when I read the agencies or the four agencies, one of

24  them, specifically, is the IRS.

25      "The four agencies did not consistently ensure that

1   collection forms on the agency Web site included a public

2   scrutiny on the four agencies' Web site ranging from 13

3   percent at VA to 55 at HUD, contained one or more

4   violations (leaving out one or more of the notices that

5   the act requires, such as a statement indicating the

6   reasons for the collection how the information will be

7   used)."

8        They also reported, "OMB and the Treasury also

9   disagreed with aspects of our findings concerning support

10  for certifications of the ten PRA standards."

11       Now, I had never heard of them at this time referred

12  to as "standards."  I was only aware that they were

13  regulations written by the Office of Management and

14  Budget.  So this "standard" phrase is something that the

15  General Accountability Office is now creating.

16       They stated further, on page 8, "OMB and the

17  Treasury also disagreed with our findings that IRS's

18  citations on its forms of 'the Internal Revenue laws of

19  the United States' does not comply with OMB's requirement

20  that agencies cite the applicable law on certain forms.

21  We continue to believe that the IRS wording does not

22  comply with OMB regulations, which state that the

23  agencies are to cite the specific legal authority

24  whenever the collection of information is required to

25  obtain or retain a benefit or is mandatory.  OMB's

1   guidance explains the reason for this requirement is as

2   follows:  'This should ensure a higher response rate and

3   help the respondents understand the benefit and/or need

4   to respond in an accurate complete manner.'  If OMB

5   determines that IRS's circumstances are such that the

6   requirement should be modified in this case, it may

7   decide to alter its regulations."

8        They went on, "Agencies of the United States

9   government collect a wide variety of information from

10  many sources to carry out their missions.  As we've

11  mentioned earlier, the IRS collects information from

12  individuals and their employers to calculate the correct

13  amount of taxes owed."

14       They continued, "The federal government has long

15  recognized the tension between the benefits and cost of

16  information collection and the need to reduce information

17  collection burdens."

18       The report gets into explaining why the 1980 act was

19  passed, what problems that agency had --

20            MR. O'REILLY:  Objection, Your Honor.  My

21  understanding is this is for Mr. Springer's good faith

22  and the discussion of the history of the Paperwork

23  Reduction Act does not seem to go there.

24            THE COURT:  Sustained.

25            MR. SPRINGER:  Okay.  The report further stated,

1   "Finally, in addition to the agency and OMB clearance

2   process, the act encouraged public participation by

3   requiring the solicitation of public comment on proposed

4   collections and, through its 'public protection clause,'

5   by providing that individuals could not be penalized for

6   failing to respond to an information collection request

7   that either does not display a valid OMB control number

8   or does not state that the request is exempt from the

9   act."

10      My understanding of that statement was why the 1980

11  act said what it said.

12      Then the report stated, "Congress addressed these

13  and other issues when reauthorizing the act in 1986 and

14  1995.  The 1986 reauthorization included relatively minor

15  amendments.  The 195 reauthorization, however, included

16  significant revisions in the Paperwork Reduction Act

17  provisions."

18      They went on to say, "As part of that review, the

19  agency CIO must ensure that each information collection

20  instrument (form, survey, or questionnaire) complies with

21  the act.  For example, the instrument must explain the

22  reasons for the collection and provide an estimate of the

23  burden of the collection."

24      They went on, "Finally, according to the act, the

25  CIO must certify that each proposed collection submitted

1    to OMB" -- that's Office of Management and Budget -- "for

2    review meets the act's ten standards" -- and then they

3    parenthetically added -- "(presented in table 1) and

4    provides support for these certifications."

5         The report went on, "The agency submissions to OMB

6    typically include a copy of the data collection

7    instrument and a Paperwork Reduction Act submission

8    (Standard Form 83-I).  The 83-I requires agencies to

9    answer questions and provide support documentation about

10   the proposed information collection, such as why the

11   collection is necessary, whether it is new or an

12   extension of a currently approved collection, whether it

13   is voluntary or mandatory, and the estimated burden

14   hours.  Further, the CIO or the CIO's designee must sign

15   the 83-I to certify as required by the act" -- they go --

16   "that a collection satisfies the ten standards of the

17   act."

18        Furthermore, the report states, "However, in our 12

19   case studies, CIOs provided these certifications" -- and,

20   again, "CIO" is collection information officer --

21   "provided these certifications despite often missing or

22   partial support from the program office sponsoring the

23   collection."

24        The report goes on, "The lack of support for these

25   certifications appears to be influenced by a variety of

1   factors.  IRS officials, for example, told us" -- that's

2   the General Accountability Office -- "that (1) tax data,

3   by its very nature, is not collected by other agencies so

4   there's no need for IRS to contact them about proposed

5   collections and (2) IRS has an effective internal process

6   for coordinating proposed forms among the various IRS

7   organizations that may have similar information.  As a

8   result, these officials said the IRS does not need to

9   further justify that its collections are not

10  duplicative.  Nonetheless, the law and instruction

11  requires support for these assertions which must be (sic)

12  provided."

13          MR. O'REILLY:  Your Honor, objection, misstating

14  what it says.

15          THE COURT:  Counsel and the parties will

16  approach.

17     (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND

18  OUT OF THE HEARING OF THE JURY.)

19          THE COURT:  What page are you on?

20          MR. SPRINGER:  Nineteen, Your Honor.

21          MR. O'REILLY:  Your Honor, Mr. Springer stated

22  "which must be provided."  That phrase is not there.

23          MR. SPRINGER:  "Which was not provided," I'm

24  sorry.

25          THE COURT:  Return to your tables.

1          (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

2     WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

3     PRESENCE AND HEARING OF THE JURY.)

4          THE COURT:  The objection will be sustained.

5     The document does not say what Mr. Springer said that it

6     said.

7          Members of the jury, perhaps it's time to reiterate

8     one matter.  And all I'm going to do is repeat one thing

9     I said yesterday.  The Court has ruled that the Form 1040

10    did not and does not violate the Paperwork Reduction

11    Act.  However, I have permitted testimony with respect to

12    Mr. Springer's assertions about his understanding of the

13    Paperwork Reduction Act and also testimony of a like

14    character from Mr. Stilley to be introduced for a limited

15    purpose on one issue and that is the issue of

16    willfulness.

17         Proof of the crimes charged in the indictment must

18    include proof beyond a reasonable doubt of an element

19    known in law as "willfulness," as will be explained in

20    more detail in my final instructions to you.

21         I have admitted evidence as to the defendant's

22    understanding of the Paperwork Reduction Act at the times

23    relevant to the indictment for your consideration with

24    respect to the issue of willfulness.

25         And let me at this point emphasize my comment with

1  respect to the times relevant to the indictment, because

2  the last tax year involved in the indictment is 2005.

3       You may continue, Mr. Springer.

4          MR. SPRINGER:  The sentence read, "Nonetheless,

5  the law and instructions require support for these

6  assertions, which was not provided."

7       The report further stated, "The PRA and related

8  regulations provided requirements for agencies to display

9  certain information on federal forms or their

10  instructions including the following:  The reason for

11  collecting the information and a description of how the

12  information will be used; an estimated time to complete

13  the form; a statement informing the public whether

14  responses are voluntary, mandatory (citing authority) or

15  required to obtain a benefit (citing the authority); a

16  currently valid OMB control number (indicating that the

17  agency has been authorized to collect the information); a

18  date indicating when OMB approval to the collection" --

19  excuse me, strike that -- "a date indicating when OMB's

20  approval to collect the information is to expire; a

21  statement that the public has a right not to respond to

22  the request for information if a valid OMB control number

23  is not displayed."

24          MR. O'REILLY:  Your Honor, for clarification, I

25  believe Mr. Springer should be required to read footnote

1    50.

2            THE COURT:  Okay.  Hold on.  This is which page

3    now?

4            MR. O'REILLY:  Page 31, Your Honor.

5            MR. SPRINGER:  I'll be glad to read it, Your

6    Honor.

7            THE COURT:  Bear with me.  Mr. Springer, in

8    fairness, you should read footnote 50.

9            MR. SPRINGER:  I will.  There's a footnote 50 in

10   the report that states, "The requirements for this

11   statement and the OMB number are together known as the

12   'public protection provision,' in that a person cannot be

13   penalized for not responding if either the control number

14   of the statement is ab" -- excuse me -- "or the statement

15   is absent.  However, the public protection provision may

16   not apply if the collection is mandated by statute (e.g.,

17   the requirement to file a tax return)."

18       Now, my understanding of that paragraph is that it

19   does not specifically state the Form 1040.  And as you'll

20   see momentarily, there's other information that supports

21   why the General Accountability Office wrote that.

22       On page 34, it says -- the report says, "In the case

23   of IRS, most of the agency's non-compliance --

24   non-compliance resulted from forms that did not cite the

25   tax law that requires the information to be collected.

1   OMB regulations and guidance state that agencies are to

2   cite the law or other authority whenever the collection

3   of information is required to or retain (sic) a benefit

4   (such as a passport or social security payment)" --

5          MR. O'REILLY:  One moment, Your Honor.  What

6   page are we on?

7          MR. SPRINGER:  Page 34.

8          MR. O'REILLY:  Thank you.

9          MR. SPRINGER:  -- "or is mandatory (with civil

10  or criminal sanctions imposed for failure to respond).

11  However, the following typical PRA notice on IRS forms

12  omits the required reference to the law."

13      Quote -- this is the IRS's statement, generally

14  (sic) statement.  "We ask for the information on this

15  form to carry out the Internal Revenue laws of the United

16  States.  You are required to give us the information.  We

17  need it to ensure that you are complying with these laws

18  and to allow us to figure and collect the right amount of

19  tax."

20      My understanding in footnote 50 that the government

21  had me read on page 31 is that in order for them to

22  satisfy -- that public protection provision was not

23  activated.  In other words, the statement that the public

24  has a right not to respond doesn't apply is -- if they

25  cite to the statutory authority that makes it mandatory.

1          And the report further stated, "When we discussed

2    with IRS officials why the specific law requiring

3    information to be reported was missing in one of our case

4    studies, the IRS Reports Clearance Officer stated the

5    IRS's burden estimation methodology increases the burden

6    estimate when a specific law is mentioned in order to

7    include the time required to read the law.  Further, IRS

8    officials told us that citing the 'Internal Revenue laws

9    of the United States' provided adequate disclosure and

10   that on many forms it would be impractical to cite a

11   specific law authorizing the collection.  Nonetheless,

12   the regulations require citation of the law so that

13   respondents are fully informed.  Until IRS corrects this

14   language on the forms, respondents may not know what law

15   is associated with the information requested.  If

16   information collections do not comply with the Paperwork

17   Reduction Act -- PRA -- requirements described, the

18   public may be asked to provide information without

19   appropriate disclosure of the information that would

20   allow the public to exercise scrutiny of agency

21   collections."

22       In this report, the General Accountability Office

23   gave each of the four agencies an opportunity to read

24   their report and explain to them why the agency would

25   disagree with the General Accountability Office's

1  position.

2      And the report stated that the Treasury CIO stated

3  that the PRA does not specify when agencies are to

4  consult and that the notices on IRS forms satisfies the

5  requirement to consult.

6      And when I get done with the report, which I'm just

7  about done with shortly, I will go through the form and

8  show you how I compared -- how I arrived at whether or

9  not the form, in my mind, as the public, and the

10  protected -- that the public protection provides, how I

11  concluded that it does not contain the information and

12  that I agree with the General Accountability Office of

13  the United States.

14      The report further states, "We disagree with

15  agencies' position on public consultation.  The language

16  of the act clearly requires consultation to occur on

17  every collection."

18      The report further states, "We also disagree with

19  the Treasury that the act does not specify when agencies

20  are to consult.  The act states that an agency shall not

21  conduct or sponsor the collection of information unless

22  in advance of the adoption or revision of the collection

23  of information the agency has evaluated the public

24  comments received under Section 3506(c)(2)."

25      The report further states, "We continue to believe

1    that the forms in question do not properly fall into this

2    category because they entail significant burden.  OMB's

3    regulations state that the certifications and elections

4    exemption only applies 'provided that (forms) entail no

5    burden other than that necessary to identify the

6    respondent, the date, the respondent's address and the

7    nature of the instrument...''

8         "OMB and the Treasury disagreed with our" -- that's

9    the General Accountability Office -- "our position that

10   IRS's reference to the 'Internal Revenue laws of the

11   United States' on its forms does not satisfy OMB's

12   regulation requiring the specific legal authority to be

13   cited.  In addition, the Treasury CIO stated that the

14   references in instructions and other IRS information

15   products to specific sections of the tax code are

16   sufficient to provide taxpayers with the knowledge of

17   what law requires them to report their information."

18        General Accountability Office responds and says,

19   "OMB's regulation states that agencies are to cite the

20   specific legal authority whenever the collection of

21   information is required to obtain or retain a benefit or

22   is mandatory.  OMB's guidance explains the reason for

23   this requirement as follows:  'This should ensure a

24   higher response rate...''

25        "We also disagree" -- the report goes on, "We also

1  disagree that references in instructions and information

2  products to specific sections of the tax code serve to

3  provide taxpayers with the knowledge of what law requires

4  them to report their information; many of these

5  references are not related to the law requiring persons

6  to report the specific information asked for on the form,

7  but rather explain how to fill it out."

8       "We make no such 'implied conclusions,'" the report

9  stated.  "Instead, our report concludes that the CIO

10  reviews were inadequate because they were not fully

11  compliant with the requirement of the PRA."

12       Is this a good time to stop, Your Honor?

13             THE COURT:  I thought I heard you say a minute

14  ago you're almost through reading from the report.

15             MR. SPRINGER:  I am.

16             THE COURT:  Okay.  Continue.

17             MR. SPRINGER:  If I'm through reading that

18  report, would this be a good time to stop?

19             THE COURT:  We're not going hear any more of

20  this report Thursday?

21             MR. SPRINGER:  No, I'm done.  I'm done with the

22  report, Your Honor.

23             THE COURT:  Pardon me?

24             MR. SPRINGER:  I'm done with the report.

25             THE COURT:  Very well.

1    Members of the jury, we'll recess until nine o'clock
2    Thursday morning.  And I said the other day, I think the
3    other day I expressed a little irritation that we cannot
4    proceed tomorrow.  Well, as the son of a veteran and the
5    father of a veteran, I should not have said that.  But
6    tomorrow we will observe Veteran's Day and we'll resume
7    at nine o'clock on Thursday morning.
8        So please do remember during our day of recess my
9    usual admonition not to discuss the case, not to
10   undertake any independent investigation of any person,
11   any fact, any issue, anything relating to the case in any
12   way, and not to reach any conclusions about the case
13   until it has been given to you for your deliberations and
14   verdict.
15       So thank you very much for your day of service to
16   the Court.  Please be available, as usual, in the jury
17   room well before nine o'clock so that we may resume
18   promptly at nine o'clock on Thursday morning.
19       All persons in the courtroom will remain seated
20   while the jury departs.
21       (JURY EXITS THE COURTROOM)
22          THE COURT:  The jury has left the courtroom.
23   Mr. Springer, your Paperwork Reduction Act
24   commentary is now at about 95 minutes.  How much more do
25   you have on the Paperwork Reduction Act?

1          MR. SPRINGER:  All I want to do now is show the

2   jury the forms that were issued by the IRS to show them

3   why I concluded they didn't contain the information as

4   the General Accountability Office also concluded.

5          THE COURT:  How long is that going to take?

6          MR. SPRINGER:  Twenty minutes at the most.

7          THE COURT:  We're not going to hear any more

8   about the Paperwork Reduction Act after 9:20 until we get

9   to closing arguments.

10         MR. SPRINGER:  Fair enough.

11         THE COURT:  Now, there will be obviously cross-

12  examination, which will, I presume, touch to some degree

13  on the Paperwork Reduction Act, but in terms of your

14  direct testimony, I'm as sure as anything that I have

15  ever ruled on in my time on the bench that, under Rule

16  403, I do have the authority to put limits on your

17  commentary under the Paperwork Reduction Act, and I fully

18  intend to hold you to your prediction.

19       Anything further before we recess until nine o'clock

20  Thursday morning?

21         MR. O'REILLY:  No, Your Honor.

22         MR. SPRINGER:  No, Your Honor.

23         THE COURT:  Court will be in recess.

24     (COURD ADJOURNED FOR THE EVENING RECESS.  FOR

25  FURTHER JURY TRIAL PROCEEDINGS, SEE VOLUME XII.)