1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE NORTHERN DISTRICT OF OKLAHOMA

3

4    UNITED STATES OF AMERICA,

5          Plaintiff,

6    vs.                        Case No. CR-09-043-SPF

7    LINDSEY KENT SPRINGER and
     OSCAR AMOS STILLEY,
8
          Defendants.
9
     ------------------------------
10

11

12            TRANSCRIPT OF JURY TRIAL PROCEEDINGS

13            BEFORE THE HONORABLE STEPHEN P. FRIOT

14               UNITED STATES DISTRICT JUDGE

15                    NOVEMBER 12, 2009

16                    VOLUME XII OF XIV

17

18

19

20

21

22

23

24

25

```
 1   APPEARANCES:
     FOR THE GOVERNMENT:
 2                              Mr. Charles Anthony O'Reilly
                                U.S. Dept. Of Justice
 3                              P.O. Box 972
                                Washington, DC 20044
 4
                                Mr. Kenneth P. Snoke
 5                              U.S. Attorney's Office (Tulsa)
                                110 W. 7th Street, Ste. 300
 6                              Tulsa, OK 74119

 7

 8   FOR DEFENDANT SPRINGER:
                                Mr. Lindsey Kent Springer
 9                              5147 S. Harvard Ave.
                                Ste. 116
10                              Tulsa, OK 74135

11                              Mr. Robert Scott Williams
                                Standby Counsel
12                              Taylor Ryan Schmidt
                                436 S. Boulder Ave., Ste. 850
13                              Tulsa, OK 74119

14   FOR DEFENDANT STILLEY:
                                Mr. Oscar Amos Stilley
15                              7103 Race Track Loop
                                Fort Smith, AR 73901
16
                                Mr. Robert Burton, IV
17                              Standby Counsel
                                Burton Law Firm, PC
18                              320 S. Boston, Ste. 2400
                                Tulsa, OK 74103
19

20                      EXAMINATION INDEX

21
     LINDSEY SPRINGER
22        CONT'D DIRECT BY MR. SPRINGER      2672
          CROSS BY MR. STILLEY               2732
23        CROSS BY MR. O'REILLY              2747
          REDIRECT BY MR. SPRINGER           2848
24        RECROSS BY MR. O'REILLY            2871

25
```

```
 1          THE COURT:  Welcome back, members of the jury.
 2  By my watch, it's 8:59.  Thank you very much.
 3      Mr. Springer, you may continue.
 4                     LINDSEY SPRINGER,
 5              CONTINUED DIRECT EXAMINATION
 6          MR. SPRINGER:  Your Honor, I would -- just to
 7  make certain I have, I would move to introduce
 8  Defendants' Exhibit Number 16, which was the instruction
 9  booklet for the 1040 form for 1992 into the record.
10          THE COURT:  Any objection?
11          MR. O'REILLY:  Yes, sir.  Objection.  It's
12  outside the scope.  He has testified to it for his good
13  faith.  1992 is not relevant to this hearing.
14          THE COURT:  Counsel and the parties will
15  approach.
16      (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND
17  OUT OF THE HEARING OF THE JURY.)
18          THE COURT:  Okay.  First of all, we're here in
19  this witness's direct testimony, so what is this outside
20  the scope of?
21          MR. O'REILLY:  Your Honor, not outside the
22  scope, it's outside the years of the indictment.
23  Mr. Springer was -- and I thought this had been
24  resolved -- was testifying to materials with respect to
25  his good faith and was going to be reading them into the
```

LINDSEY SPRINGER - CONT'D DIRECT BY MR. SPRINGER                2673

 1  record.  I don't have a huge objection to this, I just

 2  don't want the jury getting bogged down with a bunch of

 3  incendiary materials where he has already -- they've gone

 4  over.  And Mr. Springer, I believe, already read

 5  everything in that he purportedly relied on, so I'm not

 6  sure how much relevance --

 7          MR. SPRINGER:  I did read page 2, Your Honor,

 8  but I believe, for the record, I need to at least make a

 9  record that I moved them into the record.  Whether the

10  Court denies it is the next issue.  But I asked the Court

11  earlier, I think it was Tuesday, how it wanted me to

12  move, one at a time or all at the end.  And the Court

13  told me to go talk to standby counsel.  I did that.  And

14  now I'm going to -- each time I testify about a document,

15  I'm going to attempt to put it into the record of this

16  case.

17          THE COURT:  So how many of these offers are we

18  going to have?

19          MR. SPRINGER:  There would be this instruction

20  booklet.  There will be seven -- six forms and two more

21  instruction booklets.  I will try to summarize by just

22  putting one instruction booklet in that covers the entire

23  scope of the charges.

24          THE COURT:  And which instruction booklet would

25  that be?

1          MR. SPRINGER:  The 2000 instruction booklet,

2    Your Honor, because that's when the basis of the charges

3    began and that's also when the conspiracy is alleged to

4    have began.

5          THE COURT:  Well, under the authorities that I

6    discussed at length on the record early on in this trial,

7    I do think it would be prejudicial to encumber the record

8    with voluminous materials of this kind.  I have been, I

9    think, pretty tolerant in affording you opportunities to

10   read from the documents that you considered to be

11   relevant to the issue of willfulness.  That is the

12   approach that is established or at least suggested and

13   approved under a good many of the cases that I have

14   discussed on the record.  I'm inclined to permit you to

15   offer and I'm inclined to receive the 2000 instruction

16   booklet.

17         MR. SPRINGER:  Okay.

18         THE COURT:  But I really don't intend to have

19   the record encumbered with a substantial volume of other

20   materials that under Rule 403 certainly could lead to

21   confusion and prejudice.  For that reason, the objection

22   to Exhibit Number 16 will be sustained.  It is the 1992

23   instruction booklet.  I fully intend, absent some cogent

24   reason to do otherwise, to receive the 2000 instruction

25   booklet.  That does not foreclose the Court receiving

1   other materials, if there is some exceptional reason not

2   now apparent shown for receiving other similar materials.

3            MR. SPRINGER:  Your Honor, I also intend on

4   moving into the record Exhibit Number 204, which was the

5   General Accountability Office report from 2005 that I did

6   read from during my direct testimony.  And I didn't want

7   to go back over and sit down and then say I move that

8   into the record too and have to come back over again.

9   That's why I'm bringing it up.

10           THE COURT:  What says the government to that?

11           MR. O'REILLY:  We object to that, Your Honor.

12           THE COURT:  The objection will be sustained for

13  all the reasons we've discussed.  I won't receive that.

14  And in terms of any mass offer of these materials, let's

15  do that during a recess rather than taking up the jury's

16  time.

17           MR. SPRINGER:  So anything I want to move just

18  wait till the recess?

19           MR. O'REILLY:  Your Honor, with respect to the

20  materials, the information books and returns for the

21  years 2000 to 2005, we're not going to oppose the

22  introduction of those, they're voluminous, but at least

23  they do fall within the scope of the conspiracy, although

24  Mr. Springer certainly didn't file any of the forms in

25  issue.

1          MR. SPRINGER:  Is that a stipulation then that

2     we can move them into the record now?

3          THE COURT:  Let's just take them one at a time.

4     But in light of the government's election to withhold

5     objection, it's -- you're likely to have a substantially

6     easier time with documents from 2000 through 2005.  And

7     so as you proceed, you can probably routinely offer those

8     and they'll probably be routinely received in evidence.

9          MR. SPRINGER:  One more question about

10    procedure.  Once they're in and I want to publish them,

11    how do I do that?  Can I ask Mr. Stilley to do it?

12         THE COURT:  He'll make you a real good

13    paralegal.

14         MR. SPRINGER:  Thank you, Your Honor.

15         MR. O'REILLY:  Your Honor, we received this

16    morning some gift tax materials from Mr. Springer.  What

17    was the exhibit numbers?

18         MR. SPRINGER:  Exhibit 172 and 173, which was a

19    2000 gift tax return form and an instruction, which they

20    solicited testimony about during their case in chief.

21         THE COURT:  Well, we'll take that one step at a

22    time.

23         MR. SPRINGER:  Thank you, Your Honor.

24      (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

25    WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

```
 1   PRESENCE AND HEARING OF THE JURY.)

 2            THE COURT:  You may continue.

 3            MR. SPRINGER:  Thank you.  The report that I

 4   read to you, pieces of the General Accountability Office

 5   report from May of 2005, that report was written three or

 6   four years after I actually started telling the United

 7   States about what I had found.  I was telling everybody

 8   that I could about the problems I was running into, why I

 9   was listening to doctors and plumbers, and how they were

10   all having the exact same problem.

11        And when I did my looking backwards towards, for

12   instance, the notice of deficiency they had sent me in

13   1996, the IRS never said on that document what law it was

14   that required me to file a Form 1040.  They never even

15   put the statute that supported use of Bureau of Labor

16   Statistics to impose a tax liability on me.  And so as I

17   had gone back and looked at other documents, I noticed

18   that the same thing that all these people were telling me

19   over and over again, out in the public, was the same

20   thing that was not apparent on any of the documents that

21   I had to review.

22        In 1999, I obtained a copy of an 83-I form.  The

23   83-I form is the form the IRS sends to the Office of

24   Management and Budget to get approval to ask you and I

25   information on the Form 1040.  And in that application,
```

1  they have to sign a certification and that certification

2  is what's called Section 19.  And this is Defendants'

3  Exhibit Number 49.

4      And what Office of Management and Budget does is ask

5  each CIO, which is the certifying information officer, to

6  fill out an answer series of questions.  And once you get

7  to the second page of the 83-I, there is a series of

8  statements made on the application that says, "On behalf

9  of the federal agency, I certify that the collection of

10  information encompassed by this request complies with 5

11  CFR 1320.9," and the collection of information on the

12  first page is listed as the Form 1040.

13      And it says, "The following is a summary of the

14  topics regarding the proposed collection of information

15  that the certification covers.  First, that it is

16  necessary for the proper performance of agency

17  functions.  Second, it avoids unnecessary duplication.

18  Third, it reduces burden on small entities.  Fourth, it

19  uses plain, coherent, and unambiguous terminology that is

20  understandable to respondents," respondents being those

21  people who they're asking to answer --

22          MR. O'REILLY:  Objection, Your Honor.

23  Mr. Springer is testifying as to what some term means.

24  My understanding is he's testifying as far as his good

25  faith reliance in reading this document.

1          THE COURT:  Mr. Springer, were you reading

2    directly from the document or were you offering your

3    commentary?

4          MR. SPRINGER:  I was reading directly from the

5    document, Your Honor.

6          MR. O'REILLY:  Objection, Your Honor.  He was

7    not --

8          MR. SPRINGER:  I did begin to make a sentence

9    after I finished reading and then I tried to clarify what

10   I believed the word "respondents" meant.  So I will make

11   -- I'll fix that.

12         THE COURT:  Well, okay.  This is a GAO report?

13         MR. SPRINGER:  No, Your Honor.  This is the

14   application for the 1040 form.

15         THE COURT:  What exhibit is that?

16         MR. SPRINGER:  That's Exhibit Number 49.  This

17   is for the 1998 version.

18         THE COURT:  What page were you on?

19         MR. SPRINGER:  The second page, Your Honor.

20         THE COURT:  Mr. Springer?

21         MR. SPRINGER:  Yes, sir.

22         THE COURT:  It is imperative that when you read

23   from one of these documents you avoid your personal

24   commentary or at least that you make it very clear what

25   you're reading from versus what your personal commentary

1  is.  I'll expect you to clarify and correct that.

2          MR. SPRINGER:  Thank you, Your Honor.  I

3  apologize for that.

4      It is my belief that when the application is asking

5  the agencies to tell them the answers to these questions,

6  and it references the word "respondent," it's you and I

7  that they're seeking that information from.

8      The fifth certification request states, which is

9  Subsection E, "its implementation."  "Its

10 implementation," my belief is the word "it" means the

11 Form 1040.  "Its implementation will be consistent with

12 compatible and current reporting and record keeping

13 practices."  And then sub F, it indicates the retention

14 period for record keeping requirements.  And then sub G,

15 it informs respondents of the information called for

16 under 5 CFR 1320.8(b)(3).  And then there are six

17 listings below it.

18     One, it says, I -- excuse me, one, "why the

19 information is being collected; two, use of the

20 information; three, burden estimate; four, nature of

21 response."  And then parenthetically it says, "voluntary,

22 required for a benefit, or mandatory," end of

23 parentheses.  And then fifth it says, "nature and extent

24 of confidentiality."  And the last one says, "need to

25 display current valid OMB control number."

1      And then after that six, under this certification

2  document, which my belief is that the CIO must sign this

3  certification in order to go to the next level with the

4  Form 1040, the next three below that says, "It was

5  developed by an office that has planned and allocated

6  resources for the efficient and effective management and

7  use of the information to be collected.  See note in item

8  19 of the instructions."  It says -- then the next says,

9  "It uses effective and efficient statistical survey

10  methodology."  And then the last one says, "It makes

11  appropriate use of information technology."

12      And then in black, bold, italicized written words on

13  the application it says, "If you are unable to certify

14  compliance with any of these provisions" -- and I believe

15  the word "you" means the CIO, the one who has to sign the

16  document.  "If you are unable to certify compliance with

17  any of these provisions, identify the item below and

18  explain the reason in item 18 of the supporting

19  statement."  And they don't put anything.

20      And so I also found that this was the same for the

21  application that was filed in --

22          MR. O'REILLY:  Objection.  I'd like it

23  referenced that this was actually signed off on by a

24  compliance officer on September 15th of 1998.

25          THE COURT:  That would be fair to point out.

1          MR. SPRINGER:  Right.  My belief is that the

2    form has to become approved prior to when the public is

3    told or asked for information by the form.  So, for

4    instance, if it was the 1998 year, that form, in my

5    belief, doesn't exist until January of 1999.  And so then

6    my belief is that this application has to be filed before

7    the form can be circulated to the public in general.  And

8    so in my belief it also has to be approved before the

9    form can be circulated to the public.

10         And I also found that -- and this I now refer to

11   Defense Exhibit Number 50.  My belief and understanding

12   that I learned is this application, which was Exhibit 49,

13   and now I will go to Exhibit 50, they are for three

14   years.  On the first page, they actually state the date

15   that they're requesting approval.

16         They also state on the form on the first page the

17   expiration.  I could never find an expiration date on the

18   Form 1040, but I could find a year on the form.  But on

19   Defendants' Exhibit 49, it clearly, if you could remove

20   the stamp that says "received," you would note or you

21   would see that it is good for three years.  And so this

22   is why there's not another 83-I that I could find until

23   2001.  And that would be Defense Exhibit Number 50.  And

24   I found --

25         MR. O'REILLY:  Your Honor, objection.  I just

 1  want to make sure that -- are we still on 50?

 2          MR. SPRINGER:  We're now on 50.

 3          MR. O'REILLY:  Thank you.  Never mind, Your

 4  Honor.  Withdraw the objection.

 5          MR. SPRINGER:  On Defense Exhibit Number 50,

 6  which has an approval required by 9/20/01 date on it, it

 7  again goes through the same identification of the Form

 8  1040 and its schedules.  And on the second page, it

 9  contains a certification that was dated 8/16/01.  And,

10  again, all of the listing issues, where it says, "it

11  must," it informs respondents and so forth, there are not

12  any of those certification requirements listed under the

13  section that says, "If you are unable to certify

14  compliance with any of these provisions, identify the

15  term below and explain the reason in item 18 of the

16  supporting statement."

17      And the same holds true on Defendants' Exhibit

18  Number 51, which is the 83-I application.

19          MR. O'REILLY:  Objection.  I would like

20  Mr. Springer to also point out that in Defendants'

21  Exhibit 50 it states on the third page that OMB has

22  approved, without change, the forms presented by the IRS.

23          THE COURT:  Mr. O'Reilly, on some of these

24  items, it's appropriate for cross rather than --

25          MR. O'REILLY:  I apologize, Your Honor.

1           THE COURT:  Very well.  That will be overruled.

2  You may proceed.

3           MR. SPRINGER:  I'm just thinking.  I found it is

4  true that OMB would say that the IRS had approval to put

5  the OMB number 15450074 on the Form 1040.  But what I

6  also found was that OMB was not doing its job.  I found

7  that when it came to the IRS, they just rubber stamped

8  exactly what I found in that report from the General

9  Accountability Office in May of 2005.  That, for

10 instance, as Mr. O'Reilly pointed out and I read to you

11 yesterday in footnote 50 on page 31 of that report, the

12 IRS asserts to you and I that answering the questions on

13 the Form 1040 is mandatory.  Which gives them -- my

14 understanding and belief is that this would allow them

15 not to have to comply with the Paperwork Reduction Act

16 requirements.

17      They must state two things on the form.  One, under

18 my belief and as I read from the report yesterday, one is

19 that they must cite the statute that they claim makes it

20 mandatory; and, two, they must write on the form this --

21 or your obligation to answer these questions is

22 mandatory.

23      And as I read on the certification, which I'm not

24 going to read each one of them, other than I'm just

25 testifying that it's the same, the certification requires

1  them to certify that they have stated to you on the form

2  that the obligation is voluntary, required to receive a

3  benefit, or mandatory.  And although these were my words

4  beginning in 1999 and 2000 and 2001, when the general

5  accountability report came out, it only affirmed to me

6  that I was right.

7      And with respect -- because there's forms 2000

8  through 2005 at issue in the indictment in this case, I

9  have also brought -- or I also have Defense Exhibit

10  Number 52, which is the 83-I for 2005.  And this is a

11  significant change.  And the reason it's significant is

12  because there was an 83-I in '98.  Three years later

13  there's a -- and that's Defense Exhibit 49.  Then there's

14  an 83-I for 2001, three years later.  And then in '04,

15  there's another one.  But then in '05, for the year 2005,

16  they issue a new one.  And at this point, this is out of

17  sequence.  And what I learned why they did it, they

18  decided to --

19          MR. O'REILLY:  Objection, Your Honor,

20  clarification.  Where have you learned it, that it's his

21  belief.

22          THE COURT:  It's necessary for you to establish

23  your basis for firsthand knowledge.

24          MR. SPRINGER:  My firsthand knowledge is from

25  Defense Exhibit Number 52.  And I had sent a question to

1  a congressman in Washington after January of 2006 when I

2  first was made aware that the 1040 form's OMB approval

3  number was now appearing on -- under income Form 2555.  I

4  found that it appeared on the 941 forms.  I found that it

5  appeared on the W-2 forms.  And for 25 years prior, each

6  one of these forms I had found had a separate and

7  distinct OMB number on the form.

8          MR. O'REILLY:  Your Honor, just note the time is

9  9:20.

10         THE COURT:  Proceed.

11         MR. SPRINGER:  So when I looked into why these

12 numbers all changed and that a number appeared on all of

13 these forms that previously had never appeared on these

14 forms, I had received a response from OMB that was sent

15 to a congressman that just stated that IRS had decided to

16 use a new methodology.

17    Well, to me, in my belief, that was significant.

18 It's one of the reasons why I read it as a sign, I needed

19 to come back in and come back at this a little different

20 direction instead of going to play golf.  And I would

21 like to tell you just a moment about why I thought it was

22 time to play golf.

23    In 1994, there were three women over the age of 65

24 who had prophesied over me that my walk in this mission

25 would end and I would know it when I was to begin to play

1    golf.  I didn't think it would take as long as it had.

2    But I never quit on it.  I just one day I was reading on

3    an airplane a magazine and I saw John Daly from Arkansas

4    standing playing golf with three U.S. Senators.  And I

5    thought to myself, is that telling me something?  If I

6    could get there, could I have an impact with what I know?

7        And the only reason why in 2006 I decided to stop

8    and come back to this place where I'm at today is because

9    of three events that took place.  One, I was told that I

10   wasn't getting $19,000 back from the money that was

11   seized from my house; two, I had found out that they had

12   removed all of the OMB numbers from 211 different forms

13   and were now putting all of those forms under the 1040

14   form number; and then, three, I had learned that they

15   were no longer going to pursue Mr. Turner.  Which meant

16   that the national office was willing to listen.  Which

17   was something up until that point I couldn't get them to

18   listen to me.

19       Now, significant becomes in my belief, once I go

20   from the application, I then turn and look at the Form

21   1040, which is what the general -- in my belief is what

22   the General Accountability Office is saying for us all to

23   do to make certain that the certification that the IRS --

24       MR. O'REILLY:  Your Honor, objection.  Asked and

25   answered.  We've been over this a lot.

```
 1          THE COURT:  Counsel and the parties will
 2   approach.
 3       (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND
 4   OUT OF THE HEARING OF THE JURY.)
 5          THE COURT:  Mr. Springer, when we recessed day
 6   before yesterday you told me you had 20 more minutes on
 7   the Paperwork Reduction Act.  We resumed at 8:59 this
 8   morning, then we promptly had a bench conference until
 9   9:07, and then we resumed on the Paperwork Reduction
10   Act.  It's now 9:26.  How much more do you have that
11   relates to the Paperwork Reduction Act?
12          MR. SPRINGER:  I'm now on the Form 1040, Your
13   Honor.  I just had to lay my foundation for what I'm
14   getting ready to show them on the Form 1040 and then I'm
15   done.
16          THE COURT:  How long is this going to take?
17          MR. SPRINGER:  Ten more minutes.
18          THE COURT:  What do you have that relates to the
19   1040 that does not relate to the Paperwork Reduction Act?
20          MR. SPRINGER:  I just need to show the jury that
21   in my due diligence that I went and looked at the Form
22   1040, set it side by side to the application, and --
23          THE COURT:  To what application?
24          MR. SPRINGER:  To the 83-Is that I was just
25   reading from, Your Honor.
```

1           THE COURT:  That's under the Paperwork Reduction

2   Act?

3           MR. SPRINGER:  Well, actually, no, those are

4   just applications for approval, those aren't Paperwork

5   Reduction Act.  It's an application.

6           THE COURT:  Why do they call it a Paperwork

7   Reduction Act submission then?

8           MR. SPRINGER:  This is a part of the 1040 form

9   is what I'm saying that they can't get to the form

10  without having this document and I needed to show the

11  jury after I read the report from the General

12  Accountability Office.

13          THE COURT:  Okay.  You told me day before

14  yesterday you had 20 more minutes.

15          MR. SPRINGER:  Right.

16          THE COURT:  I have bent over backwards, I have

17  not charged the seven-minute bench conference against you

18  and we started this bench conference at 9:26.  I'm going

19  to give you ten minutes and after that ten minutes,

20  nothing relating to the 1040 or the Paperwork Reduction

21  Act will be said any further in your narrative

22  testimony.  You're going to hear about it on cross, but

23  I'm going to give you ten minutes and it's -- and I don't

24  care if you're in the middle of a syllable.

25          MR. SPRINGER:  I'm ready.

```
 1              THE COURT:  Okay.
 2         (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,
 3    WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE
 4    PRESENCE AND HEARING OF THE JURY.)
 5              THE COURT:  Proceed.
 6              MR. SPRINGER:  Thank you, Your Honor.
 7         Defense Exhibit Number 23 is the Form 1040 for the
 8    year 2000.  It's two pages long and I have looked at it
 9    intrinsically.  And as I read to you yesterday what the
10    General Accountability Office said, that there is none --
11    in my belief, there is not one of the certification
12    requirements on the Form 1040.  There is no statement
13    that it is mandatory.  There is no citation to statute
14    that makes it mandatory or supports it.  And that is
15    true, that I found to be true with respect to Defense
16    Exhibit Number 23 for the year 2000.  Defense Exhibit
17    Number 25.
18         Defense Exhibit Number 25 is the Form 1040 for the
19    year 2001, although my statement -- my belief is
20    consistent with the year 2000, as it is with 2001, that
21    there is no statement of mandatory or there is no
22    statutory citation on any of the certification
23    requirements that IRS certified to the Office of
24    Management and Budget that would appear on the Form 1040.
25         And then Defense Exhibit Number 27 is the Form 1040
```

1  for the year 2002.  And it's the same -- my findings and

2  my belief are the same for the year 2002 that they were

3  for 2000 or 2001.

4      Defense Exhibit Number 29 is the Form 1040 for the

5  year 2003.  I found the same omission on the Form 1040 on

6  any of the certification statements that are signed by

7  the CIO to OMB on their application of Form 83-I.

8      And then Defense Exhibit Number 31 is the Form 1040

9  for the year 2004.  And the same I found and believe to

10  be true that there is none of the certification

11  requirements that IRS CIO certified to OMB that was on

12  the Form 1040.  And that same holds true with Defense

13  Exhibit Number 33, which is the Form 1040 for 2005, that

14  none of the certifications that were made by the CIO to

15  OMB on their 83-I application appear nor did I find that

16  they even had attempted -- to attempt to satisfy what

17  they signed on their certification.

18      Defense Exhibit Number 172 is a Form 709 for the

19  year 2000 and it's a United States gift tax return.  And

20  up until 2002 and Defense Exhibit Number 172 is for the

21  year 2000, the very top --

22          MR. O'REILLY:  Objection.  I'd like some

23  reference of when Mr. Springer first saw this form.

24          THE COURT:  That would be fair.

25          MR. SPRINGER:  2004 is when I first saw this

1   form.  And it was based upon a conversation I had had

2   with the United States Department of Justice lawyer

3   Robert D. Metcalf.

4        And on Exhibit -- Defense Exhibit 172, at the very

5   top, it says, in parentheses, Section 6019 of the

6   Internal Revenue Code for gifts made during the calendar

7   year 2000.  In 2003, I found that this same 709 form they

8   removed all reference to any statute whatsoever and they

9   haven't ever came back and added any more statutes to the

10  form.  I extensively read that General Accountability

11  Office report and it was as if I had written it myself.

12       Defendants' Exhibit Numbers 24, 26, 28, 30, 32, and

13  34 are the instruction booklets for the Form 1040 for all

14  relevant years in this case.  I have read them

15  intrinsically, as you will find the General

16  Accountability Office had also done.

17       I relied on the Paperwork Reduction Act's promise.

18  I relied upon the circulated documents that the IRS gave

19  us.  I did everything I could and am still trying to do

20  everything I can to get IRS to comply with the Paperwork

21  Reduction Act.  I will not stop.  Because I believe that

22  it is the key to our future as a nation.  We must have

23  the rule of law.  We cannot have agencies of the United

24  States, in my belief, not accountable to you and I.

25            MR. O'REILLY:  Your Honor, objection.  This is

 1   argument, not testimony.

 2          THE COURT:  Overruled.

 3          MR. SPRINGER:  I would like now to discuss with

 4   you how I concluded that money people would give me was a

 5   donation or a gift versus a payment for services

 6   rendered.  And throughout this trial, I, as everyone

 7   else, have heard questions being asked about billing

 8   statements.  And we also heard -- I heard Special Agent

 9   Brian Shern say to me that I just was in a business like

10   anybody else.

11       There are things I would ask you to consider based

12   upon what I believed and knew.

13          MR. O'REILLY:  Your Honor, objection.  Asking

14   the jury to consider things is argument, not testimony.

15          THE COURT:  Overruled.  I'm going to give him

16   some leeway in the way he phrases his narrative.

17   Proceed.

18          MR. SPRINGER:  Thank you, Your Honor.  One of

19   the things that you should consider, if somebody gave me

20   money, and the Court has instructions on this, what power

21   did I have to compel them to give me money?  What would

22   happen if a check somebody wrote me bounced?  What would

23   my legal claim be to sue them to recover for the bounced

24   check that had "donation" on it or was stated as it was

25   donation?

 1          MR. O'REILLY:  Objection, Your Honor.  This is

 2   not testimony.

 3          THE COURT:  Now, at this point, Mr. Springer,

 4   you really have lapsed into argument.  On this issue, you

 5   need to be testifying about your personal perception

 6   based on firsthand knowledge or your perception of other

 7   people's understanding based on what you observed about

 8   them.

 9          MR. SPRINGER:  Thank you, Your Honor.  It is my

10   belief that if somebody gives you money and they don't

11   have some contract where you have to perform a specific

12   role or conduct, that that would be one factor to

13   consider among many others on whether or not the money

14   was treated as a gift or not.

15      In this case, the question about the money becomes,

16   to me, more about how the IRS treated the people who gave

17   me the money.  If it was a business expense, were they

18   allowed to treat it as a business expense?  Were they

19   allowed to write the money off of their gross income?

20   You've seen -- strike that.  I'm sorry.

21      I believe the evidence that -- of the checks that I

22   received sometimes were from a corporation, sometimes

23   were from a trust, sometimes were from an LLC, sometimes

24   they were from an individual.  And in each instance, the

25   government wants you to believe it was -- excuse me,

 1    strike that.  I do not believe any of those transactions
 2    were payment for contracted services.
 3        Now, in 1997, after I had concluded the second round
 4    of lawsuits with the IRS with hundreds of people, where
 5    the federal judge told us we could not revoke previously
 6    given testimony, I met by a check in the mail for $5,000
 7    a man named Geoffrey Benson.  The check was written off
 8    of an organization called The Infinity Group Company.  I
 9    had never received a $5,000 check in the mail from
10    somebody I didn't know.  So immediately before I did
11    anything with the check, I called the number on the
12    check.  I asked for the person who had signed the check.
13        I had came -- or was told in that first conversation
14    that they had found out about my name and my ministry
15    from numerous of the 10,000 members that that
16    organization had.  I asked did they have a way of telling
17    me what members they were so that I could know if I knew
18    them or recognized them.  And, eventually, it came up
19    that they had given me a few names that I had recognized
20    as had been supporting me before.
21        And I learned that this organization had told people
22    that it had a grant program.  And I did not know anything
23    about the organization at the time I got the check for
24    $5,000.  I decided to learn more.
25        I was then told that this company had made several

1   million dollars -- this organization with 10,000 members

2   had made several million dollars in investments.  At the

3   time, I had no way of verifying whether it was true or

4   not.  I just believed it to be true because 10,000 people

5   couldn't be wrong.  This was my belief at the time.

6       I developed a relationship with the organization.  I

7   then got a $10,000 check in the mail, but I was told that

8   was coming.  I then went up to Ohio and met with the

9   principals of the organization.  I left there being told

10  I was going to get $150,000.  Within a couple of weeks, I

11  received 15 $10,000 checks.  I deposit -- I cashed one

12  check after another.  Economically, I was just recovering

13  from the 1996 time period.

14      I was then told that I would get a grant of $3

15  million from the organization.  I wanted to believe it,

16  but my wife at the time didn't believe it.  It was beyond

17  belief in my mind as well, but I did have those 15

18  checks, so I did see something was coming.

19      And I was asked to help the organization.  At all

20  times, the communications that I had were about

21  donations, that I could not receive anything but

22  donations.  But at the same time, I was willing to help

23  in any way I could, as I would anybody.  In particular,

24  my concern at this point was the 10,000 members were

25  asking me to be supported by this grant and they had all

1  been told they were all making millions of dollars.  So

2  to them it was a legitimate thing as well.

3      Within three weeks of receiving $1.2 million of that

4  money, which I went and opened up with my then wife a

5  savings account only at a bank, and it required her

6  signature and my signature to open up the account.

7          MR. O'REILLY:  Objection, Your Honor.  That's

8  hearsay.

9          THE COURT:  Overruled.

10         MR. SPRINGER:  The $1.2 million was sent to me

11 by check and by wire.  And every week I was told as this

12 profit came in from this organization's investments that

13 I was going to reach the level of $3 million.  I didn't

14 know what or how I was going to handle that, but I was

15 quickly trying to figure it out because I believed that I

16 was being given this to further my mission.  And I'm

17 barely into this mission in 1997.

18     Three weeks after I received $1.2 million that was

19 deposited into the bank, the United States came in and

20 brought an action and froze that account.  And their

21 claim was that the 10,000 people had not registered their

22 pooling of their money, which was over $100 million, that

23 they had not registered their pooling with the Securities

24 and Exchange Commission.  Bondage Breakers Ministries was

25 sued as a relief defendant as well as me, Lindsey

1   Springer.  There were other people that were involved in

2   The Infinity Group organization.

3       There was an emergency hearing held in

4   Philadelphia.  Everybody in the case was allowed to have

5   money that was frozen to have lawyers, and in most cases,

6   multiple lawyers represent them.  I asked for money for

7   one lawyer and I was denied because the Court said I was

8   asking for too much.  Not only had the Court issued an

9   order that froze the $1.2 million, they had froze every

10  penny I had.

11      Within two weeks, I'm in Philadelphia at what's

12  called a temporary hearing where the question for the

13  Court is whether the freezing of everybody's assets

14  should remain in place or whether it should be lifted

15  because the government was wrong.  The Court decided

16  because the money that was given to me was a donation

17  that I could not keep the money.

18          MR. O'REILLY:  Your Honor, objection for

19  clarity.  This is Mr. Springer's perception of why the

20  Court decided what it decided.

21          MR. SPRINGER:  I'll fix it.

22          THE COURT:  That will be sustained.

23      Mr. Springer, when you start giving reasons that

24  other people, including courts, do things, you need to

25  make it very clear whether you're talking about your

 1   perception or whether you are representing something that

 2   is, in fact, documented in a way that can be established

 3   in this proceeding.

 4          MR. SPRINGER:  Yes, Your Honor.  Defense Exhibit

 5   Number 7 is an order written by The Honorable United

 6   States District Court Judge Stewart Dalzell from the

 7   Eastern District of Pennsylvania.  And his order on the

 8   first page lists Lindsey --

 9          MR. O'REILLY:  Objection.  Excuse me.  Defense

10   exhibit what?

11          MR. SPRINGER:  107.

12          MR. O'REILLY:  107.

13          MR. SPRINGER:  On page 2 of the Court's order --

14          MR. O'REILLY:  Objection.  If Mr. Springer is

15   simply going to read from the document, that's not

16   appropriate.  One, outside the scope of the charges of

17   this case, unless this goes to somehow his good faith

18   belief that all he received were gifts.

19          MR. SPRINGER:  And that's the purpose.

20          THE COURT:  Counsel and the parties will

21   approach.

22      (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND

23   OUT OF THE HEARING OF THE JURY.)

24          THE COURT:  Okay.  Mr. Springer, bearing in mind

25   the issues in this case --

1           MR. SPRINGER:  Right.

2           THE COURT:  -- what is the relevance of Exhibit

3    107 either generally or in terms of the passage you

4    propose to read?

5           MR. SPRINGER:  It's relevant because it shows

6    that I was given $1.2 million and that the money was

7    taken back away from me because it was labeled a

8    donation.  In this case, the government has said

9    donations were actually, in fact, payment for services.

10   I had to disgorge the money.  Bondage Breakers Ministries

11   is named as a party and it was very well known what I was

12   doing.  I gave a deposition in 1998 and I explained in

13   that deposition exactly what I was doing for The Infinity

14   Group Company and so I just wanted to read that passage

15   to show the jury.

16          THE COURT:  What passage?

17          MR. SPRINGER:  It's on page 2, it's one

18   paragraph, it's the fourth paragraph down.

19          THE COURT:  Okay.  Where it talks about the

20   undisclosed donation of 1.265?

21          MR. SPRINGER:  Yes, Your Honor.

22          THE COURT:  What's the relevance of that?

23          MR. SPRINGER:  It just shows that I received a

24   donation and I couldn't keep it.  It wasn't mine.  It was

25   not considered payment for services rendered.  It was

1    treated as a donation and therefore was subject to the

2    disgorgement rule.  And that shaped the belief about

3    donations that I carried from that day forward.

4          THE COURT:  That seems to -- it's not

5    conceivable -- I'm going to listen to what Mr. O'Reilly

6    has to say, and maybe he won't object to this, but it's

7    just not conceivable to me that that situation in that

8    case at that time, whether it involves this particular

9    passage or not, has any rational similarity to anything

10   that's at issue in this case.  But that said, I'll hear

11   what Mr. O'Reilly has to say.

12         MR. O'REILLY:  Your Honor, part of it is I don't

13   want the jury left with any misleading -- and, obviously,

14   I can go into cross to clear this up.  But there is a

15   subsequent highlighted passage where the Court actually

16   does explain why the Court is ordering disgorgement,

17   which is that these were unlawfully obtained investor

18   funds.  He didn't care whether it was a donation or not,

19   it was the fact they were unlawfully obtained investor

20   funds.

21         THE COURT:  Where is it?

22         MR. O'REILLY:  That's on page --

23         THE COURT:  Where is it?

24         MR. O'REILLY:  On page 9, Your Honor.  On my

25   copy it's highlighted.

1          MR. SPRINGER:  However, if I may, Your Honor, at

2    the time --

3          THE COURT:  Wait a minute.  Mr. Springer, let me

4    read this.

5          MR. SPRINGER:  Okay.

6          THE COURT:  Go ahead.

7          MR. SPRINGER:  At the time that the money was

8    taken and frozen, there was no finding of any of those

9    facts.  And I was in huge discussions with the SEC over

10   taking that money and they were fully aware of what I was

11   doing and concluded because I had no contract that it was

12   a donation and therefore it could be disgorged.  And that

13   is -- I would like to tell the jury that that began, at

14   least where I'm at now, began the basis of why I believed

15   that I could, as it starts in '99, ask people for money

16   as a donation only.

17         THE COURT:  Okay.  Mr. Springer, aside from the

18   fact it looks like this would certainly blow up in your

19   face, it has no conceivable bearing on the matters that

20   are at issue in this case and that objection will be

21   sustained.  You're going to need to find something else

22   to talk about besides this order in The Infinity Group

23   case.  That is sustained.

24         MR. SPRINGER:  There's also a Third Circuit

25   Court of Appeals order where Judge Alito wrote an order

1    that found also too that it was a donation, and that was

2    all he found.  Is Your Honor's order the conclusion -- I

3    don't want to raise it over there again and come back,

4    so --

5              THE COURT:  Is that marked as an exhibit?

6              MR. SPRINGER:  It is, Your Honor.

7              THE COURT:  Exhibit number what?

8              MR. SPRINGER:  May I go to my seat and get my

9    list?

10             THE COURT:  Yes.

11             MR. SPRINGER:  It would be Exhibit 189.

12             THE COURT:  Okay.  And what's the portion of

13   Exhibit 189 you would rely on?

14             MR. SPRINGER:  May I go get my Exhibit 189?  I'm

15   sorry, I just got my exhibit list.

16             THE COURT:  You may.

17             MR. O'REILLY:  Your Honor, may I go grab our

18   copy as well?

19             THE COURT:  You may.

20             MR. SPRINGER:  It would be the second page, Your

21   Honor, at the very bottom where the Third Circuit was

22   re-quoting and said, "In addition, Benson made an

23   undisclosed donation of $1.265 million of investor funds

24   to Lindsey Springer."  Same quote.

25             THE COURT:  Is that it?

 1              MR. SPRINGER:  That's it.

 2              THE COURT:  Both with respect to the district

 3   court order and with respect to the Third Circuit order,

 4   the Court finds no computable rational basis for the

 5   relevance of either of these documents or proposed

 6   testimony with respect thereto.  Further, if either of

 7   these documents had any relevance at all, the Court is

 8   equally convinced that the potential for confusion, waste

 9   of time, and the resulting prejudice, particularly with

10   respect to confusion of the issues, would cause the

11   prejudicial effect of these documents to far outweigh

12   their minimal probative value.

13       But I must re-emphasize that that balancing is, in

14   my view, unnecessary because they have no conceivable

15   relevance in the first instance.  So, Mr. Springer, you

16   will proceed with the next subject.

17              MR. SPRINGER:  Okay.

18       (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

19   WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

20   PRESENCE AND HEARING OF THE JURY.)

21              THE COURT:  Proceed.

22              MR. SPRINGER:  After that -- the case I was just

23   speaking of took several years of my life.  I spent a lot

24   of time in Philadelphia trying to understand how that

25   just happened.

1          And in 1999, I met Oscar Stilley through Dr. Philip

2    Roberts over a beer and pizza in Fort Smith, Arkansas.  I

3    did not know Oscar Stilley, but I did know Dr. Roberts.

4    And there was never any agreement that day or any other

5    day that Oscar Stilley and I or myself and anybody else

6    entered into with the intent of defrauding the United

7    States of any -- anything whatsoever, whether it be, as

8    you will read in the indictment, the computation, the

9    ascertainment, and the assessment and the collection of

10   taxes.  There was just no such agreement.  It was never

11   even discussed.  It would never have been discussed.

12         The reason why we met in Fort Smith, Arkansas,

13   because I was praying God would send me attorneys who

14   would see what I was seeing and Dr. Roberts, he needed an

15   attorney.  Interestingly, I did not tell Dr. Roberts

16   about Oscar Stilley.  It was Dr. Roberts who told Lindsey

17   Springer about Oscar Stilley.

18         Exhibit 191, the IRS was made fully aware by Lindsey

19   Springer that he used Checks Cashed, the name of the

20   business, Checks Cashed, not to be confused with a check-

21   cashing business, but a specific place, and they've known

22   about it for 19 years.

23         I never went to all the -- I don't know, there's 48

24   or so in Tulsa.  I didn't go to each one of those 48

25   places.  I used one company.  Yes, it is true they had

1  three locations, but they were owned by the same guy.  It

2  was no different than Bank of America having small

3  branches on each corner conveniently located for you to

4  go do what you need to do, or me.

5     But the difference was I no longer could trust

6  writing checks.  I could no longer trust having money in

7  an account, writing a check, and then having the IRS come

8  in with no warning and cleaning that account out and

9  leaving all those checks out bounced.  I couldn't do it.

10 It was not a risk I could take anymore.  I found a way to

11 always pay what I paid at the time I paid it without ever

12 being concerned anything would bounce.

13    I tried numerous times to get a credit card and this

14 was at a time when there were no prepaid credit cards.

15 That was not -- in the early '90s, mid-'90s and late

16 '90s, the advent of a prepaid card that looked like a

17 VISA didn't exist.

18    In 2004, I got married to my third wife, and my last

19 marriage.  And when I first got married, I would use my

20 wife's credit card for things that I needed.  I was

21 reluctant at first, but it was a card out of her checking

22 account, so if any money was spent, I would put it into

23 her account.  Within just a few months of doing this

24 without my name anywhere on the account, she got a letter

25 in the mail that said that Bank of America had closed the

1  account.  She called them up, she asked them why they

2  closed the account, they said we just decided to close

3  it.

4         MR. O'REILLY:  Objection, Your Honor, multiple

5  layers of hearsay.

6         THE COURT:  Sustained.

7         MR. SPRINGER:  After that account was closed,

8  and now my wife was concerned, she went and opened up an

9  account at a bank that her parents had been at for a long

10 time.  And then she went in with me and we tried to add

11 me to her account.  And they, at first, did not want to

12 do it.  But she called her mom and dad up and asked them

13 to call the bank because they had banked there for so

14 long, and they did, and the bank decided to add me to her

15 account.

16        MR. O'REILLY:  Objection as far as time frame

17 and what type of account.

18        THE COURT:  It would be appropriate to give a

19 point in time for this, if you can, Mr. Springer.

20        MR. SPRINGER:  This would be in the -- between

21 2005 and 2007 time frame.  And with documents, I could

22 refresh myself on that.  I do remember the Bank of

23 America account being closed in 2004 or 2005.  Don't

24 remember exactly what the date is.  But I do remember

25 trying to get that account open and trying to get me on

1    that account and how difficult it was.

2        And then once I was on the account, we went to the

3    bank and we tried to deposit a Bondage Breakers

4    Ministries check signed with my name on it, just like I

5    would sign them at the check-cashing place, Checks

6    Cashed, the business called Checks Cashed.  And the bank

7    said that they couldn't accept that, that I needed to

8    open up my own checking account at the bank under the

9    name Bondage Breakers Ministries and then they would let

10   me deposit the checks.

11       So I, with my wife there, we walked over to the

12   place where you would sign up to open up an account, the

13   lady had me fill out all the paperwork.  Then she came

14   back and said, I'm sorry, we can't open up that account,

15   but if your wife would sign on the account with you, that

16   we would open it.

17       So I agreed and my wife agreed that we would leave

18   the bank, try to figure out what to do about Bondage

19   Breakers Ministries.  I was concerned about Bondage

20   Breakers Ministries and her affiliation with it.  Not

21   because of anything that I was doing, but I did not want

22   it to become something that involved her.  Lindsey

23   Springer was okay, Bondage Breakers Ministries was just

24   Lindsey Springer.  So we started depositing Lindsey

25   Springer checks into her and my checking account and I

1  remained cashing Bondage Breakers Ministries' checks at

2  the check-cashing place.

3       Now, at this point, the only thing that we're using

4  out of her and my checking account --

5            MR. O'REILLY:  Your Honor, objection just for

6  clarification.  This is all after 2005?

7            MR. SPRINGER:  Yes.  Oh, excuse me, no.  No, it

8  would be at the end of 2005 or early 2006.

9            THE COURT:  Proceed.

10            MR. SPRINGER:  That I -- the best I remember.  I

11  went and inquired about how to or what was wrong with

12  Bondage Breakers Ministries and Lindsey Springer opening

13  up an account.  And I learned that the IRS --

14            MR. O'REILLY:  Objection.  Calls for hearsay.

15            THE COURT:  Sustained.

16            MR. SPRINGER:  I personally became aware --

17            MR. O'REILLY:  Objection.

18            THE COURT:  Counsel and the parties will

19  approach.

20       (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND

21  OUT OF THE HEARING OF THE JURY.)

22            THE COURT:  Now, when did this conversation take

23  place --

24            MR. SPRINGER:  Your Honor --

25            THE COURT:  Now, Mr. Springer, don't interrupt.

```
 1   When did this conversation take place that you were
 2   starting to say made you personally aware of something?
 3            MR. SPRINGER:  When the bank refused to open up
 4   an account.
 5            THE COURT:  Okay.  Give me an approximate time,
 6   even if it's just a month and year of that.
 7            MR. SPRINGER:  I believe it's December of '05,
 8   Your Honor, but I can't be just exact, but I think that
 9   that's the time period that was.
10            THE COURT:  Okay.
11            COURT SECURITY OFFICER:  One of the jurors needs
12   a break.
13       (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,
14   WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE
15   PRESENCE AND HEARING OF THE JURY.)
16            THE COURT:  Members of the jury, we'll take our
17   mid-morning break at this time.  It's -- we'll resume at
18   25 minutes after the hour.  Please remember my usual
19   admonition not to discuss or investigate the case, not to
20   reach any conclusions about the case until it has been
21   given to you for your deliberations and verdict.  Please
22   be available just a little before 25 after the hour.  You
23   may proceed.  And you can go back to your tables.
24       (JURY EXITED THE COURTROOM)
25            THE COURT:  Okay.  The jury has left the
```

```
 1   courtroom.  Is the door closed?  Okay.  Mr. Springer, the
 2   reason for that inquiry as to when this conversation took
 3   place is that if in point of time it logically relates at
 4   all to your difficulties in maintaining an account, then
 5   in turn that seems to me to be fair game by way of
 6   explanation of why you did not and could not maintain an
 7   account and that it was defensive rather than with any
 8   fraudulent intent that you -- or intent to evade and
 9   impair and defeat the ascertainment and collection of
10   revenue and so forth.
11       So the first step, though, in that analysis is
12   whether this account, if you will, that you're giving of
13   your difficulty in dealing with the bank occurred at a
14   time, that it logically would explain why you chose to
15   deal with the check-cashing store rather than by dealing
16   with a bank and establishing an account in a bank.  So if
17   you have that foundation to lay --
18            MR. SPRINGER:  Right.  I do.
19            THE COURT:  -- then I -- and if it relates to a
20   time that is relevant under the indictment, even if it's
21   the last month of the last year, then I'm probably going
22   to let it in.
23            MR. SPRINGER:  Okay.
24            THE COURT:  And on that score, that probably
25   would also help you get past some hearsay objections
```

1  based on what people at banks may have told you that's

2  really not being offered for the truth of the matter

3  asserted, but is rather offered as it relates to your

4  decisions based on those statements having been made.

5      But the first step, and this is your burden, is to

6  lay the foundation for relevance both in terms of the

7  time that the conversation took place and what it related

8  to.  With that, I'll hear you on that objection.

9          MR. SPRINGER:  In March of 2005, actually going

10  back to January 2004, I was made aware that the IRS had

11  some sort of interest in me and my social security

12  number.  By December of 2004 --

13          THE COURT:  They have had that interest for an

14  eon before that.

15          MR. SPRINGER:  Well, Your Honor, relevant to the

16  inquiry that you're making, I became subsequently aware

17  after the 6700 investigation was concluded by Ms. Meadors

18  in December of 2004, by March of 2005, by Fred Rice,

19  Agent Rice, which, Your Honor, was the judge in a case I

20  had brought in Oklahoma City where Mr. Rice had sent a

21  levy to a wrong address with the right to a CDP hearing.

22      But after that levy notice was filed upon, Mr. Rice

23  did send me a notice of federal tax lien, but I did not

24  know the impact that that would have had on opening up a

25  checking account.  And where my testimony is right now, I

1    was just giving the jury an understanding of my

2    relationship with banks.  I had just told them about what

3    happened to my wife's account when I started using it

4    with her without my name on it.  And so demonstrating the

5    logic will follow when the account was closed we tried to

6    go get an account and that's when I discovered all these

7    previous things that actually that Agent Rice had done

8    that was having the impact of why the bank was acting the

9    way it was.  And that's why I was laying that foundation.

10         I understand it goes forward, then backwards, but

11   there's a reason for it.  Because I didn't know why the

12   bank was acting the way they were until I learned that

13   they had run a credit check on me and had all of these

14   entries that Agent Rice had made on some computer system

15   that the bank uses.  And so that's why I was where I was

16   with that testimony.

17            THE COURT:  Okay.  Well, the pending question

18   was interrupted when you said, "I personally became

19   aware."

20            MR. SPRINGER:  Right.

21            THE COURT:  Now, what was it that you were going

22   to say you became aware of?

23            MR. SPRINGER:  I asked the bank why they

24   wouldn't open up that account.  And they said because you

25   have to have credit because of overdraft protection

1  policies that they had at the bank.  And it was from that

2  basis that I could not get an account on my own for

3  Bondage Breakers Ministries.

4          THE COURT:  Okay.  Now, Mr. O'Reilly, with that

5  explanation, I want to hear what you have to say in

6  support of your objection.  I'll tell you, with that

7  explanation, the answer that he proposes -- or the

8  testimony that he proposes to give to complete -- at

9  least complete that sentence doesn't sound to me to be

10  objectionable, but I'll certainly give you an opportunity

11  to steer me in some other direction.

12          MR. O'REILLY:  Your Honor, it sounds -- what

13  he's saying that he became personally aware because the

14  bank told him something.

15          THE COURT:  Right.

16          MR. O'REILLY:  First of all, we don't know who

17  the person was at the bank.  But that's hearsay if it's

18  offered for the truth of he could not open a bank

19  account.  And that appears to be the only reason

20  Mr. Springer is offering this --

21          THE COURT:  Well --

22          MR. O'REILLY:  -- is to testify to the jury I

23  could not open a bank account.

24          THE COURT:  But if he was told that he had to

25  have credit established in order to be able to open a

 1   bank account, if he testifies that he was told that, for

 2   whatever impact it might at that time have had on his

 3   state of mind, it doesn't matter whether it was true or

 4   not, does it?

 5          MR. O'REILLY:  No, Your Honor, but then I would

 6   want a limiting instruction that it is for his state of

 7   mind and not for the truth of whether or not he could

 8   open a bank account.  Furthermore, when he's talking

 9   about -- when he began his testimony it was what the bank

10   had told him that the IRS had done and then that gets

11   into several levels of hearsay.

12          THE COURT:  Well, yeah, and we're not -- there

13   is obviously some aspects of both of these defendants'

14   dealings with the IRS are relevant here, but we're not

15   going to use things like dealings with banks as the eye

16   of a needle through which to pull a lot of camels in the

17   form of a parade of horribles about the IRS.  It has got

18   to relate somehow reasonably directly to the issues in

19   this case.

20      And so, again, it's going to -- I can't sit here in

21   an anticipatory way without having a specific question or

22   a specific proposed testimony before me and call balls

23   and strikes in terms of what the jury will be permitted

24   to hear and what the jury will not be permitted to hear

25   about the IRS.  But I'll give you a rule of thumb,

1  Mr. Springer, and that is that if testimony you propose

2  to give relates in some way to the IRS's treatment of

3  you, it needs to relate pretty directly to the issues in

4  this case as opposed to general backdrop information.

5          MR. SPRINGER:  May I inquire -- state something

6  to the Court just -- understanding of this so they'll

7  know where I'm going?

8          THE COURT:  I'll allow you to say that in just a

9  moment because I'm going to rule your way before I forget

10 to.

11         MR. SPRINGER:  Thank you.

12         THE COURT:  The objection is overruled to the

13 pending question that we had on the table a few minutes

14 ago and that is you were made aware that you had to have

15 credit in order to open an account.  Okay.  So when we

16 resume with the jury, you can say that and then we'll go

17 to the next item whatever it is -- whatever it may be on

18 your list, but I'm ruling your way on that.  So what else

19 do you have?

20         MR. SPRINGER:  I believe that it's important to

21 understand that because the IRS did not use the correct

22 address I wasn't notified correctly and so how I had to

23 learn about these things was when things like an account

24 got closed of my wife's or when we tried to go in and fix

25 the problem and then that took me backwards to learn what

1   had happened and that's the relevance.

2          THE COURT:  That goes to what issue?

3          MR. SPRINGER:  The way I formed my statement.  I

4   just -- I should have laid more foundation is what I --

5   the error that I made.

6          THE COURT:  What issue in this case does that go

7   to?

8          MR. SPRINGER:  It goes to whether or not that I

9   was -- first of all, in good faith trying to open up an

10  account, whether I was trying to once they told me why

11  not, I went and tried to figure out why, which had to

12  look backwards not forwards.

13         THE COURT:  I'm not following you on this

14  backwards, not forwards.

15         MR. SPRINGER:  When they told me the reason why

16  they wouldn't open the account was because IRS had put a

17  lien against me and that I needed to contact the IRS and

18  go figure that out.  And that's just what I was told and

19  that's what I was getting ready to tell the jury.

20         THE COURT:  Well, we'll take it one step at a

21  time.  I'm having, to put it mildly, a difficult time

22  following you, but we'll take it one step at a time.  I

23  have ruled your way as to your testimony about what you

24  were made aware of, specifically that you had to have

25  credit to open an account and that that presumably caused

1    you some difficulty.  That will be permitted and then

2    we'll just take it one step at a time from there.

3           MR. O'REILLY:  Your Honor, just briefly, much of

4    what Mr. Springer just related, he testified to on

5    Tuesday, that there were liens, in fact, back in 1996.

6    He became aware of Mr. Rice with a business card in 2004

7    or 5, I don't recall off the top of my head and so I'm

8    baffled as my objection at that point would become asked

9    and answered, that it has already been covered.

10          THE COURT:  Well, on one hand, yes, I do have

11   the authority to regulate cumulative and repetitious

12   testimony.  On the other hand, it is only natural in some

13   instances for a witness to refer to a situation to which

14   he previously testified for the purpose of providing a

15   backdrop for new testimony on some new subject.

16          Tracy spent most of the day yesterday, Veterans Day,

17   transcribing Mr. Stilley's and Mr. Springer's testimony

18   and in the transcript I've got, his narrative goes from

19   page 144 to page 216.  And, indeed, I have reviewed it

20   and, indeed, he does expound quite a bit on the tax lien

21   situation and on the levies and so forth.  But if he

22   wants to refer back to that briefly by way of backdrop

23   for new testimony on new subjects, that is not

24   objectionable.

25          If it is a rehash and there's no apparent reason for

 1   it other than the fact that it is simply a rehash, then,

 2   yes, that is objectionable.  But, again, I'm going to

 3   have to take that one step at a time as it comes.

 4      Let's see, the jury is due back when?  Okay.  We'll

 5   stand in recess, then, until the jury comes back and

 6   we'll proceed just as soon as the jury comes back at the

 7   appointed hour.

 8      (A RECESS WAS HAD, AFTER WHICH THE FOLLOWING

 9   PROCEEDINGS WERE HAD IN OPEN COURT AND WITHIN THE

10   PRESENCE AND HEARING OF THE JURY.)

11           THE COURT:  Mr. Springer, you may continue.

12           MR. SPRINGER:  Thank you, Your Honor.  After I

13   learned why the bank would not let me open up a Bondage

14   Breakers Ministries account, which was -- I was aware

15   that they had notice of tax liens filed from March of

16   2005, but I wasn't aware how that impacted opening up a

17   checking account or closing an account where my name

18   wasn't even on it.

19      I tried and am still trying to this day to try to

20   fix those issues.  I have been a member of eBay since

21   2002 and I got a PayPal account with a prepaid VISA

22   card.  They constantly asked me to become verified.  And

23   on numerous occasions, I tried to become verified, which

24   meant that I had good credit, and I could not.  To this

25   day, I remain unverified.  My score on eBay is --

```
 1                MR. O'REILLY:  Objection.  This is hearsay.

 2                THE COURT:  Well, it's sustained for a different

 3    reason.

 4                MR. SPRINGER:  From 2002 and then beyond 2005,

 5    there became offers on PayPal to get a credit card, to

 6    get a PayPal credit card.  And I filled out their

 7    application.  They invited me to fill out the

 8    application.  And Defense Exhibit Number 207 demonstrates

 9    the most recent attempt at doing that, which was

10    declined.  Defense Exhibit Number 202 --

11                MR. O'REILLY:  Your Honor, objection to

12    reference to Exhibit 207.  It appears this is from

13    November -- from this month, which is --

14                THE COURT:  I can't hear you.

15                MR. O'REILLY:  I apologize.  It appears this is

16    from November of 2009.

17                THE COURT:  And that's exhibit number what?

18                MR. O'REILLY:  207, the credit card application,

19    how that would be relevant.

20                THE COURT:  Is that what you intend to refer to

21    now?

22                MR. SPRINGER:  No, I've already referred to it.

23    It was just my -- I testified it was my most recent

24    attempt to get a credit card.

25                THE COURT:  Well, Mr. Springer, your present
```

1  credit status is irrelevant and I heard your brief

2  reference to that and I trust you're not going to go back

3  to your present credit status.  Now, what's the exhibit

4  that you plan to refer to now?

5          MR. SPRINGER:  The next one is 202, Your Honor.

6          THE COURT:  Okay.  Stand by.  You may continue.

7          MR. SPRINGER:  Thank you, Your Honor.

8          THE COURT:  We're not receiving 202 at this

9  point, but I certainly want to hear your narrative

10  continue.

11          MR. SPRINGER:  Thank you, Your Honor.  In

12  January of 2004, I was contacted by the IRS wanting to do

13  an investigation on certain monies that I had received.

14  I met with the IRS.  I told the IRS the names and the

15  amounts that people gave me.  And I told the IRS that I

16  helped people and that these monies were donations or

17  gifts, but I never denied that I gave help.  There was

18  just never, as I told them, a quid pro quo.  There was no

19  thing for thing.

20      And Exhibit Number 202 are response letters from

21  those people where the IRS wrote them asking them why did

22  they give Lindsey Springer money.  And, specifically, the

23  request was involving whether I had sold a tax avoidance

24  scheme.  And Erika Dertien, which is the first page of

25  Exhibit 202, she wrote Mr. Springer --

1          MR. O'REILLY:  Your Honor, objection, hearsay.

2          THE COURT:  Sustained.

3          MR. SPRINGER:  In December of 2004, I was

4   notified that the investigation had concluded and that

5   they had not found I had violated Section 6700.  In the

6   letter I received from the IRS, they did, however, state

7   that they were going to continue to consider whether

8   those monies that were given to me were, in fact,

9   taxable.  I never heard anything from them again on that

10  subject.

11      You've heard testimony regarding a bus.

12  Mr. Bolthouse, I believe, bought a bus from me in late

13  2005, if you remember.  And in 2000, when Dr. Roberts

14  gave me money, he testified that he remembered that he

15  had asked me to use that money as I had asked for to

16  complete the conversion of a bus.  And Defendants'

17  Exhibit Number 208 is a receipt from Ozark Diesel Power

18  on November 8, 2000, which is the beginning of what ended

19  up being a $25,000 engine in that bus.

20      At the time that my home was raided in 2005, they

21  went through that bus and there was a white book similar

22  to what you've seen me open here with all the receipts

23  and expenses that I had spent on that bus.  And I do not

24  have it.  I believe that it was taken during the search.

25  But at this point, no one has seen it.

 1      For the record, Your Honor, I would move the

 2   entrance of Defendants' Exhibit Number 208.

 3          MR. O'REILLY:  No objection.

 4          THE COURT:  Defendants' Exhibit 208 is received.

 5          MR. SPRINGER:  Defense Exhibit Number 209 is a

 6   billing which I received in 2000 on November 3rd from

 7   somebody who was working weekly on that bus to redo it.

 8   I had worn it out and I was redoing it.  And Defense

 9   Exhibit Number 209 is a billing from the people who were

10   working on the bus, which that one week's bill was over

11   $2,000.  And this occurred for a year and at least three

12   months.

13      And, Your Honor, I would move into the record

14   Defense Exhibit Number 209.

15          MR. O'REILLY:  Your Honor, if we may have a

16   moment, I want to make sure these aren't already in

17   evidence under government's exhibits.

18          THE COURT:  Very well.  If you can ascertain

19   that reasonably quickly, why, we'll take a look at that.

20   It is important that we not have the same document in

21   evidence under two separate exhibit numbers.

22          MR. O'REILLY:  Your Honor, I believe these

23   exhibits are already in Government's Exhibit 303.  We'd

24   have to actually look and double-check, but I believe

25   these are redundant exhibits, both 208 and 209.  And,

1  Your Honor, if I may approach to look at the Court's

2  exhibits -- I mean, the witness's exhibits.

3          THE COURT:  You may.  Okay.  209 is in evidence

4  as the second to the last page of Government's Exhibit

5  303.  And, therefore, 209, as such, will not be received

6  because it's already in evidence.

7          MR. SPRINGER:  Thank you, Your Honor.

8          THE COURT:  You may proceed.  And, Mr. Springer,

9  obviously, you can't do this on the fly, but remember the

10  ground rules we established early on that if a document

11  is in evidence it will not be referred to by another

12  exhibit number.  You may proceed.

13          MR. SPRINGER:  Thank you, Your Honor.  If I may

14  just have one second, Your Honor, one moment.

15          THE COURT:  You may.

16          MR. O'REILLY:  Your Honor, just for

17  clarification, the government has the same objection with

18  respect to Defendants' 208 because we believe that's in

19  Government's Exhibit 324.  We'd move to strike

20  Defendants' Exhibit 208 as redundant.  Your Honor, it's

21  toward the middle of Government's Exhibit 324.

22          THE COURT:  Well, we'll address that when we

23  take our lunch recess.  Proceed.

24          MR. SPRINGER:  When Oscar Stilley gave me the

25  money from Mr. Patterson, he gave me those $20,000 checks

1  in my name exactly the way I asked for them.  He also

2  gave me the 18 $1,000 money orders exactly the way I

3  asked him to do it.  I was so used to getting $350 money

4  orders from Checks Cashed that it was saving me money if

5  I got $1,000 money orders from Oscar Stilley instead of

6  coming over to Checks Cashed and taking one check,

7  cashing that entire check, paying 2 or 3 percent on that

8  check just to get at the same place I was when

9  Mr. Stilley gave me those three $20,000 checks and the 18

10 $1,000 money orders.

11     The reason why I signed two of those checks over to

12 purchase a vehicle instead of cashing those at the Checks

13 Cashed place and then paying $40,000 in $350 money orders

14 is because it seemed a lot more convenient and it saved

15 me 3 percent on $40,000.  I asked the person who was --

16 testified in this trial, the car dealer who was allowing

17 the transaction on the Mercedes through eBay that was

18 purchased or was to be purchased, I asked him if he would

19 have any problem with that.  And he said, no, as long as

20 you send the checks first and make sure that they clear.

21 So I did that.

22     But I think relevant to my state of mind for you to

23 -- strike that.  Sorry.  When that car was purchased, my

24 name was put on that vehicle.  There was no other

25 person's name on there that the government couldn't have

1   found.  The 8300 form that was triggered by that

2   transaction went straight to the IRS, as the countless

3   other CTR forms -- 4789 I believe is the number and then

4   also the 8300s.

5           MR. O'REILLY:  Your Honor, objection.  Can we

6   have a reference to the exhibit number that Mr. Springer

7   is referring to?

8           THE COURT:  Are you referring to any particular

9   CTR form?

10          MR. SPRINGER:  No, Your Honor.

11          THE COURT:  Overruled.

12          MR. SPRINGER:  If the IRS had obtained a legal

13  right to collect money from Lindsey Springer, they were

14  in a much stronger position, in my opinion, my belief --

15          MR. O'REILLY:  Your Honor, objection.  Telling

16  -- this is speculating as to how the IRS could have tried

17  to collect taxes.

18          THE COURT:  Sustained.

19          MR. SPRINGER:  Each of the cars that I purchased

20  that have been testified about in this case were all in

21  my own name.  Had I never received money that purchased

22  those cars, there would have been nothing in my name.

23  The way I believed was -- in examining the charges is

24  that if a cashier's check --

25          MR. O'REILLY:  Your Honor, objection.  His

 1   speaking to the charges is not testimony about the facts

 2   in this case.

 3            THE COURT:  Mr. Springer, are you referring to

 4   the charges in the indictment?

 5            MR. SPRINGER:  Yes, Your Honor.

 6            THE COURT:  Okay.  That's overruled.  We'll hear

 7   it.

 8            MR. SPRINGER:  I did not intend to hide any

 9   money that was given to me in my name by buying a car and

10   putting the car in my name.  The problem that I would run

11   into is there are times I had money and then there are

12   times I didn't.  And when I did, the only choice I had

13   was either to cash the checks and put the money in my

14   house or buy a car and try my best to buy a car that

15   would not depreciate that much in value.

16       I had already become accustomed when I would get

17   money I would have to pay 2 or 3 percent just to cash the

18   check or get money orders or somehow transfer through

19   Western Union money.  So in my belief, I believed that in

20   my relationship with the IRS, that they were in a better

21   position with vehicles in my name to try to collect than

22   if I was just holding a cashier's check in my name in my

23   drawer.  This is the way -- and to this day, I still

24   maintain this is the best way to operate for me as an

25   alternative to the options that I had.

1      It is true I did ask people to make certain that

2  they were clear that when they gave me money that it was

3  an unconditional gift, that they had to agree there was

4  no expectation.

5      Some of the things I've heard during this trial I

6  had never heard before.  For instance, when Mr. Lake

7  testified that he called me and asked me if he could hire

8  me for my legal services and that I said, sure, send me

9  $30,000, that would never ever happen.  I made certain

10  with everybody that I met with, no matter what --

11          MR. O'REILLY:  Your Honor, objection.  Asked and

12  answered.  He has repeated this statement at least a half

13  a dozen times.

14          THE COURT:  We'll hear it.  It is repetitious,

15  Mr. Springer.  You need to avoid repetition.  You can say

16  this, then go on to something else.

17          MR. SPRINGER:  No matter which witness

18  testified, I made certain that there was no expectation,

19  there was no contract, that I told them that I would do

20  everything I could to continue on with my mission.  There

21  was never a statement to me by Mr. Patterson that he

22  expected me to provide him legal services for the money

23  that he was giving me.  There was never any statement by

24  Mr. Lake that he expected me to provide him legal

25  services for the money that he was giving me.  I would

1  have rejected it.  I would have turned it down.

2          MR. O'REILLY:  Objection.  This is argument.

3  This is not statements of fact.

4          THE COURT:  Overruled.

5          MR. SPRINGER:  I did not willfully fail to file

6  Form 1040 for the calendar years 2000, 2001, 2002, 2003,

7  2004, and 2005.  I did not willfully fail to report

8  substantial tax liability.  I did see to it that every

9  transaction that I was involved in required by law to be

10 reported was reported, even if it wasn't my obligation to

11 report it.

12     Your Honor, may I have just one moment?

13         THE COURT:  You surely may.

14         MR. SPRINGER:  May I go to counsel table?

15         THE COURT:  You surely may.

16         MR. SPRINGER:  Thank you, Your Honor.  Oscar

17 Stilley had no knowledge --

18         MR. O'REILLY:  Objection, Your Honor.  He can't

19 speak to what Mr. -- well, maybe he can speak to what

20 Mr. Stilley knows.  I'll withdraw it.

21         THE COURT:  Proceed.

22         MR. SPRINGER:  I never told Oscar Stilley what I

23 was doing with the three $20,000 cashier's checks or the

24 18 $1,000 money orders.  I know he was aware because I

25 told him about the $50,000 transaction with

1   Mr. Bolthouse, but that money did not become my money

2   until Mr. Bolthouse said I could have it.

3        The Turner transaction, which is $250,000, it is an

4   odd transaction.  I wish I would have handled that

5   differently.  But it was never payment for services

6   rendered.  It was treated -- at the point in time that I

7   bought the RV, it was treated as a loan.  I made certain

8   that the moment that it was ready to move out of the

9   garage from all the work I had done on it, which was

10  three and a half months of extensive work, that I went

11  straight to the tag office, I got a tag and a title for

12  it, and I made certain that his lien interest was

13  recorded with the state of Oklahoma.

14       I had spent almost $40,000 at that point on the

15  unit, not including the trailer, not including other

16  things that I had done getting ready to go.  The value of

17  the RV was at least 3 or $400,000 at the time I completed

18  it.  It had 7,000 miles on it and it's a piece of art.

19       However, the economy tanked and people stopped

20  having an interest in RVs for a while.  And in trying to

21  sell it, I could not get enough money to offset the debt

22  that was owed against it.  Mr. Turner and I agreed in May

23  of 2006 that I would start making interest payments on

24  that loan.  And that was $1,400 a month.  And I did that

25  for the better part of two-plus years until I could not

1  afford to do it and continue to do what I knew my mission

2  was.

3      I had a conversation with Mr. Turner and expressed

4  to him where I was financially and would he be interested

5  in selling the RV now or does he still want to wait and

6  hold out for the market to come back.  And he and his

7  wife and I agreed that --

8          MR. O'REILLY:  Your Honor, objection.  This is

9  calling for statements by Mr. and Mrs. Turner.  That's

10  hearsay.

11          THE COURT:  Mr. Springer, it's appropriate to

12  testify to an agreement that you made.  And for that

13  reason, the objection will be overruled.

14          MR. SPRINGER:  I agreed with Mr. Turner and his

15  wife that we would not sell the RV and that I would not

16  pay interest payments anymore at this time, that I could

17  not afford it, and that we would wait until the market

18  started to recover and every so often I would try to sell

19  the RV and the best offer that I had received so far is

20  $175,000.  Mr. Turner and I and his wife chose that

21  wasn't enough.  And I had wished he would have sold it

22  for the $175,000.  I did not know whether the market was

23  ever going to come back.  I was frankly concerned that it

24  was going to get worse.  Diesel hit at $5 a gallon.  I

25  was really concerned about it.

```
1        As we sit here right now, I don't know what the
2   future holds for that RV, but I know that Mr. Turner has
3   a secured interest in that RV.  And there's no way that
4   that RV can be sold without Mr. Turner signing a lien
5   release.  No way.
6        I have no further questions for myself, Your Honor.
7            THE COURT:  Cross-examination.
8            MR. O'REILLY:  Your Honor, I believe Mr. Stilley
9   would have the next exam.
10           THE COURT:  Well, I think you're right.
11                      CROSS-EXAMINATION
12  BY MR. STILLEY:
13  Q.   Mr. Springer, do you recall identifying Exhibits 23,
14  25, 27, 29, 31, and 33?
15  A.   I do remember it.
16  Q.   And what were those exhibits?
17  A.   1040 form for 2000, 2001, 2002, 2003, 2004, and
18  2005.
19  Q.   Did you rely on those documents in forming your
20  beliefs about any legal requirements that might be
21  applicable to you for periods relevant to this case?
22  A.   I did.
23           MR. STILLEY:  Move to admit Exhibits 23 through
24  33, odd numbers, inclusive.
25           MR. O'REILLY:  No objection, Your Honor.
```

LINDSEY SPRINGER - CROSS BY MR. STILLEY                    2733

```
 1            THE COURT:  They'll be received.  Counsel and
 2  the parties will approach.
 3       (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND
 4  OUT OF THE HEARING OF THE JURY.)
 5            THE COURT:  There's one ground rule that we
 6  should have a clear understanding of and that is,
 7  Mr. Stilley, now that the Court has received
 8  Mr. Springer's quite lengthy narrative testimony, which
 9  he chose to present that way, any cross-examination by
10  you needs to relate to your case.  If it relates -- if
11  any cross-examination simply relates in some way to
12  Mr. Springer's case without touching on your case, then
13  that basically amounts to a tag-team approach that I'm
14  not going to permit so -- and I intend to be probably
15  fairly lenient in determining whether a given question
16  relates in some way to your case.
17       But if it -- if it clearly relates only to
18  Mr. Springer's case and amounts to nothing more than
19  attempts to bolster or follow up or fortify
20  Mr. Springer's case to the exclusion of anything that
21  relates to your case, we're not going to do it that way.
22  This is not going to be a tag-team exercise.  Is that
23  understood?
24            MR. STILLEY:  Yes, Your Honor.  Since we're up
25  here, if I could inquire about the instruction booklets,
```

1  I think that's the only other thing that I intended to

2  try to move in.  I thought it was oversight on the part

3  of Mr. Springer and when we had a discussion, I told

4  Mr. Springer that I thought it would be more -- it would

5  flow better if I was allowed to ask those questions and

6  put those in.

7           MR. O'REILLY:  Your Honor, actually, Mr. Stilley

8  spoke with me.  I have no objection to him moving those

9  in per our earlier discussion.

10          THE COURT:  I think so the jury understands, you

11  should make that offer within the hearing of the jury

12  then and they'll be received.

13          MR. SPRINGER:  Okay.

14     (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

15  WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

16  PRESENCE AND HEARING OF THE JURY.)

17  Q.  (BY MR. STILLEY)  Mr. Springer, do you recall

18  identifying Defense Exhibits 24, 26, 28, 30, 32, and 34?

19  A.  Yes, I do.

20  Q.  And did you rely on those documents in formulating

21  your beliefs relevant to this case?

22  A.  Yes, I did.

23          MR. STILLEY:  Move to admit Exhibits 24 through

24  34, even numbers only, inclusive.

25          MR. O'REILLY:  No objection, Your Honor.

1          THE COURT:  They'll be received.

2          MR. O'REILLY:  Your Honor, just for

3    clarification, those are the information booklets for the

4    years 2000 through 2005, correct?

5          MR. STILLEY:  Correct.

6          THE COURT:  Very well.

7    Q.   (BY MR. STILLEY)  You've testified a bit to the jury

8    about Judy Patterson, correct?

9    A.   I believe I did.

10   Q.   Did you have occasion to assist an attorney who was

11   helping Ms. Patterson?

12   A.   Yes, I did.

13   Q.   And what was the name of the primary attorney who

14   was attorney of record for Ms. Patterson?

15   A.   Jerold W. Barringer.

16   Q.   And were you at the same time assisting the counsel

17   of record for Eddy Patterson?

18   A.   Yes, I was.

19   Q.   And what was that lawyer's name?

20   A.   Oscar Amos Stilley.

21   Q.   And as you were assisting counsel for the

22   Pattersons, did you have occasion to obtain information

23   that might be helpful to Ms. Patterson's case concerning

24   a good faith defense?  Scratch that.  Did you ask for

25   documents that might be important in understanding why

1   Judy Patterson did what she did?

2   A.   Yes.

3   Q.   And what kind of documents would be important to you

4   in understanding the reasons for Judy Patterson's

5   behavior?

6            MR. O'REILLY:  Your Honor, objection.  How

7   Ms. Patterson's behavior and her trial is not an issue in

8   this case.

9            THE COURT:  Sustained.

10  Q.   (BY MR. STILLEY)  Did Judy Patterson raise a good

11  faith defense related to the Paperwork Reduction Act?

12  A.   She tried.

13  Q.   And was she successful?

14  A.   The judge wouldn't allow her to raise it.

15  Q.   Why not?

16           MR. O'REILLY:  Objection, Your Honor.  Calls for

17  speculation.

18           THE COURT:  Sustained.

19  Q.   (BY MR. STILLEY)  Did Judy Patterson make an appeal

20  or prepare -- cause to be prepared an appeal brief to the

21  Tenth Circuit Court of Appeals?

22           MR. O'REILLY:  Your Honor, objection to this

23  line of questioning on Ms. Patterson's defenses and

24  appeals.

25           THE COURT:  Counsel and the parties will

 1  approach.

 2      (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND

 3  OUT OF THE HEARING OF THE JURY.)

 4          THE COURT:  Okay.  First of all, tell me how, if

 5  at all, this relates to your case and if it -- and if it

 6  does relate to your case, then tell me how it's relevant

 7  to your case.

 8          MR. STILLEY:  Certainly, Judge.  This is

 9  relevant to my case because I actually drafted the brief

10  for Ms. Patterson and the defense raised was Paperwork

11  Reduction Act as a substantive defense and Jerry

12  Barringer is the one who read and signed that brief.

13  Therefore, it would be relevant to Oscar Stilley's state

14  of mind because that brief was prepared, it was read,

15  signed, and filed by Mr. Barringer.

16      There were two requests for continuance whereupon

17  Ms. Patterson was told that she could get out of jail and

18  the basis was a 35(b), but we've already heard Judy

19  Patterson testify that she gave no assistance.  Oscar

20  Stilley was aware of those facts and at least generally

21  and therefore had reason to believe that the Paperwork

22  Reduction Act had substantial force and persuasion.

23          THE COURT:  That is just impossibly

24  speculative.  The objection will be sustained.

25          MR. STILLEY:  Do I need to move on then away

1    from Judy Patterson?

2          THE COURT:  There are conceivably other matters

3    relating to the Pattersons that may be relevant and not

4    repetitious.  We're getting to a point that we're not

5    going to have repetition, very much at least, but I

6    cannot categorically rule out any more testimony relating

7    to the Pattersons, so I would certainly want you to

8    understand that.  But it has got to be relevant to your

9    case in some way and not repetitious.

10          MR. STILLEY:  Thank you, Judge.

11          MR. BURTON:  Your Honor, standby counsel has

12   tried to confer with these parties and has indicated to

13   them these issues and they will not listen and have no

14   respect for our views.  I just want the Court to

15   understand that.

16          THE COURT:  Very well.  Proceed.

17       (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

18   WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

19   PRESENCE AND HEARING OF THE JURY.)

20   Q.  (BY MR. STILLEY)  Do you have personal knowledge as

21   to what Judy Patterson was told when she actually was let

22   out of jail at five months as opposed to her full

23   sentence?

24   A.   Yes, I do.

25   Q.   And what is the basis of your knowledge?

1   A.    Jerold W. Barringer.

2   Q.    And what was the information that you were told that

3   Ms. Patterson was informed of as the reasons that she was

4   let out of jail?

5            THE COURT:  Wait a minute.

6            MR. O'REILLY:  Objection, Your Honor.  Came from

7   Mr. Barringer and this is hearsay.

8            THE COURT:  Sustained.

9   Q.    (BY MR. STILLEY)  Did you at a later date have

10  occasion to assist the attorney for a gentleman named

11  Robert Lawrence?

12  A.    Yes, I did.

13  Q.    And who was the lawyer on that case?

14  A.    Oscar Amos Stilley.

15  Q.    And to help him, who did you interact with

16  principally in the Robert Lawrence case to provide

17  assistance and help?

18  A.    Oscar Stilley.

19  Q.    Do you recall what the principal defense was in that

20  case?

21           THE COURT:  Excuse me.  Mr. Stilley, if you

22  would, I think it would be helpful for all concerned to

23  establish a point in time that these matters occurred.

24           MR. STILLEY:  Sure.  Thank you, Judge.

25  Q.    (BY MR. STILLEY)  Approximately when was the

1  Lawrence indictment brought down?

2  A.   April of 2006.

3  Q.   And approximately when --

4        MR. O'REILLY:  Objection.  This falls outside

5  the time period of the evasion charge.

6        THE COURT:  Well, I want to hear -- I want to

7  hear a little more before I can confidently rule on that,

8  so the objection will be overruled at this point.

9  Q.   (BY MR. STILLEY)  Okay.  Do you recall approximately

10  when the trial was supposed to be held in the Lawrence

11  case?

12  A.   May 19, 2006.

13  Q.   And do you recall -- now that we have established a

14  time frame, do you recall what the principal defense was

15  in that case?

16  A.   Mr. Lawrence had relied solely on the Paperwork

17  Reduction Act.

18        MR. O'REILLY:  Your Honor, objection.

19  Mr. Springer cannot say what Mr. Lawrence did or did not

20  rely on.

21        THE COURT:  Sustained.

22  Q.   (BY MR. STILLEY)  What information --

23        THE COURT:  We're over in May of '06.

24  Mr. Stilley, I'm having a lot of trouble with relevance

25  of this in terms of anything you did or didn't rely on or

LINDSEY SPRINGER - CROSS BY MR. STILLEY                    2741

1   anything Mr. Springer did or didn't rely on.

2          MR. STILLEY:  The relevance would be that both

3   Oscar Stilley and Lindsey Springer were involved in this

4   and I would like to hook that up by establishing

5   Mr. Springer's basis for knowledge as to why Mr. Lawrence

6   would have both a substantive and a good faith defense.

7          THE COURT:  Well, let's have the next question.

8          MR. STILLEY:  Certainly.

9   Q.  (BY MR. STILLEY)  What character of defense on the

10  Paperwork Reduction Act did Mr. Lawrence raise or did he

11  raise more than one?

12         MR. O'REILLY:  Objection, Your Honor.  Relevance

13  in the Lawrence case and what defenses were raised.

14         THE COURT:  Sustained.

15  Q.  (BY MR. STILLEY)  What kind of documents did you

16  review relative to Robert Lawrence?

17  A.  All the pleadings that you filed.

18  Q.  Did you get discovery respecting Robert Lawrence?

19  A.  Did I get discovery?

20  Q.  Did you ever have occasion to look at discovery or

21  to attain knowledge about discovery provided in the

22  Robert Lawrence case?

23  A.  Yes.

24  Q.  Did you have occasion to get information about

25  Mr. Lawrence's communications with the IRS?

1   A.   Could you give me a time period on that question?

2   Q.   Yes.  And that would have been the time periods

3   relevant to the indictment in the Robert Lawrence case.

4   In other words, the years with respect to which Robert

5   Lawrence had been charged.

6            MR. O'REILLY:  Your Honor, objection as to the

7   whole line of questioning with respect to Mr. Robert

8   Lawrence.

9            THE COURT:  Well, the pending question is a yes

10  or no question and, specifically, did he have occasion to

11  get information about Mr. Lawrence's communications with

12  the IRS during the years relevant to the charge in that

13  case.  And that's a yes or no question and we'll hear the

14  answer, then we'll see what's next.

15            THE WITNESS:  Yes, I did.

16  Q.   (BY MR. STILLEY)  And can you tell the jury why that

17  that would be important if you were trying to help an

18  attorney representing a party?

19            MR. O'REILLY:  Your Honor, objection as to the

20  relevance of this line of questioning.

21            THE COURT:  Sustained.

22  Q.   (BY MR. STILLEY)  Did the government become -- in

23  the Robert Lawrence case become aware of the principal

24  defenses that were going to be raised in the Robert

25  Lawrence case?

1          MR. O'REILLY:  Objection as to the relevance of

2     what --

3          THE COURT:  Sustained.

4     Q.  (BY MR. STILLEY)  Do you recall what happened, what

5     was the result in the Robert Lawrence case?

6     A.  The United States filed a motion to dismiss the

7     indictment with prejudice, which means that they will

8     never bring it back again.

9          MR. O'REILLY:  Your Honor, objection.  The

10    statement has been made and it has already been

11    established, the Lawrence case was dismissed.

12         THE COURT:  Next question.

13    Q.  (BY MR. STILLEY)  Do you recall what counsel for the

14    government had said that it was going to do just before

15    filing the motion for dismissal?

16         MR. O'REILLY:  Objection.  Relevance, Your

17    Honor.

18         THE COURT:  Sustained.

19    Q.  (BY MR. STILLEY)  Did you later file any one or more

20    lawsuits to try to get an answer concerning the Paperwork

21    Reduction Act?

22    A.  I have filed four different complaints trying to get

23    the United States District Court and Appellate Court to

24    address the merits of my claims.

25         MR. O'REILLY:  Your Honor, objection.  This

1    is --

2           THE COURT:  Counsel and the parties will

3    approach.

4        (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND

5    OUT OF THE HEARING OF THE JURY.)

6           THE COURT:  Mr. Stilley, you had ample

7    opportunity during your case when you were on the stand

8    to testify about where you stand under the Paperwork

9    Reduction Act and then, of course, the record will speak

10   for itself as to the matters we have covered with

11   Mr. Springer relating to his understanding of the

12   Paperwork Reduction Act.  And the record will show, I'm

13   quite confident, that I have been indulgent almost beyond

14   reason with Mr. Stilley in expounding his views of the

15   Paperwork Reduction Act.

16       And I'm quite concerned that now that we -- that I

17   thought we had progressed to another phase of the matter

18   that we're going right back into that briar patch in

19   which I have, in my view, been most indulgent.  The

20   pending question relates to Mr. Springer's litigation

21   under the Paperwork Reduction Act.  That does not

22   conceivably relate, to me at least, does not conceivably

23   relate to your defense.  How does that relate to your

24   defense?

25           MR. STILLEY:  Judge, that would relate to my

```
 1   defense because the government chose to allege in Count 1
 2   a conspiracy continuing through 2009, plus Lindsey
 3   Springer filed these four lawsuits and made Oscar Stilley
 4   acutely aware of what he was doing, asked Stilley for
 5   help, shared documents with Stilley, made him aware of
 6   this and thus wove Oscar Stilley's mental state into
 7   Mr. Springer's mental state with respect to the events
 8   and occurrences related to these lawsuits.  That's what
 9   I'm trying to show.
10           THE COURT:  What does the government have to
11   say?
12           MR. O'REILLY:  Your Honor, I don't want this to
13   be a re-litigation of whether or not the Paperwork
14   Reduction Act is a substantive defense.  It is not.  It
15   is preposterous and these two know it and that will be
16   established in cross.  However, if he simply is asking
17   him were lawsuits filed, that's not -- I just don't want
18   us to be relitigating what the Court has already ruled.
19           THE COURT:  Even if it has some conceivable
20   relevance where I do have the discretion to exclude it
21   under Rule 403 no matter how stringent a standard might
22   be applied under Rule 403, we'll hear the answer to this
23   question, the question being or testimony being relating
24   to his civil lawsuits, but we are not, repeat, not going
25   to get into the particulars of those lawsuits.  I'll try
```

1    this lawsuit four times before we'll get into that.

2    We're not going to take up this jury's time after nearly

3    three weeks in the minutia of Mr. Springer's Paperwork

4    Reduction Act litigation.

5        You can go ahead and ask the next question, touch on

6    the civil litigation, and then get on down the road.  But

7    we're not going to dwell on this.

8            MR. STILLEY:  Your Honor, for administrative

9    convenience, my purpose is simply to ask what the claims

10   were and what the results were.  And it would be helpful

11   and save us a trip back, I just want to know what --

12           THE COURT:  What will the evidence be then on

13   that score?

14           MR. STILLEY:  Well, I think Mr. Springer has

15   already talked about the claims that he has made in the

16   different places and the combination of it would be that

17   on none of these cases has the culmination -- has the

18   Court squarely addressed the substantive issues of the

19   Paperwork Reduction Act and issued a substantive opinion.

20           THE COURT:  That is precisely the point.

21   Besides which all of this -- all of these cases that he

22   could even pretend to rely on are after 2006, we're not

23   going to go there.  Get on to your next question.

24           MR. STILLEY:  Thank you, Judge.

25       (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

```
 1  WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

 2  PRESENCE AND HEARING OF THE JURY.)

 3          MR. STILLEY:  Pass the witness.

 4          THE COURT:  Cross-examination.

 5                      CROSS-EXAMINATION

 6  BY MR. O'REILLY:

 7  Q.   Mr. Springer, you've mentioned your current wife

 8  several times.  Is she in the courtroom today?

 9  A.   She is.

10  Q.   Can you point her out to the jury, please?

11  A.   Yes.  She's in the left side of the courtroom.

12  Q.   How long have you and Mr. Stilley worked together?

13  A.   I have been sharing my information with Mr. Stilley

14  since late 1999.

15  Q.   How long have you been exchanging financial, you

16  know, either money orders or receiving IOLTA -- checks

17  from his IOLTA account?

18  A.   I'm not for sure, but I believe around April of 2000

19  maybe would have been the first time that -- and I just

20  don't remember whether I was loaning something or what it

21  was for.

22  Q.   Well, you have no recollection of why you gave

23  Mr. Stilley money in April of 2004 -- I mean, 2000.  I

24  apologize.

25  A.   I really don't.  And I -- I've thought about it,
```

LINDSEY SPRINGER - CROSS BY MR. O'REILLY                    2748

1   I've gone through my computer, I've done everything I can

2   to try to answer that question, and I do not know why I

3   would have been loaning Mr. Stilley money for a specific

4   thing, but I know it has happened a time or two when he

5   has been tight.

6   Q.   But with respect to April of 2000, you agree that

7   you did give him money?

8   A.   I did make out money orders to Oscar Stilley.  I did

9   do that.

10  Q.   In April of 2000?

11  A.   Yes, I did do that.

12  Q.   You just don't know why?

13  A.   I just -- I do not remember that.  I'm sorry.

14  Q.   Could you please give the jury an estimate of how

15  much you were getting every year through Bondage Breakers

16  Ministries and the work you were doing from 2000 to 2005?

17  A.   Are you asking me how much money people just gave me

18  or are you asking how much I spent on myself, personally,

19  out of the money that people gave me?

20  Q.   How much did you receive?

21  A.   Without seeing the instruments, I really couldn't

22  put a figure on it, but it would be more than what you've

23  seen in the charts for each of the summaries.  There are

24  many other transactions besides the ones that you've

25  seen.

1   Q.   Significantly more?

2   A.   I would say significantly more.

3   Q.   Did you also receive cash?

4   A.   As a donation?

5   Q.   Did you receive cash?  And I don't mean from

6   Mr. Delozier.

7   A.   Yeah, that's what I was going to -- I'm sorry.

8   Never in any significant amount from an individual, maybe

9   a hundred, sometimes 800.  I can remember the most being

10  maybe 8 or 900, but I could be wrong a little bit, but

11  not very much that I remember.

12  Q.   How much would you receive in cash in each year on

13  average?

14  A.   From 2000 forward?

15  Q.   2000 through 2005.

16  A.   Okay.

17  Q.   And if there's different amounts in different years,

18  please feel free to --

19  A.   Just, just, just speculating, for 2000, 2002, 2003,

20  it could be more than $250,000 in support that I had

21  received.  In 2001, I don't really remember because it

22  hasn't been a part of this case and so I haven't gone

23  back and taken a look at that.

24  Q.   And you say about $250,000.  Is that a cumulative

25  total for those years or is that each year that you

1   received in cash?

2   A.   Not cash.

3   Q.   That was the question, sir.  How much do you receive

4   --

5   A.   Oh, I'm sorry.  No, no, no, by checks.

6   Q.   The checks, we've seen a lot of those in evidence,

7   correct?

8   A.   Oh, yes, yes.

9   Q.   I'm talking about cash.  How much did you receive in

10  cash on average each year?

11  A.   I just don't know.  I would say 10 to 20,000 maybe.

12  Q.   Each year?

13  A.   Yeah.

14  Q.   So a conservative estimate would be about 10,000 in

15  cash each year?

16  A.   Yeah.  I would say the best average is probably, in

17  those years, $1,000 a month, sometimes $2,000, but other

18  months very little.

19  Q.   You testified that God told you to get rid of the

20  IRS.

21  A.   I have testified several times that that is what I

22  was told to do.

23  Q.   Did God tell you to cheat on your taxes?

24  A.   No.

25          MR. O'REILLY:  Your Honor, if I may approach the

```
 1  witness?
 2          THE COURT:  You may.
 3  Q.  (BY MR. O'REILLY)  Mr. Springer, I'm going to ask
 4  you to take a look at what has been marked for
 5  identification as Government's Exhibit 65.  Do you have
 6  that in front of you?
 7  A.  I do.
 8  Q.  What is Government's Exhibit 65?
 9  A.  It appears to be a cashier's check made out to
10  Lindsey Springer for $9,000 on November 29, 2005, which
11  states the remitter is Oscar Stilley.
12  Q.  Did you receive that check?
13  A.  I believe I did.
14          MR. O'REILLY:  Your Honor, the government moves
15  Government's Exhibit 65 into evidence.
16          THE COURT:  Any objection?
17          MR. SPRINGER:  No objection by me, Your Honor.
18          THE COURT:  It will be received.
19  Q.  (BY MR. O'REILLY)  Now, I'm going to ask you if you
20  could --
21          MR. O'REILLY:  If we could publish that for the
22  jury.  Could we have --
23  Q.  (BY MR. O'REILLY)  If you would take a look at what
24  has been marked for identification as the next exhibit,
25  Government's Exhibit 66.
```

1   A.   Yes.

2   Q.   Okay.  And, actually, before we talk about

3   Government's Exhibit 66, do you recall why Mr. Stilley

4   would have sent you $9,000 on November 29th of 2005?

5   A.   Yes, I do.

6   Q.   Why did Mr. Stilley send you $9,000 on November 29th

7   of 2005?

8   A.   I had ran out of money working on the conversion of

9   -- the RV that Mr. Turner is the lienholder on and I

10  needed to make some more advances on it.  And so that's

11  the amount of money that I asked Mr. Stilley to send me.

12  Q.   I'm going to ask you now to take a look at what has

13  been marked for identification as Government's Exhibit

14  66.  And I'm going to ask you, do you recognize that?

15  A.   I do.

16  Q.   Could you describe for the jury what is Government's

17  Exhibit 66?

18  A.   It's a check written out of Oscar Stilley's IOLTA

19  account for $1,993.56.

20  Q.   Who is it payable to?

21  A.   It's payable to Lindsey Springer.

22  Q.   What's the date on that check?

23  A.   Five -- May 2, 2006.

24  Q.   Did you receive that check?

25  A.   Yes, I did.

1          MR. O'REILLY:  Your Honor, the government would

2    move Government's Exhibit 66 into evidence.

3          THE COURT:  Any objection?

4          MR. SPRINGER:  No objection, Your Honor.

5          THE COURT:  It is received.

6    Q.  (BY MR. O'REILLY)  Do you know what this check was

7    for?

8    A.   I do.

9    Q.   Please explain to the jury what this check was for.

10   A.   Mr. Turner and I originally had an agreement where

11   for one year the loan that he had made was interest-

12   free.  And so as I needed money, I pulled that money out

13   of the IOLTA account for whatever purposes.  And then on

14   May -- around May of 2006, I had a discussion with

15   Mr. Turner about could I continue with this loan that was

16   coming fast due in one year and start making interest

17   payments.  And he agreed that I could do that.  And this

18   amount is the remaining balance that Mr. Stilley showed

19   in the account of the $250,000 that now I was being asked

20   to pay interest on and agreed to pay interest on on the

21   loan, and this ended any transaction that I had with

22   Mr. Turner and Mr. Stilley's IOLTA account on the

23   $250,000 that was in that account.

24   Q.   So as of May of 2006, May 2nd, you had spent all but

25   $1,993.56 of the money that Mr. Turner had put into your

1  possession in case he needed an attorney?

2  A.   I wouldn't phrase it "in case he needed an

3  attorney."  No, I would not agree with that.

4  Q.   Isn't that what Mr. Turner said in that chair, the

5  reason he took the $250,000 and let you hold it was so

6  that it wouldn't be seized if someone -- if the IRS came

7  in and it would be available for him if he needed to have

8  an attorney?  Wasn't that what he testified to?

9  A.   I remembered that Mr. Turner said --

10 Q.   Mr. Springer, is that what he said in the chair, not

11 what he said to you previously?

12        MR. SPRINGER:  Your Honor, I would have to

13 review his statements.  I do not remember those exact

14 words, no, I do not.

15 Q.   (BY MR. O'REILLY)  Let's talk a little bit about

16 your reliance on the Paperwork Reduction Act.  You said

17 in testimony on Tuesday that you first began learning

18 about this Paperwork Reduction Act in reading the 1992

19 instruction booklet for the Form 1040?

20 A.   I first became aware of the phrase "Paperwork

21 Reduction Act" from that booklet.

22 Q.   And you also then, I believe, told the jury and --

23 that you have read extensively about that; is that

24 correct?  About the Paperwork Reduction Act.

25        MR. SPRINGER:  May I make an objection sitting

 1    here, Your Honor?

 2              THE COURT:  State your objection.

 3              MR. SPRINGER:  Could you give me a time frame?

 4    Q.  (BY MR. O'REILLY)  Did you tell the jury that you

 5    have read about the Paperwork Act extensively?

 6    A.  Yes, I did.  I did tell the jury that.

 7    Q.  You've read, for example, the GAO report that you

 8    referenced on Tuesday?

 9    A.  Yes.

10    Q.  When you were reading that to the jury on Tuesday,

11    you almost omitted reading the passage in footnote 50

12    until Mr. O'Reilly, I, objected and that phrase was,

13    "However, the public protection provision may not apply

14    if a collection is mandated by statute (e.g., the

15    requirement to file a tax return)."

16         Please tell the jury why you were going to omit that

17    statement.

18    A.  Actually, I wasn't intending to omit it.  I believe

19    it was covered on page 34 quite extensively in the

20    report, which I read to the jury, that stated that the

21    IRS, if they want to claim a specific form is mandatory,

22    that they are required to cite the specific statute and

23    state on the form your obligation to answer these

24    questions is mandatory.  And that's what the report said.

25    Q.  Mr. Springer, isn't it a fact it is mandatory and

```
 1  you know it?

 2  A.   What is mandatory?

 3  Q.   The filing of a return.

 4  A.   My understanding of the Form 1040 is that in order

 5  for it to be mandatory they must tell you that, they must

 6  tell me that, and they must cite their authority for it.

 7  And that's what the General Accountability Office said,

 8  and I agree with them.  In fact, I had been making that

 9  statement for years before the report was actually

10  drafted.

11  Q.   Mr. Springer, how many cases have you read involving

12  the Paperwork Reduction Act in criminal willful failure

13  to file cases?

14  A.   Every case ever mentioned the word Paperwork

15  Reduction Act I've read them over and over and over

16  again.

17  Q.   Is your reading of those cases a basis for your good

18  faith?

19  A.   Reading those cases develops but is not the basis

20  for.

21  Q.   That's because there is no case that has said what

22  you claim.  In fact, every case has stated, that

23  addresses it, that failure to file a tax return is not

24  protected by the Paperwork Reduction Act; isn't that

25  true?
```

1   A.   That is not true.

2   Q.   Name one case that is a published opinion that says

3   otherwise, sir.

4   A.   First of all --

5   Q.   Sir, I asked you a question, to name a case.  I

6   didn't ask you to opine.

7         THE COURT:  Wait just a minute.  First of all, I

8   need to understand the question.  Does your question

9   relate to criminal prosecutions for willful failure to

10  file?

11        MR. O'REILLY:  Yes, Your Honor.

12        THE COURT:  Okay.  Proceed.

13        MR. SPRINGER:  United States v. Collins, 1990,

14  Tenth Circuit Court of Appeals, footnotes 12 and 13,

15  clarify it with undeniable terms.

16  Q.   (BY MR. O'REILLY)  Mr. Springer, is that the case in

17  which the Court said, "Dickstein" -- who was referenced,

18  I believe, by Mr. Bennett -- "thus lacked any arguable

19  basis in fact or law to argue that the non-compliance of

20  the 1040 forms, which defendant failed to file, did not

21  comply with the Paperwork Reduction Act.  His argument is

22  legally frivolous."  Is that the case you're talking

23  about?

24  A.   That is part of the case that I'm talking about.

25        MR. SPRINGER:  Your Honor, may I object?  He --

1  he did not read the entire opinion just then.  And when I

2  did that, he made me read something else.  Could you

3  please have him read footnotes 12 and 13 to the jury so

4  that they are not misled by his statement?

5          THE COURT:  I need to see what footnotes 12 and

6  13 say.

7          MR. SPRINGER:  Defendants' Exhibit Number 74,

8  Your Honor.

9          THE COURT:  First of all, that Collins case

10 doesn't involve a charge of willful failure to file.

11 Given my understanding of this line of questioning, I'm

12 having a hard time with the relevance of this case to

13 this line of questioning, but the relevant -- the

14 footnotes that are involved here are which?

15         MR. SPRINGER:  Twelve and 13, Your Honor.

16         THE COURT:  Let's -- first of all -- we'll

17 address that one step at a time.  First of all,

18 Mr. O'Reilly, it was my understanding -- and let's just

19 make sure that all concerned understand where the matter

20 stands at this point.  It was my understanding that your

21 question was whether Mr. Springer was aware of a case in

22 which the charge was willful failure to file and the

23 Court held that the Paperwork Reduction Act was a

24 substantive defense.  Is that correct?

25         MR. O'REILLY:  Yes, Your Honor.

1          THE COURT:  Okay.  Mr. Springer, you may answer

2    that question.

3          MR. SPRINGER:  Was a substantive defense?

4    Q.  (BY MR. O'REILLY)  Yes, sir.

5    A.  I don't know of any case where a substantive defense

6    was raised on willful failure to file a tax form, Form

7    1040, ever.

8          THE COURT:  Now, Mr. O'Reilly can read those two

9    footnotes or Mr. Springer can read those two footnotes

10   and you can do it now or later.  It seems likely that one

11   way or another they'll be read.  The relevance is another

12   matter, but you may proceed.

13         MR. O'REILLY:  Thank you, Your Honor.

14   Q.  (BY MR. O'REILLY)  Mr. Springer, stepping back a

15   bit, you read, on Tuesday, to the jury an excerpt from

16   the 1992 information booklet that we referenced earlier

17   from the form that accompanied the Form 1040.  I believe

18   it was Defendants' Exhibit 16.

19   A.  It is.

20   Q.  And you recall telling the jury that based upon this

21   language you were confused because the Commissioner of

22   the IRS, I think it was then Shirley Peterson, was

23   thanking taxpayers for complying with the law

24   voluntarily.  Do you recall that statement?

25   A.  I believe I quoted that statement out of the

1   instruction booklet and read it to the jury.

2   Q.   You didn't read the jury the full note, did you?

3   A.   No, I did not.

4   Q.   But you've read that full note, correct?

5   A.   Yes, I have.

6   Q.   And here is the actual sentence.  I want to know how

7   this impacted your good faith that you didn't have to

8   file a tax return.  And it's where the commissioner

9   writes on page 3 of what is marked as Defendants' 16.

10           MR. SPRINGER:  May I have just one moment, Your

11   Honor?

12           THE COURT:  You may.

13           MR. SPRINGER:  Okay.

14   Q.   (BY MR. O'REILLY)  You didn't read this section,

15   which I'm sure would have impacted on your good faith.

16   "At the same time" --

17   A.   Which paragraph are you on?

18   Q.   This is in the third paragraph starting roughly in

19   the middle.  "At the same time, we will direct our

20   enforcement efforts toward those who willfully fail to

21   report and pay the proper amount of tax.  All must pay

22   their fair share, just as you are doing."

23        Those words are there, aren't they?

24   A.   Absolutely.  They are written right there.

25   Q.   Why didn't you read that portion to the jury on

```
 1   Tuesday, Mr. Springer?
 2   A.   Because before you have to pay a tax, you have to be
 3   required to file a return.  That's Title 26, Section
 4   6151, that you cited in your bill of particulars to this
 5   Court.
 6   Q.   You are liable to pay a tax because you earned
 7   income; isn't that true, sir?
 8   A.   I believe that I did not receive gross income.  I
 9   never denied that I had received income.
10   Q.   You've never denied?
11   A.   That I received income.
12   Q.   At any time?
13   A.   It was gross income that I denied.
14              MR. SPRINGER:  Your Honor, I would also ask that
15   Mr. O'Reilly -- he hasn't read footnote 12 or 13, and I
16   haven't been allowed to read it yet to the jury, and now
17   he is reading from page 2 and he has not read from the
18   Paperwork Reduction Act notice that's on page 4.  And I
19   think he should be instructed to either read it to the
20   jury or I should be allowed to read it to the jury so
21   that they're not confused.
22              THE COURT:  You want to read that entire notice?
23              MR. SPRINGER:  No, Your Honor.  I'm suggesting
24   that he should be required to.  I would like the jury to
25   be aware of it.
```

1              THE COURT:  You can cover that in redirect if
2    you so desire, and we'll address it one way or the other
3    at that point.
4              MR. SPRINGER:  Thank you, Your Honor.
5    Q.   (BY MR. O'REILLY)  Mr. Stilley claims that there's
6    no requirement to file a tax return, doesn't he?
7    A.   I believe he testified to that here the other day.
8    Q.   That's incorrect, isn't it?
9    A.   Yes.
10   Q.   You agree there is a requirement to file a tax
11   return?
12   A.   There could be if a form was issued according to the
13   Paperwork Reduction Act that certification on all ten
14   issues that made the public aware of what the requirement
15   was and if it was mandated that they are required to say
16   what law on the form mandates it.  And there are three
17   options, voluntary, required to receive a benefit, or
18   mandatory.  If they don't put "mandatory" on it and they
19   don't cite the statute, the only other option is
20   voluntary.
21   Q.   Mr. Springer, that's a flat-out false statement,
22   isn't it?
23   A.   What is a false statement?
24   Q.   You are required, if you earn income, to file a
25   return; isn't that true?

1  A.   Required by what?  I don't understand your

2  question.  What do you mean "required to do"?  Required

3  by law?

4  Q.   Are you familiar with Section 6012 of Title 26?

5  A.   Very familiar.  Very familiar.

6  Q.   Section 6012 provides that every individual having

7  gross income which equals or exceeds the exemption amount

8  plus the standard deduction must file a return, doesn't

9  it?

10  A.   Yes.

11  Q.   Section -- excuse me, Section 151 of Title 26

12  provides what that exemption amount is, doesn't it?

13  A.   No.

14  Q.   Mr. Springer, doesn't Section 151 provide that the

15  exemption amount equals $2,000 plus an adjustment for

16  cost of living, just as Mr. Miller has told you on

17  numerous occasions?

18          MR. SPRINGER:  Your Honor, I would object.

19  Could Mr. O'Reilly please state which year he's referring

20  to for the exempt amount?

21          THE COURT:  Overruled.

22          MR. SPRINGER:  I have had conversations with

23  Mr. Miller.  I have witnessed him testify numerous times,

24  yes.

25  Q.   (BY MR. O'REILLY)  Section 151 provides the

1  exemption amount equals $2,000 plus the inflation

2  adjustment calculated for the year 1989, doesn't it?

3  A.   Yes.

4  Q.   And 26 USC Section 63 provides the standard

5  deduction equals $3,000 plus an inflation adjustment

6  calculated for the year 1989 as well, doesn't it?

7  A.   Yes.

8  Q.   And each year -- and, in fact, it was put into

9  evidence by Mr. Stilley the years 2000 through 2005 --

10  the IRS provides instructions that explain what the

11  current exemption amount and standard deduction are,

12  correct?

13  A.   They purport to explain.

14  Q.   They issue instruction books that explain what the

15  amount is, correct?

16  A.   They are attempting to explain, yes.

17  Q.   How many times has Mr. Miller, who was the summary

18  witness in this case, told you and Mr. Stilley this exact

19  same thing, that 6012 compels the filing of a tax return?

20  A.   I've heard him testify about it numerous times.

21  I've witnessed him be cross-examined about it.  I've

22  heard him use the phrase "numerical value."  I have heard

23  him define the phrase "threshold amount means exempt

24  amount plus standard deduction."  I've heard him explain

25  how easy it is to calculate it.  I've -- I've just

1  witnessed him so many times testify about the exempt

2  amount, the threshold amount, and the standard deduction

3  amount.  There's no doubt about it.

4  Q.  There's no doubt about it that the law requires you

5  to file a return if you earn income above the exemption

6  amount and standard deduction, correct?

7          MR. SPRINGER:  Your Honor, I object.  And I

8  would like to read the third paragraph of page 4 of the

9  instruction booklet that Mr. O'Reilly has brought up.

10          THE COURT:  Overruled.  You'll give a direct

11  answer to the question.  And then if there's anything you

12  need to cover on redirect, we'll address it at that

13  point.

14      Mr. Springer, the question was whether the law

15  requires you to file a return if you earn income above

16  the exemption amount and the standard deduction.

17          MR. SPRINGER:  You would begin at that point,

18  yes, but that's not the end of the determination.

19  Q.  (BY MR. O'REILLY)  Mr. Stilley and you are both

20  extremely familiar with both criminal and civil tax

21  cases, are you not?

22  A.  I can't testify as to what Mr. Stilley is familiar

23  with, but everything that I've encountered in my 19 years

24  I'm very familiar with.

25  Q.  You've worked with Mr. Stilley on numerous cases,

```
 1   haven't you?
 2   A.   I think he said he had five trials, and I believe
 3   four of those five I was inherently involved.
 4   Q.   Are those the only cases you have worked with
 5   Mr. Stilley on?
 6   A.   I don't really know what you mean by "cases," but
 7   I've answered every question Mr. Stilley has ever asked
 8   me.  I've done basically anything he has ever asked me to
 9   do.  I would help him in any way I could as long as it
10   was relevant to something that my mission was on.
11   Q.   Could you indicate to the jury how many different
12   individuals you have referred to Mr. Stilley as clients?
13   A.   Four maybe.
14   Q.   Only four?
15   A.   That I referred to him?
16   Q.   Yes.
17   A.   That I remember.
18   Q.   Who are those four?
19   A.   Mr. Patterson, Mr. Blackstock, the Poseleys --
20   Q.   And, Mr. Springer, you'll need to speak into the
21   microphone.
22   A.   -- and Mr. Hawkins, I believe.  I could be wrong on
23   one, I just don't right at the moment remember.
24   Q.   Okay.  And the third name you mentioned was the
25   Poseleys?
```

```
 1    A.    Yeah.

 2    Q.    That was the case in Arizona?

 3    A.    Yes.  Mr. Stilley was hired as an expert for the

 4    public defender's office in that case by the United

 5    States Government involving the Paperwork Reduction Act.

 6    Q.    I believe when you were discussing with the jury on

 7    Tuesday your reliance on the Paperwork Reduction Act, you

 8    spoke of a Supreme Court case Dole?

 9    A.    Yes.

10    Q.    That's Dole v. United Steel Workers of America,

11    correct?

12    A.    Yes.

13    Q.    There is absolutely nothing in Dole that supports

14    your position, is there?

15    A.    Dole says typical information collection requests

16    include tax forms.  The issues --

17    Q.    Does it ever mention the Internal Revenue Service in

18    its entire opinion?

19    A.    No, does not mention the Internal Revenue Service.

20    Q.    Mr. Springer, does it ever mention the Form 1040?

21    A.    No, it does not.

22    Q.    In fact, wasn't Dole a case in which a labor union

23    challenged a hazard communication standard that was

24    promulgated by the Department of Labor?

25    A.    No.  Dole was -- Dole was a case -- from my
```

1  perspective, Dole was a case that involved whether or not

2  third-party requests for information were subject to the

3  protections of the Paperwork Reduction Act.  And the

4  Supreme Court decided that although tax forms were

5  subject to the act, the third-party requests weren't.

6  And Congress, in 1994, got together, decided to overturn

7  that part of the Dole decision.  And in that statutes at

8  large that they wrote, they specifically mentioned the

9  IRS as subject to the Paperwork Reduction Act.  It's on

10  page 171 of the -- what would you call it, it's a

11  legislative history of why they passed the 1995 Paperwork

12  Reduction Act.  And it's the only agency they mentioned

13  when they were explaining it.

14  Q.   Mr. Springer, I am baffled, because what I asked you

15  was, wasn't Dole a case in which a labor union challenged

16  the hazard communication standard promulgated by the

17  Department of Labor and you answered no.  Wasn't that

18  what the case was about?

19  A.   Yes.  The case was about that, but relationships to

20  the Paperwork Reduction Act, it was a third-party request

21  form that was the subject of the Dole decision.

22  Q.   If the answer should have been yes, why did you say

23  no and go on that extemporaneous --

24  A.   I must have misunderstood your question,

25  Mr. O'Reilly.  I apologize.

1  Q.   I believe you also mentioned United States v. Dawes?

2  A.   Yes.

3  Q.   And what were the statutes charged in Dawes, if you

4  recall?

5  A.   6011 and 6012.  I think it's footnote 2 or 3.

6  Q.   Wait.  The statutes charged as criminal violations

7  were 6011 and 6012?  What were the criminal charges in

8  Dawes, if you recall?

9  A.   Tax evasion and willful failure to file, if I

10  remember correctly.  If I could refresh myself on that.

11  Q.   Please do.  And if you could reference for the

12  record what you're using to refresh your recollection.

13  A.   Certainly, I will.  It would be Defense Exhibit

14  Number 75.  It was a 7203 charge.

15  Q.   7203 is willful failure to file, correct?

16  A.   Actually, 7203 reads that when required by this

17  title or by regulation promulgated thereunder, any person

18  required by law -- make a return, I believe is the

19  language, by this title and regulation.  And then you

20  have to go somewhere else to determine whether or not

21  that statute is triggered.

22          THE COURT:  That answer will be stricken as

23  non-responsive.

24          MR. SPRINGER:  Okay.

25          THE COURT:  Mr. Springer, in all fairness, the

```
 1  question was whether Section 7203 is the willful failure
 2  to file section.
 3          MR. SPRINGER:  Yes, it is the willful failure to
 4  file generic statute.
 5          THE COURT:  Next question.
 6  Q.  (BY MR. O'REILLY)  Mr. Springer, didn't the Dawes
 7  court state, and I quote, "The Paperwork Reduction Act
 8  was not meant to provide criminals with an all-purpose
 9  escape hatch"?
10  A.  Yes.
11  Q.  Didn't Dawes also state -- and let me get the
12  citation -- they also held that "The operation of the
13  Paperwork Reduction Act in these circumstances did not
14  repeal the criminal sanctions for failing to file a
15  income tax return because the obligation to file is a
16  statutory one."
17  A.  These situations and no.
18  Q.  The opinion does not say that?
19  A.  No.  No.
20  Q.  Are you sure?
21  A.  I'm reading paragraph 11 right here.
22  Q.  I'm not asking you to read paragraph 11.  I'm saying
23  the case.  Unfortunately, this is not a paginated copy.
24  A.  If you could just point out by paragraph, I could go
25  that route, they've got numbers.
```

```
 1   Q.   We'll come back to Dawes.

 2            THE COURT:  Let me know when you get to a

 3   convenient stopping point, Mr. O'Reilly, and we'll take

 4   our midday break.

 5   Q.   (BY MR. O'REILLY)  Mr. Springer, you made brief

 6   reference to, I think, four civil lawsuits you filed with

 7   respect to the Paperwork Reduction Act; is that correct?

 8   A.   Four different lawsuits that contain claims made by

 9   the Paperwork Reduction Act, yes.

10   Q.   You have lost every one of those, haven't you?

11   A.   You have to describe what you mean by "lost."

12   Q.   That means you lost, didn't you?

13   A.   Not on the merits, no.

14   Q.   Did you win?

15   A.   They chose not to address the merits.

16   Q.   They rejected your claims, didn't they?

17   A.   No, they did not.  And you know that.

18   Q.   Mr. Springer, the IRS has been attempting to civilly

19   collect your taxes from 1990 through 1995 for over a

20   decade, haven't they?

21   A.   No.  The first time I was -- no, that's not true.

22   Q.   Didn't you receive a notice of deficiency in 1996?

23   A.   Yes, I received a notice of deficiency in 1996.

24   Q.   And the IRS has wanted to collect the money you owe

25   since then, haven't they?
```

```
 1  A.   No.
 2  Q.   The IRS just sent you a notice and just thought you
 3  would be interested; was that what your testimony is?
 4  A.   No.
 5  Q.   The IRS assessed you -- issued a notice of
 6  deficiency in 1996 for your 1990 through 1995 taxes.
 7  A.   They did issue a notice of deficiency from 1990
 8  through 1996 -- 1995 in 1996, September 3, 1996.
 9  Q.   How much did they say that you owed for those years
10  in that notice of deficiency?
11  A.   Around $70,000, I believe.
12  Q.   Please tell the jury how much you have voluntarily
13  paid of that deficiency.
14  A.   Zero.
15          MR. O'REILLY:  This is a good point to break,
16  Your Honor.
17          THE COURT:  Members of the jury, we'll take our
18  midday break at this time, again, guided by the clock on
19  the wall.  We'll resume at 15 minutes after one.  During
20  this break, of course, please remember not to discuss or
21  investigate the case in any way and not to reach any
22  conclusions about the case until it has been given to you
23  for your deliberations and verdict.  Please be available
24  for the security officer just a little before quarter
25  after one so that we may resume at that time.
```

1      All persons in the courtroom will remain seated

2  while the jury departs.

3      (JURY EXITS THE COURTROOM)

4          THE COURT:  Is there anything further we ought

5  to take up before we take our midday break?

6          MR. O'REILLY:  No, Your Honor.

7          MR. SPRINGER:  No, Your Honor.

8          THE COURT:  Pam Lynn reminded me there was one

9  exhibit, it was that single-page bill.  Please be

10  seated.  There was that single-page bill that was a

11  defendants' exhibit.

12          MR. SPRINGER:  It was 324 or 303, Your Honor,

13  was the government's and mine was 208 or 209.

14          THE COURT:  Okay.  The defendants' exhibit was

15  208.

16          MR. SPRINGER:  If it's in the evidence, Your

17  Honor, then I would withdraw those two.

18          THE COURT:  Well, we're going to take care of

19  that and then we're also going to revisit one matter.

20  Okay.  That was 324?

21          MR. SPRINGER:  Yes.

22          MR. O'REILLY:  Yes, Your Honor, about half -- a

23  little over halfway through 324.

24          MR. SPRINGER:  Your Honor, may I go over to the

25  regular table so I can follow this?

1            THE COURT:  You surely may.

2            MR. SPRINGER:  Thank you, Your Honor.

3            THE COURT:  I'm having trouble finding one

4    that's identical to 208.

5            MR. O'REILLY:  There was one --

6            THE COURT:  Okay.  Okay.  Yeah, that's -- that

7    is part of Government's Exhibit 324.  I'm not -- and I

8    want everyone to understand, I'm not harshly critical of

9    this one instance of offering an exhibit that's already

10   in evidence, but for the reasons I explained at our

11   pretrial conference, it is important and I will expect

12   all concerned to be mindful of what I thought I -- I did

13   make clear at the pretrial conference and that is that if

14   a document is in evidence as another exhibit or even as

15   part of another exhibit, then that's how it will be

16   referred to.

17       In a case like this, I consider that to be essential

18   to avoid hopeless confusion in the record.  And I will

19   expect that that will be adhered to as we proceed.  So

20   those two defendants' exhibits will be excluded because

21   they're already in evidence as government's exhibits and

22   that's -- what would that be, 208 and 209.

23           MR. SPRINGER:  209, Your Honor.

24           THE COURT:  Anything we ought to address, aside

25   from that, before we take our midday break?

1             MR. O'REILLY:  No, Your Honor.

2             MR. SPRINGER:  No, Your Honor.

3             THE COURT:  Court will be in recess.

4        (A RECESS WAS HAD, AFTER WHICH THE FOLLOWING

5   PROCEEDINGS WERE HAD IN OPEN COURT AND WITHIN THE

6   PRESENCE AND HEARING OF THE JURY.)

7             THE COURT:  Mr. O'Reilly, you may continue.

8             MR. O'REILLY:  Thank you, Your Honor.

9   Q.   (BY MR. O'REILLY)  Mr. Springer, before we broke, we

10  had briefly discussed the Dawes decision.  Do you

11  remember that?

12  A.   I do.

13  Q.   Didn't the Dawes court uphold the conviction in that

14  case?

15  A.   Yes, it did.

16  Q.   You've already testified, I belive, and the evidence

17  came in that you haven't filed for some years; is that

18  correct?  Quite a while.

19  A.   Haven't filed what, sir?

20  Q.   Tax returns.

21  A.   Specifically a 1040, no, I have not.

22  Q.   When is the last time you filed a tax return with

23  the Internal Revenue Service, to the best of your

24  recollection?

25  A.   Excluding the notice of deficiency from 1990 through

1   1995, are you saying?

2   Q.   Well, did you file in 1990?

3   A.   Actually, the Court construed that as a substitute

4   for return.

5   Q.   Mr. Springer, did you file a tax return for 1990?

6   A.   No.

7   Q.   Did you file a tax return for 1991?

8   A.   No.

9   Q.   Did you file a tax return for any year from 1990

10  forward to the present?

11  A.   No.

12  Q.   Okay.  How about going backwards, 1989, if you

13  recall?

14  A.   I don't.

15  Q.   And if you don't recall, that's fine.

16  A.   I don't.

17  Q.   Okay.

18  A.   It could be '89 or '88, I'm not certain which one it

19  is.

20  Q.   You were married at that time; is that correct?

21  A.   I was married in '87, yes.

22  Q.   And you were the bread winner for that household,

23  correct?

24  A.   Barely, yes.

25  Q.   And you were earning income?

1   A.   Barely, yes.

2   Q.   But you weren't filing tax returns?

3   A.   I did not -- as far as my understanding from my

4   mother, I was not required under those circumstances, at

5   that time, from my knowledge.

6   Q.   That had nothing to do with the Paperwork Reduction

7   Act?

8   A.   No, it did not, absolutely not.

9   Q.   Yesterday -- not yesterday, I apologize.  On

10  Tuesday, when you were discussing the Dawes decision, you

11  mentioned that that's a Tenth Circuit decision.  Remember

12  referencing that Tenth Circuit?

13  A.   1991 Dawes decision?

14  Q.   Yes, sir.

15  A.   Yes, I do.

16  Q.   And that's a Tenth Circuit decision and you

17  described what the Tenth Circuit was to the jury,

18  correct?

19  A.   Yes.  It's a circuit that covers the state of

20  Oklahoma for federal court purposes.

21  Q.   Your home is in Kellyville, Oklahoma, correct?

22  A.   Yes, I live in a home in Kellyville, Oklahoma.

23  Q.   In fact, that's the same home that the IRS agents

24  searched on September 16th of 2005, correct?

25  A.   That is true.

1   Q.   Your home in Kellyville, Oklahoma, lies within the

2   Northern Judicial District of Oklahoma, doesn't it?

3   A.   I believe the Court's instruction says Creek County

4   is within the Northern District of Oklahoma, yes.

5   Q.   So you would agree that your home, your residence,

6   is within the Northern Judicial District of Oklahoma?

7   A.   No, I do not agree with that.

8   Q.   Your home does lie within Creek County.

9        MR. SPRINGER:  Your Honor, I would object.  The

10  Court is going to instruct the jury on the law.

11       THE COURT:  Overruled.  You may tell the jury

12  where you reside.

13       MR. SPRINGER:  Okay.  I live in Creek County,

14  county of Creek, state of Oklahoma.

15  Q.   (BY MR. O'REILLY)  And county of Creek or Creek

16  County, by whatever nomenclature, is one of the counties

17  that lies within the judicial district of northern

18  Oklahoma, does it not?

19       THE COURT:  You got that wrong.  Northern

20  Judicial District of Oklahoma.

21       MR. O'REILLY:  Thank you.  With that correction,

22  Your Honor.

23       MR. SPRINGER:  I believe that Oklahoma is

24  separate from the United States and that the United

25  States has its limited power.  But the state, under the

1    Tenth Amendment, is the sovereign over the territory

2    within the state.  And so I separate them as two separate

3    entities versus one commingled entity.  And so when the

4    United States identifies a northern judicial district and

5    draws a line around it and says these counties are within

6    that judicial district, then I have to accept that for

7    what it says.  But I do not agree that the state of

8    Oklahoma is in the United States judicial district.  And

9    I don't agree that the United States judicial district is

10   in the state of Oklahoma.  And that's based upon my

11   belief of the Tenth Amendment to the United States

12   Constitution.  It says, "All powers not delegated to the

13   United States by the Constitution is reserved to the

14   states and respectively to the people."

15   Q.   (BY MR. O'REILLY)  Did you file a lawsuit based upon

16   the search of your home?

17   A.   I did.

18   Q.   Where did you file that lawsuit?

19   A.   As I was required by federal law to file in the

20   Northern District of Oklahoma.

21   Q.   This same district that we're in today?

22   A.   That is true.

23   Q.   Mr. Springer, just recently, I believe it was in

24   August of this year, there was a lawsuit that you had

25   filed that had made it up to the Tenth Circuit, an

1  opinion was rendered, 580 F.3d 1142.  Do you recall that?

2  A.  You would have to give me the date of the opinion.

3  That's the only way I could recognize it right now,

4  unless you could hand it to me.

5  Q.  August of this year?

6  A.  August 31st, yes.  August 31, 2009, yes.

7  Q.  And in that opinion, didn't -- you know, one of the

8  bases of that was you were -- it was a lawsuit based on

9  the Paperwork Reduction Act, correct?

10  A.  Yes, that is true.

11  Q.  Didn't that court state that, "We conclude that

12  Mr. Springer does not have a valid challenge under the

13  Paperwork Reduction Act"?

14  A.  Yes, they did.

15          MR. SPRINGER:  Your Honor -- never mind, I'll do

16  it later.  Sorry.

17  Q.  (BY MR. O'REILLY)  And haven't -- didn't the tax

18  court back in, I believe, 1997 state that -- described

19  your arguments as nothing but tax protester rhetoric and

20  legalistic gibberish?

21  A.  Which decision are you speaking of?

22  Q.  It was published at -- well, the Tenth Circuit

23  repeated this at 231 Fed.Appx. 793 in 2007.

24  A.  Yes, that is exactly what the tax court did say.

25  Q.  And they said that back in 1997; is that correct?

1   A.   No, the tax court -- oh -- no, I would have to read

2   that opinion to figure out exactly what you're talking

3   about.

4   Q.   Let me ask this:  Didn't they say that sometime

5   back?

6   A.   I think you're right, but I just don't remember -- I

7   don't remember the context of why he's asking me that

8   question.  The tax court did say in 1997 that my claims,

9   using the Bureau of Labor Statistics, was akin to

10  slavery, that that was frivolous.

11  Q.   Are you familiar with the case of United States v.

12  Cavins, 543 F.3d 456?

13  A.   Yes, I am.

14  Q.   How is it that you're familiar with that case?

15  A.   Dr. Cavins was indicted in 2006, I believe.  And a

16  few weeks before his trial, he called me and told me that

17  he was representing himself.  And so I stopped what I was

18  doing, got in the RV, parked it in a parking lot in

19  Wal-Mart in Springfield, Missouri, and for eight days

20  helped him as much as I could.  He didn't have any

21  money.  He couldn't buy food or gas.  And I watched his

22  entire case for him and did everything I could to help

23  him.

24  Q.   Didn't Dr. Cavins or his wife give you something

25  later on?

1  A.   No.

2  Q.   There wasn't a check that you cashed payable to

3  Sharon Cavins that's in Government's Exhibit 61?

4  A.   I would have to see it, but not based upon his case,

5  no.

6  Q.   Okay.  Are you familiar with the result of

7  Dr. Cavins -- was it Dr. Cavins?

8  A.   Yes.  He's a chiropractor -- was a chiropractor.

9  Q.   Dr. Cavins was convicted of tax evasion, wasn't he?

10  A.   Yes, he was.

11  Q.   And he raised the Paperwork Reduction Act in his

12  defense.

13  A.   Actually, he was not allowed to raise it.  The judge

14  decided that he could not raise it.

15  Q.   And the Eighth Circuit stated, and I'll quote, "He"

16  -- being Dr. Cavins -- "argues that he was entitled to

17  dismissal of the indictment or acquittal because the

18  Forms 1040 did not show him why the IRS was asking for

19  the information and how it would be used.  This

20  contention is frivolous."

21  A.   They did say that.  Yes, they did.

22  Q.   And Mr. Denny Patridge actually testified here in

23  this Court, correct?

24  A.   Yes, he did.

25  Q.   And there was a published opinion written with

1  respect to his convictions as well, weren't there?

2  A.    He testified to that opinion, yes.

3  Q.    And that Court stated in an opinion, 507 F.3d 1092,

4  by the Seventh Circuit in 2007, "As we held in Salberg,

5  the obligation to file a tax return stems from 26 USC

6  Section 7203, not from any agency's demand.   The

7  Paperwork Reduction Act does not repeal Section 7203."

8  A.    They did say that in a published opinion.   They did

9  say that.

10  Q.    Mr. and Mrs. Ouwenga raised the Paperwork Reduction

11  Act in their defense as well, did they not?

12  A.    Yes, they did.

13  Q.    They lost, didn't they?

14  A.    Actually, "they" -- I think it was Mrs. Ouwenga that

15  raised it for the first time on appeal at the Sixth

16  Circuit through Jerold Barringer.   I don't think

17  Mr. Ouwenga ever raised it.   And Mr. Barringer only

18  raised it as a complete defense and not a good faith

19  defense because she didn't know anything about it.

20  Q.    You are very familiar with case law, correct, sir?

21  A.    On the ones that I've read, yes.

22  Q.    And I'm going to ask you if you're familiar with a

23  case from the Fifth Circuit, 1992, United States v.

24  Willis, which is 958 F.2d 60.   Have you read that case?

25  A.    I just reviewed that case, as you told me during the

1   lunch break, and I have it on my computer over there

2   ready.

3   Q.   You've read it before, though?

4   A.   I don't really remember reading that case about the

5   Speedy Trial Act violations.  I don't remember that

6   whatsoever.

7   Q.   Doesn't this case also deal with the Paperwork

8   Reduction Act and a rejection of that defense?

9   A.   I didn't see it.  I pulled it up over there and I

10  didn't see what you were saying.  And if you would like

11  to look at it, I knew you didn't have it, but it's over

12  there if you'd like to see.  I didn't see Paperwork

13  Reduction Act mentioned in it one time.

14  Q.   My question to you is, do you have any recollection

15  of reviewing that case before?

16  A.   I don't remember a Willis case.  I remember Kerwin

17  from the Fifth Circuit in 1992.

18  Q.   Okay.  Well, let's -- Kerwin actually foreclosed the

19  argument about the Paperwork Reduction Act as well, did

20  it not?

21  A.   No, it did not.

22  Q.   You are familiar with United States v. Salberg,

23  which was also decided in 1992 by the Seventh Circuit?

24  A.   Very familiar.

25  Q.   So that one you are very familiar with?

1   A.   Very familiar.

2   Q.   And in Salberg, the Court stated, "Every court that

3   has considered the argument that the regulation and

4   instruction books are within the scope of the PRA has

5   rejected it."  Correct?

6   A.   Regulations and instruction booklets, yes, that's

7   what they said.  The regulations and instruction

8   booklets, everybody that has raised the PRA that applies

9   to regulations and instruction booklets, they have lost.

10  Regulations and instruction booklets, yes.

11  Q.   Mr. Springer, isn't it true you know the Paperwork

12  Reduction Act is a frivolous defense?

13  A.   No, I do not know that.

14  Q.   Well, then, could you please explain why when

15  Mr. Shern interviewed you on September 16th of 2005, in a

16  search warrant, you didn't mention that defense once?

17  A.   He didn't ask me what my defenses were.

18  Q.   Actually, Mr. Springer, isn't it true you told him

19  that you received no income and only got gifts and

20  donations?  Didn't you tell him that?

21  A.   I told him I received no gross income.  He was fully

22  aware of the amount of money I received because he asked

23  me about each person that has testified in this trial.

24  Q.   It's your testimony that Mr. Shern on that date

25  asked you about every person that testified in this

```
 1   trial?
 2   A.   No, I can't say for certain he asked me about every
 3   person, but every person that has been in here that I
 4   remember.  It was at eight o'clock in the morning, 11
 5   agents raided my home.  They took me upstairs, put me in
 6   a small room.  And for three and a half hours, they just
 7   asked me question after question after question, and I
 8   answered every one of their questions.  That's what I
 9   intended to do.
10   Q.   Mr. Springer, did you ever say, why are you even
11   here, I don't have to file because of the Paperwork
12   Reduction Act?
13   A.   Actually, no.  What actually happened was --
14   Q.   That was the question, sir.  And you didn't raise
15   that defense, did you?
16   A.   No one asked me that question, sir.
17   Q.   You spent several hours speaking with Special Agent
18   Shern and Special Agent Mr. Sivils and myself and a
19   couple of other folks in January of this year, correct?
20   A.   That is correct.
21   Q.   You never raised the Paperwork Reduction Act as a
22   defense during that meeting, did you?
23   A.   No, I did not.
24   Q.   And you are aware that every decision involving tax
25   evasion or willful failure to file where it has been
```

1  raised as a substantive defense, the appellate courts

2  have rejected it, haven't they?

3  A.   What are you saying, that the PRA applies to the

4  instruction booklets and regulations?

5  Q.   No, that it's a defense to tax evasion or willful

6  failure to file.  That has been rejected by every court

7  that has considered it, hasn't it?

8  A.   No.  The Collins case, footnote 12 and 13, I'll read

9  it eventually today.

10  Q.   Wasn't Collins decision affirmed?

11  A.   Yes, Collins decision was affirmed.

12  Q.   When Mr. Stilley presented what's now in

13  Government's Exhibit 582, he didn't assert either there

14  or in his testimony anything about the Paperwork

15  Reduction Act as your defense, did he?

16  A.   I don't know what Mr. Stilley raised.

17  Q.   You haven't reviewed what's now in evidence as

18  Government's 582?

19  A.   I have read the pertinent parts that we discussed

20  yesterday, yes.

21  Q.   And didn't you read it before Mr. Stilley appeared

22  before the grand jury?

23  A.   Did I read it before he appeared before the grand

24  jury?

25  Q.   That's the question.

```
 1  A.   Isn't it a transcript of him appearing before the
 2  grand jury?
 3  Q.   Not the transcript.   582 is the response to subpoena
 4  that he submitted.
 5  A.   Oh, no, never saw it.   Never saw it.   And for
 6  correction, is 581 the -- 581 is the testimony and 582 is
 7  the attachments to the subpoena; is that correct?
 8  Q.   That is correct.
 9  A.   Okay.   I'm sorry about that, yes.   And I never saw
10  any of that, ever.
11  Q.   Mr. Springer, how many lawsuits have you initiated?
12  A.   You want me to guess?
13  Q.   An estimate, not a wild guess.
14  A.   Explain "initiated."   You mean with my name on it?
15  Q.   Where you were the person initiating the lawsuit,
16  you filed it, either your name is on it or you caused it
17  to be filed by somebody else as opposed to being a
18  defendant.
19  A.   Maybe a thousand.
20  Q.   You sued Ms. Tiffini Berman who appeared here in
21  court, correct?
22  A.   I did.
23  Q.   You sued Mr. Martin Dingman who appeared here in
24  court.
25  A.   Still in a lawsuit with Mr. Dingman, yes.
```

1  Q.   You sued Mr. Eddy Patterson as well, didn't you?

2  A.   No, I have not sued Eddy Patterson.

3  Q.   Did he sue you?

4  A.   Yes, he sued me.

5  Q.   And you filed a lawsuit with respect to the search

6  warrant that was executed in your home in Kellyville as

7  was stated here in the Northern Judicial District.

8  A.   Yes.

9  Q.   Please tell the jury how much you asked for in

10 damages in the lawsuit that you filed with respect to the

11 search warrant.

12 A.   I asked for $1 million per person as allowed by a

13 Bivens lawsuit.  You must ask for it in order to get it.

14 Q.   How many people were you suing?

15 A.   Thirteen.

16 Q.   Mr. Springer, you've had a chance to review the

17 indictment, correct?

18 A.   Yes, I have.

19 Q.   With respect to the general allegation section --

20 let me just ask this generally:  Is there any -- let's

21 start with the general allegations.  In the general

22 allegations, is there anything in the general allegations

23 of the conspiracy count with which you disagree?

24 A.   Asking me whether it happened or disagree as to why

25 it happened?

1   Q.   Well, the general allegations don't state why, sir.

2   A.   Okay.  Hang on a minute.

3   Q.   Do you have a copy of it in front of you?

4   A.   I do.

5   Q.   I'll remind you, you need to make sure you speak

6   into the microphone.

7   A.   I'm sorry.  I've got so many things up here.  I do

8   not agree with paragraph 5.

9   Q.   It's actually a specific part with paragraph 5 you

10  disagree with, correct?

11  A.   Yeah, there's a specific part of paragraph 5 that I

12  disagree with.

13  Q.   Okay.  And that would be that both you and

14  Mr. Stilley "earned" income.

15  A.   That is true.

16  Q.   If it said "received," you would have no exception?

17  A.   That is true.

18  Q.   With respect to everything else, which is paragraphs

19  1 through 7, do you have any disagreement?

20  A.   No.

21  Q.   Now, I'm going to ask you, if you could, to take a

22  look at the overt acts that are alleged.  And I'm not

23  asking you to agree that they were in furtherance of the

24  conspiracy, only if you can tell me whether there's any

25  that you, in fact, disagree that there has been evidence

```
 1  and, in fact, that they had occurred.
 2  A.   On paragraph 15, I did not tell Mr. Shern that I did
 3  not receive income.  I said I did not receive gross
 4  income.
 5  Q.   Okay.  With the exception of that, would you
 6  otherwise agree with paragraph 15?
 7  A.   Yes.
 8  Q.   Okay.  Continue on, please.
 9  A.   I would have no knowledge of 16, so I don't --
10  Q.   Fair enough.  You weren't present at the January
11  20th interview when Mr. Stilley received the subpoena,
12  correct?
13  A.   Yes.  And 17 would be the same answer, I would not
14  know about that as well, firsthand.
15  Q.   Well, actually, you've seen Government's Exhibit
16  582, though, correct?
17  A.   Yes, I have seen it.  I have seen it.
18  Q.   And Mr. Stilley agreed that's what he provided to
19  the grand jury?
20  A.   I believe he testified that, yes.
21  Q.   So given that, would you have any -- take any
22  exception to it?
23  A.   No.
24  Q.   And similarly with 16, didn't Mr. Stilley
25  acknowledge that that's what he would have told
```

```
 1  Mr. Shern?
 2  A.   I don't remember that, but it's possible.  I'm
 3  not --
 4  Q.   Well, I don't want --
 5  A.   I'm just saying -- you asked me what I had a
 6  disagreement with.  And I just don't know about 16 from
 7  that -- yes, I believe there was some testimony given to
 8  that subject.
 9  Q.   Okay.  Continue on because I think the rest are just
10  documents.
11  A.   Yeah.
12  Q.   And I want to find out if you agree that, in fact,
13  all of this happened as indicated.
14  A.   Yes, I agree that 18 -- I actually believe that on
15  18 that it was Eddy Patterson who caused a $112,000 check
16  to be given to Oscar Stilley to be deposited in his IOLTA
17  account.
18  Q.   Actually, Mr. Springer, let me ask you this:  Who
19  would have caused it to be deposited into Mr. Stilley's
20  IOLTA account?
21  A.   Well, that would have to be Oscar Stilley in the
22  narrowest of sense, but "caused to" sometimes goes beyond
23  just the direct act, motivation.
24  Q.   So are you taking exception to 18 or no?
25  A.   I believe he deposited the check, but I believe
```

1    Mr. Patterson started that trend and not Mr. Stilley.

2    Q.   Okay.

3    A.   Number 19, I believe he did write a check in Fort

4    Smith, Arkansas, for $14,359, so I would agree with that

5    paragraph.

6    Q.   So that's Number 19?

7    A.   Nineteen.

8    Q.   In fact, that would be Exhibit 25; is that correct?

9    A.   That's right.  I would agree in Fort Smith,

10   Arkansas, Mr. Stilley caused to be written a check for

11   35,000 from his IOLTA account to me.  I would agree that

12   that occurred.

13   Q.   That would be Number 20, which is Exhibit 26?

14   A.   That's correct.  I would agree on paragraph 21 that

15   Mr. Stilley, in Fort Smith, Arkansas, used funds from his

16   IOLTA account in Fort Smith, Arkansas, and purchased a

17   $37,000 cashier's check for me in Fort Smith, Arkansas.

18   Q.   Okay.  That is paragraph 21, which that would be

19   Exhibits 101 and 102, correct?

20   A.   Yes.  And then in paragraph 22, I would agree that I

21   used the $37,000 cashier's check in Broken Arrow,

22   Oklahoma, to give to Mr. Bryson to purchase a Corvette.

23   I would agree with that.

24   Q.   Where is Broken Arrow, Oklahoma?

25   A.   It's Tulsa County.

1  Q.   So that's in the Northern Judicial District of

2  Oklahoma?

3  A.   Yes, it is, the way the Court has instructed it.

4  Q.   And I believe that was again -- that was Exhibit 102

5  and 541, correct?

6  A.   Forty-one, right.  And then 23, I believe we've seen

7  evidence -- well, "Defendant Stilley caused," he had to

8  have something to do with it to receive it, but I -- in

9  the narrowest of sense, he must have received that wire

10  into his IOLTA account, and we've all seen that evidence.

11  Q.   And in order for that to be received, he must have

12  provided his account number?

13  A.   Yeah, to Hall Estill, yes, I would agree with that.

14  Q.   And that, I believe, was Exhibit Number 107; is that

15  correct?

16  A.   I believe it's in more than one exhibit that has

17  that number on there, but, yes, I agree with that.

18       Twenty-four, I would agree that Stilley in Fort

19  Smith, Arkansas, caused three cashier's checks payable to

20  me in the amount of $20,000 each to be issued from his

21  IOLTA account.  I would agree with that.

22  Q.   I believe that would be Exhibits 33, 34, and 35?

23  A.   Yep.  Yes.  The answer is yes.  And then on 25, I

24  would agree that Stilley purchased in Fort Smith,

25  Arkansas, 18 $1,000 money orders and gave those to me and

1  I believe the evidence shows that that was taken out of

2  his IOLTA account in Fort Smith, Arkansas.

3  Q.   Okay.  And that's both from Mr. Stilley's testimony

4  and Exhibit 36, correct?

5  A.   Yeah.  I do agree with paragraph 26, that I sent

6  Patrick Turner an e-mail concerning Oscar Stilley's IOLTA

7  information at the beginning stages of sending that

8  $250,000 transaction to his IOLTA account.

9  Q.   Okay.  And that's reflected in Government's Exhibit

10  233, correct?

11  A.   And may be others, but 233 for sure.

12  Q.   Where were you when you sent that e-mail?

13  A.   I've never thought about it.  I could think about

14  that a moment.  I was -- I would either be at my home in

15  Kellyville or I would have been traveling somewhere, and

16  I just don't remember.  I would have to look at my

17  traveling records to figure that out.

18  Q.   So November 7, 2003 -- excuse me.

19  A.   August 8th.

20  Q.   August 8, 2005, you don't recall where you were?

21  A.   Right.  But it's very possible that I was at my

22  home.  Very possible.

23       Then paragraph 27, "August 11, 2005, Springer and

24  Stilley caused 192,000 to be transmitted to Defendant

25  Stilley's IOLTA account for Defendant Springer."  I would

1   agree with that.

2   Q.   Okay.  And that was from Mr. Turner, correct?

3   A.   That's correct.  That was the first of two

4   transactions, but I forget which one was which on the

5   exhibit.  But I have seen it.

6   Q.   Is that -- I believe they're both in Exhibit 140 --

7   no, actually, that's Exhibit 114.

8   A.   114.

9   Q.   Is that correct, to the best of your recollection?

10  A.   The best of my recollection.  I thought there was

11  two, but that's okay.

12  Q.   I'm sure it's reflected elsewhere as well.

13  A.   I believe there is.  And there on paragraph 28, "On

14  or about August 15th, Stilley caused 166,000 to be

15  transmitted from his IOLTA account in Fort Smith,

16  Arkansas" --

17          THE COURT:  Please slow down.

18          MR. SPRINGER:  Sorry.  -- "IOLTA account for the

19  purchase of a motor home titled in the name of Defendant

20  Springer and his wife."  I would agree that that

21  occurred.

22  Q.   (BY MR. O'REILLY)  How was it that Mr. Stilley knew

23  to cause this transmission?

24  A.   I called Oscar Stilley up and I asked him if he

25  would be willing to wire money -- I believe you've heard

1  testimony that there may have been a cashier's check

2  involved, but there wasn't, it was a wire transaction to

3  the bank of Sam Snyder in North Carolina.  And then when

4  I got there and I looked at the RV to make sure it was

5  what he said it was, I contacted Mr. Stilley from North

6  Carolina, asked him to send the wire to North Carolina.

7  And then when the wire came in and the bank signed off on

8  it, then I left with the RV and the title from the bank.

9  Q.   And that was also in Government's Exhibit 114.

10 A.   114, yeah.

11 Q.   As well as Mr. Snyder's testimony.

12 A.   As well as Mr. Snyder's testimony.  "On August 18,

13 2005, Defendant Springer and Stilley caused 58,000 to be

14 transmitted to Defendant Stilley's IOLTA account for

15 Defendant Springer."  That is true.  The transaction came

16 from Michigan and ended up in Mr. Stilley's IOLTA account

17 in Fort Smith, Arkansas.

18 Q.   And that was the remainder of the money that the

19 Turners were borrowing against their home, correct?

20 A.   No.  Actually, the Turners borrowed $300,000 and

21 they took $50,000 of the $300,000 and they invested it

22 into some high-yield investment program that they lost

23 all their money on, which I didn't know anything about.

24 And then 250,000 of that was sent in two transactions,

25 192 and 58 to Mr. Stilley's IOLTA account.

1  Q.   I'm just a little confused, but the 58,000 came from

2  money they borrowed against their home?

3  A.   Yes.  I was just making certain that that was not

4  all the money that they borrowed.  They borrowed 300,000

5  on their two homes and then took 50,000 of it and put it

6  into some high-yield --

7  Q.   They lost the other $50,000?

8  A.   That's what he told me.  Yes, that's what he told

9  me.

10 Q.   All right.  Let's go on to overt act number 30 -- or

11 paragraph 30, I should say.

12 A.   Yes.  Oscar Stilley did wire $5,560 to Oklahoma City

13 to Oklahoma Truck and Trailer Sales for the purchase of a

14 trailer that I was going to be putting behind the motor

15 home, putting a car in it, and I had built a custom golf

16 shop in the front of it so I could work on my clubs.

17 Q.   Okay.  And then on paragraph 31, on September 1st of

18 2005 -- oh, let me just -- that would have also been in

19 Exhibit 114; is that correct?

20 A.   114, yes.  These last two were.

21 Q.   Okay.

22 A.   Yes, Oscar Stilley in Fort Smith, Arkansas, caused a

23 $25,813 wire to be sent from his IOLTA account in Fort

24 Smith to Lexus of Tulsa's bank.  And I don't know where

25 that is.

1   Q.   And that was to purchase a new 2006 Lexus; is that

2   correct?

3   A.   That is correct, 2006 brand new Lexus.

4   Q.   And you traded in the other one you had?

5   A.   Actually, no.  They weren't willing to give me

6   enough money for that car.  So Trader Jack, which was

7   around the corner, he was willing to give me $6,000 more

8   for my wife's car than Lexus would give me on trade.  And

9   so I went around the corner, he wrote a check for I think

10  it was $31,000, and then Lexus of Tulsa agreed to accept

11  that check in partial payment for the new vehicle.

12  Q.   Okay.  You didn't trade it in directly, but --

13  A.   Right.  Right.

14  Q.   How much had you bought the Lexus that you traded in

15  and got $31,000 for?

16  A.   I thought it was 47 when we bought it.  I'm not --

17  it could be 46, it could be 48.

18  Q.   So you lost about 15 or 16 grand?

19  A.   Yeah, 56,000 miles.  It was good numbers for the

20  miles.

21  Q.   Let's take a look at -- and that, I believe, was in

22  Government's Exhibit 116 on the Lexus --

23  A.   Lexus, yeah.

24  Q.   -- purchase.  Okay.  Look at paragraph 32, please.

25  A.   "On the September 19th, Stilley purchased two

1   $10,000 cashier's checks payable to Defendant Springer,

2   which was in Fort Smith, Arkansas, with funds from

3   Defendant Stilley's IOLTA account."  And that's true.

4   Q.   And that, I believe, is in Exhibit 61, pages 120 and

5   122.

6   A.   It is.

7   Q.   And also Mr. Stilley testified about that --

8   A.   And he did.

9   Q.   -- on Tuesday.

10  A.   Yes.  There has been no dispute there.

11  Q.   Let's look now at paragraph 33.

12  A.   I would have the same testimony for 33 and 34 that I

13  gave for 32, which is that those are transactions that

14  did occur.

15  Q.   Okay.  With respect to 33, that's Exhibit 61 on page

16  124; is that correct?

17  A.   It's in there.  I don't remember the number, but,

18  yes, it's in there.

19  Q.   And I believe paragraph 34 is actually Exhibit 65

20  that we talked about today.

21  A.   Yes.  You just -- that was one of the first exhibits

22  you asked me about, I believe.

23  Q.   Okay.  Can we look at paragraph 35.

24  A.   No, I do not agree with paragraph 35.  It reads, "On

25  or about December 9, 2005, Defendant Springer caused

1   50,000 he earned from the sale of a motor home to be

2   transmitted to Defendant Stilley's IOLTA account."

3        And my problem with that is, is that I actually

4   didn't get the money or it was not mine until after

5   Mr. Bolthouse had came in, looked at the bus, drove it

6   for hours, and then decided at the airport, after he told

7   me he wasn't going to take it, he was getting back on an

8   airplane, he said, okay, I'll take it, at the last

9   minute.  So he called Oscar Stilley up on the phone, the

10  money was already in the IOLTA account, and he said, give

11  that money to Lindsey.  And that's how I got that money.

12  Q.   Did you get the money?

13  A.   I did.  But it wasn't earned at the time it was

14  transmitted to his IOLTA account from Mr. Bolthouse.  And

15  that's what my problem is with paragraph 35.

16  Q.   You would have had no exception to it if it said

17  "received"?

18  A.   "Caused 50,000 he received from the sale of the

19  motor home be transmit" -- no, because I didn't actually

20  have a right to that money until after it had been

21  transmitted.  Mr. Bolthouse testified he entered into a

22  contract agreement with Oscar Stilley to escrow those

23  funds until he decided that he wanted the bus.

24  Q.   Did you receive the $50,000?

25  A.   I did receive it.

```
 1   Q.   And it's just when it was transferred to
 2   Mr. Stilley's account, it's your position, at that point,
 3   it had not yet been earned or received by you until
 4   Mr. Bolthouse said, yes, I'm taking the motor home.
 5   A.   Yes.  He was trying to get it -- the price down, and
 6   I was not budging.  And as a result, he played me all the
 7   way to the airport, had me go all the way out there, he
 8   kept trying to say, I guess I'm going to go home, I guess
 9   I'm going to go home.  He stepped out of the car, got the
10   bags on the concrete at the airport, and then turned and
11   said, you won't budge, will you?  And I said no.  And
12   then he got back in the car, put his bags back in and
13   said, all right, and he picked up the phone and called
14   Stilley and said --
15   Q.   And you got $50,000?
16   A.   And I did get it.
17   Q.   Is that the same motor home that you had told
18   Mr. Shern that when you sold it you were going to start
19   repaying Mr. Turner?
20   A.   At the time, I did -- I believe I did tell Mr. Shern
21   that my plan was, although not 50,000, I thought I would
22   get 150,000 out of the bus, that I intended -- I did not
23   know it had any significance to his question, but I did
24   intend on offsetting that money with the sale of the bus.
25   Q.   Let me ask you if you'll take a look at paragraph
```

1   36.

2   A.   I believe that was an exhibit you gave me earlier.

3   Q.   Number 66, correct?

4   A.   On or about May 2, 2006, yes, Stilley caused to be

5   written a $1,993.56 from his IOLTA account to Springer,

6   which was written out of Fort Smith, Arkansas.

7   Q.   Actually, I did have a question, going back to the

8   Bolthouse transaction.  You received $50,000 from that

9   transaction, correct?

10  A.   Actually, no.  I really only got 40,000.  Ten

11  thousand -- there was either -- there was some reason why

12  I only got 40,000.  It offset something I owed or

13  something I was doing, and I don't really remember what

14  it was, but I did get 40,000 after the Bolthouse

15  transaction and not 50,000 at that time.

16  Q.   Mr. Bolthouse paid 50,000.

17  A.   He did.  I did get credit for the 50,000 in

18  Mr. Stilley's IOLTA account.

19  Q.   Mr. Stilley issued two $20,000 cashier's checks to

20  you?

21  A.   At that time, yes.

22  Q.   What -- to the best of your recollection, what

23  happened to the other 10,000?

24  A.   I don't remember exactly.  It could be that I just

25  left it in there as an accrued balance towards the RV.

1  It could have been something that I had already borrowed

2  out, I just don't remember.  It's just -- I do not know.

3  Q.   I ask you now to take a look at paragraph 37.

4  A.   "On or about July 25, 2006, Defendant Stilley caused

5  to be deposited a $175,000 check in his IOLTA account."

6  I believe we've all heard testimony from Hamlet Bennett

7  that that occurred.

8  Q.   And that's also Exhibit 134, correct?

9  A.   Right.  Came from Hawaii to Arkansas.

10  Q.   Let me ask you now to take a look at what's

11  paragraph 38.

12  A.   Yes.  I did -- it says, "Defendant Stilley caused to

13  be written a $25,000 check from his IOLTA account to

14  Bondage Breakers Ministries," which was what Mr. Bennett

15  testified he directed Mr. Stilley to do.

16  Q.   And you at the time had been helping Mr. Stilley

17  with respect to Mr. Bennett's potential defense.

18  A.   Actually, no, that's one of the odd ducks in all of

19  this.  This was a check that caught me by surprise

20  because I had never actually spoken with Mr. Bennett

21  before I got this check.  And I had never spoke to

22  Mr. Stilley about Mr. Bennett's case.  And I have to tell

23  you, after I got the check, I didn't speak at all about

24  his case because Oscar was so busy trying to get in the

25  case and circumstances came up that Mr. Bennett hired two

1  other lawyers out of Washington state and somewhere else,

2  so I don't remember doing any -- having even a

3  conversation with Mr. Bennett about that, although I did

4  have conversations with him about supporting my mission.

5  Q.   Okay.  I'm going to ask you now to take a look at

6  paragraph 39, which is the meeting this year.

7  A.   Yep.

8  Q.   Do you take exception --

9  A.   And I did say it.  No, that has been my position all

10 along.  On or about January 15, 2009, I represented that

11 I earned no -- except gross income is what I said, not

12 income, and that the money I received was given without,

13 "without any expectation for anything from anybody."  And

14 that was a guideline that I had before I would ever

15 receive any money.

16 Q.   And, again, in that whole meeting, you never raised

17 the reason you weren't filing being the Paperwork

18 Reduction Act?

19 A.   No one ever asked me why I wasn't filing.  Nobody.

20 Ever.  In fact, it came up at the end of the meeting and

21 I asked when I came back to answer the rest of your

22 questions, which I wrote a letter, when I came back --

23 Q.   Mr. Springer, there's no question pending.

24 A.   Okay.

25          MR. O'REILLY:  May I have a moment, Your Honor?

```
 1              THE COURT:  You may.
 2   Q.  (BY MR. O'REILLY)  Now, Mr. Springer, part of your
 3   asserted position has been that at least during the years
 4   at issue, 2000 through 2005, and I think even before
 5   then, all of the monies that you received were either
 6   gifts or donations and you didn't believe that you had an
 7   obligation to file and report that as income.  Is that
 8   your stated position?
 9   A.  Yes, that is my position based upon Section 102 of
10   the tax code and my understanding at that time of it.
11   Q.  Do you now have a different understanding?
12   A.  Well, yes, I do.
13   Q.  Please explain to the jury your different
14   understanding.
15   A.  You will be instructed by the Court of a definition
16   of "gift."  And although I had never seen that definition
17   in any case in any opinion reported or otherwise, ever,
18   the Court is instructing you as to the definition of
19   "gift."  And from here on in in my life I will honor that
20   definition.  But at the time that these transactions took
21   place, that was not what I understood "gift" to mean.
22   Q.  Just so we're clear, you don't contest, as you sit
23   here today, that the payments to you that you received
24   that were given to you because of your Bondage Breakers
25   Ministries, that you should have -- what you know now,
```

1  you should have reported that as income?

2  A.   Actually, what I would have done is not accepted the

3  money under the oral conditions that it was given.   I

4  would have rejected it.   I would have tried to find

5  either another way to get the money, which we discussed

6  at one of our meetings about setting up a 501(c)(3)

7  corporation where the people could then give money to the

8  corporation and then I would draw some type of salary out

9  of it and pay taxes on the salary only, but yet that the

10  money that was put in the corporation would be exempt.

11  That was one option that we discussed.   Which I wrote at

12  length in my response in February about that.

13  Q.   And, Mr. Springer, Bondage Breakers Ministries is

14  not and never has been a 501(3)(c) corporation.

15  A.   501(c)(3), right, it never has been.

16  Q.   And it never has had a tax ID number.

17  A.   Just either my driver's license number depending on

18  what the issue was or my social security number.

19  Q.   Your driver's license is not a tax ID number, is it?

20  A.   Well, no, but --

21  Q.   And that's all I asked.

22  A.   Okay.  No.

23  Q.   And I think the instruction, at least the relevant

24  part of the instruction that you're speak -- well, let me

25  ask this first:  Did you ever draw a salary from Bondage

```
 1  Breakers Ministry?
 2  A.   No, I did not.
 3  Q.   I think the relevant part of the instruction you're
 4  talking about is, "When an individual provides
 5  ministerial services as his occupation, professional or
 6  business, and controls the money he receives in
 7  connection with those activities and receives no separate
 8  salary, the income generated by those activities is
 9  taxable to the minister."
10  A.   That is what the Court's instruction says.
11  Q.   And as you sit here today, you don't dispute that?
12  A.   No, I will go by that instruction from now on.  That
13  is how I believe, so --
14  Q.   So really the focus that the jury really needs to
15  question is, did you really believe at the time
16  otherwise?  Did you, in good faith, think it was not
17  income?
18  A.   Not only did I believe it in good faith, but you
19  must also consider what I knew at the time and what I had
20  read and what I thought the word "gift" meant and --
21  Q.   Mr. Springer, is there anything that I just said
22  that you disagreed with?  If -- the question is, when you
23  received the money and at the end of the year didn't file
24  a tax return, whether in good faith, you didn't think it
25  was income?  That's the question.
```

1  A.   In part, yes.  Yes.

2  Q.   When you were reading from excerpts, you omitted

3  some significant portions of what you read, didn't you?

4  A.   On what, sir?

5  Q.   Well, like the GAO report and that footnote 50.

6  A.   I omitted several -- it was 71 pages long.  I was

7  limited to how many minutes I could speak about that.  So

8  I had to, within a box, point the important parts out,

9  so --

10 Q.   You also omitted, when you were talking about the

11 letter from the Commissioner in the 1992 information

12 book, talking about the fact that they will go after tax

13 evaders' willful failure to file.

14 A.   I didn't omit it.  I just didn't speak about it.  To

15 say "omit," I omitted everything else in the entire

16 booklet.

17 Q.   You used -- throughout the time period and

18 presumably up until today, but correct me if I'm wrong,

19 you've used the mailbox address as opposed to your home

20 address, correct?

21 A.   Yes.  I have no mailbox out in Kellyville,

22 Oklahoma.  I only have 5146 South Harvard, and I've used

23 it since the early 1990s.

24 Q.   What address do you use when you register your

25 vehicles?

1   A.   5147 South Harvard, same as on my driver's license.

2   Q.   So if someone looking for those vehicles went to

3   that address, would they see them?

4   A.   If I was there, but that's just a mail drop, so --

5   Q.   But generally, no, correct?

6   A.   Yeah.

7   Q.   Is your home in your name?

8   A.   No.

9   Q.   And I think you've already testified about your use

10  of a check cashing establishment, Checks Cashed, with

11  Mr. Delozier.

12  A.   Yes, I did.

13  Q.   And you're familiar with Government's Exhibit 61,

14  correct, which is a -- all the CTRs that Mr. Delozier

15  filed?

16  A.   Yes, I am.

17  Q.   Does your social security number appear on any of

18  the CTRs Mr. Delozier filed with respect to you?

19  A.   No.

20  Q.   Do you have any estimate as to how much you were

21  paying in check cashing fees each year?

22  A.   I really don't.

23  Q.   Would it surprise you that for the years 1999

24  through 2007, just based on what's in Exhibit 61 and

25  assuming only 2 percent, not 3 percent fees, I believe

1   it's over $25,000?

2   A.   Yes, I would believe that.

3   Q.   And I think this morning when you were testifying in

4   your direct, you stated that you couldn't risk the IRS

5   would seize money from a bank account.

6   A.   No.   What I said was, is that I couldn't take the

7   risk of writing checks and then while those checks were

8   out, the IRS coming in and levying the account, cleaning

9   all the money out, and leaving me with checks out that

10  are going to be considered bogus or hot or bad, which

11  they had done twice already.

12  Q.   Twice they seized your checking account?

13  A.   Twice they seized money in a personal and corporate

14  account at Triad Bank.

15  Q.   I think earlier in your testimony, I think it was

16  this morning, you said that you saw to it that every

17  financial transaction that should be reported was

18  reported.   Is that your testimony?

19  A.   That is my testimony.

20  Q.   However, none of those forms had your social

21  security number except for the one from Bruce Weber

22  Jewelers, I believe.

23  A.   Yeah, I was never asked for a social security

24  number.   I was asked for a driver's license.

25  Q.   Doesn't the form itself have a place for -- it says

1    "social security number"?

2    A.   Yes.  But it also says on the form, form of

3    identification.  And a social security card doesn't ID

4    anybody.  It has no picture on it.  No one would know who

5    you were with a social security card.  And I cannot get

6    on a plane with a social security card, but I can with a

7    driver's license.

8    Q.   Actually, sir, you have to have a driver's license

9    to get on a plane, but there's nothing prohibiting you

10   from holding your social security card as well, is there?

11   A.   If you still have it.

12   Q.   Why wouldn't you let your wife, Ms. Carlson, get

13   social security numbers for your children?

14   A.   Early on in 1994 and '95, I had been presented a lot

15   of information, and I was trying to understand how I was

16   held liable for $100,000, and that was not easy to

17   understand on withholding tax liabilities of a corporate

18   officer.  And what I came to the conclusion of is that by

19   them being able to put a social security number down on a

20   piece of paper and sending it to an address that they

21   knew was not a good address, that that alone allowed them

22   to say I owed them over a hundred thousand dollars.  That

23   made me a little bit angry.

24        So what I decided after being at these meetings,

25   that I would let my kids decide whether they were wanting

1   to have a social security number or not at that time.
2   But it didn't take long, within a couple of years, we
3   came to an agreement that the social security number
4   itself was not the problem, it's how you use it.  And so
5   at that point, she got social security numbers for the
6   children, and here we are.
7   Q.   Was that after you were divorced?
8   A.   It was right before we got divorced.
9   Q.   One of the affirmative acts of evasion that's
10  alleged in the indictment in addition to the use of a
11  check cashing establishment is the extensive use of
12  cash.  You use cash a lot, don't you?
13  A.   Yes.
14  Q.   And you keep -- you kept a lot of cash at your home?
15  A.   Well, we tried to keep around $20,000 and the rest
16  we would try -- any time we had it, we would keep it in
17  money orders or cashier's checks.
18  Q.   But doesn't Mrs. Springer have a bank account?
19  A.   She does.
20  Q.   And she did during the early years of your marriage
21  as well, didn't she?
22  A.   She did in 2004 when we got married and she did in
23  2005 until they closed it.
24  Q.   I'm going to ask you if you could look in the binder
25  in front of you what's marked as Government's Exhibit

```
 1   597.

 2   A.   Yes.

 3   Q.   Do you recognize that?

 4   A.   I have seen the picture before.

 5   Q.   Well, okay.  What is Government's Exhibit 597, if

 6   you know?

 7   A.   One of the only pictures of the currency that they

 8   seized on September 16, 2005.

 9   Q.   Is it the money that was taken from your home?

10   A.   I don't know.  Because they said they found $19,000,

11   but they only brought back 17.  So I don't know if this

12   picture is the 17 or the 19.  I don't know if the money

13   had already been stolen at the time that it was --

14   Q.   You recognize the picture or in the background as

15   whether it was taken inside your house?

16   A.   Yes.  It has a picture of my children that's on my

17   dresser, yes.

18   Q.   Okay.  So that is a picture of the money that was

19   found at your home?

20   A.   I do not -- it's not a picture of the money, per se,

21   it's a picture of some of the money, I don't know if it's

22   a picture of all the money.

23   Q.   Is it a picture of money, at least some money --

24   A.   Yes, it is a picture --

25   Q.   -- that was taken from your home on September 16,
```

```
 1   2005?
 2   A.   Yes.
 3           MR. O'REILLY:  Your Honor, the government would
 4   move Government's Exhibit 597 into evidence.
 5           THE COURT:  Any objection?
 6           MR. SPRINGER:  No objection, Your Honor.
 7           THE COURT:  It will be received.
 8   Q.   (BY MR. O'REILLY)  Given that your wife
 9   Mrs. Springer had a bank account, why would you risk
10   keeping $20,000 or thereabouts in your home when you
11   could have a fire or something like that?
12   A.   That's a good question.  I had traveled all over the
13   country, wore out a bus twice.  I mean, wore it out.  And
14   when you would be at a place, they wouldn't take -- most
15   forms of out-of-state payment wouldn't take money
16   orders.  So I became accustomed to having a certain
17   amount of cash.  I didn't always have it.  Sometimes I
18   would get down to $1,000 in cash.  And sometimes I would
19   get it back up to $20,000.  And sometimes it would take a
20   month or two, depending on what I was doing.
21           But when you get used to having cash like that
22   around and you travel a lot, when hats are passed and
23   people put money in it, you just become accustomed to it
24   and you don't really get concerned about it.  I live out
25   in the country.  My house has been broken into before and
```

1  my safe has been taken.  And I just continue to live the

2  way I do as best I can at that time period.

3  Q.  Mr. Springer, you indicated that the reason

4  Mr. Stilley had to send you the $20,000 in two cashier's

5  checks shortly after the search warrant was because you

6  were short of funds, correct?

7  A.  Because -- yes, yes.

8  Q.  I'm going to ask you to take a look at Government's

9  Exhibit 288, which is Mrs. Springer's -- in fact, it

10  should come up on the screen.

11  A.  Okay.

12  Q.  And, specifically, I'm going to ask you to look at

13  page 136, which is a $5,000 cash deposit on October 6th

14  of 2005.  Do you see that?

15  A.  Not yet.

16         MR. O'REILLY:  Is the screen not working?  May I

17  have a moment, Your Honor?

18         THE COURT:  You may.

19         MR. O'REILLY:  And, Your Honor, if I may move

20  back so I can be looking at the -- thank you.  Okay.

21  Your Honor, if I may approach the witness?

22         THE COURT:  You may.

23         MR. O'REILLY:  If I may have access to the Elmo,

24  please.

25  Q.  (BY MR. O'REILLY)  Can you see that, Mr. Springer?

```
 1   A.   Yes.

 2   Q.   And you're going to need to speak into the

 3   microphone.

 4   A.   I'm sorry.  Yes, I do see it.

 5   Q.   Where did this $5,000 in cash come from that was

 6   deposited into your wife's account on October 6th of

 7   2005?

 8   A.   I believe I cashed one of the checks from

 9   Mr. Stilley's IOLTA account that came out on the 19th or

10   thereafter.  I just -- I wouldn't really remember, per

11   se, but I would believe that would be where it came from.

12   Q.   Let me ask this:  Is all -- virtually all the money

13   that was deposited into your wife's account, did that

14   come from you?

15   A.   Yes.  Could you tell me what exhibit that was, what

16   number?

17   Q.   It was Exhibit 288.

18   A.   288.  And it was page 135, correct?

19   Q.   I believe it was 136.  However, that did not seem to

20   come up on the Elmo that way, so.

21   A.   Okay.

22         MR. O'REILLY:  Your Honor, if I may approach the

23   witness to return this?

24         THE COURT:  You may.

25   Q.   (BY MR. O'REILLY)  Would it surprise you if -- to
```

1  learn or would you be aware that about $10,000 in

2  additional cash was deposited into your wife's account in

3  2005 after October 6th of 2005?

4  A.   No, I would not.  We were building the RV, so we had

5  to buy lots of appliances and things and we used her card

6  out of her account.

7  Q.   You're talking about the credit card?

8  A.   Actually, I believe it was an -- it was an account

9  that has a VISA card to it, but it's like a debit card, I

10 believe.  And when you pull the money out, it pulls it

11 out of the account, I believe.

12 Q.   Now, Mr. Springer, you were here when Special Agent

13 Shern testified as well as Special Agent Beckner on the

14 computer?

15 A.   Yes.

16 Q.   And were present throughout the search at your home

17 on September 16th of 2005?

18 A.   I was.

19 Q.   There was no record of your receipt of funds found

20 in terms of any type of book or log recording your

21 receipt of income or payments, calling them donations,

22 gifts, or otherwise, was there?

23 A.   No.

24 Q.   You maintained no such record, did you?

25 A.   No, I did not.

1  Q.   Have you ever heard of another charity or ministry

2  or business that failed to keep track of money that it

3  received?

4  A.   I knew that -- no, I don't know of very many, so I

5  can't say whether I do or I don't.  But I did know that

6  Mr. Delozier was keeping solid records of every

7  transaction, just as you would in your own bank account,

8  which has been evidenced in this case.

9  Q.   Mr. Delozier was not keeping track of what checks

10  you cashed or didn't, he just had a record of all checks

11  cashed, correct?

12  A.   No, that's not true.  I had that -- there's two

13  things that had to happen when I cashed checks.  The

14  first thing was I had to sign a log.  And the second

15  thing was, is he took copies of every check I cashed.

16  Q.   Wait a minute, Mr. Springer.  The log was for

17  everybody.  It was not the personal Lindsey Springer log

18  book, was it?

19  A.   No.  But the copies of the checks were in a file

20  just for Lindsey Springer.

21  Q.   Mr. Delozier had records of the monies you received

22  from Mr. Stilley's IOLTA account?

23  A.   I don't know.  He had records of all the cashier's

24  checks that I had cashed there that came from

25  Mr. Stilley's IOLTA account.

1  Q.   But Mr. Delozier would have no record of payments

2  that were made on your behalf out of Mr. Stilley's IOLTA

3  account, would he?

4  A.   I don't understand that question.  Try me again on

5  that.

6  Q.   Mr. Delozier -- Mr. Delozier would have no record of

7  Mr. Stilley helping you buy a motor home?

8  A.   Oh, no, no.

9  Q.   Or Mr. Stilley helping you sell a motor home?

10 A.   No, he would not have any record of that.

11 Q.   Or Mr. Stilley helping you buy a car?

12 A.   No, Mr. Delozier would not have any record of that.

13 But I did keep records on all those things.

14 Q.   You did not hire Mr. Delozier to be your record

15 keeper, did you?

16 A.   That's what he was getting 2 percent for.  That's

17 why he earned that money.

18 Q.   Mr. Delozier earned 2 percent to cash the checks,

19 wasn't he?

20 A.   No, it was beyond just cashing the check.  It was

21 actually being basically my bank.  I was with him for 19

22 years.

23 Q.   Approximately how much money of yours that was given

24 to you or earned by you or however you want to

25 characterize it went through Mr. Stilley's IOLTA account

1    during the years 2000 through 2005?

2    A.   When you say "went through," do you mean money that

3    he paid me that came out of it?

4    Q.   Either paid you or paid for on your behalf, like to

5    buy a Lexus, to buy a motor home.

6    A.   Around $450,000 in six transactions.

7    Q.   Did you keep a log book of all those transactions at

8    your house?

9    A.   I have a file somewhere, yes, I did.  On any

10   transaction that I would have a cashier's check on

11   dealing with that RV, I had records of that, including

12   the wire.

13   Q.   Wait.  With respect to the RV, I'm talking about a

14   log book of all the financial transactions that went

15   through Mr. Stilley's IOLTA account.

16   A.   No, no, I didn't have a file that said here's -- I

17   didn't even look at it that way.  Most of the

18   transactions that I did didn't have anything to do or go

19   through or with Mr. Stilley's IOLTA account.

20   Q.   Mr. Springer, why wouldn't you keep a record of all

21   the payments you received?

22   A.   In addition to the records I knew was being kept,

23   are you talking about at my house?  Is that what you're

24   asking me?  I cannot have any employees.  That's the one

25   lesson I learned from having a $100,000 penalty put

*Tracy Washbourne, RDR, CRR*
United States Court Reporter
U.S. Courthouse, 200 N.W. 4th St.
Oklahoma City, OK 73102 * 405.609.5505

1  against me for a corporate liability.  So I had to do all

2  of this on my own --

3  Q.   Mr. Springer, I'm sorry.  Hold on.  I didn't ask you

4  whether or not you could have employees.  I asked you why

5  you didn't keep a record of payments you received.  It

6  has nothing to do with employees.  So please answer that

7  question.

8  A.   I believed that my records were being kept with

9  Mr. Delozier and I knew he would keep excellent records.

10 And so because I was by myself, I just did everything

11 that I could do and that was not one of those things I

12 needed to do again.

13 Q.   So Mr. Delozier had all the -- record of all the

14 cash, the thousand dollars a month that you received in

15 cash?

16 A.   No.  Mr. Delozier would not know about cash that

17 came in the mail or was passed in a hat, no.

18 Q.   Did you keep a record of those transactions, those

19 payments that you received personally at your home?

20 A.   The ones that were passed in the hat or the ones

21 that were brought in the hat, those were always tallied

22 at the end of a meeting and there was a receipt generated

23 for those.  The ones that came in the mail, I would just

24 log down on a folder the name of the person, how much

25 they gave, and any type of identifying information that I

1  could get.  Like if they gave me an e-mail address or

2  whatever because I may contact them.  But that's about

3  all the information I kept.

4  Q.  Well, if you kept information of how much money you

5  received, why wasn't that found in the search of your

6  home?

7  A.  I don't think I kept it from the perspective of how

8  much money I received.  I think I just kept it from the

9  person's name, their address or e-mail, and how much was

10 in the envelope.  I never really tallied it -- sometimes

11 I would get letters from people, had no money in it

12 whatsoever, and I would keep the same records from

13 there.  So there would only be one other notation and

14 that would be the amount of money that was in the

15 envelope.

16 Q.  Didn't putting money through Mr. Stilley's IOLTA

17 account, like you did with Mr. Turner's, make it look

18 like those were attorney fees, retainer fees?

19 A.  Well, there is some concern and, obviously,

20 hindsight being what it is, I would definitely do that

21 entire transaction differently.  But at the time,

22 Mr. Turner's concerns were that he have a place to put

23 that money.  And at that time, I had found a very good

24 deal on an RV and knew -- I believed I knew that I was

25 getting a very large amount of money in thereafter.  So

1  it worked out.  I thought it was just timing --

2  Q.  Mr. Springer, I asked, didn't it make it look like

3  Mr. Turner was paying a retainer fee?

4  A.  No.  I think the agreement that was drafted clearly

5  says that it's a loan, slash, gift agreement.  I think it

6  very clearly writes that and explains how the money is

7  supposed to be done.  That's why we drew it.  Although,

8  we should have drawn it in much more specific terms.  It

9  should have been ten pages long instead of one page, but,

10 yes.

11 Q.  Mr. Springer, you told people who were sending you

12 money to call them gifts or donations, correct?

13 A.  Told them I would -- yes, I would not accept it

14 unless it was a gift or a donation.

15 Q.  And on September 16, 2005, you told Mr. Shern that

16 you received -- no, you say gross income, but Mr. Shern

17 didn't testify to that.  He said income, correct?

18 A.  Correct.  He said he didn't remember the difference.

19 Q.  He didn't remember you saying gross income.  But

20 really that's a semantical difference that makes no

21 difference, does it?

22 A.  It really does.  And if you'll read the Court's

23 instruction on income, you'll see that it's distinctly

24 different.  Distinctly different.

25 Q.  You told Mr. Shern you received no income and people

1   -- it was only gifts and donations, correct?

2   A.   Yes.   The gross income and gifts and donations.

3   Q.   You have sat through this trial and heard several

4   witnesses say they were paying you money to help them.

5   A.   Yes.   And they were all not testifying about what

6   they told me.   They were all given something in exchange

7   for converting the idea that I was helping them into

8   legal services.   The people who you did not give any

9   deals to or did not benefit from those transactions, they

10  testified accurately as to what the agreements were at

11  the time the money was given.

12  Q.   Just like Dr. Roberts, there was no agreement

13  reached with Dr. Roberts, was there?

14  A.   No.

15  Q.   And Dr. Roberts said that he paid you because you

16  were helping him.

17  A.   Actually, that's what he said he thought.   But he

18  also told this jury that he was giving me money to help

19  me do the bus.   And he also said "donation" twice.   It

20  just depended on how you asked the question.

21  Q.   What about Mrs. Wiggins, who appeared on the

22  videotaped deposition?   She was adamant that she paid you

23  for the services of helping her collect money.   Was there

24  any doubt in her testimony?

25  A.   Yes, there is total doubt in her testimony.   And all

1  you have to do is look at the exhibits that I entered and

2  notice the questions that I asked.

3  Q.   From her testimony, not from your questions, but

4  from her testimony, didn't Mrs. Wiggins say, Lindsey, you

5  know I was paying you for services?  Isn't that what she

6  said in that deposition testimony that was received in

7  this courtroom?

8  A.   It was said, but you have to look at the context in

9  which it was said.  And she clearly stated that at the

10 time she wouldn't have given me any money because she

11 didn't have any money to give because she was broke.  But

12 if you look at the --

13 Q.   Mr. Springer, I need you to answer my questions, not

14 go off on your own frolic and detour, please.

15 A.   What's your question?

16 Q.   Remember, Mr. Patterson and Mrs. Patterson both

17 testified, correct?

18 A.   I remember.

19 Q.   And they both testified that you were paid to help

20 them and you were paid for services; isn't that how they

21 testified?

22 A.   Yes, you did get them to say that.

23 Q.   And Mr. Lake also said that -- you know, he

24 testified that you told him your fee would be $30,000 to

25 handle the case.  Mr. Lake said that, didn't he?

1   A.   He stood up here and said it.

2   Q.   Was Mr. Lake asked if any of the payments to you

3   were donations?

4   A.   Mr. Lake was told directly by me that I wouldn't

5   accept --

6   Q.   Was he asked -- the question was, was Mr. Lake asked

7   if any of the money was donations?

8   A.   While he was on the witness stand?

9   Q.   Yes, sir.

10  A.   I don't remember.

11  Q.   Didn't Mr. Lake say none of the payments were

12  donations?

13  A.   I believe that you got him to say that, yes.

14  Q.   And Mr. Denny Patridge came in both on the

15  government's case and your own and Mr. Patridge said that

16  he paid you to help him, didn't he?

17  A.   He expected that -- I believe he said that I was --

18  expected me to help his lawyer, I believe is what he

19  said, and give him spiritual counseling yesterday, I

20  believe it was, or day before, whenever he was on the

21  stand.

22  Q.   Mr. Ouwenga testified as well?

23  A.   He did.

24  Q.   I think Mr. Ouwenga even said that you and he had an

25  oral contract that you would help his wife.

1  A.  And that was somewhat true and somewhat inaccurate.

2  Q.  How much did you receive from the Ouwengas during

3  the time you were helping Mrs. Ouwenga?

4  A.  If I could see that summary chart, I could tell

5  you.  I believe it was either 100 or 125,000 over a

6  period of time.

7  Q.  It was close to a hundred thousand dollars?

8  A.  It's my memory.  Without refreshing it, I don't --

9  Q.  And Mr. Ouwenga's daughter Laurel also testified,

10  correct, as did Erika?

11  A.  As did Erika.

12  Q.  And Erika testified both -- you know, when you were

13  asking her questions that she was paying you because you

14  were helping her mother.  Did she not say that?

15  A.  She did say, and no one has ever denied, that I was

16  helping anybody who asked, including her mother.

17  Q.  And --

18  A.  She said that there were donations and that I made

19  it very clear.

20  Q.  And Ms. Gardner said that you threatened to put a

21  lien on her parents' home, didn't she?

22  A.  And she was just misunderstanding what I said.

23  Q.  Did she say -- how did she testify?  What did she

24  say?

25  A.  She said that I called her up and said if you don't

1  give me any more money, I'm going to put a lien on your

2  house.

3  Q.   Let's talk a little bit about Dr. Pizzino, the

4  dentist from Connecticut.

5  A.   Sure.

6  Q.   And Dr. Pizzino stated, I believe, that you were

7  paid for your travel and services and helping him

8  basically make a case go away.  And you were successful,

9  you and Mr. Stilley, correct?

10  A.   I believe he said he paid Oscar Stilley and I

11  believe he gave that money to me as a gift.  I believe

12  that was his direct testimony.

13  Q.   Didn't Dr. Pizzino say that you helped him?

14  A.   He did.  And no one has ever denied that.  All the

15  records say I helped people.

16  Q.   Which is why as you sit here today, there's no issue

17  in your mind, given the Court's current instructions,

18  that, in fact, it was income?

19  A.   That, in fact, it was gross income, not income,

20  based upon the Court's instruction.

21  Q.   And with respect to Dr. Pizzino, he listened to some

22  of the wrong people, some of the people I think you

23  described as "infected" before.

24  A.   Many, yes.

25  Q.   That was an individual by the name of Irwin Schiff

1   and Larry Cohen, I believe.

2   A.   I believe he said that -- yes, I believe he

3   mentioned both.  Yes, I believe that's true.

4   Q.   And you've heard of Mr. Schiff before?

5   A.   Unfortunately, yes.

6   Q.   Mr. Schiff is a problem, isn't he?

7   A.   He has been a big problem.

8   Q.   And he has been convicted three times for tax fraud.

9   A.   I've dealt with many people who have listened to

10  Mr. Schiff.

11  Q.   And in, I think, 2003, Mr. Stilley was hired and you

12  went along to help with respect to Dr. Pizzino and a

13  situation with the IRS.

14  A.   I actually didn't know what it was.  I just went up

15  there.  Mr. Stilley knew what it was about.  I had just

16  talked to Mr. Pizzino.  He asked me to come up and sit in

17  there in the room, and I did do that.  But there was no

18  quid pro quo.  There was no here's some money, sit in

19  this room and listen to what happens.  It was never like

20  that.

21  Q.   But you went up to help?

22  A.   I did.

23  Q.   And Dr. Pizzino was in a spot of trouble because he

24  had followed Mr. Schiff's advice?

25  A.   We learned that day that he was in a huge spot of

1  trouble.

2  Q.   With respect to that, did you help Mr. Stilley make

3  a presentation to the IRS on Dr. Pizzino's behalf?

4  A.   Yes, I did -- was offered the opportunity while we

5  were in the room to ask a couple of questions.  My

6  questions were not specifically centered on Dr. Pizzino,

7  but in general how they were construing Irwin Schiff's

8  check, the -- Mr. Schiff was telling the public if you

9  file something you can get a refund on the money you've

10  paid in, and Dr. Pizzino had gotten that check.  And so I

11  was trying to understand why that happened so that I

12  could figure out what I could tell the next person that

13  came along that was in that same boat.

14  Q.   Okay.  And you did not -- you and Mr. Stilley did

15  not tell the IRS that Mr. Schiff was correct?

16  A.   I never said it and I don't believe I ever heard

17  Mr. Stilley say it either.  I would never say that.

18  Q.   In fact, you both correctly deflected the criminal

19  investigation by blaming Mr. Schiff and Mr. Cohen for

20  giving Dr. Pizzino bad, if not, in fact, illegal advice.

21  A.   I believe Mr. Stilley deflected it.  I actually was

22  not allowed to communicate other than those questions

23  that I got to ask during that interview.  I was never

24  involved in any of that.

25  Q.   Okay.  So Mr. Stilley actually successfully

1  deflected it by saying words to the effect that poor

2  Dr. Pizzino followed Mr. Schiff, he's a crook?

3  A.   You know, the first time I heard that they had not

4  charged Dr. Pizzino was about a week before he testified

5  in this case.  And he called me up and I asked him how

6  was it going and asked him how his daughter was and he

7  was telling me how thankful he was that he had

8  listened --

9  Q.   Mr. Springer, not that I'm not fascinated by

10 Dr. Pizzino's family life, but the question was, didn't

11 Mr. Stilley deflect this investigation by pointing at

12 Mr. Schiff and saying this guy is a fraud, poor

13 Dr. Pizzino was fooled and followed bad advice?

14 A.   No, that's not what he said.

15 Q.   Okay.  Tell me what he said that -- I mean,

16 obviously, you were there.

17 A.   I was.  Mr. Stilley actually thought that the IRS

18 intentionally had paid the claim that Mr. Pizzino had

19 filed.

20 Q.   You mean Dr. Pizzino?

21 A.   I mean, Dr. Pizzino had made purposely to try to get

22 him entrapped or in trouble at that time.  That's what

23 Mr. Stilley told me that he was thinking happened.  It

24 was like a setup.  They were trapping Dr. Pizzino is what

25 I heard.

1  Q.   Okay.  But as part of that, they also -- Mr. Stilley

2  did say this is -- wasn't Dr. Pizzino's idea, it was

3  Mr. Schiff's?

4  A.   He did.  I do remember having a conversation with

5  Mr. -- Dr. Pizzino and -- well, I heard them say that.

6  Q.   And you agree, as we sit here today, Irwin Schiff is

7  a fraud?

8  A.   Everything he has said in his books is 100 percent

9  in error, 100 percent.

10  Q.   And yet this is the same Mr. Schiff that Mr. Stilley

11  is trying to convince this jury he believes?

12  A.   Well --

13  Q.   It's the same Mr. Schiff?

14  A.   Yes, it's the same Mr. Schiff, and I understand

15  that.

16  Q.   And with respect to all of the witnesses that came

17  in here and said they've paid you money or gave you

18  money, you don't contest that you got the money?

19  A.   No, I do not contest it, never have.

20  Q.   Even Mr. Stumpo, I guess, borrowed $3,750 to pay you

21  some money?

22  A.   Yeah, I heard that in his testimony, but I was never

23  told that when that money was given to me.

24  Q.   You weren't told that he borrowed it from --

25  A.   Right.  I did not have any knowledge of that.

1  Q.   And you also heard Mr. Stumpo say that you helped

2  him because he was in a bad spot with IFC?

3  A.   Actually, yes, I helped him and many other people in

4  that same bad spot.  To the benefit of the government, I

5  may add.

6  Q.   And the Hawkins both paid you -- they paid you a lot

7  of money.

8  A.   No, your word is "paid," but that is not true.  It

9  was never true.  And Mr. Hawkins would have to go in and

10 pray before he would decide how much money he wanted to

11 give me to support me at any given time.

12 Q.   You're not contesting that you received the money?

13 A.   Never have I contested that I received the money.

14 Q.   And you're not contesting that the Hawkins wrote the

15 checks?

16 A.   Well, right.  Mr. and Mrs. or the corporation,

17 either one, no.

18 Q.   You just take exception to the word "pay"?

19 A.   I am -- yes, there was never any quid pro quo for

20 any of that.  Never was.  All you have to do is look at

21 what was done.

22 Q.   Well, Mrs. Hawkins testified quite emphatically that

23 you promised -- you and Mr. Stilley promised that your

24 work would bring him home and would ask for more money.

25 A.   She was also aware that if her husband came in here

1    and said whatever the government asked him to say that he

2    would be coming home very soon, and that was her goal.

3    The only thing is I didn't want to disrupt that because I

4    don't believe he belongs in prison either.

5    Q.   Actually, Mr. Springer, didn't Mr. Hawkins testify

6    there has been no agreement with the government, it's a

7    hope?

8    A.   I think Mr. Snoke is the one that stood up and asked

9    him questions about his 2255 deal.  I'm not certain as to

10   the brevity of that situation.  But I do know that he --

11   and Mr. Snoke stood back up, he did say he expects on his

12   lawyer's behalf that he may be getting some benefit,

13   which was from my question that they didn't anticipate.

14   Q.   And Mrs. Hawkins was equally emphatic when she

15   testified that you asked her for a half million dollars

16   for the appeal.

17   A.   Yes.  And that was in error, 100 percent in error.

18   And it wasn't for an appeal.  Her testimony was that she

19   had learned that a U.S. Attorney had been -- had gotten

20   in trouble and that that U.S. Attorney was the prosecutor

21   against her husband.  And as a result of her getting in

22   trouble, Mrs. Hawkins called and asked me is there any

23   way you could figure out what needs to be done.  And I

24   responded to her and I said if you're going to take on

25   the United States Department of Justice, you better get a

1  bunch of lawyers and you better get them fast.  And she

2  said, well, what would you think would be needed

3  financially to do that.  And I said you could start at a

4  half a million dollars because lawyers in that arena are

5  very expensive.  Some of them are $500 an hour.

6  Q.   Mr. Springer, you had every opportunity to ask

7  Mrs. Hawkins that on cross, didn't you?

8  A.   Yes, I did.

9  Q.   You didn't do that then, did you?

10 A.   No, I didn't.

11 Q.   That's because it's not true, is it?

12 A.   No, it is very true what I just said, 100 percent

13 true.

14 Q.   Mr. Springer, it's true that you asked her for a

15 half million dollars --

16 A.   No, not true.

17 Q.   You actually had Mr. Stumpo come in and testify,

18 correct?

19 A.   I did.

20 Q.   And you asked Mr. Stumpo about how big and nice a

21 house the Hawkins have?

22 A.   That's true.

23 Q.   And Mr. Stumpo estimated it was worth, I think,

24 several million.

25 A.   Several -- $13 million, I believe.

LINDSEY SPRINGER - CROSS BY MR. O'REILLY                    2837

1   Q.   Were you hoping that the Hawkins would borrow

2   against their home and kick in a half million dollars to

3   you like you did with Mr. Turner?

4   A.   Absolutely not.  And, in fact, Mrs. Hawkins had

5   already made everyone in the war room aware that she did

6   not have any ability to hire any lawyers to do anything

7   after her husband's appeal.

8   Q.   For someone that has no gross income --

9   A.   Thank you.

10  Q.   Receives no -- you know, pays no taxes, you've lived

11  pretty well, haven't you?

12  A.   There are times where things are paid for and there

13  are times when things are very, very tough.

14  Q.   You've lived pretty well, haven't you?

15  A.   At times.

16  Q.   Driven luxury cars, bought beautiful jewelry for

17  your wife.

18  A.   I do love her.

19  Q.   How many cars have you bought just in the last --

20  you know, from 2000 to 2005?

21  A.   Maybe eight or nine.

22  Q.   What kind of cars?

23  A.   Ford or Chevrolet pickup trucks all the way up to

24  Lexus or Mercedes.

25  Q.   Plus the $166,000 motor home?

```
 1   A.   Yeah, that's not a car.
 2   Q.   I understand.  I wasn't implying you were omitting
 3   that as a car.
 4   A.   Okay.
 5   Q.   Do you have any idea how much you spent on cars from
 6   2000 to 2005?
 7   A.   You're wanting to know the difference between how
 8   much I paid and how much I sold the car for?  Or are you
 9   saying how much I paid without considering how much I
10   sold the car for?
11   Q.   Go for the net.  The difference between what you
12   paid and what you sold it for, what did it cost you?
13   A.   Over a four-year period?
14   Q.   Over a six-year period, 2000 to 2005,
15   approximately.  Excluding the motor home.  And if you
16   don't know, that's fine.
17   A.   Give me just a moment and I'll add it up for you.
18   Over the six-year period, it cost us to drive all of the
19   cars around $70,000 over the six-year period or around
20   $12,000 a year or $1,000 a month.
21   Q.   Do you still own the Corvette?
22   A.   No.  No, I do not.
23   Q.   How much did you sell the Corvette for?
24   A.   I believe it was 30,000.
25   Q.   Do you still own the Mercedes?
```

1  A.    Which one?   There were two.

2  Q.    Either.

3  A.    No, I don't own either.

4  Q.    What are you driving now?

5  A.    I drive a '99 Chevrolet Suburban, four-wheel drive.

6  Q.    You have not filed a tax return yourself since the

7  1980s.  I think we've already talked about that.

8  A.    Asked and answered, yes.

9  Q.    We've talked about that?

10  A.    Yes, we have, extensively.

11  Q.    And you've given various reasons throughout the

12  years for why, correct?

13  A.    Depending on who was asking the question and

14  depending on what the issue was, yes.

15  Q.    Well, tell the jury some of the reasons you gave the

16  tax court in 1997.

17  A.    I believe I -- on the Bureau of Labor Statistics

18  you're asking me about?

19  Q.    Well, why you didn't file a return, not why the

20  deficiency was incorrect.  I think you said something

21  before about the 16th Amendment, enslavery.

22  A.    Yes.  I didn't understand about the Bureau of Labor

23  Statistics.  I didn't know you could impose a tax

24  liability on somebody just by using statistical

25  information.  And I took exception to that.  And so in

1   trying to understand how they could do that, that became

2   a very extensive amount of research.  And I only had a

3   limited amount of time to challenge the claim in tax

4   court.  So I basically stated everything I could possibly

5   state as an objection in my petition.  Because if I

6   didn't say it, then they would construed me to have

7   waived the claims that I could possibly make.  There's a

8   time limit that you have.  And so I felt like if the IRS

9   was saying that they could use Bureau of Labor Statistics

10  to impose a tax liability on me and that the source of

11  that power was the 16th Amendment, then I believed that

12  was unconstitutional.

13  Q.   You don't believe that now?

14  A.   No.

15  Q.   When did you stop believing that?

16  A.   After I had extensive conversations in 1998 and 1999

17  with the Securities and Exchange Commission and Robert

18  D. Metcalf from the U.S. Department of Justice.

19  Q.   And Mr. Stilley put into evidence, through you,

20  various copies of the instruction book that accompanies

21  the Forms 1040, individual income tax returns.

22  A.   I think it's 23 through 31 or 33 of the defendants'

23  exhibits.

24  Q.   Twenty-four through 34, the even numbers?

25  A.   Yes.

1   Q.   And you've testified, I believe, that you've read

2   these extensively?

3   A.   Yes, I have.

4   Q.   Doesn't each one of these information books contain

5   the provision that states, in effect, other penalties can

6   be imposed for negligence, substantial understatement of

7   tax and fraud, criminal penalties may be imposed for

8   willful failure to file tax, tax evasion, or making a

9   false statement?

10  A.   Yes, that language is included on that page in that

11  book.

12  Q.   In each of them, correct?

13  A.   In each of them, yes, it is.

14  Q.   And I believe you testified on direct that it was

15  your belief that the Forms 1040 failed to comply with any

16  of the criteria set forth under this Paperwork Reduction

17  Act.

18  A.   On the certification form that they filled out with

19  OMB, none of the information on that certification

20  appears on the form, that's true.

21  Q.   None of it?

22  A.   None of it on the form.

23  Q.   Doesn't the certification require an OMB number?

24  Isn't that one of the criteria?

25  A.   Actually, not -- no, not on the certification.  That

1  comes from Section 3506(c)(1)(B) of Title 44.  That

2  actually doesn't come into the certification because the

3  certification presumes OMB is going to have a number, so

4  they don't actually make it part of their certification

5  process.

6  Q.  But isn't it also true that under the statute,

7  whether a Form 1040 is published or not, the law requires

8  each individual -- and we've already discussed this about

9  6012 over the -- I think what Mr. Miller called the

10  threshold amount, but which is the exemption plus the

11  standard deduction, every individual must make a return

12  reporting their income and deductions to which they are

13  entitled.  Isn't that what the law states, in effect?

14  A.  It's a good summary from that vantage point, but it

15  by no means is either the middle or the end of the

16  issue.  It is a starting point.

17  Q.  Well, the ending point would be actually filing a

18  return, wouldn't it?

19  A.  No, sir.  The ending point is 6011, which you have

20  never told this jury as you've stood there and asked me

21  questions.

22  Q.  Mr. Springer, isn't it the judge's job to instruct

23  on the law?

24  A.  Well, when you started asking me questions, I

25  believe that that became an issue.

1   Q.   Did I ask you about 6011?

2   A.   No, you did not.

3   Q.   People that came to you were looking for help,

4   weren't they?

5   A.   That's a very general statement.  I would say most

6   everybody that contacts me is after some type of help.

7   Doesn't really categorize itself into any one specific

8   area.

9   Q.   So would your answer be yes?

10  A.   Help, yes.

11  Q.   And, in fact, you worked with Mr. Stilley and a

12  number of other -- couple of other attorneys, at least, I

13  think Mr. Barringer being one, where people had legal

14  issues that you were going to help them with.

15  A.   Yes, at times I have helped attorneys on cases where

16  they have clients that have tax-related issues.  I have

17  done that.

18          MR. O'REILLY:  May I have a moment, Your Honor?

19          THE COURT:  You may.

20  Q.   (BY MR. O'REILLY)  But earlier you testified that

21  the first check with respect to this Infinity Group came

22  out of the blue, you had no idea why you got it?

23  A.   The $5,000 check, the original check, yes.

24  Q.   And that was in 1997?

25  A.   It has to be in '97 and I would -- just guessing, it

1  would be April or May.  Don't know for certain.

2  Q.   And subsequently --

3  A.   Could have been in February.

4  Q.   Pardon me?

5  A.   Could have been in February of '97.  I just don't

6  recollect that far back.

7  Q.   And subsequently you received about, I think, $1.2

8  million?

9  A.   Second round I received 150,000 and then the third

10 round I received, I believe, $1.2 million in both

11 cashier's checks in hundred thousand dollar increments

12 and/or wires.

13 Q.   Was the total $1.2 million or was that just the last

14 amount?

15 A.   You know, I don't recall exactly what the total

16 amount was, but the court order says it was $1.265

17 million.  I just --

18 Q.   You have no reason to contest that, do you?

19 A.   No.  No, I don't.

20 Q.   And didn't that money come from investors who had

21 been -- not that you were involved at that point.

22 A.   Thank you.

23 Q.   But the money had come from people who had been

24 defrauded by Mr. Benson and others?

25 A.   Yes, it did prove out to be that the money was not

1   only pooled incorrectly into a hundred million dollars,

2   but also that there were false statements made to the

3   10,000 members.  And I assisted in that prosecution.

4   Q.   Did you willingly give up the $1.2 million?

5   A.   No, I did not.

6   Q.   You fought it, didn't you?

7   A.   At the time, I didn't know what we found out later.

8   I thought the government was just taking it from me

9   because they didn't want me to have it.

10  Q.   Were you held in contempt?

11  A.   I was.

12  Q.   And what did you do when you received all this

13  money?  What was one of the first things you did?

14  A.   I took my wife from a crappy car to a nice car.

15  That's what I did.

16  Q.   What kind of car did you buy?

17  A.   A used Lexus from Darren Murdock at Lexus of Tulsa.

18  Q.   What else did you do?

19  A.   I bought a Mercedes for myself.

20  Q.   Go on a shopping spree in Dallas as well?

21  A.   Yes, we did.  It was time to get some new clothes.

22          MR. O'REILLY:  If I may have a moment, Your

23  Honor?

24          THE COURT:  You may.

25  Q.   (BY MR. O'REILLY)  I do have one other area I want

1  to ask you about.  You've talked a lot about why you

2  don't file federal income tax returns, either because you

3  think it's this PRA, the Paperwork Reduction Act, or

4  because it's gifts or not gifts.  Why don't you file

5  state tax returns?

6  A.   Under Oklahoma law, you're only required to file a

7  state return if you're required to file a federal

8  return.  It's just the way they wrote the law.

9  Q.   When is the last time you filed an Oklahoma state

10  return?

11  A.   The last time I filed a federal return.

12  Q.   And you've said to this jury that you were doing

13  everything you could to get the IRS -- and this is going

14  back to the federal taxes -- doing everything you could

15  to get the IRS to comply with the Paperwork Reduction

16  Act.  Do you remember that testimony?

17  A.   Since 1999, yes, I have been.

18  Q.   If nobody was paying any taxes, how could the IRS do

19  anything?

20  A.   Well, that's a great question.  And the answer is

21  that we need to overhaul our system and get it to where

22  everybody understands it to where we don't have to have

23  10,000 pages of code sections that everyone can have a

24  different theory on or a million pages of regulations

25  that nobody has the time to read or as the General

1  Accountability Office said, the reason why the IRS

2  doesn't want to put the statute on the form is because it

3  will take -- it will burden the public to read it.

4  Q.   Mr. Springer, I was able to explain your statutory

5  requirement to file by citing three different statutes,

6  wasn't I?

7  A.   Under your theory, yes.

8  Q.   And Mr. Miller has explained that to you hundreds of

9  times, hasn't he?

10 A.   Not the same theory, but he does have a theory, but

11 it's not the same theory as your theory.  You use 63.

12 You use Section 63 and 6012.  And then you went to

13 151(d).  And then you went to the additions for

14 inflation.

15 Q.   Which are contained under both 63 and 151.

16 A.   Right.

17 Q.   Mr. Springer, isn't it simply a fact that you don't

18 want to pay taxes and you're a tax cheat?

19 A.   I'm not a tax cheat.  And, actually, I have helped

20 the United States Government collect millions of dollars

21 in taxes, but I'm not going to file a tax return until

22 the law says I have to.  And in this instance, the

23 General Accountability Office report clearly tells you

24 exactly why we, as public, are supposed to police the IRS

25 and we're supposed to do it to every agency.  And when I

1  get cross-examined here myself, I'll explain more of it.

2  Q.   Didn't the tax court in 1997 reject similar

3  positions of yours and tell you you had to file?

4  A.   Sure, they did.

5         MR. O'REILLY:  Nothing further.

6         THE COURT:  Redirect.

7                REDIRECT EXAMINATION

8         MR. SPRINGER:  Your Honor, this is going to get

9  a little unique because we're going to go to the Elmo and

10  Mr. Stilley is going to, if it's okay with the Court,

11  present on the Elmo.

12         THE COURT:  That's fine.

13         MR. SPRINGER:  Okay.

14         THE COURT:  Members of the jury, I'm going to

15  see if we can get just a little closer to 3:30 before we

16  take our mid-afternoon break, but between now and then,

17  if anyone needs a break, why, we certainly will take one.

18  You may proceed.

19         MR. STILLEY:  Your Honor, may we approach?

20         THE COURT:  Approach what?

21         MR. STILLEY:  Approach the bench.

22         THE COURT:  You may.

23    (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND

24  OUT OF THE HEARING OF THE JURY.)

25         MR. STILLEY:  Standby counsel wanted to talk to

```
 1  Mr. Springer before he started his redirect and I didn't

 2  know any other way to handle it than to ask to come up

 3  here first.

 4            THE COURT:  That's fine.  That's fine.  You can

 5  take a minute or two to confer.  That will be fine.

 6            MR. SPRINGER:  No, thank you, Judge.

 7       (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

 8  WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

 9  PRESENCE AND HEARING OF THE JURY.)

10            THE COURT:  You may proceed.

11            MR. SPRINGER:  Thank you, Your Honor.

12       Mr. O'Reilly asked me questions that omitted several

13  issues and this is the problem, this is why the General

14  Accountability Office report was written because you have

15  to look at everything and not something in isolation.

16  And he suggested that when I read to you that I read in

17  isolation.  That was not my intent.  If I had my way, I

18  would have read the entire report.  However, I read to

19  you what I thought was important to understand what I

20  believe.  And I have to tell you the general

21  accountability report is very clear on the subject.

22       Mr. O'Reilly brought up the Dole decision from 1990

23  from the Supreme Court where I had stated tax forms --

24  this is what it reads -- tax forms are typical

25  information collection requests.  He asked me, but it
```

```
 1   doesn't say the IRS, does it?
 2       I don't know of any other federal agency that does
 3   tax forms for the federal government but the IRS.  So I
 4   cannot compute that tax forms are typical information
 5   collection requests doesn't mean the IRS.
 6       And there is a very important part of the Dole
 7   decision, and this is Defendants' Exhibit Number 73,
 8   tenth page in, and this is a quote from the Supreme Court
 9   of the United States.  "While the grammar of this text
10   can be faulted, its meaning is clear:  the public is
11   protected under the Paperwork Reduction Act from
12   paperwork regulations not issued in compliance with the
13   Act, only when those regulations dictate that a person
14   maintain information for an agency or provide information
15   to an agency."  And that's what we're being asked to do
16   when we answer the questions on a Form 1040.
17           MR. O'REILLY:  Objection, Your Honor.  I'd like
18   to make it very clear that there is no substantive
19   defense Paperwork Reduction Act.  This is offered only --
20           MR. SPRINGER:  Good faith.
21           MR. O'REILLY:  -- for good faith belief.
22           THE COURT:  I think we all have that
23   understanding.  Proceed.
24           MR. SPRINGER:  In that passage that I just read
25   there is just above it a passage that reads, "In
```

1    addition, if the agency nevertheless promulgates the

2    paperwork requirement, members of the public may ignore

3    it without risk of penalty."  And then they have a

4    footnote 6.  So you go to the end of the opinion and you

5    read footnote 6 and it says, "The Act allows the public,

6    by refusing to answer these information collection

7    requests, to help control 'outlaw forms.'"  And this is

8    the Dole decision in 1990.

9        Mr. O'Reilly also mentioned the Collins decision and

10   that would be Defense Exhibit Number 74.  And if you

11   remember, his question was, did I know of any cases where

12   the Paperwork Reduction Act was allowed to be considered

13   in a tax evasion or failure to file case, I believe, I

14   may be misstating one of those, but I think it was both.

15       And when you understand -- excuse me, strike that.

16   When I would read a case, I would break it down and try

17   to understand what was said and what was not said.

18   Sometimes that involves reading dissenting opinions in

19   cases, like in Roe v. Wade dealing with abortion.  And in

20   the Collins case, there were two footnotes that were

21   basically the Court making a statement, but it didn't fit

22   into the general four corners of the case.

23       And footnote 12 reads as follows, "In United States

24   v. Tedder, 787 F.2d 540 at page 542, Tenth Circuit, 1986,

25   this Court held the tax forms were not information

1  collection requests subject to the Paperwork Reduction

2  Act because the filing of an income tax return was

3  obligatory.  This holding is superseded by the Supreme

4  Court's analysis in Dole v. United Steelworkers which

5  included federal income tax forms within the category of

6  information collection requests under the Act.  Dole

7  would also appear to call into question the holdings in

8  Snyder v. the IRS, 596 F.Supp. 240, Northern District of

9  Indiana in 1984, and Cameron v. the IRS, 593 F.Supp.

10  1540, Northern District of Indiana in 1984, affirmed at

11  773 F.2d 126 in the Seventh Circuit in 1985, both of

12  which held the Paperwork Reduction Act inapplicable to

13  IRS forms."

14      And then they go on, "However, Dole does not

15  contravene our recent holding in Lonsdale that IRS

16  summons do not constitute information requests under the

17  act because they are issued in the course of an

18  investigation directed against a specific individual or

19  entity."

20      And then there's a footnote 13 which reads, "In

21  United States v. Weiss, 914 F.2d at page 1514 and then

22  page 1520 through 1522, the Second Circuit Court of

23  Appeals in 1990, the Second Circuit held that the

24  Paperwork Reduction Act did not preclude prosecution for

25  filing false Medicare and Medicaid claims, despite the

1   fact that forms in question did not contain OMB control

2   numbers.  Distinguishing Smith, where defendants were

3   prosecuted for failure to file a Plan of Operations with

4   the Forest Service, the Second Circuit reasoned that the

5   Act 'only protects a person from penalties for failing to

6   file information.  It does not protect one who files

7   information which is false.'  Id. at 1522 (quoting Funk,

8   The Paperwork Reduction Act:  Paperwork Reduction Meets

9   Administrative Law, 24 Harv.J. on Legis. 1, 77 n. 411

10  (1987) (emphasis in original)."

11       The actual footnote reads, "We recognize that

12  because defendant was charged with tax evasion and not

13  failure to file tax returns, he technically was not being

14  prosecuted for failure to provide information.  Had

15  defendants' tax evasion been effectuated through the

16  filing of falsified tax returns, Weiss would dictate that

17  no Paperwork Reduction Defense would be available to

18  him.  But because the provision of information in 1040

19  forms is inexorably linked to the statutory requirement

20  to pay taxes, and defendant failed to file such forms,

21  the Paperwork Reduction Act was applicable to such

22  conduct."  That's the Tenth Circuit in 1990 after the

23  Dole decision that Mr. O'Reilly didn't want you to know

24  about.

25            MR. O'REILLY:  Your Honor, objection.

1          THE COURT:  That will be sustained.  That will

2     be stricken.

3          MR. SPRINGER:  Then there was the Dawes

4     decision, which is Defense Exhibit Number 75.  And

5     paragraph 11, which is on the third page of Defendants'

6     Exhibit Number 75 says, "We would be inclined to follow

7     the general analysis of Wunder and Hicks and hold that

8     the operation of the PRA in these circumstances did not

9     repeal the criminal sanctions for failing to file a

10    income tax return because the obligation to file is a

11    statutory one.  However, we are not compelled to rest our

12    opinion on the statutory origin theory because we find

13    the analysis of other courts which have considered the

14    issue to be persuasive."

15       Here they, in my belief, just said that the

16    requirement to file a tax return is a theory and it's a

17    theory that as a statutory mandate they did not subscribe

18    to.  That's the way I interpreted that paragraph.

19         MR. O'REILLY:  Asked and answered and

20    repeatedly.

21         THE COURT:  How much more do you have along this

22    line?

23         MR. SPRINGER:  Just going down the list, Your

24    Honor.  Probably ten, 15 at the most.

25         THE COURT:  Continue.

1          MR. SPRINGER:  Okay.  If you'll remember,

2    Mr. O'Reilly mentioned Section 6012, 63, 151(d), and he

3    never mentioned any regulations.  If I could publish

4    Defense Exhibit Number 25 and, specifically, if you could

5    turn to the Paperwork Reduction Act notice -- I'm sorry,

6    Mr. Stilley, 24.  I'm sorry.  I believe it's 56 is the

7    page in the booklet.  Right there.  Just right there

8    would be great.

9          Now, this Defense Exhibit Number 24 has been entered

10   into evidence and it is the instruction booklet for the

11   calendar year 2000.  And you've heard me testify about

12   the Paperwork Reduction Act of 1980 and the Paperwork

13   Reduction Act of 1995.  Here we are in 2000 and the very

14   first sentence on this page in the instruction booklet

15   reads, "The IRS Restructuring and Reform Act of 1998, the

16   Privacy Act of 1974, and the Paperwork Reduction Act of

17   1980 require that when we ask you for information we must

18   first tell you our legal right to ask for the

19   information, why we're asking for it, how it will be

20   used.  We must also tell you what could happen if we do

21   not receive it and whether your response is voluntary,

22   required to obtain a benefit, or mandatory under the

23   law."

24         Now, this one paragraph, to me, is the beginning of

25   trying to say we are going to comply with the Paperwork

```
 1  Reduction Act.
 2         MR. O'REILLY:  Your Honor, objection.  This is
 3  beyond the scope.  I asked him about cases and what
 4  specific section.  It's also asked and answered in his
 5  previous testimony.
 6         THE COURT:  Sustained.
 7         MR. SPRINGER:  May we approach on that, Your
 8  Honor?
 9         THE COURT:  You may approach.
10     (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND
11  OUT OF THE HEARING OF THE JURY.)
12         THE COURT:  Okay.  What's your point here?
13         MR. SPRINGER:  When he read from the booklet, I
14  asked the Court if he could be instructed to read other
15  parts as he did to me when I was reading from the General
16  Accountability Office report.  And this Court said, no,
17  but I could address it when I was doing my redirect.  And
18  now I'm doing it and I'm being told I can't.
19         THE COURT:  Okay.  Well, is there any -- we're
20  here on redirect and the purpose of redirect is to rebut
21  things he actually went into on cross.  What is it on
22  page 56 that you want to read that rebuts what he went
23  into on cross?
24         MR. SPRINGER:  The last two paragraphs on the
25  first section was talked about 6001, which he left off;
```

1  6011, which he left off; and the regulations right here.

2  He never mentioned any of that to the jury.

3          THE COURT:  That will be sustained.  Move to

4  something else.

5      (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

6  WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

7  PRESENCE AND HEARING OF THE JURY.)

8          MR. SPRINGER:  Mr. O'Reilly mentioned or asked a

9  question about 6012, 63, and 151(d).  Nowhere on the Form

10  1040 for the years 2000 through 2005, which are marked as

11  Defense Exhibits Number 23, 25, 27, 29, 31, and 33, do

12  Section 6012 appear, Section 63 appear, Section 151(d)

13  appear, nor does the phrase "it's mandatory" appear on

14  the form.  And what was left off was Section 6001,

15  Section 6011, and the regulations.

16          MR. O'REILLY:  Your Honor, objection.  What was

17  left off the form would be the entire Title 26 code.

18  There wouldn't be room for anybody to write.

19          THE COURT:  Sustained.

20          MR. SPRINGER:  Section 6011 begins from my

21  understanding and belief --

22          MR. O'REILLY:  Objection.  6011 was not asked

23  about in cross.  It was entered in a non-responsive

24  response, but that was not addressed in cross.

25          THE COURT:  Sustained.

```
 1            MR. SPRINGER:  Mr. O'Reilly mentioned the
 2   Salberg decision from the Seventh Circuit in 1992 and he
 3   actually read a passage about the requirement to file tax
 4   returns stems from Section 7203.  7203, in my belief,
 5   doesn't require anybody to do anything.  The requirement
 6   has to come from somewhere else under my belief.  The
 7   General Accountability Office report that I read earlier
 8   only reaffirmed what I believed.
 9            MR. O'REILLY:  Objection.  That's the second
10   time in redirect that he has said that.
11            THE COURT:  Sustained.
12            MR. SPRINGER:  Mr. O'Reilly asked about the
13   notice of deficiencies and did the IRS basically send me
14   a tax bill.  And he was asking questions about did I ever
15   pay it.  And that becomes very interesting.  After the
16   tax court decision at the district court level in 1997, I
17   was allowed to appeal that case to the Tenth Circuit and
18   then all the way to the Supreme Court.
19       And my claim was that using Bureau of Labor and
20   Statistics was unconstitutional.  On June 18, 1998, the
21   Supreme Court denied considering my question.  Thirty-
22   four days later, Congress passed the Restructuring and
23   Reform Act of 1998.  And in it they passed a section
24   which now is known as Section 7491(b).  And under that
25   section, the only way they can ever use Bureau of Labor
```

1   and Statistics ever again against anybody is if they can

2   prove that that person is contained within the

3   statistical information that created the statistics in

4   the first place, basically making it almost impossible to

5   use.

6       After the tax court decision, I appealed to the

7   Tenth Circuit and the IRS decided to issue what's called

8   an assessment.  But instead of using the address of 5147

9   South Harvard --

10          MR. O'REILLY:  Your Honor, objection, beyond the

11  scope of --

12          THE COURT:  Sustained.

13          MR. SPRINGER:  I never was sent any assessment

14  or lien notice or claim I owe taxes after the notice of

15  deficiency which allowed me to dispute the taxes and they

16  sent it to an old address so that I couldn't get it.

17          MR. O'REILLY:  Objection, Your Honor.  The Court

18  just sustained that.

19          THE COURT:  Sustained.  Mr. Springer come

20  forward.

21      (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND

22  OUT OF THE HEARING OF THE JURY.)

23          THE COURT:  Okay.  Redirect is not your

24  opportunity to argue your case nor is it an opportunity

25  to rehash things that have already been gone into again

1  and again.  You are perilously close to me simply telling

2  you to step down.  And I mean it, I will do it.  You're

3  taking gross advantage of your opportunity to address on

4  redirect those matters that were gone into on cross.  And

5  I'm going to allow you to do so as long as it's proper

6  redirect, but you're not going to start arguing your

7  case, you're not going to start rehashing things that

8  have been gone into again and again.  You're not going to

9  start expounding on things that were mentioned in cross

10  only because you gave an unresponsive answer.

11      Now, if it's something that is truly fair game and

12  you, by this time, know what's fair game, then I'm going

13  to let you get into it.  But I'm not going to have you

14  sit there and make Mr. O'Reilly jump up and down every

15  other question because of your improper diatribes.

16           MR. SPRINGER:  May I tell the Court where I was

17  going so I won't go there?

18           THE COURT:  No.  We're going to go to the next

19  question.

20           MR. SPRINGER:  Okay.

21      (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

22  WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

23  PRESENCE AND HEARING OF THE JURY.)

24           MR. SPRINGER:  Mr. O'Reilly asked me if I paid

25  the taxes from the notice of deficiency in 1996.  In

1    2007, the IRS gave me a certificate of release releasing

2    the entire liability against me, all $300,000 of it.

3         Mr. O'Reilly asked me why I -- or he asked me if I

4    had filed a Bivens action or a lawsuit against the agents

5    who raided my home where I alleged they had stole money

6    and asked me did I file that in the United States

7    District Court.  And had I filed that in the state court,

8    the Department of Justice would have filed what's called

9    a notice of removal.

10        MR. O'REILLY:  Objection.  Calls for speculation

11   what the Department of Justice would have done.

12        THE COURT:  Overruled.

13        MR. SPRINGER:  Thank you.  They would have -- if

14   I had filed it in state court in Oklahoma, the State of

15   Oklahoma court, then they would have had a legal right to

16   remove it to this Court, this federal court.  And so,

17   therefore, that's why I brought that action in federal

18   court from the beginning to just avoid the time and the

19   delay.

20        Mr. O'Reilly asked me about an opinion published by

21   the Tenth Circuit on August 31, 2009.  What he did not

22   read you was this:  "One final matter remains to be

23   disposed of and that is the Commissioner's motion to

24   impose sanctions against Mr. Springer and his counsel for

25   maintaining a frivolous appeal."

 1          MR. O'REILLY:  Your Honor, objection.  That was

 2   not the -- I'll withdraw it.

 3          MR. SPRINGER:  Thank you.

 4          MR. O'REILLY:  Let him ask.

 5          MR. SPRINGER:  The next sentence is, "We deny

 6   the motion.  Although Mr. Springer's appellate briefs are

 7   far from a model of clarity, he has managed to advance

 8   several arguments in his appeal that raise difficult

 9   issues under both the tax code and the PRA.  As a result,

10   we cannot say that this appeal is sufficiently frivolous

11   to justify the imposition of sanctions.  While we commend

12   the Commissioner for the extremely helpful statement of

13   the case and statement of the facts in his response

14   brief, we also note that the Commissioner himself has

15   made a frivolous argument in his response brief and

16   motion for sanctions that mischaracterizes what happened

17   in Mr. Springer's prior appeal to this Court.  The

18   Commissioner's argument is as follows:  Mr. Springer

19   contends that he is protected from income tax penalties

20   because the 'disclosures required by the PRA are not on

21   any Form 1040 nor on any non-accompanying, disclaiming,

22   non-binding opinion, instruction or treatise.'  Taxpayer

23   made virtually the identical argument in challenging his

24   liability" -- I'm still quoting -- "for the penalties

25   that are due from him under I.R.C. 6651(a)(1) for failure

1  to file returns for 1990-1995, and this Court rejected it

2  as frivolous."  Citing to Springer at 231 F.Appx. at 801,

3  footnote 6.

4      Continuing the quote, "It is no less frivolous when

5  asserted in connection with failure-to-pay penalties."

6  And then they cite to the Commissioner's brief at page

7  24.  And they also said, "See also Motion for Sanctions

8  at 6 (making same argument)."

9      The Tenth Circuit goes on, "The Commissioner is

10 wrong about what happened in the prior appeal.  In that

11 appeal, we referred to the three underlying cases that

12 had been consolidated for appeal as Springer I, Springer

13 II, and Springer III, and we did not address the merits

14 of Mr. Springer's claims under the PRA in any of the

15 three cases.  Instead, we affirmed the district court's

16 dismissal of Springer I for lack of subject matter

17 jurisdiction, Springer, 231 F.Appx. at 797; we affirmed

18 the district court's dismissal of Springer II on the

19 ground that the tax court had exclusive jurisdiction over

20 the case, id.; and we affirmed the district court's

21 dismissal of Springer III on the ground that the PRA does

22 not create a private right of action, id. at page 799.

23 Further, in footnote 5 in the order and judgment, we

24 specifically stated" -- and this is the Tenth Circuit.

25         MR. O'REILLY:  Your Honor, objection at this

```
 1  point.  This was a very short passage that the government

 2  inquired of.  This is well beyond the scope of cross.

 3          THE COURT:  What exhibit are you reading from,

 4  Mr. Springer?

 5          MR. SPRINGER:  It's Exhibit 59, Your Honor.  It

 6  was the same exhibit he quoted from.

 7          THE COURT:  What page were you on?

 8          MR. SPRINGER:  I'm now on page 9, Your Honor, at

 9  the very top with the first full sentence beginning with

10  the word "further."

11          THE COURT:  Read the rest of that paragraph and

12  then move on to something else.

13          MR. SPRINGER:  Thank you, Your Honor.  "Further,

14  in footnote 5 in the order and judgment, we specifically

15  stated that 'in view of our jurisdictional disposition,

16  we do not reach the merits of Springer I and Springer

17  II.'  Id. at 799, footnote 5.  And, in footnote 6, the

18  footnote cited by the Commissioner in the above-quoted

19  language, we did not state that the PRA claims in

20  Springer II were frivolous.  Rather, we stated that the

21  appeal in Springer II was frivolous due to the obvious

22  jurisdictional defect arising from the fact that

23  Mr. Springer had filed Springer II in federal district

24  court when exclusive jurisdiction resided in the tax

25  court.  The Commissioner is therefore mistaken when he
```

1   argues that this Court addressed the merits of

2   Mr. Springer's PRA claims in the prior appeal, and his

3   argument is frivolous" -- the Commissioner's -- "and his

4   argument is frivolous given the obvious nature of the

5   three dispositions in that appeal."

6            THE COURT:  Members of the jury, we'll take our

7   mid-afternoon recess at this time.  We'll resume at ten

8   minutes till four.  So please be available just a little

9   before that time so that we can resume promptly at ten

10  minutes till four.  And, of course, during this brief

11  recess, please remember my usual admonition, which I will

12  not repeat at this time.

13       All persons in the courtroom will remain seated

14  while the jury departs.

15       (JURY EXITS THE COURTROOM)

16            THE COURT:  Okay.  You may step down.

17  Mr. Springer, can you give me an estimate as to how much

18  more you have on redirect?

19            MR. SPRINGER:  Very short and five minutes at

20  the most.

21            THE COURT:  Okay.  Okay.  Very well.  One thing

22  that I'll mention at this point, outside the presence of

23  the jury, just so that everyone will understand the

24  framework for closing argument.  Of course, the opinion

25  on the appeal from the tax court came out August 31st of

```
 1    2009.  That carries its own problems with it, obviously.
 2        But, Mr. Springer, just as I didn't want to mar the
 3    flow of your opening statement -- and, in fact, I applaud
 4    the way you did your opening statement.  It was not
 5    necessary for the Court to interrupt or intervene.  I
 6    will give you a heads-up now.  If I hear any suggestion
 7    in your closing argument that the language you just read
 8    about the Commissioner's frivolous argument went to the
 9    merits of the PRA, I will intervene and set the record
10    straight.  I want you to understand that.
11        Because as you know, that use of that word by the
12    Court of Appeals went to the Commissioner's
13    characterization of positions taken and results reached
14    in previous cases.  It did not go to the merits of the
15    PRA argument.  And any such suggestion during your
16    closing argument will result in my intervening to set the
17    record straight.
18            MR. SPRINGER:  If I may, Your Honor.  Is the
19    government also precluded from saying anything with
20    regard to that same opinion?
21            THE COURT:  I didn't say that anybody is
22    precluded from saying anything about that opinion.
23            MR. SPRINGER:  Okay.
24            THE COURT:  What I said is that if you take that
25    word and seek to suggest to the jury that that word was
```

```
 1   applied by the Court of Appeals to the merits of the PRA
 2   argument, I will intervene to set the record straight.
 3           MR. SPRINGER:  Am I okay to say, Your Honor,
 4   that they did not reach the merits of my claims based
 5   upon that order?  Because I thought that's what it said.
 6           THE COURT:  Well, I'm not going to coach you all
 7   the way through your closing argument.
 8           MR. SPRINGER:  But will I get an objection --
 9           THE COURT:  I'm just giving you a heads-up on
10   one very glaring item, and this will apply to both sides,
11   but any effort to distort these materials, whether
12   it's -- regardless of who it's from, I will be on that
13   like a duck on a June bug.
14           MR. SPRINGER:  Thank you.
15           THE COURT:  Okay.  Court will be in recess.
16       (A RECESS WAS HAD, AFTER WHICH THE FOLLOWING
17   PROCEEDINGS WERE HAD IN OPEN COURT AND WITHIN THE
18   PRESENCE AND HEARING OF THE JURY.)
19           THE COURT:  Mr. Springer, you may continue.
20           MR. SPRINGER:  Just in case I haven't, Your
21   Honor, I would --
22           THE COURT:  Please pull the microphone down.
23           MR. SPRINGER:  Sorry about that.  -- I would
24   move into the record Defendants' Exhibit Number 49, 50,
25   51, and 52, which were the Form 83-Is.
```

```
 1              MR. O'REILLY:  Objection, Your Honor, relevance.
 2              THE COURT:  Sustained.
 3              MR. SPRINGER:  Mr. O'Reilly asked me questions
 4    about why didn't I tell Mr. Shern on September 16, 2005,
 5    about the Paperwork Reduction Act.  And the only thing I
 6    remember during that raid, which was early on, there was
 7    a man that was with Mr. Shern that looked at me and said,
 8    you know you have to file tax returns, why don't you?
 9    And I looked at him and I said, are you taking this
10    personal?  And he never asked me another question about
11    it again.
12        On January 15, 2009, we were in the Department of
13    Justice's Office for a very long time.  I think it was
14    ten hours.  It may have been a little less, it may have
15    been a little more.  And at the -- although I had some
16    understanding, I did not know exactly what they were on,
17    I learned a great deal when I was there that day.  And at
18    the end of the day, I told them that I would go get some
19    information for them and then I would arrange another
20    time to come back and give them some more.
21        And what I did is I went back and I wrote a letter,
22    a statement, which clarified some of the statements that
23    I had made to make sure I was unequivocally clear about
24    my answers.  And defense exhibit is Number 199.
25              MR. O'REILLY:  Your Honor, objection.  The
```

```
 1  government did not ask about 199.  That was previously

 2  testified to his direct.  We moved to admit it.  We

 3  object.  It's beyond the scope of cross.

 4          THE COURT:  Counsel and the parties will

 5  approach.

 6      (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND

 7  OUT OF THE HEARING OF THE JURY.)

 8          THE COURT:  Okay.  First of all, what is it,

 9  Mr. Springer, in 199 that addresses matters covered on

10  cross?

11          MR. SPRINGER:  He asked me why I didn't tell

12  anybody at that time about the Paperwork Reduction Act

13  and I'm establishing that in the follow-up that I did and

14  I believe the jury should have a right to see that.

15          THE COURT:  Wait just a moment.  So this -- so

16  your Paperwork Reduction Act argument is covered

17  somewhere in 199?

18          MR. SPRINGER:  No, Your Honor.  It's in the

19  exhibits that were attached in 200.  I separated them.  I

20  gave them a 1040 form.

21          THE COURT:  The one that's on the floor now is

22  199.  What's in 199 that addresses anything that was

23  covered in cross?

24          MR. SPRINGER:  Nothing.  I just want to

25  establish the exhibits that were attached to 199 so I
```

1  could get to the exhibits.

2          THE COURT:  Okay.  The objection to 199 will be

3  sustained.

4          MR. O'REILLY:  For clarification, I just want to

5  make sure, I see nothing in here indicating the

6  attachment that Mr. Springer is referring to as

7  Government's Exhibit -- as Defendants' Exhibit 200.

8          MR. SPRINGER:  That's why I had to make it a

9  separate exhibit, Your Honor.  It's marked as Exhibit 200

10  with their own Bates stamp Springer 491 on the bottom of

11  it with their numbers.  These are the documents I gave

12  them and they gave to me in discovery.

13          THE COURT:  So --

14          MR. SPRINGER:  I'm going to show that I did

15  raise the PRA at that time and I had an explanation by

16  the time --

17          THE COURT:  Well, 199 certainly does not show

18  that.

19          MR. SPRINGER:  I know that, but I needed to show

20  that with 199 were these exhibits.  That's all I was

21  using --

22          THE COURT:  A blank 1040 doesn't prove that top,

23  side, or bottom.  We'll move on to the next subject.

24          MR. SPRINGER:  Okay.

25      (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

1  WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

2  PRESENCE AND HEARING OF THE JURY.)

3           MR. SPRINGER:  When I met with them in February,

4  I gave them an example of a Form 1040 and I showed them

5  the violations of the Paperwork Reduction Act on the

6  form.

7           MR. O'REILLY:  Objection, Your Honor.  Are we

8  speaking of January or February?

9           MR. SPRINGER:  February.

10           THE COURT:  Continue, Mr. Springer.

11           MR. SPRINGER:  Thank you.

12           MR. O'REILLY:  Your Honor, objection.  I don't

13  think there's any evidence of any meeting in February.

14           THE COURT:  Well, there is now.

15           MR. SPRINGER:  Thank you.

16           THE COURT:  You may continue.

17           MR. SPRINGER:  That's all I have for myself,

18  Your Honor.

19           THE COURT:  Mr. Stilley, you may conduct recross

20  under the ground rules discussed earlier today, if you

21  have any.

22           MR. STILLEY:  No questions.

23           THE COURT:  Recross, Mr. O'Reilly.

24           MR. O'REILLY:  May I have a moment, Your Honor?

25           THE COURT:  You may.

1                    RECROSS-EXAMINATION

2    BY MR. O'REILLY:

3    Q.   Mr. Springer, you stated that in your redirect that

4    the IRS had released all $300,000 of tax liabilities from

5    1990 to 1995.  Was that your testimony?

6    A.   Yes.  It was a certificate of release dated August

7    23, 2007.

8    Q.   So is it your testimony as you sit here today that

9    the IRS does not assert that you owe the money?

10   A.   No.  No, that's not my testimony here today.

11   Q.   Well, then please explain to the jury whether or not

12   you owe money to the IRS for the years 1990 to 1995 as

13   you sit here today.

14   A.   Well, the difference of whether I think I owe it

15   versus whether the IRS claims I owe it is a different

16   question.

17   Q.   Does the IRS claim you owe money for the years 1990

18   through 1995?

19   A.   Yes.

20   Q.   Has that decision been supported by court decisions

21   where you have appealed that determination by the IRS?

22   A.   No.

23   Q.   No court has ruled that the IRS is correct?

24   A.   No.  The issues in the cases that were addressed

25   were prior to August 23, 2007.  And so when the IRS

1    released the lien, certified the released lien, then that

2    cleared everything out.  But then after Mr. Shern's

3    lawyers sued me to try to take the home that I live in

4    trying to convert a lien to judgment --

5            MR. O'REILLY:  Objection, Your Honor.  One, it's

6    not responsive.  But let me just see if I understand.

7    Q.   (BY MR. O'REILLY)  Are you saying Special Agent

8    Shern's lawyers sued you?

9    A.   In the Bivens case, yes.  The lawyers that represent

10   him in the Bivens case sued me to take the home that I

11   live in to convert a judgment, a lien to judgment in 2008

12   after I wouldn't settle the Bivens case with them.

13   Q.   But the lawyers that you're speaking of are

14   representatives of the Department of Justice civil tax

15   division, not Mr. Shern's personal lawyers?

16   A.   Well, he sued personally, so I wouldn't know how to

17   answer that, but it is the same Department of Justice

18   lawyers in both cases.

19           MR. O'REILLY:  May I have a moment, Your Honor?

20           THE COURT:  You may.

21   Q.   (BY MR. O'REILLY)  Mr. Springer, isn't it true that

22   Special Agent Shern has not sued you?

23   A.   No, I sued him.  I said it's the lawyers that

24   represent him in his individual capacity.  I sued him in

25   his individual capacity.  I didn't sue him in his

1   official capacity.

2   Q.   But then what does that have to do with the IRS's

3   attempts to collect the taxes you owe from 1990 through

4   1995?

5   A.   After I refused to settle the Bivens theft case, the

6   same lawyers that represent Mr. Shern and the other ten

7   agents brought a complaint in this Court suing to convert

8   a lien to a judgment.  Then in December of 2008, I

9   received in the mail a copy of a certificate of release

10  dated August 23, 2007.  I filed it with the Court and

11  then Mr. Shern's lawyers called up the IRS --

12          MR. O'REILLY:  Objection.  Be responsive.

13  Q.   (BY MR. O'REILLY)  They are not Mr. Shern's lawyers,

14  they are Department of Justice lawyers.  Is that correct,

15  sir?

16  A.   The Department of Justice lawyers that represent

17  Mr. Shern --

18  Q.   Thank you.

19  A.   -- then called up the IRS and convinced them to

20  revoke the certificate of release.  And then they sent me

21  on August 4, 2008, new notice of federal tax lien, which

22  is the subject of tremendous legal battle.

23          THE COURT:  Okay.  Let's have the next question.

24  Q.   (BY MR. O'REILLY)  With respect to the Springer v.

25  Commissioner Internal Revenue case that you referred to

1  in your redirect, 580 F.3d 1142 -- and that was dated

2  August 31st of this year, correct, sir?

3  A.   That is correct.

4  Q.   You lost that case, didn't you?

5  A.   Yes, on the claims.  On the interest as a penalty

6  and pay penalty, they said the PRA did not apply to those

7  claims, but it applied to failure to file form claims.

8  Q.   They didn't reach the merits of that, did they?

9  A.   No, they actually were telling -- saying that the

10 Commissioner's claims that they had previously reached

11 the merits was a frivolous argument.  I believe that's

12 exactly what it says.

13 Q.   That decision was, as I said, in August of this

14 year?

15 A.   Yes.

16 Q.   So you don't in any way claim that it's because of

17 this opinion that you didn't file returns?

18 A.   No, but it was the same arguments that I was making

19 just trying to get them to the merits.  And it's very

20 difficult to get the judicial branch of government to

21 address the merits.

22 Q.   Mr. Springer, the Court did state, "We conclude that

23 Mr. Springer does not have a valid challenge under the

24 PRA, Paperwork Reduction Act, to any of these amounts."

25 A.   Right.  That's interest accruing and failure to pay

1  penalties accruing, but not failure to file penalties.

2  Q.   Every case that is ruled on willful failure to file

3  under 7203 that has considered it has rejected the

4  Paperwork Reduction Act as a substantive defense to

5  willful failure to file; is that true?

6  A.   No.   No court has ever considered the merits of my

7  claims.   The only opinions that exist regarding

8  instruction booklets and regulations that I know of on

9  the specific statement.   And if you look at the Tenth

10 Circuit's Chisholm decision in 2007, they said had

11 Mr. Chisholm's charges been predicated on failure to

12 file, he could raise it.

13 Q.   Did you ever check with the Office of Management and

14 Budget to see if the forms were not valid?

15 A.   Oh, yes.   Yes, I did.   In fact, in one case out of

16 Illinois --

17 Q.   When?

18 A.   Mr. Barringer --

19 Q.   When?

20 A.   -- and I in 2006.

21 Q.   Okay.

22         MR. O'REILLY:   No further questions.

23         THE COURT:   You may step down.

24         MR. SPRINGER:   Thank you, Your Honor.

25         THE COURT:   Mr. Springer, do you have any more

```
 1   witnesses?
 2           MR. SPRINGER:  No, Your Honor.
 3           THE COURT:  Mr. Stilley, do you rest?
 4           MR. SPRINGER:  Yes.
 5           MR. STILLEY:  Yes, Oscar Stilley rests.
 6           THE COURT:  Both defendants have rested then.
 7   Am I right about that?
 8           MR. STILLEY:  Yes, Your Honor.
 9           MR. SPRINGER:  Yes, Your Honor.
10           THE COURT:  Anything further from the
11   government?
12           MR. O'REILLY:  No, Your Honor.
13           THE COURT:  Very well.  Members of the jury,
14   both sides have rested.  That has gotten us to a major
15   milestone in the case.  All of the evidence is in and no
16   more evidence will be received.  So we are that much
17   closer to the time that contrary to the instruction that
18   I have consistently given you that it is your duty not to
19   discuss the case, we're closer, we're not there yet, but
20   we're getting closer to the time that it becomes your
21   duty to discuss the case, but we're not there yet.
22       The next step in the case will be my instructing you
23   on the law.  I anticipate that that will take about one
24   hour, which is convenient because I think it will take
25   until about five o'clock.  And I will do that now so that
```

 1   we can start fresh in the morning with the attorneys'

 2   closing arguments.  The attorneys and the parties will

 3   give their closing arguments and then the case will be

 4   yours for your deliberation and verdict.

 5       So, Pam, if you would, pass out a copy of the

 6   instructions to every juror and to the individuals at the

 7   counsel tables.

 8       Members of the jury, it is my typical practice to

 9   give every juror a copy of the instructions.  That

10   doesn't necessarily mean that you have to follow along.

11   If you would like, you can just sit back and take it all

12   in.  Or you can follow along, whichever you would prefer

13   to do.

14       The first thing you have is an index to the

15   instructions.  And let me take just a moment to give you

16   a little bit of a summary of how these instructions are

17   arranged.

18       Down through instruction, say, Instruction 15 or 16,

19   along in there, the instructions don't really get into

20   what we would call the substantive law of the case.  Now,

21   every single one of these instructions is important and

22   it is your duty under your oath as jurors to follow these

23   instructions, we covered that at the beginning of the

24   trial, but the first segment, if you will, or the first

25   section of the instructions provides some general rules

1   that are stated in these instructions for your benefit

2   and for you to follow in your consideration of the

3   evidence in this case.

4        Then, starting with Instruction 16 or 17, depending

5   on how you want to look at it, the instructions then go

6   into the what you would call the substantive law of the

7   case as it relates to Counts 1 through 6, and that

8   basically is what is covered in the remainder of the

9   instructions.

10       And now one exception to that is Instruction Number

11   3, which, as you will see, is a fairly long instruction,

12   which is an instruction that sets forth the language of

13   the indictment in this case.  And, obviously, the

14   indictment is the charging document by which this case

15   was initiated, which I discussed at some length early at

16   the beginning of the trial.

17       So with that understanding of the basic layout of

18   the instructions and the basic arrangement of the

19   instructions, I instruct you as follows:

20       Members of the jury, you have heard the evidence in

21   this case and will hear the closing arguments of the

22   government and the defendants.  It is now the duty of the

23   Court to instruct you as to the law applicable to this

24   case both from the viewpoint or position of the

25   government as the plaintiff and from the viewpoint or

1  position of the defendants.

2      Nothing said in these instructions or nothing in any

3  form of verdict prepared for your convenience is to

4  suggest or convey in any manner any information as to

5  what verdict I think you should find.  You, as the jurors

6  in this case, are the sole judges of the facts and it is

7  your duty to determine the true facts herein.  Your only

8  interest is to determine whether the government has

9  proven the defendant guilty beyond a reasonable doubt of

10  the crimes charged against that defendant in the

11  indictment.

12      By indictment, the government has accused the

13  Defendants Lindsey Kent Springer and Oscar Amos Stilley

14  of committing crimes against the United States.  This is

15  only a charge.  The defendants are presumed to be

16  innocent.  Therefore, you may find a defendant guilty

17  only if you are convinced beyond a reasonable doubt that

18  he committed the crime charged in the indictment.  If you

19  are not convinced beyond a reasonable doubt that the

20  defendant committed the crime charged, you must find him

21  not guilty.

22      At times during the trial, you saw the lawyers or

23  the defendants make objections to questions and to

24  answers by witnesses.  This simply meant that I was

25  requested to make a decision on a particular rule of

1  law.  Do not draw any conclusion from such objections or

2  from my rulings on the objections.  These are only

3  related to the legal questions that I had to determine

4  and should not influence your thinking.

5      It is my job to decide what rules of law to apply to

6  the case.  I have explained some of these rules to you in

7  the course of the trial and I will explain others to you

8  now before you go to the jury room.  You must not follow

9  some rules and ignore others.  Even if you disagree or do

10 not understand the reasons for some of the rules, you are

11 bound to follow them.

12     If you decide that the government has proven beyond

13 a reasonable doubt that a defendant is guilty of one or

14 more of the crimes charged in the indictment, it will

15 also be my job to decide what the punishment will be.

16 You should not try to guess what the punishment might be

17 or express opinions as to what it ought to be.

18 Punishment should not enter into your consideration or

19 discussions at any time.

20     The indictment reads as follows:  The grand jury

21 charges, at all times relevant to this indictment,

22 Lindsey Kent Springer, known as Springer, was a resident

23 of the city of Kellyville in the Northern District of

24 Oklahoma.  Defendant Springer used the name Bondage

25 Breakers Ministry to solicit and receive money.

2882

1    Defendant Springer's stated purpose for Bondage Breakers

2    Ministry was "to get rid of the Internal Revenue

3    Service."

4        Oscar Amos Stilley, known as Stilley, was an

5    attorney residing in Fort Smith, Arkansas.  Defendant

6    Stilley maintained an Arkansas IOLTA foundation trust

7    account known as IOLTA account at Arvest Bank.  An IOLTA

8    account is an interest-bearing account used to hold

9    client funds.

10       Defendant Springer and Stilley each earned income in

11   various ways, including assisting individuals being

12   investigated and prosecuted for federal tax violations.

13   Defendant Springer referred individuals to Defendant

14   Stilley and provided assistance on many of these cases.

15       Defendant Springer last filed an individual income

16   tax return with the Internal Revenue Service in the late

17   1980s.  Defendant Stilley last filed an individual income

18   tax return with the Internal Revenue Service in the late

19   1980s.

20       Beginning on or about 2000 and continuing until on

21   or about January 15, 2009, within the Northern District

22   of Oklahoma, and elsewhere, Defendants Springer and

23   Stilley and others, both known and unknown to the grand

24   jury, unlawfully and knowingly combined, conspired,

25   confederated, and agreed together to defraud the United

1    States by impeding, impairing, obstructing, and defeating

2    the lawful government functions of the Internal Revenue

3    Service, an agency of the United States, in the

4    ascertainment, computation, assessment, and collection of

5    revenue, that is the federal individual income taxes.

6         The object of the conspiracy was to be accomplished

7    and was accomplished through the following manner and

8    means:  Defendants Springer and Stilley would and did use

9    Defendant Stilley's IOLTA account to conceal Defendant

10   Springer's income, assets, and personal expenses.

11   Defendant Springer would and did use Defendant Stilley's

12   credit card to pay Defendant Springer's personal

13   expenses.

14        Defendants Springer and Stilley would and did use

15   cashier's checks, money orders, cash, and other means to

16   avoid creating the usual records of financial

17   transactions and to conceal Defendant Springer's income.

18   Defendants Springer and Stilley would and did knowingly

19   misrepresent the source and nature of Defendant

20   Springer's income to the Internal Revenue Service

21   employees, the grand jury, and the Department of

22   Justice.  And Defendants Springer and Stilley would and

23   did refrain from filing forms with the Internal Revenue

24   Service, including Forms 1040 and 1099.

25        In furtherance of the conspiracy and to effect the

1   object thereof, Defendants Springer and Stilley and

2   others known and unknown to the grand jury committed the

3   following overt acts, among others, in the Northern

4   District of Oklahoma and elsewhere.

5       On or about September 16, 2005, Defendant Springer

6   told Internal Revenue Service employees that all funds he

7   receives are gifts and donations, that he does not have

8   any income, and that he does not provide any services for

9   payment.

10      On or about January 20, 2006, Defendant Stilley

11  stated to the Internal Revenue Service employees that

12  people give money to Defendant Springer for his ministry

13  and expect no services in return.  On or about March 9,

14  2006, Defendant Stilley provided the grand jury with a

15  document entitled Response to Subpoena stating that

16  "Lindsey Springer does not charge for his services" and

17  purporting to list "any money paid, given, transferred,

18  or provided to Lindsey Springer for any purpose."

19      On or about June 24, 2003, Defendant Stilley caused

20  to be deposited a check for $112,500 into his IOLTA

21  account.  On or about June 30, 2003, Defendant Stilley

22  caused to be written a check for $14,359 from his IOLTA

23  account to Defendant Springer.  On or about July 21,

24  2003, Defendant Stilley caused to be written a check for

25  $35,000 from his IOLTA account to Defendant Springer.

1       On or about July 31, 2003, Defendant Stilley, using
2  funds from his IOLTA account, purchased a $37,000
3  cashier's check for Defendant Springer.  On or about July
4  31, 2003, Defendant Springer used the $37,000 cashier's
5  check to purchase a Chevrolet Corvette.
6       On or about November 6, 2003, Defendant Stilley
7  caused $375,059.90 to be transmitted to his IOLTA
8  account.  On or about November 7, 2003, Defendant Stilley
9  caused three cashier's checks payable to Defendant
10 Springer in the amount of $20,000 each to be issued from
11 his IOLTA account.  On or about November 7, 2003,
12 Defendant Stilley purchased $18,000 in money orders for
13 Defendant Springer using funds from his IOLTA account.
14      On or about August 8, 2005, Defendant Springer sent
15 an e-mail to a third person containing the account
16 number, routing number, and name of the Defendant
17 Stilley's IOLTA account.  On or about August 11, 2005,
18 Defendants Springer and Stilley caused $192,000 to be
19 transmitted to Defendant Stilley's IOLTA account for
20 Defendant Springer.  On or about August 15, 2005,
21 Defendant Stilley caused $166,000 to be transmitted from
22 his IOLTA account for the purchase of a motor home titled
23 in the name of Defendant Springer and his wife.
24      On or about August 18, 2005, Defendants Springer and
25 Stilley caused $58,000 to be transmitted to Defendant

1    Stilley's IOLTA account for Defendant Springer.  On or

2    about August 26, 2005, Defendant Stilley caused $5,560 to

3    be transmitted from his IOLTA account to Oklahoma Truck

4    and Trailer Sales for the purchase of a trailer titled in

5    the name of Defendant Springer.

6        On or about September 1, 2005, Defendant Stilley

7    caused $25,813 to be transmitted from his IOLTA account

8    to Lexus of Tulsa for the purchase of a Lexus titled in

9    the name of Defendant Springer and his wife.  On or about

10   September 19, 2005, Defendant Stilley purchased two,

11   $10,000 cashier's checks payable to Defendant Springer

12   with funds from Defendant Stilley's IOLTA account.

13       On or about November 9, 2005, Defendant Stilley

14   purchased a $10,000 cashier's check payable to Defendant

15   Springer with funds from Defendant Stilley's IOLTA

16   account.  On or about November 29, 2005, Defendant

17   Stilley purchased a $9,000 cashier's check payable to

18   Defendant Springer with funds from Defendant Stilley's

19   IOLTA account.

20       On or about December 9, 2005, Defendant Springer

21   caused $50,000 he earned from the sale of a motor home to

22   be transmitted to Defendant Stilley's IOLTA account.  On

23   or about May 2, 2006, Defendant Stilley caused to be

24   written a $1,993.56 check from his IOLTA account to

25   Defendant Springer.

1    On or about July 25, 2006, Defendant Stilley caused

2  to be deposited a $175,000 check on his IOLTA account.

3  On or about August 3, 2006, Defendant Stilley caused to

4  be written a $25,000 check from his IOLTA account to

5  Bondage Breakers Ministry.  On or about January 15, 2009,

6  Defendant Springer represented that he earned no income

7  and that the money he received was given "without any

8  expectation for anything from anybody."  All in violation

9  of Title 18, United States Code, Section 371.

10    Count 2.  General allegations in paragraphs 125 and

11  6 are incorporated as if fully set forth herein.  From on

12  or about January 1, 2000, and continuing until on or

13  about January 15, 2009, within the Northern District of

14  Oklahoma and elsewhere, Defendant Springer had and

15  received taxable income and upon that taxable income

16  there was a substantial income tax due and owing.

17    Well knowing and believing the foregoing facts,

18  Defendant Springer did willfully attempt to evade and

19  defeat the individual income taxes due and owing by him

20  to the United States of America for the calendar year

21  2000 by failing to file a United States Individual Income

22  Tax Return as required by law and by committing various

23  affirmative acts of evasion, including receiving income

24  in a fictitious name; directing individuals to write

25  "donation" or "gift" on checks that were payment for

```
1   services; directing individuals to pay for services by

2   cashier's check; using a check cashing business to cash

3   checks; using money orders, cash, and other means to

4   avoid creating the usual records of financial

5   transactions and to conceal his income; making false

6   statements to agents and employees of the Internal

7   Revenue Service; and otherwise concealing and attempting

8   to conceal from all proper officers of the United States

9   of America his true and correct income; all in violation

10  of Title 26, United States Code, Section 7201.

11        Count 3.  General allegations paragraphs 1 through 7

12  are incorporated as if fully set forth herein.  From on

13  or about January 1, 2003, and continuing to on or about

14  January 15, 2009, within the Northern District of

15  Oklahoma and elsewhere, Defendant Springer had and

16  received taxable income and upon that taxable income

17  there was a substantial income tax due and owing.

18        Well knowing and believing the foregoing facts,

19  Defendants Springer and Stilley did willfully attempt to

20  evade and defeat the individual income taxes due and

21  owing by Defendant Springer to the United States of

22  America for the calendar year 2003 by failing to file a

23  United States Individual Income Tax Return as required by

24  law and by committing various affirmative acts of

25  evasion.
```

1        Defendant Springer committed the following

2    affirmative acts of evasion:  directing individuals to

3    make checks payable to Bondage Breakers Ministry; using a

4    check cashing business to cash checks; and accepting

5    collectible coins as payment for services.

6        Defendants Springer and Stilley committed and aided

7    and abetted the commission of the following affirmative

8    acts of evasion:  using Defendant Stilley's IOLTA

9    account; using Defendant Stilley's credit card to pay

10   Defendant Springer's personal expenses; using cashier's

11   checks, money orders, cash, and other means to avoid

12   usual records and to conceal income; making false

13   statements to agents and employees of the Internal

14   Revenue Service; and otherwise concealing and attempting

15   to conceal from all proper officers of the United States

16   of America Defendant Springer's true and correct income;

17   all in violation of Title 26, United States Code, Section

18   7201, and Title 18, United States Code, Section 2.

19       Count 4.  General allegations paragraphs 1 through 7

20   are incorporated as if fully set forth herein.  From on

21   or about January 1, 2005, and continuing to on or about

22   January 15, 2009, within the Northern District of

23   Oklahoma and elsewhere, Defendant Springer had and

24   received taxable income and upon that taxable income

25   there was a substantial income tax due and owing.

1     Well knowing and believing the foregoing facts,

2  Defendants Springer and Stilley did willfully attempt to

3  evade and defeat the individual income taxes due and

4  owing by Defendant Springer to the United States of

5  America for the calendar year 2005 by failing to file a

6  United States Individual Income Tax Return, despite

7  earning income of sufficient amount to require the filing

8  of an individual income tax return, and by committing

9  various affirmative acts of evasion.

10     Defendant Springer committed the following

11  affirmative acts of evasion:  directing individuals to

12  make checks payable to Bondage Breakers Ministry and

13  using a check cashing business to cash checks.

14     Defendants Springer and Stilley committed and aided

15  and abetted the commission of the following affirmative

16  acts of evasion:  using Defendant Stilley's IOLTA

17  account; using Defendant Stilley's credit card to pay

18  Defendant Springer's personal expenses; using cashier's

19  checks, money orders, cash, and other means of payment to

20  avoid usual records and to conceal income; making false

21  statements to agents and employees of the Internal

22  Revenue Service; and otherwise concealing and attempting

23  to conceal from all proper officers of the United States

24  of America Defendant Springer's true and correct income;

25  all in violation of Title 26, United States Code, Section

1    7201, and Title 18, United States Code, Section 2.

2        Count 5.  General allegations paragraphs 1, 2, 5,

3    and 6 are incorporated as if fully set forth herein.

4    During the calendar year 2002, Defendant Springer had and

5    received gross income in excess of $7,700.  By reason of

6    such gross income, he was required by law following the

7    close of the calendar year 2002 and on or before April

8    15, 2003, to make an income tax return to the Internal

9    Revenue Service Center at Austin, Texas; to a person

10   assigned to receive returns at the local office of the

11   Internal Revenue Service at Tulsa, Oklahoma; or to

12   another Internal Revenue Service office permitted by the

13   Commissioner of Internal Revenue stating specifically the

14   items of his gross income and any deductions and credits

15   to which he was entitled.

16       Well knowing and believing all of the foregoing, he

17   did willfully fail on or about April 15, 2003, in the

18   Northern District of Oklahoma and elsewhere, to make and

19   file an income tax return; all in violation of Title 26,

20   United States Code, Section 7203.

21       Count 6.  General allegations in paragraphs 1, 2, 5,

22   and 6 are incorporated as if fully set forth herein.

23   During the calendar year 2004, Defendant Springer had and

24   received gross income totaling in excess of $15,900.  By

25   reason of that gross income, he was required by law

1   following the close of the calendar year 2004 and on or

2   before April 15, 2005, to make an income tax return to

3   the Internal Revenue Service at Austin, Texas, to a

4   person assigned to receive returns at the local office of

5   the Internal Revenue Service at Tulsa, Oklahoma, or to

6   another internal revenue service office permitted by the

7   Commissioner of Internal Revenue stating specifically the

8   items of his gross income and any deductions and credits

9   to which he was entitled.

10      Well knowing and believing all of the foregoing, he

11  did willfully fail on or about April 15, 2005, in the

12  Northern District of Oklahoma and elsewhere to make and

13  file an income tax return; all in violation of Title 26,

14  United States Code, Section 7203.

15      As to the indictment, each defendant has entered a

16  plea of not guilty, which casts upon the government the

17  burden of proving the essential allegations beyond a

18  reasonable doubt before you would be justified in

19  returning a verdict of guilty.

20      A defendant is presumed to be innocent of the crime

21  charged against him and of each and every essential

22  element of that crime.  The presumption of innocence with

23  which the defendant enters a trial continues until such

24  time, if ever, as his guilt is shown beyond a reasonable

25  doubt.  And if upon a consideration of all the evidence,

 1  facts, and circumstances in the case you entertain a

 2  reasonable doubt of the guilt of the defendant as to the

 3  crime charged against him, you must give him the benefit

 4  of that doubt and return a verdict of not guilty.

 5      The burden of proving a defendant guilty beyond a

 6  reasonable doubt that rests upon the government never

 7  shifts throughout the trial.  The law does not require a

 8  defendant to prove innocence or produce any evidence.  A

 9  defendant may rely on evidence brought out on cross-

10  examination of witnesses for the government or the

11  presumption of innocence or the weakness of the

12  government's case or favorable inferences casting doubt

13  on guilt or any of these.

14      It is not required that the government prove guilt

15  beyond all possible doubt.  The test is one of reasonable

16  doubt.  A reasonable doubt is a doubt based upon reason

17  and common sense.  The kind of doubt with a basis that

18  would make a reasonable person hesitate to act.  Proof

19  beyond a reasonable doubt must therefore be proof of such

20  a convincing character that a reasonable person would not

21  hesitate to rely and act upon it in important and weighty

22  affairs or hesitate to accept the weighty consequences.

23  The jury will remember that a defendant is never to be

24  convicted on mere suspicion or conjecture.

25      The evidence in this case consists of the sworn

 1    testimony of the witnesses and all exhibits that have

 2    been received in evidence and all facts which have been

 3    admitted or stipulated to and any facts that I may have

 4    judicially noticed.  Statements and arguments of counsel

 5    and in-court statements of the defendants, other than

 6    their sworn testimony, are not evidence in the case.  You

 7    are to consider only the evidence in the case.  But in

 8    your evaluation of the evidence, you are not limited to

 9    the bald statements of the witnesses.

10         In considering the evidence and in determining the

11    issues in this case, you should bring to your aid the

12    general knowledge which you possess, your understanding

13    of the ways of the world, and your common sense.

14         There are, generally speaking, two types of evidence

15    from which a jury may properly determine the facts of a

16    case.  One is direct evidence, such as the testimony of

17    an eyewitness.  The other is indirect or circumstantial

18    evidence.  That is the proof of a chain of facts which

19    point to the existence or non-existence of certain other

20    facts.  The law makes no distinction between direct and

21    circumstantial evidence.  The law simply requires that

22    you find the facts in accord with all the evidence in the

23    case, both direct and circumstantial.

24         While you must consider only the evidence in this

25    case, you are permitted to draw reasonable inferences

1   from the testimony and exhibits, inferences you feel are

2   justified in light of common experience.  An inference is

3   a conclusion that reason and common sense may lead you to

4   draw from facts which have been proved.  By permitting

5   such reasonable inferences, you may make deductions and

6   reach conclusions that reason and common sense lead you

7   to draw from the facts which have been established by the

8   testimony and evidence in this case.

9        You are the sole judges of the credibility or

10  believability of each witness and the weight to be given

11  to the witness's testimony.  In weighing the testimony of

12  a witness, you should consider the witness's relationship

13  to the government or the defendant and interest, if any,

14  in the outcome of the case; manner of testifying;

15  opportunity to observe or acquire knowledge concerning

16  the facts about which the witness testified; candor,

17  fairness, and intelligence and the extent to which the

18  witness has been supported or contradicted by other

19  credible evidence.  You may, in short, accept or reject

20  the testimony of any witness in whole or in part.

21       Also, the weight of the evidence is not necessarily

22  determined by the number of witnesses testifying as to

23  the existence or non-existence of any fact.  You may find

24  that the testimony of a smaller number of witnesses as to

25  any fact is more credible than the testimony of a larger

1    number of witnesses to the contrary.  The testimony of a

2    defendant should be weighed and his credibility evaluated

3    in the same way as that of any other witness.

4        You are instructed that a witness may be discredited

5    or impeached by contradictory evidence or by evidence

6    that at other times the witness has made statements that

7    are inconsistent with the witness's present testimony.

8    If you believe that any witness has been impeached and

9    thus discredited, it is your exclusive province to give

10   the testimony of that witness such credibility, if any,

11   as you may think that it deserves.

12       If any witness is shown to have knowingly testified

13   falsely concerning any material matter, you have the

14   right to distrust such witness's testimony in other

15   particulars and you may reject all of the testimony of

16   that witness or give it only such credibility as you may

17   think that it deserves.  You may also consider any

18   demonstrated bias, prejudice, or hostility of a witness

19   toward one party or the other in determining the weight

20   to be accorded to the witness's testimony.

21       I have permitted the government to present the

22   testimony of a summary witness.  This witness does not

23   profess to have personal firsthand knowledge of the

24   transactions which he summarized and this witness should

25   not be understood by you as claiming or having such

1  knowledge.  Consistent with what I have just said, this

2  witness should not be understood by you as giving you any

3  independent evidence as to the matters which are in

4  controversy in this trial.

5      For that reason, if you are not satisfied that the

6  summary testimony from this witness is supported by the

7  evidence the Court has received in this case, you should,

8  to that extent, disregard the testimony of the summary

9  witness.  On the other hand, to the extent that the

10 summary testimony is supported by the evidence the Court

11 has received in this case, you may give the summary

12 testimony such consideration as you may find it deserves

13 by way of explanation or clarification of the factual

14 contentions made by the government in this case.

15     Some charts and summaries have been shown to you to

16 help explain the evidence in this case.  Their only

17 purpose is to help explain the evidence.  These charts

18 and summaries are not evidence or proof of any facts.

19 Other summaries have actually been admitted into

20 evidence.  You should consider the evidence presented

21 concerning the preparation and accuracy of these

22 summaries and give them such weight as you believe they

23 deserve.

24     Bear in mind, however, that none of these charts and

25 summaries are independent evidence of any fact in issue

1  in this case.  To the extent that you find that these

2  charts and summaries are supported by the evidence that

3  has been received as to the transactions they represent,

4  you may give the charts and summaries such consideration

5  as you may find they deserve.

6      I will now instruct you regarding the substantive

7  law as it applies to the counts charged against the

8  defendants.  You will note that the indictment charges

9  certain crimes were committed "on or about" certain

10 dates.  The government need not establish with certainty

11 the exact date of the alleged offense.  It is sufficient

12 if the evidence in the case establishes beyond a

13 reasonable doubt that the offense was committed on a date

14 reasonably near the date alleged.

15     You are here to decide whether the government has

16 proven beyond a reasonable doubt that a defendant is

17 guilty of each crime charged against him.  The defendants

18 are not on trial for any act, conduct, or crime not

19 charged in the indictment.

20     A separate crime is charged against one or more of

21 the defendants in each count of the indictment.  You must

22 separately consider the evidence against each defendant

23 on each count and return a separate verdict as to each

24 defendant on each count.  For that purpose, as you will

25 see, you have been given separate verdict forms which you

1    will use to express your verdicts separately as to each

2    of the two defendants.  Your verdict as to any one

3    defendant or count, whether it is guilty or not guilty,

4    should not influence your verdict as to the other

5    defendant or any other counts.

6         Intent ordinarily may not be proved directly.

7    Because there is no way of fathoming or scrutinizing the

8    operations of the human mind.  You may infer a

9    defendants' intent from the surrounding circumstances.

10   Intent may be and usually is proved by circumstantial

11   evidence, if it is proved at all.

12        You may consider any statements made and any acts

13   done or omitted by a defendant and all other facts and

14   circumstances in evidence that indicate his state of

15   mind.  You may consider it reasonable to draw an

16   inference and thus find that a person intends the natural

17   consequences of acts knowingly done.  As I have stated,

18   it is entirely up to you to decide what facts to find

19   from the evidence.

20        Knowingly.  When the word "knowingly" is used in

21   these instructions, it means that the act was done

22   voluntarily and intentionally and not because of mistake

23   or accident.

24        Willfully.  For purposes of these instructions, an

25   act is done willfully if it is done voluntarily and

1   intentionally and if it is done with the purpose of
2   violating a known legal duty.
3        Willfulness requires the government to prove that
4   the law imposed a duty on the defendant, that the
5   defendant knew of this duty, and that the defendant
6   voluntarily and intentionally violated this duty.
7        Good faith defense.  In this case, the defendants
8   maintain they are not guilty of any of the crimes charged
9   because they contend they did not act willfully and acted
10  in good faith.
11       You are instructed that if a defendant had a good
12  faith misunderstanding of the law's requirements to
13  report the income at issue here, he is not guilty of
14  willfully violating a known legal duty.  You are further
15  instructed, however, a defendants' disagreement with the
16  law, no matter how earnestly held, does not constitute a
17  defense of good faith, misunderstanding, or mistake.  It
18  is the duty of all citizens to obey the law regardless of
19  whether they agree with it.
20       In determining whether or not a defendant acted
21  willfully and in determining whether a defendant acted in
22  good faith, you may consider all of the circumstances
23  surrounding the transactions and activities which you
24  find occurred.  To the extent that you are called upon to
25  evaluate the state of mind of the parties to various

1  transactions in determining whether certain payments

2  were, in fact, gifts or, on the other hand, constituted

3  payment for services rendered or to be rendered, you will

4  be guided by the rules set forth in the next two

5  instructions.

6       Under the Internal Revenue Code, gross income means

7  all income from whatever source derived, including but

8  not limited to the following items:  compensation for

9  services, including fees, commissions, fringe benefits,

10 and similar items; gross income derived from business;

11 gains derived from dealings in property; interest; rents;

12 royalties; dividends; alimony, and separate maintenance

13 payments; annuities; income from life insurance and

14 endowment contracts; pensions; income from discharge of

15 indebtedness; distributive share of partnership gross

16 income; income in respect of a decedent; and income from

17 an interest in an estate or trust.

18      Under the Internal Revenue Code, gross income does

19 not include the value of property acquired by gift,

20 bequest, devise, or inheritance.

21      As is set forth in more detail elsewhere in these

22 instructions, Defendants Springer and Stilley are charged

23 in Count 1 with conspiracy to defraud the United States

24 by interfering with the lawful functions of the Internal

25 Revenue Service.

1     In Count 2, the Defendant Springer is charged with

2  attempted income tax evasion with respect to his income

3  taxes for the year 2000.

4     In Counts 3 and 4, both of the defendants are

5  charged with attempted income tax evasion with respect to

6  Defendant Springer's income taxes for the years 2003 and

7  2005, respectively.

8     In Counts 5 and 6, Defendant Springer is charged

9  with willful failure to file federal income tax returns

10  for 2002 and 2004, respectively.

11     The government asserts that in committing these

12  alleged offenses Defendant Springer sought to conceal

13  income and to evade paying income taxes by characterizing

14  payments of money received by him as gifts or donations

15  to him or his ministry and by causing the persons making

16  the payments to do the same.  Defendants Springer and

17  Stilley, for their part, assert that certain payments

18  made to Defendant Springer were gifts or donations to

19  Mr. Springer and that gifts are excluded from income.

20     Minister and ministry.  You are instructed that

21  affiliation with an actual or purported religious

22  ministry does not exempt an individual from the

23  application of the federal income tax laws.

24     The federal income taxes levied on income received

25  by ministers and persons who hold themselves out as

1    ministers or as being associated with a ministry.  When

2    an individual provides ministerial services as his

3    occupation, profession, or business and controls the

4    money he receives in connection with those activities and

5    receives no separate salary, the income generated by

6    those activities is taxable to the minister.

7        Voluntary contributions when received and retained

8    by the minister may be income to him.  Payments made to a

9    minister as compensation for his services also constitute

10   income to him.  If money is given to a minister as a gift

11   to the ministry for religious purposes, any money which

12   is used instead for the personal benefit of the minister

13   becomes taxable income to him.

14       Gifts.  You are instructed that for federal income

15   tax purposes, taxable income does not include money or

16   property acquired by gift.  It is for you, the jury, to

17   decide whether any transfers of funds to the Defendant

18   Lindsey Springer were gifts and thus not taxable income

19   or were in reality payments for services rendered or to

20   be rendered.

21       In determining whether payment of money or property

22   to the defendant is a non-taxable gift, you should

23   consider the intent of the parties at the time the

24   payment was made.  In determining whether a transfer of

25   money is a gift for tax purposes, the question is whether

1   in actuality the transfer is a bona fide gift or simply a

2   method for paying compensation for services.

3   Consideration should be given to the intent of the

4   parties, the reasons for the transfer, and the parties'

5   performance in accordance with their intention.

6       The practical test of whether income is a gift is

7   whether it was received gratuitously and in exchange for

8   nothing.  Where the person transferring the money did not

9   act from any sense of generosity but rather to secure

10  goods, services, or some other such benefit for himself

11  or another, there is no gift.

12      The intent of the person transferring the money is

13  important in determining whether the amount received from

14  the donor by the donee is a gift for income tax

15  purposes.  However, the characterization given to a

16  certain payment by either the defendant or the person

17  making the payment is not conclusive.  Rather, you, the

18  members of the jury, must make an objective inquiry as to

19  whether a certain payment is a gift.  Among other things,

20  you should consider the terms and substance of any

21  request made by the defendant for the funds.  In

22  determining whether the transfer of funds was a gift, you

23  may also consider whether the recipient used any

24  subterfuges, cooperative intermediaries, or devious means

25  with respect to the transfer.

1     In addition, you may take into account the following

2  factors:  One, how the defendant made his living; two,

3  whether the person making the payment expects to receive

4  anything in return for it; three, whether the person

5  making the payment felt he had a duty or obligation to

6  make the payment; four, whether the person making the

7  payment did so out of fear or intimidation.

8     This is not a complete listing of all the factors

9  you should consider.  You should take into account all

10  the facts and circumstances of this case in determining

11  whether any payment was a gift.  These rules with respect

12  to payments which are asserted to have been gifts are

13  applicable to all payments which are asserted to have

14  been gifts regardless of whether or not it is asserted

15  that the payment was a gift to a minister or to a

16  ministry.

17     A violation of Section 371 of Title 18, United

18  States Code, is charged against both defendants in Count

19  1.  Section 371 provides in pertinent part that "if two

20  or more persons conspire either to commit any offense

21  against the United States or to defraud the United States

22  or any agency thereof in any manner or for any purpose

23  and one or more of such persons do any act to effect the

24  object of the conspiracy," then each such person shall be

25  guilty of an offense against the United States.

1       As I stated, Defendants Springer and Stilley are

2   charged in Count 1 with a violation of Title 18, United

3   States Code, Section 371.  This law makes it a crime to

4   willfully conspire to violate the law by defrauding the

5   United States.  The indictment charges that beginning in

6   or about 2000 and continuing until on or about January

7   15, 2009, within the Northern District of Oklahoma, and

8   elsewhere, Defendants Springer and Stilley and others

9   unlawfully and knowingly combined, conspired,

10  confederated, and agreed together to defraud the United

11  States by impeding, impairing, obstructing, and defeating

12  the lawful government functions of the Internal Revenue

13  Service, an agency of the United States, in the

14  ascertainment, computation, assessment, and collection of

15  revenue, that is federal individual income taxes.

16      Section 371 of 18 United States Code makes it a

17  crime to willfully conspire to violate the law by

18  defrauding the United States.  To find a defendant guilty

19  of this crime as charged in Count 1, you must be

20  convinced that the government has proved each of the

21  following elements beyond a reasonable doubt:  First,

22  that the defendant agreed with at least one other person

23  to violate the law by defrauding the United States;

24  second, that one of the conspirators engaged in at least

25  one overt act furthering the conspiracy's objective;

1    third, that the defendant knew the essential objective of

2    the conspiracy; fourth, that the defendant participated

3    in the conspiracy knowingly, willfully, and voluntarily;

4    and, fifth, that there was interdependence among the

5    members of the conspiracy.  That is that the members of

6    the conspiracy in some way or manner intended to act

7    together for their shared mutual benefit within the scope

8    of the conspiracy charged.

9        You are further instructed that to "defraud" the

10   United States means not only to intentionally cheat the

11   government out of property or money but also to interfere

12   with or obstruct by deceit, craft, or trickery or at

13   least by means that are dishonest one of the following

14   lawful government functions:  The lawful government

15   functions which the indictment charges were interfered

16   with by the defendants in this case are the Internal

17   Revenue Service's ascertainment, computation, assessment,

18   and collection of revenue.

19       To find a defendant guilty of a conspiracy to

20   defraud the United States, the government must prove

21   beyond a reasonable doubt that the defendant knowingly

22   and willfully acted in the manner set forth in the

23   preceding paragraph.  In order to find a defendant guilty

24   of a conspiracy to defraud the United States, the

25   government must prove beyond a reasonable doubt that the

1   defendant knew the purpose or goal of the agreement or

2   understanding and that the defendant deliberately entered

3   into the agreement intending in some way to accomplish

4   the goal or purpose of the conspiracy by this common plan

5   or action.

6        A conspiracy or agreement to defraud the United

7   States, like any other kind of agreement or

8   understanding, need not be formal, written, or even

9   expressed directly in every detail.  In order to find a

10  defendant guilty of a conspiracy to defraud the United

11  States, the government must prove beyond a reasonable

12  doubt that one of the conspirators engaged in at least

13  one of the overt acts charged in the indictment and that

14  this particular overt act was taken in furtherance of the

15  conspiracy's objective.

16       In order to find a defendant guilty of a conspiracy

17  to defraud the United States, you, the jury, must

18  unanimously agree among yourselves that the same overt

19  act was taken in furtherance of the conspiracy.  If you

20  do not unanimously agree that at least one of the overt

21  acts charged in the indictment was taken in furtherance

22  of the conspiracy's objective, then you must find the

23  defendants not guilty of the conspiracy charge.

24       The term "overt act" means some type of outward

25  objective action performed by one of the parties; two, or

1  one of the members of the agreement or conspiracy which

2  evidences that agreement.  To find a defendant guilty of

3  a conspiracy, you must unanimously agree that the same

4  overt act was committed by the same conspirator.

5      The government is not required to prove that more

6  than one of the overt acts charged in the indictment was

7  committed, but you must unanimously agree among

8  yourselves with respect to at least one of the overt acts

9  charged in the indictment.  In that regard, you are

10  instructed that Count 1 of the indictment charges the

11  following overt acts in furtherance of the conspiracy.

12  The paragraph numbers below refer to the paragraph

13  numbers as they appear in the indictment.

14      Let me inquire of counsel as to whether it's

15  necessary -- since the jury has this in writing whether

16  it's necessary to read once again paragraphs 15 through

17  39.

18          MR. O'REILLY:  Your Honor, the government feels

19  since they've already heard it once, I don't think you

20  need to read it again.

21          THE COURT:  Mr. Springer.

22          MR. SPRINGER:  I would agree with that, Your

23  Honor.

24          THE COURT:  Mr. Stilley.

25          MR. STILLEY:  Yes, Your Honor, I agree.

1          THE COURT:  Very well.  You've heard me read

2     those paragraphs one time already and they are there for

3     you to see on pages 35, 36, and down to the middle of 37

4     of the instructions and you should regard those as having

5     been re-read by me.  But with the courtesy of counsel and

6     the parties, I will not read them again.

7          Finally, you are instructed that in addition to the

8     elements described in this instruction, proof of proper

9     venue is also required before you may find a defendant

10    guilty of the crime charged in Count 1.  I will instruct

11    you later regarding proof of venue.

12         Next, I will instruct you regarding Counts 2 through

13    4 of the indictment.  Counts 2, 3, and 4 charge a

14    violation of Section 7201 of Title 26 of the United

15    States Code.  Section 7201 provides in pertinent part

16    that "any person who willfully attempts in any manner to

17    evade or defeat any tax imposed by this title or the

18    payment thereof" shall be guilty of an offense against

19    the United States.

20         Defendant Springer is charged in Count 2 with a

21    violation of this law, Title 26 of the United States

22    Code, Section 7201.  This law makes it a crime for anyone

23    to willfully attempt to evade or defeat the payment of

24    federal income tax.  The indictment charges that from on

25    or about January 1, 2000, and continuing to on or about

1    January 15, 2009, within the Northern District of

2    Oklahoma and elsewhere, Defendant Springer had and

3    received taxable income and upon that taxable income

4    there was a substantial income tax due and owing.

5        The indictment further charges that well knowing and

6    believing the foregoing facts Defendant Springer did

7    willfully attempt to evade and defeat the individual

8    income taxes due and owing by him to the United States of

9    America for calendar year 2000 by failing to file a

10   United States Individual Income Tax Return as provided by

11   law and by committing various affirmative acts of

12   evasion.

13       Defendant Springer is the only defendant charged in

14   Count 2 of the indictment.  To find Defendant Springer

15   guilty of the crime of tax evasion as charged in Count 2,

16   you must be convinced that the government has proved each

17   of the following essential elements beyond a reasonable

18   doubt:  First, that Defendant Springer owed substantial

19   income tax in addition to the tax liability which he

20   reported on his 2000 income tax return; second, that

21   Defendant Springer intended to evade and defeat payment

22   of that additional tax; third, that Defendant Springer

23   committed an affirmative act in furtherance of this

24   intent; and, fourth, that Defendant Springer acted

25   willfully, that is with the voluntary intent to violate a

1  known legal duty.

2      To "evade and defeat" the payment of tax means to

3  escape paying a tax due other than by lawful avoidance.

4  The proof need not show the exact amount of the

5  additional tax due.  However, the government is required

6  to prove beyond a reasonable doubt that the additional

7  tax due from Defendant Springer was substantial.  You are

8  instructed that an "affirmative act" to evade and defeat

9  payment of taxes is a positive act of commission designed

10  to mislead or conceal.

11      For purposes of Count 2, the affirmative acts

12  alleged in the indictment to have been committed by

13  Defendant Springer are:  receiving income in a fictitious

14  name; directing individuals to write "donation" or "gift"

15  on checks that were payment for services; directing

16  individuals to pay for services by cashier's check; using

17  a check cashing business to cash checks; using money

18  orders, cash, and other means to avoid creating the usual

19  records of financial transactions and to conceal

20  Defendant Springer's income; making false statements to

21  agents and employees of the Internal Revenue Service; or

22  otherwise concealing and attempting to conceal from all

23  proper officers of the United States of America Defendant

24  Springer's true and correct income.

25      Finally, you are instructed that in addition to the

1    elements described in this instruction proof of proper

2    venue is also required before you may find the defendant

3    guilty of the crime charged in Count 2.  I will instruct

4    you later regarding proof of venue.

5         Counts 2 and 3, nature of the offense.  And for the

6    benefit of the jury, since it's five o'clock, I'm going

7    to go through page 44 and then we'll recess overnight.

8    It won't take terribly long to finish this in the

9    morning.

10        MR. O'REILLY:  Your Honor, I believe you

11   misspoke.  Counts 3 and 4.

12        THE COURT:  I'm sorry.  The instruction that's

13   on page 42 relates to Counts 3 and 4.  And if I said

14   otherwise, that was incorrect.

15        So members of the jury, I'm going to go through page

16   44 and then tomorrow morning I will finish with the

17   remainder of the instructions, which won't take terribly

18   long, but I don't intend to keep you tonight while I

19   finish that, and then we will proceed, as I have stated,

20   with the closing arguments of counsel and the parties.

21        Counts 3 and 4 of the indictment charge both

22   Defendant Springer and Defendant Stilley with tax evasion

23   in violation of Title 26, Section 7201, of the United

24   States Code.  As previously stated, this law makes it a

25   crime to willfully attempt to evade or defeat the payment

1  of federal income tax.

2       In Count 3, the indictment charges that from on or

3  about January 1, 2003, and continuing to on or about

4  January 15, 2009, within the Northern District of

5  Oklahoma and elsewhere, Defendant Springer had and

6  received taxable income and upon that taxable income

7  there was a substantial income tax due and owing.  The

8  indictment further charges that well knowing and

9  believing the foregoing facts, Defendants Springer and

10  Stilley did willfully attempt to evade and defeat the

11  individual income taxes due and owing by Defendant

12  Springer to the United States of America for calendar

13  year 2003 by failing to file a United States Individual

14  Income Tax Return as required by law and by committing

15  various affirmative acts of evasion.

16       In Count 4, the indictment charges that from on or

17  about January 1, 2005, and continuing to on or about

18  January 15, 2009, within the Northern District of

19  Oklahoma and elsewhere, Defendant Springer had and

20  received taxable income and upon that taxable income

21  there was a substantial income tax due and owing.  The

22  indictment further alleges that well knowing and

23  believing the foregoing facts Defendants Springer and

24  Stilley did willfully attempt to evade and defeat the

25  individual income taxes due and owing by Defendant

1  Springer to the United States of America for calendar

2  year 2005 by failing to file a United States Individual

3  Income Tax Return as required by law and by committing

4  various affirmative acts of evasion.

5      To find a defendant guilty of the crime of tax

6  evasion as charged in Count 3, you must be convinced that

7  the government has proved each of the following elements

8  beyond a reasonable doubt:  first, that Defendant

9  Springer owed substantial income tax in addition to the

10  tax liability which he reported on his 2003 income tax

11  returns; second, that the defendant intended to evade and

12  defeat payment of that additional tax owed by Defendant

13  Springer; third, that in furtherance of this intent, the

14  defendant committed one of the affirmative acts charged

15  in the indictment; and, fourth, that the defendant acted

16  willfully, that is with the voluntary intent to violate a

17  known legal duty.

18      As previously stated, to evade and defeat the

19  payment of tax means to escape paying a tax due other

20  than by lawful avoidance.  Count 3 of the indictment

21  alleges a specific amount of tax due from Defendant

22  Springer for calendar year 2003.  The proof, however,

23  need not show the exact amount of the additional tax due

24  for that year.  The government is required to prove

25  beyond a reasonable doubt that the additional tax due was

1  substantial.  An affirmative act to evade or defeat the

2  payment of taxes is a positive act of commission designed

3  to mislead or conceal.

4      For purposes of Count 3, the affirmative acts

5  charged in the indictment to have been committed by

6  Defendant Springer are:  directing individuals to make

7  checks payable to Bondage Breakers Ministry; using a

8  check cashing business to cash checks; and accepting

9  collectible coins as payment for services.

10      The affirmative acts charged in the indictment by

11  Defendants Springer and Stilley are using Defendant

12  Stilley's IOLTA account; using Defendant Stilley's credit

13  card to pay Defendant Springer's personal expenses; using

14  cashier's checks, money orders, cash, and other means to

15  avoid creating the usual records of financial

16  transactions and to conceal income; making false

17  statements to agents and employees of the Internal

18  Revenue Service; and otherwise concealing and attempting

19  to conceal from all proper officers of the United States

20  of America Defendant Springer's true and correct income.

21      In addition to being charged as a principal,

22  Defendant Stilley is charged as an aider and abetter in

23  Count 3.  I will instruct you shortly regarding the

24  elements of aiding and abetting.

25      Finally, you are instructed that in addition to the

1  other elements described in this instruction, proof of

2  proper venue is also required before you may find a

3  defendant guilty of the crime charged in Count 3.  I will

4  instruct you later regarding proof of venue.

5      Members of the jury, that is as far as I'm going to

6  get in reading the instructions this afternoon.  We will

7  resume at nine o'clock tomorrow morning.  And, again,

8  we're getting close to the point that it becomes your

9  duty to discuss the case, but we are not there yet.  So

10 between now and nine o'clock tomorrow morning, please do

11 remember not to discuss the case with anyone for any

12 purpose, not to undertake any independent investigation

13 of any aspect of the case, certainly not, as I said at

14 the beginning of the trial, not to read anything in any

15 medium about the case, and not to reach any conclusions

16 about the case until after I have finished the

17 instructions and the attorneys have argued and the

18 parties have argued the case to you and the case has been

19 given to you in the jury room.

20     Now, I sure hope none of you want to take the

21 instructions home.  I hope you have something better to

22 read.  The short of it is, you can't take the

23 instructions home.  So please do leave the instructions

24 on your seat with your notebooks.  They will be very

25 carefully guarded and their confidentiality will be

 1   preserved overnight.

 2        So once again, I sincerely thank you for your day of

 3   service to the Court.  Please be available in the jury

 4   room just a little before nine in the morning.  And,

 5   again, Pam feels better when it's more like 20 till nine

 6   or thereabouts.  So please be available so that we can

 7   get started on a timely basis at nine o'clock in the

 8   morning.

 9        Now, the arguments in the case, I'll talk to the

10   attorneys and the parties about how long they want.  It's

11   not going to be more than about 45 minutes apiece.  It

12   may be 30, may be 45 minutes.  We'll discuss that.  But

13   it probably won't take me but certainly less than a half-

14   hour to read the rest of the instructions.  So you can

15   count on the arguments being over before lunch tomorrow.

16   Which means -- at least I think, barring any unforeseen

17   circumstances.

18        So beginning with the lunch recess tomorrow -- well,

19   not beginning with the lunch recess, but after the lunch

20   recess, the case will be yours for your deliberation and

21   verdict.  And at that point, the schedule will be up to

22   you to determine.  You can work, obviously, however long

23   it takes to reach a verdict.  You can work however late

24   into the day tomorrow you choose to work.

25        I will investigate -- I'll make inquiry tomorrow

1   probably during our mid-morning recess whether you would

2   like to have lunch brought in to the jury room.  If you

3   choose to remain in the jury room and have lunch during

4   your deliberations, and the timing may work out that way,

5   then that option will be available.  So I would ask you

6   to consider that possibility, but that is certainly a

7   matter for you to decide and not for anyone else to

8   decide.

9        So, once again, I sincerely thank you for your day

10   of service to the Court.  I look forward to seeing you on

11   time at nine o'clock tomorrow morning.

12        All persons in the courtroom will remain seated

13   while the jury departs.

14        (JURY EXITS THE COURTROOM)

15            THE COURT:  Okay.  First of all, are there any

16   corrections to the reading of the instructions thus far?

17            MR. O'REILLY:  Actually, Your Honor, just -- and

18   I apologize.  I don't know how I missed this before, but

19   in Instruction 27 and Instruction 28 which discusses the

20   elements of the offense --

21            THE COURT:  Well, okay.  I know what you're

22   getting to.  Because I noted it as I read, but the

23   immediate question is whether there are any corrections

24   to the reading of the instructions as they exist.

25            MR. O'REILLY:  No, Your Honor.

```
 1              THE COURT:  What say the defendants?

 2              MR. SPRINGER:  No, Your Honor.

 3              THE COURT:  Mr. Stilley.

 4              MR. STILLEY:  No, Your Honor.

 5              THE COURT:  Okay.  Now, Mr. O'Reilly, there was

 6    another matter you were going to raise?

 7              MR. O'REILLY:  Yes, Your Honor.  Count -- the

 8    elements as to Count 2 correctly reflect what the

 9    indictment is, which -- the indictment does not allege a

10    specific amount of tax due and I'm afraid the language

11    being in there may confuse the jury.  I mean --

12              THE COURT:  What page are you on?

13              MR. O'REILLY:  Oh, I'm sorry.  I'm talking about

14    page 43, which is Instruction Number 27.  And it's the

15    same problem with page 45, Instruction 28.  In the first

16    paragraph before the -- below the actual elements.  And

17    it states that Count 3 of the indictment alleges a

18    specific amount of tax due from Defendant Springer for

19    calendar year 2003.  And the indictment does not allege a

20    specific amount of tax due.

21              THE COURT:  Now, does one of the counts, in

22    fact, allege a specific amount due?

23              MR. O'REILLY:  No, Your Honor.

24              THE COURT:  Okay.

25              MR. O'REILLY:  The only specific amounts alleged
```

1   anywhere in the indictment other than the overt act, the

2   dollar amounts on some checks, are the filing

3   requirements in Counts 5 and 6 for willful failure to

4   file.

5           THE COURT:  Okay.  So you are pointing that out

6   with respect to the middle paragraph on page 43 and the

7   middle paragraph on page 45; is that right?

8           MR. O'REILLY:  Correct, Your Honor.

9           THE COURT:  Okay.  And what would you propose --

10  well, first of all, let me -- okay.  It certainly does

11  appear that I was in error in putting in Instruction 27,

12  which has been read, and 28, which has not been read,

13  that the counts -- those respective counts allege

14  specific amounts of tax due.  What would the government

15  propose?

16          MR. O'REILLY:  Your Honor, I would propose

17  simply the same language from Instruction Number 25,

18  which simply redacts that one sentence and the word

19  "however."  I believe that's all --

20          THE COURT:  So the government would propose

21  revising Instruction 27 by removing the second sentence

22  in the middle paragraph; is that right?

23          MR. O'REILLY:  Yes, Your Honor.

24          THE COURT:  And then it would be logical -- if I

25  do that, it would be logical also to remove the word

1  "however" from the next -- as the third word in the next

2  sentence.  Do you see that?

3          MR. O'REILLY:  Yes, Your Honor.

4          THE COURT:  Well, I understand your point as to

5  Instruction 27, which has been read, and Instruction 28,

6  which has not been read.  I will make inquiry first of

7  Mr. Springer and then of Mr. Stilley as to whether they

8  have any objection to that correction.

9          MR. SPRINGER:  I would propose, Your Honor -- I

10 do have an objection.  I would propose that it actually

11 read "Count 3 of the indictment does not allege a

12 specific amount of tax due from Defendant Springer for

13 calendar year 2003," because that is an accurate

14 statement in Count 3.  And I would propose the same for

15 Count -- page 45 in Count 4 and leave Count 2 just like

16 it is.

17         THE COURT:  Well, I don't think anyone proposes

18 changing anything with respect to Count 2.

19         MR. SPRINGER:  Okay, yeah.  So I would just say

20 "does not allege" and then leave the rest of it alone,

21 instead of adding -- or taking out the whole sentence and

22 "however."

23         THE COURT:  Okay.  So under that approach, then,

24 that second sentence in the middle paragraph would read

25 "Count 3 of the indictment does not allege a specific

1    amount of tax due" and so forth?

2            MR. SPRINGER:  Yes.

3            THE COURT:  It would be logical in that event

4    also to take out the word "however."

5            MR. SPRINGER:  Yes.

6            THE COURT:  Okay.  Mr. O'Reilly, how about that?

7            MR. O'REILLY:  Your Honor, I have no fundamental

8    objection to that other than it is inconsistent with the

9    Court's instruction for Count 2.  That was -- I felt that

10   -- I mean, with the exception that Mr. Stilley is also

11   charged, these are fundamentally the same elements and I

12   wouldn't want the jury to think there was some reason for

13   it to be different other than Mr. Stilley not being

14   charged.

15           THE COURT:  Mr. Stilley, you get a vote.

16           MR. STILLEY:  I adopt Mr. Springer's position.

17           THE COURT:  I think Mr. Springer's approach is

18   preferable.  And I'm glad they left their instructions.

19   And, obviously, I'll have to explain this to them in the

20   morning that this revision has been made.  And it will be

21   necessary to make it between now and nine o'clock

22   tomorrow morning, not only in this but in all 14 copies

23   that are in the jury box.

24       But so that we're very clear, on page 43, the change

25   will be in the middle paragraph and it will say "Count 3

1  of the indictment does not allege a specific amount of

2  tax due."  And then in the next sentence it will delete

3  the word "however."  And then we'll make the identical

4  change in the corresponding sentences in the middle

5  paragraph on page 45.  And we'll make that change in all

6  14 copies that are in the jury box now and on the

7  official copy that I have here.

8         MR. O'REILLY:  Your Honor, one additional

9  matter, since we're making a change to these anyway, and

10 that's with respect to first element -- and, again, I do

11 apologize, this is something I should have noted before.

12 It indicates -- it reads presently that Defendant

13 Springer owed substantial income tax in addition to the

14 tax liability which he reported on his 2003 income tax

15 returns.  The evidence is unrefuted that there were no

16 tax returns filed.  And that could again confuse and

17 mislead the jury that there were, in fact, returns filed.

18    What the government would propose, since we're

19 making these changes anyway, is that Defendant Springer

20 owed substantial income tax with respect to his 2003

21 income tax obligations.

22         THE COURT:  I tell you what, we're going to

23 recess for a few minutes.  I want you to collaborate with

24 the defendants on that correction.  That certainly did

25 catch my eye.  And it is the Court's duty certainly --

1  regardless of the outcome of the case, regardless of what

2  the verdict is, it is the Court's duty to see to it that

3  the jury is correctly instructed and to see to it in so

4  doing that the likelihood of confusion is minimized.

5      One of the more benign results or consequences of

6  confusion is that we then start getting notes from the

7  jury asking for clarification of this and that. And the

8  issues with respect to these evasion instructions that

9  have been raised certainly do present the potential for

10 that. And as I say, that's probably about the most

11 benign consequence. And I certainly do wish that the

12 attorneys and parties had caught this previously. But

13 still, we're still at the instruction stage. The

14 instructions are not in the hands of the jury in the jury

15 room yet. And so I, for that reason, consider this to be

16 a live issue, which I have a duty to address with a view

17 to avoiding -- first of all, with a duty to instructing

18 in accordance with the evidence, in accordance with the

19 law, and with a view to minimizing avoidable confusion.

20     So I'm going to leave the -- we'll recess for about

21 ten minutes to provide counsel and the parties an

22 opportunity to collaborate on what might make sense as a

23 correction to that first element in those instructions.

24     Court will be in recess.

25     (RECESS HAD)

```
 1              THE COURT:  Okay.  We're resuming outside the
 2   hearing of the jury again.  And I'll invite any
 3   announcements that anyone would have with respect to the
 4   problem that we last discussed.
 5              MR. O'REILLY:  Your Honor, we have agreed on
 6   language; however, Mr. Springer thinks there should be an
 7   additional element added in addition to this, and I'll
 8   let him speak to that.  The language that I understand we
 9   agree on is in lieu of what's now the first element that
10   Defendant Springer owed substantial income tax for the
11   year blank, whatever year it happens to be.
12              THE COURT:  Okay.  So on page 43, it would be
13   for the year 2003, right?
14              MR. O'REILLY:  Yes, Your Honor.
15              THE COURT:  And on page 40, it would be for the
16   year 2000?
17              MR. O'REILLY:  Yes, Your Honor.
18              THE COURT:  And on page 45, it would be for the
19   year 2005, right?
20              MR. O'REILLY:  Yes, Your Honor.
21              THE COURT:  Okay.  Now, Mr. Springer, I
22   understand that you have another proposal apparently on a
23   slightly different subject, but let me first inquire, do
24   you concur with that approach to the first element?
25              MR. SPRINGER:  No.  I think it should be the
```

```
 1    second element.
 2            THE COURT:  Well, do you --
 3            MR. SPRINGER:  Yes, I do agree with the changes,
 4    but I -- yes, but not as the first element.
 5            THE COURT:  Let's be clear.  Do you concur with
 6    that change in that verbiage?
 7            MR. SPRINGER:  Yes.
 8            THE COURT:  Mr. Stilley?
 9            MR. STILLEY:  Yes, Your Honor.
10            THE COURT:  Okay.  Now, what's your next
11    proposal?
12            MR. SPRINGER:  In Count 2, Your Honor, the --
13    and in Count 3 and 4, in each time it states by failing
14    to file a United States Individual Income Tax Return as
15    required by law.  And as the bill of particulars stated
16    by the government that under Section 6151, it's the
17    amount of money that would have been shown to be owed on
18    the required tax return that then would become the amount
19    that's due and owing.
20        And so I propose the Court -- because of the removal
21    of the "in addition to what was reported on his return"
22    language, that the Court first state Defendant
23    Springer -- you must find that Defendant Springer was
24    required by law to file a U.S. Individual Income Tax
25    Return for the calendar year 2000 or 2003 or 2005.  And
```

1    then, number two, you must find that Defendant Springer

2    owed substantial income tax.  And then go 3, 4, and 5 as

3    the Court has 2, 3, and 4 currently.  And that is right

4    out of the indictment.  And it's consistent with the bill

5    of particulars and the theory of the government's case.

6              THE COURT:  Does anybody have a copy -- well,

7    let's see, I was looking for Section 7201.  Does anybody

8    have a copy of Section 7201 handy?

9              MR. O'REILLY:  Do you want me to bring it up,

10   Your Honor?

11             THE COURT:  Is it in that book?

12             MR. O'REILLY:  Yes, it is.

13             THE COURT:  Okay.  Hold on.  Okay.  I've read

14   Section 7201.  I didn't realize until just a minute ago

15   that it's in the annual pamphlet.  You learn something

16   new every day.  Okay.

17             MR. SPRINGER:  Section 6151 was cited by the

18   government in their bill of particulars, Your Honor, and

19   I have it if you would like to read that.  This was the

20   theory that they presented to us prior to trial.

21             THE COURT:  Okay.  You can hand it to the clerk.

22             MR. SPRINGER:  I certainly will.

23             THE COURT:  Okay.  I'll hear from the government

24   in response.

25             MR. O'REILLY:  Very briefly, Your Honor, that is

 1   not an element of the offense of 7201 and it should not

 2   be crafted as an additional element in the jury

 3   instructions.

 4          THE COURT:  What do the Tenth Circuit pattern

 5   instructions have to say on this subject?

 6          MR. O'REILLY:  They specifically omit any such

 7   reference.

 8          THE COURT:  Okay.  I want to take a look at

 9   that.  Let's see, does anybody have the Tenth Circuit

10   pattern instruction handy?

11          MR. SPRINGER:  Looking for them right now, Your

12   Honor.

13          THE COURT:  Well, I want to get a hard copy.

14   Stand by.  I'll go get a hard copy.

15      (BRIEF RECESS)

16          THE COURT:  I have looked at the Tenth Circuit

17   pattern criminal jury instructions, specifically

18   Instruction 2.92 on tax evasion.  And the pattern

19   instruction -- well, let me preface this by saying I'm

20   not wedded to pattern instructions as such.  They're

21   certainly a very substantial aid to the Court in a lot of

22   different circumstances, but I'm not wedded to pattern

23   instructions just for the sake of giving pattern

24   instructions.

25      However, the Tenth Circuit pattern instruction

1   confirms my conception that tax evasion is a crime both

2   as a matter of form and as a matter of substance, which

3   is separate and independent of the form of willful

4   failure to file -- of the crime of willful failure to

5   file.  And for that reason, it certainly comes as no

6   surprise to me that the Tenth Circuit pattern instruction

7   does not contain the extra element that Mr. Springer, and

8   I presume Mr. Stilley, would propose to add, and I don't

9   intend to add it.

10      It's a bit of an oversimplification, but Section

11  7201 tax evasion goes to the tax as opposed to the

12  procedure by which the tax is assessed, in substance.

13  And I don't intend to add the element proposed by the

14  defendants.  And, Mr. Stilley, as I say, I presume that

15  would have been your request also.

16      Now, it is my duty to conform the instructions to

17  the evidence in the case.  And for that reason, I do

18  fully intend to make the revision to the instructions on

19  evasion to say, for instance, on page 43, that the

20  Defendant Springer owed substantial income tax for the

21  year 2003 or 2000 or 2005, as the case may be.  Because

22  that does nothing more than conform the instructions to

23  the facts of the case.

24      I'm least of all happy with myself.  Whatever

25  criticism I might have for the parties and the counsel

1    for not catching this, I should have caught it.  But we

2    are in midstream in giving the instructions.  And I'm

3    going to tell the jury that corrections have been made

4    and I'm going to start over -- my grandfather would say

5    plow up and plant over -- starting on page 40.  And we'll

6    just take it from there.  But I do think it would be

7    substantively incorrect to add that additional element

8    and I don't intend to do so.

9        Now, there's one more matter I need to address, but

10   -- and, Pam, I'll give this book to you.  You can give

11   that back to Mr. Springer.  Anything else -- well, two

12   more things I need to address.  Number one, final

13   findings under Rule 801(d) and also length of closing

14   arguments.

15       Is there anything else that the parties need to

16   address?

17           MR. O'REILLY:  No, Your Honor.

18           THE COURT:  Mr. Springer?

19           MR. SPRINGER:  May I have a moment, Your Honor?

20           THE COURT:  You may.

21           MR. SPRINGER:  Not with respect to -- if I could

22   just have a moment, Your Honor.  Your Honor, can I make a

23   motion for a directed verdict?

24           THE COURT:  You surely may.  We'll put that on

25   the agenda.

```
1              MR. SPRINGER:  Okay.

2              THE COURT:  Anything else the parties care to

3    address?

4              MR. SPRINGER:  Yes, Your Honor.

5              THE COURT:  We've got length of closing

6    argument, a renewed motion for directed verdict, and my

7    final findings under Rule 801(d).  Anything else?

8              MR. SPRINGER:  Yes, Your Honor.  I would just

9    like to, on the record, make the objection as to the

10   elements on tax evasion.  And my record is that the

11   instruction says "which he reported on his income tax

12   return," which establishes that there should be a return

13   at issue.  And in the case where there's not --

14             THE COURT:  Wait, wait, wait.  Are you going on

15   to something else?

16             MR. SPRINGER:  No, I was just making a record on

17   my objection to your findings about not including the

18   return.

19             MR. BURTON:  Your Honor, I think he was trying

20   to make his Rule 30 presentation in relation to that

21   question you asked.  That's what he was trying to do.

22             MR. SPRINGER:  Yes.

23             THE COURT:  Okay.  Very concisely tell me what

24   your point is.

25             MR. SPRINGER:  In the first element, the Tenth
```

1    Circuit pattern suggests that the substantial tax

2    deficiency should be in addition to that reported on a

3    return, which indicates that a return at least was

4    required to be filed and was filed in that element.  And

5    when the theory is that a return was not filed, then --

6              THE COURT:  What do you mean "theory"?

7              MR. SPRINGER:  I mean the government's case is

8    that --

9              THE COURT:  You don't contest that, do you?

10             MR. SPRINGER:  No, no, no, no.  I do not contest

11   it.  But I do contest whether in good faith I was

12   required to file.  And that's where that first part comes

13   in where instead of it being "in addition to the return

14   that was filed," it should say, "he was required by law

15   to file a return."  And I just wanted to make the record

16   on that, Your Honor.

17             THE COURT:  What says the government on that

18   score?

19             MR. O'REILLY:  Your Honor, that's what Your

20   honor just considered as an additional element, and we

21   oppose that.

22             THE COURT:  Very well.  That is noted.  Okay.

23   Now, how long do you want for closing arguments?  Bearing

24   in mind that whatever length of time any one of the three

25   parties has, government and two defendants, that's the

```
 1   length of time that all parties will have.
 2           MR. O'REILLY:  Your Honor, the government should
 3   be able to make their closing in a half-hour.
 4           THE COURT:  And that includes opening and
 5   rebuttal?
 6           MR. O'REILLY:  Mr. Snoke is advising me to go
 7   for 45 minutes with half-hour and 15, so --
 8           THE COURT:  Okay.  Mr. Springer and Mr. Stilley,
 9   the proposal on the floor is the government wants to take
10   30 plus 15, which is a total of 45.  So, in effect,
11   Mr. O'Reilly is proposing that you have 45 minutes and
12   that Mr. Stilley have 45 minutes.  So what is your
13   response to that?
14           MR. SPRINGER:  Your Honor, I would ask for one
15   hour.  Because I need to talk slow.  I need to be mindful
16   of our transcription of the hearing.  And it is a very
17   voluminous case.  It has three different sections:  the
18   conspiracy, the tax evasion, and then the willful failure
19   to file.  And I actually tried last night to rehearse and
20   my first go-round was an hour and a half.  So cutting it
21   down to an hour, you know, is -- I'm really cutting it in
22   half.
23           THE COURT:  Now, as a minister, you know there's
24   a reason that sermons are usually about 20 minutes long.
25           MR. SPRINGER:  Your Honor, I've thought about it
```

```
 1   so hard, that I'm doing the best I can.  I could do it in

 2   45 minutes, Your Honor, but I'm afraid I may speed my

 3   speech up.  And that becomes my biggest fear because I

 4   don't want to leave anything unargued because I've been

 5   kept to this moment to summarize three weeks of a trial,

 6   40,000 exhibits that were thrown at me.

 7             THE COURT:  Okay, fine.  Mr. Stilley.

 8             MR. STILLEY:  Your Honor, I don't have any --

 9   certainly don't have any objection to 45 minutes.  And

10   I'm really not taking a strong position on that.  But

11   that's plenty for me.

12             THE COURT:  There will be 45 minutes on a side

13   and there's three sides.  The government will have 45

14   minutes, which I take it is going to be 30 and 15.  Is

15   that right?

16             MR. O'REILLY:  Your Honor, that's what I expect

17   now.  Can I advise the Court the final breakdown tomorrow

18   morning?

19             THE COURT:  You may.  And each of the two

20   defendants will have 45 minutes apiece.  You need to make

21   sure that Pam is advised as to how much warning you want

22   when you get toward the end of your time so that you

23   won't be surprised when your time expires.

24        And on the subject of closing argument, this is more

25   for the pro se defendants than for anyone else, but the
```

1   same rules apply to everyone.  On one hand, you do have

2   more leeway in closing than you do in opening.  You're

3   entitled to give your interpretation of the evidence,

4   you're entitled to argue from the evidence, but the

5   emphasis is on the evidence.  And what I mean by that is

6   that your argument has to be -- what you say during your

7   argument has to be plausibly based on evidence received.

8   And as long as it is, then it can be argument.  Which is,

9   obviously, appropriate for closing argument even though

10  it's not appropriate for opening statement.

11      But I would want all concerned to bear in mind that,

12  yes, the argument and closing must be based somehow on

13  the evidence.  It must be within the four corners of the

14  evidence received.  I don't want to intervene and

15  interrupt the flow of anyone's closing argument, but I

16  will not hesitate to do so if I consider it to be my duty

17  to do so.

18      Also, not only must the closing arguments be

19  arguably consistent with some evidence received, the

20  closing arguments must be consistent with the law as set

21  forth in the Court's instructions.  And it is not

22  permissible to make any argument either in contradiction

23  with or inconsistent with the law as set forth in the

24  Court's instructions.  That is also the sort of problem

25  that would likely result in my intervening.

1      With that, I will hear very concise argument with

2  respect to the renewed motions for directed verdict.  And

3  this is argument in support of your motion, which is

4  decidedly different from what your closing argument to

5  the jury might be.  Because bear in mind that in ruling

6  on a Rule 29 motion, it is my duty and I'm required

7  unequivocally to view the evidence in the light most

8  favorable to the government.

9      So with that understanding, I'll hear very concise

10  argument, Mr. Stilley (sic), in support of your Rule 29

11  motion.

12          MR. SPRINGER:  Your Honor, there has been no

13  evidence of any agreement to impede any lawful function

14  of the IRS in any of the four functions that the Court

15  directed the jury, which is assessment, ascertainment,

16  computation, and collection.  Mr. Shern testified he was

17  not misled by any of my statements.  And in relationship

18  to venue as to Count 1, there are only five acts alleged

19  that are even alleged to have occurred in the Northern

20  District of Oklahoma.  And the first one, which Agent

21  Shern said he was not misled on, was paragraph 15 where

22  he stated that I stated I have no income, which I

23  testified was I said I had no gross income, and that he

24  does not provide any services for payment.

25      The next act alleged in this district is Oscar

1    Stilley's March 9 -- it's paragraph 17, March 9, 2006,
2    where he testified before a grand jury, not the Internal
3    Revenue Service, and stated that Lindsey Springer does
4    not charge for his services and so forth in paragraph 17.
5        There's no way that that statement of itself could
6    have ever misled any Internal Revenue Service employee in
7    the computation, ascertainment, assessment, and
8    collection of taxes because, again, it was only made
9    under the grand jury subpoena.
10       Then the next act is paragraph 22, which was me
11   taking a check from Mr. Stilley and using it in Oklahoma
12   in the Northern District to buy a Corvette, a $37,000
13   cashier's check.  That has been testified to was a loan
14   and it was paid back and all parties involved were aware
15   of that transaction.  The basic way I could say it is
16   that the IRS had no dog in that hunt.
17       And then the next act alleged -- that occurred as
18   alleged is alleged to have occurred in the Northern
19   District is paragraph 31 where Oscar Stilley is alleged
20   to have wired or transmitted from his IOLTA account
21   $25,813 to Lexus of Tulsa for a Lexus that was purchased
22   in my name.  There is not any ascertainment, assessment,
23   computation, or collection at issue in the purchase of a
24   Lexus in the Northern District of Oklahoma.
25       And then there is the last act within the Northern

2939

1   District of Oklahoma alleged, which is paragraph 39, and

2   that is on or about January 15, 2009, Springer

3   represented that he earned no income, that the money he

4   received was given without any expectation for anything

5   from anybody.  And, again, Mr. Shern testified he was the

6   one that representation was made to and he wasn't misled

7   in any way.

8       Those are the five acts and none of them establish

9   either that a crime committed -- was committed or an act

10  in furtherance of a conspiracy was committed in this

11  district, nor has the government even established that an

12  agreement existed.

13      And so for those reasons, all the other acts, Your

14  Honor, in Count 1, each identify what Stilley caused

15  either in Fort Smith, from Michigan to Fort Smith, from

16  Hawaii to Fort Smith, or from Fort Smith he caused a

17  check to be written.  It never says he sent the check

18  across state line into the Northern District of Oklahoma.

19      And that would be my basis for asking the Court to

20  dismiss or a directed verdict as not guilty as to Count 1

21  because the government has failed to prove any act in

22  furtherance of any conspiracy or any conspiracy to impede

23  the IRS's function that occurred in this district.

24      In Count 2, the affirmative acts that are alleged --

25  and this I understand where we're at on this.  The false

1    statements to agents and employees of the Internal

2    Revenue Service, Mr. Shern again testified that that all

3    meant either the September 16, 2005, statements that I

4    made to him at my house or the January 15 statements,

5    2009, that I made in the United States Attorney's

6    Office.  Any of the false statements that this phrase

7    could have been intending to mean for the purpose of

8    Mr. Stilley, which are not in Count 2, is a statement he

9    made in Fort Smith, Arkansas, and a statement that he

10   made to the grand jury.  And so there is no evidence of

11   any misleading or concealing anything with regard to

12   those statements.

13       The evidence is clear that for 19 years I used the

14   same check cash business.  The evidence is clear that --

15   and there has been no evidence to dispute that I had no

16   options other than that.  And the rest of Count 2 alleges

17   use of money orders, cash, and other means.  But there

18   are no other means.  There's only these means.  There's

19   no other way to do any transaction but what's alleged in

20   Count 2.  And, therefore, those should not be considered

21   as affirmative acts in furtherance of an attempt to

22   evade.

23       And I also would say that there has been no evidence

24   to fit the phrase "otherwise concealing and attempting to

25   conceal from all proper officers of the United States of

 1   America his true and correct income."  And for that

 2   reason, I believe that Count 2 fails -- the government

 3   has failed as to each of the elements to establish that

 4   there was a substantial tax liability and that there were

 5   affirmative acts in furtherance of attempting to evade

 6   that substantial tax liability.

 7        As to Count 3, my arguments would be identical to

 8   what I just made for Count 2 except with the -- there is

 9   an additional affirmative act in Count 3 which says that

10   I asked people to make checks payable to Bondage Breakers

11   Ministries.  Although I don't dispute that as being not

12   factual, it is true, but it just does not attempt --

13   doesn't show an attempt to evade a tax because somebody

14   put Bondage Breakers Ministries on a check.  And I

15   believe the only testimony we had from Mr. Miller was

16   that if he just looked at the checks he may not have been

17   able to determine what they were for.

18        But there again, that defies logic that all checks

19   that are looked at by the IRS without anything else can

20   be determinative of what the checks were for, who was

21   involved.  This is just a preposterous position that the

22   IRS is taking with respect to those checks.  So, again,

23   in addition to what I argued for Count 2, I argue again

24   for Count 3.

25        Again, there is an additional aiding and abetting

1    that Oscar Stilley and I both are having to defend which

2    has to do with the use of his IOLTA account.  And the

3    interesting part about the evidence in this case which

4    demonstrates that there is no impropriety with use of

5    that IOLTA is that the government's theory of tax evasion

6    for Count 3 is that the money that came out of the IOLTA

7    account is the money that they claim I was attempting to

8    evade the taxes on.  And I wouldn't have owed any taxes

9    until the moment I got those checks in my hand.  And it's

10   for that reason there's no way they can say that by

11   Mr. Stilley giving me the money the same exact act was an

12   attempt to evade a tax on that money.  Because they work

13   right there at the same moment.  Whether it be the -- in

14   2003, it would be the $90,000 that came out of IOLTA to

15   Lindsey Springer, the 30 --

16              THE COURT:  You need to be moving it along.

17              MR. SPRINGER:  And again the false statements

18   was Mr. Shern.  Count 4, the same with respect to those

19   arguments on the IOLTA and the rest of the affirmative

20   acts that none of those acts established that I had

21   attempted in any way or participated or attempted in any

22   way to evade any taxes imposed by the Internal Revenue

23   Code.

24        And then as to all the charges, I would argue -- I

25   would state definitely that the government has failed to

1   establish based upon what I have presented to the Court

2   and now to the jury under the Paperwork Reduction Act

3   violations that I was not required to answer any

4   questions on any Form 1040 for years 2000, 2001, 2002, 3,

5   4, or 5 based upon those violations.  Thank you, Your

6   Honor.

7           MR. O'REILLY:  Your Honor --

8           THE COURT:  Just a minute.  Mr. Springer, I

9   assume you also adopt all the arguments you made at the

10  close of the government's case?

11          MR. SPRINGER:  I do, Your Honor.

12          THE COURT:  Very well.

13          MR. SPRINGER:  Thank you.

14          MR. O'REILLY:  I just want to object, as I

15  understood what Mr. Springer just said, he is still

16  asserting a substantive Paperwork Reduction Act, which I

17  understand this Court has rejected.

18          THE COURT:  He may ultimately get his ruling,

19  you never know.  He's entitled to pretty much say what he

20  wants to say, and he just said it.  Mr. Stilley.

21          MR. STILLEY:  I would start off by adopting all

22  the arguments of both defendants at the close of the

23  government's case and Mr. Springer's arguments that he

24  just made and try to add upon that.  And I think maybe a

25  good place to hit on this and to start would be to think

1   back to what Mr. Miller said about the -- kind of the

2   thrust of what Oscar Stilley allegedly did wrong, namely

3   responding to the subpoena and saying that Lindsey

4   Springer does not charge for his services.

5       When you look back and compare what Count 1 of the

6   indictment says is wrong and you consider the law, that

7   can't be possible, because the grand jury doesn't have

8   any of those functions.  And while we're on the subject,

9   you've got overt acts, Number 16, which says that Stilley

10  told Internal Revenue Service employees that people give

11  money to defend Springer for his ministry and expect no

12  services in return.  And then you have what I was telling

13  you about in paragraph 17.  And it seems to me it would

14  be a difficult matter to preserve the record and make

15  sure that the verdict, if it's guilty, is supportable

16  without knowing what specific overt acts were acceptable.

17      Now, I would still say that these Internal Revenue

18  Service employees on January 20, even if they -- even if

19  these statements were made at that point in time, their

20  purpose was not ascertainment or collection or anything

21  like that, it was investigating a crime.  So I continue

22  to maintain that that's not good enough either.  But

23  especially when you put these various things in here, it

24  seems to me that you would create a situation where that

25  error would be a very likely possibility.

```
 1        Venue jumps up really big on this issue too because
 2   many of these transfers, which are conceded, don't even
 3   touch on Oklahoma.  For example, coming from Hawaii to
 4   Fort Smith, Arkansas.  If that was the only overt act,
 5   then you would -- you could have a situation where the
 6   jury misunderstood about venue and convicted without
 7   proof of venue.  And I understand that this is a motion
 8   for directed verdict.  I'm trying to make that particular
 9   motion.
10        Now, let's think about Count 3.  The government
11   listed Nate Colter, but they didn't put him on the
12   witness stand, and nobody testified that Oscar Stilley
13   was not duty-bound to disburse that money, nor testified
14   that it was that particular way, doing it that particular
15   way, would have been particularly more difficult for the
16   IRS or sufficient to establish the element on that
17   particular count.
18        As to Count 4, Mr. Miller testified from the stand
19   that he himself was convinced that it was a loan until --
20             MR. O'REILLY:  Your Honor, objection.  It
21   misstates what Mr. Miller said.
22             THE COURT:  That's just a little bullish about
23   his testimony.
24             MR. STILLEY:  Perhaps it is.  And I apologize,
25   Your Honor.  But, nonetheless, Mr. Miller said that what
```

1    convinced him was testimony from Ms. Hawkins.  And

2    there's no testimony and it certainly didn't happen that

3    Oscar Stilley became privy or had knowledge of these

4    other transactions or communications such that he might

5    be chargeable with knowledge whereby that a reasonable

6    jury could find that on Oscar Stilley's knowledge at the

7    time that he was guilty of the act.  And that is the

8    argument that I would make.  Thank you.

9          THE COURT:  Thank you.  In considering a motion

10    for judgment of acquittal, either at the close of the

11    government's evidence or at the close of all the

12    evidence, the Court views the evidence in the light most

13    favorable to the government.  Judgment of acquittal is

14    proper only if the evidence and all inferences to be

15    drawn from it is insufficient to permit a rational trier

16    of fact to find the essential elements of the crimes

17    charged to have been proven beyond a reasonable doubt.

18    The evidence must be substantial and not raise a mere

19    suspicion of guilt.  And the evidence certainly is

20    substantial.  For that reason, the motions are denied.

21     It is advisable, I think, although I don't know that

22    the Tenth Circuit has itself explicitly expounded on

23    this, but several other circuits have stated

24    unequivocally that even without a motion, it is desirable

25    for the trial court to make final findings with respect

1    to the admissibility of co-conspirator hearsay.

2        Now, for a statement to be admissible as a

3    co-conspirator statement, the Court must find first that

4    there was a conspiracy in existence; second, that the

5    out-of-court speaker was a member of that conspiracy;

6    third, that the defendant against whom the statement is

7    offered was a member of that conspiracy; fourth, that the

8    statement was made in furtherance of the conspiracy; and,

9    fifth, that the statement was made in the course of that

10   conspiracy.

11       Now, there are -- as a matter of fact, as a

12   practical matter, there are not a great deal of

13   co-conspirator statements in evidence in this case.

14   There certainly are some and they have been received as

15   offered and they have been received on the strength of my

16   findings at the conclusion of our James hearing at the

17   beginning of the case.

18       I have no trouble finding that by a preponderance of

19   the evidence that the government has established the

20   existence of a conspiracy during the conspiracy period

21   charged in the indictment and that the declarants who are

22   predominantly, if not entirely, Messrs Springer and

23   Stilley, were members of that conspiracy; that the

24   defendants against whom the statement is offered was a

25   member of the conspiracy.  Obviously, a statement by

1   Mr. Springer would be relevant for this purpose only if

2   it tended to prove the case against Mr. Springer and vice

3   versa.  And both of the defendants were members of the

4   conspiracy at all times that statements were made by

5   their co-defendants, which have been offered against

6   them.  The statements that are in evidence I easily find

7   by a preponderance of the evidence were made in

8   furtherance of the conspiracy and during the course of

9   the conspiracy.

10       And for that reason, it is my conclusion, and I

11  should add quite easily, that the government has carried

12  its burden of establishing the admissibility of the

13  statements which would otherwise be hearsay under Rule

14  801(d), so as to establish the admissibility of those

15  statements.

16       Is there anything further the Court ought to address

17  before we recess until nine in the morning?

18            MR. O'REILLY:  Not from the government, Your

19  Honor.

20            THE COURT:  Mr. Springer?

21            MR. SPRINGER:  No, Your Honor.

22            THE COURT:  Mr. Stilley?

23            MR. STILLEY:  No, Your Honor.

24            THE COURT:  Court will be in recess.

25       (COURT ADJOURNED FOR THE EVENING RECESS.  FOR

1    FURTHER JURY TRIAL PROCEEDINGS, SEE VOLUME XIII.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25