```
1                IN THE UNITED STATES DISTRICT COURT

2              FOR THE NORTHERN DISTRICT OF OKLAHOMA

3

4    UNITED STATES OF AMERICA,

5           Plaintiff,

6    vs.                        Case No. CR-09-43-SPF

7    LINDSEY KENT SPRINGER and
     OSCAR AMOS STILLEY,
8
            Defendants.
9
     ----------------------------
10

11

12

13

14

15            TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16          BEFORE THE HONORABLE STEPHEN P. FRIOT

17             UNITED STATES DISTRICT JUDGE

18                  NOVEMBER 13, 2009

19                 VOLUME XIII OF XIV

20

21

22

23

24

25
```

```
 1   APPEARANCES:

 2   FOR THE GOVERNMENT:
                         Mr. Charles Anthony O'Reilly
 3                       U.S. Department of Justice
                         PO Box 972
 4                       Washington, DC 20044

 5                       Mr. Kenneth P. Snoke
                         US Attorney's Office (Tulsa)
 6                       110 W. 7th Street, Ste. 300
                         Tulsa, OK 74119
 7

 8
     FOR DEFENDANT SPRINGER:
 9                       Mr. Lindsey Kent Springer
                         5147 S. Harvard Ave.
10                       Ste. 116
                         Tulsa, OK 74135
11
                         Mr. Robert Scott Williams
12                       Taylor Ryan Schmidt & Van Dalsem
                         1437 S. Boulder Ave., Ste. 850
13                       Tulsa, OK 74119

14   FOR DEFENDANT STILLEY:
                         Mr. Oscar Amos Stilley
15                       7103 Race Track Loop
                         Fort Smith, AR 72901
16
                         Mr. Charles Robert Burton, IV
17                       Burton Law Firm, PC
                         320 S. Boston, Ste. 2400
18                       Tulsa, OK 74103

19

20

21

22

23

24

25
```

```
 1          THE COURT:  Before I resume with the jury
 2   instructions, I need to see counsel and the parties very
 3   briefly here at the bench.
 4      (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND
 5   OUT OF THE HEARING OF THE JURY.)
 6          THE COURT:  Okay.  Last night, after we
 7   recessed, I repaired the errors in the first element of
 8   the evasion counts, exactly as per our conversation last
 9   night.  But then I noticed in the second element the word
10   "additional" has to be deleted because it relates to the
11   language that we deleted in the first element.
12          MR. SPRINGER:  You're right.
13          THE COURT:  So in the revised version that has
14   been included in the official copy and the jurors' copies,
15   although we obviously did not discuss this last night, I
16   deleted the word "additional."  Does the government
17   object?
18          MR. O'REILLY:  No.
19          THE COURT:  Does Defendant Springer object?
20          MR. SPRINGER:  No, Your Honor.
21          THE COURT:  Does the Defendant Stilley object?
22          MR. STILLEY:  No.
23          MR. O'REILLY:  Your Honor, I just wanted to make
24   sure that Pam had notified you of Mr. Shern's situation.
25          THE COURT:  Yes.
```

1          MR. O'REILLY:  Thank you.

2       (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

3   WITH ALL PARTIES AND COUNSEL PRESENT, AND WITHIN THE

4   PRESENCE AND HEARING OF THE JURY.)

5          THE COURT:  Members of the jury, it is, I think,

6   provident that reading of the instructions was

7   interrupted last night when we got to five o'clock and I

8   told you that I would complete reading the instructions

9   this morning because we found an error in the

10  instructions.  With the cooperation of the parties, which

11  I certainly applaud, there were actually two or three

12  errors, which have been corrected.  And so we removed

13  from all copies, including your copies, the pages that

14  contain the errors and inserted corrected copies.  And

15  none of the errors occurred before page 40, so I'm going

16  to -- although I read yesterday the Count 2 instruction

17  that begins on page 40, you now have a corrected

18  version.  And as my father would have said, we're going

19  to plow up and plant over.  And so I'm going to begin

20  with page 40.  I don't think it will add materially to

21  the length of time it will take to read the

22  instructions.

23       So beginning on page 40:

24       Defendant Springer is the only defendant charged in

25  Count 2 of the indictment.  To find Defendant Springer

1  guilty of the crime of tax evasion as charged in Count 2,

2  you must be convinced that the government has proved each

3  of the following essential elements beyond a reasonable

4  doubt:

5      First, that Defendant Springer owed substantial

6  income tax for the year 2000.

7      Second, that Defendant Springer intended to evade

8  and defeat payment of that tax.

9      Third, that Defendant Springer committed an

10 affirmative act in furtherance of this intent.

11     And, fourth, that Defendant Springer acted

12 willfully, that is, with the voluntary intent to violate

13 a known legal duty.

14     To "evade and defeat" the payment of tax means to

15 escape paying a tax due other than by lawful avoidance,

16 for the proof need not show the exact amount of the

17 additional tax due; however, the government is required

18 to prove beyond a reasonable doubt that the additional

19 tax due from Defendant Springer was substantial.

20     And by the way, the presence of the word

21 "additional" in those two sentences is also an error on

22 my part.

23     You are instructed that an affirmative act to evade

24 and defeat payment of taxes is a positive act of

25 commission designed to mislead or conceal.

1    For purposes of Count 2, the affirmative acts

2 alleged in the indictment to have been committed by

3 Defendant Springer are:  Receiving income in a fictitious

4 name; directing individuals to write "donation" or "gift"

5 on checks that were payment for services; directing

6 individuals to pay for services by cashier's check; using

7 a check-cashing business to cash checks; using money

8 orders, cash, and other means to avoid creating the usual

9 records of financial transactions and to conceal

10 Defendant Springer's income; making false statements to

11 agents and employees of the Internal Revenue Service; or

12 otherwise concealing and attempting to conceal from all

13 proper officers of the United States of America Defendant

14 Springer's true and correct income.

15    Finally, you are instructed that in addition to the

16 elements described in this instruction, proof of proper

17 venue is also required before you may find the defendant

18 guilty of the crime charged in Count 2.  I will instruct

19 you later regarding proof of venue.

20    Counts 3 and 4 of the indictment charge both

21 Defendant Springer and Defendant Stilley with tax

22 evasion, in violation of Title 26, Section 7201, of the

23 United States Code.

24    As previously stated, this law makes it a crime to

25 willfully attempt to evade or defeat the payment of

1   federal income tax.

2       In Count 3, the indictment charges that from on or

3   about January 1, 2003, and continuing to on or about

4   January 15, 2009, within the Northern District of

5   Oklahoma and elsewhere, Defendant Springer had and

6   received taxable income and upon that taxable income

7   there was a substantial income tax due and owing.

8       The indictment further charges that well-knowing and

9   believing the foregoing facts, Defendants Springer and

10  Stilley did willfully attempt to evade and defeat the

11  individual income taxes due and owing by Defendant

12  Springer to the United States of America for calendar

13  year 2003 by failing to file a United States Individual

14  Income Tax Return, as required by law, and by committing

15  various affirmative acts of evasion.

16      In Count 4, the indictment charges that from on or

17  about January 1, 2005, and continuing to on or about

18  January 15, 2009, within the Northern District of

19  Oklahoma and elsewhere, Defendant Springer had and

20  received taxable income and upon that taxable income

21  there was a substantial income tax due and owing.

22      The indictment further alleges that well-knowing and

23  believing the foregoing facts, Defendants Springer and

24  Stilley did willfully attempt to evade and defeat the

25  individual income taxes due and owing by Defendant

1    Springer to the United States of America for calendar

2    year 2005 by failing to file a United States Individual

3    Income Tax Return, as required by law, and by committing

4    various affirmative acts of evasion.

5         Count 3, to find a defendant guilty of the crime of

6    tax evasion, as charged in Count 3, you must be convinced

7    that the government has proved each of the following

8    elements beyond a reasonable doubt:

9         First, that Defendant Springer owed substantial

10   income tax for the year 2003;

11        Second, that the defendant intended to evade and

12   defeat payment of that tax owed by Defendant Springer;

13        Third, that in furtherance of this intent, the

14   defendant committed one of the affirmative acts charged

15   in the indictment;

16        And, fourth, that the defendant acted willfully,

17   that is, with the voluntary intent to violate a known

18   legal duty.

19        As previously stated, to evade and defeat the

20   payment of tax means to escape paying a tax due other

21   than by lawful avoidance.

22        Count 3 of the indictment does not allege a specific

23   amount of tax due from Defendant Springer from calendar

24   year 2003.  The proof need not show the exact amount of

25   the tax due for that year.

1       And in the official copy, I will delete the word

2  "additional."

3       The government is required to prove beyond a

4  reasonable doubt that the tax due was substantial.

5       An affirmative act to evade or defeat the payment of

6  taxes is a positive act of commission designed to mislead

7  or conceal.

8       For purposes of Count 3, the affirmative acts

9  charged in the indictment to have been committed by

10  Defendant Springer are:  Directing individuals to make

11  checks payable to Bondage Breakers Ministry; using a

12  check-cashing business to cash checks; and accepting

13  collectable coins as payment for services.

14       The affirmative acts charged in the indictment by

15  Defendants Springer and Stilley are:  Using Defendant

16  Stilley's IOLTA account; using Defendant Stilley's credit

17  card to pay Defendant Springer's personal expenses; using

18  cashier's checks, money orders, cash, and other means to

19  avoid creating the usual records of financial

20  transactions and to conceal income; making false

21  statements to agents and employees of the Internal

22  Revenue Service; and otherwise concealing and attempting

23  to conceal from all proper officers of the United States

24  of America Defendant Springer's true and correct income.

25       In addition to being charged as a principal,

1   Defendant Stilley is charged as an aider and abetter in

2   Count 3.  I will instruct you shortly regarding the

3   elements of aiding and abetting.

4       Finally, you are instructed that, in addition to the

5   other elements described in this instruction, proof of

6   proper venue is also required before you may find a

7   defendant guilty of the crime charged in Count 3.  I will

8   instruct you later regarding proof of venue.

9       Count 4.  To find a defendant guilty of the crime of

10  tax evasion as charged in Count 4, you must be convinced

11  that the government has proved each of the following

12  elements beyond a reasonable doubt:

13      First, that Defendant Springer owed substantial

14  income tax for the year 2005;

15      Second, that the defendant intended to evade and

16  defeat payment of that tax owed by Defendant Springer;

17      Third, that in furtherance of this intent, the

18  defendant committed one of the affirmative acts charged

19  in the indictment;

20      And, fourth, that the defendant acted willfully,

21  that is, with the voluntary intent to violate a known

22  legal duty.

23      Again, as previously stated, to evade and defeat the

24  payment of taxes means to escape paying a tax due other

25  than by lawful avoidance.

2960

1    Count 4 of the indictment does not charge a specific

2    amount of tax due from Defendant Springer for calendar

3    year 2005.  The proof need not show the exact amount of

4    the tax due for that year.

5        And, again, in the official version, I will delete

6    the word "additional" there.

7        The government is required to prove beyond a

8    reasonable doubt that the tax due was substantial.

9        I'll make the same correction, deleting the word

10   "additional."

11       Again, an affirmative act to evade or defeat payment

12   of taxes is a positive act of commission designed to

13   mislead or conceal.

14       For purposes of Count 4, the affirmative acts

15   alleged to have been committed by Defendant Springer, as

16   charged in the indictment, are:  Directing individuals to

17   make checks payable to Bondage Breakers Ministry and

18   using a check-cashing business to cash checks.

19       The affirmative acts by Defendants Springer and

20   Stilley, as charged in the indictment, are:  Using

21   Defendant Stilley's IOLTA account; using Defendant

22   Stilley's credit card to pay Defendant Springer's

23   personal expenses; using cashier's checks, money orders,

24   cash, and other means of payment to avoid usual records

25   and to conceal income; making false statements to agents

1   and employees of the Internal Revenue Service; and

2   otherwise concealing and attempting to conceal from all

3   proper officers of the United States of America Defendant

4   Springer's true and correct income.

5        In addition to being charged as a principal,

6   Defendant Stilley is charged as an aider and abetter in

7   Count 4.

8        Again, you are instructed that, in addition to the

9   other elements described in this instruction, proof of

10   proper venue is also required before you may find a

11   defendant guilty of the crime charged in Count 4.  I will

12   instruct you later regarding proof of venue.

13        I will now instruct you on the elements of aiding

14   and abetting.

15        With respect to aiding and abetting, you are

16   instructed that Section 2(a) of Title 18 of the United

17   States Code provides that, "Whoever commits an offense

18   against the United States or aids, abets, counsels,

19   commands, induces, or procures its commission is

20   punishable as a principal."

21        As previously stated, Counts 3 and 4 of the

22   indictment charge Defendant Stilley with violations of

23   this statute, 18 United States Code, Section 2.  This law

24   makes it a crime to intentionally help someone else

25   commit a crime.

 1       To find Defendant Stilley guilty of the tax evasion

 2  charged in Count 3 or Count 4 as an aider and abetter,

 3  you must be convinced that the government has proved each

 4  of the following elements beyond a reasonable doubt:

 5  First, that Defendant Springer committed the tax evasion

 6  crime charged in the indictment in Count 3 or in Count 4,

 7  respectively; and, second, that Defendant Stilley

 8  intentionally associated himself in some way with that

 9  crime and intentionally participated in it as he would in

10  something he wished to bring about which requires proof

11  that Defendant Stilley consciously shared Defendant

12  Springer's knowledge of the underlying criminal act of

13  the tax evasion charged and that Defendant Stilley

14  intended to help Defendant Springer commit that crime.

15       An aider and abetter need not perform the underlying

16  criminal act, be present when it is performed, or be

17  aware of the details of its commission to be guilty of

18  aiding and abetting, but a general suspicion that an

19  unlawful act may occur or that something criminal is

20  happening is not enough.  Mere presence at the scene of a

21  crime and knowledge that a crime is being committed are

22  also not sufficient to establish aiding and abetting.

23       Again, in addition to the elements of aiding and

24  abetting described in this instruction, proof of venue is

25  required in order to find a defendant guilty of a crime

1    by aiding and abetting.

2        I will instruct you later regarding proof of venue.

3        Counts 5 and 6 of the indictment charge Defendant

4    Springer only with a violation of Section 7203 of Title

5    26 of the United States Code.

6        Section 7203 provides, in pertinent part, that, "Any

7    person required under this title to pay any estimated tax

8    or tax or required by this title or by regulations made

9    under authority thereof to make a return, keep any

10   records, or supply any information, who willfully fails

11   to pay such estimated tax or tax, make such return, keep

12   such records, or supply such information at the time or

13   times required by law or regulations shall be guilty of

14   an offense against the United States."

15       As just stated, Defendant Springer is charged in

16   Counts 5 and 6 with violations of Title 26, United States

17   Code, Section 7203.  This law makes it a crime for anyone

18   to willfully fail to make and file an income tax return.

19       In Count 5, the indictment charges that during the

20   calendar year 2002, Defendant Springer had and received

21   gross income in excess of $7,700.

22       The indictment further charges that by reason of

23   such gross income Defendant Springer was required by law,

24   following the close of the calendar year 2002 and on or

25   before April 15, 2003, to make an income tax return to

1    the Internal Revenue Service stating specifically the

2    items of his gross income and any deductions and credits

3    to which he was entitled.

4        The indictment further charges that well-knowing and

5    believing all of the foregoing Defendant Springer did

6    willfully fail on or about April 15, 2003, in the

7    Northern District of Oklahoma and elsewhere, to make and

8    file an income tax return.

9        In Count 6, the indictment charges that during the

10   calendar year 2004, Defendant Springer had and received

11   gross income in excess of $15,900.  The indictment

12   further charges that, by reason of such gross income,

13   Defendant Springer was required by law, following the

14   close of the calendar year 2004 and on or before April

15   15, 2005, to make an income tax return to the Internal

16   Revenue Service stating specifically the items of his

17   gross income and any deductions and credits to which he

18   was entitled.

19       The indictment further charges that well-knowing and

20   believing all of the foregoing, Defendant Springer did

21   willfully fail on or about April 15, 2005, in the

22   Northern District of Oklahoma and elsewhere to make and

23   file an income tax return.

24       Counts 5 and 6, elements of the offense.

25       To find Defendant Springer guilty of the crime

1  charged in Count 5 or Count 6, you must be convinced that

2  the government has proved each of the following elements

3  beyond a reasonable doubt:

4      First, that Defendant Springer was required by law

5  to file a tax return concerning his income for the

6  taxable years ending December 31, 2002, for purposes of

7  Count 5 or December 31, 2004, for purposes of Count 6;

8      Second, that Defendant Springer failed to file such

9  a return at the time required by law;

10      And, third, that in failing to file the tax return,

11  Defendant Springer acted willfully, that is, with a

12  voluntary intent to violate a known legal duty.

13      For the crime of willful failure to file a tax

14  return, the government it not required to show that a tax

15  is due and owing from Defendant Springer, nor is the

16  government required to prove an intent to evade or defeat

17  any taxes.

18      Again, in addition to the elements described in this

19  instruction, proof of proper venue is also required

20  before you may find a defendant guilty of the crimes

21  charged in Counts 5 or 6.

22      I will instruct you next regarding proof of venue.

23      I will now give you instructions regarding proof of

24  venue.

25      In addition to the other elements of each crime

1   charged, the government must prove that venue is properly

2   in this Court.  This means that the government must prove

3   the crime occurred in this judicial district.

4       The government has the burden of proving this fact,

5   referred to as "venue," by a preponderance of the

6   evidence.  This is a different standard of proof than the

7   standard of proof that applies to the other elements of

8   the crimes charged.

9       Unlike proof beyond a reasonable doubt, which is the

10  standard of proof required for each of the other elements

11  of the crimes charged, the government need only prove

12  venue by a preponderance of the evidence.

13      Proof by a preponderance of the evidence is proof by

14  the greater weight of the evidence.  It is proof which

15  convinces you it is more likely than not that the crime

16  charged occurred in this judicial district.

17      When a defendant is charged with multiple crimes,

18  venue must be proven with respect to each crime charged.

19      Venue for Count 1, conspiracy.

20      With respect to venue for purposes of the conspiracy

21  charge alleged in Count 1, you are further instructed

22  that the government must prove by a preponderance of the

23  evidence either that the alleged conspiratorial agreement

24  was formed in this judicial district or that at least one

25  overt act, if any, which you have unanimously agreed took

1   place in furtherance of the objective of the conspiracy,

2   was committed by any one of the conspirators in this

3   judicial district.  For purposes of venue, the acts of

4   any conspirator are considered to be the acts of the

5   other conspirators.

6        Venue for Counts 2, 3, and 4, attempted tax

7   evasion.

8        With respect to Counts 2, 3, and 4, you are

9   instructed that, under the law that applies to this case,

10  attempted tax evasion is a "continuing offense."

11  Therefore, as to these counts, venue is proper in any

12  judicial district where the acts constituting the attempt

13  to evade taxes were begun, continued, or completed.

14       Venue as to aider and abetter, Counts 3 and 4.

15       With respect to Counts 3 and 4, you are instructed

16  that to prove venue for purposes of proving commission of

17  a crime as an aider and abetter, venue is proper where

18  the defendants' acts as an aider and abetter were

19  committed or where the underlying crime occurred.

20       Venue, Counts 5 and 6, failure to file.

21       With respect to Counts 5 and 6, which charge the

22  crime of willful failure to file, you are instructed that

23  venue is proper in the judicial district in which

24  Defendant Springer resided.

25       Any act which occurred in any of the following

 1  counties of the state of Oklahoma is an act which

 2  occurred in this judicial district:  Craig, Creek,

 3  Delaware, Mayes, Nowata, Osage, Ottawa, Pawnee, Rogers,

 4  Tulsa, and Washington.  This judicial district includes

 5  all of the counties just listed.

 6      During the trial, you undoubtedly noted some

 7  instances in which I quickly reviewed the preliminary

 8  transcript as it appeared on the computer screen.  That

 9  was only a preliminary transcript.  Any transcript which

10  could be made available to other persons for any other

11  purpose would have to be a certified transcript.  The

12  preparation of a certified transcript involves a number

13  of steps.  It is highly unlikely that a certified

14  transcript of the testimony of any witness could be

15  completed without substantial delay.

16      Moreover, if a transcript of the testimony of any

17  particular witness were provided, it might be necessary,

18  in fairness, to provide additional transcripts of the

19  testimony of other witnesses.  That would take additional

20  time resulting in further delay.

21      For that reason, it is simply not practicable to

22  prepare a transcript of testimony for use in your

23  deliberations.  It will be necessary for you to make your

24  decision based on what you remember about the evidence.

25      You must also do your very best to recall the

 1    testimony as it was presented at trial.  You should also

 2    listen very carefully to your fellow jurors'

 3    recollections as to the testimony which was given during

 4    the trial.

 5         If you find beyond a reasonable doubt from the

 6    evidence in this case and under these instructions that a

 7    defendant is guilty of a crime charged against him in

 8    this case, then you should find him guilty of that

 9    crime.

10         On the other hand, if you do not so find or if you

11    entertain a reasonable doubt as to the guilt of a

12    defendant as to the crime charged, then you should return

13    a verdict of not guilty with respect to that crime.

14         From all the facts and circumstances appearing in

15    evidence and coming to your observation during the trial,

16    and aided by the knowledge that you each possess in

17    common with other persons, you will reach your

18    conclusions.

19         You should not let sympathy, sentiment or prejudice

20    enter into your deliberations, but you should discharge

21    your duties as jurors in an impartial, conscientious, and

22    faithful manner under your oaths and return such verdict

23    as the evidence warrants when measured by these

24    instructions.

25         These instructions contain all the law whether

1  statutory or otherwise that may be applied by you in this

2  case and the rules by which you should weigh the evidence

3  and determine the facts in issue.

4      You must consider the instructions as a whole and

5  not a part to the exclusion of the rest.

6      You will not use any method of chance in arriving at

7  a verdict, but base it on the judgment of each juror

8  concurring in it.

9      After the closing arguments have been completed, the

10 bailiff will lead you to the jury deliberation room to

11 begin your deliberations.  If any of you have cell phones

12 or similar devices with you, you are instructed to turn

13 them off and give them to the bailiff as you enter the

14 jury deliberation room.  They will be held by the bailiff

15 for you and returned to you after your deliberations are

16 completed and during any lunch break or similar period

17 when you are not deliberating.

18     The purpose of this requirement is to avoid any

19 interruption or distraction during your deliberations and

20 to eliminate even the possibility of a question of

21 outside contact with the jury during your deliberations.

22     After you have retired to consider your verdict,

23 select one of your number as the foreperson and enter

24 upon your deliberations.

25     The exhibits will be available for your

1   examination.

2       If it becomes necessary during your deliberations to

3   communicate with the Court, you may send a note by a

4   bailiff signed by your foreperson or by one or more

5   members of the jury.

6       No member of the jury should ever attempt to

7   communicate with the Court by any means other than a

8   signed writing, and the Court will never communicate with

9   any member of the jury on any subject touching the merits

10  of the case otherwise than in writing or orally here in

11  open court.

12      The bailiff, too, as well as other persons, is

13  forbidden to communicate in any way or manner with any

14  member of the jury on any subject touching the merits of

15  the case.

16      Bear in mind also that you are never to reveal to

17  any person, not even to the Court, how the jury stands

18  numerically or otherwise on the question of the guilt or

19  innocence of the accused until after you have reached a

20  unanimous verdict.

21      If you fail to reach a verdict, the parties may be

22  put to the expense of another trial and may once again

23  have to endure the mental and emotional strain of a

24  trial.

25      If the case is retried, a future jury must be

 1   selected in the same manner and from the same source as

 2   you have been chosen, and there is no reason to believe

 3   that the case would ever be submitted to a jury more

 4   competent to decide this case than those of you who

 5   compose the present jury.  There is no reason to believe

 6   that there will be more or clearer evidence produced at a

 7   future trial.

 8       When you have agreed on a verdict, notify the Court

 9   of that fact by sending a note to the bailiff.  The

10   foreperson alone will sign the verdict form and you will,

11   as a body, return it into open court where the Court will

12   read the verdict.  A form of verdict will be furnished

13   for your use.

14       In this connection, you are advised that the form of

15   verdict includes a blank space before the word "not

16   guilty" and "guilty" for each crime charged against each

17   defendant in each count, so that if you find the

18   defendant not guilty or guilty, simply place a mark in

19   the appropriate space.

20       With regard to Count 1, in the event of a -- let's

21   see here.  Hold on.  There needs to be a correction.  You

22   will disregard that last sentence on page 57.

23       The verdict of the jury in this case must be

24   unanimous, which means that each juror must agree and

25   concur in the verdict.  In this connection, the Court

1   advises each of you that, as jurors, you have a duty to

2   consult with one another and to deliberate with a view to

3   reaching an agreement if it can be done without violence

4   to individual judgment.  Each of you must decide the case

5   for yourself, but only after an impartial consideration

6   of the evidence with your fellow jurors.

7        In the course of deliberations, a juror should not

8   hesitate to re-examine his or her own views and change

9   that opinion if convinced it is erroneous.  But no juror

10  should surrender his honest conviction as to the weight

11  or effect of the evidence solely because of the opinion

12  of his fellow jurors or for the mere purpose of returning

13  a verdict.

14       Counsel and the parties will please approach the

15  bench.

16       (THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH AND

17  OUT OF THE HEARING OF THE JURY.)

18            THE COURT:  Okay.  On Count -- on page 40 in the

19  middle paragraph, to further our discussion earlier this

20  morning at the bench, the word "additional" needs to be

21  removed in two other places.

22       On page 43, likewise, the word "additional" needs to

23  be removed in two other places, in the third line from

24  the bottom and in the bottom line of that middle

25  paragraph.

1     And the same correction is necessary on page 45.

2 We're removing the word "additional" in two places.

3     Then over on page 57, since these instructions have

4 repeatedly told the jury that they must unanimously

5 concur on at least one overt act, the verdict form does

6 not call for that, nor is it under these circumstances

7 required to call for that.  So it is my intent to delete

8 that final sentence on page 57.

9     Does the government object to any of these final

10 corrections?

11          MR. O'REILLY:  No, Your Honor.

12          THE COURT:  Does the Defendant Springer object

13 to any of these final corrections?

14          MR. SPRINGER:  With one exception, Your Honor,

15 because you've taken that paragraph out of the bottom of

16 page 56, could you explain what you just explained to us

17 to the jury just so that they understand that?  And then,

18 otherwise, I wouldn't have any objection.

19          THE COURT:  I'll be happy to do that.

20          MR. O'REILLY:  Okay, Your Honor.

21          THE COURT:  Mr. Stilley?

22          MR. STILLEY:  Your Honor, I do object to the

23 change there at what page?

24          MR. SPRINGER:  Fifty-six.

25          THE COURT:  Bottom of page 57.

1          MR. STILLEY:  I do object to that list that it

2     be construed that I was waiving my previous objections to

3     the jury.

4          THE COURT:  Very well.

5        (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT,

6     WITH ALL PARTIES AND COUNSEL PRESENT AND WITHIN THE

7     PRESENCE AND HEARING OF THE JURY.)

8          THE COURT:  Okay.  Members of the jury, let me

9     cover a couple of things with you, then we'll take a

10    break before we start closing arguments.

11       I don't think it's, under the circumstances,

12    necessary to substitute additional corrected pages in

13    your copies of the instructions.  Corrected pages will be

14    put in the -- in this official copy, which you will have

15    in the jury room.

16       But on page 40, in that middle paragraph, in both

17    places where it says "additional tax due," the word

18    "additional" will be deleted.

19       The same correction will be made in the

20    corresponding location on page 43 and the -- in other

21    words, deleting the word "additional" in two places, and

22    on page 45 in two places the word "additional" will be

23    deleted.

24       Then over on the page 57, in the official version of

25    the instructions that I will sign, and you'll have in the

1  jury room in this black notebook, the bottom sentence at

2  the bottom of page 57 will be deleted.

3      The reason for that very simply is that these

4  instructions say in more than one place that -- that with

5  respect to Count 1, proof of the conspiracy requires and

6  certainly any verdict of guilty with respect to the

7  conspiracy requires that you unanimously find beyond a

8  reasonable doubt that one or more of the affirmative acts

9  or overt acts occurred and that is stated in more than

10  one place in the instructions.

11      And for that reason, because that is made very clear

12  in -- otherwise in the instructions, the final sentence

13  on page 57 will be deleted because the verdict form will

14  not require you to make a specific finding as to which

15  overt act, if any, you find the government has proven

16  beyond a reasonable doubt.

17      Now, also, in the front of this -- the official copy

18  of the instructions, which I have read from, you will

19  have two verdict forms:  One with respect to Mr. Springer

20  and one with respect to Mr. Stilley.  And those verdict

21  forms will be in the front pocket here.  I believe you

22  will find these verdict forms to be self-explanatory.

23      Obviously, as you know, Mr. Springer is charged in

24  more counts than Mr. Stilley is, so the verdict form for

25  Mr. Springer is a bit longer than the verdict form with

1    respect to Mr. Stilley.

2         With that, members of the jury, we'll, without too

3    much delay, have the closing arguments, but we will take

4    a break first.  Let's see if we can hold this break to 15

5    minutes.  We'll be guided by the clock on the wall.  And

6    for that matter, if you're able to resume even a little

7    before 15 minutes, why, that would also be welcomed.

8         During this break, although we're getting close to

9    the time that it becomes your duty to discuss the case,

10   you must remember my usual admonition, which I will not

11   repeat at this time.

12        All persons in the courtroom will remain seated

13   while the jury departs.

14        (JURY EXITS THE COURTROOM)

15             THE COURT:  Okay.  We're paying the price for

16   having had so many iterations of the instructions, but I

17   think the attention that we paid to the instructions that

18   resulted in those various iterations of the instructions

19   was time very well spent.  On the whole, I think we have

20   arrived at a fair and accurate set of instructions.

21        Obviously, the word "additional" in the six places

22   -- the six, if you'll pardon the expression, additional

23   places that it appears must be deleted, and then to

24   conform, the closing instruction to the verdict form, the

25   final sentence on page 57 will be deleted.  And I will

1    make that substitution in the official version of the

2    instructions.

3         Anything further before we take a short recess?

4              MR. O'REILLY:  No, Your Honor.

5              MR. SPRINGER:  No, Your Honor.

6              MR. STILLEY:  No, Your Honor.

7              THE COURT:  Very well.  We'll stand in recess.

8         (A RECESS WAS HAD, AFTER WHICH THE FOLLOWING

9    PROCEEDINGS WERE HAD IN OPEN COURT AND WITHIN THE

10   PRESENCE AND HEARING OF THE JURY.)

11             THE COURT:  Welcome back, members of the jury.

12   We'll now have the opening portion of the closing

13   argument on behalf of the government.  The reason I say

14   "opening portion" is that because the government has the

15   burden of proof, the government is entitled to present an

16   opening portion of closing argument, then we hear closing

17   arguments of the defendants, and then the government will

18   have an opportunity for what is called "rebuttal

19   closing."  And at that point, the case will be yours for

20   your deliberations and verdict.

21        The government may proceed.

22             MR. O'REILLY:  Thank you, Your Honor.  Ladies

23   and gentlemen of the jury, may it please the Court,

24   Mr. Springer, Mr. Stilley.  Over the past several weeks,

25   you've heard and received a lot of information in the

1  form of testimony from that witness chair, in the form

2  even of deposition testimony from Ms. Wiggins, and in the

3  form of documentary evidence, which will be in binders

4  for you to review.  This evidence has all been put before

5  you in order to allow you to determine if Mr. Springer

6  and Mr. Stilley conspired to defraud the Internal Revenue

7  Service and if they agreed and helped to cheat on

8  Mr. Springer's taxes and specifically to evade

9  Mr. Springer's taxes for the years 2003 and 2005 with

10  respect to both Mr. Springer and Mr. Stilley and with

11  respect to the year 2000 with Mr. Springer alone.  And

12  just the reason for 2000 alone for Mr. Springer is that

13  they didn't start using Mr. Stilley's IOLTA account to

14  cheat on Mr. Springer's taxes until 2003.

15       The answer that you will reach, I am certain, is,

16  yes, that's what they were doing.  Most of the elements

17  of these crimes aren't even contested.  What Mr. Springer

18  and Mr. Stilley have presented in the way of their

19  defense is that this is in all good faith, they didn't

20  think they really had to file tax returns, they didn't

21  think they really owed any taxes.  Their claim is simply

22  false.

23       As the Court has already instructed you, this good

24  faith defense is a defense to the element of willfulness,

25  which you also received instruction on.  And willfulness

2980

1    requires proof that the defendants knew of the legal

2    duty, and in this case to file tax returns and to pay

3    taxes, and that they intentionally and voluntarily

4    violated that duty.  Good faith does not allow one to

5    know the law and just simply disagree with it and violate

6    it.  And that is what the evidence in this case

7    unquestionably shows.

8         And just to actually read what the good faith

9    instruction says is "a defendant's disagreement with the

10   law, no matter how earnestly held, does not constitute a

11   good faith misunderstanding or mistake."  It is the duty

12   of all citizens to obey the law regardless of whether

13   they agree with it.

14        The evidence is uncontroverted that both

15   Mr. Springer and Mr. Stilley were very knowledgeable

16   about the laws regarding taxes and it is similarly

17   uncontroverted that they willfully violated those laws.

18   Did Mr. Springer earn income?  Of course, he did.  Like

19   anyone else trying to put food on the table, a roof over

20   his family's head or a Mercedes or a Lexus in the garage,

21   he earned income.  And he earned it by working with

22   Mr. Stilley and others helping people with legal problems

23   with the IRS.

24        People paid him to help with these situations.

25   People like Ms. Wiggins, who you saw on the video.

1   Ms. Wiggins had no question, she paid Mr. Springer for

2   services.  She was -- she didn't even care about the

3   cause or mission of Bondage Breakers Ministry, she just

4   wanted her money back, and that's what she hired

5   Mr. Springer to do.  And that's what he got paid for.

6   Similarly, Dr. Roberts, who testified in that chair said

7   he paid Mr. Springer as well as Mr. Stilley to help him

8   with his legal problems with the IRS.

9       Mr. and Mrs. Patterson both testified similarly,

10  they paid Mr. Springer money to help them with their

11  legal problems.  Mr. Bennett from Hawaii, same thing.

12  Dr. Pizzino, the Connecticut dentist, also paid

13  Mr. Springer to help him with problems with the IRS.

14  There can be no serious dispute that Mr. Springer earned

15  income.

16      And during cross-examination, Mr. Springer actually

17  conceded that, yeah, he now recognizes it was income.

18  And just as Mr. Miller from the IRS explained, as he

19  summarized all the evidence, the income that Mr. Springer

20  earned was taxable and had tax consequences.

21      And if we can have Government's Exhibit 683

22  published to the jury, which you have for your

23  consideration, and those show the tax computations for

24  each year based upon the summary of all of the evidence

25  that has been presented to you, including the expenses

1    that were included in Exhibits 300 through -- into the

2    500s.  And as you saw, Mr. Springer did attempt to put a

3    couple of additional expense items in during his case.

4    Those expense items were already in the government's

5    calculations.  Mr. Miller had already given Mr. Springer

6    credit for those.

7        And also remember that Mr. Miller did not have the

8    benefit when he did these tax calculations of the extra

9    $1,000 a month that Mr. Springer admitted he received in

10   cash and he also didn't have the benefit of Mr. Stumpo's

11   $3,750 in 2003.  That would simply increase the

12   additional tax due and owing that you see.  And with

13   respect to the years 2000, 2003, and 2005, which each

14   allege tax evasion, there is a substantial tax due and

15   owing.

16       With respect to Count 5 charging Mr. Springer with

17   willful failure to file, Mr. Springer was successful in

18   hiding income, but we were still able to establish that

19   he met the threshold requirement or the filing

20   requirement as is referenced on that chart.  Mr. Springer

21   earned more than $7,700 in gross income for that year and

22   it was that low of amount because he was single in 2002.

23       For Count 6, which charges failure to file for 2004,

24   the filing requirement was $15,900 and that's because by

25   that point, Mr. Springer had remarried.  And as you can

1   see from Mr. Miller's chart, Mr. Springer easily exceeded

2   that filing requirement.

3       As indicated in there, the tax -- additional tax due

4   and owing for the year 2000 was $32,979; for the year

5   2003, it was $97,223; and for the year 2005, it was

6   $41,189.  These figures are not realistically in

7   dispute.  What is in dispute and what has been contended

8   is whether Mr. Springer and Mr. Stilley conspired to

9   defraud the Internal Revenue Service and to evade

10  Mr. Springer's income taxes or whether they in good faith

11  believed, albeit incorrectly, that the money Mr. Springer

12  received was not taxable but was only gifts and

13  donations.  And I have set aside the hours spent on the

14  Paperwork Reduction Act gibberish because it is just

15  that, gibberish.

16      As a tax court previously described some of

17  Mr. Springer's other arguments, it is nothing but tax

18  protestor rhetoric and legalistic gibberish, and both

19  Mr. Springer and Mr. Stilley are too well-versed in the

20  law and in the cases to have any good faith belief in the

21  Paperwork Reduction Act.  The fact that they disagree

22  with the law is not good faith.  And as was indicated in

23  the direct testimony of the defendants, they have seen a

24  number of their clients go to jail for willfully failing

25  to file despite raising this frivolous defense.

1      Mr. Springer told an interesting story about when he

2  went to visit a pastor back when he had tax problems.

3  And he asked the pastor, as he indicated, what should I

4  do if I have problems with the IRS?  And the pastor gave

5  him some good advice, go see an accountant or a lawyer.

6  And Mr. Springer told you he refused to follow that good

7  advice.  Instead, Mr. Springer decided to defy the law

8  and evade his federal income taxes.  When you consider

9  all the evidence in this case, you will conclude rather

10  easily that both Mr. Springer and Mr. Stilley willfully

11  acted.  They did not act in good faith.

12      They both knew that Mr. Springer was earning income

13  and that is why they both lied to Special Agent Shern

14  when he was asking them about the money.  Mr. Springer

15  lied during the search warrant.  Mr. Stilley lied when he

16  was served with a subpoena.  And what's interesting and

17  what is good evidence of the conspiracy is that they told

18  the same lie.  They had worked out the same false story

19  to tell Mr. Shern or any other IRS person that came

20  around.  And it was designed -- this lie was designed for

21  one purpose, to evade Mr. Springer's taxes.

22      Now, let's focus on Mr. Stilley for a bit because he

23  has been less of a focus on this trial than Mr. Springer

24  has.  Mr. Springer's taxes are in issue, but Mr. Stilley

25  is an attorney.  He has practiced in the world of

1   criminal tax for many years.  And as Mr. Miller, the
2   summary witness, told Mr. Stilley in response to
3   Mr. Stilley's last question in cross-examination, you're
4   a smart man, Mr. Stilley, you know that work is being
5   done by Mr. Springer.
6        And Mr. Stilley is a smart man.  He has a law
7   degree.  He has practiced law.  And he knows that his
8   story about Irwin Schiff and believing him is
9   preposterous.  Even his co-defendant, Mr. Springer,
10  acknowledged that Mr. Schiff is a fraud and a three-time
11  convicted tax fraud.  Again, willfulness and good faith
12  mean that you don't know what's going on, not that you
13  disagree with it and not that you want to hide.
14       Mr. Stilley is well aware that when individuals
15  perform services they've earned income and they have a
16  duty to file tax returns and pay taxes.  And that's what
17  this case is about.  It's about the fact that
18  Mr. Springer has not and has evaded his tax obligations
19  for years.  And, specifically, we're looking at the years
20  2000 through 2005.  But as the evidence indicated,
21  Mr. Springer is still evading or attempting to evade the
22  taxes that have been placed on him for the years 1990
23  through 1995.  That is being handled civilly.  But as he
24  told you, he has not paid a dollar, not voluntarily, at
25  least.

```
1           And the fact that Mr. Springer is trying to evade
2    his taxes is why both he and Mr. Springer -- excuse me,
3    he and Mr. Stilley lied to Special Agent Shern.  And it's
4    why Mr. Stilley presented the lie in Government's Exhibit
5    582, which is the response to grand jury subpoena that he
6    prepared and presented to the grand jury in Tulsa on
7    March the 9th of 2006.  And in that it states the lie,
8    "Lindsey Springer does not charge for his services."
9    You've heard testimony from the witness stand and from
10   the deposition of Mrs. Wiggins, Mr. Springer did charge.
11          He didn't issue billing statements, he didn't create
12   any record of income, and he certainly didn't keep any
13   records at his house that the IRS might find in a search
14   warrant, but he asked people to pay him to help them.
15   And people did.  They were desperate, they needed help.
16   And Mr. Springer used that to get money out of them.
17          And as the evidence shows and as Mr. Stilley even
18   conceded in cross-examination, Government's Exhibit 582
19   is misleading in another way.  It grossly understates the
20   contacts that Mr. Stilley had with Mr. Springer when
21   representing various individuals.  And there's only one
22   reason for that.  It's not as he tried to say, oh, blame
23   it on Mr. Coker.  No, it's because he was trying to hide
24   the fact of how much he and Mr. Springer were working
25   together.
```

 1      That lie about Mr. Coker is not credible.  And when
 2 Mr. Stilley said that he didn't think anybody had a duty
 3 to failure to file, that's just false, because he's seen
 4 far too many people go to jail for the crime of willfully
 5 failing to file.  And he has been told far too many times
 6 by courts and by Mr. Miller and other people within the
 7 IRS that there is a legal obligation to file returns when
 8 you earn income.
 9      Mr. Stilley's purported reliance on Mr. Irwin Schiff
10 could be demonstrated as a lie because when Dr. Pizzino
11 relied on Mr. Schiff and he was facing serious problems,
12 he was facing potential criminal prosecution, and that
13 was the dentist from Connecticut, Mr. Schiff -- I mean,
14 excuse me, Mr. Stilley and Mr. Springer went with
15 Dr. Pizzino and convinced the IRS that Dr. Pizzino wasn't
16 the one to blame, it was Mr. Schiff's fault because
17 Mr. Schiff gave fraudulent and bad advice and Dr. Pizzino
18 stupidly followed it.  And the IRS walked away from that
19 investigation, they did not prosecute him.  That's the
20 same Irwin Schiff that Mr. Stilley told you he still
21 believes to this day.
22      Let's look at additional evidence that the
23 defendants knew this was income.  Mr. Springer maintained
24 no bank account.  He cashed every check he got through
25 Mr. Delozier because Mr. Delozier would do that for him

 1   and didn't mind that he didn't put his social security

 2   number on the currency transaction reports.  Mr. Springer

 3   cashed hundreds of thousands of dollars of checks through

 4   Kenny Delozier.

 5        Instead -- and what he chose to do when he did that

 6   was instead of having a bank account and maybe paying a

 7   nominal $7 to $10 monthly fee, he elected to pay 2 to 3

 8   percent on every check he cashed at Mr. Delozier's rather

 9   than risk detection of the fact that he was evading his

10   income taxes.  And he kept no records of these payments

11   at his house.  He testified to that.  He did try to get

12   you to believe that Mr. Delozier was his record keeper.

13   That's just silly.  Mr. Delozier provided a service of

14   cashing checks.  He was not Mr. Springer's bookkeeper or

15   accountant.  He was his check casher.

16        With respect to those checks, Mr. Springer ended up

17   spending in the years 1999 through 2007 on the exhibits

18   that are in Government's Exhibit 61 alone over $26,000 in

19   check cashing fees.  And there's only one reason to spend

20   $26,000, the price of a car, there's only one reason he

21   did that, he was trying to evade detection of his income.

22        If Mr. Springer had truly believed that the funds

23   were not taxable because of this Paperwork Reduction Act

24   or because they were gifts, he would have opened a bank

25   account, deposited the checks with little or no cost, and

1  saved more than $25,000.  Mr. Springer didn't do that

2  because he's a tax cheat.

3      Another piece of evidence showing that the

4  defendants knew it was income was, as I indicated before,

5  Mr. Springer consistently omitted his social security

6  number on the forms that Mr. Delozier -- from checks

7  cashed filed with the IRS.  Mr. Springer knows that if he

8  put his social security number on there that would have

9  flagged the IRS that he was getting a lot of money.

10      Mr. Springer's conscious decision to omit his social

11  security number was done for one simple reason,

12  Mr. Springer didn't want the IRS to know how much he was

13  making.  This omission is proof of Mr. Springer's

14  willfulness and knowledge that he was evading income

15  taxes.

16      Similarly, with all of the payments Mr. Stilley made

17  to Mr. Springer, and I believe Mr. Springer testified

18  that it was -- he said over 400,000.  I think you've got

19  about 230,000 in evidence.  Mr. Springer -- Mr. Stilley

20  never filed any form with the IRS indicating he was

21  making payments either to or on behalf of Mr. Springer.

22      And if we could have just the summary of the

23  payments.  And you'll have all of these exhibits.  You

24  won't have this chart.  But Exhibit 25 as indicated down

25  through 135 will all be for you to consider.  These are

```
 1   all items that Mr. Stilley caused to be transmitted to
 2   Mr. Springer.  As I indicated, it's about $230,000 from
 3   June of 2003 to August of 2006.  That's almost a quarter
 4   of a million dollars.
 5        And as I indicated earlier, an additional piece of
 6   evidence showing the conspiracy is that these two made
 7   the same false representations.  That Mr. Springer earned
 8   no income and that people didn't expect anything for his
 9   services.  You've heard the witnesses, they all expected
10   something, they expected to be helped.  They didn't
11   expect a billing statement.  Mr. Springer was absolutely
12   clear, he's not going to give them a billing statement.
13   And Mr. Springer did ask many of them to write "donation"
14   or "gift" on the check, because that was part of his
15   evasion.  But what Mr. Springer was doing was providing a
16   service and he was getting paid for that service.
17        And as has become extremely clear at this trial,
18   Mr. Stilley and Mr. Springer worked very closely
19   together.  They obtained a lot of money from desperate
20   people willing to pay Mr. Springer and Mr. Stilley
21   anything to either stay out of or to try to get out of
22   prison.  On a few occasions they were successful,
23   Mr. Turner and Dr. Pizzino, they -- Mr. Springer and
24   Mr. Stilley did keep them out of jail.  Many others were
25   far less fortunate.
```

 1      And as I indicated, even after some of these folks
 2 were in jail, Mr. Springer and Mr. Stilley kept preying
 3 on them, getting more money out of them, conning them or
 4 their loved ones out of money because of the desperate
 5 situation they were in.  People like the Ouwengas and
 6 Laurel Gardner; people like the Hawkins, both Art and
 7 Cindy, who testified here.
 8      And as was admitted by Mr. Springer and was
 9 indicated by Special Agent Shern, Mr. Springer kept no
10 records of the payments he received.  And the reason he
11 kept no record was because he knew that if anybody ever
12 came across a record of payments he would be where he is
13 today, facing the fact that he had earned hundreds of
14 thousands of dollars providing legal services or other
15 assistance to people and he would have to pay taxes on
16 it.  And that was one thing that Mr. Springer did not
17 want to do.  He didn't want to pay taxes, either to the
18 IRS or to the state of Oklahoma.
19      Mr. Springer's and Mr. Stilley's consistent pattern
20 of conceit and concealment -- not conceit, I apologize,
21 deceit and concealment further undermines any credibility
22 that could be given to their asserted good faith.  You
23 don't hide and you don't lie when you've got nothing to
24 conceal.
25      The mission of Bondage Breakers Ministry, I think

1  was stated at the beginning, was to get rid of the IRS.
2  That's not disputed and let's make one thing very clear,
3  that's not why Mr. Springer is on trial.  Many people
4  would say, good, get rid of it, as long as we have some
5  other way to raise taxes.  Mr. Springer and Mr. Stilley
6  are on trial because they cheated on taxes and because
7  they attempted to defraud the IRS.
8      As Mr. Springer himself admitted, the IRS has been
9  trying to collect taxes from him civilly for years, but
10 Mr. Springer will not adhere to the law and refuses to
11 pay taxes.  That's why we're here today.
12     Mr. Stilley is on trial for an equally simple
13 reason, he willfully attempted to evade Mr. Springer's
14 federal income taxes by using his IOLTA account and by
15 lying to the IRS and to the grand jury when they were
16 trying to figure out did Mr. Springer owe taxes and, if
17 so, how much.
18     Mr. Stilley is absolutely correct when he says that
19 he is not on trial for tax fraud with respect to his own
20 taxes.  As an Arkansas resident, this isn't the
21 appropriate venue for any charges if they were
22 appropriate.  However, Mr. Stilley's willful failure to
23 file is very good evidence for you to consider as to
24 whether Mr. Stilley in good faith just happened to be
25 walking alongside Mr. Springer or whether they conspired

1   to cheat the IRS and to evade taxes.  As the evidence

2   demonstrates, Mr. Stilley did just that.  He conspired

3   with Mr. Springer to cheat on Mr. Springer's taxes.

4       As I indicated earlier, there's no serious dispute

5   that income was earned and there's no serious dispute

6   that there is tax due and owing or that tax returns

7   should have been filed.  What this is about is whether it

8   was just by mistake.  But throughout this trial,

9   Mr. Springer and Mr. Stilley have sought to mislead you

10  just as they sought to mislead the IRS.  Mr. Springer

11  read from materials that he claimed he relied on, he

12  omitted telling you the most relevant parts, including

13  footnote 50 from that GAO report where it stated that,

14  guess what, filing tax returns is statutorily mandated.

15      Also, when he read from the note from the

16  commissioner from 1992's instruction booklet and omitted

17  the passage that said -- talked about it being voluntary,

18  but then he omitted the passage that said, "We will

19  direct our enforcement efforts toward those who willfully

20  fail to report and pay the proper amount of tax."  And he

21  also didn't highlight but did admit on cross-exam that in

22  each information book for the years 2000 through 2005

23  there's a passage that advises each of us of the criminal

24  sanctions for tax evasion and willfully failing to file

25  tax returns.  But Mr. Springer did say he read those

1    earnestly and he knew them front to back.  So he knew

2    that he had to file tax returns and that there are

3    penalties for tax evasion.

4        Similarly, Mr. Stilley lied when he told you he

5    didn't believe tax returns had to be filed and he -- when

6    he denied that he conspired with Mr. Springer.  The

7    evidence is overwhelming that they did just that.  You

8    can consider the defendants' representations or

9    misrepresentations to you like a glass of milk.  And I

10   think we've all been in that situation where you go to

11   the refrigerator, you pour yourself a glass of milk, you

12   take a sip, and it's bad.  It's sour, it has gone bad.

13   And that's when you taste the testimony from the

14   defendants and it just doesn't add up, it's bad.  With

15   that glass of milk, you don't pour a little bit out and

16   then say, okay, let's try it again.  The milk has gone

17   bad, just like their representations are bad.  You throw

18   out the milk.  You toss out what's not good for you and

19   what's bad.  The defendants' credibility is bad and

20   should be tossed out.

21       The evidence establishes that Mr. Springer has

22   cheated on his taxes for years and that in 2000

23   Mr. Stilley joined forces with Mr. Springer and these two

24   con men and tax cheats began the conspiracy to defraud

25   the IRS and evade Mr. Springer's taxes.

1        Mr. Springer used his ill-gotten and untaxed gains

2   to live a very luxurious lifestyle involving Lexus cars,

3   Mercedes Benzes, luxury motor homes, nice jewelry for his

4   wife, and outings at Meadow Brook Country Club.

5        A movie stub found during the search warrant that

6   was executed at Mr. Springer's home neatly captures the

7   essence of Mr. Springer's and Mr. Stilley's long-standing

8   commission of tax fraud.  And if we can get Government's

9   Exhibit 535.  If you've seen it, it's the movie "Catch Me

10  If You Can" that starred Tom Hanks and Leonardo

11  DiCaprio.  And in that movie, Tom Hanks is an FBI agent

12  chasing a con man for years.  And that cheat is played by

13  Mr. DiCaprio.  Mr. Hanks finally catches his elusive

14  quarry.

15       Mr. Springer, Mr. Stilley, you have cheated the IRS

16  for decades, but we have caught you.  And I ask you to

17  convict each of these defendants of each charge with

18  which they have been charged in the indictment.  Thank

19  you.

20            THE COURT:  We'll now have the Defendant

21  Springer's closing argument.

22            MR. SPRINGER:  Your Honor, please the Court.

23  Mr. Burton, Mr. Williams, Mr. Stilley, Mr. O'Reilly,

24  Mr. Snoke, Mr. Shern.  That was hard to listen to.  And

25  I've had to listen to it for quite a while actually.

1       But I want to start out by drawing your attention to

2   Government's Exhibit 581, because Mr. O'Reilly said

3   Mr. Stilley went to the grand jury, that he -- he lied to

4   them.  And this is a point of contention.  This is it

5   right here.

6       There's two stories going on.  And I thank God that

7   we have juries.  Because if I had to rely on

8   Mr. O'Reilly's story, which I've had to endure for quite

9   a while, then I wouldn't even have the opportunity to

10  read this passage to you.  But it's on page 6 and it's

11  Mr. Stilley answering questions before the grand jury,

12  the same day that he supposedly gave Government's Exhibit

13  582 where he says, "Lindsey Springer doesn't charge for

14  his services."

15      And listen to his under-oath testimony.  "Okay.

16  What cases have you worked with Mr. Lindsey Springer on,"

17  Douglas Horn asks.  Stilley answers, "I couldn't list all

18  those off.  Let me put it like this:  Just about any time

19  I have a case that involves taxes, and I also, if it

20  involves taxes or securities, federal case, you can just

21  count on it that I'm going to discuss it with Lindsey

22  Springer.  I will call him.  Now, let me explain.  You're

23  probably looking that there are only two pages of

24  documents there.  I went on my computer and did a search

25  for Lindsey Springer.  However, getting a complete list

1  of every time that I had a communication with Lindsey
2  Springer would -- I didn't see any way that I could do
3  that.  Because many times, what I did is look at my
4  billing records.  And many times on my billing records,
5  it would simply say 'phone call' or something like that
6  and doesn't say who the person was that I talked to."
7      Now, does that sound like Oscar Stilley is trying to
8  mislead the government about his communications with
9  Lindsey Springer?  I assert to you that it didn't to me.
10 But I wasn't privy to this testimony until this case was
11 brought.  I never got to see these words.  I was told
12 what Mr. Stilley said he said, but that was all that I
13 knew.
14     And addressing the question about why I answered the
15 questions that Mr. Shern asked me the way I did.  First
16 of all, I fully understood and I believe Mr. Shern fully
17 understood that you cannot be answering a question about
18 why people gave you money without the understanding they
19 gave you money.  However, what I was not willing to say
20 because of the communications with each person is that I
21 did not send them a bill.  There was no way for me to
22 compel them to give me any money.  I had no leverage.  I
23 had no rights.  I couldn't go sue them if they didn't
24 give me any money.  And, in fact, in most cases, most
25 cases, I never received any money from anybody.

1      Now, that does become an issue when you're trying to

2  raise money.  And I'm quite thankful for the money that I

3  did raise.  Because when people start getting asked

4  questions by the special agents of the IRS about why they

5  gave you money, you can certainly bet they're not going

6  to be giving you any more.  And for four years, I've had

7  to endure that.

8      You saw testimony where I had cars and I was asked

9  by Mr. O'Reilly how much did those cars cost me.  And I

10  calculated very quickly $70,000 over six years.  Do you

11  know how I did that?  Because I had to sell the cars.  Do

12  you know why I had to sell them?  Because I had to

13  survive.  I could never have made it this far without

14  each of those transactions.

15      Now, there's Exhibit 675, 676, 677, 678, 679, and

16  680.  And I'd like you to walk down the list with me and

17  ask how many of these transactions do you remember went

18  through Mr. Stilley's IOLTA account.  Did Vikki Wiggins'

19  money go?  No.  Second check from Nation of Levites?

20  No.  Did any of the four checks from Dr. Roberts, who

21  Mr. Stilley represented, go through the IOLTA account of

22  Mr. Stilley?  No.  How about Eddy and Judy Patterson?

23  No.  Those checks went directly to Lindsey Springer.

24  Garlin Associated Ministries again?  No.  Manufacturers

25  Bank, James Lake?  No.  Two in a row, Mr. and

1    Mrs. Patterson again?  No.

2        Now, in 2000, the government tells you that a

3    conspiracy began with me and Mr. Stilley.  I receive

4    $160,000, their entire theory for the year 2000, and not

5    one dollar went through IOLTA in Fort Smith, Arkansas.

6    Something they just can't see.

7        For the year 2001, not charged in the indictment

8    specifically but part of the alleged conspiracy, there

9    are three checks listed:  17,500 from Mrs. Wiggins,

10   17,500 from Mrs. Wiggins, and then Roberts Chiropractic

11   again.  So in 2001, we've got the entire theory of the

12   government's case for 2001, although it's not charged,

13   and, again, not a dime goes through the IOLTA account,

14   not a single dime.

15       Government's Exhibit 677 has four checks listed for

16   2002.  You can see all four of them.  They're all four

17   from Chippewa Trails, Inc.  It's clear Arthur Hawkins was

18   a client of Oscar Stilley.  There's no dispute over it.

19   And not one dime of that money went through an IOLTA

20   account.  Every bit of it went straight to Lindsey

21   Springer or Bondage Breakers Ministries.

22       Now, in 2003, this is where the government's case

23   gets some steam.  But we have to walk through and look at

24   the whole list.  Because out of all the transactions,

25   only three basic transactions that they could have

1    possibly claimed was in an income -- or gross income
2    bracket went through Mr. Stilley's IOLTA account.
3    They're not saying that borrowing $37,000 to buy a
4    Corvette was gross income.  And they've also admitted out
5    of the 90,000 that Mr. Patterson agreed to give me, the
6    last 12 paid back that loan.  There's no evading any tax
7    on that transaction, even in their theory.
8        Did the IRS need to know about me buying a car and
9    borrowing money?  I don't know of any place where that
10   became an issue.  And I also didn't know Mr. Stilley's
11   account wasn't subject to audit.  I believed at all times
12   that it was.  And I have to tell you, although
13   Mr. Stilley is not one of the best lawyers I've ever
14   seen, he keeps some very good records.  It's one of the
15   reasons why the Ouwengas used Mr. Stilley, even though
16   they paid Mr. Barringer.  But you know what?  None of the
17   money from the Ouwengas ever went into Stilley's account
18   and to Lindsey Springer.  Again, demonstrating there's no
19   conspiracy to evade any taxes by using Mr. Stilley's
20   IOLTA account or defrauding the IRS of any money.
21       Look at the first four entries on 2003.  Arthur
22   Hawkins, Cynthia Hawkins, Cynthia Hawkins, Cynthia
23   Hawkins.  No IOLTA whatsoever.
24       Then we have Chippewa Trails, IOLTA, number 5.  And
25   then here's where we get into a problem.  This is the

1  point of contention.  These transactions with Eddy

2  Patterson in 2003, they all of a sudden make this theory

3  that reaches back into 2000, and it's still going on as

4  we sit at this table right now.  Can you imagine

5  defending yourself as an object of a conspiracy?

6      Michael Burt, not a dime went through Mr. Stilley's

7  IOLTA account.  Mr. Turner's thousand dollars?  Nope,

8  didn't go through any IOLTA account.  Mr. Turner's,

9  again, $12,500, straight to Lindsey Springer.  Cynthia

10  Hawkins?  Nope, not to Mr. Stilley's IOLTA account.

11  Carter Numismatics for coins never touched Mr. Stilley's

12  IOLTA account.  Andrew Ouwenga to Lindsey Springer?

13  Nope, not a dime.  And then we go to Eddy Patterson.

14  And, again, here we are.

15      Now, in order for these all to be evidence of a

16  conspiracy to defraud the United States, you've got to

17  buy into something that is just not buyable.

18      Mr. Patterson didn't know until a week and a half or

19  two weeks before his trial that he was even going to be

20  getting $375,000 from the insurance company.  Not two

21  weeks before his trial.  To buy the government's theory,

22  we were con men waiting in the wings for the insurance

23  company to come in and try to buy that contract so we

24  could scavenge Mr. Patterson's money.  It's just not

25  believable because it's not true.

1      Mr. Russell Young, third from the bottom on

2  Government's Exhibit 678, didn't go to Mr. Stilley's

3  IOLTA account.  And then, if you notice, the testimony,

4  withdrew 30,000, because that 30,000 right there was the

5  cashier's check that when Mr. Patterson asked me to go

6  over and get 35,000, which is listed right here, that I

7  got him a $30,000 cashier's check made payable to Tulsa

8  Sales and Rental and I gave him $5,000 in cash.  Which is

9  what he asked me to do.

10      Never thought about how that would look in a jury

11  trial, never once.  And neither did Mr. Stilley and

12  neither did Mr. Patterson.  I did what I was asked to do

13  and there's no dispute that none of that money is taxable

14  to Lindsey Springer, no matter whose theory you're

15  sitting here on, whatsoever.

16      So out of four years of transactions, so far, all

17  we've got is Mr. Patterson and an IOLTA transaction based

18  upon a $375,000 purchase of an insurance policy just a

19  few weeks before trial.  And that was his third scheduled

20  trial.  What were we going to do on the first two when

21  the insurance company didn't call up and say, hey, we

22  want to buy your policy?  See, it just doesn't make any

23  sense.  What does make sense is, as Mr. Stilley said to

24  you in the grand jury testimony, that I never refused his

25  calls and I didn't refuse anybody's calls.

1    Now, I understand what Mrs. Hawkins said up there
2  about $500,000.  And she just misunderstood.  I don't
3  know how else to explain it.  But I knew through my
4  information in the war room, as I testified, she didn't
5  have any money.  But if you're going to take on the
6  United States Department of Justice, you're going to need
7  a team of lawyers, because they have billions of dollars
8  in budget.  And that's just the way it is.
9    Here is gross income for 2004.  Let's walk through
10 and see what went through Mr. Stilley's IOLTA account.
11 Mrs. Hodsden Mayberry 2000, LLC?  Nope, didn't go through
12 the IOLTA account.  Friendship Enterprises, Patrick
13 Turner, $500?  Nope, didn't go through the IOLTA
14 account.  Friendship Enterprises, another $500?  Nope,
15 straight to Lindsey Springer.
16   Lone Star Holding, Andy Ouwenga, 25,000, didn't go
17 through the IOLTA account, went straight from
18 Mr. Ouwenga's family's trust account to Lindsey
19 Springer.  Denny Patridge?  Nope, didn't go into
20 Mr. Stilley's IOLTA's account, went straight to Lindsey
21 Springer.  Lone Star Enterprise Holding Trust, Andrew
22 Ouwenga, the second from the bottom one, didn't go into
23 the IOLTA account, went straight to Lindsey Springer.
24 Friendship Enterprises, Patrick Turner, $500, straight to
25 Lindsey Springer, no IOLTA.

1       And the allegation that the government is trying to

2   sell you, which is false, is that at this point, we're in

3   a full-fledged, full-blown conspiratorial agreement.

4           THE COURT:  Mr. Springer, Exhibit 680 is not in

5   evidence.  Now, if the government has no objection to

6   your reference to it, I'll receive it in evidence.

7   Mr. O'Reilly?

8           MR. O'REILLY:  Objection, Your Honor.

9           THE COURT:  Pardon me?

10          MR. O'REILLY:  Objection.  If it's not in

11  evidence, I don't want --

12          THE COURT:  680 is not in evidence.

13          MR. SPRINGER:  I'm sorry.  681.  There were two

14  theories in this case.  One was whether the $250,000 from

15  Mr. Turner is a loan or whether I just conned him out of

16  $250,000.  And let's just look at the con, because you're

17  going to have to buy it this way.  I had nothing to do

18  with him borrowing that money.  I was waiting until he

19  borrowed it, but I didn't know.  And then when he got it,

20  I said, hey, loan it to me.  I'll write up a very artful

21  and crafty gift loan agreement.  Send it to me.  And all

22  the time I was going to steal it from him.  I was going

23  to buy an RV with it and I was going to con him out of

24  it.

25      But somewhere between the time I bought it and the

1  time that I got to the tag office, I changed my mind.

2  Instead, I put a lien on it in favor of Mr. Turner.  Does

3  that make any sense?  Guess what he got in the mail from

4  the Oklahoma Tax Commission?  The only documents that

5  could ever release that lien.  He's the one that received

6  them, not Lindsey Springer.  I can't make him sign that

7  release.

8      But Mr. Miller said after he heard Mrs. Hawkins talk

9  about me telling her that I needed $500,000 to take on

10  the Department of Justice over prosecutorial misconduct

11  of her husband, which is totally false, that that's what

12  changed Mr. Miller's mind about what made that

13  transaction go from a loan to gross income for Lindsey

14  Springer.  That's what he said, we all heard it, and we

15  asked it several times.

16      Now, on Government's Exhibit 681, Denny Patridge did

17  not go through the IOLTA account.  Friendship

18  Enterprises, Patrick Turner, $1,000, didn't go there.

19  Friendship Enterprises, Patrick Turner, didn't go

20  through, number 3, straight to Lindsey Springer.  Patrick

21  Turner, 192,000, went straight from Mr. Turner to an

22  IOLTA account; 58,000 went straight to the IOLTA

23  account.  And then guess what?  Denny Patridge, 10,000,

24  never went to any IOLTA account.

25      Now, the government would have you think that we

1  have this huge conspiracy to hide all this money that

2  came to me.  But how many of the transactions went into

3  the IOLTA account?  Five percent or less.  You can do the

4  math.  The majority of the transactions that are alleged

5  went straight to me.  And there are checks that you've

6  seen in this case that are not alleged to be gross income

7  to Lindsey Springer.

8       Do you remember when Mr. Turner was on the stand?

9  Mr. O'Reilly showed a $100,000 cashier's check from

10 Believers Broadcasting Corporation to Lindsey Springer.

11 It's not listed.  There are many checks not listed.  He

12 left them out.

13      Do you remember the names that he called out before

14 you were picked as a jury?  Do you remember hearing the

15 name before you were picked for a juror, Robert Cavins?

16 Didn't bring him in.  Brian DiMercuiro?  Didn't bring him

17 in.  Guy Francis?

18           MR. O'REILLY:  Your Honor --

19           MR. SPRINGER:  Didn't bring him in.

20           MR. O'REILLY:  Objection to this form of -- it's

21 improper to be testifying who wasn't brought in.

22           THE COURT:  Sustained.

23           MR. SPRINGER:  If you extract out that I wasn't

24 trying to hide any money received by me through the IOLTA

25 account and that I had no control over Mr. Patterson and

1  how he wanted to give me money, maybe today I would have

2  said give me one $60,000 cashier's check instead of

3  three.  It's just easier when you have to live like I

4  have to live, it's easier to go cash one $20,000 check

5  than it is to have to go in and cash a $60,000 check.

6      Tried to keep a rule of how much money I would keep

7  on hand in my house.  Do you remember when they -- the

8  testimony about when they seized money at my house, they

9  seized 19,000 -- approximately $19,000.  I just

10  replenished the money.  I was building a bus.

11      If you will remember Mr. Patterson's words -- and

12  this is Government's Exhibit Number 176.  This is before

13  he was convicted, before he was given nine years in

14  prison, and before he was offered a deal to get out of

15  jail.  This is before the government influenced his

16  words.

17      "Dear Lindsey, please find enclosed our donation

18  check, hopefully, as an encouragement to you to continue

19  your fight against the anti-constitutional issues

20  endorsed, encouraged, and policed by our government.  If

21  we had more Christians standing up for God's laws and for

22  rights of the American people, this would once again be a

23  country of the people, by the people, and for the people

24  endowed and blessed by its creator."  The last sentence

25  says, "Thank you for being willing to suffer persecution

1   to do that which is right.  In closing, please don't

2   forget to call Eric Lynch to discuss the issues he's

3   working on."  177 uses the word "donation" again.

4       I would like to remind you a little bit about what

5   I've been through to get here.  In 1990, I was held

6   liable for $100,000 in taxes and I had no idea about it.

7   And it was a penalty.  This alone made me want to

8   understand penalties.  The Paperwork Reduction Act has a

9   public protection provision in it that prohibits any of

10  us from being penalized if the government of the United

11  States and any of its agencies fail to comply.  And I

12  truly believe, truly believed that the IRS had not

13  complied.  But in 1990, I didn't know that.  And

14  Mr. O'Reilly said I went to church and I should have

15  listened to my pastor.  But I told you I did.  I went and

16  talked to Grant Cheadle, an attorney, and he told me he

17  can't do anything for me more than I could do for myself.

18      In 1990, the IRS levied two bank accounts, caused me

19  lots of legal trouble with bounced checks.  In 1991, they

20  audited me and then said it was over.  They were just

21  looking to see if they could get any more money.  In

22  1992, the day before my third child was born, the audit

23  was reactivated.  In 1992, right after Christmas, Bondage

24  Breakers Ministries was born.

25      From 1993 to 1996, I traveled all over the country.

1   I can't tell you how I went from where I was to that.

2   It's just an amazing step, one after the other.  And I

3   met so many people who had been impacted by the IRS.  And

4   I gave them my word I would never quit.  And I stand

5   before you today keeping my word.

6       A few days after we filed a lawsuit in 1994, the IRS

7   levied my home, my cars, and once again cleaned me out.

8   But it didn't deter me.  In 1996, they imposed a tax

9   liability on me through the Bureau of Labor Statistics

10  using the correct address.  I fought it.  It didn't deter

11  me.

12      In 1997, the tax court told me that my peonage

13  argument was frivolous.  I did not know in '97 what I

14  know now.  I've been learning this from the ditch.

15      In 1999, the IRS -- or excuse me, in 1997, the IRS

16  issued assessments against me, which is the proper

17  procedure.  But there was just one mistake they made,

18  they didn't want me to know about it.  They sent them to

19  the wrong address purposely.

20      In 1999, they issued notice of tax liens.  But under

21  the 1998 Restructuring Act, which I worked diligently to

22  have Congress pass, which brought a CDP right into play

23  for everybody so they could never back up to your home

24  and take stuff without a court order or your consent,

25  they decided to send me my lien notice to the wrong

1    address again.

2        Didn't hear anything from them until 2004 when Donna

3    Meadors sent me a 6700 letter saying she was

4    investigating me for selling tax abuse shelter programs.

5    Which if there was any evidence of that, they would have

6    brought it into this case.  She used 5147 South Harvard.

7    2004, December, she ended her investigation.  2005, the

8    IRS began collection procedures on Lindsey Springer.  And

9    they went right back to that wrong address again.  As

10   soon as they had to give me notices, they didn't want to

11   send them to the address that Donna Meadors used and that

12   they used on the notice of deficiencies.

13       In this case, they say using that act was somehow

14   misleading -- that address was misleading them.  And it's

15   the very address they used to develop their Bureau of

16   Labor Statistics liability in the first place.

17       In 2005, I raised the Paperwork Reduction Act

18   because I found out for the first time what they did in

19   1999.  And I raised it.  And that's when things really

20   heated up.  I told them their forms didn't comply.  They

21   said it was frivolous administratively.  I'm looking at

22   the form, I don't see an in compliance that they've said,

23   and they're telling me I'm not seeing something.  All you

24   have to do is go look at Defense Exhibit Number 24, 26,

25   28, 30, and 32, and I believe 25 through 33 are the

1    instructions, and look and see if you can see what
2    Mr. O'Reilly tells you the law says.  Because the forms
3    that I got off the IRS.gov didn't say it's mandatory.
4            MR. O'REILLY:  Objection.  The law should be
5    coming from the Court.
6            THE COURT:  Sustained.
7            MR. SPRINGER:  What I believed when I looked at
8    those forms is exactly what I told you from the witness
9    stand.  The day I raised my first PRA claim in federal
10   court was the day Mr. -- the next day Mr. Shern was
11   appointed to criminally investigate me.  I got a notice
12   of determination on August 16, 2005.  Had 30 days to
13   appeal that to the district court.  September 15, 2005, I
14   appealed that case to Oklahoma City.  September 16th,
15   Mr. Shern raided my home.
16       Three months later I was told that I had money
17   stolen from me.  They didn't use the word "stolen."  They
18   just left me to think I just have to give up $2,000.  I
19   wondered to myself, how many times had this happened and
20   nobody ever did anything about it?  And once again, I
21   decided that I was not going to let it pass in front of
22   my eyes.
23       In 2009 -- excuse me, in 2008, I was sued.  The IRS
24   said they had a lien against me.  They found out it was
25   released.  The Department of Justice called up the IRS

3012

1  and said revoke it.

2      I'd like to show you, ladies and gentlemen, what I

3  think tax evasion does not look like.  Tax evasion does

4  not walk into a place that has to fill out a currency

5  transaction report and put your name and your driver's

6  license on it.  Tax evasion tries to hide money.

7  Mr. O'Reilly clearly kept using the word "hide" in

8  Mr. Stilley's IOLTA account.  But I just walked through

9  every one of those transactions.  Most of them that are

10  on their charts never touched Arkansas, period.  Some of

11  these CTRs, though, they are for checks that came out of

12  the IOLTA account.

13      Now, if I was trying to keep the IRS in the dark,

14  it's obvious I knew about the currency transaction

15  reports because there is so many of them.  There's just

16  one after another in Government's Exhibit Number 58.  And

17  you are welcome to go through and look at how many there

18  are.  And understand it's my name on it.  And I want to

19  point out to you that in each instance, if you will look

20  at Section 14, right here, on every one of them, it says,

21  "If an individual, describe method used to verify

22  identity" -- and then it has an X -- "driver's license,

23  state ID."

24      Mr. O'Reilly wants you to think that when I handed

25  the thing they asked me to give them that I was trying to

1    hide something from the IRS.  And that was going
2    specifically on a document that was going to the IRS.  It
3    just doesn't make any sense.
4        I understand you're asking yourself why would I pay
5    $25,000 in the course of a year in check cashing fees.
6    Excellent question.  And the answer is, what were my
7    other alternatives?  Let me tell you what they were:
8    Depositing the checks that people gave me into somebody
9    else's checking account.  And guess what would have
10   happened had I had done that with all those checks?  I'd
11   be having to defend that as an act of tax evasion.
12       But instead, I paid $25,000 a year to see to it that
13   two things never happened.  One, that I never committed
14   any acts of tax evasion; and, two, a check never bounced
15   again.  I was never held liable for a bounced check.  I
16   was never accused of writing a bounced check.  And when I
17   walked away from a transaction, it was done, every time.
18       Now, those two $20,000 checks that Mr. Stilley gave
19   me from his IOLTA account on the $60,000, the three
20   checks that came from Mr. Patterson's 375,000, two of
21   those checks got endorsed over to a Chevrolet dealership
22   where I bought a Mercedes, a '99 Mercedes.  Do you know
23   what that car dealership did?  They filled out an 8300
24   form reporting that transaction to the IRS.  It's in the
25   records in this case.

```
 1        There are so many currency transaction reports in
 2   this case, the IRS, if you look in 61, there's a currency
 3   transaction report from 1999, well before when I met
 4   Mr. Stilley.  And by the way, it takes two to have a
 5   conspiracy.  I can't conspire with myself.
 6        If you watched the entire video of Ms. Wiggins --
 7   and she's deathly ill, very frail, and being taken full
 8   advantage of by the United States Government.  I asked
 9   her a question:  What's a "gift-out"?  Do you remember
10   it?  I asked her, what do you call when the investors
11   that you have are owed money in their accounts that you
12   have, the 3,500 that she said that she had?  They're
13   called "gift-outs."  And she sat there and stared at you
14   in the camera and she said she never would have given me
15   any money as a gift because they didn't have any money
16   because of all the bad things that had happened to them.
17        And if you watch the video, I carefully show you how
18   that's not true.  That at the time she gave me the money,
19   she actually thought they had just made $3 million and
20   that it was owed to her by the Nation of Levites.  And I
21   have to tell you, consistently, as I said from the
22   witness stand, I was so careful about how I communicated
23   with anybody on whether they gave me money or not.
24        There's an Exhibit Number 1, Defense Exhibit Number
25   1, which is Mrs. Wiggins when she's not influenced by the
```

 1   U.S. Department of Justice criminal investigators of the

 2   IRS and lawyers, where she says, "I've spent time with

 3   God tonight and am supposed to explain some things that

 4   only you will understand."  Does that sound like she

 5   hired me for a business?

 6       I told you about my death experience and what it

 7   entailed.  God has many of his assistants working with

 8   me.  God has given me the sensitivity of a newborn

 9   flower.  Contradictory of a warrior, I know.  If you

10   would read the entire letter, you will get the essence of

11   my relationship.

12       It is true, I told Ms. Wiggins I could not help her

13   with the 3,500 people.  And here's why.  In 1998 -- '97

14   and '98, I had been -- I had received a $1.2 million

15   grant.  And I vigorously helped in that case.  And the

16   government knew it.  The United States Government knew

17   it.  And they decided, because I didn't have a signed

18   contract, that I had to disgorge $1.2 million.  They

19   called it a "donation."

20       And I have to tell you after that day and after all

21   the hours I spent trying to understand that with the

22   government, I made certain that everybody I talked to,

23   whoever even asked how I got money, understood how I was

24   to get money.  And Ms. Wiggins was no exception.  The

25   Nation of Levites was no exception.

 1        And I -- when I was on the stand, I said to you,
 2   think of it this way, from where I was -- now, the judge
 3   has two instructions for you, one that defines gross
 4   income -- or income and the other explains gift.  And I
 5   would like you to pay very close attention.  It's
 6   Instruction Number 18.  And the very last sentence says,
 7   "Under the Internal Revenue Code, gross income does not
 8   include the value of property acquired by gift, bequest,
 9   devise, or inheritance."  That is all that I had read and
10   that is all that I knew.
11        And what I told you from the witness stand is I have
12   never understood or seen before what the Court had
13   written at Instruction Number 19.  And when you read
14   Instruction Number 19, you will understand now that I
15   have been told that, I will no longer control my
16   ministry's mission under the last sentence on Instruction
17   Number 18.
18        But at the time that these transactions were done
19   from 2000 to 2005, I was under the impression of what
20   Judge Alito from the Third Circuit Court had said or from
21   what Judge Dalzell said at the district court in
22   Philadelphia.  I did not have the benefit of the Court's
23   Instruction Number 19.
24        "Willfulness" is a very important instruction.  And
25   "good faith" is a very important instruction here.  And I

 1    understand how difficult it is to sit through and listen

 2    to all of this.  But I am today telling you how thankful

 3    I am that you're here.  Because at least I don't have to

 4    answer to the Department of Justice.  Because they won't

 5    listen.  They won't even talk.

 6         Do you remember the report I read from the General

 7    Accountability Office where IRS and GAO were having a

 8    debate over why the IRS would not comply and the GAO was

 9    telling them you have to comply?  Mr. O'Reilly said I

10    left off paragraph 50.  And it's a very important

11    paragraph because this is where it is.  This is the deal

12    right here.  Set everything else aside.

13         Footnote 50 says, "The requirements for this

14    statement and the OMB number are together known as the

15    "public protection provision," in that a person cannot be

16    penalized for not responding if either the control number

17    or the statement is absent.  However, the public

18    protection may not apply if the collection is mandated by

19    statute."

20         And all you have to do is ask the Court for my

21    testimony, I'm certain that the Court can provide it to

22    you, where you can see those words again.

23         And if you'll just remember page 34 where the

24    General Accounting Office explained it perfectly.  "In

25    the case of IRS, most of the agency's non-compliance

1   resulted from forms that did not cite the tax law that

2   requires the information to be collected.  OMB

3   regulations and guidance state that agencies are to cite

4   the law or other authority whenever the collection of

5   information is required to obtain or retain a benefit,

6   such as a passport or social security payment, or is

7   mandatory with civil or criminal sanctions imposed for

8   failure to respond."

9       They go, "However, the following typical PRA notice

10  on IRS forms omits the required reference to the law.

11  When we discussed with IRS officials why the specific tax

12  law requiring information to be reported was missing in

13  one of our case studies, the IRS reports clearance

14  officer stated that IRS's burden estimation methodology

15  increases the burden estimate when a specific law is

16  mentioned in order to include the time required to read

17  the law.  Further, IRS officials told us that citing the

18  'internal revenue laws of the United States' provided

19  adequate disclosure and that on many forms it would be

20  impractical to cite a specific law authorizing the

21  collection.  Nonetheless, the regulations require

22  citation of the law so that respondents are fully aware.

23  Until IRS corrects this language on the forms,

24  respondents may not know what law is associated with the

25  information requested."

```
 1        If you will look in the instruction booklets,
 2   there's a Paperwork Reduction Act notice.  And in there,
 3   they cite to Section 6001, 6011, 6012, and the
 4   regulations.  Mr. O'Reilly, when he asked me questions,
 5   he said it was 6012, 63, and 151(d).  He even told you
 6   another court had said in Salberg from the Seventh
 7   Circuit, 7203 required it.  Sixty-three is not in the
 8   code -- in the instruction booklet and it's not on the
 9   form.
10           MR. O'REILLY:  Your Honor, objection.  The Court
11   has instructed about what the law is.
12           MR. SPRINGER:  My belief.
13           THE COURT:  Sustained.
14           MR. SPRINGER:  You must measure whether you
15   believe I believe what I'm saying.  And I have thousands
16   of hours and the people that I've helped go well beyond
17   what you've seen in this courtroom.  This is a billion
18   dollars in action fighting a guy who they have tried to
19   break.
20        Measure my good faith by looking at the form.  Look
21   at page 34 of the General Accountability Office report.
22   Read what they said.  Look on the form yourself that's in
23   evidence and say, decide, was I mistaken, that I just
24   refused to see that it didn't say mandatory or it did?
25   GAO said they have to tell you if it's mandatory.  They
```

1   must put the statute and the statement that says it's

2   mandatory.  And GAO told IRS that.  And that report says

3   IRS said we're not going to do it because it's too much

4   of a burden.

5       Tell that to Mr. Burt, who is in prison.  Tell that

6   to Mr. Patridge, who is in prison.  Tell that to

7   Mr. Ouwenga that it's too much of a burden.  Because

8   that's what I've seen.

9       I'm in your hands and I need your help.  Let me go

10  on with my fight.  Please.  Thank you.

11          THE COURT:  Members of the jury, we'll take a

12  short break before we have Mr. Stilley's closing

13  argument.  Please work with Pam and see if you'll be able

14  to return in give or take ten minutes.  If it takes a

15  little more, that's fine.  But work with Pam and ten, 15

16  minutes we'll resume -- we'll have Mr. Stilley's closing

17  argument and then we'll have the rebuttal portion of the

18  government's closing argument.

19      And let me give you one item of information that

20  will govern how we will proceed from here on out.  Of

21  course, during your deliberations, you will not be able

22  to discuss the case unless all jurors are in the

23  deliberation room together.  And it may be necessary to

24  take a break for lunch.  If one of you has personal

25  business that must be attended to during lunch, well,

1    that's understood.

2        Nevertheless, Pam, we're going to have lunch brought

3    in; is that right?

4              COURT SECURITY OFFICER:  That's correct, sir.

5              THE COURT:  Okay.  We'll have lunch brought in.

6    But you may not discuss the case unless all jurors are in

7    the deliberation room together.  So I know you'll be able

8    to accommodate to that.  If there is a juror who needs to

9    attend to personal business over the lunch hour, you can

10   recess for that purpose.  And as a matter of fact, you

11   may not be in deliberations quite yet by lunch anyway.

12   We'll just see how that flows.  But please take about a

13   ten, 15-minute break.  Whenever you all and Pam can get

14   back here, we'll resume with Mr. Stilley's closing

15   argument.

16       Court will be in recess.

17       (A RECESS WAS HAD, AFTER WHICH THE FOLLOWING

18   PROCEEDINGS WERE HAD IN OPEN COURT AND WITHIN THE

19   PRESENCE AND HEARING OF THE JURY.)

20             THE COURT:  We'll now have Mr. Stilley's closing

21   argument.

22             MR. STILLEY:  May it please this Honorable

23   Court, Counsel, ladies and gentlemen of the jury.  I'd

24   like to start off by telling you what this case is not

25   about.  This case is not about matters that were not

 1  alleged in the indictment.  You've heard a few things

 2  about Oscar Stilley's testimony at the grand jury.  And

 3  to the government's credit, the government is focusing on

 4  what is stated in the indictment concerning the

 5  statements made by Oscar Stilley.  Other matters chasing

 6  bunny trails about why that there was a second subpoena

 7  or why it was withdrawn, that's not part of this case and

 8  we don't have to decide it.  We need to focus on what's

 9  in the indictment.

10      Mr. Snoke -- or Mr. O'Reilly spoke for a bit about

11  Oscar Stilley and suggested that he had understated his

12  contacts with Mr. Springer.  I think that you will be

13  able to see by looking at page 6 of Exhibit 581 that

14  that's not true.  Mr. Springer has already discussed that

15  and already shown that to you.

16      Now, there's a couple of things I think I need to

17  correct.  When I was on the stand and when I testified, I

18  said that the $20,000 transaction did not relate to

19  Mr. Bolthouse, but I was mistaken and I'm sorry about

20  that.  That was a mistake.  Mr. Springer, when he was up

21  here said that it was $25,000 a year that he could have

22  saved.  Well, in the heat of battle we can make

23  mistakes.  It wasn't $25,000 a year.  It was at least a

24  $25,000 minimum over the period relating to the

25  indictment.  Certainly a mistake of the head and not of

1   the heart.

2      I want to talk to you a little bit about what the

3   government said concerning Mr. Schiff.  The government

4   suggests that Oscar Stilley still believes what

5   Mr. Schiff said.  There are certain things that Oscar

6   Stilley believes, but I hope that you'll understand and I

7   hope you'll see that Oscar Stilley does not subscribe to

8   any of the silliness that Mr. Schiff in later works in

9   later books engaged in in telling people that they ought

10  to go file claims for refund and do other things to

11  antagonize the federal government and get themselves in

12  trouble.

13     When I went and helped Mr. Pizzino, what irritated

14  me, what made me most angry was documents and writings

15  that indicated that the government, the IRS, was

16  deliberately leading Mr. Pizzino down the primrose path

17  and making him think that they were giving serious

18  consideration to his claim for refund when they were at

19  the time trying to build a criminal case.

20     Now, that being said, let's go to what this case is

21  about.  This case is about -- let's start with Count 1.

22  In Count 1, the government has to prove an agreement.  If

23  there was an agreement -- let's stop and think about

24  this.  The government is trying to convince you that

25  there was an agreement in about 2000 and nothing happened

1  until 2003.  Well, if a story doesn't make any sense,

2  maybe it's not true, and it's even more likely that it's

3  not true beyond a reasonable doubt.

4      Why would Oscar Stilley make an agreement with

5  somebody and do nothing about it for three years?  Based

6  on Oscar Stilley's performance on the stand, you might

7  even question whether Oscar Stilley could even remember

8  it that far.

9      Now, let's think about this:  If there was really

10  such an agreement, why wouldn't Lindsey Springer use

11  Oscar Stilley's IOLTA as his piggy bank and save at least

12  enough money for another nice car?  The reason is because

13  there never was any such agreement, it never took place.

14      There has got to be a law.  Did you hear anybody

15  come in and testify from this stand Oscar Stilley was

16  told about a law that he was violating, yet Oscar Stilley

17  disregarded that and still went on down the road and

18  continued to try to violate that law?  Did anybody tell

19  you if Oscar Stilley did these acts by himself, it would

20  violate this statute?  No, they didn't.  They're asking

21  you to presume that.  They're asking you to assume that

22  Oscar Stilley had that knowledge, and that we cannot do.

23      The acts, you saw, basically agreed.  Here is the

24  question:  Were they in furtherance of an agreement?

25  Certainly not.  There was no agreement for them to be in

1    furtherance of.  And, furthermore, basically, let's think

2    about this:  Nate Colter was on the list, you were asked

3    about Nate Colter.  He was the --

4         MR. O'REILLY:  Objection.  Speaking of witnesses

5    who were not called is improper.

6         THE COURT:  Sustained.

7         MR. STILLEY:  Ladies and gentlemen, the only

8    person that testified to you about IOLTA was Oscar

9    Stilley.  Oscar Stilley, when he was on the stand,

10   testified about what's required and he testified based on

11   the rule and that rule says that when money is held by --

12   on behalf of a client or a third party, upon proper

13   demand, it must be promptly given to the party to whom

14   it's entitled.  That being the case, Oscar Stilley did

15   not have a choice other than to do what he did.  And I

16   don't think any of these witnesses here have said any

17   such thing.

18       Ladies and gentlemen, you heard the government

19   parade witness after witness through this witness stand,

20   through this Court, some in prison garb, some in shackles

21   and chains, say you've been convicted.  And you've also

22   heard those same witnesses say, has that changed your

23   behavior?  No.  Yes, it has changed your behavior.  Has

24   it changed your mind?  No, it has not changed my mind.

25       I want you to stop and think about some of the great

1  thinkers of this country.  Thomas Jefferson said, "I have

2  sworn upon the altar of God eternal hostility against

3  every form of tyranny over the mind of man."  Why?

4  Because he believed in an appeal to reason, not an appeal

5  to a threat.  What the government is trying to convince

6  people with is an appeal to a threat.  Do what we say or

7  you'll go to prison.  Does that answer your question?

8  Response, no.  Reason will answer my question.

9      Ladies and gentlemen, the Congress of the United

10 States passed the original Paperwork Reduction Act in

11 1980 attempting to bring some control on various agencies

12 that had gotten out of control.  Fifteen years later

13 there was another Paperwork Reduction Act, a subsequent,

14 different act that tried to strengthen the Paperwork

15 Reduction Act to give more power to the citizens and give

16 the citizens a right to the information, including the

17 statutory or regulatory authority that required their

18 conduct.

19     Now, let's fast-forward on a little bit forward on

20 this timeline to 2004.  And you heard testimony from Judy

21 Patterson, you know what she said, and you heard

22 testimony from other witnesses.  She was convicted.  She

23 was put in prison.  Oscar Stilley prepared a brief

24 regarding the Paperwork Reduction Act.  Jerry Barringer

25 read that brief and signed it.  There was also a motion

1  for release pending appeal because these were substantial

2  issues and she shouldn't have to sit in prison over that.

3     What happened to that appeal?  The government got

4  two extensions.  And after they had gotten two

5  extensions, they worked out a deal whereby that Judy

6  Patterson walked out of prison supposedly on the basis of

7  assistance that she gave the government.  But you heard

8  Ms. Patterson testify, I didn't talk to anybody, I didn't

9  give that assistance that the government claimed.  But

10  the government was to walk -- able, through this conduct,

11  to walk away and say we didn't hear anything.  What

12  Paperwork Reduction Act?

13     Move forward to 2005.  The general -- or Government

14  Accountability Office created a report on the Paperwork

15  Reduction Act that you heard Mr. Springer testify about

16  at length and they explained the IRS is not following the

17  law, the IRS is leaving out things that are required of

18  the IRS in promulgating these forms and sending them to

19  the public and asking the public to comply with those

20  forms.  And what did the IRS say?  We disagree.  We don't

21  hear what you're saying.  We're going to continue doing

22  this the way we've been doing it all along.  We can't

23  hear.

24     Go on to 2006, you have the Robert Lawrence case.

25  Robert Lawrence did rely on the Paperwork Reduction Act.

1   His correspondence with the IRS did show that --

2          MR. O'REILLY:  Your Honor, objection.  The

3   correspondence from Mr. Lawrence is not in evidence.

4          THE COURT:  Sustained.

5          MR. STILLEY:  Mr. Lawrence did raise the

6   Paperwork Reduction Act.  On the Friday before the Monday

7   the trial was supposed to start the government dismissed

8   his case with prejudice.  They would not have to listen

9   to the claims under the Paperwork Reduction Act, they

10  would not be considered, they would not be decided by any

11  court.  That's -- Mr. Lawrence got away --

12         MR. O'REILLY:  Your Honor, objection.  It

13  appears that Mr. Stilley is arguing the substantive basis

14  of the Paperwork Reduction Act.

15         THE COURT:  Members of the jury, it is

16  appropriate for me to remind you that the Court has ruled

17  that the Form 1040 did not and does not violate the

18  Paperwork Reduction Act.  However, I have permitted

19  testimony with respect to the defendants' assertions as

20  to their understanding of the Paperwork Reduction Act to

21  be introduced for a limited purpose on one issue and that

22  is the issue of their willfulness.

23      Proof of the crimes charged in the indictment must

24  include proof beyond a reasonable doubt of an element

25  known in law as willfulness, as I have instructed you.  I

1    have admitted evidence as to the defendants'

2    understanding of the Paperwork Reduction Act at the times

3    relevant to the indictment for your consideration with

4    respect to the issue of willfulness.  There is no issue

5    in this case as to the merits of any Paperwork Reduction

6    Act defense.  And you must understand the defendants'

7    arguments on that score to be devoted to the impact, if

8    any, of the Paperwork Reduction Act on their state of

9    mind.

10        You may proceed.

11            MR. STILLEY:  Thank you, Judge.  Let's move

12   forward from the Robert Lawrence case and come down to

13   the present.  You heard testimony, Mr. Springer filed I

14   think it was four different lawsuits trying to get an

15   answer on that question.  That question -- the

16   substantive question was not answered in any of those

17   lawsuits.  You heard testimony about the words in the

18   last -- in the opinion from the Circuit Court on appeal

19   from the last case.

20        Mr. Springer raises difficult questions.  His brief

21   may not be a model of clarity, but these are serious

22   questions.  And by the way, Commissioner of the IRS, you

23   made a frivolous statement when you said that these

24   issues had been decided on the merits at a previous

25   time.  That is not true.  I want you to think, and the

1   judge is correct, the question here is, how does that

2   influence the minds of Oscar Stilley and Lindsey

3   Springer?  And I certainly concede that in this case

4   Oscar Stilley represents himself.  He does not represent

5   two parties.

6        But, of course, as you deliberate on these matters,

7   you will rely on what you've heard from all the evidence,

8   all the argument, all the witnesses.  You will rely on

9   all that in total for making your decision.  I want you

10  to think about the effect that that would have on the

11  mind-set of Oscar Stilley and Lindsey Springer.

12          MR. O'REILLY:  Your Honor, objection.  He's

13  speaking about the decision in 2009, which would not go

14  to good faith.

15          THE COURT:  You can cover that in rebuttal.  Go

16  ahead.

17          MR. STILLEY:  I want you to think about what

18  kind of result or what kind of -- how that that would

19  impact the beliefs and specifically the belief of Oscar

20  Stilley.

21      Now, there's a case that this Court talked to you

22  about when this case started.  It's the case of John

23  Peter Zenger.  And it's one of my favorite cases.  It has

24  a lot of applicability to this case.  That case came down

25  in 1735.  That case was about a publisher named John

1  Peter Zenger.  And at that point in time, there were

2  libel and sedition laws and those laws did not contain an

3  exemption for truthful criticism of the government.  As a

4  matter of fact, truth was not a defense.  It was an

5  aggravating factor because falsehoods are often easy to

6  rebut.  It's much more difficult to rebut the truth.

7      In that case, before Andrew Hamilton took the reins

8  and tried the case, two other lawyers were disbarred for

9  their efforts in trying to defend Mr. Zenger.

10          MR. O'REILLY:  Your Honor, objection.  There is

11  no evidence of this case in the record.

12          THE COURT:  Well, I mentioned it during jury

13  selection, and it is generally permissible for an

14  advocate to make reference to historical anecdotes to

15  illustrate his point.  I trust that is what Mr. Stilley

16  is doing.  You may proceed.

17          MR. STILLEY:  Thank you, Judge.  And that is

18  exactly what I'm trying to do.

19      In that case, John Peter Zenger was arrested.  He

20  was put in jail.  And eight months later, he got his

21  trial.  He continued to try to publish.  His wife would

22  come to the jail and he would write and give things to

23  his wife.  Public sentiment was at a fever pitch.  The

24  British Crown couldn't hear that.  The British Crown

25  really didn't care about that.  They continued on.  That

1    didn't cause Mr. Zenger to get reasonable bail.

2        The case -- the case was tried to a crowded

3    courtroom.  There's tremendous interest in that case.

4    Andrew Hamilton, the lawyer, made a very courageous

5    argument to that jury.  And that jury refused to convict

6    on the ground -- well, scratch that.  The jury refused to

7    convict.  And as a result of that, the government -- the

8    law -- technically, the law was not changed.

9    Technically, the law was the same.

10       However, after that period of time, the government

11   was very hesitant to bring charges against people because

12   that they had truthfully criticized the government.  Now,

13   it took -- this not only set a great precedent with

14   respect to freedom of speech, it also set a precedent

15   with respect to the right of jurors that they would not

16   be required to bring back any verdict in violence of

17   their conscience.

18           MR. O'REILLY:  Your Honor, objection.

19           THE COURT:  That will be sustained.

20       Mr. Stilley, you know the rules.  Move on to

21   something else.  That crosses the line.

22           MR. STILLEY:  Thank you, Judge.

23       Ladies and gentlemen, it was a long time before the

24   principle of that case was embodied in the Constitution

25   of the United States giving people the right to free

 1   speech and later embodied in either all or nearly all of

 2   the Constitutions of the states of this country.

 3       Ladies and gentlemen, I want to make that applicable

 4   to this case.  In this case, for example, in Count 4, the

 5   witness for the government, Mr. Miller, testified from

 6   the stand, until I had heard about the facts concerning

 7   Ms. Hawkins about the $500,000, I agreed -- I agreed

 8   with --

 9           MR. O'REILLY:  Objection.  Misstates the

10   testimony.

11           THE COURT:  The jury will recall the testimony.

12   Closing argument must be within the -- arguably, at

13   least, within the four corners of the testimony.  And I,

14   with great confidence, rely on the collective

15   recollection of the jury as to what the testimony was.

16       You may proceed.

17           MR. STILLEY:  Ladies and gentlemen, you heard

18   the testimony and you know what Mr. Miller said about it,

19   about how that he could have been convinced with respect

20   to Count 4 until he heard evidence in this case.  Let's

21   stop and think about what the government is asking you to

22   do.

23       The government is asking you to judge Oscar Stilley

24   based on hindsight and not based on the -- based on later

25   information as opposed to the information that he had at

 1   the time.  Let's stop and think about this.  What the

 2   government is trying to do is not to say that Oscar

 3   Stilley violated some bright line.  They're saying that

 4   there's a muddy line there and Oscar should not have

 5   gotten into this line and therefore he should be

 6   convicted and punished for it.

 7        Ladies and gentlemen, in 1735, 12 people took a pen

 8   and demonstrated the fact that the pen is mightier than

 9   the sword.  The pen is not only mightier than the sword,

10   it is mightier than guns and bullets and bombs.

11        Ladies and gentlemen, the British Crown couldn't

12   hear.  The British Crown paid no attention to people --

13   the fever pitch of people who wanted to be able to speak

14   free.  But 12 jurors cured the persistent deafness

15   syndrome of the British Crown.

16        What I'm asking you to do here today is to take a

17   pen, I want you to go back to the jury room, I want you

18   to deliberate carefully, I want you to look at all the

19   facts.  And when you've had sufficient time and

20   sufficient opportunity and you're convinced of the proper

21   verdict, I want you to take a pen and I want you to make

22   bold, strong strokes of that pen, not guilty.

23        And I want you to go down that list and I want you

24   to say not guilty.  And I want you to demonstrate to the

25   government, yes, there are laws, but the laws apply to

 1   everybody.  And before you violate what Congress said and

 2   penalize someone in this case by a criminal conviction,

 3   you will comply with the laws that we have made for you,

 4   which require you to put on the form the information

 5   showing what is required of the citizens.

 6           MR. O'REILLY:  Objection.  This is direct

 7   argument.

 8           THE COURT:  Sustained.

 9           MR. STILLEY:  Ladies and gentlemen, you've been

10   very kind and very attentive.  Thank you very much.

11           THE COURT:  We'll now have the rebuttal portion

12   of the government's closing argument.

13           MR. O'REILLY:  Thank you, Your Honor.

14       Ladies and gentlemen of the jury, I don't have a

15   whole lot more to tell you.  I think the evidence is

16   overwhelming that these two individuals conspired to

17   defraud the Internal Revenue Service.  And they worked

18   together to evade Mr. Springer's taxes.  And there's no

19   question that Mr. Springer didn't file.  And as evidence

20   of willfulness, there's similarly no indication other

21   than Mr. Stilley also willfully failed to file his tax

22   returns.

23       But Mr. Springer said something somewhat interesting

24   in his closing.  He said he had no leverage.  That's a

25   flat-out lie.  He had people who were desperate for help

1    and that is phenomenal leverage to get money out of

2    people and he used it, just as he did with Mrs. Hawkins

3    when he kept telling her and Mr. Stilley kept telling

4    her, I'll bring Art home.  You heard her tell about it,

5    I'll bring your husband home from jail, I just need more

6    money.

7        And Mr. Springer elicited from Mr. Stumpo an

8    assessment of Mrs. Hawkins' house, it was worth

9    millions.  And Mr. Springer wanted her to borrow against

10   it so he could get a half million dollars more of her

11   money after they already paid these two several hundred

12   thousand dollars.  None of which was reported on any

13   federal tax return.

14       Mr. Springer made reference to a check, a hundred

15   thousand dollar check and pointed out it's not in -- you

16   know, it's not in the government's tax calculations.

17   That check is from 2007.  And the reason Mr. Turner was

18   shown that check was because Mr. Springer had conned

19   Mr. Turner out of $250,000 and had no intent to repay

20   him.  If he had any intent to repay Mr. Turner, some, if

21   not all, of that hundred thousand dollars would have gone

22   to Mr. Turner.  He could have done it on any number of

23   occasions.

24       And when Mr. Turner came back to the stand, and I'll

25   have to say this testimony surprised even me,

 1  Mr. Springer got him to tell you about how they had an

 2  offer for $175,000 that could have made a significant

 3  repayment if Mr. Springer had any intent to repay it.

 4  But Mr. Turner testified still in response to

 5  Mr. Springer, oh, you talked us out of it because you

 6  knew it was worth more.  He had already received a

 7  low-ball offer of $40,000, an opportunity to get $175,000

 8  for an older motor home.  If he had any intent to repay

 9  Mr. Turner, he would have done it.

10      During Mr. Springer's closing, he talked about how

11  the IOLTA wasn't used in 2000, 2001, and 2002.  That's

12  true.  But there is evidence that these two were working

13  together as early as the year 2000 and maybe even 1999,

14  the testimony of Dr. Roberts, we have the testimony of

15  his ex-wife Ms. Carlson talking about how much they were

16  on the phone together.  And she realized it when her cell

17  phone would come up and it was Oscar Stilley on the

18  Caller ID, but it was her husband on the line.  And

19  there's no issue that Mr. Springer was using

20  Mr. Stilley's cell phone, he was using his credit card,

21  he was using his IOLTA account to receive monies and to

22  pay for motor homes, Lexuses, and other nice things.

23      And if you look at what's in evidence as

24  Government's Exhibit 690 and the following charts, it

25  will show you how money was put through the IOLTA account

1  and, as Mr. Shern testified and as Mr. Miller testified,

2  running the money through there was misleading and

3  concealing.  The IRS didn't know what it was until they

4  went out and talked to people.

5      But again, ladies and gentlemen, you wouldn't be

6  here today, at least not on this case, and we wouldn't be

7  here if Mr. Springer had paid his taxes.  I mean, it's

8  not rocket science.  He made money and he owed a lot of

9  taxes.  And as Mr. Miller's chart showed, he owed over

10 $175,000 in taxes for the years 2000 through 2005.  If he

11 had filed returns and paid taxes, we wouldn't be here.

12      This is not about criticizing your government.

13 Which Mr. Stilley was making reference to a very old case

14 that I just didn't even realize where he was going with

15 it.  Criticism of your government is fine, it's good.  My

16 wife could tell you I certainly criticize my government

17 sometimes.

18      We're here because Mr. Springer cheated on his taxes

19 and has for the last 19 or more years.  And,

20 specifically, the charges in this case are because

21 Mr. Springer cheated on his taxes for the years 2000

22 through 2005 and Mr. Stilley helped him do it.  And we

23 can show financial transactions as early as 2000 between

24 these two because there are deposits of money orders

25 purchased by Mr. Springer deposited into Mr. Stilley's

1    IOLTA account from April of 2000.  So it was more than

2    just they happened to be working together, they were in a

3    financial relationship.

4        Do we have a contract between the two that says we

5    agree to defraud?  No, that's not the way it works.  What

6    these two did was they found kindred spirits, two tax

7    cheats, and they decided to help each other.

8        Mr. Springer helped Mr. Stilley by bringing him a

9    lot of business.  As Mr. Stilley indicated in his direct

10   examination, when he first started his tax practice, it

11   was kind of a slog and tough-going and he didn't make a

12   lot of money.  But with the help of Mr. Springer, he made

13   lots of money.  And Mr. Springer, we all know how he

14   benefited.  He cheated on over $175,000 in taxes just in

15   the years 2000 through 2005.

16       What I wanted to show you, but I wasn't able to get

17   it lined up, was Mrs. Wiggins' testimony, because she was

18   very powerful and she has -- there's nothing the

19   government can give her.  We just went out and we deposed

20   her because, as you saw in the videotape, she's not

21   well.  But she was unequivocal about that she paid

22   Mr. Springer for services.  It was no donation.  And at

23   one point in response to Mr. Stilley's questions, she

24   said, no, we had a verbal agreement and also in several

25   spots in writing that he was doing a job for us,

1   referring to Mr. Springer.  He was recommended by Tom

2   LaGrow to do a job for us and that's the purpose that he

3   was involved for us, and that's the only reason he was

4   involved with us.

5       In response to the question, "So you're telling me

6   that this check was actually a payment on a contract,"

7   her answer was, "I don't think there was a contract.  It

8   was just a verbal that he's going to do this and this and

9   this for us, and we were paying him accordingly based on

10  what he felt he needed.  And that was kind of a dumb way

11  to do business.  But if Tom LaGrow, who is as honest as

12  the day is long, refers somebody to me, I have a tendency

13  to trust him."

14      And earlier in that same deposition, in response to

15  questions from Mr. Springer, Mr. Springer asked

16  Ms. Wiggins, "Now, is it true that you stopped trusting

17  me when you moved to California in November of 2001?"

18  "No," Ms. Wiggins said.  "When did you stop trusting me?"

19  And her answer is damning.  "When I called you up -- I

20  called you up and told you that I was too emotionally

21  spent.  I've got to go to California.  My husband and I

22  have to get a job.  I was standing right at my desk in

23  New Mexico when we had the conversation.  And I asked you

24  will you please continue to help the members.  And you

25  said, 'yeah, I'll do it, but I'm not going to do it for

1  nothing.'"

2      Mr. Springer wasn't going to work for nothing.

3  Nobody can afford to work for nothing.  And you certainly

4  can't afford to play golf at Meadow Brook Country Club or

5  to drive brand new Lexuses or nice Mercedes Benzes or

6  motor homes that cost over $150,000 if you're not

7  working.

8      Mr. Springer knew he was earning money and he did

9  everything he could to hide that.  He went through a

10  check cashing place.  And the fact that the person

11  insisted on having the CTRs filled out, fine, he filled

12  them out, but he put his mail drop address and he never

13  put his social security number.

14      And on the CTR that was filed by the car company,

15  that doesn't have his -- it has his mail drop address and

16  it doesn't have his social security number on it.  The

17  only time and the only CTR the IRS ever received that had

18  Mr. Springer's social security number on it, and it's

19  evidence in this case, is when he was buying jewelry for

20  his wife.  That's the only one.

21      Mr. Stilley and Mr. Springer are both tax cheats and

22  you need to look at the evidence and determine, have we

23  proved it beyond a reasonable doubt?  We have.  We have

24  and more.  And what you can do, as the judge's

25  instruction said, you need to find one overt act that you

1  all unanimously agree upon that occurred within this

2  district, within this judicial district.  And that one

3  can be Mr. Springer's lie to Mr. Shern on September 16th

4  of 2005.  Or if you wish, it can be Mr. Stilley's

5  presentation of the grand jury -- response to subpoena,

6  Government's Exhibit 582, where he did and told the same

7  lie, because that also happened in this district.

8       I thank you very much for all your attention.  Thank

9  you, Your Honor.

10          THE COURT:  Thank you.  I'm going to swear the

11 bailiff at this time and then I'll explain how we'll

12 handle lunch.

13      The bailiff will please come forward to be sworn.

14      (BAILIFF SWORN)

15          THE COURT:  Now, let me -- I'm going to let you

16 know how I think would be an appropriate way to proceed,

17 since we are now just a few minutes before noon and the

18 case is in your hands.

19      There is one juror who needs to attend to a personal

20 matter over the lunch hour and that will be done.  That

21 will certainly be accommodated.  And for that reason,

22 during that time you are not all together, you must not

23 discuss the case.  There's plenty of news to talk about,

24 about Sooner football or anything else under the sun

25 other than this case.

 1      When you are, once again, all together in the jury

 2  deliberation room, then it becomes your duty to discuss

 3  the case.

 4      And, Pam, we're having lunch brought in; is that

 5  right?

 6          COURT SECURITY OFFICER:  Yes.

 7          THE COURT:  Okay.  Very well.  I would suggest

 8  perhaps you proceed and have lunch and then recess.

 9      And I will suggest to counsel for the government and

10  the defendants that it is not necessary to return

11  everyone to the courtroom for the recess and then for the

12  formal resumption, unless somebody would suggest

13  otherwise.

14      What says the government?

15          MR. O'REILLY:  No objection from the government,

16  Your Honor.

17          THE COURT:  Mr. Springer?

18          MR. SPRINGER:  No objection, Your Honor.

19          MR. STILLEY:  No objection.

20          THE COURT:  Very well.  And then recess at any

21  time that all 12 of you are not together, and then resume

22  your deliberations or start your deliberations when you

23  are all 12 together.

24      In the meantime, Pam will be working to get the

25  exhibits together.  This official copy of the

1   instructions will be put in the courtroom.  Please do

2   remember there are some -- there's about six words plus

3   one sentence that are -- that have been corrected and are

4   corrected in this official version.

5        And so we'll get everything set up in the

6   deliberation room for you during your deliberations.

7   Once the case is in deliberation, as it soon will be,

8   then the schedule is pretty much up to you to determine.

9        Now, a word about the alternates -- let me visit

10  just a minute with Pam Lynn.

11       (DISCUSSION OFF RECORD)

12            THE COURT:  The -- I think I can say, without

13  fear of contradiction and certainly without any

14  hesitation on my part, that they also serve who serve as

15  alternates and you may yet serve.  Now, the other 12 look

16  pretty healthy to me.  But who knows.  So the two of you

17  who are alternates, Mr. Farmer and Ms. Fitzgerald, will

18  please give -- if you have not already done so -- give

19  your contact information to the deputy court clerk, Pam

20  Lynn, so that in the event of any situation that would

21  require us to press you into service, that we will

22  promptly be able to get in touch with you and have you

23  join the jury to participate in deliberations as

24  alternates.  That may seem like a relatively unlikely

25  event that for any reason we would lose one of the

1    jurors, but it's certainly not anything that I can

2    exclude as a possibility altogether.

3         So you do remain as jurors in this case until you

4    are notified that your service is complete, which means

5    that even though you will be not participating in the

6    beginning of the deliberations, at least, with the other

7    12, you will remain as jurors and you will be obligated

8    not to discuss the case, not to undertake any independent

9    investigation, and not to reach any conclusions about the

10   case until such time as you might be pressed into service

11   to deliberate with the other 12.

12        So, Mr. Farmer and Ms. Fitzgerald, the important

13   thing now is to bear in mind that those rules still apply

14   to you and to be available where Ms. Lynn will be able to

15   get in touch with you if that need should arise.

16        And, of course, Ms. Lynn, if it should turn out not

17   to be necessary to press you into service as an

18   alternate, and that's what's probable, if it should turn

19   out not to be necessary to press you into service as an

20   alternate, then Ms. Lynn will also be able to contact you

21   to inform you as to the outcome of the case.

22        So, again, Ms. Fitzgerald and Mr. Farmer, I

23   sincerely do appreciate your service as alternates and

24   your service does continue until you have been notified

25   otherwise.

 1          So the jury will retire with the bailiff to have

 2     lunch and then recess as long as may be necessary for

 3     personal matters over the noon hour and then resume your

 4     deliberations in the jury deliberation room.

 5          And, again, please remember, as tempting as it may

 6     be, you cannot discuss the case unless you are all

 7     together in the jury deliberation room.

 8          All persons in the courtroom will remain seated

 9     while the jury departs.

10          (JURY EXITS THE COURTROOM AT 12:00 NOON.)

11          THE COURT:  I will also give the official

12     instruction book and the -- with the verdict forms in the

13     pocket to Pam when she becomes available and she'll be

14     able to take that to the jury room.

15          Given the number of witnesses, the number of

16     exhibits, and in some ways, the complexity of the case, I

17     wouldn't pretend to predict how soon we'll be hearing

18     anything from the jury.  Here we are at noon on a Friday,

19     I don't have the foggiest idea how long it will be before

20     they have a verdict, but one thing that that -- a

21     possibility that we all have to bear in mind is that at

22     some point they may have a question.  I don't encourage

23     questions.  I sometimes explicitly discourage questions;

24     I did not do that in this case, but -- and, of course,

25     questions can sometimes leave us all scratching our

 1   heads, so I hope that we don't end up having to contend

 2   with notes and questions from the jury, other than a note

 3   that says we have reached a verdict.

 4        But in any event, even though deliberations may go

 5   quite a long while, it is necessary, of course, that

 6   counsel and the parties stay close so that Ms. Lynn can

 7   get everyone back in the courtroom in very short order in

 8   the event that we have any communication from the jury

 9   that requires attention in the courtroom.

10        And so please do -- if you go elsewhere in the

11   building, make sure that Pam can contact you in very

12   short order so that we may resume in the courtroom.

13        Anything further before we recess to await the

14   verdict, Mr. O'Reilly?

15            MR. O'REILLY:  Nothing from the government, Your

16   Honor.

17            MR. SPRINGER:  Nothing from me, Your Honor.

18            MR. STILLEY:  No, Your Honor.

19            THE COURT:  Very well.  I now give the official

20   copy of the instructions to the clerk to give to the

21   bailiff for the benefit of the jury in the jury

22   deliberation room.

23        Pam, anything else we ought to address before we

24   recess?  Court will be in recess.

25            (COURT ADJOURNED TO AWAIT VERDICT FROM THE JURY.)

1          THE COURT:  We have two notes from the jury and

2     signed by the foreman.  Let me get my chart here.

3     Michael Horton, who is at this end in the back row.

4     Neither of which are highly consequential, but both of

5     which I wanted to address before I give my response to

6     the jury.

7          The first one came in at 2:22.  I note that it's

8     about a half-hour later now.  It says, "Please deliver

9     all jury instruction books."  Which I take to mean the

10     copies of the instructions that were given to the jurors,

11     some of which were left in the jury box when the jury

12     retired to deliberate.

13          My proposed answer to that question would be as

14     follows:  "We will deliver the remaining sets of copies

15     to you.  Please bear in mind that in the final corrected

16     version of the instructions in the black three-ring

17     binder, the word 'additional' has been deleted on pages

18     40, 43, and 45 and that the sentence referring to

19     'further findings' has been deleted from the closing

20     instruction."  Dated November 13, 2009, signed by me.

21          Does the government have any objection to that

22     response?

23               MR. O'REILLY:  No, Your Honor.

24               THE COURT:  Mr. Springer?

25               MR. SPRINGER:  No, Your Honor.

```
 1            THE COURT:  Mr. Stilley?
 2            MR. STILLEY:  No, Your Honor.
 3            THE COURT:  Very well.  Pam, if you would, first
 4   of all, make a copy of that, make that Court's Exhibit
 5   Number 2.  And then proceed -- Mr. O'Reilly?
 6            MR. O'REILLY:  It will need to be Court's
 7   Exhibit Number 3 or 4, I believe.
 8            THE COURT:  Well, whatever the next sequential
 9   Court's exhibit number is.  But the most urgent thing, so
10   they don't think we've completely forgotten them a half-
11   hour later, is to get that and that response and these
12   copies of the instructions back there.
13       Okay.  The second note came in at 2:31.  It says,
14   "We need the exhibit table of contents.  Can someone show
15   us where it is or provide us a new one?"
16       It is routine to give the jury a copy of the index
17   to exhibits when there are numerous exhibits.  It is
18   obviously appropriate, if not necessary, and I think it's
19   probably necessary to redact the unadmitted exhibits from
20   the exhibit list before it is given to the jury, but it's
21   not at all surprising to me that this jury wants a copy
22   of the exhibit list.
23       And by the way, between the first note and second
24   note, I think we can safely infer that they're interested
25   in the law and the evidence.  So that's always a good
```

1  sign.

2     Does the government have any objection to providing

3  copies of the exhibit lists redacted to show only the

4  admitted exhibits?

5          MR. O'REILLY:  No, Your Honor, no objection.

6          THE COURT:  Mr. Springer?

7          MR. SPRINGER:  No, Your Honor, I do not.

8          THE COURT:  Mr. Stilley?

9          MR. STILLEY:  No objection.

10          THE COURT:  Now, do we have a state-of-the-art,

11  if you will, copy of the defendants' exhibit list that

12  includes all of the admitted defendants' exhibits?

13          MR. SPRINGER:  Yes, Your Honor, I believe that

14  Pam just shook her head.

15          THE COURT:  Okay.  Well, I will direct the

16  clerk, then, to proceed to prepare appropriately redacted

17  exhibit lists and to get them to the jury for the jury's

18  use and my proposed response from the Court -- well, let

19  me write it and then read it.

20     My proposed response from the Court simply states,

21  "This will be provided as soon as possible."  Does

22  anybody have any objection to that response?

23          MR. O'REILLY:  No, Your Honor.

24          MR. SPRINGER:  I do not either, Your Honor.

25          MR. STILLEY:  No, Your Honor.

1          THE COURT:  Very well.  Okay.  And within the

2   first hour we received two notes, I guess within -- they

3   went out -- actually started deliberating at one o'clock,

4   so I guess in a little over two hours, we received two

5   notes, and I don't know whether that's an indicator of

6   the way it's going to go, but it may be.  I'm a little

7   concerned about the length of time it took for everybody

8   to get back into the courtroom.  We need to be in a

9   position to be back in the courtroom more quickly.  And I

10  don't know who it was that had been at some distance, but

11  we need to be in a position to get back in the courtroom

12  more quickly just in case we get more notes.

13      I will hand the second note to the clerk with my

14  written response on it, as I dictated it into the record

15  a moment ago.  I will direct the clerk to provide that --

16  to make that the next sequential Court's exhibit and to

17  provide that to the jury and then to provide the jury

18  with appropriately redacted exhibit lists as soon as that

19  can be accomplished.

20      Is there anything further we ought to address before

21  we recess to await further word?

22          MR. SPRINGER:  Your Honor, may we also have a

23  copy of what's given to the jury redacted?

24          THE COURT:  Certainly.

25          MR. SPRINGER:  Thank you.

```
 1            THE COURT:  Very well.  Court will be in recess.
 2       (COURT IN RECESS AWAITING VERDICTS.)
 3            THE COURT:  The record will show it's
 4  approximately 20 minutes till 6 p.m., the jury having
 5  began deliberations at 1 p.m.
 6       I have a note from the same foreman, Mr. Horton:
 7  "We have not reached agreement and some of us have
 8  obligations now.  May we meet at 9:00 Monday?"
 9       Frankly, I'm not at all surprised that the
10  deliberations are continuing.  That just really does not
11  surprise me, in light of the length of this trial, and,
12  to some degree, the complexity of the case.  So it
13  certainly is my intention to recess the deliberations
14  until nine o'clock Monday, as has been requested by the
15  jury, and to resume at nine o'clock Monday.
16       I consider it to be pretty important to bring them
17  back in and admonish them carefully that they must not
18  discuss the case over the weekend.  Obviously, the matter
19  is at a very delicate stage, and I think the usual
20  admonition needs to be reinforced.  And I don't know that
21  there's much any party could say that would steer me in a
22  different direction on any of these particular matters,
23  but I'll give the government and then the defendants an
24  opportunity to comment.
25            MR. O'REILLY:  No comment, Your Honor.
```

1          MR. SNOKE:  No comment, Your Honor.  We agree.

2          MR. SPRINGER:  I have no objection to what Your

3     Honor just said.

4          THE COURT:  Mr. Stilley?

5          MR. STILLEY:  No objection.

6          THE COURT:  We'll stand in recess until the jury

7     can be brought in.

8        (COURT ADJOURNED.  THE FOLLOWING TOOK PLACE IN OPEN

9     COURT, WITH ALL PARTIES AND COUNSEL PRESENT, WITHIN THE

10    PRESENCE AND HEARING OF THE JURY.)

11         THE COURT:  Mr. Horton, I see you've been

12    elected the foreperson of the jury.

13         JURY FOREMAN HORTON:  Yes, sir.

14         THE COURT:  And I have received a note that

15    says, and I quote, "We have not reached agreement and

16    some of us have obligations now.  May we meet at 9:00

17    Monday?"

18        The answer is, most assuredly, yes.  And I'm going

19    to keep you only for about 30 more seconds.  And that is

20    to, first of all, remind you that the matter is now at an

21    exceedingly delicate stage.  Trials don't get to any more

22    delicate stage than this one is at, especially where the

23    jury is involved.  So it is, by any standard, exceedingly

24    important that you remember not to discuss the case this

25    weekend.  Find other things to think about, find other

 1   things to do, find other things to talk about.

 2       All of my admonitions apply, and you know that.  And

 3   forgive me for repeating it, but the matter is just at an

 4   exceedingly delicate stage.  So you must bear in mind all

 5   of those admonitions over the weekend.

 6       You know now, beyond a reasonable doubt, that jury

 7   service is hard work.  And I mentioned that on day two of

 8   the trial, and it is so true, jury service is hard work.

 9   I have every confidence that you are conducting

10   yourselves true to your oaths as jurors.  You are

11   following the law, you are reviewing the evidence.  Our

12   system is not built for speed.  Some things are built for

13   speed.  The jury system is not built for speed.

14       So I assure you that the Court is not at all

15   disappointed that you have not come back with an instant

16   verdict.  It doesn't work that way.  You have a solemn

17   obligation to follow your oaths.  You have a solemn

18   obligation to each other to listen carefully and

19   patiently and considerately to each other, and I know

20   that's what you've been doing.

21       I think a start on Monday morning, nine o'clock,

22   will put you in a position to -- with the benefit of a

23   weekend of mental and perhaps spiritual refreshment,

24   address the matter anew on Monday morning.  And with

25   those thoughts and my sincere appreciation for your

1    service to the Court during these last three weeks, we

2    will recess until nine o'clock Monday morning.

3        I will have you return directly to the jury

4    deliberation room.  And I will advise the parties, when

5    you are all in the deliberation room, it will not be

6    necessary for us to resume here in open court, so please

7    do make arrangements to be in the jury deliberation room

8    by nine o'clock Monday morning.

9        Now, of course, you're going to arrive in ones and

10   twos.  Remember that you cannot resume your deliberations

11   until all 12 of you are present in the jury deliberation

12   room.  Thank you very much again for your service to the

13   Court.

14       All persons in the courtroom will remain seated

15   while the jury departs.

16       (JURY EXITS THE COURTROOM.)

17           THE COURT:  Okay.  The jury has left the

18   courtroom.  I would not -- I'll just repeat along the

19   same lines that I mentioned a few minutes ago before we

20   brought the jury in, given the length of this trial,

21   given the complexity of it, I think it is far too early

22   for anyone to despair of whether we're going to get a

23   verdict.  I really think, based on everything we've heard

24   in open court, everything that has transpired, that the

25   only fair assessment of the situation after less than six

1    hours of deliberations after a three-week trial is that

2    the jury has gotten nicely started, and I think that's

3    where we are.  And I would not suggest that it's timely

4    to start thinking in any other direction.  I think the

5    jury has just gotten nicely started.  Is there anything

6    else we ought to address before we resume Monday?

7              MR. SNOKE:  Your Honor, as I told the Court

8    earlier, I will not be here Monday, unfortunately.  And

9    Mr. -- my co-counsel will be here, Mr. O'Reilly.

10             THE COURT:  As I recall, Mr. Snoke, you'll be in

11   Denver trying to salvage one of my decisions from sheer

12   reversal.

13             MR. SNOKE:  I think we're in pretty good shape.

14             THE COURT:  Well, I will certainly excuse you

15   for that purpose.

16             MR. SNOKE:  Thank you.

17             THE COURT:  Anything else we ought to address

18   from either side?

19             MR. SPRINGER:  Not at this time, Your Honor.

20             MR. O'REILLY:  No, Your Honor.

21             THE COURT:  Very well.  Court will be in recess.

22        (COURT ADJOURNED FOR THE WEEKEND RECESS.  FOR THE

23   CONCLUSION OF JURY TRIAL PROCEEDINGS, SEE VOLUME XIV.)

24

25