1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF OKLAHOMA

3

4   UNITED STATES OF AMERICA,

5          Plaintiff,

6   vs.                        Case No. CR-09-43-SPF

7   LINDSEY KENT SPRINGER and
    OSCAR AMOS STILLEY,
8
           Defendants.
9   ----------------------------

10

11

12

13

14

15          TRANSCRIPT OF SENTENCING PROCEEDINGS

16          BEFORE THE HONORABLE STEPHEN P. FRIOT

17          UNITED STATES DISTRICT JUDGE

18          APRIL 21, 2010

19          VOLUME I OF III

20

21

22

23

24

25

```
 1   APPEARANCES:

 2   FOR THE GOVERNMENT:
                              Mr. Charles Anthony O'Reilly
 3                            U.S. Department of Justice
                              PO Box 972
 4                            Washington, DC 20044

 5                            Mr. Kenneth P. Snoke
                              US Attorney's Office (Tulsa)
 6                            110 W. 7th Street, Ste. 300
                              Tulsa, OK 74119

 7

 8
     FOR DEFENDANT SPRINGER:
 9                            Mr. Lindsey Kent Springer
                              5147 S. Harvard Ave.
10                            Ste. 116
                              Tulsa, OK 74135
11
                              Mr. Robert Scott Williams
12                            Taylor Ryan Schmidt & Van Dalsem
                              1437 S. Boulder Ave., Ste. 850
13                            Tulsa, OK 74119

14   FOR DEFENDANT STILLEY:
                              Mr. Oscar Amos Stilley
15                            7103 Race Track Loop
                              Fort Smith, AR 72901
16
                              Mr. Charles Robert Burton, IV
17                            Burton Law Firm, PC
                              320 S. Boston, Ste. 2400
18                            Tulsa, OK 74103

19
                         EXAMINATION INDEX
20
     BRIAN SHERN
21       DIRECT BY MR. O'REILLY                    13
         CROSS BY MR. SPRINGER                     39
22       CROSS BY MR. STILLEY                     124

23   BRIAN MILLER
         DIRECT BY MR. O'REILLY                   173
24       CROSS BY MR. SPRINGER                    192

25
```

1          THE COURT:  Good morning.  We're here in Criminal

2    09-43, United States of America v. Lindsey Kent Springer and

3    Oscar Amos Stilley for sentencing.

4       I note that the defendants and their standby counsel are

5    present.

6          Government counsel will please give their appearances.

7          MR. O'REILLY:  Good morning, Your Honor.  Charles

8    O'Reilly and Ken Snoke for the United States.  Also with us at

9    counsel table are Special Agent Brian Shern and Saundra

10   Burgess.

11         THE COURT:  Thank you very much.

12      Let me inquire first of the defendants.  I presume that

13   you have had full opportunity to review the presentence report

14   and the addendum as provided by Rule 32; am I right about

15   that?

16         MR. SPRINGER:  Yes, Your Honor.

17         THE COURT:  Mr. Stilley?

18         MR. STILLEY:  Yes, Your Honor.

19         THE COURT:  Very well.  I'm going to, first of all,

20   assure all concerned that I have read all of the filings that

21   are related to sentencing in this case.  Obviously, they are

22   voluminous, but I'm not in any sense complaining about how

23   voluminous the filings are, I know that this is a very

24   important matter to both the government and to the defendants.

25      I have also, because of some of the issues raised by the

1    filings in this case, done a fair amount of reading of the

2    cases cited and relied upon by the defendants.

3         So both the government and the defendants may certainly

4    proceed on the basis that I have read the materials that have

5    been submitted by both sides.

6         There are issues that certainly are in controversy, and

7    I'm fully cognizant of that.  I have sought to inform myself

8    and prepare myself in every way that I could reasonably

9    anticipate to address those issues.  I have done a fair amount

10   of analysis of my own.

11        And before we get to the presentations by the parties, let

12   me, perhaps, give you some orientation as to how we will

13   proceed and how I intend to address the matters that are at

14   issue.

15        The defendants in this case stand convicted by a jury of

16   the felony offense of conspiracy to defraud the United States

17   on Count 1; the felony offense of tax evasion on Count 2 as to

18   Mr. Springer; the felony offense of tax evasion on Counts 3 and

19   4 as to both defendants; and the misdemeanor offense of willful

20   failure to file tax returns as to Mr. Springer on Counts 5 and

21   6.

22        Mr. Springer faces a maximum sentence of 22 years in the

23   custody of the Bureau of Prisons.  Mr. Stilley faces a maximum

24   sentence of 15 years in the custody of the Bureau of Prisons.

25        Now, both sides are well aware of the statutory sentencing

1  factors that govern sentencing in this case, but I think it

2  would be appropriate to review those.

3       As we proceed, and certainly in the Court's final

4  evaluation of the matter from the perspective of both sides, I

5  will be mindful of my statutory duty to impose a sentence that

6  is sufficient but not greater than necessary to fulfill the

7  objectives of sentencing under the Sentencing Reform Act.

8       I will certainly take into account the factors mandated by

9  18 United States Code, Section 3553, including the purposes of

10  sentencing set forth in 3553(a)(2), which state the need for

11  the sentence, first, to reflect the seriousness of the offense,

12  to promote respect for the law and to provide just punishment

13  for the offense; secondly, to afford adequate deterrence for

14  criminal conduct; third, to protect the public from further

15  crimes of the defendant; and, fourth, to provide the defendant

16  with needed educational or vocational training, medical care or

17  other correctional treatment in the most effective manner.

18       I will also consider, as set forth in 3553(a), the nature

19  and circumstances of the offense and the history and

20  characteristics of the defendant, the kinds of sentences

21  available, the need to avoid unwarranted sentencing disparities

22  among defendants with similar records who have been found

23  guilty of similar conduct, the advisory sentencing guideline

24  calculation and the relevant guidelines policy statements, and,

25  fifth, the need to provide restitution, all of which I assure

1    the parties I will carefully consider.

2        I'm also mindful of the fact that, under 18 United States

3    Code, Section 3661, no limitation shall be placed on the

4    information concerning the background, character and conduct of

5    a person convicted of an offense which a court of the United

6    States may receive and consider for purpose of imposing an

7    appropriate sentence.

8        Now, it will come as no surprise to anyone to either side

9    of this case, based on the sentencing-related filings, that

10   there certainly is a major point of contention with respect to

11   the scope of the activities of the defendants that may be

12   included in the Court's determination of the defendants'

13   relevant conduct for sentencing guidelines purposes.  That does

14   have some impact on the Court's determination of the amount of

15   the tax loss, among other things.

16       I would point out, however, that the practical

17   significance of this disagreement may be less than might

18   appear, because the Court's determinations under the advisory

19   sentencing guidelines are only one of the factors that the

20   Court will take into account in determining fair, just and

21   lawful sentences in this case.

22       Matters that may be outside of the scope of relevant

23   conduct for guidelines purposes may well be appropriate for

24   consideration as the Court evaluates, for instance, the history

25   and characteristics of the defendants, as required by Section

1  3553, which is a factor independent of the application of the

2  advisory guidelines and may well encompass matters outside of

3  the scope of relevant conduct under the guidelines.

4      Now, some matters that are contested by the defendants are

5  foreclosed by the verdicts of the jury in this case, but there

6  are some factual matters that are very much in issue.

7      The determination of the tax loss for sentencing purposes

8  involve some facts and issues that were not involved in the

9  trial, and I assume that the government is prepared to present

10  evidence to support its contentions as to the tax loss and as

11  to restitution.

12      Some matters of relevant conduct that are addressed in the

13  presentence report and are challenged by the defendants were

14  not involved in the trial.  By way of example only, I will note

15  that matters relating to Dale Hedberg, Ernest Swisher, and Kent

16  Hovind received no mention or, at most, very little mention at

17  trial.

18      Another example is that if the government intends to

19  assert that Mr. Stilley encouraged others to violate the

20  Internal Revenue laws within the meaning of 2T1.9(b)(2), I will

21  need to hear evidence on that, because unless my notes fail me,

22  I recall no evidence on that point at trial, with the possible

23  exception of some relatively weak testimony from Mr. Stilley

24  himself in passing in which he said, in substance, that after

25  he read Mr. Schiff's book, he concluded that he did not owe

1   income taxes and he tried to persuade other people that he was

2   correct about that.

3       Other matters may be more appropriate for argument than

4   evidence, such as the question of whether Mr. Springer would

5   receive or should receive an adjustment for abuse of a position

6   of public or private trust within the meaning of Guideline

7   Section 3B1.3.

8       So we have issues as to relevant conduct, tax loss,

9   criminal source income, use of sophisticated means,

10  encouragement of others to violate the law, aggravating role in

11  the offense, abuse of a position of trust, obstruction of

12  justice, and restitution, perhaps, among other matters.

13      As I have said, and I would ask people to -- all concerned

14  to bear this in mind, since we did have a three-week trial,

15  some of these matters may be more -- at this stage, more fair

16  game for argument than for evidence.

17      One matter that I think also bears mentioning at this

18  point is the Paperwork Reduction Act defense that was asserted

19  at trial, that was asserted primarily, if not entirely, by

20  Mr. Springer.

21      Mr. Springer, you should bear in mind that I have rejected

22  your Paperwork Reduction Act defense as a matter of law and the

23  jury has rejected it as a factual matter.

24      On the willfulness issue, the jury rejected your

25  contention that you relied in good faith on the Paperwork

1    Reduction Act.  Although you can certainly spend your time in
2    these proceedings talking about the Paperwork Reduction Act if
3    you choose to do so, I will assure you that there's nothing
4    that you could say in this sentencing proceeding about the
5    Paperwork Reduction Act that would have an effect on your
6    sentence that you would consider to be beneficial.
7         So with the benefit of these preliminary observations, I
8    will now invite the government to give the Court a concise
9    preview of your intended presentation with respect to both
10   guidelines issues and restitution and any other matters the
11   government may consider relevant under Section 3553.
12            MR. O'REILLY:  Yes, Your Honor.  The United States
13   intends to call both Special Agent Brian Shern and Revenue
14   Agent Brian Miller.  Special Agent Shern will be testifying
15   with respect to additional --
16            THE COURT:  Wait just a minute.  I need to get a
17   writing pad to write on.  I managed to get out here without a
18   pad.
19        You got one handy?
20        Thank you.  You may proceed.
21            MR. O'REILLY:  Special Agent Shern will testify with
22   respect to additional income items, a few with respect to
23   Mr. Springer, because that was the focus of the trial, and then
24   quite a number of income items with respect to Mr. Stilley.
25   Primarily, that will be done in a summary, fairly quick

 1  fashion, because we are proceeding by way of a bank deposits-

 2  type analysis, where we will have Mr. Shern's testimony that

 3  both these individuals were engaged in income-producing

 4  activity, which was actually established at trial, and then

 5  that these items have the inherent appearance of income.

 6      Special Agent Shern will also testify with respect to some

 7  specifics regarding some of the individuals who paid monies to

 8  both Mr. Springer and Mr. Stilley.

 9      With respect to the types of encouragement that --

10  primarily Mr. Stilley we will be focusing on, because I think

11  Mr. Springer's encouragement was adequately addressed at

12  trial.

13      And then with respect to Mr. Miller, his testimony will

14  primarily be to summarize the net consequences of the

15  additional tax -- of the additional income items and then

16  multiply the result by 20 percent, because under the United

17  States Sentencing Guidelines, where a defendant does not file a

18  return and a better estimate is not readily calculable, that is

19  the basis for a tax harm in this case.

20          THE COURT:  What's the percentage again?

21          MR. O'REILLY:  Twenty percent, sir.  Twenty percent

22  of gross income.

23      And with respect to that, Mr. Miller will also state how

24  he came to the state loss -- state loss calculations and also

25  thereby explain what the restitution should be, should the

```
1    Court award restitution.
2           THE COURT:  Is that 20 percent figure set forth in
3    one of the guidelines?
4           MR. O'REILLY:  Yes, Your Honor, it's 2T1.1 -- I can
5    give you the exact cite.
6           THE COURT:  Okay.  2T --
7           MR. O'REILLY:  1.1, Your Honor.  It's under the Notes
8    Number 2, "If the offense involved" --
9           THE COURT:  Okay.  Okay.  You're right.  You're
10   right.  I got confused between that and some other sections.
11          MR. O'REILLY:  The 28 percent, which is a
12   corporation.
13          THE COURT:  There's no need to dwell on that.
14          MR. O'REILLY:  All right.
15          THE COURT:  I got confused, which is not the first
16   time and won't be the last, so I do appreciate that
17   clarification.  Thank you, Mr. O'Reilly.
18       Now, for the defendants, I'm not going to require you to
19   give me a preview of any presentation you may intend to make at
20   this time, because I suspect that probably your intended
21   presentation would be impacted, to some degree, by what
22   transpires as the government proceeds.
23       However, if either defendant has any response at all to
24   the brief preliminary comments that have been made by the
25   government, I'll certainly give you that opportunity.
```

 1          MR. SPRINGER:  Thank you, Your Honor.  I was not

 2   understanding clearly about what Mr. Miller was going to

 3   summarize.  I know he said he was going to summarize something,

 4   but I wasn't sure whether Mr. Miller was going to be

 5   summarizing -- that we should be prepared for a summary of the

 6   taxes at issue at the trial or if Mr. Miller is going to be

 7   summarizing about from 1990 to 2008.  I don't believe that was

 8   clear.  And that was the only issue I had.

 9          THE COURT:  For sentencing purposes, the Court's

10   scrutiny of your tax violations is not limited to those

11   adjudicated at trial, so I anticipate that the government will

12   proceed on that basis.

13          MR. SPRINGER:  Thank you, Your Honor.

14          THE COURT:  Mr. Stilley.

15          MR. STILLEY:  May it please the Court, Your Honor, I

16   just had one -- actually, I guess, you could call it question.

17   I heard you say that Count 1 was a felony, but it would be my

18   contention that it was a misdemeanor and I guess my question

19   would be, if that is still a matter for consideration, and the

20   reason for that being is that the statute itself says that if

21   the underlying offense is a misdemeanor, then the conspiracy

22   itself is also a misdemeanor.  Is that --

23          THE COURT:  It's a felony, Mr. Stilley.  You may be

24   seated.

25       The government may proceed.

1          MR. O'REILLY:  Your Honor, the United States calls

2     Special Agent Brian Shern.

3                         BRIAN SHERN,

4     (WITNESS SWORN)

5          MR. O'REILLY:  May I approach the witness, Your

6     Honor?

7          THE COURT:  You may.

8          MR. O'REILLY:  May the record reflect that I've put

9     two exhibit binders in front of Special Agent Shern, copies of

10    which were provided both to the defendants and to the Court per

11    the Court's scheduling order.

12         THE COURT:  Very well.

13                      DIRECT EXAMINATION

14    BY MR. O'REILLY:

15    Q.   Special Agent Shern, with respect to the documents that

16    are in front of you right now -- and I'm going to first ask

17    you:  Were you asked to collect all of the items for which we

18    intended to offer evidence that they were income to the

19    defendants?

20    A.   Yes.

21    Q.   As part of that, were subpoenas -- had subpoenas

22    previously been issued?

23    A.   Yes, they had.

24    Q.   Were those issued to various financial institutions?

25    A.   Yes.

1   Q.   Also to Checks Cashed?

2   A.   Yes.

3   Q.   Was there also -- were there also subpoenas issued to

4   PayPal?

5   A.   Yes, there was.

6   Q.   At trial, was a summary done of the tax comps for purposes

7   of trial?

8   A.   Yes, there was.

9   Q.   Did that -- do those tax comps that were done for that

10  purpose, for that trial, did that include everything that --

11       THE COURT:  Stand by just a moment while I pull this

12  table over.  I need to pull a table over to -- so I can spread

13  out the exhibit notebooks.

14       You may proceed.

15  Q.   (BY MR. O'REILLY)  Special Agent Shern, do the documents

16  in front of you consist of more income items than were used for

17  purposes of that summary at trial?

18  A.   Yes, they do.

19  Q.   Do they include at least one item from a year prior to

20  2000?

21  A.   Yes.

22  Q.   And do they include items for years after 2005?

23  A.   Yes, they do.

24  Q.   Do they also include a large number of items with respect

25  to Mr. Stilley?

BRIAN SHERN - DIRECT BY MR. O'REILLY                    15

1   A.   Yes.

2   Q.   In what is in front of you, government's exhibits that are

3   numbered 3 through 236, were all of those introduced into

4   evidence at trial?

5   A.   Yes.

6   Q.   And just generally speaking, can you describe what

7   Exhibits 3 through 236 are?

8   A.   They are checks written to Mr. Springer or Bondage

9   Breakers Ministries that we obtained pursuant to subpoena to

10  Checks Cashed.

11  Q.   Are there also some items -- some checks that were paid to

12  Mr. Oscar Stilley?

13  A.   Yes.

14  Q.   With respect to all of those items, was there testimony

15  about whether these were, in fact, payments for income?

16  A.   Yes, there was.

17  Q.   For services, I should say.

18  A.   Payment for services, yes.

19  Q.   There's also a set of exhibits, 1001 through 1011.  Do you

20  recall what generally those checks are?

21  A.   Yes.  Those are checks that were not introduced at trial

22  that we obtained.

23  Q.   Were those checks that were made payable either to

24  Mr. Springer or to his -- or for his benefit?

25  A.   Yes.

1  Q.   I'm not going to go through all of those, but with respect

2  to Exhibit 1001, is that a check payable to Dale Hedberg dated

3  August 31st of 1999?

4  A.   Yes, it is.

5  Q.   Is that check endorsed over to Mr. Springer?

6  A.   Yes.  This check was discovered through the subpoena we

7  issued to Checks Cashed and it was signed over -- it's made out

8  to the order of Dale Hedberg, but we found out later that the

9  check was endorsed to Mr. Springer.

10 Q.   How did you find that out?

11 A.   It was included in the records of Mr. Delozier with Checks

12 Cashed provided to us, that -- and he explained that these were

13 checks that Mr. Springer negotiated at his check-cashing

14 business.

15 Q.   Do you know what, if any, relationship there was between

16 Mr. Springer and Mr. Hedberg?

17 A.   Yes.  Mr. Springer assisted Mr. Hedberg with legal

18 services during his trial in Illinois for state tax crimes.

19 Q.   Was Mr. Hedberg represented by counsel?

20 A.   No, he was not.

21 Q.   Did Mr. Springer sit at counsel table with Mr. Hedberg?

22 A.   Yes.

23 Q.   Were there also -- I'm going to ask you about Exhibit

24 1134, which are PayPal records from June 16, 2006, through

25 December 30th of 2009.  And I don't know if you'll have to look

1   at those or not.  Just generally, what are those?

2   A.    Those are records that we subpoenaed from PayPal that

3   reflect the activity from Mr. Springer's PayPal account,

4   specifically monies that he received from transfers to his

5   PayPal account.

6   Q.    Just generally speaking, what is a PayPal account?

7   A.    It's an Internet payment service where people can send and

8   receive money through an Internet account.  Funds are accessed

9   from checking accounts and credit cards and sent to other

10  parties through PayPal.

11  Q.    I ask you now to draw your attention to -- with respect to

12  each of those items in Exhibits 3 through 236 and 1001 through

13  1011, and including the PayPal items, are there dates

14  associated with each of those items?

15  A.    Yes, there is.

16  Q.    And is that how the -- they were characterized and

17  categorized for purposes of tax computations?

18  A.    Yes.

19  Q.    With respect to the payors or the people that caused the

20  items to be paid to Mr. Springer, have you spoken to all of

21  those people?

22  A.    No.

23  Q.    Have you spoken to a large number of them?

24  A.    Yes.

25  Q.    Are you aware with respect to any of those people you've

1  spoken to of an instance where Mr. Springer had done nothing to

2  benefit that person?

3  A.    No, I'm not aware of that.

4  Q.    I'd ask you now to take a look at what's been marked as

5  1012 to 1133, and could you generally describe for the Court

6  what those items are?

7  A.    Yes.  These are checks that we subpoenaed from various

8  bank accounts of Oscar Stilley.

9  Q.    Were they all accounts held in Mr. Stilley's name?

10  A.    There were a few items that were subpoenaed from

11  Mr. Stilley's wife's account, but the majority were items

12  subpoenaed from accounts in Mr. Stilley's name.

13  Q.    And was one of those the IOLTA account that we heard a lot

14  of testimony about at trial?

15  A.    Yes.

16  Q.    How did you learn to look at Mrs. Stilley's account?

17  A.    Some of the checks, from the witnesses we talked to, at

18  least one, I think there may be a couple more, we, during the

19  course of the investigation, determined that the check was

20  deposited into his wife's account.

21  Q.    And what was the purpose of that check?

22  A.    It was payment for legal services.

23  Q.    Provided by Mr. Stilley?

24  A.    Yes.

25  Q.    Based upon that, with respect to the Exhibits 1012 through

1  1163 -- excuse me -- through 1133, did you determine whether or

2  not those were payments for Mr. Stilley's legal services?

3  A.    For every check, we couldn't determine exactly that was

4  what they were for, but they were payments that were deposited

5  into accounts.  Some of them might have said "payment for legal

6  fees" or "retainer."

7  Q.    Did they have appearances of payments for legal fees?

8  A.    Yes.

9  Q.    During the time period in issue -- was this time period

10  2000 through 2008?

11  A.    Yes.

12  Q.    Was Mr. Stilley holding himself out as an attorney?

13  A.    Yes, he was.

14  Q.    And, in fact, for a significant portion of that time, did

15  he, in fact -- was he licensed to practice law?

16  A.    Yes.

17  Q.    With respect to that, are you aware of if at any time

18  Mr. Stilley made any representations to a court that he was

19  authorized to practice law when, in fact, he was not?

20  A.    Yes.

21  Q.    Could you please explain to the Court what you mean by

22  that.

23  A.    I believe in the District of Hawaii and here in the

24  Northern District of Oklahoma, he explained to the court that

25  he was fully authorized to practice law and represent the

1   client that was a participant in that matter, and, in fact, he

2   had been under sanctions and under -- in trouble with the

3   Arkansas Bar.

4   Q.   Was he, in fact, suspended pending disbarment or at least

5   suspended by his bar association in the state of Arkansas?

6   A.   Yes.

7   Q.   Yet he was representing to various courts that he was

8   authorized to practice law?

9   A.   That's correct.

10  Q.   Does that include for Mr. Bennett in Hawaii?

11  A.   Yes.

12  Q.   Did that also, to your knowledge, happen in the state of

13  Arizona?

14  A.   I don't recall.

15  Q.   With respect to a Dennis Poseley?

16  A.   I don't recall if that was one of the places.

17  Q.   But there was more than one occasion this happened?

18  A.   Yes.

19  Q.   With respect to the United States' contention that

20  Mr. Stilley encouraged others to violate the Internal Revenue

21  laws, are you aware of any time Mr. Stilley encouraged anyone

22  to violate the Internal Revenue laws?

23  A.   Yes.

24  Q.   Can you please identify the instance or instances.

25  A.   I reviewed the grand jury transcripts of people that

1  appeared before the grand jury:  James Lake, Eddy Patterson,

2  and Philip Roberts.

3       During their grand jury testimony, Mr. Roberts

4  specifically said that he had had questions about whether or

5  not there was a law requiring him to file and pay his taxes and

6  he sought out the advice of Mr. Stilley.

7  Q.   Let me stop you right there.  Did Mr. Roberts indicate

8  when he had gone to see Mr. Stilley?

9  A.   Yes, it was the early nineties.

10 Q.   And what did -- why did Mr. Roberts go to see Mr. Stilley?

11 A.   Because he was seeking advice from a legal expert as to

12 whether or not he was required to file and pay his taxes.

13 Q.   Did Dr. Roberts -- I apologize earlier, I referred to him

14 as "Mr. Roberts" -- did Dr. Roberts indicate what advice or

15 instruction Mr. Stilley gave him?

16 A.   Yes.

17 Q.   What did Dr. Roberts say?

18 A.   He told Mr. Stilley that he was correct in his belief,

19 that he was -- had no liability to file a return and no

20 liability to pay any tax to the United States.

21 Q.   Did Dr. Roberts follow that advice?

22 A.   Yes, he did.

23 Q.   What were the consequences to Dr. Roberts?

24       THE COURT:  Mr. O'Reilly, the witness said "he told

25 Mr. Stilley that he was correct in his belief that he was."

1  Q.   (BY MR. O'REILLY)  Is it your testimony that Dr. Roberts

2  told Mr. Stilley that he was correct in his belief?

3  A.   No, Mr. Stilley told Dr. Roberts.

4       MR. O'REILLY:  I apologize, Your Honor.  I'll try to

5  listen more carefully.

6  Q.   (BY MR. O'REILLY)  With respect to that advice he received

7  at that time, was Mr. Stilley an attorney?

8  A.   Yes.

9  Q.   Did Dr. Roberts follow that advice?

10  A.   No, he did not -- or, yes, he did.  He did not file his

11  taxes or pay his taxes.

12  Q.   Was Dr. Roberts prosecuted for willful failure to file?

13  A.   Yes, he was.

14  Q.   Was he convicted?

15  A.   Yes.

16  Q.   Do you recall how much time he served?

17  A.   I believe it was three years, but I don't recall

18  specifically.

19  Q.   Was it 16 months?  Does that refresh your recollection?

20  A.   Yes, that's right.

21  Q.   Was Dr. Roberts --

22       THE COURT:  Can you clarify when these contacts

23  between Mr. Stilley and Dr. Roberts would have occurred, at

24  least, roughly.  You may have asked, but --

25  Q.   (BY MR. O'REILLY)  Was this discussion -- did this take

BRIAN SHERN - DIRECT BY MR. O'REILLY                          23

```
 1   place in the early 1990s?

 2   A.   Yes.  I believe it was 1990 is what the transcript says

 3   that he said.

 4   Q.   In his grand jury testimony, Dr. Roberts stated he thought

 5   it was 1990?

 6   A.   Yes.

 7   Q.   Were there tax losses associated with respect to

 8   Dr. Roberts' failures to file tax returns following his

 9   discussion with Mr. Stilley that we have included in our

10   exhibits?

11   A.   Yes.

12   Q.   And are those included in Exhibits 1148 through 1151 for

13   the years 1992 through 1995, respectively?

14   A.   Yes, I believe there's a summary schedule listing all the

15   money attributed from Mr. Roberts.

16   Q.   What are Government's Exhibits 1148 through 1151?

17   A.   Those are the IRS transcripts of account for Mr. Springer

18   and Mr. Stilley and -- I'm sorry -- just 1148 through --

19   Q.   1148 through 1151.

20   A.   Those are the transcripts related to Mr. Roberts.

21   Q.   For Dr. Roberts?

22   A.   Dr. Roberts, yes.

23   Q.   And for the years 1992 through 1995, respectively?

24   A.   Yes.

25   Q.   Was Dr. Roberts -- is Dr. Roberts the only person whom you
```

1   are aware that Mr. Stilley provided this type of encouragement?

2   A.    No.

3   Q.    Who else?

4   A.    James Lake.

5   Q.    With respect to James Lake, what did -- what encouragement

6   did Mr. Stilley provide to James Lake?

7   A.    Similarly, Mr. Lake had similar views to Mr. Roberts, in

8   that he was seeking the advice of an attorney and legal experts

9   as to whether he was required to file returns, he had questions

10  about that.  And he later hired Mr. Springer and Mr. Stilley

11  and talked to them.  And both Mr. Springer and Mr. Stilley told

12  him that he had no legal requirement to file returns.

13  Q.    When did this discussion occur approximately?

14  A.    Approximately 2000.

15  Q.    With respect to Mr. Lake, is the tax loss attributed to

16  the defendants based upon Mr. Lake's conduct after receiving

17  that advice?

18  A.    Yes.

19  Q.    Did Mr. Stilley and/or Mr. Springer give similar advice to

20  either Eddy or Judith Patterson?

21  A.    Yes, they did.

22  Q.    Please explain what advice was given and -- first of all,

23  when did this occur?

24  A.    The advice to Mr. Patterson?

25  Q.    Yes.

BRIAN SHERN - DIRECT BY MR. O'REILLY                              25

1   A.    It would have been in 2000 as well.

2   Q.    What was the circumstance upon -- under which

3   Mr. Patterson -- was it Mr. Patterson or Mrs. Patterson that

4   received this advice?

5   A.    Mr. Patterson.

6   Q.    What were the circumstances under which Mr. Patterson

7   received this advice?

8   A.    He had been under criminal investigation for tax crimes

9   and other crimes and he was also seeking advice from legal

10  experts as to what to do because of his criminal

11  investigation.

12  Q.    To whom did he turn?

13  A.    Mr. Springer and Mr. Stilley.

14  Q.    What advice or encouragement did Mr. Stilley give

15  Mr. Patterson?

16  A.    Mr. Patterson asked Mr. Springer and Stilley whether or

17  not they filed tax returns and both of them replied, no, we

18  don't file tax returns.

19  Q.    Was there any other encouragement given?

20  A.    I can't recall.

21  Q.    With respect to the tax loss that has been included in the

22  tax computations, does that include tax losses occurring before

23  Mr. Patterson had this conversation with Mr. Springer and

24  Mr. Stilley?

25  A.    No.

1   Q.   Is it just the year 2000?

2   A.   Yes.

3   Q.   With respect to -- oh, let me step back, what is -- is

4   Exhibit 1147 the IRS record of Mr. Patterson's tax liability

5   for the year 2000?

6   A.   Yes.

7   Q.   And with respect to Mr. Lake, is Exhibit 1143 the account

8   transcript or the IRS record of Mr. Lake's tax liability?

9   A.   Yes, it is.

10  Q.   I'm going to ask you now to turn to a Mr. Patrick Turner.

11  Mr. Turner testified at this trial, correct?

12  A.   Yes, he did.

13  Q.   Actually, I think Mr. Turner explained the circumstances

14  under which he transferred $250,000 to Mr. Springer at trial,

15  correct?

16  A.   Yes.

17  Q.   With respect to some of the income items that have been

18  attributed in the government's calculations, specifically with

19  respect to Mr. Swisher, do you recall any discussions you had

20  with Mr. Swisher?

21  A.   Yes, I do.

22  Q.   Was that in the course of your investigation?

23  A.   Yes.

24  Q.   Also in the course of preparing for trial?

25  A.   Yes.

1   Q.   What, if any, relationship did Mr. Swisher have with

2   either of the defendants?

3   A.   Mr. Swisher told me that he had hired Mr. Stilley to

4   represent him with a tax violation that he had been charged

5   with and he had explained that Mr. Stilley had asked him if he

6   could hire Mr. Springer to help with preparing his case for him

7   and Mr. Swisher gave Stilley money so he could hire

8   Mr. Springer --

9          MR. STILLEY:  Objection, hearsay.

10         THE COURT:  Overruled.  Go ahead.

11         THE WITNESS:  Mr. Stilley -- according to what

12  Mr. Swisher told me, Mr. Stilley asked for an amount of money

13  so he could give it to Mr. Springer so Mr. Springer could help

14  them with the case.

15  Q.   (BY MR. O'REILLY)  Did Mr. Swisher tell you that

16  Mr. Stilley asked for a specific amount of money?

17  A.   He just asked -- Mr. Stilley asked Mr. Swisher, hey, I've

18  got this guy who is a really astute legal expert, do you care

19  if I bring him onboard and pay him, and Mr. Swisher agreed.

20  And Mr. Stilley paid Mr. Springer from the money that

21  Mr. Swisher provided Mr. Stilley.

22  Q.   And is that one of the checks that's included in the

23  exhibits we've already referenced?

24  A.   Yes.

25  Q.   With respect to Mr. Hovind -- actually, it's Kent Joe

BRIAN SHERN - DIRECT BY MR. O'REILLY                    28

```
 1  Hovind; is that correct?
 2  A.    Yes.
 3  Q.    Who were the Hovinds?
 4  A.    The Hovinds were a couple from Florida that had been
 5  charged with tax violations.
 6  Q.    What, if any, relationship did the defendants have with
 7  the Hovinds?
 8  A.    Mr. Stilley didn't have any relationship with the Hovinds;
 9  however, Mr. Springer helped them throughout their criminal
10  investigation and trial.
11  Q.    And are there payments from the Hovinds to Mr. Springer
12  that are included in the exhibits?
13  A.    Yes.
14  Q.    Are you familiar with -- if there's been any media or
15  other coverage of this trial?
16  A.    Yes.
17  Q.    What type of coverage are you aware of?
18  A.    Just -- there's been some stuff in the papers and there's
19  also -- a gentleman has a blog that discusses the events that
20  happened during trial.
21  Q.    And was that a blog that was maintained and started at or
22  even before the beginning of the trial and continued through
23  the trial?
24  A.    Yes.
25  Q.    Is it still active?
```

1   A.   Yes.

2   Q.   Does that blog -- I'm going to ask you to state your

3   opinion here.  Is there a perceived bias with respect to that

4   blog?

5   A.   Yes.

6   Q.   What is that bias?

7   A.   That the defendants are innocent and they're just being

8   wrongly convicted by the government.

9   Q.   Is there an indication on the blog of how many people have

10  visited that site?

11  A.   Yes.

12  Q.   When did you last check that blog?

13  A.   Yesterday afternoon.

14  Q.   How many visitors had -- did it indicate had visited that

15  blog -- that Web site as of yesterday?

16  A.   It was over 8,100, I believe.

17  Q.   During Mr. Springer's career with respect to not filing

18  tax returns and not paying taxes, has he encouraged others

19  through means other than what was discussed at trial to violate

20  the tax laws?

21  A.   Yes.

22  Q.   How so?

23  A.   Did you say during the years we had under indictment or --

24  Q.   No.

25  A.   Just any -- he assisted Mr. Dingman and Mr. Grady and

BRIAN SHERN - DIRECT BY MR. O'REILLY                    30

1   another gentleman named Mr. Robertson with preparing abusive

2   trust documentation, and also in the words of Mr. Dingman and

3   Mr. Grady, he had them file frivolous paperwork with the IRS to

4   unvolunteer from the system.

5   Q.    When was this?

6   A.    This was in the early nineties.

7   Q.    Did Mr. Springer also host a Web site?

8   A.    Yes.

9   Q.    What was that Web site?

10  A.    Penaltyprotestor.com.

11  Q.    Dot-com or dot-org?

12  A.    Whether it was com or org, it both arrived at that site.

13  Q.    Okay.  Both?

14  A.    Yes.

15  Q.    Generally describe -- what was the content of that Web

16  site?

17  A.    The Web site had links that took you to both video and

18  audio presentations that Mr. Springer put on, as well as

19  documents from cases that Mr. Springer had been involved with

20  or not involved with, many relating to the Paperwork Reduction

21  Act, and others relating to defenses that had been raised that

22  have been deemed frivolous.

23  Q.    With respect to that Web site, do you have any idea how

24  many people visited it?

25  A.    No.

1   Q.   Did some of the individuals you spoke with in the course

2   of your investigation tell you whether or not they had visited

3   the Web site?

4   A.   Yes.

5   Q.   Roughly how many of the people you talked to had, if you

6   recall?

7   A.   I believe I just remember maybe three.  Mr. Turner was the

8   one that developed the Web site.

9   Q.   He was the technical guy?

10  A.   Yes.

11  Q.   In fact, I believe he testified to that, correct?

12  A.   Yes.

13  Q.   Did Mr. Springer also host telephone conference calls?

14  A.   Yes.

15  Q.   Can you describe briefly what those telephone conference

16  calls were.

17  A.   Yes.  Most of them related to the Innovative Financial

18  Consultants case that was out of Phoenix, Arizona.  Basically,

19  it was a trust scam that advised people to put all their assets

20  into trusts to evade paying their taxes.  And once this

21  organization became under investigation, Mr. Springer hosted

22  these conference calls where people who were involved in that

23  organization would call in and he would give them advice.

24  Q.   Do you know how many people participated in the telephone

25  conference calls?

1  A.   Of our witnesses in our trial, there were at least eight

2  or nine, I believe, and they would always -- what they told us

3  was there was always several people on the calls and the calls

4  occurred at least weekly.

5           MR. O'REILLY:  If I may have a moment, Your Honor.

6           THE COURT:  You may.

7           MR. O'REILLY:  Your Honor, at this time there's

8  nothing more from Special Agent Shern from the government.

9           THE COURT:  Cross-examine --

10          MR. O'REILLY:  Your Honor, I apologize.  I don't know

11  if technically I need to do this, but I would move the exhibits

12  referenced into evidence which would be -- do you need me to do

13  that for purposes of sentencing?

14          THE COURT:  The ones that he has referred to, are

15  they ones that were received at the trial?

16          MR. O'REILLY:  Well, there were both those and some

17  new ones.  And if you want, I will move exhibits -- can you

18  tell me what the exhibit numbers are?  From 1101 -- from 1001

19  through -- up to the start of the summaries -- actually, Your

20  Honor, just for ease of purposes, I would move Government's

21  Exhibits 1001 through 1158 -- well, actually, 1156 into

22  evidence.  1157 and 1158 are transcripts of the defendants'

23  testimony; I don't think we need to move those into evidence.

24          THE COURT:  Very well.  Any objection?

25          MR. SPRINGER:  May I have just a moment, Your Honor?

 1              THE COURT:  You surely may.

 2              MR. O'REILLY:  Your Honor, just for clarification,

 3     the exhibits that were presented at trial we do not need to

 4     admit, correct?

 5              THE COURT:  That's true.  Although, if you want, I

 6     think it is helpful, to some degree, to have a discrete record

 7     for sentencing purposes, so an exhibit that was received at

 8     trial need not be readmitted, but I think it would be a good

 9     idea if you want me to consider it for sentencing purposes to

10     at least refer to it during these proceedings by exhibit

11     number.

12              MR. O'REILLY:  Then, Your Honor, what I will do is

13     simply, for clarification purposes, go through all the exhibits

14     that we are moving in and are referencing for purposes of our

15     summaries.

16              THE COURT:  First of all, we have an offer pending of

17     1001 through 1156.

18              MR. SPRINGER:  I'm sorry, Your Honor, I'm still on

19     that, I'm still at the same spot I was a second ago.

20              THE COURT:  That's fine.  Just stand by for just a

21     moment.

22              MR. SPRINGER:  I would have an objection --

23              THE COURT:  Just a minute.  Now, before I hear from

24     the defendants, Mr. O'Reilly, the ones you were getting ready

25     to read into the record, are they exhibits you've already made

 1   a reference to this morning?

 2          MR. O'REILLY:  Yes, Your Honor.  They would be

 3   Exhibits 3 through 236.  However, that is a -- there are

 4   discrete exhibits that we produced in the exhibit books, not

 5   all of the Exhibits 3 through 236 are put into evidence -- are

 6   being represented at trial because they were not evidence of

 7   income that we were -- that you had asked us to do.  I can go

 8   through and specifically enumerate --

 9          THE COURT:  That's not necessary.  Very well.

10      Now, Mr. Springer, I'll hear you.

11          MR. SPRINGER:  Your Honor, at this time, I do not

12   have an objection to 1001.  I do not have an objection to

13   1134.  I do not have an objection at this time to 1148 through

14   1152.  I do not have an objection to 1143 or 1147.

15      But the remainder of the exhibits that Mr. O'Reilly has

16   now moved into -- or attempting to move into, I don't believe

17   he's laid a foundation for them, they have not been

18   authenticated, they are based upon hearsay of testimony, and

19   they are not relevant, Your Honor, at this point because of

20   those reasons.

21          THE COURT:  Thank you.  Mr. Stilley, any objection?

22          MR. STILLEY:  Your Honor, no further objections, but

23   I join Mr. Springer's.

24          THE COURT:  Very well.

25      Let me digress for just a moment.  I probably should have

 1  mentioned this and covered this point a few minutes ago when we

 2  had the hearsay objection.  One of the great ironies of federal

 3  criminal law is that the Rules of Evidence -- the Federal Rules

 4  of Evidence do not apply at sentencing.  I personally am not

 5  totally comfortable with throwing all caution to the winds,

 6  even though the Rules of Evidence do not apply -- by their own

 7  terms, they do not apply at sentencing.  And I do think that is

 8  ironic, because very often sentencing is the most consequential

 9  stage of a criminal case.

10      The exhibits that have been offered will be received.

11      I will assure the defendants that, to the extent that

12  they're not relevant or to the extent that I am mystified as to

13  where they came from or as to their authenticity, they are not

14  going to have any significant impact and perhaps no impact on

15  my evaluation of the sentencing-related issues.

16      And the same thing applies, for instance, with respect to

17  hearsay.  Hearsay is -- hearsay that would be inadmissible in a

18  jury trial is admissible in this proceeding.  But even though

19  the Rules of Evidence don't apply, the rules of common sense do

20  apply, so the further we get out on that hearsay limb, the less

21  likely it is to have any impact on my evaluation of the matter,

22  even though it's admissible.

23      So I don't expect that the defendants will take great

24  comfort from that explanation, but I think perhaps it's

25  appropriate to give the defendants some assurance that, even

1   though the Rules of Evidence don't apply, to the extent that

2   the Rules of Evidence are based on common experience and common

3   sense, they effectively do apply and they will apply to my

4   evaluation of the issues for sentencing purposes.

5        But the exhibits that have been offered will be received.

6        Mr. O'Reilly, you may proceed.

7   Q.   (BY MR. O'REILLY)  Special Agent Shern, with respect to

8   Government's Exhibits 1012 through 1133 -- which I believe you

9   previously testified were all payments made to Mr. Stilley; is

10  that correct?

11  A.   Yes.

12  Q.   Did the vast majority of those -- are these all checks?

13  A.   I think there's a couple money orders in there, but, yes,

14  most of them are checks.

15  Q.   And with respect to -- did you go through and see whether

16  or not these checks appeared to be payments for legal services?

17  A.   Yes.

18  Q.   How did you do that?

19  A.   I took the checks that appeared -- like, if they said

20  "retainer" or if they were from an individual and it said "for

21  legal services," I took all those checks, and then checks that

22  were deposited into his Interest on Lawyers Trust Account,

23  every one of those checks I included in there, and -- as well

24  as if it was a check that wasn't deposited into his IOLTA

25  account, but I knew that it was from a client, that I know he

1  had provided legal services to in the past, then I included

2  that.

3  Q.    How would you know it was from a client for whom

4  Mr. Stilley had provided legal services?

5  A.    People that testified in trial or before the grand jury or

6  people that he was listed on PACER that he had worked a case

7  with them.

8  Q.    I'm just going to ask you about a couple of names.  I'm

9  going to ask what you know.  Are some of the checks that are

10 attributed to both Mr. Springer and to Mr. Stilley in the

11 1001-plus series, are some of those -- and, in fact, some

12 earlier from the trial, are some of those from an individual by

13 the name of Guthrie?

14 A.    Yes.

15 Q.    Who is Mr. Guthrie?

16 A.    I don't know much about Guthrie.  We never interviewed

17 him.  But Mr. Springer had some of his case postings on his Web

18 site, and as well -- I cannot recall for certain, but I think

19 the case may have been listed on PACER as well.

20 Q.    Okay.  With respect to -- did Mr. Stilley receive payments

21 from Mr. Guthrie?

22 A.    I don't remember.  I'd have to look at the exhibits.

23         THE COURT:  Mr. Shern, you testified that

24 Mr. Springer had case postings from Guthrie's case on his Web

25 site?

1          THE WITNESS:  Yes, Your Honor.

2          THE COURT:  Okay.  Go ahead.

3   Q.   (BY MR. O'REILLY)  Are you familiar with an individual by

4   the name of Palmer?

5   A.   Yes.

6   Q.   Who is Mr. Palmer?

7   A.   Mr. Palmer testified before the grand jury.  We discovered

8   Mr. Palmer because he had written Mr. Springer a few checks,

9   and when he testified -- from what I remember from his grand

10  jury testimony, he's been a supporter of Mr. Springer for a

11  long time and he talked about how Mr. Springer did various

12  legal work for people and helped people out.

13  Q.   I'm going to ask you to look at Government's Exhibit

14  Number 1060.  Is that -- appears to be a small check made

15  payable to Oscar Stilley for 20,000.54 -- should be the top

16  check.

17  A.   Yes, that's a payment, a check written from Todd and

18  Patricia Guthrie.

19  Q.   Does it indicate -- no, the top check -- you're fine,

20  Special Agent Shern.  I apologize.

21  A.   It says "legal fees" in the notation.

22  Q.   Says "legal fees" in the notation?

23  A.   Yes.

24          MR. O'REILLY:  Your Honor, at this time, nothing

25  further with respect to Special Agent Shern.

BRIAN SHERN - CROSS BY MR. SPRINGER                    39

```
 1              THE COURT:  Mr. Springer, cross-examination.
 2                      CROSS-EXAMINATION
 3  BY MR. SPRINGER:
 4  Q.   Good morning, Mr. Shern.
 5  A.   Good morning.
 6  Q.   Mr. O'Reilly referred to you as a special agent, correct?
 7  A.   Yes.
 8  Q.   Special agent for the Secretary of the Treasury; is that
 9  correct?
10  A.   For the Internal Revenue Service.
11  Q.   Internal Revenue Service?
12  A.   Yes.
13  Q.   Not the Secretary of the Treasury?
14  A.   I believe the Internal Revenue Service falls under the
15  Secretary of the Treasury.
16  Q.   Okay.  And you are a delegate of the Secretary of the
17  Treasury; is that correct?
18              MR. O'REILLY:  Objection.  Beyond the scope of direct
19  and relevance.
20              THE COURT:  Overruled.
21              THE WITNESS:  Can you repeat the question, please?
22  Q.   (BY MR. SPRINGER)  Are you a delegate of the Secretary of
23  the Treasury of the United States?
24  A.   Yes.
25  Q.   Okay.  When did you (sic) make you a delegate?
```

BRIAN SHERN - CROSS BY MR. SPRINGER                          40

1    A.   I don't know.

2            MR. O'REILLY:  Objection, Your Honor; relevance.

3            THE COURT:  Overruled.  We'll -- I'm going to hear

4    this for a while, we'll see how much, but it will be

5    overruled.

6    Q.   (BY MR. SPRINGER)  When you say "special agent," that's

7    what you're referring to is you're a delegate of the Secretary

8    of Treasury; is that correct?

9    A.   Yes.

10   Q.   Okay.  And --

11   A.   I guess to answer your prior question about -- when I said

12   "I don't know," I would assume I became a delegate whenever I

13   became a special agent.

14   Q.   Okay.  Are you familiar -- scratch that.

15       Is there anybody between you and the Secretary of the

16   Treasury that you get your delegation order to be a special

17   agent from that you know of?

18   A.   I'm not sure I know how to answer that.

19   Q.   Thank you.  If you would turn to Exhibit -- Government's

20   Exhibit Number 134, please -- excuse me -- 1134, please.  Do

21   you remember testifying earlier today with regard to Dale

22   Hedberg -- I'm sorry, 1001, I'm sorry, Your Honor.  I'm sorry.

23   I'm sorry.  I'm sorry.  It's 1001.  I'm sorry, Agent Shern.

24   It's 1001, Exhibit Number 1001.

25       Do you remember testifying earlier about a check written

BRIAN SHERN - CROSS BY MR. SPRINGER                          41

1   to Dale Hedberg for $111,701.50?

2   A.    Yes.

3   Q.    And do you remember testifying earlier that -- you said I

4   helped him during his criminal trial?

5   A.    Yes.

6   Q.    And do you remember about what time of the year and what

7   year that criminal trial was in?

8   A.    I don't remember.

9   Q.    Are you familiar with Mr. Gollihare's presentence report?

10  A.    I've seen it.  I'm somewhat familiar with it.

11  Q.    Would you have -- would 1998 refresh your memory as to

12  when Mr. Hedberg went to trial?

13  A.    Really, without looking at something, I couldn't tell you.

14  Q.    Okay.  Do you remember -- did Mr. Hedberg tell you why he

15  gave a $111,000 check under your testimony to Lindsey

16  Springer?

17  A.    Yes.

18  Q.    What did he say?

19  A.    He said it was -- he actually didn't tell me, we had

20  another agent out of Illinois go interview him.

21  Q.    Okay.

22  A.    And I talked to him on the phone once as well, but he said

23  that it was a donation so that his kids could reap the benefits

24  of your work or something of that nature.

25  Q.    Is it safe to say that this $111,000 check came well after

1    Mr. Hedberg went to trial and even went to prison and came out

2    of prison; isn't that safe to say?

3    A.   If he went to trial in '98, I guess it would have been

4    sometime -- sometime around a year that this check was given

5    later.

6    Q.   Did you investigate who Hedberg Declaration Trust Dawn

7    Jenkins was?

8    A.   Yes.

9    Q.   Who was that?

10   A.   She was the trustee of a -- his father died and he

11   inherited this money and she was the trustee and wrote him this

12   check.

13   Q.   Did his father's death have anything to do with him going

14   to trial or me sitting and helping him in his trial?

15   A.   I don't believe it did.

16   Q.   At the time that he had his trial, did you know his dad

17   was going to die?

18   A.   I don't know.

19   Q.   And did Mr. Hedberg ever tell you or the other agent that

20   at any time he owed me any money for sitting at his trial in

21   1998?

22   A.   I don't recall.

23   Q.   Have you seen any evidence of me asking Mr. Hedberg for

24   any money or him giving me any money during his trial?

25   A.   No.  All we have is this check.

BRIAN SHERN - CROSS BY MR. SPRINGER                                    43

1  Q.   And if I'm understanding you correctly, it is your

2  position that this check was to pay me for sitting at his table

3  a year and a half earlier?

4  A.   Yes.

5  Q.   Even though it came from his dad's estate when his --

6  after his dad had died?

7  A.   Yes.

8  Q.   And even though he never told anybody he owed me any money

9  whatsoever?

10 A.   That's correct.

11 Q.   So is it more like it was gratitude?

12 A.   No, I think you probably worked him like you have

13 everybody else.

14 Q.   I asked him for $111,701.50?

15 A.   You probably asked him for something.

16 Q.   I probably did, but you have no evidence that I did; is

17 that correct?

18 A.   Other than this check.

19 Q.   In your tax calculations, did you consider the gross

20 income --

21          MR. O'REILLY:  Objection, Your Honor.  Special Agent

22 Shern did not testify about the tax calculations, he only said

23 that these were used to do them.  Revenue Agent Miller will be

24 testifying about the actual tax calculations.

25          THE COURT:  Mr. Springer, I don't want to narrow

```
 1   your --

 2          MR. SPRINGER:  He's right.

 3          THE COURT:  Okay.  Go ahead.

 4          MR. SPRINGER:  He's right.

 5   Q.  (BY MR. SPRINGER)  You had mentioned, summary-wise, about

 6   some PayPal exhibits that were contained in these exhibits; do

 7   you remember that?

 8   A.   Yes.

 9   Q.   And I believe they were found at 1148 to 1152.

10          MR. O'REILLY:  Your Honor, that would be, I believe,

11   1133 -- 1134 to 1135 for the record.

12          MR. SPRINGER:  1134, right.  Okay.

13   Q.  (BY MR. SPRINGER)  Did I understand you to say that you

14   didn't contact everybody on these lists, but you had talked to

15   most of them on the list?

16   A.   I don't think I testified about who I contacted with

17   respect to the PayPal stuff.

18   Q.   And that's what I'm trying to clean up here.  When you

19   made testimony earlier that Mr. O'Reilly asked you had you

20   spoke to every one of these people and you said no, who were

21   you referring to when you said that?

22   A.   I think at the time he was talking about the checks that

23   were in the additional exhibits.

24   Q.   Okay.

25   A.   But I can't recall for sure if it was that or --
```

BRIAN SHERN - CROSS BY MR. SPRINGER                    45

1   Q.   Do you remember using the phrase "some benefit," that you

2   said they at least got "some benefit," but you didn't know for

3   sure?

4   A.   Yes, whenever he asked me do you know anybody that didn't

5   -- that you encountered that we were charging these payments

6   that you had done no work for and I said I didn't encounter

7   anybody.

8   Q.   Right.  So as far as you understand, everybody that you

9   spoke to received some benefit from their relationship with

10  me?

11  A.   Yes.

12  Q.   Okay.  And is that testimony what you rely upon to take

13  every dollar that somebody gives me and makes it gross income?

14        MR. O'REILLY:  Objection, Your Honor.  That's a legal

15  conclusion that was covered by the Court's jury instructions.

16        THE COURT:  Overruled.

17        THE WITNESS:  That's one of the factors, yes.

18  Q.   (BY MR. SPRINGER)  So if, for instance, I prayed with them

19  over the phone, would you consider that a benefit?

20  A.   If they gave you money because you prayed with them?

21  Q.   I'm just asking you:  Did you determine whether, in the

22  instance of some benefit, if somebody gave me money, and the

23  only thing I did was pray with them, is that some benefit that

24  converts the money they gave from a gift to gross income, under

25  your understanding?

BRIAN SHERN - CROSS BY MR. SPRINGER                                    46

1          MR. O'REILLY:  Objection, Your Honor.  Special Agent
2  Shern's understanding of what's a gift and what's income is not
3  an issue.
4          THE COURT:  If your objection had been that he
5  doesn't have any way of knowing whether the prayers were
6  answered, that might be another thing.  That will be
7  overruled.
8          MR. SPRINGER:  Thank you.
9          THE WITNESS:  What I testified to was the people that
10  I talked with, I didn't know of any -- with the exception of
11  maybe one that didn't -- you didn't perform some kind of work
12  for, are the ones that you prayed with, I'm not -- without
13  talking to them, I wouldn't know, but -- I wouldn't know.
14  Q.   (BY MR. SPRINGER)  Okay.  You specifically gave testimony
15  about James Lake; do you remember that?
16  A.   Yes.
17  Q.   And you said I counseled him to violate the Internal
18  Revenue laws; do you remember that testimony?
19  A.   Yes.
20  Q.   Do you remember when James Lake was indicted?  Was it
21  2000?
22  A.   I don't remember.
23          MR. SPRINGER:  Your Honor, may I have just a moment,
24  please?
25          THE COURT:  Surely.

BRIAN SHERN - CROSS BY MR. SPRINGER                    47

1   Q.   (BY MR. SPRINGER)  Could you please turn to Government's

2   Exhibit 675, please.

3   A.   Okay.

4   Q.   Do you see the last notation, number -- excuse me --

5   Number 10, 11 and 13 on the gross income of Lindsey Springer

6   chart?

7   A.   Yes.

8   Q.   Okay.  And do you see the dates over there, 11/7/2000, all

9   the way to 12/27/2000?

10   A.   Yes.

11   Q.   And it's your testimony these monies were given to me,

12   that Mr. Lake hired me to help him in his indictment in his

13   case; is that correct?

14   A.   That's correct.

15   Q.   All right.  And so Mr. Lake had already been indicted,

16   then, at the time that he gave this money; isn't that true?

17   A.   Yes, I believe so.

18   Q.   And it was for, like, 1995, 1996, 1997; isn't that true?

19   Somewhere in the mid-nineties, he had failed to file tax

20   returns, correct?

21   A.   I don't remember for sure, but it sounds about right.

22   Q.   He had failed to file tax returns long before he met

23   Lindsey Springer; isn't that true?

24   A.   Yes, that's correct.

25   Q.   And he had sought the advice of many other people other

BRIAN SHERN - CROSS BY MR. SPRINGER                          48

1   than Lindsey Springer and Oscar Stilley prior to getting

2   indicted, had he not, if you know?

3   A.   I think he was -- he was caught up in some type of trust

4   scam as well.

5   Q.   And so it's your testimony that Lindsey Springer should be

6   tagged for the tax loss for the year 2000 for James Lake

7   because he didn't file a tax return in the year 2000 -- or for

8   the year 2000?

9   A.   I think by you and Mr. Stilley telling him that he was not

10  required to -- that you didn't pay taxes and he's not required

11  to file or pay over tax, that he probably didn't pay the money

12  that he was owed -- that he owed the government.

13  Q.   Now, I know you testified that Mr. Patterson, in 2000, had

14  said that Mr. Stilley and I had told him we didn't file tax

15  returns, but I don't remember you saying Mr. Lake said that

16  Mr. Stilley and I told him that we didn't file tax returns.

17  A.   That may be correct.  I know that you told him in some

18  manner that he was not required to file tax returns.  I don't

19  remember if you and Mr. Stilley told him that you yourselves

20  didn't file tax returns or not.

21  Q.   Okay.

22  A.   But you advised him that he didn't have to.

23  Q.   That was his testimony?

24  A.   Yes.

25  Q.   And then for the years 2000, you testified, I believe,

BRIAN SHERN - CROSS BY MR. SPRINGER                                     49

```
 1   that Mr. Lake was found guilty or was -- pled guilty after he

 2   hung a jury or something in 2001; isn't that correct, early

 3   2001?

 4   A.   Yes, he testified about that.

 5   Q.   And in his plea agreement in early 2001, wouldn't it have

 6   been part of an agreement that he had to file a 2000 tax

 7   return?

 8           MR. O'REILLY:  Objection; calls for speculation.

 9           THE COURT:  Overruled.

10           THE WITNESS:  Typically, that is the case.

11   Q.   (BY MR. SPRINGER)  So there really is no way, is there,

12   Mr. Shern, that Mr. Lake either didn't file a tax return for

13   the year 2000 or acted upon anything that I -- you say I told

14   him with regard to the year 2000 only?

15   A.   I think if he would have hired a reputable attorney, they

16   may have advised him to file and pay his taxes.

17   Q.   As you stand here today, did James Lake not file a tax

18   return for the year 2000 by April 15, 2001?

19   A.   Did he not file?

20   Q.   Did he or did he not?

21   A.   I'm not for certain whether he did or didn't.  I know

22   there was a -- the transcript of his account for 2000 shows a

23   restitution payment of -- and that is what we included in our

24   calculations, I believe.

25   Q.   Restitution payment?
```

BRIAN SHERN - CROSS BY MR. SPRINGER                         50

1   A.    Yes.

2   Q.    Which would be derived from what?  Where would restitution

3   payment come from in the IRS records, if you know?

4   A.    It would have been from his -- the tax violations that he

5   committed.

6   Q.    Would it be from the tax returns that he filed as a

7   condition of his plea agreement?

8   A.    More than likely, yes.

9   Q.    So he did file a tax return for the year 2001, didn't he?

10  A.    I'm not sure if one was filed for him on -- like, often,

11  the IRS will file substitute for returns, I'm not sure without

12  specifically looking at his transcript or his account history

13  whether he did file or did not file.

14  Q.    Do you know if he was ever revoked for not filing a tax

15  return after he pled guilty?

16  A.    I don't know.

17  Q.    Okay.  Is it possible, then, that the amount of money on

18  his transcript came from a tax return that he filed?

19        MR. O'REILLY:  Objection, Your Honor.  Misstates what

20  the document shows, which is no return was filed.

21        THE COURT:  If that's so, then the witness can so

22  testify.  Overruled.

23        THE WITNESS:  Can I look at the actual transcript?

24        MR. SPRINGER:  Uh-huh.

25        THE COURT:  While he's doing that, let me make one

BRIAN SHERN - CROSS BY MR. SPRINGER                          51

 1  inquiry.  My reading of Government's Exhibit 675 indicates that

 2  that is intended to summarize income to Mr. Springer and my

 3  reading of the government's tax loss chart in its sentencing

 4  memorandum indicates that, aside from Mr. Springer's own tax

 5  liability and aside from Mr. Stilley's tax liability, the

 6  government seeks to attribute to Mr. Springer tax loss relating

 7  only to Patrick Turner and Eddy Patterson and not Mr. Lake; is

 8  that still the case?

 9          MR. O'REILLY:  May I have a moment, Your Honor?

10          THE COURT:  Surely.

11          MR. SPRINGER:  Your Honor, is that Government's

12  Exhibit 1166 that you're referring to on their new chart?

13          THE COURT:  No, I'm referring to the page 10 of the

14  government's sentencing memorandum.

15          MR. O'REILLY:  Your Honor, the Government's Exhibit

16  675 was what was put into evidence at trial.  The -- what we

17  are attributing to Mr. Springer is summarized on Government's

18  Exhibit 1160, which has a few additional income items.  The --

19  it adds, I believe, 17,000 in income for that year.

20  Specifically, it adds a check that was put into evidence but

21  not discussed at trial from Believers Broadcast Corporation,

22  Ken Geisendorffer, for $5,000.

23          THE COURT:  Okay.  Well, I can tell by looking at

24  1160 that you may not have understood my question.

25          MR. O'REILLY:  Perhaps I did not.

BRIAN SHERN - CROSS BY MR. SPRINGER                                    52

```
 1              THE COURT:  Mr. Springer asked some questions of

 2    Mr. Shern that -- from which I inferred, perhaps, that

 3    Mr. Springer thinks that the government is including a tax loss

 4    attributable to Mr. Lake in its tax loss calculations for

 5    Mr. Springer, and my reading of your sentencing memorandum

 6    indicates that, aside from the defendants themselves, the

 7    government seeks to attribute tax losses to Mr. Springer

 8    relating only to Patrick Turner and Eddy Patterson.  And my

 9    question was --

10              MR. O'REILLY:  Actually, Your Honor, in the

11    government's exhibits, which is 1177, we did include the 1,000

12    -- the 176,000 that Mr. Springer is discussing as attributable

13    to him, because Mr. Lake, our theory, is being encouraged by

14    both Mr. Springer and Mr. Stilley to continue to not file a tax

15    return or pay taxes for the year 2000, so Mr. Springer is

16    correct in his understanding of the government's position.

17              THE COURT:  Okay.  Except that I've heard on cross

18    that maybe he may well have filed for 2000.

19              MR. O'REILLY:  I'll try to rehabilitate the witness.

20              THE COURT:  Okay.  Well, proceed.

21    Q.   (BY MR. SPRINGER)  You are certain that Mr. Lake at some

22    point in time pled guilty to some tax-related charge; is that

23    correct?

24    A.   Yes.

25    Q.   And as far as you know, as you stand here today, is
```

1   Mr. Lake in full compliance with all the tax laws of the United

2   States?

3   A.    I'm not certain about that.

4   Q.    Were you here when he testified at trial?

5   A.    Yes.

6   Q.    Do you remember him saying he was in compliance?

7   A.    He might have said that, yes.

8   Q.    Thank you.

9         Next is Eddy Patterson.  Isn't it true that Mr. Patterson

10  was indicted in 2003 for tax-related charges from 1995, '96,

11  '97, '98, and '99?

12  A.    I know he was indicted in 2003, but I'm not certain of the

13  years he was charged with.

14  Q.    Is it your testimony that myself and/or Mr. Stilley should

15  be held liable under tax loss calculations because

16  Mr. Patterson did not file a 2000 tax return?

17  A.    Yes.

18  Q.    And it is your testimony because he heard -- he testified

19  that he said he heard me and Mr. Stilley say that we don't file

20  tax returns and that that's the basis by which you claim he did

21  not file a tax return for the year 2000?

22  A.    Yes, I think you specifically told him, after I reviewed

23  his grand jury transcript, that you don't file and you're

24  trying to fight the system and something of that nature and

25  that's why you don't file.

BRIAN SHERN - CROSS BY MR. SPRINGER                              54

1   Q.   So he didn't file in '96, he didn't file in '97, he didn't

2   file in '98, he didn't file in '99, he testified he met me in

3   2000, correct?

4   A.   That's correct.

5   Q.   So he didn't file in 2000, and all of a sudden, out of

6   five years of not filing tax returns, you would like to

7   attribute that the year 2000 is the year that he didn't file

8   because of me; is that correct?

9   A.   Yes, because I think that's when he sought the advice of

10  so-called experts and that basically reaffirmed that he was

11  right and that he didn't have to file.  And I think you guys,

12  you and Mr. Stilley, probably reaffirmed that in him, that he

13  didn't have a requirement to file.

14  Q.   Do you remember Mr. Patterson testifying that he did have

15  federal and state income taxes prepared?

16  A.   I don't remember him testifying to that, but I remember --

17  I believe it was Mrs. Hess that did prepare taxes for him.

18  Q.   Do you know who Mrs. Hess is?

19  A.   Yes.

20  Q.   Who is she?

21  A.   She's a CPA.

22  Q.   She also a college professor?

23  A.   Yes.

24  Q.   At TU?

25  A.   Yes.

1   Q.   Do you know how Mr. Patterson met Mrs. Hess?

2   A.   Yes.

3   Q.   How?

4   A.   You introduced her to him.

5   Q.   Now, if I was telling Mr. Patterson to not file tax

6   returns, why would I introduce Mr. Patterson to Cynthia Hess,

7   who is a CPA college professor tax preparer?

8          MR. O'REILLY:  Judge, we need a time frame for when

9   this introduction was made.

10          THE COURT:  That would help.

11  Q.   (BY MR. SPRINGER)  How did you come to know the name

12  Cynthia Hess?

13  A.   I think it was upon review of the investigation file for

14  Mr. Patterson.

15  Q.   And do you know whether Mrs. Hess -- do you know what Mrs.

16  Hess did for Mr. and Mrs. Patterson?

17  A.   She filed tax returns -- or not filed, she prepared tax

18  returns for them.

19  Q.   Okay.  And do you know whether that occurred before,

20  during or after Mr. Patterson's conviction?

21  A.   I don't recall.

22  Q.   Okay.  Did you know that Mrs. Hess prepared 2000 tax

23  returns for Eddy Patterson and his wife?

24          MR. O'REILLY:  Your Honor, objection, until we have a

25  time frame for when this happened.

1           MR. SPRINGER:  I'm getting there.

2           THE COURT:  Overruled.

3           THE WITNESS:  I don't remember if she prepared 2000

4    or not.  I know from what I remember about Mrs. Hess is that

5    she prepared tax returns for Mr. Patterson, I don't recall

6    enough about it really to testify confidently about it.

7    Q.   (BY MR. SPRINGER)  Are you aware that after Mr. Patterson

8    was found guilty that he fired Mr. Stilley and hired

9    Mr. Stephen Knor?

10   A.   Yes.

11   Q.   So isn't it safe to say, then, that Mr. Patterson and Mrs.

12   Patterson learned of Mrs. Hess before they fired Mr. Stilley?

13   A.   Yes.

14   Q.   All right.  So that would be, then, before they were found

15   guilty, now, wouldn't it?

16   A.   Yes.

17   Q.   Okay.  And that -- and they were found guilty on December

18   15, 2003; is that correct?

19   A.   Yes.

20   Q.   Okay.  And are you aware that Lindsey Springer filed a

21   lawsuit against the Richardson law firm over that issue?

22   A.   Yes.

23   Q.   And do you remember in that complaint that there were

24   exhibits attached of tax returns prepared by Cynthia Hess?

25   A.   I don't think I -- I think I may have reviewed the text,

1  along with the complaint, but I didn't review the exhibits, so

2  I don't recall.

3  Q.   Do you remember in the complaint that I alleged that I

4  introduced them to Cynthia Hess?

5            MR. O'REILLY:  Your Honor, objection as to relevance;

6  he's already asked and answered.

7            THE COURT:  That's been established.  Sustained.

8            MR. SPRINGER:  All right.

9  Q.   (BY MR. SPRINGER)  Do you remember Mr. Patterson

10 testifying that the same CPA who prepared his corporate tax

11 returns also prepared he and his wife's individual tax returns

12 for every year?

13 A.   I believe that's correct.  I think he had the returns

14 prepared but never did file them.

15 Q.   He filed the state returns, didn't he, but just not the

16 federal?

17 A.   I believe so, yes.

18 Q.   Okay.  So he had access to a CPA who advised him over

19 corporate tax and individual tax every year, even going back to

20 when he stopped filing in 1995; isn't that true?

21 A.   Yes.

22 Q.   But yet I'm the reason why he didn't file a 2000 tax

23 return, right?

24 A.   Yes.

25 Q.   Have you examined his 2000 tax return?

BRIAN SHERN - CROSS BY MR. SPRINGER                                    58

1  A.   No, I have not.

2  Q.   Where did you get the $34,000 that is being attributed as

3  tax loss to me?  Where did that number come from?

4  A.   From his transcript of account.

5  Q.   And is the information on the transcript -- what is a

6  transcript of an account?

7  A.   It basically shows, for a certain taxpayer, transactions

8  that have happened to his account with the IRS.

9  Q.   So if he files a tax return it shows up on the transcript?

10  A.   Yes.

11  Q.   Okay.  So how do you know that the information on the

12  transcript wasn't from a tax return that Cynthia Hess prepared

13  that Mr. Patterson signed and filed?

14  A.   I wouldn't be able to tell that from the transcript, but I

15  I can look at the transcript right now and see what it says.

16  Q.   Could you?  And please refer to the exhibit that you're

17  looking at.  I believe it's 1144; is that right?

18  A.   1147.

19  Q.   1147.

20  A.   It doesn't specifically say where the tax return came

21  from.

22  Q.   But it does say "tax return filed," doesn't it?

23  A.   Yes.

24  Q.   If you look at Government's Exhibit 1144 --

25          THE COURT:  That was 1144?

BRIAN SHERN - CROSS BY MR. SPRINGER                    59

1        MR. SPRINGER:  1144, Your Honor.

2        THE WITNESS:  Okay.

3   Q.   (BY MR. SPRINGER)  Do you see at the bottom of 1144, just

4   above the square where it says "transactions" on it, do you see

5   right above "processing date," it says, "return due date" or

6   "return received date," whichever is later, and it says "March

7   3, 2003"?

8   A.   Is that on the front?

9   Q.   On the very first page of 1144, just above the phrase

10  "transactions," which is in a block with two lines around it.

11  It's the second sentence above that.

12  A.   Yes, I see that.

13  Q.   Do you see where it says "March 3, 2003"?

14  A.   Yes.

15  Q.   And wasn't Mr. Patterson and Mrs. Patterson indicted in

16  April of 2003?

17  A.   I don't recall exactly when in 2003.

18  Q.   You do remember they were convicted in December of 2003,

19  right?

20  A.   Yes, I do remember that.

21  Q.   And do you remember that there was a $112,000 check in

22  July of 2003 that Mr. Patterson gave to Mr. Stilley to put in

23  his IOLTA account?  Do you remember that?

24  A.   Yes.

25  Q.   Wasn't the reason why these monies was allegedly being

1   given and deposited was to help in his criminal defense?

2   A.   Yes.

3   Q.   Okay.  Now, if you would look again to Government's

4   Exhibit Number 1147 and look at the same spot as you just did

5   on 1144, do you see the day the return was filed for the year

6   2000?

7   A.   What exhibit?  I'm sorry.

8   Q.   I'm sorry, 1147, I'm sorry.  It's -- it's just above the

9   "transaction" square.  Let's start at the top of 1147,

10  Government's Exhibit 1147.  Does it say "account transcript"

11  right there --

12  A.   Yes.

13  Q.   -- at the top?

14       And just below it, to the right, does it say "tax period

15  December 31, 2000"?

16  A.   Yes.

17  Q.   All right.  And is that the same year 2000 that you're

18  referring to when you say I caused Mr. Patterson not to file

19  his 2000 tax return because I told him I wasn't required to

20  file a return?

21  A.   Yes.  And I think for clarification here, I'm pretty

22  positive that the IRS filed this return for him, because if you

23  look further on the transcript, like in the second page --

24  Q.   Okay.

25  A.   -- there's certain notations that say "inquiry for not

BRIAN SHERN - CROSS BY MR. SPRINGER                    61

1   filing -- for non-filing of tax return, penalty for not

2   prepaying tax, penalty for filing tax return after the due

3   date."

4        So, really, without asking a revenue agent or somebody

5   that's more familiar with this transcript, I wouldn't be able

6   to tell you if he filed the return, if somebody else filed the

7   return or if a return was filed for him by the IRS.

8   Q.   Could you look on the second page of Exhibit 1147 and look

9   at the very top notation that's made in the IRS's transcript.

10  And could you please read that.

11  A.   Where at again?  I'm sorry.

12  Q.   At the very top of page 2 of 1147, where it begins with

13  the "460," which is the transaction code number, and then it

14  says, "extension of time to file extended date 8/15/2001" and

15  it's filed on 4/15/2001.

16  A.   Yes.

17  Q.   If Mr. Patterson --

18            THE COURT:  Say again where you are on that.

19            MR. SPRINGER:  I'm on 1147, Your Honor.

20            THE COURT:  Right.

21            MR. SPRINGER:  And page 2 at the very, very top.

22            THE COURT:  Okay.  Okay.  Go ahead.

23  Q.   (BY MR. SPRINGER)  And this document -- this entry says it

24  was entered on 4/15/2001 on the IRS's computer; is that

25  correct?

BRIAN SHERN - CROSS BY MR. SPRINGER                    62

1   A.   Yes.

2   Q.   Now, if I had told Mr. Patterson he didn't have to file a

3   tax return, then why would there be an extension of time to

4   file a tax return in Mr. Patterson's file?

5           MR. O'REILLY:  Objection.  Calls for speculation,

6   Your Honor.

7           THE COURT:  Overruled.

8           THE WITNESS:  I have no idea.

9   Q.   (BY MR. SPRINGER)  Do you know whether the IRS entered

10  files extensions for taxpayers on the last day to file a return

11  every year?

12  A.   No, I don't believe they do.

13  Q.   Thank you.

14      And isn't the second notation on Government's Exhibit 1147

15  on page 2 the same 460 entry, except this time Mr. Patterson is

16  seen on your transcript to be extending the 8/15/2001 due date

17  for the 2000 year return and now he's extending it from 8/15 to

18  October 15, 2001?  Isn't that true, Mr. Shern?

19  A.   Yes.

20  Q.   So even if I did tell Mr. Patterson that I didn't believe

21  I was required to file a return, he didn't act upon it, did

22  he?  Because he's filing extension after extension with the

23  IRS; isn't that true?

24  A.   Rephrase the question.

25  Q.   Did Mr. Patterson not file a 2000 tax return because, as

BRIAN SHERN - CROSS BY MR. SPRINGER                              63

1  you said under direct examination, he learned -- out of my

2  lips, I guess -- that I did not file tax returns?

3  A.   I believe that he didn't file -- I believe that the advice

4  you gave him confirmed to him that he didn't have to file a tax

5  return for 2000.

6  Q.   But your testimony in this regard, both as to adding tax

7  loss to Lindsey's -- my numbers also is that I counseled others

8  to violate the Internal Revenue law; isn't that what your

9  testimony was under direct examination?

10 A.   Yes.

11 Q.   And didn't you specifically mention Mr. Patterson?

12 A.   Yes.

13 Q.   Now, you're not saying I told him not to file a 2002 or

14 2003 or 2004 return, are you?

15 A.   No.

16 Q.   Just the 2000 year; isn't that true?

17 A.   Yes.

18 Q.   Okay.  And doesn't this transcript show that he did file

19 extensions with the IRS?

20        MR. O'REILLY:  Objection.  Asked and answered

21 repeatedly.

22        THE COURT:  Sustained.

23        MR. SPRINGER:  Thank you, Your Honor.

24 Q.   (BY MR. SPRINGER)  Now, with regard to Dr. Roberts, you

25 specifically aren't trying to tag Lindsey Springer with tax

1   loss stemming from Dr. Roberts not filing tax returns; is that

2   correct?

3   A.   Correct.

4   Q.   You are trying to tag Mr. Stilley for it because of his

5   early-on relationship with Mr. Roberts, correct?

6   A.   Yes.

7   Q.   Okay.  But you still claim that I counseled Dr. Roberts to

8   violate the Internal Revenue laws, correct?

9   A.   Yes.

10  Q.   And, specifically, you're saying that I counseled

11  Dr. Roberts into what?  What law did I tell Dr. Roberts he

12  needed to violate?

13  A.   You told him that he had no liability to file a tax return

14  or pay taxes.

15  Q.   Okay.  Now, with Dr. Roberts, do you remember the phrase

16  "Ortho/Neuro Medical"?

17  A.   Yes.

18  Q.   Do you remember what that was?

19  A.   Yes; that was his chiropractic practice.

20  Q.   Was it his tax shelter?

21  A.   I don't know.  I know he had a checking account that said

22  "Ortho/Neuro Medical" or whatever it is on his checks.

23  Q.   The money that he gave to me was from Ortho/Neuro Medical;

24  isn't that true?

25  A.   The money he paid you.

1   Q.   Right.  The money -- yeah, the money that is in the

2   evidence in this case came from Ortho/Neuro Medical?

3   A.   Most of it.  I think some -- there was a cashier's check,

4   I think, involved too.

5   Q.   Was that out of the Ortho/Neuro Medical account, if you

6   know?

7   A.   I don't recall.

8   Q.   But I had nothing to do with him setting up Ortho/Neuro

9   Medical, did I?

10  A.   I don't know.

11  Q.   Did you ever find any evidence that I did?

12  A.   No.

13  Q.   So as far as Dr. Roberts is concerned, is it only the year

14  2000 that you claim I told him to violate the Internal Revenue

15  laws by not filing a 2000 tax return or was it 1999's tax

16  return or which one was it?

17  A.   I don't remember which particular year.  I think he just

18  said that, when he talked to you and Mr. Stilley, you guys both

19  told him that he didn't have any liability to file a tax return

20  or pay taxes.

21  Q.   Okay.  Now, Dr. Roberts was indicted in 2000, correct?

22  A.   Yes, I believe so.

23  Q.   And the indictment was for years in the mid-nineties,

24  correct?

25  A.   Yes.

BRIAN SHERN - CROSS BY MR. SPRINGER                                    66

1   Q.   And it's a fact, is it not, that I -- excuse me, strike

2   that.

3        Do you have any evidence of me knowing Dr. Roberts before

4   December of 1999?

5   A.   I believe that he testified before the grand jury about

6   coming to some of your seminars that you had at a hotel in

7   Tulsa.

8   Q.   Now, are you saying that, when he came to seminars in

9   Tulsa, I told him to violate the Internal Revenue laws or are

10  you saying that when he hired me I told him to violate the

11  Internal Revenue laws?

12  A.   I'm saying that what he said in his grand jury testimony

13  is that I believe after he hired you, you told him that, but

14  I'm not sure what you told him at the seminars.

15  Q.   All right.  So if he met me -- he introduced -- strike

16  that.

17       Isn't it true that he testified he introduced Oscar

18  Stilley and me, that he had a relationship with Oscar and he

19  introduced me to Oscar Stilley?

20  A.   Yes.

21  Q.   And wasn't that in late 1999, around December of 1999, if

22  you remember?

23  A.   Yes.

24  Q.   And isn't it true that in April of 2000 he was indicted

25  for not filing tax returns, misdemeanors, back in the

1   mid-nineties?

2   A.   I'm not sure of the exact date in 2000, but I know it was

3   2000, and, yes, it was for the mid-nineties.

4   Q.   All right.  So -- and then isn't it true that, in June of

5   2000, he went to trial -- June or July of 2000, he went to

6   trial and was found guilty?

7   A.   That sounds right, yes.

8   Q.   Okay.

9           THE COURT:  Stand by for just a moment,

10  Mr. Springer.

11      I don't plan to recess for lunch until about 12:15 unless

12  anyone at either table needs a break, then we'll take a break,

13  but, otherwise, I don't plan to recess until about 12:15.

14      You may proceed.

15          MR. SPRINGER:  Thank you, Your Honor.

16  Q.   (BY MR. SPRINGER)  So you're not saying that I'm

17  responsible for why Mr. Roberts didn't file a tax return in the

18  year 2000, correct?

19  A.   No.  I think you're probably a contributing factor, but I

20  can't say that you're responsible for him not filing a tax

21  return.

22  Q.   Is it possible that if he got indicted in April of 2000

23  and he had a lawyer that he had known since 1990 named Oscar

24  Stilley, is it possible that he determined that it would be in

25  his best interest, being indicted, to say nothing to the IRS?

```
 1              MR. O'REILLY:  Objection.  Calls for speculation,

 2    plus intrudes on attorney-client privilege.

 3              THE COURT:  Overruled.

 4              THE WITNESS:  Can you repeat that question?

 5    Q.  (BY MR. SPRINGER)  Did you ever ask Dr. Roberts why he

 6    didn't file a tax return on April 15, 2000?

 7    A.   No.

 8              MR. SPRINGER:  Your Honor, may I have one second?

 9              THE COURT:  You may.

10    Q.  (BY MR. SPRINGER)  Did you ever have an interview with

11    Brenda Gray?

12    A.   Yes.

13    Q.   Do you remember who she was?

14    A.   Yes.

15    Q.   What was her relationship with Dr. Roberts?

16    A.   She was his girlfriend.

17    Q.   Okay.  Do you remember her testimony about being in

18    college at Arkansas University and having discussions in class

19    about the tax laws and how complicated they were?

20    A.   I don't specifically recall that exact comment.

21    Q.   Do you remember who introduced Oscar Stilley to

22    Dr. Roberts?

23    A.   No.

24    Q.   You don't know if it was Brenda Gray or not?

25    A.   No.
```

1   Q.   Okay.  You do know that Oscar Stilley was -- got his

2   college degree and his law degree at the University of

3   Arkansas, right?

4   A.   Yes.

5   Q.   Okay.  Same place Brenda Gray went to college?

6   A.   I don't remember.

7   Q.   That's fine.

8        As far as James Lake goes, do you know how many hours I

9   provided services to Mr. Lake?

10  A.   No.

11  Q.   Do you know how many hours I provided services to Eddy and

12  Judy Patterson?

13  A.   No.

14  Q.   Do you know how many hours I provided service to

15  Dr. Philip Roberts?

16  A.   No.

17  Q.   Do you know how many hours I provided services to

18  Ortho/Neuro Medical?

19  A.   No.

20  Q.   Do you know how many hours I provided services in -- to

21  Dale Hedberg?

22  A.   No.

23  Q.   After the trial, did you ever look into whether or not

24  Mr. Lake was -- hung a jury the first time with a different

25  lawyer and then went back and pled guilty after he hung the

1   jury?

2   A.    Yes.

3   Q.    Is that true?

4   A.    That's what happened, yes.

5   Q.    It's what happened.  So he did not go to trial with Oscar

6   Stilley?

7   A.    I think he fired him right before the trial started.

8   Q.    Thank you.

9         And he hired another -- or a reputable lawyer, did he not?

10  A.    Yes.

11  Q.    Still went to trial --

12  A.    Yes.

13  Q.    -- right?

14        Hung the jury?

15  A.    That's correct.

16  Q.    And then went and pled guilty?

17  A.    Yes.

18  Q.    Do you remember why he went and pled guilty?  Did he say

19  why?

20  A.    I can't remember for sure why.

21  Q.    Was he threatened with an obstruction of justice charge

22  for lying at the first jury trial?

23  A.    That may have been one of the factors he was looking at.

24  Q.    Which he had another reputable lawyer having him do,

25  correct?

```
 1   A.    Excuse me?

 2   Q.    Strike that.  I'm sorry.  Emotion.

 3         Earlier today, you testified about Eddy and Judith

 4   Patterson and you mentioned the phrase "2012," but I don't

 5   really think you meant to say that.  Do you remember what you

 6   were referencing in 2012?

 7   A.    No.  I don't remember saying 2012.

 8   Q.    Okay.  You also discussed Ernie Swisher.

 9   A.    Yes.

10   Q.    And that a week before his trial he was hired by -- or he

11   hired Oscar Stilley to represent him a week before trial?

12   A.    I know he hired Mr. Stilley and that sound -- yes, a week

13   before trial.

14   Q.    And he was indicted not only for tax charges, but didn't

15   he also have a bank fraud charge?

16   A.    Yes.

17   Q.    And the judge acquitted him of that charge after the

18   government closed or rested its case, didn't they -- or didn't

19   he?

20   A.    Yes.

21   Q.    So Mr. Swisher was found not guilty of the felony and

22   guilty of the three misdemeanors; is that right?

23   A.    Yes, that's correct.

24   Q.    And Oscar Stilley is the one that represented him in that

25   trial, correct?
```

BRIAN SHERN - CROSS BY MR. SPRINGER                    72

1   A.    Yes.

2   Q.    Then you said that Mr. Stilley came to Mr. Swisher and

3   said he, Mr. Stilley, wanted to hire Lindsey Springer to help

4   Mr. Stilley during the trial?

5   A.    That's what Mr. Swisher told me, yes.

6   Q.    Okay.  Do you know whether I was ever told that I was

7   being hired by Mr. Swisher or Mr. Stilley?

8   A.    I don't recall him saying whether or not he told you.  I

9   remember him saying that he worked with you.

10  Q.    Right.  And he gave me money, indirectly, through

11  Mr. Stilley?  He gave me money, right?

12  A.    Yes.

13  Q.    The evidence is clear on that?

14  A.    Yes.

15  Q.    Okay.  Is it your testimony that I counseled Mr. Swisher

16  to violate the Internal Revenue laws?

17  A.    No.

18  Q.    Okay.  And am I responsible for any tax liability

19  associated with Mr. Swisher?

20          MR. O'REILLY:  Objection.  Calls for speculation.

21          THE COURT:  Well, I don't see from anything that I

22  have that the government so asserts.  Is that correct,

23  Mr. O'Reilly?

24          MR. O'REILLY:  Correct.  There's nothing.

25          MR. SPRINGER:  Okay.  Good enough.

1          THE COURT:  Quit while you're ahead.  Go ahead.

2   Q.  (BY MR. SPRINGER)  As far as Mr. and Mrs. Hovind, you

3   testified that they made payments to me; do you remember that?

4   A.  Yes.

5   Q.  Okay.  And do you remember what year that was?

6   A.  I believe it was 2006 -- 2005 to 2007, but I think most of

7   them were 2006.

8   Q.  And the actual money and the transactions that came to

9   Lindsey Springer were from a ministry, weren't they?

10  A.  Yes.

11  Q.  They weren't specifically from Mr. and Mrs. Hovind, but

12  the underlying theme is that it was for them, correct?

13  A.  It was from them, yes.

14  Q.  Well, it was from a ministry corporation, right?

15  A.  It was from I think the -- what was on the checks was

16  Creations Science Evange --

17  Q.  Evangelism, Inc, right?

18  A.  Yes.

19  Q.  Inc.

20      So a corporation, actually, is the one that gave -- and I

21  think you testified it was $30,000; is that right?  Did you say

22  that?

23  A.  I don't think I --

24  Q.  Said an exact amount?  It's on the list you provided,

25  though, right?

BRIAN SHERN - CROSS BY MR. SPRINGER                              74

```
 1   A.   Yes.
 2   Q.   All right.  And as far as Mr. Swisher goes, do you know
 3   how many hours I worked for Mr. Swisher?
 4   A.   No.
 5   Q.   And as far as the Hovinds, do you know how many hours I
 6   worked for them?
 7   A.   No.
 8   Q.   Do you remember, when you testified at trial, you told the
 9   jury why I was not charged with willful failure to file or tax
10   evasion for the year 2001?
11   A.   Yes.
12   Q.   And what was that reason?
13   A.   Because in the schedules we prepared for trial, the tax
14   loss was minimal for the purposes of trial and so we didn't
15   charge that year.
16   Q.   Isn't it because willful failure to file was beyond the
17   six years and tax evasion required a deficiency -- a
18   substantial tax deficiency and isn't it for that reason that
19   you could not substantiate a substantial tax deficiency that
20   led you not to pursue 2001?
21   A.   Yes.
22   Q.   Okay.
23   A.   For the trial purposes.
24   Q.   And now you're taking the entire gross amount from 2001
25   and you're saying for tax loss purposes we should take 20
```

BRIAN SHERN - CROSS BY MR. SPRINGER                    75

```
1   percent of that number; isn't that true?
2          MR. O'REILLY:  Objection.  It's what the sentencing
3   guidelines dictate, not what Special Agent Shern says.
4          THE COURT:  Well, I think he's -- Mr. Springer is
5   seeking to ascertain whether that is, in fact, the government's
6   theory under the guidelines, and for that reason, it's
7   overruled.  You may answer.
8          MR. SPRINGER:  And if I may, Your Honor, the actual
9   guideline goes on to say unless a better number is available
10  and --
11         THE COURT:  Well, I'm not here to hear argument.  I
12  overruled the objection.
13         MR. SPRINGER:  I'm sorry.  Okay.  Got you.
14         THE WITNESS:  Yes, that's correct.
15  Q.  (BY MR. SPRINGER)  And then for 2002, the reason why it
16  was not a tax evasion charge was because there wasn't a tax
17  liability, a deficiency balance, that you could show for that
18  year and that's why it was only a willful failure to file; is
19  that correct?
20  A.   Yes.
21  Q.   And isn't that same true for 2004's charge, which I
22  believe was Count 6?
23  A.   Yes, I believe so.
24  Q.   So there was no charge in 2001 because the tax loss was
25  minimal, and then for 2002 and 2004, which is Count 5 and 6,
```

1  there was no tax loss and that's why those were not tax evasion

2  charges?

3  A.   That's correct.

4  Q.   But now your testimony is that there should be tax loss

5  for those years; is that correct?

6  A.   Yes.

7  Q.   So -- and is that because -- excuse me.  Strike that.

8      For 2001, you had available information that you seized

9  from the home that I lived in; is that correct?

10 A.   Yes.

11 Q.   You had records, didn't you?

12 A.   Yes.

13 Q.   As a matter of fact, there's quite a large volume of set

14 of records out of my house; isn't that correct?

15 A.   Yes.

16 Q.   And for 2001, you calculated and used those receipts that

17 you found in my home to offset the gross income that you had

18 determined to conclude that there was not enough tax deficiency

19 to warrant a charge of tax evasion, correct?

20       MR. O'REILLY:  Objection.  Asked and answered and

21 relevance.

22       THE COURT:  I think that's been covered,

23 Mr. Springer.

24       MR. SPRINGER:  I was trying to get it a different

25 way, but I'll -- okay.  Very good.

1   Q.   (BY MR. SPRINGER)  The same holds true for the year 2002,

2   2004, that how you calculated there was no tax liability is by

3   the receipts and the records that you found during the raid of

4   the home that I live in, correct?

5   A.   There were some other things besides that, but, yes.

6   Q.   For the most part, it came to -- I remember that now,

7   that's right.  You did have some outside source that you gave

8   me credit off of the gross income number, but for the most

9   part, it came from the house, correct?

10  A.   Yes.

11  Q.   Now, for the computations of tax loss for 2001, 2002, and

12  2004, you're just setting all those expenses aside, aren't

13  you?

14  A.   You mean for the purposes of sentencing?

15  Q.   Tax loss at sentencing, yes.

16  A.   Yeah, typically, at trial, you use the most conservative

17  approach, and all we had to document your expenses were the

18  expenditures that we found in the search warrant.  And I

19  believe we gave you numerous expenses that -- like a typical

20  revenue agent would never give a defendant -- or a taxpayer,

21  such as personal expenditures that we could clearly see

22  probably weren't personal, but we weren't comfortable bringing

23  that conclusion forth at trial, so for the purposes of

24  sentencing, we -- because we have such minimal records, you

25  yourself told me that you don't keep records of your ministry

BRIAN SHERN - CROSS BY MR. SPRINGER                          78

1   and your business dealings, and so we don't have a truly

2   accurate source of expense records to apply to your situation,

3   so we just use the sentencing guidelines and did a straight 20

4   percent of gross income.

5   Q.   Did you find copies of cashier's checks, money orders, and

6   the like when you raided my home?

7   A.   Yes.

8   Q.   Are those considered records by you?

9   A.   Yes.

10  Q.   Okay.  So I must have been keeping records, then, correct?

11  A.   You were keeping the actual expenditure records, but you

12  kept no ledgers or journals or anything like that to classify

13  what was business, what was personal.  And many of the money

14  order receipts we found just had straight numbers on them, they

15  didn't have documentation, what the purpose of the expenditure

16  was, and things like that.

17  Q.   So what had not been quantified, but the record itself,

18  the thing to quantify, it was in my house, wasn't it, for the

19  most part?

20  A.   To quantify a number, whether you can make that number out

21  to be a business expense or personal expense and make some type

22  of judgment on what it was, that record was useless for that

23  purpose.

24  Q.   But it was a record of an expense or a record of a

25  transaction that I participated in, correct?

BRIAN SHERN - CROSS BY MR. SPRINGER                    79

```
1              MR. O'REILLY:  Objection.  Relevance and asked and
2    answered.
3              THE COURT:  Sustained.
4    Q.  (BY MR. SPRINGER)  We met on January 15, correct, 2009?
5    A.  Yes.
6    Q.  And did we spend hours going through each one of those
7    records?
8    A.  Yes.
9    Q.  You mentioned a blog?
10   A.  Yes.
11   Q.  You also mentioned a Web site, PenaltyProtestor.org and
12   com, I believe; is that correct?
13   A.  Yes.
14   Q.  And did you say Mr. Turner was -- you admitted Mr. Turner
15   was the host of that Web site, right?
16   A.  Yes, I think he testified about that.
17   Q.  Okay.  Now, you mentioned a video was on the Web site?
18   A.  Yes.
19   Q.  And what did that -- what was that video of?
20   A.  It was of you speaking somewhere.
21   Q.  Did he ever tell anybody in that video don't go file tax
22   returns or pay taxes?
23   A.  It's been so long since I reviewed it, I don't think you
24   did, but --
25   Q.  Thank you.
```

1      Was there actually tax return forms available on

2   PenaltyProtestor.org?

3   A.   Yes, I believe that you referenced the Paperwork Reduction

4   Act and you had those forms on there to support your argument

5   about the Paperwork Reduction Act defense.

6   Q.   What my defense was, correct?

7   A.   Yes.

8   Q.   Okay.  Did you ever find any evidence where I had told

9   somebody not to file tax returns because the forms don't comply

10  with the Paperwork Reduction Act?  And I mean "any" evidence.

11  A.   I don't recall.  I know that Turner brought some of that

12  -- I think he did in his testimony.  He may have -- him or

13  Michael Burt may have brought something up in their testimony

14  about the Paperwork Reduction Act and I just assume that he

15  probably learned it from you, but I don't know.

16  Q.   Isn't it -- is it true -- excuse me.  Strike that.

17      You're trying to hold me liable for taxes for Mr. Turner

18  that he would have owed for 1999, 2000, 2001, and 2002, and

19  2003; is that correct?

20  A.   Yes.

21  Q.   Do you remember when Mr. Turner testified he met Lindsey

22  Springer?

23  A.   I don't remember, but it was after that, after those

24  years.

25  Q.   After that, thank you.

1      Do you remember him testifying about the IFC conference

2  calls that you talked about earlier today?

3  A.    Yes.

4  Q.    Okay.  So how is it, then, that you attribute Mr. Turner

5  not filing a tax return or paying tax in '99, 2000, 2001, 2002

6  or 2003 if he didn't even know me?

7  A.    I don't attribute him not filing a tax return to you, just

8  the money that he hid in Mr. Stilley's Interest on Lawyers

9  Trust Account was -- you assisted him in evading the payment of

10 those taxes that he already owed.

11 Q.    Okay.  Isn't it true Mr. Turner went and made a loan at a

12 bank for that money?

13 A.    Yes, he mortgaged both his houses to get the money.

14 Q.    And didn't he say that the reason why he borrowed that

15 money was so if he got indicted he would have money to hire a

16 lawyer and defend himself?

17       MR. O'REILLY:  Your Honor, I'm only objecting because

18 we didn't go into this.  This is beyond the scope of direct

19 because this was fully explored during the trial.

20       THE COURT:  I understand your point.  Frankly, it

21 refreshes my recollection just a little bit.  I do have notes

22 on this from trial, but I'll hear this at least for now.  Go

23 ahead.

24       MR. SPRINGER:  Thank you, Your Honor.

25       THE WITNESS:  I think he did -- he did say that, yes.

1  Q.   (BY MR. SPRINGER)  And isn't the theory behind why that

2  was gross income to me was because he was hiring me for

3  services?

4  A.   Yes.

5  Q.   Okay.  And now you're saying that he actually was evading

6  the payment of his taxes by borrowing the money on the house

7  and then sending it for services?

8  A.   I think he was under the impression that he was going to

9  send that money through Stilley's IOLTA account or put it into

10  Stilley's IOLTA account so it would make the appearance that it

11  looked like an attorney retainer and the IRS couldn't seize

12  that money that was owed to them, and then you spent the

13  money.  So on one hand, he was hiding the money, but then you

14  took it and spent it, and so it's -- you assisted him in hiding

15  his income, as well as it's income to you because I think it

16  pretty much was set out in trial and the jury concluded that

17  that was income to you and I don't think anybody ever --

18  anybody ever thought you would pay it back.

19  Q.   Was the loan proceeds to Mr. Turner income to him?

20  A.   Loan proceeds?

21  Q.   Didn't you say he borrowed that 250,000?

22  A.   Yes.

23  Q.   So it's loan proceeds, right?

24  A.   Yeah, that's not income to him.

25  Q.   To him, all right.  You just said it was and I'm just

1  asking --

2  A.   No, it wasn't.  It was --

3  Q.   He wasn't hiding his income, was he?

4  A.   No, he was evading the payment of his taxes.

5           MR. O'REILLY:  Objection.  Argumentative, asked and

6  answered.  The testimony at trial was complete, but this is

7  argument covered with this witness --

8           THE COURT:  Mr. Springer, the government's theory as

9  to Mr. Turner, as I understand it, is not that the deposit into

10 the IOLTA account was evasion of taxes, per se, but that it was

11 -- had the effect of impairing the government's collection

12 ability, so on that basis the objection will be overruled -- I

13 mean, sustained.  We'll go on to the next question.

14      As a matter of fact, how much more do you have on cross?

15           MR. SPRINGER:  Twenty more minutes, probably, 15.

16           THE COURT:  We'll take our lunch break at this time.

17 That clock on the wall is a little fast, but I have 13 minutes

18 after twelve.  We'll resume in one hour.

19      Court will be in recess.

20      (A RECESS WAS HAD.)

21           THE COURT:  Mr. Springer, you may continue.

22 Q.   (BY MR. SPRINGER)  Mr. Shern, what was the reason why you

23 mentioned the exhibits involving the PayPal?  Why did you

24 mention that?

25 A.   Why did I -- I don't remember what the question was asked

BRIAN SHERN - CROSS BY MR. SPRINGER                                84

 1  referencing the PayPal.

 2  Q.    Are you suggesting that money that was given to me through

 3  PayPal is gross income?

 4  A.    Yes.

 5  Q.    And is that based upon whether or not -- is it based upon

 6  whether I did something for the person who gave me that money?

 7  A.    I think -- the way I did the PayPal documents was if I

 8  could see that you sold something on eBay and got money for

 9  that, that stuff was all excluded.  It was just people that I

10  think referenced "thanks for your help" or things that appeared

11  that you had performed some kind of service.

12  Q.    You don't know whether I performed any service for any of

13  the people who gave money to me through PayPal, correct?

14  A.    I'd have to look at the list to see, but there may have

15  been a couple on there that we knew about, but the majority, we

16  didn't know who they were.

17  Q.    Are you including those in your tax loss calculations?

18  A.    I believe so, yes.

19          MR. SPRINGER:  Would you please pull those up.

20          THE COURT:  Mr. Springer, let me give you some

21  guidance.

22          MR. SPRINGER:  Okay.

23          THE COURT:  As a general proposition, the question of

24  whether the funds you received were for services rendered has

25  been resolved against you by the verdicts of the jury and

 1   you're bound by that.  I'm bound by that.

 2       If you want to address specific items as it relates to tax

 3   loss determination, then we'll take that one step at a time.

 4   But the overarching question of whether the funds that you

 5   received over the years that were involved in this case were

 6   received by you for services rendered has been conclusively

 7   resolved against you by the jury verdict.

 8           MR. SPRINGER:  May I ask one point of clarification?

 9   The PayPal money was not included within the jury trial, those

10   were not part of the trial, they were never alleged, and they

11   are part of the tax loss calculation as an addition to.

12           THE COURT:  Well, then you need to be specific rather

13   than general in your questions.

14           MR. SPRINGER:  Got you.  Okay.  Just one moment, Your

15   Honor.

16   Q.  (BY MR. SPRINGER)  Mr. Shern, do you remember what exhibit

17   the PayPal receipts were on?

18           MR. O'REILLY:  Your Honor, it's 1134 and 1135.

19   Q.  (BY MR. SPRINGER)  Mr. Shern, if you could look at Exhibit

20   1134.

21   A.  Okay.

22   Q.  Is it your testimony on page 1 of 1134 you considered

23   every one of these transactions through PayPal that were not a

24   part of the grand jury indictment as gross income?

25   A.  Do you care if I refresh my memory with another exhibit?

BRIAN SHERN - CROSS BY MR. SPRINGER                86

1  Q.   Please.  Which exhibit is it you're going to be looking

2  at?

3  A.   It's the one that the total of all the items we charged

4  you with.

5  Q.   1177, 1178, the last two I got from Mr. O'Reilly.

6  A.   You know what?  I don't believe he charged you with any of

7  the PayPal stuff, I think just Mr. Stilley.

8  Q.   Thank you.  Thank you.

9       Before lunch, you testified about the $250,000 loan that

10  Mr. Turner caused -- obtained and then -- isn't it true that

11  Count 5 alleges that was gross income and then the jury found

12  guilty based upon an allegation that that was gross income to

13  Lindsey Springer?

14       MR. O'REILLY:  Objection.  Compound and confusing.

15  The loan is -- I assume he's referring to the mortgage loan,

16  which would not be what was attributed to anyone's income.

17       THE COURT:  Well, Count -- isn't Count 5 the willful

18  failure to file Count?

19       MR. SPRINGER:  No, it was a tax evasion count.  It's

20  Count 4, Your Honor.

21       MR. O'REILLY:  The year 2005.

22       THE COURT:  Well, the pending question refers to

23  Count 5, which is willful failure to file.

24       MR. SPRINGER:  I'm sorry.  It's Count 4, you're

25  right.  Count 4.

```
 1           THE COURT:  Then reask it.
 2    Q.   (BY MR. SPRINGER)  Prior to lunch today, you testified
 3    that Mr. Turner obtained a loan for $250,000, correct?
 4    A.   Yes.
 5    Q.   And that it is your position that that $250,000 should be
 6    added to a tax loss calculation for Mr. Turner not paying his
 7    taxes with that $250,000; is that correct?
 8    A.   It's the $250,000 -- on one hand, it's -- we charge it as
 9    income to you based on the fact that the jury concluded that
10    you took that money and never had any intention of repaying it
11    or else that tax count wouldn't have come back guilty, so on
12    one hand, it was charged to you for the tax loss associated
13    with that $250,000 -- was charged as income to you during
14    trial.
15         And on the other hand, we're adding the fact that you
16    assisted Mr. Turner in evading his taxes that he owed by
17    helping him transfer that money into the Interest on Lawyers
18    Trust Account, we're charging that to you at sentencing, as
19    well, because you assisted him in the evasion of payment of the
20    taxes that he owed.
21    Q.   And the $250,000 was a loan.  He didn't owe any money on
22    the loan, correct?
23    A.   He owed money on the loan, yes.
24    Q.   Mr. Turner owed money on the loan that he made for
25    $250,000?
```

 1          MR. O'REILLY:  Objection.  We covered this before

 2    lunch and it's simply confusing as to what loan he's talking

 3    about, which I think is the source of Special Agent Shern's

 4    confusion.

 5          THE COURT:  Mr. Springer, you're referring to the

 6    mortgage loan made by Mr. Turner to generate the funds that

 7    were transferred to the IOLTA account?

 8          MR. SPRINGER:  Yes, Your Honor.

 9          THE COURT:  It's established that a loan was made,

10    and if a loan is made, then money is owed.  We'll go on to the

11    next question.

12    Q.   (BY MR. SPRINGER)  And so in the tax loss calculation,

13    you're double-dipping on that 250,000; isn't that true?

14    A.   No.  We're charging you with the tax loss associated with

15    the income and we're also charging you with helping Mr. Turner

16    evade the payment of the taxes that he owed.

17         He could have used the money from the loan proceeds to pay

18    his taxes that he owed, but rather than doing that, he

19    transferred the money to Mr. Stilley to make it appear to be a

20    loan retainer so that he would have funds available to use him

21    as counsel if necessary, but instead of the money being used

22    for that purpose, you took it and bought a motor home and a

23    Lexus with it and spent it.

24    Q.   Isn't that -- what you just said -- the reason why Count 4

25    even began as a charge was because the theory you advanced

1  before the grand jury and at trial was that that money was

2  gross income to me?

3  A.   Yes, that was the largest part of the income charged to

4  you for that year was that amount.

5  Q.   You said that the jury could not have found me guilty of

6  Count 4 without finding those proceeds were not a loan to me

7  just now; do you remember saying that?

8  A.   Yes.

9  Q.   How did you come to that conclusion?

10  A.   Because they charged --

11         MR. O'REILLY:  Objection, Your Honor, as to

12  relevance.

13         THE COURT:  Sustained.  Mr. Springer, I want you to

14  rest assured I'm well-aware that the funds attributable to that

15  transaction are not the -- is not the only tax liability

16  involved in Count 4.

17         MR. SPRINGER:  Thank you, Your Honor.

18  Q.   (BY MR. SPRINGER)  So Mr. Turner's transaction of $250,000

19  that he borrowed ends up being $500,000 worth of tax loss

20  proposed on -- as far as you're concerned at this sentencing

21  hearing; is that true?

22         MR. O'REILLY:  Objection.  Misstates the testimony

23  and the evidence.

24         THE COURT:  I think it does, but you piqued my

25  curiosity.  We're going to hear it.

BRIAN SHERN - CROSS BY MR. SPRINGER                         90

 1            THE WITNESS:  No, the tax loss wasn't $500,000.  The

 2   tax loss based on $250,000 income to you was charged during

 3   trial.  And then Mr. Turner owed close to $250,000 -- it wasn't

 4   exactly $250,000 -- in taxes that were assessed to him that he

 5   did not pay.  He had the ability to pay it when he took out the

 6   mortgage on his homes, but he -- rather than paying the taxes

 7   associated with that, he took the money and transferred it into

 8   Mr. Stilley's Interest on Lawyers Trust Account to make it

 9   appear to be a retainer to Mr. Stilley.

10   Q.   (BY MR. SPRINGER)  To make it appear to be a retainer to

11   Mr. Stilley?  What was it really?

12   A.   Really, it was money you convinced him to give you that

13   you took from him.

14   Q.   Okay.  Are you aware of Mr. Turner repossessing the RV?

15   A.   No, I wasn't aware of that.

16   Q.   Do you remember the testimony at trial there was a lien

17   against the property?

18   A.   Yes.

19   Q.   You mentioned on the blog that there were over 8,000 hits

20   on the blog you mentioned earlier?

21   A.   Yes.

22   Q.   You don't know what percentage of those were page visits

23   or site visits or unique visits, do you?

24   A.   I have no idea.

25   Q.   Could be a very few number of people constantly going

1   there, couldn't it?

2   A.    Could be, yes.

3   Q.    Thank you.

4         Mr. Dingman and Mr. Grady and Mr. Robertson -- do you

5   remember mentioning those three names?

6   A.    Yes.

7   Q.    Why did you mention them?  What relevance do they have to

8   this proceeding of sentencing?

9   A.    I believe that you encouraged them to violate the law.

10  Q.    And do you remember -- what specifically was it that I

11  encouraged them to do that violated the law?

12  A.    You assisted them in setting up trusts in order to evade

13  the payment of taxes, and you also helped them send -- excuse

14  me -- helped them send frivolous documentation to the Internal

15  Revenue Service to try to unvolunteer from the tax system.

16  Q.    Okay.  Do you know -- strike that.

17        To evade taxes, that's a year specific crime, correct?

18  A.    Yeah.

19        MR. O'REILLY:  Objection, Your Honor.  It calls for a

20  legal conclusion.

21        THE COURT:  Overruled.

22  Q.    (BY MR. SPRINGER)  Do you know what year I counseled

23  Mr. Dingman or Mr. Grady to commit tax evasion?

24  A.    It was sometime during the early nineties.

25  Q.    Now, Mr. Robertson, what relevance does he have to your

BRIAN SHERN - CROSS BY MR. SPRINGER                    92

```
 1  testimony about the early 1990s?
 2  A.   He was just a name that Mr. -- either Mr. Dingman or
 3  Mr. Grady mentioned to me that you had set up similar trusts
 4  for him than you did for them.
 5  Q.   Do you remember Mr. Dingman testifying about his
 6  conviction in Springfield, Missouri?
 7  A.   Yes.
 8  Q.   Do you remember he worked a special deal out with the IRS
 9  where he could go around and talk to people about what had
10  happened to him; do you remember that?
11  A.   Yes.
12  Q.   Do you remember an article that came out that caused me to
13  rise up against the newspaper about?
14  A.   Yes.
15  Q.   Okay.  And wasn't Mr. Robertson one of the deacons in that
16  article?
17  A.   I believe so, yes.
18  Q.   So Mr. Robertson is actually the one who Mr. Grady claimed
19  set him up with those trusts because that's what the article
20  said, isn't it?
21  A.   Mr. Grady told me that you were the one that assisted
22  him.  I don't remember what the article says, but they told me
23  that you were the one that came and you used to travel around
24  the midwest and promote these trusts and you helped them set
25  them up.
```

1  Q.   In your mind, is there a difference between promoting a

2  trust and setting a trust up?

3  A.   Depends on if the trust is legitimate.  I mean, trusts are

4  set up all the time that are perfectly legitimate, but it's

5  different if your motive is to evade taxes.

6  Q.   Did you ever see any of the trusts that Mr. Robertson set

7  up for Mr. Dingman and Mr. Grady?

8  A.   No.

9  Q.   So you don't know whether they were set up correctly or

10 not; is that correct?

11 A.   No, I'm just going from what they told me.

12 Q.   Okay.  Did they tell you they weren't set up correctly?

13 A.   They just told me that it was -- that you set them up for

14 them and they paid you -- paid Bondage Breakers Ministries a

15 monthly fee to help maintain the trusts.

16 Q.   Did you ever ask to see a copy of those trusts to see what

17 I allegedly set up?

18 A.   I think at one time I did ask, and the records may have

19 been involved in their own trial, and I don't think I ever

20 specifically looked at them.

21 Q.   You mentioned PenaltyProtestor.com and .org.  Did you ever

22 find any documents on PenaltyProtestor.com or .org that were

23 not already public documents in other places, such as court web

24 sites or government web sites in general?

25 A.   I don't believe so.  Almost all the documents there were

BRIAN SHERN - CROSS BY MR. SPRINGER                              94

```
 1   either tax forms or documents of trial proceedings or court

 2   orders or motions.

 3   Q.   So you don't find anything wrong with putting publicly

 4   displayed documents on a Web site, do you?

 5   A.   No.

 6   Q.   Okay.  Do you remember the testimony of Mr. Burt,

 7   Mr. Turner, and Mr. Stumpo?

 8   A.   Yes.

 9   Q.   Relevant to the conference calls with IFC?

10   A.   Yes.

11   Q.   Do you remember what each one of them told the jury I told

12   everybody on that conference call to do?

13   A.   I think some of them testified that you told them to file

14   their tax returns.

15   Q.   And that IFC had misled them; do you remember that

16   testimony?

17   A.   Yes.

18   Q.   Did you ever interview anybody who attended the IFC

19   conference calls where I advocated to them stay their course,

20   violate the Internal Revenue laws, and continue to use the

21   trust that IFC had set up for them?

22   A.   No.

23   Q.   Thank you.

24        I believe you mentioned a Mr. Todd Guthrie; do you

25   remember that name?
```

1   A.   Yes.

2   Q.   And there are checks that you've listed that -- where he

3   gave either me or Bondage Breakers Ministry name money; is that

4   correct?

5   A.   I believe so, yes.

6   Q.   Do you know how many hours I worked for him?

7   A.   No.

8   Q.   Just to clarify on Dr. Roberts, for the purposes of the

9   two-point increase for counseling somebody to violate the

10  Internal Revenue laws, do you remember what year Dr. Roberts

11  was required to file a tax return and he didn't file a tax

12  return as a result of what you claim I told him?

13  A.   No, I don't.  He just said that you told him.

14  Q.   And isn't it true, after June of 2000, after he was

15  convicted, eventually he went to jail, right?

16  A.   Yes.

17  Q.   Right.  And the 2000 return wouldn't have been due until

18  at least, under most people's understanding, April 15th of

19  2001; isn't that right?

20  A.   That's correct.

21  Q.   And if Dr. Roberts was in prison, wouldn't that make it a

22  little more difficult for him to file a tax return while he's

23  in jail?

24  A.   Possibly so.

25  Q.   Complicated tax return, not an EZ form, right?

BRIAN SHERN - CROSS BY MR. SPRINGER                    96

1   A.   Yes.

2   Q.   And do you know, after he got out of jail, who worked with

3   Dr. Roberts to get all his tax returns prepared and caught up

4   and current?

5   A.   No, I don't.

6   Q.   You don't know whether it's Brian Miller or not?

7   A.   I know Mr. Miller had some subsequent contact with

8   Mr. Roberts, but I'm not sure if he's the one that counseled

9   him on how to file his tax returns and pay over what he owed.

10           MR. SPRINGER:  Your Honor, may I have just one

11   moment?

12           THE COURT:  You may.

13   Q.   (BY MR. SPRINGER)  Would you please turn to Government's

14   Exhibit 1160, please.

15   A.   Okay.

16   Q.   My understanding of 1160 is the little asterisks by the

17   exhibit column means that the income item was included in

18   Lindsey Springer's tax loss computations presented at trial; is

19   that true?

20   A.   Yes.

21   Q.   Does that mean that the very first check at the top,

22   Number 3, was not listed for $5,000 from Believers Broadcast

23   Corporation?

24   A.   Yes, that amount was not charged as income to you during

25   trial.

BRIAN SHERN - CROSS BY MR. SPRINGER                              97

 1   Q.   And why not?

 2   A.   I think, towards the end of trial prep, we decided just

 3   not to include him as one of our witnesses.

 4   Q.   Okay.  And if you would look at the last entry on 1160, it

 5   says -- turn to 1157, of course, but it says "cash N/A Various

 6   Lindsey Springer, 12,000"?

 7   A.   Yes.

 8   Q.   Do you remember why that appears on this chart?

 9   A.   Yes.  When Mr. Miller was finishing his computations up

10   based on the testimony that he heard at trial, I believe that's

11   the amount that you testified that you received in cash in the

12   mail each particular year and so he charged that amount to

13   you.

14   Q.   Is there any evidence that I did anything for any of those

15   people who gave that $12,000 whatsoever?

16   A.   I think if you take your conduct as a whole throughout the

17   course of this trial, an assumption could be made.  There's no

18   physical evidence linking any of this $12,000 to something that

19   you did, but I think an inference can be made it's probably

20   something you did for somebody, some legal service or advice

21   that you gave to somebody.

22   Q.   Isn't that totally based upon my testimony on the witness

23   stand, that $12,000?

24   A.   Yes.

25   Q.   Did I ever say that I did anything for any of the people

1  who that amount of money I was just guessing about came from?

2  A.   No.

3  Q.   Will you turn to Government's Exhibit Number 1161,

4  please.

5  A.   Okay.

6  Q.   And the asterisks here also says, at the bottom or in the

7  middle of the page, "income item was included in Lindsey

8  Springer tax loss computations presented at trial," but you

9  didn't present any charges for 2001 at trial, did you?

10       MR. O'REILLY:  Objection.  Relevance to argumentative

11  question.  It simply -- this shows what was presented at trial

12  versus what was not presented as evidence at trial.

13       THE COURT:  Well, as I understand the pending

14  question, he is -- he is challenging that assumption, so I'm

15  going to overrule -- the relevance is marginal, but I'm going

16  to overrule the objection.

17       THE WITNESS:  What was the question again,

18  Mr. Springer?

19  Q.   (BY MR. SPRINGER)  Even though Exhibit 1161 says "income

20  item was included in Lindsey Springer's tax loss computations

21  presented at trial," there was no tax computations for the year

22  2001 presented at trial because there was no charge for 2001;

23  isn't that true?

24  A.   No, that's not entirely true, because Mr. Miller did

25  present the income that we charged you -- or not charged you,

1  but presented at trial for 2001, and I believe he explained why

2  we were not charging that year, but the amounts with the

3  asterisk on them were amounts that were presented at trial, but

4  that doesn't necessarily mean we charge you with any crime for

5  2001.

6  Q.   Right.  The actual asterisk here says "Lindsey Springer's

7  tax loss computations at trial"?

8  A.   Yes.

9  Q.   And you didn't present any tax loss computations at trial

10 for 2001, did you?

11         MR. O'REILLY:  Your Honor, objection.  Government's

12 Exhibit 676 was presented at trial, it is from the year 2001,

13 and it has those items.

14         THE COURT:  Let me take a look at it.  Hold on.  Do I

15 have that in these notebooks?  It doesn't look like it.

16         MR. O'REILLY:  You should, Your Honor.

17         THE COURT:  Never mind, I've got it.

18     Sustained.  Next question.

19 Q.   (BY MR. SPRINGER)  If you would turn to 1162, please.  On

20 the first entry, 1003, Midsummer to Sam Palmer for $10,000 --

21 do you see that entry on 1162?

22 A.   Yes.

23 Q.   Do you know what I did for Sam Palmer?

24 A.   Whenever I talked to Mr. Palmer, he indicated that he just

25 gave you money.  He didn't say you did anything for him.

BRIAN SHERN - CROSS BY MR. SPRINGER                              100

1   Q.   And if you would go back to 1161, is that the same

2   testimony that he gave with reference to the second to the last

3   item, Number 1002 from Mr. Palmer, again on 1161, it's the

4   second to the last item, from Okemah National Bank, 10,000?

5   A.   Yes.

6   Q.   The fourth item on 1162 from Windhill Management Company

7   Trust for $400, do you know of anything that I did for Windhill

8   Management Company Trust?

9   A.   No.

10  Q.   And then, again, the last entry on 1162, which is number

11  1157, the cash for 12,000, that's the same testimony you gave

12  on the last exhibit about the 12,000.  In fact, wouldn't that

13  be the same for every year, the 12,000 is the exact same

14  source, me, on that witness stand?

15  A.   Yes.

16  Q.   All right.  If you'll turn to 1163, please.  And it's

17  listed -- Exhibit Number 29.  It's in the middle of the page

18  and it's to Guy Francis, if you draw a line across, if that

19  helps, and it send ends up being $3,750.  Do you know anything

20  I did for Guy Francis?

21  A.   Yes.

22  Q.   What did I do?

23  A.   He said that you assisted him with -- I remember from

24  talking to him, he said that you assisted him with matters

25  related to his -- I think it was involvement with IFC.

1  Q.   Did he tell you that I convinced him to go back and file

2  his tax returns?

3  A.   No, he didn't.

4  Q.   But you say it had something to do with IFC?

5  A.   I think so, without looking specifically at --

6  Q.   You just don't know?

7  A.   My memorandum of interview, I don't -- yes, I don't know.

8  Q.   The next entry just below that, which is Exhibit Number

9  30, and it's CR Foundation, Larry Simmons, for $7,500?

10 A.   Yes.

11 Q.   Do you know anything that I did for that money?

12 A.   Yes.  He testified in the grand jury.  I think he

13 testified that he gave you a donation, but we know that he was

14 under criminal investigation as well and he was also involved

15 with IFC, so we don't know specifically what you did for him,

16 but we know that he paid you and that he was involved in IFC.

17 Q.   Have you subsequently found out that he's filed all of his

18 back tax returns?

19 A.   No.

20 Q.   Did you look to see whether Mr. Frances had filed all of

21 his back tax returns?

22 A.   I believe we looked during the trial, but I can't remember

23 whether he had filed or not.

24 Q.   But you do remember I was telling people that -- three

25 people at least at this trial, back in November, testified that

1    on those conference calls I was telling everybody to go file

2    their tax returns?

3    A.    Yes, that's correct.

4    Q.    So whether they gave me any money or not, if they went

5    back and filed their tax returns because I told them to do that

6    on the phone, that doesn't change whether they gave me a

7    donation or not, does it?

8    A.    I think the issue here is not whether or not you advised

9    these people, particularly, to file a tax return or not file

10   their tax return, the issue is whether they paid you money and

11   whether it was money for services or money for promoting your

12   cause, but the reason we added these people into these

13   calculations is because they had either problems with the IRS

14   as far as criminal investigations or they've been caught up in

15   IFC and you had some kind of interaction with them and helped

16   and they paid you for it.

17   Q.    They testified before the grand jury, did they not?

18   A.    Mr. Frances -- or, I mean, Mr. Simmons did.

19   Q.    And if I had performed anything in the same level that you

20   presented at trial, wouldn't you know that?

21   A.    Not if they withheld that information from me or from the

22   grand jury.  But based on the fact that they didn't meet you

23   until their troubles with IFC came and all the sudden they're

24   paying you for something.

25   Q.    Couldn't be they just wanted to support me?

1   A.    I mean, if it was like a United Way or something, they'd

2   just send the money and they wouldn't have any contact.

3   Q.    What about the judge's instruction about disinterested?

4   Didn't have any expectation?

5           MR. O'REILLY:  Your Honor, objection.  This is

6   argument and it would be appropriate at that time.

7           THE COURT:  Sustained.

8   Q.    (BY MR. SPRINGER)  Third to the last item with a number is

9   1004 -- Exhibit 1004, on Exhibit Number 1163, foreign currency

10  draft from Fabulous Limited and it says "Brian DeMercuiro

11  $3,632"?

12  A.    Yes.

13  Q.    Do you know anything that I did for Brian DeMercuiro?

14  A.    Yes.

15  Q.    What did I do?

16  A.    He participated numerous times on your conference calls

17  and you actually had one-on-one conversations with him about

18  the situation with IFC and what he was supposed to do.  And you

19  actually helped him -- he had that $3,600 tied up in some

20  foreign business unit, I think, overseas -- was tied up in an

21  overseas corporation and he said that you actually helped him

22  retrieve that money and then he paid it to you, basically.

23  Q.    So I helped him get this money and then he gave it to me

24  for helping him get it?

25  A.    I think he gave it to you for helping him get the money,

1  but more -- I think more so you helped him with his situation

2  that he was facing with IFC, because a lot of the people that

3  were involved with IFC had issues, tax problems, that they were

4  trying to overcome, and I think you used that as an opportunity

5  to switch your -- I guess what I'm trying to say is people like

6  Barbara Hodsden and Brian DeMercuiro that were good people that

7  were caught up in this scam were looking for a person that

8  would help set them straight, which they got that out of you.

9      People like Mr. Patterson, Mr. Robertson, and Mr. Lake,

10  they were looking for somebody to tell them what they believed

11  and they -- so what those people, you told them, yeah, you're

12  right in your belief that you don't have to file a tax return,

13  but then you changed your tune when you were helping these

14  other people.  Basically, what I believe is that you told the

15  people what they wanted to hear to get the money from them.

16  Q.   Is it possible that I just didn't want to tell them what

17  they should believe, that that wasn't my call?

18  A.   I think your motive was solely financial.

19  Q.   Is the negative 30,000 at the bottom the Tulsa Sales and

20  Rental check that was given back to Eddy Patterson; is that

21  what that is?

22  A.   Yes.

23  Q.   Okay.  What about the 5,000 in cash that he received,

24  where is it indicated?

25  A.   I'm not sure -- the 5,000 in cash.

 1  Q.   Remember that came from a $35,000 check?

 2  A.   Mr. Patterson told the IRS in an interview that he just

 3  paid 30,000 back to you.  I know there was a check to you for

 4  35,000, but I don't know about the 5,000 cash.

 5  Q.   Isn't the 30,000 actually from the bank to Mr. Patterson's

 6  Tulsa Sales and Rental, not back to me?

 7  A.   We deducted the $30,000 because he told us in an interview

 8  that Mr. Stilley wrote you a check for 35,000, and 30,000 of

 9  that was to go back to him.

10  Q.   Which was the cashier's check to Tulsa Sales and Rental,

11  correct, that I provided to you on January 15, 2009, or

12  thereabouts?

13  A.   Yes, I think so.

14  Q.   And then wasn't it my testimony -- unrebutted testimony

15  that -- and Mr. Patterson's too, that I also gave him cash that

16  day, that same day?

17  A.   I don't remember if Mr. Patterson testified to that or

18  not.

19  Q.   You have no evidence to doubt it, though, do you?

20  A.   No.

21  Q.   If you would turn to 1164, please.  The third entry,

22  Exhibit Number 39, is another check from Larry Simmons for

23  $10,000.  Do you see that?

24  A.   Yes.

25  Q.   Okay.  Is it your same testimony that whatever I did with

BRIAN SHERN - CROSS BY MR. SPRINGER                    106

1   him for the first check, I did the same thing for him with the

2   second check?

3   A.   Yes.

4   Q.   So if I did nothing for him on the first check, I did

5   nothing for him on the second check, right?

6   A.   I don't think -- that's not my belief.

7          MR. SPRINGER:  That's all right.  Strike that, Your

8   Honor, I'm sorry.

9   Q.   (BY MR. SPRINGER)  The second to the last is Number 45.

10  Do you see that exhibit?

11  A.   Yes.

12  Q.   From Charles Looney for $10,500?

13  A.   Yes.

14  Q.   Okay.  And that was not part of your -- the trial, but

15  it's part of this tax loss computation now.  What is it that I

16  did for Charles Looney for $10,500?

17  A.   Mr. Looney's words to me were that you were the sole

18  reason that he only got charged with a misdemeanor versus a

19  felony in his criminal case.

20  Q.   But did I do anything for Mr. Looney?

21  A.   Yes, he said you helped provide his attorneys with

22  assistance.

23  Q.   Who were his attorneys?  Do you know?

24  A.   I don't remember, offhand.

25  Q.   Isn't it true that Mr. Looney was convicted of

BRIAN SHERN - CROSS BY MR. SPRINGER                    107

```
 1  misdemeanors in his case?
 2  A.   Yes.
 3  Q.   And isn't it true --
 4          MR. O'REILLY:  Objection, Your Honor.  Just for
 5  clarification, Mr. Looney was not part of this case.
 6          THE COURT:  In his case, right.
 7          MR. SPRINGER:  I'm sorry.  I'm sorry.  I'm sorry.
 8  Q.   (BY MR. SPRINGER)  Isn't it true that the check Mr. Looney
 9  wrote to me is after his trial and his conviction?
10  A.   I don't know.
11  Q.   Would that be relevant to determine whether or not I did
12  anything for $10,500?
13  A.   In some cases, the timing of the payments would be
14  relevant so it would be one factor to look at, yes.
15  Q.   So if he had already gone through trial and then he met
16  me, how could I be the sole reason why he was found not
17  guilty?
18          MR. O'REILLY:  Objection.  Assumes facts not in
19  evidence.
20          THE COURT:  Sustained.
21  Q.   (BY MR. SPRINGER)  If you would turn to 1165, please.  Is
22  it your testimony that whatever I did for Mr. Looney's
23  Friendship Enterprises on 11/14/2004 is the same thing that I
24  did for the second entry on 1165, which is Exhibit 47 for
25  $13,000?
```

1          MR. O'REILLY:  Objection, Your Honor, merely for

2    clarification.  It was from Miracles Unlimited, not Friendship

3    Enterprises.

4          MR. SPRINGER:  I'm sorry.  Miracles Unlimited.

5          THE WITNESS:  Just to kind of add some factors to the

6    situation about the timing of payments --

7    Q.   (BY MR. SPRINGER)  Yeah.

8    A.   -- oftentimes, Mr. Roberts and Mr. Ouwenga, specifically

9    talked about how after their conviction you would tell them how

10   the court was wrong and you would continue filing things and

11   helping them post-conviction and you often got money from

12   people afterwards, so really -- I mean, the conviction date is

13   not as relevant as something you could -- you could have been

14   helping them afterwards.  I don't know specifically how you

15   helped them.

16   Q.   You don't know how many hours I worked for Mr. Looney,

17   right?

18   A.   No.

19   Q.   And then the fifth entry down is check number -- excuse

20   me -- Exhibit Number 1005 from AC&R Group?

21   A.   Yes.

22   Q.   Do you know who that is?

23   A.   No.  This was the check that I talked about that I wasn't

24   for certain who it was.  It just went through your -- it was

25   cashed at Checks Cashed.  I can't remember if it's the Phillips

1  or not.  I'm not sure.

2  Q.   Okay.  So you don't know if I did anything for AC&R

3  Group?

4  A.   No.

5  Q.   And, again, your same answers on the last entry, on 1165,

6  under $12,000?

7  A.   Yeah, about the -- your testimony.

8  Q.   If you would turn to 1166, please.  There's nothing on

9  1166 that was ever presented at trial, correct?

10 A.   There were things that we talked about during the trial, I

11 think, for certain witnesses, but none of this was presented as

12 income because we didn't charge 2006.

13 Q.   So just on the first line there -- we're just going to go

14 down quickly -- do you know anything I did for Patrick and

15 Patricia Turner for $1,000 on December 30, 2005, or

16 thereabouts?

17 A.   I know you helped Patrick Turner with his criminal

18 investigation.

19 Q.   But that was back in 2003, right?

20 A.   I don't know that you --

21       MR. O'REILLY:  Objection, Your Honor.  Actually

22 misstates the evidence at trial.  Mr. Turner testified he was

23 still concerned into 2005, which is in part why he transferred

24 $250,000 to hide from the IRS into that --

25       MR. SPRINGER:  If I can object, he just misstated the

1    evidence, but on this particular instance, I'm only talking

2    about $1,000 on Exhibit Number 1166.

3              THE COURT:  And your question is what?

4              MR. SPRINGER:  What evidence does he have that I did

5    anything for that $1,000 check from Mr. Turner on December 30,

6    2005, which was after he was told he was no longer under

7    criminal investigation.

8              THE COURT:  Go ahead.

9              THE WITNESS:  I believe Mr. Turner thinks that you're

10   the sole reason why he didn't get indicted, so I think this

11   money probably was money that he gave to you because he thinks

12   that you got him off, per se.

13   Q.   (BY MR. SPRINGER)  So in your testimony, then, he's paying

14   me just endlessly because he thinks I got him off of a criminal

15   charge?

16   A.   That's a possibility or I know that your alleged loan that

17   you had with him, you were having to pay him thousand-dollar

18   payments so this -- I mean, it could be an attempt that you're

19   paying him money trying to disguise it as loan payments and

20   then him paying you back $1,000.  I'm not sure.

21        I wouldn't say, to answer your question, that there's no

22   evidence that you did anything for him, because I think you

23   were actively involved in getting money out of him from the

24   time that you met him.

25   Q.   Wasn't the payments $1,400 a month?

1   A.   I think some of them were 14 -- yeah, I think that's

2   right.

3   Q.   Yeah, 1,400, yeah.

4   A.   Never mind.

5   Q.   The next check, Herbert and Charlene Mott for $10,000.

6   Can you tell me what I did for Herbert and Charlene Mott for

7   10,000?  And then I'll ask the next question.

8   A.   Herbert and Charlene Mott were clients of Mr. Patridge.

9   Mr. Patridge was an insurance agent.  And he faced criminal

10  charges and you -- he said he constantly talked to you and

11  bounced ideas off of you about his criminal case and you did a

12  lot of research for him.

13       Well, he -- instead of paying you directly, he told some

14  of his clients, his insurance clients, to pay you and write

15  "gift" on the check for $10,000, to pay you basically for the

16  help that you were providing to him.

17  Q.   Did Mr. Patridge also testify I never asked him for any

18  money?

19  A.   Yes, I believe he did testify to that.

20  Q.   So then if that was true, then this $10,000 was strictly

21  Mr. Patridge's doing, wasn't it?

22  A.   If that were true, yes.

23  Q.   You believe he lied?

24  A.   Yes.

25       MR. O'REILLY:  Your Honor, objection.  Mr. Patridge

BRIAN SHERN - CROSS BY MR. SPRINGER                               112

```
 1   did not cash a check.
 2             THE COURT:  I don't remember what that evidence was.
 3   Q.   (BY MR. SPRINGER)  Exhibit Number 50, the third line down
 4   for 5,000 from Mr. Patridge a month and a half later.  Do you
 5   know how many hours I worked for Mr. Patridge?
 6   A.   No.
 7   Q.   The fourth line down, Beach Fire Corporation, Larry
 8   Logsdon.  Do you see that one?
 9   A.   Yes.
10   Q.   For 20,000?
11   A.   Yes.
12   Q.   Do you know how many hours I worked for Mr. Logsdon?
13   A.   No.
14   Q.   Mr. Logsdon testified before the grand jury, didn't he?
15   A.   Yes.
16   Q.   And he testified at trial, didn't he?
17   A.   Yes.
18   Q.   And what did he tell you that I did for him in exchange
19   for this $20,000?
20   A.   I believe he said you were -- you helped him with his
21   matters before the IRS.  I know he had some civil issues with
22   the IRS.  If I remember right, he said that you -- he utilized
23   you as a researcher.  I can't be for certain.
24   Q.   You don't know what I did for Mr. Logsdon, do you?
25   A.   I don't know exactly what you did, no.
```

1   Q.   Okay.  And the next check for 20,000 from Believers

2   Broadcast Corporation, Ken Geisendorffer, do you know what I

3   did for that $20,000?

4   A.   Mr. Geisendorffer, when we talked to him --

5   Q.   Mr. Geisendorffer -- I'm sorry, is that Ken Geisendorffer?

6   A.   Yes.  Ken Geisendorffer, his father, according to

7   Mr. Geisendorffer, what he told us, was his father was actively

8   involved in going to some of your seminars and he had an issue

9   where he owned a hotel where he employed transient workers,

10  basically, and he got into an issue with employment taxes with

11  the IRS, and he used to pay you for your assistance in this IRS

12  matter.

13       And when he talked to Mr. Ken Geisendorffer, he told us

14  that you do good work and that's why he paid you.  And then he

15  also said that he was just now settling the issue that he had

16  with the IRS that you were helping him with.

17  Q.   So the statement you made before you said what Ken told

18  you, who told you that?  The one right before you said "and

19  what Mr. Ken Geisendorffer told me."

20  A.   We never talked to Ken's father, the elder Geisendorffer,

21  we just talked to Ken Geisendorffer.

22  Q.   Okay.  So you wouldn't know anything that I would have

23  done for his father because he had a stroke, right?

24  A.   Other than what Ken Geisendorffer told us that you did.

25  Q.   Right.  And did Ken say that he knew in 2006 why his

1  father would give me money like that?

2  A.   I don't think this was from his father; this was from Ken

3  Geisendorffer.

4  Q.   Did he make you aware that they owned a television

5  station?

6  A.   Yes.

7  Q.   And that they put me on their television station quite

8  frequently?

9  A.   I think I reviewed it -- a VHS tape of one of the

10  presentations that you made on his television station.

11  Q.   And also they put me on the radio, didn't they?

12  A.   I'm not sure.  Probably.

13  Q.   Okay.  Do you know who Le Roy Peaslee is for $250?

14  A.   We never talked to Mr. Peaslee.

15  Q.   Okay.  And then, of course, I presume everything you say

16  about Mr. Patridge is just an ongoing -- you don't know how

17  many hours I worked for him, you don't know what I did, but I

18  did something for him; is that a basic summary?

19  A.   We know a little bit of what you did.  Like I said, he

20  said that you -- he utilized your services as a legal

21  researcher and talked about his case a lot, but other than

22  that, no, we don't know what you did for him.

23  Q.   And the next $5,000 entry from Larry Logsdon, Beach Fire

24  Corporation, same testimony there, don't know what I did for

25  Larry Logsdon other than what he said at trial?

1   A.   Yes.

2   Q.   Okay.  And then Check Number 1 -- Exhibit Number 135 from

3   Hamlet Bennett for $25,000, do you know of anything I did for

4   Hamlet Bennett for $25,000?

5   A.   When we talked to Mr. Bennett, the first time we talked to

6   him was right before trial, right before he was to testify at

7   trial, and he said that he paid you and Mr. Stilley for legal

8   services.

9   Q.   Now, he came into this courtroom and he went under oath,

10  didn't he?

11  A.   Yes.

12  Q.   He didn't say that when he was here under oath, did he?

13  A.   I think my recollection is that he did say that, but I'm

14  not positive.

15  Q.   He actually said he gave that as a gift, if you remember

16  correctly?

17  A.   I think he may have testified that you told him to say it

18  was a gift.

19  Q.   Oh, right.  Have you reviewed his transcript before you

20  testified here today?

21  A.   No, I haven't.

22  Q.   And as far as you know, did he ever present to you

23  anything that I did for him?

24  A.   Like I said, when we talked to him, he said that you

25  helped him with his trial, because I think there was --

1  Q.   I helped him with his trial; is that what you just said?

2  A.   Yeah, I think you -- when he talked with us, he said that

3  he initially hired Mr. Stilley.  I believe he talked to you and

4  you helped him get in touch with Mr. Stilley.  And then

5  Mr. Stilley wasn't able to represent him in Hawaii because of

6  his troubles in the Bar in Arkansas, and so you then introduced

7  him to Mr. Richey.

8       And Mr. Stilley, even though he didn't represent him, kept

9  some of the money, like $75,000 or $50,000, that Mr. Bennett

10 paid Mr. Stilley, and then transferred some more money to you

11 and Mr. Richey.  And I think Mr. Richey ended up representing

12 him in trial.

13 Q.   So if the -- if Mr. Gollihare in his report said that

14 Mr. Bennett contacted Mr. Stilley first and then I wasn't the

15 one who introduced him, then would you be agreeing or

16 disagreeing with that?

17 A.   Without refreshing my memory with the transcript, I

18 couldn't say for sure whether he contacted Mr. Stilley first or

19 contacted you first.

20 Q.   So you don't know?

21 A.   No.

22 Q.   Do you trust Mr. Gollihare, if he did know?

23           MR. O'REILLY:  Objection, whether or not --

24           THE COURT:  Sustained.  We're not going to have any

25 debate back and forth about the reasoning processes -- by way

1    of testimony, at least, about the reasoning processes of the

2    probation office.

3              MR. SPRINGER:  Okay.

4    Q.  (BY MR. SPRINGER)  The next entry, Hamlet Bennett, 45,000,

5    do you remember where that came from?

6    A.   Yes, it came from Mr. Bennett.

7    Q.   Directly?

8    A.   It came from Mr. Bennett's American Savings Bank account.

9    I think it was a cashier's check or an official check.

10   "Cashier's check" is what it says.

11   Q.   And the same testimony is he gave me 45,000, said I helped

12   him, but don't know what I did?

13   A.   Yes, you helped him with his case.

14   Q.   Helped him with his case.

15        The next one, from Sam Palmer for $500, Mr. Palmer -- did

16   he tell you that was a gift?

17   A.   I think he said all the money that he gave you was gift or

18   donations.

19   Q.   Same thing with Mr. Guthrie at $500?

20   A.   We never talked to Mr. Guthrie.

21   Q.   Okay.  The next entries are Creation Science Evangelism

22   Ministries, Inc.

23              MR. O'REILLY:  It does not say "Inc." on the check.

24   I think that's a misrepresentation.

25              THE COURT:  Rephrase it, please.

BRIAN SHERN - CROSS BY MR. SPRINGER                              118

1  Q.   (BY MR. SPRINGER)  Creation Science Evangelism Ministries,

2  Kent Hovind, for $10,000.  Have you talked to Mr. Hovind?

3  A.   No, I haven't talked to Mr. Hovind, but we did obtain jail

4  tapes from conversations that you and Mr. Hovind and

5  Mr. Hovind's wife had.

6  Q.   And did those tapes reflect that he was paying me for a

7  service?

8  A.   No.

9  Q.   The next one is $5,000 from American Savings Bank, Hamlet

10  Bennett, same testimony as the other two checks, just I helped

11  him, that was it, no hours, no nothing else?

12  A.   Correct.

13  Q.   Okay.  Regents Bank is the next entry from Kent Hovind,

14  10,000, the same testimony that you just gave a minute ago,

15  about listening to the tapes and --

16  A.   Yes.

17  Q.   And then Todd Guthrie, same person, didn't talk to, as you

18  said just a moment ago, on the other 500; is that right?

19  A.   Correct.

20  Q.   Okay.  And then Patrick and Patricia Turner, $900, which

21  is the third to the last entry on 1166, did you ask Mr. Turner

22  what that was for?

23  A.   Specifically the $900, no, I don't believe I did.

24  Q.   And just to be clear about this, you never asked him what

25  the thousand dollars was for on the top of 1166 either, right?

1   A.   I think it may have came up in his grand jury testimony

2   and he said it was just -- he said that he donated to a lot of

3   charities and things and this was just another one of his

4   donations.

5   Q.   Is that true?  Does he donate to a lot of charities?

6   A.   Yes.

7   Q.   And then Dale and Cheryl Phillips, $7,500.  Did you talk

8   to them?

9   A.   No.  I believe we added them in because we -- they may

10  have been one of the cases that you had on your Web site, but

11  I'm not 100 percent sure.

12  Q.   Yeah.  As far as you know, you don't know anything I did

13  for the Phillips, no hours, no nothing?

14  A.   No.

15  Q.   Okay.  And then the various answer again is the same on

16  the last of each entry, the $12,000 came directly from my

17  testimony, correct?

18  A.   Yes.

19  Q.   All right.  If you'll turn to 1167, please, and we'll just

20  clean this up and be done.  Two more.  None of these entries

21  were presented as evidence at trial, correct?

22  A.   No, because 2007 -- that wasn't one of the years we

23  charged.

24  Q.   Now, the --

25          MR. O'REILLY:  Objection, Your Honor.  Just

 1   clarification, Exhibit 58 was referenced during the trial, it

 2   was not included as part of the tax computations at trial.

 3            THE COURT:  So 58 was -- was 58 received at trial?

 4            MR. O'REILLY:  I believe it was part of a different

 5   exhibit at that point, Exhibit 61, which was a whole collection

 6   of checks.  As the Court may recall, I was asking Mr. Turner

 7   about being repaid and I went through a series of checks.  This

 8   is the last one I referenced.

 9            THE COURT:  Proceed.

10            MR. SPRINGER:  Thank you, Your Honor.

11   Q.   (BY MR. SPRINGER)  Exhibit Number 58, which is from

12   Believers Broadcast Corporation for $100,000, did you ask

13   Mr. Geisendorffer why he gave me that check?

14   A.   Yes.

15   Q.   What did he say?

16   A.   He said because you do good work.

17   Q.   I do good work.  Did he tell you what I did for it?

18   A.   No.  Other than the fact that he said he had an IRS matter

19   that you helped him with.

20   Q.   Are you sure it wasn't his dad's IRS matter?

21   A.   From talking to him, I was under the impression that it

22   was related to that hotel, but I'm not sure.

23   Q.   And it was a state issue with not charging sales tax,

24   correct?  That refresh your memory?

25   A.   I thought it was something with employment taxes, but I

BRIAN SHERN - CROSS BY MR. SPRINGER                    121

```
 1   could be wrong.
 2   Q.   Yeah, sales tax.  But did he ever say he gave the 100,000
 3   to me because of something that I did for him?
 4   A.   He just said he gave it to you because you do good work.
 5   Q.   Okay.  Could be construed as helping a lot of people,
 6   right, "good work"?
 7   A.   It could -- yes, it could be.
 8   Q.   Patrick Turner, the $400, second entry on Exhibit 1167 for
 9   $400, did you ever ask Mr. Turner what that was for?
10   A.   Not that specific amount, no.
11   Q.   Then Exhibit Number 59 and 60, which are two checks from
12   Town & Country Bank to Lindsey Springer for $20,000, do you
13   know what those were for?
14   A.   It would be -- my testimony would be the same as with the
15   hundred-thousand above that.
16   Q.   It was the same as the hundred-thousand, okay?
17   A.   Yes.
18   Q.   Got you.
19        And then, again, the Patrick Turner, 400, 100, and 500,
20   same testimony on those?
21   A.   Yes.
22   Q.   Mr. Turner would say it was a gift.  And you didn't ask
23   him if I did anything to receive these 400, 100, and $500.
24        And then the same testimony would be the same on the
25   12,000?
```

```
 1   A.    Yes.

 2   Q.    Okay.  Am I missing 2008?  You didn't go to 2008.

 3         MR. SPRINGER:  Your Honor, may I ask the government a

 4   question?

 5      (DISCUSSION OFF RECORD)

 6         MR. SPRINGER:  No further questions of this witness,

 7   Your Honor.

 8         THE COURT:  Very well.

 9      Before Mr. Stilley cross-examines, I'd like to get --

10   touch one matter by way of clarification.  I'm going to refer

11   to the tax loss chart that was included in the government's

12   trial brief -- or not your trial brief, but government's

13   sentencing memorandum -- showing a federal income tax loss with

14   respect to Mr. Springer -- this is on page 10 -- a little over

15   $413,000.

16      Now, let me -- I'll assure the government that you're not

17   necessarily bound by the revenues that you encompassed by the

18   numbers in your sentencing memorandum, and if you've got

19   exhibits that pick up additional or different items, why,

20   that's permissible.  But, anyway, working from that $413,000

21   number, does that number include any of these $12,000 annual

22   items by way of these small payments that are plugged in on

23   these individual sheets?

24         MR. O'REILLY:  Yes, Your Honor.

25         THE COURT:  The reason I ask is, without deciding
```

1    anything one way or the other, I'm a little -- and I realized

2    as to some years, those $12,000 numbers were also included at

3    trial in the evidence at trial.  I'm -- again, without deciding

4    anything, I'm a little troubled by that in the sense that

5    Mr. Springer did have followers, he did solicit donations

6    and -- for individuals like Mr. Springer in this part of the

7    country, loosely speaking, we're in the land of the small

8    donation, it just comes in when somebody persuades somebody to

9    make a donation.  And so I'm a little concerned about assuming

10   that every dime of those $12,000 that are plugged in each year

11   would be reportable income.  Obviously, not all the evidence is

12   in, and both parties are certainly entitled to have a full say

13   on that score, but I just wanted some clarification as to

14   whether that -- those $12,000 items were also already included

15   in the 400,000 that is -- that shows up on page 10 of your

16   sentencing memorandum.

17            MR. O'REILLY:  Yes, Your Honor.  Just for

18   clarification, our theory is that Mr. Springer ran a business

19   and all the payments to that, that were not actually used for

20   ministerial purposes, basically he kept in his pocket.  First

21   of all, it's gross income, and then how he uses it would be

22   potentially deductible.  That is our theory based on the

23   Court's jury instructions at trial, also our understanding of

24   the law.  He was not a 501(c)(3) corporation.  I can cover this

25   in argument, probably, far better than now.

1            THE COURT:  Well, yeah, and there's no need to get

2    any further into it at this point.  That is -- so far as I'm

3    concerned, that is a live issue.  And not to say that there are

4    no other live issues, but that is a live issue.  I just wanted

5    to get that clarification.

6        Mr. Stilley.

7                         CROSS-EXAMINATION

8    BY MR. STILLEY:

9    Q.   Mr. Shern, you realize that the government has the burden

10   of proof in this proceeding to the preponderance of the

11   evidence, correct?

12   A.   Yes.

13   Q.   And that means that you have to have some credible

14   evidence to prove all your propositions, correct?

15   A.   Yes.

16   Q.   You realize that at some points in time during

17   Mr. Springer's cross-examination, you speculated about what

18   might possibly happen for which you had no proof, correct?

19   A.   I would say that some things I said were just speculation,

20   yes.

21   Q.   During this cross-examination, I'd like to ask you about

22   facts that you have either personal knowledge or knowledge on

23   the basis of some fact that would cause it to be a usable fact

24   in this proceeding; is that fair enough?

25   A.   Yes.

1   Q.   Now, you realize that, under the tax guidelines, when the

2   sentencing guideline manual -- that if there is a more accurate

3   way to determine a tax loss, you use the more accurate method

4   of determining tax loss; is that correct?

5            MR. O'REILLY:  Objection, Your Honor.  This is

6   argument and certainly not suitable for a witness merely

7   providing factual summaries of specific discrete items of

8   income.  He has not provided a tax calculation.

9            THE COURT:  Sustained.

10  Q.   (BY MR. STILLEY)  Can you tell the Court specifically what

11  you did in order to get facts that might allow a calculation

12  more accurate than simply using a 20 percent figure?

13  A.   As I explained to Mr. Springer, the only records of

14  expenditures and expenses that we utilized were those from the

15  search warrant, and in your case, some of the credit card

16  companies that we subpoenaed.

17       We really didn't have any books or ledgers or any kind of

18  financial statements that either one of you guys prepared to

19  determine what your business expenses or anything like that

20  were.

21       So in my opinion, there wasn't adequate information to

22  make an accurate determination of what your expenses were, so

23  the 20 percent method was appropriate in this case.

24  Q.   Sounds to me like you're saying you didn't attempt to get

25  any more accurate information; is that true?

 1   A.   No, that's not true.

 2   Q.   Okay.  Tell us the truth about what you did to try to get

 3   more accurate information.

 4   A.   In relation to Mr. Springer's, he flat-out told us that he

 5   didn't maintain any records, and so that was kind of a dead-end

 6   with respect to his business expenses.

 7        And then as far as yours, we didn't have any books or

 8   records from you.  We never did a search warrant.  All we had

 9   were records that we subpoenaed.

10   Q.   But, now, the question is:  What efforts did you make to

11   get more accurate information?  And if the answer to that is

12   no, just say no.

13            MR. O'REILLY:  Your Honor, objection.  That's an

14   argumentative question.

15            THE COURT:  Sustained.

16   Q.   (BY MR. STILLEY)  Well, can you then tell us what efforts

17   that you made to try to get the most accurate information

18   possible?

19   A.   Yes.

20   Q.   What was that?

21   A.   Issued subpoenas to all your bank accounts, all your

22   credit cards, talked to witnesses, put people before the grand

23   jury.  Basically, our whole investigation was a process of

24   obtaining information.

25   Q.   Now, there is different methods of getting information to

1  determine tax loss, correct?

2  A.   Yes.

3  Q.   There is -- there's a method that's called the -- and it's

4  sometimes used in tax prosecutions -- it's called the "net

5  worth method," correct?

6  A.   Correct.

7  Q.   Now, if you use different methods of determining what tax

8  loss actually occurred, are all the methods reasonably accurate

9  as a general rule?

10 A.   Basically, for the purposes of trial, the only burden of

11 proof is to show that there is a tax loss, and so I would say

12 that all those methods have been used in court before, so

13 they're all acceptable methods of proof.

14 Q.   But if they're reasonably accurate, we shouldn't get

15 wildly differing amounts using different methods, correct?

16        MR. O'REILLY:  Objection.  He's, again, attacking a

17 factual witness who is merely presenting discrete items of

18 income.  He has not testified about the tax loss computations,

19 nor do we anticipate having Special Agent Shern testify about

20 that.  But Agent Miller will be testifying about the tax loss

21 computations.

22        THE COURT:  Sustained.  Mr. Stilley, if you've got

23 specific items to address, this is the time to do that, but

24 general debates about the direct versus indirect method and

25 things like that are not helpful.

 1                MR. STILLEY:  Sure.

 2                THE COURT:  We'll have the next question.

 3                MR. STILLEY:  Thank you, Judge.

 4    Q.   (BY MR. STILLEY)  Now, you did come out to Oscar Stilley's

 5    house, correct?

 6    A.   Yes.

 7    Q.   And it's a fairly inexpensive house, correct?

 8    A.   Correct.

 9    Q.   Did you see the automobiles nearby?

10    A.   Yes.

11    Q.   They were pretty plain automobiles?

12    A.   Yeah, I think one was an older-model Lexus and then I

13    don't recall what the other ones were.

14    Q.   There was a 1982 Chevrolet pickup, correct?

15    A.   I don't remember.

16    Q.   The automobiles that belonged to Oscar Stilley were very

17    old, correct?

18    A.   I think I do recall seeing some old cars out there, yes.

19    Q.   You didn't see any evidence of a flashy or extravagant

20    lifestyle on the part of Oscar Stilley, did you?

21    A.   When I went out to your house, no.

22    Q.   And you looked at other times as well to see if you could

23    get evidence of that, correct?

24    A.   Get evidence of what?

25    Q.   Living a high lifestyle, because that's part of a criminal

BRIAN SHERN - CROSS BY MR. STILLEY                           129

1   investigation relating to tax, as a general rule, correct?

2   A.    Probably, like, disposition of proceeds and things like

3   that, yes, we do typically in our investigations look at how

4   people spend their money, yes.

5   Q.    And you looked at that in this case, correct?

6   A.    Yes.

7   Q.    So you got a pretty good handle on where Oscar Stilley's

8   money went, correct?

9   A.    Yes, I would say so.

10  Q.    So -- and that included a fairly basic lifestyle,

11  correct?

12  A.    From what I could tell, just from talking with you and

13  seeing what you spent, yeah, there wasn't a lot of flashy cars,

14  you didn't live in a big house, you didn't wear fancy clothes.

15  I mean, that's correct.

16  Q.    Would it be fair to say that the most extravagant

17  expenditure you saw in the records would have been the

18  expenditures for the adoption of kids from Russia?

19  A.    Yes, that would be accurate.

20  Q.    Now, you testified that Oscar Stilley had made a

21  misrepresentation to the Northern District of Oklahoma about

22  his right to practice in the Northern District, correct?

23  A.    Yes.

24  Q.    Are you aware that there was a serious dispute about

25  whether or not Oscar Stilley was entitled to practice when he

1  tried to enter his appearance -- were you aware of that?

2  A.   I just remember you tried to enter your appearance and the

3  judge found out that you had had Bar troubles in Arkansas and

4  you weren't allowed to -- you had said that you were able to

5  practice law in that district and you were not, and the judge

6  didn't allow you to represent the client there.

7  Q.   Well, now, you say that Oscar Stilley was not entitled to

8  practice, but you're having to actually speculate on that,

9  correct?

10  A.   I just know --

11       MR. O'REILLY:  Objection.  The record is quite

12  clear:  He was suspended pending disbarment.  He was suspended

13  at that time.

14       THE COURT:  At what point in time are you referring,

15  Mr. Stilley?

16       MR. STILLEY:  I'm referring to the -- the point in

17  time, I believe, would have been -- oh, I think it's about

18  '07.  Don't hold me to that, but it's somewhere just a little

19  ways back like that.  It was on the Green case.

20       THE COURT:  Well, if you can't pin it down any better

21  than that, then it's not persuasive to me.  We'll go on to the

22  next question.

23  Q.   (BY MR. STILLEY)  Are you aware, then, that Oscar Stilley

24  has, at the current time, an appeal to the Tenth Circuit Court

25  of Appeals asking that his license be reinstated because --

1  legal reasons, whereby that Oscar Stilley says that he

2  continues to this day to have the legal right to practice in

3  this district?

4  A.    No, I wasn't aware of that.

5  Q.    Would that change your mind about the conclusion that

6  Oscar Stilley had tried to mislead a court?

7  A.    No.

8  Q.    You don't have any direct evidence that Oscar Stilley

9  tried to mislead a court, do you?

10 A.    All I know is what I heard about whenever you tried to

11 make an appearance and you had Bar troubles in Arkansas and you

12 weren't supposed to be practicing law outside because your

13 license was suspended.  That's basically the extent of my

14 knowledge about the whole situation.

15 Q.    Okay.  And isn't it true that one side argued one way and

16 one side argued another?

17         THE COURT:  Excuse me.  Mr. Stilley, there's nothing

18 in this line of questioning that's going to have any impact one

19 way or the other on sentencing.

20         MR. STILLEY:  Can I ask, Your Honor, for the record

21 on why there's a different reason that I'm saying that this

22 Court should not take that into account, but if the Court is

23 not going to take these matters into account, I don't want to

24 ask any questions.

25         THE COURT:  It's time to move on to the next

```
 1  subject.
 2          MR. STILLEY:  So Hawaii is not in it either?
 3          THE COURT:  I'm not concerned about those particular
 4  matters for sentencing purposes.
 5          MR. STILLEY:  Thank you, Judge.
 6  Q.   (BY MR. STILLEY)  You previously gave testimony to certain
 7  persons suggesting that perhaps Oscar Stilley had encouraged
 8  others to violate the law; is that true?
 9  A.   Yes.
10  Q.   What specific laws were you talking about?  And I'd like
11  to get a citation, if you can cite the law that you think is
12  involved.
13  A.   Well, in the case of Mr. Roberts, where you told him he
14  didn't have any liability to file or pay taxes, it would be --
15  26 7203, failure to file, and that would be the law.
16  Q.   Well, isn't it true that really that begs the question,
17  because 7203 simply provides the punishment if a person fails
18  to file a return that is required?
19          MR. O'REILLY:  Objection, Your Honor.  This is simply
20  argumentative and was well-covered at trial.  Mr. Stilley's
21  specious theories have been rejected appropriately by this
22  Court.
23          THE COURT:  Sustained.
24  Q.   (BY MR. STILLEY)  Now, you suggested that there was --
25  that Oscar Stilley said something to Dr. Roberts suggesting
```

BRIAN SHERN - CROSS BY MR. STILLEY                            133

1   that he didn't have to pay tax?

2   A.   Yes.

3   Q.   I don't think that's true.  Can you show where you've got

4   that in your transcript?

5   A.   It's the grand jury transcript of Philip Roberts.  If you

6   have a copy of that, I can show you where he says that.

7   Q.   Okay.  Could we maybe take a look at that at a break

8   rather than take a lot of time to look right now?

9   A.   Yeah.

10  Q.   Isn't it true that Oscar Stilley didn't actually advise

11  Dr. Roberts not to file the tax return?

12          MR. O'REILLY:  Your Honor, objection to the number of

13  "nots" that were in that question.  I'm not sure exactly what

14  was asked.

15          THE COURT:  Please rephrase it.

16  Q.   (BY MR. STILLEY)  Isn't it true that the statement that

17  was allegedly made by Oscar Stilley was that he couldn't find a

18  law requiring the making of a return?

19  A.   What I remember from reading the grand jury transcript is

20  Mr. Roberts sought out your advice and you told him he was

21  correct in his assumption, that he has no liability to file a

22  tax return and no liability to pay the tax associated with it.

23  Q.   And the time frame we're talking about there is

24  approximately 1990, correct?

25  A.   Correct.

BRIAN SHERN - CROSS BY MR. STILLEY                               134

1   Q.   And you realize Oscar Stilley graduated law school in

2   1990, correct?

3   A.   I don't know when you graduated law school.

4   Q.   Did you not get educational records?

5   A.   I don't believe I did get your college transcripts.  I may

6   have -- I don't think I did get those records.

7   Q.   Isn't it true or aren't you aware that Dr. Roberts also

8   filed certain litigation in federal court trying to get answers

9   to his questions?

10  A.   I believe so, yes, I think he testified about that.

11  Q.   Wouldn't it be fair to say, then, that Dr. Roberts wasn't

12  simply relying on what Oscar Stilley said, but was also trying

13  to get an official answer?

14  A.   What he said in the transcript was that he sought out the

15  advice from you because he knew you to be an expert in legal

16  matters and he asked you that question.

17       I know that he had questions about whether or not he

18  should file and pay taxes before he approached you, but I

19  think, from what his testimony says, he asked you because you

20  were an expert in that area.

21  Q.   But do you know the dates or approximate dates when the

22  litigation was filed by Dr. Roberts trying to get answers to

23  his questions in a federal court?

24  A.   No.

25  Q.   It was after he spoke to Oscar Stilley, was it not?

1  A.   I don't know.

2  Q.   Do you know anything about that litigation?

3  A.   Other than the fact that I think he testified that he

4  filed some litigation, that's all I know.

5  Q.   Now, you talked a little bit on Springer's cross-

6  examination about Mr. Swisher, correct?

7  A.   Yes.

8  Q.   Mr. Swisher was not part of the allegations of this

9  indictment; isn't that correct?

10        MR. O'REILLY:  Objection, Your Honor.  He would be

11  part of the conspiracy to defraud in Count 1.  He was not

12  specified in any count.

13        THE COURT:  Well, I'm -- I have very recently reread

14  the indictment, so I know what the indictment says and does not

15  say, so that will be sustained.

16  Q.   (BY MR. STILLEY)  Did you do any research or make any

17  efforts to find out the scope of the specific agreement that

18  Oscar Stilley allegedly joined?

19  A.   You mean the conspiracy agreement?

20  Q.   Yes, Count 1.

21  A.   Yes.

22  Q.   And what was that?

23  A.   What efforts did I make to determine the agreement?

24  Q.   Yes.

25  A.   Talked to witnesses, looked at records, the whole -- our

1   whole investigation.

2   Q.   Did you get enough information to make a conclusion?

3   A.   A conclusion about what?

4   Q.   About what the specific -- the scope of the specific

5   agreement was that Oscar Stilley allegedly joined?

6   A.   We got enough evidence to prove that there was an

7   agreement, but I don't think there was any specific contract or

8   anything between you and Mr. Springer that you were going to

9   defraud the United States, but I think we proved our evidence

10  in trial to prove that there was an agreement between you and

11  Mr. Springer.

12  Q.   Okay.  So you got enough to say that there was an

13  agreement, but not to say what that specific agreement was,

14  correct?

15        MR. O'REILLY:  Your Honor, objection as to the

16  relevance of his line of questioning.

17        THE COURT:  Sustained.  I think it was either you or

18  Mr. Springer that brought out at trial whether or not it was

19  day one of a conspiracy.  Day one, at least for some purposes,

20  was that day at the Pizza Hut and time is counted from then.

21  And so I've heard all of that at trial.

22        MR. STILLEY:  Your Honor, for the record, can I say

23  what my reasoning is for this?

24        THE COURT:  Surely.

25        MR. STILLEY:  Thank you, Judge.  It's a case called

```
 1   United States v. Dazey, and I cited it at Docket Entry Number
 2   330 on page 2 of 6 on Document 330, in which the Tenth Circuit
 3   said that it was important to make particularized findings
 4   about the scope of the specific agreement the individual
 5   defendant joined.  And my reasoning for asking these questions
 6   was to see what facts were there for the Court.
 7            THE COURT:  Well, I understand that.  And neither --
 8   by the way, I will assure both sides that, for sentencing
 9   purposes, the conspiracy period in the indictment is not
10   necessarily the end of the story under Guideline 1B1.3.  There
11   is the matter -- the question of jointly undertaken criminal
12   activity that could begin before the conspiracy period alleged
13   in Count 1, it could continue after the conspiracy period set
14   forth in Count 1.  So to some degree, this is fair game and I'm
15   not going to foreclose you from continuing down this line of
16   questioning within reason.  But it would be helpful to the
17   Court if your questioning would get more specific and address
18   things that -- on which you may at least hope this witness can
19   shed some light.
20        So we'll have the next question.
21            MR. STILLEY:  Thank you, Judge.
22   Q.  (BY MR. STILLEY)  Do you know if there was more than one
23   unlawful conspiracy involved?  Did you see evidence of more
24   than one unlawful conspiracy?
25   A.  I think the conspiracy was just to defraud the United
```

1    States.  I think there's just one.

2    Q.   Okay.  So you think there's just one, correct?

3             MR. O'REILLY:  Your Honor, objection as to how many

4    conspiracies Special Agent Shern thinks there are.  Facts

5    coming from this witness are great and they will be helpful to

6    the Court to determine the scope of the conspiracy.  His

7    opinion as to what he believes is not a fact.

8             THE COURT:  Well, does -- let me ask this:  Does the

9    government agree with -- in general, at least, with my comment

10   that I just made a minute ago about Guideline 1B1.1 and the

11   need for sentencing purposes to determine the scope of the

12   jointly-conducted criminal activity to the extent that we are

13   going to hold one defendant accountable for matters that

14   directly relate to the other defendant?

15            MR. O'REILLY:  Absolutely, Your Honor.

16            THE COURT:  Okay.  Well, if that's the case, then why

17   is it not fair game for Mr. Stilley to cross-examine Mr. Shern,

18   the principal factual investigator, as to matters that may bear

19   directly on the Court's determination of the scope of jointly-

20   conducted criminal activity?

21            MR. O'REILLY:  The government has no objection to the

22   questions that delve into the factual basis of that; however,

23   Special Agent Shern's speculations, if you will, as to how many

24   conspiracies there may or may not have been don't get to the

25   factual questions that the Court needs answered to determine

 1   that.  And that's the government's position on that.

 2          THE COURT:  Well, I understand.  That question may,

 3   in fact, be a predicate for more specific questioning, and for

 4   that reason, I'm going to overrule the objection.

 5       You may proceed.

 6          MR. STILLEY:  Thank you, Judge.

 7   Q.  (BY MR. STILLEY)  So you said that there was one

 8   conspiracy, correct?

 9   A.  Yes.

10   Q.  Do you know when that conspiracy was made based on your

11   facts that you found?

12   A.  I don't know exactly the date that it was found, but I

13   think it was when you and Mr. Springer got together and decided

14   to represent these various people and have them pay you money

15   for legal representation and take them to trial with their

16   frivolous beliefs.

17   Q.  Okay.  Was that 2003, then?

18          MR. O'REILLY:  Objection, Your Honor.  I think the

19   evidence was they met in '99 and --

20          THE COURT:  Well, the witness has lived this case, so

21   I think he's fully capable of responding.  That's overruled.

22          THE WITNESS:  Mr. Roberts introduced you to

23   Mr. Springer in the first joint case that you guys began to

24   work on, was in 2000, and that would have either been

25   Mr. Roberts or Mr. Lake.  Both of those occurred in 2000.

1  Q.   (BY MR. STILLEY)  So is it your testimony, then, that you

2  believe the conspiracy started in 2000?

3  A.   Yes.

4  Q.   Okay.  But, now, if you look at the indictment, there's no

5  overt acts between 2000 and 2003; isn't that correct?

6  A.   I don't think there is in the indictment.

7         MR. O'REILLY:  Objection.  Relevance.  This was

8  actually covered at trial.  The question of overt acts

9  triggering the statute of limitations was already covered when

10 an overt act was first alleged was not --

11        THE COURT:  Overruled.

12        THE WITNESS:  The question was there any --

13 Q.   (BY MR. STILLEY)  Isn't it true that there weren't any

14 overt acts between 2000 and 2003?

15 A.   Mentioned in the indictment?

16 Q.   Yes.

17 A.   I believe that's correct.

18 Q.   So wouldn't that be a rather odd conspiracy, for somebody

19 to make an agreement to do something unlawful and then take no

20 steps to put it into practice for three years?

21 A.   I think -- just because we didn't specify the overt acts

22 in the indictment doesn't mean that there were none committed

23 before that date.

24 Q.   Do you think that other overt acts were committed before

25 that date?

BRIAN SHERN - CROSS BY MR. STILLEY                          141

1    A.    Yes.

2    Q.    Based on your investigation, can you give us a list of

3    those?

4    A.    I think convincing Mr. Lake and Mr. Roberts in 2000 that

5    their frivolous defenses were valid and going to trial and

6    getting money from them constitutes one overt act to defraud

7    the government -- or multiple.  I guess one in Mr. Lake's case

8    and one in Mr. Roberts' case.

9    Q.    And so this would be in 2000, correct?

10   A.    Yes.

11   Q.    Okay.  Let's go to the next one.

12   A.    That's all I've got for those.

13   Q.    Okay.  That would still leave us with a gap between 2000

14   and 2003 in which no overt acts were performed, correct?

15   A.    Can I look at the exhibits for the payments in 15 to

16   refresh my memory?

17   Q.    Sure.  Please.

18   A.    I believe you also received money from Mr. Lake and

19   Mr. Roberts in 2001 as well.  And in 2002, the Hawkins.

20   Q.    Anything else?

21   A.    No, for the time period 2000 to 2003.

22   Q.    Now, the 2001 -- what are you saying was the overt act in

23   2001?

24   A.    The fact that you continued to assist Roberts with his

25   obtaining money -- you and Mr. Springer participating together

1  to help obtain money for services from Mr. Roberts.

2  Q.   Are you saying that he simply still owed a bill and

3  because -- that he paid additional on an outstanding debt, that

4  that's an overt act?

5  A.   I think, yes, when you look at the circumstances of how

6  you obtained the money from Mr. Roberts.

7  Q.   Was that a bad way to obtain money from Mr. Roberts -- or

8  Dr. Roberts?

9  A.   I think the legal representation that you gave Mr. Roberts

10  was -- you knew was completely false and it wasn't going to be

11  effective, but yet you still put forward those defenses.

12  Q.   Okay.  So what you're saying, then, is that Oscar

13  Stilley's defense of Dr. Roberts was part of the conspiracy

14  too, correct?

15  A.   Yes.

16  Q.   Well, some of those defenses are classic and well-

17  accepted as being legally proper, correct?

18        MR. O'REILLY:  Objection.  Argumentative and not sure

19  of the relevance at this point.

20        THE COURT:  Why don't you get more specific.

21     That will be sustained.

22  Q.   (BY MR. STILLEY)  Dr. Roberts was entitled to present his

23  good-faith defense; is that correct?

24  A.   Yes.

25  Q.   Do you have any evidence that he presented anything other

1    than his good-faith defense?

2    A.    If I remember right, one of his defenses was there was no

3    requirement to file a tax return.

4    Q.    Isn't it true he said he couldn't find it and honestly

5    didn't believe it?  Isn't that what really took place?

6    A.    Yes, I believe that's correct.

7    Q.    And that's perfectly legitimate, correct?

8    A.    It's -- the good-faith defense, I believe, is a legitimate

9    defense, but before he went to trial, I think you affirmed his

10   belief in something wrong.

11   Q.    Oh, are you talking about the commentary in 1990, ten

12   years previously?

13   A.    Yes.

14   Q.    So -- but surely you don't think commentary ten years

15   previously would be part of the conspiracy, the single

16   conspiracy, do you?

17   A.    I think if you -- if you knew -- offered him advice in

18   1990 and you -- he relied on your advice and then he went to

19   trial in 2000 and you represented that same defense to him

20   through the help of Mr. Springer, yes.

21   Q.    So you think that words uttered by Oscar Stilley ten

22   years -- or approximately ten years before he met Lindsey

23   Springer are, nevertheless, part of a conspiracy with Lindsey

24   Springer?

25   A.    Not with Lindsey Springer, but -- I don't know.

1   Q.   How many people were in this single conspiracy?

2   A.   There were several.

3   Q.   Can you give me names?

4   A.   All the people that Mr. Springer asked to put "donations"

5   on checks when they full well know they weren't for donations,

6   people that transferred money into your IOLTA account to try to

7   disguise the payments to Mr. Springer.

8   Q.   Anybody else?

9   A.   Maybe Mr. Delozier for cashing checks that were made

10  payable to a ministry that didn't really exist.  I mean, it

11  existed, but it had no purpose other than disguising payments

12  from clients.

13  Q.   So you think this was a really large conspiracy, correct?

14  A.   Yes.

15  Q.   But none of these people did anything back in 1990,

16  correct?

17  A.   Not that I know of, other than Mr. Roberts.

18  Q.   So an act in 1990 couldn't possibly have been an overt act

19  in support of the conspiracy, correct?

20  A.   Correct.

21  Q.   So we can strike out -- actually, we can strike out

22  Roberts because he presented a legitimate defense, to your

23  knowledge, correct?

24       MR. O'REILLY:  Objection, Your Honor.  That's for the

25  Court to decide.

1          THE COURT:  Sustained.

2   Q.   (BY MR. STILLEY)  Now, you said that Hawkins, in 2002,

3   represented another overt act; is that correct?

4   A.   Yes.

5   Q.   And can you tell us -- well, now, were the Hawkins part of

6   the conspiracy too?

7   A.   Yes.

8   Q.   Now -- and how did they become part of the conspiracy?

9   A.   I believe they made checks out to Bondage Breakers

10  Ministry.

11  Q.   And as soon as they made that check out to Bondage

12  Breakers, they became co-conspirators, correct?

13  A.   Yes, I believe so, because they knew the money wasn't a

14  donation of any kind or a gift to any kind of charitable

15  organization.  The purpose of writing that check to Bondage

16  Breakers Ministries was to hide the fact that it was legal

17  services.

18  Q.   Now that we've discussed the acts that you say were overt

19  acts, can you tell us now what you found based on your

20  investigation that the scope of the specific agreement was?

21       And let me make that more clear.

22          MR. O'REILLY:  Objection.  He has asked and answered

23  that question several times and Special Agent Shern has

24  answered that several times.

25          THE COURT:  Are you asking about the scope of it in

BRIAN SHERN - CROSS BY MR. STILLEY                    146

```
 1   terms of time or subject matter?
 2           MR. STILLEY:  Judge, I did a bad job on that
 3   question.  Can I make that clear what I'm specifically asking
 4   about?
 5           THE COURT:  Proceed.
 6           MR. STILLEY:  I'll back up because I didn't do a good
 7   foundation.
 8   Q.   (BY MR. STILLEY)  Mr. Shern, isn't it true that many
 9   people -- before Oscar Stilley met Lindsey Springer many people
10   had given Bondage Breakers Ministries money?
11   A.   Yes.
12   Q.   So the conspiracy was already going at that time,
13   correct?
14   A.   I don't know that Mr. Springer, with the exception of
15   maybe Ms. Wiggins and Mr. Hedberg, had been able to get money
16   for legal services like he did before he teamed up with you.
17   Q.   Okay.  But, nonetheless, you've already told us that
18   everybody that put all the donors -- everybody that put money
19   in the IOLTA and Delozier were all conspirators and both the
20   donors and Delozier, by your own terms, go far before Oscar
21   Stilley and Lindsey Springer met, correct?
22   A.   Yes.
23   Q.   So it would have had to be an existing conspiracy that
24   Oscar Stilley joined, correct?
25   A.   Yes.
```

1   Q.    Okay.   Now, based on your research, what did you determine

2   would be the scope of the specific agreement that Oscar Stilley

3   joined?

4   A.    What do you mean by when you say "scope"?

5   Q.    What did Oscar Stilley agree to do that was wrong, that

6   was illegal?

7   A.    To come in and help Lindsey Springer bilk money from all

8   these clients and to hide it.

9   Q.    Anything else?

10  A.    No.

11  Q.    Now, you check PACER; isn't that true?  You check PACER to

12  check up on Oscar Stilley, right?

13  A.    Yes.

14  Q.    Did you discover that Oscar had been involved in a number

15  of cases representing children who had been abused in boarding

16  facilities?

17  A.    I believe I remember that you were involved in some cases

18  of that nature, yes.

19  Q.    Did you get enough information to realize that Oscar

20  Stilley had invested large amounts of time and money in those

21  cases?

22  A.    I didn't look at the hours or the time that you spent on

23  those cases.

24  Q.    You certainly wouldn't know the precise amount, but could

25  you tell that they were extensive dockets, big dockets, with

1  lots of papers, trials, and things like that?

2  A.   Really, my concern with looking at PACER wasn't to find

3  every legal case that you were involved in, like the scope of

4  the cases and how much you did in those cases.  It was mainly

5  to find cases where you had represented people or Mr. Springer

6  had represented people in these tax -- the witnesses involved

7  in this case.

8  Q.   But as a general rule, an individual would -- or an

9  attorney would be entitled to deduct the investment in cases

10 like that, where that they had lost the money, correct?

11 A.   That's correct.

12 Q.   Now, Mr. Springer asked you if you were a delegate of the

13 Secretary of the Treasury, correct?

14 A.   Yes.

15 Q.   Sounded to me that you just speculated that you were,

16 correct?

17         MR. O'REILLY:  Objection to the relevance on this

18 ground.

19         THE COURT:  Do you have any new ground on this point

20 you're going to cover?

21         MR. STILLEY:  No, but it will be real short.  I'm

22 just trying to get him to admit --

23         THE COURT:  Well, even if it's real short, if it's

24 not new ground, we're not going to go there.

25     Next question.

1   Q.   (BY MR. STILLEY)  Didn't you suggest in Springer's cross-

2   examination that Oscar Stilley is not a reputable attorney?

3   A.   Yes.

4   Q.   Isn't it true that a lot of people think that Oscar

5   Stilley is a reputable attorney?

6   A.   Yes, that's true.

7   Q.   Now, you spoke with a gentleman by the name of Ralph

8   Lewis, correct?

9   A.   Yes, I did.

10  Q.   He's a CPA, correct?

11  A.   Correct.

12  Q.   With many years' experience, right?

13  A.   I believe so, yes.

14  Q.   He did a lot of work for Oscar Stilley, correct?

15  A.   I think on a few cases he worked on tax returns for

16  clients that you represented, if I remember right.

17  Q.   And Oscar Stilley would pay him directly for that, did you

18  notice that?

19  A.   Yes.

20  Q.   Did you take that out of the amounts that you're claiming

21  as tax losses -- or as gross income?  Did you take those

22  amounts out?

23       MR. O'REILLY:  Your Honor, object -- objection.  This

24  witness can only testify as to discrete items of income.

25  Mr. Miller will be testifying in regard to tax computations.

1            MR. STILLEY:  The only thing I want to establish is

2    that he made no efforts to take out monies that were extended

3    directly to a professional on the benefit of the client.  I

4    just want him to acknowledge that he didn't make any attempt to

5    do that.

6            THE COURT:  And this would be things that had you

7    reported the income would have been deductible?

8            MR. STILLEY:  Certainly -- well, it would have never

9    come in my return because the money in the IOLTA was not my

10   property.  It would not have and did not ever hit my personal

11   account.

12           THE COURT:  That's a pretty dubious proposition.  I'm

13   going to overrule the objection and he may answer the question,

14   but this is not persuasive.

15           THE WITNESS:  No, I didn't give you the amounts that

16   you paid or that you paid to have Mr. Lewis do work for you,

17   because, yes, we could have identified various expenditures

18   that you had made that we -- that appeared to be business

19   expenses, but it still wouldn't have got us at an accurate

20   number, and so we used the 20 percent method, because a more

21   accurate way of determining it was -- wasn't available.

22   Q.   (BY MR. STILLEY)  But it wasn't available, really, because

23   you didn't try, correct?

24   A.   No, I don't believe that is true.  I think that we had

25   enough -- we had your bank accounts and your credit card

BRIAN SHERN - CROSS BY MR. STILLEY                    151

1   statements and records of your expenditures, but, really,

2   without you confirming whether or not they're business expenses

3   or personal expenses, I don't believe that we could have

4   arrived at an accurate number.

5   Q.   You never asked Oscar Stilley to confirm what were

6   business expenses, did you?

7   A.   No.

8   Q.   And that's common practice.  You do that routinely -- or

9   special agents routinely do that in tax cases, don't they?

10  A.   I wouldn't say "routinely."  We always try to ask, but a

11  lot of times the defendants in our cases won't meet with us and

12  won't provide that information.  We usually do ask, yes.

13  Q.   But you didn't ask Oscar?

14  A.   No.

15  Q.   Now, you also were aware that Oscar Stilley from time to

16  time would write a check to the IRS out of his IOLTA and that

17  check would be negotiated by the IRS in satisfaction of taxes

18  shown on tax returns for specific years, correct?

19  A.   Correct.

20  Q.   You didn't make any allowance for that, did you?

21  A.   No.

22       Can I go back to the previous question about -- we did ask

23  you to provide records to the grand jury.  They weren't

24  all-inclusive records of all your business dealings, but they

25  were records from money that you received from Mr. Springer or

1    money that you had paid on Springer's behalf.  And we found

2    that you didn't provide all the records during that grand jury

3    appearance and so we had no reason to believe that you would

4    provide truthful business records after the fact to compute

5    your tax loss for this hearing.

6    Q.   You told Oscar Stilley that he was not under criminal

7    investigation, isn't that true, when you asked for those

8    records?

9    A.   Yes.

10   Q.   And you later -- isn't it true that Oscar Stilley first

11   went to the grand jury and gave certain documents?

12   A.   You brought documents when you first appeared before the

13   grand jury here, yes.

14   Q.   Another subpoena was issued, correct?

15   A.   Yes.

16   Q.   And that subpoena -- the purposes of that subpoena was to

17   clarify specifically what the government wanted, correct?

18   A.   Yes.

19   Q.   That subpoena was withdrawn, correct?

20   A.   Yes.

21   Q.   Oscar Stilley cannot be condemned for failing to comply

22   with a subpoena that was withdrawn, can he?

23            MR. O'REILLY:  Your Honor, objection, calls for a

24   legal conclusion.  This was covered at trial.  Mr. Stilley

25   didn't comply with the first subpoena.

1              THE COURT:  Sustained.

2       Mr. Stilley, if it's of any help to you, I sustained that

3  objection, as much as anything else, because the question was

4  argumentative.  Meandering, argumentative questions at a very

5  high level of generality are not helpful.  If you want to

6  attack specific items, that's how you can move the ball.

7              MR. STILLEY:  Thank you, Judge.  That gives me an

8  idea.

9  Q.   (BY MR. STILLEY)  The government concluded that Oscar

10  Stilley took too hypertechnical an interpretation of the

11  language of the first subpoena, correct?

12  A.   Yes, I would say that's the case.

13  Q.   The purpose of the second subpoena was to remedy that and

14  make it very clear what the government wanted, correct?

15  A.   Yes.

16  Q.   But before the subpoena was withdrawn, Oscar Stilley never

17  indicated any intent to not comply with that new subpoena,

18  correct?

19  A.   Correct.

20             THE COURT:  Mr. Stilley, let me know when you get to

21  a convenient stopping point, we'll take our mid-afternoon

22  break.

23             MR. STILLEY:  This is a good one right here.

24             THE COURT:  Very well.  We'll take a 15-minute

25  break.

1      Court will be in recess.

2      (A RECESS WAS HAD.)

3          THE COURT:  Mr. Stilley, you may continue.

4  Q.  (BY MR. STILLEY)  Mr. Shern, Government Exhibits 1168 to

5  1176 are the government's listings of the -- well, they're

6  entitled "Gross Income of Oscar Stilley," correct?

7  A.  Correct.

8  Q.  And they go by year 2000 to 2008, correct?

9  A.  Yes.

10 Q.  How long have you had this list available to you?

11 A.  The actual list or the checks that correspond to this

12 list?

13 Q.  The list.  In other words, a summary of what the

14 government is going to claim.

15 A.  I would say maybe three months.

16 Q.  And Oscar Stilley has not been provided a copy of this --

17 these summaries until the deadline for turning over exhibit

18 lists, correct?

19 A.  That's correct.

20 Q.  Was there a particular reason for not telling Oscar

21 Stilley earlier, since it was definitely available?

22 A.  You had all the -- I mean, you had all the records from

23 your IOLTA account and everything handed over in discovery.

24 Q.  Were you aware that Oscar Stilley was complaining about

25 lack of clarity concerning the government's theory?

```
 1            MR. O'REILLY:  Objection to this line of questioning
 2   of this witness.
 3            THE COURT:  Sustained.
 4   Q.  (BY MR. STILLEY)  Based on Springer's -- your responses to
 5   Springer's cross-examination, you seem to think a trust is
 6   either valid or invalid based on the subjective intent of the
 7   creator's intent; is that true?
 8   A.   Lost you there.
 9   Q.   It sounds like you're saying that if someone creates a
10   trust for legitimate purposes, then it's a legitimate trust,
11   but if they create the same trust for purposes that you deem
12   improper, that it's an illegal trust or a wrongful trust; is
13   that true?
14   A.   I think you have to look at the circumstances surrounding
15   the whole transaction.  Like, if somebody creates a trust for
16   the purpose of evading their taxes and they do, in fact, evade
17   their taxes, then I think it's a wrongful trust.  But trusts in
18   themselves aren't bad, they're useful, but -- does that answer
19   your question?
20   Q.   Pretty close.  But it sounds to me like you're saying
21   whether a trust is legal or illegal depends upon the subjective
22   intent of the trust creator or grantor?
23            MR. O'REILLY:  Objection as to relevance to this line
24   of questioning.
25            THE COURT:  Mr. Stilley, what's your point?
```

BRIAN SHERN - CROSS BY MR. STILLEY                                    156

1           MR. STILLEY:  My point is he is trying to attribute

2    monies -- losses to the defendants on the grounds of the

3    subjective thoughts of a third person's mind.  And as soon as I

4    get that information, I want to know if he has any information

5    that -- whereby that Oscar Stilley should have known subjective

6    information within such a person's mind.

7           THE COURT:  Are you going to be getting down to some

8    specific instances to address?

9           MR. STILLEY:  Well, I want -- I think I can get him

10   to admit that he doesn't have any such evidence.

11          THE COURT:  Sustained.

12   Q.   (BY MR. STILLEY)  Now, if we could get Government Exhibit

13   1177.  Do you see that exhibit?

14   A.   Yes.

15   Q.   You're saying that -- wait a minute.  I'm sorry.

16          MR. SPRINGER:  It's "tax loss of third parties

17   relevant to Oscar Stilley."  Is that what we have on the

18   screen?

19          MR. O'REILLY:  Page 2.

20          MR. STILLEY:  Page 2.

21          MR. O'REILLY:  Your Honor, if I may, just for

22   clarification.  We had not previously moved these exhibits in,

23   because I was going to have Revenue Agent Miller deal with

24   them, but since both defendants have addressed them quite a

25   bit, the government would move Government's Exhibits 1159

```
 1   through 1177 into evidence at this time.

 2            THE COURT:  Any objection?

 3            MR. SPRINGER:  May I have one moment, Your Honor?  No

 4   objection, Your Honor.

 5            THE COURT:  Mr. Stilley?

 6            MR. STILLEY:  No objection.

 7            THE COURT:  They'll be received.  That's 1159 through

 8   1176?

 9            MR. O'REILLY:  1177.

10            THE COURT:  1177.  Very well.  They are received.

11   Q.   (BY MR. STILLEY)  Now, the first one, you're saying that

12   Oscar Stilley is responsible for the tax loss of Eddy

13   Patterson, correct?

14   A.   Yes.

15   Q.   Okay.  And, now, that would have to be under relevant

16   conduct, correct?

17   A.   Yes.

18   Q.   Do you know what count that that would have to come from?

19   Would that come from Count 1?

20   A.   I don't believe it relates to any particular count.

21   Q.   Do you have any personal knowledge how this was determined

22   to be potentially relevant conduct?

23   A.   I guess it would relate to the conspiracy count, as far as

24   you and Mr. Springer telling Mr. Patterson that you didn't file

25   returns, and Mr. Springer saying that he didn't file returns,
```

1   and because he's fighting the system and doesn't believe in

2   it.  I can't remember the exact testimony of Patterson.

3   Q.   Well, now, I mean, as a matter of general knowledge, most

4   of us realize there's a right to free speech, correct?

5   A.   Yes.

6   Q.   You're not saying that the words uttered to Mr. Patterson

7   were such as to incite any immediate lawless conduct, are you?

8   A.   Not immediate lawless conduct, but I think this is a

9   person that relied on advice from people that are experienced

10  in providing legal and tax advice, and based upon what he

11  learned from what you guys did, he followed that conduct and

12  thought it was okay.

13  Q.   And he had not been filing tax returns for a number of

14  years at that time, correct?

15  A.   Yes, that's correct.

16  Q.   It's not rational to believe that he changed his conduct

17  because of a comment by Oscar Stilley, is it?

18  A.   I guess if you -- if you're doing something wrong for many

19  years and then you decide to hire somebody or talk to somebody

20  that you understand is supposed to be an expert in this issue,

21  to confirm or deny your beliefs in this person that you trust

22  to have knowledge about this advice, tells you that, no, you're

23  right, you don't have to file returns, I believe that can just

24  reaffirm his thoughts that he didn't have to file and I know I

25  don't have to file now because Oscar Stilley and Lindsey

1  Springer don't file and they're experts in this stuff.

2  Q.   Let's make sure we have the facts straight here.  Isn't it

3  true what you said was that Eddy Patterson claimed Oscar

4  Stilley told Eddy Patterson that Stilley didn't file?

5  A.   Yes.

6  Q.   That's all, correct?

7  A.   That's all you told him?

8  Q.   Correct.  In other words, Oscar Stilley didn't say, Eddy

9  Patterson, don't file tax returns; he didn't say that, did he?

10 A.   I don't think he said that in his grand jury testimony,

11 no.

12 Q.   You have no evidence that Oscar counseled -- Oscar Stilley

13 counseled Eddy Patterson to not file a tax return, do you?

14 A.   Other than just telling him that you didn't file and the

15 evidence that you told Lake and Roberts similar things, but we

16 don't have any direct evidence that you told Mr. Patterson not

17 to file his tax returns, no.

18 Q.   And we also don't have any evidence that Patterson changed

19 his actual conduct in any way because of what Oscar Stilley

20 did?

21 A.   No.

22 Q.   Let's go on to James Lake.  James Lake had already been

23 charged before he even contacted Oscar Stilley, correct?

24 A.   Yes.

25 Q.   Oscar Stilley agreed to represent James Lake for a fee,

BRIAN SHERN - CROSS BY MR. STILLEY                                160

1   correct?

2   A.   Yes.

3   Q.   Oscar Stilley did certain work prior to trial on Lake's

4   case, right?

5   A.   Yes.

6   Q.   Oscar Stilley did not try the case, did he?

7   A.   No.

8   Q.   You have no evidence that anything that Oscar Stilley did

9   in his filings pretrial or any of his conduct of the defense

10  that Oscar Stilley did anything to cheat Mr. Lake out of his

11  money, correct?

12  A.   I would feel like I got cheated out of my money if I paid

13  you for legal representation on any matter you represented me

14  on.

15  Q.   Well, now, when we started this cross-examination, I asked

16  that if we can just keep it to the --

17           MR. O'REILLY:  Objection.  He asked a question, he

18  got an answer.

19           THE COURT:  We'll wait for the next question.  Go

20  ahead.

21           MR. STILLEY:  Your Honor, I move to strike.  That's

22  not a responsive answer to the question.  He is speculating

23  about what he might want to do and that's not what the question

24  was.

25           THE COURT:  Overruled.  Next question.

1  Q.    (BY MR. STILLEY)  You don't have any evidence that Oscar

2  Stilley committed any ethical violation or wrongful acts during

3  representation of James Lake either, do you?

4  A.    I believe Mr. Lake testified that you didn't communicate

5  that he could plead to his charges.  You withheld the fact that

6  he could plead guilty rather than stand trial for his charges.

7  Q.    So you think that Jim Lake said that?

8  A.    Yes.

9  Q.    Jim Lake got another attorney before trial, correct?

10 A.    After he fired you, he got a new attorney, yes.

11 Q.    Did the new attorney withhold the same information from

12 Mr. Lake?

13 A.    No.  The new attorney told him that I can't believe that

14 Mr. Stilley and Mr. Springer didn't actually look at your tax

15 returns at all during your case to determine whether -- what

16 the tax loss was going to be.  They did a horrible job.  They

17 didn't represent the fact that you could have just pled guilty

18 and got probation.  And they were going to take you all the way

19 up to the point of going to trial.  And he ended up doing jail

20 time where he said, if he probably didn't hire you, he could

21 have pled guilty and been done with the matter.

22 Q.    Do you have any personal knowledge that James Lake could

23 have pled guilty earlier in the case and received only

24 probation?

25 A.    The only knowledge I have is what Mr. Lake testified to

1  before the grand jury and in his interviews with me and during

2  trial.

3  Q.   And the government lawyer on that case was perfectly

4  available to you, was she not?

5  A.   I could have called her.  I don't remember if I did or

6  not.

7  Q.   Vaughn Dunnigan was her name?

8  A.   No, I didn't talk with her.

9  Q.   Okay.  So you don't have any personal knowledge about

10  whether this story is true or not, do you?

11  A.   I'm just relying on what Mr. Lake told me.

12  Q.   That's in -- a little bit on the unreliable side too,

13  correct?

14  A.   It's consistent with the other witnesses that we've talked

15  to during the case.

16  Q.   Multiple links of hearsay, isn't it?

17  A.   It's just from him to me.

18          MR. O'REILLY:  I don't understand the question, Your

19  Honor.

20          THE COURT:  Sustained.

21  Q.   (BY MR. STILLEY)  Isn't it true that the information that

22  you're talking to the Court about right now came from Mr. Lake

23  by hearsay in the multiple links of hearsay?

24          MR. O'REILLY:  Your Honor, objection.  Relevance to

25  the question.

BRIAN SHERN - CROSS BY MR. STILLEY                             163

 1           THE COURT:  It's clear to me that there's at least

 2   one or two layers of hearsay there and that -- that's all I

 3   need to know.

 4           MR. STILLEY:  Thank you, Judge.

 5   Q.  (BY MR. STILLEY)  Now, the next one is Patrick Turner.

 6   And you're saying that Oscar Stilley is responsible for tax

 7   loss related to Patrick Turner 1999, 2000, 2002, and 2003,

 8   correct?

 9   A.   Yes.

10   Q.   Those sums of money could have been paid out of the

11   $250,000 if Mr. Turner had made that particular choice,

12   correct?

13   A.   Yes.

14   Q.   You don't have any reason to believe that Oscar Stilley

15   would not have done what Mr. Turner told him to do, do you?

16   A.   Reask that question, please.

17   Q.   You don't have any reason to believe that Oscar would have

18   disregarded an instruction from Mr. Turner to pay the IRS with

19   money that Oscar Stilley held?

20   A.   No.

21   Q.   The rational reason for putting $250,000 in the account

22   would be to have enough money to prepare returns, get

23   everything paid and get everything all cleaned up, correct?

24   A.   Are you asking me if that's why he transferred the

25   $250,000 to you?

1  Q.   No, I'm asking you if that's the rational basis for

2  putting a substantial amount of money in Oscar Stilley's IOLTA

3  account.

4          MR. O'REILLY:  Calls for speculation; objection.

5          THE COURT:  Sustained.

6  Q.   (BY MR. STILLEY)  Do you know why Mr. Turner put the money

7  in Oscar Stilley's IOLTA account?

8  A.   Factually, no, but I think it's because Springer told him

9  to.

10  Q.   Are you aware that an attorney has to pay out money from

11  an IOLTA account to the person to whom it is -- who is entitled

12  to the money promptly?

13  A.   Yes.

14  Q.   So Oscar Stilley had no choice but to pay the money

15  according to the directive of Mr. Turner, correct?

16          MR. O'REILLY:  Objection.  Calls for speculation.

17          THE COURT:  Sustained.

18  Q.   (BY MR. STILLEY)  You have no evidence that Oscar Stilley

19  even knew Pat Turner in 2003, do you?

20  A.   I don't believe so, no.

21  Q.   You have no evidence that Oscar Stilley knew Pat Turner in

22  2004, do you?

23  A.   No.

24  Q.   Can you tell this Court what Oscar Stilley should have

25  done differently so that he would not be charged with this

BRIAN SHERN - CROSS BY MR. STILLEY                          165

1   substantial sum of money as being relevant conduct?

2   A.   Not helped Mr. Springer hide Mr. Turner's $250,000 by

3   going through your account.  Just walk away from the

4   transaction.

5   Q.   Well, no, that $250,000 is accounted for somewhere else,

6   is it not?

7   A.   What do you mean?

8   Q.   Aren't you double-counting if you treat this as the

9   $250,000?

10  A.   As I explained to Mr. Springer during cross, I don't

11  believe it's double-counting because the $250,000 that Springer

12  took from Mr. Turner was considered income to Mr. Springer,

13  which the tax loss resulting from that income was charged to

14  Mr. Springer.

15       The assistance of you and Mr. Springer helping Mr. Turner

16  to evade the payment of his -- Mr. Turner's taxes, in the

17  amount of whatever these numbers added up are, from Exhibit

18  1152, 1153, 1155, and 1156, which is close to -- and the

19  penalties, which is close to $250,000, we're attributing this

20  amount of money to you and Mr. Springer for helping Mr. Turner

21  evade the payment of his personal taxes.

22       So there's two separate crimes being committed here:  One

23  is tax evasion on the $250,000 that Mr. Springer received as

24  income; and, two, is assisting Mr. Turner in evading the

25  payment of his taxes.

BRIAN SHERN - CROSS BY MR. STILLEY                               166

1   Q.   Okay.  Now, I need -- let's break this down just a little

2   bit here.  When Mr. Turner sent the $250,000 to Oscar Stilley's

3   IOLTA account, did that become relevant conduct then?

4   A.   Yes.

5   Q.   And isn't it true that any person who is able to get a

6   copy of your check and see the bank account number and the

7   routing number can actually put money in the account?

8           MR. O'REILLY:  Objection as to relevance of that

9   particular piece of information.

10           THE COURT:  What's your point, Mr. Stilley?

11           MR. STILLEY:  I'm trying to break down when the

12   government's -- in the government's theory that this became

13   relevant conduct.  And what I'm trying to get him to admit is

14   that anybody that gets another person's bank account and bank

15   routing number, which is on the check, can put money in it

16   right away and without the permission of the person who has --

17   who has the bank account.  And then I want to follow up with

18   further questions about when this allegedly became relevant

19   conduct.

20           THE COURT:  Well, are you -- is it your contention

21   that you didn't know that Mr. Turner's money was going into

22   your IOLTA account?

23           MR. STILLEY:  No, I'm not making that contention.  I

24   am making the contention that -- of the same facts that were

25   brought in at trial, that Mr. Turner was interested in my

1   services, inquired and got the information, put the money in

2   the account.  And what I'm trying to show is that -- well,

3   besides what I just said there, that it couldn't possibly have

4   been a relevant conduct at that point in time, and then I want

5   to go time by time to see exactly when that took place.

6           THE COURT:  Well, I don't know that the pending

7   question goes to that, so the objection will be sustained.

8       Next question.

9   Q.  (BY MR. STILLEY)  So you're saying that the -- just

10  because that the money was wired to Oscar Stilley's account,

11  that became relevant conduct?

12  A.  Yes, because it was yours and Mr. Springer's and

13  Mr. Turner's actions to evade the payment of Mr. Turner's taxes

14  by sending that money to your IOLTA account to make it look

15  like a retainer.

16  Q.  You realize that Mr. Turner intended to utilize Oscar

17  Stilley's services at the time that the deposit was made,

18  correct?

19          MR. O'REILLY:  Objection, Your Honor.  There's

20  actually no evidence of that in this trial.

21          THE COURT:  Why don't you ask him -- if you've got

22  another question, then ask him to assume that.  I don't recall

23  that there is evidence of that.

24  Q.  (BY MR. STILLEY)  Okay.  Let me ask a little more open-

25  ended question.  Do you know why that Mr. Turner sent money --

1  sent $250,000 to Oscar Stilley's IOLTA account?

2  A.   Do you want me to tell you what I think Mr. Turner thought

3  he was doing or what I think the money was?

4  Q.   No, I want you to say what -- that you can testify about

5  based on either your personal knowledge or a basis of

6  information that is credible and reliable that you can

7  explain.

8  A.   Well, considering the fact that as soon as the money went

9  into the account and it was spent, I think Mr. Turner just --

10  he may have thought he was transferring that money over, which

11  I think he testified to as a loan in case a criminal

12  investigation started investigating him and pursuing a criminal

13  prosecution of him, that he was going to hire you to perform

14  services for him.  At the other end, I don't think Mr. Springer

15  had any intention of doing anything but spending that money on

16  himself.

17  Q.   Do you know when the money actually went into the IOLTA

18  account, the 250,000?

19  A.   I could find out by looking at the exhibits.

20  Q.   What exhibit do you need?

21  A.   It would be the -- I believe 2005 gross income of

22  Mr. Springer, Exhibit 1165.  It was the two wire transfers, one

23  for $192,000 and one for $58,000 on -- one was on August 11th

24  of 2005 and the other was August 18th of 2005.

25  Q.   Okay.  Now, where do we go to find out when the money went

1  to Oscar Stilley's IOLTA account?  Can you give us a cite for

2  that?

3  A.   Those are the dates.

4  Q.   Now, that's when the money went out.

5  A.   No, that's when the money came in.

6  Q.   Which date, 8/11 or 8/18?

7        MR. O'REILLY:  Objection.  This is simply

8  argumentative.  The documents are actually Exhibits 114, which

9  will indicate exactly what date that it was wired to

10 Mr. Stilley's IOLTA account.  I actually believe that is a copy

11 of -- 114 is a copy of the IOLTA account itself, the statement.

12       THE COURT:  Mr. Stilley, if you can make your point

13 by referring to the transaction documents, that may be helpful.

14       MR. STILLEY:  Your Honor, could I have a moment with

15 Mr. Springer to refresh my recollection?

16       THE COURT:  Surely.

17       MR. STILLEY:  Thank you.

18 Q.   (BY MR. STILLEY)  Do you have any information to suggest

19 that Oscar Stilley would -- should not have believed that the

20 money was a bona fide loan?

21 A.   I think the actions that happened afterwards, where you

22 transferred the money immediately out to purchase a motor home,

23 suggest that you didn't think it was a loan.

24 Q.   Okay.  Do you have evidence that Oscar Stilley -- when did

25 you become aware that there was a security interest that was on

1  file -- that was filed on the motor home?  When did you become

2  aware of that?

3  A.   I don't remember, but I think it might have been whenever

4  we first talked to Mr. Springer.

5  Q.   So that -- you've known about that for a long time,

6  correct?

7  A.   I think so, yes.

8  Q.   Is there any reason or fact that you can show this Court

9  that the Court should think that Oscar Stilley would look at

10 the security interest and think that it was not bona fide?

11 A.   I think the whole circumstances surrounding this case

12 would suggest that you didn't think it was a loan or that --

13 that security interest.

14 Q.   But you can't point to any specific fact, can you?

15 A.   Not specifically, no.

16 Q.   And you haven't made any inquiry, recent inquiry, of

17 Mr. Turner about what has gone on subsequently with respect to

18 the security interest, have you?

19 A.   No.

20 Q.   How long has it been since you've talked to Mr. Turner?

21 Have you talked to him since the trial?

22 A.   No.

23             THE COURT:  Is that a UCC filing?

24             MR. STILLEY:  Yes, it is.

25             THE COURT:  Was it introduced in evidence at the

1    trial?

2            MR. O'REILLY:  Yes, Your Honor.

3            THE COURT:  Okay.  I probably need to refresh my

4    recollection by looking at that.  I don't want to interrupt

5    now, but if somebody could come up with either an exhibit

6    citation or an exhibit number citation, or better yet, a copy

7    of it, that would be helpful, but I don't want to interrupt

8    your cross-examination.

9        You may proceed.

10           MR. STILLEY:  Thank you, Judge.

11   Q.   (BY MR. STILLEY)  Let's move on to Dr. Roberts.  Was --

12   and your -- and the government's contention, Mr. Delozier was

13   part of the conspiracy, correct?

14           MR. O'REILLY:  Your Honor, objection.  It misstates

15   his testimony.  It was Special Agent Shern's contention, not

16   the government's.

17           MR. STILLEY:  Beg your pardon.  Let me rephrase

18   that.

19   Q.   (BY MR. STILLEY)  Mr. Shern, in your contention,

20   Mr. Delozier was part of the conspiracy, correct?

21   A.   Yes.

22   Q.   Do you know when he joined the conspiracy?

23   A.   I guess whenever he first started cashing checks in the

24   name of Bondage Breakers Ministry.

25   Q.   And do you know when that took place?

BRIAN SHERN - CROSS BY MR. STILLEY                          172

1    A.   I don't know.  It would have been early, but I don't know

2    a specific date.

3    Q.   Okay.  Do you know for a fact that it came before April

4    15, 1996?

5    A.   I don't know.  I think Mr. Hedberg's check is the earliest

6    record we have from Checks Cashed, so I don't know.  He may

7    have cashed -- I think part of his testimony is he's been

8    cashing checks there for years, but I don't know the exact

9    date.

10   Q.   So it sounds to me like, then, that all of these years on

11   Dr. Roberts were before the conspiracy started in your theory,

12   correct?

13   A.   Yes.

14            MR. STILLEY:  Your Honor, could I have a moment?

15            THE COURT:  Surely.

16            MR. STILLEY:  Thank you.

17       Pass the witness.

18            THE COURT:  Redirect?

19            MR. O'REILLY:  No questions, Your Honor.

20            THE COURT:  You may step down.

21       We'll have the government's next witness.

22            MR. O'REILLY:  Your Honor, the United States calls

23   Revenue Agent Brian Miller.

24            THE COURT:  Very well.

25                          BRIAN MILLER,

BRIAN MILLER - DIRECT BY MR. O'REILLY                    173

```
 1   (WITNESS SWORN)

 2                        DIRECT EXAMINATION

 3   BY MR. O'REILLY:

 4   Q.   Good afternoon, Mr. Miller.  How are you today?

 5   A.   Doing well, thank you.

 6   Q.   I'm going to ask you:  Is part of the evidence that has

 7   been introduced for the sentencing, are there a series of IRS

 8   account transcripts?

 9   A.   Yes, there are.

10   Q.   Could you briefly describe for the Court what those are.

11   A.   They're a record of all the transactions relative to a

12   particular taxpayer's account and activities with the IRS

13   during a particular period.

14            MR. SPRINGER:  Could we have an exhibit on that, Your

15   Honor?

16            THE COURT:  He wasn't referring to any one in

17   particular.

18   Q.   (BY MR. O'REILLY)  I'll just ask you briefly to take a

19   look at Government's Exhibit 1136, which I believe was

20   previously entered into evidence.  Could you describe what that

21   is.  It should have come up on your screen.

22   A.   It's an account transcript from the IRS on the account of

23   Lindsey Springer for the period -- looks like --

24   Q.   The year 1990?

25   A.   1990, yeah.  It's hard to read on my screen.
```

1   Q.   And this reflects all activity on this account as of the

2   date that this was done, which it looks like March 23rd of

3   2010?

4   A.   Correct.

5   Q.   Similarly drawing your attention to exhibit --

6   Government's Exhibit 1137, is that a transcript of account for

7   Mr. Lindsey Springer for the year 1991?

8   A.   Yes, it is.

9   Q.   And, similarly, 11 -- Government's Exhibit 1138 is the

10  transcript account from the IRS for Mr. Lindsey Springer for

11  the year 1992?

12  A.   That's correct.

13  Q.   Government's Exhibit 1139 would be the IRS transcript of

14  account for Mr. Lindsey Springer for the year 1993; is that

15  correct?

16  A.   Yes.

17  Q.   Government's Exhibit 1140, 4-0, is that the IRS transcript

18  of account for Lindsey K. Springer for the year 1994?

19  A.   Yes, it is.

20  Q.   And Government's Exhibit 1141, is that the IRS transcript

21  of account for Mr. Lindsey Springer for the year 1995?

22  A.   Yes.

23  Q.   Did you utilize these exhibits in preparing summaries with

24  respect to the tax computations in this case?

25  A.   Yes, I did.

BRIAN MILLER - DIRECT BY MR. O'REILLY                    175

1   Q.   What was it that you used from these particular exhibits

2   to make the tax loss calculations?

3   A.   Well, I was asked to calculate the amount of tax loss for

4   Mr. Springer and to do that for the years 1990 through 1995.

5   And looking at the first page of this transcript, the account

6   balance amount, for example, in 1995 shows an amount of

7   $20,155.73.

8              THE COURT:  Now, which exhibit are you looking at?

9              THE WITNESS:  1141.

10             THE COURT:  Go ahead.

11             THE WITNESS:  So that reflects the amount of money

12  that is due to the government for that year from Mr. Springer.

13  Q.   (BY MR. O'REILLY)  And does that include interest and

14  penalties?

15  A.   No, the interest and penalties are separate amounts listed

16  immediately below that.

17  Q.   So the account balance is the loss?

18  A.   Yes.

19  Q.   And, similarly, for the other exhibits we looked at, you

20  took simply the tax loss that had been previously assessed

21  against Mr. Springer and added that to your tax loss

22  calculation?

23  A.   That's correct.

24  Q.   Do you know how the IRS reached these calculations?

25  A.   Not specifically, no.  I'm sure they had some basis for

1  calculating income and then computing a tax based on that

2  income.

3  Q.   Do you know if this was, in fact, an assessment that had

4  been made?

5  A.   It is an assessment, yes.

6  Q.   With respect to Government's Exhibit 1142, is that the IRS

7  transcript account for the year 2002 for Mr. Oscar Stilley?

8  A.   Yes, it is.

9  Q.   And does it show an account balance and accrued interest

10  and other items?

11  A.   It does.

12  Q.   With respect to this, do we have independent evidence of

13  income for Mr. Stilley for the year 2002?

14  A.   Yes, we did.

15  Q.   Did we, in fact, use that information in creating the tax

16  loss calculation and not this transcript information?

17  A.   Right.  For purposes of this calculation, we did not rely

18  on the transcript because we thought we might be doubling up or

19  double-dipping, so we used the same formula that we used on all

20  the other years.

21  Q.   Why is it -- do you have a reason to believe that this is

22  a complete and accurate assessment of all of Mr. Stilley's tax

23  obligations for the year 2002?

24  A.   I do not believe that it was, no.

25  Q.   Why not?

1   A.   Because the record we looked at suggested there was a

2   substantial amount of income, substantially more than what was

3   reflected here in this transcript.

4   Q.   Does this transcript reflect adjusted gross income for the

5   year 2002 of $40,373.50?

6   A.   Yes, it does.

7   Q.   And if I can draw your attention to Government's Exhibit

8   1170, I believe.  Is that a compilation of the gross income,

9   based on your calculations, attributable to Mr. Stilley for

10  that same year?

11  A.   Yes, it is.

12  Q.   And is that gross income figure $117,653?

13  A.   Correct.

14  Q.   Are you familiar with the term "bank deposits method of

15  proof"?

16  A.   Yes, I am.

17  Q.   Could you please explain what is the "bank deposits method

18  of proof"?

19  A.   Very simply put, it's a calculation done, taking all the

20  deposits into a bank account, subtracting any transfers or

21  known non-taxable amounts, and treating the net amount of

22  deposits as income to the taxpayer.

23  Q.   Is that, in effect, the methodology you used in

24  calculating the gross income with respect to both defendants in

25  this case?

1   A.   Yes, it is.

2   Q.   And when you use the bank deposits method of proof, is

3   that termed an "indirect method of proof"?

4   A.   It is.

5   Q.   And is that because it's literally not a specific item,

6   you don't go and check each individual item to determine

7   whether or not -- why it was paid?

8   A.   That's correct.

9   Q.   What do you do instead?

10  A.   You just rely on the fact that it was deposited into the

11  bank account, which would demonstrate that it was a receipt of

12  funds by the taxpayer, and then you try to verify any

13  non-taxable amount, and then the amount you're left with would

14  be considered income.

15  Q.   Do you also determine whether or not the defendant had a

16  likely source of income?

17  A.   Yes.

18  Q.   And in this case, was that done?

19  A.   Sure.

20  Q.   In fact, we heard quite a bit of evidence at trial about

21  that?

22  A.   That's right.

23  Q.   And so just with respect to Government's Exhibits 1159

24  through 1167, are those your compilations of -- effectively of

25  bank deposits method of proof with respect to Mr. Springer?

1   A.   Yes.

2   Q.   Does it also include the cash that Mr. Springer testified

3   he received each year to -- going from 2000 forward?

4   A.   Yes, it does.

5   Q.   You were present throughout the trial, correct?

6   A.   Yes, I was.

7   Q.   And you heard testimony -- all the testimony that was

8   presented?

9   A.   That's correct.

10  Q.   Do you remember testimony being asked about what types of

11  records were found in the search warrant executed at

12  Mr. Springer's home?

13  A.   Yes.

14  Q.   Were any types of ledgers, compilation of income, anything

15  from which anyone could have determined Mr. Springer's likely

16  income, was anything like that found at his home?

17  A.   No, there was not.

18  Q.   Any listing of donations he had received or gifts he had

19  received?

20  A.   Nothing like that at all.

21  Q.   Was there any ledger found itemizing business expenses?

22  A.   No.

23  Q.   With respect to the evidence, have you had a chance to go

24  through all of the evidence that was presented in this case?

25  A.   Yes, I have.

BRIAN MILLER - DIRECT BY MR. O'REILLY                    180

1   Q.   Have you also seen some of the discovery that was obtained

2   during this case?

3   A.   Yes.

4   Q.   Were -- based upon what you've reviewed, is there a way to

5   accurately determine Mr. Springer's income tax -- you know, the

6   income and the expenses and deductions so that an accurate tax

7   return could be prepared from what you've seen?

8   A.   It would be impossible.

9   Q.   Why is that?

10  A.   There's simply no way to know accurately the amounts that

11  Mr. Stilley and Mr. Springer spent in pursuit of their

12  ministry, in the case of Mr. Springer, and the legal practice

13  on the part of Mr. Stilley.

14       You know, in addition, there's no way to know unrelated

15  income, you know, from capital gains from the sale of

16  property.  There's no way to know the -- their itemized

17  deductions, like their contributions and things like that.

18       It would be impossible to come up with an accurate figure

19  for their -- to do an accurate tax return based on the records

20  that we have.

21  Q.   Who would have access to that information, if anyone?

22  A.   Mr. Springer and Mr. Stilley might if they kept those

23  records.

24  Q.   I'm now going to ask you to look at what's in evidence as

25  Government's Exhibits 1168 through 1176.  And are those your

BRIAN MILLER - DIRECT BY MR. O'REILLY                    181

1  bank deposits calculations with respect to the gross income of

2  Mr. Oscar Stilley?

3  A.   Yes, they are.

4  Q.   Is that from the years 2000 through 2008, inclusive?

5  A.   Yes.

6  Q.   And, again, with a number of these items, there was

7  actually testimony at trial; is that correct?

8  A.   That's right.

9  Q.   But, again, not every item was introduced at trial or --

10 and there's not direct specific item income evidence with

11 respect to each of these, correct?

12 A.   Right.  With regard to Mr. Stilley, many of them were not

13 introduced at trial, as a matter of fact.

14 Q.   Under the bank deposits methods of proof, are you

15 comfortable with this calculation of gross income with respect

16 to Mr. Stilley?

17 A.   I'm comfortable it's very close to a gross income figure,

18 yes.

19 Q.   Will you explain why it is you're comfortable with that?

20 A.   Mr. Stilley is obviously a practicing attorney, obviously

21 has income coming in.  Every check or income -- or item

22 deposited that we looked at appeared to be the type of receipt

23 that would be normal for a practicing attorney.

24 Q.   So they had the inherent appearance of income?

25 A.   They did.

1   Q.   Did you also help prepare a schedule that has been

2   exhibited as Government's Exhibit 1177, which reflects the tax

3   loss of third parties that are relevant to each defendant?

4   A.   Yes, I did.

5   Q.   With respect to Mr. -- well, what is -- with respect to

6   Mr. Springer, does it include Dr. Roberts' tax losses for the

7   years 1992 through 1995?

8   A.   No, Dr. Roberts is not included in Mr. Springer's.

9   Q.   Why not?

10  A.   Based on the testimony of Mr. Shern, Mr. Springer was not

11  really involved at that time with Dr. Roberts.

12  Q.   And is that also consistent with the testimony of

13  Dr. Roberts at trial?

14  A.   Yes.

15  Q.   Let's focus on Dr. Roberts for a second.  With respect to

16  these numbers, these -- the tax loss calculations and the

17  penalties and interest column, are those drawn from the earlier

18  exhibits we referenced, the transcripts of account?

19  A.   That's correct.

20  Q.   And is that true with respect to each of the identified

21  taxpayers, Mr. Eddy Patterson, James Lake, and Patrick Turner?

22  A.   Yes.

23  Q.   And, in fact, those exhibits are referenced in the left-

24  hand column, correct?

25  A.   That's right.

1  Q.   So with respect to each of these items, these amounts are

2  drawn from the IRS assessments and records with respect to each

3  taxpayer?

4  A.   According to the IRS records, these individuals currently

5  owe the government these amounts that are listed on these

6  pages.

7  Q.   And yet the tax loss only refers to the tax loss that's

8  due with respect to a specific year?

9  A.   That's correct.

10 Q.   Penalties and interest are what have -- or what may have

11 accrued since then?

12 A.   Right; and continue to accrue.

13        MR. O'REILLY:  If I may have a moment, Your Honor?

14        THE COURT:  You may.

15 Q.   (BY MR. O'REILLY)  Do you have the actual exhibit in front

16 of you, the 1177?

17 A.   Yes.

18 Q.   Okay.  Is there a second page that refers to Mr. Stilley?

19 A.   There is.

20 Q.   Were you asked with respect to each defendant to prepare a

21 summary of tax loss and restitution, as I said, with respect to

22 each defendant?

23 A.   Yes, I was.

24 Q.   And are those what are exhibited and marked for

25 identification as Government's Exhibits 1178-A for Mr. Springer

 1  and 1179-A for Mr. Stilley?

 2  A.   That's correct.

 3        MR. O'REILLY:  Your Honor, be --

 4  Q.  (BY MR. O'REILLY)  And are these summaries based upon the

 5  evidence that was introduced at trial or was introduced

 6  previously today through Special Agent Shern?

 7  A.   Yes.

 8        MR. O'REILLY:  Your Honor, the government would move

 9  Exhibits 1178-A and 1179-A into evidence.

10        THE COURT:  Any objection?

11        MR. SPRINGER:  Not at this time, Your Honor.

12        MR. STILLEY:  No objection.

13        THE COURT:  They'll be received.

14  Q.  (BY MR. O'REILLY)  With respect to the 1178-A, first,

15  please.  With respect to the first set of numbers, are those

16  simply a compilation as to each year for the gross income

17  figures you've attributed to Mr. Springer?

18  A.   Yes.  These are taken straight from the charts that were

19  discussed earlier that listed each specific item of income for

20  the bank deposits.

21  Q.   And so for the years 1999 through 2007, that added up to a

22  total gross income figure of $1,614,309?

23  A.   Yes.

24  Q.   Did that consist primarily, not exclusively, but primarily

25  of checks that were cashed at Checks Cashed?

BRIAN MILLER - DIRECT BY MR. O'REILLY                    185

1   A.   Yes.

2   Q.   And the 20 percent figure that you used for the tax loss

3   calculation, was that derived from the United States Sentencing

4   Guidelines?

5   A.   Yes.

6   Q.   With respect to what's been entitled "Prior Year Tax Loss

7   for the Years 1990 through 1995," does that come from the IRS

8   assessments against Mr. Springer?

9   A.   Yes, those are taken from the transcripts.

10  Q.   The transcripts?

11  A.   Yes.

12  Q.   And those transcripts reflect what were assessed?

13  A.   Yes.

14        MR. SPRINGER:  Transcripts of what?

15        MR. O'REILLY:  The transcripts reflect what was

16  assessed.

17        THE WITNESS:  The transcripts reflect what was

18  assessed by the IRS for those years.

19  Q.   (BY MR. O'REILLY)  And also the penalties and interest?

20  A.   Yes.

21  Q.   And, again, with respect to each of these, there's an

22  exhibit number in the far left column that allows reference to

23  where these figures came from, correct?

24  A.   Correct.

25  Q.   I'm going to actually ask you to jump down a second and

1    look at the estimated state income tax loss, '99 through 2007.

2    A.    Yes.

3    Q.    Could you explain to the Court how you calculated the

4    state income tax loss.

5    A.    We had to back into it, basically.  We took the federal

6    tax loss figure that we computed, reversed that back to a

7    federal taxable income that would have been correspondent to

8    that federal tax, then we used that federal taxable income

9    figure and applied the state income tax rate to that, as would

10   be consistent with the State of Oklahoma income tax law.

11   Q.    Similarly, did you do the same thing with the State of

12   Arkansas for Mr. Stilley?

13   A.    Yes, we did.

14   Q.    So with respect to both of these, it's an estimate of what

15   their state tax loss would be based upon the tax loss computed

16   for the federal tax loss?

17   A.    That's right.

18   Q.    We've already spoken about the third-party tax loss, which

19   was Exhibit 1177, so with respect to the total tax loss of

20   $1,325,522, is that an estimate of just tax loss?

21   A.    That is tax only.

22   Q.    That does not include penalties or interest?

23   A.    That's correct.

24         THE COURT:  Let me ask, Mr. O'Reilly, so that I

25   understand where the government is going with this exhibit, is

1   the $1.325 million number the one that the government would

2   have the Court apply on the -- to the tax table in Guideline

3   2T4.1?

4              MR. O'REILLY:  Yes, Your Honor.

5              THE COURT:  So you're not asking the Court to apply

6   the $1.7 million number to the tax table; is that correct?

7              MR. O'REILLY:  Correct, Your Honor.

8              THE COURT:  Okay.  Go ahead -- the 1.79 is relevant

9   to restitution?

10             MR. O'REILLY:  Restitution, Your Honor.  Also for

11  where within the guideline range the Court would sentence the

12  defendants.

13             THE COURT:  Well, to the extent that we're talking

14  about tax loss, as for guidelines purposes, what would be your

15  authority for me doing anything other than finding the tax loss

16  and then going to 2T4.1?

17             MR. O'REILLY:  I was unclear, Your Honor.  The total

18  tax loss is what drives the base offense level, exclusive of

19  penalties and interest is our position.  However, there is a

20  range of what the Court will reach once it gets to a -- you

21  know, it comes to its determination of what the adjusted

22  offense level is.  Where within that range we think the

23  penalties and interests may bear on the Court's decision on

24  that or whether or not the Court were considering departing,

25  whether or not to do that.  This is really for informational

 1  purposes and, again, for restitution purposes.

 2          THE COURT:  Okay.  Because you're -- you're shy of --

 3  the next level is 2-and-a-half million, and I --

 4          MR. O'REILLY:  We're not trying to get there, Your

 5  Honor.  We have no interest in that.

 6          THE COURT:  Okay.  Go ahead.

 7  Q.   (BY MR. O'REILLY)  Similar to Government's Exhibit 1178-A,

 8  did you prepare 1179-A with respect to Mr. Springer?

 9  A.   With respect to Mr. Stilley --

10  Q.   Excuse me, yes, Mr. Stilley.  It's been a long day.  I

11  apologize.

12  A.   Yes, I did.

13  Q.   With respect to Mr. Stilley, we have no tax computations

14  predating the year 2000; is that correct?

15  A.   That's correct.

16  Q.   Do you know why?

17  A.   To my knowledge, there was never any tax assessed for

18  Mr. Stilley in those prior years.

19  Q.   Do you recall, with respect to both defendants, when the

20  evidence indicated they last filed tax returns?

21  A.   I assume maybe early '80s, something like that.  I don't

22  remember for sure.

23  Q.   Sometime in the 1980s?

24  A.   Yes.

25  Q.   To your knowledge, was Mr. Stilley a practicing attorney

 1  throughout the 1990s?

 2  A.    Yes.

 3  Q.    But we don't know what that tax loss was, do we?

 4  A.    We do not.

 5  Q.    But with respect to the gross income figures that are here

 6  in Government's Exhibit 1179-A, those are derived from the

 7  exhibits that are summarized in 1168 through 1176; is that

 8  correct?

 9  A.    That's correct.

10  Q.    And, again, the 20 percent calculation from the guidelines

11  was used to reach a tax loss calculation?

12  A.    Yes.

13  Q.    Did you have any basis upon which to reach a more accurate

14  calculation of Mr. Stilley's taxes?

15  A.    No, I didn't.

16  Q.    Did Mr. Stilley provide you or the Court with any exhibits

17  supporting any expenses or non-income items?

18  A.    No, he did not.

19  Q.    And then with respect to the other lines on here, they're

20  either pulled from Mr. Springer's 1178-A -- and I do note, just

21  for the record, that it indicates 1178, it should say 1178-A.

22        And, similarly, I believe, on Mr. Springer's, where it

23  says "1179" -- actually, that one actually just has it wrong

24  completely -- I'm sorry, I'm looking at the wrong exhibit.

25  Where it says "1178," it should say -- where it says "1179," it

```
 1   should say 1179-A.

 2           THE COURT:  What are you --

 3           MR. O'REILLY:  I'll draw the Court's attention.  On

 4   the seventh line up from the bottom, under the line

 5   "co-defendants' federal tax loss," there's an exhibit number

 6   1178, which was the original exhibit number.  We had to adjust

 7   that to add an "A" to make a correction.

 8           THE COURT:  That's understood.

 9   Q.  (BY MR. O'REILLY)  And right now, we're referencing 1179-

10   A.  A similar correction needs to be made to 1178-A.

11       What was the nature of the correction that was made with

12   respect to -- that caused us to have to redo these exhibits,

13   Mr. Miller?

14   A.  Mr. Stilley had been assessed some additional tax by the

15   IRS for the year 2002, I believe.  When we reflected further on

16   that, we realized that we may be reporting or asked -- we may

17   be "double-dipping," I guess is the common way to put it, by

18   assessing or calculating the gross income here for 2002 and

19   then us using that prior year tax for 2002 also, so we backed

20   out the previously assessed tax for '02, requiring us to adjust

21   the exhibit a little bit.

22   Q.  So with respect to the information you had that was

23   available to you, are you confident in the calculations that

24   are reflected in Government's Exhibits 1178-A and 1179-A?

25   A.  Yes, I am.
```

 1          MR. O'REILLY:  If I may have a moment, Your Honor.

 2          THE COURT:  You may.

 3          MR. O'REILLY:  Nothing further from the government,

 4   Your Honor.

 5          THE COURT:  I have a couple of questions before we

 6   have cross-examination.

 7       Mr. Miller, this -- we can probably determine this pretty

 8   easily by looking at the previous exhibits, but for which of

 9   these years is there a -- what I referred to a little while ago

10   as a plug-in number of $12,000 a year with respect to

11   Mr. Springer on Exhibit 1178-A representing miscellaneous

12   donations?

13          MR. O'REILLY:  Your Honor, I can actually address

14   that very quickly.  That would be each of the years 2000

15   through 2007.

16          THE COURT:  So --

17          THE WITNESS:  So the gross income figure on Exhibit

18   1178-A for the years 2000 through '07, for each of those years,

19   it includes $12,000.

20          THE COURT:  Okay.  So that's 96,000 total?

21          THE WITNESS:  Yes.

22          THE COURT:  And if we were to back out 96,000 from

23   that total --

24          THE WITNESS:  1,518,000.

25          THE COURT:  -- that would bring you down to -- equals

BRIAN MILLER - CROSS BY MR. SPRINGER                    192

```
 1   1,518,000?

 2            THE WITNESS:  Correct.

 3            THE COURT:  Okay.  Now, push that through down to the

 4   bottom line on tax loss.  You got a calculator?

 5            MR. O'REILLY:  It would be 18,000 less, Your Honor?

 6            THE WITNESS:  How much?

 7            MR. O'REILLY:  About 18,000.

 8            THE WITNESS:  Twenty percent of 96,000.

 9            THE COURT:  Twenty percent --

10            THE WITNESS:  Of the 96,000, right.

11            THE COURT:  Very well.

12        Cross-examination.

13                         CROSS-EXAMINATION

14   BY MR. SPRINGER:

15   Q.   Good afternoon, Mr. Miller.

16   A.   Good afternoon.

17   Q.   If you could turn to 1136, please.  Mr. Miller, have you

18   ever seen an account transcript that looked like Government's

19   Exhibit Number 1136 before this case?

20   A.   I think I've seen them before.

21   Q.   You think you have?

22   A.   I don't remember specifically.  I've looked at a lot of

23   transcripts and been involved in several trials, but --

24   Q.   Usually is it 4340s that show up in a summary record of

25   assessment-type issue?
```

1   A.   I don't know the number.

2   Q.   You testified that I believe that 1136 through 1141 --

3   they were all accurate records of the IRS's assessment for 1990

4   through 1995; do you remember that testimony?

5   A.   Yes.

6   Q.   Okay.  They aren't actually assessments, are they?

7   A.   Pardon me?

8   Q.   1136 through 1141 are not assessments, are they?

9   A.   They're a record of the assessment.

10  Q.   Which means there's another record somewhere that is an

11  assessment; is that correct?

12  A.   I guess you could say that, yes.

13  Q.   All right.  And in order for a lien to arise as a matter

14  of law, doesn't the taxpayer have to be given notice and demand

15  for payment for a certain assessed year?

16  A.   I'm not familiar with the collection side of the IRS's

17  operation.

18  Q.   So you're not familiar -- is the account transcript a

19  collection side?

20  A.   The transcript is simply a reflection of the taxpayer's

21  account.  You asked about liens being filed and I don't file

22  liens.  That's our collection division's function.

23  Q.   So if you would turn to page 3 of Exhibit 1136.  Do you

24  see the fourth entry down from the top?

25  A.   Yes.  It says "lien released."

1  Q.   And what's the date on that, 8/31/2007?

2  A.   That's what it says.

3  Q.   And under an account transcript, if it says "lien

4  release," what does that mean?

5  A.   I have no idea.

6  Q.   So as you stand here today, are you telling this Court

7  that, for the year 1990, there is an outstanding tax liability

8  owed by Lindsey Springer to the United States as reflected in

9  Government's Exhibit Number 1136?

10 A.   That's exactly what I'm saying, yes.

11 Q.   And you don't know what a lien release is?

12 A.   Well, a lien, I assume, would be some sort of contractual

13 hold or claim to a particular asset, possibly, and we may have

14 released a lien.  The release of a lien, in my limited

15 understanding, does not erase a taxpayer's obligation that he

16 owes to the IRS.

17         MR. SPRINGER:  Your Honor, may I ask standby counsel

18 a question?

19         THE COURT:  Sure.  You might start by asking whether

20 he thinks releasing a tax lien releases the underlying tax

21 debt.

22    (DISCUSSION OFF RECORD)

23         MR. SPRINGER:  Your Honor, may I approach the

24 witness?

25         THE COURT:  You may.

1           MR. SPRINGER:  For the record, Your Honor, I have

2    presented the witness with Exhibit Number -- Defendants'

3    Exhibit Number 19 -- excuse me -- 18, and it is the fourth page

4    in on Exhibit Number -- Exhibit Number 19, the fourth page in

5    Exhibit Number 19, which is entitled "Certificate of Release

6    Federal Tax Lien."

7           MR. O'REILLY:  We do have an objection.  We did not

8    receive these documents until this morning.  They were due to

9    our office no later than the 14th.

10          THE COURT:  First of all, let me make sure I

11   understand what we're dealing with here.

12          MR. SPRINGER:  The fourth page in, Your Honor.

13          THE COURT:  This is a docket from the Patterson

14   case?

15          MR. SPRINGER:  No, no, come back one exhibit before

16   that.  I have my tab at the end of the exhibit instead of the

17   beginning.  And I'm sorry, Your Honor.  That would be the --

18          THE COURT:  This is a notice of deficiency.

19          MR. SPRINGER:  Okay.  Then go into the fourth page of

20   that.

21          THE COURT:  Okay.  Refresh my recollection,

22   Mr. Springer:  When were your exhibits due under the scheduling

23   order?

24          MR. SPRINGER:  They were due on the 14th, Your

25   Honor.  None of these exhibits the government has not seen.

```
 1   And I did the best I could without having to ask for a
 2   continuance, because I was ordered by Judge Kearns to move, and
 3   I did all those things as best I could.  I did give the
 4   government an exhibit list timely and there's no surprise nor
 5   harm done by this statement that they've made.
 6            THE COURT:  So you're offering Exhibit 18 at this
 7   point?
 8            MR. SPRINGER:  I haven't offered it yet.  I'm getting
 9   ready to.
10            THE COURT:  Go ahead.
11   Q.   (BY MR. SPRINGER)  Mr. Miller, on exhibit -- it's actually
12   Exhibit Number 19 and it's page 4 --
13            THE COURT:  Now, wait a minute.  You're going to 19
14   now?
15            MR. SPRINGER:  Actually, Your Honor, what I've done
16   is my exhibit tab is at the end of my exhibit instead of at the
17   beginning.  It's actually -- 19 is the exhibit.  And it was
18   listed that way on my exhibit list.
19   Q.   (BY MR. SPRINGER)  Mr. Miller, page 4 of Exhibit 19, I'm
20   going to read this and then ask you a question from it.  It
21   says, "Certificate of Release of Federal Tax Lien.  I certify
22   that the following named taxpayer under requirements of Section
23   6225 of the Internal Revenue Code has satisfied the taxes
24   listed below and all statutory additions."
25            Do you see that?
```

1   A.    I see that.

2   Q.    Okay.  And do you see the date by which it is issued from

3   the bottom?

4   A.    Yes.

5   Q.    And does that reflect similarly to Government's Exhibit

6   1136 on the third page, the fourth line, where it says "lien

7   release 8/31/2007"?

8   A.    Say that one more time.  Too many numbers for me to keep

9   up with.

10  Q.    I'm sorry.  Do you remember Government's Exhibit 1136 on

11  page 3, where it says "lien release," and then it has a date

12  entry on your transcript code, 8/31/2007?

13  A.    Yes.

14  Q.    And this date on Defendants' Exhibit Number 19, page 4, is

15  dated August 23, 2007, correct, at the bottom?

16  A.    Yes.

17  Q.    Okay.  And it does say that all taxes have been satisfied,

18  does it not?

19  A.    It says that, yes.

20  Q.    Okay.  And just for reference, in the block just below

21  that, where it says "court recording information," does it --

22  on the tax period, Column B there, do you see that -- there's

23  that kind of tax and then there's "tax period."  Do you see

24  that?

25  A.    Yes.

```
 1   Q.   And is it --

 2            THE COURT:  As was the case at trial, before you get

 3   into the substance of an exhibit, it needs to be offered and

 4   received.

 5            MR. SPRINGER:  I'm sorry.  May I have a moment on

 6   that one, Your Honor?

 7            THE COURT:  Surely.

 8            MR. SPRINGER:  Your Honor, I move to admit

 9   defendants' -- page 4 of Defendants' Exhibit 19.

10            MR. O'REILLY:  Objection, Your Honor.  Misrepresents

11   the facts.

12            THE COURT:  Okay.  It's -- it's untimely; that's

13   established.  Page 4 of Exhibit -- of your Exhibit 19 is this

14   one that has a copy of an Exhibit 10 sticker on it?

15            MR. SPRINGER:  Yes, that's from Judge Kearns' court

16   docket.

17            THE COURT:  Okay.  As far as whether it misrepresents

18   the facts or not, I don't know.  I'm not going to off-the-cuff

19   keep it out on that basis.  It's untimely, and I have one

20   question:  Is the government prejudiced, Mr. O'Reilly, in terms

21   of your ability to respond to whatever import this exhibit may

22   have?

23            MR. O'REILLY:  Well, I would be -- the defendant

24   should be required to introduce his entire exhibit if he wants

25   to do that.  First, we need to find out if this witness can
```

1  even authenticate it.

2          THE COURT:  Well, assuming that I receive, then, the

3  entire exhibit, is the government prejudiced by virtue of its

4  untimeliness in terms of your ability to respond to whatever

5  import Mr. Springer may assert these documents have?

6          MR. O'REILLY:  No, Your Honor.

7          THE COURT:  It will be received.

8          MR. SPRINGER:  Thank you, Your Honor.

9          THE COURT:  And that's the entire exhibit, beginning

10  with the one that says "TPC, 23 pages," and then it goes on --

11          MR. SPRINGER:  It says "certificates of release" --

12          THE COURT:  It goes on five pages?

13          MR. SPRINGER:  Yes, five pages.

14          THE COURT:  It will be received.  We'll call that

15  Springer Exhibit 19.  It is received.

16          MR. SPRINGER:  Thank you, Your Honor.

17  Q.  (BY MR. SPRINGER)  Mr. Miller, Government's Exhibit Number

18  1136 says that it is for the tax year -- up at the top, "tax

19  period, December 31, 1990."  Do you see that?

20  A.  Yes.

21  Q.  Okay.  And do you see on Defense Exhibit Number 19, page

22  4, that one of the tax periods where it says it's taking --

23  it's satisfied is the same year, 12/31/1990?

24  A.  Yes.

25  Q.  And do you know why it says "1040-A" on the account

1   transcript up there in the top left corner?  Do you see that?

2   A.   I do not know why it says that, no.

3   Q.   And let's see -- and then for Exhibit 1137, that's tax

4   period ending December 31, 1991, correct?

5   A.   Yes.

6   Q.   And do you see December 31, 1991, on that certificate of

7   release, as well, for the year 1991?

8   A.   Yes.

9   Q.   Okay.  And then on 1138, does the same hold true for the

10  December 31, 1992, year, does that same year appear in this

11  release as well?

12  A.   Yes, the same as '93, '94 and '95.  Save a little time.

13  Q.   Thank you.

14       You've worked at the IRS for how many years now?

15  A.   Twenty-three.

16  Q.   And prior to 2000 -- strike that.

17       You are a revenue agent specialist, correct?

18  A.   I was until just a few months ago.  I recently changed

19  jobs.

20  Q.   What are you now?

21  A.   Fraud technical advisor.

22  Q.   So prior to that new job, as a revenue agent -- you've

23  been a revenue agent even before the year 2000, correct?

24  A.   Yes.

25  Q.   And at that -- before 2000, when you worked as a revenue

1  agent, you worked under a district director structure; is that

2  correct?

3          MR. O'REILLY:  Your Honor, objection.  Relevance and

4  beyond the scope.

5          THE COURT:  Overruled at this point.

6          THE WITNESS:  I forget exactly when that change in

7  hierarchy and structure was made.

8  Q.   (BY MR. SPRINGER)  But you did at one time work under a

9  district director, correct?

10 A.   Yes, I did.

11 Q.   And at some point in time, you no longer worked under a

12 district director; is that correct?

13 A.   Yes.

14 Q.   And when that ended, who did you then begin to work under

15 as an agent?

16 A.   During both times, I worked for an individual called a

17 group manager.

18 Q.   Group manager, okay.

19 A.   That part didn't change.

20 Q.   And as far as assessments go, you're familiar with the

21 regulations dealing with assessments, correct?

22 A.   Yes, I am.

23 Q.   And isn't it true that, to this day, the regulations from

24 the Secretary of the Treasury require that a district director

25 issue all assessments?

1          MR. O'REILLY:  Objection.  Calls for a conclusion of

2   law.

3          THE COURT:  If you know.

4          THE WITNESS:  I'm not familiar with that.

5   Q.  (BY MR. SPRINGER)  Okay.  Have you ever been familiar with

6   that?

7   A.  No.

8   Q.  So as far as delegation of authority right now, to be the

9   fraud person that you -- the title that you have, you get that

10  from the Secretary of the Treasury?

11  A.  I don't deal with -- nobody ever asks me what my

12  delegation is, to be honest.

13  Q.  So you've never had to answer that?

14  A.  I know I've -- I have delegation order number 2.  So if

15  you would like to look at number 2, feel free.

16  Q.  Number 2, that's what I was looking for.  Thank you.

17         Do you know when that order was issued?

18  A.  I do not.

19  Q.  Have you had an opportunity to read Mr. Gollihare's

20  report?

21  A.  No.  I think I have seen bits and pieces of it, but I have

22  not read it.

23  Q.  If you could turn to 1177, please.  And you are the person

24  who prepared this exhibit; is that correct?

25  A.  Yes.

1  Q.    Provided the information on it, anyway?

2  A.    Basically, I transferred the information from the

3  transcript to this summary.

4  Q.    Okay.  Now, you listed down here, for 2000, Eddy

5  Patterson, right?

6  A.    Yes.

7  Q.    And the rationale behind that was -- is that because

8  Mr. Patterson had not filed a tax return in 2000; is that the

9  reason why you did that?

10  A.    I'm not as familiar with the intricacies of this case, as

11  Mr. Shern was.  I relied on his testimony and the testimony of

12  Mr. Patterson during the trial.  And it's my recollection that

13  you were involved during the year 2000, that's why we put that

14  year on there, as opposed to other years.

15  Q.    Did you see the evidence when Mr. Shern was on the stand

16  about Mr. Patterson's transcript showing he filed for an

17  extension of time on April 15, 2001?

18  A.    I saw that, but it really had no significance.

19  Q.    He did file something, didn't he?

20  A.    Lots of taxpayers file a request for extension without

21  ever having any intent to file a tax return.

22  Q.    You don't know if that's what Mr. Patterson was doing,

23  right?

24  A.    You asked me if I know something, I'm telling you that it

25  had no significance to me based on my rationale.

1  Q.   Okay.  So do you know when this $34,247 was calculated on

2  behalf of Mr. Patterson?

3  A.   It's in the transcript; I don't know off the top of my

4  head.

5  Q.   So basically this information is just something that the

6  government provided you, you've got no firsthand knowledge of

7  the information on Mr. Patterson?

8  A.   Someone with knowledge assessed that amount of tax on

9  Mr. Patterson.

10  Q.   Was that Mr. Shern?

11  A.   No.  Special agents typically, to my knowledge, never

12  assess a tax.  That's the job of a revenue agent or a tax

13  compliance officer.

14  Q.   So neither you nor Mr. Shern, the only two people

15  testifying for the government at this sentencing hearing, don't

16  know a thing about how this $34,000 was calculated?

17  A.   Correct.  Not specifically, no.  That job is assigned to

18  someone else after their case is concluded.

19  Q.   Would you turn to 1147, please, Government's Exhibit 1147.

20        THE COURT:  11 what?

21        MR. SPRINGER:  1147, Your Honor.  I'm sorry.  I was

22  away from the mic there.

23  Q.   (BY MR. SPRINGER)  Now, just a moment ago, you were

24  talking about the account transcripts on Lindsey Springer and

25  1147, apparently, is the same type of document but on Mr. and

1    Mrs. Patterson.  And do you see at the bottom where it says

2    that Mr. Patterson filed his 2000 return on March 3, 2003?

3    A.    Yes.

4    Q.    Okay.  So is it the only reason why you put 34,247 plus

5    interest and penalty on Pattersons on my third -- you called it

6    third-party tax loss is because he knew me in 2000?

7    A.    Because that's the amount of tax that was on that tax

8    return that he filed after he became aware of you and when he

9    filed.  I guess during the course of this investigation he

10   probably -- I assume he became aware that he was being

11   investigated and he probably tried to maybe help himself out by

12   preparing a tax return.

13   Q.    Did you hear Mr. Shern testify that I'm the one that found

14   Cynthia Hess, the CPA who prepared those returns?

15   A.    Right.  But I'm not sure of the exact timing of that.

16   Q.    So do you dispute the transcript of March 3, 2003?

17   A.    No, I'm saying -- I'm saying that the tax return could

18   have been filed after Mr. Patterson was aware that he was being

19   criminally investigated.

20   Q.    So you don't know when Mr. Patterson was being criminally

21   investigated?

22   A.    I don't know when the investigation began.  I don't know

23   specifically when he became aware of it.  But I believe he was

24   indicted shortly after this date, which would lead me to

25   believe that he probably knew he was being investigated.  He

1  might have been trying to help himself out and do himself a

2  favor by preparing a tax return.

3  Q.    Okay.  Could you turn to Exhibit 1160, please.  Did you

4  prepare 1160?

5  A.    Yes, I did.

6  Q.    Do you see Eddy and Judith Patterson in the payor column

7  three times for the year 2000?

8  A.    Yes, I do.

9  Q.    Two in the middle and one almost at the end?

10 A.    Correct.

11 Q.    The first one says "10,000," the second one says "10,000,"

12 and then the third from the bottom one says "10,000."  Do you

13 see that?

14 A.    Yes.

15 Q.    Do you remember that coming up at trial?

16 A.    Yes.

17 Q.    Mr. Patterson sent a letter that said, "Please accept my

18 donation"?

19 A.    Yes.

20 Q.    And do you remember you testifying that you thought it was

21 for services rendered?

22 A.    Yes.

23 Q.    And do you remember what the services were that you said I

24 provided Mr. Patterson?

25 A.    I don't believe you specifically asked me if I was -- if I

1    thought it was for services rendered.

2    Q.   You just determined that it was.  I mean --

3    A.   It was either for services rendered or it was in pursuit

4    of your ministry.  And, to me, you know, it doesn't matter;

5    it's income either way.

6    Q.   Right.  I forgot about that with you.

7         If I was the person who convinced Mr. Patterson to file a

8    tax return, where, otherwise, he wouldn't, would that change

9    your mind on that $34,000 on Mr. Patterson in your chart -- I

10   think it was 1147 -- excuse me, I'm sorry, I'm wrong -- on the

11   third-party summary for Lindsey Springer you have listed

12   $34,000, I think it was 1177?

13   A.   Right.

14   Q.   Would that change your mind on that 34,000 if I'm the one

15   that caused Mr. Patterson to file a tax return?

16   A.   I don't think I have enough information.

17         MR. O'REILLY:  Objection, Your Honor.  Calls for

18   speculation.

19         MR. SPRINGER:  It's evidence in the record, Your

20   Honor.

21         THE COURT:  Overruled.

22         THE WITNESS:  Not necessarily.  If you had a

23   conversation with Mr. Patterson right before those tax returns

24   were filed and you said, Eddy, we're busted, you know, we might

25   be able to get off or we might -- they might drop some of the

1  counts if you go ahead and file, so why don't you go ahead and

2  file those returns, maybe they'll go easy on us, under that

3  scenario, no, I would not change my opinion.

4  Q.   (BY MR. SPRINGER)  But you don't have any evidence that's

5  the scenario, do you?

6  A.   I don't have any evidence either way.

7  Q.   Okay.

8           THE COURT:  How much more do you have on cross?

9           MR. SPRINGER:  Probably 30 or 40 minutes.

10          THE COURT:  Very well.  We'll take our overnight

11  break at this time.

12      You may step down.

13      We'll resume at nine o'clock tomorrow morning.  We are

14  recessing, at least by my watch, just about exactly five

15  o'clock, because some people may have assumed that's what we

16  would do.  If we're still going at five o'clock tomorrow, don't

17  assume that we will stop at five o'clock, because we won't.  So

18  everyone involved should be conscious of that, but we will

19  resume at nine o'clock tomorrow morning.

20      Let me inquire as to what additional witnesses, if any,

21  the government has after Mr. Miller steps down.

22          MR. O'REILLY:  None, Your Honor.

23          THE COURT:  Very well.

24      I want both sides -- when all the evidence is in, I want

25  both sides to be ready to -- now that we have had the benefit

1  of some testimony, in addition to the filings, in addition to

2  my recollection of the testimony at trial -- and there's good

3  news and bad news there.  The good news is I took 42 pages of

4  notes at the trial, the bad news is that those 42 pages of

5  notes come in a distant second to what's probably going to be a

6  couple thousand pages of transcript.  So I do have some

7  recollection, aided, to some degree, by my notes, what we heard

8  at trial, obviously, I have the benefit of testimony presented

9  by both the government and the defendants here.  After it's all

10 in, I'm going to want -- I will expect the parties to summarize

11 and pull together for me their -- especially their evidence as

12 to the assertions with respect to attribution of third-party

13 tax losses.

14      I have a thorough understanding, I think, of the

15 government's approach with respect to Mr. Turner.  I do want to

16 hear a clear articulation of the parties' positions one way or

17 the other with respect to Messrs Patterson and Lake.

18      And that is -- and that is not -- because those issues --

19 and by mentioning those issues as being very much live issues,

20 I don't mean to exclude other issues, obviously, as very much

21 live issues, but those issues are very much live issues.

22      And I want to -- first of all, by the time it's over, I

23 certainly hope and expect that I will have heard both sides'

24 best case for including or excluding the tax losses

25 attributable to those individuals.

BRIAN MILLER - CROSS BY MR. SPRINGER                    210

1      Other areas that are certainly fair game for articulate

2 summaries from the parties, if you will, are the parties' final

3 analysis and the parties' final advocacy as to the

4 applicability of Guideline 2T1.1(b)(2) with respect to

5 sophisticated means, and at least as it relates to

6 Mr. Springer, the applicability of Guideline 3B1.3 with respect

7 to abuse of trust -- abuse of a position of trust.

8      So that's a word to the wise.  I want to hear more on

9 that.  I want to hear, first of all, the best evidence and then

10 the best articulated summary of that evidence before I reach my

11 conclusions.

12     But we will resume nine o'clock tomorrow morning and no

13 one -- let me repeat:  If we're still going at this hour

14 tomorrow, we will not stop.

15     Court will be in recess.

16     (COURT ADJOURNED FOR THE EVENING RECESS.  FOR FURTHER

17 SENTENCING PROCEEDINGS, SEE VOLUME II.)

18

19

20

21

22

23

24

25