1             IN THE UNITED STATES DISTRICT COURT

2           FOR THE NORTHERN DISTRICT OF OKLAHOMA

3

4    UNITED STATES OF AMERICA,

5           Plaintiff,

6    vs.                        Case No. CR-09-43-SPF

7    LINDSEY KENT SPRINGER and
     OSCAR AMOS STILLEY,
8
            Defendants.
9    _____

10

11

12

13

14

15           TRANSCRIPT OF SENTENCING PROCEEDINGS

16         BEFORE THE HONORABLE STEPHEN P. FRIOT

17            UNITED STATES DISTRICT JUDGE

18                 APRIL 22, 2010

19                 VOLUME II OF III

20

21

22

23

24

25

212

```
 1   APPEARANCES:

 2   FOR THE GOVERNMENT:
                              Mr. Charles Anthony O'Reilly
 3                            U.S. Department of Justice
                              PO Box 972
 4                            Washington, DC 20044

 5                            Mr. Kenneth P. Snoke
                              U.S. Attorney's Office (Tulsa)
 6                            110 W. 7th Street, Ste. 300
                              Tulsa, OK 74119
 7

 8
     FOR DEFENDANT SPRINGER:
 9                            Mr. Lindsey Kent Springer
                              5147 S. Harvard Ave.
10                            Ste. 116
                              Tulsa, OK 74135
11
                              Mr. Robert Scott Williams
12                            Taylor Ryan Schmidt & Van Dalsem
                              1437 S. Boulder Ave., Ste. 850
13                            Tulsa, OK 74119

14   FOR DEFENDANT STILLEY:
                              Mr. Oscar Amos Stilley
15                            7103 Race Track Loop
                              Fort Smith, AR 72901
16
                              Mr. Charles Robert Burton, IV
17                            Burton Law Firm, PC
                              320 S. Boston, Ste. 2400
18                            Tulsa, OK 74103

19
                              EXAMINATION INDEX
20
     BRIAN MILLER
21       CONTINUED CROSS BY MR. SPRINGER        213
         CROSS BY MR. STILLEY                   231
22
     LINDSEY SPRINGER
23       DIRECT BY MR. STILLEY                  245
         CROSS BY MR. STILLEY                   289
24       CROSS BY MR. O'REILLY                  290

25
```

```
 1              THE COURT:  Good morning.  Mr. Stilley, I believe we
 2    were in your cross-examination -- cross-examination of
 3    Mr. Miller.
 4              MR. SPRINGER:  I think it was me, Your Honor, cross-
 5    examination of Mr. Miller.
 6              THE COURT:  Lori, which were we?
 7              THE CLERK:  It was Lindsey Springer.
 8              THE COURT:  Okay.  Mr. Springer, you may proceed.
 9                        BRIAN MILLER,
10    (PREVIOUSLY SWORN)
11                    CONTINUED CROSS-EXAMINATION
12    BY MR. SPRINGER:
13    Q.   Good morning, Mr. Miller.
14    A.   Good morning.
15    Q.   In this case before the Court, during trial, you were a
16    summary witness on the requirement to file a tax return and tax
17    liability, correct?
18    A.   I think I was an expert witness on the requirement to file
19    and the form and a summary witness of all the testimony that
20    had been provided earlier.
21    Q.   Did you make -- you were involved in the Swisher case,
22    right?
23    A.   Yes, I was.
24              MR. O'REILLY:  Your Honor, objection.  Irrelevance of
25    the Swisher case.
```

BRIAN MILLER - CONTINUED CROSS BY MR. SPRINGER                214

```
 1            THE COURT:  Well, I need to hear a little more before
 2    I know that.  Overruled.
 3    Q.   (BY MR. SPRINGER)  Were you aware -- I'll strike Swisher
 4    for the moment.
 5         You were the summary agent -- the case agent for the
 6    Roberts case over in Arkansas; is that correct?
 7    A.   I was an assisting summary witness, like I was in this
 8    case, yes.
 9    Q.   Okay.  And after Dr. Roberts got out of prison, you had
10    further contact specifically with him; isn't that true?
11    A.   Yes, it is.
12    Q.   Were you assigned to specifically obtain all of the tax
13    returns that Dr. Roberts had not filed while he was in prison?
14    A.   Generally, that is correct, yes.
15    Q.   Okay.  And as far as the -- do you remember Dr. Roberts
16    went to trial in June of 2000?
17    A.   That sounds about right.
18    Q.   And if he was required to file a 2000 tax return, it would
19    have been due somewhere around April 15th of 2001, correct?
20    A.   Sure.
21    Q.   And do you remember that Dr. Roberts was in prison after
22    his conviction for a period of about a year?
23    A.   That sounds correct, yes.
24    Q.   So is it safe to say that when he was required to file the
25    1040 form for the year 2000, it's more than likely that he was
```

1  in prison at that time?

2  A.   I do not know, but it's certainly possible.

3  Q.   And he had complicated tax returns that he had to do;

4  isn't that true?

5  A.   There were some significant issues involved, yes.

6  Q.   And one of those was Ortho/Neuro Medical and how you

7  treated Ortho/Neuro Medical; isn't that true?

8  A.   That was part of it.

9  Q.   Right.  So if Dr. Roberts was separated from all those

10  records, then it seems logical that he wouldn't be able to file

11  a tax return for the year 2000 until after he got out of jail;

12  isn't that true?

13          MR. O'REILLY:  Objection.  Calls for speculation and

14  is suitable for argument.

15          THE COURT:  Overruled.

16          THE WITNESS:  No, I wouldn't necessarily agree with

17  that.  It's not uncommon for a person in prison to be able to

18  file a tax return.  They have ways of -- they can have others

19  get those records, get those records to an accountant, they can

20  have correspondence with an accountant, so it would not be

21  difficult for Dr. Roberts to file his tax return while he was

22  in prison.

23  Q.   (BY MR. SPRINGER)  While he was in prison.  And

24  Dr. Roberts was charged for not filing tax returns in the

25  mid-nineties, correct?

1    A.    I believe that's correct.

2    Q.    And did you ever ask him why he didn't file his 2000 tax

3    return?

4    A.    I don't remember specifically asking him about that year.

5    Q.    Okay.  Did he ever tell you that it was because I told him

6    I didn't file a tax return?

7    A.    I don't remember.

8    Q.    Thank you.

9         THE COURT:  Mr. Springer, let me get some

10   clarification.  I'm sure you are well-aware that, first of all,

11   that the situation with Dr. Roberts is relevant in this case

12   overall for two purposes:  Number one is tax loss, but the tax

13   loss relating to Dr. Roberts is attributed under the

14   government's theory only to Mr. Stilley and not to you.

15        MR. SPRINGER:  Got that.

16        THE COURT:  Okay.  So I'm assuming that you are

17   focusing yourself on the situation with Dr. Roberts only as it

18   may relate to the potential application of the Guideline 2T1.9

19   relating to encouraging others to violate the tax law.

20        MR. SPRINGER:  Yes.

21        THE COURT:  Okay.  Now, is it your position -- and,

22   in fairness, this is against the backdrop not only of the

23   testimony we heard yesterday from Agent Shern about what was --

24   what the grand jury testimony was, but we had the testimony at

25   trial of Brenda Frederiksen -- do you recall that?

1          MR. SPRINGER:  Yes.

2          THE COURT:  She quoted you, as I recall, as having

3    said, I think in the context of the Roberts trial, whether it

4    was before, during or after, but it was 2000 or 2001, in the

5    general context of the Roberts trial, she quoted you as saying

6    the tax system was basically voluntary.  Then there's other

7    testimony that was given yesterday by Agent Shern.

8      Is it your position that for the application of Guideline

9    2T1.9 to be appropriate, that the encouragement to violate the

10   tax law must have been successful?

11         MR. SPRINGER:  No.  The actual statements are that

12   Dr. Roberts chose not to file a tax return on his own and that

13   it wasn't based upon me telling him it was voluntary.

14         THE COURT:  Well, is it your position for this

15   guideline to apply that you must have, in fact, caused someone

16   to violate the tax law?

17         MR. SPRINGER:  No, sir.  My understanding of that is

18   that if I encouraged them to violate the tax law -- I think

19   there is some division right now was found in Mr. Gollihare's

20   report, between what is acceptable and not acceptable speech in

21   that regard, and all I'm trying to make -- or lay the

22   foundation of for a preponderance of the evidence is that I did

23   not for the year 2000 or any other year after that -- now,

24   obviously, before that, the money is on Oscar Stilley's side,

25   not mine, but at no time did Dr. Roberts -- was he told or was

1   there any evidence that he was specifically encouraged by me

2   not to file a tax return.

3            THE COURT:  Then to that extent, you urge me not to

4   believe the testimony of Ms. Frederiksen.

5            MR. SPRINGER:  Well, I believe what Ms. Frederiksen

6   said was what she heard.  I don't believe she said what was

7   told to Dr. Roberts.  I believe if we look at the transcript on

8   that, she was specifically talking about conversations she had

9   had.  And her tax requirements aren't at issue between myself

10  and the government with related to relevant conduct.

11           THE COURT:  Let's assume, then, that Ms. Frederiksen

12  was referring to something that you said to her.

13           MR. SPRINGER:  Okay.

14           THE COURT:  Are you urging me not to believe what she

15  said about what you said to her?

16           MR. SPRINGER:  I'd have to review her testimony to

17  say for sure.

18           THE COURT:  I don't want to break up your -- go

19  ahead.  Go ahead.

20           MR. SPRINGER:  I got you on that.

21      May I just have a second?  I'm trying to finish that

22  thought.

23           THE COURT:  Sure.  I'm sorry, I --

24           MR. SPRINGER:  No, no, no, it helps me, I'm just

25  trying to put that in perspective with what I want to do next

 1   with Mr. Miller.

 2   Q.   (BY MR. SPRINGER)  Mr. Miller, you were also involved in

 3   the James Lake trial, were you not?

 4   A.   Yes, I was.

 5   Q.   In the tax loss calculations, there's $176,000 for the

 6   year 2000 that the government has claimed that I should have

 7   impugned to my tax loss calculation for the purpose of

 8   sentencing because of something that I did with Mr. Lake; do

 9   you remember that?

10   A.   Yes.

11   Q.   Now, Mr. Lake -- you were here during his testimony,

12   correct?

13   A.   Yes.

14   Q.   Okay.

15             MR. SPRINGER:  Your Honor, may I have a moment?  I

16   need to read something.

17             THE COURT:  Certainly.

18             MR. SPRINGER:  Your Honor, I believe to conclude what

19   I was saying a moment ago is that it is my understanding the

20   government is promoting Count 1 as the lead count, the one

21   that's going to have the highest possible guideline sentence,

22   and as a result of that, we get into what's referred to as

23   relevant conduct within the scope of the conspiracy, and so

24   whether I am asking questions related to Dr. Roberts or

25   Mr. Lake, I did not -- there's no evidence that I entered into

```
 1   an agreement with them to further some illegal conduct which

 2   was the object of the conspiracy, as alleged, and so the reason

 3   why I'm asking those questions is based upon how it applies to

 4   Count 1's relevant conduct and the unlawful agreement, and I

 5   believe --

 6             THE COURT:  Well, let me -- I don't want to interrupt

 7   you, but under Guideline 1B1.3, relevant conduct for which

 8   you're accountable is clearly not limited to matters occurring

 9   within the conspiracy period charged in the indictment.

10       And there's another thing that you should bear in mind,

11   and I don't mean to lecture and it's certainly not my job to be

12   your advisor in any sense, but it's important, I think, for all

13   concerned not to lose sight of the fact that, even though we

14   talk a good deal about the defendants' accountability -- each

15   defendants' accountability for the other's conduct, to the

16   extent that it can be within the framework of jointly-conducted

17   criminal activity, which is Guideline 1B1.3(a)(1)(B), you are

18   still accountable for your own activity, in some sense, no

19   matter how far back it goes, regardless of whether it was

20   jointly-conducted activity.  That is Guideline 1B1.3(a)(1)(A).

21       And it's easy for all of us to kind of slide off in the

22   direction of thinking in terms of, well, what is within the

23   scope of the jointly-conducted activity?  And that's far from

24   the whole framework for the Court's analysis of relevant

25   conduct, because under Subsection (a)(1)(A), you are
```

 1    accountable for your activity, your personal activity,

 2    regardless of whether it was jointly-conducted.

 3         So bear that in mind, that in a temporal sense, the

 4    conspiracy period in the indictment, although perhaps of

 5    interest, is immaterial ultimately for the purpose of the

 6    Court's evaluation of your relevant conduct.

 7              MR. SPRINGER:  Is the relevant -- the question I'm on

 8    is:  Is the relevant conduct such as what Mrs. Gray said, does

 9    that reach over to an amount of money that the government

10    proposes would have been on or was on a return that was filed

11    by that person?  And I think that's where I got stuck.

12              THE COURT:  You're getting a little specific in your

13    questions to the Court.  You'll need to rely on your own

14    analysis and the assistance that your standby counsel may give.

15              MR. SPRINGER:  I'm good on that.  Okay.

16    Q.   (BY MR. SPRINGER)  Mr. Miller, are you suggesting that,

17    even if Mr. Lake had filed a tax return for the year 2000 on

18    time, that I would still be liable for tax loss that he -- that

19    his return shows if he filed?

20              MR. O'REILLY:  Objection, Your Honor.  Relevance

21    to -- the Court is the one that will be determining what he is

22    liable for and what he is not.

23              THE COURT:  Mr. O'Reilly, I'm going to ask you to

24    speak up a little, please.

25              MR. O'REILLY:  Your Honor, I object.  The question is

1  not relevant as to what Revenue Agent Miller's view is on

2  whether he would be -- Mr. Springer should be held liable;

3  that's the Court's decision.  We're straying into argument

4  here, as opposed to questions of fact.

5          MR. SPRINGER:  He did propose the chart.  He did

6  testify that he's the one that proposed the chart with

7  Mr. Lake's money on that.

8          THE COURT:  I'm going to hear it.  Obviously, the

9  testimony of a witness, like Mr. Miller, can be in a gray area

10 in terms of whether it involves facts or legal conclusions, and

11 I'm also mindful, though, of the limitations on the purposes

12 for which Mr. Miller was presented on direct, but that said,

13 for now, I'm going to overrule that objection.  He may want you

14 to repeat the question.

15         THE WITNESS:  Certainly.  Please.

16 Q.   (BY MR. SPRINGER)  Testimony would be, for Mr. Lake, I

17 told him I didn't file tax returns?

18 A.    Right.

19 Q.   Mr. Lake still files a tax return, the very next time a

20 tax return is due to be filed by him on time, because I told

21 him I didn't file a tax return, is it your position that I

22 would be liable under tax loss for the $176,000 if he had filed

23 a tax return?

24 A.    To me, what he did has no bearing on what you advised him

25 to do, I guess.  I mean, his choice -- whether or not he relied

BRIAN MILLER - CONTINUED CROSS BY MR. SPRINGER          223

1  on your advice, to me, doesn't change your behavior, I guess,

2  if that's what you're asking.

3  Q.   In other words, even if he had filed a tax return with the

4  176,000 on there, you would still be saying the 176,000 should

5  be a tax loss attributable to me?

6  A.   Off the top of my head, yes.

7  Q.   I'm trying to understand how you said that.  You heard

8  Mr. Shern yesterday talk about some people I told to file tax

9  returns and other people I told I didn't file tax returns;

10 remember that?

11 A.   Yes.

12 Q.   If I told somebody to file a tax return and they filed a

13 tax return, should I be held liable for the amount of money

14 that they owe on that tax return?

15 A.   Off the top of my head, I wouldn't think so.

16 Q.   Okay.  So the distinctive difference is whether or not I

17 told them I file a tax return or I don't, that's the difference

18 between whether the person I said anything to, their tax

19 liability becomes my tax loss; is that the best way we can

20 understand it?

21 A.   Uh-huh.  If you encourage someone to violate the law, then

22 it becomes your tax loss is my understanding.  If you

23 encouraged someone to comply with the law and they fail to

24 comply with the law, I would assume that that would be their

25 responsibility.

1   Q.   And if I tell somebody what I personally don't do, is that

2   encouraging them the way you've got it on the calculations?

3   A.   Yes, since you are in a position of being a tax expert and

4   people know that you have studied extensively the tax law and

5   people trust your opinion.

6   Q.   Isn't it true, though, that prior to this trial, the basis

7   of my claim was is that because I only received gifts?

8   A.   I don't know if that's what you told to everyone or not.

9   Q.   Do you have any evidence that I ever told anybody that I

10  received gross income and that I don't file tax returns?

11  A.   I have no evidence that the only people you told you

12  didn't file were the people who had a ministry.  It's my

13  understanding you told lots of people you didn't file, not that

14  you said I don't file because I have a ministry.

15  Q.   Well, okay.  Or because I only accept gifts, right?  That

16  was the key phrase in the trial that we were dealing with?

17  A.   Yes.

18  Q.   Okay.  So if I said -- if somebody testified I told them I

19  did not file tax return, that by no means limits what all I

20  said, that's just a phrase that has been taken out of a much

21  longer relationship, correct?

22  A.   Possibly so.

23  Q.   Right.  And wouldn't it also indicate that when people

24  would write "donation" or "gift," that there was probably some

25  conversation between them and I about that subject?

```
 1   A.    I would assume so, yes.

 2   Q.    So if I'm -- if we're having a discussion about whether

 3   this is a gift and I'm telling them I don't file a tax return,

 4   if those two were together, that the reason why I don't file

 5   tax returns is because I will only accept unconditional --

 6   condition of gift, at that time, not based upon beating a dead

 7   horse, would you still feel the same way about attributing the

 8   $176,000 or other tax liabilities of people that I told this

 9   to?

10         MR. O'REILLY:  Objection to the form of the

11   question.  I'm not -- I'm personally quite confused.

12         THE COURT:  Mr. Springer, there's two or three

13   problems:  Number one, you and the witness are hopping back and

14   forth between issues under Guideline 2T1.9(b)(2) and tax loss

15   under 2T1.1, and I'm not sure the witness is professing to be

16   an expert under -- at least under 2T1.9(b)(2).

17      Number two, what you're saying is pretty far afield from

18   anything for which he was presented as of yesterday.

19         MR. SPRINGER:  I'm sorry.

20         THE COURT:  Number three, I'm going to listen to what

21   you have to say by way of argument.

22         MR. SPRINGER:  Got you.

23         THE COURT:  Especially as -- for instance, I'll go so

24   far as to say I'm not -- I'm a little concerned about the

25   quality of the evidence as to whether you should be accountable
```

 1  for the tax loss relating to Mr. Lake, and I'm looking forward

 2  to hearing what the government has to say and what you have to

 3  say.

 4      Before we started yesterday, I had studied the record

 5  pretty closely as to the individuals who were covered in the

 6  government's sentencing memorandum, which does not include

 7  Mr. Lake, and I'm going to listen very carefully to what both

 8  you and the government have to say on that score.

 9      But your question -- the pending question really addresses

10  matters that are more appropriate for argument rather than

11  debate with this witness.

12          MR. SPRINGER:  I apologize, Your Honor.

13  Q.   (BY MR. SPRINGER)  In addition to me telling Mr. Lake I

14  don't file a tax return, do you know of any other conduct, any

15  other action I took with regard to Mr. Lake regarding his tax

16  liabilities or his problems?

17  A.   I personally do not.

18  Q.   And would that be the same for Dr. Roberts?

19  A.   The best of my recollection, yes.

20  Q.   Okay.  Could you turn to 1177, please.

21  A.   Okay.

22  Q.   And do you see the entry for Exhibit 1152 where it says

23  "Patrick Turner"?

24  A.   Yes.

25  Q.   And you heard Mr. Shern testify yesterday with regard to

1    why he believed Patrick Turner's money that he owed for '99,

2    2000, 2002, and 2003, should be within a third-party relevant

3    tax loss on Lindsey Springer; do you remember that?

4    A.   Yes.

5    Q.   Had you had discussions with him about that before he

6    testified?

7    A.   Maybe briefly.

8    Q.   Did you agree with his testimony?

9    A.   Yes.

10   Q.   Okay.  Now, did you know that the reason why Mr. Turner

11   filed these tax returns for '99, 2000, 2002, and 2003 was

12   because Lindsey Springer -- do you remember that testimony?

13   A.   I believe so.

14   Q.   So here we have a person who actually files the tax return

15   because Lindsey Springer tells him to do it and you still found

16   a way to put it under third-party relevant tax loss.  And just

17   a minute ago, didn't you just say if I told a person to file a

18   tax return, that that money would not be tax loss to Lindsey

19   Springer?

20           MR. O'REILLY:  Objection.  Argumentative, compound

21   question.

22           MR. SPRINGER:  I can rephrase, Your Honor.

23           THE COURT:  Let me inquire.  As I understand the

24   government's theory with respect to Mr. Turner -- well, first

25   of all -- and forgive me again, Mr. Springer, but I want to

```
 1   make sure I understand very clearly what both sides have to

 2   say.

 3        The tax loss, as opposed -- as distinguished from

 4   penalties and interest, attributable to Mr. Turner, which the

 5   government, in turn, seeks to hold Mr. Springer accountable for

 6   in Government's Exhibit 1177, comes out to $145,713, which to

 7   the penny is the amount shown in the chart set forth on page 10

 8   of the government's sentencing memorandum.

 9        Now, the penalties and interest are another matter and are

10   apparently there for other purposes, so we'll disregard that.

11             MR. SPRINGER:  Okay.

12             THE COURT:  So that's for '99, 2000, '02 and '03.

13        My understanding is -- and this -- I'm just going to ask

14   Mr. O'Reilly to either very briefly say I'm right or wrong.  My

15   understanding is that the theory by which the government seeks

16   to attribute a loss relating to Mr. Turner to both defendants

17   is not so much as a result of any failure to file as it is a

18   result of what I will call the deposit of the money in the

19   IOLTA account with the effect that that had on the government's

20   ability to collect what was owed; is that correct?

21             MR. O'REILLY:  Yes, Your Honor.

22             THE COURT:  Okay.  With that understanding,

23   Mr. Springer, whatever the merits of Mr. O'Reilly's objection

24   may be, he didn't say "relevance," but I've got a relevance

25   problem, because I don't think the government seeks to hold you
```

1   accountable for a tax loss relating to Mr. Turner as a result

2   of any failure on his part to file, as opposed to the fact that

3   his quarter-of-a-million dollars that he raised by mortgaging

4   his house was put beyond the reach of the government at your

5   instance and with the cooperation of Mr. Stilley, so the

6   objection is sustained but for a completely different reason

7   than what the government had to say about it.

8        Go ahead.

9            MR. SPRINGER:  Thank you, Your Honor.

10       May I have just one second?

11  Q.   (BY MR. SPRINGER)  The testimony you gave about Mr. Lake

12  and Mr. Roberts, other than I told them words with respect to

13  whether I file tax return or not, do you know of any action or

14  conduct that I took with Mr. Patterson or is the answer the

15  same as it was with the other two?

16  A.   To my knowledge, the answer would be the same.

17  Q.   Thank you.

18       Okay.  You're also aware of the claim that I should be

19  held liable for Oscar Stilley's tax loss?

20  A.   Yes, as part of the conspiracy.

21  Q.   Right.

22           MR. SPRINGER:  1179, could you pull that up,

23  Government's Exhibit 1179.

24           MR. O'REILLY:  Just for the record, I think it's

25  1179-A.

1          MR. SPRINGER:  A, I'm sorry, you're right.

2   Q.   (BY MR. SPRINGER)  What is it about Oscar Stilley's tax

3   liability that is connected to Lindsey Springer by way of the

4   conspiracy?  In other words, why did you decide to put his tax

5   liability on me for tax loss purposes?

6   A.   Because, as I think was very clearly presented during the

7   trial, you both worked together and you both benefited from the

8   actions of each other and you both made money as a result of

9   your business dealings and your representation of various tax

10  things.

11  Q.   So just because we had business dealings, we're

12  responsible for each other's tax liabilities under the

13  conspiracy count; is that what you --

14  A.   You worked together to accomplish the object of the

15  conspiracy.

16  Q.   But the object of the conspiracy wasn't to represent

17  somebody, right?  That wasn't the object.  It was to defraud

18  the IRS's lawful functions, right?

19  A.   I guess so, to defraud the IRS and to make a lot of

20  money.

21  Q.   Is making a lot of money defrauding the IRS?

22  A.   If you make a lot of money by defrauding the IRS, I guess

23  it could be looked at that way.

24  Q.   Okay.  And is it -- is it your contention, then, that

25  because Oscar Stilley was a lawyer and he represented somebody

```
 1   in a criminal tax case that that's what makes that part of the

 2   criminal conduct in Count 1?

 3            MR. O'REILLY:  Objection, Your Honor.  Relevance.

 4   This, again, is argument for the Court.

 5       Mr. Miller testified with respect to how the figures were

 6   arrived at, how the computations were achieved in terms of what

 7   is attributed to each defendant.  That's really something for

 8   argument and for the Court to rule on, not for Mr. Miller to be

 9   opining on.

10            THE COURT:  And aside from that, these are matters

11   that were fairly thoroughly explored at the trial, so that will

12   be sustained.

13            MR. SPRINGER:  Can I have a moment, Your Honor?  My

14   40 minutes is up, Your Honor.  Thank you.

15            THE COURT:  Mr. Stilley.

16                       CROSS-EXAMINATION

17   BY MR. STILLEY:

18   Q.   Much of your efforts were focused on a determination of

19   the -- what we would call the tax loss of Oscar Stilley,

20   correct?

21   A.   Yes.

22   Q.   Now, was the purpose of those efforts to get as close as

23   possible to the truth of what the tax loss would have been?

24   A.   There were two choices:  Option A or Option B.

25       Option A was compute the gross income and take 20 percent
```

1   of that.

2       Option B was to do our best, which would have been very

3   inadequate, at best, and then apply a 30 to 40 percent rate on

4   your net income.

5       I did not feel like we would get anywhere close to

6   accurate under Option B computing an accurate reflection of

7   your business income, so we went with Option A, which was to

8   just calculate your gross income, then apply 20 percent to it.

9   Q.   Okay.  But the question on the table here was the efforts

10  in furtherance of an attempt to get to the truth, was that the

11  paramount goal?  Was the paramount goal the truth?

12          MR. O'REILLY:  Objection.  It's an unclear question.

13  The truth about what?  Mr. Stilley provided no tax returns,

14  provided no business records, what is the -- the truth about

15  what is the objection.

16          THE COURT:  I'm assuming he means the truth about the

17  calculation of Mr. Stilley's tax liability as proposed by the

18  government.  On that assumption, the objection will be

19  overruled.

20          THE WITNESS:  The object is always the truth.  I did

21  not believe I could get to the truth by trying -- by computing

22  an actual tax liability for you based on the information that I

23  had and was able to get.

24  Q.   (BY MR. STILLEY)  There are multiple ways to ascertain tax

25  loss, correct?

```
1   A.   Yes.

2   Q.   If all of those are means to attain the truth, they should

3   tend toward a single point, correct?

4   A.   Yes.

5   Q.   For the simple fact that the tax liability or tax loss,

6   with small variances, should be a discrete figure, correct?

7   A.   Yes.

8   Q.   So it would help us, then, to determine whether we

9   actually attained the truth by looking at other ways of

10  calculating tax loss or tax liability, correct?

11  A.   Yes.

12  Q.   There's another way called the "net worth method,"

13  correct?

14  A.   Yes.

15  Q.   Were you aware that the probation department has

16  determined that Oscar Stilley has a negative net worth of

17  50,000?

18  A.   No.

19  Q.   Okay.  I want you to assume that for the questions that

20  we've got involved here -- and I want to ask you some questions

21  about that.  Assuming a negative net worth of $50,000 on the

22  part of Oscar Stilley at this point in time, is it not fair to

23  assume that the tax losses -- well, scratch that.

24       What other pieces of information do you need to apply the

25  net worth method of determining tax loss?
```

BRIAN MILLER - CROSS BY MR. STILLEY                          234

1  A.   I would have to know all of your income and expenses,

2  which is something I don't know.  And your point isn't really

3  valid, because there are lots of people that "make a ton of

4  money," to put it in common vernacular, a lot of people that

5  make a lot of money that have a negative net worth that have to

6  file bankruptcy, so if you're suggesting that the fact that you

7  have negative net worth implies that you didn't have income,

8  that's certainly not a reasonable assumption.  You could have

9  made a ton of money and spent a ton and a little bit and had a

10  negative net worth.  So I think -- I'm not sure the

11  appropriateness of the question and if -- whether you had a

12  negative net worth --

13           THE COURT:  Let's have the next question.

14           THE WITNESS:  It doesn't matter to me whether you

15  have negative net worth, that's not a conclusive factor in

16  deciding whether or not you had income.

17  Q.   (BY MR. STILLEY)  You have used the net worth method on

18  various taxpayers, correct?

19  A.   I have a few times, yes.

20  Q.   So you do consider that a valid means of considering tax

21  liability or tax loss, correct?

22  A.   Certainly.

23  Q.   What I previously asked you is what other items of

24  information do you need to ascertain tax loss on the net worth

25  method of valuation?  Surely you would -- let's start with you

1   would need to know something about the lifestyle or the

2   expenditures -- personal expenditures of that individual,

3   correct?

4          MR. O'REILLY:  Objection.  Relevance and asked and

5   answered.

6          THE COURT:  Sustained.

7   Q.  (BY MR. STILLEY)  Okay.  Let me ask this just -- a little

8   different question.  You have to make a check list of things

9   that you need to determine in order to come up with the net

10  worth method of valuation, correct?

11  A.   Yes.

12         THE COURT:  Mr. Stilley, let me establish one thing,

13  and I suppose I'll be happy to hear you if you think I'm headed

14  in the wrong direction on this, but I certainly don't hold

15  myself out as an expert on methods of proof in tax evasion

16  cases, but it's -- I think it's fair to say, at least in

17  general terms, that the net worth method, which was not used in

18  this case, is to some degree, at least, a last-resort method

19  that the IRS can, in some appropriate cases, use, in essence,

20  to back in to what -- back in to evidence of a substantial

21  failure to report income.

22      It wasn't used in this case.  It is an undeniable fact

23  that a person can have tremendous gross income and have a

24  negative net worth.  The fact that you, so far as the probation

25  office is aware, may have a negative net worth is of no

BRIAN MILLER - CROSS BY MR. STILLEY                          236

1   persuasive value at all in my evaluation of the tax loss

2   attributable to you.

3        So, now, if -- and so unless you can give me some very

4   good reason for further examination on the question of negative

5   net worth, we're not going to continue down this line.

6             MR. STILLEY:  Could I explain to you my reasoning and

7   thinking on that?

8             THE COURT:  Very concisely.

9             MR. SPRINGER:  Certainly, Judge.  He's already said

10  that the various methods should all tend toward the truth, and

11  I'd like to make a record to show that the net worth method

12  will indicate a zero tax liability, and I can also show that

13  there's a judge in the Lake case who said that it was not gross

14  income but adjusted gross income that was the determinative

15  number as to determine whether or not a tax return was

16  required.  It's a little bit different, but it works into this

17  net worth.

18            THE COURT:  It's time to move on to another subject.

19            MR. STILLEY:  Will I be allowed to make a record on

20  this?

21            THE COURT:  It's time to move on to another subject.

22            MR. STILLEY:  Your Honor, could I have just a

23  moment?

24            THE COURT:  Surely.

25  Q.   (BY MR. STILLEY)  In your report, you -- when you were

BRIAN MILLER - CROSS BY MR. STILLEY                    237

1  adding up the deposits, you added up the deposits that went

2  into the IOLTA account, correct?

3  A.   That was included in the computation, yes, not restricted

4  to that account.

5  Q.   Not restricted?

6  A.   Right.

7  Q.   So you used what went into that account and also what went

8  into Oscar Stilley's personal account, correct?

9  A.   Yes.

10  Q.   Did you take efforts to make sure that you didn't double

11  count?

12  A.   Yes.

13  Q.   Were you aware when you did this that the IOLTA account is

14  actually not the property of Oscar Stilley?

15  A.   I understand theoretically that the IOLTA account is not

16  the property of the attorney, but I also understand in this

17  particular case your personal funds and your personal income

18  was deposited into that account, so it's not restricted to

19  funds of your clients.

20  Q.   You're saying that personal funds were deposited into the

21  IOLTA account?

22  A.   It was clear, based on the fact that funds going into the

23  IOLTA account were transferred to your personal account.  If

24  they -- if it wasn't your money, then I guess you stole from

25  somebody, because it very clearly went from the IOLTA account

1   to your personal account for your personal benefit.

2   Q.   Some of the money did, some of the money did not,

3   correct?

4   A.   Yes.

5   Q.   And the fact the money went into -- at the time the money

6   went into the IOLTA account, there is no presumption that it

7   belongs to Oscar Stilley at that time, correct?

8   A.   It depends on the nature of the payment.

9   Q.   And you didn't make any efforts to determine which was

10  which, did you?

11  A.   We did make an effort, yes, we did.  In fact, there are

12  some items that went into the IOLTA account that were not

13  included in our list of income for you.

14  Q.   Did you see occasions where Oscar Stilley wrote checks to

15  the IRS on behalf of his clients?

16  A.   Yes.

17  Q.   Did you exclude those?

18  A.   Yes.

19  Q.   There was nothing in the report -- in the exhibits for

20  this case that indicate when this was done; why not?

21  A.   We did not list the items of income that we did not

22  include.  We went through and used our best judgment and tried

23  to follow the money the best we could to see where it went.

24  And if we saw money that clearly was being used on behalf of a

25  client as an IOLTA account is supposed to be used, we did not

BRIAN MILLER - CROSS BY MR. STILLEY                    239

```
 1   include that in the accounting.
 2   Q.   You heard Mr. Shern testify that the documents that were
 3   exhibits in this case were prepared about three months ago,
 4   right?
 5   A.   I heard him say that.
 6   Q.   When did you become aware of their existence?
 7   A.   Of the documents?
 8   Q.   Yes.
 9   A.   I don't know.
10          MR. O'REILLY:  Objection.  Just for clarification,
11   are we talking about the underlying documents or these
12   summaries?
13          MR. STILLEY:  The summaries.
14          THE WITNESS:  I assisted in the preparation of those
15   summaries a few months ago.
16   Q.   (BY MR. STILLEY)  So you knew about all those things
17   several months ago, correct?
18   A.   I wouldn't say several.  A couple of months ago.
19   Q.   Were you aware that Oscar Stilley was not given those
20   documents until a week and a day ago?
21   A.   I was not.
22   Q.   So did you have anything to do with keeping Oscar Stilley
23   from being informed of that when the government's sentencing
24   brief was filed?
25   A.   I made no attempt to withhold any information from you.
```

1    Q.    You remember the Lake case, don't you?

2    A.    Vaguely.

3    Q.    And you remember the prosecutor, Vaughn Dunnigan, correct?

4    A.    Yes.

5    Q.    Do you remember the judge?

6    A.    It was a gentleman, but I don't remember his name.

7    Q.    Okay.  You testified in that trial, correct?

8    A.    Yes.

9    Q.    And you saw Oscar Stilley and Lindsey Springer in the back

10   of the courtroom, correct?

11   A.    I did.

12   Q.    You remember that the judge determined that the number

13   that -- the income number that would determine whether a person

14   was required to file a tax return or not was adjusted gross

15   income, correct?

16            MR. O'REILLY:  Objection as to relevance in the line

17   of questioning.

18            THE COURT:  Sustained.

19            MR. STILLEY:  Can I make a record for my reasoning on

20   this?

21            THE COURT:  When this witness steps down, I'm going

22   to give you an opportunity to make a concise offer of proof

23   both on this and on the matter we discussed a few minutes ago.

24       Next question.

25            MR. STILLEY:  Your Honor, may I inquire as to how you

1   want that proffer done?

2           THE COURT:  We'll cover that when the witness steps

3   down.

4           MR. STILLEY:  Sure.  Could I have a moment, Your

5   Honor?

6           THE COURT:  Surely.

7           MR. STILLEY:  Thank you.  Pass the witness.

8       Your Honor, beg your pardon, my understanding was I was

9   supposed to do the offer of proof at a separate time.  Should I

10  do it now?

11          THE COURT:  When the witness steps down, I'll hear

12  your concise offer of proof on the two points that we've

13  covered.

14          MR. STILLEY:  Okay.  Just as an offer, then, from me,

15  correct?

16          THE COURT:  That's true.

17      Any redirect?

18          MR. O'REILLY:  No, Your Honor.

19          THE COURT:  You may step down.

20      Mr. Stilley, I'll hear your offer of proof first as to

21  what the application of the net worth method would have

22  established in this case with respect to your tax liability.

23          MR. STILLEY:  Thank you, Judge.  I think you already

24  see that I asked certain questions to establish that various

25  methods should arrive at a similar point if they're all valid

242

1   methods of arriving at the truth.

2       The net worth method would arrive at zero for Oscar

3   Stilley.  The reason I asked questions about Oscar Stilley's

4   style of living or living expenses was to establish certain

5   facts that Mr. Miller would need to ascertain the net worth

6   method.

7       And my position is that if I had been allowed to elicit

8   this testimony from Mr. Miller, he would have had to agree with

9   a low standard of living, the money not going to any place that

10  is -- would result in -- the expenditure of taxable monies

11  out.  He would have to conclude that the negative net worth

12  ensures that there was not any significant tax loss.

13          THE COURT:  Mr. Stilley, I'll hear your offer of

14  proof as to whether or not the judge in the Lake case

15  determined that the filing requirement depends on adjusted

16  gross income.

17          MR. STILLEY:  Thank you, Judge.  The -- as you heard

18  from the witness, all three, Oscar Stilley, Lindsey Springer,

19  and Mr. Miller, were all at the trial of Mr. Lake.

20      In that case, the judge determined that adjusted gross

21  income was the proper number to determine whether or not that a

22  tax return would be required to be filed.

23      There is the claim in this case that there is a failure to

24  file tax returns and that that has certain consequences.  Once

25  again, when you look at the negative net worth over a period of

1  time, no other things, such as high lifestyle or gambling or

2  anything like that, to indicate that the money has gone

3  somewhere else that would tend to show that by anybody's theory

4  that there was no tax return due under this Court's theory.

5          THE COURT:  Thank you, Mr. Stilley.

6      The Court determines that the matters encompassed by the

7  offers of proof on both points are of no consequence for

8  sentencing purposes.

9      We'll have the government's next witness.

10         MR. O'REILLY:  The government has no more witnesses,

11  Your Honor.

12         THE COURT:  Very well.  That certainly brings us to

13  one significant milestone, if you will, in the sentencing

14  proceeding.  I want the defendants to understand that when I

15  call upon them now to present their evidence, I will hear --

16  what I expect to hear is their evidence, both in response to

17  the adjustments and -- the tax loss issue and the adjustments

18  urged by the government, and as to any other matters that the

19  defendants would want the Court to consider for sentencing

20  purposes, short of their allocution, which the Court will hear

21  at a later stage.

22      So now I'm speaking in terms of evidence, not argument,

23  but I am most assuredly speaking in terms of evidence relating

24  to any matter under Section 3553 or the application of the

25  guidelines.

1      And, again, let me emphasize I will hear the defendants'

2  final arguments or final comments, if you will, by way of

3  allocution on their own behalf at a later stage.

4      Mr. Springer, you may proceed.

5           MR. SPRINGER:  May I have just a moment, Your Honor?

6           THE COURT:  Surely.

7           MR. SPRINGER:  Your Honor, could I have a brief

8  moment with my standby outside of the courtroom for a second?

9           THE COURT:  Surely.  As a matter of fact, we'll take

10  a ten-minute recess at this time.

11      (A RECESS WAS HAD.)

12           THE COURT:  Mr. Springer, you may proceed.

13           MR. SPRINGER:  Your Honor, I'm going to call myself.

14           THE COURT:  Very well.

15                     LINDSEY SPRINGER,

16  (WITNESS SWORN)

17           MR. SPRINGER:  Should I stand here or should I go

18  over there?

19           THE COURT:  As long as you don't lapse by virtue of

20  standing at the lectern, as long as you don't lapse into

21  argument, as opposed to factual matters, as long as you don't

22  also lapse into matters that are more appropriate for you to

23  cover in your allocution, then at least for the time being,

24  I'll be happy to hear you from the lectern if that is your

25  preference.

LINDSEY SPRINGER - DIRECT EXAMINATION                    245

 1            MR. SPRINGER:  Thank you, Your Honor.

 2            THE COURT:  Although for cross-examination, I may

 3   well require you to sit at the witness stand.

 4                      DIRECT EXAMINATION

 5            MR. SPRINGER:  Okay.  The first things I'd like to do

 6   is enter Defendants' Exhibit Number 22, which I believe I

 7   presented this morning to the Court.  Did I give that?

 8        May I approach, Your Honor?

 9            THE COURT:  You may.

10            MR. SPRINGER:  Defendants' Exhibit Number 22 on the

11   first page --

12            THE COURT:  Have you given this to the government?

13            MR. O'REILLY:  Your Honor, we received a copy this

14   morning.

15            MR. SPRINGER:  Yes, I have, Your Honor.  And just for

16   the record, Your Honor, you asked yesterday for the UCC filing

17   on the Turner RV, I asked Mr. Turner yesterday evening to send

18   me that and this is what I received in response from

19   Mr. Turner, which is -- the front page is the e-mail where he

20   expresses how he repossessed the RV, and then underneath it is

21   the documents -- each of the documents that Mr. Turner received

22   in the mail from the Oklahoma Tax Commission from the tag

23   office that I actually registered the RV at, and that's

24   reflected on the last page of this five-page document.

25        I would note that there is a page 6 of 9, 7 of 9, 8 of 9,

1   and 9 of 9, but this is how I got it from Mr. Turner.  It would

2   only be speculation as to what the other documents are, but

3   they're not related to the Oklahoma Tax Commission and the UCC

4   lien filing.  There may be other documents that he had before

5   that, such as the loan agreement or whatever.

6        But what Defendants' Exhibit Number 22 is, again, is --

7   the front page is Mr. Turner expressing that he has exercised a

8   voluntary repossession of the 2001 Freightliner Columbia, and

9   he put the VIN number on there, the certificate of title

10  number, and he also voluntarily repossessed a 2005 cargo

11  trailer, which was purchased with the money that came out of

12  those proceeds from Mr. Turner.

13       And the second page is the first page he received in an

14  envelope from the Oklahoma Tax Commission that was sent to him

15  after I went to the Garnett tag office in Tulsa and registered

16  the vehicle and executed the lien onto the RV at the same

17  moment it was first registered in my name.

18       The third document is the actual instruction and

19  registration form and a lien entry form that Mr. Turner

20  received in the mail in the envelope with the second page

21  attached to Defense Exhibit Number 22.  And this is dated

22  12/23/05, which is exactly the same time in which I registered

23  the vehicle for the first time in my name.

24       The third page -- fourth page, excuse me, is the

25  registration document that in Oklahoma, I believe, you're

1  required to put in our records -- and in this particular

2  instance, this is the copy for the lienholder to issue what's

3  called a lien release in the event that he is satisfied -- he

4  is authorized to then sign this document and give it to the

5  next owner of the vehicle, which is standard -- in my

6  experience dealing with vehicles in the past, that's a standard

7  three-part form that the tag office uses.  There are three

8  different colors.  And the one that Mr. Turner would have

9  received would have been the light-blue one and the green one.

10       And then the last page of this exhibit is the envelope

11  from the Garnett tag office, not from Lindsey Springer, but

12  from the Garnett tag office to Mr. Turner in Michigan.  And I

13  believe the date actually appears December 27th on the

14  envelope.  It's just very difficult with the copier that we had

15  this morning to bring that out.

16       And those are all within the time periods that were -- was

17  evidence at trial.  And I would move to enter Defendants'

18  Exhibit Number 22 at this time.

19            MR. O'REILLY:  Objection as to relevance, Your Honor.

20            THE COURT:  I want to hear more about it before I

21  conclude that it's probative of anything one way or the other.

22  So the objection is overruled.  Mr. Springer's Exhibit Number

23  22 is received.  It remains to be seen, obviously, what

24  significance it has, and to that extent, what relevance it has,

25  but it is received.

1          MR. SPRINGER:  The reason why I've entered Exhibit

2    Number 22 is because the government has suggested, although not

3    to a finding of the jury --

4          THE COURT:  Now you're lapsing into argument.

5          MR. SPRINGER:  Oh, I thought you were asking for

6    that.

7          THE COURT:  I'm hearing your testimony.  You may

8    resume your testimony.

9          MR. SPRINGER:  Okay.  It is my testimony that I did

10   not steal $250,000 from Mr. Patrick Turner, nor did I ever have

11   any intention to steal $250,000 from Mr. Turner.

12      And it is my testimony that the lien interest that he

13   acquired in the RV and now the trailer demonstrates the

14   security by which I planned the transaction, that at all times

15   I intended to protect, at that time, a short term -- ended up

16   being a much longer term, but a short-term interest in the RV

17   for Mr. Turner and his wife.

18      And the name in which the lien was placed and the address

19   in which was used was information that Mr. Turner gave me,

20   which does indicate at that time or that -- scratch that, I

21   just went to argument.

22      And Mr. Turner has now possession of the RV, possession of

23   the trailer, and is marketing and trying to sell the RV to

24   recover as much of the $250,000 as the economy currently will

25   allow him to recover.

1    At no time did I ever tell anybody that they should

2  violate the Internal Revenue laws, nor did I take action in

3  furtherance of telling anybody to violate the Internal Revenue

4  laws outside the scope of what has been resolved as the jury's

5  verdict, so I don't -- I'm not giving that testimony rehashing

6  jury trial, I'm specifically speaking about in relevant conduct

7  and in directing others to violate the Internal Revenue laws,

8  that -- that there's -- there's no act that I know of where

9  anyone has said I took steps with them outside the conduct of

10  the indictment to further act in violating any Internal Revenue

11  laws.

12    I was never, to my understanding and knowledge, ever

13  required to file any -- any type of report involving the Turner

14  money.

15    At the time the wire of Mr. Turner's money was sent to

16  Mr. Stilley's account, IOLTA account, there was an agreement to

17  allow me to use the money but there was no agreement paying me

18  the money, as reflected in Mr. Gollihare's report section by

19  section of the agreement.

20    Your Honor told me yesterday that you did not need to hear

21  the Paperwork Reduction Act argument again, however --

22         THE COURT:  I didn't foreclose you from arguing.  I

23  said then, and I'll repeat, that there's nothing you can say

24  today about the Paperwork Reduction Act that will improve your

25  position with respect to sentencing.

 1          MR. SPRINGER:  Thank you.  However, having said that,

 2    I -- at this point, I'm going to enter evidence on the years --

 3    the other years that are not covered within the indictment so

 4    that I can make a record for the Tenth Circuit that I am

 5    claiming the protection of the Paperwork Reduction Act on those

 6    years as they relate to penalties -- in tax loss calculations

 7    which results in a penalty that the Court eventually hands

 8    down.

 9        And Mr. Gollihare and the government both allege or state

10    that from 1990 through 1999, and then also 2006, 2007, and I'm

11    still a little lost on whether 2008 is part of this or not, but

12    I'm going to include it out of an abundance of caution, that

13    the Form 1040 for 1990, 1991, 1992, 1993, 1994, 1995, 1996,

14    1997, 1998, 1999, 2001, 2005 -- excuse me -- 2006, 2007, and

15    2008, each do not comply with the Paperwork Reduction Act.

16    They neither list any of the requirements at 5 CFR

17    1320.8(b)(3).  They are not on the face of the form, nor does

18    the form itself tell the public, which includes me, that I

19    am --

20          MR. O'REILLY:  Your Honor, objection as to relevance

21    to this line of testimony.

22          THE COURT:  I told Mr. Springer yesterday that if he

23    wants to talk about the Paperwork Reduction Act, that he will

24    be permitted to do so, and I said that again today.

25        Mr. Springer, you may not have understood me when I said

```
 1   there is nothing you can tell me about the Paperwork Reduction
 2   Act that will improve your position with respect to
 3   sentencing.  In fact -- well, I'll leave it at that.
 4        And bear in mind, you've already briefed it to a fare-
 5   thee-well.  You argued it at trial, well beyond the time limits
 6   that I initially imposed, so whatever record you need for the
 7   Tenth Circuit, I just can't imagine what record you might need
 8   that is not there.
 9             MR. SPRINGER:  The only thing -- and I'm not
10   testifying now, I'm representing myself over here in making
11   that response, the only thing I'm doing is I'm making certain,
12   since it's in each year claimed that for each year that I am
13   being asked to be penalized in addition to the penalties, that
14   I have made those claims, and I draw my reasoning from the
15   Chisholm decision in 2007 --
16             THE COURT:  Mr. Springer, now you're lapsing into
17   argument.  As a matter of fact, go ahead and take the stand.
18   Standing there at the lectern is just too tempting for you to
19   lapse into argument.  So you'll complete your testimony on the
20   witness stand, please.
21        (DEFENDANT SPRINGER COMPLIES.)
22             MR. SPRINGER:  In conclusion, the -- I claim the
23   protection of Title 44, Section 3512, 1995 -- for the years
24   after -- '95 and after, and 1980s code provision from 1990 to
25   1994, and my assertion of that defense is the form does not
```

LINDSEY SPRINGER - DIRECT EXAMINATION                    252

1    comply.  And I'll leave it at that.  Thank you, your Honor.

2        On Government's Exhibit Number 1160, there are two items

3    in addition to the items listed on government's original

4    Exhibit 675 at the jury trial.  And one is the very first

5    listing, a $5,000 check from Believers Broadcasting

6    Corporation.  And the last notation on the same Exhibit 1160 is

7    the $12,000 that I testified about at trial.

8        At no time did I ever say that in receipt of that $12,000

9    that I was estimating annually did I ever say that I did

10   anything for anybody or that anybody expected anything in

11   exchange for that $12,000.  And for the purpose of sentencing,

12   Your Honor, I'm going by the Court's instruction on "gift" for

13   that.

14       As far as the $5,000 entry for Ken Guisendorfer, I

15   absolutely think that that is in error, that that should say

16   Carl Guisendorfer on it, because Carl Guisendorfer had not had

17   his stroke at that time.  And that's Government's Exhibit

18   Number 3 they listed out there.

19           MR. O'REILLY:  Your Honor, objection.  This is not

20   testimony, it's argument.

21           THE COURT:  Say that again, please, sir,

22   Mr. O'Reilly.

23           MR. O'REILLY:  Apologize, Your Honor.  At this point,

24   this is argument, not testimony.

25           THE COURT:  Overruled.

1          MR. SPRINGER:  Thank you.

2      And for that $5,000 from Carl Guisendorfer, I know of

3  nothing that I was expected to do or asked to do or did do for

4  that $5,000, whatsoever.  In fact, that just came in the mail

5  to me one day.  And it just is the way it happened.

6      For Government's Exhibit 1161, there are three items on

7  that exhibit that were not originally listed in government's

8  original Exhibit 676 and -- excuse me, I'm sorry, there were

9  four items.  I'm sorry.

10      I take no issue, for tax loss purposes, of the first two

11  entries of James Lake on the top two.  For the purposes of

12  getting to appeal, I concede those two numbers.

13      However, the last two from Sam Palmer for $10,000 and

14  again the various for $12,000, and I believe -- I know what I

15  heard yesterday from Mr. Shern, which is that Mr. Palmer said

16  he neither expected me to do anything for him for that money

17  nor did I do anything for Mr. Palmer for that specific money.

18      Turning to Government's 1162, there are three items that

19  are not on government's original Number 677 that was at trial,

20  and that is the first entry from Sam Palmer for 10,000 and then

21  the Windhill Management Company Trust for 400, and then the

22  12,000 not -- under various, which is the same as it was for

23  the last two exhibits, although they -- the second entry was --

24  the second entry was not on the original Government's 677, for

25  the purposes of appeal sentencing, I concede to the Arkansas

1    IOLTA foundation of Ernest Swisher, $9,436.

2         So I take exception with the first entry of 10,000 of

3    which there is no evidence that I did anything or promised

4    anything or there was an expectation of anything in 2002 by

5    Mr. Sam Palmer or Midsummer Farms for $10,000.

6         And then the same holds true with Windhill Management

7    Company Trust for $400.  I know of nothing that they either

8    ever asked me to do or that I did for $400 or for any amount of

9    that $400.

10        And then, again, the 12,000, there's absolutely no

11   evidence, nor do I know of any evidence, for the $12,000 that I

12   estimated that people were expecting me to do anything in that

13   estimation.

14        I couldn't even begin to say what increments that thousand

15   dollars a month could come in, whether it be $50 or $25 or $75,

16   every once in a while, it would be 4 or 500, and in a very rare

17   occasion it could be up at 5,000, as Mr. Guisendorfer's check

18   once was.

19        For Government's Exhibit Number 1163, which is for the

20   gross income for 2003, there are four entries with an

21   accidental asterisks by the various listing, which I don't

22   believe was intended, although it is trial testimony.

23        I do concede to Guy Frances under the theory of the

24   government's case, because I did meet Guy Frances on an IFC

25   conference call.  So even though that wasn't a part of the

1   government's theory for tax loss calculations under the jury's

2   verdict, I concede that amount.

3        However, on Larry Simmons, which is CR Foundation, I do

4   not concede the $7,500 that was not part of Count 3.  And the

5   difference between Guy Frances and Larry Simmons is that I did

6   convince Guy Frances in conversation to file his tax returns,

7   and under the government's theory, that means I gave him advice

8   and that's what makes that, under the government's theory, a

9   taxable event.

10       With Larry Simmons, at this time, in August of 2003, I was

11  having no conversations with Mr. Simmons, other than he would

12  be on a conference call, but there was no him talking to me and

13  asking me questions about what he should do.

14       In fact, the only interest I ever remember Mr. Simmons

15  having in anything I was doing whatsoever was related to the

16  IFC case out in Phoenix, Arizona, and I remember him saying

17  that that money was for my ministry or my mission, but he never

18  said -- or there was never any conversation with me telling him

19  what you need to do and him doing it or him contacting me back

20  at that time.

21       And that's what I can remember and that's what I know.

22  Even though -- and then, again, the various for $12,000 is the

23  same testimony from the other.

24       For Government's Exhibit 1164, there is a difference

25  between original Number 679 and 1164, and out of those

1  differences, I concede to Guy Frances' $4,000, and I concede to

2  Charles Looney's $10,500, but there's absolutely no evidence

3  that I did anything or was expected to do anything for Windhill

4  Management Company Trust for $500, which was Exhibit Number 43,

5  nor at the time of May 28, 2004, with Larry Simmons was I

6  expected to do anything in receipt of the $10,000, which is

7  Government's Exhibit Number 39.

8       So out of 130,000 on that 1164, besides the 12,000 on the

9  bottom, the 10,000 to Simmons -- or from Simmons and the 500

10 from Windhill Management Company Trust, everything else for the

11 purpose of the tax loss for sentencing is conceded at this

12 point.

13      So that would remove -- off of the 130,050, that would

14 remove $22,500 off of that number, which would leave that at

15 107,550.

16      And on Government's Exhibit 1165, I concede the Charles

17 Looney check under the same theory that I was prosecuted

18 under.  However, I do not concede --

19           THE COURT:  I'm sorry.  I didn't stay up with you.

20           THE WITNESS:  I'm sorry, 1165, Your Honor.

21           THE COURT:  Right.

22           THE WITNESS:  It's the second entry.  It says --

23 which was not on original Government 680, the Charles --

24 original Government's 680, the Charles Looney check for 13,000

25 was not on that chart and was not part of the 2005 theory they

1    presented, but I do concede to that amount of money for the

2    purposes of sentencing based upon what I know I did do, which

3    was something in relation to Charles Looney's lawyer under the

4    theory that I was prosecuted under.

5          But the AC&R Group, which is Exhibit Number 1005, for

6    $6,000, I'm at a loss as to even who that is.  And whether that

7    hurts me or helps me in that regard, I know of nothing that I

8    ever did for AC&R Group that I can recollect or remember, nor

9    do I remember promising to do anything or exchanging anything

10   for that $6,000 on August 3, 2005.

11         Now, the original 680 had 252,000, and Government's

12   Exhibit 1165 has 296,500, and I just reduced that number by the

13   6,000.  And for the purposes of getting to sentence, 290,500 is

14   conceded on that.

15         Government's Exhibit Number 1166, for the purpose of

16   uncharged conduct only, I concede to the first entry of Patrick

17   Turner under a theory that I did convince Mr. Turner to file

18   tax returns and only for that reason, and that -- I'm not

19   saying that in conceding for the point that the 250,000 of the

20   transactions from Turner was gross income, I'm specifically

21   referring only to this $1,000 check and based upon the

22   government's theory.  I did concede on 1165 to the 192,000 and

23   the 58,000 from Mr. Turner and I'm not conceding that that was

24   part of the jury's verdict.

25               THE COURT:  Excuse me.

LINDSEY SPRINGER - DIRECT EXAMINATION                    258

1          THE WITNESS:  That's on 1165.  I'm sorry about that,

2    Your Honor.  I needed to be clear on that.

3          THE COURT:  Okay.  Now --

4          THE WITNESS:  On Patrick Turner, on Exhibit 1165, the

5    government has listed the -- basically the $250,000 transaction

6    as gross income to me, and for the purposes of arriving at a

7    tax loss calculation, I'm only willing to concede that 250,000

8    for the purposes of getting to a sentence, but I'm not

9    conceding that that was gross income to me for purposes of the

10   jury's verdict, nor was it ever gross income.

11        And under intention -- I understand the jury's verdict can

12   be construed, as Mr. Shern testified, to include the 250,000,

13   although I think it could be construed otherwise.  And on

14   appeal I'm going to test that vehemently.

15        I do, however, take exception with double-dipping on that

16   250,000.  I don't think it should be -- both put on as gross

17   income for Lindsey for 2005 and then also income that

18   Mr. Turner could have paid his taxes with on top of that.  So

19   I'm making myself clear there, I do not concede the 250,000

20   gross income per the jury's verdict.

21          MR. O'REILLY:  Objection.  Repeatedly answered, if

22   not asked.

23          THE COURT:  Overruled.

24          MR. SPRINGER:  I'm just making the record clear, for

25   purposes of the jury verdict, I do not agree they found the

1  $250,000 was gross income to me, as Mr. Shern testified.

2      But for the purpose of sentencing, I do agree that the

3  250,000 could be used one time, either Mr. Turner could have

4  paid his taxes or attributing it to me, but I do not concede to

5  both for the purpose of sentencing only.

6      And now I'm back to 1166, and I'm sorry for that, that I

7  missed that spot.

8          THE COURT:  Okay.  I'm making some notes,

9  Mr. Springer, so if you would, just pause for just a moment.

10          MR. SPRINGER:  Sure.

11          THE COURT:  Thank you.  You may proceed.

12          MR. SPRINGER:  Back on Government's Exhibit Number

13  1166.  I concede I did something on the Patrick Turner for

14  $1,000 based upon the government's theory and the Court's

15  definition of "gift," and that holds true with everything I've

16  said here so far and everything I'm getting ready to say.

17      On the second entry, Herbert and Charlene Mott, $10,000, I

18  concede that I did do something for Denny Patridge under the

19  government's theory, so I concede that 10,000 for purposes of

20  appeal and sentencing.

21      I concede the 5,000 on the third entry from Denny

22  Patridge.  I concede the fourth entry from Beach Fire

23  Corporation, Lawrence Logsdon, based upon the government's

24  theory and for the purposes of sentencing and appeal.

25      I do not concede Believers Broadcasting Corporation's

 1  20,000.  I know of nothing that I did for Ken Guisendorfer, and

 2  at this time, I'm certain Carl Guisendorfer had his stroke.

 3      It is true that Carl Guisendorfer, in 2004, he did run

 4  into difficulties with the Sales Tax Commission of the State of

 5  Illinois because he had a hotel where he rented rooms for

 6  whatever anybody wanted to give, and as a result of that, he

 7  did not charge sales tax, and, therefore, the State of Illinois

 8  was taking him to court, but he had a stroke and I am not aware

 9  of any of the outcome specifically in that regard.  And that

10  time period, which was right before he had his stroke, I had

11  not received any money from Carl Guisendorfer and there are

12  none listed during that time period.

13      Le Roy Peaslee, I know nothing I did for Le Roy Peaslee.

14  I don't even remember that name.  For $250; I do not concede

15  that.

16      I concede the seventh entry, Denny Patridge, of 5,000, for

17  purposes of sentencing and appeal only.

18      I do not concede Hamlet Bennett, and I'm sure Mr. Shern

19  just misspoke on how Hamlet Bennett was introduced to Oscar

20  Stilley, but it was not through Lindsey Springer.  What I

21  learned later was that Hamlet Bennett was represented in a

22  criminal indicted case by Robert Bernhoft out of Chicago,

23  Illinois -- or excuse me, Wisconsin.  He just practices in

24  Chicago, which is where he was -- had an office, I think.

25      And what happened was Oscar Stilley was representing a guy

 1   named Bob Lawrence who was indicted in 2006, and a couple of

 2   days before trial for Bob Lawrence, the United States filed a

 3   motion to withdraw the indictment with prejudice, and the only

 4   defense that Mr. Lawrence was raising was the Paperwork

 5   Reduction Act as a defense.

 6        And a day after the dismissal, Mr. Stilley told me that he

 7   got a phone call from the U.S. Assistant Attorney, who offered

 8   to pay all of Mr. Stilley's fees in relation to the prosecution

 9   of Mr. Lawrence.  And that news traveled fast.

10        And what Mr. Bennett told me was, when he heard about

11   that, he immediately jumped ship from Mr. Bernhoft and hired

12   Mr. Stilley.

13        At the time that I received that $25,000, I was not told I

14   was expected to do anything, say anything, write anything

15   whatsoever.  And at no time have I ever had a conversation with

16   Mr. Bennett where he asked me to do something.

17        I heard his testimony at trial.  I can understand the

18   confusion about that money.  If I had not received money at

19   that size before, I probably would have questioned it, but as

20   we soon see, Mr. Bennett sends me some more money independent

21   of Mr. Stilley.

22        And, again, there's nothing that I know of that

23   Mr. Bennett asked me to do.  I do know, from talking to

24   Mr. Bennett, that he did have expectations of Oscar Stilley,

25   but Oscar Stilley only was representing him for a short period

 1   of time, because he couldn't get in as his lawyer in Hawaii,

 2   and so it was Mr. Stilley who referred Mr. Bennett to Alan

 3   Richey and not Lindsey Springer.

 4       And so I gave that testimony for clarification on what

 5   Mr. Shern had said when he thought I was the one that

 6   introduced him to Mr. Stilley; that was not true.  But I don't

 7   believe Mr. Shern did that intentionally.

 8            THE COURT:  Now, you're saying you're thinking that

 9   Mr. Shern was mistaken when he said that he thought you

10   introduced --

11            MR. SPRINGER:  Yes, Mr. Bennett to Mr. Stilley.

12            THE COURT:  Well, Mr. Bennett himself testified that

13   -- well, actually, what Mr. Bennett testified to was that

14   Stilley put him in touch with you, is that --

15            MR. SPRINGER:  The first thing I got was a check for

16   $25,000 and I had never even spoken to Mr. Bennett whatsoever.

17   And then, from there, Mr. Bennett did call me and asked me

18   about the Lawrence case and asked me about what I was doing

19   with PenaltyProtestor and Paperwork Reduction Act, and I

20   expressed to him what I was doing -- no one really understood

21   why the government dismissed the case with prejudice.

22            THE COURT:  Well --

23            MR. SPRINGER:  And so that's all I ever had a

24   conversation with him about.

25            THE COURT:  My recollection, aided certainly by my

1  notes, is that Mr. Bennett testified that at least initially,

2  if not throughout, he only spoke with you on the telephone.

3  Mr. Stilley is the one who put Mr. Bennett in touch with you.

4            MR. SPRINGER:  That's true.

5            THE COURT:  And then he proceeded to testify about

6  his retainer, about the $25,000 purported donation, evidenced

7  by Plaintiff's Exhibit 135, and then he also testified about

8  some of the IOLTA money going to Mr. Richey, and then

9  ultimately, at least in part, back to him; is that consistent

10  with your recollection?

11           MR. SPRINGER:  Yes, it is, Your Honor.

12           THE COURT:  Okay.  Proceed.

13           MR. SPRINGER:  The same holds true about the next

14  entry on Hamlet Bennett for 45,000 that I just testified to

15  about the first one.

16       The $500 from Sam Palmer I do not concede to.

17       Todd Guthrie's I do concede to for $500.

18       I do concede the Kent Hovind, Kent Hovind and Region (sic)

19  Bank Kent Hovind, $10,000 transaction in 2006.

20       I do not concede the $5,000 from Hamlet Bennett, which is

21  Exhibit Number 57.

22       I concede the Todd Guthrie.

23       I concede the Turner at 900.

24       I do concede the Dale and Cheryl Phillips, 7,500, and I do

25  not concede this 12,000 under various.

 1        So there were one, two, three, four, five items there that
 2   I do not concede to for purposes of sentencing if we get to
 3   appeal.
 4        And then 1167, Government's Exhibit 1167, which is 2007.
 5        I do concede the $100,000 on Ken Guisendorfer for 2007.
 6        I concede the $400.
 7        I do not concede the $20,000 from Ken Guisendorfer, which
 8   is Item Number 3 and 4.
 9        I concede all three Turners, but I do not concede the
10   various for 12,000.
11        So I did not concede to two Guisendorfers and one various
12   on that page.
13        Your Honor, may I have a moment to go to my table to get
14   something that I was going to testify about?
15             THE COURT:  Surely.
16             MR. SPRINGER:  I did not begin Bondage Breakers
17   Ministries and its mission until 1992.
18        I was not an ardent tax protestor in the late 1980s, nor
19   had I at any time in the late 1980s implemented a scheme
20   designed to conceal income and evade the payment of personal
21   federal income taxes.
22        As I testified at trial, had I been aware of the
23   definition of "gift" that the Court gave the jury, had I been
24   able to read that in the Tax Code, I would have structured my
25   affairs through Bondage Breakers Ministries completely

1    different than I did.

2        It is true that my mission is to get rid of the Internal

3    Revenue Service.  I believe getting rid of district directors

4    accomplished that on its own.  However, by 2005, I had stopped

5    with that mission, had decided that I could do -- all I could

6    do, I had done.

7        I did keep records.  I did not keep ledgers.  And the

8    evidence in this case showed how many records I kept.

9        And my definition of "record" is a receipt or evidence of

10   a transaction.

11       When I cashed checks, I used one place.  I had the option

12   of using 50 different places.  I had no option of opening up a

13   bank account under my social security number, because, at that

14   time, the IRS, if they had a lien against you, then the banks

15   were not interested in opening up an account with you.  In

16   fact, I had had two accounts closed because the banks were made

17   aware that the IRS had placed a lien notice against me.

18       At all times, I knew Mr. Delozier kept accurate records of

19   every transaction that I participated in, every one of them.

20   Even when I knew he was being audited by the IRS in 1997, I

21   continued to use Mr. Delozier all the way up until he closed

22   his business.

23       At no time -- and he told me they were summoning records

24   about me, and for 10 more years or 11 more years I continued to

25   use the place the government knew I did my banking.

1          THE COURT:  Hold on for just a minute.  Proceed.

2          MR. SPRINGER:  At no time was the phrase "donation"

3    or "gift" designed to mislead the IRS in any way.  And in most

4    instances, a large number of the transactions did not have that

5    notation on them, and I always had the option of handwriting it

6    in in the memo and I chose not to do it, because it's not

7    something that by putting it on the check changed anything

8    about the transaction.

9          At the time, in 1995 and 1996, when I began to learn the

10   difference between "donation" and "gift," I had been involved

11   in a lawsuit with the United States and several plaintiffs, and

12   the United States had appointed Robert D. Metcalf to speak to

13   me on behalf of the government.  Judge Holmes was the judge.

14         And I developed a relationship of being able to call

15   Mr. Metcalf on the phone and ask him questions not only related

16   to me, but in other people's lives, to try to help get them and

17   their situation straightened out.  I took his advice seriously

18   and I passed it along every time.

19         Truth be known, Mr. Metcalf probably helped save the

20   government literally tens of millions of dollars in taxes by

21   what he told me to tell people to do.  Whether they were late

22   or not did not matter, it was how could we get this person back

23   to a place where -- that they could go on with their life.

24         And Mr. Shern testified about why sometimes I would say

25   one thing to one person and sometimes something to somebody

1  else, it was because I wasn't to form -- and I guarded against

2  forming their beliefs.  Whether it be what I believed, if they

3  asked me, I would tell them.  But I was not a promoter of my

4  beliefs to be their beliefs.

5      And I would always tell people that if you had gross

6  income, as Mr. Stilley stated, "adjusted gross income" is the

7  phrase that appears on the 1040 form, and Judge Pannell was the

8  judge in the case in Atlanta, who pointed out to Mr. Miller

9  that it was not gross income, but adjusted gross income, which

10 a person will determine whether they're required to file.  I

11 believe that with all my heart that that's an accurate

12 statement by Judge Pannell.

13     I was never ever assessed by the IRS or the United States

14 for tax years 1990, 1991, 1992, 1993, 1994 or 1995.  In

15 discovery, I sought to get it, and the answers that I received

16 from Mr. Metcalf and Mr. Strong is they are still looking for

17 it.

18     To me, an assessment is what the law says an assessment

19 is, not what I think it is.  An assessment is a summary record

20 recorded in the Office of the Secretary under 26 CFR 301.6301,

21 '02, and '03.  It's most commonly referred to as a RAC 006, as

22 mentioned in the Tenth Circuit Court of Appeals cases on the

23 subject.

24     In order for a lien to arise as a matter of law, there is

25 supposed to be an assessment recorded in the Office of the

```
 1  Secretary.

 2          MR. O'REILLY:  Your Honor, objection.  This appears

 3  to be argument and I'm not clear how it's relevant at this

 4  point.

 5          THE COURT:  Sustained on relevance.

 6          MR. SPRINGER:  Okay.  I never received any notice and

 7  demand for payment for 1990 through 1995 at my last known

 8  address, which was 5147 South Harvard, Number 116, Tulsa,

 9  Oklahoma 74135.

10      Defendants' Exhibit Number 19, page 1, shows the address

11  that the IRS used to mail me a notice of deficiency for 1990

12  through 1995, but that is not the address they used after

13  that.  That is why I received a release of lien certified by

14  the Secretary of Treasury when I asked for it.

15      I do concede that the word "volunteer" early on in my

16  ministry in 1992 and '93 was a word that I did use when I spoke

17  publicly, but I derived that word from the Commissioner's words

18  in the instruction booklet for '92 and '3.  It wasn't my word.

19  I stopped using that word when the Commissioner stopped using

20  that word in 1994.  The word still appears at 26 CFR 601.107,

21  but because it's not publicly stated, I don't use that phrase.

22          THE COURT:  Let me interrupt there with a question.

23  You've testified that you used the word "volunteer" because you

24  picked it up -- I don't know if it's from that cover letter

25  that comes from the 1040 or what, back in '92 or '93, but in
```

```
 1   any event, you picked it up because it was the Commissioner's
 2   word.
 3            MR. SPRINGER:  Right.
 4            THE COURT:  On that basis, did you suggest to other
 5   people that compliance with the tax laws was voluntary?
 6            MR. SPRINGER:  No, sir, I did not.  But what we did
 7   do, a large group of us -- and I, in the initial phase, was not
 8   the leader of this group, but there was 71 of us and we took
 9   that issue into federal court to former District Court Judge
10   Michael Burrage.  We brought it to his attention what it said
11   and many of us wanted to know what that meant.
12       And once we got our -- the first time we asked, we had to
13   go back and do something administrative, and so he dismissed
14   without prejudice, and so then we did what he told us we didn't
15   do.  We went back and asked again, he gave us a ruling, and we
16   all abided by that ruling.
17            THE COURT:  When you say back in '92 and '93 you used
18   the word "volunteer," then tell me how you used it.
19            MR. SPRINGER:  In a complaint in federal court on
20   April 8, 1994, 71 of us signed a complaint using the word
21   "voluntary" from the Commissioner's words and asking the Court
22   was that correct.
23            THE COURT:  Proceed.
24            MR. SPRINGER:  I have not placed any assets in
25   anybody else's name but my own.  There is a house that I lived
```

1   in for 14 years, but I never placed that from my name into a

2   trust.

3        That property was purchased by a trust from the beginning

4   with money that was given specifically for that purpose.  There

5   were two women who gave us the money to put down for that piece

6   of property, and the objective was -- is that no matter what

7   happened to me, my family would always have a place to live.

8        The money that I received that was the subject of this

9   trial, whether it be purchasing cars or the RV, every one of

10  those vehicles was put in my name.  The government could have

11  seized that property at any time.  There was nothing stopping

12  it.

13       Mr. Rice filled out a complete report on the subject

14  matter and said that there was over $250,000 worth of assets

15  that he could seize at any time that he wanted to.  Why he

16  didn't has nothing to do with me.  He had the green light from

17  the word go.

18       I do understand now under the Court's definition of "gift"

19  why the government treats the income that I received as gross

20  income.  I don't really think -- well, I know I didn't fully

21  understand it, even at the time that I met with Mr. Shern and

22  Mr. O'Reilly on January 15, 2009.  And it didn't take the trial

23  to change my opinion, it took the Court's instruction that

24  changed my opinion.  And from 2006 forward, how I've answered

25  the questions as to tax loss on those charts is based upon the

1  Court's definition.

2      Mr. Hedberg was indicted in, I believe, 1997.  He had

3  absolutely no money and did not know what to do.  And he was

4  truly the first case that I ever witnessed from a criminal

5  context.

6      I was sitting in the pews and Mr. Hedberg was shuffling

7  papers around and he didn't know what to do and he turned to

8  me -- and I'm just watching.  He turned to me and he asked the

9  judge, could he come up and help me shuffle papers.  And the

10  judge said yes.  And that was my first experience with sitting

11  at a counsel's table, and I shuffled papers for two days for

12  Mr. Hedberg.

13      At no time during that trial did I ever ask to be paid any

14  money or was there any suggestion I was going to be paid money

15  at some future event.

16      I did not know when Mr. Hedberg got out of jail and I did

17  not know when his father died.  But when he called me and told

18  me that he and his father were not -- they did not get along

19  and he had this 111,000 check and he asked me if I would use it

20  for purposes that I was using money for already, why would I

21  say, no, I won't?  I had to say, yes, I would.  I would be a

22  fool not to receive that money in the very rare occurrences

23  that it comes in like that.

24      Two or three years ago, which this is 1997 when he's

25  charged; 1998 when he goes to trial; and late 1999 when his dad

1   dies, he gets out of jail and gives me this check for

2   $111,702.  It wasn't until six or seven years later that

3   Mr. Hedberg did call me and start asking me questions, because

4   the State of Illinois was after him for not filing tax

5   returns.  And he did not like the answer that I gave him, which

6   was he needs to go file his tax returns.  But at no time did I

7   tell him to go file tax returns as an exchange for the $111,000

8   check that he gave.

9        I did find out for the first time in March of 2000, when I

10  introduced Oscar Stilley to Eddy Patterson, I did find out that

11  day that Oscar Stilley did not file tax returns.  But as

12  Mr. Gollihare reports, how Mr. Stilley and I got where we were

13  was two different paths.

14       We were -- he came from the Irwin Schiff position, which I

15  totally rejected, and I came from the position where I was only

16  going to accept money as long as I could accept it under the

17  form of a gift.

18       Mr. Patterson did ask both of us if we filed tax returns.

19  I responded that the way I get money I'm not required to

20  because I treat it as a gift.  I never told Mr. Patterson that

21  I received gross income and that I don't file tax returns.

22       I don't remember everything Mr. Stilley said in response

23  to Mr. Patterson's question, but I do remember Mr. Patterson

24  making the statement later on during his trial where he said,

25  Well, if Oscar Stilley doesn't have to file, then why do I?

1   And that is the only conversation I ever remember about filing

2   tax returns with Mr. Patterson.

3       I am the person who convinced him to file his tax

4   returns.  I had to get him past abortion first, because that's

5   why he didn't want to file his federal tax return.  And that's

6   not an easy task when I, myself, am against abortion.

7       And the reason why he filed an extension request was

8   because I asked him to at least file something until he figures

9   out what he's going to do so he doesn't have any more problems

10  with filing.

11      I had nothing to do with him actually filing an extension

12  request.  I believe his CPA did that.  And there was a

13  coordinated effort between myself and the CPA to convince him

14  to file his returns.

15      The reason why they weren't filed until 2003 is because

16  unfortunately or fortunately, the person that I went and found

17  to -- which I referred many people to, was Cynthia Hess from

18  TU.  She had health problems and I didn't know that.  And so

19  she would work for a week and then she would be bedridden for a

20  month.  And she had some illness.  I don't know what it was.

21      But Barbara Hodsden, who also was referred by me to

22  Cynthia Hess, also testified that that was the one problem she

23  had with Cynthia Hess was getting her tax returns completed

24  faster because of her health problems.

25      So Mr. Patterson not filing his returns until 2003 for the

1  year 2000, which should have been filed at least by October of

2  2001, had nothing to do with any act or conduct of Lindsey

3  Springer.  In fact, the opposite is true.  I was pushing him to

4  actually do it.  If you wanted to say I provided any service to

5  Mr. Patterson in 2000 and 2001 and 2002, that's it.

6      I was not privy to any of the representations of Oscar

7  Stilley.  With Mr. Patterson, they were all sealed grand jury

8  stuff going on.  I was not given documents.  I was not told

9  about things.  In fact, I didn't know Mr. Patterson was getting

10 indicted until after he got indicted.

11     The statement that Mr. Patterson hired me in 2003 when he

12 was indicted is erroneous.  And that I -- the statement that I

13 introduced him to Mr. Stilley in 2003 is also erroneous for the

14 criminal case.

15     Mr. Stilley had been billing Mr. Patterson for three years

16 prior to that indictment.  Mr. Patterson had three years of

17 knowing whether he wanted Oscar Stilley to represent him in his

18 criminal matters.  Mr. Patterson is the one who hired

19 Mr. Stilley to represent him in his criminal case, not Lindsey

20 Springer.

21     Mr. Patterson never hired me when he was indicted.  And

22 the records show and the evidence shows that it wasn't until

23 late July, when Mr. Patterson had a transaction of $112,000 in

24 money that he had received from cashing in some royalties, I

25 think the testimony showed, I did receive $15,000 from that

LINDSEY SPRINGER - DIRECT EXAMINATION                    275

 1   money initially.  But I was never told it was because I was

 2   being hired.

 3       It is true in October of 2000 -- September and October of

 4   2003, when Judge Eagan was assigned when Judge Cook stepped

 5   down, that I did take a very active role in Mr. Patterson and

 6   Mrs. Patterson's case, and that's because I felt sorry for

 7   them.

 8       At the time I did that, I had no idea that their errors

 9   and omissions insurance policy was going to be bought for

10   500-and-some-thousand dollars a month later.  I had no clue.

11       And this is my trial testimony, but Dick Clark and I

12   together were out trying to raise money to pay for the

13   Pattersons' lawyers because they didn't have any.

14       When you go through a three-year investigation and the

15   bank shuts you down on everything by the IRS, you have no place

16   to turn to get money, which is usually customarily what I ran

17   into in every case that I either watched, witnessed, or in the

18   government's theory, provided a service in.

19       I did provide service to James Lake under the government's

20   theory, but James Lake is a liar.  Mr. Shern testified

21   yesterday that Mr. Lake did go to trial, did hang a jury, and

22   did go back a few days later and plead guilty.  Mr. Lake

23   testified that that did not happen at his trial.

24           THE COURT:  Now, say that again that you're

25   attributing to Mr. Lake's testimony.

1          MR. SPRINGER:  Mr. Lake testified that he pled guilty

2   to charges caused because of Oscar Stilley's representations

3   and my representations to the jury, and Mr. Lake actually fired

4   Oscar Stilley -- since he, in my understanding, never had hired

5   me, there's no evidence of him firing me -- but we sat in the

6   back of the room and watched the first trial and watched

7   Mr. Lake lie through his teeth over and over again about

8   evidence.

9      I have a videotape that I prepared to play at the jury

10  trial of Mr. Lake of which I decided not to, which is -- has me

11  on it cross-examining Mr. Lake on why he doesn't file tax

12  returns, and I was trying to show --

13         THE COURT:  Let me interrupt there for the sake of

14  clarification.

15         MR. SPRINGER:  Sure.

16         THE COURT:  When you characterize Mr. Lake as a liar,

17  then, and suggest that he gave false testimony under oath,

18  you're referring to his trial, then, as opposed --

19         THE WITNESS:  No, no, no.  He sat in this chair and

20  said he pled guilty -- he looked at that jury square in the eye

21  and said he pled guilty solely because of the

22  misrepresentations of Oscar Stilley and Lindsey Springer and

23  that is not what happened.  Oscar and I were sitting in the

24  elevator, the Department of Justice lawyer in the case was with

25  us and told us that he was coming back on Monday after he hung

1    the jury and he was going to charge him with obstruction of

2    justice for lying in that jury trial.

3            THE COURT:  On the subject of Mr. Lake, then, let me

4    inquire as to one matter that he did testify to last fall in

5    this case.  He said that, among -- obviously, among other

6    things, that you prepared documents on his behalf and

7    Mr. Stilley filed them and that he paid about $38,000 to you

8    and $65 or $70,000 to Mr. Stilley.  Do you take issue with

9    Mr. Lake's testimony on those points?

10           MR. SPRINGER:  Yes, but only to a certain degree.  I

11   did prepare three documents in their very basic stage and I did

12   forward those to Mr. Stilley.  I do believe one of them with

13   Mr. Stilley's amendments did get filed with the court.  The

14   other two, I don't know what happened.  But after that, there

15   was nothing that got filed that was accepted or received by the

16   court.  My understanding was Mr. Stilley was having a very

17   difficult time getting in that case.

18           THE COURT:  Very well.  You may proceed.

19           MR. SPRINGER:  And I would add one thing to that.

20   When I first met Mr. Lake, he sent me a boxful of documents

21   that he had filed in his criminal case, and I forward those on

22   to Oscar Stilley, and they were not drafted by me.

23       I did sit at counsel's table in the Swisher trial and I

24   did, during breaks, as I customarily had done in every case I

25   had been in, gave my opinion about anything that I saw to

1  whoever would listen.

2      I did help in the initial phases with Art Hawkins.

3  Mr. Hawkins did lie about two things:  One, that I represented

4  him at his sentencing hearing, which was clearly and

5  erroneously stated, as his wife clarified; and, two, that I

6  told him I was a lawyer.

7      And there are two memos that Mr. Shern -- or the

8  government turned over to us interviewing Mr. Hawkins.  In the

9  first one, he admitted that he thought I was in a ministry on a

10 mission and the second one he said I told him I was a lawyer.

11     The influence of the government in that situation, it begs

12 the question of what motivated him to do that.  But I've never

13 told anybody I was an attorney, licensed or otherwise.  In

14 fact, I always get scolded because I tell people I'm twelfth-

15 grade educated.  Why do you tell people that, they would say.

16 And I would say that's because that's the truth.

17         THE COURT:  Mr. Hawkins testified that in this case

18 that he received a typewritten memorandum that was in evidence

19 as Government's Exhibit 204 and that this was, in his words, a

20 joint letter from Oscar Stilley and Lindsey Springer.  Do you

21 recall that letter or that memorandum?

22         MR. SPRINGER:  Yes, I do.  Yes, I do.

23         THE COURT:  And was his -- did he accurately describe

24 it as a joint letter from Oscar Stilley and Lindsey Springer?

25         MR. SPRINGER:  No.  But, Your Honor, Oscar did that

LINDSEY SPRINGER - DIRECT EXAMINATION                    279

1    because he didn't know the Hawkins.  I'm the one that

2    introduced him to the Hawkins.  And that's why he put it on

3    there.

4        For a short period of time, when Oscar was representing

5    Mr. Hawkins, Mr. Stilley would call me and ask me questions.

6    In fact, it became so routine, if you look on his billing

7    statements, he constantly was calling me.  And Mr. Stilley just

8    recognized that I will answer any question asked upon me.  I

9    took his calls just like I took anybody else's.

10            THE COURT:  Were you aware of the contents of that

11   letter at or at any time near the time it was given to

12   Mr. Hawkins?

13            MR. SPRINGER:  No.  But I was made aware of it

14   several months later, and at that point, there was nothing that

15   I could say or do about it.  And I really didn't even consider

16   it to be an issue because of where I was and what I thought at

17   that time, but I had nothing to do with my name being on that

18   letter -- that document.

19            THE COURT:  Thank you.  Proceed.

20        While we have a pause, I'll say, Mr. Stilley, if you elect

21   to testify during this sentencing proceeding, I will -- I would

22   be curious as to whether you concur with Mr. Springer's denial

23   of contemporaneous knowledge of this letter.

24        You may proceed.

25            MR. SPRINGER:  There are times when I would receive

1  e-mails from Oscar asking me to read something, and nine out of

2  ten times I would read it and then I would either e-mail him

3  back and say what I thought or I would call him on the phone.

4      And what I didn't know was every time I did that he was

5  billing his client.  I understand why he did because that's

6  what lawyers do, but had I known that, I would have acted quite

7  differently on the subject.

8      I thought he was taking advantage of the resource of

9  whatever he thought was in my head or my ability or my thoughts

10  and not that that was translating to he was on the clock for

11  his clients.

12      When I learned that, obviously, as you can see in the

13  notation in his records, things changed, because the numbers of

14  Oscar-talked-to-Lindsey went from almost four or five or ten

15  times a day, possibly, to once a week.

16      I do agree I possess a special skill.  I don't know how I

17  got it, I don't know why I got it, but I can read through that

18  tax code and those regulations and remember them like there's

19  nobody's business.  And it happened after I read the Bible.

20  It's just something that happened.  I can't explain it.  It's

21  definitely not in my schooling or my chart, and the poison is,

22  once I read it, I can't forget it.

23      At no time did I ever use that special skill, though, to

24  cause anyone or persuade anyone to violate the Internal Revenue

25  laws.  Nine times out of ten, I found them -- they were just

1  confused with no one to talk to about it.

2      When I testified at trial, I did not commit perjury on the

3  witness stand.  The word "income" and the word "gross income"

4  and the words "adjusted gross income" all have specific meaning

5  to me.

6      Most of the public uses the word "income" and "gross

7  income" and "taxable income" and "adjustable income" as all

8  meaning the same thing, but each one of them means something

9  totally different in the law.

10     And so when I read the term "gift" in 1996 or '7 for the

11  first time, before that, I was using the phrase "donation

12  only," I went to Section 102, after being made aware of it by

13  Robert D. Metcalf, and it said that all gifts bequeathed in

14  inheritance are not included within the calculation of gross

15  income.

16     So although I considered gifts and donations to be income,

17  I did not consider them to be gross income under my definition,

18  which was what I was left to, because Congress didn't define it

19  and the Secretary of the Treasury has not defined it by

20  regulation.  And that is how I found the Duberstein decision to

21  help guide me.

22     So when I told the jury that I did not treat the money

23  people gave me as gross income, that was not the same as what

24  is being said I said in written form, which is I said I had no

25  income, all I received was gifts and donations, because all

1   gifts and donations are income, they're just excluded from the

2   calculation of gross income, under my understanding prior to

3   this trial.

4       During the trial, Mr. Patterson testified about three

5   checks that he gave me for $10,000 apiece and that he said I'm

6   the one that told him to put "donation" on the check.  And, in

7   fact, in the conversation I asked him to make certain that any

8   money he gave me was a donation.  But what I did not do is ask

9   him to write the letter that accompanied the check.  He did

10  that on his own.  And that letter specifically stated, "Please

11  accept this donation for your suffering of" -- whatever.  I

12  forget the exact words.  But I had nothing to do with

13  Mr. Patterson's insistence on the letter of donation.

14      Every time anybody ever asked me any questions, whether it

15  be Donna Meadors, whether it be Brian Shern, even

16  Mr. O'Reilly, I answered their questions to the best of my

17  ability at that time.

18      I never denied any of the transactions of money that was

19  given to me.  Never.  In fact, just like the $12,000 and the

20  word "various" on the government's charts, it's me -- what I'm

21  saying is what's being used.

22      I always thought that after I learned in September '05 the

23  government's position on the criminal side, at least what I saw

24  them -- Mr. Shern saying to me when he was interviewing me, I

25  always thought that that was a legal point of contention

1   whether or not something was or wasn't a gift.  I did not know

2   it wasn't a gift until proven otherwise.

3       And I also always thought after that day, as I did

4   research, because it was so compelling and shocking of what I

5   went through that day, that there was no quid pro quo, there

6   was no this-for-that.  Whether they had given me money or not,

7   I would always help anybody if they called and asked me with

8   anything that I could help them with.  Sometimes they just

9   didn't like what I had to say.

10      I did not ever enter into an agreement with Oscar Stilley

11  in 2000 to do anything, except I agreed to help Dr. Roberts in

12  any questions that Oscar Stilley had.

13      And although Oscar is one of the attorneys, in a week's

14  time I could get a call from ten different lawyers in the

15  country.  And they weren't all the same.  I still get calls to

16  this day, I just have to reject them because of my bond

17  conditions.

18      I'll be quite honest with you, the Sentencing Guidelines,

19  especially the difference between the report that Mr. Gollihare

20  wrote and the government's objections, have confused me to the

21  point of just complete chaos.

22      If I'm disputing what the government has to say, then I

23  still have to deal with what Mr. Gollihare had to say because

24  they don't agree.

25      And although I'm not dissatisfied that they don't agree,

1    I'm glad that Mr. Gollihare is not a rubber stamp for the

2    Department of Justice.  I think that's a great thing that the

3    country needs to know.

4         But whether something is inside or outside relevant

5    conduct, Your Honor, especially on the conspiracy charge, it

6    just -- I've read Mr. Gollihare's report, I read

7    Mr. O'Reilly's objections to his report, and I guess I walked

8    out thinking I could do better.

9         I never abused a position of public or private trust.  To

10   the degree that we have any definition for those phrases, I

11   would never intentionally do that.  Understanding what the

12   guidelines explain that to be, I don't fit within those

13   guidelines.

14        I'm not aware of a single penny that I ever gave to Oscar

15   Stilley that had already been classified as gross income to

16   Lindsey Springer under the government's theory for the purpose

17   of Oscar Stilley holding that money so the government could not

18   get it, seize it, find it.

19        And in every instance, except one for -- I think there

20   were six money orders for $350 that Mr. O'Reilly asked me about

21   at trial -- any of the money that came from Mr. Stilley's IOLTA

22   account was never considered to be even gross income to me

23   until that check was written to me, whether it be the money

24   that Mr. Patterson, as Mr. Gollihare puts in his report,

25   directed Mr. Stilley to give me -- and that statement that I

1    just made is notwithstanding the loan agreement of Mr. Turner

2    and the way that has been characterized.  I obviously don't

3    agree that was gross income or income.

4        It never became -- as Mr. Gollihare puts in his report,

5    there were parts of that agreement that never took place, like

6    the -- there's a gift part of the loan gift agreement, and

7    because Mr. Turner was never indicted, I never received any of

8    that money as something I could keep.  This is why he claimed

9    and took the RV back.  And that was the gift side of the

10   agreement, which, by the way, that agreement was written by

11   both Mr. Turner and myself.  That was not just written by me.

12           THE COURT:  Let me make sure I understand a point you

13   made with respect to Mr. Turner earlier today.  When was the RV

14   actually repossessed?

15           MR. SPRINGER:  April 6th is when he and his son came

16   down and picked it up and drove it back to Michigan.

17           THE COURT:  So a little over two weeks ago?

18           MR. SPRINGER:  Yes, sir.  As I explained to him, it

19   was such a hot button for me, I could say or do nothing about

20   it.  And he called me one day and asked me would I stand in his

21   way and I said absolutely not.

22           THE COURT:  Bear with me just a minute.

23           MR. SPRINGER:  Sure.

24           THE COURT:  You may proceed.

25           MR. SPRINGER:  Thank you.

1          MR. O'REILLY:  Your Honor, has Mr. Springer finished

2    his --

3          MR. SPRINGER:  I'm sorry, just one more second.  I'm

4    just about done.

5          THE COURT:  Very well.

6          MR. SPRINGER:  I know that it is not something the

7    Court said it would consider as relevant conduct, but I -- for

8    whatever weight it has, if it has any, in Washington, D.C., in

9    the Department of Justice, there are at least one and possibly

10   two or more people that know I have helped collect literally

11   millions of dollars for the United States that they would not

12   have had an easy task at collecting otherwise.  I know it's not

13   to the relevant side, but it is something that I would like the

14   Court to -- in Mrs. Hodsden's testimony, for example, she paid

15   her taxes solely because of me.  Mr. Sal Pizzino, solely, it

16   was completely at the other end of the spectrum, he paid his

17   taxes, interest and penalty on both, because of me.

18         Those are just a couple of examples that made their way

19   into the court case because those were people who actually gave

20   me large sums of money in comparison to others who did the same

21   thing but gave me no money.

22         But there are, literally, an uncountable number of people

23   over the last ten years that have at some times got angry with

24   me over it, but still went ahead and did it anyway.  And I just

25   thought that was worth making a factual presentation on.

```
 1        Your Honor, may I have just a moment with standby

 2   counsel?

 3             THE COURT:  Surely.

 4             MR. SPRINGER:  No further questions of myself, Your

 5   Honor.

 6             THE COURT:  There's one matter I'm going to inquire

 7   about before we have cross-examination, then we're going to

 8   recess for lunch.

 9        I'm going to hand the clerk a copy of Government's Exhibit

10   204 and I'll ask the clerk to hand it to the witness.

11        And I'll ask you, Mr. Springer, to review that exhibit and

12   tell me concisely -- this really doesn't call for argument or

13   any great deal of elaboration -- of whether there's anything in

14   this exhibit that you attribute to Mr. Stilley.

15             MR. SPRINGER:  No.

16             THE COURT:  Now, you say no --

17             MR. SPRINGER:  I'm actually the author of this

18   letter.

19             THE COURT:  Okay.  Okay.  Of 204?

20             MR. SPRINGER:  Yes, sir.  Yes, sir.

21             THE COURT:  Okay.  Very well.

22             MR. SPRINGER:  If you were referring to this letter

23   before, I was unclear on that.

24             THE COURT:  Okay.  So this was written by you?

25             MR. SPRINGER:  Yes, sir.
```

LINDSEY SPRINGER - DIRECT EXAMINATION                    288

```
 1              THE COURT:  Now, tell me -- that is helpful
 2   clarification.  Now tell me, then, to what extent did
 3   Mr. Stilley have knowledge of this letter or its contents?  It
 4   shows a fax header of December 16, 2002.  To what extent did
 5   Mr. Stilley have knowledge of this letter or its contents at
 6   the time that it was provided to Mr. Hawkins?
 7              MR. SPRINGER:  I would have sent a definitely
 8   watered-down version in answering Mr. Hawkins' questions, which
 9   he asked reasons why he could go to Tom McQueen with
10   substitution-of-counsel request, and I'm not aware of what the
11   initial language was, but I remember having one paragraph.
12              THE COURT:  Perhaps you didn't understand my
13   question.  My question was very simple:  To what extent did
14   Mr. Stilley have knowledge of this letter or its contents at
15   the time that it was provided to Mr. Hawkins?
16              MR. SPRINGER:  Fully aware of it.
17              THE COURT:  We'll take our midday recess at this
18   time.  We'll recess for one hour.
19        Again, my watch doesn't quite agree -- well, actually,
20   it's -- I think maybe the clock on the wall has been adjusted a
21   little bit.  My watch is pretty close to the clock on the wall,
22   so be guided by the clock on the wall.
23        We'll resume at a quarter after the hour.
24        Yes, Mr. O'Reilly?
25              MR. O'REILLY:  Just for sequence, will Mr. Stilley be
```

1   crossing before the government?

2           THE COURT:  I think perhaps it would help move things

3   along in an orderly way for Mr. Stilley's cross-examination to

4   be next, if you have any cross-examination at all for

5   Mr. Springer.

6       Court will be in recess for one hour.

7           MR. SPRINGER:  Judge, may I show this to

8   Mr. Stilley?

9           THE COURT:  Surely.

10      (RECESS HAD)

11          THE COURT:  Good afternoon.  Mr. Stilley, do you have

12  any cross-examination for Mr. Springer?

13          MR. STILLEY:  Briefly, Your Honor.

14          THE COURT:  Very well.  Mr. Springer, you'll please

15  come back to the stand.

16          MR. SPRINGER:  Yes, sir.

17                    CROSS-EXAMINATION

18  BY MR. STILLEY:

19  Q.   How did you meet Art Hawkins?

20  A.   Paul Stumpo and Michael Burt were in his prayer group and

21  they all three contacted me after Art Hawkins received a PSR in

22  his case that said they were going to be getting 10 to, I

23  think, 15 years in prison.  And so after his lawyer told him

24  that's what he was going to get, the three of them called me,

25  and then I referred them to you.

1  Q.    And how did you introduce Oscar Stilley to Art Hawkins?

2  A.    Initially, it was with a phone call, and then

3  Mr. Hawkins -- after the phone call, there were things that

4  were memorialized in writing by the phone call at his request

5  and that ended up being the letter that we spoke about, Exhibit

6  Number 204.

7  Q.    And why was Oscar Stilley's name on that letter?

8  A.    It was -- Mr. Hawkins had requested that in his initial --

9  basically explained to him what you're going to do for him when

10  you take a lead role with Tom McQueen in his case.

11  Q.    Now, Mr. Hawkins did put some money in IOLTA for Oscar

12  Stilley, correct?

13  A.    I believe the evidence in this case showed that.

14  Q.    Did any of that money from Hawkins flow out of IOLTA to

15  you?

16  A.    I never received a dime out of any IOLTA account regarding

17  Art Hawkins.

18            MR. STILLEY:  Your Honor, could I have a moment?

19            THE COURT:  You may.

20            MR. STILLEY:  Pass the witness.

21            THE COURT:  Mr. O'Reilly.

22            MR. O'REILLY:  Thank you, Your Honor.

23                      CROSS-EXAMINATION

24  BY MR. O'REILLY:

25  Q.    Mr. Springer, you've testified that you were never

1  assessed by the IRS for the years '90 through '95?

2  A.   That is true, I never received an assessment from the IRS

3  from 1990 through 1995.

4  Q.   Haven't you, in fact, lost your civil court case with

5  respect to that contention and, in fact, you have been found to

6  owe that money?

7  A.   There were incomplete 4340s and that's the point on appeal

8  that Judge Kearns did not address.

9  Q.   The question was:  Did you lose that in the civil case?

10 Were you found to owe the money to the IRS?

11 A.   Judge Kearns ordered that they could seize the house that

12 I live in.  That was what that case was about.

13 Q.   When was that final action taken?

14 A.   March 3rd -- no, March 16, 2010.

15 Q.   So just over a month ago?

16 A.   That's true.

17 Q.   With respect to the reclaiming of the RV -- or the

18 claiming of the RV by Mr. Turner, first of all, you purchased

19 that in August of 2005, correct?

20 A.   August 15 or 16, 2005, that is correct.

21 Q.   You did not create the lien interest with respect to

22 Mr. Turner until December of that year; is that correct?

23 A.   Until I could register it, that's correct.

24 Q.   And that was after you were aware that the IRS was looking

25 at you criminally?

1  A.    Three months after, actually.  Yeah, I was aware on

2  September 16, 2005, when they raided my home.

3  Q.    Mr. Turner never sought to collect or to make a claim on

4  that lien in all the time until two weeks ago?

5  A.    No, actually, at least a couple of years ago, and I could

6  not make the payments anymore, he actually asked me to try to

7  sell it.  I testified at trial to that.  We just did not get

8  enough money offered.  And then in 2008, the economy really

9  went downhill quick and so we just paused on it.

10  Q.    I'm just wondering why would you -- why would he and you

11  wait until April of 2010 for him to finally come and pick up

12  this RV?

13  A.    Well, I would say it has something to do with this

14  criminal case and he also knew I had to vacate the house.

15  Q.    With respect to his criminal case?  Does he have --

16  A.    No, this criminal case we're in.

17  Q.    On your criminal case.

18  A.    And then I was ordered to leave a 20-acre piece of

19  property and there was just nothing else -- I couldn't just

20  park it anymore, what else can I do with it?  So I told him, I

21  said, look, I'm either going to have to put it in an RV park or

22  something like that and he said he would just come down and get

23  it.

24  Q.    Now, you went through and identified all of the checks

25  with respect to -- they're attributing to you as income in the

1   government's exhibits --

2   A.   As gross income.

3   Q.   As gross income.  That were not put into evidence at

4   trial.  And you've identified those -- for purposes of

5   sentencing, I think you concede are gross income?

6   A.   The ones I did concede to, I did concede based upon the

7   government's, you know, theory at trial.  I would agree that

8   they are gross income.

9   Q.   Why the caveat about the "government's theory at trial"?

10  A.   Well, for purposes of appeal, I'm maintaining that it

11  should have been at least a quid pro quo proof or -- there's a

12  case at the Tenth Circuit that says that somebody could give

13  you a certain amount of money, you could do something for it

14  but not earn the whole amount of money, and then the rest of

15  the money could be considered to be a gift.  And it was the

16  Church of Scientology case from the Tenth Circuit.

17  Q.   So you're taking issue with the jury instruction that was

18  given in this case?

19  A.   I am.  I'm not saying I didn't do anything, but I'm just

20  saying if it's all or nothing, for the purposes of right now,

21  which is what the judge said we're doing is all or nothing,

22  then it has to be all.

23  Q.   Wasn't the point of the jury instruction that you were

24  running a business that -- and these were receipts of the

25  business that you were putting to your personal use?

1   A.   Yes.  And I think his gift instruction did get into that

2   on page 2 quite heavily.

3             MR. O'REILLY:  If I may have a moment, Your Honor?

4             THE COURT:  You may.

5             MR. O'REILLY:  Nothing further, Your Honor.

6             THE COURT:  You may step down.

7        Mr. Springer, do you have any further witnesses?

8             MR. SPRINGER:  No, I do not, Your Honor.

9             THE COURT:  Very well.  Mr. Stilley.

10            MR. STILLEY:  No witnesses.

11            THE COURT:  No witnesses at all?

12            MR. STILLEY:  Correct.

13            THE COURT:  Very well.  And does the government have

14  any further evidence?

15            MR. O'REILLY:  No, Your Honor.

16            THE COURT:  Very well.  Let me review where we are.

17  Frankly, I had -- and I'm not complaining, but I had thought

18  that perhaps the -- we might be a little later in the day

19  before we got to this stage, so let me explain to you where we

20  are.

21        As I have said more than once, there are some issues --

22  and I don't mean to foreclose argument on any issue at all, but

23  there are some issues on which I may be and certainly am

24  especially curious and especially receptive to getting the

25  benefit of argument from both sides.

 1          We have -- and let me just review where we stand, and this
 2   is simply as a means of setting the stage, if you will, for
 3   arguments.  I want to hear arguments on these guidelines
 4   issues.  Because I'm going to have to -- obviously am going to
 5   have to rule on these guidelines issues.
 6          That is not the same as allocution.  That's not the same
 7   as either the government's or the defendants' final comments
 8   before sentencing is imposed.  As a matter of fact, I need to
 9   hear arguments and rule on those guideline issues before we
10   even get to the stage that I hear the government's and then the
11   defendants' final comments before sentence is imposed.
12          And then I need to -- with the benefit of those arguments,
13   I'm going to have to do some fairly careful consideration of
14   some of these issues.  And they are important enough to both
15   sides that I do not want to rule on the fly or anything close
16   to ruling on the fly.
17          So my -- and I hate to unnecessarily delay the completion
18   of this proceeding, but after I outline the matters on which I
19   see the need for the Court to rule, with the benefit of the
20   evidence that's been received, with the benefit of the
21   sentencing memoranda, certainly with the benefit of the
22   presentence report, and with the benefit of the arguments that
23   I will receive, that I will hear, I think I will probably need
24   to recess either -- and I doubt that it would be prudent to say
25   that we will resume and finish up today.  At the latest, we

 1   will finish up at nine o'clock tomorrow morning.  Let me assure

 2   everyone of that.

 3        But there are some issues that do deserve a very careful

 4   look.  I want to hear arguments and then I want to retreat, if

 5   you will, to chambers and very carefully consider some of these

 6   issues.

 7        And for that reason, even with the pleasant surprise of

 8   being finished with the evidence here before 1:30, I seriously

 9   doubt that I will feel comfortable in making my final rulings

10   on the guidelines issues today and pushing the matter through

11   to a conclusion this afternoon.  We'll see, but that seems

12   doubtful to me.

13        We do have issues as to tax loss.  That certainly does

14   embrace a whole "cluster," I guess would be one word for it, of

15   issues as to tax loss both with respect to the defendants'

16   personal liabilities and with respect to the extent to which

17   they can be charged with tax liabilities of other individuals

18   for guidelines purposes.

19        I've named a few names.  For the guidance of the parties,

20   I have not reached a final determination -- and that's putting

21   it mildly.  I have not reached a final determination as to the

22   extent to which the defendants are accountable for the tax loss

23   relating to Mr. Turner or Mr. Patterson or Dr. Roberts, but I

24   will say I'm farther down the road in my evaluation of the

25   issues as to those three individuals and the extent to which

1    their tax situation can be attributed to these defendants than

2    I am with the new names that I have -- obviously had not

3    thought about in that context before we had the government's

4    presentation.

5        Well, the new names are Mr. Lake -- those are obviously

6    not new names to this case, but they are new names from a

7    third-party tax loss standpoint.  That would be Mr. Lake, and I

8    guess he's the only new name, so I certainly want to hear more

9    about that.

10       We've got the issue as to the omission of a criminal

11   source income adjustment.  I want to hear from the parties on

12   that.

13       We have the issue as to the possibility of a four-level

14   adjustment for Mr. Springer based on his aggravating role.  I

15   want to hear about that.

16       Off the top of my head, I think the government objected to

17   the admission of an adjustment for use of a special skill as to

18   Mr. Springer.  That's not even available if he gets a four-

19   level adjustment for an aggravating role.  So I would

20   appreciate some clarification on that from the government.

21       The government has objected also to the omission of an

22   adjustment for use of a special skill as to Mr. Stilley.  I'll

23   certainly be receptive to argument on that, although I think

24   perhaps argument from Mr. Stilley on that score would be more

25   important at this point, because I'm inclined to at this point

 1   to agree with the government's position on that.

 2        And then the defendants have objected to the use of the

 3   2009 Guidelines Manual and obviously they're -- to some degree,

 4   their positions are mirror images of the government's positions

 5   with respect to tax loss issues, but not entirely.

 6        The defendants have objected to the sophisticated means

 7   adjustment.  I certainly will welcome argument on that.

 8        The defendants have both objected with respect to the

 9   obstruction adjustment.

10        And that's not an exhaustive list of the matters that are

11   in issue.  For instance, Mr. Springer has objected with respect

12   to the denial of a downward adjustment for acceptance of

13   responsibility.  I'm not particularly inclined to dwell on that

14   for a long time.  I'll hear whatever anybody has to say on it,

15   but I'm not inclined to dwell on that for a long time.

16        So, anyway, that's just a brief summary of some of the

17   more prominent issues, and even within them some issues are

18   more prominent than others.

19        And, again, I'm especially interested in hearing what the

20   parties have to say about the third-party -- the attribution of

21   third-party tax liability for tax loss purposes.

22        So with that, is the government prepared to argue the

23   matter?

24             MR. O'REILLY:  Yes, Your Honor.

25             THE COURT:  Very well.  You may proceed.

1    MR. O'REILLY:  Your Honor, before we begin, I would

2 like to ask the Court excuse Revenue Agent Brian Miller, if

3 that's permissible.  He may have already stepped out.

4    THE COURT:  He stepped out, reconsidered, stepped

5 back in.  You are excused.

6    MR. O'REILLY:  Thank you, Your Honor.

7    May it please the Court, the United States presented

8 during -- in its sentencing memorandum and its objections that

9 were filed in this case our explanation of how the defendants'

10 tax loss was determined for purposes of sentencing.

11    The defendants had the opportunity to present evidence

12 that would support a more accurate way of determining the --

13 what income should be attributed as income, what expenses they

14 were entitled to; they have chosen not to do that.

15    So we are left with what we have, which are checks that

16 have the inherent appearance of income, a number of which have

17 either through testimony or through the defendants' admissions

18 been shown to be income.

19    And under the bank deposits method of proof, this is --

20 when a better method is not available is, you know, a very

21 adequate, ample way of calculating the gross income of the

22 defendants from which 20 percent under the United States

23 Sentencing Guidelines is how you reach the estimated tax loss.

24    With respect to Mr. Springer, there were assessments made

25 despite his, you know, denials of the fact.  I mean, it's been

1   resolved in a civil case for the '90 through '95 years and

2   those are in evidence presented to this Court, and that is from

3   where the calculation -- the numbers come from for those

4   years.

5       If I could have 1178-A on the screen.

6       Mr. Springer, during his direct examination, went through

7   and identified specific and discrete checks to which he took

8   exception that were included in those calculations.

9       And the Court obviously has not had a chance, but I did

10  ask Revenue Agent Miller to go through and take those out and

11  recalculate the tax loss, assuming, just taking Mr. Springer at

12  his word, that those should not have been included, and that is

13  not something we concede, even were the Court to take all of

14  the items out that Mr. Springer identified as shouldn't have

15  been attributed as income to him, and even if the Court were to

16  exclude 12,000 a month -- excuse me, 12,000 a year of cash

17  income, and even if the Court were to exclude third-party tax

18  losses of Mr. Patterson and Mr. Lake, Mr. Springer's tax loss

19  would still exceed a million dollars.

20      And I'll now, you know, explain why we think third-party

21  tax losses are attributable with respect to each of the

22  individuals.

23      I'll start with Dr. Roberts.  And, again, as the Court

24  noted, Dr. Roberts is only attributed to Mr. Stilley.  In the

25  early 1990s -- I believe the testimony at trial was, in 1990,

1    Dr. Roberts was one of a number of people who questioned the

2    validity of the tax laws.  And he went to who he understood to

3    be an expert on the tax laws, a lawyer by the name of Mr. Oscar

4    Stilley, and asked him if he was correct.  Hey, I don't want to

5    file a tax return.

6         And Mr. Stilley, instead of setting him straight,

7    Mr. Stilley told him, no, you don't -- you don't have to file.

8    He gave counsel that was followed by Dr. Roberts that led to

9    Dr. Roberts willfully failing to file tax returns for a series

10   of years.

11        And that is, under the guidelines, relevant conduct

12   because it is counsel that led to a tax loss.  And it wasn't

13   like Dr. Roberts went to his neighbor, the plumber, or his

14   neighbor, the mailman, he went to whom he understood to be a

15   professional, a lawyer, and, in fact, somebody who had a

16   proclaimed expertise in tax.

17        Unfortunately, Dr. Roberts went to Mr. Stilley.  But that

18   is why the government's position is that Dr. Roberts' tax loss

19   is absolutely attributable to Mr. Stilley under relevant

20   conduct rules under Sentencing Guidelines.

21             THE COURT:  Well, when -- when was this advice or

22   counsel given by Mr. Stilley to Dr. Roberts, vis-a-vis, the

23   years that the tax liability would have arisen?

24             MR. O'REILLY:  Before, Your Honor.  It was in 1990 or

25   1991, based on Dr. Roberts' testimony at trial.  The tax years

1    that we're talking about for Dr. Roberts are --

2         If I could have Government's Exhibit 1177, page 2.

3         The tax years with respect to Dr. Roberts are 1992, 1993,

4    1994, and 1995; all tax losses occurring after receiving the

5    advice and counsel of Mr. Stilley.

6         With respect to Mr. Patterson.  Together, Mr. Stilley and

7    Mr. Springer met with and spoke with Mr. Patterson, who was

8    already a non-filer.  He had not filed since the mid to -- the

9    mid-1990s.  That conduct is not attributable to the defendants;

10   they hadn't met him yet.

11        But in 2000, in the year 2000, they did meet with

12   Mr. Patterson.  I believe the cause of that meeting was

13   because, as Mr. Patterson said, he learned he was under

14   criminal investigation and he sought counsel.

15        Again, as Mr. Stilley had with Dr. Roberts and with

16   Mr. Springer at his side, these two gave criminal advice.

17   They, together, encouraged Mr. Patterson to continue not filing

18   tax returns.  And, unfortunately, Mr. Patterson followed that

19   advice.

20        He did file a request for extensions but the tax return

21   that was filed for Mr. Patterson did not get filed until the

22   year 2003, well after the statutory due date.

23             THE COURT:  Now, was that -- and this will show you

24   my -- the fact that there's always a potential for not keeping

25   these straight.  Mr. Patterson did request extensions, is that

1    the one where we had the transcript that shows two extensions

2    and then a return filed, and there's some question as to

3    whether that was a return prepared for him by the IRS or is

4    that somebody else?

5            MR. O'REILLY:  I don't think that there's any issue

6    about who prepared the return.

7            THE COURT:  Who prepared the Patterson returns?

8            MR. O'REILLY:  I believe the testimony in evidence

9    was it was Cynthia Hess.

10           THE COURT:  Okay, Hess.  That's somebody else, then,

11   where we had that.

12       So your argument, then, is based on the evidence

13   presumably that the defendants met with Mr. Patterson in 2000,

14   encouraged him to continue to not file; is that right?

15           MR. O'REILLY:  Yes, Your Honor.

16           THE COURT:  But he ultimately did file with the help

17   of Ms. Hess?

18           MR. O'REILLY:  He did, Your Honor, but, again, not

19   until 2003, and the crime of willful failure to file and the

20   tax loss would have occurred as of the expiration of the last

21   extension, which was in October of 2001.

22           THE COURT:  So -- and that raises a point that's

23   crossed my mind in one or two contexts, and that is, is there a

24   date as of which the Court should determine that a tax loss

25   occurred, even if for that tax year the taxpayer ultimately

1  made things right?

2          MR. O'REILLY:  Yes, Your Honor.  And that would be

3  the due date of the return, whether it's by extension or by,

4  you know, not filing of any return at all, which would be April

5  -- usually April 15th.

6      I do believe that under the law, technically, if you file

7  an extension, you're supposed to file your estimated payment at

8  that time, as well, but it's not the government's position that

9  if a return hadn't been prepared whether or not that could have

10 been done.

11     If Mr. Patterson had filed his return and paid his taxes

12 by October 15th of 2001, this would not be an issue.  It would

13 still be an issue with respect to counseling someone to violate

14 the law under a different section of the Sentencing Guidelines,

15 but it would not be tax loss attributable to either of the

16 defendants if, in fact, the taxes -- the tax return had been

17 filed and the taxes paid timely.

18          THE COURT:  So the government's position is that once

19 a tax liability becomes delinquent by virtue of the advice of a

20 defendant, once a third-party's tax liability becomes

21 delinquent, that perfects the tax loss, even though that tax

22 liability is ultimately satisfied?

23          MR. O'REILLY:  If it becomes willfully delinquent,

24 Your Honor.  For example, if Mr. Patterson had, you know, filed

25 an extension request in a letter saying, I have no money, I

1   will pay you as soon as I can, there was no evidence of willful

2   failure to file, that would be a different question.

3        But the evidence in this case was that Mr. Patterson

4   wasn't filing tax returns, and the only thing that got him

5   around to filing a tax return was the fact that he was being

6   criminally prosecuted, and that didn't happen until 2003.

7        If instead the situation -- if there was no evidence that

8   Mr. Patterson had willfully not filed his return and willfully

9   not paid, again, that would not be a tax loss, even if there

10  was a tax, because it -- it would be a criminal question.  Just

11  the mere existence of a tax liability is not -- it's not the

12  government's position that the mere existence of a tax

13  liability by itself --

14        THE COURT:  So if the defendants induced him to

15  willfully fail to file as of April 15 of any given year and --

16  or at least encouraged him to failure to file, and, in fact, he

17  did for whatever reason willfully fail to file, and for this

18  purpose we'll assume that that failure was at least in part due

19  to the counsel or advice from the defendants, then as long --

20  do I understand you to be arguing that as long as that

21  violation that we'll say occurred as of April 15th of the year

22  when the return was due -- as long as you have that willful

23  violation with a resultant tax loss as of that day, then it

24  makes no difference for the tax loss determination under the

25  tax loss guidelines that the tax liability was later satisfied

1   for that year; is that right?

2          MR. O'REILLY:  Absolutely, Your Honor.  In fact,

3   under the guidelines, it speaks to that, that you cannot cure a

4   tax deficiency by a subsequent payment.

5          THE COURT:  Okay.  I need you to educate me on that,

6   because I'll have to admit that I haven't really focused hard

7   on that.

8          MR. O'REILLY:  I apologize, Your Honor.  I should

9   know this off the top of my head.  Your Honor, it is --

10         THE COURT:  2T1.1?

11         MR. O'REILLY:  Yes, under the Notes Number 5:  "The

12  tax loss is not reduced by any payment of the tax subsequent to

13  the commission of the offense."

14         THE COURT:  Okay.  I'm looking at application --

15         MR. O'REILLY:  It's before the commentary.  The last

16  item before the commentary under 2T1.1, Your Honor.

17      If it please the Court, if I get the ELMO, I can actually

18  put this on the screen.

19         THE COURT:  Okay.  That's -- hold on.  That's

20  actually guideline language, not an application note.

21         MR. O'REILLY:  I apologize, Your Honor.

22         THE COURT:  And that would be, "The tax loss is not

23  reduced by any payment of the tax subsequent to the commission

24  of the offense."

25         MR. O'REILLY:  Yes, Your Honor.

 1            THE COURT:  So your contention is, as long as you

 2   have that as of April 15th or whatever the due date might have

 3   been, then the tax loss is perfected and is not cured by later

 4   payment?

 5            MR. O'REILLY:  Correct, Your Honor.

 6            THE COURT:  Okay.  I understand your point.  Go

 7   ahead.

 8            MR. O'REILLY:  Thank you, Your Honor.

 9        I'll now move on to Mr. Lake.  And similarly to

10   Mr. Patterson, Mr. Lake testified, both before the grand jury

11   and in the trial, and he stated that the defendants together --

12   and, again, this was the person -- Mr. Stilley, who Mr. Lake

13   had hired to be his attorney, and a person who Mr. Lake

14   understood to be an expert in tax matters and other legal

15   matters in the person of Mr. Springer, and that, together, they

16   advised him that he had no legal obligation to file a tax

17   return.

18        Similarly, to Mr. Patterson --

19            THE COURT:  Okay.  Now, let's pay attention to timing

20   on that.  And let's start with Mr. Lake's testimony.  Okay.

21   Here is my beginning point, and if my beginning point is

22   apparently not correct, then you can set me straight on that.

23   But my beginning point is Mr. Lake's testimony that he called

24   Mr. Springer in October of 2000, he was charged with willful

25   failure to file for '94 through '96, and this is very spotty.

1    I mean, he gave pages and pages of testimony and my notes are

2    very spotty.

3         But Mr. Springer said he would hire either Mr. Stilley or

4    Mr. Barringer.  Mr. Springer said his fee would be $30,000 and

5    the attorney fee would be charged separately.

6         Then there was a conference call between Messrs. Springer,

7    Stilley and Lake.  $10,000 was sent to Mr. Springer in

8    November.  Maybe another $10,000 check.  Ultimately, about

9    38,000 was sent to Mr. Springer and 65 to 70,000 was sent to

10   Mr. Stilley.

11        So, anyway, the time frame is they didn't know each other

12   until the fall of 2000 and Mr. Lake was charged with the

13   willful failure to file in '94 through '96.

14        Now, if I'm wrong about that, then you need to correct me

15   on that, and then give me what else you might have to say on

16   that score.

17           MR. O'REILLY:  Your Honor, the tax loss with which we

18   have attributed Mr. Springer and Mr. Stilley as relates to

19   Mr. Lake is only for the year 2000, not his prior willful

20   failure to files.

21        Similarly, Mr. Patterson -- Mr. Lake was a chronic

22   non-filer.  He went to two individuals who he understood to be

23   professionals, experts in the tax law.  Unfortunately, Mr. Lake

24   received similar advice to Mr. Patterson, which is, you're

25   right, there's no legal obligation to file a tax return.

 1       And at least, in part, on that advice, he willfully failed
 2  to file a tax return for the year 2000.  That is the only tax
 3  loss that is exhibited in the government's exhibits, and that's
 4  under 1143, which is the assessment with respect to that year,
 5  the accounted transcript for that year for the IRS.
 6            THE COURT:  Speaking of transcripts, has Mr. Lake's
 7  trial testimony been transcribed?
 8            MR. O'REILLY:  No, Your Honor.
 9            THE COURT:  Go ahead.
10            MR. O'REILLY:  With respect to that, that occurred --
11  due date for that return upon which this tax loss would have
12  been due and payable was April 15th of 2001 or thereabouts.  I
13  don't know if it fell on a Saturday or what.  But that due date
14  was after his consultation and encouragement by the
15  defendants.
16       And that is why the government's position is that that tax
17  loss can be attributed for sentencing purposes to the
18  defendants under both the related conduct as a specific matter
19  to the defendants, but also as part of the conspiracy to
20  defraud the IRS, because together jointly they were encouraging
21  this type of criminal behavior.
22       Mr. Turner is a very different situation.  As was pointed
23  out in the direct exam of I think both the government's
24  witnesses, these are for early years, '99 through 2003, for
25  which there's no evidence that either defendant knew Mr. Turner

1    at that time.  Possibly in 2003, but I don't know that it was

2    that early.

3         But that's not why these are attributed to Mr. Turner.  I

4    mean, Mr. Turner --

5              THE COURT:  Tax liability -- I think this is

6    summarized in your exhibits, but just for the sake of

7    discussion, the tax liability that adds up to and comprises the

8    dollar amount involved here with respect to Mr. Turner is for

9    '99 through '03; is that right?

10             MR. O'REILLY:  Yes, Your Honor.  And the total amount

11   of that is $145,713.

12             THE COURT:  All right.

13             MR. O'REILLY:  But as was brought out both at trial

14   and here in the sentencing hearing, Mr. Turner sought to hide

15   that money and prevent the IRS from collecting on those taxes.

16   To that end, he borrowed -- he took mortgages against two

17   properties that he owed so that there would be no interest --

18   no equity interest for the IRS to be able to attach, and he

19   then took that money and put it where he thought -- he hid by

20   making it look like a payment to Mr. Stilley for legal

21   representation, and this was done at the encouragement and

22   urging of Mr. Springer.

23        It's just textbook evasion of payment.  There was a tax

24   due and owing, and in an attempt to evade the payment of that

25   tax, Mr. Turner hid the money by borrowing against two houses

1  and then taking that money and sending it to an attorney so it

2  looked like a legal payment.

3      And we think that's a clear-cut case of evasion of payment

4  and that's why these tax losses are attributable to both

5  defendants.

6          THE COURT:  Okay.  And those IOLTA transfers occurred

7  approximately when?

8          MR. O'REILLY:  Transfers into the IOLTA account for

9  Mr. Turner occurred in August of 2005, the first one I want to

10  say around August 11th and then the other one was about a week

11  later.

12      And as Mr. Turner testified, his understanding was that

13  they were going to keep it safe for him, that Mr. Springer was

14  going to keep this money safe, so that if he needed a lawyer --

15  because he was fearing that the IRS will come grab it -- that

16  it would be available for him.

17      Unbeknownst to Mr. Turner, Mr. Springer already had his

18  eye on a very expensive motor home which he purchased before

19  even receiving the second payment.  He also bought a Lexus upon

20  which Mr. Turner received no lien interest at any time.

21      With respect to the third-party tax loss, if the Court has

22  any further inquiry, I'm happy to address it, but that is the

23  government's theory on why those third-party's tax losses can

24  be attributed to the defendants.

25          THE COURT:  Now, Mr. Turner's testimony was, as of

1  last fall, when he testified that none of the quarter-

2  of-a-million dollars had been paid back by Mr. Springer, is

3  your recollection of his testimony any different?

4          MR. O'REILLY:  No, Your Honor.  Mr. Turner was quite

5  clear that none of the principal balance of the 250,000 had

6  been repaid.

7          THE COURT:  Okay.  Well, now, Mr. Springer says that

8  whatever might have been argued about the bona fides of that

9  transaction, based on the facts as they were, until earlier

10  this month, the bona fides are proved up by the repossession of

11  it, which shows that it was a bona fide lien and that it was

12  not a criminal source transaction at all, because the

13  repossession of it shows that it was intended to be just

14  exactly what Mr. Springer asserts that it was.  What do you say

15  to that?

16          MR. O'REILLY:  Your Honor, I think actually this is

17  the most recent act of the conspiracy.  The IRS is attempting

18  to collect on the debt of the tax liabilities for '90 through

19  '95; to that extent, they have actually foreclosed on his house

20  and likely would have been seeking to seize the RV.

21      This -- the fact that this occurred did not -- no transfer

22  occurred until April of this year, two weeks ago, immediately

23  before the IRS is attempting to seize property to satisfy

24  Mr. Springer's tax liabilities.  I think that's extremely

25  telling.  If this had been a bona fide loan or a bona fide

1   lien, Mr. Turner would have gotten that RV years ago.

2       The only reason --

3           THE COURT:  Now, this is apropos of nothing, but does

4   Mr. Turner still have some tax liability?

5           MR. O'REILLY:  Yes, he does, Your Honor.  In fact, he

6   recently, as I believe was noted in the government's sentencing

7   memorandum, he recently lost in tax court, and who knows, he

8   may use this to help pay that.

9           THE COURT:  That RV is kind of hard to miss, it's --

10          MR. O'REILLY:  I agree, Your Honor.

11          THE COURT:  It's not your average Winnebago.

12          MR. O'REILLY:  Certainly hope the IRS does their job

13  and does seize it; however, that would not change the fact that

14  as of 2005, when the monies were transferred, this was

15  attempting evasion of payment.  Any subsequent collection of

16  payment, either voluntary or involuntary, doesn't change that

17  fact.  And I think Mr. Springer would rather have Mr. Turner

18  have the RV than the IRS.

19          THE COURT:  I doubt that even Mr. Springer would

20  contest that.

21      Go ahead.

22          MR. O'REILLY:  And Your Honor is, I think, fully

23  conversant with the government's position on criminal source

24  income.  If you have any questions on that, I'm happy to

25  address them, but --

```
 1              THE COURT:  Well, you're hanging your hat on Section
 2    1343?
 3              MR. O'REILLY:  Yes.
 4              THE COURT:  Okay.  Very well.
 5              MR. O'REILLY:  Your Honor, with respect to role in
 6    the offense, I think the evidence at trial and as brought forth
 7    in the sentencing hearing has shown that this was an extensive
 8    scheme.
 9              THE COURT:  So you're not going to give up the four
10    points and take the two that might be available as to
11    Mr. Springer on special skill?
12              MR. O'REILLY:  Your Honor, actually, our position
13    with respect to Mr. Springer is it's abuse of position of
14    trust.
15              THE COURT:  Okay.
16              MR. O'REILLY:  More than a special skill.  Not that,
17    as he readily admitted, he has special skills, but we think
18    that the four points are appropriate.
19         We also think that, under the guidelines, an abuse-of-
20    position-of-trust enhancement is appropriate, and I'll get to
21    that in a moment.
22         But with respect to role in the offense, as the case law
23    is clear, and, again, we've detailed this in our sentencing
24    memorandum, even if there weren't five or more participants in
25    the conspiracy, I think the Court could find that there were.
```

1                    THE COURT:  Well, I'm not with you on that.  So
2       there's those last three words, "or otherwise extensive."
3                    MR. O'REILLY:  That's where I will go, Your Honor.
4       When you are telling people that you are a ministry and
5       encouraging -- and getting them to write checks to that effect
6       and to get them to pay you monies to denote "gift" or
7       "donation," when you are, in fact, performing services for
8       them, you are engaging people, albeit, quite likely,
9       unwittingly, in your scheme, and he had a lot of people that
10      were doing this.
11           As indicated at trial, there were people participating on
12      the telephone conference calls, there were people going to his
13      Web site.
14           And as indicated by the blog that has been following this
15      case, there is a great deal of interest in this matter, because
16      there are a lot of people who are -- who listen to
17      Mr. Springer.
18           And to the extent that Mr. Springer has told them to file
19      tax returns, great.  I am glad that he has, because he's helped
20      some people avoid either civil liabilities or criminal
21      prosecution.
22           But that's not what this case is about.  This is about
23      where he was willfully not paying his taxes, evading his taxes,
24      conspiring with Mr. Stilley.
25           As the jury has found -- and this isn't even -- it's not

1   up for dispute, the jury has determined this:  It was income,

2   gross income, or whatever you want to call it.  He had a tax

3   liability, and as the government has indicated, for sentencing

4   purposes, it appears it is well over a million dollars, with

5   everything included.

6        But this is not somebody who just did their -- you know,

7   this is not Mr. Stilley and Mr. Springer acting on their own,

8   it wasn't just a two-party conspiracy and nobody else

9   involved.

10        Mr. Delozier was effectively roped in by allowing

11   Mr. Springer to cash checks that were not made payable to

12   Mr. Springer but to this entity, Bondage Breakers Ministry, and

13   he did that because he trusted Mr. Springer.

14        And as Mr. Delozier testified, these checks -- you know,

15   he had a very low bounce rate on these checks.  They tended to

16   be good.  So Mr. Springer was a very good customer for him.

17        But we do believe that the four-level increase is

18   warranted given the number of people that were either wittingly

19   or unwittingly brought into the scheme through the actions of

20   the defendant, Mr. Springer.

21        We don't think that the role in the offense with respect

22   to this case is appropriate with respect to Mr. Stilley, as

23   indicated in our sentencing memorandum.

24            THE COURT:  Now, you and the probation officer don't

25   see eye to eye as to the scope of the activity that is fair

1  game for treatment as relevant conduct under -- what is it --

2  3B1.1?

3          MR. O'REILLY:  Correct, Your Honor, Mr. Gollihare and

4  I, we disagree.

5          THE COURT:  And so on one hand, there is an approach

6  that would suggest that at the end of the day we have to bear

7  in mind that these are tax offenses and that the indictment

8  charges tax offenses relating to these individuals' own taxes,

9  and to some degree, obviously, as between the two of them, but

10 that the heart of the case certainly was not the tax liability

11 of third parties, and that for that reason, either under the --

12 an analysis of the defendants' own conduct, or for that matter,

13 the jointly-conducted criminal activity, we don't encompass, if

14 you will, the activities of these defendants in generating

15 income, however blame-worthy they might be for not paying tax

16 on it, we don't rope them in for -- with respect to what they

17 did to generate the income.  That was not part of the

18 conspiracy.  It's not part of any jointly-undertaken criminal

19 activity.

20     And for that reason, that -- the government's theory is

21 unsustainable insofar as it seeks to hold these defendants

22 accountable for the third party's tax liabilities, because,

23 after all, that was just income-generating activity.  They

24 should have paid taxes on it, but it was just income-generating

25 activity.  Or for that matter, with respect to the Court's

1   assessment of the aggravating role, was it otherwise extensive,

2   that we also cannot get outside the realm of what was truly

3   their relevant conduct for determining whether the activity

4   that Mr. Springer orchestrated was "otherwise extensive."

5          I'd like you to address that.

6                 MR. O'REILLY:  Your Honor, actually, we do believe

7   this is a conspiracy to defraud the Internal Revenue Service.

8   At trial, the primary focus was directed at the tax liabilities

9   with respect to Mr. Springer.

10         In part, Mr. Stilley's tax liabilities received only

11  cursory mention because he's from Arkansas, there was no venue

12  here with respect to Mr. Stilley's tax obligations.  He was not

13  charged in this district with his own tax evasion.

14         That does not change the fact that he and Mr. Springer

15  together, you know, were well-aware not only that they were

16  earning income, but that they were both not filing tax returns,

17  and their jury returned a verdict that this was a conspiracy to

18  defraud the IRS.

19         Part of how each of these defendants and the people they

20  coached or counseled, encouraged, one of the ways that they

21  defrauded the IRS and impeded and impaired the ability of the

22  IRS to assess and collect taxes was by not filing tax returns.

23         This does not mean that, you know, anybody that walked

24  into Mr. Stilley's door would thereby be attributable -- that

25  their conduct is not necessarily attributable to Mr. Stilley,

1   nor even if Mr. Springer was sitting in the office with him

2   would it be necessarily attributable to Mr. Springer.

3        However, the object of the conspiracy was to impede and

4   impair the IRS in its ability to assess, collect taxes.  Where

5   either of them were -- and especially were together, they were

6   counseling others to not file tax returns and to not pay taxes,

7   that absolutely indicates that it's within the scope of the

8   object of the conspiracy and any tax loss resulting from that

9   is reasonably foreseeable to each of them.

10       Where they are counseling individuals independently,

11  without knowledge of the others, then it would only be

12  relevant -- and I think it's 1(a) of the relevant conduct, as

13  opposed to 1(b), and that is how we treated Dr. Roberts, in

14  addition to the fact that it was well before this conspiracy

15  began.  As it was indicted, it was begun in or about 2000.

16       But it is the government's position -- and, again, this is

17  a broader reading than what the presentence investigation

18  reports assert.  We think this was a broader conspiracy to

19  impede and impair the ability of the IRS to assess and collect

20  taxes.

21       What the government chose to focus on in terms of

22  presenting this at trial does not change the fact that,

23  together, Mr. Springer and Mr. Stilley encouraged Patrick

24  Turner in his attempt to evade payment of taxes, and that is

25  certainly an act furthering a conspiracy to impede and impair

1   the ability of the IRS to collect taxes.

2            THE COURT:  Okay.  So if your -- if the indictment

3   with respect to the manner and means is silent as to causing

4   third parties to violate the law, then your contention would be

5   that, be that as it may, within the concept of -- the broader

6   concept of relevant conduct that the Court should take that

7   into account?

8            MR. O'REILLY:  Yes, Your Honor.

9            THE COURT:  Okay.

10           MR. O'REILLY:  With respect to the special skill

11  enhancement, and I'll focus on Mr. Stilley.  He was a lawyer.

12  He used his knowledge of how the IRS investigates cases, how

13  cases are developed and prosecuted and used that to his

14  advantage in furthering this scheme to defraud.

15       And the use of a special skill, being a lawyer, the legal

16  skills are specifically enumerated under the Sentencing

17  Guidelines.

18       With respect to -- and if you have any more questions on

19  that -- but with respect to the abuse of position of trust, I

20  will be candid with the Court, I'm having to go to a

21  resentencing in the Ninth District -- the Ninth Circuit because

22  we actually succeeded in getting an abuse of position of trust

23  for a trust promote, because under the Sentencing Guideline

24  language, his position enabled him to further the scheme.  The

25  Ninth Circuit, however, has stated it is quite clear in the

```
 1   Ninth Circuit that you must hold a position of trust with
 2   respect to the victim, and the victim in this case is the
 3   United States Government and the Internal Revenue Service.  And
 4   if that is the law of this circuit and it seems --
 5              THE COURT:  There's a lot of Ninth Circuit law that's
 6   not the law of this circuit.
 7              MR. O'REILLY:  Yes, Your Honor.  The reason I
 8   mentioned that is Mr. Gollihare had noted in the PSR one case
 9   that did seem to suggest that, but that is the government's
10   sentencing memorandum in the case.  The Tenth Circuit does not
11   seem to take that narrow of a read of this enhancement.
12              THE COURT:  What Tenth Circuit case would you want me
13   to look at?
14              MR. O'REILLY:  Your Honor, that would be United
15   States v. Koehn, K-O-E-H-N, 74 F.3d 199.  It's a Tenth Circuit
16   case from 1996.  That was on page 17 of the United States'
17   sentencing memorandum.
18       There was also more recently a district court case out of
19   Utah where a member of my office got taken to task because they
20   did not include this particular enhancement, abuse of position
21   of trust, in a plea agreement, even though the defendant had no
22   position of trust, vis-a-vis, the IRS.  It was a trust
23   promoter, I believe, and that court was disappointed that we
24   had not included it.
25              THE COURT:  That you had not what?
```

```
 1            MR. O'REILLY:  We did not include it in that plea
 2  agreement.  It was not my case, Your Honor, but I remember a
 3  certain very young attorney complaining about being the
 4  whipping boy when it wasn't even his case to begin with.  And
 5  that case is United States v. Mercer, 472 F.Supp.2d, 1319.
 6            THE COURT:  Is that a Kansas case?
 7            MR. O'REILLY:  That's a Utah case, Your Honor.
 8            THE COURT:  Utah.  Okay.  So you want me to read the
 9  Koehn case and the Mercer case?
10            MR. O'REILLY:  Yes, Your Honor.
11            THE COURT:  Okay.
12            MR. O'REILLY:  And our position is, is that with
13  respect to the individuals that were paying him money that were
14  writing checks payable to Bondage Breakers Ministry, that were
15  writing "gifts" or "donation," they trusted Mr. Springer, and
16  that position of trust he had with respect to them facilitated
17  his ability to commit this crime.
18            THE COURT:  Okay.  Well, I see Judge Cassell's
19  opinion in Mercer is mercifully short, so, yes, I will read
20  that one.  Thank you.
21       You may proceed.
22            MR. O'REILLY:  And, Your Honor, with respect to
23  sophisticated means and the obstruction enhancement that the
24  presentence investigation reports found, we've articulated our
25  positions in the sentencing memorandum; however, I am willing
```

1    to address any questions the Court may have.

2              THE COURT:  I need to hear from you on restitution.

3              MR. O'REILLY:  Your Honor, with respect to

4    restitution, we agree with the presentence report that under

5    the -- excuse me one second.

6        Under 18 USC Section 3663(a), the crime of conspiring to

7    defraud the United States is subject to mandatory restitution,

8    and restitution, when it's mandatory, is made without regard to

9    a defendants' ability to pay, unlike the -- where restitution

10   is something that's subject to the Court's discretion as to

11   whether or not to award restitution.

12             THE COURT:  I agree with you on that, and now the

13   defendants have an opportunity to persuade me that restitution

14   is not mandatory, but assuming it's mandatory, I still have to

15   arrive at an appropriate dollar amount.

16             MR. O'REILLY:  Yes, Your Honor.  And our position is,

17   is that given the lack of any other available information that

18   the calculations made by Revenue Agent Miller are reasonably

19   accurate assessments of the tax against them and they're just

20   -- the records that Mr. Springer spoke of were solely of some

21   expenses, and as Mr. Miller indicated in his cross-examination,

22   I think he spoke specifically with respect to Mr. Stilley, but

23   I think it would apply to both, if we had all the information,

24   the net taxes would actually likely be higher.  But this is

25   simply taking 20 percent of the gross income figure, which is

```
 1  under the Sentencing Guidelines is where we need to be for

 2  sentencing purposes, it's the best figure we've got.  And

 3  restitution is mandatory.

 4      The defendants had an opportunity to present evidence

 5  supporting a tax loss figure that was different from what the

 6  government has presented.

 7          THE COURT:  The government's proposed restitution

 8  number would include the penalties and interest?

 9          MR. O'REILLY:  Yes, Your Honor, it should.

10          THE COURT:  So on 1177, then, which covers both

11  defendants, I would -- the government would urge that I adopt

12  the -- those third-party tax losses, plus the defendants' own

13  tax losses, including penalties and interest?

14          MR. O'REILLY:  I believe the presentence

15  investigation report only referenced the defendants' own tax

16  losses.  I think the Court could, but we are actually satisfied

17  with the presentence investigation report's recommendations,

18  Your Honor.  We did not object to them, and -- which is

19  significant.  That does not include the third-parties' tax

20  losses'.

21          THE COURT:  Okay.  Now, how about -- if you get that

22  sort of a number for restitution, then what I'm about to

23  mention is probably academic, but I have received no evidence

24  as to cost of prosecution.  The PSR number for cost of

25  prosecution is shockingly low.  I mean, I think whatever it
```

1    is -- what is it?  29,000?

2              MR. O'REILLY:  It's about $28,000, Your Honor.

3              THE COURT:  I think you got that invested in air

4    fare.

5              MR. O'REILLY:  Unfortunately, Your Honor, my costs

6    don't get included in that, which is possibly why the Court was

7    expecting a bigger figure.  We did supply the documentation, I

8    understood, but perhaps that was not supplied to the -- for the

9    presentence report in addition to just the raw figure.  We

10   certainly can supply the --

11             THE COURT:  Well, I'll hear from the defendants as to

12   whether they take issue with what looks to me to be an

13   incredibly low cost to prosecution number.  We'll look at it

14   one step at a time from there.

15             MR. O'REILLY:  Your Honor, we do try to be

16   efficient.  If there's no further questions --

17             THE COURT:  I may have more questions before we're

18   through here in court this afternoon, but none at this time.

19   Thank you.

20             MR. O'REILLY:  Thank you, Your Honor.

21             THE COURT:  Mr. Springer.

22        And I would urge you to bear in mind, Mr. Springer, that

23   you will have another opportunity to address the Court by way

24   of your final comments before sentence is imposed.  So the main

25   reason that -- or the main benefit to the Court from hearing

1  arguments at this point is to give the Court some clarity as to

2  the specific matters that have been at issue today and

3  yesterday.

4       MR. SPRINGER:  Thank you, Your Honor.  I'll try to

5  follow along the same line that the government did, so, first,

6  we can keep those parallel.

7       The evidence that the government tendered on Mr. Patterson

8  showed that he did file two extensions and they entered

9  absolutely no evidence of the $34,000 being owed on April 15,

10  2001, nor did they show with an extension that he owed that

11  money on August 15, 2001.

12       And with the second extension, they did not show that he

13  owed that money on October 15, 2001.

14       And the only evidence that they tendered was that he filed

15  his return on March 4, 2003, for the year 2000.  There is no

16  evidence before the Court that the reason why Mr. Patterson

17  filed two extensions, and then on March 4, 2003, filed a 2000

18  return, as the government's exhibit identifies, that that

19  reason was having to do anything with anything either I said to

20  Mr. Patterson or Mr. Stilley said to Mr. Patterson.

21       And, in fact, the evidence actually shows that what I told

22  Mr. Patterson to do, he was at least considering doing, which

23  was file returns.

24       The evidence that was presented to the Court today by my

25  unrebutted testimony was that the reason why Mr. Patterson's

1    2000 tax return did not get filed until 2003 was because

2    Cynthia Hess got sick.

3         And the experience in dealing with people who haven't

4    filed a series of tax returns is why I would recommend a person

5    like Cynthia Hess to help get those figured out, because

6    there's some hindsight to the advantage of filing five years in

7    a row, when you have losses, as in Mr. Patterson's case, that

8    he could carry over.

9         But the only evidence before the Court is that I told

10   Mr. Patterson to file the return, and because he could not do

11   it on his own, and because he went seeking help to get from --

12   I believe it was 1996, '97, '98, '99 and 2000 filed by Mrs.

13   Hess, that she was unwilling to do all the returns until all of

14   them were done.

15        And that is why, as I testified earlier, when she got

16   sick, there was nothing else anybody could do after the second

17   extension on Mr. Patterson.  There wasn't a third extension.

18        And also there's nothing reflected in the evidence of the

19   government's exhibit that shows that Mr. Patterson, when he

20   filed the extension, that he did not say here is an estimated

21   payment of tax.  We have no evidence of that.

22        I don't remember myself personally what actually happened,

23   because I believe he had a CPA who was helping him do that.

24   Obviously, if he owed $34,000 in March of 2003, from back in

25   April 15th of 2001, then the government would extensively be

1    asking for late penalties for late payment.  And there was

2    nothing reflected in the government's transcript that he had

3    been charged for late payment in regard to that filing as

4    well.

5         So to that -- for that score, I believe that

6    Mr. Patterson's $34,000 should not be considered as tax loss to

7    Lindsey Springer.

8              THE COURT:  Well, what -- if you agree with

9    Mr. Patterson's testimony that you and Mr. Stilley, in effect,

10   boasted to him that you and Mr. Stilley did not file returns,

11   then what was the context in which you said that to him?

12             MR. SPRINGER:  Well, it had to do with gifts.  As far

13   as I was concerned, that was Mr. Patterson, the only thing I

14   can receive is a gift or donation and those aren't taxable and

15   that's why I would not be required to file a return.

16        On Mr. Stilley's side, I don't know what he boasted in

17   that regard, other than what I heard him say the first meeting

18   when Mr. Patterson asked that question, and I just heard

19   Mr. Stilley say he doesn't file returns.  That's all that

20   anybody heard him say.  There was no other elaboration.

21        I did not even know at that point anything about

22   Mr. Stilley's business in that regard until Mr. Patterson

23   actually told me.

24        It was something that was quite unique when I sat down in

25   1999 with Mr. Roberts and Mr. Stilley.  We never had a

1   conversation about whether Mr. Stilley files tax returns.  And

2   I never heard Mr. Stilley tell Mr. Roberts he didn't have to

3   file tax returns.  Never one time.  If I had heard that, I

4   would have given the same response I've given every time, which

5   was they need to file those returns if they're earning gross

6   income.  And it was almost like I made them angry every time I

7   said it.  It wasn't something they wanted to hear.

8       And interestingly enough, with Mr. Patterson, as

9   Mr. Gollihare's report demonstrates, he -- he had not only not

10  filed '96, '97, '98, and '99, but he also had asked for refunds

11  for '95 and '97, which is what he was charged with.

12      And Mr. O'Reilly referred to Mr. Patterson's willful

13  failure to file the 2000 tax return.  And Mr. Patterson or Mrs.

14  Patterson were never charged for the year 2000.  There's never

15  been a finding they willfully failed to file a tax return for

16  the year 2000.  In fact, the extension filing would show

17  otherwise in that regard.

18      And keeping in mind, even though Mr. Patterson did not

19  file except the extension on April 15th, 2001, he was indicted,

20  the evidence shows, in April of 2003, and there was no 2000

21  charge in that indictment.  So even --

22          THE COURT:  Well, he blew right past April 15th of

23  '01, right?

24          MR. SPRINGER:  He filed an extension, and then he

25  filed another extension.

```
 1          THE COURT:  He blew right past October 15th.

 2          MR. SPRINGER:  He did.

 3          THE COURT:  And he felt the hot breath of the

 4  government on his neck and he ultimately filed in what?  '03?

 5          MR. SPRINGER:  Cynthia Hess was -- filed in '01 to do

 6  those returns.  It just took her a long time.  She had --

 7          MR. O'REILLY:  Objection.  There's no evidence of

 8  when Ms. Hess was hired.

 9          MR. SPRINGER:  I did testify that I'm the one that

10  went and found her, Your Honor, and it was unrebutted.

11      But the government had plenty of opportunity by April 15th

12  of 2003 to know whether Mr. Patterson had willfully failed to

13  file a 2000 tax return, and they did not charge him with that

14  willful failure to file that year.  They did, however, charge

15  him with '96, '97, '98, and '99, years that were beyond my

16  knowing and communicating with Mr. Patterson.

17      So under that score, I don't believe Mr. -- there's any

18  evidence Mr. Patterson willfully -- there's been a finding he

19  willfully failed to file a 2000 tax return having to do

20  anything with any statements made by me as to how my ministry

21  at that time operated, and I never heard him say he didn't file

22  the 2000 return because Mr. Stilley told him he didn't have to

23  file tax returns either.  I never heard Mr. Patterson say

24  that.  I may be mistaken, but I don't remember hearing him say

25  that.  I just remember him saying what he heard either of us
```

1  said, which was I said I don't have to file a tax return

2  because of gifts.

3      Now, on Mr. Lake, that's another interesting timeline.

4  Mr. Lake was indicted before he had even met myself or Oscar

5  Stilley for a series of failures to file, very similar in

6  connection like Mr. Patterson, only Mr. Patterson hadn't been

7  indicted at the time that he met Mr. Stilley or myself.

8      And Mr. Lake, as I testified today, and that Mr. Shern

9  confirmed yesterday, Mr. Lake actually, prior to his trial,

10 fired Mr. Stilley, hired another lawyer, went to trial, hung

11 the jury, and then pled guilty the following week, and still,

12 under the government's testimony, did not file a tax return for

13 the year 2000.

14     And the evidence shows that I never even knew the name

15 James Lake until December of 2000, and it -- as Mr. Gollihare

16 points out, I did not advocate -- well, strike that.

17     I did not tell Mr. Lake and there's no evidence that I

18 told Mr. Lake that he was not required to file a tax return for

19 the year 2000.

20     What there is evidence of is that Mr. Lake had already

21 stopped filing tax returns, and what he didn't like me telling

22 him is what caused him to go get other counsel.  There's a

23 reason why he fired Oscar Stilley, and he said it was because

24 he didn't like Oscar's advice.

25     And, of course, he went to trial and then eventually pled

1   and still did not file a tax return.  He was an airline pilot.

2           THE COURT:  Yeah, he was a Delta pilot.

3           MR. SPRINGER:  A Delta pilot.

4           THE COURT:  According to Mr. Shern, the grand jury

5   testimony was to the effect that both you and Mr. Stilley told

6   Mr. Lake that he had no legal obligation to file returns.

7           MR. SPRINGER:  I don't remember those exact words,

8   Your Honor.

9           THE COURT:  From Shern or from yourself?

10           MR. SPRINGER:  From Mr. Lake.  I don't remember

11   Mr. Lake saying those exact words.  I heard what Mr. Shern said

12   yesterday, and obviously I take exception to those exact

13   words.

14       The consistency of what Mr. Lake was saying had to do, in

15   my opinion, with what -- how I treated money that people gave

16   me, and this is where I got kind of crossways with him on the

17   witness stand, and this is the videotape that I chose not to

18   play, but I did testify about the videotape today and the

19   government did not cross-examine me on it whatsoever, and on it

20   I am -- I testified under oath that I am -- I'm showing

21   Mr. Lake why he's required to file a tax return, and it is --

22   it is this single event that caused him to fire Oscar Stilley,

23   and that was the point of me saying that the video showed --

24           THE COURT:  Well, was Mr. Stilley telling him to

25   hurry up and file?

1          MR. SPRINGER:  Actually, Your Honor, I left that

2    day.  I had -- probably had only two meetings with both

3    Mr. Lake and Mr. Stilley, I never heard them ever talk about

4    whether or not Mr. Lake was required to file a tax return.

5          In fact, the one conversation would have been when the

6    videotape was made and another one was out in California, where

7    Mr. Stilley was trying to get into the case and telling

8    Mr. Lake that his beliefs were not appropriate.

9          But other than that, I am not privy to other conversations

10   between Mr. Lake and Mr. Stilley.

11          THE COURT:  Proceed.

12        Bear with me just a minute.

13          MR. SPRINGER:  Interestingly, as far as Dr. Roberts

14   goes, Mr. Gollihare, on his final report, points out that Oscar

15   Stilley became an attorney on April 15, 1991, and Mr. O'Reilly

16   suggests to the Court that the -- Dr. Roberts, who at that

17   point had been a doctor, goes to a person who is not even out

18   of law school yet and becomes convinced that Dr. Roberts'

19   theories are correct because of what Oscar Stilley tells him

20   what he learned in the Irwin Schiff book, and Mr. O'Reilly

21   turns that testimony into he went to an expert on the tax law,

22   and that's why --

23          MR. O'REILLY:  Objection.  Just for clarification,

24   someone he believed to be an expert on the tax law.

25          MR. SPRINGER:  And yet Oscar Stilley didn't even know

 1   anything about taxes at the time he was coming out of law

 2   school.  Most lawyers that I've met that have come out of law

 3   school are very green on the subject matter.

 4       And so it's disingenuous to even accept that Dr. Roberts,

 5   who, by the way, was Mrs. Gray at the time, was going to the

 6   same college that Oscar Stilley was going to, that somehow

 7   Dr. Roberts would have had a warm fuzzy feeling about something

 8   that a third-year law student at the University of Arkansas

 9   was, you know, saying to him.

10       So it's impossible to accept that Dr. Roberts, in 1990,

11   went to Oscar Stilley as an attorney because he wasn't one

12   yet.  And that's on page 17 --

13           MR. O'REILLY:  Your Honor, objection, simply as to

14   relevance with respect to Mr. Springer.  Dr. Roberts' tax loss

15   is not attributed to him, so this argument does not seem

16   appropriate for Mr. Springer to be making.

17           THE COURT:  Seems odd that you're -- your pro se

18   status means that you are here for yourself.

19           MR. SPRINGER:  Sure.

20           THE COURT:  I'm having a hard time squaring this with

21   anything that might logically be argued by you on your own

22   behalf.

23           MR. SPRINGER:  Mr. O'Reilly referred in a

24   conversation with Your Honor to the phrase "relevant conduct."

25   I wrote it down and put quotes around it, when he was

```
 1  discussing with you Dr. Roberts and his reliance on
 2  Mr. Stilley.
 3            THE COURT:  Well, you're not going to be held
 4  accountable for anything Mr. Stilley said to Dr. Roberts way
 5  back in the 1990s.
 6            MR. SPRINGER:  Thank you.  I was just making sure I
 7  was on that point.
 8       Okay.  With Mr. Turner -- and I've made notations of the
 9  separation between the proposed tax liability that the
10  government has on the chart for 1999, 2000, 2002, and 2003.  I
11  think Mr. O'Reilly misspoke, unintentional, when you asked him
12  was it for 1999 through 2003, and the answer should have been
13  no, there's no 2001, it's only for four years, that is on the
14  chart.  And in that regard --
15            THE COURT:  Now, wait, wait, wait, wait.  Let's get
16  this cleared up.  My notes from Mr. O'Reilly's argument
17  indicate that his assertion by way of argument was that the
18  Turner tax liability that existed at the time of the IOLTA
19  transaction in August of '05 was Mr. Turner's tax liability for
20  '99 through '03, and you're saying that's -- that that must be
21  an oversight on Mr. O'Reilly's part?
22            MR. SPRINGER:  Well, yes, because the charts from
23  Mr. Miller on the third party for myself only have '99, 2000,
24  2002, and 2003.
25            THE COURT:  Do you take issue with the $145,713
```

1  amount that the government says was due from Mr. Turner as of

2  August of '05?

3          MR. SPRINGER:  Yes.  Absolutely.  In fact, they

4  testified just shortly ago that -- Mr. O'Reilly stated that

5  Mr. Turner just now lost in tax court over those years.

6          THE COURT:  So you're saying it should have been

7  higher?

8          MR. SPRINGER:  No.  I'm suggesting that these numbers

9  or amounts were in litigation by Mr. Turner at the time -- at

10  least up until whenever Mr. O'Reilly said -- I don't know

11  exactly the particulars about it, but he said that he lost in

12  tax court not too long ago, was the statement that

13  Mr. O'Reilly made.

14          THE COURT:  Proceed.

15          MR. SPRINGER:  I also do take exception with the

16  $145,713 as it relates to the wire transaction or the loan to

17  me.  That was certainly not any information that I was privy to

18  in 2005 with regard to Mr. Turner borrowing the money.  And

19  instead of paying $145,000 in taxes with a $250,000 loan, that,

20  instead, he wired it to me.  And there's been no evidence that

21  anybody ever said I was aware that Mr. Turner owed $145,000.

22  The only evidence is that I convinced Mr. Turner to go hire a

23  CPA and get his tax returns prepared.

24          THE COURT:  Well, you knew he -- as of the summer of

25  '05, you were well aware Mr. Turner was in hot water with the

1  IRS -- fair to say?

2       MR. SPRINGER:  Yes, fair game in that, yes, sir.

3  Yes, sir.  But did not know these amounts or these years, was

4  unaware of the specifics.

5       I met one time -- and I believe I testified about this, I

6  met one time with the Department of Justice in Michigan, and

7  Mr. Turner and I went in there together, and I was coming off

8  of the IFC conference calls and trying to convince them that I

9  believed I could convince thousands of people to file their tax

10  returns if they would just allow me a little opportunity to do

11  so.

12       And, ultimately, they did agree, although they didn't

13  express it at that time, and allowed me to continue on those

14  conference calls to convince people to file their returns.

15       I also was unaware that -- the evidence shows that I was

16  unaware that when Mr. Turner borrowed that money that he was

17  doing anything that related to the taxes itself.

18       My understanding was that he was -- from Paul Stumpo's

19  testimony, after they had witnessed a trial together, that

20  Mr. Stumpo told Mr. Turner to make sure he has enough money to

21  hire enough counsel to take on the Department of Justice if

22  he's not going to file his returns.

23       And I even believe Mr. Burt testified he was at the same

24  trial as Mr. Stumpo was and Mr. Turner was that then caused or

25  resulted in causing Mr. Turner to, I guess, go borrow that

1  money initially.

2      The government made a statement about Mr. Turner not

3  having a lien on the Lexus that was purchased with money that

4  came out of Mr. Stilley's IOLTA account from that $250,000 to

5  transaction, but what was also testified to about by me

6  directly during trial is that I spent $60 or $65,000 on that

7  RV, repairing it, bringing it up to the status it is now, and

8  including the purchase of a 22-foot trailer that I pulled

9  behind it.

10     And if you add the numbers up of all the money that was

11 spent on purchasing it, going and getting it, and all the

12 corrections -- or the repairs that I did, not including the

13 time I spent on it, which was just countless amounts of hours

14 from September until December of 2005, on my back, most days,

15 that those numbers are greater than $250,000.

16     It was just the way in which the money was positioned is

17 how it got used to buy the Lexus -- a portion of the Lexus.

18 There was a trade-in on top of that.

19     So because there was no lien on the Lexus does not mean

20 that Mr. Turner's interest wasn't secured by the money being

21 spent on the RV.

22     The government also suggests that I -- by not standing in

23 Mr. Turner's way in coming and picking up the RV that he has a

24 lien against that I've committed another act of tax evasion.

25     Now, presuming, from that angle, then that they suggest

1    that that money belonged to me and not to Mr. Turner, while at

2    the same time, Mr. Miller testifies that what I did is stole

3    the money, which none of that is true.  And you can't have a

4    lien on something that you have no control over if you stole

5    it.

6         And so here I was in this position and didn't do

7    anything.  I just sat frozen.  But if I kept it, then I stole

8    it.  If I let Mr. Turner come get it without my standing in his

9    way, committed an act of tax evasion, so says Mr. O'Reilly.

10        And the whole point was trying to get Mr. Turner back his

11   money.  And, in fact, my understanding is he is going to pay

12   the taxes that the tax court ordered he now owes when he sells

13   the RV, and that's what he told me.

14        But that had nothing to do with why I didn't stand in his

15   way to repossess it.  I hadn't been able to make a payment on

16   that RV in over two years.  And the market is coming up, the

17   economy is looking a little bit better, so he was ready to take

18   a chance with it, and that's why he came and got it.  And it is

19   hard to miss; it's quite a big monster.

20        Mr. O'Reilly mentioned the word "scheme" in reference to

21   these people who would write me checks and give -- with the

22   word "donation" on them, and the word "scheme" that he's

23   mentioning there is not the scheme in the theory of the

24   indictment, and it's not the scheme Mr. Gollihare refers to in

25   his report.  It's a different scheme.

```
 1        And the scheme is that by merely somebody writing
 2   "donation" or not on a check, that somehow that that single act
 3   defrauds the IRS.
 4        And that is just not true.  As Mr. O'Reilly then said, the
 5   defrauding is by not filing the tax returns, which, of course,
 6   willful failure to file tax return, we all know by this case,
 7   is a misdemeanor.
 8             THE COURT:  Now you're getting -- I've heard you and
 9   I'm not going to cut you off, but -- let me assure you of that,
10   but I've heard you on the various specific adjustments and on
11   the loss issues, especially the third-party tax loss issues,
12   which are very legitimate issues, but now you've moved into
13   matters that were thoroughly aired at trial and resolved
14   against you, so I'm not sure how much you're going to be able
15   to gain by arguing -- re-arguing matters that were definitively
16   resolved against you by the verdict of the jury.
17             MR. SPRINGER:  I was only emphasizing the word
18   "scheme" outside of the charge in Count 1, which was coming
19   under I think -- I believe Mr. O'Reilly was coming under
20   relevant conduct with a scheme whereby which the scheme was to
21   have people write "donation" on a check prior to the 2000 year
22   in Count 1.  I believe that's what Mr. O'Reilly was referring
23   to, and I was just --
24             THE COURT:  Are you saying that I should look at that
25   differently if it's outside of the conspiracy period versus
```

1   inside the conspiracy period?

2           MR. SPRINGER:  I don't believe that the writing of a

3   check to Lindsey Springer in and of itself is an act of

4   defrauding the IRS.  I don't believe that that lone act of

5   somebody just writing a check to me and me receiving it is an

6   attempt by anybody to defraud the IRS.  What I don't do or do

7   with it obviously has become an issue in this case.

8           THE COURT:  Okay.  Go ahead.

9           MR. SPRINGER:  But Mr. O'Reilly said it was the act

10  of them writing that check, and that's why I was standing in

11  opposition to.

12      As far as restitution goes, that is one of the places

13  where I got hung up on Count 1 versus Count 2, 3, 4, 5, and 6,

14  and what I expressed when I was on the witness stand about the

15  confusion that Count 1 and relevant conduct has then caused --

16  for instance, I'm not certain about restitution being over and

17  above the amount of money that I would have said to have been

18  owing.

19      Mr. Gollihare, in his report, he suggests that because the

20  object of the conspiracy was to evade the payment of taxes,

21  that that then allows for interest and penalty to be included,

22  whereas Mr. O'Reilly -- he argues interest and penalty.  He's

23  not pushing for it in his objections.  And specifically stated

24  that Mr. Stilley and I were not charged with either willful

25  failure to pay taxes or committing the act of attempt to evade

1  the payment of taxes in the tax evasion charges.

2      And so, again, that's where I got -- I'm still confused on

3  the difference between what Mr. Gollihare is saying, because,

4  in his view, the object of the conspiracy is evading the

5  payment of taxes, but in the government's briefs that they

6  filed, they said the object of the conspiracy was a broader

7  defraud-the-IRS theory, and -- whereas evasion of payment comes

8  into a more narrow focus and would be actually a conspiracy to

9  commit an offense against the laws of the United States, a

10 separate charge than a conspiracy to defraud the United

11 States.

12     In either way, I don't believe that interest and penalty

13 are appropriate, because Mr. Stilley and I were not found

14 guilty of evading the payment of taxes specifically or willful

15 failure to pay taxes under 7203.

16     There are many crimes there and we were charged -- I was

17 charged with willful failure to file a U.S. Individual Income

18 Tax Return form for each of the years, with affirmative acts

19 for three of the years, and Mr. O'Reilly has admitted on more

20 than one occasion the assessment -- it was the evasion of

21 assessment, not the evasion of payment, that was the theory

22 behind the government's charging.

23     So I don't -- under anybody's analysis, I believe interest

24 and penalty should not be included per the Sentencing

25 Commission's report that they should not be included.

1          THE COURT:  Tell me specifically what you refer to by

2   way of the Sentencing Commission's report.

3          MR. SPRINGER:  May I have just a moment?

4          MR. O'REILLY:  Your Honor, I may be able to clarify

5   this.  I believe Mr. Springer is confusing the tax loss

6   computation, which does include it under 2T1.1, with

7   restitution, where penalties and interest are includable.

8          THE COURT:  Well, that -- that's what prompted me to

9   make my inquiry to Mr. Springer.  If the Sentencing Commission

10  has published anything that tells me that I should ignore the

11  interest and penalties for restitution purposes, now is the

12  time to tell me about that.

13         MR. SPRINGER:  In agreeing with Mr. O'Reilly, the

14  Sentencing Commission said it shouldn't be included in tax

15  loss, so if -- if restitution is a different amount than tax

16  loss, then that's the spot that I'm confused about, because my

17  understanding of restitution was to make the victim whole.  So

18  if penalties and interest can't be included in the tax loss

19  calculation, which is the -- making the victim whole, then it

20  would seem logical that restitution would also not include

21  interest and penalty, because they have the mechanisms the IRS

22  has within their own ability to know how to calculate interest

23  and penalty in those senses.

24      Now, the Commission did say if it was evasion of payment

25  or failure to pay taxes, then interest and penalty would apply,

1   but they gave that exclusion in the guideline.

2       Mr. O'Reilly mentioned I referred on the witness stand as

3   to a special skill, and I believe my testimony was my special

4   skill was something I obtained after reading the Bible, which

5   somehow allows me to remember everything that I read in the tax

6   code.  That was the extent of my admission to special skill.

7       And I also said on the witness stand that I have no idea

8   how to explain how I got that.  There was no training.  There's

9   no evidence of any schooling.

10      And that special skill is not an issue that has ever been

11  raised in this trial by anybody.  Nobody said, because of his

12  special skill of being able to remember what he reads, this is

13  what happened to me.

14      Your Honor, may I inquire, is there still need for

15  commentary -- or statements from me regarding public or private

16  trust?

17              THE COURT:  Certainly an issue.

18              MR. SPRINGER:  Okay.  If I might just have one more

19  moment, Your Honor.

20              THE COURT:  Surely.

21              MR. SPRINGER:  First, I'd like to address the

22  otherwise extensive argument that the government has made.

23  When I was referring to what they had stated about me having

24  people write a check to me and some noting on it "donation" or

25  "gift," but, obviously, through the evidence at trial, the

majority of them did not say anything on them, that there is no

evidence that I was an organizer or leader of criminal activity

that either involved five or more participants or was otherwise

extensive.

The -- and my understanding is we're referring only to

Count 1 as the lead count of the grouping, because it is the

one the government seeks to get to the highest level of the

Sentencing Guidelines.

And in Count 1, the criminal activity in Count 1 is an

agreement between Mr. Stilley and I to defraud the IRS, and

then there's a listing in the indictment of five manner and

means.

THE COURT:  First of all, do you understand that the

application of that aggravating role guideline is -- will be

determined on the basis of your relevant conduct and not on the

basis of the conduct underlying any one count of conviction?

That's the law.  So you would do well to put your argument in

the framework of the law.

MR. SPRINGER:  United States v. Griffin, the Tenth

Circuit, in 2009, found that for the district court to consider

relevant conduct, the government must prove by a preponderance

of the evidence that the defendant engaged in conduct related

to the offense of conviction pursuant to 1B1.3 and the conduct

constituted an offense under either federal or state law.  And

that's 584 F.3d 1004, Tenth Circuit, 2009.

1      An attempt to conceal gross income or failure to file a

2  tax return could be relied upon by the Court for the meaning of

3  the phrase "criminal activity."

4      But in my opinion, that is as far as that should be

5  allowed to go.  And the government has not established any

6  other offenses, other than the ones that are in the indictment,

7  without the -- in addition to that, there is, for 2001, 2006,

8  and 2007, evidence that I received gross income for those

9  years.

10      But as they went backwards past 2000, they did not point

11  to any offense that I committed outside of the years of the

12  indictment.

13      And as far as "otherwise extensive" goes, as the probation

14  office report reports, the factor was the "extent to which

15  other people are used even if they are not criminally

16  responsible for the conduct."

17      In the instant case, the majority of the people associated

18  with the defendant, fellow tax protestors, Mr. Gollihare wrote,

19  were not criminally responsible for defendants' crimes, but

20  received a service, whether it be information, advice, legal

21  research, and writing referrals or legal counsel for which they

22  compensated the defendant resulting in gross income.

23      And Mr. Gollihare cites to 3B1.1, Comment 1, and United

24  States v. Linney, 174 Fed. Appx. 142 at 144, West Virginia.

25  And I guess that's where I'm confused, when you said just a

1  moment ago, it's all of the charges together, and I agree with

2  Mr. Gollihare's report on page 12, which said -- which says,

3  and finds, that the Count 1 offense only involved two

4  participants:  me and Mr. Stilley.

5       And for that basis, there is no evidence that the conduct

6  was otherwise extensive or deserving of a four- or three-level

7  increase.

8       Under 3B1.3, Comment Note 1, for the adjustment under

9  3B1.3 to apply, the position of public or private trust must

10 have contributed in some significant way to facilitate the

11 commission or concealment of the offense.

12      And, again, my reading of the word "offense" is all of

13 them that are related or grouped together and the lead offense

14 we billed as the one that gets the most points, and that

15 Mr. Gollihare found -- and I don't think the government objects

16 to -- is Count 1, and that's why the phrase "offense" is there,

17 under my understanding of the reading.

18      In the event that -- scratch that.

19      In United States v. Spear, Tenth Circuit, 2007, 491 F.3d

20 1150 at page 1153, the Tenth Circuit found:  "In order to apply

21 the enhancement for abuse of a position of trust, the

22 government must satisfy two elements establishing, one, that

23 the person occupied a position of trust, and, two, the position

24 of trust was used to facilitate significantly the commission

25 and concealment of the crime."

```
 1        As to the first element, a quote in this circuit, the
 2   Tenth Circuit, the question of whether an individual occupied a
 3   position of trust is evaluated from the victim's perspective,
 4   citing United States v. Chee, C-H-E-E, 514 F.3d 1106 at page
 5   1118, Tenth Circuit, 2008.  See also United States v. Slaton
 6   (ph), 2008 Westlaw District of Kansas at Number 3819836.
 7        As Mr. Gollihare finds, the conduct in this case is viewed
 8   in two parts:  The earning of income, a lawful undertaking; and
 9   the conduct of concealing this income and failing to file tax
10   returns conduct, that is not lawful.
11        The defendant, in providing information, encouraged,
12   advised and represented to fellow tax protestors, may have
13   entered into a private-trust-type relationship; however, these
14   individuals are not victims.  They sought a service and
15   received what they paid for.
16        The victim is the United States, said Mr. Gollihare,
17   through its bureau, the Internal Revenue Service.  The
18   government acknowledges that neither Defendant Springer nor
19   Defendant Stilley had a position of trust with the United
20   States, end of quote, and that's from their sentencing
21   memorandum at page 17.
22        As to the second element --
23            THE COURT:  Mr. Springer, I have read and will reread
24   the presentence report.  Do you have any more argument?
25            MR. SPRINGER:  I did not occupy a fiduciary position
```

1  relative to the United States of public or private trust.  And

2  there has been no evidence otherwise.

3      As far as special skills go -- scratch that.  I'll leave

4  that one alone.

5      May I have one moment, Your Honor?

6          THE COURT:  Surely.

7          MR. SPRINGER:  Is there any questions you would have

8  of me at this time, Your Honor?

9          THE COURT:  I do not.

10          MR. SPRINGER:  Okay.  Thank you.

11          THE COURT:  We'll take a mid-afternoon recess before

12  we have any argument Mr. Stilley may care to present.  And so

13  we'll take a 15-minute break.

14      Court will be in recess.

15      (RECESS HAD)

16          THE COURT:  Mr. Stilley.

17      Bear with me just a minute.  I left my pen in the office.

18      Thank you.  You may proceed.

19          MR. STILLEY:  May it please the Court, I'd like to

20  start off by saying that I intend to try to keep things as

21  concise as possible.  I know the Court has ruled on a lot of

22  things, and I will presume that unless the Court indicates

23  otherwise the Court remembers those things, and if the Court

24  hears anything that causes it to think that those need to be

25  changed, that the Court will do that.

1    I'd like to start with tax loss.  That's the first thing

2  that the Court had directed our attention to.  But I want to

3  attack that from, perhaps, a slightly different angle.

4    I will start with the second PSR.  Actually, perhaps, I

5  think, on tax loss, it would be better to look at the

6  addendum.  That's where that the objections were considered.

7    But, really, before I even start in on that, I think we

8  need to consider what is properly before the Court upon which

9  the Court can base its decision, and that is evidence.  We have

10 to have evidence.  It has to be proven to the preponderance of

11 the evidence.

12   At this point in time, we've got one theory from the

13 probation department and one theory from the government.  Oscar

14 Stilley disagrees.  And now we have another theory from the

15 witness stand, from Mr. Shern.

16   Mr. Shern was asked about the scope of the conspiracy, and

17 there was a reason for that.  The United States v. Dazey case

18 out of the Tenth Circuit says that certain information has to

19 be obtained so that the Court can make particularized

20 findings.

21   In order to assist the Court in doing that, I asked

22 questions of the witness to find out what the witness would say

23 what the scope of the conspiracy was.

24   Mr. Shern said that the conspiracy was a conspiracy to

25 basically cheat certain persons in need of legal services out

1   of their money.

2        And the context and the way that this was stated indicates

3   that it really didn't have anything to do with taxes.  He said

4   that Mr. Hawkins was a victim, despite the fact that

5   Mr. Hawkins' case didn't have anything to do with taxes.

6        Now, he also said that basically all the people that put

7   money in were also conspirators.  That doesn't make a lot of

8   sense.  It doesn't make a lot of sense that the conspirators

9   were -- are alleged to be victims at the same time.

10       Nevertheless, we have testimony from the witness

11  concerning what the overall conspiracy was.  And just to nail

12  things down, I said -- I asked:  How many conspiracies?  One

13  conspiracy.  What was the conspiracy for?  He testified, as I

14  just told you.  And then I asked:  Anything else?  Mr. Shern

15  said no.

16       So that brings us to what the probation department --

17  actually, the probation department at page 5 of the PSR

18  addendum did cite United States v. Dazey and explained how that

19  that analysis was necessary, and how that that had to be

20  applied.

21       It says because a defendants' accountability only extends

22  to the criminal activity he agreed to undertake.  So,

23  therefore, it's necessary to determine the scope of the

24  conspiracy, because the Court couldn't go outside that scope of

25  the conspiracy.

1    And then it's necessary -- you can see as you read further

2  in the commentary of the probation department -- it's

3  necessary, then, to see the specific criminal activity the

4  particular defendant agreed to jointly undertake, i.e., the

5  scope of the specific conduct and objectives embraced by the

6  defendants' agreement.  And that's on -- at the top of page 6.

7         THE COURT:  Well, are you suggesting to me that the

8  scope of jointly-conducted criminal activity, within the

9  meaning of Guideline 1B1.3, I believe it is, is limited by the

10  scope of the conspiracy in a count of conviction?

11         MR. STILLEY:  Yes, Your Honor.  And the reason for

12  that, I very stringently objected to any proposed sentences or

13  the PSR unless it was made specific as to what -- where the

14  basis was at.

15    And the best basis that we've got to determine where the

16  government and the probation department started is at Count 1,

17  so I'm presuming that Count 1 is where that we start before we

18  go to 1B1.3 and either (1)(a) or (1)(b).

19    And the reason that I'm saying that that is essential is

20  because although that there may have been other testimony about

21  certain facts in the case, no other person has testified and

22  given evidence in the trial or in the sentencing phase from

23  which the Court can make the particularized findings required

24  by that case.

25    And I've got that -- there's -- in one of my filings,

1    actually, in Document 330 at page 2 in Dazey, the Court said:

2    "This means proper attribution at sentencing requires

3    particularized findings about the scope of the specific

4    agreement the individual defendant joined" --

5        Now, I understand that it doesn't really make sense that

6    Mr. Shern's testimony about the scope of the agreement is

7    totally inconsistent with what the charges were.  For the

8    purposes of this sentencing agreement, we have to have evidence

9    and it has to rise to the level of preponderance of the

10   evidence.

11       Mr. Shern's testimony is all that we have.  We don't have

12   anything else from which these particularized findings about

13   the scope of the specific agreement the individual joined could

14   be determined.

15       Now, one might think, well, doesn't that mean that we

16   would simply go to a little different route and try to

17   determine what the losses were of the people who were allegedly

18   harmed by the conduct of the defendants in allegedly having

19   cheated these individuals?

20       Due process would not allow the Court to take a theory

21   that was raised for the first time at a sentencing hearing and

22   expand that and flesh that out in order to make findings of

23   losses with which to enhance or to drive a sentence on that

24   defendant.

25       The defendant is entitled to have notice of this in a

1    reasonable time.  And as you've -- I'm sure you've noticed

2    there have been certain questions of the witnesses, in addition

3    to the pleadings that I have set forth, complaining about the

4    lack of information being given to Oscar Stilley.

5        On the 11th of March, I filed my objections to the

6    presentence report, provided all the necessary parties,

7    including the government, stated that I wanted copies of the

8    documents that were relied upon in the creation of this

9    report.  And I also asked for that in a separate e-mail,

10   despite having full knowledge of this and despite the fact, by

11   the witness's own testimony, that these documents had been

12   available for about at least two or three months.  These

13   documents were not provided.

14            MR. O'REILLY:  Your Honor, objection, confusing and

15   misleading.  If the Defendant Stilley is speaking of the

16   summaries, those were not provided until the Court directed

17   sometime in the last couple of weeks.  If he's talking about

18   the underlying documents, he has had those for quite some time.

19            THE COURT:  That's understood.

20        Proceed.

21            MR. STILLEY:  And the reason that I wanted those

22   specific summaries was for the purpose of being able to

23   understand the legal theories and the factual theories of both

24   the government and the probation department, because it's

25   important to have that information in order to effectively

1   defend yourself in this proceeding, as a sentencing proceeding,

2   and as this Court has said many times, the sentencing

3   proceeding is one of the most important of the entire case.

4       This being the case, I would simply respectfully urge the

5   Court to determine that the particularized findings cannot be

6   made in -- according to the law, in any manner that would allow

7   the attribution of any losses, tax losses or other losses to

8   the Defendant Oscar Stilley with respect to Count 1 of the

9   indictment.

10      And with respect to Counts 3 and 4, I would respectfully

11  request that the Court simply declare that because neither the

12  government nor the probation department indicated that they

13  would rely on those counts as the count from which to go to the

14  guideline, that they are -- this Court would not properly use

15  either of those counts to find either tax loss or a loss on the

16  basis of the theory by Mr. Shern.

17      Now, I want to start now on Turner, Patterson, Roberts,

18  and Lake, but before I do that, I think it would be instructive

19  to look and see what is -- what we are talking about as far as

20  1B1.3 relevant conduct.

21      It says that -- and I'll start at paragraph small Roman

22  iv -- "Adjustments in chapter 3 shall be determined on the

23  basis of the following:"  If you start with A, all acts and

24  omissions committed, aided, abetted, counseled, commanded,

25  induced, procured or willfully caused by the defendant and

then -- if you skip B -- it says, that occurred during the commission of the offense of conviction in preparation for that offense or in the course of attempting to avoid detection or responsibility for that offense.

Now, this provision, especially the subpart B here, that would be applicable to Count 1, the conspiracy count.  However, now we're looking, I presume, at least, that we are looking at the government claiming that Oscar Stilley personally committed acts during the commission of the offense of conviction or in preparation or in an attempt to avoid, with respect to these four individuals.  That is my assumption and that's where I start.

When you look -- well, actually, even if you look at Count 1 or 3 or 4, none of those counts give a time frame that allows us to make any sense at all of Sentencing Guideline 1B1.3.  It simply doesn't make sense.

When you look at Roberts, the alleged statement to Roberts was made in 1990 or perhaps 1991.  The presentence report -- and, of course, on these matters, the government certainly did not object -- it says that Oscar Stilley graduated law school in December of 1990 and was admitted April 15th of 1991.

So the allegation that Oscar was an expert at that point in time and, therefore, some comment that he made is of great significance now doesn't make any sense.

It was not said during the commission of the offense or in

1   the course of attempting to avoid detection or attempting to

2   avoid detection or responsibility in -- of that offense.  Those

3   -- trying to go back that far simply stretches the guideline

4   provision far beyond anything that its plain language could

5   possibly tolerate.

6         Your Honor, could I have a moment to get the exhibits?

7              THE COURT:  Surely.

8              MR. STILLEY:  Your Honor, as to Eddy Patterson for

9   the year 2000, there's one thing I think needs to be brought

10  out, and that is the government continually tries to take words

11  by Oscar Stilley or Lindsey Springer and just keep embellishing

12  them and making them get bigger and bigger.

13        The words that are generally first cited are that Oscar

14  Stilley said that he didn't file tax returns.  They take those

15  words, and then in their arguments, they begin to embellish and

16  say Oscar told him not to file, Oscar counseled him to do that,

17  Oscar counseled him to do something else, but it's not there.

18        Furthermore, as the probation department notes, there is a

19  First Amendment, and the First Amendment guarantees a freedom

20  of speech, it guarantees rights to speech, and certainly Oscar

21  Stilley was not put on notice that simply making a comment that

22  he believed in -- to be in confidence with his client, making a

23  comment about what he did, without further, could constitute an

24  act that could either be criminal or could be used to enhance

25  some other alleged offense.  It doesn't make any sense at all.

1      And there is no -- as far as I can tell, there is no

2   suggestion that there was any conduct to go with the words

3   suggesting that there was anything more than the basic comment

4   that was made either to Patterson or to Lake or to Roberts.

5      Furthermore -- and the evidence is not heavy on this, but

6   I think it's clear from trial testimony, as well as some of the

7   sentencing testimony, that the practice of Oscar Stilley was to

8   assist people and to do the things that they asked him to do,

9   and many times it's admitted that many times Oscar assisted --

10  Oscar Stilley assisted people in preparing and filing returns.

11      And the suggestion that -- for example, on Patterson, the

12  timing of a certain event could impute liability to Oscar

13  Stilley based on an offhand comment, it's not permitted for a

14  number of reasons, for the First Amendment and for general

15  principles of criminal liability.

16      Now, on the -- on Mr. Turner, there's obviously two sides

17  of that:  There's the $250,000, and I think that the Court is

18  -- is fairly well-briefed on that, that the $250,000 does not

19  represent materially a depletion of the assets of Mr. Turner.

20  It's still available for the IRS.  I think that that has been

21  adequately addressed.

22      Let's stop and think about the means of attribution of any

23  liability on Patrick Turner to Oscar Stilley.  The facts that

24  are shown in the evidence -- to the preponderance of the

25  evidence or more include the fact that money was sent to Oscar

1   Stilley's IOLTA account.  There's nothing wrong with that.

2        The fact that it was a large sum suggests that some --

3   there was at least some contemplation of using some of that

4   money to pay taxes.  There was apparently a decision on the

5   part of the client to litigate -- I think the testimony or

6   argument at least suggests that there was a tax court case, and

7   Mr. Turner transferred that money to someone else.

8        Your Honor, I don't really understand what the government

9   or the probation department relies on.  I presume that they are

10  relying on Count 1, and I've already demonstrated the reasons

11  that Count 1 doesn't work for this.

12       I don't see how that any other count could work for this,

13  partly to attribute liability to Oscar Stilley, partly because

14  of the reasons that I have already briefed this Court, I think

15  it was December 9 of 2009, in my post-trial motion for judgment

16  as a matter of law and for new trial.

17       The law in Arkansas, it's undisputable that a lawyer who

18  is directed by his client to disburse money to another person

19  has to disburse the money.  It's not an option.  It is an

20  ethical violation.  It is a tort of conversion.  It is probably

21  a crime for a lawyer to refuse to give money to the person who

22  is entitled to the money promptly.

23       And, Your Honor, I would respectfully contend that trying

24  to hold a lawyer liable because they did something that the law

25  and ethical rules require, would be a very bad idea.  It would

1  set a new precedent.  It would chill the activities of

2  attorneys.  It would put attorneys in the place of deciding

3  which rule or which law do I break.

4      I've not heard any testimony from anyone to the effect

5  that Oscar Stilley had some other reasonable option and could

6  have followed that reasonable option but he did not.

7      And for that reason, I would respectfully submit that

8  Patrick Turner's taxes, which are still -- apparently still

9  being litigated or perhaps that litigation is closed, but there

10  was a good-faith effort on the part of the client to do what he

11  thought he had a legal right to do.  There was no evidence that

12  Oscar Stilley, in his mind, had any evil knowledge or the basis

13  for doing anything differently or any basis for reporting the

14  client's conduct to any of the authorities.

15      We know, it's a well-established matter, that there's

16  attorney-client confidentiality.  It would have to be a really

17  egregious thing that would even authorize an attorney to breach

18  his own client's confidentiality and go to some other authority

19  and tell that authority that the information gained in

20  confidence from that client.

21      Allowing the government to pile on with this and use this

22  as tax loss would be in conflict and inconsistent with very

23  important legal principles in our society.

24      Mr. Lake presents a slightly different set of facts.

25          THE COURT:  Mr. Stilley, excuse me, before you get

1   into that.  I think analytically Dr. Roberts may be in a little

2   bit different category, but is -- do you understand the

3   government to be arguing with respect to the attribution of the

4   third-party tax loss as it relates to Mr. Patterson and

5   Mr. Lake, that the government is urging that that -- what we

6   call third-party tax loss be attributed on the basis of conduct

7   that, in fact, occurred after the beginning of the conspiracy

8   period as alleged in Count 1?

9           MR. STILLEY:  Well, that depends on whose story you

10  take.  If you take Mr. Shern's testimony of 1999, I think he

11  said was the start, then the timeline would fall in the --

12  within the time of the alleged conspiracy, yes.

13          THE COURT:  Proceed.

14          MR. STILLEY:  Okay.  And that brings up the idea in

15  my mind that I respectfully contend to this Court, it's

16  fundamentally unfair to Oscar Stilley that he has to defend on

17  these two gentlemen that you just mentioned without having it

18  told to him specifically we are relying on this count, for

19  example, Count 1, and then it's either A or B, it's your

20  individual acts or it is the agreement that you made, so that I

21  know which is which, going down that road, and then setting

22  forth in their argument the particularized facts or at least

23  their position of the particularized facts whereby that they

24  can link these things together.  I contend, respectfully, that

25  it's unfair to ask Oscar Stilley to defend at a sentencing

1    proceeding without this fundamental information.

2        Okay.  On Mr. Lake, we have an individual who is already

3    criminally charged before he meets Oscar Stilley.  Mr. Lake

4    says that he was told this little snippet.  There's no

5    suggestion that he changed his conduct in any way on the basis

6    of this snippet.  There's no suggestion that there was any act

7    performed by Oscar Stilley to go with the speech whereby that

8    it might be taken out of the category of free speech and put

9    into some other category.

10       We have actual evidence that Mr. Lake fired Oscar Stilley

11   and replaced Oscar Stilley with a new legal team and then he

12   did the trial, and shortly thereafter, pleaded guilty.

13       There's -- it just doesn't make sense to try to attribute

14   all the tax losses of James Lake to Oscar Stilley on the basis

15   of an alleged offhand remark made to James Lake.

16       Taken to its logical conclusion, suppose that an

17   individual, just a person, speaks at a conference and tell --

18   or let's say they just say to ten people I don't file tax

19   returns and those other people happen not to file tax returns,

20   based on the government's theory, that person can be held

21   liable for all ten of those persons' taxes if they didn't file

22   and pay.  Anybody they made this offhand comment to could be

23   held liable, even without any encouragement, any suggestion

24   that someone had said that not filing returns was advisable,

25   and without any evidence of anything that would suggest an

 1    intent to cause imminent lawless activity.  It just doesn't

 2    make sense.

 3        It attacks one of the most foundational elements of our

 4    constitutional republic:  The right to free speech, the right

 5    to criticize the government.  And in this case, it's not even

 6    criticizing the government, it's simply making a comment.

 7        And I think you can see that the government is not

 8    satisfied that such offhand comments or such statements -- even

 9    if you just take it as a solemn statement, that such statements

10    are enough, because they continually try to say that it's a

11    little bit more, it's something else, when you -- if you look

12    back at the written record, you don't see any such things.

13        So the government seems to at least tacitly admit that

14    this is not enough evidence to charge the conduct to Oscar

15    Stilley.

16        And, once again, I can't tell you -- based on either the

17    presentence report or the government's sentencing memorandum, I

18    can't tell you where do they start, what particular count, and

19    then at 1B1.3, which particular provision that they went to and

20    then the facts that they've got.

21        I am forced to roam and try to figure out what they did.

22    And if I go down one path, then the government can get up here

23    afterwards and say, oh, he picked the wrong path, it's this

24    other path, and that is why Oscar Stilley should be held liable

25    or tagged with these amounts and that these should be claimed

1  as tax losses.

2      Your Honor, if I could set this aside and get back to my

3  paperwork.

4          THE COURT:  Surely.

5          MR. STILLEY:  Your Honor, the criminal -- the

6  criminal source question to me is rather confusing with various

7  different theories about how that might be.

8      The addendum at page 8 -- PSR addendum at page 8 addresses

9  this and says there is no evidence that the defendant defrauded

10 anyone but the IRS.

11     On the basis of my central argument, Mr. Shern has already

12 testified that the conspiracy was not to defraud the IRS, it

13 was to defraud the people who put money in, the people who gave

14 money to Lindsey Springer or Oscar Stilley.  That is who that

15 was.  And the -- and that's the evidence that we have to go

16 on.

17     The probation department is saying that this was an effort

18 to hide Turner's liquid assets from the IRS, and, secondly, to

19 fund Turner's defense.  The transaction was clearly a scam, but

20 its object was to defeat the IRS, not rip off Turner.

21     And I would respectfully contend -- well, I've already

22 stated the reasons that the lawyer should not be punished for

23 doing something he didn't have any other opportunity to -- he

24 didn't have an opportunity to change or do differently, and it

25 -- there's no evidence in the record that I can see from which

1   a finding could be made that Oscar Stilley would have had any

2   knowledge about such a plan even if it did exist.  And there

3   has to be some evidence.

4        As to the obstruction of justice, that seems to be a

5   contention that Oscar Stilley did not satisfactorily comply

6   with the subpoena from the government.  Now, actually, that's

7   not all of it.  There's two parts:  One, there is the

8   contention that Oscar Stilley testified that the money was not

9   gross income, that it was simply gifts or donations.  With

10  respect to that information, I would respectfully contend that

11  there's no basis for saying that that is perjury, because an

12  attorney could make that argument and might win.  I think this

13  Court would recognize that based on the evidence that we have

14  before us, that an attorney could argue this matter in tax

15  court, in the district court, at a circuit court or otherwise,

16  and have a possibility of winning.  And there's no evidence

17  that I can recall from anybody suggesting that Oscar Stilley

18  did not actually believe these facts and have at least a

19  reasonable basis for these facts.

20       For example, the words of Mr. Patterson, his conduct at

21  the time -- I'm not saying necessarily that there was evidence

22  that Oscar Stilley saw his letter saying that it was a

23  donation, but, nonetheless, the -- all the people who had

24  spoken to Oscar Stilley had said this is -- to say to give

25  money, had said this is a donation, and Oscar Stilley could

1  reasonably rely on the representations of his own clients to

2  say this money was actually a donation.  The people that told

3  me to give it said that it was a donation.

4      There would have to be some evidence to show that Oscar

5  Stilley could not reasonably rely upon the representations of

6  his own clients to tell the grand jury what he perceived and

7  what he believed.

8          THE COURT:  In responding to the grand jury subpoena,

9  is it your contention that, in so doing, you were acting as

10  attorney for Lindsey Springer?

11          MR. STILLEY:  Certainly not.  Certainly not.  I was

12  -- I was subpoenaed as a witness.

13          THE COURT:  Proceed.

14          MR. STILLEY:  Now, the second part of this, and once

15  again, I take great umbrage at this -- well, actually on this

16  one, I do understand what they're saying.  They're saying that

17  there's two ways that Oscar Stilley obstructed justice.  The

18  other way is to say that Oscar Stilley didn't give all the

19  documents that were responsive to the subpoena.

20      What they're really saying is that Oscar took too narrow

21  of the reading of the literal words of what they said and

22  literally complied with what they said.

23      However, there was another subpoena that was issued, there

24  was a date set, and between the time of the setting of that

25  date and the date -- and the date for performance, there was a

1   proceeding in the Northern District of Oklahoma in which

2   Mr. Snoke jumped up and said, Oscar Stilley is under criminal

3   investigation.

4        Well, now they have spilled the beans and told Oscar

5   Stilley that he is, in fact, under criminal investigation, when

6   Mr. Shern had previously said that wasn't the truth.

7        Subsequently, the government withdrew that subpoena.

8        It just doesn't make sense to tag Oscar Stilley with

9   obstruction of justice for not responding to a subpoena that

10  was withdrawn.

11       Now, they may say, well, it was for not responding to the

12  previous subpoena --

13            THE COURT:  Let me shorten this up a little bit.  I

14  have no inclination, unless you persuade me otherwise, to find

15  obstruction on the basis of any deficiency in document

16  production.

17            MR. STILLEY:  Okay.  Thank you, Judge.  That's all I

18  need to know.

19       Your Honor, could I have just a moment?

20            THE COURT:  Surely.

21            MR. STILLEY:  Thank you.

22       Your Honor, to the extent that there's any discussion of

23  sophisticated means, I am not speaking on any person's behalf

24  other than my own.  Of course, as a pro se person, that is the

25  general rule, but as to Oscar Stilley, this couldn't possibly

1    constitute sophisticated means.

2         I don't want to reiterate what I've already said before

3    about Count 1, but I think that's true here, but as to the

4    question of sophisticated means, we do have a situation where

5    Oscar Stilley had a legal duty to do what he did and simply did

6    the job that he was required to do, and nobody stated any other

7    way that Oscar could have handled his affairs so that he would

8    escape this conduct or this enhancement.

9         The Court did make a comment about the cost of prosecution

10   as that being shockingly low; however, I believe general legal

11   principles require the government to put on some proof.  And in

12   this case, Oscar Stilley objected to the costs of prosecution

13   partly for legal, as well as for factual reasons.

14        The government chose not to be specific about where that

15   they were going.  They chose not to say the -- I think it was

16   7206 or 7406.  I think it's 7206 -- which provision that they

17   were relying upon to get to the costs of prosecution.

18        They didn't put any evidence of it on.  And I'm not going

19   to speculate it was negligence as opposed to a conscious

20   decision.  It may well have been a conscious decision for the

21   simple fact, if they had put it on, then Oscar Stilley is going

22   to cross-examine on the basis of the facts as they might apply

23   to the law that the witness relied upon to say that costs of

24   prosecution were appropriate.

25        Now, when we go to the restitution, I think we have a

1    similar circumstance there, that the government is not being

2    sufficiently clear about the specific reasons that they should

3    be entitled to the restitution.

4         They -- if they chose to or if the probation department

5    chose to, they could go and specifically state here is the

6    restitution provision, here is the specific part of this law

7    that we're relying on, and here is the count that we're relying

8    upon to tag in to get the restitution, then we would have a

9    sort of chain of command so that I would have a means of

10   effectively rebutting that claim of restitution.  We didn't

11   have that.

12        I do appreciate the probation department setting forth the

13   fact that it would not be mandatory restitution, but I still

14   take the position that restitution is not proper in this case.

15        Now, there's a suggestion that Oscar Stilley should be

16   liable for Lindsey Springer's state tax and federal tax and

17   Oscar Stilley -- or Lindsey Springer, the converse.

18        Of course, I'm arguing on my own behalf, but I think it's

19   helpful for the Court in determining these general issues.

20   Let's stop and think about this.

21        If the government wanted to get this enhancement, or if

22   anybody wanted to promote this, surely they would say

23   specifically what state they're talking about.  And in my

24   initial presentence report, it didn't say what specific state

25   they were talking about, didn't give specificity about the

1    amounts, which, once again, left me, a week before the

2    sentencing hearing, before I had information, the summaries,

3    that would give me information from which that I could even

4    divine how they were going about this.

5         Now, as to these tax, and especially but not limited to

6    the state tax, we have to, once again, consider we have the

7    rule, we have the guideline, and the government or the

8    probation department had the power to say exactly how they were

9    doing this.

10        We are starting with, for example, Count 1.  That's where

11   we start.  And we also say that it was your individual conduct,

12   so we go to subpart A.  We're going to go there.  And here is

13   the facts that cause you to have a state tax liability.

14        None of those things were done.  There was -- nothing has

15   been done through the evidence or through the theory to hook up

16   a legal basis for holding Oscar Stilley liable for Lindsey

17   Springer's state taxes with Oscar Stilley's range of

18   punishment.  And I respectfully contend that that deprives due

19   process not to be given that information.

20        And, furthermore, even as to, for example, Oscar Stilley's

21   alleged liability, we have the same impediment, we have the --

22   nobody seems to want to say, okay, Mr. Stilley -- scratch

23   that.

24        We heard the government say there's no venue for Oscar

25   Stilley's personal taxes in this district.  There's no venue.

1   Now, we all understand that's not the end of the question.

2   That's really kind of the start of the question when you're at

3   the sentencing phase.  But it's not the end of the question.

4        And here is what has to be done.  Once again, the

5   government would have to say, okay -- for example, Count 1 --

6   and I'm presuming that if they had done their job, they would

7   have gone to Count 1, they would go to Count 1, and then they

8   would go to subpart B in the case of jointly undertaking

9   activity and show how that Oscar Stilley's alleged tax

10  liabilities can be brought into this sentencing phase -- how

11  that can be brought into this sentencing phase on the basis of

12  the facts.

13       And when we look at the facts, what we have to look at is

14  that this occurred during the commission of the offense of

15  conviction in preparation of that offense or in the course of

16  attempting to avoid detection or responsibility for that

17  offense.

18       We simply don't have that.  We cannot get there no matter

19  which choice is taken.  There is an insurmountable hurdle for

20  the government no matter what road they go down.

21       I would respectfully contend that the reason the

22  government was not specific in their legal theories and their

23  factual basis is because they didn't want to pin themselves

24  down.  They wanted to leave themselves open so that they could

25  put their witness on the stand and have him give a theory that

1   was totally inconsistent with matters stated previously.

2       Your Honor, could I have just a moment again?

3           THE COURT:  Surely.

4           MR. STILLEY:  Unless the Court has questions, I have

5   nothing further.

6           THE COURT:  Let me -- stand by just a moment,

7   Mr. Stilley.  Let me -- I may have a question.

8       I don't see in the addendum to the presentence report,

9   either with respect to you or with respect to Mr. Springer,

10  that there was any objection to the cost of -- with respect to

11  cost of prosecution.  Maybe -- let me make sure that was

12  covered in the first instance in the presentence report.

13          MR. STILLEY:  I think I can help you, Judge.  I think

14  that was paragraph 55 and just about at the last page.

15          THE COURT:  Paragraph 55 in the presentence report

16  with respect to you?

17          MR. STILLEY:  Yes.

18          THE COURT:  Okay.  Now -- and, again, I just went

19  back through the addendum, both with respect to you and with

20  respect to Mr. Springer, and I certainly could have missed it,

21  but is there any place in the addendum in your instance that

22  there is a statement to the effect that you did object to the

23  paragraph with respect to cost of prosecution?

24          MR. STILLEY:  Your Honor, I really don't think there

25  is, and I complained just a little bit.  I tried not to be too

 1    strident or anything, but I complained that I didn't feel like

 2    my objections were sufficiently addressed in certain cases.

 3              THE COURT:  Well, did you, in fact, object with

 4    respect to paragraph 55?

 5              MR. STILLEY:  I, in fact, did and I can tell you

 6    exactly where I did that too.  That would be in my objections

 7    at page 14, and it says, "Stilley objects to paragraph 55 in

 8    its entirety.  26 USC 7206 has nothing to do with this case."

 9    Wait a minute.  No, wait a minute.  I think -- is it 56 --

10    okay.  Both of those -- you can see what I said there.

11              THE COURT:  This is what -- which pleading is it that

12    you're reading from now?

13              MR. STILLEY:  I am -- pardon me.  It is the

14    objections of Oscar Stilley, and, unfortunately, they don't

15    have a number on them.  I think -- well, I can tell you when it

16    was filed.  It was filed the 11th of March.  And I apologize.

17    I see the government has a good practice of putting the sealed

18    document notice of electronic filing on theirs.  I didn't do

19    that.  So I'm not sure what number that is.  I'm suspecting

20    314.

21              MR. O'REILLY:  Your Honor, I don't recall what the

22    number was, but Mr. Stilley had no objection to the factual

23    predicate of paragraph -- of the cost of prosecution.  It had

24    something to do with 26 USC Section 7206(2), having nothing to

25    do with the case --

```
 1              THE COURT:  Let's not -- from either Mr. O'Reilly or

 2    Mr. Stilley, let me see what the objection --

 3              MR. O'REILLY:  May I approach, Your Honor?

 4              THE COURT:  You may.

 5              MR. O'REILLY:  Towards the back, Your Honor.

 6              THE COURT:  Okay.  I don't construe this as -- I

 7    mean, you say you object to paragraph 55 in its entirety, but

 8    then you say that simply that 26 USC Section 7206 has nothing

 9    to do with this case.  I'm hard-pressed to conclude that that

10    put the dollar amount in issue.  Nothing was -- to the extent

11    you chose to get specific, you got specific about a legal issue

12    under Section 7206.

13        Go ahead.

14              MR. STILLEY:  I think I can help you out on that,

15    because I did also incorporate Mr. Springer's objections, and

16    at page 14 of his objections, he was more specific and said --

17    he said that for purposes -- would you like me to take this and

18    let you read the document?

19              THE COURT:  If you would, give that to the clerk and

20    let me take a look at it.

21              MR. STILLEY:  Sure.

22              THE COURT:  Well, Mr. Springer's objections did take

23    issue with respect to the amount.  I'll give this back to the

24    clerk.

25              MR. O'REILLY:  Your Honor, if I may, what paragraph
```

1    are we addressing?  Because I am not finding that.

2             THE COURT:  Mr. Stilley, if you would let

3    Mr. O'Reilly take a look.  He said he would want -- I don't

4    know if he said for purposes of sentencing or appeal, but he

5    said he would want a complete accounting of it.  I think,

6    fairly construed, that means he is taking issue with the

7    amount.

8             MR. O'REILLY:  Thank you.

9             THE COURT:  Thank you, Mr. Stilley.

10            MR. STILLEY:  Thank you, Judge.

11            THE COURT:  I do have one question for

12   Mr. O'Reilly.  And I'm not inviting rebuttal argument, mind

13   you, but I do have one question.  I'm going to ask this

14   question and then I'll give the defendants an opportunity to

15   address it, if they so choose.

16       I'm concerned with the tax loss attribution among others,

17   with respect to Mr. Roberts.  That obviously applies only to

18   Mr. Stilley.

19       The tax loss is apparently attributed to the tax years '92

20   through '95 and the comments that the government relies on by

21   Mr. Stilley were apparently said back in 1990 or 1991.

22       That perhaps has some of its own factual issues, but then

23   I come to Application Note 2 under Guideline 2T1.1, and the way

24   I read Application Note 2 as it relates to individual conduct

25   as opposed to jointly-conducted activity, I have to find, in

1   order to attribute a tax loss to Mr. Stilley relating to

2   Mr. Roberts' tax liability from -- based on comments made by

3   Mr. Stilley to Mr. Roberts back in the early nineties, I have

4   to find that is part of the same course of conduct, unless the

5   -- that that includes -- well, let me put it this way:

6   Application Note 2 says, and I quote, "In determining the total

7   tax loss attributable to the offense," and then it cites

8   Guideline -- the relevant part of Guideline 1B1.1 -- "all

9   conduct violating the tax laws should be considered as part of

10  the same course of conduct or common scheme or plan unless the

11  evidence demonstrates that the conduct is clearly unrelated."

12      Now, the people who wrote the guidelines, whatever else

13  might be said of them, they used words sometimes -- when they

14  intended to be vague, they were vague.

15      One of the best illustrations of that, not involved in

16  this case, is the guideline that provides for an enhancement if

17  a firearm was possessed, with no further guidance than that.  I

18  think that's intentionally vague.

19      Well, I think the language of Application Note Number 2 is

20  intentionally specific.  "Should be considered as part of the

21  same course of conduct or common scheme or plan unless the

22  evidence demonstrates that the conduct is clearly unrelated."

23      Well, that, I take it, as a rather pointed effort from a

24  drafting standpoint to cast the burden on the defendant to show

25  that any particular activity was unrelated, because it says,

1  "unless the evidence demonstrates that the conduct is clearly

2  unrelated."

3      Even with that rather pointed thrust, if you will, I'm

4  having some difficulty taking Mr. Stilley's statements to

5  Dr. Roberts in the early nineties and relating that in any way

6  to the matters of which these defendants stand convicted so as

7  to tack it on, if you will, from a relevant conduct

8  standpoint.

9      I need you to help me on that.

10          MR. O'REILLY:  Your Honor, I believe the Court would

11  have absolutely no problem -- in fact, I know -- I believe the

12  presentence investigation report concluded correctly that

13  Mr. Springer's failure to file in earlier years --

14          THE COURT:  You mean Mr. Stilley?

15          MR. O'REILLY:  No, Mr. Springer, his failure to files

16  are relevant conduct for the tax loss for Mr. Springer from

17  1990 to 1995.

18      Similarly, Mr. Stilley did not file returns, despite

19  earning income, throughout the 1990s.  If we were talking about

20  his income, I think the Court would be similarly easily

21  persuaded that that is part of the same course of conduct.

22  It's his willful violation of tax laws.  We don't have that

23  information, but we do have --

24          THE COURT:  We don't have what information?

25          MR. O'REILLY:  What Mr. Stilley was earning for the

1    1990s.  We just don't know.  If we had that information, if we

2    had a calculable tax loss with respect to Mr. Stilley's

3    failures to file through the nineties, that would be readily

4    and easily seen as part of the same course of conduct.

5        In the same vein, it's important, the United States

6    believes, that if he is counseling people to not file and

7    continues to conduct that same course of conduct up to and into

8    the conspiracy he joined with Mr. Springer in 2000, that

9    misconduct or -- is relevant conduct as to him.

10       And that's the government's theory upon which under 1B1.3

11   (a)(1)(A), all acts and omissions committed, aided, abetted,

12   counseled -- and it goes on -- or willfully caused by the

13   defendant are includable as relevant conduct.

14       If the evidence showed --

15           THE COURT:  Well, wait a second.  Well, (a)(1)(A) is

16   qualified also by the language "that occurred during the

17   commission of the offense of conviction in preparation for that

18   offense or in the course of attempting to avoid detection or

19   responsibility for that offense."

20       Now, it should also be pointed out that Subsection A goes

21   on, in (a)(2), to say, "solely with respect to offenses that

22   require grouping," which this -- which under 2T1.1 does --

23   "that were part of the same course of conduct or common scheme

24   or plan as the offense of conviction."

25       Okay.  Then that concept is transplanted over to Guideline

1   2T1.1, when 2T1.1 talks about should be considered as "part of

2   the same course of conduct or common scheme or plan unless the

3   evidence demonstrates that the conduct is clearly unrelated."

4        So for one thing, I think -- unless I'm missing something,

5   I think you may actually have a little more wiggle room under

6   2T1.1, Application Note 2, than under 1B1.1, but --

7             MR. O'REILLY:  Your Honor, that is correct.  That is

8   actually what I should have directed the attention of the Court

9   to.  And it is our position that this was Mr. Stilley's common

10  scheme or plan throughout the 1990s and this century.

11            THE COURT:  There's no question but what he was a

12  non-filer throughout that time; I think the evidence

13  establishes that.

14            MR. O'REILLY:  Yes, Your Honor.  And based upon

15  Dr. Roberts' testimony, it appears that he was also counseling

16  others.  The fact that we only have Dr. Roberts as the one that

17  we have identified does not change the fact that it was part of

18  a common -- Mr. Stilley's common scheme.  The fact that he

19  didn't join forces and conspire with Mr. Springer until 2000

20  does not change that fact.

21            THE COURT:  Has Roberts' testimony been transcribed?

22            MR. O'REILLY:  No, Your Honor.

23            THE COURT:  Okay.  I appreciate your answer to that

24  question.

25       Mr. Stilley, do you have anything to say by way of

380

1    response on that?

2             MR. STILLEY:  Yes, sir.

3             THE COURT:  I'm just giving you an opportunity to

4    respond to the government's answer to my question.

5             MR. STILLEY:  Okay.  My position would be that,

6    before you can really address what the common scheme

7    encompasses, you would have to know what the scheme was, and

8    that takes us back to what Mr. Shern said, that the scheme

9    under Count 1, which I have to presume that's where we're at,

10   the scheme under Count 1 was to take money away from people who

11   needed legal services, regardless of whether it was tax or

12   otherwise.

13            THE COURT:  I think what Mr. O'Reilly is relying on

14   is the "same course of conduct" language from the Application

15   Note under 2T1.1, as opposed to a common scheme.  You were not

16   hooked up with Mr. Springer back in the early nineties.  So if

17   he -- if he's got anything to go on, it would be the same

18   "course of conduct" language from that Application Note.

19            MR. STILLEY:  Okay.

20            THE COURT:  You don't need to worry -- in other

21   words, you do not need to worry about -- for this purpose, the

22   application of the common scheme concept.

23            MR. STILLEY:  Okay.  As far as course of conduct, the

24   government concedes that they have no evidence of any

25   requirement to file, so -- and, really, that brings up another

1  point:  The fact that Oscar Stilley says -- he tells

2  Dr. Roberts -- if he says he doesn't file, that's irrelevant.

3  If he says that he can't find a basis for being required to

4  file, that is a little bit different situation.

5      But when you look at what was going on at that point in

6  time, the government is simply saying, well, he made a comment,

7  he didn't file returns.

8      They don't know how much money Oscar Stilley made.  I

9  don't see how that they could possibly get where they're going

10 under that different approach.

11          THE COURT:  Do you take issue with Dr. Roberts'

12 testimony in this courtroom that you told him that he had no

13 obligation to pay income taxes or file returns?

14          MR. STILLEY:  Your Honor, honestly, I would really

15 like to hear exactly what he said.  Is that a possibility?

16          THE COURT:  No.  What I just told you is pretty

17 close.

18          MR. STILLEY:  Well, Your Honor, I won't dispute what

19 he testified to from the stand.  I didn't think that it was

20 simply fair, and that's why I was really hoping I could get a

21 copy of the transcript at this point in time, but --

22          THE COURT:  We're past that.  Both sides have had

23 ample opportunity to order a transcript.

24      Do you take issue with Dr. Roberts' testimony in which he

25 characterized you as quite gifted in legal and constitutional

1  issues?

2          MR. STILLEY:  No, I don't contest that.  I don't

3  recall if he said what his time frame was.  As for today, I

4  would agree with him.

5          THE COURT:  Very well.  Thank you, sir.

6          MR. STILLEY:  Certainly.

7          THE COURT:  Just a couple more things I'd like to

8  cover before we recess.

9      First of all, Mr. Stilley asserted that his conviction on

10 Count 1 is not a felony.  I disagree with that and I have so

11 stated, and I don't really care to hear argument on that point,

12 but let me inquire first with respect to Mr. Springer:

13 Mr. Springer, you objected to a good many factual paragraphs of

14 the presentence report, and I hope you have sensed that I --

15 that even though you objected to most, if not all, of the

16 factual paragraphs, the Court has not in any sense and does not

17 in any sense have or express any sense of irritation at all.

18 This matter is very important to all concerned and I do hope

19 that you have sensed that I have been here and am here to hear

20 everything that either side has to present.

21     But lest there be any ambiguity, it's my understanding

22 from paragraph 43 that those counts would be -- would carry a

23 maximum of five years each and that paragraph -- that Counts 1

24 through 4 would carry a maximum of five years each, and Counts

25 5 and 6 a maximum of one year each.  Is that your

1  understanding?

2         MR. SPRINGER:  Yes, Your Honor.  The reason I

3  hesitate is one of my issues on appeal is about the meaning of

4  "defraud," and that would be the only hesitation I had in

5  answering that question.

6      But as it stands now, and as I stand convicted on the

7  Court's instructions, I believe that it is five years for Count

8  1 and five years for 2, 3, and 4, and then one year for 5 and

9  6.

10        THE COURT:  The misdemeanor counts one year?

11        MR. SPRINGER:  Yes.

12        THE COURT:  Okay.  Mr. Stilley, I have the same

13  question only with respect to paragraph 41, which is the

14  corresponding paragraph in your presentence report.  Consistent

15  with what I just said, and for that matter, what Mr. Springer

16  said just a moment ago, it is my understanding that the maximum

17  term as it relates to you on Counts 1, 3, and 4 would be five

18  years per count; is that correct?

19        MR. STILLEY:  Well, Your Honor, I would

20  respectfully -- most respectfully continue to urge that Count 1

21  is a misdemeanor on the grounds that the underlying offense was

22  also a misdemeanor, and I understand the complexities and I

23  respect this Court's decision.  That's why that I said, when I

24  started my argument, that I would not replow ground unless the

25  Court asked.

1          THE COURT:  Okay.  Very well.  That's understood.

2   Thank you.

3       I'm going to inquire -- does -- and this is a matter that,

4   again, relates to my desire to see to it that all parties are

5   heard and understand that they have been heard on all matters

6   they wish to assert.  I'll inquire first of the government and

7   then of the defendants.

8       Does the government or the defendants have any procedural

9   objection to the manner in which the sentencing proceeding has

10  been conducted to this point?

11          MR. O'REILLY:  Not from the United States, Your

12  Honor.

13          THE COURT:  Mr. Springer?

14          MR. SPRINGER:  Your Honor, does that question begin

15  yesterday morning through today and nothing before that?

16          THE COURT:  That's true.  And if you would like to

17  consult with your standby counsel, feel free.

18          MR. SPRINGER:  Thank you, Your Honor.

19      (DISCUSSION OFF RECORD)

20          MR. SPRINGER:  I'm still thinking about what they

21  just told me, Your Honor.  Sorry.

22      Without -- just prefacing, Your Honor, all my objections

23  up to the sentencing hearing, I maintain those objections

24  through the sentencing hearing, but as to any particular

25  objections, starting from yesterday, not including my previous

1  objections, I do not have any new objections.

2          THE COURT:  Thank you.

3      Mr. Stilley.

4          MR. STILLEY:  With respect to the past two days, I

5  don't have objections with the following provisos:  Just as

6  Mr. Springer, I continue to urge all objections during this

7  proceeding and to maintain all arguments made in pleadings

8  prior to this proceeding, and specifically, but without

9  limitation, I continue to urge the lack of adequate notice to

10 prepare for the charges that I would have to meet -- or the

11 issues that I would have to meet today on the basis of what was

12 given to me by the probation department and the government,

13 and, number three, I would continue to urge -- or to argue that

14 my ability to order a complete record in this case for these

15 proceedings is not meaningful because of lack of funds.

16      Other than that, I have no objection to the procedure of

17 these proceedings.

18          THE COURT:  Very well.  On that last point, I urge

19 you to waste no time after we're through tomorrow with getting

20 the -- preparing the necessary paperwork, perhaps with the aid

21 of your standby counsel, to obtain a transcript at public

22 expense.

23          MR. STILLEY:  Thank you, Judge.

24          THE COURT:  Mr. Springer, I have one more question

25 for you, and then I'll be putting the same question to

 1  Mr. Stilley.

 2      Bearing in mind it's a quarter till five and this has --

 3  we've explored seemingly dozens of issues, but there's one

 4  matter that I don't want to determine and address without

 5  giving you an opportunity to concisely respond, and that is

 6  I'll be happy to hear concisely any comments or objections you

 7  may have with respect to the proposed special conditions of

 8  supervision set forth beginning in paragraph 49 of your

 9  presentence report.

10          MR. SPRINGER:  May I review that again for just a

11  moment?

12          THE COURT:  You surely may.

13          MR. SPRINGER:  No, I do not, Your Honor.  That

14  appears to be the exact same language as the bond conditions

15  that I'm on right now.  I believe that's where they came from.

16          THE COURT:  Mr. Stilley?

17          MR. STILLEY:  Your Honor, most respectfully, I would

18  ask that subparagraph A be removed.  I feel that's

19  unnecessary.  I feel that I have comported myself properly with

20  respect to any work that I might do without something of this

21  nature and it seems to me to be overbroad.

22      Obviously, there are laws against unauthorized practice of

23  law, so -- that I would not want to violate any of the laws,

24  obviously.

25      And as to other things, I just don't see any evidence that

1    any acts that I might perform would be either harmful to the

2    public or otherwise such that I should not be permitted to do

3    that.

4        I don't have any objection to the last two sentences of

5    that paragraph.

6        As to paragraph B, the -- it appears to me that the

7    efforts necessary to prepare a proper appeal would consume most

8    of my time, and I would respectfully request that I be allowed

9    to do simply the work that I'm capable of finding, and that I

10   be allowed to do any lawful work that I can find and not be

11   required to do a specific amount.

12       Really, I don't think that the electronic monitoring or

13   the curfew requirements or the travel restrictions are

14   necessary or that they should be so restrictive.  I would

15   prefer that that be removed.  I would think that it could be

16   without any threat of harm.

17       And based in part on the fact that the PSR has been

18   completed, I would respectfully submit that I think C, D, and E

19   could be removed.

20           THE COURT:  Okay.  Thank you, sir.

21       We have now completed all evidence and all argument, short

22   of the government's final comments and the defendants' final

23   comments by way of allocution, which the Court will hear before

24   it imposes the sentence.

25       At nine in the morning, I will make my Rule 32(i)(3)

1  findings as to the disputed portions of the presentence

2  report.  Those will be reduced to writing by way of the

3  transcript of that portion of this hearing in which I do make

4  those findings and that partial transcript will be appended to

5  the non-public statement of reasons portion of the judgment and

6  sentence, which will be distributed to all agencies which will

7  receive copies of the presentence report.

8      So the first order of business tomorrow morning at nine

9  will be my findings pursuant to Rule 32(i)(3) as to the

10  disputed portions of the presentence report.

11      In so doing, obviously, I will rule on all of the

12  objections to the presentence report, and -- which includes the

13  tax loss issue, as well as the various adjustment issues.

14      I will then state my conclusion as to the total offense

15  level and criminal history category under the advisory

16  guidelines.  In each instance, without any contest at all, the

17  criminal history category is 1.

18      And at that point, I will also make appropriate findings

19  with respect to restitution and conditions of supervised

20  release.

21      And I will then hear the final comments of the government

22  and of the defendants by way of allocution and will impose the

23  sentence.

24      So with that, unless either side, government or the

25  defendants, have anything further this afternoon, we will

 1    recess, to resume at nine o'clock tomorrow morning, for those

 2    purposes and only for those purposes.

 3        What says the government?

 4            MR. O'REILLY:  Nothing further from the government,

 5    Your Honor.

 6            THE COURT:  Mr. Springer?

 7            MR. SPRINGER:  Yes, I have one request, Your Honor.

 8    Is it the Court's intention to allow us to report once we're

 9    sentenced?  And if so or if not, would we be able to have an

10    appeal bond hearing tomorrow for the purposes of appeal?

11        I have, like, four cases that I just had to move all those

12    boxes, all the electronic media in all these cases, and I just

13    need to understand how I need to prepare all of that, and I

14    would need a little time to do that if the Court was not going

15    to allow an appeal bond.

16            THE COURT:  I will hear you at the allocution stage

17    or even, if need be, thereafter on that score.

18            MR. SPRINGER:  Thank you.

19            THE COURT:  It is, again, subject to whatever you --

20    what you may have to say and what Mr. Stilley may have to say

21    and, for that matter, what the government may have to say.  It

22    is likely that you will be remanded to custody tomorrow.

23            MR. SPRINGER:  Okay.

24            THE COURT:  Anything further from Mr. Stilley?

25            MR. STILLEY:  No, Your Honor.

1           THE COURT:  Court will be in recess.

2       (COURT ADJOURNED FOR THE EVENING RECESS.  FOR FURTHER

3   SENTENCING PROCEEDINGS, SEE VOLUME III.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25