1            IN THE UNITED STATES DISTRICT COURT

2            FOR THE NORTHERN DISTRICT OF OKLAHOMA

3

4   UNITED STATES OF AMERICA,

5          Plaintiff,

6   vs.                          Case No. CR-09-043-SPF

7   LINDSEY KENT SPRINGER and
    OSCAR AMOS STILLEY,
8
           Defendants.
9
    _____
10

11

12                 SENTENCING PROCEEDINGS

13         BEFORE THE HONORABLE STEPHEN P. FRIOT

14            UNITED STATES DISTRICT JUDGE

15                  APRIL 23, 2010

16                 VOLUME III OF III

17

18

19

20

21

22

23

24

25

```
 1   APPEARANCES:
     FOR THE GOVERNMENT:
 2                            Mr. Charles Anthony O'Reilly
                              U.S. Dept. Of Justice (Box 972)
 3                            P.O. Box 972
                              Washington, DC 20044
 4
                              Mr. Kenneth P. Snoke
 5                            U.S. Attorney's Office (Tulsa)
                              110 W. 7th Street, Ste. 300
 6                            Tulsa, OK 74119

 7

 8   FOR DEFENDANT SPRINGER:
                              Mr. Lindsey Kent Springer
 9                            5147 S. Harvard Ave.
                              Ste. 116
10                            Tulsa, OK 74135

11                            Mr. Robert Scott Williams
                              Standby Counsel
12                            Taylor Ryan Schmidt
                              436 S. Boulder Ave., Ste.850
13                            Tulsa, OK 74119

14   FOR DEFENDANT STILLEY:
                              Mr. Oscar Amos Stilley
15                            7103 Race Track Loop
                              fort Smith, AR 73901
16
                              Mr. Robert Burton, IV
17                            Standby Counsel
                              Burton Law Firm, PC
18                            320 S. Boston, Ste. 2400
                              Tulsa, OK 74103
19

20

21

22

23

24

25
```

1           THE COURT:  I note the presence of all parties and

2    counsel as before.  I will now make my Rule 32(i)(3) findings

3    as to the disputed portions of the presentence report.  These

4    findings will be reduced to writing by way of the transcript of

5    this portion of the sentencing proceedings in which I make

6    findings pursuant to Rule 32(i)(3).  As I mentioned yesterday,

7    this partial transcript will be appended to the non-public

8    statement of reasons portion of the judgment and sentence which

9    will be distributed to all agencies which will receive copies

10   of the presentence report.

11       The first issue that I'll address is the issue of tax

12   loss.  In many ways, this is the most complex of the

13   guidelines-related issues as a review of the proceedings the

14   last two days will indicate.

15       In addressing tax loss, I refer first to Guideline 2T1.1,

16   in particular Application Note 2.  And, by the way, Lori,

17   there's one other set of materials that I need you to bring in.

18       Application Note 2 provides valuable guidance, as one

19   might expect, with the application of Guideline 2T1.1.

20   Application Note 2 states, and I quote, "In determining the

21   total tax loss attributable to the offense," and then it refers

22   to Guideline 1B1.3(a)(2), continuing the quote, "All conduct

23   violating the tax laws should be considered as part of the same

24   course of conduct or common scheme or plan unless the evidence

25   demonstrates that the conduct is clearly unrelated.  The

1    following examples are illustrative of conduct that is part of

2    the same course of conduct or common scheme or plan:  (a),

3    there is a continuing pattern of violations of the tax laws by

4    the defendant; (b,) the defendant uses a consistent method to

5    evade or camouflage income, e.g., backdating documents or using

6    offshore accounts; (c), the violations involve the same or a

7    related series of transactions; (d), the violation in each

8    instance involves a false or inflated claim of a similar

9    deduction or credit; and, (e), the violation in each instance

10   involves a failure to report or an understatement of a specific

11   source of income, e.g., interest from savings accounts or

12   income from a particular business activity.  These examples are

13   not intended to be exhaustive."

14        On this point, I do derive, also, substantial guidance

15   from the decision of the Court of Appeals in United States v.

16   Meek, 998 F.2d 776.  In that case, beginning on page 781, Judge

17   Ebel, writing for the court, said, and I quote, "In determining

18   the tax loss, a court is required to engage in a two-step

19   analysis.  First, the court must decide which tax deficiencies

20   to aggregate together.  Second, it must determine how to

21   calculate the amount of aggravated deficiencies."

22        Then on page -- continuing on page 781, a little farther

23   down the page, the court stated, and I quote, "For offenses

24   like tax evasion for which Section 3D1.2(d) would require

25   grouping of multiple convictions, Section 1B1.3(a)(2) defines

1    relevant conduct to include 'all acts or omissions that were

2    part of the same course of conduct or common scheme or plan as

3    the offense of conviction.'"  Citing Section 1B1.3(a)(2).  Now,

4    continuing in the quote, "The commentary makes clear that the

5    defendant need not have been charged or convicted of these

6    related acts or omissions in order for them to qualify as

7    relevant conduct."

8         And, obviously, that concept is central to

9    the guidelines and central to sentencing in this case because

10   the defendants' activities, in violation of the tax law, have

11   been shown to far exceed the matters -- both temporally and

12   otherwise to far exceed the matters alleged in the indictment.

13        Finally, in the Meek case, over on page 782, the court

14   reached its conclusions in that case.  And I quote, "In light

15   of Section 1B1.3(a)(2), it is clear that the district court had

16   authority to consider the defendant's failure to file tax

17   returns for the years 1984 through 1986 and 1989 through 1991,

18   even though not charged in the indictment as long as the

19   failure to file was part of the same course of conduct for

20   which the defendant was convicted.  We have no trouble

21   concluding that it was.  The commentary to Section 2T1.1 states

22   that, quote, and this is an internal quote, 'all conduct

23   violating the tax laws should be considered as part of the same

24   course of conduct or common scheme or plan unless the evidence

25   demonstrates that the conduct is clearly unrelated.'  The

1    commentary goes on to say that, 'a continuing pattern of

2    violations of the tax laws by the defendant is an example of

3    conduct that is to be considered related conduct.'

4        After citing Section 1B1.3, as I have indicated in

5    Guideline 2T1.1, the court in the Meek case then went on to

6    give its commentary as to how those ought to be applied in the

7    case then before it.  The court stated, and I quote, "This

8    commentary indicates that the government may prove that the

9    defendant's non-charged conduct was part of the same course of

10   conduct as the offense of conviction either directly by

11   establishing that this conduct was part of a continuing pattern

12   of tax violations or indirectly by establishing simply that all

13   the conduct to be aggregated constituted violations of the tax

14   code.  In the latter situation, the government is entitled only

15   to a rebuttable presumption that the defendant's non-charged

16   conduct was part of the same course of conduct as the offense

17   of conviction and the defendant may defeat this presumption by

18   coming forward with evidence that his non-charged conduct was

19   clearly unrelated to his conviction."

20       Obviously, as one might conclude from those passages from

21   the Meek case, the Court of Appeals certainly has provided

22   valuable guidance with respect to the application for Guideline

23   2T1.1.

24       The course of conduct for both of these defendants, as

25   relevant for purposes of Guideline 2T1.1, is, under the Meek

1  case and under the terms of the guideline itself, not

2  necessarily co-extensive with the conspiracy period alleged in

3  the indictment or, for that matter, with the period of

4  individual or joint tax evasion activity actually shown by the

5  evidence at trial.  Under Guideline 2T1.1, I look to all

6  conduct violating the tax laws unless the evidence demonstrates

7  that the conduct is clearly unrelated.  The consistent pattern

8  of non-compliance with the tax laws goes back before 1990 for

9  each of these two defendants.  By their own admission, they met

10  and made common cause when they met at the Pizza Hut with

11  Phillip Roberts in 1999.

12      For the years before that, each defendant is accountable,

13  under the guidelines, for tax losses attributable to his own

14  acts and omissions if there was a continuing course of criminal

15  conduct to the period of time encompassed by the indictment.

16  After that, each defendant is at least potentially accountable

17  under the guidelines for tax losses attributable to the acts of

18  the other defendant to the extent that those losses are rooted

19  in their jointly-undertaken criminal activity.

20      I will now make my findings as to tax losses with respect

21  to both defendants as to all matters other than Mr. Turner and

22  then I will make my findings with respect to Mr. Turner.

23      As to Mr. Springer, for 1990 through 1995, I find his tax

24  losses to have been established by credible evidence with

25  respect to the assessments against him and those assessment

1  amounts will be adopted for sentencing purposes.  For 1999

2  through 2007, the matter is a bit more complicated.  I have

3  eliminated the $12,000 per year in miscellaneous small

4  payments.  Now, I have no doubt that some of those payments

5  were income to Mr. Springer and under the law as articulated in

6  the jury instruction with the heading "gift minister" an

7  instruction, which I am persuaded does accurately state the

8  law, perhaps all or virtually all of those receipts did, in

9  fact, constitute income to Mr. Springer.

10      However, for the purpose of specific tax loss findings,

11  which the jury was not required to make, I do not have evidence

12  of a quality which would enable me to evaluate those relatively

13  small payments that probably amounted to thousands of

14  individual remittances.

15      As to the other receipts for the years 1999 through 2007,

16  I have relied on the evidence admitted at trial and in this

17  sentencing proceeding and have eliminated those payments as to

18  which I am not persuaded that the requisite showing has been

19  made.  Both defendants received numerous checks that in

20  Mr. O'Reilly's words had the inherent appearance of income.

21      When I make my specific year-by-year findings, which I

22  will do shortly, the amounts that I will state for each year

23  will reflect the payments which I am persuaded amounted to

24  gross income to Mr. Springer and the same will certainly apply

25  to Mr. Stilley, although the factual situation as to the

 1    payments received by Mr. Stilley is somewhat less complicated

 2    than it is with respect to Mr. Springer.

 3        This brings me to Dr. Roberts and Messrs Lake, Turner, and

 4    Patterson.  I find that Mr. Springer is accountable for the

 5    loss attributable to Mr. Turner but not for the loss

 6    attributable to Mr. Patterson or Mr. Lake.  As I have said, I

 7    will address Mr. Turner momentarily.

 8        With respect to Mr. Lake, I have reviewed the trial

 9    testimony as taken by the reporter.  The testimony of Mr. Lake

10    as it relates to Mr. Stilley is strong and convincing.  The

11    testimony of Mr. Lake vis-a-vis Mr. Springer is noticeably

12    weaker.  At trial, Mr. Lake quoted Mr. Stilley as telling him,

13    in substance, I'm an attorney, I haven't paid taxes in ten

14    years, you don't understand, you don't have to file taxes.  And

15    Mr. Stilley used those assurances in order to convince Mr. Lake

16    that Mr. Stilley could handle his problem and that he was in

17    good hands.

18        After Mr. Lake gave that testimony, he was asked

19    approximately when did that conversation happen, and Mr. Lake

20    said, it was numerous times, it was reinforced numerous times.

21    But the testimony of Mr. Lake with respect to Mr. Springer, as

22    I have said, is noticeably weaker.  Mr. Lake would only go so

23    far as to say, in substance, that Mr. Springer had referred to

24    a case that they were handling for a dentist and that

25    Mr. Springer told Mr. Lake that we have won cases in Illinois.

1       Now, Mr. Lake did quote Mr. Springer as saying, in

2   substance, you don't have to pay taxes and that's the law.  But

3   in the overall context of Mr. Lake's testimony, and bearing in

4   mind that causation must be found for a tax loss conclusion as

5   distinguished from the issue as to whether the defendants

6   encouraged others to violate the tax law, I am unable to find

7   that the testimony with respect to Mr. Springer's comments to

8   Mr. Lake is sufficiently specific, especially as compared to

9   the testimony about what Mr. Stilley said to Mr. Lake to enable

10  me to find that the tax loss attributable to Mr. Lake should be

11  likewise attributed to Mr. Springer.

12      As I have said, bearing in mind that for tax loss

13  purposes, causation is required, even though causation is not

14  required with respect to the adjustment for encouragement to

15  violate the law, I simply do not find a casual connection

16  between Mr. Springer's statements to Mr. Lake and his failure

17  to comply with the tax law.

18      With respect to Mr. Stilley, it is much easier.  He was

19  quoted, and I believe this was essentially unrebutted and if it

20  was attempted to be rebutted, it would not have been credible,

21  from Mr. Stilley, that Mr. Stilley repeatedly assured Mr. Lake

22  not only that he had not paid taxes in ten years, but you

23  simply do not have to file taxes.  And, as Mr. Lake said, this

24  was reinforced numerous times.

25      Now, as to Dr. Roberts, there is quite properly no

1    contention that Mr. Springer should be held accountable for the

2    tax loss attributed to Dr. Roberts.  I conclude that

3    Mr. Stilley is accountable for the tax loss attributable to

4    Dr. Roberts, even though those losses occurred in the early and

5    mid-1990s.  Under Guideline 2T1.1, Mr. Stilley is accountable

6    for all conduct violating the tax laws as part of the same

7    course of criminal conduct regardless of whether it took place

8    in the context of jointly-conducted criminal activity unless

9    the evidence demonstrates that the conduct is clearly

10   unrelated.

11        Criminal tax violations were Mr. Stilley's way of life,

12   starting before the earliest year of the tax losses relating to

13   Dr. Roberts.  Criminal tax violations are Mr. Stilley's way of

14   life to this day.  Early in his career as an unrepentant tax

15   cheat, Mr. Stilley began espousing the view, which he espoused

16   to Dr. Roberts, that Dr. Roberts had no obligation to pay

17   incomes taxes or to file a tax return.

18        Dr. Roberts' testimony at trial persuades me that he found

19   Mr. Stilley to be a convincing source of tax counsel.  Advice

20   to an individual earning significant income that he is not

21   obligated to comply with the tax laws is certainly

22   counterintuitive to any reasonably intelligent person, but that

23   sort of advice can nevertheless be attractive to a person who,

24   although intelligent, is at the same time fool enough to let

25   his beliefs be dictated by financial convenience rather than

1    logic.  This is especially so when the advice is coming from an

2    individual who expresses himself with the vehemence that

3    characterizes Mr. Stilley's expression of his professed beliefs

4    about the law.

5        I am convinced that Mr. Stilley was persuasive enough and

6    Dr. Roberts was gullible enough that Mr. Stilley's professed

7    views carried the day with Dr. Roberts leading directly to a

8    substantial loss of revenue to the taxing authorities.  The

9    profession of these views, together with the persistent willful

10   failure to file returns, amounts to an unbroken course of

11   conduct for Mr. Stilley from those days in the early 1990s to

12   and through the periods directly involved in the counts of

13   conviction in this case.  Mr. Stilley is accountable for the

14   tax loss, penalties, and interest attributed to Dr. Roberts.

15       In contrast, Mr. Eddy Patterson's testimony is weak as to

16   both defendants.  He ventured only that both defendants told

17   him that they did not file returns.  He said that he hoped that

18   this demonstrated that they were sincere in their

19   representation of him, which is about as logical as a crack

20   dealer wanting to make sure that his lawyer is also a crack

21   dealer.

22       In any event, I do not find the persuasive evidence of

23   inducement or causation as between the defendants and

24   Mr. Patterson that I would need to have in order to hold either

25   of the defendants accountable for the tax loss relating to

1   Mr. Patterson that I am urged to attribute to the defendants.

2       This brings me to Patrick Turner.  The transaction between

3   the defendants and Mr. Patrick Turner is, as we all know,

4   relevant both on the issue of tax loss and on the question of

5   whether there should be an enhancement under Guideline

6   2T1.1(b)(1) for failure to report income exceeding $10,000

7   derived from criminal activity.

8       Mr. Springer teamed up with Mr. Turner and Mr. Stilley to

9   defraud the United States, or at least to impede and impair the

10  collection of taxes, by parking Mr. Turner's money in

11  Mr. Stilley's IOLTA account.  And then Mr. Springer and

12  Mr. Stilley wasted no time teaming up to defraud Mr. Turner.

13  Because I am convinced that from the minute that Mr. Turner was

14  induced to mortgage his two houses, I say mortgage his two

15  houses, and to wire that money to Mr. Stilley's IOLTA account,

16  it was fully the intent of Mr. Springer that Mr. Turner would

17  never again see a penny of that money.  And it was fully the

18  intent of Mr. Stilley to cooperate in every way with

19  Mr. Springer to bring about that result if that was

20  Mr. Springer's desire.

21      At the time Messrs Springer and Stilley took Mr. Turner's

22  $250,000, their recollection of their merciless fleecing of

23  Mr. Art Hawkins of $256,000 was still relatively fresh in their

24  minds, and they knew a vulnerable target when they saw one.  So

25  Mr. Springer's $250,000 transaction with Mr. Turner was

1    fraudulent in its inception.

2        From Mr. Springer's perspective, it was fraudulent in two

3    ways.  It was fraudulent in that by parking this money in

4    Mr. Stilley's IOLTA account, Mr. Springer's and Mr. Stilley's

5    intent was to obstruct the enforcement of the tax laws of the

6    United States as to Mr. Turner.  This transaction was also

7    fraudulent in that the evidence convincingly demonstrated that

8    one way or the other, and contrary to Mr. Turner's intent,

9    Mr. Springer's intent was that Mr. Turner would never see that

10   $250,000 ever again.

11       Mr. Springer wasted no time turning that money into a

12   motor home and a Lexus.  Mr. Turner thought he was parking his

13   money, but, as I have said, as far as Mr. Springer is

14   concerned, it was gone forever the day that it hit

15   Mr. Stilley's IOLTA account.

16       The evidence as to the Uniform Commercial Code security

17   interest and the recent and very convenient repossession of the

18   motor home is entirely unpersuasive.  The motor home was

19   repossessed virtually on the eve of this sentencing and very

20   shortly after Mr. Springer saw the government's sentencing

21   memorandum.  After Mr. Springer read page 14 of the

22   government's sentencing memorandum and considered those

23   contentions in combination with the fact that the government

24   was in the process of seizing all of his property that it could

25   find, it made perfect sense for Mr. Springer to seek to

1  legitimize an intrinsically fraudulent transaction by getting

2  the motor home repossessed.

3      I should add that I am certainly mindful that it is not

4  enough for the government to show that Messrs Springer and

5  Stilley defrauded or impeded the IRS by taking Mr. Turner's

6  money and putting it in the IOLTA account and it is not enough

7  to show that this had the effect, which it certainly did have,

8  of impairing the ability of the IRS to collect what Mr. Turner

9  owed for 1999 through 2003 by helping him to evade payment and

10 collection.

11     The tax loss with respect to Mr. Turner's taxes cannot be

12 aggregated with the other tax losses for guidelines purposes if

13 the conduct leading to the tax loss on Mr. Turner was, in the

14 words of the Application Note to Guideline 2T1.1, "clearly

15 unrelated" to the defendants' common scheme or plan for

16 impeding and obstructing the IRS in the ascertainment,

17 assessment, and collection of revenue.

18     The episodes in these defendants' common scheme do not

19 have to be directly related to each other as long as they are

20 related to these defendants' common scheme or plan for impeding

21 and obstructing the IRS in the ascertainment, assessment, and

22 collection of revenue.  The transaction with Mr. Turner does

23 not have to be interrelated with the other episodes by which

24 this scheme played out, but it has to be related in some way to

25 the overall scheme.  I find that it was.

1     By August of 2005, Mr. Stilley's IOLTA account was well-

2  established as an invaluable tax evasion tool available for use

3  by Messrs Stilley and Springer in any way that it might be

4  needed for that purpose.  In the words of Application Note 9 to

5  Guideline 1B1.3, the use of the IOLTA account establishes a,

6  "similarity of modus operandi" between the Turner transaction

7  and the other instances in which defendants used the IOLTA

8  account to facilitate their common scheme.

9     It is not necessary to take an expansive view of the scope

10 of the common scheme of these defendants to conclude, as I

11 quite easily do, that the transaction with Mr. Turner by which

12 Mr. Turner's money was parked in the IOLTA account for what

13 Mr. Turner thought was safekeeping for the purpose of

14 frustrating the IRS in the performance of its legitimate

15 statutory functions was simply another episode in what

16 Application Note 2 to Guideline 2T1.1 refers to as "a

17 continuing pattern of violations of the tax laws" by these

18 defendants.

19     My findings, per year, as to the tax losses are derived

20 both from the evidence received at trial and from the evidence

21 received in this sentencing proceeding.  As I have said, the

22 situation with respect to Mr. Springer is somewhat more

23 complicated than it is with respect to Mr. Stilley.

24 Mr. Stilley's situation is just about the purest and most

25 consistent example of non-reporting of substantial income that

1  could be imagined.  And by saying that about Mr. Stilley, I

2  don't mean to put Mr. Springer in a favorable light, but,

3  nevertheless, the situation with respect to Mr. Springer is a

4  bit more complicated.

5      I will first cover the tax loss which I conclude for

6  guidelines purposes is attributable Mr. Springer.  For 1990

7  through 1995, the assessed amount of tax was $91,196.

8      Now, I'm going to read the gross income from my notes with

9  respect to '99 through 2007, it's a simple mathematical

10  proposition to take 20 percent of this, but I won't read the 20

11  percent calculation into the record other than when I get to

12  the total.

13      The gross income that I attribute to Mr. Springer for 1999

14  is $111,702; for 2000, it is $160,000; for 2001, it is $63,000;

15  for 2002, it is $48,986; for 2003, it is $391,171; for 2004, it

16  is $117,550; for 2005, it is $278,500; for 2006, it is

17  $185,650; for 2007, it is $141,400; for a total gross income of

18  $1,497,959.  At 20 percent, the tax loss attributable to that

19  is $390,787.  I also attribute to Mr. Springer the state tax

20  loss --

21          MR. O'REILLY:  Your Honor, I apologize for

22  interjecting, but you say the tax loss was 390,000?

23          THE COURT:  That's --

24          MR. O'REILLY:  That's 20 percent?  Because I believe

25  that would be an overstatement of the tax loss for --

```
 1              THE COURT:  Well, that adds the 91,000 --
 2              MR. O'REILLY:  I apologize, Your Honor.
 3              THE COURT:  That adds the 91,196 from 1990 through
 4    1995.
 5              MR. O'REILLY:  I apologize.
 6              THE COURT:  I have proportionately reduced
 7    Mr. Springer's state tax loss based on the proportion by which
 8    I have reduced the federal tax loss.  The state tax loss
 9    accordingly is $80,186, to which I add the federal tax loss
10    attributable to Mr. Stilley, which I will cover in a minute,
11    but which amounts to $377,161, and Mr. Stilley's state tax
12    loss, which is $91,627.  So the total for Mr. Springer,
13    including his state tax loss and Mr. Stilley's state and
14    federal tax loss is $548,974.  Adding Mr. Springer's federal
15    tax loss, but ignoring for the moment the tax loss attributable
16    to Mr. Turner, Mr. Springer's state and federal tax loss,
17    including his own and Mr. Stilley's, is $939,761.80, to which I
18    add $145,713 attributable to Mr. Turner for a total tax loss
19    under Guideline 2T1.1 attributable to Mr. Springer in the
20    amount of $1,085,474.80.  The penalties and interest
21    attributable to that amount to $431,801.
22         With respect to Mr. Stilley, his gross income for 2000 was
23    $131,533; for 2001, it was $73,598; for 2002, it was $117,653;
24    for 2003, it was $466,774; for 2004, it was $96,600; for 2005,
25    it was $106,984; for 2006, it was $433,368; for 2007, it was
```

1    $354,093; for 2008, it was $105,202; for a total of $1,885,805,

2    for which the tax loss at 20 percent is $377,161.

3        His state tax loss -- when I say "his," I'm referring now

4    to Mr. Stilley -- is $91,627.  I also include the federal tax

5    loss attributable to Mr. Springer but only for returns due in

6    or after 2000 in the amount of $299,591 and Mr. Springer's

7    state tax loss in the amount of $80,186, for a total for

8    Mr. Stilley in terms of his state tax loss and Mr. Springer's

9    state and federal tax loss in the amount of $471,404.  That's

10   $471,404.  Adding in Mr. Stilley's federal tax loss, the total,

11   not including the third-party tax loss attribution with respect

12   to Mr. Stilley is $848,565.  Adding in the tax loss with

13   respect to Mr. Lake, that is an additional $145,713 -- I'm

14   sorry, with respect to Mr. Turner, I should say, that is an

15   additional $145,713.  With respect to James Lake, we have an

16   additional tax loss of $176,000.  And with respect to

17   Dr. Phillip Roberts, we have an additional tax loss in the

18   amount of $129,818, for a total tax loss under Guideline 2T1.1

19   with respect to Mr. Stilley in the amount of $1,303,096.

20       Now, as we have discussed more than once over the last two

21   days and as is discussed time and again in the briefs, we have

22   numerous issues that hinge, one way or the other, on this

23   concept of jointly-conducted criminal activity.  That's

24   relevant both for tax loss purposes and for purposes of

25   application of several other guidelines.  And there has been a

 1    good deal of controversy in the case, especially for sentencing
 2    purposes, as to just what should be included in the Court's
 3    approach to determining the scope of the defendants' jointly-
 4    conducted criminal activity.
 5         Under the guidelines, of course, the government is not
 6    confined for sentencing purposes to the criminal activity
 7    charged in the indictment, either in terms of specific acts or
 8    in a temporal sense, but, obviously, the matters charged in the
 9    indictment are relevant.  And, in that regard, the indictment
10    clearly does not confine its allegations as to the objectives
11    of the conspiracy to simply a purpose of avoiding these
12    defendants' personal tax liabilities.
13         The indictment charged the defendants with a conspiracy
14    that began in 2000 and ended in January 2009 to defraud the
15    United States with respect to income taxes.  That obviously
16    includes the statutory language "collection, ascertainment,
17    assessment," and so forth, but the point is that the indictment
18    charged these defendants with a conspiracy, and that conspiracy
19    was proven by overwhelming evidence, to defraud the United
20    States with respect to income taxes.  And that statement of the
21    object of the conspiracy in paragraph 9 of the indictment was
22    most assuredly not confined to these defendants' own individual
23    income taxes.
24         With respect to the defendants' personal criminal
25    liability, the evidence understandably did focus on their

 1   personal income and their resulting personal tax obligations,

 2   but in a truly exceptional way, the jointly-conducted criminal

 3   activity that is relevant in this case includes the defendants'

 4   criminally fraudulent course of dealings with their clients.

 5        The defendants' conducts with their clients was fraudulent

 6   both vis-a-vis the clients and with respect to the United

 7   States.  At the same time, it should be noted that some of the

 8   conduct shown by the evidence is not relevant conduct for

 9   guidelines purposes but is clearly relevant for other reasons

10   under Section 3553.

11        And the parties may wonder why I singled out Government

12   Exhibit 204 for some questions from the Court yesterday.  The

13   reason very simply is that although the Hawkins' case was not a

14   tax case and so far as I recall, the defendants did not give

15   Mr. Hawkins or Mrs. Hawkins tax advice, and for that reason

16   they're certainly not chargeable with encouraging Art Hawkins

17   or Mrs. Hawkins to violate the tax law, I am also required

18   under Section 3553 to consider the history and characteristics

19   of the defendants.  I hesitate to make harsh findings without

20   very satisfactory evidence.  And Government Exhibit Number 204

21   is very satisfactory evidence of the fraudulent and predatory

22   ways of the Defendant Lindsey Springer.  And I don't -- I'm

23   tempted to read it into the record, but it is a document that

24   is just devastating and it speaks for itself.

25        It should be noted that the Hawkins' case did generate

 1    substantial unreported income and, for that reason, the
 2    Hawkins' case, for tax purposes, is certainly relevant because
 3    the $256,000 that these defendants obtained from Mr. and
 4    Mrs. Hawkins was unreported and is part of the tax loss.  But I
 5    do not consider the Hawkins' case for other guidelines purposes
 6    because there is no evidence in this case, at least that I
 7    recall, that these defendants offered any tax advice or
 8    encouragement to violate the tax laws to Mr. and Mrs. Hawkins.
 9         The letter that I have referred to, Government Exhibit
10    Number 204, shows beyond any imaginable doubt, however, the
11    audacity of Mr. Springer's fraudulent conduct.
12         This brings me to the issue of the application of the
13    guideline for criminal source income, Guideline 2T1.1(b)(1).
14    Guideline 2T1.1(b)(1) states that there is a two-level
15    enhancement, "if the defendant failed to report or correctly
16    identify the source of income exceeding $10,000 in any year
17    from criminal activity."
18         Now, as to Turner, I won't repeat my previous findings.
19    The activities of these defendants with respect to Mr. Turner
20    certainly was wire fraud under 18 United States Code, Section
21    1343.  The wiring of those funds was an integral piece of the
22    fraudulent course of conduct by which Mr. Turner was defrauded
23    of his quarter of a million dollars.
24         The findings with Mr. Turner did generate criminal source
25    -- I'm sorry, the transactions with Mr. Turner did generate

1    criminal source income.  The transactions and dealings with Art

2    Hawkins and Mrs. Hawkins also generated criminal source

3    income.  The defendants' joint representation of Arthur Hawkins

4    was, from its inception, an exercise in fraud and obtaining

5    money under false pretenses.  The defendants enriched

6    themselves at the expense of Mr. and Mrs. Hawkins in the amount

7    of approximately $250,000, and, as I recall, it was $256,000,

8    with false promises that they knew how to and would quickly

9    gain the release of Mr. Hawkins.

10        They went so far as to say, for purposes of getting money

11   from Mr. and Mrs. Hawkins, that they would get the charges

12   dismissed.  This was after he was convicted.  At each stage

13   when the court ruled against Mr. Hawkins, the defendants would

14   come up with another fraudulent but convincing assurance that

15   he would soon be a free man.  They made those assurances and

16   they got more money.

17        When Mr. Hawkins was in jail as an important family event

18   approached and for the purpose of getting still more money from

19   Mr. and Mrs. Hawkins, Messrs Springer and Stilley told

20   Mrs. Hawkins to make sure that Mr. Hawkins' tuxedo was ready to

21   go because he would soon need it.

22        Although the Hawkins' case was, as I have said and as we

23   all know, not a tax case and therefore is not an instance of

24   tax fraud or evasion, other than with respect to the

25   defendants' failure to report a quarter of a million dollars of

1   income from that case, the Hawkins' case is perhaps the most

2   poignant instance of the defendants' predation and their

3   willingness to perpetrate a peculiarly cruel variety of

4   financial fraud.  The income that the defendants derived from

5   their representation of Mr. Hawkins was criminally-derived

6   income.  This adjustment will be applied to both defendants.

7       This brings me to Guideline 2T1.1(b)(2), relating to the

8   use of sophisticated means.  In relevant part, Guideline

9   2T1.1(b)(2) states, "If the offense involved sophisticated

10  means, increase by two levels."

11      Application Note 4 under that guideline states, and I

12  quote, "Sophisticated means enhancement.  For purposes of

13  Section (b)(2), "sophisticated means" means especially complex

14  or especially intricate offense conduct pertaining to the

15  execution or concealment of an offense.  Conduct such as hiding

16  assets or transactions or both through the use of fictitious

17  entities, corporate shells or offshore financial accounts

18  ordinarily indicates sophisticated means."

19      The sophisticated means adjustment fits the facts of this

20  case as to both defendants quite well.  The most obvious

21  example of that, but certainly not the only example of that, is

22  the using of Mr. Stilley's IOLTA account.  Lawyers use their

23  trust accounts for the purpose of serving their clients.  Those

24  trust accounts are treated as custodial accounts and in, I

25  venture to say, in every state, there are very detailed rules

1   that apply to the maintenance of lawyers' trust accounts, such

2   as Mr. Stilley's IOLTA account.

3        In this case, though, Mr. Stilley's IOLTA account was an

4   instrument of fraud pure and simple, and it was an instrument

5   of fraud pure and simple for the use and benefit both of

6   Mr. Stilley and of Mr. Springer.  It was very effectively used

7   and it was used in a way that makes a mockery of the purposes

8   for which lawyers are authorized to maintain trust accounts.

9        We also have Mr. Springer's use of this non-existent

10  ministry called Bondage Breakers Ministry.  It existed in name

11  only.  It was not a corporate entity or any other sort of a

12  legal entity.  It was not a 501(c)(3) organization; although, I

13  would think probably a good many people thought that it was.

14  Bondage Breakers Ministry was just a convenient name for

15  Mr. Springer to use in order to solicit money under the guise

16  that he might present to the taxing authorities that these

17  remittances were donations.

18       Hand in hand with that, of course, was Mr. Springer's use

19  of the check cashing service.  That was integral to his, not

20  only to his financial way of life, but apparently to his entire

21  way of life.  He dealt only in cash.  He wanted to avoid any

22  reachable assets being held in his name.  And he made extensive

23  use of that check cashing service which went, of course, hand

24  in hand with his fraudulent use of both the IOLTA account

25  remittances and Bondage Breakers Ministry.

1          Hand in hand with all of that, of course, was these

2    defendants' consistent course of dispensing fraudulent advice

3    to vulnerable individuals, as I have already described.  Taking

4    all of these features of these defendants' joint criminal

5    activities together, it is quite clear that they did use

6    sophisticated means within the meaning of Guideline

7    2T1.1(b)(2).  The source of the funds that these defendants had

8    the benefit of was effectively concealed, especially as to

9    Mr. Springer.  The intent with which those funds were received

10   by Mr. Springer was effectively obfuscated by Mr. Springer

11   through the use of Bondage Breakers Ministry.  The ability to

12   trace any of those funds for any lawful purpose, including

13   administration of the tax laws was frustrated by the use of a

14   check cashing service, and all of this resulted, in substantial

15   part, from the defendants' receipt of very substantial proceeds

16   over a goodly number of years as a result of dispensing

17   fraudulent advice, mostly tax-related fraudulent advice to very

18   vulnerable individuals.  This adjustment clearly applies,

19   2T1.1(b)(2), to both defendants.

20          This brings me to Guideline 2T1.9, the proposed adjustment

21   for encouraging others to violate the tax law.  Under Guideline

22   2T1.9(b)(2), "If the conduct was intended to encourage persons

23   other than or in addition to co-conspirators to violate the

24   Internal Revenue laws or impede, impair, obstruct, or defeat

25   the ascertainment, computation, assessment, or collection of

1    revenue," there is a two-level increase.

2        It's important to note with respect to Guideline 2T1.9

3    with respect to encouraging others to violate the tax law that

4    an actual tax loss resulting from the encouragement need not be

5    shown.  Now, this is a specific offense characteristic under

6    the guidelines, so the conduct involved must be relevant

7    conduct within the meaning of Guideline 1B1.3.  But any

8    particular instance of encouragement to violate the tax law

9    does not have to be shown to have been an activity that was

10   jointly conducted by the defendants, their individual acts are

11   sufficient.

12       I also hasten to add that evidence that a defendant

13   encouraged some individuals to violate the law is not vitiated

14   by evidence that the defendant advised others to comply with

15   the law any more than a drug dealer would get credit for

16   telling his sister to stay away from drugs.

17       I credit the trial testimony of Brenda Frederiksen, who

18   testified that at a meeting in Tulsa in 2001 in the context of

19   Dr. Roberts' trial, Mr. Springer stated that the tax system is

20   basically voluntary.  As to Dr. Roberts, we also have grand

21   jury testimony.  Agent Shern testified on direct that according

22   to the grand jury testimony, Mr. Stilley told Dr. Roberts that

23   he was not required to file a return.  On cross-examination by

24   Mr. Springer, Mr. Springer elicited that this advice was given

25   by Mr. Springer as well as by Mr. Stilley.  And on cross-

 1  examination by Mr. Stilley, it was brought out that these

 2  statements also included the statement that there is no

 3  liability to pay taxes, which is a slightly different assertion

 4  than the assertion that the law does not require the filing of

 5  returns.

 6      I also credit the testimony of Martin Dingman, who

 7  testified that he met Mr. Springer in mid to late 1996.  His

 8  contact with Mr. Springer at that point was at one or more

 9  seminars relating to the tax laws.  He quoted Mr. Springer as

10  saying according to the Constitution, we are not required to

11  file personal tax returns.

12      As for Mr. Dingman and Mr. Grady, I also find that

13  Mr. Springer assisted both of these defendants in the

14  preparation of abusive trust documents and encouraged them to

15  unvolunteer from the system.

16      In 2000, both Mr. Springer and Mr. Stilley told James Lake

17  that he had no legal obligation to file tax returns.  The

18  evidence on that point is strong enough to persuade me that the

19  defendants' -- and I refer to both of them now -- the

20  defendants' conduct amounted to encouragement, even though I

21  have found that Mr. Springer's comments, at least insofar as

22  they are substantiated by the evidence, were not sufficient to

23  have caused Mr. Lake's tax violations.

24      As to Mr. and Mrs. Patterson, the testimony is that

25  Mr. Springer and Mr. Stilley told them that they, Messrs

1   Springer and Stilley, do not file tax returns.  That is

2   certainly of interest.  But in my view, at least without a more

3   compelling showing of the context for that statement, that

4   falls short of encouragement to violate the tax law.  I am

5   also, at least on this issue, unimpressed with the testimony

6   about the penaltyprotestor.com Web site and the Innovative

7   Financial Services conference calls.  The testimony falls short

8   of supporting a finding that these two modes of communication

9   were, in fact, used to encourage the violation of the tax

10  laws.  And at least as to the penaltyprotestor Web site, the

11  main thrust of the evidence is that this was more of a forum

12  for advocacy of change in the law and the system, which would

13  be constitutionally protected speech, than it was a forum for

14  advocacy of violation of the tax laws.

15       Also, at least arguably protected, and in any event not

16  persuasive under Guideline 2T1.9(b)(2), is Mr. Stilley's trial

17  testimony that after he read Mr. Schiff's book he formed and

18  expressed the belief that the claims of the IRS that the law

19  required the filing of tax return was not good enough for him.

20       Now, the fact that some of the evidence offered to support

21  an adjustment under Guideline 2T1.9(b)(2) falls short does not

22  detract one whit from the fact that some of the evidence is

23  quite persuasive.  In the context of this case, at least, it is

24  sufficient to say, and I quite easily find, that both

25  defendants have engaged in conduct during the course of their

1  jointly-conducted criminal activity that was intended to

2  encourage persons other than or in addition to co-conspirators

3  to violate the Internal Revenue laws or impede, impair,

4  obstruct, or defeat the ascertainment, computation, assessment,

5  or collection of revenue.  The two-level adjustment under

6  Guideline 2T1.9 will be applied to both defendants.

7       We'll take a 15-minute recess.

8       (RECESS HAD)

9            THE COURT:  I will now address the proposed

10 adjustment under Guideline 3B1.1(a) applicable to organizers or

11 leaders of criminal activity.  The guideline states quite

12 simply that, and I quote, "If the defendant was an organizer or

13 leader of a criminal activity that involved five or more

14 participants or was otherwise extensive," then there is a four-

15 level upward adjustment.  I derive substantial guidance with

16 respect to the application of this guideline from the Tenth

17 Circuit's decision in United States v. Yarnell, 129 F.3d 1127,

18 a decision from our Court of Appeals in 1997.  I reviewed other

19 authorities, including other quite helpful Tenth Circuit cases,

20 but I believe that Yarnell is the most instructive case from

21 our circuit with respect to the criteria for meeting the

22 "otherwise extensive" language in Guideline 3B1.1(a).

23      Yarnell surveyed cases from other circuits and adopted a

24 test articulated by the First Circuit, which is a totality of

25 the circumstances test and which holds that the extensiveness

1    of the criminal activity is not necessarily a function of the
2    precise number of persons involved whether they be culpable or
3    not, but that the court must look at not only the number of
4    participants but also the "width, breadth, scope, complexity,
5    and duration of the scheme."  That is from page 1139 of the
6    Yarnell decision.  Cases from other jurisdictions are cited in
7    Yarnell which involved these same criteria.

8        In these cases, the courts affirmed the application of
9    sentence enhancements under Section 3B1.1(a) for extensive
10   conduct involving less than five criminally culpable
11   participants.  And that is also discussed on page 1139.

12       I find and conclude that the Defendant Lindsey Springer
13   was the organizer or leader of a criminal activity, that it was
14   otherwise extensive within the meaning of Guideline 3B1.1(a).
15   It was extensive in its scope, it was extensive in its duration
16   and it was extensive in its complexity.  Numerous individuals
17   were involved, some of them wittingly and some of them
18   unwittingly.  One of the ones who is interesting in terms of
19   whether his involvement was witting or unwitting was
20   Mr. Delozier, but suffice it to say for present purposes that
21   numerous individuals were involved both wittingly and
22   unwittingly.

23       The activity indeed was extensive.  It was Mr. Lindsey
24   Springer's way of life for a goodly number of years.  It
25   involved, as I have said, his use of this fictitious entity,

1   the Bondage Breakers Ministry.  It involved individuals who

2   were both victims as well as knowing participants and

3   participants who might not have been knowing participants.  And

4   it called upon Mr. Springer to organize these activities in

5   such a way that he could delay for as long as possible being

6   called to account for his personal tax crimes.

7       I find that this case, especially as it relates to the

8   Defendant Lindsey Springer squarely falls within the scope of

9   Guideline 3B1.1(a) relating to otherwise extensive criminal

10  activity.  And I should say that perhaps one of the most cogent

11  factors to consider is the period of time.

12      Now, I'm not holding Mr. Springer for this purpose

13  accountable for the fact that, as he was proud to proclaim, he

14  hadn't filed tax returns since the 1980s, but one doesn't

15  really need to go back behind the 1990s or even the mid to late

16  1990s in order to get some concept of the extensiveness of

17  Mr. Lindsey Springer's criminal activity.

18      I now turn to the application of Guideline 3B1.3, abuse of

19  position of trust or special skill.  This guideline states as

20  relevant here, "If the defendant abused a position of public or

21  private trust or used a special skill in a manner that

22  significantly facilitated the commission or concealment of the

23  offense, increase by two levels.  This adjustment may not be

24  employed if an abuse of trust or skill is included in the base

25  offense level or specific offense characteristic."

 1       That latter exception is not applicable here because the
 2   base offense level and the specific offense characteristics do
 3   not already incorporate the concept of abuse of trust or a
 4   special skill.  The guideline goes on to say, "If this
 5   adjustment is based on an abuse of a position of trust, it may
 6   be employed in addition to an adjustment under Guideline 3B1.1,
 7   aggravating role.  If this adjustment is based solely on the
 8   use of a special skill, it may not be employed in addition to
 9   an adjustment under Section 3B1.1 aggravating role."
10       I'm also guided, of course, by Application Note 1 where
11   the guideline provides further guidance as to the concept of
12   public or private trust.  It says, "Public or private trust
13   refers to a position of public or private trust characterized
14   by professional or managerial discretion, i.e., substantial
15   discretionary judgment that is ordinarily given considerable
16   deference.  Persons holding such positions ordinarily are
17   subject to significantly less supervision than employees whose
18   responsibilities are primarily non-discretionary in nature.
19   For this adjustment to apply, the position of public or private
20   trust must have contributed in some significant way to
21   facilitating the commission or concealment of the offense,
22   e.g., by making the detection of the offense or the defendant's
23   responsibility for the offense more difficult.  This
24   adjustment, for example, applies in the case of an embezzlement
25   of a client's funds by an attorney serving as a guardian, a

1   bank executive's fraudulent loan scheme, or the criminal sexual

2   abuse of a patient by a physician under the guise of an

3   examination.  This adjustment does not apply in the case of an

4   embezzlement or theft by an ordinary bank teller or hotel clerk

5   because such positions are not characterized by the above

6   described factors."

7       The guideline also goes on in Application Note 4 to

8   provide guidance as to the concept of a special skill.  It

9   states, and I quote, "Special skill refers to a skill not

10  possessed by members of the general public and usually

11  requiring substantial education, training, or licensing.

12  Examples would include pilots, lawyers, doctors, accountants,

13  chemists, and demolition experts."

14      Now, it's true that Mr. Stilley's status as a lawyer was

15  not, strictly speaking, indispensable to his commission of the

16  crimes of which he stands convicted, but his status as a lawyer

17  and his use of the prerogatives of a lawyer were, in fact,

18  central to his role in the conspiracy and more broadly in the

19  relevant conduct as it relates to the jointly-undertaken

20  criminal activities of the defendants.

21      By way of example, it was because Mr. Stilley was a lawyer

22  that he had an IOLTA account.  His status as a lawyer

23  facilitated his function which he performed without fail as a

24  financial conduit to Mr. Springer.  It is fair to say, although

25  admittedly a bit harsh to say, that without his license to

1   practice law Mr. Stilley was worthless to Mr. Springer in

2   Mr. Springer's role as the charismatic and intellectual force

3   behind the joint criminal endeavors of these two defendants.

4        Mr. Stilley's status as a lawyer and his ability to hold

5   himself out at a criminal tax defense attorney furthered these

6   defendants' joint objective of committing tax fraud directly

7   and in counseling and advising their clients and significantly

8   facilitated the commission and concealment of these defendants'

9   offenses.  This adjustment will be applied to Mr. Stilley.

10       As to Mr. Springer, I have carefully considered the case

11  law, including the Tenth Circuit case law, and I do conclude in

12  light of the prevailing case law with respect to the

13  application of Guideline 3B1.3 that the adjustment for abuse of

14  a position of trust is not applicable to Mr. Springer in this

15  case.  Because the aggravating role adjustment will be applied

16  to Mr. Springer, the question of the use of a special skill is

17  moot as to Mr. Springer under the express terms of Guideline

18  3B1.3.

19       This brings me to consideration of the proposed

20  application of Guideline 3C1.1 relating to obstruction of

21  justice.  I listened very carefully to these defendants'

22  testimony at the trial, and I took careful notes.  Mr. Stilley

23  testified under oath that no statute says that anyone is liable

24  for income tax.  He testified under oath that no statute

25  defines income.  Now, it might be tempting to think of these as

1    just ludicrous statements made for some theatrical effect, but

2    bear in mind that he was looking at a jury when he made those

3    statements under oath, and both defendants had placed their

4    intent and their willfulness squarely in issue.  So it is not

5    -- I'm not inclined at all to dismiss those statements as

6    reckless hyperbole or otherwise to relieve Mr. Stilley of the

7    natural effect which flows from making false statements like

8    those under oath.

9        He also said that the law -- under oath, looking at the

10   jury, that the law does not command anyone to file a tax

11   return.  He also said, under oath, that Mr. Lindsey Springer

12   did not charge for or receive compensation for services

13   rendered.  He also said, under oath, that he never allowed

14   Mr. Springer to use his, Mr. Stilley's, IOLTA account as a

15   parking place for money.  He also said, under oath, that he and

16   Mr. Springer have never discussed attempting to defraud the

17   United States of income taxes.  All of those statements were

18   material, they were made under oath, and they were

19   categorically false.  They amounted to perjury.  They certainly

20   did amount to obstruction of justice on Mr. Stilley's part.

21       As for Mr. Springer, at trial, he looked at the jury and

22   testified under oath that he never had an agreement with

23   Mr. Stilley or anyone else to defraud the United States.  He

24   testified that he did not willfully fail to file Form 1040 for

25   the years 2000 through 2005.  He stated that he did not

 1  willfully fail to report substantial tax liability.  And he

 2  stated that he believed that he did not receive gross income.

 3  He also said under oath that receiving money with no

 4  expectation for anything from anybody "was a guideline that I

 5  had before I would have ever received any money."  And he has

 6  testified that there never was any quid pro quo for the money

 7  that the Hawkins paid to him.  These statements are

 8  categorically false.  They were made under oath.  They were

 9  made for the purpose of deceiving the jury, and they amounted

10  to obstruction of justice, Mr. Springer.

11      In addition, in March of 2006, Mr. Stilley told the grand

12  jury in writing that "Lindsey Springer does not charge for his

13  services."  A statement that Mr. Stilley well knew was

14  absolutely false and highly material to the grand jury's

15  investigation.  The defendants' testimony on these points was

16  unequivocal, it was false, it related to material matters that

17  were in issue in the trial of this case or before the grand

18  jury and the false testimony was willfully and intentionally

19  given as false testimony rather than as a result of confusion,

20  mistake, or faulty memory.

21      Accordingly, I rule on the government's objections to the

22  presentence report as follows:  To the extent that I have found

23  a tax loss that exceeds that found in the presentence report,

24  the government's objection to the scope of the relevant conduct

25  conclusions in the presentence reports and with respect to the

1  tax loss found in the presentence report is sustained as to

2  both defendants.

3       The government's objection to the omission of a criminal

4  source income adjustment from the presentence report is

5  sustained as to both defendants.

6       The government's objection to the omission of a four-level

7  adjustment for Mr. Springer for his aggravating role in the

8  offense is sustained.

9       The government's objection to the omission of an

10 adjustment for use of a special skill or abuse of a position of

11 trust as to Mr. Springer is overruled.

12      The government's objection to the omission of an

13 adjustment for use of a special skill as to Mr. Stilley is

14 sustained.

15      Now, with respect to the defendants' objections, the

16 defendants' objections to the use of the 2009 Guidelines Manual

17 are overruled.

18      The defendants' objections with respect to the scope and

19 accuracy of the relevant conducts of the presentence report are

20 overruled.  This is paragraphs 5 through 16 in both of the

21 presentence reports.

22      The defendants' objections with respect to the amount of

23 the tax loss are sustained in part and overruled in part, all

24 as was stated in my specific findings as to the amounts of the

25 tax losses.

1    Mr. Springer's objection with respect to paragraph 22

2  relating to grouping is overruled.

3    The defendants' objections with respect to paragraph 16

4  relating to the use of sophisticated means are overruled.

5    Mr. Springer's objection with respect to paragraph 6

6  relating to encouraging others to violate the law is overruled.

7    Mr. Stilley's objection with respect to paragraph 7

8  relating to encouraging others to violate the law is overruled.

9    Mr. Springer's objection with respect to his aggravating

10  role in the offense is overruled.

11    The defendants' objections with respect to the obstruction

12  of justice adjustment in paragraph 19 of both reports are

13  overruled.

14    Mr. Springer's objection with respect to denial of a

15  downward adjustment for acceptance of responsibility is

16  overruled.

17    And it is not necessary for the Court to address

18  Mr. Springer's objection to the reference to his previous

19  federal conviction for odometer fraud because that objection

20  has no impact on the guidelines calculation and paragraph 32

21  will be disregarded for all sentencing-related purposes.

22    Mr. Stilley's objection to the characterization of his

23  Count 1 conviction as a felony is overruled.

24    That concludes my Rule 32(i)(3) findings on the disputed

25  portions of the presentence report.

1      The criminal history category for both defendants is I.   I
2  conclude that Mr. Springer's total offense level under the
3  advisory guidelines is 34 determined as follows:   I begin with
4  a base offense level based on tax loss of 22.   There is a
5  two-level adjustment for criminal source income under Guideline
6  2T1.1(b)(1).   There is a two-level adjustment for sophisticated
7  concealment under Guideline 2T1.1(b)(2).   There is a two-level
8  adjustment for encouraging others to violate the Internal
9  Revenue laws under Guideline 2T1.9(b)(2).   There's a four-level
10  adjustment for his aggravating role under Guideline 3B1.1(a).
11  There is a two-level adjustment for obstruction of justice
12  under Guideline 3C1.1 resulting in both an adjusted offense
13  level and a total offense level of 34 resulting in a guideline
14  range of incarceration of 151 to 188 months.
15      With respect to Mr. Stilley, I arrive at a base offense
16  level of 22 based on tax loss, with a -- because the tax loss
17  exceeded a million dollars as to both defendants, a two-level
18  adjustment for criminal source income, a two-level adjustment
19  for sophisticated concealment, a two-level adjustment for
20  encouraging others to violate the Internal Revenue laws, a
21  two-level adjustment for abuse of a position of trust or use of
22  a special skill -- in this case, use of a special skill -- and
23  a two-level adjustment for obstruction of justice resulting in
24  an adjusted and a total offense level for Mr. Stilley of 32,
25  which results in a guideline range of incarceration under the

1   advisory guidelines of 121 to 151 months.

2       I will now address restitution.  I must admit that I was a

3   bit limited, I guess is one way to say it, in my ability to

4   thoroughly evaluate restitution because there were some

5   adjustments to the tax loss amounts and then there is obviously

6   penalty and interest applicable to some items and not to others

7   and the parties, perhaps understandably, from both standpoints

8   did not devote a great deal of attention in their briefs to the

9   issue of what items are fair game for restitution, what the

10  legal basis for the restitution might be, whether there's any

11  difference among the various counts with respect to restitution

12  and even whether and to what extent there should be joint and

13  several liability for restitution.

14      I'm not critical of either side for not focusing any

15  harder than they did on that from the government's standpoint.

16  These defendants are likely to be buried in restitution

17  obligations for the rest of their lives.  And under any

18  reasonable assessment of restitution, it is likely that these

19  defendants will never see the end of their restitution

20  obligation.  These tax liabilities continue to bear interest.

21  The interest payments alone, which I do not waive and will not

22  waive, will be substantial.

23      So from that standpoint, it's probably understandable that

24  the government did not spend a great deal of time on the issue

25  of restitution.  From the defendant's standpoint, the issue of

 1    restitution is certainly, by any measure, quite secondary to

 2    considerations relating to their incarceration and those

 3    guidelines and other sentencing-related matters that have a

 4    more direct bearing on whether and how long they would be

 5    incarcerated.

 6         So I'm not critical either of the defendants for not

 7    spending a great deal of time on restitution.  But the net

 8    effect of all of that was that I was just a little bit at sea,

 9    if you will, in my ability to determine what the outcome should

10    be with respect to restitution.

11         I have gone back through the numbers.  I have adjusted the

12    numbers and selected the ones that it appears to me are

13    appropriate for restitution.  To some degree, especially in the

14    case of Mr. Springer, I adjusted the numbers to reflect my

15    revision of the conclusions and findings with respect to tax

16    loss, although I have not modified the numbers as to the

17    assessed amounts.

18         And I'm also cognizant that Mr. Springer's and

19    Mr. Stilley's restitution obligation is an independent

20    freestanding obligation under the judgment and sentence of this

21    Court.  And there may well be and I suspect are other

22    independent legal means of proceeding against these defendants

23    for any amounts that are not embraced by my restitution order.

24         That said, my conclusion is that Mr. Springer's federal

25    restitution obligation is $691,343 and that his state

1   restitution obligation is $80,186.  I conclude that

2   Mr. Stilley's federal restitution obligation is $684,653 and

3   that his state restitution obligation is $91,627.

4        Does either defendant have any procedural objection to the

5   sentencing proceedings to this point?  Mr. Springer?

6             MR. SPRINGER:  May I have just a moment, Your Honor?

7   None other than the same objections I made yesterday with

8   reference to prior to the sentencing hearing objections I had,

9   Your Honor.

10            THE COURT:  Thank you, Mr. Springer.  Mr. Stilley?

11            MR. STILLEY:  I would likewise continue to maintain

12  all the objections that I have previously made and state that I

13  do not see that my due process complaints have been remedied by

14  anything that has taken place up to now.

15            THE COURT:  Thank you, Mr. Stilley.  I will now give

16  you -- for all concerned, I'll give you some understanding of

17  how we will proceed from here.

18       The defendants have a right, and it goes back hundreds of

19  years, to have what is called "allocution."  That is their

20  statements to the Court of anything, and I truly mean anything,

21  that they would want the Court to consider by way of mitigation

22  or with respect to any other matter relating to sentencing.

23  That's a very valuable right and I certainly intend to afford

24  the defendants a full opportunity to exercise their rights of

25  allocution.

1      Under Rule 32, the Court also must permit the government

2  to make its comments with respect to sentencing before sentence

3  is imposed, and I intend to do that.  In my view, in fairness,

4  given the nature of the proceeding and the possible

5  consequences to the defendants, it is fair that the defendants

6  have the last word.  For that reason, I will now invite the

7  government to offer any comments it may choose to make with

8  respect to sentencing.  Mr. O'Reilly.

9          MR. O'REILLY:  Your Honor, before I begin, just a

10  brief procedural matter.  Special Agent Shern may need to be

11  leaving here shortly.  I would ask the Court's indulgence in

12  allowing him to do so.

13          THE COURT:  Very well.

14          MR. O'REILLY:  And, Your Honor, we have said

15  everything we need to say in our sentencing memorandum.  We do

16  ask the Court to sentence high into the guidelines, as stated

17  in the sentencing memorandum, the guideline range you have

18  found based upon each defendant's absolute, long standing, and

19  continued disregard for the laws and their predatory practices

20  obtaining the income upon which they failed -- willfully failed

21  to pay and evaded their taxes.  And that's all the government

22  has, Your Honor.

23          THE COURT:  Thank you, Mr. O'Reilly.  Mr. Springer, I

24  will now hear anything you have to say relating to any aspect

25  of sentencing or in mitigation.

1          MR. SPRINGER:  Mr. O'Reilly, Mr. Shern, Mr. Snoke,

2   Mr. Burton, Mr. Williams, Mr. Stilley.  The reason, Your Honor,

3   that I defended myself in this case instead of accepting a plea

4   of guilty from Mr. O'Reilly was because -- solely because of

5   the Paperwork Reduction Act defense that I had raised four

6   times in the Tenth Circuit Court of Appeals.  Four times they

7   had found a way to avoid the merits of my claims.  The most

8   recent one was August 31, 2009, where I got a lot closer, where

9   they said I raised difficult issues.  But because the only

10  issues before the Court in that case was failure to pay

11  penalties and interest as a penalty and not failure to file

12  penalties, they decided not to get into the merits of my

13  claims.

14      The commissioner of the IRS's lawyer, Nathan Hochman, he

15  asked for sanctions against me for being frivolous in raising

16  those claims.  And he actually even told the Tenth Circuit,

17  quoting that they had found my claims were frivolous in Judge

18  Anderson's order of May 1, 2007.  And the Tenth Circuit on

19  August 31, 2009, they told the commissioner that they were

20  frivolous for making that argument because they had never ruled

21  in the two cases I had had before your Court or in the one I

22  had before Judge Eagan where I had raised the protection of the

23  Paperwork Reduction Act.

24      I had claimed on the offense in front of Judge Eagan and

25  they said I can only claim it as a defense, I claimed it as a

1    defense in the case that was on August 31, 2009, before the

2    Tenth Circuit.  But because, again, it wasn't failure to file

3    penalties, they wouldn't reach the merits.  And as Your Honor

4    noted earlier today, my Web site has been fully dedicated to

5    the Paperwork Reduction Act and the penalties, not the taxes.

6        Had I been -- had a ruling on the merits, even to the

7    point that I had been told I was frivolous by the Tenth

8    Circuit, I would have stopped with my claims and I would have

9    accepted a deal from Mr. O'Reilly.  But because they had not

10   ruled on the merits and because Mr. Hochman and others from the

11   Department of Justice were mischaracterizing what the Tenth

12   Circuit had said by saying they were saying on their Web site,

13   public Web site, the Department of Justice was saying I was

14   found to be frivolous with my Paperwork Reduction Act claims.

15   And that was not true, as the Tenth Circuit found on August 31,

16   2009.

17       I did, in 2005, if you take away the Turner transaction,

18   you do not see any more cases referred to Mr. Stilley that came

19   along or crossed my path.  I didn't quite see it the way the

20   Court saw it today, but I understand how the Court arrived at

21   its conclusions with the Turner transaction.  As I said

22   yesterday, I concede to one or the other based upon the way the

23   transaction was handled.

24       I did not contact Mr. Turner because I knew the sentencing

25   hearing was coming up or that I knew that Judge Kearn had

 1   ordered me to vacate the home that the RV was parked on.

 2   Mr. Turner actually called me first.  And after hearing

 3   Mr. Miller's testimony about it appears as though I had stole

 4   the money, I did not want to stand in Mr. Turner's way, no

 5   matter what, anymore.

 6        I understand that other than that transaction, I believe

 7   the last transaction or last transactions were in 2004 with

 8   Mr. Stilley.  And, in actuality, I had stopped.  This is why I

 9   didn't oppose the Court's supervised release conditions because

10   I am not and have not been going towards any type of defense

11   for anybody in tax-related cases that are brought to the

12   Court.  I actually was trying to go down a different road

13   entirely.

14        And I do apologize to the public in general and to

15   Mr. Hawkins.  I wish he was here and I could do it.  I even

16   would apologize to Mr. Patterson, even though the Court's

17   ruling did not find tax loss associated with me and

18   Mr. Patterson or his wife.  I would also apologize to

19   Mr. Dingman and Mrs. Dingman and Mr. Grady and Mrs. Grady.  And

20   it's not just limited to what the Court said with the Dingmans

21   in 1996 that it found, but what happened to the Dingmans after

22   that, which I did have a role in trying to stop, but at the

23   time in 1996, I didn't recognize how difficult it is to stop

24   once those things start.  And this is how I went from where I

25   was in 1996 or '95 before Judge Holmes' order, which I accepted

1    in full --

2           THE COURT:  On the subject of apologies, and this is

3    for both defendants, I hope on your own time in your own way

4    you will apologize to your families.

5           MR. SPRINGER:  I will.

6           THE COURT:  They deserve better than this.

7           MR. SPRINGER:  I understand.

8           THE COURT:  And I don't call upon you to do so here,

9    but I hope and trust that in your own time in your own way you

10   will apologize to your families.

11          MR. SPRINGER:  In the last two days I have done that

12   to my mother.

13          THE COURT:  They deserve better.

14          MR. SPRINGER:  I agree.

15          THE COURT:  Proceed.

16          MR. SPRINGER:  And my father and my children.

17   Sometimes I rationalize that taking the experience I learned

18   from 1996, '97, '98, that when those circumstances came around

19   again and I saw them I would not go down that same road, and

20   that is why people were told to file tax returns and people

21   were told to pay their taxes by me.  And I would use the

22   examples of those things I learned in '96 and '97 to persuade

23   them to listen to what I had to say.

24       I believe this time in this case and on this appeal that

25   comes from this case that I am going to get a ruling on the

1  merits of my claims.

2      The problem that I noted yesterday on the witness stand

3  that I have is that I see words with specific meaning and I --

4  it's just something I've been working on to stop, to try to get

5  a more ambiguous view.  And when I -- when I learned to write

6  an ambiguous language, to not be so focused on August 31, 2009,

7  the Tenth Circuit told me I was too ambiguous in my writing.

8  And so I'm trying to find a balance in what I have -- how I

9  speak or what I say or how I say it so that I can not cause the

10 extremes on both sides.  I do believe I've gotten better.  I

11 don't believe it's easy.  If it was, I think we'd all be able

12 to do it.

13     And as I did after the jury's verdict, I apologized to

14 Mr. Shern for having to follow the trail that was left by me.

15 Every time the government did ask me for information,

16 personally, I did to the best of my knowledge and ability.

17 Other than those exceptions that were placed at issue in this

18 trial, I always presented what they asked to whatever degree

19 they asked and I did not require them to force me to give it to

20 them.  I even agreed to go under oath for my perspective in

21 January of 2009.

22     And Mr. Miller, I've witnessed several cases with, and

23 he's a fine man.  And if he were here, I would also, as I did

24 yesterday, apologize to him for having to spend the time he had

25 to take as well.

1    Had I, again, received any ruling on the merits in 2007 or

2    2009 on my claims under the Paperwork Reduction Act, I tell

3    you, I would not be here before you today.  This would have

4    happened a long time ago in a plea agreement.  But there was no

5    other way to claim a defense but as a defense.  I tried to do

6    it as a plaintiff and they said I couldn't do it.  So it is by

7    that mode that I find myself here.

8    I do accept full responsibility for all the transactions

9    that took place.  And although I do agree with the Court that

10   the restitution order will basically be a life sentence

11   economically against me, it can be a lesson to others not to

12   ever follow down that road that I have stopped on but not soon

13   enough.

14   When my case with Mr. Dingman was dismissed by the Eighth

15   Circuit in a one-paragraph ruling, I did not appeal that

16   decision.  I tell you now, that was one of the most difficult

17   decisions that I've had to make, and I did it, which proved to

18   me that I can do it.  I don't always have to go all the way to

19   the top to satisfy the question of whether or not I waived my

20   right to something by not appealing it.  Which is something

21   that in the mid-'90s that's all the Department of Justice when

22   they would oppose anything I was doing, that's what they would

23   use against me.

24   In the August 31st order in the Tenth Circuit, they would

25   not address the question of assessment.  They said I did not

1    include it in my opening brief.  They haven't ruled on the

2    merits yet, they wouldn't address it at that time.

3        Now, I have another case back before the Tenth Circuit on

4    assessment that came out of Judge Kearn's courtroom on March

5    16th.  So I should be able to conclude that there and then I

6    should be able to conclude my Paperwork Reduction Act claims in

7    this case.  And then that should conclude anything that I have

8    to do in respect to what I believe in protecting my rights.

9        May I have just a moment, Your Honor?

10            THE COURT:  Surely.

11            MR. SPRINGER:  I'd also apologize to the United

12   States Government.  That's a difficult one for me.  And

13   although we are trying to change as people in accepting some of

14   the things we have to change, one of the things that I got from

15   not only this case, as many objections as I have, is that I

16   live in the greatest country ever seen on the planet.  Thank

17   you.

18            THE COURT:  Thank you, Mr. Springer.  Mr. Stilley.

19            MR. STILLEY:  May it please the Court, counsel,

20   parties.  I'd like to inquire about a procedural matter first

21   and that has to do with if incarceration results.  I'd like to

22   find out if I am to be allowed access to my computer files and

23   hard files for the purposes of a -- of doing my appeal.

24            THE COURT:  That's not a matter that I'm going to

25   address today.  That will be, first of all, a matter between

```
1    you and the marshal and between you and the Bureau of Prisons.

2    If there are any difficulties that you wish to place before the

3    Court relating to your access to any materials, then you will

4    certainly have the opportunity to file a motion.  If you can't

5    get access to a computer for the purpose of filing a motion,

6    then, as you're probably well aware, pro se litigants are

7    entitled to file pleadings in handwriting.  In any event, that

8    aspect of your probable incarceration and your activities after

9    you are remanded is not a matter that I'm going to address

10   today.

11           MR. STILLEY:  Your Honor, as you well know from the

12   proceedings, this is not the first time that I've been in a

13   court.  This is the first time that I've been in a court of

14   this nature on a proceeding in which Oscar Stilley was a party

15   defendant as opposed to counsel.  So there's a little bit of a

16   difference between Oscar Stilley and the typical person who

17   comes before you.  I understand what the proceedings mean.  I

18   understand what your rulings mean that you've made.  I

19   understand the import of those.  My primary consideration, and

20   I think that it will be satisfied based on what you've just

21   told me, but my primary consideration would be my ability to be

22   heard in a reasonable time and a reasonable manner with respect

23   to the process that I am due.

24       I don't wish to rehash anything because I don't think

25   that's appropriate or necessary.  I don't think it's necessary
```

1   to waste any time on that.  You have mentioned something about

2   families.  Truly, I do love my family.  I care for them.  You

3   can see from the presentence report that my wife and I have two

4   biological children, small children, and we have two that we

5   adopted from Russia, we care very much about those.  I

6   certainly care about those children and I intend to do the very

7   best by them that I can.  The principal thing that I want to

8   make sure that I do for them right now is the absolute best

9   work that I can possibly do in defending my interests.

10          Your Honor, that's all the comments that I have to say.

11  Thank you, Judge.

12          THE COURT:  Thank you, Mr. Stilley.

13          MR. SPRINGER:  Your Honor, may I on one point on --

14          THE COURT:  Surely.  Come forward, please.

15          MR. SPRINGER:  Yesterday, I asked about the

16  possibility of an appeal bond or a short amount of time and you

17  made mention, I believe, that I could raise something in my

18  allocution, and I didn't say anything in my allocution about

19  that.  Do I need to say that?  Or the other option you said was

20  after you pronounced sentence that you would consider --

21          THE COURT:  We will address that before we recess,

22  but not at this point.

23          MR. SPRINGER:  Thank you, Your Honor.

24          THE COURT:  Very well.  The Court expresses, first of

25  all, and this should have been said before, should have been

said before more than once but will emphatically be said now,
the Court expresses its sincere appreciation to the defendants'
standby counsel.

Mr. Burton and Mr. Williams, your assignment has been one
of the most thankless tasks that a court could ever ask a
member of the Bar to perform and you have persevered beyond any
reasonable expectation.  It seems inadequate to say simply, but
I say, quite simply, that your work is sincerely appreciated.

I hope that the defendants have some understanding on some
level of how well they have been served by their standby
counsel.  The defendants have been served exceedingly well by
their standby counsel under very difficult circumstances.

In the Court's view, it is unlikely that the defendants
will ever fully understand or fully appreciate how beneficial
the services of their standby counsel have been, but I have no
doubt that to the extent that the defendants have followed the
advice of their standby counsel, the standby counsel have been
instrumental in shortening the list of things that the
defendants would want the Court to disregard for sentencing
purposes.

I also express my sincere appreciation to the probation
officer, Todd Gollihare.  I must say, Mr. Gollihare, it has
been a long time, if ever, since I have seen a pair of
presentence reports that required the extent of very, very
careful review and analysis that the presentence reports and

1   the addenda required in this case.  As far as I'm concerned,

2   your services have been above and beyond any reasonable

3   expectation and any reasonable call of duty.  I, obviously,

4   have not in all respects concurred with the conclusions that

5   you have suggested in your presentence reports and the addenda,

6   but I fully respect the quality and intensity and care of the

7   work that you put into those presentence reports and the

8   addenda and it is sincerely appreciated.

9       The Court has made its sentencing determinations with due

10   regard for the advisory sentencing guidelines.  The advisory

11   sentencing guidelines have aided and indeed channeled the

12   Court's evaluation of this case for sentencing purposes in many

13   important respects.

14       As valuable as the sentencing guidelines have been, it is

15   also true that the sentences that I am about to impose would be

16   the same even with the higher total offense levels advocated by

17   the government or with the lower total offense levels advocated

18   by the defendants.  This is true because to a truly exceptional

19   degree in this case, matters that are at least arguably outside

20   the scope of the matters that may be considered in the

21   application of the advisory guidelines are, nevertheless,

22   highly relevant to the Court's evaluation of other factors

23   under Section 3553.

24       In imposing the sentence in this case, I am mindful of my

25   statutory duty to impose a sentence that is sufficient but not

greater than necessary to fulfill the objectives of sentencing
under the Sentencing Reform Act and I will take into account
the factors mandated by 18 United States Code, Section 3553.
Now, in any particular case, obviously, some of those factors
assume more importance, more relevance, more impact than
others, and that is certainly true in this case.

     In this case, the factors that are most relevant to the
Court's determination of the sentences to impose are the need
for the sentences to reflect the seriousness of the offense.
The offenses of these defendants are by any measure
extraordinarily serious and they have been committed in ways
that probably by any reasonable measure are atypical even of
the manner and means by which individuals violate these
statutory provisions.

     I also consider the need to promote respect for the law
and to provide just punishment as being especially relevant in
this case.  Certainly, the first among equals, if not the
predominant consideration in sentencing, is the need to afford
adequate deterrence to criminal conduct.

     After these proceedings are concluded, it is the Court's
open desire, and this is by statute an explicitly-recognized
sentencing consideration, it is the Court's hope and desire
that others who would be tempted to walk the path and life that
these defendants have walked, the consistently criminal,
predatory, fraudulent path in life that these defendants have

1   walked, will think of what happened to Lindsey Springer and

2   Oscar Stilley and reconsider.  That is what deterrence is all

3   about.  That is an important consideration for sentencing.

4       I also consider the need to protect the public from

5   further crimes of these defendants.  I will acknowledge, quite

6   readily, that the need to provide the defendants with needed

7   educational or vocational training or medical care or other

8   matters relating to rehabilitation are not significant,

9   although they are obviously statutory sentencing

10  considerations, they are not significant for sentencing

11  purposes in this case.

12      I don't think that there is any real possibility that

13  either one of these defendants will change their ways as a

14  result of incarceration.  Incarceration and possibly supervised

15  release will essentially be an interruption, albeit a lengthy

16  interruption, in your criminal way of life.

17      I have also been substantially influenced by the nature

18  and circumstances of the offenses and the history and

19  characteristics of the defendants, the kinds of sentences

20  available, and the need to avoid unwarranted sentencing

21  disparities among defendants with similar records who have been

22  found guilty of similar conduct.  And I'll comment further on

23  that momentarily.

24      I have also been influenced by the advisory sentencing

25  guideline calculation and the relevant guidelines policy

1  statements as well as the need to provide restitution.  All of

2  which I have carefully considered in this case.

3      As for the nature and circumstances of the offenses and

4  the history and characteristics of the defendants, I have tried

5  to find even a thin strand of truth or integrity to your

6  conduct or your way of life.  It is not there.  Not even a

7  speck.  There is not even a plausible basis upon which you

8  might have deluded yourself into thinking that you are anything

9  but complete frauds and predators.

10     Your scams have cheated the United States.  And that is a

11 serious matter in and of itself.  But the United States can

12 print money.  If anyone ever had any lingering doubt as to

13 whether you are frauds and predators, that doubt would be

14 removed by the fact that the two of you have also merciless

15 fleeced some very vulnerable people.  You are predators, pure

16 and simple.

17     In evaluating your culpability, one thing I should

18 consider in fairness to you is the possibility that you have

19 convinced yourselves to believe, in good faith, in the truth of

20 some things that would not be believable to a reasonable man.

21 That would not be fraud as we commonly understand fraud.  So if

22 you are among those who are exceptionally likely to believe

23 whatever you are told, especially if it is you who are doing

24 the telling, that might tend to diminish your culpability.  I

25 have carefully considered that possibility and I have rejected

1    it.

2        As for Mr. Stilley, my sentencing decision is

3    significantly influenced by two matters.  The first is the need

4    to avoid unwarranted sentencing disparities among defendants

5    with similar records who have been found guilty of similar

6    conduct, as you have been in this case.  The facts that

7    contribute to my evaluation of your culpability are a bit

8    different for you than for Mr. Springer.  But in terms of your

9    overall culpability, Mr. Stilley, there is no daylight between

10   you and Mr. Springer, even though his advisory guideline range

11   is higher than yours is.

12       For that reason, taking into account all of the statutory

13   sentencing factors, including the advisory sentencing

14   guidelines, the sentence in your case will include an upward

15   variance from the guideline range.  If I failed to do that in

16   your case, Mr. Stilley, your sentence would reflect a

17   completely unjustifiable and unwarranted sentencing disparity

18   as between you and Mr. Springer.

19       I must say, Mr. Stilley, that my evaluation of your

20   history and characteristics is also influenced by the fact that

21   you have, to a truly astonishing extent, used your license to

22   practice law as an instrument of fraud and a license to steal.

23   Your victims have included both the United States and the

24   individuals who have been persuaded to their everlasting sorrow

25   that you had the competence and integrity to make legitimate

1   arguments on their behalf.  This is an aspect of your history

2   and characteristics that I cannot ignore and that I conclude is

3   not addressed in anything close to a meaningful way by the

4   adjustment under Guideline 3B1.3 for use of a special skill.

5        It is painful to think that you went as long as you did

6   before you were called to account by the disciplinary

7   proceedings in Arkansas.  Mr. Stilley, you are not a lawyer in

8   any normal sense of that word.  You are a thief with a law

9   degree.

10       One other matter should be mentioned before sentence is

11  imposed.  Both of you are going to have some time, considerable

12  time to perfect your self-image as tax protestors who have been

13  persecuted and victimized by the Internal Revenue Service.

14  Before you get too far down that road, let me remind you that

15  you were indicted by a grand jury consisting of your fellow

16  citizens and not by the IRS.  You were convicted by a trial

17  jury sitting in this courtroom consisting of your fellow

18  citizens and not by the IRS.

19       The criminal statutes under which you have been convicted

20  were enacted by our elected representatives and not by the

21  IRS.  You are being sentenced by the Court and not by the IRS.

22  Most importantly, the facts that will result in your

23  considerable terms of imprisonment were created by you and not

24  by the IRS.

25       The defendants will please come to the lectern, both of

1    them.

2        One matter that I'm going to address before I impose

3    sentence, because I will consider this in the imposition of

4    sentence, does the Defendant Springer have any request as to

5    place of designation by the Bureau of Prisons?

6            MR. SPRINGER:  Yes, Your Honor.  Because of the cases

7    that I have pending and because of my family and my children, I

8    would like to be as close to Tulsa, Oklahoma, as I could be.

9    Also readily accessible to the Court for those other cases that

10   are pending.

11           THE COURT:  Mr. Stilley.

12           MR. STILLEY:  Your Honor, I think it would be

13   satisfactory to allow the Bureau of Prisons to make an

14   appropriate designation.

15           THE COURT:  Very well.  The judgment and sentence in

16   this case will also state that the Court strongly recommends

17   that the Defendants Springer and Stilley not, in any event, be

18   designated to or incarcerated in the same institution.

19       Do either of you have any reason that the sentences ought

20   not to be imposed at this time?  Mr. Springer?

21           MR. SPRINGER:  No, Your Honor.

22           THE COURT:  Mr. Stilley?

23           MR. STILLEY:  I'd reserve all the complaints and

24   objections in the entire record.  Otherwise, no.

25           THE COURT:  It is the order and judgment of the Court

1  that the Defendant Lindsey Kent Springer is hereby committed to

2  the custody of the Bureau of Prisons to be imprisoned for a

3  term of 180 months consisting of:  60 months on Count 1, 60

4  months on Count 2, and 60 months on Count 3, each such term to

5  run consecutively.  And 60 months on Count 4, 12 months on

6  Count 5, and 12 months on Count 6; the sentences on Counts 4,

7  5, and 6 to run concurrently with each other and with the

8  sentence on Count 1; for a total sentence as to all counts of

9  180 months.  And you deserve every day of it.

10      Based on the defendant's financial profile as outlined in

11  the presentence report, the Court finds that the Defendant

12  Springer does not have the ability to pay both restitution and

13  a fine; therefore, no fine is imposed.  The defendant shall

14  make restitution in the amount of $691,343 to the Internal

15  Revenue Service and in the amount of $80,186 to the Oklahoma

16  Tax Commission at the addresses which shall be set forth in the

17  judgment and sentence.

18      The cost of prosecution has not been substantiated by

19  evidence and consequently will not be addressed.  Any monetary

20  penalty is due in full immediately but payable on a schedule of

21  the greater of $25 quarterly or 50 percent of income pursuant

22  to the Federal Bureau of Prisons Inmate Financial

23  Responsibility Program while in prison.

24      If a monetary balance remains, payment is to commence not

25  later than 60 days following release from imprisonment to a

1  term of supervised release in equal monthly payments of at

2  least $100 or 10 percent of net income, whichever is greater,

3  over the duration of the term of supervised release and

4  thereafter as prescribed by law for as long as any debt

5  remains.

6       Notwithstanding the establishment of a payment schedule,

7  nothing shall prohibit the United States from executing or

8  levying upon property of the defendant discovered before or

9  after the date of this judgment.

10      Upon release from imprisonment, the defendant shall be

11  placed on a term of supervised release for a period of three

12  years as to Counts 1, 2, 3, and 4 and one year as to Counts 5

13  and 6, all such terms to run concurrently with each other.

14      Immediately upon release from custody but not later than

15  72 hours, the defendant shall report in person to the probation

16  office in the district to which he is released.  While on

17  supervised release the defendant shall not commit another

18  federal, state, or local crime.  He is prohibited during the

19  period of supervised release or afterward from possessing a

20  firearm, ammunition, destructive device, or other dangerous

21  weapon.

22      The defendant shall, at the direction of the probation

23  officer, cooperate in the collection of DNA as provided by law

24  and shall not illegally possess a controlled substance.

25      The defendant shall comply with the standard conditions of

1  supervision that have been adopted by this Court and the

2  following special conditions as set forth in the relevant

3  paragraphs of the presentence report.  The defendant shall

4  abide by the special search and seizure condition as referenced

5  in the presentence report and as found at the Court's Web

6  site.  Likewise, the defendant shall abide by the special

7  financial conditions and he shall abide by the special computer

8  restriction and monitoring conditions.

9      While on supervision, the defendant shall cooperate with

10  the Internal Revenue Service in preparing and filing a true and

11  correct income tax return for any tax years since 1987 for

12  which he has not filed a return.  You shall cooperate with the

13  IRS in civil proceedings to determine accurately your tax

14  liability for the same years, establish a payment schedule with

15  the Internal Revenue Service, and pay all taxes, interest, and

16  penalties owed in connection with your tax debt according to

17  the payment schedule set by the IRS.

18      You shall not engage in any activity that would constitute

19  the unauthorized or unlicensed practice of law or provide

20  representation or services of any kind, advice, suggestions, or

21  recommendations, whether paid or not, to any person or entity,

22  public or private, other than immediate family members with

23  respect to any matter relating to federal or state taxation.

24      The defendant will maintain no Web site that refers to any

25  matter relating to federal or state taxation.  The defendant

1   will post no material of any kind on any Web site that refers

2   to any matter relating to federal or state taxation.

3        The defendant will not file without the express written

4   permission of the probation office any civil action relating to

5   federal income tax.  Further, the defendant is prohibited from

6   engaging in any activities in or under the name of Bondage

7   Breakers Ministry.

8        The defendant will not work directly or indirectly in any

9   business, profession, or self-employment engaged in the offer,

10  sale, purchase, trade, brokering, solicitation, or similar

11  transactions with respect to any real property, securities, or

12  negotiable instruments.  You will not engage in telemarketing

13  activities, to include telephone sales and other such business,

14  campaign, venture, or transaction.

15       You shall maintain employment.  All employment must be

16  approved in advance by the probation officer.

17       You shall abide by electronic monitoring, curfew

18  requirements, and travel restrictions as and to the extent as

19  may be determined by the probation officer.

20       If instructed by the probation officer, you shall provide

21  originals or copies of all personal and business telephone

22  records and all credit card checking account and PayPal

23  statements to the U.S. probation officer.  The defendant will

24  report to the probation officer the particulars as specified by

25  the probation officer of all transactions consummated with a

1  check cashing service.  These reports shall be made within ten

2  days after the completion of any such transaction.  You shall

3  refrain from transacting business with any check cashing

4  service if so directed by the probation officer.

5      You shall disclose all e-mail accounts, PayPal accounts,

6  Internet connections, and communication devices, to include all

7  screen names and passwords.  Your use of e-mail, Internet

8  connections, or an Internet connection service will be

9  restricted and/or monitored by monitoring software and

10 otherwise with the costs of remote computer monitoring to be

11 paid by the defendant.

12     You will be prohibited from accessing any on-line service

13 using an alias or the Internet account name or designation of

14 another person or entity.  You will be prohibited from altering

15 or using any form of encryption or other methods that limit

16 access to or change the appearance of data or images.  You will

17 be prohibited from altering or destroying records of computer

18 use.

19     It is further ordered that a $600 special monetary

20 assessment, $100 per count of conviction, be paid immediately

21 to the U.S. Court Clerk for the Northern District of Oklahoma.

22     Let's see, is that correct as to the misdemeanors?  Is

23 that still 100?

24         MR. O'REILLY:  No, Your Honor.

25         PROBATION OFFICER:  No, Your Honor.  It would be

1   $50 --

2          THE COURT:  Fifty dollars, okay.  Very well.  That

3   will be adjusted accordingly.

4       The judgment and sentence will state that the Court

5   recommends that the defendant be designated to the federal

6   penal facility closest to Tulsa, Oklahoma, for which his

7   security designation qualifies him -- or his security

8   classification qualifies him.

9       Mr. Springer, you are advised that you do have a right of

10  appeal the sentence that is imposed and the judgment of the

11  Court.  Any such appeal must be filed within 14 days of the

12  date the judgment is entered.  If you wish to appeal and cannot

13  afford an appeal, there are forms available for your use to

14  request an appeal without payment of cost.

15      As I mentioned yesterday, I urge you to move without delay

16  in preparing the necessary paperwork to get a transcript at

17  public expense.  And it's my assumption -- you can work with

18  the clerk on this.  It is my assumption that you do desire to

19  appeal and to notify the Court of that intent without delay.

20  We'll address matters relating to remand momentarily.

21      Oscar Amos Stilley.  It is the order and judgment of the

22  Court that the Defendant Oscar Amos Stilley is hereby committed

23  to the custody of the Bureau of Prisons to be imprisoned for a

24  term of 180 months consisting of:  60 months on Count 1, 60

25  months on Count 3, and 60 months on Count 4, all such terms to

1   run consecutively, for a total sentence as to all counts of 180

2   months.  And you deserve every day of it.

3        Based on your financial profile as outlined in the

4   presentence report, the Court finds that you do not have the

5   ability to pay both restitution and a fine; therefore, no fine

6   is imposed.

7        You shall make restitution in the amount of $684,653 to

8   the Internal Revenue Service and the amount of $91,627 to the

9   Arkansas Department of Finance and Administration at the

10  addresses that shall be set forth in the judgment and sentence.

11       The cost of prosecution has not been substantiated by

12  evidence and, consequently, will not be assessed.

13       Any monetary penalty is due in full immediately but

14  payable on a schedule of the greater of $25 quarterly or 50

15  percent of income pursuant to the Bureau of Prisons Inmate

16  Financial Responsibility Program.  This provision in your

17  judgment and sentence will be identical to the corresponding

18  provision in Mr. Springer's judgment and sentence.

19       By the way, if -- I should also -- however, this is the

20  release from -- the supervised release, obviously, is a bit

21  different because of the different counts of conviction.  Upon

22  release from imprisonment, you shall be placed on a term of

23  supervised release for a period of three years as to Counts 1,

24  3, and 4.  All terms of supervised release shall run

25  concurrently with each other.  Should the terms of supervised

1    release be revoked, an additional term of imprisonment may be

2    imposed.  Which is true with respect to both defendants.

3         Your judgment and sentence provisions with respect to

4    reporting after release from custody, with respect to DNA, with

5    respect to possession of a controlled substance, with respect

6    to the standard conditions, with respect to the special

7    conditions will be identical to those that were imposed with

8    respect to Mr. Springer.

9         While on supervision, you shall cooperate with the

10   Internal Revenue Service in preparing and filing a true and

11   correct income tax return for any tax years since 1987 for

12   which you have not filed a return.  That will be identical for

13   you as with respect to Mr. Springer.  And the same, of course,

14   is true of the special search and seizure condition, the

15   special financial conditions, and the special computer

16   restriction and monitoring conditions.

17        Likewise, the unauthorized practice of law restriction,

18   the Web site restriction, the posting of material relating to

19   federal or state taxation, and the civil action restriction

20   will be the same for you as with respect to Mr. Springer.

21        You will not work directly or indirectly in any business,

22   profession, or self-employment engaged in the offer, sale,

23   purchase, trade, brokering, solicitation, or similar

24   transactions with respect to any real property, securities, or

25   negotiable instruments.  And the remainder of that provision

1  will be identical with respect to Mr. Springer.

2      You shall provide, if instructed by the probation officer,

3  with originals or copies of all personal and business telephone

4  records and all credit card checking account and PayPal

5  statements to the U.S. probation officer.

6      Your condition of supervised release with respect to

7  transactions with check cashing services will be identical as

8  with respect to Mr. Springer.  And the provision with respect

9  to disclosure of e-mail accounts, screen names, passwords, and

10  remote monitoring and prohibition on access of on-line services

11  in false names or aliases and the prohibition of any use of any

12  method of encryption and the prohibition of altering or

13  destroying records of computer use will be identical as with

14  the conditions applicable to Mr. Springer.

15      It is further ordered that you are assessed a $300 special

16  monetary assessment, $100 per count of conviction, to be paid

17  immediately to the U.S. Court Clerk for the Northern District

18  of Oklahoma.

19      You do have a right of appeal of this judgment and

20  sentence.  Any such appeal must be filed within 14 days of the

21  date judgment is entered.  If you wish to appeal and cannot

22  afford an appeal, there are forms available for your use and

23  the clerk is ready to work with you on perfecting your appeal.

24  As is the case with Mr. Springer, I urge you to move without

25  delay to secure a transcript of the record at public expense.

1     Mr. Springer and Mr. Stilley, you may be seated for the
2  moment.
3          MR. SPRINGER:  May I ask one question about
4  restitution?
5          THE COURT:  Surely.
6          MR. SPRINGER:  When I cooperate with the IRS to file
7  the back tax returns, is it the Court's order that the
8  restitution amount would be credited towards the amount that
9  would be shown on those returns?
10         THE COURT:  That's an accounting matter that's
11  probably more complicated than we need to get into.
12         MR. SPRINGER:  Thank you, Your Honor.
13         THE COURT:  You bet.  I now inquire as to the
14  government's position with respect to remand.
15         MR. O'REILLY:  Each defendant should be remanded,
16  Your Honor, under 3143.
17         THE COURT:  Mr. Springer, I'll be happy to hear
18  anything you have to say to the Court on the subject of remand
19  to custody.
20         MR. SPRINGER:  First of all, Your Honor, under 3143,
21  I don't think anybody is saying I'm a flight risk.  I've been
22  released on bond for over a year now.  I've been under some
23  very strict bond conditions and I have kept them, as the
24  probation report states.
25     The only real question under 3143 is whether I raise

1   issues that, if decided in my favor, would result in either a

2   reversal, a reduction, or exoneration of the charges.  In that

3   regard, the issues that I spelled out a moment ago with regard

4   to my claims that the Tenth Circuit said on August 31, 2009,

5   that I raised difficult issues that they weren't going to

6   address in that decision because of the failure to pay penalty

7   and interest penalty instead of failure to file penalty, and --

8   if I may, Your Honor.

9       In relation to whether I raised difficult issues, I would

10  direct the Court's attention to -- which is, I believe, under

11  3143(b)(2), it's about law or facts, 3143(b)(1)(B) and (A) and

12  (B).  And under the decision that the Tenth Circuit published

13  in 2007, they stated in Mr. Chisum's case, because he was not

14  charged, they said, "The PRA precludes the imposition of any

15  penalty against a person for 'failing to comply with a

16  collection of information' if either it 'does not display a

17  valid control number' or the agency fails to alert the person

18  that he or she 'is not required to respond to the collection of

19  information unless it displays a valid control number.'  A

20  3512(a) defense may be raised at any time.  Tax forms are

21  covered by the PRA.  See Dole v. United Steelworkers, 108

22  L.Ed.2d 23 (1990), Supreme Court.  Mr. Chisum contends that

23  'since there was no proof that Form 1040 was a lawful form

24  under the PRA, the trial court erred in failing to grant his

25  request to dismiss the indictment.'  But the PRA protects a

1   person only 'for failing to file information.  It does not

2   protect one who files information which is false.'"

3       And the Tenth Circuit also said in the U.S. v. Collins

4   decision in 1990, which was written by Justice Baldock, and I

5   specifically refer to footnote 13 where it says, "In United

6   States v. Weiss, the Second Circuit held that the Paperwork

7   Reduction Act did not preclude prosecution for filing false

8   Medicare and Medicaid claims, despite the fact that the forms

9   in question did not contain OMB control numbers."  Which is not

10  my issue.  "Distinguishing Smith, where defendants were

11  prosecuted for failure to file a Plan of Operations with the

12  Forest Service, the Second Circuit reasoned that the Act 'only

13  protects a person from penalties for failing to file

14  information.  It does not protect one who files information

15  which is false.'"

16      They went on to say, "We recognize that because defendant

17  was charged with tax evasion and not failure to file tax

18  returns, he technically was not being prosecuted for failure to

19  provide information.  Had defendant's tax evasion been

20  effectuated through the filing of falsified tax returns, Weiss

21  would dictate that no Paperwork Reduction Act defense would be

22  available to him.  But because the provision of information in

23  1040 forms is inexorably linked to the statutory requirement to

24  pay taxes, and defendant failed to file such forms, the

25  Paperwork Reduction Act was applicable to such conduct."

1      In United States v. Dawes, which the Court cited on a

2   January 2010 order, which is laying out -- I'm laying out in

3   the record the basis by which I believe I have an excellent

4   chance of having the Tenth Circuit rule on the merits of my

5   claims and rule in my favor is pointing to page 1193 where the

6   Tenth Circuit said, "We would be inclined to follow the general

7   analysis" --

8           THE COURT:  Excuse me, Mr. Springer.  We covered all

9   of this at trial.  I am emphatically not persuaded by your

10  arguments under the Paperwork Reduction Act.  That will

11  certainly not inform my judgment as to whether you should be

12  remanded under the criteria set forth in Section 3143(b)(1)(A)

13  and (B).

14          MR. SPRINGER:  Okay, Your Honor.  I also believe that

15  the Tenth Circuit will overturn the Court's direction to the

16  jury during my testimony about the Paperwork Reduction Act

17  because of the good faith defense position that I presented.

18  Today, the Supreme Court is meeting on my writ of mandamus

19  that's presented at the Supreme Court on its second conference,

20  which I anticipate at some point in time the Tenth Circuit is

21  going to render a decision on that case, even though it's in

22  the Supreme Court, regardless of what the Supreme Court does.

23  Because on December 4th, the Tenth Circuit said they would

24  address the issues on that when I got to the Tenth Circuit on

25  appeal.  I also have --

 1          THE COURT:  Excuse me just a moment.  Mr. O'Reilly.

 2          MR. O'REILLY:  With the Court's indulgence, may I

 3  take a short break?

 4          THE COURT:  We'll take a ten-minute recess.

 5          MR. SPRINGER:  Thank you, Your Honor.

 6      (RECESS HAD)

 7          THE COURT:  Mr. Springer, I'll hear any concluding

 8  remarks you have on the subject of remand.

 9          MR. SPRINGER:  Your Honor, if I can simply just have

10  a few days to get all of my affairs in order, to get the

11  documents filed that you suggested earlier about the

12  transcripts done, spend a couple of days with my family, say my

13  goodbyes, and then I will report to wherever you tell me, as

14  I've done every time you've ordered me to do something.

15          THE COURT:  Thank you, Mr. Springer.

16          MR. SPRINGER:  Thank you.

17          THE COURT:  Mr. Stilley.

18          MR. STILLEY:  Your Honor, I would certainly adopt but

19  not repeat -- waste time repeating what Mr. Springer has said.

20  There is a matter that I feel that I should state in fairness

21  to the Court and that is that I do take objection to an upward

22  departure without previous notice the reasons and the

23  possibility of that upward departure.

24      And I would also say that my principal concern, I think

25  reflected in the pleadings, is that I be heard in a reasonable

1  time and in a reasonable manner, which is the fundamental

2  essence of due process.  I'm not persuaded that I can do that

3  reasonably in jail and certainly not to the level that I could

4  at home with all the computer, printers, and other things, the

5  Internet, that I would have access to.

6       And I would most respectfully request that I be allowed,

7  first, release pending appeal.  If that's not done, that I be

8  given time to surrender that would extend past the preparation

9  and filing of the reply.  And if that's not allowed, then

10  whatever the Court would grant as far as giving time to self-

11  surrender.

12            THE COURT:  Thank you.

13            MR. STILLEY:  Certainly.

14            THE COURT:  On the matter initially raised by

15  Mr. Stilley, the above guideline sentence is as a result of a

16  variance and not a departure.  The United States Supreme Court

17  has made it clear and in so doing effectively overruled the

18  Tenth Circuit's Atencio decision and has made clear that the

19  Court's application of the Section 3553 factors, even though it

20  may result in an above-guideline sentence, is a variance as to

21  which notice is not required, as distinguished from the notice

22  requirements that do apply to a guidelines departure.  So that

23  objection is overruled.

24       On the issue of remand, let me first say, gentlemen, that

25  I am fully cognizant of the seriousness of this question,

1  especially as it applies in your situation having invoked your

2  right, as you have, and it's an important right, to represent

3  yourselves. And I am fully cognizant of the fact that

4  incarceration may well have some impact on your ability to

5  proceed representing yourselves. To the extent that the Court

6  can within the bounds of the law and common sense ameliorate

7  that, then I will be happy to consider anything that the Court

8  might properly address in that regard.

9      My remand decision, however, is controlled by the relevant

10  subsections of 18 United States Code, Section 3143. And it is

11  my conclusion that there is no basis, statutory or otherwise,

12  upon which to continue the defendants on bond. And that

13  finding, I must say, is made both with respect to Section

14  3143(b)(1)(A) and Section 3143(b)(1)(B).

15      My decision not to remand the defendants after trial was

16  not an easy one. And as might be suggested by the conditions

17  that I imposed at that time, it took a little work, I guess is

18  perhaps one way to say it, it took a little work for me to

19  arrive at the conclusion that the defendants should not be

20  remanded immediately after the verdict was in last fall. But I

21  was able to craft conditions that gave me the satisfaction,

22  albeit perhaps barely, that the statutory criteria for

23  continuing the defendants on bond with the matter in that

24  posture could be satisfied and were satisfied.

25      That is not the case today. I am no longer satisfied,

 1   much less by clear and convincing evidence, that the defendants

 2   are not flight risks.  We are now at a day on which the reality

 3   of the defendants' situations has become more -- certainly more

 4   unmistakably apparent and more unavoidable than it has been at

 5   any stage of these proceedings.

 6        I had to work hard, as I have said, to avoid remand at the

 7   conclusion of the trial.  I no longer have the comfort level,

 8   as I have said, much less by clear and convincing evidence,

 9   that the defendants are not flight risks at this point.

10        In this regard, I must say that I'm also influenced by my

11   evaluation of your entire criminal history and your entire long

12   history of lawless conduct.  You managed to keep yourself, in

13   the vernacular, between the fences during the pendency of these

14   proceedings.  And I think you did so because your balancing of

15   the benefits and disadvantages of doing that convinced you that

16   it was likely to your benefit to continue to comply with the

17   Court's requirements to the extent necessary to remain free.

18   I'm no longer satisfied that you would calculate the matter in

19   the same way.  And I do not find, much less by clear and

20   convincing evidence, that you are not flight risks.

21        With respect to Section 3143(b)(1)(B), I do not find that

22   there is any substantial question of law or fact likely to

23   result in reversal or any of the other relief referred to in

24   Section (b)(1)(B).  And bear in mind, gentlemen, that those are

25   conjunctive requirements.  (b)(1)(A) and (b)(1)(B) are

1    conjunctive, not alternative.

2        The defendants are both remanded to the custody of the

3    marshal to begin serving their sentences immediately.

4        Court will be in recess.  And I will direct that the

5    exhibits be withdrawn.  Court will be in recess.

6        (COURT ADJOURNED)

7                          REPORTER'S CERTIFICATE

8

9        I HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND

10   CORRECT TRANSCRIPT OF PROCEEDINGS:

11

12                    S/Tracy Washbourne
                      Tracy Washbourne, RDR, CRR
13                    United States Court Reporter
                      Western District of Oklahoma
14

15

16

17

18

19

20

21

22

23

24

25