

F I L E D

DEC 1 6 2019

Mark C. McCartt, Clerk
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,

    Plaintiff,

v.                              Case No. 09-CR-043

LINDSEY KENT SPRINGER,

    Defendant.

### DEFENDANT'S REPLY TO RESPONSE IN OPPOSITION
### TO DEFENDANT'S MOTION FOR RELEASE
### UNDER THE FIRST STEP ACT OF 2018

By:  Lindsey Kent Springer
      Pro-Se
      Fed. Reg. # 02580-063
      Federal Transfer Center
      P.O. Box 898801
      Oklahoma City, Oklahoma 73189

✓ Mail    ___ No Cert Svc    ___ No Orig Sign

___ C/J    ___ C/MJ    ___ C/Ret'd    No Env

___ No Cpys    ✓ No Env/Cpys    ___ O/J    ___ O/MJ

TABLE OF CONTENTS

Table of Authorities................................................-ii-
Reply..............................................................1

    Reply to Background............................................1

1.  Springer has exhausted all available administrative appeals
    regarding Springer's exposure to asbestos and mold.................3

    (a).  The undisputed facts.......................................6

    (b).  Springer's claims and appeals.............................8

        (i) The Remedy contemplated by the Attorney General for the
        Bureau of Prisons under 28 CFR §§ 542.10 et seq., were
        not available to Springer...............................9

        (ii) Springer made a Second attempt at appeal simply to
        show when Springer says exhausted, he means exhausted...11

2.  Springer's claims meet the jurisdiction hurdles established at
    18 U.S.C. § 3582(c)(1)(A) and the First Step Act..................12

3.  The asbestos falling to the floor and property below from the
    ceiling and walls clearly meets the definition of friable
    asbestos.........................................................13

4.  The relief Springer seeks is totally warranted under the circum-
    stances of Springer's exposure...................................15

Conclusion.........................................................17
Certificate of Service.............................................18
Declaration of Mailing.............................................18

## TABLE OF AUTHORITIES

Bivens v. Six Unknown Named Agents, 403 U.S. 388(1971)........................2
Booth v. Chimer, 532 U.S. 731, 740(2001)........................................4
Carlson v. Green, 446 U.S. 14(1980)...........................................2,3
Erikson v. Pandus, 551 U.S. 89, 94(2007)........................................5
Estelle v. Gamble, 429 U.S. 97, 106(1976).......................................5
Forbes v. Garcia, 696 Fed. Appx. 381, 382(10th Cir. 2017).......................4
Foulk v. Charrier, 262 F.3d 1001, 1006(2nd Cir. 2001)...........................6
Farmer v. Brennan, 511 U.S. 825, 834(1994).....................................16
Haines v. Kerner, 404 U.S. 519, 520-21(1972)....................................5
Holloway v. Gunnell, 685 F.2d 150, 154(5th Cir. 1982)...........................4
Jernigan v. Stuchell, 304 F.3d 1030, 1032(10th Cir. 2002).....................4,6
Jones v. Bock, 549 U.S. 199, 212(2007)..........................................4
Jones v. Davis, 366 Fed. Appx. 942, 944(10th Cir. 2010).........................5
Kikumura v. Osagie, 461 F.3d 1269, 1284(10th Cir. 2006).........................5
Kontrick v. Ryan, 540 U.S. 443, 447(2004).......................................4
Lewis v. Washington, 300 F.3d 829, 833(7th Cir. 2002)...........................6
Love v. Pullman Co., 404 U.S. 522, 526-27(1972).................................5
Lucia v. SEC, 138 S.Ct. 2044, 2055(2018)........................................3
Rhodes v. Chapman, 452 U.S. 337, 347(1981).....................................16
Rourke v. Thompson, 11 F.3d 47, 50(5th Cir. 1993)...............................5
Schuster v. Vincent, 524 F.2d 153, 159(2nd Cir. 1975)..........................16
Shah v. Quilin, 901 F.2d 1241, 1244(5th Cir.1990)...............................4
Underwood v. Wilson, 151 F.3d 292, 295(5th Cir. 1998).........................4,5
U.S. v. Fox, U.S. Dist. Lexis 89473(D. Main, 2017).............................17
U.S. v. Malley, 739 F.3d 1001, 1006(2nd Cir. 2001).............................15
U.S. v. Olanao, 507 U.S. 725, 733(1993).........................................4
U.S. v. Springer, 875 F.3d 968, 974(10th Cir. 2017).............................5
Woodford v. NGO, 548 U.S. 81, 88(2006)..........................................4

## STATUTES INVOLVED

18 U.S.C. § 912...............................................................2
          § 3553(a)(5)......................................................17
          § 3553(a)(6)......................................................17
          § 3582(c)(1)(A)...............................................1,9,12

## REGULATIONS INVOLVED

28 CFR § 542.10 to 542.18..................................................9,10
       § 542.13(a)............................................................9
       § 542.14(c)(4).........................................................9
       § 542.18..............................................................11
29 CFR § 1910-1001...........................................................16
40 CFR § 61.141...........................................................14,15

## MISCELLANEOUS

Amendment 791...............................................................17
U.S.S.G. § 2T4.1............................................................17

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,

    Plaintiff,

v.                          Case No. 09-CR-043

LINDSEY KENT SPRINGER,

    Defendant.

## REPLY

Lindsey Kent Springer ("Springer") files his Reply to the Response in Opposition to Springer's Motion for Release under the First Step Act of 2018 filed by Charles A. O'eilly ("O'Reilly") on behalf of the United States of America. Doc. 673.  O'Reilly argues two basic points that Springer "does not meet the prerequisite for filing such a motion, let alone demonstrate extra-ordinary and compelling reasons warranting immediate release." Doc. 673, p. 5. This Court can easily reject both contentions based upon the facts declared under the penalty of perjury in Springer's Motion, Doc. 669, pgs. 3 to 16, and the 18 Exhibits attached, as supplemented by Doc. 671.

Springer replies to (1) O'Reilly's assertion Springer has not exhausted all available administrative remedies for appeals under the meaning of 18 U.S.C. § 3582(c)(1)(A), (2) O'Reilly's assertion Springer has not met the jurisdictional prerequisites to warrant the relief Springer seeks, (3) O'Reilly's frivolous assertion the asbestos covering everything in both storage rooms did not meet the legal definition of friability, (4) and O'Reilly's assertion the relief Springer seeks is not totally warranted under the circumstances presented. Springer provides his reply also to O'Reilly's "Background" statement. This Court should reject each of O'Reilly's assertions.

## REPLY TO BACKGROUND

1

It is not criminal conduct to challenge the Constitutional validity of the Appointment to office, and the required Presidential Commission, to such office, of a person who is exercising significant authority of the United States. It is, however, criminal conduct to impersonate an officer of the United States knowingly. See 18 U.S.C. § 912. O'Reilly has clearly exercised such authority now more than 10 years in the Northern District of Oklahoma ("NDOK") and deserves nothing but the highest level of scrutiny.

O'Reilly, for instance, declares to this Court that Springer has "filed numerous challenges to...conditions of confinement." Doc. 673, p. 2. That declaration is 100% totally false. To show O'Reilly's artful skill on full display, he argues:

> "In his most recent motion in the Northern District of Texas, Mr. Springer raised claims challenging the conditions of his confinement in Seagoville."

Doc. 673, p. 4.

O'Reilly's term "numerous," which to reasonable persons means "many," is then supported by only Springer v. Underwood. Doc. 673, p.4. Additionally, O'Reilly's reference to Springer's Habeas Corpus Petition as a "motion" is gross, inexact, and shows O'Reilly's credibility speaking on the subject is wanting. Springer is not certain why O'Reilly finds pleasure in the fact a United States District Judge in the Northern District of Texas ("NDTX") directed Springer to sue for his exposure under the Bivens remedy, which allows personal damages from officials who violate the Eighth Amendment, see Carlson v. Green, 446 U.S. 14(1980)(citing to Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388, 396(1971)), but regardless, Springer has rights under the Bivens remedy, the Federal Tort Claims Act, and under the First Step Act of 2018. Springer is appealing the NDTX Order.

Although almost 10 years has changed Springer in numerous ways, O'Reilly provides no evidence Springer has any intention to continue fighting the

2

the Internal Revenue Service.  The next generation will have to decide that issue.  Springer is, though, incentified by the Supreme Court's own words that all America should raise appointment clause challenges, See <u>Lucia v. SEC</u>, 138 S.Ct. 2044, 2055(2018), but unless the lawyers in the excepted service and currently protected by the Merit System Protection Board intend to harrass Springer upon release, Springer's challenges shall remain where they ought and that is on prior litigation.  Springer assures this Court that it will be a source of pride for Springer to report every penny Springer receives to the IRS and will pursue settling Springer's account with the phrase "paid in full" (though that may take some time).

1. <u>Springer has exhausted all available administrative appeals regarding Springer's exposure to asbestos and mold.</u>

There are two parts to an administrative remedy in the Bureau of Prisons. What happened and what remedy.  If the Warden does not agree with what happened, it is axiomatic. the Warden will not agree to provide the requested remedy.

This is an important detail when examining whether Springer has exhausted his "administrative rights to appeal."  18 U.S.C. § 3582(c)(1)(A) reads in relevant part:

> "The Court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has **fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf**, of the laps of 30 days from the receipt of such a request by the Warden of the defendant's facility, which ever is earlier, may reduce the term of imprisonment..."

Although § 3582(c)(1)(A) does not condition relief on the magic words "exhaust administrative remedies," it does use the phrase "exhaust all administrative rights to appeal."  O'Reilly attempts to make synonymous these two phrases in his response. Doc. 673, p.7("fully exhausted all administrative rights"); and see Doc. 673, p.9("exhausted his administrative remedies by appealing any failure to do so.")

3

However, other than O'Reilly's limited defense of failure to exhaust, O'Reilly has waived and forfeited all other aspects of the affirmative defense. See Kontrick v. Ryan, 540 U.S. 443, 447(2004)("[W]aiver is the 'intelligent relinquishment or abandonment of a known right."); see also 540 U.S. at 458 (n.13)(quoting U.S. v. Olano, 507 U.S. 725, 733(1933)).  This is known as an "affirmative defense." Jones v. Bock, 549 U.S. 199, 212(2007).  In Woodford v. NGO, 548 U.S. 81, 88(2006), the Court explained administrative remedies are those "defined by the prison grievance process itself."  This is all that is required.  Administrative remedies are called "claim processing rules." Kontrick, 540 U.S. at 456.  The "level of detail necessary...to comply with the grievance procedure will vary from system to system and claim to claim, but, it is the prison's requirement...that defines the boundaries of proper exhaustion." Forbes v. Garcia, 696 Fed. Appx. 381, 382(10th Cir. 2017)(unpublished)(quoting Jones, 549 U.S. at 218.

"Even where the 'available' remedies would appear to be futile at providing the kind of remedy sought, the prisoner must exhaust the administrative remedies available." Jernigan v. Stuchell, 304 F.3d 1030, 1032(10th Cir. 2002). Of course, exhaustion is required.  Booth v. Chimer, 532 U.S. 731, 740(2001).

The Tenth Circuit explained in Jernigan that the "failure to respond to a grievance within the time limits contained in the grievance policy renders an administrative remedy unavailable." 304 F.3d at 1033.  In Underwood v. Wilson, 151 F.3d 292, 295(5th Cir. 1998), the Fifth Circuit explained "available administrative remedies are exhausted when the time limits for the prisoner's response set forth in the prison Grievance Procedures have expired."

In Shah v. Quilin, 901 F.2d 1241, 1244(5th Cir. 1990), the Fifth Circuit required only a "substantial effort to obtain an administrative remedy."(quoting Holloway v. Gunnell, 685 F.2d 150, 154(5th Cir. 1982). This exception exc-

4

uses exhaustion on the "allegation that the Bureau's own procedural irregularities caused the failure." Rourke v. Thompson, 11 F.3d 47, 50(5th Cir. 1993).

To then understand Springer's attempt at exhausting his administrative remedies involving Springer's exposure to cancer causing asbestos and breathtaking mold, and his attempt, due to that exposure, to convince the Warden at Seagoville to assist Springer in obtaining a sentence reduction of 93.3 months based upon the mathmatical assessment of a 5 days earned for every day of exposure, and the subsequent appeals that primarily focused on Springer's exposure, must be taken simultaneously.

"It is the relief sought" that controls. U.S. v. Springer, 875 F.3d 968, 974(10th Cir. 2017)("It is the substance that controls."). The Court is to liberally construe Springer's filings. See Erickson v. Pardus, 551 U.S. 89, 94 (2007)(citing Estelle v. Gamble, 429 U.S. 97, 106(1976)); see also Haines v. Kerner, 404 U.S. 519, 520-21(1972).

"A narrow exception to the exhaustion requirement applies if a Petitioner can demonstrate that exhaustion is futile." Jones v. Davis, 366 Fed. Appx. 942, 944(10th Cir. 2010)(unpublished).  The Supreme Court has cautioned that "the creating of an additional procedural technicallity...[is] particularly inappropriate in a statutory scheme in which laymen, unassisted by trained lawyers, initiates the process." Kikumura v. Osagie, 461 F.3d 1269, 1284(10th Cir. 2006) (citing Love v. Pullman Co., 404 U.S. 522, 526-27(1972)).

"Not only do inmates typically file their greiveances pro-se, but BOP procedures allow prisoners just twenty-days from the date of their injury to file a grievance; they are allowed less than a page and a half to write out a complaint; and, because they are incarcerated, the inmates often cannot investigate their own claims to identify the alleged wrong doers." Kikumura, 461 F.3d at 1284.

5

So, the Fifth, Seventh, Eighth, and Tenth Circuits are in lock step that they deem "administrative remedies exhausted when prison officials fail to respond to inmate grievances because those remedies had become 'unavailable.'" Underwood, 151 F.3d at 295; Lewis v. Washington, 300 F.3d 829, 833(7th Cir. 2002); Foulk v. Charrier, 262 F.3d 687, 698(8th Cir. 2001); Jernigan, 304 F.3d at 1032.

And usually, the request for assisting an inmate in obtaining a sentence reduction is not based upon actions taken by those same officials causing the injury for which the requested release is based.  Additionally, in or around February, 2019, while Springer was furloughed every work day to the South Central Regional Offices in Grand Prairie, Texas, inmates in the Cadre Unit were confronted by lawyers at Seagoville Camp in regard to Regional Director John Caraway's use of those inmates, by furlough, to Mr. Caraway's Church. Mr. Caraway resigned as the Regional Director amidst allegations he used inmates at Seagoville for improper purposes.  Recently, Warden Underwood also resigned and to get those inmates to Mr. Caraway's Church, by furlough, required her signature.

(a)  The undisputed facts.

It is here important to carry forward that O'Reilly does not dispute the truthfullness of each of Springer's 122 paragraphs of facts, or the 18 Exhibits for which those facts are derived.

O'Reilly accepts that:

"Mr. Christian and Mr. Rosales were aware of the white panels with dark substances scattered throughout both rooms falling from the ceilings on or about September/October, 2018, causing air quality issues with breathing [Springer] was experiencing and abnormal amounts of blood flowing from [Springer's] nose."

Doc. 669, p. 8 and Exhibit 2, p.1.

O'Reilly takes no issue with the fact Springer (1) around April 1, 2017, began cleaning foreign substances covering the shelving system in Storage 1;

6

Doc. 669, p. 4; (2) was exposed to "dusty dry dark substances, chunks of black substances, and black surface substances"; (3) was exposed to the dust and debris covering that shelve system and the floor which had "fall[en]...from the ceiling and walls"; Doc. 669, p. 5; (4) was exposed to the "fine dusty substance and chunks of black substance apparent to all was falling from the ceiling and walls"; Doc. 669, p. 5; (5) began to have upper respiratory issues including excessive bloody noses; Doc. 669, p. 5; was exposed to the strong odor coming in and from Storage 1; Doc. 669, p. 6; (7) was exposed to both Storage 1 and 2 that would not pass basic inspections based upon the falling debris; Doc. 669, p.7; (8) was responsible for cleaning for more than 500 days both Storage 1 and 2; Doc. 669, p. 7; (9) did clean routinely both Storage 1 and 2; Doc. 669, p. 7; (10) as part of his routine, was to "clean off from all property being removed from Storage 2 the dusty substance and black matter that had fallen from the walls and ceilng landing"; Doc. 669, p. 8; (11) was exposed to a "black substance" in both Storage rooms; Doc. 669, p. 8; (12) between December 15, 2017, through September 15, 2018, continually cleaned, swept, and breathed in dust that covered the property including black substances; Doc. 669, p. 9; (13) was exposed to the "dust covering property and black chunks increased in volume" and compiled outside both Storage 1 and 2; Doc. 669, p. 9; (14) in September, 2018, was informed Mr. Rees agreed to have an outside company test the "substances falling from the walls and ceiling in Storage 1 and 2"; Doc. 669, p. 10; (15) was present when an outside company visited the Warehouse on October 9, 2018 and "tested the substance falling from the walls and ceilings in Storage 1 and 2; Doc. 669, p.10; (16) on October 10, 2018, was directed to place two signs on Storage 1 and 2 instructing no one to enter either room; Doc. 669, p.10; (17) on October 11, 2018, sealed up both Storage rooms per the direction of Mr. Rees placing red signs that warned Cancer Causing Asbestos was found present inside

7

both Storage 1 and 2; Doc. 669, p. 10 and Exhibit 1(Doc. 671).

In addition, O'Reilly agrees, taking no exception, that (18) on or about May 6, 2019, through May 14, 2019, ARC Abatement abated both Storage 1 and 2 at the Warehouse removing asbestos from all inmate lockers, washers and dryers, staff furniture, toilet paper, mattresses, and other BOP property found therein; Doc. 669, p. 14-15 and Exhibit 16; (19) Damon Lynn, Bruce Padgett, and at least 5 bargained for staff members, are all pursuing claims they were exposed to both asbestos and mold; Doc. 669, p. 9, 16; and (20) all contents in both Storage 1 and 2 were destroyed upon being abated. Doc. 669, p. 11, 14-15.

(b)  Springer's claims and appeals.

What O'Reilly is arguing is that Springer's BP-9 should have said, based on the  agreement Springer was exposed to more than 500 days of Cancer Causing Asbestos and Breath-Taking Mold, Springer should have uttered the Warden advocate the Director of the BOP authorize a motion seeking a sentence reduction for Springer.  Springer is certain in the future inmates will utter those magic words.

However, Springer clearly exhausted any available administrative right to appeal the Warden's denial of Springer's request in his BP-9.  O'Reilly attaches Two exhibits to his opposition. Doc. 673, Exhibit 1 and 2.  The first is signed by someone other than the Warden dated December 26, 2018, and states:

> "This is in response to your request for Administrative Remedy **receipted December 11, 2018**, where you allege..."

Doc. 673, Exhibit 1, p. 1; Doc. 699, Exhibit 9.

So, the December 26, 2018 response is to cover every word in Springer's October 29, 2018 BP-9.  The December 26, 2018 out-of-time response reads in relevant part:

> "If you [that is Springer] are not satisfied with this response, You may **appeal** to the South Central Regional Director..."

8

Doc. 673, Exhibit 1, p. 2; Doc. 669, Exhibit 9, p. 2.

Springer is certain the term "appeal" in the Warden's out-of-time response dated December 26, 2018, is the same meaning of the term "appeal" in 18 U.S.C. § 3582(c)(1)(A).  O'Reilly does not argue otherwise.

The Second Exhibit O'Reilly attaches, signed by Amy Miller (initials "AM"), and Scott Ciolli, not John Caraway, reads:

> "This is in response to your Regional **Administrative Remedy** <u>Appeal</u> receip-
> ted January 14, 2019."

Doc. 673, Exhibit 2, p. 1; Doc. 669, Exhibit 13, p.2.

Springer's response from the Central Office Administrative Remedy also referred to what Springer filed was an "appeal." Doc. 669, Exhibit 15, p. 2. .

      (i)  <u>The remedy contemplated by the Attorney General for the Bureau</u>
           <u>Prisons under 28 CFR §§ 542.10 et seq., were not available</u>
           <u>to Springer.</u>

"On October 29, 2018, Springer made, **after several attempts to obtain administrative remedy request forms went unresponded to by the Warden and her administration,**" Springer filed his BP-9 with Counselor Shelp. See Doc. 669, p. 11 and Exhibit 2.  28 CFR § 542.13(a) requires Springer attempt informal resolution of his issues and "[E]ach Warden shall establish procedures to allow for the informal resolution of inmate complaints."

28 CFR § 542.14(c)(4)(2018), entitled "Initial Filing," required Springer to tender his BP-9 to institutional staff designated to receive such requests which is ordinarily "a correctional counselor."

Within 20 days from October 10, 2018, when Springer learned something was wrong in Storage 1 and 2, or from October 11, 2018, when Springer posted the Two Red signs reading: "Danger, Asbestos, May Cause Cancer, Cause Damage to Lungs, Authorized Personnel only," Springer timely filed his BP-9 with Counselor Shelp. Doc. 669, p. 10-11 and Exhibit 1 and 2 (Doc. 671 as to Exhibit 1).

9

But the Warden refused to acknowledge Springer's BP-9 causing Springer to send a BP-10 to the Regional Director on December 5, 2018. Doc. 669, pg. 12.and Exhibit 6.  Springer explained to the Regional Director that "[M]y reason for appeal is the denial by silence of my...BP-9. See 28 CFR § 542.18." Doc. 669, Exhibit 6, pg. 2.

It is not until December 11, 2018, that the Warden's Office decided to acknowledge receipt of Springer's October 29, 2018 BP-9.  See Doc. 669, pg. 12 and Exhibit 8, pgs. 1 and 2.  As Exhibit 7 demonstrates, the Regional Director "received" Springer's BP-10 on "December 10, 2018." Doc. 669, Exhibit 7, p.1. So, the day after the Regional Director's Office acknowledges receipt of Springer's BP-10, which included a copy of Springer's complete BP-9, the Warden decides to acknowledge receipt of Springer's October 29, 2018 BP-9.

There is not a single word in 28 CFR §§ 542.10 through 542.18 that directs the Warden to acknowledge receipt of a BP-9 only after, by silence, the inmate files a BP-10.  This  alone shows the administrative remedies contemplated by the Attorney General, and that was given public notice, was unavailable at FCI Seagoville during the time of Springer's BP-9.

Even though the December 13, 2018 rejection notice from the South Central Regional Office gives the stated reasons for rejection that (1) Springer did not provide a copy of Springer's BP-9, or a copy of the Warden's Response, the rejection letter acknowledges the Warden had not made any response by its directive "[T]he Warden's response is due 12/31/18." See Doc. 669, Exhibit 7, pg. 1.  Additionally, Springer did in fact attach the requisite copies of his BP-9. See Doc. 669, Exhibit 6, pg. 1 ("Please also find attached to my BP-10 an original BP-10 an original and two additional copies of my BP-9 and accompanying continuation page and attached Informal Resolution and Request to Staff Forms."); and See Doc. 669, Exhibit 6, pg. 12("I declare under the penalty of

10

perjury....that...I deposited my BP-10 and continuation pages and accompanying

Exhibits in the U.S. Mailbox located inside Seagoville Federal Prison Camp to

the address for the Regional Director listed above.")("I also declare under

the penalty of perjury....that I personally witnessed the BP-10 and continuat-

pages, and accompanying Exhibits, were deposited in the envelope for which this

Certificate of Service and Declaration of Mailing was placed within.").

Springer's December 5, 2018 BP-10 also explained:

"I have made numerous oral and electronic attempts to determine the date
my BP-9 was indexed in accordance with 28 CFR § 542.18 and no member of
unit team has been able to provide me that information and I have never
received any receipt acknowledging the Warden's receipt of my BP-9. 28
CFR § 542.11(a)(2) requires I be given a receipt by the Warden. I am
**unable to locate the administrative remedies required by 28 CFR §§ 542.10
through 542.18."**

Doc. 669, Exhibit 6, p. 2.

On December 21, 2018, Springer is issued a letter from the Warden's

Office, See Doc. 669, Exhibit 8, p. 1, indicating the Warden "RECEIVED"

Springer's BP-9 on December 11, 2018 which is the day after the Regional

Director's Office received it with Springer's BP-10.

The Regional Office's December 13, 2018 rejection letter leads to Spri-

nger's January 7, 2019 BP-11 which the Central Office rejected solely on the

basis that "Your Regional Appeal is due on 3/15/2019. You can appeal to

this level on or after that date." See Doc. 669, pg. 13 and Exhibit 12, p.1.

The Central Office's rejection is dated February 15, 2019. Id.

At this point, Springer has gone way beyond what the Attorney General's

administrative remedies call for.

(ii)  Springer made a Second Attempt at appeal simply to show when
      Springer says exhausted, he means exhausted.

If the BOP is going to give notice not to enter the Two Storage Rooms

due to the finding of Cancer Causing Asbestos, which can cause lung damage,

then the only way lung damage or Cancer can follow is if the asbestos is

somehow circulating therein. Springer filed a BP-10 from the Warden's Office denying Springer's BP-9. See Doc. 669, pg. 13 and Exhibit 11. The staff in the Regional Director's Office denied that appeal on February 22, 2019. See Doc. 669, pg. 13 and Exhibit 13; See also Doc. 673, Exhibit 2.. Springer clearly appealed that denial in a BP-11 dated March 12, 2019. See Doc. 669, pg. 13 and Exhibit 14.  The Central Office denied Springer's appeal on April 9, 2019. See Doc. 669, pg. 13 and Exhibit 15.

Springer has clearly, not once, but twice, exhausted any administrative remedy available and has shown, based upon how Springer's BP-9 was handled, or not handled, Springer has easily shown the administrative remedy program contemplated by the Attorney General was not available at FCI Seagoville.

2.  Springer's claims meet the jurisdictional hurdles established at 18 U.S.C. § 3582(c)(1)(A) and the First Step Act.

Springer has clearly established this Court's jurisdiction to consider Springer First Step Act Motion. O'Reilly admits Springer requested the Warden assist Springer in obtaining a reduction in Springer's Sentence of 93.3 months. Doc. 673, p. 8.  Springer made this request along with explaining his exposure to asbestos and mold. Doc. 669, pg. 11, Exhibit 2, pgs. 2,3,5.  Springer's request to staff again requested "consideration of these facts and deciding in [Springer's] favor as to each of the requests identified above and herein." Doc. 669, Exhibit 2, p.2.  Springer repeats his request in his First BP-10, Doc. 669, Exhibit 6, pg. 2, and in his Second BP-10.  Doc. 669, Exhibit 11, pg. 2. The Warden's out-of-time December 26, 2018 response reads "the relief you seek is denied." See Doc. 669, Exhibit 9, pg. 2.

The Warden did not say Springer's request for a reduction of 93.3 months cannot be addressed because Springer failed to say the magic words "file a mot-ion on my behalf."  Besides, where the Warden rested her decision on an erron-

12

eous assessment of the facts of exposure, there is no way she would have assisted Springer in obtaining release where the factual basis she had just rejected.  The Regional Director's Office says on February 22, 2019 that its response "is for informational purposes only." Doc. 669, Exhibit 13, p.2.

Well, the problem with that statement is Springer devined no information from that February 22, 2019 response other than "denied."  Springer raised Eight issues Springer had with the Warden's December 26, 2018 denial and the Regional Director's Office did not address any of them.

The Regional Director's Office response never mentions where the asbestos was found inside both Storage rooms, which had fallen from the ceiling and walls over everything below and continually, but instead stated the mastic could only become airborn "using an aggressive method such as grinding, drilling, or sanding." Doc. 669, Exhibit 13, pg.2. To suggest what covered everything below, got in Springer's cloths, his bed linens, and hair, was neither disturbed or airborn, is just in defiance of all the admitted facts.

You cannot agree Santa Clause does not exist while simultaneously agreeing Santa Clause delivers gifts on December 24, 2019 all over the Earth. Everyone with first hand knowledge would testify the material of asbestos was not att- ached to the ceiling, or walls, but falling and covering everything in both rooms.  Falling from the ceiling and walls, and hitting 11 feet below, caused the material containing asbestos to become crumbled, pulverized, and reduced to powder.

This Court has jurisdiction to decide whether Springer should be the recipient of a sentence reduction and to what extent.

3..  <u>The asbestos falling to the floor and property below from the ceiling and walls clearly meets the definition of friable asbestos.</u>

The ultimate fact question is whether the asbestos loosed in both Storage

13

Rooms was dangerous to those around and on October 10, 2018, and again on October 11, 2018, Mr. Rees declared to all that it was. See Doc. 669, pg. 10 and Exhibit 1 (Doc. 671 supplement). O'Reilly does not dispute, nor could he, that the Asbestos Containing Material ("ACM"):

> "fell from the ceiling in both rooms scattering all over everything within the two rooms meeting the meaning of friability. Under § 61.141 'non-friable cannot ever be crumbled, pulverized, or reduced to powder.' My informal and BP-9 claims show the ACM 'scattered throughout both rooms falling from the ceiling.' This undisputed fact satisfies Friability. The Warden's response agrees ACM was found in the 'mastic that adheres to the ceilings of the Storage areas."

Doc. 669, Exhibit 11, pgs. 2-3.

We all agree the asbestos, when it was first used, sat between the ceiling covering and the concrete above it.  But the adhesion quality had long lost its ability to hold the ceiling foam tile to the concrete. What was holding the foam tile to the concrete was the temperature of the freezers.  When that temperature was no longer below freezing, the ceiling foam tile, and the wall coverings, began to disintegrate and fall to the floor below.  This is why and how the ACM was crumbled, became pulverized, and the source of the dusty powder that daily covered all the property below and the floor.

Springer showed the 10% asbestos was "dry, crumbly, pulverized, as it fell from the 11ft ceilings landing on the property or floor below and not the type of ACM that anyone would grind, drill, or sand, like floor tile." Doc. 669, Exhibit 14, pg. 4.

Springer even provided the words and findings of the U.S. Department of Health and Human Services that found:

> "Asbestos fibers do not evaporate into the air or dissolve in Water. Small diameter fibers and particles may remain suspended in the air for a long time and be carried long distances by wind or water before settling down. Large diameter fibers and particles tend to settle more quickly."

Doc. 669, Exhibit 14, pg. 5.

There are six types of regulated ACM under the National Emmissions Stand-

14

ards for asbestos by the Enviromental Protection Agency. See 40 CFR §§ 61.140

to 61.157. See U.S. v. Malley, 739 F.3d 1001, 1006(2nd Cir. 2001). These are:

> "(a) Friable asbestos material, (b) Category I non-friable ACM that has
> become friable, (c) Category I non-friable ACM that will be or has been
> subjected to sanding, grinding, cutting, or abrading, or (d) Category
> II non friable ACM that has a high probability of becoming or has become
> crumbled, pulverized, or reduced to powder or by the forces expected to
> act on material in the course of demolition or renovation operations
> regulated by this subpart. 40 CFR § 61.141."

Malley, 735 F.3d at 1006.

"Friable asbestos material" is defined as "any material containing more

than 1 percent asbestos as determined using...Polorized Light Microscopy that,

when dry, can be crumbled, pulverized, or reducted to powder by hand pressure."

Malley, 739 F.3d at 1006.

The asbestos found covering everything in both rooms, that were eventually

abated, was clearly disturbed having fallen from the ceiling and walls, was

crumbly, pulverized when it collide with what was below it, dry, and dusty.

The asbestos was clearly in a friable state, air born, and stayed that way

more than 500 days until the rooms were completely sealed up from any air

movement on October 11, 2018 by Springer personally.

Springer was told by Casey Herring, who replaced Robert Freeman, that

the company that tested the air sprayed water prior to taking the air samples.

Prior to leaving Seagoville, Mr. Rees sought Springer to inform Springer that

Springer should continue to push to get tested for the exposure Springer had

to the asbestos.  He also sought Springer, if Springer was not leaving, to

operate Safety for him at the Camp..

The ACM clearly became friable upon separation from the ceiling and walls

and had become crumbled, pulverized, and reduced to powder in some instances,

when it hit what existed below it in both Storage Rooms.

4.  The relief Springer seeks is totally warranted under the circumstances
    of Springer's exposure.

This Court did not authorize in its judgment that the BOP expose Springer to more than 500 days of Cancer Causing Asbestos and Breath-Taking Mold.  O'Reilly does not say otherwise or how there is any penological interest in doing so.  Springer was not given a life sentence.  There is no question there is no cure for asbestos exposure and that the impact shows up between now and 20 years from now.  Springer is hard pressed to come up with a more extraordinary and compelling reason to receive sentencing relief from his unprecedented exposure to asbestos and mold.   And if asbestos and mold exposure to the level received by Springer does not qualify then one would be hard pressed to say what does qualify..

29 CFR § 1910-1001, Appendix G, Section II, A finds in relevant part:

"Asbestos can cause disabling respiratory disease and various types of cancer if the fibers are inhaled. Inhaling or ingesting fibers from contaminated clothing or skin can also result in these diseases, the symptoms of these diseases **generally do not appear for 20 years or more after initial exposure.**"

29 CFR § 1910.1001, Section II, entitled "Toxicology" states that "diseases associated with asbestos generally appears 20 years following the first occurrence of exposure."  Section III of the same provision finds that such exposure is "always fatal."

Being subjected to more than 500 days of 10% Cancer Causing Asbestos and Breath-Taking Mold (O'Reilly concedes Springer was subjected to more than 500 days of Breath-Taking Mold), "is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" Farmer v. Brennan, 511 U.S. 825, 834(1994)(quoting Rhodes v. Chapman, 452 U.S. 337, 347(1981))

In Schuster v. Vincent, 524 F.2d 153, 159(2nd Cir. 1975), the Second Circuit released a prisoner based upon the conditions of his confinement (albeit under Habeas Corpus).

And, if Springer were sentenced today, on the same facts used by this

16

Court on April 23, 2010, that advice by the Sentencing Commission would be two levels lower based upon the passage of Amerndment 791 adjusting tax loss table at USSG § 2T4.1 for inflation. See U.S. v. Fox, 2017 U.S. Dist. Lexis 89473 (D. Main)("Amendment 791 adjusted the monetary loss table for various economic and tax offenses to account for inflation. USSG Supp. to App. C, Amnd. 791.")

Though Amendment 791 is not retroactive, it is clarifying and this Court can consider it under its analysis of the 18 U.S.C. § 3553(a)(5) requirements (pertinent policy statement issued by the Sentencing Commission that are  in effect on the date of the sentence); and its analysis of the 18 U.S.C. § 3553-(a)(6) requirements (the need to avoid unwarranted sentencing disparity among defendants with similar records found guilty of similar offenses).

Springer is currently considered community custody by the BOP and most recently spent 5 days a week furloughed to the Grand Prairie, Texas Cadre Unit. And, prior to being transferred to FTC/OKC, Springer worked in the Regional Director's Office specifically. Springer's last job at Seagoville was Town Driver. During Springer's work at Grand Prairie, each of the 21 inmates were inmate driven to and from that complex.

Springer's mother recently was diagnosed with Dimentia and Springer's father recently had heart surgery. Both are in their 80s.

CONCLUSION

For the following reasons, and those set forth in Springer's Motion, Doc. 669, Springer respectfully requests this Court grant his Motion for Release due to more than 500 days of asbestos and mold exposure, placing Springer on Supervised Release, and rejecting O'Reilly's assertions Springer does not meet the prerequisite for filing his Motion and that Springer has not demonstrated extraordinary and compelling reasons warranting immediate release.

17

Respectfully Submitted,[1]

Lindsey Kent Springer
Fed. Reg. (# 02580-063
Federal Transfer Center
P.O. Box 898801
Oklahoma City, Oklahoma 73189

## CERTIFICATE OF SERVICE

I hereby certify that on December _11_, 2019, I sent by U.S. Mail, First
Class, Postage Prepaid, the above Reply to the Clerk of Court, 333 West Fourth
Street, Tulsa, Oklahoma 74103:

I further certify that the following are registered ECF users and shall
receive service of the above Reply through the Court's ECF System:

Charles A. O'Reilly

Server

## DECLARATION OF MAILING

I declare under the penalty of perjury pursuant to 28 U.S.C. § 1746(1),
under the laws of the United States of America, that on December _11_, 2019,
I deposited the above Reply in the U.S. Mailbox located inside the Federal
Transfer Center to the Clerk at the address listed above.

Declarant

---

1.  The current Local Criminal Rules for the Northern District of Oklahoma are
dated September 26, 2016, and no longer connect Local Civil Rules to Replies
in Criminal Cases. Springer has access only to what the BOP provides and if
the rules are different Springer is unaware of them. However, to the extent
Springer needs to justify the length of this reply, Springer assures the Court
he has endeavored to keep the Reply as short as possible in the criminal cont-
ext.

Lindsey Kent Springer
Reg # 02580-063
Federal Transfer Center
P.O. Box 898801
Oklahoma City, Oklahoma 73189

"Legal Mail"

09-cr-43-SPF
RECEIVED
DEC 16 2019
Mark C. McCartt, Clerk
U.S. DISTRICT COURT

<<02580-063<<
Clerk Of Court
Northern District of Okla
333 W 4TH ST
Tulsa, OK 74103
United States

Oklahoma City 73604 7731
THU 12 DEC 2015 PM

Post Marked 12/12/19 PG2

Sealed In the
Presence of Staff

Presence of Staff

LEGAL MAIL

Presence of Staff