1      UNITED STATES DISTRICT COURT FOR THE

2          NORTHERN DISTRICT OF OKLAHOMA

3

4  UNITED STATES OF AMERICA,

5                Plaintiff,

6  vs.                        CASE NO. 09-CR-43-CVE

7  OSCAR AMOS STILLEY,

8  _____Defendant.

9

10

11

12           TRANSCRIPT OF PROCEEDINGS
               NOVEMBER 21, 2022
13   BEFORE THE HONORABLE STEPHEN P. FRIOT, JUDGE PRESIDING

14        **REVOCATION AND SENTENCING HEARING**

15

16

17

18

19

20

21              A P P E A R A N C E S

22      MR. JEFFREY A. GALLANT and MS. VANI SINGHAL, Assistant
   United States Attorneys, Northern District of Oklahoma, Tulsa,
23   Oklahoma, appeared on behalf of the plaintiff.

24      MR. OSCAR AMOS STILLEY, pro se.

25

Reported by Greg Bloxom, RMR, CRR

```
 1                              INDEX
 2   ----------------------------------------------------------------
 3   PLAINTIFF'S WITNESSES:
 4   RYAN FORSYTH
 5          DIRECT (By Mr. Gallant) ....................... 23
            CROSS (By Mr. Stilley) ....................... 44
 6
     PLAINTIFF RESTS ....................................... 80
 7
     PLAINTIFF'S ARGUMENT ON REVOCATION ................... 83
 8
     DEFENDANT'S ARGUMENT ON REVOCATION ................... 84
 9
     COURT'S RULING ON REVOCATION ......................... 90
10
     PLAINTIFF'S ARGUMENT ON DISPOSITION ................. 104
11
     DEFENDANT'S ARGUMENT ON DISPOSITION ................. 106
12
     COURT'S RULING ON DISPOSITION ....................... 117
13
                          **********
14
15
16
17
18
19
20
21
22
23
24
25
```

U.S. District Court
Northern District of Oklahoma

```
1   PROCEEDINGS:
2   -------------------------------------------------------------
3          THE COURT:  We're proceeding this morning in Northern
4   District case number criminal 09-043, United States of America
5   vs. Oscar Amos Stilley, and we're proceeding on the basis of an
6   amended petition for warrant or summons for offender under
7   supervision, and that's been filed in the Northern District
8   case, as well, as everyone is aware, in the Western District
9   case while Mr. Stilley's supervision was pending in the Western
10  District.
11      I note counsel at the government table.  Please enter your
12  appearance.
13          MR. GALLANT:  Yes, Your Honor.  I'm Jeff Gallant from
14  the U.S. Attorney's Office here in the Northern District.  This
15  is Vani Singhal from the Northern District, AUSA.
16          THE COURT:  Okay.  Thank you very much.
17      And I note Mr. Stilley at the defense table.  And,
18  Mr. Stilley, your appearance will certainly be noted.
19          MR. STILLEY:  Thank you, Your Honor.
20          THE COURT:  You don't look all that much different.
21          MR. STILLEY:  Well, thank you, Judge.  Thank you,
22  Judge.
23          THE COURT:  You and I both have a little more gray
24  hair.
25          MR. STILLEY:  Yes, quite a bit more gray hair.
```

1      **THE COURT:**  Okay.  Understood.  You may be seated.

2      **MR. STILLEY:**  Thank you.

3      **THE COURT:**  We have some motions that were filed over

4  the weekend, actually yesterday, and they are, if you will,

5  antecedent to the matter that is scheduled this morning.  So,

6  first of all, I'm going to address some of these motions.

7      We have a motion -- and again, all these were filed

8  yesterday -- we have a motion at docket entry number 745, a

9  motion to disqualify Stephen P. Friot for lack of statutory

10  authorization.  That motion covers matters that have been

11  addressed repeatedly over the course of this case and that

12  motion, in my view, is resolved quite readily by reference to

13  the cross-designation order signed by Chief Judge Tymkovich of

14  the Tenth Circuit on December 9th, roughly a year ago,

15  specifying cross-designations within the three Oklahoma

16  districts for calendar year 2022, and for that reason the

17  motion to disqualify Stephen P. Friot for lack of statutory

18  authorization at docket entry number 745 is denied.

19      One matter I should mention, also preliminarily, is that

20  I'm told, perhaps as a result of the filing of the motion for

21  standby counsel, I'm told that the federal -- an assistant

22  federal public defender, Mr. John Campbell, is here in the

23  courtroom.  Is that correct?

24      **MR. GALLANT:**  I don't see Mr. Campbell, Your Honor.

25      **THE COURT:**  Oh, okay.

1    **MR. GALLANT:**  I believe he's a CJA attorney, Your

2    Honor.

3         **THE COURT:**  Oh, CJA attorney.  Okay.  Okay.  I was

4    told that he would be here.  In the final analysis, that's not

5    an impediment to proceeding.

6         The second motion I would address is the motion, also filed

7    yesterday, at docket entry number 744 entitled Defendant Oscar

8    Stilley's Motion to Reappoint Robert Burton, IV, as Standby

9    Counsel.  The motion, I think, presupposes that Mr. Burton is

10   on the CJA panel.  He is no longer on the CJA panel, I am told.

11   And the motion tells me reasonably clearly that Mr. Stilley is

12   not particularly receptive to counsel other than Mr. Burton.

13   But, again, Mr. Burton is no longer on the CJA panel.  This

14   motion is not accompanied by evidence of financial inability to

15   retain counsel.

16        I do note the Advisory Committee notes to Rule 44(a) of the

17   Federal Rules of Criminal Procedure, and that says, "The right

18   to assignment of counsel is not limited to those financially

19   unable to obtain counsel.  If a defendant is able to compensate

20   counsel but still cannot obtain counsel, he is entitled to the

21   assignment of counsel even though not to free counsel."

22        The fact is that it is not inconceivable that counsel could

23   be appointed to represent Mr. Stilley.  There's an argument,

24   perhaps bordering on a probability, that Mr. Stilley would be

25   responsible to compensate appointed standby counsel by paying

1  reasonable attorney's fees, especially since Mr. Stilley is the

2  one requesting appointment of standby counsel.

3      And in that respect, I note a decision from the District of

4  Columbia, *United States vs. Gibson*, 737 F.Supp. 97, a 1988

5  case, in which the court found that a non-indigent defendant

6  for whom counsel was appointed would be responsible for the

7  fees of that counsel.

8      Well, the motion we've got presents two or three problems,

9  one of which is that it is not accompanied by any indication

10 one way or the other as to whether Mr. Stilley is in a position

11 to compensate counsel; number two, it focuses rather narrowly

12 on Robert Burton as proposed counsel; number three, it was

13 filed on the day before the hearing even though this amended

14 petition was filed approximately two-and-a-half months ago.

15 That timing causes me to observe that the motion in terms of

16 any impact on today's hearing comes too late.

17     I don't foreclose the possibility of appointing counsel but

18 there are some matters that should be addressed preliminary to

19 any decision on that score.  Number one, Mr. Stilley, whether

20 he qualifies financially for CJA counsel; number two, if not,

21 is he prepared to compensate standby counsel or other appointed

22 counsel.  And for that reason, I give Mr. Stilley leave to file

23 within 15 days a supplement to his motion at docket entry

24 number 744 covering the ground that this motion does not cover:

25 number one, his receptiveness to counsel other than Mr. Burton;

1  number two, his financial condition which is best satisfied by

2  filing a financial affidavit which we ordinarily do when

3  counsel is appointed; and, number three, whether, if he is not

4  financially qualified for appointment of counsel, whether he is

5  prepared to compensate appointed standby counsel.

6      So, I neither grant nor deny the motion to reappoint Robert

7  Burton as a motion for appointment of counsel today.  This

8  motion will be left pending and Mr. Stilley is granted 15 days

9  within which to supplement that motion as I have described.

10 The filing of this motion and the matters that I have just

11 discussed will have no effect on whether we proceed today.

12     We have everyone here in the courtroom ready to go, and

13 frankly, this motion viewed especially in the context of a half

14 dozen other motions that were filed yesterday, Sunday, strikes

15 me as an ill-conceived attempt to manipulate the process and

16 derail this hearing.  We have a probation officer here from Ft.

17 Smith who drove in last night, I am told, I drove in from

18 Oklahoma City today, and we will proceed.

19     It may be that, after I look at the supplement to the

20 motion, that there will be some sort of relief granted on the

21 motion to appoint standby counsel, and if so, that standby

22 counsel would be available for any further in-court proceedings

23 in this matter.

24     So, the short version with respect to the motion at docket

25 entry number 744 is that the motion will be left pending and

1   Mr. Stilley has 15 days within which to supplement his motion
2   in the respects that I have just mentioned.
3       Okay.  And I'm told also that attorney John Campbell is on
4   his way here.  When he gets here, I may pause the proceeding
5   just briefly.  We'll just see how that flows.
6       The next motion I'll address is the motion at docket entry
7   number 746, also filed yesterday, Sunday.  It is labeled as
8   Defendant Oscar Stilley's motion to Quash the Summons and
9   Strike All Other Documents from the Western District of
10  Oklahoma and Dismiss for Lack of Jurisdiction.
11      The issues, at a high level of generalization, the issues
12  that Mr. Stilley raises are, I suppose in one sense,
13  "jurisdictional," but they don't go to subject-matter
14  jurisdiction.  Subject-matter jurisdiction existed in the
15  Western District for the short time this supervision case was
16  in the Western District, subject-matter jurisdiction exists in
17  the Northern District, and there has not been an interruption
18  in subject-matter jurisdiction with respect to the availability
19  of an Article III judge to perform judicial duties, if need be,
20  in connection with the supervision of Mr. Oscar Amos Stilley.
21      So I understand the point that Mr. Stilley seeks to make in
22  this motion, but it, I believe, is based on somewhat of a
23  misunderstanding as to whether there is indeed a subject-matter
24  jurisdiction issue, there is not, and for that reason the
25  motion at docket entry number 746 is denied.

1      That leaves four other motions, but logically these motions

2  perhaps would be addressed and they will be addressed today, if

3  need be, but perhaps these motions are best addressed, if need

4  be, after I address one matter with Mr. Stilley, and that is

5  this.  As Mr. Stilley is well aware and has been well aware for

6  about two-and-a-half months, we're here on an amended petition

7  for warrant or summons.  This amended petition contains

8  allegations as to noncompliance, asserted noncompliance with

9  the conditions of supervision which were imposed on Mr. Stilley

10  at sentencing.

11      The case came on for sentencing in 2010.  That was after a

12  presentence report was prepared and the parties had every

13  opportunity to object to various matters in the presentence

14  report.  The government had several objections, the defendants

15  had several objections, and there was no objection at all, I

16  repeat, no objection at all to any of the proposed conditions

17  of supervision including those which bring us to this

18  proceeding today.

19      So we have some conditions of supervision that, if you

20  will, are the law of the case, at least as we speak.  We have

21  allegations in the amended petition as to a violation of those

22  conditions of supervision.  They, as we speak, they are

23  unproven.  Everyone here is prepared to proceed.  But there's

24  one thing that I will certainly state unequivocally for

25  Mr. Stilley's benefit.  We're here, more or less, at the

1  beginning of Mr. Stilley's three-year term of supervised

2  release -- or not at the very beginning but more or less at the

3  beginning of it -- and, if need be, I'm confident that the

4  probation officer and Mr. Gallant are prepared to proceed.

5  But, Mr. Stilley, if we proceed, then we look retrospectively,

6  we look at were these conditions of supervision violated or

7  not.  I am quite receptive to taking a prospective view of the

8  matter, and what I mean by that is I'm prepared to wipe the

9  slate clean and start over if you're prepared to tell the court

10  that you are -- that you will commit to comply with your

11  conditions of supervision starting today.

12      All I can think of is a rather colloquial expression that

13  one of my old law partners liked to use.  He was kind of a

14  conciliatory sort of a practitioner and every now and again he

15  would kind of revert to saying, "All I want is peace in the

16  valley."  Well, all I want is peace in the valley.  I want your

17  supervision to go smoothly.  I'm told that your co-defendant,

18  Mr. Springer, is doing well on supervision.  And so, all I want

19  is peace in the valley in the sense that I am prepared to wipe

20  the slate clean and start fresh on the strength of your

21  representation in this court today that you are -- that you

22  will commit to comply with all of your conditions of

23  supervising starting today.  And what that would mean is that,

24  if you make that commitment, then you would be -- I would

25  expect you to be sitting down with your probation officer

1   immediately to get started on things like password and getting

2   the monitoring software teed up and operative and so forth.

3   And if you make that commitment, then my acceptance of that

4   commitment would be an act of trust and we would soon find out

5   whether that trust was warranted or not.  But I bring this up

6   at this point because if you're prepared to make that

7   commitment to the court this morning in open court, then I'm

8   prepared to proceed as I have described.

9       So, Mr. Stilley, you're invited to the lectern to respond

10  to the inquiry I have just made.

11          **MR. STILLEY:**  Your Honor, I'd like a few minutes to

12  talk to the opposing counsel and talk to U.S. probation.  I've

13  been talking to them extensively trying to get some clarity.

14  As you can see, I filed a motion for clarification and

15  modification.  The response I've gotten is that we can't do any

16  of that, and I'd like to talk to them and see what -- see if we

17  can come up with an understanding of what specifically that

18  they're claiming.

19      And also, I do -- and this is on a separate question -- but

20  I appreciate the 15 days but I would like to know the complete

21  scope of my options with respect to counsel.

22      So, would it be fair for me to take a few minutes to talk

23  to opposing counsel and U.S. probation about specifically

24  what's going on?

25          **THE COURT:**  I will do that.  And you may be seated,

1   Mr. Stilley.

2       Has Mr. Campbell entered the courtroom?

3          **MR. GALLANT:**  Yes, Your Honor.

4          **MR. CAMPBELL:**  Yes, Your Honor.

5          **THE COURT:**  Okay.  Mr. Campbell, obviously you don't

6   have a new client at this point but I'll ask you to be seated

7   here and let me bring you up to date on what this proceeding is

8   all about.

9       At the table with you is Oscar Amos Stilley who was

10  indicted in this court in 2009 and went to trial with his

11  co-defendant, was unsuccessful at trial resulting in a term of

12  his life.  And Mr. Stilley, who in a former phase of his life,

13  was a practicing lawyer in Arkansas, recently began his term of

14  supervised release and we're here on an amended petition for

15  warrant or summons that was filed about two-and-a-half months

16  ago alleging violations of his conditions of supervised release

17  and, for the most part, relating to information that

18  Mr. Stilley's conditions of supervision require him to provide

19  to the probation office various sorts of information.

20  Mr. Stilley filed six or seven motions yesterday, I have

21  already denied two or three of them, and we have more motions

22  to go, if need be.  But, Mr. Campbell, one of those motions was

23  a motion for appointment of counsel.  I'm unaware of whether

24  Mr. Stilley is eligible for appointment of counsel as we speak.

25  And I understand you are on the court's CJA panel; is that

1    correct?

2            **MR. CAMPBELL:**  Yes, Your Honor, that's correct.

3            **THE COURT:**  Okay.  Thank you, sir.

4        I'm not appointing you as counsel for Mr. Stilley, but

5    Mr. Stilley, in response to an inquiry I made a few minutes

6    ago, has indicated that he would like to confer with government

7    counsel and with the probation office -- or the probation

8    officer.  Specifically what prompted that request on

9    Mr. Stilley's part was my comment that I made a few minutes ago

10   that although this amended petition requires us to look

11   retrospectively at whether Mr. Stilley has complied with his

12   conditions of supervision, I am prepared to look prospectively

13   and to wipe the slate clean and give Mr. Stilley a fresh start

14   starting today if he is willing to unequivocally commit in open

15   court today that he will comply with all of his conditions of

16   supervision.  And if Mr. Stilley is prepared to make that

17   commitment, then I'm prepared to give Mr. Stilley an

18   opportunity to make good on that commitment starting today.

19   But Mr. Stilley has requested a recess, which I'm prepared to

20   do by way of a brief recess, to afford him an opportunity to

21   confer with the probation officer and with government counsel.

22       Mr. Campbell, I'm not appointing you as Mr. Stilley's

23   counsel, but with the benefit of the thumbnail sketch of the

24   status of the case that I have just given you, I would invite

25   you, if you choose to do so, but only if you choose to do so, I

1  would invite you to remain and perhaps answer any questions

2  Mr. Stilley may have during this brief recess.

3       Again, I would not view this as the result of my appointing

4  you as counsel, because I'm not doing that; he has not yet

5  established that he's qualified for appointment of counsel and

6  we've already covered that.  But with the understanding that we

7  will take a brief recess in order to afford Mr. Stilley an

8  opportunity to consider his options, would you, if you choose

9  to do so, be inclined to remain and confer with Mr. Stilley

10 during this brief recess?

11       **MR. CAMPBELL:**  Yes, Your Honor, I can do that.

12       **THE COURT:**  Okay.  Very well.

13       I've got roughly 10 minutes until 11.  We'll be in recess

14 until 20 minutes after 11.

15       Court will be in recess.

16       (RECESS)

17       **THE COURT:**  We're resuming in criminal 09-043, United

18 States of America vs. Oscar Amos Stilley.  As everyone is

19 aware, we took a short recess in order to afford Mr. Stilley

20 and the other interested parties to confer with respect to the

21 matters that I addressed just before we recessed.

22       Is there an announcement from either side on that score?

23       **MR. GALLANT:**  Do you want me to speak, Mr. Stilley?

24       **MR. STILLEY:**  All right then.  Either way.

25       **MR. GALLANT:**  All right.  Well, Your Honor, I think we

1  have an agreement, subject to what Mr. Stilley says.

2  Basically, if we could go through each violation.

3      The way this would work, with respect to the software

4  monitoring, Mr. Stilley would agree to comply but we would ask

5  the court for a modification to exclude the work computers at

6  VAMP. [sic]  We've spoken with Patti Rush who works at the --

7  at REVAMP where Mr. Stilley works and we believe they can work

8  out a situation where Mr. Stilley, his work at work, his

9  computers would be monitored by the employer.  So Mr. Stilley

10  would agree to the software -- monitoring software to be

11  installed on his personal phone, personal computer, any other

12  computers or phones he has access to except the ones at REVAMP.

13  And that would be, again, if the court's agreeable to that.

14      With respect to --

15          **THE COURT:**  Now, REVAMP is an organization that

16  employs Mr. Stilley?

17          **MR. GALLANT:**  Yes, Your Honor.

18      And Ms. Rush is here and she's worked with Mr. Forsyth, the

19  probation officer, they've communicated and they believe they

20  have a good relationship and could facilitate that situation

21  where Mr. Stilley would either be working at a standalone

22  computer or some other computer that would be, you know, sort

23  of overseen by the employer.  So that one wouldn't have any

24  monitoring software installed, but any other computer, cell

25  phone, etc., that Mr. Stilley has would be monitored.  That's

1  with respect to number one.

2      With respect to the e-mail account, password information,

3  all of that, Mr. Stilley agrees to provide those to probation.

4  And we would ask, and this goes into the -- with respect to the

5  financial information -- we'd ask he be given 15 days, and the

6  reason for that is he has represented that REVAMP works with

7  law enforcement and victims and whatnot and there may be

8  attorney-client privilege, there may be sensitive information

9  that he's gotten through the work, so that he would ask for 15

10  days to be able to work with Ms. Rush to remove anything from

11  his phones or computers that have anything to do with his job

12  because they represent -- from time to time they would forward

13  e-mails, that sort of thing.  So, probation and the government,

14  for purposes of this, we wouldn't be averse to allowing him 15

15  days to get that cleared up and then he would have to provide

16  all the login and password information, whatnot, to probation.

17      The final issue is with respect to the monthly cash flow

18  statement and the net worth statement.  Mr. Stilley says he

19  will comply with that, he would like 15 days, and also subject

20  to his motion.  His motions, quite frankly to me, don't make a

21  lot of sense, Your Honor, but he wants the court to rule on

22  those before he agrees to those conditions.  But subject to

23  those motions, and again I didn't really understand his

24  argument, but he wants you to rule on those first, and then he

25  said, my understanding is, he would comply with those

 1    conditions.  And again, he'd like 15 days to provide those

 2    completed forms to probation.

 3         **THE COURT:**  Okay.  Well, I'm looking at a motion to

 4    clarify and modify conditions.  Is that -- Mr. Stilley, when

 5    Mr. Gallant says "subject to that motion," is that the one and

 6    only motion that you're referring to there?

 7         Please rise to address the court.

 8         **MR. STILLEY:**  I beg your pardon.  Yes, Your Honor.

 9         Well, actually, I do -- I also want 749.  Basically what

10    I'm asking for is to reserve all my First Amendment peaceful

11    petition rights.  Of course, the criminal case against me, I'm

12    glad for that to go away, but as far as the motion for a true

13    and correct record, I want that first and then -- a ruling on

14    that, at least -- and then the motion --

15         **THE COURT:**  Okay.  I'll rule right now.  It's denied.

16    So that clears that.

17         **MR. STILLEY:**  Okay.  What is denied?

18         **THE COURT:**  The motion at docket entry number 749.  It

19    amounts to an attempt to relitigate matters that are merged in

20    the judgment of conviction entered 12 years ago for your fraud

21    and that was affirmed on appeal.  So the Motion For a True and

22    Correct Record, docket entry number 749 filed yesterday, is

23    denied.  So that clears that.

24         **MR. STILLEY:**  So the only thing then that would be

25    left would be 750 and any other peaceful petition that would be

1  filed at a subsequent time then?

2      **THE COURT:**  No, I'm not -- Mr. Stilley, I'm not going

3  to leave the finalization of your commitment to comply with

4  your conditions subject to some yet-unfiled motion.  That's

5  just not the way --

6      **MR. STILLEY:**  I didn't ask for that.  What I'm saying

7  is that our agreement does not constitute a waiver, in other

8  words, to prevent me, for example, litigating 750.

9      **THE COURT:**  Well, my intent with respect to your

10  motion to modify and clarify your conditions is to await the

11  government's response to the motion and then rule.

12      **MR. STILLEY:**  Okay.

13      **THE COURT:**  And that was the one motion that I was not

14  going to rule on one way or the other this morning, because any

15  offender under supervision is entitled to ask that his

16  conditions be modified.  That's not all that unusual.  And so

17  my intent was, and is, to expect the government to respond to

18  that motion, docket entry number 750, within the time allotted

19  by the local rules.

20      But again, what I need to hear from -- well, first of all,

21  Mr. Stilley, you may be seated -- back to Mr. Gallant.  I

22  needed some clarification as to just what motions.

23      **MR. GALLANT:**  I didn't understand, Your Honor.  He

24  explained it his best.  As I understood, he wanted you to rule

25  on his pending motions before he agreed to comply.  I don't

1  know if what you just stated changes his view or not.

2       **MR. STILLEY:**  Your Honor, I'm not trying to make it

3  difficult by trying to litigate, but the criminal matters

4  there, if the criminal matter goes away, that's fine for that

5  to go away.  It's the other rights going forward, and I think

6  we've got an understanding and I think we're in agreement.

7       **THE COURT:**  Well, Mr. Gallant, why don't you have a

8  seat.  I need to address Mr. Stilley.

9       **MR. GALLANT:**  I have just a couple more caveats when

10  you're done.

11       **THE COURT:**  Okay.  Well, this is not headed in a good

12  direction and I think we're going to have to have a hearing

13  today.  But Mr. Stilley, you're invited to the lectern.

14     Let me give you some clarity because we're very close to

15  just proceeding with the hearing, but let me give you some

16  clarity.  You are under some rather intrusive but well

17  justified conditions of supervision that invade your privacy.

18  No doubt about it.  That's intentional.  That's because you

19  were convicted of fraud, tax fraud, and in the course of

20  committing those frauds you also mercilessly fleeced

21  unsuspecting clients using your IOLTA account and other tools,

22  so you are under some very intrusive conditions of supervision,

23  frankly, conditions of supervision that I would never want to

24  be under myself.  But you earned it, you bought and paid for it

25  more than a decade ago.  I'm not going to modify those

1   conditions today.  I may modify them on this motion.  But the

2   commitment I need to hear from you today with respect to the

3   conditions of supervision, to which you had not a single

4   objection at the time of sentencing, what I need to hear from

5   you today is your unequivocal statement that you will comply

6   with these conditions of supervision unless and until they are

7   modified by this court.

8         **MR. STILLEY:**  The agreement that was stated, I don't

9   have any problem with that, but I want the court to understand,

10  I want the record to be clear, there are attorney-client

11  privileged materials that --

12        **THE COURT:**  Okay.  You may be seated.  We're going to

13  have a hearing.

14        **MR. STILLEY:**  Okay.

15        **MR. GALLANT:**  The government would call Ryan Forsyth.

16        **THE COURT:**  Well, wait.  I need to cover one or two

17  matters preliminarily.

18     So that everyone is clear, the motion to clarify and modify

19  conditions of supervision will remain pending.  I will expect

20  the government's response to it.

21     We have a motion at docket entry number 747 for an early

22  presentence report.  That motion is denied.  We don't do

23  presentence reports in revocation matters.

24     We had a motion for discovery and evidence at docket entry

25  number 748.  I have carefully reviewed that motion.

1   Mr. Stilley is absolutely correct that Rule 32.1(b)(2)(B)

2   requires, "Disclosure of the evidence against the person."

3       The amended petition and the government's exhibits, which

4   were supplied sometime ago by Mr. Gallant, constitute, in my

5   view, full disclosure of the evidence against the person

6   because the evidence against the person in this instance

7   consists of Mr. Stilley's alleged refusal to comply with

8   various conditions of supervision as detailed in the

9   allegations in the amended petition, and for that reason the

10  motion for discovery is denied specifically because Mr. Stilley

11  is already aware of the evidence against him and the discovery

12  or disclosure contemplated by Rule 32.1(b)(2)(B) has been

13  provided.

14      So that leaves us with the petition filed, as I have said,

15  two-and-a-half months ago.  It contains four numbered

16  violations with more than one instance asserted with respect to

17  at least one of them.  And I take Mr. Stilley's comments to the

18  court thus far this morning as invoking his right and absolute

19  right to put the government to its proof in support of these

20  violations and, with that, the government may proceed.

21          **MR. GALLANT:**  Thank you, Your Honor.

22      The government would call Ryan Forsyth to the stand.

23          **THE COURT:**  Very well.

24          **MR. STILLEY:**  Your Honor, I have a quick motion, if

25  the court pleases.  I would like to take at least 15 and I

1  would prefer 30 days to give me a chance to look for my own

2  counsel.

3          **THE COURT:**  That'll be denied, Mr. Stilley.  You may

4  be seated.  And let me explain that just a bit.  This was

5  filed two -- this amended petition was filed two-and-a-half

6  months ago.  You had ample opportunity to consider whether you

7  wanted counsel or not.  You are obviously well aware of your

8  right to retain counsel if you choose to retain counsel.  You

9  proceeded in a long complicated jury trial in this very case

10  here in Tulsa in the other courthouse in the 2009 case.  You

11  represented yourself.  You were given the benefit of a very

12  detailed *Faretta* colloquy and you chose to represent yourself

13  as an individual who at one time was admitted to the practice

14  of law in the state of Arkansas.

15      So, in those circumstances, when we have an amended

16  petition filed two-and-a-half months ago, and then you file a

17  motion for appointment of counsel on the Sunday before the

18  Monday hearing and then come to the Monday hearing asking for

19  more time to get counsel, that request is denied.

20          **MR. CAMPBELL:**  Your Honor, may I be excused?

21          **THE COURT:**  You may be excused.

22          **MR. CAMPBELL:**  Thank you.

23          **THE COURT:**  And Mr. Gallant, you may proceed.

24          **MR. GALLANT:**  Yes, Your Honor.  He needs to be sworn.

25      (WITNESS SWORN)

1    **MR. GALLANT:**  Your Honor, I would also like, for

2    purposes of this hearing, the court to take judicial notice of

3    the entire case.

4         **THE COURT:**  I certainly will.

5         **MR. GALLANT:**  Yes, Your Honor.

6                              **RYAN FORSYTH,**

7    being first duly sworn to testify the truth, the whole truth,

8    and nothing but the truth, testified as follows:

9                         **DIRECT EXAMINATION**

10   BY MR. GALLANT:

11   Q.  Sir, could you please state your name, and spell your last

12   name for the court reporter.

13   A.  Ryan Forsyth.  F-O-R-S-Y-T-H.

14   Q.  What is your occupation?

15   A.  I'm a United States Probation Officer.

16   Q.  How long have you been so employed?

17   A.  Since March of 2019.

18   Q.  What district do you work in?

19   A.  The Western District of Arkansas.

20   Q.  Do you know the defendant, Oscar Amos Stilley?

21   A.  I do.

22   Q.  Could you please just identify him for the record.

23   A.  He is the individual sitting at the defendant's table.

24        **MR. GALLANT:**  Your Honor, I would like the record to

25   reflect he identified the defendant, Mr. Stilley.

1          **THE COURT:**  The record will so reflect.

2     Q.  (BY MR. GALLANT)  Did you supervise Mr. Stilley?

3     A.  I do.

4     Q.  How is it that your district supervised Mr. Stilley?

5     A.  So, he is originally from the Western District of Arkansas.

6     He, while in prison, the Bureau of Prisons submitted a

7     relocation request.  Our district investigated it and found

8     that it was appropriate, so we accepted supervision of this

9     case.

10    Q.  When --  What was Mr. Stilley's term of supervised release?

11    A.  Three years.

12    Q.  When did that begin?

13    A.  August 10th, 2022.

14    Q.  Did Mr. Stilley's supervised release contain various

15    conditions?

16    A.  It did.

17    Q.  Was Mr. Stilley aware of those conditions?

18    A.  He was.

19    Q.  How do you know he was aware of those conditions?

20    A.  On the day of his release he reported to our office just to

21    let us know that he was released from home confinement and his

22    term of supervised release had commenced.  I met with him that

23    day and went over his conditions in detail with him in his

24    judgment.

25    Q.  Directing your attention to government exhibit number 1.

1  Are you familiar with that document?

2  A.  I am.

3  Q.  And what is it?

4  A.  It is an amended petition for warrant or summons for

5  offender under supervision.

6  Q.  And you're familiar with what's contained?

7  A.  Yes.

8  Q.  Is it completely true and accurate?

9  A.  The only thing I would note for the court is under

10 violation number 1, it says on August 10th that Mr. Stilley

11 violated this condition.  I gave him until the 18th to comply

12 with the monitoring software, that way he could kind of get his

13 ducks in a row, so to speak, and he still did not.

14 Q.  Besides that, is it true and correct to the best of your

15 knowledge?

16 A.  Yes, sir.

17       **MR. GALLANT:**  Your Honor, the government would offer

18 government exhibit number 1 for purposes of this hearing.

19       **THE COURT:**  Any objection?

20       **MR. STILLEY:**  Yes, Your Honor, I would object.  This

21 was done in the Western District of Oklahoma by a Western

22 District of Oklahoma officer, and this court stated

23 specifically that if the court found it didn't have

24 jurisdiction in the Western District of Oklahoma it would

25 vacate number 1.  What has actually happened is that the

1  district court has purported to transfer jurisdiction, and it's

2  my position that the Western District had no jurisdiction,

3  therefore, there was nothing to transfer, and there's no harm,

4  no foul if the Northern District of Oklahoma decides that they

5  want to bring some charges at this point in time.

6          **THE COURT:**  Thank you.

7      The exhibit will be received.

8  Q.  (BY MR. GALLANT)  Sir, first of all, I'd like to talk about

9  violation numbers 1 and 3 that tend to deal with computer

10 issues.  Generally speaking, did some of Mr. Stilley's

11 conditions of supervised release revolve -- involve the

12 installation of remote monitoring software, among other

13 conditions?

14 A.  Yes.

15 Q.  And what generally does that installation involve?

16 A.  Well, in our district we utilize a company called IPPC

17 Monitoring.  They usually help us with installing monitoring

18 software on the devices, and then that's something that we can

19 review daily to make sure that there are no violations

20 depending on what somebody's conditions are and what their

21 Internet usage should be.

22 Q.  And in supervising other defendants, have you used that

23 same software?

24 A.  I have.

25 Q.  And why is remote monitoring like that important for you to

1  supervise Mr. Stilley consistent with his conditions?

2  A.  Well, I mean, Mr. Stilley has that condition, first of all,

3  and it's a requirement.  Number two, he's a former attorney.

4  There is a condition that states that he is prohibited from --

5  I don't have the condition in front of me -- but prohibited

6  from practicing law or giving out legal advice as it relates to

7  tax matters.  I don't know how I would verify that he wasn't

8  doing so without the monitoring software.  As it's 2022, people

9  are usually utilizing the Internet to communicate with each

10  other where a phone's monitoring software would help me verify

11  that he's not practicing.

12  Q.  Directing your attention to government exhibit 1, violation

13  number 1, special condition number 3.  Just generally speaking,

14  what is that condition?

15  A.  Can you restate?

16  Q.  Oh, on the bottom of page 1 there's special condition

17  number 3.  Just generally speaking, what does that require?

18  A.  You say under violation 1 in subsection 3?

19  Q.  Yeah.  Well, special -- yes, the special condition number

20  3.  Yes, what does that generally involve?

21  A.  That he shouldn't be accessing any online service using an

22  alias or an Internet account name or designation of another

23  person or entity, and he should report to our office, the

24  United States Probation Office, access to any Internet site

25  containing prohibited material.

USA v Oscar Amos Stilley (11-21-2022 Revocation and Sentencing Hearing)
RYAN FORSYTH - DIRECT

1  Q.  And it requires monitoring of his computer activity;

2  correct?

3  A.  Correct.

4  Q.  Did Mr. Stilley violate that condition?

5  A.  Yes.

6  Q.  Could you summarize how Mr. Stilley violated that

7  condition.

8  A.  On the 10th of August he reported to our office and we

9  reviewed the conditions.  It takes some sort of scheduling on

10  my part with IPPC to install the software, so he was given

11  until the 18th to have that software installed.  He also

12  requested a little bit of time to talk to his employer because

13  there was some questions about whether they would be okay with

14  him -- his work activities being monitored.  On the 17th he had

15  told me during a home visit that he would not agree to the

16  installation of the software.

17  Q.  And as of today, has he complied with that requirement?

18  A.  No.

19  Q.  I would like to go to now page 3 of government 1, violation

20  number 3.  Do you see that?

21  A.  Yes, sir.

22  Q.  Special condition number 9.  Could you generally tell us

23  what's involved in that condition.

24  A.  Yeah.  Mr. Stilley is obligated to disclose all of his

25  e-mail accounts, PayPal accounts, Internet connections, and

1    communication devices, to include screen names and passwords.

2    Q.  Did Mr. Stilley violate that condition?

3    A.  Yes.

4    Q.  Could you summarize how Mr. Stilley violated that

5    condition.

6    A.  To date we've requested that information on a few

7    occasions, the e-mails and passwords, and he has refused to do

8    so.  He has provided us with some PayPal records and some Cash

9    App records, but as far as, you know -- and he's provided what

10   his e-mail is but he hasn't provided any passwords for his

11   e-mail or a screen name for his PayPal -- or sorry -- I can't

12   recall if the screen name is on the PayPal records but I don't

13   have it handy nor has he given us his password for his PayPal

14   account.

15   Q.  And he never disclosed all the e-mail accounts he has

16   access to?

17   A.  Correct.  Just one.

18   Q.  And he never provided the login or password information for

19   that or any of the accounts?

20   A.  Correct.

21   Q.  Are you able to supervise Mr. Stilley pursuant to his

22   conditions without the password and login information as

23   required by his conditions?

24   A.  No.

25   Q.  Now I'd like to go back.  In addition, as part of his

1 supervision, are there various requirements to disclose

2 information about Mr. Stilley's financial affairs, among other

3 information?

4 A.  Yes.

5 Q.  Generally speaking, are such accurate disclosures important

6 for your supervision of someone like Mr. Stilley?

7 A.  Absolutely.  He has a large amount of restitution and it's

8 important to get an accurate financial -- or accurate picture

9 of his finances so we can calculate an appropriate payment

10 amount each month based on the terms of his judgment.

11 Q.  And also the crimes he was convicted of factor into that,

12 as well?

13 A.  Absolutely, yes.

14 Q.  Are you able to supervise Mr. Stilley pursuant to the

15 conditions without such information?

16 A.  Not accurately, no.

17 Q.  Directing your attention now to violation number 2, special

18 condition number 2.  It's on page 2 of government exhibit 1.

19 Do you see that?

20 A.  Yes.

21 Q.  What is that condition, generally speaking?

22 A.  It has several subsections.  It talks about generally just

23 he shall maintain a checking account which he'll put all of his

24 money in that he earns, and that he needs to disclose his bank

25 records to the probation office.  He can't, I guess, establish

1  a new credit account or enter into any agreement for a loan

2  without first consulting with the probation office.  He's got

3  to disclose all of his assets and liabilities to the probation

4  officer.  He can't transfer, sell, or give away any assets

5  without first getting -- or first consulting with the probation

6  officer.  If he maintains interest in any profit or nonprofit

7  entity, he shall surrender or make available any documents and

8  records of said entity to the probation officer, and also a

9  financial affidavit.

10 Q.  And did Mr. Stilley violate that condition consistent to

11 what's contained in government exhibit 1?

12 A.  Yes.

13 Q.  Now, directing your attention to government exhibit 2.  Are

14 you familiar with this?

15 A.  I am.

16 Q.  And what is it?

17 A.  It is the net worth statement, also known as a PROB 48 in

18 the probation office.  It's a national document that's used by

19 every district typically in financial cases to obtain

20 information about a person under supervision's financial

21 status.

22 Q.  Have you regularly used this form in your supervision of

23 people?

24 A.  Yes.

25 Q.  This particular government exhibit 2, when did you obtain

 1   this?

 2   A.   September 5th.

 3   Q.   And how was it that you obtained this?

 4   A.   It was from Mr. Stilley via e-mail as I requested, as the

 5   5th was Labor Day, I believe.

 6   Q.   Is the form completed, totally completed?

 7   A.   No.

 8   Q.   Are you able to supervise Mr. Stilley based on government

 9   exhibit 2?

10   A.   No.

11   Q.   For example, directing your attention to page 2 of the

12   exhibit, Section C, what is requested?

13   A.   Money owed to you by others.

14   Q.   And what did Mr. Stilley say?

15   A.   "5th Amendment."

16   Q.   And then as another exhibit -- or example, Section E on

17   page 3, what is requested?

18   A.   Safe deposit boxes or storage space facility.

19   Q.   And what did he say?

20   A.   He just said, "No safe deposit boxes," but he doesn't

21   indicate whether or not he has a storage space facility.

22   Q.   And is that important for your supervision consistent with

23   the conditions?

24   A.   Yes.

25   Q.   Directing your attention to Section I.  What is requested?

1  A.  Other assets, and that could include cash on hand, jewelry,

2  art, paintings, coin collections, stamp collections, etc.

3  Q.  And what, if anything, does Mr. Stilley say?

4  A.  "5th Amendment."

5  Q.  And then with respect to K, Section K, what is that?

6  A.  Business holdings.

7  Q.  And then what does Mr. Stilley say?

8  A.  "5th Amendment."

9  Q.  And then with respect to Section M?

10  A.  Yes, transfer of assets.

11  Q.  And what did Mr. Stilley say?

12  A.  "5th Amendment."

13  Q.  Now, going to page 7, are the liabilities; is that right?

14  A.  That's correct.

15  Q.  And with respect to Section B, what is requested?

16  A.  Other debts, and that could include mortgage loans, notes

17  payable, delinquent taxes, and child support.

18  Q.  And what did Mr. Stilley say?

19  A.  "5th Amendment."

20  Q.  And then with respect to Section C, what's the request?

21  A.  Party to civil suit.

22  Q.  And what does Mr. Stilley say?

23  A.  "5th Amendment."

24  Q.  And then did Mr. Stilley sign the form?

25  A.  He did not but he submitted another page.  It was a

1  continuation document from his monthly report that has an

2  electronic signature.

3  Q.  And are you referring to the rest of government exhibit 2,

4  those four pages?

5  A.  Yes, sir.

6  Q.  And did those -- did those indicate to you a good-faith

7  basis why Mr. Stilley didn't fill out government exhibit 2?

8  A.  No.

9  Q.  And directing your attention to that, the first page that's

10  entitled "Oscar Stilley," Part D, do you see that?

11  A.  Yes, sir.

12  Q.  Can you read what Mr. Stilley says?

13  A.  "I have stated a willingness to supply bank statements,

14  PayPal statements, Cash App statements, the two most recent" --

15          **THE COURT:**  Please read more slowly.

16          **THE WITNESS:**  My apologies, Your Honor.

17  A.  "I have stated a willingness to supply bank statements,

18  PayPal statements, Cash App statements, the two most recent tax

19  returns even though they were filed prior to supervision, and

20  payroll stubs."

21  Q.  Is that information sufficient for you to adequately

22  supervise Mr. Stilley pursuant to the conditions?

23  A.  No.

24  Q.  Is it possible to adequately supervise someone pursuant to

25  the conditions if they're allowed to arbitrarily tell you what

 1  financial documents they want to disclose?

 2  A.  No.

 3  Q.  Directing your attention to government exhibit 3.  Oh, and

 4  one last question about that four-page document.  Based on your

 5  review of that document, did it ever describe a legitimate

 6  basis to invoke the Fifth Amendment to any of those questions?

 7  A.  I didn't feel so, no.

 8  Q.  Directing your attention to government exhibit 3.  What is

 9  that?

10  A.  That is the monthly cash flow statement, also known as a

11  PROB 48B in the probation system.

12  Q.  And when did you receive this?

13  A.  This was on September 5th, 2022, as well, with the other

14  document.

15  Q.  Did you receive that at the same time as government exhibit

16  number 2?

17  A.  Yes, sir.

18  Q.  Who did you receive if from?

19  A.  Mr. Stilley.  Oscar Stilley.

20  Q.  Is this a copy of the record of what Mr. Stilley sent you?

21  A.  Yes.

22          **MR. GALLANT:**  The government would offer government

23  exhibits 2 and 3 into evidence, Your Honor.

24          **THE COURT:**  Any objection?

25          **MR. STILLEY:**  Same objections.

1          **THE COURT:**  All right.  Government exhibits 2 and 3

2    will be received.

3    Q.  (BY MR. GALLANT)  What is the purpose of this form?

4    A.  To get an idea of a person under supervision's like monthly

5    expenses as well as the inflow of cash that they're getting

6    from all sources.  You know, sometimes people pay for things

7    that maybe they don't need to or that are maybe a luxury.  When

8    somebody owes a significant amount of money in restitution, we

9    try to make sure that they're meeting an appropriate payment

10   amount each month.

11   Q.  Is this form important for your supervision, particularly

12   at the beginning of supervision?

13   A.  Absolutely.

14   Q.  And why is that?

15   A.  Just to get a baseline, kind of understand a person under

16   supervision's complete financial picture.  You know,

17   Mr. Stilley, I met him on August 10th and I didn't know much

18   about him until he showed up at the office.  So, it's just good

19   to get a good idea of what his financial circumstances are and

20   then yearly we usually have those people refill out those forms

21   to see if anything changed.

22   Q.  To the best of your knowledge, on September 5th was

23   Mr. Stilley working?

24   A.  Yes.

25   Q.  But is that disclosed anywhere on government exhibit 3?

USA v Oscar Amos Stilley (11-21-2022 Revocation and Sentencing Hearing)
RYAN FORSYTH - DIRECT

37

1  A.  No.

2  Q.  What information, if anything, does Mr. Stilley disclose on

3  government exhibit 3?

4  A.  At the bottom of the page he typed in, "Financial

5  information to be supplied by bank statements in lieu of

6  filling out this form.  See attachment to Prob8 for signature

7  and date."

8  Q.  And is that sufficient for you to supervise him pursuant to

9  the conditions?

10  A.  No.

11  Q.  And how much net cashly -- net monthly cash flow does

12  Mr. Stilley show?

13  A.  It says zero.  I may think that was just automatic through

14  the form.  It's a PDF fillable form.  It stays zero until you

15  enter a figure into a column.  So I don't know if he purposely

16  put zero there or if it's just the form.

17  Q.  Directing your attention back now to government exhibit 1,

18  violation number 4.  Are you familiar with that violation?

19  A.  Yes.

20  Q.  Generally speaking, what does that require?

21  A.  Basically he's required to fill out a monthly report and

22  submit it to the probation office within the first five days of

23  each month.

24  Q.  Did Mr. Stilley violate that condition?

25  A.  Yes.

1  Q.  Could you just generally summarize how he violated that

2  condition.

3  A.  He answered "5th Amendment" on some of the questions.  Also

4  just didn't answer some of the questions at all.

5  Q.  Directing your attention to government exhibit number 4.

6  Are you familiar with that?

7  A.  Yes, sir.

8  Q.  When did you obtain this document?

9  A.  That was on September 5th.

10  Q.  Was that at the same time as you obtained government

11  exhibit 2 and 3?

12  A.  Yes, sir.

13  Q.  And who did you obtain it from?

14  A.  Oscar Stilley.

15        **MR. GALLANT:**  Your Honor, the government would offer

16  government exhibit 4 into evidence for purposes of this

17  hearing.

18        **THE COURT:**  Any objection?

19        **MR. STILLEY:**  Same objection.

20        **THE COURT:**  It'll be received.

21  Q.  (BY MR. GALLANT)  Is this one of those monthly reports that

22  you were just referring to with respect to the condition?

23  A.  Yes, sir.

24  Q.  And what month was it for?

25  A.  This is for August of 2022.

1  Q.  Was it completed in a true and correct fashion -- true,

2  correct, and complete fashion?

3  A.  Not completely, no.

4  Q.  Were you able to adequately supervise Mr. Stilley pursuant

5  to the condition based on government exhibit number 4?

6  A.  No.

7  Q.  Directing your attention to government -- Part D, for

8  instance.  Again, it says zero for total monthly cash flow.  It

9  doesn't show any cash flow whatsoever, does it?

10  A.  No.

11  Q.  And then with respect to, "Do you rent or have access to a

12  safe deposit box," --

13          **THE COURT:**  No.  Now, --

14          **MR. GALLANT:**  Oh, I'm sorry, Your Honor.

15          **THE COURT:**  -- which exhibit are you --

16          **MR. GALLANT:**  It's government exhibit 4, I'm sorry, on

17  page 1 under part D.  I'm sorry, Your Honor.

18  Q.  (BY MR. GALLANT)  So, with respect to the question, "Do you

19  rent or have access to a post office box, or safe deposit box,"

20  does Mr. Stilley answer those questions?

21  A.  No.

22  Q.  What does he put?

23  A.  Nothing, he didn't check yes or no, and on the name and

24  address of location he says, "5th Amendment."

25  Q.  And then below that, what is the question that's asked?

1   A.   "Does your spouse, significant other, or dependent have a

2   checking or savings account that you enjoy the benefits of or

3   make occasional contributions toward?"  He wrote, "5th

4   Amendment."

5   Q.   Did he answer that question?

6   A.   Just with, "5th Amendment," not appropriately.

7   Q.   And then with respect to the bottom of page 1, what does

8   that ask for?

9   A.   It says, "List all expenditures over $500 (including goods,

10  services, or gambling losses)."

11  Q.   Did Mr. Stilley answer any of those?

12  A.   No.  He wrote "5th Amendment."

13  Q.   Why are those three items, the P.O. Box, the safe deposit

14  box, accounts he may be on, and expenditures over $500, are

15  those important for you to adequately supervise Mr. Stilley

16  pursuant to the condition?

17  A.   Yes.

18  Q.   And why?

19  A.   Well, you know, he's a financial case, there's a large

20  amount owed of restitution, so I'm definitely concerned about

21  not answering things about, you know, being on other individ-

22  -- or having access to other checking or savings accounts.  The

23  same with the expenditures over $500.  The post office box, he

24  has a condition that prohibits him, and I don't have the

25  condition in front of me specifically, but basically from being

1  involved in any profit or non-profit entity that he owns

2  without kind of reporting it to us.  So, you know, if he would

3  just answer it truthfully, would it be cause for concern,

4  probably not.  Him omitting it makes us wonder, well, why, do

5  you or don't you?  The same with the safe deposit box, he could

6  have a large sum of cash that could go towards his restitution

7  balance.

8  Q.  Directing your attention to page 2.  There's a question --

9  the second -- on the right-hand column, the second one down,

10 about -- or third one down about firearms.  Is there a question

11 about that?

12 A.  Yes.  It says, "Did you possess or have access to a

13 firearm?"

14 Q.  Did Mr. Stilley answer that?

15 A.  No.

16 Q.  What does he say?

17 A.  "5th Amendment."

18 Q.  Why is that important for a probation officer to know

19 about?

20 A.  Well, possessing a firearm as a felon is a crime.  Also,

21 it's an officer safety concern.  Me and a partner will go out

22 and see him periodically and it's good to know that there are

23 no firearms or anything in the home or in the area that he may

24 have access to.

25 Q.  There's also a question about illegal drugs.  Do you see

1    that?

2    A.  Yes.

3    Q.  Did Mr. Stilley answer that question?

4    A.  No.

5    Q.  And why is that important for you to adequately supervise

6    him pursuant to the conditions?

7    A.  Well, again, using illegal drugs is also against the law,

8    but also it's important for me to know in case, you know, if

9    he's on drugs and has access to a firearm, that could be a

10   safety concern.  I'd also generally like to make sure he's not

11   dealing with some sort of addiction issue and maybe refer him

12   for treatment, if appropriate.

13   Q.  Did you have any intent to disclose to law enforcement any

14   drug use by Mr. Stilley?

15   A.  No.

16   Q.  Now, at the end of government exhibit 4, did he attach the

17   same four pages that he attached to the prior exhibit we

18   discussed?

19   A.  Yes.

20   Q.  And, again, did his explanation seem to you to be a

21   good-faith evoking of his Fifth Amendment rights?

22   A.  No.

23   Q.  Now, after September 5th, did Mr. Stilley provide you other

24   documents?

25   A.  Yes.

1  Q.  What did he provide you?

2  A.  He has since provided an Arvest Bank record I believe each

3  month since, as well as PayPal and Cash App statements.

4  Q.  And were those documents sufficient for him to comply with

5  the conditions that he violated in the amended petition?

6  A.  Not sufficient to totally absolve him from the violations

7  but definitely got him closer to complying.

8  Q.  And then were you able -- based on that limited information

9  he provided, is that sufficient for him -- for you to

10  adequately supervise him pursuant to the conditions?

11  A.  No.

12        **MR. GALLANT:**  May I have a minute, Your Honor?

13        **THE COURT:**  Surely.

14        **MR. GALLANT:**  Your Honor, the government rests.

15     Did I admit government exhibit 4?

16        **THE DEPUTY COURT CLERK:**  (NODS HEAD UP AND DOWN)

17        **MR. GALLANT:**  Okay.

18        **THE COURT:**  I have one question before we have cross-

19  examination.  You mentioned Cash App statements?

20        **THE WITNESS:**  Yes.

21        **THE COURT:**  Okay.  Well, this probably shows what

22  generation I'm in, but I'm going to ask you:  What is Cash App?

23        **THE WITNESS:**  So, it's similar to PayPal.  It's an

24  application that you can use on your phone and you can pay

25  other people with it similar to -- I use Venmo personally, I

1    don't have Cash App, but you may be able to pay for services

2    with Cash App though I'm not entirely sure.

3              **THE COURT:**  So, and I take it, one way or another

4    then, it is possible to, if need be, print out a statement of

5    transactions on using the Cash App capability; is that correct?

6              **THE WITNESS:**  Correct.

7              **THE COURT:**  Okay.  Very well.

8         Cross-examination.

9                        **CROSS-EXAMINATION**

10   BY MR. STILLEY:

11   Q.  Good afternoon, Mr. Forsyth.

12   A.  Good afternoon.

13   Q.  We have talked on a number of occasions, have we not?

14   A.  Yes.

15   Q.  And let's start at the beginning.  On August 10 when I came

16   to you, you were surprised to see me in the office; correct?

17   A.  Yes.  I wasn't notified of your release for that day.

18   Q.  Correct.  Nobody told you about that because Oscar Stilley

19   was released a year early; correct?

20   A.  I don't know.

21   Q.  Oh, okay.

22        Oscar Stilley has always been responsive when you call or

23   send an e-mail or a text; correct?

24   A.  Correct.

25   Q.  You talked a little bit about the timing.  You said that on

1   August 10 -- the accusation against me is that I did something

2   on August 10, but you agree that it was actually -- you gave me

3   until August 18th; correct?

4   A.   Correct.

5   Q.   And were you also aware that your boss talked to me on the

6   15th and the 16th about the deadline?

7   A.   I'm aware of it because of our chronological record, but --

8   Q.   Sure.  And can you tell us the name of your boss?

9   A.   His name is Brent Young.

10  Q.   Okay.  And isn't it true that Mr. Young, on the 16th, told

11  Stilley, that would be me, that the installation of the

12  monitoring software would have to be done that day and the 18th

13  was off?

14  A.   I'm not sure if that occurred on the 16th.  I can't

15  remember the dates.  I do remember something being said to that

16  effect.

17  Q.   And do you know who made the decision to do that?

18  A.   I wasn't a part of that.  I was out in the field seeing

19  people.  You know, my supervisor informed me that he had had a

20  conversation with you and told you that you needed to install

21  the software.

22  Q.   You've told me that you are only getting information,

23  you're not making the decisions about whether or not to file a

24  revocation petition; correct?

25          **MR. GALLANT:**  Your Honor, I just object to relevance.

1    **THE COURT:**  Sustained.

2  Q.  (BY MR. STILLEY)  Who has the jurisdictional control over

3  the supervision of Oscar Stilley?

4    **MR. GALLANT:**  Your Honor, I'd object to relevance.

5    **THE COURT:**  Sustained.

6    **MR. STILLEY:**  Your Honor, if I could speak briefly to

7  that.  The Constitution gives a right to confrontation, and so

8  far nobody seems to admit that they are the one that made the

9  decision.  He didn't make the decision, his boss Mr. Young

10  didn't make the decision.  I'm trying to find out who made this

11  decision, who cut me off on the 16th instead of the 18th, etc.,

12  etc.  I would respectfully request that I be allowed -- this is

13  not a jury trial -- I would request that I be allowed to

14  inquire into this and try to find out what's going on, what's

15  happening.

16    **THE COURT:**  Well, it doesn't tend to disprove the

17  violations that this witness has testified to, and for that

18  reason the objection remains sustained.

19    We'll have your next question.

20    **MR. STILLEY:**  Okay.  I'm going to maintain my

21  objection to this.  I think it does go to jurisdiction.  I

22  would like to make a record on that but I respect your decision

23  if you're not going to allow --

24    **THE COURT:**  Well, we've covered several aspects of

25  jurisdiction going back more than a decade, and I understand

1  your point, and your point has been unsuccessfully asserted and

2  in my view remains without merit.

3      We'll have your next question.

4          **MR. STILLEY:**   Okay.

5  Q.  (BY MR. STILLEY)   There's four documents in evidence today;

6  correct?

7  A.  Four exhibits.

8  Q.  Yes.

9  A.  Yes.

10 Q.  There's no name of any officer out of the Northern District

11 of Oklahoma on any of those documents, is there?

12 A.  Not to my knowledge, no.

13 Q.  But there's the names of two officers out of the Western

14 District of Oklahoma; correct?

15 A.  Just one, to my knowledge.

16 Q.  Aric Holloway and that is because he signed the amended

17 petition whereas Jay Mauldin signed the original petition;

18 correct?

19 A.  Yes, to my recollection.

20 Q.  And Mr. Mauldin and Mr. Holloway only have authority in the

21 Western District of Oklahoma; correct?

22         **MR. GALLANT:**   I just object to these questions about

23 authority.  They're not relevant, Your Honor.

24         **THE COURT:**   Sustained.

25 Q.  (BY MR. STILLEY)   Mr. Stilley, soon after meeting you,

1  explained that he was, to the best of your knowledge, he was

2  under criminal investigation; correct?

3  A.  Can you -- I don't understand the question.  Sorry.

4  Q.  Oscar Stilley told you either at your first meeting or very

5  soon thereafter that Oscar Stilley had been told by Charles

6  O'Reilly that he was under a criminal investigation in the

7  Western District of Arkansas; is that not correct?

8  A.  You had mentioned thinking you might be and being unsure.

9  I don't remember when, but yeah, it was fairly early on, but

10  you were -- you've had concerns that you were under criminal

11  investigation.

12  Q.  Correct.

13      And isn't it true that Oscar Stilley has asked you to try

14  to find out where that criminal investigation is and try to

15  find out the status?

16          **MR. GALLANT:**  Your Honor, I'd object.  That's not

17  relevant to this hearing.

18          **THE COURT:**  Well, it conceivably could have some

19  relevance to the assertion of Fifth Amendment, so I'm going to,

20  at this point at least, overrule that objection.  We'll take it

21  one step at a time.  That will be overruled.

22  A.  Can you restate the question?  Sorry.

23  Q.  (BY MR. STILLEY)  Let me put it like this:  You knew that

24  Oscar Stilley was worried about a criminal investigation;

25  right?

 1   A.   Yes.

 2   Q.   And Oscar Stilley asked you to make inquiry about it?

 3   A.   Yes.

 4   Q.   And did you ever make an inquiry about it?

 5   A.   I did.

 6   Q.   And what did you find out?

 7   A.   I didn't find out anything.

 8   Q.   Did you ever call Charles O'Reilly?

 9   A.   No.  I have talked to him briefly in the beginning when you

10   were released but it was not anything about an investigation.

11   I didn't inquire with him about an investigation.

12   Q.   So, as you sit here today, you don't know if Oscar Stilley

13   is under criminal investigation as we speak, or not, do you?

14   A.   I do not know, no.

15   Q.   But you know that Oscar Stilley is extremely concerned

16   about it; right?

17   A.   Yes, based on what you've told me, yes.

18   Q.   Okay.  And is it not also true that Oscar Stilley -- one of

19   the cond- -- scratch that.  One of the conditions is to make a

20   conditional requirement to make returns back to 1987; correct?

21   A.   Yes.

22   Q.   Oscar Stilley has been asking questions about that; right?

23   A.   Can you restate that?  Sorry.

24   Q.   Okay.  Oscar Stilley has been asking you questions about

25   that; correct?

1   A.  Yes, you've inquired about if you're all squared up on

2   that.

3   Q.  Yes.  And Oscar Stilley has contended to you that he is all

4   squared up; right?

5   A.  Yes.

6   Q.  But he hasn't been able to obtain a firm commitment about

7   that fact; right?

8   A.  To my knowledge, no.

9   Q.  Okay.  Now, wouldn't it be fair to say that, with that left

10  open, so we don't know one way or another, that would create a

11  reasonable basis for Oscar Stilley to be really worried about

12  any information, especially financial information, that he

13  might give the government?

14          **MR. GALLANT:**  Your Honor, he's just asking him to

15  speculate on somebody else's state of mind.  I don't see how

16  that --

17          **THE COURT:**  Sustained.

18          **MR. STILLEY:**  Okay.

19  Q.  (BY MR. STILLEY)  Let me try this just a little bit

20  differently.

21      You know that Oscar Stilley has concerns, that in his mind

22  Oscar Stilley is concerned about a trick bag, about being

23  trapped by giving financial information, giving information

24  into his computer, and then having that used against him in a

25  pincer attack on tax returns and on a criminal investigation?

1  A.  I don't --

2  Q.  Let's back this up.  On --

3  A.  -- understand what the question is.

4  Q.  Oscar Stilley is worried about being compelled to make

5  representations to the government, period.  That freaks Oscar

6  Stilley out; correct?

7          **MR. GALLANT:**  Your Honor, this is argument and it's

8  not -- and it's speculation.

9          **THE COURT:**  He's asking this witness about his own

10  perception, so I'm going to overrule that at this point.

11  Again, we'll take it one question at a time but I'm going to

12  overrule that.

13      You may answer.

14  A.  Based on your representations to me, yes.  You seem worried

15  about providing any information because of a possible pending

16  criminal investigation.

17  Q.  (BY MR. STILLEY)  Right.  And the same things on the tax

18  returns; correct?

19  A.  What?

20  Q.  That Oscar Stilley is nervous about what kind of

21  information that he gives that could possibly contradict

22  something else that he was required to say.

23  A.  With respect to submitting me the tax returns?

24  Q.  Correct.

25  A.  I don't know that.  I don't think you've made that

1  representation.  You very quickly gave me your 2020 and 2021

2  tax returns, which I appreciated.

3  Q.  Sure.

4      And Oscar Stilley asked for a commitment that the tax

5  return obligation is concluded; correct?

6  A.  Meaning the condition?

7  Q.  Yes, uh-huh.

8  A.  You asked if it was concluded?

9  Q.  Yes.

10  A.  And I couldn't tell you without first being able to talk

11  with the IRS to make sure that everything was all set.

12  Q.  Yes.  And since August 10, we still really don't have an

13  answer?

14  A.  Is that a question?

15  Q.  Is that not true?

16  A.  Yeah.

17  Q.  Okay.

18  A.  I don't have an answer.  I've inquired and hopefully I will

19  find out soon.

20  Q.  And you don't have any reason to believe that Oscar

21  Stilley's nervousness is faked or anything like that?  It's

22  legitimate -- a legitimate concern; correct?

23         **MR. GALLANT:**  Your Honor, I object.  That's

24  speculation.  He's asking him the legitimacy of someone else's

25  belief.

1    **THE COURT:**  You can give me your perception and then

2    we'll move on to another subject.

3    A.  I would think that you've already been convicted and you're

4    probably not under investigation, but I'm just a probation

5    officer.

6    Q.  (BY MR. STILLEY)  Right.  But if you're considering Oscar

7    Stilley's sincerity, you have nothing to tell the Judge to

8    question Oscar Stilley's sincerity about his nervousness?

9    A.  I guess I don't understand the question.

10   Q.  You understand that Oscar Stilley is nervous about making

11   affirmative representations to the government; correct?

12   A.  Correct.

13   Q.  You have nothing to tell the Judge to say that Oscar

14   Stilley's nervousness is faked or made up; correct?

15   A.  Correct.

16          **THE COURT:**  Okay.  We've covered that, so --

17          **MR. STILLEY:**  Sure.

18          **THE COURT:**  -- now it's time to move on.

19          **MR. STILLEY:**  Sure.  Got it.

20   Q.  (BY MR. STILLEY)  And you get along with Oscar Stilley

21   quite well; correct?

22   A.  Yeah, I'd say you've been pleasant, and you mentioned it,

23   reachable, very reachable, yeah.

24   Q.  And he's done three drug tests?

25   A.  Yes.

USA v Oscar Amos Stilley (11-21-2022 Revocation and Sentencing Hearing)
RYAN FORSYTH - CROSS

 1  Q.  And Oscar Stilley has never given you any trouble about

 2  that?

 3  A.  No.

 4  Q.  Everything that Oscar Stilley is required to do is done on

 5  time; correct?

 6  A.  No.

 7  Q.  I beg your pardon.  The forms that have been sent, when

 8  there's, for example, a form, it's been sent by the 5th;

 9  correct?

10  A.  Correct.

11  Q.  And isn't it true that the attachment -- we've got an

12  attachment here and we can go over that in a little bit -- but

13  isn't it true that on the attachment you have been requested to

14  state if you have a problem with any particular thing so we can

15  see if we can work that out?  And you can certainly take a

16  look.

17  A.  Yeah.  Can you point to a page where it says that

18  specifically?

19  Q.  Okay.  On the attachment to exhibit -- let's just take

20  exhibit 4 because it has it.

21  A.  Oh, I see it.  The last page?

22  Q.  Oh, you must be on another one.  Okay.  On page 2 of the

23  attachment to exhibit 4, do you have -- which one do you have

24  in front of you?

25  A.  I have exhibit 4.

1    Q.  Okay.  Are you there at page 2?

2    A.  I am.

3    Q.  Okay.  And the next-to-the-last paragraph, last two

4    sentences, it says, "I will have to plead the 5th to those

5    questions, so that I may as well plead the 5th now.  If you

6    think I don't have that right, please cite your best

7    authorities."  Correct?

8    A.  It says that, yes.

9    Q.  All right.  So I did my best to find out whether you had a

10   good basis for -- to show me that my Fifth Amendment claims

11   were invalid; correct?

12   A.  Can you restate?

13   Q.  Okay.  I asked you for any authority to show that my

14   position on the Fifth Amendment was unsupported by law?

15   A.  Yes, you did ask me that.

16   Q.  And you never cited any case law to me to show me that I'm

17   wrong?

18   A.  Correct.  I'm a probation officer, not an attorney.

19   Q.  Right.

20       And you have no reason to believe, as you sit here today,

21   that Oscar Stilley wouldn't follow the law if you showed Oscar

22   Stilley that he was wrong?

23   A.  I don't know.

24   Q.  Okay.  But I'm not asking -- I'm just saying that you don't

25   have that knowledge.  You don't have a reason to believe that

1   Oscar Stilley would do something contrary to the law if you

2   showed him the law?

3   A.   No, I guess I don't have knowledge that that would happen.

4   Q.   Okay.  Isn't it true also that you sent a letter to the

5   Northern District of Oklahoma --

6   A.   I did.

7   Q.   -- about these issues here today?

8   A.   Yes.

9   Q.   And that's not part of the exhibits; correct?

10  A.   Correct.

11  Q.   And isn't it true that you asked Ms. Kory McClintock to

12  inquire of the court whether or not it would be -- this needed

13  to be the subject of a revocation or whether I should get the

14  30 days I asked for; correct?

15  A.   Correct.

16  Q.   And can you explain to the court what the 30 days were that

17  I -- that Oscar Stilley asked for?

18  A.   You had asked me and my supervisor for 30 days to be able

19  to file a motion to clarify or continue your conditions.

20  Q.   And both of you said that you didn't have an objection to

21  that?

22  A.   I think we said that we didn't have an objection to you

23  like filing your own motion but you had to get the software

24  installed by the 18th or we were sending a letter to the

25  Northern District of Oklahoma.

 1  Q.  You passed the issue across to the Northern District of

 2  Oklahoma; correct?

 3          **MR. GALLANT:**  Your Honor, I'd object.  It's a vague

 4  question but it's not relevant.

 5          **THE COURT:**  Sustained.

 6  Q.  (BY MR. STILLEY)  Okay.  And you gave me a name, Kory

 7  McClintock, that that was a person that I needed to talk to

 8  about the issue of the 30 days; correct?

 9          **MR. GALLANT:**  Again, Your Honor, that's not relevant

10  to this petition.

11          **THE COURT:**  In case it tees up something relevant,

12  I'll hear the answer to that, and then we'll take it one

13  question at a time.

14  A.  So I had known SUSPO McClintock to be the person that I

15  would have to talk to about the violation letter about what had

16  been transpiring, so I gave you her name, yes, because I was

17  sending it to, you know, the Northern District of Oklahoma

18  probation office.

19  Q.  (BY MR. STILLEY)  But she's not the one that made the

20  decision to deny the 30-day time period either, is she?

21  A.  No, she wasn't the one that I guess denied that.

22  Q.  So, as you sit here today, based on the testimony, we still

23  don't know who made the decision to say Stilley doesn't get 30

24  days to file a motion?

25          **MR. GALLANT:**  Your Honor, I object.  That, first of

 1  all, mischaracterizes the testimony, but also it's not

 2  relevant.

 3          **THE COURT:**  Sustained.

 4          **MR. STILLEY:**  Your Honor, respectfully, if I can make

 5  my argument.  What I'm trying to show is good faith, that I was

 6  not rebellious against following a legitimate order, and asking

 7  for a reasonable period of time, and that's what I'm trying to

 8  get at and trying to make the record.  And, of course, we've

 9  got a district court here with no jury, so you can disregard

10  things that are inappropriate and state your reasons.  I'm just

11  trying to lay out the record of what took place.

12          **THE COURT:**  We'll have the next question.

13  Q.  (BY MR. STILLEY)  Okay.  Oscar Stilley sent you and a

14  number of other individuals a letter; is that not correct?

15  A.  Yes.

16  Q.  And that was -- it was addressed to various lawyers, etc.?

17  A.  Yes.

18  Q.  September 8th?

19  A.  I don't recall the date.

20  Q.  Okay.

21  A.  There's been a lot of documents and things that you've

22  submitted.

23  Q.  Sure.

24      But part of that was citations to various authorities

25  saying that a supervisee should have a reasonable period of

 1  time to file a motion, that they shouldn't be forced to violate

 2  or forced into a situation of a crim- -- facing jail without

 3  having a chance to exercise their First Amendment peaceful

 4  petition; correct?

 5          **MR. GALLANT:**  Your Honor, I'd object to the relevance

 6  of this.

 7          **THE COURT:**  Sustained.

 8  Q.  (BY MR. STILLEY)  You don't have any reason -- you could

 9  not tell this court that Oscar Stilley has ever told you that

10  he would not do what the law requires; correct?

11  A.  No, you've never said, "I'm going to break the law," or "I

12  won't follow the law."

13  Q.  Oscar Stilley has consistently attempted to get his right,

14  his First Amendment peaceful petition right, to get

15  clarification and modification; correct?

16          **MR. GALLANT:**  Your Honor, I'd object.  That's

17  speculation.

18          **THE COURT:**  Sustained.

19  Q.  (BY MR. STILLEY)  Do you have any legal opinions in your

20  possession in your office on the Fifth Amendment?

21          **MR. GALLANT:**  Objection, Your Honor.  Relevance.

22          **THE COURT:**  Sustained.

23  Q.  (BY MR. STILLEY)  Now, one of the conditions is monitoring

24  software; right?

25  A.  Yes.

USA v Oscar Amos Stilley (11-21-2022 Revocation and Sentencing Hearing)
RYAN FORSYTH - CROSS

60

1  Q.  And you told me that -- you told Oscar Stilley that you

2  still didn't know what search terms that you would need to put

3  on that software because you weren't -- or this is an unusual

4  case; correct?

5  A.  Yeah.  I don't have any financial -- you're technically a

6  financial case, I don't have any financial cases under my

7  supervision at the moment that have monitoring software, so --

8  Q.  So, even as you sit here today, you still don't know what

9  search terms you would need to monitor Oscar Stilley with

10  respect to the offense of conviction; right?

11  A.  That's not true.

12  Q.  That's not true?

13  A.  No.

14  Q.  What terms would you need?

15  A.  So, IPPC handles that and they have certain profiles for

16  certain offenses.  They have people that work there that used

17  to be prior federal probation officers, so they're

18  knowledgeable in different types of cases.  They had told me

19  that they have a financial case profile set similar to

20  something like a sex offender profile that is kind of set up

21  and I can modify from there or add certain things, remove

22  certain things.

23  Q.  Okay.  So, that knowledge is in somebody else's mind.  You

24  still, in your own mind, you don't know what terms you would

25  need?

U.S. District Court
Northern District of Oklahoma

USA v Oscar Amos Stilley (11-21-2022 Revocation and Sentencing Hearing)
RYAN FORSYTH - CROSS

1    **MR. GALLANT:**  Your Honor, I'd object.  Asked and

2  answered.  He just answered that question.

3    **THE COURT:**  Sustained.

4  Q.  (BY MR. STILLEY)  Can you tell me who my -- who is my

5  accuser within the probation on the Fifth and Sixth of the

6  Constitution?

7    **MR. GALLANT:**  Objection, Your Honor.

8    **THE COURT:**  Sustained.

9  Q.  (BY MR. STILLEY)  You never complained about the blank

10  spaces on the forms, any of them, did you?

11  A.  I believe I did.  There was a day, and I don't remember the

12  date, I want to say September 3rd, I could be wrong about that

13  day, that you came into the office to kind of -- just kind of

14  show over the forms.  It was a Friday, I think, or a Thursday.

15  But you had shown the forms, the financial documents, and they

16  weren't nearly as completed out as they ended up being, but me

17  and Brent had talked to you about that, we tried to encourage

18  you to fill them out completely and accurately, each question

19  in each section, and you agreed to take another crack at it.

20  Q.  Okay.  That was early on before the forms were turned in;

21  correct?

22  A.  Correct.  And then I believe I had another phone

23  conversation with you prior to the 5th of September that just

24  reminded you to submit those by e-mail.  We agreed on the 6th

25  because the 5th was a holiday, but you still graciously got

1  them to me on the 5th.  During our phone conversation I had

2  reminded you that you must fill them out, those documents,

3  completely and accurately and honestly or they would be

4  included in an amended petition before this court.

5  Q.  Okay.  But after you received the -- okay.  Scratch that.

6  After you received the forms, turned in, not the pro forma, the

7  forms turned in, you never sent anything in writing saying,

8  "Oscar, maybe you missed this, can you fill this in for me?"

9  A.  No, I didn't say that, no.

10  Q.  And you don't have any reason to believe that Oscar Stilley

11  would not have complied if it's something that he does not have

12  at least an arguable Fifth Amendment claim; correct?

13  A.  I'm unsure.  We have had several conversations with you, me

14  and my supervisor, about the forms, and you've filled them out

15  the way you filled them out as they're submitted today.  I'm

16  not confident that you would complete them the way I would need

17  you to or the way I've asked you to.

18  Q.  Okay.  But really the fundamentals of what's complained

19  about is the plea of Fifth Amendment, it's not the leaving of

20  blanks; correct?

21          **MR. GALLANT:**  I object.  That's a vague question.

22          **THE COURT:**  I didn't understand the question.  Please

23  rephrase it.

24          **MR. STILLEY:**  Okay.

25  Q.  (BY MR. STILLEY)  I'm trying to find out if the basis of

USA v Oscar Amos Stilley (11-21-2022 Revocation and Sentencing Hearing)
RYAN FORSYTH - CROSS

63

1   the complaint, the amended petition, that is the pleas of Fifth

2   Amendment, not some omissions of information here and there;

3   correct?

4   A.   I think they're all involved.

5   Q.   You think they're all involved?

6   A.   The computer monitoring, the pleading the Fifth on some of

7   the questions, and also just leaving some blank.

8   Q.   Okay.  But it's possible that somebody might accidentally

9   leave something off the form; right?

10  A.   Absolutely.  If you'd like to clear that up, --

11  Q.   And if you said, "Hey, Oscar, you didn't put this thing

12  down, was that on purpose," you might get a different response;

13  right?

14  A.   Possibly.

15  Q.   But you didn't do that as to any specific item?

16  A.   No, --

17  Q.   Okay.

18  A.   -- not that I recall.  I know that there was a -- the

19  second time that you submitted documents, I just reminded you

20  that I have the same objections to these that I did the first

21  set --

22  Q.   Sure.

23  A.   -- and you said, "I note those and that's fine."  But other

24  than that, no, I don't think I specifically made reference to

25  any of the blank questions.

U.S. District Court
Northern District of Oklahoma

USA v Oscar Amos Stilley (11-21-2022 Revocation and Sentencing Hearing)
RYAN FORSYTH - CROSS

64

1  Q.  Right.  And both of us tried to turn square corners with

2  each other; correct?

3  A.  I don't understand.

4  Q.  Let me help you out a little bit on this.

5      Each time I send you the documents on the 5th, I raised the

6  Fifth Amendment and object to certain things and ask you to

7  state if you have a problem with anything in particular;

8  correct?

9  A.  Yeah, you say that in the e-mail, yeah.

10 Q.  But isn't it also true that I say all your -- your previous

11 objections don't need to be restated because I understand them;

12 right?

13 A.  Correct.  Yeah.

14 Q.  Okay.  So that's what I mean by turning square corners.

15 So, it would be fair to say that we're -- both sides are trying

16 to be reasonable with the other and make things as easy as

17 possible so that both sides know what the problem is with the

18 other one?

19 A.  Yes.

20 Q.  Okay.  Now, these forms frequently will not allow an

21 explanation on the form; correct?  For example, some of the

22 blanks only allow a number, and if you try to put a letter, it

23 won't allow it?

24 A.  Yeah.  I've never tried to fill one out on a PDF, but yeah,

25 I'm sure that that's accurate.

USA v Oscar Amos Stilley (11-21-2022 Revocation and Sentencing Hearing)
RYAN FORSYTH - CROSS                                                      65

1    Q.  So your complaint is not that Oscar Stilley supplemented

2    his response with an attachment, is it?

3    A.  No, I have no issues with --

4    Q.  Oscar Stilley could supplement and state his position and

5    say where he's got questions, and you're still okay with that;

6    right?

7              **MR. GALLANT:**  I object to the characterization of

8    "okay with that."  I'm not sure what that -- it's vague.

9              **THE COURT:**  Answer if you can.

10   A.  Can you restate?

11   Q.  (BY MR. STILLEY)  Sure, sure.

12       The explanations on an attachment are not objectionable in

13   your professional opinion; correct?

14   A.  Are you asking if I like agree with the reasons that you

15   objected?

16   Q.  No.

17   A.  Just that you writing them out on a form and providing it

18   to me, is that okay?

19   Q.  Correct.  Just the very fact of explaining the supervisee's

20   position.

21   A.  Yeah, I don't have any issue with that.

22   Q.  So, if there was something wrong with the explanation, you

23   would then inform the supervisee, "Hey, there's something wrong

24   that needs to be fixed"?

25   A.  Not necessarily.

1  Q.  Well, you wouldn't recommend a petition to -- for a warrant

2  or summons unless you had given that person a chance to

3  correct, would you?

4  A.  True, which we did in this case.  We met, we kind of

5  discussed the documents the first time you completed them.  We

6  didn't even take copies of them because we kind of pointed out

7  each section that you really needed to go back and be honest

8  and truthful, that we weren't trying to catch you into anything

9  that you -- you know, in any violation.  We just were there to

10  help you and be supportive and hopefully get you going onto

11  your term of supervised release.  And then when you came back

12  with the forms, I can't -- I can't -- I can't be bogged down in

13  a constant e-mail chain back and forth with one person under

14  supervision when I have 55 other people that I deal with that,

15  some of which, pose a great risk to the community and I need to

16  be involved in their cases, as well.

17  Q.  Sure.  But you recognize that Oscar Stilley does not pose a

18  substantial risk to the community; right?

19  A.  I'm unsure.  You've been noncompliant with the documents,

20  so I don't know if you're doing anything that could violate

21  your conditions.

22  Q.  Okay.  What specific risks do you think that Oscar Stilley

23  might pose to the community?

24  A.  Can ask you that again?

25  Q.  What specific risks do you think Oscar Stilley might pose

1   to the community?

2   A.   Based upon your offense of conviction, you were convicted

3   of crimes against several different people, defrauded them.

4   There's a potential that that could occur again, so that's

5   something -- that's why you have the conditions that you have

6   and that's why we're monitoring you in that fashion.

7   Q.   Okay.   Now, you talked about the offense of conviction, so

8   let me ask about that.   Are you talking about the pretrial

9   theory in which Oscar Stilley was alleged to have paid money

10  that Lindsey Springer allegedly earned to him out of client

11  funds?   Is that your theory?

12          **MR. GALLANT:**   Your Honor, I object.

13          **THE COURT:**   Sustained.

14  Q.   (BY MR. STILLEY)   Is it your theory that Oscar -- you said

15  "offense of conviction."   I'm trying to find out what you mean

16  by "offense of conviction."   Is it the claim that Oscar Stilley

17  and Lindsey Springer stole the money that was relied on after

18  trial and long after the jury verdict?

19          **MR. GALLANT:**   Your Honor, I object.

20          **THE COURT:**   Sustained.

21      Mr. Stilley, let me clear the air.   You had a trial, a jury

22  trial, the jury convicted you, you were sentenced.   Your

23  conviction and sentence, as I recall, were affirmed on appeal.

24  Am I right about that?

25          **MR. STILLEY:**   Your Honor, I never got a chance to do

1   my appeal.  Nobody has claimed that --

2            **THE COURT:**  Okay, okay.

3            **MR. STILLEY:**  -- I've done my appeal.  The only reason

4   I couldn't do my appeal is because of two things.  One, I asked

5   -- I made an unopposed motion for the transcripts and it was

6   denied.

7            **THE COURT:**  Okay.  Let me finish, and then at the

8   argument stage, if there's anything relevant that you have to

9   say by way of argument, I'll hear you.

10       We're not going to relitigate your underlying conviction

11  for the offenses that were charged in this district on which

12  you were tried and on which the jury returned its verdict.

13  We're just not going to relitigate that.  So, bear in mind that

14  the only question before the court today is whether you did or

15  did not violate your conditions of supervised release in the

16  manner alleged in the amended petition.  Your questions need to

17  be confined to that.  We'll have the next question.

18  Q.  (BY MR. STILLEY)  Do you have any understanding of the

19  mental state that a supervisee has to have in order to be

20  criminally liable for failing to adhere to a term of

21  supervision?

22            **MR. GALLANT:**  Your Honor, I'd object to relevance.

23            **THE COURT:**  Sustained.

24  Q.  (BY MR. STILLEY)  You're aware that one of the terms --

25  excuse me -- one of the terms of supervision is to not use any

1  form of encryption that would change -- is that not correct?

2  A.  Yes.  Generally, yeah, I recall one of the special computer

3  restriction conditions, yeah.

4  Q.  Were you aware that the government sent Oscar Stilley these

5  very exhibits using Power- -- I think it's PowerPoint

6  encryption, using an encryption service that required him to

7  create a user name and an account in order to get that?

8      **MR. GALLANT:**  Your Honor, that's not at all relevant

9  to the petition.

10      **THE COURT:**  Sustained.

11  Q.  (BY MR. STILLEY)  Okay.  Can you agree that it's impossible

12  to avoid the use of any encryption in the modern world?

13  A.  I don't know.

14  Q.  So you don't know whether Oscar Stilley violated that

15  condition intentionally or not?

16  A.  I don't recall anything in the petition talking about the

17  encryption.

18      **THE COURT:**  There's no asserted violation,

19  Mr. Stilley, with respect to that particular condition of

20  supervision.  The allegation in violation number 1 is that on

21  August 10, and we've heard testimony that you were given until

22  a few days later, that Oscar Amos Stilley violated this

23  condition of supervised release when he refused to allow the

24  installation of remote monitoring software to occur.  So we're

25  here to determine whether that is a true statement or not.

1       The fact that violation number 1 refers for context to

2  other conditions of supervision is perhaps of interest by way

3  of background, but the question on violation number 1 is

4  whether you refused to allow the installation of remote

5  monitoring software.  That does not implicate the encryption

6  condition to which you have referred and that's the reason that

7  the question about encryption is not relevant to this

8  proceeding today.

9       We'll have the next question.

10  Q.  (BY MR. STILLEY)  You retain the ability to bring further

11  revocation proceedings later; correct?

12          **MR. GALLANT:**  Your Honor, again I object to relevance.

13          **THE COURT:**  Sustained.

14  Q.  (BY MR. STILLEY)  And you realize that some of the

15  conditions are impossible to perform; correct?

16          **MR. GALLANT:**  I object, Your Honor.

17          **THE COURT:**  And, Mr. Stilley, let me follow up.  You

18  have pending a motion to modify your conditions.

19          **MR. STILLEY:**  Yes.

20          **THE COURT:**  That's -- now, bear in mind, that's a

21  prospective matter; that's not going to cure any violations

22  that have occurred.  But I've heard enough to know that I may,

23  in fact, surprise you by taking a hard look at some of your

24  conditions, how some of these conditions fit your situation.

25  But questioning about violations that might occur in the future

1   are irrelevant to this proceeding today.

2       We'll have the next question.

3   Q.  (BY MR. STILLEY)  You said that you didn't have any intent

4   to disclose, for example, any potential admissions of drug use

5   to the police; correct?

6   A.  Correct.

7   Q.  That doesn't have anything to do with whether or not it's

8   an objectionable question under the Fifth Amendment, does it?

9   A.  I don't understand your question.

10  Q.  Your intent to do or not do with certain information

11  doesn't impact whether a valid Fifth Amendment right is

12  implicated; correct?

13  A.  Yes.

14  Q.  As a matter of fact, you get information for other people;

15  right?

16  A.  Can you ask that again?

17  Q.  You acquire information from Oscar Stilley and then pass it

18  along to other people; correct?

19  A.  Not typically.

20  Q.  I thought you said that you were simply getting information

21  and sending it to the Northern District of Oklahoma.

22  A.  Not on a rolling basis.  The only reason I communicated

23  with the Northern District of Oklahoma is because you're in

24  violation.

25  Q.  Isn't it true that the reason that you sent it to the

1  Northern District of Oklahoma is because the Northern District

2  of Oklahoma still has technical jurisdiction over Oscar

3  Stilley?

4  A.  Correct.

5  Q.  And those people in that office could make other decisions

6  about what to do with that information; correct?

7  A.  Sure, yeah.  I mean, if you're referencing the violation

8  report, yeah.  I mean, I sent a letter saying, "Hey, what would

9  you guys like us to do," because it wasn't our court that had

10  jurisdiction, yeah.

11  Q.  Sure.

12     Okay.  You understand that the conditions have a lot of

13  requests about, for example, financial information; correct?

14  A.  Correct.

15  Q.  And you asked for user names and passwords; right?

16  A.  I asked for them because they're in the conditions, yes.

17  Q.  Right.  I understand.  I understand.  That would include

18  the login -- the user name and the password for the Arvest

19  account; correct?

20  A.  I'm just reading over the conditions.

21     I'm not sure that it would actually be for the Arvest

22  account.

23  Q.  It says that -- technically, the condition says all user

24  names and passwords; right?

25  A.  All e-mail accounts, Internet connections, and Internet

1   connection devices including screen names and passwords to the

2   probation officer.  You shall immediately advise the probation

3   officer of any changes in his or her e-mail accounts,

4   connections, devices, or passwords.  I would say that's more

5   e-mail account pass- -- and computer, like you turn on your

6   computer and it's locked, more like screen name and password

7   information to get on the computer, any of your e-mail and I

8   guess online.  I wouldn't say that would -- and maybe the court

9   can correct me -- but I don't think that includes your Arvest

10  bank account.

11  Q.  Okay.  So, at the very minimum, that would be ambiguous?

12  A.  I'm not sure.

13  Q.  But you're not sure one way or another whether the Arvest

14  account is included; right?

15          MR. GALLANT:  Your Honor, I'd object to that.  It's

16  asked and answered.

17          THE COURT:  Sustained.

18  Q.  (BY MR. STILLEY)  Providing the -- Oscar Stilley provided

19  you with the bank statements each month on the 5th of the month

20  since he started the supervision; correct?

21  A.  The first -- so, on September 5th when you first submitted

22  these documents, the bank statements weren't with them.  You

23  had already sent me your tax returns for 2020 and 2021 as well

24  as pay stubs, but you later sent the bank statements, and since

25  have sent it with the monthly report on the 5th of each month,

1  yes.

2  Q.  Right.

3      So, as of August 10th, 2022, you've gotten statements as to

4  the bank account, Cash App, and the PayPal; correct?

5  A.  Since August 10th?

6  Q.  As for transactions occurring since that period of time.

7  A.  Yes.

8  Q.  Would that satisfy the request for the user names and

9  passwords, or is that substandard performance as to those

10 specific items?

11 A.  It wouldn't satisfy that condition because it doesn't

12 include any of your e-mail account passwords or your password

13 to get on your computer.

14 Q.  I beg your pardon.  I need to make the question clear.  I'm

15 only talking about the user names and passwords for those three

16 accounts, not for the e-mails, etc.  I'm trying to focus on

17 those three accounts.  Does the turnover of statements from

18 each of those accounts on a monthly basis satisfy the

19 requirement to provide user names and passwords?

20 A.  Just a moment.

21      **THE COURT:**  I'm not sure I understand the question.

22 Those are two different things; providing a statement is one

23 thing and providing a password is another thing.  I'm not sure

24 I understand the question.

25      **MR. STILLEY:**  I'm just trying to get him to admit

USA v Oscar Amos Stilley (11-21-2022 Revocation and Sentencing Hearing)
RYAN FORSYTH - CROSS

 1   that.  That's the point I'm trying to make.  You understand it,

 2   and I just want him to say it.

 3         **THE COURT:**  Okay.  Then you've made it.

 4      Next question.

 5         **MR. STILLEY:**  Okay.  Thank you.

 6   Q.  (BY MR. STILLEY)  There is a question about contact with

 7   persons with a criminal record.  Do you recall that?

 8   A.  On the monthly report?

 9   Q.  Yes.

10   A.  Yes.

11   Q.  And it doesn't say felons, it just says criminal record;

12   correct?

13   A.  Correct.

14   Q.  And Oscar Stilley provided a fairly extensive explanation

15   about why that he thinks that's impossible performance;

16   correct?

17   A.  Yes.

18   Q.  Is that satisfactory, or is that good enough or not?

19   A.  No.

20   Q.  What specifically did you want?

21   A.  If you have any knowledge that you've had contact with

22   somebody with a criminal record.

23   Q.  Okay.  Define "criminal record."

24   A.  Anybody involved in criminal activity actively or maybe in

25   the past.  Your conditions also require you to -- or prohibit

1  you from contact with felons unless I approve it.  It's

2  impossible to know anybody -- or everybody's criminal

3  background.  When I go to the store and buy a pack of gum, I

4  don't know if the cashier is a felon or not.  You know, all I'm

5  saying is whether you know or not that they have a criminal

6  record, it needs to be reported on the form, if you had

7  contact.

8  Q.  Okay.  Would you say that Oscar Stilley has any duty to

9  inquire about criminal records?

10 A.  To whom?

11 Q.  Okay.  For example, if Oscar Stilley calls on behalf of his

12 employer, REVAMP, Remember Every Victim And Missing Person in

13 the U.S., calls a witness, calls somebody with knowledge to try

14 and get some information to help resolve an unsolved murder,

15 does Oscar Stilley have a duty to try to find out if that

16 person has a criminal record?

17 A.  I would say, and I thought I've mentioned this to you but

18 maybe not, based on your employment and kind of what that

19 entails, it's obvious that you're going to probably encounter

20 somebody with a criminal record.  If that's within your duties

21 of employment, I don't have any issues with that.  You know,

22 it's more about who you're spending time with outside of work,

23 leisure.

24 Q.  Would you be satisfied if Oscar Stilley simply told you

25 about persons with whom he actually physically spends time?  In

 1  other words, if he goes and hangs out with them, is that

 2  sufficient?

 3  A.  I would be satisfied if the document, the PROB 8, was

 4  filled out completely and accurately and you would indicate

 5  there.  If you haven't, then you haven't, and you could select

 6  "No."

 7  Q.  So, then we could actually resolve this particular issue by

 8  agreeing that if Oscar Stilley goes and hangs out with that

 9  person, Oscar Stilley has a duty to tell you if they have a

10  criminal record or a felony?

11          **MR. GALLANT:**  Your Honor, I object.  The purpose of

12  this hearing isn't to modify his conditions, it's to decide

13  whether he violated the conditions and what sentence, if any,

14  should be --

15          **THE COURT:**  Sustained.

16          **MR. STILLEY:**  Your Honor, if I could make just a bit

17  of argument.  What I'm trying to show is there was no willful

18  or violation of any condition with evil intent particularly

19  about this and that this is the kind of thing that is entirely

20  resolvable, the kind of thing that should not result in

21  punishment, reimprisonment, or anything of that nature.

22          **THE COURT:**  Well, Mr. Stilley, I understand your

23  point.  It would be a little easier to understand if you had

24  made even the slightest attempt to give a meaningful response

25  to that question, but you didn't.  I mean, you've given a whole

1  lot more explanation today than you made any attempt to do on

2  the document.  So I understand your point.

3      And I'll say, once again, at an appropriate time I may well

4  try to craft conditions a little more conformably to your

5  situation in terms of the reporting requirements.  We'll see.

6  And that's to be determined, I'm not making any promises.  But

7  you've got me thinking on this or that in terms of crafting

8  conditions that conform more -- if you will, in a more

9  customized way to your situation.  But the objection is

10 sustained because you didn't make the slightest attempt to

11 provide any explanation of the kind that you have today.

12     We'll have the next question.

13         **MR. STILLEY:**  Certainly.  I will rely on the

14 explanation I put there.  I'm trying to make the record on this

15 basically to explain what the situation is.

16 Q.  (BY MR. STILLEY)  So, going -- we had a discussion this

17 morning here in court; correct?

18 A.  Yes.

19 Q.  And we actually resolved some ambiguities,

20 misunderstandings, etc.; correct?

21         **MR. GALLANT:**  Your Honor, I'd object again.

22         **THE COURT:**  Sustained.

23 Q.  (BY MR. STILLEY)  You wouldn't have any problem with Oscar

24 Stilley going forward with the performance that was agreed this

25 morning, going forward?

1        **MR. GALLANT:**  Your Honor, again I object.  That's not

2   relevant to this hearing.

3        **THE COURT:**  Sustained.  The question is whether the

4   violations asserted did or did not happen.  That's the only

5   thing before the court today.

6        **MR. STILLEY:**  Your Honor, if I could have a moment.  I

7   think I left some papers on my desk.

8        **THE COURT:**  Surely.

9   Q.  (BY MR. STILLEY)  You are aware that Oscar Stilley has

10  certain attorney-client privileged documents on his computer;

11  correct?

12  A.  I'm not aware of -- I'm not for certain but that's what

13  you've represented to me, yes.

14  Q.  Oscar Stilley told you that he had a treasure trove of

15  attorney-client privileged documents from the approximately 19

16  years that he spent as an attorney; correct?

17       **MR. GALLANT:**  Your Honor, again I'd object that this

18  may go to mitigation or sentencing but it doesn't have anything

19  to do with the violations.

20       **THE COURT:**  Sustained.

21  Q.  (BY MR. STILLEY)  You're also aware that Oscar Stilley has

22  access to certain confidential files with his employment;

23  correct?

24       **MR. GALLANT:**  Again I object, Your Honor, the same

25  objection as before.  This has nothing to do with the actual

1    violations.  Maybe mitigation or sentencing.

2           **THE COURT:**  Sustained.

3    Q.  (BY MR. STILLEY)  You're not trying to do anything that

4    would force Oscar Stilley to get fired from his job, are you?

5    A.  No.

6    Q.  And you understand that sometimes things such as getting

7    privileged information secured sometimes takes some time;

8    correct?

9           **MR. GALLANT:**  I object, Your Honor, on the same basis,

10   that it's not relevant to the violations.

11          **THE COURT:**  Sustained.

12          **MR. STILLEY:**  Pass the witness.

13          **THE COURT:**  Any redirect?

14          **MR. GALLANT:**  No, Your Honor.  Just the witness

15   mentioned his boss.  If he could just spell the first and last

16   name for the court reporter.  Mr. Young.

17          **THE COURT:**  Please spell the first and last name of

18   your boss.

19          **THE WITNESS:**  Yes, Your Honor.  Brent, B-R-E-N-T.

20   Young, Y-O-U-N-G.

21          **THE COURT:**  Thank you.  You may step down.

22          **MR. GALLANT:**  We have no further evidence, Your Honor,

23   and we rest.

24          **THE COURT:**  Very well.

25       Mr. Stilley, do you have any evidence to present?

1            **MR. STILLEY:**  No, Your Honor.  I object that I didn't

2    get the evidence, don't know who the accuser is, don't know --

3    I have not been afforded a compulsory process, etc.  I've made

4    my record on that in writing.  I'd like to rely on that with

5    the court's permission.  But based on the conditions, I do not

6    have any witnesses or exhibits to offer.

7            **THE COURT:**  Very well.  It's now just a little before

8    one.  We will resume at two o'clock.  I will hear -- and let me

9    give you just a little bit of a preview of what you can expect

10   beginning at two o'clock.

11       I will hear concise argument, first from the government and

12   then from Mr. Stilley, as to the matters asserted in the

13   amended petition viewed in light of the evidence the court has

14   received today.  So I will hear concise argument and then I

15   will rule on the amended petition.

16       But in terms of evidence, based on the announcements that

17   have been made just a moment ago, the record is closed in terms

18   of evidence and it is now ripe for concise argument.  In the

19   event that revocation results, I will obviously also hear

20   argument or recommendations with respect to disposition.

21       Anything further before we recess until two o'clock?

22            **MR. GALLANT:**  No, Your Honor.

23            **THE COURT:**  Mr. Stilley?

24            **MR. STILLEY:**  Just quickly.  Is that going to be split

25   up?  In other words, we argue about the merits and then later

 1   argue about the potential disposition?

 2          **THE COURT:**   You have it exactly right.

 3          **MR. STILLEY:**   Thank you, Judge.

 4          **THE COURT:**   Court will be in recess.

 5      (THE LUNCHEON RECESS WAS TAKEN)

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    AFTERNOON SESSION

2                    NOVEMBER 21, 2022

3    ------------------------------------------------------------

4        **THE COURT:**  We are resuming in criminal 09-043, United

5    States of America vs. Oscar Amos Stilley, in the hearing on the

6    amended petition for warrant or summons.  The evidence is all

7    in, as we established before we took our mid-day break.

8        I'll now hear concise argument from the government on the

9    issue of revocation.  And, as I've made clear to Mr. Stilley,

10   in response to his inquiry just before we took our break, I'll

11   hear argument on that, and then, if it should become relevant,

12   I'll hear argument separately and subsequently on the issue of

13   actual disposition.

14       Mr. Gallant, I'll hear from the government.

15       **MR. GALLANT:**  Yes, Your Honor.

16       Very concisely.  The amended petition lays out four

17   violations and there's been overwhelming evidence of

18   violations.  In fairness, I really don't believe Mr. Stilley

19   really has contested the merits of the violations but has tried

20   mitigation.

21       With respect to number 1, it is clear he did not allow or

22   agree to allow for the installation of the remote software to

23   occur.

24       With respect to number 2, he did not provide -- government

25   exhibit number 2 is the net worth statement, and then number 3

1  is a probation form B, so those are clear, they're in evidence,

2  and he did not complete them.  His invocation of the Fifth

3  Amendment based on his statement was not in good faith, and

4  quite frankly, as I understand his argument, it's really based

5  on this purported paranoia and a failure to admit his

6  underlying conviction.  It's all linked to he doesn't admit

7  that he was justly convicted of the underlying crime, and from

8  that flows all these arguments that are not in good faith.

9      And then with respect to number 3, violation number 3 has

10  to do with the password to his e-mail account, login and e-mail

11  information regarding PayPal.  Again, it's undisputed that he

12  failed to provide that to probation.

13      And then number 4 has to do with the monthly report.

14  Again, that's government exhibit number 4 is the August report,

15  and it is not filled out, it is not completed, and that was a

16  condition of his supervised release.

17      So the petition is substantially supported by the evidence,

18  really uncontested, Your Honor.

19          **THE COURT:**  Thank you very much.

20      Mr. Stilley, I'll be happy to hear from you with respect to

21  the issue of revocation.

22          **MR. STILLEY:**  Thank you, Your Honor.

23      And once again, I have the same position on concise.  You

24  asked for concise and I'll do my best to be concise with this

25  and I have great confidence because you've been with this case

1  the whole time, you know the record, you know a whole lot about

2  this case.  I do, just as the government, I rely on the entire

3  case, and this is for liability only.  As this court knows,

4  there's a lot of really sticky issues that are in the case that

5  will be -- become moot if the attack against Oscar Stilley does

6  not result in revocation.  And those --

7        **THE COURT:**  Now, say that again.

8        **MR. STILLEY:**  If the criminal attack against Oscar

9  Stilley does not result in revocation, a whole lot of issues go

10  away.  That's what I'm saying.  There's a lot of what I would

11  contend are very serious issues, Fifth Amendment rights, I

12  briefed the court on that, and I apologize for the lateness.

13  Just a whole litany of issues, the jurisdictional issue coming

14  from the Western District of Oklahoma, the accuser, etc.,

15  there's a lot of issues that all go away.

16        **THE COURT:**  Okay.  Well, forgive the interruption, but

17  I want to make sure I understand what you're saying.  When you

18  say "criminal attack," is that this petition or --

19        **MR. STILLEY:**  Yes.

20        **THE COURT:**  -- is this some investigation, or what?

21        **MR. STILLEY:**  I'm talking about the revocation, that

22  is a criminal attack, and the case law says that a punishment

23  under revocation is punishment for the original offense.  That

24  gets around a whole lot of constitutional issues.  So that's

25  what I'm talking about.

1          **THE COURT:**  Okay.  Okay.  I just wanted to make sure.

2   Go ahead.

3          **MR. STILLEY:**  Sure.

4     We've heard from the government concisely and we appreciate

5   that, I know I appreciate it and I'm sure you do, too, on

6   concisely.  But there is nothing about a bad mental state, and

7   Your Honor, I would respectfully --

8          **THE COURT:**  There's nothing what?

9          **MR. STILLEY:**  About a bad mental state or any mental

10  state or even an argument, "Hey, we don't have to have any

11  mental state, it's a strict liability crime."  And I would

12  respectfully contend you can't have a strict liability crime

13  when the case law says the punishment is for the original

14  offense.  It can't be strict -- for a whole lot of reasons, it

15  can't be strict liability.  You have to have some bad mental

16  state, and they don't have any, and they don't claim any.

17  They're not arguing any.  You should be able to say that if you

18  had any.

19     And here's what we've got to show, that Oscar Stilley

20  showed up the first day, first day, boom, straight from Little

21  Rock to Ft. Smith, to show up and explain, "Hey, we've got some

22  problems with this, I've got a bunch of attorney-client

23  privileged materials on my computer, I've got -- you know, I

24  work at a job that this won't work, you know, can I have 30

25  days," and we discussed that on the record from the stand.

1  Oscar Stilley never got a chance to talk to the decision maker.

2  The First Amendment says, hey, you've got a right to peacefully

3  petition for the redress of grievances.  And Mr. Forsyth

4  admits, "I'm not the one making the decision."  I sent this

5  over there and he sends a letter, he said he sent the letter

6  over there, I asked about it --

7      **THE COURT:**  Let me ask you to slow down just a bit,

8  please.

9      **MR. STILLEY:**  Sure.

10     **THE COURT:**  That makes it real hard to get a good -- a

11  good complete and accurate record.

12     **MR. STILLEY:**  I apologize, Your Honor, and that is

13  absolutely correct.

14     But what I'm trying to tell this court is that the record

15  that you heard today is of someone -- and you know my

16  background, you know Oscar Stilley's background -- it is a

17  record of someone who believes that he has a good-faith basis

18  for modification, clarification, trying to get that.

19     And you've also heard from the stand that Oscar Stilley was

20  given until the 18th and somebody decided, "No, we're not going

21  to give you until the 18th, we're going to cut you off today."

22  And, Your Honor, I'm sure you understand, it's hard to do these

23  things when you've got things that is totally unethical to

24  allow the government to just go into it, attorney-client

25  privileged files.  I don't think anybody disagrees that Oscar

1   Stilley would have those naturally.  It's not proper to deny

2   somebody the chance to go and ask and see, "Do I have agreement

3   here, can I go ask the court?"

4        Here's another thing.  You did not hear anything from the

5   stand to the effect Oscar Stilley is going to defy the court's

6   order once he gets a decision on this.  You heard nothing.

7   There is no evidence of that.  That would be indicative of bad

8   faith, if Oscar Stilley says that he's going to disobey a court

9   order after he's had his First Amendment peaceful petition, but

10  you don't have that, it's not there.

11       And I'm not here to relitigate the whole issues.  You know

12  Oscar Stilley continues to file -- you know that Oscar Stilley

13  has filed various pleadings, you understand that, and you can

14  see that Oscar Stilley is standing on his First Amendment

15  right, but he's standing respectfully and he's not trying to do

16  anything that would amount to a contempt of court.  Not at all.

17  There's no evidence of that and there's no good reason for a

18  finding of that.

19       Plus, and I do want to explain, I understand it might seem

20  like it's a long period of time here, but when this went to the

21  Western District of Oklahoma it went to the Western District of

22  Oklahoma on August 24th and only then were the charges made.

23  And you recognize that Oscar Stilley made some objections about

24  the jurisdiction of it and this court graciously granted the

25  opportunity to brief and show the court why the jurisdiction is

1   not there.  So I did that.  And in my mind, as the court said,
2   that the court was not sufficiently satisfied.  However, that
3   came back.  Here's what I'm saying.  Oscar Stilley does not
4   have the prescience to know that that's what took place because
5   Oscar Stilley already had it -- and this is not testimony, it's
6   argument -- Stilley already had it in his mind.  Okay.  He's
7   going to win on this because he's got the authority, he's going
8   to win.  When it comes back, Oscar Stilley is going to do the
9   same thing he did beforehand, pick up the telephone and call
10  the Northern District, "Hey, let's work together on this, let's
11  give me a little time, you know, I've got all my other duties,
12  give me a little time and let me do this and let's see what the
13  court says."
14      So, there's a lot of other issues.  The 5.1 findings.  I'm
15  not sure we actually need to go there.  But here's what I'm
16  saying on the U.S. Sentencing Guidelines 5F1.5 if the court
17  actually makes those findings.  There's a problem with the
18  whole thing.  There's a problem with the whole thing.  I'm not
19  trying to disrespect the court's decisions and the rulings in
20  this case or anything of that nature, and I do think that this
21  court, at least on some level, respects the First Amendment
22  petition, your right to exhaust your legal remedies, things of
23  that nature.  I've seen what you've done.  You know what I've
24  said in my court filings and I think that you'd have to agree
25  that I am respectful of the court and of court proceedings.

1    Your Honor, I would simply say that I think you can agree

2    that this is a rare case.  Rarely do you have a supervisee

3    saying, "Please, I think I have a good basis and I want an

4    opportunity to brief the court."  And in this rare case I think

5    it is appropriate to say, "Hey, I can't find -- with any mental

6    state at all, I can't find an intention of a willful violation

7    of the conditions of the court."

8        And the last thing I would say before -- and if you have

9    questions, I'd be happy to answer them, but if the court needs

10   to take this under advisement, I understand there's a lot of

11   paperwork that I laid on the court, and if you need to take

12   this under advisement, that's okay, I understand.  Otherwise, I

13   will see what the court rules on this proceeding.

14       **THE COURT:**  Thank you.

15       I have referred more than once to the fact that Mr. Stilley

16   has been aware of the amended petition for two-and-a-half

17   months, give or take a few days.  That's true.  Mr. Stilley's

18   term of supervised release of three years started on August

19   10th.  It was on that day, or very soon after that, that

20   Mr. Stilley knew or by any reasonable standard should have

21   known that he had some problems afoot, if you will, in terms of

22   compliance with the conditions of supervision because it was

23   then or very shortly after that, according to the testimony and

24   evidence that I have, that Mr. Stilley started to push back

25   against the conditions of supervision.  The conditions of

1    supervision that are involved here were proposed at the time of

2    sentencing.  That was in black and white.  Mr. Stilley had an

3    opportunity to object to those conditions and he did not.  So,

4    if you will, those conditions of supervision became the law of

5    the case.

6        Now, just in case it should be thought that those

7    conditions were not put there for good reason, and just in case

8    it should be thought by anyone here in the courtroom, or for

9    that matter by a reviewing court, that those conditions of

10   supervision require further attention as a legal matter as

11   opposed to as a matter of the court's discretion in possibly

12   modifying the conditions, I will refer to a case from the Court

13   of Appeals that was handed down by the Court of Appeals several

14   months after -- actually close to a year after the sentencing

15   in this case, and that is the case of *United States vs. Mike,*

16   *632 F.3d 686,* a Tenth Circuit decision from February 17th of

17   2011.  And again, the backdrop for my examination of the

18   conditions of supervision as a legal matter is the fact that

19   the proposed conditions were included in the presentence report

20   and were not objected to.  They were black letters on white

21   paper in part D of the presentence report.  Mr. Stilley did

22   lodge extensive objections to other matters but not to any of

23   the proposed conditions of supervision.

24       In looking at those conditions -- and as I say, Mr. Stilley

25   has more or less objected to those conditions, that's really

1   the heart of Mr. Stilley's response to the petition is a

2   problem with the conditions.  I want to revisit those

3   conditions because they are unquestionably intrusive.  No one

4   would want to be required to give up your e-mail passwords and

5   access to your e-mail account and to acquiesce in search --

6   computer search capability by a third party.  That is

7   intentionally intrusive and unquestionably intrusive.

8        So, in looking at the criteria in *United States vs. Mike*,

9   and I'm now looking at the three-prong test articulated in that

10  case beginning on page 692 of 632 F.3d, I look first at whether

11  the conditions are reasonably related to at least one of the

12  following: the nature and circumstances of the offense; the

13  defendant's history and characteristics; deterrence of criminal

14  conduct; the protection of the public from further crimes of

15  the defendant; and the defendant's educational, vocational,

16  medical, or other correctional needs.

17       Second, under *United States vs. Mike*, I look at whether the

18  conditions involve no greater deprivation of liberty than is

19  reasonably necessary to achieve the purpose of deterring

20  criminal activity, protecting the public, and promoting the

21  defendant's rehabilitation.

22       Third, and this is perhaps less frequently in play, but

23  nevertheless, third, under *United States vs. Mike*, I look to

24  whether the conditions in question are consistent with any

25  pertinent policy statements issued by the commission.

1    With respect to -- and *United States vs. Mike* involved

2  computer monitoring conditions.  I think perhaps that's worth

3  noting.

4    The Court of Appeals has made it clear that when we have a

5  situation involving intrusive conditions such as a computer

6  monitoring condition, the court should make particularized

7  findings to support the appropriateness of imposing those

8  conditions.

9    My particularized findings -- and I'm going to go ahead and

10  make them because it's conceivable that on review the Court of

11  Appeals could note that even though *United States vs. Mike* had

12  not been decided at the time of sentencing in this case, the

13  Court of Appeals might nevertheless feel that particularized

14  findings should have been made or that the matter of findings

15  to support the imposition of these very intrusive conditions

16  ought to be made or not made at this point.

17    And so the conditions, if you will, or the factual

18  background that in my view justifies the imposition of these

19  conditions begins with the fact, as I mentioned at sentencing,

20  and this is page 415 of the sentencing transcript,

21  "Mr. Stilley's IOLTA account was an instrument of fraud pure

22  and simple, and it was an instrument of fraud pure and simple

23  for the use and benefit both of Mr. Stilley and of

24  Mr. Springer.  It was very effectively used and it was used in

25  a way that makes a mockery of the purposes for which lawyers

1  are authorized to maintain trust accounts."

2      And so, what we know for openers is that Mr. Stilley had

3  very much the inclination to use an account that he maintained

4  in a fiduciary capacity as an instrument of fraud.

5      As I said later in the sentencing, "Mr. Stilley's status as

6  a lawyer and his ability to hold himself out as a criminal tax

7  defense attorney furthered the defendant's joint objective of

8  committing tax fraud directly and in counseling and advising

9  their clients and significantly facilitated the commission and

10  concealment of these defendants' offenses."  In other words,

11  Mr. Stilley was keenly interested in committing his frauds

12  underlying the judgment in this case as entered in this court

13  in 2010 in concealing his fraudulent activity, and that last

14  passage is quoted from page 425 of the sentencing transcript.

15      In terms of the need for protection of the public from

16  further criminal conduct on Mr. Stilley's part, I refer to my

17  comments at page 447 of the sentencing transcript, and I quote,

18  "I don't think that there is any real possibility that either

19  one of these defendants will change their ways as a result of

20  incarceration.  Incarceration and possibly supervised release

21  will essentially be an interruption, albeit a lengthy

22  interruption, in your criminal way of life."

23      Further relevant to the factors that were recited by the

24  court in *United States vs. Mike* in terms of supporting

25  intrusive conditions of supervision was my comment at the time

1   of sentencing, and I do certainly stay with this as a

2   particularized finding, and I quote, "I have tried to find even

3   a thin strand of truth or integrity to your conduct or your way

4   of life.  It is not there.  Not even a speck.  There is not

5   even a plausible basis upon which you might have deluded

6   yourself into thinking that you are anything but complete

7   frauds and predators.  Your scams have cheated the United

8   States.  And that is a serious matter in and of itself.  But

9   the United States can print money.  If anyone ever had any

10  lingering doubt as to whether you are frauds and predators,

11  that doubt would be removed by the fact that the two of you

12  have also mercilessly fleeced some very vulnerable people.  You

13  are predators, pure and simple."  That is from page 448 of the

14  sentencing transcript.

15      On page 449 I address Mr. Stilley specifically.  That last

16  comment being directed both to Mr. Stilley and to Mr. Springer.

17  On page 449 I told Mr. Stilley, and I adopt this as a

18  particularized finding in support of these conditions, and I

19  quote, "I must say, Mr. Stilley, that my evaluation of your

20  history and characteristics is also influenced by the fact that

21  you have, to a truly astonishing extent, used your license to

22  practice law as an instrument of fraud and a license to steal.

23  Your victims have included both the United States and the

24  individuals who have been persuaded to their everlasting sorrow

25  that you had the competence and the integrity to make

1   legitimate arguments on their behalf."

2       And then later in the sentencing, as indicated at page 460,

3   I went specifically through the conditions of supervised

4   release, or at least some of them, including computer

5   monitoring that are at issue here.  So those conditions were in

6   the presentence report, they were not objected to, and I

7   specifically mentioned them at sentencing, and of course they

8   are down there in black and white in the judgment and sentence.

9       And in my view, those particularized findings that I made

10  in 2010 and which I reiterate now and I adopt now because

11  Mr. Stilley has given me no reason whatsoever to think

12  differently of his proclivities, those particularized findings,

13  in my view, substantially and compellingly support the

14  imposition of the conditions that Mr. Stilley is accused of

15  having violated.  They are reasonably related to the nature and

16  circumstances of the offense, Mr. Stilley's history and

17  characteristics, the deterrence of criminal conduct, and

18  certainly the protection of the public from further crimes of

19  Oscar Amos Stilley.

20      Mr. Stilley, at the time that he committed these crimes and

21  mercilessly fleeced vulnerable people, and that was shown

22  beyond any doubt whatsoever, he used sophisticated means, he

23  used the computer, he used the Internet, he used Internet means

24  of communication.  And looking at the second *United States vs.*

25  *Mike* factor, I conclude quite readily that the conditions at

1    issue involve no greater deprivation of liberty than is

2    reasonably necessary to achieve the purpose of deterring

3    criminal activity, protecting the public, and promoting the

4    defendant's rehabilitation.

5        As to the third *United States vs. Mike* factor, the policy

6    statements, no sentencing commission policy statements have

7    been brought to my attention in this matter that would have any

8    bearing beyond the considerations already covered by the first

9    two prongs of the *United States vs. Mike* analysis.

10       Now, turning to the evidence before the court, I credit the

11   very credible testimony of probation officer Ryan Forsyth.  It

12   probably was not a cause for celebration that Mr. Forsyth drew

13   Mr. Stilley as a releasee and supervisee but I certainly have

14   the impression that Mr. Forsyth has dealt professionally in all

15   ways with Mr. Stilley.

16       They were in touch with each other at the beginning of the

17   term of supervised release.  Mr. Stilley did provide some

18   statements, for instance, from Arvest Bank, PayPal, and Cash

19   App, but that falls far short of complying with the very clear

20   reporting requirements that applied to Mr. Stilley.  I'm going

21   to comment a little bit later about those reporting

22   requirements and there may be more to be said about that, but

23   what Mr. Stilley did certainly fell far short of complying with

24   those reporting requirements.

25       I'm going to allude just briefly to what Mr. Stilley has

1  referred to more than once as a jurisdictional argument or a

2  jurisdictional issue.  This petition was filed by the United

3  States Probation Office and the order that I entered in the

4  Western District on November 3rd of this year makes it very

5  clear that the operative amended petition is the September 7,

6  1920- -- September 7, 2022 amended petition.  And it's not, as

7  I have said earlier today, it's not a matter of subject-matter

8  jurisdiction.  I transferred the case from the Western District

9  back to the Northern District because I thought that it would,

10 perhaps for one thing, better serve the interests of all

11 concerned, and as I said in that order, I was also not

12 sufficiently satisfied as to the statutory basis for transfer

13 to the Western District in the first place, and for that reason

14 we're back here where this case started, in the Northern

15 District of Oklahoma.

16      Looking at the exhibits in this case and looking at them

17 versus the violations that are asserted, looking at violation

18 number 1, it relates to a violation of special condition number

19 3.  The specific violation asserted is that Mr. Stilley

20 violated this condition when he refused to allow the

21 installation of remote monitoring software to occur.  That is

22 unquestionably true.  That has been established by the evidence

23 and testimony really without question here today.

24      Now, with respect to the possible presence of

25 attorney-client information that might be revealed with that

1   remote monitoring software, I can simply say that the intrusive

2   conditions that you have certainly earned and warranted,

3   Mr. Stilley, they might limit your employment opportunities.

4   If you have an employer who is skittish about the possibility

5   that a probation officer might see attorney-client protected

6   information, that could conceivably limit your employment

7   opportunities.  But I know of no less intrusive means of

8   monitoring whether or not you have returned to your old

9   thoroughly fraudulent and predatory ways.  So that's a matter

10  that perhaps could be revisited at a later stage if there is a

11  way to make that condition conform and accommodate the needs

12  and concerns of your employer.  But at the end of the day it

13  is, I think, a reality that very often conditions of

14  supervision can operate to limit an offender's employment

15  opportunities.

16      In any event, that violation clearly occurred.  Mr. Stilley

17  did refuse to allow the installation of remote monitoring

18  software.

19      We come to violation number 2, and I'm not going to repeat

20  the entire summary of the violative conduct, but it is true

21  that the response by Mr. Stilley to the requirements of these

22  conditions, and specifically the financial disclosure and

23  related matters, did not even come close to complying with the

24  conditions of supervision and with the reasonable requests that

25  were made by Mr. Forsyth.

1    Coming to condition number 3, or violation number 3,
2  rather, relating to disclosure of e-mail accounts, PayPal
3  accounts, Internet connections and so forth, including screen
4  names and passwords, the question is whether the following
5  assertion is true:  "As of today's date, Mr. Stilley has failed
6  to provide the probation office with his password to his e-mail
7  account or login and password information regarding his PayPal
8  account.  He has also refused to allow the probation office to
9  install monitoring software on his computer and cell phone as
10 reflected in violation number 1."

11    That assertion is undeniably true.  It is accurate to a
12 tee; Mr. Stilley did refuse to do the things that are asserted
13 with respect to violation number 3.

14    We come to violation number 4 relating to reporting to the
15 probation office, and Mr. Stilley's response to that or his
16 purported performance of that really makes a mockery of the
17 requirement of reporting to the probation office as required by
18 the probation office and he has clearly violated that
19 condition.

20    So the violation of those conditions is very clearly
21 established.  If there were any question about that, why, one
22 would need to look no further than government's exhibits 1
23 through 4 to note that the refusal of Mr. Stilley to comply
24 with his conditions of supervision is plain, not only from the
25 very credible testimony of Mr. Forsyth, but from the exhibits

1   the government has introduced into evidence.

2      The short of the matter is that nothing in the exhibits or

3   in the testimony, including Mr. Stilley's four-page

4   continuation statement attached to government exhibit number 4,

5   implicates the Fifth Amendment in any way with respect to

6   violations 1 and 3. -- and this is an important point --

7   violations 2 and 4 are reporting violations as to which

8   Mr. Stilley argued that he had a Fifth Amendment right not to

9   comply, but nothing in the exhibits or in the testimony,

10  including this four-page continuation statement, implicates the

11  Fifth Amendment in any way with respect to violations 1 and 3.

12  Violations 1 and 3, standing alone, amply support revocation.

13  The same is true, I hasten to add, with respect to violations 2

14  and 4, but I'm going to leave violations 2 and 4 pending and

15  unadjudicated.  I do determine that violations 1 and 3 have

16  been established beyond a reasonable doubt, let alone by a

17  preponderance of the evidence, but I'm going to leave

18  violations 2 and 4 pending and unadjudicated.  I may dismiss

19  those violations when I rule on the motion for modification of

20  conditions.  That is to be determined.  But in my view, the

21  violations asserted in violations 1 and 3 are serious and they

22  do compel revocation.

23     The very idea that Mr. Stilley's violations are not willful

24  is ludicrous.  Mr. Stilley, a former practicing lawyer, who

25  participated in a lengthy jury trial in this case as his own

1  lawyer and has had since August to think about compliance with

2  these conditions, Mr. Stilley is not an unintelligent man.  To

3  the contrary, Mr. Stilley, for whatever other bad choices he

4  may have made, is not an unintelligent man.  I have read a good

5  many of Mr. Stilley's pleadings and briefs, he knows how to put

6  his thoughts down on paper, whether they are meritorious or not

7  is another matter, but he knows how to put his thoughts down on

8  paper, and I conclude very easily that Mr. Stilley's violations

9  of all four of these conditions are willful.  But again, I'm

10 going to leave 2 and 4 unadjudicated, and I do find quite

11 easily that violations 1 and 3 have been proven beyond any

12 doubt.

13      Now, here's the reason that I leave 2 and 4 unadjudicated.

14 We have pending a motion to modify conditions, and after that

15 motion to modify conditions has been responded to I may attempt

16 to conform those reporting requirements, which are implicated

17 in violations 2 and 4, I may attempt to conform those more

18 closely to the circumstances in which Mr. Stilley finds

19 himself.  I can't assure anyone -- I'm not a professional at

20 drafting conditions of supervision -- I cannot assure anyone

21 that I'll be successful in attempting to conform the conditions

22 that are implicated in violations 2 and 4 more closely to

23 Mr. Stilley's situation, but I'm going to try to do that.

24      And in that connection, and the minutes of this proceeding

25 will reflect, I'm going to give Mr. Stilley 21 days within

1  which to supplement his pending motion to modify conditions of

2  supervision by filing his proposed revised version of any

3  conditions that he would request the court to revise.  I'm

4  going to give you 21 days within which to do that, and then the

5  government, whatever the response time might otherwise be will

6  be disregarded, I'm going to give the government 21 days after

7  that within which to respond to the motion and Mr. Stilley's

8  supplement, if he chooses to file one.

9      Mr. Stilley, I would recommend that you avail yourself of

10 the opportunity to file a supplement to your motion so that I

11 can see in black and white exactly what it is that you propose

12 the court does by way of modification of the reporting

13 conditions, because violations 2 and 4 are premised on your

14 reporting requirements, on your reporting conditions,

15 violations 1 and 3 are not.

16     And so, going forward, again, I am inclined to attempt to

17 make these conditions, the reporting conditions, conform just a

18 bit more to your present circumstances -- I probably said that

19 about five times and I promise I won't say it again -- but that

20 does not touch violations 1 and 3 top, side, or bottom.

21 There's nothing about your violative conduct leading to

22 violations 1 and 3 that would cause the court to revisit the

23 conditions underlying those violations.  The result is that I

24 do find and conclude that violations 1 and 3 have been quite

25 easily proven and that will result in revocation.

1      That brings us now to the matter of disposition, both on

2  the issue of -- excuse me -- both on the issue of whether there

3  should be a sentence of incarceration and whether remand to the

4  custody of the marshal should occur today if indeed the court

5  determines that a sentence of incarceration should be imposed.

6      The custody possibility resulting from these violations is

7  up to two years, the guideline range of incarceration under the

8  advisory guidelines is three to nine months, and the term of

9  supervised release would be 36 months minus any term of

10  imprisonment.

11      So I will -- I'll now hear from the government with respect

12  to the issue of disposition.  I will first hear from the

13  government on that score and then from Mr. Stilley.

14      Mr. Gallant.

15      **MR. GALLANT:**  Your Honor, this gives me no joy, but

16  Mr. Stilley needs to be incarcerated.  I have great faith and

17  admiration and respect for our probation office.  Your Honor,

18  you've sentenced many people in revocation hearings, and I've

19  been involved in a lot of the cases, and you see so many

20  probationers and people on supervised release that struggle

21  with addiction or circumstances and they're really struggling

22  to turn their lives around, and probation works extraordinarily

23  hard to provide resources, to help folks who are struggling and

24  want to improve things.  Mr. Stilley's conduct makes a mockery

25  of that.

1      This is not a zero-sum game.  Probation only has so many

2   resources, so much time, and so much energy to work and help

3   people literally transform their lives.  It doesn't happen as

4   often as you or I might like, but we've seen probation, I have,

5   do great things with people turning their lives around.

6      But what Mr. Stilley does, in effect, by his total

7   noncompliance, wastes the time and energy and resources of

8   probation so they can't devote those resources to people that

9   have gotten, you know, a smattering of the benefits that

10  Mr. Stilley has and they're not able to take advantage of their

11  intelligence and their background and their education in the

12  same way Mr. Stilley has, and they're struggling and probation

13  does everything they can to help them, and then comes along

14  Mr. Stilley who's totally noncompliant, totally wastes the time

15  and energy and resources of probation.

16      So, I would ask that the court put Mr. Stilley in jail for

17  the whole two years and then terminate supervision.  To give

18  him less time and put him back on supervision -- again, there's

19  no evidence whatsoever he had any inkling to comply with any

20  reasonable terms of supervision, Your Honor.  And I have no joy

21  in saying that, but I think under the record of this case it is

22  the only fair and just sentence.  To give him some period less

23  than the maximum and terminate his supervised release would, in

24  effect, reward Mr. Stilley for his non-compliant behavior.

25      So, respectfully, and not at all joyfully, Your Honor, I

1  think a fair and just sentence would be to remand him into

2  custody today for two years.

3      Thank you.

4          **THE COURT:**  Thank you.

5      Mr. Stilley, I would be happy to hear you.

6          **MR. STILLEY:**  Your Honor, let me start with the last

7  thing I heard out of lawyer for the government's mouth: two

8  years and kill the paper.

9          **THE COURT:**  Two years what?

10         **MR. STILLEY:**  Two years and kill the paper.  In prison

11 that's what they call it, to kill the paper.  Of course, I

12 oppose two years.  And I've asked, I've repeatedly asked orally

13 and I've asked in writing and now I filed a pleading asking

14 what is the max.  My contention for the whole time, the max,

15 this court and the Tenth Circuit found that the max was 15

16 years.  I've done 14.  The BOP gave me a year off my time.  My

17 good time was vested on the day I got out of prison, on August

18 10th it was vested, can't be taken back.  I have that good

19 time, I've earned that.  I've done 15 years but for one year.

20     Now, I've already explained about how this works, that a

21 revocation proceeding and the punishment for it is punishment

22 for the original crime.  *Haymond vs. United States,* I've cited

23 that.  The U.S. Supreme Court clearly agrees with me on that,

24 that it's punishment for the original crime, and you can't go

25 above that unless -- unless you give a jury trial, because it

1  was a jury -- it was a jury verdict that was the basis for

2  sending Oscar Stilley to prison for 15 years.  If you don't

3  have that jury verdict, you can't do it.  If the jury came back

4  and said, "Hey, we're going to get you on two counts," 10 years

5  would be the max.  I already know this court wouldn't say 15

6  when you've got two counts and five years is the max.  Well,

7  you've three counts and 15 is the max.  I took a different

8  theory, but that's your theory.  I took the theory it would be

9  11 years or less.  This court's theory is 15 years.  I've done

10 all but one year of it.

11      My contention is that all we're playing for, what's on the

12 table, what's on this card table, is only a year, that's max,

13 that's all you can do.  And if you do that, then there's -- I

14 mean, the paper is virtually, by definition, killed because

15 what are you going to do?  I mean, you can't do it.  If you

16 can't put somebody back in prison, it makes no sense to have

17 supervision.

18      So, that's my starting position, one year is the max,

19 because the Constitution of the United States guarantees a jury

20 trial.  The Congress of the United States creates offenses and

21 they say what is the maximum that a person can get for that

22 offense.

23      Now, if you'll recall, Oscar Stilley was very upset that

24 the U.S. probation said Oscar Stilley should get 61 to 73

25 months or something like that, and he got it down a little bit

1  to 54 to 60, something like that, and he was very put out and
2  thought that was wrong.  The government got it up to 121 to 151
3  and I thought that was outrageous.  And then the court said,
4  "It's not a departure, it's a variance, and I'm going to vary
5  up and I'm going to give you 180 months."  So that's the
6  sentence we're working with and that's the judgment and
7  conviction upon which I stand here today facing punishment.
8  That is the judgment.  What I'm saying is that I've already
9  done 14 of those years.  There's only one more to go.  I
10 understand the Judge might dis- -- you might disagree with me,
11 this court might disagree, but it's a serious, serious issue,
12 and what I would say is why take a chance on that.
13     So, my position is that one year is the max, and if you
14 give the year, by definition, it is a killing of the paper.
15          **THE COURT:**  By definition it's what?
16          **MR. STILLEY:**  Killing the paper.  It is eliminating
17 any further supervised release.  And the government apparently
18 thinks that supervised release should be over, they just want
19 two years for it.  What I'm telling you is, okay, not only does
20 it violate the Constitution about a jury trial, it violates
21 *Haymond*, it violates all kinds of things, it would basically --
22 it would basically be an embarrassment for the federal court
23 system if somehow the court found a way to get 16 years out of
24 a 15-year offense.  Respectfully, I don't think that's in
25 anybody's best interest, certainly not in my best interest; I

1   don't want to do any time.

2       We saw what the probation -- U.S. probation --

3           **THE COURT:**  You actually -- let me just interrupt with

4   a question.  This is probably apropos to nothing.  You actually

5   seem to be pretty -- you object to two years, and I understand

6   that, but you seem to be really pretty relaxed about the

7   prospect of going back to jail.  Is that an incorrect

8   perception?

9           **MR. STILLEY:**  Your Honor, prison does things to a

10  human mind.  I absolutely do not want to go back to prison and

11  I'm going to do my best today to do the things that are

12  necessary to ensure that I don't go back to prison.  I don't

13  want to go back to prison.  I've done a lot of time.  Two of my

14  children are going to get married within the next seven or

15  eight months.  If I go back to prison, daddy's not there.  It

16  hurts.  Let me tell you something, prison hurts.  People don't

17  understand what a devastating blow prison is to a human being.

18      So, if I seem stoic, it's because, well, you know, I'm a

19  lawyer by training, I'm told to separate your emotions, stand

20  on your hind legs, argue the facts, argue the law, understand

21  what's in front of you, put your best foot forward, and then if

22  you take a lick, you just take your lick.  But I don't want a

23  day in jail, I don't want a day in prison, I don't want any of

24  that.

25      Now, I want to come back to where I was at, the three

1  months.  Whoever it was that made the call in this, I still
2  don't know, but whoever made the call on this told Aric
3  Holloway, who did the violations report, put down, "We
4  recommend three months."  So somehow between then and now
5  somebody has gotten the idea to say, "No, we don't think it
6  should be three months and redo the paper, we think it should
7  be two years and kill the paper."  Well, I don't want to go to
8  prison for two years.  That's -- wow, that's just crazy.

9      If they say -- okay, we had this issue before, if they're
10  going to say three months and I'm asking them, "Please, hey,
11  can you put this on your violation report, can you help me out
12  a little here because I want to scotch block this thing, I
13  don't want to get more than, you know, what you told me you're
14  going to try to argue."  And also in my motion --

15          **THE COURT:**  You'll what this thing?

16          **MR. STILLEY:**  I don't want to get more than what you
17  have raised and argued in your paperwork.  In other words, I
18  want advance notice, what am I playing for, because this man
19  sitting right here at this table has been asking me, you know,
20  "Will you just agree to this?"  Well, really, I'd kind of like
21  to know what am I agreeing to?  Am I agreeing to something,
22  boom, slam?  I need to know that.  And I was trying to get
23  this.  Okay, what is the max?  I tried to explain to Aric
24  Holloway that this is not the statutory max.  Even though that
25  statute you're just talking about, I know it says two years, I

1  know that, but when you take the other statutes, the statutory

2  max is one year, and he didn't want to talk to me.  He was

3  actually rude to me and threatened to hang up on me on the

4  grounds, "Mr. Stilley, you're asking legal questions, I ain't

5  going to do that.  You keep it up, I'm going to hang up."

6      So, what I'm saying is it's a due process matter.  I've

7  cited the cases, I think it's *Irizarry vs. United States,* and

8  that is -- both the dissent and the majority, the whole thing,

9  it works together and it explains the situation with variance

10 and departure.  The United States says, "Okay, for a variance

11 you don't have to give advance notice but" -- and this is

12 actually in the dissent -- the dissent says, hey, look, we

13 disagree with this but there's a way that you can solve this

14 problem and here's how you solve this problem, you put it in

15 this PSR -- and in this case it's really called the violation

16 report -- put it in the violation report.  And then, okay, let

17 the -- let the -- let the district judge take a look and let

18 him decide, "Am I willing to agree with this?"  That way, the

19 defendant gets a chance -- he knows what he's playing for.

20     Honestly, I'm a little bit shocked that they want two years

21 on something that not long ago they wanted three months.  And

22 I'm just asking for my due process.  When my liberty is on the

23 line, that's serious.  That's really, really serious.

24     Now, let me say this.  I would rather have the two years

25 and be able to stay out and do my appeal and get my due process

1  and see what happens than get three months and get slammed and

2  knocked out so I can't do my First Amendment peaceful petition.

3  I want my -- most respectfully, Judge, I don't know how to say

4  this more respectfully, I want my peaceful petition.

5      When I went to prison, they wouldn't let me have anything.

6  They wouldn't let -- they stole the mail, and Lindsey Springer

7  filed a motion on that, and 30 days later we got shipped and

8  they said it was moot.  I got body slammed.  I never -- the

9  stuff that I take for granted over there, those -- the official

10  record, the docket items, I was never allowed to have that in

11  jail.  I don't want that to happen to me again.

12      So, whatever you do, whatever you do, I'm saying I'm not

13  going to run.  I think you know I'm not going to run.  Of all

14  the dumb things that a person could do, and you don't think I'm

15  dumb, that would be the dumbest thing ever for me to run.  I'm

16  not going to run.

17      So I'm asking for a stay of whatever sentence you want to

18  give me and let me take this up.  I've got serious, serious

19  issues.  And let's stop and think about this.  You stated your

20  findings, you stated that IOLTA was an instrument of fraud, but

21  I've already laid it down on paper that six times, six times,

22  pretrial the government said it's Oscar Stilley's fault because

23  Lindsey Springer earned money and Oscar Stilley paid it to him.

24  That's totally different than what we heard from the bench

25  today.  I'm not trying to relitigate.  What I'm trying to do is

1  to convince this court to let me have that most precious thing,

2  due process, First Amendment right to peaceful petition.

3      So I want to stay out.  I don't want to go on home

4  confinement.  On the 30th of December I got a daughter that's

5  getting married.  I don't want to go on home confinement.  I

6  want a stay of whatever sentence you put on me.  But if I can't

7  get a stay, Your Honor, you can see right there, and I cited it

8  in my paperwork, you can see that the rules and statutes say

9  you can give me basically home confinement.  It says you have

10 to stay at home except during work hours.  As far as I'm

11 concerned, I had to stay home basically all the time when I was

12 on home confinement.

13     So, if you can't see your way clear to give me a stay of

14 execution of this sentence, please just -- I was in custody of

15 the United States Department of Justice Federal Bureau of

16 Prisons for two years -- or actually -- yeah, about two years,

17 I was in their custody.  And if I say so myself, I was a model

18 inmate, I did what they wanted, I did it right.  You can check

19 with them.  I did.  So, if you --

20         **THE COURT:**  You say you were in the BOP for only two

21 years?

22         **MR. STILLEY:**  No, I was in -- see, I was in low

23 security prisons, four different low security prisons, and then

24 I was in a camp, and then I went to home confinement for two

25 years.  In September of -- let's see -- September two years

1  ago, September 1 I went to the halfway house, September 9 I

2  actually got home.  And so, since September 9, what would that

3  be, 2000, I've been on home confinement, and then on August 10,

4  which would be a little bit less than two years, I got off home

5  confinement and on supervised release.

6          **THE COURT:**  Okay.  Thank you for that clarification.

7  It was certainly not my intent that you be in BOP for only two

8  years.

9          **MR. STILLEY:**  Oh, no.

10          **THE COURT:**  Okay.

11          **MR. STILLEY:**  Oh, no, absolutely not.  I was -- yeah,

12  I was in low security prisons, you know, with tall fences and

13  razor wire for most of the time and just a little time in a

14  camp.

15      But here's what I'm saying.  I'm asking the court --

16  obviously I want the lowest sentence that I can get, but I

17  either want a stay or I want to go to home confinement.  And if

18  there's any question in the court's mind, I'd really like to

19  know, because I'd like to have the ability to brief you on this

20  because there are so many very important issues.  And I already

21  know what happens when you go to prison; you're going to get

22  hammered, hammered.

23      What lawyer can do a decent appeal brief on a case with

24  4,000 pages -- it was about 4,000 -- 4,000 pages of docketed

25  items and you don't even have it?  My wife, ex-wife now, my

1  wife tried to send it to me.  They said, "No, you can't have
2  it," and turned it around and sent it back.  Not due process.
3  None of that stuff.  And I tried to litigate the whole thing
4  the whole time.  Just this summer I got knocked out of the
5  Fifth Circuit on my challenges, administrative remedies to the
6  denial of the things that I needed for an appeal but they
7  didn't deny it with prejudice.  It was kicked out without
8  prejudice.  I don't need to go into that, to the whole reason
9  because it's not -- not relevant to this proceeding.  What I'm
10 saying is I fought the whole time trying to get due process,
11 trying to get the right to peaceful petition.
12      What I'm asking this court, as seriously and sincerely as I
13 know how to do it, is please leave me with access to what I
14 need to do my work.  And I already know that if I'm on home
15 confinement, I get along with those people fine.  So, if you
16 want to execute the sentence today, tell me.  I mean, I can
17 head to Little Rock tomorrow to go back down to City of Faith
18 and get things set up and be on home confinement.  Okay?  I
19 hope I don't have to do that, but if I have -- if I go to home
20 confinement, I can still do my appeal.
21      If I have to go to jail on this today, or at any time, I
22 mean, it's going to take a long time to litigate this to the
23 Tenth Circuit, I'm brutalized, basically I'm totaled, because
24 it for all practical purposes impossible to do a creditable
25 job.  And I'm most respectfully asking that you limit the

1  incarceration as much as you can and that you give me a chance

2  so I do have access to all the things that I need, good legal

3  research, all my files, all my notes, everything like that,

4  which I am not going to get in the custody of the BOP.  In 10

5  years behind the fence and in a camp, I never got it the whole

6  time.  So that's what I'm asking.

7      Does the court have any further questions?

8          **THE COURT:**  I do not.

9      **MR. STILLEY:**  Thank you, Judge.

10         **THE COURT:**  Thank you.  I'm going to put one question

11  to Mr. Gallant -- you may be seated -- and then you may want to

12  respond.

13      What would be, first of all, the relevant considerations

14  and then the considerations, Mr. Gallant, that you would

15  emphasize in support of immediate remand?

16         **MR. GALLANT:**  I would say his total noncompliance,

17  Your Honor.  That, as the probation officer said, he can't be

18  sure whether or not Mr. Stilley is involved -- engaged in any

19  illegal activity or not, because while he may be polite, he's

20  totally noncompliant, and I think the record is very clear on

21  that.  So, giving him any amount of time doesn't protect the

22  public and doesn't ensure that he's going to be able to report

23  when the court were to designate.

24      Now, I just have one last thing to say, Your Honor.

25  Mr. Stilley keeps asking who made the call and who decided for

1  all this to happen.  I'll tell him exactly who it was.  It's

2  Mr. Stilley who's responsible.  And I would just ask you not to

3  give him what he wants but give him what he deserves.

4          **THE COURT:**  Thank you.

5      Mr. Stilley, you're certainly entitled to respond to that

6  if you care to do so.

7          **MR. STILLEY:**  No, Your Honor.  Thank you, but I'm not

8  going to respond to that.

9          **THE COURT:**  Thank you.

10     In determining the disposition in this case, of course I

11 take into account all of the Section 3553 factors as well as

12 the chapter 7 policy statements.  And I respectfully disagree

13 with both the government and the defendant with respect to what

14 the appropriate disposition is.

15     It is my conclusion that the appropriate disposition is a

16 sentence of incarceration of three months to be followed by 33

17 months of supervised release.

18     I will acknowledge to Mr. Gallant that it is tempting to

19 impose the maximum term of two years and then do away with

20 supervised release, but regardless of how well Mr. Stilley may

21 or may not do on that remaining 33 months of supervision, I

22 want Mr. Stilley to remain within, if you will, the short reach

23 of the law for as long as possible.

24     Mr. Stilley is a fraudster, he is a predator.  Mr. Stilley,

25 you've done nothing since last August to suggest otherwise.  I

1  hate to rely just reflexively, and as a matter of fact I don't

2  rely reflexively on the findings that I made more than a decade

3  ago, but you have given me no reason to think you have changed

4  your ways.  You were a merciless predator on vulnerable people.

5  You fleeced them of their money.  So you were not just a tax

6  cheat; as you well know, you mercilessly preyed on vulnerable

7  people who had their own tax problems.  I want you to be within

8  the short reach of the law.

9      You enriched yourself at the expense of others without any

10  regard for their well-being.  I certainly do want you to be

11  within short reach of the law.  It's going to be for another 33

12  months after you serve three months.

13      These factors that bear most heavily in my conclusion that

14  that is the appropriate sentence and a sentence that is

15  sufficient but not greater than necessary to achieve the

16  statutory objectives of sentencing are, first, your history and

17  characteristics which I've already covered in some detail, the

18  need to deter you from further misconduct, and the protection

19  of the public from further criminal, fraudulent, and predatory

20  activity on your part.  And for that reason, as I say, I

21  conclude that it is appropriate that you remain under

22  supervision and that's the reason that I decline to sentence

23  you to two years to be followed by zero supervised release.

24  Your term of incarceration will be three months followed by 33

25  months of supervised release.

1    Does either side require any additional or more detailed

2  statement of reasons for this sentence to be imposed?  What

3  says the government?

4         **MR. GALLANT:**  No, Your Honor.

5         **THE COURT:**  What says the defendant?

6         **MR. STILLEY:**  No, Your Honor.

7         **THE COURT:**  I do find that the defendant, Oscar Amos

8  Stilley, has violated the conditions of supervised release as

9  asserted in violations 1 and 3.  Violations 2 and 4 remain

10  unadjudicated.  And as I have said, I will revisit those

11  conditions with the benefit of submissions from Mr. Stilley and

12  the government in response to Mr. Stilley's motion to modify

13  his conditions of release, because that implicates the

14  reporting requirements as opposed to the requirements about

15  computer searches and disclosing screen names and passwords and

16  so forth.  Those are two distinct categories of issues and I do

17  intend to revisit the conditions that are implicated with

18  respect to violations 2 and 4.

19    So, Mr. Stilley, bear in mind, you've got two opportunities

20  for further filings: number one is a further filing in support

21  of your motion for appointment of counsel, if you care to do

22  so, as I mentioned this morning; and number two is your

23  supplement to your motion to modify your conditions of

24  supervision --

25    Let's see, Camie, did I say 21 days?

1          **THE DEPUTY COURT CLERK:**  Yes.

2          **THE COURT:**  -- in 21 days with your exact proposed

3    modified conditions so that I can have something to look at and

4    consider when I determine, with the benefit of the government's

5    response, whether the conditions with respect to reporting

6    should be modified.

7          So, to return to where I started that digression, I do

8    quite readily find that the defendant has violated his

9    conditions of supervised release as set forth in violations 1

10   and 3.  Those two violations themselves compel revocation.  And

11   so the fact that I'm leaving violations 2 and 4 unadjudicated

12   for the time being really has no impact on my conclusion that

13   revocation is compelled by the evidence before me.

14         The defendant has a criminal history category of I, his

15   most serious violation is a grade C, resulting in an advisory

16   guideline imprisonment range of three to nine months.  The

17   PROTECT Act does apply.  I have certainly considered the

18   section 3553 factors as well as the chapter 7 policy

19   statements.

20         The sentence of three months is at the bottom of the

21   guideline range.  Mr. Stilley, it is my hope that by imposing a

22   sentence at the bottom of the guideline range, a guideline

23   range of three to nine months, that you do have some time to

24   reach your own conclusion that there is no option that would be

25   livable, workable, and acceptable for your family, for your

1  employer, for those who depend on you, other than to comply

2  with your conditions of supervised release.  If you reach no

3  other conclusions during your three months in jail, I hope you

4  reach that conclusion.

5      Upon release, you shall be on supervised release for a term

6  of 33 months, and all mandatory and standard conditions of

7  supervision approved as of November 1st of 2016 will be imposed

8  in addition to the special conditions set forth in the original

9  judgment from April of 2010.

10     You are further advised that from this order you do have

11  the right of appeal to the United States Court of Appeals for

12  the Tenth Circuit, and that if you cannot pay the costs of an

13  appeal you may apply for leave to appeal without payment of

14  costs for the transcript of the record and an attorney at

15  government expense.  Notice of appeal must be filed with the

16  clerk within 14 calendar days or you may request the clerk now

17  to spread the same of record.

18     I hope you've gathered, Mr. Stilley, that it's not with a

19  wave of the hand that I make my decision with respect to

20  immediate remand, but you have shown no intent from day one of

21  your supervision to comply with your conditions of supervision.

22  I conclude, however regretfully, that I cannot rely on your

23  professed intent to comply or on your professed intent to

24  report at required.  You are remanded to the custody of the

25  marshal immediately to begin serving your three-month term.

1      Court will be in recess.

2           **MR. STILLEY:**  Your Honor?

3           **MR. GALLANT:**  Your Honor?

4           **THE COURT:**  Yes?

5           **MR. GALLANT:**  Mr. Stilley, you can go first.

6           **MR. STILLEY:**  Your Honor, I do want to -- I want to

7    get the appeal in today, but I didn't hear anything about

8    allowing me to be on home confinement or allowing me to have a

9    stay of execution.  Is the stay of execution denied?

10          **THE COURT:**  A stay is denied.  You are remanded to the

11   custody of the marshal.  And by the way, if I forgot to say it,

12   the motion for a true and correct record at docket entry number

13   749 is also denied.  You are remanded to the custody of the

14   marshal to begin serving your three-month term today.  The stay

15   is denied and home confinement is denied.

16      Court will be in recess.

17          **MR. GALLANT:**  Your Honor, I just want to clarify one

18   thing.  With respect to our time, we will have 21 days after he

19   files his supplement to respond to the supplement and 750?

20          **THE COURT:**  That's correct.

21          **MR. GALLANT:**  Yes.

22          **THE COURT:**  That's correct.

23      Court will be in recess.

24      (PROCEEDINGS CLOSED)

25

1          **REPORTER'S CERTIFICATION**

2       I CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT

3   TRANSCRIPT OF THE PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4
                          CERTIFIED:    *s/Greg Bloxom*
5                                       Greg Bloxom, RMR, CRR
                                        United States Court Reporter
6                                       333 W. 4th Street, RM 411
                                        Tulsa, OK 74103
7                                       (918)699-4878
                                        greg_bloxom@oknd.uscourts.gov
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

U.S. District Court
Northern District of Oklahoma