IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA PLAINTIFF/RESPONDENT

v. Case No. 4:09-cr-043 SEH
Case No. 4:21-cv-361 & 4:25-cv-673

OSCAR STILLEY DEFENDANT/MOVANT

**DEFENDANT'S STILLEY'S CONSOLIDATED BRIEF IN SUPPORT OF SUPPLEMENT TO 2255 PETITION, MOTION FOR DISCOVERY, AND FOR AUDIO OF REVOCATION HEARING 8-13-2024**

## Contents

**INTRODUCTION** ... 2

**BACKGROUND** ... 2

**I. THIS COURT HAS BEEN STONEWALLING STILLEY.** ... 5

**II. EX PARTE REARS ITS UGLY HEAD** ... 9

**III. THIS COURT HAS A PROBLEM WITH DILATORINESS.** ... 16

**IV. THE TALE OF THE HONEY BADGER.** ... 19

**V. HOW TO CUT A MOTION BACKLOG TO ZERO IN ONE YEAR.** ... 23

**CONCLUSION** ... 24

## INTRODUCTION

Stilley will in this brief set forth facts that explain why Stilley has thus far been unable to obtain justice in this case. He will furthermore set forth reasons why justice for Stilley is inevitable, and this COURT's best course of action is to follow her own oaths, honor, integrity, and the fundamental principles of justice. He will further explain how this COURT[1] can protect, preserve, and enhance the *bird nest* she has found on the ground. In other words, Stilley will do his best to use this brief to show exquisite kindness to this COURT.

## BACKGROUND

Stilley's 2255 habeas petition was entered on the record 12-15-2025. Dkt. 846. Stilley styled this as a "provisional" pleading in large part because he deemed it the height of unfairness to deprive Stilley of the record and the ability to reasonably use that record. Fundamentally, he wanted a chance to be heard after he gained access to the wherewithal to prepare professional quality pleadings.

Stilley sought reasonable access to the courts through multiple fronts. For one, he worked at Unicor, ***earning*** additional halfway house and home confinement pursuant to the First Step Act of 2018 (FSA). That was wages, a category of contractual obligation that usually rises to the top, in ordinary litigation, bankruptcy priorities, etc. Stilley did a 37-day hunger strike in pursuit of these wages – altogether without success. A second failed hunger strike of 22 days was in large part aimed at the same goal. He received neither the FSA guaranteed halfway house or home

[1] "This COURT" in small capitals refers to the Court in the person of Sara E. Hill. The term "this Court" refers to the court more generically.

confinement, nor the Second Chance Act (SCA) halfway house and home confinement he was recommended by his case manager.

Contemporaneously with the 2255 petition, Stilley filed a motion seeking release pending 2255 proceedings. Dkt. 848. He also filed a brief in support thereof. Dkt. 851. On 2-24-2026 he filed a Motion to Compel the Government to Accept Donations Necessary for Due Process, and Access to Internet Service for Legal Purposes. Dkt. 853. He filed two separate motions for "prompt" conduct of the litigation, although the first one didn't include the term "prompt" in the title appearing on the docket. Dkt. 854, 860. He filed a second motion for release on 5-24-2026. Dkt. 858. That motion and associated pleadings the same day (Dkt. 858-862) plainly put the Court on notice that Stilley was trying to enforce his right to halfway house and home confinement, which would have allowed him access to the tools necessary for first class pleadings.

The response from this COURT? After the 12-15-2025 minute order telling the government they wouldn't have to respond without a separate order, there was nothing but a deafening silence from this Court, with respect to the motions identified above, until the Court's dismissal order and judgment of 6-23-2026. Dkt. 865, 866.

Another reason for the "provisional" modifier is the fact that Stilley fundamentally prefers not only to satisfy the express rules, but also the customs and preferences of a court. That just makes sense. Litigants who do that win more than those who don't. Stilley believes that this brief is amongst other things sufficient to finalize his 2255 petition.

Stilley does not believe the COURT will ask for any further or differently styled upgrades to his 2255 petition 12-15-2026. However, if she does, Stilley would gently

request that she explain why she wouldn't lift a finger to give Stilley the slightest chance to do quality legal writing from 12-15-2026 until his release 7-23-2026, but now better work is important and she wants it done.

Keep in mind that Stilley had a thumb drive and used it to draft pleadings for filing while at Cimarron Correctional Facility, a CoreCivic facility. See Dkt. 836 & 837. This is not to say that CoreCivic is honorable in its treatment of inmates – far from it. They sent Stilley to Greene County Jail (Springfield, Missouri) for 3 weeks, apparently just to destroy his ability to do meaningful legal work. They suspended him from the Law Library, for 2 weeks if memory serves, and after the return from Greene County permanently barred him from the Law Library.

Federal Correctional Complex – Yazoo City (FCC Yazoo City) stomped out access to computer drafting tools altogether. Stilley had his Cimarron thumb drive and another thumb drive, at FCC Yazoo City. However, he couldn't use it except under direct supervision of staff. Even then, he could only *view* pdfs. He could not print anything or prepare any documents whatsoever. Anything other than pdf files wouldn't open at all.

To the extent that the Court sees nicely formatted pleadings with a Yazoo City address, they happened in one of two ways. One, they were drafted on Trulincs and sent to a friend for formatting. Two, they were created surreptitiously, without the knowledge of prison personnel. This Court can be certain that FCC Yazoo City did not *intentionally* allow Stilley to produce well-edited and formatted pleadings. Responsible personnel at the Department of Justice-Federal Bureau of Prisons (DOJ-FBOP) fought Stilley's right of reasonable access to the courts with every fiber of their collective

beings.

## I. THIS COURT HAS BEEN STONEWALLING STILLEY.

This COURT has been stiff-arming Stilley. There's no other rational way to put it. The rule requires "prompt" screening. This Court waited 190 days to take any action with respect to Stilley's 2255 petition. Dkt. 865, 866. Under no circumstances does a 190-day delay nevertheless constitute "prompt" screening. That's especially true where, as here, the injured litigant repeatedly filed pleadings setting forth authorities showing that the failure to promptly screen and order a response to the 2255 petition is utter lawlessness. Dkt. 854, 860.

Then the Court dismissed the petition. The big problem with the dismissal is that it is not just wrong, it is embarrassingly wrong. A tiny bit of research would have exposed the fatal flaws in the Court's decision.

This Court has already been briefed on the reasons its decision is wrong. There's no need to re-hash any of that. Suffice it to say that Stilley's motion for reconsideration (Dkt. 867) remains pending – precisely because there are no words in the English language to justify and sustain the Court's decision. As of 9-1-2026 that's a total of 70 days – the presumptive period of time necessary to prepare for and commence a criminal trial, under federal speedy trial rules. It doesn't really matter what day is used for the endpoint – Stilley's motion remains pending because it cannot rationally be ruled upon without granting relief to Stilley.

As much as the 10th Circuit hates Stilley, they're not going to sustain that decision. The cost in reputational interests would simply be too high.

Plus, even if they gritted their teeth and affirmed this COURT's constitutional

abomination, neither that Court nor this Court is out of the woods. They would just be *digging the hole* deeper, with no gain to justify the pain.

What does this COURT think Stilley is doing, by submitting requests for admission, with interrogatories and requests to backstop each numbered request for admission? Is that logical, *just for this case*? The moment this COURT honors ***either*** of her sworn ***oaths*** Stilley gets the admissions and other information he needs for *total exoneration* – ***without*** discovery. So why would he bother to ask this COURT to approve discovery in a 2255? Anybody with any knowledge of 2255 procedure knows that discovery is going nowhere without a court order. So if Stilley can't get the basic court order, to require a response to the 2255 petition, why should he expect an order for responses to requests for admission?

Good question – and one that Stilley can answer. Stilley's enemies have painted themselves into a corner. They're apparently hoping this COURT will bail them out. The problem with that thinking is that this Court can ***hop off into the ditch*** with them – but she ***can't drag them out of the ditch*** no matter how hard she tries. It will only hurt the reputation of this COURT, and the federal bench in general. Whatever this Court thinks of her own professional reputation, recklessness with the reputation of the OKND and federal bench in general is – well, reckless.

Stilley has in other pleadings noted that the Luddites of Arkansas don't like active links. Stilley very much does. The federal courts aren't run by Luddites, so they too like links. If links[2] prove your case, *hop to it!*

Here's the "combination oath" that this COURT took upon ascending the federal

[2] The links must of course be proper under the rules.

bench:

> "I, Sara E. Hill, do solemnly swear (or affirm) that I will administer justice ***without respect to persons***, and do equal right to the ***poor and to the rich***, and that I will faithfully and ***impartially*** discharge and perform all the duties incumbent upon me as US District Judge under the ***Constitution*** and ***laws*** of the United States; and that I will support and defend the Constitution of the United States against ***all enemies***, foreign and domestic; that I will bear ***true faith and allegiance to the same***; that I take this obligation freely, without any mental reservation or purpose of evasion; and that I will well and faithfully discharge the duties of the office on which I am about to enter. So help me God."
> (Emphases added)

Here's the oath of Oklahoma Attorneys at Law, which this COURT took in 2003, over twenty years ago:

> I do solemnly swear that I will support, protect and defend the Constitution of the United States, and the Constitution of the State of Oklahoma; that I will do no falsehood or ***consent that any be done in court***, and if I ***know of any*** I will give knowledge thereof to the ***judges of the court***, <u>or</u> *some one of them*, ***that it may be reformed***; I will not wittingly, willingly or ***knowingly promote***, sue, or procure to be sued, ***any false or unlawful suit***, or ***give aid or consent*** to the same; I will ***<u>delay</u> no man*** for lucre or malice, but will act in the office of attorney in this court according to my ***best learning and discretion***, with all good fidelity as well to the court as to my client, so help me God.
> (Emphasis added)

This COURT has basically violated every part of these two sacred oaths, emphasized by bold and italics. These violations continue to the present day. They will not stop until this COURT takes affirmative acts to ***DO WHAT SHE SWORE TO DO***.

This COURT has done a fine job of stiff-arming Stilley, for reasons altogether contrary to her oaths, honor, logic, reason, humanity, and the dignity of our legal and judicial systems.

Stilley still faces criminal charges in Crawford County, Arkansas. Crawford County Clerk Stacey Shelly has been formally invited to erase Stilley's voter

registration, by the Arkansas Supreme Court. Do you think she's going to squander her public reputation by stiff-arming Stilley so he can't get honest answers to the requests for admission Stilley seeks to serve on the United States by the current pleadings?

Stilley is not going to the Circuit Court of Crawford County, Arkansas, without irrefutable proof that this COURT has had its fair chance to do justice and conform to its own oaths. That's why this COURT is getting these pleadings. Stilley is going to ***absolutely lay waste*** to this COURT's plausible deniability. Does this COURT think that all of Crawford County officialdom is going to ***perfectly and effectively*** support this COURT's stonewalling? Are they all universally going to *jump in the ditch* along with this COURT?

Let's make this so simple that nobody can misunderstand. There may be a dozen, a score, or a hundred reasons that the prosecution/persecution of Stilley is illegal, immoral, and unethical. There are exactly two questions to be answered in order to prove that Dockets #752 and 820 are both undeniably ***void***. Those two questions are as follows:

1) Was Oscar Stilley represented by counsel during the revocation resulting in Judgment and Commitment Order #752?
2) Did Stilley validly waive counsel during said proceedings?

Well, actually we have some sub-questions. Let's take a look at the record facts and see if they demonstrate a "valid waiver" within the meaning of the law. Here are the facts:

1) Stilley filed an ***unopposed*** motion for an initial appearance (Dkt. 741)

whereupon Judge Friot denied the motion, setting forth on the first page of said order the rule-based requirement to inform the target of a "revocation of supervised release" of his right to appointment of counsel, but essentially saying that Stilley is so sophisticated that he doesn't deserve the full benefit of law, and he knows how to file motions. Dkt. 742.

2) Stilley filed an ***unopposed*** motion for re-appointment of his experienced standby counsel (Dkt. 744) which Judge Friot lawlessly stonewalled by demanding amendment and refusing to continue the revocation trial. Minute order Dkt. 751, pg. 2.

3) During the revocation hearing, Stilley made an oral motion for 30 days, or at least 15 days, to seek counsel from his own resources, which was flatly denied. Dkt. 768, pg. 21-22.

Does that look like a "valid waiver" to this COURT? *No?* Then we have our answer, don't we? Docket #752 is ***VOID***!

## II. EX PARTE REARS ITS UGLY HEAD

Faced with a second revocation, Stilley filed a number of motions. He inquired of Charles Anthony O'Reilly, counsel for the government, about when responses to his motions might be forthcoming. O'Reilly responded, in writing, saying "the Court" had excused him from responses. Dkt. 836, pg. 8.

Here's the colloquy between Stilley and the Court during the hearing 8-13-2024, beginning at page 17 and concluding at page 18:

```
    Do you have any -- you said you had a couple of motions.
        MR. STILLEY: Yes. Yes, Your Honor.
    Thank you, Judge. I will do one -- I do need to inquire if
```

**this Court has instructed Mr. O'Reilly that he didn't have to respond to the motions,** because all those motions are defaulted. They're defaulted. **There's nothing in the record that said he had permission not to respond.** Due process says I'm entitled to see that. If he's going to-- **if he's going to oppose it, he needs to say his reasons.** So I need to find out **if there was communications that I haven't been informed of.**

THE COURT: Mr. Stilley, as a procedural matter, you are incorrect. **A trial court,** specifically a Federal District Court, **does have the authority to deny a motion which is, on its face, without merit,** and ***that is what I have done.*** You may be seated.

MR. STILLEY: Your Honor, **that does not answer the question of whether there were communications with Mr. O'Reilly.** Can I ask that and get an answer to that, whether there were communications?

THE COURT: Mr. Stilley, you will be seated.

MR. STILLEY: So I'm not going to get that answer?

THE COURT: **I have not had communications with Mr. O'Reilly.**

MR. STILLEY: Okay. I do have -- okay, you have not had. **Has somebody else in your office had a communication?**

THE COURT: Mr. Stilley, you are directed to be seated at the table.[3]

(Emphases added)

What motions did Judge Friot paint as facially meritless, with his broad and absurdly erroneous brush? The table below only includes motions that were filed in time to ensure that a response was due before the hearing.

| Dkt. | Brief | Substance of motion | Transcript | Comments |
|---|---|---|---|---|
| 803 | 8 pg. | Initial appearance | Pg. 13 | Denied by #807. |

[3] Stilley does not concede the accuracy of the transcription, but even this transcript makes it clear that Friot lied and stiff-armed Stilley about *ex parte* contact.

| | | | | |
|---|---|---|---|---|
| 804 | 4 pg. | Standby counsel | Pg. 3 | Minute order #812. |
| 805 | 12 pg. | Vacate #752 | Pg. 13-14 | |
| 808 | 9 pg. | True & Correct Record | Pg. 14 | |
| 809 | 4 pg. | Vacate #338 | Pg. 14 | |
| 810 | 3 pg. | Dismiss – Venue | Pg. 15 | O'Reilly reminder to court. |

Stilley filed 6 motions with an aggregate of 40 pages of supporting brief. Judge Friot denied the motion for initial appearance the day after Stilley filed his motion, without requesting a response from the government. Mr. O'Reilly filed no written responses in opposition to any of them. Judge Friot did not order him to respond to any of them. At the hearing 11-13-2024, Mr. O'Reilly set forth no logic or reasoning supporting the denial of any of them. You can review the pages identified in the table above, to verify the facts. Want to ask AI to find any substantive argument by Mr. O'Reilly in the transcripts of the hearing? Be my guest – *it's not there.*

Do not be deceived by the minute order docketed as 812. Judge Friot didn't even *claim* to rule on Stilley's motion to re-appoint Mr. Burton. Nothing in Docket #812 says that it is a ruling on the motion filed as Docket 804. Judge Friot DID NOT appoint standby counsel. Furthermore, consider this part of the prayer for relief in Docket #804:

> "… that if this request is denied for any reason, Stilley be informed of the options available to him with respect to the issue of 6th Amendment assistance of counsel; …"

In the brief at Dkt. 804 pg. 6 Stilley put the request for options in bold & italics, On page 6 Stilley requested that he "… be informed of the options available to him – by the magistrate judge assigned to this proceeding, and *not by any unauthorized judicial officer*." (Emphasis in original)

Judge Friot didn't ***want*** to answer that question and DID NOT answer that

question. Judge Friot had no confidence that any assigned magistrate would find that Stilley had somehow "violated" a plainly void order – much less cheat Stilley out of his rights under the 6th Amendment.

Mr. O'Reilly understood his job assignment. At page 15 O'Reilly reminded Judge Friot to rule on the motion to dismiss for lack of venue. He didn't ask to be *heard in opposition.* Why? He already knew he'd won it – regardless of law, regardless of fact.

Judge Friot ruled on it just like he ruled on virtually everything else – summarily and without reasoning. He claimed that issue of venue had been "thoroughly addressed" in previous proceedings – but didn't identify any pleadings or transcripts to support that claim.

Why is all this important? It proves that Friot not only had an *ex parte* conference and excused any responses whether written or oral – he furthermore guaranteed that the government would win on every single motion. In other words, everything that mattered in the case was decided ***before*** the question of Stilley's 6th Amendment assistance of counsel was *considered*.

In Docket #812, a minute order, Judge Friot said that Charles Robert Burton, IV, would be allowed to sit at counsel table with Stilley. Judge Friot made it clear that he wasn't appointing Mr. Burton in any capacity, and no public funds would be expended for his services. Stilley was thus granted permission to search for a dead guy, residing in the cemetery, and try to persuade him to come and assist in a criminal trial for no money. That's material for the *Babylon Bee* – not a serious court of law.

That was the status of Stilley's efforts to get 6th Amendment assistance of counsel, on the day when the *ex parte* conference was held. We don't know the date of

the *ex parte* conference, but it had to have been before 11-11-2024 at 9:46 AM, the date and time when Mr. O'Reilly sent his email saying "[T]he Court notified the United States it needn't respond to your motions." Dkt. 836, pg. 8.

It is incontrovertible that Judge Friot and Charles O'Reilly engaged in secret *ex parte* communications, ***and*** that one or more secret orders were issued, ***and*** that O'Reilly was assured that he would win on the motions without any response, whether orally or in writing. The revocation hearing itself was converted into a complete and utter farce. Stilley had the same chance that Evan Gershkovich had at his trial – which is to say, ***zero***. Stilley's fate was sealed long before the hearing began.

That was a gutsy move. Stilley had already stated under oath that he believed *ex parte* communications had been taking place between the Court and government counsel. Dkt. 701, pg. 57-59. Rather than quit this flagrantly unethical practice, both O'Reilly and Judge Friot doubled down. In light of the facts, it is a virtual certainty that Judge Friot engaged in prejudicial *ex parte* contacts on numerous occasions, dating back at least to the original criminal trial.

Caught red-handed, Friot got off the case two days later without admitting the reason. Dkt. 838. Mr. O'Reilly has neither admitted the *ex parte* contact nor provided any details of this or other *ex parte* court hearings. As for the bogus *unstated* but implied excuse that it was court personnel that did it, Judge Friot stiff-armed that question. The implication was that Stilley could either move on or get a summary contempt citation.

Exculpatory implications are irrelevant on appeal. Appeals are decided (lawfully at least) on the basis of record evidence, not speculation and implication.

Plus, Stilley has already briefed this Court on the fact that *ex parte* contact *through personnel* is an aggravating as opposed to mitigating factor. Dkt. 851, pg. 8. Judges don't have a right to drag their personnel into such unethical schemes. If they do, they have a duty to identify all personnel involved, amongst other reasons so they can be witnesses to what really happened, whether such contacts are routine, other cases in which *ex parte* communications have happened, etc. What's the truth of the matter? We still don't know.

Stilley at docket 851 pg. 12 laid the foundation of the principle of *Glossip v. Oklahoma*. Integrity is a concern of the highest order. When a collateral claim casts a dark shadow on a pivotal aspect of a case, the court should either confirm or dispel the suspicions of irregularity raised. This COURT has done precisely the opposite.

Consider the following quote from a book entitled *Prosecutorial Misconduct*:[4]

> **COMMENT**: *Ex parte* contacts are a serious problem, difficult to discover and even more difficult to combat. Defense counsel may have to exercise a certain degree of courage in raising the issue, as it is usually perceived as a direct affront to both the prosecutor and the court. While the downside risk for defense counsel is significant, the possibility of serious prejudice to your client more than justifies that risk.
>
> If counsel must raise the issue of *ex parte* contacts, be prepared to move for sentencing before a new judge following the logic of *Alverson*.[5] Argue that it would be difficult for the court to be objective about your client, particularly in light of your challenge to the court's integrity.
>
> Consider professional disciplinary actions against the prosecutor. The deterrent value of such an action on future *ex parte* contacts by other prosecutors will more than justify the enmity you may incur.

---

4 *Prosecutorial Misconduct: Law, Procedure, Forms*; 2nd Ed., by Joseph F. Lawless, Jr., © 1999 Matthew Bender & Company.

5 *United States v. Alverson*, 666 F.2d 341 (9th Cir. 1982), a case in which the appellate court remanded for sentencing before a different judge, due to *ex parte* communications with the case agent, (pg. 348) even though the information conveyed to the court was essentially the same as that contained in the presentence report. (pg. 349).

This COURT at paragraph 3 of its Chambers Rules states as follows:

> 3. Communications with the Court: The Court will not permit or entertain any improper *ex parte* communications. However, permissible communications such as those related to scheduling or administrative matters should be directed to the Court's courtroom deputy.

Why then does this COURT turn a blind eye to the most obvious and outrageous example of prejudicial *ex parte* contacts and orders imaginable?

Stilley has demonstrated entitlement to an order commanding the government to respond to each and every paragraph of his 2255 motion, to include all allegations in Docket # 701. If Stilley wants to establish the validity of his voter registration in time for the midterms, he has to reserve time for declaratory judgment in Crawford County, Arkansas. Consider now the question of time frames.

| Event | Date | Days elapsed | Total days |
|---|---|---|---|
| 2255 filing #846 | 12-15-2025 | 0 | 0 |
| Order dismissing 2255 -- 865, 866 | 06-23-2026 | 190 | 190 |
| Motion reconsideration -- #867 | 07-09-2026 | 16 | 206 |
| Current batch of filings | 09-14-2026 | 67 | 268 |
| Election day 2026 | 11-03-2026 | 50 | 323 |

This Court is boxing Stilley into a corner. Under Arkansas law, when discovery is served along with a complaint, the defendant has 45 days from the date of service to respond. A 5-day cushion is small to begin with. How pray tell is Stilley expected to litigate the validity of his voter registration if he delays further? It's just not practical.

How did Judge Friot defend his fraudulent orders? He basically had two tricks up his sleeve.

1) Don't let anyone with a conscience and competence get a word in edgewise. Keep all the magistrates off this case!!

2) Make sure that silence is golden, in that silence never amounts to an admission of ***ANYTHING!!***

This COURT needs to hear a story about a little creature called a "crayfish." You can catch them without a hook because they're hard wired to hang on to food with their claws. Sometimes they'll let you lift them out of the water and put them in a bait bucket. Generally speaking they'll let you pull them to the top of the water, and you can scoop them up with a net. You don't need a hook because their own instinct works against them. At most you need a little net to slip under them before they're pulled out of the water and realize their predicament. They *hang on* to their own destruction!

We can kind of forgive them for their short-sightedness. Their brains generally weigh about 1-2 milligrams. Not ounces! Not grams! ***Milli***grams!!! You better have some good instruments, or you can't even find their brains. They're tiny!

Stilley's trying to talk this COURT out of this fight. Stilley has his enemies, but amongst them is ***not*** this COURT! Stilley bears no malice against the COURT.

In a short period of time, silence is going to become an admission – one that boomerangs back to this COURT. Someone's going to have to 1) substantively speak or 2) by operation of law *confess*. Silence will cease to be *golden*. It will become an admission – an admission of that which you and Judge Friot have known to be the truth, for a long time.

You do you. Do you want to keep your oaths? Go for it! Do you want to take a page out of the crawfish playbook? I can't stop you, but I recommend against it.

## III. THIS COURT HAS A PROBLEM WITH DILATORINESS.

Congress has established some reporting rules for judges who can't seem to do

their job in a timely fashion. The information can be retrieved from the US Courts Civil Justice Reform Act Report Portal. It provides information on a number of metrics, one of which is the number of motions that have been pending for more than 6 months, on the docket of a given federal judge.

The 6-month delineation is a bit of misnomer, since by the rules it is impossible for any motion to be includible on the list in less than 214 days. For starters, the clock doesn't start ticking until 30 days after a motion has been filed. Second, the public reports are snapshots of two days in the year – the last day of March and the last day of September of each year. Thus it can easily be more than *one year* from the date of filing to the date that an unresolved motion must be reported. The 30-day excluded period plus the first 6 months will put many motions past the first reporting period. However, at some point it becomes necessary to report the motion.

This COURT is the undisputed champion of dilatory behavior, in the OKND. In the most recent filing, March 31, 2026, this COURT listed 134 motions that had been pending more than the allotted 6 months. Eight judicial officers in OKND had zero reportable motions. Eight other judicial officers had a total of 61 reportable motions. In other words, this Court had over twice the reportable entries of 16 other judicial officers with OKND reporting responsibilities.

This Court first reported zero entries, on March 31, 2024. For September 2024 she reported 124. For March 31, 2025 she reported 127. For September 2025 she reported 104 motions – modest progress. For March 31, 2026 she reported 134, the biggest backlog of her tenure on the bench.

The first motion on her latest filing is the same as the first motion she reported

in September 2024. The case is 17-cv-606, the motion is a Motion for Class Action Certification. She had 5 excuses – including "assignment to new judge" in September 2024. She had *exactly* the same list eighteen months later in March 2026.

Query. At what point in time does "assignment of a new judge" cease to be a valid excuse?

Did this Court inherit a terrible backlog? No, Judge Claire V. Eagan had two motions on the last list she filed before she became a senior judge. This Court received her commission on January 2, 2024. She was sworn in on January 6, 2024. She became the first female Native American federal judge in Oklahoma history.

Does the Court lack sufficient personnel? No, this Court is authorized up to 4 personnel, plus a courtroom deputy and court reporters that don't come out of the chambers budget. Divvy it up as you please. Magistrate Judge Susan E. Huntsman has a job posting up now. It offers $74,678 - $138,370 to qualified candidates, depending on qualifications and experience. It's preferred – but not required – that the candidate have CM/ECF experience and membership in a state bar.[6]

This Court got her commission not because she was the best candidate for the job, but because she was the chosen DEI (Diversity, Equity, Inclusion) candidate for the job. She gets a salary of $249,900 per year. She qualifies for federal employee health benefits, life insurance, and retirement programs. Retirement comes in as little as 15 years of active service – if she feels like it. Retirement pay is the same as active

---

6 Fascinating indeed that a person who is by definition not a "licensed attorney" can draft legal documents for a court or lawyer, but Stilley was denounced as a criminal guilty of "unauthorized practice of law" for helping inmates prepare pro se pleadings, often those necessary to vindicate their liberty or health interests.

service pay. After 15 years, working is optional. Must be nice to have such a cushy job.

Here's the problem. This Court is the first female Native American US District Court Judge in the State of Oklahoma. She got the job because she ticked the right DEI box. The "right box" had nothing to do with the ability to do a critically important job in a timely manner – or lack thereof.

Cheer up, I can help. Some of the most successful people that Stilley has known aren't very smart – and they admit it. Their secret? They inquired to find the best experts – lawyers, engineers, mechanics, CPAs, etc., in their local area. They hired the best and then figured out how to pay for them. They did what skilled experts told them to do. They succeeded.

When Stilley said in the opening paragraph that he would show exquisite kindness to this Court, he was not joking or exaggerating. But first Stilley needs to tell another story.

## IV. THE TALE OF THE HONEY BADGER.

Honey badgers are relatively small creatures, about 20-35 pounds for males, about 11-22 pounds for females, indigenous to Africa, parts of Asia, and India. They have quite the taste for venomous snakes.

Where the range of the black mamba snake overlaps that of the honey badger, the honey badger loves to prey on black mambas. Indeed, up to 25% of their diet can be venomous snakes. Eating so much "fast food" necessarily teaches honey badgers lessons that don't come to less fearless and fierce predators.

Sometimes they're bitten by black mambas. The black mamba is generally terrified of a creature who fearlessly attacks head on, since nearly everything else flees

from the mamba in abject terror. So they do their best to sink their fangs in as deeply as possible and inject the most venom possible, preferably on the honey badger's nose.

Honey badgers aren't immune to mamba venom – they just have a high resistance to it. The venom that would kill 20 grown men makes the honey badger pass out cold on the ground. He'll stay that way for two or three hours. While he's catching Zs, his body is busy neutralizing the venom.

When he becomes "alert and oriented 3X," after two or three hours of unconsciousness, he sniffs out the trail of *that* mamba. Since his nose is about 700-800 times as sensitive as a human's, he can probably distinguish one mamba from another about as well as humans can differentiate one human from another by sight. So he (or she – the females are no less fierce or fond of mambas than the males) tracks down *that* specific mamba, attacks it, kills it, and eats it.

Why? Because when a big part of your diet is one of the most venomous, aggressive, temperamental, and speedy vipers on the planet, you learn the biology as well as other parts of hunting strategy. Honey badgers sometimes get bitten on the second attempt at collecting a delicious and nutritious lunch.

Big problem for the mamba. He'll inject almost all his venom during the first fight. He cannot metabolize more venom very quickly. Under attack the second time, his bite is either a "dry bite" or a strike that injects far less venom than the first bite. Honey badgers figure that out by trial and error. The second strike never hurts as badly as the first one.

Therefore, the logical thing to do is to track down the *specific* mamba that bit him. *Ignore everything else.* It still has strong jaws and needle-sharp fangs, but for a

honey badger that's just more crunch in the lunch. He doesn't care about those details, because his dental equipment is much bigger and badder than the snake's. He'll take his chances. As far as he's concerned, the mamba that bit him is virtually defenseless in the second attack.

This is a relevant story. This COURT dithered for over 7 months because she didn't have a good argument against Stilley's 2255 motion.

Stilley on June 7, 2026 went on hunger strike, reasoning that he could handle 46 days[7] on hunger strike better than this COURT could.

Then the COURT struck with everything she had, injecting all the venom available. One fang delivered the claim that Stilley had a previous 2255, the other prong delivered the claim that Stilley didn't raise his arguments on direct appeal and thus couldn't raise them on a 2255 petition.

Big problem for the COURT. If this COURT had thought for even just a little bit, she would have realized that a retroactive recharacterization of a motion as a "2255 petition" has insuperable US Constitutional due process defects. The due process defect would have been easy to find by any first-year law student willing to spend a few minutes on an AI-assisted legal research program.

The venom of the second fang was even more laughable. Tenth Circuit and US Supreme Court precedent both *absolutely* annihilate the argument. If this Court had well-supervised, competent personnel to vet her work, they would have explained why her order was disastrously erroneous and should never hit the docket.

---

[7] In all probability prison personnel could have negotiated a return to eating about 3 days before discharge, if they were so inclined. The subject didn't come up.

Is Stilley personally angry about this COURT's order and judgment dismissing his 2255 petition? Let's put it like this. Stilley would have gladly done all 46 days on hunger strike for that order. As wrong as it was, the Court committed herself to legal theories. She *put words on paper*. She boxed herself and the government into a corner.

Stilley didn't promise to rhetorically beat up the COURT. He promised to show this COURT exquisite kindness. Here's how that will be done.

Go to the Oklahoma law schools. Talk to the professors – they know the students. Ask for smart ones, but more importantly, for students willing and able to work hard, fast, smart, and efficiently. Who can whittle my backlog down so I have ZERO reportable motions **<u>and</u>** ensure that I'm expertly briefed on the potential for being straight-up reversed for embarrassing error? Who is best able to improve the processes and workflow of my office?

A DEI hire can succeed but only by surrounding herself with the best personnel she can find. Get the *right* smart people to mask your own limitations. Don't leave a trail that gives objective and undeniable evidence of inferior drive, intelligence, or capabilities. Cover your own shortcomings with great people. The Court obviously needs legal talent, but legal talent will never reach its true potential without the right mix of managerial talent, tech talent, etc. The right talent is for sale – the COURT just has to 1) find it, 2) recruit it, and 3) optimize the value of the time and effort of that talent. Prove this COURT's naysayers wrong.

Stilley is not complaining about this COURT's selection and confirmation based upon DEI criteria. America is getting exactly what it deserves. Just remember that the middle word of that acronym stands for "equity." If this COURT is entitled to "equity,"

Stilley is too.

## V. HOW TO CUT A MOTION BACKLOG TO ZERO IN ONE YEAR.

Personnel changes are hard to make overnight. Refinement of staff is best done over time. This Court's motion backlog can nevertheless be wiped out in one year or less. Here's how.

Call a meeting. Tell your staff that everyone's in this together, the goal is to cut the list of overdue motions down by a minimum of 15 motions per month. If you don't meet that benchmark, everyone (including the Court) puts in an average of one extra hour per day for the following month. That works out to about 20 extra hours per month from the Court and Chambers staff. Everybody works extra hours until the motion backlog hits ***zero***.

Make it clear to the chambers personnel. Stilley's case number is ***not*** going to be on the September 30, 2026 report – and that's not going to be based on claiming that the COURT'S erroneous order and judgment stopped the clock. Correct rulings will be issued on Stilley's motions, before the deadline.

Ask all the chambers personnel for suggestions about improving productivity and morale. Divide tasks to take advantage of every law clerk's strengths while mitigating the effect of weaknesses. Identify the best AI talent, get them to teach everyone else. Ditto for tech and managerial talent. If necessary canvass the chambers staff of the entire court. Work out your best deal to get what you need. Get the best chambers personnel in the courthouse to teach their most valuable skills to this COURT's staff. Make sure chambers staff have the best online tools and the best training in their effective use.

When a judge consistently lags her peers by a country mile, something is unquestionably wrong. The problems are ascertainable. The shortcomings are *fixable*. Find out how other judges and their clerks maintain their professional schedules. Adopt the best practices of the smartest and best personnel in the courthouse. Reward the outcomes that matter to you. Penalize the outcomes that can only serve to stress and embarrass the Court and her personnel.

Stilley sent an email to Charles O'Reilly August 31, 2026. He hasn't responded. Stilley sent an email to Vani Singhal on September 2, 2026, asking if O'Reilly was still on the case. She hasn't responded either. They're giving Stilley the silent treatment.

## CONCLUSION

This Court should first order counsel for the government to show cause why they shouldn't be disqualified for amongst other things *ex parte* contacts and orders, within 10 days of the Court's order. Mandatory cooperation with Stilley should be included in the order. The Court should simultaneously 1) order the government to respond to every single allegation in Stilley's 2255 petition (Dkt. 846) and all documents incorporated therein within 30 days of the Court's order, 2) order the production of the audio requested by Stilley, and 3) grant Stilley the authority to serve his requested discovery on counsel of record for the government, with responses to be made in the time and in the manner required by the Federal Rules of Civil Procedure.

By: /s/ Oscar Stilley September 14, 2026

Oscar Stilley
10600 N Highway 59
Cedarville, AR 72932-9246
479.384.2303 cell phone
oscarstilley@gmail.com

**CERTIFICATE OF SERVICE**

Defendant Stilley hereby certifies that on the date stated above he electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, thereby serving all persons having ECF privileges and entitled to service in this case. Stilley is an electronic filer, not currently in custody, and thus does not need or want hard copy of court filings.